# FEDERAL HOUSING FINANCE AGENCY



## NEWS RELEASE

| | | | |
|---|---|---|---|
| For Immediate Release | **Contact:** | Corinne Russell | (202) 649-3032 |
| February 21, 2012 | | Stefanie Johnson | (202) 649-3030 |

## FHFA Sends Congress Strategic Plan for Fannie Mae and Freddie Mac Conservatorships

**Washington, DC –** Federal Housing Finance Agency (FHFA) Acting Director Edward J. DeMarco today sent to Congress a strategic plan for the next phase of the conservatorships of Fannie Mae and Freddie Mac (the Enterprises).  The plan builds on the Acting Director's February 2010 letter to Congress on the conservatorships and sets forth objectives and steps FHFA is taking or will take to meet FHFA's obligations as conservator.  Fannie Mae and Freddie Mac were placed into conservatorships Sept. 6, 2008 and have since received more than $180 billion in taxpayer support.

FHFA identifies three strategic goals for the next phase of the conservatorships:

- **Build.**  Build a new infrastructure for the secondary mortgage market;
- **Contract.**  Gradually contract the Enterprises' dominant presence in the marketplace while simplifying and shrinking their operations; and
- **Maintain.**   Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

"With the conservatorships operating for more than three years and no near-term resolution in sight, it is time to update and extend the goals and directions of the conservatorships," DeMarco wrote.  "FHFA is contemplating next steps to build an infrastructure for the secondary mortgage market that is consistent with existing policy proposals and will support any outcome of the leading legislative proposals.  FHFA looks forward to working with Congress and the Administration on a resolution of the conservatorships and a comprehensive review of the nation's housing finance system," said DeMarco.

Link to February 2010 letter

### ###

*The Federal Housing Finance Agency regulates Fannie Mae, Freddie Mac and the 12 Federal Home Loan Banks. These government-sponsored enterprises provide more than $5.7 trillion in funding for the U.S. mortgage markets and financial institutions.*



# Federal Housing Finance Agency

## Constitution Center
400 7th Street, S.W.
Washington, D.C. 20024
Telephone: (202) 649-3800
Facsimile: (202) 649-1071
www.fhfa.gov

February 21, 2012

The Honorable Timothy Johnson
Chairman
Committee on Banking, Housing,
and Urban Affairs
United States Senate
Washington, DC 20510

The Honorable Richard C. Shelby
Ranking Minority Member
Committee on Banking, Housing,
and Urban Affairs
United States Senate
Washington, DC 20510

The Honorable Spencer Bachus
Chairman
Committee on Financial Services
United States House of Representatives
Washington, DC 20515

The Honorable Barney Frank
Ranking Minority Member
Committee on Financial Services
United States House of Representatives
Washington, DC 20515

Dear Chairmen and Ranking Members:

I am pleased to transmit a strategic plan for the conservatorships of Fannie Mae and Freddie Mac
(the Enterprises) that sets forth objectives and steps the Federal Housing Finance Agency
(FHFA) is taking or will take to meet the agency's obligations as conservator.

In February 2010, I sent a letter to the then Chairmen and Ranking Members of FHFA's
oversight committees to explain the goals of the conservatorships and how FHFA was seeking to
meet those goals. That letter focused on the establishment and purposes of the conservatorships,
and the activities of the Enterprises under conservatorship.

The conservatorships of Fannie Mae and Freddie Mac have now been in place since September
2008. With the conservatorships operating for more than three years and no near-term resolution
in sight, it is time to update and extend the goals and directions of the conservatorships. FHFA
is contemplating next steps to build an infrastructure for the secondary mortgage market that is
consistent with existing policy proposals and will support any outcome of the leading legislative
proposals.

In the attached strategic plan, FHFA identifies three strategic goals for the next phase of the
conservatorships:

- Build. Build a new infrastructure for the secondary mortgage market;

- ▪ Contract.  Gradually contract the Enterprises' dominant presence in the marketplace while simplifying and shrinking their operations; and
- ▪ Maintain.  Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

The strategic plan reviews each of these goals and describes actions FHFA is planning or is already taking to accomplish them.  FHFA looks forward to working with Congress and the Administration on a resolution of the conservatorships and a comprehensive review of the nation's housing finance system.

I would be pleased to speak with you about these matters and answer any questions you may have.  I believe the information contained in this letter will help mortgage industry participants and the public better understand the role of FHFA as conservator of Fannie Mae and Freddie Mac.  Accordingly, I intend to release this plan at noon today.

Yours truly,

// s //

Edward J. DeMarco
Acting Director

Attachment



# A Strategic Plan for Enterprise Conservatorships:

# The Next Chapter in a Story that Needs an Ending

## February 21, 2012

TREASURY-2370

### *Summary*

Since establishing conservatorships for Fannie Mae and Freddie Mac (the Enterprises) in 2008, the Federal Housing Finance Agency (FHFA) and the Enterprises have focused on three key goals:

- mitigating Enterprise losses, which ultimately accrue to taxpayers;
- ensuring families have access to mortgages to buy a home or refinance an existing mortgage; and
- offering borrowers in trouble on their mortgage an opportunity to modify their loan or otherwise avoid foreclosure.

Two years ago, FHFA sent Congress a letter setting forth the agency's understanding of its conservatorship obligations and how it planned to fulfill those obligations.  It is time to update and extend that plan in view of the status of the Enterprises and the country's housing system today.  In particular, with the conservatorships operating for more than three years and no near-term resolution in sight, it is time to assess the goals and directions of the conservatorships.

This assessment has been made in light of FHFA's statutory mandate to "take such action as may be necessary to put [Fannie Mae and Freddie Mac] in a sound and solvent condition."  FHFA also needs to make sure strategic decisions about the Enterprises' future are in accord with the statutory purpose of the conservator for "reorganizing, rehabilitating, or winding up the affairs of a regulated entity."

This strategic plan outlines the steps FHFA has taken and will be taking to address these challenges.  The plan sets forth three strategic goals for the next phase of conservatorship:

1.   **Build.**  Build a new infrastructure for the secondary mortgage market.

2.   **Contract.**  Gradually contract the Enterprises' dominant presence in the marketplace while simplifying and shrinking their operations.

3.   **Maintain.**  Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

The strategic plan explores each of these goals and identifies particular actions FHFA is contemplating, or already taking, to accomplish them.

The first goal – building a new infrastructure – recognizes that the country would be without a secondary market for non-government-insured mortgages without the Enterprises.  No private sector infrastructure exists today that is capable of securitizing the $100 billion per month in new mortgages being originated.  Simply shutting down the Enterprises would drive up interest rates and limit mortgage availability.  This goal establishes the steps FHFA and the Enterprises will take to create that necessary infrastructure, including a securitization platform and national

TREASURY-2371

standards for mortgage securitization that Congress and market participants may use to develop the mortgage market of the future.

The second goal – contracting Enterprise operations – describes steps that FHFA plans to take to gradually shift mortgage credit risk from the Enterprises to private investors and eliminate the direct funding of mortgages by the Enterprises.  This goal is consistent with the fundamental goals of the conservatorship, of the Enterprises operating in a sound and solvent condition, and of limiting future risk exposure in the face of uncertainty.

The third goal – maintaining foreclosure prevention efforts and credit availability – recognizes that the work begun three years ago is not finished.  Programs and strategies to ensure ongoing mortgage credit availability, assist troubled homeowners, and minimize taxpayer losses while restoring stability to housing markets continue to require energy, focus, and resources.

Achieving these strategic goals will fulfill the legal requirements Congress assigned FHFA as conservator and also prepare the foundation for a new, stronger housing finance system in the future.  Although that future may not include Fannie Mae and Freddie Mac, at least as they are known today, this important work in conservatorship can be a lasting, positive legacy for the country and its housing system.

Properly implemented, this strategic plan should benefit:

- Homeowners, by ensuring continued emphasis on foreclosure prevention and credit availability;
- Taxpayers, by furthering efforts to limit losses from past activities while simplifying risk management and reducing future risk exposure;
- Market participants, by creating a path by which the Enterprises' role in the mortgage market is gradually reduced while maintaining market stability and liquidity; and
- Lawmakers, by building a foundation on which they may develop new legal frameworks and institutional arrangements for a sound and resilient secondary mortgage market of the future.

The public interest is best served by ensuring that Fannie Mae and Freddie Mac have the best available corporate leaders to carry out the work necessary to meet the critical goals set forth here.  The managers and staff at each company also have critical roles to play since the numerous activities and changes necessary to accomplish the strategic goals will require substantial effort by many people at Fannie Mae and Freddie Mac.

The early chapters of the conservatorship story focused on market functioning and loss mitigation.  More recent chapters have covered renewed efforts to enhance refinancing opportunities and real estate owned (REO) disposition.  The strategic goals and performance objectives set forth here provide an outline for the next chapter of the story, one that focuses in earnest on building a secondary mortgage market infrastructure that will live beyond the

3

Enterprises.  This next chapter will also see a gradual reduction in the Enterprises' dominant position in holding mortgage credit risk as private capital is encouraged back into that role.

The final chapter, though, remains the province of lawmakers.  Fannie Mae and Freddie Mac were chartered by Congress and by law, only Congress can abolish or modify those charters and set forth a vision for a new secondary market structure.

One critical point:  The steps envisioned in this strategic plan are consistent with each of the housing finance reform frameworks set forth in the white paper produced last year by the U.S. Department of the Treasury and the U.S. Department of Housing and Urban Development as well as with the leading congressional proposals introduced to-date.  This plan envisions actions by the Enterprises that will help establish a new secondary mortgage market, while leaving open all options for Congress and the Administration regarding the resolution of the conservatorships and the degree of government involvement in supporting the secondary mortgage market in the future.

4

# A Strategic Plan for Enterprise Conservatorships:

# The Next Chapter in a Story that Needs an Ending

## Introduction

The Housing and Economic Recovery Act of 2008 (HERA), which created the Federal Housing Finance Agency (FHFA), granted the Director of FHFA discretionary authority to appoint FHFA conservator or receiver of the Enterprises "for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity."[1]

On September 6, 2008, well over three years ago, FHFA exercised that authority, placing the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) (together, the Enterprises) into conservatorships.  FHFA has since overseen the largest, most complex conservatorships in history.

Two years ago, FHFA sent Congress a letter setting forth the agency's understanding of its conservatorship obligations and how it planned to fulfill those obligations.  It is time to update and extend that plan in view of the status of the Enterprises and the country's housing system today.

The two companies have received more than $180 billion in taxpayer support.  The benefit to the country from maintaining their operations has been to ensure the secondary mortgage market continues to function.  During this time, the Enterprises have completed more than 2 million foreclosure prevention actions, including more than 1 million loan modifications and they have refinanced more than 10 million mortgages.  Together they are guaranteeing roughly $100 billion per month in new mortgage production, representing about 3 of every 4 mortgages being originated.  But the Enterprises' ongoing operations are entirely dependent on taxpayer support provided through the Senior Preferred Stock Purchase Agreements with the U.S. Department of the Treasury.

The future of the Enterprises and the housing finance system continues to be the subject of many questions and much debate.  A new structure for housing finance requires congressional action,

---

[1] Housing and Economic Recovery Act of 2008, Section 1367 (a)(2), amending the Federal Housing Enterprises Financial Safety and Soundness Act, 12 USC 4617(a)(2).

TREASURY-2374

but no clear legislative consensus has emerged from the Administration or Congress.  In the meantime, like other large, complex financial institutions, the Enterprises require strategic direction though they face an uncertain future.  Market participants are also seeking answers about the future.

This strategic plan provides lawmakers and the public with an outline for how FHFA as conservator intends to guide the Enterprises over the next few years.  FHFA has developed this plan because of the following:

- The Enterprises' boards of directors and management teams can more readily fulfill the goals of conservatorship with a clear and transparent course of action.
- As investors in the Enterprises today, taxpayers deserve a plan on how their continued support will be used.
- Proposals for rebuilding the secondary mortgage market vary in their reliance on government credit guarantees but most assume some sort of securitization infrastructure to take the place of the Enterprises or assume the Enterprises' securitization infrastructures are used in some way in the future.
- Lawmakers have asked FHFA for ideas on a stable transition from a secondary market dominated by the Enterprises to one that could operate without them.
- FHFA committed to provide a strategic plan for the next stage of the conservatorships in response to a request from the Chairman of the House Financial Services Subcommittee on Oversight and Investigations in December 2011.

As with any strategic plan, this document is not a step-by-step guide.  Rather, it sets forth certain broad objectives that are consistent with FHFA's legal mandate and the policy direction that has emerged from the Administration and Congress.  Importantly, this plan is consistent with each of the housing finance reform frameworks set forth in the white paper produced last year by Treasury and the U.S. Department of Housing and Urban Development (HUD) and with the leading congressional proposals introduced to-date.  This plan envisions actions by the Enterprises that will help establish a new secondary mortgage market, while leaving open all options for Congress and the Administration regarding the resolution of the conservatorships and the degree of government involvement in supporting the secondary mortgage market in the future.

FHFA remains committed to its obligation to ensure a stable and liquid secondary mortgage market while preserving and conserving Enterprise assets to minimize taxpayer losses.  FHFA looks forward to continuing to work with Congress and the Administration on a resolution of the conservatorships and a comprehensive review of the country's housing finance system.

TREASURY-2375

## Background:  The Early Chapters of the Conservatorship Story

### The Law

As conservator and regulator, FHFA has three legal obligations that direct the agency's activities and decisions involving the Enterprises.

First, HERA specified two conservator powers, stating that the agency may "take such action as may be

(i)      necessary to put the regulated entity in a sound and solvent condition; and

(ii)     appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity."[2]

FHFA has reported on numerous occasions that, with taxpayers providing the capital supporting Enterprise operations, this "preserve and conserve" mandate directs FHFA to minimize losses on behalf of taxpayers.

Second, although each Enterprises is in conservatorship, without statutory changes their mission of supporting a stable and liquid mortgage market remains the same as before the conservatorships.  FHFA has a statutory responsibility to ensure each Enterprise "operates in a safe and sound manner"[3] and that "the operations and activities of each regulated entity foster liquid, efficient, competitive, and resilient national housing finance markets."[4]

Third, under the Emergency Economic Stabilization Act of 2008 (EESA), FHFA has a statutory responsibility to "implement a plan that seeks to maximize assistance for homeowners and use its authority to encourage the servicers of the underlying mortgages, and considering net present value to the taxpayer, to take advantage of … available programs to minimize foreclosures."[5]

---

[2] 12 USC 4617(b)(2)(D)

[3] 12 USC 4513(a)(1)(B)(i)

[4] 12 USC 4513(a)(1)(B)(ii)

[5] 12 USC 5220(b)(1)

TREASURY-2376

### Conservatorship Goals

In 2008, the immediate objectives of conservatorship were to help restore confidence in the companies, enhance their capacity to fulfill their mission, and mitigate the systemic risk that contributed directly to instability in financial markets.  Because the private mortgage securitization market had already retreated and there were no other effective secondary market mechanisms in place, the Enterprises' continued operations were necessary for most Americans to obtain a mortgage or refinance an existing mortgage.

Since 2008, several government efforts have kept the country's housing finance system functioning, including:

- the Treasury Department's financial backstop of Enterprise debt and mortgage-backed securities (MBS);
- Treasury's and the Federal Reserve's MBS purchases;
- FHFA's and the Enterprises' actions to ensure the continued functioning of the secondary mortgage market; and
- the Federal Housing Administration's (FHA) rapidly growing market presence.

As a result, credit has remained available, albeit with more restrictive underwriting terms, and more than 10 million Americans have refinanced Fannie Mae and Freddie Mac mortgages.

During these years, these same government agencies together with the Enterprises and other market participants undertook a series of efforts to help families avoid foreclosure through loan modification programs and foreclosure alternatives.  For FHFA and the Enterprises, these efforts directly relate to the "preserve and conserve" mandate because such activities are designed to reduce credit losses on mortgages originated primarily in the years before conservatorship.  In addition, these efforts are consistent with FHFA's other mandates, including the EESA mandate to maximize assistance for homeowners.  Since conservatorship began, the Enterprises have completed more than two million foreclosure prevention actions, including more than one million loan modifications.

Today, loss mitigation efforts focus on helping households as early as possible when they become delinquent on their mortgages, and employing innovative strategies for returning foreclosed properties back to the market.  The continued high level of mortgage delinquencies shows that more is left to do, but several programs now exist to address these challenges.  FHFA and the Enterprises will remain vigilant in ensuring that appropriate assistance and support is offered to all homeowners in distress through loan modifications and other foreclosure avoidance tools.

Three years into conservatorship, it is time to update and extend the goals of conservatorship in light of FHFA's statutory mandate and the market environment that has evolved since 2008.  As noted, the operations of the Enterprises in conservatorship are unlike anything the country has experienced.  The conservatorship structure was designed to allow a temporary period for an institution to stabilize and return to the market or to lead to an orderly disposition of a firm.

8

Unlike the banking industry, there are not thousands of potential firms ready to step into the business of mortgage securitization.  Indeed, outside of the securitization available through the Government National Mortgage Association (Ginnie Mae) for loans primarily backed by FHA, there is little else in place today to assume the secondary market functions served by the Enterprises.

### What Needs to Be Done Now

Policymakers need to address the future structure of housing finance, which would allow for a smooth transition from today's market.  Without action by Congress, FHFA must continue to look to the existing statutory provisions that guide the conservatorships.  In particular, FHFA must consider what it means to "take such action as may be necessary to put [Fannie Mae and Freddie Mac] in a sound and solvent condition" when it is clear that the draws the companies have taken from the Treasury are so large they cannot be repaid under any foreseeable scenarios.

Without further statutory direction, FHFA views the mandate to restore the Enterprises to a sound and solvent condition as best accomplished not only through aggressive loss mitigation efforts, but also by reducing the risk exposure of the companies, through appropriate underwriting and pricing of mortgages.  Such actions are consistent with what would be expected of a private company operating without government support.  At the same time, the unanticipated length of the conservatorships poses additional risks for taxpayers and markets not contemplated by HERA.  FHFA views those risks as best managed by contracting the Enterprises' footprint in the marketplace.

To achieve these outcomes, FHFA will need to make strategic decisions regarding the Enterprises' level of participation in the market while developing ways for the taxpayers to ultimately derive value, consistent with FHFA's "preserve and conserve" mandate.

## Reviewing the Existing Landscape:  Considerations for Moving Forward

In view of FHFA's statutory mandates and in light of the current environment, it is necessary to define new goals for the Enterprises operating in conservatorship.  Key issues and circumstances FHFA faces include the following:

- The Enterprises' losses are of such magnitude that the companies cannot repay taxpayers in any foreseeable scenario.

- The operational infrastructures at each company are working but require substantial investment to support future business.  The question is whether to improve the current infrastructure or to consider this an opportunity to build something new.

9

- In the absence of other comparable market infrastructure, minimizing future taxpayer losses and ensuring market liquidity and stability requires preserving the Enterprises as working companies.  But some of the things this approach requires, such as retaining some semblance of private sector pay comparability, have generated concerns because the companies receive substantial taxpayer assistance.

- Although the housing finance system cannot be called healthy, it is stable and functioning, albeit with substantial ongoing government support.

- Congress and the Administration have not reached consensus on how to resolve the conservatorships and define a path for housing finance.  Legislative proposals have begun to emerge, but enactment soon appears unlikely.

Absence of consensus on a resolution of the conservatorships does not imply a lack of consensus on general direction.  Both the Administration and Congress have expressed discomfort with the level of government involvement in the mortgage market and a desire for greater private sector participation and risk-taking.  A central issue remains:  whether a government guarantee is essential to a functioning mortgage market.  On other market issues, some consensus has emerged on what is needed to fix the problems we have witnessed over the past several years.  At a minimum there is a desire for greater standardization and more equitable and transparent treatment of borrowers and investors in mortgage origination, mortgage servicing, and securities disclosure.

Over the past two years, FHFA has initiated several long-term improvements to the housing finance system that address shortcomings in the current system, meet the goal of reducing taxpayer exposures, and provide flexibility for lawmakers as they move toward legislative action on housing finance.  These improvements include the following:

- The Uniform Mortgage Data Program will improve the consistency, quality, and uniformity of data collected at the beginning of the lending process.  Developing standard terms, definitions, and industry standard data reporting protocols will decrease costs for originators and appraisers and reduce repurchase risk.  It will allow new entrants to use industry standards rather than having to develop their own proprietary data systems to compete with other systems already in the market.  Common data definitions, electronic data capture, and standardized data protocols will improve efficiency, lower costs and enhance risk monitoring.  Standardizing data will be a key building block of housing finance reform.

- The Joint Servicing Compensation Initiative is considering alternatives for future mortgage servicing compensation for single-family mortgage loans.  The goals of any changes to the current Enterprise model of compensation will be improving service for borrowers, reducing financial risk to servicers, and providing flexibility for guarantors to better manage non-performing loans, while promoting continued liquidity in the "To Be Announced" mortgage securities market.  More broadly, the goals of the initiative are to consider changes to the servicing compensation structure that would improve competition

10

in the market for mortgage servicing and which could be replicated across any form of housing finance reform.

- The <u>Servicing Alignment Initiative</u> has produced a single, consistent set of protocols for servicing Enterprise mortgages from the moment they first become delinquent.  This initiative responds to concerns about how delinquent mortgages have been serviced and it simplifies the rules for mortgage servicers by giving them just one set of procedures to follow whether a mortgage is owned by Fannie Mae or Freddie Mac.  The first phase of this initiative has already been implemented.  Developed in consultation with the federal banking agencies and state attorneys general, the new requirements could serve as the basis for establishing broad national mortgage servicing standards.

- The <u>Loan-Level Disclosures Initiative</u> will produce loan-level investor disclosures on Enterprise MBS, both at the time of origination and throughout a security's life.  Improving MBS disclosures will help establish consistency and quality of data.  With better information, private investors can efficiently measure and price mortgage credit risk, which will likely be a hallmark of any form of housing finance reform.

## Writing the Next Chapter:  Setting the Strategic Goals

Looking ahead, three broad goals will define the focus of the conservatorships for the next few years:

1. **Build.**  Build a new infrastructure for the secondary mortgage market.

2. **Contract.**  Gradually contract the Enterprises' dominant presence in the marketplace while simplifying and shrinking their operations.

3. **Maintain.**  Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

Achieving these strategic goals will fulfill the legal requirements Congress assigned FHFA as conservator and also prepare the foundation for a new, stronger housing finance system in the future.  Although that future may not include Fannie Mae and Freddie Mac, at least as they are known today, this important work in conservatorship can be a lasting, positive legacy for the country and its housing system.

Properly implemented, this strategic plan should benefit:

- Homeowners, by ensuring continued emphasis on foreclosure prevention and credit availability;

11

- Taxpayers, by furthering efforts to limit losses from past activities while simplifying risk management and reducing future risk exposure;
- Market participants, by creating a path by which the Enterprises' role in the mortgage market is gradually reduced while maintaining market stability and liquidity; and
- Lawmakers, by building a foundation on which they may develop new legal frameworks and institutional arrangements for a sound and resilient secondary mortgage market of the future.

### *Strategic Goal 1:*  **Building a New Infrastructure**

The absence of any meaningful secondary mortgage market mechanisms beyond the Enterprises and Ginnie Mae is a dilemma for policymakers expecting to replace the Enterprises.  This fact was a key motivation for the conservatorships and for the Treasury support agreements in the first place.  Without an alternative market infrastructure that investors could rely on, new mortgages would have been largely unavailable if the Enterprises suddenly had been shut down.

The elements for rebuilding the market system are known and work on them can begin without knowing whether there will be a government guarantee apart from FHA in the mortgage market of the future.   In fact, the four initiatives FHFA and the Enterprises have already begun would be essential to any new infrastructure.

A secondary mortgage market infrastructure without Fannie Mae and Freddie Mac would likely include the following elements:

- A framework to connect capital markets investors to homeowners – specifically, a securitization platform that bundles mortgages into any of an array of securities structures and provides all the operational support to process and track the payments from borrowers through to the investors.

- A standardized pooling and servicing agreement that replaces the Enterprises' current Servicer Participation Agreement and corrects the many shortcomings found in the pooling and servicing agreements used in the private-label MBS market before the housing bubble burst.

- Transparent servicing requirements that set forth requirements for mortgage servicers' responsibilities to borrowers and investors across a spectrum of issues including delinquent loan servicing, solicitation for refinance or loan modifications, and servicing transfers.

- A servicing compensation structure that promotes competition for, rather than concentration of, mortgage servicing.  Such a structure would take full account of

12

mortgage servicers' costs and requirements, and consider the appropriate interaction between origination and servicing revenue.

- Detailed, timely, and reliable loan-level data for mortgage investors at the time a security is issued and throughout the life of the security. Such transparency is a prerequisite for private capital to bear a meaningful portion of mortgage credit risk.

- A sound, efficient system for document custody and electronic registration of mortgages, notes, titles, and liens that respects local property laws but also enhances the liquidity of mortgages so that borrowers may benefit from a liquid secondary market for buying and selling mortgages. Such a system should be especially attuned to privacy and security issues while providing full transparency where required by law or in the interest of borrowers.

- An open architecture for all these elements, to facilitate entry to and exit from the marketplace and an ability to adapt to emerging technologies and legal requirements over time.

<u>Securitization Platform</u>

Beyond the initiatives FHFA and the Enterprises have begun, a cornerstone to building for the future is a new securitization platform. While competing securitization platforms may emerge in the future, back-office operations arguably lend themselves to a public utility construct, at least in the early stages of building a new secondary mortgage market infrastructure. The economies of scale are substantial as are the potential market benefits of standardization to a single securitization platform. Neither Enterprise has a securitization infrastructure capable of becoming a market utility today. Taking on that role would require substantial investment of both human capital and information technology resources.

Both Enterprises would have to draw from the American taxpayer to make such a long-term infrastructure investment, so it makes more sense to do this only once. FHFA will determine how Fannie Mae and Freddie Mac can work together to build a single securitization platform that would replace their current separate proprietary systems.

In the intermediate term, a single platform would allow for a single mortgage-backed security. Accomplishing this objective will take time. FHFA and the Enterprises will provide market participants with ample time to adjust to the new structure in order to minimize disruptions and uncertainty. Ensuring, indeed enhancing, liquidity for mortgage-backed securities will be a central objective.

For the platform to have long-term value, it should have an open architecture that will permit multiple future issuers of mortgage-backed securities to access the platform and it should be flexible enough to permit a wide array of securities and mortgage structures. Since this platform could become a type of public utility (in effect) that would outlast the Enterprises as we know them today, input from all market stakeholders will be sought.

13

The intended outcome of such an important infrastructure investment is to provide a sound securitization platform on which to rebuild the country's secondary mortgage market. The platform itself will be one way American taxpayers realize a return on their substantial investment in the Enterprises while also making it possible to retire the Enterprises' proprietary systems and programs from the marketplace. The platform will be designed to issue securities supported with or without a government guarantee.

Pooling and Servicing Agreements

Beyond building the operational infrastructure to issue mortgage-backed securities, building for the future also requires developing and implementing standards for underwriting, disclosures, servicing and other considerations. Creating a robust and standardized pooling and servicing agreement is key. The strategic goal is to learn from the Enterprises' existing practices and the shortcomings identified in the private-label mortgage-backed securities market and to solicit broad public input to build a better standard for the future. Input from investors and a careful review of applicable Securities and Exchange Commission rules and best practices will be essential.

As with the securitization platform, the goal is not to rebuild Fannie Mae and Freddie Mac but rather to leverage the experience and human capital expertise at these firms to build a new infrastructure for the future. The goal is not a proprietary system but rather an open system that promotes competition and transparency while forming a basis for a stable, liquid, and efficient secondary mortgage market.

Developing these standards will not only correct past problems, it will make the existing system better. We know how past shortcomings have harmed borrowers and investors. Since the point of a secondary mortgage market is to operate an infrastructure that most efficiently brings investor capital to individual families seeking to finance a home, standards must be more transparent and accessible for both of these "end-users."


*Strategic Goal 2:*  **Contracting Enterprise Operations**

Since entering conservatorship in September 2008, Fannie Mae and Freddie Mac have bought or guaranteed roughly three of every four mortgages originated in the country. Mortgages guaranteed by FHA make up most of the rest. Reducing the Enterprises' position in the marketplace and doing so in a safe and sound manner, in the absence of other comparable private-sector players operating in this market, is the second strategic goal.

The Enterprises operate three lines of business: a single-family mortgage credit guarantee business, a multifamily mortgage credit guarantee business, and a capital markets business that finances single-family and multifamily mortgages by issuing debt securities in the capital markets.

TREASURY-2383

Single-Family Credit Guarantees

The first strategic goal sets forth a plan for moving away from each company's proprietary securitization platform but it does not address the mortgage credit insurance business. It is that business for which the securitization platform provides the architecture for delivering the Enterprise guarantee to investors. Establishing a path for shifting mortgage credit risk from the Enterprises (and, thereby, taxpayers) to private investors is central to the second goal.

Gradually shifting mortgage credit risk from Fannie Mae and Freddie Mac to private investors could be accomplished in several ways. The following are under consideration or already being implemented:

- Increase guarantee fee pricing. Continued gradual increases in the Enterprises' guarantee fee (or, g-fee) pricing may move their pricing structure closer to the level one might expect to see if mortgage credit risk was borne solely by private capital. In September 2011, FHFA announced its intention to continue a path of gradual price increases based on risk and the cost of capital. In December 2011, in the Temporary Payroll Tax Cut Continuation Act of 2011, Congress directed FHFA to increase guarantee fees by at least an average of 10 basis points and further directed that FHFA consider the cost of private capital and the risk of loss in setting guarantee fees. Congress also encouraged FHFA to require guarantee fee changes that reduce cross-subsidization of relatively risky loans and eliminate differences in fees across lenders that are not clearly based on cost or risk.

- Establish loss-sharing arrangements. Most Enterprise mortgage securitization yields securities fully guaranteed by the Enterprises. Alternative securities structures could result in private investors bearing some or all of the credit risk. FHFA is considering various approaches, including senior-subordinated security structures.

- Expand reliance on mortgage insurance. As required by law, most mortgages purchased or guaranteed by the Enterprises with less than 20 percent borrower equity in the property have private mortgage insurance in the first-credit-loss position. While some mortgage insurers are facing financial challenges as a result of housing market conditions, others may have the capital capacity to insure a portion of the mortgage credit risk currently retained by the Enterprises. This could be accomplished through deeper mortgage insurance coverage on individual loans or through pool-level insurance policies.

Multifamily Credit Guarantees

Unlike the single-family credit guarantee business, each Enterprise's multifamily business has weathered the housing crisis and generated positive cash flow. In contrast to their common approach to their single-family businesses, Fannie Mae and Freddie Mac do not take the same approach to their multifamily businesses. For a significant portion of its business, Fannie Mae shares multifamily credit risk with loan originators through its delegated underwriting program. For a significant and increasing portion of its business, Freddie Mac shares multifamily credit

15

risk with investors by issuing classes of securities backed by multifamily mortgages where the investor bears the credit risk.  Both approaches are broadly accepted in the marketplace.

Rising rental rates and declining vacancy and delinquency rates reflect, in part, the shift of some households from home ownership to renting as well as other demographic trends.  The demand for Enterprise employees with expertise in this specialized market is also strong; both companies have lost key personnel to other market participants.

Multifamily lending has played an important role in how the Enterprises have fulfilled past affordable housing mandates, but the activity itself is more akin to other commercial real estate lending than to the Enterprises' single-family businesses.  In conservatorship, the Enterprises have seen their market share grow in the multifamily sector but they do not dominate that market as they do in single-family.

Given these conditions, generating potential value for taxpayers and contracting the Enterprises' multifamily market footprint should be approached differently from single-family, and it may be accomplished using a much different and more direct method. To evaluate how to accomplish the second strategic goal in the multifamily business, each Enterprise will undertake a market analysis of the viability of its multifamily operations without government guarantees.  This will require market reviews of their respective business models and the likely viability of those models operating on a stand-alone basis after attracting private capital and adjusting pricing, if needed, to attract and retain that capital.

Capital Markets

Before conservatorship, many Enterprise observers and analysts thought capital market activities to be each company's source of greatest profits, controversy and risk.  With the numerous subsidies inherent in the government-sponsored enterprise (GSE) charters granted by Congress, the Enterprises have long been able to borrow money in the capital markets by issuing debt securities at interest rates approaching those of Treasury securities.  They did this not by virtue of their financial strength and strong capital base, but because of a broad perception in the marketplace that the government would not let the companies default on their obligations.  With this borrowing advantage, which was unavailable to other investors, the Enterprises issued debt to buy mortgages, including their own MBS, in competition with private investors.

The Enterprises fund their retained portfolios through their capital markets operations, which need to continually monitor and hedge the interest rate risk inherent in mortgages, including the risk that changing interest rates could lead to either sudden mortgage prepayments or a slowdown in mortgage prepayments.  Interest rate risk overwhelmed the savings and loan industry in the 1980s and made Fannie Mae technically insolvent in the early 1980s.  Although capital markets operations were not the leading contributor to the losses that led the Enterprises into conservatorship and the accompanying taxpayer support, it remains a complex business activity requiring specialized and expert risk managers.

16

Today, this business line is already on a gradual wind-down path.  The Treasury support agreements require the Enterprises to shrink their retained mortgage portfolios at a rate of 10 percent per year.  Most mortgages the Enterprises add to their retained portfolios today are delinquent mortgages removed from their mortgage-backed securities.  Each Enterprise also has certain legacy assets from before conservatorship, including private-label MBS, for which there is little or no liquidity in the marketplace.  Thus, over time the Enterprises' retained portfolios are becoming smaller, but also less liquid.

Maximizing returns for taxpayers on the $1.4 trillion in mortgage assets currently owned and financed by the Enterprises is a key element of FHFA's mandate as conservator.  The gradual wind-down of the retained portfolios since 2009 has led FHFA to consider strategic sales of assets that maximize value for the conservatorships.  But depressed market prices for many of these assets, particularly when tied to market illiquidity rather than a permanent decline in asset value, argues for holding some of them for a longer period to minimize taxpayer loss.

In view of the need to retain capital market expertise to operate this business, accomplishing the second strategic goal for this line of business has two basic options:  retain each company's in-house capital markets expertise to continue to manage these portfolios to maximize value while managing risk or retain a third-party investment firm(s) to manage each company's portfolio.  The first is less disruptive but retains human capital risk, especially in view of proposed legislation on Enterprise compensation.  The second option would hasten the shrinkage in Enterprise headcount but is likely to be the more costly, and it poses new control and oversight challenges for FHFA.

### *Strategic Goal 3:*  **Maintaining Foreclosure Prevention Efforts and Credit Availability**

Amidst the building up and winding down activities defined by the first two strategic goals, there remains a critical third goal:  ensuring ongoing stability and liquidity in the marketplace for new mortgages and mortgage refinancing, and continuing the critical tasks of foreclosure prevention and loss mitigation.  This third goal has been central to the conservatorships since they began and it continues to be essential today.

Together, the Enterprises purchase or guarantee roughly $100 billion in home purchase and refinanced mortgages each month.  Market confidence in the Enterprises' ongoing ability to provide this stable, liquid flow of mortgage-backed securities to investors is essential to stabilizing house prices and ensuring stability in the value of nearly $3.9 trillion in outstanding Enterprise mortgage-backed securities.

Other ongoing Enterprise activities that must be continued and enhanced include:

- Successful implementation of the Home Affordable Refinance Program (HARP), including the significant program changes announced in October 2011.

17

- Continued implementation of the Servicing Alignment Initiative, including its rigorous approach to loss mitigation through loan modifications and other means by reaching out to borrowers at the first signs of distress.

- Renewed focus on short sales, deeds-in-lieu, and deeds-for-lease options that enable households and the Enterprises to avoid foreclosure.  The frictions and barriers to more successful use of these tools should be identified and removed using the same renewed focus brought to HARP last year.  Enhanced use of these foreclosure avoidance tools may have important benefits for borrowers, neighborhoods, and taxpayers.  Given the large backlog of pending foreclosures, renewed focus on these alternatives is a near-term priority.

- Further development and implementation of the real estate owned (REO) disposition initiative announced by FHFA last year.  Adding creative strategies for placing foreclosed homes back into the marketplace, including efforts to convert properties into rental units, remains a promising path to reduce losses and to stabilize house prices and neighborhoods hit hard by the housing crisis.

Beyond these sensible strategies to assist homeowners and reduce taxpayer losses, achieving the third strategic goal will require FHFA and the Enterprises to work harder to resolve certain long-standing concerns in the marketplace that may be suppressing a more robust recovery and limiting credit availability.  Each of these will be particularly challenging to resolve as they are essential to conservatorship efforts to minimize losses and to put the Enterprises in a more sound and solvent condition to manage the new business being taken on with taxpayer support.

First, representations and warranties are a long-standing means for enhancing liquidity in the mortgage origination process while protecting the Enterprises from loans not underwritten to prescribed standards.  Representations and warranties are a loan originator's assurance to an Enterprise that a mortgage sold to the Enterprise has been underwritten as specified by contract, and, if that is found not to be the case, the originator undertakes responsibility for buying the loan back at par.  Enforcing these claims ensures the Enterprises are compensated for losses that are the legal responsibility of another party.  Still, such enforcement is costly and some have argued it has delayed market recovery because it led to new mortgage originations being underwritten to stricter standards than the Enterprises require.

FHFA and the Enterprises will respond to this market concern by aligning and making policies for representations and warranties more transparent (consistent with the first strategic goal).  As noted earlier, a long-term goal associated with the Uniform Mortgage Data Program is to reduce representation and warranty risk through up-front monitoring of loan quality.  In conjunction with this initiative and, in the interim, defining more clearly under what conditions representations and warranties will be employed to put back mortgages is an objective under the third strategic goal.  Completing the resolution of outstanding "put back" requests is a related objective.

18

Second, FHFA has filed 18 separate lawsuits in connection with alleged securities law violations in private-label mortgage-backed securities purchased by the Enterprises. Speedy resolution of these claims would also help restore some vibrancy to the mortgage market and put claims related to past deficiencies to rest.

## Accomplishing the Strategic Goals:  Human Capital and Business Realities

No business endeavor can be successful without careful consideration of human capital. The numerous activities and changes necessary to accomplish the three strategic goals described here cannot be accomplished solely by legislation or declaration. They require substantial effort by many people at both Fannie Mae and Freddie Mac.

The boards and executives responsible for the business decisions that resulted in the Enterprises entering conservatorship and subsequent taxpayer support are long gone. Nearly every current top executive at each company either joined the company *after* the conservatorships were established or were promoted from within to replace departed executives. It is also worth noting that shareholders of each Enterprise effectively have already lost their entire investment.

The public interest is best served by ensuring that Fannie Mae and Freddie Mac have the best available corporate leaders to carry out the work necessary to meet the critical goals set forth here. FHFA and the Enterprises' boards of directors currently are engaged in a search for a new chief executive officer (CEO) for each company. We are seeking accomplished corporate leaders willing to undertake the unique challenge of running a large, complex financial institution while fulfilling the public goals described here in an uncertain legislative environment. FHFA and the boards are seeking highly qualified executives willing to take on these daunting challenges as a form of public service, despite the ongoing criticism of the companies and their executives. The success of these new CEOs will depend directly on the stability and experience of the executive teams and staff already in place at each company. Disrupting what has taken more than three years to achieve will only add to taxpayer losses and threaten the fragile housing recovery.

FHFA and the Enterprise boards of directors have taken seriously the concerns raised by members of Congress and the public regarding executive compensation. For 2012, work on a new compensation structure that eliminates bonuses is nearly complete. The new structure will be all salary, some paid currently, but a larger portion will be deferred. The deferred salary will be at-risk, meaning it may be reduced (but not increased) from the target amount, and reductions would be based on shortcomings in achieving individual performance goals and corporate conservatorship goals tied to this strategic plan.

Mid-level managers and rank and file staff have been held to a pay freeze the past two years. Yet retention of these staff is at least as important as retaining senior management. The day-to-day running of the businesses and the countless decisions that result in gains or losses are made

19

in these ranks.  Even with the great uncertainty as to the future of their companies, many Enterprise staff have remained committed to the important work taking place there.

When the conservatorships were created, FHFA made clear to Enterprise employees, Congress, and the public that retaining corporate managers and staff was essential to the work of the conservatorships.  Conservatorship did not turn once-private companies into government agencies, nor their workers into government employees.  As with everything else with these conservatorships, there has been a challenging yet critical balancing required.

In addition to the senior managers and staff, the Enterprises' boards of directors have played, and continue to play, an important role in assisting Enterprise management and FHFA.  Board members themselves are engaged in a form of public service while retaining fiduciary responsibility as board members, and they too face unique challenges as boards of companies in government conservatorship.

From FHFA's standpoint, part of what is being preserved and conserved at the Enterprises is the processes and procedures, including business decision-making and requirements, of private financial institutions.  These are critical to safe and sound operations, and can be disrupted by a failure at the senior management or operational staff  levels.  Each board's oversight of its Enterprise helps to preserve and reinforce among managers and staff these important private-sector disciplines.  Each board's review and consideration of risk management practices, key business decisions, human capital management, and other key functions greatly assists FHFA in its regulatory and conservatorship responsibilities by providing the discipline and rigor expected of corporate boards.  In these ways, the boards help FHFA enhance the corporate value at each Enterprise for ultimate disposition by Congress.


## Conservatorship:  Writing the Final Chapter

The early chapters of the conservatorship story focused on market functioning and loss mitigation.  More recent chapters have covered renewed efforts to enhance refinancing opportunities and REO disposition.  The strategic goals and performance objectives set forth here provide an outline for the next chapter of conservatorship, one that focuses in earnest on building a secondary mortgage market infrastructure that will live beyond the Enterprises themselves.  This next chapter will also see a gradual reduction in the Enterprises' dominant position in holding mortgage credit risk as private capital is encouraged back into that role.

The final chapter, though, remains the province of lawmakers.  Fannie Mae and Freddie Mac were chartered by Congress and by law, only Congress can abolish or modify those charters.  The strategic plan set forth here will move the housing finance system forward and enhance the foundation on which Congress can make decisions about the role of government in the future of the country's housing finance system.  Congress then can decide on the disposition of the Enterprises and their business operations.

TREASURY-2389

This plan does not anticipate Fannie Mae and Freddie Mac continuing as they existed before conservatorship.  And though the Enterprises may well cease to exist at some point in the future, at least as they are known today, the country's $10 trillion single-family mortgage market will not go away.  Therefore, an orderly transition to a new structure is needed.

Ensuring the ongoing liquidity and stability of the market, and establishing new conduits that connect local mortgage originators with the capacity of global capital market investors, will require new institutions and legal frameworks.  The executives and employees of Fannie Mae and Freddie Mac are well situated to begin the process of building for that future and they can be expected to remain key contributors to housing finance in whatever new companies and institutional arrangements arise to replace Fannie Mae and Freddie Mac.  Getting the most value for taxpayers and bringing stability and liquidity to housing finance during this long transition remain the overriding objectives of FHFA as conservator.

21

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2011
Commission File No.: 0-50231

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | |
|---|---|
| **Federally chartered corporation** | **52-0883107** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(202) 752-7000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| None | |

**Securities registered pursuant to Section 12(g) of the Act:**
**Common Stock, without par value**
*(Title of class)*
**8.25% Non-Cumulative Preferred Stock, Series T, stated value $25 per share**
*(Title of class)*
**8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1 stated value $50 per share**
*(Title of class)*
**Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S, stated value $25 per share**
*(Title of class)*
**7.625% Non-Cumulative Preferred Stock, Series R, stated value $25 per share**
*(Title of class)*
**6.75% Non-Cumulative Preferred Stock, Series Q, stated value $25 per share**
*(Title of class)*
**Variable Rate Non-Cumulative Preferred Stock, Series P, stated value $25 per share**
*(Title of class)*
**Variable Rate Non-Cumulative Preferred Stock, Series O, stated value $50 per share**
*(Title of class)*
**5.375% Non-Cumulative Convertible Series 2004-1 Preferred Stock, stated value $100,000 per share**
*(Title of class)*
**5.50% Non-Cumulative Preferred Stock, Series N, stated value $50 per share**
*(Title of class)*
**4.75% Non-Cumulative Preferred Stock, Series M, stated value $50 per share**
*(Title of class)*
**5.125% Non-Cumulative Preferred Stock, Series L, stated value $50 per share**
*(Title of class)*
**5.375% Non-Cumulative Preferred Stock, Series I, stated value $50 per share**
*(Title of class)*
**5.81% Non-Cumulative Preferred Stock, Series H, stated value $50 per share**
*(Title of class)*
**Variable Rate Non-Cumulative Preferred Stock, Series G, stated value $50 per share**
*(Title of class)*
**Variable Rate Non-Cumulative Preferred Stock, Series F, stated value $50 per share**
*(Title of class)*
**5.10% Non-Cumulative Preferred Stock, Series E, stated value $50 per share**
*(Title of class)*
**5.25% Non-Cumulative Preferred Stock, Series D, stated value $50 per share**
*(Title of class)*

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐          Accelerated filer ☑          Non-accelerated filer ☐          Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☑

The aggregate market value of the common stock held by non-affiliates of the registrant computed by reference to the last reported sale price of the common stock quoted on the OTC Bulletin Board on June 30, 2011 (the last business day of the registrant's most recently completed second fiscal quarter) was approximately $383 million.

As of January 31, 2012, there were 1,158,072,058 shares of common stock of the registrant outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**   The information required by Item 11 in Part III will be included in an amendment to this annual report on Form 10-K filed on or before April 30, 2012.

TREASURY-2391

**TABLE OF CONTENTS**

| | | |
|---|---|---:|
| **PART I** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| Item 1. | Business  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| | Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| | Residential Mortgage Market  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 |
| | Executive Summary  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 |
| | Mortgage Securitizations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 |
| | Business Segments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 |
| | Conservatorship and Treasury Agreements  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32 |
| | Legislative and Regulatory Developments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 37 |
| | Our Charter and Regulation of Our Activities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 42 |
| | Making Home Affordable Program  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 50 |
| | Our Customers  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 51 |
| | Competition  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 52 |
| | Employees  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 53 |
| | Where You Can Find Additional Information  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 53 |
| | Forward-Looking Statements  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 53 |
| Item 1A. | Risk Factors  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 58 |
| Item 1B. | Unresolved Staff Comments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 76 |
| Item 2. | Properties  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 76 |
| Item 3. | Legal Proceedings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 77 |
| Item 4. | Mine Safety Disclosures  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 78 |
| **PART II** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 79 |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 79 |
| Item 6. | Selected Financial Data  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 82 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations  . . . | 85 |
| | Critical Accounting Policies and Estimates  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 85 |
| | Consolidated Results of Operations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 91 |
| | Business Segment Results  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 110 |
| | Consolidated Balance Sheet Analysis  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 124 |
| | Supplemental Non-GAAP Information—Fair Value Balance Sheets  . . . . . . . . . . . . . . . . . . . | 129 |
| | Liquidity and Capital Management  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 133 |
| | Off-Balance Sheet Arrangements  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 146 |
| | Risk Management  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 148 |
| | Impact of Future Adoption of New Accounting Pronouncements  . . . . . . . . . . . . . . . . . . . . . . | 193 |
| | Glossary of Terms Used in This Report  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 194 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk  . . . . . . . . . . . . . . . . . . . . . . . . . | 197 |
| Item 8. | Financial Statements and Supplementary Data  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 197 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure  . . . | 197 |
| Item 9A. | Controls and Procedures  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 197 |
| Item 9B. | Other Information  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 203 |

**PART III** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203

Item 10.   Directors, Executive Officers and Corporate Governance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203

Directors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203

Corporate Governance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

Executive Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

Item 11.   Executive Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder
Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

Item 13.   Certain Relationships and Related Transactions, and Director Independence . . . . . . . . . . . . . . 216

Policies and Procedures Relating to Transactions with Related Persons . . . . . . . . . . . . . . . . . . 216

Transactions with Related Persons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217

Director Independence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222

Item 14.   Principal Accounting Fees and Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

**PART IV** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

Item 15.   Exhibits, Financial Statement Schedules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

INDEX TO EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-1

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-1

# MD&A TABLE REFERENCE

| Table | Description | Page |
|---|---|---|
| 1 | Treasury Dividend Payments and Draws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 |
| 2 | Characteristics of Acquired Single-Family Conventional Loans by Acquisition Period . . . . . . . . . . . | 10 |
| 3 | Selected Credit Characteristics of Single-Family Conventional Loans Held, by Acquisition Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 |
| 4 | Credit Statistics, Single-Family Guaranty Book of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 |
| 5 | Level 3 Recurring Financial Assets at Fair Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 86 |
| 6 | Summary of Consolidated Results of Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 92 |
| 7 | Analysis of Net Interest Income and Yield . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 93 |
| 8 | Rate/Volume Analysis of Changes in Net Interest Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 94 |
| 9 | Impact of Nonaccrual Loans on Net Interest Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 95 |
| 10 | Fair Value Gains (Losses), Net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 96 |
| 11 | Total Loss Reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 99 |
| 12 | Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves) . . . . . . . . | 101 |
| 13 | Loss Reserve Concentration Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 103 |
| 14 | Nonperforming Single-Family and Multifamily Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 104 |
| 15 | Credit Loss Performance Metrics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 106 |
| 16 | Credit Loss Concentration Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 107 |
| 17 | Single-Family Credit Loss Sensitivity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 108 |
| 18 | Business Segment Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 111 |
| 19 | Business Segment Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 112 |
| 20 | Single-Family Business Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 113 |
| 21 | Multifamily Business Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 116 |
| 22 | Capital Markets Group Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 119 |
| 23 | Capital Markets Group's Mortgage Portfolio Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 122 |
| 24 | Capital Markets Group's Mortgage Portfolio Composition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 123 |
| 25 | Summary of Consolidated Balance Sheets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 124 |
| 26 | Summary of Mortgage-Related Securities at Fair Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 125 |
| 27 | Analysis of Losses on Alt-A and Subprime Private-Label Mortgage-Related Securities . . . . . . . . . . | 126 |
| 28 | Credit Statistics of Loans Underlying Alt-A and Subprime Private-Label Mortgage-Related Securities (Including Wraps) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 127 |
| 29 | Changes in Risk Management Derivative Assets (Liabilities) at Fair Value, Net . . . . . . . . . . . . . . . . | 129 |
| 30 | Comparative Measures—GAAP Change in Stockholders' Deficit and Non-GAAP Change in Fair Value of Net Assets (Net of Tax Effect) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 130 |
| 31 | Supplemental Non-GAAP Consolidated Fair Value Balance Sheets . . . . . . . . . . . . . . . . . . . . . . . . | 132 |
| 32 | Activity in Debt of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 136 |
| 33 | Outstanding Short-Term Borrowings and Long-Term Debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 138 |
| 34 | Outstanding Short-Term Borrowings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 139 |
| 35 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year . . . . . . . . . . . . . . . | 141 |
| 36 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year . . . . . . . . . . | 141 |

| Table | Description | Page |
|-------|-------------|------|
| 37 | Contractual Obligations | 142 |
| 38 | Cash and Other Investments Portfolio | 143 |
| 39 | Fannie Mae Credit Ratings | 144 |
| 40 | Composition of Mortgage Credit Book of Business | 151 |
| 41 | Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business | 155 |
| 42 | Single-Family Adjustable-Rate Mortgage Resets by Year | 160 |
| 43 | Delinquency Status of Single-Family Conventional Loans | 162 |
| 44 | Single-Family Serious Delinquency Rates | 163 |
| 45 | Single-Family Conventional Serious Delinquency Rate Concentration Analysis | 164 |
| 46 | Statistics on Single-Family Loan Workouts | 165 |
| 47 | Single-Family Loan Modification Profile | 166 |
| 48 | Percentage of Loan Modifications That Were Current and Performing at One and Two Years Post-Modification | 167 |
| 49 | Single-Family Foreclosed Properties | 168 |
| 50 | Single-Family Acquired Property Concentration Analysis | 169 |
| 51 | Multifamily Lender Risk-Sharing | 170 |
| 52 | Multifamily Serious Delinquency Rates | 171 |
| 53 | Multifamily Concentration Analysis | 172 |
| 54 | Multifamily Foreclosed Properties | 173 |
| 55 | Outstanding Repurchase Requests | 176 |
| 56 | Mortgage Insurance Coverage | 178 |
| 57 | Rescission Rates of Mortgage Insurance Claims | 180 |
| 58 | Estimated Mortgage Insurance Benefit | 181 |
| 59 | Unpaid Principal Balance of Financial Guarantees | 183 |
| 60 | Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve | 190 |
| 61 | Derivative Impact on Interest Rate Risk (50 Basis Points) | 191 |
| 62 | Interest Rate Sensitivity of Financial Instruments | 192 |

TREASURY-2395

# PART I

**We have been under conservatorship, with the Federal Housing Finance Agency ("FHFA") acting as conservator, since September 6, 2008. As conservator, FHFA succeeded to all rights, titles, powers and privileges of the company, and of any shareholder, officer or director of the company with respect to the company and its assets. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. Our directors do not have any duties to any person or entity except to the conservator and, accordingly, are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS unless specifically directed to do so by the conservator. We describe the rights and powers of the conservator, key provisions of our agreements with the U.S. Department of the Treasury ("Treasury"), and their impact on shareholders in "Business—Conservatorship and Treasury Agreements."**

*This report contains forward-looking statements, which are statements about matters that are not historical facts. Forward-looking statements often include words like "expect," "anticipate," "intend," "plan," believe," "seek," "estimate," "would," "should," "could," "may" or similar words. Actual outcomes may differ materially from those reflected in our forward-looking statements due to a variety of factors including, but not limited to, those discussed in "Risk Factors" and elsewhere in this report. Please review "Forward-Looking Statements" for more information on the forward-looking statements in this report.*

*You can find a "Glossary of Terms Used in This Report" in "Management's Discussion and Analysis of Financial Condition and Results of Operations ('MD&A')."*

**Item 1.   Business**

## INTRODUCTION

Fannie Mae is a government-sponsored enterprise ("GSE") that was chartered by Congress in 1938. Our public mission is to support liquidity and stability in the secondary mortgage market, where existing mortgage-related assets are purchased and sold, and increase the supply of affordable housing. Our charter does not permit us to originate loans and lend money directly to consumers in the primary mortgage market. Our most significant activity is securitizing mortgage loans originated by lenders into Fannie Mae mortgage-backed securities that we guarantee, which we refer to as Fannie Mae MBS. We also purchase mortgage loans and mortgage-related securities. We use the term "acquire" in this report to refer to both our securitizations and our purchases of mortgage-related assets. We obtain funds to support our business activities by issuing a variety of debt securities in the domestic and international capital markets. During 2011, we concentrated much of our efforts on providing liquidity and support to the mortgage market, growing the strong new book of business we have been acquiring since the beginning of 2009, and minimizing losses on loans we acquired prior to 2009. We describe our business activities below.

We are a corporation chartered by the U.S. Congress. Our conservator, FHFA, is a U.S. government agency. Treasury owns our senior preferred stock and a warrant to purchase 79.9% of our common stock. Moreover, Treasury has made a commitment under a senior preferred stock purchase agreement to provide us with funds under specified conditions and, after 2012, up to a maximum amount, to maintain a positive net worth. The U.S. government does not guarantee our securities or other obligations.

As a federally chartered corporation, we are subject to extensive regulation, supervision and examination by FHFA, and regulation by other federal agencies, including Treasury and the Department of Housing and Urban Development ("HUD").

The conservatorship we have been under since September 2008 has no specified termination date. There can be no assurance as to when or how the conservatorship will be terminated, whether we will continue to exist following conservatorship, or what changes to our business structure will be made during or following the conservatorship.

TREASURY-2396

Uncertainty about the future of our company and surrounding the compensation of our executives and other employees could jeopardize our ability to manage risks effectively, to operate our business in a safe and sound manner, to support the mortgage market and to help delinquent borrowers avoid foreclosure. Congressional action in 2011 and early 2012 included legislation that would place our employees on a government pay scale and would forbid bonus payments for senior executives. Such debate elevates voluntary turnover and impairs our ability to recruit qualified employees for critical roles in the company. A sudden and sharp decline in compensation would likely cause significant and swift employee turnover, restrict recruitment of qualified replacements and decrease engagement of remaining employees, which could have a material adverse effect on our ability to conduct business. See "Risk Factors" for further discussion of the risks to our business and our results of operations if we are unable to retain and hire qualified employees.

Our agreements with Treasury that provide for substantial U.S. government financial support also include covenants that significantly restrict our business activities. We provide additional information on the conservatorship, the provisions of our agreements with the Treasury, and its impact on our business below under "Conservatorship and Treasury Agreements" and "Risk Factors."

Our common stock is traded in the over-the-counter market and quoted on the OTC Bulletin Board under the symbol "FNMA." Our debt securities are actively traded in the over-the-counter market.

## RESIDENTIAL MORTGAGE MARKET

### The U.S. Residential Mortgage Market

We conduct business in the U.S. residential mortgage market and the global securities market. Total U.S. residential mortgage debt outstanding, which includes $10.3 trillion of single-family mortgage debt outstanding, was estimated to be approximately $11.2 trillion as of September 30, 2011, the latest date for which information was available, according to the Federal Reserve. After increasing every quarter since record keeping began in 1952 until the second quarter of 2008, single-family mortgage debt outstanding has been steadily declining since then. We owned or guaranteed mortgage assets representing approximately 28.0% of total U.S. residential mortgage debt outstanding as of September 30, 2011.

We operate our business solely in the United States and its territories, and accordingly, we generate no revenue from and have no long-lived assets other than financial instruments in geographic locations other than the United States and its territories.

### Housing and Mortgage Market and Economic Conditions

Economic growth picked up in the fourth quarter of 2011. The inflation-adjusted U.S. gross domestic product, or GDP, rose by 2.8% on an annualized basis during the quarter, according to the Bureau of Economic Analysis advance estimate. The overall economy gained an estimated 472,000 jobs in the fourth quarter as a result of employment growth in the private sector. According to the U.S. Bureau of Labor Statistics as of February 2012, the economy created 1.8 million non-farm jobs in 2011. The unemployment rate was 8.5% in December 2011, compared with 9.0% in September 2011. In January 2012, nonfarm payrolls posted a strong increase of 243,000 jobs, and the unemployment rate declined further to 8.3%. In spite of the downside risks from Europe and elsewhere, we expect that housing will start to recover if the employment market continues to improve.

Total existing home sales rose 1.7% in 2011 from 2010, according to data available through January 2012, following a 3.5% decline in 2010, despite low mortgage rates and reduced home prices. Weak demand for homes, a weak labor market and elevated vacancy and foreclosure rates are the main obstacles to the housing recovery. Sales of foreclosed homes and preforeclosure, or "short," sales (together, "distressed sales") accounted for 32% of existing home sales in December 2011, compared to 36% in December 2010, according to the National Association of REALTORS®. Faced with fierce competition from distressed sales, new home sales declined in 2011 for the sixth consecutive year, falling 6.2% to a record low. Homebuilding activity was mixed in 2011, as single-family housing starts fell approximately 9% to a record low, while multifamily starts rose 54%.

- 2 -

At the end of 2011, the number of months' supply, or the inventory/sales ratio, was consistent with historical averages for both new and existing homes. While the demand for new homes was quite weak in 2011, the inventory was also very lean. The number of new homes available for sale reached an all-time low in December 2011, when, according to the Census' December 2011 New Residential Sales Report, the months' supply was 6.1 months. For existing homes, as a result of rising sales in the fourth quarter of 2011 and a persistent decline in the number of existing homes available for sale in the second half of 2011, the months' supply fell sharply in the fourth quarter. According to the National Association of REALTORS® January 2012 Existing Home Sales Report, the months' supply of existing unsold homes was 6.2 months as of December 31, 2011, compared with an 8.3 months' supply as of September 30, 2011 and an 8.1 months' supply as of December 31, 2010. Properties that are vacant and held off the market, combined with a portion of properties backing seriously delinquent mortgages not currently listed for sale, represent a significant shadow inventory putting downward pressure on home prices. The overall mortgage market serious delinquency rate, which has trended down since peaking in the fourth quarter of 2009, remained historically high at 7.7% as of December 31, 2011, according to the Mortgage Bankers Association National Delinquency Survey. We provide information about Fannie Mae's serious delinquency rate, which also decreased during 2011, in "Executive Summary—Credit Performance."

The table below presents several key indicators related to the total U.S. residential mortgage market.

**Housing and Mortgage Market Indicators[1]**

| | 2011 | 2010 | 2009 | % Change 2011 | % Change 2010 |
|---|---|---|---|---|---|
| Home sales (units in thousands) | 4,562 | 4,513 | 4,715 | 1.1% | (4.3)% |
| New home sales | 302 | 323 | 375 | (6.5) | (13.9) |
| Existing home sales | 4,260 | 4,190 | 4,340 | 1.7 | (3.5) |
| Home price depreciation based on Fannie Mae Home Price Index ("HPI")[2] | (3.2)% | (4.3)% | (4.7)% | — | — |
| Annual average fixed-rate mortgage interest rate[3] | 4.5% | 4.7% | 5.0% | — | — |
| Single-family mortgage originations (in billions) | $ 1,362 | $ 1,701 | $ 1,884 | (19.9) | (9.7) |
| Type of single-family mortgage origination: | | | | | |
| Refinance share | 66% | 68% | 69% | — | — |
| Adjustable-rate mortgage share | 6% | 5% | 4% | — | — |
| Total U.S. residential mortgage debt outstanding (in billions)[4] | $11,177 | $11,360 | $11,712 | (1.6) | (3.0) |

[1] The sources of the housing and mortgage market data in this table are the Federal Reserve Board, the Bureau of the Census, HUD, the National Association of Realtors, and the Mortgage Bankers Association. Homes sales data are based on information available through January 2012. Single-family mortgage originations, as well as refinance shares, are based on February 2012 estimates from Fannie Mae's Economic & Strategic Research group. The adjustable-rate mortgage share is based on mortgage applications data reported by the Mortgage Bankers Association. Certain previously reported data may have been changed to reflect revised historical data from any or all of these organizations.

[2] Calculated internally using property data information on loans purchased by Fannie Mae, Freddie Mac and other third-party home sales data. Fannie Mae's HPI is a weighted repeat transactions index, measuring average price changes in repeat sales on the same properties. Fannie Mae's HPI excludes prices on properties sold in foreclosure. The reported home price depreciation reflects the percentage change in Fannie Mae's HPI from the fourth quarter of the prior year to the fourth quarter of the reported year.

[3] Based on the annual average 30-year fixed-rate mortgage interest rate reported by Freddie Mac.

[4] Information for 2011 is through September 30, 2011 and has been obtained from the Federal Reserve's September 2011 mortgage debt outstanding release.

The decline in home prices slowed in 2011. We estimate that home prices on a national basis declined by 3.2% overall in 2011, with a decline of 1.6% in the fourth quarter of 2011. We estimate that home prices have declined by 23% from their peak in the third quarter of 2006. Our home price estimates are based on preliminary data and are subject to change as additional data become available.

TREASURY-2398

We estimate that total single-family mortgage originations in 2011 decreased from 2010 levels by 20% to $1.4 trillion, with a purchase share of 34% and a refinance share of 66%.

Since the second quarter of 2008, single-family mortgage debt outstanding has been steadily declining due to a number of factors including declining home sales and prices, rising foreclosures, increased cash sales, and reduced home equity extraction. We anticipate another approximately 1.1% decline in single-family mortgage debt outstanding in 2012. Total U.S. residential mortgage debt outstanding fell during the third quarter of 2011 by an annualized rate of 2.1%.

Despite signs of stabilization and improvement, one out of thirteen borrowers was delinquent or in foreclosure during the fourth quarter of 2011, according to the Mortgage Bankers Association National Delinquency Survey. The housing market remains under pressure due to the high level of unemployment, which was a primary driver of the significant number of mortgage delinquencies and defaults in 2011. At the start of the recession in December 2007, the unemployment rate was 5.0%, based on data from the U.S. Bureau of Labor Statistics. The unemployment rate peaked at a 26-year high of 10.0% in October 2009, and remained as high as 8.3% in January 2012. We expect the unemployment rate to remain relatively flat in 2012.

The most comprehensive measure of the unemployment rate, which includes those working part-time who would rather work full-time (part-time workers for economic reasons) and those not looking for work but who want to work and are available for work (discouraged workers), was 15.1% in January 2012, substantially lower than the record high of 17.2% in October 2009.

The decline in home prices has left many homeowners with "negative equity" in their homes, which means their principal mortgage balance exceeds the current market value of their home. This increases the likelihood that borrowers will walk away from their mortgage obligations and that the loans will become delinquent and proceed to foreclosure. According to CoreLogic, approximately 11 million, or 22%, of all residential properties with mortgages were in a negative equity position in the third quarter of 2011. This potential supply also weighs on the supply/demand balance putting downward pressure on both home prices and rents. See "Risk Factors" for a description of risks to our business associated with the weak economy and housing market.

National multifamily market fundamentals, which include factors such as rents and vacancy rates, saw a second year of steady improvement during 2011, benefiting from increased rental demand coupled with limited new apartment supply. Vacancy rates continued to decline throughout most of 2011, bringing the sector back to pre-recession levels.

Based on preliminary third-party data, we estimate that the national multifamily vacancy rate fell to 6.25% in the fourth quarter of 2011, from 6.50% in the third quarter of 2011 and 7.25% in the fourth quarter of 2010. In addition, we estimate that average asking rents increased steadily for nearly two years, most recently increasing by 0.5% in the fourth quarter of 2011 on a national basis. The increase in overall rental demand was also reflected in an estimated increase of about 50,000 units in the net number of occupied rental units during the fourth quarter of 2011, according to preliminary data from Reis, Inc. That brings the total estimated net absorption for the year, (that is, the net change in the number of units occupied over the year), to 170,000 units.

Vacancy rates and rents are important to loan performance because multifamily loans are generally repaid from the cash flows generated by the underlying property. The year-long strengthening of these fundamentals helped boost property values and, in turn, spur apartment building sales during 2011 in most metropolitan areas.

While the strength of improving vacancy levels and rental rates will vary by metropolitan area, on a national basis the multifamily sector should continue to see steady demand in 2012. With job growth slowly improving, and, more importantly, the lack of new apartment supply becoming available over the next 12 to18 months, we expect that rental demand will continue to outstrip supply, thereby maintaining stable vacancy levels and healthy rent growth. As a result, the outlook remains steady for the multifamily sector over the coming year.

- 4 -

## EXECUTIVE SUMMARY

*Please read this Executive Summary together with our MD&A and our consolidated financial statements as of December 31, 2011 and related notes.*

### Our Business Objectives and Strategy

Our Board of Directors and management consult with and receive direction from our conservator in establishing our business objectives and strategy, taking into consideration our role in addressing housing and mortgage market conditions. We face a variety of different objectives that potentially conflict, which limits our ability to fully achieve all of them. Our objectives include:

- providing liquidity, stability and affordability in the mortgage market;

- minimizing credit losses from delinquent mortgages;

- providing assistance to the mortgage market and to the struggling housing market;

- limiting the amount of the investment Treasury must make under our senior preferred stock purchase agreement;

- returning to long-term profitability before taking into account the payment of dividends on our senior preferred stock to Treasury; and

- protecting the interests of the taxpayers.

In addition to these objectives, our conservator recently announced strategic goals that we will pursue. On February 21, 2012, the Acting Director of FHFA sent a letter to Congress in which he wrote, "With the conservatorships [of Fannie Mae and Freddie Mac] operating for more than three years and no near-term resolution in sight, it is time to update and extend the goals and directions of the conservatorships." He continued, "FHFA is contemplating next steps to build an infrastructure for the secondary mortgage market that is consistent with existing policy proposals and will support any outcome of the leading legislative proposals." With his letter, Acting Director DeMarco provided a strategic plan for the next phase of Fannie Mae and Freddie Mac's conservatorships. The plan identifies three strategic goals for the next phase of the conservatorships:

- **Build.** Build a new infrastructure for the secondary mortgage market;

- **Contract.** Gradually contract [Fannie Mae and Freddie Mac's] dominant presence in the marketplace while simplifying and shrinking their operations; and

- **Maintain.** Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

As a result of our uncertain future and our status as a federally chartered corporation, we can be required to take actions in pursuit of objectives other than, or that conflict with, our business objectives. For example, as we discuss below in "Legislative and Regulatory Developments—Changes to Our Single-Family Guaranty Fee Pricing" in December 2011, Congress enacted the Temporary Payroll Tax Cut Continuation Act of 2011 which, among other provisions, requires that we increase our single-family guaranty fees by at least 10 basis points and remit this increase to Treasury to fund extensions of employment tax reductions and unemployment benefits, rather than retaining this incremental revenue. In accordance with the strategic goals recently announced by FHFA, we also expect to increasingly focus on building a new infrastructure for the secondary mortgage market and on actions that will gradually decrease our presence in the marketplace while simplifying and shrinking our operations.

We are concentrating our efforts on providing liquidity and support to the mortgage market, growing the strong new book of business we have been acquiring since the beginning of 2009, minimizing our losses on loans we acquired prior to 2009, and, in support of minimizing our losses, providing assistance where feasible to struggling homeowners.

We will continue to need funds from Treasury as a result of a number of factors, including the dividends we are required to pay Treasury on the senior preferred stock, ongoing adverse conditions in the housing and mortgage

- 5 -

markets and the deteriorated credit performance of loans in our mortgage credit book of business that we acquired prior to 2009. In his February 2012 letter to Congress, Acting Director DeMarco wrote, "[I]t is clear that the draws [Fannie Mae and Freddie Mac] have taken from the Treasury are so large they cannot be repaid under any foreseeable scenarios." As a result of our draws, we do not expect to earn profits in excess of our annual dividend obligation to Treasury for the indefinite future.

There is significant uncertainty regarding the future of our company, including how long the company will continue to exist in its current form. The Administration, Congress and our regulators are considering options for the future state of Fannie Mae, Freddie Mac and the U.S. government's role in residential mortgage finance. In February 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. On February 2, 2012, Treasury Secretary Geithner stated that the Administration intended to release new details around approaches to housing finance reform, including winding down Fannie Mae and Freddie Mac, in the spring of 2012 and to work with Congressional leaders to explore options for legislation, but that he does not expect housing finance reform legislation to be enacted in 2012. In his February 2012 letter to Congress, Acting Director DeMarco states that achieving the strategic goals for the next phase of conservatorship will "prepare the foundation for a new, stronger housing finance system in the future. Although that future may not include Fannie Mae and Freddie Mac, at least as they are known today, this important work in conservatorship can be a lasting, positive legacy for the country and its housing system." We discuss efforts to reform the GSEs and the housing finance system in more detail in "Legislative and Regulatory Developments—GSE Reform."

In 2011 we refined and began implementing a plan designed to support the creation of a sustainable housing finance system by improving our business processes, infrastructure and organizational structure. We expect to continue implementing the plan in phases with goals of providing value to our customers, simplifying and standardizing our operating model, and reducing our costs.

To provide context for analyzing our consolidated financial statements and understanding our MD&A, we discuss the following topics in this executive summary:

- Our provision of liquidity and support to the mortgage market;
- Our 2011 financial performance;
- Our strong new book of business and expected losses on loans we acquired prior to 2009;
- Our efforts to reduce losses on single-family loans we acquired prior to 2009, which we refer to as our "legacy book of business";
- Credit statistics for our single-family book of business;
- Our liquidity position; and
- Our outlook.

**Providing Liquidity and Support to the Mortgage Market**

*Our Liquidity and Support Activities*

We provide liquidity and support to the U.S. mortgage market in a number of important ways:

- We serve as a stable source of liquidity for purchases of homes and financing of multifamily rental housing, as well as for refinancing existing mortgages. We provided approximately $2.3 trillion in liquidity to the mortgage market in 2009 through 2011 through our purchases and guarantees of loans, which enabled homeowners to refinance 6.6 million mortgages, 1.9 million households to purchase a home, and financing for over 1.1 million units of multifamily housing.
- We are a consistent market presence as we continue to provide liquidity to the mortgage market even when other sources of capital have exited the market, as has been shown repeatedly over the last few years. We

TREASURY-2401

estimate Fannie Mae, Freddie Mac and Ginnie Mae collectively guaranteed more than 99% of new single-family mortgage-related securities issuances in 2009 through 2011, which accounted for more than 85% of the single-family first-lien mortgages we currently estimate were originated in the United States in 2009 through 2011. Because our estimate of mortgage originations is subject to change as additional data become available, our estimated share of single-family first-lien mortgages for prior periods may change in the future, perhaps materially.

- We have strengthened our underwriting and eligibility standards to support sustainable homeownership. Our support enables borrowers to have access to a variety of conforming mortgage products, including long-term, fixed-rate mortgages, such as the prepayable 30-year fixed-rate mortgage that protects homeowners from interest rate swings.

- We helped over 900,000 homeowners retain their homes or otherwise avoid foreclosure in 2009 through 2011, which helped to support neighborhoods, home prices and the housing market. Moreover, borrowers' ability to pay their modified loans has improved in recent periods as we have enhanced the structure of our modifications. For loans modified outside of the Administration's Home Affordable Modification Program ("HAMP"), one year after modification, 67% of modifications we made in the fourth quarter of 2010 were performing, compared with 50% of modifications in the fourth quarter of 2009. For loans modified under HAMP, one year after modification, 74% of our HAMP modifications made in the fourth quarter of 2010 were performing, compared with 73% of our HAMP modifications in the fourth quarter of 2009.

- We helped borrowers refinance loans through our Refi Plus™ initiative, which provides expanded refinance opportunities for eligible Fannie Mae borrowers. We acquired approximately 732,000 loans refinanced under our Refi Plus initiative in 2011. Some borrowers may have increased their monthly payments as they took advantage of lower interest rates to reduce the terms of their loans, to switch from adjustable rates to fixed rates, or to switch from interest-only mortgages to fully amortizing mortgages. Even taking these refinancings into account, our acquisitions under Refi Plus reduced our borrowers' monthly mortgage payments by an average of $166.

- We support affordability in the multifamily rental market. Over 85% of the multifamily units we financed from 2009 through 2011 were affordable to families earning at or below the median income in their area.

- In addition to purchasing and guaranteeing loans, we provide funds to the mortgage market through short-term financing and other activities. These activities are described in more detail in "Business Segments—Capital Markets."

*2011 Acquisitions and Market Share*

In 2011, we purchased or guaranteed approximately $653 billion in loans, measured by unpaid principal balance, which includes approximately $67 billion in delinquent loans we purchased from our single-family MBS trusts. These activities enabled our lender customers to finance approximately 2,680,000 single-family conventional loans and loans for approximately 423,000 units in multifamily properties during 2011.

We currently estimate that our single-family market share was 41% in 2011, compared with 36% in 2010. These amounts represent our single-family mortgage acquisitions for each year, excluding delinquent loans we purchased from our MBS trusts, as a percentage of the single-family first-lien mortgages we currently estimate were originated in the United States that year. Because our estimate of mortgage originations in prior periods is subject to change as additional data become available, these market share estimates may change in the future, perhaps materially.

We remained the largest single issuer of mortgage-related securities in the secondary market during the fourth quarter of 2011, with an estimated market share of new single-family mortgage-related securities issuances of 54%. Our estimated market share of new single-family mortgage-related securities issuances was 43% in the third quarter of 2011 and 49% in the fourth quarter of 2010. The estimated market share increase from the third quarter of 2011 to the fourth quarter of 2011 is largely the result of increased investor demand for Fannie Mae MBS.

TREASURY-2402

We remained a constant source of liquidity in the multifamily market. We owned or guaranteed approximately 21% of the outstanding debt on multifamily properties as of September 30, 2011 (the latest date for which information was available).

**Summary of Our Financial Performance for 2011**

Our financial results for 2011 reflect the continued weakness in the housing and mortgage markets, which remain under pressure from high levels of unemployment and underemployment, and the prolonged decline in home prices since their peak in the third quarter of 2006. Our credit-related expenses continue to be a key driver of our net losses for each period presented. The substantial majority of our credit-related expenses are from single-family loans we acquired prior to 2009, which decreased as a percentage of our single-family guaranty book of business to 47% as of December 31, 2011 from 60% as of December 31, 2010. Our credit-related expenses vary from period to period primarily based on changes in home prices, borrower payment behavior, the types and volumes of loss mitigation activities completed, and actual and estimated recoveries from our lender and mortgage insurer counterparties.

In addition, the decline in interest rates during 2011 resulted in significant fair value losses on our derivatives. These fair value losses on our derivatives were offset by fair value gains during 2011 related to our mortgage investments; however, only a portion of these investments is recorded at fair value in our financial statements. Derivative instruments are an integral part of how we manage interest rate risk and an inherent part of the cost of funding and hedging our mortgage investments. We expect high levels of period-to-period volatility in our results because our derivatives are recorded at fair value in our financial statements while some of the instruments they hedge are not recorded at fair value in our financial statements.

*Total Comprehensive Loss*

We recognized a total comprehensive loss of $16.4 billion for 2011, consisting of a net loss of $16.9 billion and other comprehensive income of $447 million. In comparison, our total comprehensive loss for 2010 was $10.6 billion, consisting of a net loss of $14.0 billion and other comprehensive income of $3.4 billion.

The increase in our net loss in 2011, as compared with 2010, was primarily due to an increase in net fair value losses and credit-related expenses, which were partially offset by an increase in net interest income. The primary drivers of these changes were:

- a $6.1 billion increase in net fair value losses primarily driven by losses on our risk management derivatives in 2011 due to a significant decline in swap rates during the period;

- a $2.9 billion increase in net interest income driven by lower interest expense on debt, which was partially offset by lower interest income on loans and securities;

- an $884 million increase in credit-related expenses primarily driven by a decline in actual and projected home prices.

The $3.0 billion decline in our other comprehensive income was primarily driven by lower gains on the fair value of our available-for-sale securities due to widening credit spreads in 2011 compared with narrowing spreads in 2010.

See "Consolidated Results of Operations" for more information on our results.

*Net Worth*

Our net worth deficit of $4.6 billion as of December 31, 2011 reflects the recognition of our total comprehensive loss of $1.9 billion and our payment to Treasury of $2.6 billion in senior preferred stock dividends during the fourth quarter of 2011. The Acting Director of FHFA will submit a request to Treasury on our behalf for $4.6 billion to eliminate our net worth deficit.

In the fourth quarter of 2011, we received $7.8 billion in funds from Treasury to eliminate our net worth deficit as of September 30, 2011. Upon receipt of the additional funds requested to eliminate our net worth deficit as of

- 8 -

December 31, 2011, the aggregate liquidation preference on the senior preferred stock will be $117.1 billion, which will require an annualized dividend payment of $11.7 billion. The amount of this dividend payment exceeds our reported annual net income for every year since our inception. Through December 31, 2011, we have paid an aggregate of $19.8 billion to Treasury in dividends on the senior preferred stock.

Table 1 below displays our senior preferred stock dividend payments to Treasury and Treasury draws since entering conservatorship in 2008.

**Table 1:   Treasury Dividend Payments and Draws**

| | 2008 | 2009 | 2010 | 2011 | Cumulative Total |
|---|---|---|---|---|---|
| | | (Dollars in billions) | | | |
| Senior preferred stock dividends[1] | $ — | $ 2.5 | $ 7.7 | $ 9.6 | $ 19.8 |
| Treasury draws[2][3] | 15.2 | 60.0 | 15.0 | 25.9[4] | 116.1 |
| Cumulative percentage of senior preferred stock dividends to Treasury draws | 0.2% | 3.3% | 11.3% | 17.1% | 17.1% |

[1]   Represents total quarterly cash dividends paid to Treasury, during the periods presented, based on an annual rate of 10% per year on the aggregate liquidation preference of the senior preferred stock.

[2]   Represents the total draws received from Treasury and / or being requested based on our quarterly net worth deficits for the periods presented. Draw requests are funded in the quarter following each quarterly net worth deficit.

[3]   Treasury draws do not include the initial $1.0 billion liquidation preference of the senior preferred stock, for which we did not receive any cash proceeds.

[4]   The treasury draw to eliminate the 2011 fourth quarter net worth deficit was $4,571 million.

### *Total Loss Reserves*

Our total loss reserves, which reflect our estimate of the probable losses we have incurred in our guaranty book of business, including concessions we granted borrowers upon modification of their loans, increased to $76.9 billion as of December 31, 2011 from $75.6 billion as of September 30, 2011 and $66.3 billion as of December 31, 2010. Our total loss reserve coverage to total nonperforming loans was 31% as of December 31, 2011, compared with 30% as of September 30, 2011 and 26% as of December 31, 2010. The continued stress on a broad segment of borrowers from continued high levels of unemployment and underemployment and the prolonged decline in home prices have caused our total loss reserves to remain high for the past few years. In December 2011, we changed our definition of "total nonperforming loans." Under our new definition, we no longer reflect in this amount (1) our allowance for loan losses or (2) our allowance for accrued interest receivable related to these individually impaired loans. The amounts we report for prior periods have been revised from amounts we previously disclosed as a result of this change.

### Our Strong New Book of Business and Expected Losses on Our Legacy Book of Business

We refer to the single-family loans we have acquired since the beginning of 2009 as our "new single-family book of business" and the single-family loans we acquired prior to 2009 as our "legacy book of business." In this section, we discuss our expectations regarding the profitability of our new single-family book of business, as well as the performance and credit profile of these loans to date. We also discuss our expectations regarding losses on the loans in our legacy book of business.

### *Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations*

We present a number of estimates and expectations in this executive summary regarding the profitability of single-family loans we have acquired, our single-family credit losses and credit-related expenses, and our draws from and dividends to be paid to Treasury. These estimates and expectations are forward-looking statements based on our current assumptions regarding numerous factors, including future home prices and the future performance of our loans. Home prices are a key factor affecting the amount of credit losses and profitability we expect. As home prices decline, the loan-to-value ratios, or LTV ratios, on our loans shift higher, and both the

probability of default and the severity of loss increase. Furthermore, the level of regional variation in home price declines affects our results, as we will incur greater credit losses if home prices decline more significantly in regions where we have a greater concentration of loans.

Our future estimates of our performance, as well as the actual amounts, may differ materially from our current estimates and expectations as a result of the timing and level of, as well as regional variation in, home price changes, changes in interest rates, unemployment, other macroeconomic variables, direct and indirect consequences resulting from failures by servicers to follow proper procedures in the administration of foreclosure cases, government policy, changes in generally accepted accounting principles ("GAAP"), credit availability, social behaviors, the volume of loans we modify, the effectiveness of our loss mitigation strategies, management of our real-estate owned ("REO") inventory and pursuit of contractual remedies, changes in the fair value of our assets and liabilities, impairments of our assets, and many other factors, including those discussed in "Risk Factors," "Forward-Looking Statements" and elsewhere in this report. For example, if the economy were to enter a deep recession, we would expect actual outcomes to differ substantially from our current expectations.

### Building a Strong New Single-Family Book of Business

In 2009, we began to see the effect of actions we took, beginning in 2008, to significantly strengthen our underwriting and eligibility standards and change our pricing to promote sustainable homeownership and stability in the housing market. As a result of these changes and other market dynamics, we reduced our acquisitions of loans with higher-risk attributes. Compared with the loans we acquired in 2005 through 2008, the loans in our new single-family book of business have had better overall credit risk profiles at the time we acquired them and, based on their performance so far, we expect loans in our new single-family book of business to perform well over their lifetime.

Table 2, which displays information about the credit risk profile of our single-family loan acquisitions according to when we acquired the loans, illustrates the improvement in the credit risk profile of loans we acquired beginning in 2009 compared with loans we acquired in 2005 through 2008. Based on our experience, we expect that loans with characteristics such as higher FICO credit scores and lower original LTV ratios (that is, more equity initially held by the borrowers in the underlying properties) will perform better than loans with risk characteristics such as higher original LTV ratios, lower FICO credit scores or interest-only payment features, and Alt-A loans. Table 2 also displays information about the percentage of our single-family loans that were seriously delinquent (three or more months past due or in the foreclosure process) at the end of the first year following their acquisition, as well as our current expectation for whether loans we acquired will be profitable over their lifetime, by which we mean that we expect our fee income on these loans to exceed our credit losses and administrative costs for them.

Table 2:  Characteristics of Acquired Single-Family Conventional Loans by Acquisition Period[1]

| | Weighted Average FICO Credit Score at Origination | FICO Credit Score at Origination < 620 | Original LTV Ratio | Original LTV Ratio >90[2] | Alt-A Loans[3] | Interest-Only Loans | SDQ Rate as of 4th quarter following Acquisition year | Expectation for Profitability |
|---|---|---|---|---|---|---|---|---|
| Year of Acquisition: | | | | | | | | |
| New Single-Family Book of Business Acquisitions: | | | | | | | | |
| 2011 . . . . . . . . . . . . . . . . . . . . . . | 762 | * | 69% | 9% | 1% | 1% | Not applicable | Profitable |
| 2010 . . . . . . . . . . . . . . . . . . . . . . | 762 | * | 68% | 7% | 1% | 1% | 0.30% | Profitable |
| 2009 . . . . . . . . . . . . . . . . . . . . . . | 761 | * | 67% | 4% | * | 1% | 0.32% | Profitable |
| Weighted Average New Single-Family Book of Business Acquisitions . . . . . . . . . . . . . . . . . . | 762 | * | 68% | 6% | 1% | 1% | 0.31% | Profitable |
| Legacy Single-Family Book of Business Acquisitions:[4] | | | | | | | | |
| 2005-2008 . . . . . . . . . . . . . . | 722 | 5% | 73% | 11% | 14% | 12% | 3.04% | Not Profitable |
| 2001-2004[5] . . . . . . . . . . . . . . . . | 718 | 5% | 71% | 8% | 9% | 1% | 0.53% | Profitable |

- 10 -

---

\*      Represents less than 0.5% of the total acquisitions.

(1)    Loans that meet more than one category are included in each applicable category.

(2)    The majority of loans that we acquired in our new single-family book of business between 2009 and 2011 with original LTV ratios over 90% were loans acquired under our Refi Plus initiative. See "Changes in the Credit Profile of our Single-Family Acquisitions" for further information on Refi Plus.

(3)    Newly originated Alt-A loans acquired in 2009 through 2011 consist of the refinance of existing loans.

(4)    Loans acquired prior to 2001, which comprised approximately 1% of our single-family conventional guaranty book of business as of December 31, 2011, are not included in this table. We expect loans we acquired prior to 2001, in the aggregate, to be profitable over their lifetime.

(5)    Although we do not expect loans we acquired in 2004 to be profitable over their lifetime, we expect loans we acquired in 2001 through 2004 will, in the aggregate, be profitable over their lifetime. We have combined loans acquired in 2004 with loans from prior years because we made significant changes to our acquisition policies that affected the loans we acquired in 2005 through 2008. We expect our credit losses from loans we acquired in 2004, which are due to home price declines and prolonged unemployment, will be significantly smaller than those generated by loans we acquired in 2005 through 2008.

While Table 2 covers all of the single-family conventional loans we acquired in each period presented (or, in the case of the serious delinquency rate, those still in our book of business four quarters after the end of the year they were acquired), Table 3 displays information about loans that remained in our single-family conventional guaranty book of business as of December 31, 2011.

**Table 3:   Selected Credit Characteristics of Single-Family Conventional Loans Held, by Acquisition Period**

| | As of December 31, 2011 | | | |
|---|---|---|---|---|
| | % of Single-Family Conventional Guaranty Book of Business[1] | Current Estimated Mark-to-Market LTV Ratio[1] | Current Mark-to-Market LTV Ratio >100%[1][2] | Serious Delinquency Rate[3] |
| Year of Acquisition: | | | | |
| New Single-Family Book of Business: | | | | |
| 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19% | 70% | 4% | 0.05% |
| 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 | 72 | 5 | 0.30 |
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 | 73 | 6 | 0.62 |
| Total New Single-Family Book of Business . . . . . . . . | 53 | 71 | 5 | 0.31 |
| Legacy Book of Business: | | | | |
| 2005-2008 . . . . . . . . . . . . . . . . . . . . . . . . . . | 31 | 103 | 45 | 9.39 |
| 2004 and prior . . . . . . . . . . . . . . . . . . . . . . . . | 16 | 60 | 8 | 3.32 |
| Total Single-Family Book of Business . . . . . . . . . . . . | 100 | 79 | 18 | 3.91 |

---

(1)    Calculated based on the aggregate unpaid principal balance of single-family loans for each category divided by the aggregate unpaid principal balance of loans in our single-family conventional guaranty book of business as of December 31, 2011.

(2)    The majority of loans in our new single-family book of business as of December 31, 2011 with mark-to-market LTV ratios over 100% were loans acquired under our Refi Plus initiative. See "Changes in the Credit Profile of our Single-Family Acquisitions" for further information on Refi Plus.

(3)    The serious delinquency rates for loans acquired in more recent years will be higher after the loans have aged, but we do not expect them to approach the levels of the December 31, 2011 serious delinquency rates of loans in our legacy book of business.

TREASURY-2406

*The performance we expect for our single-family loans*

As Table 2 shows, we expect loans we have acquired since the beginning of 2009 to be profitable, in contrast to loans we acquired in 2005 through 2008. Our expectations regarding the ultimate performance of our loans are based on numerous expectations and assumptions, including those relating to expected changes in regional and national home prices, borrower behavior, public policy and other macroeconomic factors. If future conditions are more unfavorable than our expectations, loans we acquired in 2009, 2010 and 2011 could become unprofitable. For example, we expect that credit losses on these loans would exceed guaranty fee revenue if home prices declined nationally by approximately 10% from their December 2011 levels over the next five years, based on our home price index. See "Outlook" for our expectations regarding home price declines.

In our experience, an early predictor of the ultimate performance of a portfolio of loans is the rate at which the loans become seriously delinquent within a short period of time after acquisition. As Table 2 shows, the percentage of our 2009 and 2010 acquisitions that were seriously delinquent as of the end of the fourth quarter following their acquisition year was substantially lower than the average comparable serious delinquency rate for loans acquired in 2005 through 2008. Table 3 displays the serious delinquency rate for our loans as of December 31, 2011.

*Changes in the Credit Profile of Our Single-Family Acquisitions*

Single-family loans we purchased or guaranteed from 2005 through 2008 were acquired during a period when home prices were rising rapidly, peaked, and then started to decline sharply, and underwriting and eligibility standards were more relaxed than they are now. These loans were characterized by higher loan-to-value ("LTV") ratios and lower FICO credit scores than loans we have acquired since January 1, 2009. In addition, many of these loans were Alt-A loans or had other higher-risk loan attributes such as interest-only payment features. As a result of the sharp declines in home prices, 45% of loans we acquired from 2005 through 2008, measured by unpaid principal balance, had mark-to-market LTV ratios that were greater than 100% as of December 31, 2011, which means the principal balance of the borrower's primary mortgage exceeded the current market value of the borrower's home. The percentage of borrowers who owed more than their home's value is higher when second-lien loans are included. The sharp decline in home prices, the severe economic recession that began in December 2007 and continued through June 2009, and continuing high unemployment and underemployment have significantly and adversely impacted the performance of loans we acquired from 2005 through 2008. Our 2005 through 2008 acquisitions are becoming a smaller percentage of our single-family guaranty book of business, having decreased from 39% of our single-family guaranty book of business as of December 31, 2010 to 31% as of December 31, 2011.

Improvements in the credit risk profile of our acquisitions since the beginning of 2009 over acquisitions in prior years reflect changes that we made, beginning in 2008, to our pricing and eligibility standards and underwriting. These changes were intended to more accurately reflect the risk in the housing market and to significantly reduce our acquisitions of loans with higher-risk attributes. The improvements also reflect changes that mortgage insurers made to their eligibility standards. We believe the strong early performance of loans in our new single-family book of business despite the home price declines and high unemployment of the last few years is attributable to their strong credit risk profile.

The credit risk profile of loans in our new single-family book of business has been further influenced by the inclusion of a significant percentage of refinanced loans. One effect has been that the original LTV ratios of loans we acquired in each of 2010 and 2011 increased from the prior year as a result of our acquisition of loans with higher LTV ratios under our Refi Plus initiative. Refi Plus includes loans refinanced under the Home Affordable Refinance Program ("HARP"), which was established by the Administration to help borrowers who may otherwise be unable to refinance the mortgage loan on their primary residence due to a decline in home values. Original LTV ratios also increased in 2011 as a result of changes by mortgage insurers and the Federal Housing Administration ("FHA") that improved the economics of obtaining private mortgage insurance and drove an increase in our market share of home purchase mortgages with LTV ratios greater than 80%. We discuss refinancings and their impact on credit risk characteristics, as well as other changes in the credit risk

- 12 -

TREASURY-2407

characteristics of our loan acquisitions, in more detail in "MD&A—Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management."

Whether the loans we acquire in the future will exhibit an overall credit profile similar to our more recent acquisitions will depend on a number of factors, including our future pricing and eligibility standards and those of mortgage insurers and FHA, the percentage of loan originations representing refinancings, our future objectives, government policy, market and competitive conditions, and the volume and characteristics of loans we acquire under the recently announced changes to the terms of HARP.

### Expected Losses on Our Legacy Book of Business

The single-family credit losses we realized in 2009 through 2011, combined with the amounts we have reserved for single-family credit losses as of December 31, 2011, as described below, total approximately $140 billion. A substantial majority of these losses are attributable to single-family loans we purchased or guaranteed from 2005 through 2008.

While loans we acquired in 2005 through 2008 will give rise to additional credit losses that we will realize when the loans are charged off (upon foreclosure or our acceptance of a short sale or deed-in-lieu of foreclosure), we estimate that we have reserved for the substantial majority of the remaining losses on these loans. Even though we believe a substantial majority of the credit losses we have yet to realize on these loans has already been reflected in our results of operations as credit-related expenses, our credit-related expenses have remained high as weakness in the housing and mortgage markets continues. We expect that our credit-related expenses will continue to be high in 2012 but that, overall, our credit-related expenses will be lower in 2012 than in 2011. The amount of credit-related expenses we incur each period will be affected by changes in expected and actual home prices, modifications and foreclosure activity during the period.

We expect our loss reserves will remain significantly elevated relative to historical levels for an extended period because (1) we expect future defaults on loans in our legacy book of business and the resulting charge-offs will occur over a period of years and (2) a significant portion of our reserves represents concessions granted to borrowers upon modification of their loans and will remain in our reserves until the loans are fully repaid or default. In addition, given the large existing and anticipated supply of single-family homes in the market, we anticipate that it will take years before our REO inventory is reduced to pre-2008 levels.

We show how we calculate our realized credit losses in "Table 15: Credit Loss Performance Metrics." Our reserves for credit losses described in this discussion consist of (1) our allowance for loan losses, (2) our allowance for accrued interest receivable, (3) our allowance for preforeclosure property taxes and insurance receivables, and (4) our reserve for guaranty losses (collectively, our "total loss reserves"), plus the portion of fair value losses on loans purchased out of unconsolidated MBS trusts reflected in our consolidated balance sheets that we estimate represents accelerated credit losses we expect to realize. For more information on our reserves for credit losses, see "Table 11: Total Loss Reserves."

The fair value losses that we consider part of our reserves are not included in our "total loss reserves." We recorded the majority of these fair value losses prior to our adoption in 2010 of accounting guidance on the transfers of financial assets and the consolidation of variable interest entities. Before we adopted this guidance, upon our acquisition of credit-impaired loans out of unconsolidated MBS trusts, we recorded fair value loss charge-offs against our reserve for guaranty losses. The amount of these charge-offs was the amount by which the acquisition cost of these loans exceeded their estimated fair value. We expect to realize a portion of these fair value losses as credit losses in the future (for loans that eventually involve foreclosures, short sales or deeds-in-lieu of foreclosure), yet these fair value losses have already reduced the mortgage loan balances reflected in our consolidated balance sheets and have effectively been recognized in our consolidated statements of operations and comprehensive loss through our provision for guaranty losses. We consider these fair value losses as an "effective reserve," apart from our total loss reserves, to the extent that we expect to realize these amounts as credit losses on the acquired loans in the future.

- 13 -

**Reducing Credit Losses on Our Legacy Book of Business**

To reduce the credit losses we ultimately incur on our legacy book of business, we have been focusing our efforts on the following strategies:

- Reducing defaults by offering borrowers solutions that enable them to keep their homes ("home retention solutions");

- Pursuing "foreclosure alternatives," which help borrowers avoid foreclosure and reduce the severity of the losses we incur overall;

- Efficiently managing timelines for home retention solutions, foreclosure alternatives, and foreclosures;

- Improving servicing standards and servicers' execution and consistency;

- Managing our REO inventory to minimize costs and maximize sales proceeds; and

- Pursuing contractual remedies from lenders, servicers and providers of credit enhancement.

As we work to reduce credit losses, we also seek to assist distressed borrowers, help stabilize communities, and support the housing market. In dealing with distressed borrowers, we first seek home retention solutions before turning to foreclosure alternatives. When there is no viable home retention solution or foreclosure alternative that can be applied, we seek to move to foreclosure expeditiously. Prolonged delinquencies hurt local home values and destabilize communities, as these homes often go into disrepair. As a general rule, the longer borrowers remain delinquent, the greater our costs, and the more prices for surrounding homes deteriorate.

*Reducing Defaults.*   Home retention solutions are a key element of our strategy to reduce defaults, and the majority of our home retention solutions are loan modifications. Successful modifications allow borrowers who were having problems making their pre-modification mortgage payments to remain in their homes. While loan modifications contribute to higher credit-related expenses in the near term, we believe that successful modifications (those that enable borrowers to remain current on their loans) will ultimately reduce our credit losses over the long term from what they otherwise would have been if we had taken the loans to foreclosure. We completed approximately 213,000 loan modifications in 2011, bringing the total number of loan modifications we have completed since January 2009 to over 715,000. The substantial majority of these modifications involved deferring or lowering borrowers' monthly mortgage payments, which we believe increases the likelihood borrowers will be able to remain current on their modified loans. Borrowers' ability to pay their modified loans has improved in recent periods as we have enhanced the structure of our modifications. For loans modified outside of HAMP, one year after modification, 67% of modifications we made in the fourth quarter of 2010 were performing, compared with 50% of our fourth quarter 2009 modifications. For loans modified under HAMP, one year after modification, 74% of our HAMP modifications made in the fourth quarter of 2010 were performing, compared with 73% of our HAMP modifications made in the fourth quarter of 2009. We began changing the structure of our non-HAMP modifications in 2010 to lower borrowers' monthly mortgage payments to a greater extent, which improved the performance of our non-HAMP modifications overall. In addition, because post-modification performance was greater for our HAMP modifications than for our non-HAMP modifications, we began in September 2010 to include trial periods for our non-HAMP modifications, similar to those for HAMP modifications. Whether modifications are ultimately successful depends heavily on economic factors, such as unemployment rates, household wealth and income, and home prices, as well as borrowers' willingness to pay their loans. See "Table 46: Statistics on Single-Family Loan Workouts" and the accompanying discussion for additional information on our home retention efforts, as well as our foreclosure alternatives. For a description of the impact of modifications on our credit-related expenses, see "Consolidated Results of Operations—Credit-Related Expenses—Provision for Credit Losses."

*Pursuing Foreclosure Alternatives.*   If we are unable to provide a viable home retention solution for a distressed borrower, we seek to offer a foreclosure alternative and complete it in a timely manner. Our foreclosure alternatives are primarily short sales, which are also known as preforeclosure sales, as well as deeds-in-lieu of foreclosure. Overall, these alternatives reduce the severity of our loss resulting from a borrower's default while

- 14 -

enabling the borrower to avoid going through a foreclosure. We provide information about the volume of foreclosure alternatives we completed in 2011 in "Table 4: Credit Statistics, Single-Family Guaranty Book of Business."

*Managing Timelines for Workouts and Foreclosures.*    We refer to home retention solutions and foreclosure alternatives as "workouts." We believe that home retention solutions are most effective in preventing defaults when completed at an early stage of delinquency. Similarly, our foreclosure alternatives are more likely to be successful in reducing our loss severity if they are executed expeditiously. Accordingly, it is important to us for our servicers to work with delinquent borrowers early in the delinquency to determine whether home retention solutions or foreclosure alternatives will be viable and, where no workout solution is viable, to reduce delays in completing foreclosure.

Circumstances in the foreclosure environment have resulted in foreclosures proceeding at a slow pace. As a result of the housing market downturn that began in 2006 and significantly worsened in 2008, the volume of foreclosures to be processed by servicers and states significantly increased in 2009 and the first nine months of 2010. In October 2010, a number of single-family mortgage servicers temporarily halted some or all of the foreclosures they were processing after discovering deficiencies in their foreclosure processes and the processes of their service providers. In response to the foreclosure process deficiencies, some states changed their foreclosure processes to require additional review and verification of the accuracy of pending and future foreclosure filings. Some states also added requirements to the foreclosure process, including mediation processes and requirements to file new affidavits. Further, some state courts have issued rulings calling into question the validity of some existing foreclosure practices. These actions halted or significantly delayed not only existing, but new foreclosures. In addition to the new legislative, regulatory, and judicial requirements applicable to servicers generally, five of the nation's largest mortgage servicers (Bank of America Corporation, JPMorgan Chase & Co., Wells Fargo & Company, Citigroup Inc., and Ally Financial Inc. (formerly GMAC)) have agreed in principle to implement certain new servicing and foreclosure practices as part of a settlement announced February 9, 2012, with the federal government and 49 state attorneys general.

While servicers have generally ended their outright foreclosure halts, they continue to process foreclosures at a slow pace as they update their procedures to remediate their process deficiencies and meet new legislative, regulatory and judicial requirements. Servicers and states are also dealing with the backlog of foreclosures resulting from these delays and from the elevated level of foreclosures resulting from the housing market downturn.

Foreclosures generally take longer to complete in states where judicial foreclosures are required than in states where non-judicial foreclosures are permitted. For foreclosures completed in 2011, measuring from the last monthly period for which the borrowers fully paid their mortgages to when we added the related properties to our REO inventory, the average number of days it took to ultimately foreclose ranged from a low of 391 days in Missouri, a non-judicial foreclosure state, to a high of 890 days in Florida, a judicial foreclosure state. As of December 31, 2011, Florida accounted for 30% of our loans that were in the foreclosure process.

The slow pace of foreclosures has significantly impacted our ability to reduce our serious delinquency rate. The serious delinquency rate for our single-family conventional loans decreased from 5.38% as of December 31, 2009 to 3.91% as of December 31, 2011, driven by our home retention solutions, as well as foreclosure alternatives and completed foreclosures. The decrease is also attributable to our acquisition of loans with stronger credit profiles since the beginning of 2009, as these loans are now more than 50% of our single-family guaranty book of business, resulting in a smaller percentage of our loans becoming seriously delinquent. While workouts reduced our population of seriously delinquent loans, for some seriously delinquent loans no workout solution is viable. Longer foreclosure timelines result in these loans remaining in our book of business for a longer time, which has caused our serious delinquency rate to decrease more slowly in the last year than it would have if the pace of foreclosures had been faster. Extended foreclosure timelines also increase our costs of holding loans in the foreclosure process. In addition, to the extent home prices decline while foreclosure proceedings are drawn out, the proceeds we ultimately receive from the sale of the foreclosed properties will be lower. We believe the

- 15 -

changes in the foreclosure environment discussed above will continue to negatively affect our single-family serious delinquency rates, foreclosure timelines and credit-related expenses. Moreover, we believe these conditions will delay the recovery of the housing market because it will take longer to clear the market's supply of distressed homes. Distressed homes typically sell at a discount compared to non-distressed homes and, therefore, a lingering population of distressed homes will continue to negatively affect overall home prices. See "Risk Factors" for further information about the potential impact of the foreclosure process deficiencies and resulting changes in the foreclosure environment on our business, results of operations, financial condition and net worth.

*Improving Servicing Standards and Execution.*   The performance of our mortgage servicers is critical to our success in reducing defaults, completing foreclosure alternatives and managing workout and foreclosure timelines efficiently, because servicers are the primary point of contact with borrowers. Improving servicing standards is therefore a key aspect of our strategy to reduce our credit losses. We are taking a number of steps to improve the servicing of our delinquent loans.

- In June 2011, we issued new standards for mortgage servicers under FHFA's Servicing Alignment Initiative. The initiative is aimed at establishing consistency in the servicing of delinquent loans owned or guaranteed by Fannie Mae and Freddie Mac. Among other things, the new servicing standards, which became effective October 1, 2011, are designed to result in earlier, more frequent and more effective contact with borrowers and to improve servicer performance by providing servicers monetary incentives for exceeding loan workout benchmarks and by imposing fees on servicers for failing to meet loan workout benchmarks or foreclosure timelines.

- In some cases, we transfer servicing on loan populations that include loans with higher-risk characteristics to special servicers with whom we have worked to develop high-touch protocols for servicing these loans. These protocols include lowering the ratio of loans per servicer employee, prescribing borrower outreach strategies to be used at early stages of delinquency, and providing distressed borrowers a single point of contact to resolve issues. Transferring servicing on higher-risk loans enables the borrowers (and loans) to benefit from these high-touch protocols while increasing the original servicer's capacity to service the remaining loans, creating an opportunity to improve service to the remaining borrowers.

- In September 2011, we issued our first ratings of servicers' performance under our Servicer Total Achievement and Rewards ("STAR") program. The STAR program is designed to encourage improvements in customer service and foreclosure prevention outcomes for homeowners by rating servicers on their performance in these areas.

While we believe these steps will improve the servicing of our loans, ultimately we are dependent on servicers' willingness, efficiency and ability to implement our home retention solutions and foreclosure alternatives, and to manage timelines for workouts and foreclosures.

*Managing Our REO Inventory.*   Efficient management of our REO inventory of homes acquired through deed-in-lieu of foreclosure or foreclosure is another critical element of our strategy for reducing credit losses. Since January 2009, we have strengthened our REO sales capabilities by increasing resources, as we continue to manage our REO inventory to minimize costs and maximize sales proceeds. As Table 4 shows, the volume of our property dispositions increased in 2010 and 2011.

Neighborhood stabilization is a core principle in our approach to managing our REO inventory. As a result, we seek to keep properties in good condition and, in some cases, repair them to make them more marketable. Our goal is to obtain the highest price possible for the properties we sell. In 2011, we completed repairs to approximately 89,800 properties sold from our single-family REO inventory, at an average cost of approximately $6,200 per property. Repairing REO properties increases sales to owner occupants and increases financing options for REO buyers. In addition, we encourage homeownership through our "First Look" marketing period. During this "First Look" period, owner occupants, some nonprofit organizations and public entities may submit offers and purchase properties without competition from investors. Approximately 145,000 of the 244,000 single-family properties we sold in 2011 were purchased by owner occupants, nonprofit organizations or public entities.

We currently lease properties to tenants who occupied the properties before we acquired them into our REO inventory, which can minimize disruption by providing additional time to find alternate housing, help stabilize local communities, provide us with rental income, and support our compliance with federal and state laws protecting tenants in foreclosed properties. As of December 31, 2011, over 9,000 tenants leased our REO properties.

The changing foreclosure environment discussed above has delayed our acquisitions of REO properties. Given the large number of seriously delinquent loans in our single-family guaranty book of business and the large existing and anticipated supply of single-family homes in the market, we expect it will take years before our REO inventory approaches pre-2008 levels.

In February 2012, FHFA announced that it was beginning the pilot phase of an REO initiative that will allow qualified investors to purchase pools of foreclosed properties from us with the requirement to rent the purchased properties for a specified number of years. During the pilot phase, we will offer for sale pools of various types of assets including rental properties, vacant properties and nonperforming loans with a focus on the hardest-hit areas. The pilot transactions are expected to provide insight into how the participation of private investors can maximize the value of foreclosed properties and stabilize communities. We do not yet know whether this initiative will have a material impact on our future REO sales and REO inventory levels.

*Pursuing Contractual Remedies.*   We conduct targeted reviews of our loans and, when we discover loans that do not meet our underwriting or eligibility requirements, we may make demands for lenders to repurchase these loans or compensate us for losses sustained on the loans. We also make demands for lenders to repurchase or compensate us for loans for which the mortgage insurer rescinds coverage. The volume of our repurchase requests remained high in 2011, and we expect it to continue to remain high.

We requested lenders to repurchase from us or reimburse us for losses associated with loans with an unpaid principal balance of $23.8 billion during 2011. As of December 31, 2011, approximately 57% of these requests had been successfully resolved through repurchase, reimbursement or other remedies, and approximately 40% remained outstanding. Also as of December 31, 2011, approximately 90% of the $13.1 billion in repurchase requests we made in 2010, as measured by unpaid principal balance, had been successfully resolved, and approximately 5% remained outstanding. During 2011, lenders repurchased from us or reimbursed us for losses on approximately $11.5 billion in loans, measured by unpaid principal balance, pursuant to their contractual obligations. In addition, as of December 31, 2011, we had outstanding requests for lenders to repurchase from us or reimburse us for losses on $10.4 billion in loans, of which 30% had been outstanding for more than 120 days.

These dollar amounts represent the unpaid principal balance of the loans underlying the repurchase requests, not the actual amounts we have received or requested from the lenders. When lenders pay us for these requests, they pay us either to repurchase the loans or else to make us whole for our losses in cases where we have acquired and disposed of the property underlying the loans. Make-whole payments are typically for less than the unpaid principal balance because we have already recovered some of the original unpaid loan balance through the sale of the REO. As a result, our actual cash receipts relating to these outstanding repurchase requests are significantly lower than the unpaid principal balance of the loans.

In cases where a lender fails to timely honor its repurchase obligations to us, we may take additional steps to address the issue, including requiring the lender to post collateral, suspending all or a portion of our agreements with the lender, or even terminating our arrangements to acquire new loans from them. We discuss our repurchase requests and the steps we may take to address lenders' failures to honor their repurchase obligations in "MD&A—Risk Management—Institutional Counterparty Credit Risk Management—Mortgage Seller/ Servicers."

We are also pursuing contractual remedies from providers of credit enhancement on our loans, including mortgage insurers. We received proceeds under our mortgage insurance policies for single-family loans of $5.8 billion in 2011. See "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk

- 17 -

Management" for a discussion of our repurchase and reimbursement requests and outstanding receivables from mortgage insurers, as well as the risk that one or more of these counterparties fails to fulfill its obligations to us.

*Impact of Our Actions to Reduce Our Credit Losses.*    We believe the actions we have taken to stabilize the housing market and minimize our credit losses will reduce our future credit losses below what they otherwise would have been. However, continuing change in broader market conditions makes it difficult to predict how effective these actions ultimately will be in reducing our credit losses. Moreover, it will be difficult to measure the ultimate impact of our actions, given that current conditions in the housing market are unprecedented.

For more information on the strategies and actions we are taking to minimize our credit losses, see "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management."

**Credit Performance**

Table 4 presents information for each quarter of 2011 and for 2010 about the credit performance of mortgage loans in our single-family guaranty book of business and our workouts. The workout information in Table 4 does not reflect repayment plans and forbearances that have been initiated but not completed, nor does it reflect trial modifications that have not become permanent.

**Table 4:   Credit Statistics, Single-Family Guaranty Book of Business[1]**

| | 2011 | | | | | 2010 |
|---|---|---|---|---|---|---|
| | Full Year | Q4 | Q3 | Q2 | Q1 | Full Year |
| | | | (Dollars in millions) | | | |
| **As of the end of each period:** | | | | | | |
| Serious delinquency rate[2] . . . . . . . . . . . . . . . . . . | 3.91% | 3.91% | 4.00% | 4.08% | 4.27% | 4.48% |
| Seriously delinquent loan count . . . . . . . . . . . . . . | 690,911 | 690,911 | 708,847 | 729,772 | 767,161 | 801,640 |
| Nonperforming loans[3] . . . . . . . . . . . . . . . . . . . . . | $ 248,379 | $248,379 | $248,134 | $245,848 | $248,444 | $ 251,631 |
| Foreclosed property inventory: | | | | | | |
| Number of properties . . . . . . . . . . . . . . . . . . . . . | 118,528 | 118,528 | 122,616 | 135,719 | 153,224 | 162,489 |
| Carrying value  . . . . . . . . . . . . . . . . . . . . . . . | $    9,692 | $    9,692 | $ 11,039 | $ 12,480 | $ 14,086 | $   14,955 |
| Combined loss reserves[4] . . . . . . . . . . . . . . . . . . . | $ 71,512 | $ 71,512 | $ 70,741 | $ 68,887 | $ 66,240 | $   60,163 |
| Total loss reserves [5] . . . . . . . . . . . . . . . . . . . . . . . | $ 75,264 | $ 75,264 | $ 73,973 | $ 73,116 | $ 70,466 | $   64,469 |
| **During the period:** | | | | | | |
| Foreclosed property (number of properties): | | | | | | |
| Acquisitions[6] . . . . . . . . . . . . . . . . . . . . . . . . . . | 199,696 | 47,256 | 45,194 | 53,697 | 53,549 | 262,078 |
| Dispositions  . . . . . . . . . . . . . . . . . . . . . . . . . . . | (243,657) | (51,344) | (58,297) | (71,202) | (62,814) | (185,744) |
| Credit-related expenses[7] . . . . . . . . . . . . . . . . . . . | $ 27,218 | $   5,397 | $   4,782 | $   5,933 | $ 11,106 | $   26,420 |
| Credit losses[8] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 18,346 | $   4,548 | $   4,384 | $   3,810 | $   5,604 | $   23,133 |
| **Loan workout activity (number of loans):** | | | | | | |
| Home retention loan workouts[9] . . . . . . . . . . . . . . | 248,658 | 60,453 | 68,227 | 59,019 | 60,959 | 440,276 |
| Short sales and deeds-in-lieu of foreclosure  . . . . . | 79,833 | 22,231 | 19,306 | 21,176 | 17,120 | 75,391 |
| Total loan workouts . . . . . . . . . . . . . . . . . . . . . . . . | 328,491 | 82,684 | 87,533 | 80,195 | 78,079 | 515,667 |
| Loan workouts as a percentage of delinquent loans in our guaranty book of business[10] . . . . . . . . . . | 27.05% | 27.24% | 28.39% | 25.71% | 25.01% | 37.30% |

---

[1]   Our single-family guaranty book of business consists of (a) single-family mortgage loans held in our mortgage portfolio, (b) single-family mortgage loans underlying Fannie Mae MBS, and (c) other credit enhancements that we provide on

- 18 -

single-family mortgage assets, such as long-term standby commitments. It excludes non-Fannie Mae mortgage-related securities held in our mortgage portfolio for which we do not provide a guaranty.

(2)   Calculated based on the number of single-family conventional loans that are three or more months past due and loans that have been referred to foreclosure but not yet foreclosed upon, divided by the number of loans in our single-family conventional guaranty book of business. We include all of the single-family conventional loans that we own and those that back Fannie Mae MBS in the calculation of the single-family serious delinquency rate.

(3)   Represents the total amount of nonperforming loans including troubled debt restructurings and HomeSaver Advance ("HSA") first-lien loans. A troubled debt restructuring is a restructuring of a mortgage loan in which a concession is granted to a borrower experiencing financial difficulty. HSA first-lien loans are unsecured personal loans in the amount of past due payments used to bring mortgage loans current. We generally classify loans as nonperforming when the payment of principal or interest on the loan is two months or more past due. In December 2011, we changed our definition of "total nonperforming loans." Under our new definition, we no longer reflect in this amount (1) our allowance for loan losses or (2) our allowance for accrued interest receivable related to these individually impaired loans. The amounts we report for prior periods have been revised from amounts we previously disclosed as a result of this change.

(4)   Consists of the allowance for loan losses for loans recognized in our consolidated balance sheets and the reserve for guaranty losses related to both single-family loans backing Fannie Mae MBS that we do not consolidate in our consolidated balance sheets and single-family loans that we have guaranteed under long-term standby commitments. For additional information on the change in our loss reserves see "Consolidated Results of Operations—Credit-Related Expenses—Provision for Credit Losses."

(5)   Consists of (a) the combined loss reserves, (b) allowance for accrued interest receivable, and (c) allowance for preforeclosure property taxes and insurance receivables.

(6)   Includes acquisitions through deeds-in-lieu of foreclosure.

(7)   Consists of the provision for loan losses, the provision (benefit) for guaranty losses and foreclosed property expense (income).

(8)   Consists of (a) charge-offs, net of recoveries and (b) foreclosed property expense; adjusted to exclude the impact of fair value losses resulting from credit-impaired loans acquired from MBS trusts.

(9)   Consists of (a) modifications, which do not include trial modifications or repayment plans or forbearances that have been initiated but not completed; (b) repayment plans and forbearances completed and (c) HomeSaver Advance first-lien loans. See "Table 46: Statistics on Single-Family Loan Workouts" in "Risk Management—Credit Risk Management" for additional information on our various types of loan workouts.

(10)   Calculated based on annualized problem loan workouts during the period as a percentage of delinquent loans in our single-family guaranty book of business as of the end of the period.

Our single-family serious delinquency rate has decreased each quarter since the first quarter of 2010. The decrease in our serious delinquency rate is the result of home retention solutions, as well as foreclosure alternatives and completed foreclosures. The decrease is also attributable to our acquisition of loans with stronger credit profiles since the beginning of 2009, as these loans are now more than 50% of our single-family guaranty book of business, resulting in a smaller percentage of our loans becoming seriously delinquent.

Although our single-family serious delinquency rate has decreased significantly since the first quarter of 2010, our serious delinquency rate and the period of time that loans remain seriously delinquent has been negatively affected in recent periods by the increase in the average number of days it is taking to complete a foreclosure. As described in "Reducing Credit Losses on Our Legacy Book of Business—Managing Timelines for Workouts and Foreclosures," high levels of foreclosures, continuing issues in the servicer foreclosure process and new legislative, regulatory and judicial requirements have lengthened the time it takes to foreclose on a mortgage loan in many states. We expect serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process, the volume of loan modifications, and the extent to which borrowers with modified loans continue to make timely payments.

We provide additional information on our credit-related expenses in "Consolidated Results of Operations— Credit-Related Expenses" and on the credit performance of mortgage loans in our single-family book of business and our loan workouts in "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management."

- 19 -

**Liquidity**

During 2011, we issued a variety of non-callable and callable debt securities in a wide range of maturities to achieve cost-efficient funding and to extend our debt maturity profile. We believe that our ready access to debt funding since the beginning of 2009 has been primarily due to the actions taken by the federal government to support us and the financial markets. Accordingly, we believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially and adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition, results of operations and ability to continue as a going concern. Demand for our debt securities could decline in the future, as the Administration, Congress and our regulators debate our future. See "MD&A—Liquidity and Capital Management—Liquidity Management" for more information on our debt funding activities and "Risk Factors" for a discussion of the risks to our business posed by our reliance on the issuance of debt securities to fund our operations.

**Outlook**

*Overall Market Conditions.*    We expect weakness in the housing and mortgage markets to continue in 2012. The high level of delinquent mortgage loans will ultimately result in high levels of foreclosures, which is likely to add to the excess housing inventory.

We expect that single-family default and severity rates, as well as the level of single-family foreclosures, will remain high in 2012. Despite signs of multifamily sector improvement at the national level, we expect multifamily charge-offs in 2012 to remain generally commensurate with 2011 levels as certain local markets and properties continue to exhibit weak fundamentals. Conditions may worsen if the unemployment rate increases on either a national or regional basis.

We expect that changes to HARP announced in October 2011, which we discuss in "Making Home Affordable Program," will result in our acquiring more refinancings in 2012 than we would have acquired in the absence of the changes. However, we expect fewer refinancings overall in 2012 than in 2011 because a high number of mortgages have already refinanced to low rates in recent years. As a result, we expect our loan acquisitions for 2012 will be lower than in 2011. Our loan acquisitions also could be negatively affected by the decrease in the maximum size of loans we may acquire in specified high-cost areas from $729,750 to $625,500 beginning in the fourth quarter of 2011. As our acquisitions decline, our future revenues will be negatively impacted.

We estimate that total originations in the U.S. single-family mortgage market in 2012 will decrease from 2011 levels by approximately 23%, from an estimated $1.4 trillion to an estimated $1.1 trillion, and that the amount of originations in the U.S. single-family mortgage market that are refinancings will decline from approximately $896 billion to approximately $568 billion. Refinancings comprised approximately 76% of our single-family business volume in 2011, compared with 78% in 2010.

*Home Price Declines.*    We estimate that U.S. home prices have declined by 23% from their peak in the third quarter of 2006. While the rate of decline in home prices has moderated in recent quarters, we expect that home prices on a national basis will decline further before stabilizing in 2013. We currently expect a peak-to-trough home price decline on a national basis ranging from 23% to 30%, but believe that it would take the occurrence of an additional adverse economic event to reach the high end of the range. Future home price changes may be very different from our estimates as a result of significant inherent uncertainty in the current market environment, including uncertainty about the effect of actions the federal government has taken and may take with respect to tax policies, mortgage finance programs and policies and housing finance reform; the management of the Federal Reserve's MBS holdings; and the impact of those actions on home prices, unemployment and the general economic and interest rate environment. Because of these uncertainties, the actual home price decline we experience may differ significantly from these estimates. We also expect significant regional variation in home price declines and stabilization.

- 20 -

Our estimates of home price declines are based on our home price index, which is calculated differently from the S&P/Case-Shiller U.S. National Home Price Index and therefore results in different percentages for comparable declines. Our 23% to 30% peak-to-trough home price decline estimate corresponds to an approximate 32% to 40% peak-to-trough decline using the S&P/Case-Shiller index method. Our estimates differ from the S&P/Case-Shiller index in two principal ways: (1) our estimates weight expectations by number of properties, whereas the S&P/Case-Shiller index weights expectations based on property value, causing home price changes on higher priced homes to have a greater effect on the overall result; and (2) the S&P/Case-Shiller index includes sales of foreclosed homes while our estimates attempt to exclude foreclosed home sales, because we believe that differing maintenance practices and the forced nature of the sales make foreclosed home prices less representative of market values. We believe, however, that the impact of sales of foreclosed homes is indirectly reflected in our estimates as a result of their impact on the pricing of non- distressed sales. We estimate S&P/Case-Shiller comparison numbers by adjusting our internal home price estimates to compensate for the principal differences—weighting based on property value and including foreclosed property sales. In addition to these differences, our estimates are based on our own internally available data combined with publicly available data, and are therefore based on data collected nationwide, whereas the S&P/Case-Shiller index is based on publicly available data, which may be limited in certain geographic areas of the country. Our comparative calculations to the S&P/Case-Shiller index provided above are not adjusted to compensate for this data pool difference.

*Credit-Related Expenses and Credit Losses.*   Our credit-related expenses, which include our provision for credit losses, reflect our recognition of losses on our loans. Through our provision for credit losses, we recognize credit-related expenses on loans in the period in which we determine that we have incurred a probable loss on the loans as of the end of the period, or in which we have granted concessions to the borrowers. Accordingly, our credit-related expenses in each period are affected by changes in actual and expected home prices, borrower payment behavior, the types and volumes of loss mitigation activities and foreclosures we complete, and estimated recoveries from our lender and mortgage insurer counterparties. Our credit losses, which include our charge-offs, net of recoveries, reflect our realization of losses on our loans. We realize losses on loans, through our charge-offs, when foreclosure sales are completed or when we accept short sales or deeds-in-lieu of foreclosure. We expect that our credit-related expenses will remain high in 2012 but that, overall, our credit-related expenses will be lower in 2012 than in 2011. We expect our credit losses in 2012 to remain high. To the extent delays in foreclosures continue in 2012, our realization of some credit losses will be delayed. We further describe our credit loss outlook in "Our Strong New Book of Business and Expected Losses on our Legacy Book of Business—Expected Losses on Our Legacy Book of Business."

*Uncertainty Regarding our Long-Term Financial Sustainability and Future Status.*   There is significant uncertainty in the current market environment, and any changes in the trends in macroeconomic factors that we currently anticipate, such as home prices and unemployment, may cause our future credit-related expenses and credit losses to vary significantly from our current expectations. Although Treasury's funds under the senior preferred stock purchase agreement permit us to remain solvent and avoid receivership, the resulting dividend payments are substantial. We do not expect to earn profits in excess of our annual dividend obligation to Treasury for the indefinite future. In his February 2012 letter to Congress, the Acting Director of FHFA wrote, "[I]t is clear that the draws [Fannie Mae and Freddie Mac] have taken from the Treasury are so large they cannot be repaid under any foreseeable scenarios." We expect to request additional draws under the senior preferred stock purchase agreement in future periods, which will further increase the dividends we owe to Treasury on the senior preferred stock. We expect that, over time, our dividend obligation to Treasury will constitute an increasing portion of our future draws under the senior preferred stock purchase agreement. As a result of these factors, there is significant uncertainty about our long-term financial sustainability.

In addition, there is significant uncertainty regarding the future of our company, including how long the company will continue to be in its current form, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. We expect this uncertainty to continue. In February 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report states that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and

TREASURY-2416

Freddie Mac. The report emphasizes the importance of providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. On February 2, 2012, Treasury Secretary Geithner stated that the Administration intended to release new details around approaches to housing finance reform, including winding down Fannie Mae and Freddie Mac, in the spring of 2012 and to work with Congressional leaders to explore options for legislation, but that he does not expect housing finance reform legislation to be enacted in 2012.

We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding long-term reform of the GSEs. See "Legislative and Regulatory Developments" for a discussion of recent legislative reform of the financial services industry and proposals for GSE reform that could affect our business. See "Risk Factors" for a discussion of the risks to our business relating to the uncertain future of our company.

## MORTGAGE SECURITIZATIONS

We support market liquidity by securitizing mortgage loans, which means we place loans in a trust and Fannie Mae MBS backed by the mortgage loans are then issued. We guarantee to the MBS trust that we will supplement amounts received by the MBS trust as required to permit timely payment of principal and interest on the trust certificates. In return for this guaranty, we receive guaranty fees.

Below we discuss (1) two broad categories of securitization transactions: lender swaps and portfolio securitizations; (2) features of our MBS trusts; (3) circumstances under which we purchase loans from MBS trusts; and (4) single-class and multi-class Fannie Mae MBS.

### Lender Swaps and Portfolio Securitizations

We currently securitize a majority of the single-family and multifamily mortgage loans we acquire. Our securitization transactions primarily fall within two broad categories: lender swap transactions and portfolio securitizations.

Our most common type of securitization transaction is our "lender swap transaction." Mortgage lenders that operate in the primary mortgage market generally deliver pools of mortgage loans to us in exchange for Fannie Mae MBS backed by these mortgage loans. A pool of mortgage loans is a group of mortgage loans with similar characteristics. After receiving the mortgage loans in a lender swap transaction, we place them in a trust that is established for the sole purpose of holding the mortgage loans separate and apart from our assets. We deliver to the lender (or its designee) Fannie Mae MBS that are backed by the pool of mortgage loans in the trust and that represent an undivided beneficial ownership interest in each of the mortgage loans. We guarantee to each MBS trust that we will supplement amounts received by the MBS trust as required to permit timely payment of principal and interest on the related Fannie Mae MBS. We retain a portion of the interest payment as the fee for providing our guaranty. Then, on behalf of the trust, we make monthly distributions to the Fannie Mae MBS certificateholders from the principal and interest payments and other collections on the underlying mortgage loans. The structured securitization transactions we describe below in "Business Segments—Capital Markets—Securitization Activities" involve a process that is very similar to the process involved in our lender swap securitizations.

In contrast to our lender swap securitizations, in which lenders deliver pools of mortgage loans to us that we immediately place in a trust for securitization, our "portfolio securitization transactions" involve creating and issuing Fannie Mae MBS using mortgage loans and mortgage-related securities that we hold in our mortgage portfolio.

### Features of Our MBS Trusts

We serve as trustee for our MBS trusts, each of which is established for the sole purpose of holding mortgage loans separate and apart from our assets. Our MBS trusts hold either single-family or multifamily mortgage loans or mortgage-related securities. Each trust operates in accordance with a trust agreement or a trust indenture. Each MBS trust is also governed by an issue supplement documenting the formation of that MBS trust, the

- 22 -

identification of its related assets and the issuance of the related Fannie Mae MBS. The trust agreement or the trust indenture, together with the issue supplement and any amendments, are considered the "trust documents" that govern an individual MBS trust.

**Purchases of Loans from our MBS Trusts**

Under the terms of our MBS trust documents, we have the option or, in some instances, the obligation, to purchase mortgage loans that meet specific criteria from an MBS trust. For example, we have the option under the terms of the trust documents to purchase a loan from an MBS trust if the loan is delinquent as to four or more consecutive monthly payments. We generally have the obligation to purchase a mortgage loan from an MBS trust when the mortgage loan is delinquent as to 24 consecutive monthly payments. Our acquisition cost for these loans is the unpaid principal balance of the loan plus accrued interest.

In deciding whether and when to exercise our option to purchase a loan from a single-family MBS trust, we consider a variety of factors, including: our legal ability to purchase loans under the terms of the trust documents; whether we have agreed to modify the loan, which we cannot do while it remains in the trust; our mission and public policy; our loss mitigation strategies and the exposure to credit losses we face under our guaranty; our cost of funds; the impact on our results of operations; relevant market yields; the accounting impact; the administrative costs associated with purchasing and holding the loans; counterparty exposure to lenders that have agreed to cover losses associated with delinquent loans; and general market conditions. The weight we give to these factors changes depending on market circumstances and other factors.

The cost of purchasing most delinquent loans from Fannie Mae MBS trusts and holding them in our portfolio is currently less than the cost of advancing delinquent payments to security holders. We generally purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent. During 2011, we purchased approximately $67 billion in delinquent loans from our single-family MBS trusts. We expect to continue purchasing loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other constraints, including the limit on the amount of mortgage assets that we may own pursuant to the senior preferred stock purchase agreement.

For our multifamily MBS trusts, we typically exercise our option to purchase a loan from the trust if the loan is delinquent, in whole or in part, as to four or more consecutive monthly payments.

**Single-Class and Multi-Class Fannie Mae MBS**

Fannie Mae MBS trusts may be single-class or multi-class. Single-class MBS are MBS in which the investors receive principal and interest payments in proportion to their percentage ownership of the MBS issuance. Multi-class MBS are MBS, including Real Estate Mortgage Investment Conduits ("REMICs"), in which the cash flows on the underlying mortgage assets are divided, creating several classes of securities, each of which represents an undivided beneficial ownership interest in the assets of the related MBS trust and entitles the related holder to a specific portion of cash flows. Terms to maturity of some multi-class Fannie Mae MBS, particularly REMIC classes, may match or be shorter than the maturity of the underlying mortgage loans and/or mortgage-related securities. After these classes expire, cash flows received on the underlying mortgage assets are allocated to the remaining classes in accordance with the terms of the securities' structures. As a result, each of the classes in a multi-class MBS may have a different coupon rate, average life, repayment sensitivity or final maturity. Structured Fannie Mae MBS are either multi-class MBS or single-class MBS that are typically resecuritizations of other single-class Fannie Mae MBS. In a resecuritization, pools of MBS are collected and securitized.

## BUSINESS SEGMENTS

We have three business segments for management reporting purposes: Single-Family Credit Guaranty, Multifamily, and Capital Markets. In this report we refer to our business groups that run these segments as our "Single-Family business," our "Multifamily business" and our "Capital Markets group." These groups engage in complementary business activities in pursuing our mission of providing liquidity, stability and affordability to the

TREASURY-2418

U.S. housing market. These activities are summarized in the table below and described in more detail following this table. We also summarize in the table below the key sources of revenue for each of our segments and the primary expenses.

| Business Segment | Primary Business Activities | Primary Revenues | Primary Expenses |
|---|---|---|---|
| Single-Family Credit Guaranty, or Single-Family | • *Mortgage securitizations:* Works with our lender customers to securitize single-family mortgage loans delivered to us by lenders into Fannie Mae MBS in lender swap transactions<br>• *Mortgage acquisitions:* Works with our Capital Markets group to facilitate the purchase of single-family mortgage loans<br>• *Credit risk management:* Prices and manages the credit risk on loans in our single-family guaranty book of business<br>• *Credit loss management:* Works to prevent foreclosures and reduce costs of defaulted loans through foreclosure alternatives, through management of foreclosures and REO, and through pursuing contractual remedies from lenders, servicers and providers of credit enhancement | • *Guaranty fees:* Compensation for assuming and managing the credit risk on our single-family guaranty book of business<br>• *Interest income not recognized:* Consists of reimbursement costs for interest income not recognized for loans on nonaccrual status in our mortgage portfolio or in consolidated trusts, which are recorded as a reduction to our interest income<br>• *Fee and other income:* Compensation received for providing lender services | • *Credit-related expenses:* Consists of provision for single-family loan losses, provision for single-family guaranty losses and foreclosed property expense on loans underlying our single-family guaranty book of business<br>• *Administrative expenses:* Consists of salaries and benefits, occupancy costs, professional services, and other expenses associated with the Single-Family business operations |
| Multifamily | • *Mortgage securitizations:* Works with our lender customers to securitize multifamily mortgage loans delivered to us by lenders into Fannie Mae MBS in lender swap transactions<br>• *Mortgage acquisitions:* Works with our Capital Markets group to facilitate the purchase of multifamily mortgage loans<br>• *Credit risk management:* Prices and manages the credit risk on loans in our multifamily guaranty book of business<br>• *Credit loss management:* Works to prevent foreclosures and reduce costs of defaulted loans through foreclosure alternatives, through management of foreclosures and REO, and through pursuing contractual remedies from lenders, servicers and providers of credit enhancement | • *Guaranty fees:* Compensation for assuming and managing the credit risk on our multifamily guaranty book of business<br>• *Fee and other income:* Compensation received for engaging in multifamily transactions and bond credit enhancements | • *Credit-related expenses:* Consists of provision for multifamily loan losses, provision for multifamily guaranty losses and foreclosed property expense on loans underlying our multifamily guaranty book of business<br>• *Administrative expenses:* Consists of salaries and benefits, occupancy costs, professional services, and other expenses associated with our Multifamily business operations |

TREASURY-2419

| Business Segment | Primary Business Activities | Primary Revenues | Primary Expenses |
|---|---|---|---|
| Capital Markets | • *Mortgage and other investments:* Purchases mortgage assets and makes investments in non-mortgage interest-earning assets<br><br>• *Mortgage securitizations:* Purchases loans from a large group of lenders, securitizes them, and may sell the securities to dealers and investors<br><br>• *Structured mortgage securitizations and other customer services:* Issues structured Fannie Mae MBS for customers in exchange for a transaction fee and provides other fee-related services to our lender customers<br><br>• *Interest rate risk management:* Manages the interest rate risk on our portfolio by issuing a variety of debt securities in a wide range of maturities and by using derivatives | • *Net interest income:* Generated from the difference between the interest income earned on our interest-earning assets and the interest expense associated with the debt funding those assets<br><br>• *Fee and other income:* Compensation received for providing structured transactions and other lender services | • *Fair value gains and losses:* Primarily consists of fair value gains and losses on derivatives and trading securities<br><br>• *Investment gains and losses:* Primarily consists of gains and losses on the sale or securitization of mortgage assets<br><br>• *Other-than-temporary impairment:* Consists of impairment recognized on our investments<br><br>• *Administrative expenses:* Consists of salaries and benefits, occupancy costs, professional services, and other expenses associated with our Capital Markets business operations |

We are working on reorganizing our company by function rather than by business in order to improve our operational efficiencies and effectiveness. In future periods, we may change some of our management reporting and how we report our business segment results.

**Revenues from our Business Segments**

The following table displays the percentage of our total net revenues accounted for by our business segments for each of the last three years. Our prospective adoption in 2010 of revised accounting guidance on the consolidation of variable interest entities ("consolidation accounting guidance") and transfers of financial assets had a significant impact on our financial statements. Also effective in 2010, we changed the presentation of segment financial information that is currently evaluated by management. As a result, our 2010 and 2011 segment results are not comparable to prior years' segment results. We have not restated prior years' results, nor have we presented 2010 and 2011 results under the old presentation, because we determined that it was impracticable to do so. For more information about changes in our segment reporting and the financial results and performance of each of our segments, please see "MD&A—Business Segment Results" and "Note 14, Segment Reporting."

**Business Segment Revenues[1]**

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2011[2] | 2010[2] | 2009 |
| Single-Family Credit Guaranty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28% | 12% | 39% |
| Multifamily[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 5 | 3 |
| Capital Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 63 | 77 | 58 |

[1] Amounts presented represent the percentage of our total net revenues accounted for by each of our business segments.

[2] Segment results for 2011 and 2010 are not comparable with 2009 and prior years' results. In addition, under our current segment reporting structure, the sum of net revenues for our three business segments does not equal our consolidated total

- 25 -

net revenues because we separate the activity related to our consolidated trusts from the results generated by our three segments.

(3)   These amounts do not include the net interest income we earn on our multifamily investments in our mortgage portfolio, which is reflected in the revenues of our Capital Markets segment.

Under the terms of our intracompany guaranty arrangement, Capital Markets receives reimbursements primarily from Single-Family for the contractual interest due on mortgage loans held in our portfolio when interest income on the loans is no longer recognized in accordance with our nonaccrual accounting policy. As a result, the substantial increase in the number of nonaccrual loans purchased from our consolidated MBS trusts beginning in 2010 significantly increased Capital Markets' net revenue in 2010, while reducing the net revenues of Single-Family.

**Single-Family Business**

Our Single-Family business works with our lender customers to provide funds to the mortgage market by securitizing single-family mortgage loans into Fannie Mae MBS. Our Single-Family business also works with our Capital Markets group to facilitate the purchase of single-family mortgage loans for our mortgage portfolio. Our Single-Family business has primary responsibility for pricing and managing the credit risk on our single-family guaranty book of business, which consists of single-family mortgage loans underlying Fannie Mae MBS and single-family loans held in our mortgage portfolio.

A single-family loan is secured by a property with four or fewer residential units. Our Single-Family business and Capital Markets group securitize and purchase primarily conventional (not federally insured or guaranteed) single-family fixed-rate or adjustable-rate, first-lien mortgage loans, or mortgage-related securities backed by these types of loans. We also securitize or purchase loans insured by FHA, loans guaranteed by the Department of Veterans Affairs ("VA"), loans guaranteed by the Rural Development Housing and Community Facilities Program of the Department of Agriculture (the "Department of Agriculture"), manufactured housing loans, subordinate-lien mortgage loans (for example, loans secured by second liens) and other mortgage-related securities.

Revenues for our Single-Family business are derived primarily from guaranty fees received as compensation for assuming the credit risk on the mortgage loans underlying single-family Fannie Mae MBS. We also allocate guaranty fee revenues to the Single-Family business for assuming and managing the credit risk on the single-family mortgage loans held in our portfolio. The aggregate amount of single-family guaranty fees we receive or that are allocated to our Single-Family business in any period depends on the amount of single-family Fannie Mae MBS outstanding and loans held in our mortgage portfolio during the period and the applicable guaranty fee rates. The amount of Fannie Mae MBS outstanding at any time is primarily determined by the rate at which we issue new Fannie Mae MBS and by the repayment rate for the loans underlying our outstanding Fannie Mae MBS. Other factors affecting the amount of Fannie Mae MBS outstanding are the extent to which (1) we purchase loans from our MBS trusts because of borrower defaults (with the amount of these purchases affected by the rate of borrower defaults on the loans and the extent of loan modification programs in which we engage) and (2) sellers and servicers repurchase loans from us upon our demand based on a breach in the selling representations and warranties provided upon delivery of the loans.

We describe the credit risk management process employed by our Single-Family business, including its key strategies in managing credit risk and key metrics used in measuring and evaluating our single-family credit risk in "MD&A—Risk Management—Credit Risk Management—Single-Family Credit Risk Management."

*Single-Family Mortgage Securitizations and Acquisitions*

Our Single-Family business securitizes single-family mortgage loans and issues single-class Fannie Mae MBS, which are described above in "Mortgage Securitizations—Single-Class and Multi-Class Fannie Mae MBS," for our lender customers. Unlike our Capital Markets group, which securitizes loans from our portfolio, our Single-Family business securitizes loans solely in lender swap transactions, in which lenders deliver to us pools of

- 26 -

mortgage loans, which are placed immediately in a trust, in exchange for Fannie Mae MBS backed by these loans. We describe lender swap transactions, and how they differ from portfolio securitizations, in "Mortgage Securitizations—Lender Swaps and Portfolio Securitizations."

Loans from our lender customers are delivered to us through either our "flow" or "bulk" transaction channels. In our flow business, we enter into agreements that generally set agreed-upon guaranty fee prices for a lender's future delivery of individual loans to us over a specified time period. Our bulk business generally consists of transactions in which a set of loans is delivered to us in bulk, typically with guaranty fees and other contract terms negotiated individually for each transaction.

### Single-Family Mortgage Servicing, REO Management, and Lender Repurchases

#### Servicing

Generally, the servicing of the mortgage loans held in our mortgage portfolio or that back our Fannie Mae MBS is performed by mortgage servicers on our behalf. Typically, lenders who sell single-family mortgage loans to us service these loans for us. For loans we own or guarantee, the lender or servicer must obtain our approval before selling servicing rights to another servicer.

Our mortgage servicers typically collect and deliver principal and interest payments, administer escrow accounts, monitor and report delinquencies, perform default prevention activities, evaluate transfers of ownership interests, respond to requests for partial releases of security, and handle proceeds from casualty and condemnation losses. Our mortgage servicers are the primary point of contact for borrowers and perform a key role in the effective implementation of our homeownership assistance initiatives, negotiation of workouts of troubled loans, and loss mitigation activities. If necessary, mortgage servicers inspect and preserve properties and process foreclosures and bankruptcies. Because we generally delegate the servicing of our mortgage loans to mortgage servicers and do not have our own servicing function, our ability to actively manage troubled loans that we own or guarantee is limited. For more information on the risks of our reliance on servicers, refer to "Risk Factors" and "MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management."

We compensate servicers primarily by permitting them to retain a specified portion of each interest payment on a serviced mortgage loan as a servicing fee. Servicers also generally retain prepayment premiums, assumption fees, late payment charges and other similar charges, to the extent they are collected from borrowers, as additional servicing compensation. We also compensate servicers for negotiating workouts on problem loans.

We discuss steps we have taken in 2011 to improve the servicing of our delinquent loans in "MD&A—Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management—Single-Family Acquisition and Servicing Policies and Underwriting and Servicing Standards."

#### REO Management

In the event a loan defaults and we acquire a home through foreclosure or a deed-in-lieu of foreclosure, we market and sell the home through local real estate professionals. Our primary objectives are both to minimize the severity of loss to Fannie Mae by maximizing sales prices and also to stabilize neighborhoods—to prevent empty homes from depressing home values. In cases where the property does not sell, we use alternative methods of disposition, including selling homes to cities, municipalities and other public entities, and selling properties in bulk or through public auctions.

#### Lender Repurchase Evaluations

We conduct post-purchase quality control file reviews to ensure that loans sold to and serviced for us meet our guidelines. If we discover violations through reviews, we issue repurchase demands to the seller and seek to collect on our repurchase claims.

TREASURY-2422

**Multifamily Business**

A core part of Fannie Mae's mission is to support the U.S. multifamily housing market to help serve the nation's rental housing needs, focusing on low- to middle-income households and communities. Multifamily mortgage loans relate to properties with five or more residential units, which may be apartment communities, cooperative properties or manufactured housing communities.

Our Multifamily business works with our lender customers to provide funds to the mortgage market by securitizing multifamily mortgage loans into Fannie Mae MBS. Through our Multifamily business, we provide liquidity and support to the U.S. multifamily housing market principally by securitizing or purchasing loans that finance multifamily rental housing properties. We also provide some limited debt financing for other construction and rehabilitation activity related to projects that complement this business. Our Multifamily business also works with our Capital Markets group to facilitate the purchase and securitization of multifamily mortgage loans and securities for Fannie Mae's portfolio, as well as to facilitate portfolio securitization and resecuritization activities. Our multifamily guaranty book of business consists of multifamily mortgage loans underlying Fannie Mae MBS and multifamily loans and securities held in our mortgage portfolio. Our Multifamily business has primary responsibility for pricing the credit risk on our multifamily guaranty book of business and for managing the credit risk on multifamily loans and Fannie Mae MBS backed by multifamily loans that are held in our mortgage portfolio.

Revenues for our Multifamily business are derived from a variety of sources, including: (1) guaranty fees received as compensation for assuming the credit risk on the mortgage loans underlying multifamily Fannie Mae MBS and on the multifamily mortgage loans held in our portfolio and on other mortgage-related securities; (2) transaction fees associated with the multifamily business and (3) other bond credit enhancement related fees. Additionally, our Capital Markets group earns revenue that is related to our multifamily mortgage loans and securities held in our portfolio.

We describe the credit risk management process employed by our Multifamily business, along with our Multifamily Enterprise Risk Management group, including its key strategies in managing credit risk and key metrics used in measuring and evaluating our multifamily credit risk, in "MD&A—Risk Management—Credit Risk Management—Multifamily Mortgage Credit Risk Management."

### Key Characteristics of the Multifamily Mortgage Market and Multifamily Transactions

The multifamily mortgage market and our transactions in that market have a number of key characteristics that affect our multifamily activities and distinguish them from our activities in the single-family residential mortgage market.

- Funding sources:   Unlike the single-family residential mortgage market in which the GSEs' predominance makes us a driver of market standards and rates, the multifamily market is made up of a wide variety of lending sources, including commercial banks, life insurance companies, investment banks, small community banks, FHA, state and local housing finance agencies and the GSEs.

- Number of lenders; lender relationships:   In 2011, we executed multifamily transactions with 33 lenders. Of these, 25 lenders delivered loans to us under our Delegated Underwriting and Servicing, or DUS®, product line. In determining whether to do business with a multifamily lender, we consider the lender's financial strength, multifamily underwriting and servicing experience, portfolio performance and willingness and ability to share in the risk of loss associated with the multifamily loans they originate.

- Loan size:   On average, loans in our multifamily guaranty book of business are several million dollars in size. A significant number of our multifamily loans are under $5 million, and some of our multifamily loans are greater than $25 million.

- Collateral:   Multifamily loans are collateralized by properties that generate cash flows and effectively operate as businesses, such as garden and high-rise apartment complexes, seniors housing communities, cooperatives, dedicated student housing and manufactured housing communities.

TREASURY-2423

- Borrower profile:   Most multifamily borrowers are for-profit corporations, limited liability companies, partnerships, real estate investment trusts and individuals who invest in real estate for cash flow and equity returns in exchange for their original investment in the asset. Multifamily loans are generally non-recourse to the borrower. When considering a multifamily borrower, creditworthiness is evaluated through a combination of quantitative and qualitative data including liquid assets, net worth, number of units owned, experience in a market and/or property type, multifamily portfolio performance, access to additional liquidity, debt maturities, asset/property management platform, senior management experience, reputation and lender exposure.

- Borrower and lender investment:   Borrowers are required to contribute cash equity into multifamily properties on which they borrow, while lenders generally share in any losses realized from the loans that we purchase.

- Underwriting process:   Multifamily loans require a detailed underwriting process due to factors that may include the size of the loan, the market, or the complexity of the collateral or transaction.

- Term and lifecycle:   In contrast to the standard 30-year single-family residential loan, multifamily loans typically have terms of 5, 7 or 10 years, with balloon payments due at maturity.

- Prepayment terms:   Multifamily Fannie Mae loans and MBS trade in a market in which investors expect commercial investment terms, particularly limitations on prepayments of loans and the imposition of prepayment premiums.

### Multifamily Mortgage Securitizations and Acquisitions

Our Multifamily business generally creates multifamily Fannie Mae MBS and acquires multifamily mortgage assets in the same manner as our Single-Family business, as described in "Single-Family Business—Mortgage Securitizations and Acquisitions."

### Delegated Underwriting and Servicing (DUS)

In an effort to promote product standardization in the multifamily marketplace, in 1988 Fannie Mae initiated the DUS product line for acquiring individual multifamily loans.

DUS is a unique business model in the commercial mortgage industry. The standard industry practice for a multifamily loan requires the purchaser or guarantor to underwrite or re-underwrite each loan prior to deciding whether to purchase or guaranty the loan. Under our model, DUS lenders are pre-approved and delegated the authority to underwrite and service on behalf of Fannie Mae. In exchange for this authority, DUS lenders are required to share with us the risk of loss over the life of the loan, generally retaining one-third of the underlying credit risk on each loan sold to Fannie Mae. Since DUS lenders share in the credit risk, the servicing fee to the lenders includes compensation for credit risk. Delegation permits lenders to respond to customers more rapidly, as the lender generally has the authority to approve a loan within prescribed parameters, which provides an important competitive advantage.

We believe our DUS model aligns the interests of the borrower, lender and Fannie Mae. Our current 25-member DUS lender network, which is comprised of large financial institutions and independent mortgage lenders, continues to be our principal source of multifamily loan deliveries.

Fannie Mae MBS secured by DUS loans are typically backed by a single mortgage loan, which is often a fixed-rate loan. Structuring MBS to be backed by a single multifamily loan facilitates securitizations by our smaller lenders.

### Multifamily Mortgage Servicing

As with the servicing of single-family mortgages, multifamily mortgage servicing is typically performed by the lenders who sell the mortgages to us. Many of our multifamily mortgage servicers have agreed, as part of the

DUS relationship, to accept loss sharing, which we believe increases the alignment of interests between us and our multifamily loan servicers. Because of our loss-sharing arrangements with our multifamily lenders, transfers of multifamily servicing rights are infrequent, and we carefully monitor all our servicing relationships and enforce our right to approve all servicing transfers. As a seller-servicer, the lender is responsible for evaluating the financial condition of properties and property owners, administering various types of agreements (including agreements regarding replacement reserves, completion or repair, and operations and maintenance), as well as conducting routine property inspections.

***The Multifamily Markets in which We Operate***

In the multifamily mortgage market, we aim to address the rental housing needs of a wide range of the population, from those at the lower end of the income range up through middle-income households. Our mission requires us to serve the market steadily, rather than moving in and out depending on market conditions. Through the secondary mortgage market, we support rental housing for the workforce, for senior citizens and students, and for families with the greatest economic need. Our Multifamily business is organized and operated as an integrated commercial real estate finance business, with dedicated teams that address the spectrum of multifamily housing finance needs, including the teams described below.

- To meet the growing need for smaller multifamily property financing, we have a team that focuses on the purchase and guarantee of multifamily loans up to $3 million ($5 million in high income areas). We purchase these loans from DUS lenders as well as small community banks and nonprofits or similar entities. Over the years, we have been an active purchaser of these loans from both DUS and non-DUS lenders and, as of December 31, 2011, they represented 69% of our multifamily guaranty book of business by loan count and 16% based on unpaid principal balance.

- To serve low- and very low-income households, we also have a team that focuses exclusively on relationships with lenders financing privately-owned multifamily properties that receive public subsidies in exchange for maintaining long-term affordable rents. We enable borrowers to leverage housing programs and subsidies provided by local, state and federal agencies. These public subsidy programs are largely targeted to providing housing to families earning less than 60% of area median income (as defined by HUD) and are structured to ensure that the low and very low-income households who benefit from the subsidies pay no more than 30% of their gross monthly income for rent and utilities. As of December 31, 2011, this type of financing represented approximately 14% of our multifamily guaranty book of business, based on unpaid principal balance, including $16.1 billion in bond credit enhancements.

**Capital Markets**

Our Capital Markets group manages our investment activity in mortgage-related assets and other interest-earning non-mortgage investments. We fund our investments primarily through proceeds we receive from the issuance of debt securities in the domestic and international capital markets. Our Capital Markets group has primary responsibility for managing the interest rate risk associated with our investments in mortgage assets.

The business model for our Capital Markets group has evolved in recent years. Our business activity is now focused on making short-term use of our balance sheet rather than long-term investments. As a result, our Capital Markets group works with lender customers to provide funds to the mortgage market through short-term financing and investing activities. Activities we are undertaking to provide liquidity to the mortgage market include the following:

- *Whole Loan Conduit.*   Whole loan conduit activities involve our purchase of both single-family and multifamily loans principally for the purpose of securitizing them. We purchase loans from a large group of lenders and then securitize them as Fannie Mae MBS, which may then be sold to dealers and investors.

- *Early Funding.*   Lenders who deliver whole loans or pools of whole loans to us in exchange for MBS typically must wait between 30 and 45 days from the closing and settlement of the loans or pools and the issuance of the MBS. This delay may limit lenders' ability to originate new loans. Under our early lender funding programs, we purchase whole loans or pools of loans on an accelerated basis, allowing lenders to

- 30 -

receive quicker payment for the whole loans and pools, which replenishes their funds and allows them to originate more mortgage loans.

- *REMICs and Other Structured Securitizations.*    We issue structured Fannie Mae MBS (including REMICs), typically for our lender customers or securities dealer customers, in exchange for a transaction fee.

- *MBS Trading.*    We regularly enter into purchase and sale transactions with other market participants involving mortgage-backed securities issued by Fannie Mae, Freddie Mac, and Ginnie Mae, which we refer to as "agency MBS". These transactions can provide for the future delivery of mortgage-backed securities with underlying loans that share certain general characteristics (often referred to as the "TBA market"). These purchase and sale transactions also can provide for the future delivery of specifically identified mortgage-backed securities with underlying loans that have other characteristics considered desirable by some investors (often referred to as the "Specified Pools market"). Through our trading activity in the TBA and Specified Pools markets, we provide significant liquidity to the agency MBS markets.

### Securitization Activities

Our Capital Markets group is engaged in issuing both single-class and multi-class Fannie Mae MBS through both portfolio securitizations and structured securitizations involving third party assets.

- *Portfolio securitizations*.    Our Capital Markets group creates single-class and multi-class Fannie Mae MBS from mortgage-related assets held in our mortgage portfolio. Our Capital Markets group may sell these Fannie Mae MBS into the secondary market or may retain the Fannie Mae MBS in our investment portfolio.

- *Structured securitizations:*    Our Capital Markets group creates single-class and multi-class structured Fannie Mae MBS, typically for our lender customers or securities dealer customers, in exchange for a transaction fee. In these transactions, the customer "swaps" a mortgage-related asset that it owns (typically a mortgage security) in exchange for a structured Fannie Mae MBS we issue. Our Capital Markets group earns transaction fees for creating structured Fannie Mae MBS for third parties. The process for issuing Fannie Mae MBS in a structured securitization is similar to the process involved in our lender swap securitizations. For more information about that process and how it differs from portfolio securitizations, please see "Mortgage Securitizations—Lender Swaps and Portfolio Securitizations."

For a description of single-class Fannie Mae MBS, please see "Mortgage Securitizations—Single-Class and Multi-Class Fannie Mae MBS."

### Other Customer Services

Our Capital Markets group provides our lender customers with services that include offering to purchase a wide variety of mortgage assets, including non-standard mortgage loan products; segregating customer portfolios to obtain optimal pricing for their mortgage loans; and assisting customers with hedging their mortgage business. These activities provide a significant flow of assets for our mortgage portfolio, help to create a broader market for our customers and enhance liquidity in the secondary mortgage market.

### Mortgage Asset Portfolio

Although our Capital Markets group's business activities are focused on short-term financing and investing, revenue from our Capital Markets group is derived primarily from the difference, or spread, between the interest we earn on our mortgage and non-mortgage investments and the interest we incur on the debt we issue to fund these assets. Our Capital Markets revenues are primarily derived from our mortgage asset portfolio. Over time, we expect these revenues to decrease as the maximum allowable amount of mortgage assets we may own decreases each year to 90% of the amount we were permitted to own the previous year under our senior preferred stock purchase agreement with Treasury. See "Conservatorship and Treasury Agreements—Treasury Agreements—Covenants under Treasury Agreements" for more information on the decreasing limits on the amount of mortgage assets we are permitted to hold.

- 31 -

We describe the interest rate risk management process employed by our Capital Markets group, including its key strategies in managing interest rate risk and key metrics used in measuring and evaluating our interest rate risk, in "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk."

### Investment and Financing Activities

Our Capital Markets group seeks to increase the liquidity of the mortgage market by maintaining a presence as an active investor in mortgage loans and mortgage-related securities and, in particular, supports the liquidity and value of Fannie Mae MBS in a variety of market conditions.

Our Capital Markets group funds its investments primarily through the issuance of a variety of debt securities in a wide range of maturities in the domestic and international capital markets. The most active investors in our debt securities include commercial bank portfolios and trust departments, investment fund managers, insurance companies, pension funds, state and local governments, and central banks. The approved dealers for underwriting various types of Fannie Mae debt securities may differ by funding program. See "MD&A—Liquidity and Capital Management—Liquidity Management" for information on the composition of our outstanding debt and a discussion of our liquidity and debt activity.

Our Capital Markets group's investment and financing activities are affected by market conditions and the target rates of return that we expect to earn on the equity capital underlying our investments. Our investment activities also are subject to contractual limitations, including the provisions of the senior preferred stock agreement with Treasury, capital requirements (although our regulator has announced that these are not binding on us during conservatorship) and other regulatory constraints, to the extent described below under "Conservatorship and Treasury Agreements" and "Our Charter and Regulation of Our Activities."

## CONSERVATORSHIP AND TREASURY AGREEMENTS

### Conservatorship

On September 6, 2008, the Director of FHFA appointed FHFA as our conservator, pursuant to its authority under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Federal Housing Finance Regulatory Reform Act of 2008, or 2008 Reform Act (together, the "GSE Act"). The conservatorship is a statutory process designed to preserve and conserve our assets and property and put the company in a sound and solvent condition.

The conservatorship has no specified termination date and there continues to be uncertainty regarding the future of our company, including how long the company will continue to exist in its current form, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. For more information on the risks to our business relating to the conservatorship and uncertainties regarding the future of our company and business, as well as the adverse effects of the conservatorship on the rights of holders of our common stock, please see "Risk Factors."

### Management of the Company during Conservatorship

Upon its appointment, the conservator immediately succeeded to (1) all rights, titles, powers and privileges of Fannie Mae, and of any shareholder, officer or director of Fannie Mae with respect to Fannie Mae and its assets, and (2) title to the books, records and assets of any other legal custodian of Fannie Mae. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. The conservator retains the authority to withdraw its delegations at any time.

Our directors serve on behalf of the conservator and exercise their authority as directed by and with the approval, where required, of the conservator. Our directors do not have any duties to any person or entity except to the conservator. Accordingly, our directors are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS unless specifically directed to do so by the

- 32 -

conservator. In addition, the conservator directed the Board to consult with and obtain the approval of the conservator before taking action in specified areas, as described in "Directors, Executive Officers and Corporate Governance—Corporate Governance—Conservatorship and Delegation of Authority to Board of Directors."

Because we are in conservatorship, our common shareholders currently do not have the ability to elect directors or to vote on other matters. The conservator eliminated common and preferred stock dividends (other than dividends on the senior preferred stock issued to Treasury) during the conservatorship, and we are no longer managed with a strategy to maximize shareholder returns. In a letter to Congress dated February 2, 2010, the Acting Director of FHFA stated that we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship. The Acting Director also stated that FHFA does not expect that we will be a substantial buyer or seller of mortgages for our retained portfolio, except for purchases of delinquent mortgages out of our guaranteed MBS pools. For additional information about our business strategy and the goals of the conservatorship, please see "Executive Summary—Our Business Objectives and Strategy."

### *Powers of the Conservator under the GSE Act*

FHFA has broad powers when acting as our conservator. As conservator, FHFA can direct us to enter into contracts or enter into contracts on our behalf. Further, FHFA may transfer or sell any of our assets or liabilities (subject to limitations and post-transfer notice provisions for transfers of certain types of financial contracts), without any approval, assignment of rights or consent of any party. The GSE Act provides, however, that mortgage loans and mortgage-related assets that have been transferred to a Fannie Mae MBS trust must be held by the conservator for the beneficial owners of the Fannie Mae MBS and cannot be used to satisfy the general creditors of the company. As of February 29, 2012, FHFA has not exercised its power to transfer or sell our assets or liabilities. For more information on FHFA's powers as conservator and the rules governing conservatorship and receivership operations for the GSEs, please see "Our Charter and Regulation of Our Activities—Regulation and Oversight of Our Activities—Receivership."

Neither the conservatorship nor the terms of our agreements with Treasury change our obligation to make required payments on our debt securities or perform under our mortgage guaranty obligations.

Under the GSE Act, FHFA must place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations (that is, we have a net worth deficit) or if we have not been paying our debts, in either case, for a period of 60 days. In addition, the Director of FHFA may place us in receivership at his discretion at any time for other reasons, including conditions that FHFA has already asserted existed at the time the Director of FHFA placed us into conservatorship. Placement in receivership would have a material adverse effect on holders of our common stock, preferred stock, debt securities and Fannie Mae MBS. Should we be placed into receivership, different assumptions would be required to determine the carrying value of our assets, which could lead to substantially different financial results. For more information on the risks to our business relating to conservatorship and uncertainties regarding the future of our business, see "Risk Factors."

### Treasury Agreements

On September 7, 2008, we, through FHFA, in its capacity as conservator, and Treasury entered into a senior preferred stock purchase agreement, which was subsequently amended on September 26, 2008, May 6, 2009 and December 24, 2009. Unless the context indicates otherwise, references in this report to the senior preferred stock purchase agreement refer to the agreement as amended through December 24, 2009. The terms of the senior preferred stock purchase agreement, senior preferred stock and the warrant discussed below will continue to apply to us even if we are released from the conservatorship. Please see "Risk Factors" for a description of the risks to our business relating to the Treasury agreements, as well as the adverse effects of the senior preferred stock and the warrant on the rights of holders of our common stock and other series of preferred stock.

TREASURY-2428

***Senior Preferred Stock Purchase Agreement and Related Issuance of Senior Preferred Stock and Common Stock Warrant***

*Senior Preferred Stock Purchase Agreement*

Under the senior preferred stock purchase agreement, we issued to Treasury (a) one million shares of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2, which we refer to as the "senior preferred stock," and (b) a warrant to purchase, for a nominal price, shares of common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis at the time the warrant is exercised, which we refer to as the "warrant."

The senior preferred stock and warrant were issued to Treasury as an initial commitment fee in consideration of the commitment from Treasury to provide funds to us under the terms and conditions set forth in the senior preferred stock purchase agreement. The senior preferred stock purchase agreement provides that, on a quarterly basis, we generally may draw funds up to the amount, if any, by which our total liabilities exceed our total assets, as reflected in our consolidated balance sheet, prepared in accordance with GAAP, for the applicable fiscal quarter (referred to as the "deficiency amount").

On December 24, 2009, the maximum amount of Treasury's funding commitment to us under the senior preferred stock purchase agreement was increased pursuant to an amendment to the agreement. The amendment provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any net worth deficiencies attributable to periods during 2010, 2011 and 2012. If we do not have a positive net worth as of December 31, 2012, then the amount of funding available under the senior preferred stock purchase agreement after 2012 will be $124.8 billion ($200 billion less $75.2 billion in cumulative draws for net worth deficiencies through December 31, 2009). In the event we have a positive net worth as of December 31, 2012, then the amount of funding available after 2012 under the senior preferred stock purchase agreement will depend on the size of that positive net worth relative to the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, as follows:

- If our positive net worth as of December 31, 2012 is less than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less our positive net worth as of December 31, 2012.

- If our positive net worth as of December 31, 2012 is greater than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less the cumulative draws attributable to periods during 2010, 2011 and 2012.

In announcing the December 24, 2009 amendments to the senior preferred stock purchase agreement and to Treasury's preferred stock purchase agreement with Freddie Mac, Treasury noted that the amendments "should leave no uncertainty about the Treasury's commitment to support [Fannie Mae and Freddie Mac] as they continue to play a vital role in the housing market during this current crisis." The senior preferred stock purchase agreement provides that the deficiency amount will be calculated differently if we become subject to receivership or other liquidation process. We discuss our net worth deficits and FHFA's requests on our behalf for funds from Treasury in "Executive Summary—Summary of our Financial Performance for 2011."

We were scheduled to begin paying a quarterly commitment fee to Treasury under the senior preferred stock purchase agreement on March 31, 2011; however, Treasury waived the quarterly commitment fee for each quarter of 2011 and the first quarter of 2012 due to the continued fragility of the mortgage market and Treasury's belief that the imposition of the quarterly commitment fee would not generate increased compensation for taxpayers. In its notification to FHFA that it had waived the quarterly commitment fee for the first quarter of 2012, Treasury indicated that it will reevaluate the situation during the next calendar quarter to determine whether the quarterly commitment fee should then be set. The agreement provides that Treasury may waive the periodic commitment fee for up to one year at a time, in its sole discretion, based on adverse conditions in the U.S. mortgage market.

- 34 -

The senior preferred stock purchase agreement provides that the amount of the quarterly commitment fee is to be set not later than December 31, 2010 with respect to the ensuing five-year period, is to be reset for every five years thereafter, and is to be determined with reference to the market value of Treasury's funding commitment to Fannie Mae as then in effect. The agreement also provides that the amount of the quarterly commitment fee is to be mutually agreed by Treasury and Fannie Mae, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve. As of February 29, 2012, the quarterly commitment fee for the initial five-year period had not yet been established.

The senior preferred stock purchase agreement provides that the Treasury's funding commitment will terminate under any of the following circumstances: (1) the completion of our liquidation and fulfillment of Treasury's obligations under its funding commitment at that time, (2) the payment in full of, or reasonable provision for, all of our liabilities (whether or not contingent, including mortgage guaranty obligations), or (3) the funding by Treasury of the maximum amount that may be funded under the agreement. In addition, Treasury may terminate its funding commitment and declare the senior preferred stock purchase agreement null and void if a court vacates, modifies, amends, conditions, enjoins, stays or otherwise affects the appointment of the conservator or otherwise curtails the conservator's powers. Treasury may not terminate its funding commitment under the agreement solely by reason of our being in conservatorship, receivership or other insolvency proceeding, or due to our financial condition or any adverse change in our financial condition.

The senior preferred stock purchase agreement provides that most provisions of the agreement may be waived or amended by mutual written agreement of the parties; however, no waiver or amendment of the agreement is permitted that would decrease Treasury's aggregate funding commitment or add conditions to Treasury's funding commitment if the waiver or amendment would adversely affect in any material respect the holders of our debt securities or guaranteed Fannie Mae MBS.

In the event of our default on payments with respect to our debt securities or guaranteed Fannie Mae MBS, if Treasury fails to perform its obligations under its funding commitment and if we and/or the conservator are not diligently pursuing remedies in respect of that failure, the holders of our debt securities or Fannie Mae MBS may file a claim in the United States Court of Federal Claims for relief requiring Treasury to fund to us the lesser of (1) the amount necessary to cure the payment defaults on our debt and Fannie Mae MBS and (2) the lesser of (a) the deficiency amount and (b) the maximum amount that may be funded under the agreement less the aggregate amount of funding previously provided under the commitment. Any payment that Treasury makes under those circumstances will be treated for all purposes as a draw under the senior preferred stock purchase agreement that will increase the liquidation preference of the senior preferred stock.

*Senior Preferred Stock*

Pursuant to the senior preferred stock purchase agreement, we issued one million shares of senior preferred stock to Treasury on September 8, 2008 with an aggregate initial liquidation preference of $1.0 billion. The stock's liquidation preference is subject to adjustment. Dividends that are not paid in cash for any dividend period will accrue and be added to the liquidation preference. In addition, any amounts Treasury pays to us pursuant to its funding commitment under the senior preferred stock purchase agreement and any quarterly commitment fees that are either not paid in cash to Treasury or not waived by Treasury will be added to the liquidation preference. Accordingly, the aggregate liquidation preference of the senior preferred stock was $112.6 billion as of December 31, 2011 and will increase to $117.1 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of December 31, 2011.

Treasury, as holder of the senior preferred stock, is entitled to receive, when, as and if declared by our Board of Directors, out of legally available funds, cumulative quarterly cash dividends at the annual rate of 10% per year on the then-current liquidation preference of the senior preferred stock. If at any time we fail to pay cash dividends in a timely manner, then immediately following such failure and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be 12% per year.

- 35 -

The senior preferred stock ranks ahead of our common stock and all other outstanding series of our preferred stock, as well as any capital stock we issue in the future, as to both dividends and rights upon liquidation. The senior preferred stock provides that we may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the senior preferred stock unless (1) full cumulative dividends on the outstanding senior preferred stock (including any unpaid dividends added to the liquidation preference) have been declared and paid in cash, and (2) all amounts required to be paid with the net proceeds of any issuance of capital stock for cash (as described in the following paragraph) have been paid in cash. Shares of the senior preferred stock are not convertible. Shares of the senior preferred stock have no general or special voting rights, other than those set forth in the certificate of designation for the senior preferred stock or otherwise required by law. The consent of holders of at least two-thirds of all outstanding shares of senior preferred stock is generally required to amend the terms of the senior preferred stock or to create any class or series of stock that ranks prior to or on parity with the senior preferred stock.

We are not permitted to redeem the senior preferred stock prior to the termination of Treasury's funding commitment under the senior preferred stock purchase agreement. Moreover, we are not permitted to pay down the liquidation preference of the outstanding shares of senior preferred stock except to the extent of (1) accrued and unpaid dividends previously added to the liquidation preference and not previously paid down; and (2) quarterly commitment fees previously added to the liquidation preference and not previously paid down. In addition, if we issue any shares of capital stock for cash while the senior preferred stock is outstanding, the net proceeds of the issuance must be used to pay down the liquidation preference of the senior preferred stock; however, the liquidation preference of each share of senior preferred stock may not be paid down below $1,000 per share prior to the termination of Treasury's funding commitment. Following the termination of Treasury's funding commitment, we may pay down the liquidation preference of all outstanding shares of senior preferred stock at any time, in whole or in part.

_Common Stock Warrant_

Pursuant to the senior preferred stock purchase agreement, on September 7, 2008, we, through FHFA, in its capacity as conservator, issued a warrant to purchase common stock to Treasury. The warrant gives Treasury the right to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis on the date of exercise, for an exercise price of $0.00001 per share. The warrant may be exercised in whole or in part at any time on or before September 7, 2028.

**Covenants under Treasury Agreements**

The senior preferred stock purchase agreement and warrant contain covenants that significantly restrict our business activities and require the prior written consent of Treasury before we can take certain actions. These covenants prohibit us from:

- paying dividends or other distributions on or repurchasing our equity securities (other than the senior preferred stock or warrant);

- issuing additional equity securities (except in limited instances);

- selling, transferring, leasing or otherwise disposing of any assets, other than dispositions for fair market value, except in limited circumstances including if the transaction is in the ordinary course of business and consistent with past practice;

- issuing subordinated debt; and

- entering into any new compensation arrangements or increasing amounts or benefits payable under existing compensation arrangements for any of our executive officers (as defined by SEC rules) without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury.

- 36 -

We also are subject to limits, which are described below, on the amount of mortgage assets that we may own and the total amount of our indebtedness. As a result, we can no longer obtain additional equity financing (other than pursuant to the senior preferred stock purchase agreement) and we are limited in the amount and type of debt financing we may obtain.

- *Mortgage Asset Limit.*   We are restricted in the amount of mortgage assets that we may own. The maximum allowable amount was reduced by $81 billion to $729 billion on December 31, 2011. On each December 31 thereafter, we are required to reduce our mortgage assets to 90% of the maximum allowable amount that we were permitted to own as of December 31 of the immediately preceding calendar year, until the amount of our mortgage assets reaches $250 billion. Accordingly, the maximum allowable amount of mortgage assets we may own on December 31, 2012 is $656.1 billion. The definition of mortgage asset is based on the unpaid principal balance of such assets and does not reflect market valuation adjustments, allowance for loan losses, impairments, unamortized premiums and discounts and the impact of our consolidation of variable interest entities. Under this definition, our mortgage assets on December 31, 2011 were $708.4 billion. We disclose the amount of our mortgage assets on a monthly basis under the caption "Gross Mortgage Portfolio" in our Monthly Summaries, which are available on our Web site and announced in a press release.

- *Debt Limit.*   We are subject to a limit on the amount of our indebtedness. Our debt limit in 2011 was $972 billion and in 2012 is $874.8 billion. For every year thereafter, our debt cap will equal 120% of the amount of mortgage assets we are allowed to own on December 31 of the immediately preceding calendar year. The definition of indebtedness for purposes of our debt cap is based on the par value of each applicable loan and does not reflect the impact of consolidation of variable interest entities. Under this definition, our indebtedness as of December 31, 2011 was $742.3 billion. We disclose the amount of our indebtedness on a monthly basis under the caption "Total Debt Outstanding" in our Monthly Summaries, which are available on our Web site and announced in a press release.

## LEGISLATIVE AND REGULATORY DEVELOPMENTS

### GSE Reform

Policymakers and others have focused significant attention in recent years on how to reform the nation's housing finance system, including what role, if any, the GSEs should play. The Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), which was signed into law in July 2010, calls for enactment of meaningful structural reforms of Fannie Mae and Freddie Mac. The Dodd-Frank Act also required the Treasury Secretary to submit a report to Congress with recommendations for ending the conservatorships of Fannie Mae and Freddie Mac.

In February 2011, Treasury and HUD released their report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions.

The report identifies a number of policy steps that could be used to wind down Fannie Mae and Freddie Mac, reduce the government's role in housing finance and help bring private capital back to the mortgage market. These steps include (1) increasing guaranty fees, (2) gradually increasing the level of required down payments so that any mortgages insured by Fannie Mae or Freddie Mac eventually have at least a 10% down payment, (3) reducing conforming loan limits to those established in the 2008 Reform Act, (4) encouraging Fannie Mae and Freddie Mac to pursue additional credit loss protection and (5) reducing Fannie Mae's and Freddie Mac's portfolios, consistent with Treasury's senior preferred stock purchase agreements with the companies.

In addition, the report outlines three potential options for a new long-term structure for the housing finance system following the wind-down of Fannie Mae and Freddie Mac. The first option would privatize housing finance almost entirely. The second option would add a government guaranty mechanism that could scale up during times of crisis. The third option would involve the government offering catastrophic reinsurance behind

TREASURY-2432

private mortgage guarantors. Each of these options assumes the continued presence of programs operated by FHA, the Department of Agriculture and the VA to assist targeted groups of borrowers. The report does not state whether or how the existing infrastructure or human capital of Fannie Mae may be used in the establishment of such a reformed system. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. A copy of the report can be found on the Housing Finance Reform section of Treasury's Web site, www.Treasury.gov. We are providing Treasury's Web site address solely for your information, and information appearing on Treasury's Web site is not incorporated into this annual report on Form 10-K.

On February 2, 2012, Treasury Secretary Geithner stated that the Administration intended to release new details around approaches to housing finance reform, including winding down Fannie Mae and Freddie Mac, in the spring of 2012 and to work with Congressional leaders to explore options for legislation, but that he does not expect housing finance reform legislation to be enacted in 2012.

During 2011, Congress held hearings on the future status of Fannie Mae and Freddie Mac, and members of Congress offered legislative proposals relating to the future status of the GSEs. We expect hearings on GSE reform to continue in 2012 and additional legislation to be considered and proposals to be discussed, including proposals that would result in a substantial change to our business structure or that involve Fannie Mae's liquidation or dissolution. Several bills have been introduced that would place the GSEs into receivership after a period of time and either grant federal charters to new entities to engage in activities similar to those currently engaged in by the GSEs or leave secondary mortgage market activities to entities in the private sector. For example, legislation has been introduced in both the House of Representatives and the Senate that would require FHFA to make a determination within two years of enactment regarding whether the GSEs were financially viable and, if the GSEs were determined not to be financially viable, to place them into receivership. As drafted, these bills may upon enactment impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent the federal government providing an explicit guarantee of our existing and future liabilities.

In addition to bills that seek to resolve the status of the GSEs, numerous bills have been introduced and considered that could constrain the current operations of the GSEs or alter the existing authority that FHFA or Treasury has over the enterprises. For example, the Subcommittee on Capital Markets and Government Sponsored Enterprises of the House Financial Services Committee has approved bills that would:

- suspend current compensation packages and apply a government pay scale for GSE employees;

- require the GSEs to increase guaranty fees;

- subject GSE loans to the risk retention standards in the Dodd-Frank Act;

- require a quicker reduction of GSE portfolios than required under the senior preferred stock purchase agreement;

- require Treasury to pre-approve all GSE debt issuances;

- repeal the GSEs' affordable housing goals;

- provide additional authority to FHFA's Inspector General;

- prohibit FHFA from approving any new GSE products during conservatorship or receivership, with certain exceptions;

- prevent Treasury from amending the senior preferred stock purchase agreement to reduce the current dividend rate on our senior preferred stock;

- abolish the Affordable Housing Trust Fund that the GSEs are required to fund except when such contributions have been temporarily suspended by FHFA;

- 38 -

- require FHFA to identify mission critical assets of the GSEs and require the GSEs to dispose of non-mission critical assets;

- cap the maximum aggregate amount of funds Treasury or any other agency or entity of the federal government can provide to the GSEs subject to certain qualifications;

- grant FHFA the authority to revoke the enterprises' charters following receivership under certain circumstances; and

- subject the GSEs to the Freedom of Information Act.

Of these bills that passed at a subcommittee level, the only one that has passed the full committee is the bill that would put GSE employees on a government pay scale. We expect additional legislation relating to the GSEs to be introduced and considered by Congress in 2012. We cannot predict the prospects for the enactment, timing or content of legislative proposals concerning the future status of the GSEs, their regulation or operations.

In sum, there continues to be uncertainty regarding the future of our company, including how long the company will continue to exist in its current form, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. See "Risk Factors" for a discussion of the risks to our business relating to the uncertain future of our company. Also see "Risk Factors" for a discussion of how the uncertain future of our company may adversely affect our ability to retain and recruit well-qualified employees, including senior management.

**Compensation**

Legislation has been proposed in Congress that would alter the compensation programs for GSE employees. As discussed in "GSE Reform," in 2011 the House Financial Services Committee passed a bill that would place all GSE employees on a pay scale similar to that provided for federal government employees. In addition, in 2012 the House and Senate passed separate versions of the STOCK Act to ban insider trading by members of Congress and other government officials, which included a provision prohibiting senior executives at the GSEs from receiving bonuses while the GSEs are in conservatorship. The two versions of the bill must now be reconciled and passed by each chamber before they are sent to the President for signature.

If legislation is adopted that results in a significant reduction in compensation to GSE employees, it could cause a substantial number of our most skilled and experienced employees to leave and further impair our ability to retain and attract employees in a competitive marketplace, as we discuss in "Risk Factors—Our business and results of operations may be materially adversely affected if we are unable to retain and hire qualified employees." Additional legislative proposals related to compensation for GSE employees may be considered by Congress in 2012.

**Financial Regulatory Reform Legislation: The Dodd-Frank Act**

The Dodd-Frank Act is significantly changing the regulation of the financial services industry, including by its creation of new standards related to regulatory oversight of systemically important financial companies, derivatives transactions, asset-backed securitization, mortgage underwriting and consumer financial protection. The Dodd-Frank Act will directly affect our business because new and additional regulatory oversight and standards will apply to us. We may also be affected by provisions of the Dodd-Frank Act and implementing regulations that impact the activities of our customers and counterparties in the financial services industry. Extensive regulatory guidance is still needed to implement and clarify many of the provisions of the Dodd-Frank Act and regulators have not completed the required administrative processes. It is therefore difficult to assess fully the impact of this legislation on our business and industry at this time. We discuss the potential risks to our business resulting from the Dodd-Frank Act in "Risk Factors." Below we summarize some key provisions of the legislation, as well as some rules that have been proposed by various government agencies to implement

- 39 -

provisions of the Dodd-Frank Act. We are currently evaluating these proposed rules and how they may impact our business and the housing finance industry.

*Enhanced supervision and prudential standards.*   The Dodd-Frank Act established the Financial Stability Oversight Council (the "FSOC"), chaired by the Secretary of the Treasury, to ensure that all financial companies whose failure could pose a threat to the financial stability of the United States—not just banks—will be subject to strong oversight. Under the Dodd-Frank Act, the FSOC is responsible for designating systemically important nonbank financial companies, while the Federal Reserve is to establish stricter prudential standards that will apply to certain bank holding companies and to systemically important nonbank financial companies. The Federal Reserve must establish standards related to risk-based capital, leverage limits, liquidity, credit concentrations, resolution plans, reporting credit exposures and other risk management measures. On December 20, 2011, the Board of Governors of the Federal Reserve System issued proposed rules addressing a number of these enhanced prudential standards. The Federal Reserve may also impose other standards related to contingent capital, enhanced public disclosure, short-term debt limits and other requirements as appropriate.

The FSOC has issued two notices of proposed rulemaking, most recently on October 11, 2011, describing the framework, process and criteria that will inform the FSOC's designation of systemically important nonbank financial companies. Under the proposed rule, the FSOC will make such a designation if it determines that material financial distress at the nonbank financial company, or the nature, scope, size, scale, concentration, interconnectedness, or mix of the activities of the company, could pose a threat to the financial stability of the United States. FSOC action on the final designation criteria and process is expected this year. If we are designated as a systemically important nonbank financial company, we may become subject to certain enhanced prudential standards established by the Federal Reserve.

Depending on the scope and final form of these enhanced standards, and the extent to which they apply to our customers and other counterparties, their adoption and application could increase our costs and may adversely affect demand for our debt and Fannie Mae MBS.

*Minimum Capital and Margin Requirements; Swap Transactions.*   The Dodd-Frank Act requires certain institutions meeting the definition of "swap dealer" or "major swap participant" to register with the Commodity Futures Trading Commission (the "CFTC"). The CFTC and SEC have issued a joint proposed rule that would, among other things, establish the definition of "major swap participant." If we are determined to be a major swap participant, minimum capital and margin requirements would apply to our swap transactions, including transactions that are not subject to clearing. On April 28, 2011, the CFTC proposed rules governing minimum capital and margin requirements for swap dealers and major swap participants engaging in derivative trades that are not submitted for clearing to a derivatives clearing organization ("uncleared trades"). On April 12, 2011, the Federal Reserve Board, the Federal Deposit Insurance Corporation ("FDIC"), FHFA, the Farm Credit Administration and the Office of the Comptroller of the Currency proposed rules under the Dodd-Frank Act governing margin and capital requirements applicable to entities that are subject to their oversight. These proposed rules would require that, for all uncleared trades, we collect from our counterparties and provide to our counterparties collateral in excess of the amounts we have historically collected or provided, regardless of whether we are deemed to be a major swap participant. In addition, even if we are not deemed to be a major swap participant, the Dodd-Frank Act includes provisions that may require us to submit new swap transactions for clearing to a derivatives clearing organization.

*Ability to Repay.*   The Dodd-Frank Act requires creditors to determine that borrowers have a "reasonable ability to repay" mortgage loans prior to making such loans. On April 19, 2011, the Federal Reserve Board issued a proposed rule pursuant to the Dodd-Frank Act that, among others things, requires creditors to determine a borrower's "ability to repay" a mortgage loan under Regulation Z, which implements the Truth in Lending Act. If a creditor fails to comply, a borrower may be able to offset amounts owed as part of a foreclosure or recoup monetary damages. The proposed rule offers several options for complying with the ability to repay requirement, including making loans that meet certain terms and characteristics (so-called "qualified mortgages"), which may provide creditors with special protection from liability. As proposed, a loan is generally a qualified mortgage if,

- 40 -

among other things, the borrower's income and assets are verified, the loan term does not exceed 30 years, the loan is fully amortizing with no negative amortization, interest-only or balloon features, and the loan is underwritten at the maximum interest rate applicable in the first five years of the loan, taking into account all mortgage-related obligations.

*Risk Retention.*   The Dodd-Frank Act requires financial regulators to jointly prescribe regulations requiring securitizers and/or originators to maintain a portion of the credit risk in assets transferred, sold or conveyed through the issuance of asset-backed securities, with certain exceptions. On March 29, 2011, the Office of the Comptroller of the Currency, the Federal Reserve System, the Federal Deposit Insurance Corporation, the U.S. Securities and Exchange Commission, FHFA and HUD issued a joint proposed rule implementing these risk retention requirements. Under the proposed rule, securitizers would be required to retain at least 5% of the credit risk with respect to the assets they securitize. The proposed rule offers several options for compliance by parties with assets to securitize, one of which is to have either Fannie Mae or Freddie Mac securitize the assets. As long as Fannie Mae or Freddie Mac (1) fully guarantees the assets, thereby taking on 100% of their credit risk, and (2) is in conservatorship or receivership at the time the assets are securitized, no further retention of credit risk is required. Certain mortgage loans meeting the definition of a "Qualified Residential Mortgage" are exempt from the requirements of the rule. Only mortgage loans that are first-lien mortgages on primary residences with loan-to-value ratios not exceeding 80% (75% for refinancings and 70% for cash-out refinancings) and that meet certain other underwriting requirements, would meet the definition of "Qualified Residential Mortgage" under the proposal.

## Changes to Our Single-Family Guaranty Fee Pricing and Revenue

In December 2011, Congress enacted the Temporary Payroll Tax Cut Continuation Act of 2011 which, among other provisions, requires that we increase our single-family guaranty fees by at least 10 basis points and remit this increase to Treasury, rather than retaining the incremental revenue. FHFA has announced that, effective April 1, 2012, the guaranty fee on all single-family residential mortgages delivered to Fannie Mae and Freddie Mac on or after that date for securitization will increase by 10 basis points. FHFA is analyzing whether additional guaranty fee increases may be necessary to comply with the law.

Consistent with the recommendation in the Administration's report on ending the conservatorships of Fannie Mae and Freddie Mac and the February 21, 2012 letter from the Acting Director of FHFA to Congress, we expect that our single-family guaranty fees will increase in the future. We expect our future guaranty fees will incorporate private sector pricing considerations such as geographic pricing that contemplates differences in foreclosure laws across the states, pricing indicative of higher required minimum capital levels, and more significant pricing differentiation between higher-risk and lower-risk loans. These changes would be in addition to increases required in the recently enacted law, although we do not know the timing, form or extent of all of these changes.

## Discontinuation of Our Retained Attorney Network

In October 2011, FHFA directed us to phase out the practice of requiring mortgage servicers to use our network of retained attorneys to perform default- and foreclosure-related legal services for our loans. FHFA also directed us to work with Freddie Mac, through FHFA's Servicing Alignment Initiative, to develop and implement consistent requirements, policies and processes for default- and foreclosure-related legal services. As set forth in FHFA's directive, we will conduct these activities over a transitional period and will seek to minimize disruption to pending matters. During the transitional period, servicers will continue to be directly responsible for managing the foreclosure process and monitoring network firm performance, in accordance with our current requirements and contractual arrangements. Phasing out the use of our retained attorney network may make it more difficult for us to oversee the performance of default- and foreclosure-related legal services for our loans, which may adversely impact our efforts to reduce our credit losses.

For information on additional regulatory matters affecting us, refer to "Our Charter and Regulation of Our Activities."

- 41 -

## OUR CHARTER AND REGULATION OF OUR ACTIVITIES

### Charter Act

We are a shareholder-owned corporation, originally established in 1938, organized and existing under the Federal National Mortgage Association Charter Act, as amended, which we refer to as the Charter Act or our charter. The Charter Act sets forth the activities that we are permitted to conduct, authorizes us to issue debt and equity securities, and describes our general corporate powers. The Charter Act states that our purposes are to:

- provide stability in the secondary market for residential mortgages;

- respond appropriately to the private capital market;

- provide ongoing assistance to the secondary market for residential mortgages (including activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing; and

- promote access to mortgage credit throughout the nation (including central cities, rural areas and underserved areas) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing.

It is from these sections of the Charter Act that we derive our mission of providing liquidity, increasing stability and promoting affordability in the residential mortgage market. In addition to the alignment of our overall strategy with these purposes, all of our business activities must be permissible under the Charter Act. Our charter authorizes us to: purchase, service, sell, lend on the security of, and otherwise deal in certain mortgage loans; issue debt obligations and mortgage-related securities; and "do all things as are necessary or incidental to the proper management of [our] affairs and the proper conduct of [our] business."

### *Loan Standards*

Mortgage loans we purchase or securitize must meet the following standards required by the Charter Act.

- *Principal Balance Limitations.*   Our charter permits us to purchase and securitize mortgage loans secured by either a single-family or multifamily property. Single-family conventional mortgage loans are subject to maximum original principal balance limits, known as "conforming loan limits." The conforming loan limits are established each year based on the average prices of one-family residences.

  The national conforming loan limit for mortgages that finance one-family residences is $417,000 in 2012, as it was in 2011 and 2010, with higher limits for mortgages secured by two- to four-family residences and in four statutorily-designated states and territories (Alaska, Hawaii, Guam and the U.S. Virgin Islands). Higher loan limits also apply in high-cost areas (counties or county-equivalent areas) that are designated by FHFA annually. Our charter sets permanent loan limits for high-cost areas up to 150% of the national loan limit ($625,500 for a one-family residence; higher for two- to four-family residences and in the four statutorily-designated states and territories). A series of legislative acts temporarily increased our loan limits beginning in early 2008 in high-cost areas to up to 175% of the national loan limit ($729,750 for a one-family residence; higher for two- to four-family residences and in the four statutorily-designated states and territories). This temporary increase, which is no longer in effect, applied to loans originated through September 30, 2011.

  No statutory limits apply to the maximum original principal balance of multifamily mortgage loans that we purchase or securitize. In addition, the Charter Act imposes no maximum original principal balance limits on loans we purchase or securitize that are insured by FHA or guaranteed by the VA.

- *Loan-to-Value and Credit Enhancement Requirements.*   The Charter Act generally requires credit enhancement on any single-family conventional mortgage loan that we purchase or securitize if it has a loan-to-value ratio over 80% at the time of purchase. We also do not purchase or securitize second lien single-family mortgage loans when the combined loan-to-value ratio exceeds 80%, unless the second lien

- 42 -

mortgage loan has credit enhancement in accordance with the requirements of the Charter Act. The credit enhancement required by our charter may take the form of one or more of the following: (1) insurance or a guaranty by a qualified insurer of the over-80% portion of the unpaid principal balance of the mortgage; (2) a seller's agreement to repurchase or replace the mortgage in the event of default (for such period and under such circumstances as we may require); or (3) retention by the seller of at least a 10% participation interest in the mortgage. Regardless of loan-to-value ratio, the Charter Act does not require us to obtain credit enhancement to purchase or securitize loans insured by FHA or guaranteed by the VA.

### *Authority of U.S. Treasury to Purchase GSE Securities*

Pursuant to our charter, at the discretion of the Secretary of the Treasury, Treasury may purchase our obligations up to a maximum of $2.25 billion outstanding at any one time. Treasury temporarily received expanded authority, which expired on December 31, 2009, to purchase our obligations and other securities in unlimited amounts (up to the national debt limit) under the 2008 Reform Act. We describe Treasury's investment in our senior preferred stock and a common stock warrant pursuant to this expanded temporary authority under "Conservatorship and Treasury Agreements—Treasury Agreements."

### *Other Charter Act Provisions*

The Charter Act has the following additional provisions.

- *Issuances of Our Securities.*   We are authorized, upon the approval of the Secretary of the Treasury, to issue debt obligations and mortgage-related securities. Neither the U.S. government nor any of its agencies guarantees, directly or indirectly, our debt or mortgage-related securities.

- *Exemptions for Our Securities.*   The Charter Act generally provides that our securities are exempt under the federal securities laws administered by the SEC. As a result, we are not required to file registration statements with the SEC under the Securities Act of 1933 with respect to offerings of any of our securities. Our non-equity securities are also exempt securities under the Securities Exchange Act of 1934 (the "Exchange Act"). However, our equity securities are not treated as exempted securities for purposes of Sections 12, 13, 14 or 16 of the Exchange Act. Consequently, we are required to file periodic and current reports with the SEC, including annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K.

- *Exemption from Specified Taxes.*   We are exempt from taxation by states, territories, counties, municipalities and local taxing authorities, except for taxation by those authorities on our real property. We are not exempt from the payment of federal corporate income taxes.

- *Other Limitations and Requirements.*   We may not originate mortgage loans or advance funds to a mortgage seller on an interim basis, using mortgage loans as collateral, pending the sale of the mortgages in the secondary market. In addition, we may only purchase or securitize mortgages on properties located in the United States and its territories.

### Regulation and Oversight of Our Activities

As a federally chartered corporation, we are subject to government regulation and oversight. FHFA is an independent agency of the federal government with general supervisory and regulatory authority over Fannie Mae, Freddie Mac and the 12 Federal Home Loan Banks ("FHLBs"). FHFA was established in July 2008, assuming the duties of our former safety and soundness regulator, the Office of Federal Housing Enterprise Oversight ("OFHEO"), and our former mission regulator, HUD. HUD remains our regulator with respect to fair lending matters. Our regulators also include the SEC and Treasury.

The GSE Act provides FHFA with safety and soundness authority that is comparable to and in some respects broader than that of the federal banking agencies. Even if we were not in conservatorship, the GSE Act gives FHFA the authority to raise capital levels above statutory minimum levels, regulate the size and content of our portfolio and approve new mortgage products, among other things.

- 43 -

FHFA is responsible for implementing the various provisions of the GSE Act. In general, we remain subject to existing regulations, orders and determinations until new ones are issued or made.

*Capital.*    The GSE Act provides FHFA with broad authority to increase the level of our required minimum capital and to establish capital or reserve requirements for specific products and activities. FHFA also has broad authority to establish risk-based capital requirements, to ensure that we operate in a safe and sound manner and maintain sufficient capital and reserves. During the conservatorship, FHFA has suspended our capital classifications. We continue to submit capital reports to FHFA during the conservatorship, and FHFA continues to monitor our capital levels. We describe our capital requirements below under "Capital Adequacy Requirements."

*Portfolio.*    The GSE Act requires FHFA to establish standards governing our portfolio holdings, to ensure that they are backed by sufficient capital and consistent with our mission and safe and sound operations. FHFA is also required to monitor our portfolio and, in some circumstances, may require us to dispose of or acquire assets. In 2010, FHFA published a final rule adopting, as the standard for our portfolio holdings, the portfolio limits specified in the senior preferred stock purchase agreement described under "Treasury Agreements—Covenants under Treasury Agreements," as it may be amended from time to time. The rule is effective for as long as we remain subject to the terms and obligations of the senior preferred stock purchase agreement.

*New Products.*    The GSE Act requires us to obtain FHFA's approval before initially offering any product, subject to certain exceptions. The GSE Act also requires us to provide FHFA with written notice before commencing any new activity. In July 2009, FHFA published an interim final rule implementing these provisions of the GSE Act. Subsequently, the Acting Director of FHFA concluded that permitting us to offer new products at this time is inconsistent with the goals of the conservatorship. He therefore instructed us not to submit requests for approval of new products under the interim final rule. We cannot predict when or if FHFA will permit us to submit new product requests under the rule.

*Receivership.*    Under the GSE Act, FHFA must place us into receivership if it determines that our assets are less than our obligations for 60 days, or we have not been paying our debts as they become due for 60 days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and liabilities would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days thereafter. FHFA has advised us that if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the senior preferred stock purchase agreement, the Director of FHFA will not make a mandatory receivership determination.

In addition, we could be put into receivership at the discretion of the Director of FHFA at any time for other reasons, including conditions that FHFA has already asserted existed at the time the then-Director of FHFA placed us into conservatorship. The statutory grounds for discretionary appointment of a receiver include: a substantial dissipation of assets or earnings due to unsafe or unsound practices; the existence of an unsafe or unsound condition to transact business; an inability to meet our obligations in the ordinary course of business; a weakening of our condition due to unsafe or unsound practices or conditions; critical undercapitalization; the likelihood of losses that will deplete substantially all of our capital; or by consent.

In June 2011, FHFA issued a final rule establishing a framework for conservatorship and receivership operations for the GSEs. The rule is part of FHFA's implementation of the powers provided by the 2008 Reform Act, and does not seek to anticipate or predict future conservatorships or receiverships. The final rule, which became effective on July 20, 2011, establishes procedures for conservatorship and receivership, and priorities of claims for contract parties and other claimants. For example, the final rule clarifies that:

- the powers of the conservator or receiver include continuing our mission and ensuring that our operations foster liquid, efficient, competitive and resilient national housing finance markets;

- the conservator or receiver may disaffirm or repudiate any contract or lease to which we are a party for up to 18 months following the appointment of a conservator or receiver;

<div align="center">- 44 -</div>

- we are prohibited from making capital distributions while in conservatorship unless authorized by the Director of FHFA; and

- claims by current or former shareholders (including securities litigation claims) would receive the lowest priority in a receivership, behind: (1) administrative expenses of the receiver (or an immediately preceding conservator), (2) our other general or senior liabilities, and (3) obligations subordinated to those of general creditors.

The rule also provides that FHFA, as conservator, will not pay securities litigation claims against us during conservatorship, unless the Director of FHFA determines it is in the interest of the conservatorship. An action, which was brought by the Ohio Public Employees Retirement System and the State Teachers Retirement System of Ohio, is currently pending in the U.S. District Court for the District of Columbia against FHFA and Acting Director DeMarco challenging the rule's provisions regarding nonpayment of securities litigation claims.

*Prudential Management and Operational Standards.*   As required by the GSE Act, in June 2011, FHFA issued a proposed rule establishing prudential standards relating to the management and operations of Fannie Mae, Freddie Mac and the FHLBs in the following ten areas: (1) internal controls and information systems; (2) independence and adequacy of internal audit systems; (3) management of market risk exposure; (4) management of market risk—measurement systems, risk limits, stress testing, and monitoring and reporting; (5) adequacy and maintenance of liquidity and reserves; (6) management of asset and investment portfolio growth; (7) investments and acquisitions of assets; (8) overall risk management processes; (9) management of credit and counterparty risk; and (10) maintenance of adequate records. These standards are proposed to be adopted as guidelines, which the Director of FHFA may modify, revoke or add to at any time by order. The proposed rule provides that FHFA may take specified remedial actions if a regulated entity fails to meet one or more of the standards, such as requiring the entity to submit a corrective plan or increasing its capital requirements.

*Affordable Housing Goals and Duty to Serve.*   We discuss our affordable housing goals and our duty to serve underserved markets below under "Housing Goals and Duty to Serve Underserved Markets."

*Affordable Housing Allocations.*   The GSE Act requires us to set aside in each fiscal year an amount equal to 4.2 basis points for each dollar of the unpaid principal balance of our total new business acquisitions, and to allocate such amount to certain government funds. The GSE Act also allows FHFA to suspend allocations on a temporary basis. In November 2008, FHFA advised us that it was suspending our allocations until further notice.

*Executive Compensation.*   The Charter Act requires that compensation of our executives be reasonable and comparable with the compensation of executives performing similar duties in similar businesses, except that a significant portion of potential compensation must be based on our performance. Further, the GSE Act directs FHFA to prohibit us from providing unreasonable or non-comparable compensation to our executive officers. FHFA may at any time review the reasonableness and comparability of an executive officer's compensation and may require us to withhold any payment to the officer during such review. FHFA is also authorized to prohibit or limit certain golden parachute and indemnification payments to directors, officers and certain other parties. FHFA has issued rules relating to golden parachute payments, setting forth factors to be considered by the Director of FHFA in acting upon his authority to limit such payments.

*Fair Lending.*   The GSE Act requires the Secretary of HUD to assure that the GSEs meet their fair lending obligations. Among other things, HUD is required to periodically review and comment on the underwriting and appraisal guidelines of each company to ensure consistency with the Fair Housing Act. HUD is currently conducting such a review.

### Capital Adequacy Requirements

The GSE Act establishes capital adequacy requirements. The statutory capital framework incorporates two different quantitative assessments of capital—a minimum capital requirement and a risk-based capital

- 45 -

requirement. The minimum capital requirement is ratio-based, while the risk-based capital requirement is based on simulated stress test performance. The GSE Act requires us to maintain sufficient capital to meet both of these requirements in order to be classified as "adequately capitalized." However, during the conservatorship, FHFA has suspended capital classification of us and announced that our existing statutory and FHFA-directed regulatory capital requirements will not be binding. FHFA has advised us that, because we are under conservatorship, we will not be subject to corrective action requirements that would ordinarily result from our receiving a capital classification of "undercapitalized."

*Minimum Capital Requirement.*   Under the GSE Act, we must maintain an amount of core capital that equals or exceeds our minimum capital requirement. The GSE Act defines core capital as the sum of the stated value of outstanding common stock (common stock less treasury stock), the stated value of outstanding non-cumulative perpetual preferred stock, paid-in capital, and retained earnings, as determined in accordance with GAAP. Our minimum capital requirement is generally equal to the sum of 2.50% of on-balance sheet assets and 0.45% of off-balance sheet obligations. For purposes of minimum capital, FHFA has directed us to continue reporting loans backing Fannie Mae MBS held by third parties based on 0.45% of the unpaid principal balance regardless of whether these loans have been consolidated pursuant to accounting rules. FHFA retains authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities.

*Risk-Based Capital Requirement.*   The GSE Act requires FHFA to establish risk-based capital requirements for Fannie Mae and Freddie Mac, to ensure that we operate in a safe and sound manner. Existing risk-based capital regulation ties our capital requirements to the risk in our book of business, as measured by a stress test model. The stress test simulates our financial performance over a ten-year period of severe economic conditions characterized by both extreme interest rate movements and high mortgage default rates. FHFA has stated that it does not intend to publish our risk-based capital level during the conservatorship and has discontinued stress test simulations under the existing rule. We continue to submit detailed profiles of our books of business to FHFA to support FHFA's monitoring of our business activity and their research into future risk-based capital rules.

*Critical Capital Requirement.*   The GSE Act also establishes a critical capital requirement, which is the amount of core capital below which we would be classified as "critically undercapitalized." Under the GSE Act, such classification is a discretionary ground for appointing a conservator or receiver. Our critical capital requirement is generally equal to the sum of 1.25% of on-balance sheet assets and 0.25% of off-balance sheet obligations. FHFA has directed us, for purposes of critical capital, to continue reporting loans backing Fannie Mae MBS held by third parties based on 0.25% of the unpaid principal balance, notwithstanding our consolidation of substantially all of the loans backing these securities. FHFA has stated that it does not intend to publish our critical capital level during the conservatorship.

*Bank Capital and Other Supervisory Standards.*   In the wake of the financial crisis and as a result of the Dodd-Frank Act and of actions by international bank regulators, the capital regime for the banking industry is undergoing major changes. The Basel Committee on Banking Supervision finalized a set of revisions (known as Basel III) to the international capital requirements in December 2010. Basel III generally narrowed the definition of capital that can be used to meet risk-based standards and raises the amount of capital that must be held. On December 20, 2011, the Federal Reserve stated that it is working with the other U.S. banking regulators to implement the Basel III capital reforms in the United States.

The Dodd-Frank Act requires stronger regulation of major bank holding companies and nonbank financial companies designated for Federal Reserve supervision by the FSOC. The prudential standards for covered companies must include enhanced risk-based capital and leverage requirements, enhanced liquidity requirements, enhanced risk management and risk committee requirements, a requirement to submit a resolution plan, single-counterparty credit limits, stress tests, and a debt-to-equity limit for covered companies that the FSOC has determined pose a grave threat to financial stability.

Although the GSEs are not currently subject to bank capital requirements, any revised framework for GSE capital standards may be based on bank requirements, particularly if the GSEs are deemed to be systemically important financial companies subject to Federal Reserve oversight.

TREASURY-2441

*Housing Goals and Duty to Serve Underserved Markets*

Since 1993, we have been subject to housing goals. The structure of our housing goals changed in 2010 as a result of the 2008 Reform Act. The 2008 Reform Act also created a new duty for us to serve three underserved markets, which we discuss below.

*Housing Goals*

FHFA established the following single-family home purchase and refinance housing goal benchmarks for 2011 and 2010. A home purchase mortgage may be counted toward more than one home purchase benchmark.

- *Low-Income Families Home Purchase Benchmark:*   At least 27% of our acquisitions of single-family owner-occupied mortgage loans financing home purchases must be affordable to low-income families (defined as families with income no higher than 80% of area median income).

- *Very Low-Income Families Home Purchase Benchmark:*   At least 8% of our acquisitions of single-family owner-occupied mortgage loans financing home purchases must be affordable to very low-income families (defined as families with income no higher than 50% of area median income).

- *Low-Income Areas Home Purchase Benchmarks:*   At least 24% of our acquisitions of single-family owner-occupied mortgage loans financing home purchases must be for families in low-income census tracts, for moderate-income families (defined as families with income no higher than 100% of area median income) in designated disaster areas or for moderate-income families in minority census tracts. In addition, at least 13% of our acquisitions of single-family owner-occupied purchase money mortgage loans must be for families in low-income census tracts or for moderate-income families in minority census tracts.

- *Low-Income Families Refinancing Benchmark:*   At least 21% of our acquisitions of single-family owner-occupied refinance mortgage loans must be affordable to low-income families, which may include qualifying permanent modifications of mortgages under HAMP completed during the year.

If we do not meet these benchmarks, we may still meet our goals. Our single-family housing goals performance will be measured against these benchmarks and against goals-qualifying originations in the primary mortgage market. We will be in compliance with the housing goals if we meet either the benchmarks or market share measures.

FHFA also established a multifamily goal and subgoal. For each of 2011 and 2010, our multifamily mortgage acquisitions must finance at least 177,750 units affordable to low-income families, and at least 42,750 units affordable to very low-income families. There is no market-based alternative measurement for the multifamily goals.

Under FHFA's rule establishing our housing goals, which was finalized in September 2010, FHFA made significant changes to prior housing goals regulations regarding the types of products that count towards the housing goals. Private-label mortgage-related securities, second liens and single-family government loans do not count towards the housing goals. In addition, only permanent modifications of mortgages under HAMP completed during the year count towards the housing goals; trial modifications will not be counted. Moreover, these modifications count only towards the single-family low-income families refinance goal, not any of the home purchase goals.

In adopting the rule establishing our housing goals, FHFA indicated "FHFA does not intend for [Fannie Mae] to undertake uneconomic or high-risk activities in support of the [housing] goals. However, the fact that [Fannie Mae is] in conservatorship should not be a justification for withdrawing support from these market segments." If our efforts to meet our goals prove to be insufficient, FHFA determines whether the goals were feasible. If FHFA finds that our goals were feasible, we may become subject to a housing plan that could require us to take additional steps that could have an adverse effect on our results of operations and financial condition. The housing plan must describe the actions we would take to meet the goal in the next calendar year and be approved by FHFA. The potential penalties for failure to comply with housing plan requirements include a cease-and-desist order and civil

- 47 -

money penalties. See "Risk Factors" for a description of how we may be unable to meet our housing goals and how actions we may take to meet these goals and other regulatory requirements could adversely affect our business, results of operations and financial condition.

The following table presents our performance against our single-family housing benchmarks and multifamily housing goals for 2011 and 2010, as well as our performance against market share measures for 2010. Our 2011 performance results have not yet been validated by FHFA.

**Housing Goals Performance**

| | 2011 | | 2010 | | |
|---|---|---|---|---|---|
| | Result[1] | Bench-mark[2] | Result | Bench-mark | Single-Family Market Level |
| **Single-family housing goals:[3]** | | | | | |
| Low-income families home purchases | 25.77% | 27% | 25.13% | 27% | 27.2% |
| Very low-income families home purchases | 7.56 | 8 | 7.24 | 8 | 8.1 |
| Low-income areas home purchases | 22.32 | 24 | 24.05 | 24 | 24.0 |
| Low-income and high-minority areas home purchases | 11.60 | 13 | 12.37 | 13 | 12.1 |
| Low-income families refinancing | 23.05 | 21 | 20.90 | 21 | 20.2 |
| | Result[1] | Goal | Result | Goal | |
| | | (in units) | | | |
| **Multifamily housing goals:** | | | | | |
| Affordable to families with incomes no higher than 80% of area median income | 301,224 | 177,750 | 214,997 | 177,750 | |
| Affordable to families with incomes no higher than 50% of area median income | 84,244 | 42,750 | 53,908 | 42,750 | |

_____

[1] Our 2011 results have not been validated by FHFA, and after validation they may differ from the results reported above.

[2] Even if our results do not meet the 2011 benchmarks, we may still meet our goals. Our single-family housing goals performance is measured not only against these benchmarks, but also against the share of goals-qualifying originations in the primary mortgage market. We will be in compliance with the housing goals if we meet either the benchmarks or market share measures. The amount of goals-qualifying originations in the market during 2011 will not be available until the release of data reported by primary market originators under the Home Mortgage Disclosure Act in the fall of 2012.

[3] Our single-family results and benchmarks are expressed as a percentage of the total number of eligible mortgages acquired during the period.

We believe we met our single-family low-income refinance benchmark for 2011, as well as our 2011 multifamily goals. As discussed above, we can meet our single-family goals either by meeting an established benchmark or by meeting a market share measure of goals-qualifying originations in the primary mortgage market. In consultation with FHFA, we are currently analyzing our performance against our goals. We will file our assessment of our 2011 housing goals performance with FHFA in mid-March.

To determine whether we ultimately met our 2011 single-family housing goals where our performance falls below benchmark levels, we and FHFA will have to compare our performance with that of goals-qualifying originations in the primary mortgage market after the release of data reported under the Home Mortgage Disclosure Act ("HMDA"). This release will be made in the fall of 2012. At that time it will be determined whether we met any additional goals based on the HMDA market data.

For 2010, FHFA has determined that we met our single-family low-income areas home purchase goals and our single-family refinance goal, as well as our 2010 multifamily goals. FHFA determined that we did not meet our single-family low-income home purchase goal or our single-family very low-income home purchase goal. Although FHFA determined that we did not meet these two goals and that their achievement was feasible, FHFA is not requiring us to submit a housing plan. FHFA stated that a housing plan is not required because of the significant changes to the housing goals structure for 2010 and Fannie Mae's continued operation under conservatorship.

- 48 -

*Duty to Serve*

The 2008 Reform Act created the duty to serve underserved markets in order for us and Freddie Mac to "provide leadership to the market in developing loan products and flexible underwriting guidelines to facilitate a secondary market for very low-, low-, and moderate-income families" with respect to three underserved markets: manufactured housing, affordable housing preservation, and rural areas.

The duty to serve is a new oversight responsibility for FHFA. The Director of FHFA is required to establish by regulation a method for evaluating and rating the performance by us and Freddie Mac of the duty to serve underserved markets. In June 2010, FHFA published its proposed rule to implement this duty. A final rule has not been issued.

Under the proposed rule, we would be required to submit an underserved markets plan at least 90 days before the plan's effective date of January 1st of a particular year establishing benchmarks and objectives against which FHFA would evaluate and rate our performance. The plan term is two years. We will likely need to submit a plan as soon as practicable after the publication of the final rule that will be effective for the first plan period.

The 2008 Reform Act requires FHFA to separately evaluate the following four assessment factors:

- The loan product assessment factor requires evaluation of our "development of loan products, more flexible underwriting guidelines, and other innovative approaches to providing financing to each" underserved market.

- The outreach assessment factor requires evaluation of "the extent of outreach to qualified loan sellers and other market participants." We are expected to engage market participants and pursue relationships with qualified sellers that serve each underserved market.

- The loan purchase assessment factor requires FHFA to consider the volume of loans acquired in each underserved market relative to the market opportunities available to us. The 2008 Reform Act prohibits the establishment of specific quantitative targets by FHFA. However, in its evaluation FHFA could consider the volume of loans acquired in past years.

- The investment and grants assessment factor requires evaluation of the amount of investment and grants in projects that assist in meeting the needs of underserved markets.

Under the proposed rule, FHFA would give the loan purchase and outreach assessment factors significant weight. Because we are in conservatorship, the investment and grants assessment factor would receive little or no weight. In addition, FHFA would consider the loan product assessment factor, even though we are currently prohibited from entering into new lines of business and developing new products. The proposed rule states that acquisitions and activities pursuant to the duty to serve should be profitable, even if less profitable than other activities.

FHFA would evaluate our performance on each assessment factor annually, and assign a rating of "satisfactory" or "unsatisfactory" to each factor in each underserved market. The evaluation would be based on whether we have substantially met our benchmarks and objectives as outlined in our underserved markets plan. FHFA would also consider the impact of overall market conditions and other factors outside our control that could impact our ability to meet our benchmarks and objectives. Based on the assessment factor findings, FHFA would assign a rating of "in compliance" or "noncompliance" with the duty to serve each underserved market.

With some exceptions, the counting rules and other requirements would be similar to those established for the housing goals. For the loan purchase assessment factor, FHFA proposes to measure performance in terms of units rather than mortgages or unpaid principal balance. All single-family loans we acquire must meet the standards in the Interagency Statement on Subprime Mortgage Lending and the Interagency Guidance on Nontraditional Mortgage Product Risks. We are expected to review the operations of loan sellers to ensure compliance with these standards.

If we fail to comply with, or there is a substantial probability that we will not comply with, our duty to serve a particular underserved market in a given year, FHFA would determine whether the benchmarks and objectives in

TREASURY-2444

our underserved markets plan are or were feasible. If we fail to meet our duty to serve, and FHFA determines that the benchmarks and objectives in our underserved markets plan are or were feasible, then, in the Director's discretion, we may be required to submit a housing plan. Under the proposed rule, the housing plan must describe the activities that we will take to comply with the duty to serve a particular underserved market for the next calendar year, or improvements and changes in operations that we will make during the remainder of the current year.

Under the proposed rule, we would be required to provide quarterly and annual reports on our performance and progress towards meeting our duty to serve.

See "Risk Factors" for a description of how changes we may make in our business strategies in order to meet our housing goals and duty to serve requirement may increase our credit losses and adversely affect our results of operations.

## MAKING HOME AFFORDABLE PROGRAM

The Obama Administration's Making Home Affordable Program, which was introduced in February 2009, is intended to provide assistance to homeowners and prevent foreclosures. Working with our conservator, we have devoted significant effort and resources to help distressed homeowners through initiatives that support the Making Home Affordable Program. Below we describe key aspects of the Making Home Affordable Program and our role in the program. For additional information about our activities under the program, please see "Business—Making Home Affordable Program" in our Annual Report on Form 10-K for the year ended December 31, 2009. For information about the program's financial impact on us, please see "MD&A—Consolidated Results of Operations—Financial Impact of the Making Home Affordable Program on Fannie Mae."

The Making Home Affordable Program is comprised primarily of a Home Affordable Refinance Program ("HARP"), under which we acquire or guarantee loans that are refinancings of mortgage loans we own or guarantee, and Freddie Mac does the same, and a Home Affordable Modification Program ("HAMP"), which provides for the modification of mortgage loans owned or guaranteed by us or Freddie Mac, as well as other mortgage loans. These two programs were designed to expand the number of borrowers who can refinance or modify their mortgages to achieve a monthly payment that is more affordable now and into the future or to obtain a more stable loan product, such as a fixed-rate mortgage loan in lieu of an adjustable-rate mortgage loan. We participate in the Making Home Affordable Program, and our sellers and servicers offer HARP and HAMP to Fannie Mae borrowers. We also serve as Treasury's program administrator for HAMP and other initiatives under the Making Home Affordable Program.

### Changes to the Home Affordable Refinance Program

In the fourth quarter of 2011, FHFA, Fannie Mae, and Freddie Mac announced changes to HARP aimed at making refinancing under the program easier and potentially less expensive for qualifying homeowners and encouraging lenders to participate in the program. While HARP previously limited eligibility to borrowers with mortgage loans for their primary residence that had LTV ratios greater than 80% but no greater than 125%, the new HARP guidelines remove that ceiling when a borrower refinances into a new fixed-rate mortgage. Other changes to HARP include:

- eliminating risk-based fees for borrowers who refinance into loans with terms up to 20 years and lowering fees for other borrowers to no more than 75 basis points;

- eliminating the need for a new property appraisal in many cases;

- extending the ending date for HARP from June 2012 to December 2013; and

- reducing the extent to which lenders will be liable for violations of representations and warranties in connection with refinancings under HARP.

At this time, we do not know how many eligible borrowers are likely to refinance under the program and, therefore, how many HARP loans we will acquire.

- 50 -

**Our Role as Program Administrator**

Treasury has engaged us to serve as program administrator for HAMP and other initiatives under the Making Home Affordable Program. Our principal activities as program administrator include the following:

- Implementing the guidelines and policies of the Treasury program;

- Preparing the requisite forms, tools and training to facilitate efficient loan modifications by servicers;

- Creating, making available and managing the process for servicers to report modification activity and program performance;

- Calculating incentive compensation consistent with program guidelines;

- Acting as record-keeper for executed loan modifications and program administration;

- Coordinating with Treasury and other parties toward achievement of the program's goals, including assisting with development and implementation of updates to the program and initiatives expanding the program's reach; and

- Performing other tasks as directed by Treasury from time to time.

In our capacity as program administrator for the program, we support over 100 servicers that have signed up to participate with respect to non-agency loans under the program. To help servicers implement the program, we have provided information and resources through a Web site dedicated to servicers under the program. We have also communicated information about the program to servicers and helped servicers implement and integrate the program with new systems and processes. As program administrator, we have taken the following steps to help servicers implement the program:

- dedicated Fannie Mae personnel to work closely with participating servicers;

- established a servicer support call center;

- conducted ongoing conference calls with the leadership of participating servicers;

- provided training through live Web seminars and recorded tutorials; and

- made checklists and job aids available on the program Web site.

On January 27, 2012, the Administration announced an extension of HAMP for an additional year through December 31, 2013. The Acting Director of FHFA has directed us to continue modifying loans under HAMP through that date, and our role as program administrator will be extended accordingly.

## OUR CUSTOMERS

Our principal customers are lenders that operate within the primary mortgage market where mortgage loans are originated and funds are loaned to borrowers. Our customers include mortgage banking companies, savings and loan associations, savings banks, commercial banks, credit unions, community banks, insurance companies, and state and local housing finance agencies. Lenders originating mortgages in the primary mortgage market often sell them in the secondary mortgage market in the form of whole loans or in the form of mortgage-related securities.

During 2011, approximately 1,000 lenders delivered single-family mortgage loans to us, either for securitization or for purchase. We acquire a significant portion of our single-family mortgage loans from several large mortgage lenders. During 2011, our top five lender customers, in the aggregate, accounted for approximately 60% of our single-family business volume, while our top five lender customers accounted for approximately 62% of our single-family business volume in 2010. Three lender customers, Wells Fargo Bank, N.A., JPMorgan Chase Bank, NA and Bank of America, N.A., including their respective affiliates, in the aggregate accounted for more than 48% of our single-family business volume for 2011. In this report, we may refer to Bank of America, N.A. and its affiliates, collectively and individually, as "Bank of America."

- 51 -

Bank of America, which accounted for approximately 12% of our single-family business volume in 2011, is the seller/servicer with whom we have the most repurchase requests outstanding. In the fourth quarter of 2011, Bank of America slowed the pace of its repurchases. As a result, the already high volume of our outstanding repurchase requests with Bank of America increased substantially. At this time, we do not know what impact these issues will ultimately have on our future business with Bank of America. We discuss these developments in "MD&A—Risk Management—Institutional Counterparty Credit Risk Management—Mortgage Seller/Servicers."

Due to ongoing consolidation within the mortgage industry, as well as the number of mortgage lenders that have gone out of business since 2006, we, as well as our competitors, will obtain business from a decreasing number of large mortgage lenders. We will seek to provide liquidity to a broader, more diverse set of mortgage lenders. However, to the extent we become more reliant on a smaller number of lender customers, our negotiating leverage with these customers could decrease. In addition, many of our lender customers are experiencing financial and liquidity problems, which may affect the volume of business they are able to generate and their ability to honor our repurchase requests. Several of our large lender customers have exited from correspondent or broker lending, focusing instead on lending through their retail channels, which may also affect the volume of business they are able to generate. We discuss the risks that customer concentration poses to our business in "Risk Factors."

## COMPETITION

Historically, our competitors have included Freddie Mac, FHA, Ginnie Mae (which primarily guarantees securities backed by FHA-insured loans), the twelve FHLBs, financial institutions, securities dealers, insurance companies, pension funds, investment funds and other investors. Since 2008, almost all of our competitors, other than Freddie Mac, FHA, Ginnie Mae and the FHLBs, dramatically reduced or ceased their activities in the residential mortgage finance business. We remained the largest single issuer of mortgage-related securities in the secondary market in 2011. During 2011, our primary competitors for the issuance of mortgage-related securities were Ginnie Mae and Freddie Mac. We currently estimate that our single-family market share was 41% in 2011, compared with 36% in 2010. These amounts represent our single-family mortgage acquisitions for each year, excluding delinquent loans we purchased from our MBS trusts, as a percentage of the single-family first-lien mortgages we currently estimate were originated in the United States that year. Because our estimate of mortgage originations in prior periods is subject to change as additional data become available, these market share estimates may change in the future, perhaps materially.

We compete to acquire mortgage assets in the secondary market both for securitization into Fannie Mae MBS and, to a significantly lesser extent, for our investment portfolio. We also compete for the issuance of mortgage-related securities to investors. Competition in these areas is affected by many factors, including the amount of residential mortgage loans offered for sale in the secondary market by loan originators and other market participants, the nature of the residential mortgage loans offered for sale (for example, whether the loans represent refinancings), the current demand for mortgage assets from mortgage investors, the interest rate risk investors are willing to assume and the yields they will require as a result, and the credit risk and prices associated with available mortgage investments.

Competition to acquire mortgage assets is significantly affected by pricing and eligibility standards. We compete with Freddie Mac and, especially for loans with higher LTV ratios, with FHA. FHA is also able to acquire loans with higher original principal balances than we are permitted to acquire, as a result of the September 30, 2011 expiration of a temporary increase in our loan limits. We expect our guaranty fees may increase in coming years, which would likely affect our competitive environment. See "Our Charter and Regulation of Our Activities–Loan Standards" for more information about our loan limits, and "Legislative and Regulatory Developments—Changes to Our Single-Family Guaranty Fee Pricing and Revenue," for a discussion of anticipated pricing increases.

We also compete for low-cost debt funding with institutions that hold mortgage portfolios, including Freddie Mac and the FHLBs.

TREASURY-2447

Although we do not know the structure that long-term GSE reform will ultimately take, we expect that, if our company continues, we will face more competition in the future. Please see "Legislative and Regulatory Developments—GSE Reform" for discussions of GSE reform, recent legislative reform of the financial services industry that is likely to affect our business and the role of private capital in the mortgage markets.

## EMPLOYEES

As of January 31, 2012, we employed approximately 7,000 personnel, including full-time and part-time employees, term employees and employees on leave.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We make available free of charge through our Web site our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and all other SEC reports and amendments to those reports as soon as reasonably practicable after we electronically file the material with, or furnish it to, the SEC. Our Web site address is www.fanniemae.com. Materials that we file with the SEC are also available from the SEC's Web site, www.sec.gov. You may also request copies of any filing from us, at no cost, by calling the Fannie Mae Fixed-Income Securities Helpline at (800) 237-8627 or (202) 752-7115 or by writing to Fannie Mae, Attention: Fixed-Income Securities, 3900 Wisconsin Avenue, NW, Area 2H-3S, Washington, DC 20016.

All references in this report to our Web site addresses or the Web site address of the SEC are provided solely for your information. Information appearing on our Web site or on the SEC's Web site is not incorporated into this annual report on Form 10-K.

## FORWARD-LOOKING STATEMENTS

This report includes statements that constitute forward-looking statements within the meaning of Section 21E of the Exchange Act. In addition, our senior management may from time to time make forward-looking statements orally to analysts, investors, the news media and others. Forward-looking statements often include words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," "forecast," "project," "would," "should," "could," "may," "prospects," or similar words.

Among the forward-looking statements in this report are statements relating to:

- Our expectation that housing will start to recover if the employment market continues to improve;

- Our anticipation of an approximately 1.1% decline in single-family mortgage debt outstanding in 2012;

- Our expectation that the unemployment rate will remain relatively flat in 2012;

- Our expectation that, while the strength of improving vacancy levels and rental rates will vary by metropolitan area, on a national basis the multifamily sector should continue to see steady demand in 2012;

- Our expectation that rental demand for multifamily housing will continue to outstrip supply, thereby maintaining stable vacancy levels and healthy rent growth, given job growth slowly improving, and, more importantly, the lack of new apartment supply becoming available over the next 12 to 18 months;

- Our expectation that, as a result, the outlook remains steady for the multifamily sector at the national level over the coming year;

- Our expectation that we will increasingly focus on building a new infrastructure for the secondary mortgage market and on actions that will gradually decrease our presence in the marketplace while simplifying and shrinking our operations;

- Our expectation that we will experience high levels of period-to-period volatility in our results because our derivatives are recorded at fair value in our financial statements while some of the instruments they hedge are not recorded at fair value in our financial statements;

- 53 -

- Our expectation, based on their performance so far, that loans in our new single-family book of business will perform well over their lifetime;

- Our expectation that the serious delinquency rates for single-family loans acquired in recent years will be higher after the loans have aged, but not as high as the December 31, 2011 serious delinquency rates of loans in our legacy book of business;

- Our expectations regarding whether loans we acquired in specific years, individually or aggregated by ranges of years, will be profitable over their lifetime, by which we mean that we expect our fee income on these loans to exceed our credit losses and administrative costs for them;

- Our belief that credit losses on loans we have acquired since 2009 would exceed guaranty fee revenue if home prices declined nationally by approximately 10% from their December 2011 levels over the next five years, based on our home price index;

- Our expectations regarding the credit profile of loans we acquire in the future, and the factors that will influence their credit profile;

- Our estimate that, while single-family loans that we acquired from 2005 through 2008 will give rise to additional credit losses that we will realize when the loans are charged off (upon foreclosure or our acceptance of a short sale or deed-in-lieu of foreclosure), we have reserved for the substantial majority of the remaining losses on these loans;

- Our expectation that our loss reserves will remain significantly elevated relative to historical levels for an extended period because (1) we expect future defaults on loans in our legacy book of business and the resulting charge-offs will occur over a period of years and (2) a significant portion of our reserves represents concessions granted to borrowers upon modification of their loans and will remain in our reserves until the loans are fully paid or default;

- Our expectation that it will take years before our REO inventory approaches pre-2008 levels;

- Our estimate that we will realize as credit losses over two-thirds of the fair value losses on loans purchased out of unconsolidated MBS trusts that are reflected in our consolidated balance sheets, and eventually recover the remaining nearly one-third, either through net interest income for loans that cure or through foreclosed property income for loans where the sale of the collateral exceeds our recorded investment in the loan;

- Our belief that successful modifications will ultimately reduce our credit losses over the long term from what they otherwise would have been if we had taken the loans to foreclosure;

- Our belief that foreclosure delays resulting from changes in the foreclosure environment will continue to negatively impact our foreclosure timelines, credit-related expenses and single-family serious delinquency rates, and will delay the recovery of the housing market;

- Our expectation that serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process, the volume of loan modifications and the extent to which borrowers with modified loans continue to make timely payments;

- Our belief that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding;

- Our expectation that changes or perceived changes in the government's support could materially and adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition, results of operations and ability to continue as a going concern;

- Our expectation that weakness in the housing and mortgage markets will continue in 2012;

- Our expectation that the high level of delinquent mortgage loans will ultimately result in high levels of foreclosures, which is likely to add to the excess housing inventory;

TREASURY-2449

- Our expectation that home sales are unlikely to rise until the unemployment rate improves further;

- Our expectation that single-family default and severity rates, as well as the level of single-family foreclosures, will remain high in 2012;

- Our expectation that, despite signs of multifamily sector improvement at the national level, our multifamily charge-offs in 2012 will remain generally commensurate with 2011 levels as certain local markets and properties continue to exhibit weak fundamentals;

- Our expectations that changes to HARP announced in October 2011 will result in our acquiring more refinancings in 2012 than we would have acquired in the absence of the changes, but that we will acquire fewer refinancings overall in 2012 than in 2011 because a high number of mortgages have already refinanced to low rates in recent years;

- Our expectation that our loan acquisitions overall for 2012 will be lower than in 2011;

- Our belief that our loan acquisitions could be negatively affected by the decrease in the fourth quarter of 2011 in the maximum size loan we may acquire in specified high-cost areas;

- Our expectation that our future revenues will be negatively impacted to the extent our acquisitions decline;

- Our estimation that total originations in the U.S. single-family mortgage market in 2012 will decrease from 2011 levels by approximately 23%, from an estimated $1.4 trillion to an estimated $1.1 trillion, and that the amount of originations in the U.S. single-family mortgage market that are refinancings will decline from approximately $896 billion to approximately $568 billion;

- Our expectation that home prices on a national basis will decline further before stabilizing in 2013;

- Our expectation of a peak-to-trough home price decline on a national basis ranging from 23% to 30%, with the occurrence of an additional adverse economic event needed to reach the high end of the range;

- Our expectations regarding regional variations in home price declines and stabilization;

- Our expectation that our credit-related expenses will continue to be high in 2012 but that, overall, our credit-related expenses will be lower in 2012 than in 2011;

- Our expectation that our credit losses in 2012 will remain high;

- Our expectation that we will not earn profits in excess of our annual dividend obligation to Treasury for the indefinite future;

- Our expectation that the Acting Director of FHFA will submit a request to Treasury on our behalf to eliminate our net worth deficit as of December 31, 2011;

- Our expectation that we will request additional draws under the senior preferred stock purchase agreement in future periods, which will further increase the dividends we owe to Treasury on the senior preferred stock;

- Our expectation that over time our dividend obligation to Treasury will constitute an increasing portion of our future draws under the senior preferred stock purchase agreement;

- Our expectation that uncertainty regarding the future of our company will continue;

- Our expectation that we will continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other factors, including the limit on mortgage assets that we may own pursuant to the senior preferred stock purchase agreement;

- Our expectations that revenues derived from our mortgage asset portfolio will decrease over time as the maximum allowable amount of mortgage assets we may own decreases each year to 90% of the amount we were permitted to own the previous year under our senior preferred stock purchase agreement with Treasury;

- 55 -

- Our expectation that Congressional hearings on GSE reform will continue in 2012 and additional legislation will be considered and proposals will be discussed, including proposals that would result in a substantial change to our business structure or that involve Fannie Mae's liquidation or dissolution;

- Our belief that, as drafted, bills introduced in Congress that would require FHFA to make a determination within two years of enactment regarding whether the GSEs were financially viable and, if the GSEs were determined to be not financially viable, to place them into receivership may upon enactment impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent the federal government providing an explicit guarantee of our existing and future liabilities;

- Our expectation that the Dodd-Frank Act will directly affect our business because new and additional regulatory oversight and standards will apply to us, and that we may also be affected by provisions of the Dodd-Frank Act and implementing regulations that impact the activities of our customers and counterparties in the financial services industry;

- Our expectation that, if we are designated as a systemically important nonbank financial company, we may become subject to certain enhanced prudential standards established by the Federal Reserve;

- Our expectation that the adoption and application or enhanced supervision and prudential standards under the Dodd-Frank Act could increase our costs and may adversely affect demand for our debt and MBS;

- Our expectation that our single-family guaranty fees may change in the future in addition to increases required in the Temporary Payroll Tax Cut Continuation Act of 2011;

- Our expectation that our future guaranty fees will incorporate private sector pricing considerations such as geographic pricing that contemplates differences in foreclosure laws across the states, pricing indicative of higher required minimum capital levels, and more significant pricing differentiation between higher-risk and lower-risk loans;

- Our expectations that increases in our single-family guaranty fees will affect our competitive environment;

- Our expectations regarding the impact of FHFA's directive that we phase out the practice of requiring mortgage servicers to use our network of retained attorneys to perform default- and foreclosure-related legal services for our loans;

- Our expectations regarding a transitional period as we discontinue our retained attorney network;

- Our expectation that we will seek to provide liquidity to a broader, more diversified set of mortgage lenders;

- Our expectation that, although we do not know the structure that long-term GSE reform will ultimately take, if our company continues we will face more competition in the future;

- Our expectation that we will continue to need funding from Treasury, and that FHFA will request additional funds from Treasury on our behalf, to avoid triggering FHFA's obligation to place us into receivership;

- Our expectations regarding compensation we will pay our executives in the future;

- Our expectation that deterioration in the credit performance of mortgage loans that we own or that back Fannie Mae MBS will continue and result in additional credit-related expenses;

- Our expectation that we will experience additional other-than-temporary impairment write-downs of our investments in private-label mortgage-related securities;

- Our expectation that our acquisitions of Alt-A mortgage loans (which are limited to refinancings of existing Fannie Mae loans) will continue to be minimal in future periods and the percentage of the book of business attributable to Alt-A will continue to decrease over time;

- Our expectation that Refi Plus loans will perform better than the loans they replace because Refi Plus loans reduce the borrowers' monthly payments or otherwise should provide more sustainability than the borrowers' old loans (for example, by having a fixed rate instead of an adjustable rate);

TREASURY-2451

- Our expectation that our mortgage portfolio will continue to decrease due to the restrictions on the amount of mortgage assets we may own under the terms of our senior preferred stock purchase agreement with Treasury;

- Our expectation that the current market premium portion of our current estimate of the fair value of our book of business will not impact future Treasury draws, which is based on our intention generally not to have other parties assume the credit risk inherent in our book of business;

- Our expectation that, although our funding needs may vary from quarter to quarter depending on market conditions, our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirement of the senior preferred stock purchase agreement;

- Our intention to repay our short-term and long-term debt obligations as they become due primarily through proceeds from the issuance of additional debt securities;

- Our intention to use funds we receive from Treasury under the senior preferred stock purchase agreement to pay our debt obligations and to pay dividends on the senior preferred stock;

- Our expectations regarding our credit ratings and their impact on us as set forth in "MD&A—Liquidity and Capital Management—Liquidity Management—Credit Ratings";

- Our expectation that the volume of our workouts and foreclosure alternatives will remain high throughout 2012;

- Our belief that the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and income, and home prices;

- Our expectation that the amount of our outstanding repurchase requests to seller/servicers will remain high, and that we may be unable to recover on all outstanding loan repurchase obligations resulting from seller/servicers' breaches of contractual obligations;

- Our expectation that the change in our agreement with Bank of America will not be material to our business or results of operations;

- Our expectations regarding recoveries from our lenders under risk sharing arrangements, and the possibility that we may require a lender to pledge collateral to secure its recourse obligations;

- Our beliefs regarding whether our financial guarantor counterparties will be able to fully meet their obligations to us in the future;

- Our expectation that we will be required to submit certain interest rate swaps for clearing to a derivatives clearing organization in the future and that our institutional credit risk exposure to the Chicago Mercantile Exchange or other comparable exchanges or trading facilities and their members is likely to increase in the future; and

- Our expectations regarding amounts we expect to receive from Treasury for our work as program administrator, as well as amounts we expect to receive to be passed through to third-party vendors engaged by us in connection with HAMP and other initiatives under the Making Home Affordable Program.

Forward-looking statements reflect our management's expectations or predictions of future conditions, events or results based on various assumptions and management's estimates of trends and economic factors in the markets in which we are active, as well as our business plans. They are not guarantees of future performance. By their nature, forward-looking statements are subject to risks and uncertainties. Our actual results and financial condition may differ, possibly materially, from the anticipated results and financial condition indicated in these forward-looking statements. There are a number of factors that could cause actual conditions, events or results to differ materially from those described in the forward-looking statements contained in this report, including, but not limited to, the following: the uncertainty of our future; legislative and regulatory changes affecting us; challenges we face in retaining and hiring qualified employees; the deteriorated credit performance of many loans in our guaranty book of business; the conservatorship and its effect on our business; the investment by Treasury and its effect on our business; adverse effects from activities we undertake to support the mortgage market and help borrowers; limitations on our ability to access the debt capital markets; further disruptions in the housing and credit markets; defaults by one or more institutional counterparties; our reliance on mortgage

- 57 -

servicers; deficiencies in servicer and law firm foreclosure processes and the consequences of those deficiencies; guidance by the Financial Accounting Standards Board ("FASB"); operational control weaknesses; our reliance on models; the level and volatility of interest rates and credit spreads; changes in the structure and regulation of the financial services industry; and those factors described in this report, including those factors described in "Risk Factors."

Readers are cautioned to place forward-looking statements in this report or that we make from time to time into proper context by carefully considering the factors discussed in "Risk Factors." These forward-looking statements are representative only as of the date they are made, and we undertake no obligation to update any forward-looking statement as a result of new information, future events or otherwise, except as required under the federal securities laws.

## Item 1A.   Risk Factors

This section identifies specific risks that should be considered carefully in evaluating our business. The risks described in "Risks Relating to Our Business" are specific to us and our business, while those described in "Risks Relating to Our Industry" relate to the industry in which we operate. Refer to "MD&A—Risk Management" for a more detailed description of the primary risks to our business and how we seek to manage those risks.

The risks we face could materially adversely affect our business, results of operations, financial condition, liquidity and net worth, and could cause our actual results to differ materially from our past results or the results contemplated by forward-looking statements contained in this report. In addition to the risks we discuss below, we face risks and uncertainties not currently known to us or that we currently believe to be immaterial.

## RISKS RELATING TO OUR BUSINESS

### *The future of our company is uncertain.*

There is significant uncertainty regarding the future of our company, including how long the company will continue to exist in its current form, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated.

In February 2011, Treasury and HUD released a report to Congress on ending the conservatorships of the GSEs and reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions. The report also addresses three options for a reformed housing finance system. The report does not state whether or how the existing infrastructure or human capital of Fannie Mae may be used in the establishment of such a reformed system. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. On February 2, 2012, Treasury Secretary Geithner stated that the Administration intended to release new details around approaches to housing finance reform, including winding down Fannie Mae and Freddie Mac, in the spring of 2012 and to work with Congressional leaders to explore options for legislation, but that he does not expect housing finance reform legislation to be enacted in 2012. In his February 2012 letter to Congress, the Acting Director of FHFA wrote that, with "no near-term resolution [of Fannie Mae and Freddie Mac's conservatorships] in sight, it is time to update and extend the goals and directions of the conservatorships." He provided a strategic plan for the next phase of Fannie Mae and Freddie Mac's conservatorships that included, among its three strategic goals for the next phase of the conservatorships, gradually contracting Fannie Mae and Freddie Mac's dominant presence in the marketplace while simplifying and shrinking their operations.

The Subcommittee on Capital Markets and Government Sponsored Enterprises of the House Financial Services Committee has approved numerous bills that could constrain the current operations of the GSEs or alter the existing authority that FHFA or Treasury has over the enterprises. In addition, several bills have been introduced

- 58 -

in the Senate and House of Representatives that would place the GSEs into receivership after a period of time and either grant federal charters to new entities to engage in activities similar to those currently engaged in by the GSEs or leave secondary mortgage market activities to entities in the private sector. We expect that Congress will continue to hold hearings and consider legislation in 2012 on the future status of Fannie Mae and Freddie Mac, including proposals that would result in a substantial change to our business structure, our operations, or that involve Fannie Mae's liquidation or dissolution. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs. See "MD&A—Legislative and Regulatory Developments—GSE Reform" for more information about the Treasury report and Congressional proposals regarding reform of the GSEs.

***We expect FHFA to request additional funds from Treasury on our behalf to ensure we maintain a positive net worth and avoid mandatory receivership. The dividends we must pay or that accrue on Treasury's investments are substantial and are expected to increase, and we likely will not be able to fund them through net income.***

When Treasury provides the additional $4.6 billion FHFA is requesting on our behalf to cure our net worth deficit as of December 31, 2011, the aggregate liquidation preference on the senior preferred stock will be $117.1 billion, and will require an annualized dividend of $11.7 billion. The prospective $11.7 billion annual dividend obligation exceeds our reported annual net income for every year since our inception. Our ability to maintain a positive net worth has been and continues to be adversely affected by market conditions. To the extent we have a negative net worth as of the end of future fiscal quarters, we expect that FHFA will request on our behalf additional funds from Treasury under the senior preferred stock purchase agreement. Further funds from Treasury under the senior preferred stock purchase agreement will increase the liquidation preference of and the dividends we owe on our senior preferred stock and, therefore, we will need additional funds from Treasury in order to meet our dividend obligation to Treasury.

In addition, we were scheduled to begin paying a quarterly commitment fee to Treasury under the senior preferred stock purchase agreement beginning on March 31, 2011. Although Treasury has waived the quarterly commitment fee for each quarter of 2011 and the first quarter of 2012 due to the continued fragility of the mortgage market and Treasury's belief that the imposition of the quarterly commitment fee would not generate increased compensation for taxpayers, Treasury indicated that it will reevaluate the situation during the next calendar quarter to determine whether the quarterly commitment fee should then be set. The aggregate liquidation preference and dividend obligations relating to the preferred stock also will increase by the amount of any required dividend on the senior preferred stock that we fail to pay in cash and by the amount of any required quarterly commitment fee on the senior preferred stock that we fail to pay. The substantial dividend obligations and potentially substantial quarterly commitment fees on the senior preferred stock, coupled with our effective inability to pay down draws under the senior preferred stock purchase agreement, will continue to strain our financial resources and have an adverse impact on our results of operations, financial condition, liquidity and net worth, both in the short and long term.

***Our regulator is authorized or required to place us into receivership under specified conditions, which would result in the liquidation of our assets. Amounts recovered from the liquidation will likely be insufficient to repay the liquidation preference of any series of our preferred stock or to provide any proceeds to common shareholders.***

FHFA has an obligation to place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations for a period of 60 days after the filing deadline for our Form 10-K or Form 10-Q with the SEC. Because of the credit-related expenses we expect to incur on our legacy book of business and our dividend obligation to Treasury, we will continue to need funding from Treasury to avoid triggering FHFA's obligation. Although Treasury committed to providing us funds in accordance with the terms of the senior preferred stock purchase agreement, Treasury may not provide these funds to us within the required 60 days if it has exhausted its borrowing authority or if there is a government shutdown. In addition, we could be put into receivership at the discretion of the Director of FHFA at any time for other reasons, including conditions that FHFA has already asserted existed at the time the former Director of FHFA placed us into conservatorship.

- 59 -

A receivership would terminate the conservatorship. In addition to the powers FHFA has as our conservator, the appointment of FHFA as our receiver would terminate all rights and claims that our shareholders and creditors may have against our assets or under our charter arising from their status as shareholders or creditors, except for their right to payment, resolution or other satisfaction of their claims as permitted under the GSE Act. Unlike a conservatorship, the purpose of which is to conserve our assets and return us to a sound and solvent condition, the purpose of a receivership is to liquidate our assets and resolve claims against us.

To the extent we are placed into receivership and do not or cannot fulfill our guaranty to the holders of our Fannie Mae MBS, the MBS holders could become unsecured creditors of ours with respect to claims made under our guaranty.

In the event of a liquidation of our assets, only after payment of the administrative expenses of the receiver and the immediately preceding conservator, the secured and unsecured claims against the company (including repaying all outstanding debt obligations), and the liquidation preference of the senior preferred stock, would any liquidation proceeds be available to repay the liquidation preference on any other series of preferred stock. Finally, only after the liquidation preference on all series of preferred stock is repaid would any liquidation proceeds be available for distribution to the holders of our common stock. It is unlikely that there would be sufficient proceeds to repay the liquidation preference of any series of our preferred stock or to make any distribution to the holders of our common stock.

***Our business and results of operations may be materially adversely affected if we are unable to retain and hire qualified employees.***

Our business processes are highly dependent on the talents and efforts of our employees. The uncertainty of our future, limitations on employee compensation, our inability to offer equity compensation, the heightened scrutiny of our actions by Congress and regulators and the working environment created thereby, and our conservatorship have had and are likely to continue to have an adverse effect on our ability to retain and recruit well-qualified employees. We have already had significant departures by various members of executive management since shortly before we entered into conservatorship in September 2008, including two Chief Executive Officers and three Chief Financial Officers. In addition, in January 2012, our current Chief Executive Officer announced that he will step down from his position when our Board of Directors names a successor. Further turnover in key management positions and challenges in integrating new management could harm our ability to manage our business effectively and ultimately adversely affect our financial performance.

A particular threat to employee retention and hiring is the possibility of new legislation limiting executive or employee compensation. The Financial Services Committee of the House of Representatives approved a bill that would put our employees on a federal government pay scale, and both the House and the Senate approved legislation that would prohibit senior executives from receiving bonuses during conservatorship. If this or similar legislation were to become law, our employees could experience a sudden and sharp decrease in compensation. The Acting Director of FHFA stated on November 15, 2011 that this "would certainly risk a substantial exodus of talent, the best leaving first in many instances. [Fannie Mae and Freddie Mac] likely would suffer a rapidly growing vacancy list and replacements with lesser skills and no experience in their specific jobs. A significant increase in safety and soundness risks and in costly operational failures would, in my opinion, be highly likely." The Acting Director observed, "Should the risks I fear materialize, FHFA might well be forced to limit [Fannie Mae and Freddie Mac's] business activities. Some of the business [Fannie Mae and Freddie Mac] would be unable to undertake might simply not occur, with potential disruption in housing markets and the economy." We face competition from within the financial services industry and from businesses outside of the financial services industry for qualified employees. Additionally, an improving economy is likely to put additional pressures on turnover, as attractive opportunities become available to our employees. Our competitors for talent are able to provide market-based compensation and to link employees' pay to performance. The constraints on our compensation could adversely affect our ability to attract qualified candidates. While we engage in succession planning for our senior management and other critical positions and have been able to fill a number of important positions internally, our inability to offer market-based compensation would jeopardize our ability to fill vacant positions internally.

- 60 -

If we are unable to retain, promote and attract employees with the necessary skills and talent, we would face increased risks for operational failures. Our ability to conduct our business and our results of operations would likely be materially adversely affected.

***Since 2008, we have experienced substantial deterioration in the credit performance of mortgage loans that we own or that back our guaranteed Fannie Mae MBS, and we expect this deterioration to continue and result in additional credit-related expenses.***

Deterioration in the credit performance of mortgage loans we own or that back our guaranteed Fannie Mae MBS has increased our risk of incurring credit losses and credit-related expenses as a result of borrowers failing to make required payments of principal and interest on their mortgage loans.

Conditions in the housing market continue to contribute to deterioration in the credit performance of our legacy book of business, resulting in elevated serious delinquency rates and negatively impacting default rates and average loan loss severity on the mortgage loans we hold or that back our guaranteed Fannie Mae MBS. Increases in delinquencies, default rates and loss severity cause us to experience higher credit-related expenses. The credit performance of our single-family book of business has also been negatively affected by the extent and duration of the decline in home prices and high unemployment. Home price declines, adverse market conditions and continuing high levels of unemployment also have affected and may continue to affect the credit performance of and future results for our broader book of business. Further, home price declines have resulted in a large number of borrowers with "negative equity" in their properties (that is, they owe more on their mortgage loans than their houses are worth), which increases the likelihood that either these borrowers will strategically default on their mortgage loans even if they have the ability to continue to pay the loans or that distressed homeowners will sell their homes in a "short sale" for significantly less than the unpaid amount of the loans. We present detailed information about the risk characteristics of our single-family conventional guaranty book of business in "MD&A—Risk Management—Credit Risk Management—Mortgage Credit Risk Management," and we present detailed information on our 2011 credit-related expenses, credit losses and results of operations in "MD&A—Consolidated Results of Operations."

Adverse credit performance trends may increase, particularly if we experience further national and regional declines in home prices, weak economic conditions and high unemployment.

***We expect further losses and write-downs relating to our investment securities.***

We have experienced significant fair value losses and other-than-temporary impairment write-downs relating to our investment securities and recorded significant other-than-temporary impairment write-downs of some of our available-for-sale securities. A substantial portion of these fair value losses and write-downs related to our investments in private-label mortgage-related securities backed by Alt-A and subprime mortgage loans and, in the case of fair value losses, our investments in commercial mortgage-backed securities ("CMBS") due to the decline in home prices and the weak economy. We expect to experience additional other-than-temporary impairment write-downs of our investments in private-label mortgage-related securities. See "MD&A—Consolidated Balance Sheet Analysis— Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities" for detailed information on our investments in private-label mortgage-related securities backed by Alt-A and subprime mortgage loans.

If the market for securities we hold in our investment portfolio is not liquid, we must use a greater amount of management judgment to value these securities. Later valuations and any price we ultimately would realize if we were to sell these securities could be materially lower than the estimated fair value at which we carry them on our balance sheet.

Any of the above factors could require us to record additional write-downs in the value of our investment portfolio, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth.

- 61 -

*Our business activities are significantly affected by the conservatorship and the senior preferred stock purchase agreement.*

We are currently under the control of our conservator, FHFA, and we do not know when or how the conservatorship will be terminated. As conservator, FHFA can direct us to enter into contracts or enter into contracts on our behalf, and generally has the power to transfer or sell any of our assets or liabilities. In addition, our directors do not have any duties to any person or entity except to the conservator. Accordingly, our directors are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS in making or approving a decision unless specifically directed to do so by the conservator.

The conservator has determined that while we are in conservatorship, we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship. In view of the conservatorship and the reasons stated for its establishment, it is likely that our business model and strategic objectives will continue to change, possibly significantly, including in pursuit of our public mission and other non-financial objectives. Our conservator recently announced that one of the strategic goals for the next phase of our and Freddie Mac's conservatorships is to gradually contract our dominant presence in the marketplace while simplifying and shrinking our operations. Among other things, we are likely to experience significant changes in the size, growth and characteristics of our guarantor and investment activities, and we could further change our operational objectives, including our pricing strategy in our core mortgage guaranty business. Accordingly, our strategic and operational focus going forward may not be consistent with the investment objectives of our investors. In addition, we may be directed to engage in activities that are operationally difficult, costly to implement or unprofitable.

The senior preferred stock purchase agreement with Treasury includes a number of covenants that significantly restrict our business activities. We cannot, without the prior written consent of Treasury: pay dividends (except on the senior preferred stock); sell, issue, purchase or redeem Fannie Mae equity securities; sell, transfer, lease or otherwise dispose of assets in specified situations; engage in transactions with affiliates other than on arm's-length terms or in the ordinary course of business; issue subordinated debt; or incur indebtedness that would result in our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are allowed to own. In deciding whether to consent to any request for approval it receives from us under the agreement, Treasury has the right to withhold its consent for any reason and is not required by the agreement to consider any particular factors, including whether or not management believes that the transaction would benefit the company. For example, in November 2009, Treasury withheld its consent under these covenants to our proposed transfer of interests in low-income housing tax credit ("LIHTC") investments, eliminating our ability to transfer the assets for value and resulting in our recognizing a $5 billion loss in that quarter. Pursuant to the senior preferred stock purchase agreement, the maximum allowable amount of mortgage assets we were permitted to own on December 31, 2011 was $729 billion. (Our mortgage assets were approximately $708.4 billion as of that date.) On December 31, 2012, and each December 31 thereafter, our mortgage assets may not exceed 90% of the maximum allowable amount that we were permitted to own as of December 31 of the immediately preceding calendar year. The maximum allowable amount is reduced annually until it reaches $250 billion. This limit on the amount of mortgage assets we are permitted to hold could constrain the amount of delinquent loans we purchase from single-family MBS trusts, which could increase our costs.

We discuss the powers of the conservator, the terms of the senior preferred stock purchase agreement, and their impact on us and shareholders in "Business—Conservatorship and Treasury Agreements." These factors may adversely affect our business, results of operations, financial condition, liquidity and net worth.

*The conservatorship and investment by Treasury have had, and will continue to have, a material adverse effect on our common and preferred shareholders.*

We do not know when or how the conservatorship will be terminated. Moreover, even if the conservatorship is terminated, we remain subject to the terms of the senior preferred stock purchase agreement, senior preferred stock and warrant, which can only be cancelled or modified by mutual consent of Treasury and the conservator.

- 62 -

TREASURY-2457

The conservatorship and investment by Treasury have had, and will continue to have, material adverse effects on our common and preferred shareholders, including the following:

*No voting rights during conservatorship.*   The rights and powers of our shareholders are suspended during the conservatorship. The conservatorship has no specified termination date. During the conservatorship, our common shareholders do not have the ability to elect directors or to vote on other matters unless the conservator delegates this authority to them.

*Dividends to common and preferred shareholders, other than to Treasury, have been eliminated.*   Under the terms of the senior preferred stock purchase agreement, dividends may not be paid to common or preferred shareholders (other than on the senior preferred stock) without the consent of Treasury, regardless of whether we are in conservatorship.

*Liquidation preference of senior preferred stock will increase, likely substantially.*   The senior preferred stock ranks prior to our common stock and all other series of our preferred stock, as well as any capital stock we issue in the future, as to both dividends and distributions upon liquidation. Accordingly, if we are liquidated, the senior preferred stock is entitled to its then-current liquidation preference, plus any accrued but unpaid dividends, before any distribution is made to the holders of our common stock or other preferred stock. The liquidation preference on the senior preferred stock will increase to $117.1 billion when Treasury provides the additional $4.6 billion FHFA is requesting on our behalf. The liquidation preference could increase substantially as we draw on Treasury's funding commitment, if we do not pay dividends owed on the senior preferred stock or if we do not pay the quarterly commitment fee under the senior preferred stock purchase agreement. If we are liquidated, it is unlikely that there would be sufficient funds remaining after payment of amounts to our creditors and to Treasury as holder of the senior preferred stock to make any distribution to holders of our common stock and other preferred stock.

*Exercise of the Treasury warrant would substantially dilute investment of current shareholders.*   If Treasury exercises its warrant to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis, the ownership interest in the company of our then existing common shareholders will be substantially diluted, and we would thereafter have a controlling shareholder.

*No longer managed for the benefit of shareholders.*   Because we are in conservatorship, we are no longer managed with a strategy to maximize shareholder returns.

For additional description of the restrictions on us and the risks to our shareholders, see "Business— Conservatorship and Treasury Agreements."

**We may undertake efforts that adversely affect our business, results of operations, financial condition, liquidity and net worth.**

In conservatorship our business is no longer managed with a strategy to maximize shareholder returns while fulfilling our mission. Our conservator has directed us to focus primarily on minimizing our credit losses from delinquent mortgages and providing assistance to struggling homeowners to help them remain in their homes. More recently, our conservator has announced two additional strategic goals for the next phase of our conservatorship—building a new infrastructure for the secondary mortgage market and gradually contracting our dominant presence in the marketplace while simplifying and shrinking our operations. In pursuit of these or other goals prescribed by our conservator, we may take a variety of actions that could adversely affect our economic returns, possibly significantly, such as encouraging increased competition in our markets; reducing the risk-based fees we charge for certain types of loans; modifying loans to defer principal, lower the interest rate or extend the maturity; or engaging in principal reduction. We are already taking some of these actions. These activities may have short- and long-term adverse effects on our business, results of operations, financial condition, liquidity and net worth.

Other agencies of the U.S. government or Congress also may ask us to undertake significant efforts to support the housing and mortgage markets, as well as struggling homeowners. They may also ask us to take actions in

- 63 -

support of other goals. For example, as we discuss in "Business—Legislative and Regulatory Developments—Changes to Our Single-Family Guaranty Fee Pricing" in December 2011, Congress enacted the Temporary Payroll Tax Cut Continuation Act of 2011 which, among other provisions, requires that we increase our single-family guaranty fees by at least 10 basis points and remit this increase to Treasury to fund extensions of employment tax reductions and unemployment benefits, rather than retaining this incremental revenue. We anticipate that implementing this fee increase and remitting the increase to Treasury will involve operational burden and could increase our operational risk.

***We may be unable to meet our housing goals and duty to serve requirements, and actions we take to meet those requirements may adversely affect our business, results of operations, financial condition, liquidity and net worth.***

To meet our housing goals obligations, a portion of the mortgage loans we acquire must be for low- and very-low income families, families in low-income census tracts and moderate-income families in minority census tracts or designated disaster areas. In addition, when a final duty-to-serve rule is issued, we will have a duty to serve three underserved markets: manufactured housing, affordable housing preservation and rural areas. We may take actions to meet these obligations that could increase our credit losses and credit-related expenses. If we fail to meet our housing goals in a given year and FHFA finds that they were feasible, or if we fail to comply with our duty to serve requirements, we may become subject to a housing plan that could require us to take additional steps that could have an adverse effect on our financial condition. The housing plan must describe the actions we would take to meet the goals and/or duty to serve in the next calendar year and be approved by FHFA. With respect to our housing goals, the potential penalties for failure to comply with housing plan requirements are a cease-and-desist order and civil money penalties.

Mortgage market conditions during 2011 negatively affected our ability to meet our single-family goals. These conditions included reduced levels of single-family borrowing by low-income purchasers, an increase in the share of mortgages made to moderate-income borrowers due to low interest rates, continuing high unemployment, strengthened underwriting and eligibility standards, increased standards of private mortgage insurers and the increased role of FHA in acquiring goals-qualifying mortgage loans. Some or all of these conditions, which may continue in 2012, likely contributed to our failure to meet two of our single-family home purchase goals for 2010. We cannot predict the impact that market conditions during 2012 will have on our ability to meet our 2012 housing goals and duty to serve requirements.

For more information about our housing goals and duty to serve requirements, as well as our 2011 and 2010 housing goals performance, please see "Business—Our Charter and Regulation of Our Activities—Housing Goals and Duty to Serve Underserved Markets."

***Limitations on our ability to access the debt capital markets could have a material adverse effect on our ability to fund our operations and generate net interest income.***

Our ability to fund our business depends primarily on our ongoing access to the debt capital markets. Our level of net interest income depends on how much lower our cost of funds is compared to what we earn on our mortgage assets. Market concerns about matters such as the extent of government support for our business, the future of our business (including future profitability, future structure, regulatory actions and GSE status) and the creditworthiness of the U.S. government could cause a severe negative effect on our access to the unsecured debt markets, particularly for long-term debt. We believe that our ability in 2010 and 2011 to issue debt of varying maturities at attractive pricing resulted from federal government support of us and the financial markets. As a result, we believe that our status as a GSE and continued federal government support is essential to maintaining our access to debt funding. Changes or perceived changes in the government's support of us or the markets could have a material adverse effect on our ability to fund our operations. As recently as September 2011, the Federal Reserve announced that, to help support conditions in mortgage markets, it will reinvest principal payments from its holdings of agency debt and agency mortgage-backed securities in agency mortgage-backed securities. However, there can be no assurance that the government will continue to support us or the markets, or that our current level of access to debt funding will continue. In addition, due to our reliance on the U.S. government's

- 64 -

support, our access to debt funding also could be materially adversely affected by a change or perceived change in the creditworthiness of the U.S. government.

Future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, as well as our liquidity position. If we are unable to issue both short- and long-term debt securities at attractive rates and in amounts sufficient to operate our business and meet our obligations, it likely would interfere with the operation of our business and have a material adverse effect on our liquidity, results of operations, financial condition and net worth.

***Our liquidity contingency plans may be difficult or impossible to execute during a liquidity crisis.***

We believe that our liquidity contingency plans may be difficult or impossible to execute during a liquidity crisis. If we cannot access the unsecured debt markets, our ability to repay maturing indebtedness and fund our operations could be eliminated or significantly impaired. In this event, our alternative sources of liquidity—consisting of our cash and other investments portfolio and the unencumbered mortgage assets in our mortgage portfolio—may not be sufficient to meet our liquidity needs.

We believe that the amount of mortgage-related assets that we could successfully sell or borrow against in the event of a liquidity crisis or significant market disruption is substantially lower than the amount of mortgage-related assets we hold. Due to the large size of our portfolio of mortgage assets, current market conditions and the significant amount of distressed assets in our mortgage portfolio, there would likely be insufficient market demand for large amounts of these assets over a prolonged period of time, which would limit our ability to borrow against or sell these assets.

To the extent that we are able to obtain funding by pledging or selling mortgage-related securities as collateral, we anticipate that a discount would be applied that would reduce the value assigned to those securities. Depending on market conditions at the time, this discount could result in proceeds significantly lower than the current market value of these securities and could thereby reduce the amount of financing we obtain. In addition, our primary source of collateral is Fannie Mae MBS that we own. In the event of a liquidity crisis in which the future of our company is uncertain, counterparties may be unwilling to accept Fannie Mae MBS as collateral. As a result, we may not be able to sell or borrow against these securities in sufficient amounts to meet our liquidity needs.

***A decrease in the credit ratings on our senior unsecured debt could have an adverse effect on our ability to issue debt on reasonable terms and trigger additional collateral requirements, and would likely do so if such a decrease were not based on a similar action on the credit ratings of the U.S. government.***

Credit ratings on our senior unsecured debt, as well as the credit ratings of the U.S. government, are primary factors that could affect our borrowing costs and our access to the debt capital markets. Credit ratings on debt are subject to revision or withdrawal at any time by the rating agencies. Actions by governmental entities impacting the support we receive from Treasury could adversely affect the credit ratings on our senior unsecured debt.

On August 5, 2011, Standard & Poor's Ratings Services ("S&P") lowered the long-term sovereign credit rating on the U.S. to "AA+." As a result of this action, and because we directly rely on the U.S. government for capital support, on August 8, 2011, S&P lowered our long-term senior debt rating to "AA+" with a negative outlook. Previously, our long-term senior debt had been rated by S&P as "AAA" and had been on CreditWatch Negative. S&P affirmed our short-term senior debt rating of "A-1+" and removed it from CreditWatch Negative. In assigning a negative outlook on the U.S. government's long-term debt rating, S&P noted that it may lower the U.S. government's long-term debt rating to "AA" within the next two years if it sees less reduction in spending than agreed to or higher interest rates, or if new fiscal pressures during the period result in a higher general government debt trajectory than S&P currently assumes. If S&P further lowers the U.S. government's long-term debt rating, we expect that S&P would lower our long-term debt rating correspondingly.

After the U.S. government's statutory debt limit was raised on August 2, 2011, Moody's Investors Service ("Moody's") confirmed the U.S. government's rating and our long-term debt ratings. Moody's also removed the

designation that these ratings were under review for possible downgrade. Moody's revised the outlook for both the U.S. government's rating and our long-term debt ratings to negative. In assigning the negative outlook to the U.S. government's rating, Moody's indicated there would be a risk of a downgrade if (1) there is a weakening in fiscal discipline in the coming year; (2) further fiscal consolidation measures are not adopted in 2013; (3) the economic outlook deteriorates significantly; or (4) there is an appreciable rise in the U.S. government's funding costs over and above what is currently expected. On November 28, 2011, Fitch Ratings Limited ("Fitch") affirmed the long-term issuer default rating and senior unsecured debt rating of Fannie Mae at "AAA," but revised its ratings outlook on Fannie Mae's long-term issuer default rating to Negative from Stable. This action followed a similar action by Fitch on the United States sovereign rating. As of February 23, 2012 our long-term debt continued to be rated "Aaa" by Moody's and "AAA" by Fitch.

S&P, Moody's and Fitch have all indicated that they would likely lower their ratings on the debt of Fannie Mae and certain other government-related entities if they were to lower their ratings on the U.S. government.

We currently cannot predict whether one or more of these rating agencies will downgrade our debt ratings in the future, nor can we predict the potential impact. Although S&P's downgrade of our credit rating has not increased our borrowing costs or limited our access to the debt capital markets to date, an additional reduction in our credit ratings could have a material adverse impact on our access to debt funding or on the cost of our debt funding, and would likely do so if it were not based on a similar action on the credit ratings of the U.S. government. An additional reduction in our credit ratings may also trigger additional collateral requirements under our derivatives contracts and other borrowing arrangements and materially adversely affect our liquidity, our ability to conduct our normal business operations, our financial condition and our results of operations. Our credit ratings and ratings outlook are included in "MD&A—Liquidity and Capital Management—Liquidity Management—Credit Ratings."

***Deterioration in the credit quality of, or defaults by, one or more of our institutional counterparties could result in financial losses, business disruption and decreased ability to manage risk.***

We face the risk that one or more of our institutional counterparties may fail to fulfill their contractual obligations to us. Unfavorable market conditions since 2008 have adversely affected the liquidity and financial condition of our institutional counterparties. Our primary exposures to institutional counterparty risk are with mortgage seller/servicers that service the loans we hold in our mortgage portfolio or that back our Fannie Mae MBS; seller/servicers that are obligated to repurchase loans from us or reimburse us for losses in certain circumstances; third-party providers of credit enhancement on the mortgage assets that we hold in our mortgage portfolio or that back our Fannie Mae MBS, including mortgage insurers, lenders with risk sharing arrangements and financial guarantors; issuers of securities held in our cash and other investments portfolio; and derivatives counterparties.

We may have multiple exposures to one counterparty as many of our counterparties provide several types of services to us. For example, our lender customers or their affiliates also act as derivatives counterparties, mortgage servicers, custodial depository institutions or document custodians. Accordingly, if one of these counterparties were to become insolvent or otherwise default on its obligations to us, it could harm our business and financial results in a variety of ways.

An institutional counterparty may default in its obligations to us for a number of reasons, such as changes in financial condition that affect its credit rating, a reduction in liquidity, operational failures or insolvency. A number of our institutional counterparties are currently experiencing financial difficulties that may negatively affect the ability of these counterparties to meet their obligations to us and the amount or quality of the products or services they provide to us. Counterparty defaults or limitations on their ability to do business with us could result in significant financial losses or hamper our ability to do business, which would adversely affect our business, results of operations, financial condition, liquidity and net worth. For example, failure by a significant seller/servicer counterparty, or a number of seller/servicers, to fulfill repurchase obligations to us could result in a significant increase in our credit losses and have a material adverse effect on our results of operations and financial condition.

- 66 -

We routinely execute a high volume of transactions with counterparties in the financial services industry. Many of the transactions we engage in with these counterparties expose us to credit risk relating to the possibility of a default by our counterparties. In addition, to the extent these transactions are secured, our credit risk may be exacerbated to the extent that the collateral we hold cannot be realized or can be liquidated only at prices too low to recover the full amount of the loan or derivative exposure. We have exposure to these financial institutions in the form of unsecured debt instruments and derivatives transactions. As a result, we could incur losses relating to defaults under these instruments or relating to impairments to the carrying value of our assets represented by these instruments. These losses could materially and adversely affect our business, results of operations, financial condition, liquidity and net worth.

We depend on our ability to enter into derivatives transactions in order to manage the duration and prepayment risk of our mortgage portfolio. If we lose access to our derivatives counterparties, it could adversely affect our ability to manage these risks, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth.

***Given the deteriorated credit quality of many of our mortgage insurer counterparties, we may incur losses as a result of claims under our mortgage insurance policies not being paid in full or at all, and we may face business disruptions and increased concentration risk.***

We rely heavily on mortgage insurers to provide insurance against borrower defaults on single-family conventional mortgage loans with LTV ratios over 80% at the time of acquisition. The already weak financial condition of many of our mortgage insurer counterparties deteriorated at an accelerated pace during the second half of 2011, which increased the significant risk that these counterparties will fail to fulfill their obligations to pay our claims under insurance policies.

As of February 29, 2012, three of our mortgage insurance counterparties—Triad Guaranty Insurance Corporation ("Triad"), Republic Mortgage Insurance Company ("RMIC"), and PMI Mortgage Insurance Co. ("PMI")—have publicly disclosed that they are in run-off. A mortgage insurer that is in run-off continues to collect premiums on its existing insurance business, but no longer writes new insurance. This increases the risk that the mortgage insurer will fail to pay our claims under insurance policies, and could also cause the quality and speed of its claims processing to deteriorate. In 2008, Triad ceased issuing commitments for new mortgage insurance and, under an order received from its regulator, is now paying 60% of claims under its mortgage guaranty insurance policies and deferring the remaining 40% by the creation of deferred payment obligations, which may be paid in the future. In October 2011, PMI began partially deferring claims payments, and in January 2012, RMIC began partially deferring claims payments. Both PMI and RMIC are paying 50% of claims, with the remaining 50% deferred as policyholder claims. It is uncertain when, and if, regulators for Triad, RMIC or PMI will allow deferred policyholder claims to be paid or increase the amount paid on claims.

In addition to our three mortgage insurers in run-off, one mortgage insurer, Genworth Mortgage Insurance Corporation, disclosed that, absent a waiver, it estimated that it would not meet state regulatory capital requirements for its main insurance writing entity as of December 31, 2011. An additional two of our mortgage insurance counterparties (Mortgage Guaranty Insurance Corporation and Radian Guaranty Inc.) have disclosed that, in the absence of additional capital contributions to their insurance writing entity, their capital might fall below state regulatory capital requirements in the future. These three mortgage insurers, together with our three mortgage insurers in run-off, provided a combined $74.1 billion, or 81%, of our risk in force mortgage insurance coverage of our single-family guaranty book of business as of December 31, 2011. We do not know how long certain of our mortgage insurer counterparties will remain below their state-imposed risk-to-capital limits. If mortgage insurers are not able to raise capital and they exceed their risk-to-capital limits, they will likely be forced into run-off or receivership unless they can secure and maintain waivers from their state regulators.

Some mortgage insurers have explored corporate restructurings, which are intended to provide relief from risk-to-capital limits in certain states. A restructuring plan that would involve contributing capital to a subsidiary would result in less liquidity available to its parent company to pay claims on its existing book of business and an increased risk that its parent company will not pay its claims in full in the future.

- 67 -

Our loss reserves take into account our assessment of our mortgage insurer counterparties' ability to fulfill their obligations to us. If our assessment of their claims-paying abilities worsens significantly, it could result in a significant increase in our loss reserves and our credit losses.

Many mortgage insurers stopped insuring new mortgages with higher loan-to-value ratios or with lower borrower credit scores or on select property types, which contributed to the reduction in our business volumes for high loan-to-value ratio loans. As our charter generally requires us to obtain credit enhancement on single-family conventional mortgage loans with loan-to-value ratios over 80% at the time of purchase, an inability to find suitable credit enhancement may inhibit our ability to pursue new business opportunities, meet our housing goals and otherwise support the housing and mortgage markets. For example, where mortgage insurance or other credit enhancement is not available, we may be hindered in our ability to refinance loans into more affordable loans. In addition, access to fewer mortgage insurer counterparties will increase our concentration risk with the remaining mortgage insurers in the industry.

***The loss of business volume from a key lender customer could adversely affect our business and result in a decrease in our revenues.***

Our ability to generate revenue from the purchase and securitization of mortgage loans depends on our ability to acquire a steady flow of mortgage loans from the originators of those loans. We acquire most of our mortgage loans through mortgage purchase volume commitments that are negotiated annually or semiannually with lender customers and that establish a minimum level of mortgage volume that these customers will deliver to us. We acquire a significant portion of our mortgage loans from several large mortgage lenders. During 2011, our top five lender customers, in the aggregate, accounted for approximately 60% of our single-family business volume, with three of our customers accounting for greater than 48% of our single-family business volume. Accordingly, maintaining our current business relationships and business volumes with our top lender customers is important to our business.

The mortgage industry has been consolidating and a decreasing number of large lenders originate most single-family mortgages. The loss of business from any one of our major lender customers could adversely affect our revenues and the liquidity of Fannie Mae MBS, which in turn could have an adverse effect on their market value. In addition, as we become more reliant on a smaller number of lender customers, our negotiating leverage with these customers could decrease, which could diminish our ability to price our products optimally. Decreased liquidity in the housing finance market in general increases the risk that a shock to the availability of mortgage credit could occur, which could materially, adversely affect our business and results of operations.

In addition, the volume of business generated by our customers has been or may be affected by a number of factors, including (1) financial and liquidity problems that many of our lender customers are experiencing or may experience in the future, (2) our lender customers' strengthening of their lending criteria, and (3) departures by several large lender customers from correspondent or broker lending. To the extent our key lender customers significantly reduce the volume or quality of mortgage loans that the lender delivers to us or that we are willing to buy from them, we could lose significant business volume that we might be unable to replace, which could adversely affect our business and result in a decrease in our revenues. Our demands that our lender customers repurchase or compensate us for losses on loans that do not meet our underwriting and eligibility standards may strain our relationships with our lender customers and may also result in our customers reducing the volume of loans they provide us. A significant reduction in the volume of mortgage loans that we securitize could reduce the liquidity of Fannie Mae MBS, which in turn could have an adverse effect on their market value.

***Our reliance on third parties to service our mortgage loans may impede our efforts to keep people in their homes and adversely affect the re-performance rate of loans we modify.***

Mortgage servicers, or their agents and contractors, typically are the primary point of contact for borrowers as we delegate servicing responsibilities to them. We rely on these mortgage servicers to identify and contact troubled borrowers as early as possible, to assess the situation and offer appropriate options for resolving the problem and to successfully implement a solution. The demands placed on experienced mortgage loan servicers to service

- 68 -

delinquent loans, including loans eligible for the Making Home Affordable Program, have increased significantly across the industry, straining servicer capacity. To the extent that mortgage servicers are hampered by limited resources or other factors, they may not be successful in conducting their servicing activities in a manner that fully accomplishes our objectives within the timeframe we desire. Further, our servicers have advised us that they have not been able to reach many of the borrowers who may need help with their mortgage loans even when repeated efforts have been made to contact the borrower.

For these reasons, our ability to actively manage the troubled loans that we own or guarantee, and to implement our homeownership assistance and foreclosure prevention efforts quickly and effectively, may be limited by our reliance on our mortgage servicers. Our inability to effectively manage these loans and implement these efforts could have a material adverse effect on our business, results of operations and financial condition.

***Changes in the foreclosure environment and our reliance on servicers and their counsel and other service providers to complete foreclosures could continue to have a material adverse effect on our business, results of operations, financial condition and net worth.***

Circumstances in the foreclosure environment over the last few years have resulted in foreclosures proceeding at a slow pace. As a result of the housing market downturn that began in 2006 and significantly worsened in 2008, servicers and states faced significant increases in the volume of foreclosures in 2009 and the first nine months of 2010. In October 2010, a number of single-family mortgage servicers temporarily halted some or all of the foreclosures they were processing after discovering deficiencies in their own and their service providers' foreclosure processes. The servicer foreclosure process deficiencies have generated significant concern and have been reviewed by various government agencies and the various state attorneys general. On February 9, 2012, a settlement was announced between five of the nation's largest mortgage servicers (Bank of America Corporation, JPMorgan Chase & Co., Wells Fargo & Company, Citigroup Inc., and Ally Financial Inc. (formerly GMAC)) and the federal government and 49 state attorneys general. The announced settlement, among other things, will require implementation by those mortgage servicers of certain new servicing and foreclosure practices. Although servicers have generally ended their outright foreclosure halts, the processing of foreclosures continues to be slow in many states due to continuing issues in the servicer foreclosure process, including efforts by servicers to comply with regulatory consent orders and requirements, recent changes in state foreclosure laws, court rules and proceedings, and the pipeline of foreclosures resulting from these delays and the elevated level of foreclosures caused by the housing market downturn. In addition, court budget cuts in Florida and other states could further delay the processing of foreclosures.

These changes in the foreclosure environment have negatively affected our foreclosure timelines, credit-related expenses and single-family serious delinquency rates, and we expect they will continue to do so. We believe these changes will also delay the recovery of the housing market. These changes could also negatively affect the value of the private-label securities we hold and result in additional impairments on these securities. In addition, the failure of our servicers or their service providers to apply prudent and effective process controls and to comply with legal and other requirements in the foreclosure process poses operational, reputational and legal risks for us.

In addition, FHFA directed us in October 2011 to phase out the practice of requiring mortgage servicers to use our network of retained attorneys to perform default- and foreclosure-related legal services for our loans. Phasing out the requirement that servicers use our retained attorney network may negatively impact the performance of default- and foreclosure-related legal services for our loans, which may adversely impact our efforts to reduce our credit losses.

***Challenges to the MERS® company, system and processes could pose operational, reputational and legal risks for us.***

MERSCORP, Inc. ("MERSCORP") is a privately held company that maintains an electronic registry (the "MERS System") that tracks servicing rights and ownership of loans in the United States. Mortgage Electronic Registration Systems, Inc. ("MERS"), a wholly owned subsidiary of MERSCORP, Inc., can serve as a nominee

TREASURY-2464

for the owner of a mortgage loan and, in that role, become the mortgagee of record for the loan in local land records. Fannie Mae seller/servicers may choose to use MERS as a nominee; however, we have prohibited servicers from initiating foreclosures on Fannie Mae loans in MERS's name. Approximately half of the loans we own or guarantee are registered in MERS's name and the related servicing rights are tracked in the MERS System. The MERS System is widely used by participants in the mortgage finance industry. Along with a number of other organizations in the mortgage finance industry, we are a shareholder of MERSCORP.

Several legal challenges have been made disputing MERS's ability to initiate foreclosures, act as nominee in local land records, and/or assign mortgages or take other action on behalf of the loan owner. These challenges seek judicial relief ranging from money damages to injunctive/declaratory relief seeking the prevention of mortgage assignments by MERS and/or the voiding of completed foreclosures in which MERS appeared in the chain of title. These challenges have focused public attention on MERS and on how loans are recorded in local land records. As a result, these challenges could negatively affect MERS's ability to serve as the mortgagee of record in some jurisdictions, which could cause additional costs and time in the recordation process. These challenges also could result in court decisions that substantially delay new or pending foreclosures, or void completed foreclosures in certain jurisdictions, which would require that we re-foreclose on the affected properties, thereby increasing our costs and lengthening the time it takes for us to foreclose on and dispose of the properties.

In addition, where MERS is the mortgagee of record, it must execute assignments of mortgages, affidavits and other legal documents in connection with foreclosure proceedings. As a result, investigations by governmental authorities and others into the servicer foreclosure process deficiencies discussed above may impact MERS. In April 2011, federal banking regulators and FHFA announced that they were taking enforcement action against MERS and MERSCORP to address significant weaknesses in, among other things, oversight, management supervision and corporate governance at MERS and MERSCORP that were uncovered as part of the regulators' review of mortgage servicers' foreclosure processing. Failures by MERS or MERSCORP to apply prudent and effective process controls and to comply with legal and other requirements could pose counterparty, operational, reputational and legal risks for us. If investigations or new regulation or legislation restricts servicers' use of MERS, our counterparties may be required to record all mortgage transfers in land records, incurring additional costs and time in the recordation process. At this time, we cannot predict the ultimate outcome of these legal challenges to, or the enforcement action against, MERS and MERSCORP or the impact on our business, results of operations and financial condition.

***Changes in accounting standards can be difficult to predict and can materially impact how we record and report our financial results.***

Our accounting policies and methods are fundamental to how we record and report our financial condition and results of operations. From time to time, FASB changes the financial accounting and reporting standards that govern the preparation of our financial statements. In addition, those who set or interpret accounting guidance may amend or even reverse their previous interpretations or positions on how this guidance should be applied. These changes can be difficult to predict and expensive to implement, can divert management's attention from other matters, and can materially impact how we record and report our financial condition and results of operations.

***Material weaknesses in our internal control over financial reporting could result in errors in our reported results or disclosures that are not complete or accurate.***

Management has determined that, as of the date of this filing, we have ineffective disclosure controls and procedures and a material weakness in our internal control over financial reporting. In addition, our independent registered public accounting firm, Deloitte & Touche LLP, has expressed an adverse opinion on our internal control over financial reporting because of the material weakness. Our ineffective disclosure controls and procedures and material weakness could result in errors in our reported results or disclosures that are not complete or accurate, which could have a material adverse effect on our business and operations.

TREASURY-2465

Our material weakness relates specifically to the impact of the conservatorship on our disclosure controls and procedures. Because we are under the control of FHFA, some of the information that we may need to meet our disclosure obligations may be solely within the knowledge of FHFA. As our conservator, FHFA has the power to take actions without our knowledge that could be material to our shareholders and other stakeholders, and could significantly affect our financial performance or our continued existence as an ongoing business. Because FHFA currently functions as both our regulator and our conservator, there are inherent structural limitations on our ability to design, implement, test or operate effective disclosure controls and procedures relating to information within FHFA's knowledge. As a result, we have not been able to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our financial statements. Given the structural nature of this material weakness, it is likely that we will not remediate this weakness while we are under conservatorship. See "Controls and Procedures" for further discussion of management's conclusions on our disclosure controls and procedures and internal control over financial reporting.

***A failure in our operational systems or infrastructure, or those of third parties, could materially adversely affect our business, impair our liquidity, cause financial losses and harm our reputation.***

Shortcomings or failures in our internal processes, people or systems could have a material adverse effect on our risk management, liquidity, financial statement reliability, financial condition and results of operations; disrupt our business; and result in legislative or regulatory intervention, liability to customers, financial losses and damage to our reputation. For example, our business is highly dependent on our ability to manage and process, on a daily basis, an extremely large number of transactions, many of which are highly complex, across numerous and diverse markets and in an environment in which we must make frequent changes to our core processes in response to changing external conditions. These transactions are subject to various legal, accounting and regulatory standards. Our financial, accounting, data processing or other operating systems and facilities may fail to operate properly or become disabled, adversely affecting our ability to process these transactions. In addition, we rely on information provided by third parties in processing many of our transactions, and that information may be incorrect or we may fail to properly manage or analyze it.

We rely upon business processes that are highly dependent on people, legacy technology and the use of numerous complex systems and models to manage our business and produce books and records upon which our financial statements are prepared. This reliance increases the risk that we may be exposed to financial, reputational or other losses as a result of inadequately designed internal processes or systems, or failed execution of our systems. While we continue to enhance our technology, operational controls and organizational structure in order to reduce our operational risk, these actions may not be effective to manage these risks and may create additional operational risk as we execute these enhancements. In addition, our increased use of third-party service providers for some of our business functions increases the risk that an operational failure by a third party will adversely affect us.

We also face the risk of operational failure, termination or capacity constraints of any of the clearing agents, exchanges, clearinghouses or other financial intermediaries we use to facilitate our securities and derivatives transactions. Any such failure, termination or constraint could adversely affect our ability to effect transactions or manage our exposure to risk, and could have a significant adverse impact on our business, liquidity, financial condition, net worth and results of operations.

Our operations rely on the secure processing, storage and transmission of confidential and other information in our computer systems and networks. Our computer systems, software and networks may be vulnerable to breaches, unauthorized access, misuse, computer viruses or other malicious code and other events that could have a security impact. If one or more such events occurs, this could jeopardize our or our customers' or counterparties' confidential and other information processed and stored in, and transmitted through, our computer systems and networks, or otherwise cause interruptions or malfunctions in our, our customers', our counterparties' or third parties' operations, which could result in significant losses, reputational damage, litigation, regulatory fines or penalties, or adversely affect our business, financial condition or results of operations. In addition, we may be

- 71 -

required to expend significant additional resources to modify our protective measures or to investigate and remediate vulnerabilities or other exposures arising from operational and security risks.

Since the conservatorship began, we have experienced, and we expect we may continue to experience, substantial changes in our management, employees and business structure and practices. These changes could increase our operational risk and result in business interruptions and financial losses. In addition, due to events that are wholly or partially beyond our control, our systems could fail to operate properly, which could lead to financial losses, business disruptions, legal and regulatory sanctions and reputational damage.

***In many cases, our accounting policies and methods, which are fundamental to how we report our financial condition and results of operations, require management to make judgments and estimates about matters that are inherently uncertain. Management also relies on models in making these estimates.***

Our accounting policies and methods are fundamental to how we record and report our financial condition and results of operations. Our management must exercise judgment in applying many of these accounting policies and methods so that these policies and methods comply with GAAP and reflect management's judgment of the most appropriate manner to report our financial condition and results of operations. In some cases, management must select the appropriate accounting policy or method from two or more alternatives, any of which might be reasonable under the circumstances but might affect the amounts of assets, liabilities, revenues and expenses that we report. See "Note 1, Summary of Significant Accounting Policies" for a description of our significant accounting policies.

We have identified three accounting policies as critical to the presentation of our financial condition and results of operations. These accounting policies are described in "MD&A—Critical Accounting Policies and Estimates." We believe these policies are critical because they require management to make particularly subjective or complex judgments about matters that are inherently uncertain and because of the likelihood that materially different amounts would be reported under different conditions or using different assumptions.

Because our financial statements involve estimates for amounts that are very large, even a small change in the estimate can have a significant impact for the reporting period. For example, because our total loss reserves are so large, even a change that has a small impact relative to the size of our loss reserves can have a meaningful impact on our results for the quarter in which we make the change.

Due to the complexity of the critical accounting policies we have identified, our accounting methods relating to these policies involve substantial use of models. Models are inherently imperfect predictors of actual results because they are based on assumptions, including assumptions about future events. Our models may not include assumptions that reflect very positive or very negative market conditions and, accordingly, our actual results could differ significantly from those generated by our models. As a result of the above factors, the estimates that we use to prepare our financial statements, as well as our estimates of our future results of operations, may be inaccurate, perhaps significantly.

***Failure of our models to produce reliable results may adversely affect our ability to manage risk and make effective business decisions.***

We make significant use of quantitative models to measure and monitor our risk exposures and to manage our business. For example, we use models to measure and monitor our exposures to interest rate, credit and market risks, and to forecast credit losses. The information provided by these models is used in making business decisions relating to strategies, initiatives, transactions, pricing and products.

Models are inherently imperfect predictors of actual results because they are based on historical data and assumptions regarding factors such as future loan demand, borrower behavior, creditworthiness and home price trends. Other potential sources of inaccurate or inappropriate model results include errors in computer code, bad data, misuse of data, or use of a model for a purpose outside the scope of the model's design. Modeling often assumes that historical data or experience can be relied upon as a basis for forecasting future events, an assumption that may be especially tenuous in the face of unprecedented events.

- 72 -

Given the challenges of predicting future behavior, management judgment is used at every stage of the modeling process, from model design decisions regarding core underlying assumptions, to interpreting and applying final model output. To control for these inherent imperfections, our primary models are vetted by an independent model risk oversight team within our Enterprise Risk Division.

When market conditions change quickly and in unforeseen ways, there is an increased risk that the model assumptions and data inputs for our models are not representative of the most recent market conditions. Under such circumstances, we must rely on management judgment to make adjustments or overrides to our models. A formal model update is typically an extensive process that involves basic research, testing, independent validation and production implementation. In a rapidly changing environment, it may not be possible to update existing models quickly enough to properly account for the most recently available data and events. Management adjustments to modeled results are applied within the confines of the governance structure provided by a combination of our model risk oversight team and our business, finance, and risk committees.

If our models fail to produce reliable results on an ongoing basis, we may not make appropriate risk management decisions, including decisions affecting loan purchases, management of credit losses, guaranty fee pricing, asset and liability management and the management of our net worth. Any of these decisions could adversely affect our businesses, results of operations, liquidity, net worth and financial condition. Furthermore, strategies we employ to manage and govern the risks associated with our use of models may not be effective or fully reliable.

***Changes in interest rates or our loss of the ability to manage interest rate risk successfully could adversely affect our net interest income and increase interest rate risk.***

We fund our operations primarily through the issuance of debt and invest our funds primarily in mortgage-related assets that permit mortgage borrowers to prepay their mortgages at any time. These business activities expose us to market risk, which is the risk of adverse changes in the fair value of financial instruments resulting from changes in market conditions. Our most significant market risks are interest rate risk and prepayment risk. We describe these risks in more detail in "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management." Changes in interest rates affect both the value of our mortgage assets and prepayment rates on our mortgage loans.

Changes in interest rates could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. Our ability to manage interest rate risk depends on our ability to issue debt instruments with a range of maturities and other features, including call provisions, at attractive rates and to engage in derivatives transactions. We must exercise judgment in selecting the amount, type and mix of debt and derivatives instruments that will most effectively manage our interest rate risk. The amount, type and mix of financial instruments that are available to us may not offset possible future changes in the spread between our borrowing costs and the interest we earn on our mortgage assets.

***Our business is subject to laws and regulations that restrict our activities and operations, which may prohibit us from undertaking activities that management believes would benefit our business and limit our ability to diversify our business.***

As a federally chartered corporation, we are subject to the limitations imposed by the Charter Act, extensive regulation, supervision and examination by FHFA and regulation by other federal agencies, including Treasury, HUD and the SEC. As a company under conservatorship, our primary regulator has management authority over us in its role as our conservator. We are also subject to other laws and regulations that affect our business, including those regarding taxation and privacy.

The Charter Act defines our permissible business activities. For example, we may not originate mortgage loans or purchase single-family loans in excess of the conforming loan limits, and our business is limited to the U.S. housing finance sector. In addition, our conservator has determined that, while in conservatorship, we will not be permitted to engage in new products and will be limited to continuing our existing business activities and taking actions necessary to advance the goals of the conservatorship. As a result of these limitations on our

- 73 -

ability to diversify our operations, our financial condition and results of operations depend almost entirely on conditions in a single sector of the U.S. economy, specifically, the U.S. housing market. The weak and unstable condition of the U.S. housing market in recent years has therefore had a significant adverse effect on our results of operations, financial condition and net worth, which is likely to continue.

***We could be required to pay substantial judgments, settlements or other penalties as a result of civil litigation.***

We are a party to a number of lawsuits. We are unable at this time to estimate our potential liability in these matters, but may be required to pay substantial judgments, settlements or other penalties and incur significant expenses in connection with these lawsuits, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. In addition, responding to these lawsuits may divert significant internal resources away from managing our business. More information regarding these lawsuits is included in "Legal Proceedings" and "Note 19, Commitments and Contingencies."

***An active trading market in our equity securities may cease to exist, which would adversely affect the market price and liquidity of our common and preferred stock.***

Our common stock and preferred stock are now traded exclusively in the over-the-counter market. We cannot predict the actions of market makers, investors or other market participants, and can offer no assurances that the market for our securities will be stable. If there is no active trading market in our equity securities, the market price and liquidity of the securities will be adversely affected.

***Mortgage fraud could result in significant financial losses and harm to our reputation.***

We use a process of delegated underwriting in which lenders make specific representations and warranties about the characteristics of the mortgage loans we purchase and securitize. As a result, we do not independently verify most borrower information that is provided to us. This exposes us to the risk that one or more of the parties involved in a transaction (the borrower, seller, broker, appraiser, title agent, lender or servicer) will engage in fraud by misrepresenting facts about a mortgage loan. Similarly, we rely on delegated servicing of loans and use of a variety of external resources to manage our REO. We have experienced financial losses resulting from mortgage fraud, including institutional fraud perpetrated by counterparties. In the future, we may experience additional financial losses or reputational damage as a result of mortgage fraud.

## RISKS RELATING TO OUR INDUSTRY

***A further decline in U.S. home prices or activity in the U.S. housing market would likely cause higher credit losses and credit-related expenses, and lower business volumes.***

We expect weakness in the real estate financial markets to continue in 2012. The deterioration in the credit condition of outstanding mortgages will result in the foreclosure of some troubled loans, which is likely to add to excess inventory of unsold homes. We also expect heightened default and severity rates to continue during this period, and home prices, particularly in some geographic areas, may decline further. Any resulting increase in delinquencies or defaults, or in loss severity, will likely result in a higher level of credit losses and credit-related expenses, which in turn will adversely affect our results of operations, net worth and financial condition.

Our business volume is affected by the rate of growth in total U.S. residential mortgage debt outstanding and the size of the U.S. residential mortgage market. The rate of growth in total U.S. residential mortgage debt outstanding has declined substantially in response to the reduced activity in the housing market and declines in home prices, and we expect single-family mortgage debt outstanding to decrease by approximately 1.1% in 2012. A decline in the rate of growth in mortgage debt outstanding reduces the unpaid principal balance of mortgage loans available for us to purchase or securitize, which in turn could reduce our net interest income and guaranty fee income. Even if we are able to increase our share of the secondary mortgage market, it may not be sufficient to make up for the decline in the rate of growth in mortgage originations, which could adversely affect our results of operations and financial condition.

- 74 -

*The Dodd-Frank Act and regulatory changes in the financial services industry may negatively impact our business.*

The Dodd-Frank Act is significantly changing the regulation of the financial services industry, including by the creation of new standards related to regulatory oversight of systemically important financial companies, derivatives transactions, asset-backed securitization, mortgage underwriting and consumer financial protection. This legislation will directly and indirectly affect many aspects of our business and could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. The Dodd-Frank Act and related regulatory changes could require us to change certain business practices, cause us to incur significant additional costs, limit the products we offer, require us to increase our regulatory capital or otherwise adversely affect our business. Additionally, implementation of this legislation will result in increased supervision and more comprehensive regulation of our customers and counterparties in the financial services industry, which may have a significant impact on the business practices of our customers and counterparties, as well as on our counterparty credit risk.

Examples of aspects of the Dodd-Frank Act and related future regulatory changes that, if applicable, may significantly affect us include mandatory clearing of certain derivatives transactions, which could impose significant additional costs on us; minimum standards for residential mortgage loans, which could subject us to increased legal risk for loans we purchase or guarantee; and the development of credit risk retention regulations applicable to residential mortgage loan securitizations, which could impact the types and volume of loans sold to us**.** Enhanced prudential standards that become applicable to certain bank holding companies and nonbank financial companies could affect investor demand for our debt and MBS securities. We could also be designated as a systemically important nonbank financial company subject to supervision and regulation by the Federal Reserve. If this were to occur, the Federal Reserve would have the authority to examine us and could impose stricter prudential standards on us, including risk-based capital requirements, leverage limits, liquidity requirements, credit concentration limits, resolution plan and credit exposure reporting requirements, overall risk management requirements, contingent capital requirements, enhanced public disclosures and short-term debt limits. Regulators have been seeking public comment regarding the criteria for designating nonbank financial companies for heightened supervision.

Because federal agencies have not completed the extensive rulemaking processes needed to implement and clarify many of the provisions of the Dodd-Frank Act, it is difficult to assess fully the impact of this legislation on our business and industry at this time, nor can we predict what similar changes to statutes or regulations will occur in the future.

Revisions by the Basel Committee on Banking Supervision to international capital requirements, referred to as Basel III, may also have a significant impact on us or on the business practices of our customers and counterparties. Depending on how they are implemented by regulators, the Basel III rules could be the basis for a revised framework for GSE capital standards that could increase our capital requirements. The Basel III capital and liquidity rules could also affect investor demand for our debt and MBS securities, and could limit some lenders' ability to count their rights to service mortgage loans toward meeting their regulatory capital requirements, which may reduce the economic value of mortgage servicing rights. As a result, a number of our customers and counterparties may change their business practices.

In addition, the actions of Treasury, the CFTC, the SEC, the Federal Deposit Insurance Corporation, the Federal Reserve and international central banking authorities directly or indirectly impact financial institutions' cost of funds for lending, capital-raising and investment activities, which could increase our borrowing costs or make borrowing more difficult for us. Changes in monetary policy are beyond our control and difficult to anticipate.

Legislative and regulatory changes could affect us in substantial and unforeseeable ways and could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. In particular, these changes could affect our ability to issue debt and may reduce our customer base.

TREASURY-2470

*Structural changes in the financial services industry may negatively impact our business.*

The financial market crisis resulted in mergers of some of our most significant institutional counterparties. Consolidation within the financial services industry has increased and may continue to increase our concentration risk to counterparties in this industry, and we are and may become more reliant on a smaller number of institutional counterparties. This both increases our risk exposure to any individual counterparty and decreases our negotiating leverage with these counterparties. The structural changes in the financial services industry could affect us in substantial and unforeseeable ways and could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth.

*The occurrence of a major natural or other disaster in the United States could negatively impact our credit losses and credit-related expenses or disrupt our business operations in the affected geographic area.*

We conduct our business in the residential and multifamily mortgage markets and own or guarantee the performance of mortgage loans throughout the United States. The occurrence of a major natural or environmental disaster, terrorist attack, pandemic, or similar event (a "major disruptive event") in a regional geographic area of the United States could negatively impact our credit losses and credit-related expenses in the affected area.

The occurrence of a major disruptive event could negatively impact a geographic area in a number of different ways, depending on the nature of the event. A major disruptive event that either damages or destroys residential or multifamily real estate securing mortgage loans in our book of business or negatively impacts the ability of borrowers to continue to make principal and interest payments on mortgage loans in our book of business could increase our delinquency rates, default rates and average loan loss severity of our book of business in the affected region or regions, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. While we attempt to create a geographically diverse mortgage credit book of business, there can be no assurance that a major disruptive event, depending on its magnitude, scope and nature, will not generate significant credit losses and credit-related expenses.

Additionally, the contingency plans and facilities that we have in place may be insufficient to prevent an adverse effect on our ability to conduct business, which could lead to financial losses. If a disruption occurs and our senior management or other employees are unable to occupy our offices, communicate with other personnel or travel to other locations, our ability to interact with each other and with our customers may suffer, and we may not be successful in implementing contingency plans that depend on communication or travel.

## Item 1B.   Unresolved Staff Comments

None.

## Item 2.   Properties

We own our principal office, which is located at 3900 Wisconsin Avenue, NW, Washington, DC, as well as additional Washington, DC facilities at 3939 Wisconsin Avenue, NW and 4250 Connecticut Avenue, NW. We also own two office facilities in Herndon, Virginia, as well as two additional facilities located in Reston, Virginia; and Urbana, Maryland. These owned facilities contain a total of approximately 1,459,000 square feet of space. We lease the land underlying the 4250 Connecticut Avenue building pursuant to a ground lease that automatically renews on July 1, 2029 for an additional 49 years unless we elect to terminate the lease by providing notice to the landlord of our decision to terminate at least one year prior to the automatic renewal date. In addition, we lease approximately 429,000 square feet of office space, including a conference center, at 4000 Wisconsin Avenue, NW, which is adjacent to our principal office. The present lease term for the office space at 4000 Wisconsin Avenue expires in April 2013 and we have one additional 5-year renewal option remaining under the original lease. The lease term for the conference center at 4000 Wisconsin Avenue expires in April 2018. We also lease an additional approximately 317,000 square feet of office space at three other locations in Washington, DC and Virginia. We maintain approximately 723,000 square feet of office space in leased premises in Pasadena, California; Irvine, California; Atlanta, Georgia; Chicago, Illinois; Philadelphia, Pennsylvania; and three facilities in Dallas, Texas.

TREASURY-2471

**Item 3.   Legal Proceedings**

This item describes our material legal proceedings. We describe additional material legal proceedings in "Note 19, Commitments and Contingencies," which is incorporated herein by reference. In addition to the matters specifically described or incorporated by reference in this item, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that do not have a material impact on our business. Litigation claims and proceedings of all types are subject to many factors that generally cannot be predicted accurately.

We record reserves for legal claims when losses associated with the claims become probable and the amounts can be reasonably estimated. The actual costs of resolving legal claims may be substantially higher or lower than the amounts reserved for those claims. For matters where the likelihood or extent of a loss is not probable or cannot be reasonably estimated, we do not recognize in our consolidated financial statements the potential liability that may result from these matters. We presently cannot determine the ultimate resolution of the matters described below or incorporated by reference into this discussion. We have recorded a reserve for legal claims related to those matters when we were able to determine a loss was both probable and reasonably estimable. If certain of these matters are determined against us, it could have a material adverse effect on our results of operations, liquidity and financial condition, including our net worth.

***Shareholder Derivative Litigation***

Three shareholder derivative cases, filed at various times between June 2007 and June 2008, naming certain of our current and former directors and officers as defendants, and Fannie Mae as a nominal defendant, are currently pending before the U.S. Court of Appeals for the District of Columbia Circuit: *Kellmer v. Raines, et al.* (filed June 29, 2007); *Middleton v. Raines, et al.* (filed July 6, 2007); and *Agnes v. Raines, et al.* (filed June 25, 2008). The cases rely on factual allegations that Fannie Mae's accounting statements were inconsistent with the GAAP requirements relating to hedge accounting and the amortization of premiums and discounts. *Agnes* relies on factual allegations that defendants wrongfully failed to disclose our exposure to the subprime mortgage crisis and that the Board improperly authorized the company to buy back $100 million in shares while the stock price was artificially inflated. Plaintiffs seek, on behalf of Fannie Mae, various forms of monetary and non-monetary relief, including unspecified money damages (including restitution, legal fees and expenses, disgorgement and punitive damages); corporate governance changes; an accounting; and attaching, impounding or imposing a constructive trust on the individual defendants' assets. Pursuant to a June 25, 2009 order, FHFA, as our conservator, substituted itself for shareholder plaintiffs in all of these actions. On July 27, 2010, the U.S. District Court for the District of Columbia dismissed *Kellmer* and *Middleton* with prejudice and *Agnes* without prejudice. FHFA filed motions to reconsider the decisions dismissing *Kellmer and Middleton* with prejudice, and those motions were denied on October 22, 2010. FHFA appealed that denial on November 22, 2010. Plaintiffs Kellmer and Agnes also appealed the substitution and the dismissal orders. On January 20, 2011, the U.S. Court of Appeals for the District of Columbia Circuit issued an order in the *Kellmer* appeal granting FHFA's motions for the voluntary dismissal of defendants Kenneth M. Duberstein, Frederic Malek and Patrick Swygert. On that same day, in the *Middleton* appeal, the Court of Appeals for the District of Columbia issued an order granting FHFA's motions for the voluntary dismissal of defendants Stephen Ashley, Kenneth Duberstein, Thomas Gerrity, Ann Korologos, Frederic Malek, Donald Marron, Anne Mulcahy, Joe Pickett, Leslie Rahl, Patrick Swygert, and John Wulff. The remaining parties have fully briefed the appeals and the D.C. Circuit heard oral argument on the appeals on February 16, 2012.

***FHFA Private-Label Mortgage-Related Securities Litigation***

In the third quarter of 2011, FHFA, as conservator for us and for Freddie Mac, filed 16 lawsuits on behalf of us and Freddie Mac against various financial institutions, their officers and affiliated and unaffiliated underwriters who were responsible for marketing and selling private-label mortgage-related securities to us. The lawsuits seek to recover losses we and Freddie Mac incurred on the securities. FHFA filed 13 of these lawsuits in the U.S. District Court for the Southern District of New York—against Bank of America Corp.; Barclays Bank PLC; Citigroup, Inc.; Credit Suisse Holdings (USA), Inc.; Deutsche Bank AG; First Horizon National Corporation;

TREASURY-2472

Goldman, Sachs & Co.; HSBC North America Holdings Inc.; JPMorgan Chase & Co.; Merrill Lynch & Co.; Nomura Holding America Inc.; SG Americas, Inc.; and UBS Americas Inc. ("UBS") and against certain related entities and individuals. Two lawsuits—against Countrywide Financial Corporation ("Countrywide") and Morgan Stanley—were filed in the Supreme Court of the State of New York for the County of New York, and one—against The Royal Bank of Scotland Group PLC ("RBS")—was filed in the U.S. District Court for the District of Connecticut. The lawsuit against UBS was filed on July 27, 2011, and all the others were filed on September 2, 2011. The lawsuits allege that the defendants violated federal securities laws and state common law by making material misstatements and omissions in the offering documents for the securities that were sold to Fannie Mae and Freddie Mac regarding the characteristics of the loans underlying the securities. The complaints also allege state securities law violations and some allege common law fraud. The complaints seek, among other things, rescission and recovery of consideration paid for the securities at issue in the lawsuits, monetary damages and, in certain cases, punitive damages for common law fraud.

Defendants in the two cases filed in New York state court removed those cases to the U.S. District Court for the Southern District of New York and FHFA filed motions to remand the cases back to state court. On February 7, 2012, the Joint Panel on Multidistrict Litigation transferred the Countrywide case to the U.S. District Court for the Central District of California for inclusion in a multidistrict proceeding involving other actions pending against Countrywide.

On November 16, 2011, all of the cases pending in the Southern District of New York were transferred to one judge in the district, Judge Cote. Judge Cote stayed the time to answer or move to dismiss all of the cases except the UBS case. On December 2, 2011, defendants in the UBS case filed a motion to dismiss. On December 21, 2011, FHFA filed an amended complaint in the UBS case. On December 2, 2011, defendants in the RBS case pending in the District of Connecticut filed a motion to dismiss. On February 1, 2012, FHFA filed an amended complaint in the RBS case.

### Investigation by the Office of Inspector General of FHFA and the U.S. Attorney for the Eastern District of Virginia

In October 2011, we received notice of an ongoing investigation by the Office of Inspector General of FHFA ("FHFA OIG") and the U.S. Attorney for the Eastern District of Virginia with regard to a multifamily agreement with The Related Companies, L.P. The financial impact of the agreement was not material to our financial statements. In connection with the investigation, we have received subpoenas for documents from the FHFA OIG. We are cooperating with this investigation.

### Item 4.   Mine Safety Disclosures

None.

TREASURY-2473

## PART II

**Item 5.   Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

Our common stock is traded in the over-the-counter market and quoted on the OTC Bulletin Board under the ticker symbol "FNMA." The transfer agent and registrar for our common stock is Computershare, P.O. Box 43078, Providence, Rhode Island 02940.

**Common Stock Data**

The following table displays, for the periods indicated, the high and low prices per share of our common stock as reported in the Bloomberg Financial Markets service. For periods prior to our stock's delisting from the NYSE on July 8, 2010, these are high and low sales prices reported in the consolidated transaction reporting system. For periods on or after July 8, 2010, these prices represent high and low trade prices. No dividends were declared on shares of our common stock during the periods indicated.

| Quarter | High | Low |
|---|---|---|
| **2010** | | |
| First Quarter | $1.23 | $0.91 |
| Second Quarter | 1.36 | 0.34 |
| Third Quarter | 0.42 | 0.19 |
| Fourth Quarter | 0.47 | 0.27 |
| **2011** | | |
| First Quarter | $0.96 | $0.30 |
| Second Quarter | 0.50 | 0.32 |
| Third Quarter | 0.39 | 0.23 |
| Fourth Quarter | 0.27 | 0.19 |

**Dividends**

Our payment of dividends is subject to the following restrictions:

*Restrictions Relating to Conservatorship.*   Our conservator announced on September 7, 2008 that we would not pay any dividends on the common stock or on any series of preferred stock, other than the senior preferred stock.

*Restrictions Under Senior Preferred Stock Purchase Agreement.*   The senior preferred stock purchase agreement prohibits us from declaring or paying any dividends on Fannie Mae equity securities without the prior written consent of Treasury.

*Statutory Restrictions.*   Under the GSE Act, FHFA has authority to prohibit capital distributions, including payment of dividends, if we fail to meet our capital requirements. If FHFA classifies us as significantly undercapitalized, approval of the Director of FHFA is required for any dividend payment. Under the GSE Act, we are not permitted to make a capital distribution if, after making the distribution, we would be undercapitalized, except the Director of FHFA may permit us to repurchase shares if the repurchase is made in connection with the issuance of additional shares or obligations in at least an equivalent amount and will reduce our financial obligations or otherwise improve our financial condition.

*Restrictions Relating to Subordinated Debt.*   During any period in which we defer payment of interest on qualifying subordinated debt, we may not declare or pay dividends on, or redeem, purchase or acquire, our common stock or preferred stock.

TREASURY-2474

*Restrictions Relating to Preferred Stock.*    Payment of dividends on our common stock is also subject to the prior payment of dividends on our preferred stock and our senior preferred stock. Payment of dividends on all outstanding preferred stock, other than the senior preferred stock, is also subject to the prior payment of dividends on the senior preferred stock.

See "MD&A—Liquidity and Capital Management" for information on dividends declared and paid to Treasury on the senior preferred stock.

### Holders

As of January 31, 2012, we had approximately 15,000 registered holders of record of our common stock, including holders of our restricted stock. In addition, as of January 31, 2012, Treasury held a warrant giving it the right to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis on the date of exercise.

### Recent Sales of Unregistered Securities

Under the terms of our senior preferred stock purchase agreement with Treasury, we are prohibited from selling or issuing our equity interests, other than as required by (and pursuant to) the terms of a binding agreement in effect on September 7, 2008, without the prior written consent of Treasury.

We previously provided stock compensation to employees and members of the Board of Directors under the Fannie Mae Stock Compensation Plan of 1993 and the Fannie Mae Stock Compensation Plan of 2003 (the "Stock Compensation Plans"). During the quarter ended December 31, 2011, 1,157 restricted stock units vested, as a result of which 786 shares of common stock were issued, and 371 shares of common stock that otherwise would have been issued were withheld by us in lieu of requiring the recipients to pay us the withholding taxes due upon vesting. All of these restricted stock units were granted prior to our entering into conservatorship. Restricted stock units granted under the Plans typically vest in equal annual installments over three or four years beginning on the first anniversary of the date of grant. Each restricted stock unit represents the right to receive a share of common stock at the time of vesting. As a result, restricted stock units are generally similar to restricted stock, except that restricted stock units do not confer voting rights on their holders. All restricted stock units were granted to persons who were employees or members of the Board of Directors of Fannie Mae.

The securities we issue are "exempted securities" under laws administered by the SEC to the same extent as securities that are obligations of, or are guaranteed as to principal and interest by, the United States, except that, under the GSE Act, our equity securities are not treated as exempted securities for purposes of Section 12, 13, 14 or 16 of the Exchange Act. As a result, our securities offerings are exempt from SEC registration requirements and we do not file registration statements or prospectuses with the SEC under the Securities Act with respect to our securities offerings.

### Information about Certain Securities Issuances by Fannie Mae

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

Because the securities we issue are exempted securities, we do not file registration statements or prospectuses with the SEC with respect to our securities offerings. To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars or prospectuses (or supplements thereto) that we post on our Web site or in a current report on Form 8-K that we file with the SEC, in accordance with a "no-action" letter we received from the SEC staff in 2004. In cases where the information is disclosed in a prospectus or offering circular posted on our Web

- 80 -

site, the document will be posted on our Web site within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

The Web site address for disclosure about our debt securities is www.fanniemae.com/debtsearch. From this address, investors can access the offering circular and related supplements for debt securities offerings under Fannie Mae's universal debt facility, including pricing supplements for individual issuances of debt securities.

Disclosure about our obligations pursuant to some of the MBS we issue, some of which may be off-balance sheet obligations, can be found at www.fanniemae.com/mbsdisclosure. From this address, investors can access information and documents about our MBS, including prospectuses and related prospectus supplements.

We are providing our Web site address solely for your information. Information appearing on our Web site is not incorporated into this annual report on Form 10-K.

**Purchases of Equity Securities by the Issuer**

The following table displays shares of our common stock we repurchased during the fourth quarter of 2011.

| | Total Number of Shares Purchased[1] | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Program[2] | Maximum Number of Shares that May Yet be Purchased Under the Program[2] |
|---|---|---|---|---|
| | | | (Shares in thousands) | |
| **2011** | | | | |
| October 1-31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | $   — | — | — |
| November 1-30 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 0.22 | — | — |
| December 1-31 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 0.21 | — | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | | | |

[1] Consists of shares of common stock reacquired from employees to pay an aggregate of approximately $950 in withholding taxes due upon the vesting of previously issued restricted stock.

[2] We do not have any publicly announced share repurchase program under which we could purchase our common stock.

TREASURY-2476

**Item 6.      Selected Financial Data**

The selected consolidated financial data displayed below are summarized from our results of operations for the five-year period ended December 31, 2011, as well as selected consolidated balance sheet data as of the end of each year within this five-year period. Certain prior period amounts have been reclassified to conform to the current period presentation. This data should be reviewed in conjunction with the audited consolidated financial statements and related notes and with the MD&A included in this annual report on Form 10-K.

As discussed in "MD&A—Consolidated Results of Operations," prospectively adopting the consolidation accounting guidance on January 1, 2010 had a significant impact on the presentation and comparability of our consolidated financial statements due to the consolidation of the substantial majority of our single-class securitization trusts and the elimination of previously recorded deferred revenue from our guaranty arrangements. While some line items in our consolidated financial statements were not impacted, others were impacted significantly, which reduces the comparability of our results for 2011 and 2010 with the results for prior years.

| | For the Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2011** | **2010** | **2009** | **2008** | **2007** |
| | (Dollars and shares in millions, except per share amounts) | | | | |
| **Statement of operations data:** | | | | | |
| Net revenues[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 20,444 | $ 17,493 | $ 22,494 | $ 17,436 | $ 11,205 |
| Net other-than-temporary impairments . . . . . . . . . . . . . . . . . . | (308) | (722) | (9,861) | (6,974) | (814) |
| Investment gains (losses), net . . . . . . . . . . . . . . . . . . . . . . . | 506 | 346 | 1,458 | (246) | (53) |
| Fair value losses, net[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (6,621) | (511) | (2,811) | (20,129) | (4,668) |
| Administrative expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,370) | (2,597) | (2,207) | (1,979) | (2,669) |
| Credit-related expenses[3] . . . . . . . . . . . . . . . . . . . . . . . . . . | (27,498) | (26,614) | (73,536) | (29,809) | (5,012) |
| Other expenses, net[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (151) | (642) | (7,060) | (1,776) | (2,476) |
| (Benefit) provision for federal income taxes . . . . . . . . . . . . . . | (90) | (82) | (985) | 13,749 | (3,091) |
| Net loss attributable to Fannie Mae . . . . . . . . . . . . . . . . . . . . | (16,855) | (14,014) | (71,969) | (58,707) | (2,050) |
| Preferred stock dividends and issuance costs at redemption . . . | (9,614) | (7,704) | (2,474) | (1,069) | (513) |
| Net loss attributable to common stockholders . . . . . . . . . . . . . | (26,469) | (21,718) | (74,443) | (59,776) | (2,563) |
| **Common share data:** | | | | | |
| Loss per share: | | | | | |
| Basic and Diluted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (4.61) | $ (3.81) | $ (13.11) | $ (24.04) | $ (2.63) |
| Weighted-average common shares outstanding:[5] | | | | | |
| Basic and Diluted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,737 | 5,694 | 5,680 | 2,487 | 973 |
| Cash dividends declared per share . . . . . . . . . . . . . . . . . . . . | $ — | $ — | $ — | $ 0.75 | $ 1.90 |
| **New business acquisition data:** | | | | | |
| Fannie Mae MBS issues acquired by third parties[6] . . . . . . . . . | $478,870 | $497,975 | $496,067 | $434,711 | $563,648 |
| Mortgage portfolio purchases[7] . . . . . . . . . . . . . . . . . . . . . . | 173,978 | 357,573 | 327,578 | 196,645 | 182,471 |
| New business acquisitions . . . . . . . . . . . . . . . . . . . . . . . . . . | $652,848 | $855,548 | $823,645 | $631,356 | $746,119 |

TREASURY-2477

|  | As of December 31, | | | | |
|---|---|---|---|---|---|
|  | **2011** | **2010** | **2009** | **2008** | **2007** |
|  | (Dollars in millions) | | | | |
| **Balance sheet data:** | | | | | |
| Investments in securities: | | | | | |
| Fannie Mae MBS .......................... | $  24,274 | $  30,226 | $  229,169 | $  234,250 | $  179,401 |
| Other agency MBS ......................... | 16,744 | 19,951 | 43,905 | 35,440 | 32,957 |
| Mortgage revenue bonds ................... | 10,978 | 11,650 | 13,446 | 13,183 | 16,213 |
| Other mortgage-related securities ............. | 49,936 | 56,668 | 54,265 | 56,781 | 90,827 |
| Non-mortgage-related securities .............. | 49,848 | 32,753 | 8,882 | 17,640 | 38,115 |
| Mortgage loans:[8] | | | | | |
| Loans held for sale ....................... | 311 | 915 | 18,462 | 13,270 | 7,008 |
| Loans held for investment, net of allowance ..... | 2,898,310 | 2,922,805 | 376,099 | 412,142 | 396,516 |
| Total assets ................................ | 3,211,484 | 3,221,972 | 869,141 | 912,404 | 879,389 |
| Short-term debt ............................. | 151,725 | 157,243 | 200,437 | 330,991 | 234,160 |
| Long-term debt ............................. | 3,038,147 | 3,039,757 | 574,117 | 539,402 | 562,139 |
| Total liabilities ............................ | 3,216,055 | 3,224,489 | 884,422 | 927,561 | 835,271 |
| Senior preferred stock ....................... | 112,578 | 88,600 | 60,900 | 1,000 | — |
| Preferred stock ............................. | 19,130 | 20,204 | 20,348 | 21,222 | 16,913 |
| Total Fannie Mae stockholders' (deficit) equity .... | (4,624) | (2,599) | (15,372) | (15,314) | 44,011 |
| Net worth (deficit) surplus[9] ................... | (4,571) | (2,517) | (15,281) | (15,157) | 44,118 |
| **Book of business data:** | | | | | |
| Total mortgage assets[10] ...................... | $3,065,616 | $3,099,250 | $  769,252 | $  792,196 | $  727,903 |
| Unconsolidated Fannie Mae MBS, held by third parties[11] ................................ | 19,612 | 21,323 | 2,432,789 | 2,289,459 | 2,118,909 |
| Other guarantees[12] .......................... | 42,406 | 35,619 | 27,624 | 27,809 | 41,588 |
| Mortgage credit book of business ............. | $3,127,634 | $3,156,192 | $3,229,665 | $3,109,464 | $2,888,400 |
| Guaranty book of business[13] ................... | $3,037,549 | $3,054,488 | $3,097,201 | $2,975,710 | $2,744,237 |
| **Credit quality:** | | | | | |
| Total nonperforming loans[14][15] ................. | $  251,949 | $  253,579 | $  222,064 | $  119,955 | $  27,254 |
| Total loss reserves .......................... | 76,938 | 66,251 | 64,891 | 24,753 | 3,391 |
| Total loss reserves as a percentage of total guaranty book of business ......................... | 2.53% | 2.17% | 2.10% | 0.83% | 0.12% |
| Total loss reserves as a percentage of total nonperforming loans[15] ..................... | 30.54 | 26.13 | 29.22 | 20.64 | 12.44 |

|  | For the Year Ended December 31, | | | | |
|---|---|---|---|---|---|
|  | **2011** | **2010** | **2009** | **2008** | **2007** |
| **Performance ratios:** | | | | | |
| Net interest yield[16] ........................... | 0.60% | 0.51% | 1.65% | 1.03% | 0.57% |
| Average effective guaranty fee rate (in basis points)[17] ................................ | N/A | N/A | 27.6 bp | 31.0 bp | 23.7 bp |
| Credit loss ratio (in basis points)[18] .............. | 61.3 bp | 77.4 bp | 44.6 bp | 22.7 bp | 5.3 bp |
| Return on assets[19] ........................... | (0.82)% | (0.67)% | (8.27)% | (6.77)% | (0.30)% |

[1]  Consists of net interest income and fee and other income.

[2]  Consists of the following: (a) derivatives fair value gains (losses), net; (b) trading securities gains (losses), net; (c) hedged mortgage assets gains (losses), net; (d) debt foreign exchange gains (losses), net; (e) debt fair value gains (losses), net; and (f) mortgage loans fair value losses, net.

- 83 -

TREASURY-2478

(3) Consists of provision for loan losses, provision for guaranty losses and foreclosed property expense.

(4) Consists of the following: (a) debt extinguishment gains (losses), net; (b) gains (losses) from partnership investments; and (c) losses on certain guaranty contracts.

(5) Includes the weighted-average shares of common stock that would be issuable upon the full exercise of the warrant issued to Treasury from the date of conservatorship through the end of the period for 2008 and for the full year for 2009, 2010, and 2011. Because the warrant's exercise price of $0.00001 per share is considered non-substantive (compared to the market price of our common stock), the warrant was evaluated based on its substance over form. It was determined to have characteristics of non-voting common stock, and thus is included in the computation of basic and diluted loss per share.

(6) Reflects unpaid principal balance of Fannie Mae MBS issued and guaranteed by us during the reporting period less: (a) securitizations of mortgage loans held in our mortgage portfolio during the reporting period and (b) Fannie Mae MBS purchased for our mortgage portfolio during the reporting period.

(7) Reflects unpaid principal balance of mortgage loans and mortgage-related securities we purchased for our mortgage portfolio during the reporting period. Includes acquisition of mortgage-related securities accounted for as the extinguishment of debt because the entity underlying the mortgage-related securities has been consolidated in our consolidated balance sheets. For 2011 and 2010, includes unpaid principal balance of approximately $67 billion and $217 billion, respectively, of delinquent loans purchased from our single-family MBS trusts. Under our MBS trust documents, we have the option to purchase from MBS trusts loans that are delinquent as to four or more consecutive monthly payments.

(8) Mortgage loans consist solely of domestic residential real-estate mortgages.

(9) Total assets less total liabilities.

(10) Reflects unpaid principal balance of mortgage loans and mortgage-related securities reported in our consolidated balance sheets. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount. As a result of our adoption of the consolidation accounting guidance as of January 1, 2010, we reflect a substantial majority of our Fannie Mae MBS as mortgage assets and the balance as unconsolidated Fannie Mae MBS.

(11) Reflects unpaid principal balance of unconsolidated Fannie Mae MBS, held by third-party investors. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

(12) Primarily includes long-term standby commitments we have issued and single-family and multifamily credit enhancements we have provided that are not otherwise reflected in the table.

(13) Reflects mortgage credit book of business less non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

(14) Consists of on-balance sheet nonperforming loans held in our mortgage assets and off-balance sheet nonperforming loans in unconsolidated Fannie Mae MBS trusts held by third parties. Includes all nonaccrual loans, as well as troubled debt restructurings ("TDR") and HomeSaver Advance first-lien loans on accrual status. See "MD&A-Consolidated Results of Operations-Credit-Related Expenses-Nonperforming Loans" for a discussion of our nonperforming loans.

(15) In December 2011, we changed our definition of "total nonperforming loans." Under our new definition, we no longer reflect in this amount (1) our allowance for loan losses or (2) our allowance for accrued interest receivable related to these individually impaired loans. The amounts we report for prior periods have been revised from amounts we previously disclosed as a result of this change.

(16) Calculated based on net interest income for the reporting period divided by the average balance of total interest-earning assets during the period, expressed as a percentage.

(17) Calculated based on guaranty fee income for the reporting period divided by average outstanding Fannie Mae MBS and other guarantees during the period, expressed in basis points. After the adoption of consolidation accounting guidance on January 1, 2010, guaranty fee income is significantly less than prior years, making average effective guarantee fee rate an inconsequential performance ratio after 2009.

(18) Consists of (a) charge-offs, net of recoveries and (b) foreclosed property expense for the reporting period (adjusted to exclude the impact of fair value losses resulting from credit-impaired loans acquired from MBS trusts and HomeSaver Advance loans) divided by the average guaranty book of business during the period, expressed in basis points. See "MD&A-Consolidated Results of Operations-Credit-Related Expenses-Credit Loss Performance Metrics" for a discussion of how our credit loss metrics are calculated.

(19) Calculated based on net loss available to common stockholders for the reporting period divided by average total assets during the period, expressed as a percentage. Average balances for purposes of ratio calculations are based on balances at the beginning of the year and at the end of each quarter for each year shown.

- 84 -

**Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations**

*You should read this MD&A in conjunction with our consolidated financial statements as of December 31, 2011 and related notes, and with "Business—Executive Summary."*

This report contains forward-looking statements that are based upon management's current expectations and are subject to significant uncertainties and changes in circumstances. Please review "Business—Forward-Looking Statements" for more information on the forward-looking statements in this report and "Risk Factors" for a discussion of factors that could cause our actual results to differ, perhaps materially, from our forward-looking statements. Please also see "Glossary of Terms Used in This Report."

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in accordance with GAAP requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the consolidated financial statements. Understanding our accounting policies and the extent to which we use management judgment and estimates in applying these policies is integral to understanding our financial statements. We describe our most significant accounting policies in "Note 1, Summary of Significant Accounting Policies."

We evaluate our critical accounting estimates and judgments required by our policies on an ongoing basis and update them as necessary based on changing conditions. Management has discussed any significant changes in judgments and assumptions in applying our critical accounting policies with the Audit Committee of our Board of Directors. See "Risk Factors" for a discussion of the risk associated with the use of models. We have identified three of our accounting policies as critical because they involve significant judgments and assumptions about highly complex and inherently uncertain matters, and the use of reasonably different estimates and assumptions could have a material impact on our reported results of operations or financial condition. These critical accounting policies and estimates are as follows:

- Fair Value Measurement

- Other-Than-Temporary Impairment of Investment Securities

- Total Loss Reserves

**Fair Value Measurement**

The use of fair value to measure our assets and liabilities is fundamental to our financial statements and is a critical accounting estimate because we account for and record a portion of our assets and liabilities at fair value. In determining fair value, we use various valuation techniques. We describe the valuation techniques and inputs used to determine the fair value of our assets and liabilities and disclose their carrying value and fair value in "Note 18, Fair Value."

The fair value accounting rules provide a three-level fair value hierarchy for classifying financial instruments. This hierarchy is based on whether the inputs to the valuation techniques used to measure fair value are observable or unobservable. Each asset or liability is assigned to a level based on the lowest level of any input that is significant to its fair value measurement. The three levels of the fair value hierarchy are described below:

Level 1: Quoted prices (unadjusted) in active markets for identical assets or liabilities.

Level 2: Observable market-based inputs, other than quoted prices in active markets for identical assets or liabilities.

Level 3: Unobservable inputs.

The majority of the financial instruments that we report at fair value in our consolidated financial statements fall within the Level 2 category and are valued primarily utilizing inputs and assumptions that are observable in the

- 85 -

marketplace, that can be derived from observable market data or that can be corroborated by recent trading activity of similar instruments with similar characteristics. For example, we generally request non-binding prices from at least three independent pricing services to estimate the fair value of our trading and available-for-sale securities at an individual security level. We use the average of these prices to determine the fair value.

In the absence of such information or if we are not able to corroborate these prices by other available, relevant market information, we estimate their fair values based on single source quotations from brokers or dealers or by using internal calculations or discounted cash flow techniques that incorporate inputs, such as prepayment rates, discount rates and delinquency, default and cumulative loss expectations, that are implied by market prices for similar securities and collateral structure types. Because this valuation technique relies on significant unobservable inputs, the fair value estimation is classified as Level 3. The process for determining fair value using unobservable inputs is generally more subjective and involves a high degree of management judgment and assumptions. These assumptions may have a significant effect on our estimates of fair value, and the use of different assumptions as well as changes in market conditions could have a material effect on our results of operations or financial condition.

### *Fair Value Hierarchy—Level 3 Assets and Liabilities*

The assets and liabilities that we have classified as Level 3 consist primarily of financial instruments for which there is limited market activity and therefore little or no price transparency. As a result, the valuation techniques that we use to estimate the fair value of Level 3 instruments involve significant unobservable inputs, which generally are more subjective and involve a high degree of management judgment and assumptions. Our Level 3 assets and liabilities consist of certain mortgage securities and residual interests, certain mortgage loans, acquired property, partnership investments, our guaranty assets and buy-ups, our master servicing assets, certain long-term debt arrangements and certain highly structured, complex derivative instruments.

Table 5 displays a comparison, by balance sheet category, of the amount of financial assets carried in our consolidated balance sheets at fair value on a recurring basis ("recurring asset") that were classified as Level 3 as of December 31, 2011 and 2010. The availability of observable market inputs to measure fair value varies based on changes in market conditions, such as liquidity. As a result, we expect the amount of financial instruments carried at fair value on a recurring basis and classified as Level 3 to vary each period.

**Table 5:   Level 3 Recurring Financial Assets at Fair Value**

|  | As of December 31, | |
|---|---|---|
|  | **2011** | **2010** |
|  | **(Dollars in millions)** | |
| Trading securities | $    4,238 | $    4,576 |
| Available-for-sale securities | 29,492 | 31,934 |
| Mortgage loans | 2,319 | 2,207 |
| Other assets | 238 | 247 |
| Level 3 recurring assets | $  36,287 | $  38,964 |
| Total assets | $3,211,484 | $3,221,972 |
| Total recurring assets measured at fair value | $  156,552 | $  161,696 |
| Level 3 recurring assets as a percentage of total assets | 1% | 1% |
| Level 3 recurring assets as a percentage of total recurring assets measured at fair value | 23% | 24% |
| Total recurring assets measured at fair value as a percentage of total assets | 5% | 5% |

Assets measured at fair value on a nonrecurring basis and classified as Level 3, which are not presented in the table above, primarily include mortgage loans and acquired property. The fair value of Level 3 nonrecurring assets totaled $69.0 billion for the year ended December 31, 2011 and $63.0 billion for the year ended December 31, 2010.

TREASURY-2481

Financial liabilities measured at fair value on a recurring basis and classified as Level 3 consisted of long-term debt with a fair value of $1.2 billion as of December 31, 2011 and $1.0 billion as of December 31, 2010, and other liabilities with a fair value of $173 million as of December 31, 2011 and $143 million as of December 31, 2010.

### Fair Value Control Processes

We have control processes that are designed to ensure that our fair value measurements are appropriate and reliable, that they are based on observable inputs wherever possible and that our valuation approaches are consistently applied and the assumptions used are reasonable. Our control processes consist of a framework that provides for a segregation of duties and oversight of our fair value methodologies and valuations and validation procedures.

Our Valuation Oversight Committee includes senior representation from our Capital Markets segment, our Enterprise Risk Office and our Finance division. The composition of the Committee is determined by the committee chair, our Chief Financial Officer, with the objective of obtaining appropriate representation from finance, risk and select business units within Fannie Mae. The Committee is responsible for advising the committee chair based on its review of valuation methodologies and results for various financial instruments, including significant asset or liability valuations used for financial reporting. Our Price Verification Group, which is an independent control group separate from the group responsible for obtaining prices, is responsible for performing monthly independent price verification. The Price Verification Group also performs independent reviews of the assumptions used in determining the fair value of products we hold that have material estimation risk because observable market-based inputs do not exist.

Our validation procedures are intended to ensure that the individual prices we receive are consistent with our observations of the marketplace and prices that are provided to us by pricing services or dealers. We verify selected prices using a variety of methods, including comparing the prices to secondary pricing services and corroborating the prices by reference to other independent market data, such as non-binding broker or dealer quotations, relevant benchmark indices, and prices of similar instruments. We review prices for reasonableness based on variations from prices provided in previous periods, comparing prices to internally calculated expected prices and conducting relative value comparisons based on specific characteristics of securities. In addition, we compare our derivatives valuations to counterparty valuations as part of the collateral exchange process. We have formal discussions with the pricing services as part of our due diligence process in order to maintain a current understanding of the models and related assumptions and inputs that these vendors use in developing prices. The prices provided to us by independent pricing services reflect the existence of credit enhancements, including monoline insurance coverage, and the current lack of liquidity in the marketplace. If we determine that a price provided to us is outside established parameters, we will further examine the price, including having follow-up discussions with the pricing service or dealer. If we conclude that a price is not valid, we will adjust the price for various factors, such as liquidity, bid-ask spreads and credit considerations. These adjustments are generally based on available market evidence. In the absence of such evidence, management's best estimate is used. All of these processes are executed before we use the prices in preparing our financial statements.

We continually refine our valuation methodologies as markets and products develop and the pricing for certain products becomes more or less transparent. While we believe our valuation methods are appropriate and consistent with those of other market participants, using different methodologies or assumptions to determine fair value could result in a materially different estimate of the fair value of some of our financial instruments.

The dislocation of historical pricing relationships between certain financial instruments persisted during 2011 due to the housing and financial market crisis. These conditions, which have resulted in greater market volatility, wider credit spreads and a lack of price transparency, made the measurement of fair value more difficult and complex for some financial instruments, particularly for financial instruments for which there is no active market, such as our guaranty contracts and loans purchased with evidence of credit deterioration.

- 87 -

**Other-Than-Temporary Impairment of Investment Securities**

We evaluate available-for-sale securities in an unrealized loss position as of the end of each quarter for other-than-temporary impairment. A debt security is evaluated for other-than-temporary impairment if its fair value is less than its amortized cost basis. We recognize other-than-temporary impairment in earnings if one of the following conditions exists: (1) our intent is to sell the security; (2) it is more likely than not that we will be required to sell the security before the impairment is recovered; or (3) we do not expect to recover our amortized cost basis. If, by contrast, we do not intend to sell the security and will not be required to sell prior to recovery of the amortized cost basis, we recognize only the credit component of other-than-temporary impairment in earnings. We record the noncredit component in other comprehensive income. The credit component is the difference between the security's amortized cost basis and the present value of its expected future cash flows, while the noncredit component is the remaining difference between the security's fair value and the present value of expected future cash flows. If, subsequent to recognizing other-than-temporary impairment, our estimates of future cash flows improve, we recognize the change in estimate prospectively over the remaining life of securities as a component of interest income.

Our evaluation requires significant management judgment and consideration of various factors to determine if we will receive the amortized cost basis of our investment securities. We evaluate a debt security for other-than-temporary impairment using an econometric model that estimates the present value of cash flows given multiple factors. These factors include: the severity and duration of the impairment; recent events specific to the issuer and/or industry to which the issuer belongs; the payment structure of the security; external credit ratings and the failure of the issuer to make scheduled interest or principal payments. We rely on expected future cash flow projections to determine if we will recover the amortized cost basis of our available-for-sale securities.

We provide more detailed information on our accounting for other-than-temporary impairment in "Note 1, Summary of Significant Accounting Policies" and "Note 5, Investments in Securities." Also refer to "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities" for a discussion of other-than-temporary impairment recognized on our investments in Alt-A and subprime private-label securities. See "Risk Factors" for a discussion of the risks associated with possible future write-downs of our investment securities.

**Total Loss Reserves**

Our total loss reserves consist of the following components:

- Allowance for loan losses;

- Allowance for accrued interest receivable;

- Reserve for guaranty losses; and

- Allowance for preforeclosure property tax and insurance receivable.

These components can be further divided into single-family portions, which collectively make up our single-family loss reserves, and multifamily portions, which collectively make up our multifamily loss reserves.

We maintain an allowance for loan losses and an allowance for accrued interest receivable for loans classified as held for investment, including both loans we hold in our portfolio and loans held in consolidated Fannie Mae MBS trusts. We maintain a reserve for guaranty losses for loans held in unconsolidated Fannie Mae MBS trusts we guarantee and loans we have guaranteed under long-term standby commitments and other credit enhancements we have provided. We also maintain an allowance for preforeclosure property tax and insurance receivable on delinquent loans that is included in "Other assets" in our consolidated balance sheets. These amounts, which we collectively refer to as our total loss reserves, represent probable losses incurred related to loans in our guaranty book of business, including concessions granted to borrowers upon modifications of their loans, as of the balance sheet date.

- 88 -

The allowance for loan losses, allowance for accrued interest receivable and allowance for preforeclosure property tax and insurance receivable are valuation allowances that reflect an estimate of incurred credit losses related to our recorded investment in loans held for investment. The reserve for guaranty losses is a liability account in our consolidated balance sheets that reflects an estimate of incurred credit losses related to our guaranty to each unconsolidated Fannie Mae MBS trust that we will supplement amounts received by the Fannie Mae MBS trust as required to permit timely payments of principal and interest on the related Fannie Mae MBS. As a result, the guaranty reserve considers not only the principal and interest due on the loan at the current balance sheet date, but also an estimate of any additional interest payments due to the trust from the current balance sheet date until the point of loan acquisition or foreclosure. Our loss reserves consist of a specific loss reserve for individually impaired loans and a collective loss reserve for all other loans.

We have an established process, using analytical tools, benchmarks and management judgment, to determine our loss reserves. Although our loss reserve process benefits from extensive historical loan performance data, this process is subject to risks and uncertainties, including a reliance on historical loss information that may not be representative of current conditions. We continually monitor delinquency and default trends and make changes in our historically developed assumptions and estimates as necessary to better reflect present conditions, including current trends in borrower risk and/or general economic trends, changes in risk management practices, and changes in public policy and the regulatory environment. We also consider the recoveries that we expect to receive on mortgage insurance and other loan-specific credit enhancements entered into contemporaneously with and in contemplation of a guaranty or loan purchase transaction, as such recoveries reduce the severity of the loss associated with defaulted loans. Due to the stress in the housing and credit markets and the extent of deterioration in these markets, our process for determining our loss reserves has become significantly more complex and involves a greater degree of management judgment than prior to this period of housing and mortgage market stress.

### Single-Family Loss Reserves

We establish a specific single-family loss reserve for individually impaired loans, which includes loans we restructure in troubled debt restructurings, certain nonperforming loans in MBS trusts and acquired credit-impaired loans that have been further impaired subsequent to acquisition. The single-family loss reserve for individually impaired loans has grown as a proportion of the total single-family loss reserves in recent periods due to increases in the population of restructured loans. We typically measure impairment based on the difference between our recorded investment in the loan and the present value of the estimated cash flows we expect to receive, which we calculate using the effective interest rate of the original loan or the effective interest rate at acquisition for an acquired credit-impaired loan. However, when foreclosure is probable on an individually impaired loan, we measure impairment based on the difference between our recorded investment in the loan and the fair value of the underlying property, adjusted for the estimated discounted costs to sell the property and estimated insurance or other proceeds we expect to receive. We then allocate a portion of the reserve to interest accrued on the loans as of the balance sheet date.

We establish a collective single-family loss reserve for all other single-family loans in our single-family guaranty book of business using a model that estimates the probability of default of loans to derive an overall loss reserve estimate given multiple factors such as: origination year, mark-to-market LTV ratio, delinquency status and loan product type. We believe that the loss severity estimates we use in determining our loss reserves reflect current available information on actual events and conditions as of each balance sheet date, including current home prices. Our loss severity estimates do not incorporate assumptions about future changes in home prices. We do, however, use a look back period to develop our loss severity estimates for all loan categories. We then allocate a portion of the reserve to interest accrued on the loans as of the balance sheet date.

In the fourth quarter of 2011, we updated the estimated probability, based on historical trends, of a trial modification becoming a permanent modification. Permanent modifications are a better indicator of a loan's performance than loans that do not complete a trial modification period. The impact of applying a higher probability of success to our trial modifications reduced our allowance for loan losses and credit-related expenses by approximately $700 million. Additionally, we enhanced our process to estimate the recovery amount incorporated in our allowance for

- 89 -

loan losses related to repurchase requests. The recovery estimate takes into account individual loan attributes such as the probability of default and severity on our individually impaired loans and resulted in a reduction in our allowance for loan losses and our credit-related expenses of approximately $800 million.

In the third quarter of 2011, we updated our allowance for loan loss models for individually impaired loans to incorporate more home price data at the regional level rather than at the national level. We believe this approach provides a better estimation of possible home price paths and related default expectations; it has resulted in a decrease to our allowance for loan losses and a reduction in our provision for loan losses of approximately $800 million.

In the second quarter of 2011, we updated our loan loss models to incorporate more recent data on prepayments of modified loans, which contributed to an increase in our allowance for loan losses and an increase in credit-related expenses of approximately $1.5 billion. The change resulted in slower expected prepayment speeds, which extended the expected lives of modified loans and lowered the present value of cash flows on those loans. Also in the second quarter of 2011, we updated our estimate of the reserve for guaranty losses related to private-label mortgage-related securities that we have guaranteed to increase our focus on earlier stage delinquency, rather than foreclosure trends, as the primary driver in estimating incurred losses. We believe delinquencies are a better indicator of incurred losses compared to foreclosure trends because the recent delays in the foreclosure process have interrupted the normal flow of delinquent mortgages into foreclosure. This update resulted in an increase in our reserve for guaranty losses included within "Other liabilities" and an increase in credit related-expenses of approximately $700 million.

### Multifamily Loss Reserves

We establish a specific multifamily loss reserve for multifamily loans that we determine are individually impaired. We identify multifamily loans for evaluation for impairment through a credit risk assessment process. As part of this assessment process, we stratify multifamily loans into different internal risk categories based on the credit risk inherent in each individual loan and management judgment. We categorize loan credit risk, taking into consideration available operating statements and expected cash flows from the underlying property, the estimated value of the property, the historical loan payment experience and current relevant market conditions that may impact credit quality. If we conclude that a multifamily loan is impaired, we measure the impairment based on the difference between our recorded investment in the loan and the fair value of the underlying property less the estimated discounted costs to sell the property and any lender loss sharing or other proceeds we expect to receive. When a modified loan is deemed individually impaired, we measure the impairment based on the difference between our recorded investment in the loan and the present value of expected cash flows discounted at the loan's original interest rate. However, when foreclosure is probable on an individually impaired loan, we measure impairment based on the difference between our recorded investment in the loan and the fair value of the underlying property, less the estimated costs to sell the property and any lender loss sharing or other proceeds we expect to receive. We generally obtain property appraisals from independent third-parties to determine the fair value of multifamily loans that we consider to be individually impaired. We also obtain property appraisals and broker price opinions when we foreclose on a multifamily property. We then allocate a portion of the reserve to interest accrued on the loans as of the balance sheet date.

The collective multifamily loss reserve for all other loans in our multifamily guaranty book of business is established using an internal model that applies loss factors to loans in similar risk categories. Our loss factors are developed based on our historical default and loss severity experience. Management may also apply judgment to adjust the loss factors derived from our models, taking into consideration model imprecision and specifically known events, such as current credit conditions, that may affect the credit quality of our multifamily loan portfolio but are not yet reflected in our model-generated loss factors. We then allocate a portion of the reserve to interest accrued on the loans as of the balance sheet date.

- 90 -

## CONSOLIDATED RESULTS OF OPERATIONS

The section below provides a discussion of our consolidated results of operations for the periods indicated and should be read together with our consolidated financial statements, including the accompanying notes.

In 2009, the FASB concurrently revised the accounting guidance related to the consolidation of variable interest entities (the "consolidation accounting guidance") and the accounting guidance related to transfers of financial assets. The revisions to the accounting guidance for these topics replaced the previous accounting model with a qualitative model for determining the primary beneficiary of a VIE and also increased the population of entities that are subject to assessment under the consolidation accounting guidance by removing the scope exception for qualifying special purpose entities. On January 1, 2010, we prospectively adopted the revised guidance for these topics, which had a significant impact on the presentation and comparability of our consolidated financial statements. We consolidate the substantial majority of our single-class securitization trusts and upon adoption of the consolidation accounting guidance, eliminated previously recorded deferred revenue from our guaranty arrangements. While some line items in our consolidated statements of operations were not impacted, others were impacted significantly, which reduces the comparability of our results for 2011 and 2010 with our results for 2009. The following table provides a summary of the line items that were impacted significantly as a result of our adoption of the consolidation accounting standards.

| Item | Accounting Treatment |
|---|---|
| Net interest income | • We recognize the underlying assets and liabilities of the substantial majority of our MBS trusts in our consolidated balance sheets, which increases both our interest-earning assets and interest-bearing liabilities and related interest income and interest expense.<br>• Contractual guaranty fees and the amortization of deferred cash fees received after December 31, 2009 are recognized into interest income.<br>• We include nonaccrual loans from the majority of our MBS trusts in our consolidated financial statements, which decreases our net interest income as we do not recognize interest income on these loans while we continue to recognize interest expense for amounts owed to MBS certificateholders. |
| Guaranty fee income (included in Fee and other income) | • Substantially all of our guaranty-related assets and liabilities in our consolidated balance sheets are eliminated. We do not recognize income or loss from amortizing these assets and liabilities nor do we recognize changes in their fair value. We recognize both contractual guaranty fees and the amortization of deferred cash fees received after December 31, 2009 through guaranty fee income only on those amounts related to unconsolidated trusts and other credit enhancement arrangements, such as our long-term standby commitments. |
| Credit-related expenses | • As the majority of our trusts are consolidated, we do not record fair value losses on credit-impaired loans acquired from the substantial majority of our trusts.<br>• The substantial majority of our combined loss reserves are recognized in our allowance for loan losses to reflect the loss allowance against the consolidated mortgage loans. We use a different methodology to estimate incurred losses for our allowance for loan losses as compared with our reserve for guaranty losses, which reduces our credit-related expenses. |
| Investment gains (losses), net | • Our portfolio securitization transactions that reflect transfers of assets to consolidated trusts do not qualify as sales. Accordingly, we do not designate the substantial majority of our loans held for securitization as held-for-sale, thereby reducing the amount we recognize as portfolio securitization gains and losses and our lower of cost or fair value adjustments.<br>• We do not record gains or losses on the sale from our portfolio of the substantial majority of our available-for-sale MBS because these securities are eliminated in consolidation. |
| Fair value gains (losses), net | • We do not record fair value gains or losses on the majority of our trading MBS, which reduces the amount of securities subject to recognition of changes in fair value in our consolidated statement of operations. |

See "Note 1, Summary of Significant Accounting Policies" for a further discussion of the impacts of the consolidation accounting guidance on our consolidated financial statements.

Additionally, we expect high levels of period-to-period volatility in our results of operations and financial condition, principally due to changes in market conditions that result in periodic fluctuations in the estimated fair

TREASURY-2486

value of financial instruments that we mark to market through our earnings. These instruments include trading securities and derivatives. The estimated fair value of our trading securities and derivatives may fluctuate substantially from period-to-period because of changes in interest rates, credit spreads and interest rate volatility, as well as activity related to these financial instruments. While the estimated fair value of our derivatives may fluctuate, some of the financial instruments that the derivatives hedge are not recorded at fair value in our consolidated financial statements.

Table 6 displays our consolidated results of operations for the periods indicated.

**Table 6:   Summary of Consolidated Results of Operations**

| | For the Year Ended December 31, | | | Variance | |
|---|---|---|---|---|---|
| | 2011 | 2010 | 2009 | 2011 vs. 2010 | 2010 vs. 2009 |
| | | | (Dollars in millions) | | |
| Net interest income  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 19,281 | $ 16,409 | $ 14,510 | $ 2,872 | $ 1,899 |
| Fee and other income  . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,163 | 1,084 | 7,984 | 79 | (6,900) |
| **Net revenues**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **$ 20,444** | **$ 17,493** | **$ 22,494** | **$ 2,951** | **$ (5,001)** |
| Investment gains, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 506 | 346 | 1,458 | 160 | (1,112) |
| Net other-than-temporary impairments . . . . . . . . . . . . . . . . | (308) | (722) | (9,861) | 414 | 9,139 |
| Fair value losses, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (6,621) | (511) | (2,811) | (6,110) | 2,300 |
| Administrative expenses  . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,370) | (2,597) | (2,207) | 227 | (390) |
| Credit-related expenses[1] . . . . . . . . . . . . . . . . . . . . . . . . . . | (27,498) | (26,614) | (73,536) | (884) | 46,922 |
| Other non-interest expenses[2]  . . . . . . . . . . . . . . . . . . . . . . | (1,098) | (1,495) | (8,544) | 397 | 7,049 |
| Loss before federal income taxes . . . . . . . . . . . . . . . . . . . . . | (16,945) | (14,100) | (73,007) | (2,845) | 58,907 |
| Benefit for federal income taxes  . . . . . . . . . . . . . . . . . . . . . | (90) | (82) | (985) | (8) | 903 |
| **Net loss**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **(16,855)** | **(14,018)** | **(72,022)** | **(2,837)** | **58,004** |
| Less: Net loss attributable to the noncontrolling interest . . . . | — | 4 | 53 | (4) | (49) |
| **Net loss attributable to Fannie Mae** . . . . . . . . . . . . . . . . . | **$(16,855)** | **$(14,014)** | **$(71,969)** | **$(2,841)** | **$57,955** |
| Total comprehensive loss attributable to Fannie Mae . . . . . . | $(16,408) | $(10,570) | $(60,472) | $(5,838) | $49,902 |

[1]   Consists of provision for loan losses, provision for guaranty losses, and foreclosed property expense.

[2]   Consists of debt extinguishment losses, net and other expenses.

**Net Interest Income**

Net interest income represents the difference between interest income and interest expense and is a primary source of our revenue. The amount of interest income and interest expense we recognize in the consolidated statements of operations and comprehensive loss is affected by our investment and debt activity, asset yields and our funding costs.

Table 7 displays an analysis of our net interest income, average balances, and related yields earned on assets and incurred on liabilities for the periods indicated. For most components of the average balances, we use a daily weighted average of amortized cost. When daily average balance information is not available, such as for mortgage loans, we use monthly averages. Table 8 displays the change in our net interest income between periods and the extent to which that variance is attributable to: (1) changes in the volume of our interest-earning assets and interest-bearing liabilities or (2) changes in the interest rates of these assets and liabilities.

- 92 -

**Table 7:   Analysis of Net Interest Income and Yield**

| | For the Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2011** | | | **2010** | | | **2009** | | |
| | Average Balance | Interest Income/ Expense | Average Rates Earned/ Paid | Average Balance | Interest Income/ Expense | Average Rates Earned/ Paid | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid |
| | (Dollars in millions) | | | | | | | | |
| Interest-earning assets: | | | | | | | | | |
| Mortgage loans of Fannie Mae[1] .......... | $ 392,719 | $ 14,829 | 3.78% | $ 362,785 | $ 14,992 | 4.13% | $321,394 | $15,378 | 4.78% |
| Mortgage loans of consolidated trusts[1] ..... | 2,596,816 | 123,633 | 4.76 | 2,619,258 | 132,591 | 5.06 | 104,385 | 6,143 | 5.88 |
| Total mortgage loans ............... | 2,989,535 | 138,462 | 4.63 | 2,982,043 | 147,583 | 4.95 | 425,779 | 21,521 | 5.05 |
| Mortgage-related securities ............. | 316,963 | 14,607 | 4.61 | 387,798 | 19,552 | 5.04 | | | |
| Elimination of Fannie Mae MBS held in portfolio ......................... | (202,806) | (10,360) | 5.11 | (250,748) | (13,232) | 5.28 | | | |
| Total mortgage-related securities, net[2] ... | 114,157 | 4,247 | 3.72 | 137,050 | 6,320 | 4.61 | 347,467 | 17,230 | 4.96 |
| Non-mortgage securities[3] ............... | 71,713 | 117 | 0.16 | 91,613 | 221 | 0.24 | 53,724 | 247 | 0.46 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements ....................... | 26,045 | 32 | 0.12 | 28,685 | 62 | 0.22 | 46,073 | 260 | 0.56 |
| Advances to lenders .................... | 3,943 | 85 | 2.16 | 3,523 | 84 | 2.38 | 4,580 | 97 | 2.12 |
| Total interest-earning assets ............... | $3,205,393 | $142,943 | 4.46% | $3,242,914 | $154,270 | 4.76% | $877,623 | $39,355 | 4.48% |
| Interest-bearing liabilities: | | | | | | | | | |
| Short-term debt[4] ...................... | $ 160,704 | $ 301 | 0.19% | $ 212,784 | $ 619 | 0.29% | $280,260 | $ 2,306 | 0.82% |
| Long-term debt ....................... | 585,362 | 14,711 | 2.51 | 583,369 | 18,857 | 3.23 | 561,907 | 22,195 | 3.95 |
| Total short-term and long-term funding debt ......................... | 746,066 | 15,012 | 2.01 | 796,153 | 19,476 | 2.45 | 842,167 | 24,501 | 2.91 |
| Debt securities of consolidated trusts ...... | 2,651,121 | 119,010 | 4.49 | 2,682,434 | 131,617 | 4.91 | | | |
| Elimination of Fannie Mae MBS held in portfolio ......................... | (202,806) | (10,360) | 5.11 | (250,748) | (13,232) | 5.28 | | | |
| Total debt securities of consolidated trusts held by third parties ............... | 2,448,315 | 108,650 | 4.44 | 2,431,686 | 118,385 | 4.87 | 6,033 | 344 | 5.70 |
| Total interest-bearing liabilities ........... | $3,194,381 | $123,662 | 3.87% | $3,227,839 | $137,861 | 4.27% | $848,200 | $24,845 | 2.93% |
| Impact of net non-interest bearing funding ............................. | $ 11,012 | | 0.01% | $ 15,075 | | 0.02% | $ 29,423 | | 0.10% |
| Net interest income/net interest yield[2] ....... | | $ 19,281 | 0.60% | | $ 16,409 | 0.51% | | $14,510 | 1.65% |
| Net interest income/net interest yield of consolidated trusts[5] ................... | | $ 4,623 | 0.18% | | $ 974 | 0.04% | | | |

| | As of December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| **Selected benchmark interest rates[6]** | | | |
| 3-month LIBOR ............................................................... | 0.58% | 0.30% | 0.25% |
| 2-year swap rate ............................................................. | 0.73 | 0.80 | 1.42 |
| 5-year swap rate ............................................................. | 1.22 | 2.17 | 2.98 |
| 30-year Fannie Mae MBS par coupon rate ........................................ | 2.88 | 4.13 | 4.56 |

[1]   Interest income includes interest income on acquired credit-impaired loans of $2.1 billion, $2.2 billion and $619 million for the years ended December 31, 2011, 2010 and 2009, respectively. These amounts include accretion income of $1.0 billion, $1.0 billion and $405 million for the years ended December 31, 2011, 2010 and 2009, respectively, relating to a portion of the fair value losses recorded upon the acquisition of the loans. Average balance includes loans on nonaccrual status, for which interest income is recognized when collected.

- 93 -

TREASURY-2488

[2] Includes an out-of-period adjustment of $727 million to reduce "Interest income: Available-for-sale securities" in our consolidated statements of operations and comprehensive loss for the year ended December 31, 2011. Without this adjustment the average interest rate earned on total mortgage-related securities would have been 4.36% and the total net interest yield would have been 0.62%.

[3] Includes cash equivalents.

[4] Includes federal funds purchased and securities sold under agreements to repurchase.

[5] Net interest income of consolidated trusts represents interest income from mortgage loans of consolidated trusts less interest expense from debt securities of consolidated trusts. Net interest yield is calculated based on net interest income from consolidated trusts divided by average balance of mortgage loans of consolidated trusts.

[6] Data from British Bankers' Association, Thomson Reuters Indices and Bloomberg L.P.

**Table 8:   Rate/Volume Analysis of Changes in Net Interest Income**

| | 2011 vs. 2010 | | | 2010 vs. 2009 | | |
|---|---|---|---|---|---|---|
| | **Total Variance** | **Variance Due to:[1]** | | **Total Variance** | **Variance Due to:[1]** | |
| | | **Volume** | **Rate** | | **Volume** | **Rate** |
| | | | (Dollars in millions) | | | |
| Interest income: | | | | | | |
| Mortgage loans of Fannie Mae .................. | $   (163) | $ 1,185 | $ (1,348) | $   (386) | $   1,849 | $(2,235) |
| Mortgage loans of consolidated trusts ............. | (8,958) | (1,128) | (7,830) | 126,448 | 127,426 | (978) |
| Total mortgage loans ........................ | (9,121) | 57 | (9,178) | 126,062 | 129,275 | (3,213) |
| Total mortgage-related securities, net[2] ............ | (1,346) | (902) | (444) | (10,910) | (9,779) | (1,131) |
| Non-mortgage securities[3] ...................... | (104) | (42) | (62) | (26) | 125 | (151) |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements ...... | (30) | (5) | (25) | (198) | (75) | (123) |
| Advances to lenders .......................... | 1 | 9 | (8) | (13) | (24) | 11 |
| Total interest income ........................... | (10,600) | (883) | (9,717) | 114,915 | 119,522 | (4,607) |
| Interest expense: | | | | | | |
| Short-term debt[4] ............................. | (318) | (130) | (188) | (1,687) | (458) | (1,229) |
| Long-term debt ............................... | (4,146) | 64 | (4,210) | (3,338) | 821 | (4,159) |
| Total short-term and long-term funding debt ...... | (4,464) | (66) | (4,398) | (5,025) | 363 | (5,388) |
| Total debt securities of consolidated trusts held by third parties ............................... | (9,735) | 940 | (10,675) | 118,041 | 118,099 | (58) |
| Total interest expense ........................... | (14,199) | 874 | (15,073) | 113,016 | 118,462 | (5,446) |
| Net interest income[2] ........................... | $ 3,599 | $(1,757) | $ 5,356 | $   1,899 | $   1,060 | $   839 |

[1]   Combined rate/volume variances are allocated to both rate and volume based on the relative size of each variance.

[2]   Excludes an out-of-period adjustment of $727 million that reduced the interest income on mortgage related securities for the year ended December 31, 2011.

[3]   Includes cash equivalents.

[4]   Includes federal funds purchased and securities sold under agreements to repurchase.

Net interest income increased during 2011, as compared with 2010, due to lower interest expense on debt, which was partially offset by lower interest income on loans and securities. The primary drivers of these changes were:

• a reduction in the interest expense of debt of consolidated trusts driven by a decrease in rates. The rate on debt of consolidated trusts is generally driven by mortgage rates of loans securitized in MBS, and these mortgage rates declined in 2011;

• lower interest expense on funding debt due to lower borrowing rates, which allowed us to continue to replace higher-cost debt with lower-cost debt;

- 94 -

TREASURY-2489

- lower interest income on mortgage securities due to a decrease in the balance of our mortgage securities, as we continue to manage our portfolio requirements; and

- lower yields on mortgage loans as new business acquisitions continue to replace higher-yielding loans with loans issued at lower mortgage rates. The reduction in interest income on loans due to lower yields was partially offset by a reduction in the amount of interest income not recognized for nonaccrual mortgage loans, due to a decline in the balance of nonaccrual loans in our consolidated balance sheets as we continue to complete a high number of loan modifications and foreclosures.

In the three month period ended December 31, 2011, we identified an error in the rate used to calculate interest income on available-for-sale securities, which resulted in an overstatement of interest income. To correct the error, we recorded an out-of-period adjustment of $727 million to reduce "Interest Income: Available-for-sale securities" in our consolidated statement of operations and comprehensive loss for the year ended December 31, 2011.

Net interest income increased during 2010 compared with 2009 primarily as a result of an increase in interest income due to the recognition of contractual guaranty fees in interest income upon adoption of the consolidation accounting guidance and a reduction in the interest expense on debt that we have issued as lower borrowing rates allowed us to replace higher-cost debt with lower-cost debt. Partially offsetting these positive effects for 2010 was lower interest income from the interest-earning assets that we own due to lower yields on our mortgage and non-mortgage assets. The increase in net interest income was further offset by a significant increase in the number of loans on nonaccrual status in our consolidated balance sheets, because we do not recognize interest income on loans that have been placed on nonaccrual status, except when cash payments are received. The increase in loans on nonaccrual status in 2010 was due to our adoption of the consolidation accounting guidance.

Net interest yield significantly decreased for 2010 compared with 2009. We recognize the contractual guaranty fee and the amortization of deferred cash fees received after December 31, 2009 on the underlying mortgage loans of consolidated trusts as interest income, which represents the spread between the net interest yield on the underlying mortgage assets and the rate on the debt of the consolidated trusts. Upon adoption of the consolidation accounting guidance, our interest-earning assets and interest-bearing liabilities both increased by approximately $2.4 trillion. The lower spread on these interest-earning assets and liabilities reduced our net interest yield for 2010 as compared with 2009.

Additionally, our net interest income and net interest yield were higher than they would have otherwise been in 2011 and 2010 because our debt funding needs were lower than they would otherwise have been required as a result of funds we received from Treasury under the senior preferred stock purchase agreement. Further, dividends paid to Treasury are not recognized in interest expense.

Table 9 displays the interest income not recognized for loans on nonaccrual status and the resulting reduction in our net interest yield from mortgage loans.

**Table 9:   Impact of Nonaccrual Loans on Net Interest Income**

| | For the Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2011** | | **2010** | | **2009** | |
| | Interest Income not Recognized for Nonaccrual Loans[1] | Reduction in Net Interest Yield[2] | Interest Income not Recognized for Nonaccrual Loans[1] | Reduction in Net Interest Yield[2] | Interest Income not Recognized for Nonaccrual Loans[1] | Reduction in Net Interest Yield[2] |
| | (Dollars in millions) | | | | | |
| Mortgage loans of Fannie Mae . . . . . . . . . . . . . | $(4,666) | | $(4,721) | | | |
| Mortgage loans of consolidated trusts . . . . . . . . | (896) | | (3,692) | | | |
| Total mortgage loans . . . . . . . . . . . . . . . . . . . . . | $(5,562) | (18) bp | $(8,413) | (26) bp | $(1,238) | (14) bp |

- 95 -

(1)   Amount includes cash received for loans on nonaccrual status.

(2)   Calculated based on annualized interest income not recognized divided by total interest-earning assets, expressed in basis points.

For a discussion of the interest income from the assets we have purchased and the interest expense from the debt we have issued, see the discussion of our Capital Markets group's net interest income in "Business Segment Results."

**Net Other-Than-Temporary Impairment**

The net other-than-temporary impairment charges recorded in 2011 and 2010 were primarily driven by a net decline in forecasted home prices for certain geographic regions, which resulted in a decrease in the present value of our cash flow projections on Alt-A and subprime securities. The charges recorded in 2011 were partially offset by an out-of-period adjustment, which reduced "Other-than-temporary-impairments" in our consolidated statements of operations and comprehensive loss for the year ended December 31, 2011. Net other-than-temporary impairment decreased in 2010 compared with 2009 due to slower deterioration of the estimated credit component of the fair value losses of these securities. In addition, net other-than-temporary impairment decreased in 2010 compared with 2009 because, effective beginning in the second quarter of 2009, we recognize only the credit portion of other-than-temporary impairment in our consolidated statements of operations due to the adoption of new other-than-temporary impairment accounting guidance. The net other-than-temporary impairment charge recorded prior to April 1, 2009 included both the credit and non-credit components of the loss in fair value. Approximately 57% of the impairment recorded in 2009 was recorded in the first quarter of 2009 prior to the change in accounting guidance.

See "Note 5, Investments in Securities" for additional information regarding the net other-than-temporary impairment recognized in 2011, 2010 and 2009, including a discussion of an out-of-period adjustment we recorded in 2011.

**Fair Value Gains (Losses), Net**

Table 10 displays the components of our fair value gains and losses.

**Table 10:   Fair Value Gains (Losses), Net**

|  | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2011 | 2010 | 2009 |
|  | (Dollars in millions) | | |
| Risk management derivatives fair value losses attributable to: |  |  |  |
| Net contractual interest expense accruals on interest rate swaps | $(2,185) | $(2,895) | $(3,359) |
| Net change in fair value during the period | (3,954) | 1,088 | (1,337) |
| Total risk management derivatives fair value losses, net | (6,139) | (1,807) | (4,696) |
| Mortgage commitment derivatives fair value losses, net | (423) | (1,193) | (1,654) |
| Total derivatives fair value losses, net | (6,562) | (3,000) | (6,350) |
| Trading securities gains, net | 266 | 2,692 | 3,744 |
| Other, net[1] | (325) | (203) | (205) |
| Fair value losses, net | $(6,621) | $   (511) | $(2,811) |

|  | 2011 | 2010 | 2009 |
| --- | --- | --- | --- |
| 5-year swap rate: |  |  |  |
| As of March 31 | 2.47% | 2.73% | 2.22% |
| As of June 30 | 2.03 | 2.06 | 2.97 |
| As of September 30 | 1.26 | 1.51 | 2.65 |
| As of December 31 | 1.22 | 2.18 | 2.98 |

(1)   Consists of the following: debt fair value gains (losses), net, debt foreign exchange gains (losses), net, and mortgage loans fair value gains (losses), net.

TREASURY-2491

*Risk Management Derivatives Fair Value (Losses) Gains, Net*

Risk management derivative instruments are an integral part of our management of interest rate risk. We supplement our issuance of debt securities with derivative instruments to further reduce duration risk, which includes prepayment risk. We purchase option-based risk management derivatives to economically hedge prepayment risk. In cases where options obtained through callable debt issuances are not needed for risk management derivative purposes, we may sell options in the over-the-counter derivatives market in order to offset the options obtained in the callable debt. Our principal purpose in using derivatives is to manage our aggregate interest rate risk profile within prescribed risk parameters. We generally use only derivatives that are relatively liquid and straightforward to value. We consider the cost of derivatives used in our management of interest rate risk to be an inherent part of the cost of funding and hedging our mortgage investments and economically similar to the interest expense that we recognize on the debt we issue to fund our mortgage investments.

We present, by derivative instrument type, the fair value gains and losses on our derivatives for the years ended December 31, 2011, 2010 and 2009 in "Note 9, Derivative Instruments."

The primary factors affecting the fair value of our risk management derivatives include the following:

- *Changes in interest rates:*   Our derivatives, in combination with our issuances of debt securities, are intended to offset changes in the fair value of our mortgage assets. Mortgage assets tend to increase in value when interest rates decrease and, conversely, decrease in value when interest rates rise. Pay-fixed swaps decrease in value and receive-fixed swaps increase in value as swap rates decrease (with the opposite being true when swap rates increase). Because the composition of our pay-fixed and receive-fixed derivatives varies across the yield curve, the overall fair value gains and losses of our derivatives are sensitive to flattening and steepening of the yield curve.

- *Implied interest rate volatility:*   Our derivatives portfolio includes option-based derivatives, which we purchase to economically hedge the prepayment option embedded in our mortgage investments and sell to offset the options obtained through callable debt issuances when those options are not needed for risk management purposes. A key variable in estimating the fair value of option-based derivatives is implied volatility, which reflects the market's expectation of the magnitude of future changes in interest rates. Assuming all other factors are held equal, including interest rates, a decrease in implied volatility would reduce the fair value of our purchased options and an increase in implied volatility would increase the fair value of our purchased options, while having the opposite effect on the options that we have sold.

- *Changes in our derivative activity:*   As interest rates change, we are likely to rebalance our portfolio to manage our interest rate exposure. As interest rates decrease, expected mortgage prepayments are likely to increase, which reduces the duration of our mortgage investments. In this scenario, we generally will rebalance our existing portfolio to manage this risk by adding receive-fixed swaps, which shortens the duration of our liabilities. Conversely, when interest rates increase and the duration of our mortgage assets increases, we are likely to add pay-fixed swaps, which have the effect of extending the duration of our liabilities. We use derivatives to rebalance our portfolio when the duration of our mortgage assets changes as the result of mortgage purchases or sales. We also use foreign-currency swaps to manage the foreign exchange impact of our foreign currency-denominated debt issuances.

- *Time value of purchased options:*   Intrinsic value and time value are the two primary components of an option's price. The intrinsic value is determined by the amount by which the market rate exceeds or is below the exercise, or strike rate, such that the option is in-the-money. The time value of an option is the amount by which the price of an option exceeds its intrinsic value. Time decay refers to the diminishing value of an option over time as less time remains to exercise the option.

TREASURY-2492

We recorded risk management derivative fair value losses in 2011 primarily as a result of a decrease in the fair value of our pay-fixed derivatives due to a significant decline in swap rates during the period.

We recorded risk management derivative fair value losses in 2010 primarily as a result of time decay on our purchased options; a decrease in the fair value of our pay-fixed derivatives during the first quarter of 2010 due to a decline in swap rates during that period; and a decrease in implied interest rate volatility, which reduced the fair value of our purchased options.

Risk management derivative losses in 2009 were driven by losses on our receive-fixed swaps and receive-fixed option-based derivatives due to an increase in swap rates and by time decay on our purchased options, partially offset by gains on our net-pay fixed book due to higher swap rates.

Because risk management derivatives are an important part of our interest rate risk management strategy, it is important to evaluate the impact of our derivatives in the context of our overall interest rate risk profile and in conjunction with the other offsetting mark-to-market gains and losses presented in Table 10. For additional information on our use of derivatives to manage interest rate risk, including the economic objective of our use of various types of derivative instruments, changes in our derivatives activity and the outstanding notional amounts, see "Risk Management—Market Risk Management, Including Interest Rate Risk Management—Interest Rate Risk Management." See "Consolidated Balance Sheet Analysis—Derivative Instruments" for a discussion of the effect of derivatives on our consolidated balance sheets.

### Mortgage Commitment Derivatives Fair Value Losses, Net

Commitments to purchase or sell some mortgage-related securities and to purchase single-family mortgage loans are generally accounted for as derivatives. For open mortgage commitment derivatives, we include changes in their fair value in our consolidated statements of operations and comprehensive loss. When derivative purchase commitments settle, we include the fair value of the commitment on the settlement date in the cost basis of the loan or security we purchase. When derivative commitments to sell securities settle, we include the fair value of the commitment on the settlement date in the cost basis of the security we sell. Purchases of securities issued by our consolidated MBS trusts are treated as extinguishments of debt; we recognize the fair value of the commitment on the settlement date as a component of debt extinguishment gains and losses. Sales of securities issued by our consolidated MBS trusts are treated as issuances of consolidated debt; we recognize the fair value of the commitment on the settlement date as a component of debt in the cost basis of the debt issued.

We recognized losses on our mortgage commitments in 2011, 2010 and 2009 primarily due to losses on commitments to sell mortgage-related securities as a result of a decline in interest rates during the commitment period. Additionally, mortgage commitment losses in 2009 were associated with a large volume of dollar roll transactions.

### Trading Securities Gains (Losses), Net

We recognized fair value gains on our trading securities in 2011, 2010 and 2009. The estimated fair value of our trading securities may fluctuate substantially from period-to-period primarily due to changes in interest rates and credit spreads. Gains from our trading securities in 2011 were primarily driven by higher prices on our CMBS as a result of significant narrowing of the U.S. Treasury yield curve and swap yield curve spreads offset by widening credit spreads. Gains from trading securities in 2010 were primarily driven by a decrease in interest rates and narrowing of credit spreads, primarily on CMBS. Gains from trading securities in 2009 were primarily attributable to the narrowing of spreads on CMBS, agency MBS and non-mortgage related securities, partially offset by an increase in interest rates.

We provide additional information on our trading and available-for-sale securities in "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities." We disclose the sensitivity of changes in the fair value of our trading securities to changes in interest rates in "Risk Management—Market Risk Management, Including Interest Rate Risk Management—Measurement of Interest Rate Risk."

TREASURY-2493

**Administrative Expenses**

Administrative expenses decreased in 2011 compared with 2010 due to ongoing operating cost reduction efforts we are undertaking to increase productivity and lower our administrative costs. We have taken recent steps to realign our organization, personnel and resources to focus on our most critical priorities, which include providing liquidity, stability and affordability to the mortgage market. Administrative expenses increased in 2010 compared with 2009 due to an increase in employees and third-party services primarily related to our foreclosure prevention and credit loss mitigation efforts.

**Credit-Related Expenses**

We refer to our provision for loan losses and our provision for guaranty losses collectively as our "provision for credit losses." Credit-related expenses consist of our provision for credit losses and foreclosed property expense.

*Provision for Credit Losses*

Our total loss reserves provide for an estimate of credit losses incurred in our guaranty book of business, including concessions we granted borrowers upon modification of their loans, as of each balance sheet date. We establish our loss reserves through our provision for credit losses for losses that we believe have been incurred and will eventually be reflected over time in our charge-offs. When we determine that a loan is uncollectible, typically upon foreclosure, we record a charge-off against our loss reserves. We record recoveries of previously charged-off amounts as a reduction to charge-offs.

Table 11 displays the components of our total loss reserves and our total fair value losses previously recognized on loans purchased out of unconsolidated MBS trusts reflected in our consolidated balance sheets. Because these fair value losses lowered our recorded loan balances, we have fewer inherent losses in our guaranty book of business and consequently require lower total loss reserves. For these reasons, we consider these fair value losses as an "effective reserve," apart from our total loss reserves, to the extent that we expect to realize these amounts as credit losses on the acquired loans in the future. As of December 31, 2011 and 2010, we estimate that over two-thirds of this amount represents credit losses we expect to realize in the future and nearly one-third will eventually be recovered, either through net interest income for loans that cure or through foreclosed property income for loans where the sale of the collateral exceeds our recorded investment in the loan. We exclude these fair value losses from our credit loss calculation as described in "Credit Loss Performance Metrics."

**Table 11:   Total Loss Reserves**

|  | As of December 31, | |
|---|---|---|
|  | **2011** | **2010** |
|  | **(Dollars in millions)** | |
| Allowance for loan losses ................................................... | $72,156 | $61,556 |
| Reserve for guaranty losses[1] ............................................... | 994 | 323 |
| Combined loss reserves ................................................... | 73,150 | 61,879 |
| Allowance for accrued interest receivable ................................... | 2,496 | 3,414 |
| Allowance for preforeclosure property taxes and insurance receivable[2] ...... | 1,292 | 958 |
| Total loss reserves .................................................... | 76,938 | 66,251 |
| Fair value losses previously recognized on acquired credit impaired loans[3] ... | 16,273 | 19,171 |
| Total loss reserves and fair value losses previously recognized on acquired credit-impaired loans ................................................ | $93,211 | $85,422 |

_____

[1]   Amount included in "Other liabilities" in our consolidated balance sheets.

[2]   Amount included in "Other assets" in our consolidated balance sheets.

TREASURY-2494

(3)   Represents the fair value losses on loans purchased out of unconsolidated MBS trusts reflected in our consolidated balance sheets.

We refer to our allowance for loan losses and reserve for guaranty losses collectively as our combined loss reserves. We summarize the changes in our combined loss reserves in Table 12. Because we recognized mortgage loans held by newly consolidated trusts upon adoption of the consolidation accounting guidance on January 1, 2010, we increased our "Allowance for loan losses" and decreased our "Reserve for guaranty losses." The impact at the transition date is reported as "Adoption of consolidation accounting guidance." The decrease in the combined loss reserves on the adoption date represents a difference in the methodology used to estimate incurred losses for our allowance for loan losses as compared with our reserve for guaranty losses and our separate presentation of the portion of the allowance related to accrued interest as our "Allowance for accrued interest receivable."

TREASURY-2495

Table 12:   Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves)

| | For the Year Ended December 31, | | | | | | | | |
| | 2011 | | | 2010 | | | | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total | 2009 | 2008 | 2007 |
| | (Dollars in millions) | | | | | | | | |
| **Changes in combined loss reserves:** | | | | | | | | | |
| Allowance for loan losses: | | | | | | | | | |
| Beginning balance, January 1 ....... | $ 48,530 | $13,026 | $ 61,556 | $ 8,078 | $ 1,847 | $ 9,925 | $ 2,772 | $ 629 | $ 284 |
| Adoption of consolidation accounting guidance .......... | — | — | — | 43,576 | — | 43,576 | — | — | — |
| Provision for loan losses .......... | 14,080 | 11,834 | 25,914 | 13,067 | 11,635 | 24,702 | 9,569 | 4,022 | 658 |
| Charge-offs[(1)(2)] ................. | (19,398) | (1,772) | (21,170) | (15,852) | (7,026) | (22,878) | (2,245) | (1,987) | (407) |
| Recoveries ..................... | 3,636 | 1,636 | 5,272 | 1,913 | 1,164 | 3,077 | 214 | 190 | 107 |
| Transfers[(3)] .................... | 9,980 | (9,980) | — | 44,714 | (44,714) | — | — | — | — |
| Other[(4)] ....................... | 481 | 103 | 584 | (3,390) | 6,544 | 3,154 | (385) | (82) | (13) |
| Ending balance, December 31[(5)] ..... | $ 57,309 | $14,847 | $ 72,156 | $ 48,530 | $ 13,026 | $ 61,556 | $ 9,925 | $ 2,772 | $ 629 |
| **Reserve for guaranty losses:** | | | | | | | | | |
| Beginning balance, January 1 ....... | $ 323 | $ — | $ 323 | $ 54,430 | $ — | $ 54,430 | $ 21,830 | $ 2,693 | $ 519 |
| Adoption of consolidation accounting guidance .......... | — | — | — | (54,103) | — | (54,103) | — | — | — |
| Provision for guaranty losses ..... | 804 | — | 804 | 194 | — | 194 | 63,057 | 23,929 | 3,906 |
| Charge-offs ................... | (138) | — | (138) | (203) | — | (203) | (31,142) | (4,986) | (1,782) |
| Recoveries ................... | 5 | — | 5 | 5 | — | 5 | 685 | 194 | 50 |
| Ending balance, December 31 ....... | $ 994 | $ — | $ 994 | $ 323 | $ — | $ 323 | $ 54,430 | $21,830 | $ 2,693 |
| **Combined loss reserves:** | | | | | | | | | |
| Beginning balance, January 1 ....... | $ 48,853 | $13,026 | $ 61,879 | $ 62,508 | $ 1,847 | $ 64,355 | $ 24,602 | $ 3,322 | $ 803 |
| Adoption of consolidation accounting guidance .......... | — | — | — | (54,103) | 43,576 | (10,527) | — | — | — |
| Total provision for credit losses ... | 14,884 | 11,834 | 26,718 | 13,261 | 11,635 | 24,896 | 72,626 | 27,951 | 4,564 |
| Charge-offs[(1)(2)] ................. | (19,536) | (1,772) | (21,308) | (16,055) | (7,026) | (23,081) | (33,387) | (6,973) | (2,189) |
| Recoveries ..................... | 3,641 | 1,636 | 5,277 | 1,918 | 1,164 | 3,082 | 899 | 384 | 157 |
| Transfers[(3)] .................... | 9,980 | (9,980) | — | 44,714 | (44,714) | — | — | — | — |
| Other[(4)] ....................... | 481 | 103 | 584 | (3,390) | 6,544 | 3,154 | (385) | (82) | (13) |
| Ending balance, December 31[(5)] ..... | $ 58,303 | $14,847 | $ 73,150 | $ 48,853 | $ 13,026 | $ 61,879 | $ 64,355 | $24,602 | $ 3,322 |
| **Attribution of charge-offs:** | | | | | | | | | |
| Charge-offs attributable to guaranty book of business ........... | | | $(21,192) | | | $(22,901) | $(12,832) | $(4,544) | $ (825) |
| Charge-offs attributable to fair value losses on: | | | | | | | | | |
| Acquired credit-impaired loans ...................... | | | (116) | | | (180) | (20,327) | (2,096) | (1,364) |
| HomeSaver Advance loans ..... | | | — | | | — | (228) | (333) | — |
| Total charge-offs ................ | | | $(21,308) | | | $(23,081) | $(33,387) | $(6,973) | $(2,189) |
| **Allocation of combined loss reserves:** | | | | | | | | | |
| Balance at end of each period attributable to: | | | | | | | | | |
| Single-family .................. | | | $ 71,512 | | | $ 60,163 | $ 62,312 | $24,498 | $ 3,249 |
| Multifamily .................... | | | 1,638 | | | 1,716 | 2,043 | 104 | 73 |
| Total ......................... | | | $ 73,150 | | | $ 61,879 | $ 64,355 | $24,602 | $ 3,322 |
| **Single-family and multifamily combined loss reserves as a percentage of applicable guaranty book of business:** | | | | | | | | | |
| Single-family .................... | | | 2.52% | | | 2.10% | 2.14% | 0.87% | 0.13% |
| Multifamily ..................... | | | 0.84 | | | 0.91 | 1.10 | 0.06 | 0.05 |
| **Combined loss reserves as a percentage of:** | | | | | | | | | |
| Total guaranty book of business ..... | | | 2.41% | | | 2.03% | 2.08% | 0.83% | 0.12% |
| Total nonperforming loans[(6)] ........ | | | 29.03 | | | 24.40 | 28.98 | 20.51 | 12.19 |

- 101 -

TREASURY-2496

---

(1) Includes accrued interest of $1.4 billion, $2.4 billion, $1.5 billion, $642 million and $128 million for the years ended December 31, 2011, 2010, 2009, 2008 and 2007, respectively.

(2) While we purchase the substantial majority of loans that are four or more months delinquent from our MBS trusts, we do not exercise this option to purchase loans during a forbearance period. Accordingly, charge-offs of consolidated trusts generally represent loans that remained in our consolidated trusts at the time of default.

(3) Includes transfers from trusts for delinquent loan purchases.

(4) Amounts represent the net activity recorded in our allowances for accrued interest receivable and preforeclosure property taxes and insurance receivable from borrowers. The provision for credit losses, charge-offs, recoveries and transfer activity included in this table reflects all changes for both the allowance for loan losses and the valuation allowances for accrued interest and preforeclosure property taxes and insurance receivable that relate to the mortgage loans.

(5) Includes $375 million, $385 million, $726 million, $150 million, and $39 million as of December 31, 2011, 2010, 2009, 2008 and 2007, respectively, for acquired credit-impaired loans.

(6) In December 2011, we changed our definition of "total nonperforming loans." Under our new definition, we no longer reflect in this amount (1) our allowance for loan losses or (2) our allowance for accrued interest receivable related to these individually impaired loans. The amounts we report for prior periods have been revised from amounts we previously disclosed as a result of this change.

The prolonged decline in home prices and the continued stress on a broad segment of borrowers from continued high levels of unemployment and underemployment have caused our total loss reserves to remain high for the past few years. We expect our loss reserves will remain significantly elevated relative to historical levels for an extended period because: (1) we expect future defaults on loans from our legacy book of business and the resulting charge-offs will occur over a period of years; and (2) a significant portion of our reserves represents concessions granted to borrowers upon modification of their loans and will remain in our reserves until the loans are fully repaid or default. Our provision for credit losses continues to be a key driver of our net losses for each period presented. The amount of our provision for credit losses varies from period to period based on changes in home prices, borrower payment behavior, the types and volumes of loss mitigation activities completed, and actual and estimated recoveries from our lender and mortgage insurer counterparties. In addition, our provision for credit losses and our loss reserves can be impacted by updates to our allowance for loan loss models that we use to estimate our loss reserves. For further information on estimates and assumptions that are used to calculate our loan loss reserves and the impact of specific changes in estimates during 2011 see "Critical Accounting Policies and Estimates."

Our provision for credit losses increased in 2011 compared with 2010 primarily due to: (1) a decline in actual and projected home prices, which led to an increase in projected defaults and higher loss severity rates; (2) a decrease in the estimated recovery amount from mortgage insurance coverage; and (3) the implementation of new accounting guidance that increased our troubled debt restructuring ("TDR") population, which increased the number of loans that are individually impaired. A TDR is a loan restructuring that grants a concession to a borrower experiencing financial difficulties. The increase in our provision was partially offset by: (1) an increase in cash received by us and estimated amounts due to us for repurchase requests; and (2) accelerated expected prepayment speeds due to the lower interest rate environment, which reduced the expected lives of loans and increased the present value of cash flows expected on those loans.

Our provision for credit losses was impacted in 2010 by an agreement with Bank of America, N.A., and its affiliates, on December 31, 2010, to address outstanding repurchase requests for residential mortgage loans. Bank of America agreed, among other things, to make a cash payment to us of $1.3 billion, $930 million of which was recognized as a recovery of charge-offs resulting in a reduction to our provision for loan losses and allowance for loan losses.

Our provision for credit losses substantially decreased in 2010 compared with 2009 primarily because there was neither an increase in the number of seriously delinquent loans, nor a sharp decline in home prices in 2010 compared with the significant changes in these factors in 2009; therefore, we did not need to substantially increase our reserves in 2010 compared with the significant increase in our reserves in 2009. In addition, our provision for credit losses decreased in 2010 compared with 2009 due to a decline in fair value losses on acquired

TREASURY-2497

credit-impaired loans. Because of our adoption of consolidation accounting guidance in the beginning of 2010, we no longer record fair value losses upon our acquisition of credit-impaired loans from most of our MBS trusts, as the substantial majority of these trusts are now consolidated.

### Individual Impairment and Troubled Debt Restructurings

Because of the substantial volume of loan modifications we completed and the number of loans that entered a trial modification period since 2009, approximately two-thirds of our total loss reserves are attributable to individual impairment rather than the collective reserve for loan losses. Individual impairment for a TDR is based on the restructured loan's expected cash flows over the life of the loan, taking into account the effect of any concessions granted to the borrower, discounted at the loan's original effective interest rate. The individual impairment model includes forward-looking assumptions using multiple scenarios of the future economic environment, including interest rates and home prices. If we expect to recover our recorded investment in an individually impaired loan through probable foreclosure of the underlying collateral, we measure the impairment based on the fair value of the collateral, less selling costs. Based on the structure of our modifications, in particular the size of the concessions granted, and the performance of modified loans combined with the forward-looking assumptions used in our model, the allowance calculated for an individually impaired loan has generally been greater than the allowance that would be calculated under the collective reserve.

In April 2011, FASB issued new accounting guidance regarding TDRs effective for the third quarter of 2011 that applied retrospectively to January 1, 2011. In the third quarter of 2011, we recognized an incremental increase of $514 million in our provision for credit losses due to loans that were reassessed as TDRs as a result of adopting the new TDR accounting guidance. For additional information on the new TDR accounting guidance, see "Note 1, Summary of Significant Accounting Policies."

### Loss Reserves Concentration Analysis

Certain loan categories continued to contribute disproportionately to the increase in our nonperforming loans and credit losses as displayed in Table 16. These categories include: loans on properties in California, Florida, Arizona and Nevada and certain Midwest states; loans originated in 2006 and 2007; and loans related to higher-risk product types, such as Alt-A loans. Although we have identified other vintages as unprofitable, the largest and most disproportionate contributors to credit losses have been the 2006 and 2007 vintages. Accordingly, our concentration statistics throughout this MD&A focus on only these two vintages. Our combined single-family loss reserves are also disproportionately higher for these states, Alt-A loans and our 2006 and 2007 vintages. Table 13 displays our loss reserves concentration analysis.

**Table 13:   Loss Reserves Concentration Analysis**[1]

|  | Combined Single-Family Loss Reserves | |
| --- | --- | --- |
|  | As of December 31, | |
|  | **2011** | **2010** |
| Midwest states[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16% | 14% |
| California, Florida, Arizona, Nevada . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 49 | 52 |
| Alt-A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 | 30 |
| 2006 and 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 62 | 67 |

[1]   Loans that meet more than one category are included in each applicable category.

[2]   Midwest consists of IL, IN, IA, MI, MN, NE, ND, OH, SD, KS, MO and WI.

### Nonperforming Loans

Our balance of nonperforming single-family loans remained high as of December 31, 2011 due to both high levels of delinquencies and an increase in TDRs. When a TDR occurs, the loan may return to a current status, but it will continue to be classified as a nonperforming loan as the loan is not performing in accordance with its

TREASURY-2498

original terms. Table 14 displays the composition of our nonperforming loans, which includes our single-family and multifamily held-for-investment and held-for-sale mortgage loans. For information on the impact of TDRs and other individually impaired loans on our allowance for loan losses, see "Note 3, Mortgage Loans."

**Table 14:   Nonperforming Single-Family and Multifamily Loans** [1]

|  | As of December 31, | | | | |
|---|---|---|---|---|---|
|  | **2011** | **2010** | **2009** | **2008** | **2007** |
|  | (Dollars in millions) | | | | |
| On-balance sheet nonperforming loans including loans in consolidated Fannie Mae MBS trusts: |  |  |  |  |  |
| Nonaccrual loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $142,998 | $170,788 | $ 37,596 | $ 15,610 | $ 8,397 |
| Troubled debt restructurings on accrual status [2] . . . . . . . . . . . | 108,797 | 82,702 | 9,880 | 5,799 | 1,809 |
| Total on-balance sheet nonperforming loans [3] . . . . . . . . | 251,795 | 253,490 | 47,476 | 21,409 | 10,206 |
| Off-balance sheet nonperforming loans in unconsolidated Fannie Mae MBS trusts [4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 154 | 89 | 174,588 | 98,546 | 17,048 |
| Total nonperforming loans [3] . . . . . . . . . . . . . . . . . . . . . . . . . . | 251,949 | 253,579 | 222,064 | 119,955 | 27,254 |
| Allowance for loan losses and allowance for accrued interest receivable related to individually impaired on-balance sheet nonperforming loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (47,711) | (38,827) | (5,609) | (723) | (98) |
| Total nonperforming loans, net of allowance . . . . . . . . . . . . . . . | $204,238 | $214,752 | $216,455 | $119,232 | $27,156 |
| Accruing on-balance sheet loans past due 90 days or more [5] . . . . | $    768 | $    896 | $    612 | $    317 | $    204 |

|  | For the Year Ended December 31, | | | | |
|---|---|---|---|---|---|
|  | **2011** | **2010** | **2009** | **2008** | **2007** |
|  | (Dollars in millions) | | | | |
| Interest related to on-balance sheet nonperforming loans: |  |  |  |  |  |
| Interest income forgone [6] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $8,224 | $8,185 | $1,341 | $401 | $215 |
| Interest income recognized for the period [7] . . . . . . . . . . . . . . . | 6,598 | 7,995 | 1,206 | 771 | 328 |

[1]   Certain prior period amounts have been reclassified to conform to the current period presentation.

[2]   Includes HomeSaver Advance first-lien loans on accrual status.

[3]   In December 2011, we changed our definition of "total on-balance sheet nonperforming loans" and "total nonperforming loans." Under our new definitions, we no longer reflect in these amounts (1) our allowance for loan losses or (2) our allowance for accrued interest receivable related to these individually impaired loans. The amounts we report in Table 14 for prior periods have been revised from amounts we previously disclosed as a result of this change.

[4]   Represents loans that would meet our criteria for nonaccrual status if the loans had been on-balance sheet.

[5]   Recorded investment in loans that, as of the end of each period, are 90 days or more past due and continuing to accrue interest. The majority of this amount consists of loans insured or guaranteed by the U.S. government and loans for which we have recourse against the seller in the event of a default.

[6]   Represents the amount of interest income we did not record but would have recorded during the period for on-balance sheet nonperforming loans as of the end of each period had the loans performed according to their original contractual terms.

[7]   Represents interest income recognized during the period for on-balance sheet loans classified as nonperforming as of the end of each period. Includes primarily amounts accrued while the loans were performing and cash payments received on nonaccrual loans.

TREASURY-2499

*Foreclosed Property Expense*

Foreclosed property expense, which is displayed in Table 15, decreased in 2011 compared with 2010 due, in part, to an increase in cash received by us and estimated amounts due to us for repurchase requests. These amounts were recognized in our provision for credit losses and foreclosed property expense. In addition, we had fewer REO properties in 2011 compared with 2010, primarily driven by delays in the foreclosure process, which resulted in lower foreclosed property expense. The decrease in foreclosed property expense was partially offset by a decrease in the estimated recovery amount from mortgage insurance coverage.

Foreclosed property expense increased during 2010 compared with 2009 primarily due to the substantial increase in our REO inventory and an increase in valuation adjustments that reduced the value of our REO inventory during the period. Foreclosed property expense reflected the recognition of cash fees of $796 million in 2010 and $668 million in 2009 from the cancellation and restructuring of some of our pool mortgage insurance coverage. There were no such cash fees recognized in 2011. The cancelled and restructured policies covered the unpaid principal balance of approximately $42 billion in 2010 and approximately $40 billion in 2009. The fees represented an acceleration of, and discount on, claims expected to be received pursuant to the coverage net of premiums expected to be paid. These cancellations and restructurings resulted in operational savings from reduced claims processing and mitigated our counterparty credit risk given the weakened financial condition of our mortgage insurer counterparties. Further, under our December 31, 2010 agreement with Bank of America, N.A., and its affiliates, Bank of America agreed, among other things, to a cash payment of $1.3 billion, $266 million of which was recognized as a reduction to foreclosed property expense. In addition, during the second quarter of 2010, we began recording expenses related to preforeclosure property taxes and insurance to the provision for loan losses.

*Credit Loss Performance Metrics*

Our credit-related expenses should be considered in conjunction with our credit loss performance metrics. Our credit loss performance metrics, however, are not defined terms within GAAP and may not be calculated in the same manner as similarly titled measures reported by other companies. Because management does not view changes in the fair value of our mortgage loans as credit losses, we adjust our credit loss performance metrics for the impact associated with our acquisition of credit-impaired loans from unconsolidated MBS trusts and HomeSaver Advance loans. We also exclude interest forgone on nonperforming loans in our mortgage portfolio, other-than-temporary impairment losses resulting from deterioration in the credit quality of our mortgage-related securities and accretion of interest income on acquired credit-impaired loans from credit losses.

Historically, management viewed our credit loss performance metrics, which include our historical credit losses and our credit loss ratio, as indicators of the effectiveness of our credit risk management strategies. As our credit losses are now at such high levels, management has shifted its focus to our loss mitigation strategies and the reduction of our total credit losses and away from the credit loss ratio to measure performance. However, we believe that credit loss performance metrics may be useful to investors as the losses are presented as a percentage of our book of business and have historically been used by analysts, investors and other companies within the financial services industry. They also provide a consistent treatment of credit losses for on- and off-balance sheet loans. Moreover, by presenting credit losses with and without the effect of fair value losses associated with the acquisition of credit-impaired loans and HomeSaver Advance loans, investors are able to evaluate our credit performance on a more consistent basis among periods. Table 15 displays the components of our credit loss performance metrics as well as our average single-family and multifamily default rate and initial charge-off severity rate.

TREASURY-2500

**Table 15: Credit Loss Performance Metrics**

| | For the Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2011 | | 2010 | | 2009 | |
| | Amount | Ratio[1] | Amount | Ratio[1][2] | Amount | Ratio[1] |
| | (Dollars in millions) | | | | | |
| Charge-offs, net of recoveries[3] | $16,031 | 52.4 bp | $19,999 | 65.6 bp | $ 32,488 | 106.7 bp |
| Foreclosed property expense[3] | 780 | 2.6 | 1,718 | 5.6 | 910 | 3.0 |
| Credit losses including the effect of fair value losses on acquired credit-impaired loans and HomeSaver Advance loans | 16,811 | 55.0 | 21,717 | 71.2 | 33,398 | 109.7 |
| Less: Fair value losses resulting from acquired credit-impaired loans and HomeSaver advanced loans | (116) | (0.4) | (180) | (0.6) | (20,555) | (67.5) |
| Plus: Impact of acquired credit-impaired loans on charge-offs and foreclosed property expense | 2,042 | 6.7 | 2,094 | 6.8 | 739 | 2.4 |
| Credit losses and credit loss ratio | $18,737 | 61.3 bp | $23,631 | 77.4 bp | $ 13,582 | 44.6 bp |
| Credit losses attributable to: | | | | | | |
| Single-family | $18,346 | | $23,133 | | $ 13,362 | |
| Multifamily | 391 | | 498 | | 220 | |
| Total | $18,737 | | $23,631 | | $ 13,582 | |
| Single-family default rate | | 1.71% | | 1.99% | | 1.07% |
| Single-family initial charge-off severity rate[4] | | 34.82% | | 34.07% | | 37.21% |
| Average multifamily default rate | | 0.53% | | 0.61% | | 0.28% |
| Average multifamily initial charge-off severity rate[4] | | 37.10% | | 39.18% | | 32.46% |

[1] Basis points are based on the amount for each line item presented divided by the average guaranty book of business during the period.

[2] Beginning in the second quarter of 2010, expenses relating to preforeclosure taxes and insurance were recorded as charge-offs. These expenses were recorded as foreclosed property expense in the first quarter of 2010. The impact of including these costs in charge-offs was 4.7 basis points for the year ended December 31, 2010.

[3] Includes cash received pursuant to our December 31, 2010 agreement with Bank of America. The impact of this cash receipt was a reduction in charge-offs, net of recoveries, of $930 million or 3.0 basis points and a reduction in foreclosed property expense of $266 million or 0.9 basis points for the year ended December 31, 2010.

[4] Single-family and multifamily rates exclude fair value losses on credit-impaired loans acquired from MBS trusts and any costs, gains or losses associated with REO after initial acquisition through final disposition; single-family rate excludes charge-offs from short sales.

Credit losses decreased in 2011 compared with 2010 primarily due to delays in the foreclosure process, which resulted in fewer charge-offs in 2011. In addition, credit losses declined in 2011 due to an increase in cash received by us and estimated amounts due to us for repurchase requests. The increase in our credit losses in 2010 compared with 2009 was driven by an increase in the number of defaults due to the prolonged decline in the housing market and home prices.

Table 16 displays an analysis of our credit losses in certain higher-risk loan categories, loan vintages and loans within certain states that continue to account for a disproportionate share of our credit losses as compared with our other loans.

- 106 -

**Table 16:   Credit Loss Concentration Analysis**

| | Percentage of Single-Family Conventional Guaranty Book of Business Outstanding[1] | | | Percentage of Single-Family Credit Losses | | |
| | As of December 31, | | | For the Year Ended December 31, | | |
| | 2011 | 2010 | 2009 | 2011 | 2010 | 2009 |
|---|---|---|---|---|---|---|
| **Geographical distribution:** | | | | | | |
| Arizona, California, Florida and Nevada | 28% | 28% | 28% | 58% | 56% | 57% |
| Illinois, Indiana, Michigan and Ohio | 10 | 11 | 11 | 12 | 14 | 15 |
| All other states | 62 | 61 | 61 | 30 | 30 | 28 |
| Select higher-risk product features[2] | 21 | 22 | 24 | 56 | 61 | 69 |
| **Vintages:** | | | | | | |
| 2006 | 7 | 8 | 11 | 28 | 29 | 31 |
| 2007 | 10 | 12 | 15 | 30 | 36 | 36 |
| All other vintages | 83 | 80 | 74 | 42 | 35 | 33 |

---

[1]   Calculated based on the unpaid principal balance of loans, where we have detailed loan-level information, for each category divided by the unpaid principal balance of our single-family conventional guaranty book of business.

[2]   Includes Alt-A loans, subprime loans, interest-only loans, loans with original LTV ratios greater than 90% and loans with FICO credit scores less than 620.

Our 2009, 2010 and 2011 vintages accounted for approximately 2% of our single-family credit losses for 2011. Credit losses on mortgage loans typically do not peak until the third through sixth years following origination; however, this range can vary based on many factors, including changes in macroeconomic conditions and foreclosure timelines. We provide more detailed credit performance information, including serious delinquency rates by geographic region and foreclosure activity, in "Risk Management—Credit Risk Management—Mortgage Credit Risk Management."

*Regulatory Hypothetical Stress Test Scenario*

Under a September 2005 agreement with FHFA's predecessor, OFHEO, we are required to disclose on a quarterly basis the present value of the change in future expected credit losses from our existing single-family guaranty book of business from an immediate 5% decline in single-family home prices for the entire United States. Although other provisions of the September 2005 agreement were suspended in March 2009 by FHFA until further notice, this disclosure requirement was not suspended. For purposes of this calculation, we assume that, after the initial 5% shock, home price growth rates return to the average of the possible growth rate paths used in our internal credit pricing models. The sensitivity results represent the difference between future expected credit losses under our base case scenario, which is derived from our internal home price path forecast, and a scenario that assumes an instantaneous nationwide 5% decline in home prices.

Table 17 displays a comparison of the credit loss sensitivities for the periods indicated for first-lien single-family whole loans we own or that back Fannie Mae MBS, before and after consideration of projected credit risk sharing proceeds, such as private mortgage insurance claims and other credit enhancements.

TREASURY-2502

**Table 17:   Single-Family Credit Loss Sensitivity**[1]

|  | As of December 31, | |
|---|---|---|
|  | 2011 | 2010 |
|  | (Dollars in millions) | |
| Gross single-family credit loss sensitivity ........................................................ | $ 21,922 | $ 25,937 |
| Less: Projected credit risk sharing proceeds ........................................................ | (1,690) | (2,771) |
| Net single-family credit loss sensitivity ........................................................ | $ 20,232 | $ 23,166 |
| Outstanding single-family whole loans and loans underlying Fannie Mae MBS ............... | $2,769,454 | $2,782,512 |
| Single-family net credit loss sensitivity as a percentage of outstanding single-family whole loans and Fannie Mae MBS ........................................................ | 0.73% | 0.83% |

_____

[1]   Represents total economic credit losses, which consist of credit losses and forgone interest. Calculations are based on 97% of our total single-family guaranty book of business as of December 31, 2011 and December 31, 2010, respectively. The mortgage loans and mortgage-related securities that are included in these estimates consist of: (a) single-family Fannie Mae MBS (whether held in our mortgage portfolio or held by third parties), excluding certain whole loan REMICs and private-label wraps; (b) single-family mortgage loans, excluding mortgages secured only by second liens, subprime mortgages, manufactured housing chattel loans and reverse mortgages; and (c) long-term standby commitments. We expect the inclusion in our estimates of the excluded products may impact the estimated sensitivities set forth in this table. Single-family mortgage loans as of December 31, 2010 exclude subprime mortgages.

Because these sensitivities represent hypothetical scenarios, they should be used with caution. Our regulatory stress test scenario is limited in that it assumes an instantaneous uniform 5% nationwide decline in home prices, which is not representative of the historical pattern of changes in home prices. Changes in home prices generally vary on a regional, as well as a local, basis. In addition, these stress test scenarios are calculated independently without considering changes in other interrelated assumptions, such as unemployment rates or other economic factors, which are likely to have a significant impact on our future expected credit losses.

### Other Non-Interest Expenses

Other non-interest expenses consist of credit enhancement expenses, which reflect the amortization of the credit enhancement asset we record at the inception of guaranty contracts; costs associated with the purchase of additional mortgage insurance to protect against credit losses; net gains and losses on the extinguishment of debt; servicer incentive fees in connection with loans modified under HAMP; and other miscellaneous expenses.

Other non-interest expenses also include losses from partnership investments. We are a limited liability investor in LIHTC and non-LIHTC investments formed for the purpose of providing equity funding for affordable multifamily rental properties. Historically, we generally received tax benefits (tax credits and tax deductions for net operating losses) on our LIHTC investments that we used to reduce our income tax expense. Given our current tax position, it is unlikely that we will be able to use the tax benefits that we expect to receive this year and in the future from these LIHTC investments. In 2009, we reduced the carrying value of our LIHTC investments to zero because we no longer had the intent and ability to sell or otherwise transfer our LIHTC investments for value. As a result, we no longer recognize net operating losses or other-than-temporary impairment on our LIHTC investments.

Other non-interest expenses decreased in 2011 compared with 2010 primarily due to a decrease in net losses recorded on the extinguishment of debt as a result of lower funding needs in 2011 compared with higher call activity due to low interest rates in 2010. Other non-interest expenses decreased in 2010 compared with 2009 due primarily to: (1) the recognition of a $5.0 billion loss during the fourth quarter of 2009 to reduce the carrying value of our LIHTC partnership investments to zero in our consolidated financial statements; (2) a decrease in master servicing costs related to our master servicing assets and liabilities as a result of derecognizing the portion of our master servicing asset and liability relating to consolidated trusts upon adoption of the consolidation accounting guidance; (3) lower expenses for legal claim reserves; and (4) lower interest expense

- 108 -

associated with unrecognized tax benefits related to certain unresolved tax positions. The decrease in 2010 was partially offset by an increase in HAMP incentive payments and net losses recorded on the extinguishment of debt, because our borrowing costs declined and it became advantageous for us to redeem higher cost debt and replace it with lower cost debt.

**Federal Income Taxes**

We recorded a tax benefit for federal income taxes of $90 million for 2011 because we effectively settled our 2007 and 2008 tax years with the Internal Revenue Service ("IRS") in 2011. We recorded a tax benefit for federal income taxes of $82 million for 2010 primarily due to the reversal of a portion of the valuation allowance for deferred tax assets resulting from a settlement agreement reached with the IRS for our unrecognized tax benefits for the tax years 1999 through 2004. We recorded a tax benefit for federal income taxes of $985 million for 2009, due primarily to the benefit of carrying back a portion of our 2009 loss, net of the reversal of the use of certain tax credits, to prior years.

We discuss federal income taxes and the factors that led us to record a partial valuation allowance against our net deferred tax assets in "Note 10, Income Taxes." The amount of deferred tax assets considered realizable is subject to adjustment in future periods. We will continue to monitor all available evidence related to our ability to utilize our remaining deferred tax assets. If we determine that recovery is not likely, we will record an additional valuation allowance against the deferred tax assets that we estimate may not be recoverable. Our income tax expense in future periods will be reduced or increased to the extent of offsetting decreases or increases to our valuation allowance.

**Financial Impact of the Making Home Affordable Program on Fannie Mae**

*Home Affordable Refinance Program*

Because we already own or guarantee the original mortgages that we refinance under HARP, our expenses under that program have consisted mostly of limited administrative costs. See "Business—Making Home Affordable—Changes to the Home Affordable Refinance Program," for a discussion on the recent changes to HARP.

*Home Affordable Modification Program*

Loans in trial modification plans are considered TDRs and are assessed for individual impairment. These TDRs include loans that entered into a trial modification under the program but that did not receive a permanent modification under the program. We incurred impairments related to these loans that had entered a trial modification under HAMP of $5.2 billion during 2011, compared with $14.1 billion during 2010 and $26.4 billion in 2009. During 2009, approximately 40% of the impairments on these loans related to fair value losses on credit impaired loans acquired from unconsolidated MBS trusts, which represents approximately 84,000 loans. These impairments increased our provision for loan losses in our consolidated results of operations and comprehensive loss. The impairments do not reflect the reduction in our collective loss reserves that occurred as a result of beginning to individually assess the loans for impairment upon entering a trial modification.

We paid or accrued HAMP incentive fees for servicers of $338 million during 2011, compared with $339 million during 2010 and $17 million during 2009. These fees were related to loans modified under HAMP, which we recorded as part of "Other expenses." Borrower incentive payments are included in the calculation of our allowance for loan losses for individually impaired loans. Additionally, our expenses under HAMP also include administrative costs.

*Overall Impact of the Making Home Affordable Program*

Because of the unprecedented nature of the circumstances that led to the Making Home Affordable Program, we cannot quantify what the impact would have been on Fannie Mae if the Making Home Affordable Program had not been introduced. We do not know how many loans we would have modified under alternative programs, what the terms or costs of those modifications would have been, how many foreclosures would have resulted

- 109 -

nationwide, and at what pace, or the impact on housing prices if the program had not been put in place. As a result, the amounts we discuss above are not intended to measure how much the program is costing us in comparison to what it would have cost us if we did not have the program at all. See "Risk Factors" for a discussion of how efforts we may undertake in support of the housing market may affect us.

## BUSINESS SEGMENT RESULTS

We provide a more complete description of our business segments in "Business–Business Segments." Results of our three business segments are intended to reflect each segment as if it were a stand-alone business. We are working on reorganizing our company by function rather than by business in order to improve our operational efficiencies and effectiveness. In future periods, we may change some of our management reporting and how we report our business segment results. We describe the management reporting and allocation process used to generate our segment results in "Note 14, Segment Reporting." In this section, we discuss changes to our presentation for reporting results for our three business segments, Single-Family, Multifamily and Capital Markets, which have been revised due to our prospective adoption of the revised accounting guidance in 2010 on the consolidation of VIE's and transfers of financial assets. We then display our segment results for 2011, 2010 and 2009, in the tables below and provide a comparative discussion of these results. This section should be read together with our comparative discussion of our consolidated results of operations in "Consolidated Results of Operations." See "Note 14, Segment Reporting" for a reconciliation of our segment results to our consolidated results.

### Current Segment Reporting Presentation

Our prospective adoption of the consolidation accounting guidance in 2010 had a significant impact on the presentation and comparability of our consolidated financial statements because we consolidated the substantial majority of our single-class securitization trusts and eliminated previously recorded deferred revenue from our guaranty arrangements. We continue to manage Fannie Mae based on the same three business segments; however, effective in 2010 we changed the presentation of segment financial information that is currently evaluated by management.

While some line items in our segment results were not impacted by either the change from the consolidation accounting guidance or changes to our segment presentation, others were impacted materially, which reduces the comparability of our 2011 and 2010 segment results with 2009. We have not restated results prior to 2010 nor have we presented 2011 and 2010 results under the old presentation because we determined that it was impracticable to do so; therefore, our segment results reported in 2011 and 2010 are not comparable with years prior to 2010. See "Note 1, Summary of Significant Accounting Policies" for additional information regarding the impact upon adoption.

Under our current segment reporting structure, the sum of the results for our three business segments does not equal our consolidated results of operations as we separate the activity related to our consolidated trusts from the results generated by our three segments. In addition, because we apply accounting methods that differ from our consolidated results for segment reporting purposes, we include an eliminations/adjustments category to reconcile our business segment results and the activity related to our consolidated trusts to our consolidated statements of operations and comprehensive loss.

- 110 -

## Summary

Table 18 displays a summary of our segment results under our current segment reporting presentation for 2011 and 2010 and our prior segment presentation for 2009.

**Table 18:   Business Segment Summary**

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2011** | **2010** | **2009** |
| | (Dollars in millions) | | |
| Net revenues:[1] | | | |
| Single-Family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 5,675 | $ 2,126 | $ 8,784 |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,064 | 940 | 582 |
| Capital Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,901 | 13,400 | 13,128 |
| Consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 950 | 460 | — |
| Eliminations/adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (146) | 567 | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 20,444 | $ 17,493 | $ 22,494 |
| Net (loss) income attributable to Fannie Mae: | | | |
| Single-Family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(23,941) | $(26,680) | $(63,798) |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 583 | 216 | (9,028) |
| Capital Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8,999 | 16,074 | 857 |
| Consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 429 | (224) | — |
| Eliminations/adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,925) | (3,400) | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(16,855) | $(14,014) | $(71,969) |

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2011** | **2010** | **2009** |
| | (Dollars in millions) | | |
| Total assets: | | | |
| Single-Family[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  11,822 | $  14,843 | $ 19,991 |
| Multifamily[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,747 | 4,881 | 5,698 |
| Capital Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 836,700 | 873,052 | 843,452 |
| Consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,676,952 | 2,673,937 | — |
| Eliminations/adjustments[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (319,737) | (344,741) | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,211,484 | $3,221,972 | $869,141 |

[1]   Includes net interest (loss) income, guaranty fee income (expense), and fee and other income (expense).

[2]   The allowance for loan losses, allowance for accrued interest receivable and fair value losses previously recognized on acquired credit impaired loans are not treated as assets for Single-Family and Multifamily segment reporting purposes because these allowances and losses relate to loan assets that are held by the Capital Markets segment and consolidated trusts.

TREASURY-2506

## Segment Results

Table 19 displays our segment results under our current segment reporting presentation for 2011.

**Table 19:   Business Segment Results**

| | For the Year Ended December 31, 2011 | | | | | |
| | Business Segments | | | Other Activity/Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/Adjustments[2] | Total Results |
| --- | --- | --- | --- | --- | --- | --- |
| | (Dollars in millions) | | | | | |
| Net interest (loss) income . . . . . . . . . . . . . . . . . . | $ (2,411) | $ (38) | $13,920 | $ 5,765 | $ 2,045[3] | $ 19,281 |
| Provision for loan losses . . . . . . . . . . . . . . . . . . . . | (25,623) | (291) | — | — | — | (25,914) |
| Net interest (loss) income after provision for loan losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (28,034) | (329) | 13,920 | 5,765 | 2,045 | (6,633) |
| Guaranty fee income (expense) . . . . . . . . . . . . . . | 7,507 | 884 | (1,497) | (4,486)[4] | (2,181)[4] | 227[4] |
| Investment (losses) gains, net . . . . . . . . . . . . . . . | (2) | 18 | 3,711 | (315) | (2,906)[5] | 506 |
| Net other-than-temporary impairments . . . . . . . . | — | — | (306) | (2) | — | (308) |
| Fair value losses, net . . . . . . . . . . . . . . . . . . . . . . . | (7) | — | (6,596) | (226) | 208[6] | (6,621) |
| Debt extinguishment (losses) gains, net . . . . . . . . | — | — | (254) | 22 | — | (232) |
| Gains from partnership investments . . . . . . . . . . . | — | 81 | — | — | — | 81[7] |
| Fee and other income (expense) . . . . . . . . . . . . . . | 579 | 218 | 478 | (329) | (10) | 936 |
| Administrative expenses . . . . . . . . . . . . . . . . . . . . . | (1,638) | (264) | (468) | — | — | (2,370) |
| (Provision) benefit for guaranty losses . . . . . . . . . | (830) | 26 | — | — | — | (804) |
| Foreclosed property expense . . . . . . . . . . . . . . . . . | (765) | (15) | — | — | — | (780) |
| Other (expense) income . . . . . . . . . . . . . . . . . . . . . | (857) | 25 | (34) | — | (81) | (947) |
| (Loss) income before federal income taxes . . . . . . | (24,047) | 644 | 8,954 | 429 | (2,925) | (16,945) |
| Benefit (provision) for federal income taxes . . . . . | 106 | (61) | 45 | — | — | 90 |
| Net (loss) income attributable to Fannie Mae . . | $(23,941) | $ 583 | $ 8,999 | $   429 | $(2,925) | $(16,855) |

[1] Represents activity related to the assets and liabilities of consolidated trusts in our consolidated balance sheets.

[2] Represents the elimination of intercompany transactions occurring between the three business segments and our consolidated results, as well as other adjustments to reconcile to our consolidated results.

[3] Represents the amortization expense of cost basis adjustments on securities that we own in our portfolio that on a GAAP basis are eliminated.

[4] Represents the guaranty fees paid from consolidated trusts to the Single-Family and Multifamily segments. The adjustment to guaranty fee income in the Eliminations/Adjustments column represents the elimination of the amortization of deferred cash fees related to consolidated trusts that were re-established for segment reporting. Total guaranty fee income is included in fee and other income in our consolidated statements of operations and comprehensive loss.

[5] Primarily represents the removal of realized gains and losses on sales of Fannie Mae MBS classified as available-for-sale securities that are issued by consolidated trusts and retained in the Capital Markets portfolio. The adjustment also includes the removal of securitization gains (losses) recognized in the Capital Markets segment relating to portfolio securitization transactions that do not qualify for sale accounting under GAAP.

[6] Represents the removal of fair value adjustments on consolidated Fannie Mae MBS classified as trading that are retained in the Capital Markets portfolio.

[7] Gains from partnership investments are included in other expenses in our consolidated statements of operations and comprehensive loss.

TREASURY-2507

*Single-Family Business Results*

Table 20 displays the financial results of our Single-Family business for 2011 and 2010 under the current segment reporting presentation and for 2009 under the prior segment reporting presentation. The primary source of revenue for our Single-Family business is guaranty fee income. Expenses primarily include credit-related expenses, net interest loss and administrative expenses.

**Table 20:   Single-Family Business Results**

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2011** | **2010** | **2009** |
| | (Dollars in millions) | | |
| **Statement of operations data:** | | | |
| Net interest (loss) income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (2,411) | $ (5,386) | $ 428 |
| Guaranty fee income[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7,507 | 7,206 | 8,002 |
| Credit-related expenses[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (27,218) | (26,420) | (71,320) |
| Other expenses[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,925) | (2,149) | (2,283) |
| Loss before federal income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (24,047) | (26,749) | (65,173) |
| Benefit for federal income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 106 | 69 | 1,375 |
| Net loss attributable to Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (23,941) | $ (26,680) | $ (63,798) |
| **Other key performance data:** | | | |
| Single-family effective guaranty fee rate (in basis points)[4] . . . . . . . . . . . . . . . . . . . . | 26.2 | 25.1 | 27.9 |
| Single-family average charged guaranty fee on new acquisitions (in basis points)[5] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28.8 | 25.7 | 23.8 |
| Average single-family guaranty book of business[6] . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,864,919 | $2,873,779 | $2,864,759 |
| Single-family Fannie Mae MBS issues[7] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 564,606 | $ 603,247 | $ 791,418 |

[1]  Guaranty fee income is included in fee and other income in our consolidated statements of operations and comprehensive loss.

[2]  Consists of the provision for loan losses, provision for guaranty losses and foreclosed property expense.

[3]  Consists of investment gains and losses, fair value losses, fee and other income, administrative expenses and other expenses.

[4]  Calculated based on annualized Single-Family segment guaranty fee income divided by the average single-family guaranty book of business, expressed in basis points.

[5]  Calculated based on the average contractual fee rate for our single-family guaranty arrangements entered into during the period plus the recognition of any upfront cash payments ratably over an estimated average life, expressed in basis points.

[6]  Consists of single-family mortgage loans held in our mortgage portfolio, single-family mortgage loans held by consolidated trusts, single-family Fannie Mae MBS issued from unconsolidated trusts held by either third parties or within our retained portfolio, and other credit enhancements that we provide on single-family mortgage assets. Excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

[7]  Reflects unpaid principal balance of Fannie Mae MBS issued and guaranteed by the Single-Family segment during the period. Includes Housing Finance Agency (HFA) new issue bond program issuances, none of which occurred in 2011 or 2009. There were HFA new issue bond program issuances of $3.1 billion during 2010.

TREASURY-2508

<u>2011 compared with 2010</u>

Key factors affecting the results of our Single-Family business for 2011 compared with 2010 included the following:

*Net Interest Loss*

Net interest loss for the Single-Family business segment primarily consists of: (1) the cost to reimburse the Capital Markets group for interest income not recognized for loans in our mortgage portfolio on nonaccrual status; (2) the cost to reimburse MBS trusts for interest income not recognized for loans in consolidated trusts on nonaccrual status; and (3) income from cash payments received on loans that have been placed on nonaccrual status.

Net interest loss decreased in 2011 compared with 2010 primarily due to a significant decrease in interest income not recognized for loans on nonaccrual status because of a decline in the total number of loans on nonaccrual status driven by loan workouts during 2011.

*Guaranty Fee Income*

Guaranty fee income increased in 2011 compared with 2010 due to an increase in the amortization of risk-based fees, reflecting the impact of higher risk based pricing associated with our more recent acquisition vintages.

Our average single-family guaranty book of business was relatively flat period over period despite our continued high market share because of the decline in U.S. residential mortgage debt outstanding. Our estimated market share of new single-family mortgage-related securities issuances, which excludes previously securitized mortgages, remained high at 47.9% for 2011.

*Credit-Related Expenses*

Credit-related expenses and credit losses in the Single-Family business represent the substantial majority of our consolidated totals. We provide a discussion of our credit-related expenses and credit losses in "Consolidated Results of Operations—Credit-Related Expenses."

<u>2010 compared with 2009</u>

Key factors affecting the results of our Single-Family business for 2010 compared with 2009 included the following:

*Net Interest Income (Expense)*

The shift from net interest income in 2009 to net interest expense in 2010 was primarily driven by an increase in interest not recorded on nonaccrual loans, which increased to $8.4 billion in 2010 from $1.2 billion in 2009. The number of nonaccrual loans in our consolidated balance sheets increased as a result of our adoption of the consolidation accounting guidance in 2010.

*Guaranty Fee Income*

Guaranty fee income decreased in 2010, compared with 2009, primarily because: (1) we now amortize our single-family deferred cash fees under the static yield method, which resulted in lower amortization income compared with 2009 when we amortized these fees under the prospective level yield method; (2) guaranty fee income in 2009 included the amortization of certain non-cash deferred items, the balance of which was eliminated upon adoption of the consolidation accounting guidance and was not re-established on Single-Family's balance sheet at the transition date; and (3) guaranty fee income in 2009 reflected an increase in the fair value of buy-ups and certain guaranty assets which are no longer adjusted to fair value under the new segment reporting.

- 114 -

Our average single-family guaranty book of business was relatively flat period over period despite our continued high market share because of the decline in U.S. residential mortgage debt outstanding. There were fewer new mortgage originations due to weakness in the housing market and an increase in liquidations due to the high level of foreclosures. Our estimated market share of new single-family mortgage-related securities issuances, which excludes previously securitized mortgages, remained high at 44% for 2010.

The single-family average charged guaranty fee on new acquisitions increased in 2010 compared with 2009 primarily due to an increase in acquisitions of loans with characteristics that receive risk-based pricing adjustments.

*Credit-Related Expenses*

Credit-related expenses and credit losses in the Single-Family business represent the substantial majority of our consolidated totals. We provide additional information on our credit-related expenses in "Consolidated Results of Operations—Credit-Related Expenses."

*Federal Income Taxes*

We recognized an income tax benefit in 2010 due to the reversal of a portion of the valuation allowance for deferred tax assets primarily due to a settlement agreement reached with the IRS in 2010 for our unrecognized tax benefits for the tax years 1999 through 2004. The tax benefit recognized for 2009 was primarily due to the benefit of carrying back to prior years a portion of our 2009 tax loss, net of the reversal of the use of certain tax credits.

**Multifamily Business Results**

The Multifamily business results primarily reflect our multifamily guaranty business. Our multifamily business results also include activity relating to our LIHTC investments, for which we reduced the carrying value to zero in our consolidated financial statements in 2009, and our equity investments. We are no longer making new LIHTC or equity investments, although we continue to make contractually required contributions for our legacy investments. Activity from multifamily products is also reflected in the Capital Markets group results, which include net interest income related to multifamily loans and securities, gains and losses from the sale of multifamily MBS and re-securitizations, and other miscellaneous income. Of this activity, a main contributor of net income from multifamily products in the Capital Markets group results is net interest income. Estimated net interest income earned on Fannie Mae multifamily mortgage loans and multifamily MBS in the Capital Markets group results was $873 million for 2011, $865 million for 2010 and $785 million for 2009.

Table 21 displays the financial results of our Multifamily business for 2011 and 2010 under the current segment reporting presentation and for 2009 under the prior segment reporting presentation. The primary sources of revenue for our Multifamily business are guaranty fee income and fee and other income. Expenses and other items that impact income or loss primarily include credit-related expenses, administrative expenses and for 2009 net operating losses from our partnership investments.

TREASURY-2510

**Table 21:   Multifamily Business Results**

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2011 | 2010 | 2009 |
| | (Dollars in millions) | | |
| **Statement of operations data:** | | | |
| Guaranty fee income[1] ................................. | $ 884 | $ 791 | $ 675 |
| Fee and other income ................................. | 218 | 146 | 100 |
| Gains (losses) from partnership investments[2] ................................. | 81 | (70) | (6,735) |
| Credit-related expenses[3] ................................. | (280) | (194) | (2,216) |
| Other expenses[4] ................................. | (259) | (443) | (594) |
| Income (loss) before federal income taxes ................................. | 644 | 230 | (8,770) |
| Provision for federal income taxes ................................. | (61) | (14) | (311) |
| Net income (loss) ................................. | 583 | 216 | (9,081) |
| Less: Net loss attributable to the noncontrolling interests[2] ................................. | — | — | 53 |
| Net income (loss) attributable to Fannie Mae ................................. | $ 583 | $ 216 | $ (9,028) |
| **Other key performance data:** | | | |
| Multifamily effective guaranty fee rate (in basis points)[5] ................................. | 46.0 | 42.3 | 37.6 |
| Credit loss performance ratio (in basis points)[6] ................................. | 20.4 | 26.6 | 12.3 |
| Average Multifamily guaranty book of business[7] ................................. | $191,984 | $186,867 | $179,315 |
| Multifamily new business volumes[8] ................................. | $ 24,356 | $ 17,919 | $ 20,183 |
| Multifamily units financed from new business volumes[9] ................................. | 423,000 | 306,000 | 372,000 |
| Fannie Mae Multifamily MBS issuances[10] ................................. | $ 34,066 | $ 26,499 | $ 16,435 |
| Fannie Mae Multifamily structured securities issuances (issued by Capital Markets group)[11] ................................. | $ 6,435 | $ 4,808 | $ 1,648 |
| Additional net interest income earned on Fannie Mae Multifamily mortgage loans and MBS (included in Capital Markets Group's results)[12] ................................. | $ 873 | $ 865 | $ 785 |
| Average Fannie Mae Multifamily mortgage loans and MBS in Capital Markets Group's portfolio[13] ................................. | $110,748 | $115,839 | $117,417 |

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2011 | 2010 | 2009 |
| | (Dollars in millions) | | |
| Multifamily serious delinquency rate ................................. | 0.59% | 0.71% | 0.63% |
| Percentage of guaranty book of business with credit enhancement ................................. | 90% | 89% | 89% |
| Fannie Mae percentage of total multifamily mortgage debt outstanding[14] ................................. | 21.0% | 20.6% | 19.8% |
| Fannie Mae Multifamily MBS outstanding[15] ................................. | $101,574 | $77,251 | $59,852 |

---

[1]   Guaranty fee income is included in fee and other income in our consolidated statements of operations and comprehensive loss.

[2]   Gains (losses) from partnership investments are included in other expenses in our consolidated statements of operations and comprehensive loss. In 2011 and 2010, gains (losses) from partnership investments are reported using the equity method of accounting. As a result, net income (loss) attributable to noncontrolling interest from partnership investments is not included in income (loss) for the Multifamily segment. In 2009, gains (losses) from partnership investments are reported using either the equity method or consolidation, in accordance with GAAP, with net income (loss) attributable to noncontrolling interests included in partnership gains (losses).

[3]   Consists of the benefit (provision) for loan losses, benefit (provision) for guaranty losses and foreclosed property expense.

TREASURY-2511

(4) Consists of net interest income or loss, investment gains, other income or expenses, and administrative expenses.

(5) Calculated based on annualized Multifamily segment guaranty fee income divided by the average multifamily guaranty book of business, expressed in basis points.

(6) Calculated based on the annualized credit losses divided by the average multifamily guaranty book of business, expressed in basis points.

(7) Consists of multifamily mortgage loans held in our mortgage portfolio, multifamily mortgage loans held by consolidated trusts, multifamily Fannie Mae MBS issued from unconsolidated trusts held by either third parties or within our retained portfolio, and other credit enhancements that we provide on multifamily mortgage assets. Excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

(8) Reflects unpaid principal balance of multifamily Fannie Mae MBS issued (excluding portfolio securitizations) and multifamily loans purchased during the period. Includes HFA new issue bond program issuances, none of which occurred in 2011. There were HFA new issue bond program issuances of $1.0 billion and $391 million for the years ended December 31, 2010 and 2009, respectively.

(9) Excludes HFA new issue bond program.

(10) Reflects unpaid principal balance of multifamily Fannie Mae MBS issued during the period. Includes: (a) issuances of new MBS, (b) $10.0 billion and $8.7 billion of Fannie Mae portfolio securitization transactions for the years ended December 31, 2011 and 2010, respectively, and (c) $241 million and $389 million of conversions of adjustable-rate loans to fixed-rate loans and DMBS securities to MBS securities for the years ended December 31, 2011 and 2010, respectively.

(11) Reflects original unpaid principal balance of out-of-portfolio multifamily structured securities issuances by our Capital Markets Group.

(12) Net interest income was reduced by guaranty fees allocated to Multifamily from the Capital Markets Group on multifamily loans in Fannie Mae's portfolio.

(13) Based on unpaid principal balance.

(14) Includes mortgage loans and Fannie Mae MBS issued and guaranteed by the Multifamily segment. Information as of December 31, 2011 is through September 30, 2011 and is based on the Federal Reserve's September 2011 mortgage debt outstanding release, the latest date for which the Federal Reserve has estimated mortgage debt outstanding for multifamily residences. Prior period amounts may have been changed to reflect revised historical data from the Federal Reserve.

(15) Includes $28.3 billion and $19.9 billion of Fannie Mae multifamily MBS held in the mortgage portfolio, the vast majority of which have been consolidated to loans in our consolidated balance sheets, as of December 31, 2011 and 2010, respectively; and $1.4 billion of bonds issued by HFAs as of December 31, 2011 and 2010.

<u>2011 compared with 2010</u>

Key factors affecting the results of our Multifamily business for 2011 compared with 2010 included the following:

*Guaranty Fee Income*

Multifamily guaranty fee income increased in 2011 compared with 2010 primarily due to higher fees charged on new acquisitions. New acquisitions with higher guaranty fees have become an increasingly large part of our multifamily guaranty book of business.

*Gains (Losses) from Partnership Investments*

We recognized income from partnership investments in 2011 compared with losses in 2010. Overall, stronger national multifamily market fundamentals resulted in improved property-level operating performance and increased gains on the sale of investments.

*Credit-Related Expenses*

Multifamily credit-related expenses increased in 2011 compared with 2010 primarily due to a stable allowance for loan losses in 2011 compared to a decrease in 2010. Although national multifamily market fundamentals

TREASURY-2512

continued to improve in 2011, certain local markets and properties continued to underperform compared to the rest of the nation.

Multifamily credit losses, which consist of net charge-offs and foreclosed property expense, were $391 million for 2011 compared with $498 million for 2010.

*Provision for Federal Income Taxes*

In the second quarter of 2011, we reached an effective settlement of issues with the Internal Revenue Service relating to tax years 2007 and 2008, which reduced our total corporate tax liability. However, the reduction in our tax liability also reduced the low-income housing tax credits we were able to use in those years, resulting in a provision for federal income taxes for the Multifamily segment in 2011.

<u>2010 compared with 2009</u>

Key factors affecting the results of our Multifamily business for 2010 compared with 2009 included the following:

*Guaranty Fee Income*

Multifamily guaranty fee income increased in 2010 compared with 2009 primarily due to higher fees charged on new acquisitions. New acquisitions with higher guaranty fees have become an increasingly large part of our book of business.

*Losses from Partnership Investments*

In 2009, we reduced the carrying value of our LIHTC investments to zero. As a result, we no longer recognize net operating losses or other-than-temporary impairment on our LIHTC investments, which resulted in a decrease in losses from partnership investments in 2010 compared with 2009.

*Credit-Related Expenses*

Multifamily credit-related expenses decreased in 2010 compared with 2009 primarily due to a modest decrease in the allowance for loan losses in 2010, as multifamily credit trends stabilized, compared with the increase in the allowance for 2009. The provision for credit losses for 2010 was $156 million compared with $2.2 billion for 2009.

Although our allowance and provision for multifamily credit losses decreased, our multifamily charge-offs and foreclosed property expense remained elevated. Our multifamily net charge-offs and foreclosed property expense increased from $220 million in 2009 to $498 million in 2010. The increase in net charge-offs and foreclosed property expense was driven by increased volumes of multifamily REO acquisitions in 2010.

*Provision for Federal Income Taxes*

We recognized a provision for income taxes in 2010 resulting from a settlement agreement reached with the IRS with respect to our unrecognized tax benefits for tax years 1999 through 2004. The tax provision recognized in 2009 was attributable to the reversal of previously utilized tax credits because of our ability to carry back net operating losses to recover taxes from prior years.

**Capital Markets Group Results**

Table 22 displays the financial results of our Capital Markets group for 2011 and 2010 under the current segment reporting presentation and for 2009 under the prior segment reporting presentation. Following the table we discuss the Capital Markets group's financial results and describe the Capital Markets group's mortgage portfolio. For a discussion of the debt issued by the Capital Markets group to fund its investment activities, see "Liquidity and Capital Management." For a discussion of the derivative instruments that Capital Markets uses to

- 118 -

manage interest rate risk, see "Consolidated Balance Sheet Analysis—Derivative Instruments," "Risk Management—Market Risk Management, Including Interest Rate Risk Management—Derivative Instruments" and "Note 9, Derivative Instruments and Hedging Activities." The primary sources of revenue for our Capital Markets group are net interest income and fee and other income. Expenses and other items that impact income or loss primarily include fair value gains and losses, investment gains and losses, allocated guaranty fee expense, other-than-temporary impairment and administrative expenses.

**Table 22:   Capital Markets Group Results**

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | **2011** | **2010** | **2009** |
|  | (Dollars in millions) | | |
| **Statement of operations data:** | | | |
| Net interest income[1] | $13,920 | $14,321 | $14,275 |
| Investment gains, net[2] | 3,711 | 4,047 | 1,460 |
| Net other-than-temporary impairments | (306) | (720) | (9,861) |
| Fair value (losses) gains, net[3] | (6,596) | 239 | (2,811) |
| Fee and other income | 478 | 519 | 319 |
| Other expenses[4] | (2,253) | (2,359) | (2,446) |
| Income before federal income taxes | 8,954 | 16,047 | 936 |
| Benefit (provision) for federal income taxes | 45 | 27 | (79) |
| Net income attributable to Fannie Mae | $ 8,999 | $16,074 | $   857 |

---

[1] Includes contractual interest income, excluding recoveries, on nonaccrual loans received from the Single-Family segment of $6.6 billion and $6.3 billion for the years ended December 31, 2011 and 2010, respectively. Nonaccrual loans did not comprise a significant portion of the Capital Markets group's portfolio in 2009. In 2011 and 2010, Capital Markets net interest income is reported based on the mortgage-related assets held in the segment's portfolio and excludes interest income on mortgage-related assets held by consolidated MBS trusts that are owned by third parties and the interest expense on the corresponding debt of such trusts. In 2009, the Capital Markets group's net interest income included interest income on mortgage-related assets underlying MBS trusts that we consolidated under the prior consolidation accounting guidance and the interest expense on the corresponding debt of such trusts.

[2] We include the securities that we own regardless of whether the trust has been consolidated in reporting of gains and losses on securitizations and sales of available-for-sale securities.

[3] Includes primarily fair value gains or losses on derivatives and trading securities that we own, regardless of whether the trust has been consolidated.

[4] Includes allocated guaranty fee expense, debt extinguishment gains or losses, net, administrative expenses, and other income or expenses. Gains or losses related to the extinguishment of debt issued by consolidated trusts are excluded from the Capital Markets group's results because purchases of securities are recognized as such.

2011 compared with 2010

Key factors affecting the results of our Capital Markets group for 2011 compared with 2010 included the following:

*Net Interest Income*

The Capital Markets group reports interest income and amortization of cost basis adjustments only on securities and loans that are held in our portfolio. For mortgage loans held in our mortgage portfolio, when interest income is no longer recognized in accordance with our nonaccrual accounting policy, the Capital Markets group recognizes interest income reimbursements that the group receives, primarily from Single-Family, for the contractual interest due. The interest expense recognized on the Capital Markets group's statement of operations

TREASURY-2514

is limited to our funding debt, which is reported as "Debt of Fannie Mae" in our consolidated balance sheets. Net interest expense also includes a cost of capital charge allocated among the three business segments.

The Capital Markets group's net interest income decreased in 2011 compared with 2010 primarily due to a decrease in the balance of mortgage-related securities, lower coupon rates on modified loans in our portfolio and an out-of-period adjustment to reduce interest income on mortgage related securities in 2011. See "Note 5, Investment in Securities" for additional information on this adjustment. This decrease in interest income on our interest earning assets was partially offset by a decline in funding costs as we replaced higher cost debt with lower cost debt. The reimbursements of contractual interest due on nonaccrual loans from the Single-Family business were a significant portion of the Capital Markets group's interest income during 2011. However, the increase in these reimbursements was offset by the decline in interest income on our mortgage-related securities because our securities portfolio balance has declined.

Our net interest income and net interest yield were higher than they would have otherwise been in 2011, 2010 and 2009 because our debt funding needs were lower than would otherwise have been required as a result of funds we received from Treasury under the senior preferred stock purchase agreement. Further, dividends paid to Treasury are not recognized in interest expense.

We supplement our issuance of debt with interest rate-related derivatives to manage the prepayment and duration risk inherent in our mortgage investments. The effect of these derivatives, in particular the periodic net interest expense accruals on interest rate swaps, is not reflected in Capital Markets' net interest income but is included in our results as a component of "Fair value (losses) gains, net" and is displayed in "Table 10: Fair Value (Losses) Gains, Net." If we had included the economic impact of adding the net contractual interest accruals on our interest rate swaps in our Capital Markets' interest expense, Capital Markets' net interest income would have decreased by $2.2 billion for 2011 compared with a decrease of $2.9 billion for 2010.

*Net Other-Than-Temporary Impairments*

The net other-than-temporary impairments recognized by the Capital Markets group are consistent with the amount reported in our consolidated results of operations. See "Note 5, Investments in Securities" for information on our other-than-temporary impairments by major security type and primary drivers for other-than-temporary impairments recorded in 2011.

*Fair Value (Losses) Gains, Net*

The fair value losses reported for the Capital Markets group are primarily due to losses on derivatives and are consistent with the derivative gains and losses reported in our consolidated results of operations. We discuss details of these components of fair value gains and losses in "Consolidated Results of Operations—Fair Value (Losses) Gains, Net."

2010 compared with 2009

Key factors affecting the results of our Capital Markets group for 2010 compared with 2009 included the following:

*Net Interest Income*

The Capital Markets group's net interest income increased in 2010 compared with 2009 primarily due to a decline in funding costs as we replaced higher cost debt with lower cost debt.

If we had included the economic impact of adding the net contractual interest accruals on our interest rate swaps in our Capital Markets' interest expense, Capital Markets' net interest income would have decreased by $2.9 billion in 2010 compared with a $3.4 billion decrease in 2009.

- 120 -

*Investment Gains (Losses), Net*

The increase in investment gains in 2010 compared with 2009 was primarily driven by an increase in gains on securitizations as well as a significant decline in lower of cost or fair value adjustments on held-for-sale loans.

*Net Other-Than-Temporary Impairment*

The net other-than-temporary impairment recognized by the Capital Markets group is generally consistent with the net other-than-temporary impairment reported in our consolidated results of operations. We discuss details on net other-than-temporary impairment in "Consolidated Results of Operations—Net Other-Than-Temporary Impairment."

*Fair Value (Losses) Gains, Net*

The derivative gains and losses and foreign exchange gains and losses that are reported for the Capital Markets group are consistent with these same losses reported in our consolidated results of operations. We discuss details of these components of fair value gains and losses in "Consolidated Results of Operations—Fair Value (Losses) Gains, Net."

The gains on our trading securities for the segment during 2010 were driven by a decrease in interest rates and narrowing of credit spreads on CMBS.

The gains on our trading securities during 2009 were primarily attributable to the narrowing of credit spreads on CMBS, asset-backed securities, corporate debt securities and agency MBS, partially offset by an increase in interest rates in 2009.

*Federal Income Taxes*

We recognized an income tax benefit in 2010 primarily due to the reversal of a portion of the valuation allowance for deferred tax assets resulting from a settlement agreement reached with the IRS in the first quarter of 2010 for our unrecognized tax benefits for the tax years 1999 through 2004. We recorded a valuation allowance for the majority of the tax benefits associated with the pre-tax losses recognized in 2009.

*The Capital Markets Group's Mortgage Portfolio*

The Capital Markets group's mortgage portfolio consists of mortgage loans and mortgage-related securities that we own. Mortgage-related securities held by Capital Markets include Fannie Mae MBS and non-Fannie Mae mortgage-related securities. The Fannie Mae MBS that we own are maintained as securities on the Capital Markets group's balance sheets. Mortgage-related assets held by consolidated MBS trusts are not included in the Capital Markets group's mortgage portfolio.

The amount of mortgage assets that we may own is restricted by our senior preferred stock purchase agreement with Treasury. By December 31 of each year, we are required to reduce our mortgage assets to 90% of the maximum allowable amount that we were permitted to own as of December 31 of the immediately preceding calendar year, until the amount of our mortgage assets reaches $250 billion. The maximum allowable amount of mortgage assets we may own was reduced to $729 billion as of December 31, 2011 and will be reduced to $656.1 billion as of December 31, 2012. As of December 31, 2011, we owned $708.4 billion in mortgage assets, compared with $788.8 billion as of December 31, 2010.

Table 23 displays our Capital Markets group's mortgage portfolio activity for the periods indicated.

- 121 -

**Table 23:   Capital Markets Group's Mortgage Portfolio Activity[1]**

| | For the Year Ended December 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (Dollars in millions) | |
| Mortgage loans: | | |
| Beginning balance ........................................................ | $ 427,074 | $ 281,162 |
| Purchases ............................................................ | 153,218 | 313,075 |
| Securitizations[2] ...................................................... | (101,705) | (95,783) |
| Liquidations[3] ....................................................... | (80,316) | (71,380) |
| Mortgage loans, ending balance ............................................ | 398,271 | 427,074 |
| Mortgage securities: | | |
| Beginning balance ........................................................ | $ 361,697 | $ 491,566 |
| Purchases[4] .......................................................... | 20,760 | 44,495 |
| Securitizations[2] ...................................................... | 101,705 | 95,783 |
| Sales ............................................................... | (108,430) | (179,620) |
| Liquidations[3] ....................................................... | (65,589) | (90,527) |
| Mortgage securities, ending balance ......................................... | 310,143 | 361,697 |
| Total Capital Markets mortgage portfolio ...................................... | $ 708,414 | $ 788,771 |

---

[1]   Based on unpaid principal balance.

[2]   Includes portfolio securitization transactions that do not qualify for sale treatment under GAAP.

[3]   Includes scheduled repayments, prepayments, foreclosures and lender repurchases.

[4]   Includes purchases of Fannie Mae MBS issued by consolidated trusts.

Purchases of mortgage loans decreased in 2011 compared with 2010 because we purchased fewer loans that were four or more months delinquent from MBS trusts in 2011. We significantly increased our purchases of delinquent loans in 2010 and purchased the substantial majority of our delinquent loan population during the first half of 2010, which included $127 billion of loans that were four or more months delinquent as of December 31, 2009.

We expect to continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other factors including the limit on the mortgage assets that we may own pursuant to the senior preferred stock purchase agreement. We purchased approximately 384,000 delinquent loans with an unpaid principal balance of approximately $67 billion from our single-family MBS trusts in 2011. As of December 31, 2011, the total unpaid principal balance of all loans in single-family MBS trusts that were delinquent as to four or more consecutive monthly payments was $5.8 billion. In January 2012, we purchased approximately 27,000 delinquent loans with an unpaid principal balance of $4.5 billion from our single-family MBS trusts.

Table 24 displays the composition of the Capital Markets group's mortgage portfolio as of December 31, 2011 and 2010.

- 122 -

**Table 24:   Capital Markets Group's Mortgage Portfolio Composition**[1]

| | As of December 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (Dollars in millions) | |
| Capital Markets group's mortgage loans: | | |
| Single-family loans | | |
| Government insured or guaranteed ............................................... | $ 41,555 | $ 51,783 |
| Conventional: | | |
| Long-term, fixed-rate ....................................................... | 245,810 | 237,096 |
| Intermediate-term, fixed-rate ............................................... | 10,289 | 11,446 |
| Adjustable-rate ............................................................ | 23,490 | 31,526 |
| Total single-family conventional ........................................... | 279,589 | 280,068 |
| Total single-family loans ...................................................... | 321,144 | 331,851 |
| Multifamily loans | | |
| Government insured or guaranteed ............................................... | 362 | 431 |
| Conventional: | | |
| Long-term, fixed-rate ....................................................... | 3,629 | 4,413 |
| Intermediate-term, fixed-rate ............................................... | 58,885 | 71,010 |
| Adjustable-rate ............................................................ | 14,251 | 19,369 |
| Total multifamily conventional ............................................. | 76,765 | 94,792 |
| Total multifamily loans ....................................................... | 77,127 | 95,223 |
| Total Capital Markets group's mortgage loans ................................... | 398,271 | 427,074 |
| Capital Markets group's mortgage-related securities: | | |
| Fannie Mae ................................................................... | 220,061 | 260,429 |
| Freddie Mac ................................................................. | 14,509 | 17,332 |
| Ginnie Mae .................................................................. | 1,043 | 1,425 |
| Alt-A private-label securities ............................................... | 19,670 | 22,283 |
| Subprime private-label securities ........................................... | 16,538 | 18,038 |
| CMBS ........................................................................ | 23,226 | 25,052 |
| Mortgage revenue bonds ...................................................... | 10,899 | 12,525 |
| Other mortgage-related securities ........................................... | 4,197 | 4,613 |
| Total Capital Markets group's mortgage-related securities[2] ................... | 310,143 | 361,697 |
| Total Capital Markets group's mortgage portfolio ............................... | $708,414 | $788,771 |

_____

[1]   Based on unpaid principal balance.

[2]   The fair value of these mortgage-related securities was $316.5 billion and $365.8 billion as of December 31, 2011 and 2010, respectively.

The Capital Markets group's mortgage portfolio decreased as of December 31, 2011 compared with December 31, 2010 primarily due to liquidations and sales, partially offset by purchases of delinquent loans from MBS trusts. The total unpaid principal balance of nonperforming loans in the Capital Markets group's mortgage portfolio was $236.2 billion as of December 31, 2011 and $228.0 billion as of December 31, 2010. This population includes loans that have been modified and have been classified as TDRs, as well as unmodified delinquent loans that are on nonaccrual status in our consolidated financial statements. We expect our mortgage

- 123 -

TREASURY-2518

portfolio to continue to decrease due to the restrictions on the amount of mortgage assets we may own under the terms of our senior preferred stock purchase agreement with Treasury.

## CONSOLIDATED BALANCE SHEET ANALYSIS

We seek to structure the composition of our balance sheet and manage its size to comply with our regulatory requirements, to provide adequate liquidity to meet our needs, and to mitigate our interest rate risk and credit risk exposure. The major asset components of our consolidated balance sheets include our mortgage investments and our cash and other investments portfolio. We fund and manage the interest rate risk on these investments through the issuance of debt securities and the use of derivatives. Our debt securities and derivatives represent the major liability components of our consolidated balance sheets.

The section below provides a discussion of our consolidated balance sheets as of the dates indicated and should be read together with our consolidated financial statements, including the accompanying notes.

Table 25 displays our consolidated balance sheets as of December 31, 2011 and 2010.

**Table 25:   Summary of Consolidated Balance Sheets**

|  | As of December 31, | | |
|---|---|---|---|
|  | **2011** | **2010** | **Variance** |
|  | (Dollars in millions) | | |
| **Assets** | | | |
| Cash and cash equivalents and federal funds sold and securities purchased under agreements to resell or similar arrangements | $ 63,539 | $ 29,048 | $ 34,491 |
| Restricted cash | 50,797 | 63,678 | (12,881) |
| Investments in securities[1] | 151,780 | 151,248 | 532 |
| Mortgage loans: | | | |
| Of Fannie Mae | 380,379 | 407,482 | (27,103) |
| Of consolidated trusts | 2,590,398 | 2,577,794 | 12,604 |
| Allowance for loan losses | (72,156) | (61,556) | (10,600) |
| Mortgage loans, net of allowance for loan losses | 2,898,621 | 2,923,720 | (25,099) |
| Other assets[2] | 46,747 | 54,278 | (7,531) |
| Total assets | $3,211,484 | $3,221,972 | $(10,488) |
| **Liabilities and deficit** | | | |
| Debt: | | | |
| Of Fannie Mae | $ 732,444 | $ 780,044 | $(47,600) |
| Of consolidated trusts | 2,457,428 | 2,416,956 | 40,472 |
| Other liabilities[3] | 26,183 | 27,489 | (1,306) |
| Total liabilities | 3,216,055 | 3,224,489 | (8,434) |
| Senior preferred stock | 112,578 | 88,600 | 23,978 |
| Other deficit[4] | (117,149) | (91,117) | (26,032) |
| Total deficit | (4,571) | (2,517) | (2,054) |
| **Total liabilities and deficit** | $3,211,484 | $3,221,972 | $(10,488) |

[1] Includes $49.8 billion as of December 31, 2011 and $32.8 billion as of December 31, 2010 of non-mortgage-related securities that are included in our other investments portfolio, which we present in "Table 38: Cash and Other Investments Portfolio."

TREASURY-2519

(2) Consists of accrued interest receivable, net; acquired property, net; and other assets.

(3) Consists of accrued interest payable, federal funds purchased and securities sold under agreements to repurchase, and other liabilities.

(4) Consists of preferred stock, common stock, accumulated deficit, accumulated other comprehensive loss, treasury stock, and noncontrolling interest.

### Cash and Cash Equivalents and Federal Funds Sold and Securities Purchased under Agreements to Resell or Similar Arrangements

Cash and cash equivalents and federal funds sold and securities purchased under agreements to resell or similar arrangements are included in our cash and other investments portfolio. See "Liquidity and Capital Management—Liquidity Management—Cash and Other Investments Portfolio" for additional information on our cash and other investments portfolio.

### Restricted Cash

Restricted cash primarily includes unscheduled borrower payments received by the servicers or consolidated trusts due to be remitted to the MBS certificateholders in the subsequent month. Our restricted cash decreased as of December 31, 2011 compared with the balance as of December 31, 2010 primarily due to a decline in refinance activity, resulting in a decrease in unscheduled payments received.

### Investments in Mortgage-Related Securities

Our investments in mortgage-related securities are classified in our consolidated balance sheets as either trading or available-for-sale and are measured at fair value. Unrealized and realized gains and losses on trading securities are included as a component of "Fair value losses, net" and unrealized gains and losses on available-for-sale securities are included in "Other comprehensive income" in our consolidated statements of operations and comprehensive loss. Realized gains and losses on available-for-sale securities are recognized when securities are sold in "Investment gains, net" in our consolidated statements of operations and comprehensive loss. See "Note 5, Investments in Securities" for additional information on our investments in mortgage-related securities, including the composition of our trading and available-for-sale securities at amortized cost and fair value and the gross unrealized gains and losses related to our available-for-sale securities as of December 31, 2011.

Table 26 displays the fair value of our investments in mortgage-related securities, including trading and available-for-sale securities, as of December 31, 2011 and 2010. The decrease is primarily attributable to a reduction in our agency MBS investments as we continue to manage our portfolio in order to meet portfolio requirements. The decrease is also attributable to a decline in our Alt-A and subprime private-label securities. See "Investments in Private-Label Mortgage-Related Securities" for a discussion of factors that contributed to the decline in the unpaid principal balance and fair value of our Alt-A and subprime private-label securities.

**Table 26:   Summary of Mortgage-Related Securities at Fair Value**

|  | As of December 31, | |
|---|---|---|
|  | 2011 | 2010 |
|  | (Dollars in millions) | |
| Mortgage-related securities: | | |
| Fannie Mae | $ 24,274 | $ 30,226 |
| Freddie Mac | 15,555 | 18,322 |
| Ginnie Mae | 1,189 | 1,629 |
| Alt-A private-label securities | 13,032 | 15,573 |
| Subprime private-label securities | 8,866 | 11,513 |
| CMBS | 24,437 | 25,608 |
| Mortgage revenue bonds | 10,978 | 11,650 |
| Other mortgage-related securities | 3,601 | 3,974 |
| Total | $101,932 | $118,495 |

- 125 -

*Investments in Private-Label Mortgage-Related Securities*

We classify private-label securities as Alt-A, subprime, multifamily or manufactured housing if the securities were labeled as such when issued. We have also invested in private-label subprime mortgage-related securities that we have resecuritized to include our guaranty ("wraps").

The continued negative impact of the current economic environment, including sustained weakness in the housing market and high unemployment, has adversely affected the performance of our Alt-A and subprime private-label securities. The unpaid principal balance of our investments in Alt-A and subprime securities was $36.2 billion as of December 31, 2011, of which $30.2 billion was rated below investment grade. Table 27 displays the unpaid principal balance and the fair value of our investments in Alt-A and subprime private-label securities along with an analysis of the cumulative losses on these investments as of December 31, 2011. As of December 31, 2011, we had realized actual cumulative principal shortfalls of approximately 6% compared with 2% as of December 31, 2010, of the total cumulative credit losses reported in this table and reflected in our consolidated financial statements.

**Table 27:   Analysis of Losses on Alt-A and Subprime Private-Label Mortgage-Related Securities**

| | As of December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Unpaid Principal Balance | Fair Value | Total Cumulative Losses[1] | Noncredit Component[2] | Credit Component[3] |
| | (Dollars in millions) | | | | |
| Trading securities:[4] | | | | | |
| Alt-A private-label securities . . . . . . . . . . . . . . | $ 2,710 | $ 1,349 | $ (1,319) | $ (171) | $ (1,148) |
| Subprime private-label securities . . . . . . . . . . . | 2,592 | 1,280 | (1,312) | (404) | (908) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 5,302 | $ 2,629 | $ (2,631) | $ (575) | $ (2,056) |
| Available-for-sale securities:[4] | | | | | |
| Alt-A private-label securities . . . . . . . . . . . . . . | $16,960 | $11,683 | $ (5,744) | $(1,631) | $ (4,113) |
| Subprime private-label securities . . . . . . . . . . . | 13,946 | 7,586 | (6,399) | (1,970) | (4,429) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $30,906 | $19,269 | $(12,143) | $(3,601) | $ (8,542) |
| Grand Total . . . . . . . . . . . . . . . . . . . . . . . . . . . | $36,208 | $21,898 | $(14,774) | $(4,176) | $(10,598) |

[1] Amounts reflect the difference between the fair value and unpaid principal balance net of unamortized premiums, discounts and certain other cost basis adjustments.

[2] Represents the estimated portion of the total cumulative losses that is noncredit-related. We have calculated the credit component based on the difference between the amortized cost basis of the securities and the present value of expected future cash flows. The remaining difference between the fair value and the present value of expected future cash flows is classified as noncredit-related.

[3] For securities classified as trading, amounts reflect the estimated portion of the total cumulative losses that is credit-related. For securities classified as available-for-sale, amounts reflect the estimated portion of total cumulative other-than-temporary credit impairment losses, net of accretion, that are recognized in earnings.

[4] Excludes resecuritizations, or wraps, of private-label securities backed by subprime loans that we have guaranteed and hold in our mortgage portfolio as Fannie Mae securities.

Table 28 displays the 60 days or more delinquency rates and average loss severities for the loans underlying our Alt-A and subprime private-label mortgage-related securities for the most recent remittance period of the current reporting quarter. The delinquency rates and average loss severities are based on available data provided by Intex Solutions, Inc. ("Intex") and CoreLogic, LoanPerformance ("CoreLogic"). We also present the average credit enhancement and monoline financial guaranteed amount for these securities as of December 31, 2011. Based on the stressed condition of some of our financial guarantors, we believe some of these counterparties will not fully meet their obligation to us in the future. See "Risk Management—Credit Risk Management—Institutional

- 126 -

Counterparty Credit Risk Management—Financial Guarantors" for additional information on our financial guarantor exposure and the counterparty risk associated with our financial guarantors.

**Table 28:   Credit Statistics of Loans Underlying Alt-A and Subprime Private-Label Mortgage-Related Securities (Including Wraps)**

| | As of December 31, 2011 | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Unpaid Principal Balance** | | | | | | **Monoline Financial Guaranteed Amount[6]** |
| | **Trading** | **Available-for-Sale** | **Wraps[1]** | **≥60 Days Delinquent[2][3]** | **Average Loss Severity[3][4]** | **Average Credit Enhancement[3][5]** | |
| | | | | (Dollars in millions) | | | |
| **Private-label mortgage-related securities backed by:[7]** | | | | | | | |
| Alt-A mortgage loans: | | | | | | | |
| Option ARM Alt-A mortgage loans: | | | | | | | |
| 2004 and prior . . . . . . . . . . . . . | $    — | $    479 | $    — | 31.7% | 58.5% | 15.5% | $    — |
| 2005 . . . . . . . . . . . . . . . . . . . . . . . | — | 1,298 | — | 43.0 | 63.5 | 37.8 | 251 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . | — | 1,192 | — | 46.3 | 68.7 | 26.9 | 102 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . | 1,881 | — | — | 45.5 | 66.0 | 55.5 | 640 |
| Other Alt-A mortgage loans: | | | | | | | |
| 2004 and prior . . . . . . . . . . . . . | — | 6,098 | — | 10.6 | 50.8 | 12.4 | 12 |
| 2005 . . . . . . . . . . . . . . . . . . . . . . . | 83 | 4,021 | 113 | 23.2 | 57.2 | 5.2 | — |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . | 62 | 3,755 | — | 28.2 | 60.3 | 0.1 | — |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . | 684 | — | 171 | 41.1 | 65.9 | 26.2 | 274 |
| 2008[8] . . . . . . . . . . . . . . . . . . . . | — | 117 | — | — | — | — | — |
| Total Alt-A mortgage loans: . . . . . . | 2,710 | 16,960 | 284 | | | | 1,279 |
| Subprime mortgage loans: | | | | | | | |
| 2004 and prior . . . . . . . . . . . . . | — | 1,642 | 959 | 24.2 | 73.8 | 60.7 | 626 |
| 2005[8] . . . . . . . . . . . . . . . . . . . | — | 170 | 1,279 | 41.7 | 82.0 | 57.4 | 224 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . | — | 11,532 | — | 47.7 | 79.4 | 16.9 | 52 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . | 2,592 | 602 | 5,428 | 47.6 | 76.6 | 21.4 | 174 |
| Total subprime mortgage loans: . . . | 2,592 | 13,946 | 7,666 | | | | 1,076 |
| Total Alt-A and subprime mortgage loans: . . . . . . . . . . . . . . . . . . . | $5,302 | $30,906 | $7,950 | | | | $2,355 |

_____

[1] Represents our exposure to private-label Alt-A and subprime mortgage-related securities that we own or guarantee. The reported Intex delinquency data reflect information from December 2011 remittances for November 2011 payments. For consistency purposes, we have adjusted the Intex delinquency data, where appropriate, to include all bankruptcies, foreclosures and REO in the delinquency rates.

[2] Delinquency data provided by Intex, where available, for loans backing Alt-A and subprime private-label mortgage-related securities that we own or guarantee. The reported Intex delinquency data reflect information from December 2011 remittances for November 2011 payments. For consistency purposes, we have adjusted the Intex delinquency data, where appropriate, to include all bankruptcies, foreclosures and REO in the delinquency rates.

[3] The average delinquency, severity and credit enhancement metrics are calculated for each loan pool associated with securities where Fannie Mae has exposure and are weighted based on the unpaid principal balance of those securities.

[4] Severity data obtained from CoreLogic, where available, for loans backing Alt-A and subprime private-label mortgage-related securities that we own or guarantee. The CoreLogic severity data reflect information from December 2011 remittances for November 2011 payments. For consistency purposes, we have adjusted the severity data, where appropriate.

[5] Average credit enhancement percentage reflects both subordination and financial guarantees. Reflects the ratio of the current amount of the securities that will incur losses in the securitization structure before any losses are allocated to

- 127 -

securities that we own or guarantee. Percentage generally calculated based on the quotient of the total unpaid principal balance of all credit enhancements in the form of subordination or financial guarantee of the security divided by the total unpaid principal balance of all of the tranches of collateral pools from which credit support is drawn for the security that we own or guarantee.

(6) Reflects amount of unpaid principal balance supported by financial guarantees from monoline financial guarantors.

(7) Vintages are based on series date and not loan origination date.

(8) The unpaid principal balance includes private-label REMIC securities that have been resecuritized totaling $117 million for the 2008 vintage of other Alt-A loans and $15 million for the 2005 vintage of subprime loans. These securities are excluded from the delinquency, severity and credit enhancement statistics reported in this table.

## Mortgage Loans

The mortgage loans reported in our consolidated balance sheets include loans owned by Fannie Mae and loans held in consolidated trusts and are classified as either held for sale or held for investment. The decrease in mortgage loans, net of the allowance for loan losses, in 2011 was primarily driven by a high volume of mortgages that refinanced during the year due to low interest rates. For additional information on our mortgage loans, see "Note 3, Mortgage Loans." For additional information on the mortgage loan purchase and sale activities reported by our Capital Markets group, see "Business Segment Results—Capital Markets Group Results."

## Debt Instruments

Debt of Fannie Mae is the primary means of funding our mortgage investments. Debt of consolidated trusts represents the amount of Fannie Mae MBS issued from consolidated trusts and held by third-party certificateholders. We provide a summary of the activity of the debt of Fannie Mae and a comparison of the mix between our outstanding short-term and long-term debt in "Liquidity and Capital Management—Liquidity Management—Debt Funding." Also see "Note 8, Short-Term Borrowings and Long-Term Debt" for additional information on our outstanding debt.

The increase in debt of consolidated trusts in 2011 was primarily driven by sales of Fannie Mae MBS, which are accounted for as reissuances of debt of consolidated trusts in our consolidated balance sheets, since the MBS certificate ownership is transferred from us to a third party.

## Derivative Instruments

We supplement our issuance of debt securities with derivative instruments to further reduce duration risk, which includes prepayment risk, inherent in our mortgage investments. We aggregate, by derivative counterparty, the net fair value gain or loss, less any cash collateral paid or received, and report these amounts in our consolidated balance sheets as either assets or liabilities.

Our derivative assets and liabilities consist of these risk management derivatives and our mortgage commitments. We refer to the difference between the derivative assets and derivative liabilities recorded in our consolidated balance sheets as our net derivative asset or liability. We present, by derivative instrument type, the estimated fair value of derivatives recorded in our consolidated balance sheets and the related outstanding notional amounts as of December 31, 2011 and 2010 in "Note 9, Derivative Instruments." Table 29 displays an analysis of the factors driving the change during 2011 in the estimated fair value of our net derivative liability related to our risk management derivatives recorded in our consolidated balance sheets.

TREASURY-2523

**Table 29:    Changes in Risk Management Derivative Assets (Liabilities) at Fair Value, Net**

| | For the Year Ended December 31, 2011 |
| --- | --- |
| | (Dollars in millions) |
| Net risk management derivative liability as of December 31, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $    (789) |
| Effect of cash payments: | |
| Fair value at inception of contracts entered into during the period, net[1] . . . . . . . . . . . . . . . . . . . . . . . | 44 |
| Fair value at date of termination of contracts settled during the period, net[2] . . . . . . . . . . . . . . . . . . . . | 1,103 |
| Net collateral posted  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,218 |
| Periodic net cash contractual interest payments[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,377 |
| Total cash payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,742 |
| Statement of operations impact of recognized amounts: | |
| Net contractual interest expense accruals on interest rate swaps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,185) |
| Net change in fair value during the period  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (3,954) |
| Risk management derivatives fair value losses, net  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (6,139) |
| Net risk management derivative liability as of December 31, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $    (186) |

[1]    Cash receipts from sale of derivative option contracts increase the derivative liability recorded in our consolidated balance sheets. Cash payments made to purchase derivative option contracts (purchased option premiums) increase the derivative asset recorded in our consolidated balance sheets.

[2]    Cash payments made to terminate derivative contracts reduce the derivative liability recorded in our consolidated balance sheets. Primarily represents cash paid (received) upon termination of derivative contracts.

[3]    Interest is accrued on interest rate swap contracts based on the contractual terms. Accrued interest income increases our derivative asset and accrued interest expense increases our derivative liability. The offsetting interest income and expense are included as components of derivatives fair value losses, net in our consolidated statements of operations and comprehensive loss. Net periodic interest receipts reduce the derivative asset and net periodic interest payments reduce the derivative liability. Also includes cash paid (received) on other derivatives contracts.

For additional information on our derivative instruments, see "Consolidated Results of Operations—Fair Value (Losses) Gains, Net," "Risk Management—Market Risk Management, Including Interest Rate Risk Management" and "Note 9, Derivative Instruments."

**Stockholders' Deficit**

Our net deficit increased as of December 31, 2011 compared with December 31, 2010. See Table 30 in "Supplemental Non-GAAP Information—Fair Value Balance Sheets" for details of the change in our net deficit.

## SUPPLEMENTAL NON-GAAP INFORMATION—FAIR VALUE BALANCE SHEETS

As part of our disclosure requirements with FHFA, we disclose on a quarterly basis supplemental non-GAAP consolidated fair value balance sheets, which reflect our assets and liabilities at estimated fair value.

Table 30 summarizes changes in our stockholders' deficit reported in our GAAP consolidated balance sheets and in the fair value of our net assets in our non-GAAP consolidated fair value balance sheets for the year ended December 31, 2011. The estimated fair value of our net assets is calculated based on the difference between the fair value of our assets and the fair value of our liabilities, adjusted for noncontrolling interests. We use various valuation techniques to estimate fair value, some of which incorporate internal assumptions that are subjective and involve a high degree of management judgment. We describe the specific valuation techniques used to determine fair value and disclose the carrying value and fair value of our financial assets and liabilities in "Note 18, Fair Value."

- 129 -

**Table 30:   Comparative Measures—GAAP Change in Stockholders' Deficit and Non-GAAP Change in Fair Value of Net Assets (Net of Tax Effect)**

|  | For Year Ended |
|---|---|
|  | (Dollars in millions) |
| **GAAP consolidated balance sheets:** |  |
| Fannie Mae stockholders' deficit as of December 31, 2010[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $   (2,599) |
| Total comprehensive loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (16,408) |
| Capital transactions:[2] |  |
|     Funds received from Treasury under the senior preferred stock purchase agreement . . . . . . . . . . . . . . | 23,978 |
|     Senior preferred stock dividends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (9,613) |
| Capital transactions, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,365 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 |
| Fannie Mae stockholders' deficit as of December 31, 2011[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $   (4,624) |
| **Non-GAAP consolidated fair value balance sheets:** |  |
| Estimated fair value of net assets as of December 31, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(120,294) |
| Capital transactions, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,365 |
| Change in estimated fair value of net assets, excluding capital transactions . . . . . . . . . . . . . . . . . . . . . . | (21,919) |
| Decrease in estimated fair value of net assets, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (7,554) |
| Estimated fair value of net assets as of December 31, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(127,848) |

---

[1]   Our net worth, as defined under the senior preferred stock purchase agreement, is equivalent to the "Total deficit" amount reported in our consolidated balance sheets. Our net worth, or total deficit, consists of "Total Fannie Mae's stockholders' deficit" and "Noncontrolling interests" reported in our consolidated balance sheets.

[2]   Represents capital transactions, which are reported in our consolidated financial statements.

During 2011, the fair value of our net assets, excluding capital transactions, decreased by $21.9 billion. The decrease was attributable to a net decrease in the fair value of credit-related items, primarily due to declining actual and expected home prices. The continued and extended worsening home price environment contributed to higher expectations of default and lower recoveries, particularly for underwater and nonperforming loans. The volatile interest rate environment also contributed to a decline in the fair value of credit-related assets by affecting the rate used to discount expected losses to present value. These credit-related effects were partially offset by an increase in the fair value of the net portfolio attributable to the positive impact of the spread between mortgage assets and associated debt and derivatives.

### Cautionary Language Relating to Supplemental Non-GAAP Financial Measures

In reviewing our non-GAAP consolidated fair value balance sheets, there are a number of important factors and limitations to consider. The estimated fair value of our net assets is calculated as of a particular point in time based on our existing assets and liabilities. It does not incorporate other factors that may have a significant impact on our long-term fair value, including revenues generated from future business activities in which we expect to engage, the value from our foreclosure and loss mitigation efforts or the impact that legislation or potential regulatory actions may have on us. As a result, the estimated fair value of our net assets presented in our non-GAAP consolidated fair value balance sheets does not represent an estimate of our net realizable value, liquidation value or our market value as a whole. Amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary materially from the estimated fair values presented in our non-GAAP consolidated fair value balance sheets.

In addition, the fair value of our net assets attributable to common stockholders presented in our fair value balance sheet does not represent an estimate of the value we expect to realize from operating the company or

TREASURY-2525

what we expect to draw from Treasury under the terms of our senior preferred stock purchase agreement, primarily because:

- The estimated fair value of our credit exposures significantly exceeds our projected credit losses as fair value takes into account certain assumptions about liquidity and required rates of return that a market participant may demand in assuming a credit obligation. Because we do not generally intend to have other parties assume the credit risk inherent in our book of business, and therefore would not be obligated to pay a market premium for its assumption, we do not expect the current market premium portion of our current estimate of fair value to impact future Treasury draws;

- The fair value balance sheet does not reflect amounts we expect to draw in the future to pay dividends on the senior preferred stock; and

- The fair value of our net assets reflects a point in time estimate of the fair value of our existing assets and liabilities, and does not incorporate the value associated with new business that may be added in the future.

The fair value of our net assets is not a measure defined within GAAP and may not be comparable to similarly titled measures reported by other companies.

TREASURY-2526

## Supplemental Non-GAAP Consolidated Fair Value Balance Sheets

We display our non-GAAP fair value balance sheets in Table 31 below.

**Table 31:   Supplemental Non-GAAP Consolidated Fair Value Balance Sheets**

| | As of December 31, 2011 | | | As of December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | GAAP Carrying Value | Fair Value Adjustment[1] | Estimated Fair Value | GAAP Carrying Value | Fair Value Adjustment[1] | Estimated Fair Value |
| | | | (Dollars in millions) | | | |
| **Assets:** | | | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . | $ 68,336 | $ — | $ 68,336 | $ 80,975 | $ — | $ 80,975 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . . | 46,000 | — | 46,000 | 11,751 | — | 11,751 |
| Trading securities . . . . . . . . . . . . . . . . . . . . . . . | 74,198 | — | 74,198 | 56,856 | — | 56,856 |
| Available-for-sale securities . . . . . . . . . . . . . . . . | 77,582 | — | 77,582 | 94,392 | — | 94,392 |
| Mortgage loans: | | | | | | |
| Mortgage loans held for sale . . . . . . . . . . . . . . | 311 | 14 | 325 | 915 | — | 915 |
| Mortgage loans held for investment, net of allowance for loan losses: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . | 322,825 | (27,829) | 294,996 | 358,698 | (39,331) | 319,367 |
| Of consolidated trusts . . . . . . . . . . . . . . . | 2,575,485 | 76,540[2] | 2,652,025[3] | 2,564,107 | 46,038[2] | 2,610,145[3] |
| Total mortgage loans . . . . . . . . . . . . . . . . . . . . | 2,898,621 | 48,725 | 2,947,346[4] | 2,923,720 | 6,707 | 2,930,427[4] |
| Advances to lenders . . . . . . . . . . . . . . . . . . . . . | 5,538 | (118) | 5,420[5][6] | 7,215 | (225) | 6,990[5][6] |
| Derivative assets at fair value . . . . . . . . . . . . . . | 561 | — | 561[5][6] | 1,137 | — | 1,137[5][6] |
| Guaranty assets and buy-ups, net . . . . . . . . . . . . | 503 | 398 | 901[5][6] | 458 | 356 | 814[5][6] |
| Total financial assets . . . . . . . . . . . . . . . . . | 3,171,339 | 49,005 | 3,220,344[7] | 3,176,504 | 6,838 | 3,183,342[7] |
| Credit enhancements . . . . . . . . . . . . . . . . . . . . . | 455 | 2,550 | 3,005[5][6] | 479 | 3,286 | 3,765[5][6] |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . | 39,690 | (258) | 39,432[5][6] | 44,989 | (261) | 44,728[5][6] |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . | $3,211,484 | $ 51,297 | $3,262,781 | $3,221,972 | $ 9,863 | $3,231,835 |
| **Liabilities:** | | | | | | |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . . . . . . . . . . | $ — | $ — | $ — | $ 52 | $ (1) | $ 51 |
| Short-term debt: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . | 146,752 | 30 | 146,782 | 151,884 | 90 | 151,974 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . | 4,973 | — | 4,973 | 5,359 | — | 5,359 |
| Long-term debt: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . | 585,692[8] | 28,291 | 613,983 | 628,160[8] | 21,524 | 649,684 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . | 2,452,455[8] | 144,202[2] | 2,596,657 | 2,411,597[8] | 103,332[2] | 2,514,929 |
| Derivative liabilities at fair value . . . . . . . . . . . . | 916 | — | 916[9][10] | 1,715 | — | 1,715[9][10] |
| Guaranty obligations . . . . . . . . . . . . . . . . . . . . . | 811 | 3,133 | 3,944[9][10] | 769 | 3,085 | 3,854[9][10] |
| Total financial liabilities . . . . . . . . . . . . . . . . | 3,191,599 | 175,656 | 3,367,255[7] | 3,199,536 | 128,030 | 3,327,566[7] |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . . . . | 24,456 | (1,135) | 23,321[9][10] | 24,953 | (472) | 24,481[9][10] |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . | 3,216,055 | 174,521 | 3,390,576 | 3,224,489 | 127,558 | 3,352,047 |
| **Equity (deficit):** | | | | | | |
| Fannie Mae stockholders' equity (deficit): | | | | | | |
| Senior preferred[11] . . . . . . . . . . . . . . . . . . . . . . . . | 112,578 | — | 112,578 | 88,600 | — | 88,600 |
| Preferred . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19,130 | (18,163) | 967 | 20,204 | (19,829) | 375 |
| Common . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (136,332) | (105,061) | (241,393) | (111,403) | (97,866) | (209,269) |
| **Total Fannie Mae stockholders' deficit/non-GAAP fair value of net assets** . . . . . . . . . | $ (4,624) | $(123,224) | $ (127,848) | $ (2,599) | $(117,695) | $ (120,294) |
| Noncontrolling interests . . . . . . . . . . . . . . . . . . | 53 | — | 53 | 82 | — | 82 |
| Total deficit . . . . . . . . . . . . . . . . . . . . . . . . . | (4,571) | (123,224) | (127,795) | (2,517) | (117,695) | (120,212) |
| Total liabilities and equity (deficit) . . . . . . . . . | $3,211,484 | $ 51,297 | $3,262,781 | $3,221,972 | $ 9,863 | $3,231,835 |

TREASURY-2527

---

**Explanation and Reconciliation of Non-GAAP Measures to GAAP Measures**

[1] Each of the amounts listed as a "fair value adjustment" represents the difference between the carrying value included in our GAAP consolidated balance sheets and our best judgment of the estimated fair value of the listed item.

[2] Fair value of consolidated loans is impacted by credit risk, which has no corresponding impact on the consolidated debt.

[3] Includes certain mortgage loans that we elected to report at fair value in our GAAP consolidated balance sheets of $3.6 billion and $3.0 billion as of December 31, 2011 and 2010, respectively.

[4] Performing loans had a fair value of $2.8 trillion and an unpaid principal balance of $2.7 trillion as of December 31, 2011 and 2010. Nonperforming loans, which for the purposes of our non-GAAP fair value balance sheets consists of loans that are delinquent by one or more payments, had a fair value of $128.9 billion and an unpaid principal balance of $226.5 billion as of December 31, 2011 compared with a fair value of $168.5 billion and an unpaid principal balance of $287.4 billion as of December 31, 2010. See "Note 18, Fair Value" for additional information on valuation techniques for performing and nonperforming loans.

[5] The following line items: (a) Advances to lenders; (b) Derivative assets at fair value; (c) Guaranty assets and buy-ups, net; (d) Credit enhancements; and (e) Other assets, together consist of the following assets presented in our GAAP consolidated balance sheets: (a) Accrued interest receivable, net; (b) Acquired property, net; and (c) Other assets.

[6] "Other assets" include the following GAAP consolidated balance sheets line items: (a) Accrued interest receivable, net and (b) Acquired property, net. The carrying value of these items in our GAAP consolidated balance sheets totaled $21.4 billion and $27.5 billion as of December 31, 2011 and 2010, respectively. "Other assets" in our GAAP consolidated balance sheets include the following: (a) Advances to lenders; (b) Derivative assets at fair value; (c) Guaranty assets and buy-ups, net; and (d) Credit enhancements. The carrying value of these items totaled $7.1 billion and $9.3 billion as of December 31, 2011 and 2010, respectively.

[7] We estimated the fair value of these financial instruments in accordance with the fair value accounting guidance as described in "Note 18, Fair Value."

[8] Includes certain long-term debt instruments that we elected to report at fair value in our GAAP consolidated balance sheets of $4.8 billion and $3.2 billion as of December 31, 2011 and 2010, respectively.

[9] The following line items: (a) Derivative liabilities at fair value; (b) Guaranty obligations; and (c) Other liabilities, consist of the following liabilities presented in our GAAP consolidated balance sheets: (a) Accrued interest payable and (b) Other liabilities.

[10] "Other liabilities" include Accrued interest payable in our GAAP consolidated balance sheets. The carrying value of this item in our GAAP consolidated balance sheets totaled $12.6 billion and $13.8 billion as of December 31, 2011 and 2010, respectively. We assume that certain other liabilities, such as deferred revenues, have no fair value. Although we report the "Reserve for guaranty losses" as part of "Other liabilities" in our GAAP consolidated balance sheets, it is incorporated into and reported as part of the fair value of our guaranty obligations in our non-GAAP supplemental consolidated fair value balance sheets. "Other liabilities" in our GAAP consolidated balance sheets include the following: (a) Derivative liabilities at fair value and (b) Guaranty obligations. The carrying value of these items totaled $1.7 billion and $2.5 billion as of December 31, 2011 and 2010, respectively.

[11] The amount included in "estimated fair value" of the senior preferred stock is the liquidation preference, which is the same as the GAAP carrying value, and does not reflect fair value.

## LIQUIDITY AND CAPITAL MANAGEMENT

### Liquidity Management

Our business activities require that we maintain adequate liquidity to fund our operations. Our liquidity risk management policy is designed to address our liquidity risk. Liquidity risk is the risk that we will not be able to meet our funding obligations in a timely manner. Liquidity risk management involves forecasting funding requirements, maintaining sufficient capacity to meet our needs based on our ongoing assessment of financial market liquidity and adhering to our regulatory requirements.

Our treasury function resides within the Capital Markets group and is responsible for implementing our liquidity and contingency planning strategies. See "Liquidity Risk Management Practices and Contingency Planning" for a discussion of our liquidity contingency plans. Also see "Risk Factors" in this report for a description of the risks associated with our liquidity risk and liquidity contingency planning.

TREASURY-2528

*Primary Sources and Uses of Funds*

Our primary source of funds is proceeds from the issuance of short-term and long-term debt securities. Accordingly, our liquidity depends largely on our ability to issue unsecured debt in the capital markets. Our status as a GSE and federal government support of our business continue to be essential to maintaining our access to the unsecured debt markets.

In addition to funding we obtain from the issuance of debt securities, our other sources of cash include:

- principal and interest payments received on mortgage loans, mortgage-related securities and non-mortgage investments we own;

- proceeds from the sale of mortgage-related securities, mortgage loans and non-mortgage assets, including proceeds from the sales of foreclosed real estate assets;

- funds from Treasury pursuant to the senior preferred stock purchase agreement;

- borrowings under secured and unsecured intraday funding lines of credit we have established with several large financial institutions;

- guaranty fees received on Fannie Mae MBS;

- borrowings against mortgage-related securities and other investment securities we hold pursuant to repurchase agreements and loan agreements;

- payments received from mortgage insurance counterparties; and

- net receipts on derivative instruments.

Our primary funding needs include:

- the repayment of matured, redeemed and repurchased debt;

- the purchase of mortgage loans (including delinquent loans from MBS trusts), mortgage-related securities and other investments;

- interest payments on outstanding debt;

- dividend payments made to Treasury pursuant to the senior preferred stock purchase agreement;

- net payments on derivative instruments;

- the pledging of collateral under derivative instruments;

- administrative expenses; and

- losses incurred in connection with our Fannie Mae MBS guaranty obligations.

*Liquidity Risk Management Practices and Contingency Planning*

Our liquidity position could be adversely affected by many factors, both internal and external to our business, including: actions taken by our conservator, the Federal Reserve, U.S. Treasury or other government agencies; legislation relating to us or our business; a U.S. government payment default on its debt obligations; a downgrade in the credit ratings of our senior unsecured debt or the U.S government's debt from the major ratings organizations; a systemic event leading to the withdrawal of liquidity from the market; an extreme market-wide widening of credit spreads; public statements by key policy makers; a significant further decline in our net worth; loss of demand for our debt, or certain types of our debt, from a major group of investors; a significant credit event involving one of our major institutional counterparties; a sudden catastrophic operational failure in the financial sector; or elimination of our GSE status. See "Risk Factors" for a description of factors that could adversely affect our liquidity.

- 134 -

We conduct liquidity contingency planning to prepare for an event in which our access to the unsecured debt markets becomes limited. We plan for alternative sources of liquidity that are designed to allow us to meet our cash obligations without relying upon the issuance of unsecured debt.

As directed by FHFA, our liquidity management policies and practices require that we:

- maintain a portfolio of highly liquid securities to cover a minimum of 30 calendar days of net cash needs, assuming no access to the short- and long-term unsecured debt markets and other assumptions required by FHFA;

- maintain within our cash and other investments portfolio a daily balance of U.S. Treasury securities and/or cash with the Federal Reserve Bank of New York that has a redemption amount of at least 50% of the average of the previous three month-end balances of our cash and other investments portfolio (as adjusted in agreement with FHFA); and

- maintain a liquidity profile that meets or exceeds our projected 365-day net cash needs by supplementing liquidity holdings with unencumbered agency mortgage securities.

As of December 31, 2011, we were in compliance with each of the liquidity risk management policies and practices set forth above.

In addition to these FHFA requirements, we run routine operational testing of our ability to rely upon mortgage collateral to obtain financing. We enter into relatively small repurchase agreements in order to confirm that we have the operational and systems capability to do so. In addition, we have provided collateral in advance to a number of clearing banks in the event we seek to enter into repurchase agreements in the future. We do not, however, have committed repurchase agreements with specific counterparties, as historically we have not relied on this form of funding. As a result, our use of such facilities and our ability to enter into them in significant dollar amounts may be challenging in a stressed market environment. See "Risk Factors" for the risks associated with our ability to fund operations.

See "Cash and Other Investments Portfolio" and "Unencumbered Mortgage Portfolio" for further discussions of our alternative sources of liquidity if our access to the debt markets were to become limited.

### Debt Funding

We separately present the debt from consolidations ("debt of consolidated trusts") and the debt issued by us ("debt of Fannie Mae") in our consolidated balance sheets and in the debt tables below. Our discussion regarding debt funding in this section focuses on the debt of Fannie Mae. We fund our business primarily through the issuance of short-term and long-term debt securities in the domestic and international capital markets. Because debt issuance is our primary funding source, we are subject to "roll-over," or refinancing, risk on our outstanding debt.

We have a diversified funding base of domestic and international investors. Purchasers of our debt securities are geographically diversified and include fund managers, commercial banks, pension funds, insurance companies, foreign central banks, corporations, state and local governments, and other municipal authorities.

Although our funding needs may vary from quarter to quarter depending on market conditions, we currently expect our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirement of the senior preferred stock purchase agreement that we reduce our mortgage portfolio 10% per year until it reaches $250 billion.

#### Fannie Mae Debt Funding Activity

Table 32 displays the activity in the debt of Fannie Mae for the periods indicated. This activity includes federal funds purchased and securities sold under agreements to repurchase but excludes the debt of consolidated trusts

as well as intraday loans. The reported amounts of debt issued and paid off during the period represent the face amount of the debt at issuance and redemption, respectively. Activity for short-term debt of Fannie Mae relates to borrowings with an original contractual maturity of one year or less while activity for long-term debt of Fannie Mae relates to borrowings with an original contractual maturity of greater than one year.

**Table 32:   Activity in Debt of Fannie Mae**

| | For the Year Ended December 31, | | |
| | 2011 | 2010 | 2009 |
| --- | --- | --- | --- |
| | (Dollars in millions) | | |
| Issued during the period: | | | |
| Short-term:[1] | | | |
| Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $424,503 | $451,289 | $1,381,640 |
| Weighted-average interest rate . . . . . . . . . . . . . . . . . . . . . . . . | 0.12% | 0.25% | 0.18% |
| Long-term: | | | |
| Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $256,670 | $463,157 | $  295,147 |
| Weighted-average interest rate . . . . . . . . . . . . . . . . . . . . . . . . | 1.72% | 1.88% | 2.52% |
| Total issued: | | | |
| Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $681,173 | $914,446 | $1,676,787 |
| Weighted-average interest rate . . . . . . . . . . . . . . . . . . . . . . . . | 0.72% | 1.08% | 0.59% |
| Paid off during the period:[2] | | | |
| Short-term:[1] | | | |
| Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $429,711 | $499,828 | $1,513,683 |
| Weighted-average interest rate . . . . . . . . . . . . . . . . . . . . . . . . | 0.19% | 0.23% | 0.51% |
| Long-term: | | | |
| Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $302,473 | $406,267 | $  260,578 |
| Weighted-average interest rate . . . . . . . . . . . . . . . . . . . . . . . . | 2.52% | 3.16% | 4.09% |
| Total paid off: | | | |
| Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $732,184 | $906,095 | $1,774,261 |
| Weighted-average interest rate . . . . . . . . . . . . . . . . . . . . . . . . | 1.15% | 1.54% | 1.04% |

---

[1]   The amount of short-term debt issued and paid off for the year ended 2009 included $766.8 billion of debt issued and repaid to Fannie Mae MBS trusts.

[2]   Consists of all payments on debt, including regularly scheduled principal payments, payments at maturity, payments resulting from calls and payments for any other repurchases. Calls and repurchases of zero-coupon debt are reported at original face value, which does not equal the amount of actual cash payment.

Due to the adoption of the consolidation accounting guidance in 2010, we no longer include debt issued and repaid to Fannie Mae MBS trusts in our short-term debt activity, as the substantial majority of our MBS trusts were consolidated and the underlying assets and debt of these trusts were recognized in our consolidated balance sheets. In 2009, short-term debt activity of Fannie Mae, excluding debt issued and repaid to Fannie Mae MBS trusts, consisted of issuances of $614.6 billion with a weighted-average interest rate of 0.27% and repayments of $746.6 billion with a weighted-average interest rate of 0.93%.

Debt funding activity in 2011 decreased compared with 2010 primarily due to lower funding needs as a result of (1) a reduction in the size of our mortgage portfolio pursuant to the requirements of the senior preferred stock purchase agreement, (2) a decrease in our redemption of debt with higher interest rates, which we replaced with issuances of debt with lower interest rates, and (3) a decrease in our purchases of delinquent loans from MBS

- 136 -

trusts. Additionally, our debt funding needs were lower than would otherwise have been required as a result of funds we received from Treasury under the senior preferred stock purchase agreement.

Our ability to issue long-term debt has been strong primarily due to actions taken by the federal government to support us and the financial markets. We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations. In February 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. For more information on GSE reform, see "Legislative and Regulatory Developments—GSE Reform."

In addition, due to our reliance on the U.S. government's support, our access to debt funding or the cost of our debt funding could be materially adversely affected by a change or perceived change in the creditworthiness of the U.S. government. A downgrade in our credit ratings could reduce demand for our debt securities and increase our borrowing costs. S&P's downgrade of our credit rating on August 8, 2011, which was a result of a similar action on the U.S. government's sovereign credit rating, has not adversely affected our access to debt funding or the cost of our debt funding. See our discussion of credit ratings in "Risk Factors" for information about factors that may lead to the U.S. government's long-term debt rating being lowered, and "Credit Ratings" for further discussion of our dependence on our credit ratings.

Future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll-over risk and have a material adverse impact on our liquidity, financial condition and results of operations. See "Risk Factors" for a discussion of the risks we face relating to (1) the uncertain future of our company; (2) our reliance on the issuance of debt securities to obtain funds for our operations and the relative cost to obtain these funds; and (3) our liquidity contingency plans.

*Outstanding Debt*

Total outstanding debt of Fannie Mae includes federal funds purchased and securities sold under agreements to repurchase and short-term and long-term debt, excluding debt of consolidated trusts.

As of December 31, 2011, our outstanding short-term debt, based on its original contractual maturity, as a percentage of our total outstanding debt increased to 20% from 19% as of December 31, 2010. For information on our outstanding debt maturing within one year, including the current portion of our long-term debt, as a percentage of our total debt, see "Maturity Profile of Outstanding Debt of Fannie Mae." In addition, the weighted-average interest rate on our long-term debt, based on its original contractual maturity, decreased to 2.42% as of December 31, 2011 from 2.77% as of December 31, 2010.

Pursuant to the terms of the senior preferred stock purchase agreement, we are prohibited from issuing debt without the prior consent of Treasury if it would result in our aggregate indebtedness exceeding our outstanding debt limit, which is 120% of the amount of mortgage assets we were allowed to own on December 31 of the immediately preceding calendar year. Our debt limit under the senior preferred stock purchase agreement was reduced to $972 billion in 2011. As of December 31, 2011, our aggregate indebtedness totaled $742.3 billion, which was $229.7 billion below our debt limit. The calculation of our indebtedness for purposes of complying with our debt limit reflects the unpaid principal balance and excludes debt basis adjustments and debt of consolidated trusts. Because of our debt limit, we may be restricted in the amount of debt we issue to fund our operations.

- 137 -

Table 33 displays information as of December 31, 2011 and 2010 on our outstanding short-term and long-term debt based on its original contractual terms.

**Table 33:   Outstanding Short-Term Borrowings and Long-Term Debt**[1]

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2011** | | | **2010** | | |
| | Maturities | Outstanding | Weighted-Average Interest Rate | Maturities | Outstanding | Weighted-Average Interest Rate |
| | | | (Dollars in millions) | | | |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . | — | $   — | —% | — | $   52 | 2.20% |
| Short-term debt: | | | | | | |
| Fixed-rate: | | | | | | |
| Discount notes . . . . . . . . . . . . . . . . . . | — | $ 146,301 | 0.13% | — | $ 151,500 | 0.32% |
| Foreign exchange discount notes . . . . . | — | 371 | 1.88 | — | 384 | 2.43 |
| Other [2] . . . . . . . . . . . . . . . . . . . . . . . . | — | 80 | 0.04 | — | — | — |
| Total short-term debt of Fannie Mae[3] . . . . . | | 146,752 | 0.13 | | 151,884 | 0.32 |
| Debt of consolidated trusts . . . . . . . . . . . . | — | 4,973 | 0.09 | — | 5,359 | 0.23 |
| Total short-term debt . . . . . . . . . . . . . . . . | | $ 151,725 | 0.13% | | $ 157,243 | 0.32% |
| Long-term debt: | | | | | | |
| Senior fixed: | | | | | | |
| Benchmark notes and bonds . . . . . . . . | 2012 - 2030 | $ 277,146 | 2.81% | 2011 - 2030 | $ 300,344 | 3.20% |
| Medium-term notes[4] . . . . . . . . . . . . . | 2012 -2021 | 176,886 | 1.61 | 2011 -2020 | 199,266 | 2.13 |
| Foreign exchange notes and bonds . . . | 2021 -2028 | 662 | 5.44 | 2017 -2028 | 1,177 | 6.21 |
| Other[5][6] . . . . . . . . . . . . . . . . . . . . . . . | 2012 -2040 | 50,912 | 5.29 | 2011 -2040 | 44,893 | 5.64 |
| Total senior fixed . . . . . . . . . . . . . . | | 505,606 | 2.64 | | 545,680 | 3.02 |
| Senior floating: | | | | | | |
| Medium-term notes[4] . . . . . . . . . . . . . | 2012 - 2016 | 71,855 | 0.32 | 2011 -2015 | 72,039 | 0.31 |
| Other[5][6] . . . . . . . . . . . . . . . . . . . . . . . | 2020 -2037 | 420 | 8.01 | 2020 -2037 | 386 | 4.92 |
| Total senior floating . . . . . . . . . . . . | | 72,275 | 0.35 | | 72,425 | 0.34 |
| Subordinated fixed-rate: | | | | | | |
| Qualifying subordinated[7] . . . . . . . . . . | 2012 -2014 | 4,894 | 5.08 | 2011 -2014 | 7,392 | 5.47 |
| Subordinated debentures . . . . . . . . . . | 2019 | 2,917 | 9.91 | 2019 | 2,663 | 9.91 |
| Total subordinated fixed-rate . . . . . . | | 7,811 | 6.88 | | 10,055 | 6.65 |
| Total long-term debt of Fannie Mae[8] . . . . . | | 585,692 | 2.42 | | 628,160 | 2.77 |
| Debt of consolidated trusts[6] . . . . . . . . . . . | 2012 -2051 | 2,452,455 | 4.18 | 2011 - 2051 | 2,411,597 | 4.59 |
| Total long-term debt . . . . . . . . . . . . . . . . . | | $3,038,147 | 3.84% | | $3,039,757 | 4.22% |
| Outstanding callable debt of Fannie Mae[9] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | $ 187,937 | 2.17% | | $ 219,804 | 2.53% |

[1]   Outstanding debt amounts and weighted-average interest rates reported in this table include the effect of unamortized discounts, premiums and other cost basis adjustments. Reported amounts include fair value gains and losses associated with debt that we elected to carry at fair value. The unpaid principal balance of outstanding debt of Fannie Mae, which

TREASURY-2533

excludes unamortized discounts, premiums and other cost basis adjustments and debt of consolidated trusts, totaled $741.6 billion and $792.6 billion as of December 31, 2011 and 2010, respectively.

[2] Includes foreign exchange discount notes denominated in U.S. dollars.

[3] Short-term debt of Fannie Mae consists of borrowings with an original contractual maturity of one year or less and, therefore, does not include the current portion of long-term debt. Reported amounts include a net discount and other cost basis adjustments of $53 million and $128 million as of December 31, 2011 and 2010, respectively.

[4] Includes long-term debt with an original contractual maturity of greater than 1 year and up to 10 years, excluding zero-coupon debt.

[5] Includes long-term debt that is not included in other debt categories.

[6] Includes a portion of structured debt instruments that is reported at fair value.

[7] Consists of subordinated debt with an interest deferral feature.

[8] Long-term debt of Fannie Mae consists of borrowings with an original contractual maturity of greater than one year. Reported amounts include the current portion of long-term debt that is due within one year, which totaled $134.3 billion and $95.4 billion as of December 31, 2011 and 2010, respectively. Reported amounts also include unamortized discounts, premiums and other cost basis adjustments of $9.2 billion and $12.4 billion as of December 31, 2011 and 2010, respectively. The unpaid principal balance of long-term debt of Fannie Mae, which excludes unamortized discounts, premiums, fair value adjustments and other cost basis adjustments and amounts related to debt of consolidated trusts, totaled $594.8 billion and $640.5 billion as of December 31, 2011 and 2010, respectively.

[9] Consists of long-term callable debt of Fannie Mae that can be paid off in whole or in part at our option or the option of the investor at any time on or after a specified date. Includes the unpaid principal balance, and excludes unamortized discounts, premiums and other cost basis adjustments.

Table 34 below displays additional information for each category of our short-term borrowings.

**Table 34:   Outstanding Short-Term Borrowings[1]**

| | 2011 | | | | |
|---|---|---|---|---|---|
| | As of December 31 | | Average During the Year | | |
| | Outstanding | Weighted Average Interest Rate | Outstanding[2] | Weighted Average Interest Rate | Maximum Outstanding[3] |
| | (Dollars in millions) | | | | |
| Federal funds purchased and securities sold under agreements to repurchase .................... | $      — | —% | $      10 | 0.11% | $     829 |
| Fixed-rate short-term debt: | | | | | |
| Discount notes ............................. | $146,301 | 0.13% | $160,358 | 0.18% | $198,382 |
| Foreign exchange discount notes ............... | 371 | 1.88 | 327 | 2.25 | 401 |
| Other[4] ...................................... | 80 | 0.04 | 9 | 0.06 | 80 |
| Total short-term debt ........................ | $146,752 | 0.13% | | | |

| | 2010 | | | | |
|---|---|---|---|---|---|
| | As of December 31 | | Average During the Year | | |
| | Outstanding | Weighted Average Interest Rate | Outstanding[2] | Weighted Average Interest Rate | Maximum Outstanding[3] |
| | (Dollars in millions) | | | | |
| Federal funds purchased and securities sold under agreements to repurchase .................... | $      52 | 2.20% | $      72 | 0.16% | $     200 |
| Fixed-rate short-term debt: | | | | | |
| Discount notes ............................. | $151,500 | 0.32% | $210,986 | 0.29% | $260,377 |
| Foreign exchange discount notes ............... | 384 | 2.43 | 299 | 1.86 | 384 |
| Other[4] ...................................... | — | — | 15 | 0.53 | 100 |
| Floating-rate short-term debt ................... | — | — | 8 | 0.02 | 50 |
| Total short-term debt ........................ | $151,884 | 0.32% | | | |

- 139 -

TREASURY-2534

| | As of December 31 | | Average During the Year | | |
|---|---|---|---|---|---|
| | | | **2009** | | |
| | Outstanding | Weighted Average Interest Rate | Outstanding[2] | Weighted Average Interest Rate | Maximum Outstanding[3] |
| | | | (Dollars in millions) | | |
| Federal funds purchased and securities sold under agreements to repurchase ..................... | $  — | —% | $  42 | 1.55% | $  189 |
| Fixed-rate short-term debt: | | | | | |
| Discount notes ............................. | $199,987 | 0.27% | $253,884 | 0.92% | $325,239 |
| Foreign exchange discount notes ............... | 300 | 1.50 | 222 | 1.41 | 300 |
| Other[4] ..................................... | 100 | 0.53 | 199 | 1.30 | 334 |
| Floating-rate short-term debt .................... | 50 | 0.02 | 2,744 | 1.20 | 3,136 |
| Total short-term debt ......................... | $200,437 | 0.27% | | | |

---

[1]   Includes unamortized discounts, premiums and other cost basis adjustments.

[2]   For 2011, average amount outstanding has been calculated using daily balances. For 2010 and 2009, average amount outstanding has been calculated using month-end balances.

[3]   For 2011, maximum outstanding represents the highest daily outstanding balance during the year. For 2010 and 2009, maximum outstanding represents the highest month-end outstanding balance during the year.

[4]   Includes foreign exchange discount notes denominated in U.S. dollars.

_Subordinated Debt_

We had $4.9 billion in outstanding qualifying subordinated debt as of December 31, 2011. Of this amount, $2.4 billion will mature during 2012. The terms of these securities state that, if our core capital is below 125% of our critical capital requirement (which it was as of December 31, 2011), we will defer interest payments on these securities. FHFA has directed us, however, to continue paying principal and interest on our outstanding qualifying subordinated debt during the conservatorship and thereafter until directed otherwise, regardless of our existing capital levels.

Under the senior preferred stock purchase agreement, we are prohibited from issuing additional subordinated debt without the written consent of Treasury. We did not issue any subordinated debt in 2011.

_Maturity Profile of Outstanding Debt of Fannie Mae_

Table 35 displays the maturity profile, as of December 31, 2011, of our outstanding debt maturing within one year, by month, including amounts we have announced for early redemption. Our outstanding debt maturing within one year, including the current portion of our long-term debt, increased as a percentage of our total outstanding debt, excluding debt of consolidated trusts and federal funds purchased and securities sold under agreements to repurchase, to 38% as of December 31, 2011, compared with 32% as of December 31, 2010. The weighted-average maturity of our outstanding debt that is maturing within one year was 158 days as of December 31, 2011, compared with 116 days as of December 31, 2010.

TREASURY-2535

**Table 35:    Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year[1]**



_____

[1]    Includes unamortized discounts, premiums and other cost basis adjustments of $110 million as of December 31, 2011. Excludes debt of consolidated trusts maturing within one year of $7.8 billion as of December 31, 2011.

Table 36 displays the maturity profile, as of December 31, 2011, of the portion of our long-term debt that matures in more than one year, on a quarterly basis for one year and on an annual basis thereafter, excluding amounts we have announced for early redemption within one year. The weighted-average maturity of our outstanding debt maturing in more than one year was approximately 59 months as of December 31, 2011 compared with approximately 58 months as of December 31, 2010.

**Table 36:    Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year[1]**

_____

[1]    Includes unamortized discounts, premiums and other cost basis adjustments of $9.1 billion as of December 31, 2011. Excludes debt of consolidated trusts of $2.4 trillion as of December 31, 2011.

We intend to repay our short-term and long-term debt obligations as they become due primarily through proceeds from the issuance of additional debt securities. We also intend to use funds we receive from Treasury under the senior preferred stock purchase agreement to pay our debt obligations and to pay dividends on the senior preferred stock.

- 141 -

TREASURY-2536

*Contractual Obligations*

Table 37 displays, by remaining maturity, our future cash obligations related to our long-term debt, announced calls, operating leases, purchase obligations and other material noncancelable contractual obligations as of December 31, 2011.

**Table 37:   Contractual Obligations**

| | Payment Due by Period as of December 31, 2011 | | | | |
| | Total | Less than 1 Year | 1 to < 3 Years | 3 to 5 Years | More than 5 Years |
|---|---|---|---|---|---|
| | (Dollars in millions) | | | | |
| Long-term debt obligations[1] | $585,692 | $134,277 | $246,612 | $114,425 | $ 90,378 |
| Contractual interest on long-term debt obligations[2] | 80,596 | 11,996 | 18,386 | 12,322 | 37,892 |
| Operating lease obligations[3] | 120 | 36 | 43 | 26 | 15 |
| Purchase obligations: | | | | | |
| Mortgage commitments[4] | 45,530 | 45,517 | 13 | — | — |
| Other purchase obligations[5] | 234 | 158 | 72 | 4 | — |
| Other long-term liabilities reflected in the consolidated balance sheet[6] | 1,053 | 882 | 70 | 32 | 69 |
| Total contractual obligations | $713,225 | $192,866 | $265,196 | $126,809 | $128,354 |

[1] Represents the carrying amount of our long-term debt assuming payments are made in full at maturity. Amounts exclude $2.5 trillion in long-term debt from consolidations. Amounts include unamortized net discount and other cost basis adjustments of $9.2 billion.

[2] Excludes contractual interest on long-term debt from consolidations.

[3] Includes certain premises and equipment leases.

[4] Includes on- and off-balance sheet commitments to purchase mortgage loans and mortgage-related securities.

[5] Includes only unconditional purchase obligations that are subject to a cancellation penalty for certain telecom services, software and computer services, and other agreements. Excludes arrangements that may be cancelled without penalty. Amounts also include off-balance sheet commitments for the unutilized portion of lending agreements entered into with multifamily borrowers.

[6] Excludes risk management derivative transactions that may require cash settlement in future periods and our obligations to stand ready to perform under our guarantees relating to Fannie Mae MBS and other financial guarantees, because the amount and timing of payments under these arrangements are generally contingent upon the occurrence of future events. For a description of the amount of our on- and off-balance sheet Fannie Mae MBS and other financial guarantees as of December 31, 2011, see "Off-Balance Sheet Arrangements." Includes future cash payments due under our contractual obligations to fund LIHTC and other partnerships that are unconditional and legally binding and cash received as collateral from derivative counterparties, which are included in our consolidated balance sheets under "Other liabilities."

*Equity Funding*

As a result of the covenants under the senior preferred stock purchase agreement and Treasury's ownership of the warrant to purchase up to 79.9% of the total shares of our common stock outstanding, we no longer have access to equity funding except through draws under the senior preferred stock purchase agreement. For a description of the covenants under the senior preferred stock purchase agreement, see "Business—Conservatorship and Treasury Agreements—Treasury Agreements—Covenants Under Treasury Agreements." We discuss our funding under the senior preferred stock purchase agreement in "Capital Management—Capital Activity—Senior Preferred Stock Purchase Agreement."

TREASURY-2537

*Cash and Other Investments Portfolio*

Table 38 displays information on the composition of our cash and other investments portfolio for the periods indicated.

**Table 38:    Cash and Other Investments Portfolio**

| | As of December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009**[1] |
| | **(Dollars in millions)** | | |
| Cash and cash equivalents ................................................... | $ 17,539 | $17,297 | $ 6,812 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements ................................................ | 46,000 | 11,751 | 53,684 |
| Non-mortgage-related securities: | | | |
| U.S. Treasury securities[2] ................................................ | 47,737 | 27,432 | — |
| Asset-backed securities[3] ................................................ | 2,111 | 5,321 | 8,515 |
| Other ................................................................ | — | — | 367 |
| Total non-mortgage-related securities ..................................... | 49,848 | 32,753 | 8,882 |
| Total cash and other investments ........................................ | $113,387 | $61,801 | $69,378 |

---

[1]   Prior period amounts have been reclassified to conform to current year presentation. Other non-mortgage-related securities includes corporate debt securities.

[2]   Excludes $600 million and $4.0 billion of U.S. Treasury securities which are a component of cash equivalents as of December 31, 2011 and 2010, respectively, as these securities had a maturity at the date of acquisition of three months or less.

[3]   Includes securities primarily backed by credit cards loans, student loans and automobile loans.

Our cash and other investments portfolio increased in 2011 compared with 2010. We have increased the amount of cash and highly liquid non-mortgage securities held in our portfolio to bolster our liquidity position. See "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management—Issuers of Investments Held in our Cash and Other Investments Portfolio" for additional information on the risks associated with the assets in our cash and other investments portfolio.

*Unencumbered Mortgage Portfolio*

Another potential source of liquidity in the event our access to the unsecured debt market becomes impaired is the unencumbered mortgage assets in our mortgage portfolio, which could be sold or used as collateral for secured borrowing. We believe that the amount of mortgage-related assets that we could successfully sell or borrow against in the event of a liquidity crisis or significant market disruption is substantially lower than the amount of mortgage-related assets we hold. Our ability to sell whole loans from our mortgage portfolio is limited due to the credit-related issues of these loans, as well as operational constraints.

While our liquidity contingency planning attempts to address stressed market conditions and our status under conservatorship and Treasury arrangements, we believe that our liquidity contingency plans may be difficult or impossible to execute for a company of our size in our circumstances. See "Risk Factors" for a description of the risks associated with our liquidity contingency planning.

*Credit Ratings*

Our credit ratings from the major credit ratings organizations, as well as the credit ratings of the U.S. government, are primary factors that could affect our ability to access the capital markets and our cost of funds. In addition, our credit ratings are important when we seek to engage in certain long-term transactions, such as derivative transactions. S&P, Moody's and Fitch have all indicated that, if they were to lower the sovereign

TREASURY-2538

credit ratings on the U.S, they would likely lower their ratings on the debt of Fannie Mae and certain other government-related entities.

On November 28, 2011, Fitch affirmed the U.S. Issuer Default Rating ("IDR") as "AAA" and revised the rating outlook to negative. Following this action, and due to our direct reliance on the U.S. government for capital support, Fitch affirmed our long-term IDR as "AAA" and revised our rating outlook from stable to negative.

On August 5, 2011, S&P lowered the long-term sovereign credit rating on the U.S. to "AA+." As a result of this action, and due to our direct reliance on the U.S. government for capital support, on August 8, 2011, S&P lowered our long-term senior debt rating to "AA+" with a negative outlook. Previously, our long-term senior debt had been rated by S&P as "AAA" and had been on CreditWatch Negative. S&P affirmed our short-term senior debt rating of "A-1+" and removed it from CreditWatch Negative.

On August 2, 2011, Moody's confirmed the U.S. government's rating and our long-term debt ratings. Moody's also removed the designation that these ratings were under review for possible downgrade and revised the rating outlook for both the U.S. government's rating and our long-term debt ratings to negative.

We cannot predict whether one or more of these ratings agencies will lower our debt ratings in the future. See "Risk Factors" for a discussion of the possibility of further downgrades and the risks to our business relating to a decrease in our credit ratings, which could include an increase in our borrowing costs, limits on our ability to issue debt, and additional collateral requirements under our derivatives contracts and other borrowing arrangements.

Table 39 displays the credit ratings issued by the three major credit rating agencies as of February 23, 2012.

**Table 39:   Fannie Mae Credit Ratings**

| | As of February 23, 2012 | | |
| | S&P | Moody's | Fitch |
| --- | --- | --- | --- |
| Long-term senior debt . . . . . . . . . | AA+ | Aaa | AAA |
| Short-term senior debt . . . . . . . . . | A-1+ | P-1 | F1+ |
| Qualifying subordinated debt . . . | A | Aa2 | AA- |
| Preferred stock . . . . . . . . . . . . . . . | C | Ca | C/RR6 |
| Bank financial strength rating . . . | — | E+ | — |
| Outlook . . . . . . . . . . . . . . . . . . . . | Negative | Negative | Negative |
| | (for Long Term Senior Debt and Qualifying Subordinated Debt) | (for Long Term Senior Debt and Qualifying Subordinated Debt) | (for AAA rated Long Term Issuer Default Rating) |

We have no covenants in our existing debt agreements that would be violated by a downgrade in our credit ratings. However, in connection with certain derivatives counterparties, we could be required to provide additional collateral to or terminate transactions with certain counterparties in the event that our senior unsecured debt ratings are downgraded. The amount of additional collateral required depends on the contract and is usually a fixed incremental amount, the market value of the exposure, or both. See "Note 9, Derivative Instruments" for additional information on collateral we are required to provide to our derivatives counterparties in the event of downgrades in our credit ratings.

### Cash Flows

*Year Ended December 31, 2011.*   Cash and cash equivalents increased from December 31, 2010 by $242 million to $17.5 billion as of December 31, 2011. Net cash generated from investing activities totaled $464.4 billion, resulting primarily from proceeds received from repayments of loans held for investment. These net cash inflows were offset by net cash used in operating activities of $15.2 billion and net cash used in financing activities of $448.9 billion

TREASURY-2539

primarily attributable to a significant amount of debt redemptions in excess of proceeds received from the issuances of debt as well as proceeds received from Treasury under the senior preferred stock purchase agreement.

*Year Ended December 31, 2010.*   Cash and cash equivalents increased from December 31, 2009 by $10.5 billion to $17.3 billion as of December 31, 2010. Net cash generated from investing activities totaled $540.2 billion, resulting primarily from proceeds received from repayments of loans held for investment. These net cash inflows were partially offset by net cash used in operating activities of $27.4 billion resulting primarily from purchases of trading securities. The net cash used in financing activities of $502.3 billion was primarily attributable to a significant amount of debt redemptions in excess of proceeds received from the issuances of debt as well as proceeds received from Treasury under the senior preferred stock purchase agreement.

**Capital Management**

***Regulatory Capital***

FHFA has announced that, during the conservatorship, our existing statutory and FHFA-directed regulatory capital requirements will not be binding and FHFA will not issue quarterly capital classifications. We submit capital reports to FHFA during the conservatorship and FHFA monitors our capital levels. We report our minimum capital requirement, core capital and GAAP net worth in our periodic reports on Form 10-Q and Form 10-K, and FHFA also reports them on its website. FHFA is not reporting on our critical capital, risk-based capital or subordinated debt levels during the conservatorship. For information on our minimum capital requirements see "Note 16, Regulatory Capital Requirements."

***Capital Activity***

Following our entry into conservatorship, FHFA advised us to manage to a positive net worth, which is represented as the "total deficit" line item in our consolidated balance sheets. Our ability to manage our net worth continues to be very limited. We are effectively unable to raise equity capital from private sources at this time and, therefore, are reliant on the senior preferred stock purchase agreement to address any net worth deficit.

*Senior Preferred Stock Purchase Agreement*

Under the senior preferred stock purchase agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. We have received a total of $111.6 billion from Treasury pursuant to the senior preferred stock purchase agreement as of December 31, 2011. The Acting Director of FHFA will submit a request for $4.6 billion from Treasury under the senior preferred stock purchase agreement to eliminate our net worth deficit as of December 31, 2011 and request the receipt of those funds on or prior to March 31, 2012. Upon receipt of the requested funds, the aggregate liquidation preference of the senior preferred stock, including the initial aggregate liquidation preference of $1.0 billion, will equal $117.1 billion.

We expect to have a net worth deficit in future periods and therefore will be required to obtain additional funding from Treasury pursuant to the senior preferred stock purchase agreement.

The senior preferred stock purchase agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any net worth deficiencies attributable to periods during 2010, 2011 and 2012. If we do not have a positive net worth as of December 31, 2012, then the amount of funding available under the senior preferred stock purchase agreement after 2012 will be $124.8 billion ($200 billion less $75.2 billion in cumulative draws for net worth deficiencies through December 31, 2009).

In the event we have a positive net worth as of December 31, 2012, then the amount of funding available after 2012 under the senior preferred stock purchase agreement will depend on the size of that positive net worth relative to the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, as follows:

- If our positive net worth as of December 31, 2012 is less than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less our positive net worth as of December 31, 2012.

- 145 -

- If our positive net worth as of December 31, 2012 is greater than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less the cumulative draws attributable to periods during 2010, 2011 and 2012.

As of February 29, 2012, the amount of the quarterly commitment fee payable by us to Treasury under the senior preferred stock purchase agreement had not been established; however, Treasury has waived the quarterly commitment fee under the senior preferred stock purchase agreement for each quarter of 2011 and the first quarter of 2012 due to the continued fragility of the U.S. mortgage market and Treasury's belief that imposing the commitment fee would not generate increased compensation for taxpayers. Treasury stated that it will reevaluate the situation during the next calendar quarter to determine whether to set the quarterly commitment fee for the remaining quarters of 2012.

*Dividends*

The conservator announced in September 2008 that we would not pay any dividends on the common stock or on any series of outstanding preferred stock. In addition, the senior preferred stock purchase agreement prohibits us from declaring or paying any dividends on Fannie Mae equity securities (other than the senior preferred stock) without the prior written consent of Treasury. Dividends on our outstanding preferred stock (other than the senior preferred stock) are non-cumulative; therefore, holders of this preferred stock are not entitled to receive any forgone dividends in the future.

Holders of the senior preferred stock are entitled to receive, when, as and if declared by our Board of Directors, cumulative quarterly cash dividends at the annual rate of 10% per year on the then-current liquidation preference of the senior preferred stock. Treasury is the current holder of our senior preferred stock. As conservator and under our charter, FHFA has authority to declare and approve dividends on the senior preferred stock. If at any time we do not pay cash dividends on the senior preferred stock when they are due, then immediately following the period we did not pay dividends and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be 12% per year. Dividends on the senior preferred stock that are not paid in cash for any dividend period will accrue and be added to the liquidation preference of the senior preferred stock.

Our fourth quarter dividend of $2.6 billion was declared by the conservator and paid by us on December 31, 2011. Upon receipt of the additional funds from Treasury in March 2012 that FHFA will request on our behalf, the annualized dividend on the senior preferred stock will be $11.7 billion based on the 10% dividend rate. The level of dividends on the senior preferred stock will increase in future periods if, as we expect, the conservator requests additional funds on our behalf from Treasury under the senior preferred stock purchase agreement.

**OFF-BALANCE SHEET ARRANGEMENTS**

We enter into certain business arrangements to facilitate our statutory purpose of providing liquidity to the secondary mortgage market and to reduce our exposure to interest rate fluctuations. Some of these arrangements are not recorded in our consolidated balance sheets or may be recorded in amounts different from the full contract or notional amount of the transaction, depending on the nature or structure of, and accounting required to be applied to, the arrangement. These arrangements are commonly referred to as "off-balance sheet arrangements" and expose us to potential losses in excess of the amounts recorded in our consolidated balance sheets.

Our off-balance sheet arrangements result primarily from the following:

- our guaranty of mortgage loan securitization and resecuritization transactions over which we do not have control;

- other guaranty transactions;

- liquidity support transactions; and

- partnership interests.

- 146 -

Our maximum potential exposure to credit losses relating to our outstanding and unconsolidated Fannie Mae MBS and other financial guarantees is primarily represented by the unpaid principal balance of the mortgage loans underlying outstanding and unconsolidated Fannie Mae MBS and other financial guarantees of $62.0 billion as of December 31, 2011 and $56.9 billion as of December 31, 2010.

For information on the mortgage loans underlying both our on- and off-balance sheet Fannie Mae MBS, as well as whole mortgage loans that we own, see "Risk Management—Credit Risk Management."

## Partnership Investment Interests

For partnership investments where we have determined that we are the primary beneficiary, we have consolidated these investments and recorded all of the partnership assets and liabilities in our consolidated balance sheets. The carrying value of our partnership investments, which primarily include investments in affordable rental and for-sale housing partnerships, totaled $1.4 billion as of December 31, 2011, compared with $1.8 billion as of December 31, 2010.

### LIHTC Partnership Interests

In most instances, we are not the primary beneficiary of our LIHTC partnership investments, and therefore our consolidated balance sheets reflect only our investment in the LIHTC partnership, rather than the full amount of the LIHTC partnership's assets and liabilities. FHFA informed us that, after consultation with Treasury, generally we are not authorized to sell or transfer our LIHTC partnership interests. Some exceptions to this rule exist in very limited circumstances and, in most cases, only with FHFA consent.

In the fourth quarter of 2009, we reduced the carrying value of our LIHTC partnership investments to zero, as we no longer had both the intent and ability to sell or otherwise transfer our LIHTC investments for value. However, we still have an obligation to fund our LIHTC partnership investments and have recorded such obligation as a liability in our financial statements. Our obligation to fund consolidated LIHTC partnerships was $53 million as of December 31, 2011 and $139 million as of December 31, 2010. Our obligation to fund unconsolidated LIHTC partnerships was $140 million as of December 31, 2011 and $141 million as of December 31, 2010. Our contributions to consolidated LIHTC partnerships were $34 million for the year ended December 31, 2011 and $114 million for the year ended December 31, 2010. Our contribution to unconsolidated LIHTC partnerships was $42 million for the year ended December 31, 2011 and $158 million for the year ended December 31, 2010. As a result of our current tax position, we currently are not making any new LIHTC investments, other than pursuant to commitments existing prior to 2008, and are not recognizing any tax benefits in our consolidated statements of operations associated with the tax credits and net operating losses. For additional information regarding our holdings in off-balance sheet limited partnerships and other off-balance sheet transactions, refer to "Note 2, Consolidations and Transfers of Financial Assets" and "Note 17, Concentrations of Credit Risk."

## Treasury Housing Finance Agency Initiative

During the fourth quarter of 2009, we entered into a memorandum of understanding with Treasury, FHFA and Freddie Mac pursuant to which we agreed to provide assistance to state and local housing finance agencies ("HFAs") through two primary programs, which together comprise what we refer to as the HFA initiative.

In November 2011, we entered into an Omnibus Consent to HFA Initiative Program Modifications with Treasury, Freddie Mac and FHFA pursuant to which the parties agreed to specified modifications to the HFA initiative programs, including a three-year extension of the expiration date for the temporary credit and liquidity facilities ("TCLFs") from December 2012 to December 2015, and a one-year extension of the expiration date for release of escrowed funds for the new issue bond ("NIB") program from December 31, 2011 to December 31, 2012. See "Certain Relationships and Related Transactions, and Director Independence—Transactions with Related Persons—Transactions with Treasury—Treasury Housing Finance Agency Initiative" for a discussion of the HFA initiative.

Pursuant to the TCLF program that we describe in "Related Parties" in "Note 1, Summary of Significant Accounting Policies," Treasury has purchased participation interests in TCLFs provided by us and Freddie Mac

- 147 -

to the HFAs. These facilities create a credit and liquidity backstop for the HFAs. Our outstanding commitments under the TCLF program totaled $3.0 billion as of December 31, 2011 and $3.7 billion as of December 31, 2010.

Our total outstanding liquidity commitments to advance funds for securities backed by multifamily housing revenue bonds totaled $16.8 billion as of December 31, 2011 and $17.8 billion as of December 31, 2010. These commitments require us to advance funds to third parties that enable them to repurchase tendered bonds or securities that are unable to be remarketed. Any repurchased securities are pledged to us to secure funding until the securities are remarketed. We hold cash and cash equivalents in our cash and other investments portfolio in excess of these commitments to advance funds (exclusive of our outstanding commitments under the HFA TCLFs program, for which we are not required to hold excess cash).

As of December 31, 2011 and 2010, there were no liquidity guarantee advances outstanding.

## RISK MANAGEMENT

Our business activities expose us to the following three major categories of financial risk: credit risk, market risk (including interest rate and liquidity risk) and operational risk. We seek to actively monitor and manage these risks by using an established risk management framework. Our risk management framework is intended to provide the basis for the principles that govern our risk management activities.

- *Credit Risk.*   Credit risk is the potential for financial loss resulting from the failure of a borrower or institutional counterparty to honor its financial or contractual obligations, resulting in a potential loss of earnings or cash flows. In regards to financial securities or instruments, credit risk is the risk of not receiving principal, interest or any other financial obligation on a timely basis, for any reason. Credit risk exists primarily in our mortgage credit book of business and derivatives portfolio.

- *Market Risk.*   Market risk is the exposure generated by adverse changes in the value of financial instruments caused by a change in market prices or interest rates. Two significant market risks we face and actively manage are interest rate risk and liquidity risk. Interest rate risk is the risk of changes in our long-term earnings or in the value of our assets due to fluctuations in interest rates. Liquidity risk is our potential inability to meet our funding obligations in a timely manner.

- *Operational Risk.*   Operational risk is the loss resulting from inadequate or failed internal processes, people, systems, or from external events.

We are also subject to a number of other risks that could adversely impact our business, financial condition, earnings and cash flow, including human capital, legal, regulatory and compliance, reputational, strategic and execution risks that may arise due to a failure to comply with laws, regulations or ethical standards and codes of conduct applicable to our business activities and functions. These risks are typically brought to the attention of our Management Committee, our Board of Directors or one or more of the Board's committees and, in some cases, FHFA for discussion.

Another risk that can impact our financial condition, earnings and cash flow is model risk, which is defined as the potential for model errors to adversely affect the company. This occurs because of our use of modeled estimations of future economic environments, borrower behavior or valuation methodologies. See "Risk Factors" for a discussion of the risks associated with our reliance on models.

Our risk management framework and governance structure are intended to provide comprehensive controls and ongoing management of the major risks inherent in our business activities. Our ability to identify, assess, mitigate and control, and report and monitor risk is crucial to our safety and soundness.

- *Risk Identification.*   Risk identification is the process of finding, recognizing and describing risk. The identification of risk facilitates effective risk management by achieving awareness of the sources, impact and magnitude of risk.

- *Risk Assessment.*   We assess risk using a variety of methodologies, such as calculation of potential losses from loans and stress tests relating to interest rate sensitivity. When we assess risk, we look at metrics such

- 148 -

as frequency, severity, concentration, correlation, volatility and loss. Information obtained from these assessments is reviewed on a regular basis to ensure that our risk assumptions are reasonable and reflect our current positions.

- *Risk Mitigation & Control.*   We proactively develop appropriate mitigation strategies to prevent excessive risk exposure, address risks that exceed established tolerances, and address risks that create unanticipated business impact. Mitigation strategies and controls can be in the form of reduction, transference, acceptance or avoidance of the identified risk. We also manage risk through four control elements that are designed to work in conjunction with each other: (1) risk policies, (2) risk limits, (3) delegations of authority, and (4) risk committees.

- *Risk Reporting & Monitoring.*   Our business units actively monitor emerging and identified risks that are taken when executing our strategies. Risks and concerns are reported to the appropriate level of management to ensure that the necessary action is taken to mitigate the risk.

**Enterprise Risk Governance**

Our enterprise risk management structure was reorganized in 2011, and we continue to work with FHFA to implement its final form. We intend the final structure to be designed to balance a strong corporate risk management philosophy, appetite and culture with a well-defined, independent risk management function. Our objective is to ensure that people and processes are organized in a way to promote a cross-functional approach to risk management and that controls are in place to better manage our risks and comply with legal and regulatory requirements.

Our enterprise risk governance structure consists of the Board of Directors, executive leadership, including the Chief Risk Officer, the Enterprise Risk Management division, designated officers responsible for managing our financial risks, business unit chief risk officers, and risk management committees. This structure is designed to encourage a culture of accountability within the divisions and promote effective risk management throughout the company.

Our organizational structure and risk management framework work in conjunction with each other to identify risk-related trends with respect to customers, products or portfolios and external events to develop appropriate strategies to mitigate emerging and identified risks.

*Board of Directors*

The Board's Risk Policy & Capital Committee provides oversight of enterprise risk management activities and pursuant to its charter, assists the Board in providing oversight of our risk management, including overseeing the management of credit, market and operational risk policies and limits. In addition, the Audit Committee reviews the system of internal controls that we rely upon to provide reasonable assurance of compliance with our enterprise risk management processes.

*Enterprise Risk Management Division*

Our Enterprise Risk Management division reports directly to the Chief Risk Officer who reports directly to the Chief Executive Officer. The Chief Risk Officer also reports independently to the Board's Risk Policy & Capital Committee. Enterprise Risk Management is responsible for the identification of emerging risks, the monitoring and reporting of risk within the existing policies and limits and independent oversight of risk management across the company.

We manage risk by using a "three line of defense" structure. The first line of defense is the active management of risk by the business unit. Each business unit is charged with conforming to the risk guidelines, risk appetite, risk policies and limits approved by the Board's Risk Policy & Capital Committee and the Management Committee, with additional oversight provided by FHFA. The second line of defense is Enterprise Risk Management, which is responsible for ensuring compliance with the risk framework and independently reporting on risk management

- 149 -

issues and performance. The third line of defense is Internal Audit, which is responsible for ensuring all parties are performing the actions for which they are accountable and for identifying any omissions or potential process improvements. Enterprise Risk Management reports independently to the Board's Risk Policy & Capital Committee and Internal Audit reports independently to the Board's Audit Committee.

### Risk Committees

We use our risk committees as a forum for discussing emerging risks, risk mitigation strategies, and communication across business lines. Risk committees enhance the risk management framework by reinforcing our risk management culture and providing accountability for the resolution of key risk issues and decisions. Each business risk committee is chaired by the head of the business unit. In addition, the business unit chief risk officer can be designated as the committee co-chair or as a member of the committee who is responsible for the oversight of the risks discussed. Committees are also populated with key business and risk leaders from the respective business units.

Our current committee structure includes four Enterprise Risk Committees (Credit Risk, Operational Risk, Model Oversight and Capital Markets Risk) and four Business Risk Committees (Underwriting & Pricing, Asset and Liability, Credit Portfolio Management Risk and Multifamily Risk Management).

### Internal Audit

Our Internal Audit group, under the direction of the Chief Audit Executive, provides an objective assessment of the design and execution of our internal control system, including our management systems, risk governance, and policies and procedures. The Chief Audit Executive reports directly and independently to the Audit Committee of the Board of Directors, and audit personnel are compensated based on objectives set for the group by the Audit Committee rather than corporate financial results or goals. The Chief Audit Executive reports administratively to the Chief Executive Officer and may be removed only upon approval by the Board's Audit Committee. Internal audit activities are designed to provide reasonable assurance that resources are safeguarded; that significant financial, managerial and operating information is complete, accurate and reliable; and that employee actions comply with our policies and applicable laws and regulations.

### Compliance and Ethics

The Compliance and Ethics division, under the direction of the Chief Compliance Officer, is dedicated to developing policies and procedures to help ensure that Fannie Mae and its employees comply with the law, our Code of Conduct, and all regulatory obligations. The Chief Compliance Officer reports directly to our Chief Executive Officer and independently to the Audit Committee of the Board of Directors, and Compliance and Ethics personnel are compensated on objectives set for the group by the Audit Committee of the Board of Directors rather than corporate financial results or goals. The Chief Compliance Officer may be removed only upon Board approval. The Chief Compliance Officer is responsible for overseeing our compliance activities; developing and promoting a code of ethical conduct; evaluating and investigating any allegations of misconduct; and overseeing and coordinating regulatory reporting and examinations.

## Credit Risk Management

We are generally subject to two types of credit risk: mortgage credit risk and institutional counterparty credit risk. Continuing adverse market conditions have resulted in significant exposure to mortgage and institutional counterparty credit risk. The metrics used to measure credit risk are generated using internal models. Our internal models require numerous assumptions and there are inherent limitations in any methodology used to estimate macroeconomic factors such as home prices, unemployment and interest rates and their impact on borrower behavior. When market conditions change rapidly and dramatically, the assumptions of our models may no longer accurately capture or reflect the changing conditions. On a continuous basis, management makes judgments about the appropriateness of the risk assessments indicated by the models. See "Risk Factors" for a discussion of the risks associated with our use of models.

*Mortgage Credit Risk Management*

Mortgage credit risk is the risk that a borrower will fail to make required mortgage payments. We are exposed to credit risk on our mortgage credit book of business because we either hold mortgage assets, have issued a guaranty in connection with the creation of Fannie Mae MBS backed by mortgage assets or provided other credit enhancements on mortgage assets. While our mortgage credit book of business includes all of our mortgage-related assets, both on- and off-balance sheet, our guaranty book of business excludes non-Fannie Mae mortgage-related securities held in our portfolio for which we do not provide a guaranty.

*Mortgage Credit Book of Business*

Table 40 displays the composition of our entire mortgage credit book of business as of the dates indicated. Our total single-family mortgage credit book of business accounted for 93% of our total mortgage credit book of business as of December 31, 2011 and 2010.

**Table 40:   Composition of Mortgage Credit Book of Business[1]**

| | As of December 31, 2011 | | | As of December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Single-Family | Multifamily | Total | Single-Family | Multifamily | Total |
| | (Dollars in millions) | | | | | |
| Mortgage loans and Fannie Mae MBS[2] . . . . . . . . . . . . . . . . . . . . . . | $2,798,633 | $176,898 | $2,975,531 | $2,826,994 | $170,552 | $2,997,546 |
| Unconsolidated Fannie Mae MBS, held by third parties[3] . . . . . . . . . . . . . . . | 17,910 | 1,702 | 19,612 | 19,468 | 1,855 | 21,323 |
| Other credit guarantees[4] . . . . . . . . . . . . | 25,824 | 16,582 | 42,406 | 18,625 | 16,994 | 35,619 |
| Guaranty book of business . . . . . . . . | $2,842,367 | $195,182 | $3,037,549 | $2,865,087 | $189,401 | $3,054,488 |
| Agency mortgage-related securities[5] . . . | 15,522 | 33 | 15,555 | 18,797 | 24 | 18,821 |
| Other mortgage-related securities . . . . . . | 43,019 | 31,511 | 74,530 | 48,678 | 34,205 | 82,883 |
| Mortgage credit book of business . . . . | $2,900,908 | $226,726 | $3,127,634 | $2,932,562 | $223,630 | $3,156,192 |
| **Guaranty Book of Business Detail:** | | | | | | |
| Conventional Guaranty Book of Business[6] . . . . . . . . . . . . . . . . . . . . | $2,769,919 | $192,797 | $2,962,716 | $2,790,590 | $186,712 | $2,977,302 |
| Government Guaranty Book of Business[7] . . . . . . . . . . . . . . . . . . . . | $  72,448 | $  2,385 | $  74,833 | $  74,497 | $  2,689 | $  77,186 |

[1]   Based on unpaid principal balance. Prior period amounts have been reclassified to conform to the current period presentation.

[2]   Consists of mortgage loans and Fannie Mae MBS recognized in our consolidated balance sheets. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

[3]   Reflects unpaid principal balance of unconsolidated Fannie Mae MBS, held by third-party investors. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

[4]   Includes single-family and multifamily credit enhancements that we have provided and that are not otherwise reflected in the table.

[5]   Consists of mortgage-related securities issued by Freddie Mac and Ginnie Mae.

[6]   Refers to mortgage loans and mortgage-related securities that are not guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies.

[7]   Refers to mortgage loans and mortgage-related securities guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies.

In the following sections, we discuss the mortgage credit risk of the single-family and multifamily loans in our guaranty book of business. The credit statistics reported below, unless otherwise noted, pertain generally to the

TREASURY-2546

portion of our guaranty book of business for which we have access to detailed loan-level information, which constituted approximately 99% of each of our single-family conventional guaranty book of business and our multifamily guaranty book of business, excluding defeased loans, as of December 31, 2011 and 2010. We typically obtain this data from the sellers or servicers of the mortgage loans in our guaranty book of business and receive representations and warranties from them as to the accuracy of the information. While we perform various quality assurance checks by sampling loans to assess compliance with our underwriting and eligibility criteria, we do not independently verify all reported information and we rely on lender representations regarding the accuracy of the characteristics of loans in our guaranty book of business. See "Risk Factors" for a discussion of the risk that we could experience mortgage fraud as a result of this reliance on lender representations.

### Single-Family Mortgage Credit Risk Management

Our strategy in managing single-family mortgage credit risk consists of four primary components: (1) our acquisition and servicing policies and underwriting and servicing standards, including the use of credit enhancements; (2) portfolio diversification and monitoring; (3) management of problem loans; and (4) REO management. These strategies, which we discuss below, may increase our expenses and may not be effective in reducing our credit-related expenses or credit losses. We provide information on our credit-related expenses and credit losses in "Consolidated Results of Operations—Credit-Related Expenses."

In evaluating our single-family mortgage credit risk, we closely monitor changes in housing and economic conditions and the impact of those changes on the credit risk profile of our single-family mortgage credit book of business. We regularly review and provide updates to our underwriting standards and eligibility guidelines that take into consideration changing market conditions. The credit risk profile of our single-family mortgage credit book of business is influenced by, among other things, the credit profile of the borrower, features of the loan, loan product type, the type of property securing the loan and the housing market and general economy. We focus more on loans that we believe pose a higher risk of default, which typically have been loans associated with higher mark-to-market LTV ratios, loans to borrowers with lower FICO credit scores and certain higher risk loan product categories, such as Alt-A loans. These and other factors affect both the amount of expected credit loss on a given loan and the sensitivity of that loss to changes in the economic environment.

Because we believe we have limited credit exposure on our government loans, the single-family credit statistics we focus on and report in the sections below generally relate to our single-family conventional guaranty book of business, which represents the substantial majority of our total single-family guaranty book of business.

We provide information on the performance of non-Fannie Mae mortgage-related securities held in our portfolio, including the impairment that we have recognized on these securities, in "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities."

#### Single-Family Acquisition and Servicing Policies and Underwriting and Servicing Standards

Our Single-Family business, with the oversight of our Enterprise Risk Management division, is responsible for pricing and managing credit risk relating to the portion of our single-family mortgage credit book of business consisting of single-family mortgage loans and Fannie Mae MBS backed by single-family mortgage loans (whether held in our portfolio or held by third parties). Desktop Underwriter™, our proprietary automated underwriting system which measures default risk by assessing the primary risk factors of a mortgage, is used to evaluate the majority of the loans we purchase or securitize. As part of our regular evaluation of Desktop Underwriter, we conduct periodic examinations of the underlying risk assessment models and recalibrate the models based on actual loan performance and market assumptions to improve Desktop Underwriter's ability to effectively analyze risk. Subject to our prior approval, we also may purchase and securitize mortgage loans that have been underwritten using other automated underwriting systems, as well as manually underwritten mortgage loans that meet our stated underwriting requirement or meet agreed-upon standards that differ from our standard underwriting and eligibility criteria. Additionally, as the number of our delinquent and defaulted loans has increased, so has the corresponding number of these loans reviewed for compliance with our requirements. We

- 152 -

use the information obtained from these loan quality reviews to provide more timely feedback to lenders on possible areas for correction in their origination practices. We initiated underwriting and eligibility changes that became effective in 2009 that focused on strengthening the underwriting and eligibility standards to promote sustainable homeownership. The result of many of these changes is reflected in the substantially improved risk profile of the single-family acquisitions since 2009.

As discussed in "Our Charter and Regulation of Our Activities—Charter Act," our charter generally requires credit enhancement on any single-family conventional mortgage loan that we purchase or securitize if it has an LTV ratio over 80% at the time of purchase. However, under our Refi Plus initiative, which offers expanded refinance opportunities for eligible Fannie Mae borrowers and includes but is not limited to HARP, we allow our borrowers who have mortgage loans with current LTV ratios above 80% to refinance their mortgages without obtaining new mortgage insurance in excess of what was already in place. HARP offers additional refinancing flexibility to eligible borrowers with loans that have LTVs greater than 80% who are current on their loans and whose loans are owned or guaranteed by us or Freddie Mac and meet certain additional criteria. Changes to HARP that were announced in October 2011 are intended to remove certain obstacles preventing borrowers from refinancing their mortgage loans. HARP originally authorized us to acquire loans only if their current LTVs did not exceed 125% for fixed-rate loans and did not exceed 105% for adjustable-rate mortgages. The October 2011 changes to HARP permit eligible borrowers to refinance into a new loan without regard to the loan's LTV, so long as the new loan is fixed-rate and has a term of no greater than 30 years. The changes also extended HARP through December 2013. Our acquisitions under HARP are limited to refinancings where (1) we acquired the loan being refinanced on or before May 31, 2009, (2) the refinancing provides a benefit to the borrower by lowering the borrower's monthly payment, reducing the interest rate, or resulting in a more stable loan product (for example, by moving from an adjustable-rate loan to a fixed-rate loan), and (3) the loan is secured by an owner-occupied property.

Borrower-paid primary mortgage insurance is the most common type of credit enhancement in our single-family mortgage credit book of business. Primary mortgage insurance transfers varying portions of the credit risk associated with a mortgage loan to a third-party insurer. In order for us to receive a payment in settlement of a claim under a primary mortgage insurance policy, the insured loan must be in default and the borrower's interest in the property that secured the loan must have been extinguished, generally in a foreclosure action. The claims process for primary mortgage insurance typically takes three to six months after title to the property has been transferred.

Mortgage insurers may also provide pool mortgage insurance, which is insurance that applies to a defined group of loans. Pool mortgage insurance benefits typically are based on actual loss incurred and are subject to an aggregate loss limit. Under some of our pool mortgage insurance policies, we are required to meet specified loss deductibles before we can recover under the policy. We typically collect claims under pool mortgage insurance three to six months after disposition of the property that secured the loan. For a discussion of our aggregate mortgage insurance coverage as of December 31, 2011 and 2010, see "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management—Mortgage Insurers."

Our mortgage servicers are the primary points of contact for borrowers and perform a vital role in our efforts to reduce defaults and pursue foreclosure alternatives. We discuss the actions we have taken to improve the servicing of our delinquent loans below in "Problem Loan Management."

*Single-Family Portfolio Diversification and Monitoring*

Diversification within our single-family mortgage credit book of business by product type, loan characteristics and geography is an important factor that influences credit quality and performance and may reduce our credit risk. We monitor various loan attributes, in conjunction with housing market and economic conditions, to determine if our pricing and our eligibility and underwriting criteria accurately reflect the risk associated with loans we acquire or guarantee. In some cases, we may decide to significantly reduce our participation in riskier

- 153 -

loan product categories. We also review the payment performance of loans in order to help identify potential problem loans early in the delinquency cycle and to guide the development of our loss mitigation strategies.

The profile of our guaranty book of business is comprised of the following key loan attributes:

— *LTV ratio.*   LTV ratio is a strong predictor of credit performance. The likelihood of default and the gross severity of a loss in the event of default are typically lower as the LTV ratio decreases. This also applies to the estimated mark-to-market LTV ratios, particularly those over 100%, as this indicates that the borrower's mortgage balance exceeds the property value.

— *Product type.*   Certain loan product types have features that may result in increased risk. Generally, intermediate-term, fixed-rate mortgages exhibit the lowest default rates, followed by long-term, fixed-rate mortgages. Historically, adjustable-rate mortgages ("ARMs"), including negative-amortizing and interest-only loans, and balloon/reset mortgages have exhibited higher default rates than fixed-rate mortgages, partly because the borrower's payments rose, within limits, as interest rates changed.

— *Number of units.*   Mortgages on one-unit properties tend to have lower credit risk than mortgages on two-, three- or four-unit properties.

— *Property type.*   Certain property types have a higher risk of default. For example, condominiums generally are considered to have higher credit risk than single-family detached properties.

— *Occupancy type.*   Mortgages on properties occupied by the borrower as a primary or secondary residence tend to have lower credit risk than mortgages on investment properties.

— *Credit score.*   Credit score is a measure often used by the financial services industry, including our company, to assess borrower credit quality and the likelihood that a borrower will repay future obligations as expected. A higher credit score typically indicates lower credit risk.

— *Loan purpose.*   Loan purpose indicates how the borrower intends to use the funds from a mortgage loan. Cash-out refinancings have a higher risk of default than either mortgage loans used for the purchase of a property or other refinancings that restrict the amount of cash returned to the borrower.

— *Geographic concentration.*   Local economic conditions affect borrowers' ability to repay loans and the value of collateral underlying loans. Geographic diversification reduces mortgage credit risk.

— *Loan age.*   We monitor year of origination and loan age, which is defined as the number of years since origination. Credit losses on mortgage loans typically do not peak until the third through six years following origination; however, this range can vary based on many factors, including changes in macroeconomic conditions and foreclosure timelines.

Table 41 displays our single-family conventional business volumes and our single-family conventional guaranty book of business for the periods indicated, based on certain key risk characteristics that we use to evaluate the risk profile and credit quality of our single-family loans.

TREASURY-2549

**Table 41:   Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business[1]**

| | Percent of Single-Family Conventional Business Volume[2] For the Year Ended December 31, | | | Percent of Single-Family Conventional Guaranty Book of Business [3][4] As of December 31, | | |
|---|---|---|---|---|---|---|
| | **2011** | **2010** | **2009** | **2011** | **2010** | **2009** |
| Original LTV ratio:[5] | | | | | | |
| <= 60% . . . . . . . . . . . . . . . . . . . . . . . | 29% | 30% | 33% | 24% | 24% | 24% |
| 60.01% to 70% . . . . . . . . . . . . . . . . . . | 16 | 16 | 17 | 16 | 16 | 16 |
| 70.01% to 80% . . . . . . . . . . . . . . . . . . | 37 | 38 | 40 | 40 | 41 | 42 |
| 80.01% to 90%[6] . . . . . . . . . . . . . . . . . | 9 | 9 | 7 | 10 | 9 | 9 |
| 90.01% to 100%[6] . . . . . . . . . . . . . . . . | 7 | 5 | 3 | 9 | 9 | 9 |
| Greater than 100%[6] . . . . . . . . . . . . . . | 2 | 2 | * | 1 | 1 | * |
| Total . . . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average . . . . . . . . . . . . . . | 69% | 68% | 67% | 71% | 71% | 71% |
| Average loan amount . . . . . . . . . . . . . . . | $209,847 | $219,431 | $219,118 | $156,194 | $155,531 | $153,302 |
| Estimated mark-to-market LTV ratio:[7] | | | | | | |
| <= 60% . . . . . . . . . . . . . . . . . . . . . . . | | | | 26% | 28% | 31% |
| 60.01% to 70% . . . . . . . . . . . . . . . . . . | | | | 12 | 13 | 13 |
| 70.01% to 80% . . . . . . . . . . . . . . . . . . | | | | 18 | 19 | 19 |
| 80.01% to 90% . . . . . . . . . . . . . . . . . . | | | | 16 | 15 | 14 |
| 90.01% to 100% . . . . . . . . . . . . . . . . . | | | | 10 | 9 | 9 |
| Greater than 100% . . . . . . . . . . . . . . . | | | | 18 | 16 | 14 |
| Total . . . . . . . . . . . . . . . . . . . . . . . | | | | 100% | 100% | 100% |
| Weighted average . . . . . . . . . . . . . . . | | | | 79% | 77% | 75% |
| Product type: | | | | | | |
| Fixed-rate:[8] | | | | | | |
| Long-term . . . . . . . . . . . . . . . . . . . . | 67% | 72% | 82% | 73% | 74% | 75% |
| Intermediate-term . . . . . . . . . . . . . . . | 26 | 22 | 15 | 15 | 14 | 13 |
| Interest-only . . . . . . . . . . . . . . . . . . . | * | * | * | 1 | 2 | 3 |
| Total fixed-rate . . . . . . . . . . . . . . . | 93 | 94 | 97 | 89 | 90 | 91 |
| Adjustable-rate: | | | | | | |
| Interest-only . . . . . . . . . . . . . . . . . . . | 1 | 1 | 1 | 3 | 4 | 4 |
| Negative-amortizing . . . . . . . . . . . . . | — | — | * | — | * | 1 |
| Other ARMs . . . . . . . . . . . . . . . . . . | 6 | 5 | 2 | 8 | 6 | 4 |
| Total adjustable-rate . . . . . . . . . . | 7 | 6 | 3 | 11 | 10 | 9 |
| Total . . . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |

TREASURY-2550

| | Percent of Single-Family Conventional Business Volume[2] For the Year Ended December 31, | | | Percent of Single-Family Conventional Guaranty Book of Business[3][4] As of December 31, | | |
|---|---|---|---|---|---|---|
| | 2011 | 2010 | 2009 | 2011 | 2010 | 2009 |
| Number of property units: | | | | | | |
| 1 unit | 97% | 98% | 98% | 97% | 97% | 96% |
| 2-4 units | 3 | 2 | 2 | 3 | 3 | 4 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Property type: | | | | | | |
| Single-family homes | 91% | 91% | 92% | 91% | 91% | 91% |
| Condo/Co-op | 9 | 9 | 8 | 9 | 9 | 9 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Occupancy type: | | | | | | |
| Primary residence | 89% | 91% | 93% | 89% | 90% | 90% |
| Second/vacation home | 5 | 4 | 5 | 5 | 4 | 4 |
| Investor | 6 | 5 | 2 | 6 | 6 | 6 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| FICO credit score at origination: | | | | | | |
| < 620 | *% | *% | *% | 3% | 4% | 4% |
| 620 to < 660 | 2 | 2 | 2 | 7 | 7 | 8 |
| 660 to < 700 | 7 | 7 | 7 | 13 | 15 | 16 |
| 700 to < 740 | 16 | 16 | 17 | 20 | 21 | 22 |
| >= 740 | 75 | 75 | 74 | 57 | 53 | 50 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average | 762 | 762 | 761 | 738 | 735 | 730 |
| Loan purpose: | | | | | | |
| Purchase | 24% | 22% | 20% | 31% | 33% | 36% |
| Cash-out refinance | 17 | 20 | 27 | 27 | 29 | 31 |
| Other refinance | 59 | 58 | 53 | 42 | 38 | 33 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Geographic concentration:[9] | | | | | | |
| Midwest | 15% | 16% | 16% | 15% | 15% | 16% |
| Northeast | 19 | 20 | 19 | 19 | 19 | 19 |
| Southeast | 19 | 18 | 20 | 24 | 24 | 24 |
| Southwest | 16 | 15 | 15 | 15 | 15 | 15 |
| West | 31 | 31 | 30 | 27 | 27 | 26 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Origination year: | | | | | | |
| <=2001 | | | | 2% | 2% | 3% |
| 2002 | | | | 2 | 3 | 4 |
| 2003 | | | | 9 | 11 | 14 |
| 2004 | | | | 5 | 7 | 7 |
| 2005 | | | | 7 | 9 | 10 |
| 2006 | | | | 7 | 8 | 11 |
| 2007 | | | | 10 | 12 | 15 |
| 2008 | | | | 7 | 9 | 13 |
| 2009 | | | | 17 | 21 | 23 |
| 2010 | | | | 18 | 18 | — |
| 2011 | | | | 16 | — | — |
| Total | | | | 100% | 100% | 100% |

- 156 -

---

\*     Represents less than 0.5% of single-family conventional business volume or book of business.

[1]    We reflect second lien mortgage loans in the original LTV ratio calculation only when we own both the first and second lien mortgage loans or we own only the second lien mortgage loan. Second lien mortgage loans represented less than 0.6% of our single-family conventional guaranty book of business as of December 31, 2011, 2010 and 2009. Second lien mortgage loans held by third parties are not reflected in the original LTV or mark-to-market LTV ratios in this table.

[2]    Calculated based on unpaid principal balance of single-family loans for each category at time of acquisition. Single-Family business volume refers to both single-family mortgage loans we purchase for our mortgage portfolio and single-family mortgage loans we guarantee.

[3]    Calculated based on the aggregate unpaid principal balance of single-family loans for each category divided by the aggregate unpaid principal balance of loans in our single-family conventional guaranty book of business as of the end of each period.

[4]    Our single-family conventional guaranty book of business includes jumbo-conforming and high-balance loans that represented approximately 4.8% of our single-family conventional guaranty book of business as of December 31, 2011 and 3.9% as of December 31, 2010. See "Business–Our Charter and Regulation of Our Activities—Charter Act—Loan Standards" and "Risk Management—Credit Risk Management—Single Family Mortgage Credit Risk Management–Credit Profile Summary" for additional information on loan limits.

[5]    The original LTV ratio generally is based on the original unpaid principal balance of the loan divided by the appraised property value reported to us at the time of acquisition of the loan. Excludes loans for which this information is not readily available.

[6]    We purchase loans with original LTV ratios above 80% to fulfill our mission to serve the primary mortgage market and provide liquidity to the housing system. Except as permitted under Refi Plus, our charter generally requires primary mortgage insurance or other credit enhancement for loans that we acquire that have an LTV ratio over 80%.

[7]    The aggregate estimated mark-to-market LTV ratio is based on the unpaid principal balance of the loan as of the end of each reported period divided by the estimated current value of the property, which we calculate using an internal valuation model that estimates periodic changes in home value. Excludes loans for which this information is not readily available.

[8]    Long-term fixed-rate consists of mortgage loans with maturities greater than 15 years, while intermediate-term fixed-rate has maturities equal to or less than 15 years. Loans with interest-only terms are included in the interest-only category regardless of their maturities.

[9]    Midwest consists of IL, IN, IA, MI, MN, NE, ND, OH, SD and WI. Northeast includes CT, DE, ME, MA, NH, NJ, NY, PA, PR, RI, VT and VI. Southeast consists of AL, DC, FL, GA, KY, MD, MS, NC, SC, TN, VA and WV. Southwest consists of AZ, AR, CO, KS, LA, MO, NM, OK, TX and UT. West consists of AK, CA, GU, HI, ID, MT, NV, OR, WA and WY.

*Credit Profile Summary*

We continue to see the positive effects of actions we took beginning in 2008 to significantly strengthen our underwriting and eligibility standards and change our pricing to promote sustainable homeownership and stability in the housing market. The single-family loans we purchased or guaranteed in 2011 have a strong credit profile with a weighted average original LTV ratio of 69%, a weighted average FICO credit score of 762, and a product mix with a significant percentage of fully amortizing fixed-rate mortgage loans. Due to lower acquisition volume and the relatively high volume of Refi Plus loans (including HARP loans), the LTV ratios at origination for our 2011 acquisitions are higher than for our 2009 and 2010 acquisitions. In addition, we had a slight increase in the acquisition of home purchase mortgages with LTV ratios greater than 80% in 2011 compared with 2010 because: (1) most mortgage insurance companies lowered their premiums in 2011 for loans with higher credit scores; and (2) in April 2011, FHA implemented a price increase in their annual mortgage insurance premium. Both price changes improved the economics of obtaining private mortgage insurance as compared to purchasing FHA insurance and drove an increase in our market share for these loans. Approximately 18% of our total single-family conventional business volume for 2011 consisted of loans with LTV ratios higher than 80% at the time of purchase compared with 16% for 2010.

The credit profile of our acquisitions has been influenced by historically low mortgage rates in recent periods, which has resulted in an increase in the percentage of acquisitions that are refinanced loans. Refinanced loans,

- 157 -

which include Refi Plus loans, comprised 76% of our single-family acquisitions in 2011. Refinanced loans generally have a strong credit profile because refinancing indicates borrowers' ability to make their mortgage payment and desire to maintain homeownership, but Refi Plus loans, which may have lower FICO credit scores and higher LTV ratios than we generally require, in some cases may not ultimately perform as well as traditional refinanced loans. It is too early to determine whether the performance of loans with higher risk characteristics refinanced under the Refi Plus program will perform differently from other refinanced loans; however, we do expect Refi Plus loans will perform better than the loans they replace because Refi Plus loans should reduce the borrowers' monthly payments or otherwise provide more sustainability than the borrowers' old loans (for example, by having a fixed rate instead of an adjustable rate). Loans we acquired under Refi Plus in 2011 constituted approximately 24% of our total single-family acquisitions for the period, compared with approximately 23% of total single-family acquisitions in all of 2010.

In addition, the recent decline in mortgage interest rates has led to a higher percentage of acquisitions of intermediate-term fixed-rate mortgages because the lower mortgage rates have made these products more affordable to many borrowers. Effective January 1, 2012, certain loan level pricing adjustments on HARP loans will be waived on fixed-rate mortgages with terms of 20 years or less, which may have an impact on the amount of intermediate-term loans we acquire in the future.

The prolonged and severe decline in home prices has resulted in the overall estimated weighted average mark-to-market LTV ratio of our single-family conventional guaranty book of business to remain high at 79% as of December 31, 2011, and 77% as of December 31, 2010. The portion of our single-family conventional guaranty book of business with an estimated mark-to-market LTV ratio greater than 100% was 18% as of December 31, 2011, and 16% as of December 31, 2010. If home prices decline further, more loans may have mark-to-market LTV ratios greater than 100%, which increases the risk of delinquency and default.

Whether our acquisitions in 2012 will exhibit the same credit profile as our recent acquisitions depends on many factors, including our future pricing and eligibility standards, our future objectives, mortgage insurers' eligibility standards, our future volume of Refi Plus acquisitions, which typically include higher LTV ratios and lower FICO credit scores, and future market conditions. We expect the ultimate performance of all our loans will be affected by macroeconomic trends, including unemployment, the economy, and home prices.

We expect our guaranty fees to increase over the next few years, which may impact the volume of loans we acquire in the future. See "Business—Legislative and Regulatory Developments—Changes to Our Single-Family Guaranty Fee Pricing and Revenue" for information on potential changes to our guaranty fees.

*Alt-A and Subprime Loans*

Our exposure to Alt-A and subprime loans included in our single-family conventional guaranty book of business, as defined in this section, does not include (1) our investments in private-label mortgage-related securities backed by Alt-A and subprime loans or (2) resecuritizations, or wraps, of private-label mortgage-related securities backed by Alt-A mortgage loans that we have guaranteed. See "Consolidated Balance Sheet Analysis— Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities" for a discussion of our exposure to private-label mortgage-related securities backed by Alt-A and subprime loans. As a result of our decision to discontinue the purchase of newly originated Alt-A loans, except for those that represent the refinancing of an existing Fannie Mae loan, we expect our acquisitions of Alt-A mortgage loans to continue to be minimal in future periods and the percentage of the book of business attributable to Alt-A will continue to decrease over time. We are also not currently acquiring newly originated subprime loans.

We have classified a mortgage loan as Alt-A if the lender that delivered the loan to us classified the loan as Alt-A based on documentation or other features. We have classified a mortgage loan as subprime if the loan was originated by a lender specializing in subprime business or by a subprime division of a large lender. We exclude from the subprime classification loans originated by these lenders if we acquired the loans in accordance with our standard underwriting criteria, which typically require compliance by the seller with our Selling Guide (including

- 158 -

standard representations and warranties) and/or evaluation of the loans through our Desktop Underwriter system. We apply our classification criteria in order to determine our Alt-A and subprime loan exposures; however, we have other loans with some features that are similar to Alt-A and subprime loans that we have not classified as Alt-A or subprime because they do not meet our classification criteria. The unpaid principal balance of Alt-A loans included in our single-family conventional guaranty book of business of $182.2 billion as of December 31, 2011, represented approximately 6.6% of our single-family conventional guaranty book of business. The unpaid principal balance of subprime loans included in our single-family conventional guaranty book of business of $5.8 billion as of December 31, 2011, represented approximately 0.2% of our single-family conventional guaranty book of business.

*Jumbo-Conforming and High-Balance Loans*

The outstanding unpaid principal balance of our jumbo-conforming and high-balance loans was $133.0 billion, or 4.8% of our single-family conventional guaranty book of business, as of December 31, 2011 and $109.7 billion, or 3.9% of our single-family conventional guaranty book of business, as of December 31, 2010. The standard conforming loan limit for a one-unit property was $417,000 in 2011 and 2010. Our loan limits were higher in specified high-cost areas, reaching as high as $729,750 for one-unit properties; however, our loan limits for loans originated after September 30, 2011 decreased in specified high-cost areas to an amount not to exceed $625,500 for one-unit properties. Unlike FHA, which is not subject to current loan limits for refinancing its existing loans above current limits, our current loan limits apply to all new acquisitions. Therefore, we expect refinances of our existing loans above current limits to be significantly reduced. See "Business—Our Charter and Regulation of Our Activities—Charter Act—Loan Standards" for additional information on our loan limits.

*Reverse Mortgages*

The outstanding unpaid principal balance of reverse mortgage whole loans and Fannie Mae MBS backed by reverse mortgage loans in our guaranty book of business was $50.9 billion as of December 31, 2011 and $50.8 billion as of December 31, 2010. The balance of our reverse mortgage loans could increase over time, as each month the scheduled and unscheduled payments, interest, mortgage insurance premium, servicing fee, and default-related costs accrue to increase the unpaid principal balance. The majority of these loans are home equity conversion mortgages insured by the federal government through FHA. Because home equity conversion mortgages are insured by the federal government, we believe that we have limited exposure to losses on these loans. In 2010, we communicated to our lenders that we are exiting the reverse mortgage business and will no longer acquire newly originated home equity conversion mortgages.

*Adjustable-rate Mortgages and Fixed-rate Interest-only Mortgages*

ARMs are mortgage loans with an interest rate that adjusts periodically over the life of the mortgage based on changes in a specified index. Interest-only loans allow the borrower to pay only the monthly interest due, and none of the principal, for a fixed term. The majority of our interest-only loans are ARMs. Our negative-amortizing loans are ARMs that allow the borrower to make monthly payments that are less than the interest actually accrued for the period. The unpaid interest is added to the principal balance of the loan, which increases the outstanding loan balance. ARMs represented 10.7% of our single-family conventional guaranty book of business as of December 31, 2011.

Table 42 displays information for ARMs and fixed-rate interest-only loans in our single-family guaranty book of business, aggregated by product type and categorized by the year of their next scheduled contractual reset date. The contractual reset is either an adjustment to the loan's interest rate or a scheduled change to the loan's monthly payment to begin to reflect the payment of principal. The timing of the actual reset dates may differ from those presented due to a number of factors, including refinancing or exercising of other provisions within the terms of the mortgage.

TREASURY-2554

**Table 42: Single-Family Adjustable-Rate Mortgage Resets by Year**[1]

| | 2012 | 2013 | 2014 | 2015 | 2016 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | | |
| ARMs—Amortizing | $49,027 | $ 4,442 | $14,960 | $70,706 | $35,168 | $20,977 | $195,280 |
| ARMs—Interest Only | 40,268 | 7,788 | 7,254 | 19,109 | 7,737 | 7,349 | 89,505 |
| ARMs—Negative Amortizing | 6,699 | 121 | 419 | 962 | 560 | 180 | 8,941 |
| Total | $95,994 | $12,351 | $22,633 | $90,777 | $43,465 | $28,506 | $293,726 |
| Fixed-Rate Interest Only | $   309 | $   106 | $   175 | $ 1,571 | $ 9,873 | $25,403 | $ 37,437 |

---

[1]   Does not include loans we have modified, some of which are subject to higher interest rates and increased monthly payments in the future.

We have not observed a materially different performance trend for interest-only loans or negative-amortizing loans that have recently reset as compared to those that are still in the initial period. We believe the current performance trend is the result of the current low interest rate environment and we do not expect this trend to continue if interest rates rise significantly.

*Problem Loan Management*

Our problem loan management strategies are primarily focused on reducing defaults to avoid losses that would otherwise occur and pursuing foreclosure alternatives to attempt to minimize the severity of the losses we incur. If a borrower does not make required payments, or is in jeopardy of not making payments, we work with the servicers of our loans to offer workout solutions to minimize the likelihood of foreclosure as well as the severity of loss. Our loan workouts reflect our various types of home retention strategies, including loan modifications, repayment plans and forbearances, and foreclosure alternatives, including short sales and deeds-in-lieu of foreclosure. When appropriate, we seek to move to foreclosure expeditiously. For additional discussion on our efforts to reduce defaults and credit losses, see "Executive Summary—Reducing Credit Losses on Our Legacy Book of Business."

Our home retention solutions are intended to help borrowers stay in their homes and include loan modifications, repayment plans and forbearances. Because we believe that reducing delays and implementing solutions that can be executed in a timely manner and early in the delinquency increases the likelihood that our problem loan management strategies will be successful in avoiding a default or minimizing severity, it is important for our servicers to work with borrowers to complete these solutions as early in their delinquency as feasible. If the servicer cannot provide a viable home retention solution for a problem loan, the servicer will seek to offer foreclosure alternatives, primarily short sales and deeds-in-lieu of foreclosure. These alternatives reduce the severity of our loss resulting from a borrower's default while permitting the borrower to avoid going through a foreclosure. The existence of a second lien may limit our ability to provide borrowers with loan workout options, particularly those that are part of our foreclosure prevention efforts; however, we are not required to contact a second lien holder to obtain their approval prior to providing a borrower with a loan modification. We occasionally execute third-party sales, where we sell the property to a third party immediately prior to entering the foreclosure process. When appropriate, we seek to move to foreclosure expeditiously.

We seek to improve the servicing of our delinquent loans through a variety of means, including improving our communications with and training of our servicers, increasing the number of our personnel who manage our servicers, directing servicers to contact borrowers at an earlier stage of delinquency and improve their telephone communications with borrowers, and holding our servicers accountable for following our requirements. In the second quarter of 2011, we issued new standards for mortgage servicers regarding the management of delinquent loans, default prevention and foreclosure time frames under FHFA's directive to align GSE policies for servicing delinquent mortgages. The new standards, reinforced by new incentives and compensatory fees, require servicers

- 160 -

to take a more consistent approach for homeowner communications, loan modifications and other workouts, and, when necessary, foreclosures. The new standards are designed to: (1) achieve effective contact with the borrower, including creating a uniform standard for communicating with the homeowner, determining reasons for delinquency and assessing their ability to pay, and educating homeowners on the availability of foreclosure prevention options; (2) set clear timelines and establish clear and consistent policies in the foreclosure process; and (3) provide incentives to servicers to complete loan workouts earlier in the homeowner's delinquency and charge servicers compensatory fees when they fail to have the proper contact with the borrower. We believe these standards, which became effective October 1, 2011, will bring greater consistency, clarity, fairness and efficiency to the process, help improve servicer performance, and hold servicers accountable for their effectiveness in assisting homeowners.

In addition to these new standards, we have taken other steps to improve the servicing of our delinquent loans including: (1) updating our Servicing Guide, which should improve our servicers' ability to understand and comply with our requirements and allow them to complete workouts earlier in the delinquency process, thereby avoiding foreclosure; (2) implementing our STAR program, a servicer performance management system designed to encourage improvements in customer service and foreclosure prevention outcomes for homeowners by rating servicers on their performance in these areas; and (3) transferring servicing on loan populations that include loans with higher-risk characteristics to special servicers with which we have worked to develop high-touch protocols for servicing these loans. For example, in the third quarter of 2011, we agreed to purchase from Bank of America, N.A. the mortgage servicing rights associated with up to $74 billion in unpaid principal balance of mortgage loans in our single-family guaranty book of business, which represented approximately 11% of our servicing portfolio with Bank of America as of September 30, 2011. We believe retaining special servicers to service these loans using high-touch protocols will reduce our future credit losses on the transferred loan portfolio, while enabling Bank of America to better focus on our remaining portfolio with them. We continue to work with some of our servicers to test and implement high-touch servicing protocols designed for managing higher-risk loans, which include lower ratios of loans per servicer employee, beginning borrower outreach strategies earlier in the delinquency cycle and establishing a single point of resolution for distressed borrowers.

The efforts of our mortgage servicers are critical in keeping people in their homes and preventing foreclosures. We continue to work with our servicers to implement our foreclosure prevention initiatives effectively and to find ways to enhance our workout protocols and their workflow processes. As of December 31, 2011, we had established 12 Mortgage Help Centers across the nation to accelerate the response time for struggling borrowers with loans owned by us. During 2011, these centers helped borrowers obtain nearly 6,100 home retention plans. We have also established partnerships with 17 local non-profit organizations in 16 cities, collectively known as our Mortgage Help Network. The Mortgage Help Network represents a contractual relationship with select not-for-profit counseling agencies located in our top delinquent mortgage markets to provide borrowers foreclosure prevention counseling, documentation and assistance with pending loan workout solutions. We also use direct mail and phone calls to encourage homeowners to pursue home retention solutions and foreclosure alternatives, and have established partnerships with counseling agencies in ten states across the country to provide similar services. Further, in cooperation with several Multiple Listing Services across the nation, we developed the Short Sale Assistance Desk to assist real estate professionals in handling post-offer short sale issues that may relate to servicer responsiveness, the existence of a second lien, or issues involving mortgage insurance.

In the following section, we present statistics on our problem loans, describe specific efforts undertaken to manage these loans and prevent foreclosures and provide metrics regarding the performance of our loan workout activities. We generally define single-family problem loans as loans that have been identified as being at imminent risk of payment default; early stage delinquent loans that are either 30 days or 60 days past due; and seriously delinquent loans, which are loans that are three or more monthly payments past due or in the foreclosure process. Unless otherwise noted, single-family delinquency data is calculated based on number of loans. We include single-family conventional loans that we own and that back Fannie Mae MBS in the calculation of the single-family delinquency rate. Percentage of book outstanding calculations are based on the unpaid principal balance of loans for each category divided by the unpaid principal balance of our total single-family guaranty book of business for which we have detailed loan-level information.

- 161 -

*Problem Loan Statistics*

The following table displays the delinquency status of loans in our single-family conventional guaranty book of business (based on number of loans) as of the dates indicated.

**Table 43:   Delinquency Status of Single-Family Conventional Loans**

|  | As of December 31, | | |
|---|---|---|---|
|  | **2011** | **2010** | **2009** |
| Delinquency status: | | | |
| 30 to 59 days delinquent | 2.17% | 2.32% | 2.46% |
| 60 to 89 days delinquent | 0.74 | 0.87 | 1.07 |
| Seriously delinquent | 3.91 | 4.48 | 5.38 |
| Percentage of seriously delinquent loans that have been delinquent for more than 180 days | 70% | 67% | 57% |

Our serious delinquency rate decreased in 2011 compared with 2010 and 2009, driven by our home retention solutions, as well as foreclosure alternatives and completed foreclosures. The decrease is also attributable to our acquisition of loans with stronger credit profiles since the beginning of 2009, as these loans have become an increasingly larger portion of our single-family guaranty book of business, resulting in a smaller percentage of our loans becoming seriously delinquent.

Although our single-family serious delinquency rate has decreased every quarter since the first quarter of 2010, our serious delinquency rate and the period of time that loans remain seriously delinquent have been negatively affected in recent periods by the increase in the average number of days it is taking to complete a foreclosure. Continuing issues in the servicer foreclosure process and new legislative, regulatory and judicial requirements have lengthened the time it takes to foreclose on a mortgage loan in many states. In addition, servicers and states are dealing with the backlog of foreclosures resulting from these delays and from the elevated level of foreclosures resulting from the housing market downturn. Longer foreclosure timelines result in these loans remaining in our book of business for a longer time, which has caused our serious delinquency rate to decrease more slowly in the last year than it would have if the pace of foreclosures had been faster. We believe the changes in the foreclosure environment will continue to negatively affect our single-family serious delinquency rates, foreclosure timelines and credit-related expenses. For more information on the delays in the foreclosure process, see "Executive Summary—Reducing Credit Losses on Our Legacy Book of Business." We expect serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process, the volume of loan modifications and the extent to which borrowers with modified loans continue to make timely payments.

Table 44 displays a comparison, by geographic region and by loans with and without credit enhancement, of the serious delinquency rates as of the dates indicated for single-family conventional loans in our single-family guaranty book of business.

TREASURY-2557

**Table 44:   Single-Family Serious Delinquency Rates**

| | As of December 31, | | | | | |
| | 2011 | | 2010 | | 2009 | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate |
|---|---|---|---|---|---|---|
| Single-family conventional delinquency rates by geographic region:[1] | | | | | | |
| Midwest . . . . . . . . . . . . . . . . . . . | 15% | 3.73% | 15% | 4.16% | 16% | 4.97% |
| Northeast . . . . . . . . . . . . . . . . . | 19 | 4.43 | 19 | 4.38 | 19 | 4.53 |
| Southeast . . . . . . . . . . . . . . . . . | 24 | 5.68 | 24 | 6.15 | 24 | 7.06 |
| Southwest . . . . . . . . . . . . . . . | 15 | 2.30 | 15 | 3.05 | 15 | 4.19 |
| West . . . . . . . . . . . . . . . . . . . . . | 27 | 2.87 | 27 | 4.06 | 26 | 5.45 |
| Total single-family conventional loans . . . . . . . | 100% | 3.91% | 100% | 4.48% | 100% | 5.38% |
| Single-family conventional loans: | | | | | | |
| Credit enhanced . . . . . . . . . . . . . | 14% | 9.10% | 15% | 10.60% | 18% | 13.51% |
| Non-credit enhanced . . . . . . . . . | 86 | 3.07 | 85 | 3.40 | 82 | 3.67 |
| Total single-family conventional loans . . . . . . . | 100% | 3.91% | 100% | 4.48% | 100% | 5.38% |

---

[1]   See footnote 9 to "Table 41: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for states included in each geographic region.

While loans across our single-family guaranty book of business have been affected by the weak market conditions, loans in certain states, certain higher-risk loan categories, such as Alt-A loans and loans with higher mark-to-market LTVs, and our 2006 and 2007 loan vintages continue to exhibit higher than average delinquency rates and/or account for a disproportionate share of our credit losses. California, Florida, Arizona and Nevada and some states in the Midwest have experienced more significant declines in home prices coupled with unemployment rates that remain high.

Table 45 displays the serious delinquency rates and other financial information for our single-family conventional loans with some of these higher-risk characteristics as of the periods indicated. The reported categories are not mutually exclusive.

TREASURY-2558

Table 45:   Single-Family Conventional Serious Delinquency Rate Concentration Analysis

|  | As of December 31, | | | | | | | | | | | |
|  | 2011 | | | | 2010 | | | | 2009 | | | |
|  | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] |
|  | (Dollars in millions) | | | | | | | | | | | |
| States: | | | | | | | | | | | | |
| Arizona | $ 66,875 | 2% | 3.65% | 109% | $ 71,052 | 2% | 6.23% | 105% | $ 76,073 | 3% | 8.80% | 100% |
| California | 516,608 | 19 | 2.46 | 81 | 507,598 | 18 | 3.89 | 76 | 484,923 | 17 | 5.73 | 77 |
| Florida | 175,344 | 6 | 11.80 | 108 | 184,101 | 7 | 12.31 | 107 | 195,309 | 7 | 12.82 | 100 |
| Nevada | 28,766 | 1 | 7.42 | 138 | 31,661 | 1 | 10.66 | 128 | 34,657 | 1 | 13.00 | 123 |
| Select Midwest states[2] | 284,060 | 10 | 4.39 | 84 | 292,734 | 11 | 4.80 | 80 | 304,147 | 11 | 5.62 | 77 |
| All other states | 1,689,846 | 62 | 3.18 | 73 | 1,695,615 | 61 | 3.46 | 71 | 1,701,379 | 61 | 4.11 | 69 |
| Product type: | | | | | | | | | | | | |
| Alt-A[3] | 182,236 | 7 | 12.43 | 101 | 211,770 | 8 | 13.87 | 96 | 248,311 | 9 | 15.63 | 92 |
| Subprime | 5,791 | * | 23.18 | 111 | 6,499 | * | 28.20 | 103 | 7,364 | * | 30.68 | 97 |
| Vintages: | | | | | | | | | | | | |
| 2006 | 186,835 | 7 | 11.81 | 111 | 232,009 | 8 | 12.19 | 104 | 292,184 | 11 | 12.87 | 97 |
| 2007 | 269,012 | 10 | 12.62 | 112 | 334,110 | 12 | 13.24 | 104 | 422,956 | 15 | 14.06 | 96 |
| All other vintages | 2,305,652 | 83 | 2.39 | 73 | 2,216,642 | 80 | 2.62 | 70 | 2,081,348 | 74 | 3.08 | 67 |
| Estimated mark-to-market LTV ratio: | | | | | | | | | | | | |
| Greater than 100%[1] | 493,762 | 18 | 13.76 | 131 | 435,991 | 16 | 17.70 | 130 | 403,443 | 14 | 22.09 | 128 |
| Select combined risk characteristics: | | | | | | | | | | | | |
| Original LTV ratio > 90% and FICO score < 620 | 18,992 | 1 | 18.67 | 115 | 21,205 | 1 | 21.41 | 109 | 23,966 | 1 | 27.96 | 104 |

* Percentage is less than 0.5%.

[1] Second lien mortgage loans held by third parties are not included in the calculation of the estimated mark-to-market LTV ratios.

[2] Consists of Illinois, Indiana, Michigan and Ohio.

[3] For 2009, data for Alt-A loans does not reflect loans we acquired in 2009 upon the refinance of existing Alt-A loans.

*Loan Workout Metrics*

We continue to work with our servicers to implement our home retention and foreclosure prevention initiatives. Loan modifications involve changes to the original mortgage terms such as product type, interest rate, amortization term, maturity date and/or unpaid principal balance. Modifications include TDRs, which is the only form of modification in which we do not expect to collect the full original contractual principal and interest due under the loan. Other resolutions and modifications may result in our receiving the full amount due, or certain installments due, under the loan over a period of time that is longer than the period of time originally provided for under the terms of the loan. Additionally, we currently offer up to twelve months of forbearance for those homeowners who are unemployed as an additional tool to help homeowners avoid foreclosure.

In March 2009, we implemented HAMP, a modification initiative under the Making Home Affordable Program. Intended to be uniform across servicers, HAMP is aimed at helping borrowers whose loan is either currently delinquent or is at imminent risk of default. HAMP modifications can include reduced interest rates, term extensions, and/or principal forbearance to bring the monthly payment down to 31% of the borrower's gross (pre-tax) income. We require that servicers first evaluate borrowers for eligibility under HAMP before considering other workout options or foreclosure. By design, not all borrowers facing foreclosure will be eligible for a HAMP modification. As a result, we are working with servicers to ensure that borrowers who do not qualify for HAMP or who fail to successfully complete the HAMP required trial period are provided with alternative home retention options or a foreclosure avoidance alternative.

In addition, we continue to focus on alternatives to foreclosure for borrowers who are unable to retain their homes. Foreclosure alternatives may be more appropriate if the borrower has experienced a significant adverse change in financial condition due to events such as unemployment or reduced income, divorce, or unexpected issues like medical

- 164 -

bills and is therefore no longer able to make the required mortgage payments. Since the cost of foreclosure can be significant to both the borrower and Fannie Mae, to avoid foreclosure and satisfy the first-lien mortgage obligation, our servicers work with a borrower to sell their home prior to foreclosure in a short sale or accept a deed-in-lieu of foreclosure whereby the borrower voluntarily signs over the title to their property to the servicer. These alternatives are designed to reduce our credit losses while helping borrowers avoid having to go through a foreclosure.

Table 46 displays statistics on our single-family loan workouts that were completed, by type, for the periods indicated. These statistics include loan modifications but do not include trial modifications or repayment and forbearance plans that have been initiated but not completed.

**Table 46:   Statistics on Single-Family Loan Workouts**

| | For the Year Ended December 31, | | | | | |
| | 2011 | | 2010 | | 2009 | |
| | Unpaid Principal Balance | Number of Loans | Unpaid Principal Balance | Number of Loans | Unpaid Principal Balance | Number of Loans |
| | (Dollars in millions) | | | | | |
|---|---|---|---|---|---|---|
| Home retention strategies: | | | | | | |
| Modifications ................................. | $42,793 | 213,340 | $ 82,826 | 403,506 | $18,702 | 98,575 |
| Repayment plans and forbearances completed[1] ....... | 5,042 | 35,318 | 4,385 | 31,579 | 2,930 | 22,948 |
| HomeSaver Advance first-lien loans ................ | — | — | 688 | 5,191 | 6,057 | 39,199 |
| | 47,835 | 248,658 | 87,899 | 440,276 | 27,689 | 160,722 |
| Foreclosure alternatives: | | | | | | |
| Short sales ................................... | 15,412 | 70,275 | 15,899 | 69,634 | 8,457 | 36,968 |
| Deeds-in-lieu of foreclosure ...................... | 1,679 | 9,558 | 1,053 | 5,757 | 491 | 2,649 |
| | 17,091 | 79,833 | 16,952 | 75,391 | 8,948 | 39,617 |
| Total loan workouts ............................. | $64,926 | 328,491 | $104,851 | 515,667 | $36,637 | 200,339 |
| Loan workouts as a percentage of single-family guaranty book of business[2] ............................... | 2.29% | 1.85% | 3.66% | 2.87% | 1.26% | 1.10% |

[1]   Repayment plans reflect only those plans associated with loans that were 60 days or more delinquent.

[2]   Calculated based on loan workouts during the period as a percentage of our single-family guaranty book of business as of the end of the period.

HAMP guidance directs servicers to cancel or convert trial modifications after three or four monthly payments, depending on the borrower's circumstances. As of December 31, 2011, 52% of our HAMP trial modifications had been converted to permanent HAMP modifications since the inception of the program. The conversion rate for HAMP modifications since June 1, 2010, when servicers were required to perform a full verification of a borrower's eligibility prior to offering a HAMP trial modification, was 83% as of December 31, 2011. The average length of a trial period for HAMP modifications initiated after June 1, 2010 was four months.

The volume of workouts completed in 2011 decreased compared with 2010, primarily driven by a decline in the number of seriously delinquent loans in 2011, compared with 2010. In addition, we began to require that all non-HAMP modifications also must go through a trial period, which initially lowers the number of modifications that can become permanent in any particular period. The volume of workouts increased in 2010 compared with 2009 due to an increase in loan modification volume because the number of borrowers who were experiencing financial difficulty increased and a significant number of HAMP trial modifications were completed and became permanent HAMP modifications. HomeSaver Advance first-lien loans were workouts focused on borrowers facing short-term hardships, and this workout option was retired in 2010.

- 165 -

During 2011, we initiated approximately 211,000 trial modifications, including HAMP and non-HAMP, compared with approximately 166,000 trial modifications during 2010. We also initiated other types of workouts, such as repayment plans and forbearances. It is difficult to predict how many of these trial modifications and initiated plans will be completed.

The number of foreclosure alternatives we agreed to during 2011 remained high as these are favorable solutions for a large number of borrowers. We expect the volume of our workouts and foreclosure alternatives to remain high throughout 2012.

Table 47 displays the profile of loan modifications (HAMP and non-HAMP) provided to borrowers during the years indicated.

**Table 47:   Single-Family Loan Modification Profile**

|  | 2011 | 2010 | 2009 |
|---|---|---|---|
| Term extension, interest rate reduction, or combination of both[1] | 99% | 93% | 93% |
| Initial reduction in monthly payment[2] | 96 | 91 | 87 |
| Estimated mark-to-market LTV ratio > 100% | 62 | 53 | 47 |
| Troubled debt restructurings[3] | 100 | 94 | 92 |

[1]   Reported statistics for term extension, interest rate reduction or the combination include subprime adjustable-rate mortgage loans that have been modified to a fixed-rate loan.

[2]   These modification statistics do not include subprime adjustable-rate mortgage loans that were modified to a fixed-rate loan and were current at the time of the modification.

[3]   Percentage for the year ended December 31, 2011 reflects the impact of the new TDR accounting guidance which was retrospectively adopted beginning January 1, 2011. Prior periods have not been revised.

Our approach to workouts continues to focus on the large number of borrowers facing financial hardships. Accordingly, the vast majority of loan modifications we have completed since 2009 have been concentrated on deferring or lowering the borrowers' monthly mortgage payments to allow borrowers to work through their hardships.

An increasing percentage of our modifications have been made to loans with a mark-to-market LTV ratio greater than 100%. These borrowers are typically unable to refinance their mortgages or sell their homes for a price that allows them to pay off their mortgage obligation as their mortgages are greater than the value of their homes. Additionally, the serious delinquency rate for these loans tends to be significantly higher than the overall average serious delinquency rate. As of December 31, 2011, the serious delinquency rate for loans with a mark-to-market LTV ratio greater than 100% was 14%, compared with our overall average single-family serious delinquency rate of 3.91%.

Table 48 displays the percentage of our loan modifications completed during 2010 and the second half of 2009 that were current and performing one year after modification, as well as the percentage of our loan modifications completed during the second half of 2009 that were current and performing two years after modification. We implemented HAMP in early 2009, and thus did not complete a significant number of modifications under this program until the third quarter of 2009.

TREASURY-2561

**Table 48:   Percentage of Loan Modifications That Were Current and Performing at One and Two Years Post-Modification**[1][2]

| | 2010 | | | | 2009 | |
|---|---|---|---|---|---|---|
| | Q4 | Q3 | Q2 | Q1 | Q4 | Q3 |
| **One Year Post-Modification** | | | | | | |
| HAMP Modifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 74% | 74% | 74% | 76% | 73% | 71% |
| Other Modifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 67% | 67% | 65% | 55% | 50% | 39% |
| **Two Years Post-Modification** | | | | | | |
| HAMP Modifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 67% | 64% |
| Other Modifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 48% | 37% |

_____

[1]   Excludes loans that were classified as subprime ARMs that were modified into fixed rate mortgages and were current at the time of modification. Modifications included permanent modifications, but do not reflect loans currently in trial modifications.

[2]   Includes loans that are paid off.

We began changing the structure of our non-HAMP modifications in 2010 to lower borrowers' monthly mortgage payments to a greater extent, which improved the performance of our non-HAMP modifications overall. In addition, because post-modification performance was greater for our HAMP modifications than for our non-HAMP modifications, we began in September 2010 to include trial periods for our non-HAMP modifications.

There is significant uncertainty regarding the ultimate long term success of our current modification efforts. We believe the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and income, and home prices. Modifications, even those with reduced monthly payments, may also not be sufficient to help borrowers with second liens and other significant non-mortgage debt obligations. FHFA, other agencies of the U.S. government or Congress may ask us to undertake new initiatives to support the housing and mortgage markets should our current modification efforts ultimately not perform in a manner that results in the stabilization of these markets. See "Risk Factors" for a discussion of efforts we may be required or asked to undertake and their potential affect on us.

*REO Management*

Foreclosure and REO activity affect the amount of credit losses realized in a given period. Table 49 displays our foreclosure activity, by region, for the periods indicated. Regional REO acquisition and charge-off trends generally follow a pattern that is similar to, but lags, that of regional delinquency trends.

TREASURY-2562

**Table 49:   Single-Family Foreclosed Properties**

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| Single-family foreclosed properties (number of properties): | | | |
| Beginning of period inventory of single-family foreclosed properties (REO)[1] . . . . . | 162,489 | 86,155 | 63,538 |
| Acquisitions by geographic area:[2] | | | |
| Midwest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 45,167 | 57,761 | 36,072 |
| Northeast . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9,858 | 14,049 | 7,934 |
| Southeast . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 51,153 | 79,453 | 39,302 |
| Southwest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 44,675 | 55,276 | 31,197 |
| West . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 48,843 | 55,539 | 31,112 |
| Total properties acquired through foreclosure[1] . . . . . . . . . . . . . . . . . . . . . . . . | 199,696 | 262,078 | 145,617 |
| Dispositions of REO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (243,657) | (185,744) | (123,000) |
| End of period inventory of single-family foreclosed properties (REO)[1] . . . . . . . . . | 118,528 | 162,489 | 86,155 |
| Carrying value of single-family foreclosed properties (dollars in millions)[3] . . . . . . | $ 9,692 | $ 14,955 | $ 8,466 |
| Single-family foreclosure rate[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.13% | 1.46% | 0.80% |

---

[1]  Includes acquisitions through deeds-in-lieu of foreclosure.

[2]  See footnote 9 to "Table 41: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for states included in each geographic region.

[3]  Excludes foreclosed property claims receivables, which are reported in our consolidated balance sheets as a component of "Acquired property, net."

[4]  Estimated based on the total number of properties acquired through foreclosure or deeds-in-lieu of foreclosure as a percentage of the total number of loans in our single-family guaranty book of business as of the end of each respective period.

The ongoing weak economy, as well as high unemployment rates, continues to result in a high level of mortgage loans that transition from delinquent to REO status, either through foreclosure or deed-in-lieu of foreclosure. Our foreclosure rates remain high; however, foreclosure levels were lower than they would have been during 2011 due to delays in the processing of foreclosures caused by continuing foreclosure process issues encountered by our servicers and new legislative, regulatory and judicial requirements. Additionally, foreclosure levels were affected by our directive to servicers to delay foreclosure sales until the loan servicer verifies that the borrower is ineligible for a HAMP modification and that all other home retention and foreclosure prevention alternatives have been exhausted. The delay in potential foreclosures, as well as an increase in the number of dispositions of REO properties, has resulted in a decrease in the inventory of foreclosed properties since December 31, 2010.

The percentage of our single-family foreclosed properties that we determined we were unable to market for sale was 47% as of December 31, 2011 compared with 41% as of December 31, 2010. The two largest concentrations of our unable-to-market-for-sale inventory are: (1) properties that are still occupied by the person or personal property, and for which the eviction process is not yet complete ("occupied status"); and (2) properties that are within the period during which state law allows the former mortgagor and second lien holders to redeem the property ("redemption status"). Being in occupied status lengthens the time a property remains in our REO inventory by an average of one to three months; occupied status properties represented approximately 31% of our unable to market for sale inventory as of December 31, 2011 compared with approximately 40% as of December 31, 2010. Being in redemption status lengthens the time a property remains in our REO inventory by an average of two to six months; redemption status properties represented approximately 26% of our unable to market for sale inventory as of December 31, 2011 compared with approximately 27% as of December 31, 2010. As we are unable to market a higher portion of our inventory, it slows the pace at which we can dispose of our properties and increases our foreclosed property expense related to costs associated with ensuring that the property is vacant and maintaining the property.

- 168 -

In February 2012, FHFA announced that it was beginning the pilot phase of an REO initiative that will allow qualified investors to purchase pools of foreclosed properties from us with the requirement to rent the purchased properties for a specified number of years. During the pilot phase, we will offer for sale pools of various types of assets including rental properties, vacant properties and nonperforming loans with a focus on the hardest-hit areas. We do not yet know whether this initiative will have a material impact on our future REO sales and REO inventory levels.

As shown in Table 50, we have experienced a disproportionate share of foreclosures in certain states as compared with their share of our guaranty book of business. This is primarily because these states have had significant home price depreciation or weak economies and, in the case of California and Florida specifically, a significant number of Alt-A loans.

**Table 50:   Single-Family Acquired Property Concentration Analysis**

| | As of | For the Year Ended | As of | For the Year Ended | As of | For the Year Ended |
|---|---|---|---|---|---|---|
| | **December 31, 2011** | | **December 31, 2010** | | **December 31, 2009** | |
| | Percentage of Book Outstanding[1] | Percentage of Properties Acquired by Foreclosure[2] | Percentage of Book Outstanding[1] | Percentage of Properties Acquired by Foreclosure[2] | Percentage of Book Outstanding[1] | Percentage of Properties Acquired by Foreclosure[2] |
| States: | | | | | | |
| Arizona, California, Florida, and Nevada . . . . . . . . . . . . . . . . . . . . . . | 28% | 33% | 28% | 36% | 28% | 36% |
| Illinois, Indiana, Michigan, and Ohio  .. | 10 | 17 | 11 | 17 | 11 | 20 |

[1]   Calculated based on the unpaid principal balance of loans, where we have detailed loan-level information, for each category divided by the unpaid principal balance of our single-family conventional guaranty book of business.

[2]   Calculated based on the number of properties acquired through foreclosure during the period divided by the total number of properties acquired through foreclosure.

*Multifamily Mortgage Credit Risk Management*

The credit risk profile of our multifamily mortgage credit book of business is influenced by the structure of the financing, the type and location of the property, the condition and value of the property, the financial strength of the borrower and lender, market and sub-market trends and growth, and the current and anticipated cash flows from the property. These and other factors affect both the amount of expected credit loss on a given loan and the sensitivity of that loss to changes in the economic environment. We provide information on our credit-related expenses and credit losses in "Business Segment Results—Multifamily Business Results."

While our multifamily mortgage credit book of business includes all of our multifamily mortgage-related assets, both on- and off-balance sheet, our guaranty book of business excludes non-Fannie Mae multifamily mortgage-related securities held in our portfolio for which we do not provide a guaranty. Our multifamily guaranty book of business consists of: multifamily mortgage loans held in our mortgage portfolio; Fannie Mae MBS held in our portfolio or by third parties; and other credit enhancements that we provide on mortgage assets.

<u>*Multifamily Acquisition Policy and Underwriting Standards*</u>

Our Multifamily business, with the oversight of our Enterprise Risk Management division, is responsible for pricing and managing the credit risk on multifamily mortgage loans we purchase and on Fannie Mae MBS backed by multifamily loans (whether held in our portfolio or held by third parties). Our primary multifamily delivery channel is the DUS program, which is comprised of multiple lenders that span the spectrum from large financial institutions to smaller independent multifamily lenders. Multifamily loans that we purchase or that back Fannie Mae MBS are either underwritten by a Fannie Mae-approved lender or subject to our underwriting review prior to closing, depending on the product type and/or loan size. Loans delivered to us by DUS lenders and their affiliates represented 86% of our multifamily guaranty book of business as of December 31, 2011, compared with 84% as of December 31, 2010 and 81% as of December 31, 2009.

- 169 -

We use various types of credit enhancement arrangements for our multifamily loans, including lender risk-sharing, lender repurchase agreements, pool insurance, subordinated participations in mortgage loans or structured pools, cash and letter of credit collateral agreements, and cross-collateralization/cross-default provisions. The most prevalent form of credit enhancement on multifamily loans is lender risk-sharing. Lenders in the DUS program typically share in loan-level credit losses in one of two ways: (1) they bear losses up to the first 5% of unpaid principal balance of the loan and share in remaining losses up to a prescribed limit; or (2) they share up to one-third of the credit losses on an equal basis with us. Non-DUS lenders typically share or absorb credit losses based on a negotiated percentage of the loan or the pool balance.

Table 51 displays the percentage of the unpaid principal balance of loans in our multifamily guaranty book of business with lender risk-sharing and with no recourse to the lender as of the dates indicated:

**Table 51:   Multifamily Lender Risk-Sharing**

|  | As of December 31, | |
| --- | --- | --- |
|  | 2011 | 2010 |
| Lender risk-sharing | | |
| DUS | 68% | 65% |
| Non-DUS negotiated | 11 | 13 |
| No recourse to the lender | 21 | 22 |

At the time of our purchase or guarantee of multifamily mortgage loans, we and our lenders rely significantly on sound underwriting standards, which often include third party appraisals and cash flow analysis. Our standards for multifamily loans specify maximum original LTV ratios and minimum original debt service coverage ratios ("DSCR") that vary based on the loan characteristics. Original LTV reflects the borrower equity in the transaction. Similarly, original DSCR reflects the anticipated cash flow on the transaction at underwriting, with additional measures taken to address higher risk loans. Our experience has been that original LTV and DSCR values have been reliable indicators of future credit performance. The weighted average original LTV ratio for our multifamily guaranty book of business was 66% as of December 31, 2011 and 67% as of December 31, 2010 and 2009. The percentage of our multifamily guaranty book of business with an original LTV ratio greater than 80% was 5% as of December 31, 2011, 2010, and 2009. We present the current risk profile of our multifamily guaranty book of business in "Note 6, Financial Guarantees."

*Multifamily Portfolio Diversification and Monitoring*

Diversification within our multifamily mortgage credit book of business by geographic concentration, term-to-maturity, interest rate structure, borrower concentration and credit enhancement arrangement is an important factor that influences credit quality and performance and helps reduce our credit risk.

We and our lenders monitor the performance and risk concentrations of our multifamily loans and the underlying properties on an ongoing basis throughout the life of the loan; at the loan, property and portfolio level. We track credit risk characteristics to determine the loan credit quality indicator, which are the internal risk categories and are further discussed in "Note 3, Mortgage Loans." The credit risk characteristics we use to help determine the internal risk categories include the physical condition of the property, delinquency status, the relevant local market and economic conditions that may signal changing risk or return profiles, and other risk factors. For example, we closely monitor the rental payment trends and vacancy levels in local markets to identify loans that merit closer attention or loss mitigation actions, in addition to capitalization rates. We are managing our exposure to refinancing risk for multifamily loans maturing in the next several years. We have a team that proactively manages upcoming loan maturities to minimize losses on maturing loans. This team assists lenders and borrowers with timely and appropriate refinancing of maturing loans with the goal of reducing defaults and foreclosures related to loans maturing in the near term. For our investments in multifamily loans, the primary asset management responsibilities are performed by our DUS and other multifamily lenders. We periodically evaluate these lenders' and our other third party service providers' performance for compliance with our asset management criteria.

- 170 -

As part of our ongoing credit risk management process, we have worked with our lenders over the last two years to collect limited sets of quarterly property operating measures from borrowers, in addition to more complete annual financial updates, for those loans where we are entitled contractually to receive such information. We focus on loans with an estimated current DSCR below 1.0, as that is one key indicator of a loan with a well-defined weakness that may jeopardize the timely full repayment, as well as a key input into the overall risk assessment process. The percentage of loans in our multifamily guaranty book of business with a current DSCR less than 1.0 was approximately 7% as of December 31, 2011 and approximately 10% as of December 31, 2010. Our estimates of current DSCRs are based on the latest available income information for these properties and our assessments of market conditions. Although we use the most recently available results from our multifamily borrowers, there is a lag in reporting, which typically can range from 6 to 18 months, as they prepare their results in the normal course of business.

*Problem Loan Management and Foreclosure Prevention*

The number of multifamily loans at risk of becoming seriously delinquent has decreased in 2011, as early-stage delinquencies have decreased. Since delinquency rates are a lagging indicator, we expect to continue to incur additional credit losses. We periodically refine our underwriting standards in response to market conditions and enact proactive portfolio management and monitoring which are each designed to keep credit losses to a low level relative to our multifamily guaranty book of business.

*Problem Loan Statistics*

Table 52 displays a comparison of our multifamily serious delinquency rates for loans with and without credit enhancement in our multifamily guaranty book of business. We classify multifamily loans as seriously delinquent when payment is 60 days or more past due. We include the unpaid principal balance of multifamily loans that we own or that back Fannie Mae MBS and any housing bonds for which we provide credit enhancement in the calculation of the multifamily serious delinquency rate.

**Table 52:   Multifamily Serious Delinquency Rates**

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2011** | | **2010** | | **2009** | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate |
| Multifamily loans: | | | | | | |
| Credit enhanced . . . . . . . . . . . . . | 90% | 0.55% | 89% | 0.67% | 89% | 0.54% |
| Non-credit enhanced . . . . . . . . . | 10 | 0.88 | 11 | 1.01 | 11 | 1.33 |
| Total multifamily loans . . . . . | 100% | 0.59% | 100% | 0.71% | 100% | 0.63% |

The multifamily serious delinquency rate decreased as of December 31, 2011 compared with December 31, 2010 as national multifamily market fundamentals continued to improve. Table 53 displays a comparison of our multifamily serious delinquency rates for loans acquired through DUS lenders versus loans acquired through non-DUS lenders and their percentage of total multifamily credit losses.

TREASURY-2566

**Table 53:   Multifamily Concentration Analysis**

| | As of December 31, | | | | | | Percentage of Multifamily Credit Losses For the Years Ended December 31, | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2011 | | 2010 | | 2009 | | | | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | 2011 | 2010 | 2009 |
| DUS small balance loans[1] . . . . . . . . . | 8% | 0.45% | 8% | 0.55% | 7% | 0.47% | 9% | 7% | 9% |
| DUS non small balance loans[2] . . | 72 | 0.51 | 70 | 0.56 | 69 | 0.38 | 72 | 61 | 77 |
| Non-DUS small balance loans[1] . . | 9 | 1.38 | 10 | 1.47 | 11 | 1.16 | 12 | 10 | 11 |
| Non-DUS non small balance loans[2] . . | 11 | 0.57 | 12 | 0.97 | 13 | 1.54 | 7 | 22 | 3 |

_____

[1]   Loans with original unpaid principal balances up to $3 million as well as loans in high cost markets with original unpaid principal balances up to $5 million.

[2]   Loans with original unpaid principal balances greater than $3 million as well as loans in high cost markets with original unpaid principal balances greater than $5 million.

The DUS loans in our guaranty book of business have lower delinquency rates when compared with the non-DUS loans in our guaranty book primarily due to the DUS model, which has several features that align our interests with those of the lenders. Small balance non-DUS loans continue to represent a disproportionately large share of delinquencies, but they are generally covered by loss sharing arrangements that limit the credit losses we incur.

Multifamily loans with an original balance of up to $3 million nationwide or $5 million in high cost markets, which we refer to as small balance loans, acquired through non-DUS lenders continue to exhibit higher delinquencies than small balance loans acquired through DUS lenders. These small balance non-DUS loans account for 20% of our multifamily serious delinquency rate and 9% of our multifamily guaranty book of business as of December 31, 2011 compared with 21% of our multifamily serious delinquency rate and approximately 10% of our multifamily guaranty book of business as of December 31, 2010. These small balance non-DUS loan acquisitions were most common in 2007 and 2008 and have not been a significant portion of our total multifamily acquisitions since 2008. Although our 2007 and early 2008 acquisitions were underwritten to our then-current credit standards and required borrower cash equity, they were acquired near the peak of multifamily housing values. During the second half of 2008, our underwriting standards were adjusted to reflect the evolving market trends at that time.

In addition, Florida, Nevada and Ohio have a disproportionately high share of seriously delinquent loans compared with their share of the multifamily guaranty book of business as a result of slow economic recovery in certain areas of these states. These states accounted for 39% of multifamily serious delinquencies but only 8% of the multifamily guaranty book of business as of December 31, 2011.

_REO Management_

Foreclosure and REO activity affect the level of credit losses. Table 54 displays our held for sale multifamily REO balances for the periods indicated.

TREASURY-2567

**Table 54:   Multifamily Foreclosed Properties**

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| Multifamily foreclosed properties (number of properties): | | | |
| Beginning of period inventory of multifamily foreclosed properties (REO) . . . . . . . . . . . | 222 | 73 | 29 |
| Total properties acquired through foreclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 257 | 232 | 105 |
| Disposition of REO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (219) | (83) | (61) |
| End of period inventory of multifamily foreclosed properties (REO) . . . . . . . . . . . . . . . . | 260 | 222 | 73 |
| Carrying value of multifamily foreclosed properties (dollars in millions) . . . . . . . . . . . . | $ 577 | $596 | $265 |

The increase in our multifamily foreclosed property inventory reflects the continuing stress on our multifamily guaranty book of business as certain local markets and properties continue to exhibit weak fundamentals, though national multifamily market fundamentals continued to improve in 2011.

### Institutional Counterparty Credit Risk Management

We rely on our institutional counterparties to provide services and credit enhancements, including primary and pool mortgage insurance coverage, risk sharing agreements with lenders and financial guaranty contracts that are critical to our business. Institutional counterparty credit risk is the risk that these institutional counterparties may fail to fulfill their contractual obligations to us, including seller/servicers who are obligated to repurchase loans from us or reimburse us for losses in certain circumstances. Defaults by a counterparty with significant obligations to us could result in significant financial losses to us.

Several of our institutional counterparties may now be subject to provisions of the Dodd-Frank Act. However, we cannot predict its potential impact on our company or our industry at this time. For additional discussion on key provisions and additional information about this legislation please see "Legislative and Regulatory Developments—Financial Regulatory Reform Legislation" and "Risk Factors."

We have exposure primarily to the following types of institutional counterparties:

- mortgage seller/servicers that service the loans we hold in our investment portfolio or that back our Fannie Mae MBS;

- third-party providers of credit enhancement on the mortgage assets that we hold in our investment portfolio or that back our Fannie Mae MBS, including mortgage insurers, financial guarantors and lenders with risk sharing arrangements;

- custodial depository institutions that hold principal and interest payments for Fannie Mae portfolio loans and MBS certificateholders, as well as collateral posted by derivatives counterparties, repurchase transaction counterparties and mortgage originators or servicers;

- issuers of securities held in our cash and other investments portfolio;

- derivatives counterparties;

- mortgage originators and investors;

- debt security and mortgage dealers; and

- document custodians.

We routinely enter into a high volume of transactions with counterparties in the financial services industry, including brokers and dealers, mortgage lenders and commercial banks, and mortgage insurers, resulting in a significant credit concentration with respect to this industry. We also have significant concentrations of credit

TREASURY-2568

risk with particular counterparties. Many of our institutional counterparties provide several types of services for us. For example, many of our lender customers or their affiliates act as mortgage seller/servicers, derivatives counterparties, custodial depository institutions and document custodians on our behalf.

Unfavorable market conditions have adversely affected, and continue to adversely affect, the liquidity and financial condition of many of our institutional counterparties, which has significantly increased the risk to our business of defaults by these counterparties due to bankruptcy or receivership, lack of liquidity, insufficient capital, operational failure or other reasons. As described in "Risk Factors," the financial difficulties that our institutional counterparties are experiencing may negatively affect their ability to meet their obligations to us and the amount or quality of the products or services they provide to us.

In the event of a bankruptcy or receivership of one of our counterparties, we may be required to establish our ownership rights to the assets these counterparties hold on our behalf to the satisfaction of the bankruptcy court or receiver, which could result in a delay in accessing these assets causing a decline in their value. In addition, if we are unable to replace a defaulting counterparty that performs services that are critical to our business with another counterparty, it could materially adversely affect our ability to conduct our operations.

On September 22, 2009, we filed a proof of claim as a creditor in the bankruptcy case of Lehman Brothers Holdings, Inc., which filed for bankruptcy in September 2008. The claim of $8.9 billion included losses we incurred in connection with the termination of our outstanding derivatives contracts with a subsidiary of Lehman Brothers, federal securities law claims related to Lehman Brothers private-label securities and notes held in our cash and other investments portfolio, losses arising under certain REMIC and grantor trust transactions, and mortgage loan repurchase obligations. A contingent claim of $6.9 billion was also included, primarily relating to a large multifamily transaction. However, we believe we will receive only a portion of our total claims based on Lehman Brothers' financial condition.

*Mortgage Seller/Servicers*

Our primary exposures to institutional counterparty risk are with mortgage seller/servicers that service the loans we hold in our mortgage portfolio or that back our Fannie Mae MBS, as well as seller/servicers that are obligated to repurchase loans from us or reimburse us for losses in certain circumstances. We rely on mortgage seller/servicers to meet our servicing standards and fulfill their servicing obligations. As the volume of repurchase requests increases, the risk increases that affected seller/servicers will not be willing or able to meet the terms of their repurchase obligations and we may be unable to recover on all outstanding loan repurchase obligations resulting from seller/servicers' breaches of contractual obligations.

Mortgage seller/servicers collect mortgage and escrow payments from borrowers, pay taxes and insurance costs from escrow accounts, monitor and report delinquencies, and perform other required activities on our behalf. We have minimum standards and financial requirements for mortgage seller/servicers. For example, we require servicers to collect and retain a sufficient level of servicing fees to reasonably compensate a replacement servicer in the event of a servicing contract breach. In addition, we perform periodic on-site and financial reviews of our servicers and monitor their financial and portfolio performance as compared to peers and internal benchmarks. We work with our largest servicers to establish performance goals and monitor performance against the goals, and our servicing consultants work with servicers to improve servicing results and compliance with our servicing guide.

We likely would incur costs and potential increases in servicing fees and could also face operational risks if we decide to replace a mortgage seller/servicer. If a significant mortgage servicer counterparty fails, and its mortgage servicing obligations are not transferred to a company with the ability and intent to fulfill all of these obligations, we could incur penalties for late payment of taxes and insurance on the properties that secure the mortgage loans serviced by that mortgage seller/servicer. We could also be required to absorb losses on defaulted loans that a failed servicer is obligated to repurchase from us if we determine there was an underwriting or eligibility breach.

TREASURY-2569

Risk management steps we have taken or may take to mitigate our risk to sellers and servicers with whom we have material counterparty exposure include guaranty of obligations by higher-rated entities, reduction or elimination of exposures, reduction or elimination of certain business activities, transfer of exposures to third parties, receipt of collateral and suspension or termination of the selling and servicing relationship.

We are exposed to the risk that a mortgage seller/servicer or another party involved in a mortgage loan transaction will engage in mortgage fraud by misrepresenting the facts about the loan. We have experienced financial losses in the past and may experience significant financial losses and reputational damage in the future as a result of mortgage fraud. See "Risk Factors" for additional discussion on risks of mortgage fraud to which we are exposed.

Our business with our mortgage seller/servicers is concentrated. Our ten largest single-family mortgage servicers, including their affiliates, serviced 75% of our single-family guaranty book of business as of December 31, 2011, compared to 77% as of December 31, 2010. Our largest mortgage servicer is Bank of America, N.A. which, together with its affiliates, serviced approximately 21% of our single-family guaranty book of business as of December 31, 2011, compared with 26% as of December 31, 2010. In addition, we had two other mortgage servicers, JPMorgan Chase Bank, N.A. and Wells Fargo Bank, N.A., that, with their affiliates, each serviced over 10% of our single-family guaranty book of business as of December 31, 2011. In addition, Wells Fargo Bank serviced over 10% of our multifamily guaranty book of business as of December 31, 2011 and 2010. Because we delegate the servicing of our mortgage loans to mortgage servicers and do not have our own servicing function, servicers' lack of appropriate process controls or the loss of business from a significant mortgage servicer counterparty could pose significant risks to our ability to conduct our business effectively. Many of our largest servicer counterparties continue to reevaluate the effectiveness of their process controls. Many servicers are also subject to consent orders by their regulators that require the servicers to correct foreclosure process deficiencies and improve their servicing and foreclosure practices. This has resulted in extended foreclosure timelines and, therefore, additional holding costs for us, such as property taxes and insurance, repairs and maintenance, and valuation adjustments due to home price changes. See "Executive Summary" for a discussion of managing foreclosure timelines.

Unfavorable market conditions have adversely affected, and continue to adversely affect, the liquidity and financial condition and performance of many of our mortgage seller/servicers. Several mortgage seller/servicers have experienced ratings downgrades and liquidity constraints. However, our primary mortgage servicer counterparties have generally continued to meet their obligations to us during 2011.

Our mortgage seller/servicers are obligated to repurchase loans or foreclosed properties, or reimburse us for losses if the foreclosed property has been sold, under certain circumstances, such as if it is determined that the mortgage loan did not meet our underwriting or eligibility requirements, if loan representations and warranties are violated or if mortgage insurers rescind coverage. We refer to our demands that seller/servicers meet these obligations collectively as "repurchase requests." The number of our repurchase requests remained high during 2011, and we expect that the amount of our outstanding repurchase requests will remain high.

During 2011, Fannie Mae issued repurchase requests to seller/servicers for breaches of contractual obligations on $23.8 billion in loans, measured by unpaid principal balance. As of December 31, 2011, $13.5 billion, or 57%, of these requests were resolved in our favor and $9.6 billion, or 40%, remained outstanding. Repurchase requests were concluded in our favor through the repurchase collection, reimbursement of losses, or other remedies such as, but not limited to, loan pricing adjustments, indemnification or forward repurchase agreements, lender corrective action, or negotiated settlements. Similarly, during 2010, Fannie Mae issued repurchase requests to seller/servicers on $13.1 billion in loans, measured by unpaid principal balance. As of December 31, 2011, $11.8 billion, or 90%, of these requests were resolved in our favor and $658 million, or 5%, remained outstanding. During 2011, the aggregate unpaid principal balance of loans repurchased by our seller/servicers pursuant to their contractual obligations was $11.5 billion, compared with $8.8 billion in 2010.

TREASURY-2570

Table 55 displays our top five mortgage seller/servicers by outstanding repurchase requests based on the unpaid principal balance of the loans underlying repurchase requests issued as of December 31, 2011 as well as the seller/servicers' percentage of our repurchase requests that are over 120 days outstanding.

**Table 55:   Outstanding Repurchase Requests**

| Mortgage Seller/Servicer Counterparty: | As of December 31, 2011 | |
| --- | --- | --- |
| | Outstanding Repurchase Requests[1] | Percentage of Outstanding Repurchase Requests Over 120 Days[2] |
| | (Dollars in millions) | |
| Bank of America, N.A. | $ 5,449 | 18% |
| JPMorgan Chase Bank, N.A. | 1,136 | 2 |
| Citimortgage[3] | 917 | 2 |
| Wells Fargo Bank, N.A.[3] | 830 | 2 |
| SunTrust Bank, Inc.[3] | 430 | * |
| Other[4] | 1,638 | 6 |
| Total | $10,400 | |
| Outstanding repurchase requests over 120 days | $ 3,139 | |

---

\*    Less than 0.5%.

[1]    Includes repurchase requests resulting from the rescission of mortgage insurance coverage.

[2]    Represents the percentage of our total outstanding repurchase requests that have been outstanding for more than 120 days from either the original repurchase date or, for lenders remitting after the property is disposed, the date of our final loss determination.

[3]    Seller/servicer has entered into a plan with us to resolve outstanding repurchase requests and/or has posted collateral to us.

[4]    Includes some seller/servicers that have entered into a plan with us to resolve outstanding repurchase requests and/or have posted collateral to us.

The dollar amounts of our outstanding repurchase requests provided above are based on the unpaid principal balance of the loans underlying the repurchase request issued, not the actual amount we have requested from the lenders. In some cases, we allow lenders to remit payment equal to our loss, including imputed interest, on the loan after we have disposed of the REO, which is less than the unpaid principal balance of the loan. As a result, we expect our actual cash receipts relating to these outstanding repurchase requests to be significantly lower than the unpaid principal balance of the loan. Amounts relating to repurchase requests originating from missing documentation or loan files are excluded from the total requests outstanding until the completion of a full underwriting review, once the documents and loan files are received.

In the fourth quarter of 2011, Bank of America, the seller/servicer with which we have the most repurchase requests outstanding, slowed the pace of its repurchases. As a result of Bank of America's failure to honor its contractual obligations in a timely manner, the already high volume of our outstanding repurchase requests with Bank of America increased substantially. Measured by unpaid principal balance, Bank of America accounted for approximately 52% of our total outstanding repurchase requests as of December 31, 2011, compared with 45% as of September 30, 2011 and 41% as of December 31, 2010, shortly after entering into an agreement with us to address its then-outstanding repurchase requests. Similarly, Bank of America accounted for 59% of our repurchase requests that had been outstanding for more than 120 days as of December 31, 2011, compared with 48% as of September 30, 2011 and 37% as of December 31, 2010. We are taking steps to address Bank of America's delays in honoring our repurchase requests. For example, we did not renew our existing loan delivery contract with Bank of America at the end of January, which significantly restricted the types of loans it can

TREASURY-2571

deliver to us. Bank of America can continue delivering loans to us under our Refi Plus initiative, including HARP loans. Bank of America's failure to honor repurchase obligations in a timely manner has not caused us to change our estimate of the amounts we expect to collect from them ultimately, and we continue to work with Bank of America to resolve these issues. If we collect less than the amount we expect from Bank of America, we may be required to seek additional funds from Treasury under our senior preferred stock purchase agreement. Table 55 displays our top five mortgage seller/servicers by outstanding repurchase requests based on the unpaid principal balance of the loans underlying repurchase requests issued as of December 31, 2011. We do not expect the change in our agreement with Bank of America to be material to our business or results of operations as Bank of America represented less than 5% of our loan delivery volume in the quarter ended December 31, 2011.

In June 2011, we issued an announcement that (1) reminded lenders of their existing obligations with respect to mortgage insurance; (2) required lenders to report to us mortgage insurance rescissions, mortgage insurer-initiated cancellations, and claim denials; (3) confirmed our repurchase policies with respect to these actions; (4) temporarily extended from 30 to 90 days our timeframe within which lenders must repurchase loans and provided an appeal process; (5) required that all outstanding mortgage insurance-related repurchase demands as of April 30, 2011 be satisfactorily resolved by September 30, 2011; (6) reiterated our process for the redelivery of certain repurchased loans; and (7) reiterated our remedies if a lender fails to meet our repurchase requirements.

Not all outstanding mortgage insurance related repurchase demands as of April 30, 2011 were resolved by September 30, 2011. We entered into "tolling agreements" with several of our major lenders that required these lenders to post collateral based on their maximum exposure in exchange for an extension until June 2012 to resolve their outstanding mortgage insurance related repurchase demands. Bank of America has disputed many of these demands and accounts for nearly half of these unresolved mortgage insurance related requests.

We continue to aggressively pursue our contractual rights associated with these repurchase requests, including the repurchase requests we have made to Bank of America. Failure by a seller/servicer to repurchase a loan or to otherwise make us whole for our losses, may result in the imposition of certain sanctions including, but not limited to:

- requiring the posting of collateral,
- denying transfer of servicing requests or denying pledged servicing requests,
- modifying or suspending any contract or agreement with a lender, or
- suspending or terminating a lender or imposing some other formal sanction on a lender.

If we are unable to resolve these matters to our satisfaction, we may seek additional remedies. If we are unable to resolve our repurchase requests, either through collection or additional remedies, we will not recover the losses we have recognized from the associated loans.

We continue to work with our mortgage seller/servicers to fulfill outstanding repurchase requests. Failure by a significant seller/servicer counterparty, or a number of seller/servicers, to fulfill repurchase obligations to us could result in a significant increase in our credit losses and have a material adverse effect on our results of operations and financial condition. In addition, actions we take to pursue our contractual remedies could increase our costs, reduce our revenues, or otherwise have a material, adverse effect on our results of operations or financial condition. We estimate our allowance for loan losses assuming the benefit of repurchase demands only from those counterparties we determine have the financial capacity to fulfill this obligation. Accordingly, as of December 31, 2011, in estimating our allowance for loan loss we assumed no benefit from repurchase demands due to us from seller/servicers that lacked the financial capacity to honor their contractual obligations.

*Mortgage Insurers*

We use several types of credit enhancement to manage our single-family mortgage credit risk, including primary and pool mortgage insurance coverage. Table 56 displays our maximum potential loss recovery for the primary and pool mortgage insurance coverage on single-family loans in our guaranty book of business and our unpaid principal balance covered by insurance for our mortgage insurer counterparties as of December 31, 2011 and 2010. The table includes our top nine mortgage insurer counterparties, which provided over 99% of our total mortgage insurance coverage on single-family loans in our guaranty book of business as of December 31, 2011 and 2010.

- 177 -

**Table 56:   Mortgage Insurance Coverage**

| Counterparty:[3] | Maximum Coverage[1] | | | As of December 31, 2010 | Unpaid Principal Balance Covered By Insurance[2] | |
| | As of December 31, 2011 | | | | As of December 31, 2011 | As of December 31, 2010 |
| | Primary | Pool | Total | | | |
| | (Dollars in millions) | | | | | |
| Mortgage Guaranty Insurance Corporation  . . . | $20,000 | $1,479 | $21,479 | $23,277 | $ 89,872 | $101,823 |
| Radian Guaranty, Inc.  . . . . . . . . . . . . . . . . . . . | 15,072 | 433 | 15,505 | 15,370 | 63,534 | 64,042 |
| United Guaranty Residential Insurance Company  . . . . . . . . . . . . . . . . . . . . . . . . | 14,439 | 140 | 14,579 | 14,044 | 59,233 | 58,416 |
| Genworth Mortgage Insurance Corporation  . . . | 13,566 | 62 | 13,628 | 14,331 | 54,893 | 57,845 |
| PMI Mortgage Insurance Co.  . . . . . . . . . . . . . | 10,873 | 255 | 11,128 | 12,359 | 47,734 | 53,768 |
| Republic Mortgage Insurance Company  . . . . . | 8,322 | 897 | 9,219 | 10,566 | 39,130 | 46,660 |
| Triad Guaranty Insurance Corporation  . . . . . . | 2,492 | 658 | 3,150 | 3,809 | 12,400 | 16,974 |
| CMG Mortgage Insurance Company[4]  . . . . . . . | 1,951 | — | 1,951 | 1,938 | 8,241 | 8,174 |
| Essent Guaranty, Inc.  . . . . . . . . . . . . . . . . . . . | 395 | — | 395 | — | 1,685 | — |
| Others  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 217 | — | 217 | 209 | 1,214 | 1,140 |
| Total  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $87,327 | $3,924 | $91,251 | $95,903 | $377,936 | $408,842 |
| Total as a percentage of single-family guaranty book of business  . . . . . . . . . . . . . . . . . . . . . | | | 3% | 3% | 13% | 14% |

[1]   Maximum coverage refers to the aggregate dollar amount of insurance coverage (that is, "risk in force") on single-family loans in our guaranty book of business and represents our maximum potential loss recovery under the applicable mortgage insurance policies.

[2]   Represents the unpaid principal balance of single-family loans in our guaranty book of business covered under the applicable mortgage insurance policies (that is, "insurance in force").

[3]   Insurance coverage amounts provided for each counterparty may include coverage provided by consolidated affiliates and subsidiaries of the counterparty.

[4]   CMG Mortgage Insurance Company is a joint venture owned by PMI Mortgage Insurance Co. and CUNA Mutual Insurance Society.

Increases in mortgage insurance claims due to higher defaults and credit losses in recent periods have adversely affected the financial results and condition of mortgage insurers. Each of our top seven mortgage insurer counterparties that continue to be rated by S&P, Fitch and Moody's have a current insurer financial strength rating below the "AA-" level that we require under our qualified mortgage insurer approval requirements to be considered qualified as a "Type 1" mortgage insurer. Due to these low credit ratings, we primarily rely on our internal credit ratings when assessing our exposure to a counterparty.

Our rating structure is based on a scale of 1 to 20. A rating of 1 represents a counterparty that we view as having excellent credit quality and a rating of 20 represents a counterparty with poor credit quality. These internal ratings, which reflect our views of a mortgage insurer's claims paying ability, are based primarily on an assessment of the mortgage insurer's capital adequacy and liquidity. These assessments involve in-depth credit reviews of each mortgage insurer, a comprehensive analysis of the mortgage insurance sector, stress analyses of the insurer's portfolio, discussions with the insurer's management, the insurer's plans to maintain capital within the insuring entity and our views on macroeconomic variables which impact a mortgage insurer's estimated future paid losses, such as changes in home prices and changes in interest rates. From time to time, we may also discuss a counterparty's situation with the rating agencies.

As of February 29, 2012, three of our mortgage insurers (Triad, RMIC and PMI) have publicly disclosed that they are in run-off. One mortgage insurer, Genworth Mortgage Insurance Corporation, has publicly disclosed that

TREASURY-2573

absent a waiver it estimates that it would not meet state regulatory capital requirements for its main insurance writing entity as of December 31, 2011. An additional two of our mortgage insurers (Mortgage Guaranty Insurance Corporation and Radian Guaranty, Inc.) have disclosed that, in the absence of additional capital contributions to their insurance writing entity, their capital might fall below state regulatory capital requirements in the future. These six mortgage insurers provided a combined $74.1 billion, or 81%, of our risk in force mortgage insurance coverage of our single-family guaranty book of business as of December 31, 2011. We are unable to determine how long certain of our mortgage insurer counterparties will remain below their state-imposed risk-to-capital limits. If mortgage insurers are not able to raise capital and they exceed their risk-to-capital limits, they will likely be forced into run-off or receivership unless they can secure and maintain a waiver from their state regulator. A mortgage insurer that is in run-off continues to collect premiums and pay claims on its existing insurance business, but no longer writes new insurance. This would increase the risk that the mortgage insurer will fail to pay our claims under insurance policies, and could also cause the quality and speed of its claims processing to deteriorate.

The already weak financial condition of many of our mortgage insurer counterparties deteriorated at an accelerated pace during the second half of 2011, which increased the significant risk that these counterparties will fail to fulfill their obligations to pay our claims under insurance policies. We evaluate each of our mortgage insurer counterparties individually to determine whether or under what conditions it will remain eligible to insure new mortgages sold to us. However, based on our evaluation, we may impose additional terms and conditions of approval on some of our mortgage insurers, including: limiting the volume and types of loans they may insure for us; requiring them to obtain our consent prior to providing risk sharing arrangements with mortgage lenders; requiring them to meet certain financial conditions, such as maintaining a minimum level of policyholders' surplus, a maximum risk-to-capital ratio, a maximum combined ratio, or a minimum amount of acceptable liquid assets; or requiring that they secure parental or other capital support agreements.

On July 29, 2011, we notified RMIC that, effective immediately, both RMIC and its affiliate, Republic Mortgage Insurance Company of North Carolina ("RMIC-NC"), were suspended nationwide as approved mortgage insurers. We also notified our mortgage sellers and servicers that we would not accept any mortgage loan insured by RMIC or RMIC-NC that is delivered after November 30, 2011, except for refinanced Fannie Mae loans where continuation of the coverage is effected through modification of an existing mortgage insurance certificate. On October 12, 2011, RMIC and RMIC-NC each voluntarily entered into an agreement with their regulator to discontinue writing or assuming any new mortgage guaranty insurance business in all states. RMIC's parent company has indicated that it is more likely than not that the capital contributed to RMIC by its parent company will "continue on a path toward full depletion in relatively short order." In January 2012, RMIC's parent company announced that RMIC has been ordered into supervision by its regulator. Pursuant to the order, effective January 20, 2012, RMIC is paying 50% of all valid claims for an initial period not to exceed one year, with the remaining 50% deferred. It is uncertain when, and if, RMIC's regulator will allow RMIC to begin paying its deferred claims and/or increase the amount of cash RMIC pays on claims.

Following issuance by the Arizona Department of Insurance of a supervisory order directing PMI and its subsidiary PMI Insurance Co. ("PIC") to cease offering new commitments for insurance after August 19, 2011 and to cease issuing certificates after September 16, 2011, we notified PMI on August 22, 2011 that, effective immediately, PMI and its subsidiaries, PIC and PMI Mortgage Assurance Co. ("PMAC"), were suspended nationwide as approved mortgage insurers. We simultaneously notified our mortgage sellers and servicers that we would not accept any mortgage loan insured by PMI, PIC or PMAC that is delivered after December 30, 2011, except for refinanced Fannie Mae loans where continuation of the coverage is effected through modification of an existing mortgage insurance certificate.

As reported by PMI, on October 20, 2011, PMI received from its regulator an order under which the regulator now has full possession, management and control of PMI. The regulator is also seeking to place PMI into receivership; PMI's holding company has consented. As a result, we expect PMI to soon be placed in receivership. Pursuant to the order, effective October 24, 2011, the regulator instituted a partial claim payment plan whereby PMI pays 50% on all valid claims under PMI mortgage guaranty insurance policies and 50% is

- 179 -

deferred as a policyholder claim. It is uncertain when, and if, PMI's regulator will allow PMI to begin paying its deferred policyholder claims and/or increase the amount of cash PMI pays on claims.

Triad ceased issuing commitments for new mortgage insurance and began to run-off its existing business in July 2008. In April 2009, Triad received an order from its regulator that changes the way it will pay all policyholder claims. Under the order, Triad will pay 60% of all valid claims under Triad's mortgage guaranty insurance policies and defer the remaining 40% by the creation of a deferred payment obligation. Triad began paying claims through this combination of cash and deferred payment obligations in June 2009. When, and if, Triad's financial position permits, Triad's regulator will allow Triad to begin paying its deferred payment obligations and/or increase the amount of cash Triad pays on claims.

The claims obligations of RMIC, PMI and Triad have been partially deferred pursuant to orders from their state regulators. State regulators could take additional corrective actions against these companies, including placing them into receivership. While our remaining mortgage insurers have continued to pay claims owed to us in full, there can be no assurance that they will continue to do so given their current financial condition. If we determine that it is probable that we will not collect all of our claims from one or more of these mortgage insurer counterparties, it could result in an increase in our loss reserves, which could adversely affect our earnings, liquidity, financial condition and net worth.

Some mortgage insurers have explored corporate restructurings designed to provide relief from risk-to-capital limits in certain states. We have approved several restructurings so that certain of our mortgage insurer counterparties could continue to write new business in all fifty states. Additionally, mortgage insurers continue to approach us with various proposed corporate restructurings that would require our approval of affiliated mortgage insurance writing entities.

The number of mortgage loans for which our mortgage insurer counterparties have rescinded coverage continues to remain high. In those cases where the mortgage insurer has rescinded coverage, we generally require the seller/servicer to repurchase the loan or indemnify us against loss. The table below displays cumulative rescission rates as of December 31, 2011, by the period in which the claim was filed. We do not present information for claims filed in the most recent two quarters to allow sufficient time for a substantial percentage of the claims filed to reach reasonable resolution.

**Table 57:   Rescission Rates of Mortgage Insurance Claims**

|  | As of December 31, 2011 | |
| --- | --- | --- |
|  | Cumulative Rescission Rate[1] | Cumulative Claims Resolution Percentage[2] |
| **Primary mortgage insurance claims filed in:** | | |
| 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11% | 88% |
| First half of 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | 46 |
| **Pool mortgage insurance claim filed in:** | | |
| 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 | 99 |
| First half of 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 | 92 |

[1]   Represents claims filed during the period that have been rescinded as of December 31, 2011, divided by total claims filed during the same period.

[2]   Represents claims filed during the period that have been resolved as of December 31, 2011, divided by the total claims filed during the same period. Claims resolved mainly consist of claims for which we have settled and claims for which coverage has been rescinded by the mortgage insurer.

In 2010, some mortgage insurers disclosed that they entered into agreements with lenders whereby they agreed to waive certain rights to investigate claims for some of the lenders' insured loans in return for some compensation against loss. These agreements are likely to result in fewer mortgage insurance rescissions for certain groups of loans, but they do not affect our rights to demand repurchase in the event of violations of lender representations and warranties.

- 180 -

As a result, in April 2011, we issued an announcement which prohibited servicers from entering into any agreement that modifies the terms of an approved mortgage insurance master policy on loans delivered to us. We also required servicers to disclose any such agreements with mortgage insurers to us. With respect to our mortgage insurance counterparties, changes to the substance of their master policies have required our prior approval since 2005. In October 2010, we required our top mortgage insurers to notify us promptly of any agreement that affects their investigative or rescission rights. In April 2011, we further clarified and amended our mortgage insurer requirements to prohibit any agreement that has the effect of modifying a master policy, including any investigative or rescission rights, absent our approval. By taking these steps, we expect to mitigate the risk of loss for loans that would have resulted in mortgage insurance rescission, and—as a result—a lender repurchase, for loan defects that we may not have otherwise uncovered in our independent review process.

When we estimate the credit losses that are inherent in our mortgage loan portfolio and under the terms of our guaranty obligations we also consider the recoveries that we will receive on primary mortgage insurance, as mortgage insurance recoveries would reduce the severity of the loss associated with defaulted loans. We evaluate the financial condition of our mortgage insurer counterparties and adjust the contractually due recovery amounts to ensure that only probable losses as of the balance sheet date are included in our loss reserve estimate. As a result, if our assessment of one or more of our mortgage insurer counterparty's ability to fulfill their respective obligations to us worsens, it could result in an increase in our loss reserves.

The following table displays our estimated benefit from mortgage insurer recoveries. Our valuation allowance for mortgage insurer receivables increased significantly from December 31, 2010 to December 31, 2011 as a result of our determination that our mortgage insurer counterparties' financial condition has deteriorated.

**Table 58:   Estimated Mortgage Insurance Benefit**

|  | As of December 31, | |
|---|---|---|
|  | **2011** | **2010** |
|  | **(Dollars in millions)** | |
| Contractual mortgage insurance benefit[1] ...................................... | $15,099 | $17,507 |
| Less: Collectability adjustment[2] ............................................... | 2,867 | 1,150 |
| Estimated benefit included in total loss reserves .................................. | $12,232 | $16,357 |

---

[1]  Relates to loans that are individually measured for impairment and those that are collectively reserved.

[2]  Represents an adjustment that reduces the contractual benefit for our assessment of our mortgage insurer counterparties' inability to fully pay the contractual mortgage insurance claims.

For loans that are collectively evaluated for impairment, we estimate the portion of our incurred loss that we expect to recover from each of our mortgage insurance counterparties based on the losses that have been incurred, the contractual mortgage insurance coverage, and an estimate of each counterparty's resources available to pay claims to us. An analysis by our Counterparty Risk division determines whether, based on all the information available to us, any counterparty is considered probable to fail to meet their obligations in the next 30 months. This period is consistent with the amount of time over which claims related to losses incurred today are expected to be paid. If that separate analysis finds a counterparty is probable to fail, we then reserve for the shortfall between incurred claims and estimated resources available to pay claims to us.

For loans that have been determined to be individually impaired, we calculate a net present value of the expected cash flows for each loan to determine the level of impairment, which is included in our allowance for loan losses or reserve for guaranty losses. These expected cash flow projections include proceeds from mortgage insurance, that are based, in part, on the internal credit ratings for each of our mortgage insurance counterparties. Specifically, for loans insured by a mortgage insurer with a poorer credit rating, our cash flow projections include fewer proceeds from the insurer. Also, as our internal credit ratings of our mortgage insurer counterparties decrease, we reduce the amount of benefits we expect to receive from the insurance they provide, which in turn increases the fair value of our guaranty obligation.

- 181 -

TREASURY-2576

As described above, our methodologies for individually and collectively impaired loans differ as required by GAAP, but both consider the ability of our counterparties to pay their obligations in a manner that is consistent with each methodology. As the loans individually assessed for impairment consider the life of the loan, we use the noted risk ratings to adjust the loss severity in our best estimates of future cash flows. As the loans collectively assessed for impairment only look to the probable payments we would receive associated with our loss emergence period, we use the noted shortfall to adjust the loss severity.

When an insured loan held in our mortgage portfolio subsequently goes into foreclosure, we charge off the loan, eliminating any previously-recorded loss reserves, and record REO and a mortgage insurance receivable for the claim proceeds deemed probable of recovery, as appropriate. However, if a mortgage insurer rescinds insurance coverage, the initial receivable becomes due from the mortgage seller/servicer. We had outstanding receivables of $3.6 billion as of December 31, 2011 and $4.4 billion as of December 31, 2010 related to amounts claimed on insured, defaulted loans that we have not yet received, of which $639 million as of December 31, 2011 and $648 million as of December 31, 2010 was due from our mortgage seller/servicers. We assessed the total outstanding receivables for collectibility, and they were recorded net of a valuation allowance of $570 million as of December 31, 2011 and $317 million as of December 31, 2010 in "Other assets." These mortgage insurance receivables are short-term in nature, having an average duration of approximately six months, and the valuation allowance reduces our claim receivable to the amount that we consider probable of collection. We received proceeds under our primary and pool mortgage insurance policies for single-family loans of $5.8 billion during 2011 and $6.4 billion during 2010.

From time to time, we may enter into negotiated transactions with mortgage insurer counterparties pursuant to which we agree to cancel or restructure insurance coverage, in excess of charter requirements, in exchange for a fee. These insurance cancellations and restructurings may provide our counterparties with capital relief and provide us with cash in lieu of future claims that the counterparty may not be able to pay, thereby reducing our future counterparty credit exposure. The cash fees received of $796 million during 2010 are included in our total proceeds amount. Although we did not cancel or restructure any coverage during 2011, we may negotiate additional insurance coverage cancellations or restructurings in 2012.

We generally are required, pursuant to our charter, to obtain credit enhancement on single-family conventional mortgage loans that we purchase or securitize with LTV ratios over 80% at the time of purchase. In connection with Refi Plus, we are generally able to purchase an eligible loan if the loan has mortgage insurance in an amount at least equal to the amount of mortgage insurance that existed on the loan that was refinanced. As a result, these refinanced loans with updated LTV ratios above 80% may have no mortgage insurance or less insurance than we would otherwise require for a loan not originated under this program. In 2011, most mortgage insurance companies lowered their premiums for loans with high credit scores, and FHA implemented a price increase in their annual mortgage insurance premium. Both price changes improved the economics of purchasing private mortgage insurance as compared to purchasing FHA insurance and drove an increase in our acquisition of mortgage loans with LTV ratios over 80%.

*Financial Guarantors*

We are the beneficiary of financial guarantees on non-agency securities held in our investment portfolio and on non-agency securities that have been resecuritized to include a Fannie Mae guaranty and sold to third parties. Table 59 displays the total unpaid principal balance of guaranteed non-agency securities in our portfolio as of December 31, 2011, and 2010.

- 182 -

TREASURY-2577

**Table 59:   Unpaid Principal Balance of Financial Guarantees**

|  | As of December 31, | |
|---|---|---|
|  | **2011** | **2010** |
|  | (Dollars in millions) | |
| Alt-A private-label securities ................................................................. | $1,279 | $1,544 |
| Subprime private-label securities ........................................................... | 1,398 | 1,487 |
| Mortgage revenue bonds ...................................................................... | 4,931 | 5,264 |
| Other mortgage-related securities ........................................................... | 317 | 347 |
| Non mortgage-related securities ............................................................. | 46 | 172 |
| Total ............................................................................................ | $7,971 | $8,814 |

The already weak financial condition of most of the non-governmental financial guarantors that provided bond insurance coverage to us continued to deteriorate during 2011, which increased the significant risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under our financial guarantees. From time to time, we may enter into negotiated transactions with financial guarantor counterparties pursuant to which we agree to cancellation of their guaranty in exchange for a cancellation fee. We did not enter into any of these transactions in 2011 or 2010.

With the exception of Ambac Assurance Corporation ("Ambac"), as described below, none of our non-governmental financial guarantor counterparties has failed to repay us for claims under guaranty contracts. Ambac provided coverage on $3.3 billion, or 41%, of our total non-governmental guarantees, as of December 31, 2011. Based on the stressed financial condition of our non-governmental financial guarantor counterparties, we believe that all but one of these counterparties may not be able to fully meet their obligations to us in the future. We model our securities without assuming the benefit of non-governmental financial guarantees. We then adjust results for those external financial guarantees from guarantors that we determine are creditworthy, although we continue to seek collection of any amounts due to us from all counterparties. As of December 31, 2011, when modeling our securities for impairments we did not assume the benefit of external financial guarantees from non-governmental counterparties. See "Note 5, Investments in Securities" for a further discussion of our model methodology and key inputs used to determine other-than-temporary-impairment.

In March 2010, Ambac and its insurance regulator, the Wisconsin Office of the Commissioner of Insurance, imposed a court-ordered moratorium on certain claim payments under Ambac's bond insurance coverage, including claims arising under coverage on $1.2 billion of our private-label securities insured by Ambac as of December 31, 2010. Prior to March 2010, we received payments from Ambac for our claims on Ambac insured private-label securities. As a result of the moratorium, we have not received payments for the additional claims filed with Ambac in 2010. On January 24, 2011, the Wisconsin Circuit Court of Dane County confirmed Ambac's rehabilitation plan; however, the plan is subject to stay and appeal. The outcome of legal proceedings regarding the moratorium and the proposed company rehabilitation each remain uncertain at this time. We assumed no benefit for Ambac's financial guaranty when estimating other-than-temporary impairment. See "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities" for more information on our investments in private-label mortgage-related securities.

We are also the beneficiary of financial guarantees included in securities issued by Freddie Mac, the federal government and its agencies that totaled $31.4 billion as of December 31, 2011 and $25.7 billion as of December 31, 2010.

_Lenders with Risk Sharing_

We enter into risk sharing agreements with lenders pursuant to which the lenders agree to bear all or some portion of the credit losses on the covered loans. Our maximum potential loss recovery from lenders under these risk sharing agreements on single-family loans was $12.8 billion as of December 31, 2011 and $15.6 billion as of

- 183 -

TREASURY-2578

December 31, 2010. As of December 31, 2011, 58% of our maximum potential loss recovery on single-family loans was from three lenders and as of December 31, 2010, 56% of our maximum potential loss recovery on single-family loans was from the same three lenders. Our maximum potential loss recovery from lenders under these risk sharing agreements on DUS and non-DUS multifamily loans was $32.1 billion as of December 31, 2011 and $30.3 billion as of December 31, 2010. As of December 31, 2011, 40% of our maximum potential loss recovery on multifamily loans was from three DUS lenders. As of December 31, 2010, 41% of our maximum potential loss recovery on multifamily loans was from the same three DUS lenders.

Unfavorable market conditions have adversely affected, and continue to adversely affect, the liquidity and financial condition of our lender counterparties. The percentage of single-family recourse obligations to lenders with investment grade credit ratings (based on the lower of S&P, Moody's and Fitch ratings) was 46% as of December 31, 2011 and 2010. The percentage of these recourse obligations to lender counterparties rated below investment grade was 26% as of December 31, 2011 and 23% as of December 31, 2010. The remaining percentage of these recourse obligations were to lender counterparties that were not rated by rating agencies, which was 28% as of December 31, 2011 and 31% as of December 31, 2010. Given the stressed financial condition of some of our lenders, we expect in some cases we will recover less, perhaps significantly less, than the amount the lender is obligated to provide us under our risk sharing arrangement with them. Depending on the financial strength of the counterparty, we may require a lender to pledge collateral to secure its recourse obligations.

As noted above in "Multifamily Credit Risk Management," our primary multifamily delivery channel is our DUS program, which is comprised of lenders that span the spectrum from large depositories to independent non-bank financial institutions. As of December 31, 2011, approximately 51% of the unpaid principal balance of loans in our multifamily guaranty book of business serviced by our DUS lenders was from institutions with an external investment grade credit rating or a guarantee from an affiliate with an external investment grade credit rating. Given the recourse nature of the DUS program, the lenders are bound by eligibility standards that dictate, among other items, minimum capital and liquidity levels, and the posting of collateral at a highly rated custodian to secure a portion of the lenders' future obligations. We actively monitor the financial condition of these lenders to help ensure the level of risk remains within our standards. Effective January 2011, we increased the capital requirements for DUS lenders to better align with more recent actual and modeled loss projections. Lenders delivering loans through the DUS program are now required to maintain higher levels of capital.

*Custodial Depository Institutions*

A total of $66.4 billion in deposits for single-family payments were received and held by 284 institutions in the month of December 2011 and a total of $75.4 billion in deposits for single-family payments were received and held by 289 institutions in the month of December 2010. Of these total deposits, 92% as of December 31, 2011 and 2010 were held by institutions rated as investment grade by S&P, Moody's and Fitch. Our ten largest custodial depository institutions held 92% of these deposits as of December 31, 2011 and 93% of these deposits as of December 31, 2010.

If a custodial depository institution were to fail while holding remittances of borrower payments of principal and interest due to us in our custodial account, we would be an unsecured creditor of the depository for balances in excess of the deposit insurance protection and might not be able to recover all of the principal and interest payments being held by the depository on our behalf, or there might be a substantial delay in receiving these amounts. If this were to occur, we would be required to replace these amounts with our own funds to make payments that are due to Fannie Mae MBS certificateholders. Accordingly, the insolvency of one of our principal custodial depository counterparties could result in significant financial losses to us. In the month of December 2011, approximately $6.1 billion or 9% of our total deposits for single-family payments received and held by these institutions was in excess of the deposit insurance protection limit compared with approximately $6.2 billion or 8% in the month of December 2010. These amounts can vary as they are calculated based on individual payments of mortgage borrowers and we must estimate which borrowers are paying their regular principal and interest payments and other types of payments, such as prepayments from refinancing or sales.

TREASURY-2579

Due to the challenging market conditions, several of our custodial depository counterparties experienced ratings downgrades and liquidity constraints. In response, we reduced the aggregate amount of our funds permitted to be held with these counterparties and required more frequent remittances of funds.

Our counterparty exposure relating to principal and interest payments held on our behalf decreased significantly in recent years as a result of (1) the September 2009 adoption of a rule amending the deposit insurance regulations on mortgage servicer accounts to extend coverage on these accounts on a "per borrower" basis; and (2) the Dodd-Frank Act, which permanently increased the amount of federal deposit insurance available to $250,000 per depositor. The Dodd-Frank Act also provides temporary unlimited coverage through December 31, 2012 for noninterest-bearing transaction accounts. We generally use noninterest-bearing transaction accounts for otherwise ineligible custodial depository institutions.

### *Issuers of Investments Held in our Cash and Other Investments Portfolio*

Our cash and other investments portfolio primarily consists of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell or similar arrangements, U.S. Treasury securities and asset-backed securities. Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank. See "Liquidity and Capital Management—Liquidity Management—Cash and Other Investments Portfolio" for more detailed information on our cash and other investments portfolio.

Our cash and other investments portfolio, which totaled $113.4 billion as of December 31, 2011, included $48.3 billion of U.S. Treasury securities. We held no unsecured positions as of December 31, 2011. As of December 31, 2010, our cash and other investments portfolio totaled $61.8 billion and included $31.5 billion of U.S. Treasury securities and $10.3 billion of unsecured positions, all of which were short-term deposits with financial institutions that had short-term credit ratings of A-1, P-1, F1 (or equivalent) or higher from S&P's, Moody's and Fitch ratings as of December 31, 2010.

We monitor the credit risk position of our cash and other investments portfolio by duration and rating level. In addition, we monitor the financial position and any downgrades of these counterparties. The outcome of our monitoring could result in a range of events, including selling some of these investments. If one of our primary cash and other investments portfolio counterparties fails to meet its obligations to us under the terms of the investments, it could result in financial losses to us and have a material adverse effect on our earnings, liquidity, financial condition and net worth. During 2011, we continued to evaluate the growing uncertainty of the stability of various European economies and financial institutions and as a result of this evaluation, reduced the number of counterparties in our cash and other investments portfolio in those markets and began to lend to remaining counterparties on a secured basis.

### *Derivative Counterparty Credit Exposure*

Our derivative counterparty credit exposure relates principally to interest rate and foreign currency derivatives contracts. We estimate our exposure to credit loss on derivative instruments by calculating the replacement cost, on a present value basis, to settle at current market prices all outstanding derivative contracts in a net gain position at the counterparty level where the right of legal offset exists. For derivative instruments where the right of legal offset does not exist, we calculate the replacement cost of the outstanding derivative contracts in a gain position at the transaction level. The fair value of derivatives in a gain position is included in our consolidated balance sheets in "Other assets."

We manage our credit exposure by requiring counterparties to post collateral, which includes cash, U.S. Treasury securities, agency debt and agency mortgage-related securities. We have a collateral management policy with provisions for requiring collateral on interest rate and foreign currency derivative contracts in net gain positions based upon the counterparty's credit rating by requiring counterparties to post collateral. We analyze counterparty credit exposure on our derivative instruments daily and make collateral calls as appropriate based on the results of internal pricing models and dealer quotes. In the case of a bankruptcy filing by an interest rate or foreign currency derivative counterparty or other default by the counterparty under the derivative contract, we

- 185 -

would have the right to terminate all outstanding derivative contracts with that counterparty and may retain collateral previously posted by that counterparty to the extent that we are in a net gain position on the termination date.

Our net counterparty credit exposure on derivatives contracts decreased to $96 million as of December 31, 2011, from $152 million as of December 31, 2010. We had outstanding interest rate and foreign currency derivative transactions with 16 counterparties as of December 31, 2011 and 15 counterparties as of December 31, 2010. Derivatives transactions with 9 of our counterparties accounted for approximately 91% of our total outstanding notional amount as of December 31, 2011, with each of these counterparties accounting for between approximately 7% and 15% of the total outstanding notional amount. As of December 31, 2011, we had outstanding notional amounts and master netting agreements with 16 counterparties.

We expect that, under the Dodd-Frank Act, we will be required in the future to submit certain interest rate swaps for clearing to a derivatives clearing organization. In anticipation of those requirements, we have cleared a small number of new interest rate swap transactions with the Chicago Mercantile Exchange, Inc. ("CME"), a derivatives clearing organization. As a result, we are exposed to the institutional credit risk of CME and its members that execute and submit our transactions for clearing. Our institutional credit risk exposure to the CME or other comparable exchanges or trading facilities, as well as their members, will increase in the future.

See "Note 9, Derivative Instruments" for information on the outstanding notional amount and additional information on our risk management derivative contracts as of December 31, 2011 and 2010, as well as a discussion of our collateral requirements under our derivatives contracts. See "Risk Factors" for a discussion of the impact of decreases in our credit ratings on our collateral obligations under our derivatives contracts.

### Mortgage Originators, Investors, and Dealers

We are routinely exposed to pre-settlement risk through the purchase or sale of closed mortgage loans and mortgage-related securities with mortgage originators, mortgage investors, and mortgage dealers. The risk is the possibility that the counterparty will be unable or unwilling to either deliver mortgage assets or compensate us for the cost to cancel or replace the transaction. We manage this risk by determining position limits with these counterparties, based upon our assessment of their creditworthiness, and monitoring and managing these exposures.

### Debt Security Dealers

The credit risk associated with dealers that commit to place our debt securities is that they will fail to honor their contracts to take delivery of the debt, which could result in delayed issuance of the debt through another dealer. We manage these risks by establishing approval standards and limits on exposure and monitoring both our exposure positions and changes in the credit quality of dealers.

### Document Custodians

We use third-party document custodians to provide loan document certification and custody services for some of the loans that we purchase and securitize. In many cases, our lender customers or their affiliates also serve as document custodians for us. Our ownership rights to the mortgage loans that we own or that back our Fannie Mae MBS could be challenged if a lender intentionally or negligently pledges or sells the loans that we purchased or fails to obtain a release of prior liens on the loans that we purchased, which could result in financial losses to us. When a lender or one of its affiliates acts as a document custodian for us, the risk that our ownership interest in the loans may be adversely affected is increased, particularly in the event the lender were to become insolvent. We mitigate these risks through legal and contractual arrangements with these custodians that identify our ownership interest, as well as by establishing qualifying standards for document custodians and requiring removal of the documents to our possession or to an independent third-party document custodian if we have concerns about the solvency or competency of the document custodian.

TREASURY-2581

**Market Risk Management, Including Interest Rate Risk Management**

We are subject to market risk, which includes interest rate risk, spread risk and liquidity risk. These risks arise from our mortgage asset investments. Interest rate risk is the risk of loss in value or expected future earnings that may result from changes to interest rates. Spread risk is the resulting impact of changes in the spread between our mortgage assets and our debt and derivatives we use to hedge our position. Liquidity risk is the risk that we will not be able to meet our funding obligations in a timely manner.

*Interest Rate Risk Management*

Our goal is to manage market risk to be neutral to movements in interest rates and volatility, subject to model constraints and prevailing market conditions. We employ an integrated interest rate risk management strategy that allows for informed risk taking within pre-defined corporate risk limits. Decisions regarding our strategy in managing interest rate risk are based upon our corporate market risk policy and limits that are established by our Chief Market Risk Officer and our Chief Risk Officer and are subject to review and approval by our Board of Directors. Our Capital Markets Group has primary responsibility for executing our interest rate risk management strategy.

We have actively managed the interest rate risk of our "net portfolio," which is defined below, through the following techniques: (1) asset selection and structuring (that is, by identifying or structuring mortgage assets with attractive prepayment and other risk characteristics); (2) issuing a broad range of both callable and non-callable debt instruments; and (3) using interest-rate derivatives. We have not actively managed or hedged our spread risk, or the impact of changes in the spread between our mortgage assets and debt (referred to as mortgage-to-debt spreads) after we purchase mortgage assets, other than through asset monitoring and disposition. For mortgage assets in our portfolio that we intend to hold to maturity to realize the contractual cash flows, we accept period-to-period volatility in our financial performance attributable to changes in mortgage-to-debt spreads that occur after our purchase of mortgage assets. For more information on the impact that changes in spreads have on the value of the fair value of our net assets, see "Supplemental Non-GAAP Information—Fair Value Balance Sheets."

We monitor current market conditions, including the interest rate environment, to assess the impact of these conditions on individual positions and our overall interest rate risk profile. In addition to qualitative factors, we use various quantitative risk metrics in determining the appropriate composition of our consolidated balance sheet and relative mix of debt and derivatives positions in order to remain within pre-defined risk tolerance levels that we consider acceptable. We regularly disclose two interest rate risk metrics that estimate our overall interest rate exposure: (1) fair value sensitivity to changes in interest rate levels and the slope of the yield curve and (2) duration gap.

The metrics used to measure our interest rate exposure are generated using internal models. Our internal models, consistent with standard practice for models used in our industry, require numerous assumptions. There are inherent limitations in any methodology used to estimate the exposure to changes in market interest rates. The reliability of our prepayment estimates and interest rate risk metrics depends on the availability and quality of historical data for each of the types of securities in our net portfolio. When market conditions change rapidly and dramatically, as they did during the financial market crisis of late 2008, the assumptions of our models may no longer accurately capture or reflect the changing conditions. On a continuous basis, management makes judgments about the appropriateness of the risk assessments indicated by the models.

<u>Sources of Interest Rate Risk Exposure</u>

The primary source of our interest rate risk is the composition of our net portfolio. Our net portfolio consists of our existing investments in mortgage assets, investments in non-mortgage securities, our outstanding debt used to fund those assets and the derivatives used to supplement our debt instruments and manage interest rate risk, and any fixed-price asset, liability or derivative commitments.

Our performing mortgage assets consist mainly of single-family and multifamily mortgage loans. For single-family loans, borrowers have the option to prepay at any time before the scheduled maturity date or continue paying until the stated maturity. Given this prepayment option held by the borrower, we are exposed to uncertainty as to when or at what rate prepayments will occur, which affects the length of time our mortgage assets will remain outstanding and the timing of the cash flows related to these assets. This prepayment uncertainty results in a potential mismatch between the timing of receipt of cash flows related to our assets and the timing of payment of cash flows related to our liabilities.

Changes in interest rates, as well as other factors, influence mortgage prepayment rates and duration and also affect the value of our mortgage assets. When interest rates decrease, prepayment rates on fixed-rate mortgages generally accelerate because borrowers usually can pay off their existing mortgages and refinance at lower rates. Accelerated prepayment rates have the effect of shortening the duration and average life of the fixed-rate mortgage assets we hold in our portfolio. In a declining interest rate environment, existing mortgage assets held in our portfolio tend to increase in value or price because these mortgages are likely to have higher interest rates than new mortgages, which are being originated at the then-current lower interest rates. Conversely, when interest rates increase, prepayment rates generally slow, which extends the duration and average life of our mortgage assets and results in a decrease in value.

Although the fair value of our guaranty assets and our guaranty obligations is highly sensitive to changes in interest rates and the market's perception of future credit performance, we do not actively manage the change in the fair value of our guaranty business that is attributable to changes in interest rates. We do not believe that periodic changes in fair value due to movements in interest rates are the best indication of the long-term value of our guaranty business because these changes do not take into account future guaranty business activity.

_Interest Rate Risk Management Strategy_

Our strategy for managing the interest rate risk of our net portfolio involves asset selection and structuring of our liabilities to match and offset the interest rate characteristics of our balance sheet. Our strategy consists of the following principal elements:

- _Debt Instruments._   We issue a broad range of both callable and non-callable debt instruments to manage the duration and prepayment risk of expected cash flows of the mortgage assets we own.

- _Derivative Instruments._   We supplement our issuance of debt with derivative instruments to further reduce duration and prepayment risks.

- _Monitoring and Active Portfolio Rebalancing._   We continually monitor our risk positions and actively rebalance our portfolio of interest rate-sensitive financial instruments to maintain a close match between the duration of our assets and liabilities.

_Debt Instruments_

Historically, the primary tool we have used to fund the purchase of mortgage assets and manage the interest rate risk implicit in our mortgage assets is the variety of debt instruments we issue. The debt we issue is a mix that typically consists of short- and long-term, non-callable and callable debt. The varied maturities and flexibility of these debt combinations help us in reducing the mismatch of cash flows between assets and liabilities in order to manage the duration risk associated with an investment in long-term fixed-rate assets. Callable debt helps us manage the prepayment risk associated with fixed-rate mortgage assets because the duration of callable debt changes when interest rates change in a manner similar to changes in the duration of mortgage assets. See "Liquidity and Capital Management—Liquidity Management—Debt Funding" for additional information on our debt activity.

_Derivative Instruments_

Derivative instruments also are an integral part of our strategy in managing interest rate risk. Derivative instruments may be privately negotiated contracts, which are often referred to as over-the-counter derivatives, or

TREASURY-2583

they may be listed and traded on an exchange. When deciding whether to use derivatives, we consider a number of factors, such as cost, efficiency, the effect on our liquidity, results of operations, and our overall interest rate risk management strategy.

The derivatives we use for interest rate risk management purposes fall into four broad categories:

- *Interest rate swap contracts.*   An interest rate swap is a transaction between two parties in which each agrees to exchange, or swap, interest payments. The interest payment amounts are tied to different interest rates or indices for a specified period of time and are generally based on a notional amount of principal. The types of interest rate swaps we use include pay-fixed swaps, receive-fixed swaps and basis swaps.

- *Interest rate option contracts.*   These contracts primarily include pay-fixed swaptions, receive-fixed swaptions, cancelable swaps and interest rate caps. A swaption is an option contract that allows us or a counterparty to enter into a pay-fixed or receive-fixed swap at some point in the future.

- *Foreign currency swaps.*   These swaps convert debt that we issue in foreign-denominated currencies into U.S. dollars. We enter into foreign currency swaps only to the extent that we issue foreign currency debt.

- *Futures.*   These are standardized exchange-traded contracts that either obligate a buyer to buy an asset at a predetermined date and price or a seller to sell an asset at a predetermined date and price. The types of futures contracts we enter into include Eurodollar, U.S. Treasury and swaps.

We use interest rate swaps, interest rate options and futures, in combination with our issuance of debt securities, to better match the duration of our assets with the duration of our liabilities. We are generally an end user of derivatives; our principal purpose in using derivatives is to manage our aggregate interest rate risk profile within prescribed risk parameters. We generally only use derivatives that are relatively liquid and straightforward to value. We use derivatives for four primary purposes:

(1) As a substitute for notes and bonds that we issue in the debt markets;

(2) To achieve risk management objectives not obtainable with debt market securities;

(3) To quickly and efficiently rebalance our portfolio and

(4) To hedge foreign currency exposure.

Decisions regarding the repositioning of our derivatives portfolio are based upon current assessments of our interest rate risk profile and economic conditions, including the composition of our consolidated balance sheets and relative mix of our debt and derivative positions, the interest rate environment and expected trends.

### *Measurement of Interest Rate Risk*

Below we present two quantitative metrics that provide estimates of our interest rate exposure: (1) fair value sensitivity of net portfolio to changes in interest rate levels and slope of yield curve; and (2) duration gap. The metrics presented are calculated using internal models that require standard assumptions regarding interest rates and future prepayments of principal over the remaining life of our securities. These assumptions are derived based on the characteristics of the underlying structure of the securities and historical prepayment rates experienced at specified interest rate levels, taking into account current market conditions, the current mortgage rates of our existing outstanding loans, loan age and other factors. On a continuous basis, management makes judgments about the appropriateness of the risk assessments and will make adjustments as necessary to properly assess our interest rate exposure and manage our interest rate risk. The methodologies used to calculate risk estimates are periodically changed on a prospective basis to reflect improvements in the underlying estimation process.

### *Interest Rate Sensitivity to Changes in Interest Rate Level and Slope of Yield Curve*

As part of our disclosure commitments with FHFA, we disclose on a monthly basis the estimated adverse impact on the fair value of our net portfolio that would result from the following hypothetical situations:

- A 50 basis point shift in interest rates.

- A 25 basis point change in the slope of the yield curve.

- 189 -

In measuring the estimated impact of changes in the level of interest rates, we assume a parallel shift in all maturities of the U.S. LIBOR interest rate swap curve.

In measuring the estimated impact of changes in the slope of the yield curve, we assume a constant 7-year rate and a shift of 16.7 basis points for the 1-year rate and 8.3 basis points for the 30-year rate. We believe the aforementioned interest rate shocks for our monthly disclosures represent moderate movements in interest rates over a one-month period.

*Duration Gap*

Duration gap measures the price sensitivity of our assets and liabilities to changes in interest rates by quantifying the difference between the estimated durations of our assets and liabilities. Our duration gap analysis reflects the extent to which the estimated maturity and repricing cash flows for our assets are matched, on average, over time and across interest rate scenarios to the estimated cash flows of our liabilities. A positive duration gap indicates that the duration of our assets exceeds the duration of our liabilities. We disclose duration gap on a monthly basis under the caption "Interest Rate Risk Disclosures" in our Monthly Summary, which is available on our website and announced in a press release.

The sensitivity measures presented in Table 60, which we disclose on a quarterly basis as part of our disclosure commitments with FHFA, are an extension of our monthly sensitivity measures. There are three primary differences between our monthly sensitivity disclosure and the quarterly sensitivity disclosure presented below: (1) the quarterly disclosure is expanded to include the sensitivity results for larger rate level shocks of plus or minus 100 basis points; (2) the monthly disclosure reflects the estimated pre-tax impact on the market value of our net portfolio calculated based on a daily average, while the quarterly disclosure reflects the estimated pre-tax impact calculated based on the estimated financial position of our net portfolio and the market environment as of the last business day of the quarter; and (3) the monthly disclosure shows the most adverse pre-tax impact on the market value of our net portfolio from the hypothetical interest rate shocks, while the quarterly disclosure includes the estimated pre-tax impact of both up and down interest rate shocks.

Our net portfolio market value sensitivity was lower as of December 31, 2011 compared with December 31, 2010 due to a number of factors, including a lower mortgage portfolio balance and the composition of our outstanding debt. During 2011, our total mortgage portfolio balance decreased from $788.8 billion to $708.4 billion as of December 31, 2011. In addition, we issued $256.7 billion in long-term debt during 2011, primarily consisting of callable debt instruments, which hedge both the duration and the prepayment risks of our mortgage assets. See "Liquidity and Capital Management—Liquidity Management—Debt Funding" for additional information on our debt activity. Interest rates also decreased significantly during 2011, which reduced the price sensitivity of our mortgage assets, resulting in a lower market value sensitivity.

In addition, Table 60 also provides the average, minimum, maximum and standard deviation for duration gap and for the most adverse market value impact on the net portfolio for non-parallel and parallel interest rate shocks for the three months ended December 31, 2011 and 2010.

**Table 60:   Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve**[1]

| | As of December 31, | |
|---|---|---|
| | **2011** | **2010** |
| | **(Dollars in billions)** | |
| Rate level shock: | | |
| -100 basis points | $ 0.3 | $(0.8) |
| -50 basis points | 0.1 | (0.2) |
| +50 basis points | (0.1) | (0.2) |
| +100 basis points | (0.4) | (0.5) |
| Rate slope shock: | | |
| -25 basis points (flattening) | — | (0.1) |
| +25 basis points (steepening) | 0.1 | 0.1 |

TREASURY-2585

The duration gap for the three months ended December 31, 2011 averaged zero months and the maximum and minimum gap did not exceed plus or minus one month, which is similar to the results for the three months ended December 31, 2010.

| | For the Three Months Ended December 31, 2011 | | |
| --- | --- | --- | --- |
| | Duration Gap | Rate Slope Shock 25 Bps | Rate Level Shock 50 Bps |
| | (In months) | Exposure | |
| | | (Dollars in billions) | |
| Average | (0.1) | $— | $(0.1) |
| Minimum | (0.7) | — | (0.2) |
| Maximum | 0.4 | — | — |
| Standard deviation | 0.2 | — | 0.1 |

| | For the Three Months Ended December 31, 2010 | | |
| --- | --- | --- | --- |
| | Duration Gap | Rate Slope Shock 25 Bps | Rate Level Shock 50 Bps |
| | (In months) | Exposure | |
| | | (Dollars in billions) | |
| Average | 0.3 | $0.1 | $0.3 |
| Minimum | (0.7) | — | — |
| Maximum | 0.9 | 0.1 | 0.4 |
| Standard deviation | 0.3 | — | 0.1 |

---

[1]   Computed based on changes in LIBOR swap rates.

A majority of the interest rate risk associated with our mortgage-related securities and loans is hedged with our debt issuance, which includes callable debt. We use derivatives to help manage the residual interest rate risk exposure between our assets and liabilities. Derivatives have enabled us to keep our interest rate risk exposure at consistently low levels in a wide range of interest-rate environments. Table 61 displays an example of how derivatives impacted the net market value exposure for a 50 basis point parallel interest rate shock.

From December 31, 2010 to December 31, 2011, as displayed below in Table 61, debt issuance hedged a majority of the interest rate risk associated with our mortgage-related securities and loans. As displayed in Table 60, derivatives were also used to maintain a low interest rate risk exposure as the average duration gap was zero.

**Table 61:   Derivative Impact on Interest Rate Risk (50 Basis Points)**

| | Before Derivatives | After Derivatives | Effect of Derivatives |
| --- | --- | --- | --- |
| | (Dollars in billions) | | |
| As of December 31, 2011 | $(1.3) | $(0.1) | $1.2 |
| As of December 31, 2010 | $(0.9) | $(0.2) | $0.7 |

*Other Interest Rate Risk Information*

The interest rate risk measures discussed above exclude the impact of changes in the fair value of our net guaranty assets resulting from changes in interest rates. We exclude our guaranty business from these sensitivity measures based on our current assumption that the guaranty fee income generated from future business activity will largely replace guaranty fee income lost due to mortgage prepayments.

We provide additional interest rate sensitivities below in Table 62, including separate disclosure of the potential impact on the fair value of our trading assets and our other financial instruments for the periods indicated, from

- 191 -

TREASURY-2586

the same hypothetical changes in the level of interest rates as displayed above in Table 60. We also assume a parallel shift in all maturities along the interest rate swap curve in calculating these sensitivities. We believe these interest rate changes represent reasonably possible near-term changes in interest rates over the next twelve months.

**Table 62:   Interest Rate Sensitivity of Financial Instruments**

| | As of December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | | Pre-tax Effect on Estimated Fair Value | | | |
| | | Change in Interest Rates (in basis points) | | | |
| | Estimated Fair Value | -100 | -50 | +50 | +100 |
| | | (Dollars in billions) | | | |
| Trading financial instruments ............................. | $ 74.2 | $ 0.9 | $0.4 | $(0.4) | $ (0.9) |
| Other financial instruments, net[1][2] ......................... | (221.1) | 17.1 | 8.4 | (6.6) | (12.1) |

| | As of December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | | Pre-tax Effect on Estimated Fair Value | | | |
| | | Change in Interest Rates (in basis points) | | | |
| | Estimated Fair Value | -100 | -50 | +50 | +100 |
| | | (Dollars in billions) | | | |
| Trading financial instruments ............................. | $ 56.9 | $ 0.9 | $0.4 | $(0.4) | $(0.8) |
| Other financial instruments, net[1][2] ......................... | (201.1) | 10.9 | 4.1 | (3.9) | (6.1) |

---

[1]   Consists of the net of "Guaranty assets" and "Guaranty obligations" reported in our consolidated balance sheets.

[2]   Also consists of the net of all other financial instruments reported in "Note 18, Fair Value."

**Liquidity Risk Management**

See "Liquidity and Capital Management—Liquidity Management" for a discussion on how we manage liquidity risk.

**Operational Risk Management**

Our corporate operational risk framework is based on the OFHEO/FHFA Enterprise Guidance on Operational Risk Management, published September 23, 2008. Our framework is intended to provide a methodology to identify, assess, mitigate, control and monitor operational risks across the company. Included in this framework is a requirement for a system to track and report operational risk incidents. The framework also includes a methodology for business owners to conduct risk and control self assessments to self identify potential operational risks and points of execution failure, the effectiveness of associated controls, and document corrective action plans to close identified deficiencies. The success of our operational risk effort will depend on the consistent execution of the operational risk programs and the timely remediation of high operational risk issues.

We have made a number of enhancements to our operational risk management efforts including our business process focus, policies and framework. To quantify our operational risk exposure, we rely on the Basel Standardized approach, which is based on a percentage of gross income.

See "Risk Factors" for more information regarding our operational risk.

*Management of Business Resiliency*

Our business resiliency program is designed to provide reasonable assurance for continuity of critical business operations in the event of disruptions caused by the loss of facilities, technology or personnel. Despite the

TREASURY-2587

planning, testing and continuous preparation of back up venues that we engage in, a catastrophic event may still result in a significant business disruption.

### Non-Mortgage Related Fraud Risk

Our anti-fraud program provides a framework for managing non-mortgage related fraud risk. The program is designed to provide reasonable assurance for the prevention and detection of non-mortgage related fraudulent activity. However, because fraudulent activity requires the intentional circumvention of the internal control structure, the efforts of the program may not always prevent, or immediately detect, instances of such activity.

See "Risk Factors" for a discussion on our operational risk.

## IMPACT OF FUTURE ADOPTION OF NEW ACCOUNTING PRONOUNCEMENTS

We identify and discuss the expected impact on our consolidated financial statements of recently issued accounting pronouncements in "Note 1, Summary of Significant Accounting Policies."

TREASURY-2588

## GLOSSARY OF TERMS USED IN THIS REPORT

Terms used in this report have the following meanings, unless the context indicates otherwise.

An *"Acquired credit-impaired loan"* refers to a loan we have acquired for which there is evidence of credit deterioration since origination and for which it is probable we will not be able to collect all of the contractually due cash flows. We record our net investment in such loans at the lower of the acquisition cost of the loan or the estimated fair value of the loan at the date of acquisition. Typically, loans we acquire from our unconsolidated MBS trusts pursuant to our option to purchase upon default meet these criteria. Because we acquire these loans from our MBS trusts at par value plus accrued interest, to the extent the par value of a loan exceeds the estimated fair value at the time we acquire the loan, we record the related fair value loss as a charge against the "Reserve for guaranty losses."

*"Alt-A mortgage loan"* or *"Alt-A loan"* generally refers to a mortgage loan originated under a lender's program offering reduced or alternative documentation than that required for a full documentation mortgage loan but may also include other alternative product features. As a result, Alt-A mortgage loans have a higher risk of default than non-Alt-A mortgage loans. In reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the lenders that delivered the mortgage loans to us classified the loans as Alt-A based on documentation or other product features. We have loans with some features that are similar to Alt-A mortgage loans that we have not classified as Alt-A because they do not meet our classification criteria. We have classified private-label mortgage-related securities held in our investment portfolio as Alt-A if the securities were labeled as such when issued.

*"Business volume"* or *"new business acquisitions"* refers to the sum in any given period of the unpaid principal balance of: (1) the mortgage loans and mortgage-related securities we purchase for our investment portfolio; (2) the mortgage loans we securitize into Fannie Mae MBS that are acquired by third parties; and (3) credit enhancements that we provide on our mortgage assets. It excludes mortgage loans we securitize from our portfolio and the purchase of Fannie Mae MBS for our investment portfolio.

*"Buy-ups"* refer to upfront payments we make to lenders to adjust the monthly contractual guaranty fee rate on a Fannie Mae MBS so that the pass-through coupon rate on the MBS is in a more easily tradable increment of a whole or half percent.

*"Buy-downs"* refer to upfront payments we receive from lenders to adjust the monthly contractual guaranty fee rate on a Fannie Mae MBS so that the pass-through coupon rate on the MBS is in a more easily tradable increment of a whole or half percent.

*"Charge-off"* refers to loan amounts written off as uncollectible bad debts. These loan amounts are removed from our consolidated balance sheet and charged against our loss reserves when the balance is deemed uncollectible, which is generally at foreclosure.

*"Conventional mortgage"* refers to a mortgage loan that is not guaranteed or insured by the U.S. government or its agencies, such as the VA, the FHA or the Rural Development Housing and Community Facilities Program of the Department of Agriculture.

*"Credit enhancement"* refers to an agreement used to reduce credit risk by requiring collateral, letters of credit, mortgage insurance, corporate guarantees, or other agreements to provide an entity with some assurance that it will be compensated to some degree in the event of a financial loss.

*"Duration"* refers to the sensitivity of the value of a security to changes in interest rates. The duration of a financial instrument is the expected percentage change in its value in the event of a change in interest rates of 100 basis points.

*"Guaranty book of business"* refers to the sum of the unpaid principal balance of: (1) mortgage loans held in our mortgage portfolio; (2) Fannie Mae MBS held in our mortgage portfolio; (3) Fannie Mae MBS held by third

- 194 -

parties; and (4) other credit enhancements that we provide on mortgage assets. It excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

*"HomeSaver Advance loan"* refers to a 15-year unsecured personal loan in an amount equal to all past due payments relating to a borrower's first-lien mortgage loan, generally up to the lesser of $15,000 or 15% of the unpaid principal balance of the delinquent first-lien loan. The advance is used to bring the first-lien mortgage loan current. This workout option was retired in 2010.

*"Implied volatility"* refers to the market's expectation of the magnitude of future changes in interest rates.

*"Interest rate swap"* refers to a transaction between two parties in which each agrees to exchange payments tied to different interest rates or indices for a specified period of time, generally based on a notional principal amount. An interest rate swap is a type of derivative.

*"LIHTC partnerships"* refer to low-income housing tax credit limited partnerships or limited liability companies.

*"Loans," "mortgage loans"* and *"mortgages"* refer to both whole loans and loan participations, secured by residential real estate, cooperative shares or by manufactured housing units.

*"Mortgage assets,"* when referring to our assets, refers to both mortgage loans and mortgage-related securities we hold in our investment portfolio.

*"Mortgage credit book of business"* refers to the sum of the unpaid principal balance of: (1) mortgage loans held in our mortgage portfolio; (2) Fannie Mae MBS held in our mortgage portfolio; (3) non-Fannie Mae mortgage-related securities held in our investment portfolio; (4) Fannie Mae MBS held by third parties; and (5) other credit enhancements that we provide on mortgage assets.

*"Multifamily mortgage loan"* refers to a mortgage loan secured by a property containing five or more residential dwelling units.

*"Notional amount"* refers to the hypothetical dollar amount in an interest rate swap transaction on which exchanged payments are based. The notional amount in an interest rate swap transaction generally is not paid or received by either party to the transaction and is typically significantly greater than the potential market or credit loss that could result from such transaction.

*"Option-adjusted spread"* or *"OAS"* refers to the incremental expected return between a security, loan or derivative contract and a benchmark yield curve (typically, U.S. Treasury securities, LIBOR and swaps, or agency debt securities). The OAS provides explicit consideration of the variability in the security's cash flows across multiple interest rate scenarios resulting from any options embedded in the security, such as prepayment options. For example, the OAS of a mortgage that can be prepaid by the homeowner without penalty is typically lower than a nominal yield spread to the same benchmark because the OAS reflects the exercise of the prepayment option by the homeowner, which lowers the expected return of the mortgage investor. In other words, OAS for mortgage loans is a risk-adjusted spread after consideration of the prepayment risk in mortgage loans. The market convention for mortgages is typically to quote their OAS to swaps. The OAS of our debt and derivative instruments are also frequently quoted to swaps. The OAS of our net mortgage assets is therefore the combination of these two spreads to swaps and is the option-adjusted spread between our assets and our funding and hedging instruments.

*"Outstanding Fannie Mae MBS"* refers to the total unpaid principal balance of Fannie Mae MBS that is held by third-party investors and held in our mortgage portfolio.

*"Pay-fixed swap"* refers to an agreement under which we pay a predetermined fixed rate of interest based upon a set notional principal amount and receive a variable interest payment based upon a stated index, with the index

- 195 -

resetting at regular intervals over a specified period of time. These contracts generally increase in value as interest rates rise and decrease in value as interest rates fall.

*"Private-label securities"* refers to mortgage-related securities issued by entities other than agency issuers Fannie Mae, Freddie Mac or Ginnie Mae.

*"Receive-fixed swap"* refers to an agreement under which we make a variable interest payment based upon a stated index, with the index resetting at regular intervals, and receive a predetermined fixed rate of interest based upon a set notional amount and over a specified period of time. These contracts generally increase in value as interest rates fall and decrease in value as interest rates rise.

*"REMIC"* or *"Real Estate Mortgage Investment Conduit"* refers to a type of mortgage-related security in which interest and principal payments from mortgages or mortgage-related securities are structured into separately traded securities.

*"REO"* refers to real-estate owned by Fannie Mae because we have foreclosed on the property or obtained the property through a deed-in-lieu of foreclosure.

*"Severity rate"* or *"loss severity rate"* refers to a measure of the amounts that will not be recovered in the event a loan defaults. Severity rates generally reflect charge-offs as a percentage of unpaid principal balance. Additional items may be taken into account in calculating severity rates. For example, the numerator may reflect items such as foreclosed property expenses, taxes and insurance, and expected recoveries from pool insurance, while the denominator may reflect items such as purchased interest, basis, and selling costs.

*"Single-class Fannie Mae MBS"* refers to Fannie Mae MBS where the investors receive principal and interest payments in proportion to their percentage ownership of the MBS issue.

*"Single-family mortgage loan"* refers to a mortgage loan secured by a property containing four or fewer residential dwelling units.

*"Small balance loans"* refers to multifamily loans with an original unpaid balance of up to $3 million nationwide or up to $5 million in high cost markets.

*"Subprime mortgage loan"* generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower. As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers. Subprime mortgage loans were typically originated by lenders specializing in this type of business or by subprime divisions of large lenders, using processes unique to subprime loans. In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans were originated by one of these specialty lenders or a subprime division of a large lender. We exclude loans originated by these lenders if we acquired the loans in accordance with our standard underwriting criteria, which typically require compliance by the seller with our Selling Guide (including standard representations and warranties) and/or evaluation of the loans through our Desktop Underwriter system. We have loans with some features that are similar to subprime mortgage loans that we have not classified as subprime because they do not meet our classification criteria. We have classified private-label mortgage-related securities held in our investment portfolio as subprime if the securities were labeled as such when issued.

*"Structured Fannie Mae MBS"* refers to Fannie Mae MBS that are resecuritizations of other Fannie Mae MBS.

*"Swaptions"* refers to options on interest rate swaps in the form of contracts granting an option to one party and creating a corresponding commitment from the counterparty to enter into specified interest rate swaps in the future. Swaptions are traded in the over-the-counter market and not through an exchange.

TREASURY-2591

**Item 7A.   Quantitative and Qualitative Disclosures About Market Risk**

Quantitative and qualitative disclosure about market risk is set forth in "MD&A—Risk Management—Market Risk Management, including Interest Rate Risk Management."

**Item 8.   Financial Statements and Supplementary Data**

Our consolidated financial statements and notes thereto are included elsewhere in this annual report on Form 10-K as described below in "Exhibits and Financial Statement Schedules."

**Item 9.   Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A.   Controls and Procedures**

## OVERVIEW

We are required under applicable laws and regulations to maintain controls and procedures, which include disclosure controls and procedures as well as internal control over financial reporting, as further described below.

## EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

### Disclosure Controls and Procedures

Disclosure controls and procedures refer to controls and other procedures designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC. Disclosure controls and procedures include, without limitation, controls and procedures designed to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding our required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management was required to apply its judgment in evaluating and implementing possible controls and procedures.

### Evaluation of Disclosure Controls and Procedures

As required by Rule 13a-15 under the Exchange Act, management has evaluated, with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures as in effect as of December 31, 2011, the end of the period covered by this report. As a result of management's evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective at a reasonable assurance level as of December 31, 2011 or as of the date of filing this report.

Our disclosure controls and procedures were not effective as of December 31, 2011 or as of the date of filing this report because they did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws. As a result, we were not able to rely upon the disclosure controls and procedures that were in place as of December 31, 2011 or as of the date of this filing, and we continue to have a material weakness in our internal control over financial reporting. This material weakness is described in more detail below under "Description of Material Weakness." Based on discussions with FHFA and the structural nature of the weakness in our disclosure controls and procedures, it is likely that we will not remediate the weakness in our disclosure controls and procedures relating to information known to FHFA while we are under conservatorship.

- 197 -

## MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

**Overview**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting, as defined in rules promulgated under the Exchange Act, is a process designed by, or under the supervision of, our Chief Executive Officer and Chief Financial Officer and effected by our Board of Directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. Internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of our assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that our receipts and expenditures are being made only in accordance with authorizations of our management and our Board of Directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our financial statements.

Internal control over financial reporting cannot provide absolute assurance of achieving financial reporting objectives because of its inherent limitations. Internal control over financial reporting is a process that involves human diligence and compliance and is subject to lapses in judgment and breakdowns resulting from human failures. Internal control over financial reporting also can be circumvented by collusion or improper override. Because of such limitations, there is a risk that material misstatements may not be prevented or detected on a timely basis by internal control over financial reporting. However, these inherent limitations are known features of the financial reporting process, and it is possible to design into the process safeguards to reduce, though not eliminate, this risk.

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2011. In making its assessment, management used the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Management's assessment of our internal control over financial reporting as of December 31, 2011 identified a material weakness, which is described below. Because of this material weakness, management has concluded that our internal control over financial reporting was not effective as of December 31, 2011 or as of the date of filing this report.

Our independent registered public accounting firm, Deloitte & Touche LLP, has issued an audit report on our internal control over financial reporting, expressing an adverse opinion on the effectiveness of our internal control over financial reporting as of December 31, 2011. This report is included below.

**Description of Material Weakness**

The Public Company Accounting Oversight Board's Auditing Standard No. 5 defines a material weakness as a deficiency or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

Management has determined that we had the following material weakness as of December 31, 2011:

- *Disclosure Controls and Procedures.* We have been under the conservatorship of FHFA since September 6, 2008. Under the Regulatory Reform Act, FHFA is an independent agency that currently functions as both our conservator and our regulator with respect to our safety, soundness and mission. Because of the nature of the conservatorship under the Regulatory Reform Act, which places us under the "control" of FHFA (as that term is defined by securities laws), some of the information that we may need to

- 198 -

meet our disclosure obligations may be solely within the knowledge of FHFA. As our conservator, FHFA has the power to take actions without our knowledge that could be material to our shareholders and other stakeholders, and could significantly affect our financial performance or our continued existence as an ongoing business. Although we and FHFA attempted to design and implement disclosure policies and procedures that would account for the conservatorship and accomplish the same objectives as a disclosure controls and procedures policy of a typical reporting company, there are inherent structural limitations on our ability to design, implement, test or operate effective disclosure controls and procedures. As both our regulator and our conservator under the Regulatory Reform Act, FHFA is limited in its ability to design and implement a complete set of disclosure controls and procedures relating to Fannie Mae, particularly with respect to current reporting pursuant to Form 8-K. Similarly, as a regulated entity, we are limited in our ability to design, implement, operate and test the controls and procedures for which FHFA is responsible.

Due to these circumstances, we have not been able to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our consolidated financial statements. As a result, we did not maintain effective controls and procedures designed to ensure complete and accurate disclosure as required by GAAP as of December 31, 2011 or as of the date of filing this report. Based on discussions with FHFA and the structural nature of this weakness, it is likely that we will not remediate this material weakness while we are under conservatorship.

## MITIGATING ACTIONS RELATING TO MATERIAL WEAKNESS

### Disclosure Controls and Procedures

As described above under "Description of Material Weakness," we continue to have a material weakness in our internal control over financial reporting relating to our disclosure controls and procedures. However, we and FHFA have engaged in the following practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws:

- FHFA has established the Office of Conservatorship Operations, which is intended to facilitate operation of the company with the oversight of the conservator.

- We have provided drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also have provided drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.

- FHFA personnel, including senior officials, have reviewed our SEC filings prior to filing, including this annual report on Form 10-K for the year ended December 31, 2011 ("2011 Form 10-K"), and engaged in discussions regarding issues associated with the information contained in those filings. Prior to filing our 2011 Form 10-K, FHFA provided Fannie Mae management with a written acknowledgement that it had reviewed the 2011 Form 10-K, and it was not aware of any material misstatements or omissions in the 2011 Form 10-K and had no objection to our filing the Form 10-K.

- The Director of FHFA or, after August 2009, the Acting Director of FHFA, and our Chief Executive Officer have been in frequent communication, typically meeting on at least a bi-weekly basis.

- FHFA representatives attend meetings frequently with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, credit and market risk management, liquidity, external communications and legal matters.

- Senior officials within FHFA's Office of the Chief Accountant have met frequently with our senior finance executives regarding our accounting policies, practices and procedures.

In view of these activities, we believe that our consolidated financial statements for the year ended December 31, 2011 have been prepared in conformity with GAAP.

- 199 -

## CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING

**Overview**

Management has evaluated, with the participation of our Chief Executive Officer and Chief Financial Officer, whether any changes in our internal control over financial reporting that occurred during our last fiscal quarter have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Below we describe changes in our internal control over financial reporting since September 30, 2011 that management believes have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Changes in Management**

- In the first quarter of 2012, Michael J. Williams, our President and Chief Executive Officer, announced that he will step down from his position when our Board of Directors names a successor.

- During the fourth quarter of 2011, Gregory A. Fink, Senior Vice President and Controller, was appointed as our principal accounting officer, succeeding David C. Hisey, who stepped down as our Executive Vice President and Deputy Chief Financial Officer in February 2012.

TREASURY-2595

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To Fannie Mae:

We have audited the internal control over financial reporting of Fannie Mae and consolidated entities (in conservatorship) (the "Company") as of December 31, 2011, based on criteria established in *Internal Control— Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on that risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weakness has been identified and included in management's assessment:

• Disclosure Controls and Procedures—The Company's disclosure controls and procedures did not adequately ensure the accumulation and communication to management of information known to the Federal Housing Finance Agency that is needed to meet its disclosure obligations under the federal securities laws as they relate to financial reporting.

- 201 -

This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the consolidated financial statements as of and for the year ended December 31, 2011, of the Company and this report does not affect our report on such financial statements.

In our opinion, because of the effect of the material weakness identified above on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2011, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements as of and for the year ended December 31, 2011, of the Company and our report dated February 29, 2012, expressed an unqualified opinion on those financial statements and included explanatory paragraphs regarding the Company's adoption of new accounting standards and the Company's dependence upon the continued support from various agencies of the United States Government, including the United States Department of Treasury and the Company's conservator and regulator, the Federal Housing Finance Agency.

/s/ Deloitte & Touche LLP

Washington, DC
February 29, 2012

- 202 -

**Item 9B.   Other Information**

**Termination Agreement with Former Deputy Chief Financial Officer**

David C. Hisey, our former Executive Vice President and Deputy Chief Financial Officer, left the company on February 24, 2012. We entered into a termination agreement with Mr. Hisey on February 28, 2012, the terms of which were approved by FHFA. The agreement provides that Mr. Hisey will receive $966,625, representing all of his corporate performance-adjusted 2011 deferred pay, in four installments on the same payment dates as other deferred pay recipients. The agreement also provides that Mr. Hisey may elect to receive outplacement services and a subsidy for up to 18 months of medical and dental premiums if he elects COBRA continuation coverage.

The termination agreement provides that Mr. Hisey may not solicit or accept employment with or act in any way, directly or indirectly, to solicit or obtain employment or work for Freddie Mac for a period of 12 months following termination. Under the termination agreement, Mr. Hisey agreed to a general release of the company from all claims relating to his employment with or termination from the company.

<div align="center">

**PART III**

</div>

**Item 10. Directors, Executive Officers and Corporate Governance**

---

**DIRECTORS**

---

Our current directors are listed below. They have provided the following information about their principal occupation, business experience and other matters. Upon FHFA's appointment as our conservator on September 6, 2008, FHFA succeeded to all rights, titles, powers and privileges of any director of Fannie Mae with respect to Fannie Mae and its assets. More information about FHFA's September 6, 2008 appointment as our conservator and its subsequent reconstitution of our Board and direction regarding the Board's function and authorities can be found below in "Corporate Governance—Conservatorship and Delegation of Authority to Board of Directors."

As discussed in more detail below under "Corporate Governance—Composition of Board of Directors," FHFA, as conservator, appointed an initial group of directors to our Board following our entry into conservatorship, delegated to the Board the authority to appoint directors to subsequent vacancies subject to conservator review, and defined the term of service of directors during conservatorship. The Nominating and Corporate Governance Committee evaluates the qualifications of individual directors on an annual basis. In its assessment of current directors and evaluation of potential candidates for director, the Nominating and Corporate Governance Committee considers, among other things, whether the Board as a whole possesses meaningful experience, qualifications and skills in the following subject areas: business; finance; capital markets; accounting; risk management; public policy; mortgage lending, real estate, low-income housing and/or homebuilding; and the regulation of financial institutions. See "Corporate Governance—Composition of Board of Directors" below for further information on the factors the Nominating and Corporate Governance Committee considers in evaluating and selecting board members.

*Dennis R. Beresford*, 73, has served as Ernst & Young Executive Professor of Accounting at the J.M. Tull School of Accounting, Terry College of Business, University of Georgia since 1997. From 1987 to 1997, Mr. Beresford served as Chairman of the Financial Accounting Standards Board, or FASB, the designated organization in the private sector for establishing standards of financial accounting and reporting in the U.S. From 1961 to 1986, Mr. Beresford was with Ernst & Young LLP, including ten years as a Senior Partner and National Director of Accounting. In addition, Mr. Beresford served on the SEC Advisory Committee on Improvements to Financial Reporting. Mr. Beresford is currently a member of the Board of Directors of Legg Mason, Inc., where he serves as Chairman of the Audit Committee and as a member of the Finance and Risk Committees. He also serves as a

TREASURY-2598

member of the Standing Advisory Group of the Public Company Accounting Oversight Board. He previously was a member of the Board of Directors of Kimberly-Clark Corporation from November 2002 to April 2011, where he served as Chairman of the Audit Committee. He also previously was a member of the Board of Directors of MCI, Inc. from July 2002 to January 2006, where he served as Chairman of the Audit Committee. Mr. Beresford is a certified public accountant. Mr. Beresford initially became a Fannie Mae director in May 2006, before we were put into conservatorship, and FHFA appointed Mr. Beresford to Fannie Mae's Board in December 2008. Mr. Beresford serves as Chair of the Audit Committee and is also a member of the Compensation Committee and the Executive Committee.

The Nominating and Corporate Governance Committee concluded that Mr. Beresford should serve as a director due to his extensive experience in accounting, finance, business and risk management, which he gained in the positions described above. Mr. Beresford has reached the mandatory retirement age for members of the Board of Directors and, accordingly, his last day as a member of the Board is February 29, 2012.

*William Thomas Forrester*, 63, served as Chief Financial Officer of The Progressive Corporation from 1999 until his retirement in March 2007, and served in a variety of senior financial and operating positions with Progressive prior to that time. Prior to joining The Progressive Corporation in 1984, Mr. Forrester was with Price Waterhouse LLP, a major public accounting firm, from 1976 to 1984. Mr. Forrester is currently a member of the Board of Directors and Chairman of the Audit Committee of The Navigators Group, Inc. He also serves on the Finance Committee and Compensation Committee of The Navigators Group, Inc. Mr. Forrester is also currently a member of the Board of Directors of Alterra Capital Holdings Limited, where he serves on the Audit and Risk Management Committee and the Underwriting Committee. He previously was a member of the Board of Directors of Axis Capital Holdings Limited from December 2003 to May 2006, where he served as Chairman of the Audit Committee. Mr. Forrester has been a Fannie Mae director since December 2008. Mr. Forrester serves as a member of both the Audit Committee and the Nominating and Corporate Governance Committee. Mr. Forrester will serve as Chair of the Audit Committee following Mr. Beresford's retirement on February 29, 2012.

The Nominating and Corporate Governance Committee concluded that Mr. Forrester should continue to serve as a director due to his extensive experience in business, finance, accounting and risk management, which he gained in the positions described above.

*Brenda J. Gaines*, 62, served as President and Chief Executive Officer of Diners Club North America, a subsidiary of Citigroup, from October 2002 until her retirement in April 2004. She served as President, Diners Club North America, from February 1999 to September 2002. From 1988 until her appointment as President, she held various positions within Diners Club North America, Citigroup and Citigroup's predecessor corporations. She also served as Deputy Chief of Staff for the Mayor of the City of Chicago from 1985 to 1987 and as Chicago Commissioner of Housing from 1983 to 1985. Ms. Gaines also has over 12 years of experience with the Department of Housing and Urban Development, including serving as Deputy Regional Administrator from 1980 to 1981. Ms. Gaines is currently a member of the Board of Directors of Office Depot, Inc., where she serves as a member of both the Audit Committee and the Corporate Governance and Nominating Committee. Ms. Gaines is also a member of the Board of Directors of AGL Resources Inc., where she serves as a member of both the Audit Committee and the Nominating, Governance and Corporate Responsibility Committee, and Tenet Healthcare Corporation, where she serves as a member of both the Compensation Committee and the Quality, Compliance & Ethics Committee. She previously was a member of the Board of Directors of NICOR, Inc. from April 2006 to December 2011, where she served on the Corporate Governance Committee. She also previously was a member of the Board of Directors of CNA Financial Corporation from October 2004 to May 2007, where she served as a member and Chair of the Audit Committee. Ms. Gaines initially became a Fannie Mae director in September 2006, before we were put into conservatorship, and FHFA appointed Ms. Gaines to Fannie Mae's Board in December 2008. Ms. Gaines serves as Chair of the Compensation Committee and is also a member of the Audit Committee and the Executive Committee.

The Nominating and Corporate Governance Committee concluded that Ms. Gaines should continue to serve as a director due to her extensive experience in business, finance, accounting, risk management, public policy matters, mortgage lending, low-income housing, and the regulation of financial institutions, which she gained in the positions described above.

TREASURY-2599

*Charlynn Goins*, 69, served as Chairperson of the Board of Directors of New York City Health and Hospitals Corporation from June 2004 to October 2008. She also served on the Board of Trustees of The Mainstay Funds, New York Life Insurance Company's retail family of funds, from June 2001 through July 2006 and on the Board of Directors of The Community's Bank from February 2001 through June 2004. Ms. Goins also was a Senior Vice President of Prudential Financial, Inc. (formerly, Prudential Securities, Inc.) from 1990 to 1997. Ms. Goins serves as the Chairperson of the New York Community Trust. She also serves as a director and a member of the Organization and Compensation Committee of AXA Financial Inc. She is also a director of AXA Equitable, MONY Life and MONY Life of America, which are subsidiaries of AXA Financial Inc. Ms. Goins is an attorney. Ms. Goins has been a Fannie Mae director since December 2008. Ms. Goins serves as Chair of the Nominating and Corporate Governance Committee and is also a member of the Executive Committee.

The Nominating and Corporate Governance Committee concluded that Ms. Goins should continue to serve as a director due to her extensive experience in business, finance, public policy matters, and the regulation of financial institutions, which she gained in the positions described above.

*Frederick B. "Bart" Harvey III*, 62, retired in March 2008 from his role as chairman of the Board of Trustees of Enterprise Community Partners and Enterprise Community Investment, providers of development capital and technical expertise to create affordable housing and rebuild communities. Enterprise is a national non-profit that raises funds from the private sector to finance homes primarily for low and very low income people. Enterprise has also pioneered "green" affordable housing with its EnterpriseGreen Communities initiative. Mr. Harvey was Enterprise's chief executive officer from 1993 to 2007. He joined Enterprise in 1984, and a year later became vice chairman. Before joining Enterprise, Mr. Harvey served for 10 years in various domestic and international positions with Dean Witter Reynolds (now Morgan Stanley), leaving as Managing Director of Corporate Finance. Mr. Harvey was a member of the Board of Directors of the Federal Home Loan Bank of Atlanta from 1996 to 1999, a director of the National Housing Trust from 1990 to 2008, and also served as an executive committee member of the National Housing Conference from 1999 to 2008. Mr. Harvey initially became a Fannie Mae director in August 2008, before we were put into conservatorship, and FHFA appointed Mr. Harvey to Fannie Mae's Board in December 2008. Mr. Harvey serves as a member of the Nominating and Corporate Governance Committee and the Risk Policy and Capital Committee.

The Nominating and Corporate Governance Committee concluded that Mr. Harvey should continue to serve as a director due to his extensive experience in business, finance, capital markets, risk management, public policy matters, mortgage lending, low-income housing and homebuilding, which he gained in the positions described above.

*Robert H. Herz,* 58, serves as President of Robert H. Herz LLC, providing consulting services on financial reporting and other matters. He also serves as a senior advisor to and as a member of the Advisory Board of WebFilings LLC, a provider of financial reporting software. From July 2002 to September 2010, Mr. Herz was Chairman of the Financial Accounting Standards Board, or FASB. He was also a part-time member of the International Accounting Standards Board, or IASB, from January 2001 to June 2002. He was a partner in PricewaterhouseCoopers LLP from 1985 until his retirement in 2002. He serves on the Accounting Standards Oversight Council of Canada, as a member of the Standing Advisory Group of the Public Company Accounting Oversight Board, on the Leadership Board of the Manchester Business School in England, on the Advisory Council of AccountAbility.org, as Trustee of the Kessler Foundation, and as an executive in residence at the Columbia Business School. Mr. Herz has been a Fannie Mae director since June 2011. Mr. Herz is a member of both the Audit Committee and the Nominating and Corporate Governance Committee.

The Nominating and Corporate Governance Committee concluded that Mr. Herz should continue to serve as a director due to his extensive experience in accounting, business, finance, capital markets and risk management, which he gained in the positions described above.

*Philip A. Laskawy*, 70, retired from Ernst & Young in September 2001, after having held several positions during his employment there from 1961 to 2001, including serving as Chairman and Chief Executive Officer from 1994 until his retirement in September 2001. Mr. Laskawy currently serves on the Boards of Directors of General

- 205 -

Motors Corporation, Henry Schein, Inc., Lazard Ltd. and Loews Corporation. He is a member of the Audit Committee of each of these companies, including Chairman of the Audit Committee of both General Motors Corporation and Lazard Ltd. He is also Chair of the Nominating and Governance Committee and a member of the Strategic Advisory Committee at Henry Schein, Inc. and a member of the Finance & Risk Committee at General Motors Corporation. Mr. Laskawy previously was a member of the Board of Directors of The Progressive Corporation (from 2001 through December 2007) and Discover Financial Services (from June 2007 through September 2008). He served as Chairman of the Audit Committee at each of these companies. Mr. Laskawy initially became a director and Chairman of Fannie Mae's Board in September 2008. Mr. Laskawy is Chair of the Executive Committee.

The Nominating and Corporate Governance Committee concluded that Mr. Laskawy should continue to serve as a director due to his extensive experience in business, finance, accounting and risk management, which he gained in the positions described above.

*Egbert L. J. Perry*, 56, is the Chairman and Chief Executive Officer of The Integral Group LLC. Founded in 1993 by Mr. Perry, Integral is a real estate advisory, investment management and development company based in Atlanta. Mr. Perry has over 29 years experience as a real estate professional, including work in urban development, developing and investing in mixed-income, mixed-use communities, affordable/work force housing and commercial real estate projects in markets across the country. Mr. Perry currently serves as Chair of the Board of Directors of Atlanta Life Financial Group, where he serves as a member of the Audit Committee, as Chair of the Advisory Board of the Penn Institute for Urban Research and as a trustee of the University of Pennsylvania and Children's Healthcare of Atlanta. Mr. Perry served from 2002 through 2008 as a director of the Federal Reserve Bank of Atlanta. Mr. Perry has been a Fannie Mae director since December 2008. Mr. Perry is a member of both the Compensation Committee and the Risk Policy and Capital Committee.

The Nominating and Corporate Governance Committee concluded that Mr. Perry should continue to serve as a director due to his extensive experience in business, finance, accounting, mortgage lending, real estate, low-income housing and homebuilding, which he gained in the positions described above.

*Jonathan Plutzik*, 57, has served as Chairman of Betsy Ross Investors, LLC since August 2005. He also has served as President of the Jonathan Plutzik and Lesley Goldwasser Family Foundation Inc. and as Chairman of the Coro New York Leadership Center since January 2003. Mr. Plutzik served as Non-Executive Chairman of the Board of Directors at Firaxis Games from June 2002 to December 2005. Before that, he served from 1978 to June 2002 in various positions with Credit Suisse First Boston, retiring in June 2002 from his role as Vice Chairman. Mr. Plutzik has been a Fannie Mae director since November 2009. Mr. Plutzik is a member of both the Compensation Committee and the Risk Policy and Capital Committee.

The Nominating and Corporate Governance Committee concluded that Mr. Plutzik should continue to serve as a director due to his extensive experience in business, finance, capital markets, risk management and the regulation of financial institutions, which he gained in the positions described above.

*David H. Sidwell*, 58, served as Executive Vice President and Chief Financial Officer of Morgan Stanley from March 2004 to October 2007, when he retired. From 1984 to March 2004, Mr. Sidwell worked for JPMorgan Chase & Co. in a variety of financial and operating positions, most recently as Chief Financial Officer of JPMorgan Chase's investment bank from January 2000 to March 2004. Prior to joining JP Morgan in 1984, Mr. Sidwell was with Price Waterhouse LLP, a major public accounting firm, from 1975 to 1984. Mr. Sidwell serves as a Trustee of the International Accounting Standards Committee Foundation. Mr. Sidwell is currently a member of the Board of Directors and Senior Independent Director of UBS AG, where he serves as Chair of the Risk Committee and a member of the Governance & Nominating Committee. He previously was a member of the Board of Directors of MSCI Inc. from November 2007 through September 2008, where he served as Chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee. Mr. Sidwell has been a Fannie Mae director since December 2008. Mr. Sidwell is Chair of the Risk Policy and Capital Committee and a member of the Compensation Committee and the Executive Committee.

TREASURY-2601

The Nominating and Corporate Governance Committee concluded that Mr. Sidwell should continue to serve as a director due to his extensive experience in business, finance, capital markets, accounting, risk management and the regulation of financial institutions, which he gained in the positions described above.

*Michael J. Williams,* 54, has been President and Chief Executive Officer of Fannie Mae since April 2009. He previously served as Fannie Mae's Executive Vice President and Chief Operating Officer from November 2005 to April 2009. Mr. Williams also served as Fannie Mae's Executive Vice President for Regulatory Agreements and Restatement from February 2005 to November 2005, as President—Fannie Mae eBusiness from July 2000 to February 2005 and as Senior Vice President—e-commerce from July 1999 to July 2000. Prior to this, Mr. Williams served in various roles in the Single-Family and Corporate Information Systems divisions of Fannie Mae. Mr. Williams joined Fannie Mae in 1991. Mr. Williams has been a Fannie Mae director since April 2009. He is a member of the Executive Committee. In January 2012, Mr. Williams notified the company that he will step down from his position as President and Chief Executive Officer and as a member of the Board of Directors when a new President and Chief Executive Officer is appointed.

Mr. Williams serves as a member of our Board of Directors pursuant to a FHFA order that specifies that our Chief Executive Officer will serve as a member of the Board. In addition, the Nominating and Corporate Governance Committee concluded that Mr. Williams should continue to serve as a director due to his extensive experience in business, finance, accounting, mortgage lending, real estate, low-income housing and the regulation of financial institutions, which he gained in the positions described above.

## CORPORATE GOVERNANCE

### Conservatorship and Delegation of Authority to Board of Directors

On September 6, 2008, the Director of FHFA appointed FHFA as our conservator in accordance with the GSE Act. Upon its appointment, the conservator immediately succeeded to all rights, titles, powers and privileges of Fannie Mae, and of any shareholder, officer or director of Fannie Mae with respect to Fannie Mae and its assets, and succeeded to the title to the books, records and assets of any other legal custodian of Fannie Mae. As a result, our Board of Directors no longer had the power or duty to manage, direct or oversee our business and affairs.

On November 24, 2008, FHFA, as conservator, reconstituted our Board of Directors and directed us regarding the function and authorities of the Board of Directors. FHFA has delegated to our Board of Directors and management the authority to conduct our day-to-day operations, subject to the direction of the conservator. FHFA's delegation of authority to the Board became effective on December 19, 2008 when FHFA appointed nine Board members to serve in addition to the Board Chairman, who was appointed by FHFA on September 16, 2008. Pursuant to FHFA's delegation of authority to the Board, the Board is responsible for carrying out normal Board functions, but is required to obtain the review and approval of FHFA as conservator before taking action in the specified areas described below. The delegation of authority will remain in effect until modified or rescinded by the conservator. The conservatorship has no specified termination date. The directors serve on behalf of the conservator and exercise their authority as directed by and with the approval, where required, of the conservator. Our directors have no duties to any person or entity except to the conservator. Accordingly, our directors are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS unless specifically directed to do so by the conservator.

The conservator instructed that in taking actions the Board should ensure that appropriate regulatory approvals have been received. In addition, the conservator directed the Board to consult with and obtain the approval of the conservator before taking action in the following areas:

(1) actions involving capital stock, dividends, the senior preferred stock purchase agreement, increases in risk limits, material changes in accounting policy and reasonably foreseeable material increases in operational risk;

- 207 -

(2) the creation of any subsidiary or affiliate or any substantial non-ordinary course transactions with any subsidiary or affiliate;

(3) matters that relate to conservatorship;

(4) actions involving hiring, compensation and termination benefits of directors and officers at the executive vice president level and above and other specified executives;

(5) actions involving retention and termination of external auditors and law firms serving as consultants to the Board;

(6) settlements of litigation, claims, regulatory proceedings or tax-related matters in excess of a specified threshold;

(7) any merger with or acquisition of a business for consideration in excess of $50 million; and

(8) any action that in the reasonable business judgment of the Board at the time that the action is taken is likely to cause significant reputational risk.

For more information on the conservatorship, refer to "Business—Conservatorship and Treasury Agreements—Conservatorship."

**Composition of Board of Directors**

In November 2008, FHFA directed that our Board will have a minimum of nine and not more than thirteen directors. There will be a non-executive Chairman of the Board, and our Chief Executive Officer will be the only corporate officer serving as a director. Our initial directors were appointed by the conservator and subsequent vacancies have been and may continue to be filled by the Board, subject to review by the conservator. Each director will serve on the Board until the earlier of (1) resignation or removal by the conservator or (2) the election of a successor director at an annual meeting of shareholders.

Fannie Mae's bylaws provide that each director holds office for the term for which he or she was elected or appointed and until his or her successor is chosen and qualified or until he or she dies, resigns, retires or is removed from office in accordance with applicable law or regulation, whichever occurs first. Under the Charter Act, each director is elected or appointed for a term ending on the date of our next annual shareholders' meeting. As noted above, however, the conservator appointed the initial directors to our Board, delegated to the Board the authority to appoint directors to subsequent vacancies subject to conservator review, and defined the term of service of directors during conservatorship.

FHFA's examination guidance for corporate governance and our Corporate Governance guidelines include a term limit for board members, which provides that a board member may not serve on the Board for more than 10 years or past the age of 72, whichever comes first. The Director of FHFA may waive the term limit for good cause, and has waived the term limit for Mr. Beresford through the date of Fannie Mae's filing of its Form 10-K for the year ended December 31, 2011. Accordingly, in accordance with the term limit requirement, Mr. Beresford's last day as a member of the Board is February 29, 2012.

Under the Charter Act, our Board shall at all times have as members at least one person from each of the homebuilding, mortgage lending and real estate industries, and at least one person from an organization that has represented consumer or community interests for not less than two years or one person who has demonstrated a career commitment to the provision of housing for low-income households. It is the policy of the Board that a substantial majority of Fannie Mae's directors will be independent, in accordance with the standards adopted by the Board. In addition, our Corporate Governance guidelines provide that the Board, as a group, must be knowledgeable in business, finance, capital markets, accounting, risk management, public policy, mortgage lending, real estate, low-income housing, homebuilding, regulation of financial institutions, and any other areas that may be relevant to the safe and sound operation of Fannie Mae. In addition to expertise in the areas noted above, our Corporate Governance Guidelines specify that the Nominating and Corporate Governance Committee

- 208 -

will seek out Board members who possess the highest personal values, judgment, and integrity, and who have an understanding of the regulatory and policy environment in which Fannie Mae does business. The Committee also considers whether a prospective candidate for the Board has the ability to attend meetings and fully participate in the activities of the Board.

The Nominating and Corporate Governance Committee also considers diversity when evaluating the composition of the Board. Our Corporate Governance Guidelines specify that the Nominating and Corporate Governance Committee is committed to considering minorities, women and individuals with disabilities in the identification and evaluation process of prospective candidates. The Guidelines also specify that the Committee will seek out Board members who represent diversity in ideas, perspectives, gender, race, and disability. These provisions of our Corporate Governance Guidelines implement FHFA regulations that require the company to implement and maintain policies and procedures that, among other things, encourage the consideration of diversity in nominating or soliciting nominees for positions on our Board.

The Nominating and Corporate Governance Committee evaluates the qualifications and performance of current directors on an annual basis. Factors taken into consideration by the Committee in making this evaluation include:

- a director's contribution to the effective functioning of the corporation;

- any change in the director's principal area of responsibility with his or her company or his or her retirement from the company;

- whether the director continues to bring relevant experience to the Board;

- whether the director has the ability to attend meetings and fully participate in the activities of the Board;

- whether the director has developed any relationships with Fannie Mae or another organization, or other circumstances have arisen, that might make it inappropriate for the director to continue serving on the Board;

- the director's age and length of service on the Board; and

- the director's particular experience, qualifications, attributes and skills.

Information regarding the particular experience, qualifications, attributes and skills of each of our current directors is provided above under "Directors."

**Board Leadership Structure**

We have had a non-executive Chairman of the Board since 2004. FHFA examination guidance and our Corporate Governance Guidelines require separate Chairman of the Board and Chief Executive Officer positions and require that the Chairman of the Board be an independent director. Our Board is also structured so that all but one of our directors, our Chief Executive Officer, are independent. A non-executive Chairman structure enables non-management directors to raise issues and concerns for Board consideration without immediately involving management and is consistent with the Board's emphasis on independent oversight, as well as our conservator's directives.

Our Board has five standing committees: the Audit Committee, the Compensation Committee, the Executive Committee, the Nominating and Corporate Governance Committee, and the Risk Policy and Capital Committee. The Board and the standing Board committees function in accordance with their designated duties and with the authorities as set forth in federal statutes, regulations and FHFA examination and policy guidance, Delaware law (for corporate governance purposes) and in Fannie Mae's bylaws and applicable charters of Fannie Mae's Board committees. Such duties or authorities may be modified by the conservator at any time. In January 2011, the Board dissolved the Strategic Planning Committee and determined that its strategic planning oversight roles and responsibilities would be discharged by the full Board of Directors.

TREASURY-2604

The Board oversees risk management primarily through the Risk Policy and Capital Committee. This Committee oversees management's risk-related policies, including receiving, reviewing and discussing with management presentations and analyses on corporate level risk policies and limits, performance against these policies and limits, and the sufficiency of risk management capabilities. For more information on the Board's role in risk oversight, see "MD&A—Risk Management—Enterprise Risk Governance—Board of Directors."

**Corporate Governance Information, Committee Charters and Codes of Conduct**

Our Corporate Governance Guidelines, as well as the charters for our Board's Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee, and Risk Policy and Capital Committee, are posted on our Web site, www.fanniemae.com, under "Governance" in the "About Us" section of our Web site. Our Executive Committee does not have a written charter. The responsibilities, duties and authorities of the Executive Committee are set forth in our bylaws, which are also posted on our Web site, www.fanniemae.com, under "Governance" in the "About Us" section of our Web site.

We have a Code of Conduct that is applicable to all officers and employees and a Code of Conduct and Conflicts of Interest Policy for Members of the Board of Directors. Our Code of Conduct also serves as the code of ethics for our Chief Executive Officer and senior financial officers required by the Sarbanes-Oxley Act of 2002 and implementing regulations of the SEC. We have posted these codes on our Web site, www.fanniemae.com, under "Governance" in the "About Us" section of our Web site. We intend to disclose any changes to or waivers from these codes that apply to any of our executive officers or directors by posting this information on our Web site.

Although our equity securities are no longer listed on the New York Stock Exchange ("NYSE"), we are required by FHFA's corporate governance regulations and examination guidance for corporate governance, compensation practices and accounting practices to follow specified NYSE corporate governance requirements relating to, among other things, the independence of our Board members and the charters, independence, composition, expertise, duties and other requirements of our Board Committees.

**Audit Committee Membership**

Our Board has a standing Audit Committee consisting of Mr. Beresford, who is the Chair, Mr. Forrester, Ms. Gaines and Mr. Herz, all of whom are independent under the requirements of independence set forth in FHFA's corporate governance regulations (which requires the standard of independence adopted by the NYSE), Fannie Mae's Corporate Governance Guidelines and other SEC rules and regulations applicable to audit committees. The Board has determined that Mr. Beresford, Mr. Forrester, Ms. Gaines and Mr. Herz each have the requisite experience to qualify as an "audit committee financial expert" under the rules and regulations of the SEC and has designated each of them as such. Mr. Beresford's last day as a member of the Board is February 29, 2012. Following Mr. Beresford's retirement, Mr. Forrester will serve as Chair of the Audit Committee.

**Executive Sessions**

Our non-management directors meet regularly in executive sessions without management present. Our Board of Directors reserves time for executive sessions at every regularly scheduled Board meeting. The non-executive Chairman of the Board, Mr. Laskawy, presides over these sessions.

**Communications with Directors or the Audit Committee**

Interested parties wishing to communicate any concerns or questions about Fannie Mae to the non-executive Chairman of the Board or to our non-management directors individually or as a group may do so by electronic mail addressed to "board@fanniemae.com," or by U.S. mail addressed to Board of Directors, c/o Office of the Corporate Secretary, Fannie Mae, Mail Stop 1H-2S/05, 3900 Wisconsin Avenue NW, Washington, DC 20016-2892. Communications may be addressed to a specific director or directors, including Mr. Laskawy, the Chairman of the Board, or to groups of directors, such as the independent or non-management directors.

- 210 -

TREASURY-2605

Interested parties wishing to communicate with the Audit Committee regarding accounting, internal accounting controls or auditing matters may do so by electronic mail addressed to "auditcommittee@fanniemae.com," or by U.S. mail addressed to Audit Committee, c/o Office of the Corporate Secretary, Fannie Mae, Mail Stop 1H-2S/05, 3900 Wisconsin Avenue NW, Washington, DC 20016-2892.

The Office of the Corporate Secretary is responsible for processing all communications to a director or directors. Communications that are deemed by the Office of the Corporate Secretary to be commercial solicitations, ordinary course customer inquiries or complaints, incoherent or obscene are not forwarded to directors.

**Director Nominations; Shareholder Proposals**

During the conservatorship, FHFA, as conservator, has all powers of the shareholders and Board of Directors of Fannie Mae. As a result, under the GSE Act, Fannie Mae's common shareholders no longer have the ability to recommend director nominees or elect the directors of Fannie Mae or bring business before any meeting of shareholders pursuant to the procedures in our bylaws. We currently do not plan to hold an annual meeting of shareholders in 2012. For more information on the conservatorship, refer to "Business—Conservatorship and Treasury Agreements—Conservatorship."

## EXECUTIVE OFFICERS

Our current executive officers who are not also members of the Board of Directors are listed below. They have provided the following information about their principal occupation, business experience and other matters.

*Kenneth J. Bacon*, 57, has been Executive Vice President—Multifamily (formerly, Housing and Community Development) since July 2005 and was interim head of Housing and Community Development from January 2005 to July 2005. He was Senior Vice President—Multifamily Lending and Investment from May 2000 to January 2005, and Senior Vice President—American Communities Fund from October 1999 to May 2000. From August 1998 to October 1999 he was Senior Vice President of the Community Development Capital Corporation. He was Senior Vice President of Fannie Mae's Northeastern Regional Office in Philadelphia from May 1993 to August 1998. Mr. Bacon was a director of the Fannie Mae Foundation from January 1995 until it was dissolved in June 2009. He was Vice Chairman of the Fannie Mae Foundation from January 2005 to September 2008 and was Chairman from September 2008 to June 2009. Mr. Bacon is a director of Comcast Corporation and the Corporation for Supportive Housing. He is a member of the Executive Leadership Council. Mr. Bacon plans to leave the company in March 2012.

*David C. Benson*, 52, has been Executive Vice President—Capital Markets since April 2009. He also served as Treasurer from June 2010 to January 2012. Mr. Benson previously served as Fannie Mae's Executive Vice President—Capital Markets and Treasury from August 2008 to April 2009, as Fannie Mae's Senior Vice President and Treasurer from March 2006 to August 2008, and as Fannie Mae's Vice President and Assistant Treasurer from June 2002 to February 2006. Prior to joining Fannie Mae in 2002, Mr. Benson was Managing Director in the fixed income division of Merrill Lynch & Co. From 1988 through 2002, he served in several capacities at Merrill Lynch in the areas of risk management, trading, debt syndication and e-commerce based in New York and London.

*Andrew J. Bon Salle*, 46, has been Senior Vice President and Head of Underwriting and Pricing since May 2011. Mr. Bon Salle previously served as Fannie Mae's Senior Vice President—Capital Markets from March 2006 to May 2011, and as Fannie Mae's Vice President—Portfolio Management from November 2000 to February 2006. Mr. Bon Salle held the positions of Director, Finance from December 1996 to November 2000 and of Manager, Early Funding Programs from March 1994 to December 1996. Mr. Bon Salle joined Fannie Mae in September 1992 as a senior capital markets analyst.

*Terence W. Edwards*, 56, has been Executive Vice President—Credit Portfolio Management since September 2009, when he joined Fannie Mae. Prior to joining Fannie Mae, Mr. Edwards served as the President and Chief Executive Officer of PHH Corporation, a leading outsource provider of mortgage and fleet management services,

- 211 -

from January 2005 to June 2009. Mr. Edwards was also a member of the Board of Directors of PHH Corporation from January 2005 through June 2009. Prior to PHH Corporation's spin-off from Cendant Corporation (now known as Avis Budget Group, Inc.) in January 2005, Mr. Edwards served as President and Chief Executive Officer of Cendant Mortgage Corporation (now known as PHH Mortgage Corporation), a subsidiary of Cendant Corporation, beginning in February 1996. Mr. Edwards had previously served in other executive roles at PHH Corporation, which he joined in 1980.

*Jeffery R. Hayward,* 56, has been Senior Vice President and Head of Multifamily since January 2012. Mr. Hayward has served in various roles at Fannie Mae for nearly 25 years. He previously served as Fannie Mae's Senior Vice President—National Servicing Organization from April 2010 to January 2012. He also served as Senior Vice President of Community Lending in Fannie Mae's Multifamily division from May 2004 to April 2010. Prior to that time, Mr. Hayward served as both a Senior Vice President and a Vice President in Fannie Mae's Single-Family division, including as Senior Vice President in the National Business Center from November 2001 to May 2004, as Vice President for Single-Family Business Strategy from November 1999 to November 2001, as Vice President for Asset Management Services from August 1998 to November 1999 and as Vice President for Quality Control and Operations from January 1996 to August 1998. Mr. Hayward also served as Vice President for Risk Management from June 1993 to January 1996. Before that, he served as Director, Loan Acquisition from October 1992 to June 1993, as Director, Marketing from December 1989 to September 1992, and as Senior Negotiator from July 1988 to December 1989. Mr. Hayward joined the company in April 1987 as a senior MBS representative.

*Linda K. Knight,* 62, has served as the Executive Vice President leading Fannie Mae's operating plan since September 2010. Since January 2011, Ms. Knight has also led the Strategy, Execution & Transformation business unit. Ms. Knight also led the Financial Planning & Analysis business unit from January 2011 to July 2011. Ms. Knight served as Executive Vice President—Mortgage-Backed Securities and Pricing from June 2010 to September 2010, and she served as Executive Vice President and Treasurer from April 2009 to June 2010. Ms. Knight previously served as Executive Vice President—Enterprise Operations & Securities from November 2008 to April 2009. Ms. Knight was responsible for securities operations from August 2008 to September 2010. She was responsible for enterprise operations from April 2007 to April 2009, except for a period from August 2008 to September 2008. Ms. Knight served under the title Executive Vice President—Securities from August to November 2008 and as Executive Vice President—Enterprise Operations from April 2007 until August 2008. Previously, Ms. Knight served as Executive Vice President—Capital Markets from March 2006 to April 2007. Before that, she served as Senior Vice President and Treasurer from February 1993 to March 2006, and Vice President and Assistant Treasurer from November 1986 to February 1993. Ms. Knight held the position of Director, Treasurer's Office from November 1984 to November 1986. Ms. Knight joined Fannie Mae in August 1982 as a senior market analyst. Ms. Knight plans to leave the company in March 2012.

*Timothy J. Mayopoulos,* 52, has been Executive Vice President, Chief Administrative Officer, General Counsel and Corporate Secretary since September 2010. Mr. Mayopoulos was Executive Vice President, General Counsel and Corporate Secretary from April 2009 to September 2010. Before joining Fannie Mae, Mr. Mayopoulos was Executive Vice President and General Counsel of Bank of America Corporation from January 2004 to December 2008. He was Managing Director and General Counsel, Americas of Deutsche Bank AG's Corporate and Investment Bank from January 2002 to January 2004. He was Managing Director and Senior Deputy General Counsel, Americas of Credit Suisse First Boston from November 2000 to May 2001, and Managing Director and Associate General Counsel of Donaldson, Lufkin & Jenrette, Inc. from May 1996 to November 2000. Mr. Mayopoulos was previously in private law practice at Davis Polk & Wardwell and served in the Office of the Independent Counsel during the Whitewater investigation.

*Susan R. McFarland,* 51, has served as Executive Vice President and Chief Financial Officer since July 2011. Prior to joining Fannie Mae, she served as Executive Vice President, Finance and Principal Accounting Officer of Capital One Financial Corporation from March 2011 to July 2011. She served as Capital One's Executive Vice President and Controller from March 2004 to March 2011, and as Chief Financial Officer of various lines of

TREASURY-2607

business at Capital One prior to that time. Prior to joining Capital One, she was with Bank One and its predecessor bank from 1986 to 2002, most recently as the Chief Financial Officer of the Retail Bank. She started her career with Deloitte & Touche.

*John R. Nichols,* 49, has been Executive Vice President and Chief Risk Officer since August 2011. Mr. Nichols previously served as Senior Vice President and Interim Chief Risk Officer from March 2011 to August 2011. He also served as Senior Vice President and Capital Markets Chief Risk Officer from November 2010 to June 2011. Prior to joining Fannie Mae, Mr. Nichols was Managing Director for BlackRock from February 2005 to October 2010.

*Zachary Oppenheimer,* 52, has been Senior Vice President and Head of Customer Engagement since May 2011. Mr. Oppenheimer previously served as Fannie Mae's Senior Vice President and Chief Acquisition Officer from August 2009 to May 2011, and as Senior Vice President, Single-Family Mortgage Business from November 1998 through August 2009. Mr. Oppenheimer was Vice President of Marketing from April 1991 through November 1998. He held the positions of Director, Sales and Marketing from June 1988 to April 1991, of Director, MBS from May 1987 to June 1988, of MBS Manager from August 1985 to May 1987, and of Senior Sales Representative from October 1984 to August 1985. Mr. Oppenheimer joined Fannie Mae in August 1983 as an associate quality control representative.

*Michael A. Shaw,* 64, has been Executive Vice President and Chief Credit Officer since April 2009. Mr. Shaw previously served as Executive Vice President and Enterprise Risk Officer from November 2008 to April 2009, and as Executive Vice President and Chief Risk Officer from August 2008 to November 2008. Prior to that time, Mr. Shaw served as Senior Vice President—Credit Risk Oversight beginning in April 2006, when he joined Fannie Mae. Prior to that time, Mr. Shaw was employed at JPMorgan Chase & Co., where he served as Senior Credit Executive from 2004 to 2006, as Senior Risk Executive, Policy, Reporting, Analytics and Finance during 2004 and as Senior Credit Executive—Consumer, Chase Financial Services from 2003 to 2004. Prior to joining JP Morgan, Mr. Shaw held senior risk positions at GE Capital and a subsidiary from 1997 to 2003. Mr. Shaw previously served in several senior risk positions at Citigroup Inc., which he joined in 1972.

*Edward G. Watson,* 50, has been Executive Vice President—Operations and Technology, since April 2009, when he joined Fannie Mae. Mr. Watson has more than 25 years of experience in the financial services industry. Prior to joining Fannie Mae, Mr. Watson held a variety of positions with Citigroup Inc., a global diversified financial services holding company. From April 2004 to April 2008, he was Global Head, Capital Markets Operations and Institutional Clients Group Business Services. Before that, he served in a series of senior finance positions, including as Chief Financial Officer of Citigroup International, the European Investment Bank, and of Global Investment Management. Upon joining Citigroup in 1994, Mr. Watson led the effort to build the infrastructure for a start-up interest rate and equity over-the-counter derivatives business, which he ran until 1998.

Under our bylaws, each executive officer holds office until his or her successor is chosen and qualified or until he or she dies, resigns, retires or is removed from office, whichever occurs first.

### Section 16(a) Beneficial Ownership Reporting Compliance

Our directors and officers file with the SEC reports on their ownership of our stock and on changes in their stock ownership. Based on a review of forms filed during 2011 or with respect to 2011 and on written representations from our directors and officers, we believe that all of our directors and officers timely filed all required reports and reported all transactions reportable during 2011.

### Item 11.   Executive Compensation

The information required by this item will be included in an amendment to this annual report on Form 10-K filed on or before April 30, 2012.

**Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The following table provides information as of December 31, 2011 with respect to shares of common stock that may be issued under our existing equity compensation plans. At this time, we are prohibited from issuing new stock without the prior written consent of Treasury under the terms of the senior preferred stock purchase agreement, other than as required by the terms of any binding agreement in effect on the date of the senior preferred stock purchase agreement, including as required by the terms of outstanding stock options and restricted stock units.

**Equity Compensation Plan Information**

| | As of December 31, 2011 | | |
|---|---|---|---|
| Plan Category | Number of Securities to be Issued upon Exercise of Outstanding Options, Warrants and Rights (#) | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights | Number of Securities Remaining Available for Future Issuance under Equity Compensation Plans (Excluding Securities Reflected in First Column) (#) |
| Equity compensation plans approved by stockholders . . . . . . . . . . . . . | 3,143,029[1] | $72.34[2] | 41,110,196[3] |
| Equity compensation plans not approved by stockholders . . . . . . . . . . | N/A | N/A | N/A |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,143,029 | $72.34 | 41,110,196 |

[1] This amount includes outstanding stock options; restricted stock units; deferred stock units; and shares issuable upon the payout of deferred stock balances. Outstanding awards, options and rights include grants under the Fannie Mae Stock Compensation Plan of 1993, the Stock Compensation Plan of 2003 and the payout of shares deferred upon the settlement of awards made under the 1993 plan and a prior plan.

[2] The weighted average exercise price is calculated for the outstanding options and does not take into account restricted stock units or deferred shares.

[3] This number of shares consists of 11,960,258 shares available under the 1985 Employee Stock Purchase Plan and 29,149,938 shares available under the Stock Compensation Plan of 2003 that may be issued as restricted stock, stock bonuses, stock options or in settlement of restricted stock units, performance share program awards, stock appreciation rights or other stock-based awards. No more than 1,433,784 of the shares issuable under the Stock Compensation Plan of 2003 may be issued as restricted stock or restricted stock units vesting in full in fewer than three years, performance shares with a performance period of less than one year or bonus shares subject to similar vesting provisions or performance periods.

TREASURY-2609

## Beneficial Ownership

The following table shows the beneficial ownership of our common stock by each of our current directors and the named executives, and all current directors and executive officers as a group, as of February 15, 2012, unless otherwise indicated. As of that date, no director or named executive, nor all directors and current executive officers as a group, owned as much as 1% of our outstanding common stock.

| Name and Position | Amount and Nature of Beneficial Ownership[1] | | |
| --- | --- | --- | --- |
| | Common Stock Beneficially Owned Excluding Stock Options | Stock Options Exercisable or Other Shares Obtainable Within 60 Days of February 15, 2012[2] | Total Common Stock Beneficially Owned |
| David C. Benson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>  Executive Vice President—Capital Markets | 14,966 | 53,927 | 68,893 |
| Dennis R. Beresford . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>  Director | 4,719 | 0 | 4,719 |
| Terence W. Edwards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>  Executive Vice President—Credit Portfolio Management | 0 | 0 | 0 |
| W. Thomas Forrester . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>  Director | 0 | 0 | 0 |
| Brenda J. Gaines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>  Director | 487 | 0 | 487 |
| Charlynn Goins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>  Director | 0 | 0 | 0 |
| Frederick Barton Harvey, III . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>  Director | 0 | 0 | 0 |
| Robert H. Herz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>  Director | 0 | 0 | 0 |
| David C. Hisey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>  Executive Vice President and Deputy Chief Financial Officer | 4,649 | 10,000 | 14,649 |
| Philip A. Laskawy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>  Chairman of the Board | 0 | 0 | 0 |
| Timothy J. Mayopoulos . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>  Executive Vice President, Chief Administrative Officer, General<br>  Counsel and Corporate Secretary | 0 | 0 | 0 |
| Susan R. McFarland . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>  Executive Vice President and Chief Financial Officer | 0 | 0 | 0 |
| Egbert L. J. Perry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>  Director | 0 | 0 | 0 |
| Jonathan Plutzik . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>  Director | 0 | 0 | 0 |
| David H. Sidwell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>  Director | 0 | 0 | 0 |
| Michael J. Williams[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>  President and Chief Executive Officer | 239,744 | 139,089 | 378,833 |
| All directors and current executive officers as a group (24 persons)[4] . . . | 478,235 | 373,848 | 852,083 |

[1]  Beneficial ownership is determined in accordance with the rules of the SEC for computing the number of shares of common stock beneficially owned by each person and the percentage owned. Holders of stock options have no investment or voting power over the shares issuable upon the exercise of the options until the options are exercised.

TREASURY-2610

(2) These shares are issuable upon the exercise of outstanding stock options, except for 1,373 shares of deferred stock held by Mr. Williams, which he could obtain within 60 days in certain circumstances.

(3) Mr. Williams' shares include 81,541 shares held jointly with his spouse and 700 shares held by his daughter.

(4) The amount of shares held by all directors and current executive officers as a group includes 748 shares of stock held by their family members. The beneficially owned total includes 1,373 shares of deferred stock.

The following table shows the beneficial ownership of our common stock by each holder of more than 5% of our common stock as of February 15, 2012.

| 5% Holders | Common Stock Beneficially Owned | Percent of Class |
|---|---|---|
| Department of the Treasury ............................................... | Variable(1) | 79.9% |
| 1500 Pennsylvania Avenue, NW., Room 3000 Washington, DC 20220 | | |

(1) In September 2008, we issued to Treasury a warrant to purchase, for one one-thousandth of a cent ($0.00001) per share, shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis at the time the warrant is exercised. The warrant may be exercised in whole or in part at any time until September 7, 2028. As of February 29, 2012, Treasury has not exercised the warrant. The information above assumes Treasury beneficially owns no other shares of our common stock.

## Item 13.   Certain Relationships and Related Transactions, and Director Independence

### POLICIES AND PROCEDURES RELATING TO TRANSACTIONS WITH RELATED PERSONS

We review transactions in which Fannie Mae is a participant and in which any of our directors or executive officers or their immediate family members has an interest to determine whether any of those persons has a material interest in the transaction. Our current written policies and procedures for the review, approval or ratification of transactions with related persons that are required to be reported under Item 404(a) of Regulation S-K are set forth in our:

- Code of Conduct and Conflicts of Interest Policy for Members of the Board of Directors;

- Nominating and Corporate Governance Committee Charter;

- Board of Directors' delegation of authorities and reservation of powers;

- Code of Conduct for employees; and

- Conflict of Interest Policy and Conflict of Interest Procedure for employees.

In addition, depending on the circumstances, relationships and transactions with related persons may require approval of the conservator pursuant to the delegation of authority issued to the Board of Directors by the conservator on November 24, 2008 or may require the approval of Treasury pursuant to the senior preferred stock purchase agreement.

Our Code of Conduct and Conflicts of Interest Policy for Members of the Board of Directors prohibits our directors from engaging in any conduct or activity that is inconsistent with our best interests, as defined by the conservator's express directions, its policies and applicable federal law. The Code of Conduct and Conflicts of Interest Policy for Members of the Board of Directors requires each of our directors to excuse himself or herself from voting on any issue before the Board that could result in a conflict, self-dealing or other circumstance where the director's position as a director would be detrimental to us or result in a noncompetitive, favored or unfair advantage to either the director or the director's associates. In addition, our directors must disclose to the Chair of the Nominating and Corporate Governance Committee, or another member of the committee, any situation that involves or appears to involve a conflict of interest. This includes, for example, any financial interest of a director, an immediate family member of a director or a business associate of a director in any transaction being considered by the Board, as well as any financial interest a director may have in an organization doing business

- 216 -

with us. Each of our directors also must annually certify compliance with the Code of Conduct and Conflicts of Interest Policy for Members of the Board of Directors.

The Nominating and Corporate Governance Committee Charter and our Board's delegation of authorities and reservation of powers require the Nominating and Corporate Governance Committee to approve any transaction that Fannie Mae engages in with any director, nominee for director or executive officer, or any immediate family member of a director, nominee for director or executive officer, that is required to be disclosed pursuant to Item 404 of Regulation S-K. In addition, the Board's delegation of authorities and reservation of powers requires the Board and the conservator to approve any action that in the reasonable business judgment of the Board at the time the action is taken is likely to cause significant reputational risk. Depending on the Board's business judgment, this requirement might include a related party transaction.

Our Code of Conduct for employees requires that we and our employees seek to avoid any actual or apparent conflict between our business interests and the personal interests of our employees or their family members. An employee who knows or suspects a violation of our Code of Conduct must raise the issue with the employee's manager, another appropriate member of management, a member of our Human Resources division or our Compliance and Ethics division.

Our Conflict of Interest Policy and Conflict of Interest Procedure for employees requires that our executive officers report to the Compliance & Ethics Division any existing or currently proposed transaction with us, whether or not in the ordinary course of business, in which the executive officer or any immediate family member of the executive officer has a direct or indirect interest. Our Conflict of Interest Procedure for employees provides that the Compliance & Ethics Division will refer any such report to the Office of the Corporate Secretary for review to determine whether the Nominating and Corporate Governance Committee or FHFA is required to review and approve the transaction pursuant to the Nominating and Corporate Governance Committee Charter and/or the Board's delegation of authorities and reservation of powers.

We are required by the conservator to obtain its approval for various matters, some of which may involve relationships or transactions with related persons. These matters include actions involving the senior preferred stock purchase agreement, the creation of any subsidiary or affiliate or any substantial non-ordinary course transactions with any subsidiary or affiliate, actions involving hiring, compensation and termination benefits of directors and officers at the executive vice president level and above and other specified executives, and any action that in the reasonable business judgment of the Board at the time that the action is taken is likely to cause significant reputational risk. The senior preferred stock purchase agreement requires us to obtain written Treasury approval of transactions with affiliates unless, among other things, the transaction is upon terms no less favorable to us than would be obtained in a comparable arm's-length transaction with a non-affiliate or the transaction is undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence at the time the senior preferred stock purchase agreement was entered into.

We also require our directors and executive officers, not less than annually, to describe to us any situation involving a transaction with us in which a director or executive officer could potentially have a personal interest that would require disclosure under Item 404 of Regulation S-K.

## TRANSACTIONS WITH RELATED PERSONS

### Transactions with Treasury

Treasury beneficially owns more than 5% of the outstanding shares of our common stock by virtue of the warrant we issued to Treasury on September 7, 2008. The warrant entitles Treasury to purchase shares of our common stock equal to 79.9% of our outstanding common stock on a fully diluted basis on the date of exercise, for an exercise price of $0.00001 per share, and is exercisable in whole or in part at any time on or before September 7, 2028. We describe below our current agreements with Treasury, as well as payments we will be making to Treasury in the future pursuant to the Temporary Payroll Tax Cut Continuation Act of 2011.

TREASURY-2612

FHFA, as conservator, approved the senior preferred stock purchase agreement and the amendments to the agreement, our role as program administrator for the Home Affordable Modification Program and other initiatives under the Making Home Affordable Program, and the housing finance agency transactions described below.

### Treasury Senior Preferred Stock Purchase Agreement

We issued the warrant to Treasury pursuant to the terms of the senior preferred stock purchase agreement we entered into with Treasury on September 7, 2008. Under the senior preferred stock purchase agreement, we also issued to Treasury one million shares of senior preferred stock. We issued the warrant and the senior preferred stock as an initial commitment fee in consideration of Treasury's commitment to provide up to $100 billion in funds to us under the terms and conditions set forth in the senior preferred stock purchase agreement. On May 6, 2009, Treasury amended the senior preferred stock purchase agreement to increase its funding commitment to $200 billion and to revise some of the covenants in the agreement. Treasury further amended the senior preferred stock purchase agreement on December 24, 2009 in order to further increase its funding commitment as necessary to accommodate any net worth deficiencies attributable to periods during 2010, 2011 and 2012. If we do not have a positive net worth as of December 31, 2012, then the amount of funding available under the senior preferred stock purchase agreement after 2012 will be $124.8 billion ($200 billion less $75.2 billion in cumulative draws for net worth deficiencies through December 31, 2009). In the event we have a positive net worth as of December 31, 2012, then the amount of funding available after 2012 under the senior preferred stock purchase agreement will depend on the size of that positive net worth relative to the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, as follows: (a) if our positive net worth as of December 31, 2012 is less than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less our positive net worth as of December 31, 2012; or (b) if our positive net worth as of December 31, 2012 is greater than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less the cumulative draws attributable to periods during 2010, 2011 and 2012. The amendment also made some other revisions to the agreement.

The senior preferred stock purchase agreement also requires that we pay a quarterly commitment fee, beginning on March 31, 2011, in an amount to be determined by Treasury no later than December 31, 2010. As of February 29, 2012, the amount of the quarterly commitment fee payable by us to Treasury under the senior preferred stock purchase agreement had not been established; however, Treasury has waived the quarterly commitment fee for each quarter of 2011 and the first quarter of 2012 due to the continued fragility of the mortgage market and Treasury's belief that the imposition of the quarterly commitment fee would not generate increased compensation for taxpayers. In its notification to FHFA that it had waived the quarterly commitment fee for the first quarter of 2012, Treasury indicated that it will reevaluate the situation during the next calendar quarter to determine whether the quarterly commitment fee should then be set.

We have received an aggregate of $111.6 billion from Treasury under the senior preferred stock purchase agreement, and the Acting Director of FHFA will submit a request to Treasury on our behalf for an additional $4.6 billion from Treasury under the senior preferred purchase stock agreement. Through December 31, 2011, we have paid an aggregate of $19.8 billion to Treasury in dividends on the senior preferred stock. See "Business— Conservatorship and Treasury Agreements—Treasury Agreements" for more information about the senior preferred stock purchase agreement.

### Treasury Making Home Affordable Program

On February 18, 2009, the Obama Administration announced its Homeowner Affordability and Stability Plan, a plan to provide stability and affordability to the U.S. housing market. Pursuant to this plan, in March 2009, the Administration announced the details of its Making Home Affordable Program, a program intended to provide assistance to homeowners and prevent foreclosures. One of the primary initiatives under the Making Home Affordable Program is the Home Affordable Modification Program, or HAMP, which is aimed at helping borrowers whose loan is either currently delinquent or at imminent risk of default by modifying their mortgage

TREASURY-2613

loan to make their monthly payments more affordable. In addition to our participation in the Administration's initiatives under the Making Home Affordable Program, Treasury engaged us to serve as program administrator for loans modified under HAMP pursuant to the financial agency agreement between Treasury and us, dated February 18, 2009. See "Business—Making Home Affordable Program—Our Role as Program Administrator" for a description of our principal activities as program administrator for HAMP and other initiatives under the Making Home Affordable Program.

Under our arrangement with Treasury, Treasury has agreed to compensate us for a significant portion of the work we have performed in our role as program administrator for HAMP and other initiatives under the Making Home Affordable Program. Pursuant to the current budget established by Treasury, we expect to receive an aggregate of approximately $252 million from Treasury for our work as program administrator for U.S. government fiscal years 2009 through 2012, as well as receive from Treasury an additional amount of approximately $56 million to be passed through to third-party vendors engaged by us for HAMP and other initiatives under the Making Home Affordable Program. These amounts are based on current workload estimates and program scope, and will be updated to reflect any changes in policy, workload and program scope.

*Treasury Housing Finance Agency Initiative*

On October 19, 2009, we entered into a memorandum of understanding with Treasury, FHFA and Freddie Mac that established terms under which we, Freddie Mac and Treasury would provide assistance to state and local housing finance agencies ("HFAs") so that the HFAs could continue to meet their mission of providing affordable financing for both single-family and multifamily housing. Pursuant to this HFA initiative, we, Freddie Mac and Treasury are providing assistance to the HFAs through two primary programs: a temporary credit and liquidity facilities ("TCLF") program, which is intended to improve the HFAs' access to liquidity for outstanding HFA bonds, and a new issue bond ("NIB") program, which is intended to support new lending by the HFAs. We entered into various agreements in November and December 2009 to implement these HFA assistance programs, including several to which Treasury is a party. Pursuant to the TCLF program, Treasury has purchased participation interests in temporary credit and liquidity facilities provided by us and Freddie Mac to the HFAs, which facilities create a credit and liquidity backstop for the HFAs. Pursuant to the NIB program, Treasury has purchased new securities issued and guaranteed by us and Freddie Mac, which are backed by new housing bonds issued by the HFAs.

In November 2011, we entered into an Omnibus Consent to HFA Initiative Program Modifications with Treasury, Freddie Mac and FHFA pursuant to which the parties agreed to specified modifications to the HFA initiative programs, including a three-year extension of the expiration date for the TCLFs from December 2012 to December 2015, and a one-year extension of the expiration date for release of escrowed funds for the NIB program from December 31, 2011 to December 31, 2012. HFAs that participate in the extension of the TCLF program will be required to develop and submit a plan to Treasury, Fannie Mae and Freddie Mac that includes a summary of the methods the HFAs will use to reduce TCLF exposure in the future. An HFA's plan must be acceptable to Treasury, Fannie Mae and Freddie Mac in order for that HFA's TLCFs to be extended.

The total amount originally established by Treasury for the TCLF program and the NIB program was $23.4 billion: an aggregate of $8.2 billion for the TCLF program (of which $7.7 billion consisted of principal and approximately $500 million consisted of accrued interest) and an aggregate of $15.2 billion for the NIB program (of which $12.4 billion related to single-family bonds and $2.8 billion related to multifamily bonds). The amounts outstanding under these programs have been reduced since the programs were established and will continue to be reduced over time as principal payments are received on the mortgage loans financed by the NIB program and as liquidity facilities under the TCLF program are replaced by the HFAs. As of December 31, 2011, the total outstanding amount under the TCLF program was $5.9 billion (of which $5.6 billion consisted of principal and approximately $347 million consisted of accrued interest) and the total unpaid principal amount outstanding under the NIB program was $15.0 billion.

We and Freddie Mac administer these programs on a coordinated basis. We issued temporary credit and liquidity facilities and securities backed by HFA bonds on a 50-50 pro rata basis with Freddie Mac under these programs.

- 219 -

Treasury will bear the initial losses of principal under the TCLF program and the NIB program up to 35% of total original principal on a combined program-wide basis, and thereafter we and Freddie Mac each will bear the losses of principal that are attributable to our own portion of the temporary credit and liquidity facilities and the securities that we have issued. Treasury will bear all losses of unpaid interest under the two programs. Accordingly, as of December 31, 2011, Fannie Mae's maximum potential risk of loss under these programs, assuming a 100% loss of principal, was approximately $6.3 billion. As of December 31, 2011, there had been no losses of principal or interest under the TCLF program or the NIB program.

### *Temporary Payroll Tax Cut Continuation Act of 2011*

In December 2011, Congress enacted the Temporary Payroll Tax Cut Continuation Act of 2011 which, among other provisions, requires that we increase our single-family guaranty fees by at least 10 basis points and remit this increase to Treasury, rather than retaining the incremental revenue. FHFA has announced that, effective April 1, 2012, the guaranty fee on all single-family residential mortgages delivered to Fannie Mae and Freddie Mac on or after that date for securitization will increase by 10 basis points. FHFA is analyzing whether additional guaranty fee increases may be necessary to comply with the law.

### **Transactions with PHH Corporation**

Terence W. Edwards has been Executive Vice President—Credit Portfolio Management of Fannie Mae since September 14, 2009, when he joined Fannie Mae. Prior to joining Fannie Mae, Mr. Edwards served as the President and Chief Executive Officer, as well as a member of the Board of Directors, of PHH Corporation, until June 17, 2009. Mr. Edwards continued to be employed by PHH Corporation until September 11, 2009.

PHH Mortgage Corporation ("PHH"), a subsidiary of PHH Corporation, is a single-family seller-servicer customer of Fannie Mae. We regularly enter into transactions with PHH in the ordinary course of this business relationship. In 2011, PHH delivered approximately $23 billion in mortgage loans to us, which included the delivery of loans for direct payment and the delivery of pools of mortgage loans in exchange for Fannie Mae MBS. We acquired most of these mortgage loans pursuant to our early funding programs. This represented approximately 4.1% of our single-family business volume in 2011 and made PHH our sixth-largest single-family customer. In addition, as of December 31, 2011, PHH serviced approximately $76 billion of single-family mortgage loans either owned directly by Fannie Mae or backing Fannie Mae MBS, which represented approximately 2.7% of our single-family servicing book, making PHH our seventh-largest servicer. PHH also entered into transactions with us to purchase or sell approximately $15 billion in agency mortgage-related securities in 2011. As a single-family seller-servicer customer, PHH also pays us fees for its use of certain Fannie Mae technology, enters into risk-sharing arrangements with us, and provides us with collateral to secure some of its obligations. PHH renewed its delivery commitment to us in November 2010 for a 17-month term.

In December 2011, we renewed our committed purchase facility with PHH, pursuant to which PHH may have, at any given time during the term of the facility, up to $1.0 billion in outstanding early funding transactions with us. This agreement is in addition to our existing uncommitted transaction limits with PHH under our early funding programs. We have also provided PHH with an early reimbursement facility to fund certain of PHH's servicing advances. The maximum amount outstanding under this early reimbursement facility during 2011 was approximately $78 million. PHH is also a participating lender in our HomePath® Mortgage financing initiative relating to our REO properties.

We believe that Fannie Mae is one of PHH's largest business partners and that transactions with Fannie Mae are material to PHH's business. According to PHH Corporation's annual report on Form 10-K for the year ended December 31, 2010, 95% of its mortgage loan sales during 2010 were sold to, or were sold pursuant to programs sponsored by, Fannie Mae, Freddie Mac or Ginnie Mae, and it is highly dependent on programs administered by Fannie Mae, Freddie Mac and Ginnie Mae.

Pursuant to a separation agreement with PHH Corporation, Mr. Edwards is entitled to receive additional compensation from PHH Corporation for his prior services to the company. Some of this additional compensation is dependent on the performance of PHH Corporation. According to Forms 8-K filed by PHH

Corporation on August 5, 2009 and September 16, 2009, Mr. Edwards' separation agreement with PHH Corporation provided that he would receive the following additional compensation from PHH Corporation: (a) an amount equal to his base salary for a 24-month period beginning on PHH Corporation's first regular pay date after March 11, 2010; (b) annual cash bonuses for calendar years 2009, 2010 and 2011 in an amount equal to the bonus he would have received based on actual performance of the company (except that the 2011 bonus will be prorated to reflect the actual number of months covered by the severance period in 2011), which bonuses will be paid to Mr. Edwards at the same time bonuses are payable to corporate employees, but no later than March 15 after the end of the applicable performance year; and (c) a cash transition payment of $50,000 on PHH Corporation's first regular pay date after March 11, 2010. In addition, the outstanding options and restricted stock units that have been previously awarded to him will continue to vest and, on the last day of the severance period, all remaining unvested options and restricted stock units will become fully vested, except for the 2009 performance-based restricted stock units which will become vested only to the extent that performance goals have been satisfied.

Our policies and procedures for the review and approval of related party transactions described above under "Policies and Procedures Relating to Transactions with Related Persons" did not require the review, approval or ratification of the above-described transactions with PHH. Our Nominating and Corporate Governance Committee Charter and our Board's delegation of authorities did not require the Nominating and Corporate Governance Committee to review and approve these transactions because Fannie Mae did not engage in any such transactions directly with Mr. Edwards; however, the Nominating and Corporate Governance Committee has reviewed this relationship. As required under our Conflict of Interest Policy and Conflict of Interest Procedure for employees in effect at the time Mr. Edwards commenced his employment with us, Mr. Edwards reported his ongoing financial interest in PHH Corporation at the time of his employment and requested review and approval of the conflict. Our Chief Executive Officer reviewed and approved of the conflict, and to address the conflict has required that Mr. Edwards be recused from all matters relating to PHH.

**Transactions with Phelan Firms**

Kenneth J. Phelan was Executive Vice President—Chief Risk Officer from April 2009 through February 2011, when he left the company. Mr. Phelan's brother, Lawrence T. Phelan, is an equity partner with ownership interests in two law firms that perform services for Fannie Mae, as well as a minority owner in a company that performs services for these law firms on Fannie Mae matters. The services performed by these firms for Fannie Mae include loss mitigation, foreclosures, bankruptcies, REO matters, evictions and related services.

*Phelan Hallinan and Schmieg.*   Lawrence Phelan has an approximately 49% ownership interest in Phelan Hallinan and Schmieg, LLP ("PHS"), a law firm representing lenders and servicers in Pennsylvania. PHS or its predecessor (Federman and Phelan) has provided legal services to Fannie Mae for over 26 years, and is currently part of Fannie Mae's retained attorney network. In January and February 2011, PHS invoiced approximately $1.1 million in legal fees relating to work performed for Fannie Mae, which represented a significant portion of PHS's overall legal fees invoiced for those months. PHS also invoiced approximately $1.9 million in third-party costs relating to Fannie Mae matters in January and February 2011.

*Phelan Hallinan Schmieg and Diamond.*   Lawrence Phelan also has an approximately 41% ownership interest in Phelan Hallinan Schmieg and Diamond, PC ("PHSD"), a law firm representing lenders and servicers in New Jersey. PHSD has provided legal services to Fannie Mae for over 11 years, and is currently part of Fannie Mae's retained attorney network. PHSD invoiced approximately $0.8 million in legal fees in January and February 2011 relating to work performed for Fannie Mae, which represented a significant portion of PHSD's overall legal fees invoiced for those months. PHSD also invoiced approximately $1.5 million in third-party costs relating to Fannie Mae matters in January and February 2011.

*Full Spectrum Holdings.*   Lawrence Phelan also has an approximately 31% interest in Full Spectrum Holdings LLC, a company that provides support services for PHS, PHSD and other firms. Full Spectrum Holdings performs services such as title searches, investigations and service of process for PHSD and PHS on Fannie

Mae-related matters. Full Spectrum Holdings billed PHS and PHSD approximately $2.0 million for work performed on Fannie Mae matters in January and February 2011, which represented a significant portion of their revenues for those months. This amount represents approximately 59% of the third-party costs invoiced by PHS and PHSD in January and February 2011 described above.

Kenneth Phelan has no affiliation with PHS, PHSD or Full Spectrum Holdings and receives no compensation or other financial benefits from these firms. In accordance with the requirements of our Nominating and Corporate Governance Committee Charter and our Board's delegation of authorities, the Nominating and Corporate Governance Committee approved Fannie Mae's transactions with these firms.

### Transactions involving The Integral Group LLC

Egbert L.J. Perry, who joined our Board in December 2008, is the Chairman, Chief Executive Officer and controlling shareholder of The Integral Group LLC, referred to as Integral. Over the past ten years, our Multifamily (formerly, Housing and Community Development) business has invested indirectly in certain limited partnerships or limited liability companies that are controlled and managed by entities affiliated with Integral, in the capacity of general partner or managing member, as the case may be. These limited partnerships or limited liability companies are referred to as the Integral Property Partnerships. The Integral Property Partnerships own and manage LIHTC properties. We also hold multifamily mortgage loans made to borrowing entities sponsored by Integral. We believe that Mr. Perry has no material direct or indirect interest in these transactions, and therefore disclosure of these transactions in this report is not required pursuant to Item 404 of Regulation S-K. In addition, as described in "Director Independence—Our Board of Directors" below, the Board of Directors has concluded that these business relationships are not material to Mr. Perry's independence.

Mr. Perry has informed us that Integral accepted no further equity investments from us relating to Integral Property Partnerships beginning in December 2008, when he joined our Board. Mr. Perry has also informed us that Integral does not intend to seek debt financing intended specifically to be purchased by us, although, as a secondary market participant, in the ordinary course of our business we may purchase multifamily mortgage loans made to borrowing entities sponsored by Integral.

## DIRECTOR INDEPENDENCE

Our Board of Directors, with the assistance of the Nominating and Corporate Governance Committee, has reviewed the independence of all current Board members under the requirements set forth in FHFA's corporate governance regulations (which requires the standard of independence adopted by the NYSE) and under the standards of independence adopted by the Board, as set forth in our Corporate Governance Guidelines and outlined below. It is the policy of our Board of Directors that a substantial majority of our seated directors will be independent in accordance with these standards. Our Board is currently structured so that all but one of our directors, our Chief Executive Officer, is independent. Based on its review, the Board has determined that all of our non-employee directors meet the director independence requirements set forth in FHFA's corporate governance regulations and in our Corporate Governance Guidelines.

### Independence Standards

Under the standards of independence adopted by our Board, which meet and in some respects exceed the independence requirements set forth in FHFA's corporate governance regulations (which requires the standard of independence adopted by the NYSE), an "independent director" must be determined to have no material relationship with us, either directly or through an organization that has a material relationship with us. A relationship is "material" if, in the judgment of the Board, it would interfere with the director's independent judgment. The Board did not consider the Board's duties to the conservator, together with the federal government's controlling beneficial ownership of Fannie Mae, in determining independence of the Board members.

- 222 -

In addition, under FHFA's corporate governance regulations, our Audit Committee is required to be in compliance with the NYSE's listing requirements for audit committees, under which members of a company's audit committee must meet additional, heightened independence criteria. Our own independence standards require all independent directors to meet these criteria.

To assist it in determining whether a director is independent, our Board has adopted the standards set forth below, which are posted on our Web site, www.fanniemae.com, under "Governance" in the "About Us" section of our Web site:

- A director will not be considered independent if, within the preceding five years:

  - the director was our employee; or

  - an immediate family member of the director was employed by us as an executive officer.

- A director will not be considered independent if:

  - the director is a current partner or employee of our external auditor, or within the preceding five years, was (but is no longer) a partner or employee of our external auditor and personally worked on our audit within that time; or

  - an immediate family member of the director is a current partner of our external auditor, or is a current employee of our external auditor and personally works on Fannie Mae's audit, or, within the preceding five years, was (but is no longer) a partner or employee of our external auditor and personally worked on our audit within that time.

- A director will not be considered independent if, within the preceding five years:

  - the director was employed by a company at a time when one of our current executive officers sat on that company's compensation committee; or

  - an immediate family member of the director was employed as an officer by a company at a time when one of our current executive officers sat on that company's compensation committee.

- A director will not be considered independent if, within the preceding five years:

  - the director received any compensation from us, directly or indirectly, other than fees for service as a director; or

  - an immediate family member of the director received any compensation from us, directly or indirectly, other than compensation received for service as our employee (other than an executive officer).

- A director will not be considered independent if:

  - the director is a current executive officer, employee, controlling stockholder or partner of a company or other entity that does or did business with us and to which we made, or from which we received, payments within the preceding five years that, in any single fiscal year, were in excess of $1 million or 2% of the entity's consolidated gross annual revenues, whichever is greater; or

  - an immediate family member of the director is a current executive officer of a company or other entity that does or did business with us and to which we made, or from which we received, payments within the preceding five years that, in any single fiscal year, were in excess of $1 million or 2% of the entity's consolidated gross annual revenues, whichever is greater.

- A director will not be considered independent if the director or the director's spouse is an executive officer, employee, director or trustee of a nonprofit organization to which we make or have made contributions within the preceding three years (including contributions made by the Fannie Mae Foundation prior to December 31, 2008) that, in a single year, were in excess of 5% of the organization's consolidated gross annual revenues, or $120,000, whichever is less (amounts contributed under our Matching Gifts Program are not included in the contributions calculated for purposes of this standard). The Nominating and Corporate

- 223 -

Governance Committee also will receive periodic reports regarding charitable contributions to organizations otherwise associated with a director or any spouse of a director.

After considering all the facts and circumstances, our Board may determine in its judgment that a director is independent (in other words, the director has no relationship with us that would interfere with the director's independent judgment), even though the director does not meet the standards listed above, so long as the determination of independence is consistent with the NYSE definition of "independence." Where the standards above do not address a particular relationship, the determination of whether the relationship is material, and whether a director is independent, will be made by our Board, based upon the recommendation of the Nominating and Corporate Governance Committee.

**Our Board of Directors**

Our Board of Directors, with the assistance of the Nominating and Corporate Governance Committee, has reviewed the independence of all current Board members under the requirements set forth in FHFA's corporate governance regulations (which requires the standard of independence adopted by the NYSE) and under the standards of independence adopted by the Board contained in our Corporate Governance Guidelines, as outlined above. Based on its review, the Board has affirmatively determined that all of our non-employee directors meet the director independence standards of our Guidelines and the NYSE, and that each of the following ten directors is independent: Philip A. Laskawy, Dennis R. Beresford, William Thomas Forrester, Brenda J. Gaines, Charlynn Goins, Frederick B. Harvey III, Robert H. Herz, Egbert L. J. Perry, Jonathan Plutzik and David H. Sidwell.

In determining the independence of each of these Board members, the Board of Directors considered the following relationships in addition to those addressed by the standards contained in our Guidelines as set forth above:

- Certain of these Board members also serve as directors or advisory Board members of other companies that engage in business with Fannie Mae. In each of these cases, the Board members are only directors or advisory Board members of these other companies. In addition, in most instances, the payments made by or to Fannie Mae pursuant to these relationships during the past five years fell below our Guidelines' thresholds of materiality for a Board member that is a current executive officer, employee, controlling shareholder or partner of a company engaged in business with Fannie Mae. In light of these facts, the Board of Directors has concluded that these business relationships are not material to the independence of these Board members.

- Certain of these Board members also serve as trustees or board members for charitable organizations that have received donations and/or fees from Fannie Mae. In each case, the amounts of these charitable donations and/or fees fell substantially below our Guidelines' thresholds of materiality for a Board member who is a current trustee or board member of a charitable organization that receives donations from Fannie Mae. In light of this fact, the Board of Directors has concluded that these relationships with charitable organizations are not material to the independence of these Board members.

- Certain of these Board members serve as directors of other companies that hold Fannie Mae fixed income securities or control entities that direct investments in such securities. It is not possible for Fannie Mae to determine the extent of the holdings of these companies in Fannie Mae fixed income securities as all payments to holders are made through the Federal Reserve, and most of these securities are held in turn by financial intermediaries. Each director has confirmed that the transactions by these other companies in Fannie Mae fixed income securities are entered into in the ordinary course of business of these companies and are not entered into at the direction of, or upon approval by, him or her in his or her capacity as a director of these companies. In light of these facts, the Board of Directors has concluded that these business relationships are not material to the independence of these Board members.

- One of these Board members and an immediate family member of another Board member serve as a director and employee, respectively, of companies that have been sued by FHFA, as conservator to Fannie Mae and Freddie Mac, for violations of laws in the sale of residential private-label mortgage-backed securities to

Fannie Mae and Freddie Mac. The Board of Directors has concluded that these relationships were not material to the independence of these Board members.

- Mr. Perry is an executive officer and majority shareholder of The Integral Group LLC, which has had multiple indirect business relationships with Fannie Mae during the past five years. These business relationships include the following:

  - Since January 1, 2007, Fannie Mae has held six multifamily mortgage loans made to six borrowing entities sponsored by Integral. In each case, Integral participates in the borrowing entity as a general partner of the limited partnership, or as a managing member of the limited liability company, as the case may be, and holds a 0.01% economic interest in such entity. The aggregate unpaid principal balance of these loans as of December 31, 2011 constituted approximately 5% of Integral's total debt outstanding. The borrowing entities have made interest payments on these loans. The total amount of these interest payments did not exceed $1 million in any of the last five years.

  - Fannie Mae has invested as a limited partner or member in certain LIHTC funds that in turn have invested indirectly as a limited partner or member in various Integral Property Partnerships, which are lower-tier project partnerships or limited liability companies that own LIHTC properties. Integral participates indirectly as a member or the general partner of the Integral Property Partnerships (each a "Project General Partner"). The Integral Property Partnerships construct, develop and manage housing projects, a portion of which includes affordable housing units. Each Project General Partner and its affiliates earn certain fees each year in connection with those project activities, and such fees are paid from income generated by the project (other than certain developer fees paid from development sources). Fannie Mae's indirect investments in the Integral Property Partnerships, through the LIHTC funds, have not resulted in any direct payments by Fannie Mae to any Project General Partner or its affiliates, including Integral. Fannie Mae's indirect equity investment in the Integral Property Partnerships as of December 31, 2011 constituted less than 4% of the total capitalization and approximately 10% of the total equity in all of the Integral Property Partnerships.

The aggregate debt service and other required payments made, directly and indirectly, to or on behalf of Fannie Mae pursuant to these relationships with Integral for each of the past five years fall below our Guidelines' thresholds of materiality for a Board member who is a current executive officer, employee, controlling shareholder or partner of a company that engages in business with Fannie Mae. In addition, as a limited partner or member in the LIHTC funds, which in turn are limited partners in the Integral Property Partnerships, Fannie Mae has no direct dealings with Integral or Mr. Perry and has not been involved in the management of the Integral Property Partnerships. Mr. Perry also was not generally aware of the identity of the limited partners or members of the LIHTC funds, as Integral sells the partnership or LLC interests to syndicators who, in turn, syndicate these interests to limited partners or members of their choosing. Further, Integral has not accepted additional equity investments from Fannie Mae since Mr. Perry joined the Board. Fannie Mae is not currently seeking to make additional equity investments in the LIHTC market and Mr. Perry has informed Fannie Mae that Integral does not intend to seek debt financing specifically to be purchased by Fannie Mae. Based on the foregoing, the Board of Directors has concluded that these business relationships are not material to Mr. Perry's independence.

- Mr. Plutzik's wife, Leslie Goldwasser, is a Managing Director with Credit Suisse. She is not an executive officer of Credit Suisse. Fannie Mae has multiple business relationships with Credit Suisse in the ordinary course of its business. We believe that payments made by or to Fannie Mae pursuant to its relationships with Credit Suisse during the past five years likely fell below our Guidelines' thresholds of materiality for when an immediate family member of a director is a current executive officer, employee, controlling shareholder or partner of a company engaged in business with Fannie Mae. Ms. Goldwasser has confirmed that she has no direct or indirect interest or involvement in any transactions between Fannie Mae and Credit Suisse and that her compensation is not affected directly or indirectly by any such transactions. In light of these facts, the Board of Directors has concluded that these business relationships are not material to Mr. Plutzik's independence.

- 225 -

The Board determined that none of these relationships would interfere with the director's independent judgment.

Mr. Williams is not considered an independent director under the Guidelines because of his position as Chief Executive Officer.

## Item 14.   Principal Accounting Fees and Services

The Audit Committee of our Board of Directors is directly responsible for the appointment, oversight and evaluation of our independent registered public accounting firm, subject to conservator approval of matters relating to retention and termination. In accordance with the Audit Committee's charter, it must approve, in advance of the service, all audit and permissible non-audit services to be provided by our independent registered public accounting firm and establish policies and procedures for the engagement of the external auditor to provide audit and permissible non-audit services. Our independent registered public accounting firm may not be retained to perform non-audit services specified in Section 10A(g) of the Exchange Act.

Deloitte & Touche LLP was our independent registered public accounting firm for the years ended December 31, 2011 and 2010. Deloitte & Touche LLP has advised the Audit Committee that they are independent accountants with respect to the company, within the meaning of standards established by the PCAOB and federal securities laws administered by the SEC.

The following table displays the aggregate estimated or actual fees for professional services provided by Deloitte & Touche LLP in 2011 and 2010, including fees for the 2011 and 2010 audits.

| Description of Fees | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| Audit fees | $34,400,000 | $37,000,000 |
| Audit-related fees[1] | 1,850,000 | 2,500,000 |
| Tax fees | 25,000 | — |
| All other fees[2] | 65,000 | — |
| Total fees | $36,340,000 | $39,500,000 |

[1] Consists of fees billed for attest-related services on debt offerings and securitization transactions.

[2] Consists of fees billed for an assessment of the finance organization.

## Pre-Approval Policy

The Audit Committee's policy is to pre-approve all audit and permissible non-audit services to be provided by the independent registered public accounting firm. The independent registered public accounting firm and management are required to present reports on the nature of the services provided by the independent registered public accounting firm for the past year and the fees for such services, categorized into audit services, audit-related services, tax services and other services.

In connection with its approval of Deloitte & Touche as Fannie Mae's independent registered public accounting firm for Fannie Mae's 2011 integrated audit, the Audit Committee delegated the authority to pre-approve any additional audit and audit-related services to its Chairman, Mr. Beresford, who was required to report any such pre-approvals at the next scheduled meeting of the Audit Committee. Additionally, any services provided by Deloitte & Touche outside of the scope of the integrated audit must be approved by the Conservator.

In 2011, we paid no fees to the independent registered public accounting firm pursuant to the de minimis exception established by the SEC, and all services were pre-approved.

- 226 -

**PART IV**

**Item 15.   Exhibits, Financial Statement Schedules**

**(a)   Documents filed as part of this report**

**1.   Consolidated Financial Statements**

An index to financial statements has been filed as part of this report beginning on page F-1 and is incorporated herein by reference.

**2.   Financial Statement Schedules**

None.

**3.   Exhibits**

An index to exhibits has been filed as part of this report beginning on page E-1 and is incorporated herein by reference.

TREASURY-2622

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Federal National Mortgage Association

/s/ Michael J. Williams
_____
Michael J. Williams
President and Chief Executive Officer

Date: February 29, 2012

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Michael J. Williams and Susan R. McFarland, and each of them severally, his or her true and lawful attorney-in-fact with power of substitution and resubstitution to sign in his or her name, place and stead, in any and all capacities, to do any and all things and execute any and all instruments that such attorney may deem necessary or advisable under the Securities Exchange Act of 1934 and any rules, regulations and requirements of the U.S. Securities and Exchange Commission in connection with the Annual Report on Form 10-K and any and all amendments hereto, as fully for all intents and purposes as he or she might or could do in person, and hereby ratifies and confirms all said attorneys-in-fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Philip A. Laskawy<br>Philip A. Laskawy | Chairman of the Board of Directors | February 29, 2012 |
| /s/ Michael J. Williams<br>Michael J. Williams | President and Chief Executive Officer<br>and Director | February 29, 2012 |
| /s/ Susan R. McFarland<br>Susan R. McFarland | Executive Vice President and<br>Chief Financial Officer | February 29, 2012 |
| /s/ Gregory A. Fink<br>Gregory A. Fink | Senior Vice President and<br>Controller | February 29, 2012 |

TREASURY-2623

| Signature | Title | Date |
|---|---|---|
| /s/ Dennis R. Beresford<br>Dennis R. Beresford | Director | February 29, 2012 |
| /s/ William Thomas Forrester<br>William Thomas Forrester | Director | February 29, 2012 |
| /s/ Brenda J. Gaines<br>Brenda J. Gaines | Director | February 29, 2012 |
| /s/ Charlynn Goins<br>Charlynn Goins | Director | February 29, 2012 |
| /s/ Frederick B. Harvey III<br>Frederick B. Harvey III | Director | February 29, 2012 |
| /s/ Robert H. Herz<br>Robert H. Herz | Director | February 29, 2012 |
| /s/ Egbert L. J. Perry<br>Egbert L. J. Perry | Director | February 29, 2012 |
| /s/ Jonathan Plutzik<br>Jonathan Plutzik | Director | February 29, 2012 |
| /s/ David H. Sidwell<br>David H. Sidwell | Director | February 29, 2012 |

TREASURY-2624

## INDEX TO EXHIBITS

| Item | Description |
|------|-------------|
| 3.1 | Fannie Mae Charter Act (12 U.S.C. § 1716 et seq.) as amended through July 30, 2008 (Incorporated by reference to Exhibit 3.1 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2010, filed February 24, 2011) |
| 3.2 | Fannie Mae Bylaws, as amended through January 30, 2009 (Incorporated by reference to Exhibit 3.2 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.) |
| 4.1 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series D (Incorporated by reference to Exhibit 4.1 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.2 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series E (Incorporated by reference to Exhibit 4.2 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.3 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series F (Incorporated by reference to Exhibit 4.3 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.4 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series G (Incorporated by reference to Exhibit 4.4 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.5 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series H (Incorporated by reference to Exhibit 4.5 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.6 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series I (Incorporated by reference to Exhibit 4.6 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.7 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series L (Incorporated by reference to Exhibit 4.7 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 8, 2008.) |
| 4.8 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series M (Incorporated by reference to Exhibit 4.8 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 8, 2008.) |
| 4.9 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series N (Incorporated by reference to Exhibit 4.9 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 8, 2008.) |
| 4.10 | Certificate of Designation of Terms of Fannie Mae Non-Cumulative Convertible Preferred Stock, Series 2004-1(Incorporated by reference to Exhibit 4.10 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.) |
| 4.11 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series O (Incorporated by reference to Exhibit 4.11 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.) |
| 4.12 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series P (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed September 28, 2007.) |
| 4.13 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series Q (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed October 5, 2007.) |
| 4.14 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series R (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed November 21, 2007.) |
| 4.15 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series S (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed December 11, 2007.) |
| 4.16 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series T (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed May 19, 2008.) |

TREASURY-2625

| Item | Description |
|------|-------------|

4.17   Certificate of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2 (Incorporated by reference to Exhibit 4.2 to Fannie Mae's Current Report on Form 8-K, filed September 11, 2008.)

4.18   Warrant to Purchase Common Stock, dated September 7, 2008 conservator (Incorporated by reference to Exhibit 4.3 to Fannie Mae's Current Report on Form 8-K, filed September 11, 2008.)

4.19   Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of September 26, 2008, between the United States Department of the Treasury and Federal National Mortgage Association, acting through the Federal Housing Finance Agency as its duly appointed conservator (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed October 2, 2008.)

4.20   Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of May 6, 2009, between the United States Department of the Treasury and Federal National Mortgage Association, acting through the Federal Housing Finance Agency as its duly appointed conservator (Incorporated by reference to Exhibit 4.21 to Fannie Mae's Quarterly Report on Form 10-Q, filed May 8, 2009.)

4.21   Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of December 24, 2009, between the United States Department of the Treasury and Federal National Mortgage Association, acting through the Federal Housing Finance Agency as its duly appointed conservator (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed December 30, 2009.)

10.1   Fannie Mae's Elective Deferred Compensation Plan, as amended effective November 15, 2004† (Incorporated by reference to Exhibit 10.21 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.)

10.2   Amendment to Fannie Mae Elective Deferred Compensation Plan I, effective October 27, 2008† (Incorporated by reference to Exhibit 10.7 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.)

10.3   Fannie Mae Elective Deferred Compensation Plan II† (Incorporated by reference to Exhibit 10.7 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.)

10.4   Amendment to Fannie Mae Elective Deferred Compensation Plan II, effective April 29, 2008† (Incorporated by reference to Exhibit 10.1 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 8, 2008.)

10.5   Amendment to Fannie Mae Elective Deferred Compensation Plan II, effective October 27, 2008† (Incorporated by reference to Exhibit 10.10 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.)

10.6   Compensation Repayment Provisions† (Incorporated by reference to Exhibit 99.1 to Fannie Mae's Current Report on Form 8-K, filed December 24, 2009.)

10.7   Long-Term Incentive Plan, effective December 16, 2009† (Incorporated by reference to Exhibit 10.9 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.)

10.8   Deferred Pay Plan, effective December 16, 2009† (Incorporated by reference to Exhibit 10.10 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.)

10.9   Fannie Mae Form of Indemnification Agreement for directors and officers of Fannie Mae (Incorporated by reference to Exhibit 10.15 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.)

E-2

| Item | Description |
|------|-------------|

10.10    Federal National Mortgage Association Supplemental Pension Plan, as amended November 20, 2007† (Incorporated by reference to Exhibit 10.10 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.)

10.11    Amendment to Fannie Mae Supplemental Pension Plan for Internal Revenue Code Section 409A, effective January 1, 2009† (Incorporated by reference to Exhibit 10.11 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.)

10.12    Amendment to Fannie Mae Supplemental Pension Plan, executed December 22, 2008† (Incorporated by reference to Exhibit 10.18 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.)

10.13    Fannie Mae Supplemental Pension Plan of 2003, as amended November 20, 2007† (Incorporated by reference to Exhibit 10.12 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.)

10.14    Amendment to Fannie Mae Supplemental Pension Plan of 2003 for Internal Revenue Code Section 409A, effective January 1, 2009† (Incorporated by reference to Exhibit 10.13 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.)

10.15    Amendment to Fannie Mae Supplemental Pension Plan of 2003 for Internal Revenue Code Section 409A, adopted December 22, 2008† (Incorporated by reference to Exhibit 10.21 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.)

10.16    Amendment to Fannie Mae Supplement Pension Plan of 2003, effective May 14, 2010† (Incorporated by reference to Exhibit 10.1 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 5, 2010.)

10.17    Executive Pension Plan of the Federal National Mortgage Association as amended and restated† (Incorporated by reference to Exhibit 10.10 to Fannie Mae's registration statement on Form 10, filed March 31, 2003)

10.18    Amendment to the Executive Pension Plan of the Federal National Mortgage Association, as amended and restated, effective March 1, 2007† (Incorporated by reference to Exhibit 10.20 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2005, filed May 2, 2007.)

10.19    Amendment to Fannie Mae Executive Pension Plan, effective November 20, 2007† (Incorporated by reference to Exhibit 10.16 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.)

10.20    Amendment to the Executive Pension Plan of the Federal National Mortgage Association, effective January 1, 2008† (Incorporated by reference to Exhibit 10.25 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.)

10.21    Amendment to the Executive Pension Plan of the Federal National Mortgage Association, effective December 16, 2009† (Incorporated by reference to Exhibit 10.23 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.)

10.22    Amendment to the Executive Pension Plan of the Federal National Mortgage Association, effective January 1, 2010† (Incorporated by reference to Exhibit 10.22 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2010, filed February 24, 2011.)

10.23    Fannie Mae Annual Incentive Plan, as amended December 10, 2007† (Incorporated by reference to Exhibit 10.17 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.)

E-3

| Item | Description |
|------|-------------|

10.24    Fannie Mae Stock Compensation Plan of 2003, as amended through December 14, 2007† (Incorporated by reference to Exhibit 10.18 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.)

10.25    Amendment to Fannie Mae Stock Compensation Plan of 2003, as amended, for Internal Revenue Code Section 409A, adopted December 22, 2008† (Incorporated by reference to Exhibit 10.28 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.)

10.26    Fannie Mae Stock Compensation Plan of 1993†

10.27    2009 Amendment to Fannie Mae Stock Compensation Plans of 1993 and 2003† (Incorporated by reference to Exhibit 10.1 to Fannie Mae's Quarterly Report on Form 10-Q, filed November 5, 2009.)

10.28    Fannie Mae Procedures for Deferral and Diversification of Awards, as amended effective December 10, 2007† (Incorporated by reference to Exhibit 10.30 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.)

10.29    Fannie Mae Supplemental Retirement Savings Plan, as amended through April 29, 2008† (Incorporated by reference to Exhibit 10.2 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 8, 2008.)

10.30    Amendment to Fannie Mae Supplemental Retirement Savings Plan, effective October 8, 2008† (Incorporated by reference to Exhibit 10.32 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.)

10.31    Amendment to Fannie Mae Supplemental Retirement Savings Plan, effective May 14, 2010† (Incorporated by reference to Exhibit 10.2 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 5, 2010.)

10.32    Form of Nonqualified Stock Option Grant Award Document† (Incorporated by reference to Exhibit 10.33 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.)

10.33    Form of Restricted Stock Award Document†

10.34    Form of Restricted Stock Units Award Document adopted January 23, 2008† (Incorporated by reference to Exhibit 10.27 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2007, filed February 27, 2008.)

10.35    Form of Restricted Stock Units Award Document†

10.36    Senior Preferred Stock Purchase Agreement dated as of September 7, 2008, as amended and restated on September 26, 2008, between the United States Department of the Treasury and Federal National Mortgage Association (Incorporated by reference Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed October 2, 2008.)

10.37    Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of May 6, 2009, between the United States Department of the Treasury and Federal National Mortgage Association, acting through the Federal Housing Finance Agency as its duly appointed conservator (Incorporated by reference to Exhibit 4.21 to Fannie Mae's Quarterly Report on Form 10-Q, filed May 8, 2009.)

10.38    Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of December 24, 2009, between the United States Department of the Treasury and Federal National Mortgage Association, acting through the Federal Housing Finance Agency as its duly appointed conservator (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed December 30, 2009.)

TREASURY-2628

| Item | Description |
| --- | --- |
| 10.39 | Letters, dated September 1, 2005, setting forth an agreement between Fannie Mae and OFHEO |
| 10.40 | Letter Agreement between Fannie Mae and Timothy J. Mayopoulos, dated March 9, 2009† (Incorporated by reference to Exhibit 10.44 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.) |
| 10.41 | Memorandum of Understanding among the Department of the Treasury, the Federal Housing Finance Agency, the Federal National Mortgage Association, and the Federal Home Loan Mortgage Corporation, dated October 19, 2009 (Incorporated by reference to Exhibit 99.1 to Fannie Mae's Current Report on Form 8-K, filed October 23, 2009.) |
| 10.42 | Omnibus Consent to HFA Initiative Program Modifications among the Department of Treasury, the Federal Housing Finance Agency, Federal National Mortgage Association, and Federal Home Loan Mortgage Corporation, dated November 23, 2011 |
| 12.1 | Statement re: computation of ratio of earnings to fixed charges |
| 12.2 | Statement re: computation of ratio of earnings to combined fixed charges and preferred stock dividends and issuance cost at redemption |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101. INS | XBRL Instance Document* |
| 101. SCH | XBRL Taxonomy Extension Schema* |
| 101. DEF | XBRL Taxonomy Extension Definition* |
| 101. LAB | XBRL Taxonomy Extension Labels* |
| 101. PRE | XBRL Taxonomy Extension Presentation* |

* The financial information contained in these XBRL documents is unaudited. The information in these exhibits shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Fannie Mae, except to the extent, if any, expressly set forth by specific reference in such filing.

† This Exhibit is a management contract or compensatory plan or arrangement.

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Report of Independent Registered Public Accounting Firm ....................................... F-2

Financial Statements ......................................................................... F-3

Consolidated Balance Sheets as of December 31, 2011 and 2010 ................................. F-3

Consolidated Statements of Operations and Comprehensive Loss for the years ended December 31, 2011, 2010, and 2009 ........................................................................ F-4

Consolidated Statements of Cash Flows for the years ended December 31, 2011, 2010, and 2009 ....... F-5

Consolidated Statements of Equity (Deficit) for the years ended December 31, 2011, 2010 and 2009 .... F-6

Notes to Consolidated Financial Statements ..................................................... F-7

    Note 1—   Summary of Significant Accounting Policies ...................................... F-7

    Note 2—   Consolidations and Transfers of Financial Assets ................................. F-38

    Note 3—   Mortgage Loans ................................................................ F-42

    Note 4—   Allowance for Loan Losses and Reserve for Guaranty Losses ........................ F-50

    Note 5—   Investments in Securities ..................................................... F-55

    Note 6—   Financial Guarantees ......................................................... F-63

    Note 7—   Acquired Property, Net ........................................................ F-67

    Note 8—   Short-Term Borrowings and Long-Term Debt ...................................... F-68

    Note 9—   Derivative Instruments ........................................................ F-71

    Note 10—  Income Taxes ................................................................. F-75

    Note 11—  Loss Per Share ............................................................... F-78

    Note 12—  Stock-Based Compensation ..................................................... F-79

    Note 13—  Employee Retirement Benefits ................................................. F-81

    Note 14—  Segment Reporting ............................................................ F-88

    Note 15—  Equity (Deficit) ............................................................. F-95

    Note 16—  Regulatory Capital Requirements .............................................. F-102

    Note 17—  Concentrations of Credit Risk ................................................ F-104

    Note 18—  Fair Value ................................................................... F-110

    Note 19—  Commitments and Contingencies ................................................ F-128

    Note 20—  Selected Quarterly Financial Information (Unaudited) ........................... F-132

TREASURY-2630

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To Fannie Mae:

We have audited the accompanying consolidated balance sheets of Fannie Mae and consolidated entities (in conservatorship) (the "Company") as of December 31, 2011 and 2010, and the related consolidated statements of operations and comprehensive loss, cash flows, and changes in equity (deficit) for each of the three years in the period ended December 31, 2011. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Fannie Mae and consolidated entities (in conservatorship) as of December 31, 2011 and 2010, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2011, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1 to the consolidated financial statements, on January 1, 2010, the Company prospectively adopted the Financial Accounting Standards Board (FASB) new accounting standards on the transfers of financial assets and the consolidation of variable interest entities.

As also discussed in Note 1 to the consolidated financial statements, on April 1, 2009, the Company adopted the FASB modified standard on the model for assessing other-than-temporary impairments, applicable to existing and new debt securities.

As also discussed in Note 1 to the consolidated financial statements, the Company is currently under the control of its conservator and regulator, the Federal Housing Finance Agency ("FHFA"). Further, the Company directly and indirectly receives substantial support from various agencies of the United States Government, including the United States Department of Treasury and FHFA. The Company is dependent upon the continued support of the United States Government, various United States Government agencies and the Company's conservator and regulator, FHFA.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2011, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 29, 2012 expressed an adverse opinion on the Company's internal control over financial reporting because of a material weakness.

/s/ Deloitte & Touche LLP

Washington, DC
February 29, 2012

F-2

**FANNIE MAE**
**(In conservatorship)**

**Consolidated Balance Sheets**
**(Dollars in millions, except share amounts)**

| | As of December 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| **ASSETS** | | |
| Cash and cash equivalents (includes $2 and $348, respectively, related to consolidated trusts) . . . . | $ 17,539 | $ 17,297 |
| Restricted cash (includes $45,900 and $59,619, respectively, related to consolidated trusts) . . . . . . | 50,797 | 63,678 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . . | 46,000 | 11,751 |
| Investments in securities: | | |
| Trading, at fair value (includes $8 and $21, respectively, related to consolidated trusts) . . . . . | 74,198 | 56,856 |
| Available-for-sale, at fair value (includes $1,191 and $1,055, respectively, related to consolidated trusts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 77,582 | 94,392 |
| Total investments in securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 151,780 | 151,248 |
| Mortgage loans: | | |
| Loans held for sale, at lower of cost or fair value (includes $66 and $661, respectively, related to consolidated trusts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 311 | 915 |
| Loans held for investment, at amortized cost: | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 380,134 | 407,228 |
| Of consolidated trusts (includes $3,611 and $2,962, respectively, at fair value and loans pledged as collateral that may be sold or repledged of $798 and $2,522, respectively) . . | 2,590,332 | 2,577,133 |
| Total loans held for investment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,970,466 | 2,984,361 |
| Allowance for loan losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (72,156) | (61,556) |
| Total loans held for investment, net of allowance . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,898,310 | 2,922,805 |
| Total mortgage loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,898,621 | 2,923,720 |
| Accrued interest receivable, net (includes $8,466 and $8,910, respectively, related to consolidated trusts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,000 | 11,279 |
| Acquired property, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11,373 | 16,173 |
| Other assets (includes cash pledged as collateral of $1,109 and $884, respectively) . . . . . . . . . . . | 25,374 | 26,826 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,211,484 | $3,221,972 |
| **LIABILITIES AND DEFICIT** | | |
| Liabilities: | | |
| Accrued interest payable (includes $9,302 and $9,712, respectively, related to consolidated trusts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 12,648 | $ 13,764 |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . . . . . . . . | — | 52 |
| Debt: | | |
| Of Fannie Mae (includes $838 and $893, respectively, at fair value) . . . . . . . . . . . . . . . . . . . | 732,444 | 780,044 |
| Of consolidated trusts (includes $3,939 and $2,271, respectively, at fair value) . . . . . . . . . . . | 2,457,428 | 2,416,956 |
| Other liabilities (includes $629 and $893, respectively, related to consolidated trusts) . . . . . . . . | 13,535 | 13,673 |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,216,055 | 3,224,489 |
| Commitments and contingencies (Note 19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — |
| Fannie Mae stockholders' equity (deficit): | | |
| Senior preferred stock, 1,000,000 shares issued and outstanding . . . . . . . . . . . . . . . . . . . . . . | 112,578 | 88,600 |
| Preferred stock, 700,000,000 shares are authorized—555,374,922 and 576,868,139 shares issued and outstanding, respectively . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19,130 | 20,204 |
| Common stock, no par value, no maximum authorization—1,308,762,703 and 1,270,092,708 shares issued, respectively; 1,157,767,400 and 1,118,504,194 shares outstanding, respectively . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 687 | 667 |
| Accumulated deficit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (128,381) | (102,986) |
| Accumulated other comprehensive loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,235) | (1,682) |
| Treasury stock, at cost, 150,995,303 and 151,588,514 shares, respectively . . . . . . . . . . . . . . . | (7,403) | (7,402) |
| Total Fannie Mae stockholders' deficit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (4,624) | (2,599) |
| Noncontrolling interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 53 | 82 |
| Total deficit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (4,571) | (2,517) |
| Total liabilities and deficit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,211,484 | $3,221,972 |

See Notes to Consolidated Financial Statements

F-3

**FANNIE MAE**
**(In conservatorship)**

**Consolidated Statements of Operations and Comprehensive Loss**
**(Dollars and shares in millions, except per share amounts)**

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| Interest income: | | | |
| Trading securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 1,087 | $ 1,251 | $ 3,859 |
| Available-for-sale securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,277 | 5,290 | 13,618 |
| Mortgage loans (includes $123,633, $132,591, and $6,143, respectively, related to consolidated trusts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 138,462 | 147,583 | 21,521 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 117 | 146 | 357 |
| Total interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 142,943 | 154,270 | 39,355 |
| Interest expense: | | | |
| Short-term debt (includes $9, $12, and $- , respectively, related to consolidated trusts) . . . . . . . . . . . . | 310 | 631 | 2,306 |
| Long-term debt (includes $108,641, $118,373, and $344, respectively, related to consolidated trusts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 123,352 | 137,230 | 22,539 |
| Total interest expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 123,662 | 137,861 | 24,845 |
| Net interest income | 19,281 | 16,409 | 14,510 |
| Provision for loan losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (25,914) | (24,702) | (9,569) |
| Net interest (loss) income after provision for loan losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (6,633) | (8,293) | 4,941 |
| Investment gains, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 506 | 346 | 1,458 |
| Other-than-temporary impairments . . . . . . . . . . . . . . . . . . . . . . . . | (614) | (694) | (9,057) |
| Noncredit portion of other-than-temporary impairments recognized in other comprehensive income . . . . . | 306 | (28) | (804) |
| Net other-than-temporary impairments . . . . . . . . . . . . . . . . . . . . . | (308) | (722) | (9,861) |
| Fair value losses, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (6,621) | (511) | (2,811) |
| Debt extinguishment losses, net . . . . . . . . . . . . . . . . . . . . . . . . . . | (232) | (568) | (325) |
| Fee and other income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,163 | 1,084 | 7,984 |
| Non-interest loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (5,492) | (371) | (3,555) |
| Administrative expenses: | | | |
| Salaries and employee benefits . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,236 | 1,277 | 1,133 |
| Professional services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 736 | 942 | 684 |
| Occupancy expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 179 | 170 | 205 |
| Other administrative expenses . . . . . . . . . . . . . . . . . . . . . . . . . . | 219 | 208 | 185 |
| Total administrative expenses . . . . . . . . . . . . . . . . . . . . . . . | 2,370 | 2,597 | 2,207 |
| Provision for guaranty losses . . . . . . . . . . . . . . . . . . . . . . . . . . . | 804 | 194 | 63,057 |
| Foreclosed property expense . . . . . . . . . . . . . . . . . . . . . . . . . . . | 780 | 1,718 | 910 |
| Other expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 866 | 927 | 8,219 |
| Total expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,820 | 5,436 | 74,393 |
| Loss before federal income taxes . . . . . . . . . . . . . . . . . . . . . . . . . | (16,945) | (14,100) | (73,007) |
| Benefit for federal income taxes . . . . . . . . . . . . . . . . . . . . . . . . . | (90) | (82) | (985) |
| Net loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (16,855) | (14,018) | (72,022) |
| Other comprehensive income: | | | |
| Changes in unrealized losses on available-for-sale securities, net of reclassification adjustments and taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 622 | 3,504 | 11,136 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (175) | (60) | 361 |
| Total other comprehensive income . . . . . . . . . . . . . . . . . . . . | 447 | 3,444 | 11,497 |
| Total comprehensive loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (16,408) | (10,574) | (60,525) |
| Less: Comprehensive loss attributable to the noncontrolling interest . . . . . . . . . . . . . . . . . . . . . | — | 4 | 53 |
| Total comprehensive loss attributable to Fannie Mae . . . . . . . . . . . . . | $(16,408) | $(10,570) | $(60,472) |
| Net loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(16,855) | $(14,018) | $(72,022) |
| Less: Net loss attributable to the noncontrolling interest . . . . . . . . . . . | — | 4 | 53 |
| Net loss attributable to Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . | (16,855) | (14,014) | (71,969) |
| Preferred stock dividends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (9,614) | (7,704) | (2,474) |
| Net loss attributable to common stockholders . . . . . . . . . . . . . . . . . | $(26,469) | $(21,718) | $(74,443) |
| Loss per share—Basic and Diluted . . . . . . . . . . . . . . . . . . . . . . . . | $ (4.61) | $ (3.81) | $ (13.11) |
| Weighted-average common shares outstanding—Basic and Diluted . . . . . . . . . . . . . . . . . . . . . | 5,737 | 5,694 | 5,680 |

See Notes to Consolidated Financial Statements

F-4

**FANNIE MAE**
**(In conservatorship)**

**Consolidated Statements of Cash Flows**
**(Dollars in millions)**

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| **Cash flows used in operating activities:** | | | |
| Net loss | $ (16,855) | $ (14,018) | $ (72,022) |
| Reconciliation of net loss to net cash used in operating activities: | | | |
| Amortization of cost basis adjustments | (369) | 126 | 2,568 |
| Provisions for loan and guaranty losses | 26,718 | 24,896 | 72,626 |
| Valuation (gains) losses | (408) | (1,289) | 3,425 |
| (Gains) losses from partnership investments | (82) | 74 | 6,735 |
| Current and deferred federal income taxes | 1,044 | 258 | (1,919) |
| Purchases of loans held for sale | (737) | (81) | (109,684) |
| Proceeds from repayments of loans held for sale | 68 | 88 | 2,413 |
| Net change in trading securities, excluding non-cash transfers | (17,048) | (23,612) | 11,976 |
| Payments to servicers for foreclosed property expense and servicer incentive fees | (5,394) | (5,658) | (2,570) |
| Other, net | (2,175) | (8,179) | 543 |
| Net cash used in operating activities | (15,238) | (27,395) | (85,909) |
| **Cash flows provided by investing activities:** | | | |
| Purchases of trading securities held for investment | (2,951) | (8,547) | (48,659) |
| Proceeds from maturities of trading securities held for investment | 2,591 | 2,638 | 12,918 |
| Proceeds from sales of trading securities held for investment | 1,526 | 21,556 | 39,261 |
| Purchases of available-for-sale securities | (192) | (413) | (165,103) |
| Proceeds from maturities of available-for-sale securities | 13,552 | 17,102 | 48,096 |
| Proceeds from sales of available-for-sale securities | 3,192 | 7,867 | 306,598 |
| Purchases of loans held for investment | (78,099) | (86,724) | (52,148) |
| Proceeds from repayments of loans held for investment of Fannie Mae | 25,190 | 20,715 | 30,958 |
| Proceeds from repayments of loans held for investment of consolidated trusts | 544,145 | 574,740 | 26,184 |
| Net change in restricted cash | 12,881 | (15,025) | — |
| Advances to lenders | (70,914) | (74,130) | (79,163) |
| Proceeds from disposition of acquired property and short sales | 47,248 | 39,682 | 22,667 |
| Contributions to partnership investments | (178) | (351) | (688) |
| Proceeds from partnership investments | 283 | 129 | 87 |
| Net change in federal funds sold and securities purchased under agreements to resell or similar agreements | (34,249) | 41,471 | 4,230 |
| Other, net | 363 | (531) | (27,503) |
| Net cash provided by investing activities | 464,388 | 540,179 | 117,735 |
| **Cash flows used in financing activities:** | | | |
| Proceeds from the issuance of debt of Fannie Mae | 766,598 | 1,155,993 | 1,930,907 |
| Payments to redeem debt of Fannie Mae | (815,838) | (1,146,363) | (2,030,705) |
| Proceeds from issuance of debt of consolidated trusts | 233,516 | 276,575 | 58 |
| Payments to redeem debt of consolidated trusts | (647,695) | (808,502) | (601) |
| Payments of cash dividends on senior preferred stock to Treasury | (9,613) | (7,706) | (2,470) |
| Proceeds from senior preferred stock purchase agreement with Treasury | 23,978 | 27,700 | 59,900 |
| Net change in federal funds purchased and securities sold under agreements to repurchase | — | 49 | (54) |
| Other, net | 146 | (45) | 18 |
| Net cash used in financing activities | (448,908) | (502,299) | (42,947) |
| **Net increase (decrease) in cash and cash equivalents** | 242 | 10,485 | (11,121) |
| Cash and cash equivalents at beginning of period | 17,297 | 6,812 | 17,933 |
| Cash and cash equivalents at end of period | $ 17,539 | $ 17,297 | $ 6,812 |
| **Cash paid during the period for:** | | | |
| Interest | $ 128,806 | $ 140,651 | $ 26,344 |
| Income taxes | — | — | 876 |
| **Non-cash activities** (excluding impact of the transition to the consolidation accounting guidance): | | | |
| Net mortgage loans acquired by assuming debt | $ 448,437 | $ 484,699 | $ — |
| Net transfers from (to) mortgage loans held for investment of Fannie Mae to (from) mortgage loans held for investment of consolidated trusts | 33,859 | (121,852) | — |
| Transfers from advances to lenders to investments in securities | — | — | 77,191 |
| Transfers from advances to lenders to loans held for investment of consolidated trusts | 69,223 | 68,385 | — |
| Net transfers from mortgage loans to acquired property | 56,517 | 66,081 | 5,707 |

See Notes to Consolidated Financial Statements

F-5

## FANNIE MAE
### (In conservatorship)
### Consolidated Statements of Changes in Equity (Deficit)
#### (Dollars and shares in millions, except per share amounts)

Fannie Mae Stockholders' Equity (Deficit)

| | Shares Outstanding | | | Senior Preferred | Preferred Stock | Common Stock | Additional Paid-In Capital | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive Loss | Treasury Stock | Non Controlling Interest | Total Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Senior Preferred | Preferred | Common | | | | | | | | | |
| **Balance as of December 31, 2008** | 1 | 597 | 1,085 | $ 1,000 | $21,222 | $ 650 | $ 3,621 | $ (26,790) | $ (7,673) | $(7,344) | $157 | $(15,157) |
| Cumulative effect from the adoption of the accounting guidance on other-than-temporary impairments, net of tax | — | — | — | — | — | — | — | 8,520 | (5,556) | — | — | 2,964 |
| Change in investment in noncontrolling interest | — | — | — | — | — | — | — | — | — | — | (13) | (13) |
| Comprehensive loss: | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (71,969) | — | — | (53) | (72,022) |
| Other comprehensive income, net of tax effect: | | | | | | | | | | | | |
| Changes in net unrealized losses on available-for-sale securities (net of tax of $2,658) | — | — | — | — | — | — | — | — | 4,936 | — | — | 4,936 |
| Reclassification adjustment for other-than-temporary impairments recognized in net loss (net of tax of $3,441) | — | — | — | — | — | — | — | — | 6,420 | — | — | 6,420 |
| Reclassification adjustment for gains included in net loss (net of tax of $119) | — | — | — | — | — | — | — | — | (220) | — | — | (220) |
| Unrealized gains on guaranty assets and guaranty fee buy-ups | — | — | — | — | — | — | — | — | 245 | — | — | 245 |
| Amortization of net cash flow hedging gains | — | — | — | — | — | — | — | — | 9 | — | — | 9 |
| Prior service cost and actuarial gains, net of amortization for defined benefit plans | — | — | — | — | — | — | — | — | 107 | — | — | 107 |
| Total comprehensive loss | | | | | | | | | | | | (60,525) |
| Senior preferred stock dividends | — | — | — | — | — | — | (2,470) | — | — | — | — | (2,470) |
| Increase to senior preferred liquidation preference | — | — | — | 59,900 | — | — | — | — | — | — | — | 59,900 |
| Conversion of convertible preferred stock into common stock | — | (17) | 27 | — | (874) | 14 | 860 | — | — | (54) | — | — |
| Other | — | — | — | — | — | — | 72 | 2 | — | — | — | 20 |
| **Balance as of December 31, 2009** | 1 | 580 | 1,113 | $ 60,900 | $20,348 | $ 664 | $ 2,083 | $ (90,237) | $ (1,732) | $(7,398) | $ 91 | $(15,281) |
| Cumulative effect from the adoption of the accounting guidance on transfers of financial assets and consolidation | — | — | — | — | — | — | — | 6,706 | (3,394) | — | (14) | 3,298 |
| **Balance as of January 1, 2010, adjusted** | 1 | 580 | 1,113 | 60,900 | 20,348 | 664 | 2,083 | (83,531) | (5,126) | (7,398) | 77 | (11,983) |
| Change in investment in noncontrolling interest | — | — | — | — | — | — | — | — | — | — | 9 | 9 |
| Comprehensive loss: | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (14,014) | — | — | (4) | (14,018) |
| Other comprehensive income, net of tax effect: | | | | | | | | | | | | |
| Changes in net unrealized losses on available-for-sale securities (net of tax of $1,644) | — | — | — | — | — | — | — | — | 3,054 | — | — | 3,054 |
| Reclassification adjustment for other-than-temporary impairments recognized in net loss (net of tax of $253) | — | — | — | — | — | — | — | — | 469 | — | — | 469 |
| Reclassification adjustment for gains included in net loss (net of tax of $10) | — | — | — | — | — | — | — | — | (19) | — | — | (19) |
| Unrealized gains on guaranty assets and guaranty fee buy-ups | — | — | — | — | — | — | — | — | 1 | — | — | 1 |
| Prior service cost and actuarial gains, net of amortization for defined benefit plans | — | — | — | — | — | — | — | — | (61) | — | — | (61) |
| Total comprehensive loss | | | | | | | | | | | | (10,574) |
| Senior preferred stock dividends | — | — | — | — | — | — | (2,265) | (5,441) | — | — | — | (7,706) |
| Increase to senior preferred liquidation preference | — | — | — | 27,700 | — | — | — | — | — | — | — | 27,700 |
| Conversion of convertible preferred stock into common stock | — | (3) | 5 | — | (144) | 3 | 141 | — | — | — | — | — |
| Other | — | — | 1 | — | — | — | 41 | — | — | (4) | — | 37 |
| **Balance as of December 31, 2010** | 1 | 577 | 1,119 | 88,600 | 20,204 | 667 | — | (102,986) | (1,682) | (7,402) | 82 | (2,517) |
| Change in investment in noncontrolling interest | — | — | — | — | — | — | — | — | — | — | (29) | (29) |
| Comprehensive loss: | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (16,855) | — | — | — | (16,855) |
| Other comprehensive income, net of tax effect: | | | | | | | | | | | | |
| Changes in net unrealized losses on available-for-sale securities (net of tax of $250) | — | — | — | — | — | — | — | — | 465 | — | — | 465 |
| Reclassification adjustment for other-than-temporary impairments recognized in net loss (net of tax of $99) | — | — | — | — | — | — | — | — | 209 | — | — | 209 |
| Reclassification adjustment for gains included in net loss (net of tax of $28) | — | — | — | — | — | — | — | — | (52) | — | — | (52) |
| Prior service cost and actuarial gains, net of amortization for defined benefit plans | — | — | — | — | — | — | — | — | (175) | — | — | (175) |
| Total comprehensive loss | | | | | | | | | | | | (16,408) |
| Senior preferred stock dividends | — | — | — | — | — | — | (1,072) | (8,541) | — | — | — | (9,613) |
| Increase to senior preferred liquidation preference | — | — | — | 23,978 | — | — | — | — | — | — | — | 23,978 |
| Conversion of convertible preferred stock into common stock | — | (21) | 39 | — | (1,074) | 20 | 1,054 | — | — | (1) | — | — |
| Other | — | — | — | — | — | — | 18 | 1 | — | — | — | 18 |
| **Balance as of December 31, 2011** | 1 | 556 | 1,158 | $112,578 | $19,130 | $ 687 | $ — | $(128,381) | $ (1,235) | $(7,403) | $ 53 | $ (4,571) |

See Notes to Consolidated Financial Statements

F-6

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1.   Summary of Significant Accounting Policies**

*Organization*

We are a stockholder-owned corporation organized and existing under the Federal National Mortgage
Association Charter Act (the "Charter Act" or our "charter"). We are a government-sponsored enterprise
("GSE"), and we are subject to government oversight and regulation. Our regulators include the Federal Housing
Finance Agency ("FHFA"), the U.S. Department of Housing and Urban Development ("HUD"), the U.S.
Securities and Exchange Commission ("SEC"), and the U.S. Department of the Treasury ("Treasury"). The U.S.
government does not guarantee our securities or other obligations.

We operate in the secondary mortgage market by purchasing mortgage loans and mortgage-related securities,
including mortgage-related securities guaranteed by us, from primary mortgage market institutions, such as
commercial banks, savings and loan associations, mortgage banking companies, securities dealers and other
investors. We do not lend money directly to consumers in the primary mortgage market. We provide additional
liquidity in the secondary mortgage market by issuing guaranteed mortgage-related securities.

We operate under three business segments: Single-Family Credit Guaranty ("Single-Family"), Multifamily and
Capital Markets. Our Single-Family segment generates revenue primarily from the guaranty fees on the mortgage
loans underlying guaranteed single-family Fannie Mae mortgage-backed securities ("Fannie Mae MBS"). Our
Multifamily segment generates revenue from a variety of sources, including guaranty fees on the mortgage loans
underlying multifamily Fannie Mae MBS, transaction fees associated with the multifamily business and bond
credit enhancement fees. Our Capital Markets segment invests in mortgage loans, mortgage-related securities and
other investments, and generates income primarily from the difference, or spread, between the yield on the
mortgage assets we own and the interest we pay on the debt we issue in the global capital markets to fund the
purchases of these mortgage assets.

*Conservatorship*

On September 7, 2008, the Secretary of the Treasury and the Director of FHFA announced several actions taken
by Treasury and FHFA regarding Fannie Mae, which included: (1) placing us in conservatorship and (2) the
execution of a senior preferred stock purchase agreement by our conservator, on our behalf, and Treasury,
pursuant to which we issued to Treasury both senior preferred stock and a warrant to purchase common stock.

Under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Federal
Housing Finance Regulatory Reform Act of 2008, (together, the "GSE Act"), the conservator immediately
succeeded to (1) all rights, titles, powers and privileges of Fannie Mae, and of any stockholder, officer or director
of Fannie Mae with respect to Fannie Mae and its assets, and (2) title to the books, records and assets of any
other legal custodian of Fannie Mae. The conservator has since delegated specified authorities to our Board of
Directors and has delegated to management the authority to conduct our day-to-day operations. The conservator
retains the authority to withdraw its delegations at any time.

We were directed by FHFA to voluntarily delist our common stock and each listed series of our preferred stock
from the New York Stock Exchange and the Chicago Stock Exchange. The last trading day for the listed
securities on the New York Stock Exchange and the Chicago Stock Exchange was July 7, 2010, and since July 8,
2010, the securities have been traded on the over-the-counter market.

The conservator has the power to transfer or sell any asset or liability of Fannie Mae (subject to limitations and
post-transfer notice provisions for transfers of qualified financial contracts) without any approval, assignment of
rights or consent of any party. The GSE Act, however, provides that mortgage loans and mortgage-related assets

F-7

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

that have been transferred to a Fannie Mae mortgage-backed securities ("MBS") trust must be held by the conservator for the beneficial owners of the Fannie Mae MBS and cannot be used to satisfy the general creditors of Fannie Mae. As of February 29, 2012, FHFA has not exercised this power.

Neither the conservatorship nor the terms of our agreements with Treasury change our obligation to make required payments on our debt securities or perform under our mortgage guaranty obligations. FHFA issued a rule establishing a framework for conservatorship and receivership operations for the GSEs, which became effective in July 2011. The rule established procedures for conservatorship and receivership, and priorities of claims for contract parties and other claimants. This rule is part of FHFA's implementation of the powers provided by the Federal Housing Finance Regulatory Reform Act of 2008, and does not seek to anticipate or predict future conservatorships or receiverships.

The conservatorship has no specified termination date and there continues to be uncertainty regarding the future of our company, including how long the company will continue to exist in its current form, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. Under the GSE Act, FHFA must place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations or if we have not been paying our debts, in either case, for a period of 60 days. In addition, the Director of FHFA may place us in receivership at his discretion at any time for other reasons, including conditions that FHFA has already asserted existed at the time the former Director of FHFA placed us into conservatorship. Placement into receivership would have a material adverse effect on holders of our common stock, preferred stock, debt securities and Fannie Mae MBS. Should we be placed into receivership, different assumptions would be required to determine the carrying value of our assets, which could lead to substantially different financial results. We are not aware of any plans of FHFA to significantly change our business model or capital structure in the near-term.

***Senior Preferred Stock and Warrant Issued to Treasury***

On September 7, 2008, we, through FHFA in its capacity as conservator, entered into a senior preferred stock purchase agreement with Treasury. The agreement was amended on September 26, 2008, May 6, 2009 and December 24, 2009.

Pursuant to the amended senior preferred stock purchase agreement, Treasury has committed to provide us with funding as needed to help us maintain a positive net worth thereby avoiding the mandatory receivership trigger described above. As consideration for Treasury's funding commitment, we issued one million shares of senior preferred stock and a warrant to purchase shares of our common stock to Treasury.

The amended senior preferred stock purchase agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any net worth deficiencies attributable to periods during 2010, 2011, and 2012. If we do not have a positive net worth as of December 31, 2012, then the amount of funding available under the amended senior preferred stock purchase agreement after 2012 will be $124.8 billion ($200 billion less $75.2 billion in cumulative draws for net worth deficiencies through December 31, 2009).

In the event we have a positive net worth as of December 31, 2012, then the amount of funding available after 2012 under the amended senior preferred stock purchase agreement will depend on the size of that positive net worth relative to the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011, and 2012, as follows:

- If our positive net worth as of December 31, 2012 is less than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011, and 2012, then the amount of available funding will be $124.8 billion less our positive net worth as of December 31, 2012.

F-8

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

- If our positive net worth as of December 31, 2012 is greater than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011, and 2012, then the amount of available funding will be $124.8 billion less the cumulative draws attributable to periods during 2010, 2011, and 2012.

We have received a total of $111.6 billion as of December 31, 2011 under Treasury's funding commitment and the Acting Director of FHFA will submit a request for an additional $4.6 billion from Treasury to eliminate our net worth deficit as of December 31, 2011. The aggregate liquidation preference of the senior preferred stock was $112.6 billion as of December 31, 2011 and will increase to $117.1 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of December 31, 2011.

We were scheduled to begin paying a quarterly commitment fee to Treasury under the senior preferred stock purchase agreement beginning on March 31, 2011; however, Treasury waived the quarterly commitment fee for each quarter of 2011 and the first quarter of 2012 due to the continued fragility of the U.S. mortgage market and Treasury's belief that the imposition of the quarterly commitment fee would not generate increased compensation for taxpayers. In its notification to FHFA that it had waived the quarterly commitment fee for the first quarter of 2012, Treasury indicated that it will reevaluate the situation during the next calendar quarter to determine whether the quarterly commitment fee should then be set. The agreement provides that Treasury may waive the periodic commitment fee for up to one year at a time, in its sole discretion, based on adverse conditions in the U.S. mortgage market.

The senior preferred stock purchase agreement provides that the amount of the quarterly commitment fee is to be set no later than December 31, 2010 with respect to the ensuing five-year period, is to be reset for every five years thereafter, and is to be determined with reference to the market value of Treasury's funding commitment to Fannie Mae as then in effect. The agreement also provides that the amount of the quarterly commitment fee is to be mutually agreed by Treasury and Fannie Mae, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve. As of February 29, 2012, the quarterly commitment fee for the initial five-year period had not yet been established.

Treasury, as holder of the senior preferred stock, is entitled to receive, when, as and if directed by our conservator, cumulative quarterly cash dividends at the annual rate of 10% per year on the current liquidation preference of the senior preferred stock. If at any time we do not pay cash dividends in a timely manner, then all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends, the dividend rate will be 12% per year.

On September 7, 2008, we issued a warrant to Treasury giving it the right to purchase, at a nominal price, shares of our common stock equal to 79.9% of the total common stock outstanding on a fully diluted basis on the date Treasury exercises the warrant. Treasury has the right to exercise the warrant, in whole or in part, at any time on or before September 7, 2028. We recorded the warrant at fair value in our stockholders' equity as a component of additional paid-in-capital. The fair value of the warrant was calculated using the Black-Scholes Option Pricing Model. Since the warrant has an exercise price of $0.00001 per share, the model is insensitive to the risk-free rate and volatility assumptions used in the calculation and the share value of the warrant is equal to the price of the underlying common stock. We estimated that the fair value of the warrant at issuance was $3.5 billion based on the price of our common stock on September 8, 2008, which was after the dilutive effect of the warrant had been reflected in the market price. Subsequent changes in the fair value of the warrant are not recognized in our financial statements. If the warrant is exercised, the stated value of the common stock issued will be reclassified as "Common stock" in our consolidated balance sheets. Because the warrant's exercise price per share is considered non-substantive (compared to the market price of our common stock), the warrant was determined to have characteristics of non-voting common stock, and thus is included in the computation of basic and diluted

F-9

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

loss per share. The weighted-average shares of common stock outstanding for 2011, 2010 and 2009, included shares of common stock that would be issuable upon full exercise of the warrant issued to Treasury.

### Impact of U.S. Government Support

We are dependent upon the continued support of Treasury to eliminate our net worth deficit, which avoids our being placed into receivership. Based on consideration of all the relevant conditions and events affecting our operations, including our dependence on the U.S. government, we continue to operate as a going concern and in accordance with our delegation of authority from FHFA.

We fund our business primarily through the issuance of short-term and long-term debt securities in the domestic and international capital markets. Because debt issuance is our primary funding source, we are subject to "roll-over," or refinancing, risk on our outstanding debt. Our ability to issue long-term debt has been strong primarily due to actions taken by the federal government to support us and the financial markets.

We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations. In addition, due to our reliance on the U.S. government's support, our access to debt funding or the cost of debt funding also could be materially adversely affected by a change or perceived change in the creditworthiness of the U.S. government. A downgrade in our credit ratings could reduce demand for our debt securities and increase our borrowing costs. Standard & Poor's Ratings Services' ("S&P") downgrade of our credit rating on August 8, 2011, which was a result of a similar action on the U.S. government's sovereign credit rating, has not adversely affected our access to debt funding or the cost of our debt funding. Future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll-over risk and have a material adverse impact on our liquidity, financial condition and results of operations.

In February 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. On February 2, 2012, Treasury Secretary Geithner stated that the Administration intended to release new details around approaches to housing finance reform including winding down Fannie Mae and Freddie Mac in the spring of 2012 and to work with Congressional leaders to explore options for legislation, but that he does not expect housing finance reform legislation to be enacted in 2012. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs.

### Basis of Presentation

The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). The accompanying consolidated financial statements include our accounts as well as the accounts of the other entities in which we have a controlling financial interest. All intercompany balances and transactions have been eliminated.

### Related Parties

As a result of our issuance to Treasury of the warrant to purchase shares of Fannie Mae common stock equal to 79.9% of the total number of shares of Fannie Mae common stock, we and Treasury are deemed related parties.

TREASURY-2639

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

As of December 31, 2011, Treasury held an investment in our senior preferred stock with an aggregate liquidation preference of $112.6 billion. Our administrative expenses were reduced by $106 million and $167 million for the years ended December 31, 2011 and 2010, respectively, due to reimbursements from Treasury and Freddie Mac for expenses incurred as program administrator for Treasury's Home Affordable Modification Program ("HAMP") and other initiatives under Treasury's Making Home Affordable Program.

During 2011, we received a refund of $1.1 billion from the Internal Revenue Service ("IRS") related to the carryback of our 2009 operating loss to the 2008 and 2007 tax years. In addition, we effectively settled our 2007 and 2008 tax years with the IRS and as a result, we have recognized an income tax benefit of $90 million in our consolidated statements of operations and comprehensive loss for the year ended December 31, 2011.

In 2010, we entered into an agreement with certain wholly-owned subsidiaries of Ally Financial, Inc. ("Ally"). Under the agreement, we received $462 million in exchange for our release of specified Ally affiliates from potential liability relating to certain private-label securities sponsored by the affiliates and for certain selling representation and warranty liability related to mortgage loans sold and/or serviced by one of Ally's subsidiaries as of or prior to June 30, 2010. Treasury has majority ownership of Ally.

In 2009, we entered into a memorandum of understanding with Treasury, FHFA and Freddie Mac pursuant to which we agreed to provide assistance to state and local housing finance agencies ("HFAs") through two primary programs: a temporary credit and liquidity facilities ("TCLF") program and a new issue bond ("NIB") program. Pursuant to the TCLF program, Treasury has purchased participation interests in temporary credit and liquidity facilities provided by us and Freddie Mac to the HFAs, which facilities create a credit and liquidity backstop for the HFAs. Pursuant to the NIB program, Treasury has purchased new securities issued and guaranteed by us and Freddie Mac, which are backed by new housing bonds issued by the HFAs.

In November 2011, we, Treasury, Freddie Mac and FHFA consented to specified modifications to the HFA initiative programs, including a three-year extension of the expiration date of the TCLFs from December 2012 to December 2015, and a one-year extension of the expiration date for release of escrowed funds for the NIB program from December 31, 2011 to December 31, 2012.

Under the TCLF program, we had $3.0 billion and $3.7 billion outstanding, which include principal and interest, of three-year standby credit and liquidity support as of December 31, 2011 and 2010, respectively. Under the NIB program, we had $7.5 billion and $7.6 billion outstanding of pass-through securities backed by single-family and multifamily housing bonds issued by HFAs as of December 31, 2011 and 2010, respectively. Treasury will bear the initial losses of principal under the TCLF program and the NIB program up to 35% of the total original principal on a combined program-wide basis, and thereafter we will bear the losses of principal that are attributable to the TCLF and the securities we have issued. Treasury will bear all losses of unpaid interest under the two programs. As of December 31, 2011, there had been no losses of principal or interest under the TCLF program or the NIB program.

FHFA's control of both us and Freddie Mac has caused us and Freddie Mac to be related parties. No transactions outside of normal business activities have occurred between us and Freddie Mac. As of December 31, 2011 and 2010, we held Freddie Mac mortgage-related securities with a fair value of $15.6 billion and $18.3 billion, respectively, and accrued interest receivable of $69 million and $93 million, respectively. We recognized interest income on these securities held by us of $700 million, $1.1 billion and $2.0 billion for the years ended December 31, 2011, 2010 and 2009, respectively. In addition, Freddie Mac may be an investor in variable interest entities that we have consolidated, and we may be an investor in variable interest entities that Freddie Mac has consolidated.

F-11

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Use of Estimates*

Preparing consolidated financial statements in accordance with GAAP requires management to make estimates and assumptions that affect our reported amounts of assets and liabilities, and disclosure of contingent assets and liabilities as of the dates of our consolidated financial statements, as well as our reported amounts of revenues and expenses during the reporting periods. Management has made significant estimates in a variety of areas including, but not limited to, valuation of certain financial instruments, and other assets and liabilities, the allowance for loan losses and reserve for guaranty losses, and other-than-temporary impairment of investment securities. Actual results could be different from these estimates.

In the three months ended December 31, 2011, we updated the estimated probability, based on historical trends, of a trial modification becoming a permanent modification. Permanent modifications are a better indicator of a loan's performance than loans that do not complete a trial modification period. The impact of applying a higher probability of success to our trial modifications reduced our allowance for loan losses and credit-related expenses by approximately $700 million. Additionally, we enhanced our process to estimate the recovery amount incorporated in our allowance for loan losses related to repurchase requests. The recovery estimate takes into account individual loan attributes such as the probability of default and severity on our individually impaired loans and resulted in a reduction in our allowance for loan losses and our credit-related expenses of approximately $800 million.

In the three months ended September 30, 2011, we updated our allowance for loan loss models for individually impaired loans to incorporate more home price data at the regional level rather than at the national level. We believe this approach provides a better estimation of possible home price paths and related default expectations; it has resulted in a decrease to our allowance for loan losses and a reduction in our provision for loan losses of approximately $800 million.

In the three months ended June 30, 2011, we updated our loan loss models to incorporate more recent data on prepayments of modified loans, which contributed to an increase in our allowance for loan losses and an increase in credit-related expenses of approximately $1.5 billion. The change resulted in slower expected prepayment speeds, which extended the expected lives of modified loans and lowered the present value of cash flows on those loans. Also in the three months ended June 30, 2011, we updated our estimate of the reserve for guaranty losses related to private-label mortgage-related securities that we have guaranteed to increase our focus on earlier stage delinquency, rather than foreclosure trends, as the primary driver in estimating incurred losses. We believe delinquencies are a better indicator of incurred losses compared to foreclosure trends because the recent delays in the foreclosure process have interrupted the normal flow of delinquent mortgages into foreclosure. This update resulted in an increase in our reserve for guaranty losses included within "Other liabilities" and an increase in credit related-expenses of approximately $700 million.

In addition, in the three months ended June 30, 2011, we revised our estimate for amounts due to us related to outstanding repurchase requests to incorporate additional loan-level attributes which resulted in a decrease in our provision for loan losses and foreclosed property expense of $1.5 billion.

*Principles of Consolidation*

Our consolidated financial statements include our accounts as well as the accounts of the other entities in which we have a controlling financial interest. All intercompany balances and transactions have been eliminated. The typical condition for a controlling financial interest is ownership of a majority of the voting interests of an entity. A controlling financial interest may also exist in entities through arrangements that do not involve voting interests, such as a variable interest entity ("VIE").

F-12

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

<u>VIE Assessment</u>

We have interests in various entities that are considered VIEs. A VIE is an entity (1) that has total equity at risk that is not sufficient to finance its activities without additional subordinated financial support from other entities, (2) where the group of equity holders does not have the power to direct the activities of the entity that most significantly impact the entity's economic performance, or the obligation to absorb the entity's expected losses or the right to receive the entity's expected residual returns, or both, or (3) where the voting rights of some investors are not proportional to their obligations to absorb the expected losses of the entity, their rights to receive the expected residual returns of the entity, or both, and substantially all of the entity's activities either involve or are conducted on behalf of an investor that has disproportionately few voting rights.

We determine if an entity is a VIE by performing a qualitative analysis, which requires certain subjective decisions including, but not limited to, the design of the entity, the variability that the entity was designed to create and pass along to its interest holders, the rights of the parties, and the purpose of the arrangement. If we cannot conclude after a qualitative analysis whether an entity is a VIE, we perform a quantitative analysis.

The primary types of VIE entities with which we are involved are securitization trusts guaranteed by us via lender swap and portfolio securitization transactions, limited partnership investments in low-income housing tax credit ("LIHTC") and other housing partnerships, as well as mortgage and asset-backed trusts that were not created by us.

In 2009, the Financial Accounting Standards Board ("FASB") concurrently revised the accounting guidance related to the consolidation of VIEs (the "consolidation accounting guidance") and the guidance related to transfers of financial assets, and we adopted the revised guidance for these topics prospectively effective January 1, 2010 (the "transition date"). Prior to the transition date, we were exempt from evaluating entities for consolidation if they met the criteria of a qualifying special purpose entity ("QSPE") and if we did not have unilateral ability to cause the entity to liquidate or to change its QSPE status. The revisions to the accounting guidance for these topics removed the concept of a QSPE and the related exemption from evaluating such entities for consolidation from the accounting guidance, and thus all of our securitization entities that had previously been QSPEs became subject to a consolidation assessment under the consolidation accounting guidance.

<u>Primary Beneficiary Determination</u>

If an entity is a VIE, we consider whether our variable interest in that entity causes us to be the primary beneficiary. An enterprise is deemed to be the primary beneficiary of a VIE when the enterprise has both (1) the power to direct the activities of the VIE that most significantly impact the entity's economic performance, and (2) exposure to benefits and/or losses that could potentially be significant to the entity. The primary beneficiary of the VIE is required to consolidate and account for the assets, liabilities, and noncontrolling interests of the VIE in its consolidated financial statements. The assessment of the party that has the power to direct the activities of the VIE may require significant management judgment when (1) more than one party has power or (2) more than one party is involved in the design of the VIE but no party has the power to direct the ongoing activities that could be significant.

We continually assess whether we are the primary beneficiary of the VIEs with which we are involved and therefore may consolidate or deconsolidate a VIE through the duration of our involvement. Examples of certain events that may change whether or not we consolidate the VIE include a change in the design of the entity or a change in our ownership in the entity such that we no longer hold substantially all of the certificates issued by a multi-class resecuritization trust.

TREASURY-2642

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

<u>Measurement of Consolidated Assets and Liabilities</u>

As of the transition date for the revised consolidation accounting guidance, we initially measured the assets and liabilities of the consolidated securitization trusts at their unpaid principal balances and established a corresponding valuation allowance and accrued interest, as it was not practicable to determine the carrying amount of such assets and liabilities. The securitization assets and liabilities that did not qualify for the use of this practical expedient were initially measured at fair value. As such, we recognized in our consolidated balance sheets the mortgage loans underlying our consolidated trusts as "Mortgage loans held for investment of consolidated trusts." We also recognized securities issued by these trusts that are held by third parties in our consolidated balance sheets as "Debt of consolidated trusts."

Subsequent to the transition date, when we are the transferor of assets into a VIE that we consolidate at the time of the transfer, we continue to recognize the assets and liabilities of the VIE at the amounts that they would have been recognized if we had not transferred them, and no gain or loss is recognized. For all other VIEs that we consolidate subsequent to transition (that is, those for which we are not the transferor), we recognize the assets and liabilities of the VIE in our consolidated financial statements at fair value, and we recognize a gain or loss for the difference between (1) the fair value of the consideration paid, fair value of noncontrolling interests and the reported amount of any previously held interests, and (2) the net amount of the fair value of the assets and liabilities consolidated. However, for the securitization trusts established under our lender swap program, no gain or loss is recognized if the trust is consolidated at formation as there is no difference in the respective fair value of (1) and (2) above. We record gains or losses that are associated with the consolidation of VIEs as "Investment gains, net" in our consolidated statements of operations and comprehensive loss.

If we cease to be deemed the primary beneficiary of a VIE, we deconsolidate the VIE. We use fair value to measure the initial cost basis for any retained interests that are recorded upon the deconsolidation of a VIE. Any difference between the fair value and the previous carrying amount of our investment in the VIE is recorded as "Investment gains, net" in our consolidated statements of operations and comprehensive loss.

<u>Purchase/Sale of Fannie Mae Securities</u>

We actively purchase and may subsequently sell guaranteed MBS that have been issued through our lender swap and portfolio securitization transaction programs. The accounting for the purchase and sale of our guaranteed MBS issued by the trusts differs based on the characteristics of the securitization trusts and whether the trusts are consolidated.

*Single-Class Securitization Trusts*

We create single-class securitization trusts to issue single-class Fannie Mae MBS that evidence an undivided interest in the mortgage loans held in the trust. Investors in single-class Fannie Mae MBS receive principal and interest payments in proportion to their percentage ownership of the MBS issuance. We guarantee to each single-class securitization trust that we will supplement amounts received by the single-class securitization trust as required to permit timely payments of principal and interest on the related Fannie Mae MBS. This guaranty exposes us to credit losses on the loans underlying Fannie Mae MBS.

Single-class securitization trusts are used for both our lender swap and portfolio securitization transaction programs. A lender swap transaction occurs when a mortgage lender delivers a pool of single-family mortgage loans to us, which we immediately deposit into an MBS trust. The MBS are then issued to the lender in exchange for the mortgage loans. A portfolio securitization transaction occurs when we purchase mortgage loans from third-party sellers for cash and later deposit these loans into an MBS trust. The securities issued through a portfolio securitization are then sold to investors for cash. We consolidate single-class securitization trusts that

F-14

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

are issued under these programs when our role as guarantor and master servicer provides us with the power to direct matters, such as the servicing of the mortgage loans, that impact the credit risk to which we are exposed. In contrast, we do not consolidate single-class securitization trusts when other organizations have the power to direct these activities (e.g., when the loan collateral is subject to an FHA guarantee and related servicing guide).

When we purchase single-class Fannie Mae MBS issued from a consolidated trust, we account for the transaction as an extinguishment of the related debt in our consolidated financial statements. We record a gain or loss on the extinguishment of such debt to the extent that the purchase price of the MBS does not equal the carrying value of the related consolidated debt reported in our consolidated balance sheets (including unamortized premiums, discounts or the other cost basis adjustments) at the time of purchase. We account for the sale of an MBS from Fannie Mae's portfolio to a third party that was issued from a consolidated trust as the issuance of debt in our consolidated financial statements. We amortize the related premiums, discounts and other cost basis adjustments into income over time.

To determine the order in which consolidated debt is extinguished, we have elected to use a daily convention in the application of the last-issued first-extinguished method. Under this method, we record the net daily change in each MBS holding as either the issuance of debt if there has been an increase in the position that is held by third parties, or the extinguishment of the most recently issued related debt if there has been a decrease in the position held by third parties. The impact of this method is that we record the net daily activity for an MBS as if it were a single buy or sell trade, which results in a change in our beginning debt balance if the total unpaid principal balance purchased does not match the total unpaid principal balance sold.

If a single-class securitization trust is not consolidated, we account for the purchase and subsequent sale of such securities as the transfer of an investment security in accordance with the accounting guidance for transfers of financial assets.

*Single-Class Resecuritization Trusts*

Single-class resecuritization trusts are created by depositing Fannie Mae MBS into a new securitization trust for the purpose of aggregating multiple MBS into a single larger security. The cash flows from the new security represent an aggregation of the cash flows from the underlying MBS. We guarantee to each single-class resecuritization trust that we will supplement amounts received by the trust as required to permit timely payments of principal and interest on the related Fannie Mae securities. However, we assume no additional credit risk in such a resecuritization transaction, because the underlying assets are MBS for which we have already provided a guaranty. Additionally, our involvement with these trusts does not provide any incremental rights or power that would enable Fannie Mae to direct any activities of the trusts. As a result, we have concluded that we are not the primary beneficiaries of, and therefore do not consolidate, our single-class resecuritization trusts.

As our single-class resecuritization securities pass through all of the cash flows of the underlying MBS directly to the holders of the securities, they are deemed to be substantially the same as the underlying MBS. Therefore, we account for purchases of our single-class resecuritization securities as an extinguishment of the underlying MBS debt and the sale of these securities as an issuance of the underlying MBS debt.

*Multi-Class Resecuritization Trusts*

Multi-class resecuritization trusts are trusts we create to issue multi-class Fannie Mae securities, including Real Estate Mortgage Investment Conduit ("REMIC") and strip securities, in which the cash flows of the underlying mortgage assets are divided, creating several classes of securities, each of which represents a beneficial ownership interest in a separate portion of cash flows. We guarantee to each multi-class resecuritization trust that

F-15

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

we will supplement amounts received by the trusts as required to permit timely payments of principal and interest, as applicable, on the related Fannie Mae securities. However, we assume no additional credit risk in such a resecuritization transaction because the underlying assets are Fannie Mae MBS for which we have already provided a guaranty. Although we may be exposed to prepayment risk via our ownership of the securities issued by these trusts, we do not have the ability via our involvement with a multi-class resecuritization trust to impact the economic risk to which we are exposed. Therefore, we do not consolidate such a multi-class resecuritization trust until we hold a substantial portion of the outstanding beneficial interests that have been issued by the trust and are therefore considered the primary beneficiary of the trust.

In contrast to our single-class resecuritization trust, the cash flows from the underlying MBS are divided between the debt securities issued by the multi-class resecuritization trust, and therefore, the debt issued by a multi-class resecuritization trust is not substantially the same as the consolidated MBS debt. As a result, if a multi-class resecuritization trust is not consolidated, we account for the purchase and subsequent sale of such securities as the transfer of an investment security rather than the issuance or extinguishment of the related multi-class debt in accordance with the accounting guidance for the transfers of financial assets. However, if a multi-class resecuritization trust is consolidated, we account for the purchase of the securities issued by consolidated multi-class resecuritization trusts as an extinguishment of the debt issued by these trusts and the subsequent sale of such securities as the issuance of multi-class debt.

When we do not consolidate a multi-class resecuritization trust, we recognize in our consolidated financial statements both our investment in the trust and the mortgage loans of the Fannie Mae MBS trusts that we consolidate that underlie the multi-class resecuritization trust. Additionally, we recognize the unsecured corporate debt issued to third parties to fund the purchase of our investments in the multi-class resecuritization trusts and the debt issued to third parties of the MBS trusts we consolidate that underlie the multi-class resecuritization trusts. This results in the recognition of interest income from investments in multi-class resecuritization trusts and interest expense from the unsecured debt issued to third parties to fund the purchase of the investments in multi-class resecuritization trusts, as well as interest income from the mortgage loans and interest expense from the debt issued to third parties from the MBS trusts we consolidate that underlie the multi-class resecuritization trusts.

*Portfolio Securitizations*

We evaluate a transfer of financial assets in a portfolio securitization transaction to an entity that is not consolidated to determine whether the transfer qualifies as a sale. If a portfolio securitization does not meet the criteria for sale treatment, the transferred assets remain in our consolidated balance sheets and we record a liability to the extent of any proceeds received in connection with such a transfer. Transfers of financial assets for which we surrender control of the transferred assets are recorded as sales.

When a transfer that qualifies as a sale is completed, we derecognize all assets transferred and recognize all assets obtained and liabilities incurred at fair value. The difference between the carrying basis of the assets transferred and the fair value of the proceeds from the sale is recorded as a component of "Investment gains, net" in our consolidated statements of operations and comprehensive loss. Retained interests are primarily in the form of Fannie Mae MBS, REMIC certificates, guaranty assets and master servicing assets ("MSAs"). We separately describe the subsequent accounting, as well as how we determine fair value, for our retained interests in the "Investment in Securities," and "Guaranty Accounting" sections of this note.

We also enter into repurchase agreements, including dollar roll transactions, which we account for as secured borrowings. Refer to the "Securities Purchased under Agreements to Resell and Securities Sold under Agreements to Repurchase" section of this note for discussion of our accounting policies related to these transfers.

TREASURY-2645

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

***Cash and Cash Equivalents and Statements of Cash Flows***

Short-term investments that have a maturity at the date of acquisition of three months or less and are readily convertible to known amounts of cash are generally considered cash equivalents. We may pledge as collateral certain short-term investments classified as cash equivalents.

In the presentation of our consolidated statements of cash flows, we present cash flows from derivatives that do not contain financing elements and mortgage loans held for sale as operating activities. We present cash flows from federal funds sold and securities purchased under agreements to resell or similar arrangements as investing activities and cash flows from federal funds purchased and securities sold under agreements to repurchase as financing activities. We classify cash flows related to dollar roll transactions that do not meet the requirements to be accounted for as secured borrowings as purchases and sales of securities in investing activities. We classify cash flows from trading securities based on their nature and purpose. We classify cash flows from trading securities that we intend to hold for investment (the majority of our mortgage-related trading securities) as investing activities and cash flows from trading securities that we do not intend to hold for investment (primarily our non-mortgage-related securities) as operating activities.

For consolidated trusts, we classify cash flows related to mortgage loans held by our consolidated trusts as either investing activities (for principal repayments) or operating activities (for interest received from borrowers included as a component of our net loss). Cash flows related to debt securities issued by consolidated trusts are classified as either financing activities (for repayments of principal to certificateholders) or operating activities (for interest payments to certificateholders included as a component of our net loss). We distinguish between the payments and proceeds related to the debt of Fannie Mae and the debt of consolidated trusts, as applicable. We present our non-cash activities in the consolidated statements of cash flows at the associated unpaid principal balance.

F-17

TREASURY-2646

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

To conform to our current period presentation, we have reclassified certain amounts reported in our consolidated statements of cash flows. The following table displays the line item reclassifications made to our consolidated statements of cash flows for the years ended December 31, 2010 and 2009.

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2010 | | 2009 | |
| | Before Reclassification | After Reclassification | Before Reclassification | After Reclassification |
| | (Dollars in millions) | | | |
| **Reclassified line items:** | | | | |
| **Cash flows used in operating activities:** | | | | |
| Payments to servicers for foreclosed property expense and servicer incentive fees . . . . . . . . . . . . | $    — | $   (5,658) | $    — | $   (2,570) |
| Other, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (13,837) | (8,179) | (2,027) | 543 |
| **Cash flows used in financing activities:** | | | | |
| Proceeds from issuance of short-term debt of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 699,346 | $    — | $ 1,641,119 | $    — |
| Proceeds from issuance of long-term debt of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 456,602 | — | 289,806 | — |
| Proceeds from issuance of debt of Fannie Mae . . . . . | — | 1,155,993 | — | 1,930,907 |
| Other, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (45) | — | 18 |
| Payments to redeem short-term debt of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (748,550) | — | (1,773,977) | — |
| Payments to redeem long-term debt of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (397,813) | — | (256,728) | — |
| Payments to redeem debt of Fannie Mae . . . . . . . . . . | — | (1,146,363) | — | (2,030,705) |
| Proceeds from issuance of short-term debt of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . | 12,613 | — | — | — |
| Proceeds from issuance of long-term debt of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . | 263,962 | — | 58 | — |
| Proceeds from issuance of debt of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 276,575 | — | 58 |
| Payments to redeem short-term debt of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (37,210) | — | — | — |
| Payments to redeem long-term debt of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (771,292) | — | (601) | — |
| Payments to redeem debt of consolidated trusts . . . . . | — | (808,502) | — | (601) |

*Restricted Cash*

We and our servicers advance payments on delinquent loans to consolidated Fannie Mae MBS trusts. We recognize the cash advanced as "Restricted cash" in our consolidated balance sheets to the extent such amounts are due to, but have not yet been remitted to, the MBS certificateholders. In addition, when we or our servicers collect and hold cash that is due to certain Fannie Mae MBS trusts in advance of our requirement to remit these amounts to the trusts, we recognize the collected cash amounts as "Restricted cash."

We also recognize "Restricted cash" as a result of restrictions related to certain consolidated partnership funds as well as for certain collateral arrangements for which we do not have the right to use the cash.

F-18

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

***Securities Purchased under Agreements to Resell and Securities Sold under Agreements to Repurchase***

Securities Issued By Consolidated Entities

We account for transfers of securities issued by consolidated MBS trusts, including securities purchased under agreements to resell and securities sold under agreements to repurchase, as issuances or extinguishments of the related consolidated MBS debt in our consolidated financial statements.

Securities Issued By Unconsolidated Entities

We evaluate repurchase agreements, including dollar roll transactions, involving contemporaneous purchase and sale trades of securities issued by unconsolidated trusts to determine whether such agreements should be recorded as secured financings or as purchases and sales of securities.

When we enter into such agreements, we first account for our forward commitments to buy and sell the mortgage-related securities as derivatives in our financial statements at the trade date for both the purchase and sale trades. Subsequent to the trade date, but prior to the contractual settlement date, we may fully or partially settle the forward purchase or sale commitments such that all or a portion of the securities will not be delivered according to the terms of the original trade. When such a settlement occurs, the contemporaneous purchase and sale trades no longer meet the "substantially the same" criteria as necessary for secured financing treatment, and the remaining transfers are accounted for as purchases or sales of securities as described in "Investments in Securities," below.

For those commitments that are not settled prior to the contractual settlement date for the first trade, we assess whether both the purchase and sale trades have the same primary obligor, form and type, maturity, interest rate, collateral, and unpaid principal balance, and thus meet all of the criteria to be considered substantially the same. If the "substantially the same" criteria are met as of the settlement date for the first trade, we will account for the transaction as a secured financing and extinguish both the purchase and sale commitments as of that date. The fair value of securities purchased is classified in "Investments in securities" in our consolidated balance sheets.

***Investments in Securities***

*Securities Classified as Available-for-Sale or Trading*

We classify and account for our securities as either available-for-sale ("AFS") or trading. We measure AFS securities at fair value in our consolidated balance sheets, with unrealized gains and losses included in "Accumulated other comprehensive loss" ("AOCI"), net of applicable income taxes. We recognize realized gains and losses on AFS securities when securities are sold. We calculate the gains and losses using the specific identification method and record them in "Investment gains, net" in our consolidated statements of operations and comprehensive loss. We measure trading securities at fair value in our consolidated balance sheets with unrealized and realized gains and losses included as a component of "Fair value losses, net" in our consolidated statements of operations and comprehensive loss. We include interest and dividends on securities, including amortization of the premium and discount at acquisition, in our consolidated statements of operations and comprehensive loss. When we receive multiple deliveries of securities on the same day that are backed by the same pools of loans, we calculate the specific cost of each security as the average price of the trades that delivered those securities. Currently, we do not have any securities classified as held-to-maturity, although we may elect to do so in the future.

***Other-Than-Temporary Impairment of Debt Securities***

We evaluate available-for-sale securities for other-than-temporary impairment on a quarterly basis. An other-than-temporary impairment is considered to have occurred when the fair value of a debt security is below its

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

amortized cost basis and we intend to sell or it is more likely than not that we will be required to sell the security before recovery. We recognize in our consolidated statements of operations and comprehensive loss, the entire difference between the amortized cost basis of the security and its fair value. An other-than-temporary impairment is also considered to have occurred if we do not expect to recover the entire amortized cost basis of a debt security even if we do not intend or it is not more likely than not we will be required to sell the security before recovery. We separate the difference between the amortized cost basis of the security and its fair value into the amount representing the credit loss, which we recognize in our consolidated statements of operations and comprehensive loss, and the amount related to all other factors, which we recognize in "Other comprehensive loss," net of applicable taxes. In determining whether a credit loss exists, we use our best estimate of cash flows expected to be collected from the debt security.

We consider guarantees, insurance contracts or other credit enhancements (such as collateral) in determining our best estimate of cash flows expected to be collected only if (1) such guarantees, insurance contracts or other credit enhancements provide for payments to be made solely to reimburse us for failure of the issuer to satisfy its required payment obligations, (2) such guarantees, insurance contracts or other credit enhancements are contractually attached to the security and (3) collection of the amounts receivable under these agreements is deemed probable. Guarantees, insurance contracts or other credit enhancements are considered contractually attached if they are part of and trade with the security upon transfer of the security to a third party.

In periods after we recognize an other-than-temporary impairment of debt securities, we use the prospective interest method to recognize interest income. Under the prospective interest method, we calculate a new effective yield when we determine that there has been a significant increase in expected or actual cash flows. We consider a significant increase in cash flows to be at least a ten percent increase over two consecutive quarters of the expected or actual cash flows. We calculate the new effective yield by using the new cost basis and the significantly increased actual or expected cash flows.

On April 1, 2009, the FASB modified guidance on the model for assessing other-than-temporary impairments, applicable to existing and new debt securities held by us as of April 1, 2009. As a result of adopting the guidance, we recorded a cumulative-effect adjustment of $8.5 billion on a pre-tax basis ($5.6 billion after tax) to reclassify the noncredit portion of previously recognized other-than-temporary impairments from "Accumulated deficit" to AOCI. We also reduced the "Accumulated deficit" and valuation allowance by $3.0 billion for the deferred tax asset related to the amounts previously recognized as other-than-temporary impairments in our consolidated statements of operations and comprehensive loss based upon the assertion of our intent and ability to hold certain of these securities until recovery.

Prior to April 1, 2009, we considered a debt security to be other-than-temporarily impaired if its estimated fair value was less than its amortized cost basis and we determined that it was probable that we would be unable to collect all of the contractual principal and interest payments or we did not intend to hold the security until it recovered to its previous carrying amount. When we determined an investment was other-than-temporarily impaired, we wrote down the cost basis of the investment to its fair value and included the loss in "Other-than-temporary impairments" in our consolidated statements of operations and comprehensive loss. The fair value of the investment then became its new cost basis.

***Mortgage Loans***

*Loans Held for Investment*

When we acquire mortgage loans that we have the ability and the intent to hold for the foreseeable future or until maturity, we classify the loans as held for investment ("HFI"). When we consolidate a trust, we recognize the loans underlying the trust in our consolidated balance sheets. The trusts do not have the ability to sell mortgage

F-20

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

loans and the use of such loans is limited exclusively to the settlement of obligations of the trusts. Therefore, mortgages acquired when we have the intent to securitize via trusts that are consolidated will generally be classified as HFI in our consolidated balance sheets both prior to and subsequent to their securitization.

We report HFI loans at their outstanding unpaid principal balance adjusted for any deferred and unamortized cost basis adjustments, including purchase premiums, discounts and other cost basis adjustments. We recognize interest income on HFI loans on an accrual basis using the interest method, including the amortization of any deferred cost basis adjustments, unless we determine that the ultimate collection of contractual principal or interest payments in full is not reasonably assured.

*Loans Held for Sale*

When we acquire mortgage loans that we intend to sell or securitize via trusts that will not be consolidated, we classify the loans as held for sale ("HFS"). We report HFS loans at the lower of cost or fair value. Any excess of an HFS loan's cost over its fair value is recognized as a valuation allowance, with changes in the valuation allowance recognized as "Investment gains, net" in our consolidated statements of operations and comprehensive loss. We recognize interest income on HFS loans on an accrual basis, unless we determine that the ultimate collection of contractual principal or interest payments in full is not reasonably assured. Purchase premiums, discounts and other cost basis adjustments on HFS loans are deferred upon loan acquisition, included in the cost basis of the loan, and not amortized. We determine any lower of cost or fair value adjustment on HFS loans on a pool basis by aggregating those loans based on similar risks and characteristics, such as product types and interest rates.

In the event that we reclassify HFS loans to HFI, we record the loans at lower of cost or fair value on the date of reclassification. We recognize any lower of cost or fair value adjustment recognized upon reclassification as a basis adjustment to the HFI loan.

*Nonaccrual Loans*

We discontinue accruing interest on loans when we believe collectibility of principal or interest is not reasonably assured, which for single-family loans we have determined, based on our historical experience, to be when the loan becomes two months or more past due according to its contractual terms. We generally place multifamily loans on nonaccrual status when the loan is deemed to be individually impaired, unless the loan is well secured such that collectibility of principal and accrued interest is reasonably assured.

When a loan is placed on nonaccrual status, interest previously accrued but not collected becomes part of our recorded investment in the loan and is collectively reviewed for impairment. For single-family loans, we recognize interest income for loans on nonaccrual status when cash is received. For multifamily loans, we apply any payment received on a cost recovery basis to reduce principal on the mortgage loan unless the loan is determined to be well secured.

We return a single-family loan to accrual status at the point that the borrower has made sufficient payments to reduce their delinquency below our nonaccrual threshold. For modified single-family loans, the loan is not returned to accrual status until the borrower successfully makes all required payments during the trial period (generally three to four months) and the modification is made permanent. We generally return a multifamily loan to accrual status when the borrower cures the delinquency of the loan or we otherwise determine that the loan is well secured such that collectibility is reasonably assured.

TREASURY-2650

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Restructured Loans*

A modification to the contractual terms of a loan that results in granting a concession to a borrower experiencing financial difficulties is considered a troubled debt restructuring ("TDR"). Our loss mitigation programs primarily include modifications that result in the capitalization of past due amounts in combination with interest rate reductions below market and/or the extension of the loan's maturity date. Such restructurings are granted to borrowers in financial difficulty on either a permanent or contingent basis, as in the case of modifications with a trial period. We consider these types of loan restructurings to be TDRs.

We do not currently include principal or past due interest forgiveness as part of our loss mitigation programs, and as a result, we do not charge off any outstanding principal or accrued interest amounts at the time of loan modification. We believe that the loan underwriting activities we perform as a part of our loan modification process coupled with the borrower's successful performance during any required trial period provide us reasonable assurance regarding the collectibility of the principal and interest due in accordance with the loan's modified terms, which include any past due interest amounts that are capitalized at the time of modification. As such, the loan is returned to accrual status when the loan modification is completed (*i.e.*, at the end of the trial period), and we accrue interest thereafter in accordance with our interest accrual policy. If the loan was on nonaccrual status prior to entering the trial period, it remains on nonaccrual status until the borrower demonstrates performance via the trial period and the modification is finalized.

In addition to these loan modifications, we also engage in other loss mitigation activities with troubled borrowers, which include repayment plans, forbearance arrangements, and the capitalization only of past due amounts. Repayment plans and forbearance arrangements are informal agreements with the borrower that do not result in the legal modification of the loan. For all of these activities, we consider the deferral or capitalization of three or fewer missed payments to represent only an insignificant delay, and thus not a TDR. If we defer or capitalize more than three missed payments, the delay is no longer considered insignificant, and the restructuring is accounted for as a TDR.

We measure impairment of a loan restructured in a TDR individually based on the excess of the recorded investment in the loan over the present value of the expected future cash inflows discounted at the loan's original effective interest rate. Costs incurred to complete a TDR are expensed as incurred. However, when foreclosure is probable on an individually impaired loan, we measure impairment based on the difference between our recorded investment in the loan and the fair value of the underlying property, adjusted for the estimated costs to sell the property and estimated insurance or other proceeds we expect to receive.

In April 2011, FASB issued new guidance effective for the three months ended September 30, 2011 that applied retrospectively to January 1, 2011. The new guidance clarified how to determine when a borrower is experiencing financial difficulty, when a concession is granted by a creditor, and when a delay in payment is considered insignificant. The primary impact to us of adopting this new guidance was the refinement of how we define an insignificant delay. As a result, we lowered our threshold for an insignificant delay from approximately nine missed payments to three missed payments and thus this type of additional loss mitigation activity that had previously been excluded is now considered a TDR. This refinement was necessary in order to conform our policy to the new guidance on insignificant delay provided by the FASB.

As a result of adopting the new TDR accounting guidance, we identified approximately 22,000 loan restructurings for the nine months ended September 30, 2011 that had not defaulted as of September 30, 2011 and were not previously considered TDRs. The impact of this was an increase in our provision for loan losses of $514 million in our condensed consolidated statements of operations and comprehensive loss for the three

F-22

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

months ended September 30, 2011. This amount reflects the net increase in our allowance for loan losses due to identifying these restructurings as TDRs and measuring their impairment on an individual basis offset by the elimination of our allowance for loan loss measured on a collective basis related to these loans.

*Loans Purchased or Eligible to be Purchased from Trusts*

For our single-class securitization trusts that include a Fannie Mae guaranty, we have the option to purchase a loan from the trust after four or more consecutive monthly payments due under the loan are delinquent in whole or in part. With respect to single-family mortgage loans in trusts with issue dates on or after January 1, 2009, we also have the option to purchase a loan from the trust after the loan has been delinquent for at least one monthly payment, if the delinquency has not been fully cured on or before the next payment date (that is, 30 days delinquent), and it is determined that it is appropriate to execute loss mitigation activity that is not permissible while the loan is held in a trust. Fannie Mae, as guarantor or as issuer, may also purchase mortgage loans when other pre-defined contingencies have been met, such as when there is a material breach of a seller's representation and warranty. Under long-term standby commitments, we purchase credit-impaired loans from lenders when the loans subject to these commitments meet certain delinquency criteria. This arrangement also allows the lender to deliver qualified loans in exchange for our guaranteed Fannie Mae MBS.

When we purchase mortgage loans from consolidated trusts, we reclassify the loans from "Mortgage loans held for investment of consolidated trusts" to "Mortgage loans held for investment by Fannie Mae" and, upon settlement, we record an extinguishment of the corresponding portion of the debt of the consolidated trusts.

For unconsolidated trusts and long-term standby commitments, loans that are credit impaired at the time of acquisition are recorded at the lower of their acquisition cost (unpaid principal balance plus accrued interest) or fair value. A loan is considered credit impaired at acquisition when there is evidence of credit deterioration subsequent to the loan's origination and it is probable, at acquisition, that we will be unable to collect all contractually required payments receivable (ignoring insignificant delays in contractual payments). We record each acquired loan that does not meet these criteria at its acquisition cost.

For unconsolidated trusts where we are considered the transferor, we recognize the loan in our consolidated balance sheets at fair value and record a corresponding liability to the unconsolidated trust when the contingency on our option to purchase the loan from the trust has been met and we regain effective control over the transferred loan.

We base our estimate of the fair value of delinquent loans purchased from unconsolidated trusts or long-term standby commitments upon an assessment of what a market participant would pay for the loan at the date of acquisition. We utilize indicative market prices from large, experienced dealers to estimate the initial fair value of delinquent loans purchased from unconsolidated trusts or long-term standby commitments. We consider acquired credit-impaired loans to be individually impaired at acquisition, and no valuation allowance is established or carried over. We record the excess of the loan's acquisition cost over its fair value as a charge-off against our "Reserve for guaranty losses" at acquisition. We recognize any decreases in estimated future cash flows to be collected subsequent to acquisition as provisions for loan losses through our "Allowance for loan losses."

We place credit-impaired loans that we acquire from unconsolidated trusts or long-term standby commitments on nonaccrual status at acquisition in accordance with our nonaccrual policy. If we subsequently determine that the collectibility of principal and interest is reasonably assured, we return the loan to accrual status. We determine the initial accrual status of acquired loans that are not credit impaired in accordance with our nonaccrual policy.

F-23

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

When an acquired credit-impaired loan is returned to accrual status, the portion of the expected cash flows (which incorporates changes in the timing and amount that are associated with credit and prepayment events) that exceeds the recorded investment in the loan is accreted into interest income over the expected remaining life of the loan. We prospectively recognize increases in future cash flows expected to be collected as interest income over the remaining expected life of the loan through a yield adjustment. If we subsequently refinance or restructure an acquired credit-impaired loan, other than through a TDR, the loan is not accounted for as a new loan but continues to be accounted for under the accounting guidance for acquired credit-impaired loans.

*Allowance for Loan Losses and Reserve for Guaranty Losses*

The allowance for loan losses is a valuation allowance that reflects an estimate of incurred credit losses related to our recorded investment in both single-family and multifamily HFI loans. This population includes both HFI loans held by Fannie Mae and by consolidated Fannie Mae MBS trusts. When calculating our loan loss allowance, we consider only our net recorded investment in the loan at the balance sheet date, which includes the loan's unpaid principal balance and accrued interest recognized while the loan was on accrual status and any applicable cost basis adjustments.

The reserve for guaranty losses is a liability account in our consolidated balance sheets that reflects an estimate of incurred credit losses related to our guaranty to each unconsolidated Fannie Mae MBS trust that we will supplement amounts received by the Fannie Mae MBS trust as required to permit timely payments of principal and interest on the related Fannie Mae MBS and our agreements to purchase credit-impaired loans from lenders under the terms of our long-term standby commitments. As a result, the guaranty reserve considers not only the principal and interest due on the loan at the current balance sheet date, but also any additional interest payments due to the trust from the current balance sheet date until the point of loan acquisition or foreclosure.

We recognize incurred losses by recording a charge to the "Provision for loan losses" or the "Provision for guaranty losses" in our consolidated statements of operations and comprehensive loss.

*Single-Family Loans*

We recognize credit losses related to groups of similar single-family HFI loans that are not individually impaired when (1) available information as of each balance sheet date indicates that it is probable a loss has occurred and (2) the amount of the loss can be reasonably estimated. We aggregate such loans, based on similar risk characteristics, for purposes of estimating incurred credit losses and establish a collective single-family loss reserve using an econometric model that derives an overall loss reserve estimate. The estimate takes into account multiple factors which include but are not limited to origination year, loan product type, mark-to-market loan-to-value ("LTV") ratio; and delinquency status. Once loans are aggregated, there typically is not a single, distinct event that would result in an individual loan or pool of loans being impaired. Accordingly, to determine an estimate of incurred credit losses, we base our allowance and reserve methodology on historical events and trends, such as loss severity (in event of default), default rates, and recoveries from mortgage insurance contracts and other credit enhancements that provide loan level loss coverage and are either contractually attached to a loan or that were entered into contemporaneously with and in contemplation of a guaranty or loan purchase transaction. In determining our collective reserve, we use recent actual severity experienced in our real-estate owned ("REO") and loss mitigation operations, including the sales of our own foreclosed properties, to estimate the loss given default. Our allowance calculation also incorporates a loss confirmation period (the anticipated time lag between a credit loss event and the confirmation of the credit loss resulting from that event) to ensure our allowance estimate captures credit losses that have been incurred as of the balance sheet date but have not been confirmed. In addition, management performs a review of the observable data used in its estimate to ensure it is representative of prevailing economic conditions and other events existing as of the balance sheet date.

F-24

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

We record charge-offs as a reduction to the allowance for loan losses or reserve for guaranty losses when losses are confirmed through the receipt of assets in full satisfaction of a loan, such as the underlying collateral upon foreclosure or cash upon completion of a short sale. The excess of a loan's unpaid principal balance, accrued interest, and any applicable cost basis adjustments ("our total exposure") over the fair value of the assets received is treated as a charge-off loss that is deducted from the allowance for loan losses or reserve for guaranty losses. The amount charged off also considers estimated proceeds from primary mortgage insurance or other credit enhancements that are either contractually attached to a loan or that were entered into contemporaneously with and in contemplation of a guaranty or loan purchase transaction as a recovery of our total exposure, up to the amount of loss recognized as a charge-off. We record additional proceeds from primary mortgage insurance and credit enhancements in excess of our total exposure as a recovery of any forgone contractually past due interest, and then as an offset to the expenses recorded in "Foreclosed property expense" in our consolidated statements of operations and comprehensive loss when received.

*Individually Impaired Single-Family Loans*

Individually impaired single-family loans currently include those restructured in a TDR and acquired credit-impaired loans. We consider a loan to be impaired when, based on current information, it is probable that we will not receive all amounts due, including interest, in accordance with the contractual terms of the loan agreement. When making our assessment as to whether a loan is impaired, we also take into account more than insignificant delays in payment and shortfalls in amounts received. Determination of whether a delay in payment or shortfall in amount is more than insignificant requires management's judgment as to the facts and circumstances surrounding the loan.

Our measurement of impairment on an individually impaired loan follows the method that is most consistent with our expectations of recovery of our recorded investment in the loan. When a loan has been restructured, we measure impairment using a cash flow analysis discounted at the loan's original effective interest rate. If we expect to recover our recorded investment in an individually impaired loan through probable foreclosure of the underlying collateral, we measure impairment based on the fair value of the collateral, reduced by estimated disposal costs on a discounted basis and adjusted for estimated proceeds from mortgage, flood, or hazard insurance or similar sources. For individually impaired loans that we believe are probable of foreclosure, we take into consideration the sales prices of foreclosed properties in determining the value of the underlying real estate collateral.

We use internal models to project cash flows used to assess impairment of individually impaired loans, and generally update the market and loan characteristic inputs we use in these models monthly, using month-end data. Market inputs include information such as interest rates, volatility and spreads, while loan characteristic inputs include information such as mark-to-market LTV ratios and delinquency status. The loan characteristic inputs are key factors that affect the predicted rate of default for loans evaluated for impairment through our internal cash flow models. We evaluate the reasonableness of our models by comparing the results with actual performance and our assessment of current market conditions. In addition, we review our models at least annually for reasonableness and predictive ability in accordance with our corporate model review policy. Accordingly, we believe the projected cash flows generated by our models that we use to assess impairment appropriately reflect the expected future performance of the loans.

*Multifamily Loans*

We identify multifamily loans for evaluation for impairment through a credit risk assessment process. Based on this evaluation, we determine for loans that are not in homogeneous pools whether or not a loan is individually impaired. We consider a loan to be individually impaired when, based on current information gathered in our risk assessment process, it is probable that we will not receive all amounts due, including interest, in accordance with

F-25

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

the contractual terms of the loan agreement. If we determine that a multifamily loan is individually impaired, we generally measure impairment on that loan based on the fair value of the underlying collateral less estimated costs to sell the property. If we determine that an individual loan that was specifically evaluated for impairment is not individually impaired, we include the loan as part of a pool of loans with similar characteristics that are evaluated collectively for incurred losses.

We stratify multifamily loans into different internal risk categories based on the credit risk inherent in each individual loan. We categorize loan credit risk based on relevant observable data about a borrower's ability to pay, including multifamily market economic fundamentals, review of available current borrower financial information, operating statements on the underlying collateral, current debt service coverage ratios, historical payment experience, estimates of the current collateral values and other related credit documentation. As a result of this analysis, multifamily loans are categorized based on management's judgment into the following categories: (1) Green (loan with acceptable risk); (2) Yellow (loan with signs of potential weakness); (3) Orange (loan with a well-defined weakness that may jeopardize the timely full repayment); and (4) Red (loan with a weakness that makes timely collection or liquidation in full more questionable based on existing conditions and values). We evaluate loans in the orange and red risk categories to determine which ones are individually impaired.

For each risk category, certain observed default probability and loss severity (in event of default) factors, based on historical performance of loans in the same risk category, are applied against our recorded investment in the loans, including recorded accrued interest associated with such loans, to determine an appropriate allowance. Such performance data reflect historical delinquencies and charge-offs, as well as loan size. In addition, we consider any credit enhancements such as letters of credit or loss sharing arrangements with our lenders.

### Advances to Lenders

Advances to lenders represent our payments of cash in exchange for the receipt of mortgage loans from lenders in a transfer that is accounted for as a secured lending arrangement. These transfers primarily occur when we provide early funding to lenders for loans that they will subsequently either sell to us or securitize into a Fannie Mae MBS that they will deliver to us. We individually negotiate early lender funding advances with our lender customers. Early lender funding advances have terms up to 60 days and earn a short-term market rate of interest.

We report cash outflows from advances to lenders as an investing activity in our consolidated statements of cash flows. Settlements of the advances to lenders, other than through lender repurchases of loans, are not collected in cash, but rather in the receipt of either loans or Fannie Mae MBS. Accordingly, this activity is reflected as a non-cash transfer in our consolidated statements of cash flows. Currently, in our consolidated statements of cash flows, we include advances settled through receipt of securities in the non-cash activities line item entitled "Transfers from advances to lenders to investments in securities" or, if the security is issued from a consolidated Fannie Mae MBS trust, in the line item entitled "Transfers from advances to lenders to loans held for investment of consolidated trusts."

### Acquired Property, Net

"Acquired property, net" includes foreclosed property and any receivable outstanding on short sales received in full satisfaction of a loan. We recognize foreclosed property upon the earlier of the loan foreclosure event or when we take physical possession of the property (i.e., through a deed-in-lieu of foreclosure transaction). We initially measure foreclosed property at its fair value less its estimated costs to sell. We treat any excess of our recorded investment in the loan over the fair value less estimated costs to sell the property as a charge-off to the "Allowance for loan losses." Any excess of the fair value less estimated costs to sell the property over our

F-26

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

recorded investment in the loan is recognized first to recover any forgone, contractually due interest, then to "Foreclosed property expense" in our consolidated statements of operations and comprehensive loss.

We classify foreclosed properties as held for sale when we intend to sell the property and the following conditions are met at either acquisition or within a relatively short period thereafter: we are actively marketing the property and it is available for immediate sale in its current condition such that the sale is reasonably expected to take place within one year. We report these properties at the lower of their carrying amount or fair value less estimated selling costs, on a discounted basis if the sale is expected to occur beyond one year from the date of foreclosure. We do not depreciate these properties.

We recognize a loss for any subsequent write-down of the property to its fair value less its estimated costs to sell through a valuation allowance with an offsetting charge to "Foreclosed property expense" in our consolidated statements of operations and comprehensive loss. We recognize a recovery for any subsequent increase in fair value less estimated costs to sell up to the cumulative loss previously recognized through the valuation allowance. We recognize gains or losses on sales of foreclosed property through "Foreclosed property expense" in our consolidated statements of operations and comprehensive loss.

Properties that do not meet the criteria to be classified as held for sale are classified as held for use and are recorded in "Other assets" in our consolidated balance sheets. These properties are depreciated and are evaluated for impairment when circumstances indicate that the carrying amount of the property is no longer recoverable.

***Guaranty Accounting***

Our primary guaranty transactions result from mortgage loan securitizations in which we issue Fannie Mae MBS. The majority of our Fannie Mae MBS issuances fall within two broad categories: (1) lender swap transactions, where a lender delivers mortgage loans to us to deposit into a trust in exchange for our guaranteed Fannie Mae MBS backed by those mortgage loans and (2) portfolio securitizations, where we securitize loans that were previously included in our consolidated balance sheets, and create guaranteed Fannie Mae MBS backed by those loans. As guarantor, we guaranty to each MBS trust that we will supplement amounts received by the MBS trust as required to permit timely payments of principal and interest on the related Fannie Mae MBS. This obligation represents an obligation to stand ready to perform over the term of the guaranty. Therefore, our guaranty exposes us to credit losses on the loans underlying Fannie Mae MBS.

The majority of our guaranty obligations have historically arisen from lender swap transactions. In a lender swap transaction, we receive a monthly guaranty fee for our unconditional guaranty to the Fannie Mae MBS trust. The guaranty fee we receive varies depending on factors such as the risk profile of the securitized loans and the level of credit risk we assume. In lieu of charging a higher guaranty fee for loans with greater credit risk, we may require that the lender pay an upfront fee to compensate us for assuming additional credit risk. We refer to this payment as a risk-based pricing adjustment. In addition, we may charge a lower guaranty fee if the lender assumes a portion of the credit risk through recourse or other risk-sharing arrangements. We refer to these arrangements as credit enhancements. We also adjust the monthly guaranty fee so that the pass-through coupon rates on Fannie Mae MBS are in more easily tradable increments of a whole or half percent by making an upfront payment to the lender ("buy-up") or receiving an upfront payment from the lender ("buy-down").

Upon adoption of the accounting guidance on the transfers of financial assets and the consolidation of VIE's on January 1, 2010, we consolidated most of the single-class securitization trusts that are issued under our guaranty accounting programs. As such, a significant portion of our guaranty-related assets and liabilities have been derecognized from our consolidated balance sheets.

F-27

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

For those trusts that are not consolidated, we initially recognize a liability for the fair value of our obligation to stand ready to perform over the term of the guaranty as a component of "Other liabilities" in our consolidated balance sheets. We also record an offsetting guaranty asset (a retained interest for portfolio securitizations) that represents the present value of cash flows expected to be received as compensation over the life of the guaranty as a component of "Other assets" in our consolidated balance sheets.

For lender swap transactions, we initially recognize our guaranty obligation at fair value using the transaction price, as a practical expedient, upon initial recognition. Specifically, we estimate the compensation that we would require to issue the same guaranty in a standalone arm's-length transaction with an unrelated party. Because the fair value of those guaranty obligations equals the fair value of the total compensation we receive, we do not recognize losses or record deferred profit in our consolidated financial statements at inception of our guaranty contracts. As such, all upfront cash received for buy-downs and risk-based price adjustments are included as a component of our guaranty obligation at inception.

For portfolio securitizations, we initially recognize our guaranty obligation at fair value using an estimate of a hypothetical transaction price that we would receive if we were to issue our guaranty to an unrelated party in a standalone arm's-length transaction at the measurement date. We recognize any difference between the fair value of the guaranty asset and the fair value of the guaranty obligation as a component of the gain or loss on the sale of mortgage-related assets and record the difference as "Investment gains, net" in our consolidated statements of operations and comprehensive loss.

Subsequent to initial recognition, we account for the guaranty asset on lender swap transactions at amortized cost. As we collect monthly guaranty fees, we reduce guaranty assets to reflect cash payments received and recognize imputed interest income on guaranty assets as a component of "Guaranty fee income" under the prospective interest method. We reduce the corresponding guaranty obligation in proportion to the reduction in guaranty assets and recognize this reduction in our consolidated statements of operations and comprehensive loss as an additional component of "Guaranty fee income." We assess guaranty assets for other-than-temporary impairment based on changes in our estimate of the cash flows to be received. When we determine a guaranty asset is other-than-temporarily impaired, we write down the cost basis of the guaranty asset to its fair value and include the amount written-down in "Guaranty fee income" in our consolidated statements of operations and comprehensive loss. Any other-than-temporary impairment recorded on guaranty assets results in a proportionate reduction in the corresponding guaranty obligations. For portfolio securitizations, we subsequently account for the retained guarantee asset in the same manner as a trading security, with unrealized gains and losses included in "Guaranty fee income" in our consolidated statements of operations and comprehensive loss.

We record buy-ups in our consolidated balance sheets at fair value in "Other assets" in our consolidated balance sheets. We subsequently account for buy-ups in the same manner as a trading security. We account for our guaranty related to a long term standby commitment in the same manner as our guaranty resulting from an unconsolidated lender swap transaction as described above.

In addition to our guaranty assets and obligations, we recognize a liability for estimable and probable losses for the credit risk we assume on loans underlying unconsolidated Fannie Mae MBS and long term standby commitments based on management's estimate of probable losses incurred on those loans as of each balance sheet date. We record this contingent liability in our consolidated balance sheets as "Reserve for guaranty losses."

***Fannie Mae MBS included in "Investments in securities"***

When we own unconsolidated Fannie Mae MBS, we do not derecognize any components of the guaranty assets, guaranty obligations, reserve for guaranty losses, or any other outstanding recorded amounts associated with the

TREASURY-2657

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

guaranty transaction because our contractual obligation to the MBS trust remains in force until the trust is liquidated. We value Fannie Mae MBS based on their legal terms, which includes the Fannie Mae guaranty to the MBS trust, and continue to reflect the unamortized obligation to stand ready to perform over the term of our guaranty and any incurred credit losses in our "Other liabilities" and "Reserve for guaranty losses," respectively. We disclose the aggregate amount of Fannie Mae MBS held as "Investments in securities" in our consolidated balance sheets as well as the amount of our "Reserve for guaranty losses" and "Other liabilities" that relates to Fannie Mae MBS held as "Investments in securities." Upon subsequent sale of a Fannie Mae MBS, we continue to account for any outstanding recorded amounts associated with the guaranty transaction on the same basis of accounting as prior to the sale of Fannie Mae MBS, as no new assets were retained and no new liabilities have been assumed upon the subsequent sale.

***Amortization of Cost Basis Adjustments***

We amortize cost basis adjustments, including premiums and discounts on mortgage loans and securities, as a yield adjustment using the interest method over the contractual or estimated life of the loan or security. We amortize these cost basis adjustments into interest income for mortgage securities and for loans we classify as HFI. We do not amortize cost basis adjustments for loans that we classify as HFS, but include them in the calculation of the gain or loss on the sale of those loans.

We have elected to use the contractual payment terms to determine the amortization of cost basis adjustments on mortgage loans and mortgage securities initially recognized on or after January 1, 2010 in our consolidated balance sheets.

For substantially all mortgage loans and mortgage securities initially recorded on or before December 31, 2009, we use prepayment estimates in determining the periodic amortization of cost basis adjustments under the interest method using a constant effective yield. For those mortgage loans and mortgage securities for which we did not estimate prepayments, we used the contractual payment terms of the loan or security to apply the interest method. When we anticipate prepayments for the application of the interest method to mortgage loans initially recognized before January 1, 2010, we aggregate individual mortgage loans based upon coupon rate, product type and origination year and consider Fannie Mae MBS to be aggregations of similar loans for the purpose of estimating prepayments. We also recalculate the constant effective yield each reporting period to reflect the actual payments and prepayments we have received to date and our new estimate of future prepayments. We then adjust our net investment in the mortgage loans and mortgage securities to the amount the investment would have been had we applied the recalculated constant effective yield since their acquisition, with a corresponding charge or credit to interest income.

We cease amortization of cost basis adjustments during periods in which we are not recognizing interest income on a loan because the collection of the principal and interest payments is not reasonably assured (that is, when the loan is placed on nonaccrual status).

We had $16.2 billion and $16.5 billion in net unamortized discounts and other cost basis adjustments of loans of Fannie Mae included in our consolidated balance sheets as of December 31, 2011 and 2010, respectively, that may record in net interest income in future periods, and $1.3 billion and $938 million in net unamortized premiums and other cost basis adjustments in investments in securities of Fannie Mae included in our consolidated balance sheets as of December 31, 2011 and 2010, respectively, that we may record in net interest income in future periods. We had $20.7 billion and $11.8 billion in net unamortized premiums in loans of consolidated trusts included in our consolidated balance sheets as of December 31, 2011 and 2010, respectively, that we may record in net interest income in future periods, and $29.5 billion and $16.8 billion in net unamortized premiums in debt of consolidated trusts included in our consolidated balance sheets as of December 31, 2011 and 2010, respectively, that we may record in net interest income in future periods.

TREASURY-2658

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

We had $1.9 billion and $3.1 billion of other-than-temporary impairments of investments in securities as of December 31, 2011 and 2010, respectively, that represent the increase in expected cash flows since original impairment that we may record in net interest income in future periods. We had $1.7 billion and $3.2 billion of unamortized discounts on acquired credit-impaired loans as of December 31, 2011 and 2010, respectively, that we may record in net interest income in future periods if the loans are on accrual status.

### *Commitments to Purchase and Sell Mortgage Loans and Securities*

We enter into commitments to purchase and sell mortgage-backed securities and to purchase single-family and multifamily mortgage loans. Commitments to purchase or sell some mortgage-backed securities and to purchase single-family mortgage loans are generally accounted for as derivatives. Our commitments to purchase multifamily loans are not accounted for as derivatives because they do not meet the criteria for net settlement.

When derivative purchase commitments settle, we include the fair value on the settlement date in the cost basis of the loan or unconsolidated security we purchase. When derivative commitments to sell securities settle, we include the fair value of the commitment on the settlement date in the cost basis of the security we sell. Purchases and sales of securities issued by our consolidated MBS trusts are treated as extinguishment or issuance of debt, respectively. For commitments to purchase and sell securities issued by our consolidated MBS trusts, we recognize the fair value of the commitment on the settlement date as a component of debt extinguishment gains and losses or in the cost basis of the debt issued, respectively.

Regular-way securities trades provide for delivery of securities within the time generally established by regulations or conventions in the market in which the trade occurs and are exempt from application of the derivative accounting literature. Commitments to purchase or sell securities that we account for on a trade-date basis are also exempt from the derivative accounting requirements. We record the purchase and sale of an existing security on its trade date when the commitment to purchase or sell the existing security settles within the period of time that is customary in the market in which those trades take place.

Additionally, contracts for the forward purchase or sale of when-issued and to-be-announced ("TBA") securities are exempt from the derivative accounting requirements if there is no other way to purchase or sell that security, delivery of that security and settlement will occur within the shortest period possible for that type of security, and it is probable at inception and throughout the term of the individual contract that physical delivery of the security will occur. Since our commitments for the purchase of when-issued and TBA securities can be net settled and we do not document that physical settlement is probable, we account for all such commitments as derivatives.

Commitments to purchase securities that we do not account for as derivatives and do not require trade-date accounting are accounted for as forward contracts to purchase securities. We designate these commitments as AFS or trading at inception and account for them in a manner consistent with that category of securities.

### *Derivative Instruments*

We recognize all derivatives as either assets or liabilities in our consolidated balance sheets at their fair value on a trade date basis. We report derivatives in a gain position after offsetting by counterparty in "Other assets" and derivatives in a loss position after offsetting by counterparty in "Other liabilities" in our consolidated balance sheets.

We offset the carrying amounts of derivatives (other than commitments) that are in gain positions and loss positions with the same counterparty, as well as cash collateral receivables and payables associated with derivative positions in master netting arrangements. We offset these amounts because the derivative contracts have determinable amounts, we have the legal right to offset amounts with each counterparty, that right is enforceable by law, and we intend to offset the amounts to settle the contracts.

F-30

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

We evaluate financial instruments that we purchase or issue and other financial and non-financial contracts for embedded derivatives. To identify embedded derivatives that we must account for separately, we determine if: (1) the economic characteristics of the embedded derivative are not clearly and closely related to the economic characteristics of the financial instrument or other contract; (2) the financial instrument or other contract (*i.e.*, the hybrid contract) itself is not already measured at fair value with changes in fair value included in earnings; and (3) a separate instrument with the same terms as the embedded derivative would meet the definition of a derivative. If the embedded derivative meets all three of these conditions we elect to carry the hybrid financial instrument in its entirety at fair value with changes in fair value recorded in earnings.

### *Collateral*

We enter into various transactions where we pledge and accept collateral, the most common of which are our derivative transactions. Required collateral levels vary depending on the credit rating and type of counterparty. We also pledge and receive collateral under our repurchase and reverse repurchase agreements. In order to reduce potential exposure to repurchase counterparties, a third-party custodian typically maintains the collateral and any margin. We monitor the fair value of the collateral received from our counterparties, and we may require additional collateral from those counterparties, as we deem appropriate.

#### *Cash Collateral*

We record cash collateral accepted from a counterparty that we have the right to use as "Cash and cash equivalents" and cash collateral accepted from a counterparty that we do not have the right to use as "Restricted cash" in our consolidated balance sheets. We net our obligation to return cash collateral pledged to us against the fair value of derivatives in a gain position recorded in "Other assets" in our consolidated balance sheets as part of our counterparty netting calculation.

For derivative positions with the same counterparty under master netting arrangements where we pledge cash collateral, we remove it from "Cash and cash equivalents" and net the right to receive it against the fair value of derivatives in a loss position recorded in "Other liabilities" in our consolidated balance sheets as a part of our counterparty netting calculation.

#### *Non-Cash Collateral*

We classify securities pledged to counterparties as either "Investments in securities" or "Cash and cash equivalents" in our consolidated balance sheets. Securities pledged to counterparties that have been consolidated with the underlying assets recognized as loans are included as "Mortgage loans" in our consolidated balance sheets.

Our liability to third-party holders of Fannie Mae MBS that arises as the result of a consolidation of a securitization trust is collateralized by the underlying loans and/or mortgage-related securities.

We had reverse repurchase agreements outstanding of $49.5 billion and $12.3 billion as of December 31, 2011 and 2010, respectively. The fair value of non-cash collateral we accepted was $50.1 billion and $12.3 billion as of December 31, 2011 and 2010, respectively, of which we were permitted to sell or repledge $20.0 billion and $7.5 billion as of December 31, 2011 and 2010, respectively. None of the underlying collateral was sold or repledged as of December 31, 2011 and 2010. We had no repurchase agreements outstanding as of December 31, 2011 and $49 million in repurchase agreements outstanding as of December 31, 2010.

### *Debt*

Our consolidated balance sheets contain debt of Fannie Mae as well as debt of consolidated trusts. Effective January 1, 2011, we reported debt issued by us as "Debt of Fannie Mae" and by consolidated trusts as "Debt of

F-31

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

consolidated trusts." Debt issued by us represents debt that we issue to third parties to fund our general business activities. The debt of consolidated trusts represents the amount of Fannie Mae MBS issued from such trusts which is held by third-party certificateholders and prepaid without penalty at any time. We report deferred items, including premiums, discounts and other cost basis adjustments, as adjustments to the related debt balances in our consolidated balance sheets. We remeasure the carrying amount, accrued interest and basis adjustments of debt denominated in a foreign currency into U.S. dollars using foreign exchange spot rates as of the balance sheet dates and report any associated gains or losses as "Debt foreign exchange gains (losses), net" which is a component of "Fair value losses, net" in our consolidated statements of operations and comprehensive loss.

We classify interest expense as either short-term or long-term based on the contractual maturity of the related debt. We recognize the amortization of premiums, discounts and other cost basis adjustments through interest expense using the effective interest method usually over the contractual term of the debt. Amortization of premiums, discounts and other cost basis adjustments begins at the time of debt issuance. We remeasure interest expense for debt denominated in a foreign currency into U.S. dollars using the daily spot rates. The difference in rates arising from the month-end spot exchange rate used to calculate the interest accruals and the daily spot rates used to record the interest expense is a foreign currency transaction gain or loss for the period and is recognized as "Debt foreign exchange gains (losses), net" which is a component of "Fair value losses, net" in our consolidated statements of operations and comprehensive loss.

When we purchase a Fannie Mae MBS issued from a consolidated single-class securitization trust, we extinguish the related debt of the consolidated trust as the MBS debt is no longer owed to a third-party. We record debt extinguishment gains or losses related to debt of consolidated trusts to the extent that the purchase price of the MBS does not equal the carrying value of the related consolidated MBS debt reported on our balance sheets (including unamortized premiums, discounts and other cost basis adjustments) at the time of purchase.

*Income Taxes*

We recognize deferred tax assets and liabilities for the difference in the bases of assets and liabilities for financial accounting and tax purposes. We measure deferred tax assets and liabilities using enacted tax rates that are expected to be applicable to the taxable income or deductions in the period(s) the assets are realized or the liabilities are settled. We adjust deferred tax assets and liabilities for the effects of changes in tax laws and rates on the date of enactment. We recognize investment and other tax credits through our effective tax rate calculation assuming that we will be able to realize the full benefit of the credits. We reduce our deferred tax asset by an allowance if, based on the weight of available positive and negative evidence, it is more likely than not that we will not realize some portion, or all, of the deferred tax asset.

We account for income tax uncertainty using a two-step approach whereby we recognize an income tax benefit if, based on the technical merits of a tax position, it is more likely than not (a probability of greater than 50%) that the tax position would be sustained upon examination by the taxing authority, which includes all related appeals and litigation. We then recognize a tax benefit equal to the largest amount of tax benefit that is greater than 50% likely to be realized upon settlement with the taxing authority, considering all information available at the reporting date. We recognize interest expense and penalties on unrecognized tax benefits as "Other expenses" in our consolidated statements of operations and comprehensive loss.

*Pension and Other Postretirement Benefits*

We provide pension and postretirement benefits and account for these benefit costs on an accrual basis. We determine pension and postretirement benefit amounts recognized in our consolidated financial statements on an actuarial basis using several different assumptions. The two most significant assumptions used in the valuation

F-32

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

are the discount rate and the long-term rate of return on assets. In determining our net periodic benefit cost, we apply a discount rate in the actuarial valuation of our pension and postretirement benefit obligations. In determining the discount rate as of each balance sheet date, we consider the current yields on high-quality, corporate fixed-income debt instruments with maturities corresponding to the expected duration of our benefit obligations. Additionally, the net periodic benefit cost recognized in our consolidated financial statements for our qualified pension plan is impacted by the long-term rate of return on plan assets. We base our assumption of the long-term rate of return on the current investment portfolio mix, actual long-term historical return information and the estimated future long-term investment returns for each class of assets. We measure plan assets and obligations as of the date of our consolidated financial statements. We recognize the over-funded or under-funded status of our benefit plans as a prepaid benefit cost (an asset) in "Other assets" or an accrued benefit cost (a liability) in "Other liabilities," respectively, in our consolidated balance sheets. We recognize actuarial gains and losses and prior service costs and credits when incurred as adjustments to the prepaid benefit cost or accrued benefit cost with a corresponding offset in other comprehensive income (loss).

### *Earnings (Loss) per Share*

Earnings (loss) per share ("EPS") is presented for both basic EPS and diluted EPS. We compute basic EPS by dividing net income (loss) available to common stockholders by the weighted-average number of shares of common stock outstanding during the year. In addition to common shares outstanding, the computation of basic EPS includes instruments for which the holder has (or is deemed to have) the present rights as of the end of the reporting period to share in current period earnings (loss) with common stockholders (*i.e.,* participating securities and common shares that are currently issuable for little or no cost to the holder). We include in the denominator of our basic EPS computation the weighted-average shares of common stock that would be issued upon the full exercise of the warrant issued to Treasury. Diluted EPS is computed by dividing net income (loss) available to common stockholders by the weighted-average number of shares of common stock outstanding during the year, plus the dilutive effect of common stock equivalents such as convertible securities, stock options and other performance awards. We exclude these common stock equivalents from the calculation of diluted EPS when the effect of inclusion, assessed individually, would be anti-dilutive.

### *Other Comprehensive Income (Loss)*

Other comprehensive income (loss) is the change in equity, net of tax, resulting from transactions that we record directly to stockholders' deficit. These transactions include: unrealized gains and losses on AFS securities and certain commitments whose underlying securities are classified as AFS; deferred hedging gains and losses from cash flow hedges; unrealized gains and losses on guaranty assets resulting from portfolio securitization transactions; buy-ups resulting from lender swap transactions; and change in prior service costs and credits and actuarial gains and losses associated with pension and postretirement benefits in other comprehensive income (loss).

As of December 31, 2011, 2010 and 2009, we recorded a valuation allowance for our deferred tax asset for the portion of the future tax benefit that we more likely than not will not utilize in the future. We established no valuation allowance for the deferred tax asset amount related to unrealized losses recorded through AOCI on our AFS securities. We believe this deferred tax amount is recoverable because we have the intent and ability to hold these securities until recovery of the unrealized loss amounts.

TREASURY-2662

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Reclassifications*

To conform to our current period presentation, we have reclassified certain amounts reported in our consolidated financial statements. The following table displays the line items that were reclassified in our consolidated balance sheet as of December 31, 2010.

| | As of December 31, 2010 | |
| --- | --- | --- |
| | Before Reclassification | After Reclassification |
| | (Dollars in millions) | |
| **Reclassified lines to:** | | |
| **Assets:** | | |
| Servicer and MBS trust receivable | $ 951 | $ |
| Other assets | 25,875 | 26,826 |
| **Liabilities:** | | |
| Short-term debt: | | |
| Of Fannie Mae | 151,884 | |
| Of consolidated trusts | 5,359 | |
| Long-term debt: | | |
| Of Fannie Mae | 628,160 | |
| Of consolidated trusts | 2,411,597 | |
| Debt: | | |
| Of Fannie Mae | | 780,044 |
| Of consolidated trusts | | 2,416,956 |
| Reserve for guaranty losses | 323 | |
| Servicer and MBS trust payable | 2,950 | |
| Other liabilities | 10,400 | 13,673 |

TREASURY-2663

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table represents the line items that we reclassified in our consolidated statements of operations and comprehensive loss for the years ended December 31, 2010 and 2009.

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2010 | | 2009 | |
| | Before Reclassification | After Reclassification | Before Reclassification | After Reclassification |
| | (Dollars in millions) | | | |
| **Reclassified lines to:** | | | | |
| Interest income: | | | | |
| Mortgage loans: | | | | |
| Of Fannie Mae .......................... | $ 14,992 | $ | $15,378 | $ |
| Of consolidated trusts ..................... | 132,591 | | 6,143 | |
| Mortgage loans (includes $132,591 and $6,143, respectively, related to consolidated trusts) .... | | 147,583 | | 21,521 |
| Interest expense: | | | | |
| Short-term debt: | | | | |
| Of Fannie Mae .......................... | 619 | | 2,306 | |
| Of consolidated trusts ..................... | 12 | | — | |
| Short-term debt (includes $12 and $-, respectively, related to consolidated trusts) ............... | | 631 | | 2,306 |
| Long-term debt: | | | | |
| Of Fannie Mae .......................... | 18,857 | | 22,195 | |
| Of consolidated trusts ..................... | 118,373 | | 344 | |
| Long-term debt (includes $118,373 and $344, respectively, related to consolidated trusts) .... | | 137,230 | | 22,539 |
| Guaranty fee income .......................... | 202 | | 7,211 | |
| Fee and other income ........................ | 882 | 1,084 | 773 | 7,984 |
| Losses from partnership investments ............. | (74) | | (6,735) | |
| Other expenses ............................. | 853 | 927 | 1,484 | 8,219 |

*New Accounting Pronouncements*

In May 2011, FASB issued amendments to the guidance pertaining to fair value measurement and disclosure. The amendments create a common definition of fair value for GAAP and International Financial Reporting Standards ("IFRS") and align the measurement and disclosure requirements. These amendments provide further guidance on some of the principles for measuring fair value and expand the disclosure requirements specifically for Level 3 fair value measurements. The new requirements became effective for us on January 1, 2012 and we are applying them prospectively. We do not expect that the adoption of these amendments will have a material impact on our consolidated financial statements.

In December 2011, FASB issued amendments to the guidance on disclosures about offsetting assets and liabilities. The amendments require additional disclosures about financial instruments that have been offset and related arrangements to enable investors to understand the effect or potential effect of those arrangements on the company's financial positions. The newly required disclosures will enhance comparability between companies that prepare their financial statements in accordance with GAAP and those that follow IFRS. The updated guidance does not change existing offsetting eligibility criteria or the permitted balance sheet presentation for

F-35

TREASURY-2664

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

those instruments that meet the eligibility criteria. The new guidance is effective for us on January 1, 2013, and the new disclosures will be applied retrospectively. We do not expect that the adoption of these amendments will have a material impact on our consolidated financial statements.

***Adoption of the Accounting Guidance on the Transfers of Financial Assets and Consolidation of Variable Interest Entities***

Effective January 1, 2010, we prospectively adopted the revised accounting guidance related to transfers of financial assets and the consolidation of VIEs for all VIEs existing as of January 1, 2010. The revisions to the accounting guidance for these topics removed the scope exception for QSPEs and replaced the previous accounting model with a qualitative model focused on power and exposure when determining the primary beneficiary of a VIE. For substantially all of our single-class securitization trusts, our role as guarantor and master servicer provides us with the power to direct matters (primarily the servicing of the mortgage loans) that impact the credit risk to which we are exposed; therefore we consolidated these trusts upon adoption of the revised accounting guidance. In contrast, we do not consolidate single-class securitization trusts when other organizations have the power to direct these activities.

The mortgage loans and debt reported in our consolidated balance sheets increased significantly at the transition date because we recognized the underlying assets and liabilities of the newly consolidated trusts. We recorded the trusts' mortgage loans and the debt held by third parties at their unpaid principal balance at the transition date. Prospectively, we recognized the interest income on the trusts' mortgage loans and interest expense on the trusts' debt, resulting in an increase in the interest income and interest expense reported in our consolidated statements of operations and comprehensive loss compared to prior periods. Another significant impact was the elimination of our guaranty accounting for the newly consolidated trusts. We derecognized the previously recorded guaranty-related assets and liabilities associated with the newly consolidated trusts from our consolidated balance sheets. We also eliminated our reserve for guaranty losses and recognized an allowance for loan losses for such trusts.

In our consolidated statements of operations and comprehensive loss, we no longer recognize guaranty fee income for the newly consolidated trusts, as the revenue is now recorded as a component of loan interest income. When we recognized the newly consolidated trusts' assets and liabilities at the transition date, we also derecognized our investments in these trusts, resulting in a decrease in our investments in MBS that are classified as trading and AFS securities. Instead of being recorded as an asset, our investments in Fannie Mae MBS reduce the debt reported in our consolidated balance sheets. Accordingly, the purchase and subsequent sale of MBS issued by consolidated trusts are accounted for in our consolidated financial statements as the extinguishment and issuance of the debt of consolidated trusts, respectively. Furthermore, under the revised accounting guidance on transfers of financial assets, a transfer of mortgage loans from our portfolio to a trust will generally not qualify for sale treatment. The accounting guidance does not change the economic risk to our business, specifically our exposure to liquidity, credit, and interest rate risks. We continue to securitize mortgage loans originated by lenders in the primary mortgage market into Fannie Mae MBS.

**Summary of Transition Adjustments**

The cumulative impact of our adoption of the revised accounting guidance was a decrease to our total deficit of $3.3 billion at the transition date. This amount includes:

- A net decrease in our accumulated deficit of $6.7 billion, primarily driven by the reversal of the guaranty assets and guaranty obligations related to the newly consolidated trusts; and

- A net increase in our accumulated other comprehensive loss of $3.4 billion primarily driven by the reversal of net unrealized gains related to our investments in Fannie Mae MBS classified as AFS.

F-36

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

We describe in this section the impact of the implementation of the revised accounting guidance on our consolidated statements of operations and comprehensive loss. The substantial majority of the transition impact related to non-cash activity, which has not been included in our consolidated statement of cash flows.

**Impact on Statements of Operations and Comprehensive loss**

Our adoption of accounting guidance related to transfers of financial assets and consolidation of VIEs affected how certain income and expense items are reported in our consolidated statements of operations and comprehensive loss on an ongoing basis. We explain the key impacts below.

*Interest Income on Mortgage Loans*

The interest income earned on mortgage loans held by the newly consolidated trusts is recorded in our consolidated statements of operations and comprehensive loss as loan interest income. This interest income was not recorded in our consolidated statements of operations and comprehensive loss prior to the transition date as the trusts were not consolidated.

*Interest Expense on Short-Term and Long-Term Debt*

The interest expense incurred on debt of newly consolidated trusts is recorded in our consolidated statements of operations and comprehensive loss as interest expense on short-term and long-term debt. This interest expense was not recorded in our consolidated statements of operations and comprehensive loss prior to the transition date as the trusts were not consolidated.

*Provision for Loan Losses and Provision for Guaranty Losses*

Since the majority of our MBS trusts were consolidated at the transition date, the provision for loan losses recorded in periods after the transition date reflects the increase in the mortgage loans reported in our consolidated balance sheets. The provision for guaranty losses recorded in periods after the transition date reflects the subsequent decrease in unconsolidated trusts. The portion of the reserve for guaranty losses relating to loans in previously unconsolidated MBS trusts that were consolidated at the transition date was derecognized, and we recognized an allowance for loan losses as the loans are now reflected in our consolidated balance sheets.

*Guaranty Fee Income*

We do not recognize the guaranty fee income earned from consolidated trusts. Guaranty fees from consolidated trusts are reported as a component of interest income on mortgage loans. As our guaranty-related assets and liabilities pertaining to consolidated trusts were also eliminated, we no longer record amortization income or fair value adjustments related to these trusts. The guaranty fee income that continues to be recognized in our consolidated statements of operations and comprehensive loss relates to guarantees to unconsolidated trusts and other credit enhancements that we have provided.

*Debt Extinguishment Gains (Losses)*

Upon purchase of Fannie Mae MBS debt securities issued from a consolidated trust for our mortgage portfolio, we extinguish the related debt issued by the consolidated trust as we now own the debt securities instead of a third party. We record debt extinguishment gains or losses related to debt of consolidated trusts to the extent that the purchase price of the debt security does not equal the carrying value of the related consolidated debt reported in our consolidated balance sheets at the time of purchase.

F-37

TREASURY-2666

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**2.  Consolidations and Transfers of Financial Assets**

We have interests in various entities that are considered to be VIEs. The primary types of entities are securitization trusts guaranteed by us via lender swap and portfolio securitization transactions, mortgage and asset-backed trusts that were not created by us, as well as housing partnerships that are established to finance the acquisition, construction, development or rehabilitation of affordable multifamily and single-family housing. These interests include investments in securities issued by VIEs, such as Fannie Mae MBS created pursuant to our securitization transactions and our guaranty to the entity. We consolidate the substantial majority of our single-class securitization trusts.

*Types of VIEs*

*Securitization Trusts*

Under our lender swap and portfolio securitization transactions, mortgage loans are transferred to a trust specifically for the purpose of issuing a single class of guaranteed securities that are collateralized by the underlying mortgage loans. The trust's permitted activities include receiving the transferred assets, issuing beneficial interests, establishing the guaranty and servicing the underlying mortgage loans. In our capacity as issuer, master servicer, trustee and guarantor, we earn fees for our obligations to each trust. Additionally, we may retain or purchase a portion of the securities issued by each trust. We have securitized mortgage loans since 1981.

In our structured securitization transactions, we earn fees for assisting lenders and dealers with the design and issuance of structured mortgage-related securities. The trusts created in these transactions have permitted activities that are similar to those for our lender swap and portfolio securitization transactions. The assets of these trusts may include mortgage-related securities and/or mortgage loans. The trusts created for Fannie Mae Mega securities issue single-class securities while the trusts created for REMIC, grantor trust and stripped mortgage-backed securities ("SMBS") issue single-class and multi-class securities, the latter of which separate the cash flows from underlying assets into separately tradable interests. Our obligations and continued involvement in these trusts are similar to those described for lender swap and portfolio securitization transactions. We have securitized mortgage assets in structured transactions since 1986.

We also invest in mortgage-backed and asset-backed securities that have been issued via private-label trusts. These trusts are structured to provide investors with a beneficial interest in a pool of receivables or other financial assets, typically mortgage loans, credit card receivables, auto loans or student loans. The trusts act as vehicles to allow loan originators to securitize assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. The originators of the financial assets or the underwriters of the transaction create the trusts and typically own the residual interest in the trusts' assets. Our involvement in these entities is typically limited to our recorded investment in the beneficial interests that we have purchased. We have invested in these vehicles since 1987.

*Limited Partnerships*

We have historically made equity investments in various limited partnerships that sponsor affordable housing projects utilizing the low-income housing tax credit pursuant to Section 42 of the Internal Revenue Code. The purpose of these investments is to increase the supply of affordable housing in the United States and to serve communities in need. In addition, our investments in LIHTC partnerships generate both tax credits and net operating losses that may reduce our federal income tax liability. Our LIHTC investments primarily represent limited partnership interests in entities that have been organized by a fund manager who acts as the general partner. These fund investments seek out equity investments in LIHTC operating partnerships that have been established to identify, develop and operate multifamily housing that is leased to qualifying residential tenants.

F-38

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

During 2009, we explored options to sell or otherwise transfer our LIHTC investments for value consistent with our mission. FHFA informed us that, after consultation with Treasury, generally we are not authorized to sell or transfer our LIHTC partnership interests. Some exceptions to this rule exist in very limited circumstances and, in most cases, only with FHFA consent. The carrying value of our LIHTC partnership investments was reduced to zero in the consolidated financial statements as of December 31, 2009, as we no longer had both the intent and ability to sell or otherwise transfer our LIHTC investments for value.

We recognized $61 million, $145 million and $5.9 billion for the years ended December 31, 2011, 2010 and 2009, respectively, of other-than-temporary impairment losses related to our limited partnerships in "Other expenses" in our consolidated statements of operations and comprehensive loss. We no longer recognize net operating losses or impairment on our LIHTC investments, since the carrying value was reduced to zero.

As of December 31, 2011, we have an obligation to fund $193 million in capital contributions related to our LIHTC investments. This obligation has been recorded as a component of "Other liabilities" in our consolidated balance sheets. As a result of our current tax position, we did not make any LIHTC investments in 2011 other than pursuant to existing prior commitments. We are not currently recognizing the tax benefits associated with the tax credits and net operating losses in our consolidated financial statements.

### Consolidated VIEs

If an entity is a VIE, we consider whether our variable interest in that entity causes us to be the primary beneficiary. The primary beneficiary of the VIE is required to consolidate and account for the assets, liabilities and noncontrolling interests of the VIE in its consolidated financial statements. An enterprise is deemed to be the primary beneficiary when the enterprise has the power to direct the activities of the VIE that most significantly impact the entity's economic performance and exposure to benefits and/or losses could potentially be significant to the entity. In general, the investors in the obligations of consolidated VIEs have recourse only to the assets of those VIEs and do not have recourse to us, except where we provide a guaranty to the VIE.

As of December 31, 2011, we consolidated certain VIEs that were not consolidated as of December 31, 2010, generally due to increases in the amount of the certificates issued by the entity that are held in our portfolio (for example, when we hold a substantial portion of the securities issued by Fannie Mae multi-class resecuritization trusts). As a result of consolidating these entities, which had combined total assets of $4.1 billion in unpaid principal balance as of December 31, 2011, we derecognized our investment in these entities and recognized the assets and liabilities of the consolidated entities at fair value.

As of December 31, 2011, we also deconsolidated certain VIEs that were consolidated as of December 31, 2010, generally due to decreases in the amount of the certificates issued by the entity that are held in our portfolio. As a result of deconsolidating these entities, which had combined total assets of $477 million in unpaid principal balance as of December 31, 2010, we derecognized the assets and liabilities of the entities and recognized at fair value our retained interests as securities in our consolidated balance sheets.

### Unconsolidated VIEs

We also have interests in VIEs that we do not consolidate because we are not deemed to be the primary beneficiary. These unconsolidated VIEs include securitization trusts, as well as other investment entities. The following table displays the carrying amount and classification of our assets and liabilities that relate to our involvement with unconsolidated VIEs as of December 31, 2011 and 2010, as well as our maximum exposure to loss and the total assets of those unconsolidated VIEs.

F-39

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | As of December 31, 2011 | | |
|---|---|---|---|
| | Mortgage-Backed Trusts | Asset-Backed Trusts | Limited Partnership Investments |
| | (Dollars in millions) | | |
| **Assets and liabilities recorded in our consolidated balance sheets:** | | | |
| Assets: | | | |
| Available-for-sale securities[1] | $ 69,101 | $ — | $ — |
| Trading securities[1] | 24,292 | 2,111 | — |
| Other assets | 271 | — | 145 |
| Other liabilities | (1,347) | — | (153) |
| **Net carrying amount** | $ 92,317 | $ 2,111 | $ (8) |
| **Maximum exposure to loss**[1] | $100,146 | $ 2,111 | $ 137 |
| **Total assets of unconsolidated VIEs**[1] | $641,346 | $256,845 | $12,256 |

| | As of December 31, 2010[2] | | |
|---|---|---|---|
| | Mortgage-Backed Trusts | Asset-Backed Trusts | Limited Partnership Investments |
| | (Dollars in millions) | | |
| **Assets and liabilities recorded in our consolidated balance sheets:** | | | |
| Assets: | | | |
| Available-for-sale securities[1] | $ 84,770 | $ — | $ — |
| Trading securities[1] | 24,021 | 5,321 | — |
| Other assets | 257 | — | 94 |
| Other liabilities | (773) | — | (170) |
| **Net carrying amount** | $108,275 | $ 5,321 | $ (76) |
| **Maximum exposure to loss**[1] | $111,004 | $ 5,321 | $ 319 |
| **Total assets of unconsolidated VIEs**[1] | $740,387 | $363,721 | $13,102 |

---

[1] Contains securities recognized in our consolidated balance sheets due to consolidation of certain multiclass resecuritization trusts.

[2] Certain prior period amounts have been reclassified to conform to the current period presentation.

Our maximum exposure to loss generally represents the greater of our recorded investment in the entity or the unpaid principal balance of the assets covered by our guaranty. However, our securities issued by Fannie Mae multi-class resecuritization trusts that are not consolidated do not give rise to any additional exposure to loss as we already consolidate the underlying collateral.

**Transfers of Financial Assets**

We issue Fannie Mae MBS through portfolio securitization transactions by transferring pools of mortgage loans or mortgage-related securities to one or more trusts or special purpose entities. We are considered to be the transferor when we transfer assets from our own portfolio in a portfolio securitization transaction. For the years ended December 31, 2011, 2010, and 2009 the unpaid principal balance of portfolio securitizations was $118.5 billion, $120.0 billion and $216.1 billion, respectively.

F-40

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table displays some key characteristics of the securities retained in unconsolidated portfolio securitization trusts.

| | Fannie Mae Single-class MBS & Fannie Mae Megas | REMICS & SMBS |
|---|---|---|
| | (Dollars in millions) | |
| **As of December 31, 2011** | | |
| Unpaid principal balance | $ 588 | $ 12,697 |
| Fair value | 654 | 14,043 |
| Weighted-average coupon | 6.21% | 5.86% |
| Weighted-average loan age | 5.4 years | 4.5 years |
| Weighted-average maturity | 23.5 years | 18.6 years |
| **As of December 31, 2010** | | |
| Unpaid principal balance | $ 63 | $ 15,771 |
| Fair value | 68 | 16,745 |
| Weighted-average coupon | 6.58% | 6.28% |
| Weighted-average loan age | 4.2 years | 4.4 years |
| Weighted-average maturity | 25.6 years | 22.0 years |

For the years ended December 31, 2011, 2010, and 2009, the principal and interest received on retained interests was $3.0 billion, $3.5 billion and $9.7 billion, respectively.

*Managed Loans*

We define "managed loans" as on-balance sheet mortgage loans as well as mortgage loans that we have securitized in unconsolidated portfolio securitization trusts. The following table displays the unpaid principal balances of managed loans, including those managed loans that are delinquent as of December 31, 2011 and 2010.

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2011 | | 2010 | |
| | Unpaid Principal Balance | Principal Amount of Delinquent Loans[1] | Unpaid Principal Balance | Principal Amount of Delinquent Loans[1] |
| | (Dollars in millions) | | | |
| Loans held for investment | | | | |
| Of Fannie Mae | $ 396,276 | $122,392 | $ 423,686 | $141,342 |
| Of consolidated trusts | 2,570,339 | 24,893 | 2,565,347 | 34,080 |
| Loans held for sale | 312 | 57 | 964 | 127 |
| Securitized loans | 2,273 | 71 | 2,147 | 78 |
| Total loans managed | $2,969,200 | $147,413 | $2,992,144 | $175,627 |

---

[1] Represents the unpaid principal balance of loans held for investment, loans held for sale and securitized loans for which we are no longer accruing interest and loans 90 days or more delinquent which are continuing to accrue interest.

F-41

TREASURY-2670

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Qualifying Sales of Portfolio Securitizations*

The gain or loss on a portfolio securitization transaction that qualifies as a sale depends, in part, on the carrying amount of the financial assets sold. Prior to January 1, 2010, we allocated the carrying amount of the financial assets sold between the assets sold and the interests retained, if any, based on their relative fair value at the date of sale. Further, we recognized our recourse obligations at their full value at the date of sale, which reduced sale proceeds in the gain or loss calculation.

Subsequent to January 1, 2010, the majority of our portfolio securitization transactions do not qualify for sale treatment. We report the assets and liabilities of consolidated trusts created via portfolio securitization transactions that do not qualify as sales in our consolidated balance sheets.

We recognize assets obtained and liabilities incurred in a portfolio securitization that qualifies for sale treatment at fair value. We recorded a net gain on securitizations from portfolio of $146 million, $26 million and $1.0 billion for the years ended December 31, 2011, 2010, and 2009, respectively. We recognize these amounts as a component of "Investment gains, net" in our consolidated statements of operations and comprehensive loss. Proceeds from the initial sale of securities from portfolio securitizations were $1.0 billion, $660 million, and $85.7 billion for the years ended December 31, 2011, 2010, and 2009, respectively. Our continuing involvement in the form of guaranty assets and guaranty liabilities with assets that were transferred into unconsolidated trusts is not material to our consolidated financial statements.

## 3. Mortgage Loans

We own both single-family mortgage loans, which are secured by four or fewer residential dwelling units, and multifamily mortgage loans, which are secured by five or more residential dwelling units. We classify these loans as either HFI or HFS. We report HFI loans at the unpaid principal balance, net of unamortized premiums and discounts, other cost basis adjustments, and an allowance for loan losses. We report HFS loans at the lower of cost or fair value determined on a pooled basis, and record valuation changes in our consolidated statements of operations and comprehensive loss.

The following table displays our mortgage loans as of December 31, 2011 and 2010.

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2011** | | | **2010** | | |
| | **Of Fannie Mae** | **Of Consolidated Trusts** | **Total** | **Of Fannie Mae** | **Of Consolidated Trusts** | **Total** |
| | (Dollars in millions) | | | | | |
| Single-family | $319,496 | $2,470,533 | $2,790,029 | $328,824 | $2,490,623 | $2,819,447 |
| Multifamily | 77,026 | 99,872 | 176,898 | 95,157 | 75,393 | 170,550 |
| Total unpaid principal balance of mortgage loans | 396,522 | 2,570,405 | 2,966,927 | 423,981 | 2,566,016 | 2,989,997 |
| Cost basis and fair value adjustments, net | (16,143) | 19,993 | 3,850 | (16,498) | 11,777 | (4,721) |
| Allowance for loan losses for loans held for investment | (57,309) | (14,847) | (72,156) | (48,530) | (13,026) | (61,556) |
| Total mortgage loans | $323,070 | $2,575,551 | $2,898,621 | $358,953 | $2,564,767 | $2,923,720 |

For the year ended December 31, 2011, we redesignated loans with a carrying value of $561 million from HFI to HFS. For the year ended December 31, 2010, we did not redesignate loans between HFI and HFS other than at the transition date. For the year ended December 31, 2009, we redesignated loans with a carrying value of $1.2 billion from HFS to HFI and loans with a carrying value of $8.5 billion from HFI to HFS.

F-42

TREASURY-2671

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following tables display an aging analysis of the total recorded investment in our HFI mortgage loans, excluding loans for which we have elected the fair value option, by portfolio segment and class as of December 31, 2011 and 2010.

| | As of December 31, 2011[1] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 30 - 59 Days Delinquent | 60 - 89 Days Delinquent | Seriously Delinquent[2] | Total Delinquent | Current | Total | Recorded Investment in Loans Over 90 Days Delinquent and Accruing Interest | Recorded Investment in Nonaccrual Loans |
| | (Dollars in millions) | | | | | | | |
| Single-family: | | | | | | | | |
| Primary[3] | $43,516 | $15,282 | $ 80,712 | $139,510 | $2,341,646 | $2,481,156 | $111 | $ 95,959 |
| Government[4] | 109 | 49 | 327 | 485 | 51,391 | 51,876 | 327 | — |
| Alt-A | 7,155 | 3,054 | 28,323 | 38,532 | 138,880 | 177,412 | 14 | 31,356 |
| Other[5] | 3,403 | 1,431 | 11,277 | 16,111 | 73,115 | 89,226 | 96 | 12,533 |
| Total single-family | 54,183 | 19,816 | 120,639 | 194,638 | 2,605,032 | 2,799,670 | 548 | 139,848 |
| Multifamily[6] | 210 | NA | 1,105 | 1,315 | 177,906 | 179,221 | — | 2,764 |
| Total | $54,393 | $19,816 | $121,744 | $195,953 | $2,782,938 | $2,978,891 | $548 | $142,612 |

| | As of December 31, 2010[1] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 30 - 59 Days Delinquent | 60 - 89 Days Delinquent | Seriously Delinquent[2] | Total Delinquent | Current | Total | Recorded Investment in Loans Over 90 Days Delinquent and Accruing Interest | Recorded Investment in Nonaccrual Loans |
| | (Dollars in millions) | | | | | | | |
| Single-family: | | | | | | | | |
| Primary[3] | $47,048 | $18,055 | $ 93,302 | $158,405 | $2,299,080 | $2,457,485 | $139 | $110,758 |
| Government[4] | 125 | 58 | 371 | 554 | 51,930 | 52,484 | 354 | — |
| Alt-A | 8,547 | 4,097 | 37,557 | 50,201 | 156,951 | 207,152 | 21 | 41,566 |
| Other[5] | 3,785 | 1,831 | 15,290 | 20,906 | 84,473 | 105,379 | 80 | 17,022 |
| Total single-family | 59,505 | 24,041 | 146,520 | 230,066 | 2,592,434 | 2,822,500 | 594 | 169,346 |
| Multifamily[6] | 382 | NA | 1,132 | 1,514 | 171,000 | 172,514 | — | 1,012 |
| Total | $59,887 | $24,041 | $147,652 | $231,580 | $2,763,434 | $2,995,014 | $594 | $170,358 |

---

[1] Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable.

[2] Single-family seriously delinquent loans are loans that are 90 days or more past due or in the foreclosure process. Multifamily seriously delinquent loans are loans that are 60 days or more past due.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A. Primarily consists of reverse mortgages which due to their nature are not aged and are included in the current column.

F-43

TREASURY-2672

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

[5] Includes loans with higher-risk loan characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[6] Multifamily loans 60-89 days delinquent are included in the seriously delinquent column.

The following table displays the total recorded investment in our single-family HFI loans, excluding loans for which we have elected the fair value option, by class and credit quality indicator as of December 31, 2011 and 2010. The single-family credit quality indicator is updated quarterly.

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2011[1][2] | | | 2010[1][2] | | |
| | Primary[3] | Alt-A | Other[4] | Primary[3] | Alt-A | Other[4] |
| | (Dollars in millions) | | | | | |
| Estimated mark-to-market LTV ratio:[5] | | | | | | |
| Less than or equal to 80% . . . . . . . . . . . . . . . . . | $1,464,348 | $ 61,618 | $23,414 | $1,561,202 | $ 79,305 | $ 29,854 |
| Greater than 80% and less than 90% . . . . . . . . | 412,342 | 21,369 | 9,224 | 376,414 | 27,472 | 13,394 |
| Greater than 90% and less than 100% . . . . . . . . | 246,648 | 19,790 | 9,445 | 217,193 | 24,392 | 12,935 |
| Greater than 100% and less than 110% . . . . . . . | 128,428 | 16,164 | 8,951 | 112,376 | 18,022 | 11,400 |
| Greater than 110% and less than 120% . . . . . . . | 73,836 | 12,534 | 7,912 | 62,283 | 12,718 | 8,967 |
| Greater than 120% and less than 125% . . . . . . . | 25,750 | 5,087 | 3,557 | 21,729 | 5,083 | 3,733 |
| Greater than 125% . . . . . . . . . . . . . . . . . . . . . . | 129,804 | 40,850 | 26,723 | 106,288 | 40,160 | 25,096 |
| Total . . . . . . . . . . . . . . . . . . . . . . | $2,481,156 | $177,412 | $89,226 | $2,457,485 | $207,152 | $105,379 |

[1] Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable.

[2] Excludes $51.9 billion and $52.5 billion as of December 31, 2011 and 2010, respectively, of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A loans. The segment class is primarily reverse mortgages for which we do not calculate an estimated mark-to-market LTV.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Includes loans with higher-risk loan characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[5] The aggregate estimated mark-to-market LTV ratio is based on the unpaid principal balance of the loan as of the end of each reported period divided by the estimated current value of the property, which we calculate using an internal valuation model that estimates periodic changes in home value.

The following table displays the total recorded investment in our multifamily HFI loans, excluding loans for which we have elected the fair value option, by credit quality indicator as of December 31, 2011 and 2010. The multifamily credit quality indicator is updated quarterly.

| | As of December 31, | |
|---|---|---|
| | 2011[1] | 2010[1] |
| | (Dollars in millions) | |
| Credit risk profile by internally assigned grade:[2] | | |
| Green . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $131,740 | $117,388 |
| Yellow[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28,354 | 34,651 |
| Orange . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17,355 | 18,075 |
| Red . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,772 | 2,400 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $179,221 | $172,514 |

F-44

TREASURY-2673

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

---

(1) Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable.

(2) Green (loan with acceptable risk); Yellow (loan with signs of potential weakness); Orange (loan with a well defined weakness that may jeopardize the timely full repayment); and Red (loan with a weakness that makes timely collection or liquidation in full more questionable based on existing conditions and values).

(3) Includes approximately $6.9 billion and $9.7 billion of unpaid principal balance as of December 31, 2011 and 2010, respectively, classified due to no financial information.

### Individually Impaired Loans

Individually impaired loans include TDRs, acquired credit-impaired loans, and other multifamily loans regardless of whether we are currently accruing interest. The following tables display the total recorded investment, unpaid principal balance, and related allowance as of December 31, 2011 and 2010 and interest income recognized and average recorded investment for the years ended December 31, 2011 and 2010 for individually impaired loans.

| | As of December 31, 2011 | | | | For the Year Ended December 31, 2011 | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Unpaid Principal Balance | Total Recorded Investment[1] | Related Allowance for Loan Losses | Related Allowance for Accrued Interest Receivable | Average Recorded Investment | Total Interest Income Recognized[2] | Interest Income Recognized on a Cash Basis |
| | (Dollars in millions) | | | | | | |
| Individually impaired loans: | | | | | | | |
| With related allowance recorded: | | | | | | | |
| Single-family: | | | | | | | |
| Primary[3] . . . . . . . . . . . . . . . . | $116,825 | $109,684 | $29,598 | $ 674 | $100,797 | $3,735 | $ 733 |
| Government[4] . . . . . . . . . . . . . . | 258 | 258 | 67 | 8 | 229 | 12 | — |
| Alt-A . . . . . . . . . . . . . . . . . . . . . | 34,318 | 31,516 | 11,121 | 268 | 29,561 | 982 | 186 |
| Other[5] . . . . . . . . . . . . . . . . . . . . | 16,181 | 15,363 | 5,353 | 99 | 14,431 | 435 | 90 |
| Total single-family . . . . . . . . | 167,582 | 156,821 | 46,139 | 1,049 | 145,018 | 5,164 | 1,009 |
| Multifamily . . . . . . . . . . . . . . . . | 2,832 | 2,855 | 718 | 32 | 2,430 | 103 | 5 |
| Total individually impaired loans with related allowance recorded . . . . . . . . . . . . . . . . . . | 170,414 | 159,676 | 46,857 | 1,081 | 147,448 | 5,267 | 1,014 |
| With no related allowance recorded: [6] | | | | | | | |
| Single-family: | | | | | | | |
| Primary[3] . . . . . . . . . . . . . . . . . | 9,370 | 6,471 | — | — | 6,884 | 606 | 204 |
| Government[4] . . . . . . . . . . . . . . | 25 | 17 | — | — | 12 | 7 | — |
| Alt-A . . . . . . . . . . . . . . . . . . . . . | 3,056 | 1,538 | — | — | 1,771 | 205 | 63 |
| Other[5] . . . . . . . . . . . . . . . . . . . . | 680 | 367 | — | — | 467 | 57 | 19 |
| Total single-family . . . . . . . . | 13,131 | 8,393 | — | — | 9,134 | 875 | 286 |
| Multifamily . . . . . . . . . . . . . . . . | 1,759 | 1,771 | — | — | 993 | 48 | 8 |
| Total individually impaired loans with no related allowance recorded . . . . . . . . . . . . . . . . . . | 14,890 | 10,164 | — | — | 10,127 | 923 | 294 |
| Total individually impaired loans[7] . . . | $185,304 | $169,840 | $46,857 | $1,081 | $157,575 | $6,190 | $1,308 |

TREASURY-2674

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | As of December 31, 2010 | | | | For the Year Ended December 31, 2010 | | |
|---|---|---|---|---|---|---|---|
| | Unpaid Principal Balance | Total Recorded Investment[1] | Related Allowance for Loan Losses | Related Allowance for Accrued Interest Receivable | Average Recorded Investment | Total Interest Income Recognized[2] | Interest Income Recognized on a Cash Basis |
| | | | | (Dollars in millions) | | | |
| **Individually impaired loans:** | | | | | | | |
| With related allowance recorded: | | | | | | | |
| Single-family: | | | | | | | |
| Primary[3] . . . . . . . . . . . . . . | $ 99,838 | $ 93,024 | $23,565 | $ 772 | $ 81,258 | $3,314 | $1,470 |
| Government[4] . . . . . . . . . . | 240 | 248 | 38 | 7 | 141 | 9 | — |
| Alt-A . . . . . . . . . . . . . . . . . . | 30,932 | 28,253 | 9,592 | 368 | 25,361 | 897 | 407 |
| Other[5] . . . . . . . . . . . . . . . . | 14,429 | 13,689 | 4,479 | 137 | 12,094 | 384 | 204 |
| Total single-family . . . . . . | 145,439 | 135,214 | 37,674 | 1,284 | 118,854 | 4,604 | 2,081 |
| Multifamily . . . . . . . . . . . . . | 2,372 | 2,371 | 556 | 23 | 1,496 | 202 | 10 |
| Total individually impaired loans with related allowance recorded . . . . . . . . . . . . . | 147,811 | 137,585 | 38,230 | 1,307 | 120,350 | 4,806 | 2,091 |
| With no related allowance recorded:[6] | | | | | | | |
| Single-family: | | | | | | | |
| Primary[3] . . . . . . . . . . . . . . | 10,586 | 7,237 | — | — | 7,860 | 336 | 55 |
| Government[4] . . . . . . . . . . | 19 | 13 | — | — | 11 | 8 | — |
| Alt-A . . . . . . . . . . . . . . . . . . | 3,600 | 1,884 | — | — | 2,091 | 121 | 20 |
| Other[5] . . . . . . . . . . . . . . . . | 879 | 512 | — | — | 589 | 36 | 7 |
| Total single-family . . . . . . | 15,084 | 9,646 | — | — | 10,551 | 501 | 82 |
| Multifamily . . . . . . . . . . . . . | 789 | 811 | — | — | 642 | 71 | 5 |
| Total individually impaired loans with no related allowance recorded . . . . . . . . | 15,873 | 10,457 | — | — | 11,193 | 572 | 87 |
| Total individually impaired loans[7] . . . . . . . . . . . . . . . . . . | $163,684 | $148,042 | $38,230 | $1,307 | $131,543 | $5,378 | $2,178 |

---

[1] Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable.

[2] Total single-family interest income recognized of $6.0 billion for the year ended December 31, 2011 consists of $4.5 billion of contractual interest and $1.6 billion of effective yield adjustments. Total single-family interest income recognized of $5.1 billion for the year ended December 31, 2010 consists of $3.9 billion of contractual interest and $1.3 billion of effective yield adjustments.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A.

[5] Includes loans with higher-risk characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[6] The discounted cash flows or collateral value equals or exceeds the carrying value of the loan and, as such, no valuation allowance is required.

F-46

TREASURY-2675

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

[7]   Includes single-family loans restructured in a TDR with a recorded investment of $161.9 billion and $140.1 billion as of December 31, 2011 and 2010, respectively. Includes multifamily loans restructured in a TDR with a recorded investment of $956 million and $939 million as of December 31, 2011 and 2010, respectively.

The average recorded investment in impaired loans was $13.3 billion for the year ended December 31, 2009. Interest income recognized on impaired loans was $532 million for the year ended December 31, 2009.

*Troubled Debt Restructurings*

A modification to the contractual terms of a loan that results in granting a concession to a borrower experiencing financial difficulties is considered a TDR. In addition to formal loan modifications, we also engage in other loss mitigation activities with troubled borrowers, which include repayment plans and forbearance arrangements, both of which represent informal agreements with the borrower that do not result in the legal modification of the loan's contractual terms. As described in our "Summary of Significant Accounting Policies," we account for these informal restructurings as a TDR if we defer more than three missed payments. The substantial majority of the loan modifications we complete result in term extensions, interest rate reductions or a combination of both. During the year ended December 31, 2011, the average term extension of a modified loan was 90 months and the average interest rate reduction was 2.95 percentage points.

As a result of adopting the new TDR accounting guidance, we reassessed all modifications, forbearance arrangements, and repayment plans that occurred on or after January 1, 2011 through June 30, 2011 that were not previously considered TDRs and for which the allowance for loan losses was measured on a collective basis ("the transition population"). As of September 30, 2011, the recorded investment related to restructurings in the transition population that were not previously considered TDRs was $2.3 billion and the individually impaired allowance for loan losses on this population was $605 million.

The following table displays the number of loans and recorded investment in loans restructured in a TDR for the year ended December 31, 2011.

|  | For the Year Ended December 31, 2011 | |
| --- | --- | --- |
|  | Number of Loans | Recorded Investment[1] |
|  | (Dollars in millions) | |
| Single-family |  |  |
| Primary[2] | 160,227 | $28,329 |
| Government[3] | 497 | 86 |
| Alt-A | 33,416 | 7,108 |
| Other[4] | 14,724 | 3,644 |
| Total single-family | 208,864 | 39,167 |
| Multifamily | 47 | 223 |
| Total troubled debt restructurings | 208,911 | $39,390 |

[1]   Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable. Based on the nature of our modification programs, which do not include principal or interest forgiveness, there is not a material difference between the recorded investment in our loans pre- and post- modification, therefore amounts represent recorded investment post-modification.

[2]   Consists of mortgage loans that are not included in other loan classes.

F-47

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

(3)  Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A.

(4)  Includes loans with higher-risk characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

The following table displays the number of loans and recorded investment in loans restructured in a TDR that had a payment default for the year ended December 31, 2011 and were modified in a TDR in the twelve months prior to the payment default. For purposes of this disclosure, we define loans that had a payment default as single-family and multifamily loans with completed TDRs that liquidated during the period, either through foreclosure, deed-in-lieu of foreclosure or a short sale, single-family loans with completed modifications that are two or more months delinquent during the period or multifamily loans with completed modifications that are one or more months delinquent during the period.

| | For the Year Ended December 31, 2011 | |
| --- | --- | --- |
| | Number of Loans | Recorded Investment[1] |
| | (Dollars in millions) | |
| Single-family | | |
| Primary[2] | 66,088 | $11,585 |
| Government[3] | 376 | 95 |
| Alt-A | 14,223 | 3,045 |
| Other[4] | 6,843 | 1,670 |
| Total single-family | 87,530 | 16,395 |
| Multifamily | 8 | 49 |
| Total TDRs that subsequently defaulted | 87,538 | $16,444 |

(1)  Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable. Represents our recorded investment in the loan at time of payment default.

(2)  Consists of mortgage loans that are not included in other loan classes.

(3)  Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A.

(4)  Includes loans with higher-risk characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

TREASURY-2677

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Loans Acquired in a Transfer*

We acquired delinquent loans from unconsolidated trusts and long-term standby commitments with an unpaid principal balance plus accrued interest of $192 million, $279 million and $36.4 billion for the years ended December 31, 2011, 2010, and 2009, respectively. The following table displays the outstanding unpaid principal balance and accrued interest receivable, carrying amount by accrual status of acquired credit-impaired loans as of December 31, 2011 and 2010, excluding loans that were modified as TDRs subsequent to their acquisition from MBS trusts.

|  | As of December 31, | |
|---|---|---|
|  | **2011** | **2010** |
|  | **(Dollars in millions)** | |
| Outstanding contractual balance | $5,029 | $8,519 |
| Carrying amount:[1] | | |
| Loans on accrual status | $1,660 | $2,029 |
| Loans on nonaccrual status | 1,225 | 2,449 |
| Total carrying amount of loans | $2,885 | $4,478 |

[1] Carrying amount consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, impairment and accrued interest receivable.

The following table displays details on acquired credit-impaired loans at their acquisition dates for the years ended December 31, 2011, 2010 and 2009.

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | **2011** | **2010** | **2009** |
|  | **(Dollars in millions)** | | |
| Contractually required principal and interest payments at acquisition[1] | $272 | $321 | $39,197 |
| Nonaccretable difference | 157 | 154 | 9,234 |
| Cash flows expected to be collected at acquisition[1] | 115 | 167 | 29,963 |
| Accretable yield | 42 | 76 | 13,852 |
| Initial investment in acquired credit-impaired loans at acquisition | $ 73 | $ 91 | $16,111 |

[1] Contractually required principal and interest payments at acquisition and cash flows expected to be collected at acquisition are adjusted for the estimated timing and amount of prepayments.

F-49

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following table displays activity for the accretable yield of all outstanding acquired credit-impaired loans for the years ended December 31, 2011, 2010 and 2009. Accreted effective interest is shown for only those loans that we were still accounting for as acquired credit-impaired loans for the respective periods.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | (Dollars in millions) | | |
| Beginning balance, January 1 | $2,412 | $10,117 | $ 1,559 |
| Additions | 42 | 76 | 13,852 |
| Accretion | (269) | (314) | (215) |
| Reductions[1] | (833) | (6,067) | (13,693) |
| Changes in estimated cash flows[2] | 165 | (1,163) | 8,729 |
| Reclassifications to nonaccretable difference[3] | (51) | (237) | (115) |
| Ending balance, December 31 | $1,466 | $ 2,412 | $ 10,117 |

[1] Reductions are the result of liquidations and loan modifications due to TDRs.

[2] Represents changes in expected cash flows due to changes in prepayment and other assumptions.

[3] Represents changes in expected cash flows due to changes in credit quality or credit assumptions.

The following table displays interest income recognized and the impact to the "Provision for loan losses" related to loans that are still being accounted for as acquired credit-impaired loans, as well as loans that have been subsequently modified as a TDR, for the years ended December 31, 2011, 2010 and 2009.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | (Dollars in millions) | | |
| Accretion of fair value discount[1] | $1,031 | $1,024 | $405 |
| Interest income on loans returned to accrual status or subsequently modified as TDRs | 1,026 | 1,148 | 214 |
| Total interest income recognized on acquired credit-impaired loans | $2,057 | $2,172 | $619 |
| Increase in "Provision for loan losses" subsequent to the acquisition of credit-impaired loans | $ 710 | $ 963 | $691 |

[1] Represents accretion of the fair value discount that was recorded on acquired credit-impaired loans.

## 4. Allowance for Loan Losses and Reserve for Guaranty Losses

We maintain an allowance for loan losses for loans held for investment in our mortgage portfolio and loans backing Fannie Mae MBS issued from consolidated trusts and a reserve for guaranty losses related to loans backing Fannie Mae MBS issued from unconsolidated trusts and loans that we have guaranteed under long-term standby commitments. We refer to our allowance for loan losses and reserve for guaranty losses collectively as our combined loss reserves. When calculating our reserve for guaranty losses, we consider all contractually past due interest income including payments expected to be missed between the balance sheet date and the point of loan acquisition or foreclosure. When calculating our loan loss allowance, we consider only our net recorded investment in the loan at the balance sheet date, which includes interest income only while the loan was on accrual status.

F-50

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Determining the adequacy of our allowance for loan losses and reserve for guaranty losses is complex and requires judgment about the effect of matters that are inherently uncertain.

Upon recognition of the mortgage loans held by newly consolidated trusts and the associated accrued interest receivable at the transition date of our adoption of the consolidation accounting guidance on January 1, 2010, we increased our "Allowance for loan losses" by $43.6 billion, increased our "Allowance for accrued interest receivable" by $7.0 billion and decreased our "Reserve for guaranty losses" by $54.1 billion. The net decrease of $3.5 billion reflects the difference in the methodology used to estimate incurred losses for our allowance for loan losses and accrued interest receivable versus our reserve for guaranty losses.

F-51

TREASURY-2680

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Allowance for Loan Losses*

The following table displays changes in both single-family and multifamily allowance for loan losses for the years ended December 31, 2011 and 2010 and the total allowance for loan losses for the years ended December 31, 2011, 2010, and 2009.

| | For the Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2011** | | | **2010** | | | **2009** |
| | **Of Fannie Mae** | **Of Consolidated Trusts** | **Total** | **Of Fannie Mae** | **Of Consolidated Trusts** | **Total** | |
| | (Dollars in millions) | | | | | | |
| Single-family allowance for loan losses: | | | | | | | |
| Beginning balance, January 1 | $ 47,377 | $12,603 | $ 59,980 | $ 6,721 | $ 1,749 | $ 8,470 | |
| Adoption of consolidation accounting guidance | — | — | — | — | 43,170 | 43,170 | |
| Provision for loan losses | 13,940 | 11,683 | 25,623 | 12,923 | 11,592 | 24,515 | |
| Charge-offs[1][2] | (19,026) | (1,772) | (20,798) | (15,438) | (7,026) | (22,464) | |
| Recoveries | 3,636 | 1,636 | 5,272 | 1,913 | 1,164 | 3,077 | |
| Transfers[3] | 9,901 | (9,901) | — | 44,599 | (44,599) | — | |
| Other[4] | 466 | 90 | 556 | (3,341) | 6,553 | 3,212 | |
| Ending balance, December 31 | $ 56,294 | $14,339 | $ 70,633 | $ 47,377 | $ 12,603 | $ 59,980 | |
| Multifamily allowance for loan losses: | | | | | | | |
| Beginning balance, January 1 | $ 1,153 | $ 423 | $ 1,576 | $ 1,357 | $ 98 | $ 1,455 | |
| Adoption of consolidation accounting guidance | — | — | — | — | 406 | 406 | |
| Provision for loan losses | 140 | 151 | 291 | 144 | 43 | 187 | |
| Charge-offs[2] | (372) | — | (372) | (414) | — | (414) | |
| Transfers[3] | 79 | (79) | — | 115 | (115) | — | |
| Other[4] | 15 | 13 | 28 | (49) | (9) | (58) | |
| Ending balance, December 31 | $ 1,015 | $ 508 | $ 1,523 | $ 1,153 | $ 423 | $ 1,576 | |
| Total allowance for loan losses: | | | | | | | |
| Beginning balance, January 1 | $ 48,530 | $13,026 | $ 61,556 | $ 8,078 | $ 1,847 | $ 9,925 | $ 2,772 |
| Adoption of consolidation accounting guidance | — | — | — | — | 43,576 | 43,576 | |
| Provision for loan losses | 14,080 | 11,834 | 25,914 | 13,067 | 11,635 | 24,702 | 9,569 |
| Charge-offs[1][2] | (19,398) | (1,772) | (21,170) | (15,852) | (7,026) | (22,878) | (2,245) |
| Recoveries | 3,636 | 1,636 | 5,272 | 1,913 | 1,164 | 3,077 | 214 |
| Transfers[3] | 9,980 | (9,980) | — | 44,714 | (44,714) | — | — |
| Other[4] | 481 | 103 | 584 | (3,390) | 6,544 | 3,154 | (385) |
| Ending balance, December 31[5][6] | $ 57,309 | $14,847 | $ 72,156 | $ 48,530 | $ 13,026 | $ 61,556 | $ 9,925 |

[1] While we purchase the substantial majority of loans that are four or more months delinquent from our MBS trusts, we do not exercise this option to purchase loans during a forbearance period. Accordingly, charge-offs of consolidated trusts generally represent loans that remained in our consolidated trusts at the time of default.

F-52

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

(2) Total charge-offs include accrued interest of $1.4 billion, $2.4 billion and $1.5 billion for the years ended December 31, 2011, 2010 and 2009, respectively. Single-family charge-offs include accrued interest of $1.4 billion and $2.3 billion for the years ended December 31, 2011 and 2010, respectively. Multifamily charge-offs include accrued interest of $46 million and $64 million for the years ended December 31, 2011 and 2010, respectively.

(3) Includes transfers from trusts for delinquent loan purchases.

(4) Amounts represent the net activity recorded in our allowances for accrued interest receivable and preforeclosure property taxes and insurance receivable from borrowers. The provision for credit losses, charge-offs, recoveries and transfer activity included in this table reflects all changes for both the allowance for loan losses and the valuation allowances for accrued interest and preforeclosure property taxes and insurance receivable that relate to the mortgage loans.

(5) Total allowance for loan losses includes $375 million, $385 million, and $726 million as of December 31, 2011, 2010, and 2009, respectively, for acquired credit-impaired loans.

(6) Total single-family allowance for loan losses was $8.5 billion as of December 31, 2009. Total multifamily allowance for loan losses was $1.4 billion as of December 31, 2009.

As of December 31, 2011, the allowance for accrued interest receivable for loans of Fannie Mae was $2.2 billion and for loans of consolidated trusts was $336 million. As of December 31, 2010, the allowance for accrued interest receivable for loans of Fannie Mae was $3.0 billion and for loans of consolidated trusts was $439 million.

The following table displays the allowance for loan losses and total recorded investment in our HFI loans, excluding loans for which we have elected the fair value option, by impairment or reserve methodology and portfolio segment as of December 31, 2011 and 2010.

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2011** | | | **2010** | | |
| | **Single-Family** | **Multifamily** | **Total** | **Single-Family** | **Multifamily** | **Total** |
| | (Dollars in millions) | | | | | |
| Allowance for loan losses by segment: | | | | | | |
| Individually impaired loans ............ | $ 45,765 | $ 717 | $ 46,482 | $ 37,296 | $ 549 | $ 37,845 |
| Collectively reserved loans ............. | 24,494 | 805 | 25,299 | 22,306 | 1,020 | 23,326 |
| Acquired credit-impaired loans ......... | 374 | 1 | 375 | 378 | 7 | 385 |
| Total allowance for loan losses ........ | $ 70,633 | $ 1,523 | $ 72,156 | $ 59,980 | $ 1,576 | $ 61,556 |
| Recorded investment in loans by segment:(1) | | | | | | |
| Individually impaired loans ............ | $ 161,942 | $ 4,579 | $ 166,521 | $ 140,062 | $ 3,074 | $ 143,136 |
| Collectively reserved loans ............. | 2,634,456 | 174,595 | 2,809,051 | 2,677,640 | 169,332 | 2,846,972 |
| Acquired credit-impaired loans ......... | 3,272 | 47 | 3,319 | 4,798 | 108 | 4,906 |
| Total recorded investment in loans ..... | $2,799,670 | $179,221 | $2,978,891 | $2,822,500 | $172,514 | $2,995,014 |

(1) Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable.

On December 31, 2010, we entered into an agreement with Bank of America, N.A., and its affiliates, BAC Home Loans Servicing, LP, and Countrywide Home Loans, Inc., to address outstanding repurchase requests for residential mortgage loans with an unpaid principal balance of $3.9 billion delivered to us by affiliates of Countrywide Financial Corporation. Bank of America agreed, among other things, to a resolution amount of $1.5 billion, consisting of a cash payment of $1.3 billion and other payments recently made or to be made by them. We recognized $930 million as a recovery of charge-offs resulting in a reduction to "Provision for loan losses"

F-53

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

and "Allowance for loan losses," $266 million as a reduction to "Foreclosed property expense" and $142 million as receipt of amounts receivable due to the rescission of mortgage insurance coverage included in "Other Assets."

The agreement substantially resolved or addressed then outstanding repurchase requests on loans sold to us by Countrywide and permits us to bring claims for any additional breaches of our representations and warranties that are identified with respect to some of those loans. We continue to work with Bank of America to resolve repurchase requests that remain outstanding, including requests relating to loans delivered to us by Bank of America, N.A. For additional information regarding outstanding repurchase requests, refer to "Note 17, Concentrations of Credit Risk."

The year ended December 31, 2010 includes an out-of-period adjustment of $1.1 billion to our consolidated statement of operations and comprehensive loss reflecting our assessment of the collectibility of receivables from our borrowers. We identified that for a portion of our delinquent loans we had not estimated and recorded our obligation to reimburse servicers for advances they made on our behalf for preforeclosure property taxes and insurance. We also did not record a receivable from borrowers for these payments or assess the collectibility of that receivable.

*Reserve for Guaranty Losses*

The following table displays changes in the reserve for guaranty losses for the years ended December 31, 2011, 2010, and 2009.

|  | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2011 | 2010 | 2009 |
|  | (Dollars in millions) | | |
| Reserve for guaranty losses: | | | |
| Beginning balance, January 1 | $ 323 | $ 54,430 | $ 21,830 |
| Adoption of consolidation accounting guidance | — | (54,103) | — |
| Provision for guaranty losses | 804 | 194 | 63,057 |
| Charge-offs[1][2] | (138) | (203) | (31,142) |
| Recoveries | 5 | 5 | 685 |
| Ending balance, December 31 | $ 994 | $ 323 | $ 54,430 |

[1] Includes charges of $228 million for the year ended December 31, 2009 related to unsecured HomeSaver Advance loans. There were no charges related to unsecured HomeSaver Advance loans for the years ended December 31, 2011 and 2010, respectively.

[2] Includes charges recorded at the date of acquisition of $116 million, $180 million and $20.3 billion for the years ended December 31, 2011, 2010 and 2009, respectively, for acquired credit-impaired loans where the acquisition cost exceeded the fair value of the acquired loan.

TREASURY-2683

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

5.  Investments in Securities

*Trading Securities*

Trading securities are recorded at fair value with subsequent changes in fair value recorded as "Fair value losses, net" in our consolidated statements of operations and comprehensive loss. The following table displays our investments in trading securities and the cumulative amount of net losses recognized from holding these securities as of December 31, 2011 and 2010.

| | As of December 31, | |
| --- | ---: | ---: |
| | 2011 | 2010 |
| | (Dollars in millions) | |
| Mortgage-related securities: | | |
| Fannie Mae ................................................... | $ 7,424 | $ 7,398 |
| Freddie Mac .................................................. | 2,732 | 1,326 |
| Ginnie Mae ................................................... | 287 | 590 |
| Alt-A private-label securities ................................. | 1,349 | 1,683 |
| Subprime private-label securities ............................. | 1,280 | 1,581 |
| CMBS ........................................................ | 10,411 | 10,764 |
| Mortgage revenue bonds ...................................... | 724 | 609 |
| Other mortgage-related securities ............................. | 143 | 152 |
| Total ...................................................... | 24,350 | 24,103 |
| Non-mortgage-related securities: | | |
| U.S. Treasury securities ...................................... | 47,737 | 27,432 |
| Asset-backed securities ....................................... | 2,111 | 5,321 |
| Total ...................................................... | 49,848 | 32,753 |
| Total trading securities ........................................ | $74,198 | $56,856 |
| Losses in trading securities held in our portfolio, net ............ | $ 1,787 | $ 2,149 |

The following table displays information about our net trading gains and losses for the years ended December 31, 2011, 2010, and 2009.

| | For the Year Ended December 31, | | |
| --- | ---: | ---: | ---: |
| | 2011 | 2010 | 2009 |
| | (Dollars in millions) | | |
| Net trading gains (losses): | | | |
| Mortgage-related securities .................................. | $274 | $2,607 | $2,457 |
| Non-mortgage-related securities .............................. | (8) | 85 | 1,287 |
| Total ...................................................... | $266 | $2,692 | $3,744 |
| Net trading gains (losses) recorded in the period related to securities still held at period end: | | | |
| Mortgage-related securities .................................. | $268 | $2,485 | $1,974 |
| Non-mortgage-related securities .............................. | (1) | 56 | 1,146 |
| Total ...................................................... | $267 | $2,541 | $3,120 |

F-55

TREASURY-2684

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Available-for-Sale Securities*

We measure AFS securities at fair value with unrealized gains and losses recorded as a component of "Other comprehensive (loss) income," net of tax, and we record realized gains and losses from the sale of AFS securities in "Investment gains, net" in our consolidated statements of operations and comprehensive loss.

The following table displays the gross realized gains, losses and proceeds on sales of AFS securities for the years ended December 31, 2011, 2010, and 2009.

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
|  | (Dollars in millions) | | |
| Gross realized gains . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 182 | $ 566 | $ 4,521 |
| Gross realized losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 90 | 293 | 3,080 |
| Total proceeds[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,152 | 7,207 | 226,664 |

[1]   Excludes proceeds from the initial sale of securities from new portfolio securitizations included in "Note 2, Consolidations and Transfers of Financial Assets."

The following tables display the amortized cost, gross unrealized gains and losses and fair value by major security type for AFS securities we held as of December 31, 2011 and 2010.

|  | As of December 31, 2011 | | | | |
|---|---|---|---|---|---|
|  | Total Amortized Cost[1] | Gross Unrealized Gains | Gross Unrealized Losses - OTTI[2] | Gross Unrealized Losses - Other[3] | Total Fair Value |
|  | (Dollars in millions) | | | | |
| Fannie Mae  . . . . . . . . . . . . . . . . . . . . . . | $15,486 | $1,381 | $    (3) | $    (14) | $16,850 |
| Freddie Mac  . . . . . . . . . . . . . . . . . . . . . | 11,906 | 917 | — | — | 12,823 |
| Ginnie Mae  . . . . . . . . . . . . . . . . . . . . . . | 775 | 127 | — | — | 902 |
| Alt-A private-label securities  . . . . . . . . . . . . | 13,314 | 233 | (1,618) | (246) | 11,683 |
| Subprime private-label securities  . . . . . . . . . | 9,556 | 17 | (1,534) | (453) | 7,586 |
| CMBS[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13,949 | 181 | — | (104) | 14,026 |
| Mortgage revenue bonds  . . . . . . . . . . . . . . | 10,172 | 202 | (56) | (64) | 10,254 |
| Other mortgage-related securities  . . . . . . . . . | 3,687 | 92 | (39) | (282) | 3,458 |
| Total  . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $78,845 | $3,150 | $(3,250) | $(1,163) | $77,582 |

TREASURY-2685

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

|  | As of December 31, 2010 | | | | |
|---|---|---|---|---|---|
|  | Total Amortized Cost[1] | Gross Unrealized Gains | Gross Unrealized Losses - OTTI[2] | Gross Unrealized Losses - Other[3] | Total Fair Value |
|  | (Dollars in millions) | | | | |
| Fannie Mae | $21,428 | $1,453 | $    (9) | $   (44) | $22,828 |
| Freddie Mac | 15,986 | 1,010 | — | — | 16,996 |
| Ginnie Mae | 909 | 130 | — | — | 1,039 |
| Alt-A private-label securities | 15,789 | 177 | (1,791) | (285) | 13,890 |
| Subprime private-label securities | 11,323 | 54 | (997) | (448) | 9,932 |
| CMBS[4] | 15,273 | 25 | — | (454) | 14,844 |
| Mortgage revenue bonds | 11,792 | 47 | (64) | (734) | 11,041 |
| Other mortgage-related securities | 4,098 | 106 | (44) | (338) | 3,822 |
| Total | $96,598 | $3,002 | $(2,905) | $(2,303) | $94,392 |

[1] Amortized cost includes unamortized premiums, discounts and other cost basis adjustments as well as the credit component of other-than-temporary impairments ("OTTI") recognized in our consolidated statements of operations and comprehensive loss.

[2] Represents the noncredit component of other-than-temporary impairment losses recorded in "Accumulated other comprehensive loss" as well as cumulative changes in fair value for securities for which we previously recognized the credit component of an other-than-temporary impairment.

[3] Represents the gross unrealized losses on securities for which we have not recognized an other-than-temporary impairment.

[4] Amortized cost includes $686 million and $848 million as of December 31, 2011 and 2010, respectively, of increase to the carrying amount from previous fair value hedge accounting.

The following tables display additional information regarding gross unrealized losses and fair value by major security type for AFS securities in an unrealized loss position that we held as of December 31, 2011 and 2010.

|  | As of December 31, 2011 | | | |
|---|---|---|---|---|
|  | Less Than 12 Consecutive Months | | 12 Consecutive Months or Longer | |
|  | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value |
|  | (Dollars in millions) | | | |
| Fannie Mae | $   (4) | $  519 | $   (13) | $   208 |
| Alt-A private-label securities | (133) | 1,414 | (1,731) | 6,525 |
| Subprime private-label securities | (73) | 471 | (1,914) | 6,686 |
| CMBS | (20) | 1,458 | (84) | 2,790 |
| Mortgage revenue bonds | (4) | 114 | (116) | 1,971 |
| Other mortgage-related securities | (21) | 547 | (300) | 1,588 |
| Total | $(255) | $4,523 | $(4,158) | $19,768 |

F-57

TREASURY-2686

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | As of December 31, 2010 | | | |
| --- | --- | --- | --- | --- |
| | Less Than 12 Consecutive Months | | 12 Consecutive Months or Longer | |
| | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value |
| | (Dollars in millions) | | | |
| Fannie Mae | $ (35) | $ 1,461 | $ (18) | $ 211 |
| Alt-A private-label securities | (104) | 1,915 | (1,972) | 9,388 |
| Subprime private-label securities | (47) | 627 | (1,398) | 8,493 |
| CMBS | (15) | 1,774 | (439) | 10,396 |
| Mortgage revenue bonds | (206) | 5,009 | (592) | 3,129 |
| Other mortgage-related securities | (2) | 262 | (380) | 2,014 |
| Total | $(409) | $11,048 | $(4,799) | $33,631 |

*Other-Than-Temporary Impairments*

We recognize the credit component of other-than-temporary impairments of our debt securities in "Net other-than-temporary impairments" and the noncredit component in "Other comprehensive (loss) income" in our consolidated statements of operations and comprehensive loss for those securities that we do not intend to sell and for which it is not more likely than not that we will be required to sell before recovery.

The fair value of our securities varies from period to period due to changes in interest rates, in the performance of the underlying collateral and in the credit performance of the underlying issuer, among other factors. $4.2 billion of the $4.4 billion of gross unrealized losses on AFS securities as of December 31, 2011 have existed for a period of 12 consecutive months or longer. Gross unrealized losses on AFS securities as of December 31, 2011 include unrealized losses on securities with other-than-temporary impairment in which a portion of the impairment remains in "Accumulated other comprehensive loss." The securities with unrealized losses for 12 consecutive months or longer, on average, had a fair value as of December 31, 2011 that was 83% of their amortized cost basis. Based on our review for impairments of AFS securities, which includes an evaluation of the collectibility of cash flows and any intent or requirement to sell the securities, we have concluded that we do not have an intent to sell and we believe it is not more likely than not that we will be required to sell the securities. Additionally, our projections of cash flows indicate that we will recover these unrealized losses over the lives of the securities.

In the three months ended December 31, 2011, we identified an error in the rate used to calculate interest income and other-than-temporary impairments on AFS securities, which resulted in an overstatement of income and amortized cost. We have evaluated the effects of this misstatement, both quantitatively and qualitatively, and concluded that the misstatement is not material to our 2011 loss or to any prior consolidated financial statements.

To correct the above misstatement, we recorded an out-of-period adjustment of $506 million comprised of $727 million to reduce "Interest Income: Available-for-sale securities" offset by a $221 million reduction to "Other-than-temporary impairments" in our consolidated statement of operations and comprehensive loss for the year ended December 31, 2011.

TREASURY-2687

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table displays our net other-than-temporary impairments by major security type recognized in our consolidated statements of operations and comprehensive loss for the years ended December 31, 2011, 2010, and 2009.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010**[1] | **2009**[1] |
| | (Dollars in millions) | | |
| Alt-A private-label securities | $ 563 | $327 | $3,956 |
| Subprime private-label securities | (303) | 368 | 5,660 |
| Other | 48 | 27 | 245 |
| Net other-than-temporary impairments | $ 308 | $722 | $9,861 |

_____

[1]   Certain prior period amounts have been reclassified to conform to the current period presentation.

For the year ended December 31, 2011, we recorded net other-than-temporary impairment of $308 million. The net other-than-temporary impairment charges recorded in the year ended December 31, 2011 were primarily driven by an increase in collateral losses on certain Alt-A private-label securities, which resulted in a decrease in the present value of our cash flow projections on these Alt-A private-label securities, offset by the out-of-period adjustment of $221 million as discussed above.

The following table displays activity related to the unrealized credit component on debt securities held by us and recognized in our consolidated statements of operations and comprehensive loss for the years ended December 31, 2011 and 2010. A related unrealized non-credit component has been recognized in "Other comprehensive (loss) income."

| | For the Year Ended December 31, | |
|---|---|---|
| | **2011** | **2010** |
| | (Dollars in millions) | |
| Balance, January 1 | $8,215 | $8,191 |
| Additions for the credit component on debt securities for which OTTI was not previously recognized | 23 | 29 |
| Additions for credit losses on debt securities for which OTTI was previously recognized | 285 | 693 |
| Reductions for securities no longer in portfolio at period end | (7) | (154) |
| Additions (reductions) for amortization resulting from changes in cash flows expected to be collected over the remaining life of the securities[1] | 399 | (544) |
| Balance, December 31 | $8,915 | $8,215 |

_____

[1]   Amount includes out-of-period adjustment of $727 million in 2011 due to an overstatement of income and amortized cost.

As of December 31, 2011, those debt securities with other-than-temporary impairment for which we recognized in our consolidated statements of operations and comprehensive loss only the amount of loss related to credit consisted predominantly of Alt-A and subprime securities. We evaluate Alt-A (including option adjustable rate mortgage ("ARM")) and subprime private-label securities for other-than-temporary impairment by discounting the projected cash flows from econometric models to estimate the portion of loss in value attributable to credit. Separate components of a third-party model project regional home prices, unemployment and interest rates. The

F-59

TREASURY-2688

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

model combines these factors with available current information regarding attributes of loans in pools backing the private-label mortgage-related securities to project prepayment speeds, conditional default rates, loss severities and delinquency rates. It incorporates detailed information on security-level subordination levels and cash flow priority of payments to project security level cash flows. We have recorded other-than-temporary impairments for the year ended December 31, 2011 based on this analysis, with amounts related to credit loss recognized in our consolidated statements of operations and comprehensive loss. For securities we determined were not other-than-temporarily impaired, we concluded that either the bond had no projected credit loss or if we projected a loss, that the present value of expected cash flows was greater than the security's cost basis.

The following table displays the modeled attributes, including default rates and severities, which are used to determine whether our senior interests in certain non-agency mortgage-related securities will experience a cash shortfall. Assumption of voluntary prepayment rates is also an input to the present value of expected losses.

| | | As of December 31, 2011 | | | |
|---|---|---|---|---|---|
| | | | Alt-A | | |
| | Subprime | Option ARM | Fixed Rate | Variable Rate | Hybrid Rate |
| | | (Dollars in millions) | | | |
| **Vintage Year** | | | | | |
| **2004 & Prior:** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . . . . . | $ 1,642 | $ 479 | $3,369 | $ 487 | $2,242 |
| Weighted average collateral default[1] . . . . . . . . . . | 38.8% | 37.8% | 11.1% | 32.1% | 16.6% |
| Weighted average collateral severities[2] . . . . . . . . . | 61.1 | 54.0 | 49.4 | 43.6 | 40.5 |
| Weighted average voluntary prepayment rates[3] . . . | 6.2 | 11.0 | 12.6 | 9.2 | 12.7 |
| Average credit enhancement[4] . . . . . . . . . . . . . . . . | 51.3 | 15.5 | 12.1 | 22.5 | 10.4 |
| **2005** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . . . . . | $ 170 | $1,297 | $1,171 | $ 525 | $2,325 |
| Weighted average collateral default[1] . . . . . . . . . . | 71.7% | 56.1% | 40.1% | 53.7% | 38.8% |
| Weighted average collateral severities[2] . . . . . . . . . | 72.9 | 61.6 | 64.4 | 59.5 | 48.8 |
| Weighted average voluntary prepayment rates[3] . . . | 2.2 | 6.3 | 8.9 | 7.3 | 9.1 |
| Average credit enhancement[4] . . . . . . . . . . . . . . . . | 65.8 | 23.4 | 1.3 | 16.9 | 5.1 |
| **2006** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . . . . . | $11,532 | $1,192 | $ 518 | $1,576 | $1,662 |
| Weighted average collateral default[1] . . . . . . . . . . | 76.9% | 68.9% | 40.9% | 59.0% | 32.5% |
| Weighted average collateral severities[2] . . . . . . . . . | 73.4 | 64.1 | 65.8 | 59.1 | 51.4 |
| Weighted average voluntary prepayment rates[3] . . . | 2.1 | 3.7 | 8.0 | 6.3 | 9.8 |
| Average credit enhancement[4] . . . . . . . . . . . . . . . . | 17.3 | 17.3 | 1.6 | 1.5 | 0.3 |
| **2007 & After:** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . . . . . | $ 602 | $ — | $ — | $ — | $ 117 |
| Weighted average collateral default[1] . . . . . . . . . . | 77.9% | N/A | N/A | N/A | 40.7% |
| Weighted average collateral severities[2] . . . . . . . . . | 68.0 | N/A | N/A | N/A | 59.6 |
| Weighted average voluntary prepayment rates[3] . . . | 1.7 | N/A | N/A | N/A | 9.0 |
| Average credit enhancement[4] . . . . . . . . . . . . . . . . | 33.3 | N/A | N/A | N/A | 25.9 |
| **Total** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . . . . . | $13,946 | $2,968 | $5,058 | $2,588 | $6,346 |
| Weighted average collateral default[1] . . . . . . . . . . | 72.4% | 58.3% | 20.9% | 52.8% | 29.3% |
| Weighted average collateral severities[2] . . . . . . . . . | 71.8 | 61.4 | 54.6 | 56.3 | 46.7 |
| Weighted average voluntary prepayment rates[3] . . . | 2.6 | 6.0 | 11.3 | 7.0 | 10.5 |
| Average credit enhancement[4] . . . . . . . . . . . . . . . . | 22.6 | 19.7 | 8.5 | 8.6 | 6.1 |

TREASURY-2689

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

_____

[1]  The expected remaining cumulative default rate of the collateral pool backing the securities, as a percentage of the current collateral unpaid principal balance, weighted by security unpaid principal balance.

[2]  The expected remaining loss given default of the collateral pool backing the securities, calculated as the ratio of remaining cumulative loss divided by cumulative defaults, weighted by security unpaid principal balance.

[3]  The average monthly voluntary prepayment rate, weighted by security unpaid principal balance.

[4]  The average percent current credit enhancement provided by subordination of other securities. Excludes excess interest projections and monoline bond insurance.

For mortgage revenue bonds, where we cannot utilize credit-sensitized cash flows, we perform a qualitative and quantitative analysis to assess whether a bond is other-than-temporarily impaired. If a bond is deemed to be other-than-temporarily impaired, the projected contractual cash flows of the security are reduced by a default loss amount based on the security's lowest credit rating as provided by the major nationally recognized statistical rating organizations. The lower the security's credit rating, the larger the amount by which the contractual cash flows are reduced. These adjusted cash flows are then used in the present value calculation to determine the credit portion of the other-than-temporary impairment. While we have recognized other-than-temporary impairment on these bonds, we expect to realize no credit losses on the vast majority of our holdings due to the inherent financial strength of the issuers, or in some cases, the amount of external credit support from mortgage collateral or financial guarantees. The fair values of these bonds are impacted by the low levels of market liquidity and greater expected yield, which has led to unrealized losses in the portfolio that we deem to be temporary.

Other mortgage-related securities include manufactured housing securities, some of which have been other-than-temporarily impaired in 2011. For manufactured housing securities, we utilize models that incorporate recent historical performance information and other relevant public data to run cash flows and assess for other-than-temporary impairment. Given the significant seasoning of these securities we expect that the future performance will be in line with how the securities are currently performing. We model securities assuming the benefit of those external financial guarantees that are deemed creditworthy. If we determined that securities were not other-than-temporarily impaired, we concluded that either the bond had no projected credit loss or, if a loss was projected, that present value of expected cash flows was greater than the security's cost basis.

We analyzed commercial mortgage-backed securities ("CMBS") using a CMBS loss forecast model that incorporates a loan level loss forecast. This forecast takes into account loan performance, loan status, loan attributes, structures, metropolitan area, property type and macroeconomic expectations. Given the current high level of credit enhancement and collateral loss expectations, no single bond is expected to experience a principal write-down or interest shortfall. Our CMBS loss forecast expectations may change as macroeconomic conditions and the commercial real estate market evolve. As of December 31, 2011, we had no other-than-temporary impairments in our holdings of CMBS as we projected the remaining subordination to be more than sufficient to absorb the level of projected losses. While downgrades have occurred in this sector, all of our holdings remained investment grade as of December 31, 2011.

TREASURY-2690

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Maturity Information*

The following table displays the amortized cost and fair value of our AFS securities by major security type and remaining maturity, assuming no principal prepayments, as of December 31, 2011. Contractual maturity of mortgage-backed securities is not a reliable indicator of their expected life because borrowers generally have the right to prepay their obligations at any time.

| | | | One Year or Less | | After One Year Through Five Years | | After Five Years Through Ten Years | | After Ten Years | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total Amortized Cost | Total Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
| | (Dollars in millions) | | | | | | | | | |
| Fannie Mae . . . . . . . . . . . | $15,486 | $16,850 | $ — | $ — | $ 22 | $ 23 | $1,810 | $1,924 | $13,654 | $14,903 |
| Freddie Mac . . . . . . . . . . . | 11,906 | 12,823 | 1 | 1 | 43 | 45 | 1,222 | 1,316 | 10,640 | 11,461 |
| Ginnie Mae . . . . . . . . . . . | 775 | 902 | — | — | 1 | 1 | 5 | 5 | 769 | 896 |
| Alt-A private-label securities . . . . . . . . . . . . | 13,314 | 11,683 | — | — | 1 | 1 | 235 | 239 | 13,078 | 11,443 |
| Subprime private-label securities . . . . . . . . . | 9,556 | 7,586 | — | — | — | — | — | — | 9,556 | 7,586 |
| CMBS . . . . . . . . . . . . . . . | 13,949 | 14,026 | 62 | 64 | 8,469 | 8,581 | 5,116 | 5,099 | 302 | 282 |
| Mortgage revenue bonds . . | 10,172 | 10,254 | 63 | 64 | 351 | 361 | 751 | 766 | 9,007 | 9,063 |
| Other mortgage-related securities . . . . . . . . . . . | 3,687 | 3,458 | — | — | — | — | — | 13 | 3,687 | 3,445 |
| Total . . . . . . . . . . . . . . . | $78,845 | $77,582 | $ 126 | $129 | $8,887 | $9,012 | $9,139 | $9,362 | $60,693 | $59,079 |
| Weighted average yield[1] . . . . . . . . . . . . . | 4.67% | | 5.39% | | 4.18% | | 4.64% | | 4.75% | |

[1] Yields are determined by dividing interest income (including the amortization and accretion of premiums, discounts and other cost basis adjustments) by amortized cost balances as of year-end. Yields on tax exempt obligations have been computed on a tax equivalent basis. Interest income excludes out-of-period adjustment of $727 million.

*Accumulated Other Comprehensive Loss*

The following table displays our accumulated other comprehensive loss by major categories as of December 31, 2011, 2010 and 2009.

| | As of December 31, | | |
|---|---|---|---|
| | 2011 | 2010[1] | 2009 |
| | (Dollars in millions) | | |
| Net unrealized gains on available-for-sale securities for which we have not recorded other-than-temporary impairment, net of tax . . . . . . . . . . . . . . . . . . . | $ 1,152 | $ 304 | $ 1,337 |
| Net unrealized losses on available-for-sale securities for which we have recorded other-than-temporary impairment, net of tax . . . . . . . . . . . . . . . . . . . | (1,953) | (1,736) | (3,059) |
| Other losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (434) | (250) | (10) |
| Accumulated other comprehensive loss . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(1,235) | $(1,682) | $(1,732) |

[1] Includes a net increase of $3.4 billion from the adoption of the new accounting guidance.

F-62

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**6.   Financial Guarantees**

We generate revenue by absorbing the credit risk of mortgage loans in unconsolidated trusts in exchange for a guaranty fee. We also provide credit enhancements on taxable or tax-exempt mortgage revenue bonds issued by state and local governmental entities to finance multifamily housing for low- and moderate-income families. Additionally, we issue long-term standby commitments that generally require us to purchase loans from lenders if the loans meet certain delinquency criteria.

For our guarantees to unconsolidated trusts and other guaranty arrangements, we recognize a guaranty obligation for our obligation to stand ready to perform on these guarantees. These guarantees expose us to credit losses on the mortgage loans or, in the case of mortgage-related securities, the underlying mortgage loan of the related securities. The contractual terms of our guarantees range from 30 days to 40 years. However, the actual term of each guaranty may be significantly less than the contractual term based on the prepayment characteristics of the related mortgage loans. For those guarantees recognized in our consolidated balance sheets, our maximum potential exposure under these guarantees is primarily comprised of the unpaid principal balance of the underlying mortgage loans, which totaled $59.4 billion and $52.4 billion as of December 31, 2011 and 2010, respectively. The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees recognized in our consolidated balance sheets was $14.1 billion and $12.6 billion as of December 31, 2011 and 2010, respectively. In addition, we had exposure of $9.3 billion and $10.3 billion for other guarantees not recognized in our consolidated balance sheets as of December 31, 2011 and 2010, respectively. The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees not recognized in our consolidated balance sheets was $4.0 billion and $3.9 billion as of December 31, 2011 and 2010, respectively. Recoverability of such credit enhancements and recourse is subject to, among other factors, our mortgage insurers' and financial guarantors' ability to meet their obligations to us.

*Risk Characteristics of our Book of Business*

We gauge our performance risk under our guaranty based on the delinquency status of the mortgage loans we hold in portfolio, or in the case of mortgage-backed securities, the mortgage loans underlying the related securities.

For single family loans, management monitors the serious delinquency rate, which is the percentage of single-family loans three or more months past due or in the foreclosure process, and loans that have higher risk characteristics, such as high mark-to-market loan-to-value ratios.

For multifamily loans, management monitors the serious delinquency rate, which is the percentage of loans 60 days or more past due, of loans that have higher risk characteristics, to determine the overall credit quality indicator, including original debt service coverage ratios ("DSCR") on loans below 1.10 as well as current DSCR on loans below 1.0 and high original and current estimated loan to value ratios. We stratify multifamily loans into different internal risk categories based on the credit risk inherent in each individual loan.

For single and multifamily loans, we use this information, in conjunction with housing market and economic conditions, to structure our pricing and our eligibility and underwriting criteria to reflect the current risk of loans with these higher-risk characteristics, and in some cases we decide to significantly reduce our participation in riskier loan product categories. Management also uses this data together with other credit risk measures to identify key trends that guide the development of our loss mitigation strategies.

F-63

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following tables display the current delinquency status and certain higher risk characteristics of our single-family conventional and total multifamily guaranty book of business as of December 31, 2011 and 2010.

| | As of December 31, 2011[1] | | | As of December 31, 2010[1] | | |
|---|---|---|---|---|---|---|
| | 30 Days Delinquent | 60 Days Delinquent | Seriously Delinquent[2] | 30 Days Delinquent | 60 Days Delinquent | Seriously Delinquent[2] |
| Percentage of single-family conventional guaranty book of business[3] . . . . . . . . . . | 1.98% | 0.73% | 4.47% | 2.19% | 0.89% | 5.37% |
| Percentage of single-family conventional loans[4] . . . . . . . . . . . . . . . . . . . . . . . . . | 2.17 | 0.74 | 3.91 | 2.32 | 0.87 | 4.48 |

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2011[1] | | 2010[1] | |
| | Percentage of Single-Family Conventional Guaranty Book of Business[3] | Percentage Seriously Delinquent[2][4] | Percentage of Single-Family Conventional Guaranty Book of Business[3] | Percentage Seriously Delinquent[2][4] |
| **Estimated mark-to-market loan-to-value ratio:** | | | | |
| Less than 100% . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 82% | 2.24% | 84% | 2.62% |
| 100.01% to 110% . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | 8.73 | 5 | 11.60 |
| 110.01% to 120% . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 11.37 | 3 | 14.74 |
| 120.01% to 125% . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 13.25 | 1 | 16.86 |
| Greater than 125% . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | 19.08 | 7 | 24.71 |
| **Geographical distribution:** | | | | |
| Arizona . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 3.65 | 2 | 6.23 |
| California . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 | 2.46 | 18 | 3.89 |
| Florida . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | 11.80 | 7 | 12.31 |
| Nevada . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 7.42 | 1 | 10.66 |
| Select Midwest states[5] . . . . . . . . . . . . . . . . . . . . . . | 10 | 4.39 | 11 | 4.80 |
| All other states . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 62 | 3.18 | 61 | 3.46 |
| **Product distribution (not mutually exclusive):[6]** | | | | |
| Alt-A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | 12.43 | 8 | 13.87 |
| Subprime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | * | 23.18 | * | 28.20 |
| Negatively amortizing adjustable rate . . . . . . . . . . . . . . | * | 7.57 | * | 9.02 |
| Interest only . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 15.27 | 6 | 17.85 |
| Investor property . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | 4.20 | 6 | 4.79 |
| Condo/Coop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | 4.59 | 9 | 5.37 |
| Original loan-to-value ratio >90%[7] . . . . . . . . . . . . . . | 10 | 8.08 | 10 | 10.04 |
| FICO credit score <620[7] . . . . . . . . . . . . . . . . . . . . . . | 3 | 13.47 | 4 | 14.63 |
| Original loan-to-value ratio >90% and FICO credit score <620[7] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 18.67 | 1 | 21.41 |
| **Vintages:** | | | | |
| 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | 7.27 | 9 | 7.20 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | 11.81 | 8 | 12.19 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 | 12.62 | 12 | 13.24 |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | 5.64 | 9 | 4.88 |
| All other vintages . . . . . . . . . . . . . . . . . . . . . . . . . . . | 69 | 1.59 | 62 | 1.73 |

---

* Represents less than 0.5% of the single-family conventional guaranty book of business.

[1] Consists of the portion of our single-family conventional guaranty book of business for which we have detailed loan level information, which constituted approximately 99% of our total single-family conventional guaranty book of business as of December 31, 2011 and 2010.

F-64

TREASURY-2693

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

(2) Consists of single-family conventional loans that were three months or more past due or in the foreclosure process, as of the periods indicated.

(3) Calculated based on the aggregate unpaid principal balance of single-family conventional loans for each category divided by the aggregate unpaid principal balance of loans in our single-family conventional guaranty book of business.

(4) Calculated based on the number of single-family conventional loans that were delinquent divided by the total number of loans in our single-family conventional guaranty book of business.

(5) Consists of Illinois, Indiana, Michigan, and Ohio.

(6) Categories are not mutually exclusive. Loans with multiple product features are included in all applicable categories.

(7) Includes housing goals-oriented products such as MyCommunityMortgage® and Expanded Approval.®

|  | As of December 31, | | | |
|---|---|---|---|---|
|  | **2011**[(1)(2)] | | **2010**[(1)(2)] | |
|  | **30 Days Delinquent** | **Seriously Delinquent**[(3)] | **30 Days Delinquent** | **Seriously Delinquent**[(3)] |
| Percentage of multifamily guaranty book of business | 0.11% | 0.59% | 0.21% | 0.71% |

|  | As of December 31, | | | |
|---|---|---|---|---|
|  | **2011**[(1)(2)] | | **2010**[(1)(2)] | |
|  | **Percentage of Multifamily Guaranty Book of Business** | **Percentage Seriously Delinquent**[(3)] | **Percentage of Multifamily Guaranty Book of Business** | **Percentage Seriously Delinquent**[(3)] |
| **Original loan-to-value ratio:** | | | | |
| Greater than 80% | 5% | 2.51% | 5% | 0.59% |
| Less than or equal to 80% | 95 | 0.49 | 95 | 0.71 |
| **Original debt service coverage ratio:** | | | | |
| Less than or equal to 1.10 | 8 | 0.24 | 9 | 0.27 |
| Greater than 1.10 | 92 | 0.62 | 91 | 0.75 |
| **Current debt service coverage ratio:** | | | | |
| Less than 1.0[(4)] | 7 | 3.66 | 10 | 4.25 |
| **Acquisition loan size distribution:** | | | | |
| Less than or equal to $750,000 | 2 | 1.24 | 2 | 1.61 |
| Greater than $750,000 and less than or equal to $3 million | 11 | 1.04 | 12 | 1.17 |
| Greater than $3 million and less than or equal to $5 million | 9 | 0.66 | 9 | 0.88 |
| Greater than $5 million and less than or equal to $25 million | 42 | 0.64 | 42 | 0.88 |
| Greater than $25 million | 36 | 0.33 | 35 | 0.24 |
| **Maturing dates:** | | | | |
| Maturing in 2012 | 5 | 0.59 | 7 | 0.42 |
| Maturing in 2013 | 9 | 0.43 | 11 | 0.54 |
| Maturing in 2014 | 8 | 0.82 | 8 | 0.67 |
| Maturing in 2015 | 9 | 0.57 | 9 | 0.57 |
| Maturing in 2016 | 9 | 0.78 | | |

(1) Consists of the portion of our multifamily guaranty book of business for which we have detailed loan level information, which constituted approximately 99% of our total multifamily guaranty book of business as of December 31, 2011 and 2010 excluding loans that have been defeased.

(2) Calculated based on the aggregate unpaid principal balance of multifamily loans for each category divided by the aggregate unpaid principal balance of loans in our multifamily guaranty book of business.

(3) Consists of multifamily loans that were 60 days or more past due as of the periods indicated.

F-65

TREASURY-2694

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

(4)   Our estimates of current DSCRs are based on the latest available income information for these properties. Although we use the most recently available results of our multifamily borrowers, there is a lag in reporting, which typically can range from 6 to 18 months as they prepare their results in the normal course of business.

*Guaranty Obligations*

The following table displays changes in our guaranty obligations recognized in "Other liabilities" in our consolidated balance sheets for the years ended December 31, 2011, 2010, and 2009. We derecognized the majority of our guaranty obligations and deferred profit from our consolidated balance sheets on January 1, 2010 upon adoption of the consolidation accounting guidance.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| | (Dollars in millions) | | |
| Beginning balance, January 1 .................................... | $ 769 | $ 13,996 | $12,147 |
| Adoption of consolidation accounting guidance ..................... | — | (13,320) | — |
| Additions to guaranty obligations(1) .............................. | 212 | 225 | 7,577 |
| Amortization of guaranty obligations into guaranty fee income ......... | (170) | (132) | (5,260) |
| Impact of consolidation activity(2) ............................... | — | — | (468) |
| Ending balance, December 31 .................................... | $ 811 | $   769 | $13,996 |

_____

(1)   Represents the fair value of our contractual obligation at issuance of new guarantees.

(2)   Represents the derecognition of guaranty obligations during the period due to consolidations excluding the impact of adopting the consolidation accounting guidance.

Deferred profit is a component of guaranty obligations in "Other liabilities" in our consolidated balance sheets and is included in the table above. Deferred profit had a carrying amount of $31 million and $35 million as of December 31, 2011 and 2010, respectively. We recognized deferred profit amortization of $4 million, $6 million and $830 million for the years ended December 31, 2011, 2010 and 2009, respectively.

*Guaranty Assets*

As guarantor at inception of a guaranty to an unconsolidated entity, we recognize a non-contingent liability for the fair value of our obligation to stand ready to perform over the term of the guaranty in the event that specified triggering events or conditions occur. We also record a guaranty asset that represents the present value of cash flows expected to be received as compensation over the life of the guaranty.

The following table displays changes in guaranty assets recognized in "Other assets" in our consolidated balance sheets for the years ended December 31, 2011, 2010 and 2009.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| | (Dollars in millions) | | |
| Beginning balance, January 1 .................................... | $457 | $ 8,356 | $ 7,043 |
| Adoption of consolidation accounting guidance .................... | — | (8,014) | — |
| Fair value of expected cash flows at issuance for new guaranteed Fannie Mae MBS issuance ................................... | 149 | 182 | 4,135 |
| Net change in fair value of guaranty assets from portfolio securitizations ............................................ | 2 | (1) | 511 |
| Impact of amortization on guaranty contracts ..................... | (72) | (59) | (2,719) |
| Other-than-temporary impairments ............................. | (33) | (7) | (347) |
| Impact of consolidation of MBS trusts(1) ........................ | — | — | (267) |
| Ending balance, December 31 .................................... | $503 | $   457 | $ 8,356 |

F-66

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

---

(1) Represents the derecognition of guaranty assets during the period due to consolidations excluding the impact of adopting the consolidation accounting guidance.

### Fannie Mae MBS Included in Investments in Securities

For Fannie Mae MBS included in "Investments in securities" in our consolidated balance sheets, we do not eliminate or extinguish the guaranty arrangement because it is a contractual arrangement with the unconsolidated MBS trusts. We determine the fair value of Fannie Mae MBS based on observable market prices because most Fannie Mae MBS are actively traded. Fannie Mae MBS receive high credit quality ratings primarily because of our guaranty. Absent our guaranty, Fannie Mae MBS would be subject to the credit risk on the underlying loans. We continue to recognize a guaranty obligation and a reserve for guaranty losses associated with these securities because we carry these securities in our consolidated financial statements as guaranteed Fannie Mae MBS. The fair value of the guaranty obligation, net of deferred profit, associated with Fannie Mae MBS included in "Investments in securities" approximates the fair value of the credit risk that exists on these Fannie Mae MBS absent our guaranty. The fair value of our guaranty obligations associated with the Fannie Mae MBS included in "Investments in securities" was $2.2 billion and $2.0 billion as of December 31, 2011 and 2010, respectively.

### 7. Acquired Property, Net

Acquired property, net consists of held for sale foreclosed property received in full satisfaction of a loan net of a valuation allowance for declines in the fair value of foreclosed properties after initial acquisition. We classify as held for sale those properties that we intend to sell and are actively marketed for sale. The following table displays the activity in acquired property and the related valuation allowance for the years ended December 31, 2011, 2010 and 2009.

| | Acquired Property | Valuation Allowance[1] | Acquired Property, Net |
|---|---:|---:|---:|
| | | (Dollars in millions) | |
| Balance, January 1, 2009 | $ 8,040 | $(1,122) | $ 6,918 |
| Additions | 14,165 | (79) | 14,086 |
| Disposals | (12,489) | 1,379 | (11,110) |
| Write-downs, net of recoveries | — | (752) | (752) |
| Balance, December 31, 2009 | 9,716 | (574) | 9,142 |
| Additions | 25,982 | (783) | 25,199 |
| Disposals | (17,644) | 1,407 | (16,237) |
| Write-downs, net of recoveries | — | (1,931) | (1,931) |
| Balance, December 31, 2010 | 18,054 | (1,881) | 16,173 |
| Additions | 18,599 | (550) | 18,049 |
| Disposals | (24,252) | 2,635 | (21,617) |
| Write-downs, net of recoveries | — | (1,232) | (1,232) |
| Balance, December 31, 2011 | $ 12,401 | $(1,028) | $ 11,373 |

---

(1) Reflects activities in the valuation allowance for acquired properties held primarily by our single-family segment.

TREASURY-2696

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

We classify as held for use those properties that we do not intend to sell or that are not ready for immediate sale in their current condition, which are reflected in "Other assets" in our consolidated balance sheets. The following table displays the activity and carrying amount of acquired properties held for use for the years ended December 31, 2011, 2010 and 2009.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| | (Dollars in millions) | | |
| Beginning balance, January 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 889 | $ 44 | $ 11 |
| Transfers in from held for sale, net and additions . . . . . . . . . . . . . . . . . . . . . . | 1,045 | 977 | 45 |
| Transfers to held for sale, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (547) | (64) | (11) |
| Depreciation, asset write-downs, and other . . . . . . . . . . . . . . . . . . . . . . . . . . | (552) | (68) | (1) |
| Ending balance, December 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 835 | $889 | $ 44 |

**8. Short-Term Borrowings and Long-Term Debt**

*Short-Term Borrowings*

The following table displays our outstanding short-term borrowings (borrowings with an original contractual maturity of one year or less) and weighted-average interest rates of these borrowings as of December 31, 2011 and 2010.

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2011** | | **2010** | |
| | Outstanding | Weighted-Average Interest Rate[1] | Outstanding | Weighted-Average Interest Rate[1] |
| | (Dollars in millions) | | | |
| Federal funds purchased and securities sold under agreements to repurchase[2] . . . . . . . . . . . . . . . . . . . . . . | $ — | —% | $ 52 | 2.20% |
| Fixed-rate short-term debt: | | | | |
| Discount notes[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $146,301 | 0.13% | $151,500 | 0.32% |
| Foreign exchange discount notes[4] . . . . . . . . . . . . . . . . . . | 371 | 1.88 | 384 | 2.43 |
| Other[5] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 80 | 0.04 | — | — |
| Total short-term debt of Fannie Mae . . . . . . . . . . . . . . . | 146,752 | 0.13 | 151,884 | 0.32 |
| Debt of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . | 4,973 | 0.09 | 5,359 | 0.23 |
| Total short-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . | $151,725 | 0.13% | $157,243 | 0.32% |

[1] Includes the effects of discounts, premiums, and other cost basis adjustments.

[2] Represents agreements to repurchase securities from banks with excess reserves on a particular day for a specified price, with repayment generally occurring on the following day.

[3] Represents unsecured general obligations with maturities ranging from overnight to 360 days from the date of issuance.

[4] Represents foreign exchange discount notes we issue in the Euro commercial paper market with maturities ranging from 5 to 360 days which enable investors to hold short-term investments in different currencies. We do not incur foreign exchange risk on these transactions, as we simultaneously enter into foreign currency swaps that have the effect of converting debt that we issue in foreign denominated currencies into U.S. dollars.

[5] Includes foreign exchange discount notes denominated in U.S. dollars.

TREASURY-2697

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Intraday Lines of Credit*

We periodically use secured and unsecured intraday funding lines of credit provided by several large financial institutions. We post collateral which, in some circumstances, the secured party has the right to repledge to third parties. As these lines of credit are uncommitted intraday loan facilities, we may be unable to draw on them if and when needed. We had secured uncommitted lines of credit of $25.0 billion and unsecured uncommitted lines of credit of $500 million as of December 31, 2011 and 2010. We had no borrowings outstanding from these lines of credit as of December 31, 2011.

*Long-Term Debt*

Long-term debt represents borrowings with an original contractual maturity of greater than one year. The following table displays our outstanding long-term debt as of December 31, 2011 and 2010.

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2011** | | | **2010** | | |
| | **Maturities** | **Outstanding** | **Weighted-Average Interest Rate[1]** | **Maturities** | **Outstanding** | **Weighted-Average Interest Rate[1]** |
| | | | **(Dollars in millions)** | | | |
| Senior fixed: | | | | | | |
| Benchmark notes and bonds . . . . . . . . . . | 2012 - 2030 | $ 277,146 | 2.81% | 2011 - 2030 | $ 300,344 | 3.20% |
| Medium-term notes[2] . . . . . . . . . . . . . . . | 2012 - 2021 | 176,886 | 1.61 | 2011 - 2020 | 199,266 | 2.13 |
| Foreign exchange notes and bonds . . . . . | 2021 - 2028 | 662 | 5.44 | 2017 - 2028 | 1,177 | 6.21 |
| Other[3][4] . . . . . . . . . . . . . . . . . . . . . . . . . | 2012 - 2040 | 50,912 | 5.29 | 2011 - 2040 | 44,893 | 5.64 |
| Total senior fixed . . . . . . . . . . . . . . . | | 505,606 | 2.64 | | 545,680 | 3.02 |
| Senior floating: | | | | | | |
| Medium-term notes[2] . . . . . . . . . . . . . . . | 2012 - 2016 | 71,855 | 0.32 | 2011 - 2015 | 72,039 | 0.31 |
| Other[3][4] . . . . . . . . . . . . . . . . . . . . . . . . . | 2020 - 2037 | 420 | 8.01 | 2020 - 2037 | 386 | 4.92 |
| Total senior floating . . . . . . . . . . . . . | | 72,275 | 0.35 | | 72,425 | 0.34 |
| Subordinated fixed: | | | | | | |
| Qualifying subordinated[5] . . . . . . . . . . | 2012 - 2014 | 4,894 | 5.08 | 2011 - 2014 | 7,392 | 5.47 |
| Subordinated debentures . . . . . . . . . . . . | 2019 | 2,917 | 9.91 | 2019 | 2,663 | 9.91 |
| Total subordinated fixed . . . . . . . . . . | | 7,811 | 6.88 | | 10,055 | 6.65 |
| Total long-term debt of Fannie Mae[6] . . . | | 585,692 | 2.42 | | 628,160 | 2.77 |
| Debt of consolidated trusts[4] . . . . . . . . . . . | 2012 -2051 | 2,452,455 | 4.18 | 2011 - 2051 | 2,411,597 | 4.59 |
| Total long-term debt . . . . . . . . . . . . . . . | | $3,038,147 | 3.84% | | $3,039,757 | 4.22% |

---

[1]  Includes the effects of discounts, premiums and other cost basis adjustments.

[2]  Includes long-term debt with an original contractual maturity of greater than 1 year and up to 10 years, excluding zero-coupon debt.

[3]  Includes long-term debt that is not included in other debt categories.

[4]  Includes a portion of structured debt instruments that is reported at fair value.

[5]  Consists of subordinated debt issued with an interest deferral feature.

[6]  Reported amounts include a net discount and other cost basis adjustments of $9.2 billion and $12.4 billion as of December 31, 2011 and 2010, respectively.

TREASURY-2698

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Our long-term debt includes a variety of debt types. We issue both fixed and floating-rate medium-term notes with maturities greater than one year that are issued through dealer banks. We also offer Benchmark Notes and other bonds in large, regularly-scheduled issuances that provide increased efficiency, liquidity and tradability to the market. Additionally, we have issued notes and bonds denominated in several foreign currencies and are able to issue debt in numerous other currencies. We effectively convert all foreign currency-denominated transactions into U.S. dollars through the use of foreign currency swaps for the purpose of funding our mortgage assets.

Our other long-term debt includes callable and non-callable securities, which include all long-term non-Benchmark securities, such as zero-coupon bonds, fixed rate and other long-term securities, and are generally negotiated underwritings with one or more dealers or dealer banks.

***Debt of Consolidated Trusts***

Debt of consolidated trusts represents the amount of Fannie Mae MBS issued from consolidated trusts and held by third-party certificateholders.

***Characteristics of Debt***

As of December 31, 2011 and 2010, the face amount of our debt securities of Fannie Mae was $741.6 billion and $792.6 billion, respectively. As of December 31, 2011 and 2010, we had zero-coupon debt with a face amount of $165.8 billion and $174.2 billion, respectively, which had an effective interest rate of 0.68% and 0.83%, respectively.

We issue callable debt instruments to manage the duration and prepayment risk of expected cash flows of the mortgage assets we own. Our outstanding debt as of December 31, 2011 and 2010 included $187.9 billion and $219.8 billion, respectively, of callable debt that could be redeemed in whole or in part at our option or the option of the investor any time on or after a specified date.

The following table displays the amount of our long-term debt as of December 31, 2011 by year of maturity for each of the years 2012 through 2016 and thereafter. The first column assumes that we pay off this debt at maturity or on the call date if the call has been announced, while the second column assumes that we redeem our callable debt at the next available call date.

|  | Long-Term Debt by Year of Maturity | Assuming Callable Debt Redeemed at Next Available Call Date |
|---|---|---|
|  | (Dollars in millions) | |
| 2012 ............................................... | $ 134,277 | $ 303,912 |
| 2013 ............................................... | 128,714 | 109,707 |
| 2014 ............................................... | 117,898 | 78,259 |
| 2015 ............................................... | 43,673 | 21,904 |
| 2016 ............................................... | 70,752 | 33,945 |
| Thereafter ............................................ | 90,378 | 37,965 |
| Total debt of Fannie Mae[1] ............................. | 585,692 | 585,692 |
| Debt of consolidated trusts[2] ............................ | 2,452,455 | 2,452,455 |
| Total long-term debt[3] ................................. | $3,038,147 | $3,038,147 |

[1]  Reported amount includes a net discount and other cost basis adjustments of $9.2 billion.

F-70

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

(2) Contractual maturity of debt of consolidated trusts is not a reliable indicator of expected maturity because borrowers of the underlying loans generally have the right to prepay their obligations at any time.

(3) Includes a portion of structured debt instruments that is reported at fair value.

The following table displays the amount of our debt of Fannie Mae that was called and repurchased and the associated weighted-average interest rates for the years ended December 31, 2011, 2010 and 2009.

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2011 | 2010 | 2009 |
| | (Dollars in millions) | | |
| Debt called | $201,651 | $289,770 | $166,777 |
| Weighted-average interest rate of debt called | 2.4% | 3.1% | 4.2% |
| Debt repurchased | $ 2,887 | $ 1,333 | $ 6,919 |
| Weighted-average interest rate of debt repurchased | 3.1% | 3.3% | 4.3% |

**9.   Derivative Instruments**

Derivative instruments are an integral part of our strategy in managing interest rate risk. Derivative instruments may be privately negotiated contracts, which are often referred to as over-the-counter derivatives, or they may be listed and traded on an exchange. When deciding whether to use derivatives, we consider a number of factors, such as cost, efficiency, the effect on our liquidity, results of operations, and our overall interest rate risk management strategy. We choose to use derivatives when we believe they will provide greater relative value or more efficient execution of our strategy than debt securities. We typically do not settle the notional amount of our risk management derivatives; rather, notional amounts provide the basis for calculating actual payments or settlement amounts. The derivatives we use for interest rate risk management purposes consist primarily of contracts that fall into four broad categories:

- *Interest rate swap contracts.*   An interest rate swap is a transaction between two parties in which each party agrees to exchange payments tied to different interest rates or indices for a specified period of time, generally based on a notional amount of principal. The types of interest rate swaps we use include pay-fixed swaps, receive-fixed swaps and basis swaps.

- *Interest rate option contracts.*   These contracts primarily include pay-fixed swaptions, receive-fixed swaptions, cancelable swaps and interest rate caps. A swaption is an option contract that allows us or a counterparty to enter into a pay-fixed or receive-fixed swap at some point in the future.

- *Foreign currency swaps.*   These swaps convert debt that we issue in foreign-denominated currencies into U.S. dollars. We enter into foreign currency swaps only to the extent that we issue foreign currency debt.

- *Futures.*   These are standardized exchange-traded contracts that either obligate a buyer to buy an asset at a predetermined date and price or a seller to sell an asset at a predetermined date and price. The types of futures contracts we enter into include Eurodollar, U.S. Treasury and swaps.

TREASURY-2700

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Notional and Fair Value Position of our Derivatives*

The following table displays the notional amount and estimated fair value of our asset and liability derivative instruments as of December 31, 2011 and 2010.

| | As of December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2011** | | | | **2010** | | | |
| | **Asset Derivatives** | | **Liability Derivatives** | | **Asset Derivatives** | | **Liability Derivatives** | |
| | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value |
| | | | | (Dollars in millions) | | | | |
| Risk management derivatives: | | | | | | | | |
| Swaps: | | | | | | | | |
| Pay-fixed . . . . . . . . . . . . . . . . . . | $ 30,950 | $ 102 | $155,807 | $(17,391) | $ 49,085 | $ 1,812 | $228,142 | $(14,115) |
| Receive-fixed . . . . . . . . . . . . . . . | 170,668 | 8,118 | 59,027 | (93) | 172,174 | 6,493 | 52,003 | (578) |
| Basis . . . . . . . . . . . . . . . . . . . . . . | 382 | 122 | 9,240 | (44) | 435 | 29 | 50 | — |
| Foreign currency . . . . . . . . . . . . | 581 | 155 | 451 | (62) | 1,274 | 164 | 286 | (51) |
| Swaptions: | | | | | | | | |
| Pay-fixed . . . . . . . . . . . . . . . . . | 48,600 | 165 | 47,750 | (194) | 66,200 | 482 | 30,950 | (1,773) |
| Receive-fixed . . . . . . . . . . . . . . | 33,695 | 6,371 | 47,750 | (3,238) | 48,340 | 4,992 | 30,275 | (673) |
| Other[1] | 8,214 | 52 | 75 | — | 7,909 | 99 | 25 | (1) |
| Total gross risk management derivatives . . . . . . . . . . . . . . | 293,090 | 15,085 | 320,100 | (21,022) | 345,417 | 14,071 | 341,731 | (17,191) |
| Accrued interest receivable (payable) . . . . . . . . . . . . . . . . | — | 920 | — | (1,238) | — | 1,288 | — | (1,805) |
| Netting adjustment[2] . . . . . . . . . . | — | (15,829) | — | 21,898 | — | (15,175) | — | 18,023 |
| Total net risk management derivatives . . . . . . . . . . . . . | $293,090 | $ 176 | $320,100 | $ (362) | $345,417 | $ 184 | $341,731 | $ (973) |
| Mortgage commitment derivatives: | | | | | | | | |
| Mortgage commitments to purchase whole loans . . . . . . . . | $ 9,710 | $ 73 | $ 422 | $ — | $ 2,880 | $ 19 | $ 4,435 | $ (105) |
| Forward contracts to purchase mortgage-related securities . . . | 32,707 | 309 | 2,570 | (6) | 19,535 | 123 | 27,697 | (468) |
| Forward contracts to sell mortgage-related securities . . . | 1,370 | 3 | 54,656 | (548) | 40,761 | 811 | 24,562 | (169) |
| Total mortgage commitment derivatives . . . . . . . . . . . . . | $ 43,787 | $ 385 | $ 57,648 | $ (554) | $ 63,176 | $ 953 | $ 56,694 | $ (742) |
| Derivatives at fair value . . . . . . | $336,877 | $ 561 | $377,748 | $ (916) | $408,593 | $ 1,137 | $398,425 | $ (1,715) |

[1] Includes interest rate caps, futures, swap credit enhancements and mortgage insurance contracts that we account for as derivatives. The mortgage insurance contracts have payment provisions that are not based on a notional amount.

[2] The netting adjustment represents the effect of the legal right to offset under legally enforceable master netting agreements to settle with the same counterparty on a net basis, as well as cash collateral posted and received. Cash collateral posted was $6.8 billion and $3.5 billion as of December 31, 2011 and 2010, respectively. Cash collateral received was $779 million and $604 million as of December 31, 2011 and 2010, respectively.

TREASURY-2701

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

A majority of our derivative instruments contain provisions that require our senior unsecured debt to maintain a minimum credit rating from S&P and Moody's. If our senior unsecured debt were to fall below established thresholds in our governing agreements, which range from A- to BBB+, we could be required to provide additional collateral to or terminate transactions with certain counterparties. The aggregate fair value of all derivatives with credit-risk-related contingent features that were in a net liability position as of December 31, 2011 was $7.2 billion, for which we posted collateral of $6.8 billion in the normal course of business. Had all of the credit-risk-related contingency features underlying these agreements been triggered, an additional $362 million of collateral would have been required to be posted as collateral or to immediately settle our positions based on the individual agreements and our fair value position as of December 31, 2011.

The aggregate fair value of all derivatives with credit risk-related contingent features that were in a net liability position as of December 31, 2010 was $4.4 billion, for which we posted collateral of $3.5 billion in the normal course of business. Had all of the credit risk-related contingency features underlying these agreements been triggered, an additional $891 million would have been required to be posted as collateral or to immediately settle our positions based on the individual agreements and our fair value position as of December 31, 2010.

We record all derivative gains and losses, including accrued interest, in "Fair value losses, net" in our consolidated statements of operations and comprehensive loss. The following table displays, by type of derivative instrument, the fair value gains and losses, net on our derivatives for the years ended December 31, 2011, 2010, and 2009.

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
|  | (Dollars in millions) | | |
| Risk management derivatives: | | | |
| Swaps: | | | |
| Pay-fixed ............................................... | $(18,040) | $(17,573) | $ 15,012 |
| Receive-fixed ............................................... | 7,939 | 14,382 | (11,737) |
| Basis ............................................... | 86 | 17 | 96 |
| Foreign currency ............................................... | 156 | 157 | 166 |
| Swaptions: | | | |
| Pay-fixed ............................................... | 860 | (2,026) | 453 |
| Receive-fixed ............................................... | 2,932 | 3,327 | (8,706) |
| Other[1] ............................................... | (72) | (91) | 20 |
| Total risk management derivatives fair value losses, net ............. | (6,139) | (1,807) | (4,696) |
| Mortgage commitment derivatives fair value losses, net ............... | (423) | (1,193) | (1,654) |
| Total derivatives fair value losses, net ........................... | $ (6,562) | $ (3,000) | $ (6,350) |

_____

[1] Includes interest rate caps, futures, swap credit enhancements and mortgage insurance contracts.

***Derivative Counterparty Credit Exposure***

Our derivative counterparty credit exposure relates principally to interest rate and foreign currency derivative contracts. We are exposed to the risk that a counterparty in a derivative transaction will default on payments due to us. If there is a default, we may need to acquire a replacement derivative from a different counterparty at a higher cost or may be unable to find a suitable replacement. We estimate our exposure to credit loss on derivative instruments by calculating the replacement cost, on a present value basis, to settle at current market prices all

F-73

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

outstanding derivative contracts in a net gain position at the counterparty level where the right of legal offset exists. For derivative instruments where the right of legal offset does not exist, we calculate the replacement cost of the outstanding derivative contracts in a gain position at the transaction level. We manage our exposure by requiring counterparties to post collateral, which includes cash, U.S. Treasury securities, agency debt and agency mortgage-related securities.

The table below displays our counterparty credit exposure on outstanding risk management derivative instruments in a gain position by counterparty credit ratings, as well as the notional amount outstanding and the number of counterparties for all risk management derivatives as of December 31, 2011 and 2010.

| | As of December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Credit Rating[1] | | | | |
| | AA+/AA/AA- | A+/A | Subtotal[2] | Other[3] | Total |
| | (Dollars in millions) | | | | |
| Credit loss exposure[4] ................. | $ — | $ 885 | $ 885 | $ 51 | $ 936 |
| Less: Collateral held[5] ................. | — | 840 | 840 | — | 840 |
| Exposure net of collateral .............. | $ — | $ 45 | $ 45 | $ 51 | $ 96 |
| Additional information: | | | | | |
| Notional amount .................... | $63,294 | $546,967 | $610,261 | $2,929 | $613,190 |
| Number of counterparties ............. | 6 | 10 | 16 | | |

| | As of December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Credit Rating[1] | | | | |
| | AA+/AA/AA- | A+/A | Subtotal[2] | Other[3] | Total |
| | (Dollars in millions) | | | | |
| Credit loss exposure[4] ................. | $ 350 | $ 325 | $ 675 | $ 75 | $ 750 |
| Less: Collateral held[5] ................. | 273 | 325 | 598 | — | 598 |
| Exposure net of collateral ............. | $ 77 | $ — | $ 77 | $ 75 | $ 152 |
| Additional information: | | | | | |
| Notional amount .................... | $208,898 | $476,766 | $685,664 | $1,484 | $687,148 |
| Number of counterparties ............. | 7 | 8 | 15 | | |

---

[1] We manage collateral requirements based on the lower credit rating of the legal entity, as issued by S&P and Moody's. The credit rating reflects the equivalent S&P's rating for any ratings based on Moody's scale.

[2] We had exposure to 4 and 3 interest rate and foreign currency derivative counterparties in a net gain position as of December 31, 2011 and 2010, respectively. Those interest rate and foreign currency derivatives had notional balances of $127.5 billion and $106.5 billion as of December 31, 2011 and 2010, respectively.

[3] Includes defined benefit mortgage insurance contracts and swap credit enhancements accounted for as derivatives where the right of legal offset does not exist. Also includes exchange-traded derivatives, such as futures and interest rate swaps, which are settled daily through a clearinghouse.

[4] Represents the exposure to credit loss on derivative instruments, which we estimate using the fair value of all outstanding derivative contracts in a gain position. We net derivative gains and losses with the same counterparty where a legal right of offset exists under an enforceable master netting agreement. This table excludes mortgage commitments accounted for as derivatives.

[5] Represents both cash and non-cash collateral posted by our counterparties to us. Does not include collateral held in excess of exposure. We reduce the value of non-cash collateral in accordance with the counterparty agreements to help ensure recovery of any loss through the disposition of the collateral.

TREASURY-2703

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**10.   Income Taxes**

***Benefit for Income Taxes***

We operate as a government-sponsored enterprise. We are subject to federal income tax, but we are exempt from state and local income taxes. The following table displays the components of our benefit for federal income taxes for the years ended December 31, 2011, 2010 and 2009.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | (Dollars in millions) | | |
| Current income tax benefit | $(90) | $(82) | $(999) |
| Deferred income tax expense[1] | — | — | 14 |
| Benefit for federal income taxes | $(90) | $(82) | $(985) |

_____
[1]   Amount excludes the income tax effect of items recognized directly in "Fannie Mae stockholders' equity (deficit)" where we did not establish a valuation allowance.

During 2011, we received a refund of $1.1 billion from the IRS related to the carryback of our 2009 operating loss to the 2008 and 2007 tax years. In addition, we effectively settled our 2007 and 2008 tax years with the IRS and as a result, we have recognized an income tax benefit of $90 million in our consolidated statements of operations and comprehensive loss for 2011.

The following table displays the difference between our effective tax rates and the statutory federal tax rates for the years ended December 31, 2011, 2010 and 2009, respectively.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| Statutory corporate tax rate | 35.0% | 35.0% | 35.0% |
| Tax-exempt interest and dividends received deductions | 0.9 | 1.3 | 0.3 |
| Equity investments in affordable housing projects | 4.8 | 6.3 | 1.3 |
| Other | 1.0 | 0.1 | — |
| Valuation allowance | (41.2) | (42.1) | (35.2) |
| Effective tax rate | 0.5% | 0.6% | 1.4% |

Our effective tax rate is the benefit for federal income taxes expressed as a percentage of income or loss before federal income taxes. Our effective tax rates were different from the federal statutory rate of 35% for the years ended December 31, 2011, 2010 and 2009 due primarily to the increase to our valuation allowance for our net deferred tax assets that resulted in the recognition of $7.0 billion, $5.9 billion and $25.7 billion, respectively, in our provision for income taxes. In addition, our effective tax rate for the year ended December 31, 2011, was impacted by the reversal of a portion of the valuation allowance for deferred tax assets resulting from a settlement agreement reached with the IRS for our unrecognized tax benefits for the tax years 2007 through 2008.

F-75

TREASURY-2704

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Deferred Tax Assets and Liabilities*

The following table displays our deferred tax assets, deferred tax liabilities, and valuation allowance as of December 31, 2011 and 2010.

| | As of December 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (Dollars in millions) | |
| Deferred tax assets: | | |
| Allowance for loan losses and basis in acquired property, net . . . . . . . . . . . . . . . . . . . | $ 29,935 | $ 27,063 |
| Mortgage and mortgage-related assets, including acquired credit-impaired loans . . . . | 12,358 | 10,825 |
| Debt and derivative instruments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,562 | 6,627 |
| Partnership credits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,473 | 4,500 |
| Partnership and other equity investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,809 | 2,175 |
| Unrealized losses on AFS securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 442 | 772 |
| Net operating loss and alternative minimum tax credit carry forwards . . . . . . . . . . . . | 5,904 | 3,341 |
| Other, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,053 | 1,818 |
| Total deferred tax assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 64,536 | 57,121 |
| Deferred tax liabilities: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| Other, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 | 53 |
| Total deferred tax liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 | 53 |
| Valuation allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (64,080) | (56,314) |
| Net deferred tax assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $    433 | $    754 |

We recognize deferred tax assets and liabilities for the future tax consequences related to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, and for net operating loss and tax credit carryforwards. We recorded an increase in our valuation allowance in 2011 that resulted in the recognition of $7.0 billion in our provision for income taxes. This amount offsets the tax effect associated with a portion of our pre-tax loss. Our deferred tax assets, net of a valuation allowance, totaled $433 million and $754 million as of December 31, 2011 and 2010, respectively. We recorded an increase in our valuation allowance in 2010 that resulted in the recognition of $5.9 billion in our provision for income taxes. This amount represented the tax effect associated with a portion of the pre-tax loss in 2010. The change in our 2010 valuation allowance also includes a $2.4 billion reduction primarily due to our adoption of consolidation accounting guidance for amounts originally recognized in "Accumulated deficit." We recorded an increase in our valuation allowance in 2009 of $25.7 billion in our provision for income taxes. The change in our 2009 valuation allowance also includes a $3.0 billion reduction primarily due to our adoption of the accounting guidance for assessing other-than-temporary-impairments for amounts originally recognized in "Accumulated deficit."

We evaluate our deferred tax assets for recoverability using a consistent approach which considers the relative impact of both negative and positive evidence, including our historical profitability and projections of future taxable income. We are required to establish a valuation allowance for deferred tax assets and record a charge in our consolidated statements of operations and comprehensive loss or in "Fannie Mae stockholders' deficit" if we determine, based on available evidence at the time the determination is made, that it is more likely than not that some portion or all of the deferred tax assets will not be realized. In evaluating the need for a valuation

F-76

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

allowance, we estimate future taxable income or loss based on management-approved business plans and ongoing tax planning strategies. This process involves significant management judgment about assumptions that are subject to change from period to period based on changes in tax laws or variances between our projected operating performance, our actual results and other factors.

We are in a cumulative book taxable loss position and have been for more than a three-year period. For purposes of establishing a deferred tax valuation allowance, this cumulative book taxable loss position is considered significant, objective evidence that we may not be able to realize some portion of our deferred tax assets in the future. Our cumulative book taxable loss position was caused by the negative impact on our results from the weak housing and credit market conditions that deteriorated dramatically during 2008 and continued through 2011. Because of the volatile economic conditions, our projections of future credit losses are uncertain.

During 2008, we concluded that it was more likely than not that we would not generate sufficient future taxable income in the foreseeable future to realize all of our deferred tax assets. Our conclusion was based on our consideration of the relative weight of the available evidence, including the rapid deterioration of market conditions discussed above, the uncertainty of future market conditions on our results of operations, and significant uncertainty surrounding our future business model as a result of the placement of the company into conservatorship by FHFA. As a result, we recorded a valuation allowance on our net deferred tax asset for the portion of the future tax benefit that more likely than not will not be utilized in the future. We did not, however, establish a valuation allowance for the deferred tax asset amount that is related to unrealized losses recorded through AOCI for certain available-for-sale securities. We believe this deferred tax amount is recoverable because we have the intent and ability to hold these securities until recovery of the unrealized loss amounts. There have been no changes to our conclusion as of December 31, 2011.

As of December 31, 2011, we had $18.7 billion of net operating loss carryforwards that expire in 2029 through 2031, $1.6 billion of capital loss carryforwards that expire in 2014 through 2016, $5.5 billion of partnership tax credit carryforwards that expire in various years through 2031, and $128 million of alternative minimum tax credit carryforwards that have an indefinite carryforward period.

***Unrecognized Tax Benefits***

We had $758 million, $864 million, and $911 million of unrecognized tax benefits as of December 31, 2011, 2010 and 2009, respectively. Of these amounts, we had $60 million and $29 million as of December 31, 2010 and 2009, which was resolved favorably in 2011 and 2010 respectively, and reduced our effective tax rate for those years. There are no unrecognized tax benefits as of December 31, 2011 that would reduce our effective tax rate in future periods. As of December 31, 2011, we had no accrued interest payable related to unrecognized tax benefits. As of December 31, 2010, we had accrued interest payable related to unrecognized tax benefits of $5 million. For the year ended December 31, 2011, we had no interest expense related to unrecognized tax benefits and did not have any tax expense related to tax penalties. For the years ended December 31, 2010 and 2009, we had total interest expense related to unrecognized tax benefits of $2 million and $32 million, respectively, and did not have any tax expense related to tax penalties.

In 2011, the IRS effectively settled our federal income tax returns for the tax years 2007 and 2008, which resulted in a $105 million reduction in our gross balance of unrecognized tax benefits. During 2010, we and the IRS appeals division reached an agreement for all issues related to the tax years 1999 through 2004, which resulted in a $99 million reduction in our gross balance of unrecognized tax benefits for the tax years 1999 through 2004. Similarly, during 2009, we reached an agreement of $1.2 billion, net of tax credits, with the IRS on the audits of our 2005 and 2006 federal income tax returns. The decrease in our unrecognized tax benefits during the year ended December 31, 2009 is due to our settlement reached with the IRS regarding certain tax positions

F-77

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

related to fair market value losses and the settlement of tax years 2005 through 2006. It is reasonably possible that changes in our gross balance of unrecognized tax benefits may occur within the next 12 months. In connection with applications for accounting method changes filed with the IRS, it is reasonably possible that a $110 million reduction in our gross balance of unrecognized tax benefits may occur in the next 12 months.

The following table displays the changes in our unrecognized tax benefits for the years ended December 31, 2011, 2010 and 2009, respectively.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | (Dollars in millions) | | |
| Unrecognized tax benefits as of January 1 | $ 864 | $911 | $ 1,745 |
| Gross increases—tax positions in prior years | 1 | 83 | 38 |
| Gross decreases—tax positions in prior years | (2) | (31) | (1) |
| Gross increases—tax positions in current year | — | — | 761 |
| Settlements | (105) | (99) | (1,632) |
| Unrecognized tax benefits as of December 31[1] | $ 758 | $864 | $ 911 |

_____
[1] Amounts exclude tax credits and net operating losses of $758 million, $804 million and $716 million as of December 31, 2011, 2010 and 2009, respectively.

## 11.  Loss Per Share

The following table displays the computation of basic and diluted loss per share of common stock for the years ended December 31, 2011, 2010 and 2009.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | (Dollars and shares in millions, except per share amounts) | | |
| Net loss | $(16,855) | $(14,018) | $(72,022) |
| Less: Net loss attributable to the noncontrolling interest | — | 4 | 53 |
| Net loss attributable to Fannie Mae | (16,855) | (14,014) | (71,969) |
| Preferred stock dividends | (9,614) | (7,704) | (2,474) |
| Net loss attributable to common stockholders-Basic and Diluted | $(26,469) | $(21,718) | $(74,443) |
| Weighted-average common shares outstanding-Basic and Diluted[1] | 5,737 | 5,694 | 5,680 |
| Loss per share—Basic and Diluted | $ (4.61) | $ (3.81) | $ (13.11) |

_____
[1] Amounts include 4.6 billion for the years ended December 31, 2011, 2010 and 2009 of weighted-average shares of common stock, that would be issued upon the full exercise of the warrant issued to Treasury from the date the warrant was issued through December 31, 2011, 2010 and 2009, respectively.

Weighted-average options and performance awards to purchase approximately 5 million, 8 million and 14 million shares of common stock were outstanding for the years ended December 31, 2011, 2010 and 2009, respectively, and were excluded from the computation of diluted EPS in the table above as they would have been anti-dilutive.

F-78

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**12.   Stock-Based Compensation**

We have two stock-based compensation plans, the 1985 Employee Stock Purchase Plan and the Stock Compensation Plan of 2003. Under these plans, we previously offered various stock-based compensation programs where we provided employees an opportunity to purchase Fannie Mae common stock or periodically made stock awards to certain employees in the form of nonqualified stock options, performance share awards, restricted stock awards, restricted stock units or stock bonus awards. Under the senior preferred stock purchase agreement with Treasury, we may not issue Fannie Mae equity securities without the consent of Treasury, other than the senior preferred stock, the Treasury warrant, common stock issuable upon exercise of the warrant, or as required by the terms of any binding agreement in effect on the date of the senior preferred stock purchase agreement. As such, we currently do not intend to grant equity compensation to employees under these plans.

In connection with our stock-based compensation plans for shares or awards issued prior to conservatorship, we recorded compensation expense of $17 million, $39 million, and $52 million for 2011, 2010 and 2009, respectively.

***Stock-Based Compensation Plans***

The 1985 Employee Stock Purchase Plan (the "1985 Purchase Plan") provided employees an opportunity to purchase shares of Fannie Mae common stock at a discount to the fair market value of the stock during specified purchase periods. Our Board of Directors sets the terms and conditions of offerings under the 1985 Purchase Plan, including the number of available shares and the size of the discount. There were no offerings under the 1985 Purchase Plan in any year presented. The aggregate maximum number of shares of common stock available for employee purchase is 50 million. Since inception, we have made available 38,039,742 shares for purchase by employees under this plan.

The Stock Compensation Plan of 2003 (the "2003 Plan") is the successor to the Stock Compensation Plan of 1993 (the "1993 Plan"). The 2003 Plan enabled us to make stock awards in various forms and combinations, including stock options, stock appreciation rights, restricted stock, restricted stock units, performance share awards and stock bonus awards. The aggregate maximum number of shares of common stock available for award to employees and non-management directors under the 2003 Plan is 40 million. Including the effects of share cancellations, we have awarded 10,850,062 shares under this plan since its inception. The shares awarded under the 2003 Plan were authorized and unissued shares, treasury shares or shares purchased on the open market.

*Restricted Stock Program*

Under the 1993 and 2003 Plans, prior to conservatorship, employees could have received restricted stock awards ("RSAs") and, under the 2003 Plan, employees may have received restricted stock units ("RSUs"). The type of award employees received under the 2003 Plan generally depended upon years of service and age at the time of grant. Each RSU represented the right to receive a share of common stock at the time of vesting. As a result, RSUs are generally similar to restricted stock, except that RSUs do not confer voting rights on their holders. By contrast, holders of the RSAs do have voting rights. Vesting of the grants was based on continued employment. In general, grants vested in equal annual installments over three or four years beginning on the first anniversary of the date of grant. Based on the fair value of our common stock on the respective grant dates, the fair value of restricted stock that vested in 2011, 2010 and 2009 was $38 million, $51 million, and $83 million, respectively. The compensation expense related to restricted stock is based on the grant date fair value of our common stock. We recorded compensation expense for these restricted stock grants of $17 million, $39 million and $52 million for 2011, 2010 and 2009, respectively.

TREASURY-2708

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table displays restricted stock activity for 2011, 2010 and 2009.

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2011 | | 2010 | | 2009 | |
| | Number of Shares | Weighted Average Fair Value at Grant Date | Number of Shares | Weighted Average Fair Value at Grant Date | Number of Shares | Weighted Average Fair Value at Grant Date |
| | (Shares in thousands) | | | | | |
| Nonvested as of January 1 . . . . . . . . . . | 1,510 | $37.34 | 2,873 | $39.53 | 5,934 | $41.19 |
| Vested . . . . . . . . . . . . . . . . . . . . . . . | (944) | 40.39 | (1,199) | 42.58 | (1,858) | 44.78 |
| Forfeited . . . . . . . . . . . . . . . . . . . . . . | (81) | 32.89 | (164) | 37.34 | (1,203) | 39.61 |
| Nonvested as of December 31 . . . . . . . . | 485 | $32.14 | 1,510 | $37.34 | 2,873 | $39.53 |

The following table displays information related to unvested restricted stock as of December 31, 2011, 2010 and 2009.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | (Dollars in millions) | | |
| Unrecognized compensation cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 1 | $ 19 | $ 56 |
| Expected weighted-average life of unvested restricted stock . . . . . . . . . . | 0.1 years | 1.0 years | 1.6 years |

*Nonqualified Stock Options*

Under the 2003 Plan and prior to conservatorship, we could have granted stock options. Generally, these options may not be exercised until at least one year subsequent to the grant date, and the options expire ten years from the date of grant. Typically, options vest 25% per year beginning on the first anniversary of the date of grant. The exercise price of each option is equal to the fair market value of our common stock on the date we grant the option.

The following table displays nonqualified stock option activity for 2011, 2010 and 2009.

| | For the Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2011 | | | 2010 | | | 2009 | | |
| | Options | Weighted-Average Exercise Price | Weighted-Average Fair Value at Grant Date | Options | Weighted-Average Exercise Price | Weighted-Average Fair Value at Grant Date | Options | Weighted-Average Exercise Price | Weighted-Average Fair Value at Grant Date |
| | (Shares in thousands) | | | | | | | | |
| Beginning balance, January 1 . . . . . . . | 4,799 | $75.07 | $23.01 | 8,759 | $72.39 | $23.60 | 12,293 | $72.12 | $23.62 |
| Forfeited and/or expired . . . . . . . . . . | (1,720) | 79.96 | 27.49 | (3,960) | 69.15 | 25.26 | (3,534) | 71.45 | 23.66 |
| Ending balance, December 31[(1)] . . . . . | 3,079 | $72.34 | $20.50 | 4,799 | $75.07 | $23.01 | 8,759 | $72.39 | $23.60 |
| Options exercisable, December 31 . . . | 3,079 | $72.34 | $20.50 | 4,799 | $75.07 | $23.01 | 8,759 | $72.39 | $23.60 |

---

[(1)]   All options outstanding are fully vested.

TREASURY-2709

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**13.   Employee Retirement Benefits**

We sponsor both defined benefit plans and defined contribution plans for our employees, as well as a healthcare plan that provides certain health benefits for retired employees and their dependents. Net periodic benefit costs for defined benefit and healthcare plans, which are determined on an actuarial basis, and expenses for our defined contribution plans, are included in "Salaries and employee benefits expense" in our consolidated statements of operations and comprehensive loss. For the years ended December 31, 2011, 2010 and 2009, we recognized net periodic benefit costs for our defined benefit and healthcare plans and expenses for our defined contributions plans of $118 million, $112 million and $131 million, respectively.

***Defined Benefit Pension Plans and Postretirement Health Care Plan***

Our defined benefit pension plans include qualified and nonqualified noncontributory plans. Pension plan benefits are based on years of credited service and a percentage of eligible compensation. In 2007, the defined benefit pension plans were amended to cease benefits accruals for employees that did not meet certain criteria to be grandfathered under the plan and to vest those employees in their frozen accruals.

We fund our qualified pension plan through employer contributions to a qualified irrevocable trust that is maintained for the sole benefit of plan participants and their beneficiaries. Contributions to our qualified pension plan are subject to a minimum funding requirement and maximum funding limit under the Employee Retirement Income Security Act of 1974 ("ERISA") and IRS regulations.

Our nonqualified defined benefit pension plans consist of an Executive Pension Plan, Supplemental Pension Plan and the Supplemental Pension Plan of 2003. These plans cover certain employees and supplement the benefits payable under the qualified pension plan. The Executive Pension Plan was frozen in 2009. Benefits under the Executive Pension Plan are paid through a rabbi trust.

The Supplemental Pension Plan provides retirement benefits to employees who participate in our qualified pension plan and do not receive a benefit from the Executive Pension Plan, and whose salary exceeds the statutory compensation cap applicable to the qualified plan or whose benefit is limited by the statutory benefit cap. The Supplemental Pension Plan of 2003 provides additional benefits to our officers based on eligible incentive compensation, if any, received by an officer, but the amount of incentive compensation considered is limited to 50% of the officer's base salary. We pay benefits under our unfunded defined benefit Supplemental Pension Plans from our cash and cash equivalents.

We also sponsor a postretirement Health Care Plan that covers substantially all regular full-time employees who meet the applicable age and service requirements. We subsidize premium costs for medical coverage for some employees who meet the age and service requirements. Employees hired after 2007 receive access to our retiree medical plan, when eligible, but they do not qualify for the subsidy. We accrue and pay the benefits for our unfunded postretirement Health Care Plan from our cash and cash equivalents.

TREASURY-2710

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table displays components of our net periodic benefit cost for our qualified and nonqualified pension plans and other postretirement plan for the years ended December 31, 2011, 2010 and 2009. The net periodic benefit cost for each period is calculated based on assumptions at the end of the prior year.

| | For the Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2011 | | 2010 | | 2009 | |
| | Pension Plans | Other Post-Retirement Plan | Pension Plans | Other Post-Retirement Plan | Pension Plans | Other Post-Retirement Plan |
| | (Dollars in millions) | | | | | |
| Service cost | $ 39 | $ 6 | $ 37 | $ 6 | $ 37 | $ 5 |
| Interest cost | 72 | 9 | 66 | 9 | 62 | 9 |
| Other | (57) | (7) | (51) | (2) | (22) | (2) |
| Net periodic benefit cost | $ 54 | $ 8 | $ 52 | $13 | $ 77 | $12 |

Prior service costs, which are changes in benefit obligations due to plan amendments, are amortized over the average remaining service period for active employees for our pension plans and prior to the full eligibility date for the other postretirement Health Care Plan.

The following table displays amounts recorded in AOCI that have not been recognized as a component of net periodic benefit cost for the years ended December 31, 2011 and 2010.

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2011 | | 2010 | |
| | Pension Plans | Other Post-Retirement Plan | Pension Plans | Other Post-Retirement Plan |
| | (Dollars in millions) | | | |
| Net actuarial loss | $393 | $ 36 | $218 | $ 42 |
| Net prior service cost (credit) | 4 | (46) | 6 | (56) |
| Net transition obligation | — | 2 | — | 4 |
| After-tax amount recorded in AOCI | $397 | $ (8) | $224 | $(10) |

F-82

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following table displays the changes in the pre-tax amounts recognized in AOCI for the years ended December 31, 2011 and 2010.

| | For the Year Ended December 31, | | | |
| | 2011 | | 2010 | |
| | Pension Plans | Other Post-Retirement Plan | Pension Plans | Other Post-Retirement Plan |
| | (Dollars in millions) | | | |
| **Actuarial Loss** | | | | |
| Beginning balance, January 1 | $218 | $ 42 | $162 | $ 39 |
| Current year actuarial loss (gain) | 184 | (5) | 64 | 4 |
| Amortization | (9) | (1) | (8) | (1) |
| Ending balance, December 31 | $393 | $ 36 | $218 | $ 42 |
| **Prior Service Cost (Credit)** | | | | |
| Beginning balance, January 1 | $  6 | $(56) | $  7 | $(61) |
| Prior service credit due to curtailments | — | 5 | — | — |
| Amortization | (2) | 5 | (1) | 5 |
| Ending balance, December 31 | $  4 | $(46) | $  6 | $(56) |

The following table displays pre-tax amounts in AOCI as of December 31, 2011 that are expected to be recognized as components of net periodic benefit cost in 2012.

| | As of December 31, 2011 | |
| | Pension Plans | Other Post-Retirement Plan |
| | (Dollars in millions) | |
| Net actuarial loss | $31 | $ 1 |
| Net prior service cost (credit) | 1 | (5) |
| Net transition obligation | — | 2 |
| Total | $32 | $(2) |

F-83

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table displays the status of our pension and other postretirement plans as of December 31, 2011 and 2010.

| | As of December 31, | | | |
| | 2011 | | 2010 | |
| | Pension Plans | Other Post-Retirement Plan | Pension Plans | Other Post-Retirement Plan |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| **Change in Benefit Obligation** | | | | |
| Benefit obligation at beginning of year | $1,257 | $ 180 | $1,055 | $ 166 |
| Service cost | 39 | 6 | 37 | 6 |
| Interest cost | 72 | 9 | 66 | 9 |
| Plan participants' contributions | — | 2 | — | 2 |
| Net actuarial loss (gain) | 131 | (1) | 130 | 4 |
| Curtailment gain | (14) | (5) | — | — |
| Benefits paid | (33) | (8) | (31) | (7) |
| Benefit obligation at end of year | 1,452 | 183 | 1,257 | 180 |
| **Change in Plan Assets** | | | | |
| Fair value of plan assets at beginning of year | 942 | — | 799 | — |
| Actual return on plan assets | 2 | — | 125 | — |
| Employer contributions | 131 | 6 | 49 | 6 |
| Plan participants' contributions | — | 2 | — | 2 |
| Benefits paid | (33) | (8) | (31) | (8) |
| Fair value of plan assets at end of year | 1,042 | — | 942 | — |
| Funded status at end of year[1] | $ (410) | $(183) | $ (315) | $(180) |

_____
[1]  Included in other liabilities of our Consolidated Balance Sheets as of December 31, 2011 and 2010.

Actuarial gains or losses reflect annual changes in the amount of either the benefit obligation or the fair value of plan assets that result from the difference between actual experience and projected amounts or from changes in assumptions.

The following table displays the amount of the projected benefit obligation, accumulated benefit obligation and fair value of plan assets for our pension plans as of December 31, 2011 and 2010.

| | As of December 31, | |
| | 2011 | 2010 |
|---|---|---|
| | (Dollars in millions) | |
| Projected benefit obligation | $1,452 | $1,257 |
| Accumulated benefit obligation | 1,326 | 1,111 |
| Fair value of plan assets | 1,042 | 942 |

F-84

TREASURY-2713

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Contributions*

Contributions to the qualified pension plan increase the plan assets while contributions to the unfunded plans are made to fund current period benefit payments or to fulfill annual funding requirements. We were not required to make minimum contributions to our qualified pension plan for each of the years in the three-year period ended December 31, 2011 since we met the minimum funding requirements as prescribed by ERISA. However, we did make a discretionary contribution to our qualified pension plan of $124 million, $42 million and $76 million during 2011, 2010 and 2009, respectively.

During 2011, we contributed $124 million to our qualified pension plan, $7 million to our nonqualified pension plans and $6 million to our other postretirement benefit plan. During 2012, we anticipate contributing $60 million to our benefit plans, consisting of $45 million to our qualified pension plan, $7 million to our nonqualified pension plans and $8 million to our other postretirement plan.

The fair value of plan assets of our funded qualified pension plan was less than our accumulated benefit obligation by $100 million and $5 million as of December 31, 2011 and 2010, respectively. There were no plan assets returned to us as of February 29, 2012 and we do not expect any plan assets to be returned to us during the remainder of 2012.

*Assumptions*

Pension and other postretirement benefit amounts recognized in our consolidated financial statements are determined on an actuarial basis using several different assumptions that are measured as of December 31, 2011, 2010 and 2009. The following table displays the actuarial assumptions for our plans used in determining the net periodic benefit costs and the projected accumulated benefit obligations as of December 31, 2011, 2010 and 2009.

| | As of December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **Pension Benefits** | | | **Postretirement Benefits** | | |
| | **2011** | **2010** | **2009** | **2011** | **2010** | **2009** |
| **Weighted-average assumptions used to determine net periodic benefit costs:** | | | | | | |
| Discount rate ............................................... | 5.65% | 6.10% | 6.15% | 5.40% | 5.75% | 6.15% |
| Average rate of increase in future compensation ...................... | 4.00 | 4.00 | 4.00 | | | |
| Expected long-term weighted-average rate of return on plan assets ......... | 7.25 | 7.50 | 7.50 | | | |
| **Weighted-average assumptions used to determine benefit obligation at year-end:** | | | | | | |
| Discount rate ............................................... | 4.95% | 5.65% | 6.10% | 4.75% | 5.40% | 5.75% |
| Average rate of increase in future compensation ...................... | 4.00 | 4.00 | 4.00 | | | |
| **Health care cost trend rate assumed for next year:** | | | | | | |
| Pre-65 .................................................... | | | | 8.00% | 8.00% | 8.00% |
| Post-65 ................................................... | | | | 8.00 | 8.00 | 8.00 |
| **Rate that cost trend rate gradually declines to and remains at:** | | | | | | |
| Year that rate reaches the ultimate trend rate ......................... | | | | 5.00 | 5.00 | 5.00 |
| | | | | 2018 | 2018 | 2018 |

As of December 31, 2011, the effect of a 1% increase or decrease in the assumed health care cost trend rate would change the accumulated postretirement benefit obligation by less than $1 million.

TREASURY-2714

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

We review our pension and other postretirement benefit plan assumptions on an annual basis. We calculate the net periodic benefit cost each year based on assumptions established at the end of the previous calendar year, unless we remeasure as a result of a curtailment. In determining our net periodic benefit costs, we assess the discount rate to be used in the annual actuarial valuation of our pension and other postretirement benefit obligations at year-end. We consider the current yields on high-quality, corporate fixed-income debt instruments with maturities corresponding to the expected duration of our benefit obligations and supported by cash flow matching analysis based on expected cash flows specific to the characteristics of our plan participants, such as age and gender. As of December 31, 2011, the discount rate used to determine our obligation decreased by 70 basis points for pension and 65 basis points for postretirement, reflecting a corresponding rate decrease in corporate-fixed income debt instruments during 2011. We also assess the long-term rate of return on plan assets for our qualified pension plan. The return on asset assumption reflects our expectations for plan-level returns over a term of approximately seven to ten years. Given the longer-term nature of the assumption and a stable investment policy, it may or may not change from year to year. However, if longer-term market cycles or other economic developments impact the global investment environment, or asset allocation changes are made, we may adjust our assumption accordingly. Changes in assumptions used in determining pension and other postretirement benefit plan expense resulted in an increase in expense of $17 million and $4 million for the years ended December 31, 2011 and 2010, respectively, and a decrease in expense of $4 million in our consolidated statements of operations for the year ended December 31, 2009.

*Qualified Pension Plan Assets*

The following table displays our qualified pension plan assets by asset category at their fair value as of December 31, 2011 and 2010. The fair value of assets in Level 1 have been determined based on quoted prices of identical assets in active markets as of year end, while the fair value of assets in Level 2 have been determined based on the net asset value per share of the investments as of year end. None of the fair values for plan assets were determined by using significant unobservable inputs, or Level 3.

| | Fair Value Measurements as of December 31, | | | | | |
| | 2011 | | | 2010 | | |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Total |
| | (Dollars in millions) | | | | | |
| Cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . | $ — | $ 22 | $ 22 | $ — | $ 13 | $ 13 |
| Equity securities: | | | | | | |
| U.S. large-cap[1] . . . . . . . . . . . . . . . . . . . . . . . . | 353 | — | 353 | 329 | — | 329 |
| U.S. mid/small cap[2] . . . . . . . . . . . . . . . . . . . . | 91 | — | 91 | 83 | — | 83 |
| International[3] . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 167 | 167 | — | 255 | 255 |
| Fixed income securities: | | | | | | |
| Investment grade credit[4] . . . . . . . . . . . . . . . . | — | 409 | 409 | — | 262 | 262 |
| Total plan assets at fair value . . . . . . . . . . . . . . | $444 | $598 | $1,042 | $412 | $530 | $942 |

[1] Consists of a publicly traded equity index fund that tracks the S&P 500.

[2] Consists of a publicly traded equity index fund that tracks all regularly traded U.S. stocks except those in the S&P 500.

F-86

TREASURY-2715

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

(3) Consists of an international equity fund that tracks an index that consists of approximately 6,400 and 6,500 securities for 2011 and 2010, respectively, across over 40 countries. United Kingdom has the largest share with 16% in 2011. Japan had the largest share with 15% in 2010.

(4) Consists of a bond fund that tracks a broadly diversified investment grade index that consists of approximately 3,000 and 2,700 issuances of investment grade bonds for 2011 and 2010, respectively, from diverse industries. International markets represent 20% and 19% of the fund in 2011 and 2010, respectively.

Our investment strategy is to diversify our plan assets in order to reduce our concentration risk, reflect the plan's profile over time, and maintain an asset allocation that allows us to meet current and future benefit obligations. The assets of the qualified pension plan consist of exchange-listed stocks, held in broadly diversified index funds. We also invest in a broadly diversified indexed fixed income account. In addition, the plan holds liquid short-term investments that provide for monthly pension payments, plan expenses and, from time to time, may represent uninvested contributions or reallocation of plan assets. The target allocations for plan assets are from 55% to 65% for equity securities, 35% to 45% for fixed income securities and up to 2% for all other types of investments. The plan fiduciary periodically assesses our asset allocation to assure it is consistent with our plan objective.

*Expected Benefit Payments*

The following table displays the benefits we expect to pay in each of the next five years and in the aggregate for the subsequent five years for our pension plans and other postretirement plan and are based on the same assumptions used to measure our benefit obligation as of December 31, 2011.

| | Expected Retirement Plan Benefit Payments | | |
|---|---|---|---|
| | | Other Postretirement Benefits | |
| | Pension Benefits | Before Medicare Part D Subsidy | Medicare Part D Subsidy |
| | (Dollars in millions) | | |
| 2012 ............................................. | $ 36 | $ 8 | $1 |
| 2013 ............................................. | 40 | 9 | 1 |
| 2014 ............................................. | 44 | 10 | 1 |
| 2015 ............................................. | 49 | 10 | 1 |
| 2016 ............................................. | 54 | 11 | 1 |
| 2017—2021 ....................................... | 379 | 71 | 7 |

**Defined Contribution Plans**

*Retirement Savings Plan*

The Retirement Savings Plan is a defined contribution plan that includes a 401(k) before-tax feature, a regular after-tax feature and a Roth after-tax feature. Under the plan, eligible employees may allocate investment balances to a variety of investment options.

We match employee contributions in cash up to 6% of eligible compensation (base salary, overtime pay and eligible incentive compensation) for employees who are not active in our defined benefit pension plan and up to 3% of eligible compensation (base salary only) for employees who are active in our defined benefit pension plan. Matching contributions for employees who are not active in our defined benefit pension plan are 100% vested and matching contributions for employees who are active in our defined benefit pension plan are fully vested after five years of service.

F-87

TREASURY-2716

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

All employees, with the exception of those who participated in the Executive Pension Plan, receive a 2% contribution regardless of employee contributions to this plan. Participants are fully vested in this 2% contribution after three years of service.

For the years ended December 31, 2011, 2010 and 2009, the maximum employee contribution as established by the IRS was $16,500, with additional "catch- up" contributions permitted for participants aged 50 and older of $5,500.

There was no option to invest directly in our common stock for the years ended December 31, 2011, 2010 and 2009. We recorded expense for this plan of $55 million, $47 million and $42 million for the years ended December 31, 2011, 2010 and 2009, respectively.

*Supplemental Retirement Savings Plan*

The Supplemental Retirement Savings Plan is an unfunded, nonqualified defined contribution plan. This plan supplements our Retirement Savings Plan to provide benefits to employees who are not grandfathered under our defined benefit pension plan and whose annual eligible earnings exceed the IRS annual limit on eligible compensation for 401(k) plans.

We credit to the plan 8% of a participant's eligible compensation that exceeds the IRS annual limit of $245,000 in 2011. Eligible compensation consists of base salary plus eligible incentive compensation earned, if any, up to a combined maximum of two times base salary. The 8% credit consists of (1) a 6% credit that vests immediately, and (2) a 2% credit that vests after three years of service.

For the year ended December 31, 2011, we recognized expense related to this plan of $1 million; for the years ended December 31, 2010 and 2009, we recognized expense related to this plan of less than $1 million in each year.

**14.   Segment Reporting**

Our three reportable segments are: Single-Family, Multifamily, and Capital Markets. We use these three segments to generate revenue and manage business risk, and each segment is based on the type of business activities it performs. We are working on reorganizing our company by function rather than by business in order to improve our operational efficiencies and effectiveness. In future periods, we may change some of our management reporting and how we report our business segment results.

***Segment Reporting for 2011 and 2010***

Our prospective adoption in 2010 of revised accounting guidance on the consolidation of VIE's and transfers of financial assets had a significant impact on the presentation and comparability of our consolidated financial statements due to the consolidation of the substantial majority of our single-class securitization trusts and the elimination of previously recorded deferred revenue from our guaranty arrangements. We continue to manage Fannie Mae based on the same three business segments. However, effective in 2010, we changed the presentation of segment financial information that is currently evaluated by management.

Under the current segment reporting, the sum of the results for our three business segments does not equal our consolidated statements of operations and comprehensive loss, as we separate the activity related to our consolidated trusts from the results generated by our three segments. In addition, we include an eliminations/ adjustments category to reconcile our business segment results and the activity related to our consolidated trusts to our consolidated statements of operations and comprehensive loss.

F-88

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

While some line items in our segment results were not impacted by either the change from the consolidation accounting guidance or changes to our segment presentation, others were impacted significantly, which reduces the comparability of our segment results with years prior to 2010. We have neither restated results prior to 2010 nor presented 2011 and 2010 results under the old presentation as we determined that it was impracticable to do so; therefore, our segment results reported in the 2011 and 2010 are not comparable with years prior to 2010.

The section below provides a discussion of the three business segments and how each segment's financial information reconciles to our consolidated financial statements for those line items that were impacted significantly as a result of changes to our segment presentation.

*Single-Family*

Revenue for our Single-Family business is from the guaranty fees the segment receives as compensation for assuming the credit risk on the mortgage loans underlying single-family Fannie Mae MBS, most of which are held within consolidated trusts, and on the single-family mortgage loans held in our mortgage portfolio. The primary source of profit for the Single-Family segment is the difference between the guaranty fees earned and the costs of providing the guaranty, including credit-related losses.

Our current segment reporting presentation differs from our consolidated balance sheets and statements of operations and comprehensive loss in order to reflect the activities and results of the Single-Family segment. The significant differences from the consolidated statements of operations and comprehensive loss are as follows:

- *Guaranty fee income*—Guaranty fee income reflects (1) the cash guaranty fees paid by MBS trusts to Single-Family, (2) the amortization of deferred cash fees (both the previously recorded deferred cash fees that were eliminated from our consolidated balance sheets at transition and deferred guaranty fees received subsequent to transition that are currently recognized in our consolidated financial statements through interest income), such as buy-ups, buy-downs, and risk-based pricing adjustments, and (3) the guaranty fees from the Capital Markets group on single-family loans in our mortgage portfolio. To reconcile to our consolidated statements of operations and comprehensive loss, we eliminate guaranty fees and the amortization of deferred cash fees related to consolidated trusts as they are now reflected as a component of interest income. However, such accounting continues to be reflected for the segment reporting presentation.

- *Net interest income (loss)*—Net interest loss within the Single-Family segment reflects interest expense to reimburse Capital Markets and consolidated trusts for contractual interest not received on mortgage loans, when interest income is no longer recognized in accordance with our nonaccrual accounting policy in our consolidated statements of operations and comprehensive loss. Net interest income (loss), also includes an allocated cost of capital charge among the three segments that is not included in net interest income in the consolidated statement of operations and comprehensive loss.

*Multifamily*

The primary sources of revenue for our Multifamily business are (1) guaranty fees the segment receives as compensation for assuming the credit risk on the mortgage loans underlying multifamily Fannie Mae MBS, most of which are held within consolidated trusts, (2) guaranty fees on the multifamily mortgage loans held in our mortgage portfolio, (3) transaction fees associated with the multifamily business and (4) bond credit enhancement fees. Investments in rental and for-sale housing generate revenue and losses from operations and the eventual sale of the assets. In the fourth quarter of 2009, we reduced the carrying value of our LIHTC investments to zero. As a result, we no longer recognize net operating losses or other-than-temporary impairment on our LIHTC investments. While the Multifamily guaranty business is similar to our Single-Family business, neither the economic return nor the nature of the credit risk is similar to that of Single-Family.

F-89

TREASURY-2718

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Our current segment reporting presentation differs from our consolidated balance sheets and statements of operations and comprehensive loss in order to reflect the activities and results of the Multifamily segment. The significant differences from the consolidated statements of operations and comprehensive loss are as follows:

- *Guaranty fee income*—Guaranty fee income reflects the cash guaranty fees paid by MBS trusts to Multifamily and the guaranty fees from the Capital Markets group on multifamily loans in Fannie Mae's portfolio. To reconcile to our consolidated statements of operations and comprehensive loss, we eliminate guaranty fees related to consolidated trusts.

- *Gains (losses) from partnership investments*—Gains (losses) from partnership investments primarily reflect losses on investments in affordable rental and for-sale housing partnerships measured under the equity method of accounting. To reconcile to our consolidated statements of operations and comprehensive loss, we adjust the losses to reflect the consolidation of certain partnership investments.

*Capital Markets Group*

Our Capital Markets group generates most of its revenue from the difference, or spread, between the interest we earn on our mortgage assets and the interest we pay on the debt we issue to fund these assets. We refer to this spread as our net interest yield. Changes in the fair value of the derivative instruments and trading securities we hold impact the net income or loss reported by the Capital Markets group. The net income or loss reported by our Capital Markets group is also affected by the impairment of AFS securities.

Our current segment reporting presentation differs from our consolidated balance sheets and statements of operations and comprehensive loss in order to reflect the activities and results of the Capital Markets group. The significant differences from the consolidated statements of operations and comprehensive loss are as follows:

- *Net interest income*—Net interest income reflects the interest income on mortgage loans and securities owned by Fannie Mae and interest expense on funding debt issued by Fannie Mae, including accretion and amortization of any cost basis adjustments. To reconcile to our consolidated statements of operations and comprehensive loss, we adjust for the impact of consolidated trusts and intercompany eliminations as follows:

  - Interest income:   Interest income consists of interest on the segment's interest-earning assets, which differs from interest-earning assets in our consolidated balance sheets. We exclude loans and securities that underlie the consolidated trusts from our Capital Markets group balance sheets. The net interest income reported by the Capital Markets group excludes the interest income earned on assets held by consolidated trusts. As a result, we report interest income and amortization of cost basis adjustments only on securities and loans that are held in our portfolio. For mortgage loans held in our portfolio, when interest income is no longer recognized in accordance with our nonaccrual accounting policy, the Capital Markets group recognizes interest income for reimbursement from Single-Family and Multifamily for the contractual interest due under the terms of our intracompany guaranty arrangement.

  - Interest expense:   Interest expense consists of contractual interest on the Capital Markets group's interest-bearing liabilities, including the accretion and amortization of any cost basis adjustments. It excludes interest expense on debt issued by consolidated trusts. Therefore, the interest expense recognized on the Capital Markets group income statement is limited to our funding debt, which is reported as "Debt of Fannie Mae" in our consolidated balance sheets. Net interest expense also includes an allocated cost of capital charge among the three business segments that is not included in net interest income in our consolidated statements of operations and comprehensive loss.

TREASURY-2719

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

- *Investment gains or losses, net*—Investment gains or losses, net reflects the gains and losses on securitizations and sales of available-for-sale securities from our portfolio. To reconcile to our consolidated statements of operations and comprehensive loss, we eliminate gains and losses on securities that have been consolidated to loans.

- *Fair value gains or losses, net*—Fair value gains or losses, net for the Capital Markets group includes derivative gains and losses, foreign exchange gains and losses, and the fair value gains and losses on certain debt securities in our portfolio. To reconcile to our consolidated statements of operations and comprehensive loss, we eliminate fair value gains or losses on Fannie Mae MBS that have been consolidated to loans.

- *Other expenses, net*—Debt extinguishment gains or losses recorded on the segment statements of operations relate exclusively to our funding debt, which is reported as "Debt of Fannie Mae" in our consolidated balance sheets. To reconcile to our consolidated statements of operations and comprehensive loss, we include debt extinguishment gains or losses related to consolidated trusts to arrive at our total recognized debt extinguishment gains or losses.

### Segment Allocations and Results

Our segment financial results include directly attributable revenues and expenses. Additionally, we allocate to each of our segments: (1) capital using FHFA minimum capital requirements adjusted for over- or under-capitalization; (2) indirect administrative costs; and (3) a provision or benefit for federal income taxes. In addition, we allocate intracompany guaranty fee income as a charge from the Single-Family and Multifamily segments to Capital Markets for managing the credit risk on mortgage loans held by the Capital Markets group.

With the adoption of the consolidation accounting guidance, we have prospectively revised the presentation of our results for these segments to better reflect how we operate and oversee these businesses.

TREASURY-2720

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following tables display our segment results under our current segment reporting presentation for the years ended December 31, 2011 and 2010.

|  | For the Year Ended December 31, 2011 | | | | | |
|---|---|---|---|---|---|---|
|  | Business Segments | | | Other Activity/Reconciling Items | | |
|  | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments[2] | Total Results |
|  | (Dollars in millions) | | | | | |
| Net interest (loss) income .................... | $ (2,411) | $ (38) | $13,920 | $ 5,765 | $ 2,045[3] | $ 19,281 |
| Provision for loan losses ..................... | (25,623) | (291) | — | — | — | (25,914) |
| Net interest (loss) income after provision for loan losses ................................... | (28,034) | (329) | 13,920 | 5,765 | 2,045 | (6,633) |
| Guaranty fee income (expense) ............... | 7,507 | 884 | (1,497) | (4,486)[4] | (2,181)[4] | 227[4] |
| Investment (losses) gains, net ................. | (2) | 18 | 3,711 | (315) | (2,906)[5] | 506 |
| Net other-than-temporary impairments ......... | — | — | (306) | (2) | — | (308) |
| Fair value losses, net ........................ | (7) | — | (6,596) | (226) | 208[6] | (6,621) |
| Debt extinguishment (losses) gains, net ......... | — | — | (254) | 22 | — | (232) |
| Gains from partnership investments ............. | — | 81 | — | — | — | 81[7] |
| Fee and other income (expense) ............... | 579 | 218 | 478 | (329) | (10) | 936 |
| Administrative expenses ...................... | (1,638) | (264) | (468) | — | — | (2,370) |
| (Provision) benefit for guaranty losses .......... | (830) | 26 | — | — | — | (804) |
| Foreclosed property expense .................. | (765) | (15) | — | — | — | (780) |
| Other (expense) income ...................... | (857) | 25 | (34) | — | (81) | (947) |
| (Loss) income before federal income taxes ...... | (24,047) | 644 | 8,954 | 429 | (2,925) | (16,945) |
| Benefit (provision) for federal income taxes ..... | 106 | (61) | 45 | — | — | 90 |
| Net (loss) income attributable to Fannie Mae ... | $(23,941) | $ 583 | $ 8,999 | $    429 | $(2,925) | $(16,855) |

F-92

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | For the Year Ended December 31, 2010 | | | | | |
| | Business Segments | | | Other Activity/Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/Adjustments[2] | Total Results |
| | | | (Dollars in millions) | | | |
| Net interest (loss) income . . . . . . . . . . . . . . . . . . . . . . . . | $ (5,386) | $    3 | $14,321 | $ 5,073 | $ 2,398[3] | $ 16,409 |
| Provision for loan losses . . . . . . . . . . . . . . . . . . . . . . . | (24,503) | (199) | — | — | — | (24,702) |
| Net interest (loss) income after provision for loan losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (29,889) | (196) | 14,321 | 5,073 | 2,398 | (8,293) |
| Guaranty fee income (expense) . . . . . . . . . . . . . . . . . . . | 7,206 | 791 | (1,440) | (4,525)[4] | (1,830)[4] | 202[4] |
| Investment gains (losses), net . . . . . . . . . . . . . . . . . . . | 9 | 6 | 4,047 | (418) | (3,298)[5] | 346 |
| Net other-than-temporary impairments . . . . . . . . . . . . | — | — | (720) | (2) | — | (722) |
| Fair value gains (losses), net  . . . . . . . . . . . . . . . . . . | — | — | 239 | (155) | (595)[6] | (511) |
| Debt extinguishment losses, net . . . . . . . . . . . . . . . . . | — | — | (459) | (109) | — | (568) |
| Losses from partnership investments . . . . . . . . . . . . . . | — | (70) | — | — | (4) | (74)[7] |
| Fee and other income (expense) . . . . . . . . . . . . . . . . . | 306 | 146 | 519 | (88) | (1) | 882 |
| Administrative expenses . . . . . . . . . . . . . . . . . . . . . . . . | (1,628) | (384) | (585) | — | — | (2,597) |
| (Provision) benefit for guaranty losses . . . . . . . . . . . . | (237) | 43 | — | — | — | (194) |
| Foreclosed property expense . . . . . . . . . . . . . . . . . . . . | (1,680) | (38) | — | — | — | (1,718) |
| Other (expenses) income  . . . . . . . . . . . . . . . . . . . . . . | (836) | (68) | 125 | — | (74) | (853) |
| (Loss) income before federal income taxes . . . . . . . . . | (26,749) | 230 | 16,047 | (224) | (3,404) | (14,100) |
| Benefit (provision) for federal income taxes . . . . . . . . | 69 | (14) | 27 | — | — | 82 |
| Net (loss) income  . . . . . . . . . . . . . . . . . . . . . . . . . | (26,680) | 216 | 16,074 | (224) | (3,404) | (14,018) |
| Less: Net loss attributable to noncontrolling interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | 4[8] | 4 |
| Net (loss) income attributable to Fannie Mae . . . . . | $(26,680) | $ 216 | $16,074 | $   (224) | $(3,400) | $(14,014) |

---

[1]   Represents activity related to the assets and liabilities of consolidated trusts in our consolidated balance sheets.

[2]   Represents the elimination of intercompany transactions occurring between the three business segments and our consolidated trusts, as well as other adjustments to reconcile to our consolidated results.

[3]   Represents the amortization expense of cost basis adjustments on securities that we own in our portfolio that on a GAAP basis are eliminated.

[4]   Represents the guaranty fees paid from consolidated trusts to the Single-Family and Multifamily segments. The adjustment to guaranty fee income in the Eliminations/Adjustments column represents the elimination of the amortization of deferred cash fees related to consolidated trusts that were re-established for segment reporting. Total guaranty fee income is included in fee and other income in our consolidated statements of operations and comprehensive loss.

[5]   Primarily represents the removal of realized gains and losses on sales of Fannie Mae MBS classified as available-for-sale securities that are issued by consolidated trusts and retained in the Capital Markets portfolio. The adjustment also includes the removal of securitization gains (losses) recognized in the Capital Markets segment relating to portfolio securitization transactions that do not qualify for sale accounting under GAAP.

[6]   Represents the removal of fair value adjustments on consolidated Fannie Mae MBS classified as trading that are retained in the Capital Markets portfolio.

[7]   Gains (losses) from partnership investments are included in other expenses in our consolidated statements of operations and comprehensive loss.

TREASURY-2722

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(8)   Represents the adjustment from equity method accounting to consolidation accounting for partnership investments that are consolidated in our consolidated balance sheets.

The following table displays our segment results under our previous reporting presentation for the year ended December 31, 2009.

| | For the Year Ended December 31, 2009 | | | |
| | Single-Family | Multifamily | Capital Markets | Total |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| Net interest income (expense)[1] | $    428 | $   (193) | $14,275 | $ 14,510 |
| Guaranty fee income (expense)[2] | 8,002 | 675 | (1,466) | 7,211 |
| Investment (losses) gains, net | (2) | — | 1,460 | 1,458 |
| Net other-than-temporary impairments | — | — | (9,861) | (9,861) |
| Fair value losses, net | — | — | (2,811) | (2,811) |
| Debt extinguishment losses, net | — | — | (325) | (325) |
| Losses from partnership investments | — | (6,735) | — | (6,735) |
| Fee and other income | 354 | 100 | 319 | 773 |
| Administrative expenses | (1,419) | (363) | (425) | (2,207) |
| Provision for credit losses | (70,463) | (2,163) | — | (72,626) |
| Foreclosed property expense | (857) | (53) | — | (910) |
| Other expenses | (1,216) | (38) | (230) | (1,484) |
| (Loss) income before federal income taxes | (65,173) | (8,770) | 936 | (73,007) |
| Benefit (provision) for federal income taxes | 1,375 | (311) | (79) | 985 |
| Net (loss) income | (63,798) | (9,081) | 857 | (72,022) |
| Less: Net loss attributable to noncontrolling interest | — | 53 | — | 53 |
| Net (loss) income attributable to Fannie Mae | $(63,798) | $(9,028) | $    857 | $(71,969) |

---

[1]   Includes cost of capital charge.

[2]   The charge to Capital Markets represents an intercompany guaranty fee expense allocated to Capital Markets from Single-Family and Multifamily for absorbing the credit risk on mortgage loans held in our portfolio.

The following table displays total assets by segment as of December 31, 2011 and 2010.

| | As of December 31, | |
| | 2011 | 2010 |
|---|---|---|
| | (Dollars in millions) | |
| Single-Family | $  11,822 | $   14,843 |
| Multifamily | 5,747 | 4,881 |
| Capital Markets | 836,700 | 873,052 |
| Consolidated trusts | 2,676,952 | 2,673,937 |
| Eliminations/adjustments | (319,737) | (344,741) |
| Total assets | $3,211,484 | $3,221,972 |

F-94

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

We operate our business solely in the United States and its territories, and accordingly, we generate no revenue from and have no assets in geographic locations other than the United States and its territories.

### 15.   Equity (Deficit)

*Common Stock*

Shares of common stock outstanding, net of shares held as treasury stock, totaled 1.2 billion and 1.1 billion as of December 31, 2011 and 2010, respectively.

During the conservatorship, the rights and powers of shareholders are suspended. Accordingly, our common shareholders have no ability to elect directors or to vote on other matters during the conservatorship unless FHFA elects to delegate this authority to them. The senior preferred stock purchase agreement with Treasury prohibits the payment of dividends on common stock without the prior written consent of Treasury. The conservator also has eliminated common stock dividends. In addition, we issued a warrant to Treasury that provides Treasury with the right to purchase for a nominal price shares of our common stock equal to 79.9% of the total number of shares of common stock outstanding on a fully diluted basis on the date of exercise, which would substantially dilute the ownership in Fannie Mae of our common stockholders at the time of exercise. Refer to "Senior Preferred Stock and Common Stock Warrant" section of this note.

TREASURY-2724

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Preferred Stock*

The following table displays our senior preferred stock and preferred stock outstanding as of December 31, 2011 and 2010.

| Title | Issue Date | Issued and Outstanding as of December 31, | | | | Stated Value per Share | Annual Dividend Rate as of December 31, 2011 | Redeemable on or After |
| | | 2011 | | 2010 | | | | |
| | | Shares | Amount | Shares | Amount | | | |
| | | (Dollars and shares in millions, except per share amounts) | | | | | | |
| **Senior Preferred Stock** | | | | | | | | |
| Series 2008-2 . . . . . . . | September 8, 2008 | 1 | $112,578 | 1 | $88,600 | $112,578[1] | 10.000%[2] | N/A[3] |
| Total . . . . . . . . . . . . | | 1 | $112,578 | 1 | $88,600 | | | |
| **Preferred Stock** | | | | | | | | |
| Series D . . . . . . . . . | September 30, 1998 | 3 | $ 150 | 3 | $ 150 | $ 50 | 5.250% | September 30, 1999 |
| Series E . . . . . . . . . . | April 15, 1999 | 3 | 150 | 3 | 150 | 50 | 5.100 | April 15, 2004 |
| Series F . . . . . . . . . . | March 20, 2000 | 14 | 690 | 14 | 690 | 50 | 0.890[4] | March 31, 2002[5] |
| Series G . . . . . . . . . . | August 8, 2000 | 6 | 288 | 6 | 288 | 50 | 0.270[6] | September 30, 2002[5] |
| Series H . . . . . . . . . . | April 6, 2001 | 8 | 400 | 8 | 400 | 50 | 5.810 | April 6, 2006 |
| Series I . . . . . . . . . . | October 28, 2002 | 6 | 300 | 6 | 300 | 50 | 5.375 | October 28, 2007 |
| Series L . . . . . . . . . . | April 29, 2003 | 7 | 345 | 7 | 345 | 50 | 5.125 | April 29, 2008 |
| Series M . . . . . . . . . . | June 10, 2003 | 9 | 460 | 9 | 460 | 50 | 4.750 | June 10, 2008 |
| Series N . . . . . . . . . . | September 25, 2003 | 5 | 225 | 5 | 225 | 50 | 5.500 | September 25, 2008 |
| Series O . . . . . . . . . . | December 30, 2004 | 50 | 2,500 | 50 | 2,500 | 50 | 7.000[7] | December 31, 2007 |
| Convertible | | | | | | | | |
| Series 2004-1[8] . . . . | December 30, 2004 | — | 2,492 | — | 2,492 | 100,000 | 5.375 | January 5, 2008 |
| Series P . . . . . . . . . . | September 28, 2007 | 40 | 1,000 | 40 | 1,000 | 25 | 4.500[9] | September 30, 2012 |
| Series Q . . . . . . . . . . | October 4, 2007 | 15 | 375 | 15 | 375 | 25 | 6.750 | September 30, 2010 |
| Series R[10] . . . . . . . . | November 21, 2007 | 21 | 530 | 21 | 530 | 25 | 7.625 | November 21, 2012 |
| Series S . . . . . . . . . . | December 11, 2007 | 280 | 7,000 | 280 | 7,000 | 25 | 7.750[11] | December 31, 2010[12] |
| Mandatory Convertible | | | | | | | | |
| Series 2008-1 . . . . . . | May 14, 2008 | — | — | 21 | 1,074 | 50 | 8.750 | N/A |
| Series T[13] . . . . . . . . | May 19, 2008 | 89 | 2,225 | 89 | 2,225 | 25 | 8.250 | May 20, 2013 |
| Total . . . . . . . . . . . | | 556 | $ 19,130 | 577 | $20,204 | | | |

---

[1] Initial Stated Value per share was $1,000. Based on our draws of funds under the Senior Preferred Stock Variable Liquidation Preference agreement with Treasury, the Stated Value per share on December 31, 2011 was $112,578.

[2] Rate effective September 9, 2008. If at any time we fail to pay cash dividends in a timely manner, then immediately following such failure and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be 12% per year.

[3] Any liquidation preference of our senior preferred stock in excess of $1.0 billion may be repaid through an issuance of common or preferred stock. The initial $1.0 billion investment may be repaid only in conjunction with termination of the senior preferred stock purchase agreement. The provisions for termination under the senior preferred stock purchase agreement are very restrictive and cannot occur while we are in conservatorship.

[4] Rate effective March 31, 2010. Variable dividend rate resets every two years at a per annum rate equal to the two-year Maturity U.S. Treasury Rate ("CMT") minus 0.16% with a cap of 11% per year. As of December 31, 2011, the annual dividend rate was 0.89%.

TREASURY-2725

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

(5)   Represents initial call date. Redeemable every two years thereafter.

(6)   Rate effective September 30, 2010. Variable dividend rate resets every two years at a per annum rate equal to the two-year CMT rate minus 0.18% with a cap of 11% per year. As of December 31, 2011, the annual dividend rate was 0.27%.

(7)   Rate effective December 31, 2011. Variable dividend rate resets quarterly thereafter at a per annum rate equal to the greater of 7.00% or 10-year CMT rate plus 2.375%. As of December 31, 2011, the annual dividend rate was 7.00%.

(8)   Issued and outstanding shares were 24,922 as of December 31, 2011 and 2010, respectively.

(9)   Rate effective December 31, 2011. Variable dividend rate resets quarterly thereafter at a per annum rate equal to the greater of 4.50% or 3-Month LIBOR plus 0.75%. As of December 31, 2011, the annual dividend rate was 4.50%.

(10)  On November 21, 2007, we issued 20 million shares of preferred stock in the amount of $500 million. Subsequent to the initial issuance, we issued an additional 1.2 million shares in the amount of $30 million on December 14, 2007 under the same terms as the initial issuance.

(11)  Rate effective December 31, 2011. Variable dividend rate resets quarterly thereafter at a per annum rate equal to the greater of 7.75% or 3-Month LIBOR plus 4.23%. As of December 31, 2011, the annual dividend rate was 7.75%.

(12)  Represents initial call date. Redeemable every five years thereafter.

(13)  On May 19, 2008, we issued 80 million shares of preferred stock in the amount of $2.0 billion. Subsequent to the initial issuance, we issued an additional 8 million shares in the amount of $200 million on May 22, 2008 and one million shares in the amount of $25 million on June 4, 2008 under the same terms as the initial issuance.

As described under "Senior Preferred Stock and Common Stock Warrant" we issued senior preferred stock that ranks senior to all other series of preferred stock as to both dividends and distributions upon dissolution, liquidation or winding up of the company. During the conservatorship, the rights and powers of preferred stockholders (other than holders of senior preferred stock) are suspended. The senior preferred stock purchase agreement with Treasury also prohibits the payment of dividends on preferred stock (other than the senior preferred stock) without the prior written consent of Treasury. The conservator also has eliminated preferred stock dividends, other than dividends on the senior preferred stock.

Each series of our preferred stock has no par value, is non-participating, is non-voting and has a liquidation preference equal to the stated value per share. None of our preferred stock is convertible into or exchangeable for any of our other stock or obligations, with the exception of the Convertible Series 2004-1.

Shares of the Convertible Series 2004-1 Preferred Stock are convertible at any time, at the option of the holders, into shares of Fannie Mae common stock at a conversion price of $94.31 per share of common stock (equivalent to a conversion rate of 1,060.3329 shares of common stock for each share of Series 2004-1 Preferred Stock). The conversion price is adjustable, as necessary, to maintain the stated conversion rate into common stock. Events which may trigger an adjustment to the conversion price include certain changes in our common stock dividend rate, subdivisions of our outstanding common stock into a greater number of shares, combinations of our outstanding common stock into a smaller number of shares and issuances of any shares by reclassification of our common stock. No such events have occurred.

Holders of preferred stock (other than the senior preferred stock) are entitled to receive non-cumulative, quarterly dividends when, and if, declared by our Board of Directors, but have no right to require redemption of any shares of preferred stock. Payment of dividends on preferred stock (other than the senior preferred stock) is not mandatory, but has priority over payment of dividends on common stock, which are also declared by the Board of Directors. If dividends on the preferred stock are not paid or set aside for payment for a given dividend period, dividends may not be paid on our common stock for that period. There were no dividends declared or paid on preferred stock (other than the senior preferred stock) for the years ended December 31, 2011 or 2010.

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

After a specified period, we have the option to redeem preferred stock (other than the senior preferred stock) at its redemption price plus the dividend (whether or not declared) for the then-current period accrued to, but excluding, the date of redemption. The redemption price is equal to the stated value for all issues of preferred stock except Series O, which has a redemption price of $50 to $52.50 depending on the year of redemption and Convertible Series 2004-1, which has a redemption price of $105,000 per share.

Our preferred stock is traded in the over-the-counter market.

***Conversions of Preferred Stock to Common Stock***

During 2011, 38,669,995 shares of common stock were issued upon conversion of 21,493,217 shares of 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1 at the option of the holders pursuant to the terms of the preferred stock. On May 13, 2011, the mandatory conversion date, 36,398,449 shares of common stock were issued upon the mandatory conversion of all remaining outstanding shares (20,018,947 shares) of 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1, in accordance with its terms. In 2010, 2,867,318 shares of Mandatory Convertible Series 2008-1 were converted to 4,417,947 shares of common stock. In 2009, 17,335,866 shares of Mandatory Convertible Series 2008-1 were converted to 26,711,068 shares of common stock and 78 shares of Mandatory Convertible Series 2004-1 were converted to 82,705 shares of common stock.

***Senior Preferred Stock and Common Stock Warrant***

On September 8, 2008, we issued one million shares of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2 ("senior preferred stock"), with an aggregate stated value and initial liquidation preference of $1.0 billion. On September 7, 2008, we issued a warrant to purchase common stock to Treasury. The warrant gives Treasury the right to purchase shares of our common stock equal to 79.9% of the total number of shares of common stock outstanding on a fully diluted basis on the date of exercise. The senior preferred stock and the warrant were issued in consideration for the initial commitment from Treasury to provide up to $100.0 billion in cash to us under the terms set forth in the senior preferred stock purchase agreement prior to subsequent amendments. We did not receive any cash proceeds as a result of issuing these shares or the warrant. We have assigned a value of $4.5 billion to Treasury's commitment, which has been recorded as a reduction to additional paid-in-capital and was partially offset by the aggregate fair value of the warrant. There was no impact to the total balance of stockholders' equity (deficit) as a result of the issuance.

*Variable Liquidation Preference Senior Preferred Stock, Series 2008-2*

Shares of the senior preferred stock have no par value and have a stated value and initial liquidation preference equal to $1,000 per share. The liquidation preference of the senior preferred stock is subject to adjustment. To the extent dividends are not paid in cash for any dividend period, the dividends will accrue and be added to the liquidation preference of the senior preferred stock. In addition, any amounts paid by Treasury to us pursuant to Treasury's funding commitment provided in the senior preferred stock purchase agreement and any quarterly commitment fee payable under the senior preferred stock purchase agreement that is not paid in cash to or waived by Treasury will be added to the liquidation preference of the senior preferred stock. As of February 29, 2012, we have received a total of $111.6 billion under Treasury's funding commitment and the Acting Director of FHFA will request an additional $4.6 billion from Treasury to eliminate our net worth deficit as of December 31, 2011.

Holders of the senior preferred stock are entitled to receive when, as and if declared by our Board of Directors, out of legally available funds, cumulative quarterly cash dividends at an annual rate of 10% per year based on the then-current liquidation preference of the senior preferred stock. As conservator and under our Charter, FHFA

F-98

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

also has authority to declare dividends on the senior preferred stock. If at any time we fail to pay cash dividends in a timely manner, then immediately following such failure and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be 12% per year. Dividends declared and paid on our senior preferred stock were $9.6 billion, $7.7 billion and $2.5 billion for the years ended December 31, 2011, 2010 and 2009, respectively.

The senior preferred stock ranks prior to our common stock and all other outstanding series of our preferred stock as to both dividends and rights upon liquidation. We may not declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the senior preferred stock without the prior written consent of Treasury. Shares of the senior preferred stock are not convertible. Shares of the senior preferred stock have no general or special voting rights, other than those set forth in the certificate of designation for the senior preferred stock or otherwise required by law. The consent of holders of at least two-thirds of all outstanding shares of senior preferred stock is generally required to amend the terms of the senior preferred stock or to create any class or series of stock that ranks prior to or on parity with the senior preferred stock.

We are not permitted to redeem the senior preferred stock in full prior to the termination of Treasury's funding commitment under the senior preferred stock purchase agreement. However, we are permitted to pay down the liquidation preference of the outstanding shares of senior preferred stock to the extent of (1) accrued and unpaid dividends previously added to the liquidation preference and not previously paid down; and (2) quarterly commitment fees previously added to the liquidation preference and not previously paid down. In addition, to the extent we issue any shares of capital stock for cash at any time the senior preferred stock is outstanding (which requires Treasury's approval), we are required to use the net proceeds of the issuance to pay down the liquidation preference of the senior preferred stock; however, the liquidation preference of each share of senior preferred stock may not be paid down below $1,000 per share prior to the termination of Treasury's funding commitment. Following the termination of Treasury's funding commitment, we may pay down the liquidation preference of all outstanding shares of senior preferred stock at any time, in whole or in part. If we pay down the liquidation preference of each outstanding share of senior preferred stock in full, the shares will be considered redeemed as of the payment date.

*Common Stock Warrant*

The warrant gives Treasury the right to purchase shares of our common stock equal to 79.9% of the total number of shares of common stock outstanding on a fully diluted basis on the date of exercise. The warrant may be exercised in whole or in part at any time on or before September 7, 2028, by delivery to Fannie Mae of: (a) a notice of exercise; (b) payment of the exercise price of $0.00001 per share; and (c) the warrant. If the market price of one share of common stock is greater than the exercise price, in lieu of exercising the warrant by payment of the exercise price, Treasury may elect to receive shares equal to the value of the warrant (or portion thereof being canceled) pursuant to the formula specified in the warrant. Upon exercise of the warrant, Treasury may assign the right to receive the shares of common stock issuable upon exercise to any other person. If the warrant is exercised, the stated value of the common stock issued will be reclassified as "Common stock" in our consolidated balance sheets. As of February 29, 2012, Treasury had not exercised the warrant.

**Senior Preferred Stock Purchase Agreement with Treasury**

*Commitment Fee*

We were scheduled to begin paying Treasury a quarterly commitment fee beginning on March 31, 2011; however, Treasury has waived the quarterly commitment fee under the senior preferred stock purchase agreement

F-99

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

for each quarter of 2011 and the first quarter of 2012 due to the continued fragility of the U.S. mortgage market and Treasury's belief that imposing the commitment fee would not generate increased compensation for taxpayers. Treasury stated that it will reevaluate the situation to determine whether to set the quarterly commitment fee for the remaining quarters of 2012. We may elect to pay the periodic commitment fee in cash or add the amount of the fee to the liquidation preference of the senior preferred stock.

*Funding Commitment*

Treasury's funding commitment under the senior preferred stock purchase agreement is intended to ensure that we maintain a positive net worth. On December 24, 2009, the maximum amount of Treasury's funding commitment to us under the senior preferred stock purchase agreement was increased pursuant to an amendment to the agreement. The amendment provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any net worth deficiencies attributable to periods during 2010, 2011 and 2012. If we do not have a positive net worth as of December 31, 2012, then the amount of funding available under the senior preferred stock purchase agreement after 2012 will be $124.8 billion ($200 billion less $75.2 billion in cumulative draws for net worth deficiencies through December 31, 2009). In the event we have a positive net worth as of December 31, 2012, then the amount of funding available after 2012 under the senior preferred stock purchase agreement will depend on the size of that positive net worth relative to the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, as follows:

- If our positive net worth as of December 31, 2012 is less than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less our positive net worth as of December 31, 2012.

- If our positive net worth as of December 31, 2012 is greater than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less the cumulative draws attributable to periods during 2010, 2011 and 2012.

The senior preferred stock purchase agreement provides that the deficiency amount will be calculated differently if we become subject to receivership or other liquidation process. The deficiency amount may be increased above the otherwise applicable amount upon our mutual written agreement with Treasury. In addition, if the Director of FHFA determines that the Director will be mandated by law to appoint a receiver for us unless our capital is increased by receiving funds under the commitment in an amount up to the deficiency amount (subject to the maximum amount that may be funded under the agreement), then FHFA, in its capacity as our conservator, may request that Treasury provide funds to us in such amount. The senior preferred stock purchase agreement also provides that, if we have a deficiency amount as of the date of completion of the liquidation of our assets, we may request funds from Treasury in an amount up to the deficiency amount (subject to the maximum amount that may be funded under the agreement). Any amounts that we draw under the senior preferred stock purchase agreement will be added to the liquidation preference of the senior preferred stock. No additional shares of senior preferred stock are required to be issued under the senior preferred stock purchase agreement.

*Covenants*

The senior preferred stock purchase agreement, as amended, provides that, until the senior preferred stock is repaid or redeemed in full, we may not, without the prior written consent of Treasury:

- Declare or pay any dividend (preferred or otherwise) or make any other distribution with respect to any Fannie Mae equity securities (other than with respect to the senior preferred stock or warrant);

- Redeem, purchase, retire or otherwise acquire any Fannie Mae equity securities (other than the senior preferred stock or warrant);

F-100

TREASURY-2729

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

- Sell or issue any Fannie Mae equity securities (other than the senior preferred stock, the warrant and the common stock issuable upon exercise of the warrant and other than as required by the terms of any binding agreement in effect on the date of the senior preferred stock purchase agreement);

- Terminate the conservatorship (other than in connection with a receivership);

- Sell, transfer, lease or otherwise dispose of any assets, other than dispositions for fair market value: (a) to a limited life regulated entity (in the context of receivership); (b) of assets and properties in the ordinary course of business, consistent with past practice; (c) in connection with a liquidation of Fannie Mae by a receiver; (d) of cash or cash equivalents for cash or cash equivalents; or (e) to the extent necessary to comply with the covenant described below relating to the reduction of our mortgage assets beginning in 2010;

- Incur indebtedness that would result in our aggregate indebtedness exceeding $972 billion through December 31, 2011. For every year thereafter, our debt cap will equal 120% of the amount of mortgage assets we are allowed to own on December 31 of the immediately preceding calendar year;

- Issue any subordinated debt;

- Enter into a corporate reorganization, recapitalization, merger, acquisition or similar event; or

- Engage in transactions with affiliates unless the transaction is (a) pursuant to the senior preferred stock purchase agreement, the senior preferred stock or the warrant, (b) upon arm's-length terms or (c) a transaction undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence on the date of the senior preferred stock purchase agreement.

The agreement also provides that we may not own mortgage assets in excess of $729 billion as of December 31, 2011. On each December 31 thereafter, we are required to reduce our mortgage assets to 90% of the maximum allowable amount that we were permitted to own as of December 31 of the immediately preceding calendar year, until the amount of our mortgage assets reaches $250 billion.

Under the agreement, the effect of changes in generally accepted accounting principles that occurred subsequent to the date of the agreement and that require us to recognize additional mortgage assets in our consolidated balance sheets were not considered for purposes of evaluating our compliance with the limitation on the amount of mortgage assets we may own. In addition, the definition of indebtedness in the agreement was revised to clarify that it also does not give effect to any change that may be made in respect of the FASB guidance on accounting for transfers of financial assets or any similar accounting guidance.

In addition, the agreement provides that we may not enter into any new compensation arrangements or increase amounts or benefits payable under existing compensation arrangements with our named executive officers (as defined by SEC rules) without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury. As of December 31, 2011, we were in compliance with the senior preferred stock purchase agreement covenants.

*Termination Provisions*

The senior preferred stock purchase agreement provides that Treasury's funding commitment will terminate under any the following circumstances: (1) the completion of our liquidation and fulfillment of Treasury's obligations under its funding commitment at that time, (2) the payment in full of, or reasonable provision for, all of our liabilities (whether or not contingent, including mortgage guaranty obligations), or (3) the funding by Treasury of the maximum amount under the agreement. In addition, Treasury may terminate its funding commitment and declare the senior preferred stock purchase agreement null and void if a court vacates, modifies,

F-101

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

amends, conditions, enjoins, stays or otherwise affects the appointment of the conservator or otherwise curtails the conservator's powers. Treasury may not terminate its funding commitment solely by reason of our being in conservatorship, receivership or other insolvency proceeding, or due to our financial condition or any adverse change in our financial condition.

*Waivers and Amendments*

The senior preferred stock purchase agreement provides that most provisions of the agreement may be waived or amended by mutual written agreement of the parties. No waiver or amendment of the agreement, however, may decrease Treasury's aggregate funding commitment or add conditions to Treasury's funding commitment if the waiver or amendment would adversely affect in any material respect the holders of our debt securities or guaranteed Fannie Mae MBS.

*Third-party Enforcement Rights*

If we default on payments with respect to our debt securities or guaranteed Fannie Mae MBS and Treasury fails to perform its obligations under its funding commitment, and if we and/or the conservator are not diligently pursuing remedies in respect of that failure, the holders of these debt securities or Fannie Mae MBS may file a claim for relief in the United States Court of Federal Claims. The relief, if granted, would require Treasury to fund to us the lesser of (1) the amount necessary to cure the payment defaults on our debt and Fannie Mae MBS and (2) the lesser of (a) the deficiency amount and (b) the maximum amount available under the agreement less the aggregate amount of funding previously provided under the commitment. Any payment that Treasury makes under those circumstances would be treated for all purposes as a draw under the senior preferred stock purchase agreement that would increase the liquidation preference of the senior preferred stock.

**16.   Regulatory Capital Requirements**

FHFA has announced that our existing statutory and FHFA-directed regulatory capital requirements will not be binding during the conservatorship, and that FHFA will not issue quarterly capital classifications during the conservatorship. We submit capital reports to FHFA during the conservatorship and FHFA monitors our capital levels. FHFA has stated that it does not intend to report our critical capital, risk-based capital or subordinated debt levels during the conservatorship. As of December 31, 2011 and 2010, we had a minimum capital deficiency of $148.4 billion and $123.2 billion, respectively. Our minimum capital deficiency was determined based on guidance from FHFA, in which FHFA (1) directed us, for loans backing Fannie Mae MBS held by third parties, to continue reporting our minimum capital requirements based on 0.45% of the unpaid principal balance and critical capital based on 0.25% of the unpaid principal balance, regardless of whether these loans have been consolidated pursuant to accounting rules, and (2) issued a regulatory interpretation stating that our minimum capital requirements are not automatically affected by the consolidation accounting guidance. Additionally, our minimum capital deficiency excludes the funds provided to us by Treasury pursuant to the senior preferred stock purchase agreement, as the senior preferred stock does not qualify as core capital due to its cumulative dividend provisions.

Pursuant to the GSE Act, if the Director of FHFA makes a written determination that our total assets are less than our total obligations (a net worth deficit) for a period of 60 days, FHFA is mandated by law to appoint a receiver for Fannie Mae. Treasury's funding commitment under the senior preferred stock purchase agreement is intended to ensure that we avoid a net worth deficit, in order to avoid this mandatory trigger of receivership. In order to avoid a net worth deficit, our conservator may request funds on our behalf from Treasury under the senior preferred stock purchase agreement.

F-102

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

FHFA has directed us, during the time we are under conservatorship, to focus on managing to a positive net worth. As of December 31, 2011 and 2010, we had a net worth deficit of $4.6 billion and $2.5 billion, respectively.

The following table displays our regulatory capital classification measures as of December 31, 2011 and 2010.

|  | As of December 31, | |
|---|---|---|
|  | 2011[1] | 2010[1] |
|  | (Dollars in millions) | |
| Core capital[2] ........................................................ | $(115,967) | $ (89,516) |
| Statutory minimum capital requirement[3] ................................... | 32,463 | 33,676 |
| Deficit of core capital over statutory minimum capital requirement ............... | $(148,430) | $(123,192) |

---

[1] Amounts as of December 31, 2011 and 2010 represent estimates that we have submitted to FHFA.

[2] The sum of (a) the stated value of our outstanding common stock (common stock less treasury stock); (b) the stated value of our outstanding non-cumulative perpetual preferred stock; (c) our paid-in capital; and (d) our retained earnings (accumulated deficit). Core capital does not include: (a) accumulated other comprehensive income (loss) or (b) senior preferred stock.

[3] Generally, the sum of (a) 2.50% of on-balance sheet assets, except those underlying Fannie Mae MBS held by third parties; (b) 0.45% of the unpaid principal balance of outstanding Fannie Mae MBS held by third parties; and (c) up to 0.45% of other off-balance sheet obligations, which may be adjusted by the Director of FHFA under certain circumstances (See 12 CFR 1750.4 for existing adjustments made by the Director).

Our critical capital requirement is generally equal to the sum of: (1) 1.25% of on-balance sheet assets, except those underlying Fannie Mae MBS held by third parties; (2) 0.25% of the unpaid principal balance of outstanding Fannie Mae MBS held by third parties; and (3) 0.25% of other off-balance sheet obligations, which may be adjusted by the Director of FHFA under certain circumstances.

*Restrictions on Capital Distributions and Dividends*

Under the terms of the senior preferred stock purchase agreement, we are required to comply with certain restrictions and covenants. Set forth below are additional restrictions related to our capital requirements:

*Restrictions Under GSE Act.* Under the GSE Act, FHFA has the authority to prohibit capital distributions, including payment of dividends, if we fail to meet our capital requirements. If FHFA classifies us as significantly undercapitalized, we must obtain the approval of the Director of FHFA for any dividend payment. Under the GSE Act, we are not permitted to make a capital distribution if, after making the distribution, we would be undercapitalized. The Director of FHFA, however, may permit us to repurchase shares if the repurchase is made in connection with the issuance of additional shares or obligations in at least an equivalent amount and will reduce our financial obligations or otherwise improve our financial condition.

*Restrictions Relating to Subordinated Debt.* During any period in which we defer payment of interest on qualifying subordinated debt, we may not declare or pay dividends on, or redeem, purchase or acquire, our common stock or preferred stock. Our qualifying subordinated debt provides for the deferral of the payment of interest for up to five years if either: our core capital is below 125% of our critical capital requirement; or our core capital is below our statutory minimum capital requirement, and the U.S. Secretary of the Treasury, acting on our request, exercises his or her discretionary authority pursuant to Section 304(c) of the Charter Act to purchase our debt obligations. As of December 31, 2011 and 2010, our core capital was below 125% of our

F-103

TREASURY-2732

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

critical capital requirement; however, we have been directed by FHFA to continue paying principal and interest on our outstanding subordinated debt during the conservatorship and thereafter until directed otherwise, regardless of our existing capital levels.

Prior to conservatorship, we were subject to certain regulatory capital requirements, including minimum capital requirements, under the terms of various agreements and consent orders with OFHEO. We were in compliance with these regulatory capital requirements until they were suspended October 9, 2008 following our entry into conservatorship.

**17.    Concentrations of Credit Risk**

Concentrations of credit risk arise when a number of customers and counterparties engage in similar activities or have similar economic characteristics that make them susceptible to similar changes in industry conditions, which could affect their ability to meet their contractual obligations. Based on our assessment of business conditions that could impact our financial results, including those conditions arising through February 29, 2012, we have determined that concentrations of credit risk exist among single-family and multifamily borrowers (including geographic concentrations and loans with certain higher-risk characteristics), mortgage insurers, mortgage servicers, financial guarantors, lenders with risk sharing, derivative counterparties and parties associated with our off-balance sheet transactions. Concentrations for each of these groups are discussed below.

***Single-Family Loan Borrowers***

Regional economic conditions may affect a borrower's ability to repay his or her mortgage loan and the property value underlying the loan. Geographic concentrations increase the exposure of our portfolio to changes in credit risk. Single-family borrowers are primarily affected by home prices and interest rates. The geographic dispersion of our Single-Family business has been consistently diversified over the years ended December 31, 2011 and 2010, with our largest exposures in the Western region of the United States, which represented 27% of our single-family conventional guaranty book of business as of December 31, 2011 and 2010. Except for California, where 19% and 18% of the gross unpaid principal balance of our single-family conventional mortgage loans held or securitized in Fannie Mae MBS as of December 31, 2011 and 2010, respectively, were located, no other significant concentrations existed in any state.

To manage credit risk and comply with legal requirements, we typically require primary mortgage insurance or other credit enhancements if the current LTV ratio (*i.e.*, the ratio of the unpaid principal balance of a loan to the current value of the property that serves as collateral) of a single-family conventional mortgage loan is greater than 80% when the loan is delivered to us. We may also require credit enhancements if the original LTV ratio of a single-family conventional mortgage loan is less than 80%. As of December 31, 2011, 44% of our single-family conventional guaranty book of business consists of loans with an estimated mark-to-market LTV greater than 80% compared with 40% as of December 31, 2010.

***Multifamily Loan Borrowers***

Numerous factors affect a multifamily borrower's ability to repay his or her loan and the value of the property underlying the loan. The most significant factors affecting credit risk are rental rates and capitalization rates for the mortgaged property. Rental rates vary among geographic regions of the United States. The average mortgage amounts for multifamily loans are significantly larger than those for single-family borrowers and, therefore, individual defaults for multifamily borrowers can be more significant to us. However, these loans, while individually large, represent a small percentage of our total loan portfolio. Our multifamily geographic concentrations have been consistently diversified over the years ended December 31, 2011 and 2010, with our

TREASURY-2733

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

largest exposure in the Western region of the United States, which represented 34% of our multifamily guaranty book of business as of December 31, 2011. Except for California and New York, no other significant concentrations existed in any states as of December 31, 2011 and 2010. As of December 31, 2011 and 2010, 26% and 13% of the gross unpaid principal balance of our portfolio of multifamily mortgage loans held by us or securitized in Fannie Mae MBS were located in California and New York, respectively.

As part of our multifamily risk management activities, we perform detailed loan reviews that evaluate borrower and geographic concentrations, lender qualifications, counterparty risk, property performance and contract compliance. We generally require servicers to submit periodic property operating information and condition reviews, allowing us to monitor the performance of individual loans. We use this information to evaluate the credit quality of our portfolio, identify potential problem loans and initiate appropriate loss mitigation activities.

The following table displays the regional geographic concentration of single-family and multifamily loans in our mortgage portfolio and those loans held or securitized in Fannie Mae MBS as of December 31, 2011 and 2010.

| | Geographic Concentration[1] | | | |
| | Percentage of Conventional Single-Family Guaranty Book of Business[2] | | Percentage of Multifamily Guaranty Book of Business[3] | |
| | As of December 31, | | As of December 31, | |
| | 2011 | 2010 | 2011 | 2010 |
|---|---|---|---|---|
| Midwest | 15% | 15% | 8% | 8% |
| Northeast | 19 | 19 | 21 | 22 |
| Southeast | 24 | 24 | 20 | 20 |
| Southwest | 15 | 15 | 17 | 16 |
| West | 27 | 27 | 34 | 34 |
| Total | 100% | 100% | 100% | 100% |

[1] Midwest includes IL, IN, IA, MI, MN, NE, ND, OH, SD, WI; Northeast includes CT, DE, ME, MA, NH, NJ, NY, PA, PR, RI, VT, VI; Southeast includes AL, DC, FL, GA, KY, MD, NC, MS, SC, TN, VA, WV; Southwest includes AZ, AR, CO, KS, LA, MO, NM, OK, TX, UT; West includes AK, CA, GU, HI, ID, MT, NV, OR, WA and WY.

[2] Consists of the portion of our single-family conventional guaranty book of business for which we have detailed loan level information, which constituted over 99% of our total single-family conventional guaranty book of business as of December 31, 2011 and 2010.

[3] Consists of the portion of our multifamily guaranty book of business for which we have detailed loan level information, which constituted 99% of our total multifamily guaranty book of business as of December 31, 2011 and 2010.

*Alt-A and Subprime Loans and Securities*

We own and guarantee Alt-A and subprime mortgage loans and mortgage-related securities. An Alt-A mortgage loan generally refers to a mortgage loan that has been underwritten with reduced or alternative documentation than that required for a full documentation mortgage loan but may also include other alternative product features. As a result, Alt-A mortgage loans generally have a higher risk of default than non-Alt-A mortgage loans. In reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation or other product features. We have classified private-label mortgage-related securities held in our investment portfolio as Alt-A if the securities were labeled as such when issued. A subprime mortgage loan generally refers to a mortgage loan made to a borrower with a weaker credit

F-105

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

profile than that of a prime borrower. As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers. Subprime mortgage loans were typically originated by lenders specializing in this type of business or by subprime divisions of large lenders, using processes unique to subprime loans. In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans were originated by one of these specialty lenders or a subprime division of a large lender. We exclude loans originated by these lenders if we acquired the loans in accordance with our standard underwriting criteria, which typically require compliance by the seller with our Selling Guide (including standard representations and warranties) and/or evaluation of the loans through our Desktop Underwriter system. We apply our classification criteria in order to determine our Alt-A and subprime loan exposures; however, we have other loans with some features that are similar to Alt-A and subprime loans that we have not classified as Alt-A or subprime because they do not meet our classification criteria. We have classified private-label mortgage-related securities held in our investment portfolio as subprime if the securities were labeled as such when issued. We reduce our risk associated with some of these loans through credit enhancements, as described below under "Mortgage Insurers."

The following table displays information regarding our Alt-A and subprime mortgage loans and mortgage-related securities in our single-family mortgage credit book of business as of December 31, 2011 and 2010.

| | As of December 31, | | | |
| | 2011 | | 2010 | |
| | Unpaid Principal Balance | Percent of Book of Business[1] | Unpaid Principal Balance | Percent of Book of Business[1] |
| | | (Dollars in millions) | | |
| Loans and Fannie Mae MBS: | | | | |
| Alt-A[2] | $183,829 | 6% | $213,597 | 7% |
| Subprime[3] | 14,167 | ** | 15,266 | ** |
| Total | $197,996 | 7% | $228,863 | 8% |
| Private-label securities: | | | | |
| Alt-A[4] | $ 19,670 | ** | $ 22,283 | ** |
| Subprime[5] | 16,538 | ** | 18,410 | ** |
| Total | $ 36,208 | 1% | $ 40,693 | 1% |

---

**    Represent less than 1% of single-family mortgage credit book of business.

[1]    Calculated based on total unpaid principal balance of our single-family mortgage credit book of business.

[2]    Represents Alt-A mortgage loans held in our portfolio and Fannie Mae MBS backed by Alt-A mortgage loans.

[3]    Represents subprime mortgage loans held in our portfolio and Fannie Mae MBS backed by subprime mortgage loans.

[4]    Represents private-label mortgage-related securities backed by Alt-A mortgage loans.

[5]    Represents private-label mortgage-related securities backed by subprime mortgage loans.

***Other Concentrations***

***Mortgage Seller/Servicers.***    Mortgage servicers collect mortgage and escrow payments from borrowers, pay taxes and insurance costs from escrow accounts, monitor and report delinquencies, and perform other required activities on our behalf. Our business with mortgage servicers is concentrated. Our ten largest single-family mortgage servicers, including their affiliates, serviced 75% of our single-family guaranty book of business as of

F-106

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

December 31, 2011, compared with 77% as of December 31, 2010. Our ten largest multifamily mortgage servicers, including their affiliates, serviced 67% of our multifamily guaranty book of business as of December 31, 2011, compared with 70% as of December 31, 2010.

In addition to their other responsibilities our mortgage seller/servicers are obligated to repurchase loans or foreclosed properties, or reimburse us for losses if the foreclosed property has been sold, under certain circumstances, such as if it is determined that the mortgage loan did not meet our underwriting or eligibility requirements, if loan representations and warranties are violated or if mortgage insurers rescind coverage. We refer to our demands that seller/servicers meet these obligations collectively as "repurchase requests."

We continue to work with our mortgage seller/servicers to fulfill outstanding repurchase requests. Failure by a significant seller/servicer counterparty, or a number of seller/servicers, to fulfill repurchase obligations in addition to their other obligations to us could result in a significant increase in our credit losses and have a material adverse effect on our results of operations and financial condition. In addition, actions we take to pursue our contractual remedies could increase our costs, reduce our revenues, or otherwise have a material, adverse effect on our results of operations or financial condition.

*Mortgage Insurers.*   Mortgage insurance "risk in force" represents our maximum potential loss recovery under the applicable mortgage insurance policies. We had total mortgage insurance coverage risk in force of $91.2 billion on the single-family mortgage loans in our guaranty book of business as of December 31, 2011, which represented 3% of our single-family guaranty book of business. Our primary and pool mortgage insurance coverage risk in force on single-family mortgage loans in our guaranty book of business represented $87.3 billion and $3.9 billion, respectively, as of December 31, 2011, compared with $91.2 billion and $4.7 billion, respectively, as of December 31, 2010. Nine mortgage insurance companies provided over 99% of our mortgage insurance as of December 31, 2011 and 2010.

Increases in mortgage insurance claims due to higher defaults and credit losses in recent periods have adversely affected the financial results and financial condition of many mortgage insurers. Three of our mortgage insurers (Triad, RMIC and PMI) have publicly disclosed that they are in run-off. One mortgage insurer, Genworth Mortgage Insurance Corporation, has publicly disclosed that absent a waiver they estimate that they would not meet state regulatory capital requirements for their main insurance writing entity as of December 31, 2011. An additional two of our mortgage insurers (Mortgage Guaranty Insurance Corporation and Radian Guaranty, Inc.) have disclosed that, in the absence of additional capital contributions to their insurance writing entity, their capital might fall below state regulatory capital requirements in the future. These six mortgage insurers provided a combined $74.1 billion, or 81%, of our risk in force mortgage insurance coverage of our single-family guaranty book of business as of December 31, 2011. During 2011, we notified PMI Mortgage Insurance Co. ("PMI") and Republic Mortgage Insurance Company ("RMIC"), two of our mortgage insurer counterparties, that they were suspended nationwide as approved mortgage insurers.

We notified RMIC that both RMIC and its affiliate, Republic Mortgage Insurance Company of North Carolina ("RMIC-NC"), were suspended nationwide as approved mortgage insurers. We also notified our mortgage sellers and servicers that we would not accept any mortgage loan insured by RMIC or RMIC-NC that is delivered after November 30, 2011, except for refinanced Fannie Mae loans where continuation of the coverage is effected through modification of an existing mortgage insurance certificate. RMIC and RMIC-NC each voluntarily entered into an agreement with their regulator to discontinue writing or assuming any new mortgage guaranty insurance business in all states. In January 2012, RMIC's parent company announced that RMIC has been ordered into supervision by its regulator. Pursuant to the order, effective January 20, 2012, RMIC is paying 50% of all valid claims for an initial period not to exceed one year, with the remaining 50% deferred.

TREASURY-2736

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

PMI received from its regulator an order under which the regulator now has full possession, management and control of PMI. The regulator is also seeking to place PMI into receivership. Pursuant to the order, the regulator instituted a partial claim payment plan whereby all valid claims under PMI mortgage guaranty insurance policies will be paid 50% in cash and 50% deferred as a policyholder claim. It is uncertain when, and if, PMI's regulator will allow PMI to begin paying its deferred policyholder claims and/or increase the amount of cash PMI pays on claims.

The current weakened financial condition of our mortgage insurer counterparties creates an increased risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies. If we determine that it is probable that we will not collect all of our claims from one or more of these mortgage insurer counterparties, it could result in an increase in our loss reserves, which could adversely affect our earnings, liquidity, financial condition and net worth.

We evaluate the financial condition of our mortgage insurer counterparties and adjust the contractually due recovery amounts to ensure that only probable losses as of the balance sheet date are included in our loss reserve estimate. The following table displays our estimated benefit from mortgage insurers as of December 31, 2011 and 2010 that reduce our total loss reserves.

|  | As of December 31, | |
|---|---|---|
|  | **2011** | **2010** |
|  | **(Dollars in millions)** | |
| Contractual mortgage insurance benefit[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $15,099 | $17,507 |
| Less: Collectability adjustment[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,867 | 1,150 |
| Estimated benefit included in total loss reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $12,232 | $16,357 |

---

[1]   Relates to loans that are individually measured for impairment and those that are collectively reserved.

[2]   Represents an adjustment that reduces the contractual benefit for our assessment of our mortgage insurer counterparties' inability to fully pay the contractual mortgage insurance claims.

We had outstanding receivables of $3.6 billion recorded in "Other assets" in our consolidated balance sheets as of December 31, 2011 and $4.4 billion as of December 31, 2010 related to amounts claimed on insured, defaulted loans that we have not yet received, of which $639 million as of December 31, 2011 and $648 million as of December 31, 2010 was due from our mortgage seller/servicers. We assessed the total outstanding receivables for collectibility, and they are recorded net of a valuation allowance of $570 million as of December 31, 2011 and $317 million as of December 31, 2010. These mortgage insurance receivables are short-term in nature, having an average duration of approximately six months, and the valuation allowance reduces our claim receivable to the amount which is considered probable of collection as of December 31, 2011 and 2010.

We received proceeds under our primary and pool mortgage insurance policies for single-family loans of $5.8 billion during 2011 and $6.4 billion during 2010. We negotiated the cancellation and restructurings of some of our mortgage insurance coverage in exchange for a fee. The cash fees received of $796 million during 2010 are included in our total insurance proceeds amount; there were no such cash fees received during 2011. These fees represented an acceleration of, and discount on, claims to be paid pursuant to the coverage in order to reduce future exposure to our mortgage insurers and were recorded as a reduction to our "Foreclosed property expense" in our consolidated statements of operations and comprehensive loss.

F-108

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Financial Guarantors.*   We are the beneficiary of financial guarantees on non-agency securities held in our investment portfolio and on non-agency securities that have been resecuritized to include a Fannie Mae guaranty and sold to third parties. The following table displays the total unpaid principal balance of guaranteed non-agency securities in our portfolio as of December 31, 2011 and 2010.

|  | As of December 31, | |
|---|---|---|
|  | **2011** | **2010** |
|  | **(Dollars in millions)** | |
| Alt-A private-label securities | $1,279 | $1,544 |
| Subprime private-label securities | 1,398 | 1,487 |
| Mortgage revenue bonds | 4,931 | 5,264 |
| Other mortgage-related securities | 317 | 347 |
| Non mortgage-related securities | 46 | 172 |
| Total | $7,971 | $8,814 |

If a financial guarantor fails to meet its obligations to us with respect to the securities for which we have obtained financial guarantees, it could reduce the fair value of our mortgage-related securities and result in financial losses to us, which could have a material adverse effect on our earnings, liquidity, financial condition and net worth. With the exception of Ambac Assurance Corporation ("Ambac"), none of our non-governmental financial guarantor counterparties has failed to repay us for claims under guaranty contracts. Ambac provided coverage on $3.3 billion, or 41%, of our total non-governmental guarantees, as of December 31, 2011. We are also the beneficiary of financial guarantees included in securities issued by Freddie Mac, the federal government and its agencies that totaled $31.4 billion as of December 31, 2011 and $25.7 billion as of December 31, 2010.

We model our securities without assuming the benefit of non-governmental financial guarantees. We then adjust results for those external financial guarantees from guarantors that we determine are creditworthy, although we continue to seek collection of any amounts due to us from all counterparties. As of December 31, 2011, when modeling our securities for impairments we did not assume the benefit of external financial guarantees from non-governmental counterparties.

*Lenders with Risk Sharing.*   We enter into risk sharing agreements with lenders pursuant to which the lenders agree to bear all or some portion of the credit losses on the covered loans. Our maximum potential loss recovery from lenders under these risk sharing agreements on single-family loans was $12.8 billion as of December 31, 2011 and $15.6 billion as of December 31, 2010. As of December 31, 2011, 58% of our maximum potential loss recovery on single-family loans was from three lenders. As of December 31, 2010, 56% of our maximum potential loss recovery on single-family loans was from the same three lenders. Our maximum potential loss recovery from lenders under these risk sharing agreements on both Delegated Underwriting and Servicing ("DUS") and non-DUS multifamily loans was $32.1 billion as of December 31, 2011 and $30.3 billion as of December 31, 2010. As of December 31, 2011, 40% of our maximum potential loss recovery on multifamily loans was from three DUS lenders. As of December 31, 2010, 41% of our maximum potential loss recovery on multifamily loans was from the same three DUS lenders.

*Derivatives Counterparties.*   For information on credit risk associated with our derivatives transactions refer to "Note 9, Derivative Instruments and Hedging Activities."

*Parties Associated with Our Off-Balance Sheet Transactions.*   We enter into financial instrument transactions that create off-balance sheet credit risk in the normal course of our business. These transactions are designed to meet the financial needs of our customers, and manage our credit, market or liquidity risks.

TREASURY-2738

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

We have entered into guarantees for which we have not recognized a guaranty obligation in our consolidated balance sheets relating to periods prior to 2003, the effective date of accounting pronouncements related to guaranty accounting. Our maximum potential exposure under these guarantees is $9.3 billion as of December 31, 2011, and $10.3 billion as of December 31, 2010. If we were required to make payments under these guarantees, we would pursue recovery through our right to the collateral backing the underlying loans, available credit enhancements and recourse with third parties that provide a maximum coverage of $4.0 billion as of December 31, 2011 and $3.9 billion as of December 31, 2010.

**18.   Fair Value**

We use fair value measurements for the initial recording of certain assets and liabilities and periodic remeasurement of certain assets and liabilities on a recurring or nonrecurring basis.

***Fair Value Measurement***

Fair value measurement guidance defines fair value, establishes a framework for measuring fair value and expands disclosures around fair value measurements. This guidance applies whenever other accounting guidance requires or permit assets or liabilities to be measured at fair value. The guidance establishes a three-level fair value hierarchy that prioritizes the inputs into the valuation techniques used to measure fair value. The fair value hierarchy gives the highest priority, Level 1, to measurements based on unadjusted quoted prices in active markets for identical assets or liabilities. The next highest priority, Level 2, is given to measurements of assets and liabilities based on limited observable inputs or observable inputs for similar assets and liabilities. The lowest priority, Level 3, is given to measurements based on unobservable inputs.

F-110

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Recurring Changes in Fair Value*

The following tables display our assets and liabilities measured in our consolidated balance sheets at fair value on a recurring basis subsequent to initial recognition, including instruments for which we have elected the fair value option as of December 31, 2011 and 2010. Specifically, total assets measured at fair value on a recurring basis and classified as Level 3 were $36.3 billion, or 1% of "Total assets," and $39.0 billion, or 1% of "Total assets," in our consolidated balance sheets as of December 31, 2011 and 2010, respectively.

| | Fair Value Measurements as of December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| Assets: | | | | | |
| Cash equivalents[2] ............................. | $   600 | $    — | $    — | $— | $   600 |
| Trading securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae ........................... | — | 5,687 | 1,737 | — | 7,424 |
| Freddie Mac ........................... | — | 2,732 | — | — | 2,732 |
| Ginnie Mae ........................... | — | 278 | 9 | — | 287 |
| Alt-A private-label securities ............... | — | 1,004 | 345 | — | 1,349 |
| Subprime private-label securities ............ | — | — | 1,280 | — | 1,280 |
| CMBS ................................. | — | 10,411 | — | — | 10,411 |
| Mortgage revenue bonds ................... | — | — | 724 | — | 724 |
| Other ................................. | — | — | 143 | — | 143 |
| Non-mortgage-related securities: | | | | | |
| U.S. Treasury securities ................... | 47,737 | — | — | — | 47,737 |
| Asset-backed securities ..................... | — | 2,111 | — | — | 2,111 |
| Total trading securities ....................... | 47,737 | 22,223 | 4,238 | — | 74,198 |
| Available-for-sale securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae ........................... | — | 15,904 | 946 | — | 16,850 |
| Freddie Mac ........................... | — | 12,811 | 12 | — | 12,823 |
| Ginnie Mae ........................... | — | 902 | — | — | 902 |
| Alt-A private-label securities ............... | — | 4,427 | 7,256 | — | 11,683 |
| Subprime private-label securities ............ | — | — | 7,586 | — | 7,586 |
| CMBS ................................. | — | 14,026 | — | — | 14,026 |
| Mortgage revenue bonds ................... | — | 7 | 10,247 | — | 10,254 |
| Other ................................. | — | 13 | 3,445 | — | 3,458 |
| Total available-for-sale securities ................ | — | 48,090 | 29,492 | — | 77,582 |
| Mortgage loans of consolidated trusts ............ | — | 1,292 | 2,319 | — | 3,611 |

F-111

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

| | Fair Value Measurements as of December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| Other assets: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps | — | 9,247 | 170 | — | 9,417 |
| Swaptions | — | 6,536 | — | — | 6,536 |
| Other | — | 1 | 51 | — | 52 |
| Netting adjustment | — | — | — | (15,829) | (15,829) |
| Mortgage commitment derivatives | — | 368 | 17 | — | 385 |
| Total other assets | — | 16,152 | 238 | (15,829) | 561 |
| Total assets at fair value | $48,337 | $87,757 | $36,287 | $(15,829) | $156,552 |
| Liabilities: | | | | | |
| Long-term debt: | | | | | |
| Of Fannie Mae: | | | | | |
| Senior fixed | $ — | $ 432 | $ — | $ — | $ 432 |
| Senior floating | — | — | 406 | — | 406 |
| Total of Fannie Mae | — | 432 | 406 | — | 838 |
| Of consolidated trusts | — | 3,174 | 765 | — | 3,939 |
| Total long-term debt | — | 3,606 | 1,171 | — | 4,777 |
| Other liabilities: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps | — | 18,661 | 167 | — | 18,828 |
| Swaptions | — | 3,432 | — | — | 3,432 |
| Netting adjustment | — | — | — | (21,898) | (21,898) |
| Mortgage commitment derivatives | — | 548 | 6 | — | 554 |
| Total other liabilities | — | 22,641 | 173 | (21,898) | 916 |
| Total liabilities at fair value | $ — | $26,247 | $ 1,344 | $(21,898) | $ 5,693 |

F-112

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | Fair Value Measurements as of December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| Assets: | | | | | |
| Cash equivalents[2] .......................... | $ 4,049 | $ 2,300 | $ — | $ — | $ 6,349 |
| Trading securities | | | | | |
|   Mortgage-related securities: | | | | | |
|     Fannie Mae ........................... | — | 5,196 | 2,202 | — | 7,398 |
|     Freddie Mac ......................... | — | 1,326 | — | — | 1,326 |
|     Ginnie Mae .......................... | — | 590 | — | — | 590 |
|     Alt-A private-label securities ............... | — | 1,663 | 20 | — | 1,683 |
|     Subprime private-label securities ........... | — | — | 1,581 | — | 1,581 |
|     CMBS ................................ | — | 10,764 | — | — | 10,764 |
|     Mortgage revenue bonds ................... | — | — | 609 | — | 609 |
|     Other ................................ | — | — | 152 | — | 152 |
|   Non-mortgage-related securities: | | | | | |
|     U.S. Treasury securities ................... | 27,432 | — | — | — | 27,432 |
|     Asset-backed securities .................... | — | 5,309 | 12 | — | 5,321 |
|   Total trading securities ....................... | 27,432 | 24,848 | 4,576 | — | 56,856 |
| Available-for-sale securities: | | | | | |
|   Mortgage-related securities: | | | | | |
|     Fannie Mae ........................... | — | 22,714 | 114 | — | 22,828 |
|     Freddie Mac ......................... | — | 16,993 | 3 | — | 16,996 |
|     Ginnie Mae .......................... | — | 1,039 | — | — | 1,039 |
|     Alt-A private-label securities ............... | — | 6,841 | 7,049 | — | 13,890 |
|     Subprime private-label securities ........... | — | — | 9,932 | — | 9,932 |
|     CMBS ................................ | — | 14,844 | — | — | 14,844 |
|     Mortgage revenue bonds ................... | — | 11 | 11,030 | — | 11,041 |
|     Other ................................ | — | 16 | 3,806 | — | 3,822 |
|   Total available-for-sale securities ................. | — | 62,458 | 31,934 | — | 94,392 |
| Mortgage loans of consolidated trusts ............ | — | 755 | 2,207 | — | 2,962 |
| Other assets: | | | | | |
|   Risk management derivatives: | | | | | |
|     Swaps ............................... | — | 9,623 | 163 | — | 9,786 |
|     Swaptions ............................ | — | 5,474 | — | — | 5,474 |
|     Other ............................... | 3 | 24 | 72 | — | 99 |
|     Netting adjustment ...................... | — | — | — | (15,175) | (15,175) |
|   Mortgage commitment derivatives ............. | — | 941 | 12 | — | 953 |
|   Total other assets ........................... | 3 | 16,062 | 247 | (15,175) | 1,137 |
|     Total assets at fair value ................... | $31,484 | $106,423 | $38,964 | $(15,175) | $161,696 |

F-113

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | Fair Value Measurements as of December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | | (Dollars in millions) | | | |
| Liabilities: | | | | | |
| Long-term debt: | | | | | |
|   Of Fannie Mae: | | | | | |
|     Senior fixed | $— | $ 472 | $ — | $ — | $ 472 |
|     Senior floating | — | — | 421 | — | 421 |
|     Total of Fannie Mae | — | 472 | 421 | — | 893 |
|     Of consolidated trusts | — | 1,644 | 627 | — | 2,271 |
|   Total long-term debt | — | 2,116 | 1,048 | — | 3,164 |
| Other liabilities: | | | | | |
|   Risk management derivatives: | | | | | |
|     Swaps | — | 16,436 | 113 | — | 16,549 |
|     Swaptions | — | 2,446 | — | — | 2,446 |
|     Other | 1 | — | — | — | 1 |
|     Netting adjustment | — | — | — | (18,023) | (18,023) |
|   Mortgage commitment derivatives | — | 712 | 30 | — | 742 |
|   Total other liabilities | 1 | 19,594 | 143 | (18,023) | 1,715 |
|     Total liabilities at fair value | $ 1 | $21,710 | $1,191 | $(18,023) | $ 4,879 |

---

[1]  Derivative contracts are reported on a gross basis by level. The netting adjustment represents the effect of the legal right to offset under legally enforceable master netting agreements to settle with the same counterparty on a net basis, as well as cash collateral.

[2]  Cash equivalents is comprised of U.S. Treasuries that are classified as Level 1 as well as money market funds that are classified as Level 2.

The following tables display a reconciliation of all assets and liabilities measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the years ended December 31, 2011, 2010 and 2009. The tables also display gains and losses due to changes in fair value, including both realized and unrealized gains and losses, recorded in our consolidated statements of operations and comprehensive loss for Level 3 assets and liabilities for the years ended December 31, 2011, 2010 and 2009. When assets and liabilities are transferred between levels, we recognize the transfer as of the end of the period transferred.

F-114

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Fair Value Measurements Using Significant Unobservable Inputs (Level 3)
For the Year Ended December 31, 2011

| | Balance, December 31, 2010 | Included in Net Loss | Included in Other Comprehensive (Loss) Income | Purchases[1] | Sales[1] | Issuances[2] | Settlements[2] | Transfers out of Level 3[3] | Transfers into Level 3[3] | Balance, December 31, 2011 | Net Unrealized Gains (Losses) Included in Net Loss Related to Assets and Liabilities Still Held as of December 31, 2011[4] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (Dollars in millions) | | | | | | | |
| **Trading securities:** | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae | $ 2,202 | $ 14 | $ — | $ 663 | $(161) | $ — | $ (433) | $ (600) | $ 52 | $ 1,737 | $ 36 |
| Ginnie Mae | — | — | — | 9 | (9) | — | — | (27) | 36 | 9 | — |
| Alt-A private-label securities | 20 | 19 | — | — | — | — | (32) | (188) | 526 | 345 | (1) |
| Subprime private-label securities | 1,581 | (125) | — | — | — | — | (176) | — | — | 1,280 | (125) |
| Mortgage revenue bonds | 609 | 141 | — | — | — | — | (26) | — | — | 724 | 144 |
| Other | 152 | 1 | — | — | — | — | (6) | (147) | 143 | 143 | — |
| Non-mortgage-related: | | | | | | | | | | | |
| Asset-backed securities | 12 | — | — | — | — | — | (5) | (9) | 2 | — | — |
| Total trading securities | $ 4,576 | $ 50 | $ — | $ 672 | $(170) | $ — | $ (678) | $ (971) | $ 759 | $ 4,238 | $ 54 |
| **Available-for-sale securities:** | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae | $ 114 | $ — | $ 44 | $1,756 | $(383) | $ — | $ (22) | $(1,023) | $ 460 | $ 946 | $ — |
| Freddie Mac | 3 | — | — | — | — | — | (1) | — | 10 | 12 | — |
| Alt-A private-label securities | 7,049 | (100) | 119 | — | — | — | (974) | (1,684) | 2,846 | 7,256 | — |
| Subprime private-label securities | 9,932 | (386) | (580) | — | (363) | — | (1,017) | — | — | 7,586 | — |
| Mortgage revenue bonds | 11,030 | (22) | 834 | — | (109) | — | (1,486) | — | — | 10,247 | — |
| Other | 3,806 | (7) | 50 | — | — | — | (404) | — | — | 3,445 | — |
| Total available-for-sale securities | $31,934 | $(515) | $ 467 | $1,756 | $(855) | $ — | $(3,904) | $(2,707) | $3,316 | $29,492 | $ — |
| Mortgage loans of consolidated trusts | $ 2,207 | $ 8 | $ — | $ 184 | $ — | $ — | $ (339) | $ (106) | $ 365 | $ 2,319 | $ 9 |
| Net derivatives | 104 | 123 | — | — | — | (4) | (87) | (71) | — | 65 | 59 |
| Long-term debt: | | | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | | | |
| Senior floating | $ (421) | $ (88) | $ — | $ — | $ — | $ — | $ 103 | $ — | $ — | $ (406) | $ (88) |
| Of consolidated trusts | (627) | (35) | — | — | 4 | (70) | 89 | 185 | (311) | (765) | (19) |
| Total long-term debt | $(1,048) | $(123) | $ — | $ — | $ 4 | $(70) | $ 192 | $ 185 | $ (311) | $(1,171) | $(107) |

F-115

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Fair Value Measurements Using Significant Unobservable Inputs (Level 3)
For the Year Ended December 31, 2010

| | Balance, December 31, 2009 | Impact of the transition to the Consolidation Accounting Guidance | Total Gains or (Losses) (Realized/Unrealized) | | Purchases, Sales, Issuances, and Settlements, Net | Transfers out of Level 3[(3)] | Transfers into Level 3[(3)] | Balance, December 31, 2010 | Net Unrealized Gains (Losses) Included in Net Loss Related to Assets and Liabilities Still Held as of December 31, 2010[(4)] |
| | | | Included in Net Loss | Included in Other Comprehensive (Loss) Income | | | | | |
| | | | | | (Dollars in millions) | | | | |
| Trading securities: | | | | | | | | | |
| Mortgage-related: | | | | | | | | | |
| Fannie Mae | $ 5,656 | $ (2) | $ (1) | $ — | $ (223) | $(5,551) | $2,323 | $ 2,202 | $ 13 |
| Freddie Mac | — | — | — | — | (1) | (3) | 4 | — | — |
| Alt-A private-label securities | 564 | 62 | 226 | — | (77) | (1,069) | 314 | 20 | 4 |
| Subprime private-label securities | 1,780 | — | 41 | — | (240) | — | — | 1,581 | 41 |
| Mortgage revenue bonds | 600 | — | 67 | — | (58) | — | — | 609 | 66 |
| Other | 154 | — | 6 | — | (8) | — | — | 152 | 5 |
| Non-mortgage-related: | | | | | | | | | |
| Asset-backed securities | 107 | — | 1 | — | (62) | (47) | 13 | 12 | — |
| Total trading securities | $ 8,861 | $ 60 | $ 340 | $ — | $ (669) | $(6,670) | $2,654 | $ 4,576 | $129 |
| Available-for-sale securities: | | | | | | | | | |
| Mortgage-related: | | | | | | | | | |
| Fannie Mae | $ 596 | $ (203) | $ (1) | $ 2 | $ 181 | $ (580) | $ 119 | $ 114 | $ — |
| Freddie Mac | 27 | — | — | (1) | (29) | — | 6 | 3 | — |
| Ginnie Mae | 123 | — | — | 2 | (125) | — | — | — | — |
| Alt-A private-label securities | 8,312 | 471 | (54) | 1,240 | (1,322) | (4,951) | 3,353 | 7,049 | — |
| Subprime private-label securities | 10,746 | (118) | (70) | 1,078 | (1,704) | — | — | 9,932 | — |
| Mortgage revenue bonds | 12,820 | 21 | 11 | 82 | (1,902) | (2) | — | 11,030 | — |
| Other | 3,530 | 366 | (3) | 402 | (489) | — | — | 3,806 | — |
| Total available-for-sale securities | $36,154 | $ 537 | $(117) | $2,805 | $(5,390) | $(5,533) | $3,478 | $31,934 | $ — |
| Mortgage loans of consolidated trusts | $ — | $ — | $ (29) | $ — | $ 2,188 | $ (11) | $ 59 | $ 2,207 | $(29) |
| Guaranty assets and buy-ups | 2,577 | (2,568) | 1 | 1 | (11) | — | — | — | — |
| Net derivatives | 123 | — | 61 | — | (74) | (1) | (5) | 104 | (33) |
| Long-term debt: | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | |
| Senior floating | $ (601) | $ — | $ 20 | $ — | $ 160 | $ — | $ — | $ (421) | $ 24 |
| Of consolidated trusts | — | (77) | 19 | — | (631) | 92 | (30) | (627) | 2 |
| Total long-term debt | $ (601) | $ (77) | $ 39 | $ — | $ (471) | $ 92 | $ (30) | $(1,048) | $ 26 |

F-116

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | Fair Value Measurements Using Significant Unobservable Inputs (Level 3) For the Year Ended December 31, 2009 | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Total Gains or (Losses) (Realized/Unrealized) | | | | | Net Unrealized Gains (Losses) Included in Net Loss Related to Assets and Liabilities Still Held as of December 31, 2009[4] |
| | Balance, January 1, 2009 | Included in Net Loss | Included in Other Comprehensive (Loss) Income | Purchases, Sales, Issuances, and Settlements, Net | Transfers in/out of Level 3, Net[3] | Balance, December 31, 2009 | |
| | (Dollars in millions) | | | | | | |
| Trading securities: | | | | | | | |
| Mortgage-related: | | | | | | | |
| Fannie Mae . . . . . . . . . . . . . | $ 6,935 | $  278 | $  — | $(1,277) | $  (280) | $ 5,656 | $274 |
| Alt-A private-label securities . . . . . . . . . . . . | 1,118 | 57 | — | (154) | (457) | 564 | (25) |
| Subprime private-label securities . . . . . . . . . . . . | 2,318 | (83) | — | (455) | — | 1,780 | (74) |
| Mortgage revenue bonds . . . | 695 | (75) | — | (20) | — | 600 | (75) |
| Other . . . . . . . . . . . . . . . . . . | 167 | (1) | — | (12) | — | 154 | (1) |
| Non-mortgage-related: | | | | | | | |
| Asset-backed securities . . . . | 1,475 | (38) | — | (108) | (1,222) | 107 | 2 |
| Corporate debt securities  . . | 57 | 3 | — | (116) | 56 | — | — |
| Total trading securities  . . . . . . . . | $12,765 | $  141 | $  — | $(2,142) | $(1,903) | $ 8,861 | $101 |
| Available-for-sale securities: | | | | | | | |
| Mortgage-related: | | | | | | | |
| Fannie Mae . . . . . . . . . . . . . | $ 5,609 | $  (47) | $ 191 | $  (569) | $(4,588) | $  596 | $ — |
| Freddie Mac . . . . . . . . . . . . . | 80 | 3 | (6) | (21) | (29) | 27 | — |
| Ginnie Mae . . . . . . . . . . . . . | 190 | — | 1 | (7) | (61) | 123 | — |
| Alt-A private-label securities . . . . . . . . . . . . | 11,675 | (1,717) | 2,192 | (1,554) | (2,284) | 8,312 | — |
| Subprime private-label securities . . . . . . . . . . . . | 14,318 | (5,290) | 4,862 | (3,144) | — | 10,746 | — |
| Mortgage revenue bonds . . . | 12,456 | (16) | 1,349 | (969) | — | 12,820 | — |
| Other . . . . . . . . . . . . . . . . . . | 3,509 | (81) | 651 | (549) | — | 3,530 | — |
| Total available-for-sale securities . . . . . . . . . . . . . . . . | $47,837 | $(7,148) | $9,240 | $(6,813) | $(6,962) | $36,154 | $ — |
| Guaranty assets and buy-ups . . . . | $ 1,083 | $  466 | $ 243 | $  785 | $  — | $ 2,577 | $783 |
| Net derivatives . . . . . . . . . . . . . . | 310 | (42) | — | (48) | (97) | 123 | 3 |
| Long-term debt . . . . . . . . . . . . . | (2,898) | (18) | — | 1,791 | 524 | (601) | (49) |

[1]  Purchases and sales include activity related to the consolidation and deconsolidation of assets of securitization trusts.

[2]  Issuances and settlements include activity related to the consolidation and deconsolidation of liabilities of securitization trusts.

[3]  Transfers out of Level 3 consisted primarily of Fannie Mae guaranteed mortgage-related securities and private-label mortgage-related securities backed by Alt-A loans. Prices for these securities were obtained from multiple third-party vendors supported by market observable inputs. Transfers into Level 3 consisted primarily of Fannie Mae guaranteed mortgage-related securities and private-label mortgage-related securities backed by Alt-A loans. Prices for these securities are based on inputs from a single source or inputs that were not readily observable.

[4]  Amount represents temporary changes in fair value. Amortization, accretion and other-than-temporary impairments are not considered unrealized and are not included in this amount.

F-117

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following tables display realized and unrealized gains and losses included in our consolidated statements of operations and comprehensive loss for the years ended December 31, 2011, 2010 and 2009, for our Level 3 assets and liabilities measured in our consolidated balance sheets at fair value on a recurring basis.

|  | For the Year Ended December 31, 2011 | | | | |
|---|---|---|---|---|---|
|  | Interest Income | Fair Value Losses, net | Net Other-than-Temporary Impairments | Other | Total |
|  | (Dollars in millions) | | | | |
| Total realized and unrealized (losses) gains included in net loss . . . . . . | $(327) | $86 | $(229) | $13 | $(457) |
| Net unrealized (losses) gains related to Level 3 assets and liabilities still held as of December 31, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . | $   (3) | $18 | $  — | $— | $  15 |

|  | For the Year Ended December 31, 2010 | | | | |
|---|---|---|---|---|---|
|  | Interest Income | Fair Value Losses, net | Net Other-than-Temporary-Impairments | Other | Total |
|  | (Dollars in millions) | | | | |
| Total realized and unrealized gains (losses) included in net loss . . . . . . . | $319 | $416 | $(480) | $40 | $295 |
| Net unrealized gains related to Level 3 assets and liabilities still held as of December 31, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ — | $ 93 | $  — | $— | $ 93 |

|  | For the Year Ended December 31, 2009 | | | | |
|---|---|---|---|---|---|
|  | Interest Income Investments in Securities | Fee and Other Income | Fair Value Losses, net | Net Other-than-Temporary-Impairments | Total |
|  | (Dollars in millions) | | | | |
| Total realized and unrealized gains (losses) included in net loss . . . . . | $545 | $466 | $94 | $(7,706) | $(6,601) |
| Net unrealized gains related to level 3 assets and liabilities still held as of December 31, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ — | $783 | $55 | $  — | $  838 |

We use valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs. The following is a description of the valuation techniques we use for assets and liabilities measured at fair value on a recurring basis, as well as our basis for classifying these assets and liabilities as Level 1, Level 2 or Level 3. These valuation techniques are also used to estimate the fair value of financial instruments not carried at fair value but disclosed as part of the fair value of financial instruments.

*Cash Equivalents, Trading Securities and Available-for-Sale Securities*—These securities are recorded in our consolidated balance sheets at fair value on a recurring basis. Fair value is measured using quoted market prices in active markets for identical assets, when available. Securities, such as U.S. Treasuries, whose value is based on quoted market prices in active markets for identical assets are classified as Level 1. If quoted market prices in active markets for identical assets are not available, we use prices provided by up to three third-party pricing services that are calibrated to the quoted market prices in active markets for similar securities, and assets valued in this manner are classified as Level 2. In the absence of prices provided by third-party pricing services supported by observable market data, fair values are estimated using quoted prices of securities with similar characteristics or discounted cash flow models that use inputs such as spread, prepayment speed, yield, and loss severity based on market assumptions where available. Such instruments are generally classified as Level 2. Where there is limited activity or less transparency around inputs to the valuation, securities are classified as Level 3.

F-118

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Mortgage Loans Held for Investment*—The majority of HFI performing loans and nonperforming loans that are not individually impaired are reported in our consolidated balance sheets at the principal amount outstanding, net of cost basis adjustments and an allowance for loan losses. We elected the fair value option for certain loans containing embedded derivatives that would otherwise require bifurcation and consolidated loans of senior-subordinate trust structures, which are recorded in our consolidated balance sheets at fair value on a recurring basis.

Fair value of performing loans represents an estimate of the prices we would receive if we were to securitize those loans and is determined based on comparisons to Fannie Mae MBS with similar characteristics, either on a pool or loan level. We use the observable market values of our Fannie Mae MBS determined from third-party pricing services and other observable market data as a base value, from which we add or subtract the fair value of the associated guaranty asset, guaranty obligation and master servicing arrangement. We classify these valuations primarily within Level 2 of the valuation hierarchy given that the market values of our Fannie Mae MBS are calibrated to the quoted market prices in active markets for similar securities. To the extent that significant inputs are not observable or determined by extrapolation of observable points, the loans are classified within Level 3. Certain loans that do not qualify for Fannie Mae MBS securitization are valued using market-based data including, for example, credit spreads, severities and prepayment speeds for similar loans, through third-party pricing services or through a model approach incorporating both interest rate and credit risk simulating a loan sale via a synthetic structure.

Fair value of single-family nonperforming loans represents an estimate of the prices we would receive if we were to sell these loans in the nonperforming whole-loan market. We calculate the fair value of nonperforming loans based on indicative bids received on a representative sample of nonperforming loans. The bids on the sample loans are obtained from multiple active market participants. Fair value for loans that are four or more months delinquent, in an open modification period, or in a closed modification and that have performed for nine or fewer months are estimated by extrapolating from the indicative sample bids. Fair value for loans that are one to three months delinquent is estimated by an interpolation method using three inputs: (1) the fair value estimate as a performing loan; (2) the fair value estimate as a nonperforming loan; and (3) the delinquency transition rate corresponding to the loan's current delinquency status.

A portion of our single-family nonperforming loans are considered impaired and are measured at fair value in our consolidated balance sheets on a nonrecurring basis. The fair value of these nonperforming loans is measured using the value of the underlying collateral. These valuations leverage our proprietary distressed home price model. The model assigns a value using comparable transaction data. In determining what comparables to use in the calculations, the model measures three key characteristics relative to the target property: (1) distance from target property, (2) time of the transaction and (3) comparability of the nondistressed value. These loans are classified within Level 3 of the valuation hierarchy because significant inputs are unobservable.

Fair value of multifamily nonperforming loans is determined by external third-party valuations when available. If third-party valuations are unavailable, we determine the value of the collateral based on a derived property value estimation method using current net operating income of the property and capitalization rates.

*Derivatives Assets and Liabilities (collectively "derivatives")*—Derivatives are recorded in our consolidated balance sheets at fair value on a recurring basis. The valuation process for the majority of our risk management derivatives uses observable market data provided by third-party sources, resulting in Level 2 classification. Interest rate swaps are valued by referencing yield curves derived from observable interest rates and spreads to project and discount swap cash flows to present value. Option-based derivatives use a model that projects the probability of various levels of interest rates by referencing swaption and caplet volatilities provided by market

F-119

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

makers/dealers. The projected cash flows of the underlying swaps of these option-based derivatives are discounted to present value using yield curves derived from observable interest rates and spreads. Exchange-traded futures are valued using market quoted prices, resulting in Level 1 classification. Certain highly complex structured derivatives use only a single external source of price information due to lack of transparency in the market and may be modeled using observable interest rates and volatility levels as well as significant assumptions, resulting in Level 3 classification. Mortgage commitment derivatives use observable market data, quotes and actual transaction price levels adjusted for market movement, and are typically classified as Level 2. Adjustments for market movement based on internal model results that cannot be corroborated by observable market data are classified as Level 3.

*Guaranty Assets and Buy-ups*—Guaranty assets related to our portfolio securitizations are recorded in our consolidated balance sheets at fair value on a recurring basis and are classified within Level 3 of the valuation hierarchy. Guaranty assets in lender swap transactions are recorded in our consolidated balance sheets at the lower of cost or fair value. These assets, which are measured at fair value on a nonrecurring basis, are classified within Level 3 of the fair value hierarchy.

We estimate the fair value of guaranty assets based on the present value of expected future cash flows of the underlying mortgage assets using management's best estimate of certain key assumptions, which include prepayment speeds, forward yield curves, and discount rates commensurate with the risks involved. These cash flows are projected using proprietary prepayment, interest rate and credit risk models. Because guaranty assets are like an interest-only income stream, the projected cash flows from our guaranty assets are discounted using one-month LIBOR plus the option-adjusted spread ("OAS") for interest-only trust securities. The interest-only OAS is calibrated using prices of a representative sample of interest-only trust securities. We believe the remitted fee income is less liquid than interest-only trust securities and more like an excess servicing strip. We take a further haircut of the present value for liquidity considerations. This discount is based on market quotes from dealers.

The fair value of the guaranty assets includes the fair value of any associated buy-ups, which is estimated in the same manner as guaranty assets but is recorded separately as a component of "Other assets" in our consolidated balance sheets. While the fair value of the guaranty assets reflects all guaranty arrangements, the carrying value primarily reflects only those arrangements entered into subsequent to our adoption of the accounting guidance on guarantor's accounting and disclosure requirements for guarantees.

*Debt*—The majority of debt of Fannie Mae is recorded in our consolidated balance sheets at the principal amount outstanding, net of cost basis adjustments. We elected the fair value option for certain structured debt instruments, which are recorded in our consolidated balance sheets at fair value on a recurring basis.

We use third-party pricing services that reference observable market data such as interest rates and spreads to measure the fair value of debt, and thus classify that debt as Level 2. When third-party pricing is not available, we use a discounted cash flow approach based on a yield curve derived from market prices observed for Fannie Mae Benchmark Notes and adjusted to reflect fair values at the offer side of the market.

For structured debt instruments that are not valued by third-party pricing services, cash flows are evaluated taking into consideration any structured derivatives through which we have swapped out of the structured features of the notes. The resulting cash flows are discounted to present value using a yield curve derived from market prices observed for Fannie Mae Benchmark Notes and adjusted to reflect fair values at the offer side of the market. Market swaption volatilities are also referenced for the valuation of callable structured debt instruments. Given that the derivatives considered in the valuations of these structured debt instruments are classified as Level 3, the valuations of the structured debt instruments result in a Level 3 classification.

F-120

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Consolidated MBS debt is traded in the market as MBS assets. Accordingly, we estimate the fair value of our consolidated MBS debt using quoted market prices in active markets for similar liabilities when traded as assets. The valuation methodology and inputs used in estimating the fair value of MBS assets are described under "Cash Equivalents, Trading Securities and Available-for-Sale Securities." Certain consolidated MBS debt with embedded derivatives is recorded in our consolidated balance sheets at fair value on a recurring basis.

*Nonrecurring Changes in Fair Value*

The following tables display assets and liabilities measured in our consolidated balance sheets at fair value on a nonrecurring basis; that is, the instruments are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances (for example, when we evaluate for impairment), and the gains or losses recognized for these assets and liabilities for the years ended December 31, 2011, 2010 and 2009, as a result of fair value measurements.

| | Fair Value Measurements For the Year Ended December 31, 2011 | | | | For the Year Ended December 31, 2011 |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value | Total Gains (Losses) |
| | (Dollars in millions) | | | | |
| Assets: | | | | | |
| Mortgage loans held for sale, at lower of cost or fair value ................................ | $— | $ 3 | $   197 | $   200[1] | $    12 |
| Single-family mortgage loans held for investment, at amortized cost: | | | | | |
| Of Fannie Mae ........................ | — | — | 44,592 | 44,592[2] | (3,077) |
| Of consolidated trusts .................. | — | — | 882 | 882[2] | (142) |
| Multifamily mortgage loans held for investment, at amortized cost: | | | | | |
| Of Fannie Mae ........................ | — | — | 1,910 | 1,910[2] | (348) |
| Acquired property, net: | | | | | |
| Single-family ......................... | — | — | 19,498 | 19,498[3] | (2,639) |
| Multifamily ........................... | — | — | 363 | 363[3] | (87) |
| Other assets .............................. | — | — | 1,537 | 1,537[4] | (209) |
| Total assets at fair value .................. | $— | $ 3 | $68,979 | $68,982 | $(6,490) |

F-121

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | Fair Value Measurements For the Year Ended December 31, 2010 | | | | For the Year Ended December 31, 2010 |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value | Total Losses |
| | (Dollars in millions) | | | | |
| Assets: | | | | | |
| Mortgage loans held for sale, at lower of cost or fair value | $— | $6,776 | $ 535 | $ 7,311[1][5] | $ (91)[5] |
| Single-family mortgage loans held for investment, at amortized cost: | | | | | |
| Of Fannie Mae | — | — | 38,150 | 38,150[2] | (2,244) |
| Of consolidated trusts | — | — | 1,294 | 1,294[2] | (235) |
| Multifamily mortgage loans held for investment, at amortized cost: | | | | | |
| Of Fannie Mae | — | — | 1,836 | 1,836[2] | (481) |
| Acquired property, net: | | | | | |
| Single-family | — | — | 20,248 | 20,248[3] | (2,617) |
| Multifamily | — | — | 206 | 206[3] | (65) |
| Other Assets: | | | | | |
| Guaranty assets | — | — | 27 | 27 | (6) |
| Partnership investments | — | — | 107 | 107 | (145) |
| Other assets | — | — | 597 | 597[4] | (43) |
| Total assets at fair value | $— | $6,776 | $63,000 | $69,776 | $(5,927) |

F-122

FANNIE MAE
(In conservatorship)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

| | Fair Value Measurements For the Year Ended December 31, 2009 | | | | For the Year Ended December 31, 2009 |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value | Total Losses |
| | (Dollars in millions) | | | | |
| Assets: | | | | | |
| Mortgage loans held for sale, at lower of cost or fair value | $— | $22,238 | $ 3,557 | $25,795[1] | $(1,210) |
| Mortgage loans held for investment, at amortized cost | — | 330 | 4,820 | 5,150[2] | (1,173) |
| Acquired property, net | — | — | 10,132 | 10,132[3] | (503) |
| Other assets: | | | | | |
| Guaranty assets | — | — | 2,327 | 2,327 | (231) |
| Master servicing assets | — | — | 147 | 147 | (546) |
| Partnership investments | — | — | 212 | 212 | (5,943)[6] |
| Total assets at fair value | $— | $22,568 | $21,195 | $43,763 | $(9,606) |
| Liabilities: | | | | | |
| Master servicing liabilities | $— | $ — | $ 254 | $ 254 | $ (200) |
| Total liabilities at fair value | $— | $ — | $ 254 | $ 254 | $ (200) |

---

[1] Includes $73 million, $7.1 billion and $15.1 billion of mortgage loans held for sale that were sold, liquidated, deconsolidated, retained as a mortgage-related security or redesignated to mortgage loans held for investment as of December 31, 2011, 2010 and 2009, respectively.

[2] Includes $8.1 billion, $3.4 billion and $1.1 billion of mortgage loans held for investment that were liquidated or transferred to foreclosed properties as of December 31, 2011, 2010 and 2009, respectively.

[3] Includes $14.5 billion, $10.5 billion and $7.1 billion of acquired properties that were sold or transferred as of December 31, 2011, 2010 and 2009, respectively.

[4] Includes $411 million and $22 million of other assets that were sold or transferred as of December 31, 2011 and 2010, respectively.

[5] Includes $7.1 billion of estimated fair value and $68 million in losses due to the adoption of the consolidation accounting guidance.

[6] Represents impairment charges related to LIHTC partnerships and other equity investments in multifamily properties. We recognized other than temporary impairment losses of $5.5 billion related to LIHTC partnerships for the year ended December 31, 2009.

The following is a description of the valuation techniques we use for assets and liabilities measured at fair value on a nonrecurring basis under the accounting guidance for fair value measurements as well as our basis for classifying these assets and liabilities as Level 1, Level 2 or Level 3. We also use these valuation techniques to estimate the fair value of financial instruments not carried at fair value but disclosed as part of the fair value of financial instruments.

F-123

TREASURY-2752

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Mortgage Loans Held for Sale*—Loans are reported at the lower of cost or fair value in our consolidated balance sheets. The valuation methodology and inputs used in estimating the fair value of HFS loans are described under "Mortgage Loans Held for Investment" and these loans are classified as Level 2 to the extent that significant inputs are observable. To the extent that significant inputs are unobservable or determined by extrapolation of observable points, the loans are classified within Level 3.

*Acquired Property, Net and Other Assets*—Acquired property, net mainly represents foreclosed property received in full satisfaction of a loan net of a valuation allowance. Acquired property is initially recorded in our consolidated balance sheets at its fair value less its estimated cost to sell. The initial fair value of foreclosed properties is determined using a hierarchy based on the reliability of available information. The hierarchy includes offers accepted, third-party interior appraisals, independent broker price opinions, proprietary home price model values and exterior broker price opinions. We consider an offer accepted on a specific foreclosed property to be the best estimate of its fair value. If we have not accepted an offer on the property we use a third-party valuation to determine fair value. Third-party valuation could be obtained from either an interior appraisal or an interior broker price opinion. Interior appraisals and broker price opinions are performed by evaluating the property based on both its interior and exterior condition. We obtain an updated third-party appraisal when a material change has occurred to the condition of the property or when the property has been taken off the market for an extended period of time.

When an accepted offer or a third-party valuation is not available, we generally utilize the home price values using our proprietary model to determine fair value. Our proprietary home price model determines the value of a property using comparable transactions after adjusting for factors such as location, time elapsed since the last sale, and the condition of comparable properties. In certain cases where we do not have sufficient inputs to generate model values, we obtain and rely on exterior third-party appraisals or exterior broker price opinions. Exterior appraisals and exterior broker price opinions are performed by evaluating the property only from the outside and are typically used when access to the property is restricted.

Appraisals and broker price opinions are kept current using a walk forward process that updates them for any projected change in the value of the property. A majority of third-party values are updated by comparing the difference in our proprietary home price model from the month of the original appraisal/broker price opinion to the current period and by applying the resulting percentage change to the original value. If a price is not determinable through our proprietary home price model, we use a home price index to update the appraisals. The most commonly used methodologies in our valuation of acquired property are proprietary home price model and both current and walked forward interior appraisals. Combined these comprise approximately 77% of the population while accepted offers account for approximately 20% of the population.

Estimated cost to sell is based upon historical sales costs at a regional level. These costs primarily include broker fees, title expenses, seller representation expenses, and recording and transfer expenses.

Subsequent to initial measurement, the foreclosed properties that we intend to sell are reported at the lower of the carrying amount or fair value less estimated costs to sell. Foreclosed properties classified as held for use, included in "Other assets" in our consolidated balance sheets, are depreciated and are impaired when circumstances indicate that the carrying amount of the property is no longer recoverable. The fair values of our single-family foreclosed properties are determined using the same hierarchy used at the point of determining initial fair value. The fair value of our multifamily properties is derived using third-party valuations, including appraisals and broker price opinions. When third-party valuations are not available, we estimate the fair value using the current net operating income of the property and capitalization rates.

F-124

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Acquired property is classified within Level 3 of the valuation hierarchy because significant inputs are unobservable.

*Fair Value of Financial Instruments*

The following table displays the carrying value and estimated fair value of our financial instruments as of December 31, 2011 and 2010. The fair value of financial instruments we disclose includes commitments to purchase multifamily and single-family mortgage loans which are off-balance sheet financial instruments that we do not record in our consolidated balance sheets. The fair values of these commitments are included as "Mortgage loans held for investment, net of allowance for loan losses." The disclosure excludes certain financial instruments, such as plan obligations for pension and postretirement health care benefits, employee stock option and stock purchase plans, and also excludes all non-financial instruments. As a result, the fair value of our financial assets and liabilities does not represent the underlying fair value of our total consolidated assets and liabilities.

| | As of | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2011 | | December 31, 2010 | |
| | Carrying Value | Estimated Fair Value | Carrying Value | Estimated Fair Value |
| | (Dollars in millions) | | | |
| **Financial assets:** | | | | |
| Cash and cash equivalents and restricted cash . . . . . . . . . . . . . . . . . . . | $ 68,336 | $ 68,336 | $ 80,975 | $ 80,975 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 46,000 | 46,000 | 11,751 | 11,751 |
| Trading securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 74,198 | 74,198 | 56,856 | 56,856 |
| Available-for-sale securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 77,582 | 77,582 | 94,392 | 94,392 |
| Mortgage loans held for sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 311 | 325 | 915 | 915 |
| Mortgage loans held for investment, net of allowance for loan losses: | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 322,825 | 294,996 | 358,698 | 319,367 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,575,485 | 2,652,025 | 2,564,107 | 2,610,145 |
| Mortgage loans held for investment . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,898,310 | 2,947,021 | 2,922,805 | 2,929,512 |
| Advances to lenders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,538 | 5,420 | 7,215 | 6,990 |
| Derivative assets at fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 561 | 561 | 1,137 | 1,137 |
| Guaranty assets and buy-ups . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 503 | 901 | 458 | 814 |
| Total financial assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,171,339 | $3,220,344 | $3,176,504 | $3,183,342 |
| **Financial liabilities:** | | | | |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ — | $ — | $ 52 | $ 51 |
| Short-term debt: | | | | |
| Of Fannie Mae  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 146,752 | 146,782 | 151,884 | 151,974 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,973 | 4,973 | 5,359 | 5,359 |
| Long-term debt: | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 585,692 | 613,983 | 628,160 | 649,684 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,452,455 | 2,596,657 | 2,411,597 | 2,514,929 |
| Derivative liabilities at fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 916 | 916 | 1,715 | 1,715 |
| Guaranty obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 811 | 3,944 | 769 | 3,854 |
| Total financial liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,191,599 | $3,367,255 | $3,199,536 | $3,327,566 |

F-125

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following are valuation techniques for items not subject to the fair value hierarchy either because they are not measured at fair value other than for the purpose of the above table or because they are only measured at fair value at inception.

*Financial Instruments for which fair value approximates carrying value*—We hold certain financial instruments that are not carried at fair value but for which the carrying value approximates fair value due to the short-term nature and negligible credit risk inherent in them. These financial instruments include cash and cash equivalents, federal funds and securities sold/purchased under agreements to repurchase/resell (exclusive of dollar roll repurchase transactions) and the majority of advances to lenders.

*Advances to Lenders*—The carrying value for the majority of our advances to lenders approximates the fair value due to the short-term nature of the specific instruments. Other instruments include loans for which the carrying value does not approximate fair value. These loans are valued using collateral values of similar loans as a proxy.

*Guaranty Obligations*—The fair value of all guaranty obligations ("GO"), measured subsequent to their initial recognition, is our estimate of a hypothetical transaction price we would receive if we were to issue our guaranty to an unrelated party in a standalone arm's-length transaction at the measurement date. We estimate the fair value of the GO using our internal GO valuation models, which calculate the present value of expected cash flows based on management's best estimate of certain key assumptions such as current mark-to-market LTV ratios, future house prices, default rates, severity rates and required rate of return. We further adjust the model values based on our current market pricing when such transactions reflect credit characteristics that are similar to our outstanding GO. While the fair value of the GO reflects all guaranty arrangements, the carrying value primarily reflects only those arrangements entered into subsequent to our adoption of the accounting guidance on guarantor's accounting and disclosure requirements for guarantees.

**Fair Value Option**

We elected the fair value option for certain consolidated loans and debt instruments recorded in our consolidated balance sheets as a result of consolidating VIEs. These instruments contain embedded derivatives that would otherwise require bifurcation. Under the fair value option, we elected to carry these instruments at fair value instead of bifurcating the embedded derivative from the respective loan or debt instrument.

We elected the fair value option for all long-term structured debt instruments that are issued in response to specific investor demand and have interest rates that are based on a calculated index or formula and are economically hedged with derivatives at the time of issuance. By electing the fair value option for these instruments, we are able to eliminate the volatility in our results of operations that would otherwise result from the accounting asymmetry created by recording these structured debt instruments at cost while recording the related derivatives at fair value.

We elected the fair value option for the financial assets and liabilities of the consolidated senior-subordinate trust structures. By electing the fair value option for these instruments, we are able to eliminate the volatility in our results of operations that would otherwise result from different accounting treatment between loans at cost and debt at cost.

Interest income for the mortgage loans is recorded in "Mortgage loans interest income" and interest expense for the debt instruments is recorded in "Long-term debt interest expense" in our consolidated statements of operations and comprehensive loss.

F-126

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table displays the fair value and unpaid principal balance of the financial instruments for which we have made fair value elections as of December 31, 2011 and 2010.

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2011** | | | **2010** | | |
| | **Loans of Consolidated Trusts**[1] | **Long-Term Debt of Fannie Mae** | **Long-Term Debt of Consolidated Trusts**[2] | **Loans of Consolidated Trusts**[1] | **Long-Term Debt of Fannie Mae** | **Long-Term Debt of Consolidated Trusts**[2] |
| | (Dollars in millions) | | | | | |
| Fair value . . . . . . . . . . . . . . . . . . . . . . | $3,611 | $838 | $3,939 | $2,962 | $893 | $2,271 |
| Unpaid principal balance . . . . . . . . . | 4,122 | 712 | 4,012 | 3,456 | 829 | 2,572 |

[1] Includes nonaccrual loans with a fair value of $195 million and $219 million as of December 31, 2011 and 2010, respectively. The difference between unpaid principal balance and the fair value of these nonaccrual loans as of December 31, 2011 is $232 million. Includes loans that are 90 days past due with a fair value of $310 million and $369 million as of December 31, 2011 and 2010, respectively. The difference between unpaid principal balance and the fair value of these 90 or more days past due loans as of December 31, 2011 is $262 million.

[2] Includes interest-only debt instruments with no unpaid principal balance and a fair value of $115 million and $151 million as of December 31, 2011 and 2010, respectively.

*Changes in Fair Value under the Fair Value Option Election*

The following table displays fair value gains and losses, net, including changes attributable to instrument-specific credit risk, for loans and debt for which the fair value election was made. Amounts are recorded as a component of "Fair value losses, net" in our consolidated statements of operations and comprehensive loss for the years ended December 31, 2011, 2010 and 2009.

| | For the Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2011** | | | **2010** | | | **2009** |
| | **Loans** | **Long-Term Debt** | **Total Losses** | **Loans** | **Long-Term Debt** | **Total Losses** | **Long-Term Debt** |
| | (Dollars in millions) | | | | | | |
| Changes in instrument-specific credit risk . . . . . . | $(215) | $ 10 | $(205) | $ (58) | $(9) | $ (67) | $ 33 |
| Other changes in fair value . . . . . . . . . . . . . . . . . . | 79 | (92) | (13) | (73) | 14 | (59) | (64) |
| Fair value losses, net . . . . . . . . . . . . . . . . . . . . . . | $(136) | $(82) | $(218) | $(131) | $ 5 | $(126) | $(31) |

In determining the changes in the instrument-specific credit risk for loans, the changes in the associated credit-related components of these loans, primarily the guaranty obligation, were taken into consideration with the overall change in the fair value of the loans for which we elected the fair value option for financial instruments. In determining the changes in the instrument-specific credit risk for debt, the changes in Fannie Mae debt spreads to LIBOR that occurred during the period were taken into consideration with the overall change in the fair value of the debt for which we elected the fair value option for financial instruments. Specifically, cash flows are evaluated taking into consideration any derivatives through which Fannie Mae has swapped out of the structured features of the notes and thus created a floating-rate LIBOR-based debt instrument. The change in value of these LIBOR-based cash flows based on the Fannie Mae yield curve at the beginning and end of the period represents the instrument-specific risk.

F-127

TREASURY-2756

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**19.   Commitments and Contingencies**

We are party to various types of legal actions and proceedings, including actions brought on behalf of various classes of claimants. We also are subject to regulatory examinations, inquiries and investigations and other information gathering requests. In some of the matters, indeterminate amounts are sought. Modern pleading practice in the U.S. permits considerable variation in the assertion of monetary damages or other relief. Jurisdictions may permit claimants not to specify the monetary damages sought or may permit claimants to state only that the amount sought is sufficient to invoke the jurisdiction of the trial court. This variability in pleadings, together with our and our counsel's actual experience in litigating or settling claims, leads us to conclude that the monetary relief that may be sought by plaintiffs bears little relevance to the merits or disposition value of claims.

On a quarterly and annual basis, we review relevant information about all pending legal actions and proceedings for the purpose of evaluating and revising our contingencies, reserves and disclosures.

Legal actions and proceedings of all types are subject to many uncertain factors that generally cannot be predicted with assurance. Accordingly, the outcome of any given matter and the amount or range of potential loss at particular points in time is frequently difficult to ascertain. Uncertainties can include how fact finders will evaluate documentary evidence and the credibility and effectiveness of witness testimony, and how trial and appellate courts will apply the law. Disposition valuations are also subject to the uncertainty of how opposing parties and their counsel view the evidence and applicable law. Further, FHFA adopted a regulation on June 20, 2011, which provides, in part, that while we are in conservatorship, FHFA will not pay claims by our current or former shareholders, unless the Director of FHFA determines it is in the interest of the conservatorship. The presence of this regulation and the Director of FHFA's assertion that FHFA will not pay claims asserted in certain cases discussed below while we are in conservatorship creates additional uncertainty in those cases.

We establish a reserve for those matters when a loss is probable and we can reasonably estimate the amount of such loss. Reserves have been established for certain of the matters noted below. These reserves did not have a material adverse effect on our financial statements. We note, however, that in light of the uncertainties involved in such actions and proceedings, there is no assurance that the ultimate resolution of these matters will not significantly exceed the reserves we have currently accrued.

For the remaining legal actions or proceedings, including those where there is only a reasonable possibility that a loss may be incurred, we are not currently able to estimate the reasonably possible losses or ranges of losses and we have not established a reserve with respect to those actions or proceedings. We are often unable to estimate the possible losses or ranges of losses, particularly for proceedings that are in their early stages of development, where plaintiffs seek substantial or indeterminate damages, where there may be novel or unsettled legal questions relevant to the proceedings, or where settlement negotiations have not occurred or progressed. Further, as noted above, FHFA's regulation and the Director of FHFA's assertion creates additional uncertainty with respect to certain cases.

Given the uncertainties involved in any action or proceeding, regardless of whether we have established a reserve, the ultimate resolution of certain of these matters may be material to our operating results for a particular period, depending on, among other factors, the size of the loss or liability imposed and the level of our net income or loss for that period. Based on our current knowledge with respect to the matters described below, we believe we have valid defenses to the claims in these proceedings and intend to defend these matters vigorously regardless of whether or not we have recorded a loss reserve.

In addition to the matters specifically described below, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that we do not expect will have a material impact on our

F-128

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

business or financial condition. We have advanced fees and expenses of certain current and former officers and directors in connection with various legal proceedings pursuant to indemnification agreements.

*In re Fannie Mae Securities Litigation*

Fannie Mae is a defendant in a consolidated class action lawsuit initially filed in 2004 and currently pending in the U.S. District Court for the District of Columbia. In the consolidated complaint filed on March 4, 2005, lead plaintiffs Ohio Public Employees Retirement System and State Teachers Retirement System of Ohio allege that we and certain former officers, as well as our former outside auditor, made materially false and misleading statements in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 promulgated thereunder. Plaintiffs contend that Fannie Mae's accounting statements were inconsistent with GAAP requirements relating to hedge accounting and the amortization of premiums and discounts, and seek unspecified compensatory damages, attorneys' fees, and other fees and costs. On January 7, 2008, the court defined the class as all purchasers of Fannie Mae common stock and call options and all sellers of publicly traded Fannie Mae put options during the period from April 17, 2001 through December 22, 2004. On October 17, 2008, FHFA, as conservator for Fannie Mae, intervened in this case. On August 18, 2011, the parties filed various motions for summary judgment, which are fully briefed.

On October 7, 2011, FHFA, as conservator, filed a motion to stay this case for the duration of our conservatorship based on a regulation FHFA adopted on June 20, 2011, which provides in part that while we are in conservatorship, FHFA will not pay claims by our current or former shareholders, unless the Director of FHFA determines it is in the interest of the conservatorship. The Acting Director of FHFA has determined it will not pay the claims asserted in this case while we are in conservatorship. FHFA maintains, therefore, that continuing litigation of this matter would be a waste of resources. FHFA's motion was denied on November 14, 2011. FHFA's regulation has been challenged by lead plaintiffs in a separate lawsuit also pending in the U.S. District Court for the District of Columbia.

In September and December, 2010, plaintiffs served expert reports claiming damages to plaintiffs under various scenarios ranging cumulatively from $2.2 billion to $8.6 billion. Given the substantial and novel legal questions that remain, including those raised by FHFA's regulation and the Director of FHFA's determination, we are currently unable to estimate the reasonably possible loss or range of loss arising from this litigation.

*2008 Class Action Lawsuits*

Fannie Mae is a defendant in two consolidated class actions filed in 2008 and currently pending in the U.S. District Court for the Southern District of New York—*In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. On February 11, 2009, the Judicial Panel on Multidistrict Litigation ordered that the cases be coordinated for pretrial proceedings.

Given the early status of these matters, the absence of a specified demand or claim by the plaintiffs, and the substantial and novel legal questions that remain, including those raised by FHFA's regulation and the Director of FHFA's determination, we are currently unable to estimate the reasonably possible loss or range of loss arising from these lawsuits.

*In re Fannie Mae 2008 Securities Litigation*

In a consolidated complaint filed on June 22, 2009, lead plaintiffs Massachusetts Pension Reserves Investment Management Board and Boston Retirement Board (for common shareholders) and Tennessee Consolidated Retirement System (for preferred shareholders) allege that we, certain of our former officers, and certain of our underwriters violated Sections 12(a)(2) and 15 of the Securities Act of 1933. Lead plaintiffs also allege that we,

F-129

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

certain of our former officers, and our outside auditor, violated Sections 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a) of the Securities Exchange Act of 1934. Lead plaintiffs seek various forms of relief, including rescission, damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief. On October 13, 2009, the Court entered an order allowing FHFA to intervene.

On November 24, 2009, the Court granted the defendants' motion to dismiss the Securities Act claims as to all defendants. On September 30, 2010, the Court granted in part and denied in part the defendants' motions to dismiss the Securities Exchange Act claims. As a result of the partial denial, some of the Securities Exchange Act claims remain pending against us and certain of our former officers. On October 14, 2010, we and certain other defendants filed motions for reconsideration of those portions of the Court's September 30, 2010 order denying in part the defendants' motions to dismiss. Fannie Mae filed its answer to the consolidated complaint on December 31, 2010. Defendants' motions for reconsideration were denied on April 11, 2011. On July 28, 2011 lead plaintiffs filed motions to certify a class of persons who, between November 8, 2006 and September 5, 2008, inclusive, purchased or acquired (a) Fannie Mae common stock and options or (b) Fannie Mae preferred stock.

On February 1, 2012, plaintiffs sought leave to amend their complaint to add new factual allegations and the court granted plaintiffs' motion. Briefing on the pending motions for class certification will be held in abeyance pending resolution of motions to dismiss the amended complaint.

*In re 2008 Fannie Mae ERISA Litigation*

In a consolidated complaint filed on September 11, 2009, plaintiffs allege that certain of our current and former officers and directors, including former members of Fannie Mae's Benefit Plans Committee and the Compensation Committee of Fannie Mae's Board of Directors, as fiduciaries of Fannie Mae's Employee Stock Ownership Plan ("ESOP"), breached their duties to ESOP participants and beneficiaries by investing ESOP funds in Fannie Mae common stock when it was no longer prudent to continue to do so. Plaintiffs purport to represent a class of participants and beneficiaries of the ESOP whose accounts invested in Fannie Mae common stock beginning April 17, 2007. The plaintiffs seek unspecified damages, attorneys' fees and other fees and costs, and injunctive and other equitable relief. On November 2, 2009, defendants filed motions to dismiss these claims, which are now fully briefed and remain pending. On November 2, 2011, we filed a letter notifying the court of two recent decisions by the U.S. Court of Appeals for the Second Circuit that are relevant to defendants' motions to dismiss. On February 1, 2012, plaintiffs sought leave to amend their complaint to add new factual allegations and the court granted plaintiffs' motion.

*Comprehensive Investment Services v. Mudd, et al.*

This individual securities action was originally filed on May 13, 2009, by plaintiff Comprehensive Investment Services, Inc. against certain of our former officers and directors, and certain of our underwriters in the U.S. District Court for the Southern District of Texas. On July 7, 2009, this case was transferred to the Southern District of New York for coordination with *In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. Plaintiff filed an amended complaint on May 11, 2011 against us, certain of our former officers, and certain of our underwriters. The amended complaint alleges violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; violations of Section 20(a) of the Securities Exchange Act of 1934; and violations of the Texas Business and Commerce Code, common law fraud, and negligent misrepresentation in connection with Fannie Mae's May 2008 $2.0 billion offering of 8.25% non-cumulative preferred Series T stock. Plaintiff seeks relief in the form of rescission, actual damages, punitive damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief. On July 11, 2011, defendants filed motions to dismiss the amended complaint, which are now fully briefed and remain pending. On February 1, 2012, plaintiff sought leave to amend its complaint to add new factual allegations and the court granted plaintiff's motion.

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Given the preliminary stage of this lawsuit, the absence of a specified demand or claim by the plaintiff, and the substantial and novel legal questions that remain, we are currently unable to estimate the reasonably possible loss or range of loss arising from this litigation.

_Smith v. Fannie Mae, et al._

This individual securities action was originally filed on February 25, 2010, by plaintiff Edward Smith against Fannie Mae and certain of its former officers as well as several underwriters in the U.S. District Court for the Central District of California. On April 12, 2010, this case was transferred to the Southern District of New York for coordination with _In re Fannie Mae 2008 Securities Litigation_ and _In re 2008 Fannie Mae ERISA Litigation_. Plaintiff filed an amended complaint on April 19, 2011, which alleges violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; violations of Section 20(a) of the Securities Exchange Act of 1934; common law fraud and negligence claims; and California state law claims for misrepresentation in connection with Fannie Mae's December 2007 $7.0 billion offering of 7.75% fixed-to-floating rate non-cumulative preferred Series S stock. Plaintiff seeks relief in the form of rescission, actual damages (including interest), and exemplary and punitive damages. On July 11, 2011, defendants filed motions to dismiss the amended complaint, which are now fully briefed and remain pending. On February 1, 2012, plaintiff sought leave to amend his complaint to add new factual allegations and the court granted plaintiff's motion.

Given the preliminary stage of this lawsuit, the absence of a specified demand or claim by the plaintiff, and the substantial and novel legal questions that remain, we are currently unable to estimate the reasonably possible loss or range of loss arising from this litigation.

_Investigation by the Securities and Exchange Commission_

On September 26, 2008, we received notice of an ongoing investigation into Fannie Mae by the SEC regarding certain accounting and disclosure matters. On January 8, 2009, the SEC issued a formal order of investigation. On December 15, 2011, we entered into a non-prosecution agreement with the SEC. The agreement requires us to cooperate with the SEC in enforcement proceedings brought against certain of our former officers, but does not require us to pay a monetary penalty.

_Investigation by the Department of Justice_

On March 15, 2010, we received a Grand Jury subpoena for documents in connection with a Department of Justice investigation into Fannie Mae's disclosure practices. Fannie Mae has completed its production of documents in response to the subpoena.

**Unconditional Purchase and Lease Commitments**

We have unconditional commitments related to the purchase of loans and mortgage-related securities. These include both on- and off-balance sheet commitments wherein a portion of these have been recorded as derivatives in our consolidated balance sheets. Unfunded lending represents off-balance sheet commitments for the unutilized portion of lending agreements entered into with multifamily borrowers.

We lease certain premises and equipment under agreements that expire at various dates through 2029. Some of these leases provide for payment by the lessee of property taxes, insurance premiums, cost of maintenance and other costs. Rental expenses for operating leases were $40 million, $35 million and $62 million for the years ended December 31, 2011, 2010 and 2009, respectively.

TREASURY-2760

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table summarizes by remaining maturity, non cancelable future commitments related to loan and mortgage purchases, unfunded lending, operating leases, and other agreements as of December 31, 2011.

| | As of December 31, 2011 | | | |
|---|---|---|---|---|
| | Loans and Mortgage-Related Securities[1] | Unfunded Lending | Operating Leases | Other[2] |
| | (Dollars in millions) | | | |
| 2012 ..................................... | $45,517 | $66 | $ 36 | $ 92 |
| 2013 ..................................... | 11 | 17 | 25 | 43 |
| 2014 ..................................... | 2 | 1 | 18 | 11 |
| 2015 ..................................... | — | 4 | 15 | — |
| 2016 ..................................... | — | — | 11 | — |
| Thereafter ................................ | — | — | 15 | — |
| Total ................................. | $45,530 | $88 | $120 | $146 |

[1] Includes $45.4 billion, which have been accounted for as mortgage commitment derivatives.

[2] Includes purchase commitments for certain telecom services, computer software and services, and other agreements.

## 20.   Selected Quarterly Financial Information (Unaudited)

The consolidated statements of operations for the quarterly periods in 2011 and 2010 are unaudited and in the opinion of management include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of our consolidated statements of operations. The operating results for the interim periods are not necessarily indicative of the operating results to be expected for a full year or for other interim periods.

TREASURY-2761

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | For the 2011 Quarter Ended | | | |
| --- | --- | --- | --- | --- |
| | March 31 | June 30 | September 30 | December 31[1] |
| | (Dollars and shares in millions, except per share amounts) | | | |
| Interest income: | | | | |
| Trading securities ........................................... | $ 284 | $ 264 | $ 274 | $ 265 |
| Available-for-sale securities ................................ | 1,213 | 1,152 | 1,160 | (248) |
| Mortgage loans ............................................. | 35,590 | 35,333 | 34,334 | 33,205 |
| Other ....................................................... | 28 | 25 | 26 | 38 |
| Total interest income ..................................... | 37,115 | 36,774 | 35,794 | 33,260 |
| Interest expense: | | | | |
| Short-term debt ............................................. | 107 | 81 | 66 | 56 |
| Long-term debt ............................................. | 32,048 | 31,721 | 30,542 | 29,041 |
| Total interest expense .................................... | 32,155 | 31,802 | 30,608 | 29,097 |
| Net interest income ........................................ | 4,960 | 4,972 | 5,186 | 4,163 |
| Provision for loan losses ................................... | (10,587) | (5,802) | (4,159) | (5,366) |
| Net interest (loss) income after provision for loan losses ....... | (5,627) | (830) | 1,027 | (1,203) |
| Investment gains, net ....................................... | 75 | 171 | 73 | 187 |
| Other-than-temporary impairments ........................... | (57) | (28) | (232) | (297) |
| Noncredit portion of other-than-temporary impairments recognized in other comprehensive loss ........... | 13 | (28) | (30) | 351 |
| Net other-than-temporary impairments ........................ | (44) | (56) | (262) | 54 |
| Fair value gains (losses), net ............................... | 289 | (1,634) | (4,525) | (751) |
| Debt extinguishment gains (losses), net ...................... | 13 | (43) | (119) | (83) |
| Fee and other income ...................................... | 237 | 265 | 291 | 370 |
| Non-interest income (loss) ................................ | 570 | (1,297) | (4,542) | (223) |
| Administrative expenses: | | | | |
| Salaries and employee benefits .............................. | 320 | 310 | 323 | 283 |
| Professional services ....................................... | 189 | 169 | 173 | 205 |
| Occupancy expenses ........................................ | 42 | 43 | 46 | 48 |
| Other administrative expenses ............................... | 54 | 47 | 49 | 69 |
| Total administrative expenses ............................. | 605 | 569 | 591 | 605 |
| (Benefit) provision for guaranty losses ...................... | (33) | 735 | (8) | 110 |
| Foreclosed property expense (income) ........................ | 488 | (478) | 733 | 37 |
| Other expenses ............................................. | 352 | 32 | 254 | 228 |
| Total expenses ........................................... | 1,412 | 858 | 1,570 | 980 |
| Loss before federal income taxes ........................... | (6,469) | (2,985) | (5,085) | (2,406) |
| Provision (benefit) for federal income taxes ................. | 2 | (93) | — | 1 |
| Net loss .................................................... | (6,471) | (2,892) | (5,085) | (2,407) |
| Less: Net (income) loss attributable to the noncontrolling interest ...... | — | (1) | — | 1 |
| Net loss attributable to Fannie Mae ......................... | (6,471) | (2,893) | (5,085) | (2,406) |
| Preferred stock dividends ................................... | (2,216) | (2,282) | (2,494) | (2,622) |
| Net loss attributable to common stockholders ................ | $ (8,687) | $(5,175) | $(7,579) | $(5,028) |
| Loss per share—Basic and Diluted .......................... | $ (1.52) | $ (0.90) | $ (1.32) | $ (0.87) |
| Weighted-average common shares outstanding—Basic and Diluted ...... | 5,698 | 5,730 | 5,760 | 5,760 |

[1]   Includes an out-of-period adjustment of $933 million comprised of $1.2 billion to reduce "Interest Income: Available-for-sale securities" offset by a $264 million reduction to "Other-than-temporary impairments" in our consolidated statement of operations and comprehensive loss for the three months ended December 31, 2011.

TREASURY-2762

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

|  | For the 2010 Quarter Ended | | | |
|---|---|---|---|---|
|  | March 31 | June 30[1] | September 30 | December 31[2] |
|  | (Dollars and shares in millions, except per share amounts) | | | |
| Interest income: | | | | |
| Trading securities | $    315 | $    330 | $    310 | $    296 |
| Available-for-sale securities | 1,473 | 1,389 | 1,313 | 1,115 |
| Mortgage loans | 37,619 | 37,632 | 36,666 | 35,666 |
| Other | 39 | 41 | 31 | 35 |
| Total interest income | 39,446 | 39,392 | 38,320 | 37,112 |
| Interest expense: | | | | |
| Short-term debt | 118 | 167 | 194 | 152 |
| Long-term debt | 36,539 | 35,018 | 33,350 | 32,323 |
| Total interest expense | 36,657 | 35,185 | 33,544 | 32,475 |
| Net interest income | 2,789 | 4,207 | 4,776 | 4,637 |
| Provision for loan losses | (11,939) | (4,295) | (4,696) | (3,772) |
| Net interest (loss) income after provision for loan losses | (9,150) | (88) | 80 | 865 |
| Investment gains, net | 166 | 23 | 82 | 75 |
| Other-than-temporary impairments | (186) | (48) | (366) | (94) |
| Noncredit portion of other-than-temporary impairments recognized in other comprehensive loss | (50) | (89) | 40 | 71 |
| Net other-than-temporary impairments | (236) | (137) | (326) | (23) |
| Fair value (losses) gains, net | (1,705) | 303 | 525 | 366 |
| Debt extinguishment losses, net | (124) | (159) | (214) | (71) |
| Fee and other income | 233 | 294 | 304 | 253 |
| Non-interest (loss) income | (1,666) | 324 | 371 | 600 |
| Administrative expenses: | | | | |
| Salaries and employee benefits | 324 | 324 | 325 | 304 |
| Professional services | 194 | 260 | 305 | 183 |
| Occupancy expenses | 41 | 40 | 43 | 46 |
| Other administrative expenses | 46 | 46 | 57 | 59 |
| Total administrative expenses | 605 | 670 | 730 | 592 |
| (Benefit) provision for guaranty losses | (36) | 69 | 78 | 83 |
| Foreclosed property (income) expense | (19) | 487 | 787 | 463 |
| Other expenses | 230 | 224 | 196 | 277 |
| Total expenses | 780 | 1,450 | 1,791 | 1,415 |
| (Loss) income before federal income taxes | (11,596) | (1,214) | (1,340) | 50 |
| (Benefit) provision for federal income taxes | (67) | 9 | (9) | (15) |
| Net (loss) income | (11,529) | (1,223) | (1,331) | 65 |
| Less: Net (income) loss attributable to the noncontrolling interest | (1) | 5 | (8) | 8 |
| Net (loss) income attributable to Fannie Mae | (11,530) | (1,218) | (1,339) | 73 |
| Preferred stock dividends | (1,527) | (1,907) | (2,116) | (2,154) |
| Net loss attributable to common stockholders | $(13,057) | $(3,125) | $(3,455) | $(2,081) |
| Loss per share—Basic and Diluted | $   (2.29) | $   (0.55) | $   (0.61) | $   (0.37) |
| Weighted-average common shares outstanding—Basic and Diluted | 5,692 | 5,694 | 5,695 | 5,696 |

[1]  Includes out-of-period adjustment of $1.1 billion to provision for loan losses, reflecting our assessment of the collectability of the receivable from the borrowers for preforeclosure property taxes and insurance.

[2]  Includes settlement from Bank of America N.A. related to repurchase requests for residential mortgage loans of $1.3 billion.

F-134



FR009

Table of Contents

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2011

Commission File Number: 001 34139

# Federal Home Loan Mortgage Corporation

*(Exact name of registrant as specified in its charter)*

**Freddie Mac**

| | | | |
|---|---|---|---|
| **Federally chartered corporation** | **8200 Jones Branch Drive** | **52-0904874** | **(703) 903-2000** |
| *(State or other jurisdiction of incorporation or organization)* | **McLean, Virginia 22102-3110** | *(I.R.S. Employer Identification No.)* | *(Registrant's telephone number, including area code)* |
| | *(Address of principal executive offices, including zip code)* | | |

Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to Section 12(g) of the Act:

Vot ng Common Stock, no pa va ue pe sha e (OTC FMCC)
Va a e Rate, No -C at ve P efe ed Stock, pa va ue $ 00 pe sha e (OTC FMCCI)
5% Non-Cumu at ve P efe ed Stock, pa va ue $ 00 pe sha e (OTC FMCKK)
Va a e Rate, No -C at ve P efe ed Stock, pa va ue $ 00 pe sha e (OTC FMCCG)
5 % Non-Cumu at ve P efe ed Stock, par va ue $ 00 per share (OTC FMCCH)
5 79% Non-Cumu at ve P efe ed Stock, par va ue $ 00 per share (OTC: FMCCK)
Va a e Rate, No -C at ve P efe ed Stock, pa va ue $ 00 pe sha e (OTC FMCCL)
Va a e Rate, No -C at ve P efe ed Stock, pa va ue $ 00 pe sha e (OTC FMCCM)
Va a e Rate, No -C at ve P efe ed Stock, par va ue $ 00 pe sha e (OTC FMCCN)
5 8 % Non-Cumu at ve P efe ed Stock, par va ue $ 00 per share (OTC FMCCO)
6% Non-Cumu at ve P efe ed Stock, pa va ue $ 00 pe sha e (OTC FMCCP)
Va a e Rate, No -C at ve P efe ed Stock, pa va ue $ 00 pe sha e (OTC FMCCJ)
5 7% Non-Cumu at ve P efe ed Stock, par va ue $ 00 per share (OTC FMCKP)
Va a e Rate, No -C at ve Pe petua P efe ed Stock, pa va ue $ 00 pe sha e (OTC FMCCS)
6 42% No -C at ve Pe pet a Preferred Stock, par va ue $ 00 per share (OTC FMCCT)
5 9% Non-C m at ve Pe pet a P efe ed Stock, pa va ue $ 00 pe sha e (OTC FMCKO)
5 57% Non-Cumu at ve Pe petua P efe ed Stock, pa va ue $ 00 pe sha e (OTC FMCKM)
5 66% No -C at ve Pe pet a P efe ed Stock, pa va ue $ 00 pe sha e (OTC FMCKN)
6 02% No -C at ve Pe pet a P efe ed Stock, pa va ue $ 00 pe sha e (OTC FMCKL)
6 55% Non-Cumu at ve Pe petua P efe ed Stock, pa va ue $ 00 pe sha e (OTC FMCKI)
F xed- o-F oa g Ra e Non-Cumu at ve Pe petua P efe ed Stock, pa va ue $ 00 sha e (OTC FMCKJ)

I d ca e y c eck ak f e eg s a wa we -k ow seasoned ssue , as def ned n Ru e 405 of the Secu t es Act  Yes ☐  No ☒

I d cate y c eck ak ft e eg st a t s ot eq ed to f e reports pursuant to Sect on  3 or Sect on 15(d) of the Act  Yes ☐  No ☒

I d cate y c eck ak w et et e eg st a t (1) as f ed a epo ts eq ed to f f ed y Sect o 13 o 5(d) of the Sec t es Exchange Act of 1934 d ng e p eced g 2 months (o fo such sho te pe od that the eg st ant was equ ed to f e such epo ts), and (2) has been subject to such f ng equ ements fo the past 90 days  Yes ☒  No ☐

I d cate y c eck ak w et et e eg st a t as s tted e ect o ca y a d posted o ts co po ate We s te, fa y, eve y I e ac ve Da a F e eq ed o e subm tted and posted pursuant to Ru e 405 of Regu at on S-T (§232 405 of th s chapte ) du ng the p eced ng 2 months (o fo such sho te pe od that the eg st ant was equ ed to subm t and post such f es)  ☒ Yes  ☐ No

I d ca e y c eck ak f d sc os e of de q e f e s pursuant to Item 405 of Regu at on S-K s ot co ta ed e e , a d w ot e co ta ed, to t e est of eg st a t's k ow edge,  def t ve p oxy o fo a o sa e s co po a ed y efe e ce  Pa t III of t s Form 0-K o any amendment to th s Form 0 K  ☒

I d cate y c eck ak w et et e eg st a t s a a ge acce e a ed f e , an acce e a ed f e , a non-acce e a ed f e , o a sma e epo t ng company See the def n t ons of " a ge acce e a ed f e ," "acce e a ed f e " a d "s a e epo t g co pa y" R e 12 -2 of t e Exc a ge Act

| | |
|---|---|
| La ge acce e a ed f le ☐ | Acce e a ed f le ☒ |
| | S a e epo t g |
| No -acce e a ed f e (Do o c eck f a s a e epo g co pa y) ☐ | co pa y ☐ |

I d ca e y c eck ak w e e e egs a s a se co pa y (as def ned n R e 12 -2 of e Exc a ge Act)  Yes☐  No ☒

T e agg egate a ket va ue of t e co o stock e d by o -aff a es co p ed y efe e ce o ep ce a w e common equ ty was ast so d on June 30, 2011 (t e ast ess day of t e eg st a t's ost ece t y co p eted seco d f sca q a e ) was $227 4 o

As of February 27, 20 2, there were 649,733,472 shares of the eg st ant's common stock outstand ng

**DOCUMENTS INCORPORATED BY REFERENCE**  No e

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D  RA   HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# TABLE OF CONTENTS

**PART I**

| | | |
|---|---|---|
| Item | Business | 1 |
| Item   A | Risk Factors | 45 |
| Item   B | Unresolved Staff Comments | 77 |
| Item 2 | Prope ties | 77 |
| Item 3 | Legal Proceedings | 77 |
| Item 4 | Mine Safety Disclosures | 77 |

**PART II**

| | | |
|---|---|---|
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity  Securities | 78 |
| Item 6 | Selected Financial Data | 81 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 82 |
| | Mo tgage Market and Economic Conditions, and Outlook | 82 |
| | Consolidated Results of Operations | 85 |
| | Consolidated Balance Sheets Analysis | 108 |
| | Risk Management | 127 |
| | Liquidity and Capital Resources | 174 |
| | Fair Value Measurements and Analysis | 182 |
| | Off Balance Sheet Arrangements | 187 |
| | Contractual Obligations | 188 |
| | Critical Accounting Policies and Estimates | 189 |
| | Risk Management and Disclosure Commitments | 192 |
| Item 7A | Quantitative and Qualitative Disclosures About  Market Risk | 194 |
| Item 8 | Financial Statements and Supplementary Data | 199 |
| Item 9 | Changes in and Disagreements with Accountants on  Accounting and Financial Disclosure | 315 |
| Item 9A | Controls and Procedures | 315 |
| Item 9B. | Other Information | 318 |

**PART III**

| | | |
|---|---|---|
| Item   0 | Directors, Executive Officers and Corporate  Governance | 322 |
| Item 11 | Executive Compensation | 330 |
| Item   2 | Security Ownership of Certain Beneficial Owners  and Management and Related Stockholder Matters | 358 |
| Item   3 | Certain Relationships and Related Transactions, and Director Independence | 360 |
| Item   4 | Principal Accounting Fees and Services | 365 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 366 |
| **SIGNATURES** | | 367 |
| **GLOSSARY** | | 368 |
| **EXHIBIT INDEX** | | E |

i                                                                    *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# MD&A TABLE REFERENCE

| Table | Descrip ion | Page |
|---|---|---|
|  | Selected Financial Data | 81 |
| 1 | Total Single Family Loan Workout Volumes | 4 |
| 2 | Single Family Credit Guarantee Portfolio Data by Year of Origination | 7 |
| 3 | Credit Statistics, Single Family Credit Guarantee Portfolio | 8 |
| 4 | Mortgage Related Investments Po tfolio | 26 |
| 5 | Affordable Housing Goals for 2010 and 2011 and Results for 20 0 | 35 |
| 6 | Affordable Housing Goals and Results for 2009 | 36 |
| 7 | Quarterly Common Stock Information | 78 |
| 8 | Mortgage Market Indicators | 82 |
| 9 | Summary Consolidated Statements of Income and Comprehensive Income | 85 |
| 0 | Average Balance, Net Interest Income, and Rate/Volume Analysis | 86 |
| 11 | Net Interest Income | 87 |
| 12 | Derivative Gains (Losses) | 91 |
| 3 | Other Income | 93 |
| 4 | Non Interest Expense | 94 |
| 15 | REO Operations Expense, REO Inventory, and REO Dispositions | 9 5 |
| 16 | Composition of Segment Mortgage Portfolios and Credit Risk Portfolios | 98 |
| 17 | Segment Earnings and Key Metrics      Investments | 99 |
| 18 | Segment Earnings and Key Metrics      Single Family Guarantee | 102 |
| 19 | Segment Earnings Composition      Single Family Guarantee Segment | 03 |
| 20 | Segment Earnings and Key Metrics      Multifamily | 106 |
| 21 | Investments in Available For Sale Securities | 109 |
| 22 | Investments in Trading Securities | 109 |
| 23 | Characteristics of Mortgage Related Securities on Our Consolidated Balance Sheets | 110 |
| 24 | Additional Characteristics of Mortgage Related Securities on Our Consolidated Balance Sheets | 111 |
| 25 | Total Mortgage Related Securities Purchase Activity | 112 |
| 26 | Non Agency Mortgage Related Securities Backed by Subprime First Lien, Option ARM, and Alt A Loans and Certain Related Credit Statistics | 114 |
| 27 | Non Agency Mortgage Related Securities Backed by Subprime, Option ARM, Alt A and Other Loans | 115 |
| 28 | Net Impairment of Available For Sale Mortgage Related Securities Recognized in Earnings | 116 |
| 29 | Ratings of Non Agency Mortgage Related Securities Backed by Subprime, Option ARM, Alt A and Other Loans, and CMBS | 118 |
| 30 | Mortgage Loan Purchase and Other Guarantee Commitment Activity | 120 |
| 3 | Derivative Fair Values and Maturities | 121 |
| 32 | Changes in Derivative Fair Values | 122 |
| 33 | Reconciliation of the Par Value and UPB to Total Debt, Net | 123 |
| 34 | Other Short Term Debt | 124 |
| 35 | Freddie Mac Mortgage Related Securities | 125 |
| 36 | Freddie Mac Mortgage Related Securities by Class Type | 126 |
| 37 | Issuances and Extinguishments of Debt Securities of Consolidated Trusts | 126 |
| 38 | Changes in Total Equity (Deficit) | 127 |
| 39 | Repurchase Request Activity | 30 |
| 40 | Loans Released from Repurchase Obligations | 131 |
| 4 | Mortgage Insurance by Counterparty | 34 |
| 42 | Bond Insurance by Counterparty | 135 |
| 43 | Non Agency Mortgage Related Securities Covered by Primary Bond Insurance | 136 |
| 44 | Derivative Counterparty Credit Exposure | 138 |
| 45 | Characteristics of the Single Family Credit Guarantee Portfolio | 142 |
| 46 | Single Family Loans Scheduled Payment Change to Include Principal by Year at December 31, 2011 | 145 |
| 47 | Serious Delinquency Rates by Year of Payment Change to Include Principal | 145 |
| 48 | Single Family Scheduled Adjustable Rate Resets by Year at December 31, 2011 | 146 |
| 49 | Serious Delinquency Rates by Year of First Rate Reset | 146 |
| 50 | Certain Higher Risk Categories in the Single Family Credit Guarantee Portfolio | 149 |
| 51 | Single Family Home Affordable Modification Program Volume | 153 |
| 52 | Single Family Refinance Loan Volume | 155 |
| 53 | Single Family Loan Workouts, Serious Delinquency, and Foreclosures Volumes | 157 |
| 54 | Reperformance Rates of Modified Single Family Loans | 158 |

ii

*Freddie Mac*

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

| Table | Descrip ion | Page |
|---|---|---|
| 5 5 | Single Family Serious Delinquency Rates | 159 |
| 5 6 | Credit Concentrations in the Single Family Credit Guarantee Portfolio | 160 |
| 57 | Single Family Credit Guarantee Portfolio by Attribute Combinations | 161 |
| 58 | Single Family Credit Guarantee Portfolio by Year of Loan Origination | 163 |
| 5 9 | Multifamily Mortgage Portfolio     by Attribute | 164 |
| 60 | Non Performing Assets | 166 |
| 61 | REO Activity by Region | 167 |
| 62 | Credit Loss Performance | 169 |
| 63 | Single Family Charge offs and Recoveries by Reg on | 170 |
| 64 | Loan Loss Reserves Activity | 170 |
| 6 5 | Single Family Impaired Loans with Specific Reserve Recorded | 171 |
| 66 | Single Family Credit Loss Sensitivity | 171 |
| 67 | Other Debt Security Issuances by Product, at Par Value | 178 |
| 68 | Other Debt Security Repurchases, Calls, and Exchanges | 179 |
| 69 | Freddie Mac Credit Ratings | 180 |
| 70 | Summary of Assets and Liabilities at Fair Value on a Recurring Basis | 183 |
| 71 | Summary of Change in the Fair Value of Net Assets | 186 |
| 72 | Contractual Obligations by Year at December 31, 2011 | 189 |
| 73 | PMVS Results | 198 |
| 74 | Derivative Impact on PMVS L (50 bps) | 199 |
| 75 | 2012 Program Target Compensation Amounts | 320 |
| 76 | Board of Directors Committee Membership | 326 |
| 77 | 2011 Semi Monthly Base Salary, Deferred Base Salary, Target Opportunity, and Target TDC | 335 |
| 78 | Achievement of Performance Measures for the Performance Based Portion of Deferred Base Salary | 336 |
| 79 | 2011 Deferred Base Salary | 338 |
| 80 | Achievement of Performance Measures for First Installment of 2011 Target Opportunity | 338 |
| 81 | Achievement of Performance Measures for Second Installment of 2010 Target Opportunity | 339 |
| 82 | 2011 Target Opportunity | 340 |
| 83 | 2011 Target TDC Compared to the Approved 2011 Actual TDC | 34 |
| 84 | Named Executive Officer Individual Performance Summaries | 342 |
| 85 | Summary Compensation Table     2011 | 347 |
| 86 | Grants of Plan Based Awards     2011 | 348 |
| 87 | Outstanding Equity Awards at Fiscal Year End     2011 | 349 |
| 88 | Option Exercises and Stock Vested     2011 | 349 |
| 89 | Pension Benefits     2011 | 350 |
| 90 | Non Qualified Deferred Compensation | 353 |
| 91 | Potential Payments Upon Termination of Employment or Change in Control as of December 31, 2011 | 355 |
| 92 | Board Compensation     2011 Non Employee Director Compensation Levels | 357 |
| 93 | 2011 Director Compensation | 357 |
| 94 | Stock Ownership by Directors, Executive Officers, and Greater Than 5% Holders | 358 |
| 9 5 | Equity Compensation Plan Information | 359 |
| 9 6 | Auditor Fees | 365 |

iii                                                                      *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 200 |
| Freddie Mac Consolidated Statements of Income and Comprehensive Income | 202 |
| Freddie Mac Consolidated Balance Sheets | 203 |
| Freddie Mac Consolidated Statements of Equity (Deficit) | 204 |
| Freddie Mac Consolidated Statements of Cash Flows | 205 |
| Note 1: Summary of Significant Accounting Policies | 206 |
| Note 2: Conservatorship and Related Matters | 221 |
| Note 3: Variable Interest Entities | 227 |
| Note 4: Mortgage Loans and Loan Loss Reserves | 232 |
| Note 5: Individually Impaired and Non Performing Loans | 237 |
| Note 6: Real Estate Owned | 244 |
| Note 7: Investments in Securities | 245 |
| Note 8: Debt Securities and Subordinated Borrowings | 255 |
| Note 9: Financial Guarantees | 259 |
| Note 10: Retained Interests in Mortgage Related Securitizations | 261 |
| Note 11: Derivatives | 262 |
| Note 12: Freddie Mac Stockholders' Equity (Deficit) | 266 |
| Note 13: Income Taxes | 270 |
| Note 14: Segment Reporting | 273 |
| Note 15: Regulatory Capital | 281 |
| Note 16: Concentration of Credit and Other Risks | 282 |
| Note 17: Fair Value Disclosures | 290 |
| Note 18: Legal Contingencies | 306 |
| Note 19: Selected Financial Statement Line Items | 311 |
| Quarterly Selected Financial Data | 315 |

iv                                                                              *Freddie Mac*

TREASURY-2770

Source  D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## PART I

*This Annual Report on Form 10 K includes forward looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward looking statements are made as of the date of this Form 10 K and we undertake no obligation to update any forward looking statement to reflect events or circumstances after the date of this Form 10 K. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in "BUSINESS   Forward Looking Statements," and "RISK FACTORS" in this Form 10 K.*

*Throughout this Form 10 K, we use certain acronyms and terms that are defined in the "GLOSSARY."*

## ITEM 1. BUSINESS

### Conservatorship

We continue to operate under the direction of FHFA, as our Conservator  We are also subject to certain constraints on our business activities imposed by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement. We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business  Our ability to access  funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by  FHFA under statutory mandatory receivership provisions. The conservatorship and related matters have had a wide ranging  impact on us, including our regulatory supervision, management,  business, financial condition, and results of operations.

As our Conservator, FHFA succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer  or director thereof, with respect to the company and its assets  FHFA, as Conservator, has directed and will continue to direct certain of our business activities and strategies  FHFA has delegated certain authority to our Board of Directors to  oversee, and to management to conduct, day to day operations  The directors serve on behalf of, and exercise authority as  directed by, the Conservator

There is significant uncertainty as to whether or when we will  emerge from conservatorship, as it has no specified termination  date, and as to what changes may occur to our business structure  during or following conservatorship, including whether we will  continue to exist  We are not aware of any current plans of our Conservator to significantly change our business model or  capital structure in the near term  Our future structure and role will be determined by the Administration and Congress, and  there are likely to be significant changes beyond the near term  We have no ability to predict the outcome of these deliberations

A number of bills have been introduced in Congress that would  bring about changes in the business model of Freddie Mac and  Fannie Mae  In addition, on February 11, 2011, the Administration delivered a report to Congress that lays out the  Administration's plan to reform the U.S. housing finance market, including options for structuring the  government's long term role in a housing finance system in  which the private sector is the dominant provider of mortgage  credit  The report recommends winding down Freddie Mac and  Fannie Mae, and states that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions  The report states that these efforts  must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and  the housing market.

The report states that the government is committed to ensuring  that Freddie Mac and Fannie Mae have sufficient capital to  perform under any guarantees issued now or in the future and the  ability to meet any of their debt obligations, and further  states that the Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac  and Fannie Mae to honor their obligations  The report states the Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the  Administration's plan.

On February 2, 2012, the Administration announced that it  expects to provide more detail concerning approaches to reform  the U.S. housing finance market in the spring, and that it  plans to begin exploring options for legislation more  intensively with Congress  On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the  conservatorships of Freddie Mac and Fannie Mae  For more information on current legislative and regulatory initiatives,  see "Regulation and Supervision   *Legislative and Regulatory Developments.*"

Our business objectives and strategies have in some cases been  altered since we were placed into conservatorship, and may  continue to change  Based on our charter, other legislation, public statements from Treasury and FHFA officials, and guidance and directives from our Conservator, we have a variety of different, and potentially  competing, objectives  Certain  changes to our business objectives and strategies are designed to provide support for the mortgage market in a

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2771

Table of Contents

manner that serves our public mission and other non financial objectives However, these changes to our business objectives and strategies may not contribute to our profitability Some of these changes increase our expenses, while others require us to forego revenue opportunities in the near term In addition, the objectives set forth for us under our charter and by our Conservator, as well as the restrictions on our business under the Purchase Agreement, have adversely impacted and may continue to adversely impact our financial results, including our segment results. For example, our current business objectives reflect, in part, direction given to us by the Conservator. These efforts are expected to help homeowners and the mortgage market and may help to mitigate future credit losses However, some of our activities are expected to have an adverse impact on our near and long term financial results. The Conservator and Treasury also did not authorize us to engage in certain business activities and transactions, including the purchase or sale of certain assets, which we believe might have had a beneficial impact on our results of operations or financial condition, if executed Our inability to execute such transactions may adversely affect our profitability, and thus contribute to our need to draw additional funds under the Purchase Agreement

We had a net worth deficit of $146 million as of December 31, 2011, and, as a result, FHFA, as Conservator, will submit a draw request, on our behalf, to Treasury under the Purchase Agreement in the amount of $146 million Upon funding of the draw request: (a) our aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $72 3 billion; and (b) the corresponding annual cash dividend owed to Treasury will increase to $7 23 billion Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all The aggregate liquidation preference of the senior preferred stock and our related dividend obligations will increase further if we receive additional draws under the Purchase Agreement or if any dividends or quarterly commitment fees payable under the Purchase Agreement are not paid in cash The amounts we are obligated to pay in dividends on the senior preferred stock are substantial and will have an adverse impact on our financial position and net worth We expect to make additional draws under the Purchase Agreement in future periods

Our annual dividend obligation on the senior preferred stock exceeds our annual historical earnings in all but one period Although we may experience period to period variability in earnings and comprehensive income, it is unlikely that we will regularly generate net income or comprehensive income in excess of our annual dividends payable to Treasury. As a result, there is significant uncertainty as to our long term financial sustainability. Continued cash payment of senior preferred dividends, combined with potentially substantial quarterly commitment fees payable to Treasury under the Purchase Agreement, will have an adverse impact on our future financial condition and net worth The payment of dividends on our senior preferred stock in cash reduces our net worth For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury.

For more information on our current business objectives, see "Executive Summary   *Our Primary Business Objectives* " For more information on the conservatorship and government support for our business, see "Executive Summary   *Government Support for Our Business*" and "Conservatorship and Related Matters "

## Executive Summary

*You should read this Executive Summary in conjunction with our MD&A and consolidated financial statements and related notes for the year ended December 31, 2011.*

### Overview

Freddie Mac is a GSE chartered by Congress in 1970 with a public mission to provide liquidity, stability, and affordability to the U.S. housing market. We have maintained a consistent market presence since our inception, providing mortgage liquidity in a wide range of economic environments During the worst housing and financial crisis since the Great Depression, we are working to support the recovery of the housing market and the nation's economy by providing essential liquidity to the mortgage market and helping to stem the rate of foreclosures We believe our actions are helping communities across the country by providing America's families with access to mortgage funding at low rates while helping distressed borrowers keep their homes and avoid foreclosure, where feasible

### Summary of Financial Results

Our financial performance in 2011 was impacted by the ongoing weakness in the economy, including in the mortgage market, and by a significant reduction in long term interest rates and changes in OAS levels Our total comprehensive income (loss) was $(1.2) billion and $282 million for 2011 and 2010, respectively, consisting of:

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2772

Table of Contents

(a) $5.3 billion and $14.0 billion of net loss,  respectively; and (b) $4.0 billion and  $  4 3 billion of total other comprehensive income, respectively

Our total equity (deficit) was $(146) million at  December 3 , 20   , reflecting our total comprehensive  income of $1.5 billion for the fourth quarter of 2011 and our dividend payment of $1.7 billion on our senior  preferred stock on December 30, 2011. To address our deficit in net worth, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement for $146 million  Following receipt of the draw, the aggregate liquidation preference on the senior preferred stock  owned by Treasury will increase to $72.3 billion.

During 2011, we paid cash dividends to Treasury of $6.5 billion on our senior preferred stock. We received cash proceeds of $8.0 billion from draws under Treasury's funding commitment during 2011 related to quarterly deficits in equity at December 31, 2010,  June 30, 2011, and September 30, 2011.

### Our Primary Business Objectives

Under conservatorship, we are focused on the following primary  business objectives: (a) meeting the needs of the U S  residential mortgage market by making home ownership  and rental housing more affordable by providing liquidity  to  mortgage originators and, indirectly, to mortgage borrowers; (b) working to reduce the number of foreclosures and  helping to keep families in their homes, including through our  role in FHFA and other governmental initiatives, such as the FHFA directed servicing alignment initiative, HAMP and HARP, as well as our own workout and refinancing initiatives; (c) minimizing our credit losses; (d) maintaining  sound credit quality of the loans we purchase and guarantee; and (e) strengthening our infrastructure and improving overall  efficiency while also focusing on retention of key employees

Our business objectives reflect, in part, direction we have  received from the Conservator  We also have a variety of different, and potentially competing, objectives based on our charter, other legislation, public statements from Treasury and  FHFA officials, and other guidance and directives from our Conservator  For more information, see "Conservatorship and Related Matters     *Impact of Conservatorship and Related Actions on Our Business.*"  We are in discussions with FHFA regarding their strategic plan for Freddie Mac and Fannie Mae  See "Regulation and Supervision     *Legislative and Regulatory Developments      FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships*" for further information.

We believe our risks related to employee turnover are increasing. Uncertainty surrounding our future business model,  organizational structure, and compensation structure has  contributed to increased levels of voluntary employee turnover  Disruptive levels of turnover at both the executive and employee levels could lead to breakdowns in many of our operations  As a  result of the increasing risk of employee turnover, we are exploring options to enter into various strategic arrangements  with outside firms to provide operational capability and  staffing for key functions, if needed  However, these or other efforts to manage this risk to the enterprise may not be  successful.

### Providing Mortgage Liquidity and Conforming Loan  Availability

We provide liquidity and support to the U S  mortgage market in a number of important ways:

- Our support enables borrowers to have access to a variety of  conforming mortgage products, including the prepayable  30-year f xed-rate mortgage, which historically has represented the  foundation of the mortgage market

- Our support provides lenders with a constant source of liquidity  for conforming mortgage products  We estimate that we, Fannie Mae, and Ginnie Mae collectively guaranteed more than 90% of the  single family conforming mortgages originated during 20

- Our consistent market presence provides assurance to our  customers that there will be a buyer for their conforming loans  that meet our credit standards. We believe this liquidity provides our customers with confidence to continue lending in  difficult environments.

- We are an important counter cyclical influence as we stay in the  market even when other sources of capital have withdrawn

During 2011 and 2010, we guaranteed $304.6 billion and  $384 6 billion in UPB of single family conforming mortgage  loans, respectively, representing more than 1 4 million and  1.8 million borrowers, respectively, who purchased homes or  refinanced their mortgages

Borrowers typically pay a lower interest rate on loans acquired  or guaranteed by Freddie Mac, Fannie Mae, or Ginnie Mae  Mortgage originators are generally able to offer homebuyers and  homeowners lower mortgage rates on conforming loan products,  including ours, in part because of the value investors place on GSE  guaranteed mortgage related securities  Prior to 2007,  mortgage markets were less volatile, home values were stable or rising, and there were many sources of

<div align="center">3</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

mortgage funds  We estimate that, for 20 years prior to 2007, the average effective interest rates on conforming, fixed rate single family mo tgage loans were about 30 basis points lower than on non conforming loans  Since 2007, we  estimate that, at times, interest rates on conforming, f xed-rate loans, excluding conforming jumbo loans, have been  lower than those on non conforming loans by as much as  184 basis points. In December 20    , we estimate that borrowers were paying an average of 56 basis points less on  these conforming loans than on non conforming loans. These estimates are based on data provided by HSH Associates, a third party provider of mortgage market data  Future increases  in our management and guarantee fee rates, such as those  required under the recently enacted Temporary Payroll Tax Cut Continuation Act of 2011, may reduce the difference in rates between conforming and non conforming loans over time  For more  information, see "Regulation and Supervision   *Legislative and Regulatory Developments   Legislated Increase to Guarantee Fees* ."

### *Reducing Foreclosures and Keeping Families in Homes*

We are focused on reducing the number of foreclosures and  helping to keep families in their homes  In addition to our  participation in HAMP, we introduced several new initiatives during the last few years to help eligible borrowers keep their  homes or avoid foreclosure, including our relief refinance mortgage initiative  During 20    and 20  0, we helped more than  208,000 and 275,000 borrowers, respectively, either stay in their homes or sell their properties and avoid foreclosure  through HAMP and our various other workout initiatives.

On April 28, 2011, FHFA announced a new set of aligned standards for servicing non performing loans owned or guaranteed  by Freddie Mac and Fannie Mae  The servicing alignment  initiative provides for consistent ongoing processes for  non HAMP loan modifications  We implemented most aspects of this initiative in 20    We believe that the servicing alignment initiative will ultimately change, among other things, the way servicers communicate and interact with borrowers, bring  greater consistency and accountability to the servicing  industry, and help more distressed homeowners avoid foreclosure  For information on changes to mortgage servicing and foreclosure  practices that could adversely affect our business, see "Regulation and Supervision   *Legislative and Regulatory Developments   Developments Concerning Single Family Servicing Practices."*

In addition to these loan workout initiatives, our relief  refinance opportunities, including HARP (which is the portion of  our relief refinance initiative for loans with LTV ratios above 80%), are a significant part of our effort to keep families in  their homes  Relief refinance loans have been provided to more than 480,000 borrowers with LTV ratios above 80% since the initiative began in 2009, including nearly 185,000 such loans during 2011.

The table below presents our single family loan workout  activities for the last five quarters

### Table 1   Total Single Family Loan Workout Volumes[1]

|  | or the Three Months  nded | | | | |
|---|---|---|---|---|---|
|  | __12/31/2011__ | __09/30/2011__ | __06/30/2011__ | __03/31/2011__ | __12/31/2010__ |
|  |  |  | (number of loans) |  |  |
| Loan mod f ca  ons | 19,048 | 23,919 | 31,049 | 35,158 | 37,203 |
| Repaymen  p ans | 8,008 | 8,333 | 7,981 | 9,099 | 7,964 |
| Fo bea ance ag eemen s[2] | 3,867 | 4,262 | 3,709 | 7,678 | 5,945 |
| Sho   sa es and deed n  eu of fo ec osu e  ansac ons | 12,675 | 11,744 | 11,038 | 10,706 | 12,097 |
| To al s ngle-fam ly loan wo kou s | 43,598 | 48,258 | 53,777 | 62,641 | 63,209 |

(1) Based on ac  ons comple ed w h bo  owe s fo loans w h n ou  s ngle-fam ly c ed  gua an ee po  fol o  Excludes  hose mod f ca on,  epaymen , and fo bea ance
    ac v  es fo wh ch  e o  owe  as s a ed  e eq ed p ocess,    e cen o been  ade pe    anen o  effec ve, such as  oans n  mod  ca on  a a
    pe  ods  A so exc udes ce  a n  oan wo kou s whe e ou  s ngle-fam ly selle /se v ce s have execu ed ag ee  en s n  ec  en o  po  pe ods, b  ese  ave no
    been  nco po a ed n o ce  a n of ou  ope a ona  sys ems, due  o de ays n p ocess ng  These ca ego  es a e no  mu ua y exclus ve and a  oan n one ca ego y may also
    be  c  ded w   ano he  ca ego y n he same pe  od
(2) Excludes loans w  h long- e m fo bea ance unde  a comple ed loan mod f ca on  Many bo  owe s comple e a sho - e m fo bea ance ag eemen  befo e ano he  loan
    wo ko   s p s edo co  p eed  We only  epo   fo bea ance ac v  y fo  a s ngle loan once du  ng each qua  e  y pe  od  howeve , a s ng e  oan  ay be  nc uded
    unde  sepa a e fo bea ance ag eemen s n sepa a e pe  ods

We continue to directly assist troubled borrowers through  targeted outreach, loan workouts, and other efforts  Highlights of these efforts include the following:

• We completed 208,274 single family loan workouts during 2011, including 109,174 loan modifications (HAMP and non HAMP) and 46,163 short sales and deed in lieu of foreclosure transactions.

• Based on information provided by the MHA Program administrator, our servicers had completed 152,519 loan modifications under HAMP from the introduction of the initiative in 2009 through  December 31, 2011 and, as of December 31, 2011, 12,802 loans were in HAMP trial periods (this figure only includes  borrowers who made at least their first payment under the trial  period)

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2774

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA directed changes to HARP in an effort to allow more borrowers to participate in the program and benefit from refinancing their home mortgages  The Acting Director of FHFA stated that the goal of pursuing these changes is to create refinancing opportunities for more borrowers whose mortgages are owned or guaranteed by Freddie Mac and Fannie Mae while reducing risk for these entities and bringing a measure of stability to housing markets. The revisions to HARP enable us to expand the assistance we provide to homeowners by making their mortgage payments more affordable through one or more of the following ways: (a) a reduction in payment; (b) a reduction in rate; (c) movement to a more stable mortgage product type (*i.e.*, from an adjustable rate mortgage to a fixed rate mortgage); or (d) a reduction in amortization term

In November 2011, Freddie Mac and Fannie Mae issued guidance with operational details about the HARP changes to mortgage lenders and servicers after receiving information from FHFA about the fees that we may charge associated with the refinancing program. Since industry participation in HARP is not mandatory, we anticipate that implementation schedules will vary as individual lenders, mortgage insurers, and other market participants modify their processes  It is too early to estimate how many eligible borrowers are likely to refinance under the revised program

For more information about HAMP, our new non HAMP standard loan modification, other loan workout programs, HARP and our relief refinance mortgage initiative, and other initiatives to help eligible borrowers keep their homes or avoid foreclosure, see "MD&A    RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Single Family Mortgage Credit Risk    Single Family Loan Workouts and the MHA Program.*"

### *Minimizing Credit Losses*

To help minimize the credit losses related to our guarantee activities, we are focused on:

- pursuing a variety of loan workouts, including foreclosure alternatives, in an effort to reduce the severity of losses we experence over time;

- managing foreclosure timelines to the extent possible, given the increasingly lengthy foreclosure process in many states;

- managing our inventory of foreclosed properties to reduce costs and maximize proceeds; and

- pursuing contractual remedies against originators, lenders, servicers, and insurers, as appropriate.

We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses  We require our single family seller/servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification  If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure

Our servicers pursue repayment plans and loan modifications for borrowers facing financial or other hardships since the level of recovery (if a loan reperforms) may often be much higher than with foreclosure or foreclosure alternatives  In cases where these alternatives are not possible or unsuccessful, a short sale transaction typically provides us with a comparable or higher level of recovery than what we would receive through property sales from our REO inventory  In large part, the benefit of short sales arises from the avoidance of costs we would otherwise incur to complete the foreclosure and dispose of the property, including maintenance and other property expenses associated with holding REO property, legal fees, commissions, and other selling expenses of traditional real estate transactions  The foreclosure process is a lengthy one in many jurisdictions with significant associated costs to complete, including, in times of home value decline, foregone recovery we might receive from an earlier sale

We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans, and represent and warrant that those loans have been originated under specified underwriting standards. If we subsequently discover that the representations and warranties were breached (*i.e.*, contractual standards were not followed), we can exercise certain contractual remedies to mitigate our actual or potential credit losses  These contractual remedies include requiring the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan  The amount we expect to collect on outstanding repurchase requests is significantly less than the UPB of the loans subject to the repurchase requests primarily because many of these requests will likely be satisfied by the seller/servicers reimbursing us for realized credit losses  Some of these requests also may be rescinded in the course of the contractual appeals process. As of December 31, 2011, the UPB of loans subject to repurchase requests issued to our single family seller/servicers was approximately $2.7 billion, and approximately 39% of these requests were outstanding for more than four months since issuance of our initial repurchase request (this figure includes repurchase requests for

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2775

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

which appeals were pending)  Of the total amount of repurchase  requests outstanding at December 31, 2011, approximately  $1 2 billion were issued due to mortgage insurance  rescission or mortgage insurance claim denial

Our credit loss exposure is also partially mitigated by mortgage  insurance, which is a form of credit enhancement. Primary  mo tgage insurance is required to be purchased, typically at the  borrower's expense, for certain mortgages with higher LTV ratios  As of December 3 , 2011, we had mortgage insurance  coverage on loans that represent approximately   3% of the UPB of  our single family credit guarantee portfolio We received payments under primary and other mortgage insurance of $2.5 billion and $1.8 billion in 2011 and 2010, respectively, which helped to mitigate our credit losses  See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES   Table 4.5   Recourse and Other Forms of Credit Protection" for more detail  The  financial condition of many of our mortgage insurers continued  to deteriorate in 20    We expect to receive substantially less  than full payment of our claims from Triad Guaranty Insurance  Corp , Republic Mortgage Insurance Company, and PMI Mortgage  Insurance Co , which are three of our mortgage insurance  counterparties  We believe that certain other of our mortgage insurance counterparties may lack sufficient ability to meet all  their expected lifetime claims paying obligations to us as those  claims emerge  Our loan loss reserves reflect our estimates of  expected insurance recoveries related to probable incurred  losses  As of December 31, 2011, only six insurance companies  remained as eligible insurers for Freddie Mac loans,  which means that, in the future, our mortgage insurance exposure  will be concentrated among a smaller number of counterparties

See "MD&A    RISK MANAGEMENT    Credit Risk     *Institutional Credit Risk*" for further information on our agreements with our seller/servicers and our exposure to mortgage insurers

*Maintaining Sound Credit Quality of New Loan Purchases and  Guarantees*

We continue to focus on maintaining credit policies, including  our underwriting standards, that allow us to purchase and  guarantee loans made to qualified borrowers that we believe will  provide management and guarantee fee income, over the long term,  that exceeds our expected credit related and administrative  expenses on such loans

The credit quality of the single family loans we acquired in  20    (excluding relief refinance mortgages, which represented  approximately 26% of our single family purchase volume during  2011) is significantly better than that of loans we acquired from  2005 through 2008, as measured by early delinquency rate trends,  original LTV ratios, FICO scores, and the proportion of loans  underwritten with fully documented income  As of December 31,  2011 and December 31, 2010, approximately 51% and 39%,  respectively, of our single family  credit guarantee portfolio consisted of mortgage loans  originated after 2008 (including relief refinance mortgages),  which have experienced lower serious delinquency trends in the  early years of their terms than loans originated in 2005 through  2008

The improvement in credit quality of loans we have purchased  during the last three years (excluding relief refinance  mortgages) is primarily the result of the combination of: (a)  changes in our credit policies, including changes in  our underwriting standards; (b) fewer purchases of loans with  higher risk characteristics; and (c) changes in  mortgage insurers' and lenders' underwriting practices

Our underwriting procedures for relief refinance mortgages are  limited in many cases, and such procedures generally do not  include all of the changes in underwriting standards we have  implemented in the last several years  As a result, relief  refinance mortgages generally reflect many of the credit risk  attributes of the original loans  However, borrower participation  in our relief refinance mortgage initiative may  help reduce our exposure to credit risk in cases where borrower  payments under their mortgages are reduced, thereby  strengthening the borrower's potential to make their mortgage  payments

Approximately 92% of our single family purchase volume in 2011  consisted of fixed rate amortizing mortgages  Approximately 78%  and 80% of our single family purchase volumes in 2011 and 2010,  respectively, were refinance mortgages, including approximately  33% and 35%, respectively, of these loans that were relief  refinance mortgages, based on UPB

There is an increase in borrower default risk as LTV ratios  increase, particularly for loans with LTV ratios above 80%. Over  time, relief refinance mortgages with LTV ratios above 80% (HARP  loans) may not perform as well as relief refinance mortgages  with LTV ratios of 80% and below because of the continued high  LTV ratios of these loans  In addition, relief refinance  mortgages may not be covered by mortgage insurance for the full  excess of their UPB over 80%  Approximately   2% of our single  family purchase volume in both 2011 and 2010 was relief  refinance mortgages with LTV ratios above 80%  Relief refinance  mortgages of all LTV ratios comprised approximately 11% and 7%  of the UPB in our total single  family credit guarantee portfolio  at December 31, 2011 and 2010, respectively

The table below presents the composition, loan characteristics,  and serious delinquency rates of loans in our single family  credit guarantee portfolio, by year of origination at December  31, 2011

6                                                                 *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 2      Single Family Credit Guarantee Portfolio Data by Year of Origination(1)**

| | | | At December 31, 2011 | | | |
|---|---|---|---|---|---|---|
| Year of Origination | % of Portfolio | Average Credit Score(2) | Original LTV Ratio(3) | Current LTV Ratio(4) | Current LTV Ratio >100%(4)(5) | Serious Delinquency Rate(6) |
| 2011 | 14% | 755 | 70% | 70% | 5% | 0 06% |
| 2010 | 19 | 754 | 70 | 71 | 6 | 0 25 |
| 2009 | 18 | 753 | 69 | 72 | 6 | 0 52 |
| 2008 | 7 | 725 | 74 | 92 | 36 | 5 65 |
| 2007 | 10 | 705 | 77 | 113 | 61 | 11 58 |
| 2006 | 7 | 710 | 75 | 112 | 56 | 10 82 |
| 2005 | 8 | 716 | 73 | 96 | 39 | 6 51 |
| 2004 and prior | 17 | 719 | 71 | 61 | 9 | 2 83 |
| Total | 100% | 735 | 72 | 80 | 20 | 3 58 |

(1) Based on the loans remaining in the portfolio as of December 31, 2011, which comprised $1,746 billion, and have a loans originated or guaranteed by us and originated in the respective year

(2) Based on FICO score of the borrower as of the date of loan origination and may not be indicative of the borrower's credit worthiness at December 31, 2011 Excludes approximately $10 billion in UPB of loans where the FICO score is at origination were not available at December 31, 2011

(3) See endnote (4) of "Table 45   Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios

(4) We estimate current market values by adjusting the value of properties at origination based on changes in the market value of homes in the same geographical area since origination See endnote (5) of "Table 45   Characteristics of the Single-Family Credit Guarantee Portfolio" for additional information on our calculation of current LTV ratios

(5) Calculated as a percentage of the aggregate UPB of loans with LTV ratios greater than 100% in each category or a UPB of loans in the category

(6) See "MD&A   RISK MANAGEMENT   Credit Risk   *Mortgage Credit Risk   Single-family Mortgage Credit Risk*   Delinquencies" for further information on our reported serious delinquency rates

Mortgages originated after 2008, including relief refinance mortgages, represent a growing proportion of our single family credit guarantee portfolio  The UPB of loans originated in 2005 to 2008 within our single family credit guarantee portfolio  continues to decline due to liquidations, which include prepayments, refinancing activity, foreclosure alternatives, and foreclosure transfers  We currently expect that, over time, the replacement (other than through relief refinance activity) of the 2005 to 2008 vintages, which have a higher composition of loans with higher risk characteristics, should positively impact the serious delinquency rates and credit related expenses of our single family credit guarantee portfolio  However, the rate at which this replacement is occurring slowed beginning in 2010, due primarily to a decline in the volume of home purchase mortgage originations and delays in the foreclosure process  See "Table 19   Segment Earnings Composition   Single Family Guarantee Segment" for an analysis of the contribution to Segment Earnings (loss) by loan origination year

*Strengthening Our Infrastructure and Improving Overall Efficiency*

We are working to both enhance the quality of our infrastructure and improve our efficiency in order to preserve the taxpayers' investment  We are focusing our resources primarily on key projects, many of which will likely take several years to fully implement, and on making significant improvements to our systems infrastructure in order to: (a) implement mandatory initiatives from FHFA or other governmental bodies; (b) replace legacy hardware or software systems at the end of their lives and to strengthen our disaster recovery capabilities; and (c) improve our data collection and administration as well as our ability to assist in the servicing of loans

We continue to actively manage our general and administrative expenses, while also continuing to focus on retaining key talent  Our general and administrative expenses declined in 2011 compared to 2010, largely due to a reduction in the number of our employees  We do not expect that our general and administrative expenses for 2012 will continue to decline, in part due to the continually changing mortgage market, an environment in which we are subject to increased regulatory oversight and mandates and strategic arrangements that we may enter into with outside firms to provide operational capability and staffing for key functions, if needed

**Single-Family Credit Guarantee Portfolio**

The UPB of our single family credit guarantee portfolio declined approximately 3.5% and 5.0% during 2011 and 2010, respectively, as the amount of single family loan liquidations has exceeded new loan purchase and guarantee activity in the last two years  We believe this is due, in part, to declines in the amount of single family mortgage debt outstanding in the market and increased competition from Ginnie Mae and FHA/VA  Although the number of seriously delinquent loans declined in both 2010 and 2011, our delinquency rates were higher than they otherwise would have been, because the size of our portfolio has declined and therefore these rates are calculated on a smaller base of loans at the end of each period  The table below provides certain credit statistics for our single family credit guarantee portfolio

Source   D RA HOM  OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2777

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 3     Credit Statistics, Single Family Credit Guarantee Portfolio**

| | As of | | | | |
|---|---|---|---|---|---|
| | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 |
| Pay e s a s | | | | | |
| One on pas due | 2 02% | 1 94% | 1 92% | 1 75% | 2 07% |
| Two o s pas d e | 0 70% | 0 70% | 0 67% | 0 65% | 0 78% |
| Se ous y de nquen (1 | 3 58% | 3 51% | 3 50% | 3 63% | 3 84% |
| Non-pe fo m ng loans ( n mi ions)(2 | $120,514 | $119,081 | $114,819 | $115,083 | $115,478 |
| S ngle-fam ly loan loss ese ve ( n mi ions)(3 | $ 38,916 | $ 39,088 | $ 38,390 | $ 38,558 | $ 39,098 |
| REO nven o y ( n p ope es | 60,535 | 59,596 | 60,599 | 65,159 | 72,079 |
| REO asse s, ne ca y ng va ue ( n m ons) | $ 5,548 | $ 5,539 | $ 5,834 | $ 6,261 | $ 6,961 |

| | or the Three Months nded | | | | |
|---|---|---|---|---|---|
| | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 |
| | | | (in units, unless noted) | | |
| Se ous y de nquen oan add ons(1 | 95,661 | 93,850 | 87,813 | 97,646 | 113,235 |
| Loan mod ca ons( | 19,048 | 23,919 | 31,049 | 35,158 | 37,203 |
| Fo ec osu e s a s a o( | 0 54% | 0 56% | 0 55% | 0 58% | 0 73% |
| REO acqu s ons | 24,758 | 24,378 | 24,788 | 24,707 | 23,771 |
| REO d spos on seve y a o (6 | | | | | |
| Ca fo n a | 44 6% | 45 5% | 44 9% | 44 5% | 43 9% |
| A zona | 46 7% | 48 7% | 51 3% | 50 8% | 49 5% |
| F o da | 50 1% | 53 3% | 52 7% | 54 8% | 53 0% |
| Nevada | 54 2% | 53 2% | 55 4% | 53 1% | 53 1% |
| no s | 51 2% | 50 5% | 49 4% | 49 5% | 49 4% |
| Tota U S | 41 2% | 41 9% | 41 7% | 43 0% | 41 3% |
| S ng e-fam y c ed osses ( n m ons) | $ 3,209 | $ 3,440 | $ 3,106 | $ 3,226 | $ 3,086 |

(1) See "MD&A   RISK MANAGEMENT   C ed R sk   Mortgage Credit Risk   Single-Family Mortgage Credit Risk   Delinquencies" fo f e nfo ma on abou ou epo ed se ous de nquency a es

(2) Cons s s of he UPB of loans n ou s ngle-fam ly c ed gua an ee po fo o ha have unde gone a TDR o ha a e se ous y de nquen As of Decembe 31, 2011 and Decembe 31, 2010, app ox ma e y $44 4 b on and $26 6 b o UPB of TDR oa s, espec ve y, we e o onge se ous y de nquen

(3) Cons s s of he comb na on of (a) ou allowance fo loan losses on mo gage loans held fo nves men and (b) ou ese ve fo gua an ee osses assoc a ed w h non-consol da ed s ngle-fam ly mo gage secu za on us s and he p ope men s

(4) Rep esen s he numbe of comple ed mod f ca ons unde ag eemen w h he bo owe du ng he qua e Exc udes fo bea ance ag ee en s, epay en p ans, and oans n mod f ca on on a pe ods

(5) Rep ese s e a o of e be of oa s a e ed e fo ec osu e p ocess du ng he espec ve qua e d v ded by he numbe of loans n he s ngle-fam ly c ed gua an ee po fo o a a e of D e G a a ee fo a one se /se v ce s, d v ded by e agg ega e UPB of he e a ed oans The amoun of osses ecogn zed on d spos on of he p ope es equal o he a oun by wh ch he UPB of he oans exceeds he a oun of sa es p oceeds f om d spos on on of he p ope es Excludes sales comm ss ons and o he expenses, such as p ope y ma n enance and cos s, as well as appl cable ecove es f om c ed enhance en s, such as o gage nsu ance

(6) S a es p ese ed p ese e f ves a es w e o o c ed osses have been g ea es du ng 2011 Ca cu a ed as he a oun of ou losses eco ded on d spos on of REO p ope es du ng e espec ve qua e y pe od, exc d g oses bp op e case eq ess ade oun se c /se v ce s, d v ded by e agg ega e UPB of he e a ed oans The amoun of osses ecogn zed on d spos on of he p ope es equal o he a oun by wh ch he UPB of he oans exceeds he a oun of sa es p oceeds f om d spos on on of he p ope es Excludes sales comm ss ons and o he expenses, such as p ope y ma n enance and cos s, as well as appl cable ecove es f om c ed enhance en s, such as o gage nsu ance

In discussing our credit performance, we often use the terms "credit losses" and "credit related expenses" These terms are significantly different. Our "credit losses" consist of charge offs and REO operations income (expense), while our "credit related expenses" consist of our provision for credit losses and REO operations income (expense)

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single family loans of approximately $73.2 billion, and have recorded an additional $4 3 billion in losses on loans purchased from PC trusts, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008 While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred and, thus, have not yet been provisioned for, we believe that, as of December 31, 2011, we have reserved for or charged off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations

The quarterly number of seriously delinquent loan additions declined during the first half of 2011; however, we experienced a small increase in the quarterly number of seriously delinquent loan additions during the second half of 2011. As of December 31, 2011 and December 3 , 20 0, the percentage of seriously delinquent loans that have been delinquent for more than six months was 70% and 66%, respectively Several factors, including delays in the foreclosure process, have resulted in loans remaining in serious delinquency for longer periods than prior to 2008, particularly in states that require a judicial foreclosure process The credit losses and loan loss reserves associated with our single family credit guarantee portfolio remained elevated in 2011, due in part to

- Losses associated with the continued high volume of foreclosures and foreclosure alternatives These actions relate to the continued efforts of our servicers to resolve our large inventory of seriously delinquent loans Due to the length of time necessary for servicers either to complete the foreclosure process or pursue foreclosure alternatives

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2778

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

on seriously delinquent loans in our portfolio, we expect our credit losses will continue to remain high even if the volume of new serious delinquencies declines

- Continued negative impact of certain loan groups within the single family credit guarantee portfolio, such as those underwritten with certain lower documentation standards and interest only loans, as well as other 2005 through 2008 vintage loans. These groups continue to be large contributors to our credit losses

- Cumulative declines in national home prices during the last five years, based on our own index  As a result of these price declines, approximately 20% of loans in our single family credit guarantee portfolio, based on UPB, had estimated current LTV ratios in excess of 00% (underwater loans) as of December 31, 2011

- Deterioration in the financial condition of many of our mortgage insurers, which reduced our estimates of expected recoveries from these counterparties

Some of our loss mitigation activities create fluctuations in our delinquency statistics  For example, loans that we report as seriously delinquent before they enter a modification trial period continue to be reported as seriously delinquent until the modifications become effective and the loans are removed from delinquent status by our servicers. See "MD&A    RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Single family Mortgage Credit Risk    Credit Performance    Delinquencies*" for further information about factors affecting our reported delinquency rates

### Government Support for our Business

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business  Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The $200 billion cap on Treasury's funding commitment will increase as necessary to eliminate any net worth deficits we may have during 2010, 2011, and 2012. We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

To address our net worth deficit of $146 million at December 31, 2011, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $146 million  FHFA will request that we receive these funds by March 31, 2012. Upon funding of the draw request: (a) our aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $72.3 billion; and (b) the corresponding annual cash dividend owed to Treasury will increase to $7.23 billion.

We pay cash dividends to Treasury at an annual rate of 10%. During 2011, we paid dividends to Treasury of $6.5 billion.  We received cash proceeds of $8.0 billion from draws under Treasury's funding commitment during 2011. Through December 3 , 20  , we paid aggregate cash dividends to Treasury of $16.5 billion, an amount equal to 23% of our aggregate draws received under the Purchase Agreement  As of December 31, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock exceeded our annual historical earnings in all but one period

We expect to request additional draws under the Purchase Agreement in future periods  Over time, our dividend obligation to Treasury will increasingly drive future draws  Although we may experience period to period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term  In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived  Treasury waived the fee for all quarters of 2011 and the first quarter of 2012, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment  The amount of the quarterly commitment fee has not yet been established and could be substantial.

There continues to be significant uncertainty in the current mortgage market environment, and continued high levels of unemployment, weakness in home prices, and adverse changes in interest rates, mortgage security prices, and spreads could lead to additional draws  For discussion of other factors that could result in additional draws, see "RISK FACTORS    Conservatorship and Related Matters    *We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition*."

On August 5, 2011, S&P lowered the long term credit rating of the U S government to "AA+" from "AAA" and assigned a negative outlook to the rating  On August 8, 2011, S&P lowered our senior long term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating  While this could adversely affect our liquidity and the supply and cost of debt financing available to us in the future, we have not yet experienced such adverse effects  For more

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2779

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

information, see "MD&A    LIQUIDITY AND CAPITAL RESOURCES    Liquidity    *Other Debt Securities    Credit Ratings*."

Neither the U S  government nor any other agency or  instrumentality of the U S  government is obligated to fund  our mortgage purchase or financing activities or to guarantee  our securities or other obligations

For more information on the Purchase Agreement, see "Conservatorship and Related Matters "

### *Consolidated Financial Results    2011 versus 2010*

Net loss was $5.3 billion and $14.0 billion for the  years ended December 31, 2011 and 2010, respectively  Key highlights of our financial results include:

- Net interest income for the year ended December 3  , 20    increased to $18.4 billion from $16.9 billion for the  year ended December 3  , 2010, mainly due to lower funding  costs, partially offset by a decline in the average balances of  mortgage related assets

- Provision for credit losses for the year ended December 3  , 2011 decreased to $10.7 billion, compared to  $17.2 billion for the year ended December 3  , 20 0  The provision for credit losses in 2011 reflects a decline in  the rate at which single family loans transition into serious delinquency or are modified, but was partially offset by our  lowered expectations for mortgage insurance recoveries, which is  due to the continued deterioration in the financial condition of  the mortgage insurance industry in 2011.

- Non interest income (loss) was $(10 9) billion for the year  ended December 31, 2011, compared to $(11.6) billion  for the year ended December 31, 2010, largely driven by  substantial derivative losses in both periods  However, there  was a significant decline in net impairments of available for  sale securities recognized in earnings during the  year ended December 3  , 20    compared to the year ended December 3  , 20 0

- Non interest expense was $2.5 billion and $2.9 billion  in the years ended December 31, 2011 and 2010,  respectively, as we had higher expenses in 2010 than in 2011  associated with transfers and terminations of mortgage  servicing, primarily related to Taylor, Bean & Whitaker Mortgage Corp., or TBW.

- Total comprehensive income (loss) was $(1 2) billion for the  year ended December 3  , 20    compared to $282 million for the year ended December 3  , 20 0  Total comprehensive income (loss) for the year ended December 31, 2011 was  driven by the $5.3 billion net loss, partially offset by a reduction in gross unrealized losses  related to our available  for sale securities

### Our Business

We conduct business in the U.S. residential mortgage market and the global securities market, subject to the direction of  our Conservator, FHFA, and under regulatory supervision of FHFA, the SEC, HUD, and Treasury. The size of the U S  residential mortgage market is affected by many factors, including changes in interest rates, home ownership  rates, home prices, the supply of housing and lender preferences regarding credit risk and borrower preferences regarding  mortgage debt  The amount of residential mortgage debt available  for us to purchase and the mix of available loan products are  also affected by several factors, including the volume of  mortgages meeting the requirements of our charter (which is affected by changes in the conforming loan limit determined by  FHFA), our own preference for credit risk reflected in our purchase standards and the mortgage purchase and securitization  activity of other financial institutions. We conduct our operations solely in the U.S. and its territories, and do  not generate any revenue from or have assets in geographic  locations outside of the U S  and its territories

Our charter forms the framework for our business activities, the  initiatives we bring to market and the services we provide to  the nation's residential housing and mortgage industries  Our charter also determines the types of mortgage loans that we  are permitted to purchase  Our statutory mission as defined in  our charter is to:

- provide stability in the secondary market for residential  mortgages;

- respond appropriately to the private capital market;

- provide ongoing assistance to the secondary market for  residential mortgages (including activities relating to mortgages for low  and moderate income families, involving a  reasonable economic return that may be less than the return  earned on other activities); and

- promote access to mortgage credit throughout the U.S.  (including central cities, rural areas, and other  underserved areas)

The information contained herein may not be copied, adapted or distributed and its not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our charter does not permit us to originate mortgage loans or lend money directly to consumers in the primary mortgage market  We provide liquidity, stability and affordability to the U.S. housing market primarily by providing our credit guarantee for residential mortgages originated by mortgage lenders and investing in mortgage loans and mortgage related securities  We use mortgage securitization as an integral part of our activities  Mortgage securitization is a process by which we purchase mortgage loans that lenders originate, and pool these loans into guaranteed mortgage securities that are sold in global capital markets, generating proceeds that support future loan origination activity by lenders  The primary Freddie Mac guaranteed mortgage related security is the single class PC  We also aggregate and resecuritize mo tgage related securities that are issued by us, other GSEs, HFAs, or private (non agency) entities, and issue other single class and multiclass mortgage related securities to third party investors  We also enter into certain other guarantee commitments for mortgage loans, HFA bonds under the HFA initiative, and multifamily housing revenue bonds held by third parties.

Our charter limits our purchases of single family loans to the conforming loan market. The conforming loan market is defined by loans originated with UPBs at or below limits determined annually based on changes in FHFA's housing price index, a method established and maintained by FHFA for determining the national average single family home price  Since 2006, the base conforming loan limit for a one family residence has been set at $417,000, and higher limits have been established in certain "high cost" areas (currently, up to $625,500 for a one-family residence)  Higher limits also apply to two to four family residences and for mortgages secured by properties in Alaska, Guam, Hawaii, and the U.S. Virgin Islands.

Beginning in 2008, pursuant to a series of laws, our loan limits in certain high cost areas were increased temporarily above the limits that otherwise would have been applicable (up to $729,750 for a one family residence)  The latest of these increases expired on September 30, 20  We refer to loans that we have purchased with UPB exceeding the base conforming loan limit (i.e., $417,000) as conforming jumbo loans.

Our charter generally prohibits us from purchasing first lien single family mortgages if the outstanding UPB of the mortgage at the time of our purchase exceeds 80% of the value of the property securing the mortgage unless we have one of the following credit protections:

- mortgage insurance from a mortgage insurer that we determine is qualified on the portion of the UPB of the mortgage that exceeds 80%;

- a seller's agreement to repurchase or replace any mortgage that has defaulted; or

- retention by the seller of at least a 0% participation interest in the mortgage

Under our charter, our mortgage purchase operations are confined, so far as practicable, to mortgages that we deem to be of such quality, type and class as to meet generally the purchase standards of other private institutional mortgage investors. This is a general marketability standard.

Our charter requirement for credit protection on mortgages with LTV ratios greater than 80% does not apply to multifamily mortgages or to mortgages that have the benefit of any guarantee, insurance or other obligation by the U S or any of its agencies or instrumentalities (e.g., the FHA, the VA or the USDA Rural Development)

As part of HARP under the MHA Program, we may purchase single family mortgages that refinance borrowers whose mortgages we currently own or guarantee without obtaining additional credit enhancement in excess of that already in place for any such loan, even if the LTV ratio of the new loan is above 80%

## Our Business Segments

Our operations consist of three reportable segments, which are based on the type of business activities each performs     Single family Guarantee, Investments, and Multifamily  Certain activities that are not part of a reportable segment are included in the All Other category

We evaluate segment performance and allocate resources based on a Segment Earnings approach. Beginning January 1, 2010, we revised our method for presenting Segment Earnings to reflect changes in how management measures and assesses the financial performance of each segment and the company as a whole  For more information on our segments, including financial information, see "MD&A CONSOLIDATED RESULTS OF OPERATIONS     Segment Earnings" and "NOTE 14: SEGMENT REPORTING."

### Single-Family Guarantee Segment

The Single family Guarantee segment reflects results from our single family credit guarantee activities  In our Single family Guarantee segment, we purchase single family mortgage loans originated by our seller/servicers in the primary

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2781

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

mortgage market  In most instances, we use the mortgage  securitization process to package the purchased mortgage loans  into guaranteed mortgage related securities  We guarantee the payment of principal and interest on the mortgage related  security in exchange for management and guarantee fees

### Our Customers

Our customers are predominantly lenders in the primary mortgage  market that originate mortgages for homeowners  These lenders  include mortgage banking companies, commercial banks, savings  banks, community banks, credit unions, HFAs, and savings  and  loan associations.

We acquire a significant portion of our mortgages from several  large lenders  These lenders are among the largest mortgage loan  originators in the U.S. Since 2007, the mortgage industry  has consolidated significantly and a smaller number of large  lenders originate most single family mortgages  As a result, mortgage origination volume during 20   was concentrated in a  smaller number of institutions. During 2011, two mortgage lenders (Wells Fargo Bank, N.A. and JPMorgan Chase Bank, N.A.) each accounted for more than   0% of our single family mortgage purchase volume and collectively accounted for approximately 40%  of our single family mortgage purchase volume  Our top ten  lenders accounted for approximately 82% of our single family  mortgage purchase volume during 2011

Our customers also service loans in our single family credit  guarantee portfolio  A significant portion of our single family mortgage loans are serviced by several of our large customers  Because we do not have our own servicing operation, if our  servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption  in their ability to service mortgage loans, our business and financial results could be adversely affected  For information  about our relationships with our customers, see "MD&A       RISK MANAGEMENT    Credit Risk    *Institutional Credit Risk    Single Family Mortgage Seller/Servicers."*

### Our Competition

Historically, our principal competitors have been Fannie Mae,  Ginnie Mae and FHA/VA, and other financial institutions that retain or securitize mortgages, such as commercial and  investment banks, dealers, and thrift institutions. Since 2008,  most of our competitors, other than Fannie Mae, Ginnie Mae, and FHA/VA, have ceased their activities in the residential mortgage  securitization business or severely curtailed these activities relative to their previous levels  We compete on the basis of price, products, the structure of our securities, and service. Competition to acquire single family mortgages can also be  significantly affected by changes in our credit standards.

Ginnie Mae, which became a more significant competitor beginning  in 2009, guarantees the timely payment of principal and interest  on mortgage related securities backed by federally insured or  guaranteed loans, primarily those insured by FHA or guaranteed  by VA  Ginnie Mae maintained a significant market share in 2011  and 2010, in large part due to favorable pricing of loans  insured by FHA, the increase in the FHA loan limit and the availability, through FHA, of a mortgage product for borrowers  seeking greater than 80% financing who could not otherwise qualify for a conventional mortgage

The conservatorship, including direction provided to us by our  Conservator, and the restrictions on our activities under the  Purchase Agreement may affect our ability to compete in the  business of securitizing mortgages  On multiple occasions, FHFA has directed us and Fannie Mae to confer and suggest to FHFA possible uniform approaches to particular business and  accounting issues and problems. In most such cases, FHFA subsequently directed us and Fannie Mae to adopt a specific  uniform approach  It is possible that in some areas FHFA could require us and Fannie Mae to take a uniform approach that,  because of differences in our respective businesses, could place  Freddie Mac at a competitive disadvantage to Fannie Mae  For more information, see "RISK FACTORS    Conservatorship and Related Matters    *FHFA directives that we and Fannie Mae adopt uniform approaches in  some areas could have an adverse impact on our business or on  our competitive position with respect to Fannie Mae."*

### Overview of the Mortgage Securitization Process

Mortgage securitization is a process by which we purchase  mortgage loans that lenders originate, and pool these loans into  mo tgage securities that are sold in global capital markets. The  following diagram illustrates how we support

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

mortgage market liquidity when we create PCs through mortgage securitizations. These PCs can be sold to investors or held by us or our customers:



The U.S. residential mortgage market consists of a primary mortgage market that links homebuyers and lenders and a secondary mortgage market that links lenders and investors. We participate in the secondary mortgage market by purchasing mortgage loans and mortgage related securities for investment and by issuing guaranteed mortgage related securities In the Single family Guarantee segment, we purchase and securitize "single family mortgages," which are mortgages that are secured by one to four family properties

In general, the securitization and Freddie Mac guarantee process works as follows: (a) a lender originates a mortgage loan to a borrower purchasing a home or refinancing an existing mortgage loan; (b) we purchase the loan from the lender and place it with other mortgages into a security that is sold to investors (this process is referred to as "pooling"); (c) the lender may then use the proceeds from the sale of the loan or security to originate another mortgage loan; (d) we provide a credit guarantee, for a fee (generally a po tion of the interest collected on the mortgage loan), to those who invest in the security; (e) the borrower's monthly payment of mortgage principal and interest (net of a servicing fee and our management and guarantee fee) is passed through to the investors in the security; and (f) if the borrower stops making monthly payments because a family member loses a job, for example  we step in and, pursuant to our guarantee, make the applicable payments to investors in the security In the event a borrower defaults on the mortgage, our servicer works with the borrower to find a solution to help them stay in the home, or sell the property and avoid foreclosure, through our many different workout options. If this is not possible, we ultimately foreclose and sell the home

The terms of single family mortgages that we purchase or guarantee allow borrowers to prepay these loans, thereby allowing borrowers to refinance their loans when mortgage rates decline Because of the nature of long term, fixed rate mortgages, borrowers with these mortgages are protected against rising interest rates, but are able to take advantage of declining rates through refinancing When a borrower prepays a mortgage that we have securitized, the outstanding balance of the security owned by investors is reduced by the amount of the prepayment. Unscheduled reductions in loan principal, regardless of whether they are voluntary or involuntary (*e.g.* foreclosure), result in prepayments of security balances. Consequently, the owners of our guaranteed securities are subject to prepayment risk on the related mortgage

TREASURY-2783

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                    Powered by Morningstar® Document Research℠

The information herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

loans, which is principally that the investor will receive an unscheduled return of the principal, and therefore may not earn the rate of return originally expected on the investment

We guarantee these mortgage related securities in exchange for compensation, which consists primarily of a combination of management and guarantee fees paid on a monthly basis as a percentage of the UPB of the underlying loans and initial upfront payments referred to as delivery fees We may also make upfront payments to buy up the monthly management and guarantee fee rate, or receive upfront payments to buy down the monthly management and guarantee fee rate These fees are paid in conjunction with the formation of a PC to provide for a uniform coupon rate for the mortgage pool underlying the issued PC.

We enter into mortgage purchase volume commitments with many of our single family customers in order to have a supply of loans for our guarantee business These commitments provide for the lenders to deliver to us a certain volume of mortgages during a specified period of time Some commitments may also provide for the lender to deliver to us a minimum percentage of their total sales of conforming loans. The purchase and securitization of mortgage loans from customers under these contracts have pricing schedules for our management and guarantee fees that are negotiated at the outset of the contract with initial terms that may range from one month to one year We call these transactions "flow" activity and they represent the majority of our purchase volumes. The remainder of our purchases and securitizations of mortgage loans occurs in "bulk" transactions for which purchase prices and management and guarantee fees are negotiated on an individual transaction basis Mortgage purchase volumes from individual customers can fluctuate significantly If a mortgage lender fails to meet its contractual commitment, we have a variety of contractual remedies, which may include the right to assess certain fees Our mortgage purchase contracts contain no penalty or liquidated damages clauses based on our inability to take delivery of presented mortgage loans However, if we were to fail to meet our contractual commitment, we could be deemed to be in breach of our contract and could be liable for damages in a lawsuit

We seek to issue guarantees on our PCs with fee terms that we believe will, over the long term, provide management and guarantee fee income that exceeds our anticipated credit related and administrative expenses on the underlying loans Historically, we have varied our guarantee and delivery fee pricing for different customers, mortgage products, and mortgage or borrower underwriting characteristics based on our assessment of credit risk and loss mitigation related to single family loans However, on December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than 10 basis points above the average guarantee fees charged in 20  on single family mortgage backed securities Under the law, the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by the companies See "Regulation and Supervision    *Legislative and Regulatory Developments*" for further information on the impact of this new law For more information on fees, see "MD&A    RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Single Family Mortgage Credit Risk    Other Credit Risk Management Activities*."

For information on how we account for our securitization activities, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES "

### *Securitization Activities*

The types of mortgage related securities we issue and guarantee include the following:

- PCs;

- REMICs and Other Structured Securities; and

- Other Guarantee Transactions.

### *PCs*

Our PCs are single class pass through securities that represent undivided beneficial interests in trusts that hold pools of mortgages we have purchased Holding single family loans in the form of PCs rather than as unsecuritized loans gives us greater flexibility in managing the composition of our mortgage portfolio, as it is generally easier to purchase and sell PCs than unsecuritized mortgage loans, and allows more cost effective interest rate risk management For our fixed rate PCs, we guarantee the timely payment of principal and interest For our single family ARM PCs, we guarantee the timely payment of the weighted average coupon interest rate for the underlying mortgage loans We also guarantee the full and final payment of principal for ARM PCs; however, we do not guarantee the timely payment of principal on ARM PCs. We issue most of our single family PCs in transactions in which our customers provide us with mortgage loans in

<div align="center">4</div>

<div align="right">*Freddie Mac*</div>

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

exchange for PCs  We refer to these transactions as guarantor swaps. The following diagram illustrates a guarantor swap transaction:

## Guarantor Swap



We also issue PCs in exchange for cash  The following diagram illustrates an exchange for cash in a "cash auction" of PCs:

## Cash Auction of PCs



Institutional and other fixed income investors, including pension funds, insurance companies, securities dealers, money managers, commercial banks and foreign central banks, purchase our PCs. Treasury and the Federal Reserve have also purchased mortgage-related securities issued by us, Fannie Mae and Ginnie Mae under their purchase programs  The most recent of these programs ended in March 2010  During 20    , the Federal Reserve took several actions designed to support an economic recovery and maintain historically low interest rates, including resumption of purchases of agency securities, which impacted and will continue to impact the demand for and value of our PCs in the market.

PCs differ from U.S. Treasury securities and other fixed income investments in two ways  First, single family PCs can be prepaid at any time  Homeowners have the right to prepay their mortgage at any time (known as the prepayment option), and homeowner mortgage prepayments are passed through to the PC holder  Consequently, our securities implicitly have a call option that significantly reduces the average life of the security from the contractual loan maturity. As a result, our PCs generally provide a higher nominal yield than certain other fixed income products. Second, unlike U.S. Treasury securities, PCs are not backed by the full faith and credit of the United States.

In addition, in our Single family Guarantee segment we historically sought to support the liquidity of the market for our PCs and the relative price performance of our PCs to comparable Fannie Mae securities through a variety of activities, including the resecuritization of PCs into REMICs and Other Structured Securities  Other strategies may include: (a) encouraging sellers to pool mortgages that they deliver to us into PC pools with a larger and more diverse population

15                                                                                    *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012          TREASURY-2785          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

of mortgages; (b) influencing the volume and characteristics of mortgages delivered to us by tailoring our loan eligibility guidelines and other means; and (c) engaging in portfolio purchase and retention activities  Beginning in 2012, under guidance from FHFA we expect to curtail mortgage related investments portfolio purchase and retention activities that are undertaken for the primary purpose of supporting the price performance of our PCs, which may result in a significant decline in the market share of our single family guarantee business, lower comprehensive income, and a more rapid decline in the size of our total mortgage po tfolio  See *"Investments Segment      PC Support Activities"* and "RISK FACTORS      Competitive and Market Risks      *Any decline in the price performance of or demand for our PCs could have an adverse effect on the volume and profitability of our new single family guarantee business"* for additional information about our support of market liquidity for PCs.

*REMICs and Other Structured Securities*

We issue single class and multiclass securities. Single class securities involve the straight pass through of all of the cash flows of the underlying collateral to holders of the beneficial interests. Our primary multiclass securities qualify for tax  treatment as REMICs  Multiclass securities divide all of the cash flows of the underlying mortgage related assets into two or more classes designed to meet the investment criteria and portfolio needs of different investors by creating classes of securities with varying maturities, payment priorities and coupons, each of which represents a beneficial ownership interest in a separate portion of the cash flows of the underlying collateral. Usually, the cash flows are divided to modify the relative exposure of different classes to interest rate risk, or to create various coupon structures. The simplest division of cash flows is into principal only and interest only classes  Other securities we issue can involve the creation of sequential payment and planned or targeted amortization classes. In a sequential payment class structure, one or more classes receive all or a disproportionate percentage of the principal payments on the underlying mortgage assets for a period of time until that class or classes are retired, following which the principal payments are directed to other classes  Planned or targeted amortization classes involve the creation of classes that have relatively more predictable amortization schedules across different prepayment scenarios, thus reducing prepayment risk, extension risk, or both.

Our REMICs and Other Structured Securities represent beneficial interests in pools of PCs and/or ce tain other types of mo tgage related assets  We create these securities primarily by using PCs or previously issued REMICs and Other Structured Securities as the underlying collateral  Similar to our PCs, we guarantee the payment of principal and interest to the holders of tranches of our REMICs and Other Structured Securities  We do not charge a management and guarantee fee for these securities if the underlying collateral is already guaranteed by us since no additional credit risk is introduced  Because the collateral underlying nearly all of our single family REMICs and Other Structured Securities consists of other mortgage related securities that we guarantee, there are no concentrations of credit risk in any of the classes of these securities that are issued, and there are no economic residual interests in the related securitization trust  The following diagram provides a general example of how we create REMICs and Other Structured Securities

### REMICs and Other Structured Securities



We issue many of our REMICs and Other Structured Securities in transactions in which securities dealers or investors sell us mortgage-related assets or we use our own mortgage related assets (*e.g.*, PCs and REMICs and Other Structured Securities) in exchange for the REMICs and Other Structured Securities  The creation of REMICs and Other Structured Securities allows for setting differing terms for specific classes of investors, and our issuance of these securities can expand the range of investors in our mortgage related securities to include those seeking specific security attributes  For REMICs and Other Structured Securities that we issue to third parties, we typically receive a transaction, or

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                     TREASURY-2786                     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

resecuritization, fee  This transaction fee is compensation for  facilitating the transaction, as well as future administrative  responsibilities

*Other Guarantee Transactions*

We also issue mortgage related securities to third parties in exchange for non Freddie Mac mortgage related securities  We refer to these as Other Guarantee Transactions  The non Freddie Mac mortgage related securities are transferred to trusts that  were specifically created for the purpose of issuing securities,  or certificates, in the Other Guarantee Transactions. The  following diagram illustrates an example of an Other Guarantee Transaction:

### Other Guarantee Transaction



Other Guarantee Transactions can generally be segregated into  two different types  In one type, we purchase only senior  tranches from a non Freddie Mac senior subordinated  securitization, place the senior tranches into securitization  trusts, and issue Other Guarantee Transaction certificates guaranteeing the principal and interest payments on those  certificates. In this type of transaction, our credit risk  is  reduced by the structural credit protections from the related  subordinated tranches, which we do not guarantee  In the second  type, we purchase single class pass through securities, place  them in securitization trusts, and issue Other Guarantee  Transaction certificates guaranteeing the principal and interest payments on those certificates  Our Other Guarantee  Transactions  backed by single class pass through securities do  not benefit  from structural or other credit enhancement protections

Although Other Guarantee Transactions generally have underlying  mortgage loans with varying risk characteristics, we do not  issue tranches that have concentrations of credit risk beyond  those embedded in the underlying assets, as all cash flows of  the underlying collateral are passed through to the holders of  the securities and there are no economic residual interests in  the securitization trusts  Additionally, there may be other  credit enhancements and structural features retained by the  seller, such as excess interest or overcollateralization, that  provide credit protection to our interests, and reduce the  likelihood that we will have to perform under our guarantee of  the senior tranches  In exchange for providing our guarantee, we  may receive a management and guarantee fee or other delivery  fees, if the underlying collateral is not already guaranteed by  us.

In 2010 and 2009, we entered into transactions under  Treasury's NIBP with HFAs, for the partial guarantee of certain  single family and multifamily HFA bonds, which were Other  Guarantee Transactions with significant credit enhancement  provided by Treasury. While we did not engage in any of these  transactions in 2011, we continue to participate in and

<div align="center">17</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

support this program and these guarantees remain outstanding.  The securities issued by us pursuant to the NIBP were purchased  by Treasury. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS     Housing Finance Agency Initiative" for further information.

For information about the amount of mortgage related securities  we have issued, see "Table 35     Freddie Mac Mo tgage Related Securities " For information about the relative performance of mortgages underlying these securities,  refer to our "MD&A     RISK MANAGEMENT Credit Risk" section.

### Single Family PC Trust Documents

We establish trusts for all of our issued PCs pursuant to our PC master trust agreement  In accordance with the terms of our PC  trust documents, we have the option, and in some instances the  requirement, to remove specified mortgage loans from the trust  To remove these loans, we pay the trust an amount equal to the  current UPB of the mortgage, less any outstanding advances of  principal that have been distributed to PC holders. Our payments  to the trust are distributed to the PC holders at the next  scheduled payment date  From time to time, we reevaluate our practice of removing delinquent loans from PCs and alter it if  circumstances warrant  Our practice is to remove mortgages that  are 120 days or more delinquent from pools underlying our  PCs when:

- the mortgages have been modified;

- foreclosure sales occur;

- the mortgages are delinquent for 24 months; or

- the cost of guarantee payments to PC holders, including advances  of interest at the PC coupon rate, exceeds the expected cost of  holding the nonperforming loans

In February 20  0, we began the practice of removing  substantially all 120 days or more delinquent single family  mortgage loans from our issued PCs. This change in practice was  made based on a determination that the cost of guarantee  payments to the security holders will exceed the cost of holding unsecuritized non performing loans on our consolidated balance  sheets  The cost of holding unsecuritized non performing loans on our consolidated balance sheets was significantly affected by  our January 1, 2010 adoption of amendments to certain  accounting guidance and changing economics pursuant to which the  recognized cost of removing most delinquent loans from PC trusts  was less than the recognized cost of continued guarantee  payments to security holders. See "NOTE 1: SUMMARY OF  SIGNIFICANT ACCOUNTING POLICIES     Recently Adopted Accounting Guidance" for additional information

In accordance with the terms of our PC trust documents, we are  required to remove a mortgage loan (or, in some cases,  substitute a comparable mortgage loan) from a PC trust in the  following situations:

- if a court of competent jurisdiction or a federal government  agency, duly authorized to oversee or regulate our mortgage  purchase business, determines that our purchase of the mortgage  was unauthorized and a cure is not practicable without  unreasonable effort or expense, or if such a court or government  agency requires us to repurchase the mortgage;

- if a borrower exercises its option to convert the interest rate  from an adjustable rate to a fixed rate on a convertible  ARM; and

- in the case of balloon reset loans, shortly before the mortgage  reaches it's scheduled balloon reset date

### The To Be Announced Market

Because our fixed rate single family PCs are considered to be  homogeneous, and are issued in high volume and are highly  liquid, they generally trade on a "generic" basis by PC coupon rate, also  referred to as trading in the TBA market. A TBA trade in Freddie Mac securities represents a contract for the purchase or sale of PCs to be  delivered at a future date;  however, the specific PCs that will be  delivered to fulfill the trade obligation, and thus the specific characteristics of the  mortgages underlying those PCs, are not known ( *i.e.*, "announced") at the time of the trade, but only shortly before the trade is settled  The use of the TBA market increases the liquidity of mortgage investments and improves the distribution of investment capital available for residential  mortgage financing, thereby helping us to accomplish our  statutory mission. The Securities Industry and Financial Markets  Association publishes guidelines pertaining to the types of mortgages that are eligible for TBA trades Certain of our PC securities are not eligible for TBA trades,  including those backed by: (a) relief refinance mortgages with LTV  ratios greater than 105%; and (b) previously modified mortgage  loans where the borrower has missed one or more monthly payments  in a twelve month period

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-2788                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Underwriting Requirements and Quality Control Standards

We use a process of delegated underwriting for the single family mortgages we purchase or securitize  In this process, our  contracts with seller/servicers describe mortgage underwriting  standards and the seller/servicers represent and warrant to us  that the mortgages sold to us meet these standards. In our contracts with individual seller/servicers, we may waive or  modify selected underwriting standards. Through our de egated underwriting process, mortgage loans and the borrowers'  ability to repay the loans are evaluated using several critical  risk characteristics, including, but not limited to, the  borrower's credit score and credit history, the borrower's monthly income relative to debt payments, the loan's original LTV ratio, the documentation level, the number of borrowers, the type of mortgage product, and the  occupancy type of the loan  We subsequently review a sample of these loans and, if we determine that any loan is not in  compliance with our contractual standards, we may require the  seller/servicer to repurchase that mortgage  In lieu of a repurchase, we may agree to allow a seller/servicer to indemnify us against loss in the event of a default by the borrower or  enter into some other remedy  During 20    and 20  0, we reviewed a significant number of loans that defaulted in order to assess  the sellers' compliance with our purchase contracts  For more information on our seller/servicers' repurchase obligations, including recent performance under those  obligations, see "MD&A    RISK MANAGEMENT Credit Risk    Institutional Credit Risk    Single family Mortgage Seller/Servicers."

The majority of our single family mortgage purchase volume is  evaluated using an automated underwriting software tool, either  our tool (Loan Prospector), the seller/servicers' own tool, or Fannie Mae's tool  The percentage of our single family  mortgage purchase flow activity volume evaluated by the loan  originator using Loan Prospector prior to being purchased by us  was 41%, 39%, and 45% during 2011, 2010, and 2009, respectively. Beginning in 2009, we added a number of additional credit  standards for loans evaluated by other underwriting tools to improve the quality of loans we purchase that are evaluated  using these other tools  Consequently, we do not currently believe that the use of a tool other than Loan Prospector significantly increases our loan performance risk.

### Other Guarantee Commitments

In certain circumstances, we provide our guarantee of  mortgage related assets held by third parties, in exchange for a  guarantee fee, without securitizing the related assets  For example, we provide long term standby commitments to certain of  our single family customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements   In addition, during 2010 and 2009, we issued guarantees under the TCLFP on securities backed by HFA bonds as part of the HFA Initiative. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS    Housing Finance Agency Initiative" for further information.

### Credit Enhancements

Our charter requires that single family mortgages with LTV  ratios above 80% at the time of purchase be covered by specified  credit enhancements or participation interests  Primary mortgage  insurance is the most prevalent type of credit enhancement  protecting our single family credit guarantee portfolio, and is  typically provided on a loan level basis  In addition, we employ  other types of credit enhancements to further manage certain credit risk, including indemnification agreements, collateral  pledged by lenders and subordinated security structures. We also have pool insurance covering certain single family loans, though  we did not purchase any pool insurance on single family loans  during 2011 or 2010.

### Loss Mitigation and Loan Workout Activities

Loan workout activities are a key component of our loss  mitigation strategy for managing and resolving troubled assets  and lowering credit losses  Our single family loss mitigation  strategy emphasizes early intervention by servicers in  delinquent mortgages and provides alternatives to foreclosure  Other single family loss mitigation activities include providing  our single family servicers with default management tools  designed to help them manage non performing loans more  effectively and to assist borrowers in retaining home ownership  where possible, or facilitate foreclosure alternatives when continued homeownership is not an option  Loan workouts are  intended to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total  credit losses by reducing or eliminating a portion of the costs  re ated to foreclosed properties and avoiding the additional  credit losses that likely would be incurred in a REO sale

Our loan workouts include:

- Forbearance agreements, where reduced payments or no payments  are required during a defined period, generally less than one  year  They provide additional time for the borrower to return to  compliance with the original terms of the mortgage or to  implement another loan workout  During 2011, the average time period granted for completed

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2789

Table of Contents

short term forbearance agreements was between two and four months. In January 2012, we announced new unemployment forbearance terms, which permit forbearance of up to 12 months for unemployed borrowers

- Repayment plans, which are contractual plans to make up past due amounts. They mitigate our credit losses because they assist borrowers in returning to compliance with the original terms of their mortgages During 20 , the average time period granted for completed repayment plans was between two and five months

- Loan modifications, which may involve changing the terms of the loan, or adding outstanding indebtedness, such as delinquent interest, to the UPB of the loan, or a combination of both We require our servicers to examine the borrower's capacity to make payments under the new terms by reviewing the borrower's qualifications, including income. During 2011, we granted principal forbearance but did not utilize principal forgiveness for our loan modifications Principal forbearance is a change to a loan's terms to designate a portion of the principal as non interest bearing A borrower may only receive one HAMP modification, and loans may be modified once under other Freddie Mac loan modification programs However, we reserve the right to approve subsequent non HAMP loan modifications to the same borrower, based on the borrower's individual facts and circumstances.

- Short sale and deed in lieu of foreclosure transactions

In addition to these loan workout initiatives, our relief refinance opportunities, including HARP (which is the portion of our relief refinance initiative for loans with LTV ratios above 80%), are a significant part of our effort to keep families in their homes

In 2009, we began participating in HARP, which gives eligible homeowners (whose monthly payments are current) with existing loans owned or guaranteed by us or Fannie Mae an opportunity to refinance into loans with more affordable monthly payments and/or fixed rate terms Only borrowers with Freddie Mac owned or guaranteed mortgages are eligible for our relief refinance mortgage initiative, which is our implementation of HARP Through December 2011, under HARP, eligible borrowers who had mortgages with current LTV ratios above 80% and up to 125% were allowed to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA directed changes to HARP in an effort to attract more eligible borrowers who can benefit from refinancing their home mortgages The revisions to HARP are available to borrowers with loans that were sold to Freddie Mac and Fannie Mae on or before May 31, 2009 and who have current LTV ratios above 80% The program enhancements include:

- eliminating certain risk based fees for borrowers who refinance into shorter term mortgages, and lowering fees for other borrowers;

- removing the 25% LTV ratio ceiling for fixed rate mortgages;

- eliminating the requirement for lenders to provide us with certain representations and warranties that they would ordinarily be required to commit to in selling loans to us;

- eliminating the need for a new property appraisal where there is a reliable automated valuation model estimate provided by the purchasing GSE; and

- extending the end date for HARP until December 3 , 20 3

See "MD&A    RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Single family Mortgage Credit Risk    Single Family Loan Workouts and the MHA Program*" for additional information on our implementation of HARP through our relief refinance mortgage initiative For more information regarding credit risk, see "MD&A    RISK MANAGEMENT    Credit Risk," "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES," and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS."

### *Investments Segment*

The Investments segment reflects results from our investment, funding and hedging activities In our Investments segment, we invest principally in mortgage related securities and single family performing mortgage loans, which are funded by other debt issuances and hedged using derivatives. In our Investments segment, we also provide funding and hedging management services to the Single family Guarantee and Multifamily segments In the Investments segment, we are not currently a substantial buyer or seller of mortgage assets

#### *Our Customers*

Our customers for our debt securities predominantly include insurance companies, money managers, central banks, depository institutions, and pension funds. Within the Investments segment, we buy securities through various market sources. We also invest in performing single family mortgage loans, which we intend to aggregate and securitize We

<div align="center">20</div>

<div align="right">*Freddie Mac*</div>

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

purchase a significant portion of these loans from several lenders, as discussed in "*Single Family Guarantee Segment    Our Customers*."

### Our Competition

Historically, our principal competitors have been Fannie Mae and other financial institutions that invest in mortgage related securities and mortgage loans, such as commercial and investment banks, dealers, thrift institutions, and insurance companies. The conservatorship, including direction provided to us by our Conservator and the restrictions on our activities under the Purchase Agreement has affected and will continue to affect our ability to compete in the business of investing in mortgage related securities and mortgage loans

We compete for low cost debt funding with Fannie Mae, the FHLBs and other institutions  Competition for debt funding from these entities can vary with changes in economic, financial market and regulatory environments

### Assets

Historically, we have primarily been a buy and hold investor in mortgage related securities and single family performing mortgage loans  We may sell assets to reduce risk, provide liquidity, and improve our returns. However, due to limitations under the Purchase Agreement and those imposed by FHFA, our ability to acquire and sell mortgage assets is significantly constrained  For more information, see "Conservatorship and Related Matters" and "MD&A    CONSOLIDATED RESULTS OF OPERATIONS    Segment Earnings    *Segment Earnings Results Investments.*"

We may enter into a variety of transactions to improve investment returns, including: (a) dollar roll transactions, which are transactions in which we enter into an agreement to purchase and subsequently resell (or sell and subsequently repurchase) agency securities; (b) purchases of agency securities (including agency REMICs); and (c) purchases of performing single family mortgage loans  In addition, we may create REMICs from existing agency securities and sell tranches that are in demand by investors to reduce our asset balance, while conserving value for the taxpayer  We estimate our expected investment returns using an OAS approach, which is an estimate of the yield spread between a given financial instrument and a benchmark (LIBOR, agency or Treasury) yield curve. In this approach, we consider potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as the prepayment option  Additionally, in this segment we hold reperforming and modified single family mortgage loans related to our single family business. For our liquidity needs, we maintain a portfolio comprised primarily of cash and cash equivalents, non mortgage related securities, and securities purchased under agreements to resell

### Debt Financing

We fund our investment activities by issuing short term and long term debt. The conservatorship, and the resulting support we receive from Treasury, has enabled us to access debt funding on terms sufficient for our needs  While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets  and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available under the Purchase Agreement after 20 2  Additionally, the Purchase Agreement limits the amount of indebtedness we can incur

For more information, see "Conservatorship and Related Matters" and "MD&A    LIQUIDITY AND CAPITAL RESOURCES  Liquidity."

### Risk Management

Our Investments segment has responsibility for managing our interest rate risk and certain liquidity risks. Derivatives are an important part of our risk management strategy  We use derivatives primarily to: (a) regularly adjust or rebalance our funding mix in response to changes in the interest rate characteristics of our mortgage related assets; (b) hedge forecasted issuances of debt; (c) synthetically create callable and non callable funding; and (d) hedge foreign currency exposure  For more information regarding our use of derivatives, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK" and "NOTE 11: DERIVATIVES " For information regarding our liquidity management, see "MD&A    LIQUIDITY AND CAPITAL RESOURCES."

### PC Support Activities

Our PCs are an integral part of our mortgage purchase program  Our Single family Guarantee segment purchases many of our mortgages by issuing PCs in exchange for those mortgage loans in guarantor swap transactions. We also issue PCs backed by mortgage loans that we purchased for cash. Our competitiveness in purchasing single family

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-2791                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

mortgages from our seller/servicers, and thus the volume and profitability of new single family business, can be directly affected by the relative price performance of our PCs and comparable Fannie Mae securities

Historically, we sought to support the liquidity of the market for our PCs and the relative price performance of our PCs to comparable Fannie Mae securities through a variety of activities conducted by our Investments segment, including the purchase and sale of Freddie Mac and other agency mortgage related securities (e.g., dollar roll transactions), as well as through the issuance of REMICs and Other Structured Securities. Our purchases and sales of mortgage related securities and our issuances of REMICs and Other Structured Securities influence the relative supply and demand for these securities, helping to support the price performance of our PCs Depending upon market conditions, including the relative prices, supply and demand for our mortgage related securities and comparable Fannie Mae securities, as well as other factors, there may be substantial variability in any period in the total amount of securities we purchase or sell, and in the success of our efforts to support the liquidity and price performance of our mortgage related securities Historically, we incurred costs to support the liquidity and price performance of our securities, including engaging in transactions below our target rate of return We may increase, reduce or discontinue these or other related activities at any time, which could affect the liquidity and price performance of our mortgage related securities Beginning in 20 2, under guidance from FHFA we expect to curtail mortgage related investments portfolio purchase and retention activities that are undertaken for the primary purpose of supporting the price performance of our PCs, which may result in a significant decline in the market share of our single family guarantee business, lower comprehensive income, and a more rapid decline in the size of our total mortgage portfolio For more information, see "RISK FACTORS    Competitive and Market Risks    *Any decline in the price performance of or demand for our PCs could have an adverse effect on the volume and profitability of our new single family guarantee business."*

### Multifamily Segment

The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities  Although we hold multifamily mortgage loans and non agency CMBS that we purchased for investment, our purchases of such multifamily mortgage loans for investment have declined significantly since 2010, and our purchases of CMBS have declined significantly since 2008. The only CMBS that we have purchased since 2008 have been senior, mezzanine, and interest-only tranches related to certain of our securitization transactions, and these purchases have not been significant. Currently, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization  We guarantee the senior tranches of these securitizations in Other Guarantee Transactions. Our Multifamily segment also issues Other Structured Securities, but does not issue REMIC securities  Our Multifamily segment also enters into other guarantee commitments for multifamily HFA bonds and housing revenue bonds held by third parties. Historically, we issued multifamily PCs, but this activity has been insignificant in recent years

The multifamily property market is affected by local and regional economic factors, such as employment rates, construction cycles, and relative affordability of single family home prices, all of which influence the supply and demand for multifamily properties and pricing for apartment rentals. Our multifamily loan volume is largely sourced through established institutional channels where we are generally providing post construction financing to larger apartment project operators with established performance records

Our lending decisions are largely based on the assessment of the property's ability to provide rents that will generate sufficient operating cash flows to support payment of debt service obligations as measured by the expected DSCR and the loan amount relative to the value of the property as measured by the LTV ratio  Multifamily mortgages generally are without recourse to the borrower (*i.e.*, the borrower is not personally liable for any deficiency remaining after foreclosure and sale of the property), except in the event of fraud or certain other specified types of default  Therefore, repayment of the mortgage depends on the ability of the underlying property to generate cash flows sufficient to cover the related debt obligations. That in turn depends on conditions in the local rental market, local and regional economic conditions, the physical condition of the property, the quality of property management, and the level of operating expenses

Prior to 20 0, our Multifamily segment also reflected results from our investments in LIHTC partnerships formed for the purpose of providing equity funding for affordable multifamily rental properties  In these investments, we provided equity contributions to partnerships designed to sponsor the development and ongoing operations for low and moderate income multifamily apartments  We planned to realize a return on our investment through reductions in income tax expense that result from federal income tax credits and the deductibility of operating losses generated by the partnerships  However, we no longer make investments in such partnerships because we do not expect to be able to use the underlying federal income tax credits or the operating losses generated from the partnerships as a reduction to our taxable income

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-2792                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

because of our inability to generate sufficient taxable income  or to sell these interests to third parties  See "NOTE 3: VARIABLE INTEREST ENTITIES" for additional information

### Our Customers

We acquire a significant portion of our multifamily mortgage loans from several large seller/servicers  For 2011, our top two  multifamily sellers, CBRE Capital Markets, Inc. and NorthMarq  Capital, LLC, each accounted for more than 10% of our  multifamily purchase volume, and together accounted for  approximately 32% of our multifamily purchase volume  Our top 10  multifamily lenders represented an aggregate of approximately 81% of our multifamily purchase volume for 2011.

A significant portion of our multifamily mortgage loans are  serviced by several of our large customers  See "MD&A       RISK MANAGEMENT     Credit Risk     *Institutional Credit Risk*     Seller/Servicers" for additional information

### Our Competition

Historically, our principal competitors have been Fannie Mae,  FHA, and other financial institutions that retain or securitize  multifamily mortgages, such as commercial and investment banks,  dealers, thrift institutions, and insurance companies. During  2009, many of our competitors, other than Fannie Mae and FHA,  significantly curtailed their activities in the multifamily  mortgage business relative to their previous levels  Beginning in  20 0, some market participants began to re emerge in the  multifamily market, and we have faced increased competition  from some other institutional investors  We compete on the basis  of price, products, structure and service.

### Underwriting Requirements and Quality Control Standards

Our process and standards for underwriting multifamily  mortgages  differ from those used for single family mortgages  Unlike  s ng e-family mortgages, we generally do not use a delegated  underwriting process for the multifamily mortgages we purchase  or securitize  Instead, we typically underwrite and evaluate each  mortgage prior to purchase  This process includes review of  third party appraisals and cash flow analysis. Our underwriting  standards focus on loan quality measurement based, in part, on  the LTV ratio and DSCR at origination. The DSCR is one indicator  of future credit performance  The DSCR estimates a multifamily  borrower's ability to service its mortgage obligation using the  secured property's cash flow, after deducting non mortgage  expenses from income  The higher the DSCR, the more  likely a  multifamily borrower will be able to continue servicing  its  mortgage obligation. Our standards for multifamily loans  specify maximum original LTV ratio and minimum DSCR that vary  based on the loan characteristics, such as loan type (new  acquisition or supplemental financing), loan term (intermediate or  longer term), and loan features (interest only or amortizing,  fixed  or variable rate)  Since the beginning of 2009, our  multifamily loans are generally underwritten with requirements  for a maximum original LTV ratio of 80% and a DSCR of greater  than 1.25. In certain circumstances, our standards for  multifamily loans allow for certain types of loans to have an  original LTV ratio over 80% and/or a DSCR of less than 1.25,  typically where this will serve our  mission and contribute to  achieving our affordable housing  goals  In cases where we commit  to purchase or guarantee a  permanent loan upon completion of  construction or  rehabilitation, we generally require additional  credit enhancements, because underwriting for these loans  typically  requires estimates of future cash flows for calculating  the DSCR  that is expected after construction or rehabilitation is  completed

We issue other guarantee commitments under which we  guarantee payments under multifamily mortgages that back tax  exempt bonds issued by state or local HFAs  In addition, we issue  other  guarantee commitments guaranteeing payments on  securities backed  by such bonds. We underwrite the mortgages in  these cases in the same manner as for mortgages that we purchase

Multifamily seller/servicers make representations and  warranties  to us about the mortgage and about certain information  submitted  to us in the underwriting process  We have the right to  require that a seller/servicer repurchase a multifamily mortgage  for  which there has been a breach of representation or warranty   However, because of our evaluation of underwriting information   for most multifamily properties prior to purchase, repurchases  have been rare

We generally require multifamily seller/servicers to service  mortgage loans they have sold to us in order to mitigate  potential  losses. This includes property monitoring tasks beyond  those typically performed by single family servicers  We do not  oversee servicing with respect to multifamily loans we have  securitized (*i.e.*, those underlying our Other Guarantee  Transactions) as that oversight task is performed by subordinated  bondholders. For loans over $1 million and  where we have  servicing oversight, servicers must generally  submit an annual  assessment of the mortgaged property to us based on the  servicer's analysis of financial and other  information about the  property  In situations where a borrower or property is in  distress, the frequency of communications with  the borrower may  be increased  Because the activities of multifamily

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2793

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

seller/servicers are an important part of our loss mitigation process, we rate their performance regularly and may conduct on-site reviews of their servicing operations in an effort to confirm compliance with our standards.

For loans for which we oversee servicing, if a borrower is in distress, we may offer a workout option to the borrower For example, we may modify the terms of a multifamily mortgage loan, which gives the borrower an opportunity to bring the loan current and retain ownership of the property These arrangements are made with the expectation that we will recover our initial investment or minimize our losses We do not enter into these arrangements in situations where we believe we would experience a loss in the future that is greater than or equal to the loss we would experience if we foreclosed on the property at the time of the agreement

## Conservatorship and Related Matters

### Overview and Entry into Conservatorship

We have been operating under conservatorship, with FHFA acting as our conservator, since September 6, 2008. The conservatorship and related matters have had a wide ranging impact on us, including our regulatory supervision, management, business, financial condition and results of operations

On September 7, 2008, the then Secretary of the Treasury and the then Director of FHFA announced several actions taken by Treasury and FHFA regarding Freddie Mac and Fannie Mae These actions included the execution of the Purchase Agreement, pursuant to which we issued to Treasury both senior preferred stock and a warrant to purchase common stock. At that time, FHFA set forth the purpose and goals of the conservatorship as follows: "The purpose of appointing the Conservator is to preserve and conserve the company's assets and property and to put the company in a sound and solvent condition. The goals of the conservatorship are to help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their mission, and mitigate the systemic risk that has contributed directly to the instability in the current market." We refer to the Purchase Agreement and the warrant as the "Treasury Agreements "

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near term Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near term We have no ability to predict the outcome of these deliberations. On February 2, 2012, the Administration announced that it expects to provide more detail concerning approaches to reform the U.S. housing finance market in the spring, and that it plans to begin exploring options for legislation more intensively with Congress On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the conservatorships of Freddie Mac and Fannie Mae

We receive substantial support from Treasury and FHFA, as our Conservator and regulator, and are dependent upon their continued support in order to continue operating our business This support includes our ability to access funds from Treasury under the Purchase Agreement, which is critical to: (a) keeping us solvent; (b) allowing us to focus on our primary business objectives under conservatorship; and (c) avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions. During 2011, the Federal Reserve took several actions designed to support an economic recovery and maintain historically low interest rates, including resumption of purchases of agency securities, which impacted and will continue to impact the demand for and value of our PCs in the market.

Our annual dividend obligation on the senior preferred stock exceeds our annual historical earnings in all but one period Although we may experience period to period variability in earnings and comprehensive income, it is unlikely that we will regularly generate net income or comprehensive income in excess of our annual dividends payable to Treasury. As a result, there is significant uncertainty as to our long term financial sustainability.

For a description of certain risks to our business relating to the conservatorship and Treasury Agreements, see "RISK FACTORS."

### Supervision of Our Company During Conservatorship

Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director of Freddie Mac with respect to Freddie Mac and its assets, and succeeded to the title to all books, records and assets of Freddie Mac held by any other legal custodian or third party Under conservatorship, we have additional heightened supervision and direction from our regulator, FHFA, which is also acting as our Conservator

During the conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and to management to conduct, day to day operations so that the company can continue to operate in the ordinary course of

Source   D RA   HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2794

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

business  The directors serve on behalf of, and exercise authority as directed by, the Conservator. The Conservator retains the authority to withdraw or revise its delegations of authority at any time  The Conservator also retained certain  significant authorities for itself, and did not de egate them to the Board  For more information on limitations on the  Board's authority during conservatorship, see "DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE     Authority of the Board and Board Committees "

Because the Conservator succeeded to the powers, including  voting rights, of our stockholders, who therefore do not  currently have voting rights of their own, we do not expect to  hold stockholders' meetings during the conservatorship, nor  will we prepare or provide proxy statements for the solicitation of proxies

We describe the powers of our Conservator in detail below under  "Powers of the Conservator "

### Impact of Conservatorship and Related Actions on Our Business

We conduct our business subject to the direction of FHFA as our Conservator. While the conservatorship has benefited us through,  for example, improved access to the debt markets because of the  support we receive from Treasury, we are also subject to certain  constraints on our business activities by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement

While in conservatorship, we can, and have continued to, enter  into and enforce contracts with third parties. The Conservator  continues to direct the efforts of the Board of Directors and  management to address and determine the strategic direction for  the company  While the Conservator has delegated certain authority to management to conduct day to day operations, many  management decisions are subject to review and approval by FHFA and Treasury. In addition, management frequently receives directions from FHFA on various matters involving day to day operations

Our business objectives and strategies have in some cases been  altered since we were placed into conservatorship, and may  continue to change  Based on our charter, other legislation,  public statements from Treasury and FHFA officials and guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives, including:

- minimizing our credit losses;

- conserving assets;

- providing liquidity, stability and affordability in the mortgage  market;

- continuing to provide additional assistance to the struggling  housing and mortgage markets;

- managing to a positive stockholders' equity and reducing  the need to draw funds from Treasury pursuant to the Purchase Agreement; and

- protecting the interests of taxpayers

These objectives create conflicts in strategic and day to day  decision making that will likely lead to suboptimal outcomes for  one or more, or possibly all, of these objectives  We regularly receive direction from our Conservator on how to pursue these  objectives, including direction to focus our efforts on assisting homeowners in the housing and mortgage markets  Given  the important role the Administration and our Conservator have placed on Freddie Mac in addressing housing and mortgage market  conditions and our public mission, we may be required to take additional actions that could have a negative impact on our  business, operating results or financial condition. Because we  expect many of these objectives and related initiatives to  result in significant costs, there is significant uncertainty as  to the ultimate impact these initiatives will have on our future capital or liquidity needs  Certain of these objectives are  expected to help homeowners and the mortgage market and may help to mitigate future credit losses  However, some of our  initiatives are expected to have an adverse impact on our near   and long term financial results.

Certain changes to our business objectives and strategies are  designed to provide support for the mortgage market in a manner  that serves our public mission and other non financial  objectives, but may not contribute to profitability  Our efforts to help struggling homeowners and the mortgage market, in line with our mission, may help to mitigate credit losses, but in  some cases may increase our expenses or require us to forego revenue opportunities in the near term  As a result, in some  cases the objective of reducing the need to draw funds from  Treasury will be subordinated as we provide this assistance.  There is significant uncertainty as to the ultimate impact that  our efforts to aid the housing and mortgage markets will have on our future capital or liquidity needs and we cannot estimate  whether, and the extent to which, costs we incur in the near term as a result of these efforts, which for the most part we  are not reimbursed for, will be offset by the prevention or reduction of potential future costs

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-2795                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The Conservator and Treasury also did not authorize us to engage in certain business activities and transactions, including the purchase or sale of certain assets, which we believe might have had a beneficial impact on our results of operations or financial condition, if executed Our inability to execute such transactions may adversely affect our profitability, and thus contribute to our need to draw additional funds from Treasury.

The Conservator has stated that it is taking actions in support of the objectives of a gradual transition to greater private capital participation in housing finance and greater distribution of risk to participants other than the government.

These actions and objectives create risks and uncertainties that we discuss in "RISK FACTORS." For more information on the impact of conservatorship and our current business objectives, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" and "Executive Summary    *Our Primary Business Objectives."*

*Limits on Investment Activity and Our Mortgage Related Investments Portfolio*

The conservatorship has significantly impacted our investment activity Under the terms of the Purchase Agreement and FHFA regulation, our mortgage related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage related investments portfolio could not exceed $729 billion as of December 31, 2011 and may not exceed $656.1 billion as of December 31, 2012. FHFA has indicated that such portfolio reduction targets should be viewed as minimum reductions and has encouraged us to reduce the mortgage related investments portfolio at a faster rate than required, consistent with FHFA guidance, safety and soundness and the goal of conserving and preserving assets We are also subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury We are working with FHFA to identify ways to prudently accelerate the rate of contraction of the portfolio

The table below presents the UPB of our mortgage related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation

**Table 4    Mortgage Related Investments Portfolio**[1]

|  | December 31, 2011 | December 31, 2010 |
|---|---|---|
|  | (in millions) | |
| Inves men s segmen    Mo gage nves men s po fol o | $ 449,273 | $ 481,677 |
| S ngle-fam ly Gua an ee segmen    S ngle-fam ly unsecu  zed mo gage oans[2] | 62,469 | 69,766 |
| Mul fam ly segmen    Mo gage nves men s po fol o | 141,571 | 145,431 |
| To a mo gage- e a ed nves men s po fo o | $ 653,313 | $ 696,874 |

(1) Based on UPB and excludes mo gage loans and mo gage- ela ed sec  t es t ated,  t ot yet sett ed
(2) Rep esen s unsecu  zed se ous y de nquen s ng e-fam  y loans managed by he S ngle-fam ly Gua an ee segmen

FHFA has stated that we will not be a substantial buyer or seller of mortgages for our mortgage related investments portfolio FHFA also stated that, given the size of our current mortgage related investments portfolio and the potential volume of delinquent mortgages to be removed from PC pools, it expects that any net additions to our mortgage related investments portfolio would be related to that activity We expect that our holdings of unsecuritized single family loans will continue to increase during 2012 due to the revisions to HARP, which will result in our purchase of mortgage loans with LTV ratios greater than 125%, as we have not yet implemented a securitization process for such loans.

Our mortgage related investments portfolio includes assets that are less liquid than agency securities, including unsecuritized performing single family mortgage loans, multifamily mortgage loans, CMBS, and housing revenue bonds. Our less liquid assets collectively represented approximately 32% of the UPB of the portfolio at December 31, 2011, as compared to 30% as of December 3 , 20 0 Our mortgage related investments portfolio also includes illiquid assets, including unsecuritized seriously delinquent and modified single family mortgage loans which we removed from PC trusts, and our investments in non agency mortgage related securities backed by subprime, option ARM, and Alt A and other loans Our illiquid assets collectively represented approximately 29% of the UPB of the portfolio at December 31, 2011, as compared to 27% as of December 31, 2010 The changing composition of our mortgage related investments portfolio to a greater proportion of illiquid assets may influence our decisions regarding funding and hedging The description above of the liquidity of our assets is based on our own internal expectations given current market conditions. Changes in market conditions could continue to affect the liquidity of our assets at any given time

***Powers of the Conservator***

Under the GSE Act, the conservatorship provisions applicable to Freddie Mac are based generally on federal banking law As discussed below, FHFA has broad powers when acting as our conservator For more information on the GSE Act, see "Regulation and Supervision "

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-2796

Table of Contents

### General Powers of the Conservator

Upon its appointment, the Conservator immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director of Freddie Mac with respect to Freddie Mac and its assets The Conservator also succeeded to the title to all books, records and assets of Freddie Mac held by any other legal custodian or third party.

Under the GSE Act, the Conservator may take any actions it determines are necessary and appropriate to carry on our business, support public mission objectives, and preserve and conserve our assets and property. The Conservator's powers include the ability to transfer or sell any of our assets or liabilities (subject to certain limitations and post transfer notice provisions for transfers of qualified financial contracts, as defined below under "Special Powers of the Conservator     *Security Interests Protected; Exercise of Rights Under Qualified Financial Contracts*") without any approval, assignment of rights or consent of any party. The GSE Act, however, provides that mortgage loans and mortgage related assets that have been transferred to a Freddie Mac securitization trust must be held for the beneficial owners of the trust and cannot be used to satisfy our general creditors

Under the GSE Act, in connection with any sale or disposition of our assets, the Conservator must conduct its operations to maximize the NPV return from the sale or disposition of such assets, to minimize the amount of any loss realized in the resolution of cases, and to ensure adequate competition and fair and consistent treatment of offerors The Conservator is required to maintain a full accounting of the conservatorship and make its reports available upon request to stockholders and members of the public

We remain liable for all of our obligations relating to our outstanding debt and mortgage related securities FHFA has stated that our obligations will be paid in the normal course of business during the conservatorship.

### Special Powers of the Conservator

#### Disaffirmance and Repudiation of Contracts

Under the GSE Act, the Conservator may disaffirm or repudiate contracts (subject to certain limitations for qualified financial contracts) that we entered into prior to its appointment as Conservator if it determines, in its sole discretion, that performance of the contract is burdensome and that disaffirmance or repudiation of the contract promotes the orderly administration of our affairs. The GSE Act requires FHFA to exerc se its right to disaffirm or repudiate most contracts within a reasonable period of time after its appointment as Conservator In a final rule published in June 2011, FHFA defines a reasonable period of time following appointment of a conservator or receiver to be 18 months The Conservator has advised us that it has no intention of repudiating any guarantee obligation relating to Freddie Mac's mortgage related securities because it views repudiation as incompatible with the goals of the conservatorship We can, and have continued to, enter into, perform and enforce contracts with third parties.

#### Limitations on Enforcement of Contractual Rights by Counterparties

The GSE Act provides that the Conservator may enforce most contracts entered into by us, notwithstanding any provision of the contract that provides for termination, default, acceleration, or exercise of rights upon the appointment of, or the exercise of rights or powers by, a conservator

#### Security Interests Protected; Exercise of Rights Under Qualified Financial Contracts

Notwithstanding the Conservator's powers under the GSE Act described above, the Conservator must recognize legally enforceable or perfected security interests, except where such an interest is taken in contemplation of our insolvency or with the intent to hinder, delay or defraud us or our creditors. In addition, the GSE Act provides that no person will be stayed or prohibited from exercising specified rights in connection with qualified financial contracts, including termination or acceleration (other than solely by reason of, or incidental to, the appointment of the Conservator), rights of offset, and rights under any security agreement or arrangement or other credit enhancement relating to such contract. The term qualified financial contract means any securities contract, commodity contract, forward contract, repurchase agreement, swap agreement, and any similar agreement as determined by FHFA by regulation, resolution or order

#### Avoidance of Fraudulent Transfers

Under the GSE Act, the Conservator may avoid, or refuse to recognize, a transfer of any property interest of Freddie Mac or of any of our debtors, and also may avoid any obligation incurred by Freddie Mac or by any debtor of Freddie Mac, if the transfer or obligation was made: (a) within five years of September 6, 2008; and (b) with the intent to hinder, delay, or defraud Freddie Mac, FHFA, the Conservator or, in the case of a transfer in connection with a qualified financial

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2797

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

contract, our creditors  To the extent a transfer is avoided, the Conservator may recover, for our benefit, the property or, by court order, the value of that property from the initial or subsequent transferee, other than certain transfers that were made for value, including satisfaction or security of a present or antecedent debt, and in good faith  These rights are superior to any rights of a trustee or any other party, other than a federal agency, under the U.S. bankruptcy code.

*Modification of Statutes of Limitations*

Under the GSE Act, notwithstanding any provision of any contract, the statute of limitations with regard to any action brought by the Conservator is: (a) for claims relating to a contract, the longer of six years or the applicable period under state law; and (b) for tort claims, the longer of three years or the applicable period under state law, in each case, from the later of September 6, 2008 or the date on which the cause of action accrues. In addition, notwithstanding the state law statute of limitation for tort claims, the Conservator may bring an action for any tort claim that arises from fraud, intentional misconduct resulting in unjust enrichment, or intentional misconduct resulting in substantial loss to us, if the state's statute of limitations expired not more than five years before September 6, 2008

*Suspension of Legal Actions*

Under the GSE Act, in any judicial action or proceeding to which we are or become a party, the Conservator may request, and the applicable court must grant, a stay for a period not to exceed 45 days.

*Treatment of Breach of Contract Claims*

Under the GSE Act, any final and unappealable judgment for monetary damages against the Conservator for breach of an agreement executed or approved in writing by the Conservator will be paid as an administrative expense of the Conservator

*Attachment of Assets and Other Injunctive Relief*

Under the GSE Act, the Conservator may seek to attach assets or obtain other injunctive relief without being required to show that any injury, loss or damage is irreparable and immediate.

*Subpoena Power*

The GSE Act provides the Conservator, with the approval of the Director of FHFA, with subpoena power for purposes of carrying out any power, authority or duty with respect to Freddie Mac

**Treasury Agreements**

The Reform Act granted Treasury temporary authority (through December 31, 2009) to purchase any obligations and other securities issued by Freddie Mac on such terms and conditions and in such amounts as Treasury may determine, upon mutual agreement between Treasury and Freddie Mac  Pursuant to this authority, Treasury entered into several agreements with us, as described below.

<u>Purchase Agreement and Related Issuance of Senior Preferred Stock and Common Stock Warrant</u>

*Purchase Agreement*

On September 7, 2008, we, through FHFA, in its capacity as Conservator, and Treasury entered into the Purchase Agreement  The Purchase Agreement was subsequently amended and restated on September 26, 2008, and further amended on May 6, 2009 and December 24, 2009  Pursuant to the Purchase Agreement, on September 8, 2008 we issued to Treasury: (a) one million shares of Variable Liquidation Preference Senior Preferred Stock (with an initial liquidation preference of $1 billion), which we refer to as the senior preferred stock; and (b) a warrant to purchase, for a nominal price, shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis at the time the warrant is exercised, which we refer to as the warrant  The terms of the senior preferred stock and warrant are summarized in separate sections below  We did not receive any cash proceeds from Treasury as a result of issuing the senior preferred stock or the warrant  However, deficits in our net worth have made it necessary for us to make substantial draws on Treasury's funding commitment under the Purchase Agreement  As a result, the aggregate liquidation preference of the senior preferred stock has increased from $1.0 billion as of September 8, 2008 to $72.2 billion at December 3 , 20   (this figure reflects the receipt of funds requested in the draw to address our net worth deficit as of September 30, 2011)  Our dividend obligation on the senior preferred stock, based on that liquidation preference, is $7.22 billion, which exceeds our annual earnings in all but one period

The senior preferred stock and warrant were issued to Treasury as an initial commitment fee in consideration of the initial commitment from Treasury to provide up to $100 billion (subsequently increased to $200 billion) in funds to us

<div align="center">28</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

under the terms and conditions set forth in the Purchase Agreement  Under the Purchase Agreement, the $200 billion  maximum amount of the commitment from Treasury will increase as  necessary to accommodate any cumulative reduction in our net  worth during 2010, 2011 and 2012. If we do not have a capital surplus (*i.e.*, positive net worth) at the end of 2012,  then the amount of funding available after 2012 will be $149.3 billion ($200 billion funding commitment  reduced by cumulative draws for net worth deficits through  December 3 , 2009)  In the event we have a capital surplus at the end of 2012, then the amount of funding available after  2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as  follows:

- If the year end 2012 surplus is lower than the cumulative draws  needed for 2010 to 2012, then the amount of available funding is  $149.3 billion less the surplus.

- If the year end 2012 surplus exceeds the cumulative draws for  2010 to 2012, then the amount of funding available is $149.3 billion less the amount of those draws

In addition to the issuance of the senior preferred stock and  warrant, we are required under the Purchase Agreement to pay a  quarterly commitment fee to Treasury  Under the Purchase Agreement, the fee is to be determined in an amount mutually  agreed to by us and Treasury with reference to the market value of Treasury's funding commitment as then in effect, and reset every five years  We may elect to pay the quarterly commitment fee in cash or add the amount of the fee to the  liquidation preference of the senior preferred stock  Treasury  may waive the quarterly commitment fee for up to one year at a  time, in its sole discretion, based on adverse conditions in the  U S  mortgage market  The fee was originally scheduled to begin accruing on January 1, 2010 (with the first fee  payable on March 31, 2010), but was delayed until  January 1, 2011 (with the first fee payable on March 31, 2011) pursuant to an amendment to the  Purchase Agreement  Treasury waived the fee for all quarters of 2011 and the first quarter of 2012, but has indicated that it  remains committed to protecting taxpayers and ensuring that our  future positive earnings are returned to taxpayers as  compensation for their investment. Treasury stated that it would  reevaluate whether the quarterly commitment fee should be set in the second quarter of 2012. Absent Treasury waiving the  commitment fee in the second quarter of 2012, this quarterly commitment fee will begin accruing on April 1, 2012 and  will be paid each quarter for as long as the Purchase Agreement  is in effect  The amount of the fee has not yet been determined  and could be substantial.

The Purchase Agreement provides that, on a quarterly basis, we  generally may draw funds up to the amount, if any, by which our  total liabilities exceed our total assets, as reflected on our  GAAP balance sheet for the applicable fiscal quarter (referred to  as the deficiency amount), provided that the aggregate amount funded under the Purchase Agreement may not exceed Treasury's commitment  The Purchase Agreement provides that the deficiency amount will be calculated differently if we  become subject to receivership or other liquidation process  The deficiency amount may be increased above the otherwise  applicable amount upon our mutual written agreement with  Treasury. In addition, if the Director of FHFA determines that the Director will be mandated by law to appoint a receiver for  us unless our capital is increased by receiving funds under the commitment in an amount up to the deficiency amount (subject to  the maximum amount that may be funded under the agreement), then FHFA, in its capacity as our Conservator, may request that  Treasury provide funds to us in such amount. The Purchase Agreement also provides that, if we have a deficiency amount as  of the date of completion of the liquidation of our assets, we  may request funds from Treasury in an amount up to the deficiency amount (subject to the maximum amount that may be  funded under the agreement)  Any amounts that we draw under the Purchase Agreement will be added to the liquidation  preference of the senior preferred stock  No additional shares of senior preferred stock are required to be issued under the  Purchase Agreement  As a result, the expiration on December 3 , 2009 of Treasury's temporary authority to purchase obligations and other securities issued by Freddie Mac did not affect  Treasury's funding commitment under the Purchase Agreement

Under the Purchase Agreement, our ability to repay the  liquidation preference of the senior preferred stock is limited  and we will not be able to do so for the foreseeable future, if  at all. The amounts payable for dividends on the senior  preferred stock are substantial and will have an adverse impact  on our financial position and net worth. The payment of  dividends on our senior preferred stock in cash reduces our net  worth  For periods in which our earnings and other changes in  equity do not result in positive net worth, draws under the  Purchase Agreement effectively fund the cash payment of senior  preferred dividends to Treasury. It is unlikely that, over the  long term, we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury, although  we may experience period to period variability in earnings and comprehensive income  As a result, we expect to make additional  draws in future periods.

The Purchase Agreement provides that the Treasury's funding  commitment will terminate under any of the following  circumstances: (a) the completion of our liquidation and  fulfillment of Treasury's obligations under its funding  commitment at that time; (b) the payment in full of, or reasonable provision for, all of our liabilities (whether or not

<div align="center">29</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

contingent, including mortgage guarantee obligations); and  (c) the funding by Treasury of the maximum amount of the  commitment under the Purchase Agreement. In addition, Treasury may terminate its funding commitment and declare the Purchase  Agreement null and void if a court vacates, modifies, amends, conditions, enjoins, stays or otherwise affects the appointment  of the Conservator or otherwise curtails the Conservator's powers. Treasury may not terminate its funding commitment under  the Purchase Agreement solely by reason of our being in conservatorship, receivership or other insolvency proceeding, or  due to our financial condition or any adverse change in our  financial condition

The Purchase Agreement provides that most provisions of the  agreement may be waived or amended by mutual written agreement  of the parties; however, no waiver or amendment of the agreement  is permitted that would decrease Treasury's aggregate funding commitment or add conditions to Treasury's funding commitment if the waiver or amendment would adversely affect in  any material respect the holders of our debt securities or Freddie Mac mortgage guarantee obligations

In the event of our default on payments with respect to our debt  securities or Freddie Mac mortgage guarantee obligations, if  Treasury fails to perform its obligations under its funding  commitment and if we and/or the Conservator are not diligently pursuing remedies in respect of  that failure, the holders of these debt securities or Freddie  Mac mortgage guarantee obligations may file a claim in the  United States Court of Federal Claims for relief requiring Treasury to fund to us the lesser of: (a) the amount  necessary to cure the payment defaults on our debt and Freddie Mac mortgage guarantee obligations; and (b) the lesser of: (i) the deficiency amount; and (ii) the maximum amount  of the commitment less the aggregate amount of funding  previously provided under the commitment  Any payment that Treasury makes under those circumstances will be treated for all purposes as a draw under the Purchase Agreement that will  increase the liquidation preference of the senior preferred  stock.

The Purchase Agreement has an indefinite term and can terminate  only in limited circumstances, which do not include the end of  the conservatorship  The Purchase Agreement therefore could  continue after the conservatorship ends

*Issuance of Senior Preferred Stock*

Shares of the senior preferred stock have a par value of $1, and  have a stated value and initial liquidation preference equal to  $1,000 per share  The liquidation preference of the senior  preferred stock is subject to adjustment. Dividends that are not  paid in cash for any dividend period will accrue and be added to  the liquidation preference of the senior preferred stock  In  addition, any amounts Treasury pays to us pursuant to its  funding commitment under the Purchase Agreement and any  quarterly commitment fees that are not paid in cash to Treasury  nor waived by Treasury will be added to the liquidation  preference of the senior preferred stock  As described below, we may make payments to reduce the liquidation preference of the  senior preferred stock in limited circumstances

Treasury, as the holder of the senior preferred stock, is  entitled to receive, when, as and if declared by our Board of  Directors, cumulative quarterly cash dividends at the annual rate  of  0% per year on the then current liquidation preference  of the senior preferred stock  Through December 31, 2011, we have  paid cash dividends of $16.5 billion at the  direction of the Conservator  If at any time we fail to pay cash dividends in a timely manner, then immediately following such  failure and for all dividend periods thereafter until the  dividend period following the date on which we have paid in cash  full cumulative dividends (including any unpaid dividends added  to the liquidation preference), the dividend rate will be 12% per year

The senior preferred stock is senior to our common stock and all  other outstanding series of our preferred stock, as well as any  capital stock we issue in the future, as to both dividends and  rights upon liquidation. The senior preferred stock provides  that we may not, at any time, declare or pay dividends on, make  distributions with respect to, or redeem, purchase or acquire,  or make a liquidation payment with respect to, any common stock  or other securities ranking junior to the senior preferred stock  unless: (a) full cumulative dividends on the outstanding senior  preferred stock (including any unpaid dividends added to  the liquidation preference) have been declared and paid in cash;  and (b) all amounts required to be paid with the net  proceeds of any issuance of capital stock for cash (as described  in the following paragraph) have been paid in cash. Shares of  the senior preferred stock are not convertible  Shares of the  senior preferred stock have no general or special voting rights,  other than those set forth in the certificate of designation for  the senior preferred stock or otherwise required by law  The  consent of holders of at least two thirds of all outstanding  shares of senior preferred stock is generally required to amend  the terms of the senior preferred stock or to create any class  or series of stock that ranks prior to or on parity with the  senior preferred stock

We are not permitted to redeem the senior preferred stock prior  to the termination of Treasury's funding commitment set forth in  the Purchase Agreement; however, we are permitted to pay down  the liquidation preference of the outstanding shares of  senior preferred stock to the extent of: (a) accrued and unpaid  dividends previously added to the liquidation

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-2800

Table of Contents

preference and not previously paid down; and (b) quarterly commitment fees previously added to the liquidation preference and not previously paid down. In addition, if we issue any shares of capital stock for cash while the senior preferred stock is outstanding, the net proceeds of the issuance must be used to pay down the liquidation preference of the senior preferred stock; however, the liquidation preference of each share of senior preferred stock may not be paid down below $1,000 per share prior to the termination of Treasury's funding commitment Following the termination of Treasury's funding commitment, we may pay down the liquidation preference of all outstanding shares of senior preferred stock at any time, in whole or in part. If, after termination of Treasury's funding commitment, we pay down the liquidation preference of each outstanding share of senior preferred stock in full, the shares will be deemed to have been redeemed as of the payment date

*Issuance of Common Stock Warrant*

The warrant gives Treasury the right to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis on the date of exercise The warrant may be exercised in whole or in part at any time on or before September 7, 2028, by delivery to us of: (a) a notice of exercise; (b) payment of the exercise price of $0 0000 per share; and (c) the warrant If the market price of one share of our common stock is greater than the exercise price, then, instead of paying the exercise price, Treasury may elect to receive shares equal to the value of the warrant (or portion thereof being canceled) pursuant to the formula specified in the warrant. Upon exercise of the warrant, Treasury may assign the right to receive the shares of common stock issuable upon exercise to any other person

As of March 9, 2012, Treasury has not exercised the warrant.

*Covenants Under Treasury Agreements*

The Purchase Agreement and warrant contain covenants that significantly restrict our business activities. For example, as a result of these covenants, we can no longer obtain additional equity financing (other than pursuant to the Purchase Agreement) and we are limited in the amount and type of debt financing we may obtain.

*Purchase Agreement Covenants*

The Purchase Agreement provides that, until the senior preferred stock is repaid or redeemed in full, we may not, without the prior written consent of Treasury:

- declare or pay any dividend (preferred or otherwise) or make any other distribution with respect to any Freddie Mac equity securities (other than with respect to the senior preferred stock or warrant);

- redeem, purchase, retire or otherwise acquire any Freddie Mac equity securities (other than the senior preferred stock or warrant);

- sell or issue any Freddie Mac equity securities (other than the senior preferred stock, the warrant and the common stock issuable upon exercise of the warrant and other than as required by the terms of any binding agreement in effect on the date of the Purchase Agreement);

- terminate the conservatorship (other than in connection with a receivership);

- sell, transfer, lease or otherwise dispose of any assets, other than dispositions for fair market value: (a) to a limited life regulated entity (in the context of a receivership); (b) of assets and properties in the ordinary course of business, consistent with past practice; (c) in connection with our liquidation by a receiver; (d) of cash or cash equivalents for cash or cash equivalents; or (e) to the extent necessary to comply with the covenant described below relating to the reduction of our mortgage related investments portfolio;

- issue any subordinated debt;

- enter into a corporate reorganization, recapitalization, merger, acquisition or similar event; or

- engage in transactions with affiliates unless the transaction is: (a) pursuant to the Purchase Agreement, the senior preferred stock or the warrant; (b) upon arm's length terms; or (c) a transaction undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence on the date of the Purchase Agreement

These covenants also apply to our subsidiaries.

The Purchase Agreement also provides that we may not own mortgage assets with UPB in excess of: (a) $900 billion on December 31, 2009; or (b) on December 3 of each year thereafter, 90% of the aggregate amount of mortgage assets we are permitted to own as of December 3 of the immediately preceding calendar year, provided that we are not

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2801

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

required to own less than $250 billion in mortgage assets  Under the Purchase Agreement, we also may not incur indebtedness  that would result in the par value of our aggregate indebtedness  exceeding  20% of the amount of mortgage assets we are permitted  to own on December 3  of the immediately preceding calendar year  The mortgage asset and indebtedness limitations are  determined without giving effect to the changes to the accounting guidance for transfers of financial assets and  consolidation of VIEs, under which we consolidated our  single family PC trusts and certain of our Other Guarantee  Transactions in our financial statements as of January 1, 20  0

In addition, the Purchase Agreement provides that we may not  enter into any new compensation arrangements or increase amounts  or benefits payable under existing compensation arrangements of  any  named executive officer or other executive officer (as such  terms are defined by SEC rules) without the consent of the  Director of FHFA, in consultation with the Secretary of the  Treasury.

As of March 9, 2012, we believe we were in compliance with  the covenants under the Purchase Agreement

*Warrant Covenants*

The warrant we issued to Treasury includes, among others, the  following covenants: (a) we may not permit any of our  significant subsidiaries to issue capital stock or equity  securities, or securities convertible into or exchangeable for  such securities, or any stock appreciation rights or other  profit participation rights; (b) we may not take any action  to avoid the observance or performance of the terms of the warrant and we must take all actions necessary or appropriate to  protect Treasury's rights against impairment or dilution; and (c) we must provide Treasury with prior notice of specified actions  relating to our common stock, such as setting  a record date for a dividend payment, granting subscription or purchase rights, authorizing a recapitalization, reclassification, merger or similar transaction, commencing a liquidation of the company or any other action that would  trigger an adjustment in the exercise price or number or amount  of shares subject to the warrant

As of March 9, 2012, we believe we were in compliance with  the covenants under the warrant

### Effect of Conservatorship and Treasury Agreements on Existing Stockholders

The conservatorship, the Purchase Agreement and the senior  preferred stock and warrant issued to Treasury have materially  limited the rights of our common and preferred stockholders  (other than Treasury as holder of the senior preferred stock) and  had a number of adverse effects on our common and preferred  stockholders. See "RISK FACTORS      Conservatorship and Related Matters    *The conservatorship and investment by Treasury has had, and will continue to have, a material adverse effect on our common and preferred stockholders.*"

As described above, the conservatorship and Treasury Agreements  also impact our business in ways that indirectly affect our  common and preferred stockholders. By their terms, the Purchase  Agreement, senior preferred stock and warrant will continue to  exist even if we are released from the conservatorship  For a  description of the risks to our business relating to the  conservatorship and Treasury Agreements, see "RISK FACTORS."

## Regulation and Supervision

In addition to our oversight by FHFA as our Conservator, we are  subject to regulation and oversight by FHFA under our charter and the GSE Act, which was modified substantially by the Reform  Act  We are also subject to certain regulation by other government agencies

### Federal Housing Finance Agency

FHFA is an independent agency of the federal government  responsible for oversight of the operations of Freddie Mac,  Fannie Mae and the FHLBs  The Director of FHFA is appointed by  the President and confirmed by the Senate for a five year term,  removable only for cause  In the discussion below, we refer to Freddie Mac and Fannie Mae as the  "enterprises "

The Federal Housing Finance Oversight Board, or the Oversight  Board, is responsible for advising the Director of FHFA with  respect to overall strategies and policies  The Oversight Board  consists of the Director of FHFA as Chairperson, the Secretary of  the Treasury, the Chair of the SEC and the Secretary of HUD.

Under the GSE Act, FHFA has safety and soundness authority that  is comparable to, and in some respects, broader than that of the  federal banking agencies  The GSE Act also provides FHFA with  powers that, even if we were not in conservatorship, include the  authority to raise capital levels above statutory minimum levels,  regulate the size and content of our mortgage related  investments portfolio, and approve new mortgage products

<div align="center">32</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

FHFA is responsible for implementing the various provisions of the GSE Act that were added by the Reform Act  In general, we  remain subject to existing regulations, orders and  determinations until new ones are issued or made

*Receivership*

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are less than our  obligations for a period of 60 days. FHFA has notified us that the measurement period for any mandatory receivership  determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our  quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has also advised us that, if, during that 60 day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the  Director of FHFA will not make a mandatory receivership determination

In addition, we could be put into receivership at the discretion  of the Director of FHFA at any time for other reasons, including  conditions that FHFA has already asserted existed at the time the then Director of FHFA placed us into conservatorship  These include: (a) a substantial dissipation of assets or earnings due to unsafe or unsound practices; (b) the  existence of an unsafe or unsound condition to transact  business; (c) an inability to meet our obligations in the  ordinary course of business; (d) a weakening of our  condition due to unsafe or unsound practices or conditions; (e) critical undercapitalization; (f) the likelihood  of losses that will deplete substantially all of our capital; or  (g) by consent

On June 20, 2011, FHFA published a final rule that addresses conservatorship and receivership operations of Freddie  Mac, Fannie Mae and the FHLBs. The final rule establishes a  framework to be used by FHFA when acting as conservator or receiver, supplementing and clarifying statutory authorities. Among other provisions, the final rule indicates that FHFA will not permit payment of securities litigation claims during conservatorship and that claims by current or former  shareholders arising as a result of their status as shareholders  would receive the lowest priority of claim in receivership  In addition, the final rule indicates that administrative expenses  of the conservatorship will also be deemed to be administrative expenses of a subsequent receivership and that capital  distributions may not be made during conservatorship, except as  specified in the final rule

*Capital Standards*

FHFA has suspended capital classification of us during conservatorship in light of the Purchase Agreement  The existing statutory and FHFA directed regulatory capital requirements  are not binding during the conservatorship  We continue to provide  our submission to FHFA on minimum capital  FHFA continues to publish relevant capital figures (minimum capital requirement,  core capital, and GAAP net worth) but does not publish our critical capital, risk based capital or subordinated debt levels  during conservatorship.

On October 9, 2008, FHFA also announced that it will engage in rulemaking to revise our minimum capital and risk based  capital requirements  The GSE Act provides that FHFA may increase minimum capital levels from the existing statutory  percentages either by regulation or on a temporary basis by order. On March 3, 2011, FHFA issued a final rule setting forth procedures and standards for such a temporary increase in minimum capital levels. FHFA may also, by regulation or order, establish capital or reserve requirements with respect to any  product or activity of an enterprise, as FHFA considers appropriate. In addition, under the GSE Act, FHFA must, by regulation, establish risk based capital requirements to ensure the enterprises operate in a safe and sound manner, maintaining  sufficient capital and reserves to support the risks that arise in their operations and management  In developing the new  risk based capital requirements, FHFA is not bound by the risk based capital standards in effect prior to the amendment of  the GSE Act by the Reform Act

Our regulatory minimum capital is a leverage based measure that  is generally calculated based on GAAP and reflects a 2 50% capital requirement for on balance sheet assets and 0 45% capital requirement for off balance sheet obligations  Pursuant  to regulatory guidance from FHFA, our minimum capital requirement was not automatically affected by our January 1, 2010 adoption of amendments to the accounting guidance for transfers of financial assets and consolidation of  VIEs. Specifically, upon adoption of this accounting guidance,  FHFA directed us, for purposes of minimum capital, to continue  reporting our PCs held by third parties and other aggregate  off balance sheet obligations using a 0 45% capital requirement  Notwithstanding this guidance, FHFA reserves the authority under  the GSE Act to raise the minimum capital requirement for any of our assets or activities

For additional information, see "MD&A      LIQUIDITY AND CAPITAL RESOURCES      Capital Resources" and "NOTE 15: REGULATORY CAPITAL." Also, see "RISK FACTORS      Legal and Regulatory Risks" for more information

<div align="center">33</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## New Products

The GSE Act requires the enterprises to obtain the approval of FHFA before initially offering any product, subject to certain exceptions  The GSE Act provides for a public comment process on requests for approval of new products  FHFA may temporarily approve a product without soliciting public comment if delay would be contrary to the public interest  FHFA may condition approval of a product on specific terms, conditions and limitations  The GSE Act also requires the enterprises to provide FHFA with written notice of any new activity that we or Fannie Mae consider not to be a product

On July 2, 2009, FHFA published an interim final rule on prior approval of new products, implementing the new product provisions for us and Fannie Mae in the GSE Act  The rule establishes a process for Freddie Mac and Fannie Mae to provide  prior notice to the Director of FHFA of a new activity and, if applicable, to obtain prior approval from the Director if the new activity is determined to be a new product  On August 31, 2009, Freddie Mac and Fannie Mae filed joint public comments on the interim final rule with FHFA  FHFA has stated that permitting us to engage in new products is inconsistent with the goals of conservatorship and has instructed us not to submit such requests under the interim final rule. This could have an adverse effect on our business and profitability in future periods. We cannot currently predict when or if FHFA will permit us to engage in new products under the interim final rule, nor when the rule will be finalized

## Affordable Housing Goals

We are subject to annual affordable housing goals  In light of these housing goals, we may make adjustments to our mortgage loan sourcing and purchase strategies, which could further increase our credit losses  These strategies could include entering into some purchase and securitization transactions with lower expected economic returns than our typical transactions  We at times relax some of our underwriting criteria to obtain goal qualifying mortgage loans and make additional investments in higher risk mortgage loan products that we believe are more likely to serve the borrowers targeted by the goals, but have not done so to the same extent since 20 0

If the Director of FHFA finds that we failed to meet a housing goal and that achievement of the housing goal was feasible, the GSE Act states that the Director may require the submission of a housing plan with respect to the housing goal for approval by the Director  The housing plan must describe the actions we would take to achieve the unmet goal in the future  FHFA has the authority to take actions against us, including issuing a cease and desist order or assessing civil money penalties, if we: (a) fail to submit a required housing plan or fail to make a good faith effort to comply with a plan approved by FHFA; or (b) fail to submit certain data relating to our mortgage purchases, information or reports as required by law  See "RISK FACTORS    Legal and Regulatory Risks    *We may make certain changes to our business in an attempt to meet the housing goals and subgoals set for us by FHFA that may increase our losses.*"

Effective beginning calendar year 20 0, the Reform Act requires that FHFA establish, by regulation, four single family housing goals, one multifamily special affordable housing goal and requirements relating to multifamily housing for very low income families  Our housing goals for 2010 and 2011, as established by FHFA, are described below  FHFA has not yet established our housing goals for 2012.

### Affordable Housing Goals for 2010 and 2011 and Results for 2010

On September 14, 2010, FHFA published in the Federal Register a final rule establishing new affordable housing goals for Freddie Mac and Fannie Mae for 2010 and 2011. The final rule was effective on October 14, 2010  The rule establishes four goals and one subgoal for single family owner occupied housing, one multifamily special affordable housing goal, and one multifamily special affordable housing subgoal  Three of the single family housing goals and the subgoal target purchase money mortgages for: (a) low income families; (b) very  ow-income families; and/or (c) families that reside in low income areas  The single family housing goals also include one that targets refinancing mortgages for low income families  The multifamily special affordable housing goal targets multifamily rental housing affordable to low income families  The multifamily special affordable housing subgoal targets multifamily rental housing affordable to very low income families

The single family goals are expressed as a percentage of the total number of eligible mortgages underlying our total single family mortgage purchases. The multifamily goals are expressed in terms of minimum numbers of units financed.

With respect to the single family goals, the rule includes: (a) an assessment of performance as compared to the actual share of the market that meets the criteria for each goal; and (b) a benchmark level to measure performance  Where our performance on a single family goal falls short of the benchmark for a goal, we still could achieve the goal if our performance meets or exceeds the actual share of the market that meets the criteria for the goal for that year  For example, if the actual market share of mortgages to low income families relative to all mortgages originated to finance

<div align="center">34</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

owner occupied single family properties is lower than the 27% benchmark rate, we would still satisfy this goal if we achieve that actual market percentage

The rule makes a number of changes to the previous counting methods for goals credit, including prohibiting housing goals credit for purchases of private label securities However, the rule allows credit under the low income refinance goal for permanent MHA Program loan modifications. The rule also states that FHFA does not intend for the enterprises to undertake economically adverse or high risk activities in support of the goals, nor does it intend for the enterprises' state of conservatorship to be a justification for withdrawing support from these important market segments

Our housing goals for 2010 and 2011 and results for 2010 are set forth in the table below

**Table 5    Affordable Housing Goals for 2010 and 2011 and Results for 2010**

| | Goals for 2010 and 2011 | Market Level for 2010(1) | Results for 2010(2) |
|---|---|---|---|
| S ngle-fam ly pu chase money goals (benchma k levels) | | | |
| Low- ncome | 27% | 27 2% | 26 8% |
| Ve y ow- ncome | 8% | 8 1% | 7 9% |
| Low- ncome a eas(3 | 24% | 24 0% | 23 0% |
| Low- ncome a eas subgoal | 13% | 12 1% | 10 4% |
| S ng e-fam y ef nance ow- ncome goa (benchma k eve ) | 21% | 20 2% | 22 0% |
| Mul fam ly low- ncome goal ( n un s) | 161,250 | N/A | 161,500 |
| Mul fam ly low- ncome subgoal ( n un s) | 21,000 | N/A | 29,656 |

(1) De e m ned by FHFA based on s ana ys s of ma ke da a fo 2010
(2) I  Fe  a y 2012, a  e d ec o of FHFA, we ev sed o  s ngle-fam ly esul s fo 2010 o exclude mo gages unde ly ng ce a n HFA bonds
(3) FHFA w ll annually se  he benchma k level fo  he low- ncome a eas goal based on  he benchma k level fo  he low- ncome eas s  goa , p s a  adj s e  fac o
    eflec ng he add  onal nc emen a sha e of mo gages fo  mode a e- ncome fam es n des gna ed d sas e a eas n  he  os  ecen yea fo wh ch such da a s ava lable
    Fo  2010 and 2011, FHFA se  he bench  a k level fo  he low- ncome a eas goal a  24% fo  bo h pe ods

We previously reported that we did not achieve the benchmark levels for the single family low income areas goal and the related low income areas subgoal for 2010 and that we did achieve the benchmark levels for the single family low income purchase and very low income purchase goals. In February 2012, at the direction of FHFA, we revised our single family results for 20 0 to exclude mortgages underlying certain HFA bonds  FHFA determined that the resulting small shortfalls were not sufficient to require reopening its previous determination that the single family low income purchase and very low income purchase goals had been met  FHFA has informed us that, given that 2010 is the first year under which FHFA utilized the benchmark or market level for the housing goals and that we continue to operate under conservatorship, FHFA will not be requiring housing plans for goals that we did not achieve

We expect to report our performance with respect to the 20    affordable housing goals in March 2012. At this time, based on preliminary information, we believe we met the single family refinance low income goal and both multifamily goals, and believe we failed to meet the FHFA benchmark level for the single family purchase money goals and the subgoal for 2011  In such cases, FHFA regulations allow us to achieve a goal if our qualifying share matches that of the market, as measured by the Home Mortgage Disclosure Act  Because the Home Mortgage Disclosure Act data for 2011 will not be released until September 2012, FHFA will not be able to make a final determination on our performance until that time  If we fail to meet both the FHFA benchmark level and the market level, we may enter into discussions with FHFA concerning whether these goals were infeasible under the terms of the GSE Act, due to market and economic conditions and our financial condition  For more information, see "EXECUTIVE COMPENSATION    Compensation Discussion and Analysis    *Executive Management Compensation Program    Determination of the Performance Based Portion of 2011 Deferred Base Salary.*"

We anticipate that the difficult market conditions and our financial condition will continue to affect our affordable housing activities in 2012  However, we view the purchase of mortgage loans that are eligible to count toward our affordable housing goals to be a principal part of our mission and business and we are committed to facilitating the financing of affordable housing for low  and moderate income families  See also "RISK FACTORS    Legal and Regulatory Risks    *We may make certain changes to our business in an attempt to meet the housing goals and subgoals set for us by FHFA that may increase our losses.*"

*Duty to Serve Underserved Markets*

The GSE Act establishes a duty for Freddie Mac and Fannie Mae to serve three underserved markets (manufactured housing, affordable housing preservation and rural areas) by developing loan products and flexible underwriting guidelines to facilitate a secondary market for mortgages for very low , low  and moderate income families in those markets  Effective for 20 0 and subsequent years, FHFA is required to establish a manner for annually: (a) evaluating whether and

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2805

Table of Contents

to what extent Freddie Mac and Fannie Mae have complied with the duty to serve underserved markets; and (b) rating the extent of compliance

On June 7, 2010, FHFA published in the Federal Register a proposed rule regarding the duty of Freddie Mac and Fannie Mae to serve the underserved markets Comments were due on July 22, 2010 We provided comments on the proposed rule to FHFA, but we cannot predict the contents of any final rule that FHFA may release, or the impact that the final rule will have on our business or operations.

*Affordable Housing Goals and Results for 2009*

Prior to 20 0, we were subject to affordable housing goals related to mortgages for low and moderate income families, low income families living in low income areas, very low income families and families living in defined underserved areas These goals were set as a percentage of the total number of dwelling units underlying our total mortgage purchases The goal relating to low income families living in low income areas and very low income families was referred to as the "special affordable" housing goal. This special affordable housing goal also included a multifamily annual minimum dollar volume target of qualifying multifamily mortgage purchases In addition, from 2005 to 2009, we were subject to three subgoals that were expressed as percentages of the total number of mortgages we purchased that financed the purchase of s ng e-family, owner occupied properties located in metropolitan areas

Our housing goals and results for 2009 are set forth in the table below

**Table 6     Affordable Housing Goals and Results for 2009**[1]

|  | Goal | Results |
|---|---|---|
| Hous ng goa s and ac ua esu s |  |  |
| Low- and mode a e- ncome goa | 43% | 44 7% |
| Unde se ved a eas goa [2] | 32 | 26 8 |
| Spec al affo dable goa [3] | 18 | 17 8 |
| Mul fam ly spec al affo dable volume a ge (n b ons)[2] | $4 60 | $3 69 |
| Ho e p c ase s bgoa s and ac a es s |  |  |
| Low- and mode a e- ncome subgoal | 40% | 48 4% |
| Unde se ved a eas subgoal[3] | 30 | 27 9 |
| Spec al affo dable subgoal | 14 | 20 6 |

(1) An nd v dual mo gage may qual fy fo mo e han one of he goa s o subgoa s Each of he goa and subgoa pe cen ages and each of ou pe cen age esu s s
de e n ned ndependen y and canno be agg ega ed o de e m ne a pe cen age of o al pu chases ha qua f es fo hese goa s o subgoa s
(2) These goals wee de e m ned o be nfeas ble
(3) FHFA co c ded a ac eve e by s of ese goa s a d s goa s was feas e, dec ded o o eq e s o s a hous ng p an

*Affordable Housing Allocations*

The GSE Act requires us to set aside in each fiscal year an amount equal to 4.2 basis points for each dollar of the UPB of total new business purchases, and allocate or transfer such amount to: (a) HUD to fund a Housing Trust Fund established and managed by HUD; and (b) a Capital Magnet Fund established and managed by Treasury. FHFA has the authority to suspend our allocation upon finding that the payment would contribute to our financial instability, cause us to be classified as undercapitalized or prevent us from successfully completing a capital restoration plan In November 2008, FHFA advised us that it has suspended the requirement to set aside or allocate funds for the Housing Trust Fund and the Capital Magnet Fund until further notice

*Prudential Management and Operations Standards*

The GSE Act requires FHFA to establish prudential standards, by regulation or by guideline, for a broad range of operations of the enterprises. These standards must address internal controls, information systems, independence and adequacy of internal audit systems, management of interest rate risk exposure, management of market risk, liquidity and reserves, management of asset and investment portfolio growth, overall risk management processes, investments and asset acquisitions, management of credit and counterparty risk, and recordkeeping FHFA may also establish any additional operational and management standards the Director of FHFA determines appropriate

On June 20, 2011, FHFA published a proposed rule that would establish prudential standards, in the form of guidelines, relating to the management and operations of Freddie Mac, Fannie Mae, and the FHLBs This proposed rule implements certain Reform Act amendments to the GSE Act. The proposed standards address a number of business, controls, and risk management areas. The standards specify the possible consequences for any entity that fails to meet any of the standards or otherwise fails to comply (including submission of a corrective plan, limits on asset growth, increases in capital, limits on dividends and stock redemptions or repurchases, a minimum level of retained earnings or any other action that the FHFA Director determines will contribute to bringing the entity into compliance with the standards). In

TREASURY-2806

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

addition, a failure to meet any standard also may constitute an unsafe or unsound practice, which may form the basis for FHFA initiating an administrative enforcement action  Because FHFA proposes to adopt the standards as guidelines, as authorized by the Reform Act, FHFA may modify, revoke or add to the standards at any time by order

### Portfolio Activities

The GSE Act requires FHFA to establish, by regulation, criteria governing portfolio holdings to ensure the holdings are backed by sufficient capital and consistent with the enterprises' mission and safe and sound operations. In establishing these criteria, FHFA must consider the ability of the enterprises to provide a liquid secondary market through securitization activities, the portfolio holdings in relation to the mortgage market and the enterprises' compliance with the prudential management and operations standards prescribed by FHFA.

On December 28, 2010, FHFA issued a final rule adopting the portfolio holdings criteria established in the Purchase Agreement, as it may be amended from time to time, for so long as we remain subject to the Purchase Agreement

See "Conservatorship and Related Matters    *Impact of Conservatorship and Related Activities on Our Business*" for additional information on restrictions to our portfolio activities

### Anti Predatory Lending

Predatory lending practices are in direct opposition to our mission, our goals and our practices. We have instituted anti predatory lending policies intended to prevent the purchase or assignment of mortgage loans with unacceptable terms or conditions or resulting from unacceptable practices. These policies include processes related to the delivery and validation of loans sold to us. In addition to the purchase policies we have instituted, we promote consumer education and financial literacy efforts to help borrowers avoid abusive lending practices and we provide competitive mortgage products to reputable mortgage originators so that borrowers have a greater choice of financing options

### Subordinated Debt

FHFA directed us to continue to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital levels. As a result, the terms of any of our subordinated debt that provide for us to defer payments of interest under certain circumstances, including our failure to maintain specified capital levels, are no longer applicable  In addition, the requirements in the agreement we entered into with FHFA in September 2005 with respect to issuance, maintenance, and reporting and disclosure of Freddie Mac subordinated debt have been suspended during the term of conservatorship and thereafter until directed otherwise  See "NOTE 15: REGULATORY CAPITAL Subordinated Debt Commitment" for more information regarding subordinated debt

## Department of Housing and Urban Development

HUD has regulatory authority over Freddie Mac with respect to fair lending  Our mortgage purchase activities are subject to federal anti discrimination laws. In addition, the GSE Act prohibits discriminatory practices in our mortgage purchase activities, requires us to submit data to HUD to assist in its fair lending investigations of primary market lenders with which we do business and requires us to undertake remedial actions against such lenders found to have engaged in discriminatory lending practices  In addition, HUD periodically reviews and comments on our underwriting and appraisal guidelines for consistency with the Fair Housing Act and the anti discrimination provisions of the GSE Act.

## Department of the Treasury

Treasury has significant rights and powers with respect to our company as a result of the Purchase Agreement  In addition, under our charter, the Secretary of the Treasury has approval authority over our issuances of notes, debentures and substantially identical types of unsecured debt obligations (including the interest rates and maturities of these securities), as well as new types of mortgage related securities issued subsequent to the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989  The Secretary of the Treasury has performed this debt securities approval function by coordinating GSE debt offerings with Treasury funding activities. In addition, our charter authorizes Treasury to purchase Freddie Mac debt obligations not exceeding $2.25 billion in aggregate principal amount at any time.

The Reform Act granted the Secretary of the Treasury authority to purchase any obligations and securities issued by us and Fannie Mae until December 31, 2009 on such terms and conditions and in such amounts as the Secretary may determine, provided that the Secretary determined the purchases were necessary to provide stability to the financial markets, prevent disruptions in the availability of mortgage finance, and protect taxpayers  See "Conservatorship and Related Matters    *Treasury Agreements*."

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Securities and Exchange Commission

We are subject to the financial reporting requirements applicable to registrants under the Exchange Act, including the requirement to file with the SEC annual reports on Form 10 K, quarterly reports on Form 0 Q and current reports on Form 8 K. Although our common stock is required to be registered under the Exchange Act, we continue to be exempt from certain federal securities law requirements, including the following:

- Securities we issue or guarantee are "exempted securities" under the Securities Act and may be sold without registration under the Securities Act;

- We are excluded from the definitions of "government securities broker" and "government securities dealer" under the Exchange Act;

- The Trust Indenture Act of 1939 does not apply to securities issued by us; and

- We are exempt from the Investment Company Act of 940 and the Investment Advisers Act of 1940, as we are an "agency, authority or instrumentality" of the U.S. for purposes of such Acts.

### Legislative and Regulatory Developments

We discuss certain significant legislative and regulatory developments below  For more information regarding these and other legislative and regulatory developments that could impact our business, see "RISK FACTORS     Conservatorship and Related Matters" and "    Legal and Regulatory Risks "

#### Administration Report on Reforming the U.S. Housing Finance Market

On February 11, 2011, the Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long term role in a housing finance system in which the private sector is the dominant provider of mortgage credit  The report recommends  winding down Freddie Mac and Fannie Mae, stating that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the  market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market

The report states that the government is committed to ensuring  that Freddie Mac and Fannie Mae have sufficient capital to  perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further  states that the Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac  and Fannie Mae to honor their obligations  The report states the Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there  is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the  Administration's plan.

The report identifies a number of policy levers that could be  used to wind down Freddie Mac and Fannie Mae, shrink the  government's footprint in housing finance, and help bring  private capital back to the mortgage market, including  increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down  Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements  These recommendations, if implemented, would have a material  impact on our business volumes, market share, results of  operations and financial condition

As discussed below in "*Legislated Increase to Guarantee Fees*," we have recently been directed by FHFA to raise our guarantee fees  We cannot currently predict the extent to  which our business will be impacted by this increase in  guarantee fees  In addition, as discussed below in "Conforming Loan Limits," the temporary high cost area  loan limits expired on September 30, 20

We cannot predict the extent to which the other recommendations in the report will be implemented or when any actions to  implement them may be taken  However, we are not aware of any  current plans of our Conservator to significantly change our  business model or capital structure in the near term

#### FHFA'sStrategic Plan for Freddie Mac and Fannie Mae Conservatorships

On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the conservatorships of Freddie Mac  and Fannie Mae  The plan sets forth objectives and steps FHFA is taking or will take to meet FHFA's obligations as Conservator  FHFA states that the steps envisioned in the plan are consistent with each of the housing finance reform  frameworks set forth in the report delivered by the  Administration to Congress in February 2011, as well as with the  leading congressional proposals introduced to date  FHFA indicates that the plan leaves open all options for Congress and

38

*Freddie Mac*

TREASURY-2808

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

the Administration regarding the resolution of the conservatorships and the degree of government involvement in supporting the secondary mortgage market in the future

FHFA's plan provides lawmakers and the public with an outline of how FHFA as Conservator intends to guide Freddie Mac and Fannie Mae over the next few years, and identifies three strategic goals:

- **Build.** Build a new infrastructure for the secondary mortgage market;

- **Contract.** Gradually contract Freddie Mac and Fannie Mae's dominant presence in the marketplace while simplifying and shrinking their operations; and

- **Maintain.** Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages

The first of these goals establishes the steps FHFA, Freddie Mac, and Fannie Mae will take to create the necessary infrastructure, including a securitization platform and national standards for mortgage securitization, that Congress and market participants may use to develop the secondary mortgage market of the future As part of this process, FHFA would determine how Freddie Mac and Fannie Mae can work together to build a single securitization platform that would replace their current separate proprietary systems.

The second goal describes steps that FHFA plans to take to gradually shift mortgage credit risk from Freddie Mac and Fannie Mae to private investors and eliminate the direct funding of mortgages by the enterprises The plan states that the goal of gradually shifting mortgage credit risk from Freddie Mac and Fannie Mae to private investors could be accomplished, in the case of single family credit guarantees, in several ways, including increasing guarantee fees, establishing loss sharing arrangements and expanding reliance on mortgage insurance To evaluate how to accomplish the goal of contracting enterprise operations in the multifamily business, the plan states that Freddie Mac and Fannie Mae will each undertake a market analysis of the viability of its respective multifamily operations without government guarantees

For the third goal, the plan states that programs and strategies to ensure ongoing mortgage credit availability, assist troubled homeowners, and minimize taxpayer losses while restoring stability to housing markets continue to require energy, focus, and resources. The plan states that activities that must be continued and enhanced include: (a) successful implementation of HARP, including the significant program changes announced in October 2011; (b) continued implementation of the Servicing Alignment Initiative; (c) renewed focus on short sales, deeds in lieu, and deeds for lease options that enable households and Freddie Mac and Fannie Mae to avoid foreclosure; and (d) further development and implementation of the REO disposition initiative announced by FHFA in 2011.

_Legislated Increase to Guarantee Fees_

On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than 0 basis points above the average guarantee fees charged in 2011 on single family mortgage backed securities Under the law, the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by the companies.

FHFA has announced that, effective April 1, 2012, the guarantee fee on all single family residential mortgages sold to Freddie Mac and Fannie Mae will increase by 10 basis points In early 2012, FHFA will further analyze whether additional guarantee fee increases are necessary to ensure the new requirements are being met If so, FHFA will announce plans for further guarantee fee increases or other fee adjustments that may then be implemented gradually over a two year implementation window, taking into consideration risk levels and conditions in financial markets FHFA will monitor closely the increased guarantee fees imposed as a result of the new law throughout its effective period

Our business and financial condition will not benefit from the increases in guarantee fees under this law, as we must remit the proceeds from such increases to Treasury. It is currently unclear what effect this increase or any further guarantee fee increases or other fee adjustments associated with this law will have on the future profitability and operations of our single family guarantee business, or on our ability to raise guarantee fees that may be retained by us While we continue to assess the impact of this law, we currently believe that implementation of this law will present operational and accounting challenges for us

_Legislation Related to Reforming Freddie Mac and Fannie Mae_

Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near term Congress continues to hold hearings and consider legislation on the future state of Freddie Mac and Fannie Mae. On February 2, 2012, the Administration announced that it expects to provide more

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2809

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

detail concerning approaches to reform the U S housing finance market in the spring, and that it plans to begin exploring options for legislation more intensively with Congress

Several bills were introduced in Congress in 2011 that would comprehensively reform the secondary mortgage market and address the future state of Freddie Mac and Fannie Mae None of the bills have been scheduled for further consideration in the Senate In the House, several of these bills were approved by the House Financial Services Subcommittee on Capital Markets and Government Sponsored Enterprises Most recently, this subcommittee approved a bill in December 2011 that would reform the secondary mortgage market by facilitating continued standardization and uniformity in mortgage securitization. Under several of the bills, our charter would be revoked and we would be wound down or placed into receivership Such legislation could impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent an explicit guarantee of our existing and ongoing liabilities by the U S government

The House Financial Services Subcommittee on Capital Markets and Government Sponsored Enterprises approved a number of other bills in 2011 that would limit the companies' operations or alter FHFA or Treasury's authority over the companies, including bills that would require advance approval by the Secretary of the Treasury and notice to Congress for all debt issuances by the companies; require FHFA to direct the companies to increase guarantee fees; repeal our affordable housing goals; prohibit the companies from initially offering new products during conservatorship or receivership; accelerate reductions in our mortgage related investments portfolio; require that Freddie Mac and Fannie Mae mortgages be treated as other mortgages for purposes of risk retention requirements in the Dodd Frank Act; grant the FHFA Inspector General direct access to our records and employees; authorize FHFA, as receiver, to revoke the charters of Freddie Mac and Fannie Mae; prevent Treasury from lowering the dividend payment under the Purchase Agreement; abolish the Affordable Housing Trust Fund, the Capital Magnet Fund, and the HOPE Reserve Fund; require disposition of non mission critical assets; apply the Freedom of Information Act to Freddie Mac and Fannie Mae; and set a cap on the funds received under the Purchase Agreement

In 20  , the Financial Services Committee of the House of Representatives approved a bill that would generally put our employees on the federal government pay scale, and in 2012 both the House and the Senate approved legislation that would prohibit senior executives from receiving bonuses during conservatorship In February 2012, legislative proposals were introduced in the Senate that would, among other items, cap the compensation and benefits of executive officers and employees of Freddie Mac and Fannie Mae so they cannot exceed the amounts paid to the highest compensated executive or employee at the federal financial institution regulatory agencies; and require executive officers, under certain circumstances, to return to Treasury any compensation earned that exceeds the regulatory agencies' rate of compensation If this or similar legislation were to become law, many of our employees would experience a sudden and sharp decrease in compensation The Acting Director of FHFA stated on November 15, 2011 that this "would certainly risk a substantial exodus of talent, the best leaving first in many instances. [Freddie Mac and Fannie Mae] likely would suffer a rapidly growing vacancy list and replacements with lesser skills and no experience in their specific jobs. A significant increase in safety and soundness risks and in costly operational failures would, in my opinion, be highly likely " The Acting Director noted that "[s]hould the risks I fear materialize, FHFA might well be forced to limit [Freddie Mac and Fannie Mae's] business activities Some of the business [Freddie Mac and Fannie Mae] would be unable to undertake might simply not occur, with potential disruption in housing markets and the economy."

Some of the bills discussed above, if enacted, would materially affect the role of the company, our business model and our structure, and could have an adverse effect on our financial results and operations as well as our ability to retain and recruit management and other valuable employees A number of the bills would adversely affect our ability to conduct business under our current business model, including by subjecting us to new requirements that could increase costs, reduce revenues and limit or prohibit current business activities.

We cannot predict whether or when any of the bills discussed above might be enacted We also expect additional bills relating to Freddie Mac and Fannie Mae to be introduced and considered by Congress in 2012.

For more information on the potential impacts of legislative developments on compensation and employee retention, see "RISK FACTORS Conservatorship and Related Matters *The conservatorship and uncertainty concerning our future has had, and will likely continue to have, an adverse effect on the retention, recruitment and engagement of management and other employees, which could have a material adverse effect on our ability to operate our business*" and "MD&A RISK MANAGEMENT Operational Risks."

<div align="center">40</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### *Dodd Frank Act*

The Dodd Frank Act, which was signed into law on July 21, 2010, significantly changed the regulation of the financial services industry, including by creating new standards related to regulatory oversight of systemically important financial companies, derivatives, capital requirements, asset backed securitization, mortgage underwriting, and consumer financial protection  The Dodd Frank Act has directly affected and will continue to directly affect the business and operations of Freddie Mac by subjecting us to new and additional regulatory oversight and standards, including with respect to our activities and products. We may also be affected by provisions of the Dodd Frank Act and implementing regulations that affect the activities of banks, savings institutions, insurance companies, securities dealers, and other regulated entities that are our customers and counterparties

Implementation of the Dodd Frank Act is being accomplished through numerous rulemakings, many of which are still in process. Accordingly, it is difficult to assess fully the impact of the Dodd Frank Act on Freddie Mac and the financial services industry at this time. The final effects of the legislation will not be known with certainty until these rulemakings are complete  The Dodd Frank Act also mandates the preparation of studies on a wide range of issues, which could lead to additional legislation or regulatory changes

Recent developments with respect to Dodd Frank rulemakings that may have a significant impact on Freddie Mac include the following:

- Designation as a systemically important nonbank financial company      The Financial Stability Oversight Council, or FSOC, is expected to announce during 2012 which nonbank financial companies are systemically important  The Federal Reserve has recently proposed rules to implement the enhanced supervisory and prudential requirements that would apply to designated nonbank financial companies. The proposal includes rules to implement Dodd Frank requirements related to risk based capital and leverage, liquidity, single counterparty credit limits, overall risk management and risk committees, stress tests, and debt to equity limits for certain covered companies  The proposed rules also would implement Dodd Frank requirements related to early remediation of financial distress of a designated nonbank financial company. In addition, a recently adopted final rule requires designated nonbank financial companies to submit annual resolution plans that describe the company's strategy for rapid and orderly resolution in bankruptcy during times of financial distress. If Freddie Mac is designated as a systemically important nonbank financial company, we could be subject to these and other additional oversight and prudential standards.

- Derivatives Rulemakings     The U.S. Commodity Futures Trading Commission, or CFTC, has promulgated a number of final rules implementing the Dodd Frank Act's provisions relating to derivatives  However, the CFTC has yet to finalize many of the more significant derivative related rules, including rules addressing the definition of "major swap participant" and margin requirements for uncleared swaps. The Dodd Frank Act imposes certain new requirements on all swaps counterparties, including requirements addressing recordkeeping and reporting  If Freddie Mac qualifies as a major swap participant, it will be subject to increased and additional requirements, such as those relating to registration and business conduct. The eventual final rules on margin might increase the costs of our swaps transactions  According to the CFTC's tentative schedule, the CFTC expects to finalize the major swap participant definition rule in the first quarter of 2012, but it does not expect to consider final rules on margin (and numerous other topics) until later in 2012.

We continue to review and assess the impact of rulemakings and other activities under the Dodd Frank Act  For more information, see "RISK FACTORS     Legal and Regulatory Risks    *The Dodd Frank Act and related regulation may adversely affect our business activities and financial results.*"

### *Conforming Loan Limits*

Beginning in 2008, pursuant to a series of laws, our loan limits in certain high cost areas were increased temporarily above the limits that otherwise would be applicable (up to $729,750 for a one family residence)  On September 30, 20    , the latest of these increases was permitted to expire  Accordingly, our permanent high cost area loan limits apply with respect to loans originated on or after October 1, 2011 in high cost areas (currently, up to $625,500 for a one family residence). A new law reinstated higher conforming loan limits for FHA insured mo tgages through 20 3  However, these reinstated higher limits do not apply to Freddie Mac and Fannie Mae

### *Developments Concerning Single Family Servicing Practices*

There have been a number of regulatory developments in recent periods impacting single family mortgage servicing and foreclosure practices, including those discussed below. It is possible that these developments will result in significant changes to mortgage servicing and foreclosure practices that could adversely affect our business  New compliance

<div style="text-align:center">4</div>

<div style="text-align:right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

requirements placed on servicers as a result of these developments could expose Freddie Mac to financial risk as a result of further extensions of foreclosure timelines if home prices remain weak or decline We may need to make additional significant changes to our practices, which could increase our operational risk It is difficult to predict other impacts on our business of these changes, though such changes could adversely affect our credit losses and costs of servicing, and make it more difficult for us to transfer mortgage servicing rights to a successor servicer should we need to do so The regulatory developments and changes include the following:

- On April 13, 2011, the OCC, the Federal Reserve, the FDIC, and the Office of Thrift Supervision entered into consent orders with 14 large servicers regarding their foreclosure and loss mitigation practices These institutions service the majority of the single family mortgages we own or guarantee The consent orders required the servicers to submit comprehensive action plans relating to, among other items, use of foreclosure documentation, staffing of foreclosure and loss mitigation activities, oversight of third parties, use of the Mortgage Electronic Registration System, or the MERS System, and communications with borrowers We will not be able to assess the impact of these actions on our business until the servicers' comprehensive action plans are publicly available

- On April 28, 2011, FHFA announced a new set of aligned standards for servicing delinquent mortgages owned or guaranteed by Freddie Mac and Fannie Mae We implemented most aspects of this initiative effective October 1, 2011 We have also implemented a new standard modification initiative that replaced our previous non HAMP modification program beginning January 1, 2012. See "MD&A    RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Single Family Mortgage Credit Risk    Single Family Loan Workouts and the MHA Program* " FHFA has also directed us and Fannie Mae to work on a joint initiative to consider alternatives for future mortgage servicing structures and servicing compensation The development of further alternatives could impact our ability to conduct current initiatives For more information, see "RISK FACTORS    Legal and Regulatory Risks    *Legislative or regulatory actions could adversely affect our business activities and financial results*."

- On June 30, 2011, the OCC issued Supervisory Guidance regarding the OCC's expectations for the oversight and management of mortgage foreclosure activities by national banks The Supervisory Guidance contains several elements from the consent orders with the 14 major servicers that will now be applied to all national banks. In the Supervisory Guidance, the OCC directed all national banks to conduct a self assessment of foreclosure management practices by September 30, 2011 Additionally, the Guidance sets forth foreclosure management standards that mirror the broad categories of the servicing guidelines contained in the consent orders

- On October 19, 2011, FHFA announced that it has directed Freddie Mac and Fannie Mae to transition away from current foreclosure attorney network programs and move to a system where mortgage servicers select qualified law firms that meet certain minimum, uniform criteria The changes will be implemented after a transition period in which input will be taken from servicers, regulators, lawyers, and other market participants. We cannot predict the scope or timing of these changes, or the extent to which our business will be impacted by them

- Several localities have adopted ordinances that would expand the responsibilities and liability for registering and maintaining vacant properties to servicers and assignees These laws could significantly expand mortgage costs and liabilities in those areas. On December 8, 2011, FHFA directed Freddie Mac and Fannie Mae to take certain actions with respect to a municipal ordinance of the City of Chicago, and, on December 12, 2011, FHFA, on its own behalf and as conservator for Freddie Mac and Fannie Mae, filed a lawsuit against the City of Chicago to prevent enforcement of the ordinance

- On February 9, 2012, a coalition of state attorneys general and federal agencies announced that it had entered into a settlement with five large seller/servicers concerning certain issues related to mortgage servicing practices While the settlement includes changes to mortgage servicing practices, it is too early to determine if these changes will have a significant effect on us The settlement does not involve loans owned or guaranteed by us

For more information on operational risks related to these developments in mortgage servicing, see "MD&A    RISK MANAGEMENT    Operational Risks."

### *Administration Plan to Help Responsible Homeowners and Heal the Housing Market*

In his January 24, 2012 State of the Union Address, President Obama called for action to help responsible borrowers and support a housing market recovery. The Administration subsequently put forth a "Plan to Help Responsible Homeowners and Heal the Housing Market " We have implemented, or are in the process of implementing, several aspects of the Administration's plan, such as the changes to HAMP discussed in "MD&A    RISK MANAGEMENT    Credit

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2812

Table of Contents

Risk    *Mortgage Credit Risk    Single Family Loan Workouts and the MHA Program    Home Affordable Modification Program* " A number of other aspects of the plan could affect Freddie Mac, including those discussed below

The plan calls for Congress to pass legislation to establish a broad based mortgage refinancing plan. The broad based refinancing plan includes provisions to further streamline the refinancing process for borrowers with loans guaranteed by Freddie Mac and Fannie Mae It would also provide underwater borrowers who participate in HARP with the choice of taking the benefit of the reduced interest rate in the form of lower monthly payments, or applying that savings to rebuilding equity in their homes The plan would require us to change certain existing processes and could increase our costs. To date, no legislation has been introduced in Congress with respect to this plan.

The plan states that the mortgage servicing system would benefit from a single set of strong federal standards, and indicates that the Administration will work closely with regulators, Congress and stakeholders to create a more robust and comprehensive set of rules related to mortgage servicing These rules would include standards for assisting at risk homeowners.

## Employees

At February 27, 2012, we had 4,859 full time and 62 part time employees Our principal offices are located in McLean, Virginia.

## Available Information

### SEC Reports

We file reports and other information with the SEC In view of the Conservator's succession to all of the voting power of our stockholders, we have not prepared or provided proxy statements for the solicitation of proxies from stockholders since we entered into conservatorship, and do not expect to do so while we remain in conservatorship We make available free of charge through our website at www freddiemac com our annual reports on Form 10 K, quarterly reports on Form 10 Q, current reports on Form 8 K, and all other SEC reports and amendments to those reports as soon as reasonably practicable after we electronically file the material with, or furnish it to, the SEC. In addition, materials that we filed with the SEC are available for review and copying at the SEC's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at    800 SEC 0330  The SEC also maintains an internet site (www sec gov) that contains reports, proxy and information statements, and other information regarding companies that file electronically with the SEC.

We are providing our website addresses and the website address of the SEC here or elsewhere in this annual report on Form  0 K solely for your information  Information appearing on our website or on the SEC's website is not incorporated into this annual report on Form 10 K

### Information about Certain Securities Issuances by Freddie Mac

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off balance sheet arrangement. The disclosure must be made in a current report on Form 8 K under Item 2 03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC

Freddie Mac's securities offerings are exempted from SEC registration requirements  As a result, we are not required to and do not file registration statements or prospectuses with the SEC with respect to our securities offerings  To comply with the disclosure requirements of Form 8 K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars (or supplements thereto) that we post on our website or in a current report on Form 8 K, in accordance with a "no action" letter we received from the SEC staff. In cases where the information is disclosed in an offering circular posted on our website, the document will be posted on our website within the same time period that a prospectus for a non exempt securities offering would be required to be filed with the SEC.

The website address for disclosure about our debt securities is  www.freddiemac.com/debt. From this address, investors can access the offering circular and related supplements for debt securities offerings under Freddie Mac's global debt facility, including pricing supplements for individual issuances of debt securities

Disclosure about the mortgage related securities we issue, some of which are off balance sheet obligations, can be found at www.freddiemac.com/mbs. From this address, investors can access information and documents about our mortgage related securities, including offering circulars and related offering circular supplements.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2813

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Forward Looking Statements**

We regularly communicate information concerning our business activities to investors, the news media, securities analysts, and others as part of our normal operations  Some of these  communications, including this Form 10 K, contain "forward looking statements," including statements pertaining to the conservatorship, our current  expectations and objectives for our efforts under the MHA Program, the servicing alignment initiative and other programs  to assist the U.S. residential mortgage market, future  business plans, liquidity, capital management, economic and market conditions and trends, market share, the effect  of legislative and regulatory developments, implementation of new accounting guidance, credit losses, internal control remediation  efforts, and results of operations and financial condition on a  GAAP, Segment Earnings, and fair value basis. Forward looking  statements involve known and unknown risks and uncertainties,  some of which are beyond our control  Forward looking statements  are often accompanied by, and identified with, terms such as  "objective," "expect," "trend," "forecast," "anticipate," "believe," "intend," "could," "future," "may," "will," and similar phrases. These statements are not historical facts, but  rather represent our expectations based on current information,  plans, judgments, assumptions, estimates, and projections.  Actual results may differ significantly from those described in  or implied by such forward looking statements due to various  factors and uncertainties, including those described in the "RISK FACTORS" section of this Form  0 K and:

- the actions FHFA, Treasury, the Federal Reserve, the SEC, HUD, the Administration, Congress, and our management may take;

- the impact of the restrictions and other terms of the  conservatorship, the Purchase Agreement, the senior preferred stock, and the warrant on our business, including our ability to pay: (a) the dividend on the senior preferred stock; and  (b) any quarterly commitment fee that we are required to pay to Treasury under the Purchase Agreement;

- our ability to maintain adequate liquidity to fund our  operations, including following any changes in the support  provided to us by Treasury or FHFA, a change in the credit ratings of our debt securities or a change in the credit rating  of the U S  government;

- changes in our charter or applicable legislative or regulatory  requirements, including any restructuring or reorganization in  the form of our company, whether we will remain a stockholder owned company or continue to exist and whether we  will be wound down or placed under receivership, regulations  under the GSE Act, the Reform Act, or the Dodd Frank Act, regulatory or legislative actions taken to implement the Administration's plan to reform the housing finance system, regulatory or legislative actions that require us to support non mortgage market initiatives, changes to affordable housing  goals regulation, reinstatement of regulatory capital  requirements, or the exercise or assertion of additional  regulatory or administrative authority;

- changes in the regulation of the mortgage and financial services  industries, including changes caused by the Dodd Frank Act, or  any other legislative, regulatory, or judicial action at the  federal or state level;

- enforcement actions against mortgage servicers and other  mortgage industry participants by federal or state authorities;

- the scope of various initiatives designed to help in the housing  recovery (including the extent to which borrowers participate in  the recently expanded HARP program, the MHA Program and new non  HAMP standard loan modification initiative), and the impact  of such programs on our credit losses, expenses, and the size  and composition of our mortgage related investments portfolio;

- the impact of any deficiencies in foreclosure documentation  practices and related delays in the foreclosure process;

- the ability of our financial, accounting, data processing, and  other operating systems or infrastructure, and those of our  vendors to process the complexity and volume of our transactions;

- changes in accounting or tax guidance or in our accounting  policies or estimates, and our ability to effectively implement  any such changes in guidance, policies, or estimates;

- changes in general regional, national, or international  economic, business, or market conditions and competitive  pressures, including changes in employment rates and interest  rates, and changes in the federal government's fiscal and  monetary policy;

- changes in the U S  residential mortgage market, including  changes in the rate of growth in total outstanding  U S  residential mortgage debt, the size of the U.S. residential mortgage market, and home prices;

- our ability to effectively implement our business strategies,  including our efforts to improve the supply and liquidity of,  and demand for, our products, and restrictions on our ability to  offer new products or engage in new activities;

TREASURY-2814

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- our ability to recruit, retain, and engage executive officers and other key employees;

- our ability to effectively identify and manage credit, interest rate, operational, and other risks in our business, including changes to the credit environment and the levels and volatilities of interest rates, as well as the shape and slope of the yield curves;

- the effects of internal control deficiencies and our ability to effectively identify, assess, evaluate, manage, mitigate, or remediate control deficiencies and risks, including material weaknesses and significant deficiencies, in our internal control over financial reporting and disclosure controls and procedures;

- incomplete or inaccurate information provided by customers and counterparties;

- consolidation among, or adverse changes in the financial condition of, our customers and counterparties;

- the failure of our customers and counterparties to fulfill their obligations to us, including the failure of seller/servicers to meet their obligations to repurchase loans sold to us in breach of their representations and warranties, and the potential cost and difficulty of legally enforcing those obligations;

- changes in our judgments, assumptions, forecasts, or estimates regarding the volume of our business and spreads we expect to earn;

- the availability of options, interest rate and currency swaps, and other derivative financial instruments of the types and quantities, on acceptable terms, and with acceptable counterparties needed for investment funding and risk management purposes;

- changes in pricing, valuation or other methodologies, models, assumptions, judgments, estimates and/or other measurement techniques, or their respective reliability;

- changes in mortgage to debt OAS;

- the potential impact on the market for our securities resulting from any purchases or sales by the Federal Reserve or Treasury of Freddie Mac debt or mortgage related securities;

- adverse judgments or settlements in connection with legal proceedings, governmental investigations, and IRS examinations;

- volatility of reported results due to changes in the fair value of certain instruments or assets;

- the development of different types of mortgage servicing structures and servicing compensation;

- preferences of originators in selling into the secondary mortgage market;

- changes to our underwriting or servicing requirements (including servicing alignment efforts under the servicing alignment initiative), our practices with respect to the disposition of REO properties, or investment standards for mortgage related products;

- investor preferences for mortgage loans and mortgage related and debt securities compared to other investments;

- borrower preferences for fixed rate mortgages versus ARMs;

- the occurrence of a major natural or other disaster in geographic areas in which our offices or portions of our total mortgage portfolio are concentrated;

- other factors and assumptions described in this Form 10 K, including in the "MD&A" section;

- our assumptions and estimates regarding the foregoing and our ability to anticipate the foregoing factors and their impacts; and

- market reactions to the foregoing

Forward looking statements speak only as of the date they are made, and we undertake no obligation to update any forward looking statements we make to reflect events or circumstances occurring after the date of this Form 10 K

## ITEM 1A. RISK FACTORS

Investing in our securities involves risks, including the risks described below and in "BUSINESS," "MD&A," and elsewhere in this Form 10 K  These risks and uncertainties could, directly or indirectly, adversely affect our business, financial condition, results of operations, cash flows, strategies and/or prospects.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2815

Table of Contents

**Conservatorship and Related Matters**

*The future status and role of Freddie Mac is uncertain and could be materially adversely affected by legislative and regulatory action that alters the ownership, structure, and mission of the company.*

The Acting Director of FHFA stated on November 15, 2011 that "the long term outlook is that neither [Freddie Mac nor Fannie Mae] will continue to exist, at least in its current form, in the future " Future legislation will likely materially affect the role of the company, our business model, our structure, and future results of operations. Some or all of our functions could be transferred to other institutions, and we could cease to exist as a stockholder owned company at all  If any of these events were to occur, our shares could further diminish in value, or cease to have any value, and there can be no assurance that our stockholders would receive any compensation for such loss in value.

On February 11, 2011, the Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long term role in a housing finance system in which the private sector is the dominant provider of mortgage credit  The report recommends winding down Freddie Mac and Fannie Mae, stating that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements

A number of bills were introduced in the Senate and House in  20    concerning the future state of Freddie Mac and Fannie Mae  Several of these bills take a comprehensive approach that would wind down Freddie Mac and Fannie Mae (or completely restructure the companies), while other bills would revise the companies' operations in a limited manner  Congress also held hearings related to the long term future of housing finance, including the role of Freddie Mac and Fannie Mae  We expect additional legislation relating to Freddie Mac and Fannie Mae to be introduced and considered by Congress; however, we cannot predict whether or when any such legislation will be enacted. On February 2, 2012, the Administration announced that it expects to provide more detail concerning approaches to reform the U.S. housing finance market in the spring, and that it plans to begin exploring options for legislation more intensively with Congress. On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the conservatorship of Freddie Mac and Fannie Mae

For more information on the Administration's February 2011 report, GSE reform legislation, and FHFA's strategic plan, see "BUSINESS     Regulation and Supervision     *Legislative and Regulatory Developments*."

In addition to legislative actions, FHFA has expansive regulatory authority over us, and the manner in which FHFA will use its authority in the future is unclear  FHFA could take a number of regulatory actions that could materially adversely affect our company, such as changing or reinstating our current capital requirements, which are not binding during conservatorship, or imposing additional restrictions on our portfolio activities or new initiatives

*The conservatorship is indefinite in duration and the timing, conditions, and likelihood of our emerging from conservatorship are uncertain. Even if the conservatorship is terminated, we would remain subject to the Purchase Agreement, senior preferred stock, and warrant.*

FHFA has stated that there is no exact time frame as to when the conservatorship may end. Termination of the conservatorship (other than in connection with receivership) also requires Treasury's consent under the Purchase Agreement  There can be no assurance as to when, and under what circumstances, Treasury would give such consent. There is also significant uncertainty as to what changes may occur to our business structure during or following our conservatorship, including whether we will continue to exist  It is possible that the conservatorship will end with us being placed into receivership  The Acting Director of FHFA stated on September 19, 2011 that "it ought to be clear to everyone as this point, given [Freddie Mac and Fannie Mae's] losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that [Freddie Mac and Fannie Mae] will not be able to earn their way back to a condition that allows them to emerge from conservatorship."

In addition, Treasury has the ability to acquire almost 80% of our common stock for nominal consideration by exercising the warrant we issued to it pursuant to the Purchase Agreement  Consequently, the company could effectively remain under the control of the U S  government even if the conservatorship was ended and the voting rights of common stockholders restored  The warrant held by Treasury, the restrictions on our business contained in the Purchase Agreement, and the senior status of the senior preferred stock issued to Treasury under the Purchase Agreement, if the senior

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

preferred stock has not been redeemed, also could adversely affect our ability to attract new private sector capital in the future should the company be in a position to seek such capital. Moreover, our draws under Treasury's funding commitment, the senior preferred stock dividend obligation, and commitment fees paid to Treasury (commitment fees have been waived through the first quarter of 2012) could permanently impair our ability to build independent sources of capital

***We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition.***

We expect to request additional draws under the Purchase Agreement in future periods Over time, our dividend obligation to Treasury on the senior preferred stock will increasingly drive future draws Although we may experience period to period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term Dividends to Treasury on the senior preferred stock are cumulative and accrue at an annual rate of 10% (or 12% in any quarter in which dividends are not paid in cash) until all accrued dividends are paid in cash.

The size and timing of our future draws will be determined by our dividend obligation on the senior preferred stock and a variety of other factors that could adversely affect our net worth These other factors include the following:

- how long and to what extent the U S economy and housing market, including home prices, remain weak, which could increase credit expenses and cause additional other than temporary impairments of the non agency mortgage related securities we hold;

- foreclosure prevention efforts and foreclosure processing delays, which could increase our expenses;

- competitiveness with other mortgage market participants, including Fannie Mae;

- adverse changes in interest rates, the yield curve, implied volatility or mortgage to debt OAS, which could increase realized and unrealized mark to fair value losses recorded in earnings or AOCI;

- required reductions in the size of our mortgage related investments portfolio and other limitations on our investment activities that reduce the earnings capacity of our investment activities;

- quarterly commitment fees payable to Treasury, the amount of which has not yet been established and could be substantial (Treasury has waived the fee for all quarters of 2011 and the first quarter of 2012). Treasury has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment;

- adverse changes in our funding costs or limitations in our access to public debt markets;

- establishment of additional valuation allowances for our remaining net deferred tax asset;

- changes in accounting practices or guidance;

- effects of the MHA Program and other government initiatives, including any future requirements to reduce the principal amount of loans;

- losses resulting from control failures, including any control failures because of our inability to retain staff;

- limitations on our ability to develop new products, enter into new lines of business, or increase guarantee and related fees;

- introduction of additional public mission related initiatives that may adversely impact our financial results; or

- changes in business practices resulting from legislative and regulatory developments or direction from our Conservator

Under the Purchase Agreement, the $200 billion cap on Treasury's funding commitment will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011, and 2012. Although additional draws under the Purchase Agreement will allow us to remain solvent and avoid mandatory receivership, they will also increase the liquidation preference of, and the dividends we owe on, the senior preferred stock Based on the aggregate liquidation preference of the senior preferred stock of $72.3 billion (which amount includes the funds requested to address our net worth deficit as of December 31, 2011), Treasury is entitled to annual cash dividends of $7.23 billion, which exceeds our annual historical earnings in all but one period Increases in the already substantial liquidation preference and senior preferred stock dividend obligation, along with limited flexibility to redeem the senior preferred stock, will adversely affect our results of operations and financial condition and add to the significant uncertainty regarding our long term financial sustainability. This may also cause further negative publicity about our company.

47                                                                                                              *Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Our business objectives and strategies have in some cases been significantly altered since we were placed into conservatorship, and may continue to change, in ways that negatively affect our future financial condition and results of operations.

FHFA, as Conservator, has directed the company to focus on managing to a positive stockholders' equity At the direction of the Conservator, we have made changes to certain business practices that are designed to provide support for the mortgage market in a manner that serves our public mission and other non financial objectives but may not contribute to our goal of managing to a positive stockholders' equity Some of these changes have increased our expenses or caused us to forego revenue opportunities For example, FHFA has directed that we implement various initiatives under the MHA Program We expect to incur significant costs associated with the implementation of these initiatives and we cannot currently estimate whether, or the extent to which, costs incurred in the near term from these initiatives may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA directed changes to HARP in an effort to attract more eligible borrowers whose monthly payments are current and who can benefit from refinancing their home mortgages There can be no assurance that the revisions to HARP will be successful in achieving these objectives or that any benefits from the revised program will exceed our costs The Conservator and Treasury have also not authorized us to engage in certain business activities and transactions, including the purchase or sale of certain assets, which we believe might have had a beneficial impact on our results of operations or financial condition, if executed Our inability to execute such initiatives and transactions may adversely affect our profitability Other agencies of the U S government, as well as Congress, also have an interest in the conduct of our business. We do not know what actions they may request us to take.

In view of the conservatorship and the reasons stated by FHFA for its establishment, it is likely that our business model and strategic objectives will continue to change, possibly significantly, including in pursuit of our public mission and other non financial objectives Among other things, we could experience significant changes in the size, growth, and characteristics of our guarantee activities, and we could further change our operational objectives, including our pricing strategy in our core mortgage guarantee business The conservatorship has significantly impacted our investment activity, and we may face further restrictions on this activity. Accordingly, our strategic and operational focus may not always be consistent with the generation of net income. It is possible that we will make material changes to our capital strategy and to our accounting policies, methods, and estimates. In addition, we may be directed to engage in initiatives that are operationally difficult or costly to implement, or that adversely affect our financial results For example, FHFA has directed us to take various actions in support of the objectives of a gradual transition to greater private capital participation in housing finance and greater distribution of risk to participants other than the government, such as developing security structures that allow for private sector risk sharing.

On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than 0 basis points above the average guarantee fees charged in 2011 on single family mortgage backed securities Under the law, the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by the companies. It is currently unclear what effect this increase or any further guarantee fee increases or other fee adjustments associated with this law will have on the future profitability and operations of our single family guarantee business, or on our ability to raise guarantee fees that may be retained by us While we continue to assess the impact of this law on us, we currently believe that implementation of this law will present operational and accounting challenges for us

FHFA has stated that it has focused Freddie Mac and Fannie Mae on their existing core business, including minimizing credit losses, and taking actions necessary to advance the goals of the conservatorship, and is not permitting Freddie Mac and Fannie Mae to offer new products or enter into new lines of business FHFA stated that the focus of the conservatorship is on conserving assets, minimizing corporate losses, ensuring Freddie Mac and Fannie Mae continue to serve their mission, overseeing remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed These and other restrictions imposed by FHFA could adversely affect our financial results in future periods

As our Conservator, FHFA possesses all of the powers of our stockholders, officers, and directors. During the conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and to management to conduct, day to day operations so that the company can continue to operate in the ordinary course of business FHFA has the ability to withdraw or revise its delegations of authority and override actions of our Board of Directors at any time The directors serve on behalf of, and exercise authority as directed by, the Conservator. In addition, FHFA has the

<div align="center">48</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

power to take actions without our knowledge that could be  material to investors and could significantly affect our  financial performance

These changes and other factors could have material adverse  effects on, among other things, our portfolio growth, net worth,  credit losses, net interest income, guarantee fee income, net  deferred tax assets, and loan loss reserves, and could have a  material adverse effect on our future results of operations and  financial condition  In light of the significant uncertainty  surrounding these changes, there can be no assurances regarding  when, or if, we will return to profitability

***We have a variety of different, and potentially competing,  objectives that may adversely affect our financial results and  our ability to maintain positive net worth.***

Based on our charter, other legislation, public statements  from Treasury and FHFA officials and guidance and directives  from our Conservator, we have a variety of different, and  potentially  competing, objectives  These objectives include: (a)  minimizing our credit losses; (b) conserving assets; (c) providing  liquidity, stability, and affordability in the mortgage market; (d)  continuing to  provide additional assistance to the struggling  housing and mortgage markets; (e) managing to a positive  stockholders' equity and reducing the need to draw funds from  Treasury pursuant to the Purchase Agreement; and (f) protecting  the interests of the taxpayers  These  objectives create conflicts  in strategic and day to day decision making that will likely lead  to suboptimal outcomes for one or  more, or possibly all, of these  objectives  This could lead to negative publicity and damage our  reputation  We may face  increased operational risk from these  competing objectives  Current portfolio investment and mortgage  guarantee activities,  liquidity support, loan modification and  refinancing  initiatives, and foreclosure forbearance initiatives,  including our efforts under the MHA Program, are intended to  provide  support for the mortgage market in a manner that serves  our public mission and other non  financial objectives under  conservatorship, but may negatively impact our financial results  and net worth

***FHFA directives that we and Fannie Mae adopt uniform  approaches in  some areas could have an adverse impact on our  business or on our competitive position with respect to Fannie  Mae.***

FHFA is also Conservator of Fannie Mae, our primary  competitor  On multiple occasions, FHFA has directed us and  Fannie Mae to confer and suggest to FHFA possible uniform  approaches to particular business and accounting issues and  problems. It is  likely that we will receive additional directives in  the future  In most such cases, FHFA subsequently directed us  and Fannie Mae to adopt a specific uniform approach. For  example:

- In March 2009, FHFA directed Freddie Mac and Fannie  Mae to adopt the HAMP program for modification of  mortgages that they hold or guarantee, leading to a largely  uniform approach to  modifications for HAMP eligible  borrowers;

- In February 20  0, FHFA directed Freddie Mac and Fannie  Mae to work together to standardize definitions for mortgage  delivery  data;

- In January 2011, FHFA announced that it had directed  Freddie Mac and Fannie Mae to work on a joint initiative, in  coordination  with HUD, to consider alternatives for future  mortgage servicing  structures and servicing compensation;

- In April 2011, FHFA announced a new set of aligned  standards for servicing of non performing loans owned or  guaranteed by Freddie Mac and Fannie Mae, including a  standard modification initiative  for borrowers not eligible for  HAMP modifications;

- In October 2011, through the revisions to the HARP  initiative,  FHFA directed us and Fannie Mae to align certain  aspects of our and Fannie Mae's respective refinance  initiatives; and

- In December 20  , FHFA announced that the guarantee fee  on all single family residential mortgages sold to Freddie  Mac and  Fannie Mae will increase by 10 basis points to fund  the  payroll tax cut, effective April 1, 2012. This increase is  in connection with the implementation of the Temporary  Payroll Tax Cut Continuation Act of 2011.

We cannot predict the impact on our business of these actions  or  any similar actions FHFA may require us and Fannie Mae to  take in the future  It is possible that in some areas FHFA could  require us and Fannie Mae to take a uniform approach that,  because of differences in our respective businesses, could place  Freddie Mac at a competitive disadvantage to Fannie Mae  We  may be required to adopt approaches that are operationally  difficult for us to implement  It also is possible that in some cases  identifying, adopting and maintaining a uniform approach could  entail higher costs than would a unilateral approach, and that  when market conditions merit a change in a uniform approach,  coordinating the change might entail additional cost and delay  If  and when conservatorship ends, market acceptance of a uniform  approach could make it difficult to depart from that approach  even if doing so would be economically desirable

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

***We are subject to significant limitations on our business under the Purchase Agreement that could have a material adverse effect on our results of operations and financial condition.***

The Purchase Agreement includes significant restrictions on our ability to manage our business, including limitations on the amount of indebtedness we may incur, the size of our mortgage related investments portfolio, and the circumstances in which we may pay dividends, transfer certain assets, raise capital, and pay down the liquidation preference on the senior preferred stock In addition, the Purchase Agreement provides that we may not enter into any new compensation arrangements or increase amounts or benefits payable under existing compensation arrangements of any executive officers without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury. In deciding whether or not to consent to any request for approval it receives from us under the Purchase Agreement, Treasury has the right to withhold its consent for any reason and is not required by the agreement to consider any particular factors, including whether or not management believes that the transaction would benefit the company The limitations under the Purchase Agreement could have a material adverse effect on our future results of operations and financial condition.

***Our regulator may, and in some cases must, place us into receivership, which would result in the liquidation of our assets and terminate all rights and claims that our stockholders and creditors may have against our assets or under our charter; if we are liquidated, there may not be sufficient funds to pay the secured and unsecured claims of the company, repay the liquidation preference of any series of our preferred stock, or make any distribution to the holders of our common stock.***

We could be put into receivership at the discretion of the Director of FHFA at any time for a number of reasons, including conditions that FHFA has already asserted existed at the time the then Director of FHFA placed us into conservatorship These include: a substantial dissipation of assets or earnings due to unsafe or unsound practices; the existence of an unsafe or unsound condition to transact business; an inability to meet our obligations in the ordinary course of business; a weakening of our condition due to unsafe or unsound practices or conditions; critical undercapitalization; the likelihood of losses that will deplete substantially all of our capital; or by consent In addition, FHFA could be required to place us in receivership if Treasury is unable to provide us with funding requested under the Purchase Agreement to address a deficit in our net worth For more information, see " *If Treasury is unable to provide us with funding requested under the Purchase Agreement to address a deficit in our net worth, FHFA could be required to place us into receivership.*"

A receivership would terminate the conservatorship The appointment of FHFA (or any other entity) as our receiver would terminate all rights and claims that our stockholders and creditors may have against our assets or under our charter arising as a result of their status as stockholders or creditors, other than the potential ability to be paid upon our liquidation. Unlike conservatorship, the purpose of which is to conserve our assets and return us to a sound and solvent condition, the purpose of receivership is to liquidate our assets and resolve claims against us.

In the event of a liquidation of our assets, there can be no assurance that there would be sufficient proceeds to pay the secured and unsecured claims of the company, repay the liquidation preference of any series of our preferred stock or make any distribution to the holders of our common stock. To the extent that we are placed into receivership and do not or cannot fulfill our guarantee to the holders of our mortgage related securities, such holders could become unsecured creditors of ours with respect to claims made under our guarantee Only after paying the secured and unsecured claims of the company, the administrative expenses of the receiver and the liquidation preference of the senior preferred stock, which ranks senior to our common stock and all other series of preferred stock upon liquidation, would any liquidation proceeds be available to repay the liquidation preference on any other series of preferred stock Finally, only after the liquidation preference on all series of preferred stock is repaid would any liquidation proceeds be available for distribution to the holders of our common stock The aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $72.3 billion upon funding of the draw request to address our net worth deficit as of December 31, 2011 The liquidation preference will increase further if, as we expect, we make additional draws under the Purchase Agreement It will also increase if we do not pay dividends owed on the senior preferred stock in cash or if we do not pay the quarterly commitment fee to Treasury under the Purchase Agreement

If we are placed into receivership or no longer operate as a going concern, we would no longer be able to assert that we will realize assets and satisfy liabilities in the normal course of business, and, therefore, our basis of accounting would change to liquidation based accounting Under the liquidation basis of accounting, assets are stated at their estimated net realizable value and liabilities are stated at their estimated settlement amounts, which could adversely affect our net worth. In addition, the amounts in AOCI would be reclassified to earnings, which could also adversely affect our net worth

Source   D RA   HOM   OAN MORTGAG CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2820

Table of Contents

**If Treasury is unable to provide us with funding requested under the Purchase Agreement to address a deficit in our net worth, FHFA could be required to place us into receivership.**

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are less than our obligations for a period of 60 calendar days  FHFA has notified us that the measurement period for any mandatory  receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing  deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date  FHFA has also advised us that, if, during that 60 day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination  If funding has been requested under the Purchase  Agreement to address a deficit in our net worth, and Treasury is unable to provide us with such funding within the  60 day period specified by FHFA, FHFA would be required to place us into receivership if our assets remain less than our obligations  during that 60 day period

**The conservatorship and uncertainty concerning our future has had,  and will likely continue to have, an adverse effect on the retention, recruitment, and engagement of management and other  employees, which could have a material adverse effect on our ability to operate our business.**

Our ability to recruit, retain, and engage management and other  employees with the necessary skills to conduct our business has  been, and will likely continue to be, adversely affected by the  conservatorship, the uncertainty regarding its duration, the  potential for future legislative or regulatory actions that could significantly affect our existence and our role in the  secondary mortgage market, and the negative publicity concerning the GSEs  Accordingly, we may not be able to retain or replace executives or other employees with the requisite institutional knowledge and the technical, operational, risk management, and  other key skills needed to conduct our business effectively  We may also face increased operational risk if key employees leave  the company

The actions taken by Congress, Treasury, and the Conservator  to date, or that may be taken by them or other government agencies  in the future, may have an adverse effect on the retention and  recruitment of senior executives, management, and other valuable  employees  For example, we are subject to restrictions on the  amount and type of compensation we may pay our executives under  conservatorship  Also contributing to our concerns regarding  executive retention risk is the aggregate level of compensation  paid to our Section 16 executive officers, which for 2011 performance was significantly below the 25th percentile of  market based compensation  See "EXECUTIVE COMPENSATION" for more information. We cannot offer equity based compensation, which is both common in our industry  and provides a key incentive for employees to stay with the  company. The Conservator directed us to maintain individual  salaries and wage rates for all employees at 20  0 levels for 2011 and 2012 (except in the case of promotions or significant  changes in responsibilities)  Given our current status, we cannot offer the prospects of even medium term employment, much  less long term  Continued public condemnation of the company and its employees creates yet another obstacle to hiring and  retaining the talent we need

We are finding it difficult to retain and engage critical employees  and attract people with the skills and experience we  need  Voluntary attrition rates for high performing employees,  those with specialized skill sets, and those responsible for  controls over financial reporting have risen markedly since we  were placed into conservatorship  This has led to concerns about  staffing inadequacies, management depth, and employee engagement  Attracting qualified senior executives is  particularly difficult  We operate in an environment in which  virtually every business decision is closely scrutinized and  subject to public criticism and review by various government  authorities  Many executives are unwilling to work in such an environment for potentially significantly less than what they  could earn elsewhere  A recovering economy is likely to put additional pressures on turnover in 2012, as other attractive  opportunities may become available to people who we want to  retain. The high and increasing level of scrutiny from FHFA and its Office of Inspector General and other regulators has also  heightened stress levels throughout the organization and placed additional burdens on staff.

In 20   , the Financial Services Committee of the House of  Representatives approved a bill that would generally put our  employees on the federal government's pay scale, and in 20  2 the House and Senate each approved legislation containing a  provision that would prohibit senior executives from receiving bonuses during conservatorship. If this or similar legislation  were to become law, many of our employees would exper ence a  sudden and sharp decrease in compensation  The Acting Director  of FHFA stated on November 15, 2011 that this "would certainly risk a substantial exodus of talent, the best leaving  first in many instances. [Freddie Mac and Fannie Mae] likely  would suffer a rapidly growing vacancy list and replacements with  lesser skills and no experience in their specific jobs  A  significant increase in safety and soundness risks and in costly operational failures would, in my opinion, be highly  likely " The Acting Director

51                                                                                                     *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

noted that ''[s]hould the risks I fear materialize, FHFA might well be forced to limit [Freddie Mac and Fannie Mae's] business activities. Some of the business [Freddie Mac and Fannie Mae] would be unable to undertake might simply not occur, with potential disruption in housing markets and the economy '' For more information on legislative developments affecting compensation, see "BUSINESS   Regulation and Supervision   *Legislative and Regulatory Developments   Legislation Related to Reforming Freddie Mac and Fannie Mae*."

**The conservatorship and investment by Treasury has had, and will continue to have, a material adverse effect on our common and preferred stockholders.**

Prior to our entry into conservatorship, the market price for our common stock declined substantially  After our entry into conservatorship, the market price of our common stock continued to decline, and has been $1 or less per share since June 2010. As a result, the investments of our common and preferred stockholders lost substantial value, which they may never recover  There is significant uncertainty as to what changes may occur to our business structure during or following our conservatorship, including whether we will continue to exist  Therefore, it is likely that our shares could further diminish in value, or cease to have any value  The Acting Director of FHFA has stated that ''[Freddie Mac and Fannie Mae's] equity holders retain an economic claim on the companies but that claim is subordinate to taxpayer claims. As a practical matter, taxpayers are not likely to be repaid in full, so [Freddie Mac and Fannie Mae] stock lower in priority is not likely to have any value ''

The conservatorship and investment by Treasury has had, and will continue to have, other material adverse effects on our common and preferred stockholders, including the following:

- *No voting rights during conservatorship.*  The rights and powers of our stockholders are suspended during the conservatorship and our common stockholders do not have the ability to elect directors or to vote on other matters

- *No longer managed to maximize stockholder returns.*  Because we are in conservatorship, we are no longer managed with a strategy to maximize stockholder returns. FHFA has stated that it has focused Freddie Mac and Fannie Mae on their existing core business, including minimizing credit losses, and taking actions necessary to advance the goals of the conservatorship  FHFA stated that it is not permitting Freddie Mac and Fannie Mae to offer new products or enter into new lines of business  FHFA stated that the focus of the conservatorship is on conserving assets, minimizing corporate losses, ensuring Freddie Mac and Fannie Mae continue to serve their mission, overseeing remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed

- *Priority of Senior Preferred Stock.*  The senior preferred stock ranks senior to the common stock and all other series of preferred stock as to both dividends and distributions upon dissolution, liquidation or winding up of the company.

- *Dividends have been eliminated.*  The Conservator has eliminated dividends on Freddie Mac common and preferred stock (other than dividends on the senior preferred stock) during the conservatorship. In addition, under the terms of the Purchase Agreement, dividends may not be paid to common or preferred stockholders (other than on the senior preferred stock) without the consent of Treasury, regardless of whether or not we are in conservatorship

- *Warrant may substantially dilute investment of current stockholders.*  If Treasury exercises its warrant to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis, the ownership interest in the company of our then existing common stockholders will be substantially diluted. It is possible that stockholders, other than Treasury, will not own more than 20 1% of our total common stock for the duration of our existence. Under our charter, bylaws and applicable law, 20 1% is insufficient to control the outcome of any vote that is presented to the common stockholders  Accordingly, existing common stockholders have no assurance that, as a group, they will be able to control the election of our directors or the outcome of any other vote after the time, if any, that the conservatorship ends.

### Competitive and Market Risks

**Our investment activity is significantly limited under the Purchase Agreement and by FHFA, which will likely reduce our earnings from investment activities over time and result in greater reliance on our guarantee activities to generate revenue.**

We are subject to significant limitations on our investment activity, which will adversely affect the earnings capacity of our mo tgage related investments portfolio over time  These limitations include: (a) a requirement to reduce the size of

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-2822

Table of Contents

our mortgage related investments portfolio; and (b) significant constraints on our ability to purchase or sell mortgage assets

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage related investments portfolio is subject to a cap that decreases by 0% each year until the portfolio reaches $250 billion As a result, the UPB of our mortgage related investments portfolio could not exceed $729 billion as of December 31, 2011 and may not exceed $656.1 billion as of December 3 , 20 2 Our mortgage related investments portfolio has contracted considerably since we entered into conservatorship, and we are working with FHFA to identify ways to prudently accelerate the rate of contraction of the portfolio Our ability to take advantage of opportunities to purchase or sell mortgage assets at attractive prices has been, and likely will continue to be, limited In addition, we can provide no assurance that the cap on our mortgage related investments portfolio will not, over time, force us to sell mortgage assets at unattractive prices, particularly given the potential in coming periods for continued high volumes of loan modifications and removal of seriously delinquent loans, both of which result in the removal of mortgage loans from our PCs for our mortgage related investments portfolio We expect that our holdings of unsecuritized single family loans will continue to increase in 2012 due to the recent revisions to HARP, which will result in our purchase of mortgage loans with LTV ratios greater than 125%, as we have not yet implemented a securitization process for such loans For more information on the various restrictions and limitations on our investment activity and our mortgage related investments portfolio, see "BUSINESS     Conservatorship and Related Matters     *Impact of Conservatorship and Related Actions on Our Business     Limits on Investment Activity and Our Mortgage Related Investments Portfolio*."

These limitations will reduce the earnings capacity of our mortgage related investments portfolio business and require us to place greater emphasis on our guarantee activities to generate revenue However, under conservatorship, our ability to generate revenue through guarantee activities may be limited, as we may be required to adopt business practices that provide support for the mortgage market in a manner that serves our public mission and other non financial objectives, but that may negatively impact our future financial results from guarantee activities. The combination of the restrictions on our business activities under the Purchase Agreement and FHFA regulation, combined with our potential inability to generate sufficient revenue through our guarantee activities to offset the effects of those restrictions, may have an adverse effect on our results of operations and financial condition. There can be no assurance that the current profitability levels on our new single family business would be sufficient to attract new private sector capital in the future, should the company be in a position to seek such capital. We generally must obtain FHFA's approval in order to increase pricing in our guarantee business, and there can be no assurance FHFA will approve any such request. On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Our business and financial condition will not benefit from the increases in guarantee fees under this law, as we must remit the proceeds from such increases to Treasury. It is currently unclear what effect this will have on our ability to raise guarantee fees that may be retained by us. For more information, see "BUSINESS     Regulation and Supervision     *Legislative and Regulatory Developments     Legislated Increase to Guarantee Fees.*"

### *We are subject to mortgage credit risks, including mortgage credit risk relating to off-balance sheet arrangements; increased credit costs related to these risks could adversely affect our financial condition and/or results of operations.*

Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage we own or guarantee, exposing us to the risk of credit losses and credit related expenses We are primarily exposed to mortgage credit risk with respect to the single family and multifamily loans that we own or guarantee and hold on our consolidated balance sheets We are also exposed to mortgage credit risk with respect to securities and guarantee arrangements that are not reflected as assets on our consolidated balance sheets These relate primarily to: (a) Freddie Mac mortgage related securities backed by multifamily loans; (b) certain Other Guarantee Transactions; and (c) other guarantee commitments, including long term standby commitments and liquidity guarantees

Significant factors that affect the level of our single family mortgage credit risk include the credit profile of the borrower (*e.g.*, credit score, credit history, and monthly income relative to debt payments), documentation level, the number of borrowers, the features of the mortgage loan, occupancy type, the type of property securing the mortgage, the LTV ratio of the loan, and local and regional economic conditions, including home prices and unemployment rates Our credit losses will remain high for the foreseeable future due to the substantial number of mo tgage loans in our single family credit guarantee portfolio on which borrowers owe more than their home is currently worth, as well as the substantial inventory of seriously delinquent loans.

While mortgage interest rates remained low in 2011, many borrowers may not have been able to refinance into lower interest mortgages or reduce their monthly payments through mortgage modifications due to substantial declines in home values, market uncertainty, and continued high unemployment rates Therefore, there can be no assurance that continued

<div align="center">53</div>

<div align="right">*Freddie Mac*</div>

TREASURY-2823

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

low mortgage interest rates or efforts to modify and refinance mortgages pursuant to the MHA Program (including pursuant to the revisions to HARP announced in October 2011) and to modify mortgages under our other loss mitigation initiatives will reduce our overall mortgage credit risk.

We also continue to have significant amounts of mortgage loans in our single family credit guarantee portfolio with certain characteristics, such as Alt A, interest only, option ARMs, loans with original LTV ratios greater than 90%, and loans where borrowers had FICO scores less than 620 at the time of origination, that expose us to greater credit risk than do other types of mortgage loans As of December 31, 2011, loans with one or more of the above characteristics comprised approximately 20% of our single family credit guarantee portfolio See "Table 50 Certain Higher Risk Categories in the Single Family Credit Guarantee Portfolio" for more information

Beginning in 2008, the conforming loan limits were significantly increased for mortgages originated in certain "high cost" areas (the initial increases applied to loans originated after July 1, 2007) Due to our relative lack of experience with these "conforming jumbo" loans, purchases pursuant to the high cost conforming loan limits may also expose us to greater credit risks

The level of our multifamily mortgage credit risk is affected by the mortgaged property's ability to generate rental income from which debt service can be paid. That ability in turn is affected by rental market conditions (*e.g.*, rental and vacancy rates), the physical condition of the property, the quality of the property's management, and the level of operating costs For certain multifamily mortgage products, we utilize other forms of credit enhancement, such as subordination through Other Guarantee Transactions, which are intended to reduce our risk exposure

A risk we continue to monitor is that multifamily borrowers will default if they are unable to refinance their loans at an affordable rate. This risk is particularly important with respect to multifamily loans because such loans generally have a balloon payment and typically have a shorter contractual term than single family mortgages Borrowers may be less able to refinance their obligations during periods of rising interest rates or weak economic conditions, which could lead to default if the borrower is unable to find affordable refinancing However, of the $116.1 billion in UPB of loans in our multifamily mortgage portfolio as of December 31, 2011, only approximately 3% and 5% will reach their maturity during 2012 and 2013, respectively.

***We are exposed to significant credit risk related to the subprime, Alt-A, and option ARM loans that back the non agency mortgage related securities we hold.***

Our investments in non agency mortgage related securities include securities that are backed by subprime, Alt A, and option ARM loans As of December 31, 2011, such securities represented approximately 54% of our total investments in non agency mortgage related securities Since 2007, mortgage loan delinquencies and credit losses in the U S mortgage market have substantially increased, particularly in the subprime, Alt A, and option ARM sectors of the residential mortgage market In addition, home prices have declined significantly, after extended periods during which home prices appreciated As a result, the fair value of these investments has declined significantly since 2007, and we have recorded substantial other than temporary impairments, which has adversely impacted stockholders equity (deficit). In addition, most of these investments do not trade in a liquid secondary market and the size of our holdings relative to normal market activity is such that, if we were to attempt to sell a significant quantity of these securities, the pricing in such markets could be significantly disrupted and the price we ultimately realize may be materially lower than the value at which we carry these investments on our consolidated balance sheets

We could experience additional GAAP losses due to other than temporary impairments on our investments in these non agency mortgage related securities if, among other things: (a) interest rates change; (b) delinquency and loss rates on subprime, Alt A, and option ARM loans increase; (c) there is a further decline in actual or forecasted home prices; or (d) there is a deterioration in servicing performance In addition, the fair value of these investments may decline further due to additional ratings downgrades or market events Any credit enhancements covering these securities, including subordination and other structural enhancements, may not prevent us from incurring losses. During 2011, we continued to experience the erosion of structural credit enhancements on many securities backed by subprime first lien, option ARM, and Alt A loans due to poor performance of the underlying mortgages The financial condition of bond insurers also continued to deteriorate in 20    See "MD&A    CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities" for information about the credit ratings for these securities and the extent to which these securities have been downgraded

<div align="center">54</div>

<div align="right">*Freddie Mac*</div>

Source   D RA HOM   OAN MORTGAG CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

***Certain strategies to mitigate our losses as an investor in non agency mortgage-related securities may adversely affect our relationships with some of our largest seller/servicers.***

On September 2, 2011, FHFA announced that, as Conservator for Freddie Mac and Fannie Mae, it had filed lawsuits against 17 financial institutions and related defendants alleging: (a) violations of federal securities laws; and (b) in certain lawsuits, common law fraud in the sale of residential non agency mortgage related securities to Freddie Mac and Fannie Mae  These institutions include some of our largest seller/servicers and counterparties. FHFA, as Conservator, filed a similar lawsuit against UBS Americas, Inc. and related defendants on July 27, 2011. FHFA seeks to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in certain residential non agency mortgage related securities issued by these financial institutions.

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non agency mo tgage-re ated securities we hold, and are engaged in other efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors  For example, FHFA, as Conservator of Freddie Mac and Fannie Mae, has issued subpoenas to various entities seeking loan files and other transaction documents related to non agency mortgage related securities in which the two enterprises invested  FHFA stated that the documents will enable it to determine whether issuers of these securities and others are liable to Freddie Mac and Fannie Mae for certain losses they have suffered on the securities  We are assisting FHFA in this effort

These and other loss mitigation efforts may lead to further disputes with some of our largest seller/servicers and counterparties that may result in further litigation. This could adversely affect our relationship with any such company and could, for example, result in the loss of some or all of our business with a large seller/servicer  The effectiveness of these loss mitigation efforts is highly uncertain and any potential recoveries may take significant time to realize  For more information, see "MD&A    RISK MANAGEMENT    Credit Risk    *Institutional Credit Risk    Non Agency Mortgage Related Security Issuers*."

***The credit losses we experience in future periods as a result of the housing and economic downturn are likely to be larger, perhaps substantially larger, than our current loan loss reserves.***

Our loan loss reserves, as reflected on our consolidated balance sheets, do not reflect the total of all future credit losses we will ultimately incur with respect to our single family and multifamily mortgage loans, including those underlying our financial guarantees. Rather, pursuant to GAAP, our reserves only reflect probable losses we believe we have already incurred as of the balance sheet date  Accordingly, although we be eve that our credit losses may exceed the amounts we have already reserved for loans currently identified as impaired, and that additional credit losses will be incurred in the future due to the housing and economic downturn, we are not permitted under GAAP to reflect the potential impact of these future trends in our loan loss reserves  As a result of the depth and extent of the housing and economic downturn, there is significant uncertainty regarding the full extent of future credit losses  Therefore, such credit losses are likely to be larger, perhaps substantially larger, than our current loan loss reserves. Additional credit losses we incur in future periods will adversely affect our business, results of operations, financial condition, liquidity, and net worth.

***Further declines in U.S. home prices or other adverse changes in the U.S. housing market could negatively impact our business and increase our losses.***

Throughout 2011, the U.S. housing market continued to experience adverse trends, including continued price depreciation, continued high serious delinquency and default rates, and extended foreclosure timelines  Low volumes of home sales and the continued large supply of unsold homes placed further downward pressure on home prices. These conditions, coupled with continued high unemployment, led to continued high loan delinquencies and provisioning for loan losses  Our credit losses remained high in 2011, in part because home prices have exper enced significant cumulative declines in many geographic areas in recent years  We expect that national average home prices will continue to remain weak and will likely decline over the near term, which could result in a continued high rate of serious delinquencies or defaults and a level of credit related losses higher than our expectations when our guarantees were issued.

We prepare internal forecasts of future home prices, which we use for certain business activities, including: (a) hedging prepayment risk; (b) setting fees for new guarantee business; and (c) portfolio activities. It is possible that home price declines could be significantly greater than we anticipate, or that a sustained recovery in home prices would not begin until much later than we anticipate, which could adversely affect our performance of these business activities  For example, this could cause the return we earn on new single family guarantee business to be less than expected  This could also result in higher losses due to other than temporary impairments on our investments in non agency mortgage related securities than would otherwise be recognized in earnings  Government programs designed to strengthen the

<div align="center">5 5</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

U.S. housing market, such as the MHA Program, may fail to achieve expected results, and new programs could be instituted that cause our credit losses to increase  For more information, see "MD&A      RISK MANAGEMENT      Credit Risk."

Our business volumes are closely tied to the rate of growth in total outstanding U S residential mortgage debt and the size of the U S residential mortgage market  Total residential mortgage debt declined approximately   8% in the first nine months of 2011 (the most recent data available) compared to a decline of approximately 3 2% in 20  0  If total outstanding U S residential mortgage debt were to continue to decline, there could be fewer mortgage loans available for us to purchase, and we could face more competition to purchase a smaller number of loans.

While multifamily market fundamentals (*i.e.*, vacancy rates and effective rents) improved during 2011, there can be no assurance that this trend will continue  Certain local multifamily markets exhibit relatively weak fundamentals, especially some of those hit hardest by residential home price declines  Any further softening of the broader economy could have negative impacts on multifamily markets, which could cause delinquencies and credit losses relating to our multifamily activities to increase beyond our current expectations

***Our refinance volumes could decline if interest rates rise, which could cause our overall new mortgage related security issuance volumes to decline.***

We continued to experience a high percentage of refinance mortgages in our purchase volume during 2011 due to continued low interest rates and the impact of our relief refinance mortgages  Interest rates have been at historically low levels for an extended period of time  Overall originations of refinance mortgages, and our purchases of them, will likely decrease if interest rates rise and home prices remain at depressed levels  Originations of refinance mortgages will also likely decline after the Home Affordable Refinance Program expires in December 20 3  In addition, many eligible borrowers have already refinanced at least once during this period of low interest rates, and therefore may be unlikely to do so again in the near future  It is possible that our overall mortgage related security issuance volumes could decline if our volumes of purchase money mortgages do not increase to offset any such decrease in refinance mortgages  This could adversely affect the amount of revenue we receive from our guarantee activities

***We could incur significant credit losses and credit-related expenses in the event of a major natural disaster or other catastrophic event in geographic areas in which portions of our total mortgage portfolio and REO holdings are concentrated.***

We own or guarantee mortgage loans and own REO properties throughout the United States  The occurrence of a major natural or environmental disaster (such as an earthquake, hurricane, tsunami, or widespread damage caused to the environment by commercial entities), terrorist attack, pandemic, or similar catastrophic event in a regional geographic area of the United States could negatively impact our credit losses and credit related expenses in the affected area

The occurrence of a catastrophic event could negatively impact a geographic area in a number of different ways, depending on the nature of the event  A catastrophic event that either damaged or destroyed residential real estate underlying mortgage loans we own or guarantee or negatively impacted the ability of homeowners to continue to make principal and interest payments on mortgage loans we own or guarantee could increase our serious delinquency rates and average loan loss severity in the affected region or regions, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth  Such an event could also damage or destroy REO properties we own  While we attempt to maintain a geographically diverse portfolio, there can be no assurance that a catastrophic event, depending on its magnitude, scope and nature, will not generate significant credit losses and credit related expenses  We may not have insurance coverage for some of these catastrophic events  In some cases, we may be prohibited by state law from requiring such insurance as a condition to our purchasing or guaranteeing loans

***We depend on our institutional counterparties to provide services that are critical to our business, and our results of operations or financial condition may be adversely affected if one or more of our institutional counterparties do not meet their obligations to us.***

We face the risk that one or more of the institutional counterparties that has entered into a business contract or arrangement with us may fail to meet its obligations  We face similar risks with respect to contracts or arrangements we benefit from indirectly or that we enter into on behalf of our securitization trusts. Our primary exposures to institutional counterparty risk are with:

- mortgage seller/servicers;

- mortgage insurers;

<div align="center">5 6</div>

<div align="right">*Freddie Mac*</div>

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

- issuers, guarantors or third party providers of other credit enhancements (including bond insurers);

- counterparties to short term lending and other investment related agreements and cash equivalent transactions, including such agreements and transactions we manage for our PC trusts;

- derivative counterparties;

- hazard and title insurers;

- mortgage investors and originators; and

- document custodians and funds custodians.

Many of our counterparties provide several types of services to us. In some cases, our business with institutional counterparties is concentrated  The concentration of our exposure to our counterparties increased in recent periods due to industry consolidation and counterparty failures, and we continue to face challenges in reducing our risk concentrations with counterparties  Efforts we take to reduce exposure to financially weakened counterparties could further increase our exposure to other individual counterparties  In the future, our mortgage insurance exposure will be concentrated among a smaller number of counterparties  A significant failure by a major institutional counterparty could harm our business and financial results in a variety of ways, including by adversely affecting our ability to conduct operations efficiently and at cost effective rates, and have a material adverse effect on our investments in mortgage loans, investments in securities, our derivative portfolio or our credit guarantee activities  See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information.

Some of our counterparties may become subject to serious liquidity problems affecting their businesses, either temporarily or permanently, which may adversely affect their ability to meet their obligations to us  In recent periods, challenging market conditions have adversely affected the liquidity and financial condition of our counterparties  These trends may continue  In particular, we believe all of our derivative portfolio and cash and other investments portfolio counterparties are exposed to fiscally troubled European countries  It is possible that continued adverse developments in the Eurozone could significantly impact such counterparties  In turn, this could adversely affect their ability to meet their obligations to us

In the past few years, some of our largest seller/servicers have experienced ratings downgrades and liquidity constraints, and certain large lenders have failed  These challenging market conditions could also increase the likelihood that we will have disputes with our counterparties concerning their obligations to us, especially with respect to counterparties that have experienced financial strain and/or have large exposures to us. See "MD&A    RISK MANAGEMENT    Credit Risk    *Institutional Credit Risk*" for additional information regarding our credit risks to certain categories of counterparties and how we seek to manage them

The servicing of mortgage loans backing our single family non agency mortgage related securities investments is concentrated in a small number of institutions. We could experience losses on these investments from servicing performance deterioration should one of these institutions come under financial distress. Furthermore, Freddie Mac's rights as a non agency mortgage related securities investor to transfer servicing are limited

***Our financial condition or results of operations may be adversely affected if mortgage seller/servicers fail to repurchase loans sold to us in breach of representations and warranties or fail to honor any related indemnification or recourse obligations.***

We require seller/servicers to make certain representations and warranties regarding the loans they sell to us  If loans are sold to us in breach of those representations and warranties, we have the contractual right to require the seller/servicer to repurchase those loans from us  In lieu of repurchase, we may agree to allow a seller/servicer to indemnify us against losses on such mortgages or otherwise compensate us for the risk of continuing to hold the mortgages  Sometimes a seller/servicer sells us mortgages with recourse, meaning that the seller/servicer agrees to repurchase any mortgage that is delinquent for more than a specified period (usually 120 days), regardless of whether there has been a breach of representations and warranties

Some of our seller/servicers have failed to fully perform their repurchase obligations due to lack of financial capacity, while others, including many of our larger seller/servicers, have not fully performed their repurchase obligations in a timely manner  As of December 3 , 2011 and 2010, the UPB of loans subject to repurchase requests based on breaches of representations and warranties issued to our single family seller/servicers was approximately $2.7 billion and $3.8 billion, respectively  As of December 31, 2011, approximately $1.2 billion of such loans were subject to repurchase requests issued due to mortgage insurance rescission or mortgage insurance claim denial.

<div align="center">57</div>

*Freddie Mac*

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our contracts require that a seller/servicer repurchase a mortgage within 30 days after we issue a repurchase request, unless the seller/servicer avails itself of an appeal process provided for in our contracts, in which case the deadline for repurchase is extended until we decide the appeal As of December 31, 2011 and 2010, approximately 39% and 34%, respectively, of these repurchase requests were outstanding more than four months since issuance of our repurchase request (these figures included repurchase requests for which appeals were pending)

The amount we collect on these requests and others we may make in the future could be significantly less than the UPB of the loans subject to the repurchase requests primarily because we expect many of these requests will likely be satisfied by reimbursement of our realized credit losses by seller/servicers, instead of repurchase of loans at their UPB, or may be rescinded in the course of the contractual appeals process Based on our historical loss experience and the fact that many of these loans are covered by credit enhancement, we expect the actual credit losses experienced by us should we fail to collect on these repurchase requests will also be less than the UPB of the loans We may also enter into agreements with seller/servicers to resolve claims for repurchases The amounts we receive under any such agreements may be less than the losses we ultimately incur

Our credit losses may increase to the extent our seller/servicers do not fully perform their repurchase obligations Enforcing repurchase obligations of seller/servicers who have the financial capacity to perform those obligations could also negatively impact our relationships with such customers and could result in the loss of some or all of our business with such customers, which could negatively impact our ability to retain market share. It may be difficult, expensive, and time consuming to legally enforce a seller/servicer's repurchase obligations, in the event a seller/servicer continues to fail to perform such obligations

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA directed changes to HARP We may face greater exposure to credit and other losses on these HARP loans because we are not requiring lenders to provide us with certain representations and warranties on these HARP loans For more information, see "MD&A    RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk Single Family Loan Workouts and the MHA Program*    Home Affordable Refinance Program and Relief Refinance Mortgage Initiative "

We also have exposure to seller/servicers with respect to mortgage insurance When a mortgage insurer rescinds coverage or denies or curtails a claim, we may require the seller/servicer to repurchase the mortgage or to indemnify us for additional loss. The volume of rescissions, claim denials, and curtailments by mortgage insurers remains high

***We face the risk that seller/servicers may fail to perform their obligations to service loans in our single-family and multifamily mortgage portfolios or that their servicing performance could decline.***

Our seller/servicers have a significant role in servicing loans in our single family credit guarantee portfolio, which includes an active role in our loss mitigation efforts Therefore, a decline in their performance could impact our credit performance (including through missed opportunities for mortgage modifications), which could adversely affect our financial condition or results of operations and have a significant impact on our ability to mitigate credit losses. The risk of such a decline in performance remains high The high levels of seriously delinquent loan volume, the ongoing weak conditions of the mortgage market, and the number and variety of additions and changes to HAMP and our other loan modification and loss mitigation initiatives have placed a strain on the loss mitigation resources of many of our seller/servicers This has also increased the operational complexity of the servicing function, as well as the risk that errors will occur. A number of seller/servicers have had to address issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, which has further strained their resources There have also been a number of regulatory developments that have increased, or could increase, the complexity of the servicing function It is also possible that we could be directed to introduce additional changes to the servicing function that increase its complexity, such as new or revised loan modification or loss mitigation initiatives or new compensation arrangements Our expected ability to partially mitigate losses through loan modifications and other alternatives to foreclosure is a factor we consider in determining our allowance for loan losses Therefore, the inability to realize the anticipated benefits of our loss mitigation plans could cause our losses to be significantly higher than those currently estimated Weak economic conditions continue to affect the liquidity and financial condition of many of our seller/servicers, including some of our largest seller/servicers Any efforts we take to attempt to improve our servicers' performance could adversely affect our relationships with such servicers, many of which also sell loans to us.

If a servicer does not fulfill its servicing obligations (including its repurchase or other responsibilities), we may seek partial or full recovery of the amounts that such servicer owes us, such as by attempting to sell the applicable mortgage servicing rights to a different servicer and applying the proceeds to such owed amounts, or by contracting the servicing responsibilities to a different servicer and retaining the net servicing fee The ongoing weakness in the housing market has negatively affected the market for mortgage servicing rights, which increases the risk that we might not receive a

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-2828

Table of Contents

sufficient price for such rights or that we may be unable to find buyers who: (a) have sufficient capacity to service the affected mortgages in compliance with our servicing standards; (b) are willing to assume the representations and warranties of the former servicer regarding the affected mortgages (which we typically require); and (c) have sufficient capacity to service all of the affected mortgages Increased industry consolidation, bankruptcies of mortgage bankers or bank failures may also make it more difficult for us to sell such rights, because there may not be sufficient capacity in the market, particularly in the event of multiple failures. This option may be difficult to accomplish with respect to our larger seller/servicers due to operational and capacity challenges of transferring a large servicing portfolio The financial stress on servicers and increased costs of servicing may lead to strategic defaults (*i.e.*, defaults done deliberately as a financial strategy, and not involuntarily) by servicers, which would also require us to seek a successor servicer

Our seller/servicers also have a significant role in servicing loans in our multifamily mortgage portfolio We are exposed to the risk that multifamily seller/servicers could come under financial pressure, which could potentially cause degradation in the quality of the servicing they provide us including their monitoring of each property's financial performance and physical condition. This could also, in certain cases, reduce the likelihood that we could recover losses through lender repurchases, recourse agreements, or other credit enhancements, where applicable

See "MD&A    RISK MANAGEMENT    Credit Risk    *Institutional Credit Risk    Single family Mortgage Seller/Servicers*" and "    *Multifamily Mortgage Seller/Servicers*" for additional information on our institutional credit risk related to our mortgage seller/servicers

### *Our financial condition or results of operations may be adversely affected by the financial distress of our counterparties to derivatives, funding, and other transactions.*

We use derivatives for several purposes, including to regularly adjust or rebalance our funding mix in response to changes in the interest rate characteristics of our mortgage related assets and to hedge forecasted issuances of debt The relative concentration of our derivative exposure among our primary derivative counterparties remains high This concentration increased in the last several years due to industry consolidation and the failure of certain counterparties, and could further increase Three of our derivative counterparties each accounted for greater than 0% of our net uncollateralized exposure, excluding commitments, at December 31, 2011 For a further discussion of our exposure to derivative counterparties, see "MD&A    RISK MANAGEMENT    Credit Risk    *Institutional Credit Risk    Derivative Counterparties*" and "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS."

Some of our derivative and other capital markets counterparties have experienced various degrees of financial distress in the past few years, including liquidity constraints, credit downgrades, and bankruptcy. Our financial condition and results of operations may be adversely affected by the financial distress of these derivative and other capital markets counterparties to the extent that they fail to meet their obligations to us. For example, our OTC derivative counterparties are required to post collateral in certain circumstances to cover our net exposure to them on derivative contracts. We may incur losses if the collateral held by us cannot be liquidated at prices that are sufficient to cover the amount of such exposure

Our ability to engage in routine derivatives, funding, and other transactions could be adversely affected by the actions of other financial institutions. Financial services institutions are interrelated as a result of trading, clearing, counterparty, or other relationships. As a result, defaults by, or even rumors or questions about, one or more financial services institutions, or the financial services industry generally, could lead to market wide disruptions in which it may be difficult for us to find acceptable counterparties for such transactions.

We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures. Thus, if our access to the derivative markets were disrupted, it may become more difficult or expensive to fund our business activities and achieve the funding mix we desire, which could adversely affect our business and results of operations.

### *Our credit losses and other than temporary impairments recognized in earnings could increase if our mortgage or bond insurers become insolvent or fail to perform their obligations to us.*

We are exposed to risk relating to the potential insolvency of or non performance by mortgage insurers that insure single family mortgages we purchase or guarantee and bond insurers that insure certain of the non agency mortgage related securities we hold The weakened financial condition and liquidity position of these counterparties increases the risk that these entities will fail to fully reimburse us for claims under insurance policies. This risk could increase if home prices deteriorate further or if the economy worsens

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-2829                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

As a guarantor, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligations to reimburse us for claims. Thus, if any of our mortgage insurers that provide credit enhancement fails to fulfill its obligation, we could experience increased credit losses. In addition, if a regulator determined that a mortgage insurer lacked sufficient capital to pay all claims when due, the regulator could take action that might impact the timing and amount of claim payments made to us. We independently assess the financial condition, including the claims paying resources, of each of our mortgage insurers. Based on our analysis of the financial condition of a mortgage insurer and pursuant to our eligibility requirements for mortgage insurers, we could take action against a mortgage insurer intended to protect our interests that may impact the timing and amount of claims payments received from that insurer. We expect to receive substantially less than full payment of our claims from Triad Guaranty Insurance Corp., Republic Mortgage Insurance Company and PMI Mortgage Insurance Co. We also believe that certain other of our mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as such claims emerge.

In the event one or more of our bond insurers were to become insolvent, it is likely that we would not collect all of our claims from the affected insurer. This would impact our ability to recover certain unrealized losses on our investments in non agency mortgage related securities, and could contribute to net impairment of available for sale securities recognized in earnings. We evaluate the expected recovery from primary bond insurance policies as part of our impairment analysis for our investments in securities. If a bond insurer's performance with respect to its obligations on our investments in securities is worse than expected, this could contribute to additional net impairment of those securities. In addition, the fair values of our securities may further decline, which could also have a material adverse effect on our results and financial condition. We expect to receive substantially less than full payment from several of our bond insurers, including Ambac Assurance Corporation and Financial Guaranty Insurance Company, due to adverse developments concerning these companies. Ambac Assurance Corporation and Financial Guaranty Insurance Company are currently not paying any of their claims. We believe that some of our other bond insurers may also lack sufficient ability to fully meet all of their expected lifetime claims paying obligations to us as such claims emerge.

For more information on developments concerning our mortgage insurers and bond insurers, see "MD&A     RISK MANAGEMENT     Credit Risk     *Institutional Credit Risk     Mortgage Insurers" and "   Bond Insurers.*"

***If mortgage insurers were to further tighten their standards or fall out of compliance with regulatory capital requirements, the volume of high LTV ratio mortgages available for us to purchase could be reduced, which could reduce our overall volume of new business. Mortgage insurance standards could constrain our future ability to purchase loans with LTV ratios over 80%.***

Our charter requires that single family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests. Our purchases of mortgages with LTV ratios above 80% (other than relief refinance mortgages) have declined in recent years, in part because mortgage insurers tightened their eligibility requirements with respect to the issuance of insurance on new mortgages with such higher LTV ratios. If mortgage insurers further restrict their eligibility requirements for such loans, or if we are no longer willing or able to obtain mortgage insurance from these counterparties under terms we find reasonable, and we are not able to avail ourselves of suitable alternative methods of obtaining credit enhancement for these loans, we may be further restricted in our ability to purchase or securitize loans with LTV ratios over 80% at the time of purchase. This could further reduce our overall volume of new business. This could also negatively impact our ability to participate in a significant segment of the mortgage market (*i.e.*, loans with LTV ratios over 80%) should we seek, or be directed, to do so.

If a mortgage insurance company were to fall out of compliance with regulatory capital requirements and not obtain appropriate waivers, it could become subject to regulatory actions that restrict its ability to write new business in certain, or in some cases all, states. During the third quarter of 2011, Republic Mortgage Insurance Company and PMI Mortgage Insurance Co. were prohibited from writing new business by their primary state regulators and neither writes new business in any state any longer. Given the difficulties in the mortgage insurance industry, we believe it is likely that other companies may be unable to meet regulatory capital requirements.

A mortgage insurer may attempt a corporate restructuring designed to enable it to continue to write new business through a new entity in the event the insurer falls out of compliance with regulatory capital requirements. However, there can be no assurance that an insurer would be able to accomplish such a restructuring, as the restructured entity would be required to satisfy regulatory requirements as well as our own conditions. These restructuring plans generally involve contributing capital to a subsidiary or affiliate. This could result in less liquidity available to the existing mortgage insurer to pay claims on its existing book of business, and an increased risk that the mortgage insurer would not pay its claims in full in the future. We monitor the claim paying ability of our mortgage insurers. As these restructuring plans are presented

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

to us for review, we attempt to determine whether the insurers' plans make available sufficient resources to meet their obligations to policyholders of the insurance entities involved in the restructuring  However, there can be no assurance that any such restructuring will enable payment in full of all claims in the future. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES     Allowance for Loan Losses and Reserve for Guarantee Losses    *Single Family Loans*" for more information

***We could incur increased credit losses if our seller/servicers enter into arrangements with mortgage insurers for settlement of future rescission activity and such agreements could potentially reduce the ability of mortgage insurers to pay claims to us.***

Under our contracts with our seller/servicers, the rescission or denial of mortgage insurance on a loan is grounds for us to make a repurchase request to the seller/servicer  At least one of our largest servicers has entered into arrangements with two of our mortgage insurance counterparties under which the servicer pays and/or indemnifies the insurer in exchange for the mortgage insurer agreeing not to issue mortgage insurance rescissions or denials of coverage on Freddie Mac mortgages  When such an agreement is in place, we are unable to make repurchase requests based solely on a rescission of insurance or denial of coverage  Thus, there is a risk that we will experience higher credit losses if we do not independently identify other areas of noncompliance with our contractual requirements and require lenders to repurchase the loans we own  Additionally, there could be a negative financial impact on our mortgage insurers' ability to pay their other obligations to us if the payments they receive from the seller/servicers are insufficient to compensate them for the insurance claims paid that would have otherwise been denied  As guarantor of the insured loans, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligation to reimburse us for claims, and this could increase our credit losses. In April 2011, we issued an industry letter to our servicers reminding them that they may not enter into these types of agreements without our consent  Several of our servicers have asked us to consent to these types of agreements  We are evaluating these requests on a case by case basis.

***The loss of business volume from key lenders could result in a decline in our market share and revenues.***

Our business depends on our ability to acquire a steady flow of mortgage loans  We purchase a significant percentage of our single family mortgages from several large mortgage originators  During 2011 and 2010, approximately 82% and 78%, respectively, of our single family mortgage purchase volume was associated with our ten largest customers  During 2011, two mortgage lenders (Wells Fargo Bank, N.A. and JPMorgan Chase Bank, N.A.) each accounted for more than 10% of our single family mortgage purchase volume and collectively accounted for approximately 40% of our single family mortgage purchase volume  Similarly, we acquire a significant portion of our multifamily mortgage loans from several large lenders

We enter into mortgage purchase volume commitments with many of our single family customers that provide for the customers to deliver to us a certain volume of mortgages during a specified period of time  Some commitments may also provide for the lender to deliver to us a minimum percentage of their total sales of conforming loans  There is a risk that we will not be able to enter into new commitments with our key single family customers that will maintain mortgage purchase volume following the expiration of our existing commitments with them  Since 2007, the mortgage industry has consolidated significantly and a smaller number of large lenders originate most single family mortgages  The loss of business from any one of our major lenders could adversely affect our market share and our revenues  Many of our seller/servicers also have tightened their lending criteria in recent years, which has reduced their loan volume, thus reducing the volume of loans available for us to purchase.

***Ongoing weak business and economic conditions in the U.S. and abroad may adversely affect our business and results of operations.***

Our business and results of operations are significantly affected by general business and economic conditions, including conditions in the international markets for our investments or our mortgage related and debt securities  These conditions include employment rates, fluctuations in both debt and equity capital markets, the value of the U.S. dollar as compared to foreign currencies, the strength of the U S financial markets and national economy and the local economies in which we conduct business, and the economies of other countries that purchase our mortgage related and debt securities  Concerns about fiscal challenges in several Eurozone economies intensified during 2011, creating significant uncertainty in the financial markets and potential increased risk exposure for our counterparties and for us. There is also significant uncertainty regarding the strength of the U S economic recovery  If the U S economy remains weak, we could experience continued high serious delinquencies and credit losses, which will adversely affect our results of operations and financial condition

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar ® Document Research℠

TREASURY-2831

Table of Contents

The mortgage credit markets continue to be impacted by a decrease in availability of corporate credit and liquidity within the mortgage industry, causing disruptions to normal operations of major mortgage servicers and, at times, originators, including some of our largest customers. This has also contributed to significant volatility, wide credit spreads and a lack of price transparency, and the potential for further consolidation within the financial services industry.

### Competition from banking and non banking companies may harm our business.

Competition in the secondary mortgage market combined with a decline in the amount of residential mortgage debt outstanding may make it more difficult for us to purchase mortgages Furthermore, competitive pricing pressures may make our products less attractive in the market and negatively impact our financial results Increased competition from Fannie Mae, Ginnie Mae, and FHA/VA may alter our product mix, lower volumes, and reduce revenues on new business FHFA is also Conservator of Fannie Mae, our primary competitor, and FHFA's actions as Conservator of both companies could affect competition between us and Fannie Mae. It is possible that FHFA could require us and Fannie Mae to take a common approach that, because of differences in our respective businesses, could place Freddie Mac at a competitive disadvantage to Fannie Mae Efforts we may make or may be directed to make to increase the profitability of new single family guarantee business, such as by tightening credit standards or raising guarantee fees, could cause our market share to decrease and the volume of our single family guarantee business to decline Historically, we also competed with other financial institutions that retain or securitize mortgages, such as commercial and investment banks, dealers, thrift institutions, and insurance companies. While many of these institutions have ceased or substantially reduced their activities in the secondary market for single family mortgages since 2008, it is possible that these institutions will reenter the market.

Beginning in 20 0, some market participants began to re emerge in the multifamily market, and we have faced increased competition from other institutional investors

We could be prevented from competing efficiently and effectively by competitors who use their patent portfolios to prevent us from using necessary business processes and products, or to require us to pay significant royalties to use those processes and products.

### Our investment activities may be adversely affected by limited availability of financing and increased funding costs.

The amount, type and cost of our funding, including financing from other financial institutions and the capital markets, directly impacts our interest expense and results of operations A number of factors could make such financing more difficult to obtain, more expensive or unavailable on any terms, both domestically and internationally, including:

• termination of, or future restrictions or other adverse changes with respect to, government support programs that may benefit us;

• reduced demand for our debt securities;

• competition for debt funding from other debt issuers; and

• downgrades in our credit ratings or the credit ratings of the U.S. government.

Our ability to obtain funding in the public debt markets or by pledging mortgage related securities as collateral to other financial institutions could cease or change rapidly, and the cost of available funding could increase significantly due to changes in market confidence and other factors For example, in the fall of 2008, we experienced significant deterioration in our access to the unsecured medium and long term debt markets, and were forced to rely on short term debt to fund our purchases of mortgage assets and refinance maturing debt and to rely on derivatives to synthetically create the substantive economic equivalent of various debt funding structures.

We follow certain liquidity management practices and procedures However, in the event we were unable to obtain funding from the public debt markets, there can be no assurance that such practices and procedures would provide us with sufficient liquidity to meet ongoing cash obligations for an extended period

Since 2008, the ratings on the non agency mortgage related securities we hold backed by Alt A, subprime, and option ARM loans have decreased, limiting their availability as a significant source of liquidity for us through sales or use as collateral in secured lending transactions In addition, adverse market conditions have negatively impacted our ability to enter into secured lending transactions using agency securities as collateral These trends are likely to continue in the future

The composition of our mortgage related investments portfolio has changed significantly since we entered into conservatorship, as our holdings of single family whole loans have significantly increased and our holdings of agency

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-2832

Table of Contents

mortgage related securities have significantly declined  This changing composition presents heightened liquidity risk, which influences management's decisions regarding funding and hedging

### Government Support

Changes or perceived changes in the government's support of us could have a severe negative effect on our access to the debt markets and our debt funding costs. Under the Purchase Agreement, the $200 billion cap on Treasury's funding commitment will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011, and 2012. While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate  liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the  future of the GSEs and potential investor concerns about the adequacy of funding available to us under the Purchase Agreement  after 2012. The cost of our debt funding could increase if debt investors believe that the risk that we could be placed into  receivership is increasing. In addition, under the Purchase  Agreement, without the prior consent of Treasury, we may not increase our total indebtedness above a specified limit or  become liable for any subordinated indebtedness  For more information, see "MD&A    LIQUIDITY AND CAPITAL RESOURCES    Liquidity    *Actions of Treasury and FHFA.*"

We do not currently have a liquidity backstop available to us (other than draws from Treasury under the Purchase Agreement and Treasury's ability to purchase up to $2.25 billion of our obligations under its permanent statutory authority) if we  are unable to obtain funding from issuances of debt or other conventional sources  At present, we are not able to predict the likelihood that a liquidity backstop will be needed, or to identify the alternative sources of liquidity that might be  available to us if needed, other than from Treasury as referenced above

### Demand for Debt Funding

The willingness of domestic and foreign investors to purchase  and hold our debt securities can be influenced by many factors,  including changes in the world economy, changes in foreign currency exchange rates, regulatory and political  factors, as well as the availability of and preferences for other investments  If investors were to divest their holdings or  reduce their purchases of our debt securities, our funding costs could increase and our business activities could be curtailed.  The willingness of investors to purchase or hold our debt  securities, and any changes to such willingness, may materially  affect our liquidity, business and results of operations.

### Competition for Debt Funding

We compete for low cost debt funding with Fannie Mae, the FHLBs,  and other institutions  Competition for debt funding from these  entities can vary with changes in economic, financial market,  and regulatory environments  Increased competition for low cost  debt funding may result in a higher cost to finance our business, which could negatively affect our financial results.  An inability to issue debt securities at attractive rates in amounts sufficient to fund our business activities and meet our  obligations could have an adverse effect on our business,  liquidity, financial condition, and results of operations. See "MD&A    LIQUIDITY AND CAPITAL RESOURCES    Liquidity    *Other Debt Securities*" for a description of our debt issuance  programs.

Our funding costs may also be affected by changes in the amount  of, and demand for, debt issued by Treasury.

### Line of Credit

We maintain a secured intraday line of credit to provide additional intraday liquidity to fund our activities through the  Fedwire system. This line of credit requires us to post collateral to a third party. In certain circumstances, this  secured counterparty may be able to repledge the collateral underlying our financing without our consent. In addition,  because the secured intraday line of credit is uncommitted, we  may not be able to continue to draw on it if and when needed

***Any downgrade in the credit ratings of the U.S. government  would likely be followed by a downgrade in our credit ratings. A downgrade in the credit ratings of our debt could adversely  affect our liquidity and other aspects of our  business.***

Nationally recognized statistical rating organizations play an  important role in determining, by means of the ratings they  assign to issuers and their debt, the availability and cost of  funding. Our credit ratings are important to our liquidity. We currently receive ratings from three nationally recognized statistical rating organizations (S&P, Moody's, and Fitch) for our unsecured borrowings. These ratings are primarily based on the support we receive from Treasury, and therefore are affected by changes in the credit ratings of the U.S. government.

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

On August 2, 2011, President Obama signed the "Budget and Control Act of 2011" which raised the U.S. government's statutory debt limit. The raising of the statutory debt limit and details outlined in the legislation to reduce the deficit resulted in actions on the ratings of the U.S. government and our debt, including: (a) on August 5, 2011, S&P lowered the long term credit rating of the United States to "AA+" from "AAA" and assigned a negative outlook to the rating; and (b) on August 8, 2011, S&P lowered our senior long term debt credit rating to "AA " from "AAA" and assigned a negative outlook to the rating  As a result of this downgrade, we posted additional collateral  to certain derivative counterparties in accordance with the  terms of the collateral agreements with such counterparties  For  more information, see "MD&A LIQUIDITY AND CAPITAL RESOURCES    Liquidity    *Credit Ratings*."

S&P, Moody's, and Fitch have indicated that additional actions on the U.S. government's ratings could occur  if steps toward a credible deficit reduction plan are not taken  or if the U S  experiences a weaker than expected economic  recovery  Any downgrade in the credit ratings of the U S  government would be expected to be reflected in or  accompanied by a downgrade in our credit ratings

In addition to a downgrade in the credit ratings of or outlook  on the U S  government, a number of events could adversely  affect our debt credit ratings, including actions by  governmental entities or others, changes in government support  for us, additional GAAP losses, and additional draws under the  Purchase Agreement  Such actions could lead to major disruptions  in the mortgage market and to our business due to  ower liquidity, higher borrowing costs, lower asset values, and  higher credit losses, and could cause us to experience much  greater net losses and net worth deficits. The full range and  extent of the adverse effects to our business that would result  from any such ratings downgrades and market disruptions cannot be predicted with certainty  However, we expect that they could: (a) adversely affect our liquidity and cause us to limit or suspend new business activities that entail outlays of cash;  (b) make new issuances of debt significantly more costly, or potentially prohibitively expensive, and adversely affect the  supply of debt financing available to us; (c) reduce the  value of our guarantee to investors and adversely affect our ability to issue our guaranteed mortgage related securities; (d) reduce the value of Treasury and agency mortgage  securities we hold; (e) increase the cost of mortgage  financing for borrowers, thereby reducing the supply of  mortgages available to us to purchase; (f) adversely affect home prices, reducing the value of our REO and likely leading to  additional borrower defaults on mortgage loans we guarantee; and (g) trigger additional collateral requirements under our  derivatives contracts

***Any decline in the price performance of or demand for our PCs could  have an adverse effect on the volume and profitability of our new single family guarantee business.***

Our PCs are an integral part of our mortgage purchase program   We purchase many mortgages by issuing PCs in exchange for them  in guarantor swap transactions. We also issue PCs backed by  mortgage loans that we purchased for cash  Our competitiveness  in purchasing single family mortgages from our seller/servicers,  and thus the volume and profitability of new single family  business, can be directly affected by the relative price  performance of our PCs and comparable Fannie Mae securities   Increasing demand for our PCs helps support the price performance of our PCs, which in turn helps us compete with  Fannie Mae and others in purchasing mortgages

Our PCs have typically traded at a discount to comparable Fannie  Mae securities, which creates an incentive for customers to  conduct a disproportionate share of their guarantor business  with Fannie Mae and negatively impacts the economics of our  business. Various factors, including market conditions and the  relative rates at which the underlying mortgages prepay, affect  the price performance of our PCs  The changes to HARP (announced  by FHFA on October 24, 2011) could adversely affect the price  performance of our PCs, to the extent they cause the loans  underlying our PCs to refinance at a faster rate than  loans underlying comparable Fannie Mae securities (or cause the  perception that loans underlying our PCs will refinance at a  faster rate)  While we employ a variety of strategies to support  the price performance of our PCs and may consider further  strategies, any such strategies may fail or adversely affect our  business or we may cease such activities if deemed appropriate   We may incur costs to support the liquidity and price  performance of our securities  In certain circumstances, we  compensate customers for the difference in price between our PCs  and comparable Fannie Mae securities  However, this could  adversely affect the profitability and market share of our  single family guarantee business

Beginning in 20 2, under guidance from FHFA we expect to curtail  mortgage related investments portfolio purchase and retention  activities that are undertaken for the primary purpose of  supporting the price performance of our PCs, which may result in  a significant decline in the market share of our single family  guarantee business, lower comprehensive income, and a more rapid  decline in the size of our total mortgage portfolio  If these  developments occur, it may be difficult and expensive for us to  reverse or mitigate them through PC price support activities, should we desire or be directed to do so  For more information,  see "BUSINESS    Our Business Segments    *Single Family Guarantee Segment    Securitization Activities*" and "   *Investments Segment    PC Support Activities*."

64                                                                      *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2834

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are caused or limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We may be unable to maintain a liquid and deep market for our PCs, which could also adversely affect the price performance of PCs. A significant reduction in the volume of mortgage loans that we securitize could reduce the liquidity of our PCs

### Mortgage fraud could result in significant financial losses and harm to our reputation.

We rely on representations and warranties by seller/servicers about the characteristics of the single family mortgage loans we purchase and securitize, and we do not independently verify most of the information that is provided to us before we purchase the loan This exposes us to the risk that one or more of the parties involved in a transaction (such as the borrower, seller, broker, appraiser, title agent, loan officer, lender or servicer) will engage in fraud by misrepresenting facts about a mortgage loan or a borrower While we subsequently review a sample of these loans to determine if such loans are in compliance with our contractual standards, there can be no assurance that this would detect or deter mortgage fraud, or otherwise reduce our exposure to the risk of fraud We are also exposed to fraud by third parties in the mortgage servicing function, particularly with respect to sales of REO properties, single family short sales, and other dispositions of non performing assets We may experience significant financial losses and reputational damage as a result of such fraud.

### The value of mortgage related securities guaranteed by us and held as investments may decline if we were unable to perform under our guarantee or if investor confidence in our ability to perform under our guarantee were to diminish.

A portion of our investments in mortgage related securities are securities guaranteed by us Our valuation of these securities is consistent with GAAP and the legal structure of the guarantee transaction These securities include the Freddie Mac assets transferred to the securitization trusts that serve as collateral for the mortgage related securities issued by the trusts (*i.e.*, (a) multifamily PCs; (b) REMICs and Other Structured Securities; and (c) certain Other Guarantee Transactions). The valuation of our guaranteed mortgage related securities necessarily reflects investor confidence in our ability to perform under our guarantee and the liquidity that our guarantee provides If we were unable to perform under our guarantee or if investor confidence in our ability to perform under our guarantee were to diminish, the value of our guaranteed securities may decline, thereby reducing the value of the securities reported on our consolidated balance sheets, which could have an adverse affect on our financial condition and results of operations. This could also adversely affect our ability to sell or otherwise use these securities for liquidity purposes.

### Changes in interest rates could negatively impact our results of operations, stockholders' equity (deficit) and fair value of net assets.

Our investment activities and credit guarantee activities expose us to interest rate and other market risks. Changes in interest rates, up or down, could adversely affect our net interest yield Although the yield we earn on our assets and our funding costs tend to move in the same direction in response to changes in interest rates, either can rise or fall faster than the other, causing our net interest yield to expand or compress For example, due to the timing of maturities or rate reset dates on variable rate instruments, when interest rates rise, our funding costs may rise faster than the yield we earn on our assets. This rate change could cause our net interest yield to compress until the effect of the increase is fully reflected in asset yields Changes in the slope of the yield curve could also reduce our net interest yield

Our GAAP results can be significantly affected by changes in interest rates, and adverse changes in interest rates could increase our GAAP net loss or deficit in total equity (deficit) materially For example, changes in interest rates affect the fair value of our derivative portfolio Since we generally record changes in fair values of our derivatives in current income, such changes could significantly impact our GAAP results. While derivatives are an important aspect of our management of interest rate risk, they generally increase the volatility of reported net income (loss), because, while fair value changes in derivatives affect net income, fair value changes in several of the types of assets and liabilities being hedged do not affect net income We could record substantial gains or losses from derivatives in any period, which could significantly contribute to our overall results for the period and affect our net equity (deficit) as of the end of such period It is difficult for us to predict the amount or direction of derivative results Additionally, increases in interest rates could increase other than temporary impairments on our investments in non agency mortgage related securities

Changes in interest rates may also affect prepayment assumptions, thus potentially impacting the fair value of our assets, including our investments in mortgage related assets When interest rates fall, borrowers are more likely to prepay their mortgage loans by refinancing them at a lower rate An increased likelihood of prepayment on the mortgages underlying our mortgage related securities may adversely impact the value of these securities

When interest rates increase, our credit losses from ARM and interest only ARM loans may increase as borrower payments increase at their reset dates, which increases the borrower's risk of default Rising interest rates may also reduce the opportunity for these borrowers to refinance into a fixed rate loan

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar ® Document Research ℠

TREASURY-2835

Table of Contents

Interest rates can fluctuate for a number of reasons, including changes in the fiscal and monetary policies of the federal government and its agencies, such as the Federal Reserve  Federal Reserve policies directly and indirectly influence the yield on our interest earning assets and the cost of our interest bearing liabilities  The availability of derivative financial instruments (such as options and interest rate and foreign currency swaps) from acceptable counterparties of the types and in the quantities needed could also affect our ability to effectively manage the risks related to our investment funding  Our strategies and efforts to manage our exposures to these risks may not be effective. In particular, in recent periods, a number of factors have made it more difficult for us to estimate future prepayments, including uncertainty regarding default rates, unemployment, loan modifications, the impact of FHFA directed changes to HARP (announced in October 2011), and the volatility and impact of home price movements on mortgage durations. This could make it more difficult for us to manage prepayment risk, and could cause our hedging related losses to increase. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK" for a description of the types of market risks to which we are exposed and how we seek to manage those risks.

### *Changes in OAS could materially impact our fair value of net assets and affect future results of operations and stockholders' equity (deficit).*

OAS is an estimate of the incremental yield spread between a given security and an agency debt yield curve. This includes consideration of potential variability in the security's cash flows resulting from any options embedded in the security, such as prepayment options. The OAS between the mortgage and agency debt sectors can significantly affect the fair value of our net assets. The fair value impact of changes in OAS for a given period represents an estimate of the net unrealized increase or decrease in the fair value of net assets arising from net fluctuations in OAS during that period  We do not attempt to hedge or actively manage the impact of changes in mortgage to debt OAS

Changes in market conditions, including changes in interest rates or liquidity, may cause fluctuations in OAS. A widening of the OAS on a given asset, which typically causes a decline in the current fair value of that asset, may cause significant mark to fair value losses, and may adversely affect our financial results and stockholders' equity (deficit), but may increase the number of attractive investment opportunities in mortgage loans and mortgage related securities  Conversely, a narrowing or tightening of the OAS typically causes an increase in the current fair value of that asset, but may reduce the number of attractive investment opportunities in mortgage loans and mortgage related securities  Consequently, a tightening of the OAS may adversely affect our future financial results and stockholders' equity (deficit)  See "MD&A  FAIR VALUE MEASUREMENTS AND ANALYSIS     Consolidated Fair Value Balance Sheets Analysis     *Discussion of Fair Value Results*" for a more detailed description of the impacts of changes in mortgage to debt OAS

While wider spreads might create favorable investment opportunities, we are limited in our ability to take advantage of any such opportunities due to various restrictions on our mortgage related investments portfolio activities  See "BUSINESS     Conservatorship and Re ated Matters     *Impact of Conservatorship and Related Actions on Our Business     Limits on Investment Activity and Our Mortgage Related Investments Portfolio*."

### *We could experience significant reputational harm, which could affect the future of our company, if our efforts under the MHA Program and other initiatives to support the U.S. residential mortgage market do not succeed.*

We are focused on the servicing alignment initiative, the MHA Program and other initiatives to support the U S residential mortgage market  If these initiatives do not achieve their desired results, or are otherwise perceived to have failed to achieve their objectives, we may experience damage to our reputation, which may impact the extent of future government support for our business and government decisions with respect to the future status and role of Freddie Mac

### *Negative publicity causing damage to our reputation could adversely affect our business prospects, financial results, or net worth.*

Reputation risk, or the risk to our financial results and net worth from negative public opinion, is inherent in our business. Negative public opinion could adversely affect our ability to keep and attract customers or otherwise impair our customer relationships, adversely affect our ability to obtain financing, impede our ability to hire and retain qualified personnel, hinder our business prospects, or adversely impact the trading price of our securities  Perceptions regarding the practices of our competitors, our seller/servicers or the financial services and mortgage industries as a whole, particularly as they relate to the current housing and economic downturn, may also adversely impact our reputation  Adverse reputation impacts on third parties with whom we have important relationships may impair market confidence or investor confidence in our business operations as well  In addition, negative publicity could expose us to adverse legal and regulatory consequences, including greater regulatory scrutiny or adverse regulatory or legislative changes, and could

TREASURY-2836

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

affect what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist These adverse consequences could result from perceptions concerning our activities and role in addressing the housing and economic downturn, concern about our compensation practices, concerns about deficiencies in foreclosure documentation practices or our actual or alleged action or failure to act in any number of areas, including corporate governance, regulatory compliance, financial reporting and disclosure, purchases of products perceived to be predatory, safeguarding or using nonpublic personal information, or from actions taken by government regulators in response to our actual or alleged conduct

***The servicing alignment initiative, MHA Program, and other efforts to reduce foreclosures, modify loan terms and refinance mortgages, including HARP, may fail to mitigate our credit losses and may adversely affect our results of operations or financial condition.***

The servicing alignment initiative, MHA Program, and other loss mitigation activities are a key component of our strategy for managing and resolving troubled assets and lowering credit losses. However, there can be no assurance that any of our loss mitigation strategies will be successful and that credit losses will not continue to escalate The costs we incur related to loan modifications and other activities have been, and will likely continue to be, significant because we bear the full cost of the monthly payment reductions related to modifications of loans we own or guarantee, and all applicable servicer and borrower incentives We are not reimbursed for these costs by Treasury. For information on our loss mitigation activities, see "MD&A    RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Single Family Loan Workouts and the MHA Program.*"

We could be required or elect to make changes to our implementation of our other loss mitigation activities that could make these activities more costly to us, both in terms of credit expenses and the cost of implementing and operating the activities For example, we could be required to, or elect to, use principal reduction to achieve reduced payments for borrowers. This could further increase our losses, as we could bear the full costs of such reductions.

A significant number of loans are in the trial period of HAMP or the trial period of our new non HAMP standard loan modification For information on completion rates for HAMP and non HAMP modifications, see "MD&A    RISK MANAGEMENT    Credit Risk *Mortgage Credit Risk    Single Family Loan Workouts and the MHA Program* " A number of loans will fail to complete the applicable trial period or qualify for our other loss mitigation programs For these loans, the trial period will have effectively delayed the foreclosure process and could increase our losses, to the extent the prices we ultimately receive for the foreclosed properties are less than the prices we could have received had we foreclosed upon the properties earlier, due to continued home price declines These delays in foreclosure could also cause our REO operations expense to increase, perhaps substantially.

Mortgage modification initiatives, particularly any future focus on principal reductions (which at present we do not offer to borrowers), have the potential to change borrower behavior and mortgage underwriting Principal reductions may create an incentive for borrowers that are current to become delinquent in order to receive a principal reduction This, coupled with the phenomenon of widespread underwater mortgages, could significantly affect borrower attitudes towards homeownership, the commitment of borrowers to making their mortgage payments, the way the market values residential mortgage assets, the way in which we conduct business and, ultimately, our financial results.

Depending on the type of loss mitigation activities we pursue, those activities could result in accelerating or slowing prepayments on our PCs and REMICs and Other Structured Securities, either of which could affect the pricing of such securities

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA directed changes to HARP in an effort to attract more eligible borrowers whose monthly payments are current and who can benefit from refinancing their home mortgages The Acting Director of FHFA stated that the goal of pursuing these changes is to create refinancing opportunities for more borrowers whose mortgages are owned or guaranteed by Freddie Mac and Fannie Mae, while reducing risk for Freddie Mac and Fannie Mae and bringing a measure of stability to housing markets However, there can be no assurance that the revisions to HARP will be successful in achieving these objectives or that any benefits from the revised program will exceed our costs We may face greater exposure to credit and other losses on these HARP loans because we are not requiring lenders to provide us with certain representations and warranties on these HARP loans In addition, changes in expectations of mortgage prepayments could result in declines in the fair value of our investments in certain agency securities and lower net interest yields over time on other mortgage related investments The ultimate impact of the HARP revisions on our financial results will be driven by the eve of borrower participation and the volume of loans with high LTV ratios that we acquire under the program Over time, relief refinance mortgages with LTV ratios above 80% may not perform as well as relief refinance mortgages with LTV ratios of 80% and below because of the continued high LTV ratios of these loans. There is an increase in borrower default risk as LTV ratios increase, particularly

<div align="center">67</div>

<div align="right">*Freddie Mac*</div>

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

for loans with LTV ratios above 80%  In addition, relief refinance mortgages may not be covered by mortgage insurance for  the full excess of their UPB over 80%

We are devoting significant internal resources to the implementation of the servicing alignment initiative and the MHA  Program, which has, and will continue to, increase our expenses  The size and scope of these efforts may also limit our ability  to pursue other business opportunities or corporate initiatives

***We may experience further write downs and losses relating to our  assets, including our investment securities, net deferred tax  assets, REO properties or mortgage loans, that could materially  adversely affect our business, results of operations, financial  condition, liquidity and net worth.***

We experienced significant losses and write downs relating to  certain of our assets during the past several years, including  significant declines in market value, impairments of our  investment securities, market based write downs of REO  properties, losses on non performing loans removed from PC pools, and impairments on other assets. The fair value of our  assets may be further adversely affected by continued weakness in the economy, further deterioration in the housing  and financial markets, additional ratings downgrades, or other  events

We increased our valuation allowance for our net deferred tax  assets by $2.3 billion during 2011. The future status and role of Freddie Mac could be affected by actions of the  Conservator, and legislative and regulatory action that alters  the ownership, structure, and mission of the company. The uncertainty of these developments could materially affect our  operations, which could in turn affect our ability or intent to  hold investments until the recovery of any temporary unrealized  losses  If future events significantly alter our current  outlook, a valuation allowance may need to be established for  the remaining deferred tax asset

Due to the ongoing weaknesses in the economy and in the housing  and financial markets, we may experience additional write downs  and losses relating to our assets, including those that are  currently AAA rated, and the fair values of our assets may  continue to decline  This could adversely affect our results of operations, financial condition, liquidity, and net worth.

***There may not be an active, liquid trading market for our equity  securities. Our equity securities are not likely to have any  value beyond the short term.***

Our common stock and classes of preferred stock that previously  were listed and traded on the NYSE were delisted from the NYSE effective July 8, 2010, and now trade on the OTC market.  The market price of our common stock declined significantly  between June 16, 20  0, the date we announced our intention to delist these  securities, and July 8, 2010, the first day  the common stock traded exclusively on the OTC market, and may decline further. Trading  volumes on the OTC market have been, and will likely continue to be, less than those on the NYSE, which would make it more difficult for investors to execute  transactions in our securities and could make the prices of our  securities decline or be more volatile  The Acting Director of FHFA has stated that "[Freddie Mac and Fannie Mae's] equity holders retain an economic claim on the companies but that claim is subordinate to taxpayer claims. As a practical  matter, taxpayers are not likely to be repaid in full, so [Freddie Mac and Fannie Mae] stock lower in priority is not  likely to have any value "

### Operational Risks

***We have incurred, and will continue to incur, expenses and we may  otherwise be adversely affected by delays and deficiencies in  the foreclosure process.***

We have been, and will likely continue to be, adversely affected  by delays in the foreclosure process, which could increase our  expenses

The average length of time for foreclosure of a Freddie Mac loan  significantly increased in recent years, and may continue to  increase  A number of factors have contributed to this increase,  including: (a) the increasingly lengthy foreclosure process  in many states; and (b) concerns about deficiencies in seller/servicers' conduct of the foreclosure process  More recently, regulatory developments impacting mortgage servicing and foreclosure practices have also contributed to these delays  For more information on these developments, see "BUSINESS      Regulation and Supervision    *Legislative and Regulatory Developments      Developments Concerning Single Family Servicing Practices* ."

Delays in the foreclosure process could cause our credit losses  to increase for a number of reasons  For example, properties  awaiting foreclosure could deteriorate until we acquire  ownership of them through foreclosure  This would increase our  expenses to repair and maintain the properties when we do acquire them. Such delays may also adversely affect the values  of, and our losses on, the non agency mortgage related securities we hold  Delays in the foreclosure

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012          TREASURY-2838          Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

process may also adversely affect trends in home prices regionally or nationally, which could also adversely affect our financial results.

It also is possible that mortgage insurance claims could be reduced if delays caused by servicers' deficient foreclosure practices prevent servicers from completing foreclosures within required timelines defined by mortgage insurers Mortgage insurance companies establish foreclosure timelines that vary by state and range between 30 and 960 days.

Delays in the foreclosure process could create fluctuations in our single family credit statistics For example, our realization of credit losses, which consists of REO operations income (expense) plus charge offs, net, could be delayed because we typically record charge offs at the time we take ownership of a property through foreclosure Delays could also temporarily increase the number of seriously delinquent loans that remain in our single family mortgage portfolio, which could result in higher reported serious delinquency rates and a larger number of non performing loans than would otherwise have been the case

In the fall of 20 0, several large seller/servicers announced issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings These announcements raised various concerns relating to foreclosure practices A number of our seller/servicers, including several of our largest ones, temporarily suspended foreclosure proceedings in certain states while they evaluated and addressed these issues While the larger servicers generally resumed foreclosure proceedings in early 20 , single family mortgages in our portfolio have continued to experience significant delays in the foreclosure process in 2011, as compared to periods before these issues arose, particularly in states that require a judicial foreclosure process These and other factors could also delay sales of our REO properties In addition, a group consisting of state attorneys general and state bank and mortgage regulators is reviewing foreclosure practices We have terminated the eligibility of several law firms to serve as counsel in foreclosures of Freddie Mac mortgages, due to issues with respect to the firms' foreclosure practices It is possible that additional deficiencies in foreclosure practices will be identified

We have incurred, and will continue to incur, expenses related to deficiencies in foreclosure documentation practices and the costs of remediating them, which may be significant. These expenses include costs related to terminating the eligibility of certain law firms and other incremental costs. We may also incur costs if we become involved in litigation or investigations relating to these issues It will take time for seller/servicers to complete their evaluations of these issues and implement remedial actions The integrity of the foreclosure process is critical to our business, and our financial results could be adversely affected by deficiencies in the conduct of that process.

### *Issues related to mortgages recorded through the MERS System could delay or disrupt foreclosure activities and have an adverse effect on our business.*

The Mortgage Electronic Registration System, or the MERS® System, is an electronic registry that is widely used by seller/servicers, Freddie Mac, and other participants in the mortgage finance industry, to maintain records of beneficial ownership of mortgages The MERS System is maintained by MERSCORP, Inc., a privately held company, the shareholders of which include a number of organizations in the mortgage industry, including Freddie Mac, Fannie Mae, and certain seller/servicers, mortgage insurance companies, and title insurance companies

Mortgage Electronic Registration Systems, Inc , or MERS, a wholly owned subsidiary of MERSCORP, Inc., has the ability to serve as a nominee for the owner of a mortgage loan and in that role become the mortgagee of record for the loan in local land records Freddie Mac seller/servicers may choose to use MERS as a nominee Approximately 42% of the loans Freddie Mac owns or guarantees were registered in MERS' name as of December 31, 2011; the beneficial ownership and the ownership of the servicing rights related to those loans are tracked in the MERS System.

In the past, Freddie Mac servicers had the option of initiating foreclosure in MERS' name. On March 23, 2011, we informed our servicers that they no longer may initiate foreclosures in MERS' name for those mortgages owned or guaranteed by us and registered with MERS that are referred to foreclosure on or after April 1, 2011. As of April 1, 2011, foreclosure of mortgages owned or guaranteed by us for which MERS serves as nominee is accomplished by MERS assigning the record ownership of the mortgage to the servicer, and the servicer initiating foreclosure in its own name Many of our servicers were following this procedure before the March 23 announcement

MERS has also been the subject of numerous lawsuits challenging foreclosures on mortgages for which MERS is mortgagee of record as nominee for the beneficial owner For example, on February 3, 2012, the Attorney General of the State of New York filed a lawsuit against MERSCORP, Inc., MERS and several large banks alleging, among other items, that the creation and use of the MERS System has resulted in a wide range of deceptive and fraudulent foreclosure filings in New York state and federal courts. It is possible that adverse judicial decisions, regulatory proceedings or action, or

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2839

Table of Contents

legislative action related to MERS, could delay or disrupt foreclosure of mortgages that are registered on the MERS System  Publicity concerning regulatory or judicial decisions, even if such decisions were not adverse, or MERS related concerns about the integrity of the assignment process, could adversely affect the mortgage industry and negatively impact public confidence in the foreclosure process, which could lead to legislative or regulatory action  Because MERS often executes legal documents in connection with foreclosure proceedings, it is possible that investigations by governmental authorities and others into deficiencies in foreclosure practices may negatively impact MERS and the MERS System.

Federal or state legislation or regulatory action could prevent us from using the MERS System for mortgages that we currently own, guarantee, and securitize and for mortgages acquired in the future, or could create additional requirements for the transfer of mortgages that could affect the process for and costs of acquiring, transferring, servicing, and foreclosing mortgages.  Such legislation or regulatory action could increase our costs or otherwise adversely affect our business  For example, we could be required to transfer mortgages out of the MERS System. There is also uncertainty regarding the extent to which seller/servicers will choose to use the MERS System in the future.

Failures by MERS to apply prudent and effective process controls and to comply with legal and other requirements in the foreclosure process could pose legal and operational risks for us. We may also face significant reputational risk due to our ties to MERS, as we are a shareholder of MERSCORP, Inc., and a Freddie Mac officer serves on the board of directors of both entities

We cannot predict the impact that such events or actions may have on our business. On April 13, 2011, the Office of the Comptroller of the Currency, the Federal Reserve, the FDIC, the Office of Thrift Supervision, and FHFA entered into a consent order with MERS and MERSCORP, Inc., which stated that such federal regulators had identified certain deficiencies and unsafe or unsound practices by MERS and MERSCORP, Inc. that present financial, operational, compliance, legal, and reputational risks to MERSCORP, Inc. and MERS, and to its participating members, including Freddie Mac  The consent order requires MERS and MERSCORP, Inc. to, among other things, create and submit plans to ensure that MERS and MERSCORP, Inc. (a): are operated in a safe and sound manner and have adequate financial strength and staff; (b) improve communications with MERSCORP, Inc. shareholders and members; (c) intensify the monitoring of and response to litigation; and (d) establish processes to ensure data quality and strengthen certain aspects of corporate governance  The federal banking regulators have also indicated that MERSCORP, Inc. should take action to simplify its governance structure, which could involve us giving up certain governance rights  It is unclear what changes will ultimately be made and whether there will be any consequent impact on Freddie Mac's relationship with and rights with respect to the two entities

***Weaknesses in internal control over financial reporting and in disclosure controls could result in errors and inadequate disclosures, affect operating results, and cause investors to lose confidence in our reported results.***

We face continuing challenges because of deficiencies in our controls  Control deficiencies could result in errors, and lead to inadequate or untimely disclosures, and affect operating results  Control deficiencies could also cause investors to lose confidence in our reported financial results, which may have an adverse effect on the trading price of our securities  For information about our ineffective disclosure controls and two material weaknesses in internal control over financial reporting, see "CONTROLS AND PROCEDURES."

There are a number of factors that may impede our efforts to establish and maintain effective disclosure controls and internal control over financial reporting, including: (a) the nature of the conservatorship and our relationship with FHFA; (b) the complexity of, and significant changes in, our business activities and related GAAP requirements; (c) significant employee and management turnover; (d) internal reorganizations; (e) uncertainty regarding the sustainability of newly established controls; (f) data quality or servicing related issues; and (g) the uncertain impacts of the ongoing housing and economic downturn on the results of our models, which are used for financial accounting and reporting purposes. Disruptive levels of employee turnover could negatively impact our internal control environment, including internal control over financial reporting, and ability to issue timely financial statements  During 20  , we experienced significant changes to our internal control environment as a result of resignations, terminations, or changes in responsibility  We cannot be certain that our efforts to improve and maintain our internal control over financial reporting will ultimately be successful

Effectively designed and operated internal control over financial reporting provides only reasonable assurance that material errors in our financial statements will be prevented or detected on a timely basis  A failure to maintain effective internal control over financial reporting increases the risk of a material error in our reported financial results and delay in our financial reporting timeline  Depending on the nature of a control failure and any required remediation, ineffective controls could have a material adverse effect on our business

TREASURY-2840

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012                                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

***We face risks and uncertainties associated with the internal models that we use for financial accounting and reporting purposes, to manage business decisions, and to manage risks. Market conditions have raised these risks and uncertainties.***

We make significant use of business and financial models for financial accounting and reporting purposes and to manage risk. We face risk associated with our use of models. First, there is inherent uncertainty associated with model results  Second, we could fail to properly implement, operate, or use our models  Either of these situations could adversely affect our financial statements and our ability to manage risks.

We use market based information as inputs to our models. However, it can take time for data providers to prepare information, and thus the most recent information may not be available for the preparation of our financial statements  When market conditions change quickly and in unforeseen ways, there is an increased risk that the inputs reflected in our models are not representative of current market conditions

The severe deterioration of the housing and credit markets  beginning several years ago and, more recently, the extended period of economic weakness and uncertainty has increased the risks associated with our use of models  For example, certain economic events or the implementation of government policies  could create increased model uncertainty as models may not fully capture these events, which makes it more difficult to assess model performance and requires a higher degree of management judgment  Our models may not perform as well in situations for which there are few or no recent historical precedents  We have adjusted our models in response to recent events, but there remains considerable uncertainty about model results

Models are inherently imperfect predictors of actual results  Our models rely on various assumptions that may be incorrect, including that historical experience can be used to predict future results  It has been more difficult to predict the behaviors of the housing and credit capital markets and market participants over the past several years, due to, among other factors: (a) the uncertainty concerning trends in home prices; (b) the lack of historical evidence about the behavior of deeply underwater borrowers, the effect of an extended period of extremely low interest rates on prepayments, and the impact of widespread loan refinancing and modification programs (such as HARP and HAMP), including the potential for the extensive use of principal reductions; and (c) the impact of the concerns about deficiencies in foreclosure documentation practices and related delays in the foreclosure process.

We face the risk that we could fail to implement, operate, or adjust or use our models properly. This risk may be increasing due to our difficulty in attracting and retaining employees with the necessary experience and skills  For example, the assumptions underlying a model could be invalid, or we could apply a model to events or products outside the model's intended use  We may fail to code a model correctly or we could use incorrect data  The complexity and interconnectivity of our models create additional risk regarding the accuracy of model output. While we have processes and controls in place designed to mitigate these risks, there can be no assurances that such processes and controls will be successful.

Management often needs to exercise judgment to interpret or adjust modeled results to take into account new information or changes in conditions. The dramatic changes in the housing and credit capital markets in recent years have required frequent adjustments to our models and the application of greater management judgment in the interpretation and adjustment of the results produced by our models. This further increases both the uncertainty about model results and the risk of errors in the implementation, operation, or use of the models

We face the risk that the valuations, risk metrics, amortization results, loan loss reserve estimations, and security impairment charges produced by our internal models may be different from actual results, which could adversely affect our business results, cash flows, fair value of net assets, business prospects, and future financial results. For example, our models  may under predict the losses we will suffer in various aspects of our business. Changes in, or replacements of, any of our models or in any of the assumptions, judgments, or estimates used in the models may cause the results generated by the model to be materially different from those generated by the prior model  The different results could cause a revision of previously reported financial condition or results of operations, depending on when the change to the model, assumption, judgment, or estimate is implemented. Any such changes may also cause difficulties in comparisons of the financial condition or results of operations of prior or future periods

Due to increased uncertainty about model results, we also face increased risk that we could make poor business decisions in areas where model results are an important factor, including loan purchases, management and guarantee fee pricing, asset and liability management, market risk management, and quality control sampling strategies for loans in our single family credit guarantee portfolio  Furthermore, any strategies we employ to attempt to manage the risks associated with our use of models may not be effective  See "MD&A    CRITICAL ACCOUNTING POLICIES AND ESTIMATES" and "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK    Interest Rate Risk and Other Market Risks" for more information on our use of models

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                          Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Changes in our accounting policies, as well as estimates we make, could materially affect how we report our financial condition or results of operations.

Our accounting policies are fundamental to understanding our financial condition and results of operations  Certain of our accounting policies, as well as estimates we make, are "critical," as they are both important to the presentation of our financial condition and results of operations and they require management to make particularly difficult, complex or subjective judgments and estimates, often regarding matters that are inherently uncertain  Actual results could differ from our estimates and the use of different judgments and assumptions related to these policies and estimates could have a material impact on our consolidated financial statements  For a description of our critical accounting policies, see "MD&A     CRITICAL ACCOUNTING POLICIES AND ESTIMATES."

From time to time, the FASB and the SEC change the financial accounting and reporting guidance that govern the preparation of our financial statements  These changes are beyond our control, can be difficult to predict and could materially impact how we report our financial condition and results of operations  We could be required to apply new or revised guidance retrospectively, which may result in the revision of prior period financial statements by material amounts. The implementation of new or revised accounting guidance could result in material adverse effects to our stockholders' equity (deficit) and result in or contribute to the need for additional draws under the Purchase Agreement

FHFA may require us to change our accounting policies to align more closely with those of Fannie Mae  FHFA may also require us and Fannie Mae to have the same independent public accounting firm  Either of these events could significantly increase our expenses and require a substantial time commitment of management

See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for more information

### A failure in our operational systems or infrastructure, or those of third parties, could impair our liquidity, disrupt our business, damage our reputation, and cause losses.

Shortcomings or failures in our internal processes, people, or systems could lead to impairment of our liquidity, financial loss, errors in our financial statements, disruption of our business, liability to customers, further legislative or regulatory intervention, or reputational damage  Servicing and loss mitigation processes are currently under considerable stress, which increases the risk that we may experience further operational problems in the future  Our core systems and technical architecture include many legacy systems and applications that lack scalability and flexibility, which increases the risk of system failure  While we are working to enhance the quality of our infrastructure, we have had difficulty in the past conducting large scale infrastructure improvement projects

Our business is highly dependent on our ability to process a large number of transactions on a daily basis and manage and analyze significant amounts of information, much of which is provided by third parties. The transactions we process are complex and are subject to various legal, accounting, and regulatory standards. The types of transactions we process and the standards relating to those transactions can change rapidly in response to external events, such as the implementation of government mandated programs and changes in market conditions  Our financial, accounting, data processing, or other operating systems and facilities may fail to operate properly or become disabled, adversely affecting our ability to process these transactions. The information provided by third parties may be incorrect, or we may fail to properly manage or analyze it  The inability of our systems to accommodate an increasing volume of transactions or new types of transactions or products could constrain our ability to pursue new business initiatives or change or improve existing business activities

Our employees could act improperly for their own gain and cause unexpected losses or reputational damage  While we have processes and systems in place designed to prevent and detect fraud, there can be no assurance that such processes and systems will be successful.

We also face the risk of operational failure or termination of any of the clearing agents, exchanges, clearinghouses, or other financial intermediaries we use to facilitate our securities and derivatives transactions. Any such failure or termination could adversely affect our ability to effect transactions, service our customers, and manage our exposure to risk.

Most of our key business activities are conducted in our principal offices located in McLean, Virginia and represent a concentrated risk of people, technology, and facilities  Despite the contingency plans and local recovery facilities we have in place, our ability to conduct business would be adversely impacted by a disruption in the infrastructure that supports our business and the geographical area in which we are located  Potential disruptions may include outages or disruptions to electrical, communications, transportation, or other services we use or that are provided to us. If a disruption occurs and our employees are unable to occupy our offices or communicate with or travel to other locations, our ability to

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2842

Table of Contents

service and interact with our customers or counterparties may deteriorate and we may not be able to successfully implement contingency plans that allow us to carry out critical business functions at an acceptable level

Due to the concentrated risk and inadequate distribution of resources nationally, we are also exposed to the risk that a catastrophic event, such as a terrorist event or natural disaster, could result in a significant business disruption and an inability to process transactions through normal business processes  Any measures we take to mitigate this risk may not be sufficient to respond to the full range of catastrophic events that may occur.

Freddie Mac management has determined that current business recovery capabilities would not be effective in the event of a catastrophic regional business event and could result in a significant business disruption and inability to process transactions through normal business processes  While management has developed a remediation plan to address the current capability gaps, any measures we take to mitigate this risk may not be sufficient to respond to the full range of catastrophic events that may occur

### *We have experienced significant management changes, internal reorganizations, and turnover of key staff, which could increase our operational and control risks and have a material adverse effect on our ability to do business and our results of operations.*

Internal reorganizations, inability to retain key executives and staff members, and our efforts to reduce administrative expenses may increase the stress on existing processes, leading to operational or control failures and harm to our financial performance and results of operations  A number of senior officers left the company in 2011, including our Chief Operating Officer, our Executive Vice President Single Family Credit Guarantee, our Executive Vice President      Investments and Capital Markets and Treasurer, our Executive V ce President      Multifamily, our Senior Vice President      Operations & Technology, our Executive Vice President      General Counsel & Corporate Secretary, our Executive Vice President      Chief Credit Officer, and our Senior Vice President      Interim General Counsel & Corporate Secretary  On October 26, 2011, FHFA announced that our Chief Executive Officer has expressed his desire to step down in 2012  We also experienced several significant internal reorganizations in 20      and significant employee turnover

The magnitude of these changes and the short time interval in which they have occurred, particularly during the ongoing housing and economic downturn, add to the risks of operational or control failures, including a failure in the effective operation of our internal control over financial reporting or our disclosure controls and procedures. Control failures could result in material adverse effects on our financial condition and results of operations  Disruptive levels of turnover among both executives and other employees could lead to breakdowns in any of our operations, affect our ability to execute ongoing business activities, cause delays and disruptions in the implementation of FHFA directed and other important business initiatives, delay or disrupt critical technology and other projects, and erode our business, modeling, internal audit, risk management, information security, financial reporting, legal, compliance, and other capabilities  For more information, see "MD&A RISK MANAGEMENT      Operational Risks" and "CONTROLS AND PROCEDURES."

In addition, management attention may be diverted from regular business concerns by these and future reorganizations and the continuing need to operate under the framework of conservatorship.

### *We may not be able to protect the security of our systems or the confidentiality of our information from cyber attack and other unauthorized access, disclosure, and disruption.*

Our operations rely on the secure receipt, processing, storage, and transmission of confidential and other information in our computer systems and networks and with our business partners. Like many corporations and government entities, from time to time we have been, and likely will continue to be, the target of cyber attacks  Because the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently and often are not recognized until launched against a target, and because some techniques involve social engineering attempts addressed to employees who may have insufficient knowledge to recognize them, we may be unable to anticipate these techniques or to implement adequate preventative measures  While we have invested significant resources in our information security program, there is a risk that it could prove to be inadequate to protect our computer systems, software, and networks.

Our computer systems, software, and networks may be vulnerable to internal or external cyber attack, unauthorized access, computer viruses or other malicious code, computer denial of service attacks, or other attempts to harm our systems or misuse our confidential information  Our employees may be vulnerable to social engineering efforts that cause a breach in our security that otherwise would not exist as a technical matter  If one or more of such events occur, this potentially could jeopardize or result in the unauthorized disclosure, misuse or corruption of confidential and other information, including nonpublic personal information and other sensitive business data, processed, stored in, or transmitted through, our computer systems and networks, or otherwise cause interruptions or malfunctions in our

TREASURY-2843

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

operations or the operations of our customers or counterparties  This could result in significant losses or reputational damage,  adversely affect our relationships with our customers and  counterparties, and adversely affect our ability to purchase  loans, issue securities or enter into and execute other business transactions  We could also face regulatory action  Internal or external attackers may seek to steal, corrupt or disclose confidential financial assets, intellectual property, and other  sensitive information  We may be required to expend significant additional resources to modify our protective measures or to  investigate and remediate vulnerabilities or other exposures,  and we may be subject to litigation and financial losses that are not fully insured.

***We rely on third parties for certain important functions, including  some that are critical to financial reporting, our  mortgage-related investment activity, and mortgage loan  underwriting. Any failures by these vendors could disrupt our  business operations.***

We outsource certain key functions to external parties, including: (a) processing functions for trade capture,  market risk management analytics, and financial instrument  valuation; (b) custody and recordkeeping for our  mortgage related investments; (c) processing functions for mortgage loan underwriting and servicing; (d) certain  services we provide to Treasury in our role as program  compliance agent under HAMP; and (e) certain technology  infrastructure and operations  We may enter into other key  outsourcing relationships in the future  If one or more of these key external parties were not able to perform their functions  for a period of time, at an acceptable service level, or for  increased volumes, our business operations could be constrained, disrupted, or otherwise negatively impacted  Our use of vendors  also exposes us to the risk of a loss of intellectual property or of confidential information or other harm  We may also be  exposed to reputational harm, to the extent vendors do not conduct their activities under appropriate ethical standards.  Financial or operational difficulties of an outside vendor could  also hurt our operations if those difficulties interfere with  the vendor's ability to provide services to us

***Our risk management efforts may not effectively mitigate the risks  we seek to manage.***

We could incur substantial losses and our business operations  could be disrupted if we are unable to effectively identify,  manage, monitor and mitigate operational risks, interest rate  and other market risks and credit risks related to our business.  Our risk management policies, procedures and techniques may  not be sufficient to mitigate the risks we have identified or to  appropriately identify additional risks to which we are subject  See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK" and "MD&A      RISK MANAGEMENT" for a discussion of our approach to managing certain of the  risks we face.

## Legal and Regulatory Risks

***The Dodd Frank Act and related regulation may adversely affect our  business activities and financial results.***

The Dodd Frank Act, which was signed into law on July 21,  2010, significantly changed the regulation of the financial  services industry and could affect us in substantial and  unforeseeable ways and have an adverse effect on our business,  results of operations, financial condition, liquidity, and net worth  For example, the Dodd Frank Act and related future  regulatory changes could impact the value of assets that we hold, require us to change certain of our business practices,  impose significant additional costs on us, limit the products we  offer, require us to increase our regulatory capital, or make it  more difficult for us to retain and recruit management and other  employees  We will also face a more complicated regulatory  environment due to the Dodd Frank Act and related future  regulatory changes, which will increase compliance costs and could divert management attention or other resources  The Dodd Frank Act and related future regulatory changes will also  significantly affect many aspects of the financial services  industry and potentially change the business practices of our  customers and counterparties; it is possible that any such  changes could adversely affect our business and financial  results.

Implementation of the Dodd Frank Act is being accomplished  through numerous rulemakings, many of which are still in  process. The final effects of the legislation will not be known  with certainty until these rulemakings are complete  The Dodd  Frank Act also mandates the preparation of studies of a  wide range of issues, which could lead to additional legislative  or regulatory changes  It could be difficult for us to comply with any future regulatory changes in a timely manner, due to  the  potential scope and number of such changes, which could  limit our operations and expose us to liability

The long term impact of the Dodd Frank Act and related future  regulatory changes on our business and the financial services  industry will depend on a number of factors that are difficult  to predict, including our ability to successfully implement any  changes to our business, changes in consumer behavior, and our  competitors' and customers' responses to the Dodd Frank Act and related future regulatory changes

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2844

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Examples of aspects of the Dodd Frank Act that may significantly affect us include the following:

- The new Financial Stability Oversight Council could designate Freddie Mac as a non bank financial company to be subject to supervision and regulation by the Federal Reserve  If this occurs, the Federal Reserve will have authority to examine Freddie Mac and we may be required to meet more stringent prudential standards than those applicable to other non bank financial companies. New prudential standards could include requirements related to risk based capital and leverage, liquidity, single counterparty credit limits, overall risk management and risk committees, stress tests, and debt to equity limits, among other requirements

- The Dodd Frank Act will have a significant impact on the derivatives market. Large derivatives users, which may include Freddie Mac, will be subject to extensive new oversight and regulation  These new regulatory standards could impose significant additional costs on us related to derivatives transactions and it may become more difficult for us to enter into desired hedging transactions with acceptable counterparties on favorable terms

- The Dodd Frank Act will create new standards and requirements related to asset backed securities, including requiring securitizers and potentially originators to retain a portion of the underlying loans' credit risk. Any such new standards and requirements could weaken or remove incentives for financial institutions to sell mortgage loans to us

- The Dodd Frank Act and related future regulatory changes could negatively impact the volume of mortgage originations, and thus adversely affect the number of mortgages available for us to purchase or guarantee

- Under the Dodd Frank Act, new minimum mortgage underwriting standards will be required for residential mortgages, including a requirement that lenders make a reasonable and good faith determination based on "verified and documented information" that the consumer has a "reasonable ability to repay" the mortgage  The Act requires regulators to establish a class of qualified loans that will rece ve certain protections from legal liability, such as the borrower's right to rescind the loan and seek damages  Mortgage originators and assignees, including Freddie Mac, may be subject to increased legal risk for loans that do not meet these requirements

- Under the Dodd Frank Act, federal regulators, including FHFA, are directed to promulgate regulations, to be applicable to financial institutions, including Freddie Mac, that will prohibit incentive based compensation structures that the regulators determine encourage inappropriate risks by providing excessive compensation or benefits or that could lead to material financial loss. It is possible that any such regulations will have an adverse effect on our ability to retain and recruit management and other employees, as we may be at a competitive disadvantage as compared to other potential employers not subject to these or similar regulations

For more information on the Dodd Frank Act, see "BUSINESS    Regulation and Supervision    *Legislative and Regulatory Developments*."

***Legislative or regulatory actions could adversely affect our business activities and financial results.***

In addition to the Dodd Frank Act discussed in the immediately preceding risk factor, and possible GSE reform discussed in "Conservatorship and Related Matters    *The future status and role of Freddie Mac is uncertain and could be materially adversely affected by legislative and regulatory action that alters the ownership, structure, and mission of the company,*" our business initiatives may be directly adversely affected by other legislative and regulatory actions at the federal, state, and local levels  We could be negatively affected by legislation or regulatory action that changes the foreclosure process of any individual state  For example, various states and local jurisdictions have implemented mediation programs designed to bring servicers and borrowers together to negotiate workout options  These actions could delay the foreclosure process and increase our expenses, including by potentially delaying the final resolution of seriously delinquent mortgage loans and the disposition of non performing assets  We could also be affected by any legislative or regulatory changes that would expand the responsibilities and liability of servicers and assignees for maintaining vacant properties prior to foreclosure  These laws and regulatory changes could significantly expand mortgage costs and liabilities  We could be affected by any legislative or regulatory changes to existing bankruptcy laws or proceedings or foreclosure processes, including any changes that would allow bankruptcy judges to unilaterally change the terms of mortgage loans  We could be affected by legislative or regulatory changes that permit or require principal reductions, including through the bankruptcy process. Our business could also be adversely affected by any modification, reduction, or repeal of the federal income tax deductibility of mortgage interest payments

Pursuant to the Temporary Payroll Tax Cut Continuation Act of 20    , FHFA has been directed to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than 10 basis points above the average guarantee fees charged in 20    on single family mortgage backed securities to fund the payroll tax cut  If we are found to be out of compliance

*Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2845

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

with this requirement of the Act for two consecutive years, we will be precluded from providing any guarantee for a period to be determined by FHFA, but in no case less than one year

Legislation or regulatory actions could indirectly adversely affect us to the extent such legislation or actions affect the activities of banks, savings institutions, insurance companies, securities dealers, and other regulated entities that constitute a significant part of our customer base or counterparties, or could indirectly affect us to the extent that they modify industry practices Legislative or regulatory provisions that create or remove incentives for these entities to sell mortgage loans to us, purchase our securities or enter into derivatives, or other transactions with us could have a material adverse effect on our business results and financial condition.

The Basel Committee on Banking Supervision is in the process of substantially revising capital guidelines for financial institutions and has finalized portions of the so called "Basel III" guidelines, which would set new capital and liquidity requirements for banks. Phase in of Basel III is expected to take several years and there is significant uncertainty about how regulators might implement these guidelines or how the resulting regulations might impact us For example, it is possible that any new regulations on the capital treatment of mortgage servicing rights, risk based capital requirements for credit risk, and liquidity treatment of our debt and guarantee obligations could adversely affect our business results and financial condition.

***We may make certain changes to our business in an attempt to meet the housing goals and subgoals set for us by FHFA that may increase our losses.***

We may make adjustments to our mortgage loan sourcing and purchase strategies in an effort to meet our housing goals and subgoals, including changes to our underwriting standards and the expanded use of targeted initiatives to reach underserved populations For example, we may purchase loans that offer lower expected returns on our investment and increase our exposure to credit losses Doing so could cause us to forgo other purchase opportunities that we would expect to be more profitable If our current efforts to meet the goals and subgoals prove to be insufficient, we may need to take additional steps that could further increase our losses. FHFA has not yet published a final rule with respect to our duty to serve underserved markets. However, it is possible that we could also make changes to our business in the future in response to this duty If we do not meet our housing goals or duty to serve requirements, and FHFA finds that the goals or requirements were feasible, we may become subject to a housing plan that could require us to take additional steps that could have an adverse effect on our results of operations and financial condition

***We are involved in legal proceedings, governmental investigations, and IRS examinations that could result in the payment of substantial damages or otherwise harm our business.***

We are a party to various legal actions, including litigation in the U.S. Tax Court as result of a dispute of certain tax matters with the IRS related to our 1998 through 2005 federal income tax returns In addition, certain of our current and former directors, officers, and employees are involved in legal proceedings for which they may be entitled to reimbursement by us for costs and expenses of the proceedings The defense of these or any future claims or proceedings could divert management's attention and resources from the needs of the business. We may be required to establish reserves and to make substantial payments in the event of adverse judgments or settlements of any such claims, investigations, proceedings, or examinations Any legal proceeding, governmental investigation, or examination issue, even if resolved in our favor, could result in negative publicity or cause us to incur significant legal and other expenses Furthermore, developments in, outcomes of, impacts of, and costs, expenses, settlements, and judgments related to these legal proceedings and governmental investigations and examinations may differ from our expectations and exceed any amounts for which we have reserved or require adjustments to such reserves We are also cooperating with other investigations, such as the review being conducted by state attorneys general and state bank and mortgage regulators into foreclosure practices These proceedings could divert management's attention or other resources See "LEGAL PROCEEDINGS" and "NOTE 18: LEGAL CONTINGENCIES" for information about our pending legal proceedings and "NOTE 13: INCOME TAXES" for information about our litigation with the IRS relating to potential additional income taxes and penalties for the 1998 to 2005 tax years and other tax related matters

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2846

Table of Contents

### ITEM 1B. UNRESOLVED STAFF COMMENTS

None

### ITEM 2. PROPERTIES

Our principal offices consist of five office buildings in McLean, Virginia  We own four of the office buildings, comprising approximately 1 3 million square feet  We occupy the fifth building, comprising approximately 200,000 square  feet, under a lease from a third party.

### ITEM 3. LEGAL PROCEEDINGS

We are involved as a party to a variety of legal proceedings arising from time to time in the ordinary course of business  See "NOTE 18: LEGAL CONTINGENCIES" for more  information regarding our involvement as a party to various  legal proceedings

### ITEM 4. MINE SAFETY DISCLOSURES

Not applicable

<div align="center">77</div>

<div align="right"><em>Freddie Mac</em></div>

---

TREASURY-2847

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

## PART II

### ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

**Market Information**

Our common stock, par value $0.00 per share, trades in the OTC market and is quoted on the OTC Bulletin Board under the ticker symbol "FMCC." As of February 27, 2012, there were 649,733,472 shares of our common stock outstanding.

On July 8, 2010, our common stock and 20 previously listed classes of preferred securities were delisted from the NYSE We delisted such securities pursuant to a directive by the Conservator The classes of preferred stock that were previously listed on the NYSE also now trade in the OTC market.

The table below sets forth the high and low prices of our common stock on the NYSE and the high and low bid information for our common stock on the OTC Bulletin Board for the indicated periods. The OTC Bulletin Board quotations reflect inter dealer prices, without retail mark up, mark down, or commission, and may not necessarily represent actual transactions.

**Table 7     Quarterly Common Stock Information**

|  | High | Low |
| --- | --- | --- |
| **2011 Quarter Ended**(1 |  |  |
| Decembe 31 | $ 0 27 | $0 18 |
| Sep embe 30 | 0 41 | 0 24 |
| J e 30 | 0 54 | 0 34 |
| Ma ch 31 | 1 00 | 0 13 |
| **2010 Quarter Ended** |  |  |
| Decembe 31(1 | $ 0 50 | $0 29 |
| Sep embe 30(2 | 0 44 | 0 24 |
| J e 30(3 | 1 68 | 0 40 |
| Ma c 31(3 | 1 52 | 1 12 |

(1) Based on b d nfo ma on fo ou common s ock on he OTC B e n Boa d

(2) Based on he p ces of ou common s ock on he NYSE p o o July 8, 2010 and b d nfo ma on fo ou common s ock on e OTC B e Boa d o a d af e J y 8, 2010

(3) Based on he p ces of ou co on s ock on he NYSE

**Holders**

As of February 27, 2012, we had 2,104 common stockholders of record

**Dividends and Dividend Restrictions**

We did not pay any cash dividends on our common stock during 2011 or 2010.

Our payment of dividends is subject to the following restrictions:

*Restrictions Relating to the Conservatorship*

As Conservator, FHFA announced on September 7, 2008 that we would not pay any dividends on Freddie Mac's common stock or on any series of Freddie Mac's preferred stock (other than the senior preferred stock). FHFA has instructed our Board of Directors that it should consult with and obtain the approval of FHFA before taking actions involving dividends

*Restrictions Under the Purchase Agreement*

The Purchase Agreement prohibits us and any of our subsidiaries from declaring or paying any dividends on Freddie Mac equity securities (other than with respect to the senior preferred stock or warrant) without the prior written consent of Treasury.

*Restrictions Under the GSE Act*

Under the GSE Act, FHFA has authority to prohibit capital distributions, including payment of dividends, if we fail to meet applicable capital requirements Under the GSE Act, we are not permitted to make a capital distribution if, after making the distribution, we would be undercapitalized, except the Director of FHFA may permit us to repurchase shares if the repurchase is made in connection with the issuance of additional shares or obligations in at least an equivalent amount and will reduce our financial obligations or otherwise improve our financial condition. If FHFA classifies us as undercapitalized, we are not permitted to make a capital distribution that would result in our being reclassified as

*Freddie Mac*

TREASURY-2848

Source   D RA HOM   OAN MORTGAG CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

significantly undercapitalized or critically undercapitalized  If FHFA classifies us as significantly undercapitalized, approval of the Director of FHFA is required for any dividend payment; the Director may approve a capital distribution only if  the Director determines that the distribution will enhance the ability of the company to meet required capital levels promptly, will contribute to the long term financial safety and soundness of the company, or is otherwise in the public interest  Our capital requirements have been suspended during conservatorship

### Restrictions Under our Charter

Without regard to our capital classification, we must obtain  prior written approval of FHFA to make any capital distribution that would decrease total capital to an amount less than the  risk based capital level or that would decrease core capital to  an amount less than the minimum capital level  As noted above, our capital requirements have been suspended during  conservatorship.

### Restrictions Relating to Subordinated Debt

During any period in which we defer payment of interest on  qualifying subordinated debt, we may not declare or pay  dividends on, or redeem, purchase or acquire, our common stock  or preferred stock. Our qualifying subordinated debt provides  for the deferral of the payment of interest for up to five years if either: (a) our core capital is below 125% of our  critical capital requirement; or (b) our core capital is  below our statutory minimum capital requirement, and the  Secretary of the Treasury, acting on our request, exercises his or her discretionary authority pursuant to Section 306(c) of our charter to purchase our debt obligations  FHFA has directed us to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital  levels. As a result, the terms of any of our subordinated debt  that provide for us to defer payments of interest under certain  circumstances, including our failure to maintain specified  capital levels, are no longer applicable  As noted above, our capital requirements have been suspended during conservatorship

### Restrictions Relating to Preferred Stock

Payment of dividends on our common stock is also subject to the  prior payment of dividends on our 24 series of preferred stock  and one series of senior preferred stock, representing an  aggregate of 464,170,000 shares and 1,000,000 shares,  respectively, outstanding as of December 31, 2011  Payment of dividends on all outstanding preferred stock, other than the  senior preferred stock, is subject to the prior payment of dividends on the senior preferred stock. We paid dividends on  the senior preferred stock during 2011 at the direction of the  Conservator, as discussed in "MD&A    LIQUIDITY AND CAPITAL RESOURCES    Liquidity    *Dividend Obligation on the Senior Preferred Stock*" and "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)    Dividends Declared During 2011 " We did not declare or pay dividends  on any other series of preferred stock outstanding in 2011.

### Recent Sales of Unregistered Securities

The securities we issue are "exempted securities"  under the Securities Act of 1933, as amended. As a result, we do  not file registration statements with the SEC with respect to  offerings of our securities

Following our entry into conservatorship, we suspended the  operation of, and ceased making grants under, equity  compensation plans. Previously, we had provided equity  compensation under these plans to employees and members of our  Board of Directors  Under the Purchase Agreement, we cannot issue any new options, rights to purchase, participations, or  other equity interests without Treasury's prior approval. However, grants outstanding as of the date of the Purchase  Agreement remain in effect in accordance with their terms

No stock options were exercised during the three months ended  December 31, 2011. However, restrictions lapsed on 10,729  restricted stock units.

See "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" for more information

### Issuer Purchases of Equity Securities

We did not repurchase any of our common or preferred stock  during the three months ended December 31, 2011  Additionally, we do not currently have any outstanding authorizations to repurchase common or preferred stock  Under  the Purchase Agreement, we cannot repurchase our common or preferred stock without Treasury's prior consent, and we may only purchase or redeem the senior preferred stock in  certain limited circumstances set forth in the Certificate of  Creation,

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-2849                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Liquidation Preference Senior Preferred Stock

**Transfer Agent and Registrar**

Computershare Trust Company, N.A.
P O Box 43078
Providence, RI 02940 3078
Telephone: 781 575 2879
http://www computershare com/investors

80                                                                                          *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

## ITEM 6. SELECTED FINANCIAL DATA[(1)]

The selected financial data presented below should be reviewed in conjunction with MD&A and our consolidated financial statements and related notes for the year ended December 31, 2011

| | At or For The Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2011** | **2010** | **2009** | **2008** | **2007** |
| | (dollars in millions, except share-related amounts) | | | | |
| **Statements of Income and Comprehens ve Income Data** | | | | | |
| Ne n e es ncome | $ 18,397 | $ 16,856 | $ 17,073 | $ 6,796 | $ 3,099 |
| P ov s on fo c ed losses | (10,702) | (17,218) | (29,530) | (16,432) | (2,854) |
| Non-n e es ncome (loss) | (10,878) | (11,588) | (2,732) | (29,175) | (275) |
| Non-n e es expense | (2,483) | (2,932) | (7,195) | (5,753) | (5,959) |
| Ne oss a bu ab e o F edd e Mac | (5,266) | (14,025) | (21,553) | (50,119) | (3,094) |
| To al comp ehens ve ncome (loss) a bu able o F edd e Mac | (1,230) | 282 | (2,913) | (70,483) | (5,786) |
| Ne loss a bu able o common s ockholde s | (11,764) | (19,774) | (25,658) | (50,795) | (3,503) |
| Ne loss pe common sha e | | | | | |
| Bas c | (3 63) | (6 09) | (7 89) | (34 60) | (5 37) |
| D u ed | (3 63) | (6 09) | (7 89) | (34 60) | (5 37) |
| Cash d v dends pe common sha e | | | | 0 50 | 1 75 |
| We gh ed ave age common sha es ou s and ng (n t o sa ds) [(2] | | | | | |
| Bas c | 3,244,896 | 3,249,369 | 3,253,836 | 1,468,062 | 651,881 |
| D u ed | 3,244,896 | 3,249,369 | 3,253,836 | 1,468,062 | 651,881 |
| **Balance Sheets Data** | | | | | |
| Mo gage loans held-fo- nves men , a amo zed cos by consol da ed us s (ne of allowances fo loan losses) | $ 1,564,131 | $ 1,646,172 | $ | $ | $ |
| To a asse s | 2,147,216 | 2,261,780 | 841,784 | 850,963 | 794,368 |
| Deb secu es of conso da ed us s ed by d pa es | 1,471,437 | 1,528,648 | | | |
| O he deb | 660,546 | 713,940 | 780,604 | 843,021 | 738,557 |
| A o he ab es | 15,379 | 19,593 | 56,808 | 38,576 | 28,906 |
| To al F edd e Mac s ockholde s' equ y (def c ) | (146) | (401) | 4,278 | (30,731) | 26,724 |
| **Port olio Balances**[(3)] | | | | | |
| Mo gage- ela ed nves men s po fol o | $ 653,313 | $ 696,874 | $ 755,272 | $ 804,762 | $ 720,813 |
| To al F edd e Mac mo gage- ela ed secu es( | 1,624,684 | 1,712,918 | 1,854,813 | 1,807,553 | 1,701,207 |
| o a mo gage po o o( | 2,075,394 | 2,164,859 | 2,250,539 | 2,207,476 | 2,102,676 |
| Non-pe fo m ng asse s(6 | 129,152 | 125,405 | 104,984 | 46,620 | 16,119 |
| **Ra ios**[(7)] | | | | | |
| Re o ave age asse s(8)(12) | (0 2)% | (0 6)% | (2 5)% | (6 1)% | (0 4)% |
| Non-pe fo m ng asse s ra o(9 | 6 8 | 6 4 | 5 2 | 2 4 | 0 9 |
| Re u n on common eq ty(10)(12) | N/A | N/A | N/A | N/A | (21 0) |
| Eq ty to assets ra o(11)(12) | | (0 2) | (1 6) | (0 2) | 3 4 |

(1) See "NOTE 1 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" fo nfo ma on ega d ng ou accoun ng pol c es and he mpac of new accoun ng pol c es on ou consol da ed f nanc a s a e en s Effec ve Janua y 1, 2010, we adop ed amendmen s o he accoun ng gu dance fo ansfe s of f nanc al asse s a d he conso da on of VIEs Th s had a s gn f can mpac on ou f nanc al posi on and esul s fo 2010 and 2011 a e no compa able w t t e esul s f p o yea s Fo mo e nfo ma on, see "NOTE 19 SELECTED FINANCIAL STATEMENT LINE ITEMS "

(2) Inc udes he we gh ed ave age nu be of sha es ha e assoc a ed w h he wa an fo ou common s ock ssued o T easu y as pa of he Pu chase Ag ee en fo pe ods af e 2007 T s wa a s c ded bas c oss pe s a e, beca se s uncond ona y exe c sab e by he ho de a a cos of $0 00001 pe sha e

(3) Rep esen s he UPB and exc udes o gage oans and o gage- e a ed secu es aded, bu no ye set ed

(4) See "Tab e 35 F edd e Mac Mo gage-Re a ed Secu es" fo he compos on of h s l ne em

(5) See "Table 16 Compos on of Segmen Mo gage Po fol os and C ed R sk Po fol os" fo he compos on of ou o a mo gage po fo o

(6) See "Table 60 Non-Pe fo m ng Asse s" fo a desc p on of ou non-pe fo m ng asse s

(7) The d v dend payou a o on common s ock s no p esen ed because we a e epo ng a ne oss a bu ab e o common s ockholde s fo all pe ods p esen ed

(8) Ra o compu ed as ne ncome ( oss) a bu ab e o F edd e Mac d v ded by he s mple ave age of he beg nn ng and end ng ba ances of o a asse s

(9) Ra o compu ed as non-pe fo m ng asse s d v ded by he end ng UPB of ou o al mo gage po fol o, exclud ng non-F edd e Mac mo gage- ela ed secu es

(10) Ra o compu ed as ne ncome (loss) a bu able o common s ockholde s d v ded by he s mple ave age of he beg nn ng and end ng balances of o al F edd e Mac s ockho de s' equ y (def c ), ne of p efe ed s ock equ y Ra o s no p esen ed fo pe ods n wh ch he s mp e ave age of he beg nn ng and end ng ba ances of o a F edd e Mac s ockho de s' equ y (def c ) s ess han ze o

(11) Ra o compu ed as he s mple ave age of he beg nn ng and end ng ba ances of o a F edd e Mac s ockho de s' equ y (def c ) d v ded by he s mple ave age of he beg nn ng and end ng ba ances of o a asse s

(12) To calcula e he s mple ave ages fo 2010, he beg nn ng ba ances of o a asse s and o a F edd e Mac s ock o de s' equ y a e based on e Janua y 1, 2010 ba ances, so ha bo h he beg nn ng and end ng ba ances ef ec he Janua y 1, 2010 changes n accoun ng p nc p es e a ed o VIEs

81

*Freddie Mac*

Source  D RA HOM OAN MORTGAG CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this MD&A in conjunction with "BUSINESS     Executive Summary" and our consolidated financial statements and related notes for the year ended December 31, 2011.*

### MORTGAGE MARKET AND ECONOMIC CONDITIONS, AND OUTLOOK

#### Mortgage Market and Economic Conditions

*Overview*

Despite some improvements in the national unemployment rate, the housing market continued to experience challenges during 20     due primarily to continued weakness in the employment market and a significant inventory of seriously delinquent loans and REO properties in the market. The U.S. real gross domestic product rose by 1.6% during 2011, compared to 3.1% during 2010, according to the Bureau of Economic Analysis estimates released on January 27, 2012. The national unemployment rate was 8.5% in December 2011, compared to 9.4% in December 20 0, based on data from the U.S. Bureau of Labor Statistics. In the data underlying the unemployment rate, there was employment growth (net new jobs added to the economy) in each month during 2011, which shows evidence of a slow, but steady positive trend for the economy and the housing market

The table below provides important indicators for the U S residential mortgage market

**Table 8     Mortgage Market Indicators**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| Home sa e un s ( n   o sa ds)[1] | 4,564 | 4,513 | 4,715 |
| Home p ce change[2] | (3 0)% | (5 9)% | (2 3)% |
| S ng e-fam y o g na ons ( n b   ons)[3] | $ 1,350 | $ 1,630 | $ 1,840 |
| ARM sha e[4] | 12% | 10% | 7% |
| Ref nance sha e[5] | 79% | 80% | 73% |
| U S s ngle-fam ly mo gage deb ou s and ng ( n b   ons)[6] | $10,336 | $10,522 | $10,866 |
| U S mul fam ly mo gage deb ou s and ng ( n b   ons)[6] | $  841 | $  838 | $  847 |

(1) I c  des sa es of  ew a d ex s  e U S Soc ce  Na onal Assoc a on of Real o s news  elease da ed Feb ua y 22, 2012 (sa es of ex s ng ho es) and U S  Ce s s B  ea  ews  e ease da ed Feb   a y 24, 2012 (sa es of  ew homes)

(2) Ca cu a ed n e na y us ng es ma es of changes  n s ng e-fam  y home p ces by s a e, wh ch a e we gh ed us ng he p ope   y values unde ly ng ou s ngle-fam ly c ed  gua an ee po fol o o ob a na na onal ndex  The dep ec a on  a e fo  each yea p esen ed  nco po a es p ope y value nfo ma on on oa s p c  ased by bo  F edd e Mac a d Fa  e Mae   o g  Decembe 31, 2011 and he pe cen age change w  be subc ec o e vs on based on mo e  ecen pu chase nfo ma on  On he  nd ces of ho  e p ces  ay have d ffe en  esu s, as hey a e de e m ned us ng d ffe en pools of mo gage loans and ca cu a ed unde d ffe en conven  ons han ou own

(3) Sou ce  Ins de Mo  gage F nance es  ma es of o g na ons of s ngle-fam ly f  s -and second l ens da ed Janua y 27, 2012

(4) ARM sha e of  he dolla  amoun  of  o al mo gage appl ca ons  Sou ce Mo  gage Banke s Assoc a on Mo  gage Appl ca ons Su vey  Da a ef ec  annua  ave age of week y f gu es

(5) Ref nance sha e of  he numbe  of conven  onal mo gage appl ca ons  Sou ce Mo  gage Banke s Assoc a on's Mo  gage App ca ons Su vey  Da a ef ec  annua  ave age of week y f gu es

(6) So  ce  Fede a  F ow of F   ds Acco    s of  e U   ed S a es da ed Dece  be 8, 2011  The ou s and ng a  oun s fo  2011 p esen ed above  ef ec  ba ances as of Sep embe 30, 2011

*Single-Family Housing Market*

We believe the number of potential home buyers in the market, combined with the volume of homes offered for sale, will determine the direction of home prices. Within the industry, existing home sales are important for assessing the rate at which the mortgage market might absorb the inventory of listed, but unsold, homes in the U.S. (including listed REO properties) Additionally, we believe new home sales can be an indicator of certain economic trends, such as the potential for growth in gross domestic product and total U S mortgage debt outstanding Based on data from the National Association of Realtors, sales of existing homes in 20    were 4.26 million, increasing from 4.19 million during 2010  The National Association of Realtors report states that distressed and all cash sales comprised a historically high volume of existing home sales in 2011 Investors typically represent the bulk of all cash transactions. Based on data from the U.S. Census Bureau and HUD, new home sales in 2011 were approximately 304,000 homes, decreasing approximately 6% from 323,000 homes in 20 0 The relative level of mo tgage interest rates is also a factor that impacts home sale demand because lower interest rates result in more affordable housing for borrowers During 20   , the Federal Reserve took several actions designed to support an economic recovery and maintain historically low interest rates, which impacted and will likely continue to impact single family mortgage market activity, including the volume of mortgage refinancing

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2852

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The recently expanded and streamlined HARP initiative, together with interest rates that we expect to remain at historically low levels through much of 2012, may result in a high level of refinancing, particularly for borrowers that are underwater on their current loans. These changes in HARP allow eligible borrowers whose monthly payments are current to refinance and obtain substantially lower interest rates and monthly payments, which may reduce future defaults and help lower the volume of distressed sales in some markets. For information on this initiative, and its potential impact on our business and results, see "RISK FACTORS   Competitive and Market Risks   *The servicing alignment initiative, MHA Program and other efforts to reduce foreclosures, modify loan terms and refinance mortgages, including HARP, may fail to mitigate our credit losses and may adversely affect our results of operations or financial condition*," and "RISK MANAGEMENT   Credit Risk   Mortgage Credit Risk   Single Family Mortgage Credit Risk   *Single Family Loan Workouts and the MHA Program*."

We estimate that home prices decreased approximately 3 0% nationwide during 2011. This estimate is based on our own index of mortgage loans in our single family credit guarantee portfolio  Other indices of home prices may have different results, as they are determined using different pools of mortgage loans and calculated under different conventions than our own

The serious delinquency rate of our single family loans declined during 2011, but remained near historically high levels. The  Mo tgage Bankers Association reported in its National Delinquency Survey that delinquency rates on all single family  loans in the survey declined to 7 7% as of December 31, 2011, down from 8.6% at year end 2010. Residential loan performance has been generally worse in areas with higher unemployment rates and where declines in property values have  been more significant during the last five years. In its survey, the Mortgage Bankers Association presents delinquency rates both for mortgages it classifies as subprime and for mortgages it  classifies as prime conventional  The delinquency rates of subprime mortgages are markedly higher than those of prime  conventional loan products in the Mortgage Bankers Association survey; however, the delinquency experience in prime  conventional mortgage loans during the last four years has been significantly worse than in any year since the 1930s.

Based on data from the Federal Reserve's Flow of Funds Accounts, there was a sustained and significant increase in  single family mortgage debt outstanding from 2001 to 2006. This increase in mortgage debt was driven by increasing sales of new  and existing single family homes during this same period. As reported by FHFA in its Conservator's Report on the Enterprises' Financial Condition, dated June 13, 2011, the market share of mortgage backed securities issued by the GSEs and Ginnie Mae declined significantly from 2001 to 2006  while the market share of non GSE securities peaked  Non traditional mortgage types, such as interest only, Alt A, and option ARMs, also increased in market share during these years, which we believe introduced greater risk into the market  We believe these shifts in market activity, in part, help explain the significant differentiation in delinquency performance of  securitized non GSE and GSE mortgage loans as discussed below

Based on the National Delinquency Survey's data, we estimate that we owned or guaranteed approximately 24% of the  outstanding single family mortgages in the U.S. at December 31, 2011, based on number of loans. At December 3 , 20   , we held or guaranteed approximately 4 4,000 seriously delinquent single family loans, representing  approximately 11% of the seriously delinquent single family  mortgages in the market as of that date  We estimate that loans backing non GSE securities comprised approximately 9% of the  single family mortgages in the U.S. and represented approximately 29% of the seriously delinquent single family  mortgages at September 30, 20   (based on the latest information available)  As of December 31, 2011, we held non GSE single family mortgage related securities with a UPB of  $79.8 billion as investments.

The foreclosure process continues to experience delays, due to a  number of factors  This has caused the average length of time for foreclosure of a Freddie Mac loan to increase significantly  in recent years  Delays in the foreclosure process may also  adversely affect trends in home prices regionally or nationally  For more information, see "RISK FACTORS   Operational Risks   *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" and "BUSINESS   Regulation and Supervision   Legislative and Regulatory Developments   *Developments Concerning Single Family Servicing Practices*."

### *Multifamily Housing Market*

Multifamily market fundamentals continued to improve on a  national level during 2011. This improvement continues a trend  of favorable movements in key indicators such as vacancy rates  and effective rents that generally began in early 20 0  Vacancy rates and effective rents are important to loan performance because multifamily loans are generally repaid from the cash  flows generated by the underlying property and these factors significantly influence those cash flows. These improving  fundamentals and perceived optimism about demand for multifamily housing has contributed to lower capitalization rates which has  improved property values in most markets  However, the broader  economy continues to be

<div align="center">83</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2853

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

challenged by persistently high unemployment, which has prevented a more comprehensive recovery of the multifamily housing market.

**Outlook**

Forward looking statements involve known and unknown risks and uncertainties, some of which are beyond our control These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections Actual results may differ significantly from those described in or implied by such forward looking statements due to various factors and uncertainties For example, a number of factors could cause the actual performance of the housing and mortgage markets and the U S economy during 2012 to be significantly worse than we expect, including adverse changes in consumer confidence, national or international economic conditions and changes in the federal government's fiscal policies See "FORWARD LOOKING STATEMENTS" for additional information

*Overview*

We continue to expect key macroeconomic drivers of the economy such as interest rates, income growth, employment, and inflation to affect the performance of the housing and mortgage markets in 2012 Consumer confidence measures, while up from recession lows, remain below long term averages and suggest that households will likely continue to be cautious in home buying As a result of the continued high unemployment rate and relative low levels of consumer confidence, we expect that the single family housing market will likely continue to remain weak in 2012 We also expect rates on fixed rate single family mortgages to remain historically low in 2012, which, combined with the changes to HARP, may help to extend the recent high level of refinancing activity (relative to new purchase lending activity). Lastly, many large financial institutions continued to experience delays in the foreclosure process for single family loans throughout 2011 To the extent a arge volume of loans complete the foreclosure process in a short period of time, the resulting REO inventory could have a negative impact on the housing market.

We expect that home sales volume in 20 2 will be only modestly higher than in 2011. While home prices remain at significantly lower levels from their peak in most areas, estimates of the inventory of unsold homes, including those held by financial institutions and distressed borrowers, remain high Due to these and other factors, our expectation for home prices, based on our own index, is that national average home prices will continue to remain weak and will likely decline over the near term before a long term recovery in housing begins

*Single-Family*

We expect our provision for credit losses and charge offs will likely remain elevated in 2012. This is due in part to the substantial number of underwater mortgage loans in our single family credit guarantee portfolio, as well as the substantial inventory of seriously delinquent loans. For the near term, we also expect:

- loss severity of REO dispositions and short sales to remain relatively high, as market conditions, such as home prices and the rate of home sales, continue to remain weak;
- non performing assets, which include loans classified as TDRs, to continue to remain high;
- the volume of loan workouts to remain high; and
- continued high volume of loans in the foreclosure process as well as prolonged foreclosure timelines

*Multifamily*

The most recent market data available continues to reflect improving national apartment fundamentals, including decreasing vacancy rates and increasing effective rents However, some geographic areas in which we have investments in multifamily loans, including the states of Arizona, Georgia, and Nevada, continue to exhibit weaker than average fundamentals that increase our risk of future losses. We own or guarantee loans in these states that we believe are at risk of default We expect our multifamily delinquency rate to remain relatively stable in 2012.

Recent market data shows a significant increase in multifamily loan activity, compared to 2010 and 2009, and reflects that the multifamily sector has experienced greater stability and improvement in market fundamentals and investor demand than other real estate sectors We remained a constant source of liquidity in the multifamily market. Excluding CMBS and non Freddie Mac mortgage related securities, we estimate that we owned or guaranteed approximately 2 2% of outstanding mortgage loans in the market as of September 30, 2011, compared to 11.8% as of December 31, 2010. Our purchase and guarantee of multifamily loans increased approximately 32% to $20.3 billion in 2011, compared to $15.4 billion in 20 0 We expect our purchase and guarantee activity to continue to increase, but at a more moderate pace, in 2012

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-2854                                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## CONSOLIDATED RESULTS OF OPERATIONS

The following discussion of our consolidated results of operations should be read in conjunction with our consolidated financial statements, including the accompanying notes  Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported results of operations

### Change in Accounting Principles

Our adoption of amendments to the accounting guidance applicable to the accounting for transfers of financial assets and the consolidation of VIEs had a significant impact on our consolidated financial statements and other financial disclosures beginning in the first quarter of 2010

The cumulative effect of these changes in accounting principles was a net decrease of $11 7 billion to total equity (deficit) as of January 1, 2010, which included changes to the opening balances of retained earnings (accumulated deficit)  and AOCI. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," "NOTE 3: VARIABLE INTEREST ENTITIES," and "NOTE 19: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information regarding these changes

As these changes in accounting principles were applied  prospectively, our results of operations for the years ended December 31, 2011 and 20 0 (on both a GAAP and Segment Earnings basis), which reflect the consolidation of trusts that issue our single family PCs and certain Other Guarantee Transactions, are not directly comparable with the results of operations for the year ended December 31, 2009, which ref ect the accounting policies in effect during that time (*i.e.*, when the majority of the securitization entities were accounted for off balance sheet)

**Table 9     Summary Consolidated Statements of Income and  Comprehensive Income**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2011 | 2010 | 2009 |
| | | (in millions) | |
| Ne  n e es  ncome | $ 18,397 | $ 16,856 | $ 17,073 |
| P ov s on fo  c ed  losses | (10,702) | (17,218) | (29,530) |
| Ne  n e es  ncome (loss) af e  p ov s on fo  c ed  losses | 7,695 | (362) | (12,457) |
| Non- n e es  ncome (loss) | | | |
| Ga ns ( osses) on ex ngu shmen of deb  secu  es of conso da ed  us s | (219) | (164) | |
| Ga ns (losses) on e emen of o he  deb | 44 | (219) | (568) |
| Ga ns ( osses) on deb  eco ded a fa  va ue | 91 | 580 | (404) |
| De va ve ga ns (losses) | (9,752) | (8,085) | (1,900) |
| Impa men of ava lable-fo -sale secu  es | | | |
|   To a  o he - han- empo a y mpa men of ava lable-fo -sale secu  es | (2,101) | (1,778) | (23,125) |
|   Po on of o he - han- empo a y mpa men  ecogn zed n AOCI | (200) | (2,530) | 11,928 |
|   Ne  mpa men of ava lable-fo -sale secu  es  ecogn zed n ea n ngs | (2,301) | (4,308) | (11,197) |
| O he  ga ns (losses) on nves men secu  es  ecogn zed n ea n ngs | (896) | (1,252) | 5,965 |
| O he  ncome | 2,155 | 1,860 | 5,372 |
| To al non- n e es  ncome (loss) | (10,878) | (11,588) | (2,732) |
| Non- n e es  expense | | | |
| Adm n s a ve expenses | (1,506) | (1,597) | (1,685) |
| REO ope a ons expense | (585) | (673) | (307) |
| O he  expenses | (392) | (662) | (5,203) |
|   To al non- n e es  expense | (2,483) | (2,932) | (7,195) |
| Loss befo e ncome ax benef | (5,666) | (14,882) | (22,384) |
| Income ax benef | 400 | 856 | 830 |
| Ne  oss | (5,266) | (14,026) | (21,554) |
| O he  comp ehens ve ncome, ne of axes and  eclass f ca on adj s e s | | | |
|   Changes n un ea zed ga ns ( osses)  e a ed o ava lable-fo -sale secu  es | 3,465 | 13,621 | 17,825 |
|   Changes n un ea zed ga ns ( osses)  e a ed o cash f ow hedge  ela onsh ps | 509 | 673 | 773 |
|   Changes n def ned benef  p ans | 62 | 13 | 42 |
|   To al o he  comp ehens ve ncome, ne of axes and  eclass f ca on ad us men s | 4,036 | 14,307 | 18,640 |
| Comp ehens ve ncome (loss) | (1,230) | 281 | (2,914) |
|   Less  Comp ehens ve loss a  bu able o noncon oll ng n e es | | 1 | 1 |
| To al comp ehens ve ncome (loss) a  bu able o F edd e Mac | $ (1,230) | $ 282 | $ (2,913) |

### Net Interest Income

The table below summarizes our net interest income and net  interest yield and provides an attribution of changes in annual results to changes in interest rates or changes in volumes of our interest earning assets and interest bearing liabilities   Average balance sheet information is presented because we believe end of period balances are not

*Freddie Mac*

TREASURY-2855

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

representative of activity throughout the periods presented  For most components of the average balances, a daily weighted  average balance was calculated for the period  When daily weighted average balance information was not available, a simple  monthly average balance was calculated

**Table 10     Average Balance, Net Interest Income, and Rate/Volume Analysis**

| | Year ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2011** | | | **2010** | | | **2009** | | |
| | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate |
| | (dollars in millions) | | | | | | | | |
| Interest-earning assets | | | | | | | | | |
| Cash and cash equivalents | $ 5,381 | $ 3 | 0 07% | $ 8,803 | $ 77 | 0 16% | $ 55,76 | $ 193 | 0 35% |
| Federal funds sold and securities purchased under agreements to resell | 27,557 | 33 | 0 12 | 6,739 | 79 | 0 17 | 28,52 | 8 | 0 17 |
| Mortgage-related securities | | | | | | | | | |
| Mortgage-related securities[3] | 2,28 | 20,357 | 60 | 526,7 8 | 25,366 | 82 | 675,167 | 32,563 | 82 |
| Extinguishment of PCs held by Freddie Mac | (162,600) | (766 | ( 71 | (213, 11 | (11,182 | (5 2 | — | — | — |
| Total mortgage-related securities, net | 279,68 | 12,692 | 5 | 313,337 | 1 ,18 | 53 | 675,167 | 32,563 | 82 |
| Non-mortgage-related securities[3] | 2 ,587 | 99 | 0 0 | 27,995 | 191 | 0 68 | 16, 71 | 727 | 2 |
| Mortgage loans held by consolidated trusts[4][6] | 1,627,956 | 77,158 | 7 | 1,722,387 | 86,698 | 5 03 | — | — | — |
| Unsecuritized mortgage loans[4][6] | 2 ,13 | 9,12 | 3 7 | 206,116 | 8,727 | 23 | 127, 29 | 6,815 | 5 35 |
| Total interest-earning assets | $ 2,2 9,299 | $ 99,1 0 | 1 | $ 2,365,377 | $ 109,956 | 65 | $ 903,355 | $ 0,3 6 | 7 |
| Interest-bearing liabilities | | | | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $ 1,6 3,939 | $ (7 ,78 | ( 55 | $ 1,738,330 | $ (86,398 | ( 97 | $ — | $ — | — |
| Extinguishment of PCs held by Freddie Mac | (162,600) | 7,665 | 71 | (213, 11 | 11,182 | 5 2 | — | — | — |
| Total debt securities of consolidated trusts held by third parties | 1, 81,339 | (67,119 | ( 53 | 1,52 ,919 | (75,216 | ( 93 | — | — | — |
| Other debt | | | | | | | | | |
| Short-term debt | 186,30 | (331 | (0 18 | 219,65 | (552 | (0 25 | 287,259 | (2,23 | (0 78 |
| Long-term debt[7] | 503,8 2 | (12,538 | (2 9 | 5 3,306 | (16,363 | (3 01 | 557,18 | (19 916 | (3 57 |
| Total other debt | 690 1 6 | (12,869 | (1 86 | 762 960 | (16,915 | (2 22 | 8 , 3 | (22,150 | (2 62 |
| Total interest-bearing liabilities | 2,171, 85 | (79,988 | (3 68 | 2,287,879 | (92,131 | ( 03 | 8 , 3 | (22,150 | (2 62 |
| Expense related to derivatives[8] | — | (755 | (0 0 | — | (969 | (0 0 | — | (1,123 | (0 13 |
| Impact of net non-interest-bearing funding | 77,81 | — | 0 13 | 77, 98 | — | 0 13 | 58,912 | — | 0 17 |
| Total funding of interest-earning assets | $ 2,2 9,299 | $ (80,7 3 | 3 59 | $ 2,365,377 | $ (93,100 | (3 9 | $ 903,355 | $ (23,273 | (2 58 |
| Net interest income/yield | | $ 18,397 | 0 82 | | $ 16,856 | 0 71 | | $ 17,073 | 1 89 |

86

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | 2011 vs. 2010 Variance Due to | | | 2010 vs. 2009 Variance Due to | | |
|---|---|---|---|---|---|---|
| | Rate(9) | Volume(9) | Total Change | Rate(9) | Volume(9) | Total Change |
| | | | (in millions) | | | |
| nterest-earn ng assets | | | | | | |
| Cash and cash equiva ents | $ (33 | $ (10 | $ ( 3 | $ (83 | $ (33 | $ (116 |
| Federa funds so d and securities purchased under agreements to resell | (19 | (27 | (46 | (1 | 32 | 31 |
| Mortgage-re ated secur t es | | | | | | |
| Mortgage-re ated secur t es(3 | (1,082 | (3,927 | (5,009 | (50 | (7,1 7 | (7,197 |
| xt ngu shment of PCs he d by redd e Mac | 1,0 2 | 2, 75 | 3,517 | — | (11,182 | (11,182 |
| Tota mortgage-re ated secur t es, net | ( 0 | (1, 52 | (1, 92 | (50 | (18,329 | (18,379 |
| Non-mortgage-re ated secur t es(3 | (71 | (21 | (92 | (850 | 31 | (536 |
| Mortgage oans he d by conso idated trusts(4 ( | ( ,921 | ( 619 | (9,5 0 | — | 86,698 | 86,698 |
| Unsecur t zed mortgage oans(4 (6 | (1,097 | 1, 9 | 397 | (1,6 1 | 3,553 | 1,912 |
| Tota nterest earn ng assets | $ (6,181 | $ , 635 | $ (10,816 | $ (2,625 | $ 72,235 | $ 69 610 |
| Interest bear ng l ab l t es | | | | | | |
| Debt secur t es of conso dated trusts nc ud ng PCs he d by redd e Mac | $ 7,077 | $ ,537 | $ l1,61 | $ — | $ (86,398 | $ (86,398 |
| xt ngu shment of PCs he d by redd e Mac | (1,0 2 | (2, 75 | (3,517 | — | 11,182 | 11,182 |
| Tota debt secur t es of conso dated trusts he d by th rd part es | 6,035 | 2,062 | 8,097 | — | (75,216 | (75,216 |
| Other debt | | | | | | |
| Short-term debt | 1 5 | 76 | 221 | 1,2 8 | 3 | 1,682 |
| ong-term debt(7 | 2,697 | 1,128 | 3,825 | 3,068 | 85 | 3,553 |
| Tota other debt | 2,8 2 | 1,20 | 0,6 | 316 | 9 9 | 5,235 |
| Total nterest bear ng l ab l t es | 8,877 | 3 266 | 12,1 3 | ,316 | (7 ,297 | (69,981 |
| xpense re ated to der vat ves(8 | 21 | — | 21 | 15 | — | 15 |
| Tota fund ng of nterest earn ng assets | $ 9 091 | $ 3 266 | $ 12,357 | $ , 70 | $ (7 ,297 | $ (69,827 |
| Net nterest ncome | $ 2,910 | $ (1 369 | $ 1,5 1 | $ 1,8 5 | $ (2,062 | $ (217 |

(1) Excludes mo gage loans and mo gage- ela ed secu es aded,    t ot yet sett ed
(2) We calcula e ave age balances based on amo zed cos
(3) In e es ncome (expense) ncludes acc e on of he po on of mpa men cha ges ecogn zed n ea n ngs whe e we expec a s gn f can mp ovemen n cash flows
(4) Non-pe fo m ng loans, whe e n e es ncome s gene ally ecogn zed when collec ed, a e ncluded n ave age balances
(5) Loan fees, p ma y cons s ng of del ve y fees, ncluded n n e es ncome fo mo gage loans held by consol da ed us s we e $405 m ll on, $127 m ll on, and
$0 m on fo 2011, 2010, and 2009, espec ve y
(6) Loan fees, p ma y cons s ng of del ve y fees, and mul fam ly p epaymen fees, nc uded n unsecu zed mo gage oan n e es ncome we e $223 m ll on,
$130 m ll on, and $78 m on fo 2011, 2010, and 2009, espec ve y
(7) Inc udes cu en po on of ong- e m deb
(8) Rep esen s changes n fa value of de va ves c osed cash f ow hedge e a onsh ps ha we p ev ous y defe ed n AOCI and have been eclass f ed o ea n ngs
as he assoc a ed hedged fo ecas ed ssuance of deb affec s ea n ngs
(9) Ra e and vo ume changes a e ca cu a ed on he hand v dua f nanc al s a emen l ne em level Comb ned a e volume changes we e a oca ed o he nd v dua a e and
volume change based on he e a ve s ze

The table below summarizes components of our net interest income

## Table 11    Net Interest Income

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | | (in millions) | |
| Con ac ua a ouns of ne n e es ncome(1 | $18,448 | $ 17,743 | $18,937 |
| Amo za on ncome (expense) , et (2 | | | |
| Acc e on of mpa men s on ava lab e-fo -sa e secu es(3 | 115 | 392 | 1,180 |
| Asse - ela ed amo za on ncome (expense), ne | | | |
| Mo gage oans he d by conso da ed us s | (1,942) | (712) | |
| Unsecu zed mo gage loans | 182 | 311 | 233 |
| Mo gage- ela ed secu es | (239) | (272) | (1,345) |
| O he asse s | (122) | (23) | |
| Asse - e a ed amo za on expense, ne | (2,121) | (696) | (1,112) |
| Deb - ela ed amo za on ncome (expense), ne | | | |
| Deb secu es of conso da ed us s | 3,383 | 1,152 | |
| O he long- e m deb secu es | (673) | (766) | (809) |
| Deb - ela ed amo za on ncome (expense), ne | 2,710 | 386 | (809) |
| To al amo za on ncome (expense), ne | 704 | 82 | (741) |
| Expense e a ed o de va ves( | (755) | (969) | (1,123) |
| Ne n e es ncome | $ 18,397 | $16,856 | $ 17,073 |

(1) Inc udes he eve sa of n e es nco e acc ued, ne of n e es ece ved on a cash bas s, ela ed o mo gage loans a a eo o -acc a s a s
(2) Rep esen s amo za on e a ed o p em ums, d scoun s, defe ed fees a d o ed adj s es o ec a y g va e o f nanc a ns u en s, and e
eclass f ca on of p ev ously defe ed balances f om AOCI fo ce a n un n closed cash f ow hedge e a onsh ps e a ed o nd v dua deb ss a ces a d
mo gage pu chase ansac ons
(3) The po on of he mpa men cha ges ecogn zed n ea n ngs whe e we expec a s gn f can mp ovemen n cash flows s ecogn zed as ne n e es ncome Upon ou
adop on of an amendmen o he accoun ng gu dance fo nves men s n deb and equ y secu es on Ap 1, 2009, p ev ous y ecogn zed non-c ed - ela ed o he -
han-empo a y mpa men oss we e no longe acc e ed a s ne n e es ncome
(4) Rep esen s changes n fa value of de va ves c osed cash f ow hedge e a onsh ps ha we p ev ous y defe ed n AOCI and have been ec ass f ed o ea n ngs as
he assoc a ed hedged fo ecas ed ssuance of deb affec s ea n ngs

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2857

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are otherwise caused by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Net interest income and net interest yield increased $1.5 billion and 11 basis points, respectively, during the year ended December 3 , 2011, compared to the year ended December 31, 2010  The primary driver underlying the  increases was lower funding costs from the replacement of debt at lower rates. This factor was partially offset by the  reduction in the average balance of higher yielding  mortgage-re ated assets due to continued liquidations and  limited purchase activity

Net interest income decreased by $217 million during the  year ended December 3 , 20  0, compared to the year ended  December 31, 2009, primarily due to: (a) the reduction  in the average balance of higher yielding mortgage related  assets due to liquidations and limited purchase activity; and (b) higher interest expense on seriously delinquent  mortgage loans  These factors were partially offset by: (a)  lower funding costs from the replacement of debt at  lower rates and favorable rate resets on floating rate debt; and  (b) the inclusion of amounts previously classified as management and guarantee income  Net interest yield declined  substantially during the year ended December 31, 2010,  compared to the year ended December 31, 2009, because the  net interest yield of the assets held in our consolidated  single family trusts was lower than the net interest yield of PCs previously included in net interest income and our balance  of non performing mortgage loans increased

We do not recognize interest income on non performing loans that have been placed on non accrual status, except when cash  payments are received  We refer to this interest income that we do not recognize as foregone interest income  Foregone interest  income and reversals of previously recognized interest income, net of cash received, related to non performing loans was  $4.0 billion, $4.7 billion, and $349 million during the years ended December 31, 2011, 2010, and 2009,  respectively  The reduction during the year ended December 3 , 20   compared to the year ended December 31, 2010, was primarily due to the decreased  volume of non performing loans on non accrual status

The increase during the year ended December 3 , 20  0 compared to the year ended December 31, 2009 was primarily  due to our adoption of amendments to the accounting guidance  related to the accounting for transfers of financial assets  and consolidation of VIEs  Prior to adoption of these amendments and subsequent consolidation of certain trusts, we did not reverse  interest income on non performing loans for loans held by the trusts, and the forgone interest income on non performing loans  of the trusts did not reduce net interest income or net interest  yield, since it was accounted for through a charge to provision  for credit losses

During the year ended December 31, 2011, spreads on our  debt and our access to the debt markets remained favorable  relative to historical levels  For more information, see "LIQUIDITY AND CAPITAL RESOURCES     Liquidity."

The objectives set for us under our charter and conservatorship,  restrictions in the Purchase Agreement and restrictions imposed by FHFA have negatively impacted, and will continue to  negatively impact, our net interest income  For example, our  mortgage related investments portfolio is subject to a cap that decreases by  0% each year until the portfolio reaches  $250 billion. This decline in asset balances will likely cause a corresponding reduction in our interest income over  time  For more information on the various restrictions and  limitations on our investment activity and our mortgage related  investments portfolio, see "BUSINESS     Conservatorship and Related Matters     *Impact of Conservatorship and Related Actions on Our Business     Limits on Investment Activity and Our Mortgage Related  Investments Portfolio.*"

## Provision for Credit Losses

We maintain loan loss reserves at levels we believe appropriate  to absorb probable incurred losses on mortgage loans  held for investment and loans underlying our financial  guarantees  Increases in our loan loss reserves are generally  reflected in earnings through the provision for credit losses.

Since the beginning of 2008, on an aggregate basis, we have  recorded provision for credit losses associated with  single family loans of approximately $73.2 billion, and have  recorded an additional $4 3 billion in losses on loans  purchased from our PCs, net of recoveries. The majority of these losses are associated with loans originated in 2005 through  2008  While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred, and  thus have not been provisioned for, we believe that, as of  December 31, 2011, we have reserved for or charged off the majority of the total expected credit losses for these loans  Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could  require us to provide for losses on these loans beyond our  current expectations  See "Table 3     Credit Statistics, Single Family Credit Guarantee Portfolio" for  certain quarterly credit statistics for our single family credit guarantee portfolio

Our provision for credit losses was $10.7 billion in 2011  compared to $17.2 billion in 2010. The provision for credit  losses in 2011 reflects a decline in the rate at which  single family loans transition into serious delinquency or are  modified, but was partially offset by our lowered expectations for mortgage insurance recoveries, which is due to the

88                                                                                           *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

continued deterioration in the financial condition of the mortgage insurance industry in 2011. The provision for credit losses declined to $17.2 billion in 2010 compared to $29.5 billion in 2009, and reflected a decline in the rate at which delinquent loans transitioned into serious delinquency, partially offset by a higher volume of loan modifications that were classified as TDRs in 2010, compared to 2009 See "RISK MANAGEMENT   Credit Risk    *Institutional Credit Risk*" for further information on our mortgage insurance counterparties We identified a prior period error in the second quarter of 2010 that impacted our provision for credit losses and allowance for loan losses  The cumulative effect, net of taxes, of this error corrected in 20 0 was $1.2 billion, of which $0.9 billion related to the year ended December 3 , 2009

During 2011, our charge offs, net of recoveries for single family loans, exceeded the amount of our provision for credit losses  Our charge offs in 2011 remained elevated, but reflect suppression of activity due to delays in the foreclosure process and continuing weak market conditions, such as home prices and the rate of home sales  We believe the level of our charge offs will continue to remain high and may increase in 2012.

We continued to experience a high volume of completed loan modifications classified as TDRs during 2011, but the volume of such modifications was less than the volume during 2010 See "Table 54    Reperformance Rates of Modified Single Family Loans" for information on the performance of our modified loans. As of December 31, 2011 and December 31, 2010, the UPB of our single family non performing loans was $120.5 billion and $115.5 billion, respectively. These amounts include $44.4 billion and $26.6 billion, respectively, of s ng e-family TDRs that are reperforming (*i.e.*, less than three months past due)  TDRs remain categorized as non performing throughout the remaining life of the loan regardless of whether the borrower makes payments which return the loan to a current payment status after modification  See "RISK MANAGEMENT   Credit Risk    *Mortgage Credit Risk*" for further information on our single family credit guarantee portfolio, including credit performance, charge offs, our loan loss reserves balance, and our non performing assets

We adopted an amendment to the accounting guidance related to the classification of loans as TDRs in the third quarter of 2011, which significantly increases the population of problem loans subject to our workout activities that we account for and disclose as TDRs. The impact of this change in guidance on our financial results for 2011 was not significant. We expect that the number of loans that newly qualify as TDRs in 2012 will remain high, primarily because we anticipate that the majority of our modifications, both completed and those still in trial periods, will be considered TDRs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS" for additional information on our TDR loans, including our implementation of changes to the accounting guidance related to the classification of loans as TDRs.

While the total number of seriously delinquent loans declined approximately 10% and 7% during 2011 and 2010, respectively, in part due to a significant volume of loan modifications (upon completion of a modification, a delinquent single family loan is given a current payment status), our serious delinquency rate remains high compared to historical levels due to the continued weakness in home prices, persistently high unemployment, extended foreclosure timelines and foreclosure suspensions in many states, and continued challenges faced by servicers processing large volumes of problem loans  Our seller/servicers have an active role in our loan workout activities, including under the servicing alignment initiative and the MHA Program, and a decline in their performance could result in a failure to realize the anticipated benefits of our loss mitigation plans. The decline in size of our single family credit guarantee portfolio in 2011 caused our serious delinquency rate to be higher than it otherwise would have been because this rate is calculated on a smaller base of loans at year end

Our provision for credit losses and amount of charge offs in the future will be affected by a number of factors, including: (a) the actual level of mortgage defaults; (b) the impact of the MHA Program and other loss mitigation efforts; (c) any government actions or programs that impact the ability of troubled borrowers to obtain modifications, including legislative changes to bankruptcy laws; (d) changes in property values; (e) regional economic conditions, including unemployment rates; (f) delays in the foreclosure process, including those related to the concerns about deficiencies in foreclosure documentation practices; (g) third party mortgage insurance coverage and recoveries; and (h) the realized rate of seller/servicer repurchases  See "RISK MANAGEMENT   Credit Risk    *Institutional Credit Risk*" for additional information on seller/servicer repurchase obligations

Our provision (benefit) for credit losses associated with our multifamily mortgage portfolio was $(196) million and $99 million for 2011 and 2010, respectively. Our loan loss reserves associated with our multifamily mortgage portfolio were $545 million and $828 million as of December 3 , 2011 and December 31, 2010, respectively  The decline in loan loss reserves for multifamily loans in 2011 was driven primarily by positive market trends in vacancy rates and effective rents, as well as stabilizing or improved property values  However, some states in which we have investments in

<div align="center">89</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

multifamily mortgage loans, including Nevada, Arizona, and Georgia, continue to exhibit weaker than average apartment fundamentals.

**Non-Interest Income (Loss)**

*Gains (Losses) on Extinguishment of Debt Securities of Consolidated Trusts*

When we purchase PCs that have been issued by consolidated PC trusts, we extinguish a pro rata portion of the outstanding debt securities of the related consolidated trusts  We recognize a gain (loss) on extinguishment of the debt securities to the extent the amount paid to extinguish the debt security differs from its carrying value  For the years ended December 31, 2011 and 2010, we extinguished debt securities of consolidated trusts with a UPB of $75.4 billion and $17.8 billion,  respectively (representing our purchase of single family PCs  with a corresponding UPB amount). The increase in purchases of  single family PCs was due to an increased volume of dollar roll  transactions to support the market and pricing of our  single family PCs  Losses on extinguishment of these debt  securities of consolidated trusts were $219 million and $164 million for the years ended December 31, 2011 and 2010, respectively  The losses during 2011 and 2010 were primarily due to the repurchase of our debt securities at higher  net purchase premiums driven by a decrease in interest rates  during the periods  See "Table 25    Total Mortgage Related Securities Purchase Activity" for additional information regarding purchases of mortgage related securities, including those issued by consolidated PC trusts.

*Gains (Losses) on Retirement of Other Debt*

We repurchase or call our outstanding other debt securities from time to time when we believe it is economically beneficial and  to manage the mix of liabilities funding our assets  When we  repurchase or call outstanding debt securities, or holders put  outstanding debt securities to us, we recognize a gain or loss to the extent the amount paid to redeem the debt security  differs from its carrying value. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for more information  regarding our accounting policies related to debt retirements

Gains (losses) on retirement of other debt were  $44 million, $(219) million, and $(568) million  during the years ended December 31, 2011, 2010, and 2009,  respectively  We recognized gains on debt retirements during 2011, compared to losses during 2010, because we purchased debt with lower associated discounts in 2011 relative to the  comparable periods in 20 0  We recognized fewer losses on debt  retirement during 2010 compared to 2009 primarily due to  decreased losses on calls and puts in 2010 compared to 2009  For  more information, see "LIQUIDITY AND CAPITAL RESOURCES  Liquidity    *Other Debt Securities    Other Debt Retirement Activities*."

*Gains (Losses) on Debt Recorded at Fair Value*

Gains (losses) on debt recorded at fair value primarily relate  to changes in the fair value of our foreign currency denominated  debt  During 2011 and 2010, we recognized gains on debt recorded  at fair value of $91 million and $580 million,  respectively, primarily due to a combination of the U S  dollar strengthening relative to the Euro and changes  in interest rates  During 2009, we recognized losses on debt recorded at fair value of $404 million primarily due to the  U S  dollar weakening relative to the Euro  We mitigate changes in the fair value of our foreign currency denominated debt by using foreign currency swaps and foreign currency  denominated interest rate swaps

*Derivative Gains (Losses)*

The table below presents derivative gains (losses) reported in  our consolidated statements of income and comprehensive income   See "NOTE 11: DERIVATIVES    Table11.2    Gains and Losses on Derivatives" for information about gains and losses related to specific categories of derivatives  Changes in fair value and interest accruals on derivatives not in hedge accounting relationships  are recorded as derivative gains (losses) in our consolidated  statements of income and comprehensive income  At December 31, 2011, 2010, and 2009, we did not have any derivatives in hedge accounting relationships; however, there  are amounts recorded in AOCI related to discontinued cash flow hedges  Amounts recorded in AOCI associated with these closed cash flow hedges are reclassified to earnings when the  forecasted transactions affect earnings  If it is probable that  the forecasted transaction will not occur, then the deferred  gain or loss associated with the forecasted transaction is reclassified into earnings immediately

While derivatives are an important aspect of our strategy to  manage interest rate risk, they generally increase the  volatility of reported net income (loss) because, while fair value changes in derivatives affect net income (loss), fair  value changes in several of the types of assets and liabilities being hedged do not affect net income (loss)

90                                        *Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 12     Derivative Gains (Losses)**

| | Derivative Gains (Losses) | | |
| | Year Ended December 31, | | |
| | 2011 | 2010 | 2009 |
| | | (in millions) | |
|---|---|---|---|
| In e es - a e swaps | $(10,367) | $ (7,679) | $ 13,611 |
| Op on-based de va ves(1) | 7,176 | 4,843 | (10,686) |
| O he de va ves(2 | (1,529) | (755) | (882) |
| Acc ual of pe od c se lemen s(3 | (5,032) | (4,494) | (3,943) |
| o a | $ (9,752) | $(8,085) | $ (1,900) |

(1)  P   a   y nc udes pu chased ca  and pu swap ons and pu chased n e es - a e caps and f oo s

(2)  I c des f   es, fo e g  -c  e cy swaps, co      e s, swap gua an ee de va  ves, and c ed  de va  ves  Fo e gn-cu ency swaps a e def ed as swaps  w c
ne  se  e e   s based on one leg calcula ed n a fo e gn-cu  ency and he o he  leg ca cu a ed n U S  do a s  Comm en s  nc ude (a) ou  comm en s o pu chase
and se  nves  en s n secu  es  (b) ou  comm en s o pu chase mo  gage loans  and (c) ou  comm en s o pu chase and ex ngu sh o  ssue deb  secu  es of
o  co so da ed   ss

(3) Inc udes   pu ed n e es  on ze o-coupon swaps

Gains (losses) on derivatives not accounted for in hedge  accounting relationships are principally driven by changes in:  (a) interest rates and implied volatility; and (b) the  mix and volume of derivatives in our derivative portfolio

Our mix and volume of derivatives change from period to period  as we respond to changing interest rate environments  We use receive  and pay fixed interest rate swaps to adjust the interest rate characteristics of our debt funding in order to  more closely match changes in the interest rate characteristics of our mortgage related assets  A receive fixed swap results in our receipt of a fixed interest rate payment from our counterparty in exchange for a variable rate payment  Conversely, a pay fixed swap requires us to make a fixed  interest rate payment to our counterparty in exchange for a variable rate payment  Receive fixed swaps increase in value and  pay fixed swaps decrease in value when interest rates decrease (with the opposite being true when interest rates increase)

We use swaptions and other option based derivatives to adjust  the interest rate characteristics of our debt in response to  changes in the expected lives of our investments in mortgage related assets  Purchased call and put swaptions, where  we make premium payments, are options for us to enter into receive  and pay fixed swaps, respectively  Conversely, written call and put swaptions, where we receive premium payments, are options for our counterparty to enter into receive and pay fixed  swaps, respectively  The fair values of both purchased and written call and put swaptions are sensitive to changes in  interest rates and are also driven by the market's expectation of potential changes in future interest rates (referred to as "implied volatility")  Purchased swaptions generally become more valuable as implied volatility  increases and less valuable as implied volatility decreases  Recognized losses on purchased options in any given period are  limited to the premium paid to purchase the option plus any unrealized gains previously recorded  Potential losses on  written options are unlimited

We also use derivatives to synthetically create the substantive  economic equivalent of various debt funding structures  For example, the combination of a series of short term debt  issuances over a defined period and a pay fixed interest rate  swap with the same maturity as the last debt issuance is the substantive  economic equivalent of a long term fixed rate debt  instrument of comparable maturity. Similarly, the combination of non callable debt and a call swaption with the same maturity as  the noncallable debt is the substantive economic equivalent of callable debt  For a discussion regarding our ability to issue  debt, see "LIQUIDITY AND CAPITAL RESOURCES     Liquidity     *Other Debt Securities*."

During 2011, we recognized losses on derivatives of $9.8 billion, primarily due to declines in long term swap  interest rates  Specifically, during 2011, we recognized fair value losses on our pay  fixed swap positions of $23.0 billion, partially offset by fair value gains on our  ece ve-fixed swaps of $12.6 billion. We also recognized fair value gains of $7.2 billion during 2011 on our option based derivatives, resulting from gains on our purchased call swaptions as interest rates decreased  Additionally, we recognized losses of $5 0 billion related to the accrual of periodic settlements during 2011 due to our net pay fixed swap  position and a declining interest rate environment during the  year

During 20  0, declining long term swap interest rates resulted in a  loss on derivatives of $8.1 billion. Specifically, the  decrease in long term swap interest rates resulted in fair value  losses on our pay fixed swaps of $17.5 billion, partially offset by fair value gains on our receive fixed swaps of $9.7 billion. We recognized fair value gains of $4 8 billion on our option based derivatives, resulting  from gains on our purchased call swaptions primarily due to the  declines in interest rates during 2010  Additionally, we recognized losses of $4 5 billion related to the accrual of periodic settlements during 20  0 due to our net pay fixed swap  position and a declining interest rate environment during the  year

During 2009, the mix and volume of our derivative portfolio were  impacted by fluctuations in swap interest rates, resulting in a  loss on derivatives of $1.9 billion. Long term swap  interest rates and implied volatility both increased during

91

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

2009  As a result of these factors, we recorded gains on our  pay fixed swap positions, partially offset by losses on our  receive fixed swaps, resulting in a $13.6 billion net gain.  We also recorded losses of $10 7 billion on option based derivatives, primarily on our purchased call swaptions, as the impact of the increasing swap interest rates more than offset  the impact of higher implied volatility

### Investment Securities-Related Activities

Since January 1, 2010, as a result of our adoption of  amendments to the accounting guidance for transfers of financial  assets and consolidation of VIEs, we no longer account for the  single family PCs and certain Other Guarantee Transactions we  hold as investments in securities  Instead, we now recognize the  underlying mortgage loans on our consolidated balance sheets  through consolidation of the related trusts. Our adoption of these amendments resulted in a decrease in our investments in  securities of $286.5 billion on January 1, 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for additional information

#### Impairments of Available For Sale Securities

We recorded net impairments of available for sale securities  recognized in earnings, which were related to non agency  mo tgage-re ated securities, of $2.3 billion, $4.3 billion, and $11.2 billion during the years ended  December 31, 2011, 2010, and 2009. See "CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities    *Mortgage Related Securities    Other Than Temporary Impairments on Available For Sale Mortgage Related Securities*" and "NOTE 7: INVESTMENTS IN SECURITIES" for  information regarding the accounting principles for investments  in debt and equity securities and the other than temporary  impairments recorded during the years ended December 3 , 2011, 2010, and 2009.

#### Other Gains (Losses) on Investment Securities Recognized in  Earnings

Other gains (losses) on investment securities recognized in  earnings primarily consists of gains (losses) on trading  securities  We recognized $(1.0) billion, $(1.3) billion, and $4.9 billion related to gains  (losses) on trading securities during the years ended  December 31, 2011, 2010, and 2009.

Trading securities mainly include Treasury securities, agency  fixed rate and variable rate pass through mortgage related  securities, and agency REMICs, including inverse floating rate,  interest only and principal only securities  With the exception of principal only securities, our agency securities, classified as trading, were at a net premium (*i.e.* have higher net fair value than UPB) as of December 31, 2011. Gains (losses) on trading securities do not include the interest  earned on these assets, which is recorded as part of net  interest income  Additionally, our securities classified as trading are managed in the overall context of our interest rate  risk management strategy and framework  However, the impacts of changes in fair value of related derivatives and other debt  are not recognized in other gains (losses) on investment securities recognized in earnings on our consolidated statements  of income  and comprehensive income

During the years ended December 31, 2011 and 2010, the  losses on trading securities were primarily due to the movement  of securities with unrealized gains towards maturity. The  decreased losses during the year ended December 31, 2011,  compared to the year ended December 3 , 2010, was primarily due to higher fair value gains at the end of 2011 as a result  of a decline in longer term interest rates

At December 31, 2009, the fair value of our investments in  trading securities was $222.3 billion, compared to  $58.8 billion and $60 3 billion at December 31, 2011 and 2010, respectively. The  significant reduction in the fair value of our investments in  trading securities was primarily due to our adoption of amendments to the accounting  guidance for transfers of financial assets and consolidation of  VIEs, as noted above  The larger balance in our investments in  trading securities during 2009, combined with tightening OAS  levels, contributed to the gains on these trading securities  In  addition, during the year ended December 31, 2009, we sold  agency securities classified as trading with an aggregate UPB of approximately $148 7 billion, which generated realized  gains of $1.7 billion.

For a further discussion of our interest rate risk management  strategy and framework, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISKS."

### Other Income

Other income includes items associated with our guarantee  activities on non consolidated trusts, including management and  guarantee income, gains (losses) on guarantee asset, income on  guarantee obligation, gains (losses) on sale of mortgage loans,  and trust management income (expense)  Upon consolidation of  our single family PC trusts and certain Other Guarantee Transactions  commencing January 1, 2010, guarantee related items no longer have a material impact on our results and are therefore  included in other income on our consolidated statements of income and

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                                    Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

comprehensive income  The management and guarantee income  recognized during 2011 and 2010 was earned from our non consolidated securitization trusts and other mortgage credit  guarantees which had an aggregate UPB of $56.9 billion and  $44 0 billion as of December 3 , 2011 and 2010, respectively, compared to $1 87 trillion as of December 31, 2009  For additional information on the impact of consolidation  of our single family PC trusts and certain Other Guarantee  Transactions, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 19: SELECTED  FINANCIAL STATEMENT LINE ITEMS."

The table below summarizes the significant components of other  income

**Table 13    Other Income**

| | Year Ended December 31, | | |
| | 2011 | 2010 | 2009 |
| | | (in millions) | |
| O he  ncome | | | |
| Managemen  and gua an ee  ncome(1) | $  170 | $  143 | $ 3,033 |
| Ga ns ( osses) on gua an ee asse | (78) | (61) | 3,299 |
| Income on gua an ee obl ga  on | 153 | 135 | 3,479 |
| Ga ns (losses) on sale of mo  gage loans | 411 | 267 | 745 |
| Lowe -of-cos -o -fa  -value ad us men s on held-fo -sale mor gage  oans(2 | | | (679) |
| Ga ns (losses) on mo  gage loans  eco ded a  fa  value | 418 | (249) | (190) |
| Recove  es on loans  mpa  ed upon pu  chase | 473 | 806 | 379 |
| Low- ncome-hous ng  ax c ed  pa  ne sh ps(3 | | | (4,155) |
| T us  managemen  ncome (expense)(2 | | | (761) |
| All o he | 608 | 819 | 222 |
| To a  o he  ncome | $2,155 | $1,860 | $ 5,372 |

(1)  Mos  of ou  gua an ee  ela ed  ncome  n 2011 and 2010  ela es o  secu   zed mul  fam ly mo  gage loans whe e we have no  conso  da ed  he  secu   za on us s on ou  consol da ed ba ance shee s

(2)  Upon consol da  on of ou  s ngle-fam ly PC  us s and ce  a n O  he  G ua  an  ee T a  sac  o s o  Ja  a y 1, 2010, we  o longe  ncu  us  managemen  ncome and expenses and no  onge  ncu  lowe -of-cos -o -fa  -value ad us men s on s ngle-fam ly mo  gage  oans s nce a  of ou  s ng e-fam  y mo  gage oans a e class f ed as held-fo - nves men  a he  han held-fo  -sale

(3)  We w o e down  he ca  y ng va ue of ou  LIHTC  nves  men s o ze o as of Decembe  31, 2009, as we w   no  be ab e o  ea  ze any va ue fo   hese asse s e he
       o   g    ed c os  o ou   axable  ncome and  ela ed  ax l ab l  es o  h ough a sale o a t  d pa ty  See "NOTE 3  VARIABLE INTEREST ENTITIES" fo  f    e
       nfo ma on

Other income increased to $2 2 billion for the year ended  December 31, 2011, compared to $1.9 billion for the  year ended December 3 , 2010, primarily due to gains on mortgage loans recorded at fair value in 2011, compared to  losses on mortgage loans recorded at fair value in 2010, which was partially offset by lower recoveries on loans impaired upon  purchase and a decline in all other income in 2011  We recognized gains on mortgage loans recorded at fair value during  2011, compared to losses in 2010, as a result of declines in  interest rates and higher balances of loans recorded at fair  value during 2011.

*Gains (Losses) on Sale of Mortgage Loans*

In 2011 and 2010, we recognized $411 million and $267 million, respectively, in gains (losses) on sale of  mortgage loans with associated UPB of $13.7 billion and $6.6 billion, respectively. All gains (losses) on sales of mortgage  loans in 20    and 20  0 relate to multifamily mortgage loans.

Gains (losses) on sale of mortgage loans declined to  $267 million in 2010 from $745 million in 2009,  primarily due to our adoption of amendments to the accounting  guidance applicable to the accounting for transfers of financial  assets and the consolidation of VIEs, as all single family loans are consolidated on our balance sheets and are no longer  recognized as sales when we issue our PCs

*Lower of Cost or Fair Value Adjustments on Held for Sale Mortgage Loans*

We recognized lower of cost or fair value adjustments of $(679) million in 2009. Due to our adoption of amendments  to the accounting guidance applicable to the accounting for  transfers of financial assets and the consolidation of VIEs, all  single family mortgage loans on our consolidated balance sheet  were reclassified as held for investment on January 1, 20  0  Consequently, beginning in 20  0, we no longer record lower of cost or fair value adjustments on single family  mortgage loans. During 2009, we transferred $10.6 billion  of single family mortgage loans from held for sale to held for investment  Upon transfer, we evaluated the lower of cost  or fair value for each individual loan  We recognized approximately $438 million of losses associated with these  transfers during 2009, representing the unrealized losses of  certain loans on the dates of transfer; however, we were not  permitted to similarly recognize any unrealized gains on  individual loans at the time of transfer

TREASURY-2863

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Recoveries on Loans Impaired upon Purchase*

Recoveries on loans impaired upon purchase represent the recapture into income of previously recognized losses associated with purchases of delinquent loans from our PCs in conjunction with our guarantee activities  Recoveries occur when a non performing loan is repaid in full or when at the time of foreclosure the estimated fair value of the acquired property, less costs to sell, exceeds the carrying value of the loan  For impaired loans where the borrower has made required payments that return the loan to less than three months past due, the recovery amounts are instead recognized as interest income over time as periodic payments are received

During 2011, 2010, and 2009, we recognized recoveries on loans impaired upon purchase of $473 million, $806 million and $379 million, respectively  Our recoveries on loans impaired upon purchase declined in 2011, compared to 2010, due to a lower volume of foreclosure transfers and payoffs associated with loans impaired upon purchase  Recoveries on impaired loans increased in 2010, compared to 2009, due to a higher volume of short sales and foreclosure transfers, combined with improvements in home prices in certain geographical areas during 2010.

Commencing January , 20 0, we no longer recognize losses on loans purchased from PC pools related to our single family PC trusts and certain Other Guarantee Transactions due to adoption of the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs  Our recoveries in 2011 and 2010 principally relate to impaired loans purchased prior to January 1, 2010, due to the change in accounting guidance effective on that date  Consequently, our recoveries on loans impaired upon purchase will generally continue to decline over time. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information about the impact of adoption of these accounting changes

*All Other*

All other income declined to $608 million during the year ended December 31, 2011, compared to $819 million during the year ended December 31, 2010, primarily due to: (a) gains recognized in 20 0 due to the recognition of income related to mortgage servicing rights associated with TBW, one of our former seller/servicers; and (b) the correction in 2011 of certain prior period accounting errors not material to our financial statements

All other income increased to $819 million in 2010 from $222 million in 2009, primarily due to the recognition of income related to mortgage servicing rights associated with TBW, and penalties and other fees on single family seller servicers, including penalties arising from failures to complete foreclosures within required time periods, and to a lesser extent, recognition of expected loss recoveries from certain  ega claims.

**Non-Interest Expense**

The table below summarizes the components of non interest expense

**Table 14    Non Interest Expense**

| | Year Ended December 31, | | |
| | 2011 | 2010 | 2009 |
| | | (in millions) | |
| Adm n s  a  ve expe ses (1) | | | |
| Sala  es and employee benef  s | $ 832 | $ 895 | $ 912 |
| P ofess onal se v ces | 270 | 297 | 344 |
| Occupancy expense | 62 | 64 | 68 |
| O he  adm n s  a  ve expense | 342 | 341 | 361 |
| To al adm n s  a  ve expenses | 1,506 | 1,597 | 1,685 |
| REO ope a ons expense | 585 | 673 | 307 |
| O he  expenses | 392 | 662 | 5,203 |
| To al non- n e es  expense | $2,483 | $2,932 | $ 7,195 |

(1) Commenc ng n he f s qua e of 2011, we eclass f ed ce a n expenses f om o he  expenses o p ofess ona  se v ces expense  P  o pe od amoun s have been
    eclass f ed o confo m o he c  en p esen a on

*Administrative Expenses*

Administrative expenses decreased in 2011 compared to 2010, largely due to a reduction in the number of employees as part of our ongoing focus on cost reduction measures  Administrative expenses decreased in 2010 compared to 2009, in part due to our focus on cost reduction measures in 2010, particularly on professional services costs  We do not expect that our general and administrative expenses for 2012 will continue to decline, in part due to the continually changing mortgage market, an environment in which we are subject to increased regulatory oversight and mandates and strategic

94                                                                                             *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2864

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

arrangements that we may enter into with outside firms to provide operational capability and staffing for key functions, if needed

### REO Operations Expense

The table below presents the components of our REO operations expense, and REO inventory and disposition information

**Table 15    REO Operations Expense, REO Inventory, and REO Dispositions**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | (dollars in millions) | | |
| REO operations expense | | | |
| Single-family | | | |
| REO property expenses[1] | $ 1,205 | $ 1,163 | $ 708 |
| Disposition (gains) losses, net[2] | 179 | 102 | 749 |
| Change in holding period allowance, dispositions | (456) | (286) | (427) |
| Change in holding period allowance, inventory[3] | 302 | 497 | (185) |
| Recoveries | (634) | (800) | (558) |
| Total single-family REO operations expense | 596 | 676 | 287 |
| Multifamily REO operations expense (income) | (11) | (3) | 20 |
| Total REO operations expense | $ 585 | $ 673 | $ 307 |
| REO inventory (in properties), at December 31 | | | |
| Single-family | 60,535 | 72,079 | 45,047 |
| Multifamily | 20 | 14 | 5 |
| Total | 60,555 | 72,093 | 45,052 |
| REO property dispositions (in properties) | | | |
| Single-family | 110,175 | 101,206 | 69,400 |
| Multifamily | 19 | 9 | 6 |
| Total | 110,194 | 101,215 | 69,406 |

(1) Consists of costs incurred to acquire, manage, and prepare a property for sale, such as valuation adjustments, legal fees, insurance, taxes, and cleaning and other maintenance charges

(2) Represents the difference between disposition proceeds, net of selling expenses, and the fair value of the property on the date of the foreclosure or transfer

(3) Represents the (increase) decrease in the estimated fair value of properties, net of estimated selling costs, during the holding period

(4) Includes recoveries from primary mortgage insurance, pool insurance and seller/servicer repurchases

REO operations expense was $585 million in 2011, as compared to $673 million in 2010 and $307 million in 2009 The decline in REO operations expense in 2011, compared to 2010, was primarily due to the impact of a less significant decline in home prices in certain geographical areas with significant REO activity resulting in lower write downs of single family REO inventory during 2011, partially offset by lower recoveries on REO properties during 20   Lower recoveries on REO properties in 2011, compared to 2010, were primarily due to reduced recoveries from mortgage insurers, in part due to the continued deterioration in the financial condition of the mortgage insurance industry, and a decline in reimbursements of losses from seller/servicers associated with repurchase requests on loans on which we have foreclosed The increase in REO operations expense in 2010, compared to 2009, is a result of higher REO property expenses and holding period write downs that were partially offset by lower disposition losses and increased recoveries We expect REO property expenses to continue to remain high in 2012 due to expected continued high levels of single family REO acquisitions and inventory

In 20  , we believe the volume of our single family REO acquisitions was less than it otherwise would have been due to delays in the foreclosure process, particularly in states that require a judicial foreclosure process The acquisition slowdown, coupled with high disposition levels, led to an approximate 16% reduction in REO property inventory during 2011. While we expect the delays to ease in 20 2, we also expect the length of the foreclosure process will remain above historical levels For more information on how delays in the foreclosure process could adversely affect our REO operations expense, see "RISK FACTORS    Operational Risks   *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process.*" See "RISK MANAGEMENT   Credit Risk   *Mortgage Credit Risk    Non Performing Assets*" for additional information about our REO activity

### Other Expenses

Other expenses were $0 4 billion, $0 7 billion, and $5.2 billion in 2011, 2010, and 2009, respectively. Other expenses in 2011 and 2010 consist primarily of HAMP servicer incentive fees, costs related to terminations and transfers of mortgage servicing, and other miscellaneous expenses Other expenses were lower in 20   compared to 20 0, primarily

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from this use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

due to lower expenses associated with transfers and terminations of mortgage servicing, primarily related to TBW, partially offset by higher servicer incentive fees associated with HAMP during 2011 Other expenses declined significantly from 2009 to 20 0 due to reduction of losses on loans purchased, which was due to the change in accounting guidance for consolidation of VIEs we implemented on January 1, 2010 See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES     Recently Adopted Accounting Guidance" and "NOTE 19: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information.

**Income Tax Benefit**

For 2011, 2010, and 2009, we reported income tax benefit of $0.4 billion, $0.9 billion, and $0.8 billion, respectively, resulting in effective tax rates of 7%, 6%, and 4%, respectively Our effective tax rate differed from the federal statutory tax rate of 35% primarily due to the establishment of a valuation allowance against a portion of our net deferred tax assets Our income tax benefits represent amounts related to the amortization of net deferred losses on pre 2008 closed cash flow hedges, as well as the current tax benefits associated with our ability to carry back net operating tax losses generated in 2008 and 2009 See "NOTE 13: INCOME TAXES" for additional information.

**Total Comprehensive Income (Loss)**

Our total comprehensive income (loss) was $(1.2) billion, $0.3 billion, and $(2.9) billion for the years ended December 31, 2011, 2010, and 2009, respectively, consisting of: (a) $(5.3) billion, $(14.0) billion, and $(21.6) billion of net income (loss), respectively; and (b) $4.0 billion, $14.3 billion, and $18 6 billion of total other comprehensive income, respectively. See "CONSOLIDATED BALANCE SHEETS ANALYSIS     Total Equity (Deficit)" for additional information regarding total other comprehensive income (loss)

**Segment Earnings**

Our operations consist of three reportable segments, which are based on the type of business activities each performs     Investments, Single family Guarantee, and Multifamily Certain activities that are not part of a reportable segment are included in the All Other category

The Investments segment reflects results from our investment, funding and hedging activities In our Investments segment, we invest principally in mortgage related securities and single family performing mortgage loans, which are funded by other debt issuances and hedged using derivatives. In our Investments segment, we also provide funding and hedging management services to the Single family Guarantee and Multifamily segments The Investments segment reflects changes in the fair value of the Multifamily segment assets that are associated with changes in interest rates Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses

The Single family Guarantee segment reflects results from our single family credit guarantee activities In our Single family Guarantee segment, we purchase single family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage related securities We guarantee the payment of principal and interest on the mortgage related securities in exchange for management and guarantee fees Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less credit related expenses, administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses

The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities Although we hold multifamily mortgage loans and non agency CMBS that we purchased for investment, our purchases of such multifamily mortgage loans for investment have declined significantly since 2010, and our purchases of CMBS have declined significantly since 2008. The only CMBS that we have purchased since 2008 have been senior, mezzanine, and interest-only tranches related to certain of our securitization transactions, and these purchases have not been significant. Currently, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization We guarantee the senior tranches of these securitizations in Other Guarantee Transactions. Our Multifamily segment also issues Other Structured Securities, but does not issue REMIC securities Our Multifamily segment also enters into other guarantee commitments for multifamily HFA bonds and housing revenue bonds held by third parties. Historically, we issued multifamily PCs, but this activity has been insignificant in recent years Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less credit related expenses, administrative expenses, and allocated funding costs. In addition, the Multifamily segment reflects gains on sale of

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2866

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

mortgages and the impact of changes in fair value of CMBS and held for sale loans associated only with factors other than changes in interest rates, such as liquidity and credit.

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator  The financial performance of our Single family Guarantee segment and Multifamily segment are measured based on each segment's contribution to GAAP net income (loss)  Our Investments segment is measured on its contribution to GAAP total comprehensive income (loss), which consists of the sum of its contribution to: (a) GAAP net income (loss); and (b) GAAP total other comprehensive income, net of taxes  The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac  Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac

The All Other category consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments  By recording these types of activities to the All Other category, we be eve the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods  The All Other category also includes the deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward and, in 2009, the write down of our LIHTC investments.

In presenting Segment Earnings, we make significant reclassifications to certain financial statement line items in order to reflect a measure of net interest income on investments and a measure of management and guarantee income on guarantees that is in line with how we manage our business. We present Segment Earnings by: (a) reclassifying certain investment related activities and credit guarantee related activities between various line items on our GAAP consolidated statements of income and comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments

As a result of these reclassifications and allocations, Segment Earnings for our reportable segments differs significantly from, and should not be used as a substitute for, net income (loss) as determined in accordance with GAAP  Our definition of Segment Earnings may differ from similar measures used by other companies  However, we believe that Segment Earnings provides us with meaningful metrics to assess the financial performance of each segment and our company as a whole

Beginning January 1, 2010, we revised our method for presenting Segment Earnings to reflect changes in how management measures and assesses the performance of each segment and the company as a whole. This change in method, in conjunction with our implementation of the amendments to the accounting guidance relating to transfers of financial assets and the consolidation of VIEs, resulted in significant changes to our presentation of Segment Earnings  Segment Earnings for 2009 do not include changes to the guarantee asset, guarantee obligation, or other items that were eliminated or changed as a result of our implementation of the aforementioned amendments to the accounting guidance, as these amendments were applied prospectively consistent with our GAAP results. As a result, our Segment Earnings results for 2011 and 2010 are not directly comparable with the results for 2009. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information regarding the consolidation of certain of our securitization trusts.

See "NOTE 14: SEGMENT REPORTING" for further information regarding our segments, including the descriptions and activities of the segments and the reclassifications and allocations used to present Segment Earnings

<div style="text-align:center">97</div>

*Freddie Mac*

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides information about our various segment mortgage portfolios at December 31, 2011, 2010, and 2009  For a discussion of each segment's portfolios, see "*Segment Earnings   Results*."

**Table 16     Composition of Segment Mortgage Portfolios and  Credit Risk Portfolios**[1]

| | December 31, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| **Segmen  mor gage por fo  os:** | | |
| *Investments    Mortgage investments portfolio* | | |
| S ngle-fam ly unsecu  zed mo  gage  oans[2] | $    109,190 | $    79,097 |
| F edd e Mac mo  gage- ela ed secu   es | 220,659 | 263,152 |
| Non-agency mo  gage- ela ed secu   es | 86,526 | 99,639 |
| Non-F edd e Mac agency secu   es | 32,898 | 39,789 |
| *Total Investments    Mortgage investments portfolio* | 449,273 | 481,677 |
| *Single -family Guarantee     Managed loan portfolio* [3] | | |
| S ngle-fam ly unsecu  zed mo  gage  oans[ | 62,469 | 69,766 |
| S ngle-fam ly F edd e Mac mo  gage- ela ed secu   es held by us | 220,659 | 261,508 |
| S ngle-fam ly F edd e Mac mo  gage- ela ed secu   es held by  h  d pa  es | 1,378,881 | 1,437,399 |
| S ngle-fam ly o he  gua an ee comm  men[ | 11,120 | 8,632 |
| *Total Single-family Guarantee    Managed loan portfolio* | 1,673,129 | 1,777,305 |
| *Multifamily    Guarantee portfolio* [3] | | |
| Mu  fam ly F edd e Mac mo  gage  e a ed secu   es held by us | 3,008 | 2,095 |
| Mul fam ly F edd e Mac mo  gage ela ed secu   es held by  h  d pa   es | 22,136 | 11,916 |
| Mul fam ly o he  gua an ee comm  men[ | 9,944 | 10,038 |
| *Total Multifamily    Guarantee portfolio* | 35,088 | 24,049 |
| *Multifamily    Mortgage investments portfolio*[3] | | |
| Mul fam ly nves men  secu   es po fol o | 59,260 | 59,548 |
| Mu  fam y  oan po fo  o | 82,311 | 85,883 |
| *Total Multifamily    Mortgage investments portfolio* | 141,571 | 145,431 |
| *Total Multifamily portfolio* | 176,659 | 169,480 |
| Less  F edd e Mac s ngle-fam ly and ce  a n mul fam ly secu   es[6] | (223,667) | (263,603) |
| *Total mortgage portfolio* | $  2,075,394 | $  2,164,859 |
| **Cred t r sk po t olios:**[7] | | |
| *Single-family credit guarantee portfolio:* | | |
| S ngle-fam ly mo  gage loans, on-balance shee | $  1,733,215 | $  1,799,256 |
| Non-consol da ed F edd e Mac mo  gage- ela ed secu   es | 10,735 | 11,268 |
| O he  gua an ee comm  men s | 11,120 | 8,632 |
| Less  HFA- e a ed gua an ees[8] | (8,637) | (9,322) |
| Less  F edd e Mac mo  gage- e a ed secu   es backed by G nn e  Mae ce  f ca es[8] | (779) | (857) |
| *Total single-family credit guarantee portfolio* | $  1,745,654 | $  1,808,977 |
| *Multifamily mortgage portfolio* | | |
| Mul fam ly mo  gage loans, on-balance shee | $   82,311 | $   85,883 |
| Non-consol da ed F edd e Mac mo  gage- ela ed secu   es | 25,144 | 14,011 |
| O he  gua an ee comm  men s | 9,944 | 10,038 |
| Less  HFA- e a ed gua an ees[8] | (1,331) | (1,551) |
| *Total multifamily mortgage portfolio* | $   116,068 | $   108,381 |

(1)  Based on UPB and excludes mo  gage loans and mo  gage- ela ed sec   t es t aded,   t ot yet sett ed

(2)  Exc udes unsecu  zed se  ous y de nquen  s ng e-fam y  oans managed by he S ng e-fam y Gua an ee segmen  Howeve , he S ngle-fam ly Gua an ee segmen  con  nues  o ea n managemen  and gua an ee fees assoc a ed w  h unsecu  zed s ngle-fam ly loans  n he Inves men s segmen 's mo  gage nves men s po  fol o

(3)  The balances of  he mo  gage- ela ed secu   es  n  hese po  fo  os a e based o    e UPB of  e secu   y, w e e    e balances of ou  s ngle-fam ly c ed  gua an ee and mu  fam  y mo  gage po  fol os a e based on  he UPB of  he mo  gage  oans unde  y ng  he  e a ed secu   y  The d ffe ences n  he  oan and secu   y ba ances  esu  f o   he m ng of  em   ances o secu   y ho de s, wh ch s  yp ca  y 45  o 75 days af e   he mo  gage paymen  cycle of f xed- a e a d ARM PCs, espec ve y

(4)  Rep esen s unsecu  zed se  ous y de nquen  s ng e-fam  y loans managed by  he S ngle-fam ly Gua an ee segmen

(5)  Rep esen s  he UPB of  o  o gage- e a ed secu  e s fo  wh ch we p ov de ou  gua an ee  ou  secu   za on of  he  e a ed asse s

(6)  F edd e Mac's ngle-fam ly mo  gage- ela ed secu   es held by us a e  ncluded n bo h ou  Inves men s segmen 's mo  gage nves men s po  fol o and ou  S ngle-fam ly G a a  ee segmen 's managed loan po  fol o, and F edd e Mac mul fam ly mo  gage- ela ed secu   es held by us a e  ncluded n bo h he mul fam ly nves men secu   es po fo  o and he mul fam ly gua an ee po fol o  The efo e,  hese amoun s a e  deduc ed  o  econc le  o ou  o al mo gage po fol o

(7)  Rep ese  s    e UPB of  oa s fo  w c  we p ese  ca  e s c es, de   e c y  a o s o   e asse s    s epo  See "GLOSSARY" fo  f    e desc  p on

(8)  We exc ude HFA- e a ed gua an ees and ou    secu   za ons of G nn e  Mae ce  f ca es f om ou  c ed   sk po f  os and mos  e a ed asse s  cs beca se   ese  g a a ees do o  expose  s o mean ngfu  amoun s of c ed   sk due o he c ed  enhancemen  p ov ded on he   by he U S  gove n en

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2868

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

***Segment Earnings    Results***

_Investments_

The table below presents the Segment Earnings of our Investments  segment

**Table 17    Segment Earnings and Key Metrics      Investments(1)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2011 | 2010 | 2009 |
| | (dollars in millions) | | |
| Segmen  Ea  ngs | | | |
| Ne  n e es  ncome | $  7,339 | $  6,192 | $  8,090 |
| Non- n e es  ncome (loss) | | | |
| Ne  mpa  men  of ava lable-fo -sale secu  es | (1,833) | (3,819) | (9,870) |
| De  va  ve ga ns (losses) | (3,597) | (1,859) | 4,695 |
| Ga ns (losses) on  ad ng secu  es | (993) | (1,386) | 4,885 |
| Ga ns (losses) on sale of mo  gage loans | 28 | (76) | 617 |
| Ga ns (losses) on mo  gage loans  eco ded a  fa   value | 501 | 34 | (46) |
| O he  non- n e es  ncome (loss) | 1,266 | 1,023 | (774) |
| To al non- n e es  ncome (loss) | (4,628) | (6,083) | (493) |
| Non- n e es  expense | | | |
| Adm n s  a ve expenses | (398) | (455) | (515) |
| O he  non- n e es  expense | (2) | (18) | (33) |
| To al non- n e es  expense | (400) | (473) | (548) |
| Segmen  adj s  e  s(2 | 661 | 1,358 | |
| Segmen  Ea  ngs befo e  ncome  ax benef  (expense) | 2,972 | 994 | 7,049 |
| Income  ax benef  (expense) | 394 | 259 | (572) |
| Segmen  Ea  ngs, ne  of  axes,  ncud ng noncon  o  ng n e es | 3,366 | 1,253 | 6,477 |
| Less Ne  ncome    noncon  oll ng n e es | | (2) | (1) |
| Seg  en  Ea  ngs, ne  of  axes | 3,366 | 1,251 | 6,476 |
| To al o he  comp ehens ve  ncome, ne  of  axes | 3,107 | 10,226 | 11,329 |
| o a  comp ehens ve  ncome | $  6,473 | $ 11,477 | $ 17,805 |
| Key me  cs    Inves men s | | | |
| _Portfolio balances_ | | | |
| Ave age balances of  n e es -ea n ng assets (3 ( | | | |
| Mo  gage- ela ed secu   es(6 | $ 386,115 | $465,048 | $ 600,562 |
| Non-mo  gage- e a ed  nves men s(7 | 97,519 | 123,537 | 100,759 |
| Unsecu   zed s ngle-fam ly loans | 94,894 | 59,028 | 49,013 |
| To al ave age balances of  n e es -ea n ng asse s | $578,528 | $ 647,613 | $750,334 |
| _Return_ | | | |
| Ne  n e es y e d    Segmen  Ea n ngs bas s | 1 27% | 0 96% | 1 08% |

(1)  Fo   econc l a  ons of  he Segmen  Ea n ngs l ne  tems  o  he compa able l ne  tems n ou  consol da ed f nanc al s a emen s p epa ed n acco dance w h GAAP, see
  "NOTE 14  SEGMENT REPORTING    Tab e 14 2    Seg e  Ea n ngs and Reconc  a on o  GAAP Resu s"

(2)  Fo  a desc p on of ou  seg en  adjus  en s, see "NOTE 14  SEGMENT REPORTING    Seg e  Ea n ngs "

(3)  Excludes mo  gage loans and mo  gage- ela ed secu   es  aded,    t ot yet sett ed

(4)  Exc udes non-pe fo m ng s ng e-fam y mo  gage  oans

(5)  We calcula e ave age balances based on amo   zed cos

(6)  Inc udes ou   nves men s n s ng e-fam y  PCs and ce  a n O he  G a a ee T a sac o s, w c   ave bee  co so da ed    de  GAAP on ou  consol da ed balance
  s ee  s nce Ja   a y 1, 2010

(7)  Inc udes  he ave age ba ances of  n e es -ea n ng cash and cash equ va en s, non-  o  gage- e a ed secu   es, and fede a  funds so d a d sec    es p c ased    de
  a eemen s o  esell

Segment Earnings for our Investments segment increased by  $2.1 billion to $3.4 billion in 2011, compared to $1.3 billion in 2010.
Comprehensive income for our Investments segment decreased by $5 0 billion to  $6.5 billion in 2011, compared to $11.5 billion in 20 0

During 2011, the UPB of the Investments segment mortgage  investments portfolio decreased by 6 7% We held $253.6 billion of agency
securities and $86.5 billion of non agency mortgage related securities as of  December 31, 2011, compared to $302.9 billion of agency securities
and $99.6 billion of non agency  mortgage related securities as of December 3 , 20 0  The decline in UPB of agency securities is due mainly to
liquidations, including prepayments and selected sales. The decline in UPB on non agency mortgage related securities is due  mainly to the
receipt of monthly remittances of principal  repayments from both the recoveries of liquidated loans and to  a lesser extent, voluntary repayments
of the underlying collateral, representing a partial return of our investments in  these securities  Since the beginning of 2007, we have incurred
actual principal cash shortfalls of $1.5 billion on  impaired non agency mortgage related securities in the  Investments segment  See
"CONSOLIDATED BALANCE SHEETS ANALYSIS     Investments in Securities" for additional information regarding our mortgage related
securities

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-2869                    Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Segment Earnings net interest income increased $1.1 billion, and Segment Earnings net interest yield increased 31 basis points during 2011, compared to 2010. The primary driver was lower funding costs, primarily due to the replacement of debt at lower rates These lower funding costs were partially offset by the reduction in the average balance of higher yielding mortgage related assets due to continued liquidations and limited purchase activity.

Segment Earnings non interest income (loss) was $(4.6) billion in 2011, compared to $(6.1) billion in 2010. This improvement in non interest loss was mainly due to decreased net impairment of available for sale securities and decreased losses on trading securities, partially offset by increased derivative losses

Impairments recorded in our Investments segment decreased by $2.0 billion during 2011, compared to 2010, primarily due to the impact of lower interest rates in 2011 resulting in a benefit from expected structural credit enhancements on the securities The impact of lower interest rates was partially offset by the impact of declines in forecasted home prices See "CONSOLIDATED BALANCE SHEETS ANALYSIS Investments in Securities    *Mortgage Related Securities    Other Than Temporary Impairments on Available For Sale Mortgage Related Securities*" for additional information on our impairments

We recorded losses on trading securities of $(1 0) billion during 2011, compared to $(1.4) billion during 2010. Losses in both periods are primarily due to the movement of securities with unrealized gains towards maturity These losses were partially offset by larger fair value gains in 2011, due to a more significant decline in long term interest rates, compared to 20 0

We recorded derivative gains (losses) for this segment of $(3.6) billion during 2011, compared to $(1.9) billion during 2010 While derivatives are an important aspect of our strategy to manage interest rate risk, they generally increase the volatility of reported Segment Earnings, because while fair value changes in derivatives affect Segment Earnings, fair value changes in several of the types of assets and liabilities being hedged do not affect Segment Earnings During 2011 and 2010, swap interest rates decreased, resulting in fair value losses on our pay fixed swaps, partially offset by fair value gains on our receive fixed swaps and purchased call swaptions See "Non Interest Income (Loss)    *Derivative Gains (Losses)*" for additional information on our derivatives

Our Investments segment's total other comprehensive income was $3.1 billion in 2011. Net unrealized losses in AOCI on our available for sale securities decreased by $2.6 billion during 2011, primarily attributable to the impact of declining interest rates, resulting in fair value gains on our agency securities, and the recognition in earnings of other than temporary impairments on our non agency mortgage related securities, partially offset by the impact of widening OAS levels on our single family non agency mortgage related securities The changes in fair value of CMBS, excluding impacts from the changes in interest rates, are reflected in the Multifamily segment

Segment Earnings for our Investments segment decreased by $5.2 billion to $1.3 billion in 2010, compared to $6.5 billion in 2009. Comprehensive income for our Investments segment decreased by $6 3 billion to $11.5 billion in 2010, compared to $17.8 billion in 2009.

Segment Earnings net interest income and net interest yield decreased $1.9 billion and 12 basis points, respectively, during 2010, compared to 2009. The primary driver underlying these decreases was a decrease in the average balance of mortgage related securities, partially offset by a decrease in funding costs as a result of the replacement of higher cost long term debt at lower rates

Segment Earnings non interest loss increased $5.6 billion in 20 0, compared to 2009 Included in other non interest income (loss) are gains (losses) on trading securities of $(1.4) billion in 2010, compared to $4.9 billion in 2009. In 2010, the losses on trading securities was primarily due to the movement of securities with unrealized gains towards maturity, particularly interest only securities, partially offset by fair value gains on our non interest only securities classified as trading primarily due to decreased interest rates The net gains on trading securities during 2009 related primarily to tightening OAS levels

We recorded derivative gains (losses) for this segment of $(1.9) billion during 2010, compared to $4.7 billion during 2009. During 2010, swap interest rates decreased, resulting in fair value losses on our pay fixed swaps, partially offset by fair value gains on our receive fixed swaps and purchased call swaptions. During 2009, longer term swap interest rates increased, resulting in fair value gains on our pay fixed swaps, partially offset by fair value losses on our receive fixed swaps

Impairments recorded in our Investments segment decreased by $6.1 billion during 2010, compared to 2009. Impairments for 2010 and 2009 are not comparable because the adoption of the amendment to the accounting guidance for investments in debt and equity securities on April 1, 2009 significantly impacted both the identification and measurement of other than temporary impairments.

TREASURY-2870

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                              Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our Investments segment's total other comprehensive income was $10.2 billion during 2010. Net unrealized losses in AOCI on our available for sale securities decreased by $9.5 billion during 2010, primarily attributable to the impact of declining interest rates, resulting in fair value gains on our agency, single family non agency, and CMBS mortgage related securities  In addition, the impact of widening OAS levels on our single family non agency mortgage related securities during these periods was offset by fair value gains related to the movement of securities with unrealized losses towards maturity and the recognition in earnings of other than temporary impairments on our non agency mortgage related securities

For a discussion of items that may impact our Investments segment net interest income over time, see "BUSINESS    Conservatorship and Re ated Matters    *Impact of Conservatorship and Related Actions on Our Business    Limits on Investment Activity and Our Mortgage Related Investments Portfolio*" and "Net Interest Income "

<div align="center">101</div>

<div align="right">*Freddie Mac*</div>

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Single Family Guarantee*

The table below presents the Segment Earnings of our Single family Guarantee segment

**Table 18    Segment Earnings and Key Metrics    Single Family Guarantee[1]**

| | Year Ended December 31, | | |
| | 2011 | 2010 | 2009 |
| | | (dollars in millions) | |
|---|---|---|---|
| Segment Earnings | | | |
| Net interest income (expense) | $ (23) | $ 72 | $ 307 |
| Provision for credit losses | (12,294) | (18,785) | (29,102) |
| Non-interest income | | | |
| Management and guarantee income | 3,647 | 3,635 | 3,448 |
| Other non-interest income | 1,216 | 1,351 | 721 |
| Total non-interest income | 4,863 | 4,986 | 4,169 |
| Non-interest expense | | | |
| Administrative expenses | (888) | (930) | (949) |
| REO operations expense | (596) | (676) | (287) |
| Other non-interest expense | (321) | (578) | (4,854) |
| Total non-interest expense | (1,805) | (2,184) | (6,090) |
| Segment adjustments[2] | (699) | (953) | — |
| Segment Earnings (loss) before income tax (expense) benefit | (9,958) | (16,864) | (30,716) |
| Income tax (expense) benefit | (42) | 608 | 3,573 |
| Segment Earnings (loss), net of taxes | (10,000) | (16,256) | (27,143) |
| Total other comprehensive income (loss), net of taxes | 30 | 6 | 19 |
| Total comprehensive income (loss) | $ (9,970) | $ (16,250) | $ (27,124) |
| Reconciliation to GAAP net income (loss) | | | |
| Segment Earnings (loss), net of taxes | $ (10,000) | $ (16,256) | $ (27,143) |
| Credit guarantee-related adjustments | | | 5,941 |
| Tax-related adjustments | | | (2,080) |
| Total reconciling items, net of taxes | — | — | 3,861 |
| Net income (loss) attributable to Freddie Mac | $ (10,000) | $ (16,256) | $(23,282) |
| Key metrics — Single-family Guarantee | | | |
| *Balances and Volume (in billions, except rate)* | | | |
| Average balance of single-family credit guarantee portfolio and HFA guarantees | $ 1,801 | $ 1,861 | $ 1,848 |
| Issuance — Single-family credit guarantees[3] | $ 305 | $ 385 | $ 472 |
| Fixed-rate products — Percentage of purchases[4] | 92% | 95% | 99% |
| Liquidation rate — Single-family credit guarantees[5] | 24% | 29% | 24% |
| *Management and Guarantee Fee Rate (in bps):* | | | |
| Contractual management and guarantee fees | 13.7 | 13.5 | 13.9 |
| Amortization of deliver y fees | 6.5 | 6.0 | 4.8 |
| Segment Earnings management and guarantee income | 20.2 | 19.5 | 18.7 |
| *Credit* | | | |
| Serious delinquency rate, at end of period | 3.58% | 3.84% | 3.98% |
| REO inventory, at end of period (number of properties) | 60,535 | 72,079 | 45,047 |
| Single-family credit losses, in bps[6] | 72.0 | 75.8 | 42.7 |
| *Market:* | | | |
| Single-family mortgage debt outstanding (total US market, in billions)[7] | $ 10,336 | $ 10,522 | $ 10,866 |
| 30-year fixed mortgage rate[8] | 4.0% | 4.9% | 5.1% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 14 SEGMENT REPORTING — Table 14.2 — Segment Earnings and Reconciliation to GAAP Results"

(2) For a description of our segment adjustments, see "NOTE 14 SEGMENT REPORTING — Segment Earnings"

(3) Based on UPB

(4) Excludes ARMs and Balloon Transactions

(5) Represents principal repayments relating to loans underlying Freddie Mac mortgage-related securities and other guarantee commitments including those related to our removal of seriously delinquent and modified mortgage loans and balloon/reset mortgage loans out of PC pools

(6) Calculated as the amount of single-family credit losses divided by the average balance using value of our single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees

(7) Source Federal Reserve Flow of Funds Accounts of the United States of America, calculated December 8, 2011 The outstanding amount for December 31, 2011 reflects the balance as of September 30, 2011

(8) Based on Freddie Mac's Primary Mortgage Market Survey, which is a four weekly period, of which represents a national average mortgage commitment rate on a qualified borrower exclusive of any fees and points required by the lender This commitment rate applies only to financing on conforming mortgages with LTV values of 80%

Segment Earnings (loss) for our Single family Guarantee segment improved to $(10.0) billion in 2011 compared to $(16.3) billion in 2010, primarily due to a decline in Segment Earnings provision for credit losses

Segment Earnings (loss) for our Single family Guarantee segment improved to $(16.3) billion in 2010 compared to $(27.1) billion in 2009, primarily due to a decline in our Segment Earnings provision for credit losses

*Freddie Mac*

Source DRA HOM OAN MORTGAG CORP, 10 K, March 09, 2012                TREASURY-2872                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are caused by the willful misconduct or fraud of Morningstar. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides summary information about the composition of Segment Earnings (loss) for this segment for the years ended December 31, 2011 and 2010

**Table 19     Segment Earnings Composition     Single Family Guarantee Segment**

| | Year Ended December 31, 2011 | | | | | |
| | Segment Earnings Management and Guarantee Income(1) | | Credit Expenses(2) | | Net Amount(4) | |
| | Amount | Average Rate(3) | Amount | Average Rate(3) | | |
| | (dollars in millions, rates in bps) | | | | | |
| Year of origination ( | | | | | | |
| 2011 | $ 362 | 21 2 | $ (56) | 3 9 | $ 306 | |
| 2010 | 763 | 22 4 | (197) | 5 6 | 566 | |
| 2009 | 713 | 20 6 | (207) | 5 8 | 506 | |
| 2008 | 382 | 23 4 | (771) | 56 9 | (389) | |
| 2007 | 368 | 18 6 | (4,365) | 239 1 | (3,997) | |
| 2006 | 227 | 17 7 | (3,439) | 252 6 | (3,212) | |
| 2005 | 257 | 17 5 | (2,125) | 136 4 | (1,868) | |
| 2004 and prior | 575 | 18 7 | (1,730) | 50 9 | (1,155) | |
| Total | $ 3,647 | 20 2 | $(12,890) | 95 4 | $ (9,243) | |
| Administrative expenses | | | | | (888) | |
| Net interest income (expense) | | | | | (23) | |
| Other non-interest income and expenses, net | | | | | 154 | |
| Segment Earnings (loss), net of taxes | | | | | $ (10,000) | |

| | Year Ended December 31, 2010 | | | | | |
| | Segment Earnings Management and Guarantee Income(1) | | Credit Expenses(2) | | Net Amount(4) | |
| | Amount | Average Rate(3) | Amount | Average Rate(3) | | |
| | (dollars in millions, rates in bps) | | | | | |
| Year of origination ( | | | | | | |
| 2010 | $ 418 | 23 8 | $ (109) | 6 2 | $ 309 | |
| 2009 | 837 | 19 3 | (367) | 8 4 | 470 | |
| 2008 | 554 | 29 5 | (2,151) | 114 3 | (1,597) | |
| 2007 | 493 | 21 2 | (7,170) | 307 2 | (6,677) | |
| 2006 | 289 | 16 5 | (5,847) | 332 6 | (5,558) | |
| 2005 | 313 | 15 8 | (2,644) | 132 8 | (2,331) | |
| 2004 and prior | 731 | 16 3 | (1,173) | 26 1 | (442) | |
| Total | $ 3,635 | 19 6 | $(19,461) | 104 7 | $(15,826) | |
| Administrative expenses | | | | | (930) | |
| Net interest income (expense) | | | | | 72 | |
| Other non-interest income and expenses, net | | | | | 428 | |
| Segment Earnings (loss), net of taxes | | | | | $ (16,256) | |

(1) Includes amortization of deferred fees of $1 2 billion and $1 1 billion for 2011 and 2010, respectively

(2) Consists of the aggregate of the Segment Earnings provision for credit losses and Segment Earnings REO operations expense Historical measures of average credit expenses may no be representative of future events

(3) Calculated as the amount of Segment Earnings management and guarantee income or credit expenses, respectively, divided by the sum of the average carrying values of the single-family credit guarantee portfolio and the average balance of our single-family HFA mortgage guarantees

(4) Calculated as Segment Earnings management and guarantee income less credit expenses

(5) Segment Earnings management and guarantee income is presented by year of guarantee origination, whereas credit expenses are presented based on year of loan origination

For the years ended December 31, 2011 and 2010, the guarantee related revenue from mortgage guarantees we issued after 2008 exceeded the credit related and administrative expenses associated with these guarantees We currently believe our management and guarantee fee rates for guarantee issuances after 2008, when coupled with the higher credit quality of the mortgages within our new guarantee issuances, will provide management and guarantee fee income, over the long term, that exceeds our expected credit related and administrative expenses associated with the underlying loans. Nevertheless, various factors, such as continued high unemployment rates, further declines in home prices, or negative impacts of HARP loans originated in recent years (which may not perform as well as other refinance mortgages, due in part to the high LTV ratios of the loans), could require us to incur expenses on these loans beyond our current expectations Our management and guarantee fee income associated with guarantee issuances in 2005 through 2008 has not been adequate to cover the credit and administrative expenses associated with such loans, primarily due to the high rate of defaults on the loans originated in those years coupled with a high volume of refinancing since 2008 High levels of refinancing and delinquency since 2008 have significantly reduced the balance of performing loans from those years

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-2873                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

that remain in our portfolio and consequently reduced management and guarantee income associated with loans originated in 2005 through 2008 (we do not recognize Segment Earnings management and guarantee income on non accrual mortgage loans) We also believe that the management and guarantee fees associated with originations after 2008 will not be sufficient to offset the future expenses associated with our 2005 to 2008 guarantee issuances for the foreseeable future Consequently, we expect to continue reporting net losses for the Single family Guarantee segment in 2012.

Segment Earnings management and guarantee income increased slightly in 2011, as compared to 2010, primarily due to an increase in amortization of delivery fees, partially offset by a lower average balance of the single family credit guarantee portfolio during 2011 Segment Earnings management and guarantee income increased slightly in 2010 compared to 2009, primarily due to an increase in amortization of delivery fees The increase in amortization of delivery fees in 2011 and 2010 was due to the effect of declining interest rates during these years, which increased both actual refinance activity and our expectation of future refinancing activity

The UPB of the Single family Guarantee managed loan portfolio was $1.7 trillion at December 31, 2011, compared to $1.8 trillion and $1.9 trillion at December 31, 2010 and 2009, respectively The declines in 2011 and 2010 reflect that the amount of single family loan liquidations has exceeded new loan purchase and guarantee activity, which we believe is due, in part, to declines in the amount of single family mortgage debt outstanding in the market and increased competition from Ginnie Mae and FHA/VA Our loan purchase and guarantee activity in 2011 was at the lowest level we have experienced in the last several years The liquidation rate on our securitized single family credit guarantees was approximately 24%, 29%, and 24% for 2011, 2010, and 2009, respectively We expect the size of our Single family Guarantee managed loan portfolio will decline slightly during 2012.

Refinance volumes continued to be high during 2011 due to continued low interest rates, and, based on UPB, represented 78% of our single family mortgage purchase volume during 2011 compared to 80% of our single family mortgage purchase volume during 20 0 Relief refinance mortgages comprised approximately 33% and 35% of our total refinance volume during 2011 and 2010, respectively Over time, relief refinance mortgages with LTV ratios above 80% may not perform as well as relief refinance mortgages with LTV ratios of 80% and below because of the continued high LTV ratios of these loans. There is an increase in borrower default risk as LTV ratios increase, particularly for loans with LTV ratios above 80% In addition, relief refinance mortgages may not be covered by mortgage insurance for the full excess of their UPB over 80% Approximately 12% of our single family purchase volume in both 2011 and 2010 was relief refinance mortgages with LTV ratios above 80% Relief refinance mortgages of all LTV ratios comprised approximately 11% and 7% of the UPB in our total single family credit guarantee portfolio at December 31, 2011 and 2010, respectively

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA directed changes to HARP in an effort to attract more eligible borrowers whose monthly payments are current and who can benefit from refinancing their home mortgages For more information about our relief refinance mortgage initiative, see "RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Single Family Mortgage Credit Risk    Single Family Loan Workouts and the MHA Program.*"

Similar to our purchases in 2009 and 2010, the credit quality of the single family loans we acquired in 20   (excluding relief refinance mortgages) is significantly better than that of loans we acquired from 2005 through 2008, as measured by early delinquency rate trends, original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income Mortgages originated after 2008, including re ef refinance mortgages, represent a growing proportion of our single family credit guarantee portfolio The UPB of loans originated in 2005 to 2008 within our single family credit guarantee portfolio continues to decline due to liquidations, which include prepayments, refinancing activity, foreclosure alternatives, and foreclosure transfers We currently expect that, over time, the replacement (other than through relief refinance activity) of the 2005 to 2008 vintages, which have a higher composition of loans with higher risk characteristics, should positively impact the serious delinquency rates and credit related expenses of our single family credit guarantee portfolio However, the rate at which this replacement is occurring slowed beginning in 2010, due primarily to a decline in the volume of home purchase mortgage originations and delays in the foreclosure process

Provision for credit losses for the Single family Guarantee segment was $12.3 billion, $18.8 billion, and $29.1 billion in 2011, 2010, and 2009, respectively. The provision for credit losses in 2011 reflects a decline in the rate at which single family loans transition into serious delinquency or are modified, but was partially offset by our lowered expectations for mortgage insurance recoveries, which is due to the continued deterioration in the financial condition of the mortgage insurance industry in 2011. See "RISK MANAGEMENT    Credit Risk *Institutional Credit Risk*" for further information on our mortgage insurance counterparties Segment Earnings provision for credit losses declined in

<div align="center">04</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

2010, compared to 2009, primarily due to a decline in the rate at which delinquent loans transitioned into serious delinquency, partially offset by a higher volume of loan modifications that were classified as TDRs in 2010.

We adopted an amendment to the accounting guidance on the classification of loans as TDRs in 2011, which significantly increases the population of loans we account for and disclose as TDRs. The impact of this change in guidance on our financial results for 2011 was not significant We expect that the number of loans that newly qualify as TDRs in 2012 will remain high, primarily because we anticipate that the majority of our modifications, both completed and those still in trial periods, will be considered TDRs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS" for additional information on our TDR loans, including our implementation of changes to the accounting guidance on the classification of loans as TDRs.

Single family credit losses as a percentage of the average balance of the single family credit guarantee portfolio and HFA related guarantees were 72.0 basis points, 75.8 basis points, and 42.7 basis points for 2011, 2010, and 2009, respectively Charge offs, net of recoveries, associated with single family loans were $12 4 billion, $13.4 billion, and $7.6 billion in 2011, 2010, and 2009, respectively See "RISK MANAGEMENT   Credit Risk   *Mortgage Credit Risk   Single Family Mortgage Credit Risk*" for further information on our single family credit guarantee portfolio, including credit performance, charge offs, and our non performing assets

The serious delinquency rate on our single family credit guarantee portfolio was 3.58%, 3.84%, and 3.98% as of December 31, 2011, 2010, and 2009, respectively, and declined during 2011 due to a high volume of loan modifications and foreclosure transfers, as well as a slowdown in new serious delinquencies Our serious delinquency rate remains high compared to historical levels, reflecting continued stress in the housing and labor markets and extended foreclosure timelines The decline in the size of our single family credit guarantee portfolio in 2011 caused our serious delinquency rate to be higher than it otherwise would have been because this rate is calculated on a smaller base of loans at year end

Segment Earnings other non interest income was $1.2 billion, $1.4 billion, and $0.7 billion in 2011, 2010, and 2009, respectively. The decline in 2011, compared to 20 0, was primarily due to lower recoveries on loans impaired upon purchase due to a lower volume of foreclosure transfers and loan payoffs associated with these loans. The increase in Segment Earnings other non interest income in 20 0 compared to 2009 was primarily due to higher recoveries on loans impaired upon purchase driven by a higher volume of short sales and foreclosure transfers associated with these loans

Segment Earnings REO operations expense was $0 6 billion, $0.7 billion, and $0.3 billion in 2011, 2010, and 2009, respectively. The decrease in 2011, compared to 2010, was primarily due to the impact of a less significant decline in home prices in certain geographical areas with significant REO activity resulting in lower write downs of single family REO inventory during 2011, partially offset by lower recoveries on REO properties during 20   Lower recoveries on REO properties in 2011, compared to 2010, are primarily due to reduced recoveries from mortgage insurers, in part due to the continued deterioration in the financial condition of the mortgage insurance industry, and a decline in reimbursements of losses from seller/servicers associated with repurchase requests on loans on which we have foreclosed The increase in Segment Earnings REO operations expense in 2010, compared to 2009, is primarily a result of higher REO property expenses and holding period write downs that were partially offset by lower disposition losses and increased recoveries

Our REO inventory (measured in number of properties) declined 16% during 2011 due to an increase in the volume of REO dispositions and slowdowns in REO acquisition volume associated with delays in the foreclosure process Dispositions of REO increased 9% in 2011 compared to 2010, based on the number of properties sold We continued to experience high REO disposition severity ratios on sales of our REO inventory during 2011. We believe our single family REO acquisition volume and single family credit losses in 2011 have been less than they otherwise would have been due to delays in the single family foreclosure process, particularly in states that require a judicial foreclosure process See "RISK FACTORS   Operational Risks   *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" for further information.

Segment Earnings other non interest expense was $0.3 billion, $0.6 billion, and $4.9 billion in 2011, 2010, and 2009, respectively. The decline in 2011, compared to 2010, was primarily due to lower expenses associated with transfers and terminations of mortgage servicing The decline in 2010, compared to 2009, was primarily due to a decline in losses on loans purchased that resulted from changes in accounting guidance for consolidation of VIEs we implemented on January 1, 2010.

<div align="center">105</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Multifamily*

The table below presents the Segment Earnings of our Multifamily  segment

**Table 20     Segment Earnings and Key Metrics      Multifamily(1)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| | (dollars in millions) | | |
| **Segment Earnings** | | | |
| Net interest income | $ 1,200 | $ 1,114 | $ 856 |
| (Provision) benefit for credit losses | 196 | (99) | (574) |
| Non-interest income (loss) | | | |
| Management and guarantee income | 127 | 101 | 90 |
| Net impairment of available-for-sale securities | (353) | (96) | (137) |
| Derivative gains (losses) | 3 | 6 | (27) |
| Gains (losses) on sale of mortgage loans | 383 | 343 | 156 |
| Gains (losses) on mortgage loans recorded at fair value | (83) | (283) | (144) |
| Other non-interest income (loss) | 125 | 177 | (474) |
| Total non-interest income (loss) | 202 | 248 | (536) |
| Non-interest expense | | | |
| Administrative expenses | (220) | (212) | (221) |
| REO operations income (expense) | 11 | 3 | (20) |
| Other non-interest expense | (69) | (66) | (18) |
| Total non-interest expense | (278) | (275) | (259) |
| Segment Earnings (loss) before income tax benefit (expense) | 1,320 | 988 | (513) |
| Income tax benefit (expense) | (1) | (26) | — |
| Segment Earnings (loss), net of taxes, including noncontrolling interests | 1,319 | 962 | (513) |
| Less Net (income) loss  noncontrolling interests | — | 3 | 2 |
| Segment Earnings (loss), net of taxes | 1,319 | 965 | (511) |
| Total other comprehensive income, net of taxes | 899 | 4,075 | 7,292 |
| Total comprehensive income | $ 2,218 | $ 5,040 | $ 6,781 |
| **Reconciliation to GAAP net income (loss)** | | | |
| Segment Earnings (loss), net of taxes | $ 1,319 | $ 965 | $ (511) |
| Credit guarantee-related adjustments(2) | — | — | 7 |
| Fair value-related adjustments(3) | — | — | (3,761) |
| Tax-related adjustments(3) | — | — | 1,313 |
| Total reconciling items, net of taxes | — | — | (2,441) |
| Net income (loss) attributable to Freddie Mac | $ 1,319 | $ 965 | $ (2,952) |
| **Key metrics  Multifamily** | | | |
| *Balances and Volume* | | | |
| Average balance of Multifamily loan portfolio | $ 83,593 | $ 83,163 | $ 78,371 |
| Average balance of Multifamily guarantee portfolio | $ 29,861 | $ 21,787 | $ 16,203 |
| Average balance of Multifamily investment securities portfolio | $ 61,296 | $ 61,332 | $ 63,797 |
| Multifamily new loan purchase and other guarantee commitment volume(4) | $ 20,325 | $ 14,800 | $ 16,556 |
| Multifamily units financed from new volume activity(5) | 320,753 | 233,952 | 258,072 |
| Multifamily Other Guarantee Transactions issuances(4) | $ 11,722 | $ 5,694 | $ 1,979 |
| *Yield and Rate:* | | | |
| Net interest yield  Segment Earnings basis | 0.83% | 0.77% | 0.55% |
| Average Management and guarantee fee rate, in bps(4) | 42.4 | 50.1 | 53.3 |
| *Credit* | | | |
| Delinquency rate | | | |
| Credit-enhanced loans, at period end | 0.52% | 0.85% | 1.03% |
| Non-credit-enhanced loans, at period end | 0.11% | 0.12% | 0.07% |
| Total delinquency rate, at period end(6) | 0.22% | 0.26% | 0.20% |
| Allowance for loan losses and reserve for guarantee losses, at period end | $ 545 | $ 828 | $ 831 |
| Allowance for loan losses and reserve for guarantee losses, in bps | 46.4 | 75.3 | 82.1 |
| Credit losses, bps(7) | 6.3 | 9.6 | 4.4 |
| REO inventory, at period end (number of properties) | $ 133 | $ 107 | $ 31 |
| REO inventory, at period end (number of properties) | 20 | 14 | 5 |

(1) For reconciliations of Segment Earnings line items to the comparable line items in our consolidated financial statements, prepared in accordance with GAAP, see
  "NOTE 14  SEGMENT REPORTING  Table 14.2  Segment Earnings and Reconciliation to GAAP Results"
(2) Consists primarily of amortization and valuation adjustments on credit guarantee-related activity on the guarantee assets and guarantee obligations, which we excluded from segment earnings in 2009
(3) Fair value-related adjustments in 2009 consists primarily of the amortization of the hedge unwind of our investments in LIHTC partnerships in 2009  Tax-related adjustments in 2009 consists of the establishment of a partial valuation allowance against our deferred tax asset, which we included in Multifamily Segment Earnings
(4) Excludes our guarantees issued under the HFA initiative
(5) Represents Multifamily Segment Earnings  management and guarantee income, excluding prepayment and certain other fees, divided by the sum of the average balance of the multifamily guarantee portfolio and the average balance of guarantees associated with the HFA initiative, excluding certain bonds under the NIBP
(6) See "RISK MANAGEMENT  Credit Risk  Mortgage Credit Risk  Multifamily Mortgage Credit Risk" for information on our reported multifamily delinquency rate
(7) Calculated as the amount of charge-offs and recoveries divided by the average carrying value of our multifamily loan portfolio and the average balance of our multifamily guarantee portfolio, including multifamily HFA initiative guarantees

*Freddie Mac*

Source  DRA HOM  OAN MORTGAG  CORP, 10 K, March 09, 2012
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

Our purchase and guarantee of multifamily loans, excluding HFA related guarantees, increased approximately 37% to $20.3 billion for 2011, compared to $14.8 billion and $16.6 billion during 2010 and 2009, respectively. We completed Other Guarantee Transactions, excluding HFA related guarantees, of $11.7 billion, $5.7 billion, and $2.0 billion in UPB of multifamily loans in 2011, 2010, and 2009, respectively The UPB of the total multifamily portfolio increased to $176.7 billion at December 31, 2011 from $169.5 billion at December 31, 2010, primarily due to increased issuance of Other Guarantee Transactions, partially offset by maturities and other repayments of multifamily held for investment mortgage loans We expect our purchase and guarantee activity to continue to increase, but at a more moderate pace, in 2012

Segment Earnings for our Multifamily segment increased to $1.3 billion in 2011, compared to $965 million in 2010, primarily due to improvement in provision (benefit) for credit losses and lower losses on mortgage loans recorded at fair value, partially offset by higher security impairments on the CMBS portfolio Our total comprehensive income for our Multifamily segment was $2.2 billion in 2011, consisting of: (a) Segment Earnings of $1.3 billion; and (b) $0 9 billion of total other comprehensive income, which was mainly attributable to changes in fair value of available for sale CMBS in 2011.

Segment Earnings (loss) for our Multifamily segment increased to $965 million for 2010 compared to $(511) million for 2009, primarily due to increased net interest income and lower provision for credit losses in 2010 Our total comprehensive income for our Multifamily segment was $5.0 billion in 2010, consisting of: (a) Segment Earnings of $965 million; and (b) $4.1 billion of total other comprehensive income, primarily resulting from improved fair values on available for sale CMBS Our total comprehensive income for our Multifamily segment was $6.8 billion in 2009, consisting of: (a) Segment Earnings (loss) of $(0.5) billion; and (b) $7.3 billion of total other comprehensive income

Segment Earnings net interest income increased to $1.2 billion in 2011 from $1.1 billion in 2010, primarily due to lower funding costs on allocated debt in 2011 Net interest yield was 83 and 77 basis points in 2011 and 20 0, respectively Segment Earnings net interest income increased $258 million, or 30%, for 2010 compared to 2009, due to lower funding costs on allocated debt in 2010, which declined principally due to the removal of the LIHTC investments from the Multifamily segment in the fourth quarter of 2009 See "NOTE 3: VARIABLE INTEREST ENTITIES" for further information on our LIHTC investments Net interest income was also positively impacted in 2010 by an increase in prepayment fees driven by an increase in refinancing in 2010, as compared to 2009. As a result, net interest yield was 77 basis points in 2010, an improvement of 22 basis points from 2009.

Segment Earnings non interest income (loss) was $202 million, $248 million, and $(536) million in 2011, 2010, and 2009, respectively. The decline in 2011 was primarily driven by higher security impairments on CMBS, partially offset by lower losses recognized on mortgage loans recorded at fair value primarily reflecting improving market factors, such as credit and liquidity. Segment Earnings gains (losses) on mortgage loans recorded at fair value are presented net of changes in fair value due to changes in interest rates The improvement in Segment Earnings non interest income (loss) in 2010, compared to 2009, was primarily due to the absence of LIHTC partnership losses and higher gains recognized on the sale of loans through securitization in 2010

While our Multifamily Segment Earnings management and guarantee income increased 26% in 2011, compared to 2010, the average rate realized on our guarantee portfolio declined to 42 basis points in 2011 from 50 basis points in 2010. The decline in our average rate in 20 reflects the impact from our increased volume of Other Guarantee Transactions, which have lower credit risk associated with our guarantee (and thus we charge a lower rate) relative to other issued guarantees because these transactions contain significant levels of credit enhancement through subordination.

Multifamily credit losses as a percentage of the combined average balance of our multifamily loan and guarantee portfolios were 6.3, 9.6, and 4.4 basis points in 2011, 2010, and 2009, respectively Our Multifamily segment recognized a provision (benefit) for credit losses of $(196) million, $99 million, and $574 million in 2011, 2010, and 2009, respectively Our loan loss reserves associated with our multifamily mortgage portfolio were $545 million, $828 million, and $831 million at December 31, 2011, 2010, and 2009, respectively. The decline in our loan loss reserves in 2011 was driven by positive trends in vacancy rates and effective rents, as well as stabilizing or improved property values.

The credit quality of the multifamily mortgage portfolio remains strong, as evidenced by low delinquency rates and credit losses, and we believe reflects prudent underwriting practices The delinquency rate for loans in the multifamily mortgage portfolio was 0.22%, 0.26%, and 0.20% as of December 31, 2011, 2010, and 2009, respectively. As of December 31, 2011, more than half of the multifamily loans that were two or more monthly payments past due, measured both in terms of number of loans and on a UPB basis, had credit enhancements that we currently believe will mitigate our expected losses on those loans We expect our multifamily delinquency rate to remain relatively stable in 2012. See "RISK MANAGEMENT     Credit Risk     *Mortgage Credit Risk     Multifamily Mortgage Credit Risk*" for further

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

information about our reported multifamily delinquency rates and credit enhancements on multifamily loans For further information on delinquencies, including geographical and other concentrations, see "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS."

## CONSOLIDATED BALANCE SHEETS ANALYSIS

The following discussion of our consolidated balance sheets should be read in conjunction with our consolidated financial statements, including the accompanying notes Also, see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported financial position

### Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell

Cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and other liquid assets discussed in "Investments in Securities     *Non Mortgage Related Securities*," are important to our cash flow and asset and liability management, and our ability to provide liquidity and stability to the mortgage market We use these assets to help manage recurring cash flows and meet our other cash management needs We consider federal funds sold to be overnight unsecured trades executed with commercial banks that are members of the Federal Reserve System Securities purchased under agreements to resell principally consist of short term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities

The short term assets on our consolidated balance sheets also include those related to our consolidated VIEs, which are comprised primarily of restricted cash and cash equivalents at December 31, 2011 These short term assets, related to our consolidated VIEs, decreased by $9.2 billion from December 31, 2010 to December 31, 2011, primarily due to a relative decline in the level of refinancing activity

Excluding amounts related to our consolidated VIEs, we held $28.4 billion and $37.0 billion of cash and cash equivalents, $0 billion and $1 4 billion of federal funds sold, and $12.0 billion and $15.8 billion of securities purchased under agreements to resell at December 31, 2011 and 20 0, respectively The aggregate decrease in these assets was primarily driven by a decline in funding needs for debt redemptions In addition, excluding amounts related to our consolidated VIEs, we held on average $32.4 billion and $33.0 billion of cash and cash equivalents and $13.2 billion and $19.1 billion of federal funds sold and securities purchased under agreements to resell during the three months and year ended December 3 , 2011, respectively

Beginning in the third quarter of 2011, we changed the composition of our portfolio of liquid assets to hold more cash and overnight investments given the market's concerns about the potential for a downgrade in the credit ratings of the U S government and the potential that the U.S. would exhaust its borrowing authority under the statutory debt limit For more information regarding liquidity management and credit ratings, see "LIQUIDITY AND CAPITAL RESOURCES     Liquidity."

### Investments in Securities

The two tables below provide detail regarding our investments in securities as of December 31, 2011, 2010 and 2009. The tables do not include our holdings of single family PCs and certain Other Guarantee Transactions as of December 31, 2011 and 2010. For information on our holdings of such securities, see "Table 16     Composition of Segment Mortgage Portfolios and Credit Risk Portfolios "

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2879

Table of Contents

**Table 21      Investments in Available For Sale Securities**

| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| | | | (in millions) | |
| **December 31, 2011** | | | | |
| Available-for-sale mortgage-related securities | | | | |
| Freddie Mac | $ 74,711 | $ 6,429 | $ (48) | $ 81,092 |
| Subprime | 41,347 | 60 | (13,408) | 27,999 |
| CMBS | 53,637 | 2,574 | (548) | 55,663 |
| Option ARM | 9,019 | 15 | (3,169) | 5,865 |
| Alt-A and other | 13,659 | 32 | (2,812) | 10,879 |
| Fannie Mae | 19,023 | 1,303 | (4) | 20,322 |
| Obligations of states and political subdivisions | 7,782 | 108 | (66) | 7,824 |
| Manufactured housing | 820 | 6 | (60) | 766 |
| Ginnie Mae | 219 | 30 | | 249 |
| Total investments in available-for-sale mortgage-related securities | $ 220,217 | $10,557 | $ (20,115) | $ 210,659 |
| **December 31, 2010** | | | | |
| Available-for-sale mortgage-related securities | | | | |
| Freddie Mac | $ 80,742 | $ 5,142 | $ (195) | $ 85,689 |
| Subprime | 47,916 | 1 | (14,056) | 33,861 |
| CMBS | 58,455 | 1,551 | (1,919) | 58,087 |
| Option ARM | 10,726 | 16 | (3,853) | 6,889 |
| Alt-A and other | 15,561 | 58 | (2,451) | 13,168 |
| Fannie Mae | 23,025 | 1,348 | (3) | 24,370 |
| Obligations of states and political subdivisions | 9,885 | 31 | (539) | 9,377 |
| Manufactured housing | 945 | 13 | (61) | 897 |
| Ginnie Mae | 268 | 28 | | 296 |
| Total investments in available-for-sale mortgage-related securities | $247,523 | $ 8,188 | $(23,077) | $ 232,634 |
| **December 31, 2009** | | | | |
| Available-for-sale mortgage-related securities | | | | |
| Freddie Mac | $ 215,198 | $ 9,410 | $ (1,141) | $ 223,467 |
| Subprime | 56,821 | 2 | (21,102) | 35,721 |
| CMBS | 61,792 | 15 | (7,788) | 54,019 |
| Option ARM | 13,686 | 25 | (6,475) | 7,236 |
| Alt-A and other | 18,945 | 9 | (5,547) | 13,407 |
| Fannie Mae | 34,242 | 1,312 | (8) | 35,546 |
| Obligations of states and political subdivisions | 11,868 | 49 | (440) | 11,477 |
| Manufactured housing | 1,084 | 1 | (174) | 911 |
| Ginnie Mae | 320 | 27 | | 347 |
| Total available-for-sale mortgage-related securities | 413,956 | 10,850 | (42,675) | 382,131 |
| Available-for-sale non-mortgage-related securities | | | | |
| Asset-backed securities | 2,444 | 109 | | 2,553 |
| Total available-for-sale non-mortgage-related securities | 2,444 | 109 | | 2,553 |
| Total investments in available-for-sale securities | $ 416,400 | $10,959 | $(42,675) | $384,684 |

**Table 22      Investments in Trading Securities**

| | December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | | (in millions) | |
| Mortgage-related securities | | | |
| Freddie Mac | $ 16,047 | $ 13,437 | $ 170,955 |
| Fannie Mae | 15,165 | 18,726 | 34,364 |
| Ginnie Mae | 156 | 172 | 185 |
| Other | 164 | 31 | 28 |
| Total mortgage-related securities | 31,532 | 32,366 | 205,532 |
| Non-mortgage-related securities | | | |
| Asset-backed securities | 302 | 44 | 1,492 |
| Treasury bills | 100 | 17,289 | 14,787 |
| Treasury notes | 24,712 | 10,122 | |
| FDIC-guaranteed corporate medium-term notes | 2,184 | 441 | 439 |
| Total non-mortgage-related securities | 27,298 | 27,896 | 16,718 |
| Total fair value of investments in trading securities | $58,830 | $ 60,262 | $222,250 |

### Non-Mortgage-Related Securities

Our investments in non mortgage related securities provide an additional source of liquidity. We held investments in non-mortgage-related securities classified as trading of $27.3 billion and $27.9 billion as of December 31, 2011 and 2010,

Source  D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2880

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

respectively  While balances may fluctuate from period to period, we continue to meet required liquidity and contingency levels

### Mortgage-Related Securities

We are primarily a buy and hold investor in mortgage related securities, which consist of securities issued by Fannie Mae, Ginnie Mae, and other financial institutions  We also invest in our own mortgage related securities  However, the single family PCs and certain Other Guarantee Transactions we purchase as investments are not accounted for as investments in securities because we recognize the underlying mortgage loans on our consolidated balance sheets through consolidation of the related trusts

The table below provides the UPB of our investments in mortgage related securities classified as available for sale or trading on our consolidated balance sheets  The table below does not include our holdings of our own single family PCs and certain Other Guarantee Transactions. For further information on our holdings of such securities, see "Table 16    Composition of Segment Mortgage Portfolios and Credit Risk Portfolios "

**Table 23    Characteristics of Mortgage Related Securities on Our Consolidated Balance Sheets**

| | December 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Fixed Rate | Variable Rate(1) | Total | Fixed Rate | Variable Rate(1) | Total |
| | | | (in millions) | | | |
| Freddie Mac mortgage-related securities (2) | | | | | | |
| Single-family | $ 72,795 | $ 9,753 | $ 82,548 | $ 79,955 | $ 8,118 | $ 88,073 |
| Multifamily | 1,216 | 1,792 | 3,008 | 339 | 1,756 | 2,095 |
| Total Freddie Mac mortgage-related securities | 74,011 | 11,545 | 85,556 | 80,294 | 9,874 | 90,168 |
| Non-Freddie Mac mortgage-related securities | | | | | | |
| Agency securities (3) | | | | | | |
| Fannie Mae | | | | | | |
| Single-family | 16,543 | 15,998 | 32,541 | 21,238 | 18,139 | 39,377 |
| Multifamily | 52 | 76 | 128 | 228 | 88 | 316 |
| Ginnie Mae | | | | | | |
| Single-family | 253 | 104 | 357 | 296 | 117 | 413 |
| Multifamily | 16 | | 16 | 27 | | 27 |
| Total Non-Freddie Mac agency securities | 16,864 | 16,178 | 33,042 | 21,789 | 18,344 | 40,133 |
| Non-agency mortgage-related securities | | | | | | |
| Single-family ( | | | | | | |
| Subprime | 336 | 48,696 | 49,032 | 363 | 53,855 | 54,218 |
| Option ARM | | 13,949 | 13,949 | | 15,646 | 15,646 |
| Alt-A and other | 2,128 | 14,662 | 16,790 | 2,405 | 16,438 | 18,843 |
| CMBS | 19,735 | 34,375 | 54,110 | 21,401 | 37,327 | 58,728 |
| Obligations of states and political subdivisions( | 7,771 | 22 | 7,793 | 9,851 | 26 | 9,877 |
| Manufactured housing | 831 | 129 | 960 | 930 | 150 | 1,080 |
| Total non-agency mortgage-related securities(6) | 30,801 | 111,833 | 142,634 | 34,950 | 123,442 | 158,392 |
| Total UPB of mortgage-related securities | $121,676 | $139,556 | 261,232 | $137,033 | $151,660 | 288,693 |
| Premiums, discounts, deferred fees, impairments of UPB and other basis adjustments | | | (12,363) | | | (11,839) |
| Net unrealized gains (losses) on mortgage-related securities, pre-tax | | | (6,678) | | | (11,854) |
| Total carrying value of mortgage-related securities | | | $ 242,191 | | | $ 265,000 |

(1) Variable-rate mortgage-related securities include those which a coupon rate can change based on changes in the composition of the underlying collateral d

(2) We purchase REMICs and Other Structured Securities and certain Other Guarantee Transactions as investments, we account for these securities as investments in debt securities as well as investments in the debt securities of non-consolidated entities  We do no consolidate our securitization trusts since we are not deemed to be the primary beneficiary of such trusts  We are a subordinated, we recognize risk associated with the mortgage loans underlying our Freddie Mac mortgage-related securities  Mortgage loans underlying our issued single-family PCs and certain Other Guarantee Transactions are recognized on our consolidated balance sheets as held-for-investment mortgage loans, or consolidated  See "NOTE 1  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Investments in Securities" for further information on

(3) Agency securities are generally no separately rated by nationally recognized statistical rating organizations, but have historically been viewed as having a level of credit quality at least equivalent to non-agency mortgage-related securities rated AAA- and of equivalent

(4) For information about how these securities are rated, see "Table 29    Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS "

(5) Consists of housing revenue bonds  Approximately 37% and 50% of these securities were held at December 31, 2011 and 2010, respectively, we were AAA-rated as of those dates, we note lowest ratings available

(6) Credit ratings for most non-agency mortgage-related securities are designated by no fewer than two nationally recognized statistical rating organizations  Approximately 21% and 23% of total non-agency mortgage-related securities were held at December 31, 2011 and 2010, respectively, we were AAA-rated as of those dates, based on the UPB and the lowest rating available

TREASURY-2881

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides the UPB and fair value of our investments in mortgage related securities classified as available for sale or trading on our consolidated balance sheets

**Table 24    Additional Characteristics of Mortgage Related Securities on Our Consolidated Balance Sheets**

| | December 31, 2011 | | December 31, 2010 | |
| --- | --- | --- | --- | --- |
| | UPB | Fair Value | UPB | Fair Value |
| | (in millions) | | | |
| Agency pass- h ough secu es(1 | $ 24,283 | $ 26,193 | $ 31,184 | $ 33,459 |
| Age cy REMICs a d O e S c ed Sec es | | | | |
| In e es -on y secu es(2 | | 2,863 | | 3,800 |
| P nc pa -on y secu es(3 | 3,569 | 3,344 | 4,631 | 4,067 |
| Inve se floa ng- a e secu es( | 4,839 | 6,826 | 3,512 | 4,478 |
| O e S c ed Sec es | 85,907 | 93,805 | 90,974 | 96,886 |
| To al agency secu es | 118,598 | 133,031 | 130,301 | 142,690 |
| Non-agency secu es( | 142,634 | 109,160 | 158,392 | 122,310 |
| To al mo gage- ela ed secu es | $261,232 | $242,191 | $288,693 | $ 265,000 |

(1) Rep ese s a d v ded be ef c a e es s s a o d poo s of mo gages

(2) Rep esen s secu es whe e he ho de ece ves on y he n e es cash f ows

(3) Rep esen s secu es whe e he ho de ece ves on y he p nc pal cash flows

(4) Rep esen s secu es whe e he ho de ece ves n e es cash f ows ha change nve se y w h he efe ence a e ( i.e. h ghe cash f ows when n e es a es a e ow and lowe cash f ows when n e es a es a e h gh) Add ona y, hese secu es ece ve a po on of p nc pal cash flows assoc a ed w h he unde ly ng colla e al

(5) Includes fa values of $2 m ll on and $5 m ll on of n e es -on y secu es a Decembe 31, 2011 and Decembe 31, 2010, espec vely

The total UPB of our investments in mortgage related securities on our consolidated balance sheets decreased from $288.7 billion at December 3, 20 0 to $261.2 billion at December 31, 2011, while the fair value of these investments decreased from $265.0 billion at December 31, 2010 to $242 2 billion at December 31, 2011. The reduction resulted from our purchase activity remaining less than liquidations, consistent with our efforts to reduce our mortgage related investments portfolio, as described in "BUSINESS    Conservatorship and Re ated Matters    *Impact of Conservatorship and Related Actions on Our Business    Limits on Investment Activity and Our Mortgage Related Investments Portfolio*." The UPB and fair value of inverse floating rate securities increased as we created new inverse floating rate securities from existing mo tgage related securities that were on our consolidated balance sheets We create inverse floating rate securities and other REMICs and sell tranches that are in demand by investors to reduce our asset balance, while conserving value for the taxpayer These securities are managed in the overall context of our interest rate risk management strategy and framework

The table below summarizes our mortgage related securities purchase activity for 2011, 2010 and 2009. The purchase activity includes single family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated. Effective January 1, 2010, purchases of single family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated are recorded as an extinguishment of debt securities of consolidated trusts held by third parties on our consolidated balance sheets

Source    D RA HOM OAN MORTGAG CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2882

Table of Contents

**Table 25     Total Mortgage Related Securities Purchase Activity[1]**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2011 | 2010 | 2009 |
| | (in millions) | | |
| Non-Freddie Mac mortgage-related securities purchased for securitization | | | |
| Ginnie Mae Certificates | $ 77 | $ 69 | $ 56 |
| Non-agency mortgage-related securities purchased for Other Guarantee Transactions[2] | 11,527 | 9,579 | 10,189 |
| Total non-Freddie Mac mortgage-related securities purchased for securitization | 11,604 | 9,648 | 10,245 |
| Non-Freddie Mac mortgage-related securities purchased as investments in securities | | | |
| Agency securities | | | |
| *Fannie Mae:* | | | |
| Fixed-rate | 5,835 | | 43,298 |
| Variable-rate | 2,297 | 373 | 2,697 |
| Total Fannie Mae | 8,132 | 373 | 45,995 |
| *Ginnie Mae fixed-rate* | | | 27 |
| *Total agency securities* | 8,132 | 373 | 46,022 |
| Non-agency mortgage-related securities | | | |
| *CMBS* | | | |
| Fixed-rate | 14 | | |
| Variable-rate | 179 | 40 | |
| *Total CMBS* | 193 | 40 | |
| *Obligations of states and political subdivisions fixed-rated* | | | 180 |
| *Total non-agency mortgage-related securities* | 193 | 40 | 180 |
| *Total non-Freddie Mac mortgage-related securities purchased as investments in securities* | 8,325 | 413 | 46,202 |
| Total non-Freddie Mac mortgage-related securities purchased | $ 19,929 | $ 10,061 | $ 56,447 |
| Freddie Mac mortgage-related securities purchased | | | |
| *Single-family:* | | | |
| Fixed-rate | $ 94,543 | $ 40,462 | $ 176,974 |
| Variable-rate | 5,057 | 923 | 5,414 |
| *Multifamily* | | | |
| Fixed-rate | 355 | 271 | |
| Variable-rate | 117 | 111 | |
| *Total Freddie Mac mortgage-related securities purchased* | $ 100,072 | $ 41,767 | $ 182,388 |

(1) Based on UPB. Excludes mortgage-related securities traded but not yet settled
(2) Purchases in 2011 and 2010 include HFA bonds we acquired and subsequently securitized under the NIBP. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for further information on our HFA-related initiatives.

During the year ended December 31, 2011, we increased our participation in dollar roll transactions, primarily to support the market and pricing of our PCs. When these transactions involve our consolidated PC trusts, the purchase and sale represents an extinguishment and issuance of debt securities, respectively, and impacts our net interest income and recognition of gain or loss on the extinguishment of debt on our consolidated statements of income and comprehensive income. These transactions can cause short-term fluctuations in the balance of our mortgage-related investments portfolio. The increase in our purchases of agency securities in 2011, reflected in "Table 25 — Total Mortgage-Related Securities Purchase Activity" is attributed primarily to these transactions. For more information, see "RISK FACTORS — Competitive and Market Risks — *Any decline in the price performance of or demand for our PCs could have an adverse effect on the volume and profitability of our new single-family guarantee business.*"

*Unrealized Losses on Available For Sale Mortgage Related Securities*

At December 31, 2011, our gross unrealized losses, pre-tax, on available-for-sale mortgage-related securities were $20.1 billion, compared to $23.1 billion at December 31, 2010. The decrease was primarily due to gains on our agency securities and CMBS as a result of the impact of declining rates and the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities, partially offset by losses on our single-family non-agency mortgage-related securities primarily due to widening OAS levels. We believe the unrealized losses related to these securities at December 31, 2011 were mainly attributable to poor underlying collateral performance, limited liquidity and large risk premiums in the market for residential non-agency mortgage-related securities. All available-for-sale securities in an unrealized loss position are evaluated to determine if the impairment is other than temporary. See "Total Equity (Deficit)" and "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding unrealized losses on our available-for-sale securities.

Source   DRA HOM OAN MORTGAG CORP, 10-K, March 09, 2012                TREASURY-2883                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### *Higher Risk Components of Our Investments in Mortgage Related Securities*

As discussed below, we have exposure to subprime, option ARM, interest only, and Alt A and other loans as part of our investments in mortgage-re ated securities as follows:

- *Single family non agency mortgage related securities:* We hold non agency mortgage related securities backed by subprime, option ARM, and Alt A and other loans

- *Single family Freddie Mac mortgage related securities:* We hold certain Other Guarantee Transactions as part of our investments in securities  There are subprime and option ARM loans underlying some of these Other Guarantee Transactions  For more information on single family loans with certain higher risk characteristics underlying our issued securities, see "RISK  MANAGEMENT    Credit Risk   *Mortgage Credit Risk.*"

### *Non Agency Mortgage Related Securities Backed by Subprime, Option ARM, and Alt A Loans*

We categorize our investments in non agency mortgage related securities as subprime, option ARM, or Alt A if the securities were identified as such based on information provided to us when we entered into these transactions  We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt A securities. Since the first quarter of 2008, we have not purchased any non agency mortgage related securities backed by subprime, option ARM, or Alt A loans. The two tables below present information about our holdings of our available for sale non agency mortgage related securities backed by subprime, option ARM and Alt A loans.

113                                                                                                              *Freddie Mac*

---

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2884

Table of Contents

**Table 26    Non Agency Mortgage Related Securities Backed by Subprime First  Lien, Option ARM, and Alt A Loans and Certain Related Credit Statistics[1]**

|  | As of | | | | |
|---|---|---|---|---|---|
|  | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 |
|  | | | (dollars in millions) | | |
| **UPB** | | | | | |
| Subp  e f s  en[2] | $48,644 | $49,794 | $ 51,070 | $ 52,403 | $53,756 |
| Op  on ARM | 13,949 | 14,351 | 14,778 | 15,232 | 15,646 |
| Al -A[3] | 14,260 | 14,643 | 15,059 | 15,487 | 15,917 |
| G oss un ea zed osses, p e ax [ | | | | | |
| Subp  e f s  en[2] | $ 13,401 | $ 14,132 | $ 13,764 | $ 12,481 | $ 14,026 |
| Op  on ARM | 3,169 | 3,216 | 3,099 | 3,170 | 3,853 |
| Al -A[3] | 2,612 | 2,468 | 2,171 | 1,941 | 2,096 |
| P ese va e of expec ed f  e ed  losses [ | | | | | |
| Subp  e f s  en[2] | $ 6,746 | $ 5,414 | $ 6,487 | $ 6,612 | $ 5,937 |
| Op  on ARM | 4,251 | 4,434 | 4,767 | 4,993 | 4,850 |
| Al -A[3] | 2,235 | 2,204 | 2,310 | 2,401 | 2,469 |
| Colla e al del nquency a e [6] | | | | | |
| Subp  e f s  en[2] | 42% | 42% | 42% | 44% | 45% |
| Op  on ARM | 44 | 44 | 44 | 44 | 44 |
| Al -A[3] | 25 | 25 | 26 | 26 | 27 |
| Ave age c ed enhancemen [7] | | | | | |
| Subp  e f s  en[2] | 21% | 22% | 23% | 24% | 25% |
| Op  on ARM | 7 | 8 | 10 | 11 | 12 |
| Al -A[3] | 7 | 7 | 8 | 8 | 9 |
| Cumula ve colla e al loss [8] | | | | | |
| Subp  e f s  en[2] | 22% | 21% | 20% | 19% | 18% |
| Op  on ARM | 17 | 16 | 15 | 14 | 13 |
| Al -A[3] | 8 | 8 | 7 | 7 | 6 |

(1) See "*Ratings of Non-Agency Mortgage-Related Securities*" fo add onal nfo ma on abou hese secu es

(2) Excludes non-agency mo gage- ela ed secu es backed exc us ve y by subp e second ens Ce a n secu es den f ed as subp me f s en may be backed n pa t y subp e second en oans, as he unde y ng oans of hese secu es we e pe m ed o nc ude a sma l pe cen age of subp me second l en loans

(3) Excludes non-agency mo gage- ela ed secu es backed by o he loans, wh ch a e p ma ly comp sed of secu es backed by home equ y l nes of c ed

(4) Rep esen s he agg ega e of he amoun by wh ch amo zed cos , af e o he - han- empo a y mpa men s, exceeds fa value measu ed a he nd v dua o ve

(5) Rep ese  s o es a e of f  e co a ca cas f ows a we do no expec o co ec , d scoun ed a e effec ve ne es a e p c n he secu y a he da e of acqu s on Th s d scoun a e on yu zed o ana yze he cu ua ve c ed de e o a on f o secu es s nce acqu s on and may be lowe a e d sco a e used o measu e ongo ng o he - han- empo a y mpa men o be ecogn zed n ea n ngs fo secu es ha have expe enced a s gn f can mp ovemen n expec ed cash flows s nce he las ecogn on of o he - han- empo a y mpa men ecogn zed n ea n ngs

(6) De e m ned based on he numbe of oans ha a e wo mon h y pay e so e o e pas d e a d e e e sec es s g nfo ma on ob a ned f om a h d-pa y da a p ov de

(7) Ref ec s he a o of he cu en p nc pa amoun of he sec es s sed ya s a w a so osses e us befo any osses a e a oca ed o secu es t at we ow Pe cen age gene a y ca cu a ed based on (a) he o a UPB of sec es s bo d a e o e sec es we ow , d v ded by (b) he o a UPB of a of t ese t es ssed ya t e us (exc ud ng no ona ba ances) On y nc udes c ed enhancemen p ov ded by subo d na ed secu es excludes c ed enhancemen p ov ded by bond nsu ance, ove colla e al za on and o he fo ms of c ed enhancemen

(8) Based on he ac ua osses ncu ed on he co a e a unde y ng ese sec As a osses c ed o e sec es a we ho d a e s gn f can y ess han he osses on he unde y ng co a e a as p esen ed n h s ab e, as non-agency o gage- e a ed secu es backed by subp e, op on ARM, and Al -A oans we e s c ed o c ed enhancemen o a  ess, pa c a y  oug  subo d na on and o e s uc u a en ance en s

For purposes of our cumulative credit deterioration analysis,  our estimate of the present value of expected future credit  losses on our total portfolio of non agency mortgage related securities (which are set forth in "Table 23    Characteristics of Mortgage Related Securities on Our Consolidated Balance Sheets") decreased to $ 4 0 billion at December 31, 2011 from $14 3 billion at December 3 , 20 0  All of these amounts have been reflected in our net impairment of available for sale securities recognized in earnings in this period or prior periods  The decrease in the present value of expected future credit losses  was primarily due to the impact of lower interest rates in 2011  resulting in a benefit from expected structural credit enhancements on the securities  The impact of lower interest rates was partially offset by the impact of declines in  forecasted home prices

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2885

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 27    Non Agency Mortgage Related Securities Backed by Subprime, Option ARM, Alt A and Other Loans[1]

| | Three Months Ended | | | | |
|---|---|---|---|---|---|
| | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 |
| | | | (in millions) | | |
| Principal repayments and cash shortfalls [2] | | | | | |
| Subprime | | | | | |
| Principal repayments | $ 1,159 | $1,287 | $1,341 | $1,361 | $ 1,512 |
| Principal cash shortfalls | 7 | 6 | 10 | 14 | 6 |
| Option ARM | | | | | |
| Principal repayments | $ 298 | $ 318 | $ 331 | $ 315 | $ 347 |
| Principal cash shortfalls | 103 | 109 | 123 | 100 | 111 |
| Alt-A and other | | | | | |
| Principal repayments | $ 385 | $ 425 | $ 464 | $ 452 | $ 537 |
| Principal cash shortfalls | 80 | 81 | 84 | 81 | 62 |

(1) See "Ratings of Non-Agency Mortgage-Related Securities" for additional information on about these securities

(2) In addition to the contractual interest payments, we receive monthly remittances of principal repayments from both the recovery of qualified loans and, to a lesser extent, voluntary prepayments of the underlying collateral of these securities represent a principal a reduction of our investments in these securities

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non agency mortgage-related securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. The effectiveness of our efforts is highly uncertain and any potential recoveries may take significant time to realize

In June 2011, Bank of America Corporation announced that it, BAC Home Loans Servicing, LP, Countrywide Financial Corporation and Countrywide Home Loans, Inc entered into a settlement agreement with The Bank of New York Mellon, as trustee, to resolve certain claims with respect to a number of Countrywide first lien and second lien residential mortgage related securitization trusts. Bank of America indicated that the settlement is subject to final court approval and certain other conditions. There can be no assurance that final court approval of the settlement will be obtained or that all conditions will be satisfied Bank of America noted that, given the number of investors and the complexity of the settlement, it is not possible to predict the timing or ultimate outcome of the court approval process, which could take a substantial period of time We have investments in certain of these Countrywide securitization trusts and would expect to benefit from this settlement, if final court approval is obtained For more information, see "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS."

On September 2, 2011, FHFA announced that, as Conservator for Freddie Mac and Fannie Mae, it had filed lawsuits against 17 financial institutions and related defendants alleging: (a) violations of federal securities laws; and (b) in certain lawsuits, common law fraud in the sale of residential non agency mortgage related securities to Freddie Mac and Fannie Mae. FHFA, as Conservator, filed a similar lawsuit against UBS Americas, Inc. and related defendants on July 27, 2011. FHFA seeks to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in certain residential non agency mortgage related securities issued by these financial institutions.

Since the beginning of 2007, we have incurred actual principal cash shortfalls of $1.5 billion on impaired non agency mortgage-related securities, of which $193 million and $823 million related to the three months and year ended December 31, 2011, respectively Many of the trusts that issued non agency mortgage related securities we hold were structured so that realized collateral losses in excess of structural credit enhancements are not passed on to investors until the investment matures We currently estimate that the future expected principal and interest shortfalls on non agency mortgage related securities we hold will be significantly less than the fair value declines experienced on these securities

The investments in non agency mortgage related securities we hold backed by subprime, option ARM, and Alt A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements. Bond insurance is an additional credit enhancement covering some of the non agency mortgage related securities These credit enhancements are the primary reason we expect our actual losses, through principal or interest shortfalls, to be less than the underlying collateral losses in the aggregate It is difficult to estimate the point at which structural credit enhancements will be exhausted and we will incur actual losses During the year ended December 31, 2011, we continued to experience the erosion of structural credit enhancements on many securities backed by subprime, option ARM, and Alt A loans due to poor performance of the underlying collateral For more information, see "RISK MANAGEMENT    Credit Risk    Institutional Credit Risk    Bond Insurers."

115                                                                *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Other Than Temporary Impairments on Available For Sale Mortgage Related Securities*

The table below provides information about the mortgage related securities for which we recognized other than temporary impairments in earnings

**Table 28   Net Impairment of Available For Sale Mortgage Related Securities Recognized in Earnings**

| | Net Impairment o Available-For-Sale Securities Recognized in Earnings | | | | |
| | Three Months nded | | | | |
| | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 |
| | | | (in millions) | | |
| Subp me (1 | | | | | |
| 2006 & 2007 | $ 472 | $ 29 | $ 67 | $ 717 | $ 1,192 |
| O he yea s | 8 | 2 | 3 | 17 | 15 |
| To al subp me | 480 | 31 | 70 | 734 | 1,207 |
| Op on ARM | | | | | |
| 2006 & 2007 | 40 | 15 | 43 | 232 | 585 |
| O he yea s | 19 | 4 | 22 | 49 | 83 |
| To al op on ARM | 59 | 19 | 65 | 281 | 668 |
| A -A | | | | | |
| 2006 & 2007 | 22 | 29 | 16 | 15 | 204 |
| O he yea s | 21 | 10 | 15 | 23 | 161 |
| To al Al -A | 43 | 39 | 31 | 38 | 365 |
| O he loans | 3 | 41 | 1 | 2 | 7 |
| To a s bp e, op o ARM, Al -A a d o he loans | 585 | 130 | 167 | 1,055 | 2,247 |
| CMBS | 8 | 27 | 183 | 135 | 19 |
| Ma fac ed o s g | 2 | 4 | 2 | 3 | 4 |
| To a ava ab e-fo -sa e mo gage- e a ed secu es | $ 595 | $ 161 | $ 352 | $ 1,193 | $ 2,270 |

(1) Inc udes a f s and second ens

We recorded net impairment of available for sale mortgage related securities recognized in earnings of $595 million and $2.3 billion during the three months and year ended December 31, 2011, respectively, compared to $2.3 billion and $4.3 billion during the three months and year ended December 3 , 20 0, respectively We recorded these impairments because our estimate of the present value of expected future credit losses on certain individual securities increased during the periods These impairments include $585 million and $1.9 billion of impairments related to securities backed by subprime, option ARM, and Alt A and other loans during the three months and year ended December 31, 2011, respectively, compared to $2.2 billion and $4.2 billion during the three months and year ended December 3 , 20 0, respectively In addition, during the year ended December 31, 2011, these impairments include recognition of the fair value declines related to certain investments in CMBS of $181 million as an impairment charge in earnings, as we have the intent to sell these securities For more information, see "NOTE 7: INVESTMENTS IN SECURITIES    Other Than Temporary Impairments on Available for Sale Securities "

While it is reasonably possible that collateral losses on our available for sale mortgage related securities where we have not recorded an impairment charge in earnings could exceed our credit enhancement levels, we do not believe that those conditions were likely at December 3 , 2011. Based on our conclusion that we do not intend to sell our remaining available for sale mortgage related securities in an unrealized loss position and it is not more likely than not that we will be required to sell these securities before a sufficient time to recover all unrealized losses and our consideration of other available information, we have concluded that the reduction in fair value of these securities was temporary at December 31, 2011 and have recorded these fair value losses in AOCI

The credit performance of loans underlying our holdings of non agency mortgage related securities has declined since 2007 This decline has been particularly severe for subprime, option ARM, and Alt A and other loans Economic factors negatively impacting the performance of our investments in non agency mortgage related securities include high unemployment, a large inventory of seriously delinquent mortgage loans and unsold homes, tight credit conditions, and weak consumer confidence during recent years. In addition, subprime, option ARM, and Alt A and other loans backing the securities we hold have significantly greater concentrations in the states that are undergoing the greatest economic stress, such as California and Florida. Loans in these states undergoing economic stress are more likely to become seriously delinquent and the credit losses associated with such loans are likely to be higher than in other states

We rely on bond insurance, including secondary coverage, to provide credit protection on some of our investments in non agency mortgage related securities We have determined that there is substantial uncertainty surrounding certain bond insurers' ability to pay our future claims on expected credit losses related to our non agency mortgage related security investments. This uncertainty contributed to the impairments recognized in earnings during the years ended December 3 ,

Source   D RA  HOM  OAN MORTGAG  CORP, 10 K, March 09, 2012
TREASURY-2887
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

2011 and 2010. See "RISK MANAGEMENT     Credit  Risk     *Institutional Credit Risk     Bond Insurers*" and "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS     Bond Insurers" for additional information

Our assessments concerning other than temporary impairment  require significant judgment and the use of models, and are  subject to potentially significant change  In addition, changes  in the performance of the individual securities and in mortgage  market conditions may also affect our impairment assessments. Depending on the structure of the individual mortgage related  security and our estimate of collateral losses relative to the amount of credit support available for the tranches we own, a  change in collateral loss estimates can have a disproportionate impact on the loss estimate for the security  Additionally, servicer performance, loan modification programs and backlogs,  bankruptcy reform and other forms of government intervention in the housing market can significantly affect the performance of  these securities, including the timing of loss recognition of the underlying loans and thus the timing of losses we recognize  on our securities  Impacts related to changes in interest rates may also affect our losses due to the structural credit  enhancements on our investments in non agency mortgage related  securities  Foreclosure processing suspensions can also affect  our losses  For example, while defaulted loans remain in the  trusts prior to completion of the foreclosure process, the subordinate classes of securities issued by the securitization  trusts may continue to receive interest payments, rather than absorbing default losses. This may reduce the amount of funds  available for the tranches we own  Given the extent of the  housing and economic downturn, it is difficult to estimate the  future performance of mortgage loans and mortgage related  securities with high assurance, and actual results could differ materially from our expectations  Furthermore, various market  participants could arrive at materially different conclusions regarding estimates of future cash shortfalls

For more information on risks associated with the use of models,  see "RISK FACTORS     Operational Risks     *We face risks and uncertainties associated with the internal  models that we use for financial accounting and reporting  purposes, to make business decisions, and to manage risks.  Market conditions have raised these risks and  uncertainties* " For more information on how delays in the foreclosure process, including delays related to concerns  about deficiencies in foreclosure documentation practices, could  adversely affect the values of, and the losses on, the non agency mortgage related securities we hold, see "RISK  FACTORS     Operational Risks     *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in  the foreclosure process.*"

For information regarding our efforts to mitigate losses on our  investments in non agency mortgage related securities, see  "RISK MANAGEMENT     Credit Risk     *Institutional Credit Risk.*"

*Ratings of Non Agency Mortgage Related Securities*

The table below shows the ratings of non agency mortgage related  securities backed by subprime, option ARM, Alt A and other loans, and CMBS held at December 31, 2011 based on their ratings as of December 31, 2011, as well as those  held at December 3 , 20  0 based on their ratings as of December 3 , 20  0 using the lowest rating available for  each security

<div align="center">117</div>

<div align="right">*Freddie Mac*</div>

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 29     Ratings of Non Agency Mortgage Related Securities Backed by Subprime, Option ARM, Alt A and Other Loans, and CMBS**

| Credit Ratings as of December 31, 2011 | UPB | Percentage of UPB | Amortized Cost | Gross Unrealized Losses | Bond Insurance Coverage(1) |
|---|---|---|---|---|---|
| | | | (dollars in millions) | | |
| Subp me loans | | | | | |
| AAA- a ed | $ 1,000 | 2% | $ 1,000 | $ (115) | $ 23 |
| O he nves men g ade | 2,643 | 5 | 2,643 | (399) | 383 |
| Below nves men g ade(2 | 45,389 | 93 | 37,704 | (12,894) | 1,641 |
| o a | $ 49,032 | 100% | $ 41,347 | $(13,408) | $ 2,047 |
| Op on ARM oans | | | | | |
| AAA- a ed | $ | % | $ | $ | $ |
| O he nves men g ade | 76 | 1 | 76 | (8) | 76 |
| Below nves men g ade(2 | 13,873 | 99 | 8,943 | (3,161) | 39 |
| o a | $ 13,949 | 100% | $ 9,019 | $ (3,169) | $ 115 |
| Al -A a d o he loans | | | | | |
| AAA- a ed | $ 350 | 2% | $ 348 | $ (20) | $ 6 |
| O he nves men g ade | 2,237 | 13 | 2,260 | (371) | 310 |
| Below nves men g ade(2 | 14,203 | 85 | 11,053 | (2,421) | 2,139 |
| o a | $ 16,790 | 100% | $ 13,661 | $ (2,812) | $ 2,455 |
| CMBS | | | | | |
| AAA- a ed | $ 25,499 | 47% | $ 25,540 | $ (22) | $ 42 |
| O he nves men g ade | 25,421 | 47 | 25,394 | (346) | 1,585 |
| Below nves men g ade(2 | 3,190 | 6 | 2,851 | (180) | 1,697 |
| o a | $ 54,110 | 100% | $ 53,785 | $ (548) | $ 3,324 |
| To a s bp e, op o ARM, Al -A a d o te oas, a d CMBS | | | | | |
| AAA- a ed | $ 26,849 | 20% | $26,888 | $ (157) | $ 71 |
| O he nves men g ade | 30,377 | 23 | 30,373 | (1,124) | 2,354 |
| Below nves men g ade(2 | 76,655 | 57 | 60,551 | (18,656) | 5,516 |
| o a | $ 133,881 | 100% | $117,812 | $(19,937) | $ 7,941 |
| To al nves men s n mo gage- ela ed secu es | $ 261,232 | | | | |
| Pe cen age of subp e, op on ARM, Al -A a d o e oas, a d | | | | | |
| CMBS of o al nves men s n mo gage- ela ed secu es | 51% | | | | |

| Credit Ratings as o December 31, 2010 | UPB | Percentage of UPB | Amortized Cost | Gross Unrealized Losses | Bond Insurance Coverage(1) |
|---|---|---|---|---|---|
| Subp me loans | | | | | |
| AAA- a ed | $ 2,085 | 4% | $ 2,085 | $ (199) | $ 31 |
| O he nves men g ade | 3,407 | 6 | 3,408 | (436) | 449 |
| Below nves men g ade(2 | 48,726 | 90 | 42,423 | (13,421) | 1,789 |
| o a | $ 54,218 | 100% | $ 47,916 | $(14,056) | $ 2,269 |
| Op on ARM oans | | | | | |
| AAA- a ed | $ | % | $ | $ | $ |
| O he nves men g ade | 139 | 1 | 140 | (18) | 129 |
| Below nves men g ade(2 | 15,507 | 99 | 10,586 | (3,835) | 50 |
| o a | $ 15,646 | 100% | $ 10,726 | $ (3,853) | $ 179 |
| Al -A a d o he loans | | | | | |
| AAA- a ed | $ 1,293 | 7% | $ 1,301 | $ (87) | $ 7 |
| O he nves men g ade | 2,761 | 15 | 2,765 | (362) | 368 |
| Below nves men g ade(2 | 14,789 | 78 | 11,498 | (2,002) | 2,443 |
| o a | $ 18,843 | 100% | $ 15,564 | $ (2,451) | $ 2,818 |
| CMBS | | | | | |
| AAA- a ed | $ 28,007 | 48% | $ 28,071 | $ (52) | $ 42 |
| O he nves men g ade | 26,777 | 45 | 26,740 | (676) | 1,655 |
| Below nves men g ade(2 | 3,944 | 7 | 3,653 | (1,191) | 1,704 |
| o a | $ 58,728 | 100% | $ 58,464 | $ (1,919) | $ 3,401 |
| To a s bp e, op o ARM, Al -A a d o te oas, a d CMBS | | | | | |
| AAA- a ed | $ 31,385 | 21% | $ 31,457 | $ (338) | $ 80 |
| O he nves men g ade | 33,084 | 23 | 33,053 | (1,492) | 2,601 |
| Below nves men g ade(2 | 82,966 | 56 | 68,160 | (20,449) | 5,986 |
| o a | $ 147,435 | 100% | $132,670 | $(22,279) | $ 8,667 |
| To al nves men s n mo gage- ela ed secu es | $288,693 | | | | |
| Pe cen age of subp e, op on ARM, Al -A a d o e oas, a d | | | | | |
| CMBS of o al nves men s n mo gage- ela ed secu es | 51% | | | | |

(1) Rep ese s ea o of UPB cove ed by bo d s a ce T s amoun does no ep esen he max mum amoun of osses we cou d ecove , as e bo d s a ce also cove s ne es

(2) I c des ec es w S&P c ed a gs be ow BBB and ce a n secu es ha a e no onge a ed

118

Source D RA HOM OAN MORTGAG CORP, 10 K, March 09, 2012

TREASURY-2889

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any errors, omissions or delays in the content, or for any actions taken in reliance thereon. The information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Mortgage Loans**

The UPB of mortgage loans on our consolidated balance sheet declined to $1.8 trillion as of December 31, 2011 from $1.9 trillion as of December 31, 2010. This decline reflects that the amount of single family loan liquidations has exceeded new loan purchase and guarantee activity in 2011, which we believe is due, in part, to declines in the amount of single family mortgage debt outstanding in the market and increased competition from Ginnie Mae and FHA/VA. Our single family loan purchase and guarantee activity in 2011 was at the lowest level we have experienced in the last several years. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further detail about the mortgage loans on our consolidated balance sheets.

The UPB of unsecuritized single family mortgage loans increased by $22.8 billion to $171.7 billion at December 31, 2011 from $148.9 billion at December 31, 2010, primarily due to our continued removal of seriously delinquent and modified loans from the mortgage pools underlying our PCs. Based on the amount of the recorded investment of these loans, approximately $72.4 billion, or 4 2%, of the single family mortgage loans on our consolidated balance sheet as of December 3 , 20  were seriously delinquent, as compared to $84.2 billion, or 4.7%, as of December 31, 2010. This decline was primarily due to modifications, foreclosure transfers, and short sale activity. The majority of these seriously delinquent loans are unsecuritized, and were removed by us from our PC trusts. As guarantor, we have the right to remove mortgages that back our PCs from the underlying loan pools under certain circumstances. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS" for more information on our removal of single family loans from PC trusts. We expect that our holdings of unsecuritized single family loans will continue to increase in 2012 due to the recent revisions to HARP, which will result in our purchase of mortgages with LTV ratios greater than 125%, as we have not yet implemented a securitization process for such loans. See "RISK MANAGEMENT  Credit Risk  *Mortgage Credit Risk  Single Family Mortgage Credit Risk  Single Family Loan Workouts and the MHA Program*" for additional information on HARP.

The UPB of unsecuritized multifamily mortgage loans was $82.3 billion at December 31, 2011 and $85.9 billion at December 31, 2010. Our multifamily loan activity in 2011 primarily consisted of purchases of loans intended for securitization and subsequently sold through Other Guarantee Transactions. We expect to continue to purchase and subsequently securitize multifamily loans, which supports liquidity for the multifamily market and affordability for multifamily rental housing, as our primary multifamily business strategy.

We maintain an allowance for loan losses on mortgage loans that we classify as held for investment on our consolidated balance sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage related securities backed by multifamily loans, certain single family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risk. Collectively, we refer to our allowance for loan losses and our reserve for guarantee losses as our loan loss reserves. Our loan loss reserves were $39.5 billion and $39.9 billion at December 31, 2011 and 2010, respectively, including $38.9 billion and $39 1 billion, respectively, related to single family loans. At December 31, 2011 and 2010, our loan loss reserves, as a percentage of our total mortgage portfolio, excluding non Freddie Mac securities, was 2.1% and 2.0%, respectively, and as a percentage of the UPB associated with our non performing loans was 32 0% and 33 7%, respectively. See "RISK MANAGEMENT  Credit Risk  *Mortgage Credit Risk  Loan Loss Reserves*" for more information about our loan loss reserves.

The table below summarizes our purchase and guarantee activity in mortgage loans. This activity consists of: (a) mortgage loans underlying consolidated single family PCs issued in the period (regardless of whether such securities are held by us or third parties); (b) single family and multifamily mortgage loans purchased, but not securitized, in the period; and (c) mortgage loans underlying our mortgage related financial guarantees issued in the period, which are not consolidated on our balance sheets.

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2890

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 30**     **Mortgage Loan Purchase and Other Guarantee Commitment Activity[1]**

| | Year Ended December 31, | | | | | |
| | 2011 | | 2010 | | 2009 | |
| | UPB Amount | % of Total | UPB Amount | % of Total | UPB Amount | % of Total |
|---|---|---|---|---|---|---|
| | | | (dollars in millions) | | | |
| Mortgage loan purchases and guarantee issuances | | | | | | |
| Single-family: | | | | | | |
| 30-year amortizing fixed-rate | $194,746 | 57% | $ 258,621 | 64% | $392,291 | 80% |
| 20-year amortizing fixed-rate | 21,378 | 6 | 23,852 | 6 | 11,895 | 2 |
| 15-year amortizing fixed-rate | 78,543 | 23 | 83,025 | 21 | 64,590 | 13 |
| Adjustable-rate[2] | 25,685 | 8 | 16,534 | 4 | 2,809 | 1 |
| Interest-only[3] | | | 909 | <1 | 845 | <1 |
| HFA bonds | | | 2,469 | 1 | 802 | <1 |
| FHA/VA and other governmental | 441 | <1 | 968 | <1 | 2,118 | 1 |
| *Total single-family[4]* | 320,793 | 94 | 386,378 | 96 | 475,350 | 97 |
| Multifamily[5] | 20,325 | 6 | 15,372 | 4 | 16,571 | 3 |
| *Total mortgage loan purchases and other guarantee commitment activity[5]* | $ 341,118 | 100% | $ 401,750 | 100% | $ 491,921 | 100% |
| Percentage of mortgage purchases and other guarantee commitment activity with credit enhancements[6] | | 8% | | 9% | | 8% |

(1) Based on UPB. Excludes mortgage loans subject to our yet-to-be-settled. Excludes the removal of seriously delinquent loans and bad or non/reserve mortgages out of PC issues. Includes our guarantee commitments associated with home mortgage loans. See endnote (5) for further information.

(2) Includes data for tiz g ARMs with 1-, 3-, 5-, 7-, and 10-year amortizing fixed-rate periods. We did not purchase any option ARM loans during the years ended December 31, 2011, 2010, or 2009.

(3) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed-rate and variable-rate interest-only loans.

(4) Includes $27.7 billion, $23.9 billion, and $26.3 billion of mortgage loans in excess of $417,000, which we refer to as conforming jumbo mortgages, for the years ended December 31, 2011, 2010, and 2009, respectively.

(5) Includes issuances of other guarantee commitments on single-family loans of $4.4 billion, $5.7 billion, and $2.4 billion and issuances of other guarantee commitments on multifamily loans of $10.0 billion, $17.5 billion, and $0.5 billion during the years ended December 31, 2011, 2010, and 2009, respectively, which consist of securitized guarantees of HFA bonds under TCLFP in 2010 and 2009.

(6) See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancements" for further details on credit enhancements of mortgage loans in our multifamily mortgage and single-family credit guarantee portfolios.

See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" and "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS — Table 16.2 — Certain Higher Risk Categories in the Single Family Credit Guarantee Portfolio" for information about mortgage loans in our single family credit guarantee portfolio that we believe have higher risk characteristics.

**Derivative Assets and Liabilities, Net**

The composition of our derivative portfolio changes from period to period as a result of derivative purchases, terminations, or assignments prior to contractual maturity, and expiration of the derivatives at their contractual maturity. We classify net derivative interest receivable or payable, trade/settle receivable or payable, and cash collateral held or posted on our consolidated balance sheets in derivative assets, net and derivative liabilities, net. See "NOTE 11: DERIVATIVES" for additional information regarding our derivatives.

The table below shows the fair value for each derivative type, the weighted average fixed rate of our pay fixed and receive fixed swaps, and the maturity profile of our derivative positions reconciled to the amounts presented on our consolidated balance sheets as of December 31, 2011. A positive fair value in the table below for each derivative type is the estimated amount, prior to netting by counterparty, that we would be entitled to receive if the derivatives of that type were terminated. A negative fair value for a derivative type is the estimated amount, prior to netting by counterparty, that we would owe if the derivatives of that type were terminated.

Source: D RA HOM OAN MORTGAG CORP, 10 K, March 09, 2012                    TREASURY-2891                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 31    Derivative Fair Values and Maturities**

| | Notional or Contractual Amount(2) | Total Fair Value(3) | December 31, 2011 Fair Value(1) (dollars in millions) | | | |
|---|---|---|---|---|---|---|
| | | | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| Interest-rate swaps | | | | | | |
| Receive-fixed | | | | | | |
| Swaps | $ 195,716 | $ 10,651 | $ 22 | $ 390 | $ 2,054 | $ 8,185 |
| Weighted average fixed rate(4) | | | 1.17% | 1.03% | 2.26% | 3.35% |
| Forward-starting swaps(5) | 16,092 | 2,239 | | | | 2,239 |
| Weighted average fixed rate(4) | | | | | | 3.96% |
| Total receive-fixed | 211,808 | 12,890 | 22 | 390 | 2,054 | 10,424 |
| Basis (floating to floating) | 2,750 | (2) | | | (6) | 4 |
| Pay-fixed | | | | | | |
| Swaps | 276,564 | (31,565) | (62) | (1,319) | (6,108) | (24,076) |
| Weighted average fixed rate(4) | | | 1.59% | 2.20% | 3.13% | 3.84% |
| Forward-starting swaps(5) | 12,771 | (2,923) | | | | (2,923) |
| Weighted average fixed rate(4) | | | % | % | % | 5.16% |
| Total pay-fixed | 289,335 | (34,488) | (62) | (1,319) | (6,108) | (26,999) |
| Total interest-rate swaps | 503,893 | (21,600) | (40) | (935) | (4,050) | (16,575) |
| Option-based | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 76,275 | 12,975 | 5,348 | 3,895 | 816 | 2,916 |
| Written | 27,525 | (2,932) | (118) | (2,556) | (258) | |
| Put swaptions | | | | | | |
| Purchased | 70,375 | 638 | 24 | 49 | 166 | 399 |
| Written | 500 | (2) | (2) | | | |
| Other option-based derivatives(6) | 38,549 | 2,254 | | | | 2,254 |
| Total option-based | 213,224 | 12,933 | 5,252 | 1,388 | 724 | 5,569 |
| Futures | 41,281 | 5 | 5 | | | |
| Foreign-currency swaps | 1,722 | 97 | 34 | 63 | | |
| Commitments(7) | 14,318 | (56) | (56) | | | |
| Swap guarantee derivatives | 3,621 | (37) | | (1) | (1) | (35) |
| Subtotal | 778,059 | (8,658) | $ 5,195 | $ 515 | $ (3,327) | $ (11,041) |
| Credit derivatives | 10,190 | (4) | | | | |
| Subtotal | 788,249 | (8,662) | | | | |
| Derivative net receivable (payable), net | | (1,069) | | | | |
| Trade/settle receivable (payable), net | | 1 | | | | |
| Derivative cash collateral (held) posted, net | | 9,413 | | | | |
| Total | $788,249 | $ (317) | | | | |

(1) Fair value is categorized based on the period from December 31, 2011 until the maturity of the derivative.

(2) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received and paid and generally do not represent actual amounts to be exchanged. Notional or contractual amounts are not recorded as assets or liabilities on our consolidated balance sheets.

(3) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net, and does not include derivative interest receivable (payable), net, trade/settle receivable (payable), net, and derivative cash collateral (held) or posted, net.

(4) Represents the notional weighted average for the fixed leg of the swaps.

(5) Represents interest-rate swap agreements that have a scheduled start or begin on future dates, ranging from less than one year to greater than five years as of December 31, 2011.

(6) Primarily includes purchased interest-rate caps and floors.

(7) Commitments include (a) our commitments to purchase and sell investments in securities, (b) our commitments to purchase mortgage loans and (c) our commitments to purchase and extinguish our debt securities or other consolidated trust debt securities.

At December 31, 2011, the net fair value of our total derivative portfolio was $(317) million, as compared to $(1.1) billion at December 31, 2010. During the year ended December 31, 2011, the fair value of our total derivative portfolio increased primarily due to additional cash collateral we posted to our counterparties during this period, partially offset by the impact of declines in interest rates. See "NOTE 11: DERIVATIVES" for the notional or contractual amounts and related fair values of our total derivative portfolio by product type at December 31, 2011 and 2010, as well as derivative collateral posted and held

121

*Freddie Mac*

TREASURY-2892

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below summarizes the changes in derivative fair values

**Table 32       Changes in Derivative Fair Values**

|  | 2011(1) | 2010(2) |
|---|---|---|
|  | (in millions) | |
| Beginning balance, at January 1    Net asset (liability) | $ (6,560) | $(2,267) |
| Net change in | | |
| Commitments(3) | (36) | (31) |
| Credit derivatives | (11) | (8) |
| Swap guarantee derivatives | (1) | (2) |
| Other derivatives( | | |
| Changes in fair value | (3,383) | (3,508) |
| Fair value of new contracts entered into during the period( | 594 | 444 |
| Contracts realized or otherwise settled during the period | 735 | (1,188) |
| Ending balance, at December 31    Net asset (liability) | $(8,662) | $ (6,560) |

(1) Refer to "Table 31    Derivative Fair Values and Maturities" for a reconciliation of net fair value on the amounts presented on our consolidated balance sheets as of December 31, 2011

(2) At December 31, 2010, fair value in  s ab e exc udes deriv n es  ecce vab e o (payab e), ne of $(820) m   on,  ade/se  ecce vab e o (payab e), ne o  $1 m   on, and de va ve cash co a e a pos ed, ne of $6 3 b   on

(3) Comm men s nclude (a) ou comm men s o pu chase and sell nves men s n secu   es (b) ou comm men s o pu chase mo gage loans and (c) ou comm men s  o p c ase a dex  e g s o se ede  sec   es o fo  conso da ed us s

(4) Inc des fa r va e changes fo  n e es - a e swaps, op o  -based de va ves, f   es, a d fo e g - c  e cy swaps

(5) Cons s s p ma ly of cash p em ums pa d o  ece ved on op ons

See "CONSOLIDATED RESULTS OF OPERATIONS     Non Interest Income (Loss)     *Derivative Gains (Losses)*" for a description of gains (losses) on our derivative positions

**REO, Net**

We acquire properties, which are recorded as REO assets on our consolidated balance sheets, typically as a result of borrower default on mortgage loans that we own, or for which we have issued our financial guarantee. The balance of our REO, net, declined to $5.7 billion at December 31, 2011 from $7  billion at December 3 , 20 0  We believe the volume of our single family REO acquisitions in 2011 was less than it otherwise would have been due to delays in the foreclosure process, particularly in states that require a judicial foreclosure process While we expect the delays to ease in 20 2, we also expect these delays will remain above historical levels  We also expect our REO inventory to remain at elevated levels, as we have a large inventory of seriously delinquent loans in our single family credit guarantee portfolio, many of which will likely complete the foreclosure process and transition to REO during 2012 as our servicers work through their foreclosure related issues  To the extent a arge volume of loans completes the foreclosure process in a short period of time, the resulting REO inventory could have a negat ve impact on the housing market  See "RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Non Performing Assets*" for additional information about our REO activity

**Deferred Tax Assets, Net**

We recognize deferred tax assets and liabilities based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates  We record valuation allowances to reduce our net deferred tax assets when it is more likely than not that a tax benefit will not be realized  The realization of our net deferred tax assets is dependent upon the generation of sufficient taxable income or, with respect to the portion of our deferred tax assets related to our available for sale securities, our intent and ability to hold such securities to the recovery of any temporary unrealized losses  On a quarterly basis, we consider all evidence currently available, both positive and negative, in determining whether, based on the weight of that evidence, the net deferred tax assets will be realized or whether a valuation allowance is necessary

After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, and related difficulty in forecasting future profit levels, we continue to record a valuation allowance on a portion of our net deferred tax assets as of December 31, 2011 and 2010  Our valuation allowance increased by $2.3 billion during 2011 to $35.7 billion, primarily attributable to an increase in temporary differences during the period  As of December 3 , 2011, after consideration of the valuation allowance, we had a net deferred tax asset of $3.5 billion, primarily representing the tax effect of unrealized losses on our available for sale securities  We believe the deferred tax asset related to these unrealized losses is more likely than not to be realized because of our assertion that we have the intent and ability to hold our available for sale securities until any temporary unrealized losses are recovered

122

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### IRS Examinations

Prior to 20  , the IRS completed its examinations of tax years 1998 to 2007  We received Statutory Notices from the IRS assessing $3 0 billion of additional income taxes and penalties for the 1998 to 2007 tax years, principally related to  questions of timing and potential penalties regarding our tax accounting method for certain hedging transactions  We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the 1998 to 2005 Statutory Notices. We paid the tax assessed in the Statutory Notice received for the years 2006  to 2007 of $36 million and will seek a refund through the administrative process, which could include filing suit in Federal District Court  We believe appropriate reserves have been provided for settlement on reasonable terms  For additional  information, see "NOTE 13: INCOME TAXES."

### Other Assets

Other assets consist of the guarantee asset related to  non consolidated trusts and other guarantee commitments, accounts and other receivables, and other miscellaneous assets  Other assets decreased to $10.5 billion as of  December 31, 2011 from $10.9 billion as of December 3 , 20  0 primarily because of a decrease in other  receivables related to mortgage insurers and credit enhancements  due to a decline in default volume. See "NOTE 19: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information

### Total Debt, Net

PCs and Other Guarantee Transactions issued by our consolidated  trusts and held by third parties are recognized as debt  securities of consolidated trusts held by third parties on our  consolidated balance sheets  Debt securities of consolidated  trusts held by third parties represents our liability to third  parties that hold beneficial interests in our consolidated  trusts. The debt securities of our consolidated trusts may be prepaid without penalty at any time

Other debt consists of unsecured short term and long term debt  securities we issue to third parties to fund our business  activities  It is classified as either short term or long term  based on the contractual maturity of the debt instrument  See  "LIQUIDITY AND CAPITAL RESOURCES" for a discussion of our management activities related to other debt

The table below reconciles the par value of other debt and the  UPB of debt securities of consolidated trusts held by third  parties to the amounts shown on our consolidated balance sheets

**Table 33      Reconciliation of the Par Value and UPB to Total Debt, Net**

| | December 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| | (in millions) | |
| To a  deb | | |
| O  e  deb | | |
|   Pa  va ue | $  674,314 | $   728,217 |
|   Unamo   zed balance of d scoun s and p em ums[1] | (13,891) | (14,529) |
|   Hedg ng- ela ed and o he  bas s adj s   e  s[2] | 123 | 252 |
|    S   o a | 660,546 | 713,940 |
| Deb  sec   es of conso da ed    s s e d by     d pa  es | | |
|   UPB | 1,452,476 | 1,517,001 |
|   Unamo   zed balance of d scoun s and p em ums | 18,961 | 11,647 |
|    S   o a | 1,471,437 | 1,528,648 |
| To a  de  , e | $2,131,983 | $2,242,588 |

(1) P  ma  ly  ep esen s unamo   zed d scoun s on ze o-coupon deb
(2) P  ma  y  ep esen s defe  as  ela ed o deb  ns  umen s ha  we  e n hedge accoun ng  e a  onsh ps, and changes  n  he fa   va ue a   bu ab e o  ns  umen -spec f c
   n  e es - a e and c ed   sk  ela ed o fo e gn-cu  ency denom na ed deb

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2894

Table of Contents

The table below summarizes our other short term debt

**Table 34    Other Short Term Debt**

| | 2011 | | | | |
| | December 31, | | Average Outstanding During the Year | | Maximum |
| | Balance, Net(1) | Weighted Average Effective Rate(2) | Balance, Net(3) (dollars in millions) | Weighted Average Effective Rate(4) | Balance, Net Outstanding at Any Month End |
|---|---|---|---|---|---|
| Reference Bills® securities and discount notes | $ 161,149 | 0 11% | $ 181,209 | 0 17% | $ 196,126 |
| Medium-term notes | 250 | 0 24 | 826 | 0 23 | 2,564 |
| Federal funds purchased and securities sold under agreements to repurchase | | | 13 | 0 16 | |
| Other short-term debt | $ 161,399 | 0 11 | | | |

| | 2010 | | | | |
| | December 31, | | Average Outstanding During the Year | | Maximum |
| | Balance, Net(1) | Weighted Average Effective Rate(2) | Balance, Net(3) (dollars in millions) | Weighted Average Effective Rate(4) | Balance, Net Outstanding at Any Month End |
|---|---|---|---|---|---|
| Reference Bills® securities and discount notes | $ 194,742 | 0 24% | $ 213,465 | 0 25% | $ 240,037 |
| Medium-term notes | 2,364 | 0 31 | 1,955 | 0 34 | 3,661 |
| Federal funds purchased and securities sold under agreements to repurchase | | | 72 | 0 30 | |
| Other short-term debt | $ 197,106 | 0 25 | | | |

| | 2009 | | | | |
| | December 31, | | Average Outstanding During the Year | | Maximum |
| | Balance, Net(1) | Weighted Average Effective Rate(2) | Balance, Net(3) (dollars in millions) | Weighted Average Effective Rate(4) | Balance, Net Outstanding at Any Month End |
|---|---|---|---|---|---|
| Reference Bills® securities and discount notes | $ 227,611 | 0 26% | $ 261,020 | 0 70% | $ 340,307 |
| Medium-term notes | 10,560 | 0 69 | 19,372 | 1 10 | 34,737 |
| Federal funds purchased and securities sold under agreements to repurchase | | | 33 | 0 29 | |
| Other short-term debt | $ 238,171 | 0 28 | | | |

(1) Represents par value, net of associated discounts and premiums, of which $0 2 billion, $0 9 billion, and $0 5 billion of short-term debt represents the fair value of debt securities on which the fair value option was elected at December 31, 2011, 2010, and 2009, respectively
(2) Represents the approximate weighted average effective rate for each series of outstanding balances at end of the period, which includes the amortization of discounts or premiums and issuance costs
(3) Represents par value, net of associated discounts, premiums, and issuance costs Issuance costs are reported on our assets caption on our consolidated balance sheets
(4) Represents the approximate weighted average effective rate during the period, which includes the amortization of discounts or premiums and issuance costs

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2895

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents the UPB for Freddie Mac issued mortgage related securities by the underlying mortgage product type

**Table 35      Freddie Mac Mortgage Related Securities[1]**

| | December 31, 2011 | | | December 31, 2010 | | | December 31, 2009 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Issued by Consolidated Trusts | Issued by Non Consolidated Trusts | Total | Issued by Consolidated Trusts | Issued by Non Consolidated Trusts | Total | Total |
| | | | | (in millions) | | | |
| S ng e-fam y | | | | | | | |
| 30-yea o mo e amo z ng f xed- a e | $ 1,123,105 | $ | $ 1,123,105 | $1,213,448 | $ | $1,213,448 | $ 1,318,053 |
| 20-yea amo z ng f xed- a e | 68,584 | | 68,584 | 65,210 | | 65,210 | 57,705 |
| 15-yea amo z ng f xed- a e | 252,563 | | 252,563 | 248,702 | | 248,702 | 241,721 |
| Adj s ab e- a e[2] | 69,402 | | 69,402 | 61,269 | | 61,269 | 68,428 |
| In e es -only[3] | 59,007 | | 59,007 | 79,835 | | 79,835 | 131,529 |
| FHA/VA and o he gove nmen al | 3,267 | | 3,267 | 3,369 | | 3,369 | 1,343 |
| *Total single-family* | 1,575,928 | | 1,575,928 | 1,671,833 | | 1,671,833 | 1,818,779 |
| Mu fam y | | 4,496 | 4,496 | | 4,603 | 4,603 | 5,085 |
| *Total single-family and multifamily* | 1,575,928 | 4,496 | 1,580,424 | 1,671,833 | 4,603 | 1,676,436 | 1,823,864 |
| O he Gua an ee T ansac ons | | | | | | | |
| HFA bo ds ( | | | | | | | |
| S ng e- am y | | 6,118 | 6,118 | | 6,168 | 6,168 | 3,113 |
| Mu fam y | | 966 | 966 | | 1,173 | 1,173 | 391 |
| To a HFA bonds | | 7,084 | 7,084 | | 7,341 | 7,341 | 3,504 |
| O he | | | | | | | |
| S ng e- am y( | 12,877 | 3,838 | 16,715 | 15,806 | 4,243 | 20,049 | 23,841 |
| Mu fam y | | 19,682 | 19,682 | | 8,235 | 8,235 | 2,655 |
| To a O he Gua an ee T ansac ons | 12,877 | 23,520 | 36,397 | 15,806 | 12,478 | 28,284 | 26,496 |
| REMICs a d Ot e St ct ed Sec t es backed by G Mae Ce f ca es[6] | | 779 | 779 | | 857 | 857 | 949 |
| To al F edd e Mac Mo gage-Rela ed Secu es | $1,588,805 | $ 35,879 | $1,624,684 | $1,687,639 | $ 25,279 | $1,712,918 | $ 1,854,813 |
| Less Repu chased F edd e Mac Mo gage- Re a ed Secu es[7] | (136,329) | | (136,329) | (170,638) | | (170,638) | |
| To al UPB of deb secu es of consol da ed t sts e d y h d pa es | $ 1,452,476 | | | $ 1,517,001 | | | |

(1) 2011 and 2010 a oun s a e based on UPB of he secu es and exc des o gage-e a ed deb aded, b no ye se ed 2009 a oun s a e based on UPB of he mo gage loans unde ly ng ou mo gage- ela ed f nanc al gua an ees

(2) I c des $1 2 b , $1 3 b , a d $1 4 b ll on n UPB of op on ARM mo gage loans as of Dece be 31, 2011, 2010, and 2009, espec ve y See endno e (5) fo add onal nfo ma on on op on ARM loans a back o O he Gua an ee T a sac o s

(3) Rep esen s oans whe e he bo owe pays n e es on y fo a pe od of me befo e he bo owe beg ns mak ng p nc pal paymen s Inc udes bo h f xed- and va ab e-a e n e es -only loans

(4) Co s s of bo ds we acq ed a d esec zed de e NIBP

(5) Backed by non-agency mo gage- ela ed secu es ha nclude p me, FHA/VA, and subp me mo gage oans a d so nc ude $7 3 o , $8 4 o , a d $9 6 b on n UPB of secu es backed by op on ARM mo gage oans a Dece be 31, 2011, 2010, and 2009, espec ve y

(6) Backed y FHA/VA oa s

(7) Rep esen s he UPB of epu chased F edd e Mac Mo gage- e a ed secu es ha a e conso da ed on ou ba ance shee s and ncludes ce a n em ance amoun s assoc a ed w o esec y us ad n s a on ha e payab e o h d-pa y mo gage- ela ed secu y holde s Ou hold ngs of non-consol da ed F edd e Mac mo gage- ela ed secu es a e p esen ed n "Tab e 23 Cha ac e s cs of Mo gage-Re a ed Secu es on Ou Conso da ed Ba ance S ee s"

Excluding Other Guarantee Transactions, the percentage of amortizing fixed rate single family loans underlying our consolidated trust debt securities, based on UPB, was approximately 92% at both December 31, 2011 and 2010. The majority of newly issued Freddie Mac single family mortgage related securities during 20 were backed by refinance mortgages During 20 , the UPB of Freddie Mac mortgage related securities issued by consolidated trusts declined approximately 5.9%, as the volume of our new issuances has been less than the volume of liquidations of these securities. The UPB of multifamily Other Guarantee Transactions, excluding HFA related securities, increased to $19.7 billion as of December 31, 2011 from $8.2 billion as of December 31, 2010, due to increased multifamily loan securitization activity

125                                                                                  *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents additional details regarding our issued and guaranteed mortgage related securities

**Table 36    Freddie Mac Mortgage Related Securities by Class Type**[1]

| | December 31, | | |
| | 2011 | 2010 | 2009 |
| | (in millions) | | |
| *Held by Freddie Mac:* | | | |
| S ng e-c ass | $ 125,271 | $ 157,752 | $ 255,171 |
| Mu  c ass | 98,396 | 105,851 | 119,444 |
| *Total held by Freddie Mac*[2] | 223,667 | 263,603 | 374,615 |
| *Held by third parties* | | | |
| S ng e-c ass | 949,301 | 1,020,200 | 1,031,869 |
| Mu  c ass | 451,716 | 429,115 | 448,329 |
| *Total held by third parties* | 1,401,017 | 1,449,315 | 1,480,198 |
| **Total Fredd e Mac mortgage-related securi ies**[2] | $1,624,684 | $1,712,918 | $1,854,813 |

(1) Based on UPB of he secu es and exc udes mo gage- e a ed sec  t es t aded,  t ot yet sett ed
(2) Beg nn ng Janua y 1, 2010, ncludes s ngle-fam ly s ng e-c ass and ce a n u  c ass secu  es he d by us, wh ch a e eco ded as ex ngu shmen s of deb  secu  es of conso a ed us s on ou  conso da ed ba ance shee s P o 2010, a F edd e Mac mo gage- e a ed secu  es he d by us we e accoun ed fo as nves men s n sec  es o o  conso da ed ba ance s ee s See "NOTE 1 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" fo a d sc ss o of o s gn f can  accoun ng pol c es ela ed o ou nves men s n sec  es a d he ex nct on of deb  s s

The table below presents issuances and extinguishments of the debt securities of our consolidated trusts during 2011 and 2010, as well as the UPB of consolidated trusts held by third parties.

**Table 37    Issuances and Extinguishments of Debt Securities of Consolidated Trusts**[1]

| | Year Ended December 31, | |
| | 2011 | 2010 |
| | (in millions) | |
| Beg nn ng ba ance of deb secu  es of conso da ed us s he d by    d pa  es | $ 1,517,001 | $1,564,093 |
| Issuances o h d pa  es of deb secu  es of conso da ed t sts | | |
| Issuances based on unde y ng  o  gage p oduc  ype | | |
| 30-yea  o mo e amo  z ng f xed- a e | 177,951 | 255,101 |
| 20-yea  amo  z ng f xed- a e | 19,250 | 24,293 |
| 15-yea  amo  z ng f xed- a e | 76,917 | 78,316 |
| Adj s ab e- a e | 25,675 | 15,869 |
| In e es -only | 152 | 845 |
| FHA/VA | 160 | 1,429 |
| Deb sec  es of co so da ed    s s a ed by s a ss a ce | (10,910) | (15,725) |
| Ne ss a ces of deb sec  es of co so da ed  s s | 289,195 | 360,128 |
| Re ss ances of deb sec  es of conso da ed  s s p ev o s y ed y s[2] | 80,485 | 51,209 |
| To a ssuances o h d pa  es of deb secu  es of conso da ed us s | 369,680 | 411,337 |
| Ex g s e s, e[3] | (434,205) | (458,429) |
| End ng ba ance of deb secu  es of conso da ed us s he d by h d pa  es | $1,452,476 | $ 1,517,001 |

(1) Based o UPB
(2) Rep ese  s o sa es of PCs a d ce a  O e G a a ee T a sac o s p ev o s y ed by s
(3) Rep esen s (a) UPB of ou pu c ases f o     d pa  es of PCs a d O e G a a ee T a sac o s ss ed by o  co so da ed  s s (b) p  c pa epay e s  e a ed o PCs and O e G a a ee T a sac o s ss ed y o  co so da ed  s s a d (c) ce an e ance a oun s assoc a ed w h o u  us sec  y adm n s a on ha a e payab e o h d-pa y mo gage- ela ed secu y holde s as of Decembe 31, 2011 and 2010

**Other Liabilities**

Other liabilities consist of the guarantee obligation, the reserve for guarantee losses on non consolidated trusts and other mo tgage-re ated financial guarantees, servicer liabilities, accounts payable and accrued expenses, and other miscellaneous liabilities Other liabilities decreased to $6.0 billion as of December 31, 2011 from $8.1 billion as of December 31, 2010 primarily because of a decrease in: (a) credit loss related liabilities, largely due to short sale adjustments related to accrued estimated losses on unsettled transactions; and (b) servicer advanced interest liabilities, due to a decrease in seriously delinquent loans during the year ended December 31, 2011. See "NOTE 19: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information.

126

*Freddie Mac*

Source   D RA HOM   OAN MORTGAG CORP, 10 K, March 09, 2012      Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Total Equity (Deficit)**

The table below presents the changes in total equity (deficit) and certain capital related disclosures

**Table 38     Changes in Total Equity (Deficit)**

| | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 | Twelve Months Ended 12/31/2011 |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Beginning balance | $ (5,991) | $ (1,478) | $ 1,237 | $ (401) | $ (58) | $ (401) |
| Net income (loss) | 619 | (4,422) | (2,139) | 676 | (113) | (5,266) |
| Other comprehensive income (loss), net of taxes | | | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | 701 | (80) | 903 | 1,941 | 1,097 | 3,465 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 118 | 124 | 135 | 132 | 153 | 509 |
| Changes in defined benefit plans | 68 | 2 | 1 | (9) | 19 | 62 |
| Total comprehensive income (loss) | 1,506 | (4,376) | (1,100) | 2,740 | 1,156 | (1,230) |
| Capital draw funded by Treasury | 5,992 | 1,479 | | 500 | 100 | 7,971 |
| Senior preferred stock dividends declared | (1,655) | (1,618) | (1,617) | (1,605) | (1,603) | (6,495) |
| Other | 2 | 2 | 2 | 3 | 4 | 9 |
| Total equity (deficit)/Net worth | $ (146) | $ (5,991) | $ (1,478) | $ 1,237 | $ (401) | $ (146) |
| Aggregate draws under the Purchase Agreement (as of period end)[1] | $ 71,171 | $ 65,179 | $ 63,700 | $ 63,700 | $ 63,200 | $ 71,171 |
| Aggregate senior preferred stock dividends paid to Treasury in cash (as of period end) | $ 16,521 | $ 14,866 | $ 13,248 | $ 11,631 | $ 10,026 | $ 16,521 |
| Percentage of dividends paid to Treasury in cash to aggregate draws (as of period end) | 23% | 23% | 21% | 18% | 16% | 23% |

(1) Does not include the initial $1.0 billion liquidation preference of senior preferred stock we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received

We requested a total of $7.6 billion and $13.0 billion in draws from Treasury under the Purchase Agreement to eliminate quarterly equity deficits for 2011 and 2010, respectively. In addition, we paid cash dividends to Treasury of $6.5 billion and $5.7 billion during 2011 and 2010, respectively

Net unrealized losses on our available for sale securities in AOCI decreased by $701 million and $3.5 billion during the three months and year ended December 31, 2011, respectively. The decrease for the three months ended December 31, 2011 was primarily due to the impact of tightening OAS levels on our CMBS. The decrease for the year ended December 31, 2011 was primarily due to gains on our agency securities and CMBS as a result of the impact of declining rates and the recognition in earnings of other than temporary impairments on our non agency mortgage related securities, partially offset by losses on our single family non agency mortgage related securities due to widening OAS levels. Net unrealized losses on our closed cash flow hedge relationships in AOCI decreased by $118 million and $509 million during the three months and year ended December 31, 2011, respectively, primarily attributable to the reclassification of losses into earnings related to our closed cash flow hedges as the originally forecasted transactions affected earnings

## RISK MANAGEMENT

Our investment and credit guarantee activities expose us to three broad categories of risk: (a) credit risk; (b) interest rate risk and other market risk; and (c) operational risk. See "RISK FACTORS" for additional information regarding these and other risks

Risk management is a critical aspect of our business. We manage risk through a framework whereby our executive management is responsible for independent risk evaluation. Within this framework, executive management monitors performance against our risk management strategies and established risk limits and reporting thresholds, identifies and assesses potential issues and provides oversight regarding changes in business processes and activities.

Overall, the legal, political and regulatory influences on the financial services industry and the capital markets have increased and created significant challenges and, as a result, we believe that our risk profile increased in 2011. Drivers of this increase are: (a) mandated participation in government sponsored assistance programs; (b) continued deterioration of the mortgage insurer sector, resulting in further concentration issues; and (c) weakened global macro economic conditions and increased market volatility

Internally, our environment has also contributed to a higher risk profile. We have observed: (a) a significant increase in people risk due to the uncertainty of the future of our company; (b) an increase in operational risk due to employee turnover, key person dependencies, and the level and pace of organizational change within our company; and (c) an

127                                                                                           *Freddie Mac*

Source  FREDDIE MAC  LOAN MORTGAGE CORP, 10 K, March 09, 2012        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

inadequacy of our business continuity and disaster recovery plans that may inhibit our ability to return to normal business operations in the event of a disaster event

We expect legal, political and regulatory influences to continue to increase in 2012, which could increase uncertainty in the mortgage industry, increase our operational and people risks, and increase the uncertainty associated with the use of our models

## Credit Risk

We are subject primarily to two types of credit risk: institutional credit risk and mortgage credit risk. Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will fail to meet its obligations Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage we own or guarantee We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage related security, or other guarantee commitment

### *Institutional Credit Risk*

Since 2008, challenging market conditions have adversely affected the liquidity and financial condition of our counterparties The concentration of our exposure to our counterparties increased beginning in 2008 due to industry consolidation and counterparty failures.

Our exposure to single family mortgage seller/servicers remained high during 2011 with respect to their repurchase obligations arising from breaches of representations and warranties made to us for loans they underwrote and sold to us. We rely on our single family seller/servicers to perform loan workout activities as well as foreclosures on loans that they service for us Our credit losses could increase to the extent that our seller/servicers do not fully perform these obligations in a timely manner The financial condition of the mortgage insurance industry continued to deteriorate during 2011, and the substantial majority of our mortgage insurance exposure is concentrated with four counterparties all of which are under significant financial stress. In addition, our exposure to derivatives counterparties remains highly concentrated as compared to historical levels

We continue to face challenges in reducing our risk concentrations with counterparties Efforts we make to reduce exposure to financially weakened counterparties could further increase our exposure to other individual counterparties or increase concentration risk overall The failure of any of our significant counterparties to meet their obligations to us could have a material adverse effect on our results of operations, financial condition, and our ability to conduct future business. For more information, see "RISK FACTORS Competitive and Market Risks *We depend on our institutional counterparties to provide services that are critical to our business, and our results of operations or financial condition may be adversely affected if one or more of our institutional counterparties do not meet their obligations to us.*"

### <u>Non Agency Mortgage Related Security Issuers</u>

Our investments in securities expose us to institutional credit risk to the extent that servicers, issuers, guarantors, or third parties providing credit enhancements become insolvent or do not perform their obligations Our investments in non Freddie Mac mortgage related securities include both agency and non agency securities However, agency securities have historically presented minimal institutional credit risk due to the guarantee provided by those institutions, and the U.S. government's support of those institutions.

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non agency mo tgage-re ated securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. The effectiveness of our efforts is highly uncertain and any potential recoveries may take significant time to realize

In June 2011, Bank of America Corporation announced that it, BAC Home Loans Servicing, LP, Countrywide Financial Corporation and Countrywide Home Loans, Inc entered into a settlement agreement with The Bank of New York Mellon, as trustee, to resolve certain claims with respect to a number of Countrywide first lien and second lien residential mortgage related securitization trusts Bank of America indicated that the settlement is subject to final court approval and certain other conditions There can be no assurance that final court approval of the settlement will be obtained or that all conditions will be satisfied. Bank of America noted that, given the number of investors and the complexity of the settlement, it is not possible to predict the timing or ultimate outcome of the court approval process, which could take a substantial period of time We have investments in certain of these Countrywide securitization trusts and would expect to benefit from this settlement, if final court approval is obtained. For more information, see "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS."

TREASURY-2899

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

On September 2, 2011, FHFA announced that, as Conservator for Freddie Mac and Fannie Mae, it had filed lawsuits against 17 financial institutions and related defendants alleging: (a) violations of federal securities laws; and (b) in certain lawsuits, common law fraud in the sale of residential non agency mortgage related securities to Freddie Mac and Fannie Mae. FHFA, as Conservator, filed a similar lawsuit against UBS Americas, Inc. and related defendants on July 27, 2011. FHFA seeks to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in certain residential non agency mortgage related securities issued by these financial institutions.

See "CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities" for additional information on credit risk associated with our investments in mortgage related securities, including higher risk components and impairment charges we recognized in the years ended December 31, 2011, 2010, and 2009 related to these investments  For information about institutional credit risk associated with our investments in non mortgage related securities, see "NOTE 7: INVESTMENTS IN SECURITIES    Table 7.9    Trading Securities" as well as "Cash and Other Investments Counterparties" below

### Single family Mortgage Seller/Servicers

We acquire a significant portion of our single family mortgage purchase volume from several large lenders, or seller/servicers  Our top 10 single family seller/servicers provided approximately 82% of our single family purchase volume during 2011. Wells Fargo Bank, N.A. and JPMorgan Chase Bank, N.A. accounted for 28% and 13%, respectively, of our single family mortgage purchase volume and were the only single family seller/servicers that comprised 10% or more of our purchase volume in 2011

We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans, and represent and warrant that those loans have been originated under specified underwriting standards. If we subsequently discover that the representations and warranties were breached (*i.e.*, that contractual standards were not followed), we can exercise certain contractual remedies to mitigate our actual or potential credit losses  These contractual remedies include the ability to require the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan  As part of our expansion of HARP, we have agreed not to require lenders to provide us with certain representations and warranties that they would ordinarily be required to commit to in selling loans to us  As a result, we may face greater exposure to credit and other losses on these HARP loans  For more information, see "*Mortgage Credit Risk    Single Family Mortgage Credit Risk    Single Family Loan Workouts and the MHA Program    Home Affordable Refinance Program*."

We are exposed to institutional credit risk arising from the potential insolvency or non performance by our mortgage seller/servicers, including non performance of their repurchase obligations arising from breaches of the representations and warranties made to us for loans they underwrote and sold to us or failure to honor their recourse and indemnification obligations to us  Pursuant to their repurchase obligations, our seller/servicers are obligated to repurchase mortgages sold to us when there has been a breach of the representations and warranties made to us with respect to the mortgages  In lieu of repurchase, we may choose to allow a seller/servicer to indemnify us against losses realized on such mortgages or otherwise compensate us for the risk of continuing to hold the mortgages  In some cases, the ultimate amounts of recovery payments we have received from seller/servicers may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations  If a seller/servicer does not satisfy its repurchase or indemnification obligations with respect to a loan, we will be subject to the full range of credit risks posed by the loan if the loan fails to perform, including the risk that a mortgage insurer may deny or rescind coverage on the loan (if the loan is insured) and the risk that we will incur credit losses on the loan through the workout or foreclosure process

Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts, in which case the deadline for repurchase is extended until we decide the appeal  Some of our seller/servicers have failed to fully perform their repurchase obligations due to lack of financial capacity, while others, including many of our larger seller/servicers, have not fully performed their repurchase obligations in a timely manner  The table below provides a summary of our repurchase request activity for 2011, 2010, and 2009.

<div align="center">129</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 39     Repurchase Request Activity**[1]

| | Year Ended December 31, | | |
| | 2011 | 2010 | 2009 |
| | | (in millions) | |
|---|---|---|---|
| Beg nn ng balance | $ 3,807 | $ 4,201 | $ 3,608 |
| New eq ests ss ed | 9,172 | 16,498 | 12,364 |
| Req ests co ec ed[2] | (4,490) | (7,467) | (5,326) |
| Req ests cance ed[3] | (5,707) | (9,298) | (4,776) |
| O he ( | (66) | (127) | (1,669) |
| End ng Balance | $ 2,716 | $ 3,807 | $ 4,201 |

(1) Beg nn ng and end ng ba ances ep esen  he UPB of he  oans assoc a ed w  e ep c ase eq ess New eq ess ss ed a  d eques s cance ed ep esen  he
    a o  of  e eq es , w  e eques s co ec ed ep esen  cash paymen  ece ved
(2) Reques s co ec ed nc ude paymen s  ece ved upon fu f men of  e ep c ase eq es , e  b  se e  of osses fo  eq ess assoc a ed w h fo eclosed mo gage
    oans, nego a ed se  emen s, and o he  a  e na ve  emed es
(3) Cons s p   a y of hose  eques s ha we e  eso ved by he se v ce p o d ng m ss ng documen a  on o a successful appeal of t  e eq est
(4) O he nc udes  e s ha affec  he UPB of he oan wh  e he  ep c ase  eq est s o tsta d g, s c as c a ges  UPB d e to paymen s made on he loan Also
    c  des eq ess dee ed unco ec b e due o coun e pa y fa u es

As shown in the table above, the amount of new repurchase requests declined from $16.5 billion in 2010 to $9.2 billion in 2011. This decline reflects: (a) a lower volume of loan reviews performed in 20   relating to loans originated in 2008 and prior years; (b) the reduction in the number of loans originated in 2005 to 2008, including those with higher risk characteristics, within our single family  credit guarantee portfolio; and (c) the increase in the number of loans covered by negotiated agreements (as discussed below) or originated by counterparties that defaulted in recent years.

The UPB of loans subject to open repurchase requests declined to  approximately $2.7 billion as of December 31, 2011 from $3.8 billion as of December 3 , 20  0 because the combined volume of requests collected and cancelled exceeded the  volume of new request issuances  As measured by UPB, approximately 39% and 34% of the repurchase requests outstanding  at December 31, 2011 and December 31, 2010, respectively, were outstanding for four months or more since  issuance of the initial request (these figures include  repurchase requests for which appeals were pending)  As of December 31, 2011, two of our largest seller/servicers had  aggregate repurchase requests outstanding, based on UPB, of $1 4 billion, and approximately 48% of these requests were  outstanding for four months or more since issuance of the  initial request The amount we expect to collect on the  outstanding requests is significantly less than the UPB of the  loans subject to repurchase requests primarily because many of these requests will likely be satisfied by reimbursement of our  realized credit losses by seller/servicers, instead of repurchase of loans at their UPB  Some of these requests also  may be rescinded in the course of the contractual appeal  process. Based on our historical loss experience and the fact  that many of these loans are covered by credit enhancements, we  expect the actual credit losses experienced by us should we fail  to collect on these repurchase requests will also be less than  the UPB of the loans

Mortgage insurance rescission repurchase requests tend to be  outstanding longer than other repurchase requests for a number  of reasons, including: (a) lenders do not agree with the  basis used by the mortgage insurers to rescind coverage; (b) the mortgage insurers' appeals process for rescissions can be lengthy (as long as one year or more); (c) lenders expect us to suspend repurchase enforcement  until after the appeal decision by the mortgage insurer is made (although this is not our practice); and (d) in certain  cases, we have agreed to consider a repurchase alternative that would allow certain of our seller/servicers to provide us a  commitment for the amount of lost mortgage insurance coverage in  ieu of a full repurchase. Until a decision on such a repurchase  alternative is made, we temporarily suspend the collection  efforts for outstanding repurchases associated with mortgage  insurance rescission for these seller/servicers  Of the total  amount of repurchase requests outstanding at December 3 , 2011, approximately $1.2 billion were issued due to  mortgage insurance rescission or mortgage insurance claim  denial. Our actual credit losses could increase should the  mortgage insurance coverage not be reinstated and we fail to  collect on these repurchase requests

During 20  0 and 2009, we entered into agreements with certain of  our seller/servicers to release specified loans from certain  repurchase obligations in exchange for one time cash payments  In a memorandum to the FHFA Office of Inspector General dated September 19, 2011, FHFA stated that in 2011 it had  "suspended certain future repurchase agreements with  seller/servicers concerning their repurchase obligations pending the outcome" of a review by Freddie Mac of its loan  sampling methodology  We are in discussions with FHFA concerning our review of our sampling methodology  We cannot predict when this process will be completed or whether or when FHFA will terminate or revise its suspension. It is possible that our loan sampling methodology could change in ways that increase our  repurchase request volumes with our seller/servicers  During 2011, we expanded our reviews of defaulted loans to include  certain loans that were previously excluded from our review process.

In order to resolve outstanding repurchase requests on a more  timely basis with our single family seller/servicers in the  future, we have begun to require certain of our larger seller/servicers to commit to plans for completing repurchases,

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2901

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

with financial consequences or with stated remedies for non compliance, as part of the annual renewals of our contracts with them  As of December 31, 2011, our 13 largest seller/servicers, which hold more than 81% of all outstanding  repurchase requests, are subject to the revised contract terms  We continue to review loans and pursue our rights to issue  repurchase requests to our counterparties, as appropriate.

Our estimate of recoveries from seller/servicer repurchase  obligations is considered in our allowance for loan losses as of  December 31, 2011 and December 31, 2010; however, our actual recoveries may be different than our estimates  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Allowance for Loan Losses and Reserve for Guarantee Losses" for further information  We believe we have appropriately provided for these exposures, based upon our  estimates of incurred losses, in our loan loss reserves at  December 31, 2011 and December 31, 2010; however, our actual losses may exceed our estimates

The table below summarizes the percentage of our single family  credit guarantee portfolio by year of loan origination that is  subject to agreements releasing loans from certain repurchase  obligations, including TBW and other defaulted counterparties.  Since January 1, 2009, we have entered into three negotiated agreements (including the agreements with GMAC and  Bank of America discussed below) and have released repurchase obligations with 27 other seller/servicers who were either no  longer in operation or no longer approved as our  seller/servicers, at December 31, 2011

**Table 40    Loans Released from Repurchase Obligations(1)**

| Year of origination: | UPB (in billions) | As of December 31, 2011 Percentage of Single-family Credit Guarantee Portfolio |
|---|---|---|
| Nego a ed ag eemen s | | |
| 2008 | $  21 8 | 1 2% |
| 2007 | 48 2 | 2 8 |
| 2006 | 38 0 | 2 2 |
| 2005 | 34 5 | 2 0 |
| 2004 and p o | 23 4 | 1 3 |
| S   o a | 165 9 | 9 5 |
| O he   eleased loans (2 | | |
| 2011 and 2010 | 0 3 | <0 1 |
| 2009 | 11 5 | 0 7 |
| 2008 | 10 4 | 0 6 |
| 2007 | 16 3 | 0 9 |
| 2006 | 8  8 | 0 5 |
| 2005 | 6 3 | 0 4 |
| 2004 and p o | 3 3 | 0 2 |
| o a | $ 222 8 | 12 8% |

(1) Cons s s of all loans  eleased f om cea n  epu chase ob  ga ons s nce Janua y 1, 2009

(2) Cons s s of oans assoc a ed w h se e /se v ce s who we e e he no onge n bus ness o no onge  app oved as ou  se e /se v ce s a , Decembe  31, 2011  We   ece ved o ,  some cases, expec  o  ece ve cash o al ng app ox ma ely $0 1 b  on f om he FDIC o o he  h d pa es fo he  elease of  ela ed loans f om se v c ng ob  ga ons fo  defaul ed selle /se v ce s

GMAC Mortgage, LLC and Residential Funding Company, LLC  (collectively GMAC), indirect subsidiaries of Ally Financial Inc  (formerly, GMAC Inc ), are seller/servicers that together  serviced and subserviced for an affiliated entity approximately 4% of the single family loans in our single family credit  guarantee portfolio as of December 31, 2011  In March 2010,  we entered into an agreement with GMAC, under which they made a one time payment to us for the partial release of repurchase  obligations relating to loans sold to us prior to  January 1, 2009.  The partial release does not affect any of GMAC's  potential repurchase obligations for loans sold to us by GMAC after January 1, 2009, nor does it affect the ability to recover amounts associated with failure to comply  with our servicing requirements  This agreement did not have a material impact on our 2011 or 2010 consolidated statements of  income and comprehensive income  Ally Financial Inc  recently stated that the protracted period of adverse developments in the mortgage finance and credit markets has  adversely affected Residential Capital LLC's business, liquidity, and its capital position and has raised substantial  doubt about Residential Capital LLC's ability to continue as a going concern  Residential Capital LLC is the  parent company of Residential Funding Company, LLC, one of our mortgage servicers  For information on our exposure to institutional counterparties, see "RISK FACTORS    Competitive and Market Risks    *We depend on our institutional counterparties to provide services that are critical to our business, and our results of operations or  financial condition may be adversely affected if one or more of our institutional counterparties do not meet their obligations  to us.*"

On December 3 , 20 0, we entered into an agreement with Bank of America, N.A., and two of its affiliates, BAC Home Loans  Servicing, LP and Countrywide Home Loans, Inc., to resolve our  currently outstanding and future claims for repurchases arising  from the breach of representations and warranties on certain  loans purchased by us from Countrywide

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

Home Loans, Inc. and Countrywide Bank FSB. Under the terms of the agreement, we received a $1 28 billion cash payment in consideration for releasing Bank of America and its two affiliates from current and future repurchase requests arising from loans sold to us by the Countrywide entities for which the first regularly scheduled monthly payments were due on or before December 31, 2008 The UPB of the loans in this portfolio as of December 31, 2010, was approximately $114 billion The agreement applies only to certain claims for repurchase based on breaches of representations and warranties and the agreement contains specified limitations and does not cover loans sold to us or serviced for us by other Bank of America entities This agreement did not have a material impact on our 2011 or 2010 consolidated statements of income and comprehensive income

On August 24, 2009, TBW filed for bankruptcy. Prior to that date, we had terminated TBW's status as a seller/servicer of our loans We had exposure to TBW with respect to its loan repurchase obligations We also had exposure with respect to certain borrower funds that TBW held for the benefit of Freddie Mac. TBW received and processed such funds in its capacity as a servicer of loans owned or guaranteed by Freddie Mac. TBW maintained certain bank accounts, primarily at Colonial Bank, to deposit such borrower funds and to provide remittance to Freddie Mac Colonial Bank was placed into receivership by the FDIC in August 2009.

On or about June 14, 2010, we filed a proof of claim in the TBW bankruptcy aggregating $1.78 billion. Of this amount, approximately $1.15 billion related to current and projected repurchase obligations and approximately $440 million related to funds deposited with Colonial Bank, or with the FDIC as its receiver, which were attributable to mortgage loans owned or guaranteed by us and previously serviced by TBW. The remaining $190 million represented miscellaneous costs and expenses incurred in connection with the termination of TBW's status as a seller/servicer of our loans.

In June 2011, with the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW At the time of settlement, we estimated our uncompensated loss exposure to TBW to be approximately $0.7 billion. This estimated exposure largely relates to outstanding repurchase claims that have already been substantially provided for in our financial statements through our provision for loan losses. Our ultimate losses could exceed our recorded estimate Potential changes in our estimate of uncompensated loss exposure or the potential for additional claims as discussed below could cause us to record additional losses in the future

We understand that Ocala Funding, LLC, which is a wholly owned subsidiary of TBW, or its creditors, may file an action to recover certain funds paid to us prior to the TBW bankruptcy. However, no actions against Freddie Mac related to Ocala have been initiated in bankruptcy court or elsewhere to recover assets We are also involved in an adversary proceeding in bankruptcy court brought by certain underwriters at Lloyds, London and London Market Insurance Companies against TBW, Freddie Mac, and other parties For more information on these matters, including terms of the TBW settlement, see "NOTE 18: LEGAL CONTINGENCIES     Taylor, Bean & Whitaker Bankruptcy."

A significant portion of our single family mortgage loans are serviced by several large seller/servicers Our top three single family loan servicers, Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A., together serviced approximately 49% of our single family mortgage loans as of December 31, 2011. Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A. serviced approximately 26%, 12%, and 11%, respectively, of our single family mortgage loans, as of December 31, 2011 Because we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, our business and financial results could be adversely affected

During the second half of 2010, a number of our single family servicers, including several of our largest, announced that they we e evaluating the potential extent of issues relating to the possible improper execution of documents associated with foreclosures of loans they service, including those they service for us Some of these companies temporarily suspended foreclosure proceedings in certain states in which they do business While these servicers generally resumed foreclosure proceedings in the first quarter of 2011, the rate at which they are effecting foreclosures has been slower than prior to the suspensions. See "RISK FACTORS     Operational Risks     *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" for further information

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses For example, our seller/servicers have an active role in our loan workout efforts, including under the MHA Program and the recent servicing alignment initiative, and therefore, we also have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans. In addition, during 2011, there have been several regulatory developments that have

<div align="center">132</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                           Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

affected and will continue to significantly impact our single family mortgage servicers  For more information on regulatory and other developments in mortgage servicing, and how these developments may impact our business, see "BUSINESS    Regulation and Supervision    *Legislative and Regulatory Developments    Developments Concerning Single Family Servicing Practices*."

While we have legal remedies against seller/servicers who fail to comply with our contractual servicing requirements, we are exposed to institutional credit risk in the event of their insolvency or if, for other causes, seller/servicers fail to perform their obligations to repurchase affected mortgages, or (at our option) indemnify us for losses resulting from any breach, or pay damages for any breach  In the event a seller/servicer does not fulfill its repurchase or other responsibilities, we may seek partial recovery of amounts owed by the seller/servicer by transferring the applicable mortgage servicing rights of the seller/servicer to a different servicer  However, this option may be difficult to accomplish with respect to our largest seller/servicers due to the operational and capacity challenges of transferring a large servicing portfolio  In 2011, we changed most of our servicing standards to permit full or partial termination of loan servicing in order to transfer portions of the servicing portfolios to new servicers

*Multifamily Mortgage Seller/Servicers*

As of December 31, 2011, our top three multifamily servicers, Berkadia Commercial Mortgage LLC, CBRE Capital Markets, Inc., and Wells Fargo Bank, N.A., each serviced more than  0% of our multifamily mortgage portfolio, and together serviced approximately 40% of our multifamily mortgage portfolio. For 2011, our top two multifamily sellers, CBRE Capital Markets, Inc. and NorthMarq Capital, LLC, accounted for 20% and 12%, respectively, of our multifamily purchase volume. Our top  0 multifamily lenders represented an aggregate of approximately 81% of our multifamily purchase volume for 2011.

In our multifamily business, we are exposed to the risk that multifamily seller/servicers could come under financial pressure, which could potentially cause degradation in the quality of the servicing they provide us, including their monitoring of each property's financial performance and physical condition. This could also, in certain cases, reduce the likelihood that we could recover losses through lender repurchases, recourse agreements or other credit enhancements, where applicable. This risk primarily relates to multifamily loans that we hold on our consolidated balance sheets where we retain all of the related credit risk  We monitor the status of all our multifamily seller/servicers in accordance with our counterparty credit risk management framework.

*Mortgage Insurers*

We have institutional credit risk relating to the potential insolvency of, or non performance by, mortgage insurers that insure single family mortgages we purchase or guarantee  As a guarantor, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligations to reimburse us for claims. If any of our mortgage insurers that provide credit enhancement fail to fulfill their obligation, we could experience increased credit losses

We attempt to manage this risk by establishing eligibility standards for mortgage insurers and by monitoring our exposure to individual mortgage insurers  Our monitoring includes performing regular analysis of the estimated financial capacity of mortgage insurers under different adverse economic conditions  In addition, state insurance authorities regulate mortgage insurers and we periodically meet with certain state authorities to discuss their views  We also monitor the mortgage insurers' credit ratings, as provided by nationally recognized statistical rating organizations, and we periodically review the methods used by such organizations  None of our mortgage insurers had a rating higher than BBB as of February 27, 2012. In evaluating the likelihood that an insurer will have the ability to pay our expected claims, we consider our own analysis of the insurer's financial capacity, any downgrades in the insurer's credit rating, and various other factors.

As part of the estimate of our loan loss reserves, we evaluate the recovery and collectability related to mortgage insurance policies for mortgage loans that we hold on our consolidated balance sheets as well as loans underlying our non consolidated Freddie Mac mortgage related securities or covered by other guarantee commitments  We believe that many of our mortgage insurers are not sufficiently capitalized to withstand the stress of the current weak economic environment  Additionally, a number of our mortgage insurers have exceeded risk to capital ratios required by their state insurance regulators  In many cases, such states have issued waivers to allow the companies to continue writing new business in their states. Most waivers are temporary in duration or contain other conditions that the companies may be unable to continue to meet due to their weakened condition or other factors  As a result of these and other factors, we reduced our expectations of recovery from several of these insurers in determining our allowance for loan losses associated with our single family loans on our consolidated balance sheet as of December 31, 2011

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below summarizes our exposure to mortgage insurers as of December 3 , 20   In the event that a mortgage insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses resulting from such failure  As of December 31, 2011, most of the coverage outstanding from mortgage insurance shown in the table below is attributed to primary policies rather than pool insurance policies

### Table 41    Mortgage Insurance by Counterparty

| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | As of December 31, 2011 | | |
| | | | Primary Insurance[2] | Pool Insurance[2] (in billions) | Coverage Outstanding[3] |
|---|---|---|---|---|---|
| Mo gage Gua an y Insu ance Co po a on (MGIC) | B | Nega ve | $   48 0 | $   28 3 | $   12 2 |
| Rad a  G a a  y I c | B | Nega ve | 36 2 | 7 0 | 10 0 |
| Genwo h Mo gage Insu ance Co po a on | B | Nega ve | 29 9 | 0 8 | 7 5 |
| U  ed G a a y Res de  a I s a ce Co | BBB | S ab e | 28 4 | 0 2 | 7 0 |
| PMI Mo  gage Insu ance Co  (PMI)( | CCC | Nega ve | 24 0 | 1 3 | 6 1 |
| Repub c Mo gage Insu ance Company (RMIC)( | No  Ra ed | N/A | 19 5 | 1 9 | 4 9 |
| T ad G a a y I s a ce Co p[6] | No  Ra ed | N/A | 8 2 | 0 7 | 2 1 |
| CMG Mo gage I s a ce Co | BBB | Nega ve | 3 0 | 0 1 | 0 7 |
| Esse t G a a ty, I c | No  Ra ed | N/A | 0 8 | | 0 1 |
| o a | | | $   198 0 | $   40 3 | $   50 6 |

(1) La e a  a g va ab e as of Feb a y 27, 2012 Rep e s e  he owe  of S&P and Moody's c ed  a ngs and  ooks I  s ab e,  he a ga d o  ook of  e

   ega e y s s a ed   e s of  e S&P eq va e

(2) Rep ese s ea o  of UPB a  e e d of  e pe od fo o  s ngle-fam ly c ed  gua an ee po fo o cove ed by he  espec ve ns  ance ype T ese a  o n s a e

   based on ou  g oss cove age w hou  ega d o ne  ng of cove age ha  may ex s  o he ex en an affec ed  o gage s cove ed unde  bo h ypes of  s a ce See

   "Ta e 4 5   Reco se a d O he F oms of C ed P o ec on" in "NOTE 4  MORTGAGE LOANS AND LOAN LOSS RESERVES" fo  f e  nfo ma on

(3) Rep esen s he  ema n ng agg ega e con ac ual l m  fo  e mbu semen  of losses unde  pol c es of bo h p ma y and pool  s  a ce T ese a o  s a e based o o

   g oss cove age w hou  ega d o ne  ng of cove age ha  may ex s  o he ex en an affec ed mo  gage s cove ed unde  bo h ypes of nsu ance

(4) Beg nn ng n Oc obe  2011, PMI began pay ng val d cla ms 50% n cash and 50% n defe ed paymen  ob ga ons unde  o de of  s s a ce egu a o

(5) In Janua y 2012, RMIC began pay ng va d c a  s 50% n cash and 50% n defe ed paymen  ob ga ons unde  o de  of  s s a e egula o

(6) Beg nn ng n June 2009, T ad began pay ng va d c a ms 60% n cash and 40% n defe ed paymen  ob ga ons unde  o de of  s s a e egua o

We received proceeds of $2.5 billion and $1.8 billion during the years ended December 31, 2011 and 2010,  respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single family loans  We had outstanding receivables from mortgage insurers, net of associated reserves, of $1.0 billion and $1.5 billion  as of December 31, 2011 and December 31, 2010,  respectively

The UPB of single family loans covered by pool insurance  declined approximately 29% during 2011, primarily due to  prepayments and other liquidation events  We did not purchase pool insurance on single family loans in 2011  Our pool insurance policies generally have coverage periods that range from 10 to 12 years  In many cases, we entered into these  agreements to cover higher risk mortgage product types delivered to us through bulk transactions. As of December 31, 2011, pool insurance policies that will expire: (a) during 20 2  covered approximately $2.4 billion in UPB of loans, and the remaining contractual limit for reimbursement of losses on such  loans was approximately $0.2 billion; and (b) between 2013 and 2018 covered approximately $35.0 billion in UPB of loans, and the remaining contractual limit for reimbursement of losses on such loans was approximately $0.8 billion  The remaining pool insurance policies, for which the remaining  contractual limit for reimbursement of losses was approximately $0.9 billion, expire after 2018  Any losses in excess of the contractual limit will be borne by us  These figures include coverage under our pool insurance policies based on the stated  coverage amounts under such policies  As noted below, we do not expect to receive full payment of our claims from several of  these counterparties

Based on information we received from MGIC, we understand that  MGIC may challenge our future claims under certain of their pool insurance policies  We believe that our pool insurance policies with MGIC provide us with the right to obtain recoveries for  losses up to the aggregate limit indicated in the table above  However, MGIC's interpretation of these policies would result in claims coverage approximately $0.6 billion lower than the amount of coverage outstanding set forth in the table  above  We expect this difference to increase but not to exceed approximately $0 7 billion

In August 2011, we suspended PMI and its affiliates and RMIC and  its affiliates as approved mortgage insurers, making loans  insured by either company (except relief refinance loans with  pre existing insurance) ineligible for sale to Freddie Mac  Both  of these companies ceased writing new business during the third  quarter of 2011, and have been put under state supervision. PMI  instituted a partial claim payment plan in October 2011, under which claim payments will be made 50% in cash, with the  remaining amount deferred as a policyholder claim  RMIC instituted a partial claim payment plan in January 2012, under  which claim payments will be made 50% in cash and 50% in  deferred payment obligations for an initial period not to exceed  one year  We and FHFA are in discussions with the state regulators of PMI and RMIC

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2905

Table of Contents

concerning future payments of our claims  It is not yet clear  how the state regulators of PMI and RMIC will administer their  respective deferred payment plans.

Triad is continuing to pay claims 60% in cash and 40% in  deferred payment obligations under orders of its state  regulator  To date, the state regulator has not allowed Triad to begin paying its deferred payment obligations, and it is  uncertain when or if Triad will be permitted to do so  If Triad, PMI, and RMIC do not pay their deferred payment obligations, we  would lose a significant portion of the coverage from these counterparties shown in the table above

Given the difficulties in the mortgage insurance industry, we  believe it is likely that other companies may also exceed their  regulatory capital limit in the future. In addition to Triad, RMIC, and PMI, we believe that certain other of our mortgage  insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as those  claims emerge  In the future, we believe our mortgage insurance exposure will likely be concentrated among a smaller number of  counterparties

At least one of our largest servicers entered into arrangements  with two of our mortgage insurance counterparties for settlement  of future rescission activity for certain mortgage loans  Under such agreements, servicers pay  and/or indemnify mortgage insurers in exchange for the mortgage insurers agreeing not to issue mortgage insurance rescissions  and /or denials of coverage related to origination defects on  Freddie Mac owned mortgages  For loans covered by these  agreements, we may be at risk of additional loss to the extent  we do not independently uncover loan defects and require lender repurchase for loans that otherwise would have resulted in  mortgage insurance rescission  Additionally, this type of activity could adversely affect our mortgage insurers' ability to pay in some economic scenarios  In April 2011, we issued an industry letter to our servicers reminding them that  they may not enter into these types of agreements without our  consent. Several of our servicers have asked us to consent to these types of agreements  We are evaluating these requests on a case by case basis  For more information, see "RISK FACTORS    Competitive and Market Risks   *We could incur increased credit losses if our seller/servicers enter into  arrangements with mortgage insurers for settlement of future rescission activity and such agreements could potentially reduce the ability of mortgage insurers to pay claims to us* ."

### *Bond Insurers*

Bond insurance, which may be either primary or secondary  policies, is a credit enhancement covering certain of the  non agency mortgage related securities we hold  Primary policies  are acquired by the securitization trust issuing the securities  we purchase, while secondary policies are acquired by us. Bond  insurance exposes us to the risk that the bond insurer will be  unable to satisfy claims.

The table below presents our coverage amounts of bond insurance,  including secondary coverage, for the non agency  mortgage-re ated securities we hold  In the event a bond insurer  fails to perform, the coverage outstanding represents our  maximum exposure to credit losses related to such a failure

### Table 42      Bond Insurance by Counterparty

| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | As of December 31, 2011 | |
|---|---|---|---|---|
| | | | Coverage Outstanding[2] | Percent of Total[2] |
| | | | (dollars in billions) | |
| Ambac Assu ance Co po a  on (Ambac)[3 | No  a ed | N/A | $        4 3 | 44% |
| F nanc a  Gua an y Insu ance Co  pany (FGIC)[3 | No  a ed | N/A | 1 8 | 19 |
| MBIA I  s  a ce Co p | B | Unde  Rev ew | 1 3 | 14 |
| Ass  ed G a a ty M   c pa Co p | AA | S ab e | 1 1 | 11 |
| Na  ona  Pub  c F nance Gua an ee Co p | BBB | Deve op ng | 1 1 | 11 |
| Sy  co a G a a  ee I c [3 | CC | Deve op ng | 0 1 | 1 |
| Rad a  G a a  y I c (Rad a ) | B | Nega ve | <0 1 | |
| o a | | | $        9 7 | 100% |

(1) L a es  a   gs ava  ab e as of Feb  a y 27, 2012  Rep esen s  e owe  of S&P and Moody's c ed    a ngs  In h s ab e, he a  ng and ou  ook of  he  ega  en  y s    s a ed    e  s of  e S&P eq u va e

(2) Rep esen s he  ema n ng con  ac ual l m  fo  e mbu semen of  osses,  c d g os    e e s a do  e  expe ses, o n-agency mo  gage- ela ed secu   es

(3) A  bac, FGIC, a d Sy  co a G a a  ee I c a e c  e   y ope a   g unde  egu a o y supe v s on

We monitor the financial strength of our bond insurers in  accordance with our risk management policies  Some of our larger  bond insurers are in runoff mode where no new business is being  issued  We expect to receive substantially less than full payment of our claims from several of our bond insurers, including Ambac and FGIC, due to adverse developments concerning  these companies  Ambac and FGIC are currently not paying any of their claims  We believe that we will likely receive substantially less than full payment of our claims from some of  our other bond insurers, because we believe they also lack  sufficient ability to fully meet all of their expected lifetime claims  paying obligations to us as such

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2906

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

claims emerge  In the event one or more of our other bond  insurers were to become subject to a regulatory order or  insolvency proceeding, our ability to recover certain unrealized  losses on our mortgage related securities would be negatively  impacted  We considered our expectations regarding our bond insurers' ability to meet their obligations in making our impairment determinations at December 31, 2011 and  December 3 , 2010. See "NOTE 7: INVESTMENTS IN  SECURITIES    Other Than Temporary Impairments on Available For Sale Securities" for additional information regarding impairment losses on securities covered by bond  insurers.

The table below shows the non agency mortgage related securities  we hold that were covered by primary bond insurance at  December 3 , 2011 and December 31, 2010

**Table 43     Non Agency Mortgage Related Securities Covered by Primary Bond  Insurance**

| | Ambac | | FG C | | MB A  nsurance Corp | | AGMC(1 ) | | Other(2) | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UPB(3) | Gross Unrealized Losses(4) | UPB(3) | Gross Unrealized Losses(4) | UPB(3) | Gross Unrealized Losses(4) | UPB(3) | Gross Unrealized Losses(4) | UPB(3) | Gross Unrealized Losses(4) | UPB(3) | Gross Unrealized Losses(4) |
| | | | | | (in millions) | | | | | | | |
| **At December 31, 2011** | | | | | | | | | | | | |
| rst  en subpr me | $  6 9 | $    ( 69 | $  831 | $   (230 | $   8 | $    (1 | $  0 | $   (91 | $   — | $   — | $  1,862 | ( 91 |
| Second en subpr me | — | — | 185 | — | — | — | — | — | — | — | 185 | — |
| Opt on ARM | 39 | — | — | — | — | — | 76 | (8 | — | — | 115 | (8 |
| A t-A and other | 993 | (87 | 7 3 | ( 6 | 366 | (3 | 289 | (81 | 6 | (3 | 2, 55 | (230 |
| Manufactured housing | 8 7 | (1 | — | — | 139 | (6 | — | — | — | — | 226 | (20 |
| CMBS | 2,195 | (86 | — | — | — | — | — | — | 1,129 | (38 | 3,32 | (12 |
| Obl gat ons of states and pol t cal subd v s ons | 363 | (11 | 38 | (1 | 197 | (5 | 319 | (3 | 17 | (2 | 93 | (22 |
| ota | $  296 | $  (367 | $ 1,797 | $  (287 | $  710 | $  (15 | $ 1,088 | $  (183 | $ 1,210 | $  ( 3 | $ 9,101 | (895 |
| **At December 31, 2010** | | | | | | | | | | | | |
| rst  en subpr me | $  676 | $  (207 | $  92 | $  (322 | $  12 | $   (1 | $  27 | $  (99 | $  3 | $   — | $  2,0 2 | (629 |
| Second en subpr me | — | — | 227 | (12 | — | — | — | — | — | — | 227 | (12 |
| Opt on ARM | 50 | — | — | — | — | — | 129 | (16 | — | — | 179 | (16 |
| A t-A and other | 1,150 | (186 | 832 | (93 | 25 | (29 | 3 0 | (82 | 71 | (1 | 2,818 | (391 |
| Manufactured housing | 97 | (11 | — | — | 15 | (15 | — | — | — | — | 251 | (26 |
| CMBS | 2,206 | (277 | — | — | — | — | — | — | 1,195 | (159 | 3, 01 | ( 36 |
| Obl gat ons of states and pol t cal subd v s ons | 19 | ( | 38 | (2 | 23 | (19 | 366 | (18 | 17 | (3 | 17 | (86 |
| ota | $  598 | $  (725 | $ 2,021 | $  ( 29 | $  825 | $  (64 | $ 1,262 | $  (215 | $ 1,286 | $  (163 | $ 9,992 | (1 96 |

(1) Assu ed Gua an y Mun c pa  Co p  was fo    e y known as F ranc a  Secu  y  Ass  a ce
(2) Rep ese   s   a ce p ov ded  y Sy co a G a a  ee I c., Rad a   G o p, I c., a d CIFG Ho d  gs Ltd, a d   c  des ce ta   expos   es o o ds   s ed y  NPFGC, fo   e y k ow  as MBIA I s  a ce Co p of I   o s, w c  s as b s a y of MBIA I  c , e pa  en co  pany of MBIA Insu ance Co p
(3) Rep esen s he a  oun  of UPB cove ed by  nsu ance cove age  Th s  amoun  does no  ep esen  he max mum amoun  of  osses we cou d  ecove , as   e   s a ce   a so cove s unpa d n e es
(4) Rep esen s he a  oun  of g oss un ea  zed  osses a  he  espec  ve epo  ng da e on he secu   es w h  nsu ance
(5) The ma o  y of he Al -A a d o he   oans cove ed by bond  nsu ance a e secu    es backed by home equ  y l nes of c ed

### Cash and Other Investments Counterparties

We are exposed to institutional credit risk arising from the  potential insolvency or non performance of counterparties of  non-mortgage-re ated investment agreements and cash equivalent  transactions, including those entered into on behalf of our  securitization trusts. These financial instruments are investment grade at the time of purchase and primarily  short term in nature, which mitigates institutional credit risk  for these instruments.

Our cash and other investment counterparties are primarily  financial institutions and the Federal Reserve Bank  As of December 31, 2011 and December 3 , 20 0, there were $68.5 billion and $91.6 billion, respectively, of cash and other non  mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal  Reserve Bank. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information on counterparty  credit ratings and concentrations within our cash and other  investments.

### Document Custodians

We use third party document custodians to provide loan  document certification and custody services for the loans that  we purchase and securitize  In many cases, our seller/servicer  customers or their affiliates also serve as document custodians  for us. Our ownership rights to the mortgage loans that we own or that back our PCs and REMICs and Other Structured  Securities  could be challenged if a seller/servicer intentionally or negligently pledges or sells the loans that we purchased or  fails to obtain a release of prior liens on the loans that we  purchased, which could result in financial losses to us. When a  seller/servicer or one of its affiliates acts as a document  custodian for us, the risk that our ownership interest in the loans may be adversely affected is increased, particularly in  the event the seller/servicer were to become insolvent  We seek to mitigate these risks through legal and contractual  arrangements with these custodians that identify

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2907

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

our ownership interest, as well as by establishing qualifying standards for document custodians and requiring transfer of the documents to our possession or to an independent third party document custodian if we have concerns about the solvency or competency of the document custodian.

### Derivative Counterparties

We execute OTC derivatives and exchange traded derivatives and are exposed to institutional credit risk with respect to both types of derivative transactions. We are an active user of exchange traded derivatives, such as Treasury and Eurodollar futures, and are required to post initial and maintenance margin with our clearing firm in connection with such transactions. The posting of this margin exposes us to institutional credit risk in the event that our clearing firm or the exchange's clearinghouse fail to meet their obligations. However, the use of exchange traded derivatives lessens our institutional credit risk exposure to individual counterparties because a central counterparty is substituted for individual counterparties, and changes in the value of open exchange traded contracts are settled daily via payments made through the financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk to individual counterparties because transactions are executed and settled directly between us and each counterparty, exposing us to potential losses if a counterparty fails to meet its contractual obligations. When our net position with a counterparty in OTC derivatives subject to a master netting agreement has a market value above zero (*i.e.*, it is an asset reported as derivative assets, net on our consolidated balance sheets), the counterparty is obligated to deliver collateral in the form of cash, securities, or a combination of both, in an amount equal to that market value (less a small unsecured "threshold" amount) as necessary to satisfy its net obligation to us under the master agreement.

The Dodd Frank Act will require central clearing and trading on exchanges or comparable trading facilities of many types of derivatives. Pursuant to the Dodd Frank Act, the U.S. Commodity Futures Trading Commission, or CFTC, is in the process of determining the types of derivatives that must be subject to this requirement. See "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments — Dodd Frank Act*" for more information. We continue to work with the Chicago Mercantile Exchange and others to implement a central clearing platform for interest rate derivatives. We will be exposed to institutional credit risk with respect to the Chicago Mercantile Exchange or other comparable exchanges or trading facilities in the future, to the extent we use them to clear and trade derivatives, and to the members of such clearing organizations that execute and submit our transactions for clearing.

We seek to manage our exposure to institutional credit risk related to our OTC derivative counterparties using several tools, including:

- review of external rating analyses;

- strict standards for approving new derivative counterparties;

- ongoing monitoring and internal analysis of our positions with, and credit rating of, each counterparty;

- managing diversification mix among counterparties;

- master netting agreements and collateral agreements; and

- stress testing to evaluate potential exposure under possible adverse market scenarios.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

All of our OTC derivative counterparties are major financial institutions and are experienced participants in the OTC derivatives market. However, a large number of OTC derivative counterparties had credit ratings of A+ or below as of February 27, 2012. We require counterparties with credit ratings of A or below to post collateral if our net exposure to them on derivative contracts exceeds $ million. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information.

The relative concentration of our derivative exposure among our primary derivative counterparties remains high. This concentration has increased significantly since 2008 due to industry consolidation and the failure of certain counterparties, and could further increase. The table below summarizes our exposure to our derivative counterparties, which represents the net positive fair value of derivative contracts, re ated accrued interest and collateral held by us from our counterparties, after netting by counterparty as applicable (*i.e.*, net amounts due to us under derivative contracts which are recorded as derivative assets). In addition, we have derivative liabilities where we post collateral to counterparties. Pursuant to certain collateral agreements we have with derivative counterparties, the amount of collateral that we are required to post is based on the credit rating of our long term senior unsecured debt securities from S&P or Moody's. The

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

lowering or withdrawal of our credit rating by S&P or Moody's may increase our obligation to post collateral, depending on the amount of the counterparty's exposure to Freddie Mac with respect to the derivative transactions  At December 3 , 20  , our collateral posted exceeded our collateral held. See "CONSOLIDATED BALANCE SHEETS ANALYSIS     Derivative Assets and Liabilities, Net" and "Table 31 Derivative Fair Values and Maturities" for a reconciliation of fair value to the amounts presented on our consolidated balance sheets as of December 31, 2011, which includes both cash collateral held and posted by us, net.

**Table 44    Derivative Counterparty Credit Exposure**

| | | As of December 31, 2011 | | | | |
|---|---|---|---|---|---|---|
| Rating(1) | Number of Counterparties(2) | Notional or Contractual Amount(3) | Total Exposure at Fair Value(4) | Exposure, Net of Collateral(5) | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold(6) |
| | | | (dollars in millions) | | | |
| AA | 5 | $ 73,277 | $    536 | $      19 | 5 0 | $10 m   on o  ess |
| A | 6 | 337,013 | 2,538 | 1 | 5 8 | $1 m   on o  ess |
| A | 5 | 208,416 | 12 | 51 | 6 2 | $1 m   on o  ess |
| A- | 2 | 89,284 | | | 5 5 | $1 m   on o  ess |
| S  o a (7 | 18 | 707,990 | 3,086 | 71 | 5 8 | |
| Fu u es and c ea nghouse-se ed de  va ves | | 43,831 | 8 | 8 | | |
| Comm  men s(8) | | 14,318 | 38 | 38 | | |
| Swap gua an ee de  va ves | | 3,621 | | | | |
| O he  de  va ves(9 | | 18,489 | 1 | 1 | | |
| To al de  va ves | | $788,249 | $   3,133 | $    118 | | |

| | | As of December 31, 2010 | | | | |
|---|---|---|---|---|---|---|
| Rating(1) | Number of Counterparties(2) | Notional or Contractual Amount(3) | Total Exposure at Fair Value(4) | Exposure, Net of Collateral(5) | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold(6) |
| | | | (dollars in millions) | | | |
| AA | 3 | $  53,975 | $ | $ | 6 8 | $10 m   on o  ess |
| AA | 4 | 270,694 | 1,668 | 29 | 6 4 | $10 m   on o  ess |
| A | 7 | 441,004 | 460 | 1 | 6 2 | $1 m   on o  ess |
| A | 3 | 177,277 | 16 | 2 | 5 2 | $1 m   on o  ess |
| S  o a (7 | 17 | 942,950 | 2,144 | 32 | 6 1 | |
| Fu u es and c ea nghouse-se ed de  va ves | | 215,983 | 6 | 6 | | |
| Comm  men s(8) | | 14,292 | 103 | 103 | | |
| Swap gua an ee de  va ves | | 3,614 | | | | |
| O he  de  va ves(9 | | 28,657 | 2 | 2 | | |
| To al de  va ves | | $1,205,496 | $   2,255 | $    143 | | |

(1)  We use he  owe  c  ed  a  ngs o manage co  a e a  equ  emen s In h s  ab e, he  a ng of he ega  e   y s sa ed   e   of  S&P eq  va e
(2)  Based on legal en   es Aff l a ed legal en   es a e  epo ed sepa a ely
(3)  No  ona  o  con ac ua  amoun s a e used o ca cu a e he pe  od c se  lemen  amoun s o be  ece ved o pa d and gene  ally do no  ep esen ac ua  aoun s be  exchanged
(4)  Fo  eac  co  e pa y,  s a  o   c  des de  va ves w  a pos  ve fa  va e ( eco ded as he va ue of he asse s,  e ), nc ud ng he  e a ed acc  ued  n e es   ece vab e/payab e, when app cab e Fo  co  e pa  es c  ded   es b o a , pos  ons a e shown ne d a he coun e pa y  eve  nc ud ng acc ued  n e es   ece vab e/payab e and ade/se  e fees
(5)  Ca cu a ed as To a  Exposu e a  Fa  Va ue  ess cash co  a e a  he d as de e    ned a  he coun e pa y eve  Inc udes a  coun s  e a ed o ou  pos ng of cash co a e al  excess of o  de  va ve ab  y as de e  m ned a  he coun e pa y eve  Fo  de  va ves se  ed h ough an exchange o  c ea nghouse, excludes cons de a  on of  ma n enance ma g n pos ed by ou  co  e pa y
(6)  Coun e pa  es a e equ  ed o pos  co  a e a  when  he  expos  e exceeds ag eed-upon colla e al pos ng  h esholds  These  h esholds a e  yp cally based o   e  coun e pa y's c ed   a ng and a e  nd v dually nego a ed
(7)  Cons s s of OTC de  va ve ag eemen s fo   n e es   a e swaps, op on-based de  va ves (exc ud ng can w  en op ons), fo e g  c  e cy swaps, a d p  c ased  n e es - a e caps
(8)  Comm  men s  nclude (a) ou  comm  men s o pu chase and sell  nves men s  n secu  es  (b) ou  comm  men s o pu chase mo  gage loans and (c) ou  comm  men s o p  c ase a dex  g s o se de  sec es of o  conso da ed  us s
(9)  Cons s s p ma ly of  ce a n w  en op ons and ce a in de  va ves  W  en op ons do no p esen  coun e pa y c ed   expos  e, beca  se we  ece ve a o e-  me up-f on  p em um  n exchange fo  g v ng he ho de   he  gh o exec  e an  con ac  unde  spec f ed e  s, wh ch gene a y p us us n a ab  y pos on

Over time, our exposure to individual counterparties for OTC  interest rate swaps, option based derivatives, foreign currency swaps, and purchased interest rate caps varies depending on  changes in fair values, which are affected by changes in  period end interest rates, the implied volatility of interest rates, foreign currency exchange rates, and the amount of  derivatives held  If all of our counterparties for these  derivatives defaulted simultaneously on December 31, 2011,  the combined amount of our uncollateralized and  overcollateralized exposure to these counterparties, or our maximum loss for accounting purposes after applying netting  agreements and collateral, would have been approximately

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-2909

Table of Contents

$71 million. Our similar exposure as of December 31, 2010 was $32 million  Three counterparties each accounted  for greater than  0% and collectively accounted for 97% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at December 31, 2011  These counterparties were HSBC Bank USA, Royal Bank of Scotland, and  UBS AG., all of which were rated "A" or above by S&P as of February 27, 2012.

Approximately 99% of our counterparty credit exposure for OTC  interest rate swaps, option based derivatives, foreign currency  swaps, and purchased interest rate caps was collateralized at  December 3 , 20    (excluding amounts related to our posting  of cash collateral in excess of our derivative liability as determined at the counterparty level)  The remaining exposure  was primarily due to exposure amounts below the applicable counterparty collateral posting threshold, as well as market  movements during the time period between when a derivative was  marked to fair value and the date we received the related  collateral  In some instances, these market movements result in  us having provided collateral that has fair value in excess of our obligation, which represents our overcollateralization  exposure  Collateral is typically transferred within one business day based on the values of the related derivatives

In the event a derivative counterparty defaults, our economic  loss may be higher than the uncollateralized exposure of our  derivatives if we are not able to replace the defaulted  derivatives in a timely and cost effective fashion  We could also  incur economic loss if the collateral held by us cannot be liquidated at prices that are sufficient to recover the amount  of such exposure  We monitor the risk that our uncollateralized exposure to each of our OTC counterparties for interest rate  swaps, option based derivatives, foreign currency swaps, and  purchased interest rate caps will increase under certain adverse  market conditions by performing daily market stress tests. These  tests, which involve significant management judgment, evaluate the potential additional uncollateralized exposure we would have  to each of these derivative counterparties on OTC derivatives contracts assuming certain changes in the level and implied  volatility of interest rates and certain changes in foreign  currency exchange rates over a brief time period  Our actual  exposure could vary significantly from amounts forecasted by  these tests

The total exposure on our OTC forward purchase and sale  commitments, which are treated as derivatives for accounting  purposes, was $38 million and $103 million at  December 31, 2011 and December 31, 2010, respectively  These commitments are uncollateralized  Because the typical maturity of our forward purchase and sale commitments is less  than 60 days and they are generally settled through a  clearinghouse, we do not require master netting and collateral  agreements for the counterparties of these commitments  However, we monitor the credit fundamentals of the counterparties to our  forward purchase and sale commitments on an ongoing basis in an  effort to ensure that they continue to meet our internal risk  management standards.

### Selected European Sovereign and Non Sovereign Exposures

The sovereign debt of Spain, Italy, Ireland, Portugal, and  Greece (which we refer to herein as "troubled European  countries") and the credit status of financial institutions  with significant exposure to the troubled European countries has  been adversely impacted due to weaknesses in the economic and fiscal situations of those countries. Moody's and  Standard & Poor's recently downgraded a number of European countries, including Italy, Spain, and Portugal. We are monitoring our  exposures to these countries and institutions

As of December 31, 2011, we did not hold any debt issued by  the governments of these troubled European countries and did not  hold any financial instruments entered into with sovereign  governments in those countries  As of that date, we also did not  hold any debt issued by corporations or financial institutions  domiciled in these troubled European countries and did not hold  any other financial instruments entered into with corporations or financial institutions domiciled in those countries  For  purposes of this discussion, we consider an entity to be domiciled in a country if its parent entity is headquartered in  that country.

Our derivative portfolio and cash and other investments  portfolio counterparties include a number of major European and  non European financial institutions. Many of these institutions  operate in Europe, and we believe that all of these financial  institutions have direct or indirect exposure to these troubled European countries  For many of these institutions, their direct  and indirect exposures to these troubled European countries change on a daily basis  We monitor our major counterparties'  exposures to troubled European countries, and adjust our exposures and risk limits to individual counterparties accordingly  Our exposures to derivative portfolio and cash and other investments portfolio counterparties are described in "Derivative  Counterparties," "Cash and Other Investments  Counterparties" and "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS."

In recent months, we have taken a number of actions designed  to reduce our exposures to certain derivative portfolio and cash  and other investments portfolio counterparties due to their  exposure to troubled European countries, including substantially  reducing our derivative exposure limits, our limits on the  amount of unsecured overnight deposits, and our

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2910

Table of Contents

limits for asset backed commercial paper  For certain repurchase  counterparties, we have reduced the credit limit and restricted  the term of such transactions to overnight  We have also ceased investing in prime money funds that could hold substantial  amounts of the non U S  sovereign debt

It is possible that continued adverse developments in Europe  could significantly impact our counterparties that have direct  or indirect exposure to troubled European countries  In turn,  this could adversely affect their ability to meet their  obligations to us  For more information, see "RISK FACTORS    Competitive and Market Risks    *We depend on our institutional counterparties to provide services that are critical to our business, and our results of operations or financial condition may be adversely affected if  one or more of our institutional counterparties do not meet their obligations to us.*"

## Mortgage Credit Risk

We are exposed to mortgage credit risk principally in our single family credit guarantee and multifamily mortgage  portfolios because we either hold the mortgage assets or have  guaranteed mortgages in connection with the issuance of a  Freddie Mac mortgage related security, or other guarantee commitment  We are also exposed to mortgage credit risk related to our investments in non Freddie Mac mortgage related  securities  For information about our holdings of these  securities, see "CONSOLIDATED BALANCE SHEETS  ANALYSIS    Investments in Securities  *Mortgage Related Securities.*"

Single family mortgage credit risk is primarily influenced by  the credit profile of the borrower of the mortgage (*e.g.*, credit score, credit history, and monthly income relative to debt payments), documentation level, the number of borrowers,  the features of the mortgage itself, the purpose of the mortgage, occupancy type, property type, the LTV ratio, and local and regional economic conditions, including home prices  and unemployment rates  Multifamily mortgage credit risk is  primarily influenced by multifamily market conditions (*e.g.*, rental and vacancy rates), the quality of the property's management, the features of the mortgage itself,  the LTV ratio, the property's operating cash flow, and the local and regional economic conditions

All mortgages that we purchase or guarantee have an inherent  risk of default. To manage our mortgage credit risk in our  single family credit guarantee and multifamily mortgage  portfolios, we focus on three key areas: underwriting standards  and quality control process; portfolio diversification; and portfolio management activities, including loss mitigation and  use of credit enhancements

### Single Family Mortgage Credit Risk

Through our delegated underwriting process, single family  mortgage loans and the borrowers' ability to repay the loans  are evaluated using several critical risk characteristics,  including, but not limited to, the borrower's credit score  and credit history, the borrower's monthly income relative to debt payments, the original LTV ratio, the type of mortgage product and the occupancy type of the loan. As part of our  quality control process, after our purchase of the loans, we  review the underwriting documentation for a sample of loans for  compliance with our contractual standards. The most common underwriting deficiencies found in our reviews in 2011  are related to insufficient income and inadequate or missing documentation to support borrower qualification  The next most  common deficiency is inaccurate data entered into Loan  Prospector, our automated underwriting system  We are continuing to perform quality control sampling for loans we purchased in  2011 and have not yet compiled our results

We meet with our larger seller/servicers with deficiencies from  our performing loan sampling to help ensure they make  appropriate changes to their underwriting process  In addition,  for all of our largest seller/servicers, we actively manage the  current quality of loan originations by providing monthly written and oral communications regarding loan defect rates and  the drivers of those defects as identified in our performing loan quality control sampling reviews  If necessary, we work  with seller/servicers to develop an appropriate plan of  corrective action  For loans with identified underwriting  deficiencies, we may require immediate repurchase or allow  performing loans to remain in our portfolio subject to our continued right to issue a repurchase request to the  seller/servicers, depending on the facts and circumstances. Our  right to request repurchase by seller/servicers is intended to  protect us against deficiencies in underwriting by our  seller/servicers  While this protection is intended to reduce our mortgage credit risk, it increases our institutional risk  exposure to seller/servicers  See "*Institutional Credit Risk Single Family Mortgage Seller/Servicers*" for further information on repurchase requests  Our contracts with some seller/servicers give us the right to levy financial penalties when mortgage loans delivered  to us fail to meet our aggregate loan quality metrics  See "BUSINESS    Our Business" and "BUSINESS    Our Business Segments    *Single Family Guarantee Segment    Underwriting Requirements and Quality Control Standards*" for information about our charter requirements for single family  loan purchases, delegated underwriting, and our quality control monitoring. See "BUSINESS    Regulation and Supervision

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2911

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Federal Housing Finance Agency        *Affordable Housing Goals*" for a discussion of factors that may cause us to  purchase loans that do not meet our normal standards.

We were significantly adversely affected by deteriorating conditions in the single family housing and mortgage markets  during 2008 and 2009. During 2005 to 2007, financial  institutions substantially increased origination and  securitization of certain higher risk mortgage loans, such as subprime, option ARM, interest only and Alt A, and these loans comprised a much larger proportion of origination  and securitization issuance volumes during 2006 and 2007, and to  a lesser extent in 2005, as compared to prior or subsequent  years. During this time, we increased our participation in the  market for these products through our purchases of non agency  mortgage related securities and through our loan securitization and guarantee activities  Our expanded participation in these  products was driven by a combination of competing objectives and pressures, including meeting our affordable housing goals,  competition, the desire to maintain or increase market share,  and generating returns for investors. The mortgage market has  changed considerably since 2007  Financial institutions have  tightened their underwriting standards, which has significantly reduced the amount of subprime, option ARM, interest only, and Alt A loans being originated

Conditions in the mortgage market continued to remain  challenging during 2011  Most single family mortgage loans,  especially those originated from 2005 through 2008, have been  affected by the compounding pressures on household wealth caused  by significant declines in home values that began in 2006 and  the ongoing weak employment environment  Our serious delinquency  rates remained high in 2011 compared to historical levels, as  discussed in "Credit Performance        Delinquencies " The UPB of our single family non performing  loans remained at high levels during 2011

*Characteristics of the Single Family Credit Guarantee Portfolio*

The average UPB of loans in our single family credit guarantee  portfolio was approximately $151,000 and $150,000 at  December 31, 2011 and December 31, 2010, respectively  Our single family mortgage purchases and other guarantee  commitment activity in 2011 decreased by 17% to $320.8 billion, as compared to $386.4 billion in 2010.  Approximately 92% of the single family mortgages we purchased in 20    were fixed rate amortizing mortgages, based on UPB  Approximately 78% of the single family mortgages we purchased in 20    were refinance mortgages, including approximately 26% that  were relief refinance mortgages, based on UPB

The table below provides additional characteristics of  single family mortgage loans purchased during 2011, 2010, and  2009, and of our credit guarantee portfolio at December 3 , 2011, 2010, and 2009.

TREASURY-2912

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 45     Characteristics of the Single Family Credit Guarantee Portfolio(1)**

| | Percent of Purchases During The Year ended December 31, | | | Portfolio(2) at December 31, | | |
|---|---|---|---|---|---|---|
| | 2011 | 2010 | 2009 | 2011 | 2010 | 2009 |
| **Original LTV Ratio Range(3)(4)** | | | | | | |
| 60% and below | 30% | 31% | 3 % | 23% | 23% | 23% |
| Above 60% to 70% | 17 | 17 | 18 | 16 | 16 | 16 |
| Above 70% to 80% | | 5 | 1 | 2 | 3 | 5 |
| Above 80% to 90% | 5 | | 5 | 9 | 9 | 8 |
| Above 90% to 100% | | 3 | 2 | 8 | 8 | 8 |
| Above 100% | <1 | <1 | <1 | 2 | 1 | — |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average original LTV ratio | 67% | 67% | 66% | 72% | 71% | 71% |
| **Estimated Current LTV Ratio Range(5)** | | | | | | |
| 60% and below | | | | 25% | 27% | 28% |
| Above 60% to 70% | | | | 12 | 12 | 12 |
| Above 70% to 80% | | | | 18 | 17 | 16 |
| Above 80% to 90% | | | | 15 | 16 | 16 |
| Above 90% to 100% | | | | 10 | 10 | 10 |
| Above 100% to 110% | | | | 6 | 6 | 6 |
| Above 110% to 120% | | | | | | |
| Above 120% | | | | 10 | 8 | 8 |
| Total | | | | 100% | 100% | 100% |
| Weighted average estimated current LTV ratio | | | | | | |
| Relief refinance mortgages(6) | | | | 79% | 78% | 85% |
| All other mortgages | | | | 80% | 78% | 77% |
| Total mortgages | | | | 80% | 78% | 77% |
| **Credit Score(3)(7)** | | | | | | |
| 740 and above | 7 % | 73% | 73% | 55% | 53% | 50% |
| 700 to 739 | 17 | 17 | 18 | 21 | 21 | 22 |
| 660 to 699 | 7 | 7 | 7 | 1 | 15 | 16 |
| 620 to 659 | 2 | 2 | 2 | 7 | 7 | 8 |
| Less than 620 | <1 | 1 | <1 | 3 | 3 | 3 |
| Not available | <1 | <1 | <1 | <1 | 1 | 1 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average credit score | | | | | | |
| Relief refinance mortgages(6) | | | | 7 | 7 5 | 738 |
| All other mortgages | | | | 73 | 732 | 729 |
| Total mortgages | | | | 735 | 733 | 730 |
| **Loan Purpose** | | | | | | |
| Purchase | 22% | 20% | 20% | 30% | 31% | 35% |
| Cash-out refinance | 18 | 21 | 26 | 27 | 29 | 30 |
| Other refinance(8) | 60 | 9 | 5 | 3 | 0 | 35 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Property Type** | | | | | | |
| Detached townhome(9) | 9 % | 9 % | 9 % | 92% | 92% | 92% |
| Condo Co-op | 6 | 6 | 6 | 8 | 8 | 8 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Occupancy Type** | | | | | | |
| Primary residence | 92% | 93% | 93% | 91% | 91% | 91% |
| Second vacation home | | | 5 | 5 | 5 | 5 |
| Investment | | 3 | 2 | | | |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

(1) Purchases are based on a weighted average based on the UPB of the single-family credit guarantee portfolio. The Guarantee Transactions when ending balances of $2 billion at December 31, 2011, 2010, and 2009, are excluded for portfolio balance data since these securities are backed by non-Freddie Mac issued securities for which the own characteristics data was no available.

(2) Includes loans acquired under our relief refinance initiative, which began in 2009.

(3) Purchases columns exclude mortgage loans acquired under our relief refinance initiative. See "Table 52 — Single-Family Refinance Loan Volume" for further information on the LTV ratios of these loans.

(4) Original LTV ratios are calculated as the amount of the mortgage we guarantee, including the credit-enhanced portion, divided by the lesser of the appraised value or the purchase price for the property at the time of mortgage origination or the mortgage borrower's purchase price. Second liens not owed to us are generally excluded from the LTV calculation because we generally do not receive data about them. The existence of a second lien mortgage reduces the borrower's equity in a home and, therefore, can increase the risk of default.

(5) Current LTV ratios are estimates, which are updated on a monthly basis. Current value estimates are derived by adjusting the original value of the property origination based on changes in the market value of homes in the same geographical area since origination. Estimated current LTV ratio changes are not applicable to properties acquired via a deed exchange, deed in lieu or deed day financing by third parties.

(6) Relief refinance mortgages comprised approximately 11%, 7%, and 2% of our single-family credit guarantee portfolio by UPB as of December 31, 2011, 2010, and 2009, respectively.

(7) Credit score data is based on FICO scores. Although we obtain an updated credit information on once or can borrowers after the origination of a mortgage, such as those borrowers seeking a modification, we do not obtain update credit score of the borrower of the origination of a mortgage.

(8) Other refinance transactions include (a) refinance mortgages with a "no-cash-out" to the borrower and (b) refinance mortgages for which the delivery data provided was not sufficient for us to determine whether or not the mortgage was a no-cash-out refinance transaction.

(9) Includes manufactured housing and others when reported in development communities. The UPB of manufactured housing mortgage loans purchased during 2011, 2010, and 2009, was $376 million, $403 million, and $607 million, respectively.

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   FREDDIE HOME LOAN MORTGAGE CORP, 10 K, March 09, 2012          TREASURY-2913          Powered by Morningstar® Document Research℠

Table of Contents

Loan to Value Rat o

An important safeguard against credit losses on mortgage loans in our single family credit guarantee portfolio is provided by the borrowers' equity in the underlying properties  As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or sell the property for an amount at or above the balance of the outstanding mortgage loan  There is an increase in borrower default risk as LTV ratios increase, particularly for loans with LTV ratios above 80%. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and, based upon historical information, is more likely to default than other borrowers due to limits in the ability to sell or refinance  The UPB of mortgages in our single family credit guarantee portfolio with estimated current LTV ratios greater than 100% was 20% and 18% as of December 31, 2011 and December 31, 2010, respectively  The serious delinquency rate for single family loans with estimated current LTV ratios greater than 100% was 12.8% and 14.9% as of December 31, 2011 and December 3 , 20 0, respectively  Due to declines in home prices since 2006, we estimate that as of December 31, 2011, approximately 49% of the loans originated in 2005 through 2008 that remained in our single family credit guarantee portfolio as of that date had current LTV ratios greater than 100%  In recent years, loans with current LTV ratios greater than 100% contributed disproportionately to our credit losses  As of December 31, 2011 and December 31, 2010, for the loans in our single family credit guarantee portfolio with greater than 80% estimated current LTV ratios, the borrowers had a weighted average credit score at origination of 724 and 72 , respectively

Credit Score

Credit scores are a useful measure for assessing the credit quality of a borrower  Credit scores are numbers reported by credit repositories, based on statistical models, that summarize an individual's credit record  FICO scores are the most commonly used credit scores today  FICO scores are ranked on a scale of approximately 300 to 850 points  Statistically, borrowers with higher credit scores are more likely to repay or have the ability to refinance than those with lower scores  We only obtain credit scores of borrowers at the time of origination and do not typically receive updated data on borrower credit scores after origination  Credit scores presented within this Annual Report on Form  0 K are at the time of origination and may not be indicative of borrowers' creditworthiness at December 31, 2011

Loan Purpose

Mortgage loan purpose indicates how the borrower intends to use the funds from a mortgage loan. In a purchase transaction, the funds are used to acquire a property  In a cash out refinance transaction, in addition to paying off existing mortgage liens, the borrower obtains additional funds that may be used for other purposes, including paying off subordinate mortgage liens and providing unrestricted cash proceeds to the borrower  In other refinance transactions, the funds are used to pay off existing mortgage liens and may be used in limited amounts for certain specified purposes; such refinances are generally referred to as "no cash out" or "rate and term" refinances  The percentage of home purchase loans in our loan acquisition volume remained at low levels during 20    Historically low interest rates contributed to high refinance activity in 2011, though it declined from 2010 levels  Cash out refinancings generally have had a higher risk of default than mortgages originated in no cash out, or rate and term, refinance transactions.

Property Type

Townhomes and detached single family houses are the predominant type of single family property  Condominiums are a property type that historically experiences greater volatility in home prices than detached single family residences  Condominium loans in our single family credit guarantee portfolio have a higher percentage of first time homebuyers and homebuyers whose purpose is for investment or for a second home  In practice, investors and second home borrowers often seek to finance the condominium purchase with loans having a higher original LTV ratio than other borrowers  Approximately 36% of the condominium loans within our single family credit guarantee portfolio are in California, Florida, and Illinois, which are among the states that have been most adversely affected by the economic recession and housing downturn. Condominium loans comprised 15% of our credit losses during both years ended December 31, 2011 and 2010, while these loans comprised 8% of our single family credit guarantee portfolio at both dates

Occupancy Type

Borrowers may purchase a home as a primary residence, second/vacation home or investment property that is typically a rental property  Mortgage loans on properties occupied by the borrower as a primary residence tend to have a lower credit risk than mortgages on investment properties or secondary residences

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2914

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Geographic Concentration

Local economic conditions can affect borrowers' ability to repay loans and the value of the collateral underlying the loans  Because our business involves purchasing mortgages from every geographic region in the U S , we maintain a geographically diverse single family credit guarantee portfolio  While our single family credit guarantee portfolio's geographic distribution was relatively stable in recent years  and remains broadly diversified across these regions, we were negatively impacted by overall home price declines in each region since 2006  Our credit losses continue to be greatest in those states that experienced significant decreases in property values since 2006, such as California, Florida, Nevada and Arizona. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" for more information concerning the distribution of our single family credit guarantee portfolio by geographic region

Attribute Combinations

Certain combinations of loan characteristics often can indicate a higher degree of credit risk  For example, single family mortgages with both high LTV ratios and borrowers who have lower credit scores typically experience higher rates of serious delinquency and default  We estimate that there were $11.1 billion and $11.8 billion at December 31, 2011 and December 31, 2010, respectively, of loans in our single family credit guarantee portfolio with both original LTV ratios greater than 90% and FICO scores less than 620 at the time of loan origination  Certain mortgage product types, including interest only or option ARM loans, that have additional higher risk characteristics, such as lower credit scores or higher LTV ratios, will also have a higher risk of default than those same products without these characteristics  The presence of a second lien mortgage can also increase the risk that a borrower will default  A second lien mortgage reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages  As of December 31, 2011 and December 31, 2010, approximately 15% and 14% of loans in our single family credit guarantee portfolio had second lien financing by third parties at the time of origination of the first mortgage, and we estimate that these loans comprised 17% and 19%, respectively, of our seriously delinquent loans, based on UPB  However, borrowers are free to obtain second lien financing after origination and we are not entitled to receive notification when a borrower does so  Therefore, it is likely that additional borrowers have post origination second lien mortgages

*Single Family Mortgage Product Types*

Product mix affects the credit risk profile of our total mortgage portfolio  The primary mortgage products in our single family credit guarantee portfolio are first lien, fixed rate mortgage loans  In general, 15 year amortizing fixed rate mortgages exhibit the lowest default rate among the types of mortgage loans we securitize and purchase, due to the accelerated rate of principal amortization on these mortgages and the credit profiles of borrowers who seek and qualify for them  In a rising interest rate environment, balloon/reset and ARM borrowers typically default at a higher rate than fixed rate borrowers  However, during recent years, when interest rates have generally declined, our delinquency and default rates on adjustable rate and balloon/reset mortgage loans on a relative basis have been as high as, or higher than, fixed rate loans because these borrowers are also susceptible to declining housing and economic conditions and/or had other higher risk characteristics  Interest only and option ARM loans are higher risk mortgage products based on the features of these types of loans  Interest only loans feature an increase in the monthly payment at the date of first reset ( *i.e.*, when the monthly payment begins to include principal), while option ARMs feature initial periods during which the borrower has various options as to the amount of each monthly payment, until a specified date, when the terms are recast  See "*Other Categories of Single Family Mortgage Loans*" below for additional information on higher risk mortgages in our single family credit guarantee portfolio

In recent years, including 2011, we experienced a high volume of loan modifications, as troubled borrowers were able to take advantage of the various programs that we offered  The majority of our loan modifications result in new terms that include fixed interest rates after modification  However, our HAMP loan modifications result in an initial interest rate that subsequently adjusts to a new rate that is fixed for the remaining life of the loan  We have classified these loans as fixed rate products for presentation within this Form  0 K and elsewhere in our reporting even though they have a rate adjustment provision because the change in rate is determined at the time of modification rather than at a future date

The following paragraphs provide information on the interest only, option ARM, adjustable rate, and conforming jumbo loans in our single family credit guarantee portfolio  Interest only and option ARM loans have experienced significantly higher serious delinquency rates than fixed rate amortizing mortgage products

*Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar ® Document Research℠

TREASURY-2915

Table of Contents

Interest Only Loans

Interest only loans have an initial period during which the borrower pays only interest, and at a specified date the monthly payment increases to begin reflecting repayment of principal  Interest only loans represented approximately 4% and 5% of the UPB of our single family credit guarantee portfolio at December 31, 2011 and December 31, 2010, respectively  We purchased a limited number of interest only loans after 2008 and fully discontinued purchasing such loans on September 1, 2010

The table below presents information for single family mortgage loans in our single family credit guarantee portfolio, excluding Other Guarantee Transactions, at December 31, 2011 that contain interest only payment terms  The reported balances in the table below are aggregated by interest only loan product type and categorized by the year in which the loan begins to require payments of principal. At December 31, 2011, approximately      % of these interest only loans are scheduled to begin requiring payments of principal in 2012 or 2013. The timing of the actual change in payment terms may differ from those presented due to a number of factors, including refinancing

**Table 46      Single Family Loans Scheduled Payment Change to Include Principal by Year at December 31, 2011[1]**

|  | 2011 and Prior | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 and Beyond | Total |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  | (in millions) |  |  |  |  |
| ARM/ n e es -on y | $ 13,002 | $4,725 | $3,498 | $ 1,673 | $ 4,207 | $ 7,400 | $ 19,526 | $ 54,031 |
| F xed/ n e es -only |  |  |  | 15 | 377 | 2,229 | 15,321 | 17,942 |
| o a | $ 13,002 | $4,725 | $3,498 | $1,688 | $4,584 | $9,629 | $34,847 | $71,973 |

(1) Based on he UPBs of  o gage p oduc s ha con a n n e es -only p ov s ons and ha beg n amo   za on of p nc pa  n each of he yea s shown  These  epo ed balances a e based on  he UPB of he unde  y ng mo  gage oans and do no  ef ec  he pub c-p va  ab e secu  y ba ances we use o  epo  he compos  on of ou PCs a d REMICs a d Ot e S  uc u ed Secu  es  Exc udes (a)  o gage oans    de y gO e G aa ee T as  ac o sa d (b) a  ymo  gage oans wh ch comple ed a mod f ca  on befo e he end of  he  espec  ve pe  od and fo  wh ch  he e es no  z ng loan p oduc

The table below presents the trend of serious delinquency information for single family interest only mortgage loans in our single family credit guarantee portfolio, excluding Other Guarantee Transactions, categorized by the year in which the loan begins to require payments of principal  Loans where the year of payment change is 2011 or prior have already changed to  require payments of principal as of December 31, 2011; loans where the year of payment change is 20 2 or later still  require only payments of interest as of December 31, 2011 and will not require payments of principal until a future period.

**Table 47      Serious Delinquency Rates by Year of Payment Change to Include Principal[1]**

|  | As of December 31, | | |
|---|---|---|---|
| Year of payment change: | 2011 | 2010 | 2009 |
| 2009 and p  o | 7 19% | 8 66% | 10 34% |
| 2010 | 10 38 | 12 73 | 10 68 |
| 2011 | 18 96 | 19 65 | 16 95 |
| 2012 and af e | 18 63 | 19 11 | 18 49 |

(1) Based on oans  ema n ng  n he s ngle-fam ly gua an ee po  fo  o as of Decembe  31, 2011, 2010, and 2009,  a he  han a   oans gua an eed by us and o  g na ed n  he  espec  ve yea   Excludes mo  gage oans wh ch comple ed a mod f ca on befo e he end of  he  espec ve pe  od and fo  wh ch  he e s no  he loan we e changed o an amo   z ng loan p oduc

As shown in the table above, the serious delinquency rates of interest only loans that experienced a change in payment to include principal during the last three years were not significantly impacted in the year the loan began the amortization of principal  We believe that the higher serious delinquency rates for interest only loans with payment changes  in 20 0 and after (compared to those interest only loans with payment changes in 2009 and prior) reflect that those borrowers have been more negatively impacted by the ongoing adverse economic conditions, including declines in home prices, than interest only loans that experienced payment changes in earlier years.

In recent years, interest only loans experienced high serious delinquency rates well before reaching the dates at which the loans begin to require amortization of principal  We believe that interest only loan performance during the last three years  was more adversely affected by changes in employment, home prices, and other regional and macro economic conditions, than  the increase in the borrower's monthly payment (when the loans begin to require payments of principal). In addition,  a number of these loans were categorized as Alt A, due to reduced documentation standards at the time of loan origination  The overall serious delinquency rate for all interest only loans in our single family credit guarantee portfolio was 17 6% as of December 31, 2011  Approximately 82% of all interest only loans in our single family credit guarantee portfolio had not yet begun amortization of principal  and 69% of all interest only loans in our single family credit guarantee portfolio had current LTV ratios greater than 100% as of December 31, 2011. Since a substantial portion

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

of these loans were originated in 2005 through 2008 and are located in geographical areas that have been most impacted by declines in home prices since 2006, we believe that the serious delinquency rate for interest only loans will remain high in 2012.

Option ARM Loans

Most option ARM loans have initial periods during which the borrower has various options as to the amount of each monthly payment, until a specified date, when the terms are recast At both December 31, 2011 and December 31, 2010, option ARM loans represented less than 1% of the UPB of our single family credit guarantee portfolio Included in this exposure was $7.3 billion and $8.4 billion of option ARM securities underlying certain of our Other Guarantee Transactions at December 31, 2011 and December 31, 20 0, respectively While we have not categorized these option ARM securities as either subprime or Alt A securities for presentation within this Form 0 K and elsewhere in our reporting, they could exhibit similar credit performance to collateral identified as subprime or Alt A We have not purchased option ARM loans in our single family credit guarantee portfolio since 2007 For information on our exposure to option ARM loans through our holdings of non agency mortgage related securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities."

Adjustable Rate Mortgage Loans

The table below presents information for single family mortgage loans in our single family credit guarantee portfolio, excluding Other Guarantee Transactions, at December 31, 2011 that contain adjustable payment terms The reported balances in the table below are aggregated by product type and categorized by year of the next scheduled contractual reset date At December 31, 2011, approximately 59% of these loans have interest rates that are scheduled to reset in 2012 or 2013 The timing of the actual reset dates may differ from those presented due to a number of factors, including prepayments or exercising of provisions within the terms of the mortgage (certain of which could delay or accelerate the timing of the reset date)

**Table 48    Single Family Scheduled Adjustable Rate Resets by Year at December 31, 2011[1]**

|  | 2012 | 2013 | 2014 | 2015 (in millions) | 2016 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| ARMs amo  z ng | $ 29,540 | $ 2,557 | $ 2,103 | $ 8,329 | $14,802 | $12,838 | $ 70,169 |
| ARMs/ n e es -on y[2] | 33,650 | 7,825 | 3,611 | 2,805 | 2,531 | 3,609 | 54,031 |
| Balloon ese s | 384 | 62 | 11 | 9 | <1 | 2 | 468 |
| o a | $63,574 | $10,444 | $5,725 | $11,143 | $17,333 | $ 16,449 | $124,668 |

(1) Based on he UPBs of  o gage p oduc s ha con a n adjus ab e- a e n e es p ov sons and a e schedu ed o ese du ng he pe ods spec f ed above These
    epo ed balances a e based on he UPB of he unde y ng mo gage oans and do no  ef ec he pub c y-ava ab e secu y ba ances we use o  epo  he compos on
    of o  PCs a d REMICs a d Ot e S ucu ed Secu es Exc udes (a)  o gage oans unde y ng O he Gua an ee T ansac ons s nce a e ese  nfo ma on s no
    ava ab e o s fo  ese oans and (b) any amo  z ng ARM loans wh ch compe ed f ca on befo e he end of he  espec ve pe od and fo  wh ch he e ms o
    he oan we e changed  o a f xed- a e oan p oduc
(2) Ref c s he UPB of n e es -on y oans ha  ese  n each of he yea s shown We  epo  oans n he n e es -on y ca ego y f he  o g nal e ms nclude n e es -only
    p ov s ons fo  a p e-de e m ned pe od of  me befo e he mon hly paymen  changes o  nclude amo  za on of p nc pal Includes $13 0 b ll on of loans ha  ave  e
    n e es -on y a o g na on ha have conve ed o nclude amo  za on of p nc pal as of December 31, 2011

The table below presents serious delinquency information for single family adjustable rate mortgage loans in our single family credit guarantee portfolio, excluding Other Guarantee Transactions, categorized by the year in which the loan first had an interest rate reset Loans where the year of first interest rate reset is 2011 or prior have already had one or more interest rate resets as of December 31, 2011; loans where the year of first interest rate reset is 20 2 or later have not yet had an interest rate reset as of December 3 , 2011 and will not have an interest rate reset until a future period

**Table 49    Serious Delinquency Rates by Year of First Rate Reset[1]**

|  | As of December 31, | | |
|---|---|---|---|
| Year of payment change: | 2011 | 2010 | 2009 |
| 2009 and p o | 3 48% | 3 70% | 4 45% |
| 2010 | 7 63 | 9 90 | 8 38 |
| 2011 | 17 50 | 18 01 | 17 31 |
| 2012 and af e | 10 16 | 13 24 | 14 62 |

(1) Based on loans ema n ng n he s ngle-fam ly c ed  gua an ee po  fo  o as of Decembe 31, 2011, 2010, and 2009, a he  a a  oa s g a a  eed by s a d
    o g na ed n he  espec ve yea  Excludes mo  gage loans wh ch comple ed a mod f ca on befo e he end of he  espec ve pe od and fo  wh ch he  e ms of he loan
    we e changed  o a f xed- a e oan p oduc

As shown in the table above, the trend in serious delinquency rates of adjustable rate loans that experienced an interest rate reset during the last three years has not been significantly impacted by the change in interest rate of the loan

146                                                        *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2917

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Except for interest only loans that began to amortize at the reset date, there were not significant increases to the borrowers' payments when these loans reached their first reset dates because market interest rates have generally declined in recent years  Interest only loans are a higher risk mortgage product, which feature an increase in the monthly payment at the date of first reset which is not solely related to the contractual interest rate (*i.e.*, when the monthly payment begins to include principal)  In recent years, ARM loans have experienced high serious delinquency rates we  before reaching dates at which the loans have reached their first rate reset  We believe that ARM loan performance during the last three years has been more adversely affected by changes in  employment, home prices, and other regional and macro economic  conditions, than by changes in the interest rates of the loans  See "RISK FACTORS     Competitive and Market Risks     *Changes in interest rates could negatively impact our results of operations, stockholders' equity (deficit) and fair value of net assets"* for additional information. Since a substantial portion of ARM loans were originated in 2005 through 2008 and are located in geographical areas that have been most impacted by declines in home prices since 2006, we believe that the serious delinquency rate for ARM loans will continue to remain high in 2012

Conforming Jumbo Loans

We purchased $27.7 billion and $23.9 billion of conforming jumbo loans during the years ended December 31, 2011 and 2010, respectively  The UPB of conforming jumbo loans in our single family credit guarantee portfolio as of December 31, 2011 and December 31, 2010 was $49.8 billion and $37.8 billion, respectively. The average size of these loans was approximately $545,000 and $548,000 at December 31, 2011 and December 31, 2010, respectively  See "BUSINESS     Regulation and Supervision     *Legislative and Regulatory Developments*" for further information on the conforming loan limits.

*Other Categories of Single Family Mortgage Loans*

While we have classified certain loans as subprime or Alt A for purposes of the discussion below and elsewhere in this Form 10 K, there is no universally accepted definition of subprime or Alt A, and our classification of such loans may differ from those used by other companies  For example, some financial institutions may use FICO scores to delineate certain residential mortgages as subprime  In addition, we do not rely primarily on these loan classifications to evaluate the credit risk exposure relating to such loans in our single family credit guarantee portfolio  For a definition of the subprime and Alt A single family loans and securities in this Form 10 K, see "GLOSSARY "

Subprime Loans

Participants in the mortgage market may characterize single family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime  While we have not historically characterized the loans in our single family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see "*Higher Risk Loans in the Single Family Credit Guarantee Portfolio*" and "Table 57     Single Family Credit Guarantee Portfolio by Attribute Combinations" for further information)  In addition, we estimate that approximately $2.3 billion and $2.5 billion of security collateral underlying our Other Guarantee Transactions at December 31, 2011 and December 31, 2010, respectively, were identified as subprime based on information provided to us when we entered into these transactions

We also categorize our investments in non agency mortgage related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions  At December 31, 2011 and December 31, 2010, we held $49 0 billion and $54.2 billion, respectively, in UPB of non agency mortgage related securities backed by subprime loans  These securities were structured to provide credit enhancements, and 7% and  0% of these securities were investment grade at December 31, 2011 and December 31, 2010, respectively  The credit performance of loans underlying these securities deteriorated significantly beginning in 2008  For more information on our exposure to subprime mortgage loans through our investments in non agency mortgage related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS     Investments in Securities "

Alt A Loans

Although there is no universally accepted definition of Alt A, many mortgage market participants classify single family loans with credit characteristics that range between their prime and subprime categories as Alt A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. The UPB of Alt A loans in our single family credit guarantee portfolio declined to $94.3 billion as of December 31, 2011 from $115.5 billion as of December 31, 2010. The UPB of our Alt A loans declined in 2011 primarily due to refinancing into other mortgage products, foreclosure transfers, and other liquidation events. As of December 31, 2011, for Alt A loans in our single

Source   D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-2918              Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

family credit guarantee portfolio, the average FICO score at origination was 718 Although Alt A mortgage loans comprised approximately 5% of our single family credit guarantee portfolio as of December 3 , 20   , these loans represented approximately 28% of our credit losses during 2011.

During the first quarter of 2011, we identified approximately $0.6 billion in UPB of single family loans underlying certain Other Guarantee Transactions that had been previously reported in both the Alt A and subprime categories. Commencing March 31, 2011, we no longer repo t these loans as Alt A (but continue to report them as subprime) and we revised the prior periods to conform to the current period presentation

We did not purchase any new single family Alt A mortgage loans in our single family credit guarantee portfolio during 2011 Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre existing mortgage (including Alt A loans) was originated under less than full documentation standards. However, in the event we purchase a refinance mortgage in one of these programs and the original loan had been previously identified as Alt A, such refinance loan may no longer be categorized or reported as an Alt A mortgage in this Form  0 K and our other financial reports because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt A loan As a result, our reported Alt A balances may be lower than would otherwise be the case had such refinancing not occurred From the time the relief refinance initiative began in 2009 to December 31, 2011, we purchased approximately $ 5 3 billion of relief refinance mortgages that were previously categorized as Alt A loans in our portfolio, including $5.1 billion during 2011.

We also hold investments in non agency mortgage related securities backed by single family Alt A loans. At December 31, 2011 and December 3 , 20 0, we held investments of $16.8 billion and $18.8 billion, respectively, of non agency mortgage related securities backed by Alt A and other mortgage loans and 15% and 22%, respectively, of these securities were categorized as investment grade The credit performance of loans underlying these securities deteriorated significantly since the beginning of 2008 and continued to deteriorate during 20  We categorize our investments in non agency mortgage related securities as Alt A if the securities were identified as such based on information provided to us when we entered into these transactions For more information on our exposure to Alt A mortgage loans through our investments in non agency mortgage related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS   Investments in Securities."

Higher Risk Loans in the Single Family Credit Guarantee Portfolio

The table below presents information about certain categories of single family mortgage loans within our single family credit guarantee portfolio that we believe have certain higher risk characteristics These loans include categories based on product type and borrower characteristics present at origination The table includes a presentation of each higher risk category in isolation A single loan may fall within more than one category (for example, an interest only loan may also have an original LTV ratio greater than 90%) Mortgage loans with higher LTV ratios have a higher risk of default, especially during housing and economic downturns, such as the one the U.S. has experienced since 2007

<div align="center">148</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 50     Certain Higher Risk Categories in the Single Family Credit Guarantee Portfolio(1)**

| | As of December 31, 2011 | | | |
| | UPB | Estimated Current LTV(2) | Percentage Modified(3) | Serious Delinquency Rate(4) |
|---|---|---|---|---|
| | | (dollars in billions) | | |
| Loans w h one o mo e spec f ed cha ac e s cs | $342 9 | 105% | 7 2% | 9 3% |
| Ca ego es (nd v dual cha ac e s cs) | | | | |
| Al -A( | 94 3 | 107 | 8 8 | 11 9 |
| In e es -only(6 | 72 0 | 120 | 0 2 | 17 6 |
| Op on ARM(7 | 8 4 | 119 | 5 5 | 20 5 |
| O g nal LTV a o g ea e han 90%, non- el ef ef nance mor gages(8) | 107 9 | 108 | 8 1 | 8 5 |
| O g nal LTV a o g ea e han 90%, el ef ef nance mor gages(8) | 59 3 | 104 | 0 1 | 1 3 |
| Lowe FICO sco es a o g na on (less han 620)(8) | 55 6 | 93 | 13 4 | 12 9 |

| | As of December 31, 2010 | | | |
| | UPB | Estimated Current LTV(2) | Percentage Modified(3) | Serious Delinquency Rate(4) |
|---|---|---|---|---|
| | | (dollars in billions) | | |
| Loans w h one o mo e spec f ed cha ac e s cs | $368 8 | 100% | 5 5% | 10 3% |
| Ca ego es (nd v dual cha ac e s cs) | | | | |
| Al -A( | 115 5 | 99 | 5 7 | 12 2 |
| In e es -only(6 | 95 4 | 112 | 0 5 | 18 4 |
| Op on ARM(7 | 9 4 | 115 | 3 1 | 21 2 |
| O g nal LTV a o g ea e han 90%, non- el ef ef nance mor gages(8) | 117 8 | 105 | 6 3 | 9 1 |
| O g nal LTV a o g ea e han 90%, el ef ef nance mor gages(8) | 36 5 | 101 | 0 1 | 0 7 |
| Lowe FICO sco es a o g na on (less han 620)(8) | 61 2 | 89 | 10 4 | 13 9 |

(1) Ca ego es a e no add ve and a sng e oan may be nc uded n mul ple ca ego es f mo e han one cha ac e s c s assoc a ed w h he loan Loans w h a comb na on
    of ese cha ac e s cs w have an even h ghe sk of defau han hose w h an nd v dua cha ac e s c
(2) See e d o e (5) o "Tab e 45     Cha ac e s cs of he S ng e-Fam y C ed Gua an ee Po fol o" fo nfo ma on on ou calcula on of cu en LTV a os
(3) Rep esen s he pe cen age of oans based on oan coun n ou s ngle-fam ly c ed gua an ee po fol o ha have been mod f ed unde ag ee en w h he bo owe ,
    nc ud ng hose w h no c a ges      e e es ano c a ges      e e pas due a c a ges a e added o he ou s and ng p nc pa ba ance of he oan
    Exc udes oans unde y ng ca n O he Gua an ee T ansac ons fo wh ch da a was no ava ab e
(4) See "Po fol o Managemen Ac v es-C ed Pe fo mance-Del nquenc es" fo fu he nfo ma on abou o epo ed se o s de nq ency a es
(5) Loa s w      e Al -A ca ego y con nue o ema n n ha ca ego y follow ng mod f ca on, even hough he bo owe may have p ov ded full documen a on of asse s
    and ncome o comple e he mod f ca on
(6) The pe cen ages of n e es -only loans wh ch have been mod f ed a pe od end ef ec    a a nu be of ese oans ave no ye been ass gned o he new p oduc
    due o g ea e (pos -mod f ca on), p ma ly due o dec n p ocess ng
(7) Loans w h n he op on ARM ca ego y con nue o ema n n ha ca ego y follow ng mod f ca on, even hough he mod f ed loan no longe p ov des fo op onal
    paymen p ov s ons
(8) See e d o es (4) a d (7) o "Tab e 45    Cha ac e s cs of he S ngle-Fam ly C ed Gua an ee Po fol o" fo nfo ma on on ou calcula on of o g nal LTV a os and
    o se of FICO sco es, espec ve y

Loans with one or more of the above characteristics comprised approximately 20% of our single family credit guarantee portfolio as of both December 31, 2011 and 2010  The total UPB of loans in our single family credit guarantee portfolio  with one or more of these characteristics declined approximately 7% to $343 billion as of December 31, 2011 from $369 billion as of December 31, 2010. This decline was  principally due to liquidations resulting from prepayments, refinancing activity, and liquidations resulting from foreclosure events and foreclosure alternatives, but was partially offset by increases in loans with original LTV ratios greater than 90% due to our relief refinance mortgage activity in 2011. The serious delinquency rates associated with these  loans declined to 9 3% as of December 31, 2011 from 10 3% as of December 3 , 20 0

*Credit Enhancements*

The portfolio information below excludes our holdings of  non Freddie Mac mortgage related securities  See "CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities    *Mortgage Related Securities*" for credit enhancement and other  information about our investments in non Freddie Mac mo tgage related securities

Our charter requires that single family mortgages with LTV ratios above 80% at the time of purchase be covered by specified  credit enhancements or participation interests  However, as discussed below, under HARP, we allow eligible borrowers who have mortgages with high current LTV ratios to refinance their mortgages without obtaining new mortgage insurance in excess of  what was already in place. Primary mortgage insurance is the most prevalent type of credit enhancement protecting our  single family credit guarantee portfolio, and is typically provided on a loan level basis  In addition, for some mortgage  loans, we elect to share the default risk by transferring a  portion of that risk to various third parties through a variety  of other credit enhancements

At December 31, 2011 and December 31, 2010, our single family credit enhanced mortgages represented  4% and  5%, respectively, of our single family credit guarantee portfolio, excluding those backing Ginnie Mae Certificates and

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012
TREASURY-2920
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

HFA bonds guaranteed by us under the HFA initiative  Freddie Mac securities backed by Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative are excluded because we consider the incremental credit risk to which we are exposed to be insignificant

We had recoveries (excluding reimbursements for our expenses) of $2.8 billion and $3.4 billion that reduced our charge offs of single family loans during the years ended December 31, 2011 and 2010, respectively. These amounts include $1.8 billion and $2.1 billion during the years ended December 31, 2011 and 2010, respectively, in recoveries associated with our primary and pool mortgage  insurance policies and other credit enhancements  We had additional recoveries from credit enhancements that provided  reimbursement for and reduced our expenses by $0 3 billion during both 2011 and 2010. During 2011 and 2010, the credit enhancement coverage for our single family loan purchases was lower than in periods before 2009 and earlier, primarily as a  result of high refinance activity  Refinance loans (other than  relief refinance mortgages) typically have lower LTV ratios, and are more likely to have an LTV ratio below 80% and not require credit protection as specified in our charter  In addition, we have been purchasing significant amounts of relief refinance  mortgages  These mortgages allow for the refinance of existing loans guaranteed by us under terms such that we may not have  mortgage insurance for some or all of the UPB of the mortgage in excess of 80% of the value of the property for certain of these  loans.

Our ability and desire to expand or reduce the portion of our  total mortgage portfolio covered by credit enhancements will depend on: (a) our evaluation of the credit quality of new business purchase opportunities; (b) the risk profile of  our portfolio; (c) the credit worthiness of potential counterparties; and (d) the future availability of  effective credit enhancements at prices that permit an attractive return  While the use of credit enhancements reduces our exposure to mortgage credit risk, it increases our exposure  to institutional credit risk. As guarantor, we remain responsible for the payment of principal and interest if  mortgage insurance or other credit enhancements do not provide  full reimbursement for covered losses  Our credit losses could  increase if an entity that provides credit enhancement fails to  fulfill its obligation, as this would reduce the amount of our credit loss recoveries

Primary mortgage insurance is the most prevalent type of credit  enhancement protecting our single family credit guarantee  portfolio and is typically provided on a loan level basis  Primary mortgage insurance transfers varying portions of the  credit risk associated with a mortgage to a third party insurer. Generally, in order to file a claim under a primary mortgage insurance policy, the insured loan must be in default and the borrower's interest in the underlying property must have been extinguished, such as through a foreclosure action  The mortgage insurer has a prescribed period of time within which to  process a claim and make a determination as to its validity and  amount.

Other prevalent types of credit enhancements that we use are  lender recourse (under which we may require a lender to  repurchase a loan upon default) and indemnification agreements  (under which we may require a lender to reimburse us for credit  losses realized on mortgages), as well as pool insurance  Pool insurance provides insurance on a pool of loans up to a stated  aggregate loss limit  In addition to a pool level loss coverage limit, some pool insurance contracts may have limits on coverage  at the loan level  In certain instances, the cumulative losses  we have incurred as of December 31, 2011 combined with our  expectations of potential future claims may exceed the maximum  limit of loss allowed by the policy

In order to file a claim under a pool insurance policy, we generally must have finalized the primary mortgage claim,  disposed of the foreclosed property, and quantified the net loss payable to us with respect to the insured loan to determine the  amount due under the pool insurance policy  Certain pool insurance policies have specified loss deductibles that must be  met before we are entitled to recover under the policy  We have institutional credit risk relating to the potential insolvency  or non performance of mortgage insurers that insure mortgages we purchase or guarantee  See  *"Institutional Credit Risk     Mortgage Insurers"* for further discussion about pool insurance coverage and our mortgage loan insurers.

Certain of our single family Other Guarantee Transactions  utilize subordinated security structures as a form of credit  enhancement  At December 31, 2011 and 2010, the UPB of single family Other Guarantee Transactions with subordination  coverage at origination was $3.3 billion and $3.9 billion, and the subordination coverage on these  securities was $647 million and $825 million,  respectively  At December 31, 2011 and 2010, the average serious delinquency rate on single family Other Guarantee  Transactions with subordination coverage was 20.9% and 21.1%,  respectively

See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS  RESERVES" for additional information about credit protection and other forms of credit enhancements covering loans  in our single family credit guarantee portfolio as of  December 31, 2011 and December 31, 2010

*Other Credit Risk Management Activities*

To compensate us for higher levels of risk in some mortgage  products, we may charge upfront delivery fees above a base  management and guarantee fee, which are calculated based on  credit risk factors such as the mortgage product type,

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012
TREASURY-2921
Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are caused or limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

loan purpose, LTV ratio and other loan or borrower characteristics  We implemented several increases in delivery fees that became effective in 2009 applicable to single family mortgages with certain higher risk loan characteristics  We implemented additional delivery fee increases that become effective March 1, 2011 (or later, as outstanding contracts permitted) for single family loans with higher LTV ratios  These fee increases do not apply to relief refinance mortgages with LTV ratios greater than 80% and with settlement dates on or after July 1, 2011. Given the uncertainty of the housing market in recent years, during 2011 and 2010, we entered into arrangements with certain existing customers at their renewal dates that allow us to change credit and pricing terms more  quickly than in the past. In response to a July 2011 request from FHFA, we have incorporated into our agreements with  single family sellers the ability to change our management and  guarantee fees upon 90 days or less notice to sellers, if directed to do so by FHFA

On December 23, 2011, President Obama signed into law the  Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than   0 basis points above the average guarantee fees charged in 20    on single family mortgage backed securities  For more  information, see "BUSINESS    Regulation and Supervision    *Legislative and Regulatory Developments     Legislated Increase to Guarantee Fees.*"

*Single Family Loan Workouts and the MHA Program*

Loan workout activities are a key component of our loss  mitigation strategy for managing and resolving troubled assets  and lowering credit losses. Our loan workouts consist of: (a) forbearance agreements; (b) repayment plans;  (c) loan  modifications; and (d) foreclosure alternatives (short sales or deed in lieu of foreclosure transactions)  Our single family loss mitigation strategy  emphasizes early intervention by servicers in delinquent mortgages and provides alternatives to foreclosure  Other  single family loss mitigation activities include providing our  single family servicers with default management tools designed to  help them manage non performing loans more effectively and to  assist borrowers in retaining home ownership where possible, or  facilitate foreclosure alternatives when continued homeownership  is not an option  See "BUSINESS    Our Business Segments    *Single Family Guarantee Segment    Loss Mitigation and Loan Workout Activities*" for a general description of our loan  workouts.

Loan workouts are intended to reduce the number of delinquent  mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by reducing or eliminating a portion of  the costs related to foreclosed properties and avoiding the  additional credit losses that likely would be incurred in a REO sale  While we incur costs in the short term to execute our loan  workout initiatives, we believe that, overall, these initiatives could reduce our ultimate credit losses over the long term

HAMP and our new non HAMP standard loan modification are  important components of our loan workout program and have many  similar features, including the initial incentive fees paid to  servicers upon completion of a modification  Both of these loan  modification initiatives are intended to provide borrowers the  opportunity to obtain more affordable monthly payments and to  reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our credit losses by  reducing or eliminating a portion of the costs related to  foreclosed properties  However, we cannot currently estimate whether, or the extent to which, costs incurred in the near term  from HAMP and our new non HAMP standard loan modification may be offset, if at all, by the prevention or reduction of potential  future costs of serious delinquencies and foreclosures

Our seller/servicers have a significant role in servicing loans  in our single family credit guarantee portfolio, which includes  an active role in our loss mitigation efforts  Therefore, a  decline in their performance could impact the overall quality of  our credit performance (including through missed opportunities  for mortgage modifications), which could adversely affect our  financial condition or results of operations and have significant impacts on our ability to mitigate credit losses  The risk of such a decline in performance remains high. For more  information, see "RISK FACTORS    Competitive and Market Risks    *We face the risk that seller/servicers may fail to perform their obligations to service loans in our single family and multifamily mortgage  portfolios or that their servicing performance could  decline.*"

We establish guidelines for our servicers to follow and provide  them default management tools to use, in part, in determining  which type of loan workout would be expected to provide the best  opportunity for minimizing our credit losses  We require our  single family seller/servicers to first evaluate problem loans  for a repayment or forbearance plan before considering  modification  If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before  considering foreclosure  During 2011, we helped more than  208,000 borrowers either stay in their homes or sell their properties and avoid foreclosures through our various workout  programs, including HAMP, and we completed approximately 122,000 foreclosures

<div align="center">151</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts, and set market standards. Participation in the MHA Program is an integral part of our mission of providing stability to the housing market. Through our participation in this program, we help borrowers maintain home ownership  Some of the key initiatives of this program include HAMP and HARP, which are discussed below

Home Affordable Modification Program

HAMP commits U S government, Freddie Mac and Fannie Mae funds to help eligible homeowners avoid foreclosures and keep their homes through mortgage modifications, where possible  Under this program, we offer loan modifications to financially struggling homeowners with mortgages on their primary residences that reduce the monthly principal and interest payments on their mortgages  HAMP requires that each borrower complete a trial period during which the borrower will make monthly payments  based on the estimated amount of the modification payments. Trial periods are required for at least three months  After the final trial period payment is received by our servicer and the borrower has provided necessary documentation, the borrower and servicer will enter into the modification  We bear the costs of these activities, including the cost of any monthly payment reductions

Pursuant to the servicing alignment initiative, we changed some of the processes and procedures for our loans under HAMP to match the new processes and procedures for the servicing alignment initiative  Certain other features of HAMP include the following:

- Under HAMP, the goal is to reduce the borrowers' monthly mortgage payments to 31% of gross monthly income, which may be achieved through a combination of methods, including interest rate reductions, term extensions, and principal forbearance  Although HAMP contemplates that some servicers will also make use of principal reduction to achieve reduced payments for borrowers, we have only used forbearance and have not used principal reduction in modifying our loans.

- For HAMP modifications with a trial period beginning on or after October 1, 2011, servicers are paid incentive fees on a tiered structure, ranging from $400 to $1,600, based on the severity of the delinquency at the start of the trial period  Prior to October 1, 2011, servicers were paid a $1,000 incentive fee when they modified a loan and an additional $500 incentive fee if the loan was current when it entered the trial period  In addition, servicers receive up to $1,000 for any modification that reduces a borrower's monthly payment by 6% or more, in each of the first three years after the modification, as long as the modified loan remains current

- Borrowers whose loans are modified through HAMP accrue monthly incentive payments that are applied annually to reduce up to $1,000 of their principal per year, for five years, as long as they are making timely payments under the modified loan terms

- HAMP applies to loans originated on or before January 1, 2009.

On January 27, 2012, Treasury announced enhancements to HAMP, including extending the end date to December 3 , 20 3, expanding the program's eligibility criteria for modifications, increasing incentives paid to investors who engage in principal reduction, and extending to the GSEs the opportunity to receive investor incentives for principal reduction. Treasury has not yet published details about the incentives that will be available to the GSEs  FHFA announced that the GSEs will extend their use of HAMP until December 3 , 20 3, and continue to offer the standard modification under the servicing alignment initiative  FHFA noted that Treasury's expanded eligibility criteria for HAMP modifications are consistent with our standard non HAMP modification

FHFA announced that it has been asked to consider the newly available HAMP incentives for principal reduction  FHFA previously released an analysis concluding that principal forgiveness does not provide benefits that are greater than principal forbearance as a loss mitigation tool  FHFA stated that its assessment of the investor incentives now being offered by Treasury will follow its previous analysis, including consideration of the eligible universe, operational costs to implement such changes, and potential borrower incentive effects

<div align="center">152</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents the number of single family loans that completed modification or were in trial periods under HAMP as of December 31, 2011 and December 31, 2010

**Table 51    Single Family Home Affordable Modification Program Volume[1]**

| | As of December 31, 2011 | | As of December 31, 2010 | |
|---|---|---|---|---|
| | Amount[2] | Number of Loans | Amount[2] | Number of Loans |
| | (dollars in millions) | | | |
| Comp e ed HAMP mod ca ons[3] | $33,681 | 152,519 | $23,635 | 107,073 |
| Loans n he HAMP a pe od | $ 2,790 | 12,802 | $ 4,905 | 22,352 |

(1) Based on nfo ma on epo ed by ou se v ce s o he MHA og am adm n s a o
(2) Fo oans n he HAMP a pe od, h s ef ec s he oan balance p o o mod f ca on Fo comple ed HAMP mod f ca ons, he amoun ep esen s he ba ance of oans af e mod f ca on de HAMP
(3) Comp e ed HAMP mod f ca ons a e hose whe e he bo owe has ade he as a pe od pay en , has p ov ded he equ ed documen a on and he mod f ca on has become effec ve Amoun s p esen ed ep esen comp e ed HAMP mod f ca ons w h effec ve da es s nce ou mplemen a on of HAMP n 2009 h ough Decembe 31, 2011 and Decembe 31, 2010, espec vely

As of December 31, 2011, the borrower's monthly payment was reduced on average by an estimated $565, which amounts to an average of $6,780 per year, and a total of $1 0 billion in annual reductions for all of our completed HAMP modifications (these amounts are calculated by multiplying the number of completed modifications by the average reduction in monthly payment, and have not been adjusted to reflect the actual performance of the loans following modification) Except in limited instances, each borrower's reduced payment will remain in effect for a minimum of five years, and borrowers whose interest rates were adjusted below market levels will have their interest rate and payment gradually increased after the fifth year to a rate consistent with the market rate at the time of modification We bear the cost associated with the borrowers' payment reductions Although mortgage investors under the MHA Program are entitled to certain subsidies from Treasury for reducing the borrowers' monthly payments from 38% to 3 % of the borrower's income, we do not receive such subsidies on modified mortgages owned or guaranteed by us.

A standard trial period plan is three months in duration. Our servicers are permitted to add an interim month, which will be reported as a fourth trial period month. In addition, our servicers are authorized to extend a trial period for up to an additional two months when the borrower is in bankruptcy in order to provide additional time to have the mortgage removed from the bankruptcy plan, which is a pre requisite to a modification under HAMP. The number of our loans in the HAMP trial period declined to 12,802 as of December 31, 2011 from 22,352 as of Decembe 3 , 20 0 A large number of borrowers entered into HAMP trial period plans when the program was initially introduced in 2009. Significantly fewer new borrowers entered into HAMP trial period plans beginning in the second half of 20 0, when we changed the income documentation requirements as discussed below We expect fewer borrowers will initiate HAMP modification during 2012 than 2011, because a large number of the delinquent borrowers that were eligible for the program have already completed the trial period or attempted to do so, but failed

To address documentation issues experienced when the program began, guidelines for HAMP provide that, beginning with trial periods that became effective on or after June , 20 0, borrowers must provide income documentation before entering into a HAMP trial period Prior to the June 1, 2010 changes to HAMP, we experienced approximately a 38% modification completion rate under the program Given the changes made to the program effective June , 20 0, we have since experienced a modification completion rate in excess of 80% When a borrower's HAMP trial period is cancelled, the loan is considered for our other workout activities

Approximately 40% of our loans in the HAMP trial period as of December 3 , 20 have been in the trial period for more than the minimum duration of three months Based on information provided by the program administrator, the average length of the trial period for loans in the program as of December 31, 2011 was five months For more information on our redefault rates on these loans, see "Table 54 Reperformance Rates of Modified Single Family Loans "

HAMP is one modification option for single family loans, but we also have completed a large volume of modifications through our non HAMP loan modification initiatives

The costs we incur related to HAMP have been, and will likely continue to be, significant for the following reasons:

- Except for certain Other Guarantee Transactions and loans underlying our other guarantee commitments, we bear the full cost of the monthly payment reductions related to modifications of loans we own or guarantee and all servicer and borrower incentives, and we will not receive a reimbursement of these costs from Treasury. We paid $184 million of servicer incentives during 2011, as compared to $178 million of such incentives during 2010 As of December 31, 2011, we accrued $77 million for both initial and recurring servicer incentives not yet due We paid $111 million of borrower incentives during 2011, as compared to $64 million of these incentives during 20 0

<div align="center">153</div>

<div align="right">*Freddie Mac*</div>

Source  D RA HOM  OAN MORTGAG CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

As of December 31, 2011, we accrued $60 million for borrower incentives not yet due  We also have the potential to incur additional servicer incentives and borrower incentives as long as the borrower remains current on a loan modified under HAMP

• Under HAMP, we typically provide concessions to borrowers, which generally include interest rate reductions and often also provide for forbearance (but not forgiveness) of principal

• Some borrowers will fail to complete the HAMP trial period and others will default on their HAMP modified loans  For those borrowers who redefault or who do not complete the trial period and do not qualify for another loan workout, HAMP will have delayed the resolution of the loans through the foreclosure process  If home prices decline while these events take place, such delay in the foreclosure process may increase the losses we recognize on these loans, to the extent the prices we ultimately receive for the foreclosed prope ties are less than the prices we could have received had we foreclosed upon the properties ear er

• Non GSE mortgages modified under HAMP include mortgages backing our investments in non agency mortgage related securities  Such modifications reduce the monthly payments due from affected borrowers, and thus reduce the payments we receive on these securities (to the extent the payment reductions have not been absorbed by subordinated investors or by other credit enhancement)

Servicing Alignment Initiative and Non HAMP Modifications

In February 2011, FHFA directed Freddie Mac and Fannie Mae to develop consistent requirements, policies, and processes for the servicing of non performing loans  This directive was designed to create greater consistency in servicing practices and to build on the best practices of each of the GSEs. In April 2011, pursuant to this directive, FHFA announced a new set of aligned standards (known as the servicing alignment initiative) for servicing non performing loans owned or guaranteed by Freddie Mac and Fannie Mae that are designed to help servicers do a better job of communicating and working with troubled borrowers and to bring greater accountability to the servicing industry  We announced our detailed requirements for this initiative on June 30, 2011, with implementation beginning for loans that were delinquent as of October 1, 2011 These standards provide for earlier and more frequent communication with delinquent borrowers, consistent requirements for collecting documents from borrowers, consistent timelines for responding to borrowers, and consistent timelines for processing foreclosures  These standards are expected to result in greater alignment of servicer processes for both HAMP and most non HAMP workouts

Under these new servicing standards, we will pay incentives to servicers that exceed certain performance standards with respect to servicing delinquent loans  We will also assess compensatory fees from servicers if they do not achieve a minimum performance benchmark with respect to servicing delinquent loans  These incentives may result in our payment of increased fees to our seller/servicers, the cost of which may be at least partially mitigated by the compensatory fees paid to us by our servicers that do not perform as required

As part of the servicing alignment initiative, we began implementation of a new non HAMP standard loan modification initiative. This new standard modification replaced our previous non HAMP modification initiative beginning January 1, 2012  The new standard modification requires a three month trial period  Servicers were permitted to begin offering standard modification trial period plans with effective dates on or after October 1, 2011  A modest number of borrowers entered trial periods under our standard non HAMP modification initiative as of December 3 , 20    We expect to experience a temporary decline in completed modification volume in the first half of 2012, below what otherwise would be expected, as servicers transition borrowers to the new standard modification initiative and borrowers complete the trial period. This new standard modification program is expected to result in a higher volume of modifications where we partially forbear (but do not forgive) principal until the borrower sells the home or refinances or pays off the mortgage. The standard modification provides an extension of the loan's term to 480 months  In addition, the new modification initiative currently provides for a standard modified interest rate of 5% (though FHFA could change this in the future). This new initiative also provides for a servicer incentive fee schedule for non HAMP modifications, comparable to the HAMP servicer incentive fee structure, effective October 1, 2011  The incentive fees are intended to provide greater incentives to our servicers to modify loans earlier in the delinquency, which may cause the servicer incentive costs associated with our modification activities to increase in the future  The standard modification does not include borrower incentive payments or recurring servicer incentive fees after the initial servicer incentive payment.

We expect that the costs we incur related to our new non HAMP standard loan modifications will likely be significant. These costs will be similar to those described above under "Home Affordable Modification Program" relating to: (a) bearing the full cost of monthly payment reductions; (b) paying initial incentive fees to servicers; (c) providing concessions to borrowers; and (d) the potential for delaying the resolution of loans through the foreclosure process  While

<div align="center">154</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

we incur costs in the short term to execute our non HAMP standard modifications, we believe that, overall, our non HAMP standard modification could reduce our ultimate credit losses over the mortgage term

Home Affordable Refinance Program and Relief Refinance Mortgage Initiative

HARP gives eligible homeowners (whose monthly payments are current) with existing loans that are owned or guaranteed by us or Fannie Mae an opportunity to refinance into loans with more affordable monthly payments and/or fixed rate terms Through December 2011, under HARP, eligible borrowers who had mortgages with current LTV ratios above 80% and up to 125% were allowed to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place Beginning December 20 , HARP was expanded to allow eligible borrowers who have mortgages with current LTV ratios above 125% to refinance under the program

Our underwriting procedures for relief refinance mortgages are limited in many cases, and such procedures generally do not include all of the changes in underwriting standards we have implemented in the last several years As a result, relief refinance mortgages generally reflect many of the credit risk attributes of the original loans However, borrower participation in our relief refinance mortgage initiative may help reduce our exposure to credit risk in cases where borrower payments under their mortgages are reduced, thereby strengthening the borrower's potential to make their mortgage payments

Part of the relief refinance mortgage initiative is our implementation of HARP, and relief refinance options are also available for certain non HARP loans HARP is targeted at borrowers with current LTV ratios above 80%; however, our relief refinance initiative also allows borrowers with LTV ratios of 80% and below to participate Over time, relief refinance mortgages with LTV ratios above 80% (HARP loans) may not perform as well as other refinance mortgages because of the continued high LTV ratios of these loans Our relief refinance initiative is only for qualifying mortgage loans that we already hold or guarantee We continue to bear the credit risk for refinanced loans under this program, to the extent that such risk is not covered by existing mortgage insurance or other existing credit enhancements The implementation of the relief refinance mortgage initiative resulted in a higher volume of purchases than we would expect in the absence of the program

The table below presents the composition of our purchases of refinanced single family loans during the year ended December 31, 2011 and 20 0

**Table 52     Single Family Refinance Loan Volume**[1]

| | Year Ended December 31, 2011 | | | Year Ended December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Amount | Number of Loans | Percent | Amount | Number of Loans | Percent |
| | | | (dollars in millions) | | | |
| Re ef ef nance mo gages | | | | | | |
| Above 105% LTV a o | $ 8,174 | 36,307 | 3 1% | $ 3,977 | 16,667 | 1 1% |
| Above 80% o 105% LTV a o | 31,566 | 148,643 | 12 6 | 43,906 | 192,650 | 13 1 |
| 80% and be ow LTV a o | 42,304 | 267,633 | 22 6 | 57,766 | 323,851 | 22 0 |
| o a e ef ef nance mo gages | $ 82,044 | 452,583 | 38 3% | $105,649 | 533,168 | 36 2% |
| To al ef nance loan vo ume | $246,913 | 1,183,304 | 100 0% | $303,060 | 1,470,786 | 100 0% |

(1) Cons s s of all s ngle-fam ly ef nance mo gage loans ha we e p c ased o g a a eed d g e pe od, exc d g hose assoc a ed w h o he gua an ee comm men s and O he G a an ee T ansac ons
(2) Cons s s of el ef ef nance mo gages and o he ef nance mor gages

Relief refinance mortgages comprised approximately 33% and 35% of our total refinance volume during 2011 and 2010, respectively Relief refinance mortgages with LTV ratios above 80% represented approximately 2% of our total single family credit guarantee portfolio purchases during both 2011 and 2010. Relief refinance mortgages comprised approximately   % and 7% of the UPB in our total single family credit guarantee portfolio at December 31, 2011 and December 31, 2010, respectively As of December 31, 2011, the serious delinquency rates for relief refinance loans with: (a) LTV ratios of 80% or less; (b) LTV ratios from 80% to 100%; (c) LTV ratios of more than 100%; and (d) total relief refinance mortgage loans for all LTV ratios were 0.2%, 0.9%, 1.5%, and 0.6%, respectively

On October 24, 2011 FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA directed changes to HARP in an effort to attract more eligible borrowers whose monthly payments are current and who can benefit from refinancing their home mortgages The Acting Director of FHFA stated that the goal of pursuing these changes is to create refinancing opportunities for more borrowers whose mortgages are owned or guaranteed by Freddie Mac and Fannie Mae while reducing risk for these entities and bringing a measure of stability to housing markets. The revisions to HARP enable us to expand the assistance we may provide to homeowners by making their mortgage payments more affordable through one or more of the following ways: (a) a reduction in payment; (b) a reduction in rate; (c) movement to a more stable

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012
TREASURY-2926
Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

mortgage product type (*i.e.*, from an ARM to a fixed rate mortgage); or (d) a reduction in amortization term  See "BUSINESS      Our Business Segments      *Single Family Guarantee Segment      Loss Mitigation and Loan Workout Activities*" for additional information about recent changes to HARP

In November 2011, Freddie Mac and Fannie Mae issued guidance  with operational details about the HARP changes to mortgage  lenders and servicers after receiving information from FHFA about the fees that we may charge associated with the  refinancing program. Since industry participation in HARP is not mandatory, we anticipate that implementation schedules will vary  as individual lenders, mortgage insurers and other market participants modify their processes  It is too early to estimate  how many eligible borrowers are likely to refinance under the  revised program

The revisions to HARP will help to reduce our exposure to credit  risk to the extent that HARP refinancing strengthen the  borrowers' capacity to repay their mortgages and, in some cases, reduce the payments under their mortgages  These revisions to HARP could also reduce our credit losses to the extent that the revised program contributes to bringing  stability to the housing market  However, we may face greater  exposure to credit and other losses on these HARP loans because  we are not requiring lenders to provide us with certain  representations and warranties on the refinanced HARP loans  We could also experience declines in the fair values of certain  agency security investments classified as available for sale or trading resulting from changes in expectations of mortgage  prepayments and lower net interest yields over time on other  mortgage-re ated investments  As a result, there can be no assurance that the benefits from the revised program will exceed  our costs  See "RISK FACTORS      Competitive and Market Risks      *The servicing alignment initiative, MHA Program and other efforts to reduce foreclosures, modify loan terms and refinance mortgages, including HARP, may fail to mitigate our credit losses and may adversely affect our results of operations or financial condition*" for additional information

Home Affordable Foreclosure Alternatives Program

HAFA is designed to permit borrowers who meet basic HAMP eligibility requirements to sell their homes in short sales, if  such borrowers did not qualify for or participate in a HAMP  trial period, failed to complete their HAMP trial period, or  defaulted on their HAMP modification  HAFA also provides a process for borrowers to convey title to their homes through a  deed in lieu of foreclosure  HAFA took effect in April 20 0 and ends on December 3 , 20 3  We began our implementation of this program in August 2010  We completed a small number of HAFA transactions on our single  family mortgage loans during 2011

Hardest Hit Fund

In 20 0, the federal government created the Hardest Hit Fund,  which provides funding for state HFAs to create unemployment  assistance initiatives to help homeowners in those states that  have been hit hardest by the housing crisis and economic  downturn  To the extent our borrowers participate in the HFA unemployment assistance programs and the full contractual  payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into  further delinquency. Based on information provided to us by our  seller/servicers, we believe participation in these programs by  our borrowers has been limited through December 31, 2011

Compliance Agent

We are the compliance agent for Treasury for certain foreclosure avoidance activities under HAMP by mortgage holders other than  Freddie Mac and Fannie Mae  Among other duties, as the program  compliance agent, we conduct examinations and review servicer  compliance with the published requirements for the program  Some of these examinations are on site, and others involve off site documentation reviews  We report the results of our examination findings to Treasury. Based on the examinations, we may also provide Treasury with advice, guidance  and lessons learned to improve operation of the program

The table below presents volumes of single family loan workouts,  serious delinquency, and foreclosures for 2011, 2010, and 2009.

<div align="center">156</div>

<div align="right">*Freddie Mac*</div>

<div align="center">TREASURY-2927</div>

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 53    Single Family Loan Workouts, Serious Delinquency, and Foreclosures Volumes**[1]

| | Years Ended December 31, | | | | | |
| | 2011 | | 2010 | | 2009 | |
| | Number of Loans | Loan Balances | Number of Loans | Loan Balances | Number of Loans | Loan Balances |
| | | | (dollars in millions) | | | |
| Home retention actions | | | | | | |
| Loan modifications[2] | | | | | | |
| with no change in terms[3] | 4,371 | $    778 | 4,639 | $    799 | 5,866 | $  1,008 |
| with term extension | 16,354 | 3,011 | 20,664 | 3,602 | 15,996 | 2,500 |
| with reduction of contractual interest rate and, in certain cases, term extension | 68,584 | 15,231 | 114,686 | 25,277 | 40,915 | 8,605 |
| with rate reduction, term extension and principal forbearance | 19,865 | 5,319 | 30,288 | 7,915 | 2,667 | 621 |
| Total loan modifications[4] | 109,174 | 24,339 | 170,277 | 37,593 | 65,044 | 12,734 |
| Repayment plans[5] | 33,421 | 4,787 | 31,210 | 4,523 | 33,725 | 4,711 |
| Forbearance agreements[6] | 19,516 | 3,821 | 34,594 | 7,156 | 14,628 | 2,848 |
| Total home retention actions | 162,111 | 32,947 | 236,081 | 49,272 | 113,397 | 20,293 |
| Foreclosure alternatives | | | | | | |
| Short sales | 45,623 | 10,524 | 38,773 | 9,109 | 18,890 | 4,481 |
| Deed in lieu of foreclosure transactions | 540 | 94 | 402 | 63 | 329 | 56 |
| Total foreclosure alternatives | 46,163 | 10,618 | 39,175 | 9,172 | 19,219 | 4,537 |
| Total single-family loan workouts | 208,274 | $43,565 | 275,256 | $58,444 | 132,616 | $24,830 |
| Serious delinquent loan additions | 374,970 | | 502,710 | | 597,188 | |
| Single-family foreclosures[7] | 121,751 | | 142,877 | | 90,436 | |
| Serious delinquencies, as reported | 414,134 | | 462,439 | | 498,829 | |

(1) Based on completed actions with borrowers of loans which our single-family credit guarantee portfolio. Excludes those modifications, repayments and forbearance activities for which the borrower has started, but not yet completed, a trial or other workout period. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in connection with reinstatement periods, but these have not been incorporated into one of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be classified in another category in the same period (see endnote 6)

(2) As a result of our adoption of an amendment to the accounting guidance on the classification of loans as TDRs, which became effective in the third quarter of 2011, we began a process of accounting for loans as TDRs beginning in January once loans become subject to one or two cycles of modification of considered TDRs, including those loans in a previously subject to workout activities accounted during of the first half of 2011 See "NOTE 5 INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information

(3) Under terms of the category type, past due or in arrears added to the principal balance and reamortized based on the original contractual loan terms

(4) Includes completed loan modifications under HAMP however, the number of such completed modifications may be reported by the MHA Program administrators on a reporting basis due to differences in the timing of recognizing the completions by us and the administrators

(5) Represents the number of borrowers that are reported to have completed the full term of a repayment plan for past due or other. Excludes the number of borrowers that are actively repaying past due amounts under a repayment plan, which included 21,382 and 23,151 borrowers as of December 31, 2011 and 2010, respectively

(6) Excludes loans with longer-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another forbearance workout or repayment or forbearance activity for a single loan once during each quarter of however, a single loan may be included under separate forbearance agreements in separate reporting periods

(7) Represents the number of our single-family loans having completed foreclosure transfers, including in kind for properties, sales and the disposition of the property as a safe deed delivery or deed-in-kind payment or other acquisition on which the ownership of the property as a safe deed delivery or deed-payment or other

We experienced declines in home retention actions, particularly loan modifications, in 2011 compared to 2010, primarily due to declines in the number of seriously delinquent loan additions and in borrower participation in HAMP in 2011. A large number of borrowers entered into HAMP trial period plans when the program was initially introduced in 2009, and completed or terminated their modifications in 2010. Significantly fewer borrowers entered into HAMP trial period plans beginning in the second half of 2010 when we changed the income documentation requirements. The UPB of loans in our single family credit guarantee portfolio for which we have completed a loan modification increased to $69 billion as of December 31, 2011 from $52 billion as of December 31, 2010. The number of modified loans in our single family credit guarantee portfolio continued to increase and such loans comprised approximately 2.9% and 2.1% of our single family credit guarantee portfolio as of December 31, 2011 and December 31, 2010, respectively. The estimated current LTV ratio for all modified loans in our single family credit guarantee portfolio was 123%, and the serious delinquency rate on these loans was 17.2% as of December 31, 2011.

Foreclosure alternative volume increased 18% in 2011, compared to 2010, and we expect the volume of foreclosure alternatives to remain high in 2012 primarily because we offer incentives to servicers to complete short sales instead of foreclosures. We plan to introduce additional initiatives in 2012 designed to help more distressed borrowers avoid foreclosure through short sale and deed in lieu of foreclosure transactions.

The table below presents the reperformance rate of modified single family loans in each of the last eight quarterly periods.

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012
TREASURY-2928
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 54    Reperformance Rates of Modified Single Family Loans[1]**

| HAMP loan modi ications: | Quarter of oan Modification Completion[2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 |
| me s nce mod f ca on- | | | | | | | | |
| 3 o 5  on hs | 96% | 96% | 95% | 94% | 93% | 94% | 95% | 94% |
| 6 o 8  o   s | | 93 | 93 | 92 | 92 | 91 | 93 | 93 |
| 9 o 11 mon hs | | | 90 | 89 | 90 | 89 | 90 | 90 |
| 12 o 14 mon hs | | | | 87 | 87 | 87 | 8 8 | 8 8 |
| 15 o 17 mon hs | | | | | 85 | 85 | 86 | 86 |
| 18 o 20 mon hs | | | | | | 83 | 84 | 85 |
| 21 o 23 mon hs | | | | | | | 82 | 82 |
| 24 o 26  on  s | | | | | | | | 81 |

| Non-HAMP loan modi ications: | Quarter of oan Modification Completion[2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 |
| me s nce mod f ca on- | | | | | | | | |
| 3 o 5  on hs | 92% | 92% | 93% | 94% | 93% | 93% | 94% | 90% |
| 6 o 8  o   s | | 85 | 86 | 89 | 90 | 86 | 87 | 82 |
| 9 o 11 mon hs | | | 81 | 83 | 85 | 82 | 80 | 75 |
| 12 o 14 mon hs | | | | 78 | 81 | 78 | 77 | 69 |
| 15 o 17 mon hs | | | | | 77 | 74 | 74 | 66 |
| 18 o 20 mon hs | | | | | | 70 | 70 | 64 |
| 21 o 23 mon hs | | | | | | | 66 | 61 |
| 24 o 26  on  s | | | | | | | | 58 |

| Total (HAMP and Non-HAMP): | Quarter of oan Modification Completion[2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 |
| me s nce mod f ca on- | | | | | | | | |
| 3 o 5  on hs | 94% | 95% | 95% | 94% | 93% | 94% | 95% | 92% |
| 6 o 8  o   s | | 90 | 90 | 90 | 91 | 90 | 92 | 8 8 |
| 9 o 11 mon hs | | | 86 | 86 | 8 8 | 87 | 8 8 | 84 |
| 12 o 14 mon hs | | | | 82 | 84 | 85 | 86 | 80 |
| 15 o 17 mon hs | | | | | 81 | 82 | 84 | 78 |
| 18 o 20 mon hs | | | | | | 79 | 81 | 76 |
| 21 o 23 mon hs | | | | | | | 79 | 73 |
| 24 o 26  on  s | | | | | | | | 71 |

(1) Rep ese s e pe ce age of oa s a a e c e o ess a    ee on y pay en s pas due as we as ose pa d- n-full o ep c ased Exc des oans n
   mod f ca on a pe ods

(2) Loan mod f ca ons a e ecogn zed as comple ed n he qua e ly pe od n wh ch he se v ce has epo ed he mod f ca on as effec ve and he ag eemen has been
   accepted y s, w c ce a n cases may be delayed by a backlog n se v ce p ocess ng of mod f ca ons In he second qua e of 2011, we ev sed he calcula on
   of epe fo mance a es o be e accoun fo e-mod f ed oans (i.e., ose w e e a bo owe s ece ved a second mod f ca on) The ev sed calcula on ef ec s he
   s a us of each mod f ca on sepa a e y In he case of a emod f ed loan whe e he bo owe s pe fo m ng, he p ev ous mod f ca on would be p esen ed as be ng n
   defa he appl cable pe od

The redefault rate is the percentage of our modified loans that became seriously delinquent, transitioned to REO, or completed a loss producing foreclosure alternative, and is the inverse of the reperformance rate As of December 3 , 20 , the redefault rate for all of our single family loan modifications (including those under HAMP) completed during the first nine months of 2011, and full years 2010, 2009, and 2008 was 10%, 20%, 50%, and 67%, respectively. Many of the borrowers that received modifications in 2008 and 2009 were negatively affected by worsening economic conditions, including high unemployment rates during the last several years As of December 31, 2011, the redefault rate for loans modified under HAMP in the first nine months of 2011, and full years 2010 and 2009 was approximately 7%, 16% and 19%, respectively These redefault rates may not be representative of the future performance of modified loans, including those modified under HAMP We be eve the redefault rate for loans modified in the last three years, including those modified under HAMP, is likely to increase, particularly since the housing and economic environments remain challenging

*Credit Performance*

Delinquencies

We report single family serious delinquency rate information based on the number of loans that are three monthly payments or more past due or in the process of foreclosure, as reported by our servicers Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as delinquent as long as the borrower is current under the modified terms Single family loans for which the borrower is subject to a forbearance agreement will continue to reflect the past due status of the borrower To the extent our borrowers participate in the HFA unemployment assistance initiatives and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-2929                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our single family delinquency rates include all single family loans that we own, that back Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by either Ginnie Mae Certificates or HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancements provided on them by the U.S. government.

Some of our workout and other loss mitigation activities create fluctuations in our delinquency statistics. For example, single family loans that we report as seriously delinquent before they enter a trial period under HAMP or our new non HAMP standard modification continue to be reported as seriously delinquent for purposes of our delinquency reporting until the modifications become effective and the loans are removed from delinquent status by our servicers. However, under our previous non HAMP modifications, the borrower would return to a current payment status sooner, because these modifications did not have trial periods. Consequently, the volume, timing, and type of loan modifications impact our reported serious delinquency rate  As discussed above in "*Single Family Loan Workouts and the MHA Program*," the new non HAMP standard loan modification initiative includes a trial period comparable to that of our HAMP modification initiative  In addition, there may be temporary timing differences, or lags, in the reporting of payment status and modification completion due to differing practices of our servicers that can affect our delinquency reporting

Our serious delinquency rates have been affected by delays, including those due to temporary actions to suspend foreclosure transfers of occupied homes, increases in foreclosure process timeframes, process requirements of HAMP, general constraints on servicer capacity (which affects the rate at which servicers modify or foreclose upon loans), and court backlogs (in states that require a judicial foreclosure process) These delays lengthen the period of time in which loans remain in seriously delinquent status, as the delays extend the time it takes for seriously delinquent loans to be modified, foreclosed upon or otherwise resolved and thus transition out of seriously delinquent status. As a result, we believe our single family serious delinquency rates were higher in 2011 and 2010 than otherwise would have been  As of December 3 , 2011 and 20 0, the percentage of seriously delinquent loans that have been delinquent for more than six months was 70% and 66%, respectively

The table below presents serious delinquency rates for our single family credit guarantee portfolio

**Table 55      Single Family Serious Delinquency Rates**

| | | | As of December 31, | | | |
|---|---|---|---|---|---|---|
| | 2011 | | 2010 | | 2009 | |
| | Percentage of Portfolio | Serious Delinquency Rate | Percentage of Portfolio | Serious Delinquency Rate | Percentage of Portfolio | Serious Delinquency Rate |
| S ng e-fam  y | | | | | | |
| Non-c ed  -enhanced | 86% | 2 84% | 85% | 3 01% | 84% | 3 02% |
| C ed -enhanced | 14 | 8 03 | 15 | 8 27 | 16 | 8 68 |
| To al s ngle-fam ly c ed  gua an ee por o o(1 | 100% | 3 58 | 100% | 3 84 | 100% | 3 98 |

(1) As of Dece  be  31, 2011, 2010, and 2009, app ox    a e y 68%, 61%, and 49%,  espec  ve y, of he s ng e-fam  y oans  epo  ed as se o s y de   q e   we e     e p ocess of fo eclosu e

Serious delinquency rates of our single family credit guarantee portfolio declined to 3 58% as of December 31, 2011 from 3 84% as of December 31, 2010  Our serious delinquency rate remains high compared to historical levels, reflecting continued stress in the housing and labor markets. The improvement in our single family serious delinquency rate during 2011 was primarily due to a high volume of loan modifications and foreclosure transfers, as well as a slowdown in new serious delinquencies. See "Table 54      Reperformance Rates of Modified Single Family Loans" for information on the performance of modified loans  Although the number of seriously delinquent loans declined in both 2010 and 2011, the decline in the size of our single family credit guarantee portfolio in 20    caused our delinquency rates to be higher than they otherwise would have been, because these rates are calculated on a smaller  base of loans at the end the year

Serious delinquency rates for interest only and option ARM products, which together represented approximately 5% of our total single family credit guarantee portfolio at December 31, 2011, were 17.6% and 20.5%, respectively, at December 31, 2011, compared with 18.4% and 21.2%, respectively, at December 31, 2010  Serious delinquency rates of single family 30 year, fixed rate amortizing loans, a more traditional mortgage product, were approximately 3 9% and 4 0% at December 31,  2011 and 2010, respectively.

The tables below present serious delinquency rates categorized by borrower and loan characteristics, including geographic region and origination year, which indicate that certain concentrations of loans have been more adversely affected by declines in home prices since 2006  In certain states, our single family serious delinquency rates have remained persistently high  As of December 31, 2011, single family loans in Arizona, California, Florida, and Nevada

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2930

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

comprised 25% of our single family credit guarantee portfolio, and the serious delinquency rate of loans in these states was 6.2%. During the year ended December 31, 2011, we also continued to experience high serious delinquency rates on single family loans originated between 2005 and 2008. We purchased significant amounts of loans with higher risk characteristics in those years  In addition, those borrowers are more susceptible to the declines in home prices since 2006 than those homeowners that have built up equity in their homes over time

The table below presents credit concentrations for certain loan groups in our single family credit guarantee portfolio

**Table 56     Credit Concentrations in the Single Family Credit Guarantee Portfolio**

| | As of December 31, 2011 | | | | | |
|---|---|---|---|---|---|---|
| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio(1) | Percentage Modified(2) | Serious Delinquency Rate |
| | | (dollars in billions) | | | | |
| Geog aph cal d s  bu on | | | | | | |
| A  zona, Ca fo n a, F o  da, and Nevada | $  38 | $  406 | $  444 | 93% | 4 6% | 6 2% |
| A  o he  s a es | 56 | 1,246 | 1,302 | 75 | 2 5 | 2 9 |
| Yea  o  o  g na  on | | | | | | |
| 2011 | | 250 | 250 | 70 | | 0 1 |
| 2010 | | 324 | 324 | 71 | <0 1 | 0 3 |
| 2009 | <1 | 315 | 315 | 72 | 0 1 | 0 5 |
| 2008 | 7 | 113 | 120 | 92 | 4 4 | 5 7 |
| 2007 | 29 | 138 | 167 | 113 | 10 2 | 11 6 |
| 2006 | 25 | 99 | 124 | 112 | 9 3 | 10 8 |
| 2005 | 18 | 124 | 142 | 96 | 5 1 | 6 5 |
| 2004 and p  o | 15 | 289 | 304 | 61 | 2 5 | 2 8 |

| | As of December 31, 2010 | | | | | |
|---|---|---|---|---|---|---|
| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio(1) | Percentage Modified(2) | Serious Delinquency Rate |
| | | (dollars in billions) | | | | |
| Geog aph cal d s  bu on | | | | | | |
| A  zona, Ca fo n a, F o  da, and Nevada | $  47 | $  410 | $  457 | 91% | 3 3% | 7 1% |
| A  o he  s a es | 69 | 1,283 | 1,352 | 73 | 1 9 | 3 0 |
| Yea  o  o  g na  on | | | | | | |
| 2010 | | 323 | 323 | 70 | | 0 1 |
| 2009 | | 391 | 391 | 70 | <0 1 | 0 3 |
| 2008 | 10 | 149 | 159 | 86 | 2 2 | 4 9 |
| 2007 | 36 | 172 | 208 | 104 | 6 2 | 11 6 |
| 2006 | 31 | 125 | 156 | 104 | 5 8 | 10 5 |
| 2005 | 21 | 156 | 177 | 91 | 3 3 | 6 0 |
| 2004 and p  o | 18 | 377 | 395 | 58 | 1 7 | 2 5 |

| | 2011 | | | 2010 | | |
|---|---|---|---|---|---|---|
| | Alt-A | Non Alt-A | Total | Alt-A | Non Alt-A | Total |
| | | (in millions) | | | (in millions) | |
| **Cred  Losses** | | | | | | |
| Geog aph cal d s  bu on | | | | | | |
| A  zona, Ca fo n a, F o  da, and Nevada | $2,641 | $ 5,081 | $7,722 | $ 3,708 | $ 4,950 | $8,658 |
| A  o he  s a es | 1,050 | 4,209 | 5,259 | 1,438 | 3,964 | 5,402 |
| Yea  o  o  g na  on | | | | | | |
| 2011 | | 2 | 2 | | | |
| 2010 | | 62 | 62 | | <1 | <1 |
| 2009 | <1 | 177 | 177 | <1 | 63 | 63 |
| 2008 | 102 | 903 | 1,005 | 116 | 777 | 893 |
| 2007 | 1,455 | 3,245 | 4,700 | 1,905 | 2,836 | 4,741 |
| 2006 | 1,314 | 2,328 | 3,642 | 1,920 | 2,340 | 4,260 |
| 2005 | 713 | 1,566 | 2,279 | 1,091 | 1,701 | 2,792 |
| 2004 and p  o | 107 | 1,007 | 1,114 | 114 | 1,197 | 1,311 |

(1)  See  e  d  o e (5)  o "Tab e 45    Cha ac e  s cs of  he S ng e-Fam  y C ed  Gua an ee Po fol o" fo  nfo ma on on ou  calcula on of es ma ed c  e  LTV a os
(2)  Rep ese  s  pe ce age of  oa s, based o  oa  co       o  s ngle-fam ly c ed  gua an ee po  fol o, ha  have been mod f ed unde  ag eemen w h  he bo  owe ,
      nc ud ng  hose w h  oa  c a ges     es a eo  a   y da e,    we e pas  d e a   oun s a e added  o  he ou s and ng p  nc pa  ba ance of  he  loan

The table below presents statistics for combinations of certain characteristics of the mortgages in our single family credit guarantee portfolio as of December 31, 2011 and December 3 , 20 0

160

*Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2931

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 57    Single Family Credit Guarantee Portfolio by Attribute Combinations**

| | December 31, 2011 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current LTV Ratio ≤ 80[1] | | Current LTV Ratio of > 80 to 100[1] | | Current LTV > 100[1] | | Current LTV Ratio All loans[1] | | |
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
| **By Product type** | | | | | | | | | |
| FICO scores < 620 | | | | | | | | | |
| 20 and 30- year or more amort zing fixed-rate | 0.9% | 8.1% | 0.8% | 13.1% | 1.0% | 23.7% | 2.7% | 16.6% | 12% |
| 15 year amort zing fixed rate | 0.2 | 2 | <0.1 | 10.1 | <0.1 | 17.6 | 0.2 | 1.2 | 7 |
| ARMs adjustable rate[4] | 0.1 | 10.8 | <0.1 | 17.2 | <0.1 | 25 | 0.1 | 9.8 | 15 |
| interest only[5] | <0.1 | 16.0 | <0.1 | 22 | 0.1 | 3.9 | 0.1 | 0 | 30.3 |
| Other[6] | <0.1 | 3.6 | <0.1 | 7 | 0.1 | 1.1 | 0.1 | 2 | 5.6 |
| Total FICO scores < 620 | 1.2 | 7.0 | 0.8 | 13.5 | 1.2 | 2.1 | 3.2 | 13 | 12.9 |
| FICO scores of 620 to 659 | | | | | | | | | |
| 20 and 30- year or more amort zing fixed-rate | 2.0 | 5.2 | 1.5 | 8.9 | 2.0 | 18 | 5.5 | 11.5 | 10.1 |
| 15 year amort zing fixed rate | 0.6 | 2.5 | <0.1 | 6.1 | <0.1 | 15.1 | 0.6 | 0.6 | 2.8 |
| ARMs adjustable rate[4] | 0.1 | 5.5 | 0.1 | 11.7 | 0.1 | 23.6 | 0.3 | 2.0 | 12.6 |
| interest only[5] | <0.1 | 10 | 0.1 | 18.6 | 0.3 | 31.7 | 0 | 0.3 | 27.2 |
| Other[6] | <0.1 | 2.8 | <0.1 | 8 | <0.1 | 5.5 | <0.1 | 1 | 5 |
| Total FICO scores of 620 to 659 | 2.7 | | 1.7 | 9.1 | 2 | 19 | 6.8 | 8.9 | 9 |
| FICO scores of >= 660 | | | | | | | | | |
| 20 and 30- year or more amort zing fixed-rate | 3.6 | 1.0 | 20.3 | 2 | 12 | 9.2 | 67.3 | 2.7 | 2.8 |
| 15 year amort zing fixed rate | 13.1 | 0 | 1.0 | 1.1 | 0.2 | 6.0 | 1.3 | 0.1 | 0.5 |
| ARMs adjustable rate[4] | 2.5 | 1.1 | 0.8 | 3 | 0.8 | 1.8 | 1 | 0.5 | 5 |
| interest only[5] | 0 | 3.7 | 0.7 | 9.2 | 2.5 | 20.7 | 3.6 | 0.2 | 16.2 |
| Other[6] | <0.1 | 2.0 | <0.1 | 2.0 | 0.1 | 2.0 | 0.1 | 0.5 | 2.0 |
| Total FICO scores >= 660 | 50.6 | 0.8 | 22.8 | 2.6 | 16.0 | 10.8 | 89 | 1.9 | 2.6 |
| FICO scores not available | 0.3 | 8 | 0.2 | 11.9 | 0.1 | 21 | 0.6 | 5.5 | 8.9 |
| All FICO scores | | | | | | | | | |
| 20 and 30- year or more amort zing fixed-rate | 37.7 | 1.6 | 22.5 | 3 | 15.6 | 11.5 | 75.8 | 1 | 3.9 |
| 15 year amort zing fixed rate | 13.8 | 0.6 | 1.1 | 1.5 | 0.2 | 7.3 | 15.1 | 0.1 | 0.7 |
| ARMs adjustable rate[4] | 2.7 | 1.8 | 1.0 | 5.5 | 0.9 | 16 | 6 | 1.0 | 5.5 |
| interest only[5] | 0.5 | | 0.8 | 10.5 | 2.8 | 22.2 | 1 | 0.2 | 17.6 |
| Other[6] | 0.1 | 8.9 | 0.1 | 8 | 0.2 | 8 | 0 | 6.8 | 8.6 |
| Total single-family credit guarantee portfolio[7] | 5.8% | 1.3% | 25.5% | 3.6% | 19.7% | 12.8% | 100.0% | 2.9% | 3.6% |
| **By Region[8]** | | | | | | | | | |
| FICO scores < 620 | | | | | | | | | |
| North Central | 0.2% | 6.3% | 0.2% | 11.7% | 0.2% | 20.1% | 0.6% | 13 % | 12.0% |
| Northeast | 0 | 9.3 | 0.2 | 19.0 | 0.3 | 28.9 | 0.9 | 1.3 | 1.9 |
| Southeast | 0.2 | 7.9 | 0.2 | 13.9 | 0.3 | 29.5 | 0.7 | 13.9 | 15.9 |
| Southwest | 0.2 | 5.1 | 0.1 | 11.0 | 0.1 | 19.5 | 0 | 9 | 8.0 |
| West | 0.2 | 6 | 0.1 | 9.1 | 0.3 | 19.5 | 0.6 | 16.2 | 11.8 |
| Total FICO scores < 620 | 1.2 | 7.0 | 0.8 | 13.5 | 1.2 | 2.1 | 3.2 | 13 | 12.9 |
| FICO scores of 620 to 659 | | | | | | | | | |
| North Central | 0.5 | 0 | 0.3 | 8.2 | 0.5 | 15.1 | 1.3 | 8.7 | 8 |
| Northeast | 0.8 | 5.8 | 0.5 | 12.9 | 0 | 23.3 | 1.7 | 9.1 | 10.3 |
| Southeast | 0.5 | 5.2 | 0.3 | 9.5 | 0.6 | 2.1 | 1 | 9.1 | 12.2 |
| Southwest | 0.5 | 3.1 | 0.3 | 7.0 | 0.1 | 13.6 | 0.9 | 5.9 | 5.1 |
| West | 0 | 3.1 | 0.3 | 6.8 | 0.8 | 17.6 | 1.5 | 12.0 | 10.0 |
| Total FICO scores of 620 to 659 | 2.7 | | 1.7 | 9.1 | 2 | 19 | 6.8 | 8.9 | 9 |
| FICO scores of >=660 | | | | | | | | | |
| North Central | 8.5 | 0.7 | 7 | 2.3 | 2.8 | 7 | 16.0 | 1.6 | 2.0 |
| Northeast | 1.9 | 1.0 | 5.7 | 3.9 | 2.0 | 12.6 | 22.6 | 1.6 | 2.3 |
| Southeast | 7.1 | 1.2 | 3.9 | 2.8 | 3.8 | 1 | 1.8 | 2.1 | 2 |
| Southwest | 7 | 0.6 | 2.7 | 2.0 | 0 | 6.2 | 10.5 | 0.9 | 1.1 |
| West | 12.7 | 0.5 | 5.8 | 1.7 | 7.0 | 10.1 | 25.5 | 2.9 | 3.0 |
| Total FICO scores >= 660 | 50.6 | 0.8 | 22.8 | 2.6 | 16.0 | 10.8 | 89 | 1.9 | 2.6 |
| Total FICO scores not available | 0.3 | 8 | 0.2 | 11.9 | 0.1 | 21 | 0.6 | 5.5 | 8.9 |
| All FICO scores | | | | | | | | | |
| North Central | 9.1 | 1.0 | 5.3 | 3.2 | 3.6 | 9.5 | 18.0 | 2.6 | 2.9 |
| Northeast | 16.1 | 1.6 | 6 | 5.3 | 2.7 | 15.8 | 25.2 | 2.7 | 3 |
| Southeast | 7.9 | 1.8 | | 0 | 7 | 16.8 | 17.0 | 3 | 5.5 |
| Southwest | 8.2 | 1.1 | 3.2 | 3.1 | 0.6 | 9 | 12.0 | 1.8 | 1.8 |
| West | 13.5 | 0.7 | 6.2 | 2.1 | 8.1 | 11.3 | 27.8 | 3.8 | 3.6 |
| Total single-family credit guarantee portfolio[7] | 5.8% | 1.3% | 25.5% | 3.6% | 19.7% | 12.8% | 100.0% | 2.9% | 3.6% |

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2932

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

| | December 31, 2010 | | | | | | | | |
| | Current TV Ratio ≤ 80[ ] | | Current TV Ratio of > 80 to 100[ ] | | Current TV > 100[ ] | | Current TV Ratio All oans[ ] | | |
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
|---|---|---|---|---|---|---|---|---|---|
| **By Product ype** | | | | | | | | | |
| CO scores < 620 | | | | | | | | | |
| 20 and 30- year or more amort z ng f xed-rate | 1 1% | 8 6% | 0 8% | 15 1% | 0 9% | 27 5% | 2 8% | 12 9% | 15 1% |
| 15 year amort z ng f xed rate | 0 2 | 6 | <0 1 | 11 8 | <0 1 | 22 2 | 0 2 | 1 8 | 5 1 |
| ARMs adjustab e rate[4 | 0 1 | 12 2 | <0 1 | 18 | <0 1 | 28 6 | 0 1 | 7 6 | 16 9 |
| nterest on y[ | <0 1 | 17 6 | 0 1 | 25 3 | 0 1 | 39 9 | 0 2 | 0 9 | 33 3 |
| Other[6 | <0 1 | 3 7 | <0 1 | 8 5 | 0 1 | 13 2 | 0 1 | 3 1 | 5 6 |
| Tota F CO scores < 620 | 1 | 7 6 | 0 9 | 15 3 | 1 1 | 27 9 | 3 | 10 | 13 9 |
| F CO scores of 620 to 659 | | | | | | | | | |
| 20 and 30- year or more amort z ng f xed-rate | 2 | 5 2 | 1 7 | 9 8 | 1 8 | 20 5 | 5 9 | 8 3 | 10 3 |
| 15 year amort z ng f xed rate | 0 6 | 2 6 | <0 1 | 7 3 | <0 1 | 16 6 | 0 6 | 0 9 | 3 0 |
| ARMs adjustab e rate[4 | 0 1 | 6 0 | 0 1 | 13 5 | 0 1 | 25 9 | 0 3 | 1 5 | 13 6 |
| nterest on y[ | <0 1 | 10 9 | 0 2 | 20 6 | 0 3 | 35 6 | 0 5 | 0 9 | 29 2 |
| Other[6 | <0 1 | 2 6 | <0 1 | 5 | <0 1 | 5 3 | <0 1 | 1 0 | 3 |
| Tota F CO scores of 620 to 659 | 3 1 | 5 | 2 0 | 10 3 | 2 2 | 22 0 | 7 3 | 6 5 | 9 9 |
| F CO scores of >= 660 | | | | | | | | | |
| 20 and 30- year or more amort z ng f xed-rate | 36 5 | 1 0 | 20 0 | 2 8 | 10 | 10 | 66 9 | 1 9 | 2 8 |
| 15 year amort z ng f xed rate | 12 5 | 0 | 0 9 | 1 | 0 1 | 7 3 | 13 5 | 0 1 | 0 5 |
| ARMs adjustab e rate[4 | 1 9 | 1 6 | 0 8 | 5 | 0 8 | 17 0 | 3 5 | 0 | 5 6 |
| nterest on y[ | 0 7 | 3 7 | 1 2 | 10 3 | 2 8 | 23 1 | 7 | 0 | 16 7 |
| Other[6 | <0 1 | 2 1 | <0 1 | 2 0 | 0 1 | 1 3 | 0 1 | 0 | 1 7 |
| Total F CO scores >= 660 | 51 6 | 0 8 | 22 9 | 3 1 | 1 2 | 12 6 | 88 7 | 1 3 | 2 7 |
| CO scores not ava ab e | 0 | 6 | 0 1 | 11 9 | 0 1 | 23 7 | 0 6 | 1 | 8 8 |
| A F CO scores | | | | | | | | | |
| 20 and 30- year or more amort z ng f xed-rate | 0 2 | 1 6 | 22 6 | 3 9 | 13 2 | 13 1 | 76 0 | 2 9 | 0 |
| 15 year amort z ng f xed rate | 13 3 | 0 6 | 0 9 | 2 0 | 0 2 | 8 8 | 1 | 0 2 | 0 8 |
| ARMs adjustab e rate[4 | 2 1 | 2 | 1 0 | 7 0 | 0 9 | 18 7 | 1 | 0 | 6 7 |
| nterest on y[ | 0 7 | 5 | 1 3 | 11 7 | 3 2 | 2 9 | 5 2 | 0 5 | 18 |
| Other[6 | 0 2 | 9 3 | 0 1 | 8 6 | 0 1 | 7 3 | 0 | 5 2 | 8 6 |
| Tota s ng e-fam y cred t guarantee portfol o[7 | 56 5% | 1 % | 25 9% | 3% | 17 6% | 1 9% | 100 0% | 2 1% | 3 8% |
| **By Reg on[8** | | | | | | | | | |
| CO scores < 620 | | | | | | | | | |
| North Centra | 0 2% | 7 1% | 0 2% | 13 7% | 0 2% | 22 5% | 0 6% | 10 9% | 13 0% |
| Northeast | 0 5 | 9 | 0 3 | 19 9 | 0 2 | 30 5 | 1 0 | 10 7 | 1 5 |
| Southeast | 0 2 | 8 | 0 2 | 15 5 | 0 3 | 31 9 | 0 7 | 10 7 | 16 |
| Southwest | 0 3 | 5 9 | 0 1 | 12 7 | 0 1 | 2 1 | 0 5 | 7 6 | 9 2 |
| West | 0 2 | 5 6 | 0 1 | 13 5 | 0 3 | 28 0 | 0 6 | 12 3 | 15 8 |
| Tota F CO scores < 620 | 1 | 7 6 | 0 9 | 15 3 | 1 1 | 27 9 | 3 | 10 | 13 9 |
| F CO scores of 620 to 659 | | | | | | | | | |
| North Centra | 0 6 | 3 | 0 | 9 6 | 0 | 16 6 | 1 | 6 6 | 8 9 |
| Northeast | 0 9 | 5 | 0 6 | 13 7 | 0 3 | 23 2 | 1 8 | 6 | 9 6 |
| Southeast | 0 5 | 5 3 | 0 | 10 0 | 0 6 | 25 5 | 1 5 | 6 6 | 12 1 |
| Southwest | 0 6 | 3 | 0 3 | 8 1 | 0 1 | 15 3 | 1 0 | 5 | 5 6 |
| West | 0 5 | 3 5 | 0 3 | 9 6 | 0 8 | 23 7 | 1 6 | 8 5 | 12 7 |
| Tota F CO scores of 620 to 659 | 3 1 | 5 | 2 0 | 10 3 | 2 2 | 22 0 | 7 3 | 6 5 | 9 9 |
| F CO scores of >= 660 | | | | | | | | | |
| North Centra | 8 9 | 0 7 | 9 | 2 8 | 2 3 | 7 9 | 16 1 | 1 2 | 2 1 |
| Northeast | 15 0 | 1 0 | 5 6 | | 1 5 | 12 0 | 22 1 | 1 1 | 2 1 |
| Southeast | 7 | 1 2 | 1 | 3 0 | 3 6 | 15 1 | 15 1 | 1 | 1 |
| Southwest | 7 3 | 0 7 | 2 9 | 2 3 | 0 3 | 6 8 | 10 5 | 0 7 | 1 2 |
| West | 13 0 | 0 6 | 5 | 2 7 | 6 5 | 13 8 | 2 9 | 2 1 | 3 9 |
| Total F CO scores >= 660 | 51 6 | 0 8 | 22 9 | 3 1 | 1 2 | 12 6 | 88 7 | 1 3 | 2 7 |
| CO scores not ava ab e | 0 | 6 | 0 1 | 11 9 | 0 1 | 23 7 | 0 6 | 1 | 8 8 |
| A F CO scores | | | | | | | | | |
| North Centra | 9 6 | 1 2 | 5 6 | 3 9 | 3 0 | 10 5 | 18 2 | 2 0 | 3 1 |
| Northeast | 16 6 | 1 6 | 6 | 6 0 | 2 0 | 15 | 25 0 | 1 9 | 3 2 |
| Southeast | 8 2 | 1 9 | 7 | 3 | 5 | 17 8 | 17 | 2 | 5 6 |
| Southwest | 8 2 | 1 2 | 3 | 3 6 | 0 5 | 10 9 | 12 1 | 1 5 | 2 1 |
| West | 13 9 | 0 9 | 5 8 | 3 | 7 6 | 15 5 | 27 3 | 2 7 | 7 |
| Tota s ng e-fam y cred t guarantee portfol o[7 | 56 5% | 1 % | 25 9% | 3% | 17 6% | 1 9% | 100 0% | 2 1% | 3 8% |

(1)  he current  V ratios are our estimates  See endnote (5) to "Tab e  5   Character st cs of the S ng e-Fam y Cred t Guarantee Portfo o" for further information
(2)  Based on UPB of the s ng e-fam y cred t guarantee portfo o
(3)  See endnote (2) to "Tab e 56   Cred t Concentrat ons in the S ng e- am y Cred t Guarantee Portfo io"
( )   nc udes ba oon resets and option ARM mortgage oans
(5)   nc udes both fixed rate and adjustab e rate oans   he percentages of nterest on y oans wh ch have been mod f ed at period end ref ect that a number of these  oans have not yet been ass gned to the r new product category(post mod f cat on), primar y due to de ays in processing
(6)  Cons st of FHA VA and other government guaranteed mortgages
(7)   he tota of F CO scores categories may not sum due to the nc us on of oans where  CO scores are not ava ab e n the respect ve tota s for a oans  See endnote (7) to "Tab e  5   Character st cs of the S ng e-Fam y Cred t Guarantee Portfo o" for further information about our use of F CO scores
(8)  Presentat on w th the fo ow ng reg ona des gnat on  West (A  , AZ, CA, GU,H , D, M , NV, OR, U  , WA)  Northeast (C  , D  , DC,MA,M  , MD, NH, NJ, NY, PA,R  , VT, VA, WV)  North Centra  (  , N , A, M , MN, ND, OH, SD, W )  Southeast(A  , F  , GA,  Y, MS, NC, PR, SC,  N, V )  and Southwest (AR, CO,  S,  A, MO,N  , NM, OK, TX, WY)

162

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2933

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents delinquency and default rate  information for loans in our single family credit guarantee  portfolio based on year of origination

**Table 58     Single Family Credit Guarantee Portfolio by Year of Loan Origination**

| Year of Loan Origination | As of December 31, 2011 | | As of December 31, 2010 | | As of December 31,2009 | |
|---|---|---|---|---|---|---|
| | Percentage of Portfolio | Foreclosure and Short Sale Rate(1) | Percentage of Portfolio | Foreclosure and Short Sale Rate(1) | Percentage of Portfolio | Foreclosure and Short Sale Rate(1) |
| 2011 | 14% | % | | | | |
| 2010 | 19 | 0 05 | 18 | | | |
| 2009 | 18 | 0 17 | 21 | 0 04 | 23 | |
| 2008 | 7 | 2 23 | 9 | 1 26 | 12 | 0 37 |
| 2007 | 10 | 7 49 | 11 | 4 92 | 14 | 2 24 |
| 2006 | 7 | 6 95 | 9 | 5 00 | 11 | 2 70 |
| 2005 | 8 | 4 07 | 10 | 2 95 | 12 | 1 63 |
| 2000  h ough 2004 | 17 | 1 04 | 22 | 0 88 | 28 | 0 69 |
| o a | 100% | | 100% | | 100% | |

(1) Calcula ed fo  each yea  of o  g na  on as  he numbe  of loans  ha  have p oceeded  o fo ec osu e  ansfe  o  sho  sa e and  es  ed  a  ce d  oss, exc  d  g a y  s bseq e   ecove  es du  ng  he pe  od f om o  g na  on  o Decembe  31, 2011, 2010, and 2009,  espec  ve y, d v ded by   e n   be of oans n ou  s ng e-fam  y  c ed  gua an ee po  fol o o  g na ed n  ha  yea

The UPB of loans originated after 2008 comprised 51% of our  portfolio as of December 31, 2011, including 11% of our portfolio that were relief refinance mortgages (regardless of LTV ratio)  At December 31, 2011, approximately 32% of our single family credit guarantee portfolio consisted of mortgage loans originated from 2005 through 2008  Loans originated from  2005 through 2008 have experienced higher serious delinquency rates in the earlier years of their terms as compared to our  historical experience  We attribute this serious delinquency performance to a number of factors, including: (a) the  expansion of credit terms under which loans were underwritten  during these years; (b) an increase in the origination and our purchase of interest only and Alt A mortgage products in these years; and (c) an environment of  persistently high unemployment, decreasing home sales, and broadly declining home prices in the period following the  loans' origination  Interest only and Alt A products have higher inherent credit risk than traditional  fixed rate mortgage products

*Multifamily Mortgage Credit Risk*

Portfolio diversification, particularly by product and  geographical area, is an important aspect of our strategy to  manage mortgage credit risk for multifamily loans. We monitor a variety of mortgage loan characteristics that may affect the  default experience on our multifamily mortgage portfolio, such as the LTV ratio, DSCR, geographic location and loan maturity. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" for more information about the loans in our  multifamily mortgage portfolio  We also monitor the performance  and risk concentrations of our multifamily loans and the  underlying properties throughout the life of the loan

The table below provides certain attributes of our multifamily  mortgage portfolio at December 3  , 20    and 20  0

163                                                    *Freddie Mac*

Source    D  RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012                      Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 59     Multifamily Mortgage Portfolio     by Attribute**

| | UPB (1) at | | Delinquency Rate(2) at | |
| --- | --- | --- | --- | --- |
| | December 31, 2011 | December 31, 2010 | December 31, 2011 | December 31, 2010 |
| | (dollars in billions) | | | |
| **Original LTV ratio(3)** | | | | |
| Be ow 75% | $ 78 8 | $ 72 0 | 0 10% | 0 08% |
| 75% o 80% | 30 9 | 29 8 | 0 08 | 0 24 |
| Above 80% | 6 4 | 6 6 | 2 34 | 2 30 |
| o a | $ 116 1 | $ 108 4 | 0 22% | 0 26% |
| We gh ed ave age LTV a o a o g na on | 70% | 70% | | |
| | | | | |
| **Maturity Dates** | | | | |
| 2011 | N/A | $ 2 3 | N/A | 0 97% |
| 2012 | $ 3 0 | 4 1 | 1 35% | 0 82 |
| 2013 | 5 6 | 6 2 | | |
| 2014 | 7 6 | 8 5 | 0 03 | 0 02 |
| 2015 | 11 0 | 12 0 | 0 17 | 0 09 |
| Beyond 2015 | 88 9 | 74 7 | 0 22 | 0 29 |
| o a | $ 116 1 | $ 108 4 | 0 22% | 0 26% |
| | | | | |
| **Year o Acquisition or Guarantee(4)** | | | | |
| 2004 and p o | $ 12 4 | $ 15 9 | 0 40% | 0 31% |
| 2005 | 7 2 | 7 9 | 0 20 | |
| 2006 | 10 8 | 11 6 | 0 25 | 0 25 |
| 2007 | 19 8 | 20 8 | 0 74 | 0 97 |
| 2008 | 20 6 | 23 0 | 0 09 | 0 03 |
| 2009 | 13 8 | 15 2 | | |
| 2010 | 12 7 | 14 0 | | |
| 2011 | 18 8 | N/A | | N/A |
| o a | $ 116 1 | $ 108 4 | 0 22% | 0 26% |
| | | | | |
| **Current Loan Size Distribution** | | | | |
| Above $25 m ll on | $ 42 8 | $ 39 6 | 0 06% | 0 07% |
| Above $5 m ll on o $25 m ll on | 64 0 | 59 4 | 0 31 | 0 38 |
| $5 m ll on and below | 9 3 | 9 4 | 0 31 | 0 37 |
| o a | $ 116 1 | $ 108 4 | 0 22% | 0 26% |
| | | | | |
| **Legal Structure** | | | | |
| Unsecu zed loans | $ 82 3 | $ 85 9 | 0 10% | 0 11% |
| Non-consol da ed F edd e Mac mo gage- ela ed secu es | 24 2 | 12 8 | 0 64 | 1 30 |
| O he gua an ee comm men s | 9 6 | 9 7 | 0 18 | 0 23 |
| o a | $ 116 1 | $ 108 4 | 0 22% | 0 26% |
| | | | | |
| **Credit Enhancement** | | | | |
| C ed -enhanced | $ 31 6 | $ 20 9 | 0 52% | 0 85% |
| Non-c ed -enhanced | 84 5 | 87 5 | 0 11 | 0 12 |
| o a | $ 116 1 | $ 108 4 | 0 22% | 0 26% |

(1) Beg nn ng n he second qua e of 2011, we exc ude non-consol da ed mo gage- ela ed secu es fo wh ch we do no p ov de ou gua an ee The p o pe od has been ev sed o confo m o he cu en pe od p esen a on

(2) See "Del nquenc es" below fo mo e nfo ma on abou ou mul fam ly del nquency a es

(3) O g nal LTV a o a e calcula ed as he UPB of he mo gage, d v ded by e esse of e app a sed va e of e p ope y a he me of mo gage o g na on o , excep fo ef nance oans, he mo gage bo owe 's pu chase p ce Second l ens no owned o gua an eed by us a e exc uded f o e LTV a o calcula on The ex s ence of a second en educes he bo owe 's eq y e p ope y a d, e efo e, ca n ease he sk of defau

(4) Based on e he (a) he yea of acqu s on, fo oans eco ded on ou conso da ed ba ance shee o (b) he yea ha we ssued ou gua an ee, fo he e a ning loans n ou mu fam y mo gage po fo o

Our multifamily mortgage portfolio consists of product types that are categorized based on loan terms Multifamily loans may be interest only or amortizing, fixed or variable rate, or may switch between fixed and variable rate over time However, our multifamily loans generally have balloon maturities ranging from five to ten years Amortizing loans reduce our credit exposure over time because the UPB declines with each mortgage payment Fixed rate loans may also create less risk for us because the borrower's payments are determined at origination, and, therefore, the risk that the monthly mortgage payment could increase if interest rates rise as with a variable rate mortgage is eliminated As of both December 31, 2011 and 2010, approximately 85% of the multifamily loans on our consolidated balance sheets had fixed interest rates while the remaining loans had variable interest rates

*Freddie Mac*

Source   D RA HOM  OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2935

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Because most multifamily loans require a significant lump sum (*i.e.*, balloon) payment of unpaid principal at maturity, the inability to refinance or pay off the loan at maturity is a serious concern for us  Borrowers may be less able to refinance  their obligations during periods of rising interest rates, which could lead to default if the borrower is unable to find  affordable refinancing  Loan size at origination does not generally indicate the degree of a loan's risk, but it does  indicate our potential exposure to default

While we believe the underwriting practices we employ for our  multifamily loan portfolio are prudent, the ongoing weak  economic conditions in the U S  negatively impacted  multifamily rental properties  Our delinquency rates have  remained relatively low compared to other industry participants, which we believe to be, in part, the result of our underwriting  standards versus those used by others in the industry.

Although property values increased in recent quarters, they are  still below the highs of a few years ago and are lower than when  many of the loans were originally underwritten, particularly in  areas where economic conditions remain weak  As a result, if  property values do not continue to improve, borrowers may experience significant difficulty refinancing as their loans  approach maturity, which could increase borrower defaults or increase modification volumes. Of the $116.1 billion in UPB  of our multifamily mortgage portfolio as of December 3  , 2011, only 3% and 5% will mature during 2012 and 2013,  respectively, and the remaining 92% will mature in 2014 and beyond

In certain cases, we may provide short term loan extensions of  up to 12 months for certain borrowers. Modifications and  extensions of loans are performed in an effort to minimize our losses  During the year ended December 31, 2011, we extended and modified unsecuritized multifamily loans totaling $391 million in UPB, compared with $816 million during  the year ended December 3  , 20 0  Multifamily unsecuritized loan modifications during the year ended December 31, 2011  included: (a) $99 million in UPB for short term loan  extensions; and (b) $292 million in UPB for loan  modifications  Where we have granted a concession to borrowers  experiencing financial difficulties, we account for these loans as TDRs  When we execute a modification classified as a TDR, the  loan is then classified as nonperforming for the life of the loan regardless of its delinquency status  At December 31, 2011, we had $893 million of multifamily loan UPB  classified as TDRs on our consolidated balance sheets

We use credit enhancements to mitigate risk of loss on certain  multifamily mortgages and housing revenue bonds  Historically,  we required credit enhancements on loans in situations where we  delegated the underwriting process for the loan to the  seller/servicer, which provides first loss coverage on the mortgage loan  We may also require credit enhancements during  construction or rehabilitation in cases where we commit to purchase or guarantee a permanent loan upon completion and in  cases where occupancy has not yet reached a level that produces  the operating income that was the basis for underwriting the  mortgage  Additionally, certain Other Guarantee Transactions  issued by our Multifamily segment have related subordinated classes, that we do not guarantee, that provide credit loss  protection to the senior classes that we guarantee  Subordinated classes are allocated credit losses prior to the senior classes  See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections and  other forms of credit enhancements covering loans in our  multifamily mortgage portfolio as of December 31, 2011 and 20  0

*Delinquencies*

Our multifamily delinquency rates include all multifamily loans  that we own, that are collateral for Freddie Mac securities, and  that are covered by our other guarantee commitments, except  financial guarantees that are backed by HFA bonds because these  securities do not expose us to meaningful amounts of credit risk  due to the guarantee or credit enhancement provided by the  U S  government  We report multifamily delinquency rates based on UPB of mortgage loans that are two monthly payments or  more past due or in the process of foreclosure, as reported by our servicers  Mortgage loans whose contractual terms have been  modified under agreement with the borrower are not counted as  delinquent as long as the borrower is current under the modified  terms. In addition, multifamily loans are not counted as  delinquent if the borrower has entered into a forbearance agreement and is abiding by the terms of the agreement, whereas  single family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the  borrower, if applicable.

Our delinquency rates for multifamily loans are positively  impacted to the extent we have been successful in working with  troubled borrowers to modify their loans prior to becoming  delinquent or by providing temporary relief through loan  modifications, including short term extensions  Some geographic areas, including the states of Arizona, Georgia, and Nevada,  continue to exhibit weaker than average fundamentals that increase our risk of future losses  We own or guarantee loans in  these states that are non performing, or we believe are at risk of  default  For further information regarding concentrations in  our multifamily mortgage portfolio, including regional  geographic composition, see "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS."

<div align="center">165</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our multifamily mortgage portfolio delinquency rate declined to  0 22% at December 31, 2011 from 0 26% at December 31,  2010. Our delinquency rate for credit enhanced loans was 0 52%  and 0.85% at December 31, 2011 and 2010, respectively, and for non credit enhanced loans was 0.11% and 0.12% at December 31, 2011 and 2010, respectively  As of December 31, 2011, more than one half of our multifamily loans that were two monthly payments or more past due, measured  both in terms of number of loans and on a UPB basis, had credit enhancements that we currently believe will mitigate our  expected losses on those loans

*Non Performing Assets*

Non performing assets consist of single family and multifamily  loans that have undergone a TDR, single family seriously  delinquent loans, multifamily loans that are three or more  payments past due or in the process of foreclosure, and REO  assets, net. Non performing assets also include multifamily loans that are deemed impaired based on management judgment  We place non performing loans on non accrual status when we believe the collectability of interest and principal on a loan is not  reasonably assured, unless the loan is well secured and in the  process of collection  When a loan is placed on non accrual status, any interest income accrued but uncollected is reversed  Thereafter, interest income is recognized only upon receipt of cash payments  We did not accrue interest on any loans three monthly payments or more past due in 2011 or 20 0

We classify TDRs as those loans where we have granted a  concession to a borrower that is experiencing financial  difficulties. TDRs remain categorized as non performing throughout the remaining life of the loan regardless of whether  the borrower makes payments which return the loan to a current payment status after modification. See "NOTE 5:  INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS" for further information about our TDRs.

The table below provides detail on non performing loans and REO  assets on our consolidated balance sheets and non performing  loans underlying our financial guarantees

**Table 60      Non-Performing Assets(1)**

| | 2011 | 2010 | December 31, 2009 | 2008 | 2007 |
|---|---|---|---|---|---|
| | | | (dollars in millions) | | |
| Non-pe fo m ng mo gage loans    on balance shee | | | | | |
| S ngle-fam ly TDRs | | | | | |
|   Repe fo m ng (*i.e.*, ess a     ee o   y pay e s pas d e) | $ 44,440 | $ 26,612 | $     711 | $     484 | $     282 |
|   Se ous y de nquen | 11,639 | 3,144 | 477 | 163 | 67 |
| Mul fam ly TDRs(2 | 893 | 911 | 229 | 150 | 167 |
|   To a  TDRs | 56,972 | 30,667 | 1,417 | 797 | 516 |
| O he s ng e-fam y non-pe fo m ng oans(3 | 63,205 | 84,272 | 12,106 | 5,590 | 5,842 |
| O he mu  fam y non-pe fo m ng oans( | 1,819 | 1,750 | 1,196 | 197 | 188 |
| To al non-pe fo m ng mo gage loans    on balance shee | 121,996 | 116,689 | 14,719 | 6,584 | 6,546 |
| Non-pe fo m ng mo gage loans    off-balance shee | | | | | |
| S ng e-fam y oans | 1,230 | 1,450 | 85,395 | 36,718 | 7,786 |
| Mul fam ly loans | 246 | 198 | 178 | 63 | 51 |
| To al non-pe fo m ng mo gage loans    off-balance shee | 1,476 | 1,648 | 85,573 | 36,781 | 7,837 |
| Rea es a e ow ed,  e | 5,680 | 7,068 | 4,692 | 3,255 | 1,736 |
| To al non-pe fo m ng asse s | $129,152 | $125,405 | $104,984 | $ 46,620 | $16,119 |
| Loan loss ese ves as a pe cen age of ou  non-pe fo m ng mor gage oans | 32 0% | 33 7% | 33 8% | 36 0% | 19 6% |
| To al non-pe fo m ng asse s as a pe cen age of  he o al mo gage po fol o, exclud ng non-F dd e Mac secu es | 6 8% | 6 4% | 5 2% | 2 4% | 0 9% |

(1) Mo gage oan a  o n s a e based on UPB and REO, ne  s based on  ca y ng va ues
(2) As of Decembe 31, 2011, app ox ma ely $872 m ll on n UPB of  ese oa s we e c  e
(3) Rep esen s oans ecogn zed by us on ou  conso da ed ba ance s ee s,  c d g oa s e oved f o  PC   s s d e o  e bo owe 's se ous del nquency
(4) Of  s a o  , $1 8    o , $1 6     o , a d $1 1 b  on of UPB we e c en a  Dece  be 31, 2011, Decembe 31, 2010, and Decembe 31, 2009 espec ve y

The amount of non performing assets increased to $129.2 billion as of December 31, 2011, from $125.4 billion at December 31, 2010, primarily due to a significant increase in single family loans classified as  TDRs, which was substantially offset by a decline in the rate at which loans transitioned into serious delinquency. The UPB of loans categorized as TDRs increased to $57.0 billion at  December 31, 2011 from $30.7 billion at December 3 , 20 0, largely due to a continued high volume of loan modifications during 2011 in which we extended the term of the loan, decreased the contractual interest rate, deferred the  balance on which contractual interest is computed, or made a  combination of these changes. TDRs during 2011 include HAMP and non HAMP loan modifications as well as loans in modification  trial periods and certain other loss mitigation actions  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

POLICIES," and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS" for information about our  implementation of an amendment to the accounting guidance on  classification of loans as TDRs in 2011. In 2011, our non HAMP modifications comprised a greater portion of our completed loan  modification volume and the volume of HAMP modifications  declined, compared to 20  0 activity  We expect our non performing assets, including loans deemed to be TDRs, to  remain at elevated levels in 20  2

The table below provides detail by region for REO activity  Our REO activity consists almost entirely of single family  residential properties  Consequently, our regional REO acquisition trends generally follow a pattern that is similar  to, but lags, that of regional serious delinquency trends of our single family credit guarantee portfolio  See "Table 57     Single Family Credit Guarantee Portfolio by Attribute Combinations" for information about regional serious delinquency rates

**Table 61     REO Activity by Region**[1]

| | December 31, | | |
| --- | --- | --- | --- |
| | 2011 | 2010 | 2009 |
| | | (number of properties) | |
| **REO Inventory** | | | |
| Beg nn ng p ope  y  nven o  y | 72,093 | 45,052 | 29,346 |
| Ad us men  o beg nn ng balance[2] | | 1,340 | |
| P ope  es acqu  ed by  eg on | | | |
| No  heas | 6,970 | 11,022 | 7,529 |
| So t  east | 23,195 | 35,409 | 19,255 |
| No h Cen  a | 26,259 | 29,550 | 19,946 |
| So t  west | 12,861 | 14,092 | 8,942 |
| Wes | 29,371 | 36,843 | 29,440 |
| To al p ope  es acqu  ed | 98,656 | 126,916 | 85,112 |
| P ope  es d sposed by  eg on | | | |
| No  heas | (8,883) | (8,490) | (5,663) |
| So t  east | (28,310) | (26,082) | (15,678) |
| No h Cen  a | (25,971) | (22,349) | (15,549) |
| So t  west | (13,099) | (11,044) | (7,142) |
| Wes | (33,931) | (33,250) | (25,374) |
| To al p ope  es d sposed | (110,194) | (101,215) | (69,406) |
| End ng p ope  y  nven o  y | 60,555 | 72,093 | 45,052 |

(1) See e  d  o  e (8)  o "Ta  e 57     S ngle-Fam ly C ed  Gua an ee Po  fo  o by A   bu e Comb na  ons" fo  a desc  p on of  hese  eg ons
(2) Rep ese  s REO asse s assoc a ed w   p  ev o s  y non-consol da ed mo  gage   us s  ecogn zed upon adop on of  he amendmen   o  he accoun  ng gu dance fo  consol da on of VIEs o  Ja  a y 1, 2010

After having increased 60% in 2010, our REO property inventory  declined 16% in 2011. The decline in 2011 is primarily due to a decline in the volume of single family foreclosures caused by  delays in the foreclosure process, combined with continued  strong levels of REO disposition activity during the period. The  increase in 2010 was due, in part, to increased levels of  foreclosures associated with borrowers that did not qualify for or did not successfully complete a modification or short sale   The average length of time for foreclosure of a Freddie Mac loan significantly increased in recent years due to temporary  suspensions, delays, and other factors. During 2011 and 2010,  the nationwide average for completion of a foreclosure (as  measured from the date of the last scheduled payment made by the  borrower) on our single family delinquent loans, excluding those  underlying our Other Guarantee Transactions, was 506 days and 446 days, respectively, which included: (a) an average of 633 days and 551 days, respectively, for foreclosures completed in states that require a judicial  foreclosure process; and (b) an average of 449 days and 384 days, respectively, for foreclosures completed in states that do not require a judicial foreclosure process  We exper enced significant variability in the average time for  foreclosure by state in 2011. For example, during 2011, the  average time for completion of foreclosures associated with loans in our single family credit guarantee portfolio, excluding  Other Guarantee Transactions, was 375 days in Michigan and 841 days in Florida.

We expect the pace of our REO acquisitions will continue to be  affected by delays in the foreclosure process in 2012  However,  we expect the volume of our REO acquisitions will likely remain  elevated, as we have a large inventory of seriously delinquent  loans in our single family credit guarantee portfolio, many of which will likely complete the foreclosure process and  transition to REO during 2012 as our servicers continue to work through their foreclosure related issues  This inventory of  seriously delinquent loans arose due to various factors and  events that have lengthened the problem loan resolution process and delayed the transition of such loans to a workout or  foreclosure transfer (and then, to REO). These factors and events include the effect of HAMP, suspensions of foreclosure transfers, and the increasingly lengthy foreclosure process in many states.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2938

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our single family REO acquisitions in 2011 were most significant in the states of California, Michigan, Georgia, Florida, and Arizona, which collectively represented 43% of total REO acquisitions based on the number of properties. These states collectively represented 48% of total REO acquisitions in 2010  The states with the most properties in our REO inventory as of December 31, 2011 were Michigan and California  At December 31, 2011, our REO inventory in Michigan and California comprised 12% and 10%, respectively, of total REO property inventory, based on the number of properties

We are limited in our REO disposition efforts by the capacity of the market to absorb large numbers of foreclosed properties  An increasing portion of our REO acquisitions are: (a) located in jurisdictions that require a period of time after foreclosure during which the borrower may reclaim the property; or (b) occupied and we have either retained the tenant under an existing lease or begun the process of eviction  All of these factors resulted in an increase in the aging of our inventory  During the period when the borrower may reclaim the property, or we are completing the eviction process, we are not able to market the property. As of December 31, 2011, 2010, and 2009, approximately 33%, 28%, and 35%, respectively, of our REO properties were not marketable due to the above conditions  Our temporary suspension of certain REO sales during the fourth quarter of 2010 (for up to three months) due to concerns about deficiencies in foreclosure documentation practices also caused the average holding period to increase  Primarily for these reasons, the average holding period of our REO properties increased in the last two years, though it varies significantly in different states  Excluding any post foreclosure period during which borrowers may reclaim a foreclosed property, the average holding period associated with our REO dispositions during the years ended December 31, 2011 and 2010 was 197 days and 155 days, respectively. As of December 31, 2011 and 2010, the percentage of our single family REO property inventory that had been held for sale longer than one year was 7 1% and 3 4%, respectively  We continue to actively market these properties through our established initiatives

The percentage of interest only and Alt A loans in our single family credit guarantee portfolio, based on UPB, was approximately 4% and 5%, respectively, at December 31, 2011 and was 8% on a combined basis. The percentage of our REO acquisitions in 2011 that had been financed by either of these loan types represented approximately 30% of our total REO acquisitions, based on loan amount prior to acquisition.

We began to expand our methods for REO sales during 2010, including the expanded use of REO auctions and bulk sale transactions of properties in certain geographical areas  Although auction and bulk sales are potentially available for use in all geographical areas, these methods of REO disposition have to date only been used for our more difficult to sell or highly distressed inventory. As a result, in 2011, auction and bulk sales represented an insignificant portion of our REO dispositions  In addition, in certain locations we have offered REO properties for purchase by Neighborhood Stabilization Program grant recipients prior to listing the properties for sale to the general public  For the first 15 days following listing, we also offer most of our REO properties exclusively to Neighborhood Stabilization Program grant recipients and purchasers who intend to occupy the properties

On August 10, 2011, FHFA, in consultation with Treasury and HUD, announced a request for information seeking input on new options for sales and rentals of single family REO properties held by Freddie Mac, Fannie Mae and FHA  According to the announcement, the objective of the request for information was to help address current and future REO inventory. The request for information solicited alternatives for maximizing value to taxpayers and increasing private investment in the housing market, including approaches that support rental and affordable housing needs. We are participating in discussions with FHFA and other agencies with respect to this initiative  It is too early to determine the impact this initiative may have on the levels of our REO property inventory, the process for disposing of REO property or our REO operations expense

### *Credit Loss Performance*

Many loans that are seriously delinquent, or in foreclosure, result in credit losses  The table below provides detail on our credit loss performance associated with mortgage loans and REO assets on our consolidated balance sheets and underlying our non consolidated mo tgage related financial guarantees

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                          Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2939

Table of Contents

**Table 62     Credit Loss Performance**

| | December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | | (dollars in millions) | |
| REO | | | |
| REO a a ces, e | | | |
| S ng e- am y | $ 5,548 | $ 6,961 | $ 4,661 |
| Mu fam y | 132 | 107 | 31 |
| o a | $ 5,680 | $ 7,068 | $ 4,692 |
| REO ope a ons ( ncome) expense | | | |
| S ng e- am y | $ 596 | $ 676 | $ 287 |
| Mu fam y | (11) | (3) | 20 |
| o a | $ 585 | $ 673 | $ 307 |
| Cha ge-offs | | | |
| S ng e-fam y | | | |
| C a ge-offs, g oss[1] ( nc ud ng $14 7 b on, $16 2 b on, and $9 4 b ll on ela ng o loan loss eves, espec vely) | $15,149 | $16,746 | $ 9,661 |
| Recove es[2] | (2,764) | (3,362) | (2,088) |
| S ngle-fam ly, ne | $12,385 | $13,384 | $ 7,573 |
| Mul fam ly | | | |
| C a ge-offs, g oss[1] ( nclud ng $75 m ll on, $104 m ll on, and $21 m ll on ela ng o loan loss ese ves, espec vely) | $ 83 | $ 104 | $ 21 |
| Recove es[2] | (1) | (1) | |
| Mu fam y, ne | $ 82 | $ 103 | $ 21 |
| To al Cha ge-offs | | | |
| C a ge-offs, g oss[1] ( c d g $148 b o , $16 3 b o , a d $9 4 b ll on ela ng o loan loss ese ves, espec vely) | $15,232 | $16,850 | $ 9,682 |
| Recove es[2] | (2,765) | (3,363) | (2,088) |
| To a Cha ge-offs, ne | $12,467 | $13,487 | $ 7,594 |
| C ed Losses[3] | | | |
| S ng e- am y | $12,981 | $ 14,060 | $ 7,860 |
| Mu fam y | 71 | 100 | 41 |
| o a | $ 13,052 | $ 14,160 | $ 7,901 |
| To al ( n ps)[4] | 68 1 | 72 2 | 40 7 |

(1) Rep esen he ca y ng a oun of a oan ha has been d scha ged n o de o emove he loan f om ou conso da ed balance shee s a he me of esolu on, ega dless of when he mpac of he c ed loss was eco ded on ou consol da ed s a emen s of ncome and comp ehens ve ncome h ough he p ov s on fo c ed losses o losses on loans pu chased Cha ge-offs p ma ly esu f om fo ec osu e ansfe s and sho sa es and a e gene a y ca cu a ed as he eco ded nves men of a oan a he da e of d scha ge ess he es ma ed va ue n f na d spos on o a he un se n a sho sa e

(2) Recove es of cha ge-offs p ma ly esul f om fo eclosu e ansfe s and sho sa es on oans whe e a sha e of defau sk has been assu ed by o gage nsu e s, se v ce s, o o he h d pa es h ough c ed enhancemen s

(3) Excludes fo egone n e es on non-pe fo m ng loans, wh ch educes o e ese es co e b so ef ec ed o o a c ed osses In add on, exc udes o he ma ke -based c ed losses (a) ncu ed on ou nves men s n mo gage loans and mo gage- ela ed secu es and (b) ecogn zed n ou consol da ed s a emen s of ncome and comp ehens ve ncome

(4) Ca cu a ed as c ed osses d v ded by he ave age ca y ng value of ou o al mo gage po fol o, exclud ng non-F edd e Mac mo gage- ela ed secu es and ha po on of REMICs and O e S c ed Sec es a e backed by G e Mae Cae f ca es

    Our credit loss performance metric generally measures losses at the conclusion of the loan and related collateral resolution process. There is a significant lag in time from the implementation of problem loan workout activities until the final resolution of seriously delinquent mortgage loans and REO assets. Our credit loss performance is based on our charge offs and REO expenses We primarily record charge offs at the time we take ownership of a property through foreclosure and at the time of settlement of foreclosure alternative transactions Single family charge offs, gross, for 2011 and 2010 were $15.1 billion and $16.7 billion, respectively, and were associated with approximately $31 5 billion and $33.9 billion, respectively, in UPB of loans. Our net charge offs in 2011 remained elevated, but reflect suppression of activity due to delays in the foreclosure process and continuing weak market conditions We expect our charge offs and credit losses to remain high in 2012 and they may increase over 20   levels, due to the large number of single family non performing loans that will likely be resolved as our servicers work through their foreclosure related issues and because market conditions, such as home prices and the rate of home sales, continue to remain weak.

    Our credit losses during 2011 continued to be disproportionately high in those states that experienced significant declines in property values since 2006, such as California, Florida, Nevada, and Arizona, which collectively comprised approximately 60% of our total credit losses in 2011 Due to declines in property values since 2006, we continued to experience high REO disposition severity ratios on sales of our REO inventory during 2011. In addition, although Alt A loans comprised approximately 5% and 6% of our single family credit guarantee portfolio at December 31, 2011 and 2010, respectively, these loans accounted for approximately 28% and 37% of our credit losses in 2011 and 2010,

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2940

Table of Contents

respectively  See "Table 3   Credit Statistics, Single Family Credit Guarantee Portfolio" for  information on REO disposition severity ratios, and see "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information about our credit losses.

The table below provides detail by region for charge offs  Regional charge off trends generally follow a pattern that is  similar to, but lags, that of regional serious delinquency trends.

**Table 63     Single Family Charge offs and Recoveries by Region[1]**

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2011 | | | 2010 | | | 2009 | | |
| | Charge offs, gross | Recoveries[2] | Charge offs, net | Charge offs, gross | Recoveries[2] (in millions) | Charge offs, net | Charge offs, gross | Recoveries[2] | Charge offs, net |
| No heas | $ 1,033 | $ (226) | $ 807 | $ 1,367 | $ (318) | $ 1,049 | $ 854 | $ (194) | $ 660 |
| So t east | 3,210 | (693) | 2,517 | 4,311 | (1,005) | 3,306 | 2,124 | (557) | 1,567 |
| No h Cen a | 2,502 | (615) | 1,887 | 2,638 | (694) | 1,944 | 1,502 | (393) | 1,109 |
| So t west | 777 | (243) | 534 | 761 | (288) | 473 | 484 | (169) | 315 |
| Wes | 7,627 | (987) | 6,640 | 7,669 | (1,057) | 6,612 | 4,697 | (775) | 3,922 |
| o a | $ 15,149 | $ (2,764) | $ 12,385 | $ 16,746 | $ (3,362) | $ 13,384 | $ 9,661 | $ (2,088) | $ 7,573 |

(1) See e d o e (8) o "Ta  e 57   S ngle-Fam ly C ed  Gua an ee Po  fol o by A  bu e Comb na  ons" fo  a desc  p on of hese  eg ons
(2) Recove  es of cha ge-offs p  ma  ly  esul  f om fo eclosu e  ansfe s and sho  sa es on  oans whe e a sha e of defau   sk has been assu  ed by  o  gage nsu e s, se v ce s, o  o he   h d pa  es  hough c ed  enhancemen s

*Loan Loss Reserves*

We maintain mortgage related loan loss reserves at levels we believe appropriate to absorb probable incurred losses on  mortgage loans held for investment on our consolidated balance sheets and those underlying Freddie Mac mortgage related  securities and other guarantee commitments  Determining the loan loss reserves is complex and requires significant management  judgment about matters that involve a high degree of subjectivity  See "CRITICAL ACCOUNTING POLICIES AND ESTIMATES     Allowance for Loan Losses and Reserve for Guarantee Losses" for further information

The table below summarizes our loan loss reserves activity for  held for investment mortgage loans recognized on our  consolidated balance sheets and underlying Freddie Mac  mortgage related securities and other guarantee commitments, in  total

**Table 64     Loan Loss Reserves Activity[1]**

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2011 | 2010 | 2009 | 2008 | 2007 |
| | | | (dollars in millions) | | |
| To al loan loss  ese ves | | | | | |
| Beg nn ng balance | $ 39,926 | $ 33,857 | $ 15,618 | $ 2,822 | $ 619 |
| Ad us  en s o beg nn ng balance[2] | | (186) | | | |
| P ov s on fo  c ed  losses | 10,702 | 17,218 | 29,530 | 16,432 | 2,854 |
| C a ge-offs, g oss[3] | (14,810) | (16,322) | (9,402) | (3,072) | (376) |
| Recove  es | 2,765 | 3,363 | 2,088 | 779 | 239 |
| T a sfe s, e ( | 878 | 1,996 | (3,977) | (1,343) | (514) |
| End ng balance | $ 39,461 | $ 39,926 | $ 33,857 | $ 15,618 | $ 2,822 |
| Componen s of loan loss  ese ves | | | | | |
| S ng e-am y | $ 38,916 | $ 39,098 | $ 33,026 | $ 15,341 | $ 2,760 |
| Mu  fam y | $ 545 | $ 828 | $ 831 | $ 277 | $ 62 |
| To al loan loss  ese ve, as a pe cen age of  he o al mo  gage po  fol o, exclud ng non-F edd e Mac secu es | 2 08% | 2 03% | 1 69% | 0 81% | 0 16% |

(1) Cons s s of  ese ves fo   oans he d-fo -  nves men  and  hose unde ly ng F edd e Mac mo  gage- ela ed secu  es and o he   gua an ee comm  men s
(2) Ad us men s  ea e o  he adop on of amendmen s o  he accoun ng gu dance fo   ansfe s of f nanc a  asse s and conso  da on of VIEs  See "NOTE 1  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES     Rece  Adop ed Accoun ng Gu dance" fo  fu  he   nfo ma on
(3) Cha ge-offs  e a ed o  oan oss  ese ves  ep esen  he amoun  of a  oan ha  has been d scha ged o   emove  he  oan f om ou   conso  da ed ba ance shee  due o  he  fo eclosu e  ansfe o a sho  sa e o  deed n  eu of fo ec osu e on  Cha ge-offs exc ude $422     on, $528     on, $280 m  on, $377 m  on, and $156 m ll on fo   o  yea s e ded Dece  be  31, 2011, 2010, 2009, 2008, a d 2007,  espec ve y, e a ed o ce a   oa s p c ased   de  f nanc al gua an ees and  eflec ed w h n losses on loans pu chased on ou  conso da ed s a emen s of  ncome and comp ehens ve ncome
(4) Recove  es of cha ge-offs p  ma  ly  esul  f om fo eclosu e  a e na  ves and REO acqu s  ons on  oans whe e (a) a sha e of defau   sk has been assumed by mo  gage  s e s, se v ce s o  o he   h d pa  es  h ough c ed  enhancemen s o  (b) we  ece ved a  e mbu semen of ou  losses f om a selle /se v ce  assoc a ed w h a  ep  c ase eq es  o  a  oa  ha  expe enced a fo eclosu e  ansfe  o a fo eclosu e al e na ve
(5) Cons s p  ma  ly of (a) amoun s  ela ed o  ag eemen s w h selle /se v ce s whe e  he  ansfe  ela es o a  specific amoun  of  he  ecogn zed  ese ves fo  gua an ee  osses assoc a ed w h  oans pu chased f om non-consol da ed F edd e Mac mo  gage- ela ed secu   es and o he  gua an ee comm  men s and (c) he amoun s a   bu ab e o  ecap al za on of pas due  n e es on mod f ed mo  gage  oa s  See "I   o a C ed  R sk     S ngle-fam ly Mo  gage Selle  Se v ce s" fo  mo e nfo ma on abou  ou  ag eemen s w h  ou  selle  se v ce s

170

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2941

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We adopted an amendment to the accounting guidance related to the classification of loans as TDRs in the third quarter of 2011, which significantly increases the population of problem loans subject to our workout activities that we account for and disclose as TDRs. The impact of this change in guidance on our financial results for 2011 was not significant because the loan loss reserve associated with those loans determined on a collective basis prior to their classification as TDRs was not materially different from the loan loss reserve of the loans determined on an individual basis upon classification as TDRs at the time of the adoption of this amendment  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS" for additional information on our accounting policies for loan loss reserves and TDR loans, including our implementation of changes to the accounting guidance related to the classification of loans as TDRs

The table below summarizes our allowance for loan loss activity for individually impaired single family mortgage loans on our consolidated balance sheets for which we have recorded a specific reserve

**Table 65     Single Family Impaired Loans with Specific Reserve Recorded**

| | As of December 31, 2011 | |
|---|---|---|
| | # o  Loans | Amount |
| | | (in millions) |
| TDRs ( eco ded  nves men ) | | |
| Decembe  31, 2010 balance | 128,241 | $ 28,440 |
| New add  ons | 136,316 | 27,791 |
| Repaymen s | (4,655) | (1,243) |
| Loss eve  s(1 | (7,607) | (1,537) |
| O he | 454 | 43 |
| Decembe  31, 2011 balance | 252,749 | 53,494 |
| O he ( eco ded  nves men )(2 | 25,565 | 2,433 |
| Decembe  31, 2011 balance | 278,314 | 55,927 |
| o a s ng e-fam  y  mpa ed  oans-a  owance fo  oan  osses | | (15,100) |
| Ne  nves men | | $ 40,827 |

(1) Cons s s of fo ec osu e  ansfe  o fo ec osu es a e na ve, such as a deed n  eu of fo ec osu e o  sho  sa e  ansac on
(2) Cons s s of  oans  mpa ed upon pu chase wh ch expe  enced fu he de e o a on n bo owe c ed

See "CONSOLIDATED RESULTS OF OPERATIONS     Provision for Credit Losses," for a discussion of our provision for credit losses and charge off activity

*Credit Risk Sensitivity*

Under a 2005 agreement with FHFA, then OFHEO, we are required to disclose the estimated increase in the NPV of future expected credit losses for our single family credit guarantee portfolio over a ten year period as the result of an immediate 5% decline in home prices nationwide, followed by a stabilization period and return to the base case. This sensitivity analysis is hypothetical and may not be indicative of our actual results. We do not use this analysis for determination of our reported results under GAAP  As shown in the table below, our credit loss sensitivity declined in the last half of 2011, primarily due to the effects of a decline in mortgage interest rates, which affected recent and future expectations of refinancing activity

**Table 66     Single Family Credit Loss Sensitivity**

| | Before Receipt of Credit Enhancements(1) | | After Receipt of Credit Enhancements(2) | |
|---|---|---|---|---|
| | NPV(3) | NPV Ratio(4) | NPV(3) | NPV Ratio(4) |
| | (dollars in millions) | | | |
| At | | | | |
| Decembe  31, 2011 | $8,328 | 47 7  ps | $7,842 | 44 9  ps |
| Sep embe  30, 2011 | $8,824 | 49 5  ps | $8,229 | 46 1  ps |
| J  e 30, 2011 | $10,203 | 56 5  ps | $ 9,417 | 52 2  ps |
| Ma ch 31, 2011 | $9,832 | 54 2  ps | $8,999 | 49 6  ps |
| Decembe  31, 2010 | $ 9,926 | 54 9  ps | $ 9,053 | 50 0 bps |

(1) Assumes  ha  none of  he c ed  enhancemen s cu en y cove  ng ou  mo  gage loans have any m  ga ng  mpac on ou c ed  losses
(2) Assumes we collec  amoun s due f om c ed  enhancemen p ov de s af e  g v ng effec  o ce  a n assump ons abou  coun e pa  y  defa    a es
(3) Based on  he s ng e-fam y c ed  gua an ee po  fo o, exclud ng  REMICs a d O e  S  c ed Sec    es  acked  y G  e Mae Ce  f ca es
(4) Ca cu a ed as  he  a o of NPV of nc ease n c ed   osses  o he s ng e-fam y c ed  gua an ee po  fo o, def ned n n o e (3) above

**Interest Rate and Other Market Risks**

For a discussion of our interest rate and other market risks, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2942

Table of Contents

**Operational Risks**

Risk types have become increasingly inter related such that an operational breakdown can result in a credit or market related event or loss Operational risks are inherent in all of our business activities and can become apparent in various ways, including accounting or operational errors, business interruptions, fraud, and failures of the technology used to support our business activities. Our risk of operational failure may be increased by vacancies or turnover in officer and key business unit positions and failed or inadequate internal controls These operational risks may expose us to financial loss, interfere with our ability to sustain timely and reliable financial reporting, or result in other adverse consequences

We have faced challenges with respect to managing servicers and credit loss mitigation due to a number of factors, including high volumes of seriously delinquent loans and inadequate systems Implementation of the revised HARP initiative will place additional strain on existing systems, processes, and key resources On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. While we continue to assess the impact of this law on us, we currently believe that implementation of this law will present operational and accounting challenges for us For more information, see, "BUSINESS    Regulation and Supervision    *Legislative and Regulatory Developments* " We may also face increased operational risk due to the requirement that we and Fannie Mae align certain s ng e-family mortgage servicing practices for non performing loans. On April 28, 2011, FHFA announced a new set of aligned standards for servicing by Freddie Mac and Fannie Mae Implementing this servicing alignment initiative has become a top priority for the company, but may pose significant short term operational challenges in data management and place additional strain on existing systems, processes, and key resources, particularly if the requirements were to change or new requirements were to be imposed on servicers whether through government directives or servicer settlements with the state attorneys general See "Credit Risk    *Mortgage Credit Risk    Single Family Mortgage Credit Risk    Single Family Loan Workouts and the MHA Program*" for more information There also have been a number of other regulatory developments in recent periods impacting single family mortgage servicing and foreclosure practices, including top servicers entering into consent orders with federal banking regulators The servicing model for single family mortgages may face further significant changes in the future. As a result, we may be required to make additional significant changes to our practices, which could further increase our operational risk. See "BUSINESS    Regulation and Supervision    *Legislative and Regulatory Developments    Developments Concerning Single Family Servicing Practices*" for more information

Our business decision making, risk management, and financial reporting are highly dependent on our use of models In recent periods, external market factors have increasingly contributed to a growing risk associated with the use of these models For example, certain economic events or the implementation of government policies could create increased model uncertainty as models may not fully capture these events, which makes it more difficult to assess model performance and requires a higher degree of management judgment We have taken certain actions to mitigate this risk to the extent possible, including additional efforts in the area of model oversight and governance pertaining to clarifying roles, aligning model resources, and providing more transparency to management over model issues and changes

Our primary business processing and financial accounting systems lack sufficient flexibility to handle all the complexities of, and changes in, our business transactions and related accounting policies and methods This requires us to rely more extensively on spreadsheets and other end user computing systems. These systems are likely to have a higher risk of operational failure and error than our primary systems, which are subject to our information technology general controls We believe we are mitigating this risk through active monitoring of, and improvements to, controls over the development and use of end user computing systems.

In order to manage the risk of inaccurate or unreliable valuations of our financial instruments, we engage in an ongoing internal review of our valuations. We perform analysis of valuations on a monthly basis to confirm the reasonableness of the valuations For more information on the controls in our valuation process, see "FAIR VALUE MEASUREMENTS AND ANALYSIS    Fair Value Measurements    *Controls over Fair Value Measurement.*"

Our risks related to employee turnover are increasing Throughout 2011 and early 2012, Congress continued to publicly debate our: (a) current primary business objectives and whether we should be doing more to help distressed homeowners; (b) future business structure following conservatorship, including whether we will continue to exist; and (c) current compensation structure, including whether senior executives should be entitled to bonuses or whether all employees should be placed on the government pay scale Moreover, the Administration has called for a "wind down" of the GSEs, an ongoing development our employees follow closely The visible public debate regarding the future role of the GSEs continues within the media and Congress

Uncertainty surrounding our future business model, organizational structure, and compensation structure is adversely impacting our internal control environment We believe these factors are also contributing to increased levels of voluntary

<div align="center">172</div>

*Freddie Mac*

Source    D RA HOM    OAN MORTGAG CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

employee turnover, including 17% voluntary turnover at our Senior and Executive Vice President levels in 20   Additionally, the Conservator directed us to maintain individual salaries and wage rates for all employees at 20 0 levels for 20   and 20 2 (except in the case of promotions or significant changes in responsibilities) In 2011, we made certain significant reorganizations which included targeted divisional staff reductions in an effort to manage general and administrative expenses All of these activities impact our ability to retain our employees and compensate them for their work Disruptive levels of turnover at both the executive and employee levels could lead to breakdowns in many of our operations that impact our ability to: (a) serve our mission and meet our objectives; (b) manage credit and other risks related to our $2 1 trillion total mortgage portfolio (including interest rate and other market risks related to our $653 billion mortgage related investment portfolio); (c) reduce the need to draw funds from Treasury; and (d) issue timely financial statements.

We are finding it difficult to retain and engage critical employees and attract people with the skills and experience we need Because we maintain succession plans for our senior management positions, we were able to quickly fill some of these positions vacated in 2011, or eliminate them through reorganizations However, such alternatives are limited and may not be available to address future senior management departures. While we update our succession plans regularly, in many areas we have already executed these plans and we may need to search outside the company for replacements to fill these senior positions We face increased difficulty filling senior positions given the uncertainty around compensation We operate in an environment in which virtually every business decision is closely scrutinized and subject to public criticism and review by various government authorities Many executives are unwilling to work in such an environment for potentially significantly less than what they could earn elsewhere Accordingly, we may not be able to retain or replace executives or other employees with the requisite institutional knowledge and the technical, operational, risk management, and other key skills needed to conduct our business effectively

As a result of the increasing risk of employee turnover, we are exploring options to enter into various strategic arrangements with outside firms to provide operational capability and staffing for key functions, if needed Should we experience significant turnover in key areas, we may need to exercise these strategic arrangements and significantly increase the number of outside firms and consultants used in our business operations, limit certain business activities, and/or increase our operational costs However, these or other efforts to manage this risk to the enterprise may not be successful

A recovering economy is likely to put additional pressures on turnover in 2012, as other attractive opportunities may become available to people who we want to retain For more information on these matters, including the potential impacts of the risks related to employee retention, see "RISK FACTORS   Conservatorship and Related Matters   *The conservatorship and uncertainty concerning our future has had, and will likely continue to have, an adverse effect on the retention, recruitment and engagement of management and other employees, which could have a material adverse effect on our ability to operate our business,"* "   Operational Risks   *Weaknesses in internal control over financial reporting and in disclosure controls could result in errors and inadequate disclosures, affect operating results, and cause investors to lose confidence in our reported results*" and "   *We have experienced significant management changes, internal reorganizations, and turnover of key staff, which could increase our operational and control risks and have a material adverse effect on our ability to do business and our results of operations."*

Freddie Mac management has determined that current business recovery capabilities may not be effective in the event of a catastrophic regional business event and could result in a significant business disruption and inability to process transactions through normal business processes While management has developed a remediation plan to address the current capability gaps, any measures we take to mitigate this risk may not be sufficient to respond to the full range of catastrophic events that may occur The remediation plan is designed to improve Freddie Mac's ability to recover an acceptable level of critical business functionality within predetermined time frames to address regional business disruptions, such as a terrorist event, natural disaster, loss of infrastructure services, denial of access, and/or a pandemic For more information, see "RISK FACTORS   Operational Risks   *A failure in our operational systems or infrastructure, or those of third parties, could impair our liquidity, disrupt our business, damage our reputation, and cause losses."*

Our operations rely on the secure receipt, processing, storage, and transmission of confidential and other information in our computer systems and networks and with our business partners. Like many corporations and government entities, from time to time we have been, and likely will continue to be, the target of cyber attacks Because the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently and often are not recognized until launched against a target, and because some techniques involve social engineering attempts addressed to employees who may have insufficient knowledge to recognize them, we may be unable to anticipate these techniques or to implement adequate preventative measures While we have invested significant resources in our information security

<div align="center">173</div>

<div align="right">*Freddie Mac*</div>

Source   D RA HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

program, there is a risk that it could prove to be inadequate to protect our computer systems, software, and networks. For additional information, see "RISK FACTORS     Operational Risks     *We may not be able to protect the security of our systems or the confidentiality of our information from cyber attack and other unauthorized access, disclosure, and disruption*."

Management, including the company's Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our internal control over financial reporting and our disclosure controls and procedures as of December 31, 2011 As of December 31, 2011, we had two material weaknesses in our internal control over financial reporting causing us to conclude that both our internal control over financial reporting and disclosure controls and procedures were not effective as of December 3 , 20   , at a reasonable level of assurance

- The first material weakness relates to our inability to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our consolidated financial statements  We have not been able to update our disclosure controls and procedures to provide reasonable assurance that information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure Given the structural nature of this weakness, we believe it is likely that we will not remediate this material weakness while we are under conservatorship  We consider this situation to be a material weakness in our internal control over financial reporting

- The second material weakness relates to our inability to effectively manage information technology changes and maintain adequate controls over information security monitoring, resulting from increased levels of employee turnover  As discussed above, we are finding it difficult to retain and engage critical employees and attract people with the skills and experience we need  In most areas, we have been ab e to  everage succession plans and reassign responsibilities to maintain sound internal control over financial reporting  However, in the fourth quarter of 2011, we experienced a significant increase in the number of control breakdowns within certain areas of our information technology division, specifically within groups responsible for information change management and information security. We identified deficiencies in the following areas: (a) approval and monitoring of changes to certain technology applications and infrastructure; (b) monitoring of select privileged user activities; and (c) monitoring user activities performed on certain technology hardware systems. These control breakdowns could have impacted applications which support our financial reporting processes. Increased levels of employee turnover contributed to ineffective management oversight of controls in these areas resulting in these deficiencies  We believe that these issues aggregate to a material weakness in our internal control over financial reporting  We also consider this material weakness to cause our disclosure controls and procedures to be ineffective

In view of the mitigating actions we have undertaken related to these material weaknesses, we believe that our consolidated financial statements for the year ended December 3 , 20    have been prepared in conformity with GAAP  For additional information, see "CONTROLS AND PROCEDURES."

## LIQUIDITY AND CAPITAL RESOURCES

**Liquidity**

Our business activities require that we maintain adequate liquidity to fund our operations, which may include the need to make payments of principal and interest on our debt securities, including securities issued by our consolidated trusts, and  otherwise make payments related to our guarantees of mortgage assets; make payments upon the maturity, redemption or repurchase of our debt securities; make net payments on derivative instruments; pay dividends on our senior preferred stock; purchase mortgage related securities and other investments; purchase mortgage loans; and remove modified or seriously delinquent loans from PC trusts.

We fund our cash requirements primarily by issuing short term and long term debt  Other sources of cash include:

- receipts of principal and interest payments on securities or mortgage loans we hold;

- other cash flows from operating activities, including the management and guarantee fees we receive in connection with our guarantee activities (excluding those we must remit to Treasury pursuant to the Temporary Payroll Tax Cut Continuation Act of 2011 commencing in April 2012);

- borrowings against mortgage related securities and other investment securities we hold; and

- sales of securities we hold

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2945

Table of Contents

We have also received substantial amounts of cash from Treasury pursuant to draws under the Purchase Agreement, which are made to address deficits in our net worth  We received $8.0 billion in cash from Treasury during 2011 pursuant to draws under the Purchase Agreement

We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct  our normal business activities, although the costs of our debt  funding could vary.

As a result of the potential that the U S  would exhaust its borrowing authority under the statutory debt limit and  market concerns regarding the potential for a downgrade in the credit rating of the U S  government, beginning in the third quarter of 2011, we changed the composition of our portfolio of liquid assets to hold more cash and overnight investments. On August 5, 2011, S&P lowered the long term credit rating of the U S  government to "AA+" from "AAA" and assigned a negative  outlook to the rating. On August 8, 2011, S&P lowered our senior long term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating  While this could adversely affect our liquidity, and the supply and cost of debt financing available to us in the future, we  have not yet experienced such adverse effects  For more  information, see "*Other Debt Securities     Credit Ratings*" and "RISK FACTORS     Competitive and Market Risks     *Any downgrade in the credit ratings of the U.S. government would likely be followed by a downgrade in our credit ratings. A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business.*"

We may require cash in order to fulfill our mortgage purchase  commitments  Historically, we fulfilled our purchase commitments re ated to our mortgage purchase flow business primarily by swap  transactions, whereby our customers exchanged mortgage loans for  PCs, rather than using cash. However, it is at the discretion of the seller, subject to limitations imposed by the contract  governing the commitment, whether the purchase commitment is fulfilled through a swap transaction or with cash. We provide liquidity to our seller/servicers through our cash purchase program. Loans purchased through the cash purchase program can  be sold to investors through a cash auction of PCs, and, in the interim, are carried as mortgage loans on our consolidated  balance sheets. See "OFF BALANCE SHEET ARRANGEMENTS" for additional information regarding our mortgage purchase commitments

We make extensive use of the Fedwire system in our business activities  The Federal Reserve requires that we fully fund our  account in the Fedwire system to the extent necessary to cover  cash payments on our debt and mortgage related securities each  day, before the Federal Reserve Bank of New York, acting as our fiscal agent, will initiate such payments. We routinely use an  open line of credit with a third party, which provides intraday  liquidity to fund our activities through the Fedwire system  This line of credit is an uncommitted intraday loan facility. As a result, while we expect to continue to use the facility, we  may not be able to draw on it, if and when needed  This line of  credit requires that we post collateral that, in certain  circumstances, the secured party has the right to repledge to  other third parties, including the Federal Reserve Bank. As of December 3 , 20  , we pledged approximately $10.5 billion of securities to this secured party. See  "NOTE 7: INVESTMENTS IN SECURITIES     Collateral Pledged" for further information

Depending on market conditions and the mix of derivatives we  employ in connection with our ongoing risk management  activities, our derivative portfolio can be either a net source  or a net use of cash  For example, depending on the prevailing  interest rate environment, interest rate swap agreements could cause us either to make interest payments to counterparties or  to receive interest payments from counterparties  Purchased options require us to pay a premium while written options allow  us to receive a premium

We are required to pledge collateral to third parties in  connection with secured financing and daily trade activities  In  accordance with contracts with certain derivative  counterparties, we post collateral to those counterparties for  derivatives in a net loss position, after netting by counterparty, above agreed upon posting thresholds. See "NOTE 7: INVESTMENTS IN  SECURITIES     Collateral Pledged" for information about assets we pledge as collateral

We are involved in various legal proceedings, including those  discussed in "LEGAL PROCEEDINGS," which may result in  a use of cash in order to settle claims or pay certain costs

For more information on our short  and long term liquidity  needs, see "CONTRACTUAL OBLIGATIONS."

*Liquidity Management*

Maintaining sufficient liquidity is of primary importance and we  continually strive to enhance our liquidity management practices  and policies  Under these practices and policies, we maintain an  amount of cash and cash equivalent reserves in the form of  liquid, high quality short term investments that is intended to  enable us to meet ongoing cash obligations for an extended  period, in the event we do not have access to the short  or long term unsecured debt markets  We also actively manage the  concentration of debt maturities and closely monitor our monthly maturity profile

<div align="center">175</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2946

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our liquidity management policies provide for us to:

- maintain funds sufficient to cover our maximum cash liquidity needs for at least the following 35 calendar days, assuming no access to the short or long term unsecured debt markets At least 50% of such amount, which is based on the average daily 35 day cash liquidity needs of the preceding three months, must be held: (a) in U.S. Treasury securities with remaining maturities of five years or less or other U S government guaranteed securities with remaining maturities of one year or less; or (b) as uninvested cash at the Federal Rese ve Bank of New York;

- limit the proportion of debt maturing within the next year We actively manage the composition of short and long term debt, as well as our patterns of redemption of callable debt, to manage the proportion of effective short term debt to reduce the risk that we will be unable to refinance our debt as it comes due; and

- maintain unencumbered collateral with a value greater than or equal to the largest projected cash shortfall on any one day over the following 365 calendar days, assuming no access to the short and long term unsecured debt markets. This is based on a daily forecast of all existing contractual cash obligations over the following 365 calendar days.

Throughout 2011, we complied with all requirements under our liquidity management policies Furthermore, the majority of the funds used to cover our short term cash liquidity needs was invested in short term assets with a rating of A /P or AAA or was issued by a counterparty with that rating In the event of a downgrade of a position or counterparty, as applicable, below minimum rating requirements, our credit governance policies require us to exit from the position within a specified period

We also continue to manage our debt issuances to remain in compliance with the aggregate indebtedness limits set forth in the Purchase Agreement

We are monitoring events related to troubled European countries and have taken a number of actions designed to reduce our exposures, including exposures related to certain derivative portfolio and cash and other investments portfolio counterparties For more information, see "RISK MANAGEMENT Credit Risk Institutional Credit Risk Selected European Sovereign and Non Sovereign Exposures."

To facilitate cash management, we forecast cash outflows These forecasts help us to manage our liabilities with respect to asset purchases and runoff, when financial markets are not in crisis For further information on our management of interest rate risk associated with asset and liability management, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

Notwithstanding these practices and policies, our ability to maintain sufficient liquidity, including by pledging mo tgage related and other securities as collateral to other financial institutions, could cease or change rapidly and the cost of the available funding could increase significantly due to changes in market confidence and other factors For more information, see "RISK FACTORS Competitive and Market Risks *Our investment activities may be adversely affected by limited availability of financing and increased funding costs.*"

### Actions of Treasury and FHFA

Since our entry into conservatorship, Treasury and FHFA have taken a number of actions that affect our cash requirements and ability to fund those requirements. The conservatorship, and the resulting support we received from Treasury, has enabled us to access debt funding on terms sufficient for our needs

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth The Purchase Agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011, and 2012. If we do not have a capital surplus (*i.e.*, positive net worth) at the end of 2012, then the amount of funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 3 , 2009) In the event we have a capital surplus at the end of 2012, then the amount of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as follows:

- If the year end 2012 surplus is lower than the cumulative draws needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

- If the year end 2012 surplus exceeds the cumulative draws for 2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws

<div align="center">176</div>

*Freddie Mac*

TREASURY-2947

Source   D RA  HOM  OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available to us under the Purchase Agreement after 20 2 The costs of our debt funding could also increase due to the downgrades discussed above or in the event of any future downgrades in our credit ratings or the credit ratings of the U.S. government. Upon funding of the draw request that FHFA will submit to eliminate our net worth deficit at December 3 , 20 , our aggregate funding received from Treasury under the Purchase Agreement will increase to $71 3 billion This aggregate funding amount does not include the initial $ 0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received Our draw request represents our net worth deficit at quarter end rounded up to the nearest $1 million

We are required to pay a quarterly commitment fee to Treasury under the Purchase Agreement, as discussed below in "*Dividend Obligation on the Senior Preferred Stock*."

The GSE Act requires us to set aside or allocate monies each year to certain funds managed by HUD and Treasury. However, FHFA has suspended this requirement For more information, see "BUSINESS    Regulation and Supervision    *Federal Housing Finance Agency Affordable Housing Allocations*."

For more information on these matters, see "BUSINESS    Conservatorship and Related Matters" and "    Regulation and Supervision."

### Dividend Obligation on the Senior Preferred Stock

Following funding of the draw request related to our net worth deficit at December 31, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $7.22 billion to $7.23 billion, which exceeds our annual historical earnings in all but one period The senior preferred stock accrues quarterly cumulative dividends at a rate of 10% per year or 12% per year in any quarter in which dividends are not paid in cash until all accrued dividends have been paid in cash. We paid dividends of $6.5 billion in cash on the senior preferred stock during 2011 at the direction of our Conservator Through December 31, 2011, we paid aggregate cash dividends to Treasury of $16.5 billion, an amount equal to 23% of our aggregate draws received under the Purchase Agreement Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth and will increasingly drive future draws. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived. Treasury waived the fee for all quarters of 2011 and the first quarter of 2012, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment The amount of the fee has not yet been established and could be substantial

The payment of dividends on our senior preferred stock in cash reduces our net worth For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury. Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all

As discussed in "Capital Resources," we expect to make additional draws under the Purchase Agreement in future periods Further draws will increase the liquidation preference of and the dividends we owe on the senior preferred stock

### Other Debt Securities

We fund our business activities primarily through the issuance of short and long term debt The investor base for our debt is predominantly institutional. Competition for funding can vary with economic, financial market, and regulatory environments. Historically, we have mainly competed for funds in the debt issuance markets with Fannie Mae and the FHLBs. We repurchase or call our outstanding debt securities from time to time to help support the liquidity and predictability of the market for our debt securities and to manage our mix of liabilities funding our assets.

To fund our business activities, we depend on the continuing willingness of investors to purchase our debt securities We expect that, over time, the reduction in our mortgage related investments portfolio will reduce our funding needs Changes or perceived changes in the government's support of us could have a severe negative effect on our access to the debt markets and on our debt funding costs. In addition, any change in applicable legislative or regulatory exemptions, including those described in "BUSINESS    Regulation and Supervision," could adversely affect our access to some debt investors, thereby potentially increasing our debt funding costs.

177

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

Spreads on our debt and our access to the debt markets remained  favorable relative to historical levels during the three months  and year ended December 31, 2011, due largely to support from the U S  government  As a result, we were able to  replace certain higher cost debt with lower cost debt  Our short term debt was 24% of outstanding other debt at  December 31, 2011 as compared to 28% at December 31, 20  0  Beginning in the fourth quarter of 2011, we started  issuing a higher percentage of long term debt  This allows us to  take advantage of attractive long term rates while decreasing our reliance on interest rate swaps, which may lessen the  volatility of derivative gains (losses) on our consolidated statements of income and comprehensive income  For more  information about derivative gains (losses), see "CONSOLIDATED RESULTS OF OPERATIONS    Non Interest Income (Loss)      *Derivative Gains (Losses)*."

Because of the debt limit under the Purchase Agreement, we may  be restricted in the amount of debt we are allowed to issue to  fund our operations  Our debt cap under the Purchase Agreement was $972 billion in 2011 and declined to  $874.8 billion on January 1, 2012. As of December 31, 2011, we estimate that the par value of our  aggregate indebtedness totaled $674 3 billion, which was  approximately $297.7 billion below the applicable debt cap.  As of December 3  , 20  0, we estimate that the par value of  our aggregate indebtedness totaled $728.2 billion, which was approximately $351 8 billion below the then applicable  limit of $1 08 trillion  Our aggregate indebtedness is calculated as the par value of other debt  We disclose the amount  of our indebtedness on this basis monthly under the  caption "Other Debt Activities    Total Debt Outstanding" in our  Monthly Volume Summary reports, which are available on our web site at www freddiemac com and in current reports on  Form 8 K we file with the SEC

### Other Debt Issuance Activities

The table below summarizes the par value of other debt  securities we issued, based on settlement dates, during 2011 and 20  0

**Table 67      Other Debt Security Issuances by Product, at Par Value**[1]

| | Year Ended December 31, | |
| --- | ---: | ---: |
| | 2011 | 2010 |
| | (in millions) | |
| O he  sho  - e m deb | | |
|   Refe ence B  s® sec    es a d d sco    o es | $ 412,165 | $481,853 |
|   Med um- e m no es    callable | | 1,500 |
|   Med um- e m no es    non-ca  ab e[2] | 450 | 1,364 |
|   To al o he  sho  - e m deb | 412,615 | 484,717 |
| O he  long- e m deb | | |
|   Med um- e m no es    callable | 172,464 | 219,847 |
|   Med um- e m no es    non-callable | 77,810 | 74,487 |
|   U S do a  Refe ence No es® secu    es    non-callable | 47,500 | 36,500 |
|   To al o he  long- e m deb | 297,774 | 330,834 |
| To a o he  deb  ssued | $ 710,389 | $ 815,551 |

(1)  Exc  des fede a f  ds p  c ased a d sec    es so d    de ag ee en s o  epu chase, and  nes of c ed  A so exc udes deb  secu    es of conso da ed  us s he d by   d pa  es

(2)  Includes $450 m ll on and $1 4 b ll on of med um- e m no es    non-ca  ab e  ssued fo   he yea s ended  Decembe  31, 2011 and 2010,  espec  ve y, wh ch we e  ela ed o deb  exchanges

### Other Short Term Debt

We fund our operating cash needs, in part, by issuing Reference Bills® securities and other discount notes, which are short term instruments with maturities of one year or less that are sold on  a discounted basis, paying only principal at maturity. Our Reference Bills® securities program consists of large issues of short term debt  that we auction to dealers on a regular schedule  We issue discount notes with maturities ranging from one day to one year  in response to investor demand and our cash needs  Short term  debt also includes certain medium term notes that have original  maturities of one year or less

### Other Long Term Debt

We issue debt with maturities greater than one year primarily through our medium term notes program and our Reference  Notes® securities program

*Medium term Notes*

We issue a variety of fixed  and variable rate medium term notes, including callable and non callable fixed rate  securities, zero coupon securities and variable rate securities,  with various maturities ranging up to 30 years  Medium term

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2949

Table of Contents

notes with original maturities of one year or less are classified as short term debt  Medium term notes typically contain call provisions, effective as early as three months or as long as ten years after the securities are issued

*Reference Notes® Securities*

Reference Notes® securities are regularly issued, U.S. dollar denominated,  non callable fixed rate securities, which we generally issue  with original maturities ranging from two through ten years  Prior to 2005, we issued €Reference  Notes® securities denominated in Euros, which remain outstanding  We hedge our exposure to changes in foreign currency exchange rates  by entering into swap transactions that convert foreign currency denominated obligations to U S  dollar denominated  obligations. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK     Interest Rate Risk and Other  Market Risks     *Sources of Interest Rate Risk and Other Market Risks*" for more information

<u>Subordinated Debt</u>

During 2011 and 2010, we did not call or issue any Freddie  SUBS® securities  At December 31, 2011 and 2010, the balance of our subordinated debt outstanding was $0.4 billion and  $0.7 billion, respectively. Our subordinated debt in the form of Freddie SUBS® securities is a component of our risk management and disclosure  commitments with FHFA. See "RISK MANAGEMENT AND DISCLOSURE COMMITMENTS" for a discussion of changes affecting our  subordinated debt as a result of our placement in conservatorship and the Purchase Agreement, and the Conservator's suspension of certain requirements relating  to our subordinated debt. Under the Purchase Agreement, we may not issue subordinated debt without Treasury's consent.

<u>Other Debt Retirement Activities</u>

We repurchase, call, or exchange our outstanding medium  and long term debt securities from time to time to help support the  liquidity and predictability of the market for our other debt  securities and to manage our mix of liabilities funding our assets  When our debt securities become seasoned or one time call options on our debt securities expire, they may become less  liquid, which could cause their price to decline. By repurchasing debt securities, we help preserve the liquidity of  our debt securities and improve their price performance, which  helps to reduce our funding costs over the long term  Our repurchase activities also help us manage the funding mismatch,  or duration gap, created by changes in interest rates  For example, when interest rates decline, the expected lives of our  investments in mortgage related securities decrease, reducing the need for long term debt  We use a number of different means to shorten the effective weighted average lives of our  outstanding debt securities and thereby manage the duration gap, including retiring long term debt through repurchases or calls;  changing our debt funding mix between short and long term debt; or using derivative instruments, such as entering into  receive fixed swaps or terminating or assigning pay fixed swaps  From time to time, we may also enter into transactions in which  we exchange newly issued debt securities for similar outstanding  debt securities held by investors.

The table below provides the par value, based on settlement  dates, of other debt securities we repurchased, called, and  exchanged during 2011 and 2010.

**Table 68     Other Debt Security Repurchases, Calls, and  Exchanges**[1]

| | Year Ended December 31, | |
| | 2011 | 2010 |
| --- | --- | --- |
| | (in millions) | |
| Rep  c ases of o  s a d g €Refe e ce  No es® secu   es | $       258 | $       262 |
| Repu  chases of ou s and ng med um- e m no es | 12,064 | 5,301 |
| Calls of callable med um- e m no es | 185,489 | 256,256 |
| Exchanges of med um- e m no es | 450 | 1,364 |

(1) Exc  des deb sec    es of co  so da ed   s s  e d by    d pa  es

179                                                        *Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Credit Ratings*

Our ability to access the capital markets and other sources of funding, as well as our cost of funds, is highly dependent upon our credit ratings  The table below indicates our credit ratings  as of February 27, 2012.

**Table 69      Freddie Mac Credit Ratings**

| | Nationally Recognized Statistical Rating Organization | | |
| | S&P | Moody s | Fitch |
|---|---|---|---|
| Sen o  ong- e m de  (1 | AA+ | Aaa | AAA |
| Sho  - e m de  (2 | A-1 | -1 | F1 |
| S  o d  a ed de   (3 | A | Aa2 | AA |
| P efe  ed s ock( | C | Ca | C/RR6 |
| Ou look | Nega ve (fo  sen o  long-e    deb  and s bo d  a ed deb ) | Nega ve (fo  sen o  long-e    deb  and s bo d  a ed deb ) | Nega ve (fo  AAA- a ed long- e m Issue  Defaul  Ra ng) |

(1) Cons s s of med um- e m no es, U S  do a  Refe ence  No es® secu     es and €Refe ence No es® secu     es
(2) Cons s s of Refe ence B   s® sec     es a d sco    o es
(3) Cons s s of F edd e SUBS® secu     es
(4) Does no   nc ude sen o  p efe  ed s ock  ssued  o  T easu y

Our credit ratings are primarily based on the support we receive from Treasury, and therefore are affected by changes in the credit ratings of the U S  government

On November 21, 2011, the Joint Select Committee (formed as  a result of the Budget and Control Act of 2011) announced that efforts to reach a deficit reduction agreement had been  unsuccessful. Subsequent to this announcement, on  November 28, 2011, Fitch affirmed the U S  government's long term Issuer Default Rating, or IDR, at "AAA" and revised the rating outlook  to  negative from stable  On this date, Fitch also affirmed the ratings on our senior long term debt, short term debt,  subordinated debt, and preferred stock, while affirming our  "AAA" IDR and revising the outlook on this rating to  negative from stable

For information about other ratings actions in 2011 and factors  that could lead to future ratings actions and the potential  impact of a downgrade in our credit ratings, see "RISK  FACTORS      Competitive and Market Risks      *Any downgrade in the credit ratings of the U.S. government would likely be followed by a downgrade in  our credit ratings. A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of  our business*."

A security rating is not a recommendation to buy, sell or hold securities  It may be subject to revision or withdrawal at any  time by the assigning rating organization  Each rating should be  evaluated independently of any other rating

### Cash and Cash Equivalents, Federal Funds Sold, Securities Purchased  Under Agreements to Resell, and Non Mortgage Related Securities

Excluding amounts related to our consolidated VIEs, we held  $67.8 billion in the aggregate of cash and cash  equivalents, securities purchased under agreements to resell, and non mortgage related securities at December 3 , 20    These investments are important to our cash flow and asset and liability management and our ability to provide liquidity and  stability to the mortgage market  At December 31, 2011, our non mortgage related securities primarily consisted of  FDIC guaranteed corporate medium term notes and Treasury notes  that we could sell to provide us with an additional source of  liquidity to fund our business operations. For additional  information on these assets, see "CONSOLIDATED BALANCE SHEETS ANALYSIS      Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell" and "    Investments in Securities      *Non Mortgage Related Securities*."

### Mortgage Loans and Mortgage-Related Securities

We invest principally in mortgage loans and mortgage related securities, certain categories of which are largely unencumbered  and highly liquid. Our primary source of liquidity among these  mortgage assets is our holdings of agency securities  In  addition, our unsecuritized performing single family mortgage  loans are also a potential source of liquidity  Our holdings of CMBS are less liquid than agency securities. Our holdings of non agency mortgage related securities backed by subprime,  option ARM, and Alt A and other loans are not liquid due to market conditions and the continued poor credit quality of the underlying assets  Our  holdings of unsecuritized seriously delinquent and modified single  family mortgage loans are also illiquid

We are subject to limits on the amount of mortgage assets we can  sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury  See "BUSINESS      Conservatorship and Related Matters      *Impact of Conservatorship and Related Actions on Our Business      Limits on Investment  Activity and Our Mortgage Related Investments Portfolio*" for more information on these limits and on the relative liquidity of our mortgage assets

*Freddie Mac*

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are caused by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2951

Table of Contents

## Cash Flows

Our cash and cash equivalents decreased $8.6 billion to  $28.4 billion during 2011 and decreased $27.7 billion  to $37.0 billion during 2010. Cash flows provided by  operating activities during 2011 and 2010 were  $10.3 billion and $10.8 billion, respectively, primarily driven by cash proceeds from net interest income  Cash flows provided by investing activities during 2011 and 2010 were  $373.7 billion and $385.6 billion, respectively, primarily resulting from net proceeds received as a result  of repayments of single family held  for investment mortgage loans  Cash flows used for financing activities during 2011 and 2010  were $392.6 billion and $424.1 billion, respectively, largely attributable to funds used to repay debt securities of consolidated trusts held by third parties.

Our cash and cash equivalents increased approximately  $19.4 billion during 2009 to $64.7 billion at  December 31, 2009. Cash flows provided by operating activities during 2009 were $1.3 billion, which primarily  related to cash proceeds from net interest income, partially offset by net cash proceeds used to purchase held  for sale  mortgage loans  Cash flows provided by investing activities  during 2009 were $47.6 billion, primarily resulting from  net proceeds related to sales and maturities of our  available for sale securities, partially offset by a net increase in trading securities. Cash flows used for financing  activities for 2009 were $29.5 billion, largely attributable to repayments of short term debt, partially offset by $36.9 billion received from Treasury under the Purchase  Agreement

## Capital Resources

Our entry into conservatorship resulted in significant changes  to the assessment of our capital adequacy and our management  of capital. On October 9, 2008, FHFA announced that it was suspending capital classification of us during conservatorship  in light of the Purchase Agreement  FHFA continues to monitor our capital levels, but the existing statutory and FHFA directed regulatory capital requirements are not binding during conservatorship  We continue to provide submissions to FHFA on minimum capital. See "NOTE 15: REGULATORY CAPITAL" for our minimum capital requirement, core capital,  and GAAP net worth results as of December 31, 2011 and 2010. In addition, notwithstanding our failure to maintain  required capital levels, FHFA directed us to continue to make  interest and principal payments on our subordinated debt  For more information, see "BUSINESS     Regulation and Supervision      *Federal Housing Finance Agency Subordinated Debt*."

Under the Purchase Agreement, Treasury made a commitment  to provide us with funding, under certain conditions, to eliminate  deficits in our net worth  The Purchase Agreement provides that,  if FHFA determines as of quarter end that our liabilities have exceeded  our assets under GAAP, Treasury will contribute funds to us in an amount equal to the difference between such  liabilities and assets; a higher amount may be drawn if Treasury and Freddie Mac mutually agree that the draw should be increased  beyond the level by which liabilities exceed assets under GAAP  In each case, the amount of the draw cannot exceed the maximum  aggregate amount that may be funded under the Purchase Agreement

We are focusing our risk and capital management, consistent with  the objectives of conservatorship, on, among other things,  maintaining a positive balance of GAAP equity in order to reduce the likelihood that we will need to make additional draws on the  Purchase Agreement with Treasury. Our business objectives and strategies have in some cases been altered since we were placed  into conservatorship, and may continue to change  Certain changes to our business objectives and strategies are designed  to provide support for the mortgage market in a manner that serves public policy and other non financial objectives  In this  regard, we are focused on serving our mission, helping families  keep their homes, and stabilizing the economy by playing a vital  role in the Administration's housing programs  However, these changes to our business objectives and strategies may  conflict with maintaining positive GAAP equity

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less  than our obligations for a period of 60 days. Obtaining funding from Treasury pursuant to its commitment under the Purchase Agreement enables us to avoid being placed into receivership by FHFA  At December 31, 2011, our liabilities exceeded our assets under  GAAP by $146 million  Accordingly, we must obtain funding from Treasury pursuant to its commitment under the Purchase Agreement in order to avoid  being placed into receivership by FHFA. FHFA, as Conservator, will likelihood will submit a draw request to Treasury under the Purchase  Agreement in the amount of $146 million, which we expect to receive by March 31, 2012. See "BUSINESS     Regulation and Supervision     *Federal Housing Finance Agency    Receivership*" for additional information on mandatory receivership

We expect to make further draws under the Purchase Agreement in future periods  Given the substantial senior preferred stock  dividend obligation to Treasury, which will increase with additional draws, senior preferred stock dividend payments will  increasingly drive our future draw requests. The size and timing of our future draws will be determined by the dividend  obligation and a variety of other factors that could adversely affect our net worth  For more information, see

<p style="text-align:center">181</p>

<p style="text-align:right"><em>Freddie Mac</em></p>

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

"RISK FACTORS    Conservatorship and Related Matters   *We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition.*"

For more information on the Purchase Agreement, its effect on our business and capital management activities, factors that could adversely affect the size and timing of further draws, and the potential impact of making additional draws, see "Liquidity   *Dividend Obligation on the Senior Preferred Stock*," "BUSINESS   Executive Summary   *Government Support for Our Business*" and "RISK FACTORS."

## FAIR VALUE MEASUREMENTS AND ANALYSIS

**Fair Value Measurements**

Fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date  The accounting guidance for fair value measurements and  disclosures establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value  based on the inputs a market participant would use at the measurement date  Observable inputs reflect market data obtained  from independent sources  Unobservable inputs reflect  assumptions based on the best information available under the  circumstances. Unobservable inputs are used to measure fair  value to the extent that observable inputs are not available, or in situations where there is little, if any, market activity for  an asset or liability at the measurement date  We use valuation techniques that seek to maximize the use of observable inputs,  where available, and minimize the use of unobservable inputs

The three levels of the fair value hierarchy under the  accounting guidance for fair value measurements and disclosures  are described below:

- Level 1: Quoted prices (unadjusted) in active markets that  are accessible at the measurement date for identical assets or  liabilities;

- Level 2: Quoted prices for similar assets and liabilities  in active markets; quoted prices for identical or similar assets  and liabilities in markets that are not active; inputs other  than quoted market prices that are observable for the asset or  liability; and inputs that are derived principally from or  corroborated by observable market data for substantially the  full term of the assets or liabilities; and

- Level 3: Unobservable inputs for the asset or liability  that are supported by little or no market activity and that are  significant to the fair value.

We categorize assets and liabilities measured and reported at  fair value in our consolidated balance sheets within the fair  value hierarchy based on the valuation process used to derive  their fair values and our judgment regarding the observability  of the related inputs  Those judgments are based on our knowledge and observations of the markets relevant to the  individual assets and liabilities and may vary based on current market conditions  In applying our judgments, we review ranges  of third party prices and transaction volumes, and hold  discussions with dealers and pricing service vendors to  understand and assess the extent of market benchmarks available  and the judgments or modeling required in their processes  Based on these factors, we determine whether the inputs are observable  and whether the principal markets are active or inactive

Our Level 1 financial instruments consist of exchange traded  derivatives, Treasury bills, and Treasury notes, where quoted prices exist for the exact instrument in an active market.

Our Level 2 instruments generally consist of high credit  quality agency securities, CMBS, non mortgage related  asset backed securities, FDIC guaranteed corporate medium term notes, interest rate swaps, option based derivatives, and foreign currency denominated debt  These instruments are generally valued through one of the following methods: (a) dealer or pricing service inputs with the value derived  by comparison to recent transactions involving similar  securities and adjusting for differences in prepayment or  liquidity characteristics; or (b) modeled through an industry standard modeling technique that relies upon observable  inputs such as discount rates and prepayment assumptions.

Our Level 3 assets primarily consist of non agency mortgage  related securities  The non agency mo tgage related  securities market continued to be illiquid during 2011, with low transaction volumes, wide credit spreads, and limited  transparency  We value the non agency mortgage related securities we hold based primarily on prices received from  pricing services and dealers. The techniques used by these  pricing services and dealers to develop the prices generally are  either: (a) a comparison to transactions involving  instruments with similar collateral and risk profiles; or (b) industry standard modeling, such as a discounted cash  flow model  For a large majority of the securities we value  using dealers and pricing services, we obtain multiple  independent prices, which are non binding both to us and our  counterparties

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2953

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

When multiple prices are received, we use the median of the prices. The models and related assumptions used by the dealers and pricing services are owned and managed by them  However, we  have an understanding of their processes used to develop the  prices provided to us based on our ongoing due diligence  We periodically have discussions with our dealers and pricing  service vendors to maintain a current understanding of the processes and inputs they use to develop prices  We make no adjustments to the individual prices we receive from third party pricing services or dealers for non agency mortgage related  securities beyond calculating median prices and discarding  certain prices that are determined not to be valid based on our  validation processes  See "*Controls over Fair Value Measurement"* for information on our validation processes

Our valuation process and related fair value hierarchy  assessments require us to make judgments regarding the liquidity  of the marketplace  These judgments are based on the volume  of securities traded in the marketplace, the width of bid/ask  spreads and dispersion of prices on similar securities. As previously mentioned, the non agency mortgage related security  markets continued to be illiquid during 2011. We continue to utilize the prices on such securities provided to us by various  pricing services and dealers and believe that the procedures  executed by the pricing services and dealers, combined with our  internal verification and analytical processes, help ensure that  the prices used to develop our financial statements are in accordance with the accounting guidance for fair value  measurements and disclosures.

The prices provided to us consider the existence of credit  enhancements, including bond insurance coverage, and the current  lack of liquidity in the marketplace  We also consider credit risk in the valuation of our assets and liabilities, with the  credit risk of the counterparty considered in asset valuations and our own institutional credit risk considered in liability  valuations  See "*Consideration of Credit Risk in Our Valuation"* for more information

We periodically evaluate our valuation techniques and may change  them to improve our fair value estimates, to accommodate market developments or to compensate for changes in data availability  and reliability or other operational constraints  We review a range of market quotes from pricing services or dealers and  perform analysis of internal valuations on a monthly basis to  confirm the reasonableness of the valuations.

The table below summarizes our assets and liabilities measured  at fair value on a recurring basis at December 31, 2011 and 20 0

**Table 70    Summary of Assets and Liabilities at Fair Value on a Recurring Basis**

| | December 31, | | | |
| | 2011 | | 2010 | |
| | Total GAAP Recurring Fair Value | Percentage in Level 3 | Total GAAP Recurring Fair Value | Percentage in Level 3 |
|---|---|---|---|---|
| | (dollars in millions) | | | |
| **Asse s:** | | | | |
| Inves  en s n secu  es | | | | |
| Ava lable-fo -sale, a  fa  value | $ 210,659 | 28% | $ 232,634 | 30% |
| T ad  g, a  fa  va  e | 58,830 | 4 | 60,262 | 5 |
| Mo  gage loans | | | | |
| He d-fo -sa e, a  fa  va ue | 9,710 | 100 | 6,413 | 100 |
| De  va ue asse s,  e (1) | 118 | | 143 | |
| O  e  asse s | | | | |
| G a a  ee asse , a  fa  va  e | 752 | 100 | 541 | 100 |
| A o  e , a  fa  va  e | 151 | 100 | 235 | 100 |
| To a  asse s ca  ed a  fa  va ue on a  ecu  ng bas s(1) | $280,220 | 23 | $ 300,228 | 25 |
| **Liabili ies:** | | | | |
| Deb  secu  es  eco ded a  fa  va ue | $   3,015 | % | $   4,443 | % |
| De  va  ve l ab l  es,  e (1) | 435 | | 1,209 | 3 |
| To al l ab l  es ca  ed a  fa  value on a  ecu  ng bas s(1) | $   3,450 | | $   5,652 | 2 |

(1) Pe cen ages by level a e based on g oss fa  value of de  va  ve asse s and de  va  ab   es befo e coun e pa y ne  ng, cash co a e a  ne   ng, ne
    ece vable o  payable and ne  de  va  ve ne  es  ece  vab e o  payab e

*Changes in Level 3 Recurring Fair Value Measurements*

At December 31, 2011 and 2010, we measured and recorded at  fair value on a recurring basis, assets of $72.5 billion and $80.0 billion, respectively, or approximately 23% and 25% of total assets carried at fair value on a recurring basis,  using significant unobservable inputs (Level 3), before the impact of counterparty and cash collateral netting  Our  Level 3 assets at December 31, 2011 primarily consist of non agency mortgage related securities  At December 3 , 2011 and 2010, we also measured and recorded at fair value on a  recurring basis, Level 3 derivative liabilities of $0.1 billion and $0.8 billion, or less than 1% and 2%,  respectively, of total liabilities carried at fair value on a recurring basis, before the impact of counterparty and cash  collateral netting

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2954

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

During 2011, the fair value of our Level 3 assets decreased due to: (a) monthly remittances of principal repayments from the underlying collateral of non agency mo tgage related securities; and (b) the widening of OAS levels on these securities. During 2011, we had a net transfer into Level 3 assets of $267 million, resulting from a change in valuation method for certain mortgage related securities due to a lack of relevant price quotes from dealers and third party pricing services

During 2010, our Level 3 assets decreased by $81.7 billion primarily due to the transfer of the majority of CMBS from Level 3 to Level 2 and our adoption of amendments to the accounting guidance applicable to the accounting for transfers of financial assets and the consolidation of VIEs. During 2010, the CMBS market continued to improve and we observed significantly less variability in fair value quotes received from dealers and third party pricing services In the fourth quarter of 20 0 we determined that these market conditions stabilized to a degree that we be eve indicates unobservable inputs are no longer significant to the fair values of these securities As a result, we transferred $51.3 billion of CMBS from Level 3 to Level 2 The adoption of the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs resulted in the elimination of $28 8 billion in our Level 3 assets on January 1, 2010, including: (a) certain mortgage related securities issued by our consolidated trusts that are held by us; and (b) the guarantee asset for guarantees issued to our consolidated trusts In addition, we transferred $0 4 billion of other Level 3 assets to Level 2 during 2010, resulting from improved liquidity and availability of price quotes received from dealers and third party pricing services.

See "NOTE 17: FAIR VALUE DISCLOSURES Table 17.2 Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs" for the Level 3 reconciliation For discussion of types and characteristics of mortgage loans underlying our mortgage-related securities, see "Table 23 Characteristics of Mortgage Related Securities on Our Consolidated Balance Sheets" and "RISK MANAGEMENT Credit Risk *Mortgage Credit Risk Single Family Mortgage Credit Risk.*"

### Consideration of Credit Risk in Our Valuation

We consider credit risk in the valuation of our assets and liabilities through consideration of credit risk of the counterparty in asset valuations and through consideration of our own institutional credit risk in liability valuations on our GAAP consolidated balance sheets

We consider credit risk in our valuation of investments in securities based on fair value measurements that are largely the result of price quotes received from multiple dealers or pricing services. Some of the key valuation drivers of such fair value measurements can include the collateral type, collateral performance, credit quality of the issuer, tranche type, weighted average life, vintage, coupon, and interest rates We also make adjustments for items such as credit enhancements or other types of subordination and liquidity, where applicable. In cases where internally developed models are used, we maximize the use of market based inputs or calibrate such inputs to market data.

We also consider credit risk when we evaluate the valuation of our derivative positions The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation For derivatives that are in an asset position, we hold collateral against those positions in accordance with agreed upon thresholds The amount of collateral held depends on the credit rating of the counterparty and is based on our credit risk policies. Similarly, for derivatives that are in a liability position, we post collateral to counterparties in accordance with agreed upon thresholds. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment grade credit ratings of A or above See "RISK MANAGEMENT Credit Risk *Institutional Credit Risk Derivative Counterparties*" for a discussion of our counterparty credit risk.

See "NOTE 17: FAIR VALUE DISCLOSURES Valuation Methods and Assumptions Subject to Fair Value Hierarchy" for additional information regarding the valuation of our assets and liabilities.

### Controls over Fair Value Measurement

We employ control processes to validate the techniques and models we use to determine fair value These processes are designed to help ensure that fair value measurements are appropriate and reliable These control processes include review and approval of new transaction types, price verification, and review of valuation judgments, methods, models, process controls, and results. Groups within our Finance and Enterprise Risk Management divisions, independent of our trading and investing function, execute, validate, and review the valuation process. Additionally, the Valuation & Finance Model Committee (Valuation Committee), which includes senior representation from business areas and our Enterprise Risk Management and Finance divisions, participates in the review and validation process.

<div style="text-align:center">184</div>

*Freddie Mac*

Source D RA HOM OAN MORTGAG CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our control process includes performing monthly independent verification of fair value measurements by comparing the methodology driven price to other market source data (to the extent available), and uses independent analytics to determine if assigned fair values are reasonable This review covers all categories of products with increased attention to higher risk/impact valuations. Validation processes are intended to help ensure that the individual prices we receive from third parties are consistent with our observations of the marketplace and prices that are provided to us by other dealers or pricing services Where applicable, prices are back tested by comparing the settlement prices to our fair value measurements Analytical procedures include automated checks of prices for reasonableness based on variations from prices in previous periods, comparisons of prices to internally calculated expected prices, based on market moves, and relative value and yield comparisons based on specific characteristics of securities To the extent that we determine that a price is outside of established parameters, we will further examine the price, including follow up discussions with the specific pricing service or dealer and ultimately will not use that price if we are not able to determine that the price is valid These processes are executed prior to the use of the prices in our financial statements

Where models are employed to assist in the measurement of fair value, all changes made to those models during the periods presented are put through the corporate model change governance process and material changes are reviewed by the Valuation Committee Inputs used by those models are regularly updated for changes in the underlying data, assumptions, or market conditions

**Consolidated Fair Value Balance Sheets Analysis**

Our consolidated fair value balance sheets present our estimates of the fair value of our financial assets and liabilities See "NOTE 17: FAIR VALUE DISCLOSURES    Table 17.6    Consolidated Fair Value Balance Sheets" for our fair value balance sheets In conjunction with the preparation of our consolidated fair value balance sheets, we use a number of financial models See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK    Interest Rate Risk and Other Market Risks," "RISK FACTORS" and "RISK MANAGEMENT    Operational Risks" for information concerning the risks associated with these models

During 2011 and 2010, our fair value results were impacted by several improvements in our approach for estimating the fair value of certain financial instruments. See "CRITICAL ACCOUNTING POLICIES AND ESTIMATES," "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 17: FAIR VALUE DISCLOSURES" for more information on fair values.

*Key Components of Changes in Fair Value of Net Assets*

Our attribution of changes in the fair value of net assets relies on models, assumptions, and other measurement techniques that evolve over time The following are the key components of the attribution analysis:

*Core Spread Income*

Core spread income on our investments in mortgage loans and mortgage related securities is a fair value estimate of the net current period accrual of income from the spread between our mortgage related investments and our debt, calculated on an option adjusted basis. OAS is an estimate of the yield spread between a given financial instrument and a benchmark (LIBOR, agency or Treasury) yield curve, after consideration of potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as prepayment options

*Changes in Mortgage To Debt OAS*

The fair value of our net assets can be significantly affected from period to period by changes in the net OAS between the mortgage and agency debt sectors The fair value impact of changes in OAS for a given period represents an estimate of the net unrealized increase or decrease in fair value of net assets arising from net fluctuations in OAS during that period. We do not attempt to hedge or actively manage the basis risk represented by the impact of changes in mortgage to debt OAS because we generally hold a substantial portion of our mortgage assets for the long term and we do not believe that periodic increases or decreases in the fair value of net assets arising from fluctuations in OAS will significantly affect the long term value of our investments in mortgage loans and mortgage related securities

*Asset Liability Management Return*

Asset liability management return represents the estimated net increase or decrease in the fair value of net assets resulting from net exposures related to the market risks we actively manage We do not hedge all of the interest rate risk that exists at the time a mortgage is purchased or that arises over its life. The market risks to which we are exposed as a result of our investment activities that we actively manage include duration and convexity risks, yield curve risk and volatility risk.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses can be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2956

Table of Contents

We seek to manage these risk exposures within prescribed limits  as part of our overall investment strategy. Taking these risk positions and managing them within prudent limits is an integral  part of our investment activity  We expect that the net exposures related to market risks we actively manage will generate fair value returns, although those positions may result  in a net increase or decrease in fair value for a given period  See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK     Interest Rate Risk and Other Market Risks" for more information

### Core Management and Guarantee Fees, Net

Core management and guarantee fees, net represents a fair value  estimate of the annual income of our credit guarantee  activities, based on current credit guarantee characteristics  and market conditions. This estimate considers both contractual  management and guarantee fees collected over the life of the credit guarantees and credit related delivery fees collected up  front when pools are formed, and associated costs and obligations, which include default costs.

### Change in the Fair Value of Credit Guarantee Activities

Change in the fair value of credit guarantee activities  represents the estimated impact on the fair value of the credit  guarantee business resulting from increases in the amount of  such business we conduct plus the effect of changes in interest  rates, projections of the future credit outlook and other market factors (*e.g.*, impact of the passage of time on cash flow  discounting)  Our estimated fair value of credit guarantee activities will change as credit conditions change

We generally do not hedge changes in the fair value of our  existing credit guarantee activities, with two exceptions  discussed below  While periodic changes in the fair value of credit guarantee activities may have a significant impact on the  fair value of net assets, we believe that changes in the fair value of our existing credit guarantee activities are not the  best indication of long term fair value expectations because  such changes do not reflect our expectation that, over time,  replacement business will largely replenish management and  guarantee fee income lost because of prepayments  However, to the extent that projections of the future credit outlook  reflected in the changes in fair value are realized, our fair value results may be affected

We hedge interest rate exposure related to net buy ups (up front  payments we make that increase the management and  guarantee fee that we will receive over the life of the pool) and  float (expected gains or losses resulting from our mortgage  security program remittance cycles)  These value changes are considered in asset liability management return (described  above) because they relate to hedged positions  The change in  the fair value of credit guarantee activities includes the  impact of changes in interest rates and other market factors on  the unhedged portion of the projected cash flows from the credit  guarantee business

#### Discussion of Fair Value Results

The table below summarizes the change in the fair value of net  assets for 2011 and 2010.

#### Table 71    Summary of Change in the Fair Value of Net Assets

|  | 2011 | 2010 |
|---|---|---|
|  | (in billions) | |
| Beg nn ng balance | $(58 6) | $ (62 5) |
| Changes n fa  va ue of ne  asse s, befo e cap  a   ansac  ons | (21 3) | (2 9) |
| Cap  a   ansac  ons |  | |
| D v de ds a d s a e ss a ces,  e (1 | 1 5 | 6 8 |
| End ng balance | $(78 4) | $(58 6) |

(1) I c  des  e f  ds  ece ved f o  T eas  y of $8 0 b   o  and $12 5 b   on fo  2011 and 2010,  espec  ve y, unde   he  Pu chase Ag ee  en , wh ch  nc eased  he  1qu da  on p efe ence of ou  sen o  p efe ed s ock

During 2011, the fair value of net assets, before capital  transactions, decreased by $21.3 billion, compared to a  $2.9 billion decrease during 2010  The decrease in the fair  value of net assets, before capital transactions, during 2011,  was primarily due to: (a) a decrease in the fair value of our single family loans due to our fourth quarter 2011 change in  estimate discussed below, coupled with a decline in seasonally adjusted home prices in the continued weak credit environment;  and (b) unrealized losses from the widening of OAS levels  on our single family non agency mortgage related securities  The decrease in fair value was partially offset by a tightening of  OAS levels on our agency securities and high investment core spread income

During the fourth quarter of 2011, our fair value results as  presented in our consolidated fair value balance sheets were  affected by a change in estimate which increased the implied  capital costs included in our valuation of single family  mortgage loans due to a change in the estimation of a risk premium assumption embedded in our modeled valuation of such  loans. This change in estimate led to a $14.2 billion  decrease in our fair value measurement of mortgage loans

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2957

During 2010, the decrease in the fair value of net assets, before capital transactions, was primarily due to: (a) an increase in the risk premium related to our single family loans as higher capital was applied reflecting the continued weak and uncertain credit environment; and (b) a change in the estimation of a risk premium assumption embedded in our model to apply credit costs, which led to a $6.9 billion decrease in our fair value measurement of mortgage loans The decrease in fair value was partially offset by high estimated core spread income and an increase in the fair value of our investments in residential and commercial mortgage related securities driven by the tightening of OAS levels

When the OAS on a given asset widens, the fair value of that asset will typically decline, all other market factors being equal However, we believe such OAS widening has the effect of increasing the likelihood that, in future periods, we will recognize income at a higher spread on this existing asset The reverse is true when the OAS on a given asset tightens    current period fair values for that asset typically increase due to the tightening in OAS, while future income recognized on the asset is more likely to be earned at a reduced spread. However, as market conditions change, our estimate of expected fair value gains and losses from OAS may also change, and the actual core spread income recognized in future periods could be significantly different from current estimates

## OFF BALANCE SHEET ARRANGEMENTS

We enter into certain business arrangements that are not recorded on our consolidated balance sheets or may be recorded in amounts that differ from the full contract or notional amount of the transaction These off balance sheet arrangements may expose us to potential losses in excess of the amounts recorded on our consolidated balance sheets

### Securitization Activities and Other Guarantee Commitments

We have certain off balance sheet arrangements related to our securitization activities involving guaranteed mortgages and mortgage-re ated securities, though most of our securitization activities are on balance sheet Our off balance sheet arrangements related to these securitization activities primarily consisted of: (a) Freddie Mac mortgage related securities backed by multifamily loans; and (b) certain single family Other Guarantee Transactions. We also have off balance sheet arrangements related to other guarantee commitments, including long term standby commitments and liquidity guarantees

We guarantee the payment of principal and interest on Freddie Mac mortgage related securities we issue and on mortgage loans covered by our other guarantee commitments Therefore, our maximum potential off balance sheet exposure to credit losses relating to these securitization activities and the other guarantee commitments is primarily represented by the UPB of the underlying loans and securities, which was $56.9 billion, $43.9 billion, and $1.5 trillion at December 31, 2011, 2010, and 2009, respectively Our off balance sheet arrangements re ated to securitization activity have been significantly reduced from historical levels due to accounting guidance for transfers of financial assets and the consolidation of VIEs, which we adopted on January 1, 2010. See "NOTE 1:  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Recently Adopted Accounting Guidance" and "NOTE 9:  FINANCIAL GUARANTEES" for more information on our off balance sheet securitization activities and other guarantee commitments

We provide long term standby commitments to certain of our customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements These other guarantee commitments totaled $8.6 billion, $5.5 billion, and $5.1 billion of UPB at December 3 , 2011, 2010, and 2009, respectively. We also had other guarantee commitments outstanding with respect to multifamily housing revenue bonds of $9.6 billion, $9.7 billion, and $9.2 billion in UPB at December 31, 2011, 2010, and 2009, respectively. These other guarantee commitments allow us to expand our support to the housing markets in certain circumstances where securitization is not warranted or practicable. In addition, as of December 31, 2011, 2010, and 2009, we issued other guarantee commitments on HFA bonds under the TCLFP with UPB of $2.9 billion, $3.5 billion, and $0.8 billion respectively

As part of the guarantee arrangements pertaining to certain multifamily housing revenue bonds and securities backed by multifamily housing revenue bonds, we provided commitments to advance funds, commonly referred to as "liquidity guarantees," totaling $12.0 billion, $12.6 billion, and $12.4 billion at December 31, 2011, 2010, and 2009, respectively. These guarantees require us to advance funds to third parties that enable them to repurchase tendered bonds or securities that are unable to be remarketed Any repurchased securities are pledged to us to secure funding until the securities are remarketed. We hold cash and cash equivalents in excess of these commitments to advance funds At December 31, 2011, 2010, and 2009, there were no liquidity guarantee advances outstanding. Advances under our liquidity guarantees would typically mature in 60 to 120 days. In addition, as part of the HFA initiative, we, together with Fannie Mae, provide liquidity guarantees for certain variable rate single family and multifamily housing revenue bonds, under which Freddie Mac generally is obligated to purchase 50% of any tendered bonds that cannot be remarketed within five business days For more information on the HFA Initiative, including our participation in the TCLFP, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS    Housing Finance Agency Initiative "

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses may be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our exposure to losses on the transactions described above would be partially mitigated by the recovery we would receive through exercising our rights to the collateral backing the underlying loans and the available credit enhancements, which may include recourse and primary insurance with third parties. In addition, we provide for incurred losses each period on these guarantees within our provision for credit losses.

## Other Agreements

We own interests in numerous entities that are considered to be VIEs for which we are not the primary beneficiary and which we do not consolidate in accordance with the accounting guidance for the consolidation of VIEs. These VIEs relate primarily to our investment activity in mortgage related assets and non mortgage assets, and include LIHTC partnerships, certain Other Guarantee Transactions, and certain asset backed investment trusts. Our consolidated balance sheets reflect only our investment in the VIEs, rather than the full amount of the VIEs' assets and liabilities. See "NOTE 3: VARIABLE INTEREST ENTITIES" for additional information related to our variable interests in these VIEs.

As part of our credit guarantee business, we routinely enter into forward purchase and sale commitments for mortgage loans and mortgage related securities. Some of these commitments are accounted for as derivatives. Their fair values are reported as either derivative assets, net or derivative liabilities, net on our consolidated balance sheets. For more information, see "RISK MANAGEMENT     Credit Risk     Institutional Credit Risk     Derivative Counterparties." We also have purchase commitments primarily related to our mortgage purchase flow business, which we principally fulfill by issuing PCs in swap transactions, and, to a lesser extent, commitments to purchase or guarantee multifamily mortgage loans that are not accounted for as derivatives and are not recorded on our consolidated balance sheets. These non derivative commitments totaled $271.8 billion, $220.7 billion and $325.9 billion, in notional value at December 31, 2011, 2010, and 2009, respectively.

In connection with the execution of the Purchase Agreement, we, through FHFA, in its capacity as Conservator, issued a warrant to Treasury to purchase 79.9% of our common stock outstanding on a fully diluted basis on the date of exercise. See "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" for further information.

## CONTRACTUAL OBLIGATIONS

The table below provides aggregated information about the listed categories of our contractual obligations as of December 31, 2011. These contractual obligations affect our short and long term liquidity and capital resource needs. The table includes information about undiscounted future cash payments due under these contractual obligations, aggregated by type of contractual obligation, including the contractual maturity profile of our debt securities (other than debt securities of consolidated trusts held by third parties). The timing of actual future payments may differ from those presented due to a number of factors, including discretionary debt repurchases. Our contractual obligations include other purchase obligations that are enforceable and legally binding. For purposes of this table, purchase obligations are included through the termination date specified in the respective agreement, even if the contract is renewable. Many of our purchase agreements for goods or services include clauses that would allow us to cancel the agreement prior to the expiration of the contract within a specified notice period; however, this table includes these obligations without regard to such termination clauses (unless we have provided the counterparty with actual notice of our intention to terminate the agreement).

In the table below, the amounts of future interest payments on debt securities outstanding at December 31, 2011 are based on the contractual terms of our debt securities at that date. These amounts were determined using the key assumptions that: (a) variable rate debt continues to accrue interest at the contractual rates in effect at December 31, 2011 until maturity; and (b) callable debt continues to accrue interest until its contractual maturity. The amounts of future interest payments on debt securities presented do not reflect certain factors that will change the amounts of interest payments on our debt securities after December 31, 2011, such as: (a) changes in interest rates; (b) the call or retirement of any debt securities; and (c) the issuance of new debt securities. Accordingly, the amounts presented in the table do not represent a forecast of our future cash interest payments or interest expense.

The table below excludes certain obligations that could significantly affect our short and long term liquidity and capital resource needs. These items, which are listed below, have generally been excluded because the amount and timing of the related future cash payments are uncertain:

- future payments related to debt securities of consolidated trusts held by third parties, because the amount and timing of such payments are generally contingent upon the occurrence of future events and are therefore uncertain. These payments generally include payments of principal and interest we make to the holders of our guaranteed mortgage related securities in the event a loan underlying a security becomes delinquent. We also remove

<div align="center">188</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

mortgages from pools underlying our PCs in certain circumstances, including when loans are 120 days or more delinquent, and retire the associated PC debt;

- any future cash payments associated with the liquidation preference of the senior preferred stock, as well as the quarterly commitment fee and the dividends on the senior preferred stock because the timing and amount of any such future cash payments are uncertain. As of December 31, 2011, the aggregate liquidation preference of the senior preferred stock was $72.2 billion and our annual dividend obligation was $7.22 billion. See "BUSINESS     Conservatorship and Related Matters     Treasury Agreements" for additional information;

- future cash settlements on derivative agreements not yet accrued, because the amount and timing of such payments are dependent upon changes in the underlying financial instruments in response to items such as changes in interest rates and foreign exchange rates and are therefore uncertain;

- future dividends on the preferred stock we have issued (other than the senior preferred stock), because dividends on these securities are non cumulative;

- the guarantee arrangements pertaining to multifamily housing revenue bonds, where we provided commitments to advance funds, commonly referred to as "liquidity guarantees," because the amount and timing of such payments are generally contingent upon the occurrence of future events and are therefore uncertain; and

- future cash contributions to our Pension Plan, as we have not yet determined whether to make a cash contribution in 2012

**Table 72     Contractual Obligations by Year at December 31, 2011**

| | Total | 2012 | 2013 | 2014 (in millions) | 2015 | 2016 | Thereafter |
|---|---|---|---|---|---|---|---|
| Long-term debt (1) | $ 512,871 | $ 127,798 | $ 142,943 | $ 87,453 | $ 33,897 | $ 45,526 | $ 75,254 |
| Short-term debt (1) | 161,443 | 161,443 | | | | | |
| Interest payable (2) | 55,882 | 17,189 | 7,806 | 6,062 | 4,685 | 3,683 | 16,457 |
| Other liabilities reflected on our consolidated balance sheet | | | | | | | |
| Other contractual obligations (3)(4) | 680 | 492 | 11 | 11 | 9 | 8 | 149 |
| Purchase obligations | | | | | | | |
| Price lock commitments (6) | 11,434 | 11,434 | | | | | |
| Other purchase obligations | 545 | 361 | 50 | 17 | 9 | 6 | 2 |
| Operating lease obligations | 43 | 12 | 12 | 10 | 4 | 3 | 2 |
| Total specified contractual obligations | $ 742,898 | $ 318,829 | $ 150,822 | $ 93,553 | $ 38,604 | $ 49,226 | $ 91,864 |

(1) Represents par value of Callable debt secured by subordinated security as collateral and any Exercisable debt securities of consolidated entities issued by date certain. For additional information on our order, see "NOTE 8 DEBT SECURITIES AND SUBORDINATED BORROWINGS."

(2) Includes estimated future interest payments on our short-term and long-term debt because estimates as well as the accrual of periodic cash settlements of derivatives, netted by company. Also includes accrued interest payable recorded on our consolidated balance sheet, which consists primarily of the accrual of interest for our PCs and certain Other Guarantee Transactions, that the accrual of interest on short-term and long-term debt.

(3) Accrued obligations related to our defined benefit plans, defined contribution plans, and executive deferred compensation plan are not included in the Total and 2012 columns. However, our timing of payments due under these obligations is uncertain.

(4) Other contractual obligations include future cash payments due under our contractual obligations to make delayed equity contributions to LIHTC partnerships and payables to our consolidated issuers as described for the administration of our accounts receivable and to the underlying assets of Freddie Mac mortgage-related securities.

(5) As of December 31, 2011, we have recorded tax liabilities as for unrecognized tax benefits totaling $1.4 billion and allocated interest of $266 million. These amounts have been excluded from this table because we cannot estimate the years in which these liabilities may be settled. See "NOTE 13 INCOME TAXES" for additional information.

(6) Purchase commitments represent our obligations to purchase mortgage loans and mortgage-related securities from third parties. The majority of purchase commitments are recorded as capital on a fair account for as derivatives in accordance with the accounting guidance for derivatives and hedging.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in conformity with GAAP requires us to make a number of judgments, estimates and assumptions that affect the reported amounts within our consolidated financial statements. Certain of our accounting policies, as well as estimates we make, are critical, as they are both important to the presentation of our financial condition and results of operations and require management to make difficult, complex, or subjective judgments and estimates, often regarding matters that are inherently uncertain. Actual results could differ from our estimates and the use of different judgments and assumptions related to these policies and estimates could have a material impact on our consolidated financial statements.

Our critical accounting policies and estimates relate to: (a) allowances for loan losses and reserve for guarantee losses; (b) fair value measurements; (c) impairment recognition on investments in securities; and (d) realizability of net deferred tax assets. For additional information about our critical accounting policies and estimates and other significant accounting policies, including recently issued accounting guidance, including guidance that we have not yet adopted and

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2960

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

that will likely affect our consolidated financial statements, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES "

**Allowance for Loan Losses and Reserve for Guarantee Losses**

The allowance for loan losses and the reserve for guarantee losses represent estimates of incurred credit losses  The allowance for loan losses pertains to all single family and multifamily loans classified as held for investment on our consolidated balance sheets, whereas the reserve for guarantee losses relates to single family and multifamily loans underlying our non consolidated Freddie Mac mortgage related securities and other guarantee commitments  We use the same methodology to determine our allowance for loan losses and reserve for guarantee losses, as the relevant factors affecting credit risk are the same  Determining the appropriateness of the loan loss reserves is a complex process that is subject to numerous estimates and assumptions requiring significant management judgment about matters that involve a high degree of subjectivity. Our process involves a greater degree of management judgment than prior to this period of housing and mortgage market instability

We estimate credit losses related to homogeneous pools of loans in accordance with the accounting guidance for contingencies  Loans that we evaluate for individual impairment are measured in accordance with the subsequent measurement requirements of the accounting guidance for receivables

We believe the level of our loan loss reserves is reasonable based on internal reviews of the factors and methodologies used  No single statistic or measurement determines the appropriateness of the loan loss reserves  Changes in one or more of the estimates or assumptions used to calculate the loan loss reserves could have a material impact on the loan loss reserves and provision for credit losses

*Single-Family Loan Loss Reserves*

Single family loans are aggregated into pools based on similar risk characteristics and measured collectively using a statistically based model that evaluates a variety of factors affecting collectability, including but not limited to: current LTV ratios, a loan's product type, delinquency/default status and history, and geographic location. Inputs used by the model are regularly updated for changes in the underlying data, assumptions, and market conditions. We consider the output of this model, together with other information such as expected future levels of loan modifications and expected repurchases of loans by seller/servicers as a result of their non compliance with our underwriting standards, the adequacy of third party credit enhancements, and the effects of macroeconomic variables such as rates of unemployment and the effects of home price changes on borrower behavior  The inability to realize the benefits of our loss mitigation plans, a lower realized rate of seller/servicer repurchases, further declines in home prices, further deterioration in the financial condition of our mortgage insurance counterparties, or delinquency rates that exceed our current projections would cause our losses to be significantly higher than those currently estimated

There is significant risk and uncertainty associated with our estimate of losses incurred on our single family loans  The process for determining the estimate is complex  It uses models and requires us to make judgments about matters that are difficult to predict, the most significant of which are the probability of default and estimated loss severity  We regularly evaluate the underlying estimates and models we use when determining loan loss reserves and update our assumptions to reflect our historical experience and current view of economic factors  See "RISK FACTORS    Operational Risks   *We face risks and uncertainties associated with the internal models that we use for financial accounting and reporting purposes, to make business decisions and to manage risks. Market conditions have raised these risks and uncertainties*."

Individually impaired single family loans include loans that have undergone a TDR and are measured for impairment as the excess of our recorded investment in the loan over the present value of the expected future cash flows  Our expectation of future cash flows incorporates many of the judgments indicated above

*Multifamily Loan Loss Reserves*

To determine loan loss reserves for the multifamily loan portfolio, including determining which loans are individually impaired, we consider all available evidence including, but not limited to, operating cash flows from the underlying property as represented by its current DSCR, the fair value of collateral underlying the loans, evaluation of the repayment prospects, the adequacy of third party credit enhancements, year of origination, certain macroeconomic data, and available economic data related to multifamily real estate, including apartment vacancy and rental rates

Multifamily loans evaluated collectively for impairment are aggregated into book year vintages and measured by benchmarking published historical commercial mortgage data to those vintages based upon some of the factors listed above

TREASURY-2961

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                         Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Individually impaired multifamily loans are measured for impairment based on the fair value of the underlying collateral, as reduced by estimated disposition costs, as multifamily loans are generally collateral dependent and most multifamily loans are non recourse to the borrower Non recourse means generally that the cash flows of the underlying property (including any associated credit enhancements) serve as the source of funds for repayment of the loan

### Fair Value Measurements

Assets and liabilities within our consolidated financial statements measured at fair value include: (a) mortgage related and non mortgage related securities; (b) mortgage loans held for sale; (c) derivative instruments; (d) debt securities denominated in foreign currencies and certain other debt; and (e) REO  The accounting guidance for fair value measurements and disclosures establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value based on the inputs a market participant would use at the measurement date. Fair value measurements under this hierarchy are distinguished by quoted market prices, observable inputs, and unobservable inputs. The measurement of fair value requires management to make judgments and assumptions and the process for determining fair value using unobservable inputs is generally more subjective and involves a higher degree of management judgment and assumptions than the measurement of fair value using observable inputs. These judgments and assumptions may have a significant effect on our measurements of fair value, and the use of different judgments and assumptions, as well as changes in market conditions, could have a material effect on our consolidated statements of income and comprehensive income as well as our consolidated fair value balance sheets  For information regarding our fair value methods and assumptions, see "NOTE 17: FAIR VALUE DISCLOSURES" and "FAIR VALUE MEASUREMENTS AND ANALYSIS" for additional information regarding fair value hierarchy and measurements

### Impairment Recognition on Investments in Securities

We recognize impairment losses on available for sale securities within our consolidated statements of income and comprehensive income as net impairment of available for sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other than temporary

We conduct quarterly reviews to evaluate each available for sale security that has an unrealized loss for other than temporary impairment An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis  We recognize other than temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security  If we do not intend to sell the security and we believe it is not more likely than not that we will be required to sell prior to recovery of its unrealized loss, we recognize only the credit component of other than temporary impairment in earnings and the amounts attributable to all other factors are recognized, net of tax, in AOCI  The credit component represents the amount by which the present value of cash flows expected to be collected from the security is less than the amortized cost basis of the security.

The evaluation of whether unrealized losses on available for sale securities are other than temporary requires significant management judgments and assumptions and consideration of numerous factors  We perform an evaluation on a security by security basis considering all available information  The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment  For information regarding important factors, judgments and assumptions, see "NOTE 7: INVESTMENTS IN SECURITIES     Impairment Recognition on Investments in Securities "

For the majority of our available for sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other than temporary and is recorded within our consolidated statements of income and comprehensive income as net impairment of available for sale securities recognized in earnings

See "NOTE 7: INVESTMENTS IN SECURITIES     Table 7 2    Available For Sale Securities in a Gross Unrealized Loss Position" for the length of time our available for sale securities have been in an unrealized loss position. Also see "NOTE 7: INVESTMENTS IN SECURITIES     Table 7.3    Significant Modeled Attributes for Certain Non Agency Mortgage Related Securities" for the modeled default rates and severities that were used to determine whether our senior interests in ce tain non agency mo tgage related securities would experience a cash shortfall. See "CONSOLIDATED BALANCE SHEETS ANALYSIS     Investments in Securities" for more information on impairment recognition on securities

<div align="center">191</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We believe our judgments and assumptions used in our evaluation of other than temporary impairment are reasonable. However, different judgments or assumptions could have resulted in materially different recognition of other than temporary impairment. It is possible that the losses we ultimately realize could be significantly higher or lower than the losses we have recognized in our financial results to date.

### Realizability of Deferred Tax Assets, Net

We use the asset and liability method to account for income taxes pursuant to the accounting guidance for income taxes. Under this method, deferred tax assets and liabilities are recognized based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates. Valuation allowances are recorded to reduce net deferred tax assets when it is more likely than not that a tax benefit will not be realized. The realization of these net deferred tax assets is dependent upon the generation of sufficient taxable income in available carryback years from current operations and unrecognized tax benefits, and upon our intent and ability to hold available for sale debt securities until the recovery of any temporary unrealized losses. On a quarterly basis, we determine whether a valuation allowance is necessary. In so doing, we consider all evidence currently available, both positive and negative, in determining whether, based on the weight of that evidence, it is more likely than not that the net deferred tax assets will be realized.

The consideration of this evidence requires significant estimates, assumptions, and judgments, particularly about our future financial condition and results of operations and our intent and ability to hold available for sale debt securities with temporary unrealized losses until recovery. As discussed in "RISK FACTORS," the conservatorship and related matters fundamentally affecting our control, management, and operations are likely to affect our future financial condition and results of operations. These events have resulted in a variety of uncertainties regarding our future operations, our business objectives and strategies, and our future profitability, the impact of which cannot be reliably forecasted at this time. As such, any changes in these estimates, assumptions or judgments may have a material effect on our financial position and results of operations.

We determined that, as of September 30, 2008, it was more likely than not that we would not realize the portion of our net deferred tax assets that is dependent upon the generation of future taxable income. This determination was driven by the events and the resulting uncertainties as of that date. Those conditions continued to exist as of December 31, 2011. As a result, we continue to maintain a valuation allowance against these net deferred tax assets at December 31, 2011. It is possible that, in future periods, the uncertainties regarding our future operations and profitability could be resolved such that it could become more likely than not that these net deferred tax assets would be realized due to the generation of sufficient taxable income. If that were to occur, we would assess the need for a reduction of the valuation allowance, which could have a material effect on our financial position and results of operations in the period of the reduction.

Also, we determined that a valuation allowance is not necessary for the portion of our net deferred tax assets that is dependent upon our intent and ability to hold available for sale debt securities until the recovery of any temporary unrealized losses. These temporary unrealized losses have only impacted AOCI, not income from continuing operations or our taxable income, nor will they impact income from continuing operations or taxable income if they are held to maturity. As such, the realization of this deferred tax asset is not dependent upon the generation of sufficient taxable income but rather on our intent and ability to hold these securities until recovery of these unrealized losses which may be at maturity. Our conclusion that these unrealized losses are temporary and that we have the intent and ability to hold these securities until recovery requires significant estimates, assumptions, and judgments, as described above in "Impairment Recognition on Investments in Securities." Any changes in these estimates, assumptions, or judgments in future periods may result in the recognition of an other than temporary impairment, which would result in some of this deferred tax asset not being realized and may have a material effect on our financial position and results of operations. For more information see "NOTE 13: INCOME TAXES."

### RISK MANAGEMENT AND DISCLOSURE COMMITMENTS

In October 2000, we announced our adoption of a series of commitments designed to enhance market discipline, liquidity and capital. In September 2005, we entered into a written agreement with FHFA, then OFHEO, that updated these commitments and set forth a process for implementing them. A copy of the letters between us and OFHEO dated September 1, 2005 constituting the written agreement has been filed as an exhibit to our Registration Statement on Form 10, filed with the SEC on July 18, 2008, and is available on the Investor Relations page of our web site at www.freddiemac.com/investors/sec_filings/index.html

In November 2008, FHFA suspended our periodic issuance of subordinated debt disclosure commitment during the term of conservatorship and thereafter until directed otherwise. In March 2009, FHFA suspended the remaining disclosure

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2963

Table of Contents

commitments under the September 1, 2005 agreement until further notice, except that: (a) FHFA will continue to monitor our adherence to the substance of the liquidity management and contingency planning commitment through normal supervision activities; and (b) we will continue to provide interest rate risk and credit risk disclosures in our periodic public reports.

For the year ended December 31, 2011, our duration gap averaged zero months, PMVS L averaged $359 million and PMVS YC averaged $21 million. Our 2011 monthly average duration gap, PMVS results and related disclosures are provided in our Monthly Volume Summary reports, which are available on our web site, www freddiemac com/investors/volsum and in current reports on Form 8 K we file with the SEC For disclosures concerning credit risk sensitivity, see "RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Credit Risk Sensitivity*."

<div align="center">193</div>

<div align="right">*Freddie Mac*</div>

---

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

**Interest Rate Risk and Other Market Risks**

*Sources of Interest Rate Risk and Other Market Risks*

Our investments in mortgage loans and mortgage related securities expose us to interest rate risk and other market risks arising primarily from the uncertainty as to when borrowers will pay the outstanding principal balance of mortgage loans and mortgage related securities, known as prepayment risk, and the resulting potential mismatch in the timing of our receipt of cash flows related to our assets versus the timing of payment of cash flows related to our liabilities used to fund those assets For the vast majority of our mortgage related investments, the mortgage borrower has the option to make unscheduled payments of additional principal or to completely pay off a mortgage loan at any time before its scheduled maturity date (without having to pay a prepayment penalty) or make principal payments in accordance with their contractual obligation We use derivatives as an important part of our strategy to manage interest rate and prepayment risk When determining to use derivatives to mitigate our exposures, we consider a number of factors, including cost, efficiency, exposure to counterparty risks, and our overall risk management strategy. See "MD&A    RISK MANAGEMENT" and "RISK FACTORS" for a discussion of our market risk exposure, including those related to derivatives, institutional counterparties, and other market risks.

Our credit guarantee activities also expose us to interest rate risk because changes in interest rates can cause fluctuations in the fair value of our existing credit guarantees We generally do not hedge these changes in fair value except for interest rate exposure related to net buy ups and float Float, which arises from timing differences between when the borrower makes principal payments on the loan and the reduction of the PC balance, can lead to significant interest expense if the interest rate paid to a PC investor is higher than the reinvestment rate earned by the securitization trusts on payments received from mortgage borrowers and paid to us as trust management income

The principal types of interest rate risk and other market risks to which we are exposed are described below

*Duration Risk and Convexity Risk*

Duration is a measure of a financial instrument's price sensitivity to changes in interest rates (expressed in percentage terms) We compute each instrument's duration by applying an interest rate shock, both upward and downward, to the LIBOR curve and evaluating the impact on the instrument's fair value As interest rates have reached historically low levels, the methodology previously used by management to calculate duration and convexity began to produce risk sensitivities that were increasingly unstable and not representative of expected price movements In order to alleviate the instability, we changed the shift size required to calculate duration and convexity from 50 basis points to 25 basis points beginning November 14, 2011. The effect of this change on our duration and convexity measures was not material Convexity is a measure of how much a financial instrument's duration changes as interest rates change Similar to the duration calculation, we compute each instrument's convexity by applying the shock, both upward and downward, to the LIBOR curve and evaluating the impact on the duration. Currently, short term interest rates are at historically low levels and, at some points, the LIBOR curve is less than 25 basis points (and less than 50 basis points that was the threshold before the November 14, 2011 change). As a result, the basis point shock to the LIBOR curve described above is bounded by zero. Our convexity risk primarily results from prepayment risk.

We seek to manage duration risk and convexity risk through asset selection and structuring (that is, by acquiring or structuring mortgage-related securities with attractive prepayment and other characteristics), by issuing a broad range of both callable and non callable debt instruments, and by using interest rate derivatives and written options Managing the impact of duration risk and convexity risk is the principal focus of our daily market risk management activities. These risks are encompassed in our PMVS and duration gap risk measures, discussed in greater detail below We use prepayment models to determine the estimated duration and convexity of mortgage assets for our PMVS and duration gap measures When interest rates decline, mortgage asset prices tend to rise, but the rise is limited by the increased likelihood of prepayments, which exposes us to negative convexity Through the use of our models, we estimate on a weekly basis the negative convexity profile of our portfolio over a wide range of interest rates This process is designed to help us to identify the particular interest rate scenarios where the convexity of our portfolio appears to be most negative, and therefore the particular interest rate scenario where the interest rate price sensitivity of our financial instruments appears to be most acute. We use this information to develop hedging strategies that are customized to provide interest rate risk protection for the specific interest rate environment where we believe we are most exposed to negative convexity risk This strategy allows us to select hedging instruments that are expected to be most efficient for our portfolio, thereby reducing the overall cost of interest rate hedging activities

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2965

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

By managing our convexity profile over a wide range of interest rates, we are able to hedge prepayment risk for particular interest rate scenarios. As a result, the intensity and frequency of our ongoing risk management actions is relatively constant over a wide range of interest rate environments  Our approach to convexity risk management focuses our portfolio rebalancing activities for the specific interest rate scenario where market and interest rate volatility appear to be most  pronounced. This approach to convexity risk reduces our ongoing  rebalancing activity to a relatively low level compared to the  overall daily trading volume of interest rate swaps and Treasury  futures.

The expected loss in portfolio market value is an estimate of  the sensitivity to changes in interest rates of the fair value  of all interest earning assets, interest bearing liabilities, and derivatives on a pre tax basis  When we calculate the  expected loss in portfolio market value and duration gap, we also take into account the cash flows related to certain credit  guarantee related items, including net buy ups and expected gains or losses due to net interest from float  In making these calculations, we do not consider the sensitivity to  interest rate changes of the following assets and liabilities:

- *Credit guarantee activities.*  We do not consider the sensitivity of the fair value of credit guarantee  activities to changes in interest rates except for the guarantee related items mentioned above ( *i.e.*, net buy ups and float), because we believe the expected benefits from replacement business provide an adequate hedge against  interest rate changes over time

- *Other assets with minimal interest rate sensitivity.*  We do not include other assets, primarily non financial instruments such as fixed assets and REO, because we estimate their impact on PMVS and duration gap  to be minimal

### Yield Curve Risk

Yield curve risk is the risk that non parallel shifts in the  yield curve (such as a flattening or steepening) will adversely  affect the fair value of net assets and ultimately adversely  affect GAAP total equity (deficit)  Because changes in the  shape, or slope, of the yield curve often arise due to changes in the market's expectation of future interest rates at  different points along the yield curve, we evaluate our exposure  to yield curve risk by examining potential reshaping scenarios  at various points along the yield curve  We manage yield curve risk with the use of derivatives. Our yield curve risk under a  specified yield curve scenario is reflected in our  PMVS YC disclosure.

### Volatility Risk

Volatility risk is the risk that changes in the market's expectation of the magnitude of future variations in interest  rates will adversely affect the fair value of net assets and ultimately adversely affect GAAP total equity (deficit)  Volatility risk arises from the prepayment risk that is inherent in mortgages or mortgage related securities  Volatility risk is the risk that the homeowner's prepayment option will gain or lose value as the expected volatility of future interest rates changes  In general, as expected future interest rate  volatility increases, the homeowner's prepayment option increases in value, thus negatively impacting the value of the  mortgage security backed by the underlying mortgages  We manage volatility risk by maintaining a portfolio of callable debt and  option based interest rate derivatives that have relatively long  option terms  We actively manage and monitor our volatility risk  exposure over a range of changing interest rate scenarios;  however, we do not eliminate our volatility risk exposure completely

### Basis Risk

Basis risk is the risk that interest rates in different market  sectors will not move in tandem and will adversely affect the  fair value of net assets and ultimately adversely affect GAAP total equity (deficit). This risk arises principally because we  genera y hedge mo tgage-re ated investments with debt securities. As principally a buy and hold investor, we do not actively manage overall basis risk, also  referred to as mortgage to debt OAS risk or spread risk, arising  from funding mortgage related investments with our debt  securities  See "MD&A    FAIR VALUE MEASUREMENTS AND ANALYSIS    Key Components of Changes in Fair Value of Net Assets    *Changes in Mortgage To Debt OAS"* for additional information  We also incur basis risk when we use LIBOR  or Treasury based  instruments in our risk management activities

### Model Risk

Proprietary models, including mortgage prepayment models,  interest rate models, and mortgage default models, are an  integral part of our investment framework. As market conditions change rapidly, as they have since 2007, the assumptions that we  use in our models for our sensitivity analyses may not keep pace  with these market changes. As such, these analyses are not  intended to provide precise forecasts of the effect a change in market interest rates would have on the estimated fair values of  our net assets  We actively manage our model risk by reviewing the performance of

<div align="center">195</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

our models  To improve the accuracy of our models, changes to  the underlying assumptions or modeling techniques are made on a  periodic basis  Model development and model testing are reviewed  and approved independently by our Enterprise Risk Management  division  Model performance is also reported regularly through a  series of internal management committees  See "MD&A    RISK MANAGEMENT  Operational Risks" and "RISK FACTORS    Operational Risks    *We face risks and uncertainties associated with the internal models that we use for financial accounting and reporting purposes, to make business decisions  and to manage risks. Market conditions have raised these risks and uncertainties"* for a discussion of the developments and risks associated with our use of models. Given the  importance of models to our investment management practices,  model changes undergo a rigorous review process  As a result, it is common for model changes to take several months to complete  Given the time consuming nature of the model change review  process, it is sometimes necessary for risk management purposes for management to make adjustments to our interest rate risk  statistics that reflect the expected impact of the pending model change. These adjustments are included in our PMVS and duration  gap disclosures.

### *Foreign Currency Risk*

Foreign currency risk is the risk that fluctuations in currency  exchange rates (*e.g.*, Euros to the U.S. dollar) will  adversely affect the fair value of net assets and ultimately  adversely affect GAAP total equity (deficit)  We are exposed to foreign currency risk because we have debt denominated in currencies other than the U.S. dollar, our functional currency  We mitigate virtually all of our foreign currency risk by entering into swap transactions that effectively convert  foreign currency denominated obligations into U S  dollar denominated obligations

### **Interest-Rate Risk Management Strategy and Framework**

Although we cannot hedge all of our exposure to changes in  interest rates, this exposure is subject to established limits  and is monitored through our risk management process  We employ a risk management strategy that seeks to substantially match the  duration characteristics of our assets and liabilities. Through our asset and liability management process, we seek to mitigate  interest rate risk by issuing a wide variety of callable and non callable debt products  The prepayment option held by  mortgage borrowers drives the fair value of our mortgage assets  such that the combined fair value of our mortgage assets and  non callable debt will decline if interest rates move  significantly in either direction  We seek to mitigate much of our exposure to changes in interest rates by funding a  significant portion of our mortgage portfolio with callable  debt  When interest rates change, our option to redeem this debt  offsets a large portion of the fair value change driven by  the mortgage prepayment option  However, because the mortgage prepayment option is not fully hedged by callable debt, the  combined fair value of our mortgage assets and debt will be affected by changes in interest rates

To further reduce our exposure to changes in interest rates, we  hedge a significant portion of the remaining prepayment risk  with option based derivatives. These derivatives primarily consist of call swaptions, which tend to increase in value as  interest rates decline, and put swaptions, which tend to  increase in value as interest rates increase  We also seek to  manage interest rate risk by changing the effective interest terms of the portfolio, primarily using interest rate swaps,  which we refer to as rebalancing  For further discussion of why  we use derivatives and the types of derivatives we use, see  "NOTE 11: DERIVATIVES."

Our approach to managing interest rate risk is designed to be  disciplined and comprehensive  Our objective is to minimize our  interest-rate risk exposure across a range of interest rate  scenarios  To do this, we analyze the interest rate sensitivity  of financial assets and liabilities at the instrument level on a daily basis and across a variety of interest rate scenarios. For  risk management purposes, the interest rate characteristics of each instrument are determined daily based on market prices and  internal models. The fair values of our assets, liabilities and  derivatives are primarily based on either third party prices, or  observable market based inputs. These fair values, whether  direct from third parties or derived from observable inputs, are  reviewed and validated by groups that are separate from our  trading and investing function. See "MD&A    FAIR VALUE MEASUREMENTS AND ANALYSIS    Fair ValueMeasurements    *Controls over Fair Value Measurement.*"

Annually, the Business and Risk Committee of our Board of Directors establishes certain Board limits for interest rate  risk measures, and if we exceed these limits we are required to  notify the Business and Risk Committee and address the limit  overage  These limits encompass a range of interest rate risks that include duration risk, convexity risk, volatility risk, and  yield curve risk associated with our use of various financial instruments, including derivatives. Also on an annual basis, our  Enterprise Risk Management division establishes management  limits and makes recommendations with respect to the limits to  be established at the Board level  These limits are reviewed by  our Enterprise Risk Management Committee, which is responsible  for reviewing performance as compared to the established limits  The management limits

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-2967                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

are set at values below those set at the Board level, which is intended to allow us to follow a series of predetermined actions in the event of a breach of the management limits and helps ensure proper oversight to reduce the possibility of exceeding the Board limits. We also establish management limits that do not have corresponding Board limits.

***Portfolio Market Value Sensitivity and Measurement of Interest-Rate Risk***

*PMVS and Duration Gap*

Our primary interest rate risk measures are PMVS and duration gap. PMVS is an estimate of the change in the market value of our net assets and liabilities from an instantaneous 50 basis point shock to interest rates, assuming no rebalancing actions are undertaken and assuming the mortgage to LIBOR basis does not change. (The shock used for calculating PMVS is not the same as the shock used for calculating duration and convexity, described above under *"Duration Risk and Convexity Risk."*) PMVS is measured in two ways, one measuring the estimated sensitivity of our portfolio market value to parallel movements in interest rates (PMVS Level or PMVS L) and the other to nonparallel movements (PMVS YC).

- We calculate our exposure to changes in interest rates using effective duration. Effective duration measures the percentage change in the price of financial instruments from a 1% change in interest rates. Financial instruments with positive duration increase in value as interest rates decline. Conversely, financial instruments with negative duration increase in value as interest rates rise.

- Together, duration and convexity provide a measure of an instrument's overall price sensitivity to changes in interest rates. We utilize the aggregate duration and convexity risk of all interest rate sensitive instruments on a daily basis to estimate the two PMVS metrics. The duration and convexity measures are used to estimate PMVS under the following formula:

PMVS = [*Duration*] multiplied by [rate shock] plus [0.5 multiplied by *Convexity*] multiplied by [rate shock]$^2$

In the equation, [rate shock] represents the interest rate change expressed in percentage terms. For example, a 50 basis point adverse change will be expressed as 0 5%. The result of this formula is the percentage of sensitivity to the change in rate, which is expressed as: PMVS = (0.5 Duration) + (0 125 Convexity)

- To estimate PMVS L, an instantaneous parallel 50 basis point shock is applied to the yield curve, as represented by the US swap curve, holding all spreads to the swap curve constant. This shock is applied to the duration and convexity of all interest rate sensitive financial instruments. The resulting change in market value for the aggregate portfolio is computed for both the up rate and down rate shock and the change in market value in the more adverse scenario of the up and down rate shocks is the PMVS. In cases where both the up rate and down rate shock results in a positive impact, the PMVS is zero. Because this process uses a parallel, or level, shock to interest rates, we refer to this measure as PMVS L.

- To estimate sensitivity related to the shape of the yield curve, a yield curve steepening and flattening of 25 basis points is applied to the duration of all interest rate sensitive instruments. The resulting change in market value for the aggregate portfolio is computed for both the steepening and flattening yield curve scenarios. The more adverse yield curve scenario is then used to determine the PMVS yield curve. Because this process uses a non parallel shock to interest rates, we refer to this measure as PMVS YC.

- Duration gap measures the difference in price sensitivity to interest rate changes between our assets and liabilities, and is expressed in months relative to the market value of assets. For example, assets with a six month duration and liabilities with a five month duration would result in a positive duration gap of one month. A duration gap of zero implies that the duration of our assets equals the duration of our liabilities. As a result, the change in the value of assets from an instantaneous move in interest rates, either up or down, would be expected to be accompanied by an equal and offsetting change in the value of liabilities, thus leaving the fair value of equity unchanged. A positive duration gap indicates that the duration of our assets exceeds the duration of our liabilities which, from a net perspective, implies that the fair value of equity will increase in value when interest rates fall and decrease in value when interest rates rise. A negative duration gap indicates that the duration of our liabilities exceeds the duration of our assets which, from a net perspective, implies that the fair value of equity will increase in value when interest rates rise and decrease in value when interest rates fall. Multiplying duration gap (expressed as a percentage of a year) by the fair value of our assets will provide an indication of the change in the fair value of our equity to be expected from a  % change in interest rates

The 50 basis point shift and 25 basis point change in slope of the LIBOR yield curve used for our PMVS measures reflect reasonably possible near term changes that we believe provide a meaningful measure of our interest rate risk

<div align="center">197</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

sensitivity.  Our PMVS measures assume instantaneous shocks.  Therefore, these PMVS measures do not consider the effects on  fair value of any rebalancing actions that we would typically  expect to take to reduce our risk exposure

### Limitations of Market Risk Measures

Our PMVS and duration gap estimates are determined using models  that involve our best judgment of interest rate and prepayment assumptions  Accordingly, while we believe that PMVS and duration gap are useful risk management tools, they should be  understood as estimates rather than as precise measurements  While PMVS and duration gap estimate our exposure to changes in  interest rates, they do not capture the potential impact of certain other market risks, such as changes in volatility, basis, and foreign currency risk.  The impact of these other market risks can be significant.

There are inherent limitations in any methodology used to  estimate exposure to changes in market interest rates  Our  sensitivity analyses for PMVS and duration gap contemplate only  certain movements in interest rates and are performed at a  particular point in time based on the estimated fair value of our existing portfolio  These sensitivity analyses do not  consider other factors that may have a significant effect on our financial instruments, most notably business activities and  strategic actions that management may take in the future to  manage interest rate risk. As such, these analyses are not  intended to provide precise forecasts of the effect a change in  market interest rates would have on the estimated fair value of our net assets.

In addition, it has been more difficult in recent years to  measure and manage the interest rate risk related to mortgage  assets as risk for prepayment model error remains high due to  uncertainty regarding default rates, unemployment, loan  modification, and the volatility and impact of home price movements on mortgage durations  Mis estimation of prepayments  could result in hedging related losses

### PMVS Results

The table below provides duration gap, estimated point in time and minimum and maximum PMVS L and PMVS YC results, and an average of the daily values and standard deviation for the years  ended December 31, 2011 and 2010  The table below also  provides PMVS L estimates assuming an immediate 100 basis  point shift in the LIBOR yield curve  We do not hedge the entire  prepayment risk exposure embedded in our mortgage assets  The  interest rate sensitivity of a mortgage portfolio varies across  a wide range of interest rates  Therefore, the difference between PMVS at 50 basis points and 100 basis  points is non linear  Our PMVS L (50 basis points) exposure at the  end of December 31, 2011 was $465 million; approximately half was  driven by our duration exposure and the  other half was driven by  our negative convexity exposure  The PMVS L at December 3 , 20   declined compared to December 3 , 20  0 primarily due to a decline  in our negative convexity exposure as long term rates significantly declined  On an  average basis for the year, our PMVS L (50 basis points) was $359 million, which was primarily driven by our negative convexity  exposure on our  mortgage assets

**Table 73     PMVS Results**

|  |  | PMVS-YC | PMVS-L | |
| --- | --- | --- | --- | --- |
|  |  | 25 bps | 50 bps | 100 bps |
|  |  | | (in millions) | |
| Ass    ng s  f of   e LIBOR y  e d c  ve |  |  |  |  |
| Decembe  31, 2011 |  | $   7 | $ 465 | $ 1,349 |
| Decembe  31, 2010 |  | $  35 | $588 | $1,884 |

|  | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | 2011 | | | 2010 | | |
|  | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps |
|  | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | |
| Ave age | (0 0) | $  21 | $ 359 | 0 0 | $  23 | $ 338 |
| M n mum | (1 0) | $ | $ | (0 7) | $ | $ |
| Max mum | 1 2 | $  94 | $ 721 | 0 7 | $  83 | $ 668 |
| S anda d dev a  on | 0 3 | $  15 | $ 126 | 0 3 | $  18 | $ 179 |

Derivatives have historically enabled us to keep our  interest rate risk exposure at consistently low levels in a wide  range of interest rate environments  The table below shows that the PMVS L risk levels for the periods presented would generally  have been higher if we had not used derivatives  The derivative impact on our PMVS L (50 basis points) was $(2 0) billion at December 31, 2011, a decline of $1.0 billion from December 31, 2010  The decline was primarily driven by a decline in long term rates, which resulted in lower duration and convexity exposures on our mortgage assets, without a full offsetting impact from our existing debt  and derivative portfolios  In order to remain within our risk management limits, we rebalanced our portfolio with  receive fixed swaps, which lowered our derivative duration  exposure

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses can be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2969

Table 74    Derivative Impact on PMVS L (50 bps)

| | Before Derivatives | After Derivatives | ffect of Derivatives |
|---|---|---|---|
| | | (in millions) | |
| At | | | |
| Deceme  31, 2011 | $ 2,470 | $  465 | $ (2,005) |
| Deceme  31, 2010 | $ 3,614 | $  588 | $(3,026) |

*Duration Gap Results*

We actively measure and manage our duration gap exposure on a daily basis  In addition to duration gap management, we also  measure and manage the price sensitivity of our portfolio to  eleven different specific interest rate changes from three  months to 30 years. The price sensitivity of an instrument to specific changes in interest rates is known as the  instrument's key rate duration risk. By managing our  duration exposure both in aggregate through duration gap and to  specific changes in interest rates through key rate duration, we  expect to limit our exposure to interest rate changes for a wide  range of interest rate yield curve scenarios  Our average  duration gap, rounded to the nearest month, for the months of December 2011 and 2010 was zero months in both periods  Our  average duration gap, rounded to the nearest month, during the  years ended December 31, 2011 and 2010 was zero months in  both periods

The disclosure in our Monthly Volume Summary reports, which are available on our website at www freddiemac com and in current  reports on Form 8 K we file with the SEC, reflects the average of the daily PMVS L,  PMVS YC and duration gap estimates for a given reporting period (a month, quarter or year).

**Derivative-Related Risks**

Our use of derivatives exposes us to credit risk with respect to  our counterparties to derivative transactions  Through  counterparty selection, all derivative transactions are executed  in a manner that seeks to control and reduce counterparty credit  exposure  In order to attempt to minimize the potential replacement cost should a derivative counterparty fail, we  utilize derivative counterparty limits  Board level counterparty  limits are approved by the Board's Business and Risk Committee  Management and Board counterparty limits, which  include current exposure and potential exposure in a stress scenario, are monitored by members of our Enterprise Risk  Management division, which is responsible for establishing and monitoring credit and counterparty risk tolerances for our  business activities and reporting to the Business and Risk Committee as appropriate  See "MD&A    RISK MANAGEMENT    Credit Risk    *Institutional Credit Risk    Derivative Counterparties*" for information on derivative counterparty credit risk

Our use of derivatives also exposes us to derivative market  liquidity risk, which is the risk that we may not be able to  enter into or exit out of derivative transactions at a reasonable cost. A lack of sufficient capacity or liquidity in the  derivatives market could limit our risk management activities, increasing our exposure to interest rate risk  To help maintain continuous access to derivative markets, we use a  variety of products and transact with a number of different  derivative counterparties  In addition to OTC derivatives, we  also use exchange traded derivatives, asset securitization  activities, callable debt, and short term debt to rebalance our  portfolio

The Dodd Frank Act will require that, in the future, many types  of derivatives be centrally cleared and traded on exchanges or  comparable trading facilities  See "MD&A    RISK MANAGEMENT    Credit Risk    *Institutional Credit Risk    Derivative Counterparties*" for additional information on this  requirement and our use of a central clearing platform for  interest rate derivatives

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

TREASURY-2970

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of Freddie Mac:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income and comprehensive income, of equity (deficit), and of cash flows present fairly, in all material respects, the financial position of Freddie Mac, a stockholder owned government sponsored enterprise, and its subsidiaries at December 31, 2011 and 2010, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2011 in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2011, based on criteria established in Internal Control    Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) because material weaknesses in internal control over financial reporting related to: (1) disclosure controls and procedures that do not provide adequate mechanisms for information known to the Federal Housing Finance Agency ("FHFA") that may have financial statement disclosure ramifications to be communicated to management, and (2) controls and procedures that do not provide adequate mechanisms for managing information technology changes and monitoring information security existed as of that date  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The material weaknesses referred to above are described in Management's Report on Internal Control Over Financial Repo ting appearing under Item 9A  We considered these material weaknesses in determining the nature, timing, and extent of audit tests applied in our audit of the 2011 consolidated financial statements, and our opinion regarding the effectiveness of the Company's internal control over financial reporting does not affect our opinion on those consolidated financial statements  The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in management's report referred to above  Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits  We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation  Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances  We believe that our audits provide a reasonable basis for our opinions.

We have also audited in accordance with auditing standards generally accepted in the United States of America the supplemental consolidated fair value balance sheets of the Company as of December 31, 2011 and 2010. As described in "Note 17: Fair Value Disclosures", the supplemental consolidated fair value balance sheets have been prepared by management to present relevant financial information that is not provided by the historical cost consolidated balance sheets and is not intended to be a presentation in conformity with accounting principles generally accepted in the United States of America  In addition, the supplemental consolidated fair value balance sheets do not purport to present the net realizable, liquidation, or market value of the Company as a whole  Furthermore, amounts ultimately realized by the Company from the disposal of assets or amounts required to settle obligations may vary significantly from the fair values presented  In our opinion, the supplemental consolidated fair value balance sheets referred to above present fairly, in all material respects, the information set forth therein as described in "Note 17: Fair Value Disclosures"

As discussed in "Note 2: Conservatorship and Related Matters", in September 2008, the Company was placed into conservatorship by the FHFA. The U.S. Department of Treasury ("Treasury") has committed financial support to the Company and management continues to conduct business operations pursuant to the delegated authorities from FHFA during conservatorship. The Company is dependent upon the continued support of Treasury and FHFA.

As discussed in "Note 1: Summary of Significant Accounting Policies", the Company adopted as of January 1, 2010, amendments to the accounting guidance for transfers of financial assets and the consolidation of variable interest entities, which changed, among other things, how it evaluates securitization trusts for purposes of consolidation

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2971

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles A company's internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements  Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate

/s/ PricewaterhouseCoopers LLP
McLean, Virginia
March 9, 2012

*Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| | (in millions, except share-related amounts) | | |
| *Interest income* | | | |
| Mo gage loans | | | |
| He d by conso da ed us s | $ 77,158 | $ 86,698 | $ |
| Unsecu zed | 9,124 | 8,727 | 6,815 |
| *Total mortgage loans* | 86,282 | 95,425 | 6,815 |
| Inves men s n secu es | 12,791 | 14,375 | 33,290 |
| O he | 67 | 156 | 241 |
| *Total interest income* | 99,140 | 109,956 | 40,346 |
| *Interest expense* | | | |
| Deb secu es of conso da ed us s | (67,119) | (75,216) | |
| O he deb | (12,869) | (16,915) | (22,150) |
| *Total interest expense* | (79,988) | (92,131) | (22,150) |
| Expense e a ed o de va ves | (755) | (969) | (1,123) |
| *Net interest income* | 18,397 | 16,856 | 17,073 |
| P ov s on fo c ed losses | (10,702) | (17,218) | (29,530) |
| *Net interest income (loss) after provision for credit losses* | 7,695 | (362) | (12,457) |
| *Non-interest income (loss)* | | | |
| Ga ns ( osses) on ex ngu shmen of deb secu es of conso da ed u s s | (219) | (164) | |
| Ga ns (losses) on e emen of o he deb | 44 | (219) | (568) |
| Ga ns ( osses) on deb eco ded a fa va ue | 91 | 580 | (404) |
| De va ve ga ns (losses) | (9,752) | (8,085) | (1,900) |
| Impa men of ava lable-fo -sale secu es | | | |
| To al o he - han- empo a y mpa men of ava lable-fo -sale secu es | (2,101) | (1,778) | (23,125) |
| Po on of o he - han- empo a y mpa men ecogn zed n AOCI | (200) | (2,530) | 11,928 |
| Ne mpa men of ava lable-fo -sale secu es ecogn zed n ea n ngs | (2,301) | (4,308) | (11,197) |
| O he ga ns (losses) on nves men secu es ecogn zed n ea n ngs | (896) | (1,252) | 5,965 |
| O he ncome | 2,155 | 1,860 | 5,372 |
| *Non-interest income (loss)* | (10,878) | (11,588) | (2,732) |
| *Non-interest expense* | | | |
| Sala es and employee benef s | (832) | (895) | (912) |
| P ofess onal se v ces | (270) | (297) | (344) |
| Occupancy expense | (62) | (64) | (68) |
| O he adm n s a ve expenses | (342) | (341) | (361) |
| *To al adm n s a ve expenses* | (1,506) | (1,597) | (1,685) |
| Rea es a e owned ope a ons expense | (585) | (673) | (307) |
| O he expenses | (392) | (662) | (5,203) |
| *Non-interest expense* | (2,483) | (2,932) | (7,195) |
| Loss befo e ncome ax benef | (5,666) | (14,882) | (22,384) |
| Income ax benef | 400 | 856 | 830 |
| *Net loss* | (5,266) | (14,026) | (21,554) |
| O he comp ehens ve ncome, ne of axes and eclass f ca on adj s e s | | | |
| Changes n un ea zed ga ns ( osses) e a ed o ava lable-fo -sale secu es | 3,465 | 13,621 | 17,825 |
| Changes n un ea zed ga ns ( osses) e a ed o cash f ow hedge ela onsh ps | 509 | 673 | 773 |
| Changes n def ned benef p ans | 62 | 13 | 42 |
| *To al o he comp ehens ve ncome, ne of axes and eclass f ca on ad us men s* | 4,036 | 14,307 | 18,640 |
| Comp ehens ve ncome (loss) | (1,230) | 281 | (2,914) |
| Less Comp ehens ve loss a bu able o noncon oll ng n e es | | 1 | 1 |
| *Total comprehensive income (loss) attributable to Freddie Mac* | $ (1,230) | $ 282 | $ (2,913) |
| *Net loss* | $ (5,266) | $ (14,026) | $ (21,554) |
| Less Ne oss a bu ab e o noncon o ng n e es | | 1 | 1 |
| *Net loss attributable to Freddie Mac* | (5,266) | (14,025) | (21,553) |
| P efe ed s ock d v dends | (6,498) | (5,749) | (4,105) |
| *Net loss attributable to common stockholders* | $ (11,764) | $ (19,774) | $ (25,658) |
| Ne loss pe common sha e | | | |
| Bas c | $ (3 63) | $ (6 09) | $ (7 89) |
| D u ed | $ (3 63) | $ (6 09) | $ (7 89) |
| We gh ed ave age common sha es ou s and ng ( n housands) | | | |
| Bas c | 3,244,896 | 3,249,369 | 3,253,836 |
| D u ed | 3,244,896 | 3,249,369 | 3,253,836 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2973

Table of Contents

## FREDDIE MAC
## CONSOLIDATED BALANCE SHEETS

| | December 31, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions, except share-related amounts) | |
| **Assets** | | |
| Cash and cash equivalents (includes $2 and $1, respectively, related to our consolidated VIEs) | $ 28,442 | $ 37,012 |
| Restricted cash and cash equivalents (includes $27,675 and $7,514, respectively, related to our consolidated VIEs) | 28,063 | 8,111 |
| Federal funds sold and securities purchased under agreements to resell (includes $0 and $29,350, respectively, related to our consolidated VIEs) | 12,044 | 46,524 |
| *Investments in securities* | | |
| Available-for-sale, at fair value (includes $204 and $817, respectively, pledged as collateral that may be repledged) | 210,659 | 232,634 |
| Trading, at fair value | 58,830 | 60,262 |
| Total investments in securities | 269,489 | 292,896 |
| *Mortgage loans* | | |
| Held-for-investment, at amortized cost | | |
| By consolidated trusts (net of allowances for loan losses of $8,351 and $11,644, respectively) | 1,564,131 | 1,646,172 |
| Unsecuritized (net of allowances for loan losses of $30,912 and $28,047, respectively) | 207,418 | 192,310 |
| Total held-for-investment mortgage loans, net | 1,771,549 | 1,838,482 |
| Held-for-sale, at lower-of-cost-or-fair-value (includes $9,710 and $6,413 at fair value, respectively) | 9,710 | 6,413 |
| Total mortgage loans, net | 1,781,259 | 1,844,895 |
| Accrued interest receivable (includes $6,242 and $6,895, respectively, related to our consolidated VIEs) | 8,062 | 8,713 |
| Derivative assets, net | 118 | 143 |
| Real estate owned, net (includes $60 and $118, respectively, related to our consolidated VIEs) | 5,680 | 7,068 |
| Deferred tax assets, net | 3,546 | 5,543 |
| Other assets (Note 19) (includes $6,083 and $6,001, respectively, related to our consolidated VIEs) | 10,513 | 10,875 |
| Total assets | $ 2,147,216 | $ 2,261,780 |
| **Liabilities and equity (deficit)** | | |
| *Liabilities* | | |
| Accrued interest payable (includes $5,943 and $6,502, respectively, related to our consolidated VIEs) | $ 8,898 | $ 10,286 |
| *Debt, net:* | | |
| Debt securities of consolidated trusts held by third parties | 1,471,437 | 1,528,648 |
| Other debt (includes $3,015 and $4,443 at fair value, respectively) | 660,546 | 713,940 |
| Total debt, net | 2,131,983 | 2,242,588 |
| Derivative liabilities, net | 435 | 1,209 |
| Other liabilities (Note 19) (includes $3 and $172, respectively, related to our consolidated VIEs) | 6,046 | 8,098 |
| Total liabilities | 2,147,362 | 2,262,181 |
| Commitments and contingencies (Notes 9, 11, and 18) | | |
| *Equity (deficit)* | | |
| Senior preferred stock, at redemption value | 72,171 | 64,200 |
| Preferred stock, at redemption value | 14,109 | 14,109 |
| Common stock, $0.00 par value, 4,000,000,000 shares authorized, 725,863,886 shares issued and 649,725,302 shares and 649,179,789 shares outstanding, respectively | | |
| Additional paid-in capital | 3 | 7 |
| Retained earnings (accumulated deficit) | (74,525) | (62,733) |
| *AOCI, net of taxes, related to:* | | |
| Available-for-sale securities (includes $10,334 and $10,740, respectively, related to net unrealized losses on securities for which other-than-temporary impairment has been recognized in earnings) | (6,213) | (9,678) |
| Cash flow hedge relationships | (1,730) | (2,239) |
| Defined benefit plans | (52) | (114) |
| Total AOCI, net of taxes | (7,995) | (12,031) |
| Treasury stock, at cost, 76,138,584 shares and 76,684,097 shares, respectively | (3,909) | (3,953) |
| Total equity (deficit) | (146) | (401) |
| Total liabilities and equity (deficit) | $ 2,147,216 | $ 2,261,780 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

TREASURY-2974

Source   DIRA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# FREDDIE MAC
## CONSOLIDATED STATEMENTS OF EQUITY (DEFICIT)

| | Freddie Mac Stockholders' Equity (Deficit) | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares Outstanding | | | Senior Preferred Stock, at Redemption Value | Preferred Stock, at Redemption Value | Common Stock, at Par Value | Additional Paid In Capital | Retained Earnings (Accumulated Deficit) | AOC , Net of Tax | Treasury Stock, at Cost | Noncontrolling Interest | Total Equity (Deficit) |
| | Senior Preferred Stock | Preferred Stock | Common Stock | | | | | | | | | |
| | | | | | | (in millions) | | | | | | |
| Balance as o  December 31, 2008 | 1 | 6 | 6 7 | $ 1 ,800 | $ 1 ,109 | $ — | $ 19 | $ (23,191 | $ (32,357 | $ ( ,111 | $ 97 | $ (30,63 |
| Cumu at ve effect of change  n account ng pr nc ple | — | — | — | — | — | — | — | 1 996 | (9 931 | — | — | 5,065 |
| *Comprehensive income (loss):* | | | | | | | | | | | | |
| Net oss | — | — | — | — | — | — | — | (21,553 | — | — | (1 | (21,55 |
| Other comprehens ve  ncome ( oss), net of taxes | — | — | — | — | — | — | — | — | 18,6 0 | — | — | 18,6 0 |
| *Comprehensive income (loss)* | — | — | — | — | — | — | — | (21,553 | 18,6 0 | — | (1 | (2,91 |
| ncrease  n l qu dat on pre erence | — | — | — | 36,900 | — | — | — | — | — | — | — | 36,900 |
| Stock-based compensation | — | — | — | — | — | — | 5 8 | — | — | — | — | 5 8 |
| ncome tax benef t from stock  based compensat on | — | — | — | — | — | — | 7 | — | — | — | — | 7 |
| Common stock issuances | — | — | 2 | — | — | — | (90 | — | — | 92 | — | 2 |
| ransfer from retained earnings (accu ated de c t to add t onal pa d  n cap tal | — | — | — | — | — | — | 63 | (63 | — | — | — | — |
| Sen or preferred stock d v dends dec ared | — | — | — | — | — | — | — | ( ,105 | — | — | — | ( ,105 |
| D v dend equ va ent payments on exp red stock opt ons | — | — | — | — | — | — | — | (5 | — | — | — | (5 |
| D v dends and other | — | — | — | — | — | — | — | — | — | — | (2 | (2 |
| **Ending balance at December 31, 2009** | 1 | 6 | 649 | $ 51,700 | $ 1 ,109 | $ — | $ 57 | $ (33,921 | $ (23,6 8 | $ ( ,019 | $ 9 | $ ,372 |
| **Balance as o  December 31, 2009** | 1 | 6 | 649 | $ 51,700 | $ 1 ,109 | $ — | $ 57 | $ (33,921 | $ (23,6 8 | $ ( ,019 | $ 9 | $ ,372 |
| Cumu at ve effect of change  n account ng pr nc ple | — | — | — | — | — | — | — | (9,011 | (2 690 | — | (2 | (11,703 |
| Ba ance as of January 1, 2010 | 1 | 6 | 649 | 51,700 | 1 ,109 | — | 57 | ( 2,932 | (26,338 | ( ,019 | 92 | (7,331 |
| *Comprehensive income (loss):* | | | | | | | | | | | | |
| Net oss | — | — | — | — | — | — | — | (1 ,025 | — | — | (1 | (1 ,026 |
| Other comprehens ve  ncome ( oss), net of taxes | — | — | — | — | — | — | — | — | 1 ,307 | — | — | 1 ,307 |
| *Comprehensive income (loss)* | — | — | — | — | — | — | — | (1 ,025 | 1 ,307 | — | (1 | 281 |
| ncrease  n l qu dat on pre erence | — | — | — | 12,500 | — | — | — | — | — | — | — | 12,500 |
| Stock-based compensation | — | — | — | — | — | — | 2 | — | — | — | — | 2 |
| ncome tax benef t from stock  based compensat on | — | — | — | — | — | — | 1 | — | — | — | — | 1 |
| Common stock issuances | — | — | — | — | — | — | (67 | — | — | 66 | — | (1 |
| Noncontro ng  nterest purchase | — | — | — | — | — | — | (31 | — | — | — | (89 | (120 |
| ransfer from retained earnings (accumu ated de c t to add t onal pa d  n cap tal | — | — | — | — | — | — | 23 | (23 | — | — | — | — |
| Sen or preferred stock d v dends dec ared | — | — | — | — | — | — | — | (5,7 9 | — | — | — | (5,7 9 |
| D v dend equ va ent payments on exp red stock opt ons | — | — | — | — | — | — | — | ( | — | — | — | ( |
| D v dends and other | — | — | — | — | — | — | — | — | — | — | (2 | (2 |
| **Ending balance at December 31, 2010** | 1 | 6 | 649 | $ 6 ,200 | $ 1 ,109 | $ — | $ 7 | $ (62,733 | $ (12,031 | $ (3,953 | $ — | $ ( 01 |
| **Balance as of December 31, 2010** | 1 | 6 | 649 | $ 6 ,200 | $ 1 ,109 | $ — | $ 7 | $ (62,733 | $ (12,031 | $ (3,953 | $ — | $ ( 01 |
| *Comprehensive income (loss):* | | | | | | | | | | | | |
| Net oss | — | — | — | — | — | — | — | ( 266 | — | — | — | ( 266 |
| Other comprehens ve  ncome ( oss), net of taxes | — | — | — | — | — | — | — | — | ,036 | — | — | ,036 |
| *Comprehensive income (loss)* | — | — | — | — | — | — | — | ( 266 | ,036 | — | — | (1,230 |
| ncrease  n l qu dat on pre erence | — | — | — | 7,971 | — | — | — | — | — | — | — | 7,971 |
| Stock-based compensation | — | — | — | — | — | — | 11 | — | — | — | — | 11 |
| ncome tax benef t from stock  based compensat on | — | — | — | — | — | — | 1 | — | — | — | — | 1 |
| Common stock issuances | — | — | 1 | — | — | — | ( | — | — | — | — | — |
| ransfer from retained earnings (accumu ated de c t to add t onal pa d  n cap tal | — | — | — | — | — | — | 28 | (28 | — | — | — | — |
| Sen or preferred stock d v dends dec ared | — | — | — | — | — | — | — | (6 9 | — | — | — | (6 9 |
| D v dend equ va ent payments on exp red stock opt ons | — | — | — | — | — | — | — | (3 | — | — | — | (3 |
| **Ending balance at December 31, 2011** | 1 | 6 | 650 | $ 72,171 | $ 1 ,109 | $ — | $ 3 | $ (7 ,525 | $ (7 99 | $ (3 909 | $ — | $ (1 6 |

*The accompanying notes are an integral part of these  consolidated financial statements.*

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2975

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# FREDDIE MAC
## CONSOLIDATED STATEMENTS OF CASH FLOWS

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2011** | **2010** | **2009** |
|  | (in millions) | | |
| **Cash flows from operating activities** | | | |
| Net loss | $ (5,266) | $ (14,026) | $ (21,554) |
| Adjustments to reconcile net loss to net cash provided by operating activities | | | |
| Deferred fee losses (gains) | 4,721 | 3,591 | (2,046) |
| Asset-related amortization, net of premiums, discounts, and basis adjustments | 2,063 | 326 | 163 |
| Debt-related amortization of premiums and discounts on certain debt securities and basis adjustments | (1,629) | 1,127 | 3,959 |
| Net discounts paid on retirements of other debt | (713) | (1,959) | (4,303) |
| Net premiums received from issuance of debt securities of consolidated trusts | 4,091 | 3,888 | |
| Losses on extinguishment of debt securities of consolidated trusts and other debt | 175 | 383 | 568 |
| Provision for credit losses | 10,702 | 17,218 | 29,530 |
| Losses on investment activity | 2,368 | 5,542 | 5,356 |
| (Gains) losses on debt recorded at fair value | (91) | (580) | 404 |
| Deferred income tax benefit | (117) | (670) | (670) |
| Purchases of held-for-sale mortgage loans | (16,550) | (10,330) | (101,976) |
| Sales of mortgage loans acquired as held-for-sale | 14,027 | 6,728 | 88,094 |
| Repayments of mortgage loans acquired as held-for-sale | 54 | 21 | 3,050 |
| Change in | | | |
| Accrued interest receivable | 651 | 832 | (1,193) |
| Accrued interest payable | (1,080) | (1,700) | (1,324) |
| Income taxes payable | (281) | 662 | 312 |
| Other, net | (2,805) | (233) | 2,918 |
| *Net cash provided by operating activities* | 10,320 | 10,820 | 1,288 |
| **Cash flows from investing activities** | | | |
| Purchases of trading securities | (47,977) | (55,509) | (250,411) |
| Proceeds from sales of trading securities | 33,734 | 17,771 | 153,093 |
| Proceeds from maturities of trading securities | 14,545 | 40,389 | 69,025 |
| Purchases of available-for-sale securities | (12,171) | (6,542) | (15,346) |
| Proceeds from sales of available-for-sale securities | 2,643 | 2,645 | 22,259 |
| Proceeds from maturities of available-for-sale securities | 34,316 | 44,398 | 86,702 |
| Purchases of held-for-investment mortgage loans | (44,129) | (68,180) | (23,606) |
| Repayments of mortgage loans acquired as held-for-investment | 369,981 | 425,298 | 6,862 |
| (Increase) decrease in restricted cash | (19,952) | 7,399 | 426 |
| Net proceeds from (payments of) mortgage insurance and acquisitions and dispositions of real estate owned | 12,665 | 13,093 | (4,690) |
| Net decrease (increase) in federal funds sold and securities purchased under agreements to resell | 34,480 | (32,023) | 3,150 |
| Derivative premiums and terminations and swap collateral, net | (4,447) | (3,075) | 99 |
| Purchase of noncontrolling interests | | (23) | |
| *Net cash provided by investing activities* | 373,688 | 385,641 | 47,563 |
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of debt securities of consolidated trusts held by third parties | 96,042 | 96,253 | |
| Repayments of debt securities of consolidated trusts held by third parties | (436,320) | (461,084) | |
| Proceeds from issuance of other debt | 1,024,323 | 1,115,097 | 1,333,859 |
| Repayments of other debt | (1,078,050) | (1,180,935) | (1,395,806) |
| Increase in liquidation preference of senior preferred stock | 7,971 | 12,500 | 36,900 |
| Repurchase of REIT preferred stock | | (100) | |
| Payment of cash dividends on senior preferred stock | (6,495) | (5,749) | (4,105) |
| Excess tax benefit associated with stock-based awards | 1 | 1 | 1 |
| Payments of low-income housing tax credit partnerships notes payable | (50) | (115) | (343) |
| *Net cash used in financing activities* | (392,578) | (424,132) | (29,494) |
| Net (decrease) increase in cash and cash equivalents | (8,570) | (27,671) | 19,357 |
| Cash and cash equivalents at beginning of year | 37,012 | 64,683 | 45,326 |
| *Cash and cash equivalents at end of year* | $ 28,442 | $ 37,012 | $ 64,683 |
| **Supplemental cash flow information** | | | |
| Cash paid (received) for | | | |
| Debt interest | $ 84,370 | $ 95,468 | $ 25,169 |
| Net derivative interest received/(paid) | 4,791 | 4,305 | 2,274 |
| Income taxes | (1) | (848) | (472) |
| Non-cash investing and financing activities | | | |
| Held-for-sale mortgage loans securitized and retained as trading and available-for-sale securities | | | 1,088 |
| Underlying mortgage loans related to guarantor swap transactions | 280,621 | 324,004 | |
| Debt securities of consolidated trusts issued by third parties issued for guarantor swap transactions | 280,621 | 324,004 | |
| Transfers from held-for-investment mortgage loans to held-for-sale mortgage loans | | 196 | 435 |
| Transfers from held-for-sale mortgage loans to held-for-investment mortgage loans | | | 10,336 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

Source   DRA HOM  OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2976

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Freddie Mac was chartered by Congress in 1970 to stabilize the nation's residential mortgage market and expand opportunities for home ownership and affordable rental housing. Our statutory mission is to provide liquidity, stability and affordability to the U.S. housing market. We are a GSE regulated by FHFA, the SEC, HUD, and the Treasury, and are currently operating under the conservatorship of FHFA For more information on the roles of FHFA and the Treasury, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS."

We are involved in the U.S. housing market by participating in the secondary mortgage market We do not participate directly in the primary mortgage market Our participation in the secondary mortgage market includes providing our credit guarantee for mortgages originated by mortgage lenders in the primary mortgage market and investing in mortgage loans and mortgage related securities

Our operations consist of three reportable segments, which are based on the type of business activities each performs     Single family Guarantee, Investments, and Multifamily Our Single family Guarantee segment reflects results from our single family credit guarantee activities In our Single family Guarantee segment, we purchase single family mortgage loans originated by our seller/servicers in the primary mortgage market In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage related securities We guarantee the payment of principal and interest on the mortgage related securities in exchange for management and guarantee fees Our Investments segment reflects results from our investment, funding, and hedging activities In our Investments segment, we invest principally in mortgage related securities and single family performing mortgage loans, which are funded by debt issuances and hedged using derivatives. Our Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities In our Multifamily segment, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization See "NOTE 14: SEGMENT REPORTING" for additional information

Under conservatorship, we are focused on the following primary business objectives: (a) meeting the needs of the U S residential mortgage market by making home ownership and rental housing more affordable by providing liquidity to mortgage originators and, indirectly, to mortgage borrowers; (b) working to reduce the number of foreclosures and helping to keep families in their homes, including through our role in FHFA and other governmental initiatives, such as the FHFA directed servicing alignment initiative, HAMP and HARP, as well as our own workout and refinancing initiatives; (c) minimizing our credit losses; (d) maintaining sound credit quality of the loans we purchase and guarantee; and (e) strengthening our infrastructure and improving overall efficiency while also focusing on retention of key employees We also have a variety of different, and potentially competing, objectives based on our charter, other legislation, public statements from Treasury and FHFA officials, and other guidance and directives from our Conservator For information regarding these objectives, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS      Business Objectives."

Throughout our consolidated financial statements and related notes, we use certain acronyms and terms which are defined in the "GLOSSARY "

### Basis of Presentation

The accompanying consolidated financial statements have been prepared in accordance with GAAP and include our accounts as well as the accounts of other entities in which we have a controlling financial interest All intercompany balances and transactions have been eliminated

Our current accounting policies are described below We are operating under the basis that we will realize assets and satisfy liabilities in the normal course of business as a going concern and in accordance with the delegation of authority from FHFA to our Board of Directors and management Certain amounts in prior periods' consolidated financial statements have been reclassified to conform to the current presentation

We evaluate the materiality of identified errors in the financial statements using both an income statement, or "rollover," and a balance sheet, or "iron curtain," approach, based on relevant quantitative and qualitative factors. Net loss includes certain adjustments to correct immaterial errors related to previously reported periods

We recorded the cumulative effect of certain miscellaneous errors related to previously reported periods as corrections in the year ended December 31, 2011 We concluded that these errors are not material individually or in the aggregate to our previously issued consolidated financial statements for any of the periods affected, or to our earnings for the full year ended December 31, 2011, or to the trend of earnings The impact to earnings, net of taxes, for the year ended December 3 , 2011 was $0.4 billion.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2977

Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Use of Estimates

The preparation of financial statements requires us to make estimates and assumptions that affect: (a) the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements; and (b) the reported amounts of revenues and expenses and gains and losses during the reporting period Management has made significant estimates in preparing the financial statements, including, but not limited to, establishing the allowance for loan losses and reserve for guarantee losses, valuing financial instruments and other assets and liabilities, assessing impairments on investments, and assessing the realizability of net deferred tax assets Actual results could be different from these estimates

## Consolidation and Equity Method of Accounting

The consolidated financial statements include our accounts and those of our subsidiaries The net earnings attributable to the noncontrolling interests in our consolidated subsidiaries are reported separately in the consolidated statements of income and comprehensive income as comprehensive (income) loss attributable to noncontrolling interest All material intercompany transactions have been eliminated in consolidation

For each entity with which we are involved, we determine whether the entity should be consolidated in our financial statements We consolidate entities in which we have a controlling financial interest The method for determining whether a controlling financial interest exists varies depending on whether the entity is a VIE or non VIE A VIE is an entity: (a) that has a total equity investment at risk that is not sufficient to finance its activities without additional subordinated financial support provided by another party; or (b) where the group of equity holders does not have: (i) the power, through voting rights or similar rights, to direct the activities of an entity that most significantly impact the entity's economic performance; (ii) the obligation to absorb the entity's expected losses; or (iii) the right to receive the entity's expected residual returns

Our policy is to consolidate VIEs in which we hold a controlling financial interest and are therefore deemed to be the primary beneficiary An enterprise has a controlling financial interest in, and thus is deemed to be the primary beneficiary of, a VIE if it has both: (a) the power to direct the activities of the VIE that most significantly impact its economic performance; and (b) exposure to losses or benefits of the VIE that could potentially be significant to the VIE We perform ongoing assessments to determine if we are the primary beneficiary of the VIEs with which we are involved and, as such, conclusions may change over time as the nature and extent of our involvement changes

Historically, we were exempt from applying the accounting guidance applicable to consolidation of VIEs to the majority of our securitization trusts, as well as certain of our investment securities issued by third parties, because they had been designed to meet the definition of a QSPE Upon the effective date of the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs, the concept of a QSPE and the related scope exception from the consolidation provisions applicable to VIEs were removed from GAAP; consequently, all of our securitization trusts, as well as our investment securities issued by third parties that had previously been QSPEs, became subject to a consolidation assessment. The results of our consolidation assessments on certain types of securitization trusts are explained in the paragraphs that follow

We use securitization trusts in our securities issuance process that are VIEs. We are the primary beneficiary of trusts that issue our single family PCs and certain Other Guarantee Transactions. See "NOTE 3: VARIABLE INTEREST ENTITIES" for more information. When we transfer assets into a VIE that we consolidate at the time of the transfer (or shortly thereafter), we recognize the assets and liabilities of the VIE at the amounts that they would have been recognized if they had not been transferred, and no gain or loss is recognized on these transfers For all other VIEs that we consolidate, we recognize the assets and liabilities of the VIE at fair value, and we recognize a gain or loss for the difference between: (a) the fair value of the consideration paid and the fair value of any noncontrolling interests held by third parties; and (b) the net amount, as measured on a fair value basis, of the assets and liabilities consolidated

For entities that are not VIEs, the usual condition of a controlling financial interest is ownership of a majority voting interest in an entity We use the equity method of accounting for entities over which we have the ability to exercise significant influence, but not control

## Securitization Activities through Issuances of Freddie Mac Mortgage Related Securities

### *Overview*

When we securitize single family mortgages that we purchase, we issue mortgage related securities called PCs that can be sold to investors or held by us. Guarantor swaps are transactions where financial institutions exchange mortgage loans for PCs backed by these mortgage loans Multilender swaps are similar to guarantor swaps, except that formed PC

<div style="text-align:center">207</div>

*Freddie Mac*

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

pools include loans that are contributed by more than one party  We issue PCs through various swap based exchanges significantly  more often than through cash based exchanges  We issue REMICs and Other Structured Securities in transactions in which  securities dealers or investors sell us mortgage related assets in exchange for REMICs and Other Structured Securities  We also  issue Other Guarantee Transactions to third parties in exchange for non Freddie Mac mortgage related securities

### PCs

Our PCs are pass through debt securities that represent  undivided beneficial interests in a pool of mortgages held by a  securitization trust. For our fixed rate PCs, we guarantee the  timely payment of interest and principal  For our ARM PCs, we  guarantee the timely payment of the weighted average coupon  interest rate for the underlying mortgage loans  We do not guarantee the timely payment of principal for ARM PCs; however, we do guarantee the full and final payment of principal

Various types of fixed income investors purchase our PCs, including pension funds, insurance companies, securities  dealers, money managers, commercial banks, and foreign central  banks. PCs differ from U.S. Treasury securities and certain other fixed income investments in two primary ways. First, they can be prepaid at any time because homeowners may pay off the  underlying mortgages at any time prior to a loan's maturity  Because homeowners have the right to prepay their mortgage, the securities implicitly have a call option that  significantly reduces the average life of the security as  compared to the contractual maturity of the underlying loans  Consequently, mortgage related securities generally provide a higher nominal yield than certain other fixed income products  Second, PCs are not backed by the full faith and credit of the United States, as are U.S. Treasury securities. However, we  guarantee the payment of interest and principal on all of our  PCs, as discussed above

In return for providing our guarantee of the payment of  principal and interest, we earn a management and guarantee fee  that is paid to us over the life of an issued PC, representing a  portion of the interest collected on the underlying loans

### PC Trusts

Prior to January 1, 2010, our PC trusts met the definition  of QSPEs and were not consolidated. Effective January 1, 20  0, the concept of a QSPE was removed from GAAP and entities  previously considered QSPEs were required to be evaluated for  consolidation  Based on our evaluation, we determined that we are the primary  beneficiary of trusts that issue our  single family PCs. Therefore, effective January 1, 2010, we consolidated on our balance sheet the assets and liabilities of  these trusts at their UPB, with accrued interest, allowance for  credit losses or other than temporary impairments recognized as  appropriate, using the practical expedient permitted upon  adoption since we determined that calculation of carrying values was not practical  Other assets and liabilities that were  consolidated effective January 1, 2010 that either did not have a UPB or were required to be carried at fair value were  measured at fair value. As a result of this consolidation, we  have recognized on our consolidated balance sheets the mortgage loans underlying our issued single family PCs as mortgage loans  held for investment by consolidated trusts, at amortized cost. We also recognized the corresponding single family PCs held by  third parties on our consolidated balance sheets as debt securities of consolidated trusts held by third parties  After  January 1, 2010, the assets and liabilities of trusts that  we consolidate are recorded at either their: (a) carrying  value if the underlying assets are contributed by us to the  trust; or (b) fair value for those securitization trusts established for our guarantor swap program  Refer to  "Mortgage Loans" and "Debt Securities Issued" below for further information on the subsequent accounting treatment of these assets and liabilities,  respectively

### REMICs and Other Structured Securities

Our REMICs and Other Structured Securities use resecuritization  trusts that meet the definition of a VIE  REMICs and Other  Structured Securities represent beneficial interests in groups  of PCs and other types of mortgage related assets  We create  these securities primarily by using PCs or previously issued  mortgage related securities as collateral  Similar to our PCs,  we guarantee the payment of principal and interest to the holders of the tranches of our REMICs and Other Structured  Securities  However, for REMICs and Other Structured Securities  where we have already guaranteed the underlying assets, there  is  no incremental exposure to credit loss assumed by us

With respect to the resecuritization trusts used for REMICs and  Other Structured Securities whose underlying assets are PCs, we  do not have rights to receive benefits or obligations to absorb  losses that could potentially be significant to the trusts  because we have already provided a guarantee on the underlying  assets  Additionally, our involvement with these trusts does not  provide us with any power that would enable us to direct the significant economic activities of these entities  Although we  may be exposed to prepayment risk through our ownership of the  securities issued by these trusts, we do not have the ability  through our involvement with the trust to impact the economic  risks to which we are exposed

TREASURY-2979

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

As a result, we have concluded that we are not the primary beneficiary of, and therefore do not consolidate, the resecuritization trusts used for REMICs and Other Structured Securities whose underlying assets are PCs unless we hold substantially all of the outstanding beneficial interests that have been issued by the trust and are therefore considered the primary beneficiary of the trust.

We receive a transaction fee from third parties for issuing REMICs and Other Structured Securities in exchange for PCs or other mortgage-related assets We defer the portion of the transaction fee that is equal to the estimated value of our future administrative responsibilities for issued REMICs and Other Structured Securities These responsibilities include ongoing trustee services, administration of pass through amounts, paying agent services, tax reporting, and other required services We estimate the value of these future responsibilities based on quotes from third party vendors who perform each type of service and, where quotes are not available, based on our estimates of what those vendors would charge The remaining portion of the transaction fee relates to compensation earned in connection with structuring related services we rendered to third parties and is allocated between REMICs and Other Structured Securities we retain, if any, and the REMICs and Other Structured Securities acquired by third parties, based on the relative fair value of the securities The portion of the fee allocated to any REMICs and Other Structured Securities we retain is deferred as a carrying value adjustment and is amortized into interest income using the effective interest method over the contractual lives of these securities The fee allocated to REMICs and Other Structured Securities acquired by third parties is recognized immediately in earnings as other income

### Other Guarantee Transactions

Other Guarantee Transactions are mortgage related securities that we issue to third parties in exchange for non Freddie Mac mortgage-re ated securities. Other Guarantee Transactions typically involve us purchasing either the senior tranches from a non Freddie Mac senior subordinated securitization or single class pass through securities, placing the acquired assets into a securitization trust, providing a guarantee of the principal and interest of the acquired assets and issuing securities backed by these assets To the extent that we are deemed to be the primary beneficiary of such a securitization trust, we recognize the mortgage loans underlying the Other Guarantee Transaction as mortgage loans held for investment, at amortized cost Correspondingly, we recognize the issued securities held by third parties as debt securities of consolidated trusts However, to the extent we are not deemed to be the primary beneficiary of such a securitization trust, we recognize a guarantee asset, to the extent a management and guarantee fee is charged, and we recognize a guarantee obligation at fair value We do not receive transaction fees, apart from our management and guarantee fee, for these transactions.

### Purchases and Sales of Freddie Mac Mortgage-Related Securities

#### PCs

When we purchase PCs that have been issued by consolidated PC trusts, we extinguish the outstanding debt securities of the re ated consolidated trust We recognize a gain (loss) on extinguishment of the debt securities to the extent the amount paid to redeem the debt differs from carrying value, adjusted for any related purchase commitments accounted for as derivatives

When we sell PCs that have been issued by consolidated PC trusts, we recognize a liability to the third party beneficial interest holders of the related consolidated trust as debt securities of consolidated trusts held by third parties. That is, our sale of PCs issued by consolidated PC trusts is accounted for as the issuance of debt, not as the sale of investment securities

#### Single Class REMICs and Other Structured Securities

Our mortgage related securities that we classify as REMICs and Other Structured Securities may be single class or multiclass resecuritization transactions. In REMICs and Other Structured Securities that are single class securities, the collateral includes PCs and single class REMICs and Other Structured Securities We do not consolidate these resecuritization trusts as we are not deemed to be the primary beneficiary of such trusts. Our single class REMICs and Other Structured Securities pass through all of the cash flows of the underlying PCs directly to the holders of the securities and are deemed to be substantially the same as the underlying PCs. As a result, when we purchase single class REMICs and Other Structured Securities, we extinguish a pro rata portion of the outstanding debt securities of the related PC trust on our consolidated balance sheets

When we sell single class REMICs and Other Structured Securities, we recognize a liability to the third party beneficial interest holders of the related consolidated PC trust as debt securities of consolidated trusts held by third

<div align="center">209</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

parties. That is, our sale of single class REMICs and Other Structured Securities is accounted for as the issuance of debt, not as the sale of investment securities

*Multiclass REMICs and Other Structured Securities*

In multiclass REMICs and Other Structured Securities, the collateral includes PCs and REMICs and Other Structured Securities Generally, PCs serve as the primary type of collateral for these resecuritizations We do not consolidate these resecuritization trusts as we are not deemed to be the primary beneficiary of such trusts unless we hold substantially all of the outstanding beneficial interests that have been issued by the trust and are therefore considered to be the primary beneficiary. In our multiclass REMICs and Other Structured Securities, the cash flows of the underlying PCs are divided (*e.g.*, stripped and/or time tranched). Due primarily to this division of cash flows, these securities are not deemed to be substantially the same as the underlying PCs. As a result, when we purchase multiclass REMICs and Other Structured Securities, we record these securities as investments in debt securities rather than as the extinguishment of debt since we are investing in the debt securities of a non consolidated entity See "Investments in Securities" for further information regarding our accounting for investments in multiclass REMICs and Other Structured Securities. The purchase of these securities is generally funded through the issuance of unsecured debt to third parties

We recognize, as assets, both the investment in the multiclass REMICs and Other Structured Securities and the mortgage loans backing the PCs held by the trusts which underlie the multiclass REMICs and Other Structured Securities. Additionally, we recognize, as liabilities, the unsecured debt issued to third parties to fund the purchase of the multiclass REMICs and Other Structured Securities as well as the debt issued to third parties of the PC trusts we consolidate which underlie the multiclass REMICs and Other Structured Securities. This results in recognition of interest income from both assets and interest expense from both liabilities

When we sell multiclass REMICs and Other Structured Securities, we account for the transfer in accordance with the accounting guidance for transfers of financial assets To the extent the transfer of multiclass REMICs and Other Structured Securities qualifies as a sale, we de recognize all assets sold and recognize all assets obtained and liabilities incurred Any gain (loss) on the sale of multiclass REMICs and Other Structured Securities is reflected in our consolidated statements of income and comprehensive income as a component of other gains (losses) on investment securities To the extent the transfer of multiclass REMICs and Other Structured Securities does not qualify as a sale, we account for the transfer as a financing transaction and recognize a liability for the proceeds received from third parties in the transfer.

**Other Guarantee Commitments**

In certain circumstances we also provide our guarantee of mortgage related assets held by third parties without our securitization of the related assets For example, we provide long term standby commitments to certain of our single family customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements In addition, during 2009 and 2010, we issued guarantees under the TCLFP on securities backed by HFA bonds as part of the HFA Initiative

**Cash and Cash Equivalents**

Highly liquid investment securities that have an original maturity of three months or less are accounted for as cash equivalents. In addition, cash collateral that we have the right to use for general corporate purposes and that we obtain from counterparties to derivative contracts is recorded as cash and cash equivalents.

**Restricted Cash and Cash Equivalents**

Cash collateral accepted from counterparties that we do not have the right to use for general corporate purposes is recorded as restricted cash in our consolidated balance sheets Restricted cash includes cash remittances received on the underlying assets of our consolidated trusts, which are deposited into a separate custodial account. These cash remittances include both scheduled and unscheduled principal and interest payments. The cash remittances are segregated in the separate custodial account until they are remitted to the PC, REMIC and Other Structured Securities holders on their respective security payment dates, and are not commingled with our general operating funds As securities administrator, we invest the cash held in the custodial account, pending distribution to our PC, REMIC, and Other Structured Securities holders, in short term investments and are entitled to the interest income earned on these short term investments, which is recorded as interest income, other on our consolidated statements of income and comprehensive income

**Mortgage Loans**

Upon acquisition, we classify a loan as either held for sale or held for investment Mortgage loans that we have the ability and intent to hold for the foreseeable future are classified as held for investment Historically, we classified

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2981

Table of Contents

mortgage loans that we purchased to use as collateral for future PC and other mortgage related security issuances as held for sale because we intended to securitize the loans in transactions that qualified for derecognition from our consolidated financial statements and did not have the intent to hold these loans for the foreseeable future Effective January , 20 0 we were required to consolidate our single family PC trusts and certain Other Guarantee Transactions, and, therefore, recognized these securities on our consolidated balance sheets These consolidated entities do not have the ability to sell mortgage loans and generally are only permitted to hold such loans for the settlement of the corresponding obligations of these entities As such, loans we acquire and which we intend to securitize using an entity we will consolidate will generally be classified as held for investment both prior to and subsequent to their securitization, in accordance with our intent and ability to hold such loans for the foreseeable future

Held for investment mortgage loans are reported in our consolidated balance sheets at their outstanding UPB, net of deferred fees and other cost basis adjustments (including unamortized premiums and discounts, delivery fees and other pricing adjustments) These deferred items are amortized into interest income over the contractual lives of the loans using the effective interest method We recognize interest income on an accrual basis except when we believe the collection of principal or interest is not probable If the collection of principal and interest is not probable, we cease the accrual of interest income

Mortgage loans not classified as held for investment are classified as held for sale Held for sale loans are reported at ower-of-cost-or-fa r-value on our consolidated balance sheets Any excess of a held for sale loan's cost over its fair value is recognized as a valuation allowance in other income on our consolidated statement of income and comprehensive income, with changes in this valuation allowance also being recorded in other income. Premiums, discounts, and other cost basis adjustments recognized upon acquisition on single family loans classified as held for sale are deferred and not amortized We have elected the fair value option for multifamily mortgage loans held for sale that we intend to securitize and sell to investors. See "NOTE 17: FAIR VALUE DISCLOSURES Fair Value Election *Multifamily Held For Sale Mortgage Loans with Fair Value Option Elected*." Thus, these multifamily mortgage loans are measured at fair value on a recurring basis, with subsequent gains or losses related to sales or changes in fair value reported in other income in our consolidated statements of income and comprehensive income

Cash flows related to mortgage loans held by our consolidated trusts are classified as either investing activities (*e.g.*, principal repayments) or operating activities (*e.g.*, interest payments received from borrowers included within net income (loss)) In addition, cash flows related to purchases of mortgage loans held for sale are classified in operating activities When mortgage loans held for sale are sold or securitized, proceeds from the sale or securitization and any related gain or loss are classified in operating activities

**Allowance for Loan Losses and Reserve for Guarantee Losses**

The allowance for loan losses and the reserve for guarantee losses represent estimates of incurred credit losses The allowance for loan losses pertains to all single family and multifamily loans classified as held for investment on our consolidated balance sheets whereas the reserve for guarantee losses relates to single family and multifamily loans underlying our non consolidated Freddie Mac mortgage related securities and other guarantee commitments Total held for investment mortgage loans, net are shown net of the allowance for loan losses on our consolidated balance sheets The reserve for guarantee losses is included within other liabilities on our consolidated balance sheets We recognize incurred losses by recording a charge to the provision for credit losses in our consolidated statements of income and comprehensive income Determining the appropriateness of the loan loss reserves is a complex process that is subject to numerous estimates and assumptions requiring significant judgment about matters that involve a high degree of subjectivity.

We estimate credit losses related to homogeneous pools of loans in accordance with the accounting guidance for contingencies Accordingly, we maintain an allowance for loan losses on mortgage loans held for investment when it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated Loans that we evaluate for individual impairment are measured in accordance with the subsequent measurement requirements of the accounting guidance for receivables

For both the single family and multifamily portfolios, we charge off (in full or in part) our recorded investment in a loan in the period it is determined that the loan (or a portion thereof) is uncollectible, which generally occurs at final disposition of the loan However, if losses are evident prior to final disposition, earlier recognition of a charge off is required by our policies We also consider charge offs for certain very small balance loans and upon the occurrence of certain events such as natural disasters. A charge off is also recorded if we realize a specific credit loss upon the modification of a loan in a TDR. We do not have any established threshold in terms of days past due beyond which we partially or fully charge off loans.

<div align="center">211</div>

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### *Single-Family Loans*

We determine single family loan loss reserves both on a collective and individual basis. For further discussion on individually impaired single family loans, refer to "Impaired Loans" below

We estimate loan loss reserves on homogeneous pools of single family loans using a statistically based model that evaluates a variety of factors affecting collectability  The homogeneous pools of single family mortgage loans are determined  based on common underlying characteristics, including current LTV ratios and trends in home prices, loan product type and geographic region  In determining the loan loss reserves for single family loans at the balance sheet date, we evaluate key  inputs and factors including, but not limited to:

- current LTV ratios and historical trends in home prices;

- loan product type;

- delinquency/default status and history;

- actual and estimated rates of collateral loss severity for  similar loans;

- geographic location;

- loan age;

- sourcing channel;

- occupancy type;

- UPB at origination;

- expected ability to partially mitigate losses through loan  modification or other alternatives to foreclosure;

- expected proceeds from mortgage insurance contracts that are  contractually attached to a loan or other credit enhancements  that were entered into contemporaneous with and in contemplation  of a guarantee or loan purchase transaction;

- expected repurchases of mortgage loans by sellers under their  obligations to repurchase loans that are inconsistent with  certain representations and warranties made at the time of sale;

- counterparty credit of mortgage insurers and seller/servicers;

- pre foreclosure real estate taxes and insurance;

- estimated selling costs should the underlying property  ultimately be sold; and

- trends in the timing of foreclosures

Freddie Mac relies upon third parties to provide primary  servicing for the performing and non performing loan portfolio  At loan delivery, the seller provides us with the loan data, which includes loan characteristics and underwriting  information. Each month, the servicers provide us with monthly loan level servicing data, including delinquency and loss  information

Certain loan servicing data is reported to us on a real time  basis, such as loan pay offs and foreclosure events. However,  certain monthly servicing data, including delinquency status, is  delivered on a one month delay  For example, December loan  delinquency data delivered to Freddie Mac at the end of December  or beginning of January reflects the loan delinquency status  related to the December    payment cycle  We incorporate the delinquency status data into our allowance for loan loss  calculation generally without adjustment for the one month delay

Our single family loan loss reserve default models are estimated  based on the most recent 12 months of actual borrower  behavior reflected in status and delinquency data reported by  our servicers  The data provides a loan level history of  delinquency, foreclosures, foreclosure alternatives, modifications, and repurchases. Our single family loan loss  reserve severity is estimated from the most recent three months  of sales experience realized on our distressed property  dispositions and the most recent six months of mortgage  insurance recoveries and pre foreclosure expenses on our distressed properties including REO, short sales, and  third party sales. We use historical trends in home prices in our single family loan loss reserve process, primarily through  the use of estimated current total LTV ratios in our default models and through the use of recent home price sales experience  in our severity estimate  However, we do not use a forecast of  trends in home prices in our single family loan loss reserve process.

Our loan loss reserves reflect our best current estimates of  incurred losses  Our loan loss reserve estimate includes  projections related to strategic loss mitigation activities, including loan modifications for troubled borrowers, and  projections of recoveries through repurchases by seller/servicers of defaulted loans due to failure to follow  contractual

TREASURY-2983

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

underwriting requirements at the time of the loan origination   For loans where foreclosure is probable, impairment is measured  on an aggregate basis based upon an estimate of the underlying  collateral value  At an individual loan level, our estimate also  considers the effect of historical home price changes on borrower behavior and the impact of our loss mitigation actions,  including our loan modification efforts  We apply estimated proceeds from primary mortgage insurance that is contractually  attached to a loan and other credit enhancements entered into contemporaneous with and in contemplation of a guarantee or loan  purchase transaction as a recovery of our recorded investment in  a charged off loan, up to the amount of loss recognized as a  charge off  Proceeds from credit enhancements received in excess  of our recorded investment in charged off loans are recorded as a decrease to REO operations expense in our consolidated  statements of income and comprehensive income when received

Our reserve estimate also reflects our best projection of  delinquencies we believe are likely to occur as a result of loss  events that have occurred through December 31, 2011 and 2010, respectively  However, the continued weakness in the national housing market, the uncertainty in other macroeconomic factors, and uncertainty of the success of modification efforts  under HAMP and other loan workout programs, make forecasting of delinquency rates inherently imprecise

We validate and update the model and factors to capture changes  in actual loss experience, as well as the effects of changes in  underwriting practices and in our loss mitigation strategies  We also consider macroeconomic and other factors that impact the  quality of the loans underlying our portfolio including regional  housing trends, applicable home price indices, unemployment and  employment dislocation trends, consumer credit statistics and the extent of third party insurance  We determine our loan loss  reserves based on our assessment of these factors

*Multifamily Loans*

For multifamily loans identified as impaired, we individually  determine the specific loan loss reserves  Refer to  "Impaired Loans" below for further discussion on individually impaired multifamily loans. Multifamily loans  evaluated collectively for impairment are aggregated into book year vintages and measured by benchmarking published historical  commercial mortgage data to those vintages based upon available  economic data related to multifamily real estate, including  apartment vacancy and rental rates.

### Non-Performing Loans

Non performing loans consist of single family and multifamily  loans that have undergone a TDR, single family seriously  delinquent loans, multifamily loans that are three or more  payments past due or in the process of foreclosure, and  multifamily loans that are deemed impaired based upon management judgment  We place mortgage loans on non accrual status when we believe collectability of interest and principal is not reasonably assured, which generally occurs when a loan is three  monthly payments past due, unless the loan is well secured and  in the process of collection based upon an individual loan assessment. A loan is considered past due if a full payment of principal and interest is not received within one month of its due date. When a loan is placed on non accrual status, any  interest income accrued but uncollected is reversed  Thereafter, interest income is recognized only upon receipt of cash payments

A non accrual mortgage loan may be returned to accrual status  when the collectability of principal and interest is reasonably  assured. For single family loans, we determine that  collectability is reasonably assured when we have received  payment of principal and interest such that the loan becomes less than three monthly payments past due. For multifamily  loans, the collectability of principal and interest is  considered reasonably assured based on a quantitative and  qualitative analysis of the factors specific to the loan being  assessed. Upon a loan's return to accrual status, all previously reversed interest income is recognized and  amortization of any basis adjustments into interest income is  resumed

### Impaired Loans

We consider a loan to be impaired when it is probable, based on  current information, that we will not receive all amounts due  (including both principal and interest) in accordance with the  contractual terms of the original loan agreement  This  assessment is made taking into consideration any more than  insignificant delays in the timing of our expected receipt of  these amounts

*Single-Family*

Individually impaired single family loans include loans that  have undergone a TDR  Impairment and interest income recognition  are discussed separately in the paragraphs that follow. All other single family loans are aggregated and measured  collectively for impairment based on similar risk characteristics  Collective impairment is measured as described  above in the "Allowance for Loan Losses and Reserve for Guarantee Losses     Single Family Loans" section  of this note

<div align="center">213</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

If we determine that foreclosure on the underlying collateral is probable, we measure impairment based upon the fair value of the collateral, as reduced by estimated disposition costs and adjusted for estimated proceeds from insurance and similar sources.

### Multifamily

Multifamily impaired loans include TDRs, loans three monthly payments or more past due, and loans that are deemed impaired based on management judgment Factors considered by management in determining whether a loan is impaired include, but are not limited to, the underlying property's operating performance as represented by its current DSCR, available credit enhancements, current LTV ratio, management of the underlying property, and the property's geographic location Multifamily loans are measured individually for impairment based on the fair value of the underlying collateral, as reduced by estimated disposition costs, as the repayment of these loans is generally provided from the cash flows of the underlying collateral and any associated credit enhancement Except for cases of fraud and certain other types of borrower defaults, most multifamily loans are non recourse to the borrower so generally the cash flows of the underlying property (including any associated credit enhancements) serve as the source of funds for repayment of the loan Interest income recognition on non TDR multifamily impaired loans is subject to our non accrual policy as discussed in "Non Performing Loans."

### Troubled Debt Restructurings

Both single family and multifamily loans which experience a modification to their contractual terms which results in a concession being granted to a borrower experiencing financial difficulties are considered TDRs A concession is deemed granted when, as a result of the restructuring, we do not expect to collect all amounts due, including interest accrued, at the original contractual interest rate As appropriate, we also consider other qualitative factors in determining whether a concession is deemed granted, including whether the borrower's modified interest rate is consistent with that of a non troubled borrower We do not consider restructurings that result in a delay in payment that is insignificant to be a concession We generally consider a delay in monthly amortizing payments of three months or less to be insignificant We generally consider all other delays in payment, including balloon payments, to be more than insignificant A concession typically includes one or more of the following being granted to the borrower: (a) loans in trial periods where the expected permanent modification will change our expectation of collecting all amounts due at the original contract rate; (b) a delay in payment that is more than insignificant; (c) a reduction in the contractual interest rate; (d) interest forbearance for a period of time that is not insignificant or forgiveness of accrued but uncollected interest amounts; and (e) a reduction in the principal amount of the loan. On July 1, 20 , we adopted an amendment to the accounting guidance related to the classification of loans as TDRs. This amendment clarified when a restructuring such as a loan modification is considered a TDR For additional information, see "Recently Adopted Accounting Guidance    *A Creditor's Determination of Whether a Restructuring is a Troubled Debt Restructuring,"* be ow

Impairment of a loan having undergone a TDR is measured as the excess of our recorded investment in the loan over the present value of the expected future cash flows, discounted at the loan's original effective interest rate for fixed rate loans or at the loan's effective interest rate prior to modification for ARM loans Our expectation of future cash flows incorporates, among other items, an estimated probability of default which is based on a number of market factors as well as the characteristics of the loan, such as past due status. Subsequent to the modification date, interest income is recognized at the modified interest rate, subject to our non accrual policy as discussed in "Non Performing Loans" above, with all other changes in the present value of expected future cash flows being recognized as a component of the provision for credit losses in our consolidated statement of income and comprehensive income

### Investments in Securities

Investments in securities consist primarily of mortgage related securities. We classify securities as "available for sale" or "trading " We currently do not classify any securities as "held to maturity," although we may elect to do so in the future In addition, we elected the fair value option for certain available for sale mortgage related securities, including investments in securities that: (a) can contractually be prepaid or otherwise settled in such a way that we may not recover substantially all of our initial recorded investment; or (b) are not of high credit quality at the acquisition date and are identified as within the scope of the accounting guidance for investments in beneficial interests in securitized financial assets Subsequent to our election, these securities were classified as trading securities Securities classified as available for sale and trading are reported at fair value with changes in fair value included in AOCI and other gains (losses) on investment securities, respectively See "NOTE 17: FAIR VALUE DISCLOSURES" for more information on how we determine the fair value of securities

*Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We record purchases and sales of securities that are specifically exempt from the requirements of derivatives and hedge accounting on a trade date basis. Securities underlying forward purchases and sales contracts that are not exempt from the requirements of derivatives and hedge accounting are recorded on the expected settlement date with a corresponding commitment recorded on the trade date

When we purchase REMICs and Other Structured Securities and certain Other Guarantee Transactions that we have issued, we account for these securities as investments in debt securities, as we are investing in the debt securities of a non consolidated entity We consolidate the trusts that issue these securities when we hold substantially all of the outstanding beneficial interests issued by the trusts We recognize interest income on the securities and interest expense on the debt we issued See "Securitization Activities through Issuances of Freddie Mac Mo tgage-Re ated Securities *Purchases and Sales of Freddie Mac Mortgage Related Securities*" for additional information on accounting for purchases of PCs and beneficial interests issued by resecuritization trusts

In connection with transfers of financial assets that qualified as sales prior to the adoption of the amendments to the accounting guidance on transfers of financial assets and the consolidation of VIEs, we may have retained individual securities not transferred to third parties upon the completion of a securitization transaction These securities may have been backed by mortgage related assets purchased from our customers, PCs, and REMICs and Other Structured Securities. The securities we acquired in these transactions were classified as available for sale or trading and are considered guaranteed investments Therefore, the fair values of these securities reflect that they are considered to be of high credit quality and the securities are not subject to credit related impairments. They are subject to the credit risk associated with the underlying collateral Therefore, our exposure to credit losses on collateral underlying our retained securitization interests was recorded within our reserve for guarantee losses

For most of our investments in securities, interest income is recognized using the effective interest method Deferred items, including premiums, discounts, and other basis adjustments, are amortized into interest income over the contractual lives of the securities

For certain investments in securities, interest income is recognized using the prospective effective interest method We specifically apply this accounting to beneficial interests in securitized financial assets that: (a) can contractually be prepaid or otherwise settled in such a way that we may not recover substantially all of our recorded investment; (b) are not of high credit quality at the acquisition date; or (c) have been determined to be other than temporarily impaired We recognize as interest income (over the life of these securities) the excess of all estimated cash flows attributable to these interests over their book value using the effective interest method We update our estimates of expected cash flows periodically and recognize changes in the calculated effective interest rate on a prospective basis

We recognize impairment losses on available for sale securities within our consolidated statements of income and comprehensive income as net impairment of available for sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other than temporary On April 1, 2009, we prospectively adopted an amendment to the accounting guidance for investments in debt and equity securities This amendment changed the recognition, measurement, and presentation of other than temporary impairment for debt securities

We conduct quarterly reviews to identify and evaluate each available for sale security that has an unrealized loss for other than temporary impairment An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis.

We recognize other than temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security If we do not intend to sell the security and it is not more likely than not that we will be required to sell the security prior to recovery of its unrealized loss, we recognize only the credit component of other than temporary impairment in earnings and the amounts attributable to all other factors are recognized, net of tax, in AOCI The credit component represents the amount by which the present value of cash flows expected to be collected from the security is less than the amortized cost basis of the security. The evaluation of whether unrealized losses on available for sale securities are other than temporary contemplates numerous factors We perform an evaluation on a security by security basis considering all available information and our analysis is refined where the current fair value or other characteristics of the security warrant The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment. See "NOTE 7: INVESTMENTS IN SECURITIES Impairment Recognition on Investments in Securities" for a discussion of important factors we consider in our evaluation

For the majority of our available for sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery

<div align="center">215</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other than temporary and is recorded within our consolidated statements of income and comprehensive income as net impairment of available for sale securities recognized in earnings

We elected the fair value option for available for sale securities identified as within the scope of the accounting guidance for investments in beneficial interests in securitized financial assets to better reflect the valuation changes that occur subsequent to impairment write downs recorded on these instruments By electing the fair value option for these instruments, we reflect valuation changes through our consolidated statements of income and comprehensive income in the period they occur, including increases in value For additional information on our election of the fair value option, see "NOTE 17: FAIR VALUE DISCLOSURES."

Gains and losses on the sale of securities are included in other gains (losses) on investment securities recognized in earnings, including those gains (losses) reclassified into earnings from AOCI We use the specific identification method for determining the cost basis of a security in computing the gain or loss

For securities classified as trading or available for sale and those securities where we elected the fair value option, we classify the cash flows as investing activities because we hold these securities for investment purposes In cases where the transfer of available for sale securities represents a secured borrowing, we classify the related cash flows as financing activities

### Repurchase and Resale Agreements and Dollar Roll Transactions

We enter into repurchase and resale agreements primarily as an investor or to finance certain of our security positions Such transactions are accounted for as secured financings because the transferor does not relinquish control over the transferred assets.

We also engage in dollar roll transactions whereby we enter into an agreement to sell and subsequently repurchase (or purchase and subsequently resell) agency securities When these transactions involve securities issued by consolidated entities, they are treated as issuances and extinguishments of debt When these transactions involve securities issued by entities we do not consolidate, they are treated as purchases and sales as the security initially transferred is not required to be the same or substantially the same as the security subsequently returned.

### Debt Securities Issued

Debt securities that we issue are classified on our consolidated balance sheets as either debt securities of consolidated trusts held by third parties or other debt

As a result of the adoption of the amendments to the accounting guidance on transfers of financial assets and the consolidation of VIEs, we consolidated our single family PC trusts and certain Other Guarantee Transactions in our financial statements commencing January 1, 2010. Consequently, PCs and Other Guarantee Transactions issued by the consolidated trusts and held by third parties are recognized as debt securities of consolidated trusts held by third parties on our consolidated balance sheets The debt securities of our consolidated trusts are prepayable without penalty at any time Other debt represents short term and long term debt securities that we issue to third parties to fund our general business activities

Both debt of our consolidated trusts and other debt, except for certain debt for which we elected the fair value option, are reported at amortized cost. Deferred items, including premiums, discounts, and hedging related basis adjustments are reported as a component of total debt, net Issuance costs are reported as a component of other assets These items are amortized and reported through interest expense using the effective interest method over the contractual life of the related indebtedness Amortization of premiums, discounts, and issuance costs begins at the time of debt issuance Amortization of hedging related basis adjustments is initiated upon the discontinuation of the re ated hedge relationship

We elected the fair value option on foreign currency denominated debt and certain other debt securities The change in fair value for debt recorded at fair value is reported as gains (losses) on debt recorded at fair value in our consolidated statements of income and comprehensive income. Upfront costs and fees on foreign currency denominated debt are recognized in earnings as incurred and not deferred For additional information on our election of the fair value option, see "NOTE 7: FAIR VALUE DISCLOSURES."

When we purchase a PC or a REMIC and Other Structured Security that is a single class security from a third party, we extinguish the debt of the related PC trusts and recognize a gain or loss related to the difference between the amount paid to redeem the debt security and its carrying value, adjusted for any related purchase commitments accounted for as derivatives, in earnings as a component of gains (losses) on extinguishment of debt securities of consolidated trusts. Cash

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2987

Table of Contents

flows related to debt securities issued by our consolidated trusts are classified as either financing activities (*e.g.,* repayment of principal to PC holders) or operating activities (*e.g.,* interest payments to PC holders included within net income (loss))  Other than interest paid, cash flows related to other debt are classified as financing activities  Interest paid on other debt is classified as operating activities

When we repurchase or call outstanding other debt, we recognize a gain or loss related to the difference between the amount paid to redeem the debt security and the carrying value in earnings as a component of gains (losses) on retirement of other debt  Contemporaneous transfers of cash between us and a creditor in connection with the issuance of a new debt security and satisfaction of an existing debt security are accounted for as either an extinguishment or a modification of an existing debt security  If the debt securities have substantially different terms, the transaction is accounted for as an extinguishment of the existing debt security  The issuance of a new debt security is recorded at fair value, fees paid to the creditor are expensed and fees paid to third parties are deferred and amortized into interest expense over the life of the new debt security using the effective interest method  If the terms of the existing debt security and the new debt security are not substantially different, the transaction is accounted for as a modification of the existing debt  Fees paid to the creditor are deferred and amortized over the life of the modified unsecured debt security using the effective interest method and fees paid to third parties are expensed as incurred

## Derivatives

Derivatives are reported at their fair value on our consolidated balance sheets  Derivatives in a net asset position, including net derivative interest receivable or payable, are reported as derivative assets, net. Similarly, derivatives in a net liability position, including net derivative interest receivable or payable, are reported as derivative liabilities, net  We offset fair value amounts recognized for the right to reclaim cash collateral or the obligation to return cash collateral against fair value amounts recognized for derivative instruments executed with the same counterparty under a master netting agreement  Changes in fair value and interest accruals on derivatives are recorded as derivative gains (losses) in our consolidated statements of income and comprehensive income

We evaluate whether financial instruments that we purchase or issue contain embedded derivatives  In accordance with an amendment to derivatives and hedging accounting guidance regarding certain hybrid financial instruments, we elected to measure newly acquired or issued financial instruments that contain embedded derivatives at fair value, with changes in fair value recorded in our consolidated statements of income and comprehensive income  At December 31, 2011 and 2010, we did not have any embedded derivatives that were bifurcated and accounted for as freestanding derivatives

At December 31, 2011 and 2010, we did not have any derivatives in hedge accounting relationships; however, there are amounts recorded in AOCI related to discontinued cash flow hedges which are recognized in earnings as the originally forecasted transactions affect earnings  If it becomes probable the originally forecasted transaction will not occur, the associated deferred gain or loss in AOCI would be reclassified to earnings immediately

In the consolidated statements of cash flows, cash flows related to the acquisition and termination of derivatives, other than forward commitments, are generally classified in investing activities  Cash flows related to forward commitments are classified within the section of the consolidated statements of cash flows in accordance with the cash flows of the financial instruments to which they relate

## REO

REO is initially recorded at fair value less costs to sell and is subsequently carried at the lower of cost or fair value less costs to sell  When we acquire REO, losses arise when the carrying basis of the loan (including accrued interest) exceeds the fair value of the foreclosed property, net of estimated costs to sell and expected recoveries through credit enhancements  Losses are charged off against the allowance for loan losses at the time of REO acquisition  REO gains arise and are recognized immediately in earnings when the fair value of the foreclosed property less costs to sell plus expected recoveries through credit enhancements exceeds the carrying basis of the loan (including all amounts due from the borrower)  Amounts we expect to receive from third party insurance or other credit enhancements are recorded as receivables when REO is acquired. The receivable is adjusted when the actual claim is filed and is reported as a component of other assets on our consolidated balance sheets  Material development and improvement costs relating to REO are capitalized  Operating expenses specifically identifiable with an REO property are included in REO operations income (expense); all other expenses are recognized within other administrative expenses in our consolidated statement of income and comprehensive income  Estimated declines in REO fair value that result from ongoing valuation of the properties are provided for and charged to REO operations income (expense) when identified  Any gains and losses from REO dispositions are included in REO operations income (expense)

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                  TREASURY-2988                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Income Taxes

We use the asset and liability method of accounting for income taxes under GAAP. Under this method, deferred tax assets and liabilities are recognized based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates as well as tax net operating loss and tax credit carryforwards  To the extent tax laws change, deferred tax assets and liabilities are adjusted, when necessary, in the period that the tax change is enacted  Valuation allowances are recorded to reduce net deferred tax  assets when it is more likely than not that a tax benefit will  not be realized  The realization of these net deferred tax assets is dependent upon the generation of sufficient taxable  income in available carryback years, from current operations and from unrecognized tax benefits, and upon our intent and ability  to hold available  for sale debt securities until the recovery of any temporary unrealized losses. On a quarterly basis, our management determines whether a valuation allowance is  necessary  In so doing, our management considers all evidence currently available, both positive and negative, in determining  whether, based on the weight of that evidence, it is more likely than not that the net deferred tax assets will be realized  Our  management determined that, as of December 31, 2011 and 2010, it was more likely than not that we would not realize  the  portion of our net deferred tax assets that is dependent upon  the generation of future taxable income  This determination was driven by events and the resulting uncertainties that existed as  of December 31, 2011 and 2010  For more information about the evidence that management considers and our determination of  the need for a valuation allowance, see "NOTE 13:  INCOME TAXES."

Income tax benefit (expense) includes: (a) deferred tax  benefit (expense), which represents the net change in the  deferred tax asset or liability balance during the year plus any  change in a valuation allowance; and (b) current tax  benefit (expense), which represents the amount of tax currently payable to or receivable from a tax authority including any  related interest and penalties plus amounts accrued for  unrecognized tax benefits (also including any related interest  and penalties)  Income tax benefit (expense) excludes the tax  effects related to adjustments recorded to equity

Regarding tax positions taken or expected to be taken (and any  associated interest and penalties), we recognize a tax position  so long as it is more likely than not that it will be sustained  upon examination, including resolution of any related appeals or  litigation processes, based on the technical merits of the position  We measure the tax position at the largest amount of benefit that is greater than 50% likely of being realized upon ultimate settlement  See "NOTE 13: INCOME TAXES" for additional information

## Earnings Per Common Share

We have participating securities related to options and  restricted stock units with dividend equivalent rights that  receive dividends as declared on an equal basis with common shares but are not obligated to participate in undistributed net  losses  These participating securities consist of: (a) vested and unvested options to purchase common stock; and (b)  restricted stock units that earn dividend  equivalents at the same rate when and as declared on common  stock. Consequently, in accordance with accounting guidance for  earnings per share, we use the "two class" method of computing earnings per share  The "two class"  method  is an earnings allocation formula that determines earnings per  share for common stock and participating securities based on  dividends declared and participation rights in undistributed  earnings

Basic earnings per common share is computed as net income  available to common stockholders divided by the weighted average  common shares outstanding for the period  The weighted average  common shares outstanding for our basic earnings per share  calculation includes the weighted average number of shares that  are associated with the warrant for our common stock issued to  Treasury as part of the Purchase Agreement. This warrant is included since it is unconditionally exercisable by the holder  at a minimal cost of $0 00001 per share  Diluted earnings per common share is determined using the weighted average number of  common shares during the period, adjusted for the dilutive effect of common stock equivalents  Dilutive common stock  equivalents reflect the assumed net issuance of additional  common shares pursuant to certain of our stock based compensation plans that could potentially dilute earnings per  common share. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for further information on the warrant for our common stock issued to Treasury as part of the Purchase Agreement

Diluted loss per common share is computed as net loss  attributable to common stockholders divided by weighted average  common shares outstanding     diluted for the period, which considers the effect of dilutive common equivalent shares  outstanding  For periods with net income, the effect of dilutive common equivalent shares outstanding includes: (a) the  weighted average shares related to stock options; and (b) the weighted average of restricted shares and restricted stock units. Such items are included in the  calculation of weighted average common shares outstanding     diluted during periods of net income,  when the assumed conversion of the share equivalents has a  dilutive effect  Such items are excluded from the weighted  average common shares outstanding     basic.

218

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Comprehensive Income**

Comprehensive income is the change in equity, on a net of tax basis, resulting from transactions and other events and circumstances from non owner sources during a period It includes all changes in equity during a period, except those resulting from investments by stockholders. We define comprehensive income as consisting of net income (loss) plus changes in: (a) the unrealized gains and losses on available for sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans

**Recently Adopted Accounting Guidance**

*A Creditor's Determination of Whether a Restructuring is a Troubled Debt Restructuring*

On July 1, 2011, we adopted an amendment to the accounting guidance related to the classification of loans as TDRs, which clarifies when a restructuring such as a loan modification is considered a TDR This amendment clarifies the guidance regarding a creditor's evaluation of whether a debtor is experiencing financial difficulty and whether a creditor has granted a concession to a debtor for purposes of determining if a restructuring constitutes a TDR.

Both single family and multifamily loans that experience restructurings resulting in a concession being granted to a borrower experiencing financial difficulties are considered TDRs The amendment provides guidance to determine whether a borrower is experiencing financial difficulties, which is largely consistent with the guidance for debtors As we had previously analogized to the guidance for debtors, this change does not have a significant impact on our determination of whether a borrower is experiencing financial difficulties Pursuant to this amendment, a concession is deemed to have been granted when, as a result of the restructuring, we do not expect to collect all amounts due, including interest accrued, at the original contractual interest rate The amendment also specifies that a concession shall not be determined by comparing the borrower's pre restructuring effective interest rate to the post restructuring effective interest rate These changes result in a significant impact on our determination of whether a concession has been granted

The amendment was effective for interim and annual periods beginning on or after June 15, 2011 and applied as of July 1, 2011 to restructurings occurring on or after January 1, 2011. As of September 30, 2011, the total recorded investment in loans identified as TDRs during the third quarter of 20 which relate to modifications or agreements entered into between January 1, 2011 and June 30, 2011 was $7.5 billion, and the allowance for credit losses related to those loans was $ 7 billion We recognized additional provision for credit losses of $0.2 billion during the third quarter of 2011 due to the population of restructurings occurring in the first half of 2011 that are now considered TDRs.

Please refer to "NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS" for further disclosures regarding our loan restructurings accounted for and disclosed as TDRs and for discussion regarding how modifications and other loss mitigation activities are factored into our allowance for loan losses

*Accounting for Transfers of Financial Assets and Consolidation of VIEs*

On January 1, 2010, we prospectively adopted amendments to the accounting guidance applicable to the accounting for transfers of financial assets and the consolidation of VIEs. The amendment for transfers of financial assets was applicable on a prospective basis to new transfers, while the amendment relating to consolidation of VIEs was applied prospectively to all entities within its scope as of the date of adoption

We use securitization trusts in our securities issuance process. Prior to January 1, 2010, these trusts met the definition of QSPEs and were not subject to consolidation Effective January 1, 2010, the concept of a QSPE was removed from GAAP and entities previously considered QSPEs were required to be evaluated for consolidation Based on our consolidation evaluation, we determined that we are the primary beneficiary of trusts that issue our single family PCs and certain Other Guarantee Transactions. As a result, a large portion of our off balance sheet assets and liabilities prior to January 1, 2010 have been consolidated Effective January 1, 2010, we consolidated these trusts and recognized the assets and liabilities at their UPB, with accrued interest, allowance for credit losses or other than temporary impairments recognized as appropriate, using the practical expedient permitted upon adoption since we determined that calculation of historical carrying values was not practical. Other newly consolidated assets and liabilities that either do not have a UPB or are required to be carried at fair value were measured at fair value. See "Consolidation and Equity Method of Accounting" above for a discussion of our assessment to determine whether we are considered the primary beneficiary of a trust and thus need to consolidate it. As such, we recognized on our consolidated balance sheets the mortgage loans underlying our issued single family PCs and certain Other Guarantee Transactions as mortgage loans held for investment by consolidated trusts, at amortized cost We also recognized the corresponding single family PCs and certain Other Guarantee Transactions held by third parties on our consolidated balance sheets as debt securities of consolidated trusts held by third parties After January 1, 2010, new consolidations of trust assets and liabilities are recorded at either their:

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012          TREASURY-2990                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

(a) carrying value if the underlying assets are contributed by us to the trust and consolidated at the time of transfer; or (b) fair value for the assets and liabilities that are consolidated under the securitization trusts established for our guarantor swap program.

In light of the consolidation of our single family PC trusts and certain Other Guarantee Transactions as discussed above, effective January , 20 0 we elected to change the amortization method for deferred items (*e.g.*, premiums, discounts, and other basis adjustments) related to mortgage loans and investments in securities. We made this change to align the amortization method for these assets with the amortization method for deferred items associated with the related liabilities. As a result of this change, deferred items are amortized into interest income using an effective interest method over the contractual lives of these assets instead of the estimated life that was used for periods prior to 2010. It was impracticable to retrospectively apply this change to prior periods, so we recognized this change as a cumulative effect adjustment to the opening balance of retained earnings (accumulated deficit), and future amortization of these deferred items will be recognized using this new method. The effect of the change in the amortization method for deferred items was immaterial to our consolidated financial statements in 20 0.

The cumulative effect of these changes in accounting principles was a net decrease of $11 7 billion to total equity (deficit) as of January 1, 2010, which includes changes to the opening balances of retained earnings (accumulated deficit) and AOCI. This net decrease was driven principally by: (a) the elimination of unrealized gains resulting from the extinguishment of PCs held as investment securities upon consolidation of the PC trusts, representing the difference between the UPB of the loans underlying the PC trusts and the fair value of the PCs, including premiums, discounts, and other basis adjustments; (b) the elimination of the guarantee asset and guarantee obligation established for guarantees issued to securitization trusts we consolidated; and (c) the application of our non accrual policy to single family seriously delinquent mortgage loans consolidated as of January 1, 20 0.

### Change in the Impairment Model for Debt Securities

On April 1, 2009 we prospectively adopted an amendment to the accounting guidance for investments in debt and equity securities, which provided additional guidance on accounting for and presenting impairment losses on debt securities. This amendment changed the recognition, measurement and presentation of other than temporary impairment for debt securities, and was intended to bring greater consistency to the timing of impairment recognition and provide greater clarity to investors about the credit and non credit components of impaired debt securities not expected to be sold. It also changed: (a) the method for determining whether an other than temporary impairment exists; and (b) the amount of an impairment charge to be recorded in earnings.

As a result of the adoption, we recognized a cumulative effect adjustment, net of tax, of $15.0 billion to our opening balance of retained earnings (accumulated deficit) on April 1, 2009, with a corresponding adjustment of $(9.9) billion, net of tax, to AOCI. The cumulative adjustment reclassified the non credit component of previously recognized other than temporary impairments from retained earnings to AOCI. The difference between these adjustments of $5 1 billion primarily represented the release of the valuation allowance previously recorded against the deferred tax asset that was no longer required upon adoption of this amendment. See "NOTE 7: INVESTMENTS IN SECURITIES" for further disclosures regarding our investments in securities and other than temporary impairments.

### Recently Issued Accounting Guidance, Not Yet Adopted Within These Consolidated Financial Statements

### Fair Value Measurement

In May 2011, the FASB issued amendments to the accounting guidance pertaining to fair value measurement and disclosure. These amendments provide both: (a) clarification about the FASB's intent about the application of existing fair value measurement and disclosure requirements; and (b) changes to some of the principles or requirements for measuring fair value or for disclosing information about fair value measurements. These amendments are effective for interim and annual periods beginning after December 15, 2011 and are to be applied prospectively, with early adoption not permitted by public companies. We do not expect that the adoption of these amendments will have a material impact on our consolidated financial statements.

### Reconsideration of Effective Control for Repurchase Agreements

In April 2011, the FASB issued an amendment to the guidance for transfers and servicing with regard to repurchase agreements and other agreements that both entitle and obligate a transferor to repurchase or redeem financial assets before their maturity. This amendment removes the criterion related to collateral maintenance from the transferor's assessment of effective control. It focuses the assessment of effective control on the transferor's rights and obligations with respect to the transferred financial assets and not whether the transferor has the practical ability to perform in accordance with those

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

rights or obligations  The amendment is effective for interim  and annual periods beginning on or after December 15, 2011.  We do not expect that the adoption of this amendment will have a  material impact on our consolidated financial statements

## NOTE 2: CONSERVATORSHIP AND RELATED MATTERS

### Entry Into Conservatorship

On September 6, 2008, the Director of FHFA placed us into conservatorship. On September 7, 2008, Treasury and FHFA announced several actions regarding Freddie Mac and Fannie Mae  These actions included the execution of the Purchase Agreement, pursuant to which we issued to Treasury both senior preferred stock and a warrant to purchase common stock.

### Business Objectives

We continue to operate under the direction of FHFA, as our Conservator. The conservatorship and related matters have had a  wide ranging impact on us, including our regulatory supervision,  management, business, financial condition and results of  operations. Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and  privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets  The Conservator also succeeded to the title to all books,  records, and assets of Freddie Mac held by any other legal  custodian or third party. During the conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and management to conduct, day to day  operations so that the company can continue to operate in the ordinary course of business. The directors serve on behalf of,  and exercise authority as directed by, the Conservator

We are also subject to certain constraints on our business  activities by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement  Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent

While in conservatorship, we can, and have continued to,  enter into and enforce contracts with third parties. The Conservator  continues to direct the efforts of the Board of Directors and  management to address and determine the strategic direction for  the company  While the Conservator has delegated certain  authority to management to conduct day to day operations, many  management decisions are subject to review and approval by FHFA and Treasury. In addition, management frequently receives directions from FHFA on various matters involving day to day operations

FHFA has stated that it has focused Freddie Mac and Fannie Mae on their existing core business, including minimizing credit  losses, and taking actions necessary to advance the goals of  conservatorship, and is not permitting Freddie Mac and Fannie  Mae to offer new products or enter into new lines of business  Our business objectives and strategies have, in some cases, been  altered since we were placed into conservatorship, and may continue to change  These changes to our business objectives and  strategies may not contribute to our profitability  Based on our charter, other legislation, public statements from Treasury and FHFA officials and other guidance and directives from our Conservator, we have a variety of different, and potentially  competing, objectives, including:

- minimizing credit losses;

- conserving assets;

- providing liquidity, stability and affordability in the mortgage  market;

- continuing to provide additional assistance to the struggling  housing and mortgage markets;

- maintaining a positive stockholders' equity and reducing  the need to draw funds from Treasury pursuant to the Purchase Agreement; and

- protecting the interests of taxpayers

The Conservator has stated that it is taking actions in support  of the objectives of gradual transition to greater private  capital participation in housing finance and greater distribution of risk to participants other than the government.  The Conservator has also stated that it is focusing on retaining value in the business operations of Freddie Mac and Fannie Mae,  overseeing remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound  corporate governance principles are followed

These objectives create conflicts in strategic and day to day  decision making that will likely lead to suboptimal outcomes for  one or more, or possibly all, of these objectives  We regularly receive direction from our Conservator on how to pursue our  objectives under conservatorship, including direction to focus our efforts on assisting homeowners in the housing and mortgage  markets. The Conservator and Treasury have also not authorized us to engage in certain

221                                                                                                          *Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar ® Document Research℠

Table of Contents

business activities and transactions, including the purchase or sale of certain assets, which we believe might have had a beneficial impact on our results of operations or financial condition, if executed Our inability to execute such transactions may adversely affect our profitability, and thus contribute to our need to draw additional funds from Treasury. However, we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

The Acting Director of FHFA stated that FHFA does not expect we will be a substantial buyer or seller of mortgages for our mortgage-re ated investments portfolio We are also subject to limits on the amount of assets we can sell from our mortgage related investments portfolio in any calendar month without review and approval by FHFA and, if FHFA determines, Treasury.

Given the important role the Administration and our Conservator have placed on Freddie Mac in addressing housing and mortgage market conditions and our public mission, we may be required to take additional actions that could have a negative impact on our business, operating results, or financial condition. Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a manner that serves our public mission and other non financial objectives, but may not contribute to our profitability Some of these changes increase our expenses, while others require us to forego revenue opportunities in the near term In addition, the objectives set forth for us under our charter and by our Conservator, as well as the restrictions on our business under the Purchase Agreement, have adversely impacted and may continue to adversely impact our financial results, including our segment results For example, our efforts to help struggling homeowners and the mortgage market, in line with our public mission, may help to mitigate our credit losses, but in some cases may increase our expenses or require us to forgo revenue opportunities in the near term There is significant uncertainty as to the ultimate impact that our efforts to aid the housing and mortgage markets, including our efforts in connection with the MHA Program, will have on our future capital or liquidity needs We are allocating significant internal resources to the implementation of the various initiatives under the MHA Program and to the servicing alignment initiative as directed by FHFA on April 28, 2011, which has increased, and will continue to increase, our expenses We cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist The Acting Director of FHFA stated on September 19, 2011 that "it ought to be clear to everyone at this point, given [Freddie Mac and Fannie Mae's] losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that [Freddie Mac and Fannie Mae] will not be able to earn their way back to a condition that allows them to emerge from conservatorship " The Acting Director of FHFA stated on November 15, 2011 that "the long term outlook is that neither [Freddie Mac nor Fannie Mae] will continue to exist, at least in its current form, in the future " We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near term Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near term We have no ability to predict the outcome of these deliberations

On February 11, 2011, the Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long term role in a housing finance system in which the private sector is the dominant provider of mortgage credit The report recommends winding down Freddie Mac and Fannie Mae, and states that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations The report states the Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including

<div align="center">222</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements  These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations, and financial condition.

The temporary high cost area limits expired on September 30, 2011. In addition, as discussed below, we have been directed to increase our guarantee fees  We cannot predict the extent to which the other recommendations in the report will be implemented or when any actions to implement them may be taken.

On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than  0 basis points above the average guarantee fees charged in 2011 on single family mortgage backed securities  Under the law, the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by the companies.  The law also permits FHFA to determine a schedule for guarantee fee increases over a two year period

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA directed changes to HARP in an effort to attract more eligible borrowers whose monthly payments are current and who can benefit from refinancing their home mortgages  The revisions to HARP will be available to borrowers with loans that were sold to Freddie Mac and Fannie Mae on or before May 31, 2009 and who have current LTV ratios above 80%

In November 2011, Freddie Mac and Fannie Mae issued guidance with operational details about the HARP changes to mortgage lenders and servicers after receiving information from FHFA about the fees that we may charge associated with the refinancing program. Because industry participation in HARP is not mandatory, we anticipate that implementation schedules will vary as individual lenders, mortgage insurers and other market participants modify their processes  It is too early to estimate how many eligible borrowers are likely to refinance under the revised program

## Purchase Agreement

### Overview

The Conservator, acting on our behalf, entered into the Purchase Agreement on September 7, 2008  The Purchase Agreement was subsequently amended and restated on September 26, 2008, and further amended on May 6, 2009 and December 24, 2009. Under the December 2009 amendment to the Purchase Agreement, the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011 and 2012. If we do not have a capital surplus (*i.e.*, positive net worth) at the end of 2012, then the amount of funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 31, 2009)  In the event we have a capital surplus at the end of 2012, then the amount of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as follows:

- If the year end 2012 surplus is lower than the cumulative draws needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

- If the year end 2012 surplus exceeds the cumulative draws for 2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws

The Purchase Agreement requires Treasury, upon the request of the Conservator, to provide funds to us after any quarter in which we have a negative net worth (that is, our total liabilities exceed our total assets, as reflected on our GAAP balance sheet)  In addition, the Purchase Agreement requires Treasury, upon the request of the Conservator, to provide funds to us if the Conservator determines, at any time, that it will be mandated by law to appoint a receiver for us unless we receive these funds from Treasury  In exchange for Treasury's funding commitment, we issued to Treasury, as an aggregate initial commitment fee: (a) one million shares of Variable Liquidation Preference Senior Preferred Stock (with an initial liquidation preference of $1 billion), which we refer to as the senior preferred stock; and (b) a warrant to purchase, for a nominal price, shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis at the time the warrant is exercised, which we refer to as the warrant  We received no other consideration from Treasury for issuing the senior preferred stock or the warrant

Under the terms of the Purchase Agreement, Treasury is entitled to a dividend of 10% per year, paid on a quarterly basis (which increases to 12% per year if not paid timely and in cash) on the aggregate liquidation preference of the senior preferred stock, consisting of the initial liquidation preference of $1 billion plus funds we receive from Treasury and any dividends and commitment fees not paid in cash. To the extent we draw on Treasury's funding commitment, the

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2994

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

liquidation preference of the senior preferred stock is increased by the amount of funds we receive  The senior preferred stock is senior in liquidation preference to our common stock and all other series of preferred stock

In addition to the issuance of the senior preferred stock and warrant, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury  Under the Purchase Agreement, the fee is to be determined in an amount mutually agreed to by us and Treasury with reference to the market value of Treasury's funding commitment as then in effect, and reset every five years  We may elect to pay the quarterly commitment fee in cash or add the amount of the fee to the liquidation preference of the senior preferred stock  Treasury may waive the quarterly commitment fee for up to one year at a time, in its sole discretion, based on adverse conditions in the U S mortgage market  The fee was originally scheduled to begin accruing on January 1, 2010 (with the first fee payable on March 31, 2010), but was delayed until January 1, 2011 (with the first fee payable on March 31, 2011) pursuant to an amendment to the Purchase Agreement  Treasury waived the fee for all quarters of 2011 and the first quarter of 2012, but has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. Treasury stated that it would reevaluate whether the quarterly commitment fee should be set in the second quarter of 2012. Absent Treasury waiving the commitment fee in the second quarter of 2012, this quarterly commitment fee will begin accruing on April 1, 2012 and must be paid each quarter for as long as the Purchase Agreement is in effect  The amount of the fee has not yet been determined and could be substantial.

Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all  The aggregate liquidation preference of the senior preferred stock and our related dividend obligations will increase further if we receive additional draws under the Purchase Agreement or if any dividends or quarterly commitment fees payable under the Purchase Agreement are not paid in cash  The amounts payable for dividends on the senior preferred stock are substantial and will have an adverse impact on our financial position and net worth

The payment of dividends on our senior preferred stock in cash reduces our net worth  For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury. It is unlikely that, over the long term, we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury, although we may experience period to period variability in earnings and comprehensive income. As a result, we expect to make additional draws in future periods

The Purchase Agreement includes significant restrictions on our ability to manage our business, including limiting the amount of indebtedness we can incur and capping the size of our mortgage related investments portfolio  While the senior preferred stock is outstanding, we are prohibited from paying dividends (other than on the senior preferred stock) or issuing equity securities without Treasury's consent.

The Purchase Agreement has an indefinite term and can terminate only in limited circumstances, which do not include the end of the conservatorship  The Purchase Agreement therefore could continue after the conservatorship ends. Treasury has the right to exercise the warrant, in whole or in part, at any time on or before September 7, 2028

## Purchase Agreement Covenants

The Purchase Agreement provides that, until the senior preferred stock is repaid or redeemed in full, we may not, without the prior written consent of Treasury:

- declare or pay any dividend (preferred or otherwise) or make any other distribution with respect to any Freddie Mac equity securities (other than with respect to the senior preferred stock or warrant);

- redeem, purchase, retire or otherwise acquire any Freddie Mac equity securities (other than the senior preferred stock or warrant);

- sell or issue any Freddie Mac equity securities (other than the senior preferred stock, the warrant and the common stock issuable upon exercise of the warrant and other than as required by the terms of any binding agreement in effect on the date of the Purchase Agreement);

- terminate the conservatorship (other than in connection with a receivership);

- sell, transfer, lease or otherwise dispose of any assets, other than dispositions for fair market value: (a) to a limited life regulated entity (in the context of a receivership); (b) of assets and properties in the ordinary course of business, consistent with past practice; (c) in connection with our liquidation by a receiver; (d) of cash or cash equivalents for cash or cash equivalents; or (e) to the extent necessary to comply with the covenant described below relating to the reduction of our mortgage related investments portfolio;

<div align="center">224</div>

<div align="right"><em>Freddie Mac</em></div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

- issue any subordinated debt;

- enter into a corporate reorganization, recapitalization, merger, acquisition or similar event; or

- engage in transactions with affiliates unless the transaction is: (a) pursuant to the Purchase Agreement, the senior preferred stock or the warrant; (b) upon arm's length terms; or (c) a transaction undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence on the date of the Purchase Agreement

The covenants also apply to our subsidiaries.

The Purchase Agreement also provides that we may not own mortgage assets with a UPB in excess of: (a) $900 billion on December 31, 2009; or (b) on December 3 of each year thereafter, 90% of the aggregate amount of mortgage assets we are permitted to own as of December 3 of the immediately preceding calendar year, provided that we are not required to own less than $250 billion in mortgage assets. Under the Purchase Agreement, we also may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding 20% of the amount of mortgage assets we are permitted to own on December 3 of the immediately preceding calendar year The mortgage asset and indebtedness limitations are determined without giving effect to any change in the accounting guidance related to transfers of financial assets and consolidation of VIEs or any similar accounting guidance Therefore, these limitations were not affected by our implementation of the changes to the accounting guidance for transfers of financial assets and consolidation of VIEs, under which we consolidated our single family PCs and certain Other Guarantee Transactions in our financial statements as of January 1, 2010.

In addition, the Purchase Agreement provides that we may not enter into any new compensation arrangements or increase amounts or benefits payable under existing compensation arrangements of any named executive officer or other executive officer (as such terms are defined by SEC rules) without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury.

### Warrant Covenants

The warrant we issued to Treasury includes, among others, the following covenants: (a) our SEC filings under the Exchange Act will comply in all material respects as to form with the Exchange Act and the rules and regulations thereunder; (b) we may not permit any of our significant subsidiaries to issue capital stock or equity securities, or securities convertible into or exchangeable for such securities, or any stock appreciation rights or other profit participation rights; (c) we may not take any action that will result in an increase in the par value of our common stock; (d) we may not take any action to avoid the observance or performance of the terms of the warrant and we must take all actions necessary or appropriate to protect Treasury's rights against impairment or dilution; and (e) we must provide Treasury with prior notice of specified actions relating to our common stock, such as setting a record date for a dividend payment, granting subscription or purchase rights, authorizing a recapitalization, reclassification, merger or similar transaction, commencing a liquidation of the company or any other action that would trigger an adjustment in the exercise price or number or amount of shares subject to the warrant

### Termination Provisions

The Purchase Agreement provides that the Treasury's funding commitment will terminate under any of the following circumstances: (a) the completion of our liquidation and fulfillment of Treasury's obligations under its funding commitment at that time; (b) the payment in full of, or reasonable provision for, all of our liabilities (whether or not contingent, including mortgage guarantee obligations); and (c) the funding by Treasury of the maximum amount of the commitment under the Purchase Agreement In addition, Treasury may terminate its funding commitment and declare the Purchase Agreement null and void if a court vacates, modifies, amends, conditions, enjoins, stays or otherwise affects the appointment of the Conservator or otherwise curtails the Conservator's powers. Treasury may not terminate its funding commitment under the Purchase Agreement solely by reason of our being in conservatorship, receivership or other insolvency proceeding, or due to our financial condition or any adverse change in our financial condition.

### Waivers and Amendments

The Purchase Agreement provides that most provisions of the agreement may be waived or amended by mutual written agreement of the parties; however, no waiver or amendment of the agreement is permitted that would decrease Treasury's aggregate funding commitment or add conditions to Treasury's funding commitment if the waiver or amendment would adversely affect in any material respect the holders of our debt securities or Freddie Mac mortgage guarantee obligations

<div align="center">225</div>

<div align="right">*Freddie Mac*</div>

---

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Third party Enforcement Rights

In the event of our default on payments with respect to our debt securities or Freddie Mac mortgage guarantee obligations, if Treasury fails to perform its obligations under its funding commitment and if we and/or the Conservator are not diligently pursuing remedies in respect of that failure, the holders of these debt securities or Freddie Mac mortgage guarantee obligations may file a claim in the United States Court of Federal Claims for relief requiring Treasury to fund to us the lesser of: (a) the amount necessary to cure the payment defaults on our debt and Freddie Mac mortgage guarantee obligations; and (b) the lesser of: (i) the deficiency amount; and (ii) the maximum amount of the commitment less the aggregate amount of funding previously provided under the commitment Any payment that Treasury makes under those circumstances will be treated for all purposes as a draw under the Purchase Agreement that will increase the liquidation preference of the senior preferred stock.

### Impact of the Purchase Agreement and FHFA Regulation on the Mortgage Related Investments Portfolio

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage related investments portfolio is subject to a cap that decreases by 0% each year until the portfolio reaches $250 billion As a result, the UPB of our mortgage related investments portfolio could not exceed $729 billion as of December 31, 2011 and may not exceed $656.1 billion as of December 3 , 20 2 The UPB of our mortgage related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation, was $653 3 billion at December 3 , 2011. The annual 10% reduction in the size of our mortgage related investments portfolio is calculated based on the maximum allowable size of the mortgage-re ated investments portfolio, rather than the actual UPB of the mortgage related investments portfolio, as of December 3 of the preceding year The limitation is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs

### Government Support for our Business

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

Significant recent developments with respect to the support we received from the government during 20   include the following:

- we received $8.0 billion in funding from Treasury under the Purchase Agreement in 20   , which increased the aggregate liquidation preference of the senior preferred stock to $72.2 billion as of December 31, 2011; and

- we paid dividends of $6.5 billion in cash on the senior preferred stock to Treasury at the direction of the Conservator

To address our net worth deficit of $146 million at December 31, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $146 million, and will request that we receive these funds by March 31, 2012. Our draw request represents our net worth deficit at quarter end rounded up to the nearest $1 million Following funding of the draw request related to our net worth deficit at December 31, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $7.22 billion to $7.23 billion, which exceeds our annual historical earnings in all but one period

Through December 31, 2011, we paid $16.5 billion in cash dividends in the aggregate on the senior preferred stock Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth. In addition, cash payment of quarterly commitment fees payable to Treasury will negatively impact our future net worth over the long term Treasury waived the fee for all quarters of 2011 and the first quarter of 2012. The amount of the fee has not yet been established and could be substantial. As a result of additional draws and other factors: (a) the liquidation preference of, and the dividends we owe on, the senior preferred stock would increase and, therefore, we may need additional draws from Treasury in order to pay our dividend obligations; and (b) there is significant uncertainty as to our long term financial sustainability

See "NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS" and "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" for more information on the terms of the conservatorship and the Purchase Agreement

### Housing Finance Agency Initiative

On October 19, 2009, we entered into a Memorandum of Understanding with Treasury, FHFA, and Fannie Mae, which sets forth the terms under which Treasury and, as directed by FHFA, we and Fannie Mae, would provide assistance,

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                TREASURY-2997                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

through three separate initiatives, to state and local HFAs so that the HFAs can continue to meet their mission of providing affordable financing for both single family and multifamily housing  The parties agreed to certain modifications to the initiatives on November 23, 2011  FHFA directed us and Fannie Mae to participate in the HFA initiative on a basis that is consistent with the goals of being commercially reasonable and safe and sound. Treasury's participation in these assistance initiatives does not affect the amount of funding that Treasury can provide to Freddie Mac under the terms of the Purchase Agreement

From October 19, 2009 to December 31, 2009, we, Treasury, Fannie Mae, and participating HFAs entered into definitive agreements setting forth the respective parties' obligations under this initiative  The initiatives are as follows:

- TCLFP    In December 2009, on a 50 50 pro rata basis, Freddie Mac and Fannie Mae agreed to provide $8.2 billion of credit and liquidity support, including outstanding interest at the date of the guarantee, for variable rate demand obligations, or VRDOs, previously issued by HFAs. This support was provided through the issuance of guarantees, which provide credit enhancement to the holders of such VRDOs and also create an obligation to provide funds to purchase any VRDOs that are put by their holders and are not remarketed  Treasury provided a credit and liquidity backstop on the TCLFP. These guarantees replaced existing liquidity facilities from other providers  The guarantees are scheduled to expire on or before December 31, 2012. However, Treasury has given TCLFP participants the option to extend their individual TCLFP facilities for an additional three years to December 3 , 2015. This option must be exercised in 20 2

- NIBP    In December 2009, on a 50 50 pro rata basis, Freddie Mac and Fannie Mae agreed to issue in total $15.3 billion of partially guaranteed pass through securities backed by new single family and certain new multifamily housing bonds issued by HFAs. Treasury purchased all of the pass through securities issued by Freddie Mac and Fannie Mae. This initiative provides financing for HFAs to issue new housing bonds.

Treasury will bear the initial losses of principal up to 35% of total principal for these two initiatives combined, and thereafter Freddie Mac and Fannie Mae each will be responsible only for losses of principal on the securities that it issues to the extent that such losses are in excess of 35% of all losses under both initiatives. Treasury will bear all losses of unpaid interest  Under both initiatives, we and Fannie Mae were paid fees at the time bonds were securitized and also will be paid ongoing fees

The third initiative under the HFA initiative is described below:

- *Multifamily Credit Enhancement Initiative.*  Using existing housing bond credit enhancement products, Freddie Mac is providing a guarantee of new housing bonds issued by HFAs, which Treasury purchased from the HFAs. Treasury will not be responsible for a share of any losses incurred by us in this initiative.

**Related Parties as a Result of Conservatorship**

As a result of our issuance to Treasury of the warrant to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding, on a fully diluted basis, we are deemed a related party to the U S  government  Except for the transactions with Treasury discussed above in "Business Objectives," "Government Support for our Business" and "Housing Finance Agency Initiative" as well as in "NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS," and "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)," no transactions outside of normal business activities have occurred between us and the U S  government during the year ended December 3 , 20    In addition, we are deemed related parties with Fannie Mae as both we and Fannie Mae have the same relationships with FHFA and Treasury  All transactions between us and Fannie Mae have occurred in the normal course of business.

**NOTE 3: VARIABLE INTEREST ENTITIES**

We use securitization trusts in our securities issuance process, and are required to evaluate the trusts for consolidation on an ongoing basis  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Consolidation and Equity Method of Accounting" for further information regarding the consolidation of certain VIEs

Based on our evaluation of whether we hold a controlling financial interest in these VIEs, we determined that we are the primary beneficiary of trusts that issue our single family PCs and certain Other Guarantee Transactions. Therefore, we consolidate on our balance sheet the assets and liabilities of these trusts. In addition to our PC trusts, we are involved with numerous other entities that meet the definition of a VIE, as discussed below

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-2998

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### VIEs for which We are the Primary Beneficiary

#### Single-family PC Trusts

Our single family PC trusts issue pass through securities that represent undivided beneficial interests in pools of mortgages held by these trusts For our fixed rate PCs, we guarantee the timely payment of interest and principal For our ARM PCs, we guarantee the timely payment of the weighted average coupon interest rate for the underlying mortgage loans and the full and final payment of principal; we do not guarantee the timely payment of principal on ARM PCs In exchange for providing this guarantee, we may receive a management and guarantee fee and up front delivery fees We issue most of our single family PCs in transactions in which our customers exchange mortgage loans for PCs We refer to these transactions as guarantor swaps.

PCs are designed so that we bear the credit risk inherent in the loans underlying the PCs through our guarantee of principal and interest payments on the PCs The PC holders bear the interest rate or prepayment risk on the mortgage loans and the risk that we will not perform on our obligation as guarantor For purposes of our consolidation assessments, our evaluation of power and economic exposure with regard to PC trusts focuses on credit risk because the credit performance of the underlying mortgage loans was identified as the activity that most significantly impacts the economic performance of these entities We have the power to impact the activities related to this risk in our role as guarantor and master servicer

Specifically, in our role as master servicer, we establish requirements for how mortgage loans are serviced and what steps are to be taken to avoid credit losses (*e.g.*, modification, foreclosure). Additionally, in our capacity as guarantor, we have the ability to remove defaulted mortgage loans out of the PC trust to help manage credit losses See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS" for further information regarding our removal of mortgage loans out of PC trusts These powers allow us to direct the activities of the VIE (*i.e.*, the PC trust) that most significantly impact its economic performance In addition, we determined that our guarantee to each PC trust to provide principal and interest payments obligates us to absorb losses that could potentially be significant to the PC trusts Accordingly, we concluded that we are the primary beneficiary of our single family PC trusts.

At December 31, 2011 and 2010, we were the primary beneficiary of, and therefore consolidated, single family PC trusts with assets totaling $1.6 trillion and $1.7 trillion, respectively, as measured using the UPB of issued PCs. The assets of each PC trust can be used only to settle obligations of that trust. In connection with our PC trusts, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancement We also have credit protection for certain of our PC trusts that issue PCs backed by loans or certificates of federal agencies (such as FHA, VA, and USDA). See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES    Credit Protection and Other Forms of Credit Enhancement" for additional information regarding third party credit enhancements related to our PC trusts

#### Other Guarantee Transactions

Other Guarantee Transactions are mortgage related securities that we issue to third parties in exchange for non Freddie Mac mortgage-re ated securities. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Securitization Activities through Issuances of Freddie Mac Mortgage Related Securities" for information on the nature of Other Guarantee Transactions The degree to which our involvement with securitization trusts that issue Other Guarantee Transactions provides us with power to direct the activities that most significantly impact the economic performance of these VIEs (*e.g.,* the ability to direct the servicing of the underlying assets of these entities) and obligation to absorb losses that could potentially be significant to the VIEs (*e.g.,* the existence of third party credit enhancements) varies by transaction. For all Other Guarantee Transactions, our variable interest in these VIEs represents some form of credit guarantee, whether covering all the issued beneficial interests or only the most senior ones The nature of our credit guarantee typically determines whether we have power over the activities that most significantly impact the economic performance of the VIE

For those Other Guarantee Transactions where our credit guarantee is in a first loss position to absorb credit losses on the underlying assets of these entities as of the reporting date, we would also have the ability to direct servicing of the underlying assets, which is the power to direct the activities that most significantly impact the economic performance of these VIEs. As a result, we would be the primary beneficiary, and we would consolidate the VIE For those Other Guarantee Transactions in which our credit guarantee is not in a first loss position to absorb credit losses on the underlying assets of these entities as of the reporting date (*i.e.*, our credit guarantee is in a secondary loss position), we would not have the ability to direct servicing of the underlying assets, so we would not be the primary beneficiary, and we would not consolidate the VIE

<div align="center">228</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our consolidation determination took into consideration the  specific facts and circumstances of our involvement with each of  these entities  As a result, we have  concluded that we are the  primary beneficiary of certain Other Guarantee Transactions with  underlying assets totaling $12.9 billion and $15.8 billion at December 31, 2011 and 2010,  respectively  For those Other Guarantee Transactions that we do  consolidate, the investors in these securities have recourse  only to the assets of those VIEs

### Consolidated VIEs

The table below represents the carrying amounts and  classification of the assets and liabilities of consolidated  VIEs on our consolidated balance sheets

**Table 3.1    Assets and Liabilities of Consolidated VIEs**

| Consolidated Balance Sheets Line Item | December 31, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| Cas  a d cas  eq  va e  s | $          2 | $          1 |
| Res   c ed cas  a d cas  eq  va e  s | 27,675 | 7,514 |
| Fede a  f  ds so d a d sec   es p c ased   de ag ee  e  s o  rese | | 29,350 |
| Mo  gage loans held-fo - nves men  by consol da ed  us s | 1,564,131 | 1,646,172 |
| Acc ued  n e es  ecce vab e | 6,242 | 6,895 |
| Rea  es a e ow ed,  e | 60 | 118 |
| O he  asse s | 6,083 | 6,001 |
| To al asse s of consol da ed VIEs | $ 1,604,193 | $ 1,696,051 |
| Acc ued  n e es  payab e | $  5,943 | $  6,502 |
| Deb  secu   es of conso  da ed  us s  e d by    d pa  es | 1,471,437 | 1,528,648 |
| O he   ab    es | 3 | 172 |
| To al l ab l  es of consol da ed VIEs | $ 1,477,383 | $ 1,535,322 |

### VIEs for which We are not the Primary Beneficiary

The table below represents the carrying amounts and  classification of the assets and liabilities recorded on our  consolidated balance sheets related to our variable interests in non consolidated VIEs, as well as our maximum exposure to loss  as a result of our involvement with these VIEs  Our involvement with VIEs for which we are not the primary beneficiary generally  takes one of two forms: (a) purchasing an investment in these entities; or (b) providing a guarantee to these  entities  Our maximum exposure to loss for those VIEs in which  we have purchased an investment is calculated as the maximum  potential charge that we would recognize in earnings if that  investment were to become worthless  This amount does not include other than temporary impairments or other write downs  that we previously recognized through earnings  Our maximum exposure to loss for those VIEs for which we have provided a  guarantee represents the contractual amounts that could be lost  under the guarantees if counterparties or borrowers defaulted,  without consideration of possible recoveries under credit  enhancement arrangements  We do not believe the maximum exposure to loss disclosed in the table below is representative of the  actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related  collateral liquidation, including possible recoveries under  credit enhancement arrangements

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3000

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 3.2    Variable Interests in VIEs for which We are not the Primary Beneficiary**

| | | December 31, 2011 | | | |
| | Asset-Backed Investment Trusts(1) | Mortgage-Related Security Trusts | | Unsecuritized Multifamily Loans(3) | Other(1)(4) |
| | | Freddie Mac Securities(2) | Non-Freddie Mac Securities(1) | | |
| | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 447 | $ | $ | $ | $ |
| Restricted cash and cash equivalents | | 53 | | 33 | 167 |
| *Investments in securities* | | | | | |
| Available-for-sale, at fair value | | 81,092 | 121,743 | | |
| Trading, at fair value | 302 | 16,047 | 15,473 | | |
| *Mortgage loans* | | | | | |
| Held-for-investment, unsecuritized | | | | 72,295 | |
| Held-for-sale | | | | 9,710 | |
| Accrued interest receivable | | 471 | 420 | 353 | 6 |
| Derivative assets, net | | | | | 1 |
| Other assets | | 432 | 1 | 375 | 434 |
| *Liabilities* | | | | | |
| Derivative liabilities, net | | (1) | | | (42) |
| Other liabilities | | (585) | | (39) | (675) |
| **Maximum Exposure to Loss** | $ 749 | $36,438 | $ 153,620 | $ 82,766 | $11,198 |
| **Total Assets of Non-Consolidated VIEs(5)** | $ 16,748 | $ 41,740 | $ 921,219 | $134,145 | $25,616 |

| | | December 31, 2010 | | | |
| | Asset-Backed Investment Trusts(1) | Mortgage-Related Security Trusts | | Unsecuritized Multifamily Loans(3) | Other(1)(4) |
| | | Freddie Mac Securities(2) | Non-Freddie Mac Securities(1) | | |
| | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 9,909 | $ | $ | $ | $ |
| Restricted cash and cash equivalents | | 52 | | 34 | 464 |
| *Investments in securities* | | | | | |
| Available-for-sale, at fair value | | 85,689 | 137,568 | | |
| Trading, at fair value | 44 | 13,437 | 18,914 | | |
| *Mortgage loans* | | | | | |
| Held-for-investment, unsecuritized | | | | 78,448 | |
| Held-for-sale | | | | 6,413 | |
| Accrued interest receivable | | 419 | 717 | 372 | 5 |
| Derivative assets, net | | | | | 2 |
| Other assets | | 277 | 6 | 23 | 381 |
| *Liabilities* | | | | | |
| Derivative liabilities, net | | (2) | | | (41) |
| Other liabilities | | (408) | (3) | (36) | (1,034) |
| **Maximum Exposure to Loss** | $ 9,953 | $ 26,392 | $ 176,533 | $ 85,290 | $ 11,375 |
| **Total Assets of Non-Consolidated VIEs(5)** | $ 129,479 | $29,368 | $ 1,036,975 | $138,330 | $25,875 |

(1) For our involvement with non-consolidated asset-backed investment trusts, or Freddie Mac securities y ssa d ce a o he VIEs where we do no provide a guarantee, our maximum exposure to loss consists of the carrying amount of the security's classified as, and to the amortized cost of the security's classified as available-for-sale for our investments and related assets recorded on our consolidated balance sheets, including any unrealized amounts recorded in AOCI for securities classified as available-for-sale

(2) Freddie Mac securities include our variable interests in single-family REMICs and Other Structured Securities, multifamily PCs, multifamily Other Structured Securities, and Other Guarantee Transactions that we do no consolidate For our variable interests in non-consolidated Freddie Mac securities y trusts for which we have provided a guarantee, our maximum exposure to loss consists of any guarantee assets we have guaranteed, which see as we consolidate a certain interests guarantees However, our investments in single-family REMICs and Other Structured Securities are amounts we consolidate and do no give rise to any additional maximum exposure to loss as we already consolidate due to our holding the related security's

(3) For unsecuritized multifamily loans, our maximum exposure to loss is based on the UPB of these loans, as adjusted for loan reserve basis adjustments, any associated loan allowance for loan losses, accrued interest receivable, and the associated amounts held on held-for-sale loans

(4) For the non-consolidated VIEs where we have provided a guarantee, our maximum exposure to loss is the contractual amount of credit enhancements or guarantees we have provided or the aggregate fee current pay to borrowers on default, or which consists of possible recoveries under credit enhancement arrangements

(5) Represents the remaining UPB of assets held by non-consolidated VIEs using the most current information available, where our own continuing involvement is significant We do not include the assets of our non-consolidated trusts related to single-family REMICs and Other Structured Securities trusts as a total as we already consolidate the underlying collateral of these trusts on our consolidated balance sheets

### Asset-Backed Investment Trusts

We invest in a variety of short term non mortgage related, asset backed investment trusts. These short term investments represent interests in trusts consisting of a pool of receivables or other financial assets, typically credit card receivables, auto loans, or student loans. These trusts act as vehicles to allow originators to securitize assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest rate risk of the underlying pool. The originators of the financial assets or the underwriters

Source  DIRA  HOM  OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3001

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

of the securities offering create the trusts and typically own the residual interest in the trust assets See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our asset backed investments

At December 31, 2011 and 2010, we had investments in 11 and 23 asset backed investment trusts in which we had a variable interest but were not considered the primary beneficiary, respectively Our investments in these asset backed investment trusts as of December 31, 2011 were made in 2011 At both December 31, 2011 and 2010, we were not the primary beneficiary of any such trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. As such, our investments in these asset backed investment trusts are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES." Our investments in these trusts totaled $0.7 billion and $10.0 billion as of December 31, 2011 and 2010, respectively, and are included as cash and cash equivalents, available for sale securities or trading securities on our consolidated balance sheets At both December 31, 2011 and 2010, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment

### Mortgage-Related Security Trusts

#### Freddie Mac Securities

Freddie Mac securities related to our variable interests in non consolidated VIEs primarily consist of our REMICs and Other Structured Securities and Other Guarantee Transactions. REMICs and Other Structured Securities are created by using PCs or previously issued REMICs and Other Structured Securities as collateral Our involvement with the resecuritization trusts that issue these securities does not provide us with rights to receive benefits or obligations to absorb losses nor does it provide any power that would enable us to direct the most significant activities of these VIEs because the ultimate underlying assets are PCs for which we have already provided a guarantee (*i.e.*, all significant rights, obligations and powers are associated with the underlying PC trusts). As a result, we have concluded that we are not the primary beneficiary of these resecuritization trusts

Other Guarantee Transactions are created by using non Freddie Mac mortgage related securities as collateral At both December 31, 2011 and 2010, our involvement with certain Other Guarantee Transactions does not provide us with the power to direct the activities that most significantly impact the economic performance of these VIEs As a result, we hold a variable interest in, but are not the primary beneficiary of, certain Other Guarantee Transactions.

For non consolidated REMICs and Other Structured Securities and Other Guarantee Transactions, our investments are primarily included in either available for sale securities or trading securities on our consolidated balance sheets See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES Securitization Activities through Issuances of Freddie Mac Mortgage Related Securities" for additional information on accounting for purchases of PCs and beneficial interests issued by resecuritization trusts. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets

#### Non Freddie Mac Securities

We invest in a variety of mortgage related securities issued by third parties, including non Freddie Mac agency securities, CMBS, other private label securities backed by various mortgage related assets, and obligations of states and political subdivisions. These investments typically represent interests in trusts that consist of a pool of mortgage related assets and act as vehicles to allow originators to securitize those assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest rate risk of the underlying pool The originators of the financial assets or the underwriters of the securities offering create the trusts and typically own the residual interest in the trust assets See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our non Freddie Mac securities

Our investments in these non Freddie Mac securities at December 31, 2011 were made between 1994 and 2011 We are not generally the primary beneficiary of non Freddie Mac securities trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance We were not the primary beneficiary of any significant non Freddie Mac securities trusts as of December 31, 2011 and 2010. Our investments in non consolidated non Freddie Mac mortgage related securities are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES " At both December 31, 2011 and 2010, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets

231

*Freddie Mac*

Source D RA HOM OAN MORTGAG CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Unsecuritized Multifamily Loans

We purchase loans made to various multifamily real estate entities. We primarily purchase such loans for securitization, and to a lesser extent, investment purposes  These real estate entities are primarily single asset entities (typically  partnerships or limited liability companies) established to acquire, construct, rehabilitate, or refinance residential  properties, and subsequently to operate the properties as residential rental real estate  The loans we acquire usually are, at origination, equal to 80% or less of the value of the  related underlying property  The remaining 20% of value is typically funded through equity contributions by the partners or  members of the borrower entity  In certain cases, the 20% not funded through the loan we acquire also includes subordinate  loans or mezzanine financing from third party lenders

We held more than 7,000 unsecuritized multifamily loans at both December 31, 2011 and 2010. The UPB of our investments in  these loans was $82.3 billion and $85.9 billion as of December 31, 2011 and 2010, respectively, and was included in unsecuritized held for investment mortgage loans, at amortized cost, and held for sale mortgage loans at fair value  on our consolidated balance sheets  We are not generally the primary beneficiary of the multifamily real estate borrowing  entities because the loans we acquire are passive in nature and  do not provide us with the power to direct the activities of these entities that most significantly impact their economic  performance  However, when a multifamily loan becomes delinquent, we may become the primary beneficiary of the  borrowing entity depending upon the structure of this entity and the rights granted to us under the governing legal documents  At both December 31, 2011 and 2010, the amount of  unsecuritized multifamily loans for which we could be considered the primary beneficiary of the underlying borrowing entity was  not material. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES     Mortgage Loans" and  "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for more information

### Other

Our involvement with other VIEs includes our investments in  LIHTC partnerships, certain other mortgage related guarantees,  and certain short term default and other guarantee commitments  that we account for as derivatives:

- *Investments in LIHTC Partnerships:*  We hold equity investments in various LIHTC partnerships that invest in  lower tier or project partnerships that are single asset entities  In February 20  0, the Acting Director of FHFA, after consultation with Treasury, informed us that we may not sell or transfer our investments in LIHTC assets and that he sees no  other disposition options  As a result, we wrote down the carrying value of our LIHTC investments to zero as of  December 3  , 2009, as we will not be able to realize any  value from these investments either through reductions to our  taxable income and related tax liabilities or through a sale to  a third party.

- *Certain other mortgage related guarantees:*  We have other guarantee commitments outstanding on multifamily  housing revenue bonds that were issued by third parties. As part of certain other mortgage related guarantees, we also provide  commitments to advance funds, commonly referred to as "liquidity guarantees," which require us to advance  funds to enable third parties to purchase variable rate multifamily housing revenue bonds, or certificates backed by  such bonds, that cannot be remarketed within five business days after they are tendered by their holders

- *Certain short term default and other guarantee commitments  accounted for as derivatives*:  Our involvement in these VIEs includes our guarantee of the performance of  interest rate swap contracts in certain circumstances and credit  derivatives we issued to guarantee the payments on multifamily  loans or securities

At December 31, 2011 and 2010, we were the primary  beneficiary of one and three, respectively, real estate entities  that invest in credit enhanced multifamily housing revenue bonds  that were not deemed to be material  We were not the primary  beneficiary of the remainder of other VIEs because our involvement in these VIEs is passive in nature and does not  provide us with the power to direct the activities of the VIEs  that most significantly impact their economic performance  See  Table 3.2 for the carrying amounts and classification of the assets  and liabilities recorded on our consolidated balance sheets related to our variable interests in non consolidated  VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs  Also see "NOTE 9: FINANCIAL GUARANTEES" for additional information about our involvement with the VIEs related to mortgage related guarantees  and short term default and other guarantee commitments discussed  above

### NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES

We own both single family mortgage loans, which are secured by  one to four family residential properties, and multifamily  mortgage loans, which are secured by properties with five or  more residential rental units  For a discussion of our  significant accounting policies regarding our mortgage loans and loan loss reserves, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES."

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below summarizes the types of loans on our consolidated balance sheets as of December 31, 2011 and 20 0

### Table 4.1    Mortgage Loans

| | December 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Unsecuritized | Held by Consolidated Trusts | Total | Unsecuritized | Held by Consolidated Trusts | Total |
| | | | (in millions) | | | |
| S ng e-fam  y (1 | | | | | | |
| F xed- a e | | | | | | |
|   Amor  z ng | $ 153,177 | $1,418,751 | $1,571,928 | $ 126,561 | $1,493,206 | $ 1,619,767 |
|   In e es -only | 3,184 | 14,758 | 17,942 | 4,161 | 19,616 | 23,777 |
|    To al f xed- a e | 156,361 | 1,433,509 | 1,589,870 | 130,722 | 1,512,822 | 1,643,544 |
| Adj  s ab e- a e | | | | | | |
|   Amor  z ng | 3,428 | 68,362 | 71,790 | 3,625 | 59,851 | 63,476 |
|   In e es -only | 10,376 | 43,655 | 54,031 | 13,018 | 58,792 | 71,810 |
|    To a  ad us ab e- a e | 13,804 | 112,017 | 125,821 | 16,643 | 118,643 | 135,286 |
| O he  Gua an ee T ansac  ons backed by non-F edd e Mac | | | | | | |
|   secu  es | | 12,776 | 12,776 | | 15,580 | 15,580 |
| FHA/VA and o he  gove nmen al | 1,494 | 3,254 | 4,748 | 1,498 | 3,348 | 4,846 |
| o a s ng e- am  y | 171,659 | 1,561,556 | 1,733,215 | 148,863 | 1,650,393 | 1,799,256 |
| Mul  fam  y (1 | | | | | | |
|   F xed- a e | 69,647 | | 69,647 | 72,679 | | 72,679 |
|   Adj  s ab e- a e | 12,661 | | 12,661 | 13,201 | | 13,201 |
|   O he  gove nmen a | 3 | | 3 | 3 | | 3 |
| o a  mu  fam  y | 82,311 | | 82,311 | 85,883 | | 85,883 |
| To al UPB of mo  gage loans | 253,970 | 1,561,556 | 1,815,526 | 234,746 | 1,650,393 | 1,885,139 |
| Defe  ed fees, una  o zed p e  u  s, d scoun s and o he  cos bas s adj s es | (6,125) | 10,926 | 4,801 | (7,665) | 7,423 | (242) |
| Lowe  of cos  o  fa  va ue ad us men s on  oans he d-fo -sa e(2 | 195 | | 195 | (311) | | (311) |
| Allowance fo  loan losses on mo  gage loans held-fo - nves men | (30,912) | (8,351) | (39,263) | (28,047) | (11,644) | (39,691) |
| To al mo  gage loans, ne | $ 217,128 | $ 1,564,131 | $1,781,259 | $ 198,723 | $1,646,172 | $1,844,895 |
| Mo  gage  oans, ne | | | | | | |
|   Held-fo - nves men | $ 207,418 | $ 1,564,131 | $1,771,549 | $ 192,310 | $1,646,172 | $1,838,482 |
|   He d-fo -sa e | 9,710 | | 9,710 | 6,413 | | 6,413 |
| To al mo  gage loans, ne | $ 217,128 | $ 1,564,131 | $1,781,259 | $ 198,723 | $1,646,172 | $1,844,895 |

(1) Based o  UPB a d exc  d g  o gage oa s  aded, b   o  ye  se  ed
(2) Cons s s of fa  va ue ad us men s assoc a ed w h mo  gage loans fo  wh ch we have made a fa  value elec  on

During 2011 and 2010, we purchased $316.3 billion and $380.7 billion, respectively, in UPB of single family mortgage loans and $2.7 billion and $3.2 billion, respectively, in UPB of multifamily loans that were classified as held for investment at purchase  Our sales of multifamily mortgage loans occur primarily through the issuance of multifamily Other Guarantee Transactions. See "NOTE 9: FINANCIAL GUARANTEES" for more information. We did not sell a significant amount of held for investment loans during 2011  We did not have significant reclassifications of mortgage loans  into held for sale in 20

### Credit Quality of Mortgage Loans

We evaluate the credit quality of single family loans using  different criteria than the criteria we use to evaluate  multifamily loans. The current LTV ratio is one key factor we consider when estimating our loan loss reserves for  single family loans  As estimated current LTV ratios increase, the borrower's equity in the home decreases, which  negatively affects the borrower's ability to refinance or  to sell the property for an amount at or above the balance of the outstanding mortgage loan  If a borrower has an estimated  current LTV ratio greater than 100%, the borrower is "underwater" and, based upon historical information,  is more likely to default than other borrowers due to limits in  the ability to sell or refinance  A second lien mortgage also reduces the borrower's equity in the home, and has a  similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the  combined balances of the first and second mortgages  As of December 31, 2011 and 2010, approximately 15% and 14%, respectively, of loans in our single family credit  guarantee portfolio had second lien financing by third parties at the time of origination of the first mortgage, and  we estimate that these loans comprised 17% and 19%, respectively, of our seriously delinquent loans, based on UPB  However, borrowers are free to  obtain second lien financing after origination, and we are not  ent t ed to rece ve notification when a borrower does so  Therefore, it is likely that additional borrowers have  post origination second lien

233

*Freddie Mac*

TREASURY-3005

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

mortgages  For further information about concentrations of risk  associated with our single family and multifamily mortgage  loans, see "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS."

The table below presents information on the estimated current  LTV ratios of single family loans on our consolidated balance sheets, all of which are held  for investment  Our current LTV ratio estimates are based on available data through December of  each year presented

**Table 4.2    Recorded Investment of Held For Investment Mortgage Loans, by  LTV Ratio**

| | As of December 31, 2011 | | | | As of December 31, 2010 | | | |
| | Estimated Current LTV Ratio[1] | | | | Estimated Current LTV Ratio[1] | | | |
| | < 80 | >80 to 100 | > 100[2] | Total | < 80 | >80 to 100 | > 100[2] | Total |
| | (in millions) | | | | | | | |
| Single-family loans: | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[3] | $ 641,698 | $383,320 | $247,468 | $1,272,486 | $ 704,882 | $393,853 | $216,388 | $ 1,315,123 |
| 15-year amortizing fixed-rate | 238,287 | 18,280 | 2,966 | 259,533 | 233,422 | 16,432 | 2,523 | 252,377 |
| Adjustable-rate[3] | 43,728 | 13,826 | 9,180 | 66,734 | 34,252 | 13,273 | 9,149 | 56,674 |
| Alt-A, interest-only, and option ARM[5] | 30,589 | 29,251 | 79,418 | 139,258 | 45,068 | 44,540 | 85,213 | 174,821 |
| Total single-family loans | $ 954,302 | $444,677 | $ 339,032 | 1,738,011 | $1,017,624 | $468,098 | $ 313,273 | 1,798,995 |
| Multifamily loans | | | | 72,801 | | | | 79,178 |
| Total recorded investment of held-for-investment loans | | | | $ 1,810,812 | | | | $1,878,173 |

(1) The current LTV ratios are management estimates, which are updated on a quarterly basis  Current market values are estimated by adjusting the value of the property  based on changes in the market value of homes in the same geographical area since the  last  reporting  time  The value of a property is our original market value based on the sales  price for purchase mortgages and the original appraisal for refinance mortgages  Changes in market value are derived from our internal index which measures price  changes for repeat sales and refinancings on homes with properties financed by Freddie Mac and Fannie Mae single-family mortgage acquisitions, including foreclosure  sales  Estimates of the current LTV ratio do not include the credit-enhanced portion of the loan and exclude any secondary financing by third parties  The existence of a  second lien reduces the borrower's equity in property and, therefore, can increase risk of default

(2) The serious delinquency rate for the total of single-family mortgage loans with estimated current LTV ratios in excess of 100% was 12 8% and 14 9% as of  December 31, 2011 and December 31, 2010, respectively

(3) The majority of our loan modifications resulted in new terms that include fixed interest rates after modification  However, our HAMP loan modifications resulted in an  increase in the rate as they go through a sequentially adjustments to a new interest rate starting at a fixed rate for the remaining life of the loan  We have classified these loans as fixed-rate  for presentation  on  every  category  average rate adjustment provision, because the change in a rate is determined over the life of the modification as have than a future date

(4) Includes balloon/reset mortgage loans and excludes option ARMs

(5) We discontinued purchases of Alt-A loans on March 1, 2009 (once a purchase commitment was previously specified and entered), and interest-only loans effective September 1, 2010, and  have no purchased option ARM loans since 2007  Modified loans with no Alt-A category years remain as such, even though the option ARM category remains as such even though the modified loan no  longer provides for option payment provisions

For information about the payment status of single family and  multifamily mortgage loans, including the amount of such loans  we deem impaired, see "NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS." For a discussion of certain  indicators of credit quality for the multifamily loans on our consolidated balance sheets, see "NOTE 16:  CONCENTRATION OF CREDIT AND OTHER RISKS    Multifamily Mortgage Portfolio "

**Allowance for Loan Losses and Reserve for Guarantee Losses, or Loan Loss  Reserve**

We maintain an allowance for loan losses on mortgage loans that  we classify as held  for investment on our consolidated balance  sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage related securities backed by multifamily  loans, certain single family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental  credit risk.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3006

Table of Contents

The table below summarizes loan loss reserve activity

**Table 4.3    Detail of Loan Loss Reserves**

| | Year Ended December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2011** | | | | **2010** | | | |
| | Allowance or Loan Losses | | | | Allowance or Loan Losses | | | |
| | Unsecuritized | Held By Consolidated Trusts | Reserve for Guarantee Losses(1) | Total | Unsecuritized | Held By Consolidated Trusts | Reserve for Guarantee Losses(1) | Total |
| | (in millions) | | | | | | | |
| *Single-family:* | | | | | | | | |
| Beginning balance | $ 27,317 | $ 11,644 | $ 137 | $ 39,098 | $ 693 | $ | $ 32,333 | $ 33,026 |
| Adjustments to beginning balance(2) | | | | | | 32,006 | (32,192) | (186) |
| Provision for credit losses | 2,796 | 8,059 | 43 | 10,898 | 7,532 | 9,540 | 47 | 17,119 |
| Charge-offs(3 | (13,756) | (970) | (9) | (14,735) | (12,856) | (3,351) | (11) | (16,218) |
| Recoveries(3 | 2,618 | 146 | | 2,764 | 2,647 | 715 | | 3,362 |
| Transfers, etc(( | 11,431 | (10,528) | (12) | 891 | 29,301 | (27,266) | (40) | 1,995 |
| Ending balance | $ 30,406 | $ 8,351 | $ 159 | $ 38,916 | $ 27,317 | $ 11,644 | $ 137 | $ 39,098 |
| *Multifamily* | | | | | | | | |
| Beginning balance | $ 730 | $ | $ 98 | $ 828 | $ 748 | $ | $ 83 | $ 831 |
| Provision (benefit) for credit losses | (152) | | (44) | (196) | 84 | | 15 | 99 |
| Charge-offs(3 | (73) | | (2) | (75) | (103) | | (1) | (104) |
| Recoveries(3 | 1 | | | 1 | 1 | | | 1 |
| Transfers, etc( | | | (13) | (13) | | | 1 | 1 |
| Ending balance | $ 506 | $ | $ 39 | $ 545 | $ 730 | $ | $ 98 | $ 828 |
| *Total* | | | | | | | | |
| Beginning balance | $ 28,047 | $ 11,644 | $ 235 | $ 39,926 | $ 1,441 | $ | $ 32,416 | $ 33,857 |
| Adjustments to beginning balance(2) | | | | | | 32,006 | (32,192) | (186) |
| Provision for credit losses | 2,644 | 8,059 | (1) | 10,702 | 7,616 | 9,540 | 62 | 17,218 |
| Charge-offs(3 | (13,829) | (970) | (11) | (14,810) | (12,959) | (3,351) | (12) | (16,322) |
| Recoveries(3 | 2,619 | 146 | | 2,765 | 2,648 | 715 | | 3,363 |
| Transfers, etc(( | 11,431 | (10,528) | (25) | 878 | 29,301 | (27,266) | (39) | 1,996 |
| Ending balance | $ 30,912 | $ 8,351 | $ 198 | $ 39,461 | $ 28,047 | $ 11,644 | $ 235 | $ 39,926 |

Total loan loss reserve as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities          2 08%          2 03%

(1) All of these loans are collectively evaluated for impairment Our reserve for guarantee losses is included in other liabilities

(2) Adjustments are a result of the adoption of amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs See "NOTE 1 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Recent Adopted Accounting Guidance" for further information

(3) Charge-offs represent the amount of a loan that has been discharged or removed the loan from our consolidated balance sheet principally due to the foreclosure transfer or a short sale es Charge-offs exclude $422 million and $528 million for the years ended December 31, 2011 and 2010, respectively, related to certain loans purchased out of financial guarantees and recorded as losses on loans purchased when the expenses on our consolidated statements of income and comprehensive income We record charge-offs and recoveries on a loan by consolidated trust reserve on a loss reserve (such as a foreclosure transfer to foreclosure alternative) occurs on a loan while it remains in a consolidated trust  Recoveries of charge-offs primarily result from foreclosure alternatives and REO acquisitions on loans where (a) a state of default risk has been assumed by mortgage insurers, services, or other third parties through credit enhancements or (b) we received a reimbursement of our losses from a seller service associated with a repurchase request on a loan that has experienced a foreclosure transfer or a foreclosure alternative

(4) In February 2010, we began to repurchase all of removing subst antially all 120 days or more delinquent single-family mortgage loans from our PC trusts We removed $44 1 billion and $127 5 billion on UPB of loans from PC trusts during the years ended December 31, 2011 and 2010, respectively As a result, our loss reserves associated with loans removed from PC trusts were a reserve and from the allowance for loan losses to a reserve recorded by consolidated trusts or the allowance for loan losses securitized

(5) For the years ended December 31, 2011 and 2010, consists of (a) approximately $10 5 billion and $27 5 billion, respectively, of reclassifications of single-family reserves related to our removal of loans previously held by consolidated trusts (as discussed in note (4) above)  (b) approximately $1 1 billion and $1 1 billion, respectively, due to a recapitalization of past due notes on modified mortgage loans (c) $(258) million and $757 million, respectively, related to agreements with sellers/servicers where the transfer related to recoveries recorded under these agreements to compensate us for estimated credit losses and (d) $48 million and $100 million, respectively, of other transfers

235

*Freddie Mac*

Source   DRA HOM   OAN MORTGAG CORP, 10 K, March 09, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents our allowance for loan losses and our recorded investment in mortgage loans, held for investment, by impairment evaluation methodology

**Table 4.4    Net Investment in Mortgage Loans**

|  | December 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
|  | Single-family | Multifamily | Total | Single-family | Multifamily | Total |
|  | (in millions) | | | | | |
| *Recorded investment* | | | | | | |
| Collectively evaluated | $1,677,974 | $ 70,131 | $1,748,105 | $ 1,762,490 | $ 76,541 | $ 1,839,031 |
| Individually evaluated | 60,037 | 2,670 | 62,707 | 36,505 | 2,637 | 39,142 |
| Total recorded investment | 1,738,011 | 72,801 | 1,810,812 | 1,798,995 | 79,178 | 1,878,173 |
| *Ending balance of the allowance for loan losses* | | | | | | |
| Collectively evaluated | (23,657) | (260) | (23,917) | (30,477) | (382) | (30,859) |
| Individually evaluated | (15,100) | (246) | (15,346) | (8,484) | (348) | (8,832) |
| Total ending balance of the allowance | (38,757) | (506) | (39,263) | (38,961) | (730) | (39,691) |
| Net investment in mortgage loans | $1,699,254 | $ 72,295 | $1,771,549 | $ 1,760,034 | $ 78,448 | $1,838,482 |

A significant number of unsecuritized single family mortgage loans on our consolidated balance sheets are individually evaluated for impairment and substantially all single family mortgage loans held by our consolidated trusts are collectively evaluated for impairment The ending balance of the allowance for loan losses associated with our held for investment unsecuritized mortgage loans represented approximately 13 0% and 12 7% of the recorded investment in such loans at December 31, 2011 and 2010, respectively The ending balance of the allowance for loan losses associated with mortgage loans held by our consolidated trusts represented approximately 0 5% and 0 7% of the recorded investment in such loans as of December 31, 2011 and 2010, respectively

### Credit Protection and Other Forms of Credit Enhancement

In connection with many of our mortgage loans held for investment and other mortgage related guarantees, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancements

The table below presents the UPB of loans on our consolidated balance sheets or underlying our financial guarantees with credit protection and the maximum amounts of potential loss recovery by type of credit protection

**Table 4.5    Recourse and Other Forms of Credit Protection[1]**

|  | UPB at | | Maximum Coverage[2] at | |
|---|---|---|---|---|
|  | December 31, 2011 | December 31, 2010 | December 31, 2011 | December 31, 2010 |
|  | (in millions) | | | |
| Single-family | | | | |
| Primary mortgage insurance | $ 198,007 | $ 217,133 | $ 48,741 | $ 52,899 |
| Lender recourse and indemnification | 8,798 | 10,064 | 8,453 | 9,566 |
| Pool insurance[3] | 26,754 | 37,868 | 1,855 | 2,687 |
| HFA indemnification | 8,637 | 9,322 | 3,023 | 3,263 |
| Subordination | 3,281 | 3,889 | 647 | 825 |
| Other credit enhancements | 133 | 223 | 99 | 118 |
| Total | $ 245,610 | $ 278,499 | $ 62,818 | $ 69,358 |
| Multifamily | | | | |
| HFA indemnification | $ 1,331 | $ 1,551 | $ 466 | $ 543 |
| Subordination | 23,636 | 12,252 | 3,359 | 1,414 |
| Other credit enhancements | 8,334 | 9,004 | 2,554 | 2,930 |
| Total | $ 33,301 | $ 22,807 | $ 6,379 | $ 4,887 |

(1) Includes the credit protection on associated with unsecuritized mortgage loans, loans held by our consolidated trusts, mortgage guarantees and excludes FHA/VA and other government loans Except for subordination coverage, these amounts exclude credit protection associated with $16 6 billion and $19 8 billion in UPB of single-family loans underlying Other Guarantee Transactions as of December 31, 2011 and December 31, 2010, respectively, for which the information was no available

(2) Except for subordination, these represent the remaining amount of loss recovery we have available as of the end of the respective periods of each year's agreements

(3) Maximum coverage amounts presented have been limited to the remaining UPB as of the end Pool protection amounts have been revised to conform to our current period of presentation Exclude approximately $13 5 billion and $19 7 billion in UPB as December 31, 2011 and 2010, respectively, where the related loans are also covered by primary mortgage insurance

(4) Represents the amount of pool insurance embursement of losses on securities we average a credit backed by subject area at local HFA bonds, which cover Treasury bearing insurance losses on these securities up to 35% of those issued under HFA covered a combined basis Treasury would also bear losses of unpaid principal

(5) Represents Freddie Mac issued mortgage-related securities which subordination on pool protection, excluding those backed by HFA bonds Excludes mortgage-related securities where subordination coverage was exhausted or maximum coverage amounts were eliminated other remaining UPB had a Proposed amounts have been revised to conform our current period of presentation

236
*Freddie Mac*

Source   DIRA HOM   OAN MORTGAG CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single family credit guarantee portfolio, and is typically provided on a loan level basis  Pool insurance contracts generally provide insurance on a group, or  pool, of mortgage loans up to a stated aggregate loss limit  We did not buy pool insurance in 2011 or 2010. In recent periods,  we also reached the maximum limit of recovery on certain of these contracts. For information about counterparty risk  associated with mortgage insurers, see "NOTE 16:  CONCENTRATION OF CREDIT AND OTHER RISKS      Mortgage Insurers."

We also have credit protection for certain of the mortgage loans  on our consolidated balance sheets that are covered by insurance  or partial guarantees issued by federal agencies (such as FHA,  VA, and USDA). The total UPB of these loans was $4.7 billion and $4.8 billion as of December 3  , 2011 and 2010, respectively.

### NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS

#### Individually Impaired Loans

Individually impaired single family loans include performing and  non performing TDRs, as well as loans acquired under our  financial guarantees with deteriorated credit quality  Individually impaired multifamily loans include TDRs, loans  three monthly payments or more past due, and loans that are impaired based on management judgment  For a discussion of our  significant accounting policies regarding impaired and non performing loans, which are applied consistently for  multifamily loans and single family loan classes, see  "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES "

Total loan loss reserves consist of a specific valuation  allowance related to individually impaired mortgage loans, and a  general reserve for other probable incurred losses  Our recorded investment in individually impaired mortgage loans and the  related specific valuation allowance are summarized in the table below by product class (for single family loans)

**Table 5.1      Individually Impaired Loans**

| | Balance at December 31, 2011 | | | | For The Year Ended December 31, 2011 | |
| | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | Interest Income Recognized |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| S ng e-fam  y — | | | | | | |
| *With no specific allowance recorded* [1] | | | | | | |
| 20 a d 30-yea  o  mo e, amo   z ng f xed- a e[2] | $ 7,073 | $ 3,200 | $ | $ 3,200 | $ 3,352 | $    336 |
| 15-yea  amor  z ng f xed- a e[2] | 57 | 23 | | 23 | 26 | 7 |
| Adj sta  e a e[3] | 13 | 6 | | 6 | 7 | 1 |
| A t-A,  n e es -on y, and op  on ARM[ | 1,987 | 881 | | 881 | 940 | 72 |
| To al w h no spec f c allowance  eco ded | 9,130 | 4,110 | | 4,110 | 4,325 | 416 |
| *With specific allowance recorded* [ | | | | | | |
| 20 a d 30-yea  o  mo e, amo   z ng f xed- a e[2] | 44,672 | 43,533 | (11,253) | 32,280 | 35,707 | 889 |
| 15-yea  amor  z ng f xed- a e[2] | 367 | 347 | (43) | 304 | 230 | 12 |
| Adj sta  e a e[3] | 280 | 268 | (59) | 209 | 155 | 5 |
| A t-A,  n e es -on y, and op  on ARM[ | 12,103 | 11,779 | (3,745) | 8,034 | 9,391 | 173 |
| To al w h  spec f c allowance  eco ded | 57,422 | 55,927 | (15,100) | 40,827 | 45,483 | 1,079 |
| *Combined single-family:* | | | | | | |
| 20 a d 30-yea  o  mo e, amo   z ng f xed- a e[2] | 51,745 | 46,733 | (11,253) | 35,480 | 39,059 | 1,225 |
| 15-yea  amor  z ng f xed- a e[2] | 424 | 370 | (43) | 327 | 256 | 19 |
| Adj sta  e a e[3] | 293 | 274 | (59) | 215 | 162 | 6 |
| A t-A,  n e es -on y, and op  on ARM[ | 14,090 | 12,660 | (3,745) | 8,915 | 10,331 | 245 |
| To al s ng e- am  y[6] | $66,552 | $ 60,037 | $ (15,100) | $44,937 | $49,808 | $ 1,495 |
| Mul  fam ly | | | | | | |
| *With no specific allowance recorded* [7] | $ 1,049 | $ 1,044 | $ | $ 1,044 | $ 1,427 | $    65 |
| *With specific allowance recorded* | 1,644 | 1,626 | (246) | 1,380 | 1,920 | 81 |
| o a  mu  fam y | $ 2,693 | $ 2,670 | $   (246) | $ 2,424 | $ 3,347 | $   146 |
| o a s ng e-fam y and mu  fam y | $69,245 | $ 62,707 | $(15,346) | $47,361 | $ 53,155 | $ 1,641 |

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-3009                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Balance at December 31, 2010 | | | | For The Year Ended December 31, 2010 | |
| --- | --- | --- | --- | --- | --- | --- |
| | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | Interest Income Recognized |
| | | | (in millions) | | | |
| Single-family — | | | | | | |
| *With no specific allowance recorded* (1) | | | | | | |
| 20- and 30-year amortizing fixed-rate(2) | $ 8,462 | $ 3,721 | $ | $ 3,721 | $ 4,046 | $ 521 |
| 15-year amortizing fixed-rate(2) | 119 | 50 | | 50 | 58 | 7 |
| Adjustable-rate(3) | 20 | 9 | | 9 | 12 | 1 |
| Alt-A, interest-only, and option ARM( | 2,525 | 1,098 | | 1,098 | 1,220 | 114 |
| Total with no specific allowance recorded | 11,126 | 4,878 | | 4,878 | 5,336 | 643 |
| *With specific allowance recorded* ( | | | | | | |
| 20- and 30-year amortizing fixed-rate(2) | 25,504 | 24,502 | (6,283) | 18,219 | 15,128 | 561 |
| 15-year amortizing fixed-rate(2) | 229 | 198 | (17) | 181 | 175 | 10 |
| Adjustable-rate(3) | 168 | 153 | (23) | 130 | 114 | 5 |
| Alt-A, interest-only, and option ARM( | 7,035 | 6,774 | (2,161) | 4,613 | 3,753 | 116 |
| Total with specific allowance recorded | 32,936 | 31,627 | (8,484) | 23,143 | 19,170 | $ 692 |
| *Combined single-family:* | | | | | | |
| 20- and 30-year amortizing fixed-rate(2) | 33,966 | 28,223 | (6,283) | 21,940 | 19,174 | 1,082 |
| 15-year amortizing fixed-rate(2) | 348 | 248 | (17) | 231 | 233 | 17 |
| Adjustable-rate(3) | 188 | 162 | (23) | 139 | 126 | 6 |
| Alt-A, interest-only, and option ARM( | 9,560 | 7,872 | (2,161) | 5,711 | 4,973 | 230 |
| Total single-family(6) | $ 44,062 | $ 36,505 | $(8,484) | $28,021 | $ 24,506 | $ 1,335 |
| Multifamily | | | | | | |
| *With no specific allowance recorded* (7) | $ 734 | $ 729 | $ | $ 729 | $ 847 | $ 33 |
| *With specific allowance recorded* | 1,927 | 1,908 | (348) | 1,560 | 2,112 | 74 |
| Total multifamily | $ 2,661 | $ 2,637 | $ (348) | $ 2,289 | $ 2,959 | $ 107 |
| Total single-family and multifamily | $46,723 | $ 39,142 | $(8,832) | $ 30,310 | $27,465 | $ 1,442 |

(1) Individually impaired loans with no specific related valuation allowance primarily represent mortgage loans purchased out of PC pools and accounted for in accordance with the accounting guidance for loans and debt securities acquired with deteriorated credit quality, have no expected future deterioration

(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio"

(3) Includes balloon/reset mortgage loans and excludes option ARMs

(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio"

(5) Consists primarily of mortgage loans classified as TDRs

(6) As of December 31, 2011 and 2010, includes $57.4 billion and $32.9 billion, respectively, of UPB associated with loans for which we have recorded a specific allowance, and $9.1 billion and $11.1 billion, respectively, of UPB associated with loans have no specific allowance recorded. See endnote (1) for additional information

(7) Individually impaired multifamily loans with no specific related valuation allowance primarily represent loans for which the collateral value is sufficient only in excess of the loan balance to result in no recovery of the entire recorded investment if the property were foreclosed upon or otherwise subject to disposition

The average recorded investment in individually impaired loans for the year ended December 31, 2009, was approximately $10.7 billion.

We recognized interest income on individually impaired loans of $0.8 billion for the year ended December 31, 2009. Interest income foregone on individually impaired loans was approximately $1.6 billion, $0.8 billion, and $0.3 billion for the years ended December 31, 2011, 2010, and 2009, respectively.

## Mortgage Loan Performance

We do not accrue interest on loans three months or more past due

238

*Freddie Mac*

Source: FREDDIE MAC, LOAN MORTGAGE CORP, 10-K, March 09, 2012

TREASURY-3010

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents the recorded investment of our single family and multifamily mortgage loans, held for investment, by payment status.

**Table 5.2     Payment Status of Mortgage Loans**(1)

| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
|---|---|---|---|---|---|---|
| | | | | **December 31, 2011** | | |
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20- and 30-year or more, amortizing fixed-rate(2) | $ 1,191,809 | $24,964 | $ 9,006 | $ 46,707 | $1,272,486 | $ 46,600 |
| 15-year amortizing fixed-rate(2) | 256,306 | 1,499 | 361 | 1,367 | 259,533 | 1,361 |
| Adjustable-rate(3) | 63,929 | 724 | 239 | 1,842 | 66,734 | 1,838 |
| Alt-A, interest-only, and option ARM(4) | 109,967 | 4,617 | 2,172 | 22,502 | 139,258 | 22,473 |
| Total single-family | 1,622,011 | 31,804 | 11,778 | 72,418 | 1,738,011 | 72,272 |
| Total multifamily | 72,715 | 2 | 15 | 69 | 72,801 | 1,882 |
| Total single-family and multifamily | $1,694,726 | $31,806 | $11,793 | $ 72,487 | $1,810,812 | $ 74,154 |
| | | | | **December 31, 2010** | | |
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20- and 30-year or more, amortizing fixed-rate(2) | $1,226,874 | $26,442 | $10,203 | $ 51,604 | $ 1,315,123 | $ 51,507 |
| 15-year amortizing fixed-rate(2) | 248,572 | 1,727 | 450 | 1,628 | 252,377 | 1,622 |
| Adjustable-rate(3) | 53,205 | 826 | 335 | 2,308 | 56,674 | 2,303 |
| Alt-A, interest-only, and option ARM(4) | 137,395 | 5,701 | 3,046 | 28,679 | 174,821 | 28,620 |
| Total single-family | 1,666,046 | 34,696 | 14,034 | 84,219 | 1,798,995 | 84,052 |
| Total multifamily | 79,044 | 41 | 7 | 86 | 79,178 | 1,751 |
| Total single-family and multifamily | $ 1,745,090 | $34,737 | $14,041 | $ 84,305 | $1,878,173 | $ 85,803 |

(1) Based on recorded investment in the loan. Mortgage loans whose contractual terms have been modified under agreements in which the borrower agreed to count as past due as long as the borrower is current under the modified terms. The repayment terms as of a loan may be affected by temporary timing differences, or lags, in the reporting of historical information on our services.

(2) See endnote (3) of "Table 4.2    Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio"

(3) Includes balloon/reset mortgage loans and excludes option ARMs

(4) See endnote (5) of "Table 4.2    Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio"

We have the option under our PC agreements to remove mortgage loans from the loan pools that underlie our PCs under certain circumstances to resolve an existing or impending delinquency or default. Since the first quarter of 2010, our practice generally has been to remove loans from PC trusts when the loans have been delinquent for 120 days or more. As of December 31, 2011, there were $3.0 billion in UPB of loans underlying our PCs that were 120 days or more delinquent, and that met our criteria for removing the loan from the consolidated trust. Generally, we remove these delinquent loans from the PC trust, and thereby extinguish the related PC debt, at the next scheduled PC payment date, unless the loans proceed to foreclosure transfer, complete a foreclosure alternative or are paid in full by the borrower before such date

When we remove mortgage loans from consolidated trusts, we reclassify the loans from mortgage loans held for investment by consolidated trusts to unsecuritized mortgage loans held for investment and record an extinguishment of the corresponding portion of the debt securities of the consolidated trusts. We removed $44.1 billion and $127.5 billion in UPB of loans from PC trusts or associated with other guarantee commitments during the years ended December 31, 2011 and 2010, respectively

239

*Freddie Mac*

Source   FREDDIE MAC — FEDERAL HOME LOAN MORTGAGE CORP, 10-K, March 09, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below summarizes the delinquency rates of mortgage loans within our single family credit guarantee and multifamily mortgage portfolios

**Table 5.3    Delinquency Rates**(1)

| | | December 31, 2011 | | December 31, 2010 |
|---|---|---|---|---|
| *Single-family:* | | | | |
| Non-c ed -enhanced po fol o | | | | |
| Se ous de nquency a e | | 2 80% | | 2 97% |
| To a numbe of se ous y de nquen oans | | 273,184 | | 296,397 |
| C ed -enhanced po fol o | | | | |
| Se ous de nquency a e | | 7 56% | | 7 83% |
| To a numbe of se ous y de nquen oans | | 120,622 | | 144,116 |
| To al po fol o, exclud ng O he Gua an ee T ansac ons | | | | |
| Se ous de nquency a e | | 3 46% | | 3 73% |
| To a numbe of se ous y de nquen oans | | 393,806 | | 440,513 |
| O e G a an ee T ansac ons (2 | | | | |
| Se ous de nquency a e | | 10 54% | | 9 86% |
| To a numbe of se ous y de nquen oans | | 20,328 | | 21,926 |
| o a s ng e-fam y | | | | |
| Se ous de nquency a e | | 3 58% | | 3 84% |
| To a numbe of se ous y de nquen oans | | 414,134 | | 462,439 |
| *Multifamily* (3 | | | | |
| Non-c ed -enhanced po fol o | | | | |
| De nquency a e | | 0 11% | | 0 12% |
| UPB of del nquen loans ( n m ll ons) | $ | 93 | $ | 106 |
| C ed -enhanced po fol o | | | | |
| De nquency a e | | 0 52% | | 0 85% |
| UPB of del nquen loans ( n m ll ons) | $ | 166 | $ | 182 |
| To al Mul fam ly | | | | |
| De nquency a e | | 0 22% | | 0 26% |
| UPB of del nquen loans ( n m ll ons) | $ | 259 | $ | 288 |

(1) S ngle-fam ly mo gage loans whose con ac ual e ms have been mod f ed unde ag eemen w h he bo owe a e no coun ed as se ous y de nquen f he bo owe s ess han he on h y pay e s pas d e de e od f ed e s Se o s del nquenc es on s ngle-fam ly mo gage loans unde ly ng ce a n REMICs a d O he St ct ed Sec t es, Ot e G a a Tee T ansac ons, and o he gua an ee comm men s may be epo ed on a d ffe e sc ed ed e o va a ces d s y p ac ce

(2) O he Gua an ee T ansac ons gene ally have unde ly ng mo gage oans w h h ghe sk cha ac e s cs, bu so e O he Gua an ee T ansac ons may p ov de nhe en c ed p o ec ons f om losses d e o de y g s old a o , excess e es , ove olla a l a d mo e f na ue es

(3) Mul fam ly del nquency pe fo mance s based on UPB of mo gage oans tha e wo mon h y paymen s o mo e pas due o hose n he p ocess of fo eclosu e and ncludes mul fam ly O he Gua an ee T ansac ons Exc udes mo gage oans whose con ac ua e ms have been mod f ed unde an ag eemen w h he bo owe as ong as he bo owe s ess han wo mon h y pay en s pas due unde he od f ed con ac ua e s

We continue to implement a number of initiatives to modify and restructure loans, including the MHA Program Our implementation of the MHA Program, for our loans, includes the following: (a) an initiative to allow mortgages currently owned or guaranteed by us to be refinanced without obtaining additional credit enhancement beyond that already in place for the loan (our relief refinance mortgage, which is our implementation of HARP); (b) an initiative to modify mortgages for both homeowners who are in default and those who are at risk of imminent default (HAMP); and (c) an initiative designed to permit borrowers who meet basic HAMP eligibility requirements to sell their homes in short sales or to complete a deed in lieu of foreclosure transaction (HAFA) As part of accomplishing certain of these initiatives, we pay various incentives to servicers and borrowers We bear the full costs associated with these loan workout and foreclosure alternatives on mortgages that we own or guarantee and do not receive a reimbursement for any component from Treasury These initiatives slowed the rate of growth in s ng e-family REO assets on our consolidated balance sheets during 2011 and 2010; however, the number and amount of individually impaired loans increased due to higher volumes of TDRs We cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives As discussed below, we recently introduced a new non HAMP standard loan modification process that replaced our previous non HAMP modification initiative

**Troubled Debt Restructurings**

On July 1, 2011, we adopted an amendment to the accounting guidance for receivables, which clarifies the guidance regarding a creditor's evaluation of when a restructuring is considered a TDR While our adoption of this amendment did not have an impact on how we account for TDRs, it did have a significant impact on the population of loans that we account for as TDRs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Recently Adopted Accounting Guidance" for further information on our implementation of this guidance

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### *Single-Family TDRs*

We rely on our single family servicers to contact borrowers who are in default and to identify a loan workout, or other alternative to foreclosure, in accordance with our requirements  We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best  opportunity for minimizing our credit losses  We require our single family servicers to first evaluate problem loans for a  repayment or forbearance plan before considering modification  If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering  foreclosure  We receive information related to loan workouts, such as modifications and loans in a modification trial period,  and other alternatives to foreclosure from our servicers at the loan level on at least a monthly basis  For loans in a  modification trial period under HAMP, we do not receive the terms of the expected completed modification until the  modification is completed  For these loans, we only receive notification that they are in a modification trial period under HAMP. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES      Allowance for Loan Losses and Reserve for Guarantee Losses" for more detail

Repayment plans are agreements with the borrower that give the  borrower a defined period of time to reinstate the mortgage by  paying regular payments plus an additional agreed upon amount in  repayment of the past due amount  These agreements are  considered TDRs if they result in a delay in payment that is  considered to be more than insignificant

Forbearance agreements are agreements between the servicer and  the borrower where reduced payments or no payments are required  during a defined period  These agreements are considered TDRs if  they result in a delay in payment that is considered to be more  than insignificant

In the case of borrowers considered for modifications, our  servicers obtain information on income, assets, and other  borrower obligations to determine modified loan terms  Under  HAMP, the goal of a single family loan modification is to reduce  the borrower's monthly mortgage payments to 3  % of the borrower's gross monthly income, which may be achieved  through a combination of methods, including: (a) interest rate reductions; (b) term extensions; and  (c) principal forbearance  Principal forbearance is when a  portion of the principal is non interest bearing, but this does not represent principal forgiveness  Although HAMP contemplates that some servicers will also make use of principal forgiveness to achieve reduced payments for borrowers, we have only used  forbearance of principal and have not used principal forgiveness  in modifying our loans.

HAMP requires that each borrower complete a trial period during  which the borrower will make monthly payments based on the  estimated amount of the modification payments. Trial periods are  required for at least three months  After the final trial period  payment is received by our servicer, the borrower and servicer  enter into the modification  With the adoption of the new  accounting guidance for TDRs in the third quarter of 2011, we began to consider restructurings under HAMP as TDRs at the  inception of the trial period if the expected modification will  result in a change in our expectation to collect all amounts due  at the original contract rate

Our HAMP and non HAMP modification initiatives are available for  borrowers experiencing what is generally expected to be a  onger-term financial hardship. Historically, for our non HAMP modifications, our single family servicers have generally taken  an approach to modifying the loan's terms in the following order of priority until the  borrower's monthly payment  amount is reduced to a sustainable level given the borrower's individual circumstances: (a) extend the  term of the loan; and (b) reduce the interest rate of the  loan. As discussed below, this non HAMP modification initiative has been replaced by the standard modification effective  January 1, 2012.

In April 2011, FHFA announced a new set of aligned standards for servicing non performing loans owned or guaranteed by Freddie  Mac and Fannie Mae  As part of the servicing alignment  initiative, we implemented a new non HAMP standard loan  modification initiative  This new standard modification replaced  our previous non HAMP modification initiative beginning  January 1, 2012. The new standard modification requires a three month trial period  Servicers began offering standard  modification trial period plans with effective dates on or after  October 1, 2011. We consider restructurings under this initiative as TDRs at the inception of the trial period if the  expected modification will result in a change in our expectation to collect all amounts due at the original contract rate

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

In the table below, we provide information about our single family loans that were initially classified as TDRs in 2011.

**Table 5.4    Single Family TDRs, by Type**

| | Year Ended December 31, 2011 | | |
|---|---|---|---|
| | Number of Loans | Pre-TDR Recorded Investment | Percentage of Recorded Investment |
| | | (in millions, except for number of loans) | |
| Type of completed loan modification | | | |
| No change in terms[1][2] | 4,084 | $   674 | 2% |
| Extension of term[2] | 14,137 | 2,290 | 8 |
| Reduction of contractual interest rate, since in cases, extension of term | 51,592 | 10,569 | 38 |
| Rate reduction, extension of term, and principal forbearance | 13,645 | 3,314 | 12 |
| Subtotal - loan modification activity | 83,458 | 16,847 | 60 |
| Other activity | | | |
| Loans that entered into a modification trial period[3] | 25,513 | 5,353 | 19 |
| Forbearance agreement[2] | 22,100 | 4,198 | 15 |
| Repayment plan[2] | 10,787 | 1,699 | 6 |
| Subtotal - other activity | 58,400 | 11,250 | 40 |
| Total single-family TDRs | 141,858 | $28,097 | 100% |

(1) Under these modification types, past due amounts are added to the principal balance and reamortized based on the original contractual loan terms.

(2) Represents only those agreements or plans that have resulted in more than an insignificant delay, which is generally considered by us as more than the monthly payments under the original terms.

(3) Represents loans that entered into a trial period for a modification. Beginning in the third quarter of 2011, we began to classify loans as TDRs when they entered a trial period rather than when the modification was completed. As of December 31, 2011, 15,368 of these loans had completed the trial period and received a modification, 7,756 loans remained in a trial period.

(4) As of December 31, 2011, we were 6,615 on a completed a forbearance agreement or began the modification process, 9,705 on a started an expedited a loss event or returned to a delinquent repayment status, and 5,780 on a started remained in forbearance.

(5) As of December 31, 2011, we were 3,220 on a completed a repayment plan or began the modification process, 5,012 loans have experienced a loss event or remained in the plan and ended the quarter, and 2,555 on a sweeper above swept economizing the repayment plan (actively repaying past due amounts during the trial period).

For information on how we determine our allowance for loan losses, including how payment defaults are considered in this determination, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES."

The table above presents completed loan modification activity based on the following types of modification:

- No change in terms: This involves the addition of past due amounts, including delinquent monthly principal and interest payments, to the remaining principal balance and allows for amortization of such past due amounts over the loan's remaining original contractual life with no other change in terms. These modifications are considered TDRs if they result in a delay in payment that is considered to be more than insignificant.

- Extension of term: This involves resetting the contractual life of the loan to a longer term, and the longer amortization period generally results in a reduced monthly payment compared to the pre modified terms These modifications are considered TDRs if they result in a delay in payment that is considered to be more than insignificant.

- Reduction of contractual interest rate: These modifications are considered TDRs as they result in a concession being granted to the borrower as we do not expect to collect all amounts due, including accrued interest at the original contractual interest rate

- Principal forbearance: This involves the separation of a portion of the principal balance, which is not amortized nor used in determining the amount of monthly interest No interest accrues on this portion of the principal and repayment is delayed until either the final payoff of the mortgage, the maturity date, or the transfer of the property Accordingly, this reduces the monthly payment amount compared to the pre modified terms These modifications are considered TDRs as they result in a concession being granted to the borrower as we do not expect to collect all amounts due, including accrued interest at the original contractual interest rate

During the year ended December 3 , 20   , the average term extension was 96 months and the average interest rate reduction was 2.7% on completed modifications classified as TDRs.

*Multifamily TDRs*

The assessment as to whether a multifamily loan restructuring is considered a TDR contemplates the unique facts and circumstances of each loan. This assessment considers qualitative factors such as whether the borrower's modified interest

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3014

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

rate is consistent with that of a borrower having a similar credit profile at the time of modification  In certain cases,  for maturing loans we may provide short term loan extensions of up to  2 months with no changes to the effective borrowing rate  In other cases we may make more significant modifications of terms for borrowers experiencing financial difficulty, such as reducing the interest rate or extending the maturity for longer than 12 months  In cases where we do modify  the contractual terms of the loan, the changes in terms may be similar to those of single family loans, such as an extension of the term, reduction of contractual rate, principal forbearance,  or some combination of these features

### *TDR Activity and Performance*

The table below provides additional information about both our single family and multifamily TDR activity during the year ended December 3 , 20  , based on the original category of the loan before modification  Our presentation of TDR activity includes all loans that were newly classified as a TDR during the respective periods  Prior to classification as a TDR, these loans were previously evaluated for impairment, including our estimation for loan losses, on a collective basis  Loans classified as a TDR in one period may be subject to further  action (such as a modification or remodification) in a subsequent period. In such cases, the subsequent activity would  not be reflected in the table below since the loan would already have been classified as a TDR.

**Table 5.5     TDR Activity, by Segment**

| | Year  nded December 31, 2011 | |
|---|---|---|
| | # o  Loans | Post TDR Recorded Investment |
| | | (in millions, except for number of loans) |
| *Single-family* | | |
| 20 a d 30-yea  z ng f xed- a e | 100,948 | $ 19,263 |
| 15-yea  amo  z ng f xed- a e | 6,529 | 651 |
| Adj  s ab e- a e(1 | 3,287 | 657 |
| A t-A,  n e es -on y, and op  on ARM | 31,094 | 8,355 |
| o a S ng e-fam  y | 141,858 | 28,926 |
| *Multifamily* | | |
| o a | 23 | 254 |
| o a | 141,881 | $ 29,180 |

(1) Includes balloon  ese mo  gage loans

The aggregate recorded investment of single family loans classified as TDRs during 2011 was higher post modification (as shown in the table above) than the aggregate recorded investment  of the pre modified loans (as shown in Table 5.4    Single Family TDRs, by Type) since past due amounts are added to the principal balance at the time  of restructuring.

The measurement of impairment for TDRs is based on the excess of  our recorded investment in the loans over the present value of the loans' expected future cash flows  Generally, restructurings that are TDRs have a higher allowance for loan losses than restructurings that are not considered TDRs because restructurings that are TDRs involve a concession being granted to the borrower  Our process for determining the appropriate allowance for loan losses for both single family and multifamily loans considers  the impact that our loss mitigation activities, such as loan restructurings, have on probabilities of default  For single family loans evaluated individually and collectively for  impairment that have been modified, the probability of default is adversely impacted by the incidence of redefault that we have  experienced on similar loans that have completed a modification  For multifamily loans, the incidence of redefault on loans that  have been modified does not directly impact the allowance for  loan losses as our multifamily loans are generally evaluated  individually for impairment which is based on the fair value  of the underlying collateral and contemplates the unique facts  and circumstances of the loan  The process for determining  the appropriate allowance for loan losses for multifamily loans evaluated collectively for impairment considers the incidence of  redefault on loans that have completed a modification

The table below presents the performance of our TDR  modifications based on the original category of the loan before  restructuring  Modified loans within the Alt A category continue to remain in that category, even though the  borrower may have provided full documentation of assets and income before completing the modification  Modified loans within  the option ARM category continue to remain in that category even though the modified loan no longer provides for optional payment  provisions  Substantially all of our completed single family  loan modifications classified as a TDR during 2011 resulted in a  modified loan with a fixed interest rate or one that is fixed  below market for five years and then gradually adjusts to a market rate (determined at the time  of modification) and remains  fixed at that new rate for the

243                                                                                          *Freddie Mac*

TREASURY-3015

Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

remaining term  The table below reflects only performance of  completed modifications and excludes loans subject to other loss  mitigation activity that were classified as TDRs.

**Table 5.6     Payment Defaults of Completed TDR Modifications, by  Segment(1)**

| | Year Ended December 31, 2011 | |
| | # o  Loans | Post TDR Recorded Investment(2) |
| | | (in millions, except number of loans modified) |
| --- | --- | --- |
| *Single-family* | | |
| 20 a d 30-yea  o  mo e, amo   z ng f xed- a e | 23,592 | $ 4,417 |
| 15-yea  amo   z ng f xed- a e | 890 | 91 |
| Adj  s ab e- a e | 519 | 111 |
| A t-A,  n e es -on y, and op  on ARM | 5,794 | 1,529 |
| o a s ng e- am y | 30,795 | $ 6,148 |
| *Multifamily* | 7 | $ 18 |

(1) Rep ese  s TDR  oa s  a xpe e ced a pay  e  defa   d   g  he pe  od and had comple ed a mod f ca on even  n he  welve  mon hs p o o  he paymen  defa   A pay  e  defa   occ  s when a bo  owe  e he  (a) became  wo o  mo e mon hs de  q e  o ( ) co  p e ed a oss eve , s c as a so  sa e o  fo ec osu e  We on y  nc ude paymen  defau  s fo  a s ng e  oan once du  ng each qua  e y pe  od  howeve , a s ng e  loan w ll be  eflec ed mo e  han once  f he  bo  owe  expe  e ced a o e  pay  e  defa   as bseq e  q a e

(2) Rep esen s  he  eco ded nves   en a  he end of  he pe od n wh ch  he  oan was mod f ed and does no  ep esen  he  eco ded nves men as of Decembe  31, 2011

During 2011, there were 2,163 loans with other loss mitigation activities (*i.e.*, repayment plan, forbearance agreement,  or trial period modifications) initially classified as TDRs, with a post TDR recorded investment of $371 million, that  returned to a current payment status, and then subsequently became two months delinquent. In addition, during 2011, there  were 3,109 loans with other loss mitigation activities initially classified as TDRs, with a post TDR recorded investment  of $520 million that subsequently experienced a loss event, such as a short sale or a foreclosure transfer

### NOTE 6: REAL ESTATE OWNED

We obtain REO properties: (a) when we are the highest bidder at foreclosure sales of properties that collateralize  non performing single family and multifamily mortgage loans owned by us; or (b) when a delinquent borrower chooses to  transfer the mortgaged property to us in lieu of going through the foreclosure process  Upon acquiring single family  properties, we establish a marketing plan to sell the property  as soon as practicable by either listing it with a sales broker  or by other means, such as arranging a real estate auction. Upon  acquiring multifamily properties, we may operate them using third party property management firms for a period to stabilize  value and then sell the properties through commercial real estate brokers  However, certain jurisdictions require a period  of time after foreclosure during which the borrower may reclaim the property  During the period when the borrower may reclaim  the property, or we are completing the eviction process, we are not able to market the property and this extends our holding  period for these properties  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for a discussion of our  significant accounting policies for REO

The table below provides a summary of the change in the carrying  value of our combined single family and multifamily REO  balances  For the periods presented in the table below, the weighted average holding period for our disposed properties was  less than one year

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3016

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 6.1     REO**

| | Year Ended December 31, | | |
| | 2011 | 2010 | 2009 |
| | | (in millions) | |
|---|---|---|---|
| Beg nn ng ba ance     REO, g oss | $ 7,908 | $  5,125 | $ 4,216 |
| Ad us   en s o beg nn ng balance(1 | | 158 | |
| Add  ons | 9,591 | 13,211 | 9,420 |
| D spos  ons | (11,255) | (10,586) | (8,511) |
| End ng ba ance    REO, g oss | 6,244 | 7,908 | 5,125 |
| Beg nn ng balance, valua on allowance | (840) | (433) | (961) |
| Ad us men  o beg nn ng balance(1 | | (11) | |
| Change n valua on allowance | 276 | (396) | 528 |
| End ng balance, valua on allowance | (564) | (840) | (433) |
| E d  g ba a ce    REO,  e | $ 5,680 | $  7,068 | $ 4,692 |

(1) Ad us men  o  he beg nn ng ba ance  e a ed  o  he adop on of new accoun  ng gu dance fo   ansfe s of f nanc a  asse s and  conso da on of VIEs  See "NOTE 1  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" fo  fu  he  nfo ma on

The REO balance, net at December 31, 2011 and December 3 , 20 0 associated with single family properties  was $5.5 billion and $7.0 billion, respectively, and the balance associated with multifamily properties  was $133 million and $107 million, respectively. The West region represented approximately 30% and 29% of our  single family REO additions during the years ended  December 31, 2011 and 2010, respectively, based on the number of properties, and the North Central region represented  approximately 27% and 23% of our single family REO additions during these periods  Our single family REO inventory consisted  of 60,535 properties and 72,079 properties at December 31,  2011 and December 31, 2010, respectively  The pace of our REO acquisitions slowed beginning in the fourth quarter of 2010  due to delays in the foreclosure process  These delays in foreclosures continued in 2011, particularly in states that  require a judicial foreclosure process  See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS      Seller/Servicers" for information about regional  concentration of our portfolio as well as further details about delays in the single  family foreclosure process

Our REO operations expenses includes REO property expenses, net  losses incurred on disposition of REO properties, adjustments to  the holding period allowance associated with REO properties to  record them at the lower of their carrying amount or fair value  less the estimated costs to sell, and recoveries from insurance and other  credit enhancements  An allowance for estimated  declines in the REO fair value during the period properties are held reduces  the carrying value of REO property  Excluding holding period valuation adjustments, we recognized losses of $165 million and $93 million on REO dispositions  during 2011 and 2010, respectively. We increased our valuation allowance for properties in our REO inventory by $304 million and $498 million in 2011 and 2010,  respectively

REO property acquisitions that result from extinguishment of our  mortgage loans held on our consolidated balance sheets are  treated as non cash transfers. The amount of non cash acquisitions of REO properties during the years ended  December 31, 2011, 2010, and 2009 was $8.7 billion, $12.3 billion, and $0.9 billion, respectively.

### NOTE 7: INVESTMENTS IN SECURITIES

The table below summarizes amortized cost, estimated fair  values, and corresponding gross unrealized gains and gross  unrealized losses by available for sale securities by major security type. At December 31, 2011 and 2010, all available for sale securities are mo tgage related securities

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3017

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Table 7.1    Available For Sale Securities

| December 31, 2011 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| | | | (in millions) | |
| Ava lable-fo -sale secu   es | | | | |
| F edd e Mac | $ 74,711 | $ 6,429 | $    (48) | $ 81,092 |
| Subp  me | 41,347 | 60 | (13,408) | 27,999 |
| CMBS | 53,637 | 2,574 | (548) | 55,663 |
| Op  on ARM | 9,019 | 15 | (3,169) | 5,865 |
| Al -A a  d o he | 13,659 | 32 | (2,812) | 10,879 |
| Fann e Mae | 19,023 | 1,303 | (4) | 20,322 |
| Obl ga  ons of s a es and pol  cal subd v s ons | 7,782 | 108 | (66) | 7,824 |
| Ma  fac   ed  o s  g | 820 | 6 | (60) | 766 |
| G nn e Mae | 219 | 30 | | 249 |
| To al ava lable-fo -sale secu   es | $ 220,217 | $10,557 | $ (20,115) | $ 210,659 |
| | | | | |
| December 31, 2010 | | | | |
| Ava lable-fo -sale secu   es | | | | |
| F edd e Mac | $ 80,742 | $ 5,142 | $   (195) | $ 85,689 |
| Subp  me | 47,916 | 1 | (14,056) | 33,861 |
| CMBS | 58,455 | 1,551 | (1,919) | 58,087 |
| Op  on ARM | 10,726 | 16 | (3,853) | 6,889 |
| Al -A a  d o he | 15,561 | 58 | (2,451) | 13,168 |
| Fann e Mae | 23,025 | 1,348 | (3) | 24,370 |
| Obl ga  ons of s a es and pol  cal subd v s ons | 9,885 | 31 | (539) | 9,377 |
| Ma  fac   ed  o s  g | 945 | 13 | (61) | 897 |
| G nn e Mae | 268 | 28 | | 296 |
| To al ava lable-fo -sale secu   es | $247,523 | $ 8,188 | $(23,077) | $232,634 |

**Available-For-Sale Securities in a Gross Unrealized Loss Position**

The table below shows the fair value of available for sale  securities in a gross unrealized loss position, and whether they  have been in that position less than 12 months, or   2 months or greater, including the non credit related portion of other than temporary impairments which have been recognized in AOCI

*Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 7.2    Available For Sale Securities in a Gross Unrealized Loss Position**

| December 31, 2011 | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Gross Unrealized Losses | | | | Gross Unrealized Losses | | | | Gross Unrealized Losses | | |
| | Fair Value | Other Than Temporary Impairment(1) | Temporary Impairment(2) | Total | Fair Value | Other Than Temporary Impairment(1) | Temporary Impairment(2) | Total | Fair Value | Other Than Temporary Impairment(1) | Temporary Impairment(2) | Total |
| | | | | | (in millions) | | | | | | | |
| Available for sale securities | | | | | | | | | | | | |
| Freddie Mac | $ 2,96 | $ — | $ — | $ (4 | $ 1,88 | $ — | $ (44 | $ (44 | $ 4,080 | $ — | $ (48 | $ (48 |
| Subprime | 8 | — | ( | ( | 27 7 2 | — | (2,622 | ( 3,407 | 27 7 0 | ( 0,786 | (2,622 | (13,408 |
| CMBS | 997 | (20 | (4 | (6 | 3 7 3 | (9 | (478 | (487 | 4 70 | ( 9 | ( 8 | (8 |
| Opt on ARM | 9 | (13 | — | (13 | 7 3 | (3,067 | (89 | ( 3 1 6 | 838 | (3,080 | (89 | (3 69 |
| Alt A and other | 97 | ( 4 | — | ( 8 | 9,070 | (2,088 | (606 | (2,694 | 0,267 | (2,202 | (6 0 | (2,812 |
| Fannie Mae | 44 | — | (2 | (2 | 4 | — | (2 | (2 | 1 1 8 | — | (4 | (4 |
| Obligations of states and political subdivisions | 292 | — | (6 | (6 | 2 1 7 | — | (60 | (60 | 2,449 | — | (66 | (66 |
| Manufactured housing | 97 | ( | — | ( | 3 | — | (44 | (44 | — | — | 2 | (49 |
| Total available for sale securities in a gross unrealized loss position | $ 6,26 | $ (1,3 | $ — | $ (7 | $ (2,0 | $ 0,28 | $ (1,993 | $ (3,912 | $ 9,90 | $ 6,6 | $ ( 6,46 | $ (3,969 | $ (20,11 |

| December 31, 2010 | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Gross Unrealized Losses | | | | Gross Unrealized Losses | | | | Gross Unrealized Losses | | |
| | Fair Value | Other Than Temporary Impairment(1) | Temporary Impairment(2) | Total | Fair Value | Other Than Temporary Impairment(1) | Temporary Impairment(2) | Total | Fair Value | Other Than Temporary Impairment(1) | Temporary Impairment(2) | Total |
| | | | | | (in millions) | | | | | | | |
| Available for sale securities | | | | | | | | | | | | |
| Freddie Mac | $ 2,494 | $ — | $ — | $ (70 | $ (70 | $ 1,880 | $ — | $ (12 | $ (12 | $ 4,374 | $ — | $ ( 9 | $ ( 9 |
| Subprime | 6 | — | — | ( | ( | 33,839 | ( 0,04 | (4 0 | (4 0 | 33 8 | ( 0,04 | (4 0 | ( 4 0 6 |
| CMBS | 2 9 0 | — | ( 1 | ( 1 | 8 89 | (844 | ( 024 | (1,868 | 844 | (844 | ( 07 | ( 9 9 |
| Opt on ARM | 3 | ( | — | ( | 6,838 | (3,744 | ( 08 | (3 8 2 | 6 84 | (3 7 | ( 08 | (3 8 3 |
| Alt A and other | 2 | — | (3 | (3 | 12,02 | ( 846 | (602 | (3 8 | 2,067 | ( 846 | (60 | (2 1 |
| Fannie Mae | | — | — | — | 4 | — | (3 | (3 | 68 | — | (3 | (3 |
| Obligations of states and political subdivisions | 3 9 3 | — | ( 63 | ( 63 | 3 02 | — | (3 | (3 | 7 3 | — | ( 39 | ( 39 |
| Manufactured housing | 8 | — | — | — | 07 | (4 | (1 | (60 | | — | (46 | (1 | (6 |
| Total available for sale securities in a gross unrealized loss position | $ 9 0 | $ — | $ (2 | $ (287 | $ (289 | $ 67,399 | $ — | $ (6 | $ (22,788 | $ 76,909 | $ (16,22 | $ (6 | $ (23,077 |

(1) Represents the gross unrealized losses for securities for which we have previously recognized other-than-temporary impairments in earnings.
(2) Represents the gross unrealized losses for securities for which we have previously recognized other-than-temporary impairments in earnings.

At December 31, 2011, total gross unrealized losses on available for sale securities were $20.1 billion. The gross unrealized losses relate to 1,625 individual lots representing 1,556 separate securities, including securities with non credit related other than temporary impairments recognized in AOCI. We purchase multiple lots of individual securities at different times and at different costs. We determine gross unrealized gains and gross unrealized losses by specifically evaluating investment positions at the lot level; therefore, some of the lots we hold for a single security may be in an unrealized gain position while other lots for that security may be in an unrealized loss position, depending upon the amortized cost of the specific lot.

**Impairment Recognition on Investments in Securities**

We recognize impairment losses on available for sale securities within our consolidated statements of income and comprehensive income as net impairment of available for sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other than temporary.

We conduct quarterly reviews to evaluate each available for sale security that has an unrealized loss for other than temporary impairment. An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis. We recognize other than temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security. If we do not intend to sell the security and we believe it is not more likely than not that we will be required to sell prior to recovery of its unrealized loss, we recognize only the credit component of other than temporary impairment in earnings and the amounts attributable to all other factors are recognized in AOCI. The credit component represents the amount by which the present value of expected future cash flows to be collected from the security is less than the amortized cost basis of the security. The present value of expected future cash flows represents our estimate of future contractual cash flows that we expect to collect, discounted at the effective interest rate implicit in the security at the date of acquisition or the effective interest rate determined based on significantly improved cash flows subsequent to initial impairment.

Our net impairment of available for sale securities recognized in earnings on our consolidated statements of income and comprehensive income for the years ended December 31, 2011, 2010, and 2009, includes amounts related to certain securities where we have previously recognized other than temporary impairments through AOCI, but upon the

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                TREASURY-3019                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

recognition of additional credit losses, these amounts were reclassified out of non credit losses in AOCI and charged to earnings In certain instances, we recognized credit losses in excess of unrealized losses in AOCI

The determination of whether unrealized losses on available for sale securities are other than temporary requires significant management judgments and assumptions and consideration of numerous factors We perform an evaluation on a security by security basis considering all available information The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment Important factors include, but are not limited to:

- whether we intend to sell the security and it is not more likely than not that we will be required to sell the security before sufficient time elapses to recover all unrealized losses;

- loan level default modeling for single family residential mortgages that considers individual loan characteristics, including current LTV ratio, FICO score, and delinquency status, requires assumptions about future home prices and interest rates, and employs internal default models and prepayment assumptions. The modeling for CMBS employs third party models that require assumptions about the economic conditions in the areas surrounding each individual property; and

- security loss modeling combining the modeled performance of the underlying collateral relative to its current and projected credit enhancements to determine the expected cash flows for each evaluated security

For the majority of our available for sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other than temporary and is recorded within our consolidated statements of income and comprehensive income as net impairment of available for sale securities recognized in earnings

See "Table 7 2    Available For Sale Securities in a Gross Unrealized Loss Position" for the length of time our available for sale securities have been in an unrealized loss position Also see "Table 7 3    Significant Modeled Attributes for Certain Available For Sale Non Agency Mortgage-Re ated Securities" for the modeled default rates and severities that were used to determine whether our senior interests in certain non agency mortgage related securities would experience a cash shortfall.

### Freddie Mac and Fannie Mae Securities

We record the purchase of mortgage related securities issued by Fannie Mae as investments in securities in accordance with the accounting guidance for investments in debt and equity securities In contrast, our purchase of mortgage related securities that we issued (e.g., PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions) is recorded as either investments in securities or extinguishment of debt securities of consolidated trusts depending on the nature of the mortgage related security that we purchase See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Securitization Activities through Issuances of Freddie Mac Mortgage Related Securities" for additional information

We hold these investments in securities that are in an unrealized loss position at least to recovery and typically to maturity. As the principal and interest on these securities are guaranteed and we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses, we consider these unrealized losses to be temporary

### Non Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans

We believe the unrealized losses on the non agency mortgage related securities we hold are a result of poor underlying collateral performance, limited liquidity, and large risk premiums. We consider securities to be other than temporarily impaired when future credit losses are deemed likely.

Our review of the securities backed by subprime, option ARM, and Alt A and other loans includes loan level default modeling and analyses of the individual securities based on underlying collateral performance, including the collectability of amounts from bond insurers. In the case of bond insurers, we also consider factors such as the availability of capital, generation of new business, pending regulatory action, credit ratings, security prices, and credit default swap levels traded on the insurers We consider loan level information including estimated current LTV ratios, FICO scores, and other loan level characteristics We also consider the differences between the loan level characteristics of the performing and non performing loan populations For additional information regarding bond insurers, see "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS    Bond Insurers."

TREASURY-3020

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents the modeled default rates and  severities, without regard to subordination, that are used to  determine whether our senior  interests in certain available for sale non agency mortgage related securities will  experience a cash shortfall  Our proprietary default model incorporates assumptions about future home prices, as defaults  and severities are modeled at the loan level and then  aggregated  The model uses projections of future home prices at the state level  Assumptions about voluntary prepayment rates  are also an input to the model and are discussed below

**Table 7.3    Significant Modeled Attributes for Certain Available For Sale Non Agency Mortgage Related Securities**

| | | | December 31, 2011 | | |
| | | | | Alt-A(1) | |
| Issuance Date | Subprime First Lien(2) | Option ARM | Fixed Rate | Variable Rate | Hybrid Rate |
| | | | (dollars in millions) | | |
| **2004 and p  o** | | | | | |
| UPB | $    1,218 | $    117 | $   867 | $   512 | $2,195 |
| We gh ed ave age colla e al defa    s(3 | 36% | 33% | 8% | 43% | 24% |
| We gh ed ave age colla e al seve   es( | 56% | 55% | 47% | 52% | 41% |
| We gh ed ave age volun a y p epaymen   a es( | 6% | 7% | 19% | 7% | 8% |
| Ave age c ed  enhancemen (6 | 43% | 15% | 14% | 18% | 15% |
| **2005** | | | | | |
| UPB | $    6,293 | $ 2,882 | $ 1,206 | $   840 | $3,944 |
| We gh ed ave age colla e al defa    s(3 | 55% | 51% | 24% | 53% | 38% |
| We gh ed ave age colla e al seve   es( | 67% | 63% | 55% | 59% | 50% |
| We gh ed ave age volun a y p epaymen   a es( | 4% | 6% | 14% | 7% | 8% |
| Ave age c ed  enhancemen (6 | 52% | 12% | 3% | 26% | 5% |
| **2006** | | | | | |
| UPB | $  19,823 | $ 6,661 | $   549 | $ 1,127 | $1,183 |
| We gh ed ave age colla e al defa    s(3 | 65% | 63% | 37% | 61% | 50% |
| We gh ed ave age colla e al seve   es( | 72% | 69% | 61% | 68% | 57% |
| We gh ed ave age volun a y p epaymen   a es( | 7% | 6% | 13% | 9% | 8% |
| Ave age c ed  enhancemen (6 | 15% | 3% | 7% | (1)% | 1% |
| **2007** | | | | | |
| UPB | $  21,310 | $ 4,289 | $   159 | $ 1,354 | $   324 |
| We gh ed ave age colla e al defa    s(3 | 62% | 58% | 53% | 60% | 60% |
| We gh ed ave age colla e al seve   es( | 73% | 69% | 69% | 67% | 67% |
| We gh ed ave age volun a y p epaymen   a es( | 7% | 7% | 11% | 9% | 8% |
| Ave age c ed  enhancemen (6 | 17% | 11% | 11% | (7)% | % |
| **To a** | | | | | |
| UPB | $  48,644 | $13,949 | $2,781 | $3,833 | $7,646 |
| We gh ed ave age colla e al defa    s(3 | 61% | 59% | 24% | 56% | 37% |
| We gh ed ave age colla e al seve   es( | 72% | 68% | 58% | 64% | 51% |
| We gh ed ave age volun a y p epaymen   a es( | 6% | 6% | 15% | 8% | 8% |
| Ave age c ed  enhancemen (6 | 21% | 7% | 8% | 5% | 7% |

(1) Excludes non-agency mo  gage- ela ed secu    es backed by o  he  loans, wh ch a e p ma  ly comp sed of secu   es backed by  home equ  y l nes of c ed

(2) Excludes non-agency mo  gage- ela ed secu    es backed excu  ve y by subp    e second  ens  Ce a n secu    es  den  f ed as subp  me f  s  en may be backed  n

pa t y subp    e second   en  oans, as  he unde  y ng  oans of  hese  secu    es we e  o  nclude a small pe cen age of subp  me second l en  loans

(3) T e expec ed cu  u a ve defau   a e  exp essed as a pe cen age of  he cu  en  co  a e a  UPB

(4) The expec ed ave age  oss g ven defau   ca cu a ed as  he  a o of cumu a  ve  oss ove  cumu a  ve defau   fo  each secu  y

(5) T e secu    y's vo    a y p epay e    a e  ep ese   s  e  ave age of  he mon h y vo un a y p epaymen    a es  we gh ed by  he  secu  y's  o  a   d ng UPB

(6) Ref ec s  he a  o of  he cu  en  p nc pa a  oun of  he sec    es  ss ed y a   s  a w  a so    osses    e  us befo e any  osses a e a  oca ed  o secu    es

t  at we ow   Pe cen age gene a  y ca cu a ed based on  (a)  he  o a  UPB of sec    ess bo d  a e o  e sec    es we ow  , d v ded by  (b)  he  o a  UPB of a  of  he

sec   es  ss ed y t  e   us  (exc ud ng no  na  ba ances)  On y  nc udes c ed  enhance  en  p ov ded by  subo d na ed secu    es  exc udes c ed  enhancemen

p ov ded by bond  nsu ance, ove  colla e al za  on and o  he  fo  ms of c ed  enhancemen   Nega  ve va ues a e shown when co a e a   osses ha ve ye   o be app  ed

to t  e   anches exceed  he  ema n ng c ed  enhancemen , f any

In evaluating the non agency mortgage related securities backed  by subprime, option ARM, and Alt A and other loans for other than temporary impairment, we noted that  the percentage of securities that were AAA rated and the  percentage that were investment grade declined significantly since acquisition  While these ratings have declined, the  ratings themselves are not determinative that a loss is more or  less likely. While we consider credit ratings in our analysis, we believe that our detailed security by security analyses provide a more consistent view of the ultimate collectability of contractual amounts due to us. As such, we have impaired securities with current ratings ranging from CCC  to AAA and have determined that other securities within the same  ratings were not other than temporarily impaired  However, we  carefully consider individual ratings, especially those below  investment grade, including changes since December 31, 2011

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-3021

Table of Contents

Our analysis is subject to change as new information regarding delinquencies, severities, loss timing, prepayments, and other factors becomes available  While it is reasonably possible that, under certain conditions, collateral losses on our remaining available for sale securities for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of December 31, 2011

### Commercial Mortgage-Backed Securities

CMBS are exposed to stresses in the commercial real estate market  We use external models to identify securities that may have an increased risk of failing to make their contractual payments. We then perform an analysis of the underlying collateral on a security by security basis to determine whether we will receive all of the contractual payments due to us  During the year ended December 3 , 20  , we recognized the unrealized fair value losses related to certain investments in CMBS of $181 million as an impairment charge in earnings because we have the intent to sell these securities  While it is reasonably possible that, under certain conditions, collateral losses on our CMBS for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of December 31, 2011  We do not intend to sell the remaining CMBS and it is not more likely than not that we will be required to sell such securities before recovery of the unrealized losses

### Obligations of States and Political Subdivisions

These investments consist of housing revenue bonds  We believe the unrealized losses on obligations of states and political subdivisions are primarily a result of movements in interest rates and liquidity and risk premiums. We have determined that the impairment of these securities is temporary based on our conclusion that we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses  We believe that any credit risk related to these securities is minimal because of the issuer guarantees provided on these securities

### Bond Insurance

We rely on bond insurance, including secondary coverage, to provide credit protection on some of our non agency mortgage-re ated securities. Circumstances in which it is likely a principal and interest shortfall will occur and there is substantial uncertainty surrounding a bond insurer's ability to pay all future claims can give rise to recognition of other than temporary impairment recognized in earnings  See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS    Bond Insurers" for additional information.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

TREASURY-3022

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Other Than Temporary Impairments on Available for Sale Securities

The table below summarizes our net impairments of available for sale securities recognized in earnings by security type

**Table 7.4    Net Impairment of Available For Sale Securities Recognized in Earnings**[1]

| | Net Impairment of Available-For-Sale Securities Recognized in Earnings For The Year Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| | (in millions) | | |
| Available-for-sale securities | | | |
| Subprime | $ (1,315) | $ (1,769) | $ (6,526) |
| Option ARM | (424) | (1,395) | (1,726) |
| Alt-A and other | (198) | (1,020) | (2,572) |
| CMBS[2] | (353) | (97) | (137) |
| Manufactured housing | (11) | (27) | (51) |
| Total other-than-temporary impairments on mortgage-related securities | (2,301) | (4,308) | (11,012) |
| Non-mortgage-related securities | | | |
| Asset-backed securities | | | (185) |
| Total other-than-temporary impairments on non-mortgage-related securities | | | (185) |
| Total other-than-temporary impairments on available-for-sale securities | $ (2,301) | $ (4,308) | $ (11,197) |

(1) As a result of the adoption of an amendment to the accounting guidance for investments in debt and equity securities on April 1, 2009, net impairment of available-for-sale securities recognized in earnings for the nine months ended December 31, 2009 (which is included in the year ended December 31, 2009) and the years ended December 31, 2011 and 2010 includes credit other-than-temporary impairment. Net impairment of securities, which we incurred prior to our decision to sell or is more likely than not we will be required to sell, is comprised, as net impairment of available-for-sale securities recognized in earnings for the three months ended March 31, 2009 (which is included in the year ended December 31, 2009) includes both credit-related and non-credit-related other-than-temporary impairments as well as other-than-temporary impairments on securities for which we could no assert the positive intent and ability to hold until recovery of the unrealized losses

(2) Includes $181 million of other-than-temporary impairments recognized in earnings for the year ended December 31, 2011, as we have either elected to sell or are at a credit loss on securities before recovery of its amortized cost basis

The table below presents the changes in the unrealized credit related other than temporary impairment component of the amortized cost related to available for sale securities: (a) that we have written down for other than temporary impairment; and (b) for which the credit component of the loss is recognized in earnings  The credit related other than temporary impairment component of the amortized cost represents the difference between the present value of expected future cash flows, including the estimated proceeds from bond insurance, and the amortized cost basis of the security prior to considering credit losses  The beginning balance represents the other than temporary impairment credit loss component related to available for sale securities for which other than temporary impairment occurred prior to January 1, 2011, but will not be realized until the securities are sold, written off, or mature  Net impairment of available for sale securities recognized in earnings is presented as additions in two components based upon whether the current period is: (a) the first time the debt security was credit impaired; or (b) not the first time the debt security was credit impaired  The credit loss component is reduced if we sell, intend to sell or believe we will be required to sell previously credit impaired available for sale securities   Additionally, the credit loss component is reduced by the amortization resulting from significant increases in cash flows expected to be collected that are recognized over the remaining life of the security

251                                                                                           *Freddie Mac*

TREASURY-3023

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 7.5    Other Than Temporary Impairments Related to Credit Losses on Available-For-Sale Securities[1]**

| | Year Ended December 31, 2011 (in millions) |
|---|---:|
| Credit-related other-than-temporary impairments on available-for-sale securities recognized in earnings | |
| Beginning balance — remaining credit losses to be realized on available-for-sale securities held at the beginning of the period where other-than-temporary impairment was recognized in earnings | $ 15,049 |
| Additions | |
| Amounts related to credit losses for which an other-than-temporary impairment was not previously recognized | 80 |
| Amounts related to credit losses for which an other-than-temporary impairment was previously recognized | 2,070 |
| Reductions | |
| Amounts for securities which were sold, written off or matured | (957) |
| Amounts previously recognized in other comprehensive income have recognized in earnings because we intend to sell the security or it's more likely than not we will be required to sell the security before recovery of its amortized cost basis | (161) |
| Amounts related to amortization resulting from significant increases in cash flows expected to be collected that are recognized over the remaining life of the security | (93) |
| Ending balance — remaining credit losses to be realized on available-for-sale securities held as per end where other-than-temporary impairments were recognized in earnings | $ 15,988 |

(1) Excludes other-than-temporary impairments on securities we have intend to sell or it's more likely than not we will be required to sell before recovery of the unrealized losses

### Realized Gains and Losses on Sales of Available For Sale Securities

The table below illustrates the gross realized gains and gross realized losses received from the sale of available for sale securities

**Table 7.6    Gross Realized Gains and Gross Realized Losses on Sales of Available For Sale Securities**

| | Year Ended December 31, | | |
|---|---:|---:|---:|
| | **2011** | **2010** | **2009** |
| | (in millions) | | |
| **Gross realized gains** | | | |
| Mortgage-related securities | | | |
|   Freddie Mac | $ 77 | $27 | $ 879 |
|   Fannie Mae | 14 | 54 | 2 |
|   CMBS | 37 | | |
|   Obligations of states and political subdivisions | 11 | 3 | 2 |
|   Total mortgage-related securities gross realized gains | 139 | 84 | 883 |
| Non-mortgage-related securities | | | |
|   Asset-backed securities | | 10 | 313 |
|   Total non-mortgage-related securities gross realized gains | | 10 | 313 |
| Gross realized gains | 139 | 94 | 1,196 |
| **Gross realized losses** | | | |
| Mortgage-related securities [1] | | | |
|   Freddie Mac | | (1) | (113) |
|   CMBS | (81) | | |
|   Option ARM | | (6) | |
|   Total mortgage-related securities gross realized losses | (81) | (7) | (113) |
| Gross realized losses | (81) | (7) | (113) |
| Net realized gains (losses) | $ 58 | $87 | $1,083 |

(1) These individual sales do not change our conclusion that we do not intend to sell the majority of our remaining mortgage-related securities and is more likely than not we will be required to sell such securities before a recovery of the unrealized losses

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                TREASURY-3024                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Maturities and Weighted Average Yield of Available For Sale Securities**

The table below summarizes the remaining contractual maturities of available for sale securities and weighted average yield of available for sale securities

**Table 7.7    Maturities and Weighted Average Yield of Available For Sale Securities[1]**

| December 31, 2011 | Amortized Cost | Fair Value | Weighted Average Yield[2] |
|---|---|---|---|
| | (dollars in millions) | | |
| Available-for-sale securities | | | |
| Due within 1 year or less | $ 40 | $ 40 | 4.84% |
| Due after 1 year through 5 years | 1,208 | 1,259 | 5.34 |
| Due after 5 years through 10 years | 5,269 | 5,540 | 5.07 |
| Due after 10 years | 213,700 | 203,820 | 3.59 |
| Total available-for-sale securities | $ 220,217 | $ 210,659 | 3.63 |

(1) Maturity information provided is based on contractual maturities, which may not be representative of the expected lives of obligations underlying these securities as they may be prepaid at any time without penalty.

(2) The weighted average yield is calculated based on a yield for each individual held at December 31, 2011 excluding any fully taxable-equivalent adjustments, weighted on a tax-exempt sources of interest income. The numerator for the individual yield consists of the sum of (a) the year-end interest coupon accrued emula computed by the year-end UPB; and (b) the annualized amortization income or expense calculated for December 2011 (excluding the accretion of non-credit-related other-than-temporary impairments and any adjustments recorded for changes in the effective yield. The denominator for the individual loan yield consists of the year-end amortized cost of the loan excluding effects of other-than-temporary impairments on the UPB of impaired loans.

**AOCI Related to Available For Sale Securities**

The table below presents the changes in AOCI related to available for sale securities. The net unrealized holding gains represent the net fair value adjustments recorded on available for sale securities throughout the periods presented, after the effects of our federal statutory tax rate of 35%. The net reclassification adjustment for net realized losses represents the amount of those fair value adjustments, after the effects of our federal statutory tax rate of 35%, that have been recognized in earnings due to a sale of an available for sale security or the recognition of an impairment loss.

**Table 7.8    AOCI Related to Available For Sale Securities**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | (in millions) | | |
| Beginning balance | $(9,678) | $(20,616) | $(28,510) |
| Adjustments to initially apply the adoption of amendments to accounting guidance for transfers of financial assets and the consolidation of VIEs[1] | | (2,683) | |
| Adjustments to initially apply the adoption of an amendment to the accounting guidance for investments in debt and equity securities[2] | | | (9,931) |
| Net unrealized holding gains[3] | 2,007 | 10,876 | 11,250 |
| Net reclassification adjustment for net realized losses[4] | 1,458 | 2,745 | 6,575 |
| Ending balance | $ (6,213) | $ (9,678) | $ (20,616) |

(1) Net of tax benefit of $1.4 billion for the year ended December 31, 2010

(2) Net of tax benefit of $5.3 billion for the year ended December 31, 2009

(3) Net of tax expense of $1.1 billion, $5.9 billion and $6.1 billion for the years ended December 31, 2011, 2010 and 2009, respectively

(4) Net of tax benefit of $785 million, $1.5 billion, and $3.5 billion for the years ended December 31, 2011, 2010, and 2009, respectively

(5) Includes the reversal of previously recorded unrealized losses that have been recognized on our consolidated statements of income and comprehensive income as impairment losses on available-for-sale securities of $1.5 billion, $2.8 billion, and $7.3 billion, net of taxes, for the years ended December 31, 2011, 2010, and 2009, respectively

*Freddie Mac*

Source    FREDDIE MAC HOME LOAN MORTGAGE CORP, 10 K, March 09, 2012

TREASURY-3025

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Trading Securities**

The table below summarizes the estimated fair values by major security type for trading securities

**Table 7.9    Trading Securities**

| | December 31, | |
| | 2011 | 2010 |
| | (in millions) | |
| Mo gage- ela ed secu es | | |
| F edd e Mac | $ 16,047 | $ 13,437 |
| Fann e Mae | 15,165 | 18,726 |
| G nn e Mae | 156 | 172 |
| O he | 164 | 31 |
| To al mo gage- ela ed secu es | 31,532 | 32,366 |
| Non-mo gage- ela ed secu es | | |
| Asse -backed secu es | 302 | 44 |
| T easu y b s | 100 | 17,289 |
| T eas y o es | 24,712 | 10,122 |
| FDIC-gua an eed co po a e med um- e m no es | 2,184 | 441 |
| To al non-mo gage- ela ed secu es | 27,298 | 27,896 |
| To al fa value of ad ng secu es | $58,830 | $ 60,262 |

Trading securities mainly include Treasury securities, agency fixed rate and variable rate pass through mortgage related securities, and agency REMICs, including inverse floating rate, interest only and principal only securities  With the exception of principal only securities, our agency securities, classified as trading, were at a net premium (*i.e.*, have higher net fair value than UPB) as of December 31, 2011.

For the years ended December 31, 2011, 2010, and 2009, we recorded net unrealized gains (losses) on trading securities held at those dates of $(1.0) billion, $(1.4) billion, and $4.3 billion, respectively.

Total trading securities include $1.9 billion and $2.5 billion, respectively, of hybrid financial assets as defined by the derivative and hedging accounting guidance regarding certain hybrid financial instruments as of December 31, 2011 and 2010. Gains (losses) on trading securities on our consolidated statements of income and comprehensive income include $(109) million and $(53) million, respectively, related to these hybrid financial securities for the years ended December 31, 2011 and 2010.

**Collateral Pledged**

*Collateral Pledged to Freddie Mac*

Our counterparties are required to pledge collateral for securities purchased under agreements to resell transactions, and most derivative instruments are subject to collateral posting thresholds generally related to a counterparty's credit rating  We consider the types of securities being pledged to us as collateral when determining how much we lend related to securities purchased under agreements to resell transactions  Additionally, we subsequently and regularly review the market values of these securities compared to amounts loaned in an effort to minimize our exposure to losses. We had cash and cash equivalents pledged to us related to derivative instruments of $3.2 billion and $2.2 billion at December 3 , 2011 and 2010, respectively  Although it is our practice not to repledge assets held as collateral, a portion of the collateral may be repledged based on master agreements related to our derivative instruments  At December 31, 2011 and 2010, we did not have collateral in the form of securities pledged to and held by us under these master agreements  Also at December 31, 2011 and 2010, we did not have securities pledged to us for securities purchased under agreements to resell transactions that we had the right to repledge  From time to time we may obtain pledges of collateral from certain seller/servicers as additional security for their obligations to us, including their obligations to repurchase mortgages sold to us in breach of representations and warranties. This collateral may take the form of cash, cash equivalents, or agency securities

In addition, we hold cash and cash equivalents as collateral in connection with certain of our multifamily guarantees and mortgage loans as credit enhancements. The cash and cash equivalents held as collateral related to these transactions at December 31, 2011 and 2010 was $246 million and $550 million, respectively.

*Collateral Pledged by Freddie Mac*

We are required to pledge collateral for margin requirements with third party custodians in connection with secured financings and derivative transactions with some counterparties  The level of collateral pledged related to our derivative instruments is determined after giving consideration to our credit rating. As a result of S&P's downgrade of our senior long term debt credit rating from AAA to AA  on August 8, 20  , we posted additional collateral to certain derivative

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3026

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

counterparties in accordance with the terms of the collateral agreements with such counterparties  As of December 3 , 2011, we had one secured, uncommitted intraday line of credit with a third party in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs, in connection with our use of the Fedwire system  In certain circumstances, the line of credit agreement gives the secured party the right to repledge the  securities underlying our financing to other third parties,  including the Federal Reserve Bank  We pledge collateral to meet our collateral requirements under the line of credit agreement  upon demand by the counterparty.

The table below summarizes all securities pledged as collateral  by us, including assets that the secured party may repledge and  those that may not be repledged

**Table 7.10       Collateral in the Form of Securities Pledged**

| | December 31, | |
| --- | --- | --- |
| | **2011** | **2010** |
| | (in millions) | |
| Sec   es p edged w     e ab   y fo   e sec   ed pa y o  epledge | | |
| Deb sec   es of co so da ed   s s  e d by    d pa  es(1 | $ 10,293 | $ 9,915 |
| Ava lable-fo -sale secu   es | 204 | 817 |
| Sec   es p edged w   o    e ab   y fo   e sec   ed pa y o  epledge | | |
| Deb sec   es of co so da ed   s s  e d by    d pa  es(1 | 8 8 | 5 |
| To al secu   es pledged | $10,585 | $10,737 |

(1) Rep esen s PCs he d by us n ou  Inves  en s seg en   o  gage  nves men s po  fo lo and pledged as colla e al wh ch a e   eco ded as a  educ  on o  deb  secu   es of
     consol da ed   s s  e d by    d pa es o o   co so da ed ba a ces men s

*Securities Pledged with the Ability of the Secured Party to Repledge*

At December 3 , 20   , we pledged securities with the ability of the secured party to repledge of $10 5 billion,  of which $10.5 billion was collateral posted in connection with our secured uncommitted intraday line of credit with a third party as discussed above.

At December 3 , 20 0, we pledged securities  with the ability of the secured party to repledge of $10 7 billion,  of which $10.5 billion was collateral posted in connection with our secured uncommitted intraday line of credit with a  third party as discussed above.

There were no borrowings against the line of credit at  December 31, 2011 or 2010. The remaining $25 million and $0 2 billion of collateral posted with the ability of the secured party to repledge at December 3 , 20   and 2010, respectively, was posted in connection with our margin account related to futures transactions

*Securities Pledged without the Ability of the Secured Party to Repledge*

At December 31, 2011 and 2010, we pledged securities  without the ability of the secured party to repledge of  $88 million and $5 million, respectively, at a clearinghouse in connection with the trading and settlement of  securities

*Collateral in the Form of Cash Pledged*

At December 31, 2011, we pledged $12 7 billion of collateral in the form of cash and cash equivalents, all but  $133 million of which related to our derivative agreements  as we had $12.7 billion of such derivatives in a net loss  position  At December 3 , 20 0, we pledged $8.5 billion of collateral in the form of cash and cash  equivalents, all but $40 million of which related to our  derivative agreements as we had $9.3 billion of such derivatives in a net loss position  The remaining $133 million and $40 million was posted at  clearinghouses in connection with our securities and other  derivative transactions at December 31, 2011 and 2010,  respectively

### NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS

Debt securities that we issue are classified on our consolidated  balance sheets as either debt securities of consolidated trusts  held by third parties or other debt  We issue other debt to fund our operations

Under the Purchase Agreement, without the prior written consent  of Treasury, we may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding   20% of the amount of mortgage assets we are allowed to own on December 3  of the immediately preceding calendar year  Because of this debt limit, we may be restricted in the amount of debt we are  allowed to issue to fund our operations  Under the Purchase Agreement, the amount of our "indebtedness" is  determined without giving effect to the January , 20 0  change in the accounting guidance related to transfers of  financial assets and consolidation of VIEs. Therefore,  "indebtedness" does not include

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3027

Table of Contents

debt securities of consolidated trusts held by third parties. We also cannot become liable for any subordinated indebtedness without the prior consent of Treasury.

Our debt cap under the Purchase Agreement was $972.0 billion in 2011 and declined to $874.8 billion on January 1, 2012. As of December 31, 2011, we estimate that the par value of our aggregate indebtedness totaled $674.3 billion, which was approximately $297 7 billion below the applicable debt cap Our aggregate indebtedness is calculated as the par value of other debt

In the tables below, the categories of short term debt (due within one year) and long term debt (due after one year) are based on the original contractual maturity of the debt instruments classified as other debt.

The table below summarizes the interest expense and the balances of total debt, net per our consolidated balance sheets

### Table 8.1    Total Debt, Net

| | Interest Expense For The Year Ended December 31, | | | Balance, Net[1] | |
| | 2011 | 2010 | 2009 | December 31, 2011 | December 31, 2010 |
| | (in millions) | | | | |
|---|---|---|---|---|---|
| Other debt | | | | | |
| Short-term debt | $ 331 | $ 552 | $ 2,234 | $ 161,399 | $ 197,106 |
| Long-term debt | | | | | |
| Senior debt | 12,505 | 16,317 | 19,754 | 498,779 | 516,123 |
| Subordinated debt | 33 | 46 | 162 | 368 | 711 |
| Total long-term debt | 12,538 | 16,363 | 19,916 | 499,147 | 516,834 |
| Total other debt | 12,869 | 16,915 | 22,150 | 660,546 | 713,940 |
| Debt securities of consolidated trusts held by third parties | 67,119 | 75,216 | — | 1,471,437 | 1,528,648 |
| Total debt, net | $79,988 | $92,131 | $22,150 | $ 2,131,983 | $ 2,242,588 |

(1) Represents par value, net of associated debt discounts, premiums, and hedge-related basis adjustments, which, on a combined basis, were $0 2 billion and $0 9 billion, respectively, of other short-term debt, and $2 8 billion and $3 6 billion, respectively, of other long-term debt at December 31, 2011 and 2010. Had we elected the fair value option on certain debt that we have chosen to elect the fair value option on certain debt securities we would not have the fair value option on certain debt at December 31, 2011 and 2010

During 2011, 2010, and 2009, we recognized fair value gains (losses) of $91 million, $581 million, and $(405) million, respectively, on our foreign currency denominated debt, of which $40 million, $461 million, and $(209) million, respectively, are gains (losses) related to our net foreign currency translation

### Other Short Term Debt

As indicated in "Table 8.2    Other Short Term Debt", a majority of other short term debt consisted of Reference Bills® securities and discount notes, paying only principal at maturity Reference Bills® securities, discount notes, and medium term notes are unsecured general corporate obligations Certain medium term notes that have original maturities of one year or less are classified as other short term debt

The table below summarizes the balances and effective interest rates for other short term debt

### Table 8.2    Other Short Term Debt

| | December 31, 2011 | | | December 31, 2010 | | |
| | Par Value | Balance, Net[1] | Weighted Average Effective Rate[2] | Par Value | Balance, Net[1] | Weighted Average Effective Rate[2] |
| | | | (dollars in millions) | | | |
|---|---|---|---|---|---|---|
| Reference Bills® securities and discount notes | $161,193 | $ 161,149 | 0 11% | $194,875 | $ 194,742 | 0 24% |
| Medium-term notes | 250 | 250 | 0 24 | 2,364 | 2,364 | 0 31 |
| Other short-term debt | $161,443 | $ 161,399 | 0 11 | $197,239 | $ 197,106 | 0 25 |

(1) Represents par value, net of associated debt discounts and premiums
(2) Represents the weighted average effective rate, which has remained consistent above the effective rate of these securities, which includes the amortization of discounts or premiums and issuance costs

### Federal Funds Purchased and Securities Sold Under Agreements to Repurchase

Securities sold under agreements to repurchase are effectively collateralized borrowing transactions where we sell securities with an agreement to repurchase such securities These agreements require the underlying securities to be delivered to the dealers who are the counterparties to the transactions Federal funds purchased are unsecuritized borrowings from commercial banks that are members of the Federal Reserve System At both December 31, 2011 and 2010, we had no balances in federal funds purchased and securities sold under agreements to repurchase.

*Freddie Mac*

Source   DRA HOM   LOAN MORTGAGE CORP, 10 K, March 09, 2012

TREASURY-3028

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Other Long Term Debt

The table below summarizes our other long term debt

**Table 8.3    Other Long Term Debt**

| | Contractual Maturity(1) | December 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|---|
| | | Par Value | Balance, Net(2) | Weighted Average ffective Rate(3) | Par Value | Balance, Net(2) | Weighted Average ffective Rate(3) |
| | | | | (dollars in millions) | | | |
| O he  long- e m deb | | | | | | | |
| O he  sen o  de t ( | | | | | | | |
| F xed- a e | | | | | | | |
| Med um- e m no es  ca ab e( | 2012 - 2037 | $ 96,958 | $ 96,938 | 1 78% | $107,328 | $ 107,272 | 2 60% |
| Med um- e m no es   non-callable | 2012 - 2028 | 41,303 | 41,470 | 1 33 | 31,107 | 31,335 | 1 73 |
| U S do a  Refe ence No es® secu  es   non- ca ab e | 2012 - 2032 | 238,145 | 238,244 | 3 17 | 239,497 | 239,486 | 3 69 |
| €Refe ence No es® secu  es   non-callable | 2012 - 2014 | 1,722 | 1,766 | 4 76 | 2,021 | 2,131 | 4 72 |
| Va able- a e | | | | | | | |
| Med um- e m no es  ca ab e(6 | 2012 - 2028 | 21,230 | 21,229 | 2 40 | 32,404 | 32,403 | 2 81 |
| Med um- e m no es  non-callable | 2012 - 2026 | 86,010 | 86,019 | 0 26 | 91,332 | 91,346 | 0 57 |
| Ze o-coupon | | | | | | | |
| Med um- e m no es   callable | 2033 - 2041 | 12,475 | 3,281 | 5 39 | 12,191 | 2,971 | 5 69 |
| Med um- e m no es   non-callable | 2012 - 2039 | 14,475 | 9,753 | 4 67 | 14,189 | 9,035 | 5 07 |
| Hedg ng- e a ed bas c ad us men s | | N/A | 79 | | N/A | 144 | |
| To al o he  sen o  deb | | 512,318 | 498,779 | | 530,069 | 516,123 | |
| O e s bo d a ed deb | | | | | | | |
| F xed- a e | 2016 - 2018 | 221 | 218 | 6 59 | 578 | 575 | 5 74 |
| Ze o-coupon | 2019 | 332 | 150 | 10 51 | 331 | 136 | 10 51 |
| To a  o he  subo d na ed deb | | 553 | 368 | | 909 | 711 | |
| To al o he  long- e m deb | | $ 512,871 | $ 499,147 | 2 27 | $530,978 | $ 516,834 | 2 78 |

(1) Rep esen s con ac ua  ma u  es a  Decembe  31, 2011

(2) Rep esen s pa  va ue of  ong-e  deb  secu  es and subo d na ed bo  ow ngs, ne  of assoc a ed d scoun s o  p em ums  and hedge- e a ed bas s adjus   en s

(3) Rep esen s he we gh ed ave age effec ve a e ha  ema ns co s a   ove  e f e of  e se  e , w  c  des  e amo   za on of d scoun s o  p em ums, ss  a ce costs, a d hedg ng- e a ed bas s ad us men s

(4) Fo  deb  de o   a ed  a  c  e cy o  e  a  e U S do a , e o s a ng ba ance  s based on  e exc ange  a e a  Decembe  31, 2011 and 2010, espec vely

(5) Includes callable F edd eNo es® secu  es of $2 9 b   on and $5 4 b   on a  Decembe  31, 2011 and 2010, espec vely

(6) Includes callable F edd eNo es® secu  es of $1 3 b   on and $7 0 b   on a  Decembe  31, 2011 and 2010, espec vely

A portion of our other long term debt is callable  Callable debt gives us the option to redeem the debt security at par on one or more specified call dates or at any time on or after a specified call date

### Debt Securities of Consolidated Trusts Held by Third Parties

Debt securities of consolidated trusts held by third parties  represents our liability to third parties that hold beneficial interests in our consolidated securitization trusts (*i.e.*, single family PC trusts and certain Other Guarantee Transactions).

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3029

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below summarizes the debt securities of consolidated trusts held by third parties based on underlying mortgage product type.

**Table 8.4    Debt Securities of Consolidated Trusts Held by Third Parties[1]**

| | December 31, 2011 | | | | December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Contractual Maturity[2] | UPB | Balance, Net[3] | Weighted Average Coupon[2] | Contractual Maturity[2] | UPB | Balance, Net[3] | Weighted Average Coupon[2] |
| | | (dollars in millions) | | | | (dollars in millions) | | |
| Single-family | | | | | | | | |
| 30-year or more, fixed-rate | 2012 - 2048 | $1,034,680 | $1,047,556 | 4.92% | 2011 - 2048 | $1,110,943 | $1,118,994 | 5.03% |
| 20-year fixed-rate | 2012 - 2032 | 67,323 | 68,502 | 4.53 | 2012 - 2031 | 63,941 | 64,752 | 4.78 |
| 15-year fixed-rate | 2012 - 2027 | 242,077 | 246,023 | 4.09 | 2011 - 2026 | 227,269 | 229,510 | 4.41 |
| Adjustable-rate | 2012 - 2047 | 60,544 | 61,395 | 3.18 | 2011 - 2047 | 50,904 | 51,351 | 3.69 |
| Interest-only[4] | 2026 - 2041 | 45,807 | 45,884 | 4.91 | 2026 - 2041 | 61,773 | 61,830 | 5.30 |
| FHA/VA | 2012 - 2041 | 2,045 | 2,077 | 5.67 | 2011 - 2040 | 2,171 | 2,211 | 5.88 |
| Total debt securities of consolidated trusts | | | | | | | | |
| held by third parties[5] | | $1,452,476 | $1,471,437 | | | $1,517,001 | $1,528,648 | |

(1) Debt securities of consolidated trusts are either repayable when housing or repayable.
(2) Based on contractual maturity and weighted average of debt securities of consolidated trusts issued by third parties.
(3) Represents par value, net of associated discounts, premiums, and issuances.
(4) Includes interest-only securities and interest-only mortgage loans that allow the borrower to pay only interest for a fixed period of time before the loans begin to amortize.
(5) The effective rate for debt securities of consolidated trusts issued by third parties was 4.22% and 4.57% as of December 31, 2011 and 2010, respectively.

The table below summarizes the contractual maturities of other long term debt securities and debt securities of consolidated trusts held by third parties at December 31, 2011.

**Table 8.5    Contractual Maturity of Other Long Term Debt and Debt Securities of Consolidated Trusts Held by Third Parties**

| Annual Maturities | Par Value[1][2] |
|---|---|
| | (in millions) |
| Other debt | |
| 2012 | $ 127,798 |
| 2013 | 142,943 |
| 2014 | 87,453 |
| 2015 | 33,897 |
| 2016 | 45,526 |
| Thereafter | 75,254 |
| Debt securities of consolidated trusts issued by third parties[3] | 1,452,476 |
| Total | 1,965,347 |
| Net discounts, premiums, hedge-related and other basis adjustments | 5,237 |
| Total debt securities of consolidated trusts held by third parties and other long-term debt | $1,970,584 |

(1) Represents par value of other long-term debt securities and subordinated borrowings and UPB of debt securities of consolidated trusts issued by third parties.
(2) For other debt denominated in a currency other than U.S. dollars, par value is based on the exchange rate at December 31, 2011.
(3) Contractual maturities of debt securities of consolidated trusts held by third parties may not represent expected maturity as they are repayable at any time when housing or repayable.
(4) Other basis adjustments primarily represent changes in fair value attributable to our non-specific credit risk and interest-rate risk related to the foreign-currency denominated debt.

**Lines of Credit**

At both December 31, 2011 and 2010, we had one secured, uncommitted intraday line of credit with a third party totaling $10 billion. We use this line of credit regularly to provide us with additional liquidity to fund our intraday payment activities through the Fedwire system in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs. No amounts were drawn on this line of credit at December 31, 2011 or 2010. We expect to continue to use the current facility to satisfy our intraday financing needs; however, as the line is uncommitted, we may not be able to draw on it if and when needed.

**Subordinated Debt Interest and Principal Payments**

In a September 23, 2008 statement concerning the conservatorship, the Director of FHFA stated that we would continue to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital.

Source   FREDDIE MAC HOME LOAN MORTGAGE CORP, 10 K, March 09, 2012                TREASURY-3030

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

levels. As a result, the terms of any of our subordinated debt that provide for us to defer payments of interest under certain circumstances, including our failure to maintain specified capital levels, are no longer applicable

### NOTE 9: FINANCIAL GUARANTEES

When we securitize single family mortgages that we purchase, we issue mortgage related securities that can be sold to investors or held by us. During the years ended December 31, 2011 and 2010, we issued and guaranteed $300.2 billion and $375.9 billion, respectively, in UPB of Freddie Mac mortgage related securities backed by single family mortgage loans (excluding those backed by HFA bonds)

Beginning January , 20 0, we no longer recognize a financial guarantee for such arrangements as we instead recognize both the mortgage loans and the debt securities of these securitization trusts on our consolidated balance sheets The table below presents our maximum potential exposure, our recognized liability, and the maximum remaining term of our financial guarantees that are not consolidated on our balance sheets

**Table 9.1    Financial Guarantees**

| | December 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Maximum Exposure(1) | Recognized Liability | Maximum Remaining Term | Maximum Exposure(1) | Recognized Liability | Maximum Remaining Term |
| | | | (dollars in millions, terms in years) | | | |
| Non-consol da ed F edd e Mac secu es(2 | $35,879 | $  300 | 42 | $ 25,279 | $  202 | 41 |
| O he gua an ee comm men s(3 | 21,064 | 487 | 37 | 18,670 | 427 | 3 8 |
| De va ve ns umen s | 37,737 | 2,977 | 34 | 37,578 | 301 | 35 |
| Se v c ng- ela ed p em um gua an ees | 151 | | 5 | 172 | | 5 |

(1) Max u exposu e ep esen s he con ac ua a oun s ha cou d be os unde he non-conso da ed gua an ees f coun e pa es o bo owe s defau ed, w ou cons de a on of poss ble ecove es unde c ed enhance en a range en s, such as ecou se p ov s ons, h d-pa y nsu ance con ac s, o f co a e a he d o pledged The max mum exposu e d sclosed above s no ep esen a ve of e p gua an ee key o nc , based on u h s o ca oss expe ence and af e cons de a on of p oceeds f om ela ed colla e al l qu da on The max mum exposu e fo ou qu d y gua an ees s no u ua y exc us ve of ou defau gua an ees on e sa e sec es e efo e, hese amoun s a e nc uded w h n he max mum exposu e of non-conso da ed F edd e Mac secu es and o he gua an ee comm men s

(2) As of Dece be 31, 2011 and Dece be 31, 2010, he UPB of non-conso da ed F edd e Mac secu es assoc a ed w h s ng e-fam y mo gage oans was $10 7 b on a d $11 3 b ll on, espec vely The ema n ng balances ela e o mu fam y mo gage oans

(3) As of Dece be 31, 2011 and Dece be 31, 2010, he UPB of o he gua an ee comm men s assoc a ed w h s ngle-fam ly mo gage loans was $11 1 b ll on and $8 6  o , espec vely The ema n ng balances ela e o mul fam ly mo gage oans

**Non-Consolidated Freddie Mac Securities**

We issue three types of mortgage related securities: (a) PCs; (b) REMICs and Other Structured Securities; and (c) Other Guarantee Transactions We guarantee the payment of principal and interest on these securities, which are backed by pools of mortgage loans, irrespective of the cash flows received from the borrowers Commencing January 1, 2010, only our guarantees issued to non consolidated securitization trusts are accounted for in accordance with the accounting guidance for guarantees (i.e., a guarantee asset and guarantee obligation are recognized)

Our securities issued in resecuritizations of our PCs and other previously issued REMICs and Other Structured Securities are not consolidated as they do not give rise to any additional exposure to credit loss as we already consolidate the underlying collateral The securities issued in these resecuritizations consist of single class and multiclass securities backed by PCs, REMICs, interest only strips, and principal only strips. Since these resecuritizations do not increase our credit risk, no guarantee asset or guarantee obligation is recognized for these transactions and they are excluded from the table above

We recognize a guarantee asset, guarantee obligation and a reserve for guarantee losses, as necessary, for securities issued by non consolidated securitization trusts and other guarantee commitments for which we are exposed to incremental credit risk Our guarantee obligation represents the recognized liability, net of cumulative amortization, associated with our guarantee of multifamily PCs and certain Other Guarantee Transactions issued to non consolidated securitization trusts. In addition to our guarantee obligation, we recognize a reserve for guarantee losses, which is included within other liabilities on our consolidated balance sheets, which totaled $0.2 billion at both December 31, 2011 and 2010, respectively For many of the loans underlying our non consolidated guarantees, there are credit protections from third parties, including subordination, covering a portion of our exposure. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections on loans we guarantee See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information about our accounting for financial guarantees

During 2011 we issued approximately $11.8 billion, compared to $5.9 billion in 2010, in UPB of non consolidated Freddie Mac securities primarily backed by multifamily mortgage loans, for which a guarantee asset and guarantee

Source  D RA  HOM  OAN MORTGAG  CORP, 10 K, March 09, 2012            TREASURY-3031            Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

obligation were recognized  During 20 0, we also issued  $3 9 billion in UPB of non consolidated Other Guarantee  Transactions backed by HFA bonds as part of the NIBP, for which a guarantee asset and guarantee obligation were recognized

In connection with transfers of financial assets to  non consolidated securitization trusts that are accounted for as  sales and for which we have incremental credit risk, we recognize our guarantee obligation in accordance with the  accounting guidance for guarantees  Additionally, we may retain an interest in the transferred financial assets (*e.g.*, a beneficial interest issued by the securitization trust)  See "NOTE 10: RETAINED INTERESTS IN MORTGAGE  RELATED SECURITIZATIONS" for further information on these retained interests

## Other Guarantee Commitments

We provide long term standby commitments to certain of our customers, which obligate us to purchase seriously delinquent  loans that are covered by those agreements  During 2011 and 2010, we issued and guaranteed $4.4 billion and  $3 2 billion, respectively, in UPB of long term standby commitments  These other guarantee commitments totaled  $8.6 billion and $5.5 billion of UPB at December 31, 2011 and December 3 , 20 0, respectively  We also had other guarantee commitments on multifamily housing  revenue bonds that were issued by HFAs of $9.6 billion and $9.7 billion in UPB at December 31, 2011 and December 31, 2010, respectively  In addition, as of December 31, 2011, and 2010, respectively, we had issued guarantees under the TCLFP on securities backed by HFA bonds with UPB of $2.9 billion, and $3.5 billion, respectively

## Derivative Instruments

Derivative instruments include written options, written  swaptions, interest rate swap guarantees, and short term default  guarantee commitments accounted for as credit derivatives  See "NOTE 11: DERIVATIVES" for further discussion of these derivative guarantees

We guarantee the performance of interest rate swap contracts in two circumstances  First, we guarantee that a borrower will  perform under an interest rate swap contract linked to a  borrower's ARM  And second, in connection with our issuance of certain REMICs and Other Structured Securities, which are backed by tax  exempt bonds, we guarantee that the sponsor of the  transaction will perform under the interest rate swap contract linked to the senior variable rate certificates that we issued

We also have issued REMICs and Other Structured Securities with stated final maturities that are shorter than the stated  maturity of the underlying mortgage loans  If the underlying  mortgage loans to these securities have not been purchased by a  third party or fully matured as of the stated final maturity date of such securities, we will sponsor an auction of the  underlying assets  To the extent that purchase or auction proceeds are insufficient to cover unpaid principal amounts due  to investors in such REMICs and Other Structured Securities, we  are obligated to fund such principal. Our maximum exposure on  these guarantees represents the outstanding UPB of the REMICs  and Other Structured Securities subject to stated final maturities

## Servicing Related Premium Guarantees

We provide guarantees to reimburse servicers for premiums paid  to acquire servicing in situations where the original seller is  unable to perform under its separate servicing agreement  The  liability associated with these agreements was not material at  December 31, 2011 and 2010

## Other Indemnifications

In connection with certain business transactions, we may provide  indemnification to counterparties for claims arising out of  breaches of certain obligations (*e.g.*, those arising from representations and warranties) in contracts entered into in the  normal course of business. Our assessment is that the risk of any material loss from such a claim for indemnification is  remote and there are no significant probable and estimable losses associated with these contracts  In addition, we provided  indemnification for litigation defense costs to certain former  officers who are subject to ongoing litigation  See "NOTE 18: LEGAL CONTINGENCIES" for further  information on ongoing litigation  The recognized liabilities on our consolidated balance sheets related to indemnifications were  not significant at December 31, 2011 and 2010

As part of the guarantee arrangements pertaining to multifamily  housing revenue bonds, we provided commitments to advance funds, commonly referred to as "liquidity guarantees "  These  guarantees require us to advance funds to enable others to  repurchase any tendered tax exempt and related taxable bonds that are unable to be remarketed  Any such advances are treated  as loans and are secured by a pledge to us of the repurchased securities until the securities are

---

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-3032                                     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

remarketed. We hold cash and cash equivalents on our consolidated balance sheets for the amount of these commitments  No advances under these liquidity guarantees were outstanding at  December 31, 2011 and 2010

**Securitization Trusts**

We established securitization trusts for the administration  of cash remittances received on the underlying assets of our PCs  and REMICs and Other Structured Securities. As described in  "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," we recognize the cash held by our consolidated single  family PC trusts and certain Other Guarantee Transactions  as restricted cash and cash equivalents on our consolidated balance sheets  We receive fees as master servicer, issuer, trustee and administrator for our consolidated PCs and REMICs  and Other Structured Securities. Such amounts are recorded  within net interest income  These fees are derived from interest  earned on principal and interest cash flows held in restricted cash and cash equivalents between the time funds are remitted to  the trust by servicers and the date of distribution to our PCs and REMICs and Other Structured Securities holders. These fees  are offset by interest expense we incur when a borrower prepays a mortgage, but the full amount of interest for the month is due  to the PC investor  We recognized net trust management income (expense) of $0 million during 2011 and 2010 (on our non  consolidated trusts), and $(761) million during 2009  (on all trusts), on our consolidated statements of income and  comprehensive income

### NOTE 10: RETAINED INTERESTS IN MORTGAGE  RELATED SECURITIZATIONS

Beginning January 1, 2010, in accordance with the amendment  to the accounting guidance for consolidation of VIEs, we  consolidated our single family PC trusts and certain Other  Guarantee Transactions. As a result, a large majority of our  transfers of financial assets that historically qualified as sales  (*e.g.*, the transfer of mortgage loans to our single family PC  trusts) are no longer treated as such because the financial assets are transferred to a consolidated entity  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information regarding the impacts of consolidation of our single  family PC trusts and certain Other  Guarantee Transactions.

Certain of our transfers of financial assets to non consolidated  trusts and third parties may continue to qualify as sales. In  connection with our transfers of financial assets that qualify  as sales, we may retain certain interests in the transferred  assets  Our retained interests are primarily beneficial interests issued by non  consolidated securitization trusts (*e.g.*, multifamily PCs and multiclass resecuritization  securities) These interests are included in investments in  securities on our consolidated balance sheets  In addition, our  guarantee asset recognized in connection with non  consolidated securitization transactions also represents a retained interest  For more information about our retained interests in mortgage  related securitizations, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES     Investments in Securities " These transfers and our resulting retained  interests are not significant to our consolidated financial  statements in 2011 and 2010.

Our exposure to credit losses on the loans underlying our  retained securitization interests is recorded within our reserve  for guarantee losses For further information regarding our  charge offs and other activity associated with our reserve for  guarantee losses on loans for which we have provided our guarantee, see "NOTE 4: MORTGAGE LOANS AND LOAN LOSS  RESERVES."

**Retained Interests, Guarantee Asset**

During 2009, the fair values of our guarantee asset associated  with single family loans at the time of securitization and  subsequent fair value measurements at the end of a period were  primarily estimated using third party information. Consequently,  we derived our assumptions by determining those implied by our  valuation estimates, with the internal rate of return, or  discount rate, adjusted where necessary to align our internal models with estimated fair values determined using third  party information  However, prepayment rates are presented based on our  internal models and were not similarly adjusted  For the  portion of our guarantee asset that was valued by obtaining  dealer quotes on proxy securities, we derived the assumptions  from the prices we were provided  For the year ended  December 3 , 2009, we estimate the average internal rate of return, prepayment rates and weighted average lives used in  measuring the fair value of our guarantee asset associated with  single family loans were 13.8%, 26.4%, and 3.3 years,  respectively  These estimates represent the average assumptions  used both at the end of the period as well as the valuation assumptions at guarantee issuance during the year on a combined  basis  Our estimate of the average internal rate of return represents a UPB weighted average of the discount rates implied  by a model which employs multiple interest rate scenarios versus  a single assumption.

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Cash Flows Associated with Non Consolidated Trusts**

We receive proceeds in securitizations accounted for as sales  for those securities sold to third parties  Subsequent to these  securitizations, we receive cash flows related to interest income and repayment of principal on the securities we retain  for investment  Regardless of whether our issued mortgage related security is sold to third parties or held by us  for investment, we are obligated to make cash payments to  acquire foreclosed properties and certain delinquent or impaired  mortgages under our financial guarantees  In addition to the  securitization and sale transactions discussed below, the cash flows on retained interests related to securitizations accounted  for as sales during 2009 consisted of: (a) cash receipts associated with our guarantee asset of $2.9 billion; (b) cash receipts associated with principal and interest on  our retained interests of $21.4 billion; and (c) cash  payments associated with delinquent or foreclosed loans and  required purchase of balloon mortgages of $26.3 billion. In addition, we are obligated under our guarantee to make up any  shortfalls in principal and interest to the holders of our securities. See "NOTE 9: FINANCIAL GUARANTEES"  for additional information on these payments in 2009. Cash flows  associated with our retained interests in 2011 and 2010 were not  significant.

**Gains and Losses on Securitizations Accounted for as Sales**

The gain or loss on a securitization that qualifies as a sale is  determined, in part, based on the carrying amounts of the  financial assets sold. The carrying amounts of the assets sold  are allocated between those sold to third parties and those held  as retained interests based on their relative fair value at the date of sale  We recognized net pre tax gains (losses) on transfers of mortgage loans, PCs and REMICs and Other Structured Securities that were accounted for as sales of approximately  $1.5 billion for the year ended December 31, 2009.  These transactions were not significant in 2011 and 2010 due to  the changes in the accounting guidance for consolidation of VIEs  that became effective January 1, 20  0

## NOTE 11: DERIVATIVES

### Use of Derivatives

We use derivatives primarily to:

- hedge forecasted issuances of debt;

- synthetically create callable and non callable funding;

- regularly adjust or rebalance our funding mix in response to  changes in the interest rate characteristics of our  mortgage related assets; and

- hedge foreign currency exposure

*Hedge Forecasted Debt Issuances*

When we commit to purchase mortgage investments, such  commitments are typically for a future settlement ranging from  two weeks to three months after the date of the commitment  To facilitate larger and more predictable debt issuances that  contribute to lower funding costs, we use interest rate derivatives to economically hedge the interest rate risk  exposure from the time we commit to purchase a mortgage to  the time the related debt is issued

*Create Synthetic Funding*

We also use derivatives to synthetically create the substantive  economic equivalent of various debt funding structures  For example, the combination of a series of short term debt  issuances over a defined period and a pay fixed interest rate  swap with the same maturity as the last debt issuance is the  substantive economic equivalent of a long term fixed rate debt  instrument of comparable maturity. Similarly, the combination of non callable debt and a call swaption, or option to enter into a  receive fixed interest rate swap, with the same maturity as the  non callable debt, is the substantive economic equivalent of  callable debt  These derivatives strategies increase our funding  flexibility and allow us to better match asset and liability cash  flows, often reducing overall funding costs.

*Adjust Funding Mix*

We generally use interest rate swaps to mitigate contractual  funding mismatches between our assets and liabilities  We also  use swaptions and other option based derivatives to adjust the  contractual terms of our debt funding in response to changes in  the expected lives of our investments in mortgage related  assets. As market conditions dictate, we take rebalancing  actions to keep our interest rate risk exposure within management set limits  In a declining interest rate environment,  we typically enter into receive fixed interest rate swaps or  purchase Treasury based derivatives to shorten the duration of  our funding to offset the declining duration of our mortgage  assets  In a rising interest rate environment, we

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3034

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

typically enter into pay fixed interest rate swaps or sell Treasury based derivatives in order to lengthen the duration of our funding to offset the increasing duration of our mortgage assets.

### Foreign Currency Exposure

We use foreign currency swaps to eliminate virtually all of our exposure to fluctuations in exchange rates related to our foreign currency denominated debt by entering into swap transactions that effectively convert foreign currency denominated obligations into U S dollar denominated obligations

### Types of Derivatives

We principally use the following types of derivatives:

- LIBOR and Euribor based interest rate swaps;

- LIBOR and Treasury based options (including swaptions);

- LIBOR and Treasury based exchange traded futures; and

- Foreign currency swaps

In addition to swaps, futures and purchased options, our derivative positions include the following:

### Written Options and Swaptions

Written call and put swaptions are sold to counterparties allowing them the option to enter into receive and pay fixed interest rate swaps, respectively Written call and put options on mortgage related securities give the counterparty the right to execute a contract under specified terms, which generally occurs when we are in a liability position We use these written options and swaptions to manage convexity risk over a wide range of interest rates Written options lower our overall hedging costs, allow us to hedge the same economic risk we assume when selling guaranteed final maturity REMICs with a more liquid instrument, and allow us to rebalance the options in our callable debt and REMICs portfolios We may, from time to time, write other derivative contracts such as caps, floors, interest rate futures and options on buy up and buy down commitments

### Commitments

We routinely enter into commitments that include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts Most of these commitments are considered derivatives and therefore are subject to the accounting guidance for derivatives and hedging

### Swap Guarantee Derivatives

In connection with some of the guarantee arrangements pertaining to multifamily housing revenue bonds and multifamily pass through certificates, we may also guarantee the sponsor's or the borrower's obligations as a counterparty on any related interest rate swaps used to mitigate interest rate risk, which are accounted for as swap guarantee derivatives

### Credit Derivatives

We entered into credit risk sharing agreements for certain credit enhanced multifamily housing revenue bonds held by third parties in exchange for a monthly fee In addition, we have purchased mortgage loans containing debt cancellation contracts, which provide for mortgage debt or payment cancellation for borrowers who experience unanticipated losses of income dependent on a covered event The rights and obligations under these agreements have been assigned to the servicers However, in the event the servicer does not perform as required by contract, under our guarantee, we would be obligated to make the required contractual payments

For a discussion of our significant accounting policies related to derivatives, please see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Derivatives."

<div align="center">263</div>

<div align="right">*Freddie Mac*</div>

Source   D RA HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar ® Document Research ℠

Table of Contents

## Derivative Assets and Liabilities at Fair Value

The table below presents the location and fair value of derivatives reported in our consolidated balance sheets

### Table 11.1    Derivative Assets and Liabilities at Fair Value

| | At December 31, 2011 | | | At December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Notional or Contractual Amount | Derivatives at Fair Value Assets(1) | Liabilities(1) | Notional or Contractual Amount | Derivatives at Fair Value Assets(1) | Liabilities(1) |
| | | | (in millions) | | | |
| To a de va ve po fo o | | | | | | |
| *Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging(2* | | | | | | |
| I es - a e swaps | | | | | | |
| Rece ve-f xed | $ 211,808 | $ 12,998 | $ (108) | $ 324,590 | $ 6,952 | $ (3,267) |
| Pay-f xed | 289,335 | 19 | (34,507) | 394,294 | 3,012 | (24,210) |
| Bas s (floa ng o floa ng) | 2,750 | 5 | (7) | 2,375 | 6 | (2) |
| To a n es - a e swaps | 503,893 | 13,022 | (34,622) | 721,259 | 9,970 | (27,479) |
| Op on-based | | | | | | |
| Call swap ons | | | | | | |
| P c ased | 76,275 | 12,975 | | 114,110 | 8,391 | |
| W en | 27,525 | | (2,932) | 11,775 | | (244) |
| P Swap o s | | | | | | |
| P c ased | 70,375 | 638 | | 59,975 | 1,404 | |
| W en | 500 | | (2) | 6,000 | | (8) |
| O he op on-based de va ves(3 | 38,549 | 2,256 | (2) | 47,234 | 1,460 | (10) |
| To al op on-based | 213,224 | 15,869 | (2,936) | 239,094 | 11,255 | (262) |
| F t es | 41,281 | 5 | | 212,383 | 3 | (170) |
| Fo e gn-cu ency swaps | 1,722 | 106 | (9) | 2,021 | 172 | |
| Comm men s( | 14,318 | 38 | (94) | 14,292 | 103 | (123) |
| C ed de va ves | 10,190 | 1 | (5) | 12,833 | 12 | (5) |
| Swap gua an ee de va ves | 3,621 | | (37) | 3,614 | | (36) |
| To al de va ves no des gna ed as hedg ng ns umen s | 788,249 | 29,041 | (37,703) | 1,205,496 | 21,515 | (28,075) |
| Ne ng adj s es( | | (28,923) | 37,268 | | (21,372) | 26,866 |
| To al de va ve po fol o, ne | $788,249 | $ 118 | $ (435) | $1,205,496 | $ 143 | $ (1,209) |

(1) The va ue of de va ves on ou conso da ed ba ance shee s s epo ed as de va ve asse s, ne and de va ve ab es, et

(2) See "Use of De va ves" fo add onal nfo ma on abou he pu pose of en e ng n o de va ves no des gna ed as hedg ng ns umen s and ou ove a sk managemen s a eg es

(3) P ma y nc udes pu chased n e es - a e caps and f oo s

(4) Comm men s nc ude (a) ou comm men s o pu chase and sell nves men s n secu es (b) ou comm men s o pu chase mo gage loans and (c) ou comm men s o p c ase a dex g o ss ede sec es of o conso da ed u s

(5) Rep e se s co e pay e g, cas co a ea e g, e ade/se e ece vab e o payab e, and ne de va ve n e es ece vable o payable The ne cash colla e al posted a d e ade/se e ece vab e we e $9 4 b on and $1 m on, espec ve y A December 31, 2011 The ne cash co a e a pos ed and ne ade/se e ece vable we e $6 3 b on and $1 on, espec ve y a December 31, 2010 The ne n e es ece vab e (payab e) of de va ve asse s and de va ve l ab l es was app ox ma ely $(1 1) b on and $(0 8) b on a December 31, 2011 and 2010, espec ve y, wh ch was ma n y e a ed o e es - a e swaps a we a ee ed n o

The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement Derivatives in a net asset position are reported as derivative assets, net. Similarly, derivatives in a net liability position are reported as derivative liabilities, net Cash collateral we obtained from counterparties to derivative contracts that has been offset against derivative assets at December 31, 2011 and 2010 was $3.2 billion and $2.2 billion, respectively Cash collateral we posted to counterparties to derivative contracts that has been offset against derivative liabilities at December 31, 2011 and 2010 was $12.6 billion and $8.5 billion, respectively. We are subject to collateral posting thresholds based on the credit rating of our long term senior unsecured debt securities from S&P or Moody's. The lowering or withdrawal of our credit rating by S&P or Moody's may increase our obligation to post collateral, depending on the amount of the counterparty's exposure to Freddie Mac with respect to the derivative transactions. As a result of S&P's downgrade of Freddie Mac's credit rating of our long term senior unsecured debt from AAA to AA+ on August 8, 2011, we posted additional collateral to certain derivative counterparties in accordance with the terms of the derivative agreements

The aggregate fair value of all derivative instruments with credit risk related contingent features that were in a liability position on December 31, 2011, was $12.7 billion for which we posted collateral of $12 6 billion in the normal course of business If the credit risk related contingent features underlying these agreements had been triggered on December 31, 2011, we would have been required to post an additional $0 billion of collateral to our counterparties

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3036

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

At December 31, 2011 and 2010, there were no amounts of cash collateral that were not offset against derivative assets, net or derivative liabilities, net, as applicable  See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information related to our derivative counterparties

## Gains and Losses on Derivatives

The table below presents the gains and losses on derivatives reported in our consolidated statements of income and comprehensive income

**Table 11.2    Gains and Losses on Derivatives**

| Derivatives in Cash Flow Hedging Relationships[1][2] | Amount of Gain or (Loss) Reclassified from AOCI into Earnings (Effective Portion) | | |
| --- | --- | --- | --- |
| | Year Ended December 31, | | |
| | 2011 | 2010 | 2009 |
| | (in millions) | | |
| Closed cash flow hedges[3] | $ (758) | $ (1,010) | $ (1,165) |

| Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging[5] | Derivative Gains (Losses)[4] | | |
| --- | --- | --- | --- |
| | Year Ended December 31, | | |
| | 2011 | 2010 | 2009 |
| | (in millions) | | |
| Interest - rate swaps | | | |
| Receive-fixed | | | |
| Foreign-currency denominated | $ (49) | $ (119) | $ 64 |
| US dollar denominated | 12,686 | 9,825 | (13,337) |
| Total receive-fixed swaps | 12,637 | 9,706 | (13,273) |
| Pay-fixed | (22,999) | (17,450) | 27,078 |
| Basis (floating to floating) | (5) | 65 | (194) |
| Total interest - rate swaps | (10,367) | (7,679) | 13,611 |
| Option based | | | |
| Call swaptions | | | |
| Purchased | 10,234 | 6,548 | (10,566) |
| Written | (2,337) | (199) | 248 |
| Put swaptions | | | |
| Purchased | (1,614) | (1,621) | 323 |
| Written | 14 | 82 | (321) |
| Other option-based derivatives[6] | 879 | 33 | (370) |
| Total option-based | 7,176 | 4,843 | (10,686) |
| Futures | (154) | (210) | (300) |
| Foreign-currency swaps[7] | (41) | (468) | 138 |
| Commitments[8] | (1,340) | (85) | (708) |
| Credit derivatives | — | 5 | (4) |
| Swap guarantee derivatives | 3 | 3 | (20) |
| Other[9] | 3 | — | 12 |
| Subtotal | (4,720) | (3,591) | 2,043 |
| Accrual of periodic settlements[10] | | | |
| Receive-fixed interest - rate swaps[11] | 4,173 | 6,381 | 5,817 |
| Pay-fixed interest - rate swaps | (9,241) | (10,909) | (9,964) |
| Foreign-currency swaps | 22 | 19 | 89 |
| Other | 14 | 15 | 115 |
| Total accrual of periodic settlements | (5,032) | (4,494) | (3,943) |
| Total | $ (9,752) | $ (8,085) | $ (1,900) |

(1) Derivatives have met specific criteria may be accounted for as cash flow hedges  Net deferred gains and losses on closed cash flow hedges (i.e., where a derivative was either terminated or redesignated) are also included in AOCI until the related forecasted transaction affects earnings or is deemed to be probable of not occuring

(2) No amounts of gains or (losses) were recognized in AOCI on derivatives (effective portion) and no hedge income (neffective portion and amount excluded from effectiveness testing)

(3) Amounts reported in AOCI related to changes in the fair value of commitments to purchase securities that were designated as cash flow hedges are recognized as basis adjustments of the acquired assets, which are amortized, over the estimated life of the asset  For receive-fixed swaps payments on our debt, these payments on long-term debt are recorded in expense related to derivatives

(4) Gains (losses) are reported on our consolidated statements of income and comprehensive income

(5) See "Use of Derivatives" for additional information on about the purpose of entering into derivatives, including designated as hedging instruments and our overall risk management strategies

(6) Primarily includes purchased interest - rate caps and floors

(7) Foreign-currency swaps are defined as swaps where settlement is based on one leg calculated in a foreign-currency and one or more legs calculated in US dollars

(8) Commitments include (a) our commitments to purchase and sell investments in securities (b) our commitments to purchase mortgage loans and (c) our commitments to purchase and extinguish loss redeem securities of our consolidated trusts

(9) Related to the bankruptcy of Lehman Brothers Holdings, Inc., or Lehman

(10) For derivatives not qualifying for hedge accounting, the accrual of periodic cash settlements is recorded in derivative gains (losses) on our consolidated statements of income and comprehensive income

(11) Includes imputed interest on zero-coupon swaps

*Freddie Mac*

Source  DRA HOM  OAN MORTGAG CORP, 10 K, March 09, 2012                                    TREASURY-3037                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**Hedge Designation of Derivatives**

At December 31, 2011 and 2010, we did not have any derivatives in hedge accounting relationships; however, there are deferred net losses recorded in AOCI related to closed cash flow hedges. As shown in "Table 11.3     AOCI Related to Cash Flow Hedge Relationships", the total AOCI related to derivatives designated as cash flow hedges was a loss of $1.7 billion and $2.2 billion at December 31, 2011 and 2010, respectively, composed of deferred net losses on closed cash flow hedges  Closed cash flow hedges involve derivatives that have been terminated or are no longer designated as cash flow hedges  Fluctuations in prevailing market interest rates have no impact on the deferred portion of AOCI relating to losses on closed cash flow hedges

The previous deferred amount related to closed cash flow hedges remains in our AOCI balance and will be recognized into earnings over the expected time period for which the forecasted transactions impact earnings. Over the next 12 months, we estimate that approximately $415 million, net of taxes, of the $1 7 billion of cash flow hedge losses in AOCI at December 31, 2011 will be reclassified into earnings  The maximum remaining length of time over which we have hedged the exposure related to the variability in future cash flows on forecasted transactions, primarily forecasted debt issuances, is 22 years  However, over 70% and 90% of AOCI relating to closed cash flow hedges at December 31, 2011 will be reclassified to earnings over the next five and ten years, respectively

The table below presents the changes in AOCI related to derivatives designated as cash flow hedges  Net reclassifications of losses to earnings represents the AOCI amount that was recognized in earnings as the originally hedged forecasted transactions affected earnings, unless it was deemed probable that the forecasted transaction would not occur  If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the hedge related to the forecasted transaction would be reclassified into earnings immediately

**Table 11.3     AOCI Related to Cash Flow Hedge Relationships**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2011** | **2010** | **2009** |
| | | (in millions) | |
| Beg nn ng balance(1) | $(2,239) | $ (2,905) | $(3,678) |
| Cumu a ve effec of change n accoun ng p nc p e(2 | | (7) | |
| Ne eclass f ca ons of losses o ea n ngs(3 | 509 | 673 | 773 |
| End ng balance(1) | $ (1,730) | $(2,239) | $ (2,905) |

(1) Rep esen s ne defe ed ga ns and osses on c osed (*i.e.*, e m na ed o edes gna ed) cash flow hedges
(2) Rep esen s adus en o n a y app y he accoun ng gu dance fo accoun ng fo ansfe s of f nanc a asse s and conso da on of VIEs, as we as a change n he amo za on me hod fo ce a n ela ed defe ed ems Ne of ax benef of $4 m ll on fo he yea ended Decembe 31, 2010
(3) Ne of ax benef of $249 on, $337 on, and $392 m on fo he yea s ended Decembe 31, 2011, 2010, and 2009, espec ve y

### NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)

**Issuance of Senior Preferred Stock**

Pursuant to the Purchase Agreement described in "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS," we issued one million shares of senior preferred stock to Treasury on September 8, 2008. The senior preferred stock was issued to Treasury in partial consideration of Treasury's commitment to provide funds to us under the Purchase Agreement

Shares of the senior preferred stock have a par value of $1, and have a stated value and initial liquidation preference equal to $1,000 per share  The liquidation preference of the senior preferred stock is subject to adjustment. Dividends that are not paid in cash for any dividend period will accrue and be added to the liquidation preference of the senior preferred stock  In addition, any amounts Treasury pays to us pursuant to its funding commitment under the Purchase Agreement and any quarterly commitment fees that are not paid in cash to Treasury nor waived by Treasury will be added to the liquidation preference of the senior preferred stock  As described below, we may make payments to reduce the liquidation preference of the senior preferred stock in limited circumstances

Treasury, as the holder of the senior preferred stock, is entitled to receive, when, as and if declared by our Board of Directors, cumulative quarterly cash dividends at the annual rate of 0% per year on the then current liquidation preference of the senior preferred stock  Total dividends paid in cash during 2011, 2010, and 2009 at the direction of the Conservator were $6.5 billion, $5.7 billion, and $4.1 billion, respectively  If at any time we fail to pay cash dividends in a timely manner, then immediately following such failure and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be 2% per year

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3039

**Table of Contents**

The senior preferred stock ranks ahead of our common stock and all other outstanding series of our preferred stock, as well as any capital stock we issue in the future, as to both dividends and rights upon liquidation. The senior preferred stock provides that we may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any Freddie Mac common stock or other securities ranking junior to the senior preferred stock unless: (a) full cumulative dividends on the outstanding senior preferred stock (including any unpaid dividends added to the liquidation preference) have been declared and paid in cash; and (b) all amounts required to be paid with the net proceeds of any issuance of capital stock for cash (as described in the following paragraph) have been paid in cash. Shares of the senior preferred stock are not convertible Shares of the senior preferred stock have no genera or special voting rights, other than those set forth in the certificate of designation for the senior preferred stock or otherwise required by law The consent of holders of at least two thirds of all outstanding shares of senior preferred stock is generally required to amend the terms of the senior preferred stock or to create any class or series of stock that ranks prior to or on parity with the senior preferred stock

We are not permitted to redeem the senior preferred stock prior to the termination of Treasury's funding commitment set forth in the Purchase Agreement; however, we are permitted to pay down the liquidation preference of the outstanding shares of senior preferred stock to the extent of: (a) accrued and unpaid dividends previously added to the liquidation preference and not previously paid down; and (b) quarterly commitment fees previously added to the liquidation preference and not previously paid down. In addition, if we issue any shares of capital stock for cash while the senior preferred stock is outstanding, the net proceeds of the issuance must be used to pay down the liquidation preference of the senior preferred stock; however, the liquidation preference of each share of senior preferred stock may not be paid down below $1,000 per share prior to the termination of Treasury's funding commitment Following the termination of Treasury's funding commitment, we may pay down the liquidation preference of all outstanding shares of senior preferred stock at any time, in whole or in part If, after termination of Treasury's funding commitment, we pay down the liquidation preference of each outstanding share of senior preferred stock in full, the shares will be deemed to have been redeemed as of the payment date

The table below provides a summary of our senior preferred stock outstanding at December 31, 2011

### Table 12.1    Senior Preferred Stock

| | Draw Date | Shares Authorized | Shares Outstanding | Total Par Value | Initial Liquidation Preference Price per Share | Total Liquidation Preference(1) | Redeemable On or After(2) |
|---|---|---|---|---|---|---|---|
| | | | | (in millions, except initial liquidation preference price per share) | | | |
| *Senior preferred stock:*(3) | | | | | | | |
| 10% | Septe e 8, 2008ₜ | 1 00 | 1 00 | $ 1 00 | $ 1,000 | $ 1,000 | N/A |
| 10% | Nove be 24, 2008 | | | | N/A | 13,800 | N/A |
| 10% | Ma c 31, 2009 | | | | N/A | 30,800 | N/A |
| 10% | J e 30, 2009 | | | | N/A | 6,100 | N/A |
| 10% | J e 30, 2010 | | | | N/A | 10,600 | N/A |
| 10% | Sep embe 30, 2010 | | | | N/A | 1,800 | N/A |
| 10% | Decembe 30, 2010 | | | | N/A | 100 | N/A |
| 10% | Ma ch 31, 2011 | | | | N/A | 500 | N/A |
| 10% | Sep embe 30, 2011 | | | | N/A | 1,479 | N/A |
| 10% | Decembe 30, 2011 | | | | N/A | 5,992 | N/A |
| To al, sen o p efe ed s ock | | 1 00 | 1 00 | $ 1 00 | | $ 72,171 | |

(1) A ounts a ed a ede p on va ue

(2) In acco dance w h he Pu chase Ag ee en , un he sen o p efe ed s ock s epa d o edee ed n fu , we ay no , w o e p o w e co se of T eas y, edee , p c ase, e o o he w se acqu e any F edd e Mac equ y secu es (o he han he sen o p efe ed s ock o wa an )

(3) D v dends on e sen o p efe ed s ock a ccu u a ve, and e d v dend a e s 10% pe yea Howeve , f any me we fa o pay cash d v dends n a me y manne , hen mmed a ely follow ng such fa lu e and fo all d v dend pe ods he eaf e on he d v dend pe od fo ow ng he da e on wh ch we have pa d n cash fu cu ua ve d v dends, he d v dend a e w be 12% pe yea

(4) We d d no ece ve any cash p oceeds f o T easu y as a esu of ssu ng he n a l qu da on p efe ence

(5) Rep esen s an nc ease n he qu da on p efe ence of ou sen o p efe ed s ock due o he ece p of funds f o T easu y

We received $500 million in March 2011, $1.5 billion in September 2011, and $6.0 billion in December 2011 pursuant to draw requests that FHFA submitted to Treasury on our behalf to address the deficits in our net worth as of December 31, 2010, June 30, 2011, and September 30, 2011, respectively In addition, we had a deficit in net worth of $146 million as of December 31, 2011. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS Government Support for our Business" for additional information regarding the draw request that FHFA, as Conservator, will submit on our behalf to Treasury to address our deficit in net worth The aggregate liquidation preference on the senior preferred stock owned by Treasury was $72.2 billion and $64.2 billion as of December 31, 2011 and December 31, 2010, respectively See "NOTE 15: REGULATORY CAPITAL" for additional information

Source   D RA HOM OAN MORTGAG CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-3040

Table of Contents

**Common Stock Warrant**

Pursuant to the Purchase Agreement described in "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS," on September 7, 2008, we, through FHFA, in its capacity as Conservator, issued a warrant to purchase common stock to Treasury. The warrant was issued to Treasury in partial consideration of Treasury's commitment to provide funds to us under the terms set forth in the Purchase Agreement

The warrant gives Treasury the right to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis on the date of exercise  The warrant may be exercised in whole or in part at any time on or before September 7, 2028, by delivery to us of: (a) a notice of exercise; (b) payment of the exercise price of $0 0000 per share; and (c) the warrant  If the market price of one share of our common stock is greater than the exercise price, then, instead of paying the exercise price, Treasury may elect to receive shares equal to the value of the warrant (or portion thereof being canceled) pursuant to the formula specified in the warrant. Upon exercise of the warrant, Treasury may assign the right to receive the shares of common stock issuable upon exercise to any other person

We account for the warrant in permanent equity  At issuance on September 7, 2008, we recognized the warrant at fair value,  and we do not recognize subsequent changes in fair value while the warrant remains classified in equity  We recorded an aggregate fair value of $2 3 billion for the warrant as a component of additional paid in capital  We derived the fair value of the warrant using a modified Black Scholes model  If the warrant is exercised, the stated value of the common stock issued will be reclassified to common stock in our consolidated balance sheets. The warrant was determined to be in substance non voting common stock, because the warrant's exercise price of $0 0000 per share is considered non substantive (compared to the market price of our common stock). As a result, the warrant is included in the computation of basic and diluted earnings (loss) per share. The weighted average shares of common stock outstanding for the years ended December 31, 2011, 2010, and 2009, respectively, included shares of common stock that would be issuable upon full exercise of the warrant issued to Treasury.

**Preferred Stock**

The table below provides a summary of our preferred stock outstanding at December 31, 2011  We have the option to redeem our preferred stock on specified dates, at their redemption price plus dividends accrued through the redemption date  However, without the consent of Treasury, we are restricted from making payments to purchase or redeem preferred stock as well as paying any preferred dividends, other than dividends on the senior preferred stock. In addition, all 24 classes of preferred stock are perpetual and non cumulative, and carry no significant voting rights or rights to purchase additional Freddie Mac stock or securities. Costs incurred in connection with the issuance of preferred stock are charged to additional paid in capital

TREASURY-3041

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 12.2    Preferred Stock**

| Issue Date | | Shares Authorized | Shares Outstanding | Total Par Value | Redemption Price per Share | Total Outstanding Balance[1] | Redeemable On or After[2] | OTC Symbol[3] |
|---|---|---|---|---|---|---|---|---|
| | | (in millions, except initial liquidation preference price per share) | | | | | | |
| *Preferred stock* | | | | | | | | |
| 1996 Variable-rate | April 26, 1996 | 5.00 | 5.00 | $ 5.00 | $ 50.00 | $ 250 | June 30, 2001 | FMCCI |
| 5.81% | October 27, 1997 | 3.00 | 3.00 | 3.00 | 50.00 | 150 | October 27, 1998 | (5) |
| 5% | March 23, 1998 | 8.00 | 8.00 | 8.00 | 50.00 | 400 | March 31, 2003 | FMCKK |
| 1998 Variable-rate[6] | September 23 and 29, 1998 | 4.40 | 4.40 | 4.40 | 50.00 | 220 | September 30, 2003 | FMCCG |
| 5.10% | September 23, 1998 | 8.00 | 8.00 | 8.00 | 50.00 | 400 | September 30, 2003 | FMCCH |
| 5.30% | October 28, 1998 | 4.00 | 4.00 | 4.00 | 50.00 | 200 | October 30, 2000 | (5) |
| 5.10% | March 19, 1999 | 3.00 | 3.00 | 3.00 | 50.00 | 150 | March 31, 2004 | (5) |
| 5.79% | July 21, 1999 | 5.00 | 5.00 | 5.00 | 50.00 | 250 | June 30, 2009 | FMCCK |
| 1999 Variable-rate[7] | November 5, 1999 | 5.75 | 5.75 | 5.75 | 50.00 | 287 | December 31, 2004 | FMCCL |
| 2001 Variable-rate[8] | January 26, 2001 | 6.50 | 6.50 | 6.50 | 50.00 | 325 | March 31, 2003 | FMCCM |
| 2001 Variable-rate[9] | March 23, 2001 | 4.60 | 4.60 | 4.60 | 50.00 | 230 | March 31, 2003 | FMCCN |
| 5.81% | March 23, 2001 | 3.45 | 3.45 | 3.45 | 50.00 | 173 | March 31, 2011 | FMCCO |
| 6% | May 30, 2001 | 3.45 | 3.45 | 3.45 | 50.00 | 173 | June 30, 2006 | FMCCP |
| 2001 Variable-rate[10] | May 30, 2001 | 4.02 | 4.02 | 4.02 | 50.00 | 201 | June 30, 2006 | FMCCJ |
| 5.70% | October 30, 2001 | 6.00 | 6.00 | 6.00 | 50.00 | 300 | December 31, 2006 | FMCKP |
| 5.81% | January 29, 2002 | 6.00 | 6.00 | 6.00 | 50.00 | 300 | March 31, 2007 | (5) |
| 2006 Variable-rate[11] | July 17, 2006 | 15.00 | 15.00 | 15.00 | 50.00 | 750 | July 30, 2011 | FMCCS |
| 6.42% | July 17, 2006 | 5.00 | 5.00 | 5.00 | 50.00 | 250 | July 30, 2011 | FMCCT |
| 5.90% | October 16, 2006 | 20.00 | 20.00 | 20.00 | 25.00 | 500 | September 30, 2011 | FMCKO |
| 5.57% | January 16, 2007 | 44.00 | 44.00 | 44.00 | 25.00 | 1,100 | December 31, 2011 | FMCKM |
| 5.66% | April 16, 2007 | 20.00 | 20.00 | 20.00 | 25.00 | 500 | March 31, 2012 | FMCKN |
| 6.02% | July 24, 2007 | 20.00 | 20.00 | 20.00 | 25.00 | 500 | June 30, 2012 | FMCKL |
| 6.55% | September 28, 2007 | 20.00 | 20.00 | 20.00 | 25.00 | 500 | September 30, 2017 | FMCKI |
| 2007 Fixed-to-floating rate[12] | December 4, 2007 | 240.00 | 240.00 | 240.00 | 25.00 | 6,000 | December 31, 2012 | FMCKJ |
| Total preferred stock | | 464.17 | 464.17 | $464.17 | | $ 14,109 | | |

(1) Amounts stated are redemption value.

(2) In accordance with the Purchase Agreement, unless the senior preferred stock is repaid or redeemed in full, we may not, without the prior written consent of Treasury, redeem, purchase, or otherwise acquire any Freddie Mac equity securities (other than the senior preferred stock or warrant).

(3) Preferred stock trades exclusively through the OTC market unless otherwise noted.

(4) Dividend rate resets quarterly at a dividend rate equal to three-month LIBOR plus 1%, divided by 1.377, and is capped at 9.00%.

(5) Issued through private placement.

(6) Dividend rate resets quarterly at a dividend rate equal to three-month LIBOR plus 1%, divided by 1.377, and is capped at 7.50%.

(7) Dividend rate resets on January 1 of every five-year safe January 1, 2005 based on a five-year Constant Maturity Treasury rate, and is capped at 11.00%. Optional redemption on December 31, 2004 and on December 31 of every five years thereafter.

(8) Dividend rate resets on April 1 of every two-year safe April 1, 2003 based on a two-year Constant Maturity Treasury rate plus 0.10%, and is capped at 11.00%. Optional redemption on March 31, 2003 and on March 31 of every two years thereafter.

(9) Dividend rate resets on April 1 of every year based on 12-month LIBOR minus 0.20%, and is capped at 11.00%. Optional redemption on March 31, 2003 and on March 31 of every year thereafter.

(10) Dividend rate resets on July 1 of every two-year safe July 1, 2003 based on the two-year Constant Maturity Treasury rate plus 0.20%, and is capped at 11.00%. Optional redemption on June 30, 2003 and on June 30 of every two years thereafter.

(11) Dividend rate resets quarterly at a dividend rate equal to three-month LIBOR plus 0.50% but no less than 4.00%.

(12) Dividend rate resets at a fixed rate of 8.375% from December 4, 2007 through December 31, 2012. For the period beginning on or after January 1, 2013, dividend rate resets quarterly at a dividend rate equal to the greater of (a) three-month LIBOR plus 4.16% per annum, or (b) 7.875% per annum. Optional redemption on December 31, 2012, and on December 31 every five years thereafter.

## Stock Based Compensation

Following the implementation of the conservatorship in September 2008, we suspended the operation of our ESPP, and are no longer making grants under our 2004 Employee Plan or our Directors' Plan. We collectively refer to the 2004 Employee Plan and the 1995 Employee Plan as the Employee Plans. Under the Purchase Agreement, we cannot issue any new options, rights to purchase, participations or other equity interests without Treasury's prior approval. However, grants outstanding as of the date of the Purchase Agreement remain in effect in accordance with their terms.

We did not repurchase or issue any of our common shares or non-cumulative preferred stock during 2011 and 2010, except for issuances of treasury stock as reported on our consolidated statements of equity (deficit) relating to stock based compensation granted prior to conservatorship. Common stock delivered under these stock based compensation plans consists of treasury stock or shares acquired in market transactions on behalf of the participants. During 2011, restrictions lapsed on 851,131 restricted stock units and 37,630 restricted stock units were forfeited. At December 31, 2011, 491,363 restricted stock units remained outstanding. In addition, there were 41,160 shares of restricted stock outstanding at both December 31, 2011 and 2010. During 2011, no stock options were exercised and 1,160,820 stock options were forfeited or expired. At December 31, 2011, 2,021,632 stock options were outstanding.

For purposes of the earnings per share calculation, antidilutive potential common shares excluded from the computation of dilutive potential common shares were 3,383,185, 5,290,347, and 7,541,077 at December 31, 2011, 2010, and 2009, respectively.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-K, March 09, 2012     TREASURY-3042     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Dividends Declared During 2011**

No common dividends were declared in 2011. During 2011, we paid dividends of $6.5 billion in cash on the senior preferred stock at the direction of our Conservator  We did not declare or pay dividends on any other series of Freddie Mac preferred stock  outstanding during 2011.

On March 30, 2010, our REIT subsidiaries paid preferred stock dividends for one quarter, consistent with approval from Treasury and direction from FHFA  During 2010, each of our two REIT subsidiaries was eliminated via a merger transaction and no  other preferred or common stock dividends were paid by the REITs  during the year ended December 3 , 20 0

**Delisting of Common Stock and Preferred Stock from NYSE**

On July 8, 2010, we delisted our common and 20  previously listed classes of preferred securities from the NYSE  pursuant to a directive by FHFA, our Conservator

Our common stock and the classes of preferred stock that were  previously listed on the NYSE are traded exclusively in the OTC  market. Shares of our common stock now trade under the ticker  symbol FMCC. We expect that our common stock and the previously  listed classes of preferred stock will continue to trade in the OTC  market so long as market makers demonstrate an interest in  trading the common and preferred stock.

## NOTE 13: INCOME TAXES

**Income Tax Benefit**

We are exempt from state and local income taxes  The table below  presents the components of our income tax benefit for 2011,  2010, and 2009.

**Table 13.1      Federal Income Tax Benefit**

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2011** | **2010** | **2009** |
|  | | (in millions) | |
| Cu en  ncome  ax benef | $283 | $ 186 | $ 160 |
| Defe ed  ncome  ax benef | 117 | 670 | 670 |
| To al  ncome  ax benef (1 | $ 400 | $856 | $830 |

(1) Does no  ef ec  (a)  he defe ed  ax effec s of un eal zed (ga ns) losses on ava lable-fo -sale secu  es,  he  ax effec s of ne  (ga ns)  osses  e a ed o  he effec  ve po  on of de va ves des gna ed n cash flow hedge  e a  onsh ps, and  he  ax effec s of ce a n changes n ou  def ned benef  p ans wh ch a e  epo ed as pa  of AOCI; (b) ce  a n s ock-based compensa  on  ax effec s  epo ed as pa  of add  ona  pa d- n cap a  and (c)  he  ax effec of  he cumu a ve effec of change n accoun ng p  nc ples

A reconciliation between our federal statutory income tax rate  and our effective tax rate for 2011, 2010, and 2009 is presented  in the table be ow

**Table 13.2      Reconciliation of Statutory to Effective Tax Rate**

|  | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | **2011** | | **2010** | | **2009** | |
|  | **Amount** | **Percent** | **Amount** | **Percent** | **Amount** | **Percent** |
|  | (dollars in millions) | | | | | |
| S a u o y co po a e  ax  a e | $ 1,983 | 35 0% | $ 5,209 | 35 0% | $ 7,834 | 35 0% |
| Tax-exemp  n e es | 179 | 3 2 | 213 | 1 4 | 252 | 1 1 |
| Tax c ed  s | 566 | 10 0 | 585 | 3 9 | 594 | 2 7 |
| Un ecogn zed  ax benef  s and  e a ed  n e es /con ngency  ese ves | (21) | (0 4) | (12) | (0 1) | (12) | (0 1) |
| Valua  on allowance | (2,325) | (41 0) | (5,155) | (34 6) | (7,860) | (35 1) |
| O he | 18 | 0 3 | 16 | 0 1 | 22 | 0 1 |
| Effec  ve  ax  a e | $  400 | 7 1% | $  856 | 5 7% | $  830 | 3 7% |

In 2011, 2010, and 2009, our effective tax rate differs from the  statutory tax rate of 35% primarily due to the establishment of  a valuation allowance against a portion of our net deferred tax  assets. Our income tax benefits recognized in 2011, 2010, and  2009 represent amounts related to the amortization of net deferred  losses on pre 2008 closed cash flow hedges, as well as  the current tax benefits associated with our ability to carry back net operating tax losses generated in 2008 and 2009

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3043

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Deferred Tax Assets, Net

The sources and tax effects of temporary differences that give rise to significant deferred tax assets and liabilities for the years ended December 31, 2011 and 2010 are presented in the table below

### Table 13.3    Deferred Tax Assets, Net

| | 2011 | 2010 |
|---|---|---|
| | (in millions) | |
| Deferred tax assets | | |
| Deferred fees | $ 3,957 | $ 1,561 |
| Basis differences related to derivative investments | 4,903 | 4,630 |
| Credit related items and allowance for loan losses | 12,398 | 17,850 |
| Unrealized (gains) losses related to available-for-sale securities | 3,345 | 5,211 |
| LIHTC and AMT credit carryforward | 2,885 | 2,360 |
| Net operating loss carryforward, net of unrecognized tax benefits | 18,053 | 12,122 |
| Other, net | 172 | 268 |
| Total deferred tax assets | 45,713 | 44,002 |
| Deferred tax liabilities | | |
| Basis differences related to assets held for investment (1) | (6,367) | (4,886) |
| Basis differences related to debt | (140) | (192) |
| Total deferred tax liability | (6,507) | (5,078) |
| Valuation allowance (2) | (35,660) | (33,381) |
| Deferred tax assets, net | $ 3,546 | $ 5,543 |

(1) The deferred tax liability balance for basis differences related to assets held for investment includes a basis adjustment on certain mortgage loans. This deferred tax liability offsets a portion of the deferred tax assets for credit related items and allowance for loan losses
(2) The valuation allowance as of December 31, 2010 includes $3.1 billion related to the adoption of the accounting guidance for transfers of financial assets and consolidation of VIEs

We use the asset and liability method to account for income taxes in accordance with the accounting guidance for income taxes. Under this method, deferred tax assets and liabilities are recognized based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates. Valuation allowances are recorded to reduce net deferred tax assets when it is more likely than not that a tax benefit will not be realized. The realization of our net deferred tax assets is dependent upon the generation of sufficient taxable income in available carryback years from current operations and unrecognized tax benefits, and upon our intent and ability to hold available for sale debt securities until the recovery of any temporary unrealized losses

After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, and related difficulty in forecasting future profit levels, we continue to record a valuation allowance on a portion of our net deferred tax assets as of December 31, 2011 and 2010. Our valuation allowance increased by $2.3 billion during 2011 to $35.7 billion, primarily attributable to an increase in temporary differences during the period. As of December 31, 2011, after consideration of the valuation allowance, we had a net deferred tax asset of $3.5 billion, primarily representing the tax effect of unrealized losses on our available for sale securities. We believe the deferred tax asset related to these unrealized losses is more likely than not to be realized because of our assertion that we have the intent and ability to hold our available for sale securities until any temporary unrealized losses are recovered

As of December 31, 2011, we had a net operating loss carryforward of $51.6 billion and a LIHTC carryforward of $2.9 billion that will expire over multiple years beginning in 2030 and 2027, respectively. Our AMT credit carryforward of $4 million will not expire

## Unrecognized Tax Benefits

### Table 13.4    Unrecognized Tax Benefits

| | 2011 | 2010 | 2009 |
|---|---|---|---|
| | (in millions) | | |
| Balance at January 1 | $1,220 | $ 805 | $636 |
| Changes based on tax positions in prior years | 130 | 372 | (34) |
| Changes based on tax positions in current years | 6 | 48 | 203 |
| Decreases in unrecognized tax benefits due to settlements with taxing authorities | (1) | (5) | — |
| Balance at December 31 | $1,355 | $1,220 | $805 |

At December 31, 2011, we had total unrecognized tax benefits, exclusive of interest, of $1.4 billion. This amount relates to tax positions for which ultimate deductibility is highly certain, but for which there is uncertainty as to the

Source   FREDDIE MAC HOME LOAN MORTGAGE CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3044

Table of Contents

timing of such deductibility. If favorably resolved, $1 2 billion of unrecognized tax benefits would have a positive impact on the effective tax rate due to the reversal of the valuation allowance established against deferred tax assets created by the uncertain tax positions This favorable impact would be offset by a $20 million tax expense related to the establishment of a valuation allowance against credits that have been carried forward A valuation allowance has not been recorded against this amount because a portion of the unrecognized tax benefits was used as a source of taxable income in our realization assessment of our net deferred tax assets

We continue to recognize interest and penalties, if any, in income tax expense The net accrued interest receivable was approximately $254 million at December 31, 2011, a $9 million change from December 31, 2010. Amounts included in total accrued interest relate to: (a) unrecognized tax benefits; (b) pending claims with the IRS for open tax years; (c) the tax benefit related to the settlement for tax years 1985 to 1997; and (d) the impact of payments made to the IRS in prior years in anticipation of potential tax deficiencies Included in the $254 million of net accrued interest receivable as of December 31, 2011 and $245 million as of December 3 , 20 0, is interest payable of approximately $266 million and $248 million, respectively, which is allocable to unrecognized tax benefits We have accrued no amounts for penalties during 2011, 2010, or 2009.

The period for assessment under the statute of limitations for federal income tax purposes is open on corporate income tax returns filed for tax years 1998 to 2010. We received Statutory Notices from the IRS assessing $3 0 billion of additional income taxes and penalties for the 1998 to 2007 tax years, principally related to questions of timing and potential penalties regarding our tax accounting method for certain hedging transactions. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices for tax years 1998 to 2005. The IRS responded to our petition with the U S Tax Court on December 21, 2010 On July 6, 2011, the U.S. Tax Court issued a Notice Setting Case for Trial and a Standing Pretrial Order. The trial date set forth in the Notice was December 12, 2011 On September 7, 2011, a joint motion for continuance was filed with the U.S. Tax Court. The joint motion was granted and on October 11, 2011 the parties submitted a status report and the court set a revised trial date of November 5, 2012. We paid the tax assessed in the Statutory Notice received in December 20 for the years 2006 to 2007 of $36 million and will seek a refund through the administrative process, which could include filing suit in Federal District Court.

We believe appropriate reserves have been provided for settlement on reasonable terms However, changes could occur in the gross balance of unrecognized tax benefits that could have a material impact on income tax expense in the period the issue is resolved if the outcome reached is not in our favor and the assessment is in excess of the amount currently reserved In light of the revised trial date, the fact that no settlement discussions have occurred for an extended period of time, and the information currently available, we do not believe it is reasonably possible that the issue will be resolved within the next 12 months.

For a discussion of our significant accounting policies related to income taxes, please see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES      Income Taxes."

<div align="center">272</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 14: SEGMENT REPORTING

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator  See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for additional information about the conservatorship

We present Segment Earnings by: (a) reclassifying certain investment related activities and credit guarantee related activities between various line items on our GAAP consolidated statements of income and comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments  These reclassifications and allocations are described in "Segment Earnings."

We do not consider our assets by segment when evaluating segment performance or allocating resources  We conduct our operations solely in the U S  and its territories  Therefore, we do not generate any revenue from geographic locations outside of the U.S. and its territories.

### Segments

Our operations consist of three reportable segments, which are based on the type of business activities each performs     Investments, Single family Guarantee, and Multifamily. The chart below provides a summary of our three reportable segments and the All Other category  As reflected in the chart, certain activities that are not part of a reportable segment are included in the All Other category  The All Other catego y consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management  decisions outside the control of the management of our reportable segments  By recording these types of activities to  the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies  that are executed within the reportable segments and provide  greater comparability across time periods  Items included in the  All Other category consist of: (a) the deferred tax asset  valuation allowance associated with previously recognized income tax credits carried forward; and (b) in 2009, the  write down of our LIHTC investments  Other items previously  recorded in the All Other category prior to the revision to our  method for presenting Segment Earnings on January 1, 2010,  as discussed below, have been allocated to our three reportable segments

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3046

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Segment | Description | Activities/Items |
|---|---|---|
| Investments | The Investments segment reflects results from our investments, funding and hedging activities. In our Investments segment, we invests principally in mortgage-related securities and single-family mortgage loans, which are funded by other debt issuances and hedged with derivatives. In our Investments segment, we also provide funding and hedging management services to the Single-family Guarantee and Multifamily segments. The Investments segment reflects changes in the fair value of the Multifamily segment assets as a result of changes in interest rates. Segment Earnings for this segment consists primarily of the returns on these investments, less the related funding, hedging, and administrative expenses. | • Investments, including mortgage-related securities and single-family performing mortgage loans<br><br>• Investments asset-backed securities<br><br>• Above-adjusted securities/securities, excluding CMBS and multifamily housing revenue bonds<br><br>• Debt issuances<br><br>• All asset/liability management items<br><br>• Guarantee-type/buy-down items, net of execution gains/losses<br><br>• Cash and liquidity management<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated administrative expenses and taxes |
| Single-Family Guarantee | The Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our sellers/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related security in exchange for management and guarantee fees. Segment Earnings for this segment consists primarily of management and guarantee fee revenues, including amortization of upfront fees, less credit-related expenses, administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses. | • Management and guarantee fees on PCs, including those earned by us, and single-family mortgage loans in the mortgage investments portfolio<br><br>• Up-front credit guarantee fees<br><br>• Adjustments for delivery performance<br><br>• Credit losses on all single-family assets<br><br>• Expected net float income or expense on single-family credit guarantee portfolio<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated debt costs, administrative expenses and taxes |
| Multifamily | The Multifamily segment reflects results from our investment (both purchases and disposals), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans and non-agency CMBS that we purchased for investment, or the purchases of commercial multifamily mortgage loans for investment have declined significantly since 2010, and our purchases of CMBS have declined significantly since 2008. The only CMBS that we have purchased since 2008 have been senior, mezzanine, and interest-only tranches related to our securitization of loans that we acquired, and except for purchases above or below significant face value, or primarily results in assets we aggregate and then securitize. We guarantee the senior tranches of these securitizations in our Multifamily Guarantee Transactions. Our Multifamily segment also assesses the guarantee commitments for multifamily HFA bonds and disposes of investments in bonds. Historically, we issued multifamily PCs, but such activity has been insignificant in recent years. Segment Earnings for this segment consists primarily of the net interest earned on assets related to our multifamily investments activity and management and guarantee fee income, less credit-related expenses, administrative expenses, and allocated funding costs. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in fair value of CMBS and held-for-sale loans associated with any shift in our credit guarantee business, changes in net interest rates, such as credit-related items. | • Multifamily mortgage loans held-for-sale and associated securitization activities<br><br>• Investments in CMBS, multifamily housing revenue bonds, and multifamily mortgage loans held-for-investment<br><br>• Allocated debt costs, administrative expenses and taxes<br><br>• Other guarantee commitments on multifamily HFA bonds and other guarantee-related bonds<br><br>• LIHTC and valuation allowance<br><br>• Deferred tax asset valuation allowance |
| All Other | The All Other category consists of material corporate-level expenses that relate (a) to our reportable segments; and (b) based on management decisions on our side the control of the management of our reportable segments. | • LIHTC write-down<br><br>• Tax settlements, as applicable<br><br>• Legal settlements, as applicable<br><br>• The deferred tax asset valuation allowance associated with previously recognized income tax credits, as well as other amounts carried forward |

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   DRA HOM   OAN MORTGAG CORP, 10 K, March 09, 2012    TREASURY-3047    Powered by Morningstar® Document Research℠

Source   D RA   HOM   OAN MORTGAG   CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Segment Earnings**

Beginning January 1, 2010, we revised our method for presenting Segment Earnings to reflect changes in how management measures and assesses the performance of each segment and the company as a whole. This change in method, in conjunction with our implementation of changes in accounting guidance relating to transfers of financial assets and the consolidation of VIEs, resulted in significant changes to our presentation of Segment Earnings Under the revised method, the financial performance of our Single family Guarantee segment and Multifamily segment are measured based on each segment's contribution to GAAP net income (loss) Our Investments segment is measured on its contribution to GAAP total comprehensive income (loss), which consists of the sum of its contribution to: (a) GAAP net income (loss); and (b) GAAP total other comprehensive income, net of taxes. Beginning January 1, 2010, under the revised method, the sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac

Segment Earnings for 2009 reflects the changes in our method of measuring and assessing the performance of our reportable segments described above However, Segment Earnings for 2009 does not include changes to the guarantee asset, guarantee obligation or other items that were eliminated or changed as a result of our implementation of the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs adopted on January 1, 2010, as this change was applied prospectively consistent with our GAAP results. Consequently, our Segment Earnings results for 2011 and 2010 are not directly comparable with the results for 2009. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information regarding the consolidation of certain of our securitization trusts.

The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac However, the accounting principles we apply to present certain financial statement line items in Segment Earnings for our reportable segments, in particular Segment Earnings net interest income and management and guarantee income, differ significantly from those applied in preparing the comparable line items in our consolidated financial statements prepared in accordance with GAAP Accordingly, the results of such line items differ significantly from, and should not be used as a substitute for, the comparable line items as determined in accordance with GAAP For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "Table 14.2     Segment Earnings and Reconciliation to GAAP Results "

Many of the reclassifications, adjustments and allocations described below relate to the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs These amendments require us to consolidate our single family PC trusts and certain Other Guarantee Transactions, which makes it difficult to view the results of the three operating segments from a GAAP perspective For example, as a result of the amendments, the net guarantee fee earned on mortgage loans held by our consolidated trusts is included in net interest income on our GAAP consolidated statements of income and comprehensive income Previously, we separately recorded the guarantee fee on our GAAP consolidated statements of income and comprehensive income as a component of non interest income Through the reclassifications described below, we move the net guarantee fees earned on mortgage loans into Segment Earnings management and guarantee income

*Investment Activity-Related Reclassifications*

In preparing certain line items within Segment Earnings, we make various reclassifications to earnings determined under GAAP re ated to our investment activities, including those described below Through these reclassifications, we move certain items into or out of net interest income so that, on a Segment Earnings basis, net interest income reflects how we measure the effective interest on securities held in our mortgage investments portfolio and our cash and other investments portfolio

We use derivatives extensively in our investment activity The reclassifications described below allow us to reflect, in Segment Earnings net interest income, the costs associated with this use of derivatives.

• The accrual of periodic cash settlements of all derivatives is reclassified in Segment Earnings from derivative gains (losses) into net interest income to fully reflect the periodic cost associated with the protection provided by these contracts

• Up front cash paid or received upon the purchase or writing of swaptions and other option contracts is reclassified in Segment Earnings prospectively on a straight line basis from derivative gains (losses) into net interest income

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3049

Table of Contents

over the contractual life of the instrument to fully reflect the periodic cost associated with the protection provided by these contracts.

Amortization related to certain items is not relevant to how we measure the economic yield earned on the securities held in our investments portfolio Therefore, as described below, we reclassify these items in Segment Earnings from net interest income to non interest income

- Amortization related to derivative commitment basis adjustments associated with mortgage related and non mortgage related securities is reclassified in Segment Earnings from net interest income to non interest income

- Amortization related to accretion of other than temporary impairments on non mortgage related securities held in our cash and other investments portfolio is reclassified in Segment Earnings from net interest income to non interest income

- Amortization related to premiums and discounts associated with PCs and Other Guarantee Transactions issued by our consolidated trusts that we previously held and subsequently transferred to third parties is reclassified in Segment Earnings from net interest income to non interest income The amortization is related to deferred gains (losses) on transfers of these securities

### *Credit Guarantee Activity-Related Reclassifications*

In preparing certain line items within Segment Earnings, we make various reclassifications to earnings determined under GAAP re ated to our credit guarantee activities, including those described below All credit guarantee related income and costs are included in Segment Earnings management and guarantee income

- Net guarantee fee is reclassified in Segment Earnings from net interest income to management and guarantee income

- Implied management and guarantee fee related to unsecuritized mortgage loans held in the mortgage investments portfolio is reclassified in Segment Earnings from net interest income to management and guarantee income

- The portion of the amount reversed for accrued but uncollected interest upon placing loans on a non accrual status that relates to guarantee fees is reclassified in Segment Earnings from net interest income to management and guarantee income The remaining portion of the allowance for lost interest is reclassified in Segment Earnings from net interest income to provision for credit losses Under GAAP basis earnings and Segment Earnings, the guarantee fee is not accrued on loans three monthly payments or more past due

### *Segment Adjustments*

In presenting Segment Earnings net interest income and management and guarantee income, we make adjustments to better reflect how management measures and assesses the performance of each segment and the company as a whole These adjustments relate to amounts that, effective January 1, 2010, are no longer reflected in net income (loss) as determined in accordance with GAAP as a result of the adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs These adjustments are reversed through the segment adjustments line item within Segment Earnings, so that Segment Earnings (loss) for each segment equals GAAP net income (loss) attributable to Freddie Mac for each segment Segment adjustments consist of the following:

- We adjust our Segment Earnings net interest income for the Investments segment to include the amortization of cash premiums and discounts and buy up and buy down fees on the consolidated Freddie Mac mortgage related securities we purchase as investments As of December 3 , 2011, the unamortized balance of such premiums and discounts and buy up and buy down fees was $1.6 billion. These adjustments are necessary to reflect the economic yield realized on investments in consolidated Freddie Mac mortgage related securities purchased at a premium or discount or with buy up or buy down fees

- We adjust our Segment Earnings management and guarantee income for the Single family Guarantee segment to include the amortization of delivery fees recorded in periods prior to the January 1, 2010 adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs As of December 31, 2011, the unamortized balance of such fees was $2.2 billion. We consider such fees to be part of the effective rate of the guarantee fee on guaranteed mortgage loans This adjustment is necessary in order to better reflect the realization of revenue associated with guarantee contracts over the life of the underlying loans

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3050

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Segment Allocations

The results of each reportable segment include directly attributable revenues and expenses  Administrative expenses that are not directly attributable to a segment are allocated to our segments using various methodologies, depending on the nature of the expense (*i.e.*, semi direct versus indirect). Net interest income for each segment includes allocated debt funding costs related to certain assets of each segment  These allocations, however, do not include the effects of dividends paid on our senior preferred stock  The tax credits generated by the LIHTC partnerships and any valuation allowance on these tax credits are allocated to the Multifamily segment  The deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward is allocated to the "All Other" category  All remaining taxes are calculated based on a 35% federal statutory rate as applied to pre tax Segment Earnings

The table below presents Segment Earnings by segment

**Table 14.1     Summary of Segment Earnings and Total Comprehensive Income (Loss)(1)**

|  | Year Ended December 31, | | |
|  | 2011 | 2010 | 2009 |
|  | | (in millions) | |
| Segmen Earnngs (oss), ne of axes |  |  |  |
| Invesmens | $ 3,366 | $ 1,251 | $ 6,476 |
| Sngle-famly Guaranee | (10,000) | (16,256) | (27,143) |
| Mulfamy | 1,319 | 965 | (511) |
| All Ohe | 49 | 15 | (4,240) |
| Toa Segmen Earnngs (oss), ne of axes | (5,266) | (14,025) | (25,418) |
| Reconclaon o GAAP ne ncome (loss) arbuable o Fedde Mac |  |  |  |
| Ced guaranee- eaed adjsmens(2 |  |  | 5,948 |
| Tax- eaed adusmens |  |  | (2,083) |
| Toal econclng ems, ne of axes |  |  | 3,865 |
| Ne ncome (oss) arbuable o Fedde Mac | $(5,266) | $(14,025) | $(21,553) |
| Toal comprehensve ncome (loss) of segmens |  |  |  |
| Invesmens | $ 6,473 | $ 11,477 | $ 17,805 |
| Sngle-famly Guaranee | (9,970) | (16,250) | (27,124) |
| Mulfamy | 2,218 | 5,040 | 6,781 |
| All Ohe | 49 | 15 | (4,240) |
| Toal comprehensve ncome (loss) of segmens | (1,230) | 282 | (6,778) |
| Reconclaon o GAAP ne ncome (loss) arbuable o Fedde Mac |  |  |  |
| Ced guaranee- eaed adjsmens(2 |  |  | 5,948 |
| Tax- eaed adusmens |  |  | (2,083) |
| Toal econclng ems, ne of axes |  |  | 3,865 |
| Toal comprehensve ncome (loss) arbuable o Fedde Mac | $(1,230) | $   282 | $ (2,913) |

(1) Begnnng Januay 1, 2010, he sum of Segmen Earnngs fo each segmen and he All Ohe caegoy equas GAAP ne ncome (oss) arbuable o Fedde Mac  Lkewse, he sum of oa comprehensve ncome (loss) fo each segmen and he All Ohe caegoy equals GAAP oal comprehensve ncome (loss) arbuable o Fedde Mac

(2) Conssps maly of amozaon and valuaon adusmens eaed o he guaranee asse and guaranee ob gaon whch ae excluded fom Segmen Earnngs and cash compensaon exchanged a he meof securzaon, excudng y- pad buy-down fees, whch sao zed n eanngs These econclng ems exs n peods pro o 2010 as he amendmen o he accounng gudance fo anses of fnancal asse s and consodaon of VIEs was appovedpospec vey on Jaay 1, 2010

277

*Freddie Mac*

Source   DRA HOM   OAN MORTGAG CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents detailed financial information by financial statement line item for our reportable segments and All Other

**Table 14.2    Segment Earnings and Reconciliation to GAAP Results**

Year Ended December 31, 2011

(in millions)

| | Investments | Single family Guarantee | Multifamily | All Other | Total Segment Earnings (Loss), Net of Taxes | Reconciliation to Consolidated Statements of Income and Comprehensive Income | | Total Reconciling Items | Total per Consolidated Statements of Income and Comprehensive Income |
| | | | | | | Reclassifications(1) | Segment Adjustments(2) | | |
|---|---|---|---|---|---|---|---|---|---|
| Net interest income | $ 7,339 | $ (23 | $ 200 | $ | $ 8,516 | $ 9,220 | $ 66 | $ 9,881 | $ 18,397 |
| (Provision) benefit for credit losses | | (12,294 | 96 | | (12,098 | 396 | | 396 | ( 0,702 |
| Non interest income (loss) | | | | | | | | | |
| Management and guarantee income(3) | | 3,647 | 27 | | 3,774 | (2,990 | (699 | (3,604 | 70 |
| Net impairment of available for sale securities recognized in earnings | (1,833 | (3,3 | | | (2,186 | ( | ( | ( | (2,301 |
| Derivative gains (losses) | (3,97 | | 3 | | (3,9 | (61,8 | | (61,8 | (9,72 |
| Gains (losses) on trading securities | (993 | | 39 | | (9,4 | | | | (9,4 |
| Gains (losses) on sale of mortgage loans | 28 | | 383 | | 4 | | | | 4 |
| Gains (losses) on mortgage loans recorded at fair value | 0 | | (83 | | 4,8 | | | | 4,8 |
| Other non interest income (loss) | 266 | 2,6 | 86 | | 2,868 | (1,38 | | (1,38 | 30 |
| Non interest expense | | | | | | | | | |
| Administrative expenses | (398 | (888 | (220 | | ( 06 | | | | ( 06 |
| REO operations income (expense) | | ( 96 | | | ( 8 | | | | ( 8 |
| Other non interest expense | (2 | (321 | (69 | | (392 | | | | (392 |
| Segment adjustments(2) | 66 | (699 | | | (38 | | 38 | 38 | |
| Income tax (expense) benefit | 394 | (42 | ( | 49 | 400 | | | | 400 |
| Net income (loss) | 3,366 | ( 0,000 | 3,9 | 49 | ( 266 | | | | ( 266 |
| Total other comprehensive income net of taxes | 3,07 | 30 | 899 | | 4,036 | | | | 4,036 |
| Comprehensive income (loss) | $ 6,473 | $ (9,970 | $ 2,218 | $ 49 | $ (1,230 | $ | $ | $ | $ (1,230 |

Year Ended December 31, 2010

| | Investments | Single family Guarantee | Multifamily | All Other | Total Segment Earnings (Loss), Net of Taxes | Reconciliation to Consolidated Statements of Income and Comprehensive Income | | Total Reconciling Items | Total per Consolidated Statements of Income and Comprehensive Income |
| | | | | | | Reclassifications(1) | Segment Adjustments(2) | | |
|---|---|---|---|---|---|---|---|---|---|
| Net interest income | $ 6,902 | $ 72 | $ 4 | $ | $ 7,378 | $ 8,120 | $ 13,8 | $ 9,478 | 16,8 6 |
| Provision for credit losses | | (18,78 | (99 | | (18,88 | 666 | | 666 | (17,218 |
| Non interest income (loss) | | | | | | | | | |
| Management and guarantee income(3) | | 3,63 | 0 | | 3,736 | (2,640 | (9,3 | (3,93 | 43 |
| Net impairment of available for sale securities recognized in earnings | (3,819 | | (96 | | (3,91 | (393 | | (393 | ( 308 |
| Derivative gains (losses) | (189 | | 6 | | (18,3 | (6,232 | | (6,232 | (8,08 |
| Gains (losses) on trading securities | (1,386 | | 47 | | (1,339 | | | | (1,339 |
| Gains (losses) on sale of mortgage loans | (76 | | 3,3 | | 267 | | | | 267 |
| Gains (losses) on mortgage loans recorded at fair value | 3 | | (283 | | (249 | | | | (249 |
| Other non interest income (loss) | 1,023 | 1,31 | 30 | | 2,0 | ( 21 | | ( 21 | 1,983 |
| Non interest expense | | | | | | | | | |
| Administrative expenses | ( | (930 | (212 | | ( 97 | | | | ( 97 |
| REO operations income (expense) | | (676 | 3 | | (673 | | | | (673 |
| Other non interest expense | (18 | ( 78 | (66 | | (662 | | | | (662 |
| Segment adjustments(2) | 13,8 | (9,3 | | | 40 | | (40 | (40 | |
| Income tax (expense) benefit | 2,9 | 608 | (26 | 1 | 8,6 | | | | 8,6 |
| Net income (loss) | 12,3 | (16,26 | 962 | 1 | ( 4,026 | | | | ( 4,026 |
| Less net income (loss) noncontrolling interests | (2 | | 3 | | | | | | |
| Net income (loss) attributable to Freddie Mac | 12,1 | (16,26 | 96 | 1 | (14,02 | | | | (14,02 |
| Total other comprehensive income net of taxes | 10,226 | 6 | 4,07 | | 4,307 | | | | 4,307 |
| Total comprehensive income (loss) attributable to Freddie Mac | $ 477 | $ (16,20 | $ 040 | $ 1 | $ 282 | $ | $ | $ | $ 282 |

278

*Freddie Mac*

Source: FREDDIE MAC, LOAN MORTGAGE CORP, 10-K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3052

| | Investments | Single family Guarantee | Multifamily | All Other | Total Segment Earnings (Loss), Net of Taxes | Reclassifications[1] | Credit Guarantee related Adjustments[4] | Tax related Adjustments | Total Reconciling Items | Total per Consolidated Statements of Income and Comprehensive Income |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | _(in millions)_ | | | | |
| Net interest income | $ 8 090 | $ 307 | $ 8 6 | $ | $ 9 2 3 | $ 7 799 | $ 21 | $ | $ 7 820 | $ 7 073 |
| Provision or credit losses | | (29 102 | ( 74 | | (29 676 | 40 | 6 | | 46 | (29 30 |
| Non interest income (loss | | | | | | | | | | |
| Management and guarantee income[3] | 3 8 | | 90 | | 3 38 | 440 | (94 | | ( 0 | 3 033 |
| Net impairment o available or sale securities recognized in earnings | (9 870 | | ( 37 | | ( 0 007 | ( 90 | | | ( 90 | ( 97 |
| Derivative gains (losses | 4 69 | | (27 | | 4 668 | (6 68 | | | (6 68 | ( 900 |
| Gains (losses on trading securities | 88 | | (3 | | 882 | | | | | 882 |
| Gains (losses on sale o mortgage loans | 6 7 | | 6 | | 773 | | (28 | | (28 | 74 |
| Gains (losses on mortgage loans recorded at air value | (46 | | ( 44 | | ( 90 | | | | | ( 90 |
| Other non interest income (loss | (774 | 72 | (47 | (3 6 3 | (4 77 | ( 0 | 7 083 | | 6 072 | 1 89 |
| Non interest expense | | | | | | | | | | |
| Administrative expenses | ( 1 | (949 | (221 | | (1 68 | | | | | (1 68 |
| R O operat ons expense | | (287 | (20 | | (307 | | | | | (307 |
| Other non interest expense | (33 | ( 8 | (18 | ( 09 | ( 0 4 | | ( 89 | | ( 89 | ( 203 |
| income tax (expense bene it | ( 72 | 3 73 | | (478 | 2 23 | 390 | | (2 083 | ( 693 | 830 |
| Net income (loss | 6 477 | (27 143 | ( 13 | (4 240 | (2 419 | | 9 8 | (2 083 | (21 | |
| Less net (income loss noncontrolling interests | ( | | 2 | | | | | | | |
| Net income (loss attributable to reddie Mac | 6 476 | (27 143 | ( | (4 240 | (2 18 | | 9 8 | (2 083 | 3 86 | (21 3 |
| Total other comprehensive income net o taxes | 11 329 | 9 | 7 292 | | 8 640 | | | | | 8 640 |
| Total comprehensive income (loss attributable to reddie Mac | $ 17 80 | $ (27 124 | $ 6 78 | $ (4 240 | $ (6 778 | $ | $ 9 8 | $ (2 083 | $ 3 86 | $ (2 913 |

(1) See "Segmen Ea n ngs   _Investment Activity-Related Reclassifications_" a d "   _Credit Guarantee Activity-Related Reclassifications_" fo nfo ma on ega d ng t ese eclass f ca ons

(2) See "Segmen Ea n ngs   _Segment Adjustments_" fo add onal nfo ma on ega d ng hese adj s e s

(3) Managemen and gua an ee ncome o al pe consol da ed s a emen s of ncome and comp ehens ve ncome s ncluded n o he ncome on ou GAAP consol da ed s a emen s of ncome and comp ehens ve ncome

(4) Cons s p ma ly of amo za on and valua on ad us men s pe a n ng o he gua an ee asse and gua an ee ob ga on wh ch a e excluded f om Segmen Ea n ngs and cash compensa on exchanged a he me of secu za on, exc ud ng  y- p a d buy-down fees, wh ch s a o zed n o ea n ngs These econc l ng ems ex s n pe ods p o o 2010 as he amendmen o he accoun ng gu dance fo ansfe s of f nanc al asse s and conso da on of VIEs was app ed p ospec ve y on Ja a y 1, 2010

279

_Freddie Mac_

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3053

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents total comprehensive income (loss) by segment

**Table 14.3    Total Comprehensive Income (Loss) of Segments[1]**

| | Year Ended December 31, 2011 | | | | | |
| | | Other Comprehensive Income (Loss), Net of Taxes | | | | |
| | Net Income (Loss) Freddie Mac | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | Total Other Comprehensive Income (Loss) Net of Taxes | Total Comprehensive Income (Loss) Freddie Mac |
| | | | (in millions) | | | |
|---|---|---|---|---|---|---|
| Total comprehensive income (loss) of segments | | | | | | |
| Investments | $ 3,366 | $ 2,573 | $ 508 | $ 26 | $ 3,107 | $ 6,473 |
| Single-family Guarantee | (10,000) | | | 30 | 30 | (9,970) |
| Multifamily | 1,319 | 892 | 1 | 6 | 899 | 2,218 |
| All Other | 49 | | | | | 49 |
| Total per consolidated statements of income and comprehensive income | $ (5,266) | $ 3,465 | $ 509 | $ 62 | $ 4,036 | $ (1,230) |

| | Year Ended December 31, 2010 | | | | | |
| | | Other Comprehensive Income (Loss), Net of Taxes | | | | |
| | Net Income (Loss) Freddie Mac | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | Total Other Comprehensive Income (Loss) Net of Taxes | Total Comprehensive Income (Loss) Freddie Mac |
| | | | (in millions) | | | |
|---|---|---|---|---|---|---|
| Total comprehensive income (loss) of segments | | | | | | |
| Investments | $ 1,251 | $ 9,547 | $ 673 | $ 6 | $ 10,226 | $ 11,477 |
| Single-family Guarantee | (16,256) | | | 6 | 6 | (16,250) |
| Multifamily | 965 | 4,074 | | 1 | 4,075 | 5,040 |
| All Other | 15 | | | | | 15 |
| Total per consolidated statements of income and comprehensive income | $ (14,025) | $ 13,621 | $ 673 | $ 13 | $ 14,307 | $ 282 |

| | Year Ended December 31, 2009 | | | | | |
| | | Other Comprehensive Income (Loss), Net of Taxes | | | | |
| | Net Income (Loss) Freddie Mac | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | Total Other Comprehensive Income (Loss) Net of Taxes | Total Comprehensive Income (Loss) Freddie Mac |
| | | | (in millions) | | | |
|---|---|---|---|---|---|---|
| Total comprehensive income (loss) of segments | | | | | | |
| Investments | $ 6,476 | $ 10,536 | $ 774 | $ 19 | $ 11,329 | $ 17,805 |
| Single-family Guarantee | (27,143) | | | 19 | 19 | (27,124) |
| Multifamily | (511) | 7,289 | (1) | 4 | 7,292 | 6,781 |
| All Other | (4,240) | | | | | (4,240) |
| Total Segment Earnings (loss), net of taxes | (25,418) | 17,825 | 773 | 42 | 18,640 | (6,778) |
| Reconciliation to non-GAAP net income (loss) attributable to Freddie Mac | | | | | | |
| Credit guarantee-related adjustments | 5,948 | | | | | 5,948 |
| Tax-related adjustments | (2,083) | | | | | (2,083) |
| Total reconciling items, net of taxes | 3,865 | | | | | 3,865 |
| Total per consolidated statements of income and comprehensive income | $ (21,553) | $ 17,825 | $ 773 | $ 42 | $ 18,640 | $ (2,913) |

(1) Beginning January 1, 2010, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012                                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3054

Table of Contents

## NOTE 15: REGULATORY CAPITAL

On October 9, 2008, FHFA announced that it was suspending capital classification of us during conservatorship in light of the Purchase Agreement  FHFA continues to closely monitor our capital levels, but the existing statutory and FHFA directed regulatory capital requirements are not binding during conservatorship  We continue to provide our submission to FHFA on minimum capital, however we no longer provide our submission of risk based capital to FHFA

Our regulatory minimum capital is a leverage based measure that  is generally calculated based on GAAP and reflects a 2 50% capital requirement for on balance sheet assets and 0 45% capital requirement for off balance sheet obligations  Based  upon our adoption of amendments to the accounting guidance for  transfers of financial assets and consolidation of VIEs, we  determined that, under the new consolidation guidance, we are the primary beneficiary of trusts that issue our single family PCs and certain Other Guarantee Transactions and, therefore, effective January 1, 2010, we consolidated on our balance  sheet the assets and liabilities of these trusts. Pursuant to  regulatory guidance from FHFA, our minimum capital requirement  was not automatically affected by adoption of these amendments  Specifically, upon adoption of these amendments, FHFA directed us, for purposes of minimum capital, to continue reporting  single family PCs and certain Other Guarantee Transactions held by third parties using a 0 45% capital requirement  FHFA reserves the authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities  On  March 3, 2011, FHFA issued a final rule setting forth procedures and standards in the event FHFA were to make such a temporary increase in minimum capital levels

### Regulatory Capital Standards

The GSE Act established minimum, critical, and risk based  capital standards for us, however per guidance received from  FHFA we no longer are required to submit risk based capital  reports to FHFA

Prior to our entry into conservatorship, those standards  determined the amounts of core capital that we were to maintain  to meet regulato y capital requirements  Core capital consisted  of the par value of outstanding common stock (common stock  issued less common stock held in treasury), the par value of outstanding non cumulative, perpetual preferred stock,  additional paid in capital and retained earnings (accumulated deficit), as determined in accordance with GAAP

#### Minimum Capital

The minimum capital standard required us to hold an amount of  core capital that was generally equal to the sum of 2 50% of  agg egate on balance sheet assets and approximately 0 45% of the  sum of our PCs held by third parties and other aggregate  off balance sheet obligations

#### Critical Capital

The critical capital standard required us to hold an amount of  core capital that was generally equal to the sum of 1 25% of  agg egate on balance sheet assets and approximately 0 25% of the  sum of our PCs held by third parties and other aggregate  off balance sheet obligations

### Performance Against Regulatory Capital Standards

The table below summarizes our minimum capital requirements and  deficits and net worth

### Table 15.1    Net Worth and Minimum Capital

|  | December 31, 2011 | December 31, 2010 |
|---|---|---|
|  | (in millions) | |
| GAAP  et wo  h(1 | $            (146) | $            (401) |
| Co e cap  al (def c )(2 (3 | $        (64,322) | $        (52,570) |
| Less M n mum cap  al  equ emen (2 | 24,405 | 25,987 |
| M n mum cap  a  su p us (def c  )(2 | $        (88,727) | $        (78,557) |

(1) Ne  w  h (def c ) ep esen s  he d ffe ence be ween ou  asse s and  ab   es unde GAAP
(2) Co e cap  al and m n mum cap  al f gu es fo  Decembe 31, 2011 a e es  FHFA s  he au ho  a ve sou ce fo  ou  egula o y cap al
(3) Co e cap a  exc udes ce  a n componen s of GAAP o a  equ y (def c )(i.e., AOCI,  q  da o  p efe e ce of  e sen o  p efe  ed s ock) as hese  ems do no  mee  t e stat to y def n  on of co e cap al

Following our entry into conservatorship, we have focused our  risk and capital management, consistent with the objectives of conservatorship, on, among other things, maintaining a positive  balance of GAAP equity in order to reduce the likelihood that we  will need to make additional draws on the Purchase Agreement with Treasury. The Purchase Agreement provides that, if FHFA determines as of quarter end that our liabilities have exceeded our assets under GAAP, Treasury will contribute funds to us in an amount equal to the difference between such liabilities and assets.

*Freddie Mac*

Source    D RA   HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date FHFA has advised us that, if, during that 60 day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination If funding has been requested under the Purchase Agreement to address a deficit in our net worth, and Treasury is unable to provide us with such funding within the 60 day period specified by FHFA, FHFA would be required to place us into receivership if our assets remain less than our obligations during that 60 day period

To address our net worth deficit of $146 million at December 31, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $146 million, and will request that we receive these funds by March 31, 2012. Our draw request represents our net worth deficit at quarter end rounded up to the nearest $1 million. Upon funding of this draw request, our aggregate funding received from Treasury under the Purchase Agreement will increase to $7 3 billion This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received As a result of the additional $146 million draw request, the aggregate liquidation preference on the senior preferred stock owned by Treasury will increase from $72.2 billion at December 31, 2011 to $72.3 billion. We paid a quarterly dividend of $1.6 billion, $1.6 billion, $1.6 billion, and $1.7 billion on the senior preferred stock in cash on March 31, 2011, June 30, 2011, September 30, 2011, and December 30, 20 , respectively, at the direction of the Conservator Following funding of the draw request related to our net worth deficit at December 31, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $7.22 billion to $7.23 billion, which exceeds our annual historical earnings in all but one period

### Subordinated Debt Commitment

In October 2000, we announced our adoption of a series of commitments designed to enhance market discipline, liquidity and capital In September 2005, we entered into a written agreement with FHFA that updated those commitments and set forth a process for implementing them FHFA, as Conservator of Freddie Mac, has suspended the requirements in the September 2005 agreement with respect to issuance, maintenance and reporting and disclosure of Freddie Mac subordinated debt during the term of conservatorship and thereafter until directed otherwise

## NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS

### Single family Credit Guarantee Portfolio

Our business activity is to participate in and support the residential mortgage market in the United States, which we pursue by both issuing guaranteed mortgage securities and investing in mortgage loans and mortgage related securities

The table below summarizes the concentration by year of origination and geographical area of the approximately $ 7 trillion and $1.8 trillion UPB of our single family credit guarantee portfolio at December 31, 2011 and 2010, respectively See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" and "NOTE 7: INVESTMENTS IN SECURITIES" for more information about credit risk associated with loans and mortgage related securities that we hold.

Source D RA HOM OAN MORTGAG CORP, 10 K, March 09, 2012 TREASURY-3056 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 16.1    Concentration of Credit Risk    Single Family Credit Guarantee Portfolio**

| | December 31, 2011 | | December 31, 2010 | | Percent of Credit Losses(1) Year Ended | |
| --- | --- | --- | --- | --- | --- | --- |
| | Percentage of Portfolio(2) | Serious Delinquency Rate(3) | Percentage of Portfolio(2) | Serious Delinquency Rate(3) | December 31, 2011 | December 31, 2010 |
| Yea of O g na on | | | | | | |
| 2011 | 14% | 0 1% | N/A | N/A | | N/A |
| 2010 | 19 | 0 3 | 18% | 0 1% | <1% | |
| 2009 | 18 | 0 5 | 21 | 0 3 | 1 | <1% |
| 2008 | 7 | 5 7 | 9 | 4 9 | 8 | 7 |
| 2007 | 10 | 11 6 | 11 | 11 6 | 36 | 34 |
| 2006 | 7 | 10 8 | 9 | 10 5 | 28 | 30 |
| 2005 | 8 | 6 5 | 10 | 6 0 | 18 | 20 |
| 2004 and p o | 17 | 2 8 | 22 | 2 5 | 9 | 9 |
| o a | 100% | 3 6% | 100% | 3 8% | 100% | 100% |
| Reg on( | | | | | | |
| Wes | 28% | 3 6% | 27% | 4 7% | 53% | 48% |
| No heas | 25 | 3 4 | 25 | 3 2 | 7 | 8 |
| No h Cen a | 18 | 2 9 | 18 | 3 1 | 16 | 15 |
| So t east | 17 | 5 5 | 18 | 5 6 | 20 | 25 |
| So t west | 12 | 1 8 | 12 | 2 1 | 4 | 4 |
| o a | 100% | 3 6% | 100% | 3 8% | 100% | 100% |
| State( | | | | | | |
| Ca fo n a | 16% | 3 4% | 16% | 4 9% | 29% | 26% |
| F o da | 6 | 10 9 | 6 | 10 5 | 13 | 19 |
| no s | 5 | 4 7 | 5 | 4 6 | 5 | 5 |
| Georg a | 3 | 3 3 | 3 | 4 1 | 4 | 3 |
| M ch gan | 3 | 2 3 | 3 | 3 0 | 4 | 5 |
| A zona | 2 | 4 3 | 3 | 6 1 | 11 | 11 |
| Nevada | 1 | 9 8 | 1 | 11 9 | 7 | 6 |
| All o he | 64 | 2 8 | 63 | 2 8 | 27 | 25 |
| o a | 100% | 3 6% | 100% | 3 8% | 100% | 100% |

(1) C ed losses cons s of he agg ega e amoun of cha ge-offs, ne of ecove es, and REO ope a on expense n each of he espec ve pe ods and exclude fo egone
    n e es on non-pe fo m ng loans and o he ma ke -based losses ecogn zed on ou consol da ed s a emen s of ncome and comp ehens ve ncome
(2) Based on he UPB of ou s ng e-fam y c ed gua an ee po fol o, wh ch ncludes unsecu zed s ngle-fam ly mo gage oans he d by us on ou conso da ed ba ance
    s ee s a d ose unde y ng F edd e Mac mo gage- ela ed secu es, o cove ed by ou o he gua an ee comm men s
(3) Se ous del nquenc es on mo gage loans nclude ly ng ce a REMICs a d Ot e St ct ed Sec es, Ot e G a a tee T ansac ons, and o e g a an ee
    comm men s may be epo ed on a d ffe e sc ed ed e ova a ces     d sy p ac ce
(4) Reg o des g at o  West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); No t east (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA,
    WV); No t  Ce t a  (IL, IN, IA, MI, MN, ND, OH, SD, WI); So t east (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); So t west (AR, CO, KS, LA,
    MO, NE, NM, OK, TX, WY)
(5) S a es p ese ed based o  ose w  e  g es pe ce age of c ed osses du ng he yea ended Dece  31, 2011 Ou op seve s a es based o  e  g es
    pe ce age of UPB as of Decembe  31, 2011 a e Ca fo n a (16%), F  o s (5%), New Yo k (5%), Texas (4%), New Je sey (4%), a d V g n a (4%),
    and comp sed 44% of ou s ngle-fam ly c ed  gua an ee po fol o as of Decembe  31, 2011

**Credit Performance of Certain Higher Risk Single Family Loan Categories**

    Participants in the mortgage market often characterize single family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Many mortgage market participants classify single family loans with credit characteristics that differ from their prime and subprime categories as Alt A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both However, there is no universally accepted definition of subprime or Alt A  Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mo tgage (including Alt A loans) was originated under less than full documentation standards. In the event we purchase a refinance mortgage in either our re ef refinance mortgage initiative or in another refinance mortgage initiative and the original loan had been previously identified as Alt A, such refinance loan may no longer be categorized or reported as Alt A in the table below because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt A loan  As a result, our reported Alt A balances may be lower than would otherwise be the case had such refinancing not occurred

    Although we do not categorize single family mortgage loans we purchase or guarantee as prime or subprime, we recognize that there are a number of mortgage loan types with certain characteristics that indicate a higher degree of credit risk  For example, a borrower's credit score is a useful measure for assessing the credit quality of the borrower

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-3057
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Statistically, borrowers with higher credit scores are more likely to repay or have the ability to refinance than those with lower scores

Presented below is a summary of the serious delinquency rates of certain higher risk categories of single family loans in our single family credit guarantee portfolio  The table includes a presentation of each higher risk category in isolation  A single loan may fall within more than one category (for example, an interest only loan may also have an original LTV ratio greater than 90%). Loans with a combination of these attributes will have an even higher risk of delinquency than those with isolated characteristics.

**Table 16.2    Certain Higher Risk Categories in the Single Family Credit Guarantee Portfolio[1]**

| | Percentage of Portfolio[1] | | Serious Delinquency Rate | |
|---|---|---|---|---|
| | December 31, 2011 | December 31, 2010 | December 31, 2011 | December 31, 2010 |
| In e es -only | 4% | 5% | 17 6% | 18 4% |
| Op on ARM | <1 | 1 | 20 5 | 21 2 |
| Al -A(2 | 5 | 6 | 11 9 | 12 2 |
| O g nal LTV  a o g ea e  han 90%(3 | 10 | 9 | 6 7 | 7 8 |
| Lowe  FICO sco es a o g na on (less  han 620) | 3 | 3 | 12 9 | 13 9 |

(1) Based o  UPB

(2) Al -A oans may no  nc ude  hose  oans  ha  we e p ev ous y c ass f ed as  Al -A a  d  ha  have been  ef nanced as e  he  a el ef  ef nance mo  gage  o  n ano he
 ef nance mo  gage  n  a  ve

(3) Based o  f  s  e expos  o  e p ope y I c  des  e c ed -enhanced po  on of  he  oan and exc udes any seconda y f nanc ng by  h  d pa  es  The
 ex s ence of a second l en  ed ces  e bo  owe 's eq  y  e p ope  y a d, he efo e, nc eases  he  sk of defau

The percentage of borrowers in our single family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 20% and 18% at December 31, 2011 and December 31, 2010, respectively  As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan  If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and is more likely to default than other borrowers  The serious delinquency rate for single family loans with estimated current LTV ratios greater than 100% was 12.8% and 14.9% as of December 31, 2011 and December 3 , 20 0, respectively

We categorize our investments in non agency mortgage related securities as subprime, option ARM, or Alt A if the securities were identified as such based on information provided to us when we entered into these transactions  We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt A securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on these categories and other concentrations in our investments in securities

**Multifamily Mortgage Portfolio**

The table below summarizes the concentration of multifamily mortgages in our multifamily mortgage portfolio by certain attributes. Information presented for multifamily mortgage loans includes certain categories based on loan or borrower characteristics present at origination  The table includes a presentation of each category in isolation  A single loan may fall within more than one category (for example, a non credit enhanced loan may also have an original LTV ratio greater than 80%)

<div align="center">284</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 16.3     Concentration of Credit Risk     Multifamily Mortgage Portfolio**

| | December 31, 2011 | | December 31, 2010 | |
| | UPB(1) | Delinquency Rate(2) | UPB(1) | Delinquency Rate(2) |
|---|---|---|---|---|
| | (in billions) | | | |
| State(3) | | | | |
| Ca fo n a | $ 20 2 | 0 02% | $ 19 3 | 0 06% |
| Texas | 14 0 | 0 46 | 12 7 | 0 52 |
| New Yo k | 9 6 | | 9 2 | |
| F o da | 7 1 | 0 05 | 6 4 | 0 56 |
| V rg n a | 6 3 | | 5 6 | |
| Ma y and | 5 7 | | 5 3 | |
| A o he s a es | 53 2 | 0 35 | 49 9 | 0 35 |
| o a | $116 1 | 0 22% | $108 4 | 0 26% |
| Reg on( | | | | |
| No heas | $ 33 1 | 0 01% | $ 31 1 | % |
| Wes | 29 9 | 0 07 | 28 3 | 0 07 |
| So t west | 22 4 | 0 44 | 20 2 | 0 61 |
| So t east | 20 7 | 0 65 | 19 2 | 0 59 |
| No h Cen a | 10 0 | 0 01 | 9 6 | 0 30 |
| o a | $116 1 | 0 22% | $108 4 | 0 26% |
| Ca ego v( | | | | |
| O g nal LTV a o g ea e han 80% | $ 6 4 | 2 34% | $ 6 6 | 2 30% |
| O g nal DSCR below 1 10 | 2 8 | 2 58 | 3 2 | 1 22 |
| Non-c ed enhanced loans | 84 5 | 0 11 | 87 5 | 0 12 |

(1) Beg nn ng n he second qua e of 2011, we exc ude non-consol da ed mo gage- ela ed secu es fo wh ch we do no p ov de ou gua an ee The p o p e od has been ev sed o confo m o he cu en pe od p esen a on

(2) Based on he UPB of mul fam ly mo gages wo mon hly paymen s o mo e del nquen o n fo eclosu e

(3) Rep esen s he s x s a es w h he h ghes geog aph c concen a on by UPB a Decembe 31, 2011

(4) See endno e (4) o "Tab e 16 1    Concen a on of C ed R sk    S ngle-fam ly C ed   Gua an ee Po fol o" fo a desc p on of hese eg ons

(5) These ca ego es a e no mu ua y exc us ve and a oan n one ca ego y may also be included w h n ano he

One indicator of risk for mortgage loans in our multifamily mortgage portfolio is the amount of a borrower's equity in the underlying property  A borrower's equity in a property decreases as the LTV ratio increases  Higher LTV ratios negatively affect a borrower's ability to refinance or sell a property for an amount at or above the balance of the outstanding mortgage  The DSCR is another indicator of future credit performance. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non mortgage expenses from income  The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation

Our multifamily mortgage portfolio includes certain loans for which we have credit enhancement  Credit enhancement significantly reduces our exposure to a potential credit loss  As of December 31, 2011, more than one half of the multifamily loans that were two monthly payments or more past due, measured both in terms of number of loans and on a UPB basis, had credit enhancements that we currently believe will mitigate our expected losses on those loans  See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for additional information about credit enhancements on multifamily loans.

We estimate that the percentage of loans in our multifamily mortgage portfolio with a current LTV ratio of greater than  00% was approximately 5% and 8% at December 31, 2011 and December 31, 2010, respectively, and our estimate of the current average DSCR for these loans was 1.1 at both December 3 , 20   and December 3 , 20 0  We estimate that the percentage of loans in our multifamily mortgage portfolio with a current DSCR less than 1.0 was 5% and 7% at December 31, 2011 and December 31, 2010, respectively, and the average current LTV ratio of these loans was 107% and 108%, respectively  Our estimates of current DSCRs are based on the latest available income information for these properties and our assessments of market conditions. Our estimates of the current LTV ratios for multifamily loans are based on values we receive from a third party service provider as well as our internal estimates of property value, for which we may use changes in tax assessments, market vacancy rates, rent growth and comparable property sales in local areas as well as third party appraisals for a portion of the portfolio  We periodically perform our own valuations or obtain third party appraisals in cases where a significant deterioration in a borrower's financial condition has occurred, the borrower has applied for refinancing, or in certain other circumstances where we deem it appropriate to reassess the property value  Although we use the most recently available results of our multifamily borrowers to estimate a property's value, there may be a significant lag in reporting, which could be six months or more, as they complete their results in the normal course of business  Our internal estimates of property valuation are derived using techniques that include income capitalization, discounted cash flows, sales comparables, or replacement costs.

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012          TREASURY-3059          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Seller/Servicers**

We acquire a significant portion of our single family mortgage purchase volume from several large seller/servicers with whom we have entered into mortgage purchase volume commitments that provide for the lenders to deliver us up to a certain volume of mortgages during a specified period of time Our top 0 single family seller/servicers provided approximately 82% of our single family purchase volume during the year ended December 31, 2011. Wells Fargo Bank, N.A. and JPMorgan Chase Bank, N.A., accounted for 28%, and 13%, respectively, of our single family mortgage purchase volume and were the only single family seller/servicers that comprised 0% or more of our purchase volume during the year ended December 31, 2011 We are exposed to the risk that we could lose purchase volume to the extent these arrangements are terminated without replacement from other lenders

We are exposed to institutional credit risk arising from the potential insolvency or non performance by our seller/servicers of their obligations to repurchase mortgages or (at our option) indemnify us in the event of: (a) breaches of the representations and warranties they made when they sold the mortgages to us; or (b) failure to comply with our servicing requirements Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts. As of December 31, 2011 and 2010, the UPB of loans subject to our repurchase requests issued to our single family seller/servicers was approximately $2.7 billion and $3.8 billion, and approximately 39% and 34% of these requests, respectively, were outstanding for more than four months since issuance of our initial repurchase request as measured by the UPB of the loans subject to the requests (these figures included repurchase requests for which appeals were pending) As of December 31, 2011, two of our largest seller/servicers had agg egate repurchase requests outstanding, based on UPB, of $1 4 billion, and approximately 48% of these requests were outstanding for four months or more since issuance of the initial request During 2011 and 2010, we recovered amounts that covered losses with respect to $4 4 billion and $6.4 billion, respectively, of UPB on loans subject to our repurchase requests.

GMAC Mortgage, LLC and Residential Funding Company, LLC (collectively GMAC), indirect subsidiaries of Ally Financial Inc (formerly, GMAC Inc ), are seller/servicers that together serviced and subserviced for an affiliated entity approximately 4% of the single family loans in our single family credit guarantee portfolio as of December 31, 2011 In March 2010, we entered into an agreement with GMAC, under which they made a one time payment to us for the partial release of repurchase obligations relating to loans sold to us prior to January 1, 2009. The partial release does not affect any of GMAC's potential repurchase obligations for loans sold to us by GMAC after January 1, 2009, nor does it affect the ability to recover amounts associated with failure to comply with our servicing requirements The agreement did not have a material impact on our 2011 or 2010 consolidated statements of income and comprehensive income

On December 3 , 20 0, we entered into an agreement with Bank of America, N.A., and two of its affiliates, BAC Home Loans Servicing, LP and Countrywide Home Loans, Inc., to resolve our currently outstanding and future claims for repurchases arising from the breach of representations and warranties on certain loans purchased by us from Countrywide Home Loans, Inc. and Countrywide Bank FSB. Under the terms of the agreement, we received a $1.28 billion cash payment in consideration for releasing Bank of America and its two affiliates from current and future repurchase requests arising from loans sold to us by the Countrywide entities for which the first regularly scheduled monthly payments were due on or before December 3 , 2008 The UPB of the loans in this portfolio, as of December 31, 2010, was approximately $114 billion The agreement applies only to certain claims for repurchase based on breaches of representations and warranties and the agreement contains specified limitations and does not cover loans sold to us or serviced for us by other Bank of America entities. This agreement did not have a material impact on our 2011 or 2010 consolidated statements of income and comprehensive income

On August 24, 2009, one of our single family seller/servicers, Taylor, Bean & Whitaker Mortgage Corp., or TBW, filed for bankruptcy and announced its plan to wind down its operations We had exposure to TBW with respect to its loan repurchase obligations We also had exposure with respect to certain borrower funds that TBW held for the benefit of Freddie Mac. TBW received and processed such funds in its capacity as a servicer of loans owned or guaranteed by Freddie Mac. TBW maintained certain bank accounts, primarily at Colonial Bank, to deposit such borrower funds and to provide remittance to Freddie Mac Colonial Bank was placed into receivership by the FDIC in August 2009.

With the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW The settlement was filed with the bankruptcy court on June 22, 2011. The court approved the settlement and confirmed TBW's proposed plan of liquidation on July 21, 2011, which became effective on August 10, 2011. See "NOTE 18: LEGAL CONTINGENCIES" for additional information on the settlement, our claims arising from TBW's bankruptcy, and potential claims by Ocala Funding, LLC, which is a wholly owned subsidiary of TBW, or Ocala's creditors.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3060

Table of Contents

As previously disclosed, we joined an investor group that delivered a notice of non performance in 20 0 to The Bank of New York Mellon, as Trustee, and Countrywide Home Loans Servicing LP (now known as BAC Home Loans Servicing, LP), related to the possibility that certain mortgage pools backing certain mortgage related securities issued by Countrywide Financial Corporation and related entities include mortgages that may have been ineligible for inclusion in the pools due to breaches of representations or warranties

On June 29, 2011, Bank of America Corporation announced that it, BAC Home Loans Servicing, LP, Countrywide Financial Corporation and Countrywide Home Loans, Inc entered into a settlement agreement with The Bank of New York Mellon, as trustee, to resolve all outstanding and potential claims related to alleged breaches of representations and warranties (including represen tations), substantially all historical loan servicing claims and certain other historical claims with respect to 530 Countrywide first lien and second lien residential mortgage related securitization trusts Bank of America indicated that the settlement is subject to final court approval and certain other conditions, including the receipt of a private letter ruling from the IRS There can be no assurance that final court approval of the settlement will be obtained or that all conditions will be satisfied Bank of America noted that, given the number of investors and the complexity of the settlement, it is not possible to predict the timing or ultimate outcome of the court approval process, which could take a substantial period of time We have investments in certain of these Countrywide securitization trusts and would expect to benefit from this settlement, if final court approval is obtained.

In connection with the settlement, Bank of America Corporation entered into an agreement with the investor group Under this agreement, the investor group agreed, among other things, to use reasonable best efforts and to cooperate in good faith to effectuate the settlement, including to obtain final court approval Freddie Mac was not a party to this agreement, but agreed to retract any previously delivered notices of non performance upon final court approval of the settlement

The Bank of New York Mellon, as trustee, filed the settlement in state court in New York and planned to seek approval at a hearing, which approval would bind all investors in the related trusts The court directed that any objections to the settlement be filed no later than August 30, 2011. On August 30, 2011, FHFA announced that, in its capacity as conservator, it had filed an appearance and conditional objection regarding the settlement, in order to obtain any additional pertinent information developed in the matter In the announcement, FHFA, as conservator, stated that it is aware of no basis upon which it would raise a substantive objection to the settlement at this time, but that it believes it prudent not only to receive additional information as it continues its due diligence of the settlement, but also to reserve its capability to voice a substantive objection in the unlikely event that necessity should arise.

On August 26, 2011, the case was removed to Federal court. The trustee filed a motion to remand the case back to state court. On October 19, 2011, the Federal court denied the trustee's motion to remand The trustee appealed this decision. On February 27, 2012, the federal appellate court reversed the district court and ordered the case to be remanded back to state court.

On September 2, 2011, FHFA announced that, as Conservator for Freddie Mac and Fannie Mae, it had filed lawsuits against 17 financial institutions and related defendants alleging: (a) violations of federal securities laws; and (b) in certain lawsuits, common law fraud in the sale of residential non agency mortgage related securities to Freddie Mac and Fannie Mae. FHFA, as Conservator, filed a similar lawsuit against UBS Americas, Inc. and related defendants on July 27, 2011. FHFA seeks to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in certain residential non agency mortgage related securities issued by these financial institutions.

The ultimate amounts of recovery payments we receive from seller/servicers may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations Our estimate of probable incurred losses for exposure to seller/servicers for their repurchase obligations is considered in our allowance for loan losses as of December 31, 2011 and 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES Allowance for Loan Losses and Reserve for Guarantee Losses" for further information We believe we have appropriately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at December 31, 2011 and 2010; however, our actual losses may exceed our estimates

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses For example, our seller/servicers have an active role in our loss mitigation efforts, including under the servicing alignment initiative and the MHA Program, and therefore, we have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans

A significant portion of our single family mortgage loans are serviced by several large seller/servicers Our top three single family loan servicers, Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A., together

<div align="center">287</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

serviced approximately 49% of our single family mortgage loans as of December 31, 2011. Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A. serviced approximately 26%, 12%, and 11%, respectively, of our single family mortgage loans, as of December 31, 2011  Since we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, it could have an adverse impact on our business and financial results.

During the second half of 2010, a number of our seller/servicers, including several of our largest ones, temporarily suspended foreclosure proceedings in some or all states in which they do business. These seller/servicers announced these suspensions were necessary while they evaluated and addressed issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, including affidavits  While these servicers generally resumed foreclosure proceedings in the first quarter of 2011, the rate at which they are effecting foreclosures has been slower than prior to the suspensions. See "NOTE 6: REAL ESTATE OWNED" for additional information.

As of December 31, 2011 our top three multifamily servicers, Berkadia Commercial Mortgage LLC, CBRE Capital Markets, Inc., and Wells Fargo Bank, N.A., each serviced more than  0% of our multifamily mortgage portfolio and together serviced approximately 40% of our multifamily mortgage portfolio

In our multifamily business, we are exposed to the risk that multifamily seller/servicers could come under financial pressure, which could potentially cause degradation in the quality of the servicing they provide us, including their monitoring of each property's financial performance and physical condition. This could also, in certain cases, reduce the likelihood that we could recover losses through lender repurchases, recourse agreements, or other credit enhancements, where applicable. This risk primarily relates to multifamily loans that we hold on our consolidated balance sheets where we retain all of the related credit risk  We monitor the status of all our multifamily seller/servicers in accordance with our counterparty credit risk management framework.

## Mortgage Insurers

We have institutional credit risk relating to the potential insolvency of or non performance by mortgage insurers that insure single family mortgages we purchase or guarantee  We evaluate the recovery and collectability from insurance policies for mortgage loans that we hold for investment as well as loans underlying our non consolidated Freddie Mac mortgage related securities or covered by other guarantee commitments as part of the estimate of our loan loss reserves  See "NOTE 1:  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES      Allowance for Loan Losses and Reserve for Guarantee Losses" for additional information  As of December 31, 2011, these insurers provided coverage, with maximum loss limits of $50.6 billion, for $238.3 billion of UPB, in connection with our single family credit guarantee portfolio  Our top five mortgage insurer counterparties, Mortgage Guaranty Insurance Corporation (or MGIC), Radian Guaranty Inc., Genworth Mortgage Insurance Corporation, United Guaranty Residential Insurance Co , and PMI Mortgage Insurance Co  (or PMI) each  accounted for more than 10% and collectively represented approximately 84% of our overall mortgage insurance coverage at  December 3 , 20    All our mortgage insurance counterparties are rated BBB or below as of February 27, 2012, based on the lower of the S&P or Moody's rating scales and stated in terms of the S&P equivalent.

We received proceeds of $2.5 billion and $1.8 billion during 2011 and 2010, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single family loans  We had outstanding receivables from mortgage insurers of $1.8 billion and $2.3 billion as of December 31, 2011 and 2010, respectively  The balance of our outstanding accounts receivable from mortgage insurers, net of associated reserves, was approximately $1.0 billion and  $1.5 billion as of December 31, 2011 and 2010, respectively

In August 2011, we suspended RMIC and its affiliates, and PMI and its affiliates, as approved mortgage insurers for Freddie Mac loans, making loans insured by either company ineligible for sale to Freddie Mac  Both of these companies ceased writing new  business during the third quarter of 2011, and have been put under state supervision. PMI instituted a partial claim payment plan in October 2011, under which claim payments will be made 50% in cash, with the remaining amount deferred as a policyholder claim  RMIC instituted a partial claim payment plan in January 2012, under which claim payments will be made 50% in  cash and 50% in deferred payment obligations for an initial period not to exceed one year  We and FHFA are in discussions with the state regulators of PMI and RMIC concerning future payments of our claims  It is not yet clear how the state regulators of PMI and RMIC will administer their respective deferred payment plans. In the future, our mortgage insurance exposure will likely be concentrated among a smaller number of mortgage insurer counterparties

Triad Guaranty Insurance Corp., or Triad, is continuing to pay claims 60% in cash and 40% in deferred payment obligations under orders of its state regulator  To date, the state regulator has not allowed Triad to begin paying its deferred payment obligations and it is uncertain when or if Triad will be permitted to do so

<div align="center">288</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Bond Insurers

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering some of the non agency mortgage related securities we hold Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. At December 31, 2011, we had coverage, including secondary policies, on non agency mortgage related securities totaling $9.7 billion of UPB. At December 31, 2011, our top five bond insurers, Ambac Assurance Corporation (or Ambac), Financial Guaranty Insurance Company (or FGIC), MBIA Insurance Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corp , each accounted for more than 0% of our overall bond insurance coverage and collectively represented approximately 99% of our total coverage

We evaluate the expected recovery from primary bond insurance policies as part of our impairment analysis for our investments in securities. FGIC and Ambac are currently not paying any claims. In addition, if a bond insurer fails to meet its obligations on our investments in securities, then the fair values of our securities may further decline, which could have a material adverse effect on our results and financial condition We recognized other than temporary impairment losses during 20 and 20 0 related to investments in mortgage related securities covered by bond insurance as a result of our uncertainty over whether or not certain insurers will meet our future claims in the event of a loss on the securities See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on our evaluation of impairment on securities covered by bond insurance.

### Cash and Other Investments Counterparties

We are exposed to institutional credit risk arising from the potential insolvency or non performance of counterparties of non-mortgage-re ated investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank As of December 31, 2011 and 2010, including amounts related to our consolidated VIEs, there were $68.5 billion and $91.6 billion, respectively, of cash and other non mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank As of December 31, 2011, these included:

- $3.6 billion of cash equivalents invested in 16 counterparties that had short term credit ratings of A or above on the S&P or equivalent scale;

- $12 0 billion of securities purchased under agreements to resell with three counterparties that had short term S&P ratings of A or above; and

- $52 3 billion of cash deposited with the Federal Reserve Bank (as a non interest bearing deposit)

### Derivative Portfolio

#### *Derivative Counterparties*

Our use of OTC derivatives and exchange traded derivatives exposes us to institutional credit risk The requirement that we post initial and maintenance margin with our clearing firm in connection with exchange traded derivatives such as futures contracts exposes us to institutional credit risk in the event that our clearing firm or the exchange's clearinghouse fail to meet their obligations However, the use of exchange traded derivatives lessens our institutional credit risk exposure to individual counterparties, because a central counterparty is substituted for individual counterparties and changes in the value of open exchange traded contracts are settled daily via payments through the financial clearinghouse established by each exchange OTC derivatives, however, expose us to institutional credit risk to individual counterparties because transactions are executed and settled between us and each counterparty, exposing us to potential losses if a counterparty fails to meet its contractual obligations

Our use of OTC interest rate swaps, option based derivatives, and foreign currency swaps is subject to rigorous internal credit and legal reviews All of our OTC derivatives counterparties are major financial institutions and are experienced participants in the OTC derivatives market.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                TREASURY-3063                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Master Netting and Collateral Agreements

We use master netting and collateral agreements to reduce our credit risk exposure to our active OTC derivative counterparties for interest rate swaps, option based derivatives, and foreign currency swaps Master netting agreements provide for the netting of amounts receivable and payable from an individual counterparty, which reduces our exposure to a single counterparty in the event of default. On a daily basis, the market value of each counterparty's derivatives outstanding is calculated to determine the amount of our net credit exposure, which is equal to derivatives in a net gain position by counterparty after giving consideration to collateral posted Our collateral agreements require most counterparties to post collateral for the amount of our net exposure to them above the applicable threshold Bilateral collateral agreements are in place for all of our active OTC derivative counterparties Collateral posting thresholds are tied to a counterparty's credit rating Derivative exposures and collateral amounts are monitored on a daily basis using both internal pricing models and dealer price quotes Collateral is typically transferred within one business day based on the values of the related derivatives This time lag in posting collateral can affect our net uncollateralized exposure to derivative counterparties

Collateral posted by a derivative counterparty is typically in the form of cash, although U.S. Treasury securities, Freddie Mac mortgage related securities, or our debt securities may also be posted In the event a counterparty defaults on its obligations under the derivatives agreement and the default is not remedied in the manner prescribed in the agreement, we have the right under the agreement to direct the custodian bank to transfer the collateral to us or, in the case of non cash collateral, to sell the collateral and transfer the proceeds to us.

Our uncollateralized exposure to counterparties for OTC interest rate swaps, option based derivatives, foreign currency swaps, and purchased interest rate caps, after applying netting agreements and collateral, was $71 million and $32 million at December 31, 2011 and 2010, respectively In the event that all of our counterparties for these derivatives were to have defaulted simultaneously on December 31, 2011, our maximum loss for accounting purposes would have been approximately $71 million Three counterparties each accounted for greater than 0% and collectively accounted for 97% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at December 3 , 2011. These counterparties were HSBC Bank USA, Royal Bank of Scotland, and UBS AG, all of which were rated "A" or above by S&P as of February 27, 2012.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives, was $38 million and $103 million at December 31, 2011 and 2010, respectively These commitments are uncollateralized Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis to ensure that they continue to meet our internal risk management standards.

## NOTE 17: FAIR VALUE DISCLOSURES

### Fair Value Hierarchy

The accounting guidance for fair value measurements and disclosures establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value Fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date Observable inputs reflect market data obtained from independent sources. Unobservable inputs reflect assumptions based on the best information available under the circumstances We use valuation techniques that seek to maximize the use of observable inputs, where available, and minimize the use of unobservable inputs.

The three levels of the fair value hierarchy are described below:

- Level 1: Quoted prices (unadjusted) in active markets that are accessible at the measurement date for identical assets or liabilities;

- Level 2: Quoted prices for similar assets and liabilities in active markets; quoted prices for identical or similar assets and liabilities in markets that are not active; inputs other than quoted market prices that are observable for the asset or liability; and inputs that are derived principally from or corroborated by observable market data for substantially the full term of the assets; and

- Level 3: Unobservable inputs for the asset or liability that are supported by little or no market activity and that are significant to the fair values.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Assets and liabilities are classified in their entirety within the fair value hierarchy based on the lowest level input that is significant to the fair value measurement. The table below sets forth by level within the fair value hierarchy assets and liabilities measured and reported at fair value on a recurring basis in our consolidated balance sheets at December 31, 2011 and 2010.

**Table 17.1    Assets and Liabilities Measured at Fair Value on a Recurring Basis**

| | Fair Value at December 31, 2011 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment(1) | Total |
| | | | (in millions) | | |
| **Assets:** | | | | | |
| Investments in securities | | | | | |
| Available-for-sale, at fair value | | | | | |
| Mortgage-related securities | | | | | |
| Freddie Mac | $ | $ 79,044 | $ 2,048 | $ | $ 81,092 |
| Subprime | | | 27,999 | | 27,999 |
| CMBS | | 51,907 | 3,756 | | 55,663 |
| Option ARM | | | 5,865 | | 5,865 |
| Alt-A and other | | 11 | 10,868 | | 10,879 |
| Fannie Mae | | 20,150 | 172 | | 20,322 |
| Obligations of states and political subdivisions | | | 7,824 | | 7,824 |
| Manufactured housing | | | 766 | | 766 |
| Ginnie Mae | | 237 | 12 | | 249 |
| Total available-for-sale securities, at fair value | | 151,349 | 59,310 | | 210,659 |
| Trading, at fair value | | | | | |
| Mortgage-related securities | | | | | |
| Freddie Mac | | 14,181 | 1,866 | | 16,047 |
| Fannie Mae | | 14,627 | 538 | | 15,165 |
| Ginnie Mae | | 134 | 22 | | 156 |
| Other | | 74 | 90 | | 164 |
| Total mortgage-related securities | | 29,016 | 2,516 | | 31,532 |
| Non-mortgage-related securities | | | | | |
| Asset-backed securities | | 302 | | | 302 |
| Treasury bills | 100 | | | | 100 |
| Treasury notes | 24,712 | | | | 24,712 |
| FDIC-guaranteed corporate medium-term notes | | 2,184 | | | 2,184 |
| Total non-mortgage-related securities | 24,812 | 2,486 | | | 27,298 |
| Total trading securities, at fair value | 24,812 | 31,502 | 2,516 | | 58,830 |
| Total investments in securities | 24,812 | 182,851 | 61,826 | | 269,489 |
| Mortgage loans | | | | | |
| Held-for-sale, at fair value | | | 9,710 | | 9,710 |
| Derivative assets, net | | | | | |
| Interest-rate swaps | | 12,976 | 46 | | 13,022 |
| Option-based derivatives | 1 | 15,868 | | | 15,869 |
| Other | 5 | 110 | 35 | | 150 |
| Subtotal, before netting adjustments | 6 | 28,954 | 81 | | 29,041 |
| Netting adjustments(1) | | | | (28,923) | (28,923) |
| Total derivative assets, net | 6 | 28,954 | 81 | (28,923) | 118 |
| Other assets | | | | | |
| Guarantee asset, at fair value | | | 752 | | 752 |
| Other, at fair value | | | 151 | | 151 |
| Total other assets | | | 903 | | 903 |
| Total assets carried at fair value on a recurring basis | $ 24,818 | $ 211,805 | $ 72,520 | $ (28,923) | $ 280,220 |
| **Liabilities:** | | | | | |
| Debt securities, recorded at fair value | $ | $ 3,015 | $ | $ | $ 3,015 |
| Derivative liabilities, net | | | | | |
| Interest-rate swaps | | 34,601 | 21 | | 34,622 |
| Option-based derivatives | 1 | 2,934 | 1 | | 2,936 |
| Other | | 103 | 42 | | 145 |
| Subtotal, before netting adjustments | 1 | 37,638 | 64 | | 37,703 |
| Netting adjustments(1) | | | | (37,268) | (37,268) |
| Total derivative liabilities, net | 1 | 37,638 | 64 | (37,268) | 435 |
| Total liabilities carried at fair value on a recurring basis | $ 1 | $ 40,653 | $ 64 | $ (37,268) | $ 3,450 |

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   DRA HOM   OAN MORTGAG CORP, 10 K, March 09, 2012          TREASURY-3065          Powered by Morningstar® Document Research℠

Table of Contents

| | Fair Value at December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment(1) | Total |
| | | | (in millions) | | |
| **Assets:** | | | | | |
| Investments in securities | | | | | |
| Available-for-sale, at fair value | | | | | |
| Mortgage-related securities | | | | | |
| Freddie Mac | $ | $ 83,652 | $ 2,037 | $ | $ 85,689 |
| Subprime | | | 33,861 | | 33,861 |
| CMBS | | 54,972 | 3,115 | | 58,087 |
| Option ARM | | | 6,889 | | 6,889 |
| Alt-A and other | | 13 | 13,155 | | 13,168 |
| Fannie Mae | | 24,158 | 212 | | 24,370 |
| Obligations of states and political subdivisions | | | 9,377 | | 9,377 |
| Manufactured housing | | | 897 | | 897 |
| Ginnie Mae | | 280 | 16 | | 296 |
| Total available-for-sale securities, at fair value | | 163,075 | 69,559 | | 232,634 |
| Trading, at fair value | | | | | |
| Mortgage-related securities | | | | | |
| Freddie Mac | | 11,138 | 2,299 | | 13,437 |
| Fannie Mae | | 17,872 | 854 | | 18,726 |
| Ginnie Mae | | 145 | 27 | | 172 |
| Other | | 11 | 20 | | 31 |
| Total mortgage-related securities | | 29,166 | 3,200 | | 32,366 |
| Non-mortgage-related securities | | | | | |
| Asset-backed securities | | 44 | | | 44 |
| Treasury bills | 17,289 | | | | 17,289 |
| Treasury notes | 10,122 | | | | 10,122 |
| FDIC-guaranteed corporate medium-term notes | | 441 | | | 441 |
| Total non-mortgage-related securities | 27,411 | 485 | | | 27,896 |
| Total trading securities, at fair value | 27,411 | 29,651 | 3,200 | | 60,262 |
| Total investments in securities | 27,411 | 192,726 | 72,759 | | 292,896 |
| Mortgage loans | | | | | |
| Held-for-sale, at fair value | | | 6,413 | | 6,413 |
| Derivative assets, net | | | | | |
| Interest-rate swaps | | 9,921 | 49 | | 9,970 |
| Option-based derivatives | | 11,255 | | | 11,255 |
| Other | 3 | 266 | 21 | | 290 |
| Subtotal, before netting adjustments | 3 | 21,442 | 70 | | 21,515 |
| Netting adjustments(1 | | | | (21,372) | (21,372) |
| Total derivative assets, net | 3 | 21,442 | 70 | (21,372) | 143 |
| Other assets | | | | | |
| Guarantee asset, at fair value | | | 541 | | 541 |
| All other, at fair value | | | 235 | | 235 |
| Total other assets | | | 776 | | 776 |
| Total assets carried at fair value on a recurring basis | $ 27,414 | $ 214,168 | $ 80,018 | $ (21,372) | $ 300,228 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ | $ 4,443 | $ | $ | $ 4,443 |
| Derivative liabilities, net | | | | | |
| Interest-rate swaps | | 26,856 | 623 | | 27,479 |
| Option-based derivatives | 8 | 252 | 2 | | 262 |
| Other | 170 | 28 | 136 | | 334 |
| Subtotal, before netting adjustments | 178 | 27,136 | 761 | | 28,075 |
| Netting adjustments(1 | | | | (26,866) | (26,866) |
| Total derivative liabilities, net | 178 | 27,136 | 761 | (26,866) | 1,209 |
| Total liabilities carried at fair value on a recurring basis | $ 178 | $ 31,579 | $ 761 | $ (26,866) | $ 5,652 |

(1) Represents counterparty netting, cash collateral netting, and trade/settlement receivable or payable and net derivative interest receivable or payable. The net cash collateral posted at date trade/settlement receivable was $9.4 billion and $1 million, respectively, at December 31, 2011. The net cash collateral posted at date trade/settlement receivable was $6.3 billion and $1 billion, respectively, at December 31, 2010. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(1.1) billion and $(0.8) billion at December 31, 2011 and 2010, respectively, which was mainly related to interest-rate swaps at the weighted-average net settlement no.

*Freddie Mac*

Source    DRA  HOM  OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-3066

Table of Contents

**Recurring Fair Value Changes**

For the year ended December 31, 2011, we did not have any significant transfers between Level 1 and Level 2 assets or liabilities

Our Level 3 items mainly consist of non agency mortgage related securities  Level 3 measurements consist of assets and liabilities that are supported by little or no market activity where observable inputs generally are not available  The fair value of these assets and liabilities is measured using significant inputs that are considered unobservable. Unobservable inputs reflect assumptions based on the best information available under the circumstances  We use valuation techniques that seek to maximize the use of observable inputs, where available, and minimize the use of unobservable inputs. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy" for additional information about the valuation methods and assumptions used in our fair value measurements

During 2011, the fair value of our Level 3 assets decreased primarily due to: (a) monthly remittances of principal repayments from the underlying collateral of non agency mortgage related securities; and (b) the widening of OAS levels on single family non agency mortgage related securities  During 2011, we had a net transfer into Level 3 assets of $267 million, resulting from a change in valuation method for certain mortgage related securities due to a lack of relevant price quotes from dealers and third party pricing services

During 2010, our Level 3 assets decreased by $81.7 billion primarily due to the transfer of the majority of CMBS from Level 3 to Level 2 and our adoption of new accounting guidance applicable to the accounting for transfers of financial assets and consolidation of VIEs. During 2010, the CMBS market continued to improve and we observed significantly less variability in fair value quotes received from dealers and third party pricing services. In the fourth quarter of 20 0 we determined that these market conditions stabilized to a degree that we believe indicates that unobservable inputs are no longer significant to the fair values of these securities and, as a result, we transferred $51.3 billion of CMBS from Level 3 to Level 2  The adoption of amendments to the accounting guidance applicable to the accounting for transfers of financial assets and the consolidation of VIEs resulted in the elimination of $28.8 billion in our Level 3 assets on January 1, 2010, including: (a) certain mortgage related securities issued by our consolidated trusts that are held by us; and (b) the guarantee asset for guarantees issued to our consolidated trusts. In addition, we transferred $0 4 billion of other Level 3 assets to Level 2 during 2010, resulting from improved liquidity and availability of price quotes received from dealers and third party pricing services

The table below provides a reconciliation of the beginning and ending balances for assets and liabilities measured at fair value using significant unobservable inputs (Level 3)

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3067

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 17.2    Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs**

| | | For The Year Ended December 31, 2011 | | | | | | | | | |
| | | Realized and unrealized gains (losses) | | | | | | | | | |
| | Balance, January 1, 2011 | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income(1) | Total | Purchases | Issuances | Sales | Settlements, net(5) | Net transfers in and/or out of Level 3(6) | Balance, December 31, 2011 | Unrealized gains (losses) still held(7) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | | | | | |
| **Investments in securities** | | | | | | | | | | | |
| Available-for-sale, at fair value | | | | | | | | | | | |
| Mortgage-related securities | | | | | | | | | | | |
| Freddie Mac | $ 2,037 | $ | $ 83 | $ 83 | $ 119 | $ | $ | $ (92) | $ (99) | $ 2,048 | $ |
| Subprime | 33,861 | (1,315) | 707 | (608) | | | | (5,254) | | 27,999 | (1,315) |
| CMBS | 3,115 | (152) | 802 | 650 | | | (67) | (115) | 173 | 3,756 | (162) |
| Option ARM | 6,889 | (424) | 684 | 260 | | | | (1,284) | | 5,865 | (424) |
| Alt-A and other | 13,155 | (198) | (387) | (585) | | | | (1,702) | | 10,868 | (198) |
| Fannie Mae | 212 | | 2 | 2 | | | | (37) | (5) | 172 | |
| Obligations of states and political subdivisions | 9,377 | 13 | 550 | 563 | | | | (609) | (1,507) | 7,824 | |
| Manufactured housing | 897 | (11) | (6) | (17) | | | | (114) | | 766 | (11) |
| Ginnie Mae | 16 | | (1) | (1) | | | | (3) | | 12 | |
| Total available-for-sale mortgage-related securities | 69,559 | (2,087) | 2,434 | 347 | 119 | | | (676) | (10,108) | 69 | 59,310 | (2,110) |
| Trading, at fair value | | | | | | | | | | | |
| Mortgage-related securities | | | | | | | | | | | |
| Freddie Mac | 2,299 | (832) | | (832) | 492 | 25 | (92) | (213) | 187 | 1,866 | (834) |
| Fannie Mae | 854 | (340) | | (340) | 137 | | (81) | (43) | 11 | 538 | (340) |
| Ginnie Mae | 27 | (1) | | (1) | | | | (4) | | 22 | (1) |
| Other | 20 | | | | | 91 | (18) | (3) | | 90 | |
| Total trading mortgage-related securities | 3,200 | (1,173) | | (1,173) | 629 | 116 | (191) | (263) | 198 | 2,516 | (1,175) |
| **Mortgage loans** | | | | | | | | | | | |
| Held-for-sale, at fair value | 6,413 | 828 | | 828 | 16,550 | | (14,027) | (54) | | 9,710 | 214 |
| Net derivatives(8) | (691) | 907 | | 907 | | (46) | | (155) | 2 | 17 | 165 |
| **Other assets** | | | | | | | | | | | |
| Guarantee asset(9) | 541 | (25) | | (25) | | 288 | | (52) | | 752 | (25) |
| All other | 235 | (84) | | (84) | | | | (52) | | 151 | (84) |
| Total other assets | 776 | (109) | | (109) | | 288 | | (52) | | 903 | (109) |

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3068

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Balance, December 31, 2009 | Cumulative effect of change in accounting principle(10) | Balance, January 1, 2010 | Realized and unrealized gains (losses) | | | Purchases, issuances, sales, and settlements, net(5) | Net transfers in and/or out of Level 3(6) | Balance, December 31, 2010 | Unrealized gains (losses) still held(7) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Included in earnings(1)(2)(3)(4) | Included in comprehensive income(1) | Total | | | | |
| | | | | (in millions) | | | | | | |
| Investments in securities | | | | | | | | | | |
| Available-for-sale, at fair value | | | | | | | | | | |
| Mortgage-related securities | | | | | | | | | | |
| Freddie Mac | $ 20,807 | $ (18,775) | $ 2,032 | $ | $ | 5 | $ 5 | $ | $ | 2,037 | $ |
| Subprime | 35,721 | | 35,721 | (1,769) | 7,046 | 5,277 | (7,137) | | 33,861 | (1,769) |
| CMBS | 54,019 | | 54,019 | | 369 | 369 | | (51,273) | 3,115 | |
| Option ARM | 7,236 | | 7,236 | (1,402) | 2,611 | 1,209 | (1,556) | | 6,889 | (1,395) |
| Alt-A and other | 13,391 | | 13,391 | (1,020) | 3,128 | 2,108 | (2,344) | | 13,155 | (1,020) |
| Fannie Mae | 338 | | 338 | | | | | (139) | 13 | 212 | |
| Obligations of states and political subdivisions | 11,477 | | 11,477 | 4 | (123) | (119) | (1,981) | | 9,377 | |
| Manufactured housing | 911 | | 911 | (27) | 126 | 99 | (113) | | 897 | (27) |
| Ginnie Mae | 4 | | 4 | | (1) | (1) | (5) | 18 | 16 | |
| Total available-for-sale mortgage-related securities | 143,904 | (18,775) | 125,129 | (4,214) | 13,161 | 8,947 | (13,275) | (51,242) | 69,559 | (4,211) |
| Trading, at fair value | | | | | | | | | | |
| Mortgage-related securities | | | | | | | | | | |
| Freddie Mac | 2,805 | (5) | 2,800 | (777) | | (777) | 659 | (383) | 2,299 | (799) |
| Fannie Mae | 1,343 | | 1,343 | (449) | | (449) | (38) | (2) | 854 | (449) |
| Ginnie Mae | 27 | | 27 | 1 | | 1 | (1) | | 27 | 1 |
| Other | 28 | (1) | 27 | (1) | | (1) | (4) | (2) | 20 | (1) |
| Total trading mortgage-related securities | 4,203 | (6) | 4,197 | (1,226) | | (1,226) | 616 | (387) | 3,200 | (1,248) |
| Mortgage loans | | | | | | | | | | |
| Held-for-sale, at fair value | 2,799 | | 2,799 | (1) | | (1) | 3,615 | | 6,413 | (308) |
| Net derivatives(8) | (430) | | (430) | (141) | | (141) | (120) | | (691) | (619) |
| Other assets | | | | | | | | | | |
| Guarantee asset(9) | 10,444 | (10,024) | 420 | (24) | | (24) | 145 | | 541 | (24) |
| All other | | | | 55 | | 55 | 180 | | 235 | 55 |
| Total other assets | 10,444 | (10,024) | 420 | 31 | | 31 | 325 | | 776 | 31 |

(1) Changes in fair value for available-for-sale investments are recorded in AOCI, while gains and losses from sales are recorded in net gains (losses) on investments on our consolidated statements of income and comprehensive income. For mortgage-related securities classified as trading, the realized and unrealized gains (losses) are recorded in net gains (losses) on investments on our consolidated statements of income and comprehensive income.

(2) Changes in fair value of derivatives are recorded in net derivative gains (losses) on our consolidated statements of income and comprehensive income for those not designated as accounting hedges.

(3) Changes in fair value of the guarantee asset are recorded in net income on our consolidated statements of income and comprehensive income.

(4) For held-for-sale mortgage loans with a fair value option elected, gains (losses) on fair value changes and sale of mortgage loans are recorded in net income on our consolidated statements of income and comprehensive income.

(5) For non-agency mortgage-related securities, primarily represents principal repayments.

(6) Transfers in and/or out of Level 3 during a period are disclosed as if the transfer occurred at the beginning of the period.

(7) Represents the amount of total gains or losses for the period, included in earnings, attributable to the change in unrealized gains (losses) related to assets and liabilities classified as Level 3 that were still held at December 31, 2011 and 2010, respectively. Included in these amounts are recorded-related fair value change-hedge temporary impairments recorded on available-for-sale securities.

(8) Net derivatives include derivative assets and derivative liabilities reported on our consolidated balance sheets as well as liabilities reported as accrued interest payable, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

(9) We estimate that all amounts recorded for unrealized gains and losses on our guarantee asset relate to those amounts still in position. The amounts reflected as included in earnings represent the period of fair value changes of our guarantee asset.

(10) Represents the adjustment to adoption of the amended accounting guidance for transfers of financial assets and consolidation of VIEs.

*Freddie Mac*

Source   DIRA   HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3069

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Non-recurring Fair Value Changes**

Certain assets are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances. We consider the fair value measurement related to these assets to be non recurring These assets include impaired held for investment multifamily mortgage loans and REO, net These fair value measurements usually result from the write down of individual assets to current fair value amounts due to impairments.

The fair value of impaired multifamily held for investment mortgage loans is generally based on the value of the underlying property Given the relative illiquidity in the markets for these impaired loans, and differences in contractual terms of each loan, we classified these loans as Level 3 in the fair value hierarchy. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy   *Mortgage Loans, Held for Investment*" for additional details

REO is initially measured at its fair value less costs to sell In subsequent periods, REO is reported at the lower of its carrying amount or fair value less costs to sell. Subsequent measurements of fair value less costs to sell are estimated values based on relevant current and historical factors, which are considered to be unobservable inputs. As a result, REO is classified as Level 3 under the fair value hierarchy See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy   *REO, Net*" for additional details

The table below presents assets measured and reported at fair value on a non recurring basis in our consolidated balance sheets by level within the fair value hierarchy at December 31, 2011 and 2010, respectively

**Table 17.3    Assets Measured at Fair Value on a Non Recurring Basis**

| | Fair Value at December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for dentical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant nobservable Inputs ( evel 3) | Total | Total Gains ( osses)(3) |
| | (in millions) | | | | |
| **Assets measured at fa r value on a non-recurr ng bas s:** | | | | | |
| Mo gage loans (1 | | | | | |
| Held-fo - nves men | $ | $ | $  1,380 | $ 1,380 | $   (16) |
| REO,  e (2 | | | 3,146 | 3,146 | (118) |
| To a asse s measu ed a fa va ue on a non- ecu ng bas s | $ | $ | $  4,526 | $4,526 | $  (134) |

| | Fair Value at December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for dentical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant nobservable Inputs ( evel 3) | Total | Total Gains ( osses)(3) |
| | (in millions) | | | | |
| **Assets measured at fa r value on a non-recurr ng bas s:** | | | | | |
| Mo gage loans (1 | | | | | |
| Held-fo - nves men | $ | $ | $  1,560 | $ 1,560 | $  (183) |
| REO,  e (2 | | | 5,606 | 5,606 | (290) |
| To a asse s measu ed a fa va ue on a non- ecu ng bas s | $ | $ | $  7,166 | $ 7,166 | $  (473) |

(1) Rep esen s ca y ng va ue and e a ed w e-down of oans fo w c adj s e s a e based o e fa va ea o s T ese oans nc ude mpa ed mu fam y
   mo gage loans ha a e class f ed as held-fo - nves men and have a ela ed valua on a owance

(2) Rep esen s he fa va ue and e a ed osses of fo ec osed p ope es a we e ea ed a fa va e s bseq e o e n e ass f ca on as REO, ne The
   ca y ng amoun of REO, e was w e dow o fa va e of $3 1 b o , ess es ma ed cos s o sell of $221 m ll on (o app ox ma ely $2 9 b on) a Decembe 31,
   2011 The ca y ng a o of REO, e was w e dow o fa va e of $5 6 b on, ess es ma ed cos s o se of $406 m ll on (o app ox ma ely $5 2 b ll on) a
   Decembe 31, 2010

(3) Rep esen s he o a ne ga ns ( osses) eco ded on ems measu ed a fa va ue on a non- ecu ng bas s as of Decembe 31, 2011 and 2010, espec vely

**Fair Value Election**

We elected the fair value option for certain types of securities, multifamily held for sale mortgage loans, foreign currency denominated debt, and certain other debt

***Certain Available-for-Sale Securities with Fair Value Option Elected***

We elected the fair value option for certain available for sale mortgage related securities to better reflect the natural offset these securities provide to fair value changes recorded historically on our guarantee asset at the time of our election  In addition, upon adoption of the accounting guidance for the fair value option, we elected this option for available for sale securities within the scope of the accounting guidance for investments in beneficial interests in securitized financial assets to better reflect any valuation changes that would occur subsequent to impairment write downs previously recorded on these instruments By electing the fair value option for these instruments, we reflect valuation changes through our consolidated statements of income and comprehensive income in the period they occur, including any increases in value.

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3070

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

For mortgage related securities and investments in securities that were selected for the fair value option and subsequently classified as trading securities, the change in fair value is recorded in other gains (losses) on investment securities recognized in earnings in our consolidated statements of income and comprehensive income. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding the net unrealized gains (losses) on trading securities, which include gains (losses) for other items that are not selected for the fair value option Related interest income continues to be reported as interest income in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES     Investments in Securities" for additional information about the measurement and recognition of interest income on investments in securities

### Debt Securities with Fair Value Option Elected

We elected the fair value option for foreign currency denominated debt and certain other debt securities In the case of foreign currency denominated debt, we have entered into derivative transactions that effectively convert these instruments to U S dollar denominated floating rate instruments The fair value changes on these derivatives were recorded in derivative gains (losses) in our consolidated statements of income and comprehensive income We elected the fair value option on these debt instruments to better reflect the economic offset that naturally results from the debt due to changes in interest rates We also elected the fair value option for certain other debt securities containing potential embedded derivatives that required bifurcation

The changes in fair value of debt securities with the fair value option elected were $91 million, $580 million, and $(404) million for the years ended December 31, 2011, 2010, and 2009, respectively, which were recorded in gains (losses) on debt recorded at fair value in our consolidated statements of income and comprehensive income The changes in fair value related to fluctuations in exchange rates and interest rates were $89 million, $583 million, and $(204) million for the years ended December 31, 2011, 2010, and 2009, respectively. The remaining changes in the fair value of $2 million, $(3) million, and $(200) million were attributable to changes in credit risk for the years ended December 31, 2011, 2010, and 2009 respectively

The change in fair value attributable to changes in credit risk was primarily determined by comparing the total change in fair value of the debt to the total change in fair value of the interest rate and foreign currency derivatives used to hedge the debt Any difference in the fair value change of the debt compared to the fair value change in the derivatives is attributed to credit risk.

The difference between the aggregate fair value and aggregate UPB for long term debt securities with fair value option elected was $43 million and $108 million at December 31, 20   and 20 0, respectively Related interest expense continues to be reported as interest expense in our consolidated statements of income and comprehensive income See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES Debt Securities Issued" for additional information about the measurement and recognition of interest expense on debt securities issued

### Multifamily Held For Sale Mortgage Loans with Fair Value Option Elected

We elected the fair value option for multifamily mortgage loans that were purchased for securitization. Through this channel, we acquire loans that we intend to securitize and sell to CMBS investors While this is consistent with our overall strategy to expand our multifamily business, it differs from our previous buy and hold strategy with respect to multifamily loans held for investment Therefore, these multifamily mortgage loans were classified as held for sale mortgage loans in our consolidated balance sheets to reflect our intent to sell in the future

We recorded $828 million, $(1) million, and $(81) million from the change in fair value in gains (losses) on mortgage loans recorded at fair value in other income in our consolidated statements of income and comprehensive income for the years ended December 31, 2011, 2010, and 2009 respectively The changes in fair value of these loans were primarily attributable to changes in interest rates and other non credit related items such as liquidity. The changes in fair value attributable to credit risk were not material given that these loans were generally originated within the past six to twelve months and have not seen a change in their credit characteristics

The difference between the aggregate fair value and the aggregate UPB for multifamily held for sale loans with the fair value option elected was $195 million and $(311) million at December 31, 2011 and 2010, respectively Related interest income continues to be reported as interest income in our consolidated statements of income and comprehensive income See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES     Mortgage Loans" for additional information about the measurement and recognition of interest income on our mortgage loans

TREASURY-3071

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Valuation Methods and Assumptions Subject to Fair Value Hierarchy**

We categorize assets and liabilities that we measure and report at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation process used to derive the fair value and our judgment regarding the observability of the related inputs

### *Investments in Securities*

#### *Agency Securities*

Fixed rate agency securities are valued based on dealer published quotes for a base TBA security, adjusted to reflect the measurement date as opposed to a forward settlement date ("carry") and pay ups for specified collateral The base TBA price varies based on agency, term, coupon, and settlement month. The carry adjustment converts forward settlement date prices to spot or same day settlement date prices such that the fair value is estimated as of the measurement date, and not as of the forward settlement date. The carry adjustment uses our internal prepayment and interest rate models A pay up is added to the base TBA price for characteristics that are observed to be trading at a premium versus TBAs; this currently includes seasoning and low loan balance attributes Haircuts are applied to a small subset of positions that are less liquid and are observed to trade at a discount relative to TBAs; this includes securities that are not eligible for delivery into TBA trades.

Adjustable rate agency securities are valued based on the median of prices from multiple pricing services. The key valuation drivers used by the pricing services include the interest rate cap structure, term, agency, remaining term, and months to next coupon reset, coupled with prevailing market conditions, namely interest rates

Because fixed rate and adjustable rate agency securities are generally liquid and contain observable pricing in the market, they generally are classified as Level 2

Multiclass structures are valued using a variety of methods, depending on the product type The predominant valuation methodology uses the median prices from multiple pricing services. This method is used for structures for which there is typically significant, relevant market activity Some of the key valuation drivers used by the pricing services are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates Other tranche types that are more challenging to price are valued using the median prices from multiple dealers These include structured interest only, structured principal only, inverse floating rate, and inverse interest only structures Some of the key valuation drivers used by the dealers are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates In addition, there is a subset of tranches for which there is a lack of relevant market activity that are priced using a proxy relationship where the position is matched to the closest dealer priced tranche, then valued by calculating an OAS using our proprietary prepayment and interest rate models from the dealer priced tranche If necessary, our judgment is applied to estimate the impact of differences in prepayment uncertainty or other unique cash flow characteristics related to that particular security We then determine the fair values for these securities by using the estimated OAS as an input to the valuation calculation in conjunction with interest rate and prepayment models to calculate the NPV of the projected cash flows. These positions typically have smaller balances and are more difficult for dealers to value There is also a subset of positions for which prices are published on a daily basis; these include trust interest only and trust principal only strips. These are fairly liquid tranches and are quoted on a regular settlement date basis In order to align the regular settlement date price with the balance sheet date, the OAS is calculated based on the published prices. Then the tranche is valued using that OAS applied to the balance sheet date

Multiclass agency securities are classified as Level 2 or 3 depending on the significance of the inputs that are not observable

#### *Commercial Mortgage Backed Securities*

CMBS are valued based on the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the collateral type, collateral performance, capital structure, issuer, credit enhancement, coupon, and weighted average life, coupled with the observed spread levels on trades of similar securities The weighted average coupon of the collateral underlying our CMBS investments was 5.7% as of both December 3 , 20 and 20 0 The weighted average life of the collateral underlying our CMBS investments was 3.7 years and 4.3 years, respectively, as of December 31, 2011 and 2010 Many of these securities have significant prepayment lockout periods or penalty periods that limit the window of potential prepayment to a relatively narrow band. These securities are primarily classified as Level 2

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar ® Document Research℠

TREASURY-3072

Table of Contents

### Subprime, Option ARM, and Alt A and Other (Mortgage Related)

These private label investments are valued using either the median of multiple dealer prices or the median prices from multiple pricing services  Some of the key valuation drivers used by the dealers and pricing services include the product type, vintage, collateral performance, capital structure, credit enhancements, and coupon, coupled with interest rates and spreads observed on trades of similar securities, where possible  The market for non agency mortgage related securities backed by subprime, option ARM, and Alt A and other loans is highly illiquid, resulting in wide price ranges as well as wide credit spreads. These securities are primarily classified as Level 3

The table below presents the fair value of subprime, option ARM, and Alt A and other investments we held by origination year

**Table 17.4    Fair Value of Subprime, Option ARM, and Alt A and Other Investments by Origination Year**

| | Fair Value at | | | |
|---|---|---|---|---|
| Year of Origination | December 31, 2011 | | December 31, 2010 | |
| | | (in millions) | | |
| 2004 and p  o | $ | 4,287 | $ | 4,998 |
| 2005 | | 10,411 | | 13,126 |
| 2006 | | 16,155 | | 19,333 |
| 2007 | | 13,890 | | 16,461 |
| 2008 and beyond | | | | |
| o a | $ | 44,743 | $ | 53,918 |

### Obligations of States and Political Subdivisions

These primarily represent housing revenue bonds, which are valued by taking the median prices from multiple pricing services  Some of the key valuation drivers used by the pricing services include the structure of the bond, call terms, cross collateralization features, and tax exempt features coupled with municipal bond rates, credit ratings, and spread levels  These securities are unique, resulting in low trading volumes and are classified as Level 3 in the fair value hierarchy.

### Manufactured Housing

Securities backed by loans on manufactured housing properties are dealer priced and we arrive at the fair value by taking the median of multiple dealer prices  Some of the key valuation drivers include the collateral's performance and vintage  These securities are classified as Level 3 in the fair value hierarchy because key inputs are unobservable in the market due to low levels of liquidity

### Asset Backed Securities (Non Mortgage Related)

These private label non mortgage related securities are valued based on prices from pricing services  Some of the key valuation drivers include the discount margin, subordination level, and prepayment speed, coupled with interest rates  They are classified as Level 2 because of their liquidity and tight pricing ranges

### Treasury Bills and Treasury Notes

Treasury bills and Treasury notes are classified as Level 1 in the fair value hierarchy since they are actively traded and price quotes are widely available at the measurement date for the exact security we are valuing

### FDIC Guaranteed Corporate Medium Term Notes

Since these securities carry the FDIC guarantee, they are considered to have no credit risk. They are valued based on yield analysis. They are classified as Level 2 because of their high liquidity and tight pricing ranges.

### Mortgage Loans, Held for Sale

Mortgage loans, held for sale represent multifamily mortgage loans with the fair value option elected  Thus, all held for sale mortgage loans are measured at fair value on a recurring basis.

The fair value of multifamily mortgage loans is generally based on market prices obtained from a third party pricing service provider for similar actively traded mortgages, adjusted for differences in loan characteristics and contractual terms. The pricing service aggregates observable price points from two markets: agency and non agency. The agency market consists of purchases made by the GSEs of loans underwritten by our counterparties in accordance with our guidelines while the non agency market generally consists of secondary market trades between banks and other financial institutions of loans that were originated and initially held in portfolio by these institutions. The pricing service blends the

TREASURY-3073

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

observable price data obtained from these two distinct markets  into a final composite price based on the expected probability  that a given loan will trade in one of these two markets  This estimated probability is largely a function of the loan's credit quality, as determined by its current LTV ratio and DSCR. The result of this blending technique is that lower credit  quality loans receive a lower percentage of agency price  weighting and higher credit quality loans receive a higher  percentage of agency price weighting

Given the relative illiquidity in the marketplace for  multifamily mortgage loans and differences in contractual terms,  these loans are classified as Level 3 in the fair value  hierarchy.

### Mortgage Loans, Held for Investment

Mortgage loans, held for investment measured at fair value on a  non recurring basis represent impaired multifamily mortgage  loans, which are not measured at fair value on an ongoing basis  but have been written down to fair value due to impairment  The valuation technique we use to measure the fair value of impaired  multifamily mortgage loans, held  for investment is based on the  value of the underlying property and may include assessment of third party appraisals, environmental, and engineering reports  that we compare with relevant market performance to arrive at a fair value  Our valuation technique incorporates one or more of the following methods: income capitalization, discounted cash  flow, sales comparables, and replacement cost  We consider the physical condition of the property, rent levels, and other  market drivers, including input from sales brokers and the  property manager  We classify impaired multifamily mortgage loans, held  for investment as Level 3 in the fair value hierarchy as their valuation includes significant unobservable  inputs.

### Derivative Assets, Net

Derivative assets largely consist of interest rate swaps,  option based derivatives, futures, and forward purchase and sale  commitments that we account for as derivatives. The carrying  value of our derivatives on our consolidated balance sheets is  equal to their fair value, including net derivative interest receivable or payable, trade/settle receivable or payable and is  net of cash collateral held or posted, where allowable by a master netting agreement  Derivatives in a net unrealized gain  position are reported as derivative assets, net. Similarly,  derivatives in a net unrealized loss position are reported as  derivative liabilities, net

#### *Interest Rate Swaps and Option Based Derivatives*

The fair values of interest rate swaps are determined by using  the appropriate yield curves to discount the expected cash flows  of both the fixed and variable rate components of the swap  contracts  In doing so, we first observe publicly available  market spot interest rates, such as money market rates, Eurodollar futures contracts and LIBOR swap rates. The spot  curves are translated to forward curves using internal models  From the forward curves, the periodic cash flows are calculated  on the pay and receive side of the swap and discounted back at  the relevant forward rates to arrive at the fair value of the  swap. Since the fair values of the swaps are determined by using  observable inputs from active markets, these are generally  classified as Level 2 under the fair value hierarchy

Option based derivatives include call and put swaptions and  other option based derivatives, the majority of which are  European options  The fair values of the European call and put  swaptions are calculated by using market observable interest  rates and dealer supplied interest rate volatility grids as inputs to our option pricing models. Within each grid, prices  are determined based on the option term of the underlying swap and the strike rate of the swap  Derivatives with embedded  American options are valued using dealer provided pricing grids  The grids contain prices corresponding to specified option terms  of the underlying swaps and the strike rate of the swaps.  Interpolation is used to calculate prices for positions for which  specific grid points are not provided  Derivatives with embedded  Bermudan options are valued based on prices provided directly by counterparties. Swaptions are classified as  Level 2 under the fair value hierarchy  Other option based  derivatives include exchange traded options that are valued by  exchange published daily closing prices  Therefore,  exchange traded options are classified as Level   under the fair value hierarchy  Other option based derivatives also  include purchased interest rate cap and floor contracts that are  valued by using observable market interest rates and cap and  floor rate volatility grids obtained from dealers, and  cancellable interest rate swaps that are valued by using dealer  prices. Cap and floor contracts are classified as Level 2  and cancellable interest rate swaps with fair values using  significant unobservable inputs are classified as Level 3  under the fair value hierarchy

The table below shows the fair value, prior to counterparty and  cash collateral netting adjustments, for our interest rate swaps  and option based derivatives and the maturity profile of our  derivative positions  It also provides the weighted average  fixed rates of our pay fixed and receive fixed swaps  As of December 31, 2011 and 2010 our option based derivatives had  a remaining weighted average life of 5 0 years and 4.5 years, respectively.

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3074

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 17.5    Fair Values and Maturities for Interest-Rate Swaps and Option Based Derivatives**

| | Notional or Contractual Amount | Total Fair Value(2) | Fair Value(1) | | | |
|---|---|---|---|---|---|---|
| **December 31, 2011** | | | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| I e es - a e swaps | | | | | | |
| Rece ve-f xed | | | | | | |
| Swaps | $ 195,716 | $ 10,651 | $ 22 | $ 390 | $ 2,054 | $ 8,185 |
| We gh ed ave age f xed a e(3 | | | 1 17% | 1 03% | 2 26% | 3 35% |
| Fo wa d-s a ng swaps( | 16,092 | 2,239 | | | | 2,239 |
| We gh ed ave age f xed a e(3 | | | | | | 3 96% |
| Bas s (floa ng o floa ng) | 2,750 | (2) | | (6) | 4 | |
| Pay-f xed | | | | | | |
| Swaps | 276,564 | (31,565) | (62) | (1,319) | (6,108) | (24,076) |
| We gh ed ave age f xed a e(3 | | | 1 59% | 2 20% | 3 13% | 3 84% |
| Fo wa d-s a ng swaps( | 12,771 | (2,923) | | | | (2,923) |
| We gh ed ave age f xed a e(3 | | | | | | 5 16% |
| To a ne es - a e swaps | $ 503,893 | $ (21,600) | $ (40) | $ (935) | $ (4,050) | $(16,575) |
| Op on-based de va ves | | | | | | |
| Call swap ons | $ 103,800 | $ 10,043 | $ 5,230 | $ 1,339 | $ 558 | $ 2,916 |
| P swap o s | 70,875 | 636 | 22 | 49 | 166 | 399 |
| O he op on-based de va ves( | 38,549 | 2,254 | | | | 2,254 |
| To al op on-based | $ 213,224 | $ 12,933 | $5,252 | $1,388 | $ 724 | $ 5,569 |

| | Notional or Contractual Amount | Total Fair Value(2) | Fair Value(1) | | | |
|---|---|---|---|---|---|---|
| **December 31, 2010** | | | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| I e es - a e swaps | | | | | | |
| Rece ve-f xed | | | | | | |
| Swaps | $ 302,178 | $ 3,314 | $ 137 | $ 534 | $ 1,269 | $ 1,374 |
| We gh ed ave age f xed a e(3 | | | 1 54% | 1 12% | 2 39% | 3 66% |
| Fo wa d-s a ng swaps( | 22,412 | 371 | | 123 | (9) | 257 |
| We gh ed ave age f xed a e(3 | | | | 3 47% | 1 88% | 4 19% |
| Bas s (floa ng o floa ng) | 2,375 | 4 | | | 4 | |
| Pay-f xed | | | | | | |
| Swaps | 338,035 | (17,189) | (273) | (1,275) | (3,297) | (12,344) |
| We gh ed ave age f xed a e(3 | | | 3 11% | 2 21% | 3 04% | 4 02% |
| Fo wa d-s a ng swaps( | 56,259 | (4,009) | | | | (4,009) |
| We gh ed ave age f xed a e(3 | | | | | | 4 54% |
| To a ne es - a e swaps | $ 721,259 | $(17,509) | $ (136) | $ (618) | $ (2,033) | $(14,722) |
| Op on-based de va ves | | | | | | |
| Call swap ons | $ 125,885 | $ 8,147 | $ 2,754 | $ 2,661 | $ 1,246 | $ 1,486 |
| P swap o s | 65,975 | 1,396 | 136 | 451 | 226 | 583 |
| O he op on-based de va ves( | 47,234 | 1,450 | (8) | | (1) | 1,459 |
| To al op on-based | $ 239,094 | $ 10,993 | $2,882 | $ 3,112 | $ 1,471 | $ 3,528 |

(1) Fa r value s ca ego zed based on he pe od f om Dece 31, 2011 and 2010, espec ve y, un he con ac ua ma u y of he de va ves

(2) Repe es s fa va e fo eac p od c ype, p o o coun e pa y ne ng, cas co a e a ne ng, ne ade/se e ece vab e o payab e, and ne de va ne ece vab e o payab e adj s es

(3) Repes en s he no ona we gh ed ave age a e fo he f xed eg of e swaps

(4) Rep esen s n e es - a e swap ag ee en s ha a e schedu ed o beg n on fu u e da es ang ng f om ess han one yea o h en yea s

(5) P ma y nc udes pu chased n e es a e caps and f oo s

*Other Derivatives*

Other derivatives mainly consist of exchange traded futures, foreign currency swaps, certain forward purchase and sale commitments, and credit derivatives The fair value of exchange traded futures is based on end of day observed closing prices obtained from third party pricing services; therefore, they are classified as Level 1 under the fair value hierarchy. The fair value of foreign currency swaps is determined by using the appropriate yield curves to calculate and discount the expected cash flows for the swap contracts; therefore, they are classified as Level 2 under the fair value hierarchy since the fair value estimates are determined through models that use observable inputs from active markets.

Certain purchase and sale commitments are also considered to be derivatives and are classified as Level 2 or Level 3 under the fair value hierarchy, depending on the fair value hierarchy classification of the purchased or sold item, whether a security or loan. Such valuation techniques are further discussed in the *"Investments in Securities"* section above and "Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy    Mortgage Loans*."

TREASURY-3075

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Credit derivatives primarily include purchased credit default swaps and certain short term default guarantee commitments, which are valued using prices from the respective counterparty and verified using third party dealer credit default spreads at the measurement date We classify credit derivatives as Level 3 under the fair value hierarchy due to the inactive market and significant divergence among prices obtained from the dealers

### *Consideration of Credit Risk in Our Valuation of Derivatives*

The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation Additionally, the fair value of derivative liabilities considers the impact of our institutional credit risk. Based on this evaluation, and because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, our fair value of derivatives is not adjusted for credit risk. Substantially all of our credit risk arises from counterparties with investment grade credit ratings of A or above. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" for a discussion of our counterparty credit risk.

### *Other Assets, Guarantee Asset*

Our guarantee asset is valued either through obtaining dealer quotes on similar securities or through an expected cash flow approach. Because of the broad range of liquidity discounts applied by dealers to these similar securities and because the expected cash flow valuation approach uses significant unobservable inputs, we classified the guarantee asset as Leve 3

### *REO, Net*

REO is carried at the lower of its carrying amount or fair value less costs to sell. The fair value of REO is calculated using an internal model that considers state and collateral level data to produce an estimate of fair value based on REO dispositions in the most recent three months We use the actual disposition prices on REO and the current loan UPB to estimate the current fair value of REO. Certain adjustments, such as state specific adjustments, are made to the estimated fair value, as applicable. Due to the use of unobservable inputs, REO is classified as Level 3 under the fair value hierarchy

### *Debt Securities Recorded at Fair Value*

We elected the fair value option for foreign currency denominated debt instruments and certain other debt securities See "Fair Value Election    *Debt Securities with Fair Value Option Elected"* for additional information We determine the fair value of these instruments by obtaining multiple quotes from dealers Since the prices provided by the dealers consider only observable data such as interest rates and exchange rates, these fair values are classified as Level 2 under the fair value hierarchy

### *Derivative Liabilities, Net*

See discussion under *"Derivative Assets, Net"* above

### **Consolidated Fair Value Balance Sheets**

The supplemental consolidated fair value balance sheets in the table below present our estimates of the fair value of our financial assets and liabilities at December 31, 2011 and 2010. The valuations of financial instruments on our consolidated fair value balance sheets are in accordance with the accounting guidance for fair value measurements and disclosures and the accounting guidance for financial instruments. The consolidated fair value balance sheets do not purport to present our net realizable, liquidation, or market value as a whole Furthermore, amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary significantly from the fair values presented.

During the fourth quarter of 2011, our fair value results as presented in our consolidated fair value balance sheets were affected by a change in estimate which increased the implied capital costs included in our valuation of single family mortgage loans due to a change in the estimation of a risk premium assumption embedded in our modeled valuation of such loans. This change in estimate led to a $14.2 billion decrease in our fair value measurement of mortgage loans

During the second quarter of 2010, our fair value results as presented in our consolidated fair value balance sheets were affected by a change in the estimation of a risk premium assumption embedded in our model to apply credit costs, which led to a $6.9 billion decrease in our fair value measurement of mortgage loans For more information concerning our approach to valuation related to our mortgage loans, see "Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy    *Mortgage Loans."*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3076

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses can not be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 17.6    Consolidated Fair Value Balance Sheets**

| | December 31, 2011 | | December 31, 2010 | |
| | Carrying Amount(1) | Fair Value | Carrying Amount(1) | Fair Value |
|---|---|---|---|---|
| | | (in billions) | | |
| **Assets** | | | | |
| Cash and cash equivalents | $ 28.4 | $ 28.4 | $ 37.0 | $ 37.0 |
| Restricted cash and cash equivalents | 28.1 | 28.1 | 8.1 | 8.1 |
| Federal funds sold and securities purchased under agreements to resell | 12.0 | 12.0 | 46.5 | 46.5 |
| *Investments in securities* | | | | |
| Available-for-sale, at fair value | 210.7 | 210.7 | 232.6 | 232.6 |
| Trading, at fair value | 58.8 | 58.8 | 60.3 | 60.3 |
| *Total investments in securities* | 269.5 | 269.5 | 292.9 | 292.9 |
| *Mortgage loans* | | | | |
| Mortgage loans held by consolidated trusts | 1,564.2 | 1,598.2 | 1,646.2 | 1,667.5 |
| Unsecuritized mortgage loans | 217.1 | 205.9 | 198.7 | 191.5 |
| *Total mortgage loans* | 1,781.3 | 1,804.1 | 1,844.9 | 1,859.0 |
| Derivative assets, net | 0.1 | 0.1 | 0.1 | 0.1 |
| Other assets | 27.8 | 28.5 | 32.3 | 37.2 |
| Total assets | $2,147.2 | $2,170.7 | $2,261.8 | $2,280.8 |
| **Liabilities** | | | | |
| *Debt, net:* | | | | |
| Debt securities of consolidated trusts issued by third parties | $1,471.4 | $1,552.5 | $1,527.7 | $1,589.5 |
| Other debt | 660.6 | 681.2 | 713.9 | 729.7 |
| *Total debt, net* | 2,132.0 | 2,233.7 | 2,242.6 | 2,319.2 |
| Derivative liabilities, net | 0.4 | 0.4 | 1.2 | 1.2 |
| Other liabilities | 14.9 | 15.0 | 18.4 | 19.0 |
| Total liabilities | 2,147.3 | 2,249.1 | 2,262.2 | 2,339.4 |
| **Net assets** | | | | |
| Senior preferred stockholders | 72.2 | 72.2 | 64.2 | 64.2 |
| Preferred stockholders | 0.6 | 0.6 | 14.1 | 0.3 |
| Common stockholders | (86.4) | (151.2) | (78.7) | (123.1) |
| Total net assets | (0.1) | (78.4) | (0.4) | (58.6) |
| Total liabilities and net assets | $2,147.2 | $2,170.7 | $2,261.8 | $2,280.8 |

(1) Equals the amount reported on our GAAP consolidated balance sheets.

## Limitations

Our consolidated fair value balance sheets do not capture all elements of value that are implicit in our operations as a going concern because our consolidated fair value balance sheets only capture the values of the current investment and securitization portfolios as of the dates presented. For example, our consolidated fair value balance sheets do not capture the value of new investment and securitization business that would likely replace prepayments as they occur, nor do they include any estimation of intangible or goodwill values. Thus, the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets does not represent an estimate of our net realizable, liquidation or market value as a whole.

The fair value of certain financial instruments is based on our assumed current principal exit market as of the dates presented. As new markets are developed, our assumed principal exit market may change. The use of different assumptions and methodologies to determine the fair values of certain financial instruments, including the use of different principal exit markets, could have a material impact on the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets.

We report certain assets and liabilities that are not financial instruments (such as property and equipment and REO), as well as certain financial instruments that are not covered by the disclosure requirements in the accounting guidance for financial instruments, such as pension liabilities, at their carrying amounts in accordance with GAAP on our consolidated fair value balance sheets. We believe these items do not have a significant impact on our overall fair value results. Other non-financial assets and liabilities on our GAAP consolidated balance sheets represent deferrals of costs and revenues that are amortized in accordance with GAAP, such as deferred debt issuance costs and deferred fees. Cash receipts and payments related to these items are generally recognized in the fair value of net assets when received or paid, with no basis reflected on our fair value balance sheets.

303

*Freddie Mac*

TREASURY-3077

Source   D RA  HOM   OAN MORTGAG  CORP, 10-K, March 09, 2012      Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy**

The following are valuation assumptions and methods for items not subject to the fair value hierarchy either because they are not measured at fair value other than on the fair value balance sheet or are only measured at fair value at inception

*Cash and Cash Equivalents*

Cash and cash equivalents largely consist of highly liquid investment securities with an original maturity of three months or less used for cash management purposes, as well as cash held at financial institutions and cash collateral posted by our derivative counterparties  Given that these assets are short term in nature with limited market value volatility, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value

*Federal Funds Sold and Securities Purchased Under Agreements to Resell*

Federal funds sold and securities purchased under agreements to resell principally consist of short term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities and federal funds sold  Given that these assets are short term in nature, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value

*Mortgage Loans*

Single family mortgage loans are not subject to the fair value hierarchy since they are classified as held for investment and recorded at amortized cost  Certain multifamily mortgage loans are subject to the fair value hierarchy since these are either recorded at fair value with the fair value option elected or they are held for investment and recorded at fair value upon impairment, which is based upon the fair value of the collateral as multifamily loans are collateral dependent

<u>Single Family Loans</u>

We determine the fair value of single family mortgage loans as an estimate of the price we would receive if we were to securitize those loans, as we believe this represents the principal market for such loans. This principal market assumption applies to both loans held by consolidated trusts and unsecuritized loans and excludes single family loans for which a contractual modification has been completed  Our estimate of fair value is based on comparisons to actively traded mortgage related securities with similar characteristics  We adjust to reflect the excess coupon (implied management and guarantee fee) and credit obligation related to performing our guarantee

To calculate the fair value, we begin with a security price derived from benchmark security pricing for similar actively traded mortgage related securities, adjusted for yield, credit, and liquidity differences. This security pricing process is consistent with our approach for valuing similar securities retained in our investment portfolio or issued to third parties  See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy    *Investments in Securities*."

We estimate the present value of the additional cash flows, which consist of the implied management and guarantee fees in excess of the coupon on the mortgage related securities  Our approach for estimating the fair value of the implied management and guarantee fees at December 31, 2011 used third party market data as practicable. The valuation approach for the majority of implied management and guarantee fees relates to fixed rate loan products with coupons at or near current market rates and involves obtaining dealer quotes on hypothetical securities constructed with collateral characteristics from our single family credit guarantee portfolio  The remaining portion of the implied management and guarantee fees relates to underlying loan products for which comparable market prices were not readily available  These relate specifically to ARM products, highly seasoned loans, and fixed rate loans with coupons that are not consistent with current market rates  For this portion of the single family credit guarantee portfolio, the implied management and guarantee fees are valued using an expected cash flow approach, leveraging the market information received on the more liquid portion of the population and including only those cash flows expected to result from our contractual right to receive management and guarantee fees

The implied management and guarantee fee for single family mortgage loans is also net of the related credit and other costs (such as general and administrative expense) and benefits (such as credit enhancements) inherent in our guarantee obligation  We use delivery and guarantee fees charged by us as a market benchmark for all guaranteed loans that would qualify for purchase under current underwriting standards (used for the majority of the guaranteed loans, but accounts for a small share of the overall fair value of the guarantee obligation)  For loans that do not qualify for purchase based on current underwriting standards, we use our internal credit models, which incorporate factors such as loan characteristics, loan performance status information, expected losses, and risk premiums without further adjustment (used

<div align="center">304</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.
Powered by Morningstar® Document Research℠

for less than a majority of the guaranteed loans, but accounts for the largest share of the overall fair value of the guarantee obligation)

For single family mortgage loans for which a contractual modification has been approved, we estimate fair value based on our estimate of prices we would receive if we were to sell these loans in the whole loan market, as this represents our current principal market for modified loans These prices are obtained from multiple dealers who reference market activity, where available, for modified loans and use internal models and their judgment to determine default rates, severity rates, and risk premiums.

The fair value of single family mortgage loans is a fair value measurement with limited market benchmarks and significant unobservable inputs In determining the fair value of single family mortgage loans, valuation outcomes can vary widely based on management judgments and decisions used in determining: (a) a principal exit market; (b) modeling assumptions; and (c) inputs used to determine variables including risk premiums, credit costs, security pricing, and implied management and guarantee fees Specifically, the valuation of single family mo tgage loans could change significantly based on changes in our assumptions about the probability of default, severity, home prices, and risk premium.

### Multifamily Loans

For a discussion of the techniques used to determine the fair value of held for sale, and both impaired and non impaired held for investment multifamily loans, see "Valuation Methods and Assumptions Subject to Fair Value Hierarchy     *Mortgage Loans, Held for Investment"* and " *Mortgage Loans, Held for Sale,"* respectively

### Other Assets

Most of our other assets are not financial instruments required to be valued at fair value under the accounting guidance for disclosures about the fair value of financial instruments, such as property and equipment For most of these non financial instruments in other assets, we use the carrying amounts from our GAAP consolidated balance sheets as the reported values on our consolidated fair value balance sheets, without any adjustment. These assets represent an insignificant portion of our GAAP consolidated balance sheets

We adjust the GAAP basis deferred taxes reflected on our consolidated fair value balance sheets to include estimated income taxes on the difference between our consolidated fair value balance sheets net assets attributable to common stockholders, including deferred taxes from our GAAP consolidated balance sheets, and our GAAP consolidated balance sheets equity attributable to common stockholders To the extent the adjusted deferred taxes are a net asset, this amount is included in other assets In addition, if our net deferred tax assets on our consolidated fair value balance sheets, calculated as described above, exceed our net deferred tax assets on our GAAP consolidated balance sheets that have been reduced by a valuation allowance, our net deferred tax assets on our consolidated fair value balance sheets are limited to the amount of our net deferred tax assets on our GAAP consolidated balance sheets If the adjusted deferred taxes are a net liability, this amount is included in other liabilities

Accrued interest receivable is one of the components included within other assets on our consolidated fair value balance sheets On our GAAP consolidated balance sheets, we reverse accrued but uncollected interest income when a loan is placed on non accrual status. There is no such reversal performed for the fair value of accrued interest receivable disclosed on our consolidated fair value balance sheets Rather, we include in our fair value disclosure the amount we deem to be collectible As a result, there is a difference between the accrued interest receivable GAAP basis carrying amount and its fair value disclosed on our consolidated fair value balance sheets

### Total Debt, Net

Total debt, net represents debt securities of consolidated trusts held by third parties and other debt that we issued to finance our assets. On our consolidated GAAP balance sheets, total debt, net, excluding debt securities for which the fair value option has been elected, is reported at amortized cost, which is net of deferred items, including premiums, discounts, and hedging related basis adjustments

For fair value balance sheet purposes, we use the dealer published quotes for a base TBA security, adjusted for the carry and pay up price adjustments, to determine the fair value of the debt securities of consolidated trusts held by third parties. The valuation techniques we use are similar to the approach we use to value our investments in agency securities for GAAP purposes See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy     *Investments in Securities     Agency Securities"* for additional information regarding the valuation techniques we use

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Other debt includes both non callable and callable debt, as well as short term zero coupon discount notes The fair value of the short term zero coupon discount notes is based on a discounted cash flow model with market inputs. The valuation of other debt securities represents the proceeds that we would receive from the issuance of debt and is generally based on market prices obtained from broker/dealers or reliable third party pricing service providers We elected the fair value option for foreign currency denominated debt and certain other debt securities and reported them at fair value on our GAAP consolidated balance sheets See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy    *Debt Securities Recorded at Fair Value"* for additional information

### Other Liabilities

Other liabilities consist of accrued interest payable on debt securities, the guarantee obligation for our other guarantee commitments and guarantees issued to non consolidated entities, the reserve for guarantee losses on non consolidated trusts, servicer advanced interest payable and certain other servicer liabilities, accounts payable and accrued expenses, payables related to securities, and other miscellaneous liabilities We believe the carrying amount of these liabilities is a reasonable approximation of their fair value, except for the guarantee obligation for our other guarantee commitments and guarantees issued to non consolidated entities The technique for estimating the fair value of our guarantee obligation related to the credit component of the loan's fair value is described in the "Mortgage Loans    Single Family Loans" section

As discussed in "Other Assets," other liabilities may include a deferred tax liability adjusted for fair value balance sheet purposes

### Net Assets Attributable to Senior Preferred Stockholders

Our senior preferred stock held by Treasury in connection with the Purchase Agreement is recorded at the stated liquidation preference for purposes of the consolidated fair value balance sheets As the senior preferred stock is restricted as to its redemption, we consider the liquidation preference to be the most appropriate measure for purposes of the consolidated fair value balance sheets

### Net Assets Attributable to Preferred Stockholders

To determine the preferred stock fair value, we use a market based approach incorporating quoted dealer prices

### Net Assets Attributable to Common Stockholders

Net assets attributable to common stockholders is equal to the difference between the fair value of total assets and the sum of total liabilities reported on our consolidated fair value balance sheets, less the value of net assets attributable to senior preferred stockholders and the fair value attributable to preferred stockholders

## NOTE 18: LEGAL CONTINGENCIES

We are involved as a party in a variety of legal and regulatory proceedings arising from time to time in the ordinary course of business including, among other things, contractual disputes, personal injury claims, employment related litigation and other legal proceedings incidental to our business We are frequently involved, directly or indirectly, in litigation involving mortgage foreclosures From time to time, we are also involved in proceedings arising from our termination of a seller/servicer's eligibility to sell mortgages to, and/or service mortgages for, us In these cases, the former seller/servicer sometimes seeks damages against us for wrongful termination under a variety of legal theories In addition, we are sometimes sued in connection with the origination or servicing of mortgages These suits typically involve claims alleging wrongful actions of seller/servicers Our contracts with our seller/servicers generally provide for indemnification against liability arising from their wrongful actions with respect to mortgages sold to or serviced for Freddie Mac

Litigation and claims resolution are subject to many uncertainties and are not susceptible to accurate prediction In accordance with the accounting guidance for contingencies, we reserve for litigation claims and assessments asserted or threatened against us when a loss is probable and the amount of the loss can be reasonably estimated

In 2011, we paid approximately $8 million for the advancement of legal fees and expenses of current and former officers and directors pursuant to our indemnification obligations to them These fees and expenses related to some of the matters described below and to certain shareholder derivative lawsuits that were dismissed in April and May 2011. This figure does not include certain administrative support costs and certain costs related to document production and storage

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-3080

Table of Contents

**Putative Securities Class Action Lawsuits**

*Ohio Public Employees Retirement System ("OPERS") vs. Freddie Mac, Syron, et al.* This putative securities class action lawsuit was filed against Freddie Mac and certain former officers on January 18, 2008 in the U.S. District Court for the Northern District of Ohio purportedly on behalf of a class of purchasers of Freddie Mac stock from August 1, 2006 through November 20, 2007. The plaintiff alleges that the defendants violated federal securities laws by making false and misleading statements concerning our business, risk management and the procedures we put into place to protect the company from problems in the mortgage industry. On April 10, 2008, the Court appointed OPERS as lead plaintiff and approved its choice of counsel. On September 2, 2008, defendants filed motions to dismiss plaintiff's amended complaint. On November 7, 2008, the plaintiff filed a second amended complaint, which removed certain allegations against Richard Syron, Anthony Piszel, and Eugene McQuade, thereby leaving insider trading allegations against only Patricia Cook The second amended complaint also extends the damages period, but not the class period  The plaintiff seeks unspecified damages and interest, and reasonable costs and expenses, including attorney and expert fees  On November 19, 2008, the Court granted FHFA's motion to intervene in its capacity as Conservator. On April 6, 2009, defendants filed motions to dismiss the second amended complaint. On December 21, 2011, the plaintiff filed a notice advising the Court of a non prosecution agreement entered into between Freddie Mac and the SEC on December 15, 2011 (discussed below in "Government Investigations and Inquiries"), and stating its intention to file a motion for leave to amend its complaint. On January 23, 2012, the Court denied defendants' motions to dismiss and set a briefing schedule for plaintiff's motion for leave to amend its complaint. On February 13, 2012, plaintiff filed motion for leave to amend, which seeks leave to file a third amended complaint

At present, it is not possible for us to predict the probable outcome of this lawsuit or any potential impact on our business, financial condition, or results of operations  In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the following factors, among others: the inherent uncertainty of pre trial litigation; and the fact that the parties have not yet briefed and the Court has not yet ruled upon motions for class certification or summary judgment.  In particular, absent the certification of a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss

*Kuriakose vs. Freddie Mac, Syron, Piszel and Cook.* Another putative class action lawsuit was filed against Freddie Mac and certain former officers on August 15, 2008 in the U.S. District Court for the Southern District of New York for alleged violations of federal securities laws purportedly on behalf of a class of purchasers of Freddie Mac stock from November 21, 2007 through August 5, 2008. The plaintiffs claim that defendants made false and misleading statements about Freddie Mac's business that artificially inflated the price of Freddie Mac's common stock, and seek unspecified damages, costs, and attorneys' fees. On February 6, 2009, the Court granted FHFA's motion to intervene in its capacity as Conservator. On May 19, 2009, plaintiffs filed an amended consolidated complaint, purportedly on behalf of a class of purchasers of Freddie Mac stock from November 20, 2007 through September 7, 2008  Freddie Mac filed a motion to dismiss the complaint on February 24, 2010. On March 30, 2011, the Court granted without prejudice Freddie Mac's motion to dismiss all claims, and allowed the plaintiffs the option to file a new complaint, which they did on July 15, 2011. The defendants have filed motions to dismiss the second amended consolidated complaint  On February 17, 2012, plaintiff served a motion seeking leave to file a third amended consolidated complaint based on the non prosecution agreement entered into between Freddie Mac and the SEC on December 15, 2011.

At present, it is not possible for us to predict the probable outcome of this lawsuit or any potential impact on our business, financial condition, or results of operations  In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the following factors, among others: the inherent uncertainty of pre trial litigation; the fact that the Court has not yet ruled upon the defendants' motions to dismiss the second amended complaint or plaintiffs' motion seeking leave to file a third amended complaint; and the fact that the parties have not yet briefed and the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the a eged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss

**Energy Lien Litigation**

On July 14, 2010, the State of California filed a lawsuit against Freddie Mac, Fannie Mae, FHFA, and others in the U.S. District Court for the Northern District of California, alleging that Freddie Mac and Fannie Mae committed unfair business practices in violation of California law by asserting that property liens arising from government sponsored energy initiatives such as California's Property Assessed Clean Energy, or PACE, program cannot take priority over a mortgage to

307                                                                                                *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                          Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

be sold to Freddie Mac or Fannie Mae  The lawsuit contends that  the PACE programs create liens superior to such mortgages and  that, by affirming Freddie Mac and Fannie Mae's positions, FHFA has violated the National Environmental Policy Act, or NEPA, and the Administrative Procedure Act, or APA  The complaint seeks declaratory and injunctive relief, costs and  such other relief as the court deems proper

Similar complaints have been filed by other parties  On July 26, 2010, the County of Sonoma filed a lawsuit against  Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging similar violations of California law, NEPA, and the APA  In a filing dated September 23, 2010, the County of Placer moved to intervene in the Sonoma County lawsuit  as a party plaintiff seeking to assert similar claims, which motion was granted on November 1, 2010. On October 1,  2010, the City of Palm Desert filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA in the Northern District of California. On October 8, 2010, Leon County and the Leon County Energy Improvement District filed a similar complaint  against Fannie Mae, Freddie Mac, FHFA, and others in the  Northern District of Florida  On October 12, 2010, FHFA filed a motion before the Judicial Panel on Multi District  Litigation seeking an order transferring these cases as well as a related case filed only against FHFA, for coordination or  consolidation of pretrial proceedings  This motion was denied on February 8, 2011. On October 14, 2010, the defendants  filed a motion to dismiss the lawsuits pending in the Northern  District of California. Also on October 14, 2010, the County of Sonoma filed a motion for preliminary injunction  seeking to enjoin the defendants from giving any force or effect in Sonoma County to certain directives by FHFA regarding energy retrofit loan programs and other related relief  On October 26, 2010, the Town of Babylon filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA, as well as  the Office of the Comptroller of the Currency, in the U.S. District Court for the Eastern District of New York.

The defendants filed motions to dismiss these lawsuits.  The courts have entered stipulated orders dismissing the individual  officers of Freddie Mac and Fannie Mae from the cases  On  December 17, 2010, the judge handling the cases in the  Northern District of California requested a position statement  from the United States, which was filed on February 8,  2011. On June 13, 2011, the complaint filed by the Town of Babylon was dismissed. On August 11, 2011, the Town of Babylon filed a notice of appeal to the U S  Court of  Appeals for the Second Circuit. On August 26, 2011, the California federal court granted in part defendants' motion  to dismiss, leaving only plaintiffs' APA and NEPA claims against FHFA  The California federal district court cases were  thereafter consolidated and the plaintiffs in those cases filed  a joint motion for summary judgment on January 23, 2012.  FHFA cross moved for summary judgment on February 27, 2012.

Sonoma County's motion for preliminary injunction  was granted in part, requiring FHFA to provide a notice and comment period with regard to its directives  FHFA filed an appeal of the injunction on September 15, 2011, and the District Court granted FHFA a  0 day stay of the injunction to allow FHFA to request a further stay from the U.S. Court of Appeals for the Ninth Circuit, which  occurred on October 11, 2011. By order dated December 20, 2011, the Ninth Circuit denied the request for  a stay with respect to the notice and comment period  Accordingly, on January 26, 2012, FHFA issued an advance notice of proposed rulemaking and notice of intent to prepare an  environmental impact statement

On October 17, 2011 the City of Palm Desert voluntarily  dismissed any remaining claims it might have had against Freddie  Mac. The complaint filed by Leon County was dismissed by the  Court on September 30, 2011  Leon County filed a notice of appeal to the U.S. Court of Appeals for the Eleventh Circuit on November 28, 2011.

At present, it is not possible for us to predict the probable  outcome of these lawsuits or any potential impact on our  business, financial condition or results of operations  In addition, we are unable to reasonably estimate the possible loss  or range of possible loss in the event of an adverse judgment in the foregoing matters due to the following factors, among  others: the inherent uncertainty of pre trial litigation; and  the fact that the appeals filed by the Town of Babylon and Leon County are still pending

## Government Investigations and Inquiries

On December 15, 2011, the SEC and Freddie Mac entered into  a non prosecution agreement related to an investigation by the  SEC's Division of Enforcement into possible violations of the  federal securities laws by Freddie Mac and others that  occurred prior to Freddie Mac's entry into conservatorship, arising from, among other things, public statements concerning  Freddie Mac's exposure to subprime and Alt A mortgages

Under the non prosecution agreement, without admitting or  denying liability, Freddie Mac has agreed to accept responsibility for its conduct and to not dispute, contest, or contradict a set of factual statements in the non prosecution  agreement, except in legal proceedings in which the SEC is not a party  Freddie Mac also has agreed to cooperate fully and  truthfully in the SEC's investigation and any other related  enforcement litigation or proceeding to which the SEC is a

308                                                                                          *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

party  In addition, Freddie Mac agreed to cooperate fully and truthfully in any other related official investigation or proceeding by any U S  federal agency

The non prosecution agreement provides that, subject to the  full, truthful, and continuing cooperation of Freddie Mac and  its compliance with all obligations, prohibitions and undertakings in the non prosecution agreement, the SEC agrees  not to bring any enforcement action or proceeding against Freddie Mac arising from the SEC's investigation

The non prosecution agreement does not require Freddie Mac to  pay any monetary penalty or other amount  The agreement  indicates that, in entering into the non prosecution agreement, the SEC recognizes the unique circumstances presented by Freddie  Mac's current status, including the financial support provided to Freddie Mac by Treasury, the role of FHFA as Freddie Mac's conservator, and the costs that may be imposed on U.S. taxpayers.

On December 16, 2011, the SEC announced that it had charged three former executives of Freddie Mac with securities laws  violations These executives are former Chairman of the Board  and CEO Richard F  Syron, former Executive Vice President and Chief Business Officer Patricia L  Cook, and former Executive Vice President for the single  family guarantee business Donald J. Bisenius.

**Related Third Party Litigation and Indemnification Requests**

On December 15, 2008, a plaintiff filed a putative class  action lawsuit in the U.S. District Court for the Southern  District of New York against certain former Freddie Mac officers and others styled *Jacoby vs. Syron, Cook, Piszel, Banc of America Securities LLC, JP Morgan Chase & Co., and FTN Financial Markets.*  The complaint, as amended  on December 17, 2008, contends that the defendants made  material false and misleading statements in connection with  Freddie Mac's September 2007 offering of non cumulative, non convertible, perpetual fixed rate preferred stock, and that such statements "grossly overstated Freddie Mac's capitalization" and "failed to disclose Freddie Mac's exposure to mortgage related losses, poor underwriting standards and risk management procedures." The  complaint further alleges that Syron, Cook, and Piszel made additional false statements following the offering  Freddie Mac  is not named as a defendant in this lawsuit, but the  underwriters previously gave notice to Freddie Mac of their  intention to seek full indemnity and contribution under the  Underwriting Agreement in this case, including reimbursement of fees and disbursements of their legal counsel  The case is  currently dormant and we believe plaintiff may have abandoned it

By letter dated October  7, 2008, Freddie Mac received  formal notification of a putative class action securities  lawsuit, *Mark vs. Goldman, Sachs & Co., J.P. Morgan Chase & Co., and Citigroup Global Markets Inc.,* filed on September 23, 2008, in the U.S. District Court for the Southern District of New York, regarding the company's November 29, 2007 public  offering of $6 billion of 8 375% Fixed to Floating Rate Non Cumulative Perpetual Preferred Stock

On January 29, 2009, a plaintiff filed a putative class  action lawsuit in the U.S. District Court for the Southern  District of New York styled *Kreysar vs. Syron, et al.* On April 30, 2009, the Court consolidated the Mark case  with the Kreysar case, and the plaintiffs filed a consolidated class action complaint on July 2, 2009. The consolidated  complaint alleged that three former Freddie Mac officers,  certain underwriters and Freddie Mac's auditor violated  federal securities laws by making material false and misleading  statements in connection with the company's November 29, 2007 public offering of $6 billion of  8 375% Fixed to Floating Rate Non Cumulative Perpetual Preferred  Stock. The complaint further alleged that certain defendants  and others made additional false statements following the offering  The complaint named as defendants Syron, Piszel, Cook, Goldman,  Sachs & Co., JPMorgan Securities Inc., Banc of America  Securities LLC, Citigroup Global Markets Inc., Credit Suisse  Securities (USA) LLC, Deutsche Bank Securities Inc., Morgan  Stanley & Co. Incorporated, UBS Securities LLC and PricewaterhouseCoopers LLP

After the Court dismissed, without prejudice, the  plaintiffs' consolidated complaint, amended consolidated  complaint, and second consolidated complaint, the plaintiffs filed a third amended consolidated complaint against  PricewaterhouseCoopers LLP, Syron and Piszel, omitting Cook and the underwriter defendants, on November 14, 2010. On  January 11, 2011, the Court granted the remaining  defendants' motion to dismiss the complaint with respect to  PricewaterhouseCoopers LLP, but denied the motion with respect to Syron and Piszel. On April 4, 2011, Piszel filed a motion for partial judgment on the pleadings  The Court granted  that motion on April 28, 2011. The plaintiffs moved for class certification on June 30, 2011, but withdrew this  motion on July 5, 2011. The plaintiffs again moved for class certification on August 30, 2011, which motion remains pending

Freddie Mac is not named as a defendant in the consolidated  lawsuit, but the underwriters previously gave notice to Freddie  Mac of their intention to seek full indemnity and contribution  under the underwriting agreement in this case, including  reimbursement of fees and disbursements of their legal counsel  At present, it is not possible for us to predict the probable  outcome of the lawsuit or any potential impact on our business, financial condition or results of operations

<div align="center">309</div>

*Freddie Mac*

TREASURY-3083

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the inherent uncertainty of pre trial litigation and the fact that the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the a eged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss

On July 6, 2011, plaintiffs filed a lawsuit in the U.S. District Court for Massachusetts styled *Liberty Mutual Insurance Company, Peerless Insurance Company, Employers Insurance Company of Wausau, Safeco Corporation and Liberty Life Assurance Company of Boston vs. Goldman, Sachs & Co.* The complaint alleges that Goldman, Sachs & Co made materially misleading statements and omissions in connection with Freddie Mac's November 29, 2007 public offering of $6 billion of 8 375% Fixed to Floating Rate Non Cumulative Perpetual Preferred Stock Freddie Mac is not named as a defendant in this lawsuit.

In an amended complaint dated February 17, 2012, Western and Southern Life Insurance Company and others asserted claims against GS Mortgage Securities Corp., Goldman Sachs Mortgage Company and Goldman Sachs & Co. in the Court of Common Pleas, Hamilton County, Ohio The amended complaint asserts, among other things, that "Goldman Sachs" is liable to plaintiffs under the Ohio Securities Act for alleged misstatements and omissions in connection with $6 billion of preferred stock issued by Freddie Mac on December 4, 2007 Freddie Mac is not named as a defendant in this lawsuit.

**Lehman Bankruptcy**

On September 15, 2008, Lehman filed a chapter 11 bankruptcy petition in the Bankruptcy Court for the Southern District of New York. Thereafter, many of Lehman's U.S. subsidiaries and affiliates also filed bankruptcy petitions (collectively, the "Lehman Entities") Freddie Mac had numerous relationships with the Lehman Entities which give rise to several claims. On September 22, 2009, Freddie Mac filed proofs of claim in the Lehman bankruptcies aggregating approximately $2 1 billion On April 14, 2010, Lehman filed its chapter 11 plan of liquidation and disclosure statement, providing for the liquidation of the bankruptcy estate's assets over the next three years The plan and disclosure statement were subsequently modified several times Hearings to consider confirmation of the plan were conducted on December 6, 2011 and, on that date, the plan was confirmed by the court. The plan sets aside $1.2 billion to be available for payment in full of our priority claim relating to losses incurred on short term lending transactions with certain Lehman Entities if it is ultimately allowed as a priority claim, but leaves open for subsequent litigation whether our claim of priority status is proper In the event that this claim is not ultimately accorded priority status, it will be treated as a senior unsecured claim under the plan, pursuant to which Freddie Mac would be entitled to receive an estimated distribution of approximately 2 % (or approximately $250 million) over the next three years The plan also provides that general unsecured claims, such as our claim relating to repurchase obligations of $868 million, will be entitled to a distribution of approximately 19.9% of the allowed amount, if any. The plan does not adjudge or allow our unsecured repurchase obligations claim, but permits claims allowance proceedings to continue Finally, the plan entitles Freddie Mac to a distribution of approximately 39% (or about $6.4 million) payable over the next three years on our allowed claim exceeding $ 6 million relating to losses on derivative transactions

**Taylor, Bean & Whitaker Bankruptcy**

On August 24, 2009, TBW filed for bankruptcy in the Bankruptcy Court for the Middle District of Florida. Prior to that date, Freddie Mac had terminated TBW's status as a seller/servicer of loans On or about June 14, 2010, Freddie Mac filed a proof of claim in the TBW bankruptcy aggregating $1.78 billion. Of this amount, about $1 15 billion related to current and projected repurchase obligations and about $440 million related to funds deposited with Colonial Bank, or with the FDIC as its receiver, which were attributable to mortgage loans owned or guaranteed by us and previously serviced by TBW. The remaining $190 million represented miscellaneous costs and expenses incurred in connection with the termination of TBW's status as a seller/servicer

With the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. The settlement, which is discussed below, was filed with the bankruptcy court on June 22, 2011. The court approved the settlement and confirmed TBW's proposed plan of liquidation on July 21, 2011, which became effective on August 10, 2011.

Under the terms of the settlement, we have been granted an unsecured claim in the TBW bankruptcy estate in the amount of $1.022 billion, largely representing our claims to past and future loan repurchase exposures We estimate that this claim may result in a distribution to us of approximately $40 45 million, which is based on the plan of liquidation

<div align="center">3 0</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

and disclosure statement filed with the court by TBW indicating that general unsecured creditors are likely to receive a distribution of 3 3 to 4 4 cents on the dollar The settlement provides that $6 million of this amount is to be paid to certain creditors of TBW. In addition, pursuant to the settlement, we have received net proceeds of $156 million through December 31, 2011 relating to various funds on deposit, net of amounts we were required to assign or pay to other parties The settlement also allows for our sale of TBW related mortgage servicing rights and provides a formula for determining the amount of the proceeds, if any, to be allocated to third parties that have asserted interests in those rights During the year ended December 3 , 20 , we recognized a $0 2 billion gain, primarily representing the difference between the amounts we assigned, or paid, to TBW and their creditors and the liability recorded on our consolidated balance sheet

At the time of settlement, we estimated our uncompensated loss exposure to TBW to be approximately $0.7 billion. This estimated exposure largely relates to outstanding repurchase claims that have already been substantially provided for in our financial statements through our provision for loan losses. Our ultimate losses could exceed our recorded estimate Potential changes in our estimate of uncompensated loss exposure or the potential for additional claims as discussed below could cause us to record additional losses in the future

We understand that Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, or its creditors, may file an action to recover certain funds paid to us prior to the TBW bankruptcy However, no actions against Freddie Mac related to Ocala have been initiated in bankruptcy court or elsewhere to recover assets Based on court filings and other information, we understand that Ocala or its creditors may attempt to assert fraudulent transfer and other possible claims totaling approximately $840 million against us related to funds that were a eged y transferred from Ocala to Freddie Mac custodial accounts We also understood that Ocala might attempt to make claims against us asserting ownership of a large number of loans that we purchased from TBW. The order approving the settlement provides that nothing in the settlement shall be construed to limit, waive or release Ocala's claims against Freddie Mac, except for TBW's claims and claims arising from the allocation of the loans discussed above to Freddie Mac

On or about May 14, 2010, certain underwriters at Lloyds, London and London Market Insurance Companies brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage bankers bonds providing fidelity and errors and omissions insurance coverage Several excess insurers on the bonds thereafter filed similar claims in that action Freddie Mac has filed a proof of loss under the bonds, but we are unable at this time to estimate our potential recovery, if any, thereunder Discovery is proceeding

**IRS Litigation**

We received Statutory Notices from the IRS assessing $3 0 billion of additional income taxes and penalties for the 1998 to 2007 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices for the 1998 to 2005 tax years. We paid the tax assessed in the Statutory Notice received for the years 2006 to 2007 of $36 million and will seek a refund through the administrative process, which could include filing suit in Federal District Court We believe appropriate reserves have been provided for settlement on reasonable terms For information on this matter, see "NOTE 13: INCOME TAXES."

## NOTE 19: SELECTED FINANCIAL STATEMENT LINE ITEMS

As discussed in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," we adopted amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs effective January 1, 2010 As a result of this change in accounting principles, certain line items on our consolidated statements of income and comprehensive income, consolidated balance sheets, and consolidated statements of cash flows are no longer material to our 2011 and 2010 consolidated results of operations, financial position, and cash flows

As this change in accounting principles was applied prospectively, the results of operations for the years ended December 31, 2011 and 20 0 reflect the consolidation of our single family PC trusts and certain Other Guarantee Transactions while the results of operations for the year ended December 3 , 2009 reflect the accounting policies in effect at that time, *i.e.*, these securitization entities were accounted for off balance sheet

<div align="center">311</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Impacts on Consolidated Statements of Income and Comprehensive Income**

Prospective adoption of these changes in accounting principles also significantly impacted the presentation of our consolidated statements of income and comprehensive income  These impacts are discussed below:

### *Line Items No Longer Separately Presented*

Line items that are no longer separately presented on our consolidated statements of income and comprehensive income include:

- Management and guarantee income    we no longer recognize management and guarantee income on PCs and Other Guarantee Transactions issued by trusts that we have consolidated; rather, the portion of the interest collected on the underlying loans that represents our management and guarantee fee is recognized as part of interest income on mortgage loans  We continue to recognize management and guarantee income related to our other guarantee commitments and guarantees issued to non consolidated entities in other income;

- Gains (losses) on guarantee asset and income on guarantee obligation    we no longer recognize a guarantee asset and a guarantee obligation for guarantees issued to trusts that we have consolidated; therefore, we also no longer recognize gains (losses) on guarantee asset and income on guarantee obligation for such trusts  However, we continue to recognize a guarantee asset and a guarantee obligation for our other guarantee commitments and guarantees issued to non consolidated entities and the corresponding gains (losses) on guarantee asset and income on guarantee obligation, which are recorded in other income;

- Losses on loans purchased    we no longer recognize the acquisition of loans from PC trusts that we have consolidated as a purchase with an associated loss, as these loans are already reflected on our consolidated balance sheet  Instead, when we acquire a loan from these entities, we reclassify the loan from mortgage loans held for investment by consolidated trusts to unsecuritized mortgage loans held for investment and record the cash tendered as an extinguishment of the related PC debt within debt securities of consolidated trusts held by third parties. We continue to recognize losses on loans purchased related to our other guarantee commitments and losses from purchases of loans from non consolidated entities in other expenses;

- Recoveries of loans impaired upon purchase    as these acquisitions of loans from PC trusts that we have consolidated are no longer treated as purchases for accounting purposes, there will be no recoveries of such loans related to consolidated VIEs that require recognition in our consolidated statements of income and comprehensive income; and

- Trust management income    we no longer recognize trust management income from the single family PC trusts that we consolidate; rather, such amounts are now recognized in net interest income

### *Line Items Significantly Impacted and Still Separately Presented*

Line items that were significantly impacted and that continue to be separately presented on our consolidated statements of income and comprehensive income include:

- Interest income on mortgage loans    we now recognize interest income on the mortgage loans underlying PCs and Other Guarantee Transactions issued by trusts that we consolidate, which includes the portion of interest that was historically recognized as management and guarantee income  Upfront credit related and other fees received in connection with such loans historically were treated as a component of the related guarantee obligation; prospectively, these fees are treated as basis adjustments to the loans to be amortized over their respective lives as a component of interest income on mortgage loans;

- Interest income on investments in securities    we no longer recognize interest income on our investments in the PCs and Other Guarantee Transactions issued by trusts that we consolidate, as we now recognize interest income on the mortgage loans underlying PCs and Other Guarantee Transactions issued by trusts that we consolidate;

- Interest expense    we now recognize interest expense on PCs and Other Guarantee Transactions that were issued by trusts that we consolidate and are held by third parties; and

- Other gains (losses) on investments    we no longer recognize other gains (losses) on investments for single family PCs and certain Other Guarantee Transactions because those securities are no longer accounted for as investments by us as a result of our consolidation of the related trusts

<div align="center">312</div>

*Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Impacts on Consolidated Statements of Cash Flows**

The adoption of these changes in accounting principles also significantly impacted the presentation of our consolidated statements of cash flows  At transition when we consolidated our single family PCs and certain Other Guarantee Transactions, there was significant non cash activity

The table below highlights the significant line items that are no longer disclosed separately on our consolidated statements of income and comprehensive income

**Table 19.1    Line Items No Longer Disclosed Separately on Our Consolidated Statements of Income and Comprehensive Income**

|  | 2011 | 2010 | 2009 |
|---|---|---|---|
|  | | For The Year Ended December 31, | |
|  | | (in millions) | |
| O he   ncome | | | |
| Managemen  and gua an ee  ncome | $   170 | $   143 | $ 3,033 |
| Ga ns ( osses) on gua an ee asse | (78) | (61) | 3,299 |
| Income on gua an ee obl ga on | 153 | 135 | 3,479 |
| Ga ns (losses) on sale of mo  gage loans | 411 | 267 | 745 |
| Lowe -of-cos -o -fa  -value ad us men s on held-fo -sale mor gage  oans | | | (679) |
| Ga ns (losses) on mo  gage loans eco ded a  fa  value | 418 | (249) | (190) |
| Recove  es on loans mpa  ed upon pu chase | 473 | 806 | 379 |
| Low- ncome hous ng  ax c ed  pa ne sh ps | | | (4,155) |
| T us  managemen  ncome (expense) | | | (761) |
| All o he | 608 | 819 | 222 |
| To al o he  ncome pe  consol da ed s a emen s of  ncome and comp ehens ve  ncome | $2,155 | $1,860 | $ 5,372 |
| O he  expenses | | | |
| Losses on  oans pu chased | $   10 | $   25 | $ 4,754 |
| All o he | 382 | 637 | 449 |
| To al o he  expenses pe  consol da ed s a emen s of  ncome and comp ehens ve  ncome | $   392 | $   662 | $ 5,203 |

The table below highlights the significant line items that are no longer disclosed separately on our consolidated balance sheets

**Table 19.2    Line Items No Longer Disclosed Separately on Our Consolidated Balance Sheets**

|  | December 31, 2011 | December 31, 2010 |
|---|---|---|
|  | (in millions) | |
| O  e  asse s | | |
| G a a  ee asse | $   752 | $   541 |
| Accoun s and o he   ece vab es | 8,350 | 8,734 |
| All o he | 1,411 | 1,600 |
| To a o he  asse s | $  10,513 | $  10,875 |
| O he   ab   es | | |
| Gua an ee obl ga on | $   787 | $   625 |
| Se v ce  ab   es | 3,600 | 4,456 |
| Acco  s payab e a d acc  ed expe ses | 845 | 1,760 |
| All o he | 814 | 1,257 |
|  o a o he   ab   es | $  6,046 | $  8,098 |

The table below highlights the significant line items that are no longer disclosed separately on our consolidated statements of cash flows.

**Table 19.3    Line Items No Longer Disclosed Separately on Our Consolidated Statements of Cash Flows**

|  | 2011 | 2010 | 2009 |
|---|---|---|---|
|  | | For The Year Ended December 31, | |
|  | | (in millions) | |
| Ad us men s o econc  e ne  oss o ne  cash f om ope a ng ac v  es | | | |
| Low- ncome hous ng  ax c ed  pa ne sh ps | $   | $   | $ 4,155 |
| Losses on  oans pu chased | 10 | 25 | 4,754 |
| Change  n | | | |
| D e to PCs a d REMICs a d Ot e  St  ct  ed Sec  t es t  sts | 8 | 14 | 250 |
| G a a  ee asse , a fa  va e | (210) | (121) | (5,597) |
| Gua an ee obl ga on | 158 | (17) | (183) |
| Ot e , et | (2,771) | (134) | (461) |
| To a o  e, e | $(2,805) | $(233) | $ 2,918 |

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3087

Table of Contents

**END OF CONSOLIDATED FINANCIAL STATEMENTS AND ACCOMPANYINGNOTES**

3 4                                                                  *Freddie Mac*

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## QUARTERLY SELECTED FINANCIAL DATA
### (UNAUDITED)

| | 2011 | | | | |
|---|---|---|---|---|---|
| | 1Q | 2Q | 3Q | 4Q | Full-Year |
| | (in millions, except share-related amounts) | | | | |
| Net interest income | $ 4,540 | $ 4,561 | $ 4,613 | $ 4,683 | $ 18,397 |
| Provision for credit losses | (1,989) | (2,529) | (3,606) | (2,578) | (10,702) |
| Non-interest income (loss) | (1,252) | (3,857) | (4,798) | (971) | (10,878) |
| Non-interest expense | (697) | (546) | (687) | (553) | (2,483) |
| Income tax benefit (expense) | 74 | 232 | 56 | 38 | 400 |
| Net income (loss) attributable to Freddie Mac | $ 676 | $ (2,139) | $ (4,422) | $ 619 | $ (5,266) |
| Net loss attributable to common stockholders | $ (929) | $ (3,756) | $ (6,040) | $ (1,039) | $ (11,764) |
| Net loss per common share (1) | | | | | |
| Basic | $ (0.29) | $ (1.16) | $ (1.86) | $ (0.32) | $ (3.63) |
| Diluted | $ (0.29) | $ (1.16) | $ (1.86) | $ (0.32) | $ (3.63) |

| | 2010 | | | | |
|---|---|---|---|---|---|
| | 1Q | 2Q(2) | 3Q | 4Q | Full-Year |
| | (in millions, except share-related amounts) | | | | |
| Net interest income | $ 4,125 | $ 4,136 | $ 4,279 | $ 4,316 | $ 16,856 |
| Provision for credit losses | (5,396) | (5,029) | (3,727) | (3,066) | (17,218) |
| Non-interest income (loss) | (4,854) | (3,627) | (2,646) | (461) | (11,588) |
| Non-interest expense | (667) | (479) | (828) | (958) | (2,932) |
| Income tax benefit (expense) | 103 | 286 | 411 | 56 | 856 |
| Net (income) loss attributable to noncontrolling interest | 1 | | | | 1 |
| Net loss attributable to Freddie Mac | $ (6,688) | $ (4,713) | $ (2,511) | $ (113) | $ (14,025) |
| Net loss attributable to common stockholders | $ (7,980) | $ (6,009) | $ (4,069) | $ (1,716) | $ (19,774) |
| Net loss per common share (1) | | | | | |
| Basic | $ (2.45) | $ (1.85) | $ (1.25) | $ (0.53) | $ (6.09) |
| Diluted | $ (2.45) | $ (1.85) | $ (1.25) | $ (0.53) | $ (6.09) |

(1) Earnings (loss) per common share is computed independently for each of the quarters presented. Diluted earnings (loss) per share, esc of effo quares ay o equa full-year amoun Earnings (loss) per common share amoun s may no ecac ae s g ea o ss ow s abe de o ound ng

(2) For a discussion of an eo den f ed du ng he h e mon hs e ded J e 30, 2010, see "MD&A — CONSOLIDATED RESULTS OF OPERATIONS — Provision for Credit Losses."

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None

## ITEM 9A. CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms and that such information is accumulated and communicated to management of the company, including the company's Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. In designing our disclosure controls and procedures, we recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and we must apply judgment in implementing possible controls and procedures

Management, including the company's Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of December 31, 2011 As a result of management's evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of December 3 , 20 , at a reasonable eve of assurance due to the two material weaknesses in our internal control over financial reporting discussed below For additional information related to these material weaknesses, see "Management's Report on Internal Control Over Financial Reporting "

Our disclosure controls and procedures did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws We have not been able to update our disclosure controls and procedures to provide reasonable assurance that

*Freddie Mac*

Source D RA HOM OAN MORTGAG CORP, 10 K, March 09, 2012          TREASURY-3089          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure  Based on discussions with FHFA and the structural nature of this continuing weakness, it is likely that we will not remediate this weakness in our disclosure controls and procedures while we are under conservatorship.

In addition, based on our assessment as of December 31, 2011, we identified a material weakness related to our inability to effectively manage information technology changes and maintain adequate controls over information security monitoring, resulting from increased levels of employee turnover

## Management's Report on Internal Control Over Financial Reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule   3a   5(f)  Internal control over financial reporting is a process designed by, or under the supervision of, our Chief Executive Officer and Chief Financial Officer and effected by the Board of Directors,  management and other personnel to provide reasonable assurance regarding the reliability of our financial reporting and the  preparation of financial statements for external purposes in  accordance with GAAP

Because of its inherent limitations, internal control over  financial reporting may not prevent or detect misstatements  It is a process that involves human diligence and compliance and is, therefore, subject to lapses in judgment and breakdowns  resulting from human error  It also can be circumvented by collusion or improper management override  Because of its  limitations, there is a risk that internal control over  financial reporting may not prevent or detect on a timely basis  errors that could cause a material misstatement of the financial  statements

We assessed the effectiveness of our internal control over financial reporting as of December 31, 2011. In making our assessment, we used the criteria set forth by the Committee of  Sponsoring Organizations of the Treadway Commission, or COSO, in  *Internal Control Integrated Framework.* A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material  misstatement of the company's annual or interim financial  statements will not be prevented or detected on a timely basis by a company's internal controls. Based on our assessment,  we identified two material weaknesses related to: (a) our inability to update our disclosure controls and procedures in a  manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal  securities laws, including disclosures affecting our consolidated financial statements; and (b) our inability  to effectively manage information technology changes and maintain adequate controls over information security monitoring,  resulting from increased levels of employee turnover

We have been under conservatorship of FHFA since September 6, 2008  FHFA is an independent agency that currently functions as both our Conservator and our regulator  with respect to our safety, soundness and mission. Because we are in conservatorship, some of the information that we may need to meet our disclosure obligations may be solely within the  knowledge of FHFA  As our Conservator, FHFA has the power to take actions without our knowledge that could be material to  investors and could significantly affect our financial  performance  Although we and FHFA have attempted to design and implement disclosure policies and procedures that would account  for the conservatorship and accomplish the same objectives as disclosure controls and procedures for a typical reporting  company, there are inherent structural limitations on our ability to design, implement, test or operate effective  disclosure controls and procedures under the current  circumstances. As our Conservator and regulator, FHFA is limited in its ability to design and implement a complete set of  disclosure controls and procedures relating to us, particularly with respect to current reporting pursuant to Form 8 K. Similarly, as a regulated entity, we are limited in our ability to design, implement, operate and test the controls and  procedures for which FHFA is responsible  For example, FHFA may formulate certain intentions with respect to the conduct of our business that, if known to management, would require  consideration for disclosure or reflection in our financial statements, but that FHFA, for regulatory reasons, may be  constrained from communicating to management  As a result, we have concluded that this control deficiency constitutes a  material weakness in our internal control over financial  reporting

We are finding it difficult to retain and engage critical employees and attract people with the skills and experience we  need  In most areas, we have been able to leverage succession  plans and reassign responsibilities to maintain sound internal  control over financial reporting  However, in the fourth quarter of 2011, we experienced a significant increase in the number of  control breakdowns within certain areas of our information technology division, specifically within groups responsible for  information change management and information security  We identified deficiencies in the following areas: (a) approval and monitoring of changes to certain  technology applications and infrastructure; (b) monitoring of select privileged user activities; and (c) monitoring  user activities performed on certain technology hardware  systems. These control breakdowns could have impacted applications which support our financial reporting processes.  Increased

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                       Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

levels of employee turnover contributed to ineffective management oversight of controls in these areas resulting in these deficiencies We believe that these issues aggregate to a material weakness in our internal control over financial reporting

Because of these material weaknesses, we have concluded that our internal control over financial reporting was not effective as of December 31, 2011 based on the COSO criteria PricewaterhouseCoopers LLP, an independent registered public accounting firm, audited the effectiveness of our internal control over financial reporting as of December 31, 2011 and also determined that our internal control over financial reporting was not effective PricewaterhouseCoopers LLP's report appears in "FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM."

**Mitigating Actions Related to the Material Weaknesses in Internal Control Over Financial Reporting**

As described under "Management's Report on Internal Control Over Financial Reporting," we have two material weaknesses in internal control over financial reporting as of December 31, 2011

Given the structural nature of the material weakness related to our inability to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, we believe it is likely that we will not remediate this material weakness while we are under conservatorship However, both we and FHFA have continued to engage in activities and employ procedures and practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws These include the following:

- FHFA has established the Office of Conservatorship Operations, which is intended to facilitate operation of the company with the oversight of the Conservator

- We provide drafts of our SEC filings to FHFA personnel for their review and comment prior to filing We also provide drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release

- FHFA personnel, including senior officials, review our SEC filings prior to filing, including this annual report on Form 10 K, and engage in discussions regarding issues associated with the information contained in those filings Prior to filing this annual report on Form 10 K, FHFA provided us with a written acknowledgement that it had reviewed the annual report on Form 10 K, was not aware of any material misstatements or omissions in the annual report on Form 10 K, and had no objection to our filing the annual report on Form 10 K

- The Acting Director of FHFA is in frequent communication with our Chief Executive Officer, typically meeting (in person or by phone) on a weekly basis.

- FHFA representatives hold frequent meetings, typically weekly, with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, capital markets management, external communications, and legal matters.

- Senior officials within FHFA's accounting group meet frequently, typically weekly, with our senior financial executives regarding our accounting policies, practices, and procedures

We have performed the following mitigating actions regarding the material weakness related to our inability to effectively manage information technology changes and maintain adequate controls over information security monitoring, resulting from increased levels of employee turnover:

- Reviewed potential unauthorized changes to applications supporting our financial statements for proper approvals.

- Reviewed and approved user access capabilities for applications supporting our financial reporting processes

- Maintained effective business process controls over financial reporting

- Filled the vacant positions or reassigned responsibilities within the information change management and information security monitoring groups.

We also intend to take the following remediation actions related to this material weakness:

- Take select actions targeted to reduce employee attrition in key control areas

- Assess staffing requirements to ensure appropriate staffing over information security controls and develop cross training programs within these areas to mitigate the risk to the internal control environment should we continue to experience high levels of employee turnover

- Improve automation capabilities for the identification and resolution of potential unauthorized system changes

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3091

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- Update our policies and procedures to document control processes

- Provide additional training to IT individuals that execute or manage security controls

- Explore options to enter into various strategic arrangements with outside firms to provide operational capability and staffing for these functions, if needed.

In view of our mitigating actions related to these material weaknesses, we believe that our consolidated financial statements for the year ended December 3 , 20   have been prepared in conformity with GAAP

**Changes in Internal Control Over Financial Reporting During the Quarter Ended December 31, 2011**

We evaluated the changes in our internal control over financial reporting that occurred during the quarter ended December 31, 2011 and concluded that the following matters have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting

Raymond G Romano, Executive Vice President    Chief Credit Officer and John R Dye, Senior Vice President    Interim General Counsel & Corporate Secretary, left the company during the fourth quarter of 2011. On October 26, 2011, FHFA announced that Charles E. Haldeman Jr., Chief Executive Officer, has expressed his desire to step down in 2012, and that the Board and FHFA will be developing a succession plan.

In addition, a number of senior officers left the company in earlier periods  We maintain succession plans for our senior management positions, which has enabled us to fill some of our vacant senior management positions quickly  However, we may not be able to continue to do so in the future  We have eliminated other vacant senior management positions through reorganizations  In addition, we have experienced elevated levels of voluntary turnover in the fourth quarter of 2011 and earlier periods, and expect this trend to continue as the public debate regarding the future role of the GSEs continues  We continue to have concerns about staffing inadequacies, management depth, and employee engagement  Disruptive levels of turnover at both the executive and senior levels could lead to breakdowns in any of our operations, affect our execution capabilities, cause delays in the implementation of critical technology and other projects, and erode our business, modeling, internal audit, risk management, information security, financial reporting, legal, compliance, and other capabilities

Based on our assessment as of December 31, 2011, we identified a material weakness related to our inability to effectively manage information technology changes and maintain adequate controls over information security monitoring, resulting from increased levels of employee turnover  For additional information related to this material weakness, see  "Management's Report on Internal Control Over Financial Reporting "

FHFA also announced on October 26, 2011, that two Board members, John A. Koskinen (Chairman) and Robert R. Glauber (Chairman, Governance and Nominating Committee), have reached the company's mandatory retirement age and would be stepping down from the Board  This occurred at the end of their then current terms in March 2012  In order to promote a smooth transition, per FHFA's announcement, Christopher Lynch, previously the Chairman of the Audit Committee, assumed the position of Non Executive Chairman of the Board effective at the December 2011 Board meeting  A third Board member, Laurence E. Hirsch, notified the company on October 18, 2011 that he would not seek re election to the Board when his term expires  Mr. Hirsch's term expired in March 2012. In addition, on March 7, 2012, Clayton Rose (Chairman of the Audit Committee) notified the company that he will resign from the Board of Directors effective as of 6:00 pm Eastern Standard Time on March 9, 2012.

## ITEM 9B. OTHER INFORMATION

**Election of Directors**

Upon the appointment of FHFA as our Conservator on September 6, 2008, the Conservator immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets, including, without limitation, the right of holders of our common stock to vote with respect to the election of directors and any other matter for which stockholder approval is required or deemed advisable

318 *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses may be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

On March 6, 2012, the Conservator executed a written consent re electing each of the then current directors as members of our Board of Directors, other than Messrs. Glauber, Hirsch, and Koskinen, effective as of that date  The individuals elected by the Conservator for another term as directors are listed below

Linda B. Bammann
Carolyn H. Byrd
Charles E. Haldeman, Jr.
Christopher S. Lynch
Nicolas P. Retsinas
Clayton S  Rose
Eugene B. Shanks, Jr.
Anthony A. Williams

The terms of the directors elected under the March 6, 2012  consent will continue until the date of the next annual meeting  of stockholders or the Conservator next elects directors by  written consent, whichever occurs first.

On March 7, 2012, Clayton Rose notified the company that he will  resign from the Board of Directors effective as of 6:00 pm  Eastern Standard Time on March 9, 2012.

**2012 Executive Management Compensation Program**

On March 8, 2012, FHFA approved a new compensation structure for our Covered Officers with limited input from  Freddie Mac's management and Compensation Committee  The 20 2 Executive Management Compensation Program, or the 20 2  Executive Compensation Program, is effective January 1, 2012  Compensation under the 2012 Executive Compensation Program  consists solely of salary paid in cash, with two components    Base Salary and Deferred  Salary    which are described in the table below  No portion of the 20 2 Executive Compensation Program includes a bonus component

| Element of Compensation | Description | Primary Compensation Ob ectives | Key Features |
|---|---|---|---|
| Base Sa a y | Ea ned and pa d on a sem -mon hly bas s | To p ov de a f xed level of compensa o o each Cove ed Off ce fo  he  espons b l y level of h s he pos on | Ca o exceed $500,000 pe yea , excep fo  e CEO a d CFO, o o he exce o s as a oved by FHFA |
| Defe ed Sala y | *Fixed Portion* The f xed po on of Defe ed Sa a y s ea ned sem -mon h y d  g eac q a e a d pa d o  e as bus ness day of he co espond ng qua e of he follow ng yea | To encou age execu ve e en on | The po  on ea ned du ng 2012 bu pa d as of  e da e of  e m na on s pa d as desc bed be ow |
| | *At-Risk Portion* The a - sk po on of Defe ed Sa a y s ea ned and pa d n he same manne as he f xed po on of Defe ed Sa a y,  t s s ject to educ on based on co po a e and nd v dual pe fo mance | To encou age ach evemen of co po a e and nd v dual pe fo mance goa s | The po  on ea ned du ng 2012 bu pa d as of  e da e of  e m na on s pa d as desc bed be ow<br><br>The 2012 co po a e ob ec ves aga ns wh ch co po a e pe fo mance w  be measu ed fo  he named execu ves' 2012 a - sk defe ed sala y a e desc bed be ow unde "2012 Conse va o sh p Sco eca d"<br><br>Eq a o 30% of Ta ge TDC, a f of w c  ay be ed ced based on co po a e pe fo mance and half of wh ch ay be ed ced based on nd v dual pe fo mance |

*Effect of Termination of Employment.* Base Salary ceases upon a Covered Officer's termination of employment  The treatment of Deferred Salary upon the termination of a Covered Officer for any reason other than for cause is as described  be ow

• *Deferred Salary    Fixed Portion.* The portion earned during 2012 but unpaid as of the date of termination is  reduced by 2% for each full or partial month by which the  Covered Officer's termination precedes January 31, 20 4

• *Deferred Salary    At Risk Portion.* The portion earned during 2012 but unpaid as of the date of termination is paid in full, but remains subject to reduction for corporate and individual performance

319                                                                                          *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

All Deferred Salary paid following a Covered Officer's termination of employment will be paid on the same quarterly schedule as if the Covered Officer had not terminated employment

**2012 Target Total Direct Compensation**

In establishing each Named Executive Officer's 2012 Target TDC, the Compensation Committee reviewed 2011 data from the Comparator Group and two alternative survey sources  Specifically, for the positions of CEO, CFO, EVP      Single Family Business, Operations and Technology and EVP      Chief Enterprise Risk Officer, the Compensation Committee, at the recommendation of Meridian Compensation Partners, LLC, or Meridian, reviewed competitive market  compensation data from the Comparator Group  For the position of  EVP      Chief Administrative Officer, the Compensation Committee, also at the recommendation of Meridian, reviewed  competitive market data from surveys published by Aon Hewitt and McLagan, because no reasonable match was available in the  Comparator Group

In December 20   , the Compensation Committee applied  the criteria described below under "EXECUTIVE  COMPENSATION  Compensation Discussion and Analysis     Executive Management Compensation Program     *Elements of Compensation and Total Direct Compensation    Establishing Target TDC*" to either develop 20 2 TDC recommendations for each of the Named  Executive Officers or review recommendations presented by senior  management

The 2012 Target TDC recommendation for each of the Named Executive Officers was reviewed by FHFA  While the Compensation Committee's 2012 Target TDC recommendations for our Named Executive Officers, in the aggregate, were below the 25th  percentile of the competitive market, FHFA instructed the Compensation Committee to reduce the Target TDC for each of the Named Executive Officers by 10%, with the exception of Ms. Wisdom. For Ms. Wisdom, 2012 Target TDC is unchanged from 2011 in consideration of the expansion in the  scope of her responsibilities during 2011 resulting from the  integration of the credit risk management function in her  division. For Mr. Weiss and Ms. Wisdom, the Compensation Committee increased Base Salary by 10%, with an  equal decrease in Deferred Salary, to create more consistent Base Salary levels for EVPs who have comparable levels of  responsibility.

The following table sets forth the components of compensation on  an annual basis for each of our Named Executive Officers.

**Table 75      2012 Program Target Compensation Amounts**

| Named Executive Officer | Title | 2012 Base Salary | 2012 Deferred Salary | | Target TDC |
|---|---|---|---|---|---|
| | | | ixed Portion | At-Risk Portion | |
| C  a es E  Ha de  a  J | CEO | $ 900,000 | $2,880,000 | $1,620,000 | $ 5,400,000 |
| Ross J  Ka | EVP  CFO | 675,000 | 1,530,000 | 945,000 | 3,150,000 |
| A   o y N  Re z | EVP   S ng e-Fa      y Bus ness, Ope a  ons and  echno ogy | 500,000 | 1,232,500 | 742,500 | 2,475,000 |
| Je  y We ss | EVP   Ch ef Adm n s a ve Off ce | 495,000 | 891,000 | 594,000 | 1,980,000 |
| Pa ge H  W sdom | EVP   Ch ef En e p se R sk Off ce | 467,500 | 757,500 | 525,000 | 1,750,000 |

**2012 Conservatorship Scorecard**

On March 8, 2012, FHFA instituted a scorecard for use in the new compensation program  The scorecard is applicable to  both Freddie Mac and Fannie Mae and establishes the following  objectives and performance targets/measures for 2012  These  objectives and performance targets/measures will be used in determining the amount payable to Covered Officers with respect  to one half of the at risk portion of 20 2 Deferred Salary

The scorecard scoring will be based not only on the ultimate  accomplishment of results but also our cooperation, relative  contribution and collaboration with the Board of Directors, FHFA, Fannie Mae, and market participants, as appropriate to the particular measure  FHFA will consider our creativity, collaboration, effectiveness, and commitment to the particular  matter  Most goals have a target date of completion of December 3 , 20 2  However, if we are able to accomplish  the goal earlier in the year that will be taken into  consideration in the scoring to offset shortfalls elsewhere

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                          TREASURY-3094                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Object ves | Weigh ing | Targets / Measures |
|---|---|---|
| **1. Build a New Infrastructure** | 30% | |
| **• Continued progress on, or completion of, mortgage market enhancement activities already underway** | 15% | |
| oan- eve D sc osure n Mortgage Backed Secur ty (MBS) | | • Deve op temp ate for enhanced oan- eve d sc osures for s ng e-fam y MBS that ncorporates market standards and is cons stent w th ma nta n ng l qu d ty n the to-be-announced market emp ate to be submitted to Federa Hous ng nance Agency (FHFA) by June 30, 2012 |
| – Uniform Mortgage Data Program (UMDP) | | • Meet articu ated Uniform Mortgage Data Program (UMDP) timetab es as fo ows |
| | | – Uniform Co atera Data Porta (UCDP) e ectronic appraisa submission requirement by March 19, 2012 |
| | | – Uniform oan De ivery Data (U DD) format oan de ivery data by Ju y 23, 2012 |
| | | De ver new U DD data po nt n comp ance w th S C Ru e 15Ga-1 by November 30, 2012 |
| | | Not fy market of optiona U DD data points, inc uding those necessary to improve disc osure and for other business uses in 2012 |
| | | • Not fy market of serv c ng data standard, inc uding data necessary to improve disc osure, and agree on t metab e for data co ect on to beg n n 2013 by December 31, 2012 |
| | | • Deve op p ans that everage uniform appraisa data and U DD for enhanced risk management by December 31, 2012 |
| | | • Cooperate with FHFA imp ementation of porta to accept e ectron c appra sa s |
| Se er Serv cer Contract Harmon zat on | | • Appropriate resource a ocation to se er-serv cer contract harmon zat on and comm tment to targeted t metab es as out ned n FHFA d rect ve |
| **• Securitization Platform** | 10% | • n co aboration with FHFA and the other nterpr se, deve op and f na ze a p an by December 31, 2012 for the des gn and bu d of a s ng e secur t zat on p atform that can serve both nterprises and a post-conservatorship market with mu tip e future issuers |
| **• Pooling and Servicing Agreements** | 5% | • Propose a mode poo ng and serv c ng agreement (PSA), co aborate with other nterprise and FHFA on a speci c proposa , seek pub ic comment, and produce fina recommendations for standard nterprise trust documentation by December 31, 2012 |
| **2. Contract the Enterprises dominant presence in the marketplace while simplifying and shrinking certain operations.** | 30% | |
| **• Work with FHFA to evaluate options for meeting conservatorship goals, including shifting mortgage credit risk to private investors via assessment of:** | 10% | |
| Mu t fam y ne of bus ness | | • Undertake a market ana ysis by December 31, 2012 of the v ab ty of mu t fam y bus ness operations without government guarantees Review the ike y v ab ty of these mode s operat ng on a stand-a one bas s after attract ng pr vate cap ta and ad ust ng pr c ng f needed |
| – nvestment assets and nonperforming oans | | • Perform ana ys s of nvestments portfo o as descr bed n the strateg c p an by the fourth quarter of 2012 and make preparat ons for the compet t ve d spos t on of a poo of nonperform ng assets by September 30, 2012 |
| | | • Rev ew opt ons w th board of d rectors and FHFA and make appropriate recommendations for future actions |
| | | • mp ement p an agreed to by board and FHFA |
| **• Risk Sharing** | 10% | • n t ate r sk shar ng transact ons by September 30, 2012 |
| | | • xecute new r sk shar ng transact ons beyond the traditiona charter required mortgage insurance coverage |
| | | • Propose t me for cont nued growth n r sk sharing through 2013 |
| **• Pricing** | 10% | |
| S ng e-fam y Guarantee Fee Pr c ng ncreases | | • Deve op and beg n mp ement ng p an to ncrease guarantee fee pr c ng to more c ose y approx mate the private sector |
| | | • Set uniform pricing across oan se ers to extent pract cab e |
| Set p an to pr ce for state aw affects on mortgage credit osses g ven defau t | | • Work with FHFA to deve op appropriate r sk based pr c ng by state State eve pr c ng gr d to be comp eted by August 31, 2012 |
| **3. Maintain foreclosure prevention activities and credit availability for new and re inanced mortgages.** | 20% | |
| **• Loss Mitigation through continued implementation and enhancement of Servicer Alignment Initiative** | 10% | • nhance transparency of servicer requirements around forec osure time ines and compensatory fees and pub ish app icab e announcements by September 30, 2012 |
| **• Short Sales** | | • nhance short sa es programs that nc ude efforts to dent fy program obstac es that mpact ut zat on by June 30, 2012 App icab e ender announcements to forec osure a ternatives by September 30, 2012 |
| **• Deeds in ieu and Deeds for ease** | | • Des gn, deve op or enhance deed n eu and deed-for- ease programs that nc ude efforts to dent fy and reso ve program obstac es that mpact ut zat on by September 30, 2012 App icab e ender announcements to forec osure a ternat ves by December 31, 2012 |
| **• Real Estate Owned Sales** | 10% | • mp ement, as needed, oans to fac tate rea estate owned (R O) sa es program by June 30, 2012 |
| | | • xpand f nanc ng for sma nvestors n R O properties by June 30, 2012 |
| | | • In t ate d spos t on p ot, e ther through financing or b u k sa es, by September 30, 2012 |
| | | • xpand pi ot programs and estab ish ongoing sa es program, as agreed with FHFA, during 2012 |
| **4. Manage Ef iciently in Support of Conservatorship Goals** | 20% | |
| **• Conservatorship / Board Priorities** | 20% | • Work c ose y with FHFA toward conc uding t gat on assoc ated w th pr vate abe secur t es and who e oan repurchase c aims, as appropriate |
| | | • Pr or t ze and manage nterpr se operations in support of conservatorship goa s and board d rect ons |
| | | • Adapt to evo ving conservatorship requirements |
| | | • Co aborate fu y with FHFA and, when requested, the other nterprise |
| | | • Act ve y seek and cons der pub c nput on conservatorship-re ated projects, as requested |
| | | • ffect ve y dent fy, commun cate, and remed ate s tuat ons that create r sk for the conservatorsh ps or avoidab e taxpayer osses |
| | | • nsure corporate governance procedures are ma nta ned, nc ud ng t me y report ng to the board and adher ng to board mandates and expectations |
| | | • Take steps to m t gate key person dependenc es and ma nta n appropr ate nterna contro s and r sk management governance |
| | | • Ach eve m estones agreed to w th n the year with regard to accounting a ignment |

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

# PART III

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

**Background**

On September 6, 2008, the Director of FHFA appointed FHFA as our Conservator. Upon its appointment as Conservator, FHFA immediately succeeded to, among other things, the right of holders of our common stock to vote with respect to the election of directors  As a result, stockholders no longer have the ability to recommend director nominees or vote for the election of our directors  Accordingly, we will not solicit proxies, distribute a proxy statement to stockholders, or hold an annual meeting of stockholders in 2012  Instead, the Conservator has elected directors by a written consent in lieu of an annual meeting, as it has done in previous years.

**Directors**

On November 24, 2008, the Conservator reconstituted our Board of Directors and delegated certain powers to the Board  while reserving certain powers of approval to itself  See "Authority of the Board and Board Committees." The Conservator determined that the Board is to have a non executive Chairman, and is to consist of a minimum of nine and not more  than 13 directors, with the Chief Executive Officer being the only corporate officer serving as a member of the Board

On October 26, 2011, FHFA announced that Charles E. Haldeman, Jr  had informed the Board of his desire to step down from his position as CEO and Director of Freddie Mac in the coming year. The Board is conducting a search for a new CEO, in consultation with FHFA  An informal committee consisting of Nominating and Governance Committee members Eugene B  Shanks, Jr. (chair), Nicolas P. Retsinas and Carolyn H. Byrd, along with Non Executive Chairman Christopher S. Lynch, is conducting the search on behalf of the Board  The executive search firm SpencerStuart has been retained to assist in the  search.

FHFA also announced on October 26, 2011 that two members of the Freddie Mac Board of Directors, John A  Koskinen and Robert R  Glauber, have reached the company's mandatory retirement age and will not be eligible for re election to the Board at the  end of their current term  In anticipation of those retirements and to promote a smooth transition, Mr. Lynch, who previously served as chairman of the Board's Audit Committee, assumed the position of Non Executive Chairman, effective December 2, 2011  A third Board member, Laurence E. Hirsch, notified the company on October 18, 2011 that he  would not seek re election to the Board when his term expired

The Conservator executed a written consent, effective March 6, 2012, electing all of the then current directors  other than Messrs. Glauber, Hirsch and Koskinen to another  term as our directors  The terms of those directors will end: (a) on the date of the next annual meeting of our stockholders; or (b) when the Conservator next elects  directors by written consent, whichever occurs first. Currently, we have eight directors  The Board is conducting a search for  individuals qualified to fill the remaining seats on the Board  that are currently vacant.

Our Board seeks candidates for director who have achieved a high  level of stature, success, and respect in their principal  occupations. Each of our current directors was selected as a  candidate because of his or her character, judgment, experience,  and expertise  The qualifications of candidates also were evaluated in light of the requirement in our charter, as amended  by the Reform Act, that our Board must at all times have at least one individual from the homebuilding, mortgage lending and  real estate industries, and at least one person from an  organization representing consumer or community interests or one  person who has demonstrated a career commitment to the provision  of housing for low income households  Consistent with the  examination guidance for corporate governance issued by FHFA, the factors considered also include the knowledge directors would have, as a group, in the areas of business, finance,  accounting, risk management, public policy, mortgage lending, real estate, low income housing, homebuilding, regulation of  financial institutions, and any other areas that may be relevant  to our safe and sound operation  Additionally, in accordance with the guidance issued by FHFA, we considered whether a  candidate's other commitments, including the number of other board memberships held by the candidate, would permit the  candidate to devote sufficient time to the candidate's duties and responsibilities as a director  See "CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE    Board Diversity" for additional  information concerning the Board's consideration of diversity in identifying director nominees and candidates

<div align="center">322</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The following is a brief discussion of: the age and length of Board service of each director; each director's experience, qualifications, attributes, and/or skills that led to his or her selection as a director; and other biographical information about our directors, as of March 6, 2012:

- Linda B. Bammann joined the Board in December 2008. She is 55 years old She is an experienced finance executive with in depth knowledge of risk management gained from her previous employment and board memberships. Ms. Bammann's risk management experience enables her to contribute significantly to the Board's oversight of our enterprise risk management

  Ms. Bammann was Executive Vice President, Deputy Chief Risk Officer for JPMorgan Chase & Co from July 2004 until her retirement in January 2005. Prior to that, Ms. Bammann held several positions with Bank One Corporation beginning in 2000, including Executive Vice President and Chief Risk Management Officer from 2001 until Bank One's acquisition by JPMorgan Chase & Co. in July 2004. Ms. Bammann also was a member of Bank One's executive planning group From 1992 to 2000, Ms. Bammann was a Managing Director with UBS Warburg LLC and predecessor firms. Ms. Bammann was a board member of the Risk Management Association, and chairperson of the Loan Syndications and Trading Association. Ms. Bammann currently is a director of Manulife Financial Corporation, where she is a member of the Risk Committee and the Management Resources and Compensation Committee, and of The Manufacturers Life Insurance Company, a subsidiary of Manulife Financial Corporation

- Carolyn H Byrd joined the Board in December 2008 She is 63 years old She is an experienced finance executive who has held a variety of leadership positions. She also has significant public company audit committee experience Ms. Byrd's internal audit and public company audit committee experience enables her to support the Board's oversight of our internal control over financial reporting and compliance matters

  Ms. Byrd has been Chairman and Chief Executive Officer of GlobalTech Financial, LLC, a financial services company she founded, since 2000. From 1997 to 2000, Ms. Byrd was President of Coca Cola Financial Corporation. From 1977 to 1997, Ms. Byrd held a variety of domestic and international positions with The Coca Cola Company, including Chief of Internal Audits and Director of the Corporate Auditing Department She is currently a director of AFC Enterprises, Inc , where she is a member of the Audit Committee and the Corporate Governance Committee and of Regions Financial Corporation, where she is a member of the Audit Committee and the Risk Committee. Ms. Byrd is a former member of the board of directors and audit committee member of Circuit City Stores, Inc. and RARE Hospitality International, Inc., and she also served on the board of directors of St. Paul Travelers Companies, Inc.

- Charles E. Haldeman, Jr. joined the Board in August 2009, upon the commencement of his employment as Chief Executive Officer of Freddie Mac He is 63 years old He is an experienced finance executive and leader of finance and investment organizations Mr Haldeman's experience as a leader of financial organizations enables him to provide valuable business and operating perspectives to the Board

  Prior to joining Freddie Mac, Mr Haldeman served as Chairman of Putnam Investment Management, LLC, the investment advisor for the Putnam Funds, from July 2008 through June 2009. He joined Putnam Investments in 2002 as Senior Managing Director and Co Head of the investment division, was appointed President and Chief Executive Officer in November 2003, and served in that capacity until June 2008 He was a member of Putnam Funds' Board of Trustees from 2004 until July 2009, and was named President of the Putnam Funds in 2007. He served as a member of Putnam Investments' Board of Trustees from November 2003 until June 2009, where he served as a member of the audit committee Prior to joining Putnam, Mr Haldeman served as Chief Executive Officer of Delaware Investments from 2000 to 2002, and as chairman from 2001 to 2002 He was the President and Chief Operating Officer of United Asset Management Corporation from 1998 to 1999. Mr. Haldeman served as chairman of Dartmouth College's Board of Trustees from 2007 until 2010

- Christopher S Lynch joined the Board in December 2008 He is 54 years old He is an experienced senior accounting executive who served as the lead audit signing partner and account executive for several large financial institutions with mortgage lending businesses He also has significant public company audit committee experience and risk management experience Mr Lynch's extensive experience in finance, accounting and risk management enables him to provide valuable guidance to the Board on complex accounting and risk management issues, including in his roles as Non Executive Chairman and member of our Audit Committee

  Mr Lynch has served as Non Executive Chairman of Freddie Mac since December 2011 Mr Lynch is an independent consultant providing a variety of services to financial intermediaries, including risk management, strategy, governance, financial and regulatory reporting and troubled asset management Prior to retiring from

<div align="center">323</div>

<div align="right">*Freddie Mac*</div>

Source   D RA HOM   OAN MORTGAG CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

KPMG LLP in May 2007, Mr. Lynch held a variety of leadership positions at KPMG, including National Partner in Charge Financial Services, the U.S. firm's largest industry division. Mr. Lynch chaired KPMG's Americas Financial Services Leadership team, was a member of the Global Financial Services Leadership and the U.S. Industries Leadership teams and led the Banking & Finance practice Mr Lynch also served as a partner in KPMG's Department of Professional Practice and as a Practice Fellow at the Financial Accounting Standards Board. Mr. Lynch was the lead and audit signing partner for some of KPMG's largest financial services clients Mr Lynch also is a director of American International Group, Inc , where he is the Chair of the Audit Committee and a member of the Finance and Risk Management Committee In addition, Mr Lynch serves on the National Audit Committee Chair Advisory Council of the National Association of Corporate Directors

- Nicolas P Retsinas joined the Board in 2007 He is 65 years old He is an experienced leader in the governmental and educational sectors, with in depth knowledge of the mortgage lending and real estate industries He also has represented consumer and community interests and has demonstrated a career commitment to the provision of housing for low income households Mr Retsinas' public, private and academic experience, including his service on the boards of several not for profit organizations, enables him to bring to the Board broad knowledge and understanding of housing and consumer and community issues.

Mr Retsinas is a senior lecturer in Real Estate at the Harvard Business School and is Director Emeritus of Harvard University's Joint Center for Housing Studies, where he served as Director from 1998 to 2010 He is also a lecturer in Housing Studies at the Graduate School of Design Prior to his Harvard appointment, Mr. Retsinas served as Assistant Secretary for Housing Federal Housing Commissioner at the United States Department of Housing and Urban Development from 1993 to 1998 and as Director of the Office of Thrift Supervision from 1996 to 1997. He served on the Board of the Federal Deposit Insurance Corporation from 1996 to 1997, the Federal Housing Finance Board from 1993 to 1998 and the Neighborhood Reinvestment Corporation from 1993 to 1998. Mr Retsinas also formerly served on the Board of Trustees for the National Housing Endowment. Currently, Mr. Retsinas serves on the Board of Trustees for Enterprise Community Partners, on the Board of Directors of the Center for Responsible Lending, and as a member of the Bipartisan Policy Center's Housing Commission

- Clayton S Rose joined the Board in October 20 0 He is 53 years old He is a finance executive with leadership experience in finance and investment organizations, experience serving on and chairing public company audit committees, and academic experience focused on financial services and managerial ethics Mr Rose's leadership, operating and academic experience enables him to provide the Board with valuable guidance regarding business execution, corporate finance and capital markets, as well as financial reporting and controls oversight

Mr Rose is Professor of Management Practice at the Harvard Business School, and has been a member of its faculty since July 2007 He was awarded a PhD in sociology (with distinction) from the University of Pennsylvania in the same year. He was an adjunct professor at the Stern School of Business at New York University from 2002 to 2004, and at the Graduate School of Business at Columbia University from 2002 to 2006. In 2001, Mr Rose served as Vice Chairman and Chief Operating Officer of JP Morgan, the investment bank of J.P. Morgan Chase & Co. Previously, he worked at J.P. Morgan & Co. Incorporated from 1981 to 2000, where, among other positions, he was head of the Global Investment Banking and the Global Equities Divisions and served as a member of the firm's executive committee Mr Rose is a member of the board of directors of XL Group plc, where he is a member of the Nominating, Governance and External Affairs Committee and the Risk and Finance Committee He is a trustee of the Howard Hughes Medical Institute, where he has chaired the audit and compensation committee since March 2009, and is a director of Public/Private Ventures, where he has chaired the audit committee since October 20 From November 2007 to March 2010, he served as Chairman of the board of managers of Highbridge Capital Management, an alternative investment management firm owned by JPMorgan Chase & Co Mr Rose previously served as a member of the boards of directors of Mercantile Bankshares Corporation from September 2003 to April 2007, where he served on the audit committee, and of Lexicon Pharmaceuticals, Inc from July 2004 through September 2007, where he chaired the audit committee from March 2005 through September 2007 From October 2006 to October 2011, he was a trustee of the National Opinion Research Center at the University of Chicago, and chaired its audit committee.

- Eugene B Shanks, Jr joined the Board in December 2008 He is 64 years old He is an experienced finance executive with leadership and risk management expertise Mr. Shanks' leadership and risk management experience enables him to provide the Board with valuable guidance on risk management issues and our strategic direction

Mr. Shanks is a Trustee of Vanderbilt University, a member of the Advisory Board of the Stanford Institute for Economic Policy Research, a director of ACE Limited, where he serves as a member of the Risk and Finance

<div align="center">324</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Committee, a Senior Advisor to Bain and Company, and a founding director at The Posse Foundation  From November 2007 until August 2008, Mr. Shanks was a senior consultant to Trinsum Group, Incorporated, a strategic consulting and asset management company. From 1997 until its sale in 2002, Mr. Shanks was President and Chief Executive Officer of NetRisk, Inc., a risk management software and advisory services company he founded  From 1973 to 1978 and from 1980 to 1995, Mr. Shanks held a variety of positions with Bankers Trust New York Corporation, including head of Global Markets from 1986 to 1992  and President and Director from 1992 to 1995. From 1978 to 1980,  he was Treasurer of Commerce Union Bank in Nashville, Tennessee.

- Anthony A  Williams joined the Board in December 2008  He is 60 years old  He is an experienced leader of state and  local governments, with extensive knowledge concerning real estate and housing for low income individuals  He also has  significant experience in financial matters and is an experienced academic focusing on public management issues  Mr Williams' leadership and operating experience in the public sector allows him to provide a unique perspective on  state and local housing issues.

Mr Williams is a Lecturer in Public Management at Harvard's Kennedy School of Government. Since January 2012  he has served as a Senior Fellow of the Government Practice at  The Corporate Executive Board Company, and from January 2010  through December 2011, he served as the Executive Director of the Government Practice  Since September 2011, Mr  Williams has been affiliated with McKenna, Long & Aldridge, LLP, a law firm. From May 2009 until September 2011, Mr  Williams was affiliated with the law firm Arent Fox LLP. Prior to this, Mr. Williams served as the Chief Executive Officer of Primum Public Realty Trust, beginning in  January 2007. Mr. Williams served as the Mayor of Washington, D.C. from 1999 to January 2007, and as its Chief Financial Officer from 1995 to 1998. In 2005, Mr  Williams served as Vice Chair of the Metropolitan Washington Council of Governments, and in 2004, Mr. Williams served as President of the National League of  Cities. From 1993 to 1995, Mr. Williams was the first Chief Financial Officer for the U S  Department of Agriculture  From 1991 to 1993, Mr. Williams was the Deputy State Comptroller of Connecticut. From 1989 to 1991, Mr. Williams was the Executive Director of the Community Development Agency  of St. Louis, Missouri. From 1988 to 1989, Mr. Williams was an Assistant Director with the Boston Redevelopment Authority where he led the Department of Neighborhood Housing and Development, one of the Authority's four primary divisions. Mr. Williams also previously served as a director of Meruelo Maddux Properties, Inc , where he was a member of the Audit Committee and the  Nominating and Corporate Governance Committee  Mr. Williams also is a member of the Board of Trustees of the Calvert Sage Fund and of each fund comprising the Calvert Multiple Funds.

## Authority of the Board and Board Committees

The directors serve on behalf of, and exercise authority as  directed by, the Conservator  The Conservator has delegated to the Board and its committees authority to function in accordance  with the duties and authorities set forth in applicable  statutes, regulations and regulatory examination and policy guidance, and our Bylaws and Board committee charters, as such  duties or authorities may be modified by the Conservator. The Conservator has instructed the Board that it should consult with  and obtain the approval of the Conservator before taking action in the following areas:

- actions involving capital stock, dividends, the Purchase  Agreement between us and Treasury, increases in risk limits, material changes in accounting policy, and reasonably  foreseeable material increases in operational risk;

- creation of any subsidiary or affiliate or any substantial  transaction between us and any of our subsidiaries or  affiliates, except for transactions undertaken in the ordinary  course (*e.g.*, the creation of a trust, REMIC, REIT, or similar vehicle);

- matters that relate to conservatorship, such as, but not limited  to, the initiation of, and material actions in connection with,  significant litigation addressing the actions or authority of the Conservator, repudiation of contracts, qualified financial  contracts in dispute due to our conservatorship, and counterparties attempting to nullify or amend contracts due to  our conservatorship;

- actions involving hiring, compensation, and termination benefits  of directors and officers at the executive vice president  level  and above (including, regardless of title, executive positions  with the functions of chief operating officer, chief financial  officer, general counsel, chief business officer, chief investment officer, treasurer, chief compliance officer, chief risk officer, and chief/general/internal auditor);

- actions involving the retention and termination of external  auditors and law firms serving as consultants to the Board;

- settlements in excess of $50 million of litigation, claims,  regulatory proceedings, or tax related matters;

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                     TREASURY-3100                     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- any merger with or purchase or acquisition of a business involving consideration in excess of $50 million; and

- any action that, in the reasonable business judgment of the Board at the time that the action is taken, is likely to cause significant reputation risk.

The Board has five standing committees: Audit; Business and Risk; Compensation; Coordinating; and Nominating and Governance. All standing committees other than the Coordinating Committee meet regularly The membership of each committee as of March 6, 2012 is shown in the table below

**Table 76     Board of Directors Committee Membership**

| Director | Audit | Business and Risk | Compensation | Coordinating | Nominating and Governance |
|---|---|---|---|---|---|
| L  Bammann | | C | √ | √ | |
| C  By  d | √ | | | | √ |
| C  Haldeman | | | | | |
| C  Ly  c | √ | | √ | C | |
| N  Rets  as | | √ | | | √ |
| C  Rose | C | | √ | √ | |
| E  S  a  ks | | √ | | √ | C |
| A  W ll ams | √ | | C | √ | |

√  Membe  of  he Comm  ee

C   Cha  man of  he Comm  ee

Charters reflecting the duties of the committees have been adopted by the Board and approved by the Conservator All of the charters of the standing committees are available on our website at www freddiemac com/governance/bd_committees html

Our Board has an independent Non Executive Chairman, whose responsibilities include presiding over meetings of the Board, regularly scheduled executive sessions of the non employee directors, and executive sessions including only the independent directors that occur at least once annually if any of the non employee directors are not independent Mr Koskinen was initially appointed to the position of Non Executive Chairman by the Conservator in September 2008. Mr. Koskinen served in that role in 2011 until Mr. Lynch was appointed Non Executive Chairman on December 2, 2011.

**Communications with Directors**

Interested parties wishing to communicate any concerns or questions about Freddie Mac to the Non Executive Chairman of the Board or to our non employee directors as a group may do so by U.S. mail, addressed to the Corporate Secretary, Freddie Mac, Mail Stop 200, 8200 Jones Branch Drive, McLean, VA 22102 3110 Communications may be addressed to a specific director or directors or to groups of directors, such as the independent or non employee directors

**Executive Officers**

As of March 6, 2012, our executive officers are as follows:

| Name | Age | Year of Affiliation | Position |
|---|---|---|---|
| C  a  es E  Ha de  a , J | 63 | 2009 | Ch ef Execu  ve Off ce |
| Ross J  Ka  | 53 | 2009 | Execu  ve V ce P es den   Ch ef F nanc al Off ce |
| A   o  y N  Re  z | 48 | 2010 | Execu  ve V ce P es den   S ng e-Fa   y Bus ness, Ope a  ons and Technology |
| Je  y We  ss | 54 | 2003 | Execu  ve V ce P es den   Ch ef Adm n s   a  ve Off ce |
| Pa ge H  W sdom | 50 | 2008 | Exec   ve V ce P es den   En e p  se R sk O   cer |
| Dav d M  B  ckman | 46 | 1999 | Sen o  V ce P es den   Mul  fam ly |
| Deva yo  Ghose | 60 | 1997 | Sen o  V ce P es den   Inves   en s and Cap a  Ma kets, a d T eas  e |
| T  o  y F  Kenny | 50 | 2007 | Sen o  V ce P es den   Gene a  Aud  o |
| Robe  D  Ma  oux | 44 | 2002 | Sen o  V ce P es den   Co po a e Con  o e  & P  nc pal Accoun  ng Off ce |
| A  ca S  Mya  a | 47 | 2008 | V ce P es den   In e m Gene a  Counse  & Co po a e Sec e a y |
| Ca ol A  Wambeke | 52 | 1997 | Sen o  V ce P es den   Ch ef Compl ance Off ce |

The following is a brief biographical description of each executive officer who is not also a member of the Board

Ross J  Kari was appointed Executive Vice President    Chief Financial Officer in October 2009. Mr. Kari joined us from Fifth Third Bancorp, a financial services firm, where he served as Executive Vice President and Chief Financial Officer beginning in November 2008 Previously, he served as Executive Vice President and Chief Financial Officer of Safeco Corporation, an insurance firm, from June 2006 to October 2008 Prior to that, Mr Kari served as Executive Vice President and Chief Operating Officer of the Federal Home Loan Bank of San Francisco, a government sponsored enterprise and part of the Federal Home Loan Bank System, from February 2002 to June 2006. Mr. Kari is a member of the board of directors of KKR Financial Holdings LLC where he is the Chairman of the Audit Committee

Anthony Renzi was appointed Executive Vice President    Single Family Business, Operations and Technology in April 2011. In this position, Mr Renzi has broad responsibilities over the single family line of business, including the

326

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

administration, relationship and performance management of Freddie Mac Seller/Servicers; performance of Freddie Mac's guarantee book of business; sourcing, servicing and REO operations; and pricing and securitization operations In addition, he is responsible for the management of the firm's enterprise technology He joined us as Executive Vice President    Single Family Portfolio Management in April 20 0 Prior to joining us, Mr. Renzi served as chief operating officer of GMAC Residential Capital and president of GMAC Mortgage Corporation since 2008, and managed their operational and financial activities From 2006 to 2008, he was chief operating officer of the Residential Finance Group, where he led servicing operations, risk management, and strategic sourcing. Prior to that, Mr. Renzi held a number of key executive positions at GMAC Mortgage

Jerry Weiss was appointed Executive Vice President    Chief Administrative Officer in August 2010 In this role, Mr Weiss manages the services and operations of Freddie Mac's Strategy; External Relations, including Government and Industry Relations; Public Relations and Corporate Marketing; Internal Communications; Human Resources; Models, Mission and Research; and Making Home Affordable Compliance organizations For a period subsequent to his appointment as Executive Vice President    Chief Administrative Officer, he also served as our Chief Compliance Officer from August 2010 until June 2011 Prior to August 2010, Mr Weiss served as our Senior Vice President and Chief Compliance Officer and in various other senior management capacities since joining us in October 2003 Prior to joining us, Mr. Weiss worked from 1990 at Merrill Lynch Investment Managers, most recently as First Vice President and Global Head of Compliance From 1982 to 1990, Mr. Weiss was with a national law practice in Washington, D.C., where he specialized in securities regulation and corporate finance matters

Paige H Wisdom was appointed Executive Vice President    Chief Enterprise Risk Officer in October 2010. In this role, Ms. Wisdom is responsible for providing overall leadership and direction for enterprise risk management and leads an integrated framework for managing credit risk, market risk, operational risk and all other aspects of risk across the organization Prior to this, she served as our Senior Vice President Chief Enterprise Risk Officer from April 2010 until October 2010 Prior to this appointment, she served as the Senior Vice President Business Unit Chief Financial Officer from January 2008 until April 2010 From August 2004 until December 2007, Ms. Wisdom served as a Business Unit Chief Financial Officer at Bank of America for key businesses including Global Business and Financial Services; Business Lending; and Global Technology, Service and Fulfillment. Prior to joining Bank of America, Ms. Wisdom served at Bank One Corporation/JP Morgan from June 2000 until July 2004, as the Chief Financial Officer, Corporate Bank and Co Head Credit Portfolio Management Prior to that she served in capital markets positions at UBS/Warburg Dillon Read, Citibank Salomon Smith Barney, and Swiss Bank Corporation.

David M. Brickman was appointed Senior Vice President    Multifamily in July 2011. In this role, he is responsible for overall management of the Multifamily Division's business operations From December 2008 until July 2011, he served as Vice President in charge of various units responsible for Multifamily Capital Markets operations. In his previous roles at Freddie Mac, Mr. Brickman led the multifamily pricing, costing and research teams, was responsible for the development and implementation of new quantitative pricing models and financial risk analysis frameworks for all multifamily programs, and helped design several of Freddie Mac's multifamily financing products, including the Capital Markets Execution. Prior to joining Freddie Mac in 1999, Mr Brickman co led the Mortgage Finance and Credit Analysis group in the consulting practice at Pricewaterhouse Coopers LLP

Devajyoti Ghose was appointed Senior Vice President    Investments and Capital Markets, and Treasurer in May 2011. Prior to this, he served as Vice President    Asset Liability Management and Deputy Treasurer from October 2010 until May 2011 From December 2008 until October 20 0, he served as Vice President in charge of various units responsible for Debt and Liquidity Management, Debt Portfolio Management and Single Family Pricing and Analytics From February 2005 until December 2008, Mr Ghose served as Vice President Convexity Management Before that, he held various senior positions at Freddie Mac in which he was responsible for evaluating the risks and returns of Freddie Mac's guarantee fee business and developing valuation models for various fixed income securities including mo tgage-re ated products, debentures and interest rate derivatives. Prior to joining Freddie Mac in 1997, Mr. Ghose was an assistant professor in econometrics at the University of Arizona.

Timothy F. Kenny was appointed Senior Vice President    General Auditor in July 2008 Prior to this appointment, Mr. Kenny served as Vice President and Interim General Auditor starting in May 2008 Before that, he served as our Vice President    Assistant General Auditor from September 2007 to May 2008 From 2001 to 2007, Mr Kenny was a Managing Director with BearingPoint, Inc (formerly KPMG Consulting, Inc ) where he directed a large team of financial professionals on a variety of financial risk management consulting projects with Ginnie Mae, the Federal Housing Administration, private sector mortgage bankers and other federal credit agencies He joined KPMG LLP, the predecessor organization to KPMG Consulting, in 1986, was promoted to a KPMG Audit Partner in 1997, and served in that position until the separation of KPMG Consulting from KPMG LLP in February 2001. From 2004 until 2008, Mr. Kenny was a

<div align="center">327</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are caused by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

member of the board of directors of Farmer Mac, a government sponsored enterprise that has established a secondary market for agricultural loans.

Robert D Mailloux was appointed Senior Vice President    Corporate Controller & Principal Accounting Officer in April 20  0  Prior to holding his current position, Mr Mailloux served as our Vice President    Acting Corporate Controller beginning in October 2008 Prior to that appointment, he served as Vice President    Multifamily & Corporate Segment Controller, from May 2008 until October 2008, and as Vice President    Corporate Financial Accounting from September 2004 until May 2008  Before that, Mr Mailloux held the position of Director Corporate Reporting and Analysis from March 2002 until September 2004  Before joining us, Mr. Mailloux served for 12 years at a leading accounting firm, where he managed a variety of large audit and consulting engagements in the financial services and real estate industries

Alicia S Myara was appointed Vice President    Interim General Counsel & Corporate Secretary in November 2011. In this role, Ms. Myara is responsible for managing the corporate governance, litigation, real estate, securities and other legal aspects of the company's business operations  She joined Freddie Mac in January 2008 as Vice President/Deputy General Counsel    Corporate Governance  She also serves as General Counsel and Secretary of the Freddie Mac Foundation  Prior to joining Freddie Mac, she spent ten years with Amtrak, a government owned corporation providing intercity passenger rail service in the United States, serving as its General Counsel and Corporate Secretary from 2002 until 2006.

Carol A Wambeke was appointed Senior Vice President    Chief Compliance Officer in June 2011. In this position, she manages Freddie Mac's compliance with legal and regulatory requirements and related controls that govern the company's business activities. Prior to this, Ms. Wambeke served as Vice President of Compliance & Regulatory Affairs from June 2008 until June 2011. In this role, she was responsible for coordinating regulatory related activities across the company and advising management on regulatory concerns and initiatives  Prior to transferring to the Compliance Division, she was Vice President    Regulatory Reporting & Analysis from February 2005 to June 2008 and Vice President    Regulatory Capital Operations from March 2004 to February 2005  She joined Freddie Mac in 1997 as a senior economist and served in various positions prior to 2004 with responsibility for financial and housing economics and regulatory capital management

## Section 16(a) Beneficial Ownership Reporting Compliance

Section  6(a) of the Exchange Act requires the directors and executive officers of a reporting company and persons who own more than  0% of a registered class of such company's equity securities to file reports of ownership and changes in ownership with the SEC. Based solely on a review of such reports, we believe that during 2011 all of our directors and executive officers complied with such reporting obligations

## Codes of Conduct

We have separate codes of conduct applicable to all employees and to Board members that outline the principles, policies, and laws governing their activities  Upon joining us or our Board, all employees and directors, respectively, are required to sign acknowledgements that they have read the applicable code and agree to abide by it  In addition, all employees and directors must respond to an annual questionnaire concerning code compliance  The employee code also serves as the code of ethics for senior executives and financial officers required by the Sarbanes Oxley Act and SEC regulations  Copies of our employee and director codes of conduct are available, and any amendments or waivers that would be required to be disclosed are posted, on our website at www freddiemac com

## Audit Committee Financial Expert

We have a standing Audit Committee that satisfies the "audit committee" definition under Section 3(a)(58)(A) of the Exchange Act and the requirements of Ru e  0A-3 under the Exchange Act  Although our stock was delisted from the NYSE in July 2010, certain of the corporate governance requirements of the NYSE Listed Company Manual, including those relating to audit committees, continue to apply to us because they are incorporated by reference in the FHFA corporate governance regulations  Our Audit Committee satisfies the "audit committee" requirements set forth in Sections 303A 06 and 303A 07 of the NYSE Listed Company Manual  The current members of the Audit Committee are Carolyn H. Byrd, Christopher S. Lynch, Clayton S. Rose and Anthony A. Williams, all of whom the Board determined in February 2012 are independent within the meaning of Ru e  0A-3 under the Exchange Act and Section 303A 02 of the NYSE Listed Company Manual.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3103

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Mr  Rose has been a member of the Audit Committee since November 2011 and is currently its chairman. The Board  determined in November 2011 and again in February 2012 that  Mr  Rose meets the definition of an "audit committee  financial expert" under SEC regulations

329

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## ITEM 11. EXECUTIVE COMPENSATION

**Executive Summary**

Our principal goal under conservatorship has been to keep the company functioning so we can continue to carry out our housing mission. We are particularly concerned about our ability to fulfill our mission if we are unable to attract and retain competent and experienced executives — a very real concern given the uncertainty surrounding our future business model, organizational structure, and compensation structure, which is adversely impacting our internal control environment  We believe these factors are also contributing to increased levels of voluntary employee turnover, including 17% voluntary turnover at our Senior and Executive Vice President levels in 2011. Additionally, the Conservator directed us to maintain individual salaries and wage rates for all employees at 2010 levels for 20   and 20 2 (except in the case of promotions or significant changes in responsibilities). In 2011, we made certain significant reorganizations which included targeted divisional staff reductions in an effort to manage general and administrative expenses  All of these activities impact our ability to retain our employees and compensate them for their work  Disruptive levels of turnover at both the executive and employee levels could lead to breakdowns in many of our operations that impact our ability to: (a) serve our mission and meet our objectives; (b) manage credit and other risks related to our $2.1 trillion total mortgage portfolio (including interest rate and other market risks related to our $653 billion mortgage related investment portfolio); (c) reduce the need to draw funds from Treasury; and (d) issue timely financial statements.

We are finding it difficult to retain and engage critical employees and attract people with the skills and experience we need  Because we maintain succession plans for our senior management positions, we were able to quickly fill some of these positions vacated in 2011, or eliminate them through reorganizations  However, such alternatives are limited and may not be available to address future senior management departures. While we update our succession plans regularly, in many areas we have already executed these plans and we may need to search outside the company for replacements to fill these senior positions  We face increased difficulty filling senior positions given the uncertainty around compensation  We operate in an environment in which business decisions are closely scrutinized and subject to public criticism and review by various government authorities  Many executives are unwilling to work in such an environment for potentially significantly less than what they could earn elsewhere  Accordingly, we may not be able to retain or replace executives or other employees with the requisite institutional knowledge and the technical, operational, risk management, and other key skills needed to conduct our business effectively  A recovering economy is likely to put additional pressures on turnover in 2012, as other attractive opportunities may become available to people who we want to retain

Also contributing to our concerns regarding executive retention risk is the aggregate level of compensation paid to our Section  6 executive officers, which for 2011 performance was significantly below the 25th percentile of market based compensation  Any compensation changes that appear excessive, abrupt or arbitrary are likely to create heightened levels of operational risk  We anticipate that any significant adverse changes in executive compensation levels will result in numerous vacancies in senior positions that are important for our sound operation, since the incumbents in these positions possess significant business and leadership skills that are in demand elsewhere in the market at substantially higher levels of compensation  Filling vacancies at further reduced compensation levels with equally capable and experienced individuals is not likely  especially given the uncertainty and criticism surrounding the GSEs. In this environment, increased uncertainty and instability in the top ranks would likely cascade down to other officers and employees  The resulting loss of talent and institutional knowledge would cause an appreciable increase in the operational risk of the company

In evaluating the potential impact of legislation to further reduce the pay of our executives and employees, the Acting Director of FHFA stated in his testimony to the U.S. Senate Committee on Banking, Housing and Urban Affairs on November 15, 2011 that:

> *"a sudden and sharp change in pay would certainly risk a substantial exodus of talent, the best leaving first in many instances. [The GSEs] likely would suffer a rapidly growing vacancy list and replacements with lesser skills and no experience in their specific jobs. A significant increase in safety and soundness risks and in costly operational failures would, in my opinion, be highly likely."*

As a result of the increasing risk of employee turnover, we are exploring options to enter into various strategic arrangements with outside firms to provide operational capability and staffing for key functions, if needed  Should we experience significant turnover in key areas, we may need to exercise these strategic arrangements and significantly increase the number of outside firms and consultants used in our business operations, limit certain business activities, and/or increase our operational costs  However, these or other efforts to manage the risks to the enterprise may not be successful

<div align="center">330</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Compensation Discussion and Analysis**

This section contains information regarding our compensation programs and policies, as modified by direction we received from FHFA as Conservator  These programs and policies were applicable to the following individuals, who were determined to be our Named Executive Officers for the year ended December 3 , 2011 under SEC rules.

- Charles E. Haldeman, Jr., Chief Executive Officer

- Ross J Kari, Executive Vice President    Chief Financial Officer

- Anthony N Renzi, Executive Vice President    Single Family Business, Operations and Technology

- Jerry Weiss, Executive Vice President    Chief Administrative Officer

- Paige H Wisdom, Executive Vice President    Chief Enterprise Risk Officer

**_Executive Management Compensation Program_**

_Overview of Program Structure_

The Executive Management Compensation Program, or the Executive Compensation Program, covers the compensation of Freddie Mac executives in the following positions, each a Covered Officer:

- Chief Executive Officer (CEO), Chief Operating Officer (COO), and Chief Financial Officer (CFO);

- All Executive Vice Presidents (EVPs); and

- All Senior Vice Presidents (SVPs)

Each Named Executive Officer is a Covered Officer

The Executive Compensation Program is a result of collaboration and compromise with FHFA that reflects the principles established by Treasury's executive compensation guidelines for companies receiving federal assistance  Specifically, the Executive Compensation Program was designed to align executive pay with achievement of our mission of providing liquidity, stability, and affordability to a troubled mortgage market and with certain financial, infrastructure development and other corporate performance objectives established annually by our Board and approved by FHFA  These objectives reflect our responsibilities both under our charter and in conservatorship  as determined by the Conservator  The Executive Compensation Program establishes strict recapture provisions that protect the interests of taxpayers  The Executive Compensation Program attempts to balance our need to retain critical executives and attract new executive talent while continuing to support the nation's housing recovery amidst the uncertainties regarding our future

One key element of the Executive Compensation Program that differs from Treasury's executive compensation guidelines is that all compensation is delivered exclusively in cash  We cannot provide equity based compensation to our employees under the terms of the Purchase Agreement with Treasury, unless such grants are approved by Treasury. In addition, uncertainty regarding our future status makes our common stock ineffective as a vehicle for delivering incentive compensation

Participation in the Executive Compensation Program is contingent upon a Covered Officer agreeing to be bound by the terms of a recapture arrangement that has been approved by both the Compensation Committee and FHFA  A further discussion of the recapture arrangement is set forth below in "Other Executive Compensation Considerations    Recapture Policy "

Finally, although the Compensation Committee takes the lead role in considering and recommending executive compensation, FHFA has become increasingly involved in the process and has limited the Compensation Committee's flexibility in certain respects, as previously discussed. In addition, the following circumstances limit the Compensation Committee's authority during conservatorship:

- FHFA issued a directive on December 16, 2010 requiring the Compensation Committee to set 2011 Target TDC at a level that was either the same as or lower than each Named Executive Officer's 2010 Target TDC, absent a promotion or a significant change in responsibilities  On December 13 , 2011, FHFA extended this directive for setting 2012 Target TDC and subsequently instructed the Compensation Committee to further reduce the compensation levels of senior management

- When FHFA was appointed as our Conservator in September 2008, it assumed all of the rights, titles, powers, and privileges of the company and its stockholders, directors and management, including the authority to set executive compensation  Under the terms of the Purchase Agreement, FHFA is required to consult with Treasury on any increases in compensation or new compensation arrangements for our executive officers

<div align="center">33</div>

_Freddie Mac_

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- Our directors serve on behalf of FHFA and exercise their authority as directed by FHFA  More information about the role of our directors is provided above in "Directors, Executive Officers, and Corporate Governance      Authority of the Board and Board Committees."

- FHFA has directed that our Board consult with and obtain FHFA's approval before taking any action involving compensation or termination benefits for any officer at the level of executive vice president and above and, regardless of title, executives who hold positions with the functions of chief operating officer, chief financial officer, general counsel, chief business officer, chief investment officer, treasurer, chief compliance officer, chief risk officer, and chief/general internal auditor

- FHFA retains the authority not only to approve both the terms and amount of any compensation prior to payment to any of our execut ve officers, but also to modify any existing compensation arrangements

Elements of Compensation and Total Direct Compensation

Under the Executive Compensation Program in effect for 2011, a Covered Officer's Target TDC consists of three elements      Semi Monthly Base Salary, Deferred Base Salary, and a Target Incentive Opportunity. The Target TDC is established for each annual performance cycle, as explained in the next section  Under the 20    Executive Compensation Program, two thirds of a Covered Officer's Target TDC consists of the sum of the Semi Monthly and Deferred Base Salaries, and  one third consists of the Target Incentive Opportunity  More information on the three elements of the Target TDC is provided be ow

- Semi Monthly Base Salary is paid in cash on a semi monthly basis  and provides a fixed level of compensation designed to fairly compensate each Named Executive Officer for the responsibility  eve of his/her position  Semi Monthly Base Salary cannot exceed $500,000 per year, except for the CEO and CFO, or other exceptions as  approved from time to time by FHFA

- Deferred Base Salary is earned during one year but not paid  until the corresponding quarter of the following year to provide  an incentive for executive retention  Deferred Base Salary is  provided in two portions:

    1. The fixed portion provides certainty as to amount and is  not subject to increase or decrease on the basis of company performance; and

    2. The performance based portion is subject to adjustment and provides incentives to the Covered Officers to achieve  specific company performance measures

    Each Named Executive Officer's Deferred Base Salary was  initially divided equally between the fixed and  performance based portions  The fixed portion was earned during  each quarter and paid in a fixed amount on the last business day  of the corresponding quarter of the following calendar year  The performance based portion is earned and paid on the same  timetable as the fixed portion, but the Executive Compensation Program permits the amount actually paid to range from 0% to  125% based on the performance based Deferred Base Salary funding level determined by the Compensation Committee with the approval  of FHFA  Each Covered Officer's payment is equal to his or her target multiplied by the funding level and there is no  individual differentiation  While the Executive Compensation  Program allowed for an approved funding level for  performance based Deferred Base Salary greater than  00%, it was  the intention of the Compensation Committee not to approve a  funding level in excess of  00% while the company was in  conservatorship

- The Target Incentive Opportunity (Target Opportunity or TO) is a performance based, long term incentive award designed to provide incentives to the Covered Officers to achieve specific corporate  performance measures  Each Covered Officer's target award  is equal to one third of his or her annual Target TDC. The TO is  granted annually and earned over a two year period based on the  considerations discussed below  Half of each award is earned in the  year granted, with the other half earned in the following  year  Payment will occur no later than March 15 of the year  following the year to which the annual performance measures are  applicable  While the Executive Compensation Program allows for an approved funding level that exceeds 100%,  it is the current  intention of the Compensation Committee not to approve a funding level in excess of  00% while the company is in  conservatorship  Each Named Executive Officer's TO payments, however, may range from 0% to 150% of target, based on an  assessment of  division and/or individual performance as determined by the Chief Executive  Officer or, in the case of the Chief Executive Officer, the Board of  Directors  The amount of each Named Executive Officer's TO payment is subject to the approval of both the  Compensation Committee and FHFA  The individual differentiation of TO payments is discussed further in, "   Determination of Actual Target Opportunity."

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Except in the limited circumstances described below (see "Potential Payments Upon Termination of Employment or Change in Control"), we will pay installments of TO and Deferred Base Salary awards only if the Named Executive Officer is employed by Freddie Mac on the scheduled payment date

Effective January 1, 2012, FHFA approved a new compensation structure for our executives, the 20 2 Executive Compensation Program See "OTHER INFORMATION    2012 Executive Management Compensation Program" above for additional information It may be amended or replaced by FHFA or the Compensation Committee, subject to approval by FHFA after consulting with Treasury.

The following diagram depicts Target TDC, including each of the three elements of compensation, under the Executive Compensation Program in effect for 2011



### Performance Measures for the Performance Based Elements of Compensation

The performance measures for the performance based portion of Deferred Base Salary, the first installment of the 2011 TO grant, and the second installment of the 2010 TO grant, together with a description of the assessment of actual performance against such measures, are presented below in '' Determination of the Performance Based Portion of 2011 Deferred Base Salary" and " Determination of Actual Target Opportunity " These performance measures, which were developed by management, the Compensation Committee, and FHFA, were chosen because we believe they reflect our priorities under conservatorship They also generally require the participation and support of employees throughout the company

### Determination of 2011 Target TDC for Named Executive Officers

*Role of Compensation Consultants*

As part of the annual process to determine the Target TDC for each of the Named Executive Officers, the Compensation Committee receives guidance from an independent compensation consultant that is selected by the Compensation Committee In addition to the annual process to determine the Target TDC, the compensation consultant provides guidance during the course of the year on executive compensation matters and can be engaged for special projects, as needed, by either the Compensation Committee or the full Board.

The Compensation Committee has engaged Meridian Compensation Partners, LLC (Meridian) as its consultant since September 2010. Meridian was selected by the Compensation Committee without any recommendation by management Meridian has not provided the Compensation Committee with any non executive compensation services, nor has the firm provided any consulting services to our management

*Gathering Comparative Market Compensation Data*

As part of its process to establish each Named Executive Officer's Target TDC under the Executive Compensation Program, the Compensation Committee reviewed the compensation of executives in comparable positions at companies that are either in a similar line of business or are otherwise comparable for purposes of recruiting and retaining

TREASURY-3108

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source

Table of Contents

individuals with the requisite skills and capabilities. We refer to this group of companies as the Comparator Group  In September  2011, the Compensation Committee reviewed and discussed  the composition of the Comparator Group with Meridian and determined  that the following companies should be included in the  Comparator Group used to establish target compensation levels  for 2012:

| | | |
|---|---|---|
| Allstate | The Hartford | Prudential |
| American Express | JPMorgan Chase* | State Street |
| Bank of America* | MasterCard | SunTrust |
| Bank of New York Mellon | MetLife | U.S. Bancorp |
| Capital One | Northern Trust | Visa |
| Citigroup* | PNC | Wells Fargo* |
| Fannie Mae | | |

\*   Compensa on da a  o be used f om  hese d ve s f ed bank ng  f  ms  s  aken only f om  he  mo  gage o  eal es a e d v s ons

While the 2012 Comparator Group continues to include  19 companies, the Committee did make two changes to the  composition of the Comparator Group in September 2011, adding  Capital One and removing BlackRock. In both cases, these changes  were made after considering several factors, including whether  each company's business is in the same or a similar industry, whether we compete for executive talent and whether the company participates in the compensation survey we use to  benchmark competitive market data for our senior executives

In the event there is insufficient data from the Comparator  Group for any of the Named Executive Officer positions, or if  Meridian believes that additional data sources would strengthen  the analysis of competitive market compensation levels, the  Compensation Committee can use alternative survey sources to make these assessments. For 2011 and 2012 compensation, the  alternative survey sources used by the Compensation Committee were compensation surveys published by McLagan and Aon Hewitt.  In order to preserve confidentiality and encourage continuing participation, these consulting firms do not attribute the data  in their surveys to the companies that participate in their  surveys.

*Establishing Target TDC*

In establishing Target TDC levels for our Named Executive  Officers, the Compensation Committee used as a guideline the  market median, or 50th percentile, of the total direct compensation,  consisting of base salary, annual incentive, and  long term incentive awards, paid to comparable positions at Comparator Group companies or in the  alternative survey sources  The Compensation Committee's authority was limited to setting 2011 Target TDC at a level that was either the  same as or lower than each Named Executive Officer's 20 0 Target TDC, based on FHFA's directive that the company maintain individual salaries  and wage rates at 2010 levels for 2011,  absent a promotion or a significant change in responsibilities

In establishing the Named Executive Officers' 2011 Target  TDC, the Compensation Committee reviewed 20 0 data from the  Comparator Group and the alternative survey source  Specifically,  for the positions of CEO, CFO and EVP     Chief Enterprise Risk Officer, the Compensation Committee reviewed competitive market data  from the Comparator Group  For the EVP     Single Family Business, Operations and Technology, the Compensation Committee reviewed  competitive market data from a survey published by McLagan.  For the EVP     Chief Administrative Officer, no reasonable match was available in  either the Comparator Group or the  alternative survey source and therefore the competitiveness of this position's Target TDC was evaluated  by comparing the scope and breadth of the position's responsibilities  with those of other executive level positions within the company

In December 20 0, the Compensation Committee applied the  criteria described above to either develop 20   TDC  recommendations for each of the Named Executive Officers or review recommendations  presented by senior management and  management's compensation consultant, Aon Hewitt  For Mr  Renzi, the December 20 0 review related to his role as EVP      Single Family Portfolio Management and the process was repeated at the time of his promotion into his  current role in June 2011, at which time the Compensation  Committee reviewed 20 0 data from both the Comparator Group and a survey published by Aon Hewitt.

The 2011 Target TDC for each of the Named Executive  Officers was reviewed and approved by FHFA

The table below sets forth the approved 2011 Semi Monthly  Base  Salary, Deferred Base Salary, TO, and Target TDC for our Named Executive Officers  These amounts represent compensation  targets, not the actual amount of compensation paid for  performance during 2011. As a result of FHFA's directive to freeze Semi Monthly Base  Salary and Target TDC at 2010 levels, the aggregate Target TDC  for our Named Executive Officers is in the lowest quartile of total  direct compensation paid to  comparable positions at Comparator Group companies or, where applicable, in the alternative survey

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3109

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

sources. Information about the amounts actually paid during or with respect to performance during 20   to these executives is set forth in Table 85.

**Table 77    2011 Semi Monthly Base Salary, Deferred Base Salary, Target Opportunity, and Target TDC**

| Named Executive Officer | Title | Semi-Monthly Base Salary | 2011 Target TDC (Annualized) | | |
|---|---|---|---|---|---|
| | | | Deferred Base Salary | Target Opportunity | Target TDC |
| C  a es E  Ha de  a , J | CEO | $ 900,000 | $ 3,100,000 | $ 2,000,000 | $ 6,000,000 |
| Ross J  Ka | EVP    CFO | 675,000 | 1,658,333 | 1,166,667 | 3,500,000 |
| A   o y N Re z | EVP    S ng e-Fa   y Bus ness, Ope a ons and echno ogy | 500,000 | 1,333,333 | 916,667 | 2,750,000 |
| Je  y We ss | EVP    Ch ef Adm n s  a ve Off ce | 450,000 | 1,016,667 | 733,333 | 2,200,000 |
| Pa ge H  W sdom | EVP    Ch ef En e p  se R sk Off ce | 425,000 | 741,667 | 583,333 | 1,750,000 |

(1) As d scussed fu   he  n "De e    na on of Ac ua  Ta ge  Oppo  un y," M  Ha deman w    no   ece ve  he Ta ge  Oppo  un y ns allmen s appl cable  o h s
    pe fo mance du  ng 2011

*Determination of the Performance Based Portion of 2011 Deferred Base Salary*

Over the course of 20  , the Compensation Committee received updates from management on our achievement against the performance objectives used to determine the funding level for the performance based portion of Deferred Base Salary  In the fourth quarter of 2011, management presented the Compensation Committee with a final assessment against the performance objectives and concluded that we achieved most, but not all, of the performance objectives

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3110

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents the performance measures and management's assessment of our achievement against those performance objectives

**Table 78    Achievement of Performance Measures for the Performance Based Portion of Deferred Base Salary**

| Performance Measure | Weighting | Key Factors Impacting Achievement Assessment |
|---|---|---|
| **Mission**<br>• Suppo oss ga on and fo eclosu e p even on ac v es, nclud ng he Obama Adm n s a on's Mak ng Home Affo dable P og am, as easu ed by he numbe of comple ed mod f ca ons and wo kou s of 60-day de nquenc es<br>• P ov de a "sa sfac o y" D y o Se ve unde se ved a ke s and ach eve an " n comp ance" execu on a ng Add onally, mee he 2011 affo dable goals and subgoals ( f feas ble, as de e m ned by FHFA); a d<br>• P ov de a ke s ppo o g S ng e-Fam y cas a d g a a ee p c ases | 30% | • We comp e ed ove 109,000 HAMP and non-HAMP mod f ca ons, a he h gh end of he a ge ange of 80,000 -120,000 Add ona y, we ach eved he bo owe ou each eas e, wh ch measu es he numbe of wo kou s each mon h fo 60-day de nquenc es as a pe cen of e o a 60-day de nq en popu a on We en ed n o wo kou s fo 3 2% of such o gages, above he h gh end of he a ge ange of 2 5%-3 0%<br>• W espec o e 2011 affo dab e goals, based on p el m na y nfo ma on, we bel eve we me he s ng e-fam y ef nance ow- ncome goa and bo h mu fam y goa s We d d no mee he FHFA benchma k level fo s ngle-fam ly pu chase-money goals o subgoals fo 2011<br>• S ng e-fam y pu chases as a pe cen age of agency vo u e was 28%, wh ch was above p an ( e a ge ange was 23%-27%) due n pa o nc eased ef nance vo u es du ng he ow n e es a env on en ha ex s ed h oughout 2011 Ou sha e of pu chase vo u e ends o nc ease du ng pe ods when ef nanc ng ac v y s h gh |
| **F nanc al and R sk**<br>Mee a ge s fo<br>• Segmen Ea n ngs o To al Comp ehens ve Income<br>• In e na e u n on econom c cap a on all new p c ases;<br>• U de w g q a yo ews ng e-fam y and mul fam ly pu chases<br>• Vo e of s o va a s a d deeds- e o fo ec osu e and<br>• Eff c ency/adm n s a ve expenses | 30% | • Fo he seg en ea n ngs ob ec ve<br>   S g e-Fa y The oss of jus unde $100 b on fo 2011 was w h n he a ge ange of losses of $4 b ll on o $10 b ll on due o h ghe han an c pa ed c ed - e a ed expenses<br>   M t fa y Segmen ea n ngs of $1 3 b on we e above he h gh end of he a ge ange of $0 6 b ll on o $1 0 b ll on<br>   I vest e ts Segmen o al comp ehens ve ncome of $6 5 b ll on was below he a ge ange of $8 b ll on o $10 b ll on due p ma ly o h ghe han fo ecas ma k-o-ma ke losses on de va ves and ava lable-fo -sale mo gage secu es<br>• Fo he n e na e u n on econo c cap a on new pu chase ob ec ve<br>   S g e-Fa y The 17% n e na e u n on econom c cap a exceeded he a ge ange of 10%-14%<br>   M t fa y The 17% n e na e u n on econom c cap a was w h n he a ge ange of 16%-20%<br>   I vest e ts In e na e u n on econom c cap a of 6% was be ow he a ge ange of 10%-14% due o pu chases made o o mp ove PC pe fo mance<br>• Fo e de w g q a yo ewp c ases<br>   S g e-Fa y Pe fo mance aga ns h s ob ec ve s measu ed us ng he cumula ve defa a e fo ew o s q e of ewp c ases, wh ch was 1 45%, eas y ach ev ng he a ge of 5% o ess<br>   M t fa y The we gh ed ave age amo z ng deb cove age a o on he wo s 10% of new mu fam y pu chases of 1 25x s gh y exceeded he a ge ange of 1 20x-1 23x<br>• We co p ed ove 46,000 sho sa es and deeds-n-l eu of fo eclosu e du ng 2011, w h n e a ge ange of 35,000-50,000<br>• We me he ob ec ve of n ng 2011 adm n s a ve expenses - exclud ng cos s assoc a ed w spec a po c y and hous ng n a ves such as he Mak ng Home Affo dable p og am o no mo e han $1 4 b ll on Ad n s a ve expenses easu ed on h s bas s o a ed $1 34 b on |
| **Bus ness Infrastructure**<br>• Ma n a n o a se v ce and qua y s anda ds fo ex s ng echnology and ope a ons f ast c e;<br>• Comple e deploymen of all planned s ess f as c e a ce a ce esa d<br>• Comple e all o he planned nfo ma on echno ogy n a ves | 30% | • Pe fo mance nd ca o s used o mon o se v ce and qua y s anda ds de ons a e ha hose s a da ds we e me h oughou 2011<br>• A wo k was comp e ed as p anned fo p o ec s nvolv ng mul fam ly and f nance ansac on accoun ng Fo s ngle-fam ly, many p o ec s we e comple ed as p anned, b so e we e e canceled o we e no comple ed du ng 2011 The h gh-cos , h gh- sk S ngle-Fam ly Mas e Se v c ng p o ec s we e cance ed o enab e esou ces o add ess he Se v c ng Al gnmen n a ve<br>• Ach eved m les ones and/o comple ed all o he planned nfo ma on echnology n a ves |
| **Account ng and Controls**<br>• Comple e all planned con ols remed a on ac v es<br>• Exec e 2011 e a a d p a ; and<br>• Ma n a n effec ve con ol ove f nanc a epo ng (exclud ng he ma e al weakness ela ed o o d sc osu e con o s and p ocedu es) | 10% | • Many p anned emed a on ac v es we e comple ed Ind ca o s of he p og ess made du ng 2011 nclude emed a on of all S gn f can Def c enc es a ge d a he beg nn ng of he pe fo mance yea , and el eva e by placed on he wo k of ou In e na Aud o gan za on by ou Conse va o a do exe a ado s<br>• Successfu y co p ed 11 of 12 ob ec ves - nc ud ng he h ee h ghes we gh ed ob ec ves- e a e a a d p a<br>• See he d scuss on be ow fo nfo ma on a o e t ve tst a t occ ed s seq e t tot e n al assessmen s by managemen and he Compensa on Comm ee |

336

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                         Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

During its presentation of our achievement against the performance measures, management presented additional considerations that the Compensation Committee might want to take into account when determining an appropriate funding level  These additional considerations were:

- Implementation of a new governance process for technology projects that management believes will significantly improve the company's ability to deliver critical projects and also resulted in the cancellation or deferral of a significant number of previously planned projects;

- Execution of the Servicing Alignment Initiative, a significant new FHFA directive that aligns GSE loss mitigation requirements and is intended to bring more consistency to the servicing industry and help more distressed homeowners avoid foreclosure;

- Implementation of the Servicing Success Program, which seeks to improve the company's management of servicer performance through defined metrics, benchmarks, requirements, financial incentives, and compensatory fees;

- Favorable results from a June 2011 survey of Multifamily Production and Asset Management customers (the results of a similar survey of Single Family customers were not available in time to be considered by the Compensation Committee);

- Unfavorable impact on the Investments Segment's internal return on economic capital of purchases made during 2011 to support the performance of Freddie Mac PCs;

- Delay in developing a corporate investigations policy and procedure;

- Deficiencies in the company's business continuity strategy in the event of a regional business disruption; and

- The adverse effects of significant turnover among the company's senior executives during 2011

Management then proposed a funding range for the performance based portion of the Deferred Base Salary that it believed reflected our performance against the goals, taking into account the additional considerations  After reviewing and discussing management's final assessment against the performance goals, the Compensation Committee then discussed the additional considerations and determined that these should also be evaluated in determining the appropriate funding level for the performance based portion of Deferred Base Salary  The Compensation Committee then developed a preliminary recommended funding level for the performance based portion of Deferred Base Salary, which was then submitted to FHFA for review

After the Compensation Committee's submission of its initial recommendation to FHFA, FHFA advised the company that certain mortgages preliminarily included in the company's calculation are not eligible to be counted toward affordable housing goals compliance  Consequently, we failed to meet the FHFA benchmark level for the single family affordable purchase money goals and subgoals for 2011.

In addition, subsequent to management's assessment of our achievement against the performance measures and the Compensation Committee's submission of its initial recommendation to FHFA, management determined that we did not maintain effective internal control over financial reporting and identified one new material weakness related to information technology  See "CONTROLS AND PROCEDURES" above. The Compensation Committee assessed 2011 performance against this and other performance measures based on the best information available at the time of the assessment

Following FHFA's review of our performance, it instructed the Compensation Committee to reduce its recommended funding level in light of the required revisions to the affordable housing goal counting process, and indicated the maximum funding level it would approve  In accordance with FHFA's instruction, the Compensation Committee, without concurring with FHFA's determination, directed management to proceed using a funding level for the performance based portion of the Deferred Base Salary of 87%, the maximum funding level that FHFA indicated it would approve

The following chart compares the target and actual amounts of 2011 Deferred Base Salary for each Named Executive Officer  The actual amount earned, which is based exclusively on corporate performance and for which there is no individual differentiation, is scheduled to be paid in equal quarterly installments on the last business day of each calendar quarter of 2012.

337                                    *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 79     2011 Deferred Base Salary**

| | Target 2011 Deferred Base Salary | | | Actual 2011 Deferred Base Salary | | |
|---|---|---|---|---|---|---|
| Named Executive Officer | ixed Portion | Performance Based Portion | Total Target Deferred Base Salary | ixed Portion | Performance Based Portion | Total Actual Deferred Base Salary |
| M  Haldeman | $1,550,000 | $1,550,000 | $ 3,100,000 | $1,550,000 | $1,348,500 | $2,898,500 |
| M  Ka | 829,167 | 829,166 | 1,658,333 | 829,167 | 721,375 | 1,550,542 |
| M  Re z | 592,614 | 592,613 | 1,185,227 | 592,614 | 515,574 | 1,108,188 |
| M  We ss | 508,334 | 508,333 | 1,016,667 | 508,334 | 442,249 | 950,583 |
| Ms  W sdom | 370,834 | 370,833 | 741,667 | 370,834 | 322,624 | 693,458 |

In order to receive the Deferred Base Salary that was earned  during 2011, the Covered Officer must be employed by us on the  payment date, subject to certain exceptions  If a Covered Officer is involuntarily terminated, any unpaid Deferred Base Salary will be forfeited unless the Compensation Committee recommends that the Covered Officer receive either all or a  portion of the unpaid Deferred Base Salary and the Compensation Committee's recommendation is approved by FHFA after consulting with Treasury, as appropriate. Further, if a Covered Officer voluntarily terminates employment, any unpaid Deferred  Base Salary will be forfeited

*Determination of Actual Target Opportunity*

Over the course of 20   , the Compensation Committee received  updates from management on our achievement against the  performance objectives used to determine the funding level for the two TO installments. In the fourth quarter of 2011,  management presented the Compensation Committee with a final assessment against the performance objectives used in  determining the funding level for the two installments for which payment is based on performance during 2011.

For the first installment of the 2011 TO, management concluded  that we would achieve most, but not all of the performance  objectives  The table below presents the performance measures  and management's assessment of our achievement against those performance measures for the first installment of the 2011 TO.

**Table 80     Achievement of Performance Measures for First  Installment of 2011 Target Opportunity**

| Performance Measure | Weighting | Key Factors Impacting Achievement Assessment |
|---|---|---|
| **Business Infrastructure**<br>•  Transition greater than 95% of customers from legacy mortgage delivery and servicing systems; and,<br>•  Achieve the 20    goals associated with remediation of the identified deficiencies in the company's information technology infrastructure. | 40% | •   00% of customers were transitioned from the legacy servicing system two months prior to the year end deadline  All customers also ended their use of the legacy mortgage delivery system during 2011; and,<br>•  All 2011 information technology infrastructure goals were achieved by year end |
| **Financial Execution**<br>Conserve capital by limiting the 2011 draw from Treasury to no more than $8 billion. | 40% | The 2011 draw request from Treasury was $7.6 billion, at the  high end of the target range of $0 to $8 billion |
| **Mission**<br>Same as for the performance based element of Deferred Base Salary. | 20% | Same as for the performance based element of Deferred Base  Salary. |

During its presentation of our achievement against the  performance measures, management presented two additional  considerations for the Compensation Committee to take into  account when determining an appropriate funding level  These  additional considerations were:

•  The cancellation of certain key business infrastructure projects  resulting from the implementation of the new governance process  for technology projects; and

•  Execution of the Servicing Alignment Initiative

Management then proposed a funding range for the first  installment of the 20    TO that it believed reflected our  performance, taking into account the additional considerations

After reviewing and discussing management's final performance assessment against the specific performance goals,  the Compensation Committee concurred with management's assessment  The Compensation Committee then discussed the

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

additional considerations and determined that these should also be included in determining the appropriate funding level for the first installment of the 2011 TO  The Compensation Committee then developed a preliminary recommended funding level for the 2011 TO first installment, which was then submitted to FHFA for review

Following FHFA's review of our achievement against the performance objectives, it instructed the Compensation Committee to substantially reduce its recommended funding level in light of the following:

- The 2011 draw from Treasury was at the high end of the target range established at the beginning of the year; and

- As discussed above, required revisions in the affordable housing goal counting process, of which the company received notice after management's assessment and the Compensation Committee's original recommendation, resulted in our failure to meet the FHFA benchmark level for the single family affordable purchase money goals or subgoals for 2011

FHFA informed the Compensation Committee of the maximum funding level that it would approve  In accordance with FHFA's instruction, the Compensation Committee, without concurring, directed management to implement a funding level for the 20  TO first installment of 79%, the maximum funding level that FHFA indicated it would approve

For the second installment of the 2010 TO, management concluded that we would achieve most, but not all, of the performance objectives  The table below presents the performance measures and management's assessment of our achievement against those performance measures for the second installment of the 2010 TO.

**Table 81    Achievement of Performance Measures for Second Installment of 2010 Target Opportunity**

| Performance Measure | Weighting | Key Factors Impacting Achievement Assessment |
|---|---|---|
| **Mission** Same as for performance based element of Deferred Base Salary. | 35% | Same as for the performance based element of Deferred Base Salary. |
| **Controls Remediation** Strengthen the control environment, taking into consideration progress in remediating Significant Deficiencies, Material Weaknesses, Internal Audit critical and major issues and FHFA Matters Requiring Attention scheduled to be remediated during 2011. | 20% | Many planned remediation activities were completed  Indicators of the progress made during 2011 include remediation of all Significant Deficiencies targeted at the beginning of the performance year, and reliance being placed on the work of our internal audit organization by the Conservator and our external auditors  There also were fewer repeat controls findings. |
| **Financial Execution** Same as for the new purchase financial execution objective applicable to the performance based element of Deferred Base Salary and the Conserve Capital objective applicable to the first installment of the 2011 TO. | 20% | Same as for the new purchase financial execution objective applicable to the performance based element of Deferred Base Salary and the Conserve Capital objective applicable to the first installment of the 2011 TO. |
| **Business Infrastructure** • Complete the 20    elements of the business infrastructure plan developed in 2010; and, • Maintain normal service and quality standards for existing technology and operations infrastructure. | 25% | • All work was completed as planned for projects involving multifamily and finance transaction accounting  For single family, many projects were completed as planned, but some were either cancelled or were not completed during 2011. The high cost, high risk Single Family Master Servicing projects were canceled to enable resources to address the Servicing Alignment Initiative; and, • Performance indicators used to monitor service and quality standards demonstrate that those standards were met throughout 2011 |

Management presented the same two additional considerations applicable to the first installment of the 2011 TO for the Compensation Committee's consideration when determining an appropriate funding level

Management then proposed a funding range for the second installment of the 20 0 TO that it believed reflected our performance, taking into account the additional considerations

After reviewing and discussing management's final performance assessment against the specified performance measures, the Compensation Committee concurred with management's assessment  The Compensation Committee then

<div align="center">339</div>

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

discussed the additional considerations and determined that these should also be included in determining the appropriate funding level for the second installment of the 2010 TO. The Compensation Committee then developed a preliminary recommended funding level for the second installment of the 2010 TO, which was then submitted to FHFA for review

Following FHFA's review of our performance, it instructed the Compensation Committee to reduce its recommended funding level in light of revisions to the affordable housing goal counting process discussed above and informed the Compensation Committee of the maximum funding level that it would approve In accordance with FHFA's instruction, the Compensation Committee, without concurring with FHFA's determination, directed management to proceed using a funding level for the 2010 TO second installment of 84%, the maximum level that FHFA indicated it would approve

For both TO installments, a portion of the available funds has been allocated to provide a cash award to approximately 500 employees in either administrative or professional staff roles who do not participate in our annual short term incentive program This decision was made to recognize the contributions of these employees who provide valuable core services to the company In addition, these employees are generally in lower paid roles with limited advancement opportunities and are thus more adversely impacted by FHFA's continuation of the directive to freeze salaries and wage rates at 2010 levels This allocation reduced the funding level available for distribution for the first 2011 TO installment and the second 2010 TO installment to approximately 78% and 83%, respectively

For both the second 2010 and first 2011 TO installments, the Compensation Committee concurred with the CEO's recommendations regarding how the remaining available TO funds should be allocated among the Covered Officers under the Executive Compensation Program, including the Named Executive Officers other than himself The recommended allocation was made after considering the factors listed below

- Each officer's performance against his/her individual 2011 performance objectives in terms of both business results and leadership effectiveness;

- The relative contributions of each officer in relation to the contributions of the other officers;

- Each of the Named Executive Officers either achieved or exceeded his/her 2011 individual performance objectives The relatively narrow spread of the individual differentiation between the largest and smallest TO awards (expressed as a percentage of each Named Executive Officer's target) supports our continued emphasis of the need for highly coordinated, cross functional collaboration; and

- The entire senior officer team accomplished a great deal in an extraordinarily difficult operating environment during 2011 and these accomplishments are especially significant considering the number of senior management departures during the year

Mr Haldeman informed the Compensation Committee that the company's best interests would be served if he was not a participant in the February 2012 TO allocation process, which would result in him not receiving payment of either TO installment While the Committee felt that Mr Haldeman's performance during 2011 merited payment of the TO installments, it also accepted his request that it should exclude him from the TO allocation process After considering these and other factors, the Compensation Committee determined that Mr Haldeman should not receive either TO installment Mr Haldeman will forfeit the remaining 2011 TO installment and any 2011 earned but unpaid Deferred Base Salary upon his planned departure from the company later this year

The following chart summarizes the TO applicable to performance during 2011 for each of the Named Executive Officers and the amount that was approved by the Compensation Committee and FHFA and paid on February 16, 2012.

**Table 82    2011 Target Opportunity**

| Named Executive Officer | 2011 First Installment | | 2010 Second Installment | |
|---|---|---|---|---|
| | Target | Actual | Target | Actual |
| M Haldeman | $1,000,000 | $ | $1,000,000 | $ |
| M Ka | 583,334 | 480,125 | 583,333 | 508,646 |
| M Re z | 414,773 | 308,416 | 176,136 | 138,807 |
| M We ss | 366,667 | 316,367 | 329,166 | 302,365 |
| Ms W sdom | 291,667 | 251,656 | 253,181 | 232,567 |

The 2010 second installment amount for Mr Renzi reflects a pro ration of his annual TO based on his date of hire in 2010.

*2011 Target TDC Compared to 2011 Actual TDC*

The following table shows 2011 Target TDC compared to the approved 2011 actual TDC for each of the Named Executive Officers. The amounts displayed in both the "Total Target" and "Total Actual" columns include the sum of

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-3115                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Semi Monthly Base Salary, Deferred Base Salary and those amounts associated with the first installment of the 2011 TO and the second installment of the 2010 TO

**Table 83    2011 Target TDC Compared to the Approved 2011 Actual TDC**

| Named Executive Officer | 2011 Semi-Monthly Base Salary | 2011 Deferred Base Salary | | Target Opportunity (2011 1st Installment and 2010 2nd Installment) | | Total[1] | |
|---|---|---|---|---|---|---|---|
| | | Target | Actual | Target | Actual | Target | Actual |
| M  Haldeman | $  900,000 | $  3,100,000 | $2,898,500[2] | $  2,000,000 | $ | $  6,000,000 | $3,798,500 |
| M  Ka | 675,000 | 1,658,333 | 1,550,542 | 1,166,667 | 988,771 | 3,500,000 | 3,214,313 |
| M  Re  z | 473,864 | 1,185,227 | 1,108,188 | 590,909 | 447,223 | 2,250,000 | 2,029,275 |
| M  We ss | 450,000 | 1,016,667 | 950,583 | 695,833 | 618,732 | 2,162,500 | 2,019,315 |
| Ms  W sdom | 425,000 | 741,667 | 693,458 | 544,848 | 484,223 | 1,711,515 | 1,602,681 |

(1) The  ab e does no  nc ude  he second  ns a  men  of each Named  Execu  ve Off ce 's 2011 TO  ha  s schedu ed  o be pa d  n Ma ch 2013
(2) M  Ha deman w  fo fe  any ea ned bu  unpa d Defe  ed Base Sa a y when he  eaves  he co  pany

### Named Executive Officer Individual Performance Objectives

Each Named Executive Officer is a member of the Management Committee, a group of our senior most officers  In addition to  shared corporate objectives, each Named Executive Officer also  had individual performance objectives which are generally  established at the beginning of the year by Mr  Haldeman or, in the case of Mr. Haldeman, the Board. The chart below describes those individual performance objectives, as well as the level of achievement against those objectives  Certain of  the individual performance objectives were either corporate  performance objectives or supported achievement of one or more  of the corporate performance objectives  Achievement against the  corporate performance objectives is discussed above in "Determination of the Performance Based Portion of Deferred  Base Salary" and "Determination of Actual Target Opportunity " The level of achievement against each Named Executive Officer's individual performance objectives is  evaluated using two considerations    business results and leadership effectiveness    which are given equal  weight

34                                                           *Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 84    Named Executive Officer Individual Performance Summaries**

| Individual Performance Measures | Assessment of Performance |
|---|---|
| **Mr. Haldeman:**<br>• ead the execut on o ob ect ves nc uded n the corporate scorecard<br>• Assist the Conservator s cons derat on of a termat ves for the future of the U S housing and mortgage markets<br>• Strengthen critica la ent management processes, nc ud ng deve opment of the sen or eadersh p team and comp et on of n t at ves des gned to ncrease employee engagement and,<br>• Foster a risk management cu ture throughout the company, nc ud ng prov d ng v s b e support for risk management | During 2011, Mr Ha deman continued to bu d strong and co aborat ve re at onsh ps, both w th n the company and w th our Conservator His eadership sty e has supported achievement of our business objectives as we as our Conservator s efforts to assess a ternative future structures for the housing finance system Under Mr Ha deman s eadership during 2011, the company achieved most, but not a , of the corporate scorecard ob ect ves The company strengthened the ta ent management process by n t at ng a best u tiness leadersh p deve opment program for a mid- and senior- eve eaders, focus ng the company on deve op ng stronger eaders at mu tip e eve s Mr Ha deman has continued to strengthen the risk management function by supporting a strategy to e evate the r sk management processes and by fostering a risk-aware cu ture where every emp oyee is a risk manager |
| **Mr. Kari:**<br>• Ma nta n effect ve nternal controls over f nanc a report ng and complete the remed at on of f ve separate s gn cant de c enc es<br>• mprove the readabi ity and qua ity of pub ic disc osures and earnings re eases<br>• Comp ete a f nance-re ated bus ness nfrastructure de verab es nc uded n the 2011 corporate scorecard<br>• dent fy and mp ement process improvements to make company processes more efficient and manage adm n strat ve expenses to ach eve G&A expense targets and,<br>• mprove engagement of f nance d v s on emp oyees, w th a spec c ocus on the d v s on s eadership team | Mr ar was a stab z ng eadersh p presence for emp oyees n h s d v s on as we as h s fe ow Management Comm ttee members during what was an especia y cha enging year at the company He d spays an openness for tack ng d ff cu t ssues and cons stent y str ves to mprove support and partnersh p w th the business units Under his eadership during 2011, business resu ts for the f nance organ zat on were above p an and nc uded enhancements to the readab ty and qua ty of the company s financia d sc osures, and comp et on of a of the f nance-re ated bus ness nfrastructure de verab es dependent on pro ects cance ed or de ayed as part of mp ement ng the new techno ogy governance mode He a so mp emented mprovements to nternal processes, and e m nated redundanc es that reduced expenses Account ng eff c ency cont nues to mprove and Mr s team worked closely w th co aboration over nd v dua accomp shment and by mp ement ng n t at ves des gned to mprove emp oyee engagement Wh e certa n contro s over f nanc a report ng were strengthened dur ng the year as a resu t of the remed at on of severa s gn f cant de c enc es the company dent f ed one new mater a weakness as of December 31, 2011 |
| **Mr. Renzi:**<br>Mr Renzi was promoted to ead the s ng e-fam y bus ness, operat ons and techno ogy functions in Apri 2011 According y, nd v dual performance ob ect ves for h s new ro e were not estab shed for h m pr or to the beg nn ng of the year n add t on to h s ongo ng respons b l t es assoc ated w th the sourc ng and serv c ng of our s ng e-fam y oan portfo o and management of our information techno ogy operations and infrastructure, h is areas of focus during 2011 inc uded<br>• Making organizationa changes to enab e us to become an industry-ead ng operat on<br>• ransforming our information techno ogy organ zat on, nc ud ng imp ementing a process to more effect ve y manage ma ntenance of and enhancements to our techno ogy infrastructure<br>• mproving servicer performance management and oss mitigation act v t es<br>• E ect ve y ut l z ng oreclosure a ternat ves to m n m ze osses on de inquent mortgages<br>• Reduc ng R O vendor concentrat on r sk and<br>• stab sh ng a c ear operat ng bus ness p an that guides the business over the course of the next one to three years | Mr Renzi assumed a broadened ro e beginning in Apri 2011, wh ch nc uded be ng respons b e for the s ng e fam y bus ness, operations and techno ogy organization He assumed this ro e ust as the FHFA d rected Serv c ng A gnment n t at ve began H s eadersh p sk , mortgage f nance ndustry expert se and focus on execut on enab ed h m to dr ve the mp ementat on of the po icy and process changes re ated to that H A n t at ve He has estab shed a pos t ve and mot vat ng eadersh p presence w th h s new organ zat on that has fac l tated s gn f cant progress in the company s production sourcing and oss m t gat on efforts Upon assuming his current ro e, Mr Renzi a so dent f ed cr t ca changes needed to better support our mission h s ed to, among other th ngs, a reorgan zat on of our argest d v s on that has now moved a number of groups prev ous y spread across mu tip e organ zat ons to mprove bus ness execut on, better meet the needs of our customers and estab ish a c ear operating business p an to he p guide our business through the next 12 to 36 months Under Mr Renz s eadersh p, a new serv c ng scorecard was deve oped to monitor servicer performance and a new framework for managing servicer performance was deve oped and mp emented, both of wh ch were nstrumenta n deve op ng the Serv c ng A gnment n t at ve e a so of the deve opment of a new techno ogy governance mode , under which information techno ogy was centra zed and a new structure was estab ished to dent fy pr or t ze and deve op cr t ca nformat on techno ogy so ut ons to meet evo v ng bus ness needs He worked to reduce vendor concentrat on r sk by add ng two new R O as vendors to mprove market ng efforts, enhance pr c ng prec s on, reduce nventory cyc e t mes and, n turn, oss sever ty eve s |
| **Mr. Weiss:**<br>• Develop a cohes ve and e ect Ch e Adm n strat ve Off cer team that serves as a resource to both nterna and externa stakeho ders on a variety of operations and po cy ssues<br>• ntegrate the Mode s d v s on and enhance mode governance<br>• Oversee serv cer comp ance w th the prov s ons of the Administration s Home Affordab e Mod f cat on Program (HAMP)<br>• Make human resources processes more e c ent and reduce costs where appropriate<br>• nhance ta ent deve opment by aunching a eadersh p deve opment program for mid- and senior- eve eaders and<br>• Serve as a key iaison to FHFA | Mr We ss s know edge of the company, eadersh p sk s and ab ty to manage mu t p e bus ness n t at ves ed to a further ncrease n the scope o h s respons b l t es n 2011 He added the f nanc a mode ng organ zat on to the other funct ons he eads, wh ch now nc ude MHA-C human resources act ons government and industry re ations and corporate strategy and mission Under h s eadersh p dur ng 2011, the strategy, pub c po cy, government re ations and communications teams worked together effect ve y to provide expertise, information and data to management, the Board and other parties on a variety of po icy and procedura issues Under Mr Weiss eadership, mode governance, deve opment, documentation, performance monitoring and prioritization have become more robust He a so successfu y ed the team respons b e for oversee ng serv cers and h s work w th the requirements of HAMP, as a financia agent of the U S Treasury With respect to human resources matters, the company ach eved s gn f cant bus ness resu ts, nc ud ng mp ement ng major changes to our emp oyee benefits programs that wi s gn f cant y reduce the future cost of those programs wh e st ll prov d ng market competit ve benef ts to employees, accelerat ng the compensat on p ann ng process to create eff c enc es, and estab sh ng a eadersh p deve opment program for m d- and sen or- eve eaders Throughout the year, Mr We ss successfu y gu ded the company s re at onsh p w th FHFA during a cha eng ng per od He served as both a a son on a var ety of sens t ve matters that perta n to our unique current operating environment and a re iab e resource on GS po icy and future state issues |
| **Ms. Wisdom:**<br>• Strengthen the company s risk management capabi t es<br>• ead the rebu d ng of the corporate mode oversight process and re ated mode governance capabi t es<br>• mp ement an enhanced new business n t at ve process and,<br>• mprove engagement of enterpr se r sk management d v s on emp oyees, w th a spec f c focus on the d v s on s eadersh p team | During 2011, Ms Wisdom successfu y ed the enterprise risk function during a period of great change and has taken steps to s gn f cant y strengthen the funct on She prov des strong eadership and has proven capab e at driving change across the organ zat on wh e estab sh ng co aborat ve re at onsh ps w th key stakeho ders During 2011, she strengthened our risk management governance by s mp fy ng and stream n ng overs ght and dec s on mak ng As part of th s effort, she ntegrated the cred t r sk management funct on nto the enterpr se r sk management organization, estab ishing a unified risk management function As a resu t, a ignment with business units across the company was substantia y improved, and the company s cred t r sk oversight was strengthened Ms Wisdom a so successfu y ed an effort to rebui d the corporate mode process and re ated governance, a cross d v s ona effort invo ving stakeho ders throughout the company She redesigned and imp emented a new governance structure associated with the execut on of corporate new bus ness n t at ves that engages execut ve management ear er n the process, prov des c ear, cons stent commun cat on, de vers comprehens ve enterpr se w de r sk assessments, and prov des ncreased transparency From an emp oyee engagement perspective, she has provided numerous eadersh p and sk s deve opment opportun t es for a eve s of staff n her d v s on and has ncreased her v s b l ty and thus the v s b l ty o the r sk management funct on — both nterna y and externa y |

## Written Agreements Relating to Employment of CEO and CFO

We have entered into: (a) a Memorandum Agreement; and (b) a recapture agreement with each of Messrs. Haldeman and Kari in connection with their employment as our executive officers Copies of the Memorandum Agreement and the recapture agreement regarding Messrs. Haldeman and Kari were filed as Exhibits 10.1 and 10.2, respectively, to our Current Reports on Form 8 K filed on July 21 and September 24, 2009 with respect to each executive's employment with us

Source   D RA HOM   OAN MORTGAG CORP, 10 K, March 09, 2012   TREASURY-3117   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The compensation provisions of each executive's Memorandum Agreement, in combination with provisions of the Executive Compensation Program, are summarized separately below  Additional information about the components of executive compensation is discussed above in " Elements of Compensation and Total Direct Compensation "

Mr. Haldeman's compensation, as provided in his Memorandum Agreement, is as follows:

- A Semi Monthly Base Salary of $900,000 per year;
- Deferred Base Salary in the amount of $3 1 million for each of 2009 and 2010, payable as described above; and
- A Target Opportunity in the amount of $2 0 million for each of 2009 and 2010, payable as described above.

Mr. Kari's compensation, as provided in his Memorandum Agreement, is as follows:

- A Semi Monthly Base Salary of no less than $675,000 per year;
- Deferred Base Salary of $1,658,333 for each of 2009 and 2010,  payable as described above;
- A Target Opportunity of $1,166,667 for each of 2009 and 2010, payable as described above; and
- A cash sign on award of $1,950,000 in recognition of the annual incentive opportunity and unvested equity that Mr. Kari forfeited by leaving his previous employer. This award was paid in installments during Mr. Kari's first year of employment with us

Their Memorandum Agreements provide that Messrs Haldeman and Kari will receive the following additional forms of compensation during their employment with us:

- The opportunity to participate in all employee benefit plans offered to our senior executive officers, including our SERP, pursuant to the terms of these plans  For a description of these plans see "Compensation Tables" below; and
- If we terminate the employment of Mr Haldeman or Mr Kari for any reason other than cause (as defined in the Memorandum Agreement), he will be eligible to receive termination benefits pursuant to the terms of any then applicable severance plan or policy, subject to the approval of FHFA  Executive Compensation Program participants, including Messrs. Haldeman and Kari, are not currently entitled to a guaranteed level of severance benefits upon any type of termination event other than death or disability  For additional information on compensation and benefits payable in the event of a termination of employment, see "Potential Payments Upon Termination of Employment or Change in Control" be ow

We have also entered into recapture and restrictive covenant agreements with each of the executives  The recapture requirements included in these agreements, and the similar recapture requirements applicable to all other Covered Officers under the Recapture Policy, are described below under "Recapture Policy "  The non competition and non solicitation provisions included in the restrictive covenant agreement are described in "Potential Payments Upon Termination of Employment or Change in Control "

We have also entered into indemnification agreements with certain of our current directors and executive officers, each, an indemnitee, including Messrs. Haldeman and Kari. With respect to indemnification agreements entered into with executive officers in or after August 2011, the form of agreement has been revised to provide that indemnification rights under the agreement would terminate if and when the execut ve officer remained with Freddie Mac after ceasing to report directly to the CEO with respect to any claims arising from matters occurring after the officer was no longer a direct CEO report  Similar indemnification rights would continue to be available to such executive officers under the Bylaws going forward.

The indemnification agreements provide that we will indemnify the indemnitee to the fullest extent permitted by our Bylaws and Virginia law. This obligation includes, subject to certain terms and conditions, indemnification against all liabilities and expenses (including attorneys' fees) actually and reasonably incurred by the indemnitee in connection with any threatened or pending action, suit or proceeding, except such liabilities and expenses as are incurred because of the indemnitee's willful misconduct or knowing violation of criminal law. The indemnification agreements provide that if requested by the indemnitee, we will advance expenses, subject to repayment by the indemnitee of any funds advanced if it is ultimately determined that the indemnitee is not entitled to indemnification  The rights to indemnification under the indemnification agreements are not exclusive of any other right  the indemnitee may have under any statute, agreement or otherwise  Our obligations under the indemnification agreements will continue after the indemnitee is no longer a director or officer of the company with respect to any possible claims based on the fact that the indemnitee was a director or officer, and the indemnification agreements will remain in effect in the event the conservatorship is terminated. The indemnification agreements also provide that indemnification for actions instituted by FHFA will be governed by the standards set forth in FHFA's Notice of Proposed Rulemaking published in the Federal Register on November  4, 2008,

<div align="center">343</div>

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

proposing an amendment to FHFA's interim final golden parachute payments regulation to address prohibited and permissible indemnification payments. In January 2009, FHFA issued final regulations relating to golden parachute payments  Under those final regulations, FHFA may limit golden parachute payments, and the regulations set forth factors to be considered by the Director of FHFA in acting upon his authority to limit these payments  A proposed rule was published by FHFA in June 2009 that has not yet been adopted in final form  In general, this proposal would give FHFA the authority to prohibit indemnification payments in cases involving administrative proceedings before FHFA or civil actions initiated by FHFA

**Other Executive Compensation Considerations**

*Perquisites*

We believe that perquisites should be a minimal part of the compensation package for our Named Executive Officers  We provide certain perquisites because we believe there is a business related benefit, including that the perquisites assist in attracting and retaining executive talent  None of the perquisites offered provide for a gross up to cover the taxes due on the perquisite itself  Accordingly, the only perquisite provided to the Named Executive Officers during 2011 was reimbursement for assistance with personal financial planning, tax planning, and/or estate planning, up to an annual maximum benefit that varies by position

Although available, none of the Named Executive Officers received the following perquisites during 20  :

- *Physical Examination.* Reimbursement of up to $700 of expenses associated with a comprehensive annual physical exam that are not otherwise covered by the Named Executive Officer's medical insurance;

- *Relocation Benefits.* Under our relocation program, we provide assistance in finding and moving into a new home and selling an existing home, temporary lodging, reimbursement of certain travel expenses, and a one time payment to cover miscellaneous expenses; and,

- *Spousal Travel Expenses.* Reimbursement of business related spousal travel expenses

Additionally, total annual perquisites for any Named Executive Officer cannot exceed $25,000 without FHFA approval

*Supplemental Executive Retirement Plan*

Our Named Executive Officers are eligible to participate in our Supplemental Executive Retirement Plan, or SERP  The SERP is designed to provide participants with the full amount of benefits to which they would have been entitled under our Pension Plan and Thrift/401(k) Savings Plan if those plans: (a) were not subject to certain limits on compensation that can be taken into account under the Internal Revenue Code; and (b) did not exclude from "compensation" amounts deferred under our Executive Deferred Compensation Plan and the Mandatory Executive Deferred Base Salary Plan

On June 27, 2011, the SERP was amended, with the approval of FHFA  Under this amendment, which became effective January 1, 2012, eligibility for the "Pension SERP Benefit" (as defined in the SERP) will be limited, and Executives (as defined in the SERP) whose employment with the company commences after December 3 , 20  (or who are rehired after that date) will not be eligible for the Pension SERP Benefit  However, non Executives employed as of December 31, 2011 who are subsequently promoted to Executive positions will be eligible for the Pension SERP Benefit. The 2011 amendment also revises the "Thrift/401(k) SERP Benefit" (as defined in the SERP)  A copy of this amendment, which provides additional information about the changes made to the Thrift/401(k) SERP Benefit, was filed as Exhibit 10 1 to our current report on Form 8 K filed on June 28, 2011.

We provide a SERP because it helps us to remain competitive with the companies with which we compete for talent and thereby assists in attracting and retaining executive talent  For additional information regarding this benefit see "Compensation Tables" below

*Recapture Policy*

The Recapture Policy provides that certain compensation paid under the Executive Compensation Program will be subject to recapture if any of the following events occur subsequent to the date that the Named Executive Officer agreed to the terms of the Recapture Policy

- *Payment Based on Materially Inaccurate Information*     If the Named Executive Officer obtains a bonus or incentive payment based on materially inaccurate financial statements or performance metrics

344                                                                          *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- *Termination for Cause*    If the Named Executive Officer's employment is terminated for cause, as defined in the Recapture Policy

- *Subsequent Determination of Cause*    If, within two years of the termination of the Named Executive Officer's employment, the Board makes a determination in good faith that circumstances existed at the time of the Named Executive Officer's termination that would have justified a termination for cause and that actions taken by the Named Executive Officer resulted in material business or reputational harm to us.

The additional event listed below is applicable only to Messrs. Haldeman and Kari.

- *Accounting Restatement Resulting from the Executive's Misconduct*    If misconduct by the CEO and/or the CFO necessitates the preparation of an accounting restatement due to material non compliance with financial reporting requirements

If any of these triggering events occur, the Board will determine whether more compensation was paid to the Named Executive Officer than would otherwise have been paid had we been aware of the triggering event or events at the time the compensation was paid or awarded If a determination is made that we paid or awarded a Named Executive Officer more compensation than he or she otherwise would have received, the following elements of compensation will be subject to recapture: (a) Deferred Base Salary; (b) Target Opportunity; (c) any equity awards that vest after the adoption of the Executive Compensation Program; and (d) any termination benefits paid Only compensation paid up to two years prior to the triggering event or the date of termination or compensation paid at the time of termination, as applicable, will be subject to recapture Additionally, the occurrence of a triggering event may result in cancellation of any future payment obligations and/or any outstanding equity awards.

The amount of compensation recaptured will be determined by the Board, subject to the guidelines described above Additional details are included in the Recapture Policy, which was filed as Exhibit 0 4 to our Current Report on Form 8 K filed on December 3 , 2009 For the triggering event applicable only to Messrs. Haldeman and Kari, the compensation subject to recapture will be determined in accordance with Section 304 of the Sarbanes Oxley Act

### Stock Ownership and Hedging Policies

In November 2008, FHFA approved the suspension of our stock ownership guidelines because we had ceased paying our executives stock based compensation Also, the Purchase Agreement prohibits us from issuing any shares of our equity securities without the prior written consent of Treasury. The suspension of stock ownership requirements is expected to continue through the conservatorship and until we resume granting stock based compensation

All employees, including our Named Executive Officers, are prohibited from purchasing and selling derivative securities related to our equity securities, including warrants, puts and calls, or from dealing in any derivative securities other than pursuant to our stock based benefit plans. All directors and employees (including the Named Executive Officers) are prohibited from transacting in options (other than options granted by us) or other hedging instruments as specified in our Insider Trading Policy In addition, all directors and employees (including our Named Executive Officers) are prohibited from holding our securities in a margin account or pledging our securities as collateral for a loan

### Section 162(m) Limits on the Tax Deductibility of Our Compensation Expenses

Section 62(m) of the Internal Revenue Code imposes a $1 million limit on the amount that a company may annually deduct for compensation to its CEO and certain other Named Executive Officers, unless, among other things, the compensation is "performance based," as defined in section 162(m) Given the conservatorship and the desire to maintain flexibility to promote our corporate goals, the performance based element of Deferred Base Salary and the Target Opportunity applicable to performance during 2011 are not structured to qualify as performance based compensation under section 162(m).

### Compensation Committee Interlocks and Insider Participation

None of the members of the Board of Directors who served on the Compensation Committee during fiscal year 2011 were our officers or employees or had any relationship with us that would be required to be disclosed by us under Item 407(e)(4) of Regulation S K

### Compensation Committee Report

The Compensation Committee has reviewed and discussed the Compensation Discussion and Analysis with management and, based on such review and discussion, has recommended to the Board that the Compensation Discussion and Analysis be included in this Annual Report on Form 10 K

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                      Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3120

Table of Contents

This report is respectfully submitted by the members of the  Compensation Committee of the Board

> Anthony A. Williams, Chairman
> Linda B. Bammann
> Christopher S. Lynch
> Clayton S  Rose

**Compensation and Risk**

With respect to 2011, our management conducted an assessment of our compensation plans and programs that were in place during  the year and that were applicable to employees at all levels,  including the Executive Compensation Program in which our  executives participate  The purpose of the assessment was to  determine whether the design and operation of our compensation  plans create incentives for employees to take inappropriate risks that are reasonably likely to have a material adverse  effect on us. The assessment was conducted by members of our enterprise risk management and human resources teams, as well as  by Aon Hewitt, management's compensation consultant

The review included an evaluation of the mix of fixed and  variable compensation; eligibility for participation in  incentive programs, the process by which target compensation  levels are established, the process for establishing performance  objectives and for evaluating performance against those objectives, the methodology used to allocate the incentive  funding among divisions, departments, and individual employees (including maximum individual payout levels); and the  involvement of the Compensation Committee and FHFA in the compensation process  An evaluation was also made of the linkage  between corporate and divisional performance objectives

The assessment was discussed with the Compensation Committee in  February 2012. Management's conclusion, with which the Compensation Committee concurred, is that our compensation  policies and practices applicable during 2011 do not create  risks that are reasonably likely to have a material adverse  effect on us

In March 20  2, FHFA adopted a new Executive Compensation Program  effective January   , 20  2  Management does not believe that  this program will create inappropriate risk taking incentives  for employees  However, the Compensation Committee and  management are concerned that this program may have an adverse  effect on the company in future periods  Significant adverse  changes in compensation levels could result in increased vacancies in positions that are important for our sound  operation, since the incumbents in these positions possess  significant business and leadership skills that are in demand  elsewhere in the market at substantially higher levels of  compensation  Resulting loss of talent and institutional knowledge would cause an appreciable increase in the operational  risk of the company. See "EXECUTIVE COMPENSATION     Executive Summary" and "RISK FACTORS     ***The conservatorship and uncertainty  concerning our future has had, and will likely continue to have,  an adverse effect on the retention, recruitment, and engagement  of management and other employees, which could have a material  adverse effect on our ability to operate our business.***" We are finding it difficult to retain and engage critical employees and attract people with the skills and  experience we need  Voluntary attrition rates for high performing employees, those with specialized skill sets, and those responsible for controls over financial reporting have  risen markedly since we were placed into conservatorship. This has led to concerns about staffing inadequacies, management  depth, and employee engagement  Attracting qualified senior executives is particularly difficult

<div align="center">346</div>

*Freddie Mac*

TREASURY-3121

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Compensation Tables

The following tables set forth compensation information for our Named Executive Officers: our Chief Executive Officer, our Chief Financial Officer, and our three other most highly compensated executive officers who were serving as executive officers as of December 3 , 2011.

**Table 85     Summary Compensation Table    2011**

| | Year | Salary Paid During Year(1) | Salary Deferred(2) | Bonus(3) | Non-Equity Incentive Plan Compensation(4) Performance Based Deferred Base Salary | Non-Equity Incentive Plan Compensation(4) Target Opportunity | Change in Pension Value and Nonqualified Deferred Compensation Earnings(5) | All Other Compensation(6) | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Charles E. Haldeman, Jr.** Ch ef Execut ve Off cer | 2011 | $ 900,000 | $1,550,000 | $ — | $ 1,3 8,500 | $ — | $ 239,255 | $ 72,915 | $ ,110,670 |
| | 2010 | 900,000 | 1,550,000 | — | 1,362, 50 | 1,322,250 | 21 , 60 | 10 ,37 | 5, 53,53 |
| | 2009 | 356,250 | 1,227,083 | — | — | 395,833 | — | 56, 89 | 2,035,655 |
| **Ross J. Kari** EVP  Ch e F nanc al O cer | 2011 | 675,000 | 829,167 | — | 721,375 | 988,771 | 118, 28 | 55,292 | 3,388,033 |
| | 2010 | 675,000 | 829,167 | 1, 62,500 | 728,838 | 676,133 | 69,7 2 | 391,276 | ,832,656 |
| | 2009 | 151,010 | 370 999 | 87,500 | — | 130,502 | — | 69 290 | 1,209,301 |
| **Anthony N. Renzi** VP   S ng e- am  y Bus ness, Operat ons and Techno ogy | 2011 | 73,86 | 592,61 | — | 515,57 | 7,223 | 86,379 | 32,993 | 2,1 8,6 7 |
| **Jerry Weiss** EVP  Ch e Adm n strat ve O cer | 2011 | 50,000 | 508,33 | — | 2,2 9 | 618,732 | 16 , 82 | 73,735 | 2,257,532 |
| **Paige H. Wisdom** EVP  Ch e Enterpr se R sk O cer | 2011 | 25,000 | 370,83 | — | 322,62 | 8 ,223 | 102,07 | 8,129 | 1,752,88 |

(1) T e a  ss ow ep ese Se -Mo  y Base Saa y  de  e Execu ve Compensa on P og am as desc bed n "Compensa on D scuss on and Ana ys s   Exec  ve Management Compensa on P og am "

(2) The a  oun s shown ep esen he f xed po on of Defe ed Base Saa y ea ned unde  he e s of he Execu ve Co pensa on P og am The f xed po on of he 2011 Defe ed Base Saa y ea ned du ng each ca enda qua e n 2011 w  be pa d n cash o  e as b s ness day of eco d of g q a e  2012, p ov ded he Na ed Execu ve Off cer s e p oyed by us on such pay  e da e o  e ev s ce of edu es, e es o  as a long- e m d sab l  y n 2012 The ema n ng po  on of he 2011 Defe ed Base Saa y s epo ed n "Non-Equ y Incen ve P an Compensa on" because  s pe fo mance-based and he a oun ha s pa d s va able

Amoun s shown as 2009 Defe ed Base Sa a y we e ea ned du ng each ca enda qua e n 2010 and 2009, espec ve y, and pa d ca o  e as bus ness day of he co espond ng qua e n 2011 and 2010, espec ve y The 2009 amoun epo ed n h s co umn fo M Ha deman has been ev sed o co ec an e o  ea o p ev ous y epo ed ($1,277,083)

(3) The a  oun s shown fo M Ka  ep esen he  po on of he cash s gn-on bonus pa d n 2010 and 2009, wh ch he ece ved n  ecogn on of he fo fe ed annual ncen ve oppo un y and unves ed equ y a h s p ev ous e p oye See "Co pensa on D scuss on and Ana ys s   W  en Ag eemen s Re a ng o Emp oymen of CEO a d CFO "

(4) The 2011 amoun s epo ed ef ec he po on of he 2011 and 2010 Ta get Oppo un es ha we e ea ned fo 2011 and pa d on Fe  a y 16, 2012 a d te  pe fo mance-based po  on of he 2011 Defe ed Base Saa y ea ned du ng each ca enda qua e n 2011, w c s c ed o d o be pa d o e as b s ess day of he co espond ng qua e n 2012 See "Compensa on D scuss on and Ana ys s   Execu ve Manage en Compensa on P og am   Pe fo mance Measu es fo he Pe fo mance-Based E emen s of Compensa on "

As d sc ssed f  e  "Co pe sa o D scuss o a d Ana ys s  De e m na on of Ac ual Ta ge Oppo un y," M Ha deman w no ece ve he TO n s a men s appl cable o h s pe fo mance du ng 2011

The 2010 amoun s epo ed ef ec he po on of he 2010 and 2009 Ta get Oppo un es ha we e ea ned fo 2010 and pa d on Fe  a y 18, 2011 a d te  pe fo mance-based po  on of he 2010 Defe ed Base Saa y ea ned du ng each ca enda qua e n 2010 and pa d on he as bus ness day of he co espond ng qua e n 2011

The 2009 amoun s epo ed ef ec he po on of he 2009 Ta get Oppo  y a was ea ned fo 2009 a d pa d o Ma c 12, 2010

(5) The amoun s epo ed n h s co umn ef ec he ac ua a  nc ease n p esen va ue of each Na ed Execu ve Off cer's acc ued benef s unde ou Pens on P an a d t  e Pens on SERP Benef t d e e m ned us ng he me pe ods and assump ons appl ed n ou conso da ed f nanc al s a emen s fo  he yea s ended Dece be 31, 2009, 2010, a d 2011, espec ve y

W  excep o of M We ss, e va es epo ed nc ude a oun s ha he Na ed Execu ve Off ces a e no cu en y en ed o ece ve because suc a oun s a e o e o y ves ed T e a oun s epo ed do no nc ude va ues assoc a ed w h he e me med cal benef s, wh ch a e gene a ly ava lable on he same e ms o all e p oyees Defe ed Base Sa a y unde he Execu ve Compensa on P og am s no cons de ed compensa on on el g ble fo defe al n acco dance w h he Execu ve Defe ed Compensa on P an, o  EDCP The Execu ve Compensa on P og am does no p ov de fo n e es on Defe ed Base Sa a y

(6) Amoun s eflec ( ) ma ch ng con  bu ons we made o ou  ax-qua f ed Th f 401(k) Sav gs P a  ( ) acc s ued benef ts a pa  o e Th f 401(k) SERP Benef t ( ) F exDo a s (desc bed be ow) and ( v) pe qu s es and o he pe sona benef s ece ved These amoun s fo 2011 a e as follows

| | Thrift/401(k) Savings Plan Contributions | Thrift/401(k) SERP Benefit Accruals | Total Flex Dollars | Perquisites |
|---|---|---|---|---|
| M  Haldeman | $ 6,750 | $ 47,250 | $18,915 | $ |
| M  Ka | 6,750 | 33,750 | 14,792 | |
| M  Re z | 4,350 | 18,082 | 10,561 | |
| M  We ss | 13,500 | 40,500 | 19,735 | |
| Ms  W sdom | 9,562 | 28,688 | 9,879 | |

Employee con  bu ons o he Th f 401(k) Sav ngs Plan a e ava lable on he same e ms o all of ou  employees We ma ch up o he f s 6% of el g ble compensa on a  100% of he emp oyee's con  bu ons, w h he pe cen age ma ched dependen upon he employee's leng h of se v ce Employee con  bu ons and ou ma ch ng con  bu ons a e nves ed n acco dance w h he employee's nves men elec ons and a e mmed a ely

*Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                     TREASURY-3122                     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

ves ed I add o , o ad s c eona y bas s, we may make an add ona con bu on o o Th f 401(k) Sav gs P a , efe ed o as e "Bas c Co b o ," t at s alloca ed on behalf of each el g ble employee, based on a s a ed pe cen age of each employee's el g ble co pensa on When we ake a Bas c Con bu on, occu s afe he end of he ca enda yea o wh ch e a es The fo u a fo eco b o s 2% of pay fo e Soc a Sec y wage ase, w c was $106,800 fo 2011, a d 4% of pay above e Soc a Secu y wage ase Bas c Con bu ons we e app oved and pos ed o e p oyees' accoun s 2009 and 2010, bu no n 2011 Bas c Con bu ons ece ved on o afe Janua y 1, 2008 a e s jec o a g added ves g sc ed ves a employees w h less han f ve yea s of se v ce a e o f y ves ed e Bas c Co o o e co o da e, become ves ed a he a e of 20% pe yea ove he f s f ve yea s of se v ce

Fo add ona nfo ma on ega d ng he Th f 401(k) SERP Benef , see "Non-q a f ed Defe ed Compensa on" below Amoun s fo he Th f 401(k) Sav ngs Plan con bu ons and Th f 401(k) SERP Be ef acc oun a o ega d o ves g s a us To be e g be fo he po on of he Th f 401(k) SERP Be ef a bu abe o ma ch ng con bu ons, he Named Execu ve Off ce mus con bu e he max mum amoun pe m ed de e es of e Th f 401(k) Sav ngs P an on a pe-ax bas s h oughou he en e pe od of he yea n wh ch he Named Execu ve Off ce s el g ble o ake such con bu ons

F exDo a s a e p ov ded unde ou F ex be Benef s P an and a gene ally ava lable on he same bas s o all employees o offse cos s e a ed med ca , den a and v s on cove age, g oup e m fe nsu ance, acc den a dea h and pe sona oss s s a ce, a d vaca on p c ase F exDo a s ca be used o offse he cos of o he be ef s a da y sed F exDo a s a e payable as axable ncome

Pe qu s es a e valued a he agg ega e nc emen al cos o s D g e yea s epo ed, e agg ega e va ue of pe qu s es ece ved by all Named Execu ve Off ce s o e a Mess s H de a a d Ka was less a $10,000 I acco da ce w SEC es a o s s ow de "A O e Compensa on" do no nclude pe qu s es o pe sona benef s fo a Na ed Execu ve Off ce ha , n he agg ega e, a oun o ess han $10,000

The amoun shown n he "A O he Compensa on" column fo 2010 fo M Haldeman cons s s en ely of eloca on expenses pa d as pa of he eloca on benef we ag eed o p ov de when we h ed h Th a oun shown n he "All O he Compensa on" column fo 2010 fo M Ka cons s of (a) eloca on expenses of $369,484 pa d as pa of e eloca on be ef we ag eed o p ov de when we h ed h m and (b) f nanc a p ann ng se v ces As pa of o s a d execu ve eloca on p og am, we pu chased M Ka 's fo me home a a p ce equa o he ave age of wo ndependen app a sa s, wh e he p ce a wh ch he home ul ma ely sold was s gn f can ly lowe because of a dec ne n he ho e's va ue be ween ou pu chase and es a e SEC es eq e a we c de s d ffe e ce as sca yea 2010 compensa on

We ca cu a ed he nc emen a cos o us of p ov d ng each of M Haldeman's and M Ka 's eloca on expe ses ased o a c a cos s, eo a o o expe ses c ed by s p ov d g e be ef

## *Grants of Plan Based Awards  2011*

The following table contains information concerning grants of plan based awards to each of the Named Executive Officers during 2011. We are prohibited from issuing equity securities without Treasury's consent under the terms of the Purchase Agreement Accordingly, no stock awards were granted during 2011 For a description of the performance and other measures used to determine payouts, see "Compensation Discussion & Analysis Executive Management Compensation Program Elements of Compensation and Total Direct Compensation Deferred Base Salary," "Target Opportunity," "Performance Measures for the Performance Based Elements of Compensation," "Determination of the Performance Based Portion of 2011 Deferred Base Salary," and "Determination of Actual Target Opportunity "

## Table 86  Grants of Plan Based Awards  2011

| Name | Award | | Estimated Future Payouts Under Non-Equity Incentive Plan Awards[1] | |
| | | Threshold | Target | Maximum |
|---|---|---|---|---|
| M Haldeman | Ta ge Oppo un y[2] | $ | $ 2,000,000 | $ 3,000,000 |
| | Pe fo mance-Based Defe ed Base Sala y | | 1,550,000 | 1,937,500 |
| | **Total** | | 3,550,000 | 4,937,500 |
| M Ka | Ta ge Oppo un y | | 1,166,667 | 1,750,000 |
| | Pe fo mance-Based Defe ed Base Sala y | | 829,166 | 1,036,458 |
| | **Total** | | 1,995,833 | 2,786,458 |
| M Re z | Ta ge Oppo un y | | 829,545 | 1,244,318 |
| | Pe fo mance-Based Defe ed Base Sala y | | 592,613 | 740,766 |
| | **Total** | | 1,422,158 | 1,985,084 |
| M We ss | Ta ge Oppo un y | | 733,333 | 1,100,000 |
| | Pe fo mance-Based Defe ed Base Sala y | | 508,333 | 635,416 |
| | **Total** | | 1,241,666 | 1,735,416 |
| Ms W sdom | Ta ge Oppo un y | | 583,333 | 875,000 |
| | Pe fo mance-Based Defe ed Base Sala y | | 370,833 | 463,541 |
| | **Total** | | 954,166 | 1,338,541 |

(1) The a oun s epo ed ef ec he Ta ge Oppo un y and he pe fo mance-based po on of he Defe ed Base Sala y g an ed n 2011 The Ta ge Oppo un y ac ua y ea ned can ange f om 0% of a ge ( epo ed n he Th eshold column) up o a max mum of 150% of a ge ( epo ed n he Max mum column) The pe fo mance-based po on of he Defe ed Base Sa a y ac ua y ea ned can ange f om 0% of a ge ( epo ed n he Th eshold column) up o a max mum of 125% of a ge ( epo ed n t e Max mum co umn) Howeve , wh e he Execu ve Compensa on P og am allows fo an app oved fund ng level g ea e han 100%, s he cu en n en on of he Compensa on Comm ee no o app ove a fund ng level n excess of 100% wh le he company s n conse va o sh p Ac ua amoun s ea ned a e epo ed n he "Non-Equ y Incen ve Plan Compensa on" column of "Tab e 85 Summa y Compensa on Table 2011"

The 2011 Ta ge Oppo un y s schedu ed o be pa d n wo s a es, e f s of w c occ ed o Feb a y 16, 2012, a d e seco d of w c s sc ed ed o occu no a e han Ma ch 15, 2013 The pe fo mance-based po on of he 2011 Defe ed Base Sa a y s payab e n equa qua e y ns a en s on he as bus ness day of eac qua e n 2012

(2) As d sc ssed f e "Co pe sa o D scuss o a d Analys s De e m na on of Ac ual Ta ge Oppo un y," M Ha deman w no ece ve he TO n s a men s appl cable o h s pe fo mance du ng 2011

*Freddie Mac*

Source D RA HOM OAN MORTGAG CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

TREASURY-3123

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### *Outstanding Equity Awards at Fiscal Year End   2011*

The following table shows outstanding equity awards held by the Named Executive Officers as of December 31, 2011

**Table 87    Outstanding Equity Awards at Fiscal Year End   2011**

| | | | Option Awards[3] | | | | Stock Awards[3] | |
|---|---|---|---|---|---|---|---|---|
| Name | Award Type[1] | Grant Date | Number of Securities Underlying Unexercised Options Exercisable (# | Number of Securities Underlying Unexercised Options Unexercisable (# | Option Exercise Price ($)[2] | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (# | Market Value of Shares or Units of Stock That Have Not Vested ($)[4] |
| Mr Ha deman | — | | — | — | $ | | — | $ — |
| Mr Kari | — | | — | — | | | — | — |
| Mr Renz | — | | — | — | | | — | — |
| Mr We ss | SO | 08 09 0 | ,970 | — | 6 36 | 8 8 201 | — | — |
| | SO | 05 06 05 | 5,6 0 | — | 62 69 | 5 5 2015 | — | — |
| | SO | 06 06 06 | 5,980 | — | 60 5 | 06 0 16 | — | — |
| | RSU | 03 07 08 | — | — | — | | 5,726 | 1,21 |
| Ms Wisdom | RSU | 03 07 08 | — | — | — | | 8,270 | 1,753 |

(1) The ows abe ed "SO" nd ca e s ock op ons and he ows abe ed "RSU" nd ca e es c ed s ock un s

(2) Cons s en w h he e c se p ce was se a a p ce equa o he fa a ke va ue of ou common ock on he g an

(3) A o s epo ed s ab e fo RSUs ep ese e ves ed po on of awa ds, wh e amoun s epo ed n h s ab e fo op ons ep esen he unexe c sed po on of awa ds T e ves g schedu es fo he op on and s ock awa ds epo ed n h s ab e a e as follows

• S ock op o s g a ed o A g s 9, 2004 ves ed a a e of 25% beg g o e f s a ve sa y of e g a da e, a d 25% o Ap 1, 2006, Ap 1, 2007, a d Ap 1, 2008

• S ock op o s g a ed o May 6, 2005 a d J e 5, 2006 ves ed a a a e of 25% annua y beg nn ng on he ann ve sa y of e g a da es

• RSUs g a ted o Ma c 7, 2008 vest at a ate of 25% annua y beg nn ng on he ann ve sa y of he g an da e

(4) Ma ke va es ca c a ed by p y ng e be of RSUs he d by each Named Execu ve Off ce on December 31, 2011 by he clos ng p ce of ou common s ock on December 30, 2011 ($0 212), e a s ad g day of e yea

For information on alternative settlement provisions of RSU and stock option grants in the event of certain terminations, see "Table 91 Potential Payments Upon Termination of Employment or Change in Control as of December 3 , 20  " below

### *Option Exercises and Stock Vested   2011*

The following table sets forth information concerning value realized upon the vesting of RSUs during 2011 by each of the Named Executive Officers No Named Executive Officer exercised options in 2011.

**Table 88    Option Exercises and Stock Vested   2011**

| | Stock Awards | |
|---|---|---|
| Name | Number of shares Acquired on Vesting (#)[1] | Value Realized on Vesting ($)[2] |
| M Haldeman | | $ |
| M Ka | | |
| M Re z | | |
| M We ss | 9,114 | 4,212 |
| Ms W sdom | 9,949 | 5,002 |

(1) A o s epo ed ef ec e be of RSUs a ves ed d g 2011 p o o ou w hhold ng of sha es o sa sfy appl cable taxes

(2) Amoun s epo ed a e ca cu a ed by mu p y ng he numbe of RSUs a ves ed d g 2011 by e fa a ke va ue of o common s ock on he da e of ves ng

### *Pension Benefits   2011*

The following table shows the actuarial present value of the accumulated retirement benefits payable to each of the Named Executive Officers under our Pension Plan and the Pension SERP Benefit (the component of the SERP that relates

349

*Freddie Mac*

Source   D RA HOM  OAN MORTGAG  CORP, 10 K, March 09, 2012    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

to the Pension Plan), computed as of December 31, 2011  A summary of the material terms of each plan follows the table,  including information on early retirement

**Table 89    Pension Benefits    2011**

| Name | Plan Name | Number of Years Credited Service(#)(1) | Present value o Accumulated Benefit (s)(2) | Payments During Last Fiscal Year ($) |
|---|---|---|---|---|
| M  Haldeman | Pens on Plan | 2 3 | $       66,196 | $ |
| | Pens on SERP Benef | 2 3 | 387,519 | |
| M  Ka | Pens on Plan | 2 2 | 39,779 | |
| | Pens on SERP Benef | 2 2 | 148,391 | |
| M  Re z | Pens on Plan | 2 | 33,661 | |
| | Pens on SERP Benef | 2 | 52,718 | |
| M  We ss | Pens on Plan | 8 2 | 184,141 | |
| | Pens on SERP Benef | 8 2 | 386,583 | |
| Ms  W sdom | Pens on Plan | 4 | 74,916 | |
| | Pens on SERP Benef | 4 | 136,130 | |

(1) Amoun s epo ed epesen  he c ed ed yea s of se v ce fo  each Named Execu ve Off ce  as of Decembe  31, 2011, unde  he Pens on P an and  he Pens on SERP Benef , espec ve y

(2) A o s epo ed ef ec  e p ese  va e, exp essed as a   p su  as of Dece  be 31, 2011, of each Na ed Execu ve Off ce 's benef s unde  he Pens on Plan and  e Pens on SERP Benef , espec ve y  A oun s epo ed a e cacu a ed assu  ng pay en a  e ea es un educed e  en da e, as spec f ed n he P ans  Fo benef s ea ned  h ough Dece  be 31, 2010, he Pens on P an p ov de an un educed ea y  e  emen benef a  he ea e of (a) age 62 and 15 yea s of se v ce a d ( ) age 65  T e Pens on SERP Benef  does no p ov de an ea y e  emen benef , he efo e age 65 s he assumed commencemen da e  Fo Mess s Ha de a , Ka a Re z a d Ms W sdo , ea o s sow  c dea o s, f a y,  w c e Na ed Execu ve Off ce s a e no ye ves ed Pens on P an and Pens on SERP Be f s d o ves         e pa c pa  a s f ve yea s of ves ng se v ce , a wh ch   he pa c pan ves s fu y

**Pension Plan**

The Pension Plan is a tax qualified, defined benefit pension  plan that we maintain, covering substantially all employees who  have attained age 2  and completed one year of service with us  Amendments were made to the Pension Plan, effective January 1, 2012, that limit participation in the Pension Plan to those individuals who were hired (or rehired) prior to January 1, 2012. Each of the current Named Executive Officers is eligible to participate in the Pension Plan  Pension Plan benefits are based on an employee's years of service  and compensation, up to limits imposed by law. Specifically, the normal retirement benefit under the Pension Plan for service  after December 31, 1988 is a monthly payment commencing at age 65 calculated as follows:

• 1% of the participant's highest average monthly compensation for the 36 consecutive month period during which  the participant's compensation was the highest;

• multiplied by the participant's full and partial years of credited service under the Pension Plan

For purposes of the Pension Plan, compensation includes the  non deferred base salary paid to each employee (which includes  Semi Monthly Base Salary under our Executive Compensation Program), as well as overtime pay, shift differentials, non deferred bonuses paid under our corporate wide annual bonus program or pursuant to a functional incentive plan (excluding  the value of any stock options or cash equivalents), commissions and salary reductions under the Thrift/401(k) Savings Plan and the Flexible Benefits Plan, and qualified  transportation benefits under Internal Revenue Code Section 132(f)(4)  Compensation does not include, among  other things, supplemental compensation plans providing temporary pay, deferrals under the Executive Compensation Program, or amounts paid after termination of employment other  than amounts included in a final paycheck.

Notwithstanding the lump sum nature of the disclosure in the  preceding table, for 2011 lump sum payments were not permitted  under the Pension Plan if the present value of the accrued  benefit would equal or exceed $25,000  The normal form of  benefit under the Pension Plan is an annuity providing monthly payments for the life of the participant (and a survivor annuity  for the participant's spouse if applicable). Optional forms of benefit payment are available  A benefit with an actuarial present value equal to or less than $5,000 may only be paid as a  lump sum.

Throughout 2011, participants under the Pension Plan who  terminate employment before age 55 with at least five years  of service are considered "terminated vested" participants. Such participants may commence their benefit under  the Pension Plan as early as age 55. The benefit is equal to the vested portion of the participant's accrued benefit, reduced by 1/180th for each of the first 60 months,  and by 1/360th for each of the next 60 months, by  which the commencement of such benefits precedes age 65

An early retirement benefit is available to a participant who  terminates employment on or after age 55 with at least five  years of service  For service before January 1, 2011, this early retirement benefit is reduced by 3% for each year  (prorated monthly for partial years) by which the commencement of such benefits precedes the earlier of: (a) the

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                TREASURY-3125                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

participant's attainment of age 65; or (b) the participant's attainment of age 62 or later with at least 15 years of service  For service after December 31, 2010, the reduction is 5% for each year (prorated monthly for partial years) by which the commencement of benefits precedes the participant's attainment of age 65. For participants with service prior to January 1, 2011 and after December 31, 2010, the reductions are separately calculated, and the early retirement benefit is the sum of the two calculations  Death benefits are available provided the participant completed at least five years of service prior to death

**Supplemental Executive Retirement Plan     Pension SERP Benefit**

The Pension SERP Benefit component of the SERP is designed to provide participants with the full amount of benefits to which they would have been entitled under the Pension Plan if that plan: (a) was not subject to certain limits on compensation that can be taken into account under the Internal Revenue Code; and (b) did not exclude from "compensation" Deferred Base Salary and amounts deferred under our EDCP  For example, the Pension Plan is only permitted under the Internal Revenue Code to consider the first $245,000 of an employee's compensation during 2011 for the purpose of determining the participant's compensation based normal retirement benefit  Effective January 1, 2010, the SERP was amended to provide that the maximum covered compensation for purposes of the SERP, relative to a Covered Officer, may not exceed two times the Covered Officer's Semi Monthly Base Salary  We believe the Pension SERP Benefit is an appropriate benefit because offering such a benefit helps us remain competitive with companies in the Comparator Group

The Pension SERP Benefit is calculated as the participant's accrued annual benefit payable at age 65 (or current age, if greater) under the Pension Plan without application of the limits described in the preceding paragraph, less the participant's actual accrued benefit under the Pension Plan  The Pension SERP Benefit is vested for each participant to the same extent that the participant is vested in the corresponding benefit under the Pension Plan

To be eligible for the Pension SERP Benefit for any year, the Named Executive Officer must be eligible to participate in the Pension Plan  Each of the Named Executive Officers is eligible to participate in the Pension Plan  Eligibility for the Pension SERP Benefit and the Pension Plan has been eliminated for employees (including executive officers) hired or rehired after January 1, 2012  See "Other Executive Compensation Considerations     Supplemental Executive Retirement Plan" above

Pension SERP Benefits that vest on or after January 1, 2005 are generally distributed in a lump sum after separation from service and are payable 90 days after the end of the calendar year in which separation occurs. Subject to plan limitations and restrictions under Internal Revenue Code Section 409A, employees may elect that this portion of the Pension SERP Benefit be paid upon separation in the form of a single life annuity at age 65 or in reasonably equal annual installments over five, 10 or 15 years (including interest). Under IRS rules, distributions to so called "key employees" (as defined by the IRS in regulations concerning Internal Revenue Code Section 409A) on account of separation from service may not commence earlier than six months from the key employee's separation from service  Payments under the SERP will be delayed if necessary to meet this requirement  In the case of death, the Pension SERP Benefit is distributed as a lump sum within 90 days of such event.

Pension SERP Benefits that vested prior to January 1, 2005 are generally distributed after separation from service (other than retirement) in the form of a single life annuity commencing at age 65  In the case of retirement, the vested pre 2005 Pension SERP Benefit is combined with the vested pre 2005 Thrift/401(k) SERP Benefit and is paid out in the form of a single life annuity payable at age 65 (or in a series of reasonably equal installments over 15 years commencing with retirement if actuarial estimates indicate that payment form would yield a onger period of payment)  In the case of death, the vested pre 2005 Pension SERP Benefit is paid in the form of a lump sum within 90 days of such event

**Non qualified Deferred Compensation**

*Executive Deferred Compensation Plan*

The EDCP is a non qualified plan and is unfunded (benefits are paid from our general assets). The EDCP has, in the past, allowed the Named Executive Officers to defer receipt of a portion of their annual base pay and cash bonus (and to defer settlement of RSUs granted between 2002 and 2007)  In both December 2010 and December 2011, we advised participants in the EDCP that we are suspending deferrals of pay under the EDCP during calendar year 2011 and 2012. We will review future deferral options during the fourth quarter of 2012  None of the Named Executive Officers has a balance under the EDCP

<div align="center">351</div>

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Supplemental Executive Retirement Plan     Thrift/401(k) SERP Benefit*

The Thrift/401(k) SERP Benefit component of the SERP is an unfunded, nonqualified defined contribution plan designed to provide participants with the full amount of benefits that they would have been entitled to under the Thrift/401(k) Savings Plan if that plan: (a) was not subject to certain limits on compensation that can be taken into account under the Internal Revenue Code; and (b) did not exclude from compensation Deferred Base Salary and amounts deferred under our EDCP For example, in 2011 under the Internal Revenue Code, only the first $245,000 of an employee's compensation is considered when determining our percentage based matching contribution and the basic contribution for any participant in the Thrift/401(k) Savings Plan. Effective January 1, 2010, the SERP was amended to provide that the maximum covered compensation for purposes of the SERP, relative to a Covered Officer, may not exceed two times the Covered Officer's Semi Monthly Base Salary We believe the Thrift/401(k) SERP Benefit is an appropriate benefit because offering such a benefit helps us remain competitive with companies in the Comparator Group.

The Thrift/401(k) SERP Benefit equals the amount of the employer matching contributions and basic contribution for each Named Executive Officer that would have been made to the Thrift/401(k) Savings Plan during the year, based upon the participant's e g b e compensation, without application of the above limits, less the amount of the matching contributions and basic contribution actually made to the Thrift/401(k) Savings Plan during the year Participants are credited with earnings or losses in their Thrift/401(k) SERP Benefit accounts based upon each participant's individual direction of the investment of such notional amounts among the virtual investment funds available under the SERP. Such investment options are based upon and mirror the performance of the investment options available under the Thrift/401(k) Savings Plan As of December 31, 2011, there were 21 investment options in which participants' notional amounts could be deemed invested

To be eligible for the Thrift/401(k) SERP Benefit, the Named Executive Officer must be eligible for matching contributions and basic contributions under the Thrift/401(k) Savings Plan for part of the year In addition, to be eligible for the portion of the Thrift/401(k) SERP Benefit attributable to employer matching contributions, the Named Executive Officer must contribute the maximum amount permitted under the terms of the Thrift/401(k) Savings Plan on a pre tax basis throughout the entire portion of the year in which the Named Executive Officer is e g b e to make such contributions. The portion of the Thrift/401(k) SERP Benefit that is attributable to employer matching contributions is vested when accrued, while the accrual relating to the basic contribution paid prior to 2008 is subject to five year cliff vesting, the accrual relating to the basic contribution attributable to calendar years 2008 20 is subject to five year graded vesting of 20% per year, and the accrual relating to the new employer discretionary contribution (which will replace the basic contribution for 2012) will be subject to three year cliff vesting. The Thrift/401(k) SERP Benefits that vest on or after January 1, 2005 are generally distributed in a lump sum payable 90 days after the end of the calendar year in which separation from service occurs A six month delay in commencement of distributions on account of separation from service applies to key employees, in accordance with Internal Revenue Code Section 409A If the Named Executive Officer dies, the vested Thrift/401(k) SERP Benefit is paid in the form of a lump sum within 90 days of death.

Thrift/401(k) SERP Benefits that vested prior to January 1, 2005 are generally distributed after separation from service (other than retirement) in the form of three reasonably equal annual installments, starting in the first quarter of the calendar year following the year in which the separation from service occurs In the case of retirement, the vested pre 2005 Thrift/401(k) SERP Benefit is combined with the vested pre 2005 Pension SERP Benefit and is payable in the form of a single life annuity at age 65 (or in a series of reasonably equal installments over 15 years commencing with retirement if actuarial estimates indicate that this payment form would yield a longer period of payment) In the case of death, the vested pre 2005 Thrift/401(k) SERP Benefit is paid in the form of a lump sum within 90 days of such event.

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012                                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The following table shows the contributions, earnings, withdrawals and distributions, and accumulated balances under the Thrift/401(k) SERP Benefit for each Named Executive Officer  As of December 31, 2011, none of the Named Executive Officers was  a participant in the EDCP.

**Table 90      Non Qualified Deferred Compensation**

| Name | Executive Contribution in Last FY ($)(1) | Freddie Mac Accruals in Last FY ($)(2) | Aggregate Earnings in Last FY ($)(3) | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at Last FYE ($)(4) |
|---|---|---|---|---|---|
| M  Haldeman | | | | | |
| Th f 401(k) SERP Be ef | $ | $  47,250 | $      38 | $ | $  69,793 |
| M  Ka | | | | | |
| Th f 401(k) SERP Be ef | | 33,750 | 4 | | 33,754 |
| M  Re z | | | | | |
| Th f 401(k) SERP Be ef | | 18,082 | 2 | | 18,084 |
| M  We ss | | | | | |
| Th f 401(k) SERP Be ef | | 40,500 | (13,175) | | 344,818 |
| Ms  W sdom | | | | | |
| Th f 401(k) SERP Be ef | | 28,688 | 64 | | 74,717 |

(1) The SERP does no  allow fo  employee con  bu ons

(2) A o  s epo ed ef eco  acc as  de  e Th f 401(k) SERP Benef  du ng 2011  These a  oun s a e a so  epo ed n  he "All O he  Compensa on" column  n "Table 85  Summa y Compensa on Tab e  2011"

(3) A  oun s epo ed ef epen  he  oa  ne es  and o he  ea nings c ed ed o  each Na ed Execu ve Off ce  unde  he Th f 401(k) SERP Be ef t

(4) A  oun s epo ed ef eco  he accu  u a ed ba ances unde  he Th f 401(k) SERP Benef  for each Na ed Execu ve Off ce  Unde  he Th f 401(k) SERP Be ef t, ma ch ng con  bu on acc uals ves  mmed a ely, whe eas  he bas c con  bu on acc ua s a e ng o  he bas c con  bu on pa d p o  2008 a a sub e  oc ff ves ng of 100% a  he end of f ve yea s and he acc ua s e ng  he acc ua s ves  bjec o f ve-yea g aded ves ng of 20% pe  yea  Messs Ha de a , Ka , a d Re z, a d Ms W sdo  ave o  e  ef ve-yea  ves ng equ e en fo  he bas c con  bu on  M  We ss s f  y ves ed  h s account  The d ffe ence n he agg ega e ba ance above and  he acc ua e ba an e seq a o e non-ves ed bas c o  b op s ea  gs T eves ed a o  o - vested co  ponen s unde  he Th f 401(k) SERP Benef  for each Named Execu ve Off ce  a e as fo ows  ( ) M  Ha de a  ves ed ba a ce $69,793  o -ves ed  a a ce $0; ( ) M  Ka  vested a a ce $33,754;  o -ves ed ba a ce $0  ( ) M  Re z  ves ed a a ce $18,084;  o -vested  a a ce $0; ( v) M  We ss  vested a a ce $344,818;  o -vested  a a ce $0; (v) Ms  W sdo  vested a a ce $71,469;  o -ves ed a a ce $3,248  Messs Ha de a , Ka , a d Renz  do  o  ave a  ves ed ba a ce  o  obas c con  bu ons have been made s nce hey o ned  he company  Fo  a mo e de a led d scuss on of  he ma ch ng con  bu on acc ua s and bas c con  bu on acc ua s, see "Supp e en a  Execu ve Re  e en P an   Th f 401(k) SERP Be ef " above

The fo  ow ng 2010 Th f 401(k) SERP Benef  acc ua a  oun s a e inc he oun n "All O he  Compensa on" n he 2010 Summa y Compensa on Table as compensa on fo  each Named Execu ve Off ce  fo  whom such acc ua s we e made and  epo ed du ng 2010 as fo ows  (a) M  Ha deman  $22,500  and  ( ) M  Ka  $0  See o  Fo m 10-K f ed o  Feb a y 24, 2011  Mess s Ha de a  a d Ka  bo  ad acc a s ef $0 d  g 2009 beca se, based o  e  e  da es, hey we e no  e g b e fo  Th f 401(k) SERP Be ef aac See A  e d e No 2 o o  Fo m 10-K f ed on Ap  12, 2010  In add  on, Mess s Renz  a d We ss a d Ms W sdo  ad Th f 401(k) SERP Be ef t acc a a o  s of $0, $57,300 a d $33,529  espec ve y fo  2010, a hough  h s was no  epo ed n  t e  Summa y Compensa on Tab e because  hey we e no  Named Execu ve Off ce s fo  2010

## Potential Payments Upon Termination of Employment or Change-in-Control

We have entered into certain agreements and maintain certain plans that call for us to pay compensation to our Named Executive Officers in the event of a termination of employment with us  The compensation and benefits potentially payable to  each Named Executive Officer if the officer had terminated his employment under various circumstances as of December 31, 2011  are described in the discussion and reported in the table below  For more information, see "Employment and Separation Agreements" below  FHFA reviewed the terms of the employment agreements for Messrs. Haldeman and Kari and approved the termination benefits set forth therein  The actual  payment of any level of termination benefits is subject to FHFA review and approval

We are not obligated to provide any additional compensation to our Named Executive Officers in connection with a change in  control

Each of our Named Executive Officers is subject to a restrictive  covenant agreement with us  Each agreement provides that the Named Executive Officer will not seek employment with designated  competitors for a specified period immediately following  termination of employment, regardless of whether the  executive's employment is terminated by the executive, by us, or by mutual agreement. The specified period is 24 months for Messrs. Haldeman and Kari and 12 months for Messrs. Renzi and Weiss and Ms. Wisdom. During the 12 month period immediately following termination, each executive also  agrees not to: (a) solicit or recruit any of our managerial  employees; (b) compete against us in any of our business activities; or (c) make disparaging remarks about us. The  agreement also provides for confidentiality of information that constitutes trade secrets or proprietary or other confidential  information

As of December 31, 2011, Mr. Weiss had vested in his benefits under the Thrift/401(k) SERP Benefit and the Pension SERP Benefit, while Messrs. Haldeman, Kari and Renzi and Ms. Wisdom had  not  The amounts presented in the table below do not include  vested balances in the Thrift/401(k) SERP Benefit or vested benefits in the Pension SERP Benefit, because such vesting was not in connection with a termination or change in control  Amounts shown in the tables also do not include certain items  available to all employees generally upon a termination event

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-3128                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

For RSUs, the value shown in the table is calculated on a  grant by grant basis by multiplying the number of unvested RSUs by the closing price of our common stock on December 30, 2011  No value is  included in the tables for stock options because the exercise  prices for all such options held by Named Executive Officers are  substantially higher than the closing price of our common stock  on December 30, 20

### Potential Payments to Current Named Executive Officers

The Executive Compensation Program addresses the treatment of  Semi Monthly Base Salary, Deferred Base Salary, and the Target Opportunity upon various termination events  In order to be  eligible to receive any portion of a Target Opportunity installment payment, a Covered Officer must have been employed  for a minimum of four whole calendar months during the  performance year to which the award applies.

Additionally, none of the Covered Officers are guaranteed  termination benefits upon any type of termination event other  than death or disability and the actual payment of any level of  termination benefits is subject to FHFA review and approval at the time of payment  The discussion that follows describes the  termination benefits, if any, provided upon various types of  termination events

- *Death.*  Any earned but unpaid Deferred Base Salary or Target Opportunity installments will be paid as soon as administratively possible in the event of death  If, at the time of death, the funding level has not been determined,  the award will remain outstanding until such determination is made. Payment will occur as soon as administratively possible  following the determination of the funding level

- *Disability.*  Treatment upon a Long Term Disability (as defined in the Executive Compensation Program) is  the same as upon death, except that payment of any Deferred Base  Salary will occur in accordance with the approved payment  schedule and not as soon as administratively possible following  termination of employment

- *Retirement.*  Treatment upon an eligible Retirement (as defined in the Executive Compensation Program) is  the same as upon Long Term Disability, except that only a pro rata portion of a Target Opportunity installment payment  will occur based on the number of whole months worked in the  performance year during which the officer retires  No  information is provided in the table below with respect to a termination of employment on account of a retirement because  none of the Named Executive Officers was retirement eligible  under the Executive Compensation Program as of December 3  , 2011.

- *Voluntary or For Cause.*  The Named Executive Officers are not entitled to any termination benefits  in the event of a voluntary termination or a termination for  cause and all earned but unpaid Deferred Base Salary and the  unpaid portion of any outstanding Target Opportunity awards are  forfeited

- *Involuntary Termination Without Cause.*  The Named Executive Officers are not  entitled to any termination benefits in the event of an involuntary termination without cause unless the Compensation  Committee recommends that the Named Executive Officer receive termination benefits and the Committee's recommendation is  approved by FHFA after consulting with Treasury, as appropriate. In determining whether to recommend payment of termination  benefits and the amount of such benefits, the Compensation  Committee will take into account one or more factors that it  determines are relevant, including:

  - The facts and circumstances associated with the termination;

  - The performance and contributions of the Named Executive Officer  during his or her tenure with us;

  - The amount of earned but unpaid Deferred Base Salary as of the  date of termination; and

  - Our need to provide reasonable and competitive termination  benefits in order to attract and retain high caliber executives  during conservatorship.

Under interim guidance from FHFA, the amount of any termination  benefits recommended by the Compensation Committee in the event  of an involuntary termination without cause may not exceed  $1 million and must also be limited to the greater of:

- 00% of the Named Executive Officer's earned but unpaid  Deferred Base Salary as of the date of termination; or,

- 2/3rds of the Named Executive Officer's earned but unpaid  Deferred Base Salary as of the date of termination plus a  supplemental amount not to exceed 2/3rds of the Named Executive  Officer's Semi Monthly Base Salary

The following table describes the potential payments as of December 3  , 20   upon termination of the Named Executive  Officers employed as of that date that results from death or  disability  There are no payments or benefits

354                                                                                             *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

payable upon termination of employment for other reasons or upon a change in control  Additionally, Semi Monthly Base Salary is only payable through the date of death or a termination resulting from disability  The amounts presented in this table do not include vested balances in the Thrift/401(k) SERP Benefit, or vested benefits in the Pension SERP Benefit as of December 31, 2011, because such vesting was not in connection with a termination or change  in control  Amounts shown in the table also do not include certain items available to all employees generally upon a termination event  Additional information is provided in the footnotes following the table

**Table 91    Potential Payments Upon Termination of Employment or Change-in-Control as of December 31, 2011**

| | Death | Disability |
|---|---|---|
| **Charles E. Haldeman, Jr.** | | |
| Compensa on | | |
| Defe ed Base Sala y(1 | $2,898,500 | $2,898,500 |
| Ta ge Oppo un y(2 | | |
| Benef s | | |
| Non-Qual f ed Pens on(3 | | 387,519 |
| o a | $2,898,500 | $3,286,019 |
| **Ross J. Kari** | | |
| Compensa on | | |
| Defe ed Base Sala y(1 | $ 1,550,542 | $ 1,550,542 |
| Ta ge Oppo un y(2 | 988,771 | 988,771 |
| Benef s | | |
| Non-Qual f ed Pens on(3 | | 148,391 |
| o a | $2,539,313 | $2,687,704 |
| **Anthony N. Renz** | | |
| Compensa on | | |
| Defe ed Base Sala y(1 | $ 1,108,188 | $ 1,108,188 |
| Ta ge Oppo un y(2 | 447,223 | 447,223 |
| Benef s | | |
| Non-Qual f ed Pens on(3 | | 52,718 |
| o a | $ 1,555,411 | $ 1,608,129 |
| **Jerry We ss** | | |
| Compensa on | | |
| Defe ed Base Sala y(1 | $  950,584 | $  950,584 |
| Ta ge Oppo un y(2 | 618,732 | 618,732 |
| Eq ty Awa ds | 1,214 | 1,214 |
| o a | $ 1,570,530 | $ 1,570,530 |
| **Paige H. Wisdom** | | |
| Compensa on | | |
| Defe ed Base Sala y(1 | $  693,459 | $  693,459 |
| Ta ge Oppo un y(2 | 484,223 | 484,223 |
| Eq y Awa ds(4) | 1,753 | 1,753 |
| Benef s | | |
| Non-Qual f ed Pens on(3 | | 136,130 |
| Non-Qual f ed Defe ed Compensa on(3 | | 3,248 |
| o a | $ 1,179,435 | $ 1,318,813 |

(1) T e a on epo ed as Defe ed Base Sa a y s eq a o any ea ed   pa d Defe ed Base Sa a y, adj s ed o ef ec e app oved fund ng eve
(2) T e a o s epo ed de Ta ge Oppo   y a eq a o e f s ns allmen assoc a o ef e ns allmen assoc a ed w h he 2010 Ta ge Oppo   y Bo a o s ave bee adj s ed o ef ec e app oved fund ng eve s and he nd v dua d ffe en a on based on d v s on and/o nd v dual pe fo mance
(3) The amoun s epo ed unde Non-Qua f ed Pens on and Non-Qual f ed Defe ed Compensa on eflec he non-ves ed Pe s o SERP Be ef a d e o -ves ed Th f 401(k) SERP Be ef , espec ve y, as of Dece be 31, 2011 U de e e s of e SERP, a pa c pa co   es acc e se v ce wh le d sabled (as def ed e SERP)
(4) The amoun epo ed unde Equ y Awa ds ef ec s he mmed a e ves ng of he Named Execu ve Off ce 's ou s and ng RSU g an s n e even of dea o d sab y Dea ha s o esu s n he   ed a e se e en of he ou s and ng RSUs, wh e a D sab y even esu s n con nued ves ng of a g an s n acco dance w e ves g sc ed o  ed   e awa d ag eemen as f e m na on had no occu ed  The va ues shown we e ca cu a ed by  u p y ng he nu be of RSUs ha w con nue o ves by he c os ng p ce o  sha es ou s ock on Dece be 30, 2011 ($0 212), e as ad ng day of e yea

### Alternative Settlement Provisions for Equity Awards in the Event of Certain Terminations

#### RSUs

The RSUs awarded to our employees, including our Named Executive Officers, contain alternative settlement provisions in the event of certain terminations, as follows:

• **Death.**  Immediate vesting and settlement occurs in the event of death

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3130

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- **Disability and Retirement.** In the event of disability, normal retirement, or a retirement other than a normal retirement (all as defined in the 2004 Employee Plan), RSUs will vest immediately and will be settled in accordance with the vesting schedule outlined in the award agreement as if termination had not occurred This treatment is subject to the executive's signing an agreement containing certain restrictive covenants to protect our business interests  Violation of any of the covenants results in the forfeiture of unsettled shares and the requirement to repay any after tax gain realized from the settlement of shares within 12 months of the forfeiture event

- **Involuntary Termination Without Cause.** In the event of an involuntary termination other than for cause, the Compensation Committee may, contingent upon approval from FHFA, provide for RSUs to vest immediately and settle in accordance with the vesting schedule outlined in the award agreement as if termination had not occurred. Under interim guidance provided by FHFA, this provision is limited to awards scheduled to vest within  2 months of the executive's termination date

- **All Other Terminations.** If the Named Executive Officer's employment is terminated for any reason other than those described above, all RSUs unvested as of the date of termination are forfeited

_Stock Options_

The stock options granted to our employees, including our Named Executive Officers, all of which were exercisable as of December 3 , 20  , include alternative settlement provisions in the event of certain terminations which are similar to the provisions for RSUs, with the following modifications:

- **Death.** The stock options remain exercisable until the earlier of the original expiration date or three years after the date of termination in the event of death

- **Disability.** The stock options remain exercisable for the full balance of their term in the event of disability.

- **Retirement.** In the event of retirement, as defined in the 2004 Employee Plan, stock options will remain exercisable for the full balance of their term, subject to the executive's signing an agreement containing the same restrictive covenants as described above for RSUs.

- **All Other Terminations.** If the individual's employment is terminated for any reason other than those described above, the stock options remain exercisable until the earlier of the original expiration date or 90 days following termination

## Employment and Separation Agreements

### Messrs. Haldeman and Kari

The various agreements entered into in connection with the employment of Messrs. Haldeman and Kari are summarized above  See " Written Agreements Relating to Employment of CEO and CFO."

### Messrs. Renzi and Weiss and Ms. Wisdom

We do not have any continuing obligations under the letter agreements that were entered into with Mr  Renzi, Mr. Weiss and Ms. Wisdom at the time of their employment

## Director Compensation

After we entered conservatorship, FHFA approved compensation for Board members in the form of cash retainers only, paid on a  quarterly basis  Under the terms of the Purchase Agreement, without Treasury's consent, we are prohibited from making stock grants to directors while this agreement remains in effect  We do not maintain any pension or retirement plans for directors  Non employee directors are reimbursed for reasonable out of pocket costs for attending each meeting of the Board or a  Board committee of which they are a member

The reasons for this shift toward compensation delivered entirely in cash were similar, in the case of director compensation, to some of those described above regarding the structural change in executive compensation (see "Overview     Executive Management Compensation Program     Overview of Program Structure")  However, the considerations underlying director and executive compensation differed in one key respect. There is no provision in the director compensation program for pay that varies depending on business results. While such incentive compensation is deemed appropriate to give management strong incentives to devise and execute business plans and achieve positive financial results, it is viewed in the case of directors as inconsistent with their oversight role

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Board compensation levels during conservatorship are shown in  the table below

**Table 92     Board Compensation     2011 Non Employee Director Compensation Levels**

| Board Service | |
|---|---|
| Cash Compensa on | |
| Ann a Re a ne | $ 160,000 |
| Annua Re a ne fo Non-Execu ve Cha man | 290,000 |
| **Comm ttee Serv ce** (Cas ) | |
| Annua Re a ne fo Aud Comm ee Cha | $ 25,000 |
| Annua Re a ne fo Bus ness and R sk Co ee Cha | 15,000 |
| Annua Re a ne fo Comm ee Cha s (o he han Aud o B s ess a d R sk) | 10,000 |
| Annual Re a ne fo Aud Comm ee Membe s | 10,000 |

The following table summarizes the 2011 compensation provided to  all persons who served as non employee directors during 2011

**Table 93     2011 Director Compensation**

| Name | Fees Earned or Paid in Cash | Change in Pension Value and Nonqualified Deferred Compensation Earnings(5) | All Other Compensation(6) | Total |
|---|---|---|---|---|
| C  Lynch[1] | $ 193,356 | $ | $ | $193,356 |
| J  Kosk nen[2] | 290,000 | | 19,150 | 309,150 |
| L  Bammann | 175,000 | | 2,500 | 177,500 |
| C  By d | 170,000 | | 1,370 | 171,370 |
| R  G aube [2] [3] [ | 180,000 | | 20,000 | 200,000 |
| L  H sc | 160,000 | | 20,000 | 180,000 |
| N  Re s  as[3] | 160,000 | | 3,450 | 163,450 |
| C  Rose[1] | 163,736 | | | 163,736 |
| E  S a ks, J  [1 | 170,000 | | 20,000 | 190,000 |
| A  W ams[1] | 171,495 | | | 171,495 |

(1) Amoun s nc ude add ona compensa on ea ned by he des gna ed d ec o s n he  new o es on he Boa d beg nn ng on he effec ve da e of he  appo n men s  M Ly c 's appo n men  was effec ve as of Decembe 2, 2011  he appo n men s of he new Comm ee cha s we e effec ve as of Novembe 7, 2011  The  o es and  add ona compensa on du ng 2011 a e as fo ows  M  Lynch (Non-Execu ve C a a )  $8,356  M  Rose (A d Co ee ca )  $3,736; a d  M  W ll ams (Compensa on Co ee cha )  $1,495  M  Shanks' 2011 compensa on was no affec ed by he change n h s espons b e s f om Compensa on  Comm ee cha o cha  of he Nom a ng and Gove nance Comm ee

(2) Amoun s shown eflec compensa on ac ually pa d o Mess s  Kosk nen and G aube  du ng 2011  In acco dance w h es abl shed p ac ce fo  paymen of d ec o  compensa on, annua e a ne s and comm ee fees a e pa d n advance a he beg nn ng of each qua e  As a esu  of he changes n boa d ass gnmen s and  espons b es desc bed n No e 1 above, he co pensa on ea ned by Mess s  Kosk nen and G aube  d g efo  qua e of 2011 was ess a ea o s  pa d o he  a he beg nn ng of he qua e  The ove pay en s we e deduc ed f o  he a oun s pa d o hose d ec o s n Janua y 2012, fo ef s qua e of  2012, as fo ows  M  Kosk e  $10,598; M  G aube  $1,495

(3) A Decembe 31, 2011, he agg ega e numbe of common sha es  de y g eo s a d g RSU awa ds a  ad o ves ed a d we e held by each non-employee  d ec o was as follows  M  G a e  1,253 s a es; a d M  Rets as  1,253 s a es

(4) A Decembe 31, 2011, he agg ega e numbe of common sha es unde y ng o s a d ng op on awa ds, exe c sab e and unexe c sab e, he d by each non-emp oyee  d ec o was as fo ows  M  G a e  1,822 s a es

(5) We do no have any pens on o e emen p ans fo ou  non-employe d ec o s

(6) In 2011, he F edd e Mac Founda on p ov ded a do a -fo -do a ma ch o e g b e o ganza ons and ns u ons, up o an agg ega e amoun of $20,000 pe d ec o pe  calenda yea  Ma ch ng con bu ons made o cha es des gna ed by he non-employee d ec o s we e as follows  M  Kosk nen, $19,150; Ms Ba  , $2,500;  Ms By d, $1,370; M  G a e , $20,000; M  H sc , $20,000; M  Rets as, $3,450; a d M  S a ks, J , $20,000

**Indemnification.**  We have also made arrangements to indemnify our directors against certain  liabilities which are similar to the terms on  which our executive officers are indemnified  For a description of such terms, see "   Written Agreements Relating to Employment of CEO and  CFO."

357                                    *Freddie Mac*

Source   D RA  HOM  OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

**Security Ownership**

Our only class of voting stock is our common stock. (Upon its appointment as Conservator, FHFA immediately succeeded to the voting rights of holders of our common stock ) The following table shows the beneficial ownership of our common stock as of March 6, 2012 by our current directors, our Named Executive Officers, all of our directors and executive officers as a group, and holders of more than 5% of our common stock. Beneficial ownership is determined in accordance with SEC rules for computing the number of shares of common stock beneficially owned by a person and the percentage ownership of that person As of March 6, 2012, each director and Named Executive Officer, and all of our directors and executive officers as a group, owned less than 1% of our outstanding common stock. The information presented below is based on information provided to us by the individuals or entities specified in the table

**Table 94    Stock Ownership by Directors, Executive Officers, and Greater Than 5% Holders**

| Name | Position | Common Stock Beneficially Owned Excluding Stock Options[1] | Stock Options Exercisable Within 60 Days of March 6, 2012 | Total Common Stock Beneficially Owned |
|---|---|---|---|---|
| Linda B Bammann | Director | | | |
| Carolyn H Byrd | Director | | | |
| Christopher S Lynch | Director | | | |
| Nicolas P Retsinas | Director | 9,552[2] | | 9,552 |
| Clayton S Rose | Director | | | |
| Eugene B Shanks, Jr | Director | | | |
| Anthony A Williams | Director | | | |
| Charles E Haldeman, Jr | Chief Executive Officer | | | |
| Ross J Kari | EVP | Chief Financial Officer | | |
| Anthony N Renzi | EVP  Single-family Business, Operations and Tech | | | |
| Jerry Weiss | EVP  Chief Administrative Officer | 37,842[3] | 16,590 | 54,432 |
| Paige H Wisdom | EVP  Chief Enterprise Risk Officer | 25,458[4] | | 25,458 |
| *All directors and executive officers as a group (18 persons)* | | 123,984[5] | 35,548 | 159,532 |

| 5% Holder | Common Stock Beneficially Owned | Percent of Class |
|---|---|---|
| US Department of the Treasury<br>1500 Pennsylvania Avenue, NW<br>Washington, D C 20220 | Variable[6] | 79 9% |

(1) Includes shares of stock beneficially owned as of March 6, 2012 Also includes RSUs vesting within 60 days of March 6, 2012 A RSU represents a contractual right to receive one share of our common stock at a specified future date See "Executive Compensation Compensation Discussion and Analysis" above for more information

(2) Includes 5,613 RSUs and 150 dividend equivalents on RSUs

(3) Includes 5,276 RSUs

(4) Includes 8,270 RSUs

(5) Includes 30,299 RSUs and 150 dividend equivalents on RSUs

(6) In September 2008, we issued to Treasury a warrant to purchase, for one one-thousandth of a cent ($0 00001) per share, shares of our common stock equal to 79 9% of our on a number of shares of our common stock on a and on a fully diluted basis a the time he was an issue exercised The warrant may be exercised in whole or part any time Sept 7, 2028 As of date of filing, Treasury has not exercised the warrant The information above assumes Treasury beneficially owns no of the shares of our common stock

**Securities Authorized for Issuance Under Equity Compensation Plans**

The following table provides information about our common stock that may be issued upon the exercise of options, warrants, and rights under our existing equity compensation plans at December 31, 2011. Our stockholders have approved the ESPP, the 2004 Employee Plan, the 1995 Employee Plan, and the Directors' Plan We suspended the operation of these plans following our entry into conservatorship and are no longer granting awards under such plans.

TREASURY-3133

Source  DRA HOM  OAN MORTGAG  CORP, 10 K, March 09, 2012                   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 95    Equity Compensation Plan Information**

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equ y compensa on p ans app oved by s ockho de s | 2,554,155(1 | $      47 63(2 | 34,931,333(3 |
| Equ y compensa on p ans no  app oved by s ockho de s | None | N/A | None |

(1) I c  des 532,523  es  c ed s ock    s a d s a es of  es  c ed s ock  ssued unde   he D  ec o s' P an and  he E   p oyee P ans

(2) Fo   e p pose of ca c a g s a o  ,  e es c ed s ock    s a d s a es of  es  c ed s ock a e ass g ed a va  e of ze o

(3) I c  des 27,466,099 s a es, 5,845,739 s a es, a d 1,619,495 s a es ava ab e fo   ss a ce  de   e 2004 E  p oyee P an,  he ESPP and  he D  ec o s' P an,
    espec ve y  No sha es a e ava  ab e fo   ssuance unde   he 1995 Employee Plan

359                                                                                                                        *Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

**Policy Governing Related Person Transactions**

The Board has adopted a written policy governing the approval of related person transactions. This policy sets forth procedures for the review and approval or ratification of transactions involving related persons, which consist of any person who is, or was at any time since the beginning of our last completed fiscal year, a director, a director nominee, an executive officer, or an immediate family member of any of the forego ng persons.

Under authority delegated by the Board, our General Counsel and the Nominating and Governance Committee (or its Chair under certain circumstances), each, an Authorized Approver, are responsible for applying the Related Person Transactions Policy Transactions covered by the Related Person Transactions Policy consist of any transaction, arrangement or relationship or series of similar transactions, arrangements or relationships, in which: (a) the aggregate amount involved exceeded or is expected to exceed $ 20,000; (b) we were or are expected to be a participant; and (c) any related person had or will have a direct or indirect material interest The Related Person Transactions Policy includes a list of categories of transactions identified by the Board as having no significant potential for an actual conflict of interest or the appearance of a conflict or improper benefit to a related person, and thus not subject to review

Our Legal Division assesses whether any proposed transaction involving a related person is covered by the Related Person Transactions Policy If so, the transaction is reviewed by the appropriate Authorized Approver In consultation with the Chair of the Nominating and Governance Committee, the General Counsel may refer any proposed transaction to the Nominating and Governance Committee for review and approval.

If possible, approval of a related person transaction is obtained prior to the effectiveness or consummation of the transaction. If advance approval of a related person transaction by the appropriate Authorized Approver is not feasible or otherwise not obtained, then the transaction is considered promptly by the appropriate Authorized Approver to determine whether ratification is warranted

In determining whether to approve or ratify a related person transaction covered by the Related Person Transactions Policy, the appropriate Authorized Approver reviews and considers all relevant information which may include: (a) the nature of the related person's interest in the transaction; (b) the approximate total dollar value of, and extent of the related person's interest in, the transaction; (c) whether the transaction was or would be undertaken in the ordinary course of our business; (d) whether the transaction is proposed to be, or was, entered into on terms no less favorable to us than terms that could have been reached with an unrelated third party; and (e) the purpose, and potential benefits to us, of the transaction

**Corporate Governance Guidelines**

In June 2011, the Board adopted our amended Corporate Governance Guidelines, or our Guidelines, which are available on our website at www freddiemac com/governance/pdf/gov_guidelines pdf

**Director Independence**

The non employee members of the Board evaluated the independence, as defined in both Sections 4 and 5 of our Guidelines and in Section 303A 02 of the NYSE Listed Company Manual, of the members of our Board who have served in 2012, each of whom also served on our Board in 2011. In connection with that evaluation, the non employee members of the Board determined that all current members of our Board (other than Charles E. Haldeman, Jr., our CEO) were independent during their service in 2011 and 2012. Mr. Haldeman is not considered an independent director because he is our CEO

The non employee members of the Board also concluded that all current members of the Audit Committee, the Compensation Committee, and the Nominating and Governance Committee are independent within the meaning of both Sections 4 and 5 of our Guidelines and Section 303A 02 of the NYSE Listed Company Manual The non employee members of the Board also determined that all current members of the Audit Committee are independent within the meaning of Ru e 0A-3 promulgated under the Exchange Act, and Section 303A 06 of the NYSE Listed Company Manual.

In determining the independence of each Board member, the non employee members of the Board reviewed the following categories or types of relationships, in addition to those specifically addressed by the standards contained in Section 5 of our Guidelines, to determine whether those relationships, either individually or when aggregated with other

TREASURY-3135

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

relationships, would constitute a material relationship between the Director and us that would impair a Director's judgment as a member of the Board or create the perception or appearance of such an impairment:

- *Board Memberships With For Profit Business Partners.* Mses. Bammann and Byrd and Messrs. Glauber, Lynch, Retsinas, Rose and Shanks serve as directors of other companies that engage or have engaged in business with us resulting in payments between us and such companies during the past three fiscal years After considering the nature and extent of the specific relationship between each of those companies and us, and the fact that these Board members are directors of these other companies rather than employees, the non employee members of the Board concluded that those business relationships did not constitute material relationships between any of the Directors and us that would impair their independence as our Directors

- *Board Memberships With Charitable Organizations To Which We Have Made Contributions.* Mr. Retsinas serves as a board member of a charitable organization that has received monetary contributions from us or the Freddie Mac Foundation The total annual amount contributed was below the applicable threshold in our Guidelines that would require a specific determination that Mr. Retsinas is independent in spite of the contributions The non employee members of the Board considered the contributions and the nature of the organization and concluded that the relationship with the charitable organization did not constitute a material relationship between Mr. Retsinas and us that would impair his independence as our Director

- *Board Members Who Are Executive Officers Or Employees Of Business Partners.* Mr. Williams was appointed as Executive Director of the Government Practice at The Corporate Executive Board Company in January 2010 and served in that role during 2011. In January 2012, Mr. Williams became a Senior Fellow of the Government Practice of CEB CEB provides best practices research and analysis and executive education to corporations through memberships in various subject matter interest groups organized and managed by CEB. Mr. Williams' responsibilities at CEB include contributing to and authoring literature; advising on the development of CEB's state and local government service strategy and its existing federal government service offerings; and promoting future CEB services. In 2009, 2010, 2011 and 2012 year to date, we paid CEB $362,100, $515,700, $447,500 and $492,400, respectively, for memberships in certain of CEB's subject matter interest groups Currently, we are a member of 14 CEB groups, and in 2009, 2010 and 2011 we were a member of 11, 12 and 13 groups, respectively. The annual amounts of our payments to CEB in 2009 and 2010 were substantially below 2% of CEB's annual revenues for the applicable years and the 2011 and 2012 payments are substantially less than 2% of CEB's 20 0 revenues (the latest year for which CEB revenue is publicly available). Therefore, under our Guidelines, those annual payments do not preclude the non employee members of the Board from concluding that Mr. Williams is independent. The non employee members of the Board considered those payments and the nature and extent of the relationship between us and CEB and concluded that this business relationship did not constitute a material relationship between Mr Williams and us that would impair Mr. Williams' independence as our Director

- *Financial Relationships with For Profit Business Partners.* Since 2005, Ms. Bammann has owned stock of JPMorgan Chase & Co., or JPMorgan In the aggregate, this stock represents a material portion of her net worth JPMorgan conducts significant business with Freddie Mac, including, among other things, as a single family and multifamily seller/servicer, as an underwriter of our debt and mortgage securities and as a capital markets counterparty. In order to eliminate any potential conflict of interest that might arise as a result of this stock ownership, Ms. Bammann has agreed to recuse herself from discussing and acting upon any matters that are to be considered by the full Board or any of the committees of which she is a member (including the Business and Risk Committee, which she chairs), and that relate directly to JPMorgan, and that therefore might affect the value of her JPMorgan stock The Audit Committee Chairman, in consultation with the Non Executive Chairman, will address any questions that may arise regarding whether recusal from a particular discussion or action is appropriate

In evaluating Ms Bammann's independence in light of her ownership of JPMorgan stock, the non employee members of the Board considered the nature and extent of Freddie Mac's business relationship with JPMorgan and any potential impact that her stock ownership might have on her independent judgment as a Freddie Mac director, taking into account the recusal arrangement The non employee members of the Board concluded that Ms. Bammann's recusal arrangement concerning JPMorgan would address any actual or potential conflicts of interest that might arise with respect to her ownership of JPMorgan stock Accordingly, the non employee members concluded that Ms. Bammann's ownership of JPMorgan stock does not constitute a material relationship between her and Freddie Mac that would impair her independence as a Freddie Mac Director

Mr Rose receives an annuity and retiree medical benefits from JPMorgan in connection with his retirement from that firm in 2001. The amount of Mr. Rose's annuity is fixed and does not depend in any way on JPMorgan's revenues or

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

profits  In evaluating the impact of Mr  Rose's annuity from JPMorgan on his independence, the non employee members of the Board considered the structure of the annuity, the amount of the annuity as a percentage of Mr  Rose's annual adjusted gross income, the retiree medical benefits and Freddie Mac's business relationship with JPMorgan  The non employee members of the Board also were  informed that Mr  Rose had agreed to recuse himself from discussing or acting upon any matter to be considered by our  Board that could threaten the viability of JPMorgan  The non employee members of the Board concluded that  Mr  Rose's JPMorgan annuity and retiree medical benefits do not constitute a material relationship between him and Freddie Mac that would impair his independence as a Freddie  Mac Director

## Board Diversity

The Board identifies Director nominees or candidates when the  Conservator has requested that the Board identify candidates for  the Conservator to consider for election by written consent  and  when there is a vacancy on the Board, at which time the Board  may exercise the authority delegated to it by the Conservator to  fill such vacancies, subject to review by the Conservator

Our charter provides that our Board must at all times have at  least one person from the homebuilding, mortgage lending, and  rea  estate industries, and at least one person from an  organization representing community or consumer interests or one  person who has demonstrated a career commitment to the provision  of housing for low income households  In addition, the  examination guidance for corporate governance issued by FHFA provides that in identifying individuals for nomination for  election to the Board, the Board should consider the knowledge of  such individuals, as a group, in the areas of business,  finance, accounting, risk management, public policy, mortgage  lending, real estate, low income housing, homebuilding, regulation of financial institutions, and any other areas that  may be relevant to our safe and sound operation

In addition, the Board has adopted a formal policy (articulated  in our Guidelines) with regard to the consideration of diversity  in identifying director nominees and candidates  As articulated  in the policy, the Board seeks to have a diversity of talent,  perspectives, experience and cultures among its members,  including minorities, women and individuals with disabilities,  and considers such diversity in the candidate solicitation and  nomination processes  The policy also states that the Board  seeks to have a diversity of talent on the Board and that  candidates are selected, in part, for their experience and  expertise  The policy also explains that when identifying  director nominees, the Nominating and Governance Committee considers, among other factors, our needs, the talents and  skills then available on the Board, and, with respect to  incumbent directors, their continued involvement in business and  professional activities relevant to us, the skills and  experience that should be represented on the Board, the availability  of other individuals with desirable skills to join  the Board, and the desire to maintain a diverse Board.

FHFA also has adopted a final rule regarding minority and women  inclusion that became effective on January 28, 2011. The final  rule implements section 1116 of HERA and requires us to, among  other things, promote diversity and the inclusion of  women, minorities, and individuals with disabilities in all  activities, including in the election of directors, as required  by these regulations

## Board Leadership Structure and Role in Risk Oversight

The positions of Chief Executive Officer and Non Executive  Chairman of the Board are held by different individuals. This  leadership structure was established by the Conservator when it  appointed separate individuals to hold those two positions in  September 2008  The examination guidance for corporate  governance issued by FHFA provides that once separated, the  functions of the Chief Executive Officer and the Non Executive  Chairman of the Board should remain separated until such time as  the Director of FHFA determines otherwise

The responsibility for risk oversight is shared by two  committees of the Board, the Business and Risk Committee and the  Audit Committee. The Business and Risk Committee is responsible  for assisting the Board in the oversight, on an enterprise wide  basis, of our risk management framework, including management of  credit risk (including counterparty risk), market risk (including interest rate and liquidity risk), model risk, operational  risk, strategic risk, and reputation risk. The risk  oversight responsibilities of the Audit Committee include reviewing: (a) management's guidelines and policies governing the processes  for assessing and managing our risks;  and (b) our major financial risk exposures (including but  not limited to market, credit, and operational risks) and the  steps management has taken to monitor and control such exposures.

The Business and Risk Committee and the Audit Committee  generally meet in joint session at least quarterly to carry out  their respective risk oversight responsibilities on behalf of  the Board  The membership of those two committees collectively  consists of all members of the Board except Messrs. Koskinen and Haldeman, who generally also have

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-3137

Table of Contents

attended the joint sessions  Copies of the Charters of the Audit  Committee and the Business and Risk Committee are available on  our website at http://www.freddiemac.com/governance/bd_committees.html

The Chief Enterprise Risk Officer reports regularly to the joint  meetings of the Business and Risk Committee and the Audit  Committee  The Chief Enterprise Risk Officer also reports to the  full Board as appropriate.

For a discussion of the Compensation Committee's conclusion  that our compensation policies and practices do not create risks  that are reasonably likely to have a material adverse effect on  us, see "Executive Compensation     Compensation and Risk."

## Transactions with 5% Shareholders

As a result of our issuance to Treasury of the warrant to  purchase shares of our common stock equal to 79.9% of the total  number of shares of our common stock outstanding, on a fully  diluted basis, we are deemed a related party to the U S  government  Except for the transactions with Treasury discussed in "BUSINESS     Executive Summary     Government Support for our Business," "BUSINESS  Regulation and Supervision     Legislative and Regulatory Developments     Legislated Increase to Guarantee Fees," "NOTE 2:  CONSERVATORSHIP AND RELATED MATTERS     Related Parties as a Result of Conservatorship" as well as in  "NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS," and "NOTE 12: FREDDIE MAC  STOCKHOLDERS' EQUITY (DEFICIT)," no transactions outside of normal business activities have occurred between us  and the U S  government since the beginning of 2011

FHFA, as conservator, approved the Purchase Agreement and our  administrative role in the MHA Program and the Memorandum of Understanding with Treasury, FHFA, and Fannie Mae (see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS     Housing Finance Agency Initiative")  The remaining transactions described  in the sections referenced  above did not require review and approval under any of our policies and procedures relating to transactions with related  persons.

In addition, we are deemed related parties with Fannie Mae as  both we and Fannie Mae have the same relationships with FHFA and Treasury. All transactions between us and Fannie Mae have occurred  in the normal course of business.

## Transactions with Institutions Related to Directors

In the ordinary course of business, we were a party during 2011,  and expect to continue to be a party during 2012, to certain  business transactions with institutions affiliated with members  of our Board  Management believes that the terms and conditions  of the transactions were no more and no less favorable to us  than the terms of similar transactions with unaffiliated  institutions to which we are, or expect to be, a party The only such transaction that is required to be disclosed under SEC  rules is described below

Mr  Williams joined our Board in December 2008  In January of 20  0, he was appointed Executive Director of the Government  Practice at CEB and since January 2012 he has served as a Senior  Fellow. CEB provides best practices research and analysis and  executive education to corporations through memberships in various subject matter interest groups organized and managed by CEB. Mr. Williams' responsibilities at CEB include contributing to and authoring literature; advising on the  development of CEB's state and local government service  strategy and its existing federal government service offerings;  and promoting future CEB services. We purchased memberships in  certain membership groups, and paid CEB approximately $447,500 and $492,400 for those  memberships, in 2011 and 20  2 year to date, respectively

This transaction was not required to be reviewed, approved or  ratified under our Related Person Transactions Policy because  the Board concluded that our business relationship with CEB did  not constitute a material relationship between Mr  Williams and us that would impair Mr. Williams' independence as our director

## Transactions with Institutions Related to Executive Officers

Mr. Renzi joined us in April 2010 and currently serves as our  Executive Vice President     Single Family Business, Operations  and Technology  Prior to joining Freddie Mac, he served as the  Chief Operating Officer of GMAC Residential  Capital and as  President of GMAC Mortgage Corporation  That employment ended in  March 20  0

GMAC Residential Capital, LLC, GMAC Mortgage Corporation, GMAC  Mortgage, LLC, and Residential Funding Company, LLC are all affiliated entities, and are now reorganized as subsidiaries of  Ally Financial Inc., or Ally.

GMAC Mortgage, LLC, is a seller/servicer that sold mortgages to  Freddie Mac with an aggregate unpaid principal balance of  approximately $15.8 billion in 2011, and mortgages with an  aggregate unpaid principal balance of approximately  $1.2 billion through January 31, 2012.

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3138

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses may not be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

GMAC Mortgage, LLC and Residential Funding Company, LLC (indirect subsidiaries of Ally) are seller/servicers that together se viced and subserviced for an affiliated entity approximately 3 6% of the single family loans in our single family credit guarantee portfolio as of December 3 , 2011 In 2012, these entities continue to service and subservice our single family loans in our single family credit guarantee portfolio

At the time Mr Renzi joined us, he was entitled to payments from Ally consisting of unpaid deferred stock units granted during his employment At that time, the remaining payments had an aggregate grant date value of approximately $860,000 The aggregate amount actually paid may be either higher or lower based on Ally's value Payments are scheduled to be made in cash semi monthly and will continue through March 2015.

In order to eliminate any potential conflict of interest, Mr Renzi, in his capacity as an employee of Freddie Mac, has been, and will continue to be, recused from any transactions with or decisions relating to Ally or its affiliates through such time that he has received his last payment from Ally and its affiliates Specifically, Mr Renzi has been recused from serving as the final decision maker, and from influencing final decisions, relating to: (a) any and all aspects of Freddie Mac's relationship with Ally or its affiliates pertaining to both performing and non performing loan servicing; (b) any other business transactions with Ally or its affiliates or their status as a counterparty with us; or (c) reviews of Ally or its affiliates by our MHA Compliance function under the Financial Agency Agreement with Treasury

Mr Renzi's relationship with Ally and its affiliates was not required to be reviewed, approved or ratified under our Related Person Transactions Policy because Mr. Renzi, in his capacity as an employee, is recused from any involvement in transactions with or decisions relating to Ally and its affiliates for the period that he is receiving payments on unpaid stock units. For this reason, Mr. Renzi does not have a material interest in our relationship with Ally or its affiliates

## Conservatorship Agreements

Treasury, FHFA, and the Board of Governors of the Federal Reserve System have taken a number of actions to support us during conservatorship, including entering into the Purchase Agreement, described in this Form 10 K See "BUSINESS Conservatorship and Re ated Matters Treasury Agreements," "BUSINESS Executive Summary Government Support for our Business" and "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS Related Parties as a Result of Conservatorship."

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012            Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

## ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES

**Description of Fees**

The following is a description of fees billed to us by PricewaterhouseCoopers LLP, our independent public accountants, during 2011 and 20 0

**Table 96     Auditor Fees**[1]

| | 2011 | 2010 |
|---|---|---|
| A d t Fees[2] | $ 25,617,867 | $29,484,646 |
| A d -Re a ed Fees[3] | 8,725 | 18,000 |
| Tax Fees( | 3,040,750 | 3,050,000 |
| All O h e  Fees( | 11,399 | 148,805 |
| o a | $28,678,741 | $ 32,701,451 |

(1) These fees ep esen a  oun b  ed w h n he des gna ed yea  a d  c de e     sa  e expe ses of $283,246 a d $436,051 fo  2011 and 2010, espec vely

(2) A d  fees  c de fees a d expe ses b  ed by P  cewa e houseCoope s n connec on w h he SAS 100 qua e y  ev ews of ou  n e m f nanc al nfo ma on and he    a d  of ou  annua  conso da ed f nanc a s a e en s The aud  fees b  ed du ng 2011 ncude fees and expenses e a ed o he 2010 ($7,902,260) a d 2011 ($17,727,006) a d ts I  add t o  to  e amoun s shown above, app ox ma ely $12 3 m ll on of fees and  e mbu sable expenses w ll be b lled n 2012 fo  he 2011    a d  T ea d  fees b dd  g 2010  c de fees a d expe ses e ated to t e 2009 ($8,839,260) a d 2010 ($20,645,386) a d ts A d t fees of $83,020 a d $95,542  2011 a d 2010, espec ve y, e a ed o  e F edd e Mac Fo nda on a e exc ded beca se  ese fees a e  c  ed a d pa d sepa a e y by  e F edd e Mac Fo  da o

(3) The 2011 and 2010 aud  - ela ed fees  esul ed f om  enewals of o  Co  pe o s  sc p o  ($8,725 a d $18,000, espec ve y)

(4) The  ax fees b lled  n 2011  ela ed o non-aud   ax compl ance se v ces  nclud ng  he p epa a on of he company's 2010  ax  eu n The  ax fees b ed n 2010 cove ed  se v ces ela ed o he p epa a on of  he co  pany's 2009  ax  etu ns, p epa a on of qua e y  ma ed ax ca cu a ons and o he  se v ces ela ed o  mp ov ng    F edd e Mac's a    ax compl ance p ocess ($3,000,000), as well as p ocess documen a on se v ces and  ax accoun ng me hod change se v ces ($50,000)

(5) A  o he  fees fo  2011 and 2010  esu  ed f om fees and expenses b lled by P  cewa e houseCoope s fo  he pe fo mance of non-aud   adv so y se v ces e a ed o a    p el m na y assessmen of ce  a n aspec s of the company's  echnology  mplemen a on ($11,399) and managemen 's eo gan za on of o   F a ce D v s o  ($148,805),    espec vely

**Approval of Independent Auditor Services and Fees**

As provided in its charter, the Audit Committee appoints, subject to FHFA approval, our independent public accounting firm and reviews the scope of the annual audit and pre approves, subject (as required) to FHFA approval, all audit and non audit services permitted under applicable law to be performed by the independent public accounting firm

The Sarbanes Oxley Act and related rules adopted by the SEC require that all services provided to companies subject to the reporting requirements of the Exchange Act by their independent auditors be pre approved by their audit committee or by authorized members of the committee, with certain exceptions The Audit Committee's charter requires that the Audit Committee pre approve any audit services, and any non audit services permitted under applicable law, to be performed by our independent auditors (or to designate one or more members of the Audit Committee to pre approve such services and report such pre approval to the Audit Committee)

Audit services that are within the scope of an auditor's engagement approved by the Audit Committee prior to the performance of those services are deemed pre approved and do not require separate pre approval Audit services not within the scope of an Audit Committee approved engagement, as well as permissible non audit services, must be separately pre approved by the Audit Committee

When the Audit Committee pre approves a service, the Audit Committee typically sets a dollar limit for such service Management endeavors to obtain pre approval of the Audit Committee, or of the Chairman of the Audit Committee (when the Chairman of the Audit Committee has been delegated such authority), before it incurs fees exceeding the dollar limit If the Chairman of the Audit Committee approves the increase, the Chairman will report such approval at the Audit Committee's next scheduled meeting

The pre approval procedure is administered by our senior financial management, which reports throughout the year to the Audit Committee The Audit Committee pre approved all audit, audit related, tax, and other services performed in 2010 and 2011.

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3140

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**PART IV**

**ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

(a)   Documents filed as part of this report:

(1)   Consolidated Financial Statements

The consolidated financial statements required to be filed in  this annual report on Form   0 K are included in Part II, Item 8

(2)   Financial Statement Schedules

None

(3)   Exhibits

An Exhibit Index has been filed as part of this annual report on  Form   0 K beginning on page E    and is incorporated herein by reference

366                                                                                        *Freddie Mac*

Source    D  RA   HOM    OAN MORTGAG   CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized

Federal Home Loan Mortgage Corporation

By: /s/  Charles E. Haldeman, Jr.
   Charles E. Haldeman, Jr.
   Chief Executive Officer

Date: March 9, 2012

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated

| Signature | Capacity | Date |
|---|---|---|
| /s/  Chr stopher S  Lynch*<br>Ch stophe S  Lynch | No  -Exec t ve C a    a  of t e Boa d | Ma ch 9, 20 2 |
| /s/  Cha  es E  Ha deman, J<br>Cha  es E  Ha deman, J | C  ef Exec  ve Off ce  a d D  ec o<br>(P  nc pa  Execu  ve Off ce ) | Ma ch 9, 20 2 |
| /s/  Ross J  Ka<br>Ross J  Ka | Execu  ve V ce P es den    Ch ef F nanc a  Off ce<br>(P  nc pal F nanc al Off ce ) | Ma ch 9, 20 2 |
| /s/  Robert D  Ma  o x<br>Robe t D  Ma  o x | Se  o  V ce P es de t   Co po ate Co t o e a d<br>P  nc pa  Accoun ng Off ce  (P  nc pa  Accoun ng Off ce ) | Ma ch 9, 20 2 |
| /s/  L nda B  Bammann*<br>L  da B Ba    a | D  ec o | Ma ch 9, 20 2 |
| /s/  Ca o yn H  Byrd*<br>Ca o y  H  Byrd | D  ec o | Ma ch 9, 20 2 |
| /s/  N co as P  Rets nas*<br>N colas P  Re s  as | D  ec o | Ma ch 9, 20 2 |
| /s/  C ayton S  Rose*<br>C ay o  S  Rose | D  ec o | Ma ch 9, 20 2 |
| /s/  Eugene B  Shanks, Jr *<br>Eugene B  Shanks, Jr | D  ec o | Ma ch 9, 20 2 |
| /s/  Anthony A  W   ams*<br>Anthony A  W   a  s | D  ec o | Ma ch 9, 20 2 |

*By: /s/  Ross J. Kari
   Ross J. Kari
   Attorney in Fact

<div align="center">367</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

## GLOSSARY

This Glossary includes acronyms and defined terms that are used  throughout this Form 10 K

**1995 Employee Plan**    1995 Stock Compensation  Plan, as amended

**2004 Employee Plan**    2004 Stock Compensation  Plan, as amended and restated June 6, 2008

**Administration**    Executive branch of the U.S. Government.

**Agency securities**    Generally refers to mortgage  related securities issued by the GSEs or government  agencies

**Alt  A loan**    Although there is no universally  accepted definition of Alt A, many mortgage market participants classify single family loans with credit characteristics that range between their prime and  subprime categories as Alt A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative  income or asset documentation requirements compared to a full documentation mortgage loan, or both  In determining our  Alt A exposure on loans underlying our single family credit guarantee  portfolio, we classified mortgage loans as Alt A if the lender that delivers them to us classified the loans as  Alt A, or if the loans had reduced documentation requirements, as well as a combination of certain credit characteristics and expected  performance characteristics at acquisition which, when compared to full documentation loans in our portfolio, indicate that the  loan should be classified as Alt A  In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance  initiative and the original loan had been previously identified as Alt A, such refinance loan may no longer be categorized or reported as  an Alt A mortgage in this Form  0 K and our other financial reports because the new refinance loan  replacing the original loan would not be identified by the  servicer as an Alt A loan  As a result, our reported Alt A balances may be lower than would otherwise be the case had such  refinancing not occurred  For non agency mortgage related securities that are backed by Alt A loans, we categorize our investments in non agency mortgage related  securities as Alt A if the securities were identified as such based on information provided  to us when we entered into these transactions

**AMT**    Alternative Minimum Tax

**AOCI**    Accumulated other comprehensive income (loss), net of taxes

**ARM**    Adjustable rate mortgage    A mortgage loan with an interest rate that adjusts periodically  over the life of the mortgage loan based on changes in a benchmark index.

**Board**    Board of Directors

**Bond insurers**    Companies that provide credit  insurance principally covering securitized assets in both the  primary issuance and secondary markets.

**BPS**    Basis points    One one hundredth of 1%.  This term is commonly used to  quote the yields of debt instruments or movements in interest rates

**Cash and other investments portfolio**    Our cash and other investments portfolio is comprised of our cash and  cash equivalents, federal funds sold and securities purchased  under agreements to resell, and investments in  non mo tgage related securities

**CD&A**    Compensation Discussion and Analysis

**CEB**    The Corporate Executive Board Company

**CEO**    Chief Executive Officer

**CFO**    Chief Financial Officer

**Charter**    The Federal Home Loan Mortgage Corporation Act, as amended, 12 U.S.C. § 1451 et seq.

**CMBS**    Commercial mortgage  backed security    A security backed by mortgages on commercial property (often including multifamily rental properties) rather than one to four family residential real  estate  Although the mortgage pools underlying CMBS can include  mortgages financing multifamily properties and commercial  properties, such as office buildings and hotels, the classes of  CMBS that we hold receive distributions of scheduled cash flows only from multifamily properties  Military housing revenue bonds  are included as CMBS within investments related disclosures  We have not identified CMBS as either subprime or  Alt A securities

368                                                                                                      *Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                                 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Conforming loan/Conforming jumbo loan/Conforming loan limit**    A conventional single family mortgage loan with an original principal balance that is equal to or less than the applicable conforming loan limit, which is a dollar amount cap on the size of the original principal balance of single family mortgage loans we are permitted by law to purchase or securitize The conforming loan limit is determined annually based on changes in FHFA's housing price index Any decreases in the housing price index are accumulated and used to offset any future increases in the housing price index so that conforming loan limits do not decrease from year to year Since 2006, the base conforming loan limit for a one family residence has been set at $417,000, and higher limits have been established in certain "high cost" areas (currently, up to $625,500 for a one family residence). Higher limits also apply to two to four family residences, and for mortgages secured by properties in Alaska, Guam, Hawaii and the U.S. Virgin Islands.

Actual loan limits are set by FHFA for each county (or equivalent), and the loan limit for specific high cost areas may be lower than the maximum amounts We refer to loans that we have purchased with UPB exceeding the base conforming loan limit (*i.e.*, $417,000) as conforming jumbo loans

Beginning in 2008, pursuant to a series of laws, our loan limits in certain high cost areas were increased temporarily above the limits that otherwise would have been applicable (up to $729,750 for a one family residence) The latest of these increases expired on September 30, 20

**Conservator**    The Federal Housing Finance Agency, acting in its capacity as conservator of Freddie Mac

**Convexity**    A measure of how much a financial instrument's duration changes as interest rates change

**Core spread income**    Refers to a fair value estimate of the net current period accrual of income from the spread between mortgage related investments and debt, calculated on an option adjusted basis.

**Covered Officer**    Those executives in the following positions, each of whom are compensated pursuant to the Executive Management Compensation Program: (a) Chief Executive Officer; (b) Chief Operating Officer; (c) Chief Financial Officer; (d) all Executive Vice Presidents; and (e) all Senior Vice Presidents Each of the Named Executive Officers is a Covered Officer

**Credit enhancement**    Any number of different financial arrangements that are designed to reduce credit risk by partially or fully compensating an investor in the event of certain financial losses Examples of credit enhancements include mortgage insurance, overcollateralization, indemnification agreements, and government guarantees

**Credit losses**    Consists of charge offs and REO operations income (expense)

**Credit related expenses**    Consists of our provision for credit losses and REO operations income (expense)

**Deed in lieu of foreclosure**    An alternative to foreclosure in which the borrower voluntarily conveys title to the property to the lender and the lender accepts such title (sometimes together with an additional payment by the borrower) in full satisfaction of the mortgage indebtedness

**Delinquency**    A failure to make timely payments of principal or interest on a mortgage loan For single family mortgage loans, we generally report delinquency rate information for loans that are seriously delinquent. For multifamily loans, we report delinquency rate information based on the UPB of loans that are two monthly payments or more past due or in the process of foreclosure

**Derivative**    A financial instrument whose value depends upon the characteristics and value of an underlying financial asset or index, such as a security or commodity price, interest or currency rates, or other financial indices

**Directors' Plan**    1995 Directors' Stock Compensation Plan, as amended and restated

**Dodd Frank Act**    Dodd Frank Wall Street Reform and Consumer Protection Act

**DSCR**    Debt Service Coverage Ratio    An indicator of future credit performance for multifamily loans The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non mortgage expenses from income The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation

**Duration**    Duration is a measure of a financial instrument's price sensitivity to changes in interest rates

**Duration gap**    One of our primary interest rate risk measures Duration gap is a measure of the difference between the estimated durations of our interest rate sensitive assets and liabilities We present the duration gap of our financial instruments in units expressed as months. A duration gap of zero implies that the change in value of our interest rate rate

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3144

Powered by Morningstar ® Document Research℠
The information contained herein may be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

sensitive assets from an instantaneous change in interest rates  would be expected to be accompanied by an equal and offsetting  change in the value of our debt and derivatives, thus leaving  the net fair value of equity unchanged

**EDCP**    Executive Deferred Compensation Plan

**Effective rent**    The average rent actually paid by the tenant over the term of a lease

**ESPP**    Employee Stock Purchase Plan

**Euribor**    Euro Interbank Offered Rate

**EVP**    Executive Vice President

**Exchange Act**    Securities and Exchange Act of 1934, as amended

**Executive Compensation Program**    Executive Management Compensation Program, as amended and restated

**Fannie Mae**    Federal National Mortgage Association

**FASB**    Financial Accounting Standards Board

**FDIC**    Federal Deposit Insurance Corporation

**Federal Reserve**    Board of Governors of the Federal Reserve System

**FHA**    Federal Housing Administration

**FHFA**    Federal Housing Finance Agency    FHFA is an independent agency of the U S  government established by the Reform Act with responsibility for regulating Freddie Mac, Fannie Mae, and the  FHLBs.

**FHLB**    Federal Home Loan Bank

**FICO score**    A credit scoring system developed by Fair, Isaac and Co. FICO scores are the most commonly used  credit scores today  FICO scores are ranked on a scale of  approximately 300 to 850 points with a higher value indicating a  lower likelihood of credit default

**Fixed rate mortgage**    Refers to a mortgage originated at a specific rate of interest that remains constant  over the life of the loan

**Foreclosure alternative**    A workout option pursued when a home retention action is not successful or not  possible  A foreclosure alternative is either a short sale or deed in lieu of foreclosure

**Foreclosure transfer**    Refers to our completion of a transaction provided for by the foreclosure laws of the  applicable state, in which a delinquent borrower's ownership interest in a mortgaged property is terminated and  title to the property is transferred to us or to a third party  State foreclosure laws commonly refer to such transactions as  foreclosure sales, sheriff's sales, or trustee's sales, among other terms  When we, as mortgage holder, acquire a property in this manner, we pay for it by extinguishing some or  all of the mortgage debt

**Freddie Mac mortgage related securities**    Securities we issue and guarantee, including PCs, REMICs and  Other Structured Securities, and Other Guarantee Transactions.

**GAAP**    Generally accepted accounting principles

**Ginnie Mae**    Government National Mortgage Association

**GSE Act**    The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the  Reform Act

**GSEs**    Government sponsored enterprises    Refers to certain legal entities created by the U.S. government, including Freddie Mac, Fannie Mae, and the FHLBs.

**Guarantee fee**    The fee that we receive for guaranteeing the payment of principal and interest to mortgage  security investors.

**Guidelines**    Corporate Governance Guidelines,  as revised

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012                    TREASURY-3145                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**HAFA**    Home Affordable Foreclosures Alternative program    In 2009, the Treasury Department introduced the HAFA program to provide an option for HAMP eligible homeowners who are unable to keep their homes  The HAFA program took effect on April 5, 2010 and we implemented it effective August 1, 2010

**HAMP**    Home Affordable Modification Program    Refers to the effort under the MHA Program whereby the U S  government, Freddie Mac and Fannie Mae commit funds to help eligible homeowners avoid foreclosure and  keep their homes through mortgage modifications

**HARP**    Home Affordable Refinance Program    Refers to the effort under the MHA Program that seeks to help eligible borrowers (whose monthly payments are current) with existing loans that are guaranteed by us or Fannie Mae to refinance into loans with more affordable monthly payments and/or fixed rate terms  Through December 20  , under HARP, eligible borrowers who had mortgages with current LTV ratios above 80% and up to  25% were allowed to refinance their mortgages without  obtaining new mortgage insurance in excess of what is already in  place Beginning December 20  , HARP was expanded to allow  eligible borrowers who have mortgages with current LTV ratios above 125% to refinance under the program  The relief refinance  initiative, under which we also allow borrowers with LTV ratios of 80% and below to participate, is our implementation of HARP for our loans.

**HFA**    State or local Housing Finance Agency

**HUD**    U.S. Department of Housing and Urban  Development    Prior to the enactment of the Reform  Act, HUD had general regulatory authority over Freddie Mac, including authority over our affordable housing goals and new  programs  Under the Reform Act, FHFA now has general regulatory authority over us, though HUD still has authority over Freddie Mac with respect to fair lending

**Implied volatility**    A measurement of how the value of a financial instrument changes due to changes in the  market's expectation of potential changes in future interest rates  A decrease in implied volatility generally increases the estimated fair value of our mortgage assets and  decreases the estimated fair value of our callable debt and  options based derivatives, while an increase in implied  volatility generally has the opposite effect

**Interest only loan**    A mortgage loan that allows the borrower to pay only interest (either fixed rate or  adjustable rate) for a fixed period of time before principal amortization payments are required to begin  After the end of the interest only period, the borrower can choose to refinance  the loan, pay the principal balance in total, or begin paying  the monthly scheduled principal due on the loan

**IRS**    Internal Revenue Service

**LIBOR**    London Interbank Offered Rate

**LIHTC partnerships**    Low income housing tax credit partnerships    Prior to 2008, we invested as a  limited partner in LIHTC partnerships, which are formed for the  purpose of providing funding for affordable multifamily rental  properties. These LIHTC partnerships invest directly in limited partnerships that own and operate multifamily rental properties  that generate federal income tax credits and deductible operating losses

**Liquidation preference**    Generally refers to an amount that holders of preferred securities are entitled to  receive out of available assets, upon liquidation of a company. The initial liquidation preference of our senior preferred stock  was $  0 billion  The aggregate liquidation preference of our senior preferred stock includes the initial liquidation  preference plus amounts funded by Treasury under the Purchase  Agreement  In addition, dividends and periodic commitment fees  not paid in cash are added to the liquidation preference of the  senior preferred stock  We may make payments to reduce the  liquidation preference of the senior preferred stock only in  limited circumstances.

**LTV ratio**    Loan to value ratio    The ratio of the unpaid principal amount of a mortgage loan to the  value of the property that serves as collateral for the loan, expressed as a percentage  Loans with high LTV ratios generally tend to have a higher risk of default and, if a default occurs, a greater risk that the amount of the gross loss will be high  compared to loans with lower LTV ratios  We report LTV ratios based solely on the amount of the loan purchased or guaranteed by us, generally excluding any second lien mortgages (unless we  own or guarantee the second lien)

**MD&A**    Management's Discussion and Analysis of Financial Condition and Results of Operations

**MHA Program**    Making Home Affordable Program    Formerly known as the Housing Affordability  and Stability Plan, the MHA Program was announced by the Obama  Administration in February 2009  The MHA Program is designed to  help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. The MHA Program includes HARP and HAMP

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Mortgage assets**     Refers to both mortgage loans and the mortgage related securities we hold in our mortgage related investments portfolio

**Mortgage related investments portfolio**     Our investment portfolio, which consists principally of mortgage related securities and single family and multifamily mortgage loans  The size of our mortgage related investments portfolio under the Purchase Agreement is determined without giving effect to the January 1, 2010 change in accounting guidance related to transfers of financial assets and consolidation of VIEs  Accordingly, for purposes of the portfolio limit, when PCs and certain Other Guarantee Transactions are purchased into the mortgage related investments portfolio, this is considered the acquisition of assets rather than the reduction of debt

**Mortgage to debt OAS**     The net OAS between the mortgage and agency debt sectors  This is an important factor in determining the expected level of net interest yield on a new mortgage asset  Higher mortgage to debt OAS means that a newly purchased mortgage asset is expected to provide a greater return relative to the cost of the debt issued to fund the purchase of the asset and, therefore, a higher net interest yield  Mo tgage to debt OAS tends to be higher when there is weak demand for mortgage assets and lower when there is strong demand for mortgage assets

**MRA**     Matter requiring attention

**Multifamily mortgage**     A mortgage loan secured by a property with five or more residential rental units

**Multifamily mortgage portfolio**     Consists of multifamily mortgage loans held by us on our consolidated balance sheets as well as those underlying non consolidated Freddie Mac mortgage related securities, and other guarantee commitments, but excluding those underlying our guarantees of HFA bonds under the HFA Initiative

**Net worth (deficit)**     The amount by which our total assets exceed (or are less than) our total liabilities as reflected on our consolidated balance sheets prepared in conformity with GAAP

**NIBP**     New Issue Bond Program is a component of the Housing Finance Agency Initiative in which we and Fannie Mae issued partially guaranteed pass through securities to Treasury that are backed by bonds issued by various state and local HFAs. The program provides financing for HFAs to issue new housing bonds. Treasury is obligated to absorb any losses under the program up to a certain level before we are exposed to any losses.

**NPV**     Net present value

**NYSE**     New York Stock Exchange

**OAS**     Option adjusted spread     An estimate of the incremental yield spread between a particular financial instrument (*e.g.*, a security, loan or derivative contract) and a benchmark yield curve (*e.g.*, LIBOR or agency or U.S. Treasury securities). This includes consideration of potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as prepayment options.

**OCC**     Office of the Comptroller of the Currency

**OFHEO**     Office of Federal Housing Enterprise Oversight

**Option ARM loan**     Mortgage loans that permit a variety of repayment options, including minimum, interest only, fully amortizing 30-year and fully amortizing 15 year payments  The minimum payment alternative for option ARM loans allows the borrower to make monthly payments that may be less than the interest accrued for the period  The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance  For our non agency mortgage related securities that are backed by option ARM loans, we categorize securities as option ARM if the securities were identified as such based on information provided to us when we entered into these transactions  We have not identified option ARM securities as either subprime or Alt A securities

**OTC**     Over the counter

**Other guarantee commitments**     Mortgage related assets held by third parties for which we provide our guarantee without our securitization of the related assets

**Other Guarantee Transactions**     Transactions in which third parties transfer non Freddie Mac mortgage related securities to trusts specifically created for the purpose of issuing mortgage related securities, or certificates, in the Other Guarantee Transactions.

**PCs**     Participation Certificates     Securities that we issue as part of a securitization transaction  Typically we purchase mortgage loans from parties who sell mortgage loans, place a pool of loans into a PC trust and issue PCs from that trust.

372

*Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The PCs are generally transferred to the seller of the mortgage loans in consideration of the loans or are sold to third party investors if we purchased the mortgage loans for cash

**Pension Plan**    Employees' Pension Plan

**Pension SERP Benefit**    The component of the SERP that relates to the Pension Plan

**PMVS**    Portfolio Market Value Sensitivity    One of our primary interest rate risk measures  PMVS measures are estimates of the amount of average potential pre tax loss in the market value of our net assets due to parallel (PMVS L) and non parallel (PMVS YC) changes in LIBOR

**Primary mortgage market**    The market where lenders originate mortgage loans and lend funds to borrowers  We do not lend money directly to homeowners, and do not participate in this market.

**Purchase Agreement / Senior Preferred Stock Purchase Agreement**    An agreement the Conservator, acting on our behalf, entered into with Treasury on September 7, 2008, which was subsequently amended and restated on September 26, 2008 and further amended on May 6, 2009 and December 24, 2009.

**QSPE**    Qualifying Special Purpose Entity    A term used within the former accounting guidance on transfers and servicing of financial assets to describe a particular trust or other legal vehicle that was demonstrably distinct from the transferor, had significantly limited permitted activities and could only hold certain types of assets, such as passive financial assets. Prior to January 1, 2010, the securitization trusts that were used for the administration of cash remittances received on the underlying assets of our PCs and REMICs and Other Structured Securities were QSPEs and, as such, they were not consolidated.

**Recorded Investment**    The dollar amount of a loan recorded on our consolidated balance sheets, excluding any valuation allowance, such as the allowance for loan losses, but which does reflect direct write downs of the investment  For mortgage loans, direct write downs consist of valuation allowances associated with recording our initial investment in loans acquired with evidence of credit deterioration at the time of purchase  Recorded investment excludes accrued interest income

**Reform Act**    The Federal Housing Finance Regulatory Reform Act of 2008, which, among other things, amended the GSE Act by establishing a single regulator, FHFA, for Freddie Mac, Fannie Mae, and the FHLBs.

**REIT**    Real estate investment trust    To maintain REIT status under the Internal Revenue Code, a REIT must distribute 90% of its taxable earnings to shareholders annually  During the second quarter of 2010, our majority owned REIT subsidiaries were eliminated via a merger transaction.

**Relief refinance mortgage**    A single family mortgage loan delivered to us for purchase or guarantee that meets the criteria of the Freddie Mac Relief Refinance Mortgage$_{SM}$ initiative  Part of this initiative is our implementation of HARP for our loans, and relief refinance options are also available for certain non HARP loans  Although HARP is targeted at borrowers with current LTV ratios above 80%, our initiative also allows borrowers with LTV ratios of 80% and below to participate

**REMIC**    Real Estate Mortgage Investment Conduit    A type of multiclass mortgage related security that divides the cash flows (principal and interest) of the underlying mortgage related assets into two or more classes that meet the investment criteria and portfolio needs of different investors.

**REMICs and Other Structured Securities** (or in the case of Multifamily securities, **Other Structured Securities**)    Single and multiclass securities issued by Freddie Mac that represent beneficial interests in pools of PCs and certain other types of mortgage related assets  REMICs and Other Structured Securities that are single class securities pass through the cash flows (principal and interest) on the underlying mortgage related assets  REMICs and Other Structured Securities that are multiclass securities divide the cash flows of the underlying mortgage related assets into two or more classes designed to meet the investment criteria and portfolio needs of different investors  Our principal multiclass securities qualify for tax treatment as REMICs

**REO**    Real estate owned    Real estate which we have acquired through foreclosure or through a deed in lieu of foreclosure

**RSU**    Restricted stock unit

**S&P**    Standard & Poor's

<div align="center">373</div>

<div align="right">*Freddie Mac*</div>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**SEC**    Securities and Exchange Commission

**Secondary mortgage market**    A market consisting of institutions engaged in buying and selling mortgages in the form of whole loans (*i.e.*, mortgages that have not been securitized) and mortgage related securities  We participate in the secondary mortgage market by purchasing mortgage loans and mortgage related securities for investment and by issuing guaranteed mortgage related securities, principally PCs

**Senior preferred stock**    The shares of Variable Liquidation Preference Senior Preferred Stock issued to Treasury under the Purchase Agreement

**Seriously delinquent**    Single family mortgage loans that are three monthly payments or more past due or in the process of foreclosure as reported to us by our servicers

**SERP**    Supplemental Executive Retirement Plan

**Short sale**    Typically an alternative to foreclosure consisting of a sale of a mortgaged property in which the homeowner sells the home at market value and the lender accepts proceeds (sometimes together with an additional payment or promissory note from the borrower) that are less than the outstanding mortgage indebtedness in full satisfaction of the loan

**Single family credit guarantee portfolio**    Consists of unsecuritized single family loans, single family loans held by consolidated trusts, and single family loans underlying non consolidated Other Guarantee Transactions and covered by other guarantee commitments  Excludes our REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates and our guarantees under the HFA Initiative

**Single family mortgage**    A mortgage loan secured by a property containing four or fewer residential dwelling units

**Spread**    The difference between the yields of two debt securities, or the difference between the yield of a debt security and a benchmark yield, such as LIBOR.

**Strips**    Mortgage pass through securities created by separating the principal and interest payments on a pool of mortgage loans  A principal only strip entitles the security holder to principal cash flows, but no interest cash flows, from the underlying mortgages  An interest only strip entitles the security holder to interest cash flows, but no principal cash flows, from the underlying mortgages.

**Subprime**    Participants in the mortgage market may characterize single family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime  Subprime generally refers to the credit risk classification of a loan. There is no universally accepted definition of subprime  The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include, among other factors, a combination of high LTV ratios, low credit scores or originations using lower underwriting standards, such as limited or no documentation of a borrower's income  While we have not historically characterized the loans in our single family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk  Notwithstanding our historical characterizations of the single family credit guarantee portfolio, certain security collateral underlying our Other Guarantee Transactions have been identified as subprime based on information provided to Freddie Mac when the transactions were entered into  We also categorize our investments in non agency mo tgage-re ated securities as subprime if they were identified as such based on information provided to us when we entered into these transactions

**SVP**    Senior Vice President

**Swaption**    An option contract to enter into an interest rate swap  In exchange for an option premium, a buyer obtains the right but not the obligation to enter into a specified swap agreement with the issuer on a specified future date

**TBA**    To be announced

**TCLFP**    Temporary Credit and Liquidity Facility Program is a component of the Housing Finance Agency Initiative in which we and Fannie Mae issued credit guarantees to holders of variable rate demand obligations issued by various state and local HFAs  Treasury is obligated to absorb any losses under the program up to a certain level before we are exposed to any losses  The program is scheduled to expire on December 3 , 2012; however, Treasury has given participants the option to extend the program facility to December 3 , 20 5

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3149

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**TDC**      Total direct compensation

**TDR**      Troubled debt restructuring      A type of loan modification in which the changes to the contractual terms result in concessions to borrowers that are experiencing financial difficulties

**Thrift/401(k) SERP Benefit**      The component of the SERP that relates to the Thrift/401(k) Savings Plan.

**TO**      Target Incentive Opportunity, or Target Opportunity

**Total comprehensive income (loss)**      Consists of net income (loss) plus total other comprehensive income (loss)

**Total other comprehensive income (loss)**      Consists of the after tax changes in: (a) the unrealized gains and losses on available for sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans

**Total mortgage portfolio**      Includes mortgage loans and mortgage related securities held on our consolidated balance sheets as well as the balances of our non consolidated issued and guaranteed single class and multiclass securities, and other mortgage related financial guarantees issued to third parties

**Treasury**      U.S. Department of the Treasury

**UPB**      Unpaid principal balance

**USDA**      U S Department of Agriculture

**VA**      U.S. Department of Veteran Affairs

**VIE**      Variable Interest Entity      A VIE is an entity: (a) that has a total equity investment at risk that is not sufficient to finance its activities without additional subordinated financial support provided by another party; or (b) where the group of equity holders does not have: (i) the ability to make significant decisions about the entity's activities; (ii) the obligation to absorb the entity's expected losses; or (iii) the right to receive the entity's expected residual returns

**Warrant**      Refers to the warrant we issued to Treasury on September 8, 2008 pursuant to the Purchase Agreement  The warrant provides Treasury the ability to purchase shares of our common stock equal to 79.9% of the total number of shares of Freddie Mac common stock outstanding on a fully diluted basis on the date of exercise

**Workout, or loan workout**      A workout is either: (a) a home retention action, which is either a loan modification, repayment plan, or forbearance agreement; or (b) a foreclosure alternative, which is either a short sale or a deed in lieu of foreclosure

**XBRL**      eXtensible Business Reporting Language

**Yield curve**      A graphical display of the relationship between yields and maturity dates for bonds of the same credit quality  The slope of the yield curve is an important factor in determining the level of net interest yield on a new mortgage asset, both initially and over time  For example, if a mortgage asset is purchased when the yield curve is inverted, with short term rates higher than long term rates, our net interest yield on the asset will tend to be lower initially and then increase over time  Likewise, if a mortgage asset is purchased when the yield curve is steep, with short term rates lower than long term rates, our net interest yield on the asset will tend to be higher initially and then decrease over time

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012
TREASURY-3150
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## EXHIBIT INDEX

| Exhibit No. | Description* |
|---|---|
| 3.1 | Federal Home Loan Mortgage Corporation Act ( 2 U S C §1451 et seq.), as amended through July 21, 2010 (incorporated by reference to Exhibit 3 to the Registrant's Quarterly Report on Form 0 Q for the quarterly period ended June 30, 2010, as filed on August 9, 2010) |
| 3.2 | Bylaws of the Federal Home Loan Mortgage Corporation, as amended and restated June 3, 20 (incorporated by reference to Exhibit 3 to the Registrant's Current Report on Form 8 K as filed on June 7, 2011) |
| 4.1 | Eighth Amended and Restated Certificate of Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Voting Common Stock (no par value per share) dated September 10, 2008 (incorporated by reference to Exhibit 4 to the Registrant's Current Report on Form 8 K as filed on September 11, 2008) |
| 4.2 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Rate, Non Cumulative Preferred Stock (par value $1.00 per share), dated April 23, 1996 (incorporated by reference to Exhibit 4 2 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008) |
| 4 3 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.81% Non Cumulative Preferred Stock (par value $1.00 per share), dated October 27, 1997 (incorporated by reference to Exhibit 4 3 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008) |
| 4 4 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5% Non Cumulative Preferred Stock (par value $1.00 per share), dated March 23, 1998 (incorporated by reference to Exhibit 4 4 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.5 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.1% Non Cumulative Preferred Stock (par value $1.00 per share), dated September 23, 1998 (incorporated by reference to Exhibit 4 5 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.6 | Amended and Restated Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Rate, Non Cumulative Preferred Stock (par value $1 00 per share), dated September 29, 1998 (incorporated by reference to Exhibit 4 6 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.7 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.3% Non Cumulative Preferred Stock (par value $1.00 per share), dated October 28, 1998 (incorporated by reference to Exhibit 4 7 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.8 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.1% Non Cumulative Preferred Stock (par value $1.00 per share), dated March 19, 1999 (incorporated by reference to Exhibit 4 8 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.9 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.79% Non Cumulative Preferred Stock (par value $1.00 per share), dated July 21, 1999 (incorporated by reference to Exhibit 4 9 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4 10 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Rate, Non Cumulative Preferred Stock (par value $1.00 per share), dated November 5, 1999 (incorporated by reference to Exhibit 4 0 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008) |
| 4.11 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Rate, Non Cumulative Preferred Stock (par value $1.00 per share), dated January 26, 2001 (incorporated by reference to Exhibit 4 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008) |

E                                                                               *Freddie Mac*

Source  D RA  HOM  OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Exhibit No. | Description* |
|---|---|
| 4.12 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Rate, Non Cumulative Preferred Stock (par value $1.00 per share), dated March 23, 2001 (incorporated by reference to Exhibit 4 2 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008) |
| 4 13 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.81% Non Cumulative Preferred Stock (par value $1.00 per share), dated March 23, 2001 (incorporated by reference to Exhibit 4 3 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4 14 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Rate, Non Cumulative Preferred Stock (par value $1.00 per share), dated May 30, 2001 (incorporated by reference to Exhibit 4 4 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008) |
| 4.15 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 6% Non Cumulative Preferred Stock (par value $1.00 per share), dated May 30, 2001 (incorporated by reference to Exhibit 4 5 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.16 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.7% Non Cumulative Preferred Stock (par value $1 00 per share), dated October 30, 2001 (incorporated by reference to Exhibit 4 6 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.17 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.81% Non Cumulative Preferred Stock (par value $1.00 per share), dated January 29, 2002 (incorporated by reference to Exhibit 4 7 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008) |
| 4.18 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Rate, Non Cumulative Perpetual Preferred Stock (par value $1.00 per share), dated July 17, 2006 (incorporated by reference to Exhibit 4 8 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008) |
| 4.19 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 6 42% Non Cumulative Perpetual Preferred Stock (par value $1.00 per share), dated July 17, 2006 (incorporated by reference to Exhibit 4 9 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008) |
| 4 20 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5 9% Non Cumulative Perpetual Preferred Stock (par value $1.00 per share), dated October 16, 2006 (incorporated by reference to Exhibit 4 20 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008) |
| 4.21 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.57% Non Cumulative Perpetual Preferred Stock (par value $1.00 per share), dated January 16, 2007 (incorporated by reference to Exhibit 4 2 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008) |
| 4.22 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.66% Non Cumulative Perpetual Preferred Stock (par value $1.00 per share), dated April 16, 2007 (incorporated by reference to Exhibit 4 22 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008) |
| 4 23 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 6 02% Non Cumulative Perpetual Preferred Stock (par value $1.00 per share), dated July 24, 2007 (incorporated by reference to Exhibit 4 23 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008) |
| 4 24 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 6.55% Non Cumulative Perpetual Preferred Stock (par value $1.00 per share), dated September 28, 2007 (incorporated by reference to Exhibit 4 24 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008) |

E 2                                                                                                *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Exhibit No. | Description* |
|---|---|
| 4.25 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Fixed to Floating Rate Non Cumulative Perpetual Preferred Stock (par value $1 00 per share), dated December 4, 2007 (incorporated by reference to Exhibit 4 25 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008) |
| 4.26 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Liquidation Preference Senior Preferred Stock (par value $1.00 per share), dated September 7, 2008 (incorporated by reference to Exhibit 4 2 to the Registrant's Current Report on Form 8 K as filed on September 11, 2008) |
| 4.27 | Federal Home Loan Mortgage Corporation Global Debt Facility Agreement, dated February 25, 2011 (incorporated by reference to Exhibit 4 to the Registrant's Quarterly Report on Form 10 Q for the quarterly period ended March 31, 2011, as filed on May 4, 2011) |
| 0.1 | Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan (as amended and restated as of June 6, 2008) (incorporated by reference to Exhibit 0 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 0.2 | First Amendment to the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan (incorporated by reference to Exhibit 0 2 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 0 3 | Second Amendment to the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan (incorporated by reference to Exhibit 0 4 to the Registrant's Quarterly Report on Form 10 Q for the quarterly period ended June 30, 2009, as filed on August 7, 2009)† |
| 0 4 | Form of Nonqualified Stock Option Agreement for executive officers under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for awards on and after March 4, 2005 but prior to January 1, 2006 (incorporated by reference to Exhibit 0 3 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 0.5 | Form of Nonqualified Stock Option Agreement for executive officers under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for awards on and after January 1, 2006 (incorporated by reference to Exhibit 0 4 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)† |
| 0.6 | Form of Restricted Stock Units Agreement for executive officers under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for awards on and after March 4, 2005 (incorporated by reference to Exhibit 0 5 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)† |
| 0.7 | Form of Restricted Stock Units Agreement for executive officers under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for supplemental bonus awards on March 7, 2008 (incorporated by reference to Exhibit 0 6 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)† |
| 0.8 | Form of Performance Restricted Stock Units Agreement for executive officers under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for supplemental bonus awards on March 29, 2007 (incorporated by reference to Exhibit 0 7 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)† |
| 0.9 | Form of Performance Restricted Stock Units Agreement for executive officers under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for awards on March 7, 2008 (incorporated by reference to Exhibit 0 8 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)† |
| 0 10 | Federal Home Loan Mortgage Corporation Global Amendment to Affected Stock Options under Nonqualified Stock Option Agreements and Separate Dividend Equivalent Rights, effective December 3, 2005 (incorporated by reference to Exhibit 10.9 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)† |
| 0.11 | Federal Home Loan Mortgage Corporation Amendment to Restricted Stock Units Agreements and Performance Restricted Stock Units Agreements, dated December 3, 2008 (incorporated by reference to Exhibit 0 0 to the Registrant's Annual Report on Form 10 K for the fiscal year ended December 31, 2008, as filed on March 11, 2009)† |
| 0.12 | Federal Home Loan Mortgage Corporation 1995 Stock Compensation Plan (incorporated by reference to Exhibit 0 0 to the Registrant's Registration Statement on Form 0 as filed on July 18, 2008)† |

Source   D RA  HOM   OAN MORTGAG CORP, 10 K, March 09, 2012

TREASURY-3153

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Exhibit No. | Description* |
|---|---|
| 10.13 | First Amendment to the Federal Home Loan Mortgage Corporation 1995 Stock Compensation Plan (incorporated by reference to Exhibit 10 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.14 | Second Amendment to the Federal Home Loan Mortgage Corporation 1995 Stock Compensation Plan (incorporated by reference to Exhibit 10 2 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.15 | Third Amendment to the Federal Home Loan Mortgage Corporation 1995 Stock Compensation Plan (incorporated by reference to Exhibit 10 3 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.16 | Form of Nonqualified Stock Option Agreement for executive officers under the Federal Home Loan Mortgage Corporation 1995 Stock Compensation Plan (incorporated by reference to Exhibit 10 4 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.17 | Form of Restricted Stock Units Agreement for executive officers under the Federal Home Loan Mortgage Corporation 1995 Stock Compensation Plan (incorporated by reference to Exhibit 10 5 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.18 | Federal Home Loan Mortgage Corporation Employee Stock Purchase Plan (as amended and restated as of January 1, 2005) (incorporated by reference to Exhibit 10 6 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.19 | Federal Home Loan Mortgage Corporation 1995 Directors' Stock Compensation Plan (as amended and restated June 8, 2007) (incorporated by reference to Exhibit 10 7 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.20 | Form of Nonqualified Stock Option Agreement for non employee directors under the Federal Home Loan Mortgage Corporation 1995 Directors' Stock Compensation Plan for awards in 2006 (incorporated by reference to Exhibit 10 20 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.21 | Form of Restricted Stock Units Agreement for non employee directors under the Federal Home Loan Mortgage Corporation 1995 Directors' Stock Compensation Plan for awards in 2006 (incorporated by reference to Exhibit 10 23 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.22 | Form of Restricted Stock Units Agreement for non employee directors under the Federal Home Loan Mortgage Corporation 1995 Directors' Stock Compensation Plan for awards since 2006 (incorporated by reference to Exhibit 10 24 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.23 | Federal Home Loan Mortgage Corporation Directors' Deferred Compensation Plan (as amended and restated April 3, 1998) (incorporated by reference to Exhibit 10 25 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.24 | First Amendment to the Federal Home Loan Mortgage Corporation Directors' Deferred Compensation Plan (as amended and restated April 3, 1998) (incorporated by reference to Exhibit 10 27 to the Registrant's Annual Report on Form 10 K for the fiscal year ended December 31, 2008, as filed on March 11, 2009)† |
| 10.25 | Federal Home Loan Mortgage Corporation Executive Deferred Compensation Plan (as amended and restated effective January 1, 2008) (incorporated by reference to Exhibit 10 28 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.26 | First Amendment to the Federal Home Loan Mortgage Corporation Executive Deferred Compensation Plan (as amended and restated effective January , 2008) (incorporated by reference to Exhibit 10 6 to the Registrant's Quarterly Report on Form 10 Q for the quarterly period ended September 30, 2008, as filed on November 14, 2008)† |
| 10.27 | 2009 Officer Short Term Incentive Program (incorporated by reference to Exhibit 10 30 to the Registrant's Annual Report on Form 10 K for the fiscal year ended December 31, 2008, as filed on March 11, 2009)† |
| 10.28 | 2010 Vice President and Non Officer Long Term Incentive Award Program (incorporated by reference to Exhibit 10 3 to the Registrant's Quarterly Report on Form 10 Q for the quarterly period ended June 30, 2009, as filed on August 9, 2010)† |
| 10.29 | Officer Severance Policy, dated April 11, 2011 (incorporated by reference to Exhibit 10 2 to the Registrant's Quarterly Report on Form 10 Q for the quarterly period ended March 31, 2011, as filed on May 4, 2011)† |

<center>E-4</center> <div align="right">*Freddie Mac*</div>

Source  D RA  HOM  OAN MORTGAG  CORP, 10 K, March 09, 2012         TREASURY-3154         Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Exhibit No. | Description* |
|---|---|
| 10.30 | Federal Home Loan Mortgage Corporation Severance Plan (as restated and amended effective January 1, 1997) (incorporated by reference to Exhibit 10.3 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.31 | First Amendment to the Federal Home Loan Mortgage Corporation Severance Plan (incorporated by reference to Exhibit 10.32 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.32 | Federal Home Loan Mortgage Corporation Supplemental Executive Retirement Plan (as amended and restated effective January 1, 2008) (incorporated by reference to Exhibit 10.33 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.33 | First Amendment to the Federal Home Loan Mortgage Corporation Supplemental Executive Retirement Plan (As Amended and Restated January , 2008) (incorporated by reference to Exhibit 10.38 to the Registrant's Annual Report on Form 10 K for the fiscal year ended December 31, 2009, as filed on February 24, 2010)† |
| 10.34 | Second Amendment to the Federal Home Loan Mortgage Corporation Supplemental Executive Retirement Plan (as Amended and Restated January 1, 2008) (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8 K as filed on June 28, 2011)† |
| 10.35 | Federal Home Loan Mortgage Corporation Long Term Disability Plan (incorporated by reference to Exhibit 10.34 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.36 | First Amendment to the Federal Home Loan Mortgage Corporation Long Term Disability Plan (incorporated by reference to Exhibit 10.35 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.37 | Second Amendment to the Federal Home Loan Mortgage Corporation Long Term Disability Plan (incorporated by reference to Exhibit 10.36 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.38 | Executive Management Compensation Program (as amended and restated as of June 2, 20 ) (incorporated by reference to Exhibit 10.4 to the Registrant's Quarterly Report on Form 10 Q for the quarterly period ended June 30, 2011, as filed on August 8, 2011)† |
| 10.39 | Federal Home Loan Mortgage Corporation Mandatory Executive Deferred Base Salary Plan, Effective as of January 1, 2009 (incorporated by reference to Exhibit 10.45 to the Registrant's Annual Report on Form 10 K for the fiscal year ended December 31, 2009, as filed on February 24, 2010)† |
| 10.40 | First Amendment To The Federal Home Loan Mortgage Corporation Mandatory Executive Deferred Base Salary Plan (As Effective January 1, 2009) (incorporated by reference to Exhibit 10.5 to the Registrant's Quarterly Report on Form 10 Q for the quarterly period ended June 30, 2011, as filed on August 8, 2011)† |
| 10.41 | Executive Management Compensation Recapture Policy (incorporated by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8 K, as filed on December 24, 2009)† |
| 10.42 | Memorandum Agreement, dated July 20, 2009, between Freddie Mac and Charles E. Haldeman, Jr. (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8 K, as filed on July 21, 2009)† |
| 10.43 | Recapture Agreement, dated July 2 , 2009, between Freddie Mac and Charles E Haldeman, Jr (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8 K, as filed on July 21, 2009)† |
| 10.44 | Restrictive Covenant and Confidentiality Agreement, dated July 21, 2009, between Freddie Mac and Charles E. Haldeman, Jr (incorporated by reference to Exhibit 10.7 to the Registrant's Quarterly Report on Form 10 Q for the quarterly period ended September 30, 2009, as filed on November 6, 2009)† |
| 10.45 | Memorandum Agreement, dated September 24, 2009, between Freddie Mac and Ross J Kari (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8 K, as filed on September 24, 2009)† |
| 10.46 | Recapture Agreement, dated September 24, 2009, between Freddie Mac and Ross J Kari (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8 K, as filed on September 24, 2009)† |
| 10.47 | Restrictive Covenant and Confidentiality Agreement, dated September 24, 2009, between Freddie Mac and Ross J Kari (incorporated by reference to Exhibit 10.9 to the Registrant's Quarterly Report on Form 10 Q for the quarterly period ended September 30, 2009, as filed on November 6, 2009)† |

Source   D RA  HOM  OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3155

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Exhibit No. | Description* |
|---|---|
| 0 48 | Restrictive Covenant and Confidentiality Agreement, dated April  4, 20  0, between Freddie Mac and Anthony Renzi† |
| 0.49 | Restrictive Covenant and Confidentiality Agreement, dated October  5, 2004, between Freddie Mac and Jerry Weiss† |
| 0.50 | Restrictive Covenant and Confidentiality Agreement, dated December  9, 2007, between Freddie Mac and [Paige H. Wisdom]† |
| 0.51 | Description of non employee director compensation (incorporated  by reference to Exhibit  0  to the Registrant's Current Report on Form 8 K as filed on December 23, 2008)† |
| 0.52 | PC Master Trust Agreement dated January 4, 2012 |
| 0.53 | Form of Indemnification Agreement between the Federal Home Loan  Mortgage Corporation and executive officers (for agreements with officers entered into prior to August 2011) and outside Directors (incorporated by reference to Exhibit  0 2 to the Registrant's Current Report on Form 8 K as filed on  December 23, 2008)† |
| 0.54 | Form of Indemnification Agreement between the Federal Home Loan  Mortgage Corporation and executive  officers (for agreements with officers entered into beginning in  August 2011)† |
| 0.55 | Consent of Defendant Federal Home Loan Mortgage Corporation with  the Securities and Exchange Commission, dated September 18, 2007 (incorporated by reference to Exhibit  0 65 to the  Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 0.56 | Letters, dated September 1, 2005, setting forth an agreement  between Freddie Mac and FHFA (incorporated by reference to Exhibit  0 67 to the Registrant's Registration Statement on  Form 10 as filed on July 18, 2008) |
| 0.57 | Amended and Restated Senior Preferred Stock Purchase Agreement  dated as of September 26, 2008, between the United States Department of the Treasury and Federal Home Loan Mortgage Corporation, acting through the Federal Housing Finance Agency as its duly appointed Conservator (incorporated by reference to  Exhibit 10 1 to the Registrant's Quarterly Report on Form 10 Q for the quarterly period ended September 30, 2008, as filed  on November 14, 2008) |
| 0.58 | Amendment to Amended and Restated Senior Preferred Stock  Purchase Agreement, dated as of May 6, 2009, between the United States Department of the Treasury and Federal Home Loan  Mortgage Corporation, acting through the Federal Housing Finance Agency as its duly appointed Conservator (incorporated by  reference to Exhibit 10 6 to the Registrant's Quarterly Report on Form 10 Q for the period ended March 31, 2009, as filed on  May 12,  2009) |
| 0.59 | Second Amendment dated as of December 24, 2009, to the Amended  and Restated Senior Preferred Stock Purchase Agreement dated as of September 26, 2008, between the United States Department  of the Treasury and Federal Home Loan Mortgage Corporation, acting  through the Federal Housing Finance Agency as its duly appointed  Conservator (incorporated by reference to Exhibit  0  to the Registrant's Current Report on Form 8 K, as filed on  December 29, 2009) |
| 0.60 | Warrant to Purchase Common Stock, dated September 7, 2008  (incorporated by reference to Exhibit  0 2 to the Registrant's Current Report on Form 8 K as filed on  September 11, 2008) |
| 0.61 | Memorandum of Understanding Among the Department of Treasury,  the Federal Housing Finance Agency, the Federal National Mortgage Association, and the Federal Home Loan Mortgage  Corporation, dated October 19, 2009 (incorporated by reference to Exhibit  0  to the Registrant's Current Report on Form 8 K, as filed on October 23, 2009) |
| 0.62 | Omnibus Consent to HFA Initiative Program Modifications, dated  November 23, 2011, among the U.S.  Department of the Treasury, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation and the  Federa  Housing Finance Agency |
| 12.1 | Statement re: computation of ratio  of earnings to fixed charges and computation of ratio of  earnings to combined fixed charges and preferred stock dividends |
| 24.1 | Powers of Attorney |
| 3  .1 | Certification of Chief Executive Officer pursuant to Securities  Exchange Act Rule   3a   4(a) |
| 3  .2 | Certification of Executive Vice President      Chief Financial  Officer pursuant to  Securities Exchange Act Rule   3a   4(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C.  Section 1350 |
| 32.2 | Certification of Executive Vice President      Chief Financial  Officer pursuant to  18 U.S.C. Section 1350 |

E 6                                                                                                                                    *Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

| Exhibi  No. | Descrip ion* |
|---|---|
| 101.INS | XBRL Instance Document[1] |
| 101.SCH | XBRL Taxonomy Extension Schema[1] |
| 101.CAL | XBRL Taxonomy Extension Calculation[1] |
| 101.LAB | XBRL Taxonomy Extension Labels[1] |
| 101 PRE | XBRL Taxonomy Extension Presentation[1] |
| 101 DEF | XBRL Taxonomy Extension Definition[1] |

(1) The f nanc a  nfo ma on con a ned n  hese XBRL documen s s unaud ed The  nfo   a on n  hese exh b s sha  no  be dee  ed "f ed" fo  pu poses of Sec  on 18 of   e Sec    es Exc a ge Ac  of 1934, o  o  e w se s bjec   o   e  ab    es of Sec  on 18, no  sha    hey be deemed  nco po a ed by  efe ence  n o any d sclosu e  documen   ela ng to F edd e Mac, except to t e exte t, f a y, exp ess y set fo  h by spec f c  efe ence  n such f  ng

* The SEC f e nu  be s fo   he Reg s an 's Reg s  a on S a e  en on Fo   10, Annua  Repo  s on Fo m 10-K, Qua  e  y Repo  s on  orm 10-Q a d C   e t Repo ts on Fo m 8-K a e 000-53330 a d 001-34139

† Th s exh b   s a managemen con ac o  compensa o y plan o  a angemen

E 7                                                                                            *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 10.48**

## RESTRICTIVE COVENANT AND CONFIDENTIALITY AGREEMENT

In exchange for the mutual promises and consideration set forth below, this Restrictive Covenant and Confidentiality Agreement ("Agreement") is entered into by and between the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Company") and Anthony Renzi ("Executive"), effective on the date the Executive assigns a personal signature to page 6 of this Agreement

### I. Definitions

The following terms shall have the meanings indicated when used in this Agreement

A. *Competitor*: The following entities, and their respective parents, successors, subsidiaries, and affiliates are competitors: (i) Fannie Mae (ii) all Federal Home Loan Banks (including the Office of Finance); and (iii) such other entities to which Executive and the Company may agree in writing from time to time

B. *Confidential Information*: Information or materials in written, oral, magnetic, digital, computer, photographic, optical, electronic, or other form, whether now existing or developed or created during the period of Executive's employment with Freddie Mac, that constitutes trade secrets and/or proprietary or confidential information. This information includes, but is not limited to: (i) all information marked Proprietary or Confidential; (ii) information concerning the components, capabilities, and attributes of Freddie Mac's business plans, methods, and strategies; (iii) information relating to tactics, plans, or strategies concerning shareholders, investors, pricing, investment, marketing, sales, trading, funding, hedging, modeling, sales and risk management; (iv) financial or tax information and analyses, including but not limited to, information concerning Freddie Mac's capital structure and tax or financial planning; (v) confidential information about Freddie Mac's customers, borrowers, employees, or others; (vi) pricing and quoting information, policies, procedures, and practices; (vii) confidential customer lists; (viii) proprietary algorithms; (ix) confidential contract terms; (x) confidential information concerning Freddie Mac's policies, procedures, and practices or the way in which Freddie Mac does business; (xi) proprietary or confidential data bases, including their structure and content; (xii) proprietary Freddie Mac business software, including its design, specifications and documentation; (xiii) information about Freddie Mac products, programs, and services which has not yet been made public; (xiv) confidential information about Freddie Mac's dealings with third parties, including dealers, customers, vendors, and regulators; and/or (xv) confidential information belonging to third parties to which Executive received access in connection with Executive's employment with Freddie Mac Confidential Information does not include general skills, experience, or knowledge acquired in connection with Executive's employment with Freddie Mac that otherwise are generally known to the public or within the industry or trade in which Freddie Mac operates

C. *Severance*: Cash compensation paid pursuant to Freddie Mac's Severance Policy

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

2

D. *Severance Policy*: Freddie Mac Policy 3 254 1 (Severance      Officers), or any subsequent and superceding severance policy

## II. Non Competition

Executive recognizes that as a result of Executive's employment with Freddie Mac, Executive has access to and knowledge of critically sensitive Confidential Information, the improper disclosure or use of which would result in grave competitive harm to Freddie Mac  Therefore, Executive agrees that neither during Executive's employment with Freddie Mac, nor for the twelve ( 2) months immediately following termination of Executive's employment for any reason, will Executive consider offers of employment from, seek or accept employment with, or otherwise directly or indirectly provide professional services to any Competitor, if the Executive will be rendering duties, responsibilities or services for the Competitor that are of the type and nature rendered or performed by you during the past two years of your employment with Freddie Mac. Executive acknowledges and agrees that this covenant has unique, substantial and immeasurable value to Freddie Mac, that Executive has sufficient skills to provide a livelihood for Executive while this covenant remains in force, and that this covenant will not interfere with Executive's ability to work consistent with Executive's experience, training and education  This non competition covenant applies regardless of whether Executive's employment is terminated by Executive, by Freddie Mac, or by a joint decision.

## III. Non-Solicitation and Non Recruitment

During Executive's employment with Freddie Mac and for a period of twelve ( 2) months after Executive's termination date, Executive will not solicit or recruit, attempt to solicit or recruit or assist another in soliciting or recruiting any Freddie Mac managerial employee (including manager level, Executive level, or officer level employee) with whom Executive worked, or any employee whom Executive directly or indirectly supervised at Freddie Mac, to leave the employee's employment with Freddie Mac for purposes of employment or for the rendering of professional services. This prohibition against solicitation does not apply if Freddie Mac has notified the employee being solicited or recruited that his/her employment with the Company will be terminated pursuant to a corporate reorganization or reduction in force

## IV. Treatment of Confidential Information

A. *Non Disclosure*  Executive recognizes that Freddie Mac is engaged in an extremely competitive business and that, in the course of performing Executive's job duties, Executive will have access to and gain knowledge about Confidential Information  Executive further recognizes the importance of carefully protecting this Confidential Information in order for Freddie Mac to compete successfully  Therefore, Executive agrees that Executive will neither divulge Confidential Information to any persons, including to other Freddie Mac employees who do not have a Freddie Mac business related need to know, nor make use of the Confidential Information for the Executive's own benefit or for the benefit of anyone else other than Freddie Mac  Executive further agrees to take all reasonable precautions to prevent the disclosure of Confidential Information to unauthorized persons or entities, and to comply with all Company policies, procedures, and instructions regarding the treatment of such information

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

3

B.  *Return of Materials*  Executive agrees that upon termination of Executive's employment with Freddie Mac  for any reason whatsoever, Executive will deliver to Executive's immediate supervisor all tangible materials embodying Confidential Information, including, but not limited to, any documentation, records, listings, notes, files, data,  sketches, memoranda, models, accounts, reference materials,  samples, machine readable media, computer disks, tapes, and  equipment which in any way relate to Confidential Information,  whether developed by Executive or not  Executive further agrees not to retain any copies of any materials embodying Confidential  Information

C.  *Post Termination Obligations*  Executive agrees that after the termination of Executive's employment  for any reason, Executive will not use in any way whatsoever, nor disclose any Confidential Information learned or obtained in  connection with Executive's employment with Freddie Mac without first obtaining the written permission of the Executive  Vice President of Human Resources of Freddie Mac  Executive further agrees that, in order to assure the continued  confidentiality of the Confidential Information, Freddie Mac may  correspond with Executive's future employers to advise them generally of Executive's exposure to and knowledge of Confidential Information, and Executive's obligations and responsibilities regarding the Confidential Information  Executive understands and agrees that any such contact may  include a request for assurance and confirmation from such  employer(s) that Executive will not disclose Confidential  Information to such employer(s), nor will such employer(s) permit any use whatsoever of the Confidential Information  To enable Freddie Mac to monitor compliance with the obligations imposed by this Agreement, Executive further agrees to inform in  writing Freddie Mac's Executive Vice President of Human Resources of the identity of Executive's subsequent employer(s) and Executive's prospective job title and  responsibilities prior to beginning employment Executive agrees that this notice requirement shall remain in effect for twelve  ( 2) months following the termination of Executive's  Freddie Mac employment

D.  *Ability to Enforce Agreement and Assist Government Investigations*  Nothing in this Agreement prohibits or otherwise restricts you from: (1) making any disclosure of information required by law; (2) assisting  any regulatory or law enforcement agency or legislative body to  the extent you maintain a legal right to do so notwithstanding  this Agreement; (3) filing, testifying, participating in or  otherwise assisting in a proceeding relating to the alleged  violation of any federal, state, or local law, regulation, or rule, to the extent you maintain a legal right to do so notwithstanding this Agreement; or (4) filing, testifying,  participating in or otherwise assisting the Securities and  Exchange Commission or any other proper authority in a proceeding relating to allegations of fraud

## V.  Consideration Given to Executive

In exchange for agreeing to be bound by the terms, conditions,  and restrictions stated in this Agreement, Freddie Mac will  provide the Executive with the following consideration, each of which itself is adequate consideration for Executive's  agreement to be bound by the provisions of this Agreement:

A.  *Employment.*  Executive will be employed by Freddie Mac as Executive Vice President, Single Family Portfolio  Management

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012                                                 Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

4

B. *Severance*  Executive acknowledges that under Freddie Mac's Severance Policy, Executive may be eligible to receive Severance upon termination of employment, the duration of which is within the discretion of Freddie Mac  In the event the Executive's employment is terminated and the circumstances of the termination qualify the Executive for  Severance under the Severance Policy, then the Executive shall  ece ve severance pay in accordance with the Severance Policy in  effect at the time of termination  The payment of severance  pursuant to the terms of the Severance Policy and of this paragraph is contingent on Freddie Mac receiving, prior to  payment, any required approval from the Director of the Federal Housing Finance Agency ("FHFA"), including required approval under any applicable statutes and regulations. The  Severance payment provided by this Paragraph V(B) is in place of, and not in addition to, Severance to which  Executive would otherwise be entitled under any other agreement between Executive and Freddie Mac

## VI.  Reservation of Rights

Executive agrees that nothing in this Agreement constitutes a  contract or commitment by Freddie Mac to continue  Executive's employment in any job position for any period  of time, nor does anything in this Agreement limit in any way  Freddie Mac's right to terminate Executive's employment at any time for any reason

## VII.  Compliance with the Code of Conduct and Corporate Policies &  Procedures

As a Freddie Mac employee, Executive will be subject to Freddie  Mac's Code of Conduct ("Code") and to Corporate  Policy 3 206, Personal Securities Investments Policy ("Policy") that, among other things, limit the investment activities of  Freddie Mac employees  Executive agrees to fully comply with the Code and the Policy, copies of which are enclosed for  Executive s review

Executive further agrees to be bound by, and comply fully with,  his/her obligations under the Personal Securities Investments Policy  Executive agrees to consult with Freddie Mac's Chief Compliance Officer as soon as practical prior to beginning  employment about any investments that Executive or a "covered household member," as that term is defined  in the Policy, may have that may be prohibited by the Policy  Executive also agrees to disclose prior to beginning employment  any other matter or situation that may create a conflict of  interest as such term is defined in the Code

In addition, prior to beginning employment, Executive agrees to  disclose to Freddie Mac's Human Resources Division the terms of any employment, confidentiality or stock grant  agreements to which Executive may currently be subject that may  affect Executive's future employment or recruiting  activities so that Freddie Mac may ensure that Executive's  employment by Freddie Mac and conduct as a Freddie Mac emp oyee are not inconsistent with any of their terms

## VIII.  Absence of Any Conflict of Interest

---

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

5

Executive represents that Executive does not have any confidential information, trade secrets or other proprietary information that Executive obtained as the result of Executive's employment with another employer that Executive will be using in Executive's position at Freddie Mac Executive also represents that Executive is not subject to any employment, confidentiality or stock grant agreements, or any other restrictions or limitations imposed by a prior employer, which would affect Executive's ability to perform the duties and responsibilities for Freddie Mac in the job position offered, and further represents that Executive has provided Freddie Mac with copies of any such agreements or limitations so that Freddie Mac can make an independent judgment that Executive's employment with Freddie Mac is not inconsistent with any of its terms.

## IX. Enforcement

A   Executive acknowledges that Executive may be subject to discipline, up to and including termination of employment, for Executive's breach or threat of breach of any provision of this Agreement

B   Executive agrees that irreparable injury will result to Freddie Mac's business interests in the event of breach or threatened breach of this Agreement, the full extent of Freddie Mac's damages will be impossible to ascertain, and monetary damages will not be an adequate remedy for Freddie Mac Therefore, Executive agrees that in the event of a breach or threat of breach of any provision(s) of this Agreement, Freddie Mac, in addition to any other relief available, shall be entitled to temporary, preliminary, and permanent equitable relief to restrain any such breach or threat of breach by Executive and all persons acting for and/or in concert with Executive, without the necessity of posting bond or security, which Executive expressly waives

C   Executive agrees that each of Executive's obligations specified in this Agreement is a separate and independent covenant, and that all of Executive's obligations set forth herein shall survive any termination, for any reason, of Executive's Freddie Mac employment To the extent that any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable because it is overbroad, that provision shall be limited and enforced to the extent permitted by applicable law Should any provision of this Agreement be declared or determined by any court of competent jurisdiction to be unenforceable or invalid under applicable law, the validity of the remaining obligations will not be affected thereby and only the unenforceable or invalid obligation will be deemed not to be a part of this Agreement

D   This Agreement is governed by, and will be construed in accordance with, the laws of the Commonwealth of Virginia, without regard to its or any other jurisdiction's conflict of law provisions Executive agrees that any action related to or arising out of this Agreement shall be brought exclusively in the United States District Court for the Eastern District of Virginia, and Executive hereby irrevocably consents to personal jurisdiction and venue in such court and to service of process by United States Mail or express courier service in any such action.

E   If any dispute(s) arise(s) between Freddie Mac and Executive with respect to any matter which is the subject of this Agreement, the prevailing party in such dispute(s) shall be entitled to recover from the other party all of its costs and expenses, including its reasonable attorneys' fees

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

6

**Executive has been advised to discuss all aspects of this Agreement with Executive's private attorney. Executive acknowledges that Executive has carefully read and understands the terms and provisions of this Agreement and that they are reasonable. Executive signs this Agreement voluntarily and accepts all obligations contained in this Agreement in exchange for the consideration to be given to Executive as outlined above, which Executive acknowledges is adequate and satisfactory, and which Executive further acknowledges Freddie Mac is not otherwise obligated to provide to Executive. Neither Freddie Mac nor its agents, representatives, directors, officers or employees have made any representations to Executive concerning the terms or effects of this Agreement, other than those contained in this Agreement.**

By: /s/ Anthony Renzi _____        Date: 4- 4- 0 _____
      Anthony Renzi

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 10.49

## RESTRICTIVE COVENANT AND CONFIDENTIALITY AGREEMENT

In exchange for the mutual promises and consideration set forth below, this Restrictive Covenant and Confidentiality Agreement ("Agreement") is entered into by and between the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Company") and Jerry Weiss ("Executive"), effective as of this 15th day of October, 2004.

### I. Definitions

The following terms shall have the meanings indicated when used in this Agreement

A.  *Competitor*: The following entities, and their respective parents, successors, subsidiaries, and affiliates are competitors: (i) Fannie Mae (ii) all Federal Home Loan Banks (including the Office of Finance); and (iii) such other entities to which Executive and the Company may agree in writing from time to time

B.  *Confidential Information*: Information or materials in written, oral, magnetic, digital, computer, photographic, optical, electronic, or other form, whether now existing or developed or created during the period of Executive's employment with Freddie Mac, that constitutes trade secrets and/or proprietary or confidential information. This information includes, but is not limited to: (i) all information marked Proprietary or Confidential; (ii) information concerning the components, capabilities, and attributes of Freddie Mac's business plans, methods, and strategies; (iii) information relating to tactics, plans, or strategies concerning shareholders, investors, pricing, investment, marketing, sales, trading, funding, hedging, modeling, sales and risk management; (iv) financial or tax information and analyses, including but not limited to, information concerning Freddie Mac's capital structure and tax or financial planning; (v) confidential information about Freddie Mac's customers, borrowers, employees, or others; (vi) pricing and quoting information, policies, procedures, and practices; (vii) confidential customer lists; (viii) proprietary algorithms; (ix) confidential contract terms; (x) confidential information concerning Freddie Mac's policies, procedures, and practices or the way in which Freddie Mac does business; (xi) proprietary or confidential data bases, including their structure and content; (xii) proprietary Freddie Mac business software, including its design, specifications and documentation; (xiii) information about Freddie Mac products, programs, and services which has not yet been made public; (xiv) confidential information about Freddie Mac's dealings with third parties, including dealers, customers, vendors, and regulators; and/or (xv) confidential information belonging to third parties to which Executive received access in connection with Executive's employment with Freddie Mac Confidential Information does not include general skills, experience, or knowledge acquired in connection with Executive's employment with Freddie Mac that otherwise are generally known to the public or within the industry or trade in which Freddie Mac operates

Source    D RA   HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

2

C. *Severance*: Cash compensation paid pursuant to Freddie Mac's Severance Policy

D. *Severance Policy*: Freddie Mac Policy 3 254 1 (Severance      Officers), or any subsequent and superceding severance policy

## II.  Non Competition

Executive recognizes that as a result of Executive's employment with Freddie Mac, Executive has access to and knowledge of critically sensitive Confidential Information, the improper disclosure or use of which would result in grave competitive harm to Freddie Mac  Therefore, Executive agrees that neither during Executive's employment with Freddie Mac, nor for the twelve ( 2) months immediately following termination of Executive's employment for any reason, will Executive consider offers of employment from, seek or accept employment with, or otherwise directly or indirectly provide professional services to any Competitor  Executive acknowledges and agrees that this covenant has unique, substantial and immeasurable value to Freddie Mac, that Executive has sufficient skills to provide a livelihood for Executive while this covenant remains in force, and that this covenant will not interfere with Executive's ability to work consistent with Executive's experience, training and education. This non competition covenant applies regardless of whether Executive's employment is terminated by Executive, by Freddie Mac, or by a joint decision

## III.  Non-Solicitation and Non Recruitment

During Executive's employment with Freddie Mac and for a period of twelve ( 2) months after Executive's termination date, Executive will not solicit or recruit, attempt to solicit or recruit or assist another in soliciting or recruiting any Freddie Mac managerial employee (including manager level, Executive level, or officer level employee) with whom Executive worked, or any employee whom Executive directly or indirectly supervised at Freddie Mac, to leave the employee's employment with Freddie Mac for purposes of employment or for the rendering of professional services. This prohibition against solicitation does not apply if Freddie Mac has notified the employee being solicited or recruited that his/her employment with the Company will be terminated pursuant to a corporate reorganization or reduction in force

## IV.  Treatment of Confidential Information

A. *Non Disclosure*  Executive recognizes that Freddie Mac is engaged in an extremely competitive business and that, in the course of performing Executive's job duties, Executive will have access to and gain knowledge about Confidential Information  Executive further recognizes the importance of carefully protecting this Confidential Information in order for Freddie Mac to compete successfully  Therefore, Executive agrees that Executive will neither divulge Confidential Information to any persons, including to other Freddie Mac employees who do not have a Freddie Mac business related need to know, nor make use of the Confidential Information for the Executive's own benefit or for the benefit of anyone else other than Freddie Mac  Executive further agrees to take all reasonable precautions to prevent the disclosure of Confidential Information to unauthorized persons or entities, and to comply with all Company policies, procedures, and instructions regarding the treatment of such information

Source   D RA  HOM  OAN MORTGAG  CORP, 10 K, March 09, 2012                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

3

B. *Return of Materials*  Executive agrees that upon termination of Executive's employment with Freddie Mac  for any reason whatsoever, Executive will deliver to Executive's immediate supervisor all tangible materials embodying Confidential Information, including, but not limited to, any documentation, records, listings, notes, files, data,  sketches, memoranda, models, accounts, reference materials,  samples, machine readable media, computer disks, tapes, and  equipment which in any way relate to Confidential Information,  whether developed by Executive or not  Executive further agrees not to retain any copies of any materials embodying Confidential  Information

C. *Post Termination Obligations*  Executive agrees that after the termination of Executive's employment  for any reason, Executive will not use in any way whatsoever, nor disclose any Confidential Information learned or obtained in  connection with Executive's employment with Freddie Mac without first obtaining the written permission of the Executive  Vice President of Human Resources of Freddie Mac  Executive further agrees that, in order to assure the continued  confidentiality of the Confidential Information, Freddie Mac may  correspond with Executive's future employers to advise them generally of Executive's exposure to and knowledge of Confidential Information, and Executive's obligations and responsibilities regarding the Confidential Information  Executive understands and agrees that any such contact may  include a request for assurance and confirmation from such  employer(s) that Executive will not disclose Confidential  Information to such employer(s), nor will such employer(s) permit any use whatsoever of the Confidential Information  To enable Freddie Mac to monitor compliance with the obligations imposed by this Agreement, Executive further agrees to inform in  writing Freddie Mac's Executive Vice President of Human Resources of the identity of Executive's subsequent employer(s) and Executive's prospective job title and  responsibilities prior to beginning employment Executive agrees that this notice requirement shall remain in effect for twelve  ( 2) months following the termination of Executive's  Freddie Mac employment

D. *Ability to Enforce Agreement and Assist Government Investigations*  Nothing in this Agreement prohibits or otherwise restricts you from: (1) making any disclosure of information required by law; (2) assisting  any regulatory or law enforcement agency or legislative body to  the extent you maintain a legal right to do so notwithstanding  this Agreement; (3) filing, testifying, participating in or  otherwise assisting in a proceeding relating to the alleged  violation of any federal, state, or local law, regulation, or rule, to the extent you maintain a legal right to do so notwithstanding this Agreement; or (4) filing, testifying,  participating in or otherwise assisting the Securities and  Exchange Commission or any other proper authority in a proceeding relating to allegations of fraud

## V.  Consideration Given to Executive

In exchange for agreeing to be bound by the terms, conditions,  and restrictions stated in this Agreement, Freddie Mac will  provide the Executive with the following consideration, each of which itself is adequate consideration for Executive's  agreement to be bound by the provisions of this Agreement:

Source    D RA  HOM    OAN MORTGAG  CORP, 10 K, March 09, 2012                                             Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.