4

A. *Employment.* Executive will be employed by Freddie Mac as SVP    Chief Compliance Officer

B. *Severance*  Executive acknowledges that under Freddie Mac's Severance Policy, Executive may be eligible to receive Severance upon termination of employment, the duration of which is within the discretion of Freddie Mac   In the event the Executive's employment is terminated and the circumstances of the termination qualify the Executive for  Severance under the Severance Policy, then the Executive shall  eee ve Severance for twelve (  2) months following  termination  If at the time this Agreement is entered into, Executive occupies a position that is an "executive office " of Freddie Mac, as determined by the Office of Federal Housing Enterprise  Oversight ("OFHEO") under section  303(7) of the Federal Housing Enterprises Financial Safety and Soundness Act  of 1992 and under OFHEO's executive compensation regulation  (66 Federa  Reg ster 47550 (2001)), then Executive acknowledges that receipt of the twelve (  2) months  severance under this paragraph is contingent upon any legally required approval from the Director of OFHEO  If such approval  is not received, then Executive will not be eligible for Severance  The Severance guarantee provided by this  Paragraph V(B) is in place of, and not in addition to,  Severance to which Executive would otherwise be entitled under  any other agreement between Executive and Freddie Mac

## VI.  Reservation of Rights

Executive agrees that nothing in this Agreement constitutes a  contract or commitment by Freddie Mac to continue  Executive's employment in any job position for any period  of time, nor does anything in this Agreement limit in any way  Freddie Mac's right to terminate Executive's employment at any time for any reason

## VII.  Compliance with the Code of Conduct and Corporate Policies &  Procedures

As a Freddie Mac employee, Executive will be subject to Freddie  Mac's Code of Conduct ("Code") and to Corporate  Policy 1 906, Investment Limitations Policy ("Policy") that, among  other things, limit the investment activities of Freddie Mac  employees  Executive agrees to fully comply with the Code and the Policy, copies of which are enclosed for Executive's review

Executive further agrees to be bound by, and comply fully with,  his/her obligations under the Investment Limitations Policy  Executive  agrees to consult with Freddie Mac's Chief Compliance  Officer as soon as practical prior to beginning employment about  any investments that Executive or a "covered household member," as that term is defined in the Policy,  may have that may be prohibited by the Policy  Executive also agrees to disclose prior to beginning employment any other matter or  situation that may create a conflict of interest as such term is  defined in the Code

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

5

In addition, prior to beginning employment, Executive agrees to disclose to Freddie Mac's Human Resources Division the terms of any employment, confidentiality or stock grant agreements to which Executive may currently be subject that may affect Executive's future employment or recruiting activities so that Freddie Mac may ensure that Executive's employment by Freddie Mac and conduct as a Freddie Mac emp oyee are not inconsistent with any of their terms

## VIII.  Absence of Any Conflict of Interest

Executive represents that Executive does not have any confidential information, trade secrets or other proprietary information that Executive obtained as the result of Executive's employment with another employer that Executive will be using in Executive's position at Freddie Mac Executive also represents that Executive is not subject to any employment, confidentiality or stock grant agreements, or any other restrictions or limitations imposed by a prior employer, which would affect Executive's ability to perform the duties and responsibilities for Freddie Mac in the job position offered, and further represents that Executive has provided Freddie Mac with copies of any such agreements or limitations so that Freddie Mac can make an independent judgment that Executive's employment with Freddie Mac is not inconsistent with any of its terms.

## IX.  Enforcement

A  Executive acknowledges that Executive may be subject to discipline, up to and including termination of employment, for Executive's breach or threat of breach of any provision of this Agreement

B  Executive agrees that irreparable injury will result to Freddie Mac's business interests in the event of breach or threatened breach of this Agreement, the full extent of Freddie Mac's damages will be impossible to ascertain, and monetary damages will not be an adequate remedy for Freddie Mac  Therefore, Executive agrees that in the event of a breach or threat of breach of any provision(s) of this Agreement, Freddie Mac, in addition to any other relief available, shall be entitled to temporary, preliminary, and permanent equitable relief to restrain any such breach or threat of breach by Executive and all persons acting for and/or in concert with Executive, without the necessity of posting bond or security, which Executive expressly waives

C  Executive agrees that each of Executive's obligations specified in this Agreement is a separate and independent covenant, and that all of Executive's obligations set forth herein shall survive any termination, for any reason, of Executive's Freddie Mac employment  To the extent that any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable because it is overbroad, that provision shall be limited and enforced to the extent permitted by applicable law  Should any provision of this Agreement be declared or determined by any court of competent jurisdiction to be unenforceable or invalid under applicable law, the validity of the remaining obligations will not be affected thereby and only the unenforceable or invalid obligation will be deemed not to be a part of this Agreement

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                           Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

6

D   This Agreement is governed by, and will be construed in accordance with, the laws of the Commonwealth of Virginia, without regard to its or any other jurisdiction's conflict of law provisions  Executive agrees that any action  related to or arising out of this Agreement shall be brought exclusively in the United States District Court for the Eastern  District of Virginia, and Executive hereby irrevocably consents to personal jurisdiction and venue in such court and to service  of process by United States Mail or express courier service in  any such action.

E   If any dispute(s) arise(s) between Freddie Mac and  Executive with respect to any matter which is the subject of  this Agreement, the prevailing party in such dispute(s) shall be  entitled to recover from the other party all of its costs and  expenses, including its reasonable attorneys' fees

**Executive has been advised to discuss all aspects of this  Agreement with Executive's private attorney. Executive acknowledges that Executive has carefully read and understands  the terms and provisions of this Agreement and that they are  reasonable. Executive signs this Agreement voluntarily and accepts all obligations contained in this Agreement in exchange  for the consideration to be given to Executive as outlined above, which Executive acknowledges is adequate and  satisfactory, and which Executive further acknowledges Freddie Mac is not otherwise obligated to provide to Executive. Neither  Freddie Mac nor its agents, representatives, directors, officers or employees have made any representations to Executive  concerning the terms or effects of this Agreement, other than those contained in this Agreement.**

By: /s/  Jerry Weiss                                          Date:  0/  5/04
      Jerry Weiss

By: /s/  Michael W  Hager                               Date:  0 27 04
      Freddie Mac

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 10.50

## RESTRICTIVE COVENANT AND CONFIDENTIALITY AGREEMENT

In exchange for the mutual promises and consideration set forth below, this Restrictive Covenant and Confidentiality Agreement ("Agreement") is entered into by and between the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Company") and Paige H. Kurtz ("Executive"), effective on the date the Executive assigns a personal signature to page 6 of this Agreement

### I. Definitions

The following terms shall have the meanings indicated when used in this Agreement

A. *Competitor*: The following entities, and their respective parents, successors, subsidiaries, and affiliates are competitors: (i) Fannie Mae (ii) all Federal Home Loan Banks (including the Office of Finance); and (iii) such other entities to which Executive and the Company may agree in writing from time to time

B. *Confidential Information*: Information or materials in written, oral, magnetic, digital, computer, photographic, optical, electronic, or other form, whether now existing or developed or created during the period of Executive's employment with Freddie Mac, that constitutes trade secrets and/or proprietary or confidential information. This information includes, but is not limited to: (i) all information marked Proprietary or Confidential; (ii) information concerning the components, capabilities, and attributes of Freddie Mac's business plans, methods, and strategies; (iii) information relating to tactics, plans, or strategies concerning shareholders, investors, pricing, investment, marketing, sales, trading, funding, hedging, modeling, sales and risk management; (iv) financial or tax information and analyses, including but not limited to, information concerning Freddie Mac's capital structure and tax or financial planning; (v) confidential information about Freddie Mac's customers, borrowers, employees, or others; (vi) pricing and quoting information, policies, procedures, and practices; (vii) confidential customer lists; (viii) proprietary algorithms; (ix) confidential contract terms; (x) confidential information concerning Freddie Mac's policies, procedures, and practices or the way in which Freddie Mac does business; (xi) proprietary or confidential data bases, including their structure and content; (xii) proprietary Freddie Mac business software, including its design, specifications and documentation; (xiii) information about Freddie Mac products, programs, and services which has not yet been made public; (xiv) confidential information about Freddie Mac's dealings with third parties, including dealers, customers, vendors, and regulators; and/or (xv) confidential information belonging to third parties to which Executive received access in connection with Executive's employment with Freddie Mac Confidential Information does not include general skills, experience, or knowledge acquired in connection with Executive's employment with Freddie Mac that otherwise are generally known to the public or within the industry or trade in which Freddie Mac operates

C. *Severance*: Cash compensation paid pursuant to Freddie Mac's Severance Policy

D. *Severance Policy*: Freddie Mac Policy 3 254 1 (Severance Officers), or any subsequent and superceding severance policy

Source D RA HOM OAN MORTGAG CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## II.  Non Competition

Executive recognizes that as a result of Executive's employment with Freddie Mac, Executive has access to and  knowledge of critically sensitive Confidential Information, the improper disclosure or use of which would result in grave  competitive harm to Freddie Mac  Therefore, Executive agrees that neither during Executive's employment with Freddie Mac, nor for the twelve ( 2) months immediately following  termination of Executive's employment for any reason, will Executive consider offers of employment from, seek or accept  employment with, or otherwise directly or indirectly provide professional services to any Competitor, if the Executive will  be render duties, responsibilities or services for the Competitor that are of the type and nature rendered or performed  by you during the past two years of your employment with Freddie  Mac. Executive acknowledges and agrees that this covenant has  unique, substantial and immeasurable value to Freddie Mac, that  Executive has sufficient skills to provide a livelihood for  Executive while this covenant remains in force, and that this  covenant will not interfere with Executive's ability to work consistent with Executive's experience, training and education  This non competition covenant applies regardless of whether Executive's employment is terminated by Executive,  by Freddie Mac, or by a joint decision.

## III.  Non-Solicitation and Non Recruitment

During Executive's employment with Freddie Mac and for a  period of twelve ( 2) months after Executive's termination date, Executive will not solicit or recruit, attempt to solicit or recruit or assist another in soliciting or  recruiting any Freddie Mac managerial employee (including manager level, Executive level, or officer level employee) with  whom Executive worked, or any employee whom Executive directly  or indirectly supervised at Freddie Mac, to leave the  employee's employment with Freddie Mac for purposes of  employment or for the rendering of professional services. This prohibition against solicitation does not apply if Freddie Mac  has notified the employee being solicited or recruited that his/her employment with the Company will be terminated pursuant to a  corporate reorganization or reduction in force

## IV.  Treatment of Confidential Information

A.  *Non Disclosure*  Executive recognizes that Freddie Mac is engaged in an extremely competitive business and  that, in the course of performing Executive's job duties, Executive will have access to and gain knowledge about  Confidential Information  Executive further recognizes the importance of carefully protecting this Confidential Information  in order for Freddie Mac to compete successfully  Therefore, Executive agrees that Executive will neither divulge  Confidential Information to any persons, including other  Freddie Mac employees who do not have a Freddie Mac business related need to know, nor make use of the Confidential  Information for the Executive's own benefit or for the benefit of anyone else other than Freddie Mac  Executive further  agrees to take all reasonable precautions to prevent the  disclosure of Confidential Information to unauthorized persons  or entities, and to comply with all Company policies,  procedures, and instructions regarding the treatment of such information

B.  *Return of Materials*  Executive agrees that upon termination of Executive's employment with Freddie Mac  for any reason whatsoever, Executive will deliver to Executive's immediate supervisor all tangible materials  embodying Confidential Information, including, but not limited

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

3

to, any documentation, records, listings, notes, files, data, sketches, memoranda, models, accounts, reference materials, samples, machine readable media, computer disks, tapes, and equipment which in any way relate to Confidential Information, whether developed by Executive or not  Executive further agrees not to retain any copies of any materials embodying Confidential Information

C.  *Post Termination Obligations*  Executive agrees that after the termination of Executive's employment for any reason, Executive will not use in any way whatsoever, nor disclose any Confidential Information learned or obtained in connection with Executive's employment with Freddie Mac without first obtaining the written permission of the Executive  Vice President of Human Resources of Freddie Mac  Executive further agrees that, in order to assure the continued confidentiality of the Confidential Information, Freddie Mac may correspond with Executive's future employers to advise them generally of Executive's exposure to and knowledge of Confidential Information, and Executive's obligations and responsibilities regarding the Confidential Information  Executive understands and agrees that any such contact may include a request for assurance and confirmation from such employer(s) that Executive will not disclose Confidential Information to such employer(s), nor will such employer(s) permit any use whatsoever of the Confidential Information  To enable Freddie Mac to monitor compliance with the obligations imposed by this Agreement, Executive further agrees to inform in writing Freddie Mac's Executive Vice President of Human Resources of the identity of Executive's subsequent employer(s) and Executive's prospective job title and responsibilities prior to beginning employment  Executive agrees that this notice requirement shall remain in effect for twelve ( 2) months following the termination of Executive's Freddie Mac employment

D.  *Ability to Enforce Agreement and Assist Government Investigations*  Nothing in this Agreement prohibits or otherwise restricts you from: (1) making any disclosure of information required by law; (2) assisting any regulatory or law enforcement agency or legislative body to the extent you maintain a legal right to do so notwithstanding this Agreement; (3) filing, testifying, participating in or otherwise assisting in a proceeding relating to the alleged violation of any federal, state, or local law, regulation, or rule, to the extent you maintain a legal right to do so notwithstanding this Agreement; or (4) filing, testifying, participating in or otherwise assisting the Securities and Exchange Commission or any other proper authority in a proceeding relating to allegations of fraud

## V.  Consideration Given to Executive

In exchange for agreeing to be bound by the terms, conditions, and restrictions stated in this Agreement, Freddie Mac will provide the Executive with the following consideration, each of which itself is adequate consideration for Executive's agreement to be bound by the provisions of this Agreement:

A.  *Employment.*  Executive will be employed by Freddie Mac as Senior Vice President, Business Unit Chief Financial Officer

B.  *Severance*  Executive acknowledges that under Freddie Mac's Severance Policy, Executive may be eligible to receive Severance upon termination of employment, the duration of which is within the discretion of Freddie Mac  In the event the Executive's employment is

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

4

terminated and the circumstances of the termination qualify the Executive for Severance under the Severance Policy, then the Executive shall receive Severance for twelve ( 2) months following termination If at the time this Agreement is entered into, Executive occupies a position that is an "executive officer" of Freddie Mac, as determined by the Office of Federal Housing Enterprise Oversight ("OFHEO") under section 303(7) of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 and under OFHEO's executive compensation regulation (66 Federal Reg ster 47550 (2001)), then Executive acknowledges that receipt of the twelve ( 2) months severance under this paragraph is contingent upon any legally required approval from the Director of OFHEO If such approval is not received, then Executive will not be eligible for Severance The Severance guarantee provided by this Paragraph V(B) is in place of, and not in addition to, Severance to which Executive would otherwise be entitled under any other agreement between Executive and Freddie Mac

C.  *Cash Sign On Payment.*  Executive will receive a one time cash sign on payment in the amount of $100,000 00 minus legally required and/or other lawful deductions. This payment is subject to the terms and conditions set forth in the Cash Sign On Agreement the Executive executed as a condition of receiving such payment

D.  *Restricted Stock Unit Grant Sign On.*  Executive will receive a one time restricted stock unit grant with a total dollar value of $150,000 00, which is subject to the terms of Freddie Mac's 2004 Stock Compensation Plan, applicable resolutions of the Compensation and Human Resources Committee of the Board of Directors and the grant agreement provided to the Executive

## VI.  Reservation of Rights

Executive agrees that nothing in this Agreement constitutes a contract or commitment by Freddie Mac to continue Executive's employment in any job position for any period of time, nor does anything in this Agreement limit in any way Freddie Mac's right to terminate Executive's employment at any time for any reason

## VII.  Compliance with the Code of Conduct and Corporate Policies & Procedures

As a Freddie Mac employee, Executive will be subject to Freddie Mac's Code of Conduct ("Code") and to Corporate Policy 3 206, Personal Securities Investments Policy ("Policy") that, among other things, limit the investment activities of Freddie Mac employees Executive agrees to fully comply with the Code and the Policy, copies of which are enclosed for Executive s review

Executive further agrees to be bound by, and comply fully with, his/her obligations under the Personal Securities Investments Policy Executive agrees to consult with Freddie Mac's Chief Compliance Officer as soon as practical prior to beginning employment about any investments that Executive or a "covered household member," as that term is defined in the Policy, may have that may be prohibited by the Policy Executive also agrees to disclose prior to beginning employment any other matter or situation that may create a conflict of interest as such term is defined in the Code

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                      Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

5

In addition, prior to beginning employment, Executive agrees to disclose to Freddie Mac's Human Resources Division the terms of any employment, confidentiality or stock grant agreements to which Executive may currently be subject that may affect Executive's future employment or recruiting activities so that Freddie Mac may ensure that Executive's employment by Freddie Mac and conduct as a Freddie Mac emp oyee are not inconsistent with any of their terms

## VIII.  Absence of Any Conflict of Interest

Executive represents that Executive does not have any confidential information, trade secrets or other proprietary information that Executive obtained as the result of Executive's employment with another employer that Executive will be using in Executive's position at Freddie Mac Executive also represents that Executive is not subject to any employment, confidentiality or stock grant agreements, or any other restrictions or limitations imposed by a prior employer, which would affect Executive's ability to perform the duties and responsibilities for Freddie Mac in the job position offered, and further represents that Executive has provided Freddie Mac with copies of any such agreements or limitations so that Freddie Mac can make an independent judgment that Executive's employment with Freddie Mac is not inconsistent with any of its terms.

## IX.  Enforcement

A   Executive acknowledges that Executive may be subject to discipline, up to and including termination of employment, for Executive's breach or threat of breach of any provision of this Agreement

B   Executive agrees that irreparable injury will result to Freddie Mac's business interests in the event of breach or threatened breach of this Agreement, the full extent of Freddie Mac's damages will be impossible to ascertain, and monetary damages will not be an adequate remedy for Freddie Mac  Therefore, Executive agrees that in the event of a breach or threat of breach of any provision(s) of this Agreement, Freddie Mac, in addition to any other relief available, shall be entitled to temporary, preliminary, and permanent equitable relief to restrain any such breach or threat of breach by Executive and all persons acting for and/or in concert with Executive, without the necessity of posting bond or security, which Executive expressly waives

C   Executive agrees that each of Executive's obligations specified in this Agreement is a separate and independent covenant, and that all of Executive's obligations set forth herein shall survive any termination, for any reason, of Executive's Freddie Mac employment  To the extent that any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable because it is overbroad, that provision shall be limited and enforced to the extent permitted by applicable law  Should any provision of this Agreement be declared or determined by any court of competent jurisdiction to be unenforceable or invalid under applicable law, the validity of the remaining obligations will not be affected thereby and only the unenforceable or invalid obligation will be deemed not to be a part of this Agreement

D   This Agreement is governed by, and will be construed in accordance with, the laws of the Commonwealth of Virginia, without regard to its or any other jurisdiction's conflict of law

---

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                          TREASURY-3174                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

6

provisions  Executive agrees that any action related to or arising out of this Agreement shall be brought exclusively in the United States District Court for the Eastern District of Virginia, and Executive hereby irrevocably consents to personal jurisdiction and venue in such court and to service of process by United States Mail or express courier service in any such action

E   If any dispute(s) arise(s) between Freddie Mac and  Executive with respect to any matter which is the subject of this Agreement, the prevailing party in such dispute(s) shall be entitled to recover from the other party all of its costs and expenses, including its reasonable attorneys' fees

**Executive has been advised to discuss all aspects of this Agreement with Executive's private attorney. Executive acknowledges that Executive has carefully read and understands the terms and provisions of this Agreement and that they are reasonable. Executive signs this Agreement voluntarily and accepts all obligations contained in this Agreement in exchange for the consideration to be given to Executive as outlined above, which Executive acknowledges is adequate and satisfactory, and which Executive further acknowledges Freddie Mac is not otherwise obligated to provide to Executive. Neither Freddie Mac nor its agents, representatives, directors, officers or employees have made any representations to Executive concerning the terms or effects of this Agreement, other than those contained in this Agreement.**

By: /s/  Paige H  Kurtz _____     Date: 12/19/07 _____

    Paige H  Kurtz

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 10.52**

**Freddie Mac**

**PC MASTER TRUST AGREEMENT**

**THIS PC MASTER TRUST AGREEMENT** is entered into as of January 4, 2012, by and among Freddie Mac in its corporate capacity as Depositor, Administrator and Guarantor, Freddie Mac in its capacity as Trustee, and the Holders of the PCs offered from time to time pursuant to Freddie Mac's Offering Circular referred to herein

**WHEREAS:**

(a) Freddie Mac is a corporation duly organized and existing under and by virtue of the Freddie Mac Act and has full corporate power and authority to enter into this Agreement and to undertake the obligations undertaken by it herein; and

(b) Freddie Mac may from time to time (i) purchase Mortgages, in accordance with the applicable provisions of the Freddie Mac Act, (ii) as Depositor, transfer and deposit such Mortgages into various trust funds that are established pursuant to this Agreement and that are referred to herein as "PC Pools," (iii) as Trustee, create and issue hereunder, on behalf of the related PC Pool, PCs representing undivided beneficial ownership interests in the assets of that PC Pool and otherwise act as trustee for each such PC Pool, (iv) as Guarantor, guarantee the payment of interest and principal for the benefit of the Holders of such PCs and (v) as Administrator, administer the affairs of each such PC Pool.

**NOW, THEREFORE,** in consideration of the premises and mutual covenants contained in this Agreement, the parties to this Agreement, do hereby declare and establish this Agreement and do hereby undertake and otherwise agree as follows with respect to the transfer of the Mortgages to various PC Pools, the issuance of the PCs and the establishment of the rights and obligations of the parties

**Definitions**

The following terms used in this Agreement have the respective meanings set forth below

*Accrual Period:* As to any PC and any Payment Date, (i) the calendar month preceding the month of the Payment Date for Gold PCs or (ii) the second calendar month preceding the month of the Payment Date for ARM PCs

*Administrator:* Freddie Mac, in its corporate capacity, as administrator of the PC Pools created under this Agreement

*Agreement:* This PC Master Trust Agreement, dated as of January 4, 2012, by and among Freddie Mac in its corporate capacity as Depositor, Administrator and Guarantor, Freddie Mac in its capacity as Trustee, and the Holders of the various PCs, as originally executed, or as modified, amended or supplemented in accordance with the provisions set forth herein  Unless the context requires otherwise, the term "Agreement" shall be deemed to include any applicable Pool Supplement entered into pursuant to Section   0   of this Agreement

*ARM:* An adjustable rate Mortgage

1

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*ARM PC:* A PC with a Payment Delay of 75 days and which is backed by ARMs. ARM PCs include Deferred Interest PCs.

*Book Entry Rules:* The provisions from time to time in effect, currently contained in Title 24, Part 81, Subpart H of the Code of Federal Regulations, setting forth the terms and conditions under which Freddie Mac may issue securities on the book entry system of the Federal Reserve Banks and authorizing a Federal Reserve Bank to act as its agent in connection with such securities

*Business Day:* A day other than (i) a Saturday or Sunday and (ii) a day when the Federal Reserve Bank of New York (or other agent acting as Freddie Mac's fiscal agent) is closed or, as to any Holder, a day when the Federal Reserve Bank that maintains the Holder's account is closed

*Conventional Mortgage:* A Mortgage that is not guaranteed or insured by the United States or any agency or instrumentality of the United States

*Custodial Account:* As defined in Section 3 05(e) of this Agreement

*Deferred Interest:* The amount by which the interest due on a Mortgage exceeds the borrower's monthly payment, which amount is added to the unpaid principal balance of the Mortgage

*Deferred Interest PC:* A PC representing an undivided beneficial ownership interest in a PC Pool that includes Mortgages providing for negative amortization

*Depositor:* Freddie Mac, in its corporate capacity, as depositor of Mortgages into the PC Pools created under this Agreement

*Eligible Investments:* Any one or more of the following obligations, securities or holdings maturing on or before the Payment Date applicable to the funds so invested:

(i) obligations of, or obligations guaranteed as to the full and timely payment of principal and interest by, the United States;

(ii) obligations of any agency or instrumentality of the United States (other than Freddie Mac) or taxable debt obligations of any state or local government (or political subdivision thereof) that have a long term rating or a short term rating, as applicable, from S&P, Moody's or Fitch in any case in one of its two highest rating categories for long term securities or in its highest ratings category for short term securities;

(iii) time deposits of any depository institution or trust company domiciled in the Cayman Islands or Nassau and affiliated with a financial institution that is a member of the Federal Reserve System, provided that the short term securities of the depository institution or trust company are rated by S&P, Moody's or Fitch in the highest applicable ratings category for short term securities;

(iv) federal funds, certificates of deposit, time deposits and bankers' acceptances with a fixed maturity of no more than 365 days of any depository institution or trust company, provided that the short term securities of the depository institution or trust company are rated by S&P, Moody's or Fitch in the highest applicable ratings category for short term securities;

(v) commercial paper with a fixed maturity of no more than 270 days, of any corporation that is rated by S&P, Moody's or Fitch in its highest short term ratings category;

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(vi) debt securities that have a long term rating or a short term rating, as applicable, from S&P, Moody's or Fitch, in any case in one of its two highest ratings categories for long term securities or in its highest ratings category for short term securities;

(vii) money market funds that are registered under the Investment Company Act of 1940, as amended, are entitled, pursuant to Rule 2a 7 of the Securities and Exchange Commission, or any successor to that rule, to hold themselves out to investors as money market funds, and are rated by S&P, Moody's or Fitch in one of its two highest ratings categories for money market funds;

(viii) asset backed commercial paper that is rated by S&P, Moody's or Fitch in its highest short term ratings category;

(ix) repurchase agreements on obligations that are either specified in any of clauses (i), (ii), (iv), (v), (vi) or (viii) above or are mortgage backed securities insured or guaranteed by an entity that is an agency or instrumentality of the United States; provided that the counterparty to the repurchase agreement is an entity whose short term debt securities are rated by S&P, Moody's or Fitch in its highest ratings category for short term securities; and

(x) any other investment without options that is approved by Freddie Mac and is within the two highest ratings categories of the applicable rating agency for long term securities or the highest ratings category of the applicable rating agency for short term securities

The rating requirement will be satisfied if the relevant security, issue or fund at the time of purchase receives at least the minimum stated rating from at least one of S&P, Moody's or Fitch. The rating requirement will not be satisfied by a rating that is the minimum rating followed by a minus sign or by a rating lower than Aa2 from Moody's

*Event of Default:* As defined in Section 5 01 of this Agreement

*FHA/VA Mortgage:* A Mortgage insured by the Federal Housing Administration or by the Department of Agriculture Rural Development (formerly the Rural Housing Service) or guaranteed by the Department of Veterans Affairs or the Department of Housing and Urban Development

*Final Payment Date:* As to any PC, the first day of the latest month in which the related Pool Factor will be reduced to zero  The Administrator publishes the Final Payment Date upon formation of the related PC Pool

*Fitch:* Fitch, Inc., also known as Fitch Ratings, or any successor thereto.

*Freddie Mac:* The Federal Home Loan Mortgage Corporation, a corporation created pursuant to the Freddie Mac Act for the purpose of establishing and supporting a secondary market in residential mortgages  Unless the context requires otherwise, the term "Freddie Mac" shall be deemed to refer to Freddie Mac acting in one or more of its corporate capacities, as specified or as provided in context, and not in its capacity as Trustee

*Freddie Mac Act:* Title III of the Emergency Home Finance Act of 1970, as amended, 12 U.S.C. §§1451 1459.

*Gold PC:* A PC with a Payment Delay of 45 days and which is backed by fixed rate Mortgages

*Guarantor:* Freddie Mac, in its corporate capacity, as guarantor of the PCs issued by each PC Pool.

3

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012       Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Guide:* Freddie Mac's Single Family Seller/Servicer Guide, as supplemented and amended from time to time, in which Freddie Mac sets forth its mortgage purchase standards, credit, appraisal and underwriting guidelines and servicing policies.

*Holder:* With respect to any PC Pool, any entity that appears on the records of a Federal Reserve Bank as a holder of the related PCs

*Monthly Reporting Period:* The period, which period the Administrator has the right to change as provided in Section 3 05(d) of this Agreement, during which servicers report Mortgage payments to the Administrator, generally consisting of:

(i) in the case of all payments other than full prepayments on the Mortgages, the one month period (A) ending on the 15 $^t$ of the month preceding the related Payment Date for Gold PCs and (B) ending on the 15 $^t$ of the second month preceding the related Payment Date for ARM PCs; and

(ii) in the case of full prepayments on the Mortgages (including repurchases of the Mortgages pursuant to Section 02(c) of this Agreement), the calendar month preceding the related Payment Date for Gold PCs and the second calendar month preceding the related Payment Date for ARM PCs; *provided, however,* that with respect to full prepayments on PCs issued before September 1, 1995, the Monthly Reporting Period generally is from the 16 $^t$ of a month through the 15 $^t$ of the next month

*Moody's:* Moody's Investors Service, Inc , or any successor thereto

*Mortgage:* A mortgage loan or a participation interest in a mortgage loan that is secured by a first or second lien on a one to four family dwelling and that has been purchased by the Depositor and transferred by the Depositor to the Trustee for inclusion in the related PC Pool  With respect to each PC Pool, the Mortgages to be included therein shall be identified on the books and records of the Depositor and the Administrator

*Mortgage Coupon:* The per annum fixed or adjustable interest rate of a Mortgage

*MultiLender Swap Program:* A program under which Freddie Mac purchases Mortgages from one or more sellers in exchange for PCs representing undivided beneficial ownership interests in a PC Pool consisting of Mortgages that may or may not be those delivered by the seller(s)

*Negative Amortization Factor:* With respect to PCs backed by Mortgages providing for negative amortization, a truncated eight digit decimal number that reflects the amount of Deferred Interest added to the principal balances of the related Mortgages in the preceding month

*Offering Circular:* Freddie Mac's Mortgage Participation Certificates Offering Circular dated January 4, 2012, as amended and supplemented by any Supplements issued from time to time, or any successor thereto, as it may be amended and supplemented from time to time

*Payment Date:* The 15th of each month or, if the 15th is not a Business Day, the next Business Day.

*Payment Delay:* The delay between the first day of the Accrual Period for a PC and the related Payment Date

*PC:* With respect to each PC Pool, a Mortgage Participation Certificate issued pursuant to this Agreement, representing a beneficial ownership interest in such PC Pool  The term "PC'' includes a Gold PC or an ARM PC unless the context requires otherwise

4

---

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3179

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*PC Coupon:* The per annum fixed or adjustable rate of a PC calculated as described in the Offering Circular or the applicable Pool Supplement, computed on the basis of a 360 day year of twelve 30 day months

*PC Issue Date:* With respect to each PC Pool, the date specified in the related Pool Supplement or, if not specified therein, the date on which Freddie Mac issues a PC in exchange for the Mortgages delivered by a dealer or other customer

*PC Pool:* With respect to each PC, the corpus of the related trust fund created by this Agreement, consisting of (i) the related Mortgages and all proceeds thereof, (ii) amounts on deposit in the Custodial Account, to the extent allocable to such PC Pool, (iii) the right to receive payments under the related guarantee and (iv) any other assets specified in the related Pool Supplement, excluding any investment earnings on any of the assets of that PC Pool  With respect to each PC Pool, and unless expressly stated otherwise, the provisions of this Agreement will be interpreted as referring only to the Mortgages included in that PC Pool, the PCs issued by that PC Pool and the Holders of those PCs.

*Person:* Any legal person, including any individual, corporation, partnership, limited liability company, financial institution, joint venture, association, joint stock company, trust, unincorporated organization or governmental unit or political subdivision of any governmental unit.

*Pool Factor:* With respect to each PC Pool, a truncated eight digit decimal calculated for each month by the Administrator which, when multiplied by the original principal balance of the related PCs, will equal their remaining principal amount  The Pool Factor for any month reflects the remaining principal amount after the payment to be made on the Payment Date in the same month for Gold PCs or in the following month for ARM PCs

*Pool Supplement:* Any physical or electronic document or record (which may be a supplement to the Offering Circular or any other supplemental document prepared by Freddie Mac for the related PCs), which, together herewith, evidences the establishment of a PC Pool and modifies, amends or supplements the provisions hereof in any respect whatsoever  The Pool Supplement for a particular PC Pool shall be binding and effective upon formation of the related PC Pool and issuance of the related PCs, whether or not such Pool Supplement is executed, delivered or published by Freddie Mac

*Purchase Documents:* The mortgage purchase agreements between Freddie Mac and its Mortgage sellers and servicers, which are the contracts that govern the purchase and servicing of Mortgages and which include, among other things, the Guide and any negotiated modifications, amendments or supplements to the Guide

*Record Date:* As to any Payment Date, the close of business on the last day of (i) the preceding month for Gold PCs or (ii) the second preceding month for ARM PCs.

