(e) Any instrument given by or on behalf of any Holder of a Debt Security in connection with any consent to any such modification, amendment or supplement shall be irrevocable once given and shall be conclusive and binding on all subsequent Holders of such Debt Security or any Debt Security issued, directly or indirectly, in exchange or substitution therefor, irrespective of whether or not notation in regard thereto is made thereon. Any modification, amendment or supplement of this Agreement or of the terms of Debt Securities shall be conclusive and binding on all Holders of Debt Securities affected thereby, whether or not they have given such consent or were present at any meeting (unless by the terms of this Agreement a written consent or an affirmative vote of such Holders is required), and whether or not notation of such modification, amendment or supplement is made upon the Debt Securities.

**Section 8.06. Securities Acquired by Freddie Mac.**

Freddie Mac may, from time to time, repurchase or otherwise acquire (either for cash or in exchange for newly issued Debt Securities) all or a portion of any issue of Debt Securities. Any Debt Securities owned by Freddie Mac shall have an equal and proportionate benefit under the provisions of this Agreement, without preference, priority or distinction as among such Debt Securities, except that in determining whether the Holders of the required percentage of the outstanding principal amount (or notional principal amount) of an issue of Debt Securities have given any required demand, authorization, notice, consent or waiver under this Agreement, any Debt Securities owned by Freddie Mac or any person directly or indirectly controlling or controlled by or under direct or indirect common control with Freddie Mac shall be disregarded and deemed not to be outstanding for the purpose of such determination.

**Section 8.07. Notice.**

(a) Any notice, demand or other communication which by any provision of this Agreement is required or permitted to be given to or served upon any Holder may be given or served in writing by deposit thereof, postage prepaid, in the mail, addressed to such Holder as such Holder's name and address may appear in the records of Freddie Mac, a Federal Reserve Bank or the Registrar, as the case may be, or, in the case of a Holder of a Fed Book Entry Debt Security, by transmission to such Holder through the communication system linking the Federal Reserve Banks, or, in the case of a Holder of a Debt Security maintained on DTC, by transmission to such Holder through the DTC communication system. Such notice, demand or other communication to or upon any Holder shall be deemed to have been sufficiently given or made, for all purposes, upon mailing or transmission.

(b) If and so long as an issue of Debt Securities is admitted for trading on the Euro MTF Market and listed on the Official List of the Luxembourg Stock Exchange and the rules of the Luxembourg Stock Exchange so require, notices with respect to such issue of Debt Securities also shall be published in a newspaper of general circulation in Luxembourg (which is expected to be *Luxemburger Wort*) or on the website of the Luxembourg Stock Exchange (http://www.bourse.lu) or, if such publication is not practical, elsewhere in Europe, if the rules of that exchange so require. Notice by publication shall be deemed to have been given on the date of publication or, if published more than once, on the date of first publication.

(c) Any notice, demand or other communication which by any provision of this Agreement is required or permitted to be given to or served upon Freddie Mac shall be given in writing addressed (until another address is published by Freddie Mac) as follows: Federal Home Loan Mortgage Corporation, 8200 Jones Branch Drive, McLean, Virginia 22102 Attention: General Counsel and Secretary. Such notice, demand or other communication to or upon Freddie Mac shall be deemed to have been sufficiently given or made only upon actual receipt of the writing by Freddie Mac.

Source D RA HOM OAN MORTGAG CORP, 10 Q, May 03, 2012 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Section 8.08. Governing Law.**

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE HOLDERS AND FREDDIE MAC WITH RESPECT TO THE DEBT SECURITIES SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE UNITED STATES. INSOFAR AS THERE MAY BE NO APPLICABLE PRECEDENT,AND INSOFAR AS TO DO SO WOULD NOT FRUSTRATE THE PURPOSES OF THE FREDDIE MAC ACT OR ANY PROVISION OF THIS AGREEMENT OR THE TRANSACTIONS GOVERNED THEREBY, THE LAWS OF THE STATE OF NEW YORK SHALL BE DEEMED REFLECTIVE OF THE LAWS OF THE UNITED STATES.

**Section 8.09. Headings.**

The Article, Section and Subsection headings are for convenience only and shall not affect the construction of this Agreement.

**FEDERAL HOME LOAN MORTGAGE CORPORATION**

Source D RA HOM OAN MORTGAG CORP, 10 Q, May 03, 2012 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 12.1**

## RATIO OF EARNINGS TO FIXED CHARGES AND RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS

| | ThYee Marthn rded McYmh 31, | | 0 ecYErded Dene9 beY31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2812 | 2811 | 2811 | 2818 | 2887 | 288( | 288o |
| | | | | ldasscYnir 9 issiarn) | | | |
| Ne ncome (loss) befo e ncome ax benef (expense) and cumula ve effec of changes n accoun ng p nc ples | $ 563 | $ 602 | $ (5,666) | $(14,882) | $(22,384) | $(44,564) | $ (5,989) |
| Add | | | | | | | |
| Low- ncome hous ng ax c ed pa ne sh ps | | | | | 4,155 | 453 | 469 |
| To a n e es expense | 18,069 | 20,968 | 79,988 | 92,131 | 22,150 | 33,332 | 38,482 |
| In e es fac o n en a expenses | 1 | 1 | 4 | 5 | 7 | 8 | 7 |
| Ea gs ( oss), as adj s ed | $18,633 | $ 21,571 | $ 74,326 | $ 77,254 | $ 3,928 | $ (10,771) | $ 32,969 |
| F xed cha ges | | | | | | | |
| To a n e es expense | $ 18,069 | $20,968 | $79,988 | $ 92,131 | $ 22,150 | $ 33,332 | $38,482 |
| In e es fac o n en a expenses | 1 | 1 | 4 | 5 | 7 | 8 | 7 |
| Cap al zed n e es | | | | | | | |
| To al f xed cha ges | $ 18,070 | $20,969 | $ 79,992 | $ 92,136 | $ 22,157 | $ 33,340 | $38,489 |
| Sen o p efe ed s ock and p efe ed s ock d v dends(1 | 1,804 | 1,605 | 6,498 | 5,749 | 4,105 | 675 | 398 |
| To al f xed cha ges nclud ng p efe ed s ock d v dends | $19,874 | $22,574 | $ 86,490 | $ 97,885 | $ 26,262 | $ 34,015 | $38,887 |
| Ra o of ea n ngs o f xed cha ges(2 | 1 03 | 1 03 | | | | | |
| Ra o of ea n ngs o comb ned f xed cha ges and p efe ed s ock d v dends(3 | | | | | | | |

(1) Sen o p efe ed s ock and p efe ed s ock d v dends ep esen p e- ax ea n ngs equ ed o cove any sen o p efe ed s ock and p efe ed s ock d v dend equ emen s co p ed s g o effec ve ax a e, wheneve he e s an nco e ax p ov s on, fo he e evan pe ods

(2) Ra o of ea n ngs o f xed cha ges s compu ed by d v d ng ea gs ( oss), as adj s ed by o a f xed c a ges Fo e a o o eq a 1 00, ea gs ( oss), as adj s ed mus nc ease y $5 7 o , $14 9 o , $18 2 o , $44 1 b o , a d $5 5 b o fo e yea s e ded Dece be 31, 2011, 2010, 2009, 2008, a d 2007, espec vely

(3) Ra o of ea n ngs o comb ned f xed cha ges and p efe ed s ock d v dends s co pu ed by d v d ng ea n ngs ( oss), as adjus ed by o al f xed cha ges nclud ng p efe ed s ock d v dends Fo e a o o eq a 1 00, ea gs ( oss), as adj s ed s nc ease by $1 2 b on, $1 0 b on, $12 2 b o , $20 6 b o , $22 3 o , $44 8 b o , a d $5 9 b o fo e ee o s e ded Ma c 31, 2012 a d 2011 a d fo e yea s e ded Dece be 31, 2011, 2010, 2009, 2008, and 2007, espec ve y

Source D RA HOM OAN MORTGAG CORP, 10 Q, May 03, 2012 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.1**

**CERTIFICATION**

**PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a 14(a)**

I, Charles E. Haldeman, Jr., certify that:

1. I have reviewed this Quarterly Report on Form 0 Q for the quarter ended March 3 , 20 2 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3 Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4 The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 3a 5(e) and 15d 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a 15(f) and 15d 15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date: May 3, 2012

/s/ Charles E. Haldeman, Jr.
Charles E. Haldeman, Jr.
Chief Executive Officer

Source D RA HOM OAN MORTGAG CORP, 10 Q, May 03, 2012 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.2**

**CERTIFICATION**

**PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a 14(a)**

I, Ross J. Kari, certify that:

1. I have reviewed this Quarterly Report on Form 0 Q for the quarter ended March 3 , 20 2 of the Federal Home Loan Mortgage Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3 Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4 The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 3a 5(e) and 15d 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a 15(f) and 15d 15(f)) for the registrant and have:
   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date: May 3, 2012

/s/ Ross J. Kari

Ross J. Kari
Executive Vice President Chief Financial Officer

Source D RA HOM OAN MORTGAG CORP, 10 Q, May 03, 2012 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 32.1**

**CERTIFICATION**

**PURSUANT TO 18 U.S.C. SECTION 1350,**

**AS ENACTED BY SECTION 906 OF THE SARBANES OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form   0 Q for the quarter ended March 3  , 20  2 of the Federal Home  Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof  (the "Report"), I, Charles E. Haldeman, Jr., Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to  Section 906 of the Sarbanes Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of Section   3(a) or   5(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all  material respects, the financial condition and results of  operations of the Company.

Date: May 3, 2012

/s/  Charles E. Haldeman, Jr.
Charles E. Haldeman, Jr.
Chief Executive Officer

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 32.2**

**1 ECRTII TI FRTAO**

**NPCUPFOR RA S8 P.U.1 . UE1 RTAO S350,**

**FUEOF1 RED BY UE1 RTAO 906 AI RHE UFCBFOEU AXLEY F1 R AI 2002**

In connection with the Quarterly Report on Form 0 Q for the quarter ended March 3 , 20 2 of the Federal Home Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Ross J Kari, Executive Vice President Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes Oxley Act of 2002, that to my knowledge:

1. The Report fully complies with the requirements of Section 3(a) or 5(d) of the Securities Exchange Act of 1934; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: May 3, 2012

/s/ Ross J. Kari

Ross J. Kari
Executive Vice President Chief Financial Officer

Source D RA HOM OAN MORTGAG CORP, 10 Q, May 03, 2012 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# GSE Preferred Stock Purchase Agreements
# Summary Review and Key Considerations

Presentation to The Office of Management and Budget
Sensitive and Pre-Decisional

May 23, 2012

# Discussion Agenda

Sensitive / Pre-Decisional

1) Overview of the GSE Preferred Stock Purchase Agreements (PSPAs)

2) Review of Key Considerations With Existing PSPAs

3) Review GSE Financial Projections

    - Base Case

    - Stress Case

4) Treasury's PSPA Modification Proposal

TREASURY-3776

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

2

# Section 1: Overview of the GSE Preferred Stock Purchase Agreements

Sensitive / Pre-Decisional

**1) Overview of the GSE Preferred Stock Purchase Agreements (PSPAs)**

2) Review of Key Considerations With Existing PSPAs

3) Review GSE Financial Projections

- Base Case
- Stress Case

4) Treasury's PSPA Modification Proposal

TREASURY-3777

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

# Conservatorship & the PSPAs

Sensitive / Pre-Decisional

- In September 2008, the Federal Housing Finance Agency ("FHFA") placed Fannie Mae and Freddie Mac (the "GSEs") into conservatorship.

