# Tab 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| PERRY CAPITAL LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>JACOB J. LEW, *et al.*,<br><br>                    Defendants. | Civil Action No. 13-cv-1025 (RLW) |
| FAIRHOLME FUNDS, INC., *et al.*<br><br>                    Plaintiffs,<br><br>          v.<br><br>FEDERAL HOUSING FINANCE AGENCY,<br>*et al.*,<br><br>                    Defendants. | Civil Action No. 13-cv-1053 (RLW) |
| ARROWOOD INDEMNITY COMPANY,<br>*et al.*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>FEDERAL NATIONAL MORTGAGE<br>ASSOCIATION, *et al.*,<br><br>                    Defendants. | Civil Action No. 13-cv-1439 (RLW) |

## DECLARATION OF MARIO UGOLETTI

I, Mario Ugoletti, hereby declare, based on personal knowledge of the facts, as follows:

1.      I am Special Advisor to the Office of the Director of the Federal Housing Finance Agency ("FHFA"), a role I assumed in September 2009. As Special Advisor, my responsibilities include advising FHFA's Acting Director Edward DeMarco concerning the Senior Preferred Stock Purchase Agreements ("PSPAs"), described *infra*. Additionally, I serve as the primary liaison with Treasury concerning the PSPAs and any amendments to the PSPAs.

2.      I was employed at Treasury from 1995 to 2009, serving as Director of the Office of Financial Institutions Policy from 2004-2009. In that capacity, I participated in the creation and implementation of the PSPAs.

3.      FHFA is an independent federal agency with regulatory authority over the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") (together, the "Enterprises") and the twelve Federal Home Loan Banks ("Banks"). 12 U.S.C. § 4511.

4.      On September 6, 2008, FHFA's Director appointed FHFA as Conservator of the Enterprises, and on September 7, 2008 FHFA as Conservator of the Enterprises entered into two materially identical Senior Preferred Stock Purchase Agreements (together, the "PSPAs") with the United States Treasury ("Treasury")—one for Fannie Mae and one for Freddie Mac. The Amended and Restated Agreements dated September 26, 2008 and subsequent amendments are currently available at http://www.fhfa.gov/Default.aspx?Page=364.

5.      The PSPAs were a last resort after it became apparent that no infusions of capital from the private sector were forthcoming to save the Enterprises. *See Oversight Hearing to Examine Recent Treasury and FHFA Actions Regarding the Housing GSEs Before the H. Comm. on Financial Services*, 110th Cong., at 5 (Sep. 25, 2008) (statement of James B. Lockhart III,

Director, Federal Housing Finance Agency), currently *available at*

http://archives.financialservices.house.gov/hearing110/lockhart092508.pdf ("After substantial

effort and communication with market participants, each company reported to FHFA and to

Treasury that it was unable to access capital markets to bolster its capital position without

Treasury financing. FHFA's and Treasury's own discussions with investment bankers and

investors corroborated this conclusion."). The PSPAs provided the market with assurances that

Treasury would provide a backstop to the Enterprises. Absent the commitments of Treasury, the

Enterprises would have collapsed. *See id.* at 5-6 ("In the absence of access to new capital, the only

alternative left to the firms was to cease new business and shed assets in a weak market. That would

have been disastrous for the mortgage markets as mortgage rates would have continued to move

higher and, in turn, disastrous for the Enterprises as the prices of their securities would have fallen

and credit losses would have increased."); Timothy F. Geithner, Secretary, U.S. Dep't of the

Treasury, Written Testimony Before the H. Comm. on Financial Services (Mar. 23, 2010),

currently *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg603.aspx ("In

2007, the GSEs reported combined losses of over $5 billion . . . The GSEs ultimately reported

combined 2008 losses in excess of $108 billion. . . . Both companies were severely

undercapitalized and would not have been able to meet their obligations without the intervention

and financial support of the government."). With the PSPAs and the market assurance they

provided, the Enterprises were able to remain in operation.

6.     The PSPAs provided that the Enterprises would draw funds from Treasury against

the Treasury commitment if the Enterprises exhausted all of their stockholder equity and had a

negative net worth (defined as liabilities exceeding assets). If Enterprise liabilities exceeded

assets, the provision for mandatory receivership in the Housing and Economic Recovery Act of

2008 ("HERA") would be triggered. The PSPAs were designed so that the Enterprises could

draw funds from Treasury in amounts necessary to cure their negative net worth and bring their

capital to zero.  By the end of 2008, all shareholder equity had been exhausted and the

Enterprises drew on the Treasury commitment to avoid mandatory receivership.  *See* FHFA Data

as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE &

Mortgage-Related Securities at 2, currently *available at*

http://www.fhfa.gov/webfiles/25784/TSYSupport%202013-11-13.pdf (Freddie Mac draw of

$13.8 billion for third quarter 2008; Fannie Mae draw of $15.2 billion for fourth quarter 2008).

     7.     The PSPAs gave Treasury an expansive bundle of rights and entitlements in

exchange for the lifeline that Treasury provided, without which the Enterprises would have gone

out of business.  For example, Treasury received warrants to acquire 79.9% of the common stock

of the Enterprises for a nominal payment.  In addition, under the PSPAs, Treasury obtained

Senior Preferred Stock that is senior in priority over all other series of preferred stock.  The

Treasury Senior Preferred Stock in each Enterprise had an initial face value of $1 billion, which

increases by any amount that the Enterprises draw from Treasury under the Treasury

Commitment.  Further, the Treasury Senior Preferred Stock has a liquidation preference so that

Treasury has priority over any other preferred or common shareholders in the event of a

liquidation — that is, Treasury is entitled to the value of its Senior Preferred Stock (face value

plus any amounts drawn from Treasury by the Enterprises, without reduction for dividends or

other amounts that the Enterprises might pay to Treasury) before any other shareholders —

preferred or common — are paid anything in liquidation.

     8.     The Treasury Senior Preferred Stock also included payment obligations from the

Enterprises to Treasury, commensurate with the enormous risks and financial commitments that

Treasury assumed.  The Enterprises were obligated to pay a 10% annual dividend together with a

Periodic Commitment Fee ("PCF") that was "intended to fully compensate [Treasury] for the support provided by the ongoing Commitment." Amended and Restated Agreements, § 3.2(b) (Sept. 26, 2008). The PSPAs provided that the amount of the PCF to be imposed beginning January 2010 "shall be determined with reference to the market value of the Commitment as then in effect." *Id.*

9.      The PSPA gave Treasury the right, in its sole discretion, to waive the PCF for a year at a time "based on adverse conditions in the United States mortgage market." Treasury exercised this right to waive the PCF for 2010 and 2011, years in which the Enterprises had insufficient funds to pay even the 10% dividend, let alone an additional PCF, stating that "the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer." Periodic Commitment Fee Waiver Letters from Dept. of Treasury to FHFA (Dec. 29, 2010; Mar. 31, 2011; Jun. 30, 2011; Sept. 30, 2011; Dec. 21, 2011). It was clear by this time that, given the risks of the Enterprises and the enormity of the Treasury commitment, the value of the PCF was incalculably large.

10.      Under the Second Amendment to the PSPAs (executed December 24, 2009), Treasury was obligated to commit any amount of funds necessary to maintain the Enterprises' positive net worth through December 31, 2012, subject to an initial cap of $200 billion for each of the Enterprises plus the amount of draws between January 1, 2010 and December 31, 2012. As of January 1, 2013, however, Treasury's financial commitment cap became fixed: the amount

remaining available to Fannie Mae under the cap was $117.6 billion, and the amount remaining available to Freddie Mac under the cap was $140.5 billion.[1]

11.   By late 2011, analysts and key stakeholders, including institutional and Asian investors in the Enterprises' debt and mortgage backed securities (MBS), began expressing concerns about the adequacy of Treasury's financial commitment to the Enterprises after January 1, 2013, when the cap on Treasury's funding commitment would become fixed.

12.   The principal driver of these concerns about the adequacy of Treasury's capital commitment were questions about the Enterprises' ability to pay the 10% annual dividend to Treasury without having to draw additional funds from Treasury, thereby eating away at the amount remaining available under the capped Treasury commitment.  From the outset of the PSPAs, the Enterprises could not at times generate enough income to make these dividend payments.

13.   The Enterprises drew funds from Treasury to pay the required 10% dividend back to Treasury.  Of the $188 billion the Enterprises drew from Treasury from the outset of the PSPAs (September 2008) to the execution of the Third Amendment (August 2012), $45.7 billion was drawn solely to pay the 10% annual dividend back to Treasury.  *See* FHFA, Data as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE and

---

[1]   Under the Second Amendment to the PSPAs, Treasury committed to provide each Enterprise the greater of: (i) $200 billion or (ii) $200 billion plus the Enterprise's cumulative draws for 2010, 2011, and 2012, less the Enterprise's positive net worth, if any, on December 31, 2012.  Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, at 3.

For Fannie Mae, alternative (ii) provided the greater amount: $200 billion + $40.9 billion (cumulative draws for 2010-2012) − $7.2 billion (positive net worth on December 31, 2012) − $116.1 billion (total draws from 2008-2012) = $117.6 billion.

For Freddie Mac, alternative (ii) provided the greater amount:  $200 billion + $20.6 billion (cumulative draws for 2010-2012) − $8.8 billion (positive net worth on December 31, 2012) − $71.3 (total draws from 2008-2012) = $140.5 billion.

FHFA 0006

Mortgage-Related Securities at 2, 3.  Additionally, each time the Enterprises drew funds to pay

the 10% dividend, the total amount of the Treasury draw increased, in turn increasing the amount

of the next 10% dividend payment.

14.     By mid-2012, the amount of the annual 10% dividend had grown so large—$11.7

billion for Fannie Mae and $7.2 billion for Freddie Mac—that it appeared unlikely that either of

the Enterprises would be able to meet that amount consistently without drawing additional funds

from Treasury.  *See* Freddie Mac, Quarterly Report (Form 10-Q) at 10, 85 (May 3, 2012),

currently *available at* http://www.freddiemac.com/investors/sec_filings/index.html ("Over time,

our dividend obligation to Treasury will increasingly drive future draws.  Although we may

experience period-to-period variability in earnings and comprehensive income, it is unlikely that

we will generate net income or comprehensive income in excess of our annual dividends payable

to Treasury over the long term."); Freddie Mac, Quarterly Report (Form 10-Q) at 10, 92 (Aug. 7,

2012), currently *available at* http://www.freddiemac.com/investors/sec_filings/index.html

(same); Fannie Mae, Quarterly Report (Form 10-Q) at 11, 81 (May 9, 2012), currently *available*

*at* http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2012/q12012.pdf

("Although we may experience period-to-period volatility in earnings and comprehensive

income, we do not expect to generate net income or comprehensive income in excess of our

annual dividend obligation to Treasury over the long term."); Fannie Mae, Quarterly Report

(Form 10-Q) at 12-13, 83 (Aug. 8, 2012), currently *available at*

http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2012/q22012.pdf

(same).  Because the cap on the Treasury commitment became fixed on January 1, 2013, each

dollar drawn from Treasury merely to repay the Treasury dividend was one less dollar available

to the Enterprises to draw in the event the Enterprise suffered losses due, for example, to a decline in the housing market or broader economic turbulence.

15.     Market forecasts—which FHFA monitored—predicted that the Enterprises' ongoing payment of the 10% dividend would completely exhaust Treasury's funding commitment within ten years, leading to potential downgrades in the Enterprises' credit ratings. Moody's rating service opined that the 10% dividend payments would "eliminate Fannie Mae's contingent capital by 2019 and Freddie Mac's by 2022 . . . [even] assum[ing] that the GSEs are able to fully offset credit losses, which we believe is unlikely." Moody's, Sector Comment, "Plan To Raise Fannie Mae and Freddie Mac Guarantee Fees Raises Question of Support," at 2 (Sept. 26, 2011). Moody's stated that this "would be credit negative and prompt a review of [the Enterprises'] Aaa ratings." *Id*. Likewise, Deutsche Bank observed that "diminishing Treasury support raises the risk that the agencies one day might face challenges in covering MBS losses" and that such a risk "becomes greater in a housing market catastrophe, such as the one that started in the US after 2006." Deutsche Bank, *The Path of US Support for Fannie Mae, Freddie Mac*, THE OUTLOOK, Mar. 14, 2012, at 6.

16.     FHFA shared the concerns that the 10% annual dividend to Treasury would reduce the amount of the Treasury commitment starting in 2013. Treasury also generated and provided certain forecasts to FHFA that were similar to those prepared by market participants.

17.     These concerns about the adequacy of Treasury's financial commitment undermined the purpose of the PSPAs to express financial support to holders of Enterprise debt (*i.e.*, bondholders) and mortgage backed securities. *See* FHFA Mortgage Market Note (Dec. 5, 2008), currently *available at* http://www.fhfa.gov/webfiles/1241/mmnote084.pdf. The strength of that support depends upon the Enterprises having a sufficiently large pool of available funds

from Treasury that will permit the Enterprises to continue to operate under adverse market conditions that may arise in the coming years.

18.     To resolve these concerns, FHFA and Treasury agreed on the provisions that were incorporated into the Third Amendment, executed on August 17, 2012. The Third Amendment (1) eliminated the 10% annual dividend, (2) added a quarterly variable dividend in the amount (if any) of each Enterprises' positive net worth (above net worth values that were specified in the Third Amendment), and (3) suspended the PCF for as long as the quarterly variable dividend is in effect. The new dividend structure eliminated the risk that borrowings to make fixed dividend payments would lead to the exhaustion of the Treasury commitment.

19.     These changes in structure did not change the underlying economics of the PSPAs. It was my belief at this time, given the size and importance of the Treasury commitment, that through the liquidation preference, fixed dividends, and the market value of the PCF, Treasury would receive as much from the Enterprises under the Second Amendment as it would under the Third Amendment. Thus, the intention of the Third Amendment was not to increase compensation to Treasury — the Amendment would not do that — but to protect the Enterprises from the erosion of the Treasury commitment that was threatened by the fixed dividend. The Third Amendment was therefore consistent with the intent of the original PSPAs to (1) fully compensate Treasury for the value of its financial support, without which the Enterprises would have been forced into receivership, and (2) protect the Enterprises and the national housing market.

20.     At the time of the negotiation and execution of the Third Amendment, the Conservator and the Enterprises had not yet begun to discuss whether or when the Enterprises would be able to recognize any value to their deferred tax assets. Thus, neither the Conservator

nor Treasury envisioned at the time of the Third Amendment that Fannie Mae's valuation allowance on its deferred tax assets would be reversed in early 2013, resulting in a sudden and substantial increase in Fannie Mae's net worth, which was paid to Treasury in mid-2013 by virtue of the net worth dividend.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this \_17\_ day of \_DECEMBER\_ 2013 at Washington, D.C.

By: _____
MARIO UGOLETTI

*Special Advisor to the Office of the Director,*
*Federal Housing Finance Agency*

10

# Tab 2

# FEDERAL HOUSING FINANCE AGENCY

 

## STATEMENT

**Contact:**  Corinne Russell   (202) 414-6921
Stefanie Mullin   (202) 414-6376

For Immediate Release
September 7, 2008

## STATEMENT OF FHFA DIRECTOR JAMES B. LOCKHART

Good Morning

Fannie Mae and Freddie Mac share the critical mission of providing stability and liquidity to the housing market.  Between them, the Enterprises have $5.4 trillion of guaranteed mortgage-backed securities (MBS) and debt outstanding, which is equal to the publicly held debt of the United States.  Their market share of all new mortgages reached over 80 percent earlier this year, but it is now falling. During the turmoil last year, they played a very important role in providing liquidity to the conforming mortgage market.  That has required a very careful and delicate balance of mission and safety and soundness.  A key component of this balance has been their ability to raise and maintain capital.  Given recent market conditions, the

1

balance has been lost.  Unfortunately, as house prices, earnings and capital have continued to deteriorate, their ability to fulfill their mission has deteriorated.  In particular, the capacity of their capital to absorb further losses while supporting new business activity is in doubt.

Today's action addresses safety and soundness concerns.  FHFA's rating system is called GSE Enterprise Risk or G-Seer.  It stands for Governance, Solvency, Earnings and Enterprise Risk which includes credit, market and operational risk. There are pervasive weaknesses across the board, which have been getting worse in this market.

Over the last three years OFHEO, and now FHFA, have worked hard to encourage the Enterprises to rectify their accounting, systems, controls and risk management issues.  They have made good progress in many areas, but market conditions have overwhelmed that progress.

The result has been that they have been unable to provide needed stability to the market.   They also find themselves unable to meet their affordable housing mission. Rather than letting these conditions fester and worsen and put our markets in jeopardy, FHFA, after painstaking review, has decided to take action now.

2

Key events over the past six months have demonstrated the increasing challenge faced by the companies in striving to balance mission and safety and soundness, and the ultimate disruption of that balance that led to today's announcements.  In the first few months of this year, the secondary market showed significant deterioration, with buyers demanding much higher prices for mortgage backed securities.

In February, in recognition of the remediation progress in financial reporting, we removed the portfolio caps on each company, but they did not have the capital to use that flexibility.

In March, we announced with the Enterprises an initiative to increase mortgage market liquidity and market confidence.  We reduced the OFHEO-directed capital requirements in return for their commitments to raise significant capital and to maintain overall capital levels well in excess of requirements.

In April, we released our Annual Report to Congress, identifying each company as a significant supervisory concern and noting, in particular, the deteriorating mortgage credit environment and the risks it posed to the companies.

3

In May OFHEO lifted its 2006 Consent Order with Fannie Mae after the company completed the terms of that order.  Subsequently, Fannie Mae successfully raised $7.4 billion of new capital, but Freddie Mac never completed the capital raise promised in March.

Since then credit conditions in the mortgage market continued to deteriorate, with home prices continuing to decline and mortgage delinquency rates reaching alarming levels.  FHFA intensified its reviews of each company's capital planning and capital position, their earnings forecasts and the effect of falling house prices and increasing delinquencies on the credit quality of their mortgage book.

In getting to today, the supervision team has spent countless hours reviewing with each company various forecasts, stress tests, and projections, and has evaluated the performance of their internal models in these analyses.  We have had many meetings with each company's management teams, and have had frank exchanges regarding loss projections, asset valuations, and capital adequacy.  More recently, we have gone the extra step of inviting the Federal Reserve and the OCC to have some of their senior mortgage credit experts join our team in these assessments.

4

The conclusions we reach today, while our own, have had the added benefit of their insight and perspective.

After this exhaustive review, I have determined that the companies cannot continue to operate safely and soundly and fulfill their critical public mission, without significant action to address our concerns, which are:

- the safety and soundness issues I mentioned, including current capitalization;

- current market conditions;

- the financial performance and condition of each company;

- the inability of the companies to fund themselves according to normal practices and prices; and

- the critical importance each company has in supporting the residential mortgage market in this country,

Therefore, in order to restore the balance between safety and soundness and mission, FHFA has placed Fannie Mae and Freddie Mac into conservatorship. That is a statutory process designed to stabilize a troubled institution with the

5

objective of returning the entities to normal business operations.  FHFA will act as the conservator to operate the Enterprises until they are stabilized.

The Boards of both companies consented yesterday to the conservatorship.  I appreciate the cooperation we have received from the boards and the management of both Enterprises.  These individuals did not create the inherent conflict and flawed business model embedded in the Enterprises' structure.  I thank the CEOs for their service in these difficult times.

The goal of these actions is to help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their mission, and mitigate the systemic risk that has contributed directly to the instability in the current market.  The lack of confidence has resulted in continuing spread widening of their MBS, which means that virtually none of the large drop in interest rates over the past year has been passed on to the mortgage markets.  On top of that, Freddie Mac and Fannie Mae, in order to try to build capital, have continued to raise prices and tighten credit standards.

FHFA has not undertaken this action lightly.  We have consulted with the Chairman of the Board of Governors of the Federal Reserve System, Ben

6

Bernanke, who was appointed a consultant to FHFA under the new legislation. We have also consulted with the Secretary of the Treasury, not only as an FHFA Oversight Board member, but also in his duties under the law to provide financing to the GSEs. They both concurred with me that conservatorship needed to be undertaken now.

There are several key components of this conservatorship:

First, Monday morning the businesses will open as normal, only with stronger backing for the holders of MBS, senior debt and subordinated debt.

Second, the Enterprises will be allowed to grow their guarantee MBS books without limits and continue to purchase replacement securities for their portfolios, about $20 billion per month without capital constraints.

Third, as the conservator, FHFA will assume the power of the Board and management.

Fourth, the present CEOs will be leaving, but we have asked them to stay on to help with the transition.

7

Fifth, I am announcing today I have selected Herb Allison to be the new CEO of Fannie Mae and David Moffett the CEO of Freddie Mac.  Herb has been the Vice Chairman of Merrill Lynch and for the last eight years chairman of TIAA-CREF. David was the Vice Chairman and CFO of US Bancorp.   I appreciate the willingness of these two men to take on these tough jobs during these challenging times.  Their compensation will be significantly lower than the outgoing CEOs. They will be joined by equally strong non-executive chairmen.

Sixth, at this time any other management action will be very limited.  In fact, the new CEOs have agreed with me that it is very important to work with the current management teams and employees to encourage them to stay and to continue to make important improvements to the Enterprises.

Seventh, in order to conserve over $2 billion in capital every year, the common stock and preferred stock dividends will be eliminated, but the common and all preferred stocks will continue to remain outstanding.  Subordinated debt interest and principal payments will continue to be made.

8

Eighth, all political activities -- including all lobbying -- will be halted immediately.  We will review the charitable activities.

Lastly and very importantly, there will be the financing and investing relationship with the U.S. Treasury, which Secretary Paulson will be discussing.  We believe that these facilities will provide the critically needed support to Freddie Mac and Fannie Mae and importantly the liquidity of the mortgage market.

One of the three facilities he will be mentioning is a secured liquidity facility which will be not only for Fannie Mae and Freddie Mac, but also for the 12 Federal Home Loan Banks that FHFA also regulates.  The Federal Home Loan Banks have performed remarkably well over the last year as they have a different business model than Fannie Mae and Freddie Mac and a different capital structure that grows as their lending activity grows.  They are joint and severally liable for the Bank System's debt obligations and all but one of the 12 are profitable. Therefore, it is very unlikely that they will use the facility.

During the conservatorship period, FHFA will continue to work expeditiously on the many regulations needed to implement the new law.  Some of the key regulations will be minimum capital standards, prudential safety and soundness

9

standards and portfolio limits.  It is critical to complete these regulations so that any new investor will understand the investment proposition.

This decision was a tough one for the FHFA team as they have worked so hard to help the Enterprises remain strong suppliers of support to the secondary mortgage markets.  Unfortunately, the antiquated capital requirements and the turmoil in housing markets over-whelmed all the good and hard work put in by the FHFA teams and the Enterprises' managers and employees.  Conservatorship will give the Enterprises the time to restore the balances between safety and soundness and provide affordable housing and stability and liquidity to the mortgage markets.   I want to thank the FHFA employees for their work during this intense regulatory process.  They represent the best in public service.  I would also like to thank the employees of Fannie Mae and Freddie Mac for all their hard work.  Working together we can finish the job of restoring confidence in the Enterprises and with the new legislation build a stronger and safer future for the mortgage markets, homeowners and renters in America.

Thank you and I will now turn it back to Secretary Paulson.

10

# Tab 3

.

## U.S. DEPARTMENT OF THE TREASURY

# Press Center

### Statement by Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers

9/7/2008
hp-1129

**Washington, DC--** Good morning. I'm joined here by Jim Lockhart, Director of the new independent regulator, the Federal Housing Finance Agency, FHFA.

In July, Congress granted the Treasury, the Federal Reserve and FHFA new authorities with respect to the GSEs, Fannie Mae and Freddie Mac. Since that time, we have closely monitored financial market and business conditions and have analyzed in great detail the current financial condition of the GSEs – including the ability of the GSEs to weather a variety of market conditions going forward. As a result of this work, we have determined that it is necessary to take action.

Since this difficult period for the GSEs began, I have clearly stated three critical objectives: providing stability to financial markets, supporting the availability of mortgage finance, and protecting taxpayers – both by minimizing the near term costs to the taxpayer and by setting policymakers on a course to resolve the systemic risk created by the inherent conflict in the GSE structure.

Based on what we have learned about these institutions over the last four weeks – including what we learned about their capital requirements – and given the condition of financial markets today, I concluded that it would not have been in the best interest of the taxpayers for Treasury to simply make an equity investment in these enterprises in their current form.

The four steps we are announcing today are the result of detailed and thorough collaboration between FHFA, the U.S. Treasury, and the Federal Reserve.

We examined all options available, and determined that this comprehensive and complementary set of actions best meets our three objectives of market stability, mortgage availability and taxpayer protection.

Throughout this process we have been in close communication with the GSEs themselves. I have also consulted with Members of Congress from both parties and I appreciate their support as FHFA, the Federal Reserve and the Treasury have moved to address this difficult issue.

Before I turn to Jim to discuss the action he is taking today, let me make clear that these two institutions are unique. They operate solely in the mortgage market and are therefore more exposed than other financial institutions to the housing correction. Their statutory capital requirements are thin and poorly defined as compared to other institutions. Nothing about our actions today in any way reflects a changed view of the housing correction or of the strength of other U.S. financial institutions.

I support the Director's decision as necessary and appropriate and had advised him that conservatorship was the only form in which I would commit taxpayer money to the GSEs.

I appreciate the productive cooperation we have received from the boards and the management of both GSEs. I attribute the need for today's action primarily to the inherent conflict and flawed business model embedded in the GSE structure, and to the ongoing housing correction. GSE managements and their Boards are responsible for neither. New CEOs supported by new non-executive Chairmen have taken over management of the enterprises, and we hope and expect that the vast majority of key professionals will remain in their jobs. I am particularly pleased that the departing CEOs, Dan Mudd and Dick Syron, have agreed to stay on for a period to help with the transition.

I have long said that the housing correction poses the biggest risk to our economy. It is a drag on our economic growth, and at the heart of the turmoil and stress for our financial markets and financial institutions. Our economy and our markets will not recover until the bulk of this housing correction is behind us. Fannie Mae and Freddie Mac

are critical to turning the corner on housing. Therefore, the primary mission of these enterprises now will be to proactively work to increase the availability of mortgage finance, including by examining the guaranty fee structure with an eye toward mortgage affordability.

To promote stability in the secondary mortgage market and lower the cost of funding, the GSEs will modestly increase their MBS portfolios through the end of 2009. Then, to address systemic risk, in 2010 their portfolios will begin to be gradually reduced at the rate of 10 percent per year, largely through natural run off, eventually stabilizing at a lower, less risky size.

Treasury has taken three additional steps to complement FHFA's decision to place both enterprises in conservatorship. First, Treasury and FHFA have established Preferred Stock Purchase Agreements, contractual agreements between the Treasury and the conserved entities. Under these agreements, Treasury will ensure that each company maintains a positive net worth. These agreements support market stability by providing additional security and clarity to GSE debt holders – senior and subordinated – and support mortgage availability by providing additional confidence to investors in GSE mortgage backed securities. This commitment will eliminate any mandatory triggering of receivership and will ensure that the conserved entities have the ability to fulfill their financial obligations. It is more efficient than a one-time equity injection, because it will be used only as needed and on terms that Treasury has set. With this agreement, Treasury receives senior preferred equity shares and warrants that protect taxpayers. Additionally, under the terms of the agreement, common and preferred shareholders bear losses ahead of the new government senior preferred shares.

These Preferred Stock Purchase Agreements were made necessary by the ambiguities in the GSE Congressional charters, which have been perceived to indicate government support for agency debt and guaranteed MBS. Our nation has tolerated these ambiguities for too long, and as a result GSE debt and MBS are held by central banks and investors throughout the United States and around the world who believe them to be virtually risk-free. Because the U.S. Government created these ambiguities, we have a responsibility to both avert and ultimately address the systemic risk now posed by the scale and breadth of the holdings of GSE debt and MBS.

Market discipline is best served when shareholders bear both the risk and the reward of their investment. While conservatorship does not eliminate the common stock, it does place common shareholders last in terms of claims on the assets of the enterprise.

Similarly, conservatorship does not eliminate the outstanding preferred stock, but does place preferred shareholders second, after the common shareholders, in absorbing losses. The federal banking agencies are assessing the exposures of banks and thrifts to Fannie Mae and Freddie Mac. The agencies believe that, while many institutions hold common or preferred shares of these two GSEs, only a limited number of smaller institutions have holdings that are significant compared to their capital.

The agencies encourage depository institutions to contact their primary federal regulator if they believe that losses on their holdings of Fannie Mae or Freddie Mac common or preferred shares, whether realized or unrealized, are likely to reduce their regulatory capital below "well capitalized." The banking agencies are prepared to work with the affected institutions to develop capital restoration plans consistent with the capital regulations.

Preferred stock investors should recognize that the GSEs are unlike any other financial institutions and consequently GSE preferred stocks are not a good proxy for financial institution preferred stock more broadly. By stabilizing the GSEs so they can better perform their mission, today's action should accelerate stabilization in the housing market, ultimately benefiting financial institutions. The broader market for preferred stock issuance should continue to remain available for well-capitalized institutions.

The second step Treasury is taking today is the establishment of a new secured lending credit facility which will be available to Fannie Mae, Freddie Mac, and the Federal Home Loan Banks. Given the combination of actions we are taking, including the Preferred Share Purchase Agreements, we expect the GSEs to be in a stronger position to fund their regular business activities in the capital markets. This facility is intended to serve as an ultimate liquidity backstop, in essence, implementing the temporary liquidity backstop authority granted by Congress in July, and will be available until those authorities expire in December 2009.

Finally, to further support the availability of mortgage financing for millions of Americans, Treasury is initiating a temporary program to purchase GSE MBS. During this ongoing housing correction, the GSE portfolios have been constrained, both by their own capital situation and by regulatory efforts to address systemic risk. As the GSEs have grappled with their difficulties, we've seen mortgage rate spreads to Treasuries widen, making mortgages less affordable for homebuyers. While the GSEs are expected to moderately increase the size of their portfolios over the next 15 months through prudent mortgage purchases, complementary government efforts can aid mortgage affordability. Treasury will begin this new program later this month, investing in new GSE MBS. Additional purchases will be made as deemed appropriate. Given that Treasury can hold these securities to maturity, the spreads between Treasury issuances and GSE MBS indicate that there is no reason to expect

taxpayer losses from this program, and, in fact, it could produce gains. This program will also expire with the Treasury's temporary authorities in December 2009.

Together, this four part program is the best means of protecting our markets and the taxpayers from the systemic risk posed by the current financial condition of the GSEs. Because the GSEs are in conservatorship, they will no longer be managed with a strategy to maximize common shareholder returns, a strategy which historically encouraged risk-taking. The Preferred Stock Purchase Agreements minimize current cash outlays, and give taxpayers a large stake in the future value of these entities. In the end, the ultimate cost to the taxpayer will depend on the business results of the GSEs going forward. To that end, the steps we have taken to support the GSE debt and to support the mortgage market will together improve the housing market, the US economy and the GSEs' business outlook.

Through the four actions we have taken today, FHFA and Treasury have acted on the responsibilities we have to protect the stability of the financial markets, including the mortgage market, and to protect the taxpayer to the maximum extent possible.

And let me make clear what today's actions mean for Americans and their families. Fannie Mae and Freddie Mac are so large and so interwoven in our financial system that a failure of either of them would cause great turmoil in our financial markets here at home and around the globe. This turmoil would directly and negatively impact household wealth: from family budgets, to home values, to savings for college and retirement. A failure would affect the ability of Americans to get home loans, auto loans and other consumer credit and business finance. And a failure would be harmful to economic growth and job creation. That is why we have taken these actions today.

While we expect these four steps to provide greater stability and certainty to market participants and provide long-term clarity to investors in GSE debt and MBS securities, our collective work is not complete. At the end of next year, the Treasury temporary authorities will expire, the GSE portfolios will begin to gradually run off, and the GSEs will begin to pay the government a fee to compensate taxpayers for the on-going support provided by the Preferred Stock Purchase Agreements. Together, these factors should give momentum and urgency to the reform cause. Policymakers must view this next period as a "time out" where we have stabilized the GSEs while we decide their future role and structure.

Because the GSEs are Congressionally-chartered, only Congress can address the inherent conflict of attempting to serve both shareholders and a public mission. The new Congress and the next Administration must decide what role government in general, and these entities in particular, should play in the housing market. There is a consensus today that these enterprises pose a systemic risk and they cannot continue in their current form. Government support needs to be either explicit or non-existent, and structured to resolve the conflict between public and private purposes. And policymakers must address the issue of systemic risk. I recognize that there are strong differences of opinion over the role of government in supporting housing, but under any course policymakers choose, there are ways to structure these entities in order to address market stability in the transition and limit systemic risk and conflict of purposes for the long-term. We will make a grave error if we don't use this time out to permanently address the structural issues presented by the GSEs.

In the weeks to come, I will describe my views on long term reform. I look forward to engaging in that timely and necessary debate.

-30-

**REPORTS**

- FHFA Director Lockhart Remarks on Housing GSE Actions
- Fact Sheet: FHFA Conservatorship
- Fact Sheet: Treasury Preferred Stock Purchase Agreement
- Fact Sheet: Treasury MBS Purchase Program
- Fact Sheet: Treasury GSE Credit Facility
- Freddie Mac Warrant to Purchase Common Stock
- Freddie Mac Certificate
- Freddie Mac Senior Preferred Stock Purchase Agreement
- Fannie Mae Warrant to Purchase Common Stock
- Fannie Mae Certificate
- Fannie Mae Senior Preferred Stock Purchase Agreement

# Tab 4



# U.S. TREASURY DEPARTMENT OFFICE OF PUBLIC AFFAIRS

**EMBARGOED UNTIL** 11 a.m. (EDT), September 7, 2008
**CONTACT** Brookly McLaughlin, (202) 622-2920

**FACT SHEET:**
**TREASURY SENIOR PREFERRED STOCK PURCHASE AGREEMENT**

Fannie Mae and Freddie Mac debt and mortgage backed securities outstanding today amount to about $5 trillion, and are held by central banks and investors around the world.  Investors have purchased securities of these government sponsored enterprises in part because the ambiguities in their Congressional charters created a perception of government backing.  These ambiguities fostered enormous growth in GSE debt outstanding, and the breadth of these holdings pose a systemic risk to our financial system.  Because the U.S. government created these ambiguities, we have a responsibility to both avert and ultimately address the systemic risk now posed by the scale and breadth of the holdings of GSE debt and mortgage backed securities.

To address our responsibility to support GSE debt and mortgage backed securities holders, Treasury entered into a Senior Preferred Stock Purchase Agreement with each GSE which ensures that each enterprise maintains a positive net worth.  This measure adds to market stability by providing additional security to GSE debt holders – senior and subordinated-- and adds to mortgage affordability by providing additional confidence to investors in GSE mortgage-backed securities.  This commitment also eliminates any mandatory triggering of receivership.

These agreements are the most effective means of averting systemic risk and contain terms and conditions to protect the taxpayer. They are more efficient than a one-time equity injection, in that Treasury will use them only as needed and on terms that the Treasury deems appropriate.

These agreements provide significant protections for the taxpayer, in the form of senior preferred stock with a liquidation preference, an upfront $1 billion issuance of senior preferred stock with a 10% coupon from each GSE, quarterly dividend payments, warrants representing an ownership stake of 79.9% in each GSE going forward, and a quarterly fee starting in 2010.

**Terms of the Agreements:**

- The agreements are contracts between the Department of the Treasury and each GSE.  They are indefinite in duration and have a capacity of $100 billion each, an amount chosen to demonstrate a strong commitment to the GSEs' creditors and mortgage backed security holders.  This number is unrelated to the Treasury's analysis of the current financial conditions of the GSEs.

- If the Federal Housing Finance Agency determines that a GSE's liabilities have exceeded its assets under generally accepted accounting principles, Treasury will contribute cash capital to the GSE in an amount equal to the difference between liabilities and assets. An amount equal to

each such contribution will be added to the senior preferred stock held by Treasury, which will be senior to all other preferred stock, common stock or other capital stock to be issued by the GSE. These agreements will protect the senior and subordinated debt and the mortgage backed securities of the GSEs. The GSE's common stock and existing preferred shareholders will bear any losses ahead of the government.

- In exchange for entering into these agreements with the GSEs, Treasury will immediately receive the following compensation:
  - o $1 billion of senior preferred stock in each GSE
  - o Warrants for the purchase of common stock of each GSE representing 79.9% of the common stock of each GSE on a fully-diluted basis at a nominal price

- The senior preferred stock shall accrue dividends at 10% per year. The rate shall increase to 12% if, in any quarter, the dividends are not paid in cash, until all accrued dividends have been paid in cash.

- The senior preferred stock shall not be entitled to voting rights. In a conservatorship, voting rights of all stockholders are vested in the Conservator.

- Beginning March 31, 2010, the GSEs shall pay the Treasury on a quarterly basis a periodic commitment fee that will compensate the Treasury for the explicit support provided by the agreement. The Secretary of the Treasury and the Conservator shall determine the periodic commitment fee in consultation with the Chairman of the Federal Reserve.  This fee may be paid in cash or may be added to the senior preferred stock.

- The following covenants apply to the GSEs as part of the agreements.
  - o Without the prior consent of the Treasury, the GSEs shall not:
    - ▪ Make any payment to purchase or redeem its capital stock, or pay any dividends, including preferred dividends (other than dividends on the senior preferred stock)
    - ▪ Issue capital stock of any kind
    - ▪ Enter into any new or adjust any existing compensation agreements with "named executive officers" without consulting with Treasury
    - ▪ Terminate conservatorship other than in connection with receivership
    - ▪ Sell, convey or transfer any of its assets outside the ordinary course of business except as necessary to meet their obligation under the agreements to reduce their portfolio of retained mortgages and mortgage backed securities
    - ▪ Increase its debt to more than 110% of its debt as of June 30, 2008
    - ▪ Acquire or consolidate with, or merge into, another entity.

- Each GSE's retained mortgage and mortgage backed securities portfolio shall not exceed $850 billion as of December 31, 2009, and shall decline by 10% per year until it reaches $250 billion.

**-30-**

# Tab 5

# FEDERAL HOUSING FINANCE AGENCY

 

## FACT SHEET

**Contact:**  Corinne Russell    (202) 414-6921
Stefanie Mullin    (202) 414-6376

## QUESTIONS AND ANSWERS ON CONSERVATORSHIP

Q:    What is a conservatorship?