*S&P:* Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc., or any successor thereto.

*Trustee:* Freddie Mac, in its capacity as trustee of each PC Pool formed under this Agreement, and its successors and assigns, which will have the trustee responsibilities specified in this Agreement, as amended or supplemented from time to time

*Trustee Event of Default:* As defined in Section 6 06 of this Agreement

5

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# ARTICLE I

## Conveyance of Mortgages; Creation of PC Pools

**Section 1.01. Declaration of Trust; Transfer of Mortgages.** The Depositor, by delivering any Mortgages pursuant to this Agreement, unconditionally, absolutely and irrevocably hereby transfers, assigns, sets over and otherwise conveys to the Trustee, on behalf of the related Holders, all of the Depositor's right, title and interest in and to such Mortgages, including all payments of principal and interest thereon received after the month in which the PC Issue Date occurs  Once Mortgages have been identified as being part of a related PC Pool for which at least one PC has been issued, they shall remain in that PC Pool unless removed in a manner consistent with this Agreement  Concurrently with the Depositor's transferring, assigning, setting over and otherwise conveying the Mortgages to the Trustee for a PC Pool, the Trustee hereby accepts the Mortgages so conveyed and acknowledges that it holds the entire corpus of each PC Pool in trust for the exclusive benefit of the related Holders and shall deliver to, or on the order of, the Depositor, the PCs issued by such PC Pool  The Administrator agrees to administer the related PC Pool and such PCs in accordance with the terms of this Agreement  On the related PC Issue Date and upon payment to the Depositor for any such PC by a Holder, such Holder shall, by virtue thereof, acknowledge, accept and agree to be bound by all of the terms and conditions of this Agreement

A Pool Supplement shall evidence the establishment of a particular PC Pool and shall relate to specific PCs representing the entire beneficial ownership interests in such PC Pool  If for any reason the creation of a Pool Supplement is delayed, Freddie Mac shall create one as soon as practicable, and such delay shall not affect the validity and existence of the PC Pool or the related PCs  With respect to each PC Pool, the collective terms hereof and of the related Pool Supplement shall govern the issuance and administration of the PCs related to such PC Pool, and all matters related thereto, and shall have no applicability to any other PC Pool or PCs  As applied to each PC Pool, the collective terms hereof and of the related Pool Supplement shall constitute an agreement as if the collective terms of those instruments were set forth in a single instrument  In the event of a conflict between the terms hereof and the terms of a Pool Supplement for a PC Pool, the terms of the Pool Supplement shall control with respect to that PC Pool  A Pool Supplement is not considered an amendment to this Agreement requiring approval pursuant to Section 7 05

**Section 1.02. Identity of the Mortgages; Substitution and Repurchase.**

(a) In consideration for the transfer of the related Mortgages by the Depositor to a PC Pool, the Depositor (i) shall receive the PCs issued by such PC Pool and (ii) may retain such PCs or transfer them to the related Mortgage seller or otherwise, as the Depositor deems appropriate

(b) After the PC Issue Date but prior to the first Payment Date, the Depositor may, in accordance with its customary mortgage purchase and pooling procedures, adjust the amount and identity of the Mortgages to be transferred to a PC Pool, the PC Coupon and/or the original unpaid principal balance of the PCs and the Mortgages in the PC Pool, provided that any changes to the characteristics of the PCs shall be evidenced by an amendment or supplement to the related Pool Supplement

(c) Except as provided in this Section 1 02 or in Section 1 03, once the Depositor has transferred a Mortgage to a particular PC Pool, such Mortgage may not be transferred out of such PC Pool, except (x) if a mortgage insurer exercises an option under an insurance contract to purchase such Mortgage or (y) in the case of repurchase by the Guarantor, the Administrator or the related Mortgage seller or servicer, under the following circumstances:

(i) The Guarantor may repurchase from the related PC Pool a Mortgage in connection with a guarantee payment under Section 3 09(a)(ii)

6

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(ii) The Administrator may repurchase from the related PC Pool, or require or permit a Mortgage seller or servicer to repurchase, any Mortgage if a repurchase is necessary or advisable (A) to maintain servicing of the Mortgage in accordance with the provisions of the Guide, or (B) to maintain the status of the PC Pool as a grantor trust for federal income tax purposes

(iii) The Guarantor may repurchase from the related PC Pool, or require or permit a Mortgage seller or servicer to repurchase, any Mortgage if (A) such Mortgage is 120 or more days delinquent, or (B) the Guarantor determines, on the basis of information from the related borrower or servicer, that loss of ownership of the property securing a Mortgage is likely or default is imminent due to borrower incapacity, death or hardship or other extraordinary circumstances that make future payments on such Mortgage unlikely or impossible.

(iv) The Guarantor may repurchase from the related PC Pool a Mortgage if a bankruptcy court approves a plan that materially affects the terms of the Mortgage or authorizes a transfer or substitution of the underlying property

(v) The Administrator may require or permit a Mortgage seller or servicer to repurchase from the related PC Pool any Mortgage or (within six months of the issuance of the related PCs) substitute for any Mortgage a Mortgage of comparable type, unpaid principal balance, remaining term and yield, if there is (A) a material breach of warranty by the Mortgage seller or servicer, (B) a material defect in documentation as to such Mortgage or (C) a failure by a seller or servicer to comply with any requirements or terms set forth in the Guide and, if applicable, other Purchase Documents

(vi) The Administrator shall repurchase from the related PC Pool any Mortgage or (within two years of the issuance of the related PCs) substitute for any Mortgage a Mortgage of comparable type, unpaid principal balance, remaining term and yield, if (A) a court of competent jurisdiction or a federal government agency duly authorized to oversee or regulate Freddie Mac's mortgage purchase business determines that Freddie Mac's purchase of such Mortgage was unauthorized and Freddie Mac determines that a cure is not practicable without unreasonable effort or expense or (B) such court or government agency requires repurchase of such Mortgage

(vii) To the extent a PC Pool includes convertible ARMs or Balloon/Reset Mortgages (each, as defined in the Offering Circular), the Administrator shall repurchase from the related PC Pool or require or allow the Mortgage seller or servicer to repurchase such Mortgages (a) when the borrower exercises its option to convert the related interest rate from an adjustable rate to a fixed rate, in the case of a convertible ARM; and (b) shortly before such Mortgage reaches its scheduled balloon repayment date, in the case of a Balloon/Reset Mortgage

(d) The purchase price of a Mortgage repurchased by a Mortgage seller or servicer shall be equal to the then unpaid principal balance of such Mortgage, less any principal on such Mortgage that the Mortgage seller or servicer advanced to the Depositor or the Administrator  The purchase price of a Mortgage repurchased by the Administrator or the Guarantor under this Agreement shall be equal to the then unpaid principal balance of such Mortgage, less any outstanding advances of principal on such Mortgage that the Administrator, on behalf of the Trustee, distributed to Holders. The Administrator, on behalf of the Trustee, agrees to release any Mortgage from the PC Pool upon payment of the applicable purchase price

(e) In determining whether a Mortgage shall be repurchased from the related PC Pool as described in this Section 1 02, the Guarantor and the Administrator may consider such factors as they deem appropriate, including the reduction of administrative costs (in the case of the Administrator) or possible exposure as Guarantor under its guarantee (in the case of the Guarantor)

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                                 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Section 1.03. Post Settlement Purchase Adjustments**

(a) The Administrator shall make any post settlement purchase adjustments necessary to reflect the actual aggregate unpaid principal balance of the related Mortgages or other Mortgage characteristics as of the date of their purchase by the Depositor or their delivery to the Trustee in exchange for PCs, as the case may be.

(b) Post settlement adjustments may be made in such manner as the Administrator deems appropriate, but shall not adversely affect any Holder's rights to monthly payments of interest at the PC Coupon, any Holder's pro rata share of principal or any Holder's rights under the Guarantor's guarantees. Any reduction in the principal balance of the Mortgages held by a PC Pool shall be reflected by the Administrator as a corresponding reduction in the principal balance of the related PCs with a corresponding principal payment to the related Holders, on a pro rata basis

**Section 1.04. Custody of Mortgage Documents.**  With respect to each PC Pool, the Administrator, a custodian acting as its agent (which may be a third party or a trust or custody department of the related seller or servicer), or the originator or seller of the Mortgage may hold the related Mortgage documents, including Mortgage notes and participation certificates evidencing the Trustee's legal ownership interest in the Mortgages  The Administrator may adopt and modify its policies and procedures for the custody of Mortgage documents at any time, provided such modifications are prudent and do not materially and adversely affect the Holders' interests

**Section 1.05. Interests Held or Acquired by Freddie Mac.**  Freddie Mac shall have the right to purchase and hold for its own account any PCs. Subject to Section 7 06, PCs held or acquired by Freddie Mac from time to time and PCs held by other Holders shall have equal and proportionate benefits, without preference, priority or distinction  In the event that Freddie Mac retains any interest in a Mortgage, the remaining interest in which is part of a PC Pool, Freddie Mac's interest in such Mortgage shall rank equally with that of the related PC Pool, without preference, priority or distinction  No Holder shall have any priority over any other Holder

**Section 1.06. Intended Characterization.**  It is intended that the conveyance, transfer, assignment and setting over of the Mortgages by the Depositor to the Trustee pursuant to this Agreement be a true, absolute and unconditional sale of the related Mortgages by the Depositor to the Trustee, and not a pledge of the Mortgages to secure a debt or other obligation of the Depositor, and that the Holders of the related PCs shall be the beneficial owners of such Mortgages  Notwithstanding this express intention, however, if the Mortgages are determined by a court of competent jurisdiction or other competent authority to be the property of the Depositor, then it is intended that: (a) this Agreement be deemed to be a security agreement within the meaning of Articles 8 and 9 of the Uniform Commercial Code; (b) the conveyances provided for in Section 1 01 shall be deemed to be (1) a grant by the Depositor to the Trustee on behalf of the related Holders of a security interest in all of the Depositor's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to the related Mortgages, any and all general intangibles consisting of, arising from or relating to any of the foregoing, and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all amounts from time to time held or invested in the Custodial Account and allocable to such Mortgages, whether in the form of cash, instruments, securities or other property and (2) an assignment by the Depositor to the Trustee on behalf of the related Holders of any security interest in any and all of the Depositor's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to the property described in the foregoing clause (  ); and (c) notifications to Persons holding such property, and acknowledgments, receipts or confirmations from Persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, financial intermediaries, bailees or agents (as applicable) of the Trustee on behalf of the related Holders, for the purpose of perfecting such security interest under applicable law

8

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Section 1.07. Encumbrances.** Except as may otherwise be provided expressly in this Agreement, neither Freddie Mac nor the Trustee shall directly or indirectly, assign, sell, dispose of or transfer all or any portion of or interest in any PC Pool, or permit all or any portion of any PC Pool to be subject to any lien, claim, mortgage, security interest, pledge or other encumbrance of any other Person  This Section shall not be construed as a limitation on Freddie Mac's rights with respect to PCs held by it in its corporate capacity

## ARTICLE II

### Administration and Servicing of the Mortgages

**Section 2.01. The Administrator as Primary Servicer.** With respect to each PC Pool, the Administrator shall service or supervise servicing of the related Mortgages and administer, on behalf of the Trustee, in accordance with the provisions of the Guide and this Agreement, including management of any property acquired through foreclosure or otherwise, all for the benefit of the related Holders  The Administrator shall have full power and authority to do or cause to be done any and all things in connection with such servicing and administration that the Administrator deems necessary or desirable. The Administrator shall seek from the Trustee, as representative of the related Holders, any consents or approvals relating to the control, management and servicing of the Mortgages included in any PC Pool and that are required hereunder

**Section 2.02. Servicing Responsibilities.** With respect to each PC Pool, the Administrator shall service or supervise servicing of the related Mortgages in a manner consistent with prudent servicing standards and in substantially the same manner as the Administrator services or supervises the servicing of unsold mortgages of the same type in its portfolio  In performing its servicing responsibilities hereunder, the Administrator may engage servicers, subservicers and other independent contractors or agents  The Administrator may discharge its responsibility to supervise servicing of the Mortgages by monitoring servicers' performance on a reporting and exception basis  Except as provided in Articles V and VI and Sections 7 05 and 7 06 of this Agreement, Freddie Mac, as Administrator shall not be subject to the control of the Holders in the discharge of its responsibilities pursuant to this Article  Except with regard to its guarantee obligations pursuant to Section 3 09 with respect to a PC Pool, the Administrator shall have no liability to any related Holder for the Administrator's actions or omissions in discharging its responsibilities under this Article II other than for any direct damage resulting from its failure to exercise that degree of ordinary care it exercises in the conduct and management of its own affairs  In no event shall the Administrator have any liability for consequential damages

**Section 2.03. Realization Upon Defaulted Mortgages.** With respect to each PC Pool, unless the Administrator deems that another course of action (e g , charge off) would be in the best economic interest of the Holders, the Administrator (or its authorized designee or representative) shall, as soon as practicable, foreclose upon (or otherwise comparably convert the ownership of) any real property securing a Mortgage which comes into and continues in default and as to which no satisfactory arrangements can be made for collection of delinquent payments  In connection with such foreclosure or conversion, the Administrator (or its authorized designee or representative) shall follow such practices or procedures as it deems necessary or advisable and consistent with general mortgage servicing standards.

**Section 2.04. Automatic Acceleration and Assumptions.**

(a) With respect to each PC Pool, to the extent provided in the Guide, the Administrator shall enforce the terms of each applicable Mortgage that gives the mortgagee the right to demand full payment of the unpaid principal balance of the Mortgage upon sale or transfer of the property securing the Mortgage regardless of the creditworthiness of the transferee (a right of "automatic acceleration''), subject to applicable state and federal law and the Administrator's then current servicing policies

9

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(b) With respect to each PC Pool, the Administrator shall permit the assumption by a new mortgagor of an FHA/VA Mortgage upon the sale or transfer of the underlying property, as required by applicable regulations. Any such assumption shall be in accordance with applicable regulations, policies, procedures and credit requirements and shall not result in loss or impairment of any insurance or guaranty.

**Section 2.05. Prepayment Penalties.** Unless otherwise provided in the Pool Supplement for a PC Pool, the related Holders shall not be entitled to receive any prepayment penalties, assumption fees or other fees charged on the Mortgages included in such PC Pool, and either the related servicer or the Administrator shall retain such amounts.

**Section 2.06. Mortgage Insurance and Guarantees.**

(a) With respect to each PC Pool, if a Conventional Mortgage is insured by a mortgage insurer and the mortgage insurance policy is an asset of such PC Pool, the related Holders acknowledge that the insurer shall have no obligation to recognize or deal with any Person other than the Administrator, the Trustee, or their respective authorized designees or representatives regarding the mortgagee's rights, benefits and obligations under the related insurance contract

(b) With respect to each PC Pool, each FHA/VA Mortgage shall have in full force and effect a certificate or other satisfactory evidence of insurance or guaranty, as the case may be, as may be issued by the applicable government agency from time to time  None of these agencies has any obligation to recognize or deal with any Person other than the Administrator, the Trustee, or their respective authorized designees or representatives with regard to the rights, benefits and obligations of the mortgagee under the contract of insurance or guaranty relating to each FHA/VA Mortgage included in such PC Pool

# ARTICLE III

## Distributions to Holders; Guarantees

**Section 3.01. Monthly Reporting Period.** For purposes of this Agreement with respect to any PC Pool, any payment or any event with respect to any Mortgage included in such PC Pool that is reported to the Administrator by the related servicer as having been made or having occurred within a Monthly Reporting Period shall be deemed to have been received by the Administrator or to have in fact occurred within such Monthly Reporting Period used by the Administrator for such purposes. Payments reported by servicers include all principal and interest payments made by a borrower, insurance proceeds, liquidation proceeds and repurchase proceeds. Events reported by servicers include foreclosure sales, payments of insurance claims and payments of guarantee claims

**Section 3.02. Holder's Undivided Beneficial Ownership Interest.** With respect to each PC Pool, the Holder of a PC on the Record Date shall be the owner of record of a pro rata undivided beneficial ownership interest in the remaining principal balance of the Mortgages in the related PC Pool as of such date and shall be entitled to interest at the PC Coupon on such pro rata undivided beneficial ownership interest, in each case on the related Payment Date  Such pro rata undivided beneficial ownership interest shall change accordingly if any Mortgage is added to or removed from such PC Pool in accordance with this Agreement  A Holder's pro rata undivided beneficial ownership interest in the Mortgages included in a PC Pool is calculated by dividing the original unpaid principal balance of the Holder's PC by the original unpaid principal balance of all the Mortgages in the related PC Pool

**Section 3.03. Distributions of Principal.** With respect to each PC Pool, the Administrator, on behalf of the Trustee, shall withdraw from the Custodial Account and shall distribute to each related Holder its pro rata share of principal collections with respect to the Mortgages in such PC Pool, including, if applicable, each Holder's pro rata share of the aggregate amount of any Deferred Interest that has been

0

TREASURY-3185

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

added to the principal balance of the related Mortgages; *provided, however*, that with respect to guarantee payments, the Guarantor's obligations herein shall be subject to its subrogation rights pursuant to Section 3.10. The Administrator may retain from any prepayment or delinquent principal payment on any Mortgage, for reimbursement to the Guarantor, any amount not previously received with respect to such Mortgage but paid by the Guarantor to the related Holders under its guarantee  For Mortgages purchased by the Depositor in exchange for PCs under its MultiLender Swap Program, the Depositor shall retain principal payments made on such Mortgages in the amount of any difference between the aggregate unpaid principal balance of the Mortgages as of delivery by the seller and the aggregate unpaid principal balance as of the PC Issue Date, and the Depositor shall purchase additional Mortgages with such principal payments; such additional Mortgages may or may not be included in the related PC Pool represented by the PCs received by the seller

**Section 3.04. Distributions of Interest.** With respect to each PC Pool, the Administrator, on behalf of the Trustee, shall withdraw from the Custodial Account and shall distribute to each related Holder its pro rata share of interest collections with respect to the Mortgages included in such PC Pool, at a rate equal to the PC Coupon (excluding, if applicable, each Holder's pro rata share of any Deferred Interest that has been added to the principal balance of the related Mortgages)  Interest shall accrue during the applicable Accrual Periods  The Administrator may retain from any delinquent interest payment on any Mortgage, for reimbursement to the Guarantor, any amount not previously received with respect to such Mortgage but paid by the Guarantor to the related Holders under its guarantee  With respect to each PC Pool, a partial month's interest retained by Freddie Mac or remitted to the related Holders with respect to prepayments shall constitute an adjustment to the fee payable to the Administrator and the Guarantor pursuant to Section 3 08(a) for such PC Pool

**Section 3.05. Payments.**

(a) With respect to each PC Pool, distributions of principal and interest on the related PCs shall begin in the month after issuance for Gold PCs and in the second month after issuance for ARM PCs. The Administrator, on behalf of the Trustee, shall calculate, or cause to be calculated, for each PC the distribution amount for the current calendar month

(b) On or before each Payment Date, the Administrator, on behalf of the Trustee, shall instruct the Federal Reserve Banks to credit payments on PCs from the Custodial Account to the appropriate Holders' accounts  The related PC Pool's payment obligations shall be met upon transmittal of the Administrator's payment order to the Federal Reserve Banks provided sufficient funds are then on deposit in the Custodial Account  A Holder shall receive the payment of principal, if applicable, and interest on each Payment Date on each PC held by such Holder as of the related Record Date

(c) The Administrator relies on servicers' reports of mortgage activity to prepare the Pool Factors  There may be delays or errors in processing mortgage information, such as a servicer's failure to file an accurate or timely report of its collections of principal or its having filed a report that cannot be processed  In these situations the Administrator's calculation of scheduled principal to be made on Gold PCs may not reflect actual payments on the related Mortgages  The Administrator shall account for and reconcile any differences as soon as practicable.

(d) The Administrator reserves the right to change the period during which a servicer may hold funds prior to payment to the Administrator, as well as the period for which servicers report payments to the Administrator, including adjustments to the Monthly Reporting Period  Either change may change the time at which prepayments are distributed to Holders. Any such change, however, shall not impair Holders' rights to payments as otherwise provided in this Section.

(e) The Administrator shall maintain one or more accounts (together, the "Custodial Account"), segregated from the general funds of Freddie Mac, in its corporate capacity, for the deposit of collections of

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3186

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

principal (including full and partial principal prepayments) and interest received from or advanced by the servicers in respect of the Mortgages  Mortgage collections in respect of the PC Pools established by Freddie Mac under this Agreement or trust funds established by Freddie Mac pursuant to any other trust agreements may be commingled in the Custodial Account, provided that the Administrator keeps, or causes to be kept, separate records of funds with respect to each such PC Pool and other trust fund  Collections due to Freddie Mac, in its corporate capacity as owner of mortgages held in its portfolio, may also be commingled in the Custodial Account, provided that the Administrator shall withdraw such amounts for remittance to Freddie Mac on a monthly basis. Funds on deposit in the Custodial Account may be invested by the Administrator in Eligible Investments  Investment earnings on deposits in the Custodial Account shall be for the benefit of the Administrator, and any losses on such investments shall be paid by the Administrator. On each Payment Date, amounts on deposit in the Custodial Account shall be withdrawn upon the order of the Administrator, on behalf of the Trustee, for the purpose of making distributions to the related Holders, in accordance with this Agreement

**Section 3.06. Pool Factors.**

(a) The Administrator, on behalf of the Trustee, shall calculate and make payments to Holders on each Payment Date based on the monthly Pool Factors (including Negative Amortization Factors) until such time as the Administrator determines that a more accurate and practicable method for calculating such payments is available and implements that method  Pursuant to Section 7 05(e), the Administrator may modify the Pool Factor methodology from time to time, without the consent of Holders  With respect to each PC Pool, the Administrator, on behalf of the Trustee, shall do the following:

(i) The Administrator shall publish or cause to be published for each month a Pool Factor with respect to each PC Pool  Beginning in the month after formation of a PC Pool, Pool Factors shall be published on or about the fifth Business Day of the month, which Pool Factors may reflect prepayments reported to the Administrator after the end of the related Monthly Reporting Period and before the publication of the applicable Pool Factors  However, the Administrator may, in its own discretion, publish Pool Factors on any other Business Day. The Pool Factor for the month in which the PC Pool is established is   00000000 and need not be published

(ii) The Administrator shall distribute principal each month to a Holder of a Gold PC in an amount equal to such Holder's pro rata share of such principal, calculated by multiplying the original principal balance of the Gold PC by the difference between its Pool Factors for the preceding and current months.

(iii) The Administrator shall distribute principal each month to a Holder of an ARM PC in an amount equal to such Holder's pro rata share of such principal, calculated by multiplying the original principal balance of the ARM PC by the difference between its Pool Factors for the two preceding months

(iv) The Administrator shall distribute interest each month in arrears to a Holder (assuming no Deferred Interest) in an amount equal to 1/12th of the applicable PC Coupon multiplied by such Holder's pro rata share of principal, calculated by multiplying the original principal balance of such Holder's PC by the preceding month's Pool Factor for Gold PCs or by the second preceding month's Pool Factor for ARM PCs

(v) For any month that Deferred Interest has accrued on a Deferred Interest PC, the Administrator shall distribute principal (if any is due) to a Holder in an amount equal to such Holder's pro rata share of principal, calculated by (A) subtracting the preceding month's Pool Factor from the second preceding month's Pool Factor, (B) adding to the difference the Negative Amortization Factor for the preceding month and (C) multiplying the resulting sum by the original PC principal balance  The interest payment on the Deferred Interest PC in that month shall be (i) 1/12th of the PC Coupon

12

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

multiplied by (ii) the original principal balance of the Holder's PC multiplied by (iii) the preceding month's Pool Factor minus the preceding month's Negative Amortization Factor

(b) With respect to each PC Pool, a Pool Factor shall reflect prepayments reported for the applicable Monthly Reporting Period  The Administrator, on behalf of the Trustee, may also, in its discretion, reflect in a Pool Factor any prepayments reported after the end of the applicable Monthly Reporting Period  To the extent a given Pool Factor (adjusted as necessary for payments made pursuant to the Guarantor's guarantee of timely payment of scheduled principal on Gold PCs) does not reflect the actual unpaid principal balance of the related Mortgages, the Administrator shall account for any difference by adjusting subsequent Pool Factors as soon as practicable

(c) In the case of a PC Pool that is comprised of ARMs, a Pool Factor shall be based upon the unpaid principal balance of the related Mortgages that servicers report to the Administrator for the Monthly Reporting Period that ended in the second month preceding the month in which the Pool Factor is published. The Administrator, on behalf of the Trustee, may also, in its discretion, include as part of the aggregate principal payment in any month any prepayments received after the Monthly Reporting Period that ended in the second month preceding the month in which the Pool Factor is published  To the extent a given Pool Factor does not reflect the actual aggregate unpaid principal balance of the Mortgages, the Administrator shall account for any difference by adjusting subsequent Pool Factors as soon as practicable

(d) The Pool Factor method for a PC Pool may affect the timing of receipt of payments by related Holders but shall not affect the Guarantor's guarantee with respect to such PC Pool, as set forth in Section 3 09  The Guarantor's guarantee shall not be affected by the implementation of any different method for calculating and paying principal and interest for any PC Pool, as permitted by this Section 3.06.

### Section 3.07. Servicing Fees; Retained Interest.

(a) To the extent provided by contractual arrangement with the Administrator, with respect to each PC Pool, the related servicer of each Mortgage included in such PC Pool shall be entitled to retain each month, as a servicing fee, any interest payable by the borrower on a Mortgage that exceeds the servicer's required remittance with respect to such Mortgage  Each servicer is required to pay all expenses incurred by it in connection with its servicing activities and shall not be entitled to reimbursement for those expenses, except as provided in Section 3 08(c)  If a servicer advances any principal and/or interest on a Mortgage to the Administrator prior to the receipt of such funds from the borrower, the servicer may retain (i) from prepayments or collections of delinquent principal on such Mortgage any payments of principal so advanced, or (ii) from collections of delinquent interest on such Mortgage any payments of interest so advanced  To the extent permitted by its servicing agreement, the servicer is entitled to retain as additional compensation certain incidental fees related to Mortgages it services

(b) With respect to a PC Pool, pursuant to the related Purchase Documents, a seller may retain each month as extra compensation a fixed amount of interest on a Mortgage included in such PC Pool  In such event, the related servicer shall retain each month as a servicing fee the excess of any interest payable by the borrower on such Mortgage (less the seller's retained interest amount) over the servicer's required remittance with respect to such Mortgage

### Section 3.08. Administration Fee; Guarantee Fee.

(a) Subject to any adjustments required by Section 3 04, with respect to any PC Pool, the Administrator and the Guarantor shall be entitled to receive from monthly interest payments on each related Mortgage a fee (to be allocated between the Administrator and the Guarantor as they may agree) equal to the excess of any interest received by the Administrator from the servicer over the amount of interest payable to the related Holders;  *provided, however,* that the aggregate fee amount shall be automatically adjusted with respect to each PC Pool to the extent a Pool Factor does not reflect the unpaid principal

3

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

balance of the Mortgages  Any such adjustment shall equal the difference between (i) interest at the applicable PC Coupon computed on the aggregate unpaid principal balance of the Mortgages for such month based on monthly principal payments actually received by the Administrator and (ii) interest at the applicable PC Coupon computed on the remaining balance of the Mortgages included in the PC Pool derived from the Pool Factor  The Administrator shall (i) withdraw the aggregate fee amount from the Custodial Account prior to distributions to the related Holders, (ii) retain its portion of the fee for the Administrator's own account and (iii) remit the remaining portion of the fee to the Guarantor as the guarantee fee  In addition, the Administrator is entitled to retain as additional compensation certain incidental fees on the Mortgages as provided in Section 2 05 and certain investment earnings as provided in Section 3 05(e)

(b) The Depositor shall pay all expenses incurred in connection with the transfer of the Mortgages, the establishment and administration of each PC Pool and the issuance of the PCs  Any amounts (including attorney's fees) expended by the Trustee or the Administrator (or the servicers on the Administrator's behalf) for the protection, preservation or maintenance of the Mortgages, or of the real property securing the Mortgages, or of property received in liquidation of or realization upon the Mortgages, shall be expenses to be borne pro rata by the Administrator and the Holders in accordance with their interests in each Mortgage  The Administrator, on behalf of the Trustee, may retain an amount sufficient to pay the portion of such expenses borne pro rata by the Depositor and the Holders from payments otherwise due to Holders, which may affect the timing of receipt of payments by Holders but shall not affect the Guarantor's obligations under Section 3 09

(c) The Administrator shall reimburse a servicer for any amount (including attorney's fees) it expends (on the Administrator's behalf and with its approval) for the protection, preservation or maintenance of the Mortgages, or of the real property securing the Mortgages, or of property received in liquidation of or realization upon the Mortgages  Such expenses shall be reimbursable to the servicer from the assets of the related PC Pool, to the extent provided in the Guide

(d) Any fees and expenses described above shall not affect the Guarantor's guarantee with respect to any PC Pool, as set forth in Section 3 09

**Section 3.09. Guarantees.**

(a) With respect to each PC Pool, the Guarantor guarantees to the Trustee and to each Holder of a PC:

(i) the timely payment of interest at the applicable PC Coupon;

(ii) the full and final payment of principal on the underlying Mortgages on or before the Payment Date that falls (A) in the month of its Final Payment Date, for Gold PCs, or (B) in the month after its Final Payment Date, for ARM PCs; and

(iii) for Gold PCs only, the timely payment of scheduled principal on the underlying Mortgages

In the case of Deferred Interest PCs, the Guarantor's guarantee of principal includes, and its guarantee of interest excludes, any Deferred Interest added to the principal balances of the related Mortgages  The Guarantor shall make payments of any guaranteed amounts by transfer to the Custodial Account for distribution to the related Holders, in accordance with Sections 3 03 and 3 04  The guarantees pursuant to this Section will inure to the benefit of each PC Pool and its related Holders, and shall be enforceable by the Trustee of that PC Pool and by such Holders, as provided in Article V of this Agreement

(b) The Guarantor shall compute guaranteed scheduled monthly principal payments on any Gold PC, subject to any applicable adjustments, in accordance with procedures adopted by the Guarantor from time to time  With respect to each PC Pool, any payment the Guarantor makes to the Administrator, on behalf

4

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

of the Trustee, on account of the Guarantor's guarantee of scheduled principal payments shall be considered to be a payment of principal for purposes of calculating the Pool Factor for such PC Pool and the Holder's pro rata share of the remaining unpaid principal balance of the related Mortgages

(c) The Guarantor's guarantees shall continue to be effective or shall be reinstated (i) in the event that any principal or interest payment made to a Holder is for any reason returned by the Holder pursuant to an order, decree or judgment of any court of competent jurisdiction that the Holder was not entitled to retain such payment pursuant to this Agreement and (ii) notwithstanding any provision hereof permitting fees, expenses, indemnities or other amounts to be paid from the assets of any PC Pool

**Section 3.10. Subrogation.** With respect to each PC Pool, the Guarantor shall be subrogated to all the rights, interests, remedies, powers and privileges of each related Holder in respect of any Mortgage included in such PC Pool on which it has made guarantee payments of principal and/or interest to the extent of such payments. Nothing in this Section shall impair the Guarantor's right to receive distributions in its capacity as Holder, if it is a Holder of any PCs.