  - As stated by FHFA, the goals of conservatorship include: (1) helping restore confidence in the GSEs, (2) enhancing the GSEs' capacity to fulfill their role in the housing market, and (3) mitigating the systemic risk that has contributed to market instability.

- When the GSEs entered conservatorship, each GSE received capital support through a Preferred Stock Purchase Agreement ("PSPAs") with the U.S. Department of Treasury ("Treasury").

  - The PSPAs were designed to provide confidence to the market that the GSEs would remain solvent.

- Under the PSPAs, Treasury committed to make advances of funds to each GSE for each calendar quarter in which the liabilities of the respective GSE exceeded its assets in order to maintain solvency (i.e. maintain positive net worth).

  - Operationally, there is a one quarter lag between the net worth deficit being measured and subsequently cured by a PSPA draw. (I.e., a one-quarter delayed payment)

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

TREASURY-3778

# Conservatorship & the PSPAs (Cont'd)

Sensitive / Pre-Decisional

- The initial cap on the Treasury Senior Preferred Stock funding commitment to each GSE was $100 billion. In return for the commitments, Treasury received a preferred stock certificate from each GSE. Treasury also received warrants with the right to purchase up to 79.9 percent of the common equity of each GSE.
  - Under the terms of each preferred stock certificate, the "liquidation preference" value increases dollar-for-dollar by the amount of each advance of funds made by Treasury to the respective GSE under the commitment.
  - The cash dividend rate on the preferred stock under the PSPAs was set at 10 percent of the cumulative liquidation preference.
- Since they were initially established, the PSPAs have been amended twice:
  - First, in May 2009, when the commitment caps were increased to $200 billion for each GSE;
  - Second, in December 2009, when the fixed $200 billion cap was amended to increase by the amount of draws between January 1, 2010 and December 31, 2012.
- After December 31, 2012, the commitment cap becomes fixed again and the unused balance of the commitment will be available to be drawn under the existing terms of the PSPAs.

# PSPAs: Key Terms

Sensitive / Pre-Decisional

| As of December 31, 2011 | |
|---|---|
| **Core Terms** | |
| Amended & Restated PSPAs | Signed on September 26, 2008. |
| Amendments Dated | 1st Amendment – May 6, 2009; 2nd Amendment – December 24, 2009. |
| Liquidation Preference | Increases with draws under the funding commitment.[1] |
| Dividend Rate | Cash 10%; if elected to be paid in kind ("PIK") 12%. |
| Seniority of Senior Preferred Stock | Senior Preferred Stock is senior to the existing preferred stock issued prior to conservatorship and common equity but is junior to all debt claims and obligations. |
| | |
| **Covenants** | |
| Retained Investment Portfolio | Reduce by 10% per year until the GSEs' retained portfolios each reach $250 billion. |
| Dividend Payments to Other Parties | None permitted until senior preferred stock is repaid in full. |
| Asset Sales | No sale, transfer, or disposition of any assets other than dispositions for fair value in the ordinary course of business. |
| Leverage Limitation | Not permitted to increase debt to more than 120% of the total amount of mortgages and mortgage-backed securities owned by each enterprise. |
| | |
| **Other Terms** | |
| Warrants | Right to purchase up to 79.9 percent of the common equity at one-thousandth of one cent ($0.00001) per share, fully diluted. Warrants expire Sept. 7, 2028. |

(1) As amended on December 24, 2009, each PSPA commits Treasury to provide additional support to each Enterprise through the end of 2012 in exchange for a greater liquidation preference. Treasury's financial commitment now equals the greater of $200 billion or $200 billion plus cumulative net worth deficits experienced during 2010, 2011, and 2012, less any surplus remaining as of December 31, 2012. Beginning in 2013, the capacity available becomes fixed and the remaining capacity declines as there are further draws.

# PSPAs: Usage To Date

Sensitive / Pre-Decisional

- Cumulative gross draws by Fannie Mae through December 31, 2011 total $117.2 billion (including the initial $1 billion liquidation preference), of which $19.8 billion were drawn to fund senior preferred stock dividends paid to Treasury (net investment of $96.4 billion).
- Cumulative gross draws by Freddie Mac through December 31, 2011 total $72.3 billion (including the initial $1 billion liquidation preference), of which $16.5 billion were drawn to fund senior preferred stock dividends paid to Treasury (net investment of $54.8 billion).
- Since 2008, nearly 17% of the total PSPA draws by Fannie Mae and nearly 10% of the total PSPA draws by Freddie Mac have been used to pay senior preferred stock dividends back to Treasury.

# Remaining Preferred Stock Purchase Agreement Capacity

Sensitive / Pre-Decisional

- Initial Purchase Agreement had a specified funding commitment cap of $100 billion for each GSE.
- The May 2009 amendment increased the specified cap for each institution to a fixed $200 billion.
- The Dec. 2009 amendment modified the fixed cap and allowed the cap to increase dollar for dollar for any draws between Jan. 1, 2010 and Dec. 31, 2012.
  - At the end of 2009, Fannie Mae had drawn $75.2 billion and Freddie Mac had drawn $50.7 billion, excluding the initial $1.0 billion liquidation preference for which the GSEs did not receive cash proceeds.
- At the end of 2012, these caps become fixed and there will be ~$125 billion of capacity remaining for Fannie Mae and ~$149 billion for Freddie Mac.
  - This remaining capacity will decline to the extent there are further draws from 2013 onward.

**Fannie Mae:**

| | |
|---|---|
| PSPA cap as of 12/24/09 amendment | $200 billion |
| + Est. PSPA draws[1] Jan. '10 – Dec. '12 | + $65.9 billion |
| Total est. PSPA cap on Dec. 31, 2012 | $265.9 billion |
| - PSPA draws through Dec. 31, 2009 | - $75.2 billion |
| - Est. PSPA draws[1] Jan. '10 – Dec. '12 | - $65.9 billion |
| = Remaining capacity Dec. 31, 2012 *(less any positive net worth on Dec. 31, 2012)* | $124.8 billion |

**Freddie Mac:**

| | |
|---|---|
| PSPA cap as of 12/24/09 amendment | $200 billion |
| + Est. PSPA draws[2] Jan. '10 – Dec. '12 | + $25.1 billion |
| Total est. PSPA cap on Dec. 31, 2012 | $225.1 billion |
| - PSPA draws through Dec. 31, 2009 | - $50.7 billion |
| - Est. PSPA draws[1] Jan. '10 – Dec. '12 | - $25.1 billion |
| = Remaining capacity Dec. 31, 2012 *(less any positive net worth on Dec. 31, 2012)* | $149.3 billion |

[1] Actual draws between January 1, 2010 and March 31, 2012, forecasted draws thereafter. Forecasted draws through December 31, 2012 as estimated by the base case forecast in the Federal Housing Finance Agency's annual "Projections of the Enterprises' Financial Performance" report, released October 2011.

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

TREASURY-3782

# Section 2: Review Key Considerations With Existing PSPAs

Sensitive / Pre-Decisional

1) Overview of the GSE Preferred Stock Purchase Agreements (PSPAs)

**2) Review of Key Considerations With Existing PSPAs**

3) Review GSE Financial Projections
   - Base Case
   - Stress Case

4) Treasury's PSPA Modification Proposal

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

9

TREASURY-3783

# Structural Considerations With The PSPAs

Sensitive / Pre-Decisional

- A large percentage of recent draws has been used to fund dividend payments.
  - Of Fannie Mae's $117.2 billion draw, $19.4 billion (~17%) has been used to fund dividends.
  - Of Freddie Mac's $72.3 billion draw, $7.0 billion (~10%) has been used to fund dividends.
- Financial modeling employed by the GSEs, FHFA and Treasury highlights that a majority of future draws will likely be used to pay dividend payments to Treasury.
  - Our annual dividend obligation on the senior preferred stock exceeds our annual historical earnings in all but one period… it is unlikely that we will regularly generate net income… in excess of our annual dividends payable to Treasury. As a result, there is significant uncertainty as to our long-term financial sustainability. Continued cash payment of senior preferred dividends… will have an adverse impact on our future financial condition and net worth…" – Freddie Mac 2011 10-K.
  - "We will continue to need funds from Treasury as a result of a number of factors, including the dividends we are required to pay Treasury on the senior preferred stock… As a result of our draws, we do not expect to earn profits in excess of our annual dividend obligation to Treasury for the indefinite future…" – Fannie Mae 2011 10-K.
- The circularity described above (i.e. the GSEs drawing from Treasury to pay dividend payments to Treasury) reduces Treasury's ability to support the capital needs of the GSEs once the final level of the caps are fixed as of the December 31, 2012 financials.

# Section 3: Review GSE Financial Projections

Sensitive / Pre-Decisional

1) Overview of the GSE Preferred Stock Purchase Agreements (PSPAs)

2) Review of Key Considerations With Existing PSPAs

**3) Review GSE Financial Projections**

- **Base Case**
- **Stress Case**

4) Treasury's PSPA Modification Proposal

# Primary GSE Financial Forecast Assumptions

Sensitive / Pre-Decisional

- As conservator, FHFA evaluated the GSEs financial future by performing sensitivity analysis, commonly referred to as the "stress tests."
  - The sensitivity analysis included a base and downside case and were projected out to year 2014.
  - The sensitivity analysis used assumptions about GSE operations, loan performance, macroeconomic and financial market conditions, and house prices.
- Treasury also evaluated the financial prospects of the GSEs.
  - Grant Thornton was engaged as an independent, third-party consultant to perform a valuation of the entities for the Treasury Financial Report and OMB budget estimation figures.
  - Grant Thornton developed their own forecasts based, in part, on the assumptions used by FHFA.
  - The Grant Thornton models were projected out until each GSE depleted its PSPA capacity.
- Both the FHFA and Grant Thornton analysis were used to generate the forecast estimates on the subsequent pages.