A:    A conservatorship is the legal process in which a person or entity is appointed to establish control and oversight of a Company to put it in a sound and solvent condition.  In a conservatorship, the powers of the Company's directors, officers, and shareholders are transferred to the designated Conservator.

Q:    What is a Conservator?

A:    A Conservator is the person or entity appointed to oversee the affairs of a Company for the purpose of bringing the Company back to financial health.

In this instance, the Federal Housing Finance Agency ("FHFA") has been appointed by its Director to be the Conservator of the Company in accordance with the Federal Housing Finance Regulatory Reform Act of 2008 (Public Law 110-289) and the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (12 U.S.C. 4501, et seq., as amended) to keep the Company in a safe and solvent financial condition.

Q:    How is a Conservator appointed?

A:    By statute, the FHFA is appointed Conservator by its Director after the Director determines, in his discretion, that the Company is in need of reorganization or rehabilitation of its affairs.

Q:    What are the goals of this conservatorship?

FHFA 0026

A:      The purpose of appointing the Conservator is to preserve and conserve the Company's
        assets and property and to put the Company in a sound and solvent condition.   The
        goals of the conservatorship are to help restore confidence in the Company, enhance its
        capacity to fulfill its mission, and mitigate the systemic risk that has contributed directly
        to the instability in the current market.

        There is no reason for concern regarding the ongoing operations of the Company.  The
        Company's operation will not be impaired and business will continue without
        interruption.

Q:      When will the conservatorship period end?

A:      Upon the Director's determination that the Conservator's plan to restore the Company to
        a safe and solvent condition has been completed successfully, the Director will issue an
        order terminating the conservatorship.  At present, there is no exact time frame that can
        be given as to when this conservatorship may end.

Q:      What are the powers of the Conservator?

A:      The FHFA, as Conservator, may take all actions necessary and appropriate to (1) put the
        Company in a sound and solvent condition and (2) carry on the Company's business and
        preserve and conserve the assets and property of the Company.

Q:      What happens upon appointment of a Conservator?

A:      Once an "Order Appointing a Conservator" is signed by the Director of FHFA, the
        Conservator immediately succeeds to the (1) rights, titles, powers, and privileges of the
        Company, and any stockholder, officer, or director of such the Company with respect to
        the Company and its assets, and (2) title to all books, records and assets of the Company
        held by any other custodian or third-party.  The Conservator is then charged with the duty
        to operate the Company.

Q:      What does the Conservator do during a conservatorship?

A:      The Conservator controls and directs the operations of the Company.  The Conservator
        may (1) take over the assets of and operate the Company with all the powers of the
        shareholders, the directors, and the officers of the Company and conduct all business of
        the Company; (2) collect all obligations and money due to the Company; (3) perform all
        functions of the Company which are consistent with the Conservator's appointment; (4)
        preserve and conserve the assets and property of the Company; and (5) contract for
        assistance in fulfilling any function, activity, action or duty of the Conservator.

Q:      How will the Company run during the conservatorship?

A:      The Company will continue to run as usual during the conservatorship.  The Conservator
        will delegate authorities to the Company's management to move forward with the

business operations.  The Conservator encourages all Company employees to continue to perform their job functions without interruption.

Q:     Will the Company continue to pays its obligations during the conservatorship?

A:     Yes, the Company's obligations will be paid in the normal course of business during the Conservatorship.  The Treasury Department, through a secured lending credit facility and a Senior Preferred Stock Purchase Agreement, has significantly enhanced the ability of the Company to meet its obligations.  The Conservator does not anticipate that there will be any disruption in the Company's pattern of payments or ongoing business operations.

Q:     What happens to the Company's stock during the conservatorship?

A:     During the conservatorship, the Company's stock will continue to trade.  However, by statute, the powers of the stockholders are suspended until the conservatorship is terminated. Stockholders will continue to retain all rights in the stock's financial worth; as such worth is determined by the market.

Q:     Is the Company able to buy and sell investments and complete financial transactions during the conservatorship?

A:     Yes, the Company's operations continue subject to the oversight of the Conservator.

Q:     What happens if the Company is liquidated?

A:     Under a conservatorship, the Company is not liquidated.

Q:     Can the Conservator determine to liquidate the Company?

A:     The Conservator cannot make a determination to liquidate the Company, although, short of that, the Conservator has the authority to run the company in whatever way will best achieve the Conservator's goals (discussed above).  However, assuming a statutory ground exists and the Director of FHFA determines that the financial condition of the company requires it, the Director does have the discretion to place any regulated entity, including the Company, into receivership.  Receivership is a statutory process for the liquidation of a regulated entity. There are no plans to liquidate the Company.

Q:     Can the Company be dissolved?

A:     Although the company can be liquidated as explained above, by statute the charter of the Company must be transferred to a new entity and can only be dissolved by an Act of Congress.

FHFA 0028

# Tab 6

# OVERSIGHT HEARING TO EXAMINE RECENT TREASURY AND FHFA ACTIONS REGARDING THE HOUSING GSEs

# HEARING

BEFORE THE

## COMMITTEE ON FINANCIAL SERVICES

## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED TENTH CONGRESS

SECOND SESSION

———

SEPTEMBER 25, 2008

———

Printed for the use of the Committee on Financial Services

## Serial No. 110–142



U.S. GOVERNMENT PRINTING OFFICE

45–626 PDF                WASHINGTON : 2009

_____

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

## HOUSE COMMITTEE ON FINANCIAL SERVICES

BARNEY FRANK, Massachusetts, *Chairman*

| | |
|---|---|
| PAUL E. KANJORSKI, Pennsylvania | SPENCER BACHUS, Alabama |
| MAXINE WATERS, California | DEBORAH PRYCE, Ohio |
| CAROLYN B. MALONEY, New York | MICHAEL N. CASTLE, Delaware |
| LUIS V. GUTIERREZ, Illinois | PETER T. KING, New York |
| NYDIA M. VELAZQUEZ, New York | EDWARD R. ROYCE, California |
| MELVIN L. WATT, North Carolina | FRANK D. LUCAS, Oklahoma |
| GARY L. ACKERMAN, New York | RON PAUL, Texas |
| BRAD SHERMAN, California | STEVEN C. LaTOURETTE, Ohio |
| GREGORY W. MEEKS, New York | DONALD A. MANZULLO, Illinois |
| DENNIS MOORE, Kansas | WALTER B. JONES, JR., North Carolina |
| MICHAEL E. CAPUANO, Massachusetts | JUDY BIGGERT, Illinois |
| RUBÉN HINOJOSA, Texas | CHRISTOPHER SHAYS, Connecticut |
| WM. LACY CLAY, Missouri | GARY G. MILLER, California |
| CAROLYN McCARTHY, New York | SHELLEY MOORE CAPITO, West Virginia |
| JOE BACA, California | TOM FEENEY, Florida |
| STEPHEN F. LYNCH, Massachusetts | JEB HENSARLING, Texas |
| BRAD MILLER, North Carolina | SCOTT GARRETT, New Jersey |
| DAVID SCOTT, Georgia | GINNY BROWN-WAITE, Florida |
| AL GREEN, Texas | J. GRESHAM BARRETT, South Carolina |
| EMANUEL CLEAVER, Missouri | JIM GERLACH, Pennsylvania |
| MELISSA L. BEAN, Illinois | STEVAN PEARCE, New Mexico |
| GWEN MOORE, Wisconsin, | RANDY NEUGEBAUER, Texas |
| LINCOLN DAVIS, Tennessee | TOM PRICE, Georgia |
| PAUL W. HODES, New Hampshire | GEOFF DAVIS, Kentucky |
| KEITH ELLISON, Minnesota | PATRICK T. McHENRY, North Carolina |
| RON KLEIN, Florida | JOHN CAMPBELL, California |
| TIM MAHONEY, Florida | ADAM PUTNAM, Florida |
| CHARLES WILSON, Ohio | MICHELE BACHMANN, Minnesota |
| ED PERLMUTTER, Colorado | PETER J. ROSKAM, Illinois |
| CHRISTOPHER S. MURPHY, Connecticut | KENNY MARCHANT, Texas |
| JOE DONNELLY, Indiana | THADDEUS G. McCOTTER, Michigan |
| BILL FOSTER, Illinois | KEVIN McCARTHY, California |
| ANDRÉ CARSON, Indiana | DEAN HELLER, Nevada |
| JACKIE SPEIER, California | |
| DON CAZAYOUX, Louisiana | |
| TRAVIS CHILDERS, Mississippi | |

JEANNE M. ROSLANOWICK, *Staff Director and Chief Counsel*

(II)

# C O N T E N T S

_____

|  | Page |
|---|---|
| Hearing held on: | |
| September 25, 2008 | 1 |
| Appendix: | |
| September 25, 2008 | 55 |

## WITNESSES

### THURSDAY, SEPTEMBER 25, 2008

| | |
|---|---|
| Allison, Herbert M., Jr., President and Chief Executive Officer, Fannie Mae | 36 |
| Lockhart, Hon. James B. III, Director, Federal Housing Finance Agency | 11 |
| Moffett, David M., Chief Executive Officer, Freddie Mac | 38 |

## APPENDIX

| | |
|---|---|
| Prepared statements: | |
| Bachmann, Hon. Michele | 56 |
| Brown-Waite, Hon. Ginny | 58 |
| Kanjorski, Hon. Paul E. | 60 |
| Allison, Herbert M., Jr. | 62 |
| Lockhart, Hon. James B. III | 67 |
| Moffett, David M. | 83 |

### ADDITIONAL MATERIAL SUBMITTED FOR THE RECORD

| | |
|---|---|
| Bachmann, Hon. Michele: | |
| Letter to Hon. James B. Lockhart, signed by Members of Congress, dated September 11, 2008 | 86 |
| Article from Investor's Business Daily, "How A Clinton-Era Rewrite Made Subprime Crisis Inevitable," by Terry Jones, dated September 24, 2008 | 89 |
| Kanjorski, Hon. Paul E.: | |
| Written statement of the Massachusetts Bankers Association | 91 |

(III)

# OVERSIGHT HEARING TO EXAMINE RECENT TREASURY AND FHFA ACTIONS REGARDING THE HOUSING GSEs

————

**Thursday, September 25, 2008**

U.S. HOUSE OF REPRESENTATIVES,
COMMITTEE ON FINANCIAL SERVICES,
*Washington, D.C.*

The committee met, pursuant to notice, at 12:08 p.m., in room 2128, Rayburn House Office Building, Hon. Maxine Waters [member of the committee] presiding.

Members present: Representatives Kanjorski, Waters, Watt, Sherman, Capuano, Lynch, Miller of North Carolina, Green, Ellison, Wilson, Perlmutter, Murphy, Speier; Bachus, Castle, Royce, Biggert, Shays, Capito, Hensarling, Garrett, Brown-Waite, and Bachmann.

Ms. WATERS. [presiding] The Committee on Financial Services will come to order. This hearing is an oversight hearing to examine recent Treasury and FHFA actions regarding the housing GSEs.

I will yield myself as much time as I may consume. Let me start by saying that Chairman Frank and, I suppose, Subcommittee Chairman Kanjorski, should be joining us shortly. I think the world knows where Mr. Frank is today and what he is doing.

And, of course, the hearing that we are having today is a hearing that is absolutely necessary based on the recent actions that stunned many of us with the takeover of Fannie Mae and Freddie Mac.

Let me just say that when I first came to the House of Representatives, I was eager to be involved on the Financial Services Committee because of my concern for housing. And I was very pleased to learn about the mission of Fannie and Freddie and very pleased to work with Fannie and Freddie as we helped to find more ways to offer housing opportunities in communities that had been redlined in those days.

I think the mission of Fannie and Freddie was a good mission then, and should continue to be a mission that can certainly help many Americans realize the American dream. I know that Fannie and Freddie both were criticized very strongly by many, because some thought that they had too much perceived support from the government and were able to get money at favorable rates. Some thought they were much too big, and still others thought that their mission had creeped into areas where it should not be. And so I can recall when FM Watch was organized and all of the politics of that.

(1)

2

And, having said all of that, we find ourselves here today talking about oversight of Freddie Mac. But I want to remind everyone that it was this committee, under the leadership of Mr. Frank in May of 2007 that passed out the legislation to strengthen the oversight of Fannie and Freddie. So we took into account some of those criticisms, and I think that this committee was certainly responsible in what it did to address some of those concerns.

I think we were first directed towards some of the problems in accounting when we held some very interesting hearings about the accounting practices of Fannie, and then later on Freddie. I am hopeful that our new Oversight Committee is moving in the right direction.

But let me just say first, as a Nation, we absolutely need the functions that Fannie Mae and Freddie Mac fulfilled in the mortgage markets to continue to be carried out. And they need to be carried out by an entity or entities that are committed to affordable housing, as we required Fannie and Freddie to be.

How that entity or entities are constructed is something that Congress has to think carefully about. And I look forward to hearing from the witnesses on that issue clearly. The word "quasi" is an adjective that should probably not be applicable to the new structure.

Second, in addition to preserving the critical liquidity and secondary market functions and commitment to affordable homeownership Fannie Mae and Freddie Mac undertook, we need to bear in mind another object lesson of this crisis. No entity, no matter how large, is an island unto itself. By this, I mean that in the end, as big as Fannie and Freddie were, and as solid as the underwriting standards were to the subprime and Alt-A industry, they could not survive the turmoil created by the utter lack of Federal regulation that pervaded the rest of the mortgage market.

Therefore, any restructuring of Fannie Mac and Freddie Mae, however sound, will be of little impact in the absence of a complete overhaul of our regulatory structures. As Chairman Frank has frequently noted in recent days, this will be the top of our agenda in the committee next year. But I think it is important to note how inextricably linked it is to today's hearing.

With that, I will yield to—oh, you are sitting in, Mr. Neugebauer. I was going to call on Mr. Bachus, but you certainly are not he. So I will yield to Mr. Neugebauer.

Mr. NEUGEBAUER. I am not even going to touch that. Thank you.

You know, as we look forward to this hearing today, I think one of the things that we all realize is that a very stable mortgage market is the key to bringing stability back to the housing market. And as it has done in the past in times of credit crises in this country, going back to the savings and loan problems in the 1980's, Freddie Mac and Fannie Mae are really one of the few—the only game in town in many cases for the mortgage market. And so it is imperative that we continue this process to make sure that Fannie and Freddie provide the opportunities that they have provided in the past to the marketplace today.

But there is a new dynamic, Director Lockhart, as you know, and that is now the American taxpayers have a very strong stake, or a very big stake, a potential stake in the safety and the soundness

3

of these two entities. And so not only are you directing an entity that is providing mortgage liquidity to the market so that many American citizens can own homes and continue to do that, but you are also going to have to manage this entity in a way that we minimize any potential repercussions to the American taxpayers.

I have been talking with some folks over the last few days about how these markets are performing, and I am going to be very interested to hear from you—as you have been purchasing these loans, securitizing them, and hopefully selling the mortgage instruments into the marketplace—how that is going.

There are some other market functions that Freddie and Fannie have played in previous years of providing some liquidity for some existing product out there. I am going to be anxious to hear what you have done to do that. I think there are a couple of concerns that I know I have, and I think some of my colleagues have, is that where are we with, for example, the decision to—whether to fund any additional money or to fund any money to the affordable housing fund?

I know that Freddie and Fannie have been generous in some of their giving to other entities over the years. Quite honestly, my personal opinion is that in a time like this, where we have two companies that are in conservatorship, that the dividends have been suspended, who all of the shareholders and—preferred shareholders—and we have an entity that is in conservatorship, that is not an entity that ought to be passing out money to other entities and affecting the overall capitalization of that company or those entities. Because, quite honestly, at some point in time, this committee and others, we are going to have to have a discussion about our exit strategy here.

We have gotten the American taxpayers basically into a position here of having some stakeholder positions in these companies and it is not the intent, I don't think, of many of us for that to be a long-term relationship, and that at some point in time, we have to determine what is the best course of action without disrupting the mortgage markets and without disrupting and causing angst in the marketplace, but at some point in time coming to some decision as to where we go on a post-conservatorship relationship with these companies. But again, I want to stress to you that I believe that continuing to make any distributions out of these entities is not appropriate, and I am going to be anxious to hear your thoughts on that.

And with that, I yield back my time.

Ms. WATERS. Thank you very much.

Mr. Sherman for 2 minutes.

Mr. SHERMAN. Thank you. This is the season of bailouts. There is one model of bailout that we call the Fannie, Freddie, and AIG model where the Federal Government takes control of the entity and limits executive compensation, and, at least with AIG and I believe with Fannie and Freddie, has a real upside.

The other model is the Bush-Paulson bailout model. With that model, the Federal Government gets zero control of the entity but only takes control of toxic assets. The Federal Government has no serious limit on $10-million-a-year salaries, though there may be some limit that Bush implied he might tolerate on the bonus com-

4

pensation and esoteric formulas that are used to calculate it. But the $10-million-a-year salaries would continue.

And finally, under the Bush-Paulson bailout model, the upside stays with the shareholders and the executives. We put up the cash; they have the upside. I have yet to be convinced that we should be following the Bush-Paulson bailout model and not looking at the Fannie-Freddie-AIG model as something to use as we go forward. I yield back.

Ms. WATERS. Thank you very much.

Mr. Shays for 3 minutes.

Mr. SHAYS. Thank you, Madam Chairwoman. For too long, we, Congress, allowed Fannie Mae and Freddie Mac to play by a different set of rules than other publicly traded companies. They didn't even have to disclose any basic financial information or adhere to minimum accounting standards, yet their implicit Federal guarantee made both enterprises quite attractive to investors.

In 2002, I authored a bill with Congressman Markey, the Uniform Security and Disclosure Act, which would have extended Federal security and registration and reporting requirements to Fannie and Freddie Mac by bringing them under the 1933 and 1934 Securities Act. This bill had only 21 cosponsors—15 Republicans and 6 Democrats. We introduced this bill again in 2003, this time with 27 cosponsors—13 Democrats and 15 Republicans.

Then in 2003, I introduced an amendment to H.R. 2430, the Mutual Funds Integrity and Free Transparency Act, during a Financial Services Committee markup. The amendment would have prohibited any registered investment company, particularly Fannie and Freddie, from using deceptive or misleading names. The amendment was opposed by both sides of the aisle and overwhelmingly defeated by voice vote. No one spoke in favor of it. During this markup, I warned that we would be back if we didn't address the need to better regulate Fannie and Freddie.

The same concerns were raised by the SEC, the Federal Reserve, and the Treasury Department in a 2003 report, jointly recommending the repeal of these exemptions to the 1933 and 1934 acts. That was in 2003. The report cited a need to provide investors the same basic financial and operation information about GSEs as they would need for any other publicly traded company.

We also considered regulatory form in the 109th Congress, the year 2005 to be exact. I was an original cosponsor of this reform legislation which would have replaced the Office of Federal Housing Enterprise Oversight, OFHEO, and established a more robust regulatory authority to oversee the GSEs and their risky investment portfolios in order to alleviate the systemic risk that now has put the entire financial system in jeopardy.

I recommend to all members who seem to want to criticize this Administration to see if they were cosponsors of that amendment and to see what they did to make reforms.

Unfortunately, it was not until this year both Chambers of Congress were able to enact meaningful reform. We are here today because we didn't act soon enough. We knew Fannie and Freddie were so big and so underregulated that they posed a threat to our economic security.

5

I think it is pretty clear we need to demand accountability from these companies for their previous actions as well as transparency in the future. But right now our job in Congress is to restore liquidity in the market. My only hope is we will not have Members in this Chamber and in the Senate act like somehow they were part of the reform, part of the solution, and blame someone else, when they weren't there when you had a chance to act.

Ms. WATERS. Thank you very much.

Mr. Scott for 2 minutes.

Mr. SCOTT. Thank you, Madam Chairwoman. So much is happening so fast here, it is almost difficult to keep up with it. There are so many moving parts. We are in such a terribly, terribly, challenging time economically. But this hearing is very timely.

I have a couple of concerns as a result of the government takeover of Fannie and Freddie. I worry about the situation facing our community banks. Our community banks make up 85 percent of the lenders that hold Fannie Mae and Freddie Mae stock, and the Fannie and Freddie fallout is particularly affecting Main Street America because these community banks are the backbone of communities across the country.

So I definitely hope we can get into that and see what this takeover means as far as that is concerned.

I also would like to get your opinion on what this takeover means as far as a loss of share value of these companies. And as if that is not enough problems, we have the FBI looking at Fannie and Freddie for investigations. And as if that is not enough problems, there are 25 other investigations going on with Freddie and Fannie. So we have a real, real doosie here.

I am looking forward to getting into this with you and I appreciate it, Madam Chairwoman. I yield back the balance of my time.

Ms. WATERS. Thank you, Mr. Scott.

Mr. Hensarling for 2 minutes.

Mr. HENSARLING. Thank you, Madam Chairwoman. When you have a wheel in a ditch, the first thing you need to do is get the wheel out of the ditch, not point fingers.

Having said that, I feel there is a little bit of revisionist history that I must comment upon. People who came to the Fannie and Freddie reform issue in May of 2008 came about a decade too late. I have been here for 6 years and there have been people pointing out the systemic risk that these two organizations posed to the economy for every day that I have been here. Not once did Alan Greenspan come before this committee and not warn about the systemic risk in Fannie and Freddie.

I believe, one, we have to get the wheel out of the ditch; but at the same time, we have to look at the root cause of the problem that we are in today. I believe that is Fannie and Freddie, creatures born in a government laboratory, not in the competitive environment of a market economy.

Because of that, Madam Chairwoman, I believe it would help instill more confidence in the markets if we would go to the root of the problem. And because of that, later today, I will be introducing the GSE Free Market Reform Act that over a period of time would return Fannie and Freddie to a competitive marketplace. It would end the conservatorship after 2 years. It would allow FHFA to ei-

6

ther, one, send it into receivership at that time or put them back into the marketplace where they would see new portfolio limits that would decline 20 percent each year, increase minimal capital requirements that would mirror those of well-capitalized banks. It would repeal the recent increases and the conforming loan limits and limit those conforming mortgage purchases that are at or below the area median income price.

After such time, the GSEs would have an opportunity to renew this charter for 3 years. After 6 years, it would sunset. Their special privileges would be withdrawn. I think it is a piece of legislation that hopefully will be considered by the committee, and soon. With that, I yield back the balance of my time.

Ms. WATERS. Thank you very much.

I see that Mr. Kanjorski has entered the room. Mr. Kanjorski, do you have an opening statement?

Mr. KANJORSKI. Let me submit it for the record.

Ms. WATERS. Mr. Kanjorski will submit his opening statement for the record.

Mr. Green for 2 minutes.

Mr. GREEN. Thank you, Madam Chairwoman. In his absence, I would like to thank the Chair of the full committee, Chairman Frank, because he has been a champion for reform. And I would like to echo what the chairwoman has said about 2007 and his taking positive productive action to reform and strengthen with the legislation for oversight as relates to Fannie and Freddie. He truly has done what he could within the time that he has had the gavel to make a difference, and I salute him for it.

I am concerned about restructuring of loans. There are many people who will not be able to keep their homes by simply extending the time to pay, by simply deciding that some forgiveness may take place with reference to fees that are owed while they are in foreclosure.

Many people are going to lose their homes. And when I say "many," we are talking about more than a few hundred thousand. Many, many people. And it seems to me that restructuring loans is important, which is why we with FHA allowed for the refinancing that would take place when loans have been embraced by both the seller—the lender and the borrower, to the extent that the holder of the note is willing to write down the loan to the current market and then 15 percent, thereabout, of the current market value. That is a helpful means by which people can stay in their homes.

The unfortunate circumstance is that there has not been enlightened self-interest on behalf of the holders of the mortgages such that we could see an accelerated pace. And perhaps there is one that I have not noticed. So I will be interested in seeing how much restructuring is actually taking place. That is an important thing to know. And I thank you for appearing today. I yield back.

Mr. KANJORSKI. [presiding] Mr. Garrett, for 2 minutes, please.

Mr. GARRETT. I thank the Chair and the ranking members for holding this important hearing today. And in light of the severity of the situation the country is in, I am a little surprised that there are not more people here for this very important hearing.

I do appreciate the Director and welcome him to the committee. It is good to see you again and I look forward to your testimony. In the wake of Fannie Mae and Freddie Mac being put into conservatorship by the Federal Housing and Finance Administration, I am pleased to see more and more people are coming to grips that the GSE model, as was set up and ran, was a failed model. That was acknowledged by Secretary Paulson, by Chairman Bernanke, and even by the former CEO of Freddie Mac, Richard Syron, as well, saying it was an impossible task that he had there.

I want to take this minute, though, to thank Director Lockhart for two specific actions that you have already taken directly after the GSEs were put into conservatorship. First, I want to thank you for cutting off their lobbying activities. Federal Government agencies are not allowed to lobby Congress or give campaign contributions to Members. And since Fannie and Freddie are essentially agencies, and it has now been proven, that fact—of the Federal Government, they should not be donating money or influencing Members in regard to policy that we are considering that will affect on them or their new regulator.

This, as an aside, is something that I have tried to do in the past and during this Congress as well, and have been rebuffed at every attempt to do so. So thank you for doing that.

Second, I want to thank you for reining in the compensation that was supposed to be paid to the now departed executives. The government, quite honestly, should not pay executives millions of dollars in compensation when the government had to come in and take over the company and then use taxpayer dollars to keep it afloat.

So I thank you for those two very important actions you have taken, and I look forward to your additional testimony.

Mr. KANJORSKI. Thank you, Mr. Garrett.

Mr. Ellison, for 2 minutes, please.

Mr. ELLISON. Let me join my voice to those who agree that this is no time for finger pointing. It is actually time for all of us to try to work together to restore confidence and liquidity in the financial markets and the American economy.

But one of the things that I am concerned about is that housing financing efforts that have resulted in giving moderate- to low-income people opportunities to be able to get into housing have come under attack this last week and have been blamed for being the problem. I want to very soundly reject that idea. I plan on asking you about that, Mr. Director. I was hoping to ask about it yesterday, but I didn't get a chance to. I mean, I even heard things like the Community Reinvestment Act is the cause of this current crisis, even though the Community Reinvestment Act only applies to commercial banks, does not apply to mortgage originators, who are the ones that originated the overwhelming number of these subprime loans. In fact, the CRA probably reduced the impact of this problem because they limited the ability for subprime loans to be issued through banks because they were regulated.

Also today, you know, we have heard quite a bit of criticism over the Fannie and Freddie model, and I just want to remind my friends that Fannie and Freddie were pretty late to the game of accepting as part of their assets these more liquid—these—what we

8

are calling illiquid assets today. In fact, the subprime model, which has been going on for a number of years, but Fannie and Freddie really added this as part of their business in 2005, 2006, 2007, which is late in the game.

And so I just want to make it clear that part of what I want to make sure to do is to protect programs for low- and moderate-income people to be able to gain housing. And I personally am not going to just sit by and let people trash programs that have helped folks get into housing who have been struggling to get it.

Fannie and Freddie, I don't think, are failed models. The CRA certainly is not a failed program. These are important and good programs and should be protected. And if you want to find blame somewhere, let's look at Gramm-Leach-Bliley. Let us look at the very deregulation that so many people called for and clamored for, and now we have seen the full manifestation of what deregulation, lack of corporate responsibility, put together with flat declining wages for the American people will bring about. It has brought about this. So I look forward to the debate.

Mr. KANJORSKI. Thank you, Mr. Ellison.

Mr. Manzullo.

Mr. MANZULLO. Thank you, Mr. Chairman. In June of 2000, I gave a cadre of Fannie Mae lobbyists the heave-ho and told them to get out of my office; I didn't want to see them back in my office ever again. I said some other things which I can't repeat to the public. They had gone out, under the arrogance of Franklin Raines, who had siphoned off $90 million in 6 years from Fannie Mae, and stole the name of 2,000 of my constituents whom I represent, and used them to petition me against the bill that would have reformed Fannie Mae and Freddie Mac the way they were intended to do business.

But the problem was not only did my constituents not consent to the use of their names in this Astro Turf lobbying campaign, but the very reforms that Fannie and Freddie were posing may have protected the very homeowners and taxpayers whose identities were stolen by the garbage that was running Fannie Mae at the time.

In one of his first Capital Markets Subcommittee hearings on GSE reform in March of 2000, Congressman Baker, the author of H.R. 3703, said the bill seeks to improve supervision and diminish systemic risk now, whether they are waiting for the time of crisis to expose the faults of a hobbled regulatory structure. That was 8 years ago. And through an army of lobbyists armed with foundations or fake coalitions, Fannie Mae and Freddie Mac have been allowed to continue their record of questionable business practices.

It comes as no surprise that that type of leadership has led to the disaster that we have on our hands today. My constituents are angry. They want to know why somebody who siphoned off from the organization that kind of money, and now they come back asking for a rescue, and their great plan to privatize the profits into their own deep pockets and to socialize the risk and let the American taxpayers pick up the bill for an organization whose very purpose was to help them buy homes.

Mr. KANJORSKI. Mr. Royce, for 2 minutes, please.

9

Mr. ROYCE. Thank you, Mr. Chairman. I think for Mr. Garrett and for Mr. Shays and for myself and for many others, this is a time for, "I told you so." I think after 5 years of calling attention to this and laying out exactly this problem, this is a time to look into how this risk was created and why it wasn't stopped.

And frankly, the takeover of Fannie Mae and Freddie Mac—that marks the official failure of this experiment—but, you know, because of the implicit guarantee, the implicit guarantee there, these institutions could borrow at a lower rate in the market than a legitimately private institution. And this model led to excessive risk-taking by these firms, because they didn't have a regulator with a right to look into systemic risk.

On September 7th, with their capital base rapidly deteriorating and with leveraged ratios 6 times higher than our depository institutions, that is how far they were leveraged, the Federal Housing Agency moved against Fannie and Freddie and put them into conservatorship.

Now, while the quasi-public model was the foundation for the troubles that sank these two institutions, weak regulatory authority established by Congress in 1992 failed to prevent the excessive risk taking that many of us cautioned against. And it is unfortunate that our fears were proven correct, and this episode could have been prevented in 2005 when I introduced an amendment on the House Floor to give the regulator the necessary authority, with the support, by the way, of the Federal Reserve that argued for this.

Mr. Shays referenced this. We had legislation to try to do this. And we brought the amendment to the House Floor to curtail these companies' portfolios based on systemic risk. And my amendment was defeated, leaving the underlying legislation unable to address the grave risk that these institutions posed to our broader capital markets.

Now, the 1992 legislation which established what was then OFHEO, for the first time in history placed explicit mandates on the GSEs, which dedicated a percentage of their business on three specific affordable housing goals each year, and these mandates skewed the marketplace by providing excessive liquidity to the lending institutions, making loans to individuals that could not afford them, and exposed the GSEs to a riskier class of loan.

Alt-A loans at both Fannie and Freddie made up 10 percent of their business. It accounted for 50 percent of their recent losses earlier this year. So the move by Congress in the early 1990's, the inherent flaw in the government-sponsored enterprise structure, the lax regulations, all enabled Fannie and Freddie to take on more risk than they could handle and ultimately led to their demise.

I think Congress' failure to pass such critical legislation over the years, especially since the mortgage industry began to deteriorate 18 months ago, is one of Washington's greatest oversights in recent history. And I am glad, Mr. Chairman, that we are having this hearing now to discuss it. Thank you.

Mr. KANJORSKI. Thank you very much, Mr. Royce.

Ms. Bachmann.

Mrs. BACHMANN. Mr. Chairman, I thank you for this opportunity and I appreciate the severity of the crisis that we are looking at

10

today. In an article written by Terry Jones of Investor's Business Daily he said, and I quote, Fannie Mae and Freddie Mac, even into the early 1990's, with the juggernauts or would later be.

While President Carter in 1977 signed the Community Reinvestment Act, which pushed Fannie and Freddie to aggressively lend to minority communities, it was President Clinton who supercharged the process. After he entered office in 1993, he extensively rewrote Fannie's and Freddie's rules, and in doing so he turned the two quasi-private mortgage funding firms into a semi-nationalized monopoly that dispensed cash to markets, made loans to large Democrat voting blocks, and handed favors, jobs, and money to political allies.

This potential mix led inevitably to corruption and to the Fannie and Freddie collapse. The rewrite that was done back in 2000 made getting a satisfactory Community Reinvestment Act rating harder to get. Banks were given strict new numerical quotas and measures for the level of diversity in their loan portfolios. Getting a good CRA rating was key for a bank that wanted to expand or merge with another, so loans started being made on the basis of race and often on little else.

The HUD Secretary at that time was Andrew Cuomo. He made a series of decisions, reported the Village Voice newspaper, between 1997 and 2001 that gave birth to the country's current crisis. These were changes that led Freddie and Fannie to get into the subprime loan market in a big way.

Between campaign donations and between the changes in the rules of the Community Reinvestment Act, we have seen a dramatic impact on the current subprime mortgage meltdown. It is important that minorities have access to money. It is important that communities of color have access to homeownership; however, we need to have strong lending rules that have served our Nation so well. This has hurt, unfortunately, the minority community and communities of color even more than other communities.

This was a well-intentioned law. I firmly believe that the Community Reinvestment Act was well-intentioned and meant to put more minorities and people of color into homes. This is a good, positive movement; however, the final event of this Act was to, in fact, remove communities of color from true homeownership and subject other communities to a more difficult time to receive the loans that they so desperately need to be able to get into homeownership. Fannie and Freddie, with their massive loan portfolios stuffed with securitized mortgage-backed paper created from subprime loans, are a failed legacy of the early 1990's era. I yield back.

Mr. KANJORSKI. Thank you very much. All members having sought recognition have been recognized.

I now have a unanimous consent request that the Massachusetts Bankers Association statement be entered into the record without objection. There being none, it is so ordered.

And now, we want to recognize our good friend from Connecticut, Mr. Shays.

Mr. SHAYS. Thank you, Mr. Chairman. For the purpose of an introduction—while I hope I have some tough questions for our witness, I have tremendous admiration. He is a constituent from Greenwich, Connecticut—and, when you look at his biography you

11

just realize—a very dedicated man. He is clearly the Director and Chairman of the Oversight Board of the Federal Housing Finance Agency that regulates Fannie Mae and Freddie Mac and the 12 Federal Home Loan Banks.

He previously served as Deputy Commissioner and Chief Operating Officer of the Social Security Administration and as Secretary to the Social Security Board of Trustees from 2002 to 2006; and then in 1989 to 1993, under the first Bush Administration, Mr. Lockhart was the Executive Director and CEO of the Pension Benefit Guaranty Corporation. This is obviously a wealth of service in the private sector.

He is a graduate from a Connecticut institution, Yale, and got his MBA from Harvard. And probably the most important thing in his resume, he was an officer in the U.S. Navy. We appreciate your service, and this is the man who is now coming to testify before us.

Mr. KANJORSKI. Thank you, Mr. Shays. Mr. Lockhart, that was quite an introduction. I don't know what you paid for it, but—if you will, sir.

### STATEMENT OF THE HONORABLE JAMES B. LOCKHART III, DIRECTOR, FEDERAL HOUSING FINANCE AGENCY

Mr. LOCKHART. Thank you, Mr. Chairman. I appreciate that and I certainly thank you, Congressman Shays, and the members of the committee. Thank you for the opportunity to testify on Fannie Mae and Freddie Mac and the conservatorships.

Before doing so, I would like to thank this committee for its efforts to pass the GSE reform legislation and create the Federal Housing Finance Agency, which is not quite 2 months old. Fannie Mae and Freddie Mac share the critical mission of providing stability, liquidity, and affordability to the housing market. Between them, these enterprises have $5.3 trillion of guaranteed mortgage-backed securities and debt outstanding. Their market share of all new mortgages originated in the first half of this year was 76 percent.

During the turmoil that started last year, they played a very important role in providing liquidity to the conforming mortgage market which really required a very delicate balance of mission versus safety and soundness. It also required adequate capital. That balance was completely upset in August as house prices, credit losses, and markets continued to deteriorate. Without the ability to raise capital, they could not provide stability or liquidity to the mortgage market. In fact, they were adding to the instability. Their antiquated capital structures, even with the OFHEO additional capital requirements, were not adequate for this market.

Rather than putting the markets in further jeopardy, FHFA decided to take action. The goal of these dual conservatorships is to help restore confidence in Fannie Mae and Freddie Mac in the mortgage market, enhance their capacity to fulfill their mission, reduce systemic risk, and make mortgages available at lower costs to the American people.

FHFA based its determination for conservatorships on five key areas which worsened significantly over the last 2 or 3 months. The first area was accelerating safety and soundness weaknesses. The second was continued and substantial deterioration in equity, debt,

12

and MBS markets. The third was the current and projected financial performance and condition of each company. Fourth, they had the inability to raise capital or even to issue debt at normal prices, at normal amounts. Fifth, was their inability to fulfill that mission which is so critical to supporting the Nation's residential housing market.

As part of our examinations, we have supplemented our own exam teams with senior mortgage credit examiners from the Federal Reserve and the Office of the Comptroller of the Currency. These examiners corroborated our own analysis of a deteriorating credit environment and its threat to capital.

In August, Freddie Mac reported losses of $4.7 billion over the last year and Fannie Mae reported losses over the last year of $9.7 billion. We had finished our semiannual examination that pointed to significant and critical weaknesses across the board. Each company reported to FHFA and to the Treasury that it was unable to access capital markets and, as you know, we have been asking and putting pressure on them to continue to raise capital. They couldn't do it, and the only way they could do it was with Treasury support.

Without the ability to raise capital, they would have had to shed assets in a very weak market, which would have been disastrous for the mortgage market and also for the actual credit losses of the two companies. Therefore, in order to restore the balance between safety and soundness and mission, FHFA placed Fannie Mae and Freddie Mac into conservatorship.

We did not take this action lightly. We consulted with Chairman Bernanke who was made a consultant, as you know, in the legislation that just passed. We also consulted with Secretary Paulson. They both concurred with me that conservatorship needed to be undertaken.

Let me now turn to the conservatorships. First signs, despite all the market turmoil, are that the conservatorships are positive. I am pleased to say that enterprise funding cost and the spreads on the MBS have declined and, most importantly, home rates for 30-year mortgages in particular fell below 6 percent for the first time since January. On the first day after we announced the conservatorships, two businesses opened with stronger backing for the holders of their mortgage-backed securities, their senior debt, and subordinated debt. The enterprises will now have the ability to grow their portfolios and their guaranty books again to support this market.