**Section 3.11. Termination Upon Final Payment.** Each PC Pool is irrevocable and will terminate only in accordance with the terms of this Agreement Except as provided in Sections 3.05(e), 6.06 and 7.01, with respect to each PC Pool, Freddie Mac's and the Trustee's obligations and responsibilities under this Agreement shall terminate as to a PC Pool and its Holders upon (i) the full payment to such Holders of all principal and interest due to the Holders based on the Pool Factors or by reason of the Guarantor's guarantees or (ii) the payment to the Holder of all amounts held by Freddie Mac and the Trustee, respectively, and required to be paid hereunder; *provided, however,* that in no event shall any PC Pool created hereby continue beyond the expiration of 2 years from the death of the survivor of the descendants of Joseph P  Kennedy, the late ambassador of the United States to the Court of St  James's, living on the date hereof

**Section 3.12. Effect of Final Payment Date.** The actual final payment on a PC may occur prior to the Payment Date specified in Section 3 09(a)(ii) due to prepayments of principal, including prepayments made in connection with the repurchase of any Mortgage from the related PC Pool

**Section 3.13. Payment Error Corrections.** In the event of a principal or interest payment error, the Administrator, in its sole discretion, may effect corrections by the adjustment of payments to be made on future Payment Dates or in such other manner as it deems appropriate

## ARTICLE IV

## PCs

**Section 4.01. Form and Denominations.** With respect to each PC Pool, the principal balances, PC Coupons and other characteristics of the PCs to be issued shall be specified in the related Pool Supplement  Delivery of the PCs of a PC Pool shall constitute the issuance of the PCs for that PC Pool  PCs shall be issued, held and transferable only on the book entry system of the Federal Reserve Banks in minimum original principal amounts of $1,000 and additional increments of $1  PCs shall at all times remain on deposit with a Federal Reserve Bank in accordance with the provisions of the Book Entry Rules  A Federal Reserve Bank will maintain a book entry recordkeeping system for all transactions in PCs with respect to Holders

**Section 4.02. Transfer of PCs.** PCs may be transferred only in minimum original principal amounts of $1,000 and additional increments of $1. PCs may not be transferred if, as a result of the transfer, the

15

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

transferor or the new Holder would have on deposit in its account PCs of the same issue with an original principal amount of less than $1,000.The transfer, exchange or pledge of PCs shall be governed by the fiscal agency agreement between Freddie Mac and a Federal Reserve Bank, the Book Entry Rules and such other procedures as shall be agreed upon from time to time by Freddie Mac and a Federal Reserve Bank  A Federal Reserve Bank shall act only upon the instructions of the Holder in recording transfers of a PC  A charge may be made for any transfer of a PC and shall be made for any tax or other governmental charge imposed in connection with a transfer of a PC  Freddie Mac hereby assigns to the Trustee Freddie Mac's rights under each fiscal agency agreement with respect to PCs issued by any PC Pool.

   **Section 4.03. Record Date.**  The Record Date for each Payment Date shall be the close of business on the last day of the preceding month for Gold PCs and the second preceding month for ARM PCs  A Holder of a PC on the books and records of a Federal Reserve Bank on the Record Date shall be entitled to payment of principal and interest on the related Payment Date  A transfer of a PC made on or before the Record Date in a month shall be recognized as effective as of the first day of such month.

**ARTICLE V**

**Remedies**

   **Section 5.01. Events of Default.**  With respect to each PC Pool, an "Event of Default'' means any one of the following events:

   (a) Default by the Guarantor or the Administrator in the payment of interest or principal to the related Holders as and when the same shall become due and payable as provided in this Agreement, and the continuance of such default for a period of 30 days

   (b) Failure by the Guarantor or the Administrator to observe or perform any other covenants of this Agreement relating to their respective obligations, and the continuance of such failure for a period of 60 days after the date of receipt by such party of written notice of such failure and a demand for remedy by the affected Holders representing not less than 65 percent of the remaining principal balance of any affected PC Pool

   (c) The entry by any court having jurisdiction over the Guarantor or the Administrator of a decree or order for relief in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or for the appointment of a receiver, liquidator, assignee, custodian or sequestrator (or other similar official) of the Guarantor or the Administrator or for any substantial part of its property, or for the winding up or liquidation of its affairs, if such decree or order remains unstayed and in effect for a period of 60 consecutive days.

   (d) Commencement by the Guarantor or the Administrator of a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consent by the Guarantor or the Administrator to the entry of an order for relief in an involuntary case under any such law, or its consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian or sequestrator (or other similar official) of the Guarantor or the Administrator or for any substantial part of their respective properties, or any general assignment made by the Guarantor or the Administrator for the benefit of creditors, or failure by the Guarantor or the Administrator generally to pay their debts as they become due

The appointment of a conservator (or other similar official) by a regulator having jurisdiction over the Guarantor or the Administrator, whether or not such party consents to such appointment, shall not constitute an Event of Default.

16

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**Section 5.02. Remedies.**

(a) If an Event of Default occurs and is continuing with respect to a PC Pool, the Holders of PCs representing a majority of the remaining principal balance of such PC Pool may, by written notice to Freddie Mac, remove Freddie Mac as Administrator and nominate its successor under this Agreement with respect to such PC Pool  The nominee shall be deemed appointed as Freddie Mac's successor as Administrator unless Freddie Mac objects within 10 days after such nomination  Upon such objection:

(i) The Administrator may petition any court of competent jurisdiction for the appointment of its successor; or

(ii) Any bona fide Holder that has been a Holder for at least six months may, on behalf of such Holder and all others similarly situated, petition any such court for appointment of the Administrator's successor.

(b) If a successor Administrator is appointed, the Administrator shall submit to its successor a complete written report and accounting of the Mortgages in the affected PC Pool and shall take all other steps necessary or desirable to transfer its interest in and administration of such PC Pool to its successor

(c) Subject to the Freddie Mac Act, a successor may take any action with respect to the Mortgages as may be reasonable and appropriate in the circumstances  Prior to the designation of a successor, the Holders of PCs representing a majority of the remaining principal balance of any affected PC Pool may waive any past or current Event of Default

(d) Appointment of a successor shall not relieve Freddie Mac, in its capacity as Guarantor, of its guarantee obligations as set forth in this Agreement

**Section 5.03. Limitation on Suits by Holders.**

(a) With respect to any PC Pool, except as provided in Section 5 02, no Holder shall have any right to institute any action or proceeding at law or in equity or in bankruptcy or otherwise or seek any other remedy whatsoever against Freddie Mac or the Trustee with respect to this Agreement or the related PCs or Mortgages, unless:

(i) Such Holder previously has given the Trustee written notice of an Event of Default and the continuance thereof;

(ii) The Holders of PCs representing a majority of the remaining principal balance of any affected PC Pool have made a written request to the Trustee to institute an action or proceeding in its own name and have offered the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred;

(iii) The Trustee has failed to institute any such action or proceeding for 60 days after its receipt of the written notice, request and offer of indemnity described above; and

(iv) The Trustee has not received from such Holders any direction inconsistent with the written request described above during the 60 day period

(b) No Holder shall have any right under this Agreement to prejudice the rights of any other Holder, to obtain or seek preference or priority over any other Holder or to enforce any right under this Agreement, except for the ratable and common benefit of all Holders of PCs representing interests in any affected PC Poo

17

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(c) For the protection and enforcement of the provisions of this Section, Freddie Mac, the Trustee and each and every Holder shall be entitled to such relief as can be given either at law or in equity  Notwithstanding the foregoing, no Holder's right to receive payment (or to institute suit to enforce payment) of principal and interest as provided herein on or after the due date of such payment shall be impaired or affected without the consent of the Holder

ARTICLE VI

Trustee

**Section 6.01. Duties of Trustee.**

(a) If an Event of Default has occurred and is continuing with respect to a PC Pool, the Trustee shall exercise the rights and powers vested in it by this Agreement and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b) Except during the continuance of an Event of Default, the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Agreement and shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement and no implied covenants or obligations shall be read into this Agreement against the Trustee

(c) The Trustee and its directors, officers, employees and agents may not be protected from liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of their respective duties or by reason of reckless disregard of obligations and duties under this Agreement, except that:

(i) this paragraph does not limit the effect of paragraph (b) of this Section;

(ii) the Trustee shall not be liable for any action taken, or not taken, by the Trustee in good faith pursuant to this Agreement or for errors in judgment; and

(iii) the Trustee shall not be required to take notice or be deemed to have notice or knowledge of any default or Event of Default, unless the Trustee obtains actual knowledge or written notice of such default or Event of Default  In the absence of such actual knowledge or notice, the Trustee may conclusively assume that there is no default or Event of Default

(d) Every provision of this Agreement shall be subject to the provisions of this Section and Section 6 02

(e) The Trustee shall not be liable for indebtedness evidenced by or arising under this Agreement, including principal of or interest on the PCs, or interest on any money received by it except as the Trustee may agree in writing

(f) Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law or the terms of this Agreement

(g) No provision of this Agreement shall require the Trustee to expend, advance or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

18

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(h) The Trustee may, but shall not be obligated to, undertake any legal action that it deems necessary or desirable in the interest of Holders  The Trustee may be reimbursed for the legal expenses and costs of such action from the assets of the related PC Pool

**Section 6.02. Certain Matters Affecting the Trustee.**

(a) The Trustee, and any director, officer, employee or agent of the Trustee may rely in good faith on any certificate, opinion or other document of any kind which, prima facie, is properly executed and submitted by any appropriate Person respecting any matters arising hereunder. The Trustee may rely on any such documents believed by it to be genuine and to have been signed or presented by the proper Person and on their face conforming to the requirements of this Agreement  The Trustee need not investigate any fact or matter stated in such documents

(b) Before the Trustee acts or refrains from acting, it may require an officer's certificate or an opinion of counsel, which shall not be at the expense of the Trustee  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on an officer's certificate or opinion of counsel  The right of the Trustee to perform any discretionary act enumerated in this Agreement shall not be construed as a duty and the Trustee shall not be answerable for other than its willful misfeasance, bad faith or gross negligence in the performance of such act

(c) The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys or a custodian or nominee

(d) The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; provided, that the Trustee's conduct does not constitute willful misfeasance, bad faith or gross negligence  In no event shall the Trustee have any liability for consequential damages

(e) The Trustee may consult with and rely on the advice of counsel, accountants and other advisors and shall not be liable for errors in judgment or for anything it does or does not do in good faith if it so relies  Any opinion of counsel with respect to legal matters relating to this Agreement and the PCs shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with any opinion of such counsel.

(f) Any fees, expenses and indemnities payable from the assets of any PC Pool to Freddie Mac, in its capacity as Trustee, in the performance of its duties and obligations hereunder shall not affect Freddie Mac's guarantee with respect to that PC Pool, as set forth in Section 3 09

**Section 6.03. Trustee's Disclaimer.** The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Agreement, the assets of the PC Pool or the PCs

**Section 6.04. Trustee May Own PCs.** Subject to Section 7 06, the Trustee in its individual or any other capacity may become the owner or pledgee of PCs with the same rights as it would have if it were not the Trustee

**Section 6.05. Indemnity.** Each PC Pool shall indemnify the Trustee and the Trustee's employees, directors, officers and agents, as provided in this Agreement, against any and all claims, losses, liabilities or expenses (including attorneys' fees) incurred by it in connection with the administration of this trust and the performance of its duties under this Agreement (to the extent not previously reimbursed above), including, without limitation, the execution and filing of any federal or state tax returns and information returns and being the mortgagee of record with respect to the related Mortgages  The Trustee shall notify the Administrator promptly of any claim for which it may seek indemnity. Failure by the Trustee to so

19

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

notify the Administrator shall not relieve the related PC Pool of its obligations hereunder  A PC Pool shall not be required to reimburse any expense or indemnify against any loss, liability or expense incurred by the Trustee through the Trustee's own willful misfeasance, bad faith or gross negligence.

The Trustee's rights pursuant to this Section shall survive the discharge of this Agreement.

**Section 6.06. Replacement of Trustee.** The Trustee may resign at any time  Any successor Trustee shall resign if it ceases to be eligible in accordance with the provisions of Section 6 09  In either case, the resignation of the Trustee shall become effective, and the resigning Trustee shall be discharged from its obligations with respect to the PC Pools created under this Agreement by giving 90 days' written notice of the resignation to the Depositor, the Guarantor and the Administrator and upon the effectiveness of an appointment of a successor Trustee, which may be as of a date prior to the end of the 90 day period  Upon receiving such notice of resignation, the Depositor shall promptly appoint one or more successor Trustees by written instrument, one copy of which is delivered to the resigning Trustee and one copy of which is delivered to the successor Trustee  The successor Trustee need not be the same Person for all PC Pools  If no successor Trustee has been appointed for a PC Pool, or one that has been appointed has not accepted the appointment within 90 days after giving such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee

Prior to an Event of Default, or if an Event of Default has occurred and has been cured with respect to a PC Pool, Freddie Mac cannot be removed as Trustee with respect to that PC Pool  If an Event of Default has occurred and is continuing while Freddie Mac is the Trustee, at the direction of Holders of PCs representing a majority of the remaining principal balance of such PC Pool, Freddie Mac shall resign or be removed as Trustee, and to the extent permitted by law, all of the rights and obligations of the Trustee with respect to the related PC Pool only, will be terminated by notifying the Trustee in writing  Holders of PCs representing a majority of the remaining principal balance of the PC Pool will then be authorized to name and appoint one or more successor Trustees  Notwithstanding the termination of the Trustee, its liability under this Agreement and arising prior to such termination shall survive such termination.

If a successor Trustee is serving as the Trustee, the following events are "Trustee Events of Default" with respect to a PC Pool:

(i) the Trustee fails to comply with Section 6.09;

(ii) the Trustee is adjudged bankrupt or insolvent;

(iii) a receiver or other public officer takes charge of the Trustee or its property; or

(iv) the Trustee otherwise becomes incapable of acting

If at any time a Trustee Event of Default has occurred and is continuing, the Guarantor (or if an Event of Default has occurred and is continuing, the Depositor) may, and if directed by Holders of PCs representing a majority of the remaining principal balance of such PC Pool, shall, remove the Trustee as to such PC pool and appoint a successor Trustee by written instrument, one copy of which shall be delivered to the Trustee so removed and one copy of which shall be delivered to the successor Trustee, and the Guarantor (or if an Event of Default has occurred and is continuing, the Depositor) shall give written notice of the successor Trustee to the Holders affected by the succession  Notwithstanding the termination of the Trustee, its liability under this Agreement arising prior to such termination will survive such termination.

If the Trustee resigns or is removed or if a vacancy exists in the office of the Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee), the Depositor shall promptly appoint a successor Trustee that satisfies the eligibility requirements of Section 6.09.

20

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

The retiring Trustee agrees to cooperate with the Depositor and any successor Trustee in effecting the termination of the retiring Trustee's responsibilities and rights hereunder and shall promptly provide such successor Trustee all documents and records reasonably requested by it to enable it to assume the Trustee's functions hereunder.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Depositor, the Guarantor and the Administrator Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Agreement with respect to such PC Pool  The successor Trustee shall mail a notice of its succession to the related Holders  The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee.

If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee or the Depositor may petition any court of competent jurisdiction for the appointment of a successor Trustee

**Section 6.07. Successor Trustee By Merger.** If a successor Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee; provided, that such corporation or banking association shall be otherwise qualified and eligible under Section 6.09.

**Section 6.08. Appointment of Co Trustee or Separate Trustee.**

(a) Notwithstanding any other provisions of this Agreement, at any time, for the purpose of meeting any legal requirement of any jurisdiction in which any part of a PC Pool may at the time be located, the Trustee shall have the power and may execute and deliver all instruments to appoint one or more Persons to act as a co trustee or co trustees, or separate trustee or separate trustees, of all or any part of such PC Pool and to vest in such Person or Persons, in such capacity and for the benefit of the related Holders, such title to such PC Pool, or any part thereof, and, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Trustee may consider necessary or desirable  No co trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 6 09 and no notice to the related Holders of the appointment of any co trustee or separate trustee shall be required under Section 6 06 hereof

(b) With respect to each PC Pool, every separate trustee and co trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i) all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co trustee jointly (it being understood that such separate trustee or co trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the related PC Pool or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co trustee, but solely at the direction of the Trustee;

(ii) no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

21

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(iii) the Trustee may at any time accept the resignation of or remove any separate trustee or co trustee

(c) Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co trustees, as effectively as if given to each of them  Every instrument appointing any separate trustee or co trustee shall refer to this Agreement and the conditions of this Article VI  Each separate trustee and co trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee  Every such instrument shall be filed with the Trustee.

(d) Any separate trustee or co trustee may at any time constitute the Trustee, its agent or attorney in fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name  If any separate trustee or co trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee

**Section 6.09. Eligibility; Disqualification.**  Freddie Mac is eligible to act as the Trustee and is initially the Trustee for the PC Pools created under this Agreement  Any successor to Freddie Mac (i) at the time of its appointment as Trustee, must be reasonably acceptable to Freddie Mac and (ii) must be organized as a corporation or association doing business under the laws of the United States or any State thereof, be authorized under such laws to exercise corporate trust powers, have combined capital and surplus of at least $50,000,000 and be subject to supervision or examination by federal or state financial regulatory authorities  If any successor Trustee shall cease to satisfy the eligibility requirements set forth in (ii) above, that successor Trustee shall resign immediately in the manner and with the effect specified in Section 6 06

## ARTICLE VII

### Miscellaneous Provisions

**Section 7.01. Annual Statements.**  Within a reasonable time after the end of each calendar year, the Administrator (or its agent) shall furnish to each Holder on any Record Date during such year information that the Administrator deems necessary or desirable to enable Holders and beneficial owners of PCs to prepare their United States federal income tax returns, if applicable

**Section 7.02. Limitations on Liability.**  Neither Freddie Mac in its corporate capacity, nor any of its directors, officers, employees, authorized designees, representatives or agents ("related persons'') shall be liable to Holders for any action taken, or not taken, by them or by a servicer in good faith pursuant to this Agreement or for errors in judgment  This provision shall not protect Freddie Mac or any related person against any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties under this Agreement  In no event shall Freddie Mac or any related person be liable for any consequential damages  Freddie Mac and any related person may rely in good faith on any document or other communication of any kind properly executed and submitted by any Person with respect to any matter arising under this Agreement  Freddie Mac has no obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service or supervise the servicing of the Mortgages in accordance with this Agreement and which in its opinion may involve any expense or liability for Freddie Mac. Freddie Mac may, in its discretion, undertake or participate in any action it deems necessary or

22

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

desirable with respect to any Mortgage, this Agreement, the PCs or the rights and duties of the parties hereto and the interests of the Holders hereunder  In such event, the legal expenses and costs of such action and any resulting liability shall be expenses for the protection, preservation and maintenance of the Mortgages borne pro rata by Freddie Mac and Holders as provided in Section 3 08(b)

**Section 7.03. Limitation on Rights of Holders.**  The death or incapacity of any Person having an interest in a PC shall not terminate this Agreement or any PC Pool  Such death or incapacity shall not entitle the legal representatives or heirs of such Person, or any Holder for such Person, to claim an accounting, take any action or bring any proceeding in any court for a partition or winding up of the related PC Pool, nor otherwise affect the rights, obligations and liabilities of the parties hereto or any of them

**Section 7.04. Control by Holders.**  With respect to any PC Pool, except as otherwise provided in Articles V and VI and Sections 7 05 and 7 06, no Holder shall have any right to vote or to otherwise control in any manner the operation and management of the Mortgages included in such PC Pool, or the obligations of the parties hereto  This Agreement shall not be construed so as to make the Holders from time to time partners or members of an association  Holders shall not be liable to any third person by reason of any action taken by the parties to this Agreement pursuant to any provision hereof

**Section 7.05. Amendment.**

(a) Freddie Mac and the Trustee may amend this Agreement (including any related Pool Supplement) from time to time without the consent of any Holders to (i) cure any ambiguity or correct or supplement any provision in this Agreement,  *provided, however,* that any such amendment shall not have a material adverse effect on any Holder; (ii) maintain the classification of any PC Pool as a grantor trust for federal income tax purposes; or (iii) avoid the imposition of any state or federal tax on a PC Pool; it being understood that any amendment permitting the repurchase of a Mortgage by Freddie Mac due to a delinquency of less than 120 days, other than in the circumstances described in Section 1.02(c)(iii), may not be adopted under this clause (a).

(b) Except as provided in Section 7 05(c), Freddie Mac and the Trustee may amend this Agreement as to any PC Pool, with the consent of Holders representing not less than a majority of the remaining principal balance of the affected PC Pool

(c) Freddie Mac and the Trustee may not amend this Agreement, without the consent of a Holder, if such amendment would impair or affect the right of such Holder to receive payment of principal and interest on or after the due date of such payment or to institute suit for the enforcement of any such payment on or after such date

(d) To the extent that any provisions of this Agreement differ from the provisions of any Freddie Mac Mortgage Participation Certificates Agreement or PC Master Trust Agreement dated prior to the date of this Agreement, this Agreement shall be deemed to amend such provisions of the prior agreement, but only to the extent that Freddie Mac, under the terms of such prior agreement, could have effected such change as an amendment of such prior agreement without the consent of Holders of PCs thereunder; *provided, however,* that the trust declarations and related provisions set forth in Section 7 05(d) of the PC Master Trust Agreement dated as of December 3 , 2007 are hereby reaffirmed with respect to each PC Pool created before December 3 , 2007

(e) Notwithstanding any other provision of this Section, (i) the Administrator (in its own discretion and in its own interest) and the Trustee (at the Administrator's direction) may amend this Agreement to reflect any modification in the Administrator's methodology of calculating payments to Holders, including any modifications described in Section 3.05(d) and Section 3.06(a) and the manner in which it distributes prepayments to Holders, (ii) the Administrator (in its own discretion and in its own interest) and the Trustee (at the Administrator's direction) may amend this Agreement to cure any inconsistency between this

23

---

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Agreement and the provisions of the Guide and (iii) the Depositor (in its own discretion and in its own interest) and the Trustee (at the Administrator's direction) may amend any Pool Supplement to make the adjustments described in Section 1 02(b) to the characteristics of the Mortgages to be transferred to a PC Pool or to the related PCs

**Section 7.06. Voting Rights.**

If Freddie Mac is acting as Administrator or Trustee and an Event of Default has occurred and is continuing, any PCs held by Freddie Mac for its own account shall be disregarded and deemed not to be outstanding for purposes of exercising the remedies set forth in Section 5 02 and the second paragraph of Section 6.06.

**Section 7.07. Persons Deemed Owners.** With respect to each PC Pool, Freddie Mac, the Trustee, the Administrator and a Federal Reserve Bank (or any agent of any of them) may deem and treat the related Holder(s) as the absolute owner(s) of a PC and the undivided beneficial ownership interests in the Mortgages included in the related PC Pool for the purpose of receiving payments and for all other purposes, and none of Freddie Mac, the Trustee, the Administrator or a Federal Reserve Bank (nor any agent of any of them) shall be affected by any notice to the contrary  All payments made to a Holder, or upon such Holder's order, shall be valid, and, to the extent of the payment, shall satisfy and discharge the related PC Pool's payment obligations with respect to the Holder's PC  None of Freddie Mac, the Trustee, the Administrator or any Federal Reserve Bank shall have any direct obligation to any beneficial owner unless it is also the Holder of a PC

**Section 7.08. Governing Law.** THIS AGREEMENT AND THE PARTIES' RIGHTS AND OBLIGATIONS WITH RESPECT TO PCs, SHALL BE GOVERNED BY THE LAWS OF THE UNITED STATES. INSOFAR AS THERE MAY BE NO APPLICABLE PRECEDENT, AND INSOFAR AS TO DO SO WOULD NOT FRUSTRATE THE PURPOSES OF THE FREDDIE MAC ACT OR ANY PROVISION OF THIS AGREEMENT OR THE TRANSACTIONS GOVERNED HEREBY, THE LOCAL LAWS OF THE STATE OF NEW YORK SHALL BE DEEMED REFLECTIVE OF THE LAWS OF THE UNITED STATES.

**Section 7.09. Grantor Trust Status.** No provision in this Agreement shall be construed to grant Freddie Mac, the Trustee or any other Person authority to act in any manner which would cause a PC Pool not to be treated as a grantor trust for federal income tax purposes

**Section 7.10. Payments Due on Non Business Days.** If the date fixed for any payment on any PC is a day that is not a Business Day, then such payment shall be made on the next succeeding Business Day, with the same force and effect as though made on the date fixed for such payment, and no interest shall accrue for the period after such date

**Section 7.11. Successors.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, including any successor by operation of law, and permitted assigns.

**Section 7.12. Headings.** The headings in this Agreement are for convenience only and shall not affect the construction of this Agreement

**Section 7.13. Notice and Demand.**

(a) Any notice, demand or other communication required or permitted under this Agreement to be given to or served upon any Holder may be given or served (i) in writing by deposit in the United States mail, postage prepaid, and addressed to such Holder as such Holder's name and address may appear on the books and records of a Federal Reserve Bank or (ii) by transmission to such Holder through the communication system of the Federal Reserve Banks  Any notice, demand or other communication to or

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3199

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

upon a Holder shall be deemed to have been sufficiently given or made, for all purposes, upon mailing or transmission

(b) Any notice, demand or other communication which is required or permitted to be given to or served under this Agreement may be given in writing addressed as follows (i) in the case of Freddie Mac in its corporate capacity, to Freddie Mac, 8200 Jones Branch Drive, McLean, Virginia 22102, Attention: Executive Vice President     General Counsel and Secretary and (ii) in the case of the Trustee, to: Freddie Mac (as Trustee), 8200 Jones Branch Drive, McLean, Virginia 22  02, Attention: Executive Vice President     General Counsel and Secretary

(c) Any notice, demand or other communication to or upon Freddie Mac or the Trustee shall be deemed to have been sufficiently given or made only upon its actual receipt of the writing

25

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

THE SALE OF A PC AND RECEIPT AND ACCEPTANCE OF A PC BY OR ON BEHALF OF A HOLDER, WITHOUT ANY SIGNATURE OR FURTHER MANIFESTATION OF ASSENT, SHALL CONSTITUTE THE UNCONDITIONAL ACCEPTANCE BY THE HOLDER AND ALL OTHERS HAVING A BENEFICIAL INTEREST IN SUCH PC OF ALL THE TERMS AND PROVISIONS OF THIS AGREEMENT (INCLUDING THE RELATED POOL SUPPLEMENT) AND THE AGREEMENT OF FREDDIE MAC, SUCH HOLDER AND SUCH OTHERS THAT THOSE TERMS AND PROVISIONS SHALL BE BINDING, OPERATIVE AND EFFECTIVE.

FEDERAL HOME LOAN MORTGAGE CORPORATION, in its
corporate capacity and as Trustee

_____ /s/ Mark D. Hanson _____
Authorized Signatory

Source   D RA   HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 10.54

## INDEMNIFICATION AGREEMENT ("Agreement")

### between

## FEDERAL HOME LOAN MORTGAGE CORPORATION ("Freddie Mac")

### and [Name] ("Indemnitee")

WHEREAS, the inability to attract and retain qualified persons as directors and officers is detrimental to the best interests of Freddie Mac's stockholders and Freddie Mac should act to assure such persons that there will be adequate certainty of protection through insurance and indemnification against risks of claims and actions against them arising out of their service to and activities on behalf of Freddie Mac; and

WHEREAS, Freddie Mac has adopted provisions in its Bylaws providing for indemnification of its officers and directors against all liabilities reasonably incurred in connection with proceedings in which they are involved as a result of their service to Freddie Mac, except such liabilities as are incurred because of the indemnitee's willful misconduct, knowing violation of criminal law or receipt of an improper personal benefit, and Freddie Mac wishes to clarify and enhance the rights and obligations of Freddie Mac and Indemnitee with respect to indemnification; and

WHEREAS, Freddie Mac has elected to follow the corporate governance practices and procedures of the law of the Commonwealth of Virginia, including without limitation the Virginia Stock Corporation Act, as the same may be amended from time to time; and

WHEREAS, in order to induce and encourage highly experienced and capable persons such as Indemnitee to serve and continue to serve as directors and officers of Freddie Mac and in any other capacity with respect to Freddie Mac, and to otherwise promote the desirable end that such persons will resist what they consider unjustified lawsuits and claims made against them in connection with the performance of their duties to Freddie Mac, with the knowledge that certain costs, judgments, penalties, fines, liabilities and expenses incurred by them in their defense of such litigation are to be borne by Freddie Mac and they will receive the maximum protection against such risks and liabilities as may be afforded under Freddie Mac's bylaws and applicable law; and

WHEREAS, Freddie Mac desires to have Indemnitee serve or continue to serve as a director or officer of Freddie Mac and in such other capacity with respect to Freddie Mac as Freddie Mac may request, as the case may be, free from undue concern for unpredictable, inappropriate or unreasonable legal risks and personal liabilities by reason of Indemnitee acting in accordance with the standards of Freddie Mac's bylaws in the performance of Indemnitee's duties at Freddie Mac; and Indemnitee desires so to serve or to continue so to serve Freddie Mac, provided, and on the express condition, that he is furnished with the indemnity set forth hereinafter;

WHEREAS, the Federal Housing Finance Agency ("FHFA") was appointed conservator of Freddie Mac on September 6, 2008;

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                  Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Now, therefore, in consideration of Indemnitee's service or continued service as a director or officer of Freddie Mac, the parties hereto agree as follows:

1.   <u>Service by Indemnitee</u>   Indemnitee will serve or continue to serve as a director or officer of Freddie Mac in good faith so long as Indemnitee is duly elected or appointed and until such time as Indemnitee is removed as permitted by law or tenders a resignation in writing

2.   <u>Indemnification</u>   Freddie Mac shall indemnify Indemnitee to the fullest extent permitted by Freddie Mac's Bylaws and Virginia law in effect on the date hereof or as the Bylaws or such law may from time to time be amended (but, in the case of any such amendment, only to the extent that such amendment permits Freddie Mac to provide broader indemnification rights than the Bylaws or said law permitted Freddie Mac to provide prior to such amendment) Without diminishing the scope of the indemnification provided by this Section, the rights of indemnification of Indemnitee provided hereunder shall include but shall not be limited to those rights hereinafter set forth, except that no indemnification shall be paid to Indemnitee:

(a)   to the extent expressly prohibited by Virginia law;

(b)   for which payment is actually made to Indemnitee or for Indemnitee's benefit under a valid and collectible insurance policy or under a valid and enforceable indemnity clause, bylaw or agreement of Freddie Mac or any other entity that Indemnitee serves at the request of Freddie Mac, except in respect of any indemnity exceeding the payment under such insurance, clause, bylaw or agreement;

(c)   in connection with a Proceeding (or part thereof) initiated by Indemnitee unless such Proceeding (or part thereof) was authorized by the Board of Directors

3.   <u>Action or Proceedings Other than an Action by or in the Right of Freddie Mac</u>   Except as limited by Section 2 above, Indemnitee shall be entitled to the indemnification rights provided in this Section if Indemnitee is a party or is threatened to be made a party to any Proceeding (other than an action by or in the name of Freddie Mac) by reason of the fact that Indemnitee is or was a director, officer, employee or agent of Freddie Mac, or is or was serving at the request of Freddie Mac as a director, officer, manager, partner, trustee, fiduciary, employee or agent of another corporation, limited liability company, partnership, joint venture, trust or other entity, including service with respect to an employee benefit plan  Pursuant to this Section, Indemnitee shall be indemnified against all Liabilities and Expenses actually and reasonably incurred by Indemnitee in connection with such Proceeding, except such Liabilities and Expenses as are incurred because of Indemnitee's willful misconduct or knowing violation of the criminal law; provided, however, that Freddie Mac may not indemnify Indemnitee in connection with any Proceeding charging improper personal benefit to Indemnitee, whether or not involving action in his official capacity, to the extent Indemnitee was adjudged liable on the basis that personal benefit was improperly received by Indemnitee

4.   <u>Indemnity in Proceedings by or in the Name of Freddie Mac</u>   Except as limited by Section 2 above, Indemnitee shall be entitled to the indemnification rights provided in this Section if Indemnitee was or is a party or is threatened to be made a party to any Proceeding brought by or in the name of Freddie Mac to procure a judgment in its favor by reason of the fact

2

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

that Indemnitee is or was a director, officer, employee or agent of Freddie Mac  Pursuant to this Section, Indemnitee shall be indemnified against all Liabilities and Expenses actually and reasonably incurred by Indemnitee in connection with such Proceeding, except such Liabilities and Expenses as are incurred because of Indemnitee's willful misconduct or knowing violation of the criminal law; provided, however, that Freddie Mac may not indemnify Indemnitee in connection with any Proceeding charging improper personal benefit to Indemnitee, whether or not involving action in his official capacity, to the extent Indemnitee was adjudged liable on the basis that personal benefit was improperly received by Indemnitee

5.    Indemnification for Costs, Charges and Expenses of Successful Party  Notwithstanding the limitations of Sections 3 and 4 above, Freddie Mac shall indemnify Indemnitee who entirely prevails, on the merits or otherwise, in the defense of any Proceeding to which Indemnitee was a party because he is or was director, officer, employee or agent of Freddie Mac or was serving at the request of Freddie Mac as a director, officer, manager, partner, trustee, fiduciary, employee or agent of another corporation, limited liability company, partnership, joint venture, trust or other entity, including service with respect to an employee benefit plan, against Expenses incurred by Indemnitee in connection with the Proceeding