# Fannie Mae Base Case PSPA Forecast

Sensitive / Pre-Decisional

| Projections: $ in billions | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Comprehensive Income (Loss)[1] | ($13.1) | $5.4 | $13.1 | $13.5 | $9.1 | $8.5 | $8.0 | $7.9 | $8.5 | $8.4 | $8.1 | $8.0 |
| Total Gross PSPA Draw | $28.7 | $11.4 | $2.9 | $1.2 | $7.0 | $7.1 | $8.2 | $9.4 | $9.8 | $10.7 | $12.1 | $13.5 |
| Total Dividend Paid | ($11.8) | ($14.0) | ($14.8) | ($15.0) | ($15.2) | ($15.9) | ($16.6) | ($17.5) | ($18.4) | ($19.4) | ($20.6) | ($21.8) |
| Total PSPA Draw Net of PSPA Dividends | $16.9 | ($2.6) | ($11.9) | ($13.8) | ($8.2) | ($8.8) | ($8.4) | ($8.1) | ($8.6) | ($8.7) | ($8.5) | ($8.3) |
| *Projected End of Period Net Worth*[2] | *($6.2)* | *($3.4)* | *($2.2)* | *($2.5)* | *($1.6)* | *($1.9)* | *($2.3)* | *($2.4)* | *($2.5)* | *($2.9)* | *($3.3)* | *($3.6)* |
| Percent of Dividends Funded by PSPA Draws | 100% | 81% | 20% | 8% | 46% | 45% | 49% | 54% | 53% | 55% | 59% | 62% |
| Dollar Amt. of Dividends Funded by Earnings | $0.0 | $2.6 | $11.9 | $13.8 | $8.2 | $8.8 | $8.4 | $8.1 | $8.6 | $8.7 | $8.5 | $8.3 |
| **Cumulative Cash Dividends Funded by Earnings** | **$0.0** | **$2.6** | **$14.5** | **$28.3** | **$36.5** | **$45.3** | **$53.7** | **$61.7** | **$70.4** | **$79.1** | **$87.6** | **$95.9** |
| **Cumulative Net Return To Taxpayers By FY2023**[3] | - | - | - | - | - | - | - | - | - | - | - | **$92.4** |
| Beginning PSPA Liquidation Preference | $112.6 | $141.3 | $152.7 | $155.6 | $156.8 | $163.8 | $170.9 | $179.1 | $188.5 | $198.3 | $209.0 | $221.1 |
| Total Gross Liquidation Preference | $28.7 | $11.4 | $2.9 | $1.2 | $7.0 | $7.1 | $8.2 | $9.4 | $9.8 | $10.7 | $12.1 | $13.5 |
| Cumulative Gross Liquidation Preference | $141.3 | $152.7 | $155.6 | $156.8 | $163.8 | $170.9 | $179.1 | $188.5 | $198.3 | $209.0 | $221.1 | $234.6 |
| *Remaining PSPA Funding Capacity* | *$125.0* | *$120.8* [4] | *$117.9* | *$116.7* | *$109.7* | *$102.6* | *$94.4* | *$85.0* | *$75.2* | *$64.5* | *$52.4* | *$38.9* |
| **Cumulative Net PSPA Investment**[5] | **$112.3** | **$109.7** | **$97.7** | **$84.0** | **$75.8** | **$67.0** | **$58.6** | **$50.5** | **$41.9** | **$33.2** | **$24.7** | **$16.4** |

Per annum projected PSPA draws and dividends
$ in billions
$60
$20
($20)
($60)
'11 '12 '13 '14 '15 '16 '17 '18 '19 '20 '21 '22 '23
10% Cash Dividend
Net Compreh. Income (1)
Gross PSPA Liqd. Pref.
Projected PSPA funding capacity as a result of draws
$ in billions
$150
$120
$90
$60
$30
$0
'11 '12 '13 '14 '15 '16 '17 '18 '19 '20 '21 '22 '23
PSPA Capacity Left

(1) Net comprehensive income is defined as the sum of economic net interest margin, fees and other income less a provision for credit losses, administrative expenses and other non-interest expenses.
(2) Negative every year because of a one quarter timing delay in payment of PSPA draw requests. Calculated as the sum of net comprehensive income and total gross PSPA draws less total dividends paid.
(3) The cumulative net return to taxpayers by FY2023 represents the sum of the cumulative cash dividends funded by earnings as of FY2023 and the projected end of period net worth in FY2023.
(4) Remaining PSPA funding capacity reduced by draws that occur after January 1, 2013. Potential PSPA draws in 4Q 2012 appear as FY2013 but do not reduce PSPA capacity.
(5) The cumulative net PSPA investment decreases by the dollar amount of dividends funded by earnings paid to the U.S. Department of the Treasury.

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

13

TREASURY-3787

# Fannie Mae Downside Case PSPA Forecast

Sensitive / Pre-Decisional

| Projections: $ in billions | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Comprehensive Income (Loss)[1] | ($49.0) | ($8.8) | $12.9 | $18.6 | $9.3 | $8.7 | $8.2 | $8.0 | $8.7 | $8.5 | - | - |
| Total Gross PSPA Draw | $58.1 | $34.3 | $11.3 | $4.5 | $18.6 | $14.5 | $16.5 | $18.4 | $19.9 | $8.7 | - | - |
| Total Dividend Paid | ($12.9) | ($18.6) | ($21.1) | ($21.9) | ($22.2) | ($23.7) | ($25.2) | ($26.9) | ($28.8) | ($8.7) | - | - |
| Total PSPA Draw Net of PSPA Dividends | $45.2 | $15.7 | ($9.8) | ($17.4) | ($3.6) | ($9.2) | ($8.7) | ($8.5) | ($8.9) | - | - | - |
| *Projected End of Period Net Worth*[2] | *($20.3)* | *($13.4)* | *($10.3)* | *($9.0)* | *($3.4)* | *($3.9)* | *($4.4)* | *($4.9)* | *($5.2)* | - | - | - |
| Percent of Dividends Funded by PSPA Draws | 100% | 100% | 54% | 21% | 84% | 61% | 65% | 68% | 69% | - | - | - |
| Dollar Amt. of Dividends Funded by Earnings | $0.0 | $0.0 | $9.8 | $17.4 | $3.6 | $9.2 | $8.7 | $8.5 | $8.9 | - | - | - |
| Cumulative Cash Dividends Funded by Earnings | $0.0 | $0.0 | $9.8 | $27.2 | $30.8 | $40.0 | $48.7 | $57.2 | $66.2 | - | - | - |
| Cumulative Net Return To Taxpayers By FY2023[3] | - | - | - | - | - | - | - | - | $60.9 | - | - | - |
| Beginning PSPA Liquidation Preference | $112.6 | $170.7 | $205.0 | $216.3 | $220.8 | $239.4 | $253.9 | $270.4 | $288.8 | $308.7 | - | - |
| Total Gross Liquidation Preference | $58.1 | $34.3 | $11.3 | $4.5 | $18.6 | $14.5 | $16.5 | $18.4 | $19.9 | $8.7 | - | - |
| Cumulative Gross Liquidation Preference | $170.7 | $205.0 | $216.3 | $220.8 | $239.4 | $253.9 | $270.4 | $288.8 | $308.7 | $317.4 | - | - |
| *Remaining PSPA Funding Capacity* | *$125.0* | *$112.4* [4] | *$101.1* | *$96.6* | *$78.0* | *$63.5* | *$47.0* | *$28.6* | *$8.7* | *($0.0)* | - | - |
| Cumulative Net PSPA Investment[5] | $140.6 | $156.2 | $146.4 | $129.1 | $125.5 | $116.3 | $107.6 | $99.0 | $90.1 | - | - | - |

TREASURY-3788

## Per annum projected PSPA draws and dividends

$ in billions

$60
$20
($20)
($60)
'11 '12 '13 '14 '15 '16 '17 '18 '19 '20 '21 '22 '23
10% Cash Dividend | Net Compreh. Income (1) | Gross PSPA Liqd. Pref.

## Projected PSPA funding capacity as a result of draws

$ in billions

$150
$120
$90
$60
$30
$0
'11 '12 '13 '14 '15 '16 '17 '18 '19 '20 '21 '22 '23
PSPA Capacity Left

(1) Net comprehensive income is defined as the sum of economic net interest margin, fees and other income less a provision for credit losses, administrative expenses and other non-interest expenses.
(2) Negative every year because of a one quarter timing delay in payment of PSPA draw requests. Calculated as the sum of net comprehensive income and total gross PSPA draws less total dividends paid.
(3) The cumulative net return to taxpayers by FY2023 represents the sum of the cumulative cash dividends funded by earnings as of FY2023 and the projected end of period net worth in FY2023.
(4) Remaining PSPA funding capacity reduced by draws that occur after January 1, 2013. Potential PSPA draws in 4Q 2012 appear as FY2013 but do not reduce PSPA capacity.
(5) The cumulative net PSPA investment decreases by the dollar amount of dividends funded by earnings paid to the U.S. Department of the Treasury.

# Freddie Mac Base Case PSPA Forecast

Sensitive / Pre-Decisional

| Projections: $ in billions | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Comprehensive Income (Loss)[1] | $6.7 | $9.5 | $10.6 | $6.0 | $5.5 | $5.5 | $5.6 | $5.3 | $5.5 | $5.4 | $5.4 | $5.4 |
| Total Gross PSPA Draw | $10.5 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $1.5 | $2.5 | $2.6 | $3.0 | $3.3 |
| Total Dividend Paid | ($7.3) | ($7.7) | ($7.7) | ($7.7) | ($7.7) | ($7.7) | ($7.7) | ($7.7) | ($7.9) | ($8.2) | ($8.4) | ($8.7) |
| Total PSPA Draw Net of PSPA Dividends | $3.2 | ($7.7) | ($7.7) | ($7.7) | ($7.7) | ($7.7) | ($7.7) | ($6.2) | ($5.4) | ($5.6) | ($5.4) | ($5.4) |
| *Projected End of Period Net Worth*[2] | *$3.5* | *$5.3* | *$8.2* | *$6.6* | *$4.4* | *$2.3* | *$0.2* | *($0.7)* | *($0.6)* | *($0.7)* | *($0.8)* | *($0.8)* |
| Percent of Dividends Funded by PSPA Draws | 100% | 0% | 0% | 0% | 0% | 0% | 0% | 19% | 32% | 32% | 36% | 38% |
| Dollar Amt. of Dividends Funded by Earnings | $0.0 | $7.7 | $7.7 | $7.7 | $7.7 | $7.7 | $7.7 | $6.2 | $5.4 | $5.6 | $5.4 | $5.4 |
| **Cumulative Cash Dividends Funded by Earnings** | **$0.0** | **$7.7** | **$15.3** | **$23.0** | **$30.7** | **$38.3** | **$46.0** | **$52.2** | **$57.6** | **$63.2** | **$68.6** | **$74.0** |
| **Cumulative Net Return To Taxpayers By FY2023**[3] | - | - | - | - | - | - | - | - | - | - | - | **$73.2** |
| Beginning PSPA Liquidation Preference | $72.2 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $84.2 | $86.7 | $89.3 | $92.3 |
| Total Gross Liquidation Preference | $10.5 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $1.5 | $2.5 | $2.6 | $3.0 | $3.3 |
| Cumulative Gross Liquidation Preference | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $84.2 | $86.7 | $89.3 | $92.3 | $95.6 |
| *Remaining PSPA Funding Capacity* | *$150.0* | *$150.0* [4] | *$150.0* | *$150.0* | *$150.0* | *$150.0* | *$150.0* | *$148.5* | *$146.0* | *$143.4* | *$140.4* | *$137.1* |
| **Cumulative Net PSPA Investment**[5] | **$60.5** | **$52.8** | **$45.2** | **$37.5** | **$29.8** | **$22.2** | **$14.5** | **$8.3** | **$2.9** | ($2.7) | ($8.1) | ($13.5) |

TREASURY-3789

## Per annum projected PSPA draws and dividends



## Projected PSPA funding capacity as a result of draws



(1) Net comprehensive income is defined as the sum of economic net interest margin, fees and other income less a provision for credit losses, administrative expenses and other non-interest expenses.
(2) Negative in some years because of a one quarter timing delay in payment of PSPA draw requests. Calculated as the sum of net comprehensive income and total gross PSPA draws less total dividends paid.
(3) The cumulative net return to taxpayers by FY2023 represents the sum of the cumulative cash dividends funded by earnings as of FY2023 and the projected end of period net worth in FY2023.
(4) Remaining PSPA funding capacity reduced by draws that occur after January 1, 2013. Potential PSPA draws in 4Q 2012 appear as FY2013 but do not reduce PSPA capacity.
(5) The cumulative net PSPA investment decreases by the dollar amount of dividends funded by earnings paid to the U.S. Department of the Treasury.