We were able to hire highly qualified new chief executive officers, whom you will be hearing from shortly, and nonexecutive chairmen. FHFA worked with the new CEOs to establish employee retention programs. In order to conserve over $2 billion in annual capital, the common stock and preferred dividends were eliminated.

Critically, the liquidity, MBS investment, and senior preferred stock facilities with the U.S. Treasury are all in place. These facilities provide the needed support to Freddie Mac and Fannie Mae to fulfill their mission over the long term while giving a potential upside for the taxpayers.

The key facility is a senior preferred stock agreement which supports all past and future debt and MBS issuances until the terms of the facilities are completely satisfied.

13

The second facility is a secured credit facility. This facility is not only for Fannie Mae and Freddie Mac but also for the 12 Federal Home Loan Banks.

Another element of the Treasury's financing plan is to hire investment managers to purchase Fannie Mae and Freddie Mac mortgage-backed securities.

Separately, we also support President Bush's and Secretary Paulson's comprehensive approach to relieving the stress on other financial institutions and markets.

I can promise you that FHFA will continue to work expeditiously on the many regulations needed to implement the new law.

Importantly, the new legislation also adds affordable housing and mission enforcement to the responsibilities of safety and soundness regulator. While FHFA has had these responsibilities for less than 2 months, we are placing a high priority on them. As companies' operating under conservatorships, I have already instructed each new CEO to examine underwriting standards and pricing. Fannie Mae and Freddie Mac will continue to be active in multifamily lending, which is really a critical component of affordable housing.

Over the last year, we have been challenging Fannie Mae and Freddie Mac to be more creative on foreclosure preventions. They have responded and are doing so.

The new legislation established a Housing Trust Fund to increase and preserve the supply of affordable, rentable housing and increased homeownership for very low-income families. I recognize the importance of the Housing Trust Fund to many Members of Congress. Enforcement of the affordable housing goals is now an FHFA responsibility as well. The very ambitious goals set by HUD back in 2004 do not reflect today's market. Even if these goals are not obtainable, however, each enterprise will develop and implement ambitious plans to support the borrowers and markets targeted by those goals.

In conclusion, the decision to appoint a conservatorship for each enterprise was a tough but necessary one. They can now play their correct role of being part of the solution and not part of the problem. With the new legislation and your support, we can restore confidence in the enterprises, and build a stronger and safer future for the mortgage markets, homeowners, and renters in America.

Thank you. I would be pleased to answer questions.

[The prepared statement of Director Lockhart can be found on page 67 of the appendix.]

Mr. KANJORSKI. Thank you, Mr. Lockhart.

Mr. Lockhart, how did your assessments of the capital position of Fannie and Freddie change in late August and early September?

Mr. LOCKHART. We were assessing Fannie and Freddie continuously for over the last year. In July, we started an examination in combination with the Federal Reserve, the OCC, and others. We also were continuing our semiannual examination. The combination of those exams showed that the capital position of these two companies was continuing to deteriorate and there were significant questions about loss reserves and other than temporary impairments, which going forward we felt would impair their ability to serve their mission.

14

Mr. KANJORSKI. What was the primary cause for their deterioration of capital?

Mr. LOCKHART. It was a series of issues, but the primary cause was changes in the housing market and, in particular, the business they put on their books in 2006 and 2007 that was of lower credit quality than previous years.

Mr. KANJORSKI. You are not saying it was the deflation of real estate, but it was the bad business choices made in 2006 and 2007?

Mr. LOCKHART. It was a combination. Certainly, the housing market hurt all lenders, and in reality they probably had better books than many other lenders. But still, just the magnitude of $5.3 trillion of exposure on a very thin capital base meant that base could not support the potential losses.

Mr. KANJORSKI. If the real estate market had not deteriorated in the last few years, and if the bad practices had not been carried on in 2006 and 2007, do you have an opinion as to whether or not Fannie and Freddie would have continued to exist as they did prior to the conservatorship?

Mr. LOCKHART. Well, certainly 2 or 3 years ago they were doing fine before the housing market turned down. They always had, as you know, and I was talking about, for the last 2½ years the need for reform. They needed to be strengthened and they needed a stronger capital position.

Mr. KANJORSKI. So you have an opinion that this failure—if I recall, my memory says we did the GSE reform starting in 2003 and we passed it in the House; it would go to the Senate and linger there, and we passed it 2 years later and another 2 years later, and it lingered until this last summer. If, in fact, we changed and went into that world-class independent regulator that you now are, would that potentially have given you the strength and capacity to save these two organizations?

Mr. LOCKHART. If the legislation was similar to the one that was passed this year—

Mr. KANJORSKI. Yes.

Mr. LOCKHART. —it certainly gave us the kind of capital controls we needed. It certainly gave us the ability to control the size of the portfolios. I think those were two of the very important things. Also, it gave us a lot more power in the safety and soundness side that we didn't have either. It is certainly a much stronger bill. If we would have had it 5 years ago, maybe we wouldn't be having this hearing.

Mr. KANJORSKI. So potentially when Congress failed to adequately respond to everybody's comments that we needed a stronger world-class regulator, and we tried to do it for 5 years and failed for 4 of those 5 years, and then finally passed the same bill that had been sent to the Senate before, if we had done that earlier when we originally sent it over—we are not trying to find out who may have been at fault here, we will leave that up to the press and the public to determine that—but it is reasonable to assume that Fannie and Freddie would have succeeded in remaining in place without a conservatorship?

Mr. LOCKHART. Certainly, that would have helped. I mean, obviously, this market is a tougher market than anybody has seen in a long, long time. Certainly we had much stronger capital require-

15

ments. If their portfolios were smaller, if they had taken less risk, they would certainly be much better off than they are today.

Mr. KANJORSKI. I have just asked a lot of questions of you, but let me go to just one other one. Appraisal independence is very important. How will the conservatorship affect the agreements with Attorney General Cuomo?

Mr. LOCKHART. We have been working with the Attorney General on those appraisal standards and we are very near finalizing them. We hope within the next couple of weeks to put them out. They have been modified somewhat. They still really show that we strongly support the independents. Because it has taken us longer than we expected to do it, we would expect to actually not have the January 1st implementation date. We expect to slip that in a month or 2, or maybe 3. We expect to have the appraisal standards out very shortly.

Mr. KANJORSKI. Very good. Seeing that I have exhausted my time, I will recognize Mr. Neugebauer.

Mr. NEUGEBAUER. Thank you. Director Lockhart, when you look at Fannie Mae and Freddie Mac's business, obviously they were in the portfolio business and in the securitization business as well. When you go—and you were assessing their losses, can you give me a breakdown of what percentage of the losses were attributed to portfolio and what were attributed to the securities that they had?

Mr. LOCKHART. At the moment, their major losses are related to credit and they have credit risk in both their portfolios and their mortgage-backed securities. Historically, the portfolios also took on a significant amount of interest rate risk and they have shown over the last year some relatively large losses from interest rate risk as well.

The portfolios also took on what are called private label mortgage-backed securities. These AAA securities that they invested in were underlying mortgages that were subprime and Alt-A mortgages. Those have shown significant declines. In the case of Freddie Mac in particular, they have shown something like a $20 billion loss on those securities. In Fannie Mae, it is more like an $8 billion loss.

So, there were big losses from credit in both their mortgage-backed security portfolios and their guarantys.

Mr. NEUGEBAUER. When you look at those private-label securities, do you have the infrastructure in place to really unwrap those, look inside those securities, and begin to give somewhat of a picture of, you know, what the underlying credit risks to Fannie and Freddie are?

Mr. LOCKHART. Yes. We have been working with both of the companies and we have actually been asking them to do cash flow analysis down to the individual mortgage. We have also been working with other providers of that kind of software to look at the risk inherent in those private label securities.

Mr. NEUGEBAUER. So, do you have any indication of what the contingent liability is? In other words, if you have a capital structure of "X," and then when you look inside these securities and look at both their interest rate risk and their credit risk, do you have an idea of what the potential liability is, and does that exceed the current assets of those entities?

16

Mr. LOCKHART. The companies disclose every quarter a mark to market of those portfolios. As I said in the end of June, they were about $20 billion underwater at Freddie Mac and about $8 billion at Fannie Mae. Obviously, these markets continue to move and there has been deterioration since then. If you look at the balance sheets of both companies, they still have more assets than liabilities. As you know, that is the test for the Treasury to put in money.

Mr. NEUGEBAUER. Now, one of the issues that is being kicked around outside of Freddie and Fannie is the Treasury getting into a similar business that I guess Fannie Mae was in and making a market or purchasing some of these private-label securities. Is there the infrastructure within Freddie Mac and Fannie Mae not necessarily to purchase those, but to help provide some idea of what is exactly inside those securities and to help establish a fair market value of those? Because one of the things, as you know in the marketplace right now, everybody is looking at these individual securities and each one of them is an individual, if it is private label, it is an individual security and it depends on what kind of mortgages, where those mortgages were originated. And so to be able to determine an accurate value of that security, you have to kind of take the wrapper off and look inside.

Do these entities have the ability to help facilitate that?

Mr. LOCKHART. Fannie and Freddie have internal models, but also they have been working, as we have, with external experts in the field. I assume the facility that Secretary Paulson is proposing would also be using these many external experts. There certainly is the ability to go mortgage by mortgage and look at the characteristics in the mortgages. To get an accurate price, there is no such thing in this marketplace. But you can certainly get some ranges of prices that are indicating the underlying economics.

Mr. NEUGEBAUER. I think one of the key determination factors here is to get a feel for what was the underlying value of the collateral under those securities because the bottom line is that in the event of a default, you are going to go back and look at the collateral, and not just the mortgage collateral, the mortgage itself, but the collateral underlying the mortgage.

Are you able to go that deep where you can tell, for example, in Sacramento, California, we have a loan in this portfolio, and it may be current or it may be 30 days delinquent, but also the prices in that particular zip code for resale are down 20 or 30 or 40 percent—

Mr. LOCKHART. Certainly, people are working on those kinds of models to better obtain that kind of detail. It needs to be done to better understand what is underlying these securities.

Mr. NEUGEBAUER. You really couldn't make a fair assessment of the value of that security without that information, could you?

Mr. LOCKHART. It is certainly very helpful to have the underlying mortgage information, yes, sir.

Mr. NEUGEBAUER. I think my time is up. I saw you reach for the gavel and I was—

Mr. KANJORSKI. Mr. Sherman is recognized.

Mr. SHERMAN. Thank you. Mr. Lockhart, are Fannie and Freddie currently allowed to purchase no doc or low doc loans?

17

Mr. LOCKHART. Fannie and Freddie do make a few low doc and no doc loans, although that has really stopped pretty dramatically. They are reviewing that practice. Basically, at this point, I don't think they are making any no doc loans. The vast majority of the loans they are making today are well documented.

Mr. SHERMAN. Why would you allow them to make any such loans? At very best, these are loans to creditworthy borrowers who are cheating on their taxes. And now that the Federal Government more explicitly controls these entities, rewarding those who choose to cheat on their taxes doesn't seem to be part of your mandate.

Why wouldn't your board absolutely prohibit no doc and low doc loans?

Mr. LOCKHART. Both companies are reviewing their practices, as we have asked them to do, and we will be hearing from them.

Mr. SHERMAN. In other words, you are not going to answer my question except to say they are working on it and you won't express an opinion on it yourself here in spite of the fact that—

Mr. LOCKHART. I will express an opinion that historically low doc loans have been one of the big problems in the mortgage market. Certainly no document loans have been a big problem, and they are well aware of it. It has been a big problem in Fannie and Freddie, and they are fixing them.

Mr. SHERMAN. Well, I would hope that you would look at this. Since you do work for the Federal Government, also on the tax side, in facilitating tax fraud or facilitating people who are either lying to their lender or they are lying to the tax authorities strikes me as not consistent with your role.

The executive compensation is something we are focused on a bit with this bailout bill. It looks like you hired a Fannie Mae or a Freddie Mac CEO for $900,000. Now, there are very few positions involving the financial world that are quite as challenging or as complex as being CEO of Freddie Mac. Are you able to get executives who can handle Freddie Mac for less than $1 million a year?

Mr. LOCKHART. We are in the process of negotiating contracts with the two CEOs. In my view, we have two very high-quality people whom you will be hearing from shortly. They have only been on the job 2½ weeks, so hopefully you won't ask them too many tough questions.

Mr. SHERMAN. Then you have already paid them for the last 2½ weeks. Are you paying them at a rate below or above a rate of $1 million a year currently?

Mr. LOCKHART. The question is that high-quality financial executives in my mind certainly should and could earn more than a million dollars a year; and if that is the question you are asking me, certainly—

Mr. SHERMAN. I am not asking what you think is fair, because I could take you to my district and have you—you seem to have lined up a good quality financial executive for under a million dollars a year. Does this demonstrate that it is at least possible to get somebody reasonably capable of doing one of these major jobs for less than a million dollars?

Mr. LOCKHART. The two individuals have taken these jobs because of the public service element as well. I would expect to pay them more than a million dollars a year.

18

Mr. SHERMAN. So this headline that it is going to be $900,000 is erroneous?

Mr. LOCKHART. Well, that is their salary. They will probably have bonuses related to their performance.

Mr. SHERMAN. Okay. I noticed that we are able to get somebody to preside over the Federal Government for only $400,000 a year and free housing.

Now, dividends: Which dividends have actually gone out the door and been paid in July, August, and September by Fannie and Freddie? And are you taking or demanding any legal action to recover those dividends from shareholders?

Mr. LOCKHART. The dividends that were declared were paid, but—

Mr. SHERMAN. How much money did we lose on that?

Mr. LOCKHART. I am not quite sure, but it was about $100 million—no, it was significantly less than that. I am sorry; I don't know. I will have to look up that number.

There was only one dividend payment that was declared before we put them into conservatorship that had to be paid under the contract. Since then, no dividends have been paid.

Mr. SHERMAN. Did you make any effort to try not to pay that dividend that went out, even after the conservatorship started?

Mr. LOCKHART. No, we actually followed the law.

Mr. SHERMAN. Without litigation, without—

Mr. LOCKHART. No, we decided the appropriate thing to do was to follow the law.

Mr. SHERMAN. To pay the dividend?

Mr. LOCKHART. Yes.

Mr. SHERMAN. Okay.

The housing markets, in retrospect, look like—or those involved at Fannie and Freddie seem to be using models for what mortgages would be paid, what the mortgages would be worth that were based on the idea that it was unlikely that housing prices would ever decline. And now, in retrospect, you look back and you see charts showing the fair market value of all homes in the country being far more than the household income of the country could support.

And you also see—as Alan Greenspan has, I believe, pointed out—the large, increased inventory of unoccupied homes available for sale.

How is it that so many people who were worth so many millions of dollars a year got it so wrong when these two charts show that obviously housing prices had to come down?

Mr. LOCKHART. As the chairman has said before, there was exuberance in markets. This is one of the markets that obviously had a bubble in it. People just thought that house prices would continue to go up.

There were a lot of people who were starting to say at some point they were going to come down. Certainly, even the two companies were saying that a year or so ago, that housing prices were going to start to fall.

Mr. SHERMAN. But they didn't change their behavior. I hope for a mere $900,000, you can get smarter people.

I yield back.

Mr. KANJORSKI. The gentleman's time has expired.

19

Mrs. Biggert? I am sorry, it should be Mr. Royce.

Mr. ROYCE. Thank you, Mr. Chairman.

Director Lockhart, I think you spoke about the credit risk and the interest rate risk that these portfolios took on, and I assume now those portfolios are about $100 billion underwater. At one point, they had $1.5 trillion in the portfolios.

You mentioned that the credit profile at both enterprises followed the market down in 2006 and in 2007. So my question would be, had Congress acted in the early stages of this crisis to pass meaningful GSE reform—and that would imply reform with a systemic risk regulator to do something about the problem, as argued by the Federal Reserve at the time and as would have been included in my legislation and my amendment—do you think, had that happened, could that have led not to a situation today where Fannie and Freddie were in conservatorship? Could we have prevented that potentially?

Mr. LOCKHART. A significantly stronger regulatory regime with stronger capital rules, stronger safety and soundness rules, stronger portfolio rules, many of the things we tried to do, but really didn't have the power to do over the past few years, would certainly have helped prevent this from happening, yes, sir.

Mr. ROYCE. The other question I would ask, as has been reported in the press, even as the bubble was popping, these institutions dived into pools of subprime and Alt-A liar loans, as they have been called, to meet congressional demand to finance affordable housing. As the Wall Street Journal wrote the other day, Fannie and Freddie's patrons on Capitol Hill didn't care about the risks inherent in their combined trillion-dollar-plus mortgage portfolios so long as they helped meet political goals on housing.

Even after taxpayers have had to pick up a bailout tab that may grow as large as $200 billion, House Financial Services Chairman Barney Frank still won't back a reduction in their mortgage portfolios, says the Wall Street Journal on that.

So Director Lockhart, in your testimony you also mention the increased portion of riskier loans taken on by the GSEs in recent years, especially since the beginning of 2007. And I have heard that while Alt-A loans make up, what, 10 percent of the portfolio, they make up 50 percent of the recent losses for the GSEs.

Can you expand upon the role this riskier class of loans played in the GSEs' downfall?

Mr. LOCKHART. Certainly what was happening in the mortgage market in late 2005, 2006, and 2007, there was really a feeding frenzy on lower-quality loans. Wall Street was packaging them together and putting them into these many tranched securities, either subprime or Alt-A, and Fannie and Freddie, to meet their housing goals and for other reasons, purchased these securities.

They also did a lot of not subprime, but did Alt-A and lower documentation loans and some of the more interest-only and other exotic mortgages in that period. And that basically led to them taking on more risk than they traditionally had, and that caused significant losses.

Mr. ROYCE. And my last question: Due to the lack of the ability of the regulator at this point to basically regulate for systemic risk, to stop systemic risk—we know banks leverage 10 to 1 typically—

20

how much were Fannie Mae and Freddie Mac leveraging at this point in time?

Mr. LOCKHART. If you look at the leverage, and one way you can look at it, I think it is reasonable, is their mortgage credit exposure, the $5.3 trillion that they have versus their capital, they were at about 1 percent. They were significantly leveraged.

Mr. ROYCE. Give me an approximate percentage, just a ballpark.

Mr. LOCKHART. 1 to 2 percent. Based on their capital—

Mr. ROYCE. In terms of their capital. And so they had the credit risk and the interest rate risk inherent in these portfolios on top of, you know, all of this compounding to leverage in a way that was just reckless.

Mr. LOCKHART. I think that is why we kept asking. I testified in this committee even before I had my confirmation hearing in the Senate about the need for capital for these two companies and about the need for reform.

Mr. ROYCE. Right.

Mr. LOCKHART. For the last year, we have been pushing them to build more and more capital. One of the things that happened is, they just couldn't do it anymore.

Mr. ROYCE. Well, a number of us, including Mr. Garrett, Mr. Shays, and myself have been pushing for over 5 years. But I appreciate that very much, Director Lockhart, and thank you.

Mr. KANJORSKI. Thank you very much, Mr. Royce.

We have three votes on. It will take us approximately 30 minutes, so the Chair will recess. Upon the completion of the three votes, we will continue. Thank you.

[Recess]

Mr. KANJORSKI. The committee will reconvene. And Mr. Lynch of Massachusetts is, I think, our next questioner.

Mr. LYNCH. Thank you, Mr. Chairman. And I want to thank the witness as well for his good work and his willingness to help the committee with its work.

I just have a question regarding the wider problem that we are having here with the complex derivatives and especially those with mortgage-backed elements to it. I am trying to get an answer; and this is more on the implementation stages of trying to right the ship, so to speak.

And I guess, very generally, I would like to ask you, Mr. Lockhart, if you have overseen any of the what they would call "unwinding process" between some of these complex—taking some of these, you know, mortgage-backed securities, multitranche securities, and trying to unwind them—trying to unwind them so that they can be sold, repackaged, and saved.

And, you know, I am going to have some traders come in and explain to me in micro detail how this happens. Because I have some misgivings about the bigger program that we are considering in the next few days and the speed at which we might be able to unwind some of these securities that we buy and get them back out on the market and try to recapture some of the money that we are taking from the taxpayer perhaps in the next few days.

Can you shed any light on this? I know you are a pretty smart guy, and you are sort of in the middle of this, but you might have other smart people that you rely on for this piece.

21

So I am not sure. I don't want to put you on the spot, but any information you could give us would be helpful.

Mr. LOCKHART. Wall Street sold a lot of what are called "private label securities," where they packaged up mortgages, and sometimes they were subprime mortgages, sometimes what they call Alt-A, and sometimes even prime mortgages.

They structured them into sometimes 10 different what they call tranches, and the highest one would have AAA, and you go down to something that is really junk.

What happened is Wall Street then took some of the lower-quality ones and put them into a new security, a collateralized debt obligation, and did it all over again, and did those tranches.

Fannie and Freddie never bought any of the collateralized debt obligations; they just bought the private label securities.

Mr. LYNCH. I see.

Mr. LOCKHART. They just bought the AAAs.

Now, what has happened as the house prices have deteriorated, some of those AAAs are no longer AAAs. Trying to put those securities together is somewhat difficult. We have actually been talking over the last year with both companies about a Humpty-Dumpty back together again approach. And potentially, part of the proposal coming out of Secretary Paulson and President Bush would be to be able to buy some of those securities and be able to work through those mortgages. Hopefully, what can be done is, we can work with individual homeowners, prevent foreclosures, have loan modifications, and then potentially get the people into new mortgages or sell those mortgages in a less toxic way.

Mr. LYNCH. And I appreciate—you described the intention or the hope of the administration of, I know, Secretary Paulson; but what I am trying to dig at is, how does that happen at the implementation stages? How do we get that done? Because looking at some of these CDOs, it is difficult. And I have talked to some pretty smart people on this—Harvey Pitt, former SEC—and it is very difficult to understand who owns what in some of these very complex derivatives.

And here we are about to consider, you know, taking $700 billion in taxpayers' money for the purpose of purchasing, okay, $700 billion, 80 percent of which are securitized. There are—only 20 percent of them are whole loans, whole home mortgages; the rest of them are securitized, and most of those are subprime and Alt-A and God knows what rating they have today.

I am just nervous about the complexity of trying to unwind some of these securities. And I am looking for some assurances that the impact of what we are doing here is actually going to be felt in the market and not be diluted with a process of unwinding that takes months and months and months.

And, you know, unfortunately, you are the witness who is before me this afternoon, so you get the question.

Mr. LOCKHART. It is a complex process, but it needs to be done. We need to free up the balance sheets of the financial institutions so they can lend again.

As these are taken off the balance sheets, there will be the opportunity. One of the key opportunities will be to get into the underlying mortgages. And that is the key thing, to help people in

22

these underlying mortgages to have their mortgages modified, to prevent foreclosures, and to try to get them into new, better mortgages.

Many of the mortgages, as you know, had teaser rates at the beginning that are now going up. We need to get these people out of those mortgages.

Mr. LYNCH. I understand my time has expired. If I could ask you, though—and thank you for your forbearance, Mr. Chairman—can I get somebody from your shop to sit down, and let's go over that whole unwinding process?

Mr. LOCKHART. Our people would be happy to do that.

Mr. LYNCH. Thank you very much.

I yield back my time, Mr. Chairman. Thank you.

Mr. KANJORSKI. Thank you, Mr. Lynch.

The gentlelady from Minnesota, Ms. Bachmann.

Mrs. BACHMANN. Thank you so much, Mr. Chairman, and also to our witness, Mr. Lockhart.

Mr. Lockhart, I am interested in your thoughts regarding the Housing Trust Fund that was created in the Housing and Economic Recovery Act, and whether or not FHFA plans to finance it while the GSEs remain in conservatorship. I sent you a letter that was signed by 37 other Members of our body, urging you not to sign it during these very dire, dismal economic times for the GSEs.

And, Mr. Chairman, I would ask unanimous consent that this letter would be submitted for the record, Mr. Chairman.

Mr. KANJORSKI. Without objection, it is so ordered.

Mrs. BACHMANN. Thank you, Mr. Chairman.

The legislation that authorizes this fund, Mr. Lockhart, also specifically directs you to suspend payments to the fund if these allocations: Number one, are contributing or would contribute to the financial instability of the enterprise; number two, are causing or would cause the enterprise to be classified as undercapitalized; or number three, are preventing or would prevent the enterprise from successfully completing a capital restoration plan under section 1369(c).

It just seems to me that the GSEs have already met these specifications one, two, and three. And I am wondering, Mr. Lockhart, do you plan to suspend financing of the Housing Trust Fund while the GSEs are in the present state of conservatorship?

Mr. LOCKHART. We are well aware of the language and certainly have analyzed the language. We will be reviewing, when they put out their third quarter numbers, whether we think it is right to suspend or not.

At this point, as you know, the money for the first year is not going to go into an affordable housing fund, it is going into the HOPE for Homeowners part of the bill. To the extent that happens, Treasury would have to put in the money instead of Fannie and Freddie.

We will be working that over, looking at the language and looking at the financial results, and I will be happy to respond to your letter.

Mrs. BACHMANN. Mr. Chairman, if I could just follow up with Mr. Lockhart?

23

Mr. Lockhart, do you know about what date that would be when you receive that information?

Mr. LOCKHART. They should be reporting their third quarter numbers in November. There will be no funding before then. Once we have seen the numbers, we will make our decision.

Mrs. BACHMANN. Mr. Chairman, and Mr. Lockhart, I am wondering, so you stated then that Treasury would be putting money into the HOPE NOW account?

Mr. LOCKHART. That is, as I understand it, how the law works, yes.

Mrs. BACHMANN. Okay. Mr. Chairman, I yield back. Thank you so much.

And thank you, Mr. Lockhart.

Mr. KANJORSKI. Thank you very much, Ms. Bachmann.

Mr. Cleaver?

Mr. CLEAVER. Thank you, Mr. Chairman.

Mr. Lockhart, I have about four questions, and the first is rather simple: Have you been involved with the Fed Chairman and the Treasurer in the negotiations and discussions that have been taking place in an attempt to produce some kind of rescue plan?

Mr. LOCKHART. No, not actively. We were certainly very involved with them when we were looking at the conservatorships. I was on a panel with them earlier this week, but we have not been active in negotiations. We have been talking to people off and on, but we have not been an active participant.

Mr. CLEAVER. I am just wondering because—I mean, if in fact the crisis we are facing was launched by the housing crisis, I just have some difficulty not seeing you involved.

Mr. LOCKHART. We have talked to people in Treasury and certainly people in the Federal Reserve about the issue; but as I said, it has really been the Chairman and the Secretary that have done most of the structuring.

Mr. CLEAVER. One of the sticking points for many of us is the bankruptcy change that we are advocating, which would allow a bankruptcy judge to modify the principal in an attempt to keep people in their homes.

Is that a realistic—I mean, I know you are going to talk around it, but I am going to ask you anyway. Is that a realistic and fair inclusion in the legislation that we are going to ultimately consider this weekend, I think?

Mr. LOCKHART. I can't answer that for the Secretary, but I can tell you that I think the better solution is to modify people before they get into bankruptcy; and to prevent foreclosures before, because bankruptcy is such a big blot on their record. Fannie and Freddie are reaching out to people and trying to help them modify before they get into the need for bankruptcy.

Mr. CLEAVER. I agree, and we were a part of that, this committee was. But you can understand why we, most of us have 100 percent of our constituents opposed to any kind of resolution of this issue that would require large investment of the taxpayers' dollars into the purchasing what could be toxic assets, and wealthy folk would have a second home actually excluded in a bankruptcy, whereas people in their primary home cannot.

24

And that doesn't sell well in Sedalia, Missouri. People are angry about that. So that is one of the reasons many of us are concerned about it.

My other question is related to the preferred stock issued by Fannie and Freddie and the claim by many of the banks that it is dragging them under. I read somewhere that upwards of $30 billion has been negatively impacted by the dividend payments of Fannie and Freddie on preferred stock. And I am wondering, is there any kind of evaluation right now of the suspension of dividend payments on Fannie's and Freddie's preferred stock?

Mr. LOCKHART. Fannie and Freddie had about $35 billion in preferred stock outstanding, and it was widely held. But there are certainly some holdings, and significant holdings, by banks and smaller community banks as well. We felt that they could not afford that preferred dividend in conservatorship, and that is why it was eliminated.

We are not rethinking that decision. We had talked to the bank regulators before that decision was made, and we are continuing to talk to the bank regulators; and certainly they are taking actions with the individual banks to try to help them address any that have capital problems.

Mr. CLEAVER. Of course, many of those banks are the smaller community banks. I had a conference call with a number of them in Missouri this morning.

Mr. LOCKHART. Right.

Mr. CLEAVER. And this is one of the concerns they are expressing.

Mr. LOCKHART. We also now, because of the new law, supervise the Federal Home Loan Banks, which deal a lot with smaller banks. They are very actively working with the smaller banks and certainly making advances as necessary to the smaller banks. So that part is continuing to work, and we will be working with the smaller banks, some of which may have these preferred stocks.

Mr. CLEAVER. That is all, Mr. Chairman.

I would like to express appreciation to you, Director Lockhart, for the genteel, evasive way you dealt with the question on bankruptcy.

Mr. LOCKHART. Thank you.

Mr. CLEAVER. That was very skillful.

Mr. LOCKHART. Thank you, Congressman.

Mr. KANJORSKI. Thank you, Mr. Cleaver.

Mr. Ellison is recognized.

Mr. ELLISON. Thank you, Mr. Chairman.

Sir, thank you for coming here today. I have a few questions for you. First of all, in your view, is the Community Reinvestment Act at all to blame for this housing meltdown we have seen over the last several days and weeks and months?

Mr. LOCKHART. I am not an expert in the Community Redevelopment Act because—

Mr. ELLISON. Reinvestment Act.

Mr. LOCKHART. Reinvestment Act, I am sorry, CRA, because Fannie and Freddie are not subject to that.

Mr. ELLISON. I understand. I am going to get to that.

25

Mr. LOCKHART. I can't really say that it is responsible. It wouldn't seem apparent to me that it would be.

Mr. ELLISON. Now—okay, so just to ask a few basics: You do know that CRA applies only to commercial banks, right?

Mr. LOCKHART. Right.

Mr. ELLISON. And you do know that not most, but the over-whelming number of subprime loans that have ended in foreclosure had come from mortgage originators, not commercial banks?

Mr. LOCKHART. Certainly some came from commercial banks, but a lot came from various other channels, mortgage brokers and other originators, and they were packaged up and sold to Wall Street, yes.

Mr. ELLISON. Right. So to somehow imply it is the CRA, your sense of what you do know, though you are not an expert, is that it is really not the case. Am I right about that?

Mr. LOCKHART. Again, my view is that I have never heard that to be a major issue at this point.

The real problem was everybody lowered their underwriting standards dramatically. They were making loans to people who couldn't afford them, and they were not telling people that they couldn't afford them when they were making the loans. That was the problem.

Mr. ELLISON. And based on your understanding, there is nothing in the CRA that says, you shall lower your underwriting standards. Am I right about that?

Mr. LOCKHART. I assume so, yes.

Mr. ELLISON. Let's talk about Fannie and Freddie. They had their own goals for affordable housing. Is that right?

Mr. LOCKHART. That is correct.

Mr. ELLISON. Can you tell me whether Fannie and Freddie's pur-suit of its own affordable housing goals contributed in any way to the demise of Fannie and Freddie?

Mr. LOCKHART. They are not demised. They are actually ongoing companies—

Mr. ELLISON. Right. That is true.

Mr. LOCKHART. —that are extremely active in the mortgage mar-ket, and still the major players in the mortgage market.

Mr. ELLISON. Thank you for that correction.

You know what I mean. I mean the fact that they—

Mr. LOCKHART. They are in conservatorship, and they are con-tinuing to do and fulfill their mission in conservatorship. They had goals set by HUD which, before the legislation passed, set the goals. Now that the legislation has passed, we will be setting goals in the future, this new agency.

The goals were aggressive and, significantly, they were set in 2004 and escalated over the years. As they escalated, it became harder and harder for the two companies to meet those goals, and sometimes they had to stretch. And sometimes that stretch meant that they potentially lowered the underwriting standards.

Certainly, they got credit for many of the subprime mortgages in those AAA securities that they bought.

Mr. ELLISON. But is there anything in the mandate of Fannie and Freddie that says, reduce your underwriting standards in order to meet affordable housing goals?

26

Mr. Lockhart. No. The mandate of Freddie and Fannie actually is to keep strong underwriting standards. For instance, by charter, they are only allowed 80 percent loan-to-value loans.

Mr. Ellison. Right, so Fannie and Freddie are actually enjoined to keep good underwriting standards. So if somebody made a decision to take an overabundance of, say, Alt-A loans, that would not be in the spirit of that mandate to keep good underwriting standards. Is that right?

Mr. Lockhart. They made some trade-offs over the years, and it turned out those trade-offs were unsuccessful. They basically lowered their underwriting standards; and maybe part of that was to get affordable housing, but oftentimes it was just that they felt it was an attractive loan.

Mistakes were definitely made, and that is one of the reasons that they are in conservatorships.

Mr. Ellison. Right.

And other than, for example, getting credit for trying to move toward affordable housing goals, Fannie and Freddie's decision to take a greater percentage of its portfolio in those no doc, low doc-type loans, they got other benefits from that as well. Am I right about that?

Mr. Lockhart. Certainly it was a higher margin business than just prime business, yes.

Mr. Ellison. They made more money from it?

Mr. Lockhart. Yes.

Mr. Ellison. So it really wasn't altruism?

Mr. Lockhart. They thought they were going to make more money.

Mr. Ellison. Right. They thought they were going to make more money for it.

Mr. Lockhart. Right.

Mr. Ellison. So altruism about affordable housing probably wasn't the major factor. Wouldn't you agree with that?

Mr. Lockhart. I can't really get into the minds of the underwriters of Fannie and Freddie.

They were looking at a variety of things. Affordable housing goals were one. Profitability was one too, and certainly credit risk was another.

Mr. Ellison. Right.

Now, the Washington Post reported on its front page a few weeks ago that Fannie and Freddie actually engaged in some accounting procedures that may not be standard on affordable housing; and HUD let them do it. Instead of buying responsible CRA mortgages made by banks and nonprofits in Minnesota, they let GSEs nurture brokers who would finance subprime, higher-cost loans.

Can you respond to that statement?

Mr. Lockhart. I am not sure that I—

Mr. Ellison. Follow that?

Mr. Lockhart. —am aware of that.

Mr. Ellison. Me either. Anyway, thank you very much.

Mr. Lockhart. Thank you.

Mr. Kanjorski. The gentleman from Colorado, Mr. Perlmutter.

Mr. Perlmutter. Thank you, Mr. Chairman.

And Mr. Lockhart, thank you for your testimony today. I do appreciate really—you know, with maybe one exception—your answering these pretty straight. So I just have some factual questions so I understand this a little better.

The balance sheet, let's go Freddie Mac first. In July, you all were here to talk to us about the new bill, the FHA, Fannie Mae-Freddie Mac regulatory bill.

In July, what did the balance sheet of Freddie Mac look like?

Mr. LOCKHART. Freddie Mac had core capital of about $37 billion. It had a shareholders net worth of about $13 billion. Actually, another way some commentators were looking at it, as if they marked everything to market, it was a negative number. There are a variety of ways to look at balance sheets, but the legal way, the one that is in the law, is core capital, which was $37 billion.

Mr. PERLMUTTER. All right. And we will talk about marked to market in just a second.

So assets versus liabilities, what were the assets, and generally what are the assets of these two organizations?

Mr. LOCKHART. The assets of the two organizations are really their mortgage portfolios. At that point, I think Freddie had almost $800 billion in mortgage portfolios, $69 billion in liquid assets; and debt of $874 billion really pretty much offset that. The balance sheet is very simple. They borrowed to invest.

Mr. PERLMUTTER. Okay. And so from whom do they borrow?

Mr. LOCKHART. They issue their securities worldwide. They borrow from institutions in this country, they borrow from central banks around the world, and they borrow from international investors. It is really spread throughout the world.

Mr. PERLMUTTER. Short-term, long-term, mixture?

Mr. LOCKHART. They try to do long-term, because their assets are long-term, but they have, especially at the moment, a big mix of short-term debt.

Mr. PERLMUTTER. Okay.

Now Fannie Mae, back in July when you were here, what was their balance sheet, what were their assets and their liabilities?

Mr. LOCKHART. They had core capital of $47 billion, so they were bigger. They had shareholders equity of $41 billion. They actually had a positive fair value of $125 billion, as well.

Mr. PERLMUTTER. What was their portfolio?

Mr. LOCKHART. Their portfolio was somewhat similar, $758 billion in mortgage-backed securities, and then another $104 billion in liquid assets, and debt of $846 billion.

Mr. PERLMUTTER. Okay. Fast forward to September whatever, whenever you took the conservatorship. What were the assets and liabilities and core capital of Freddie Mac and what were the assets and liabilities of Fannie Mae? And tell me how mark to market played a role in that.

Mr. LOCKHART. We did not see a new balance sheet. They only produce public information once a quarter.

What we were looking at at that point, and in August and September, were some of the very big exposures on the balance sheets and the ranges of possible losses, particularly in areas like credit losses, and also the losses on their private label securities, and also some other issues related to things like their deferred tax asset.

28

There were a lot of exposures on that balance sheet that could produce a much lower capital number.

Mr. PERLMUTTER. So during the month of August, if I understand correctly, your office, as well as some outside firms, tried to come in and examine the books of Fannie Mae and Freddie Mac. Is that right?

Mr. LOCKHART. Our job is to examine. We are continuously examining both firms. In July, we brought in help from the Federal Reserve and also the Office of the Comptroller of the Currency, including some of their credit examiners to look at the situation as well.

Mr. PERLMUTTER. In August, were these organizations—when you took the conservatorship, were they paying their debts as they came due? I mean, were they—what was their income versus their operating expenses?

Mr. LOCKHART. They were paying their debts as they came due, and they continued to pay their debts as they came due. The problem was the markets were starting to close up. They were starting to look like they might not be able to borrow in the future, and the risks were too high to the system not to take the conservatorship action.