6.    Partial Indemnification  If Indemnitee is entitled under any provision of this Agreement to indemnification by Freddie Mac for some or a portion of the Liabilities or Expenses actually and reasonably incurred in connection with any action, suit or proceeding (including an action, suit or proceeding brought by or on behalf of Freddie Mac), but not, however, for all of the total amount thereof, Freddie Mac shall nevertheless indemnify Indemnitee for the portion of such Liabilities and Expenses actually and reasonably incurred to which Indemnitee is entitled

7.    Indemnification for Expenses of a Witness  Notwithstanding any other provision of this Agreement, to the maximum extent permitted by applicable law, Indemnitee shall be entitled to indemnification against all Expenses actually and reasonably incurred or suffered by Indemnitee or on Indemnitee's behalf if Indemnitee appears as a witness or otherwise incurs legal expenses as a result of or related to Indemnitee's service as a director, officer, employee or agent of Freddie Mac, in any threatened, pending or completed Proceeding to which Indemnitee neither is, nor is threatened to be made, a party; provided, however, that no such indemnification will be provided with respect to Expenses incurred in obtaining legal advice regarding Indemnitee's willful misconduct, knowing violation of the criminal law or receipt of improper personal benefits

8.    Determination of Entitlement to Indemnification.  Upon written request by Indemnitee for indemnification pursuant to Sections 3, 4, 5, 6 or 7, the entitlement of Indemnitee to indemnification, to the extent not provided pursuant to the terms of this Agreement, shall be determined by the following person or persons who shall be empowered to make such determination: (i) by the Board of Directors by a majority vote of a quorum consisting of directors not at the time parties to the proceeding; (ii) by a majority vote of a committee duly designated by the Board of Directors (in which designation directors who are parties may participate), consisting solely of two or more directors not at the time parties to the proceeding; (iii) by Special Legal Counsel (as defined below) (1) selected by the Board of Directors or its committee in a manner prescribed in subsection (i) or (ii) hereof, or (2) if a quorum of the Board

3

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

of Directors cannot be obtained under subsection (i) hereof and a committee cannot be designated under subsection (ii) hereof, selected by a majority vote of the full Board of Directors (in which selection directors who are parties may participate); or (iv) by the stockholders, provided, however, that shares owned by or voted under the control of directors who are at the time parties to the proceeding may not be voted on the determination  Upon failure of the Board of Directors or committee designated by the Board of Directors, as applicable, so to select such Special Legal Counsel, or upon failure of Indemnitee so to approve, such Special Legal Counsel shall be selected upon application to a court of competent jurisdiction  Authorization of indemnification and evaluation as to reasonableness of Expenses shall be made in the same manner as the determination that indemnification is permissible, as provided in this Section 8, provided however, that, if the determination is made by Special Legal Counsel, authorization of indemnification and evaluation as to the reasonableness of Expenses shall be made by those entitled under subsection (iii) hereof to select such Special Legal Counsel

Such determination of entitlement to indemnification shall be made not later than 90 calendar days after receipt by Freddie Mac of a written request for indemnification  Such request shall include documentation or information which is necessary for such determination and which is reasonably available to Indemnitee  Any Expenses incurred by Indemnitee in connection with a request for indemnification or payment of Expenses hereunder, under any other agreement, any provision of Freddie Mac's Bylaws or any directors' and officers' liability insurance, shall be borne by Freddie Mac  Freddie Mac hereby indemnifies Indemnitee for any such Expense and agrees to hold Indemnitee harmless therefrom irrespective of the outcome of the determination of Indemnitee's entitlement to indemnification  If the person making such determination shall determine that Indemnitee is entitled to indemnification as to part (but not all) of the application for indemnification, such person shall reasonably prorate such partial indemnification among the claims, issues or matters at issue at the time of the determination

9.   Presumptions and Effect of Certain Proceedings   The Corporate Secretary of Freddie Mac shall, promptly upon receipt of Indemnitee's request for indemnification, advise in writing the Board of Directors or such other person or persons empowered to make the determination as provided in Section 8 that Indemnitee has made such request for indemnification  The Corporate Secretary of Freddie Mac shall also promptly notify the Conservator that such a request has been made  Upon making such request for indemnification, Indemnitee shall be presumed to be entitled to indemnification hereunder and Freddie Mac shall have the burden of proof in making any determination contrary to such presumption  The termination of any Proceeding described in Sections 3 or 4 by judgment, order, settlement or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself be determinative that the Indemnitee did not meet the relevant standard of conduct

10.   Remedies of Indemnitee in Cases where Claim is not Paid in Full in a Timely Manner   If a claim under this Agreement is not paid in full by Freddie Mac within 90 days after a written claim has been received by Freddie Mac, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, Indemnitee may at any time thereafter apply to either the United States District Court for the district within which Freddie Mac's principal office is located or to the court where the Proceeding is pending, if any, for an order directing Freddie Mac to make an advancement of expenses or to provide

4

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

indemnification  The court shall order Freddie Mac to make an advancement of expenses or to provide indemnification, as the case may be, if it determines that Indemnitee is entitled under this Agreement to such an advancement of expenses or indemnification, and in such event shall order Freddie Mac to pay Indemnitee's reasonable expenses (including attorneys' fees) to obtain the order  Neither the failure of Freddie Mac (including its Board of Directors, committee, Special Legal Counsel or its stockholders) to have made a determination, as provided in Section 8, prior to the commencement of such action permitted by this Section, that Indemnitee is entitled to receive an advancement of expenses or indemnification, nor the determination by Freddie Mac (including its Board of Directors, committee, Special Legal Counsel or its stockholders) that Indemnitee is not entitled to an advancement of expenses or indemnification, shall create a presumption to that effect or otherwise itself be a defense to Indemnitee's application for an advancement of expenses or indemnification

11.    Remedies of Indemnitee in Cases of Determination not to Indemnify or to Pay Expenses  In the event that a determination is made that Indemnitee is not entitled to indemnification hereunder or if payment has not been timely made following a determination of entitlement to indemnification pursuant to Sections 8 and 9, or if Expenses are not paid pursuant to Section 17, Indemnitee shall be entitled to final adjudication in a court of competent jurisdiction of entitlement to such indemnification or payment from Freddie Mac  Alternatively, Indemnitee at Indemnitee's option may seek an award in an arbitration to be conducted by a single arbitrator pursuant to the rules of the American Arbitration Association, such award to be made within 60 days following the filing of the demand for arbitration  Freddie Mac shall not oppose Indemnitee's right to seek any such adjudication or award in arbitration or any other claim  The determination in any such judicial proceeding or arbitration shall be made  *de novo*  and Indemnitee shall not be prejudiced by reason of a determination (if so made) pursuant to Sections 8 or 9 that Indemnitee is not entitled to indemnification  If a determination is made or deemed to have been made pursuant to the terms of Section 8 or 9 that Indemnitee is entitled to indemnification, Freddie Mac shall be bound by such determination and is precluded from asserting that such determination has not been made or that the procedure by which such determination was made is not valid, binding and enforceable  Freddie Mac further agrees to stipulate in any such court or before any such arbitrator that Freddie Mac is bound by all the provisions of this Agreement and is precluded from making any assertions to the contrary  If the court or arbitrator shall determine that Indemnitee is entitled to any indemnification or payment of Expenses hereunder, Freddie Mac shall pay all Expenses actually and reasonably incurred by Indemnitee in connection with such adjudication or award in arbitration (including, but not limited to, any appellate Proceedings)

12.    Other Rights to Indemnification  The rights to indemnification and to the advancement of expenses conferred in this Agreement shall not be exclusive of any other right which any person may have or hereafter acquire under any statute (including Freddie Mac's enabling legislation), or any agreement, vote of stockholders or disinterested directors or otherwise

13.    Expenses to Enforce Agreement  In the event that Indemnitee is subject to or intervenes in any Proceeding in which the validity or enforceability of this Agreement is at issue or seeks an adjudication or award in arbitration to enforce Indemnitee's rights under, or to recover damages for breach of, this Agreement, Indemnitee, if Indemnitee prevails in whole or in

5

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

part in such action, shall be entitled to recover from Freddie Mac and shall be indemnified by Freddie Mac against any actual Expenses incurred by Indemnitee

    14.   <u>Effective Date and Continuation of Indemnity</u>  This Agreement shall be [retroactive to and] effective as of [date]  All agreements and obligations of Freddie Mac contained herein ("Freddie Mac's Obligations") shall commence on such effective date and continue during the period Indemnitee is an officer or employee of Freddie Mac who reports directly to the Chief Executive Officer of Freddie Mac (a "CEO Direct Report")  Freddie Mac's Obligations shall terminate as of the date, if any, as of which Indemnitee is no longer a CEO Direct Report (the "Termination Date") with respect to any possible claims relating entirely to any period beginning on or after the Termination Date; *provided, however,* that Freddie Mac's Obligations shall continue after the Termination Date with respect to any possible claims that are based in whole or in part on the fact that prior to the Termination Date, Indemnitee was a director, officer, employee or agent of Freddie Mac or was serving at the request of Freddie Mac as a director, officer, manager, partner, trustee, fiduciary, employee or agent of another corporation, limited liability company, partnership, joint venture, trust or other entity, including service with respect to an employee benefit plan  This Agreement shall be binding upon all successors and assigns of Freddie Mac (including any transferee of all or substantially all of its assets and any successor by merger or operation of law) and shall inure to the benefit of the heirs, personal representatives and estate of Indemnitee  The termination of Freddie Mac's Obligations at the Termination Date notwithstanding, Indemnitee shall continue to have such indemnification, advancement and related rights as may be provided to Indemnitee at that time or thereafter under Freddie Mac's Bylaws, Virginia law, Freddie Mac's enabling legislation, any other agreement, vote of stockholders or disinterested directors or otherwise

    15.   <u>Notification and Defense of Claim</u>  Promptly after receipt by Indemnitee of notice of any Proceeding, Indemnitee will, if a claim in respect thereof is to be made against Freddie Mac under this Agreement, notify the Corporate Secretary of Freddie Mac in writing of the commencement thereof; but the omission so to notify Freddie Mac will not relieve it from any liability that it may have to Indemnitee  Notwithstanding any other provision of this Agreement, with respect to any such Proceeding of which Indemnitee notifies Freddie Mac:

    (a)   Freddie Mac shall be entitled to participate therein at its own expense; and

    (b)   Except as otherwise provided in this Section 15(b), to the extent that it may wish, Freddie Mac, jointly with any other indemnifying party similarly notified, shall be entitled to assume the defense thereof, with counsel satisfactory to Indemnitee  After notice from Freddie Mac to Indemnitee of its election so to assume the defense thereof, Freddie Mac shall not be liable to Indemnitee under this Agreement for any expenses of counsel subsequently incurred by Indemnitee in connection with the defense thereof except as otherwise provided below  Indemnitee shall have the right to employ Indemnitee's own counsel in such Proceeding, but the fees and expenses of such counsel incurred after notice from Freddie Mac of its assumption of the defense thereof shall be at the expense of Indemnitee unless (i) the employment of counsel by Indemnitee has been authorized by Freddie Mac, (ii) Indemnitee shall have reasonably concluded that there may be a conflict of interest between Freddie Mac and Indemnitee in the conduct of the defense of such action or (iii) Freddie Mac shall not within 60 calendar days of receipt of

6

---

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

notice from Indemnitee in fact have employed counsel to assume the defense of the action, in each of which cases the fees and expenses of Indemnitee's counsel shall be at the expense of Freddie Mac  Freddie Mac shall not be entitled to assume the defense of any Proceeding brought by or on behalf of Freddie Mac or as to which Indemnitee shall have made the conclusion provided for in (ii) above; and

(c)   If Freddie Mac has assumed the defense of a Proceeding, Freddie Mac shall not be liable to indemnify Indemnitee under this Agreement for any amounts paid in settlement of any Proceeding effected without Freddie Mac's written consent  Freddie Mac shall not settle any Proceeding in any manner that would impose any penalty or limitation on or disclosure obligation with respect to Indemnitee without Indemnitee's written consent  Neither Freddie Mac nor Indemnitee will unreasonably withhold its consent to any proposed settlement

16.   <u>Notices</u>  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt  All communications shall be sent:

(a)   To Indemnitee at:

   [Name]
   Federal Home Loan Mortgage Corporation
   8200 Jones Branch Drive
   McLean, Virginia 22102

(b)   To Freddie Mac at:

   Federal Home Loan Mortgage Corporation
   8200 Jones Branch Drive
   McLean, Virginia 22102
   Attention: Corporate Secretary
   Telephone: 703 903 2690
   Fax: 703 903 2623

or to such other address as may have been furnished by a party hereto to the other party hereto, by like notice

17.   <u>Advancement of Expenses</u>  Indemnitee shall have the right to have the Expenses reasonably incurred or suffered in defending any Proceeding in advance of its final disposition or in the circumstances described in Section 7 paid by Freddie Mac (hereinafter, an "advancement of expenses"); provided, however, that an advancement of expenses shall be made (i) only upon delivery to Freddie Mac of a written statement by Indemnitee of Indemnitee's good faith be  ef

7

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

that he has met the standard of conduct set forth in the applicable Section of this Agreement, and (ii) only if Indemnitee furnishes to Freddie Mac a written undertaking, executed by or on behalf of Indemnitee, to repay any funds advanced if Indemnitee is not entitled to mandatory indemnification under Section 5 and it is ultimately determined that Indemnitee did not meet the standard of conduct set forth in the applicable Section of this Agreement  The undertaking required above shall be an unlimited general obligation of Indemnitee but need not be secured and shall be accepted without reference to the financial ability of Indemnitee to make repayment

18.   Severability; Prior Indemnification Agreements  If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever (a) the validity, legality and enforceability of the remaining provisions of this Agreement (including without limitation, all portions of any paragraphs of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that are not by themselves invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby, and (b) to the fullest extent possible, the provisions of this Agreement (including, without limitation, all portions of any paragraph of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that are not themselves invalid, illegal or unenforceable) shall be construed so as to give effect to the intent of the parties that Freddie Mac provide protection to Indemnitee to the fullest enforceable extent  This Agreement shall supersede and replace any prior indemnification agreements entered into by and between Freddie Mac and Indemnitee and any such prior agreements shall be terminated upon execution of this Agreement

19.   Headings; References; Pronouns  The headings of the sections of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof References herein to section numbers are to sections of this Agreement  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as appropriate

20.   Definitions  For purposes of this Agreement:

(a)   "Expenses" includes, without limitation, expenses incurred in connection with the defense or settlement of any and all investigations, judicial or administrative proceedings or appeals, attorneys' fees, witness fees and expenses, fees and expenses of accountants and other advisors, retainers and disbursements and advances thereon, the premium, security for, and other costs relating to any bond (including cost bonds, appraisal bonds or their equivalents), and any expenses of establishing a right to indemnification under Sections 8, 11 and 13 above but shall not include the amount of judgments, fines or penalties actually levied against Indemnitee and shall include only amounts reasonably and actually incurred by Indemnitee

(b)   "Liabilities" means the obligation to pay a judgment, settlement, penalty, fine, including any excise tax assessed with respect to an employee benefit plan, or reasonable expenses incurred with respect to a Proceeding

(c)   "Special Legal Counsel" means a law firm or a member of a law firm that neither is presently nor in the past five years has been retained to represent: (i) Freddie Mac or Indemnitee in any matter material to either such party, provided, however, that it shall be

8

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

permissible for Special Legal Counsel to have been previously engaged by Freddie Mac, its Board of Directors or committee thereof to make determinations with respect to indemnification or advancement of expenses, or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder Notwithstanding the foregoing, the term "Special Legal Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either Freddie Mac or Indemnitee in an action to determine Indemnitee's right to indemnification under this Agreement

(d)    "Proceeding" includes any threatened, pending or completed investigation (other than internal investigations of the conduct of Freddie Mac employees), action, suit or other proceeding, whether brought in the name of Freddie Mac or otherwise, against Indemnitee, for which indemnification is not prohibited under Section 2 above and whether of a civil, criminal, administrative, arbitrative or investigative and whether formal or informal, including, but not limited to, actions, suits or proceedings in which Indemnitee may be or may have been involved as a party or otherwise, by reason of the fact that Indemnitee is or was a director, officer, employee or agent of Freddie Mac, or is or was serving, at the request of Freddie Mac, as a director, officer, manager, partner, trustee, fiduciary, employee or agent of another corporation, limited liability company, partnership, joint venture, trust or other entity, including service with respect to an employee benefit plan, whether or not Indemnitee is serving in such capacity at the time any Liability or Expense is incurred for which indemnification or reimbursement can be provided under this Agreement

21.   Other Provisions.

(a)    This Agreement shall be interpreted and enforced in accordance with the laws of Virginia, without regard to its conflict of laws rules

(b)    This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement  Only one such counterpart signed by the party against whom enforceability is sought needs to be produced as evidence of the existence of this Agreement

(c)    This Agreement shall not be deemed an employment contract between Freddie Mac and Indemnitee, and Indemnitee specifically acknowledges that Indemnitee may be discharged at any time for any reason, with or without cause, and with or without severance compensation, except as may be otherwise provided in a separate written contract between Indemnitee and Freddie Mac

(d)    Upon a payment to Indemnitee under this Agreement, Freddie Mac shall be subrogated to the extent of such payment to all of the rights of Indemnitee to recover against any person for such liability, and Indemnitee shall execute all documents and instruments required and shall take such other actions as may be necessary to secure such rights, including the execution of such documents as may be necessary for Freddie Mac to bring suit to enforce such rights

9

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                                         Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(e)   No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both parties hereto  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver  Any subsequent supplement, modification or amendment of this Agreement shall not diminish Indemnitee's rights under this Agreement with respect to any act or omission occurring before such supplement, modification or amendment

(f)   Nothing in this Agreement shall be construed to permit indemnification expressly prohibited by 12 U.S.C. 4636.

(g)   Notwithstanding any provision to the contrary in this Agreement, indemnification for actions instituted by FHFA will be governed by the standards set forth in FHFA's Notice of Proposed Rulemaking, transmitted to the Federal Register on November 6, 2008, implementing 12 U S C  4518

(h)   Nothing in this Agreement is intended to, or shall be construed to, create in any way any liability or obligation on the part of the United States or any department or agency thereof under or in any provision of this Agreement, it being the intention of Freddie Mac and Indemnitee that the obligations undertaken by Freddie Mac hereunder are the sole and exclusive responsibility of Freddie Mac

(i)   In the event conservatorship is terminated, this Agreement shall remain in full force and effect

0

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date set forth in Section   4

FEDERAL HOME LOAN MORTGAGE CORPORATION

By: _____

Charles E  Haldeman, Jr , Chief Executive Officer

Date: _____

_____

[Name], Indemnitee

Date: _____

11

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**EXHIBIT 1**

UNDERTAKING TO REPAY INDEMNIFICATION EXPENSES

I, _____, agree to reimburse Federal Home Loan Mortgage Corporation ("Freddie Mac") for all expenses paid to me by Freddie Mac pursuant to Section 17 of the Indemnification Agreement effective as of [date] for my defense in any civil or criminal action, suit, or proceeding, in the event, and to the extent that it shall ultimately be determined that I am not entitled to retain such amounts  I believe in good faith that I have met the standard of conduct set forth in the Indemnification Agreement effective as of [date]

Signature _

Typed Name

Office

DISTRICT OF COLUMBIA) ss:

Before me _____, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument, and who, after being duly sworn, stated that the contents of said instrument is to the best of his knowledge and belief true and correct and who acknowledged that he executed the same for the purpose and consideration therein expressed

GIVEN under my hand and official seal at Washington, D.C., this       day of 201

_____
Notary Public

My commission expires:

12

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 10.62**

### OMNIBUS CONSENT TO HFA INITIATIVE PROGRAM MODIFICATIONS

This Omnibus Consent to HFA Initiative Program Modifications (this "Consent") is entered into by the undersigned,  on behalf of the United States Department of the Treasury ("Treasury"), the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively the  "GSEs") and the Federal Housing Finance Agency ("FHFA")

The parties hereto are parties to that certain Memorandum of  Understanding dated October 19, 2009 (the "MOU")  whereby Treasury, FHFA, Fannie Mae and Freddie Mac jointly agreed to the terms and conditions set forth therein  for  purposes of implementing the HFA Initiative (as defined in the MOU) including, without limitation, the New Issue Bond Program  (NIBP) and the Temporary Credit and Liquidity Program (TCLP). (as such terms are defined in the MOU). Capitalized terms used  but not defined herein shall have the meanings assigned to such  terms in the MOU.

In accordance with the MOU, Treasury, Fannie Mae and Freddie Mac  entered into certain agreements pursuant to which Treasury, as authorized by the Housing and Economic Recovery Act of 2008,  agreed to purchase GSE securities and other obligations for the  purpose of implementing the HFA Initiative and establishing the NIBP and TCLP. Such agreements include, without limitation, New Issue Bond Program Agreements and Settlement Agreements dated December 9, 2009 and December 18, 2009, for the NIBP  and the Agreements to Purchase Participation dated December 2009 for the TCLP (HFA Initiative Program Agreements)

State and local housing finance agencies (HFAs), because of the  continued disruption in the housing finance market, have  requested that modifications be made to certain terms and  requirements of the NIBP and TCLP and the agreements underlying  the NIBP and TCLP. In response to such requests, Treasury, as the party currently exercising Decision Control, consents to  such modifications to be implemented by the GSEs in a manner consistent with the term sheets attached hereto  as Exhibit A (Modifications)

This Consent shall evidence the consent of Treasury, acknowledged by Fannie Mae and Freddie Mac, to the  Modifications, whether relating to the NIBP or the TCLP or both. Treasury, Fannie Mae and Freddie Mac agree to enter into any amendments to the HFA Initiative Program Agreements that are necessary or appropriate to reflect the Modifications  Additionally, the GSEs agree to enter into with HFAs any amendments to the agreements underlying the NIBP and TCLP that are necessary or appropriate to reflect the Modifications  However, Treasury, Fannie Mae and Freddie Mac reserve the right to approve all such amendments. Furthermore, Treasury, Fannie Mae and Freddie Mac agree that the Modifications in no way change any rights, obligations, or duties of the parties under  the HFA Initiative Program Agreements that are not explicitly addressed in the Modifications

In reliance on this Consent and subject to the approval of the  amendments as described above by Treasury, Fannie Mae, and  Freddie Mac, (i) the GSEs have determined that the  Modifications will not adversely affect their ability to conduct  the HFA Initiative in a manner that is consistent with the goals of being both commercially reasonable and safe and sound,  (ii) FHFA has reviewed the Modifications and determined that participation by the GSEs in

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

implementing the Modifications to the HFA Initiative is consistent with the goals and objectives of the MOU, (iii) implementation of the Modifications by the GSEs will not affect FHFA's directive to participate in the HFA Initiative contained in the MOU, or its approval under the FHFA delegation of authorities and related instructions to the GSEs' Boards of Directors also set forth in the MOU, and (iv) each GSE has determined, with respect to itself, that it has all necessary right, power and authority to honor its obligations under and in accordance with the HFA Initiative Program Agreements (as affirmed by and in accordance herewith) notwithstanding the Modifications

This Consent is executed this 23 day of November, 2011.

UNITED STATES DEPARTMENT OF THE TREASURY

By   /s/ Richard L  Gregg
     Richard L  Gregg
     Fiscal Assistant Secretary

2

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

[Signature Page to Consent to HFA Initiative Program Modifications]

FEDERAL NATIONAL MORTGAGE ASSOCIATION

By   /s/ Jennifer R. Whip

Name Jennifer R. Whip
Title Vice President for Customer Engagement
Customer Development

3

Source   D RA HOM   OAN MORTGAG CORP, 10 K, March 09, 2012        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

[Signature Page to Consent to HFA Initiative Program Modifications]

FEDERAL HOME LOAN MORTGAGE CORPORATION

By    /s/ Michael L  Dawson
Name Michael L  Dawson
Title Vice President Customer Business
Management Single Family Sourcing and
Securitization


By    /s/ W. Kimball Griffith
Name W. Kimball Griffith
Title Vice President Multifamily Affordable
Sales and Investments

4

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

[Signature Page to Consent to HFA Initiative Program Modifications]

FEDERAL HOUSING FINANCE AGENCY

By   /s/ David J  Pearl
Name David J  Pearl
Title Executive Advisor Office of Housing and
Regulatory Policy

5

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-3218

**EXHIBIT A**

Contents:

NIBP Extension Term Sheet

TCLP Extension Term Sheet

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## NIBP EXTENSION TERM SHEET

**Overview**

Treasury and the GSEs have agreed to permit (i) the extension of the existing December 3 , 20    deadline for release of escrowed New Issue Bond Program ("NIBP") funds and (ii) other modifications to the existing NIBP requirements subject to the terms and conditions described herein (collectively, the "Program Modifications")  Issuers that elect to avail themselves of the permitted extension (or that choose to implement the other permitted modifications to the NIBP) will be required to do so pursuant to  amendments to the Related Documents approved or prescribed by Treasury and the GSEs and implemented prior to the earlier of  (i) any mandatory redemption date of Program Bonds pursuant  to Section 2.6(a) of the Indenture Appendices (as defined below) or (ii) any  other action by an Issuer not currently authorized by the  Re ated Documents

This Term Sheet is intended only to provide a general outline of the contemplated Program Modifications, and is subject to  modification at any time by Treasury and the GSEs. Capitalized terms used but not defined in this Term Sheet shall have the meanings assigned to such terms in the existing NIBP forms of Supplemental Indenture/Resolution Appendix for Use with Single  Family Escrow Bonds, Single Family Small Issue Escrow Bonds or Multifamily Escrow Bonds, as the case may be (collectively, the  "Indenture Appendices")

**Term of Extension**

Issuers may, in accordance with the terms and conditions set forth herein, extend the deadline for release of Escrowed  Proceeds from December 31, 2011 to December 31, 2012  The maturity date for all Converted Program Bonds may not be  extended

**Increase in Number of Permitted Release Dates**

Issuers opting to extend the deadline for release of Escrowed  Proceeds will be allowed a total of 9 Release Dates for each  Single Family and Multifamily program (including those provided  for by the existing Related Documents)

**Revisions to Mechanism for Determining**
**the NIBP Permanent Rate**

The interest rate payable by an Issuer relative to any Program  Bond with a Release Date in 20  2 shall be determined as follows:

***Determination of WAL-based Rate:***  The permanent interest rate on Program Bonds will be based on  (i) the applicable credit based Spread plus (ii) an index rate based on the weighted average life (the  "WAL") of the relevant Program Bonds. The WAL will be based on maturity and redemption schedules set forth in the  applicable Program Bond Official Statement. Program Bond sinking  fund schedules must be constructed with a zero prepayment assumption  The WAL will then be used to calculate two index rates based on the linear interpolation between an

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                                                 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

established   0 year Treasury rate and a 30-year "AAA" MMD* rate interest rate as specified below

***Annual Ceiling:*** Each Issuer will have the opportunity to request a "Ceiling Rate Pair" for  2012 on any day between December 1, 2011 and December 9, 2011  The rates comprising the Ceiling Rate Pair will be set by taking the   0 year CMT and the 30-year "AAA" MMD* from the close of business of the preceding  business day. CMT rates are as published on the Treasury website and MMD rates are rates as published by Thomson Reuters daily. These two rates each increased by 60 basis points will  collectively be known as the Ceiling Rate Pair  If an Issuer does not request a ceiling CMT lock between December   , 2011 and December 9, 2011, the Ceiling Rate Pair recorded at the close of business on December 8, 2011 will be locked for that Issuer  Note: Neither rate in the Ceiling Rate Pair  constitutes an absolute ceiling; the rates are inputs to the interpolation calculation described below

All requests for a Ceiling Rate Pair should be made via  e-ma   to: HFAInitiative@SSgA com, with a cc: to JPM HFA@jpmorgan com  SSgA will confirm the Ceiling Rate Pair that was locked within two  (2) business days. All requests that are time stamped by 11:59 p.m., Eastern Time, on a specific date will be honored

***Final Rate Calculation:***  Rate determination for 20  2 Release Dates will proceed as follows:

Upon receipt of a Notification of Interest Rate Conversion or a  Notification of Interest Rate  Conversion/Redemption Certificate, SSgA will determine the "Notification Date Rate Pair" comprising the   0 year CMT and 30-year "AAA" MMD* as of close of business on the previous business day.

The Issuer must submit a schedule of Program Bond maturities,  mandatory redemptions and WAL, as certified by the Issuer, on or prior to the first business day at least nine (9) calendar  days prior to the Release Date  The schedule submitted must  reflect exactly the schedule that will be included in the  relevant Program Bond Official Statement  On or prior to the  first business day at least seven (7) calendar days prior to the Release Date, SSgA will notify the Issuer as to its  Permanent Rate  The new "Permanent Rate" will be  (i) the applicable Spread plus (ii) an index rate (R) to be found by calculating for both the Ceiling Rate Pair and  the Notification Date Rate Pair the linearly interpolated point between the   0 year and 30-year rates in that pair utilizing the WAL. Specifically, for each of the two rate pairs, the interpolated index rate (exclusive of the Spread) will equal:

$$R = CMT_{10} + \frac{WAL \quad 10}{20} \quad (MMD_{30} \quad CMT_{10})$$

The index used will be the *lower* of that calculated from the Ceiling Rate Pair or Notification Date Rate Pair (rounded to  the nearest basis point). If the WAL is less than

---

* If o    ed a e a  y a e pa   s eco ded,   e 30-yea "AAA" MMD  a e s be ow   e 10-yea CMT o   e 30-yea CMT,  he h ghe  of  he 10-yea CMT a d   e 30-yea CMT o s c da e w    e sed    e of  e 30-yea "AAA" MMD

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

TREASURY-3221

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

0 years, the index rate used will be the lower of the   0 year CMT rates from the Ceiling Rate Pair or Notification Date Rate Pair

*Additional Multifamily Credit Premium:*  In addition, all Multifamily Program Bonds Released in 2012 shall be subject to an increase in the applicable Spread of 80 basis points.

**Optional Issuance of Market Bonds**

Single Family Issuers releasing Escrowed Proceeds in 20 2 will  no longer be required to issue Market Bonds (although if Market  Bonds are issued, they will be subject to the existing NIBP requirements regarding Market Bond maturity schedules and  application of mortgage prepayments).

**Addition of Issuer Escrow Redemption Fee**

Issuers will be subject to a new fee (equal to  30% per annum)  on Escrowed Proceeds applied to the redemption of Program Bonds   Such fee shall accrue on an actual/actual basis commencing  April 1, 2012, and shall be payable from funds of the  Issuer on the date on which any Escrowed Proceeds are used to  redeem Program Bonds between April 1, 2012 and  the expiration of NIBP on December 31, 2012  Escrowed Proceeds which are applied to redemption of Program Bonds prior to  April 1, 2012 or released at any time within NIBP  requirements are **not** subject to the fee  The Participation Fee instituted in 20  0 for certain Issuers will  remain applicable

**Use of Single Family NIBP Proceeds**
**to Fund Multifamily NIBP Loans**

Subject to applicable requirements of existing Program Bond  documents and applicable tax, securities, state and local law  requirements, Issuers that were originally participants in the  NIBP Multifamily program will be authorized to use NIBP Single  Family Escrowed Proceeds to fund qualifying Multifamily mortgage loans (subject to existing NIBP requirements)  In order to avail  themselves of this option, Issuers will be required to amend the applicable Related Documents to implement the NIBP Multifamily  program requirements. Any Issuer pursuing this structure must indicate the proposed use of funds (Single Family or  Multifamily) in its Notification of Interest Rate Conversion or  Notification of Interest Rate Conversion/Release Certificate, as  applicable

The resulting mortgage loans will be pledged under the  applicable Single Family indenture  Any amendments to such  Single Family indenture necessary to allow for funding of Multifamily mortgage loans thereunder must be made by the Issuer  prior to the applicable Release Date. Any such Multifamily loans must constitute security *only* for the Program Bonds, Escrowed Proceeds of which funded such loans (subject to the Issuer's ability to pledge any residual amounts upon  payment in full of the relevant Program Bonds)  Furthermore,  Program Bonds secured by Multifamily loans pursuant to this  provision must mature or be subject to mandatory redemption or  tender within 17 years of the Release Date or, in the case of Construction Program Bonds, within 17 years of the  expiration of the interest only construction period (which may not exceed 4 years)  The underlying mortgage loans must be  guaranteed by the GSEs. Any Issuer pursuing this structure will  work closely with GSE Special Closing

3

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Counsel to ensure that these transactions meet program parameters and are acceptable to the GSEs and Treasury.