# Freddie Mac Downside Case PSPA Forecast

Sensitive / Pre-Decisional

| Projections: $ in billions | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Comprehensive Income (Loss)[1] | ($7.8) | $6.6 | $8.9 | $6.1 | $5.6 | $5.6 | $5.7 | $5.4 | $5.5 | $5.4 | $5.4 | $5.4 |
| Total Gross PSPA Draw | $20.7 | $2.3 | $0.5 | $2.7 | $3.6 | $4.0 | $4.4 | $5.1 | $5.5 | $6.2 | $6.8 | $7.5 |
| Total Dividend Paid | ($7.6) | ($8.8) | ($9.0) | ($9.1) | ($9.4) | ($9.7) | ($10.2) | ($10.6) | ($11.2) | ($11.7) | ($12.4) | ($13.1) |
| Total PSPA Draw Net of PSPA Dividends | $13.1 | ($6.5) | ($8.4) | ($6.4) | ($5.8) | ($5.7) | ($5.8) | ($5.5) | ($5.7) | ($5.5) | ($5.6) | ($5.6) |
| *Projected End of Period Net Worth*[2] | *($1.1)* | *($0.9)* | *($0.5)* | *($0.8)* | *($0.9)* | *($1.1)* | *($1.2)* | *($1.3)* | *($1.5)* | *($1.6)* | *($1.8)* | *($2.0)* |
| Percent of Dividends Funded by PSPA Draws | 100% | 26% | 6% | 30% | 38% | 41% | 43% | 48% | 49% | 53% | 55% | 57% |
| Dollar Amt. of Dividends Funded by Earnings | $0.0 | $6.5 | $8.4 | $6.4 | $5.8 | $5.7 | $5.8 | $5.5 | $5.7 | $5.5 | $5.6 | $5.6 |
| **Cumulative Cash Dividends Funded by Earnings** | **$0.0** | **$6.5** | **$14.9** | **$21.3** | **$27.0** | **$32.8** | **$38.6** | **$44.1** | **$49.7** | **$55.3** | **$60.8** | **$66.4** |
| **Cumulative Net Return To Taxpayers By FY2023**[3] | - | - | - | - | - | - | - | - | - | - | - | **$64.4** |
| Beginning PSPA Liquidation Preference | $72.2 | $92.9 | $95.2 | $95.7 | $98.4 | $102.0 | $106.0 | $110.4 | $115.5 | $121.0 | $127.2 | $134.0 |
| Total Gross Liquidation Preference | $20.7 | $2.3 | $0.5 | $2.7 | $3.6 | $4.0 | $4.4 | $5.1 | $5.5 | $6.2 | $6.8 | $7.5 |
| Cumulative Gross Liquidation Preference | $92.9 | $95.2 | $95.7 | $98.4 | $102.0 | $106.0 | $110.4 | $115.5 | $121.0 | $127.2 | $134.0 | $141.5 |
| *Remaining PSPA Funding Capacity* | *$150.0* | *$149.0* [4] | *$148.4* | *$145.7* | *$142.1* | *$138.1* | *$133.7* | *$128.6* | *$123.1* | *$116.9* | *$110.1* | *$102.6* |
| **Cumulative Net PSPA Investment**[5] | **$70.4** | **$64.0** | **$55.6** | **$49.2** | **$43.4** | **$37.7** | **$31.9** | **$26.4** | **$20.7** | **$15.2** | **$9.6** | **$4.0** |

TREASURY-3790

## Per annum projected PSPA draws and dividends

$ in billions
$30
$20
$10
$0
($10)
'11 '12 '13 '14 '15 '16 '17 '18 '19 '20 '21 '22 '23
10% Cash Dividend
Net Compreh. Income (1)
Gross PSPA Liqd. Pref.

## Projected PSPA funding capacity as a result of draws

$ in billions
$160
$120
$80
$40
$0
'11 '12 '13 '14 '15 '16 '17 '18 '19 '20 '21 '22 '23
PSPA Capacity Left

(1) Net comprehensive income is defined as the sum of economic net interest margin, fees and other income less a provision for credit losses, administrative expenses and other non-interest expenses.
(2) Negative every year because of a one quarter timing delay in payment of PSPA draw requests. Calculated as the sum of net comprehensive income and total gross PSPA draws less total dividends paid.
(3) The cumulative net return to taxpayers by FY2023 represents the sum of the cumulative cash dividends funded by earnings as of FY2023 and the projected end of period net worth in FY2023.
(4) Remaining PSPA funding capacity reduced by draws that occur after January 1, 2013. Potential PSPA draws in 4Q 2012 appear as FY2013 but do not reduce PSPA capacity.
(5) The cumulative net PSPA investment decreases by the dollar amount of dividends funded by earnings paid to the U.S. Department of the Treasury.

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

16

# Section 4: Treasury's PSPA Modification Proposal

Sensitive / Pre-Decisional

1) Overview of the GSE Preferred Stock Purchase Agreements (PSPAs)
2) Review of Key Considerations With Existing PSPAs
3) Review GSE Financial Projections
   - Base Case
   - Stress Case
4) **Treasury's PSPA Modification Proposal**

TREASURY-3791

# Goals of Modifying the PSPAs

- Treasury would like to modify the PSPAs given the challenges and circularity embedded in the current structure.
- Any modification would need to achieve four core goals:

  1) Protect the taxpayers' investment in the GSEs.
  2) There should be no material difference in the net cash returned to taxpayers (i.e., the difference between draws taken and dividends received) as would be expected with the fixed ten percent dividend.
  3) The maximum financial upside possible should be retained for the taxpayer if/when the GSEs return to sustained profitability.
  4) Should be executed in a transparent manner that maintains stakeholder confidence in the GSEs so they can fulfill their current and future mission.

# Treasury's PSPA Modification Proposal

Sensitive / Pre-Decisional

- Replace the fixed 10% quarterly cash dividend paid by each GSE to Treasury with a variable quarterly dividend equal to a net worth sweep based upon financial results.
  - If quarterly net worth[(1)] is positive above a minimum amount[(2)], all of that value would be paid to Treasury.
  - If quarterly net worth[(1)] is negative, no dividends would be paid to Treasury.
    - The GSEs would draw on the remaining funding commitment capacity to maintain positive net worth.
- The proposed modification has the following impact on PSPA operations:
  - Eliminates the circularity of Treasury funding dividends paid to Treasury.
  - All future net income/profits are distributed to Treasury as dividends.
  - Future draws are only used to meet solvency needs and fund actual operating losses to the extent necessary.

(1) Net worth is determined by subtracting the total liabilities from the total assets as reflected on the GSE balance sheets as of an applicable date, prepared in accordance with GAAP.

(2) Treasury is proposing a minimum net worth amount of $10,000,000,000 for the quarterly reporting periods between January 1, 2013 and December 31, 2019. For all subsequent periods, the minimum net worth amount will be $1,000,000. The economic rationale behind the minimum net worth amount is to avoid having unnecessary PSPA draws that result from price volatility in the GSEs mortgage investment portfolios. By January 1, 2020, these portfolios need to be reduced to $250 billion from their current levels of $708 billion and $653 billion at Fannie Mae and Freddie Mac, respectively.

# Hypothetical Cashflows prior to 2020 where the GSE has positive net worth that totals less than $10 billion

Sensitive / Pre-Decisional

## Current 10% Annualized Dividend

### *Quarter with Positive Net Worth*

| | | |
|---|---|---|
| Income Statement | Net Comprehensive Income | $2.00 |
| Balance Sheet | Assets | $3,202.00 |
| | Liabilities | $3,200.00 |
| | Net Worth | $2.00 |
| | *Dividend Accrued* | *$2.50* |
| Cash Flows: TSY | Dividend Payment | $2.50 |
| | Less: Increase in Liq. Pref. | ($0.50) |
| | Net Cash to/from Treasury | $2.00 |
| PSPAs | Beg. Cum. Liquidation Pref. | $100.00 |
| | End. Cum. Liquidation Pref. | $100.50 |

### *Quarter with Negative Net Worth*

| | | |
|---|---|---|
| Income Statement | Net Comprehensive Income | ($2.00) |
| Balance Sheet | Assets | $3,198.00 |
| | Liabilities | $3,200.00 |
| | Net Worth | ($2.00) |
| | *Dividend Accrued* | $2.50 |
| Cash Flows: TSY | Dividend Payment | $2.50 |
| | Less: Increase in Liq. Pref. | ($4.50) |
| | Net Cash to/from Treasury | ($2.00) |
| PSPAs | Beg. Cum. Liquidation Pref. | $100.00 |
| | End. Cum. Liquidation Pref. | $104.50 |

## Proposed Net Worth Sweep

### *Quarter with Positive Net Worth*

| | | |
|---|---|---|
| Income Statement | Net Comprehensive Income | $2.00 |
| Balance Sheet | Assets | $3,202.00 |
| | Liabilities | $3,200.00 |
| | Net Worth | $2.00 |
| | *Dividend Accrued* | *$0.00* |
| Cash Flows: TSY | Dividend Payment | $0.00 |
| | Less: Increase in Liq. Pref. | $0.00 |
| | Net Cash to/from Treasury | $0.00 |
| PSPAs | Beg. Cum. Liquidation Pref. | $100.00 |
| | End. Cum. Liquidation Pref. | $100.00 |