Mr. PERLMUTTER. And did it apply—were both in the same boat, or was Freddie Mac in a worse position than Fannie Mae? Or how would you, as the regulator, compare the two?

Mr. LOCKHART. That is a good question. Certainly, on June 30th, the capital position of Fannie Mae was stronger than the capital position of Freddie Mac. However, they were losing more money. They lost about $2.2 billion in the second quarter while Freddie lost about $800 million. Fannie Mae also has a much bigger portfolio, so they had a bigger exposure to credit risk.

It is hard to equate the two, but they both had significant risk.

Mr. PERLMUTTER. I thank you, and I would like to visit with some of your staff to really get into this a little bit more.

Mr. LOCKHART. We would be happy to do that.

Mr. PERLMUTTER. Thank you very much.

Mr. KANJORSKI. Okay. The gentleman from Colorado has completed his examination.

The gentleman from Connecticut, Mr. Murphy.

Mr. MURPHY. Thank you very much, Mr. Chairman.

Thank you, Mr. Lockhart. I just have a few quick questions, building on Mr. Cleaver's questions regarding the effect on depository institutions. I certainly understand the statement in the prepared testimony regarding your understanding that their regulator is willing to work with banks that may be put in a particularly difficult position by the lack of dividends.

I think much of the frustration from those institutions, whether they held 5 percent of their capital in Fannie and Freddie, or 20 percent of their capital, was that, you know, they felt that they were being asked, in fact, and saw the rules regarding the amount of position that they could take be relaxed in order to try to be part of the solution. And having seen regulators allow them to take bigger positions in Fannie and Freddie, they now feel, I think, a little bit more dispirited about where this has gone since then.

29

And so I have heard sort of two things, whether the dividends have been suspended or whether they have been permanently terminated. And you certainly said to Mr. Cleaver's questions that you don't have any plans now to revisit that issue. But do you have any timeframe, do you have any belief or reason to believe that in the future you may return dividends to those preferred shares?

Mr. LOCKHART. First of all, the dividends are noncumulative, so the ones that are missed are missed.

Mr. MURPHY. Yes.

Mr. LOCKHART. Going forward, coming out of conservatorship, there is a possibility. I don't know how large that possibility would be, but there is a possibility.

Many banks were aware. These prices had deteriorated well before we took our action in September, and many banks had already started to take impairments for well over a year on their holdings in these preferred. It wasn't as sudden as you might think. In fact, the preferred stocks were selling at about 50 percent of their face value before we took the action.

Mr. MURPHY. And without being able to reinstate those dividends, there are several other solutions that might be able to help those institutions, including a postponement of their ability to mark-to-market those assets pending some resolution of the actual value of the asset, as well as some differential tax treatment, their ability to potentially take ordinary versus capital losses.

Have you been involved at all in those conversations or spoken to the community banks about those requests pending on the legislation that we are examining now?

Mr. LOCKHART. We have talked to some of the community banks, and we have had some of the State banking associations in to discuss alternatives. It is really up to the bank regulators. To the extent it is going to be a change in the tax treatment, that is up to Congress.

Mr. MURPHY. And just lastly, to the extent the actions taken through the conservatorship have led to this problem for many banks that now precipitate them to be asking for relief before other bodies, to the extent that if you believe that that is a reasonable ask, I think that many of us would certainly appreciate your advocacy with them or on their behalf.

Mr. Chairman, thank you very much for the time.

Mr. KANJORSKI. Thank you, Mr. Murphy.

The gentlelady from California, Ms. Speier.

Ms. SPEIER. Thank you, Mr. Chairman.

Director Lockhart, the Federal Government, the taxpayers, have injected $250 billion into Fannie and Freddie, correct?

Mr. LOCKHART. No, that is not correct. They actually haven't invested anything yet. What they have done is, they have put facilities in place that they might draw down in the future if needed. At this point, there has been no taxpayer money put into Fannie and Freddie.

Ms. SPEIER. So they continue to be private companies?

Mr. LOCKHART. They are private companies in conservatorship, which means that the Agency, FHFA, has replaced the board of directors as the executive, if you will, and we have chosen new CEOs to take over the companies. The shareholders are still in place;

30

both the preferred and common shareholders have an economic interest in the companies.

Ms. SPEIER. All right. Do you think that the naked shorts contributed to the financial ruin of Fannie and Freddie?

Mr. LOCKHART. There was certainly a lot of activity in Fannie and Freddie's stocks over the last 2 or 3 months, and there was probably some short selling. Whether they were naked or not, I don't know.

Ms. SPEIER. Do you think there is any reason to call in the appropriate Federal investigators to see if there was any fraud associated with it?

Mr. LOCKHART. I am sure that the SEC is looking at those issues. We are pretty close to the SEC; in fact, the Chairman of the SEC is on our Oversight Board. I am sure that they are very aware of the situation and are looking at it.

Ms. SPEIER. So it is certainly, I think, the intent of those in Congress that if we are going to assist Fannie and Freddie to the tune of $250 billion, that we see mortgages reset so that foreclosures don't take place. But the reality, it appears, is that most of what you hold are not mortgages, but securities that are mortgage-backed. Is that correct?

Mr. LOCKHART. Their basic business is to buy mortgages. They package them into securities and then put a guarantee on them. They have well over $3 trillion of those outstanding.

In addition, they buy some of those securities themselves and keep them in their portfolio. They have also bought securities issued by other issuers, those private label ones I was talking about. In addition, they have whole mortgage loans.

The vast majority of their holdings are either that they have guaranteed or they hold in their portfolios. They have about, of their $5 trillion, $200 billion or so that are not their own securities, but are mortgages.

Ms. SPEIER. So you are in a position then to do, for instance, what some of the other institutions have done, FDIC being one, to freeze the interest rates, keep people in their homes, and adjust the mortgages?

Mr. LOCKHART. Fannie and Freddie have very active loan modification/foreclosure prevention programs. It is very important to them; they are working very hard on expanding those activities.

We just put out a report yesterday, which we are going to update quarterly, looking at those loan modification activities. I would be happy to send you a copy of it.

Ms. SPEIER. Do I have any more time, Mr. Chairman?

Mr. KANJORSKI. There are no lights.

Ms. SPEIER. My last question, I guess I am very confused by why you would continue a no doc or low doc policy when the Fed has basically said that verification by institutions is mandatory now.

Mr. LOCKHART. They are not continuing. What they are doing is, they are making a few low documentation loans at this point, as I understand. The amount has dropped dramatically, as far as I know, and they are looking at that policy. Basically, as I understand, the ones that are made are to people with relatively high incomes and very high FICO scores.

31

Ms. SPEIER. Well, I have income, not high income, and a high FICO score; and I had to give all that documentation when I put an offer in on a house just 2 weeks ago. So I would encourage you to abandon that policy.

Thank you, Mr. Chairman.

Mr. KANJORSKI. The gentleman from Connecticut, Mr. Shays.

Mr. SHAYS. Thank you.

Mr. Lockhart, thank you for being here. I want to get back to what I wrestle with, and that is why Fannie and Freddie, two of the largest financial institutions in the world, were never under the 1933 and 1934 Securities Acts. The 1933 and 1934 Acts were to prevent the kind of problems we have now; they were part of the Franklin Delano Roosevelt Administration.

And I know that you were recommending that we get them to play by the rules. Everyone else has to. But they still don't. They are under the 1934 Act; they are not under the 1933 Act. Can you give me a reason why they shouldn't be under the 1933 Act?

Mr. LOCKHART. They have both now registered with the SEC. Freddie just completed that in June. They went through a very thorough registration process.

Mr. SHAYS. With all due respect, that is under the 1934 Act?

Mr. LOCKHART. Right.

Mr. SHAYS. And let me just say, to express my bias, the reason they agreed to come under the 1934 Act is, they were concerned they might have to come under the 1933 Act, so they voluntarily told the Congress and the SEC that they had agreed to go under, so back off.

When we put this legislation in, I got a call from Frank Raines the next day saying, "What the hell are you doing?" I had one of their lobbyists practically knock down my door and say, "How dare you introduce this bill before checking with me?"

So I am not impressed that they voluntarily agreed. What I am troubled with is that they are not under the 1933 Act. Why are they not under the 1933 Act?

Mr. LOCKHART. Congress, when they passed the new law, put them under the 1934 Act, but not the 1933 Act.

The 1933 Act has additional disclosures on securities. My view is when you look at the financial statements and their disclosures, they are quite extensive at this point. Of course, it is an issue that Congress can continue to look at.

Mr. SHAYS. Okay. Let me put it differently. So you are not advocating. Is there any reason why they should not be under the 1933 Act?

Mr. LOCKHART. My view is that the 1933 Act would not add significant disclosure beyond the 1934 Act, and it could increase cost and friction in the mortgage market.

Mr. SHAYS. Because they would have to play by the same rules that everyone else has to play by?

Mr. LOCKHART. Effectively, because they are the biggest issuers of mortgage-backed securities and securities in this country, and it would be extremely paperwork-intensive.

But, again, it is an issue for Congress to look at.

Mr. SHAYS. I understand that. The bottom line to this is, though, that had they been under the 1934 Act a lot sooner, they wouldn't

32

have been in the mess they are in because they played by different rules. Isn't it true that Freddie Mac has still not complied to the 1934 Act?

Mr. LOCKHART. Freddie Mac just completed registration in June under the 1934 Act.

Mr. SHAYS. And that is how many years after—I am sorry, I interrupted you.

Mr. LOCKHART. It is the first time in their history that they were ever registered with the SEC, if that is the question you are asking.

Mr. SHAYS. Well, no, my question is, didn't they volunteer to be under the 1934 Act about 3 years ago?

Mr. LOCKHART. Probably longer than that—4 or 5 years.

Mr. SHAYS. So it has taken them that long?

Mr. LOCKHART. What happened was, all the accounting messes were discovered. They were never able to. It took them 3 years to actually become a timely filer.

Mr. SHAYS. And the reason the accounting mess was there was they weren't under the 1934 Act. Because had they been under it, they would have had to disclose, there would have been transparency; the SEC would have said, you are not conforming.

And we would have been able to at least not be in as deep a mess as we are in right now; isn't that correct?

Mr. LOCKHART. If they had been registered with the SEC, there may have been more disclosure than they historically had. There is no doubt about that.

Mr. SHAYS. And if they had disclosure, they wouldn't have been able to do some of the things they had done, correct?

That is not a hard question to answer.

Mr. LOCKHART. Yes, it is. You can disclose, but not disclose the truth.

Mr. SHAYS. But they didn't have to disclose it. They didn't have to lie.

Mr. LOCKHART. Yes. So I mean—

Mr. SHAYS. Well, let me ask it differently.

If they had disclosed and disclosed the truth, they wouldn't have been able to do that; isn't that correct?

Mr. LOCKHART. That is correct. If they would have had good disclosure and good accounting, which they didn't back then; they didn't have good accounting.

Mr. SHAYS. They did not?

Mr. LOCKHART. They did not.

Mr. SHAYS. Yes.

Mr. LOCKHART. And that was one of the big problems.

Mr. SHAYS. Well, it is not your fault. It is Congress' fault for letting them get away with it.

And the only problem I have in this whole process is hearing Members of Congress mouth off about what a tragedy this is, why it happened, blaming someone else, when they voted against the very legislation that would have gotten them under the 1933 and 1934 Acts.

I yield back.

Mr. LOCKHART. Thank you.

Mr. KANJORSKI. The gentleman from North Carolina, Mr. Watt.

33

Mr. WATT. Thank you, Mr. Chairman. I am over here.

I wasn't here for Director Lockhart's testimony, and I don't have any questions, but I did want to publicly apologize to him. I accused him of doing something that he did not do. It was actually Mr. Preston who did it. I just wanted to apologize to him publicly. He knows what I am talking about, so please accept my apologies.

Mr. LOCKHART. I appreciate that. Thank you, Congressman.

Mr. SHAYS. Is that sackcloth over your back?

Mr. KANJORSKI. Does anybody have a chain?

Mr. Capuano from Massachusetts.

Mr. CAPUANO. Thank you, Mr. Chairman.

Mr. Lockhart, thank you for being here. I know you have already answered the question, I heard it earlier, but I want to hear it again very clearly.

At this moment, how many taxpayer dollars are invested in Fannie and Freddie since the conservatorship has been—

Mr. LOCKHART. No taxpayer dollars are invested in Fannie and Freddie.

Mr. CAPUANO. Thank you. I knew it, but I think it is an important point to make, particularly this week, that the possibility is there, we all know that, but up until this point things—absent things beyond your control, at least things internally are heading in the right direction, and no taxpayer dollars have been put on the table.

Mr. LOCKHART. No. There is a senior preferred facility from the U.S. Treasury that they will tap if they have negative net worth, that is, assets minus liabilities are negative. They will put money in, but until that happens, there is no money that has been put in.

They haven't had to borrow under the facilities either.

Mr. CAPUANO. Thank you.

The other question I had, as I understand it, other than the degree or maybe some of the amounts of the dollars, as I understand it, Fannie and Freddie were not doing anything unique to Fannie and Freddie that other people in the marketplace were not doing, such as investing in Alt-As and maybe some exotic items and maybe some low verification items.

Is that a fair assessment or an unfair one?

Mr. LOCKHART. They were not doing things that other people didn't. In fact, their underwriting standards, frankly, were higher than many other people's standards.

Their problem was really the structure of the companies, that they didn't have enough capital to support the kind of risks that they were taking. The capital requirements put on them by Congress were changed, but unfortunately, a little late.

Mr. CAPUANO. Right. And I agree with that assessment. Again, I am just trying to have you say it.

That being the case, one of the things I am interested in is, right now, because of the conservatorship, it is my understanding that some private institutions, particularly—banks in particular—I am also interested in public pension funds, who in many ways were doing the right thing by investing in Fannie and Freddie, doing something that they are supposed to do—safe, secure, good cause; Fannie and Freddie do good work, at least their mission is good. They were doing the right thing, but because of the conservator-

34

ship, they may be now technically in violation possibly of some of the capitalization requirements that they have; and pension funds—not capitalization requirements, but some of the under-writing standards that they are required to.

And I know you are aware of it, but again I would like to put it on the record that: Number one, you are aware of it; and number two, you are working positively towards trying to address those issues.

Mr. LOCKHART. We certainly are aware of it. One of the key reasons that the financing was put in the way it was, was to protect the mortgage-backed security holders and the debt holders of these companies, that over $5 trillion.

That was so important, to track that exposure. We had to make a decision that there were some parts that couldn't be protected, and that was the common and preferred. Common and preferred holders are equity holders, and they are more at risk. When you are investing in common stock or preferred, you have more risk than you do when you are in debt.

Mr. CAPUANO. And I understand that. If everything works out the way we hope it works out and people hold on to what they have—again, I know there are some bumps in the middle of the road—in theory, there is no reason to believe that anybody, in the final analysis, should lose any money when this is all said and done?

Mr. LOCKHART. I can't say that.

Mr. CAPUANO. I understand. I said it. I didn't think you would, but I thought I would try.

Mr. LOCKHART. I would think that the common shareholders have already lost a significant amount of money, and certainly the preferreds. It is hard to imagine they would go all the way back.

At any rate, they still have some economic interest in this company, and going forward there may be some value.

Mr. CAPUANO. Okay. Thank you very much.

Mr. KANJORSKI. Mr. Garrett, do you have a desire to examine Mr. Lockhart, or are you going to allow him to escape? He has been on that seat for a number of hours.

Mr. GARRETT. Two minutes. Thank you. I will be brief, and I apologize for just running in.

Following up on my introductory comments to you and commending you for some of the actions that you have previously taken in that area, I read through your full testimony, because your testimony here was an abbreviation of that testimony.

Along the lines of contributions by Fannie and Freddie, what you did was good, as far as I know, was the elimination, as far as lobbying on the Hill and also contributions by Fannie and Freddie from their respective accounts.

A question for you, though—and it is not clear in here—is, what is the status with regard to these entities making contributions, charitable contributions, instead? Is that continuing?

Mr. LOCKHART. What we said and what they are doing is they are reviewing their charitable contributions. They are going to put together a plan of what charities they think they should be giving to in the future.

35

Obviously, when you are in conservatorship, one would think your contribution budget would be significantly less, and they will certainly be looking at that. On the other hand, there are some good causes there that they have supported over the years. They are going to be making recommendations to the conservator as to what they think they should continue to contribute to.

Mr. GARRETT. Okay. Just a couple of questions along that line, and maybe a comment. You have heard both sides say what they believe caused this problem, and you have heard probably both revisionist history, as Jeb said effectively, what did occur and what didn't occur.

One of the expressions out there in politics, as you know, is follow the money, as to what influence at least political contributions may have in any organization on the drafting of reform or not drafting of reform. Clearly, political contributions, has been said throughout history, that it can have a direct impact.

I would think, considering, if you look from my reading of the paper at least, that charitable contributions can also, if those charitable contributions just coincidentally go to the same places as political contributions—not necessarily, of course, directly to the Members, they can't, but to one of the Members' community, their pet projects and that sort of thing. So I would have a real concern from a political aspect of trying to get the reform, I think, that you and I both would like to see here occur.

Along that line, as well—I know you can't give me an answer to this right now, but I am curious about this—are you looking, not just prospectively, you are saying you are going to look into as far as what the future, are you looking also retrospectively what has been their history of charitable contributions?

And I guess before you answer that, I will say, if the answer is yes, is there data that we can get that would document where that has been over the last "X" number of years?

Mr. LOCKHART. We made a commitment to the chairman a month or so ago to put out a record of the history of their contributions for this year. Certainly, we will be putting that out. I am not sure if we are going to go back in history, but we will put out this year's contributions.

Mr. GARRETT. Okay. If it is possible—I mean, I assume it would be; I don't know how hard—but if it is possible just to go back a few years, 3 or 4 years, I would really be curious, and I think the public would just be curious, to see if there is any correlation as to where the charitable contributions go.

One of the questions that I bet somebody asked but I will throw out a different line, your opinion on the housing fund, which came about, of course, through the July bill and what have you, just your opinion as to whether or not that has—I always coin the phrase—a tax on the GSEs and the bottom-line effect of that on going forward?

Mr. LOCKHART. As I answered the Congresswoman from Minnesota, we will be looking at whether they should pay the 4.2 percent basis points for this year. Certainly, we will be looking at their financial results as they publish them for the third quarter.

You can look at that as a tax. You can look at it as a cost of doing business. You can look at it in a variety of different ways.

36

They don't pay State income taxes. They have some significant benefits from their GSE status, as you know, historically. So, to me—

Mr. GARRETT. That was always the argument why it was there, the benefit that they got. And so they have an obligation in going forward, if we want to make sure that they are able to continue to do those things, whether or not we want to at least give them a temporary break of that.

Mr. LOCKHART. Right.

Mr. GARRETT. Yes. Thank you very much. I appreciate your candor on those questions, and I look forward to hearing back from you, if possible, on some of those in more details. Thank you, Director.

Mr. LOCKHART. Thank you.

Mr. GARRETT. Thank you, Mr. Chairman.

Mr. KANJORSKI. Thank you, Mr. Garrett.

Thank you, Mr. Lockhart. If you are fast, you can get out of that table before another Member shows up.

Mr. LOCKHART. Thank you, Mr. Chairman. I appreciate it.

Mr. KANJORSKI. At this point, we are going to ask our two members of the next panel to come forward, Mr. Allison and Mr. Moffett.

Gentlemen, welcome to the hearing.

Maybe we will try Mr. Allison first for his opening statement.

## STATEMENT OF HERBERT M. ALLISON, JR., PRESIDENT AND CHIEF EXECUTIVE OFFICER, FANNIE MAE

Mr. ALLISON. Thank you, Mr. Chairman, and members of the committee. Thanks for inviting me to testify this afternoon.

I am Herb Allison, and I spent 36 years in the financial services industry, including as president and chief operating officer of Merrill Lynch and, most recently, as chairman, president, and chief executive of TIAA–CREF. I am honored to have been selected as the new president and CEO of Fannie Mae.

The Federal Housing Finance Agency placed Fannie Mae into conservatorship to conserve our assets, restore sound operations, and ensure that Fannie Mae could continue to fulfill its mission. Our job is to balance the needs for safety, soundness, and taxpayer protection with providing the most support possible to the mortgage market.

You asked me to address how Fannie Mae plans to operate, pursue its mission and prevent foreclosures.

Since September 7th, we have provided a steady supply of funding and liquidity to mortgage lenders. Our single-family and multifamily purchase and securitization activities have continued at a strong pace, despite the uncertainty of the markets. We securitized about $31 billion in single-family mortgages during the first 3 weeks of September.

On September 10th, we sold $7 billion in 2-year debt securities to global investors, the largest such offering in our history and a strong sign of confidence that investors are willing to fund our work. Since early last year, Fannie Mae has provided more than $1 trillion in liquidity to the mortgage market, and we are preparing to do even more.

37

In a market like this, making sure mortgages are accessible and affordable to homeowners is vitally important, but so is preventing foreclosures. Because working with borrowers in trouble requires personal interaction, we have increased staffing in our servicing operations in Dallas, Texas. We are also increasing the use of specialty servicers skilled in problem loan workouts, and have revamped our incentives to all of our servicers. We have issued 38,000 bridge loans this year to borrowers who fell behind because of a temporary life event such as a serious illness or a job loss.

But the scale of the current crisis and the responsibility entrusted to us by the government require that we do far more to stabilize the market, provide liquidity and prevent foreclosures to keep people in their homes. So we are looking at every aspect of our business, with the goal of improving our funding, pricing, trading, risk management and foreclosure-prevention efforts.

We are evaluating how we can participate in the FHA HOPE for Homeowners Program. We are also, as Director Lockhart said, in discussions with the FDIC and IndyMac on how we can help that institution with its streamlined loan modification program. We are increasing our purchases of mortgage-backed securities to bolster market liquidity, so that new mortgages remain available and affordable. Finally, we are examining our underwriting and our pricing standards to assure that we strike the right balance between expanding our activities and safeguarding taxpayers.

Mr. Chairman, we are working closely with our conservator and Treasury to find ways to assist in government efforts, including the mortgage asset liquidity fund proposed by Secretary Paulson to help the mortgage market recover.

As we take these steps to support the market, we are also taking steps to improve Fannie Mae. We are re-examining the company's risk posture, controls, expenses, operations, technology, corporate governance, and management structure, all to align Fannie Mae more closely with our mission and eventually to remove the need for government assistance.

Thank you again, Mr. Chairman, for this opportunity. I look forward to working with you, this committee, and the Congress during this difficult period in our housing markets and in our country. Thank you.

[The prepared statement of Mr. Allison can be found on page 62 of the appendix.]

Mr. KANJORSKI. Thank you, Mr. Allison.

And now the CEO of Freddie Mac, Mr. Moffett.

## STATEMENT OF DAVID M. MOFFETT, CHIEF EXECUTIVE OFFICER, FREDDIE MAC

Mr. MOFFETT. Thank you, Mr. Chairman. My name is David Moffett, and I am the new CEO of Freddie Mac. I am pleased to appear before you today.

With the committee's permission, I would like to submit my written testimony for the record.

I joined Freddie Mac less than 3 weeks ago, when the company was placed under the conservatorship of its regulator, the Federal Housing Finance Agency, or FHFA. I have a long career in the

38

banking industry, having served as vice chairman and chief financial officer of US Bank from 1993 until my retirement last year.

It is indeed an honor to have been chosen to lead Freddie Mac at this critical time. Nothing could be more important to our country's economic strength than to support housing markets with a stable supply of low-cost mortgage funds.

Along with Freddie Mac's dedicated employees, I am firmly committed to achieving the goals described by Treasury Secretary Paulson on September 7th, namely those of stability, mortgage availability, and taxpayer protection.

Working collaboratively with FHFA Director Lockhart, I am quickly getting up to speed. And I am working with Freddie Mac's nonexecutive chairman, John Koskinen, to appoint a new board of directors.

The combination of conservatorship coupled with Treasury's strong support has already been beneficial. The conservatorship lets us focus on strengthening our company, and the Treasury program is providing needed confidence to those who help fund our operations.

The easing of capital and liquidity concerns made possible by the Treasury funding commitment under the senior preferred stock purchase agreement and the Treasury's GSE credit facility is enabling us to bring greater liquidity in the market. Since the conservatorship, we have begun ramping up our purchases of mortgage-backed securities, buying more than $8 billion in mortgage-backed securities in the past 10 days alone.

Freddie Mac also remains focused on our affordable housing mission. Although the challenging market is making the housing goals very difficult to achieve, we estimate that our affordable mortgage purchases will substantially mirror the levels of the goal-qualifying loans being originated today.

And our multifamily program continues to provide needed liquidity to the affordable housing market. Every day, we are working diligently with our servicers to keep families in their homes, by providing borrowers viable workout alternatives such as forbearance, repayment plans, and loan modifications.

I am impressed with the company's innovative approach, such as the mass modification pilot that we are now conducting. In the weeks to come, I will be reviewing all of Freddie Mac's approaches to see if there are any other ways that we can help lenders in a prudent and a very sustainable way.

In closing, let me affirm that the conservatorship and the strong Treasury support is helping rebuild confidence in the company and in the U.S. mortgage market. I look forward to working closely with this committee and others on all these vital issues confronting the mortgage market and the housing market today.

Thank you, and I look forward to your questions.

[The prepared statement of Mr. Moffett can be found on page 83 of the appendix.]

Mr. KANJORSKI. Thank you very much, Mr. Moffett.

I am just going to take a few moments so we can move into questions quickly. Welcome onboard. You are, should I say overpaid executives or underpaid executives? I am not sure.

Mr. MOFFETT. We are not sure either.

39

Mr. KANJORSKI. But I am sure both this committee and the American people will take a little bit out of your hides before it is over.

If I could ask really in a joint question, what are your anticipations of success for Fannie and Freddie after everything settles down and you come up with a workable model? What can we expect on how they will contribute to stabilizing of the real estate market?

Mr. Allison?

Mr. ALLISON. Actually, I believe, first of all, we can take heart from the fact that Fannie Mae has a very strong employee base, extremely dedicated to the mission of providing affordable home-ownership to Americans.

We have, as you know, a very large book of assets. Much of those are good assets. They have been current for years. We do have, though, a large subportion of those assets that are troubled, and it is going to take some time to work those off the balance sheet.

But I do believe that when that is done—and it will be done—that the company will be in a very strong position to continue to serve the country.

Mr. KANJORSKI. Very good.

Mr. Moffett?

Mr. MOFFETT. Yes, Freddie Mac, just as Mr. Allison stated, has some wonderful employees, and they are very dedicated to the mission of Freddie Mac and the housing market.

I think what you would expect from us over the near term and over the long term is to work out some of these problems in our mortgage portfolio. And I think what you will see over time, we will work through those loans and we will get some resolution with regard to the outcome of those loans.

I think, in addition to that, we need to spend some time examining our credit criteria, all the programs around credit underwriting. Several of the Congressmen have mentioned accounting. We are focusing a lot of time and attention around the accounting area.

We are going to build an organization that can sustain itself and continue to meet its mission over time, which really means we are reviewing every aspect of the business. And we are working hard, at the same time, to restore confidence in Freddie Mac, both with our customers and also the securities market to provide us debt.

Mr. KANJORSKI. I guess one other question: If we had in some way totally privatized Fannie and Freddie, would they have been a sufficient threat to the American economy that, as private organizations, the Federal Government would have had to have taken action to rescue them? Or could they have just been allowed to cease?

I don't know if my question is clear, but I am trying to jump into what we think we should do in the future with regard to Fannie and Freddie. In other words, should you be this special model that you are, or should we totally privatize you and then, if there is a failure in the future, let you go?

Mr. ALLISON. I think what we are confronting right now is the need to put these institutions on a sound footing in their current situation and given the crisis in the financial markets. And that is going to take a great deal of effort on the part of both institutions.

40

I don't think we are in a position today to look forward and make recommendations on what the form of these companies should be in the future. I think that is something that Congress will be involved in, as well as the next Administration.

But the fact is that, as Mr. Lockhart said earlier, these companies were highly leveraged, and, given the almost unprecedented disruption of the capital markets, they were facing grave difficulties, and that the conservatorship seems to me to have been necessary.

Mr. KANJORSKI. You really do believe it was a perfect storm?

Mr. ALLISON. I think it is a storm that we haven't seen, certainly in my lifetime. And I think it is today still an extreme threat to the country's economy and to the global economy.

Mr. KANJORSKI. Very good.

Mr. Moffett?

Mr. MOFFETT. I think the role of the conservatorship is really the time and the place to rebuild Freddie Mac. And I think, with the support of Treasury and the support both in the capital and in the funding, it gives us that time to rebuild the company.

I am in no position at this time to recommend how Freddie Mac should be structured in the future. I certainly wouldn't pretend to be in that position. But I think this rebuilding period, while we are in conservatorship, will yield good results. And I think the employees are dedicated to building back the reputation of Freddie Mac. And, during this time of conservatorship, I think it will make a big difference to regain that confidence and regain both the employees' and the public's view of Freddie Mac.

At that time, then certainly the question of in what form it moves forward once it gets through this conservatorship, I think, does need re-examination.

Mr. KANJORSKI. Very good. Thank you very much.

I think I have exhausted my time.

The gentleman from Connecticut, Mr. Shays.

Mr. SHAYS. Thank you.

Thank you both very, very much, Mr. Allison and Mr. Moffett. I am unclear on a few things that are obvious to a lot of people, but just walk me through it fairly quickly. You both are the CEOs of the companies. Do you have a board of directors?

Mr. ALLISON. We don't as yet, no.

Mr. SHAYS. So who do you answer to? Do you answer to the regulator?

Mr. ALLISON. Well, currently the regulator is serving as our board of directors. We do have a nonexecutive chairman who has been appointed, Mr. Philip Laskaway.

Mr. SHAYS. Is that the same for you, Mr. Moffett?

Mr. MOFFETT. Exactly.

Mr. SHAYS. Okay. No stockholders?

Mr. ALLISON. We have stockholders. We still have public stockholders.

Mr. SHAYS. So the public stockholders basically have no value right now?

Mr. ALLISON. The stock today at both companies is selling at a little over $2 a share.

41

Mr. SHAYS. Okay. Explain to me the difference between conservatorship or—you are a conservatorship; is that correct?

Mr. ALLISON. That is correct.

Mr. MOFFETT. Yes, sir.

Mr. SHAYS. Okay. Explain what that means.

Mr. ALLISON. The company remains in its current form, but its board has been replaced by our regulator, Director Lockhart. He is exercising the authorities of the board. And I have been delegated by the director to be the chief executive responsible for the—

Mr. SHAYS. And how is that different from a receivership?

Mr. ALLISON. A receivership looks to liquidate the company, whereas, in a conservatorship, the conservator is conserving the assets.

Mr. SHAYS. Thank you.

Mr. Moffett, I am assuming that you would be saying basically the same thing.

Mr. MOFFETT. Yes, exactly.

Mr. SHAYS. Okay, and I thank you for not saying it twice.

Neither of you have called on the $100 billion that is available to you; is that correct?

Mr. MOFFETT. That is correct.

Mr. SHAYS. When you do, what do you give up for the stockholders?

Mr. ALLISON. Well, if we had to turn to the—

Mr. SHAYS. Let me ask you this way. If you could go to the private marketplace, would that be preferable than turning to the government?

Mr. ALLISON. Well, right now we have a facility from the Treasury where the Treasury stands behind us with $100 billion in return for the preferred stock arrangement.

Mr. SHAYS. Right. And does that enable you to go to the private marketplace with credibility? Or, when you need funds, where is the first place you go to seek some of those funds?

Mr. ALLISON. Well, first of all, we can go directly to the debt markets today. And we do every day. We are extremely active. In fact, Fannie Mae—

Mr. SHAYS. And that is true for you, Mr. Moffett?

Mr. MOFFETT. Yes.

Mr. SHAYS. I am sorry to interrupt, but you are being very helpful, and I am learning a lot.

Is there a point in time when you do not think you will be able to go to the debt market? And is that proprietary, or is it in weeks? Months? What?

Mr. ALLISON. We are active in the debt markets today. In fact, Fannie Mae issued a 2-year note about 2 weeks ago for $700 billion. Demand was over $9 billion. It was the largest debt financing of its type in the history of the company.

Mr. SHAYS. So the fact that the Federal Government is there is making the debt market more comfortable?

Mr. ALLISON. Yes, sir.

Mr. SHAYS. Is it conceivable you might be able to avoid having to turn to the Federal Government for any of this $200 billion? Unlikely or likely that you could avoid it?

42

Mr. ALLISON. Speaking for Fannie Mae, we are now in the midst of an intensive examination of all of our assets.

Mr. SHAYS. Give me the short version to the question.

Mr. ALLISON. We are not sure, at this point. It is going to take a couple of months of intensive work to really understand the risk composition of the assets and to begin to plot a path forward.

Mr. SHAYS. Is it the same with you, Mr. Moffett?

Mr. MOFFETT. Yes. I think this next 6 months is going to be very telling, because we are both spending a lot of time trying to evaluate the assets.

Mr. SHAYS. And your question will be also the condition of the market, as well.

Mr. MOFFETT. First of all, I think the next 6 months will determine whether we are going to need to access the facility.

Mr. SHAYS. Is it conceivable that the plan that we are trying to work out with the Treasury Department and with the Federal Reserve will help make it less likely that you will have to turn to Federal dollars for assistance?

Mr. MOFFETT. It is conceivable.

Mr. SHAYS. Or certainly less reliant on it?

Mr. MOFFETT. It is conceivable that the facility you are describing could help, and it could especially in several ways. One, it could give confidence to the securities market and confidence to the mortgage markets. That could play a role in allowing more refinancing and more mortgages.

Mr. SHAYS. So, in some ways, we may be double counting when we say we are going to have to spend $200 billion here and so on. You may, by our taking action elsewhere, you may not have to rely on the $200 billion to $100 billion each? Is that possible? Not likely, but possible?

Mr. MOFFETT. It is just hard to determine, at this point.

Mr. SHAYS. Fair enough, fair enough.

Thank you both very much.

Thank you, Mr. Chairman.

Mr. KANJORSKI. Thank you, Mr. Shays.

The gentleman from North Carolina, Mr. Watt.

Mr. WATT. Thank you, Mr. Chairman. Mr. Allison, Mr. Moffett, it is good to see you.

Mr. Allison, you have done a good job with TIAA–CREF, moving part of it to Charlotte. I appreciate that.

Mr. ALLISON. Thank you, Congressman.

Mr. WATT. We always appreciate the fine citizenship of that corporation there.

I presume you are not related to the Allison who is now the head of BB&T?

Mr. ALLISON. Sir, actually, that Mr. Allison and I had dinner together a few nights ago, and over the years we have traded e-mails, because we are distantly related. My own family comes from North Carolina.

Mr. WATT. All right. We won't pursue that in public.

[Laughter]

It might embarrass somebody.

Perhaps I should have taken an opportunity to ask Mr. Lockhart some of the questions. I really wanted to get more focused on the

43

future of Fannie and Freddie, but it sounds like you all are not prepared to talk about the future of Fannie and Freddie. So let me try to get into this this way.

It seems to me, based on what I have read, that the mission of Fannie and Freddie changed by default when you all took it over, because—when we took it over, I guess—in the takeover statement, Mr. Lockhart said, "I have determined that the companies cannot continue to operate safely and soundly and fulfill their critical public mission."

I have read Mr. Paulson's statement that says, "Since the difficult period for the GSEs began, I have clearly stated three critical objectives: Providing stability to financial markets; supporting the availability of mortgage finance; and protecting taxpayers."

Apparently, in testimony before the Senate, Mr. Lockhart said, "There is no expectation that either Fannie or Freddie will meet the affordable housing goals that were set for 2008." They didn't meet them in 2007 either, even when things were going great.

I am trying to figure out what Fannie and Freddie's goal mission is as you understand it now. And if it is not trying to meet its affordable housing goals, if it is just supporting housing for richer people rather than affordable housing, why that couldn't be done through the regular private market without any government subsidy.

I guess my question is, both now and future, can Fannie and Freddie have a useful purpose that is a government objective of helping people get into housing without either an implicit or an explicit government subsidy of some kind?

Now, that is a big, broad question that I just asked, but I don't know how to ask it any more succinctly than that. And maybe I should shut up before time runs out and let you all wax and wane in that context a little bit.

Mr. ALLISON. All right. David, do you want to begin? I would like to follow up, though.

Mr. MOFFETT. First of all, the company today is seeking to fulfill its mission. It is seeking to provide stability to the mortgage market, and we are doing that by being active in purchasing mortgage-backed securities, which will lead and have led to lower mortgage rates.

We are seeking to fulfill our affordable housing goals. I think the point that I made earlier is it is a very difficult market to do that in today. We are buying and providing mortgage money in the affordable housing market in two ways. One is in the multifamily area. That business continues to operate, and it has continued to provide financing in the multifamily market. It is also doing that in the affordable market, as well.

So both of those missions we are continuing. I think the issue that you are raising is, how can we pursue this mission and, at the same time, be concerned about safety and soundness. And I—

Mr. WATT. No, I don't think those things are mutually exclusive. I am just—well, go ahead.

Mr. MOFFETT. Well, what I am trying to get to is I think the conservatorship provides the time, in order to rebuild the capital of the company, to work through the credit problems and, at the same time, meet our mission responsibilities.

44

Granted, the affordable housing goals that were established in 2004 were based on some assumptions about what the environment would be in 2008. That has clearly changed. And, therefore, we are still seeking avenues and ways to reach those goals, but they are going to be very, very difficult to meet.

Mr. ALLISON. Let me just add, if I may, that we are totally committed to striving to meet our housing goals, and that is a central part of our mission. In fact, I recently reorganized Fannie Mae, in just the last 2 weeks, so that our housing and community development area reports directly to me.

We have been very active in supporting efforts to prevent foreclosures in cities and in rural areas. We have developed a strong and preferred partnership with State housing finance agencies. In fact, we have made a $10 billion commitment to finance single-family loans for first-time homebuyers. Fannie Mae has purchased $1.88 billion in FHA loans this year alone.

We are the Nation's largest investor in affordable multifamily housing. We provided $26 billion for multifamily housing this year alone. And so far this year, we have served more than 350,000 families who are at or below the area median income and 170,000 families at or below 60 percent of area median income. And even as we have done all that, we are redoubling our efforts going forward.

Mr. KANJORSKI. Mr. Allison, I thank you.