**Special Rules Applicable to Issuers**
**Participating in the TCLP**

A number of additional NIBP modifications will apply to Issuers who are also participating in the Temporary Credit and Liquidity Program ("TCLP") extension. Specifically, such modifications address the following issues:

***Limit on Refundings:*** The 30% limit on Program Bond proceeds used for all VRDO refundings (including refundings of TCLP supported bonds) will remain unchanged but Issuers will be permitted to utilize an additional 0% of Program Bond proceeds if such Program Bonds will be used only to refund TCLP supported VRDOs. Each Issuer shall indicate on the relevant Notification of Interest Rate Conversion or Notification of Interest Rate Conversion/Redemption Certificate what portion, if any, of Program Bond proceeds is being used for refundings

***Required Use of NIBP Proceeds to Refund TCLP Supported Bonds:*** Issuers will be required to covenant to use NIBP Escrowed Proceeds to refund TCLP supported bonds at any time that (i) the refunded bonds are either unhedged or any hedge can be terminated without cost to the Issuer and (ii) such a refunding can be accomplished such that the mortgage assets relating to the refunded bonds generate revenues sufficient to pay the Program Bonds and all related fees and expenses Releases of NIBP Bonds for the sole purpose of refunding TCLP supported bonds will **not** be counted for purposes of the limit on the number of permitted Release Dates

***Increased Flexibility on Use of Single Family NIBP Escrowed Proceeds.*** Subject to applicable tax, securities, state and local law requirements and the requirements of the Related Documents including the provisions outlined in the section entitled "Use of Single Family NIBP Proceeds to Fund Multifamily NIBP Loans" above, Single Family NIBP Escrowed Proceeds will be permitted to be used to refund TCLP supported bonds regardless of whether the Program Bonds or the refunded bonds are single family or multifamily bonds.

***Collateral Review Requirement:*** Notwithstanding anything in the foregoing or in the Related Documents, Treasury and the GSEs shall have the ability to review and approve or disapprove, in their sole discretion, mortgage loan collateral transferred to an NIBP indenture as collateral for Program Bonds used to refinance TCLP supported bonds.

Generally, however, mortgage loan collateral transferred to an NIBP indenture should be reflective of a cross section of the collateral within the TCLP indenture and should not adversely affect the existing credit profile of the bond indenture as determined by Treasury and the GSEs. Pricing of NIBP Program Bonds will be determined based on collateral quality and indenture structure as determined by the Rating Agencies

If the collateral transferred to the NIBP indenture is such that all bonds in the indenture are backed by the same pool of collateral, pricing of the Spread will be based on the rating of the new bond issue (which should be the same as the existing rating of the NIBP Program Bonds).

4

TREASURY-3223

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Alternatively, if the collateral being transferred is "walled off" within the indenture and possesses a credit profile acceptable to Treasury and the GSEs, pricing of the Spread will be based on the new bond rating, which may not be lower than "Baa'/"BBB."

**_Freeze on NIBP Releases:_**  Upon release of this Term Sheet, and prior to formally documenting the TCLP related program modifications described herein, an Issuer participating in the TCLP program (unless it has affirmatively opted out of any available extension or modification of the TCLP) will be prohibited from scheduling new Release Dates in any amount that would cause the total amount of Program Bonds proceeds released to exceed 60% of the Issuer's original Program Bond principal amount for the applicable program (Single Family or Multifamily) (subject to waivers for pending and previously anticipated releases)  The freeze will not apply for any release that facilitates the refunding of a TCLP supported VRDO

**Additional Fees**

Issuer's participating in the extension described in this Term Sheet shall be required to pay the GSEs a to be determined fee to cover the expenses of the GSEs associated with the Program Modifications described herein, and shall be required to pay to be determined fees of GSE Special Closing Counsel relating to the review and approval of NIBP document amendments

5

---

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**TCLP EXTENSION TERM SHEET**

**Overview**

Treasury and the GSEs have agreed to permit (i) the extension of the existing expiration date of the Temporary Credit and Liquidity Facilities ("TCLFs") issued under the Temporary Credit and Liquidity Program ("TCLP") to the first to occur of (a) the sixth (6th) anniversary of the Effective Date or (b) December 31, 2015, pursuant to a preliminary plan (a "Preliminary Plan") and a detailed final plan (a "Final Plan") prepared by the Issuers, and (ii) other modifications to the existing TCLP requirements subject to the terms and conditions described herein (collectively, the "Program Modifications") Issuers that elect to avail themselves of the permitted extension will be required to do so pursuant to amendments to the Related Documents approved or prescribed by Treasury and the GSEs, and implemented within thirty (30) calendar days of approval of the Final Plan by Treasury and the GSEs (see "Plans" below)

Issuers under TCLP that elect to avail themselves of the Program Modifications are required to implement the NIBP program modifications unless no escrowed proceeds are available to the Issuer under NIBP. In addition, upon release of this Term Sheet, and prior to formally documenting the Program Modifications, an Issuer will be subject to, among other things, a freeze on new NIBP releases unless it has affirmatively opted out of the Program Modifications (see "NIBP Extension Term Sheet Special Rules Applicable to Issuers Participating in the TCLP")

This Term Sheet is intended only to provide a general outline of the contemplated Program Modifications, and is subject to modifications at any time by Treasury and the GSEs. Capitalized terms used but not defined in this Term Sheet shall have the meaning assigned to such terms in the existing TCLP forms of TCLF and Reimbursement Agreement

**General Modifications**

*Term of Extension*

Issuers may, in accordance with the terms and conditions set forth herein, extend the existing expiration date of the TCLFs from the first to occur of the third (3rd) anniversary of the Effective Date or December 3 , 20 2 to the first to occur of the sixth (6th) anniversary of the Effective Date or December 31, 2015.

*Pricing*

Pricing for the TCLFs will be based upon the higher of (i) the TCLP supported VRDO rating or (ii) the Issuer's general obligation bond rating, as set forth below:

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

| Lowest Unenhanced Bond Rating (or equivalent) | Single Family | | |
|---|---|---|---|
| | Year 4 (2013) | Year 5 (2014) | Year 6 (2015) |
| 'Aaa'/'AAA' | 0.90% | 0.90% | 0.95% |
| 'Aa'/'AA' | 00% | 00% | 1.05% |
| 'A' | 1.15% | 1.15% | 1.20% |
| 'Baa'/'BBB' | 1.75% | 1.75% | 1.85% |

| Lowest Unenhanced Bond Rating (or equivalent) | Multifamily | | |
|---|---|---|---|
| | Year 4 (2013) | Year 5 (2014) | Year 6 (2015) |
| 'Aaa'/'AAA' | 00% | 00% | 1.05% |
| 'Aa'/'AA' | 00% | 00% | 1.05% |
| 'A' | 1.20% | 1.20% | 1.25% |

Pricing for the TCLFs will be determined as of the date of the execution of the Program Modifications

*New Swaps*

Any swaps entered into subsequent to the release of this Term Sheet by the Issuers that elect to avail themselves of the Program Modifications ("New Swaps") must be with a swap counterparty rated at least 'Baa' by Moody's Investors Service or 'BBB' by Standard & Poor's Rating Services. In addition, New Swaps must include par termination provisions approved by Treasury and the GSEs.

*Reporting Requirements*

Issuers will be required to provide Treasury and the GSEs further information under the Indenture Supplements and the Reimbursement Agreements Attached as <u>Exhibit A</u> is the proposed additional reporting requirements for the Issuers under TCLP.

**Bank Bond Modifications**

*Bank Bond Maturity*

Bank Bonds are required to mature no later than the earliest of (i) the thirteenth ( 3t ) anniversary of the Effective Date, (ii) the tenth ( 0t ) anniversary of the date on which the related Bank Bond becomes subject to a Term Out Period and (iii) December 31, 2022.

2

TREASURY-3226

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*New Base Rate*

Bank Bonds will accrue interest at a new fluctuating "Base Rate" of prime plus 2 0%

*New Default Rate*

Bank Bonds will accrue interest at a new fluctuating "Default Rate" of prime plus 3 0% upon an Event of Default

## Plans

*Preliminary Plan*

Issuers electing to avail themselves of the permitted extension will be required to develop and submit a Preliminary Plan to Treasury and the GSEs by January 31, 2012. The Preliminary Plan must include a summary of the methods that the Issuers will implement to reduce TCLP exposure by utilizing (i) NIBP bonds to refund TCLP supported VRDOs, as referenced in the NIBP Extension Term Sheet (see "NIBP Extension Term Sheet   Special Rules Applicable to Issuers Participating in the TCLP    Required Use of NIBP Proceeds to Refund TCLP Supported Bonds") and/or (ii) non NIBP mechanisms. Attached as <u>Exhibit B</u> is the proposed informational requirements for Issuer submission of a Preliminary Plan

Treasury and the GSEs will endeavor to provide all of its feedback on the Preliminary Plan by April 30, 2011.

*Final Plan*

Each Issuer will prepare and submit a Final Plan to Treasury and the GSEs within thirty (30) calendar days after Treasury and the GSEs have notified the Issuer that it has received final feedback on the Preliminary Plan. The Final Plan must include, among other things, (i) the timing of all par swap termination options and Issuer intent to exercise such options, (ii) plans to convert TCLP supported VRDOs to fixed rate bonds using NIBP or other means, (iii) any recommended covenants by Treasury and the GSEs to be added to the Related Documents and (iv) any additional reporting requirements recommended by Treasury and the GSEs to be added to the Related Documents The Final Plan will be approved or disapproved by Treasury and the GSEs, in their sole discretion, within thirty (30) calendar days after Treasury and the GSEs have notified the Issuer that it has received final feedback on the Final Plan

## Implementation

Upon approval of the Final Plan by Treasury and the GSEs, the provisions of the Final Plan must be incorporated into the Re ated Documents within thirty (30) calendar days If the Final Plan is disapproved by Treasury and the GSEs, the TCLFs will expire on the existing unextended expiration date

3

TREASURY-3227

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

In all events, Issuers will be responsible for all legal  expenses incurred by Treasury and the GSEs as necessary to  execute the Program Modifications

4

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

EXHIBIT A

**ADDITIONAL REPORTING REQUIREMENTS**

In addition to the reporting requirements set forth in the form Indenture Supplements and Reimbursement Agreement, as amended, each Issuer electing to avail themselves of the Program Modifications must provide to Treasury and the GSEs the following:

(1) not later than 15 days after the end of each calendar month, the relevant portfolio performance data specified in Exhibit E to the form Indenture Appendices under the heading "Monthly Single Family Indenture Reporting Requirements" for all single family loans held within the trust estate of the underlying indentures;

(2) not later than 15 days after the end of each calendar month, the relevant portfolio performance data specified in Exhibit E 1 to the form Indenture Appendices, as amended, under the heading "Multifamily Indenture Reporting Requirements    Multi Loan Pools" or in Exhibit E 1 to the form Indenture Appendices under the heading "Multifamily Indenture Report Requirements    Single Loan" (as applicable) for all multifamily loans held within the trust estate of the underlying indentures;

(3) in addition to preparation by the Issuer of a Preliminary Plan and a Final Plan, not later than 15 days after the end of each calendar quarter (unless already supplied by the Issuer in connection with the Preliminary Plan and the Final Plan), a data template as provided by Treasury and GSEs to be completed by the Issuer for such quarter that will enumerate the following bond attributes including, but not limited to:

    (a) details on all outstanding VRDOs and auction rate debt (even if held by Issuer), other than unhedged bonds described in clauses (b) and (c) below, including:

        (i)   outstanding principal balances,

        (ii)  maturities,

        (iii) amortization schedules,

        (iv)  reset rate type (e g  daily or weekly; 7 day, 28 day or 35 day) and

        (v)   rate formula (e g  LIBOR + 2 00%);

    (b) details on each unhedged TCLP supported bond including:

        (i)   outstanding principal balance,

        (ii)  maturity,

        (iii) amortization schedule,

        (iv)  reset rate type and

A

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(v)   rate formula;

(c)   details on each unhedged non TCLP supported VRDOs and auction rate debt (even if held by Issuer) including:

      (i)   outstanding principal balance,

      (ii)   maturity,

      (iii)   amortization schedule,

      (iv)   reset rate type and

      (v)   rate formula;

(d)   details on each liquidity facility including:

      (i)   liquidity provider,

      (ii)   liquidity provider rating,

      (iii)   amount,

      (iv)   expiration date,

      (v)   liquidity fee,

      (vi)   material bank bond terms (e.g., term, price and amortization) and

      (vii)    bank bond payment priorities;

(e)   details on each swap or cap, specifying the related bond in clause (a) above, including:

      (i)   counterparty,

      (ii)   expiration date,

      (iii)   fixed pay swap rate or cap rate,

      (iv)   collateralization thresholds,

      (v)   par termination amounts and exercise dates, if applicable, and

      (vi)   mark to market valuation; and

(f)   plans for reducing outstanding VRDO balances of the Issuer

A 2

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

The foregoing data template is to be provided in connection with required updated meetings or calls to be held with Treasury and the GSEs (i) quarterly for calendar year 2012 and (ii) as required by Treasury and the GSEs for calendar years subsequent to 2012.

(4)   such other information as may be reasonably requested from time to time by Treasury or the GSEs, whether such information is published or unpublished, respecting the affairs, condition and/or operations, financial or otherwise, of the Issuer, the underlying indenture or the TCLP supported bonds (including, without limitation, loan level data, required by the GSEs with respect to any asset management surveillance and/or disclosure requirement)

A-3

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

EXHIBIT B

**PRELIMINARY PLAN FOR REDUCING TCLP EXPOSURE**

*Overview*

The TCLP Extension Term Sheet requires each HFA, which is seeking to execute the Program Modifications to develop and submit a Preliminary Plan. Specifically, it states that the Plan must include a summary of all of the strategies the HFA expects to employ in the pursuit of the following goals:

- Maximize swap terminations in support of VRDO refunding

- Maximize reduction in VRDO balances

- Maximize refunding of VRDOs to a fixed rate

- Maximize equity in the indenture

- Maximize replacement of TCLP by private sector liquidity providers

Treasury and the GSEs intend to use these plans along with data that has been collected for the following purposes:

- Gather baseline information on each HFA's current situation and general operating strategy

- Assist in discussions regarding each HFA's development of a detailed Final Plan

- Develop a clearer understanding of any economic, legal or policy obstacles affecting each HFA's ability to reduce their TCLP exposure

- Identify new strategies that may be beneficial in achieving the objectives of the Program Modifications

- Develop an implementable strategy to maximize replacement of TCLP by private sector liquidity providers, maximize reduction in VRDO balances or maximize refunding of VRDOs to a fixed rate

*Response Format*

Below is a suggested structure for the submission of the Preliminary Plan It is divided into three sections: Overview of the Current Situation, Use of the Primary Strategies, and Use of Other Strategies:

I    Overview of the Current Situation

- This should be a brief description of the HFA's current conditions and general strategies to manage the finances of the HFA and its indentures. This should include any major financial strains and what strategies are currently in place to

B 1

TREASURY-3232

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

address them. The overview should also discuss the impact of the extension and any obstacles to meeting its objectives

- Provide a data template as provided by Treasury and the GSEs and detailed in paragraph 3 of "Exhibit A      Additional Reporting Requirements" as it relates to the Preliminary Plan proposed by the HFA

II   Use of the Primary Strategies

Using the sub questions as a guide where applicable, please provide details (including timing and principal amounts where possible), on the HFA's abilities and plans to utilize the specific tools below  If the HFA is unable to utilize specific strategies, please provide a brief explanation of the reasons it is not possible.

- Exercising Par Termination Options:

  - What quantity of par terminations do you expect to have the option of exercising over the life of the extension?

  - What strategies have you been employing in deciding whether to exercise par termination options?

  - What additional steps have you taken with swap providers to structure par termination options or collateral requirement reductions?

  - How will those strategies change in light of the extension and Program Modifications?

- VRDO Redemptions:

  - How much of your TCLP VRDO balance do you expect to be able to redeem through expected collateral amortization?

  - What are the key drivers of the speed at which VRDOs are redeemed?
    Include:

    - Drivers that may be controllable such as cross calling

    - Drivers that cannot easily be changed such as other bonds in the indenture with payment priority

  - Do you expect to use all excess revenues to redeem VRDOs and, if not, please explain your intended uses of excess funds?

  - Do you plan to originate any new loans under you TCLP indenture and, if so, what will be the impact on the speed of redemption on your VRDOs?

- VRDO Refunding into fixed rate instruments through NIBP Refundings:

  - How much of your NIBP balance do you expect to be able to use to refund VRDOs?

  - To what extent do you believe outstanding swaps will be an impediment?

  - How will you determine the collateral to be used for NIBP Refundings?

  - What if anything could make such transactions financially detrimental?

B 2

TREASURY-3233

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

- Does the mortgage collateral backing your VRDOs have a sufficiently high yield to pay NIBP refunding bonds at the contemplated NIBP rates?

- Do you plan to refund MF VRDOs with SF NIBP funds and vice versa? Do you think you can or will amend your indenture(s) to facilitate such transactions?

- VRDO Refunding into fixed rate instruments through market transactions:

  - What is your view of the market's appetite for such bonds?

  - What steps can you take to facilitate fixed rate refundings in the market?

  - What are the obstacles to such transactions?

- Obtaining replacement liquidity providers in the market:

  - What has been your experience over the two past years in securing replacement liquidity facilities?

  - What, if anything, could change (in the market or in your portfolio), which would enable you to secure a replacement liquidity facility?

  - What steps will you take to find new liquidity providers?

  - Are there small, incremental steps you could take over the course of the extension to introduce private sector liquidity providers?

- Converting to floating rate notes without tender options:

  - Would such a structure be helpful in meeting the objectives of the program? If so, how would you benefit?

  - In what quantity and when would you have the ability to execute such conversions?

III   Use of Other Strategies

Treasury and the GSEs are open to exploring any other strategies that are consistent with the goals above Examples of such strategies include:

- Use of premium NIBP bonds to refund VRDOs with outstanding swaps and using the premium to finance swap tear up costs.

- Innovative market transactions that will reduce TCLP exposure

Please identify any other strategies that you might employ, describing impact and any critical issues that must be addressed including:

- Treasury and GSE related strategies

- Private market strategies

B-3

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 12.1

## RATIO OF EARNINGS TO FIXED CHARGES AND
## RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2011** | **2010** | **2009** | **2008** | **2007** |
| | | | **(dollars in millions)** | | |
| Net loss before income tax benefit (expense) and cumulative effect of changes in accounting principles | $ (5,666) | $(14,882) | $(22,384) | $(44,564) | $ (5,989) |
| Add | | | | | |
| Low-income housing tax credit partnerships | | | 4,155 | 453 | 469 |
| To al interest expense | 79,988 | 92,131 | 22,150 | 33,332 | 38,482 |
| Interest factor on rental expenses | 4 | 5 | 7 | 8 | 7 |
| Earnings (loss), as adjusted | $ 74,326 | $ 77,254 | $  3,928 | $ (10,771) | $ 32,969 |
| Fixed charges | | | | | |
| To al interest expense | $79,988 | $ 92,131 | $ 22,150 | $ 33,332 | $38,482 |
| Interest factor on rental expenses | 4 | 5 | 7 | 8 | 7 |
| Capitalized interest | | | | | |
| To al fixed charges | $ 79,992 | $ 92,136 | $ 22,157 | $ 33,340 | $38,489 |
| Senior preferred stock and preferred stock dividends[1] | 6,498 | 5,749 | 4,105 | 675 | 398 |
| To al fixed charges including preferred stock dividends | $ 86,490 | $ 97,885 | $ 26,262 | $ 34,015 | $38,887 |
| Ratio of earnings to fixed charges[2] | ⸺ | ⸺ | ⸺ | ⸺ | ⸺ |
| Ratio of earnings to combined fixed charges and preferred stock dividends[3] | ⸺ | ⸺ | ⸺ | ⸺ | ⸺ |

(1) Senior preferred stock and preferred stock dividends represent pre-tax earnings equired o cover any senior preferred stock and preferred stock dividend equirements s co preferred s go effective vax a e, whenever he e san inco e ax p ovis on, fo he elevan pe ods

(2) Ratio of earnings to fixed charges s computed by dividing earnings (loss), as adjusted by to al fixed charges For a ratio o equal 100, ea ngs (loss), as adjusted mus increase y $57 o, $149 o, $182 o, $441 b o, a d $55 b o fo e yea s ded Dece be 31, 2011, 2010, 2009, 2008, a d 2007, espectively

(3) Ratio of earnings to combined fixed charges and preferred stock dividends s co puted by dividing earnings (loss), as adjusted by to al fixed charges including preferred stock dividends For a ratio o equal 100, earnings (loss), as adjusted s ncease by $12 2 b o, $20 6 b o, $22 3 o, $44 8 o, a d $5 9 b on fo e yea s e ded Dece be 31, 2011, 2010, 2009, 2008, and 2007, espective y

Source   D RA HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 24.1**

**Power of Attorney**

**Annual Report on Form 10-K**
**Freddie Mac**

KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the  Federa Home Loan Mortgage Corporation), a federally chartered  corporation, hereby constitute and appoint Charles E.  Haldeman, Jr., Alicia S. Myara and Ross J. Kari, and each of them severally, my true and lawful attorney in fact with  power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all  things and execute any and all instruments that such attorney  may deem necessary or advisable under the Securities Exchange  Act of 1934 and any rules, regulations and requirements of the  U.S. Securities and Exchange Commission in connection with  the Annual Report on Form   0 K for the year ended December 31, 2011 and any and all  amendments thereto, as fully for all intents and purposes as I  might or could do in person, and hereby ratify and confirm all  said attorneys in fact and agents, each acting alone, and his or  her substitute or substitutes, may lawfully do or cause to be  done by virtue hereof

IN WITNESS WHEREOF, I have executed this Power of Attorney as of February 2, 2012.

/s/ Linda B. Bammann
Linda B. Bammann

Source    D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Power of Attorney**

**Annual Report on Form 10-K**
**Freddie Mac**

KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the Federal Home Loan Mortgage Corporation), a federally chartered corporation, hereby constitute and appoint Charles E. Haldeman, Jr., Alicia S. Myara and Ross J. Kari, and each of them severally, my true and lawful attorney in fact with power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all things and execute any and all instruments that such attorney may deem necessary or advisable under the Securities Exchange Act of 1934 and any rules, regulations and requirements of the U.S. Securities and Exchange Commission in connection with the Annual Report on Form 0 K for the year ended December 31, 2011 and any and all amendments thereto, as fully for all intents and purposes as I might or could do in person, and hereby ratify and confirm all said attorneys in fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof

IN WITNESS WHEREOF, I have executed this Power of Attorney as of February 2, 2012.

/s/ Carolyn H. Byrd
Carolyn H. Byrd

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Power of Attorney**

**Annual Report on Form 10-K**
**Freddie Mac**

KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the  Federa Home Loan Mortgage Corporation), a federally chartered  corporation, hereby constitute and appoint Charles E.  Haldeman, Jr., Alicia S. Myara and Ross J. Kari, and each of them severally, my true and lawful attorney in fact with power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all  things and execute any and all instruments that such attorney  may deem necessary or advisable under the Securities Exchange  Act of 1934 and any rules, regulations and requirements of the  U.S. Securities and Exchange Commission in connection with  the Annual Report on Form   0 K for the year ended December 31, 2011 and any and all  amendments thereto, as fully for all intents and purposes as I  might or could do in person, and hereby ratify and confirm all  said attorneys in fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be  done by virtue hereof

IN WITNESS WHEREOF, I have executed this Power of Attorney as of February 2, 2012.

/s/ Christopher S. Lynch
Christopher S. Lynch

Source   D  RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Power of Attorney**

**Annual Report on Form 10-K**
**Freddie Mac**

KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the Federal Home Loan Mortgage Corporation), a federally chartered corporation, hereby constitute and appoint Charles E. Haldeman, Jr., Alicia S. Myara and Ross J. Kari, and each of them severally, my true and lawful attorney in fact with power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all things and execute any and all instruments that such attorney may deem necessary or advisable under the Securities Exchange Act of 1934 and any rules, regulations and requirements of the U.S. Securities and Exchange Commission in connection with the Annual Report on Form 0 K for the year ended December 31, 2011 and any and all amendments thereto, as fully for all intents and purposes as I might or could do in person, and hereby ratify and confirm all said attorneys in fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof

IN WITNESS WHEREOF, I have executed this Power of Attorney as of February 2, 2012.

/s/ Nicolas P. Retsinas
Nicolas P. Retsinas

TREASURY-3239

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Power of Attorney**

**Annual Report on Form 10-K**
**Freddie Mac**

KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the Federa Home Loan Mortgage Corporation), a federally chartered corporation, hereby constitute and appoint Charles E. Haldeman, Jr., Alicia S. Myara and Ross J. Kari, and each of them severally, my true and lawful attorney in fact with power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all things and execute any and all instruments that such attorney may deem necessary or advisable under the Securities Exchange Act of 1934 and any rules, regulations and requirements of the U.S. Securities and Exchange Commission in connection with the Annual Report on Form 0 K for the year ended December 31, 2011 and any and all amendments thereto, as fully for all intents and purposes as I might or could do in person, and hereby ratify and confirm all said attorneys in fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof

IN WITNESS WHEREOF, I have executed this Power of Attorney as of February 2, 2012.

/s/ Clayton S. Rose
Clayton S Rose

TREASURY-3240

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Power of Attorney**

**Annual Report on Form 10-K**
**Freddie Mac**

KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the  Federa Home Loan Mortgage Corporation), a federally chartered  corporation, hereby constitute and appoint Charles E.  Haldeman, Jr., Alicia S. Myara and Ross J. Kari, and each of them severally, my true and lawful attorney  in fact with power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all  things and execute any and all instruments that such attorney  may deem necessary or advisable under the Securities Exchange  Act of 1934 and any rules, regulations and requirements of the  U.S. Securities and Exchange Commission in connection with  the Annual Report on Form  0 K for the year ended December 31, 2011 and any and all  amendments thereto, as fully for all intents and purposes as I  might or could do in person, and hereby ratify and confirm all  said attorneys in fact and agents, each acting alone, and his or  her substitute or substitutes, may lawfully do or cause to be  done by virtue hereof

IN WITNESS WHEREOF, I have executed this Power of Attorney as of February 2, 2012.


/s/ Eugene B. Shanks, Jr.
Eugene B. Shanks, Jr.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Power of Attorney**

**Annual Report on Form 10-K**
**Freddie Mac**

KNOW ALL PERSONS BY THESE PRESENTS, that I, the undersigned, a director of Freddie Mac (formally known as the  Federa Home Loan Mortgage Corporation), a federally chartered  corporation, hereby constitute and appoint Charles E.  Haldeman, Jr., Alicia S. Myara and Ross J. Kari, and each of them severally, my true and lawful attorney in fact with power of substitution and resubstitution to sign in my name, place and stead, in any and all capacities, to do any and all  things and execute any and all instruments that such attorney  may deem necessary or advisable under the Securities Exchange  Act of 1934 and any rules, regulations and requirements of the  U.S. Securities and Exchange Commission in connection with  the Annual Report on Form   0 K for the year ended December 31, 2011 and any and all  amendments thereto, as fully for all intents and purposes as I  might or could do in person, and hereby ratify and confirm all  said attorneys in fact and agents, each acting alone, and his or her substitute or substitutes, may lawfully do or cause to be  done by virtue hereof

IN WITNESS WHEREOF, I have executed this Power of Attorney as of February 2, 2012.


/s/ Anthony A. Williams
Anthony A. Williams

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.1**

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a 14(a)

I, Charles E. Haldeman, Jr., certify that:

1. I have reviewed this Annual Report on Form  0 K for the year ended December 3 , 20   of the Federal Home  Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue  statement of a material fact or omit to state a material fact  necessary to make the statements made, in light of the circumstances under which such statements were made, not  misleading with respect to the period covered by this report;

3 Based on my knowledge, the financial statements, and other  financial information included in this report, fairly present in  all material respects the financial condition, results of  operations and cash flows of the registrant as of, and for, the  periods presented in this report;

4 The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls  and procedures (as defined in Exchange Act Rules   3a   5(e) and 15d 15(e)) and internal control over financial reporting (as defined in  Exchange Act Rules 13a 15(f) and 15d 15(f)) for the registrant and have:

   a.   Designed such disclosure controls and procedures, or caused such  disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the  registrant, including its consolidated subsidiaries, is made  known to us by others within those entities, particularly during  the period in which this report is being prepared;

   b.   Designed such internal control over financial reporting, or  caused such internal control over financial reporting to be  designed under our supervision, to provide reasonable assurance  regarding the reliability of financial reporting and the  preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our  conclusions about the effectiveness of the disclosure controls  and procedures, as of the end of the period covered by this  report based on such evaluation; and

   d.   Disclosed in this report any change in the registrant's  internal control over financial reporting that occurred during  the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual  report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over  financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal  control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board  of directors (or persons performing the equivalent functions):

   a.   All significant deficiencies and material weaknesses in the  design or operation of internal control over financial reporting  which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and  report financial information; and

   b.   Any fraud, whether or not material, that involves management or  other employees who have a significant role in the  registrant's internal control over financial reporting

Date: March 9, 2012

/s/  Charles E. Haldeman, Jr.
Charles E. Haldeman, Jr.
Chief Executive Officer

**TREASURY-3243**

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.2**

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a 14(a)

I, Ross J. Kari, certify that:

1. I have reviewed this Annual Report on Form  0 K for the year ended December 3  , 20    of the Federal Home  Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue  statement of a material fact or omit to state a material fact  necessary to make the statements made, in light of the circumstances under which such statements were made, not  misleading with respect to the period covered by this report;

3  Based on my knowledge, the financial statements, and other  financial information included in this report, fairly present in  all material respects the financial condition, results of  operations and cash flows of the registrant as of, and for, the  periods presented in this report;

4  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls  and procedures (as defined in Exchange Act Rules   3a   5(e) and 15d 15(e)) and internal control over financial reporting (as defined in  Exchange Act Rules 13a 15(f) and 15d 15(f)) for the registrant and have:

   a.  Designed such disclosure controls and procedures, or caused such  disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the  registrant, including its consolidated subsidiaries, is made  known to us by others within those entities, particularly during  the period in which this report is being prepared;

   b.  Designed such internal control over financial reporting, or  caused such internal control over financial reporting to be  designed under our supervision, to provide reasonable assurance  regarding the reliability of financial reporting and the  preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our  conclusions about the effectiveness of the disclosure controls  and procedures, as of the end of the period covered by this  report based on such evaluation; and

   d.  Disclosed in this report any change in the registrant's  internal control over financial reporting that occurred during  the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual  report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over  financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal  control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board  of directors (or persons performing the equivalent functions):

   a.  All significant deficiencies and material weaknesses in the  design or operation of internal control over financial reporting  which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and  report financial information; and

   b.  Any fraud, whether or not material, that involves management or  other employees who have a significant role in the  registrant's internal control over financial reporting

Date: March 9, 2012

/s/  Ross J. Kari
_____
Ross J. Kari
Executive Vice President     Chief Financial Officer

Source   D  RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 32.1**

**CERTIFICATION**

**PURSUANT TO 18 U.S.C. SECTION 1350,**

**AS ENACTED BY SECTION 906 OF THE SARBANES OXLEY ACT OF 2002**

In connection with the Annual Report on Form   0 K for the year ended December 3  , 20    of the Federal Home  Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof  (the "Report"), I, Charles E. Haldeman, Jr., Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to  Section 906 of the Sarbanes Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of Section   3(a) or   5(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all  material respects, the financial condition and results of  operations of the Company.

Date: March 9, 2012

/s/  Charles E. Haldeman, Jr.
Charles E. Haldeman, Jr.
Chief Executive Officer

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 32.2**

**1 ECRTI TI  F RTAO**

**NP CUP F OR RA  S8  P .U.1 .  UE1 RTAO S350,**

**F U EOF 1 RED BY  UE1 RTAO 906 A1  RHE  UF CBF OEU AXLEY  F 1  R AI  2002**

In connection with the Annual Report on Form   0 K  for the year ended December 3  , 20     of the Federal Home  Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof  (the "Report"), I, Ross J  Kari, Executive Vice President     Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of Section   3(a) or   5(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all  material respects, the financial condition and results of  operations of the Company.