### *Quarter with Negative Net Worth*

| | | |
|---|---|---|
| Income Statement | Net Comprehensive Income | ($2.00) |
| Balance Sheet | Assets | $3,198.00 |
| | Liabilities | $3,200.00 |
| | Net Worth | ($2.00) |
| | *Dividend Accrued* | *$0.00* |
| Cash Flows: TSY | Dividend Payment | $0.00 |
| | Less: Increase in Liq. Pref. | ($2.00) |
| | Net Cash to/from Treasury | ($2.00) |
| PSPAs | Beg. Cum. Liquidation Pref. | $100.00 |
| | End. Cum. Liquidation Pref. | $102.00 |

TREASURY-3794

# Hypothetical Cashflows prior to 2020 where the GSE has positive net worth that totals more than $10 billion

Sensitive / Pre-Decisional

## Current 10% Annualized Dividend

### *Quarter with Positive Net Worth*

| | | |
|---|---|---|
| Income Statement | Net Comprehensive Income | $2.00 |
| Balance Sheet | Assets | $3,212.00 |
| | Liabilities | $3,200.00 |
| | Net Worth | $12.00 |
| | *Dividend Accrued* | *$2.50* |
| Cash Flows: TSY | Dividend Payment | $2.50 |
| | Less: Increase in Liq. Pref. | $0.00 |
| | Net Cash to/from Treasury | $2.50 |
| PSPAs | Beg. Cum. Liquidation Pref. | $100.00 |
| | End. Cum. Liquidation Pref. | $100.00 |

## Proposed Net Worth Sweep

### *Quarter with Positive Net Worth*

| | | |
|---|---|---|
| Income Statement | Net Comprehensive Income | $2.00 |
| Balance Sheet | Assets | $3,212.00 |
| | Liabilities | $3,200.00 |
| | Net Worth | $12.00 |
| | *Dividend Accrued* | *$2.00* |
| Cash Flows: TSY | Dividend Payment | $2.00 |
| | Less: Increase in Liq. Pref. | $0.00 |
| | Net Cash to/from Treasury | $2.00 |
| PSPAs | Beg. Cum. Liquidation Pref. | $100.00 |
| | End. Cum. Liquidation Pref. | $100.00 |

TREASURY-3795

# Hypothetical Cashflows Where The GSE Has Positive Net Worth After 2020

Sensitive / Pre-Decisional

## Current 10% Annualized Dividend

### *Quarter with Positive Net Worth*

| | | |
|---|---|---|
| Income Statement | Net Comprehensive Income | $2.00 |
| Balance Sheet | Assets | $3,212.00 |
| | Liabilities | $3,200.00 |
| | Net Worth | $12.00 |
| | *Dividend Accrued* | *$2.50* |
| Cash Flows: TSY | Dividend Payment | $2.50 |
| | Less: Increase in Liq. Pref. | $0.00 |
| | Net Cash to/from Treasury | $2.50 |
| PSPAs | Beg. Cum. Liquidation Pref. | $100.00 |
| | End. Cum. Liquidation Pref. | $100.00 |

## Proposed Net Worth Sweep

### *Quarter with Positive Net Worth*

| | | |
|---|---|---|
| Income Statement | Net Comprehensive Income | $2.00 |
| Balance Sheet | Assets | $3,212.00 |
| | Liabilities | $3,200.00 |
| | Net Worth | $12.00 |
| | *Dividend Accrued* | *$12.00* |
| Cash Flows: TSY | Dividend Payment | $12.00 |
| | Less: Increase in Liq. Pref. | $0.00 |
| | Net Cash to/from Treasury | $12.00 |
| PSPAs | Beg. Cum. Liquidation Pref. | $100.00 |
| | End. Cum. Liquidation Pref. | $100.00 |

# Fannie Mae Base Case PSPA Forecast Under Sweep Proposal

Sensitive / Pre-Decisional

| Projections: $ in billions | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Comprehensive Income (Loss)[1] | ($13.1) | $5.4 | $13.1 | $13.5 | $9.1 | $8.5 | $8.0 | $7.9 | $8.5 | $8.4 | $8.1 | $8.0 |
| Total Gross PSPA Draw | $28.7 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Total Net Worth Sweep Dividend | ($11.8) | $0.0 | ($2.3) | ($13.5) | ($9.1) | ($8.5) | ($8.0) | ($7.9) | ($18.5) | ($8.4) | ($8.1) | ($8.0) |
| Total PSPA Draw Net of Net Worth Sweep | $16.9 | $0.0 | ($2.3) | ($13.5) | ($9.1) | ($8.5) | ($8.0) | ($7.9) | ($18.5) | ($8.4) | ($8.1) | ($8.0) |
| *Projected End of Period Net Worth*[2] | *($6.2)* | *($0.8)* | *$10.0* | *$10.0* | *$10.0* | *$10.0* | *$10.0* | *$10.0* | *$0.0* | *$0.0* | *$0.0* | *$0.0* |
| Percent of Dividends Funded by PSPA Draws | 100% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Dollar Amt. of Dividends Funded by Earnings | $0.0 | $0.0 | $2.3 | $13.5 | $9.1 | $8.5 | $8.0 | $7.9 | $18.5 | $8.4 | $8.1 | $8.0 |
| **Cumulative Cash Dividends Funded by Earnings** | **$0.0** | **$0.0** | **$2.3** | **$15.8** | **$24.9** | **$33.4** | **$41.4** | **$49.3** | **$67.8** | **$76.2** | **$84.3** | **$92.4** |
| **Cumulative Net Return To Taxpayers By FY2023**[3] | - | - | - | - | - | - | - | - | - | - | - | **$92.4** |
| Beginning PSPA Liquidation Preference | $112.6 | $141.3 | $141.3 | $141.3 | $141.3 | $141.3 | $141.3 | $141.3 | $141.3 | $141.3 | $141.3 | $141.3 |
| Total Gross Liquidation Preference | $28.7 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Cumulative Gross Liquidation Preference | $141.3 | $141.3 | $141.3 | $141.3 | $141.3 | $141.3 | $141.3 | $141.3 | $141.3 | $141.3 | $141.3 | $141.3 |
| *Remaining PSPA Funding Capacity* | *$125.0* | *$125.0* [4] | *$125.0* | *$125.0* | *$125.0* | *$125.0* | *$125.0* | *$125.0* | *$125.0* | *$125.0* | *$125.0* | *$125.0* |
| **Cumulative Net PSPA Investment**[5] | **$112.3** | **$112.3** | **$110.0** | **$96.5** | **$87.4** | **$78.9** | **$70.9** | **$63.0** | **$44.4** | **$36.0** | **$27.9** | **$19.9** |

TREASURY-3797

Per annum projected PSPA draws and dividends
$ in billions
$80
$60
$40
$20
$0
($20)
($40)
($60)
'11 '12 '13 '14 '15 '16 '17 '18 '19 '20 '21 '22 '23
Net Worth Sweep Dividend (6)
Net Compreh. Income (1)
Gross PSPA Liqd. Pref.
Projected PSPA funding capacity as a result of draws
$ in billions
$160
$110
$60
$10
($40)
'11 '12 '13 '14 '15 '16 '17 '18 '19 '20 '21 '22 '23
PSPA Capacity Left

(1) Net comprehensive income is defined as the sum of economic net interest margin, fees and other income less a provision for credit losses, administrative expenses and other non-interest expenses.
(2) Until 2020, the GSEs can retain $10 billion in net worth before being required to sweep dividends. Calculated as the sum of net comprehensive income and total gross PSPA draws less total dividends paid.
(3) The cumulative net return to taxpayers by FY2023 represents the sum of the cumulative cash dividends funded by earnings as of FY2023 and the projected end of period net worth in FY2023.
(4) Remaining PSPA funding capacity reduced by draws that occur after January 1, 2013. Potential PSPA draws in 4Q 2012 appear as FY2013 but do not reduce PSPA capacity.
(5) The cumulative net PSPA investment decreases by the dollar amount of dividends funded by earnings paid to the U.S. Department of the Treasury.
(6) Net worth sweep dividend begins in FY2013. 10 percent cash dividend paid through FY2012.

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

23

# Fannie Mae Downside Case PSPA Forecast Under Sweep Proposal

Sensitive / Pre-Decisional

| Projections: $ in billions | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Comprehensive Income (Loss)[1] | ($49.0) | ($8.8) | $12.9 | $18.6 | $9.3 | $8.7 | $8.2 | $8.0 | $8.7 | $8.5 | $8.2 | $8.2 |
| Total Gross PSPA Draw | $58.1 | $15.7 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Total Net Worth Sweep Dividend | ($12.9) | $0.0 | $0.0 | ($8.1) | ($9.3) | ($8.7) | ($8.2) | ($8.0) | ($18.7) | ($8.5) | ($8.2) | ($8.2) |
| Total PSPA Draw Net of Net Worth Sweep | $45.2 | $15.7 | $0.0 | ($8.1) | ($9.3) | ($8.7) | ($8.2) | ($8.0) | ($18.7) | ($8.5) | ($8.2) | ($8.2) |
| *Projected End of Period Net Worth*[2] | *($20.3)* | *($13.4)* | *($0.5)* | *$10.0* | *$10.0* | *$10.0* | *$10.0* | *$10.0* | *$0.0* | *$0.0* | *$0.0* | *$0.0* |
| Percent of Dividends Funded by PSPA Draws | 100% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Dollar Amt. of Dividends Funded by Earnings | $0.0 | $0.0 | $0.0 | $8.1 | $9.3 | $8.7 | $8.2 | $8.0 | $18.7 | $8.5 | $8.2 | $8.2 |
| **Cumulative Cash Dividends Funded by Earnings** | **$0.0** | **$0.0** | **$0.0** | **$8.1** | **$17.4** | **$26.1** | **$34.2** | **$42.3** | **$60.9** | **$69.5** | **$77.6** | **$85.8** |
| **Cumulative Net Return To Taxpayers By FY2023**[3] | - | - | - | - | - | - | - | - | - | - | - | **$85.8** |
| Beginning PSPA Liquidation Preference | $112.6 | $170.7 | $186.3 | $186.3 | $186.3 | $186.3 | $186.3 | $186.3 | $186.3 | $186.3 | $186.3 | $186.3 |
| Total Gross Liquidation Preference | $58.1 | $15.7 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Cumulative Gross Liquidation Preference | $170.7 | $186.3 | $186.3 | $186.3 | $186.3 | $186.3 | $186.3 | $186.3 | $186.3 | $186.3 | $186.3 | $186.3 |
| *Remaining PSPA Funding Capacity* | *$125.0* | *$125.0* [4] | *$125.0* | *$125.0* | *$125.0* | *$125.0* | *$125.0* | *$125.0* | *$125.0* | *$125.0* | *$125.0* | *$125.0* |
| **Cumulative Net PSPA Investment**[5] | **$0.0** | **$154.0** | **$154.0** | **$145.9** | **$136.6** | **$127.9** | **$119.8** | **$111.8** | **$93.1** | **$84.6** | **$76.4** | **$68.2** |

## Per annum projected PSPA draws and dividends

$ in billions

$80, $60, $40, $20, $0, ($20), ($40), ($60)

'11 '12 '13 '14 '15 '16 '17 '18 '19 '20 '21 '22 '23

Net Worth Sweep Dividend (6) — Net Compreh. Income (1) — Gross PSPA Liqd. Pref.