And, Mr. Watt, we have about 6 minutes left in our vote.

Mr. WATT. Thank you, Mr. Chairman.

Mr. KANJORSKI. There are three votes. We will take them and take about 25 minutes to return.

Fortunately, this is a great learning process for both of you. You will find out why you won't want to come testify before Congress.

[Laughter]

But we will be back, and several of our members want additional time. So thank you very much for your indulgence.

[Recess]

Mr. LYNCH. [presiding] In the interest of time, I would like to reconvene the hearing. We will be joined by Chairman Kanjorski in a bit. We appreciate the forbearance of the witnesses here.

And I would like, at this point, to recognize Mrs. Capito for her questions.

Mrs. CAPITO. Thank you, Mr. Chairman.

I want to thank the two gentleman for waiting, as well. I am going to ask a couple of short questions now. Both your stocks are still trading. Are they trading as preferred and then general stocks? What is the stock price now—

Mr. MOFFETT. Roughly $2, both of them.

Mrs. CAPITO. Both $2. And what was the high?

Mr. ALLISON. If you mean prior to the conservatorship?

Mrs. CAPITO. Yes.

Mr. ALLISON. I think ours was around $60 or so.

Mr. MOFFETT. I think ours was more like $70 at some point.

Mrs. CAPITO. Last summer?

Mr. MOFFETT. Yes.

Mrs. CAPITO. I know that a lot of Members have been contacted by community banks, and you might have addressed this in your statements, so excuse me if you are repeating. But I just talked to

45

a community banker who invested, and when asking their regulator if this was a good investment, they were very much encouraged to go to the preferred stock. And they are asking for, like, a fair treatment, I believe is what they would prefer, excepting losses maybe.

But I think the fact that the government now is in front of the other shareholders is a difficult thing for them to accept, especially since they have been playing by the rules and doing what they should do. What do I tell my banker at home?

Mr. ALLISON. I think you can tell them, as the Director said this morning, that the regulators are working with these banks; they understand the problem and the concerns. I believe the regulator also said that there is no plan to resume dividends but that they would work with the various banks to see how they can give them some relief, perhaps, from the capital requirements. That is my understanding.

David?

Mr. MOFFETT. Yes, my understanding is that the conservator made the decision to suspend the dividends. And I think the testimony earlier this morning basically suggested that, for the time being, they are not going to relook at the dividend issue.

So that is really a conservator issue. It is really a question for Director Lockhart.

Mrs. CAPITO. Looking at your balance sheets now, could you sustain the dividends now in your current condition?

Mr. ALLISON. Again, there was a decision by the conservator to suspend the dividends at the time that the conservator took over these institutions.

I can speak for Fannie Mae. We are looking at our entire financial situation. We are about to embark on financial planning for the coming year. We are reviewing all of our risk portfolios. So we are not yet in a position to have visibility toward what our future financials might look like. And even then, when we finish our planning, we will have a range of possible financial scenarios, depending mainly on housing prices over the next year or 2.

Mr. MOFFETT. Yes, I would agree. We are in the midst of doing a plan for 2009, which a lot of the issue is going to be focused on capital. And that capital is going to be focused on, can we sustain our capital over a longer period of time? I think, in the near term, the assessment that we are going through right now is more critical, quite frankly.

Mrs. CAPITO. One final question, and I think it is sort of a mind-of-the-man-on-the-street type of question, that these financial instruments were all packaged, and nobody really knew what was in them.

Do you know now what is in these packaged mortgages in the detail that you need to know so that you can determine—this may be naive, the way I am thinking about it. If something is packaged with 100 loans, 2 are bad, 80 are good, and 18 are in the middle. Do you know now what you are holding, and can you say with a certainty that you will know that?

Mr. ALLISON. Oh, yes. And speaking for Fannie Mae, we have begun a complete review of our balance sheet in depth.

Mrs. CAPITO. In depth to, like, even to—

46

Mr. ALLISON. Down to, in many cases, singular loans. We can also type certain types of loans, which are similar in documentation and risk characteristics.

But where we have to—we are going down to single loans. And this is going to take us several months. It is a very intense effort that started 2 days after I arrived. We need to move quickly on this and intensely, because we will be filing our third quarter reports later on in the fall and we want to make sure those are as accurate as possible and that our disclosure is as complete as we can make it.

Mr. MOFFETT. And we are doing exactly the same thing. I think it is going to take several months in order to drill down to each individual asset at the loan level or at the security level to really, fully understand the impact that this has had on the securities and, therefore, on the mortgages underneath them. So it is going to take some time.

Mrs. CAPITO. Okay. Thank you both.

Mr. LYNCH. Following up on Mrs. Capito's question, with respect to the community banks, there needs to be some type of accommodation for those banks. They were encouraged by government officials and by others to invest. They are a bulwark in many communities against the current crisis. And there has to be some way to provide some relief.

Let me just ask you, earlier, in response to questioning from Mr. Shays of Connecticut about the necessity of resorting to the $100 billion support that you might rely on if you need it, I just—I guess I have a more pessimistic view of this thing. And I also serve on the Government Oversight Committee, and so we are looking from a much more critical standpoint.

But if I look at, over the last year, what some of these international commercial firms and what some of these investment banks have written down based on their portfolios, they have written down about $500 billion in holdings. As a matter of fact, if you take the top 25 firms there, you know, they have written down considerably more than Fannie and Freddie have, which have a much higher, a much larger portfolio. They have written down $500 billion. Fannie has written down $5 billion, and Freddie has written down $2 billion, roughly.

That just does not jive. They have looked already at their portfolios, and they have written it down. And we are in the process of looking at ours, you know, figuratively speaking. That does not look good to me. And if there is something I am missing in that analysis, could you explain that to me?

Mr. ALLISON. Well, Congressman, again, I think both of these institutions are taking a fresh look at that balance sheet. And we are using outside experts, as well as our own people, as a double check. This is going to be an extremely intensive process.

Mr. LYNCH. It could be bad, right?

Mr. ALLISON. Well, I wouldn't draw any conclusions at this point. We will be disclosing this fall what we think the position is.

And, also, one has to keep in mind that we have to look at various scenarios of housing prices, which have a very important impact on the expected value of those securities. So, at best, we can

47

present a range of possible outcomes to the conservator and, eventually, I am sure, to Members of Congress.

Mr. LYNCH. Okay. I understand that is the process, and you have explained that quite well on several occasions, and I don't want to eat up all my time on that.

Mr. Moffett, I assume you are going to give me the same—

Mr. MOFFETT. I would just give you—we are going through exactly the same process. But one thing I think is important to think about is that the composition of what different institutions have can vary wildly. So their business, although it may be mortgage, it may be different kinds of mortgages.

Mr. LYNCH. Fair enough.

Mr. MOFFETT. I think that is one of the things that we are also trying to do, is not jump to any conclusions but get the facts.

Mr. LYNCH. And I do understand that you were more likely to have AAA, you know, or top-rated securities, as opposed to what some of these other firms were doing. So I think that might ameliorate things as well.

Let me ask, again, sort of piggy-backing on Mrs. Capito's questions, we have a program now where we are anticipating at the outset $700 billion, you know, purchasing a lot of securities. Eighty percent of that $700 billion is basically—80 percent of the entire market there is securitized mortgages.

And you are talking about going through this process that is taking several months to pull these mortgages out and look at each one of them. I can't imagine that the new entity doing this is going to have any better time with such a larger portfolio they are going to acquire.

Is there any estimate that you have on what you are doing, how many months that will take?

Mr. ALLISON. I don't think I could give you an estimate. I think one of the ways that the government may try to ascertain the value of those securities is through an auction process where many different players can give their own estimates of those values.

And let me also say that we are having conversations with the Treasury about how we might help them in their administration of their program down the road.

Mr. LYNCH. Okay.

Mr. ALLISON. But, honestly, I can't tell you how they would value those securities.

Mr. LYNCH. All right.

Mr. Moffett, could you enlighten us on that at all?

Mr. MOFFETT. No, I think that is exactly right. I think what the Treasury is trying to do is create a market so they can get the best prices for the securities, so that there is at least a way to find the price. And I think it is just going to take some time, quite frankly, to sort out what it is.

Mr. LYNCH. All right.

The Chair recognizes Mr. Garrett from New Jersey.

Mr. GARRETT. Thanks to the gentlemen, realizing you are new on the job, so to speak. I appreciate that, as far as your answers are concerned, but can you give me the best estimate?

You have probably heard some of my previous questions. One of the questions I should have asked at the end of each one of those—

48

well, he said, we are looking into these things. I should have asked the question, can you give us a ballpark timeline of when we should look at them? So I will throw them out to you, since you are the guys that are dealing with them on a daily basis.

One of the areas, as you saw my concern, was just the charitable contributions by the organizations. Correct me if I am wrong. You are looking at the situation now.

Mr. MOFFETT. No, that is exactly—we have been instructed by Director Lockhart to go through them in detail and give him a plan as to what we would do and what we wouldn't do. And it is really going to be in his hands.

Mr. GARRETT. Okay. Oh, okay. So then you have to give him—I should ask that question, then. What is the timeframe that you are supposed to give him the plan?

Mr. MOFFETT. We haven't set a timeframe, but it is a high priority of his. And we are working to meet that.

Mr. GARRETT. And you heard my other—

Mr. ALLISON. Yes, sir.

Mr. GARRETT. You heard my other question to him also. Is it possible to do a retrospective look, go and have somebody go into the accounting office someplace or the other in the old files and pull out the records and say, this is what we gave in 2007, 2006, and 2005? Is that a big—

Mr. MOFFETT. I don't know yet, but we are going to try to do that.

Mr. ALLISON. We will be glad to respond to any inquiry from a Member of Congress about that. And I don't know what the records are, but we will certainly attempt to provide the information.

Mr. GARRETT. If you could both consider this a request to put it in writing, I would appreciate that. Because you see my concern. I mean, the article in one of the papers said that there was just a happenstance correlation, as far as charitable contributions going to those Members who happen to be stronger supporters of the GSEs. Maybe that is just happenstance, just as most earmarks happenstance only go to the chairmen of the various committees down here. That is just a coincidence, too, always.

But the other question that I asked—and I will ask your side—is, what is your opinion on the element of the housing trust fund in the July legislation? Does that make your life any easier?

I know, Mr. Moffett, your closing remarks were that you are trying to make this company stronger and what have you, and I assume Mr. Allison is also trying to do that. Does that make your life easier, or does it have no impact upon you?

Mr. MOFFETT. Well, my view is that the most important issue at this time is to figure out the values of the securities, just like we addressed before, to figure out exactly what we need to do going forward. And that is going to be a byproduct of either how—the capital needs of the company are ultimately going to determine that. But we are way too early.

Mr. GARRETT. When you come out with your plan, I guess, going forward, will you come out—and Mr. Allison, too—will you come out with a plan and say, this is how we should go forward? And, in that plan, say one of the elements of going forward will be the current law, which requires us to do "X," and if we keep that in

49

place, it will mean this, and if we don't do that, it will mean "Y?" Is that how—

Mr. MOFFETT. I think the interim step is—it is really going to be Director Lockhart's call, because he is the one who has to make that assessment. We are going to give him the facts, and we will give him the projection.

Mr. GARRETT. You will give projections both ways?

Mr. MOFFETT. Both ways.

Mr. GARRETT. He has been doing all the talking.

Mr. ALLISON. My understanding is the rules have not yet been promulgated on that. So we are waiting for the rules, and as soon as we have them, we are going to analyze that and then make our recommendations to Director Lockhart.

Mr. GARRETT. And another question from the other side—I thought it was an interesting one; I didn't know it was still going on—it was with regard to the no doc loans. That is also something—documentation loans that are apparently still going on. And this is also all part of the package that you would be looking at.

Mr. ALLISON. Let me try to be clear on that. From a Fannie Mae standpoint, we are not actively engaged in any significant no doc or low doc lending today.

I think we have to look a little differently at the secondary market activities, where, in order to provide greater liquidity into the mortgage market, we may decide to purchase some securities in the open market that do have some Alt-A in them, but where the Alt-A is current and it is seasoned. In other words, if there is a record that it has been paying steadily, we might view that differently. But we are not doing new Alt-A type business today.

Mr. GARRETT. I understand. I appreciate that clarification.

Last question—I am on the yellow light here, so let me just ask this, and this was brought up because of your comment at the end of your—making a stronger company and all. There are some people who thought it should not have been a conservatorship, that it should have been a receivership and go in that direction to address future systemic problems.

The question I have was, your predecessor made the comment that was in the paper that said his role was almost, I think his words were, an impossible one. It really applies to you, as well. He was implying that he had dual responsibilities and that it was an impossible task for him to serve both masters, basically. I am paraphrasing.

Do both of you see that the current structure is, as Mr. Syron said, an impossible role for any CEO to actually to try to cater to both masters?

Mr. ALLISON. From my standpoint, as I said in my prepared remarks, we have to balance the need for safety, soundness, and protecting the taxpayer with the mission of the organization, which is to be active in the markets and help provide affordable financing for homeowners.

That is a balance, and we have to gauge both. And we have to be open about the way we are making that balance and those tradeoffs.

Mr. GARRETT. He was also comparing with regard to, at that point, the equity holders in the company as well.

50

Mr. ALLISON. Well, today the taxpayers are, in fact, indirectly equity holders, and we have to keep their interests in mind. So, on the one hand, the American public owns homes, but they are also taxpayers. We have to make a tradeoff.

And I think the key to this is going to be to be transparency about the decision tools we are using to make those types of tradeoffs. We will have to get approval of the conservator, as well as eventually our own board. And we will have to come to Congress and explain those tradeoffs, as well.

Mr. MOFFETT. I think ultimately the tradeoffs are going to have to be made by Congress. I think you are going to have to deal with that issue, that seemingly very difficult balance between shareholders and the taxpayers. And I don't think we are in a position, at least at this juncture, to comment on that. But that is ultimately going to be the issue.

Mr. GARRETT. It is the proverbial "above the pay grade."

Thank you, gentlemen.

Mr. LYNCH. All right. The Chair recognizes the distinguished gentleman from Colorado, Mr. Perlmutter, for 5 minutes.

Mr. PERLMUTTER. Thank you, Mr. Chairman.

Ordinarily, I am the guy who sees the glass as half-empty, and Mr. Lynch and Mr. Garrett see it as half-full. But I am going to reverse that today, because, coming from Colorado, we have seen our foreclosures drop and the number of homes available on the market reduced substantially. So I think, you know—but we went into this before anybody else did. So I just see that.

My questions to you, first I would like to ask—they are just kind of the simple ones.

For Fannie Mae, what is your cash flow each month, I mean, your income versus your expenses on a general basis? And you can give it to me before taxes, after taxes, I don't care.

Mr. ALLISON. Well, if you look at total cash flows from financings and the cash flows out through loans, etc., today the cash flows are actually positive. And we have been able, as I mentioned in my earlier remarks, to raise our all-time record 2-year financing of $7 billion. We are able to raise money, as well, in the short-term money markets. And we have managed to maintain stability in the amount of mortgage-backed securities underwriting that we are doing today, in spite of the turmoil in the markets.

Mr. PERLMUTTER. So you are making $1 million, $2 million, $3 million?

Mr. ALLISON. Again, there is a difference between cash flow and earnings. And, again, that is something we are looking at today.

Mr. PERLMUTTER. What about Freddie Mac?

Mr. MOFFETT. Well, exactly. Freddie Mac also has positive cash flow. It is too early to determine what the earnings will be in the third quarter and then in the future. But right now it is positive cash flow.

Mr. PERLMUTTER. Which then brings me to the question that you both have talked about, which is capital. How much capital does—I mean, I can't remember whether, in the law that we passed in July, whether we set a capital requirement for Fannie Mae and Freddie Mac.

If we did, what is it? If not, what are you shooting for?

51

Mr. Allison or Mr. Moffett, go ahead.

Mr. ALLISON. Allow me, then.

One of the reasons we are conducting this exercise to value the portfolio on our balance sheet is to determine how much capital we actually have. And that is going to depend on an analysis of the value of the balance sheet with the assets, what are these assets worth today—and, by the way, there will be ranges of values, depending on projections of home prices—and also what are our liabilities today. And we will deduct the liabilities from the new asset valuations and conclude what our equity capital is.

And, again, there is economic equity, to make this a little more complicated, and there is GAAP equity. And we will be reporting both when we publish our third-quarter financial statements. So I can't give you a precise answer today until we do that valuation as to how much capital we have.

Mr. PERLMUTTER. Okay. But my question to you two is, Mr. Lockhart said that, back in July, it was 1 or 2 percent capital. Now, I don't know whether it was equity or GAAP or what he was talking about, but apparently that was too low. What are you shooting for, like, 5 percent like a bank has to have, or what?

Mr. MOFFETT. At this juncture, I am just going to, not repeat what Mr. Allison said, but I think we have to determine what the base is, the base capital, based on the assessment of the assets at the end. And I think that is where all the energy is being focused, on what exactly is the fair value of the assets.

From the capital point, then I think both of our goals are to retain capital and build capital in the companies. And I think that is going to depend on future losses and future expectations for home prices. But I think the goal is to establish that base and then to try to grow the capital base from there.

I do understand that Director Lockhart's team is working on capital ratios, re-assessing what those capital ratios are going to be and should be. And it is too early, and I certainly am not privy to that. But they are working at that level, to determine what those ratios should be.

Mr. PERLMUTTER. All right. We have this $700 billion thing we have just been kicking around for a couple of days and are supposed to act on it very quickly. But let's take your organizations, all right? You guys go in, you look at your portfolio, you say, "Okay, we have 10 percent distressed properties." Do you then cordon that off and then sell it? Is that something that you would be planning to do?

I am just trying to figure out what it is that is going to happen with that $700 billion, whether it affects a Fannie Mae or a Freddie Mac or if it is purely Goldman Sachs and Bank of America. I don't know who it is. And I don't know if you have thought about it, because we are sort of doing this on the fly as we speak.

Mr. ALLISON. Well, we, first of all, have to determine what we believe the economic value to—let's say, maturity of those assets are. And then we have to compare that to the market price of the asset out on the open market and the liquidity of the market, the market's ability to absorb large volumes of those securities.

And so we have a lot of judgment calls to make down the road, and we haven't yet. Until we value these portfolios, we will not be

52

in a position to have an asset disposition planned. But that is something we are going to have to develop in the months to come. I can assure you that we are working extremely hard to understand this portfolio and to begin developing strategies going forward.

Mr. PERLMUTTER. Okay. Is it the same for you, Mr. Moffett?

Mr. MOFFETT. Yes, I think, just to add to that, I think one of the assessments will need to be should we sell them, or, as Mr. Allison discussed, maybe we will realize the value over the long haul and maybe it is not in the best interest to sell the assets.

So that is why this asset valuation process is so important, not just for the capital considerations that we are dealing with today, but also real value, should we keep the assets, work through them, and over time realize that value.

Mr. PERLMUTTER. Sort of, on the positive side—I know my time is up—in this conservatorship you actually have time to do that.

Mr. MOFFETT. That is right.

Mr. PERLMUTTER. Thank you.

I yield back.

Mr. LYNCH. Okay, we thank the gentleman. I want to thank you both for attending the hearing and for helping the committee with its work.

I do want to, before we close, just ask you the same question I asked of Mr. Lockhart when he was here before. Back in the day when the taxpayer was not a shareholder as they are now, and back in the day when the taxpayer did not have any skin in the game, it wasn't necessary for the members of this committee to understand in such minute detail the conduct of and the details of these complex securities.

However, now the game has changed. And so we need both Democrats and Republicans on this committee, we need—exactly as I asked Mr. Lockhart—we need your folks who are trying to do this work pulling these securities apart, valuing them, to give that same instruction to us and let us observe that practice.

So either we have some of your folks come up to the Hill and demonstrate that to the members, or we arrange something for us to go over to Fannie and Freddie and observe that practice as it is going on, without disrupting things, obviously.

But we now need to know in this level of detail what we have here. Because we have some pretty important decisions to make, and I think it will help the members enormously if they can actually reduce this down to a degree where they can actually understand it.

I think that is where much of the weakness in the market was, lack of transparency. People didn't know what they had, so fear struck because of the unknown. If we can remove some of that unknown, at least in the minds of the Members of Congress, it would greatly help our ability to find a cogent solution in all of this.

So I will ask you both on the record, if you will be willing to do that?

Mr. MOFFETT. We will do that, and we look forward to it.

Mr. ALLISON. We will absolutely do that.

And, furthermore, we are looking at how we can communicate these issues in our public disclosure in a way that is as under-

53

standable as possible and as clear as possible. These are very complex subjects, as you well know. Reducing them to simple, understandable concepts for the public is very important, I am sure to both of us.

But in the meantime, we want to be as open as possible with you. And please call on us any time, and we will be happy to respond.

Mr. LYNCH. Thank you. I appreciate that.

I know that we have a lot going on today. There are members in various committees right now in meetings on some other matters that are very important. So I note that some members may have additional questions for this panel which they may wish to submit in writing. So, without objection, I would ask that the hearing record remain open for 30 days for members to submit written questions to the witnesses here and to place their responses in the record.

With that, this meeting is now adjourned.

[Whereupon, at 4:28 p.m., the hearing was adjourned.]

FHFA 0086

# A P P E N D I X

September 25, 2008

(55)

56

**Statement by Rep. Michele Bachmann**
**House Financial Services Committee**
**Hearing on Treasury Action on Housing GSEs**
**September 25, 2008**

Thank you, Mr. Chairman, for convening this important hearing.

A week ago, it would have been inconceivable that today's hearing, focused as it is on the government bailout of Fannie Mae and Freddie Mac, could take a backseat to anything. But here we are, examining a bailout with a start-up price of $200 billion that is dwarfed by Secretary Paulson's latest bailout proposal which costs three and a half times that amount.  The two bailouts are inextricably linked; not just by their timing.  It is incontrovertible that the failure of Fannie and Freddie are at the very core of the financial services sector crisis.

For years, Republicans pushed to reform Fannie and Freddie by scaling back their portfolios and empowering their regulator with the appropriate authority needed to ensure true financial soundness.  We were met with strong opposition from the other side of the aisle and this reform was delayed for far too long.  Congress waited until the last possible moment -- the moment when it was reacting to a crisis rather than preventing one -- to make any reforms.

And, though some progress was made with those reforms, there is still much work to be done to prevent future failure and future bailouts of the GSEs.  We cannot just tinker around the edges; we must address the major structural problems.  They operated for years with an implicit taxpayer guarantee.  That guarantee is now explicit and that changes everything.

Privatizing these entities so they may function without the backing of the federal government would make them stronger, more efficient and more capable of playing their parts in the daily marketplace.  And, the taxpayer would finally rid itself of the unfair and undeserved burden these mortgage giants have laid upon them.

I am pleased that Mr. Allison of Fannie Mae and Mr. Moffett of Freddie Mac are here today.  I have been calling on their predecessors to resign for months.  I believe this change of leadership was the right move for the GSEs and for our financial markets.  It ensures a fresh start and helps erase investors' lack of confidence in the management of the massive GSEs.

Mr. Lockhart, I appreciate your appearance here today and look forward to your testimony.  As you know, Fannie and Freddie own or guarantee mortgage-related obligations of more than $5.4 trillion, an amount roughly equal to the United States' publicly held debt.  I am glad that the Federal Housing Finance Agency (FHFA) exercised its new authority quickly over the GSEs, though I believe that receivership may have been more appropriate and I remain seriously concerned about the protection of taxpayers as this plan takes shape.

1

57

Additionally, two weeks ago, I sent you a letter cosigned by 37 Members of Congress urging you to refrain from financing the Housing Trust Fund that was recently authorized by the *Housing and Economic Recovery Act of 2008*.  You may recall that the law provided for such suspension authority.

I've had serious concerns about the Housing Trust Fund from the beginning but regardless of one's views of its merits, there should be no disagreement that during the conservatorship and during this time of instability, neither the GSEs nor the American homeowner can afford to finance it.  As my letter states, "The very fact that the GSEs need such a massive taxpayer bailout is proof that siphoning funds from these entities to finance the Housing Trust Fund would be irresponsible and harmful to homeowners, taxpayers, the GSEs, and America's financial markets."  I look forward to your thoughts on this issue and others.

Thank you, Mr. Chairman.

2

58

 U.S. Congresswoman

# Ginny Brown-Waite

*Representing Citrus, Hernando, Lake, Levy,*
*Marion, Pasco, Polk, and Sumter Counties*



House Committee on Financial Services
Hearing on GSE Conservatorship
September 25, 2008
Statement for the Record

Thank you for holding this hearing, Mister Chairman.

A little over two months ago, Treasury Secretary Henry Paulson came to this committee and asked for the authority to place Fannie Mae and Freddie Mac into a government conservatorship should the market deteriorate further. At the time, he told us it was very unlikely that Treasury would ever exercise this authority.

Congress duly granted Treasury the authority Paulson requested, and also created the Federal Housing Finance Agency as the new regulator of the two government sponsored entities.

We were quite mindful of Secretary Paulson's warning of an impending crisis, but we took him at his word when he said any action was unlikely. Yet less than two months later, Secretary Paulson announced that the Federal Housing Finance Agency would be taking legal control over Fannie Mae and Freddie Mac.

The aim was to improve the availability of mortgage credit and bring stability to the markets. As we now know, this did not happen.

Let me be clear: I do not doubt that a conservatorship is necessary. Fannie Mae and Freddie Mac were government sponsored entities with an implicit backing from the American taxpayer. However, I doubt the candor of the administration on this matter and I have significant concerns.

Nearly one-quarter of US banks hold preferred stock of Fannie Mae and Freddie Mac. This stock was considered a relatively safe investment, but their value is now almost entirely wiped out.

The resulting loss in equity has deeply affected community banks. Thus, they now face write-downs and the need to raise capital at a time when many are already struggling to remain solvent.

Page 1 of 2

59

Since these banks are on Main Street and not Wall Street, the federal government considers them to be too small to save.  But something must be done to help these community banks, who, unlike Wall Street, have acted responsibly over the last few years.

Lastly, this crisis began with the federal government forcing Fannie and Freddie to take out sub-prime mortgage loans in a bid to boost homeownership.  This process began under the Carter administration and accelerated under Clinton.

Moreover, Fannie and Freddie were allowed to hold just 2.5% of capital to back their investments versus 10% for banks.  Looking forward, changes will have to be made to the way Fannie and Freddie issue loans.  I have attached a news article which appeared in the Investors Business Daily on September 25, 2008 which explains this in detail.

Mister Chairman, thank you again for holding this hearing and I look forward to hearing from the witnesses before the committee today.

Page 2 of 2

60

**OPENING STATEMENT OF CONGRESSMAN PAUL E. KANJORSKI**

**COMMITTEE ON FINANCIAL SERVICES**

**OVERSIGHT HEARING TO EXAMINE RECENT**
**TREASURY AND FHFA ACTIONS REGARDING THE HOUSING GSEs**

**SEPTEMBER 25, 2008**

———————————

We meet today to examine the recent decisions to place Fannie Mae and Freddie Mac into conservatorship and to provide backstop liquidity to them. At this hearing we will hear from the new CEOs at both government-sponsored enterprises, or GSEs. We will also hear from an experienced regulator who now sits in a new seat at the Federal Housing Finance Agency, which the Congress created in July after more than eight years of hard work.

At the very first hearing on GSE regulatory reform in March 2000, I said that we needed to put in place a strong, independent regulator with the resources needed to get the job done, and I consistently worked toward that goal. As we neared completion of the GSE bill, I also asked Treasury Secretary Paulson at our recent July hearing on systemic risk and the financial markets whether he needed additional emergency powers to respond to the growing problems in our financial markets.

Initially, Secretary Paulson indicated that he did not, but within days he asked the Congress for emergency powers to provide a liquidity backstop for Fannie Mae and Freddie Mac. To protect taxpayers, we worked to modify his initial proposal, and we added it to the final version of the Housing and Economic Recovery Act of 2008. We are, at this moment, doing the same thing once again with the swift consideration of the $700 billion Troubled Asset Relief Act to rescue our nation's ailing financial system and protect taxpayers.

Fannie Mae and Freddie Mac play a vital role in our housing markets and the wider economy during these uncertain times. They own or back about $5.4 trillion of our nation's mortgages. In the current environment, they are also currently helping to finance about three-quarters of new mortgages.

During these stressful economic times, the GSEs needed more access to capital -- capital that only the government can provide. Placing the companies into conservatorship and providing them with backstop liquidity was done to promote economic growth and better stabilize the economy. In essence, we protected them so that they could protect homeowners, homebuyers, taxpayers, and other regulated financial institutions.

The decision to place the GSEs into conservatorship and provide supplemental capital carries with it serious responsibilities for our panel. We must perform our oversight role with great care and in a bipartisan spirit. This hearing will provide us with an opportunity to learn more about why Director Lockhart made the decisions he did, and it will allow us to hear from the new GSE leaders about their goals and recent actions. In particular, I hope that Director Lockhart will explain how his assessments of the capital position at the GSEs changed and why he decided to take the actions that he did.

During today's discussions, I hope that we will have the chance to address the issue of appraisal independence, too. New York Attorney General Cuomo reached an agreement with the

61

GSEs in March that used the appraisal independence definition that I included in H.R. 3837 and which I added to the mortgage underwriting reform bill passed by the House last November.

While we both agreed on the content of an appraisal independence standard, we implemented it in different ways. H.R. 3837 would implement these standards by changing the regulation of the appraisal industry, and the Cuomo-GSE agreement would force structural changes on the financial services industry.

During the recent comment period on this agreement, many people raised concerns about the methodology used to implement it. The GSEs and Attorney General Cuomo have yet to announce changes to the agreement, and I hope that Director Lockhart will offer his thoughts on these matters later today.

The recent takeover of Fannie Mae and Freddie Mac also means that in 2009, the Congress will spend a significant amount of time considering how our nation's system of housing finance operates and how to best revise it. During these debates, we must ensure that community banks, credit unions, and other small lenders have access to a neutral source of funding to provide affordable housing opportunities for average Americans. I suspect that today's hearing will be viewed by many as the beginning of these structural debates.

In sum, we have begun a new stage in the life of the GSEs. I look forward to learning how their new CEOs will transform these two vital institutions. I also look forward to hearing from Director Lockhart about his views on these matters. I yield back the balance of my time.

————————————————

62

**Statement of Herbert M. Allison**
**President and Chief Executive, Fannie Mae**
**Hearing before the House Committee on Financial Services**
**Thursday, Sept. 25, 2008**

Chairman Frank, Ranking Member Bachus and members of this committee, thank you for inviting me to testify today.

The Federal Housing Finance Agency placed Fannie Mae into conservatorship on Sept. 6. As Director Lockhart announced the following day, this step was taken to stabilize Fannie Mae and ensure its safety, soundness and solvency, and to reduce the growing systemic risks to the mortgage finance system.

You asked me to address how we are pursuing our mission to support the mortgage market, provide liquidity, and prevent foreclosures since the conservatorship began.

The government's actions have given Fannie Mae the responsibility and the flexibility to expand our service to the market and provide more liquidity. Under this conservatorship our job is to balance the needs of safety and soundness and taxpayer protection with the imperative that we provide the most support possible to the mortgage market. We are acutely aware of our public purpose.

We have been working closely with our conservator, Treasury and the Federal Reserve to achieve this balance. We are committed to being as transparent as possible with Congress and the American public about our actions and results.

We are focused on meeting the goals of the conservatorship — conserving our assets, restoring sound operations and meeting our mission. We communicate daily with FHFA and have been assuring that their needs for Fannie Mae data and planning are met. With this foundation and with the Department of the Treasury's backstop, we are mindful that we need to operate in a safe and sound manner and we need to move quickly to perform our role as a core stabilizing factor in the markets.

Let me respond to the specific matters you asked me to address.

**The Past Three Weeks**

At the outset of the conservatorship, our top priority was to ensure our business continued uninterrupted, and to make clear to our customers and the market that Fannie Mae is open for business.

- In spite of extreme market turbulence and disruption, we continued to provide a steady supply of funding to U.S. single-family and multifamily lenders during this period. We securitized about $31 billion in single-family mortgages during the first three weeks of September, an amount roughly equal to our securitization

63

volume in the first three weeks of August, despite a much more challenging market during this month.

- Days after the conservatorship became effective, we sold $7 billion in two-year Benchmark Note debt securities to global investors, allowing us to make additional mortgage purchases to support the market.  This was the largest debt issuance of this kind in our history, and the rates we received were substantially better than the rates before the conservatorship.  The result demonstrated renewed market confidence in the GSEs following the government's action.

- Our multifamily business has continued unabated.  Director Lockhart made clear in his statement of September 12 that our continued leadership in, and support for, affordable rental properties is a key component of the conservatorship. We are committed to meeting that directive.

- A key test of our market impact is mortgage rates – the cost of financing a home. Primary mortgage market rates, especially for 30-year fixed rate conforming loans, fell in the days after the conservatorship commenced. We are working to build on this so that the tightening of yields seen in the mortgage-backed securities market results in savings to consumers.

- We are continuing our contractual relationships, which has assured both investors and contractors of our stability and ongoing business plans.

- Lastly, we have an excellent non-executive chairman who is working on reconstituting our board to provide advice and guidance to the firm in line with the obligations of the conservatorship.

### Keeping People in Their Homes

Let me take this opportunity to report briefly on some of the steps Fannie Mae has taken to help reduce home foreclosures and provide liquidity to the market:

- Because preventing foreclosures is a staff-intensive, high-touch business, we have increased staffing in our servicing operations center in Dallas, Texas. We are currently working with our major servicers to ensure as few loans as possible go to foreclosure referral, and not before all alternatives to foreclosure, such as repayment plans, forbearance and modifications, are fully explored.

- We are in the process of increasing our use of specialty servicers skilled in problem loan workouts, and have revamped all of our servicer incentives to encourage them to change their own processes so no borrower who needs help falls through bureaucratic cracks.

- We have also provided bridge loans this year to nearly 38,000 homeowners who fell behind because of a serious illness, job loss or other temporary issue.

64

- Finally, Fannie Mae has provided $1 trillion of liquidity through its guaranty and purchases since early last year, or about $3 billion a day. Our share of new single-family mortgage-backed securities issued was 48 percent for the first half of the year.

**Preparing to Do More**

However, given the scale of the current crisis, these actions clearly are not enough.  The responsibility entrusted by the government to us when it provided the capital and liquidity facilities requires that we do far more to stabilize the market, prevent foreclosures and provide liquidity so that creditworthy borrowers continue to have access to affordable mortgages.

We are looking at every aspect of our business, with the goal of improving our funding, pricing, trading, risk management and foreclosure-prevention efforts. New initiatives that take greater advantage of Fannie Mae's breadth and size may entail risks and costs in the short-run, but will have long-run benefits to the country and Fannie Mae by helping staunch the flow of foreclosures, encourage homeowners to ride out the cycle, and help put a floor under home prices.

To that end, we are:

- Examining our underwriting and pricing standards to assure that the appropriate balance is struck between expanding our activities and safeguarding the interests of taxpayers.

- Increasing purchases of mortgage-backed securities to bolster market liquidity, so that new mortgages remain available and affordable. Treasury and FHFA are counting on us to do this, and we will.

- Working closely with our loan servicers to come up with new and better foreclosure prevention solutions to keep people in their homes. We have begun a comprehensive effort to reduce the flow of delinquent loans being referred to foreclosure.

- Evaluating how we can participate in the FHA Hope for Homeowners program to reduce principal loan balances, once the rules of the program are finalized. A good number of Fannie Mae borrowers may benefit from this program.

- As Director Lockhart has said, we are in discussions with IndyMac and the FDIC to evaluate how we can best integrate the FDIC-announced streamlined loan modification program into our own loss-mitigation efforts related to those loans IndyMac services.

65

- Developing new plans to perform on our obligation to serve low-income and underserved borrowers and renters. Our binding affordable housing goals are ambitious, and in this market may be unattainable. But we will not shirk responsibility to do all we can to achieve them.

- Finally, we are working closely with FHFA and Treasury to find ways Fannie Mae can assist in government efforts, including the mortgage asset liquidity fund proposed by Secretary Paulson, to deal with mortgage asset quality in a broader way by modifying mortgages, preventing foreclosures, and keeping more people in their homes.

**Actions by the Treasury and Federal Reserve**

Last week's actions by the Federal Reserve and the Treasury to support our discount notes and to purchase our mortgage-backed securities should help improve the liquidity of the mortgage market and ensure access to affordable new mortgages.

Together with FHFA's directive to increase purchases of mortgage-backed securities, these actions are primarily designed to keep mortgage rates as low as possible. Treasury's proposal for a government liquidity vehicle for illiquid mortgage-related securities should help in this regard, so that the troubles of the non-agency market can begin to be addressed and the global flow of capital and credit, upon which the secondary mortgage market depends, can continue.

While these actions have helped, the credit markets remain unsettled. Treasury has said that our senior and subordinated debt holders, as well as holders of our MBS, are protected without regard to when those securities were issued or guaranteed. We are working with the investment community to better their understanding of the long-term soundness of our debt securities, and the binding legal obligation to support those securities provided by the Treasury Department.

**Moving Forward**

Lastly, with the close supervision of FHFA, we are undertaking a full re-examination of the company's risk posture and controls, both in the context of safety and soundness and in the context of providing maximum liquidity support for affordable mortgage lending during this extraordinary period.

We are reviewing all of our mortgage guaranty pricing and underwriting standards. Now that our capital base is secure, we can reevaluate our pricing for credit risk. This means we will reexamine the pricing of our guaranty fee in light of current conditions and the needs of the market today. Done correctly, this should have long-term benefits for the mortgage market and Fannie Mae.

I have initiated a full review of our operations, technology, governance and management structure to align the company with the new reality of the marketplace and the goals of

66

the conservatorship. We are going to examine all of our operating costs with an eye on delivering service more effectively and efficiently. Our resources will be targeted on the fulfillment of our mission, which is:

- To enhance the liquidity of the secondary markets for conventional mortgages;
- To make mortgages and rental housing as affordable as possible for low-and-moderate-income families;
- To prevent foreclosures; and,
- To safely and responsibly deliver reasonably priced credit for mortgages that are sustainable over the long haul.

Our goals are to realign Fannie Mae to deliver on this mission, to develop realistic plans to achieve sustainability, and to eventually remove the need for government assistance.