Date: March 9, 2012

/s/  Ross J. Kari
_____
Ross J. Kari
Executive Vice President     Chief Financial Officer

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012                                  Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 K, March 09, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**North America** United States

 **Deutsche Bank**

Securitization

Global Markets Research

MBS and Securitized Products

14 March 2012

# The Outlook
## In MBS and Securitized Products

**Resi: The path of US support for Fannie Mae, Freddie Mac** .................... Page 4
*Unlimited US Treasury support for the agencies likely ends this year. Then a new and less certain path begins.*

**CRE: Could CMBS loans become fully recourse?** ..................................... Page 8
*A recent court decision on a small loan which was securitized over ten years ago has the potential to challenge the main tenets of the CMBS market – the non-recourse nature of the loans.*

**Consumer ABS: Opportunities in equipment ABS** ................................. Page 10
*The strong price performance of high-quality equipment ABS has been supported by strengthening credit fundamentals in the sector*

**Relative Value / ALM Strategies**

**Servicer based opportunities and risks in the Consumer Relief Program**
................................................................................................... Page 12
*What the settlement could mean for investors in non agency*

**Sector Analysis**

**Agency MBS: Putting a price on LTV** ...................................................... Page 15
*HARP loans with the highest LTV still show the best value*

**Rates: Underwriting the recovery** ............................................................ Page 19
*We continue to expect the Fed to "underwrite" the recovery by maintaining monetary stimulus though the balance of the year. This leaves us constructive and in the mode of buying dips.*

**Economics: Labor market begins to blossom** ............................................ Page 23
*The February employment report was solid as both headline and private payrolls each topped 200k for the third month in a row*

Deutsche Bank 2012 MBS and Securitization Conference
Tuesday, March 27, 2012, New York City
Featured speakers: Rick Reider, BlackRock and Edward DeMarco, Federal Housing Finance Agency

Call your sales representative for an invitation

## Market Update

**Research Team**

**Coordinators**
**Steven Abrahams**, Residential MBS
**Harris Trifon**, Commercial RE
**Elen Callahan**, Consumer ABS

**Residential MBS**
Steven Abrahams
(+1) 212 250-3125
steven.abrahams@db.com

Ying Shen
(+1) 212 250-1158
ying.shen@db.com

Doug Bendt
(+1) 212 250-5442
douglas.bendt@db.com

Richard Mele
(+1) 212 250-0031
richard.mele@db.com

Jeff Ryu
(+1) 212 250-3984
jeff.ryu@db.com

Jason Wu
(+1) 212 250-6157
jason.wu@db.com

**Commercial Real Estate**
Harris Trifon
(+1) 212 250-5893
harris.trifon@db.com

David Zhou
(+1) 212 250-1952
david-j.zhou@db.com

**Consumer and Esoteric ABS**
Elen Callahan
(+1) 212 250-8161
elen.callahan@db.com

Douglas W. Runte
(+1) 212 250-9319
douglas.runte@db.com

**Prepayment and Default Modeling**
Ying Shen
(+1) 212 250-1158
ying.shen@db.com

Jason Wu
(+1) 212 250-6157
jason.wu@db.com

**Portfolio Strategies**
Christopher Helwig
(+1) 212 250-3033
christopher.helwig@db.com

**Rates**
Dominic Konstam
(+1) 212 250-9753
dominic.konstam@db.com

**Economics**
Joseph LaVorgna
(+1) 212 250-7329
joseph.lavorgna@db.com

Deutsche Bank Securities Inc.

All prices are those current at the end of the previous trading session unless otherwise indicated. Prices are sourced from local exchanges via Reuters, Bloomberg and other vendors. Data is sourced from Deutsche Bank and subject companies. Deutsche Bank does and seeks to do business with companies covered in its research reports. Thus, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. DISCLOSURES AND ANALYST CERTIFICATIONS ARE LOCATED IN APPENDIX 1. MICA(P) 146/04/2011.

Deutsche Bank

# 2012 MBS and Securitization Conference

*Passion to Perform*

**Tuesday, March 27, 2012**

**Trump SoHo**          **SoHo Ballrooms, 3rd Floor**
**246 Spring Street**     **New York, NY 10013**

12:30 – 1:00 pm     **Registration**

1:00 – 5:00 pm      **Business Sessions**

**Welcome and Opening Remarks**
*Jeff Mayer*, Managing Director, Head of Corporate & Investment Bank North America, Deutsche Bank

**Keynote Speaker**
*Rick Rieder*, CIO, Fundamental Fixed Income Portfolios, BlackRock

**Europe, the US Economy & Beyond**
*Torsten Slok*, Managing Director, Chief International Economist, Deutsche Bank

**Securitized Credit Panel: The New Capital Paradigm**
Moderator:    *Harris Trifon*, Director, Head of Commercial Real Estate Debt Research, Deutsche Bank
Traders:       *Ben Solomon*, Managing Director, Head of US CMBS Secondary Trading, Deutsche Bank
                    *Pius Sprenger*, Managing Director, Co-Head of Structured Products Trading, Deutsche Bank
Clients:        *Randy Robertson*, Head of Securitized Assets, BlackRock
                    *Andy Solomon*, Head of Commercial Real Estate Debt, Angelo Gordon

**Networking Break**

**Agency MBS Panel: The New Impact of Regulation & Politics**
Moderator:    *Steve Abrahams*, Managing Director, Head of MBS and Securitization Research, Deutsche Bank
Traders:       *Chris Babu*, Managing Director, Co-Head of Agency CMO and Derivative Trading, Deutsche Bank
                    *Troy Dixon*, Managing Director, Co-Head of Structured Products Trading, Deutsche Bank
Clients:        *Gary Kain*, President & CIO, American Capital Agency Corp.
                    *Alan Galishoff*, Managing Director and Portolio Manager, Millennium Partners
                    *Kurt Weisenfluh*, Head of US Rates and Agency Mortgages, BlackRock Model-Based Fixed Income Portfolio Management

**Perspectives from Washington, DC**
*Edward DeMarco*, Acting Director, Federal Housing Finance Agency

5:00 – 6:30 pm      **Networking Reception**
SoHi Room, 46th Floor



14 March 2012    The Outlook

Deutsche Bank ◨

# Triple-A generic secondary market spread indications

| Data on this page as of 3/9/12 | Average life bucket | | | | | |
|---|---|---|---|---|---|---|
| | 1yr | 2yr | 3yr | 5yr | 7yr | 10yr |
| **US floating-rate spreads (bp) to LIBOR** | | | | | | |
| Credit cards (1-month) | -- | 7 | 10 | 23 | 30 | 40 |
| Student loan FFELP (3-month) | 20 | 35 | 45 | 70 | 95 | 115 |
| Student loan private credit (3-month) | -- | 150 | -- | -- | 325 | -- |
| Home equity loan (HEL) ARM Seq (Note: vs. 1, 3, 6yr) | 350 | -- | 750 | 975 | -- | -- |
| **US fixed-rate spreads (bp) to swaps** | | | | | | |
| Autos (Note: 1yr auto vs. EDSF) | 1 | 10 | 27 | -- | -- | -- |
| Wrapped auto (subprime) | -- | 85 | -- | -- | -- | -- |
| Credit cards | -- | 4 | 12 | 24 | 33 | 43 |
| CMBS cash AAA | -- | -- | -- | 175 | 185 | 155 |
| Home equity loan (HEL) | -- | 475 | 725 | 975 | 1000 | 1075 |
| Equipment | 10 | 25 | 35 | -- | -- | -- |
| **US fixed-rate spreads (bp) to Treasuries** | | | | | | |
| Autos | -- | 35.3 | 53.5 | -- | -- | -- |
| Credit cards | -- | 29.3 | 38.5 | 49.8 | 53.3 | 51 |
| Home equity loan (HEL) | -- | 500.3 | 751.5 | 1000.8 | 1020.3 | 1083 |
| **Agency (nominal spreads to Treasuries) (bp)** | | | | | | |
| Agency MBS - Curr Cpn (15yr) | -- | -- | -- | 112 | -- | -- |
| Agency MBS - Curr Cpn (30yr) (vs. 7.5yr) | -- | -- | -- | -- | 148 | -- |
| **Other (bp)** | | | | | | |
| Industrial single-A corporate spreads (to UST) | -- | 33.8 | 47.0 | 73.2 | -- | 111 |

# MBS, CMBS and ABS spread charts

### US floating-rate spreads (bp)




— 2yr Card (LIBOR)  — 2yr SL (LIBOR)  — 3yr HEL ARM SEQ (rt axis)

Card and HEL ARM spreads to 1m LIBOR; student loan spreads to 3m LIBOR

### US fixed-rate spreads to swaps (bp)


— 3yr Auto  — 5yr Card  — 5yr CMBS  — 5yr HEL (rt axis)

Three-year auto spreads are for prime benchmark autos

### US fixed-rate ABS spreads to Treasuries (bp)


— 2yr Auto  — 5yr Credit card  — 5yr HEL (rt axis)

Spread charts reflect generic secondary triple-A levels for each asset class.
*Source for all is Deutsche Bank, except Corporates (to UST), which is Bloomberg Finance LP.*

### Agency MBS – CC LIBOR option adjusted spread (bp)



For detailed sector data, please refer to the companion document, *The Outlook: Data Addendum.*

14 March 2012    The Outlook



## RESI

# The path of US support for Fannie Mae, Freddie Mac

December 31 of this year marks the scheduled end to unlimited US Treasury support for Fannie Mae and Freddie Mac. Limited support begins the next day in amounts likely to be around $125 billion for Fannie Mae and $150 billion for Freddie Mac. The agencies will need that support along with reserves and income to cover future losses on mortgage-backed securities, repay debt and pay dividends on preferred stock issued to the US Treasury. In his letter to Congress last month, the acting director of the Federal Housing Finance Agency wrote that "it is clear that the draws [Fannie Mae and Freddie Mac] have taken from the Treasury are so large they cannot be repaid under any foreseeable scenarios." Both Fannie Mae and Freddie Mac have subsequently said that the need to pay dividends to Treasury creates "significant uncertainty about our long-term financial sustainability." That uncertainty puts both their MBS and debt at risk.

Many observers around the agency mortgage market have assumed that the US Treasury will extend unlimited support for Fannie Mae and Freddie Mac before the December 31 deadline. Unlimited support would allow the agencies to continue covering dividends and any other costs. But a close reading of the legislation that authorizes Treasury support suggests that Treasury may not be able to extend unlimited support without approval by Congress. Although Treasury has not confirmed that interpretation, other senior government officials and executives of other government-sponsored enterprises similarly understand that Treasury cannot readily extend unlimited support. That interpretation is also shared by a senior mortgage insurance executive and a Washington lawyer that has analyzed US support for the agencies. Given divisions in Congress over the future of the agencies and the lack of any legislative progress on reform, easy Congressional approval seems unlikely.

An inability to extend unlimited backing could force the Treasury to consider other means for relieving financial pressure on the agencies. The most likely relief would come from suspending the annual 10% dividend that the agencies will owe to the Treasury on its holdings of preferred stock, which currently stand at $188 billion. That would likely allow the agencies to easily service their MBS and debt. But it might also come with political costs.

Uncertainty over US financial backing for Fannie Mae and Freddie Mac and their ability to service securities could

widen spreads and reduce liquidity in MBS and debt as expiration of unlimited support approaches. It is a risk that all MBS portfolios need to anticipate.

**The authority for Treasury support**

Congress first gave the US Treasury authority to support Fannie Mae and Freddie Mac in the Housing and Economic Recovery Act of 2008, enacted July 30. Section 1117 of the bill gave the Treasury authority to buy unlimited amounts of Fannie Mae and Freddie Mac obligations but set a deadline for exercising that authority of December 31, 2009.

On September 7, 2008, the US put the agencies into conservatorship under the Federal Housing Finance Agency, and each agency signed a Senior Preferred Stock Purchase Agreement (PSPA) with the Treasury, which was restated and amended on September 26, 2008. The restated agreement allowed each agency to draw up to $100 billion to cover any quarterly losses as calculated under GAAP. With every draw, the agency would issue a like amount of preferred stock to the Treasury. The preferred stock paid a 10% annual dividend.

On May 6, 2009, the agencies and the Treasury amended the PSPA again, this time raising the maximum draw to $200 billion.

Then on December 24, 2009, shortly before the unlimited purchase authority expired, the agencies and the Treasury amended the PSPA again. This amended version authorized the Treasury to provide up to $200 billion of support for each agency and to cover an unlimited amount of losses in 2010, 2011 and 2012. The agencies subsequently have interpreted the agreement as requiring Treasury to reduce the $200 billion in support available after 2012 by any amounts drawn in 2008 or 2009. Since Fannie Mae drew $75.2 billion from the Treasury in those years, it's filings with the SEC show it expects to have $124.8 billion in support left. Since Freddie Mac drew $50.7 billion, it expects to have $149.3 billion.

Since the agencies and the Treasury have modified the PSPA three times, many observers assume the parties could modify it again and extend unlimited loss coverage beyond 2012. However, the original December 31, 2009, deadline for authorizing purchases looks likely to prevent

TREASURY-3251

Deutsche Bank Securities Inc.

14 March 2012    The Outlook                                                                    Deutsche Bank

that extension. The original legislation authorizing Treasury support and the PSPA both give the Treasury and the agencies broad rights to modify other parts of the existing agreement.  But extending purchase authority likely will take an act of Congress.

**Dividend pressure**

Limited US support for the agencies and the need to pay dividends to Treasury eventually could leave both agencies weakened.  Fannie Mae has said that it does not expect to earn profits in excess of its annual dividend obligation "for the indefinite future."  Freddie Mac has noted that it is unlikely to regularly generate enough income to cover its annual dividends to the Treasury.  The PSPA requires the agencies to issue more preferred stock to the Treasury to cover any shortfall in dividend payments.  As a result, the obligation to the Treasury grows as a compounded rate, something noted before by my colleague in rates strategy, Dan Sorid.

The timing for when Fannie Mae and Freddie Mac might exhaust Treasury support depends on the fixed amount available after 2012, the amount of preferred stock held by the Treasury and the ability of the agencies to cover the preferred dividend with revenue from guaranteeing MBS and from their investment portfolios.  Some of these things are easy to estimate while others require stylized assumptions.

The simplest but least likely scenario would require the agencies to cover their preferred dividends without access to revenue, which is substantial and likely to remain so beyond 2012. This scenario also assumes that the two agencies breakeven on all other activities. Nevertheless, this scenario shows the most potential stress on the agencies and sets a lower bound to Treasury support.  For Fannie Mae, the FHFA last October projected that the agency would cumulatively draw $142 billion in preferred stock by the end of 2012.  With an expected $124.8 billion in fixed support after 2012, servicing the preferred stock would exhaust Treasury support by the end of 2020 (Figure 1, No Income).  For Freddie Mac, the FHFA projected a cumulative draw of $76 billion.   With $149.3 billion in fixed support, the preferred dividend would exhaust support by the end of 2025 (Figure 2, No Income).



**Figure 1: The potential impact of preferred dividends on Treasury backstop for Fannie Mae**

Source: FHFA, Deutsche Bank



**Figure 2: The potential impact of preferred dividends on Treasury backstop for Freddie Mac**

Source: FHFA, Deutsche Bank

A more realistic scenario would allow the agencies to draw revenue from their guarantee and investment businesses.  Estimating that likely revenue requires a host of assumptions.

The guarantee businesses at both agencies look very healthy.  Both agencies hold sizable reserves against foreseeable losses, which reduce the burden on future revenue to cover those losses.  Fannie Mae holds $93.2 billion in reserves, and Freddie Mac $39.7 billion.  The quality of newly guaranteed loans also has increased dramatically, with both borrower credit score and debt-to-income ratio showing higher averages and higher lower bounds.  The average loan-to-value ratio ranges around 70.

**Deutsche Bank**

Recent books of guarantees arguably are among the best ever written by the agencies. Both agencies also have raised new guarantee fees in recent years, even though recent changes to the Home Affordable Refinance Program have reduced some of them. Based on discussions with major servicers, the average new guarantee fee going to the agencies is approaching 40 bp. The FHFA plans to raise guarantee fees further. Nevertheless, both agencies hold large legacy guarantee books with lower average fees. For Fannie Mae, if it kept its balance of guaranteed loans and MBS steady at the current $3.1 trillion and took in a conservative 25 bp of fees with 8 bp of expenses for losses and administration, the revenue would extend the life of Treasury support from 2020 to 2023 (Figure 1, G-fee Income Only). For Freddie Mac, if its balance of guarantees stayed at the current $2.1 trillion, the life of Treasury support would extend from 2025 to 2030 (Figure 2, G-fee Income Only).

The investment portfolios at each agency face a different future. The PSPA requires each portfolio to shrink by 10% annually starting at $900 billion in 2010. The limit today has fallen to $729 billion. Traditionally, these portfolios have provided the bulk of agency revenue, often exceeding two-thirds of the total before the financial crisis. But much of that revenue depended on a spread between funding and assets unlikely to prevail in the future. The composition of the portfolio also has changed, with non-agency securities and unsecuritized loans making up a larger percentage. Revenues from the portfolios are probably hardest to estimate. One reasonable assumption is that the agencies keep the portfolio balances roughly in line with the required limits and that the portfolios deliver the roughly 60 bp of option-adjusted spread targeted in the past. For Fannie Mae, adding portfolio revenue under these assumptions to guarantee revenue further extends the life of Treasury support from 2025 to 2029 (Figure 1, G-fee and Portfolio Income). For Freddie Mac, the portfolio revenue extends Treasury support from 2030 to 2037 (Figure 2, G-fee and Portfolio Income).

**Market implications**

For MBS investors, diminishing Treasury support raises the risk that the agencies one day might face challenges in covering MBS losses. The high quality of current loans and the prospect of rising guarantee fees should allow the agencies to cover losses in most scenarios. The risk becomes greater in a housing market catastrophe, such as the one that started in the US after 2006. Although it is difficult to know how much support investors might consider enough, recent Sequoia Mortgage Trust securitizations provide one of the few benchmarks. SEMT 2011-2, for example, securitized fixed-rate loans with a

weighted average loan-to-value of 59, a credit score of 773 and a loan size of $799,000. Fitch, the only agency that reviewed the transaction, required subordination of 7.4% to rate the most senior class 'AAA.' On agency loans, the higher loan-to-value ratio and the lower average loan balance might require more subordination. For Fannie Mae, the $124.8 billion in support liked at the start of next year is equal to only 4.04% of its guaranteed loans and MBS. Including Fannie Mae's $93.2 billion in loss reserves, that percentage rises to 7.05%. For Freddie Mac, it's $149.3 billion in support amounts to 7.22% of guaranteed loans and MBS. Adding its $39.7 billion in reserves brings the percentage to 9.14%. Those percentages would likely fall along with remaining Treasury support as the agencies paid preferred dividends. Presumably, investors would begin trading agency MBS to progressively wider spreads.

Beyond MBS, concerns about Treasury support could also affect money markets, where the Fed's latest data show that agency MBS and CMOs collateralize $757 billion or 43.4% of total tri-party repo. Agency debt collateralizes another $117 billion or 6.7% of the total. Margin requirements and lending spreads might rise, reducing liquidity and further widening spreads in these products.

Investors in agency debt already differentiate shorter debt from longer. As late as mid-2007, all Fannie Mae and Freddie Mac debt traded at yields below the swap curve. Since the crisis started, only issues with maturities of five years or less have traded that tight. The prospect of falling Treasury support might lead MBS investors in the same direction.

**Possible solutions**

If Treasury and the agencies want to avoid the possible market implications of diminishing Treasury support, then the parties to the PSPA could elect to amend it and defer or reduce the dividend. Deferring the dividend would almost surely leave the agencies with enough guarantee and investment revenue to cover MBS losses and manage portfolio funding. If the dividend continued to accrue while deferred, it might still pose risk to the agencies if the US ever chose to reinstate payment. If the dividend did not accrue, then the agencies might build up enough capital over time to return full principal. Alternatively, the parties could reduce the dividend to a level that the agencies would be able to cover comfortably with guarantee and investment income. That level would likely vary for Fannie Mae and Freddie Mac, with Fannie Mae needing a larger reduction. Based on the stylized assumptions used here for projecting guarantee and investment revenue, a 5% dividend might be manageable for both agencies.

**Deutsche Bank**

If deferring or reducing the preferred dividend proved politically unpalatable, then the agencies might have to consider selling parts of their investment portfolios now held at a gain.  That could slow the compounding of the preferred dividend in the near term, but it would also likely reduce investment revenues in the long term.  Beyond the impact on the agencies' balance sheet, sales could also put pressure on the secondary market to absorb the supply.

**Trading scenarios**

The political risks of deferring or reducing the PSPA dividend might lead the current administration to wait until after this year's elections to address the issues.  In the mean time, investor attention to US support for Fannie Mae and Freddie Mac will likely grow as the expiration of unlimited backing approaches. Spreads and liquidity for the agencies' MBS and debt could become choppy.

Nevertheless, Fannie Mae and Freddie Mac remain critical to US mortgage finance, and Washington seems unlikely to risk weakening investor confidence in the safety of their MBS and debt.  The two agencies, for the nine months through September of last year, guaranteed more than 64% of all new mortgage originations.  With banks and other private capital likely to come back slowly to mortgage lending, policymakers almost certainly need Fannie Mae and Freddie Mac to help bridge the transition.  Look for Treasury and the agencies to restructure the PSPA dividend after the November elections, and for spreads and liquidity to improve sharply.

\* \* \*

**The view in rates**

As the prospects of immediate crisis in Greece recede and the indications of steady if modest growth in the US continues, longer US yields should rise.  An end to QE2 without promise of QE3 should also nudge up yields.  My colleague Peter Hooper argues that the Fed is unlikely to launch QE3 unless unemployment rises or inflation expectations fall, neither of which seem likely.  Researchers from the Bank for International Settlements

estimated on Monday that the Fed's current buy program ultimately will trim 10-year yields by 85 bp.  If the program ends, additions to the stock of 10-year Treasury debt should slowly lift yields.  Of course, there is ongoing risk of recession in Europe exceeding expectations and risk that continuing weakness in US housing keeps growth slow.  But forces for higher yields still look likely to prevail.

**The view in spread markets**

Most spread products, MBS included, continue to hold their ground because carry has trumped other risk factors.  But MBS have good prospects if rates do move higher.  In that case, actual mortgage rates to borrowers should move up very slowly as originators try to hold rates down and keep the pipeline full.   The last few weeks have started to show that trend.  That should reduce extension risk in MBS and help their performance relative to most rates benchmarks.

MBS investors still have time to position for HARP, which should push up prepayments sharply in March and April.  Preferences, among others:

- Long specified pools, short TBA

- Long 2010 and 2011 pools, short pre-May 2009

- Long 15-year TBA pools, short 30-year

**The view in mortgage credit**

The S&P/Case-Shiller 20-City Index finished 2011 at a new low, but most of that was the usual winter slowdown.  Prices should still slide in 2012, but declines in distressed inventory should ease some of the pressure on housing.

*Steven Abrahams (+1) 212 250-3125*

14 March 2012    The Outlook

 Deutsche Bank

## CRE

# Could CMBS loans become fully recourse?

*Published concurrently with March 14, 2012, CMBS* A recent court decision on a small loan which was securitized over ten years ago has the potential to challenge the main tenets of the CMBS market – the non-recourse nature of the loans. Throughout the years there have been numerous examples of borrowers both large and small taking advantage of the non-recourse provision to remove them from underperforming properties or situations. In fact an argument could be made that the non-recourse provisions found in CMBS loan agreements has been one of the major reasons for the market's success over nearly the last two decades. In the note below, we trace through events which led to the court case in question, the case itself and the various scenarios which could play out from here.

**The property and workout process**

The Cherryland Center loan ($8.7mm original balance) was securitized in the GMACC 2002-C3 transaction and carried a 6.28% interest rate. The collateral for the loan was a 164k sf anchored retail property in Traverse City, MI. The property like so many others got into trouble when the occupancy began to fall and pushed the DSCR below 1.0x. The full details of the workout process are detailed below.

| Workout Timeline | |
|---|---|
| **Date** | **Event** |
| Dec-08 | Transferred to special servicer, DSCR reported to be 1.11x |
| Jan-09 | Borrower indicates payment will not be made in 2009 |
| Sep-09 | Payment is not made as DSC turned negative |
| Nov-09 | Borrower requests interest-only payments in 2010 |
| Mar-10 | Servicer pursues foreclosure |
| Aug-10 | Asset is foreclosed on but former borrower contests receiver during 6 month statuary redemption |
| Sep-10 | McKinley appointed the receiver |
| Nov-10 | Occupancy drops from 83% to 36% |
| Jan-11 | Appraised value falls to $3.9mm from 4.95mm a year before and $12.3mm at issuance |
| Mar-11 | BOVs are ordered, redemption period ends |
| Jun-11 | Occupany increased to 64%, property is listed for sale |
| Oct-11 | Occupany increased to 82% when Big Lots moves in, asset declared non-recoverable |

*Source: Deutsche Bank*

**Legal Arguments**

Once the asset fell into default, the Trust took the unique approach to secure proceeds through arguing the Borrower failed to keep the SPE solvent and was therefore liable for the deficiency judgment. Below is a short summary of the Wells Fargo Bank, NA v. Cherryland Mall Limited Partnership case.

Trust – The Borrower was liable for the deficiency because the non-recourse/SPE covenants were breached. The covenants required the Borrower to remain solvent and pay its debts. Therefore, because the Borrower became delinquent on the loan the covenants were breached.

Borrower – The covenants were not breached because the SPE term was not properly defined in the loan agreement and as a result, they maintained their status as an SPE and the Guaranty was not applicable. An alternative argument which was also used centered on the principle that the intent of the Guaranty was to prevent insolvency as a result of "bad boy" acts and not a decline in the value of the property.

Court of Appeals – sided with the Trust. They did not think that the loan agreement properly defined the SPE. The Court found that the list of covenants in the loan agreement were commonly found in other CMBS loan agreements and were considered SPE covenants. The Court analyzed loan documents with similar or identical provisions to the loan agreement in question as the basis for the decision. Regarding the Borrower's second argument (ie. intent), the Court rejected this as well because the documents only started that any failure to remain solvent was a violation and did not specify the manner an insolvency occurred.

**Potential paths**

What happens next is impossible to say but there are a few possibilities. The first is that the Michigan Supreme Court agrees to take the case and eventually reverses the lower court's ruling. There is a briefing scheduled next week to discuss the merits of the case after which a decision will be made whether to proceed or not. Of course, the Court could also agree to take the case and agree with the current opinion. A third possibility is that a newly introduced bill becomes law and effectively nullifies the ruling. The fourth scenario and worst outcome from a borrowers perspective is similar cases are brought in other states and their courts agree with Michigan's.

TREASURY-3255

Deutsche Bank Securities Inc.

14 March 2012    The Outlook

Deutsche Bank

Although there are a myriad of outcomes, *we view all of this as a positive for CMBS* investors, especially those invested further out the legacy credit curve. We believe *the fear of some CMBS loans turning into recourse will allow special servicers to exert much more leverage in the negotiation process.* More equity contributions on modified loans are likely and in some cases borrowers will come out of pocket to cure defaults or prevent defaults where it is viewed as a lower cost option (as opposed to letting a loan become delinquent and have a Trust pursue full recourse due to the Cherryland decision).

The subset of loans which are impacted for now is limited to those secured by properties in Michigan. However, the number of loans is actually smaller. Why? *The crux of the issue is how the loan agreements were written and each originator uses a slightly different template.* For example, the language in the loan agreement used at DB would not be open to the same outcome as the Cherryland case due to the way the SPE solvency covenant is defined. Specifically the clause states: *Borrower has been, is, and intends to remain solvent and Borrower has paid and intends to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets; provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower.*

While it is extremely difficult to estimate how much of the CMBS universe or even how many loans secured by Michigan properties use language most similar to the DB version or the Cherryland language (Archon was the originator), we can identify a potential sample. There are potentially at least $1B of loans which are at risk and if other states adopt a similar stance, perhaps upwards of $5B. Keep in mind, the delinquency rate on CMBS loans secured by Michigan properties is about 50% higher than the CMBS universe at over 13%. In the chart below we

detail the origination volumes and delinquent loan totals for the largest originators excluding DB. Depending on which of the scenarios outlined above comes to fruition, we will update our analysis and potential exposure list.



**Figure 3: Michigan CMBS origination volumes and delinquencies**

Source: Deutsche Bank, Intex

*Harris Trifon (+1) 212 250-5893*
*Dave Zhou (+1) 212 250-1952*

Deutsche Bank

## CONSUMER ABS
# Opportunities in equipment ABS

Equipment ABS has benefitted from the robust demand of new issue high-quality short ABS. This was particularly evident with the highly successful $998.8 million John Deere Owner Trust (JDOT) 2012-A, which was heavily subscribed and very broadly distributed. The deal was offered in four tranches and priced quite favorably compared to an earlier offering from the JDOT shelf (see Figure 4). Additionally, as a testament to the demand for paper in this sector, JDOT 2012-A compared very favorably to recently priced prime triple-A auto ABS. For example, the 2-year triple-A JDOT 2012-A priced 3bp tighter than a recently issued 2-year triple-A from Honda (HAROT 2012-1) and 4 bp tighter than the 3-year triple-A class from the same deal.

**Figure 4: JDOT 2012-A pricing strong market demand for ABS paper underpinned by strengthening credit fundamentals in the sector**

| Date | Deal | Cl | Ratings (M/S/F) | Size | OWAL | Index | Spd |
|------|------|-----|-----------------|------|------|-------|-----|
| 2/22/12 | JDOT 2012-A | A1 | P-1/-/F-1+ | 304 | 0.4 | lLibor | -24 |
| | | A2 | Aaa/-/AAA | 255 | 1.1 | EDSF | 8 |
| | | A3 | Aaa/-/AAA | 343 | 2.2 | lSwaps | 15 |
| | | A4 | Aaa/-/AAA | 97 | 3.3 | lSwaps | 24 |
| 4/13/11 | JDOT 2011-A | A1 | P-1/-/F-1+ | 334 | 0.4 | lLibor | -4 |
| | | A2 | Aaa/-/AAA | 333 | 1.1 | EDSF | 20 |
| | | A3 | Aaa/-/AAA | 340 | 2.2 | lSwaps | 25 |
| | | A4 | Aaa/-/AAA | 99 | 3.3 | lSwaps | 35 |

*Source: Deutsche Bank, Thomson Reuters*

Secondary market spreads on equipment ABS tightened for all credit ratings in 2011 and are currently at or near per-recession levels. For example, the secondary market offering spread on a generic triple-A 2-year tightened by 37% YOY and is currently at 25 bp, while a 2-year single-A trades a spread of 130 bp, which is about 4% tighter YOY. Both levels were last seen in 2007.

The strong price performance is also reflected in the shrinking spread differential between autos and

equipment ABS[1]. Figure 5 plots the pick-up from top-tier 3-year auto ABS to top-tier 3-year equipment ABS at various rating categories.

**Figure 5: The spread pick-up from auto ABS to equipment ABS shrank through 2011**



*Source: Deutsche Bank*

In certain cases secondary market spreads on autos are trading wider to comparable equipment ABS. Over the past 12 months the pick-up for double-A and triple-B rated bonds shrank by 52 bp and 35 bp, respectively, as this part of the curve has represented the sweet spot of strong credit fundamentals and healthy rates. Today double-A secondary equipment trades 2 bp through autos while triple-B equipment is flat to autos of similar tenor and rating[2]. Although performance has been stable, we think the current level of pick-up in these rating categories is not sustainable as the market is deeper and issuance volume much greater for auto ABS than for equipment ABS. For 3-year paper, we find the triple-A and single-A rating categories more compelling. The pick-up for triple-A and single-A bonds also tightened during this period, but to a lesser extent. Currently investors can pick up 30 bp by trading out of 3-year single-A autos and into comparable equipment ABS. The pick-up from triple-A autos to equipment is 10 bp.