## Projected PSPA funding capacity as a result of draws

$ in billions

$160, $110, $60, $10, ($40)

'11 '12 '13 '14 '15 '16 '17 '18 '19 '20 '21 '22 '23

PSPA Capacity Left

(1) Net comprehensive income is defined as the sum of economic net interest margin, fees and other income less a provision for credit losses, administrative expenses and other non-interest expenses.
(2) Until 2020, the GSEs can retain $10 billion in net worth before being required to sweep dividends. Calculated as the sum of net comprehensive income and total gross PSPA draws less total dividends paid.
(3) The cumulative net return to taxpayers by FY2023 represents the sum of the cumulative cash dividends funded by earnings as of FY2023 and the projected end of period net worth in FY2023.
(4) Remaining PSPA funding capacity reduced by draws that occur after January 1, 2013. Potential PSPA draws in 4Q 2012 appear as FY2013 but do not reduce PSPA capacity.
(5) The cumulative net PSPA investment decreases by the dollar amount of dividends funded by earnings paid to the U.S. Department of the Treasury.
(6) Net worth sweep dividend begins in FY2013. 10 percent cash dividend paid through FY2012.

# Freddie Mac Base Case PSPA Forecast Under Sweep Proposal

Sensitive / Pre-Decisional

| Projections: $ in billions | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Comprehensive Income (Loss)[1] | $6.7 | $9.5 | $10.6 | $6.0 | $5.5 | $5.5 | $5.6 | $5.3 | $5.5 | $5.4 | $5.4 | $5.4 |
| Total Gross PSPA Draw | $10.5 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Total Net Worth Sweep Dividend | ($7.3) | ($3.0) | ($10.6) | ($6.0) | ($5.5) | ($5.5) | ($5.6) | ($5.3) | ($15.5) | ($5.4) | ($5.4) | ($5.4) |
| Total PSPA Draw Net of Net Worth Sweep | $3.2 | ($3.0) | ($10.6) | ($6.0) | ($5.5) | ($5.5) | ($5.6) | ($5.3) | ($15.5) | ($5.4) | ($5.4) | ($5.4) |
| *Projected End of Period Net Worth*[2] | *$3.5* | *$10.0* | *$10.0* | *$10.0* | *$10.0* | *$10.0* | *$10.0* | *$10.0* | *$0.0* | *$0.0* | *$0.0* | *$0.0* |
| Percent of Dividends Funded by PSPA Draws | 100% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Dollar Amt. of Dividends Funded by Earnings | $0.0 | $3.0 | $10.6 | $6.0 | $5.5 | $5.5 | $5.6 | $5.3 | $15.5 | $5.4 | $5.4 | $5.4 |
| **Cumulative Cash Dividends Funded by Earnings** | **$0.0** | **$3.0** | **$13.6** | **$19.6** | **$25.1** | **$30.6** | **$36.2** | **$41.5** | **$57.0** | **$62.4** | **$67.8** | **$73.2** |
| **Cumulative Net Return To Taxpayers By FY2023**[3] | - | - | - | - | - | - | - | - | - | - | - | **$73.2** |
| Beginning PSPA Liquidation Preference | $72.2 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 |
| Total Gross Liquidation Preference | $10.5 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Cumulative Gross Liquidation Preference | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 |
| *Remaining PSPA Funding Capacity* | *$150.0* | *$150.0* [4] | *$150.0* | *$150.0* | *$150.0* | *$150.0* | *$150.0* | *$150.0* | *$150.0* | *$150.0* | *$150.0* | *$150.0* |
| **Cumulative Net PSPA Investment**[5] | **$60.5** | **$57.5** | **$46.9** | **$40.9** | **$35.4** | **$29.9** | **$24.3** | **$19.0** | **$3.5** | ($2.0) | ($7.4) | ($12.7) |

Per annum projected PSPA draws and dividends
$ in billions
$30
$20
$10
$0
($10)
'11 '12 '13 '14 '15 '16 '17 '18 '19 '20 '21 '22 '23
Net Worth Sweep Dividend (6)
Net Compreh. Income (1)
Gross PSPA Liqd. Pref.
Projected PSPA funding capacity as a result of draws
$ in billions
$200
$150
$100
$50
$0
'11 '12 '13 '14 '15 '16 '17 '18 '19 '20 '21 '22 '23
PSPA Capacity Left

(1) Net comprehensive income is defined as the sum of economic net interest margin, fees and other income less a provision for credit losses, administrative expenses and other non-interest expenses.
(2) Until 2020, the GSEs can retain $10 billion in net worth before being required to sweep dividends. Calculated as the sum of net comprehensive income and total gross PSPA draws less total dividends paid.
(3) The cumulative net return to taxpayers by FY2023 represents the sum of the cumulative cash dividends funded by earnings as of FY2023 and the projected end of period net worth in FY2023.
(4) Remaining PSPA funding capacity reduced by draws that occur after January 1, 2013. Potential PSPA draws in 4Q 2012 appear as FY2013 but do not reduce PSPA capacity.
(5) The cumulative net PSPA investment decreases by the dollar amount of dividends funded by earnings paid to the U.S. Department of the Treasury.
(6) Net worth sweep dividend begins in FY2013. 10 percent cash dividend paid through FY2012.

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE 25

TREASURY-3799

# Freddie Mac Downside Case PSPA Forecast Under Sweep Proposal

Sensitive / Pre-Decisional

| Projections: $ in billions | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Comprehensive Income (Loss)[1] | ($7.8) | $6.6 | $8.9 | $6.1 | $5.6 | $5.6 | $5.7 | $5.4 | $5.5 | $5.4 | $5.4 | $5.4 |
| Total Gross PSPA Draw | $20.7 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Total Net Worth Sweep Dividend | ($7.6) | $0.0 | ($4.4) | ($6.1) | ($5.6) | ($5.6) | ($5.7) | ($5.4) | ($15.5) | ($5.4) | ($5.4) | ($5.4) |
| Total PSPA Draw Net of Net Worth Sweep | $13.1 | $0.0 | ($4.4) | ($6.1) | ($5.6) | ($5.6) | ($5.7) | ($5.4) | ($15.5) | ($5.4) | ($5.4) | ($5.4) |
| *Projected End of Period Net Worth[2]* | *($1.1)* | *$5.5* | *$10.0* | *$10.0* | *$10.0* | *$10.0* | *$10.0* | *$10.0* | *$0.0* | *$0.0* | *$0.0* | *$0.0* |
| Percent of Dividends Funded by PSPA Draws | 100% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Dollar Amt. of Dividends Funded by Earnings | $0.0 | $0.0 | $4.4 | $6.1 | $5.6 | $5.6 | $5.7 | $5.4 | $15.5 | $5.4 | $5.4 | $5.4 |
| Cumulative Cash Dividends Funded by Earnings | $0.0 | $0.0 | $4.4 | $10.5 | $16.1 | $21.7 | $27.4 | $32.7 | $48.2 | $53.7 | $59.1 | $64.4 |
| Cumulative Net Return To Taxpayers By FY2023[3] | - | - | - | - | - | - | - | - | - | - | - | $64.4 |
| Beginning PSPA Liquidation Preference | $72.2 | $92.9 | $92.9 | $92.9 | $92.9 | $92.9 | $92.9 | $92.9 | $92.9 | $92.9 | $92.9 | $92.9 |
| Total Gross Liquidation Preference | $20.7 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Cumulative Gross Liquidation Preference | $92.9 | $92.9 | $92.9 | $92.9 | $92.9 | $92.9 | $92.9 | $92.9 | $92.9 | $92.9 | $92.9 | $92.9 |
| *Remaining PSPA Funding Capacity* | *$150.0* | *$150.0* [4] | *$150.0* | *$150.0* | *$150.0* | *$150.0* | *$150.0* | *$150.0* | *$150.0* | *$150.0* | *$150.0* | *$150.0* |
| Cumulative Net PSPA Investment[5] | $0.0 | $70.4 | $66.1 | $60.0 | $54.3 | $48.8 | $43.1 | $37.7 | $22.2 | $16.8 | $11.4 | $6.0 |

Per annum projected PSPA draws and dividends
$ in billions
$30
$20
$10
$0
($10)
'11 '12 '13 '14 '15 '16 '17 '18 '19 '20 '21 '22 '23
Net Worth Sweep Dividend (6)
Net Compreh. Income (1)
Gross PSPA Liqd. Pref.
Projected PSPA funding capacity as a result of draws
$ in billions
$200
$150
$100
$50
$0
'11 '12 '13 '14 '15 '16 '17 '18 '19 '20 '21 '22 '23
PSPA Capacity Left

(1) Net comprehensive income is defined as the sum of economic net interest margin, fees and other income less a provision for credit losses, administrative expenses and other non-interest expenses.
(2) Until 2020, the GSEs can retain $10 billion in net worth before being required to sweep dividends. Calculated as the sum of net comprehensive income and total gross PSPA draws less total dividends paid.
(3) The cumulative net return to taxpayers by FY2023 represents the sum of the cumulative cash dividends funded by earnings as of FY2023 and the projected end of period net worth in FY2023.
(4) Remaining PSPA funding capacity reduced by draws that occur after January 1, 2013. Potential PSPA draws in 4Q 2012 appear as FY2013 but do not reduce PSPA capacity.
(5) The cumulative net PSPA investment decreases by the dollar amount of dividends funded by earnings paid to the U.S. Department of the Treasury.
(6) Net worth sweep dividend begins in FY2013. 10 percent cash dividend paid through FY2012.

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

26

TREASURY-3800

# Summary

Sensitive / Pre-Decisional

- The net cash returned to taxpayers post the dividend modification is materially equivalent under the proposal as with the 10 percent fixed dividend.
  - The aggregate net cash returned by the GSEs remains materially the same.

**Fannie Mae Base Case Net Cash Returned to Taxpayers**
($ in billions)

$100
$80
$60
$40
$20
$0
'13 '14 '15 '16 '17 '18 '19 '20 '21 '22 '23
10% Cash Net Dividend
Net Worth Sweep Dividend

**Fannie Mae Downside Case Net Cash Returned to Taxpayers**
($ in billions)

**Freddie Mac Base Case Net Cash Returned to Taxpayers**
($ in billions)

**Freddie Mac Downside Case Net Cash Returned to Taxpayers**
($ in billions)

# Summary (Cont'd)

Sensitive / Pre-Decisional

- The net PSPA investment is also materially equivalent under the proposal as with the 10 percent fixed dividend.
  - Under all scenarios, net draws (total payments made by Treasury to GSEs under PSPA funding commitments less dividends received) are materially equivalent.
  - In certain positive scenarios (not modeled), the proceeds recaptured by Treasury might be higher.
- The residual economic value of Treasury's existing and future liquidation preference may be higher as investor confidence in the GSEs should improve, which will decrease funding costs and enhance profitability.