Thank you again, Mr. Chairman, for this opportunity. You and this committee have provided valuable leadership on GSE and housing policy, and I look forward to working with you through this difficult period for our housing markets and our country. I will be happy to take any questions from the committee.

67

**Statement of**

**The Honorable James B. Lockhart III, Director**

**Federal Housing Finance Agency**

**Before the House Committee on**

**Financial Services**

**on the Appointment of FHFA as Conservator for**

**Fannie Mae and Freddie Mac**

**September 25, 2008**

Chairman Frank, Ranking Minority Member Bachus, and members of the Committee, thank you for the opportunity to testify on the Federal Housing Finance Agency's (FHFA) decision to place Fannie Mae and Freddie Mac into conservatorship and the plans of the conservator for the ongoing operations of these companies.   But before doing so, I would like to thank this Committee in for its efforts to pass the government sponsored enterprise (GSE) reform legislation, the Housing and Economic Recovery Act of 2008 (HERA).

Fannie Mae and Freddie Mac share the critical mission of providing stability, liquidity, and affordability to the housing market.  Between them, these Enterprises have $5.3 trillion of guaranteed mortgage-backed securities (MBS) and debt outstanding, which is equal to the publicly held debt of the United States.  Their market share of all new mortgages was 76 percent during the first half of this year. During the turmoil that started last year, they have played a very important role in providing liquidity to the conforming mortgage market.  That required capital to support a careful and delicate balance of mission with safety and soundness.   A key component of this balance has been their ability to raise and maintain capital. Because of recent

68

market conditions, that balance was upset.  Unfortunately, as house prices, earnings and capital have continued to deteriorate, their ability to fulfill their mission has deteriorated.  In particular, the capacity to raise capital to absorb further losses without Treasury Department support vanished.  That left both Enterprises unable to provide counter-cyclical market support.  Worse, it threatened to further damage the mortgage and housing markets if they had to sell assets.

In retrospect and despite OFHEO's surplus capital requirements, the caps on the growth of their portfolios, and repeated warnings about credit risk, the credit profile at both Enterprises followed the market down in 2006 and 2007.  They bought or guaranteed many more low documentation, low verification and non-standard ARM mortgages than they had in the past.  For example, for the first half of 2007, roughly one-third of the Enterprises' new business was composed of Alt-A (less than standard documentation), interest-only, or Option ARM products, and mortgages with layered (multiple) risk characteristics versus 14 percent in 2005.  For Fannie Mae, roughly 40 percent of new business in the first half of 2007 was in Alt-A and interest-only products versus 26 percent in 2005.  The quality of their holdings of private-label mortgage securities (PLS) issued by others also deteriorated.  The portfolio caps restrained the size of their PLS books, but maturing subprime and Alt-A PLS were replaced by PLS from the much riskier 2006 and 2007 origination years.  As house prices turned down, delinquencies, foreclosures, losses on real-estate owned and reserves against future losses soared.

Over the last several years OFHEO, now FHFA, worked hard to encourage the Enterprises to rectify their accounting, internal controls systems and risk management issues.  Both Enterprises and their dedicated managers and employees made good progress in many areas, but market

2

69

conditions overwhelmed that progress.  Their antiquated capital structures even with the OFHEO additional requirement were not adequate for this market.

The result was that the Enterprises were unable to provide needed stability to the market.  They also found themselves unable to meet their affordable housing mission.

Rather than letting these conditions worsen and put the markets in further jeopardy, FHFA decided to take action.  The goal of these dual conservatorships is to help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their mission, reduce the systemic risk and make more mortgages available at a lower cost for the American people.

<u>The Determination to Appoint a Conservator</u>

FHFA based its determination on five key areas, which worsened significantly over the past several months:

1.  Accelerating safety and soundness weaknesses, especially with regard to credit risk, earnings outlook, and capitalization;

2.  Continued and substantial deterioration in equity, debt, and MBS market conditions;

3.  The current and projected financial performance and condition of each company as reflected in its second quarter financial reports and our ongoing examinations;

4.  The inability of the companies to raise capital or to issue debt according to normal practices and prices; and

3

70

5. The critical importance of each company in supporting the country's residential mortgage market.

It became apparent during on intense supervisory review, beginning in July, that market conditions were deteriorating more quickly than the companies had anticipated. In anticipation of the late-July enactment of the Housing and Economic Recovery Act of 2008 (HERA), we supplemented our own examination activity with consultations with senior mortgage credit examiners from the Federal Reserve and the Office of the Comptroller of the Currency. These examiners corroborated our own analysis of the deteriorating credit environment and its threat to capital.

During the last part of July and in August, FHFA was completing its confidential semi-annual examination ratings. FHFA's rating system is called GSE Enterprise Risk or G-Seer. It stands for Governance, Solvency, Earnings and Enterprise Risk which includes credit, market and operational risk. There were significant and critical weaknesses across the board.

The Enterprises themselves disclosed in their second quarter filing how the rapidly changing credit environment in July was very negatively affecting their outlook and ability to raise capital. Freddie Mac reported losses of $4.7 billion over the last year and Fannie Mae reported losses of $9.7 billion.

The internal supervisory reviews and market evidence led us to conclude that the companies each presented critical safety and soundness concerns pertaining to credit risk and to continued deterioration in the market environment. Importantly, key developments in July and August

4

71

demonstrated market recognition of these heightened credit concerns and the effect of the deteriorating market environment on the Enterprises. New equity capital in any meaningful size became unavailable, and yields on Enterprise debt and MBS rose relative to other benchmarks. These developments convinced us that the time to act was now.

During the July and August period, there were a wide variety of published reports speculating on the Enterprises' solvency, the need to raise more capital, their accounting practices, their ability to continue to borrow and even government bailouts. The rating agencies continued to dramatically lower all ratings except the AAA senior debt ratings. Their stock prices fell rapidly and their borrowing costs increased. Conditions in the mortgage market continued to deteriorate with much higher delinquencies and foreclosures. Housing prices continued to fall.

Central banks ceased buying and began selling Enterprise securities. Relatively small sales triggered large price moves. Despite financing 30-year mortgages, the Enterprises had to rely on short-term discount notes, with only a few fixed-rate debt securities issued, none with maturity greater than three years. Yet they had $89 billion in long-term debt maturing in the second half of 2008.

After substantial effort and communication with market participants, each company reported to FHFA and to Treasury that it was unable to access capital markets to bolster its capital position without Treasury financing. FHFA's and Treasury's own discussions with investment bankers and investors corroborated this conclusion. In the absence of access to new capital, the only alternative left to the firms was to cease new business and shed assets in a weak market. That would have been disastrous for the mortgage markets as mortgage rates would have continued to

5

72

move higher and, in turn, disastrous for the Enterprises as the prices of their securities would have fallen and credit losses would have increased.

Therefore, in order to restore the balance between safety and soundness and mission, FHFA placed Fannie Mae and Freddie Mac into conservatorship. That is a statutory process designed to stabilize a troubled institution with the objective of maintaining normal business operations and restoring its safety and soundness. It was the most prudent regulatory action to take.

FHFA did not undertake this action lightly. We consulted with the Chairman of the Board of Governors of the Federal Reserve System, Ben Bernanke, who was made a consultant to FHFA under the new legislation. We also consulted with the Secretary of the Treasury, not only as an FHFA Oversight Board member, but also in line with his ability under the law to provide financing to the GSEs. They both concurred with me that conservatorship needed to be undertaken.

FHFA will act as the conservator of the Enterprises until they are stabilized. The Treasury's financial commitments, authorized by the new law, were critical to creating a workable conservatorship structure.

Let me now turn to the conservatorships. First signs are that the conservatorships are positive. A lack of confidence had resulted in continued widening of the spread between yields of their MBS and yields of Treasury securities, which meant that virtually none of the large drop in Treasury interest rates over the past year had been passed on to the mortgage markets. On top of that, Freddie Mac and Fannie Mae, in order to try to build capital, may have raised prices and

6

73

tightened credit standards beyond what was necessary for sound underwriting. I am pleased to say that the Enterprises' funding costs and the spreads on MBS have declined. As denoted in the attached chart, yields on Freddie Mac guaranteed mortgage securities have declined relative to Treasury debt yields by a third of a percentage point since the Friday before the conservatorship. This lower cost has been passed on to homebuyers, with 30-year fixed-rate mortgage rates below 6 percent for the first time since January.

On the first day, businesses opened as normal, but with stronger backing for the holders of MBS, senior debt and subordinated debt. Consistent with the terms of the Treasury's financial assistance, over the next 15 months, we will allow each company to increase its portfolio, up to $850 billion, before requiring gradual declines in the portfolios of 10 percent per year. The Enterprises will also continue to grow their guarantee MBS books.

As the conservator, FHFA assumed the power of the board and management. Highly qualified, new Chief Executive Officers have been appointed. The new CEOs are Herb Allison of Fannie Mae and David Moffett of Freddie Mac. Herb has served as President and Chief Operating Officer of Merrill Lynch and for the last six years Chairman and CEO of TIAA-CREF. David had previously served as the Vice Chairman and CFO of US Bancorp. I appreciate the willingness of these two men to take on these tough jobs during these challenging times. In addition, their compensation will be significantly lower than the outgoing CEOs.

Although it is not necessary in a conservatorship, new boards are being formed as a matter of good governance. New non-executive Chairmen were announced last week. Philip Laskawy, former Chairman and CEO of Ernst and Young, has agreed to be the Chairman of Fannie Mae.

7

74

John Koskinen, former President and CEO of Palmieri Company, a corporate turnaround management company, and former Deputy Director for Management at OMB, has agreed to be the Chairman of Freddie Mac.

As part of the conservatorship, the CEOs of Fannie Mae and Freddie Mac were asked to leave after a transition period.  Under the new legislation's "golden parachute" language, and existing regulations, FHFA directed that severance payments not be made to the CEOs.  As appropriate for senior executive officers, their pay over their years at the Enterprises was also at risk, as a major portion of their bonuses were in stock.  Their actual pay based on today's stock price was about a third of what was reported in the press at the time.

FHFA worked with the new CEOs to establish employee retention programs.  They agree with me that it is very important to work with the current management teams and employees to encourage them to stay and to continue to make important improvements to the Enterprises.

All political activities -- including all lobbying -- were halted immediately.  We will review the charitable activities to ensure that these reflect their mission and their conservatorship status.

In order to conserve over $2 billion in annual capital, the common stock and preferred stock dividends were eliminated.  I recognize that the loss of dividend income may have an adverse effect on some investors, including depository institutions.  Before taking our action, we consulted with the bank regulators and I understand that they are working with individual institutions under their jurisdiction that may have capital invested in Enterprise preferred stock. As you know, any preferred stock is part of the issuing firm's equity account and is issued to

8

75

absorb losses ahead of debt holders.   Subordinated debt interest and principal payments will continue to be made, even if the capital test is breached.

Finally and very importantly, the liquidity, MBS investment, and senior preferred stock facilities with the U.S. Treasury, are all in place.  These facilities will provide critically needed support to Freddie Mac and Fannie Mae to fulfill their mission over the long term, while giving a potential upside for the taxpayer.  The key facility is the senior preferred stock agreement, which ensures that each Enterprise maintains a positive net worth.  This measure adds to market stability by providing additional security to GSE debt holders – senior and subordinated – and adds to mortgage affordability by providing additional confidence to investors in GSE MBS.  The senior preferred facility supports all past and future debt and MBS issuances, until the terms of the facility are completely satisfied.   In light of this facility the existing regulatory capital requirements will not be binding during the conservatorship.  As SEC registrants, the Enterprises will continue to report their financial results quarterly.

The second facility is a secured credit facility that is not only for Fannie Mae and Freddie Mac, but also for the 12 Federal Home Loan Banks that FHFA also regulates.  The Federal Home Loan Banks have performed remarkably well over the last year as they have a different business model than Fannie Mae and Freddie Mac and a different capital structure that grows as their lending activity grows.   They are jointly and severally liable for the Bank System's debt obligations and all but one of the 12 are profitable. Therefore, it is very unlikely that they will use the facility.

9

76

Another element of Treasury's financing plan is to hire investment managers to purchase Fannie Mae and Freddie Mac MBS.  The goal is to provide additional liquidity to the MBS and lower the costs of mortgages.  FHFA helped originate this approach.  As such, we are pleased that Treasury has decided to implement these purchases quickly and on a larger scale than originally planned.

We also support other recent actions and proposals of the Bush Administration, Secretary Paulson and Chairman Bernanke designed to take a comprehensive approach to relieving the stress on our financial institutions and markets.  Among these actions are:

- o   Requesting authority from Congress to purchase troubled mortgage assets from financial institutions; and
- o   Protecting investors in money market funds.

These actions are designed to get at the root cause of financial market turmoil which is the liquidity in the nation's mortgage market.

Let me now bring you up-to-date on our actions since September 7.  The new CEOs were introduced to Enterprise senior management at separate meetings at FHFA offices on Sunday, September 7.

To reassure financial counterparties, later that day FHFA posted a statement on its website emphasizing that all existing contracts with the Enterprises remain in effect, that the Enterprises have the authority to enter into new contracts, and that the enforceability of such new contracts is

10

77

not affected by the appointment of the conservator.  I also sent a statement to employees at both Enterprises explaining the conservatorships, and that the purposes of the action are to help restore confidence in the Enterprises, enhance their ability to fulfill their mission, and mitigate systemic risk.

Since the Enterprises opened for business on September 8, FHFA personnel have been continuously on site, both at the Enterprises' headquarters and locations of other key operations to ensure a smooth transition and continued business operations.  FHFA personnel include examiners, attorneys and other experts to provide for timely communications between the GSE, the conservator, and the examination team.  As a conservatorship team, the FHFA representatives are there to reassure Enterprise employees about the continued business operations objective of the conservatorship, to support the needs of the new CEOs as they become familiar with their new organizations, and to act as a conduit and communicate any questions and issues that need resolution back to me.

FHFA will continue to work expeditiously on the many regulations needed to implement the new law.  Some of the key regulations will be minimum capital standards, prudential safety and soundness standards and portfolio limits.  Importantly, the new legislation adds affordable housing and mission enforcement to the responsibilities of the safety and soundness regulator.

While FHFA has had these responsibilities for only a matter of weeks, we are placing a high priority on them.  A key reason for moving quickly to conservatorship was that the companies' abilities to serve their mission had been impaired.

11

FHFA 0109

78

As the companies operate in conservatorship, I have already instructed each new CEO to examine the underwriting standards and pricing. They have begun to do so, and I expect any changes to reflect both safe and sound business strategy and attentiveness to the Enterprise's mission.

Fannie Mae and Freddie Mac are important to the secondary market for multifamily loans, and multifamily lending is critical to the affordable housing mission of the Enterprises. I am determined to ensure that, in conservatorship, both Enterprises remain dedicated to, and actively involved in, multifamily lending. I released a statement to this effect so that market participants may have assurance that the Enterprises will continue to be a source of underwriting and financing for multifamily loans. That statement acknowledged the importance of all aspects of the Enterprises' multifamily businesses – including the LIHTC (low-income housing tax credit) area and liquidity facilities for remarketed mortgage revenue bonds.

Over the last year, we have actively challenged Fannie Mae and Freddie Mac to be more creative on foreclosure prevention. They have responded, but more has to be done. We have worked with them to publicly report their loan modification activities, but that work was slowed by the many other actions we were undertaking. Yesterday we did publish our first quarterly report on their foreclosure prevention activities. We will publish a second quarter update next week.

Going forward, we will work with the CEOs to modify business practices, such as the lengthy delay before pulling delinquent loans from securitized pools. Practices such as this were motivated by capital concerns, but undermined efforts to help distressed borrowers. If we are to address the problem of mortgage delinquencies, a systematic approach to loan modification is

12

79

essential.  Well before last week's actions, we had already asked the Enterprises to facilitate the loan modification program the FDIC has undertaken with IndyMac Federal.  I expect the ongoing work on loan modifications being done there, and with other seller servicers, to continue to be a high priority for the conservatorships, both as a matter of good business and as a matter of supporting the Enterprises' mission.

The new legislation established a Housing Trust Fund to increase and preserve the supply of rental housing for extremely low and very low income families, including homeless families, and to increase homeownership for extremely low and very low income families.  I recognize the importance of the Housing Trust Fund to many members of Congress.    Under the law, the principal duty of FHFA involves the approval of funds paid by each Enterprise equal to 4.2 basis points for each dollar of unpaid principal balance of its total new business purchases.  In the near-term, these funds will be used to fund a key component of the new law, the FHA HOPE for Homeowners Program, which will be funded by Treasury if the Enterprises do not.  Enterprise funds are to be used to reimburse Treasury for the cost of the Hope Bonds.  My understanding is that Treasury has already issued $29.5 million in Hope Bonds to fund the program's start-up costs.

Congress also required that the FHFA Director consider circumstances in which such allocations would be suspended. The Director is required to temporarily suspend such allocations upon a finding that they are contributing,  or would contribute, to the financial instability of the Enterprise, are causing, or would cause, the Enterprise to be classified as undercapitalized, or are preventing, or would prevent, an Enterprise from successfully completing a capital restoration plan described in the legislation.  Accordingly, I intend to make that determination only after a

13

80

careful and thorough review of existing conditions including their third quarter results.  Treasury has provided assurances that a temporary suspension of Enterprise contributions would not impede issuance of Hope Bonds, so the Hope for Homeowners program will not be harmed, even if Enterprises contributions are temporarily suspended

Enforcement of the affordable housing goals established for the Enterprises by the Congress, once HUD's responsibility, is now up to FHFA.  While ensuring liquidity in the mortgage marketplace has necessarily been a primary focus in recent weeks and months, ensuring that low and moderate income persons and underserved areas have ready access to affordable mortgage loans remains a critical responsibility of the Enterprises.  In the near-term, the Enterprises are charged with meeting the very ambitious goals set by HUD back in 2004, a year in which the mortgage marketplace looked far different than it does today. In 2007, they missed two subgoals. Based on our discussions with the Enterprises, the miss will be larger in 2008.

The market turmoil of this year resulted in a tightening of underwriting criteria for the purchase of new, unseasoned loans used by individual lenders—the entities that actually originate loans sold to the GSEs—and private mortgage insurers, thereby reducing the availability of traditionally goal rich high loan-to-value home purchase loans. In addition, the collapse of the private label, secondary mortgage market further reduced the share of home purchase loans qualifying for goals. Finally, the rise of FHA as a market force means fewer high-LTV, goal-rich borrowers for Fannie Mae and Freddie Mac.  Even if some or all of these goals are found to be unattainable, I will expect each Enterprise to develop and implement ambitious plans to support the borrowers and markets targeted by the goals.

14

81

We have begun to meet with affordable housing advocates, seeking their perspective on implementation of the new goals structure.

Finally, I am pleased to report that FHFA expects to have a regulation in place by October 1 to implement Section 1218 of HERA, which provides temporary authority for the Federal Home Loan Banks to use a portion of the subsidy money in Affordable Housing Program to refinance mortgages for families at or below 80 percent of area median income. In broad terms, we intend to issue a regulation implementing this program so that it supports the refinance program in HERA's Hope for Homeowners program by permitting AHP funding of additional principal write-downs or payment of closing costs. We've discussed this initiative with the FHA, which is very supportive of the prospect of added support on this initiative.

Conclusion

The decision to appoint a conservator for each Enterprise was a tough, but necessary one. They can now play their correct role of being part of the solution and not part of the problem. Unfortunately, all the good and hard work put in by the FHFA and the Enterprises was not sufficient to offset the consequences of the antiquated capital requirements and the turmoil in housing markets. Conservatorship will give the Enterprises time to restore the balances between safety and soundness and their missions. I want to thank the FHFA employees for their work during this intense regulatory process. They represent the best in public service.

I also recognize that many employees at each company have been working extremely hard through years of remediation and through the past year of market volatility. Employees have lost personal savings as a result of the plummet in their company's stock price and they have been

15

82

working, and continue to work, long hours in the face of uncertainty.  To them, I say thank you and pledge that, as conservator, we share the common goal of stabilizing your company while ensuring it continues to serve its public purpose of providing stability, liquidity, and affordability to the mortgage market.

Working together we can finish the job of restoring confidence in the Enterprises and with the new legislation you provided, build a stronger and safer future for the mortgage markets, homeowners and renters in America.

Thank you.  I would be pleased to answer any questions you may have.

16

83

**Testimony of David M. Moffett**
**Chief Executive Officer, Freddie Mac**

COMMITTEE ON FINANCIAL SERVICES
UNITED STATES HOUSE OF REPRESENTATIVES
September 25, 2008

Chairman Frank, Ranking Member Bachus and members of the Committee:

Good afternoon.  My name is David Moffett, and I am the new Chief Executive Officer of Freddie Mac.  I am pleased to appear before the Committee today to discuss the ongoing business operations of Freddie Mac, particularly our affordable housing and other mission activities.

I joined Freddie Mac less than three weeks ago when the company was placed under the conservatorship of its regulator, the Federal Housing Finance Agency (FHFA).  I am working in cooperation with FHFA and other federal authorities to put the company on a sound footing and help the nation's housing market recover as quickly as possible.

Prior to joining Freddie Mac, I spent more than 30 years in the banking industry.  I served as vice chairman and chief financial officer of U.S. Bancorp from 1993 until my retirement last year.  Until September 7, 2008, I was a senior advisor to the Carlyle Group, focused on global financial services.

I consider it an honor to have been chosen to lead Freddie Mac at this critical time. Nothing could be more important to our country's long-term economic strength than to support the housing markets with a stable supply of low-cost mortgage money.  Along with Freddie Mac's dedicated employees, I am firmly committed to achieving the goals of the conservatorship as described by Secretary Paulson on September 7 – namely, those of market stability, mortgage availability and taxpayer protection.

The decision to place an institution in conservatorship is a difficult one.  I believe that the conservatorship, coupled with the Treasury's strong support, has already been beneficial to Freddie Mac, helping us meet our mission, lower mortgages rates and stabilize the nation's mortgage markets.  The conservatorship lets us focus on restoring vitality to our institution, and the Treasury program lets us step forward with the confidence of those who help fund our operations and the broader markets.

In all of these activities, we are working closely with FHFA.  While the conservatorship means more coordination with our regulator than in the past, I can tell you that FHFA is responsive and works with us to facilitate decision-making and planning.  I intend to work with our non-executive chair, John Koskinen, to move quickly to build a new board of directors and to develop a planning strategy whereby we can move business plans quickly to FHFA and then into practice.

1

84

Now let me turn to the subject of this hearing – Freddie Mac's business operations as they pertain to our affordable housing and mission activities, including loan modifications and the other steps we are taking to reduce foreclosures.

First and foremost, Freddie Mac is open for business. The company's core business of buying mortgages and issuing securities has been strengthened by the conservatorship. The easing of capital and liquidity concerns made possible by the Treasury funding commitment under the Senior Preferred Stock Purchase Agreement and the Treasury's GSE credit facility will enable us to bring greater liquidity to the market, as envisioned by Treasury Secretary Paulson, Federal Reserve Chairman Bernanke and Director Lockhart. Already we have begun ramping up our purchases of mortgage-backed securities and will continue to support the market as conditions warrant.

Taken together, these actions are having a positive effect on markets and consumers. Since September 5, spreads between Freddie Mac 10-year debt and comparable Treasuries have tightened about 15 basis points, and mortgage spreads to Treasuries have tightened by between 25 and 30 basis points. And while multiple factors are involved, conventional conforming mortgage rates have dropped by over a half percentage point in the past two weeks, based on our mortgage market survey.[1] In response, there has been a considerable increase in mortgage applications. According to the Mortgage Bankers Association, between September 5 and September 19, applications to refinance conventional mortgages rose 76 percent, pushing total conventional mortgage applications up 23 percent.[2] These are all encouraging signs.

In addition to providing needed liquidity, Freddie Mac remains focused on meeting our affordable housing mission, including the affordable housing goals. As was the case in 2007, market conditions are making it harder to meet certain affordable housing targets. Nevertheless, we estimate that our affordable mortgage purchases will substantially mirror the levels of goal-qualifying loans being originated in the market today. Our multifamily program also is continuing to provide needed liquidity to affordable rental housing during this turbulent period.

Finally, Freddie Mac remains actively engaged in reducing foreclosures. We start from the proposition that in the vast majority of cases foreclosure is in no ones' interest – not the investor, not the lender and certainly not the homeowner. Every day we work

---

[1] Freddie Mac's Primary Mortgage Market Survey®. For the week ending September 18, 2008, the average rate for a 30-year fixed-rate conventional conforming mortgage was 5.8 percent. For the week ending September 4, the rate was 6.35 percent, a difference of 57 basis points.
[2] Mortgage Bankers Association's Mortgage Applications Survey. For the week ending September 5, 2008, the total conventional applications index (seasonally adjusted) was 553.8 and the conventional refinance index was 998.3. For the week ending September 19, 2008, the total conventional index was 683.0 and the conventional refinance index was 1,756.8.

2

85

Testimony of David M. Moffett
Chief Executive Officer, Freddie Mac
COMMITTEE ON FINANCIAL SERVICES
UNITED STATES HOUSE OF REPRESENTATIVES
September 25, 2008

diligently with our servicers to provide borrowers viable workout alternatives, such as forbearance, repayment plans and loan modifications. In the past few months, we increased the financial incentives we pay servicers who help families avoid foreclosure and launched a Mass Modification pilot program in addition to our regular modification programs. In this new initiative, servicers solicit seriously delinquent borrowers with a pre-approved modification plan. Notwithstanding the continued difficulty of contacting many borrowers, early results are positive.

All these efforts are producing results. Of the 12 million single-family mortgages Freddie Mac currently guarantees, approximately 124,000 – or slightly more than one percent – are seriously delinquent, meaning they are 90 days or more past due or have begun the foreclosure process. So far in 2008, we have completed about 48,000 workouts of these seriously delinquent loans. All told, we are on track to enable 82,000 families avoid foreclosure by year-end.

Workouts are critically important, but they will not help stabilize the market unless borrowers are able to sustain homeownership going forward. As a general rule, we direct servicers to underwrite each modification based on the borrower's actual circumstances at the time. Reliance on outdated or less comprehensive information might simply set the borrower up for another failure. We also want to ensure that the borrower has sufficient cushion to cover unanticipated expenses that might otherwise force the borrower back into default. We have found this approach to be very successful over the past few years.

Currently, we are achieving affordability for many delinquent borrowers through combinations of permanent term and interest-rate modifications, thereby avoiding the losses associated with the reduction of principal. In situations where these steps are insufficient, other options may be considered, such as a partial reduction of principal.

On October 1, 2008, the HOPE for Homeowners refinance program becomes effective. Under this program, borrowers may refinance into new mortgages insured by FHA, provided the borrowers' existing lenders take the full market loss and an additional 10 percent write-down and pay a fee. We anticipate that, in certain cases, the HOPE for Homeowners program may be another viable option.

In closing, let me repeat that it is a great honor to be leading Freddie Mac at this critical time. I look forward to working with Chairman Frank, Ranking Member Bachus and the members of the Committee to ensure that Freddie Mac fully meets its mission going forward.

I look forward to your questions.

3

86

MICHELE BACHMANN
6TH DISTRICT, MINNESOTA

COMMITTEE:
FINANCIAL SERVICES

HOUSE REPUBLICAN
POLICY COMMITTEE

ASSISTANT REPUBLICAN WHIP

### Congress of the United States
#### House of Representatives
#### Washington, DC 20515–2306

412 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-2331

6043 HUDSON ROAD, SUITE 330
WOODBURY, MN 55125
(651) 731-5400

110 2ND STREET S, SUITE 232
WAITE PARK, MN 56387
(320) 253-9991

www.bachmann.house.gov

September 11, 2008

Director James B. Lockhart
Federal Housing Finance Agency (FHFA)
1700 G Street, NW, 4th Floor
Washington, DC 20552

Dear Director Lockhart:

We are writing to request that, as conservator of the Government Sponsored Enterprises (GSEs) Fannie Mae and Freddie Mac, the Federal Housing Finance Agency (FHFA) use its authority to suspend contributions by the GSEs to the Housing Trust Fund (Sec. 1337) recently authorized by the *Housing and Economic Recovery Act of 2008* (P.L. 110-289.)

As you know, this legislation created a vaguely defined Housing Trust Fund financed by 4.2 basis points for each dollar of unpaid principal balance from Fannie Mae and Freddie Mac's total new business purchases. Additionally, the legislation explicitly states that:

> "The Director shall temporarily suspend allocations under subsection (a) by an
> enterprise upon a finding by the Director that such allocations—
>
> (1) are contributing, or would contribute, to the financial instability of the
> enterprise;
> (2) are causing, or would cause, the enterprise to be classified as undercapitalized;
> or
> (3) are preventing, or would prevent, the enterprise from successfully completing
> a capital restoration plan under section 1369C."

Your recent decision to place the GSEs into conservatorship demonstrates that these entities are currently experiencing "financial instability" and would, without a direct investment by American taxpayers, be in an undercapitalized position. Regardless of one's views of the merits of the Housing Trust Fund -- which we question -- there should be no disagreement that during this time of conservatorship the GSEs and American homeowners across our nation simply cannot afford to finance it.

Fannie Mae and Freddie Mac currently own or guarantee mortgage-related obligations of more than $5.4 trillion, an amount roughly equal to the United States' publicly held debt, and the U.S. Treasury has exercised its new authorities to provide them with billions of dollars in taxpayer backing to stay afloat. The very fact that the GSEs need such a massive taxpayer bailout is proof that siphoning funds from these entities to finance the

87

Housing Trust Fund would be irresponsible and harmful to homeowners, taxpayers, the GSEs, and America's financial markets.

Once again, as you continue to assess the financial position of the GSEs, we urge you to refrain from allocating any dollars to the Housing Trust Fund as described by Section 1337 of P.L. 110-289.  We respectfully ask that you provide us with a response regarding your intentions.

Thank you for your consideration of this request.

Sincerely,

Ranking Member Spencer Bachus

Rep. Michele Bachmann

Republican Whip Roy Blunt

Rep. Jeb Hensarling

Rep. Tom Feeney

Rep. Scott Garrett

Rep. Tom Price

Rep. Mike Pence

Rep. Ed Royce

Rep. Judy Biggert

Rep. Marsha Blackburn

Rep. Randy Neugebauer

Rep. Patrick McHenry

Rep. Peter Roskam

Rep. Thaddeus McCotter

Rep. Gresham Barrett

88

Rep. Geoff Davis

Rep. Kenny Marchant

Rep. John Campbell

Rep. Tim Walberg

Rep. John Kline

Rep. Ginny Brown-Waite

Rep. Ron Paul

Rep. Donald Manzullo

Rep. Paul Broun

Rep. Marilyn Musgrave

Rep. Ted Poe

Rep. Jo Ann Emerson

Rep. Barbara Cubin

Rep. Dan Burton

Rep. Steve Scalise

Rep. Steve King

Rep. Kevin McCarthy

Rep. Walter Jones

Rep. Trent Franks

Rep. Pete Sessions

Rep. Kevin Brady

Rep. Joe Pitts

89



**INVESTOR'S BUSINESS DAILY**

September 24, 2008

# How A Clinton-Era Rule Rewrite Made Subprime Crisis Inevitable

By TERRY JONES

One of the most frequently asked questions about the subprime market meltdown and housing crisis is: How did the government get so deeply involved in the housing market?

The answer is: President Clinton wanted it that way.

**Fannie Mae** (FNM) and **Freddie Mac**, (FRE) even into the early 1990s, weren't the juggernauts they'd later be.

While President Carter in 1977 signed the Community Reinvestment Act, which pushed Fannie and Freddie to aggressively lend to minority communities, it was Clinton who supercharged the process. After entering office in 1993, he extensively rewrote Fannie's and Freddie's rules.

In so doing, he turned the two quasi-private, mortgage-funding firms into a semi-nationalized monopoly that dispensed cash to markets, made loans to large Democratic voting blocs and handed favors, jobs and money to political allies. This potent mix led inevitably to corruption and the Fannie-Freddie collapse.

Despite warnings of trouble at Fannie and Freddie, in 1994 Clinton unveiled his National Homeownership Strategy, which broadened the CRA in ways Congress never intended.

Addressing the National Association of Realtors that year, Clinton bluntly told the group that "more Americans should own their own homes." He meant it.

Clinton saw homeownership as a way to open the door for blacks and other minorities to enter the middle class.

Though well-intended, the problem was that Congress was about to change hands, from the Democrats to the Republicans. Rather than submit legislation that the GOP-led Congress was almost sure to reject, Clinton ordered Robert Rubin's Treasury Department to rewrite the rules in 1995.

The rewrite, as City Journal noted back in 2000, "made getting a satisfactory CRA rating harder." Banks were given strict new numerical quotas and measures for the level of "diversity" in their loan portfolios. Getting a good CRA rating was key for a bank that wanted to expand or merge with another.

Loans started being made on the basis of race, and often little else.

"Bank examiners would use federal home-loan data, broken down by neighborhood, income group and race, to rate banks on performance," wrote Howard Husock, a scholar at the Manhattan Institute.

http://license.icopyright.net/user/viewFreeUse.act?fuid=MTU5NzM2NA%3D%3D          9/26/2008

90

Investor's Business Daily: How A Clinton-Era Rule Rewrite Made Subprime Crisis Inevit...   Page 2 of 2

But those rules weren't enough.

Clinton got the Department of Housing and Urban Development to double-team the issue. That would later prove disastrous.

Clinton's HUD secretary, Andrew Cuomo, "made a series of decisions between 1997 and 2001 that gave birth to the country's current crisis," the liberal Village Voice noted. Among those decisions were changes that let Fannie and Freddie get into subprime loan markets in a big way.

Other rule changes gave Fannie and Freddie extraordinary leverage, allowing them to hold just 2.5% of capital to back their investments, vs. 10% for banks.

Since they could borrow at lower rates than banks due to implicit government guarantees for their debt, the government-sponsored enterprises boomed.

With incentives in place, banks poured billions of dollars of loans into poor communities, often "no doc" and "no income" loans that required no money down and no verification of income.

By 2007, Fannie and Freddie owned or guaranteed nearly half of the $12 trillion U.S. mortgage market — a staggering exposure.

Worse still was the cronyism.

Fannie and Freddie became home to out-of-work politicians, mostly Clinton Democrats. An informal survey of their top officials shows a roughly 2-to-1 dominance of Democrats over Republicans.

Then there were the campaign donations. From 1989 to 2008, some 384 politicians got their tip jars filled by Fannie and Freddie.

Over that time, the two GSEs spent $200 million on lobbying and political activities. Their charitable foundations dropped millions more on think tanks and radical community groups.

Did it work? Well, if measured by the goal of putting more poor people into homes, the answer would have to be yes.

From 1995 to 2005, a Harvard study shows, minorities made up 49% of the 12.5 million new homeowners.

The problem is that many of those loans have now gone bad, and minority homeownership rates are shrinking fast.

Fannie and Freddie, with their massive loan portfolios stuffed with securitized mortgage-backed paper created from subprime loans, are a failed legacy of the Clinton era.

© Copyright 2008 Investor's Business Daily. Permission granted for up to 10 copies. All rights reserved.
You may forward this article or get additional permissions by typing http://license.icopyright.net/3.7543?
icx_id=2008092{generalleft3} into any web browser. Investor's Business Daily Inc. and Investor's Business Daily logos are registered trademarks of Investor's Business Daily Inc.. The iCopyright logo is a registered trademark of iCopyright, Inc.

91

## Massachusetts Bankers Association

**Statement of the Massachusetts Bankers Association**
**House Committee on Financial Services**
**Oversight Hearing to Examine Recent Treasury and FHFA Actions**
**Regarding the Housing GSEs**
**Thursday, September 25, 2008**

On behalf of our 200 commercial, savings, cooperative, and savings and loan members throughout Massachusetts and New England, the Massachusetts Bankers Association (MBA) appreciates the opportunity to submit this statement regarding the negative consequences of the recent decision by the Treasury Department and Federal Housing Finance Agency (FHFA) to place Fannie Mae and Freddie Mac into conservatorship, particularly as it relates to the treatment of their preferred stock. This action clearly has broad implications for the entire financial system and the overall U.S. economy.

While we recognize that Treasury Secretary Henry Paulson acted to stabilize the housing market by encouraging continued availability of liquidity from the government-sponsored enterprises (GSEs), the move to restructure the GSEs has significant implications for banks, particularly community banks. We are most concerned that some aspects of the plan actually hurt housing, with many banks potentially reducing the availability of credit to consumers and businesses due to the lost value of their GSE investment.

When the plan was originally proposed, Treasury, the FHFA and the bank regulatory agencies estimated that only a few dozen banks would be affected. However, according to recent industry estimates, banks throughout the country are holding between $10 billion and $15 billion in GSE preferred stock, which was effectively wiped out by Treasury's actions. While the banking industry in Massachusetts continues to be in a strong financial condition, many banks throughout the Commonwealth invested in Fannie Mae and Freddie Mac preferred stock and will now suffer reductions in capital due to the government's actions.

More than $7.4 billion of this capital was raised in preferred stock offerings as recently as November and December 2007. These investments – standard means for the banking industry and the GSEs to provide and raise capital – have always been viewed as a conservative investment by financial institutions. Federal regulatory officials have allowed, and at various times even promoted, these investments as acceptable and appropriate for community banks to hold in their investment portfolios.

In fact, commenting on Freddie Mac's capital plan, which included a preferred stock offering on November 27, 2007, Office of Federal Housing Enterprise Oversight (OFHEO) Director James Lockhart stated that Freddie Mac's "announcement of the steps it intends to take reflects prudential actions," and that, "these actions should enhance its ability to continue to fulfill its housing finance mission." Shortly after the December offering, OFHEO said that both GSEs were adequately capitalized as of the end of the third quarter and, in referring to the just-issued preferred shares, said "OFHEO considers this significant increase to the capital bases of both enterprises prudent, considering both market condition and the need to maintain sufficient capital."

As recently as July and August of this year, Director Lockhart and Secretary Paulson were still publicly stating that Fannie and Freddie were adequately capitalized. On July 13, 2008, Director Lockhart said, "the enterprises' $95 billion in total capital, their cash and liquidity portfolios and their

Massachusetts Bankers Association, Inc.
73 Tremont Street, Suite 306
Boston, Massachusetts 02108-3906
Tel. 617-523-7595 / Fax. 617-523-6373
http:www.massbankers.org

92

Statement of the Massachusetts Bankers Association
September 25, 2008
Page 2

experienced management serve as strong support for the enterprises' continued operation." Secretary Paulson also said on multiple occasions in recent months that neither a change in the corporate structure of the GSEs, nor government intervention would be needed.