The strong price performance has been underpinned by strengthening credit fundamentals in the sector, which in turn have been supported by a slowly recovering economy. Figure 6 charts the average losses of the

---

[1] Equipment lease ABS are compared to auto ABS because they, too, offer low prepayment risk and comparable average life and structure.
[2] Historically, equipment ABS has traded wider than autos given the size of the two markets. As of YE 2011, there were $118 billion of auto ABS outstanding. There were $14.9 billion of equipment ABS outstanding – Source: SIFMA

14 March 2012    The Outlook

**Deutsche Bank**

Equipment Leasing and Finance Association[3]'s Monthly Leasing Index. In January, average charge-offs as a percentage of net receivables fell to 0.5%, from 0.7% in December and from 0.9% one-year ago. This positive performance has been reflected in securitized pools. According to the Fitch Equipment ABS Index, total 60+ delinquencies for Fitch-rated equipment ABS stood at 27 bp in January 2012, a 72% decrease from the level one year ago. The three-month moving average for this metric currently stands at 25 bp.

**Figure 6: Average Losses (Charge-offs) as a % of net receivables - YOY comparison**



Source: Equipment Leasing and Finance Association – Monthly Leasing and Finance Index January 2012

We expect that collateral performance and issuance volume will continue to improve modestly and to the extent that the recovery and the improving tone in the US labor market continues. Figure 7 shows that overall new business volume for January 2012 was $5.1 billion, up 21% year-over year. Furthermore, recent data shows that while big companies are cautious about hiring, smaller companies are more optimistic (see Figure 8). This bodes well for an increase in the leasing and business activity of small businesses and for an increase in volume and collateral diversity in small and mid-ticket equipment lease ABS.

**Figure 7: New Business Volume ($ billion) - YOY Comparison**



Source: Equipment Leasing and Finance Association – Monthly Leasing and Finance Index January 2012

**Figure 8:Increased hiring of small businesses supports small & mid-ticket businesses**



As found in the presentation Deutsche Bank, "US Employment Ou look: Labor Market on Sustained Improving Trend," March 2012. Source JOLTS, DB Global Markets Research

In 2011, there were $10.2 billion of equipment ABS, a 31% increase over 2010's volume, but still well below the peak levels of 2003/2005 (see Figure 9). Volume was led by CNH, with 29% market share, GE Capital, with 27% and John Deere, with 11%. So far this year, we've seen $2.4 billion of new issue volume with ABS from John Deere, GE Capital and Volvo[4].

**Figure 9: Equipment ABS volume expanded by 31% in 2011. 2012 volume so far stays apace with 2011 YOY**



Source: Deutsche Bank

*Elen Callahan (+1) 212 250-8161*

---

[3] The Equipment Leasing and Finance Association's (ELFA) Monthly Leasing and Finance Index (MLFI-25), which reports economic activity for the $628 billion equipment finance sector.

[4] As of this writing, CNH Capital America LLC is in the market w th ts first public retail term ABS of the year.

14 March 2012    The Outlook

**Deutsche Bank** ⬛

R ELATIVE V ALUE / ALM S TRATEGIES

# Servicer based opportunities and risks in the Consumer Relief Program

The details of yesterday's filing in the foreclosure settlement were consistent with the points we outlined in last week's piece *Details of the AG Settlement Revealed.* Now that the dust has settled, we try to predict how servicers might apply principal modifications to isolate both potential opportunities and risks.

In setting forth a framework for these opportunities, we think there are three likely outcomes. The first outcome we will call investor positive where a servicer will modify portfolio loans exclusively. In the instance where the first lien resided in a securitized trust and a modified second lien was in portfolio the likely outcomes would be the following:

■  Bonds lower in the capital structure would benefit most from reperforming delinquent loans and writing down portfolio 2nd liens outside of the trust

■  Senior bonds in prime jumbo and Alt-a securitizations would benefit from lower severities on redefaults. Downside to senior investors would be that deals would be releveraged from a credit perspective by reperforming borrowers.

■  Subprime last cash flows would benefit from lower severities as result of modification of portfolio seconds, resulting in lower severities.

■  Subprime current pay bonds would be negatively impacted as loans would be removed from the DQ bucket, diminishing potential cashflow from liquidations available to deleverage those tranches.

The second outcome we will call investor negative where a servicer will modify loans in securitized trusts. In an investor negative construct the likely outcomes would be the following:

■  Bonds lower in the capital structure would be written down much faster as a result of principal reductions, significantly curtailing potential cash flow to those classes.

■  Senior bonds in prime jumbo and Alt-a will be negatively impacted. Wiping out subordinate tranches faster would preclude seniors from deleveraging as result of voluntary prepayments

■  Subprime seniors would be negatively impacted as the principal reductions would effectively be instantaneous liquidations at 100% severity.

The third outcome is a neutral or 'safe harbor' outcome, where there is likely little potential impact to bond holders.

Next we look at where potential opportunities may exist for investors to benefit from a potential "investor positive" construct. First we took the securitized private label balances by each of the five servicers and broke them down by collateral type and serious delinquency. Then for those loans greater than 60+ days delinquent we looked at what percentage of those loans had second liens behind them as seen in Figure 10 below. The rationale being if we are able to ascertain what servicers will likely modify only portfolio loans, then we can see what sectors are most exposed to those second liens that could be modified.

| Figure 10: Percentage of Second Liens behind Seriously delinquent securitized loans | | | | | |
|---|---|---|---|---|---|
| | | UPB | 60+ | w 2nd | % of Total DQ w/2nd |
| Prime | Chase | 45,590 | 6,874 | 1,402 | 20% |
| | B of A | 25,594 | 4,412 | 840 | 19% |
| | Citi | 4,411 | 269 | 4 | 1% |
| | Wells | 51,744 | 5,354 | 1,899 | 35% |
| | GMAC | 5,320 | 442 | 132 | 30% |
| Alt-A | Chase | 38,462 | 12,279 | 3,330 | 27% |
| | B of A | 61,960 | 26,424 | 9,514 | 36% |
| | Citi | 3,896 | 691 | 83 | 12% |
| | Wells | 21,487 | 5,354 | 1,885 | 35% |
| | GMAC | 24,016 | 7,208 | 3,308 | 46% |
| Subprime | Chase | 28,004 | 12,562 | 3,683 | 29% |
| | B of A | 18,639 | 10,946 | 2,266 | 21% |
| | Citi | 55 | 3 | 0 | 6% |
| | Wells | 20,861 | 9,013 | 2,046 | 23% |
| | GMAC | 1,269 | 370 | 65 | 18% |

Source: Deutsche Bank, Core Logic

For reasons we will explain in greater detail below, we believe that Wells, Chase and Citi are likely to take an investor friendly approach to the modifications, while B of A could have a more investor negative approach, GMAC/Ally would likely be investor neutral.

Bonds backed by Wells' prime jumbo and Alt-a loans have the greatest percentage of 2nd liens behind them at 35%

14 March 2012   The Outlook

**Deutsche Bank** ▮

followed by Chase subprime and Alt-a loans at 29% and 27% respectively. Given the dollar price leverage in Alt-a and subprime relative to prime jumbo, we would tend to favor expressing the investor friendly view in those asset classes.

In the analysis below we attempt to gauge potential servicer behavior.

**Investor Positive**

**Wells Fargo**

As stated last week, it appears based on the language in Wells 10-K that they will exclusively target portfolio loans. In the section of the release which references their obligations under the Consumer Relief Program, Wells explicitly states that the expanded principal reduction modifications on first and second liens will be executed on loans *"owned and serviced by Wells Fargo."* This appears to effectively remove any of the guess work around predicting their behavior with regards to the settlement and there should be some opportunity for investors given Wells' position.

While impossible to know for certain how the other servicers will approach the modifications, the data in Figure 11 below may provide some insight to potential behavior.

**Figure 11: Settlement Liability, Portfolio and Securitization Exposures by Servicer**

| | | Chase | B of A | Citi | Wells | GMAC |
|---|---|---|---|---|---|---|
| Total Servicing Platform | Borrower Relief Settlement Interest | $4,210 | $8,580 | $1,790 | $4,340 | $200 |
| | Principal Modification Settlement | $3,675 | $7,626 | $1,411 | $3,400 | $185 |
| | UPB of Total Servicing | 1,168,170 | 1,768,260 | 534,400 | 1,821,830 | 379,420 |
| | Non Agency & Portfolio | 731,274 | 1,055,298 | 307,066 | 931,502 | 225,755 |
| | Closed End Liens 30-89 Days DQ (Serviced) | 8,368 | 14,691 | 2,158 | 17,322 | 5,157 |
| | Closed End Liens > 90 Days DQ (Serviced) | 49,404 | 94,686 | 1,335 | 5,755 | 10,084 |
| Portfolio | 1-4 Family 1st Liens | 137,294 | 293,700 | 114,366 | 252,091 | 14,307 |
| | Open Ended HELs | 86,698 | 104,066 | 27,482 | 95,717 | 2,639 |
| | Closed End 2nds | 7,888 | 18,033 | 2,063 | 13,263 | 1,676 |
| | Total OBS Resi | 231,880 | 415,799 | 143,911 | 361,071 | 18,622 |
| | % of NPLs/ Total Loans | 7.75% | 4.30% | 4.44% | 3.91% | 1.15% |
| | Loan Loss Allowance | 27,609 | 33,873 | 30,115 | 19,372 | 722 |
| | % Loan Loss Reserves to Modification Amt | 13% | 23% | 5% | 18% | 26% |

*Source: Deutsche Bank, SNL, FDIC*

**JP Morgan Chase**

One other potentially likely candidate to modify portfolio loans would be JP/Chase. This is likely a result of two factors. First, JP has the largest percentage of nonperforming loans of the top five servicers with 7.75% of total loans in the nonperforming bucket. While it seems reasonable that given these modifications would result in

a positive NPV result for JP and that they would get credit towards the settlement for these modifications that there may be motivation to focus on portfolio loans rather than trust loans. Secondly, the $3.6 billion which JP must allocate to principal reductions is only 13% of their current loan loss allowance, leaving them potentially well positioned to focus on portfolio loans.

**Citi**

We maintain some reservations about Citi given the size of their settlement obligation relative to the total amount of delinquent non agency exposure. It is disproportionately large and therefore any level of trust modifications would likely have an impact on investors. That being said, given Citi's allowance of roughly $30 billion, they appear to be more than adequately reserved to focus on portfolio loans to fulfill their $1.4 billion principal modification obligation under the settlement.

**Investor Negative**

**Bank of America**

Of the five servicers, it appears on the surface that Bank of America may be the most likely to modify trust loans. As reported in the Wall Street Journal last Friday, B of A reached a separate deal with the agencies to provide deeper than anticipated principal reductions to reduce its penalties by up to $850 million. Their principal modification commitment of the settlement would be in excess of 23% of BAC's loan loss allowance as of December 31. While Wells was transparent with their intention to modify only portfolio loans in their 10K, Bank of America made no such assurances in their statement on Friday when the news was released about the magnitude of the principal reductions. Potential upside in Countrywide bonds from numerous lawsuits and repurchase clams could be significantly mitigated if not completely negated if B of A begins modifying loans in the trusts.

**Neutral**

**GMAC/Ally**

Given the rather nominal amount of principal modifications ($185 million) relative to the total outstanding exposure of GMAC serviced non agency loans, it is hard to imagine a scenario where either portfolio or trust mods would have a large scale impact on investors in those securities. That being said, the size of the settlement is significant relative to their overall loan loss allowance of $722 million.

 Deutsche Bank

**Conclusion**

There appear to be potential alpha opportunities resultant from the AG settlement. While the vast majority of Wells issuance was in the jumbo prime sector, lower dollar price WFMBS seniors and mezzanine cash flows could provide better than expected returns as underlying loans are deleveraged in the event of the extinguishment of second lien principal. Additionally, JPMAC shelf subprime could provide equally good if not better returns given the incrementally higher dollar price leverage in subprime. For now, we would proceed with caution on CWALT bonds until Bank of America's course of action becomes clearer.

*Christopher Helwig (+1) 212 250-3033*

14 March 2012    The Outlook

**Deutsche Bank**

SECTOR ANALYSIS
# Putting a price on LTV

## Agency MBS

With the Home Affordable Refinance Program (HARP) likely to drive prepayments up sharply in the next few months, more pools backed by HARP loans will come flowing into the agency MBS market. The market already recognizes some of the value in these pools since HARP borrowers can only go through the program once, leaving them with limited refinancing opportunities afterwards. Within the MHA sector, higher LTV pools look attractive in valuation relative to lower LTV pools. Furthermore, MHA pools and CMOs appear to be attractive alternatives to rates and corporate debts.

### Limited refinancing options for HARP borrowers

MHA pools have been issued since the summer of 2009, shortly after the launch of HARP. HARP allows a borrower with a high LTV to refinance through the program only if the loan was originated before May 31, 2009. Since every loan refinanced through HARP has an origination date that falls past the eligibility deadline, a borrower can only go through the program once. Since all HARP borrowers have estimated loan-to-value ratios above 80%, they face limited alternatives for refinancing a second time. And as the LTV of the HARP loan goes up, those alternatives approach zero.

As a result of limited refinancing options, HARP pools have prepaid slowly and consistently. Figure 12 shows the historical prepayments for 2010 MHA pools compared to the 2010 conventional cohorts. While low mortgage rates helped drive the 2010 conventional speeds up above 20 CPR for 4.0%s and 4.5%s late last year, prepayments on MHA pools remained in the single digits.

Some of the prepayment differences are due to the weaker credit profiles of MHA borrowers. For example, MHA borrowers tend to have slightly lower FICO scores as seen in Figure 13. For 2010 4.5%s, for example, average FICO on MHA pools range from 744 to 747, which is 11 to 14 points lower than the 758 credit score of the 2010 vintages. In addition, 4.5%s MHA pools tend to have higher gross WACs by a few basis points. However, those differences do not fully explain the large prepayment gap between the two, and the main driver of the prepayment differences looks to be from the limited refinancing alternatives of HARP borrowers.

**Figure 12: Prepayments for MHA pools have shown muted response to refinancing**







Source: CPRCDR, Deutsche Bank

Since MHA pools show a muted refinancing response to low mortgage rates, turnover plays a larger role in their prepayments. And within the turnover, default-related turnover makes up a large portion of their pay-downs due to weaker credit profiles of the borrowers. Based on Freddie Mac's supplemental data, buyouts made up 2% and 7% of Freddie Mac conventional 30-year 4.5%s and 5.0%s prepayments in February, respectively. Meanwhile, they were nearly 67% of prepayments for 4.5%s and 5.0%s in the Freddie Mac U6 program, which is comprised of 105% to 125% LTV HARP loans. Lower credit quality borrowers should lead to larger default-related turnover, as well as larger overall turnover, in MHA pools compared to conventionals. Thus, a better convexity profile of MHA pools comes from both the refinancing and the turnover side.

14 March 2012   The Outlook

Deutsche Bank

### Figure 13: Collateral characteristics of MHA pools, 9 March 2012

| | Amt | WAC | WALA | WAOLS | | | CPR hist | |
|---|---|---|---|---|---|---|---|---|
| | ($BN) | (%) | (mth) | ($K) | FICO | 1M | 3M | 6M |
| **FN 30Y 2010 4.0%** | | | | | | | | |
| FNCL | 108.2 | 4.50 | 15 | 258 | 767 | 17.9 | 20.1 | 18.2 |
| MHA: 80-90 LTV | 2.9 | 4.50 | 15 | 276 | 761 | 4.9 | 6.1 | 5.6 |
| MHA: 90-95 LTV | 1.0 | 4.52 | 15 | 271 | 762 | 3.1 | 3.7 | 3.6 |
| MHA: 95-100 LTV | 0.4 | 4.53 | 15 | 267 | 760 | 2.7 | 2.7 | 3.1 |
| MHA: 100-105 LTV | 0.3 | 4.50 | 15 | 262 | 757 | 2.6 | 1.9 | 1.9 |
| CQ: 105+ LTV | 0.2 | 4.56 | 15 | 229 | 756 | 0.3 | 1.1 | 1.6 |
| **FN 30Y 2010 4.5%** | | | | | | | | |
| FNCL | 108.0 | 4.94 | 20 | 245 | 758 | 20.5 | 22.6 | 20.5 |
| MHA: 80-90 LTV | 2.5 | 4.92 | 16 | 268 | 747 | 4.3 | 6.9 | 6.2 |
| MHA: 90-95 LTV | 1.1 | 4.93 | 16 | 264 | 744 | 3.3 | 3.0 | 3.3 |
| MHA: 95-100 LTV | 0.9 | 4.97 | 16 | 260 | 745 | 5.2 | 4.4 | 4.1 |
| MHA: 100-105 LTV | 0.6 | 4.96 | 16 | 254 | 747 | 2.5 | 4.3 | 3.8 |
| CQ: 105+ LTV | 1.0 | 5.03 | 17 | 245 | 748 | 4.7 | 4.9 | 4.3 |
| **FN 30Y 2010 5.0%** | | | | | | | | |
| FNCL | 52.5 | 5.36 | 21 | 227 | 738 | 16.4 | 17.7 | 16.3 |
| MHA: 80-90 LTV | 0.5 | 5.37 | 16 | 268 | 721 | 8.4 | 7.4 | 6.9 |
| MHA: 90-95 LTV | 0.4 | 5.38 | 16 | 262 | 725 | 11.3 | 9.3 | 6.4 |
| MHA: 95-100 LTV | 0.4 | 5.38 | 17 | 260 | 726 | 6.4 | 6.4 | 6.2 |
| MHA: 100-105 LTV | 0.4 | 5.40 | 16 | 249 | 729 | 6.4 | 6.3 | 6.5 |
| CQ: 105+ LTV | 1.5 | 5.49 | 20 | 252 | 739 | 6.8 | 6.0 | 5.5 |

Source: Deutsche Bank

### Figure 14: Pay-ups on MHA pools have appreciated to loan balance pool levels, 20 July 2011 – 1 March 2012



Source: Deutsche Bank

**Pay-ups on MHA have appreciated since last summer**

The market has warmed to this prepayment profile and the pay-up on MHA pools has appreciated as a result. Last summer, MHA pools traded at or below HLB levels but they have rallied higher since then (Figure 14). This is due to the strong call protection displayed by MHA pools during last fall's refi wave and better comfort with the prepayment behaviors of the borrowers. In addition, higher pay-ups also reflect the diminished risks from re-HARPing, given that the latest changes to the program have excluded this option, as well as recent weaknesses in TBA dollar rolls.

**High LTV MHA pools look attractive**

Within the MHA sector, HARP pools with the highest LTVs have the lowest actual-to-theoretical pay-up ratios and hence, show the best relative value (Figure 15). Theoretical pay-ups are computed by running MHA pools at same OAS as TBAs and then subtracting the resulting prices from the TBA price. Pools that show the lowest ratios of actual to theoretical pay-up offer the cheapest valuation. For 80-to-90 LTV MHA 4.5%s, the current pay-up of $1-26 is 339% of the theoretical pay-up of $0-17, while this ratio drops to 100% for 100-to-105 LTV MHA 4.5%s and to 80% for CQ 4.5%s.

The good relative value in the highest LTV pools arguably comes from MBS investors' reluctance to give up carry for convexity. Based on the model speed, TBA 4.5%s offer 2.65% yield for 3.0 years of negative convexity. In comparison, the CQ offers higher yield at 3.04% while having better convexity of -0.6 years.  Other 4.5% MHA pools fall in between those two.

14 March 2012   The Outlook

Deutsche Bank ▤

| Figure 15: Fair valuations on MHA pool pay-up, 9 March 2012 | | | | |
|---|---|---|---|---|
| MHA type | price | Actual Pay-up | Theo. Pay-up | % of Theo. value |
| FN 30Y 4.0% TBA | 105-03+ | | | |
| MHA: 80-90 LTV | 106-03+ | 1-00 | 0-13+ | 251% |
| MHA: 90-95 LTV | 106-11+ | 1-08 | 1-02 | 118% |
| MHA: 95-100 LTV | 106-13+ | 1-10 | 1-23 | 76% |
| MHA: 100-105 LTV | 106-19+ | 1-16 | 2-09 | 66% |
| CQ: 105+ LTV | 106-23+ | 1-20 | 3-07+ | 50% |
| FN 30Y 4.5% | 106-12+ | | | |
| MHA: 80-90 LTV | 108-06+ | 1-26 | 0-17 | 339% |
| MHA: 90-95 LTV | 108-18+ | 2-08 | 1-17 | 142% |
| MHA: 95-100 LTV | 108-24+ | 2-12 | 1-30+ | 122% |
| MHA: 100-105 LTV | 108-30+ | 2-18 | 2-18 | 100% |
| CQ: 105+ LTV | 109-04+ | 2-24 | 3-14+ | 80% |
| FN 30Y 5.0% | 107-28 | | | |
| MHA: 80-90 LTV | 109-24 | 1-28 | 1-28 | 100% |
| MHA: 90-95 LTV | 110-04 | 2-08 | 2-27 | 79% |
| MHA: 95-100 LTV | 110-10 | 2-14 | 3-09 | 74% |
| MHA: 100-105 LTV | 110-16 | 2-20 | 3-30 | 67% |
| CQ: 105+ LTV | 110-20 | 2-24 | 4-28+ | 56% |

Source: YieldBook, Deutsche Bank

Another approach to pool valuation is through comparison of carry offered by specified pools to TBAs. Monthly carry advantage of different MHA pools over TBA can be divided into pay-up levels to compute break-even months, which measures how quickly pay-ups will be returned. For CQ 4.5%s, monthly carry adds up to around 10.2/32s, or around 6/32s better than TBAs (Figure 16). At those levels, the monthly carry will recoup the pay-up in 15 months.

**MHA pools look attractive to rates and corporate debts**

MHA pools also look like good alternatives to high quality corporate debt. Indicative yields on AA seven-year corporate debt are at around 1.84%. In comparison, CQ 4.5%s yields around 3.04%, offering 120 bp of additional yield over the AA corporate with similar durations. Given the better convexity profile of MHA pools compared to TBAs, this trade gives up on much less on convexity than it would have with TBAs.

| Figure 16: MHA pools offer carry advantage to TBAs | | | | | | |
|---|---|---|---|---|---|---|
| | PRICE | b/e CPR | Monthly Carry (32s) | Carry Adv. (32s) | Pay-up (32s) | b/e months |
| FN 4.0 TBA | 105.13 | 23.1 | 6.3 | | | |
| MHA: 80-90 LTV | 106.95 | 10.5 | 7.6 | 1.4 | 32 | 23 |
| MHA: 90-95 LTV | 107.32 | 6.4 | 8.4 | 2.1 | 40 | 19 |
| MHA: 95-100 LTV | 107.51 | 4.7 | 8.8 | 2.5 | 42 | 17 |
| MHA: 100-105 LTV | 107.70 | 3.7 | 8.9 | 2.6 | 48 | 18 |
| CQ: 105+ LTV | 107.88 | 3.2 | 8.9 | 2.7 | 52 | 19 |
| FN 4.5 TBA | 106.39 | 34.0 | 4.3 | | | |
| MHA: 80-90 LTV | 107.39 | 12.0 | 8.5 | 4.2 | 58 | 14 |
| MHA: 90-95 LTV | 107.64 | 7.6 | 9.4 | 5.1 | 70 | 14 |
| MHA: 95-100 LTV | 107.70 | 6.2 | 9.7 | 5.4 | 76 | 14 |
| MHA: 100-105 LTV | 107.89 | 5.0 | 9.9 | 5.6 | 82 | 15 |
| CQ: 105+ LTV | 108.02 | 3.5 | 10.2 | 5.9 | 88 | 15 |

Source: Bloomberg Finance LP, Deutsche Bank

CMOs off of HARP loans also look attractive to rates. Figure 17 highlights the total return profile of FHR 3996 TB, a 2.25% sequential off of Freddie Mac U6 4.5%s, compared to a duration-neutral portfolio of two-year and ten-year Treasuries. In a base case, the CMO returns around 2.5% for the year, or nearly 70 bp better than the duration-neutral portfolio of two-year and ten-year Treasuries (Figure 17). The return profile of CMO holds well in a 50 bp rally and 50 bp sell-off scenarios.

| Figure 17: One-year total return profile of sequential off of high LTV pools |
|---|



Source: Yieldbook, Deutsche Bank

Similar to other call-protected paper, one risk of owning MHA pools is in the rate sell-off; as refinancings slow, call-protection offered by MHA pools becomes less valuable. However, primary mortgage rates have been fairly sticky at around 4.0%, and the spread between primary and secondary mortgage rates widened to almost 100 bps

Deutsche Bank

from a longer-term average of 60 bps as rates have rallied. Thus, any rate sell-off will likely compress this spread first and primary mortgage rates will likely trail the sell-off in rates.

**Jeff Ryu (+1) 212 250-3984**

TREASURY-3265

14 March 2012    The Outlook                                                                    Deutsche Bank ◧

## SECTOR ANALYSIS
# Underwriting the recovery

## Rates

We continue to expect the Fed to "underwrite" the recovery by maintaining monetary stimulus though the balance of the year.  This is much more likely to be accomplished through a "Twist2" program sterilized through reverse repo than it is via a new round of unsterilized asset purchases.  The purpose of the policy tool is to crowd investors out of Treasuries and into riskier credit instruments.  Credit growth shows signs of having accelerated, particularly in C&I loans, but the Fed will likely want to see a consistent pattern of credit creation before risking what might otherwise be a premature withdrawal of stimulus.  We continue to see the greater risk to the recovery as being too little, rather than too much, policy accommodation.

From an historical perspective, current relative valuations of bonds and equities appear anomalous.  If Treasuries are right, then equity values appear too high; if equities are right, then Treasury yields appear too low by as much as 50 bp.  The risk to lower equities is a weaker balance sheet and potential additional precautionary savings.  The risk to higher Treasury yields is that the incentive to invest in riskier credit instruments will be undermined, disrupting the portfolio balance channel.  This too would likely ultimately undermine risky asset values.  In a vacuum, one would expect the relative pricing anomaly to resolve itself through higher Treasury rates, lower equity valuations, or both. In the absence of resurgent credit creation, none of these are acceptable to the Fed.  One might think of Twist2 as a third way for the Fed that maintains incentives for credit creation, provides some additional stimulus for the FOMC doves, yet placates the hawks on the FOMC by avoiding further expansion of the monetary base.

In the absence of credit creation, the larger monetary base coupled with a constant multiplier results in capital chasing the prices of the existing stock of assets higher. In the presence of credit creation, new assets are created at a more or less constant pricing structure.  The risk of a premature withdrawal of stimulus – before credit creation is on stronger footing - is essentially that of a "levered" decrease in risky asset prices to their pre-stimulus levels.

One of the primary implications of this environment is that volatility should remain generally low, particularly at the long end of the curve.  To trade back to the lows of the recent range, or indeed to trade to new lows, would require activity data to roll over, or a new shock from Europe. We expect neither in the short run.  At the same time, we expect the Fed to effectively cap yields in order to safeguard the economic incentives for further portfolio shifts into riskier assets.

There are headwinds to the Fed's task of maintaining the current yield structure.  The first is the declining share of foreign ownership in the Treasury market.  Foreign official ownership of the Treasury market fell 1.3% in Q4, and has fallen to 33% from the peak in mid 2009 – a decline of 5%.  This is a reflection of slower growth and the resulting slower accumulation of reserves by structural current account surplus countries.



**Figure 18: Declining foreign official ownership of Treasuries**

Source: Deutsche Bank

It is likely that this is but the beginning of a more secular trend stemming from the resolution of structural imbalances.  As public and private sector savings increase in the US, the current account deficit declines, and foreign accumulation of dollars slows, the Treasury market will transition from an internationally financed market to a domestically financed market.

This could prove disruptive, particularly given the apparent slowdown in China.  A steady decrease in reserve accumulation, particularly if accompanied by an erosion of the dollar's share of reserve holdings, could create additional upward pressure on Treasury yields.

14 March 2012    The Outlook                                                          Deutsche Bank

**Figure 19: Chinese reserve growth as function of real GDP growth**



Source: Deutsche Bank

**Figure 20: Cumulative Distribution of Prices, unconditional and conditioned on 3% ULC increase**



Source: Deutsche Bank

For this reason additional Fed ownership of the Treasury market, particularly at the long end of the curve, could prove beneficial as a smoothing mechanism as the US transitions to a domestically financed market.

We do not think that the concentration of risk on the Fed's balance sheet, and the likely losses that will result when rates can climb sustainably, is a limiting factor in Fed action. The Fed's net income more than doubled from the beginning of the financial crisis to the end of 2010 due to the increase in the size of the balance sheet, itself an artefact of achieving its dual mandate. By the same logic, losing that windfall – and likely even more – should similarly be construed as an externality of achieving the mandate.

A second potential headwind to the Fed is inflation. Payroll revisions and falling productivity have resulted in a significant increase in unit labor costs. However, ULC increases need not spill directly over into higher inflation. The key issue is pricing power. In the presence of pricing power, higher ULC could simply be passed along to consumers in the form of higher prices. However, in the absence of pricing power, if corporations attempt to defend profit margins, given higher ULC and falling productivity the reaction of corporations could be slow hiring or even reduced headcount.

Superficially, significant increases in ULCs do produce higher inflation. We analyzed this by looking at quarterly price and ULC data for unit gross value added data. 50% of quarterly y/y changes to prices in the quarter following the observation of ULC since 1970 were 2% or less. However, when one conditions the data on a 3% increase or greater in ULCs, 50% of the price increases in the next quarter were 6% or less. The data, however, depend heavily on the inflationary environment of the 1970s. We would argue that the 1970s were substantially different with regard to Fed credibility, wage indexing, and other considerations. Indeed, the Fed has more recently enhanced its credibility with an explicit target. Pricing power was far more muted (<2%) in 2000 and 2007-2008.

Turning to profitability, we repeat the same analysis. In the case of profits, historically 40% of the quarterly data consisted of decreases to profit margins, subject to the same lag as the price analysis. However, given a 3% increase in ULC, 60% of the time profit margins fell in the following quarter.

**Figure 21: Cumulative distribution of profits, unconditionally and conditioned on 3% increase in ULC**



Source: Deutsche Bank

14 March 2012   The Outlook                                                                    Deutsche Bank

The risk scenario is that slower global growth and increased household savings limit the ability of corporations to pass along price increases to consumers, and in response corporations cut labor input in response to falling productivity and higher costs. This could lengthen the time required for the economy to absorb excess capacity and actually extend the period for which the Fed must continue to underwrite credit creation and, more broadly, the recovery.

## Risk assets and the end of the Twist

One conundrum of recent financial market performance has been the stubbornly low level of Treasury yields amid solid performance of risk assets, in particular equities. Traditional portfolio theory argues that stocks and bonds tend to move in opposite directions. We believe the reason stocks have done well is precisely because interest rates on risk free assets are low. The Fed has driven investors out of Treasuries into spread product and equities through Operation Twist and Quantitative Easing. In the Twist program, the Fed is absorbing the duration equivalent of $54 billion a month in 10-year notes via long end buying, representing about 45% of the duration supply from the Treasury.



**Figure 22: 10yr Treasury yield around the end of prior QEs (end of QE date set to 0)**

10yr UST

— QE1 (MBS purchases ended 03/31/10)
— QE2 (ended 06/30/11)

Trading Days

Source: Bloomberg Financial LP and Deutsche Bank

Aggregate data on financial asset demand, shown in the table here from the Fed's Flow of Funds data that came out on Thursday, March 8, paint a less clear picture, as the Fed's duration takeout is not apparent merely from par values. It is notable, however, that among the net buyers of agency and corporate bonds are the duration-hungry pension/insurance sector, which added $68 billion in those two asset categories. (The figures shown here adjust the Flow of Funds data to include each sector's direct holdings of securities as well as indirect holdings via mutual fund investments.) Overall, Treasury assets

grew by more than $300 billion, with a large chunk absorbed by money market funds (classified in our table as "Other U.S. domestic"), which buy bills, and foreigners. Purchases and flows shown here do not differentiate between holdings of Treasury bills, notes, and bonds.



**Figure 23: S&P 500 index around the end of prior QEs (end of QE date set to 0)**

S&P 500

— QE1 (MBS purchases ended 03/31/10)
— QE2 (ended 06/30/11)

Trading Days

Source: Bloomberg Financial LP and Deutsche Bank

Asset prices nevertheless suggest that QE and the Twist have done their job in crowding investors out of risk free Treasuries into risk assets in search for higher yields. Corporate bonds, mortgages, and stocks have been the prime beneficiaries of the crowding out. US domestic bond fund investors who have an overweight in spread products have been rewarded in solid total return so far this year.