# FEDERAL HOUSING FINANCE AGENCY
# OFFICE OF INSPECTOR GENERAL

## Fannie Mae and Freddie Mac: Where the Taxpayers' Money Went

**WHITE PAPER: WPR-2012-02** **DATED: May 24, 2012**



FEDERAL HOUSING FINANCE AGENCY
OFFICE OF INSPECTOR GENERAL

# AT A GLANCE

## Fannie Mae and Freddie Mac: Where the Taxpayers' Money Went

### Why FHFA-OIG Did This Evaluation

On July 30, 2008, the Housing and Economic Recovery Act (HERA) was enacted for the purpose of strengthening the regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) (collectively, the Enterprises). Six weeks later, the Enterprises entered conservatorships overseen by the newly created Federal Housing Finance Agency (FHFA). Shortly thereafter, the U.S. Department of the Treasury (Treasury) began making quarterly investments in the Enterprises to prevent their insolvency because they were rapidly losing billions of dollars. By the end of 2011, U.S. taxpayers had invested nearly $185 billion in Fannie Mae and Freddie Mac.

Questions have arisen regarding why Fannie Mae and Freddie Mac required such federal intervention, how the Enterprises have used Treasury's extraordinary investment, and who may have benefited from it. In this white paper, FHFA's Office of Inspector General (FHFA-OIG) attempts to answer these and other questions relating to Treasury's investments in the Enterprises. Understanding the answers to these questions will be important for policy makers as they determine the future of the Enterprises and more generally the nation's housing and related financial markets.

### Discussion

When U.S. housing prices stopped their rapid rise and began declining nationwide in 2006-2007, homeowners started defaulting on their mortgages at accelerating rates. At that time, Fannie Mae and Freddie Mac owned or guaranteed mortgages worth more than $5 trillion, nearly half of the U.S. mortgage market. They did not have adequate capital reserves to continue operating in the face of the growing losses on their mortgage portfolios.

In September 2008, the Enterprises entered conservatorships overseen by FHFA, and, to prevent their insolvency, Treasury began making quarterly capital contributions to each institution. This money has been used primarily to cover losses stemming from single-family mortgage loans that the Enterprises had acquired from 2004 through 2008. In addition, but to a lesser extent, Treasury's investments have covered payments of dividends to Treasury as well as losses from investments and other expenses.

Without assistance from Treasury, the Enterprises likely would not have been able to repay their debts or honor their mortgage-backed securities (MBS) guarantees. Further, they would have been unable to finance new mortgages or create new MBS, two of the cornerstones of the U.S. housing finance system.

### Conclusion

U.S. government intervention protected the numerous creditors – both domestic and foreign – who had purchased bonds and MBS issued by Fannie Mae and Freddie Mac. Allowing the Enterprises to meet their debt and guarantee obligations enabled them to continue to support the secondary market. However, the cost of rescuing the Enterprises has been high, with total Treasury support for the Enterprises currently expected to range from a quarter to a third of a trillion dollars.

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... 3
ABBREVIATIONS .......... 5
PREFACE .......... 6
BACKGROUND .......... 7
About the Enterprises .......... 7
Provisions for Loan Losses in the Enterprises' Portfolios .......... 8
MBS Guarantees .......... 9
Defaults and Foreclosures .......... 9
The Financial Crisis and Its Effect on the Enterprises .......... 10
The Crisis .......... 10
The Bubble Inflated .......... 10
The Bubble Burst .......... 10
The Impact .......... 11
The Conservatorships .......... 12
ENTERPRISE GAINS & LOSSES 2008-2011 .......... 17
Summary of Gains, Losses, and Use of Funds .......... 17
Single-Family .......... 19
Retained Mortgage Loans .......... 19
MBS Guarantees .......... 19
Multifamily .......... 20
Investments .......... 21
Private-Label MBS .......... 21
Derivatives .......... 23
Other Losses .......... 23
Accounting Adjustments .......... 24
Dividends to Treasury .......... 24

PUTTING THE LOSSES IN PERSPECTIVE: WINNERS AND LOSERS .............................. 25

Losers: Stockholders .............................................................................................. 25

Winners: Holders of Bonds and Guaranteed MBS .......................................................... 25

OUTLOOK: FORECASTING FUTURE GOVERNMENT PAYMENTS ................................ 27

SCOPE AND METHODOLOGY ............................................................................... 28

APPENDIX .................................................................................................................. 29

The Mechanics of Treasury Financial Support of the Enterprises ....................................... 29

The Draw ............................................................................................................. 29

How the Draw is Calculated ........................................................................................ 29

ADDITIONAL INFORMATION AND COPIES ........................................................ 30

# ABBREVIATIONS

Fannie Mae............................................................................ Federal National Mortgage Association

FHFA ........................................................................................Federal Housing Finance Agency

FHFA-OIG.....................................Federal Housing Finance Agency Office of Inspector General

Freddie Mac ...................................................................Federal Home Loan Mortgage Corporation

Ginnie Mae............................................................... Government National Mortgage Association

HERA......................................................................Housing and Economic Recovery Act of 2008

MBS .........................................................................................Mortgage-Backed Securities

PSPAs ........................................................................ Senior Preferred Stock Purchase Agreements

RMBS ..................................................................Residential Mortgage-Backed Securities

Treasury .......................................................................... U.S. Department of the Treasury

**Federal Housing Finance Agency**
**Office of Inspector General**
Washington, DC

# PREFACE

FHFA-OIG was established by HERA,[1] which amended the Inspector General Act of 1978.[2] FHFA-OIG is authorized to conduct audits, investigations, and other studies of the programs and operations of FHFA; to recommend policies that promote economy and efficiency in the administration of such programs and operations; and to prevent and detect fraud and abuse in them. This white paper provides an overview of the purposes of the government's extraordinary investments in the Enterprises; the uses to which the proceeds of such investments have been applied; and the prospects for repayment of the government's investments.

This white paper was written principally by Senior Investigative Evaluator Bruce McWilliams and Senior Financial Analyst Alan Rhinesmith. Assistant Inspector General for Evaluations David Frost and Senior Financial Analyst Timothy Lee contributed to its completion. FHFA-OIG appreciates the assistance of FHFA and Enterprise staff in completing this paper. It has been distributed to Congress, the Office of Management and Budget, and others and will be posted on FHFA-OIG's website, www.fhfaoig.gov.

George Grob
Deputy Inspector General for Evaluations
FHFA Office of Inspector General

[1] Public Law No. 110-289.

[2] Public Law No. 95-452.

# BACKGROUND

Following an unprecedented rise in housing prices, the housing market began collapsing in late 2006.  This had widespread, adverse impacts on those financial institutions heavily concentrated in mortgage financing, such as Fannie Mae and Freddie Mac.

To prevent the Enterprises' insolvency, Treasury invested approximately $185 billion in them from September 6, 2008 through the end of 2011.  Treasury's actions have resulted in controversy and questions have arisen concerning why Fannie Mae and Freddie Mac required such federal intervention, how the Enterprises have used Treasury's extraordinary investment, and who may have benefited from it.

In a nutshell, it is believed that the investment permitted Fannie Mae and Freddie Mac to avoid insolvency, which, given their dominant position in housing finance and the trillions of dollars of securities issued, could have caused the collapse of the U.S. housing finance system.  Additional consequences of Treasury's intervention include that the Enterprises' shareholders lost almost all their investments, but the Enterprises' bond holders and investors in guaranteed mortgage-backed securities (MBS) were protected.  More importantly, homeowners and other participants in the housing market directly benefited from Treasury's buttressing of the market.

## About the Enterprises

Fannie Mae and Freddie Mac provide liquidity to the housing finance system by supporting the secondary mortgage market.  The Enterprises purchase residential mortgages that meet their underwriting criteria from loan sellers.  The loan sellers can then use the sales proceeds to originate additional mortgages.  The Enterprises can hold the mortgages in their own investment portfolios or package them into MBS that are, in turn, sold to investors.  For a fee, the Enterprises guarantee the payment of mortgage principal and interest on the MBS they sell.

As depicted in Figure 1, to finance their purchase of billions of dollars of mortgage loans, the Enterprises:  (1) borrow funds from large individual, institutional, and foreign investors; and (2) create and sell MBS.

**Figure 1: Overview of Enterprises and Role of FHFA**[3]

## Provisions for Loan Losses in the Enterprises' Portfolios

Inevitably, some homeowners will encounter difficulty making their mortgage payments. If a homeowner stops making payments, the Enterprise has to account for the revenue shortfall related to an owned- or guaranteed-mortgage. The Enterprises have established special accounts or reserves to cover losses incurred on loans they own in their investment portfolios. They typically contribute to these accounts every quarter. These quarterly contributions to reserves are called **provisions for loan**

> **Provision for Loan and Guarantee Losses**
> An accounting concept that refers to the reduction of current income to establish a reserve fund for mortgage losses.

[3] Source: General Accountability Office, *Financial Audit: Federal Housing Finance Agency's Fiscal Years 2011 and 2010 Financial Statements*, Nov. 2011, Figure 4.

**losses** in that they provide against future losses. Provisions for loan losses – and the reserves they fund – can be attributable to a specific loan or can be based on the general expectation that a portion of the loans in the portfolio as a whole will **default**.

**Default**
Occurs when a mortgagor misses one or more payments.

**Mortgage Guarantees**
Historically, the Enterprises purchased mortgages and securitized them, then provided a guarantee to investors that if the mortgagor defaulted, the Enterprise would make timely principal and interest payments to the securitization trust, which in turn would make payments to the security holder.

### MBS Guarantees

With respect to **mortgage guarantees** associated with the MBS that Fannie Mae and Freddie Mac sell, they collect a monthly fee to ensure the payment of principal and interest to MBS investors. This fee – spread over the life of the pool of loans that comprise a particular MBS – is intended to cover that small portion of loans that are expected to default. And, similar to the practice for the loans they retain in their own portfolios, the Enterprises establish reserves for losses on the MBS portfolios they guarantee.[4]

### Defaults and Foreclosures

After a homeowner defaults on a loan that the Enterprises own or guarantee, a loan servicer – typically, a vendor hired to collect mortgage payments, set aside taxes and insurance premiums, forward principal and interest obligations to mortgage owners, and respond to payment defaults – may commence **foreclosure** on behalf of the Enterprises. Foreclosure is designed to recover the proceeds of a defaulted loan through the sale of the mortgaged property. Once the servicer has foreclosed on a loan and taken the title on the property, the Enterprise essentially erases – or **charges off** – the unpaid mortgage balance from its accounting records. Following charge off, if the Enterprise sells the property to a third party, the sales price will offset losses.