Finally, the preferred stocks were rated with investment grades of AA- by Standard & Poor's and Aa3 by Moody's. After statements by Treasury Secretary Paulson at the time of the Bear Stearns takeover, S & P raised its rating to AAA.

Community and regional banks have been, and continue to be, front line players in the effort to resolve the mortgage crisis and provide capital to qualified borrowers in a safe and sound manner. If $1 of bank capital supports $7.60 in lending activity, the $10-$15 billion dollars of capital removed from these institutions due to the Treasury action could result in mortgage lending activity being reduced by $76 billion and $114 billion. Additionally, assuming a 3% spread on such growth, an additional $3 billion dollars in net interest income (and, in effect, capital) also has been lost. From a public policy perspective, does it make sense to save an estimated $1 billion in dividends for Fannie and Freddie at the expense of more than $13-18 billion in capital losses for community banks and possibly more than $100 billion in fewer loans?

Now, as banks are forced to raise additional capital to compensate – and the cost of doing so increases due to damaged investor confidence in the preferred market – any potential growth plans are likely to be modified or scaled-back. Anecdotally we have heard of several curtailed branch expansions, thus reducing jobs and loans. Separately, we believe that Treasury's action could cause community and regional banks to begin to assess "event risk" in a more dramatic way, further inhibiting future growth and demanding a higher risk-adjusted rate of return on investments.

The purchase of preferred stock reflected the public-private partnership between the banking industry and the GSEs. OFHEO called for recapitalization and the banking sector responded in an effort to support the housing market and the GSEs. The industry's trust in the government and its ability and willingness to collaborate with private enterprise has been broken by Treasury's actions.

We have detailed a number of issues below that we hope the Committee will consider.

**Tax Issues**

While we recognize that this Committee does not have jurisdiction over tax policy, we do believe that there are a number of issues with regard to the tax treatment of GSE preferred stock that could quickly alleviate some of the current problems that community banks are facing. Given the current legislative environment and the need to act prior to September 30th, a one-time, limited tax relief provision may be the most expeditious way to address the issue.

GSE preferred stock is considered a capital asset of any bank that is not a securities dealer. Depending on size, banks are currently subject to a 34%-35% corporate federal tax rate. Taxable income derived from ordinary or capital assets have the same tax rate. Ordinary losses provide a tax reduction against taxable income derived from both ordinary and capital assets; however capital losses only provide a tax reduction against taxable income derived from other capital assets.

93

Statement of the Massachusetts Bankers Association
September 25, 2008
Page 3

While some institutions may be able to offset excess capital losses against capital gains taxable income, not every bank has gains to offset these losses. If these losses were temporarily classified as ordinary losses, this could provide a 34%-35% tax reduction against ordinary income in an institution's two prior and 20 succeeding tax years. Given the extraordinary nature of the government's intervention, the current limitation on the deductibility of excess GSE preferred stock capital losses penalizes banks.

We encourage you to work with your colleagues on the Ways & Means Committee on these proposals and we hope that tax relief for banks that invested in GSE preferred stock can be included in any comprehensive relief legislation.

**Restoration of Capital**

MBA strongly believes that restoring the capital entrusted to the GSEs by the banking industry is imperative to stabilizing the lending markets and ensuring that banks have the ability to put these funds to work in communities throughout the country.

- **Short-term Accounting Issues**

    Accounting rules related to the impairment of Fannie and Freddie preferred stock must not further amplify the current situation by creating event risk. With the pending September 30, 2008 requirement that banks classify these holdings as impaired, many regional and community banks will be taking charges against income and capital.

    These charges, which have already been partially reflected in the bank's own capital being reduced, will also be deducted from their income. We would encourage Congress, Treasury, state and federal regulators, and the Financial Accounting Standards Board (FASB) to work together to apply a temporary moratorium of at least 180 days on impairment. This delay will allow some rationality to return to the markets and give policy makers the necessary time to evaluate these issues and address the consequences of Treasury's actions.

- **Long-term Solution**

    Ultimately, MBA believes the necessary solution must return the capital to the preferred shareholders so that the vital work of providing mortgage financing will not be stymied and confidence in the government and the mortgage markets will be restored -- as was originally intended. We believe there are two potential options that Congress should consider:

    1. Restoring the dividend on the preferred stock:

    The FHFA should restore the full or partial dividend, with a statement explaining that the dividend will be reviewed regularly to ensure it is achieving its objective and minimizing potential taxpayer exposure. Preferred holders are not investors looking for high capital returns like holders of common stock. Again, preferred stock is structured as, and is, a debt instrument that essentially can be classified as capital on the issuer's balance sheet. They are unique investors in the GSEs' mission of providing liquidity to the mortgage market and supporting that mission in exchange for a fair dividend return.

94

Statement of the Massachusetts Bankers Association
September 25, 2008
Page 4

By restoring the dividend, the view is that the market will restore value to the holders, since an efficient risk/return trade off can be gauged. This approach will also begin to rebuild investor trust and allow the GSEs to return to the capital markets when they need to raise capital.

2. Converting the preferred stock to debt:

Another alternative could be to convert preferred shares in the GSEs to bonds with an established maturity date (i.e. 5-10 years), along with a continuous call provision. This will allow Fannie and Freddie, in whatever form in the future, to provide capital back to the community banks while also allowing the government to refinance the debt at the most opportune time for the agencies.

If the federal government decides to sell the GSEs' assets, taxpayers could receive their investment back. If the agencies are not sold and are maintained in their current form, profitability will provide redemption, or refunding. In addition, with the AAA rating now applied to the bond, the actual interest cost to the government will be far less than the average dividend cost of the preferred issued.

## Regulatory Issues

There are also several key issues that we believe should be discussed with the banking regulators.

- **Government Guarantee of GSE MBS and Debt**

The federal banking regulators, along with the Treasury, must acknowledge that an institution's holdings of GSE mortgage-backed securities are at least partially backed by the full faith and credit of the federal government. While Treasury has stated that the goal of the conservatorship was to protect bondholders, we have heard more ambiguous statements from the banking regulators. It is important that the government's guarantee of these instruments is clarified for the banking industry as well as other bondholders.

Another benefit of this clarification is that GSE debt would then be assigned a risk weighting as low as zero – similar to Treasury securities. At a time when some institutions might be forced to raise capital due to losses on the preferred stock, recognizing the new, lower risk weighting of these bonds could reduce the amount of capital that might be required.

- **Waiver Policy for Brokered Deposits**

Brokered deposits may be an option for some institutions that must raise additional liquidity as a result of the GSE conservatorship's impact on capital and depositor response. Currently, the banking regulators have a waiver process for banks which are less than well capitalized to accept brokered deposits. Because of these one-time, extraordinary circumstances, that waiver process should clearly be streamlined and all consideration should be given to these institutions in granting these requests.

Similarly, regulatory flexibility must extend to the exam process, with regulators considering recent events as a one-time event, not an impairment of core earnings

95

Statement of the Massachusetts Bankers Association
September 25, 2008
Page 5

- **Implications for the Deposit Insurance Fund**

The destruction of bank capital will undoubtedly increase the number of problem banks leading to increased burden upon the resources of the Deposit Insurance Fund (DIF). Even without additional bank failures, the increased stress on the FDIC will cause deposit insurance assessments to rise, further depressing bank earnings and limiting lending.

- **Capital Restoration Plans**

We also ask that you strongly urge the banking regulators to allow those institutions most impacted adequate time to restore their lost capital. Again, this was a one-time, extraordinary event, and regulatory flexibility is key in allowing those banks that have been adversely affected by the government's actions to regain their financial health.

**<u>Conclusion</u>**

On behalf of our member banks, we thank you for the opportunity to present our views on Treasury's recent conservatorship of the GSEs. We appreciate the Committee's efforts in addressing some of the unintended consequences of these actions, and we look forward to working with you as Congress considers possible short- and long-term responses to the Treasury action. Please contact us if you have any questions or need additional information.

# Tab 7

EXECUTION VERSION

## AMENDED AND RESTATED SENIOR PREFERRED STOCK PURCHASE AGREEMENT

AMENDED AND RESTATED SENIOR PREFERRED STOCK PURCHASE AGREEMENT (this "Agreement") dated as of September 26, 2008, between the UNITED STATES DEPARTMENT OF THE TREASURY ("Purchaser") and FEDERAL NATIONAL MORTGAGE ASSOCIATION ("Seller"), acting through the Federal Housing Finance Agency (the "Agency") as its duly appointed conservator (the Agency in such capacity, "Conservator"). Reference is made to Article 1 below for the meaning of capitalized terms used herein without definition.

### Background

A.  The Agency has been duly appointed as Conservator for Seller pursuant to Section 1367(a) of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (as amended, the "FHE Act").  Conservator has determined that entry into this Agreement is (i) necessary to put Seller in a sound and solvent condition; (ii) appropriate to carry on the business of Seller and preserve and conserve the assets and property of Seller; and (iii) otherwise consistent with its powers, authorities and responsibilities.

B.  Purchaser is authorized to purchase obligations and other securities issued by Seller pursuant to Section 304(g) of the Federal National Mortgage Association Charter Act, as amended (the "Charter Act").  The Secretary of the Treasury has determined, after taking into consideration the matters set forth in Section 304(g)(1)(C) of the Charter Act, that the purchases contemplated herein are necessary to (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer.

C.  Purchaser and Seller executed and delivered the Senior Preferred Stock Purchase Agreement dated as of September 7, 2008 (the "Original Agreement"), and the parties thereto desire to amend and restate the Original Agreement in its entirety as set forth herein.

THEREFORE, the parties hereto agree as follows:

### Terms and Conditions

## 1.  DEFINITIONS

As used in this Agreement, the following terms shall have the meanings set forth below:

"*Affiliate*" means, when used with respect to a specified Person (i) any direct or indirect holder or group (as defined in Sections 13(d) and 14(d) of the Exchange Act) of holders of 10.0% or more of any class of capital stock of such Person and (ii) any current or former director or officer of such Person, or any other current or former employee of such Person that currently exercises or formerly exercised a material degree of Control over such Person, including without limitation each current or former Named Executive Officer of such Person.

"*Available Amount*" means, as of any date of determination, the lesser of (a) the Deficiency Amount as of such date and (b) the Maximum Amount as of such date.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under United States federal law and the law of the State of New York.

"*Capital Lease Obligations*" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other similar arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for purposes hereof, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"*Control*" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Deficiency Amount*" means, as of any date of determination, the amount, if any, by which (a) the total liabilities of Seller exceed (b) the total assets of Seller (such assets excluding the Commitment and any unfunded amounts thereof), in each case as reflected on the balance sheet of Seller as of the applicable date set forth in this Agreement, prepared in accordance with GAAP; provided, however, that:

>  (i)  for the avoidance of doubt, in measuring the Deficiency Amount liabilities shall exclude any obligation in respect of any capital stock of Seller, including the Senior Preferred Stock contemplated herein;

>  (ii)  in the event that Seller becomes subject to receivership or other liquidation process or proceeding, "Deficiency Amount" shall mean, as of any date of determination, the amount, if any, by which (a) the total allowed claims against the receivership or other applicable estate (excluding any liabilities of or transferred to any LLRE (as defined in Section 5.4(a)) created by a receiver) exceed (b) the total assets of such receivership or other estate (excluding the Commitment, any unfunded amounts thereof and any assets of or transferred to any LLRE, but including the value of the receiver's interest in any LLRE);

>  (iii)  to the extent Conservator or a receiver of Seller, or any statute, rule, regulation or court of competent jurisdiction, specifies or determines that a liability of Seller (including without limitation a claim against Seller arising from rescission of a purchase or sale of a security issued by Seller (or guaranteed by Seller or with respect to which Seller is otherwise liable) or for damages arising from the purchase, sale or retention of such a security) shall be subordinated (other than pursuant to a contract providing for such subordination) to all other liabilities of Seller or shall be treated on par with any class of equity of Seller, then such liability shall be excluded in the calculation of Deficiency Amount; and

(iv) the Deficiency Amount may be increased above the otherwise applicable amount by the mutual written agreement of Purchaser and Seller, each acting in its sole discretion.

"*Designated Representative*" means Conservator or (a) if Conservator has been superseded by a receiver pursuant to Section 1367(a) of the FHE Act, such receiver, or (b) if Seller is not in conservatorship or receivership pursuant to Section 1367(a) of the FHE Act, Seller's chief financial officer.

"*Director*" shall mean the Director of the Agency.

"*Effective Date*" means the date on which this Agreement shall have been executed and delivered by both of the parties hereto.

"*Equity Interests*" of any Person shall mean any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity, ownership or profits of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*GAAP*" means generally accepted accounting principles in effect in the United States as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board from time to time.

"*Indebtedness*" of any Person means, for purposes of Section 5.5 only, without duplication, (a) all obligations of such Person for money borrowed by such Person, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services, other than trade accounts payable, (e) all Capital Lease Obligations of such Person, (f) obligations, whether contingent or liquidated, in respect of letters of credit (including standby and commercial), bankers' acceptances and similar instruments and (g) any obligation of such Person, contingent or otherwise, guaranteeing or having the economic effect of guaranteeing any Indebtedness of the types set forth in clauses (a) through (f) payable by another Person other than Mortgage Guarantee Obligations.

"*Liquidation End Date*" means the date of completion of the liquidation of Seller's assets.

"*Maximum Amount*" means, as of any date of determination, $100,000,000,000 (one hundred billion dollars), less the aggregate amount of funding under the Commitment prior to such date.

"*Mortgage Assets*" of any Person means assets of such Person consisting of mortgages, mortgage loans, mortgage-related securities, participation certificates, mortgage-backed commercial paper, obligations of real estate mortgage investment conduits and similar assets, in each case to the extent such assets would appear on the balance sheet of such Person in accordance with GAAP as in effect as of the date hereof (and, for the avoidance of doubt, without giving effect to any change that may be made hereafter in respect of Statement of Financial Accounting Standards No. 140 or any similar accounting standard).

"*Mortgage Guarantee Obligations*" means guarantees, standby commitments, credit enhancements and other similar obligations of Seller, in each case in respect of Mortgage Assets.

"*Named Executive Officer*" has the meaning given to such term in Item 402(a)(3) of Regulation S-K under the Exchange Act, as in effect on the date hereof.

"*Person*" shall mean any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, estate, unincorporated organization or government or any agency or political subdivision thereof, or any other entity whatsoever.

"*SEC*" means the Securities and Exchange Commission.

"*Senior Preferred Stock*" means the Variable Liquidation Preference Senior Preferred Stock of Seller, substantially in the form of Exhibit A hereto.

"*Warrant*" means a warrant for the purchase of common stock of Seller representing 79.9% of the common stock of Seller on a fully-diluted basis, substantially in the form of Exhibit B hereto.

## 2. COMMITMENT

2.1. *Commitment.*  Purchaser hereby commits to provide to Seller, on the terms and conditions set forth herein, immediately available funds in an amount up to but not in excess of the Available Amount, as determined from time to time (the "Commitment"); provided, that in no event shall the aggregate amount funded under the Commitment exceed $100,000,000,000 (one hundred billion dollars).  The liquidation preference of the Senior Preferred Stock shall increase in connection with draws on the Commitment, as set forth in Section 3.3 below.

2.2. *Quarterly Draws on Commitment.*  Within fifteen (15) Business Days following the determination of the Deficiency Amount, if any, as of the end of each fiscal quarter of Seller which ends on or before the Liquidation End Date, the Designated Representative may, on behalf of Seller, request that Purchaser provide immediately available funds to Seller in an amount up to but not in excess of the Available Amount as of the end of such quarter.  Any such request shall be valid only if it is in writing, is timely made, specifies the account of Seller to which such funds are to be transferred, and contains a certification of the Designated Representative that the requested amount does not exceed the Available Amount as of the end of the applicable quarter. Purchaser shall provide such funds within sixty (60) days of its receipt of such request or, following any determination by the Director that the Director will be mandated by law to appoint a receiver for Seller if such funds are not received sooner, such shorter period as may be necessary

to avoid such mandatory appointment of a receiver if reasonably practicable taking into consideration Purchaser's access to funds.

2.3. *Accelerated Draws on Commitment.*  Immediately following any determination by the Director that the Director will be mandated by law to appoint a receiver for Seller prior to the Liquidation End Date unless Seller's capital is increased by an amount (the "Special Amount") up to but not in excess of the then current Available Amount (computed based on a balance sheet of Seller prepared in accordance with GAAP that differs from the most recent balance sheet of Seller delivered in accordance with Section 5.9(a) or (b)) on a date that is prior to the date that funds will be available to Seller pursuant to Section 2.2, Conservator may, on behalf of Seller, request that Purchaser provide to Seller the Special Amount in immediately available funds. Any such request shall be valid only if it is in writing, is timely made, specifies the account of Seller to which such funds are to be transferred, and contains certifications of Conservator that (i) the requested amount does not exceed the Available Amount (including computations in reasonable detail and satisfactory to Purchaser of the then existing Deficiency Amount) and (ii) the requested amount is required to avoid the imminent mandatory appointment of a receiver for Seller.  Purchaser shall provide such funds within thirty (30) days of its receipt of such request or, if reasonably practicable taking into consideration Purchaser's access to funds, any shorter period as may be necessary to avoid mandatory appointment of a receiver.

2.4. *Final Draw on Commitment*.  Within fifteen (15) Business Days following the determination of the Deficiency Amount, if any, as of the Liquidation End Date (computed based on a balance sheet of Seller as of the Liquidation End Date prepared in accordance with GAAP), the Designated Representative may, on behalf of Seller, request that Purchaser provide immediately available funds to Seller in an amount up to but not in excess of the Available Amount as of the Liquidation End Date.  Any such request shall be valid only if it is in writing, is timely made, specifies the account of Seller to which such funds are to be transferred, and contains a certification of the Designated Representative that the requested amount does not exceed the Available Amount (including computations in reasonable detail and satisfactory to Purchaser of the Deficiency Amount as of the Liquidation End Date).  Purchaser shall provide such funds within sixty (60) days of its receipt of such request.

2.5. *Termination of Purchaser's Obligations.*  Subject to earlier termination pursuant to Section 6.7, all of Purchaser's obligations under and in respect of the Commitment shall terminate upon the earliest of:  (a) if the Liquidation End Date shall have occurred, (i) the payment in full of Purchaser's obligations with respect to any valid request for funds pursuant to Section 2.4 or (ii) if there is no Deficiency Amount on the Liquidation End Date or if no such request pursuant to Section 2.4 has been made, the close of business on the 15th Business Day following the determination of the Deficiency Amount, if any, as of the Liquidation End Date; (b) the payment in full of, defeasance of or other reasonable provision for all liabilities of Seller, whether or not contingent, including payment of any amounts that may become payable on, or expiry of or other provision for, all Mortgage Guarantee Obligations and provision for unmatured debts; and (c) the funding by Purchaser under the Commitment of an aggregate of $100,000,000,000 (one hundred billion dollars).  For the avoidance of doubt, the Commitment shall *not* be terminable by Purchaser solely by reason of (i) the conservatorship, receivership or other insolvency proceeding of Seller or (ii) the Seller's financial condition or any adverse change in Seller's financial condition.

## 3.  PURCHASE OF SENIOR PREFERRED STOCK AND WARRANT; FEES

3.1. *Initial Commitment Fee*.  In consideration of the Commitment, and for no additional consideration, on the Effective Date (or as soon thereafter as is practicable) Seller shall sell and issue to Purchaser, and Purchaser shall purchase from Seller, (a) one million (1,000,000) shares of Senior Preferred Stock, with an initial liquidation preference equal to $1,000 per share ($1,000,000,000 (one billion dollars) liquidation preference in the aggregate), and (b) the Warrant.

3.2. *Periodic Commitment Fee*.  (a)  Commencing March 31, 2010, Seller shall pay to Purchaser quarterly, on the last day of March, June, September and December of each calendar year (each a "Periodic Fee Date"), a periodic commitment fee (the "Periodic Commitment Fee").  The Periodic Commitment Fee shall accrue from January 1, 2010.

(b)  The Periodic Commitment Fee is intended to fully compensate Purchaser for the support provided by the ongoing Commitment following December 31, 2009.  The amount of the Periodic Commitment Fee shall be set not later than December 31, 2009 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect.  The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; provided, that Purchaser may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

(c)  At the election of Seller, the Periodic Commitment Fee may be paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock so that the aggregate liquidation preference of all such outstanding shares of Senior Preferred Stock is increased by an amount equal to the Periodic Commitment Fee.  Seller shall deliver notice of such election not later than three (3) Business Days prior to each Periodic Fee Date.  If the Periodic Commitment Fee is not paid in cash by 12:00 pm (New York time) on the applicable Periodic Fee Date (irrespective of Seller's election pursuant to this subsection), Seller shall be deemed to have elected to pay the Periodic Commitment Fee by adding the amount thereof to the liquidation preference of the Senior Preferred Stock, and the aggregate liquidation preference of the outstanding shares of Senior Preferred Stock shall thereupon be automatically increased, in the manner contemplated by the first sentence of this section, by an aggregate amount equal to the Periodic Commitment Fee then due.

3.3. *Increases of Senior Preferred Stock Liquidation Preference as a Result of Funding under the Commitment.*  The aggregate liquidation preference of the outstanding shares of Senior Preferred Stock shall be automatically increased by an amount equal to the amount of each draw on the Commitment pursuant to Article 2 that is funded by Purchaser to Seller, such increase to occur simultaneously with such funding and ratably with respect to each share of Senior Preferred Stock.

3.4. *Notation of Increase in Liquidation Preference*.  Seller shall duly mark its records to reflect each increase in the liquidation preference of the Senior Preferred Stock contemplated

- 6 -

herein (but, for the avoidance of doubt, such increase shall be effective regardless of whether Seller has properly marked its records).

## 4. REPRESENTATIONS

Seller represents and warrants as of the Effective Date, and shall be deemed to have represented and warranted as of the date of each request for and funding of an advance under the Commitment pursuant to Article 2, as follows:

4.1. *Organization and Good Standing*.  Seller is a corporation, chartered by the Congress of the United States, duly organized, validly existing and in good standing under the laws of the United States and has all corporate power and authority to carry on its business as now conducted and as proposed to be conducted.

4.2. *Organizational Documents*.  Seller has made available to Purchaser a complete and correct copy of its charter and bylaws, each as amended to date (the "Organizational Documents"). The Organizational Documents are in full force and effect.  Seller is not in violation of any provision of its Organizational Documents.

4.3. *Authorization and Enforceability*.  All corporate or other action on the part of Seller or Conservator necessary for the authorization, execution, delivery and performance of this Agreement by Seller and for the authorization, issuance and delivery of the Senior Preferred Stock and the Warrant being purchased under this Agreement, has been taken.  This Agreement has been duly and validly executed and delivered by Seller and (assuming due authorization, execution and delivery by the Purchaser) shall constitute the valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent the enforceability thereof may be limited by bankruptcy laws, insolvency laws, reorganization laws, moratorium laws or other laws of general applicability affecting creditors' rights generally or by general equitable principles (regardless of whether enforcement is sought in a proceeding in equity or at law).  The Agency is acting as conservator for Seller under Section 1367 of the FHE Act.  The Board of Directors of Seller, by valid action at a duly called meeting of the Board of Directors on September 6, 2008, consented to the appointment of the Agency as conservator for purposes of Section 1367(a)(3)(I) of the FHE Act, and the Director of the Agency has appointed the Agency as Conservator for Seller pursuant to Section 1367(a)(1) of the FHE Act, and each such action has not been rescinded, revoked or modified in any respect.

4.4. *Valid Issuance*.  When issued in accordance with the terms of this Agreement, the Senior Preferred Stock and the Warrant will be duly authorized, validly issued, fully paid and non-assessable, free and clear of all liens and preemptive rights.  The shares of common stock to which the holder of the Warrant is entitled have been duly and validly reserved for issuance. When issued and delivered in accordance with the terms of this Agreement and the Warrant, such shares will be duly authorized, validly issued, fully paid and nonassessable, free and clear of all liens and preemptive rights.

4.5. *Non-Contravention*.

(a)  The execution, delivery or performance by Seller of this Agreement and the con-summation by Seller of the transactions contemplated hereby do not and will not (i) conflict with or violate any provision of the Organizational Documents of Seller; (ii) conflict with or violate any law, decree or regulation applicable to Seller or by which any property or asset of Seller is bound or affected, or (iii) result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give to others any right of termination, amendment, acceleration or cancellation of, or result in the creation of a lien upon any of the properties or assets of Seller, pursuant to any note, bond, mortgage, indenture or credit agreement, or any other con-tract, agreement, lease, license, permit, franchise or other instrument or obligation to which Seller is a party or by which Seller is bound or affected, other than, in the case of clause (iii), any such breach, default, termination, amendment, acceleration, cancellation or lien that would not have and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, property, operations or condition of the Seller, the authority of the Conservator or the validity or enforceability of this Agreement (a "<u>Material Adverse Effect</u>").

(b)  The execution and delivery of this Agreement by Seller does not, and the consumma-tion by Seller of the transactions contemplated by this Agreement will not, require any consent, approval, authorization, waiver or permit of, or filing with or notification to, any governmental authority or any other person, except for such as have already been obtained.

## 5.  COVENANTS

From the Effective Date until such time as the Senior Preferred Stock shall have been re-paid or redeemed in full in accordance with its terms:

5.1. *Restricted Payments*.  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, declare or pay any dividend (preferred or otherwise) or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of Seller's Equity Inter-ests (other than with respect to the Senior Preferred Stock or the Warrant) or directly or indi-rectly redeem, purchase, retire or otherwise acquire for value any of Seller's Equity Interests (other than the Senior Preferred Stock or the Warrant), or set aside any amount for any such pur-pose.

5.2. *Issuance of Capital Stock*.  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, sell or issue Equity Interests of Seller or any of its subsidiaries of any kind or nature, in any amount, other than the sale and issuance of the Senior Preferred Stock and Warrant on the Effective Date and the common stock subject to the Warrant upon exercise thereof, and other than as required by (and pursuant to) the terms of any binding agreement as in effect on the date hereof.

5.3. *Conservatorship*.  Seller shall not (and Conservator, by its signature below, agrees that it shall not), without the prior written consent of Purchaser, terminate, seek termination of or per-mit to be terminated the conservatorship of Seller pursuant to Section 1367 of the FHE Act, other

than in connection with a receivership pursuant to Section 1367 of the FHE Act.

5.4. *Transfer of Assets*.  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, sell, transfer, lease or otherwise dispose of (in one transaction or a series of related transactions) all or any portion of its assets (including Equity Interests in other persons, including subsidiaries), whether now owned or hereafter acquired (any such sale, transfer, lease or disposition, a "<u>Disposition</u>"), other than Dispositions for fair market value:

(a)  to a limited life regulated entity ("<u>LLRE</u>") pursuant to Section 1367(i) of the FHE Act;

(b)  of assets and properties in the ordinary course of business, consistent with past practice;

(c)  in connection with a liquidation of Seller by a receiver appointed pursuant to Section 1367(a) of the FHE Act;

(d)  of cash or cash equivalents for cash or cash equivalents; or

(e)  to the extent necessary to comply with the covenant set forth in Section 5.7 below.

5.5. *Indebtedness*.  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, incur, assume or otherwise become liable for (a) any Indebtedness if, after giving effect to the incurrence thereof, the aggregate Indebtedness of Seller and its subsidiaries on a consolidated basis would exceed 110.0% of the aggregate Indebtedness of Seller and its subsidiaries on a consolidated basis as of June 30, 2008 or (b) any Indebtedness if such Indebtedness is subordinated by its terms to any other Indebtedness of Seller or the applicable subsidiary.  For purposes of this covenant the acquisition of a subsidiary with Indebtedness will be deemed to be the incurrence of such Indebtedness at the time of such acquisition.

5.6. *Fundamental Changes*.  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, (i) merge into or consolidate or amalgamate with any other Person, or permit any other Person to merge into or consolidate or amalgamate with it, (ii) effect a reorganization or recapitalization involving the common stock of Seller, a reclassification of the common stock of Seller or similar corporate transaction or event or (iii) purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or substantially all of the assets of any other Person or any division, unit or business of any Person.

5.7. *Mortgage Assets*.  Seller shall not own, as of any applicable date, Mortgage Assets in excess of (i) on December 31, 2009, $850 billion, or (ii) on December 31 of each year thereafter, 90.0% of the aggregate amount of Mortgage Assets of Seller as of December 31 of the immediately preceding calendar year; <u>provided</u>, that in no event shall Seller be required under this Section 5.7 to own less than $250 billion in Mortgage Assets.

5.8. *Transactions with Affiliates.*  Seller shall not, and shall not permit any of its subsidiaries to, without the prior written consent of Purchaser, engage in any transaction of any kind or nature with an Affiliate of Seller unless such transaction is (i) pursuant to this Agreement, the Senior Preferred Stock or the Warrant, (ii) upon terms no less favorable to Seller than would be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate of Seller or (iii) a transaction undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence as of the date hereof.

5.9. *Reporting.*  Seller shall provide to Purchaser:

(a)  not later than the time period specified in the SEC's rules and regulations with respect to issuers as to which Section 13 and 15(d) of the Exchange Act apply, annual reports on Form 10-K (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form);

(b)  not later than the time period specified in the SEC's rules and regulations with respect to issuers as to which Section 13 and 15(d) of the Exchange Act apply, reports on Form 10-Q (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form);

(c)  promptly from time to time after the occurrence of an event required to be therein reported (and in any event within the time period specified in the SEC's rules and regulations), such other reports on Form 8-K (or any successor or comparable form);

(d)  concurrently with any delivery of financial statements under paragraphs (a) or (b) above, a certificate of the Designated Representative, (i) certifying that Seller is (and since the last such certificate has at all times been) in compliance with each of the covenants contained herein and that no representation made by Seller herein or in any document delivered pursuant hereto or in connection herewith was false or misleading in any material respect when made, or, if the foregoing is not true, specifying the nature and extent of the breach of covenant and/or representation and any corrective action taken or proposed to be taken with respect thereto, and (ii) setting forth computations in reasonable detail and satisfactory to the Purchaser of the Deficiency Amount, if any;

(e)  promptly, from time to time, such other information regarding the operations, business affairs, plans, projections and financial condition of Seller, or compliance with the terms of this Agreement, as Purchaser may reasonably request; and

(f)  as promptly as reasonably practicable, written notice of the following:

(i)  the occurrence of the Liquidation End Date;

(ii)  the filing or commencement of, or any written threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any governmental authority or in arbitration, against Conservator, Seller or any other Person which, if adversely determined, would reasonably be expected to have a Material Adverse Effect;

(iii)  any other development that is not a matter of general public knowledge and that has had, or would reasonably be expected to have, a Material Adverse Effect.

5.10. *Executive Compensation*.  Seller shall not, without the consent of the Director, in consultation with the Secretary of the Treasury, enter into any new compensation arrangements with, or increase amounts or benefits payable under existing compensation arrangements of, any Named Executive Officer of Seller.

## 6.  MISCELLANEOUS

6.1. *No Third-Party Beneficiaries*.  Until the termination of the Commitment, at any time during the existence and continuance of a payment default with respect to debt securities issued by Seller and/or a default by Seller with respect to any Mortgage Guarantee Obligations, any holder of such defaulted debt securities or beneficiary of such Mortgage Guarantee Obligations (collectively, the "Holders") may (a) deliver notice to the Seller and the Designated Representative requesting exercise of all rights available to them under this Agreement to draw on the Commitment up to the lesser of the amount necessary to cure the outstanding payment defaults and the Available Amount as of the last day of the immediately preceding fiscal quarter (the "Demand Amount"), (b) if Seller and the Designated Representative fail to act as requested within thirty (30) days of such notice, seek judicial relief for failure of the Seller to draw on the Commitment, and (c) if Purchaser shall fail to perform its obligations in respect of any draw on the Commitment, and Seller and/or the Designated Representative shall not be diligently pursuing remedies in respect of such failure, file a claim in the United States Court of Federal Claims for relief requiring Purchaser to pay Seller the Demand Amount in the form of liquidated damages.  Any payment of liquidated damages to Seller under the previous sentence shall be treated for all purposes, including the provisions of the Senior Preferred Stock and Section 3.3 of this Agreement, as a draw and funding of the Commitment pursuant to Article 2.  The Holders shall have no other rights under or in respect of this Agreement, and the Commitment shall not otherwise be enforceable by any creditor of Seller or by any other Person other than the parties hereto, and no such creditor or other Person is intended to be, or shall be, a third party beneficiary of any provision of this Agreement.

6.2. *Non-Transferable; Successors*.  The Commitment is solely for the benefit of Seller and shall not inure to the benefit of any other Person (other than the Holders to the extent set forth in Section 6.1), including any entity to which the charter of Seller may be transferred, to any LLRE or to any other successor to the assets, liabilities or operations of Seller.  The Commitment may not be assigned or otherwise transferred, in whole or in part, to any Person (including, for the avoidance of doubt, any LLRE to which a receiver has assigned all or a portion of Seller's assets) without the prior written consent of Purchaser (which may be withheld in its sole discretion).  In no event shall any successor to Seller (including such an LLRE) be entitled to the benefit of the Commitment without the prior written consent of Purchaser.  Seller and Conservator, for themselves and on behalf of their permitted successors, covenant and agree not to transfer or purport to transfer the Commitment in contravention of the terms hereof, and any such attempted transfer shall be null and void *ab initio*.  It is the expectation of the parties that, in the event Seller were placed into receivership and an LLRE formed to purchase certain of its assets and assume certain of its liabilities, the Commitment would remain with Seller for the benefit of the holders of the

debt of Seller not assumed by the LLRE.

6.3. *Amendments; Waivers.*  This Agreement may be waived or amended solely by a writing executed by both of the parties hereto, and, with respect to amendments to or waivers of the provisions of Sections 5.3, 6.2 and 6.11, the Conservator; provided, however, that no such waiver or amendment shall decrease the aggregate Commitment or add conditions to funding the amounts required to be funded by Purchaser under the Commitment if such waiver or amendment would, in the reasonable opinion of Seller, adversely affect in any material respect the holders of debt securities of Seller and/or the beneficiaries of Mortgage Guarantee Obligations, in each case in their capacities as such, after taking into account any alternative arrangements that may be implemented concurrently with such waiver or amendment.  In no event shall any rights granted hereunder prevent the parties hereto from waiving or amending in any manner whatsoever the covenants of Seller hereunder.

6.4. *Governing Law; Jurisdiction; Venue*.  This Agreement and the Warrant shall be governed by, and construed in accordance with, the federal law of the United States of America if and to the extent such federal law is applicable, and otherwise in accordance with the laws of the State of New York.  The Senior Preferred Stock shall be governed as set forth in the terms thereof.  Except as provided in section 6.1 and as otherwise required by law, the United States District Court for the District of Columbia shall have exclusive jurisdiction over all civil actions arising out of this Agreement, the Commitment, the Senior Preferred Stock and the Warrant, and venue for any such civil action shall lie exclusively in the United States District Court for the District of Columbia.

6.5. *Notices*.  Any notices delivered pursuant to or in connection with this Agreement shall be delivered to the applicable parties at the addresses set forth below:

> If to Seller:
>
> Federal National Mortgage Association
> c/o Federal Housing Finance Authority
> 1700 G Street, NW
> 4th Floor
> Washington, DC 20552
> Attention:  General Counsel
>
> If to Purchaser:
>
> United States Department of the Treasury
> 1500 Pennsylvania Avenue, NW
> Washington DC   20220
> Attention:  Under Secretary for Domestic Finance

with a copy to:

United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington DC   20220
Attention:  General Counsel

If to Conservator:

Federal Housing Finance Authority
1700 G Street, NW
4th Floor
Washington, DC 20552
Attention:  General Counsel

All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail.  All notices hereunder shall be effective upon receipt.

6.6. *Disclaimer of Guarantee*.  This Agreement and the Commitment are not intended to and shall not be deemed to constitute a guarantee by Purchaser or any other agency or instrumentality of the United States of the payment or performance of any debt security or any other obligation, indebtedness or liability of Seller of any kind or character whatsoever.

6.7. *Effect of Order; Injunction; Decree*.  If any order, injunction or decree is issued by any court of competent jurisdiction that vacates, modifies, amends, conditions, enjoins, stays or otherwise affects the appointment of Conservator as conservator of Seller or otherwise curtails Conservator's powers as such conservator (except in each case any order converting the conservatorship to a receivership under Section 1367(a) of the FHE Act), Purchaser may by written notice to Conservator and Seller declare this Agreement null and void, whereupon all transfers hereunder (including the issuance of the Senior Preferred Stock and the Warrant and any funding of the Commitment) shall be rescinded and unwound and all obligations of the parties (other than to effectuate such rescission and unwind) shall immediately and automatically terminate.

6.8. *Business Day*.  To the extent that any deadline or date of performance of any right or obligation set forth herein shall fall on a day other than a Business Day, then such deadline or date of performance shall automatically be extended to the next succeeding Business Day.

6.9. *Entire Agreement*.  This Agreement, together with the Senior Preferred Stock and Warrant, contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, term sheets, statements, letters of intent or representations, written or oral, with respect thereto.

6.10. *Remedies*.  In the event of a breach by Seller of any covenant or representation of Seller set forth herein, Purchaser shall be entitled to specific performance (in the case of a breach of

- 13 -

covenant), damages and such other remedies as may be available at law or in equity; provided, that Purchaser shall not have the right to terminate the Commitment solely as a result of any such breach, and compliance with the covenants and the accuracy of the representations set forth in this Agreement shall not be conditions to funding the Commitment.

6.11. *Tax Reporting*.  Neither Seller nor Conservator shall take, or shall permit any of their respective successors or assigns to take, a position for any tax, accounting or other purpose that is inconsistent with Internal Revenue Service Notice 2008-76 (or the regulations to be issued pursuant to such Notice) regarding the application of Section 382 of the Internal Revenue Code of 1986, as amended, a copy of which Notice has been provided to Seller in connection with the execution of this Agreement.