**Figure 24: Demand for U.S. assets over Operation Twist (Q4 '11)**

|  | Treasuries | AGY/MBS | Corp | Equity | Cash | Total |
|---|---|---|---|---|---|---|
| Fed | (1) | (37) | 0 | 0 | 35* | (3) |
| Households * | 51 | (33) | (23) | (101) | 137 | 32 |
| Banks | (7) | 52 | (17) | (2) | (23) | 4 |
| Pension, Insurance | 32 | 23 | 45 | (15) | (4) | 80 |
| Other US Domestic | 176 | (22) | (13) | 4 | 158 | 337 |
| Total Foreign | 75 | (7) | (26) | (11) | 82 | 113 |
| *Private Foreign* | 99 | 3 | (25) |  |  |  |
| *Official Foreign* | (24) | (10) | (1) |  |  |  |
| Total (FF) | 326 | (24) | (34) | (125) | 350 | 527 |

Source: Federal Reserve; Deutsche Bank; Note: Q4 to Q4 '11 difference in Flow of Funds levels, except for equities, which reflect flows; * Additional assets allocated to each sector in proportion to mutual fund holdings. Cash entry for Federal Reserve reflects reserves, with an increase in reserves reflected as a decline in "cash", but is not used in FoF cash total.

Following this logic, it's possible that we see some relative "crowding back" into Treasuries from other assets towards the end of the Twist. The stock market sell-off on Tuesday, March 6 reminded investors of how risky assets suffered towards the end of QE1 and QE2. The S&P 500 index had a local peak shortly after the Fed

14 March 2012    The Outlook

**Deutsche Bank**

concluded QE1 MBS purchases (tapered), as well as QE2. TIPS breakevens drifted lower, and even deflation scare was priced in after QE1. MBS basis widened, particularly after QE2. Therefore, we believe it's crucial that the Fed continues the Twist in some format in the second half of this year to avoid a downturn in risk assets, as was the case at the end of QE1 and QE2. This becomes more important in light of the fiscal tightening that would take place if Bush-era tax rates were to rise by year end.

| Figure 25: Demand for U.S. assets over 2011 | | | | | | |
|---|---|---|---|---|---|---|
| | Treasuries | AGY/MBS | Corp | Equity | Cash | Total |
| Fed | 642 | (198) | 0 | (26) | (594)* | (177) |
| Households * | (128) | (11) | (56) | (142) | 382 | 45 |
| Banks | (33) | 144 | (12) | 1 | 638 | 739 |
| Pension, Insurance | 122 | 65 | 202 | (48) | (2) | 339 |
| Other US Domestic | 172 | 3 | (63) | 9 | (677) | (557) |
| Total Foreign | 291 | (40) | (46) | (32) | 148 | 321 |
| *Private Foreign* | 171 | (28) | (44) | (16) | | 83 |
| *Official Foreign* | 120 | (12) | (3) | (16) | | 90 |
| Total (FF) | 1067 | (37) | 24 | (247) | 489 | 1297 |

Source: Federal Reserve; Deutsche Bank; Note: Q4 '10 to Q4 '11 difference in Flow of Funds levels, except for equities, which reflect flows; * Additional assets allocated to each sector in proportion to mutual fund holdings. Cash entry for Federal Reserve reflects reserves, with an increase in reserves reflected as a decline in "cash", but is not used in FoF cash total.

*Dominic Konstam (1) 212 250-9753*
*Alex Li (1) 212 250-5483*
*Aleksandar Kocic (1) 212 250 0376*
*Stuart Sparks (1) 212 250 0332*
*Daniel Sorid (1) 212 250 1407*
*Steven Zeng (1) 212 250 9373*

TREASURY-3269                    Deutsche Bank Securities Inc.

14 March 2012    The Outlook

Deutsche Bank ◼

## SECTOR ANALYSIS
# Labor market begins to blossom

## Economics

*Summary: The February employment report was solid as both headline and private payrolls each topped 200k for the third month in a row. Despite a 0.2% increase in the participation rate, the unemployment rate was steady at 8.3%. The factory workweek and temporary hiring, which are two leading indicators of the labor market, showed further advancement. Finally, the consistent pattern of upward revisions to private payrolls remained in place. This speaks of continued understatement of household wages and salaries.*

**Employment gains are running at their fastest pace in nearly six years.** Nonfarm payrolls increased +227k in February after December and January were revised up by a cumulative 61k. The December and January increases now stand at +223k and +284k, respectively. The February gain therefore produces a three-month moving average of +245k, up from +221k previously. Excluding the government's temporary 2010 Census hires, the last three months have seen the strongest payroll gains since the three months ending May 2006 (+260k). Private payrolls are up +233k, after rising a revised +285k in January, as the rate of government job loss has slowed markedly over the past several months. This is due to a dramatic improvement in state and local tax revenue.

The gains in employment were fairly broad-based in February, although they were not as widespread as January when the diffusion index of private payrolls hit 70.3% (the highest reading since January 1998). The February diffusion index came in at a decent 57.9%, but the three-month moving average actually rose nearly one point to 64.0% from 63.2% previously. Goods employment was up +24k, led by a +31k increase in manufacturing, the fifth gain in a row and the 15th increase in the last 16 months. The 0.1 hour increase in the factory workweek to 41.9 hours lifted the series to its highest reading since January 1998. Combined with the aforementioned increase in manufacturing employment, the index of manufacturing hours increased +0.5% in February following a +0.9% increase in January. Rising factory jobs and hours point toward another solid gain in manufacturing production; and this in turn points to further large inventory building, an important catalyst for current quarter growth.

**Weather may not have been a factor.** The weakest part of the goods sector was construction, where employment declined -13k, the first decline since last October. This should mitigate some concern that unseasonably warm winter weather is temporarily lifting employment. Another leading indicator of the labor market, temp hiring, jumped 45k in February, the largest increase since January 2010

(+58K). Often, if companies are unsure about future economic demand, they employ "temps" before committing to more permanent hires. The fact that temp hiring is improving in an environment of healthier underlying job gains suggests to us that we could see a step-up in nonfarm payroll gains later this spring.

**Service-sector hiring is growing, too.** Private service-sector employment was up +209k after rising +202k previously. These are the first back-to-back 200k-plus gains since March-April 2011. In February, education and health services were up +71k while leisure and hospitality services rose +44k, and professional and business services excluding temps increased a decent +37k. However, there is some concern these service sector jobs in particular and the broad improvement in hiring will fade next quarter, similar to what happened last year and the year before. We are more sanguine for a couple of reasons. One, the economy is much healthier today than either last year or the year before. For example, initial jobless claims are hovering near four-year lows; corporate profits have attained new cyclical highs and households have had two more years to deleverage. Two, the European crisis flared up significantly in 2010 and to a similar extent in 2011, which also experienced massive global manufacturing supply disruptions owing to the Japanese tsunami/earthquake. Food and energy costs were also rising at a much faster rate last year. Barring another exogenous shock, we believe the labor market is finally on a sustainable upward path. The fact that employment gains are understated makes us even more confident in the outlook.

**Payroll gains are still undercounted**. Despite the ongoing upward revisions to private payrolls, we believe the numbers are still being undercounted. This is due to the fact that household employment is surging—it rose +428k in February and has risen almost 2 million in the past six months, about 800k faster than the 1.2 million increase in nonfarm payrolls. This meant that even though the labor force participation rate edged up 0.2 to 63.9%, because household unemployment reversed a string of declines and rose a small 48k, the unemployment rate was steady at 8.3%. Based on what we are seeing in claims, the unemployment rate is likely to resume its descent again next month. We expect average hourly earnings, which were up just 0.1% in February, the fourth such gain in a row, to turn higher, matching what has been a 3.5% gain already seen in total compensation per hour.

*Joseph A. LaVorgna (212) 250-7329*

14 March 2012    The Outlook                                                          Deutsche Bank 

# Appendix 1

## Important Disclosures
Additional information available upon request

**For disclosures pertaining to recommendations or estimates made on a security mentioned in this report, please see the most recently published company report or visit our global disclosure look-up page on our website at** http://gm.db.com/ger/disclosure/DisclosureDirectory.eqsr.

## Analyst Certification

The views expressed in this report accurately reflect the personal views of the undersigned lead analyst(s). In addition, the undersigned lead analyst(s) has not and will not receive any compensation for providing a specific recommendation or view in this report. Steve Abrahams/Harris Trifon/Elen Callahan

| Deutsche Bank debt rating key |
|---|

**Buy:** These bonds are expected to outperform other issues in the sector/industry group over the next three to six-month period.
**Hold:** These bonds are fairly valued currently. If owned, no need to sell, but we await events/ releases/ conditions that would make the bond attractive enough for us to upgrade. In the interim, the bond will likely perform as well as the average issue in the sector/industry group.
**Sell:** There exists a significant likelihood that these bonds will underperform relative to other issues in their sector/industry group, at least over the next three months.



Deutsche Bank

# Regulatory Disclosures

## 1. Important Additional Conflict Disclosures

Aside from within this report, important conflict disclosures can also be found at https://gm.db.com/equities under the "Disclosures Lookup" and "Legal" tabs. Investors are strongly encouraged to review this information before investing.

## 2. Short-Term Trade Ideas

Deutsche Bank equity research analysts sometimes have shorter-term trade ideas (known as SOLAR ideas) that are consistent or inconsistent with Deutsche Bank's existing longer term ratings. These trade ideas can be found at the SOLAR link at http://gm.db.com.

## 3. Country-Specific Disclosures

**Australia and New Zealand:** This research, and any access to it, is intended only for "wholesale clients" within the meaning of the Australian Corporations Act and New Zealand Financial Advisors Act respectively.

**Brazil:** The views expressed above accurately reflect personal views of the authors about the subject company(ies) and its(their) securities, including in relation to Deutsche Bank. The compensation of the equity research analyst(s) is indirectly affected by revenues deriving from the business and financial transactions of Deutsche Bank.

**EU countries:** Disclosures relating to our obligations under MiFiD can be found at http://www.globalmarkets.db.com/riskdisclosures.

**Japan:** Disclosures under the Financial Instruments and Exchange Law: Company name - Deutsche Securities Inc. Registration number - Registered as a financial instruments dealer by the Head of the Kanto Local Finance Bureau (Kinsho) No. 117. Member of associations: JSDA, Type II Financial Instruments Firms Association, The Financial Futures Association of Japan, Japan Securities Investment Advisers Association. This report is not meant to solicit the purchase of specific financial instruments or related services. We may charge commissions and fees for certain categories of investment advice, products and services. Recommended investment strategies, products and services carry the risk of losses to principal and other losses as a result of changes in market and/or economic trends, and/or fluctuations in market value. Before deciding on the purchase of financial products and/or services, customers should carefully read the relevant disclosures, prospectuses and other documentation. "Moody's", "Standard & Poor's", and "Fitch" mentioned in this report are not registered credit rating agencies in Japan unless "Japan" or "Nippon" is specifically designated in the name of the entity.

**Malaysia:** Deutsche Bank AG and/or its affiliate(s) may maintain positions in the securities referred to herein and may from time to time offer those securities for purchase or may have an interest to purchase such securities. Deutsche Bank may engage in transactions in a manner inconsistent with the views discussed herein.

**Russia:** This information, interpretation and opinions submitted herein are not in the context of, and do not constitute, any appraisal or evaluation activity requiring a license in the Russian Federation.

## Risks to Fixed Income Positions

Macroeconomic fluctuations often account for most of the risks associated with exposures to instruments that promise to pay fixed or variable interest rates. For an investor that is long fixed rate instruments (thus receiving these cash flows), increases in interest rates naturally lift the discount factors applied to the expected cash flows and thus cause a loss. The longer the maturity of a certain cash flow and the higher the move in the discount factor, the higher will be the loss. Upside surprises in inflation, fiscal funding needs, and FX depreciation rates are among the most common adverse macroeconomic shocks to receivers. But counterparty exposure, issuer creditworthiness, client segmentation, regulation (including changes in assets holding limits for different types of investors), changes in tax policies, currency convertibility (which may constrain currency conversion, repatriation of profits and/or the liquidation of positions), and settlement issues related to local clearing houses are also important risk factors to be considered. The sensitivity of fixed income instruments to macroeconomic shocks may be mitigated by indexing the contracted cash flows to inflation, to FX depreciation, or to specified interest rates – these are common in emerging markets. It is important to note that the index fixings may – by construction – lag or mis-measure the actual move in the underlying variables they are intended to track. The choice of the proper fixing (or metric) is particularly important in swaps markets, where floating coupon rates (i.e., coupons indexed to a typically short-dated interest rate reference index) are exchanged for fixed coupons. It is also important to acknowledge that funding in a currency that differs from the currency in which the coupons to be received are denominated carries FX risk. Naturally, options on swaps (swaptions) also bear the risks typical to options in addition to the risks related to rates movements.

Deutsche Bank

---

**David Folkerts-Landau**

Managing Director
Global Head of Research

| Guy Ashton | Marcel Cassard | Stuart Parkinson |
|---|---|---|
| Head | Global Head | Associate Director |
| Global Research Product | Fixed Income Research | Company Research |

| Asia-Pacific | Germany | Americas | Europe |
|---|---|---|---|
| Fergus Lynch | Andreas Neubauer | Steve Pollard | Richard Smith |
| Regional Head | Regional Head | Regional Head | Regional Head |

Principal Locations

| **Deutsche Bank AG London** | **Deutsche Bank AG New York** | **Deutsche Bank AG Hong Kong** | **Deutsche Securities Inc. Japan** |
|---|---|---|---|
| 1 Great Winchester Street | 60 Wall Street | Filiale Hongkong | 2-11-1 Nagatacho |
| London EC2N 2EQ | New York, NY 10005 | Intl. Commerce Centre | Sanno Park Tower |
| Tel: (44) 20 7545 8000 | United States of America | 1 Austin Road West Kowloon, | Chiyoda-ku, Tokyo 100-6171 |
| | Tel: (1) 212 250-2500 | Hong Kong | Tel: (81) 3 5156 6770 |
| | | tel: (852) 2203 8888 | |

| **Deutsche Bank AG Frankfurt** | **Deutsche Bank Ltd.** | **Deutsche Bank AG Singapore** | **Deutsche Bank AG Australia** |
|---|---|---|---|
| Große Gallusstraße 10-14 | Aurora business park | One Raffles Quay | Deutsche Bank Place, Level 16 |
| 60272 Frankfurt am Main | 82 bld.2 Sadovnicheskaya street | South Tower | Corner of Hunter & Phillip Streets |
| Germany | Moscow, 115035 | Singapore 048583 | Sydney NSW 2000 |
| Tel: (49) 69 910 00 | Russia | Tel: (65) 6423 8001 | Tel: (61) 2 8258 1234 |
| | Tel: (7) 495 797-5000 | | |

**Deutsche Bank Dubai**

Dubai International Financial Centre
The Gate, West Wing, Level 3
P.O. Box 504 902
Dubai City
Tel: (971) 4 3611 700

---

Subscribers to research via email receive their electronic publication on average 1-2 working days earlier than the printed version.

If you would like to receive this or any other product via email please contact your usual Deutsche Bank representative.

Publication Address:
Deutsche Bank AG
New York
60 Wall Street
New York, NY 10005
United States of America
Tel: (1) 212 250-2500

Internet:
http://gmr.db.com
Ask your usual contact for a username and password.

# Global Disclaimer

The information and opinions in this report were prepared by Deutsche Bank AG or one of its affiliates (collectively "Deutsche Bank"). The information herein is believed to be reliable and has been obtained from public sources believed to be reliable. Deutsche Bank makes no representation as to the accuracy or completeness of such information.

Deutsche Bank may engage in securities transactions, on a proprietary basis or otherwise, in a manner **inconsistent** with the view taken in this research report. In addition, others within Deutsche Bank, including strategists and sales staff, may take a view that is **inconsistent** with that taken in this research report.

Opinions, estimates and projections in this report constitute the current judgement of the author as of the date of this report. They do not necessarily reflect the opinions of Deutsche Bank and are subject to change without notice. Deutsche Bank has no obligation to update, modify or amend this report or to otherwise notify a recipient thereof in the event that any opinion, forecast or estimate set forth herein, changes or subsequently becomes inaccurate. Prices and availability of financial instruments are subject to change without notice. This report is provided for informational purposes only. It is not an offer or a solicitation of an offer to buy or sell any financial instruments or to participate in any particular trading strategy. Target prices are inherently imprecise and a product of the analyst judgement.

As a result of Deutsche Bank's March 2010 acquisition of BHF-Bank AG, a security may be covered by more than one analyst within the Deutsche Bank group. Each of these analysts may use differing methodologies to value the security; as a result, the recommendations may differ and the price targets and estimates of each may vary widely.

In August 2009, Deutsche Bank instituted a new policy whereby analysts may choose not to set or maintain a target price of certain issuers under coverage with a Hold rating. In particular, this will typically occur for "Hold" rated stocks having a market cap smaller than most other companies in its sector or region. We believe that such policy will allow us to make best use of our resources. Please visit our website at http://gmr.db.com to determine the target price of any stock.

The financial instruments discussed in this report may not be suitable for all investors and investors must make their own informed investment decisions. Stock transactions can lead to losses as a result of price fluctuations and other factors. If a financial instrument is denominated in a currency other than an investor's currency, a change in exchange rates may adversely affect the investment. Past performance is not necessarily indicative of future results. Deutsche Bank may with respect to securities covered by this report, sell to or buy from customers on a principal basis, and consider this report in deciding to trade on a proprietary basis.

Unless governing law provides otherwise, all transactions should be executed through the Deutsche Bank entity in the investor's home jurisdiction. In the U.S. this report is approved and/or distributed by Deutsche Bank Securities Inc., a member of the NYSE, the NASD, NFA and S PC. In Germany this report is approved and/or communicated by Deutsche Bank AG Frankfurt authorized by the BaFin. In the United Kingdom this report is approved and/or communicated by Deutsche Bank AG London, a member of the London Stock Exchange and regulated by the Financial Services Authority for the conduct of investment business in the UK and authorized by the BaFin. This report is distributed in Hong Kong by Deutsche Bank AG, Hong Kong Branch, in Korea by Deutsche Securities Korea Co. This report is distributed in Singapore by Deutsche Bank AG, Singapore Branch, and recipients in Singapore of this report are to contact Deutsche Bank AG, Singapore Branch in respect of any matters arising from, or in connection with, this report. Where this report is issued or promulgated in Singapore to a person who is not an accredited investor, expert investor or institutional investor (as defined in the applicable Singapore laws and regulations), Deutsche Bank AG, Singapore Branch accepts legal responsibility to such person for the contents of this report. In Japan this report is approved and/or distributed by Deutsche Securities Inc. The information contained in this report does not constitute the provision of investment advice. In Australia, retail clients should obtain a copy of a Product Disclosure Statement (PDS) relating to any financial product referred to in this report and consider the PDS before making any decision about whether to acquire the product. Deutsche Bank AG Johannesburg is incorporated in the Federal Republic of Germany (Branch Register Number in South Africa: 1998/003298/10). Additional information relative to securities, other financial products or issuers discussed in this report is available upon request. This report may not be reproduced, distributed or published by any person for any purpose without Deutsche Bank's prior written consent. Please cite source when quoting.

Copyright © 2012 Deutsche Bank AG

---



**DEPARTMENT OF THE TREASURY**
**WASHINGTON, D.C. 20220**

March 30, 2012

## ACTION MEMORANDUM FOR UNDERSECRETARY MILLER

**FROM**:    Michael Stegman, Counselor to the Secretary

**SUBJECT**:    Periodic Commitment Fee Waiver Letter for Q2 2012

In December 2011, Treasury made a decision to waive the Periodic Commitment Fee (PCF) for the calendar year of 2012 (see attached Action Memo as approved by Secretary Geithner). Treasury has elected to communicate its waiver to the Federal Housing Finance Administration (FHFA) on a quarterly basis in a formal letter. The attached waiver letter will waive the PCF for Q2 2012.

## RECOMMENDATION

That you sign the PCF waiver letter for Q2 2012.

_____ Approve    _____ Disapprove    _____ Let's Discuss

## BACKGROUND

The Periodic Commitment Fee is intended to compensate taxpayers for the financial support that Treasury provides to Fannie Mae and Freddie Mac through the Preferred Stock Purchase Agreement (PSPA). Treasury may waive the Periodic Commitment Fee for up to one year at a time at its sole discretion based on adverse conditions in the mortgage market. On December 21, 2011, Secretary Geithner made a decision to waive the PCF for the calendar year of 2012 on two bases: (1) the expected financial draws from Fannie Mae and Freddie Mac were likely to be in excess of dividends those firms pay back to taxpayers under the PSPAs – in other words, setting a PCF would not produce any additional income for taxpayers; and (2) setting the PCF could place greater strains on the housing market recovery, which remains fragile. At the time of the policy decision, we elected to communicate the waiver to FHFA on a quarterly basis via a formal letter.

Waiving the PCF for 2012 preserved full optionality to set the PCF for 2013 if housing markets are more stable and if the GSEs are generating positive net income in excess of their dividend commitments.

## ATTACHMENTS
1. Q2 2012 PCF Waiver Letter (for signature)
2. TFG December Action Letter approving waiver for CY 2012



UNDER SECRETARY

DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.

March 30, 2012

Edward DeMarco
Acting Director
Federal Housing Finance Agency
400 7th Street, SW
Washington, DC 20024

Dear Acting Director DeMarco:

As you know, in the letter to you dated December 21, 2011, Treasury communicated to you its
waiver, for the first quarter of Calendar Year (CY) 2012, of the "Periodic Commitment Fee"
(PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of
September 26, 2008, as amended (the Agreement), between the United States Department of the
Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal
Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the second quarter of CY 2012, the
PCF payable by each Enterprise. Treasury takes this step due to the continued fragility of the
mortgage market and the belief that the imposition of the PCF at this time would not fulfill its
intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the
PCF should then be set. Treasury remains committed to protecting taxpayers and ensuring that
future positive earnings of the Enterprises are returned to taxpayers as compensation for their
investment.

Sincerely,

Mary J. Miller
Under Secretary for Domestic Finance



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

December 21, 2011

**ACTION MEMORANDUM FOR SECRETARY GEITHNER**

**FROM**:   Cyrus Amir-Mokri, Assistant Secretary for Financial Institutions
Mary Miller, Assistant Secretary for Financial Markets

**SUBJECT**:   2012 Periodic Commitment Fee for GSE Preferred Stock Purchase Agreements

In December 2010, Treasury decided to waive the Periodic Commitment Fee (PCF) for calendar year 2011. (See attached Action Memo with your approval.) This memo seeks your approval to waive the PCF for calendar year 2012.

**RECOMMENDATION**

That you approve a waiver of the Periodic Commitment Fee (PCF) for calendar year 2012 and you instruct Treasury staff to communicate the PCF waiver to the Federal Housing Finance Agency (FHFA) on a quarterly basis.

_____ Approve   _____ Disapprove   _____ Let's Discuss

**BACKGROUND**

The Periodic Commitment Fee is intended to compensate taxpayers for the ongoing financial support that Treasury provides to Fannie Mae and Freddie Mac through the Preferred Stock Purchase Agreement (PSPA). Setting the PCF requires mutual agreement by Treasury and FHFA, in consultation with the Federal Reserve. However, in its sole discretion, Treasury may waive the PCF for up to one year at a time based on adverse conditions in the mortgage market.

On December 22, 2010, you approved the waiver of the PCF for calendar year 2011. The basis for the decision was that the expected financial draws by Fannie Mae and Freddie Mac were forecast to exceed the dividends those firms pay back to taxpayers under the PSPAs, and that, accordingly, setting the PCF would not produce any additional income for taxpayers. Last year's waiver did not generate significant interest from the media or others.

In approving the waiver for calendar year 2011, Treasury also decided that it would nevertheless re-evaluate the continued need for the waiver on a quarterly basis and would communicate that quarterly waiver assessment to FHFA in writing. (Deputy Secretary Wolin signed the most recent such communication to FHFA dated September 30, 2011 – see attachment.) No PCF has been set or paid to date.

## REASONS THAT WAIVER OF THE PCF REMAINS APPROPRIATE

***Given the size of current and expected GSE draws over time, imposing the PCF would not generate increased return for taxpayers because it would lead the GSEs to increase their Treasury draws***

- Over the longer term, the GSEs are not expected to generate enough net income to cover required dividend payments and forecasted losses.

- Even if the GSEs generated positive net income after dividends in the near term, that income could be used to offset potential draws in future quarters.

***Imposing the PCF could place greater strain on housing market recovery, which remains fragile***

- Private capital has not adequately returned to the market and Fannie Mae, Freddie Mac, and FHA/GNMA continue to account for approximately 90% of mortgage originations – versus less than 40% five years ago.

- More than 10 million borrowers remain underwater on their mortgages.

Waiving the PCF at year-end preserves full optionality to set the PCF next year, if housing markets stabilize and the GSEs generate positive net income in excess of their dividend commitments.  Consistent with the approach taken for calendar year 2011, we plan to communicate quarterly Treasury's waiver decision to FHFA in writing.

## ATTACHMENTS

1. Secretary Geithner December 2010 Action Letter approving waiver for CY 2011
2. 3Q 2011 Letter to FHFA indicating approval of waiver for 3Q 2011
3. 4Q 2011 Letter to FHFA indicating approval of waiver for 4Q 2011
4. 1Q 2012 Draft Letter to FHFA indicating approval of waiver for 1Q 2012

TREASURY-3277



**DEPARTMENT OF THE TREASURY**
**WASHINGTON, D.C.  20220**

December 20, 2010

## ACTION MEMORANDUM FOR SECRETARY GEITHNER

**FROM:**   Jeffrey A. Goldstein
Under Secretary for Domestic Finance

**SUBJECT:**   Periodic Commitment Fee for GSE Preferred Stock Purchase Agreements (PSPAs)

**Recommendation**

That you waive the Periodic Commitment Fee (PCF) for 2011 and reconsider next year.

_____ Approve   _____ Disapprove   _____ Let's Discuss

**Background:**
- The amended PSPA agreements between Treasury and GSEs specify that a Periodic Commitment Fee (PCF) be set by December 31, 2010.
- The date for setting the PCF was previously moved from December 31, 2009 to December 31, 2010 as part of the broader amendments to the PSPAs on December 24, 2009.  Therefore, no PCF has been set or paid to date.
- Treasury may waive the PCF for one year at a time in its sole discretion based on adverse conditions in the mortgage market.
- The PCF is to be mutually agreed to by Treasury and FHFA, in consultation with the Federal Reserve.  The PCF was designed to fully compensate Treasury for providing its ongoing financial commitment.

**Considerations:**

**Reasons to Waive the PCF for 2011**

*Housing markets remain fragile*
- Private capital has yet to return to the market
  - Fannie Mae, Freddie Mac, and FHA/GNMA currently account for over 95% of mortgage originations – the historic average is around 40%
  - The spread between prime jumbos and conforming mortgages is still elevated and is currently around 100 basis points – the historic average is closer to 20 basis points
  - Since September 2008, there has only been one private label new issue securitization to come to the market (Redwood Sequoia deal)
- Nearly 11 million borrowers are underwater on their mortgages
- Mortgage delinquency rates remain elevated (5.2% for prime, 36.5% for subprime, and 11.9% for FHA)
- Foreclosure starts and completions remain elevated

1

*Given the size of current GSE draws, imposing a PCF would only lead to increased Treasury draws and not generate increased return for the taxpayer*
- According to the FHFA stress tests in the base case, both GSEs are expected to require additional draws through the end of 2011 to cover net income losses and required dividend payments (although projected draws are < $1 billion for Freddie Mac in Q3 and Q4) (see appendix)

*Other than timing, no real additional taxpayer value is created*
- Even if the GSEs generated positive surplus of net income after dividends, that surplus can be used to offset potential draws in future quarters

*Potentially confusing message to the market*
- Last year we stated that the fragility of the housing market was one of the rationales for postponing setting the commitment fee; by setting the fee this year (at any level), we could be viewed as implicitly making an affirmative statement on the health of the housing market

*Waiving the PCF for 2011 preserves full optionality to set the PCF next year if housing markets are more stable and if the GSEs are generating positive net income in excess of their dividend commitments*

## Reasons to Set the PCF
- Makes clear the Administration's commitment to ensure existing common equity holders will not have access to any positive earnings from the GSEs in the future
- Illustrates further commitment to recouping taxpayer support

**If you decided to set the PCF, there are two potential options:**
Option 1 – Set the PCF as a percentage of the liquidation preference of the outstanding preferred stock
Option 2 – Set the PCF equal to any generated positive net income (subject to further legal review)
*These would have to be mutually agreed by FHFA in consultation with the Federal Reserve*

2

**Appendix:**

**FHFA "Base Case" (Scenario 2) Projections - FNMA**
**($ in billions)**

|      | Gross Draw | Dividend | Net Income | AOCI (1) Change | Cumulative Gross Draw |
|------|-----------|----------|-----------|-----------------|----------------------|
| 4Q10 |           |          |           |                 | $104.6               |
| 1Q11 | $9.6      | $2.3     | -$7.6     | $0.3            | 114.2                |
| 2Q11 | 8.8       | 2.6      | -6.4      | 0.3             | 122.9                |
| 3Q11 | 7.9       | 2.9      | -5.4      | 0.3             | 130.9                |
| 4Q11 | 8.7       | 3.1      | -5.8      | 0.3             | 139.6                |

**FHFA "Base Case" (Scenario 2) Projections - FHLMC**
**($ in billions)**

|      | Gross Draw | Dividend | Net Income | AOCI (1) Change | Cumulative Gross Draw |
|------|-----------|----------|-----------|-----------------|----------------------|
| 4Q10 |           |          |           |                 | $72.6                |
| 1Q11 | $1.2      | $1.8     | -$0.4     | $0.9            | 73.8                 |
| 2Q11 | 1.3       | 1.8      | -0.4      | 0.9             | 75.1                 |
| 3Q11 | 0.6       | 1.9      | 0.4       | 0.9             | 75.7                 |
| 4Q11 | 0.2       | 1.9      | 0.7       | 0.9             | 75.9                 |

(1) AOCI = Accumulated Other Comprehensive Income
Retained earnings changes from changes in the value of certain AFS assets

TREASURY-3280



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

June 30, 2011

The Honorable Edward DeMarco
Acting Director
Federal Housing Finance Agency
1700 G Street NW
Washington, DC 20552-0003

Dear Acting Director DeMarco:

As you know, in my letter to you dated March 31, 2011, I communicated to you our waiver, for the second quarter of Calendar Year (CY) 2011, of the "Periodic Commitment Fee" (PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the third quarter of CY 2011, the PCF payable by each Enterprise. Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set. Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Jeffrey A. Goldstein



**THE DEPUTY SECRETARY OF THE TREASURY**
WASHINGTON

September 30, 2011

The Honorable Edward DeMarco
Acting Director
Federal Housing Finance Agency
1700 G Street NW
Washington, DC  20552-0003

Dear Acting Director DeMarco:

As you know, in the letter to you dated June 30, 2011, Treasury communicated to you its waiver, for the third quarter of Calendar Year (CY) 2011, of the "Periodic Commitment Fee" (PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the fourth quarter of CY 2011, the PCF payable by each Enterprise.  Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set.  Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Neal S. Wolin



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

December 31, 2011

The Honorable Edward DeMarco
Acting Director
Federal Housing Finance Agency
1700 G Street, NW
Washington, DC 20552-0003

Dear Acting Director DeMarco:

As you know, in the letter to you dated September 30, 2011, Treasury communicated to you its waiver, for the fourth quarter of Calendar Year (CY) 2011, of the "Periodic Commitment Fee" (PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the first quarter of CY 2012, the PCF payable by each Enterprise. Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set. Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Cyrus Amir-Mokri



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.

UNDER SECRETARY

March 30, 2012

Edward DeMarco
Acting Director
Federal Housing Finance Agency
400 7th Street, SW
Washington, DC 20024

Dear Acting Director DeMarco:

As you know, in the letter to you dated December 21, 2011, Treasury communicated to you its waiver, for the first quarter of Calendar Year (CY) 2012, of the "Periodic Commitment Fee" (PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the second quarter of CY 2012, the PCF payable by each Enterprise. Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set. Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Mary J. Miller
Under Secretary for Domestic Finance

MOODY'S
INVESTORS SERVICE



Fannie Mae and Freddie Mac Capital Positions

April 4, 2012

# Discussion Topics

1. Moody's earnings estimates and credit losses

2. Alternatives to reverse GSE capital deficits

   i.   Increased guarantee fees

   ii.  Lower preferred dividends

   iii. Other

3. Prospects for reform

MOODY'S
INVESTORS SERVICE

Meeting with U.S. Treasury, April 4, 2012    2