**Foreclosure**
The legal process used by a lender to obtain possession of a mortgaged property.

**Charges Off**
An accounting term describing the elimination of an asset, such as a mortgage loan, from a company's books. It does not necessarily imply a reduction in the company's assets, depending on the allowance established for loan losses.

The Enterprises aim to contribute to their loan loss and guarantee portfolio reserves sufficiently to cover these losses. However, with the collapse of the housing market and the ensuing

[4] Fannie Mae uses the term "guaranty fee," whereas Freddie Mac uses the term "management and guarantee fee." This report refers to them both as "guarantee fees."

financial crisis, losses on loans and payment on guarantee obligations vastly exceeded the Enterprises' abilities to cover their losses.

## The Financial Crisis and Its Effect on the Enterprises

### The Crisis

*The Bubble Inflated*

From 2001 until it reached its peak in 2006, the U.S. housing market experienced a rapid increase in real estate values.[5] During this time, prices of single-family homes increased by an average of more than 12% annually. Home price appreciation was accompanied by a rapid increase in mortgage indebtedness. Total mortgage debt outstanding in the U.S. more than doubled, from $5.1 trillion in 2000 to $11.2 trillion in the second quarter of 2008. This swift escalation of home prices and mortgage indebtedness is often referred to as the "housing bubble."

During the housing bubble, Fannie Mae's mortgage-related assets and guarantees increased from $1.3 trillion in 2000 to $3.1 trillion in 2008, or approximately 11% annually. Likewise, Freddie Mac's mortgage-related assets and guarantees increased from $1 trillion in 2000 to $2.2 trillion in 2008, or 11% annually.

*The Bubble Burst*

In 2007, housing prices began to plummet and loan delinquencies and defaults significantly increased. As reflected in Figure 2, after more than doubling over six years, home prices fell by 27% between 2006 and 2008.

[5] Over a longer period, between 1997 and 2006, home values increased 124%.

**Figure 2: Average Single Family Residence Prices, 2000-2011**[6]

## The Impact

The collapse of housing prices had widespread adverse impacts on many sectors of the U.S. economy, particularly for those financial institutions and investors that were heavily concentrated in mortgage financing such as Fannie Mae and Freddie Mac. The Enterprises had grown rapidly with only a thin capital cushion to provide protection against losses. The capital they were required to hold to protect them from losses on their investment portfolio and guarantee obligations met regulatory standards but fell well below capital levels maintained by many large financial institutions.[7] Hence, the Enterprises were ill-prepared for a sharp

[6] Standard and Poor's, *S&P/Case-Shiller Home Price Indices* (Instrument: Case-Shiller 20-City Composite Seasonally Adjusted, Frequency: Monthly) (online at www.standardandpoors.com/indices/sp-case-shiller-home-price-indices/en/us/?indexId=spusa-cashpidff--p-us----).

[7] In 2007, Federal Reserve Board Chairman Ben S. Bernanke said:

> Because of both regulatory requirements and the force of market discipline, banks hold much more capital than GSEs [government-sponsored enterprises] hold. The very largest bank holding companies generally hold equity capital equal to 6 percent or more of assets, and the largest regional banks generally have capital ratios of about 8 percent. (As I am sure you are keenly aware, community banks often have a capital-to-assets ratio exceeding 10 percent.) In comparison, the GSEs hold capital equal to roughly 3.5 percent of assets. The justification for the low capital holdings of GSEs relative to banks is unclear. The largest banks are more diversified than the GSEs; and although banks likely assume greater credit risks, they probably are less subject to interest-rate risk than are GSEs. Moreover, the recent experience of the GSEs suggests that they are subject to at least as much operational risk as the large banks.

Board of Governors of the Federal Reserve System, *Statement of Chairman Ben S. Bernanke* (Mar. 6, 2007) (online at www.federalreserve.gov/newsevents/speech/bernanke20070306a htm).

nationwide decline in housing prices. When housing prices for the United States overall fell by an average of 9% in 2007, the Enterprises' businesses began to come under increasing stress. By early 2008, both institutions were experiencing financial difficulties and, as more and more homeowners became delinquent on their mortgages, their rates of seriously delinquent (i.e., 90 or more days delinquent) owned- or guaranteed-loans rapidly exceeded levels experienced during the preceding decade.

The financial crisis has produced unprecedented losses for the Enterprises. Fannie Mae lost $5 billion in the second half of 2007 and another $4.5 billion through the first half of 2008. Freddie Mac lost $3.7 billion in the second half of 2007 and $1 billion during the first half of 2008. Subsequently, the collapse in the market for MBS in the fall of 2008 resulted in even larger losses for both entities. For the full year 2008, Fannie Mae and Freddie Mac together recorded losses of more than $100 billion ($58.7 billion and $50.1 billion, respectively). To put these losses into perspective, over the 37 year period from 1971 to mid-2008, Fannie Mae and Freddie Mac earned $95 billion, less than they lost in 2008 alone. And, the losses continued; from 2008 through the end of the third quarter of 2011, the Enterprises lost $261 billion.[8] In other words, the amount lost during the conservatorships is more than twice as large as the cumulative net income that the Enterprises reported as public companies.[9]

## The Conservatorships

In July 2008, HERA was enacted. Among other things, HERA strengthened the regulator's ability to place the Enterprises in conservatorships and authorized it to place them into receiverships.[10] Additionally, HERA empowered Treasury to provide financial assistance to Fannie Mae and Freddie Mac through the end of 2009.

---

[8] Federal Housing Finance Agency, *Conservator's Report on the Enterprises' Financial Condition, Third Quarter 2011*, at 9 (online at http://www.fhfa.gov/webfiles/22855/Conservator'sReport3Q2011F122111F.pdf) (accessed Apr. 16, 2012). This is a comprehensive income figure (upon which Treasury investments are calculated); net income figures reported by the Enterprises may differ.

As depicted in Figure 5, the Enterprises' cumulative losses exceed the amount of Treasury's investment by $78 billion. When the conservatorships commenced, the Enterprises had $78 billion in capital available, and this capital partially offset losses and the need for additional Treasury investment.

[9] Federal Housing Finance Agency, *FHFA Report to Congress 2010*, at 114, 131 (online at www fhfa.gov/webfiles/21570/FHFA2010RepToCongress61311.pdf) (accessed Feb. 29, 2012).

[10] Under the previous statute governing federal oversight of the Enterprises, the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, Public Law No. 102-550, the Enterprises' regulator, Office of Federal Housing Enterprise Oversight, had the authority to place an Enterprise in conservatorship, but not receivership.

On September 6, 2008, Fannie Mae and Freddie Mac entered conservatorships overseen by FHFA.[11] Among the key reasons FHFA cited for taking this action were concerns about the financial conditions of the Enterprises and their ability to raise capital and to continue funding themselves; FHFA also noted "the critical importance each company has in supporting the residential mortgage market in this country."[12]

At the same time, and in coordination with FHFA, Treasury exercised its authority under HERA to provide support to the Enterprises to ensure their solvency. In taking this action, former Treasury Secretary Henry Paulson stated that Treasury had concluded – based on a thorough review of the financial conditions of the Enterprises, their projected abilities to withstand difficult market conditions, and the need to provide stability to unsettled financial markets – that it was necessary both to place them in conservatorships and to set up a process for providing financial support to them, as needed.[13]

Treasury's financial support has been in the form of purchases of senior preferred stock issued by the Enterprises in accordance with Senior Preferred Stock Purchase Agreements (PSPAs). Under the terms of the PSPAs, whenever an Enterprise's liabilities exceed its assets (as determined using **Generally Accepted Accounting Principles (GAAP)**), Treasury provides sufficient cash to eliminate that deficit in exchange for an increase in the value of the senior preferred stock.[14] The PSPAs thus provide the Enterprises a financial backstop.[15] Since establishing the conservatorships, Treasury has made equity investments in the Enterprises almost every quarter and, by the end of 2011, the cumulative amount of such taxpayer investments stood at $185 billion, as shown in Figure 3.[16]

**Generally Accepted Accounting Principles (GAAP)**
A set of rules that is agreed upon by industry boards as common accounting practices.

---

[11] For a more complete discussion of the impact of placing the Enterprises in conservatorships, see *FHFA-OIG's Current Assessment of FHFA's Conservatorships of Fannie Mae and Freddie Mac* (WPR-2012-001, March 28, 2012) (available at www.fhfaoig.gov/Content/Files/WPR-2012-001.pdf).

[12] Federal Housing Finance Agency, *Statement of FHFA Director James B. Lockhart* (Sept. 7, 2008) (online at www.treasury.gov/press-center/press-releases/Documents/fhfa_statement_090708hp1128.pdf).

[13] U.S. Department of the Treasury, *Statement by Secretary Henry M. Paulson, Jr*. (Sept. 7, 2008) (online at www.treasury.gov/press-center/press-releases/Pages/hp1129.aspx).

[14] Federal Housing Finance Agency, *Mortgage Market Note U.S. Treasury Support for Fannie Mae and Freddie Mac*, at 3 (online at www.fhfa.gov/webfiles/15362/MMNote_10-1_revision_of_MMN_09-1A_01192010.pdf) (accessed on Feb. 29, 2012).

[15] *Id*.

[16] This figure, $185 billon, includes the $2 billion initial commitment fee. Treasury was issued stock representing this fee as payment for agreeing to invest in the Enterprises as required.

Initially, the Enterprises were to receive from Treasury no more than $200 billion. The PSPAs were subsequently revised to increase this amount to $400 billion. The PSPAs were amended a third time to increase the investment ceiling to $400 billion over the amount actually drawn as of December 31, 2012 (less any positive equity – which is unlikely – at that date). To illustrate, given the investment of $185 billion at the end of 2011, if no more cash were drawn before December 31, 2012, (and stockholder equity is zero or less on that date), then the ceiling will be $585 billion ($185 billion plus $400 billion).

**Figure 3: Federal Government Support Since Conservatorship**[17]

As a condition of receiving financial support under the PSPAs, the Enterprises agreed to pay Treasury quarterly dividends. The dividend amounts are based on a 10% annual rate on Treasury's outstanding investment.

The Enterprises' dividend obligations, which are exacerbated by the 10% annual rate, are so large that they have yet to earn enough to pay them annually. Consequently, Treasury has had to advance additional sums to the Enterprises to pay dividends. As of the end of 2011, Treasury's investment in the Enterprises, excluding the amount needed to fund the dividend payments, is

[17] Federal Housing Finance Agency, *Data as of January 2, 2012 on Treasury and Federal Reserve Purchase Programs for GSE and Mortgage-Related Securities*, at Table 1 (online at www.fhfa.gov/webfiles/23193/TSYSupport1312012.pdf) (accessed Mar. 9, 2012); and Federal Housing Finance Agency, *Mortgage Market Note, US Treasury Support for Fannie Mae and Freddie Mac*, page 3 (January 20, 2010).