6.12. *Non-Severability*.  Each of the provisions of this Agreement is integrated with and integral to the whole and shall not be severable from the remainder of the Agreement.  In the event that any provision of this Agreement, the Senior Preferred Stock or the Warrant is determined to be illegal or unenforceable, then Purchaser may, in its sole discretion, by written notice to Conservator and Seller, declare this Agreement null and void, whereupon all transfers hereunder (including the issuance of the Senior Preferred Stock and the Warrant and any funding of the Commitment) shall be rescinded and unwound and all obligations of the parties (other than to effectuate such rescission and unwind) shall immediately and automatically terminate.

[Signature Page Follows]

# Tab 8

### AMENDED AND RESTATED SENIOR PREFERRED STOCK PURCHASE AGREEMENT

AMENDED AND RESTATED SENIOR PREFERRED STOCK PURCHASE AGREEMENT (this "Agreement") dated as of September 26, 2008, between the UNITED STATES DEPARTMENT OF THE TREASURY ("Purchaser") and FEDERAL HOME LOAN MORTGAGE CORPORATION ("Seller"), acting through the Federal Housing Finance Agency (the "Agency") as its duly appointed conservator (the Agency in such capacity, "Conservator"). Reference is made to Article 1 below for the meaning of capitalized terms used herein without definition.

### Background

A.  The Agency has been duly appointed as Conservator for Seller pursuant to Section 1367(a) of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (as amended, the "FHE Act").  Conservator has determined that entry into this Agreement is (i) necessary to put Seller in a sound and solvent condition; (ii) appropriate to carry on the business of Seller and preserve and conserve the assets and property of Seller; and (iii) otherwise consistent with its powers, authorities and responsibilities.

B.  Purchaser is authorized to purchase obligations and other securities issued by Seller pursuant to Section 306(l) of the Federal Home Loan Mortgage Corporation Act, as amended (the "Charter Act").  The Secretary of the Treasury has determined, after taking into consideration the matters set forth in Section 306(l)(1)(C) of the Charter Act, that the purchases contemplated herein are necessary to (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer.

C.  Purchaser and Seller executed and delivered the Senior Preferred Stock Purchase Agreement dated as of September 7, 2008 (the "Original Agreement"), and the parties thereto desire to amend and restate the Original Agreement in its entirety as set forth herein.

THEREFORE, the parties hereto agree as follows:

### Terms and Conditions

## 1.  DEFINITIONS

As used in this Agreement, the following terms shall have the meanings set forth below:

"*Affiliate*" means, when used with respect to a specified Person (i) any direct or indirect holder or group (as defined in Sections 13(d) and 14(d) of the Exchange Act) of holders of 10.0% or more of any class of capital stock of such Person and (ii) any current or former director or officer of such Person, or any other current or former employee of such Person that currently exercises or formerly exercised a material degree of Control over such Person, including without limitation each current or former Named Executive Officer of such Person.

"*Available Amount*" means, as of any date of determination, the lesser of (a) the Deficiency Amount as of such date and (b) the Maximum Amount as of such date.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under United States federal law and the law of the State of New York.

"*Capital Lease Obligations*" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other similar arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for purposes hereof, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"*Control*" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Deficiency Amount*" means, as of any date of determination, the amount, if any, by which (a) the total liabilities of Seller exceed (b) the total assets of Seller (such assets excluding the Commitment and any unfunded amounts thereof), in each case as reflected on the balance sheet of Seller as of the applicable date set forth in this Agreement, prepared in accordance with GAAP; provided, however, that:

    (i)  for the avoidance of doubt, in measuring the Deficiency Amount liabilities shall exclude any obligation in respect of any capital stock of Seller, including the Senior Preferred Stock contemplated herein;

    (ii)  in the event that Seller becomes subject to receivership or other liquidation process or proceeding, "Deficiency Amount" shall mean, as of any date of determination, the amount, if any, by which (a) the total allowed claims against the receivership or other applicable estate (excluding any liabilities of or transferred to any LLRE (as defined in Section 5.4(a)) created by a receiver) exceed (b) the total assets of such receivership or other estate (excluding the Commitment, any unfunded amounts thereof and any assets of or transferred to any LLRE, but including the value of the receiver's interest in any LLRE);

    (iii)  to the extent Conservator or a receiver of Seller, or any statute, rule, regulation or court of competent jurisdiction, specifies or determines that a liability of Seller (including without limitation a claim against Seller arising from rescission of a purchase or sale of a security issued by Seller (or guaranteed by Seller or with respect to which Seller is otherwise liable) or for damages arising from the purchase, sale or retention of such a security) shall be subordinated (other than pursuant to a contract providing for such subordination) to all other liabilities of Seller or shall be treated on par with any class of equity of Seller, then such liability shall be excluded in the calculation of Deficiency Amount; and

- 2 -

(iv) the Deficiency Amount may be increased above the otherwise applicable amount by the mutual written agreement of Purchaser and Seller, each acting in its sole discretion.

"*Designated Representative*" means Conservator or (a) if Conservator has been superseded by a receiver pursuant to Section 1367(a) of the FHE Act, such receiver, or (b) if Seller is not in conservatorship or receivership pursuant to Section 1367(a) of the FHE Act, Seller's chief financial officer.

"*Director*" shall mean the Director of the Agency.

"*Effective Date*" means the date on which this Agreement shall have been executed and delivered by both of the parties hereto.

"*Equity Interests*" of any Person shall mean any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity, ownership or profits of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*GAAP*" means generally accepted accounting principles in effect in the United States as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board from time to time.

"*Indebtedness*" of any Person means, for purposes of Section 5.5 only, without duplication, (a) all obligations of such Person for money borrowed by such Person, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services, other than trade accounts payable, (e) all Capital Lease Obligations of such Person, (f) obligations, whether contingent or liquidated, in respect of letters of credit (including standby and commercial), bankers' acceptances and similar instruments and (g) any obligation of such Person, contingent or otherwise, guaranteeing or having the economic effect of guaranteeing any Indebtedness of the types set forth in clauses (a) through (f) payable by another Person other than Mortgage Guarantee Obligations.

"*Liquidation End Date*" means the date of completion of the liquidation of Seller's assets.

"*Maximum Amount*" means, as of any date of determination, $100,000,000,000 (one hundred billion dollars), less the aggregate amount of funding under the Commitment prior to such date.

"*Mortgage Assets*" of any Person means assets of such Person consisting of mortgages, mortgage loans, mortgage-related securities, participation certificates, mortgage-backed commercial paper, obligations of real estate mortgage investment conduits and similar assets, in each case to the extent such assets would appear on the balance sheet of such Person in accordance with GAAP as in effect as of the date hereof (and, for the avoidance of doubt, without giving effect to any change that may be made hereafter in respect of Statement of Financial Accounting Standards No. 140 or any similar accounting standard).

"*Mortgage Guarantee Obligations*" means guarantees, standby commitments, credit enhancements and other similar obligations of Seller, in each case in respect of Mortgage Assets.

"*Named Executive Officer*" has the meaning given to such term in Item 402(a)(3) of Regulation S-K under the Exchange Act, as in effect on the date hereof.

"*Person*" shall mean any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, estate, unincorporated organization or government or any agency or political subdivision thereof, or any other entity whatsoever.

"*SEC*" means the Securities and Exchange Commission.

"*Senior Preferred Stock*" means the Variable Liquidation Preference Senior Preferred Stock of Seller, substantially in the form of Exhibit A hereto.

"*Warrant*" means a warrant for the purchase of common stock of Seller representing 79.9% of the common stock of Seller on a fully-diluted basis, substantially in the form of Exhibit B hereto.

## 2. COMMITMENT

2.1. *Commitment.*  Purchaser hereby commits to provide to Seller, on the terms and conditions set forth herein, immediately available funds in an amount up to but not in excess of the Available Amount, as determined from time to time (the "Commitment"); provided, that in no event shall the aggregate amount funded under the Commitment exceed $100,000,000,000 (one hundred billion dollars).  The liquidation preference of the Senior Preferred Stock shall increase in connection with draws on the Commitment, as set forth in Section 3.3 below.

2.2. *Quarterly Draws on Commitment.*  Within fifteen (15) Business Days following the determination of the Deficiency Amount, if any, as of the end of each fiscal quarter of Seller which ends on or before the Liquidation End Date, the Designated Representative may, on behalf of Seller, request that Purchaser provide immediately available funds to Seller in an amount up to but not in excess of the Available Amount as of the end of such quarter.  Any such request shall be valid only if it is in writing, is timely made, specifies the account of Seller to which such funds are to be transferred, and contains a certification of the Designated Representative that the requested amount does not exceed the Available Amount as of the end of the applicable quarter.  Purchaser shall provide such funds within sixty (60) days of its receipt of such request or, following any determination by the Director that the Director will be mandated by law to appoint a receiver for Seller if such funds are not received sooner, such shorter period as may be necessary

to avoid such mandatory appointment of a receiver if reasonably practicable taking into consideration Purchaser's access to funds.

2.3. *Accelerated Draws on Commitment.*  Immediately following any determination by the Director that the Director will be mandated by law to appoint a receiver for Seller prior to the Liquidation End Date unless Seller's capital is increased by an amount (the "Special Amount") up to but not in excess of the then current Available Amount (computed based on a balance sheet of Seller prepared in accordance with GAAP that differs from the most recent balance sheet of Seller delivered in accordance with Section 5.9(a) or (b)) on a date that is prior to the date that funds will be available to Seller pursuant to Section 2.2, Conservator may, on behalf of Seller, request that Purchaser provide to Seller the Special Amount in immediately available funds. Any such request shall be valid only if it is in writing, is timely made, specifies the account of Seller to which such funds are to be transferred, and contains certifications of Conservator that (i) the requested amount does not exceed the Available Amount (including computations in reasonable detail and satisfactory to Purchaser of the then existing Deficiency Amount) and (ii) the requested amount is required to avoid the imminent mandatory appointment of a receiver for Seller.  Purchaser shall provide such funds within thirty (30) days of its receipt of such request or, if reasonably practicable taking into consideration Purchaser's access to funds, any shorter period as may be necessary to avoid mandatory appointment of a receiver.

2.4. *Final Draw on Commitment*.  Within fifteen (15) Business Days following the determination of the Deficiency Amount, if any, as of the Liquidation End Date (computed based on a balance sheet of Seller as of the Liquidation End Date prepared in accordance with GAAP), the Designated Representative may, on behalf of Seller, request that Purchaser provide immediately available funds to Seller in an amount up to but not in excess of the Available Amount as of the Liquidation End Date.  Any such request shall be valid only if it is in writing, is timely made, specifies the account of Seller to which such funds are to be transferred, and contains a certification of the Designated Representative that the requested amount does not exceed the Available Amount (including computations in reasonable detail and satisfactory to Purchaser of the Deficiency Amount as of the Liquidation End Date).  Purchaser shall provide such funds within sixty (60) days of its receipt of such request.

2.5. *Termination of Purchaser's Obligations.*  Subject to earlier termination pursuant to Section 6.7, all of Purchaser's obligations under and in respect of the Commitment shall terminate upon the earliest of:  (a) if the Liquidation End Date shall have occurred, (i) the payment in full of Purchaser's obligations with respect to any valid request for funds pursuant to Section 2.4 or (ii) if there is no Deficiency Amount on the Liquidation End Date or if no such request pursuant to Section 2.4 has been made, the close of business on the 15th Business Day following the determination of the Deficiency Amount, if any, as of the Liquidation End Date; (b) the payment in full of, defeasance of or other reasonable provision for all liabilities of Seller, whether or not contingent, including payment of any amounts that may become payable on, or expiry of or other provision for, all Mortgage Guarantee Obligations and provision for unmatured debts; and (c) the funding by Purchaser under the Commitment of an aggregate of $100,000,000,000 (one hundred billion dollars).  For the avoidance of doubt, the Commitment shall *not* be terminable by Purchaser solely by reason of (i) the conservatorship, receivership or other insolvency proceeding of Seller or (ii) the Seller's financial condition or any adverse change in Seller's financial condition.

## 3.  PURCHASE OF SENIOR PREFERRED STOCK AND WARRANT; FEES

3.1. *Initial Commitment Fee*.  In consideration of the Commitment, and for no additional consideration, on the Effective Date (or as soon thereafter as is practicable) Seller shall sell and issue to Purchaser, and Purchaser shall purchase from Seller, (a) one million (1,000,000) shares of Senior Preferred Stock, with an initial liquidation preference equal to $1,000 per share ($1,000,000,000 (one billion dollars) liquidation preference in the aggregate), and (b) the Warrant.

3.2. *Periodic Commitment Fee*.  (a)  Commencing March 31, 2010, Seller shall pay to Purchaser quarterly, on the last day of March, June, September and December of each calendar year (each a "Periodic Fee Date"), a periodic commitment fee (the "Periodic Commitment Fee").  The Periodic Commitment Fee shall accrue from January 1, 2010.

(b)  The Periodic Commitment Fee is intended to fully compensate Purchaser for the support provided by the ongoing Commitment following December 31, 2009.  The amount of the Periodic Commitment Fee shall be set not later than December 31, 2009 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect.  The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; provided, that Purchaser may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

(c)  At the election of Seller, the Periodic Commitment Fee may be paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock so that the aggregate liquidation preference of all such outstanding shares of Senior Preferred Stock is increased by an amount equal to the Periodic Commitment Fee.  Seller shall deliver notice of such election not later than three (3) Business Days prior to each Periodic Fee Date.  If the Periodic Commitment Fee is not paid in cash by 12:00 pm (New York time) on the applicable Periodic Fee Date (irrespective of Seller's election pursuant to this subsection), Seller shall be deemed to have elected to pay the Periodic Commitment Fee by adding the amount thereof to the liquidation preference of the Senior Preferred Stock, and the aggregate liquidation preference of the outstanding shares of Senior Preferred Stock shall thereupon be automatically increased, in the manner contemplated by the first sentence of this section, by an aggregate amount equal to the Periodic Commitment Fee then due.

3.3. *Increases of Senior Preferred Stock Liquidation Preference as a Result of Funding under the Commitment*.  The aggregate liquidation preference of the outstanding shares of Senior Preferred Stock shall be automatically increased by an amount equal to the amount of each draw on the Commitment pursuant to Article 2 that is funded by Purchaser to Seller, such increase to occur simultaneously with such funding and ratably with respect to each share of Senior Preferred Stock.

3.4. *Notation of Increase in Liquidation Preference*.  Seller shall duly mark its records to reflect each increase in the liquidation preference of the Senior Preferred Stock contemplated

herein (but, for the avoidance of doubt, such increase shall be effective regardless of whether Seller has properly marked its records).

## 4.  REPRESENTATIONS

Seller represents and warrants as of the Effective Date, and shall be deemed to have represented and warranted as of the date of each request for and funding of an advance under the Commitment pursuant to Article 2, as follows:

4.1. *Organization and Good Standing*.  Seller is a corporation, chartered by the Congress of the United States, duly organized, validly existing and in good standing under the laws of the United States and has all corporate power and authority to carry on its business as now conducted and as proposed to be conducted.

4.2. *Organizational Documents*.  Seller has made available to Purchaser a complete and correct copy of its charter and bylaws, each as amended to date (the "Organizational Documents"). The Organizational Documents are in full force and effect.  Seller is not in violation of any provision of its Organizational Documents.

4.3. *Authorization and Enforceability*.  All corporate or other action on the part of Seller or Conservator necessary for the authorization, execution, delivery and performance of this Agreement by Seller and for the authorization, issuance and delivery of the Senior Preferred Stock and the Warrant being purchased under this Agreement, has been taken.  This Agreement has been duly and validly executed and delivered by Seller and (assuming due authorization, execution and delivery by the Purchaser) shall constitute the valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent the enforceability thereof may be limited by bankruptcy laws, insolvency laws, reorganization laws, moratorium laws or other laws of general applicability affecting creditors' rights generally or by general equitable principles (regardless of whether enforcement is sought in a proceeding in equity or at law).  The Agency is acting as conservator for Seller under Section 1367 of the FHE Act.  The Board of Directors of Seller, by valid action at a duly called meeting of the Board of Directors on September 6, 2008, consented to the appointment of the Agency as conservator for purposes of Section 1367(a)(3)(I) of the FHE Act, and the Director of the Agency has appointed the Agency as Conservator for Seller pursuant to Section 1367(a)(1) of the FHE Act, and each such action has not been rescinded, revoked or modified in any respect.

4.4. *Valid Issuance*.  When issued in accordance with the terms of this Agreement, the Senior Preferred Stock and the Warrant will be duly authorized, validly issued, fully paid and nonassessable, free and clear of all liens and preemptive rights.  The shares of common stock to which the holder of the Warrant is entitled have been duly and validly reserved for issuance. When issued and delivered in accordance with the terms of this Agreement and the Warrant, such shares will be duly authorized, validly issued, fully paid and nonassessable, free and clear of all liens and preemptive rights.

4.5. *Non-Contravention*.

(a)  The execution, delivery or performance by Seller of this Agreement and the con-summation by Seller of the transactions contemplated hereby do not and will not (i) conflict with or violate any provision of the Organizational Documents of Seller; (ii) conflict with or violate any law, decree or regulation applicable to Seller or by which any property or asset of Seller is bound or affected, or (iii) result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give to others any right of termination, amendment, acceleration or cancellation of, or result in the creation of a lien upon any of the properties or assets of Seller, pursuant to any note, bond, mortgage, indenture or credit agreement, or any other con-tract, agreement, lease, license, permit, franchise or other instrument or obligation to which Seller is a party or by which Seller is bound or affected, other than, in the case of clause (iii), any such breach, default, termination, amendment, acceleration, cancellation or lien that would not have and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, property, operations or condition of the Seller, the authority of the Conservator or the validity or enforceability of this Agreement (a "<u>Material Adverse Effect</u>").

(b)  The execution and delivery of this Agreement by Seller does not, and the consumma-tion by Seller of the transactions contemplated by this Agreement will not, require any consent, approval, authorization, waiver or permit of, or filing with or notification to, any governmental authority or any other person, except for such as have already been obtained.

## 5.  COVENANTS

From the Effective Date until such time as the Senior Preferred Stock shall have been re-paid or redeemed in full in accordance with its terms:

5.1. *Restricted Payments*.  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, declare or pay any dividend (preferred or otherwise) or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of Seller's Equity Inter-ests (other than with respect to the Senior Preferred Stock or the Warrant) or directly or indi-rectly redeem, purchase, retire or otherwise acquire for value any of Seller's Equity Interests (other than the Senior Preferred Stock or the Warrant), or set aside any amount for any such pur-pose.

5.2. *Issuance of Capital Stock*.  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, sell or issue Equity Interests of Seller or any of its subsidiaries of any kind or nature, in any amount, other than the sale and issuance of the Senior Preferred Stock and Warrant on the Effective Date and the common stock subject to the Warrant upon exercise thereof, and other than as required by (and pursuant to) the terms of any binding agreement as in effect on the date hereof.

5.3. *Conservatorship*.  Seller shall not (and Conservator, by its signature below, agrees that it shall not), without the prior written consent of Purchaser, terminate, seek termination of or per-mit to be terminated the conservatorship of Seller pursuant to Section 1367 of the FHE Act, other

than in connection with a receivership pursuant to Section 1367 of the FHE Act.

5.4. *Transfer of Assets*.  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, sell, transfer, lease or otherwise dispose of (in one transaction or a series of related transactions) all or any portion of its assets (including Equity Interests in other persons, including subsidiaries), whether now owned or hereafter acquired (any such sale, transfer, lease or disposition, a "<u>Disposition</u>"), other than Dispositions for fair market value:

(a)  to a limited life regulated entity ("<u>LLRE</u>") pursuant to Section 1367(i) of the FHE Act;

(b)  of assets and properties in the ordinary course of business, consistent with past practice;

(c)  in connection with a liquidation of Seller by a receiver appointed pursuant to Section 1367(a) of the FHE Act;

(d)  of cash or cash equivalents for cash or cash equivalents; or

(e)  to the extent necessary to comply with the covenant set forth in Section 5.7 below.

5.5. *Indebtedness*.  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, incur, assume or otherwise become liable for (a) any Indebtedness if, after giving effect to the incurrence thereof, the aggregate Indebtedness of Seller and its subsidiaries on a consolidated basis would exceed 110.0% of the aggregate Indebtedness of Seller and its subsidiaries on a consolidated basis as of June 30, 2008 or (b) any Indebtedness if such Indebtedness is subordinated by its terms to any other Indebtedness of Seller or the applicable subsidiary.  For purposes of this covenant the acquisition of a subsidiary with Indebtedness will be deemed to be the incurrence of such Indebtedness at the time of such acquisition.

5.6. *Fundamental Changes*.  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, (i) merge into or consolidate or amalgamate with any other Person, or permit any other Person to merge into or consolidate or amalgamate with it, (ii) effect a reorganization or recapitalization involving the common stock of Seller, a reclassification of the common stock of Seller or similar corporate transaction or event or (iii) purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or substantially all of the assets of any other Person or any division, unit or business of any Person.

5.7. *Mortgage Assets*.  Seller shall not own, as of any applicable date, Mortgage Assets in excess of (i) on December 31, 2009, $850 billion, or (ii) on December 31 of each year thereafter, 90.0% of the aggregate amount of Mortgage Assets of Seller as of December 31 of the immediately preceding calendar year; <u>provided</u>, that in no event shall Seller be required under this Section 5.7 to own less than $250 billion in Mortgage Assets.

5.8. *Transactions with Affiliates.*  Seller shall not, and shall not permit any of its subsidiaries to, without the prior written consent of Purchaser, engage in any transaction of any kind or nature with an Affiliate of Seller unless such transaction is (i) pursuant to this Agreement, the Senior Preferred Stock or the Warrant, (ii) upon terms no less favorable to Seller than would be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate of Seller or (iii) a transaction undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence as of the date hereof.

5.9. *Reporting.*  Seller shall provide to Purchaser:

(a)  not later than the time period specified in the SEC's rules and regulations with respect to issuers as to which Section 13 and 15(d) of the Exchange Act apply, annual reports on Form 10-K (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form);

(b)  not later than the time period specified in the SEC's rules and regulations with respect to issuers as to which Section 13 and 15(d) of the Exchange Act apply, reports on Form 10-Q (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form);

(c)  promptly from time to time after the occurrence of an event required to be therein reported (and in any event within the time period specified in the SEC's rules and regulations), such other reports on Form 8-K (or any successor or comparable form);

(d)  concurrently with any delivery of financial statements under paragraphs (a) or (b) above, a certificate of the Designated Representative, (i) certifying that Seller is (and since the last such certificate has at all times been) in compliance with each of the covenants contained herein and that no representation made by Seller herein or in any document delivered pursuant hereto or in connection herewith was false or misleading in any material respect when made, or, if the foregoing is not true, specifying the nature and extent of the breach of covenant and/or representation and any corrective action taken or proposed to be taken with respect thereto, and (ii) setting forth computations in reasonable detail and satisfactory to the Purchaser of the Deficiency Amount, if any;

(e)  promptly, from time to time, such other information regarding the operations, business affairs, plans, projections and financial condition of Seller, or compliance with the terms of this Agreement, as Purchaser may reasonably request; and

(f)  as promptly as reasonably practicable, written notice of the following:

(i)  the occurrence of the Liquidation End Date;

(ii)  the filing or commencement of, or any written threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any governmental authority or in arbitration, against Conservator, Seller or any other Person which, if adversely determined, would reasonably be expected to have a Material Adverse Effect;

- 10 -

(iii)  any other development that is not a matter of general public knowledge and that has had, or would reasonably be expected to have, a Material Adverse Effect.

5.10. *Executive Compensation*.  Seller shall not, without the consent of the Director, in consultation with the Secretary of the Treasury, enter into any new compensation arrangements with, or increase amounts or benefits payable under existing compensation arrangements of, any Named Executive Officer of Seller.

## 6.  MISCELLANEOUS

6.1. *No Third-Party Beneficiaries*.  Until the termination of the Commitment, at any time during the existence and continuance of a payment default with respect to debt securities issued by Seller and/or a default by Seller with respect to any Mortgage Guarantee Obligations, any holder of such defaulted debt securities or beneficiary of such Mortgage Guarantee Obligations (collectively, the "Holders") may (a) deliver notice to the Seller and the Designated Representative requesting exercise of all rights available to them under this Agreement to draw on the Commitment up to the lesser of the amount necessary to cure the outstanding payment defaults and the Available Amount as of the last day of the immediately preceding fiscal quarter (the "Demand Amount"), (b) if Seller and the Designated Representative fail to act as requested within thirty (30) days of such notice, seek judicial relief for failure of the Seller to draw on the Commitment, and (c) if Purchaser shall fail to perform its obligations in respect of any draw on the Commitment, and Seller and/or the Designated Representative shall not be diligently pursuing remedies in respect of such failure, file a claim in the United States Court of Federal Claims for relief requiring Purchaser to pay Seller the Demand Amount in the form of liquidated damages.  Any payment of liquidated damages to Seller under the previous sentence shall be treated for all purposes, including the provisions of the Senior Preferred Stock and Section 3.3 of this Agreement, as a draw and funding of the Commitment pursuant to Article 2.  The Holders shall have no other rights under or in respect of this Agreement, and the Commitment shall not otherwise be enforceable by any creditor of Seller or by any other Person other than the parties hereto, and no such creditor or other Person is intended to be, or shall be, a third party beneficiary of any provision of this Agreement.

6.2. *Non-Transferable; Successors*.  The Commitment is solely for the benefit of Seller and shall not inure to the benefit of any other Person (other than the Holders to the extent set forth in Section 6.1), including any entity to which the charter of Seller may be transferred, to any LLRE or to any other successor to the assets, liabilities or operations of Seller.  The Commitment may not be assigned or otherwise transferred, in whole or in part, to any Person (including, for the avoidance of doubt, any LLRE to which a receiver has assigned all or a portion of Seller's assets) without the prior written consent of Purchaser (which may be withheld in its sole discretion).  In no event shall any successor to Seller (including such an LLRE) be entitled to the benefit of the Commitment without the prior written consent of Purchaser.  Seller and Conservator, for themselves and on behalf of their permitted successors, covenant and agree not to transfer or purport to transfer the Commitment in contravention of the terms hereof, and any such attempted transfer shall be null and void *ab initio*.  It is the expectation of the parties that, in the event Seller were placed into receivership and an LLRE formed to purchase certain of its assets and assume certain of its liabilities, the Commitment would remain with Seller for the benefit of the holders of the

debt of Seller not assumed by the LLRE.

6.3. *Amendments; Waivers.*  This Agreement may be waived or amended solely by a writing executed by both of the parties hereto, and, with respect to amendments to or waivers of the pro-visions of Sections 5.3, 6.2 and 6.11, the Conservator; <u>provided</u>, <u>however</u>, that no such waiver or amendment shall decrease the aggregate Commitment or add conditions to funding the amounts required to be funded by Purchaser under the Commitment if such waiver or amendment would, in the reasonable opinion of Seller, adversely affect in any material respect the holders of debt securities of Seller and/or the beneficiaries of Mortgage Guarantee Obligations, in each case in their capacities as such, after taking into account any alternative arrangements that may be im-plemented concurrently with such waiver or amendment.  In no event shall any rights granted hereunder prevent the parties hereto from waiving or amending in any manner whatsoever the covenants of Seller hereunder.

6.4. *Governing Law; Jurisdiction; Venue*.  This Agreement and the Warrant shall be gov-erned by, and construed in accordance with, the federal law of the United States of America if and to the extent such federal law is applicable, and otherwise in accordance with the laws of the State of New York.  The Senior Preferred Stock shall be governed as set forth in the terms thereof.  Except as provided in section 6.1 and as otherwise required by law, the United States District Court for the District of Columbia shall have exclusive jurisdiction over all civil actions arising out of this Agreement, the Commitment, the Senior Preferred Stock and the Warrant, and venue for any such civil action shall lie exclusively in the United States District Court for the District of Columbia.

6.5. *Notices*.  Any notices delivered pursuant to or in connection with this Agreement shall be delivered to the applicable parties at the addresses set forth below:

> If to Seller:
>
> Federal Home Loan Mortgage Corporation
> c/o Federal Housing Finance Authority
> 1700 G Street, NW
> 4th Floor
> Washington, DC 20552
> Attention:  General Counsel
>
> If to Purchaser:
>
> United States Department of the Treasury
> 1500 Pennsylvania Avenue, NW
> Washington DC   20220
> Attention:  Under Secretary for Domestic Finance

with a copy to:

United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington DC   20220
Attention:  General Counsel

If to Conservator:

Federal Housing Finance Authority
1700 G Street, NW
4th Floor
Washington, DC 20552
Attention:  General Counsel

All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail.  All notices hereunder shall be effective upon receipt.

6.6. *Disclaimer of Guarantee*.  This Agreement and the Commitment are not intended to and shall not be deemed to constitute a guarantee by Purchaser or any other agency or instrumentality of the United States of the payment or performance of any debt security or any other obligation, indebtedness or liability of Seller of any kind or character whatsoever.

6.7. *Effect of Order; Injunction; Decree*.  If any order, injunction or decree is issued by any court of competent jurisdiction that vacates, modifies, amends, conditions, enjoins, stays or otherwise affects the appointment of Conservator as conservator of Seller or otherwise curtails Conservator's powers as such conservator (except in each case any order converting the conservatorship to a receivership under Section 1367(a) of the FHE Act), Purchaser may by written notice to Conservator and Seller declare this Agreement null and void, whereupon all transfers hereunder (including the issuance of the Senior Preferred Stock and the Warrant and any funding of the Commitment) shall be rescinded and unwound and all obligations of the parties (other than to effectuate such rescission and unwind) shall immediately and automatically terminate.

6.8. *Business Day*.  To the extent that any deadline or date of performance of any right or obligation set forth herein shall fall on a day other than a Business Day, then such deadline or date of performance shall automatically be extended to the next succeeding Business Day.

6.9. *Entire Agreement*.  This Agreement, together with the Senior Preferred Stock and Warrant, contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, term sheets, statements, letters of intent or representations, written or oral, with respect thereto.

6.10. *Remedies*.  In the event of a breach by Seller of any covenant or representation of Seller set forth herein, Purchaser shall be entitled to specific performance (in the case of a breach of

covenant), damages and such other remedies as may be available at law or in equity; <u>provided</u>, that Purchaser shall not have the right to terminate the Commitment solely as a result of any such breach, and compliance with the covenants and the accuracy of the representations set forth in this Agreement shall not be conditions to funding the Commitment.

6.11. *Tax Reporting*.  Neither Seller nor Conservator shall take, or shall permit any of their respective successors or assigns to take, a position for any tax, accounting or other purpose that is inconsistent with Internal Revenue Service Notice 2008-76 (or the regulations to be issued pursuant to such Notice) regarding the application of Section 382 of the Internal Revenue Code of 1986, as amended, a copy of which Notice has been provided to Seller in connection with the execution of this Agreement.

6.12. *Non-Severability*.  Each of the provisions of this Agreement is integrated with and integral to the whole and shall not be severable from the remainder of the Agreement.  In the event that any provision of this Agreement, the Senior Preferred Stock or the Warrant is determined to be illegal or unenforceable, then Purchaser may, in its sole discretion, by written notice to Conservator and Seller, declare this Agreement null and void, whereupon all transfers hereunder (including the issuance of the Senior Preferred Stock and the Warrant and any funding of the Commitment) shall be rescinded and unwound and all obligations of the parties (other than to effectuate such rescission and unwind) shall immediately and automatically terminate.

[Signature Page Follows]

# Tab 9

*The Department of the Treasury*

## ANNUAL
## FINANCIAL REPORT



PART III

FHFA 0156

FHFA 0157

# MESSAGE FROM THE ASSISTANT SECRETARY FOR MANAGEMENT AND CHIEF FINANCIAL OFFICER



November 17, 2008

Secretary Paulson's message describes the Department of the Treasury's unprecedented role and expanded responsibilities in helping to stabilize the nation's economy. During the first critical weeks following enactment of the Housing and Economic Recovery Act and the Emergency Economic Stabilization Act, Treasury professionals in the areas of procurement, financial management, information technology, human capital, and operations acted swiftly to ensure that these functions were mobilized to support rapid implementation. We anticipate a continuing critical role for these teams in fiscal year 2009 in support of the Troubled Asset Relief Program and the newly established Office of Financial Stability.

During the course of the year, Treasury took a number of steps to strengthen corporate management councils and forums, including bureau head meetings and active Department-wide functional councils headed by the Chief Financial Officer, the Chief Information Officer, the Chief Human Capital Officer, the Senior Procurement Executive, and the Director of Emergency Programs. To strengthen the Department's privacy, governance, disclosure, and record-keeping programs, a new Office of Privacy and Treasury Records was established by combining key functions and elevating the integrated effort to report directly to the Assistant Secretary for Management. The Department also re-energized the E-Board Information Technology Investment Oversight forum to provide increased executive-level strategic direction and scrutiny of major projects, and strengthened corporate management of shared services by initiating an ongoing Working Capital Fund Review Program with participation by all bureaus.

The Department of the Treasury once again received an unqualified audit opinion on its financial statements. We are working diligently to resolve financial systems material weaknesses which are preventing the Department from achieving full compliance with federal financial systems requirements and, along with weaknesses in non-financial areas, result in providing only qualified assurance that the Department is meeting federal financial management and internal control objectives. The Department closed two long-standing material weaknesses in fiscal year 2008, and no new weaknesses were identified, leaving four open material weaknesses as of September 30, 2008. These remaining weaknesses involve complex solutions that will require several years of sustained, hard work to resolve. The last of the Department's material weaknesses is scheduled to be closed in fiscal year 2012. The Department will also need to devote special attention to the Management Challenges outlined by the Department's Inspectors General. These challenges do not necessarily indicate deficiencies in performance; however, they represent inherent risks that must be monitored continuously. This is especially true of the new challenges the Department faces in working to stabilize and improve the distressed financial markets.

In the coming months, as our nation awaits the beginning of a new Administration, the dedicated men and women of the Department of the Treasury will continue to carry out the vital mission of the Treasury Department on behalf of the American people, while making all necessary preparations to support a smooth and effective transition.

Sincerely,

Peter B. McCarthy
Assistant Secretary for Management
and Chief Financial Officer

Case 1:13-cv-01053-RCL   Document 24-2   Filed 12/17/13   Page 168 of 170

*This page intentionally left blank*



**OFFICE OF
INSPECTOR GENERAL**

**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

November 17, 2008

**INFORMATION MEMORANDUM FOR SECRETARY PAULSON**

**FROM:**

**SUBJECT:**    Audit of the Department of the Treasury's Financial Statements for Fiscal Years 2008 and 2007

**INTRODUCTION**

I am pleased to transmit KPMG LLP's report on the Department of the Treasury's (the Department) financial statements as of and for the fiscal years (FY) ending September 30, 2008 and 2007.

The Department of the Treasury Office of Inspector General is responsible for ensuring that the financial statement audit of the Department of the Treasury is conducted in accordance with the Chief Financial Officers' Act of 1990, as amended by the Government Management Reform Act of 1994.

**RESULTS OF INDEPENDENT AUDIT**

Under a contract monitored by my office, KPMG LLP, an independent certified public accounting firm, performed an audit of the FY 2008 and 2007 financial statements. The contract required that the audit be performed in accordance with generally accepted government auditing standards issued by the Comptroller General of the United States; Office of Management and Budget Bulletin No. 07-04, *Audit Requirements for Federal Financial Statements*; and the *GAO/PCIE Financial Audit Manual*.

In its audit of the Department of the Treasury, KPMG LLP

- found that the financial statements were fairly presented, in all material respects, in conformity with U.S. generally accepted accounting principles;

- reported that the three material weaknesses related to financial systems and reporting identified by the auditor of the Internal Revenue Service (IRS) are collectively considered a material weakness for the Department as a whole;

- reported that control deficiencies related to (1) financial management practices at the departmental level and (2) controls over foreign currency transactions represent significant deficiencies for the Department as a whole;

- reported an instance of noncompliance with laws and regulations related to the Internal Revenue Code Section 6325;

- reported that the Department's financial management systems did not substantially comply with the requirements of the Federal Financial Management Improvement Act of 1996 (FFMIA); and

- reported an instance of a potential Anti-deficiency Act violation related to transactions and activities of the Financial Crimes Enforcement Network

IRS's pervasive internal control weaknesses have existed since audits of its financial statements were initiated in FY 1992. The Government Accountability Office (GAO), the auditor of IRS's financial statements for the fiscal years ending September 30, 2008 and 2007, reported that the bureau continued to make significant strides in addressing its financial management challenges and material weaknesses in its internal controls. In particular, IRS made progress to address control deficiencies over tax revenue and refunds such that GAO no longer considers the remaining control deficiencies in this area a material weakness. IRS also improved internal controls over safeguarding hard-copy taxpayer receipts and data that enabled GAO to conclude that the remaining issues in this area no longer constitute a significant deficiency. However, IRS faces serious challenges from its use of obsolete financial management systems that do not conform to the requirements of FFMIA. Until IRS resolves the issues affecting the automated systems it relies on to process tax related transactions, it will be challenged to sustain the level of effort needed to produce reliable financial statements in a timely manner. Continued IRS and Department senior leadership involvement is essential to effectively address IRS's remaining financial management challenges.

## EVALUATION OF AUDITORS' PERFORMANCE

To ensure the quality of the audit work performed, we reviewed KPMG LLP's approach and planning of the audit, evaluated the qualifications and independence of the auditors, monitored the progress of the audit at key points, reviewed and accepted KPMG LLP's audit report, and performed other procedures that we deemed necessary. We also provide oversight of the audits of financial statements and certain accounts and activities conducted at 12 component entities of the Department. Our review, as differentiated from an audit in accordance with generally accepted government auditing standards, was not intended to enable us to express, and we do not express, an opinion on the financial statements or conclusions about the effectiveness of internal control or on whether the Department's financial management systems substantially complied with the Federal Financial Management Improvement Act of 1996 or conclusions on compliance with laws and regulations. KPMG LLP is responsible for the attached auditor's report dated November 17, 2008, and the conclusions expressed in that report. However, our review disclosed no instances where KPMG LLP did not comply, in all material respects, with generally accepted government auditing standards.

I appreciate the courtesies and cooperation extended to KPMG LLP and my staff during the audit. Should you or your staff have questions, you may contact me at (202) 622-1090 or Marla A. Freedman, Assistant Inspector General for Audit, at (202) 927-5400.

Attachment


cc:     Peter B. McCarthy
        Assistant Secretary for Management
        and Chief Financial Officer