## 14. RESERVE POSITION IN THE INTERNATIONAL MONETARY FUND

The United States participates in the IMF through a quota subscription. Quota subscriptions are paid partly through the transfer of reserve assets, such as foreign currencies or SDR, which are international reserve currency assets created by the IMF, and partly by making domestic currency available as needed through a non-interest-bearing letter of credit. This letter of credit, issued by the Treasury Department and maintained by the FRBNY, represents the bulk of the IMF's holdings of dollars. Approximately one quarter of 1 percent of the U.S. quota is maintained in cash balances in an IMF account at FRBNY.

While resources for transactions between the IMF and the United States are appropriated, they do not result in net budgetary outlays. This is because U.S./IMF quota transactions constitute an exchange of monetary assets in which the United States receives an equal offsetting claim on the IMF in the form of an increase in the U.S. reserve position in the IMF, which is interest-bearing and can be drawn at any time for balance of payments needs. When the IMF draws dollars from the letter of credit to finance its operations and expenses, the drawing does not represent a net budget outlay on the part of the United States because there is a commensurate increase in the U.S. reserve position. When the IMF repays dollars to the United States, no net budget receipt results because the U.S. reserve position declines concurrently in an equal amount.

As of September 30, 2009, the U.S. quota in the IMF was 37.1 billion SDR, valued at approximately $66.6 billion. (The quota as of September 30, 2008, was 37.1 billion SDR, valued at approximately $57.9 billion.) The quota consisted of the following (in millions):

|  | 2009 | 2008 |
|---|---|---|
| Letter of Credit /1 | $ 53,056 | $ 53,012 |
| U.S. Dollars Held in Cash by the IMF /1 | 44 | 88 |
| Reserve Position /2 | 13,469 | 4,750 |
| U.S. Quota in the IMF | $ 66,569 | $ 57,850 |

1/ This amount is included in entity appropriated funds under Note 2, Fund Balance with Treasury, and unexpended appropriations – Obligations/ Undelivered orders.

2/ This amount is included in the Cumulative Results of Operations.

On June 24, 2009, the Supplemental Appropriations Act, 2009 (Public Law 111-32) was enacted and it provides authorization and appropriations for an increase in the United States quota share in the IMF by the dollar equivalent of 4.97 billion SDRs which at the SDR/dollar exchange rate applicable September 30, 2009 is equivalent to $7.9 billion. However, this increase in the United States quota share is not effective as of September 30, 2009 and will not come into effect until other IMF member countries undertake certain actions with respect to the IMF.

The U.S. reserve position is denominated in SDR, as is the U.S. quota. Consequently, fluctuations in the value of the dollar with respect to the SDR results in valuation changes in dollar terms for the U.S. reserve position in the IMF as well as the IMF letter of credit. The Treasury Department periodically adjusts these balances to maintain the SDR value of the U.S. quota and records the change as a deferred gain or loss in its cumulative results of operations. These adjustments, known as maintenance of value adjustments, are settled annually after the close of the IMF financial year on April 30. Such adjustments do not involve a flow of funds. At April 30, 2009, the annual settlement with the IMF resulting from the appreciation of the dollar against the SDR since April 30, 2008, called for an downward adjustment of the U.S. quota by $4.3 billion and a corresponding increase to

Unexpended Appropriations on the Statement of Changes in Net Position (At April 30, 2008, the depreciation of the dollar against the SDR since April 30, 2007, called for an upward adjustment of the U.S. quota by $3.4 billion and a corresponding increase to Unexpended Appropriations.) The dollar balances shown above for the U.S. quota includes accrued valuation adjustments. At September 30, 2009, the Treasury Department recorded a net deferred valuation gain in the amount of $498 million for deferred maintenance of value adjustments needed at year end ($15.5 million loss at September 30, 2008).

The United States earns "remuneration" (interest) on its reserve position in the IMF except for the portion of the reserve position originally paid in gold. Remuneration is paid quarterly and is calculated on the basis of the SDR interest rate. The SDR interest rate is a market-based interest rate determined on the basis of a weighted average of interest rates on short-term instruments in the markets of the currencies included in the SDR valuation basket. Payment of a portion of this remuneration is deferred as part of a mechanism for creditors and debtors to share the financial consequences of overdue obligations to the IMF, such as unpaid overdue interest, and to similarly share the burden of establishing any contingency accounts deemed necessary to reflect the possibility of non-repayment of relevant principal amounts. As overdue interest is paid, previously deferred remuneration corresponding to the creditors' share of the burden of earlier nonpayment is included in the next payment of remuneration. The deferred remuneration corresponding to the creditors' share of establishing the contingency accounts is usually paid when there are no longer any relevant overdue obligations or when the IMF Executive Board determines to pay the remuneration. There was no deduction in the remuneration paid by the IMF as a result of burden-sharing during fiscal years 2009 or 2008. For fiscal years 2009 and 2008, the Treasury Department received $40 million and $59 million as remuneration, respectively.  (See Note 6.)

In addition to quota subscriptions, the IMF maintains borrowing arrangements to supplement its resources in times of crisis when IMF liquidity is low. The United States currently participates in two such arrangements – the General Arrangements to Borrow (GAB) and the New Arrangements to Borrow (NAB). There were no U.S. loans outstanding under these arrangements in fiscal year 2009 and fiscal year 2008. The dollar equivalent of SDR 6.7 billion has been appropriated to finance U.S. participation in the GAB and NAB; as of September 30, 2009 and September 30, 2008, this amounted to $10.6 billion and $10.5 billion, respectively, in standing appropriations available for lending through the GAB or NAB as needed. As is the case for the U.S. quota in the IMF, budgetary treatment of U.S. participation in the GAB and NAB does not result in net budgetary outlays, since transactions under the GAB or NAB result in concurrent adjustments to the U.S. reserve position in the IMF.

Public Law 111-32 also provided the authorization and appropriations for an increase in the United States participation in the NAB by the dollar equivalent of SDR 75 billion which at the SDR/dollar exchange rate applicable on September 30, 2009 is equivalent to $119 billion. However, this increase in the United States participation in the NAB is not effective as of September 30, 2009 and will not come into effect until all IMF member countries participating in the NAB come to a final agreement on certain modifications to the decision governing the NAB. Although $119 was appropriated under Public Law 111-32, the United States has publicly stated that it will limit its commitment to $100 billion whenever a final decision is reached.

## 15. TAX, OTHER, AND RELATED INTEREST RECEIVABLES, NET

Tax, other, and related interest receivables include receivables from tax assessments, excise taxes, fees, penalties, and interest assessed and accrued that were not paid or abated, reduced by an estimate for uncollectible amounts. In addition to amounts attributed to taxes, interest income due on monies deposited in Federal Reserve Banks is also included in this line item.

As of September 30, 2009 and September 30, 2008, Tax, Other, and Related Interest Receivables, and Net, consisted of the following (in millions):

| Non-Entity: | 2009 | 2008 |
|---|---|---|
| IRS Federal Tax Receivable, Gross | $ 128,115 | $ 112,067 |
| Less: Allowance on Taxes Receivable | (99,027) | (83,046) |
| Receivable, Deposit of Earnings, Federal Reserve Banks | 1,254 | 1,465 |
| Other Receivables and Interest | 33 | 28 |
| Less: Allowance on Other and Related Interest Receivable | (15) | (19) |
| Total Tax, and Other Non-Entity Receivables, Net | $ 30,360 | $ 30,495 |
| | | |
| Entity: | | |
| Miscellaneous Entity Receivables and Related Interest | 48 | 383 |
| Total Tax, Other, and Related Interest Receivables, Net | $ 30,408 | $ 30,878 |

IRS federal taxes receivable constitute the largest portion of the receivables. IRS federal taxes receivable consists of tax assessments, penalties, and interest which were not paid or abated, and which were agreed to by either the taxpayer and IRS, or the courts. An allowance for doubtful accounts is established for the difference between the gross receivables and the portion deemed collectible. The portion of tax receivables estimated to be collectible and the allowance for doubtful accounts are based on projections of collectability from a statistical sample of taxes receivable. The Treasury Department does not establish an allowance for the receivable on deposits of Federal Reserve Bank earnings.

FHFA 1008

## 16. INVENTORY AND RELATED PROPERTY, NET

Inventory and related property includes inventory, operating materials and supplies, and forfeited property held by Treasury Department. The Treasury Department's operating materials and supplies are maintained for the production of bureau products. The Treasury Department maintains inventory accounts or balances (e.g., metals, paper, etc.) for use in manufacturing currency and coins. The cost of these items is included in inventory costs, and is recorded as cost of goods sold upon delivery to customers. Inventory for check processing activities is also maintained. As of September 30, 2009 and September 30, 2008, inventory and related property consisted of the following (in millions):

|  | 2009 | 2008 |
|---|---|---|
| Operating materials and supplies held for use | $ 17 | $ 16 |
| Operating materials and supplies held in reserve for future use | 24 | 24 |
| Forfeited property | 62 | 100 |
| Inventory – raw materials | 239 | 355 |
| Inventory – work in process | 128 | 86 |
| Inventory – finished goods | 142 | 135 |
| Allowance for inventories and related property | (14) | (18) |
| Total Inventories and Related Property, Net | $ 598 | $ 698 |

FHFA 1009

## 17. PROPERTY, PLANT, AND EQUIPMENT, NET

As of September 30, 2009 and September 30, 2008, property, plant, and equipment consisted of the following (in millions):

| | Depreciation Method | Service Life | Cost | Accumulated Depreciation | 2009 Net Book Value |
|---|---|---|---|---|---|
| Buildings, structures, and facilities | S/L | 3 - 50 years | $ 676 | $ (308) | $ 368 |
| Furniture, fixtures, and equipment | S/L | 2 - 20 years | 3,048 | (2,268) | 780 |
| Construction in progress | N/A | N/A | 38 | 0 | 38 |
| Land and land improvements | N/A | N/A | 12 | 0 | 12 |
| Internal use software | S/L | 2 -10 years | 1,352 | (807) | 545 |
| Internal use software in development | N/A | N/A | 112 | 0 | 112 |
| Assets under capital lease | S/L | 2 - 25 years | 25 | (23) | 2 |
| Leasehold improvements | S/L | 2 - 25 years | 482 | (303) | 179 |
| Total | | | $ 5,745 | $ (3,709) | $ 2,036 |

| | Depreciation Method | Service Life | Cost | Accumulated Depreciation | 2008 Net Book Value |
|---|---|---|---|---|---|
| Buildings, structures, and facilities | S/L | 3 - 50 years | $ 669 | $ (297) | $ 372 |
| Furniture, fixtures, and equipment | S/L | 2 - 20 years | 3,376 | (2,608) | 768 |
| Construction in progress | N/A | N/A | 35 | 0 | 35 |
| Land and land improvements | N/A | N/A | 12 | 0 | 12 |
| Internal use software | S/L | 2-10 years | 1,151 | (664) | 487 |
| Internal use software in development | N/A | N/A | 205 | 0 | 205 |
| Assets under capital lease | S/L | 2 - 25 years | 30 | (20) | 10 |
| Leasehold improvements | S/L | 2 - 25 years | 580 | (392) | 188 |
| Total | | | $ 6,058 | $ (3,981) | $ 2,077 |

The service life ranges vary significantly due to the diverse nature of PP&E held by the Treasury Department.

## HERITAGE ASSETS

The Treasury Department Complex (Main Treasury Building and Annex) was declared a national historical landmark in 1972. The Treasury Department Complex is treated as a multi-use heritage asset and is expected to be preserved indefinitely. The building housing the United States Mint in Denver, Colorado, is also considered a multi-use heritage asset.

## 18. NON-ENTITY ASSETS

Non-entity assets are those that are held by the Treasury Department but are not available for use by the Treasury Department. For example non-entity Fund Balance with Treasury represents unused balances of appropriations received by various Treasury Department entities to conduct custodial operations such as the payment of interest on the federal debt and refunds of taxes and fees. Non-entity loans and interest receivable represents loans managed by the Treasury Department on behalf of the U.S. Government. These loans are provided to federal agencies, and the Treasury Department is responsible for collecting these loans and transferring the proceeds to the General Fund of the U.S. Government. Non-entity cash, foreign currency, and other monetary assets include the operating cash of the U.S. Government, managed by the Treasury Department. It also includes foreign currency maintained by various U.S. and military disbursing offices, as well as seized monetary instruments. Non-Entity Investments in GSEs include the GSE senior preferred stock and warrants held by Treasury on behalf of the General Fund. As the stock and warrants are liquidated all proceeds are returned to the General Fund.

As of September 30, 2009 and September 30, 2008, non-entity assets consisted of the following (in millions):

|  | 2009 | 2008 |
|---|---|---|
| Intra-governmental Assets: | | |
| Fund Balance (Note 2) | $ 513 | $ 889 |
| Loans and Interest Receivable (Note 3) | 348,800 | 226,194 |
| Accounts Receivable and Related Interest (Note 5) | 285 | 372 |
| Advances to the Black Lung Trust Fund (Note 1G) | 0 | 10,484 |
| Advances to the Unemployment Trust Fund (Note 1H) | 7,981 | 0 |
| Due from the General Fund (Note 4) | 11,992,719 | 10,100,763 |
| **Total Non-Entity Intra-governmental Assets** | $ 12,350,298 | $ 10,338,702 |
| | | |
| Cash, Foreign Currency, and Other Monetary Assets (Note 6) | $ 269,579 | $ 364,941 |
| Gold and Silver Reserves (Note 7) | 11,062 | 11,062 |
| Loans and Interest Receivable (Note 13) | 127 | 130 |
| Investments in GSEs (Note 9) | 64,679 | 7,032 |
| Tax, Other, and Related Interest Receivable, Net (Note 15) | 30,360 | 30,495 |
| Beneficial Interest in AIG Trust | 23,472 | 0 |
| Miscellaneous Assets | 3 | 12 |
| **Total Non-Entity Assets** | $ 12,749,580 | $ 10,752,374 |
| **Total Entity Assets** | 1,097,021 | 364,664 |
| **Total Assets** | $ 13,846,601 | $ 11,117,038 |

## 19. FEDERAL DEBT AND INTEREST PAYABLE

The Treasury Department is responsible for administering the federal debt on behalf of the U.S. Government. The federal debt includes borrowings from the public as well as borrowings from federal agencies. The federal debt managed by the Treasury Department does not include debt issued by other governmental agencies such as the Tennessee Valley Authority or the Department of Housing and Urban Development.

The federal debt as of September 30, 2009 and September 30, 2008 was as follows (in millions):

| Intra-governmental | 2009 | 2008 |
|---|---|---|
| Beginning Balance | $ 4,179,570 | $ 3,922,548 |
| New Borrowings/Repayments | 140,322 | 257,022 |
| Subtotal at Par Value | $ 4,319,892 | $ 4,179,570 |
| Premium/(Discount) | 33,779 | 32,489 |
| Interest Payable Covered by Budgetary Resources | 49,409 | 50,355 |
| Total | $ 4,403,080 | $ 4,262,414 |

| Owed to the Public | 2009 | 2008 |
|---|---|---|
| Beginning Balance | $ 5,808,691 | $ 5,049,305 |
| New Borrowings/Repayments | 1,743,171 | 759,386 |
| Subtotal at Par Value | $ 7,551,862 | $ 5,808,691 |
| Premium/(Discount) | (33,906) | (36,124) |
| Interest Payable Covered by Budgetary Resources | 41,349 | 40,127 |
| Total | $ 7,559,305 | $ 5,812,694 |

Debt held by the public approximates the U.S. Government's competition with other sectors in the credit markets. In contrast, debt held by federal entities, primarily trust funds, represents the cumulative annual surpluses of these funds (i.e., excess of receipts over disbursements plus accrued interest) that have been used to finance general government operations.

## FEDERAL DEBT HELD BY OTHER FEDERAL AGENCIES

Certain federal agencies are allowed to invest excess funds in debt securities issued by the Treasury Department on behalf of the U.S. Government. The terms and the conditions of debt securities issued are designed to meet the cash needs of the U.S. Government. The vast majority is non-marketable securities issued at par value, but some are issued at market prices whose prices and interest rates reflect market terms. The average interest rate for debt held by the federal entities in fiscal year 2009 was 4.3 percent (4.83 percent in fiscal year 2008).

The federal debt also includes intra-governmental marketable debt securities that certain agencies are permitted to buy and sell on the open market. The debt, at par value (not including interest receivable), owed to federal agencies as of September 30, 2009 and September 30, 2008 was as follows (in millions):

FHFA 1012

|  | 2009 | 2008 |
|---|---|---|
| Social Security Administration | $ 2,504,248 | $ 2,367,138 |
| Office of Personnel Management | 828,952 | 797,107 |
| Department of Defense Agencies | 375,519 | 335,672 |
| Department of Health and Human Services | 376,512 | 380,540 |
| All Other Federal Entities - Consolidated | 234,661 | 299,113 |
| Total Federal Debt Held by Federal Entities | $ 4,319,892 | $ 4,179,570 |

The above balances do not include premium/discount and interest payable.

## FEDERAL DEBT HELD BY THE PUBLIC

As of September 30, 2009 and September 30, 2008, Federal Debt held by the Public consisted of the following:

| (at par value, in millions) | Term | Average Interest Rates | 2009 |
|---|---|---|---|
| Marketable: |  |  |  |
| Treasury Bills | 1 Year or Less | 0.3% | $ 1,986,174 |
| Treasury Notes | 2 - 10 Years | 3.0% | 3,772,964 |
| Treasury Bonds | Over 10 Years | 6.5% | 677,491 |
| Treasury Inflation Protected Security (TIPS) | 5 Years or More | 2.1% | 551,308 |
| Total Marketable |  |  | $ 6,987,937 |
| Non-Marketable | On Demand to Over 10 Years | 3.7% | 563,925 |
| Total Federal Debt (Public) |  |  | $ 7,551,862 |

| (at par value, in millions) | Term | Average Interest Rates | 2008 |
|---|---|---|---|
| Marketable: |  |  |  |
| Treasury Bills | 1 Year or Less | 1.6% | $ 1,484,332 |
| Treasury Notes | 2 - 10 Years | 4.1% | 2,623,364 |
| Treasury Bonds | Over 10 Years | 7.1% | 578,504 |
| Treasury Inflation Protected Security (TIPS) | 5 Years or More | 2.0% | 523,951 |
| Total Marketable |  |  | $ 5,210,151 |
| Non-Marketable | On Demand to Over 10 Years | 4.1% | 598,540 |
| Total Federal Debt (Public) |  |  | $ 5,808,691 |

The above balances do not include premium/discount and interest payable.

The Treasury Department issues marketable bills at a discount or at par and pays the par amount of the security upon maturity. The average interest rate on Treasury bills represents the original issue effective yield on securities outstanding as of September 30, 2009 and September 30, 2008, respectively. Treasury bills are issued with a term of one year or less.

The Treasury Department issues marketable notes and bonds as long-term securities that pay semi-annual interest based on the securities' stated interest rates. These securities are issued at either par value or at an amount that reflects a discount or a premium. The average interest rate on marketable notes and bonds represents the

FHFA 1013

stated interest rate adjusted by any discount or premium on securities outstanding as of September 30, 2009 and September 30, 2008. Treasury notes are issued with a term of 2 to 10 years and Treasury bonds are issued with a term of more than 10 years. The Treasury Department also issues inflation–indexed securities (TIPS) that have interest and redemption payments, which are tied to the Consumer Price Index, a widely used measurement of inflation. TIPS are issued with a term of five years or more. At maturity, TIPS are redeemed at the inflation-adjusted principal amount, or the original par value, whichever is greater. TIPS pay a semi-annual fixed rate of interest applied to the inflation-adjusted principal.

Over the course of fiscal year 2009, changes in economic conditions, financial markets, and fiscal policy as well as a reduction in nonmarketable debt issuance have caused an increase in Treasury's marketable borrowing needs. Financial market strains have impacted the real economy, and the nation has experienced lower economic growth, lower receipts, and increased outlays. The Treasury Department has responded to the increase in marketable borrowing requirements by increasing issuance sizes of regular bills, the frequency, terms, and issuance sizes of cash management bills, and the issuance sizes of nominal coupon security offerings.

Federal Debt Held by the Public includes federal debt held outside of the U. S. Government by individuals, corporations, Federal Reserve Banks (FRB), state and local governments, foreign governments and central banks. As of September 30, 2009, the FRB had total holdings of $769 billion, with a very small amount lent to dealers and not collateralized by other Treasury securities. As of September 30, 2008, the FRB owned $221 billion, net of $256 billion in securities lent to dealers and not collateralized by other Treasury securities, for total holdings of $477 billion. These securities are held in the FRB System Open Market Account (SOMA) for the purpose of conducting monetary policy.

The amount of outstanding federal debt is limited by the statutory debt ceiling. Outstanding debt is projected to reach the statutory debt ceiling in late December 2009. Congressional actions to increase the debt ceiling are currently pending. In the event Congressional action is delayed, the Treasury Department has various options available to it to issue additional debt to fund government operations until Congressional action is completed.

FHFA 1014

## 20. OTHER DEBT AND INTEREST PAYABLE

Borrowings outstanding are with the Civil Service Retirement and Disability Fund (CSR&DF), which is administered by the Office of Personnel Management (OPM). At September 30, 2009 and September 30, 2008, FFB had borrowings of $11.9 billion and $14.0 billion and an associated unamortized premium of $229 million and $288 million, respectively. These borrowings are at stated interest rates ranging from 4.625 percent to 5.250 percent, effective interest rate of 4.125 percent, and with maturity dates range from June 30, 2010 to June 30, 2019.

NOTE 20. OTHER DEBT AND INTEREST PAYABLE

## 21. D.C. PENSIONS AND JUDICIARY RETIREMENT ACTUARIAL LIABILITY

Pursuant to Title XI of the *Balanced Budget Act of 1997*, as amended (the Act), on October 1, 1997, Treasury became responsible for certain District of Columbia retirement plans. The Act was intended to relieve the District of Columbia government of the burden of unfunded pension liabilities transferred to the District by the U.S. Government in 1979. To fulfill its responsibility, Treasury manages two funds — the D.C. Teachers', Police Officers' and Firefighters' Federal Pension Fund (the D.C. Federal Pension Fund) and the District of Columbia Judicial Retirement and Survivors Annuity Fund (the Judicial Retirement Fund). The Treasury Department is required to make annual amortized payments from the General Fund of the U.S. Government to the D.C. Federal Pension Fund and the Judicial Retirement Fund. The actuarial cost method used to determine costs for the retirement plans is the Aggregate Entry Age Normal Actuarial Cost Method. The actuarial liability is based upon long term assumptions selected by the Treasury Department. The pension benefit costs incurred by the plans are included on the Consolidated Statements of Net Cost.

### D.C. FEDERAL PENSION FUND

The purpose of the D.C. Federal Pension Fund is to make federal benefit payments and pay necessary administrative expenses for the District of Columbia Police Officers', Firefighters', and Teachers' Retirement Plans for benefits earned based upon service on or before June 30, 1997. The amount paid into the D.C. Federal Pension Fund from the General Fund of the U.S. Government was $400.3 million for fiscal year 2009 ($340.2 million during fiscal year 2008). As of September 30, 2009, the unobligated budgetary resources of the D.C. Federal Pension Fund were approximately $3,557.8 million, and the pension actuarial liability was $8,892.5 million, resulting in an unfunded liability of $5,334.7 million. (As of September 30, 2008, the unobligated budgetary resources of the D.C. Federal Pension Fund were approximately $3,564.2 million, and the pension actuarial liability was $8,640.8 million, resulting in an unfunded liability of $5,076.6 million.) In fiscal year 2009, the assumption for the annual rate of investment return in fiscal year 2010 was 4.5 percent for the D.C. Federal Pension Fund with a gradual increase to 6.0 percent by fiscal year 2016; and the assumption for the future annual rate of inflation and future cost-of-living adjustments was 3.5 percent. In fiscal year 2008, the assumption for the annual rate of investment return in fiscal year 2009 was 4.7 percent for the D.C. Federal Pension Fund with a gradual increase to 6 percent by fiscal year 2014; and the assumption for the future annual rate of inflation and future cost of-living adjustments was 3.5 percent. In fiscal year 2009, the assumption for the future annual rate of salary increases ranged from 3.5 percent to 6.5 percent for police officers and firefighters, based on years of service, and ranged from 3.5 percent to 5.5 percent for teachers, based on years of service. In fiscal year 2008, the assumption for the future annual rate of salary increases was 6.5 percent for police officers and firefighters, and 5.5 percent for teachers.

### JUDICIAL RETIREMENT FUND

The purpose of the Judicial Retirement Fund is to make federal benefit payments and pay necessary administrative expenses for the Judges' Retirement Plans for all benefits earned. The amount paid into the Judicial Retirement Fund from the General Fund of the U.S. Government was $7.04 million for fiscal year 2009 ($6.98 million during fiscal year 2008). As of September 30, 2009, the unobligated budgetary resources of the Judicial Retirement Fund were approximately $122.4 million, and the pension actuarial liability was $156.6 million, resulting in an unfunded liability of $34.2 million. (As of September 30, 2008, the unobligated budgetary resources of the Judicial Retirement Fund were approximately $118.5 million, and the pension actuarial liability was $161.6 mil-

FHFA 1016

lion, resulting in an unfunded liability of $43.1 million.) In fiscal year 2009, the assumption for the annual rate of investment return in fiscal year 2010 was 5.2 percent for the Judicial Retirement Fund with a gradual increase to 6 percent by fiscal year 2017; and the assumption for the future annual rate of inflation and future cost-of-living adjustments was 3.5 percent. In fiscal year 2008, the assumption for the annual rate of investment return in fiscal year 2009 was 5.2 percent for the Judicial Retirement Fund with a gradual increase to 6 percent by fiscal year 2015; and the assumption for the future annual rate of inflation and future cost-of-living adjustments was 3.5 percent. In fiscal year 2009, the assumption for the future annual rate of salary increases was 3.5 percent for judges. This assumption was unchanged from fiscal year 2008.

NOTE 21. D.C. PENSIONS AND JUDICIARY RETIREMENT ACTUARIAL LIABILITY

## 22. LIABILITIES

*Liabilities Not Covered by Budgetary and Other Resources*

As of September 30, 2009 and September 30, 2008, liabilities not covered by budgetary and other resources consisted of the following (in millions):

| | 2009 | 2008 |
|---|---|---|
| Intra-governmental Liabilities Not Covered by Budgetary and Other Resources: | | |
| Federal Debt Principal, Premium/Discount (Note 19) | $    4,353,671 | $    4,212,059 |
| Other Intra-governmental Liabilities | 105 | 105 |
| Total Intra-governmental Liabilities Not Covered by Budgetary and Other Resources | $    4,353,776 | $    4,212,164 |
| Federal Debt Principal, Premium/Discount (Note 19) | 7,517,956 | 5,772,567 |
| Gold and Silver Reserves held by the U.S. Mint | 10,494 | 10,494 |
| D.C. Pensions Liability (Note 21) | 5,369 | 5,120 |
| Liabilities to GSEs | 91,937 | 13,800 |
| Other Liabilities | 1,057 | 1,085 |
| Total Liabilities Not Covered by Budgetary and Other Resources | $    11,980,589 | $    10,015,230 |
| Total Liabilities Covered by Budgetary and Other Resources | 1,437,956 | 792,097 |
| Total Liabilities | $    13,418,545 | $    10,807,327 |

*Other Liabilities*

Total "Other Liabilities" displayed on the Balance Sheets consists of both liabilities that are covered and not covered by budgetary resources.

The amounts displayed of $3,331 million and $4,052 million, respectively, at September 30, 2009 and September 30, 2008 consisted of the following (in millions):

| | 2009 | | |
|---|---|---|---|
| | Current | Non-Current | Total |
| Intra-governmental | | | |
| Unfunded Federal Workers Compensation Program Liability (FECA) | $    46 | $    57 | $    103 |
| Accounts Payable | 61 | 0 | 61 |
| Accrued Interest Payable | (3) | 0 | (3) |
| Other Accrued Liabilities | 263 | 1 | 264 |
| Total Intra-governmental | $    367 | $    58 | $    425 |
| | | | |
| With the Public | | | |
| Actuarial Federal Workers Compensation Program Liability (FECA) | 0 | 533 | 533 |
| Liability for Deposit Funds (Held by the Federal Government for Others) and Suspense Accounts | 71 | 0 | 71 |
| Accrued Funded Payroll and Benefits | 488 | 0 | 488 |
| Capital Lease Liabilities | 1 | 0 | 1 |
| Accounts Payable and Other Accrued Liabilities | 2,194 | 44 | 2,238 |
| Total with the Public | $    2,754 | $    577 | $    3,331 |

|  | 2008 | | |
|---|---|---|---|
|  | Current | Non-Current | Total |
| **Intra-governmental** | | | |
| Unfunded Federal Workers Compensation Program Liability (FECA) | $ 45 | $ 57 | $ 102 |
| Accounts Payable | 76 | 0 | 76 |
| Other Accrued Liabilities | 165 | 2 | 167 |
| Total Intra-governmental | $ 286 | $ 59 | $ 345 |
| | | | |
| **With the Public** | | | |
| Actuarial Federal Workers Compensation Program Liability (FECA) | 0 | 594 | 594 |
| Liability for Deposit Funds (Held by the Federal Government for Others) and Suspense Accounts | 526 | 0 | 526 |
| Accrued Funded Payroll and Benefits | 424 | 0 | 424 |
| Capital Lease Liabilities | 4 | 1 | 5 |
| Accounts Payable and Other Accrued Liabilities | 2,460 | 43 | 2,503 |
| Total with the Public | $ 3,414 | $ 638 | $ 4,052 |

NOTE 22. LIABILITIES

## 23. NET POSITION

Unexpended Appropriations represents the amount of spending authorized as of year-end that is unliquidated or unobligated and has not lapsed, been rescinded, or withdrawn. No-year appropriations remain available for obligation until expended. Annual appropriations remain available for upward or downward adjustment of obligations until expired.

Cumulative Results of Operations represents the net results of operations since inception, and includes cumulative amounts related to investments in capitalized assets and donations and transfers of assets in and out without reimbursement. Also included as a reduction in Cumulative Results of Operations are accruals for which the related expenses require funding from future appropriations and assessments. These future funding requirements include, among others (a) accumulated annual leave earned but not taken, (b) accrued workers compensation, (c) credit reform cost reestimates, and (d) expenses for contingent liabilities.

The amount reported as "appropriations received" are appropriated from the Treasury General Fund of the U.S. Government receipts, such as income taxes, that are not earmarked by law for a specific purpose. This amount will not necessarily agree with the "appropriation received" amount reported on the Statement of Budgetary Resources (SBR) because of differences between proprietary and budgetary accounting concepts and reporting requirements. For example, certain dedicated and earmarked receipts are recorded as "appropriations received" on the SBR, but are recognized as exchange or non-exchange revenue (i.e., typically in special and non-revolving trust funds) and reported on the Statement of Changes in Net Position in accordance with Statement of Federal Financial Accounting Standards (SFFAS No. 7).

## TRANSFERS TO THE GENERAL FUND AND OTHER

The amount reported as "Transfers to the General Fund and Other" on the Consolidated Statements of Changes in Net Position under "Other Financing Sources" includes the credit reform downward reestimates to be collected by the General Fund and current year negative subsidy transferred of $118,139 million and $7,220 million, respectively, for the year ended September 30, 2009. Also included is $95,600 million in GSE General Fund exchange revenue from the gross increase in value of the GSE preferred stock. In addition, these transfers also include distribution of interest revenue to the General Fund of the U.S. Government of $30.1 billion and $13.5 billion, for the years ended September 30, 2009 and September 30, 2008, respectively. The interest revenue is accrued on inter-agency loans held by the Treasury Department on behalf of the U.S. Government. A corresponding balance is reported on the Consolidated Statement of Net Cost under "Federal Costs: Less Interest Revenue from Loans." The amount reported on the Consolidated Statement of Net Cost is reduced by eliminations with Treasury bureaus. Also included in "Transfers to the General Fund and Other" is $4,336 million (GSE Dividends) and $7,032 million (initial GSE preferred stock) transferred to the general fund for the years ended September 30, 2009 and September 30, 2008, respectively. In addition, $(37,953) million of GSE senior preferred stock valuation loss and other transfers of $238 million are included as of September 30, 2009.

The Treasury Department also includes seigniorage in "Transfers to the General Fund and Other." Seigniorage is the face value of newly minted circulating coins less the cost of production. The United States Mint is required to distribute the seigniorage that it recognizes to the General Fund of the U.S. Government. The distribution is also included in "Transfers to the General Fund and Other." In any given year, the amount recognized as seigniorage may differ for the amount distributed to the General Fund by an insignificant amount due to timing differences.

FHFA 1020

Seigniorage in the amounts of $447.1 million and $728.6 million was recognized, respectively, for the years ended September 30, 2009 and September 30, 2008. Total distributions from the Mint to the General Fund, including seigniorage and numismatic profit, amounted to $ 475 million and $750 million, respectively, for the years ended September 30, 2009 and September 30, 2008.

The transfers are summarized in the following table:

|  | 2009 | 2008 |
|---|---|---|
| Downward Reestimates of Credit Reform Subsidies | $ 118,139 | $ 0 |
| Credit Reform Negative Subsidies | 7,220 | 0 |
| Interest Revenue | 30,124 | 13,500 |
| Increase in Liquidity Preference of GSE Preferred Stock | 95,600 | 0 |
| GSE Preferred Stock Dividends | 4,336 | 0 |
| GSE Warrants and Stock Valuation (net) | (37,953) | 0 |
| GSE Warrants and Stock - Fee for SPPS Agreement | 0 | 7,032 |
| Other | 238 | 256 |
| | $ 217,704 | $ 20,788 |

NOTE 23. NET POSITION

## 24. CONSOLIDATED STATEMENT OF NET COST AND NET COSTS OF TREASURY SUB-ORGANIZATIONS

The Treasury Department's Consolidated Statement of Net Cost displays information on a consolidated basis. The complexity of the Treasury Department's organizational structure and operations requires that supporting schedules for Net Cost be included in the notes to the financial statements. These supporting schedules provide consolidating information, which fully displays the costs of each sub-organization (Departmental Offices and each operating bureau).

The classification of sub-organizations has been determined in accordance with SFFAS No. 4, *Managerial Cost Accounting Concepts and Standards for the Federal Government* which states that the predominant factor is the reporting entity's organization structure and existing responsibility components, such as bureaus, administrations, offices, and divisions within a department.

Each sub-organization is responsible for accumulating costs. The assignment of the costs to Treasury-wide programs is the result of using the following cost assignment methods: (1) direct costs, (2) cause and effect, and (3) cost allocation.

Intra-Departmental costs/revenues resulting from the provision of goods and/or services on a reimbursable basis among Departmental sub-organizations are reported as costs by providing sub-organizations. Accordingly, such costs/revenues are eliminated in the consolidation process.

To the extent practical or reasonable to do so, earned revenue is deducted from the gross costs of the programs to determine their net cost. There are no precise guidelines to determine the degree to which earned revenue can reasonably be attributed to programs. The attribution of earned revenues requires the exercise of managerial judgment.

OMB Circular No. A-136, *Financial Reporting Requirements*, requires that the presentation of the Statements of Net Cost align directly with the goals and outcomes identified in the Strategic Plan. Accordingly, Treasury Department has presented the gross costs and earned revenues by the applicable strategic goals in its fiscal years 2007 - 2012 Strategic Plan. The majority of Treasury bureaus' and reporting entities' net cost information falls within one strategic goal in the Statement of Net Cost. Two of Treasury's components, TTB and DO allocate costs to multiple programs using a net cost percentage calculation.

In the last quarter of 2008, the Treasury Department began incurring cost in association with the GSE Senior Preferred Stock Purchase Program. The amount included in the SNC as economic program entity cost is $173,737 million for fiscal year 2009 and $13,800 million for fiscal year 2008. The 2009 amount represents the current year liquidity payment of $81,800 million to the GSEs; fourth quarter liquidity payment accrual of $15,000 million payable to Fannie Mae; and accrual of $76,937 million contingent liability for future liquidity payments to GSEs. In addition, $43,931 million of preferred stock valuation loss (expense) and $5,978 million of common stock valuation gain (revenue) are reported in the SNC as non-entity. Also, reported in the SNC as non-entity revenue is $4,336 million in GSE dividends. The fiscal year 2008 amount represents the expense portion of the quarter ended September 30, 2008 accrual of the payment to Freddie Mac, which was disbursed in December 2008. There was no payment for Fannie Mae for fiscal year 2008. Nor was there a fiscal year 2009 year-end accrual to Freddie Mac as of September 30, 2009. In fiscal year 2008, Treasury disclosed these GSE costs separately as a below the line item on the SNC. However, Treasury concluded that the cost of this program helps accomplish the Treasury

FHFA 1022

strategic goal of ensuring that the U.S. economy performs at its full economic potential. Thus, as of September 30, 2009 the cost of these investments in GSEs are aligned in the Economic Program section of the SNC. (See Note 9)

In fiscal year 2009, new program activity cost incurred by the OFS and SIGTARP are aligned in the Statement of Net Cost as Economic cost and Management cost, respectively. The establishment of the OFS helps to ensure that the U.S. economy performs at its full potential by stabilizing the financial system through implementation of the Financial Stability Plan. SIGTARP's objective is to promote and ensure management and organizational excellence by providing accountability and transparency. Fiscal year 2009 OFS equity program costs were $15,650 million; direct loan program costs were $26,032 million. Details of these costs are provided in Notes 8 and 12, respectively. These OFS program costs, and the GSE Senior Preferred Stock Purchase Program costs described above, comprise the major portion of Economic Program costs in the Statement of Net Cost.

As of September 30, 2009 and September 30, 2008, the Economic Program gross cost consisted of the following (in millions):

| Economic Program Gross Cost | 2009 | 2008 |
|---|---:|---:|
| GSE SPSPA - Liquidity Payments | $ 81,800 | $ - |
| GSE SPSPA - Year-End Accrual | 15,000 | 13,800 |
| GSE SPSPA - Contingent Commitments | 76,937 | - |
| GSE SPSPA Gross Cost | 173,737 | 13,800 |
| GSE MBS Subsidy, Reestimates & Admin Cost | (12,880) | - |
| GSE MBS - Other Intragovernmental Gross Cost | 5,569 | - |
| Total GSE SPSPA & MBS Economic Gross Cost | $ 166,426 | $ 13,800 |
| DO Combined (exluding GSE) | 4,187 | 2,202 |
| BEP | 475 | 530 |
| MNT | 2,453 | 2,036 |
| OCC | 732 | 680 |
| OFS | 47,994 | - |
| OTS | 239 | 251 |
| TTB | 50 | 49 |
| | 56,130 | 5,748 |
| Combined Economic Program Gross Cost | 222,556 | 19,548 |
| Eliminations | (12,066) | (409) |
| Consolidated Economic Program Gross Cost | $ 210,490 | $ 19,139 |

The Treasury Department's SNC also presents interest expense on the Federal Debt and other federal costs incurred as a result of assets and liabilities managed on behalf of the U.S. Government. These costs are not reflected as program costs related to the Treasury Department's strategic plan missions. Such costs are eliminated in the consolidation process to the extent that they involve transactions with Treasury Department sub-organizations.

Other federal costs for the years ended September 30, 2009 and September 30, 2008 consisted of the following (in millions):

|  | 2009 | 2008 |
|---|---|---|
| Credit Reform Interest on Uninvested Funds (Intra-governmental) | $  6,534 | $  5,043 |
| Resolution Funding Corporation | 2,120 | 1,393 |
| Judgment Claims and Contract Disputes | 2,305 | 786 |
| Corporation for Public Broadcasting | 461 | 448 |
| Legal Services Corporation | 388 | 347 |
| All Other Payments | 323 | 315 |
| Total | $  12,131 | $  8,332 |

NOTE 24. CONSOLIDATED STATEMENT OF NET COST AND NET COSTS OF TREASURY SUB-ORGANIZATIONS

## 24. Consolidated Statement of Net Cost and Net Costs of Treasury Sub-organizations (in millions):

| For Year Ended September 30, 2009<br><br>Program Costs: | Bureau of Engraving and Printing | Bureau of the Public Debt | Departmental Offices | Financial Crimes Enforcement Network | Financial Management Service | Internal Revenue Service | U.S. Mint |
|---|---|---|---|---|---|---|---|
| **Financial Program:** | | | | | | | |
| Intra-governmental Gross Costs | $ 0 | $ 111 | $ 1,440 | $ 0 | $ 184 | $ 4,145 | $ 0 |
| Less: Earned Revenue | 0 | (22) | (1,948) | 0 | (167) | (55) | 0 |
| Intra-governmental Net Costs | $ 0 | $ 89 | $ (508) | $ 0 | $ 17 | $ 4,090 | $ 0 |
| | | | | | | | |
| Gross Costs with the public | $ 0 | $ 221 | $ 829 | $ 0 | $ 1,153 | $ 8,725 | $ 0 |
| Less: Earned Revenue | 0 | (8) | (1) | 0 | 0 | (313) | 0 |
| Net Costs with the public | $ 0 | $ 213 | $ 828 | $ 0 | $ 1,153 | $ 8,412 | $ 0 |
| Net Cost: Financial Program | $ 0 | $ 302 | $ 320 | $ 0 | $ 1,170 | $ 12,502 | $ 0 |
| **Economic Program:** | | | | | | | |
| Intra-governmental Gross Costs | $ 83 | $ 0 | $ 12,151 | $ 0 | $ 0 | $ 0 | $ 73 |
| Less: Earned Revenue | (3) | 0 | (6,146) | 0 | 0 | 0 | (10) |
| Intra-governmental Net Costs | $ 80 | $ 0 | $ 6,005 | $ 0 | $ 0 | $ 0 | $ 63 |
| | | | | | | | |
| Gross Costs with the public | $ 392 | $ 0 | $ 206,456 | $ 0 | $ 0 | $ 0 | $ 2,380 |
| Less: Earned Revenue | (481) | 0 | (10,824) | 0 | 0 | 0 | (2,456) |
| Net Costs with the public | $ (89) | $ 0 | $ 195,632 | $ 0 | $ 0 | $ 0 | $ (76) |
| Net Cost: Economic Program | $ (9) | $ 0 | $ 201,637 | $ 0 | $ 0 | $ 0 | $ (13) |
| **Security Program:** | | | | | | | |
| Intra-governmental Gross Costs | $ 0 | $ 0 | $ 121 | $ 68 | $ 0 | $ 0 | $ 0 |
| Less: Earned Revenue | 0 | 0 | (16) | (1) | 0 | 0 | 0 |
| Intra-governmental Net Costs | $ 0 | $ 0 | $ 105 | $ 67 | $ 0 | $ 0 | $ 0 |
| | | | | | | | |
| Gross Costs with the public | $ 0 | $ 0 | $ 147 | $ 55 | $ 0 | $ 0 | $ 0 |
| Less: Earned Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Costs with the public | $ 0 | $ 0 | $ 147 | $ 55 | $ 0 | $ 0 | $ 0 |
| Net Cost: Security Program | $ 0 | $ 0 | $ 252 | $ 122 | $ 0 | $ 0 | $ 0 |
| **Management Program:** | | | | | | | |
| Intra-governmental Gross Costs | $ 0 | $ 56 | $ 145 | $ 0 | $ 0 | $ 0 | $ 0 |
| Less: Earned Revenue | 0 | (159) | (222) | 0 | 0 | 0 | 0 |
| Intra-governmental Net Costs | $ 0 | $ (103) | $ (77) | $ 0 | $ 0 | $ 0 | $ 0 |
| | | | | | | | |
| Gross Costs with the public | $ 0 | $ 104 | $ 329 | $ 0 | $ 0 | $ 0 | $ 0 |
| Less: Earned Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Costs with the public | $ 0 | $ 104 | $ 329 | $ 0 | $ 0 | $ 0 | $ 0 |
| Net Cost: Management Program | $ 0 | $ 1 | $ 252 | $ 0 | $ 0 | $ 0 | $ 0 |
| **Net Cost of Operations** | $ (9) | $ 303 | $ 202,461 | $ 122 | $ 1,170 | $ 12,502 | $ (13) |

FHFA 1025

## 24. Consolidated Statement of Net Cost and Net Costs of Treasury Sub-organizations (in millions):

| For Year Ended September 30, 2009<br>Program Costs: | Office of the Comptroller of the Currency | Office of Thrift Supervision | Alcohol, Tobacco Tax and Trade Bureau | Combined Total | Eliminations and Adjustments | 9/30/2009 Consolidated |
|---|---|---|---|---|---|---|
| **Financial Program:** | | | | | | |
| Intra-governmental Gross Costs | $ 0 | $ 0 | $ 14 | $ 5,894 | $ (1,548) | $ 4,346 |
| Less: Earned Revenue | 0 | 0 | 0 | (2,192) | 258 | (1,934) |
| Intra-governmental Net Costs | $ 0 | $ 0 | $ 14 | $ 3,702 | $ (1,290) | $ 2,412 |
| | | | | | | |
| Gross Costs with the public | $ 0 | $ 0 | $ 39 | $ 10,967 | $ 0 | $ 10,967 |
| Less: Earned Revenue | 0 | 0 | (2) | (324) | 0 | (324) |
| Net Costs with the public | $ 0 | $ 0 | $ 37 | $ 10,643 | $ 0 | $ 10,643 |
| **Net Cost: Financial Program** | $ 0 | $ 0 | $ 51 | $ 14,345 | $ (1,290) | $ 13,055 |
| **Economic Program:** | | | | | | |
| Intra-governmental Gross Costs | $ 100 | $ 37 | $ 13 | $ 12,457 | $ (12,066) | $ 391 |
| Less: Earned Revenue | (22) | (11) | 0 | (6,192) | 6,166 | (26) |
| Intra-governmental Net Costs | $ 78 | $ 26 | $ 13 | $ 6,265 | $ (5,900) | $ 365 |
| | | | | | | |
| Gross Costs with the public | $ 632 | $ 202 | $ 37 | $ 210,099 | $ 0 | $ 210,099 |
| Less: Earned Revenue | (752) | (245) | (0) | (14,758) | (1) | (14,759) |
| Net Costs with the public | $ (120) | $ (43) | $ 37 | $ 195,341 | $ (1) | $ 195,340 |
| **Net Cost: Economic Program** | $ (42) | $ (17) | $ 50 | $ 201,606 | $ (5,901) | $ 195,705 |
| **Security Program:** | | | | | | |
| Intra-governmental Gross Costs | $ 0 | $ 0 | $ 0 | $ 189 | $ (66) | $ 123 |
| Less: Earned Revenue | 0 | 0 | 0 | (17) | 14 | (3) |
| Intra-governmental Net Costs | $ 0 | $ 0 | $ 0 | $ 172 | $ (52) | $ 120 |
| | | | | | | |
| Gross Costs with the public | $ 0 | $ 0 | $ 0 | $ 202 | $ 0 | $ 202 |
| Less: Earned Revenue | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Costs with the public | $ 0 | $ 0 | $ 0 | $ 202 | $ 0 | $ 202 |
| **Net Cost: Security Program** | $ 0 | $ 0 | $ 0 | $ 374 | $ (52) | $ 322 |
| **Management Program:** | | | | | | |
| Intra-governmental Gross Costs | $ 0 | $ 0 | $ 0 | $ 201 | $ (65) | $ 136 |
| Less: Earned Revenue | 0 | 0 | 0 | (381) | 321 | (60) |
| Intra-governmental Net Costs | $ 0 | $ 0 | $ 0 | $ (180) | $ 256 | $ 76 |
| | | | | | | |
| Gross Costs with the public | $ 0 | $ 0 | $ 0 | $ 433 | $ 0 | $ 433 |
| Less: Earned Revenue | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Costs with the public | $ 0 | $ 0 | $ 0 | $ 433 | $ 0 | $ 433 |
| **Net Cost: Management Program** | $ 0 | $ 0 | $ 0 | $ 253 | $ 256 | $ 509 |
| **Net Cost of Operations** | $ (42) | $ (17) | $ 101 | $ 216,578 | $ (6,987) | $ 209,591 |

## 24. Consolidated Statement of Net Cost and Net Costs of Treasury Sub-organizations (in millions):

| Fiscal Year Ended September 30, 2008<br>Program Costs: | Bureau of Engraving and Printing | Bureau of the Public Debt | Departmental Offices | Financial Crimes Enforcement Network | Financial Management Service | Internal Revenue Service | U.S. Mint |
|---|---|---|---|---|---|---|---|
| **Financial Program:** | | | | | | | |
| Intra-governmental Gross Costs | $ 0 | $ 71 | $ 1,392 | $ 0 | $ 202 | $ 4,107 | $ 0 |
| Less: Earned Revenue | 0 | (15) | (2,009) | 0 | (159) | (72) | 0 |
| Intra-governmental Net Costs | $ 0 | $ 56 | $ (617) | $ 0 | $ 43 | $ 4,035 | $ 0 |
| | | | | | | | |
| Gross Costs with the public | $ 0 | $ 256 | $ 373 | $ 0 | $ 1,120 | $ 8,441 | $ 0 |
| Less: Earned Revenue | 0 | (10) | (1) | 0 | 0 | (287) | 0 |
| Net Costs with the public | $ 0 | $ 246 | $ 372 | $ 0 | $ 1,120 | $ 8,154 | $ 0 |
| **Net Cost: Financial Program** | $ 0 | $ 302 | $ (245) | $ 0 | $ 1,163 | $ 12,189 | $ 0 |
| **Economic Program:** | | | | | | | |
| Intra-governmental Gross Costs | $ 81 | $ 0 | $ 14,262 | $ 0 | $ 0 | $ 0 | $ 78 |
| Less: Earned Revenue | (8) | 0 | (811) | 0 | 0 | 0 | (10) |
| Intra-governmental Net Costs | $ 73 | $ 0 | $ 13,451 | $ 0 | $ 0 | $ 0 | $ 68 |
| | | | | | | | |
| Gross Costs with the public | $ 449 | $ 0 | $ 1,740 | $ 0 | $ 0 | $ 0 | $ 1,958 |
| Less: Earned Revenue | (509) | 0 | (1,529) | 0 | 0 | 0 | (2,063) |
| Net Costs with the public | $ (60) | $ 0 | $ 211 | $ 0 | $ 0 | $ 0 | $ (105) |
| **Net Cost: Economic Program** | $ 13 | $ 0 | $ 13,662 | $ 0 | $ 0 | $ 0 | $ (37) |
| **Security Program:** | | | | | | | |
| Intra-governmental Gross Costs | $ 0 | $ 0 | $ 139 | $ 58 | $ 0 | $ 0 | $ 0 |
| Less: Earned Revenue | 0 | 0 | (18) | (2) | 0 | 0 | 0 |
| Intra-governmental Net Costs | $ 0 | $ 0 | $ 121 | $ 56 | $ 0 | $ 0 | $ 0 |
| | | | | | | | |
| Gross Costs with the public | $ 0 | $ 0 | $ 171 | $ 52 | $ 0 | $ 0 | $ 0 |
| Less: Earned Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Costs with the public | $ 0 | $ 0 | $ 171 | $ 52 | $ 0 | $ 0 | $ 0 |
| **Net Cost: Security Program** | $ 0 | $ 0 | $ 292 | $ 108 | $ 0 | $ 0 | $ 0 |
| **Management Program:** | | | | | | | |
| Intra-governmental Gross Costs | $ 0 | $ 51 | $ 143 | $ 0 | $ 0 | $ 0 | $ 0 |
| Less: Earned Revenue | 0 | (237) | (224) | 0 | 0 | 0 | 0 |
| Intra-governmental Net Costs | $ 0 | $ (186) | $ (81) | $ 0 | $ 0 | $ 0 | $ 0 |
| | | | | | | | |
| Gross Costs with the public | $ 0 | $ 207 | $ 300 | $ 0 | $ 0 | $ 0 | $ 0 |
| Less: Earned Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Costs with the public | $ 0 | $ 207 | $ 300 | $ 0 | $ 0 | $ 0 | $ 0 |
| **Net Cost: Management Program** | $ 0 | $ 21 | $ 219 | $ 0 | $ 0 | $ 0 | $ 0 |
| **Net Cost of Treasury Operations** | $ 13 | $ 323 | $ 13,928 | $ 108 | $ 1,163 | $ 12,189 | $ (37) |

NOTE 24. CONSOLIDATED STATEMENT OF NET COST AND NET COSTS OF TREASURY SUB-ORGANIZATIONS

## 24. Consolidated Statement of Net Cost and Net Costs of Treasury Sub-organizations (in millions):

| Fiscal Year Ended September 30, 2008<br><br>Program Costs: | Office of the Comptroller of the Currency | Office of Thrift Supervision | Alcohol, Tobacco Tax and Trade Bureau | Combined Total | Eliminations and Adjustments | 9/30/2008 Consolidated |
|---|---|---|---|---|---|---|
| **Financial Program:** | | | | | | |
| Intra-governmental Gross Costs | $ 0 | $ 0 | $ 13 | $ 5,785 | $ (1,442) | $ 4,343 |
| Less: Earned Revenue | 0 | 0 | 0 | (2,255) | 272 | (1,983) |
| Intra-governmental Net Costs | $ 0 | $ 0 | $ 13 | $ 3,530 | $ (1,170) | $ 2,360 |
| | | | | | | |
| Gross Costs with the public | $ 0 | $ 0 | $ 36 | $ 10,226 | $ 0 | $ 10,226 |
| Less: Earned Revenue | 0 | 0 | (1) | (299) | 0 | (299) |
| Net Costs with the public | $ 0 | $ 0 | $ 35 | $ 9,927 | $ 0 | $ 9,927 |
| **Net Cost: Financial Program** | $ 0 | $ 0 | $ 48 | $ 13,457 | $ (1,170) | $ 12,287 |
| **Economic Program:** | | | | | | |
| Intra-governmental Gross Costs | $ 96 | $ 34 | $ 13 | $ 14,564 | $ (409) | $ 14,155 |
| Less: Earned Revenue | (27) | (14) | 0 | (870) | 845 | (25) |
| Intra-governmental Net Costs | $ 69 | $ 20 | $ 13 | $ 13,694 | $ 436 | $ 14,130 |
| | | | | | | |
| Gross Costs with the public | $ 584 | $ 217 | $ 36 | $ 4,984 | $ 0 | $ 4,984 |
| Less: Earned Revenue | (710) | (254) | (1) | (5,066) | 0 | (5,066) |
| Net Costs with the public | $ (126) | $ (37) | $ 35 | $ (82) | $ 0 | $ (82) |
| **Net Cost: Economic Program** | $ (57) | $ (17) | $ 48 | $ 13,612 | $ 436 | $ 14,048 |
| **Security Program:** | | | | | | |
| Intra-governmental Gross Costs | $ 0 | $ 0 | $ 0 | $ 197 | $ (74) | $ 123 |
| Less: Earned Revenue | 0 | 0 | 0 | (20) | 16 | (4) |
| Intra-governmental Net Costs | $ 0 | $ 0 | $ 0 | $ 177 | $ (58) | $ 119 |
| | | | | | | |
| Gross Costs with the public | $ 0 | $ 0 | $ 0 | $ 223 | $ 0 | $ 223 |
| Less: Earned Revenue | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Costs with the public | $ 0 | $ 0 | $ 0 | $ 223 | $ 0 | $ 223 |
| **Net Cost: Security Program** | $ 0 | $ 0 | $ 0 | $ 400 | $ (58) | $ 342 |
| **Management Program:** | | | | | | |
| Intra-governmental Gross Costs | $ 0 | $ 0 | $ 0 | $ 194 | $ (70) | $ 124 |
| Less: Earned Revenue | 0 | 0 | 0 | (461) | 296 | (165) |
| Intra-governmental Net Costs | $ 0 | $ 0 | $ 0 | $ (267) | $ 226 | $ (41) |
| | | | | | | |
| Gross Costs with the public | $ 0 | $ 0 | $ 0 | $ 507 | $ 0 | $ 507 |
| Less: Earned Revenue | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Costs with the public | $ 0 | $ 0 | $ 0 | $ 507 | $ 0 | $ 507 |
| **Net Cost: Management Program** | $ 0 | $ 0 | $ 0 | $ 240 | $ 226 | $ 466 |
| **Net Cost of Treasury Operations** | $ (57) | $ (17) | $ 96 | $ 27,709 | $ (566) | $ 27,143 |

## 25. ADDITIONAL INFORMATION RELATED TO THE COMBINED STATEMENTS OF BUDGETARY RESOURCES

Federal agencies are required to disclose additional information related to the Combined Statements of Budgetary Resources (per OMB Circular No. A-136).  In accordance with SFFAS No. 7, the Department must report the value of goods and services ordered and obligated which have not been received. This amount includes any orders for which advance payment has been made but for which delivery or performance has not yet occurred. The information for the fiscal years ended September 30, 2009 and September 30, 2008 was as follows (in millions):

|  | 2009 | 2008 |
|---|---|---|
| Undelivered orders: |  |  |
| Paid | $      171 | $      1,888 |
| Unpaid | 185,641 | 55,625 |
| Undelivered orders at the end of the year | $      185,812 | $      57,513 |
|  |  |  |
| Contributed Capital | $      40 | $      24 |

Apportionment Categories of Obligations Incurred:
Direct vs. Reimbursable Obligations

|  | 2009 | 2008 |
|---|---|---|
| Obligations Incurred |  |  |
| Direct - Category A | $      14,715 | $      7,050 |
| Direct - Category B | 977,506 | 20,623 |
| Direct - Exempt from Apportionment | 390,305 | 455,126 |
| Total Direct | 1,382,526 | 482,799 |
|  |  |  |
| Reimbursable - Category A | 1 | 2 |
| Reimbursable - Category B | 3,386 | 3,287 |
| Reimbursable - Exempt from Apportionment | 1,282 | 1,446 |
| Total Reimbursable | 4,669 | 4,735 |
| Total Direct and Reimbursable | $      1,387,195 | $      487,534 |

FHFA 1029

## TERMS OF BORROWING AUTHORITY USED

The GSE MBS Purchase and TARP equity investment programs (excluding HAMP) have authority to borrow under the *Federal Credit Reform Act of 1990* (FCRA), as amended. The FFB and IAP also have borrowing authority. The FCRA provides indefinite borrowing authority to financing accounts to fund the unsubsidized portion of direct loans and to satisfy obligations in the event the financing account's resources are insufficient. Repayment requirements are defined by OMB Circular A-11. Interest expense due is calculated based on the beginning balance of borrowings outstanding and the borrowings/repayments activity that occurred during the fiscal year. Undisbursed Treasury Department borrowings earn interest at the same rate as the financing account pays on its debt owed to BPD. In the event that principal and interest collections exceed the interest expense due, the excess will be repaid to the Treasury Department. If principal and interest do not exceed interest expense due, the Treasury Department will borrow the difference. The Treasury Department makes periodic principal repayments based on the analysis of cash balances and future disbursement needs. All interest on borrowing were due the last day of the fiscal year, on September 30, 2009.  Interest rates on FCRA borrowings range from 1.00% to 6.48%.

**Available Borrowing, End of Year:**

|  | 2009 | 2008 |
|---|---|---|
| Beginning Balance | $  29,810 | $  5,716 |
| Current Authority | 548,734 | 34,308 |
| Decreases | (107,475) | (4,767) |
| Borrowing Authority Converted to Cash | (419,559) | (5,447) |
| **Ending Balance** | **$  51,510** | **$  29,810** |

### Reconciliation of the President's Budget

The *Budget of the United States* (also known as the President's Budget), with actual numbers for fiscal year 2009, was not published at the time that these financial statements were issued. The President's Budget is expected to be published in 2010. It will be available from the United States Government Printing Office. The following chart displays the differences between the Combined Statement of Budgetary Resources (SBR) in the fiscal year 2008 *Performance and Accountability Report* and the actual fiscal year 2008 balances included in the fiscal year 2010 President's Budget (PB).

**RECONCILIATION OF FISCAL YEAR 2008 COMBINED STATEMENT OF BUDGETARY RESOURCES TO THE FISCAL YEAR 2010 PRESIDENT'S BUDGET (IN MILLIONS)**

| | Budgetary Resources | Outlays (net of offsetting collections) | Offsetting Receipts | Net Outlays | Obligations Incurred |
|---|---|---|---|---|---|
| Statement of Budgetary Resources Amounts | $ 772,164 | $ 479,079 | $ (16,211) | $ 462,868 | $ 487,534 |
| **Included in the Treasury Department Chapter of the President's Budget (PB) but not in the Statement of Budgetary Resources (SBR):** | | | | | |
| IRS non-entity tax credit payments (1) | 94,505 | 94,506 | (21) | 94,485 | 94,506 |
| Tax and Trade Bureau (TTB) non-entity collections for Puerto Rico | 373 | 373 | 0 | 373 | 373 |
| Non-Treasury offsetting receipts included in Treasury chapter of PB | 0 | 0 | (35) | (35) | 0 |
| Treasury offsetting receipts considered to be "General Fund" transactions for reporting purposes (2) | 0 | 0 | (214) | (214) | 0 |
| Continued dumping subsidy – CBP | 396 | 265 | 0 | 265 | 265 |
| Other | 2 | (2) | 0 | (2) | 0 |
| Subtotal | 95,276 | 95,142 | (270) | 94,872 | 95,144 |
| **Included in the SBR but not in the Treasury Department chapter of the PB:** | | | | | |
| Treasury resources shown in non-Treasury chapters of the PB, included in SBR (3) | (29,532) | (3,359) | 0 | (3,359) | (3,018) |
| Offsetting collections net of collections shown in PB | (8,246) | 0 | (640) | (640) | 0 |
| Treasury offsetting receipts shown in other chapters of PB, part of which is in SBR | 0 | 0 | 147 | 147 | 0 |
| Unobligated balance carried forward, recoveries of prior year funds and expired accounts | (1,332) | 0 | 0 | 0 | (19) |
| Exchange Stabilization Fund resources not shown in PB (4) | (30,576) | 0 | 0 | 0 | (247) |
| Treasury Financing Accounts (CDFI and ATSB) | (34,312) | (5,074) | 0 | (5,074) | (5,415) |
| IRS user fees and 50% Transfer Accounts and Capital Transfers to General Fund not included in PB | 4,798 | 0 | 0 | 0 | 0 |
| Other | 5 | (1) | 0 | (1) | (3) |
| Subtotal | (99,195) | (8,434) | (493) | (8,927) | (8,702) |
| Trust Fund – Comptroller of the Currency (OCC) | (81) | 81 | 0 | 81 | 0 |
| President's Budget Amounts* | $ 768,164 | $ 565,868 | $ (16,974) | $ 548,894 | $ 573,976 |

1. These are primarily Earned Income Tax Credit and Child Tax Credit payments that are reported with refunds as custodial activities in Treasury's financial statements and thus are not reported as budgetary resources.

2. These are receipt accounts that Treasury manages on behalf of other agencies and considered to be "General Fund" receipts rather than receipts of the Treasury Department reporting entity.

3. The largest of these resources relate to Treasury's International Assistance Programs.

4. Exchange Stabilization Fund (ESF) is a self-sustaining component that finances its operations with the buying and selling of foreign currencies to regulate the fluctuations of the dollar. Because of the nature of the activities of the component, it does not receive appropriations, and therefore is excluded from the PB.

* Per President's Budget for fiscal year 2010 – Budgetary Resources and Outlays are from the Analytical Perspective. Offsetting Receipts and Obligations Incurred are from the Appendix.

NOTE 25. ADDITIONAL INFORMATION RELATED TO THE COMBINED STATEMENTS OF BUDGETARY RESOURCES

## LEGAL ARRANGEMENTS AFFECTING USE OF UNOBLIGATED BALANCES

The use of unobligated balances is restricted based on annual legislation requirements or enabling authorities. Funds are presumed to be available for only one fiscal year unless otherwise noted in the annual appropriation language. Unobligated balances in unexpired fund symbols are available in the next fiscal year for new obligations unless some restrictions had been placed on those funds by law. In those situations, the restricted funding will be temporarily unavailable until such time as the reasons for the restriction have been satisfied or legislation has been enacted to remove the restriction.

Amounts in expired fund symbols are not available for new obligations, but may be used to adjust obligations and make disbursements that were recorded before the budgetary authority expired or to meet a bona fide need that arose in the fiscal year for which the appropriation was made.

## 26. COLLECTION AND DISPOSITION OF CUSTODIAL REVENUE

The Treasury Department collects the majority of federal revenue from income and excise taxes. Collection activity, by revenue type and tax year, was as follows for the years ended September 30, 2009 and September 30, 2008 (in millions):

| | Tax Year | | | | 2009 Collections |
|---|---|---|---|---|---|
| | **2009** | **2008** | **2007** | **Pre-2007** | |
| Individual Income and FICA Taxes | $ 1,296,427 | $ 702,557 | $ 22,250 | $ 15,323 | $ 2,036,557 |
| Corporate Income Taxes | 138,144 | 69,016 | 1,692 | 16,630 | 225,482 |
| Estate and Gift Taxes | 92 | 3,979 | 796 | 19,810 | 24,677 |
| Excise Taxes | 54,502 | 12,512 | 102 | 132 | 67,248 |
| Railroad Retirement Taxes | 3,559 | 1,148 | 3 | 1 | 4,711 |
| Unemployment Taxes | 4,772 | 1,859 | 36 | 98 | 6,765 |
| Federal Reserve Banks Earnings | 24,552 | 9,766 | 0 | 0 | 34,318 |
| Beneficial Interest in AIG Trust | 23,472 | 0 | 0 | 0 | 23,472 |
| Fines, Penalties, Interest, and Other Revenue | 1,892 | 37 | 0 | 0 | 1,929 |
| Subtotal | $ 1,547,412 | $ 800,874 | $ 24,879 | $ 51,994 | $ 2,425,159 |
| Less Amounts Collected for Non-federal Entities | | | | | (487) |
| Total | | | | | $ 2,424,672 |

| | Tax Year | | | | 2008 Collections |
|---|---|---|---|---|---|
| | **2008** | **2007** | **2006** | **Pre-2006** | |
| Individual Income and FICA Taxes | $ 1,455,017 | $ 799,244 | $ 23,498 | $ 16,567 | $ 2,294,326 |
| Corporate Income Taxes | 222,000 | 113,949 | 2,010 | 16,104 | 354,063 |
| Estate and Gift Taxes | 23 | 19,248 | 1,266 | 9,287 | 29,824 |
| Excise Taxes | 48,106 | 17,909 | 119 | 159 | 66,293 |
| Railroad Retirement Taxes | 3,769 | 1,164 | 1 | 5 | 4,939 |
| Unemployment Taxes | 5,146 | 2,026 | 42 | 117 | 7,331 |
| Federal Reserve Banks Earnings | 25,879 | 7,719 | 0 | 0 | 33,598 |
| Fines, Penalties, Interest, and Other Revenue | 1,936 | 297 | 0 | 0 | 2,233 |
| Subtotal | $ 1,761,876 | $ 961,556 | $ 26,936 | $ 42,239 | $ 2,792,607 |
| Less Amounts Collected for Non-federal Entities | | | | | (407) |
| Total | | | | | $ 2,792,200 |

Amounts reported for Corporate Income Taxes collected in fiscal year 2009 include corporate taxes of $9 billion for tax year 2010 (similarly, amounts reported for Corporate Income Taxes collected in fiscal year 2008 include corporate taxes of $10 billion for tax year 2009). Individual Income and FICA Taxes includes $83 billion in payroll taxes collected from other federal agencies ($79 billion in fiscal year 2008).

## Amounts Provided to Fund the Federal Government

For the years ended September 30, 2009 and September 30, 2008, collections of custodial revenue transferred to other entities were as follows (in millions):

|  | 2009 | 2008 |
|---|---|---|
| Department of the Interior | $ 487 | $ 407 |
| General Fund | 1,963,228 | 2,366,126 |
| Total | $ 1,963,715 | $ 2,366,533 |

## Federal Tax Refunds Paid

Refund activity, broken out by revenue type and by tax year, was as follows for the years ended September 30, 2009 and September 30, 2008 (in millions):

|  | Tax Year | | | | |
|---|---|---|---|---|---|
|  | 2009 | 2008 | 2007 | Pre-2007 | 2009 Refunds |
| Individual Income and FICA Taxes | $ 1,075 | $ 293,971 | $ 30,361 | $ 14,222 | $ 339,629 |
| Corporate Income Taxes | 6,626 | 32,646 | 17,370 | 38,558 | 95,200 |
| Estate and Gift Taxes | 0 | 324 | 566 | 358 | 1,248 |
| Excise Taxes | 535 | 541 | 81 | 626 | 1,783 |
| Railroad Retirement Taxes | 0 | 2 | 0 | 1 | 3 |
| Unemployment Taxes | 1 | 66 | 13 | 29 | 109 |
| Total | $ 8,237 | $ 327,550 | $ 48,391 | $ 53,794 | $ 437,972 |

|  | Tax Year | | | | |
|---|---|---|---|---|---|
|  | 2008 | 2007 | 2006 | Pre-2006 | 2008 Refunds |
| Individual Income and FICA Taxes | $ 935 | $ 342,216 | $ 19,217 | $ 6,980 | $ 369,348 |
| Corporate Income Taxes | 2,206 | 19,610 | 10,446 | 22,078 | 54,340 |
| Estate and Gift Taxes | 0 | 343 | 428 | 251 | 1,022 |
| Excise Taxes | 439 | 497 | 107 | 208 | 1,251 |
| Railroad Retirement Taxes | 0 | 1 | 1 | (9) | (7) |
| Unemployment Taxes | 1 | 65 | 14 | 39 | 119 |
| Fines, Penalties, Interest, and Other Revenue | 1 | 0 | 0 | 0 | 1 |
| Total | $ 3,582 | $ 362,732 | $ 30,213 | $ 29,547 | $ 426,074 |

## Federal Tax Refunds Payable

As of September 30, 2009 and September 30, 2008, refunds payable to taxpayers consisted of the following (in millions):

|  | 2009 | 2008 |
|---|---|---|
| Alcohol, Tobacco Tax and Trade Bureau | $ 9 | $ 12 |
| Internal Revenue Service | 4,031 | 3,064 |
| Total | $ 4,040 | $ 3,076 |

NOTE 26. COLLECTION AND DISPOSITION OF CUSTODIAL REVENUE
**FHFA 1034**

## 27. EARMARKED FUNDS

Earmarked funds are financed by specifically identified revenues, often supplemented by other financing sources, which remain available over time. These specifically identified revenues and other financing sources are required by statute to be used for designated activities or purposes. SFFAS No. 27, *Identifying and Reporting Earmarked Funds*, issued by the FASAB defines the following three criteria for determining an earmarked fund: 1) A statute committing the Federal Government to use specifically identified revenues and other financing sources only for designated activities, benefits or purposes; 2) Explicit authority for the earmarked fund to retain revenues and other financing sources not used in the current period for future use to finance the designated activities, benefits, or purposes; and 3) A requirement to account for and report on the receipt, use, and retention of the revenues and other financing sources that distinguishes the earmarked fund from the government's general revenues.

The majority of Treasury Department's earmarked fund activities are attributed to the ESF and the pension and retirement funds managed by the Office of DCP. In addition, several Treasury bureaus operate with "public enterprise revolving funds" and receive no appropriations from the Congress. These bureaus are BEP, U.S. Mint, OCC, and OTS. Other miscellaneous earmarked funds are managed by BPD, DO, FMS, IRS, and TFF.

The following is a list of earmarked funds and a brief description of the purpose, accounting, and uses of these funds.

| Exchange Stabilization Fund (ESF) | | |
|---|---|---|
| ESF | 20X4274 | ESF Money Market Guaranty Facility |
| ESF | 20X4444 | Exchange Stabilization Fund |

| D.C. Pensions | | |
|---|---|---|
| DCP | 20X1713 | Federal payment – D.C. Judicial Retirement |
| DCP | 20X1714 | Federal payment – D.C. Federal Pension Fund |
| DCP | 20X5511 | D.C. Federal Pension Fund |
| DCP | 20X8212 | D.C. Judicial Retirement and Survivor's Annuity Fund |

| Public Enterprise Revolving Funds | | |
|---|---|---|
| BEP | 20X4502 | Bureau of Engraving and Printing Fund |
| MNT | 20X4159 | Public Enterprise Revolving Fund |
| OCC | 20X8413 | Assessment Funds |
| OTS | 20X4108 | Public Enterprise Revolving Fund |
| IRS | 20X4413 | Federal Tax Lien Revolving Fund |

| Other Earmarked Funds | | |
|---|---|---|
| BPD | 20X5080 | Gifts to Reduce Public Debt |
| DO | 20X5407 | Sallie Mae Assessments |
| DO | 20X5816 | Confiscated and Vested Iraqi Property and Assets |
| DO | 20X8790 | Gifts and Bequests Trust Fund |
| FMD | 205445 | Debt Collection |
| FMD | 20X5081 | Presidential Election Campaign |
| FMD | 20X8902 | Esther Cattell Schmitt Gift Fund |

| | | |
|---|---|---|
| FMS | 203/45445 | Debt Collection Special Fund |
| FMS | 204/55445 | Debt Collection Special Fund |
| FMS | 205/65445 | Debt Collection Special Fund |
| FMS | 206/75445 | Debt Collection Special Fund |
| FMS | 207/85445 | Debt Collection Special Fund |
| FMS | 208/95445 | Debt Collection Special Fund |
| FMS | 209/05445 | Debt Collection Special Fund |
| IRS | 20X5510 | Private Collection Agent Program |
| IRR | 20x5433 | Informant Reimbursement |
| TFF | 20X5697 | Treasury Forfeiture Fund |

The ESF uses funds to purchase or sell foreign currencies, to hold U.S. foreign exchange and SDR assets, and to provide financing to foreign governments. ESF accounts and reports its holdings to FMS on the SF224, "Statement of Transactions," as well as to the Congress and Treasury Department's policy office. The *Gold Reserve Act of 1934*, *Bretton Woods Agreement Act of 1945*, P.L. 95-147 and P.L. 94-564 established and authorized the use of the Fund. SDR in the IMF, Investments in U.S. Securities (BPD), and Investments in Foreign Currency Denominated Assets are the sources of revenues or other financing sources. ESF's earnings and realized gains on foreign currency denominated assets represent inflows of resources to the government, and the revenues earned are the result of intra-governmental inflows.

D.C. Pension Funds provide annuity payments for retired D.C. teachers, police officers, judges, and firefighters. The sources of revenues are through annual appropriations, employees' contributions, and interest earnings from investments.  All proceeds are earmarked. Note 21 provides detailed information on various funds managed by the Office of DCP.

Treasury Department's four non-appropriated bureaus, BEP, Mint, OCC, and OTS, operate "public enterprise funds" that account for the revenue and expenses related to the production and sale of numismatic products and circulating bureaus coinage (Mint), the currency printing activities (BEP), and support of oversight functions of banking (OCC) and thrift operations (OTS). 31 USC § 5142 established the revolving fund for BEP to account for revenue and expenses related to the currency printing activities. Public Law 104-52 (31 USC § 5136) established the Public Enterprise Fund for the Mint to account for all revenue and expenses related to the production and sale of numismatic products and circulating coinage. Revenues and other financing sources at the Mint are mainly from the sale of numismatic and bullion coins, and the sale of circulating coins to the Federal Reserve Bank system. 12 USC § 481 established the Assessment Funds for OCC, and 103 Stat. 278 established the Public Enterprise Revolving Fund for OTS. Revenue and financing sources are from the bank examination and assessments for the oversight of the national banks, savings associations, and savings and loan holding companies. These earmarked funds do not directly contribute to the inflows of resources to the government; however, revenues in excess of costs are returned to the General Fund of the U.S. Government. There are minimal transactions with other government agencies.

There are other earmarked funds at several Treasury bureaus, such as donations to the Presidential Election Campaign Fund, funds related to the debt collection program, gifts to reduce the public debt, and other enforcement related activities. Public laws, statutory laws, U.S. Code, and the *Debt Collection Improvement Act* estab-

lished and authorized the use of these funds. Sources of revenues and other financing sources include contribu-tions, cash and property forfeited in enforcement activities, public donations, and debt collection.

## INTRA-GOVERNMENTAL INVESTMENTS IN TREASURY SECURITIES

The Federal Government does not set aside assets to pay future benefits or other expenditures associated with earmarked funds. Treasury Department bureaus and other federal agencies invest some of the earmarked funds that they collect from the public. The funds are invested in securities issued by Treasury Department's Bureau of the Public Debt (BPD). The cash collected by BPD is deposited in the General Fund of the U.S. Government, which uses the cash for general government purposes.

The investments provide Treasury Department bureaus and other federal agencies with authority to draw upon the General Fund of the U.S. Government to make future benefit payments or other expenditures. When the Treasury Department bureaus or other federal agencies require redemption of these securities to make expendi-tures, the government finances those expenditures out of accumulated cash balances, by raising taxes or other receipts, by borrowing from the public or repaying less debt, or by curtailing other expenditures. This is the same way that the government finances all other expenditures.

The securities are an asset to the Treasury Department bureaus and other federal agencies and a liability of the BPD. The General Fund of the U.S. Government is liable to BPD. Because the Treasury Department bureaus and other federal agencies are parts of the U.S. Government, these assets and liabilities offset each other from the standpoint of the government as a whole. For this reason, they do not represent an asset or a liability in the U.S. Government-wide financial statements.

The balances related to the investments made by the Treasury Department bureaus are not displayed on the Treasury Department's financial statements because the bureaus are subcomponents of the Treasury Department. However, the General Fund of the U.S. Government remains liable to BPD for the invested balances and BPD remains liable to the investing Treasury Department bureaus (see Note 4).

NOTE 27. EARMARKED FUNDS

## Summary Information for Earmarked Funds as of and for the Year ended September 30, 2009 (in millions):

| | Exchange Stabilization Fund | D.C. Pensions | Public Enterprise Revolving Funds | Other Earmarked Funds | Combined Earmarked Funds | Eliminations* | 9/30/2009 Totals |
|---|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | | |
| ASSETS: | | | | | | | |
| Fund Balance | $ 0 | $ 0 | $ 573 | $ 312 | $ 885 | $ 0 | $ 885 |
| Investments/Related Interest (Intra-governmental) | 19,816 | 3,866 | 1,346 | 707 | 25,735 | 25,735 | 0 |
| Cash, Foreign Currency/Other Monetary Assets | 71,662 | 0 | 0 | 18 | 71,680 | 0 | 71,680 |
| Investments and Related Interest | 13,537 | 0 | 0 | 0 | 13,537 | 0 | 13,537 |
| Other Assets | 0 | 13 | 1,207 | 104 | 1,324 | 10 | 1,314 |
| **Total Assets** | $ 105,015 | $ 3,879 | $ 3,126 | $ 1,141 | $ 113,161 | $ 25,745 | $ 87,416 |
| | | | | | | | |
| LIABILITIES: | | | | | | | |
| Intra-governmental Liabilities | 0 | 0 | 37 | 194 | 231 | 28 | 203 |
| Certificates Issued to Federal Reserve Banks | 5,200 | 0 | 0 | 0 | 5,200 | 0 | 5,200 |
| Allocation of Special Drawing Rights | 55,953 | 0 | 0 | 0 | 55,953 | 0 | 55,953 |
| Other Liabilities | 16 | 9,104 | 623 | 181 | 9,924 | 0 | 9,924 |
| Total Liabilities | 61,169 | 9,104 | 660 | 375 | 71,308 | 28 | 71,280 |
| | | | | | | | |
| NET POSITION: | | | | | | | |
| Unexpended Appropriations | 200 | 0 | 0 | 0 | 200 | 0 | 200 |
| Cumulative Results of Operations | 43,646 | (5,225) | 2,466 | 766 | 41,653 | 0 | 41,653 |
| **Total Liabilities and Net Position** | $ 105,015 | $ 3,879 | $ 3,126 | $ 1,141 | $ 113,161 | $ 28 | $ 113,133 |
| | | | | | | | |
| **Statement of Net Cost** | | | | | | | |
| Gross Cost | $ 1,117 | $ 785 | $ 3,899 | $ 214 | $ 6,015 | $ 60 | $5,955 |
| Less Earned Revenue | (4,951) | (134) | (3,981) | 0 | (9,066) | (187) | (8,879) |
| **Total Net Cost of Operations** | $ (3,834) | $ 651 | $ (82) | $ 214 | $ (3,051) | $ (127) | $ (2,924) |
| | | | | | | | |
| **Cumulative Results of Operations** | | | | | | | |
| Beginning Balance, as adjusted | $ 39,618 | $ (4,982) | $ 2,350 | $ 575 | $ 37,561 | $ 0 | $ 37,561 |
| | | | | | | | |
| Budgetary Financing Sources | 194 | 408 | 0 | 345 | 947 | 1 | 946 |
| Other Financing Sources | 0 | 0 | 34 | 60 | 94 | (27) | 121 |
| Total Financing Sources | 194 | 408 | 34 | 405 | 1,041 | (26) | 1,067 |
| Net Cost of Operations | 3,834 | (651) | 82 | (214) | 3,051 | 127 | 2,924 |
| Net Change | 4,028 | (243) | 116 | 191 | 4,092 | 101 | 3,991 |
| **Total Cumulative Results of Operations** | $ 43,646 | $ (5,225) | $ 2,466 | $ 766 | $ 41,653 | $ 101 | $ 41,552 |

\* The eliminations reported above include both inter and intra eliminations for the Earmarked Funds. The total eliminations amount will not agree with the eliminations reported in the Statement of Changes in Net Position, which include eliminations for Other Funds.

## Summary Information for Earmarked Funds as of and for the Year ended September 30, 2008 (in millions):

| | Exchange Stabilization Fund | D.C. Pensions | Public Enterprise Revolving Funds | Other Earmarked Funds | Combined Earmarked Funds | Eliminations* | 9/30/2008 Totals |
|---|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | | |
| ASSETS: | | | | | | | |
| Fund Balance | $   33 | $   0 | $   459 | $   228 | $   720 | $   0 | $   720 |
| Investments/Related Interest Intra-governmental | 16,847 | 3,859 | 1,251 | 592 | 22,549 | 22,549 | 0 |
| Cash, Foreign Currency/Other Monetary Assets | 22,221 | 0 | 0 | 16 | 22,237 | 0 | 22,237 |
| Investments and Related Interest | 10,543 | 0 | 0 | 0 | 10,543 | 0 | 10,543 |
| Other Assets | 298 | 16 | 1,292 | 133 | 1,739 | 9 | 1,730 |
| **Total Assets** | $ 49,942 | $ 3,875 | $ 3,002 | $ 69 | $ 57,788 | $ 22,558 | $ 35,230 |
| | | | | | | | |
| LIABILITIES: | | | | | | | |
| Intra-governmental Liabilities | $   0 | $   0 | $   37 | $ 150 | $   187 | $   29 | $   158 |
| Certificates Issued to Federal Reserve | 2,200 | 0 | 0 | 0 | 2,200 | 0 | 2,200 |
| Allocation of Special Drawing Rights | 7,630 | 0 | 0 | 0 | 7,630 | 0 | 7,630 |
| Other Liabilities | 330 | 8,856 | 617 | 182 | 9,985 | 0 | 9,985 |
| Total Liabilities | $ 10,160 | $ 8,856 | $ 654 | $ 332 | $ 20,002 | $ 29 | $ 19,973 |
| | | | | | | | |
| NET POSITION: | | | | | | | |
| Unexpended Appropriations | $   200 | $   0 | $   0 | $   0 | $   200 | $   0 | $   200 |
| Cumulative Results of Operations | 39,582 | (4,981) | 2,348 | 637 | 37,586 | 0 | 37,586 |
| **Total Liabilities and Net Position** | $ 49,942 | $ 3,875 | $ 3,002 | $ 969 | $ 57,788 | $ 29 | $ 57,759 |
| | | | | | | | |
| **Statement of Net Cost** | | | | | | | |
| Gross Cost | $   250 | $   339 | $ 3,496 | $ 337 | $ 4,422 | $   62 | $ 4,360 |
| Less Earned Revenue | (1,986) | (152) | (3,593) | (6) | (5,737) | (650) | (5,087) |
| **Total Net Cost of Operations** | $ (1,736) | $   187 | $   (97) | $ 331 | $ (1,315) | $ (588) | $ (727) |
| | | | | | | | |
| **Cumulative Results of Operations** | | | | | | | |
| Beginning Balance | $ 37,846 | $ (5,141) | $ 2,206 | $ 474 | $ 35,385 | $   0 | $ 35,385 |
| | | | | | | | |
| Budgetary Financing Sources | 0 | 347 | 0 | 442 | 789 | 23 | 766 |
| Other Financing Sources | 0 | 0 | 45 | 52 | 97 | (31) | 128 |
| Total Financing Sources | 0 | 347 | 45 | 494 | 886 | (8) | 894 |
| Net Cost of Operations | 1,736 | (187) | 97 | (331) | 1,315 | 588 | 727 |
| Net Change | 1,736 | 160 | 142 | 163 | 2,201 | 580 | 1,621 |
| **Total Cumulative Results of Operations** | $ 39,582 | $ (4,981) | $ 2,348 | $ 637 | $ 37,586 | $ 580 | $ 37,006 |

\* The eliminations reported above include both inter and intra eliminations for the Earmarked Funds. The total eliminations amount will not agree with the eliminations reported in the Statement of Changes in Net Position, which include eliminations for Other Funds.

NOTE 27. EARMARKED FUNDS

## 28. RECONCILIATION OF NET COST OF OPERATIONS TO BUDGET

The Reconciliation of Net Cost of Operations to Budget explains the difference between the budgetary net obligations and the proprietary net cost of operations. For fiscal years 2009 and 2008, OMB did not prescribe a format for this reconciliation in OMB Circular No. A-136, *Financial Reporting Requirements*, as amended, so that preparers might develop a more robust presentation tailored to their agency. As of September 30, 2009 and September 30, 2008, the Reconciliation of Net Cost of Operations to Budget consisted of the following (in millions):

| | 2009 | 2008 |
|---|---|---|
| **RESOURCES USED TO FINANCE ACTIVITIES:** | | |
| Budgetary Resources Obligated: | | |
| Obligations Incurred | $ 1,387,195 | $ 487,534 |
| Less: Spending Authority from Offsetting Collections and Recoveries | (321,262) | (9,401) |
| Obligations Net of Offsetting Collections and Recoveries | 1,065,933 | 478,133 |
| Less: Offsetting Receipts | (44,614) | (16,211) |
| **Net Obligations** | $ 1,021,319 | $ 461,922 |
| Other Resources: | | |
| Donations and Forfeiture of Property | 127 | 112 |
| Financing Sources for Accrued and Discount on the Debt | 6,027 | (3,870) |
| Transfers In/Out Without Reimbursement | (36) | (21) |
| Imputed Financing from Cost Absorbed by Others | 793 | 729 |
| Transfers to the General Fund and Other (Note 23) | (217,704) | (20,788) |
| Net Other Resources Used to Finance Activities | (210,793) | (23,838) |
| **Total Resources Used to Finance Activities (Note 1 AC)** | $ 810,526 | $ 438,084 |
| | | |
| **RESOURCES USED TO FINANCE ITEMS NOT PART OF THE NET COST OF OPERATIONS:** | | |
| Change in Budgetary Resources Obligated for Goods, Services, and Benefits Ordered but not yet Provided | $ 49,063 | $ 1,229 |
| Credit Program Collections that Increase Liabilities for Loans Guarantees or Allowances for Subsidy | (6) | (5) |
| Adjustment to Accrued Interest and Discount on the Debt | 8,687 | (6,731) |
| Other (primarily resources that finance the acquisition of assets or liquidation of liabilities) | 320,755 | (10,745) |
| Total Resources Used to Finance Items Not Part of the Net Cost of Operations | 378,499 | (16,252) |
| **Total Resources Used to Finance the Net Cost of Operations (Note 1 AC)** | $ 432,027 | $ 454,336 |
| | | |
| Total Components of Net Cost of Operations that will Require or Generate Resources in Future Periods (Note 1 AC) | 87,673 | 13,814 |
| | | |
| Total Components of Net Cost of Operations that will not Require or Generate Resources | 3,232 | 1,201 |
| **Total Components of Net Cost of Operations that will not Require or Generate Resources in the Current Period (Note 1 AC)** | 90,905 | 15,015 |
| **Net Cost of Operations** | $ 522,932 | $ 469,351 |

FHFA 1040

## 29. FINANCIAL STABILITY AND STIMULUS ACTIVITIES

### GOVERNMENT SPONSORED ENTERPRISES (GSEs)

The Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) are stockholder-owned GSEs. Congress established these GSEs to increase the supply of mortgage loans and to reduce the accompanying costs. A key responsibility is to package purchased mortgages into securities. These securities are subsequently sold to investors. Proceeds from sales are used to buy additional mortgages and keep money flowing through the mortgage markets.

Increasingly difficult conditions in the housing market challenged the soundness and profitability of GSEs, thereby undermining the entire housing market. This led Congress to pass the *Housing and Economic Recovery Act of 2008* in July 2008 (HERA). This Act created the new Federal Housing Finance Agency (FHFA), with enhanced regulatory authority over the GSEs, and provided the Secretary of the Treasury with certain authorities intended to ensure the financial stability of the GSE, if necessary.

Due to deteriorating conditions in the housing mortgage markets and the resulting negative financial impact on the GSEs, they were placed under FHFA conservatorship on September 7, 2008. This action was taken to preserve GSE assets, ensure a sound and solvent financial condition, and mitigate systemic risks that contributed to current market instability. The FHFA director will terminate the conservatorship once safe and solvent conditions are established.

Pursuant to the authorities provided to the Secretary under the HERA, the Treasury Department, also on September 7, 2008, took three additional steps to help ensure the liquidity of the GSEs. This included:

Senior Preferred Stock Purchase Agreements (Note 9)

The Secretary of the Treasury entered into a Senior Preferred Stock Purchase Agreements (SPSPA) with Fannie Mae and Freddie Mac to provide substantial financial support to the enterprises; thereby minimizing potential systemic financial risks associated with the deteriorating financial condition of Fannie Mae and Freddie Mac. The agreement provides for the Treasury Department to increase its investment in the senior preferred stock of the GSEs if at the end of any quarter the FHFA, acting as the conservator, determines that the liabilities of either GSE, individually, exceed its respective assets. The gross amount available for this purpose is $200 billion per GSE and these preferred stock agreements have no expiration date.

GSE Credit Facility (Note 12)

The Government Sponsored Enterprise Credit Facility (GSECF) was established to ensure credit availability to the GSEs and the Federal Home Loan Banks. This lending facility will provide secured funding on an as needed basis under terms and conditions established by the Secretary to protect taxpayers. The GSEs and the Federal Home Loan Banks are eligible to borrow under this program. The GSECF provides liquidity, if needed, until December 31, 2009.

Funding will be provided directly by the Treasury Department from its account held at the Federal Reserve Bank of New York (FRBNY) in exchange for eligible collateral from the GSE which will be limited to guaranteed MBS issued by the GSE as well as advances made by the Federal Home Loan Banks. Loan requests will require approval from the Treasury Department and verification by the FRBNY that adequate collateral

FHFA 1041

has been pledged. Loans made through the GSECF are subject to the federal debt limit. Loans will be for short-term durations and are in general expected to be for less than one month but no shorter than one week. Loans will not be made with a maturity date beyond December 31, 2009. The rate on a loan request ordinarily will be based on the daily London Interbank Borrowing Rate (LIBOR) for a similar term loan plus 50 basis points. The rate is set at the discretion of the Secretary with the objective of protecting the taxpayer, and is subject to change. There is no stated limitation on loans provided through the GSECF. However, loans are limited to the amounts of available collateral. There were no loans made through the GSECF in fiscal year 2008 or 2009.

GSE Mortgage-Backed Securities (MBS) Purchase Program (Note 12)

Under this program, the Treasury Department, via Asset Managers, purchases GSE MBS in the open market. The Asset Managers are also authorized to enter into other trade/sell transactions such as Pair Offs, Turns, Assignments, and Dollar Rolls. By purchasing these credit-guaranteed securities, the Treasury Department seeks to broaden access to mortgage funding for current and prospective homeowners and to promote stability in the mortgage market. The size and timing of the MBS purchases is subject to the discretion of the Secretary. The scale of the program will be based on developments in the capital and housing markets. As these securities are backed by individual mortgages, they are accounted for under the *Federal Credit Reform Act of 1990*.

The actions taken by the Department thus far are temporary, as defined by section 1117 of HERA, and are intended to provide financial stability until Fannie Mae and Freddie Mac can return to normal operations or until the Administration and Congress address how they should be structured going forward. As of September 30, 2009, there are no plans to bring these organizations into the government; rather, the purpose of these financial arrangements is to maintain the solvency of the GSEs so they can continue to fulfill their vital roles in the home mortgage market while the Administration and Congress deliberate what, if any, structural changes should be made.

## TEMPORARY GUARANTEE PROGRAM MONEY MARKET FUNDS

In September 2008, the Treasury Department established a Temporary Guarantee Program (Program) for Money Market Funds. Under this Program the Treasury Department guaranteed to investors that they would receive the stable share price (SSP) for shares held in participating money market funds up to the number of shares held as of the close of business on September 19, 2008. To participate in the Program, eligible money market funds had to submit an application and pay a premium of 1 basis point if the fund's net asset value (NAV) is greater than or equal to 99.75 percent of the SSP, or 1.5 basis points of the SSP if the fund's NAV is less than 99.75 percent of the SSP but greater than or equal to 99.50 percent of the SSP.

Under this program, any outlays would have been paid out initially from the ESF, and then under the provisions of Section 131 of the *Emergency Economic Stabilization Act of 2008*. Such outlays would then be reimbursed from funds available under the Troubled Asset Relief Program. The temporary guarantee program was extended and continued to provide coverage through September 19, 2009 to shareholders up to amounts that they held in participating money market funds as of the close of business on September 19, 2008. As of September 30, 2009, the program had expired. Treasury did not receive any claims for payment. As of September 30, 2009, the Treasury Department had collected a total of approximately $1.2 billion in program participation payments. All participant payments are invested into U.S. Government securities.

FHFA 1042

## HOME OWNERSHIP PRESERVATION ENTITY (HOPE BOND)

The *Home Ownership Preservation Entity (HOPE) Fund for Homeowners Act of 2008*, of the *Housing and Recovery Act of 2008*, authorizes the Secretary of the Treasury to issue HOPE bonds without any limitations as to the purchaser of the issuance. Due to the cost of issuing special purpose bonds to the public, the Secretary of the Treasury has decided to issue the HOPE bonds to the Federal Financing Bank (FFB). The total outstanding HOPE bonds may not exceed $300,000 million. The FFB's purchase of HOPE bonds issued by the Secretary is consistent with the core mission of the FFB. FFB purchased $462.5 million in bonds at par value in fiscal year 2009 and one bond at par value of $29.5 million in fiscal year 2008, with floating interest rate to be reset quarterly. The interest rate is 0.183 percent and 1.6 percent as of September 30, 2009 and September 30, 2008, respectively. The bonds have 30 year maturity dates starting on August 27, 2038 and ending on July 15, 2039. The HOPE bonds are reported as investments held-to-maturity and the related interest receivable is reported as accrued interest receivable in FFB's stand-alone financial statements. The HOPE bond transactions are subsequently eliminated at the Departmental level.

## TROUBLED ASSET RELIEF PROGRAM (TARP)

The *Emergency Economic Stabilization Act of 2008* (EESA) established the Troubled Asset Relief Program (TARP) on October 3, 2008 to be administered by the Treasury Department and established the Office of Financial Stability within the Department's Office of Domestic Finance. The Act gave the Treasury Secretary broad and flexible authority to purchase and insure mortgages and other troubled assets, as well as to inject capital into banks and other commercial companies by taking equity positions in those entities, if needed, to stabilize the financial markets or an industry. The TARP is intended to promote market stability and protect the U.S. economy by authorizing Treasury Department to purchase and guarantee troubled mortgage-related assets and other financial assets. EESA also provides for the purchase of any other financial instruments that the Secretary determines, after consultation with the Federal Reserve Banks' Board Chairman, is necessary in order to promote financial market stability.

The EESA established certain criteria under which the TARP would operate, including provisions that impact the budgeting, accounting, and reporting of troubled assets acquired under the Act. Section 101(a) of the EESA provided the authority for the Secretary to purchase troubled assets, and Section 101(a)(3) of the EESA established the Office of Financial Stability (OFS) to implement the TARP. Section 102 of the EESA required the Secretary to establish a program to guarantee troubled assets originated or issued prior to March 14, 2008, including mortgage-backed securities. Section 115 of the EESA limits the authority of the Secretary to purchase troubled assets to $700 billion[10] outstanding at any one time, calculated at the aggregate purchase prices of all troubled assets held. There was approximately $291 billion outstanding (the amount on the original investment that is due to be repaid to Treasury) against the Section 115 authority as of September 30, 2009. Section 120 of the EESA established that the authorities under Sections 101(a), excluding Section 101(a)(3) and Section 102 of the EESA shall terminate on December 31, 2009. Section 120 of the EESA further establishes that the Secretary, upon submission of a written certification to Congress, may extend the authority provided under the Act to expire no later than 2 years from the date of the enactment of the Act (October 3, 2008).

---

10   *The Helping Families Save Their Homes Act of 2009* (Publ.No. 111-22, Div. A, 123 Stat., 1632 (2009), amended the act to reduce the maximum allowable amount of outstanding troubled assets under the act by approximately $1.3 billion, from $700.0 billion to $698.7 billion.

NOTE 29. FINANCIAL STABILITY AND STIMULUS ACTIVITIES

TARP has engaged in purchases of equity including preferred stock and common stock Warrants from financial institutions and insurance companies. In addition, the TARP has established a guarantee program for financial institutions. TARP has made direct loans as well as equity investments in preferred stock to support the automotive industry and to unfreeze secondary credit markets. TARP funds are being used to help families stay in their homes. TARP also has funded an initiative to address the challenge of legacy assets in the financial marketplace. Details concerning the specific TARP programs is provided in Notes 8 and 12.

## Subsidy Reestimates

The purpose of reestimates is to update original program subsidy estimates to reflect actual cash flow experience as well as changes in forecasts of future cash flows. Forecasts of future cash flows are updated based on actual program performance to date, additional publicly available relevant historical market data on securities performance, revised expectations for future economic conditions, and enhancements to cash flow projection methods. Financial statement reestimates for all programs were performed using actual financial transaction data through September 30, 2009. In accordance with credit reform guidance and to ensure the timely completion of the credit reform reestimate process, market and security specific data publicly available as of September 30, 2009, was used for the CPP, AGP, TIP, and direct loan AIFP, and data through August 31, 2009 was used for the equity portion of AIFP, AIG, and TALF in the reestimate calculations. Treasury assessed the key inputs of the reestimates using data publicly available as of September 30, 2009, and in its determination, there were no significant changes to the key inputs for the three programs for which August 31, 2009 data was used that would require a revision to the reestimates.

Downward reestimates for the fiscal year ended September 30, 2009, are as follows:

| Program | Downward Reestimate Amounts (in millions) | | |
| --- | --- | --- | --- |
| | Subsidy | Interest | Total |
| AGP | $ (1,097) | $ (77) | $ (1,174) |
| Direct Loan | | | |
| AIFP | $ (9,039) | $ (1,571) | $ (10,610) |
| CBLI/TALF | (222) | (21) | (243) |
| Subtotal Direct | $ (9,261) | $ (1,592) | $ (10,853) |
| Equity Investment | | | |
| CPP | $ (68,558) | $ (3,861) | $ (72,419) |
| TIP | (20,366) | (1,101) | (21,467) |
| AIG | (845) | (280) | (1,125) |
| AIIP | (2,331) | (379) | (2,710) |
| Subtotal Equity | $ (92,100) | $ (5,621) | $ (97,721) |
| Total | $ (102,458) | $ (7,290) | $ (109,748) |

Descriptions of the reestimates, by TARP Program, are as follows:

All of the approximately $1,174 million in downward reestimates for the AGP is due to improvements in market conditions from when the guarantee was committed in January 2009. The improved market conditions resulted in an increase in the projected AGP asset due to the net present value of the estimated cash inflows from the

preferred stock and warrants received by Treasury from Citigroup as a premium being greater than the estimated value of future claim payments associated with the $5,000 million guarantee.

All of the approximately $10,610 million in downward reestimates for the Automotive Industry Direct Loan Financing Programs (AIDLFP) direct loans is the result of the post bankruptcy improved financial position of one of the major companies participating in the program. The $243 million in downward reestimates for the TALF is entirely due to projected improved performance of the securities within the program versus the original estimate.

The approximately $70,718 million in repurchases during fiscal year 2009 accounts for approximately $9,700 million of the $72,419 million in downward reestimates in the CPP. Projected repurchases of approximately $30,000 million in the next 12 months accounts for approximately $5,410 million, with the $57,309 million balance in downward reestimates in the CPP due to improved market conditions from when the original estimate was made in December 2008.

The $21,467 million in downward reestimates in the Targeted Investment Program (TIP) is mostly due to improved market conditions from when the original estimates were made in December 2008 and January 2009. Approximately $2,300 million is due to a $20,000 million repurchase forecast within 12 months following September 30, 2009.

All of the $1,125 million in downward reestimates for the AIG Investment Program and $2,710 million in downward reestimates for the AIIP equity programs are due to improvements in market conditions from when the equities were purchased resulting in a reduction in the projected costs of the programs.

## AMERICAN INTERNATIONAL GROUP (AIG)

As described in Note 8, in fiscal year 2009, the Department ultimately invested $42 billion in Series E perpetual, non-cumulative 10% preferred shares of AIG through the Systemically Significant Failing Institutions Program. And, to further assist the stability and restructuring of AIG, the Treasury Department agreed to make an additional $29 billion available to AIG under the Treasury credit facility. In return, the Department received $29 billion of AIG series F perpetual, non-cumulative 10% preferred stock (300,000 shares) and a warrant to purchase 3,000 shares of AIG common stock. The initial liquidation preference of the Series F preferred shares is zero and increases pro rata by the amount of each drawdown by AIG. As of September 30, 2009, AIG had drawn $1.1 billion through the credit facility, leaving an outstanding commitment to AIG at September 30 of $27.9 billion.

Under the initial terms of the credit facility agreement with AIG and the Federal Reserve Bank of New York (FRBNY), a 77.9% equity interest in AIG (in the form of Series C Convertible Participating Serial Preferred Stock convertible into approximately 77.9% of the issued and outstanding shares of common stock) was issued to a trust established by the FRBNY. Subsequent to the initial agreement, a reverse stock split of AIG's common stock increased this to 79.8%. The U.S. Government is the sole beneficiary of that trust, so that when the stock is ultimately liquidated the proceeds will be deposited into the General Fund of the U.S. Government. The U.S. Government will be the ultimate recipient of any dividends on the stock and any proceeds from the liquidation of the stock. The accounting and reporting for any activities related to the government's beneficial interest in the stock held by the trust will be done by the Treasury Department. The trustees of the trust are independent of both the Department and the FRBNY, and are not involved in day-to-day management of AIG.

As the U.S. Government is the sole beneficiary of the trust, and as it is anticipated that the U.S. Government will ultimately realize an economic benefit from its beneficial interest in the trust, the Treasury Department has recorded a non-entity asset of $23,472 million as of September 30, 2009, and corresponding custodial revenue for the same amount. The value recorded is based on the market value of the trust's AIG holdings at September 30, 2009; as the underlying AIG common stock is actively traded on the New York Stock Exchange, this represents the best independent valuation available for the government's beneficial interest. The U.S. Government's proceeds will be received when AIG's credit line with the FRBNY is terminated, AIG has redeemed the preferred stock owned by the Treasury Department through TARP, and the trustees sell the stock held by the trust. The Treasury Department will re-value its beneficial interest in the trust each year until the trust is liquidated. Like any asset, future events may increase or decrease the value of the U.S. Government's interest in the trust. The amount ultimately realized by the U.S. Government upon liquidation of the trust is inherently subject to substantial uncertainty regarding future economic events that could affect the future value of AIG common stock.

The Department's participation in enhancing AIG's capital and liquidity in order to facilitate an orderly restructuring of the company are in addition to the FRBNY activities in this regard.

## THE AMERICAN RECOVERY AND REINVESTMENT ACT OF 2009 (RECOVERY ACT)

President Obama signed the Recovery Act into law on February 17, 2009. The Recovery Act is an extraordinary response to a crisis unlike any since the Great Depression, and includes measures to modernize the nation's infrastructure, enhance energy independence, expand educational opportunities, preserve and improve affordable health care, provide tax relief, and protect those in greatest need.

The Department of the Treasury has various responsibilities related to Recovery Act programs, including the implementation of some sixty tax incentives for households and businesses; local and state government support; and investments in renewable energy, low income housing, and health care. Treasury has taken a risk-based approach and focused on balancing the requirements of speed, quality, and accountability to ensure Recovery Act funds are distributed timely and accurately. To achieve these objectives, Treasury established a Recovery Act implementation team housed within the purview of the Assistance Secretary for Management/Chief Financial Officer responsible for working with the program offices across the Department. The Recovery Act team facilitates all Recovery Act implementation department-wide and interfaces with the broader Recovery Act community. As part of this broad responsibility, the team establishes internal processes, addresses external data requirements, manages risk inherent in Recovery Act implementation, and coordinates Treasury Recovery Act audits.

Here are some of the Recovery Act programs implemented by Treasury during fiscal year 2009:

- The Recovery Act provided $250 one-time *Economic Recovery Payments* to eligible retirees, veterans, and other high-need recipients. The Financial Management Service received $7 million to cover administrative expenses incurred in sending these payments, either via electronic funds transfer or by check, to millions of recipients of Social Security, Supplemental Security Insurance, Railroad Retirement, and Veterans Administration benefits.

- The Community Development Financial Institutions (CDFI) Fund received $2 million to cover administrative expenses related to implementing Recovery Act provisions that apply to two existing programs. These existing programs and related Recovery Act funding are the *CDFI Program*, which received $90

million in additional funds to make grants, loans, equity investments, deposits, and secondary capital investments to certified CDFIs that deploy the funds in underserved, low-income communities, and to targeted populations; and the *Native American CDFI Assistance Program*, which received $8 million in additional funds under the Recovery Act to make grants, loans, equity investments, deposits, and secondary capital investments to certified CDFIs that deploy the funds in Native American communities or to Native American populations.

- The *New Markets Tax Credit (NMTC) Program*, which does not provide direct funding to CDFI because it is a tax credit, was provided an additional $1.5 billion of allocation authority for 2009; NMTC facilitates investment in low-income communities by permitting taxpayers to receive a non-refundable credit against federal income taxes for making Qualified Equity Investments in Treasury-certified Community Development Entities (businesses and real estate developments) in low-income communities. The Recovery Act authorizes the CDFI Fund to allocate $3 billion of tax credit authority to qualified Community Development Entities (CDEs) under the New Markets Tax Credit (NMTC) Program, as follows: $1.5 billion to CDEs that applied for allocation authority under the 2008 NMTC allocation round, and $1.5 billion to CDEs that applied for allocation authority under the 2009 NMTC allocation round. This $3 billion in allocation authority is in addition to the $3.5 billion in non-Recovery Act funds that was already allocated for the NMTC in 2009.

- The *Cash Assistance for Specified Energy Property in Lieu of Tax Credits Program* promotes renewable energy. The Office of the Fiscal Assistant Secretary (OFAS) designed the program in conjunction with the Department of Energy. Energy reviews the applications for completeness and initial approval. OFAS then reviews the applications and either approves or denies the request. Payment is made by the Office of Financial Management which follows its standard procedures for making payments. The energy program payments are treated as an expense in the Treasury financial statements. This program provides an alternative means to attract financing for renewable energy projects by providing direct payment in lieu of tax credits. The program began accepting applications on July 31, 2009, and by September 30, 2009, had made awards for 37 projects totaling over $1 billion.

- The *Cash Assistance to States for Low-Income Housing Projects in Lieu of Tax Credits Program* allows construction or acquisition and rehabilitation of low-income housing projects to continue where developers were unable to proceed due to insufficient financing. The program addresses the near-term goal of creating and retaining jobs, as well as the long-term benefit of increasing the affordable housing supply. OFAS administers this program. Funds are awarded to State Housing Credit Agencies to make sub-awards to fund the construction and/or acquisition and rehabilitation of low-income housing projects, creating jobs and increasing the supply of low-income housing.  In lieu of tax credits, forty housing agencies had received approval for over $2.5 billion as of September 30, 2009.

- In 2009, the Internal Revenue Service (IRS) implemented a number of Recovery Act tax provisions impacting both individuals and businesses, including the Making Work Pay credit; the First-Time Home Buyer credit; a new COBRA health insurance continuation premium subsidy; and several new bond programs.

## 30. SCHEDULE OF FIDUCIARY ACTIVITY

Fiduciary activities are the collection or receipt, and the management, protection, accounting, investment, and disposition by the Federal Government of cash or other assets, in which non-Federal individuals or entities have an ownership interest that the Federal Government must uphold.

Fiduciary cash and other assets are not assets of the Federal Government, and accordingly are not recognized on the Balance Sheet.

The following funds have been identified by the Treasury Department as meeting the criteria for fiduciary activity. Details of the funds, as well as fiduciary relationships, is provided below.

| Bureau | Fund Code | Authority | Fund Title |
|--------|-----------|-----------|------------|
| BEP | 20X6513.013 | 31 USC 5119 | Mutilated Currency Claims Funds |
| BPD | 20X6008 | 31 USC 3513 | Payment Prin. & Interest Govt. Agencies |
| FMD | 20X6045 | 31 USC 3328 | Proceeds, Payments of Unpaid Checks |
| FMD | 20X6048 | 31 USC 3329, 3330 | Proceed of Withheld Foreign Check |
| FMD | 2015X6078 | 50 APP. USC 2012 | War Claims FD, FCSC |
| FMD | 20X6092 | 31 USC 1321 | Debt Management Operations |
| FMD | 20X6104 | 22 USC 1627 | Albanian Claims Fund, Treasury |
| FMD | 20X6133 | 31 USC 1322 | Payment of Unclaimed Moneys |
| FMD | 20X6309 | 22 USC 1627(a) | Libyan Claims Settlement Fund |
| FMD | 20X6311 | 98 Stat. 1876 | Kennedy Center Revenue Bond |
| FMD | 20X6312 | 22 USC 1627 | Iranian Claims Settlement Fund |
| FMD | 20X6314 | 22 USC 1644g | German Democrat Settlement Fund |
| FMD | 20X6315 | 22 USC 1645h | Vietnam Claims Settlement Fund |
| FMD | 20X6501.018 | 31 USC 3513 | Small Escrow Amounts |
| FMD | 20X6720 | 31 USC 3513 | SM DIF Account for Dep. & Check Adj. |
| FMD | 20X6830 | 104 Stat. 1061 | Net Interest Payments to/from State |
| FMD | 20X6999 | 31 USC 3513 | Accounts Payable, Check Issue UNDDR |
| IRR | 20X6737 | 90 Stat. 269-270 | Collections for Northern Mariana Islands |
| IRR | 20X6738 | 31 USC 3513 | Coverover Withholding-US Virgin Islands |
| IRR | 20X6740 | 31 USC 3515 | Coverover Withholdings-Guam |
| IRR | 20X6741 | 31 USC 3513 | Coverover Withhold Samoa |
| OAS | 20X6317.001 | 22 USC 2431 | Belize Escrow, Debt Reduction |
| OAS | 20X6501.018 | 31 USC 3513 | Small Escrow Amounts |
| OTS | 20X6501.76 | 31 USC 3513 | Small Escrow Amounts |

Unclaimed monies were authorized by 31 U.S.C. 5119, which authorized Financial Management Service, Department of the Treasury, to collect unclaimed monies on behalf of the public. Other fiduciary activities by the Department of the Treasury as listed above are included in All Other Fiduciary Funds

*Schedule of Fiduciary Activity (in millions):*

| | Unclaimed Monies-FMD | All Other Fiduciary Funds | 2009 Total Fiduciary Funds |
|---|---|---|---|
| Fiduciary Net Assets, Beginning of the Year | $   366 | $   43 | $   409 |
| **Increases** | | | |
| Contributions to Fiduciary Net Assets | 28 | 1,063 | 1,091 |
| Investment earnings | 0 | 1 | 1 |
| Total Increases | 28 | 1,064 | 1,092 |
| **Decreases** | | | |
| Disbursements to and on behalf of beneficiaries | (4) | (899) | (903) |
| Total Decreases | (4) | (899) | (903) |
| Net Increase (Decrease) in fiduciary assets | 24 | 165 | 189 |
| Fiduciary Net Assets, End of Year | $   390 | $   208 | $   598 |

*Schedule of Fiduciary Net Assets (in millions):*

| | Unclaimed Monies-FMD | All Other Fiduciary Funds | 2009 Total Fiduciary Funds |
|---|---|---|---|
| **Fiduciary Assets** | | | |
| Cash and cash equivalents | $   390 | $   193 | $   583 |
| Investments | 0 | 15 | 15 |
| Total Fiduciary Assets | 390 | 208 | 598 |
| Total Fiduciary Net Assets | $   390 | $   208 | $   598 |

NOTE 30. SCHEDULE OF FIDUCIARY ACTIVITY

## 31. COMMITMENTS AND CONTINGENCIES

### LEGAL CONTINGENCIES

The Treasury Department is a party in various administrative proceedings, legal actions, and claims, including equal opportunity matters which may ultimately result in settlements or decisions adverse to the U.S. Government. These contingent liabilities arise in the normal course of operations and their ultimate disposition is unknown. Treasury Department has one contingent liability in fiscal year 2009 related to legal action taken in the case, *American Council of the Blind and Others*, where losses are determined to be probable and amount of loss can be estimated. The Treasury Department has disclosed contingent liabilities where the conditions for liability recognition have not been met and the likelihood of unfavorable outcome is more than remote. The Treasury Department does not accrue for possible losses related to cases where the potential loss cannot be estimated or the likelihood of an unfavorable outcome is less than probable.

In some cases, a portion of any loss that may occur may be paid by the Treasury Department's Judgment Fund, which is separate from the operating resources of the Treasury Department. For cases related to the *Contract Disputes Act of 1978* and awards under federal anti-discrimination and whistleblower protection acts, the Treasury Department must reimburse the Judgment Fund from future appropriations.

In the opinion of the Treasury Department's management and legal counsel, based on information currently available, the expected outcome of legal actions, individually or in the aggregate, will not have a materially adverse effect on the Treasury Department's financial statements, except for the legal actions described below.

### PENDING LEGAL ACTIONS

- *The American Council of the Blind and Others, et. al. v. Paulson*: Plaintiffs have filed suit against the Department under Section 504 of the Rehabilitation Act seeking the redesign of U.S. currency. In 2007, a judge ruled that the current U.S. currency design violates this Act and this ruling was appealed. In 2008, the United States Court of Appeals for the District of Columbia Circuit affirmed the District Court's ruling. No monetary damages were awarded by the Court. However, the Treasury Department is required to provide meaningful access to United States currency for blind and other visually impaired persons. This may require changes to U.S. currency (excluding the one-dollar note.) The Court ordered such changes to be completed in connection with each denomination of currency, not later than the date when a redesign is next approved by the Secretary of the Treasury. Because the cost of implementing these changes will be incorporated into future currency redesign costs, no redesign costs have been accrued in the accompanying financial statements as of September 30, 2009 and September 30, 2008.

  The Court of Appeals in the above mentioned case ordered the parties to confer and attempt to negotiate attorney fees and costs to be awarded the plaintiffs.  In December 2008, the parties filed a joint stipulation agreeing to $800 thousand in attorney fees and costs that was paid from the Judgment Fund in February 2009.

- *Amidax Trading Group v. S.W.I.F.T.* makes allegations that the Treasury Department's Terrorist Finance Tracking Program has involved unlawful disclosure of information by the Society for Worldwide Interbank Financial Telecommunications (S.W.I.F.T.). Defendants include the Department of the Treasury as well as several Treasury officials. The case was dismissed on February 13, 2009, and the plaintiff has subsequently

appealed that ruling.  The Treasury Department is unable to determine the likelihood of an unfavorable outcome or an estimate of potential loss at this time.

- *Cobell et al. v. Salazar et al. (formerly Cobell v. Kempthorne)*: Native Americans allege that the Department of Interior and the Department of the Treasury have breached trust obligations with respect to the management of the plaintiffs' individual Indian monies. On August 7, 2008, the Federal District Court issued an opinion awarding $455 million to the plaintiffs.  This decision was overturned on appeal in July 2009. The appellate court found that the government owes a cost-effective accounting, in scale with available funds. The District Court is considering further proceedings. The Treasury Department is unable to determine the likelihood of an unfavorable outcome or an estimate of potential loss at this time. (Please refer to Note 33, Subsequent Events, for additional information.)

- Tribal Trust Fund Cases: Numerous cases have been filed in U.S. District Courts in which Native American Tribes seek a declaration that the U.S. has not provided the tribes with a full and complete accounting of their trust funds, and seek an order requiring the government to provide such an accounting. In addition, there are a number of other related cases seeking damages in the United States Court of Federal Claims which do not name the Department as a defendant. It is not possible at this time to determine the likelihood of an unfavorable outcome or an estimate of the amount or range of any potential loss.

- Other Legal Actions: The Treasury Department is also involved in employment related legal actions (e.g., Discrimination, Equal Employment Opportunity Commission, Merit System Protection Board, etc.) for which an unfavorable outcome is reasonably possible, but for which an estimate of potential loss cannot be determined at this time. It is not expected that these cases will have a material effect on the Treasury Department's financial position or results.

- There are other legal actions pending for which the possibility of loss could not be determined, and where the ultimate resolution of the legal actions may materially affect the Treasury Department's financial position or results. As of September 30, 2009, four legal claims amounting to approximately $113 million existed for which the possibility of loss could not be determined.

## OTHER COMMITMENTS AND CONTINGENCIES

### Treaties and International Agreements

The Office of Management and Budget, Circular No. A-136, *Financial Reporting Requirements and the Treasury Financial Manual, Volume 1, Part 2-4700* require the recognition and disclosure of financial information related to Treaties and International Agreements for fiscal year 2009 financial reporting. The focus of this requirement is to identify Departmental Treaties and International Agreements that commit and obligate the Federal Government and may result in a possible exposure to loss.  Any recognition and disclosure of Treaty and International Agreement loss contingencies would be presented in accordance with SFFAS No. 5, *Accounting for Liabilities of the Federal Government*. Any recognition would depend on the likelihood of the future event occurring and the measurability of an amount or range of loss.

The Treasury Department does not have any treaties or international agreements to report for fiscal year 2009.

## Multilateral Development Banks (MDB)

The Treasury Department has subscribed to capital for certain MDB, portions of which are callable under certain limited circumstances to meet the obligations of the respective MDB. There has never been, nor is there anticipated, a call on the Treasury Department's commitment for these subscriptions.  As of September 30, 2009 and September 30, 2008, U.S. callable capital in MDB was as follows (in millions):

|  | 2009 | 2008 |
|---|---|---|
| African Development Bank | $ 1,634 | $ 1,634 |
| Asian Development Bank | 5,911 | 5,911 |
| European Bank for Reconstruction and Development | 1,805 | 1,805 |
| Inter-American Development Bank | 28,687 | 28,687 |
| International Bank for Reconstruction and Development | 22,641 | 22,641 |
| Multilateral Investment Guarantee Agency | 301 | 301 |
| North American Development Bank | 1,275 | 1,275 |
| Total | $ 62,254 | $ 62,254 |

## Terrorism Risk Insurance Program

The *Terrorism Risk Insurance Act* (TRIA or the Act) was signed into law on November 26, 2002. This law was enacted to address market disruptions resulting from terrorist attacks on September 11, 2001. The Act helps to ensure available and affordable commercial property and casualty insurance for terrorism risk, and simultaneously allows private markets to stabilize. The Terrorism Risk Insurance Program is activated upon the certification of an "act of terrorism" by the Secretary of the Treasury Department in concurrence with the Secretary of State and the Attorney General. If a certified act of terrorism occurs, insurers may be eligible to receive reimbursement from the U.S. Government for insured losses above a designated deductible amount. Insured losses above this amount will be shared between insurance companies and the U.S. Government. The Act also gives the Treasury Department authority to recoup federal payments made under the Program through policyholder surcharges under certain circumstances and contains provisions designed to manage litigation arising from or relating to a certified act of terrorism.

The original TRIA program was to expire on December 31, 2005, but the Program was extended through December 31, 2007 by the *Terrorism Risk Insurance Extension Act of 2005* (Extension Act). This law included the following significant changes: it reduced the federal role in terrorism risk insurance markets by increasing insurer deductibles and excluding certain types of previously covered insurance. The Extension Act also reduced the U.S. Government's share of insured losses and added a "Program Trigger" provision which precludes federal payments unless insured losses from a certified act of terrorism exceed $100 million.

On December 26, 2007, the *Terrorism Risk Insurance Program Reauthorization Act of 2007* (Reauthorization Act) was enacted extending the Program through December 31, 2014. The Reauthorization Act, among other Program changes, revised the definition of "Act of Terrorism" to remove the certification requirement that the act be committed by an individual acting on behalf of a foreign person or foreign interest; revised the provisions of the Act with regard to the cap on annual liability for insured losses of $100 billion; and established deadlines by which recoupment of federal payments made under the Program would have to be accomplished.

In 2008, the Treasury Department published interim guidance and an interim final rule conforming regulations to statutory changes in the Reauthorization Act pertaining to the mandatory insurance availability and insurer disclosure requirements of the Program as well as the addition of coverage for domestic acts of terrorism. On April 21, 2009, Treasury Department published the interim final rule as final.

In September 2008, the Treasury Department issued two notices of proposed rulemaking with requests for comment. One proposed rule incorporates and clarifies statutory requirements of the Reauthorization Act for capping the annual liability for insured losses at $100 billion. The proposed rule describes how the Treasury Department will determine the pro rata share of insured losses to be paid by each insurer that incurs losses under the Program when insured losses would otherwise exceed the cap and how the Federal share of compensation will be calculated. The Treasury Department expects to issue a final rule incorporating public comments early in fiscal year 2010.

The other proposed rule sets forth the requirements for recoupment of the Federal share of compensation for insured losses. The rule describes how the Treasury Department will determine the amounts to be recouped and the requirements for insurers to collect, report, and remit surcharges to the Treasury Department. The Treasury Department expects to issue a final rule incorporating public comments early in fiscal year 2010. There were no claims under TRIA as of September 30, 2008 and September 30, 2009.

### Exchange Stabilization Agreement (ESA)

In April 1994, Treasury signed the North American Framework Agreement (NAFA), which includes the ESA with Mexico. The Treasury Department has a standing swap line for $3 billion with Mexico under the NAFA and its implementing ESA. The amounts and terms (including the assured source of repayment) of any borrowing under NAFA and ESA will have to be negotiated and agreed to before any actual drawing can occur. The ESA does provide sample clauses that state that transactions shall be exchange rate neutral for the ESF and shall bear interest based on a then current rate tied to U.S. Treasury bills. There were no drawings outstanding on the ESF swap line as of September 30, 2009 and 2008. On December 10, 2008, the Treasury renewed its participation in the agreement until December 2010.

### Contingent Liability to Government Sponsored Enterprises

The Treasury Department has recorded a contingent liability at September 30, 2009 (zero at September 30, 2008) of $76.9 billion to the Government Sponsored Enterprises, Fannie Mae and Freddie Mac, based on probable future liability under the Senior Preferred Stock Purchase Agreement between the Treasury Department and the GSEs. Refer to Note 9 for a full description of the agreements and related contingent liability.

FHFA 1053

## 32. IMPUTED FINANCING COSTS

In accordance with SFFAS No. 30, *Inter-Entity Cost Implementation Amending SFFAS 4, Managerial Cost Accounting Standards and Concepts*, the material Imputed Inter-departmental financing sources currently recognized by the Department include the actual cost of future benefits for the federal pension plans that are paid by other federal entities, the Federal Employees Health Benefits Program (FEHB), and any un-reimbursed payments made from the Treasury Judgment Fund on behalf of the Department.

SFFAS No. 5, *Accounting for Liabilities for the Federal Government*, requires that employing agencies recognize the cost of pensions and other retirement benefits during their employees' active years of service. SFFAS No. 5 requires OPM to provide cost factors necessary to calculate cost. OPM actuaries calculate the value of pension benefits expected to be paid in the future, and then determines the total funds to be contributed by and for covered employees, such that the amount calculated would be sufficient to fund the projected pension benefits. For employees covered by Civil Service Retirement System (CSRS), the cost factors are 25.8% of basic pay for regular, 43.5% law enforcement officers, 20% regular offset, and 38% law enforcement officers offset. For employees covered by Federal Employees Retirement System (FERS), the cost factors are 12.3% of basic pay for regular and 26.7% for law enforcement officers. The information for the fiscal years ended September 30, 2009 and September 30, 2008 was as follows (in millions):

|  | 2009 | 2008 |
|---|---|---|
| U.S. Treasury Judgment Fund | $ 0.8 | $ 6.5 |
| Pension | 264.0 | 254.1 |
| Health Insurance | 501.1 | 449.8 |

## 33. SUBSEQUENT EVENTS

### Housing Finance Agency Initiative

Under the *Housing and Economic Recovery Act of 2008* (HERA), the Treasury Department, together with the Federal Housing Finance Agency, Fannie Mae, Freddie Mac, and the Department of Housing and Urban Development announced in October 2009 an initiative to provide support to state and local housing finance agencies (HFAs). HFAs have historically played a central role in providing a safe, sustainable path to homeownership for working families in all 50 states and many localities across the country. This initiative will continue to support low mortgage rates and expand resources for low and middle income borrowers to purchase or rent homes, making them more affordable over the long term. The HFA Initiative includes two separate programs: (1) the Temporary Credit and Liquidity Program (TCLP) and (2) the New Issue Bond Program (NIBP).

The Treasury Department has received preliminary apportionments in the amounts of $9 billion for the TCLP and $19 billion for the NIBP. On December 4, 2009, Treasury entered into a participation interest under the TCLP with the Pennsylvania Housing Finance Agency. As of this date, however, no bonds have been provided to Fannie Mae or Freddie Mac requiring the Treasury Department to disburse funds. On December 9, 2009, under the NIBP, the Treasury Department entered into an obligation of approximately $7 billion to purchase securities of Fannie Mae and Freddie Mac which are backed by HFA revenue bonds and/or escrow funds.

### Troubled Asset Relief Program

On December 9, 2009, the Secretary of the Treasury, pursuant to Section 120(b) of EESA, certified that he was extending the spending authority provided under the Act to October 3, 2010. The spending authority was originally set to expire on December 31, 2009. This extension was necessary to assist American families and stabilize financial markets because it will, among other things, enable the Treasury Department to continue to implement programs that address housing markets and the needs of small businesses, and to maintain the capacity to respond to unforeseen threats to the economy stemming from financial instability.

On December 9, 2009, Bank of America repaid all amounts received under the CPP and TIP totaling $45 billion plus dividends accrued since November 15, 2009, thereby terminating its participation in TARP. The Treasury Department still holds the warrants issued under these programs, but has no other investment in Bank of America.

On November 1, 2009, a CPP participant, CIT Group, filed for Chapter 11 Bankruptcy. The Treasury Department had invested $2.3 billion in senior preferred shares of CIT Group and received a warrant for the purchase of common shares. Treasury does not expect a significant recovery of its preferred stock investment. As such, this investment has been reduced to zero. The ultimate amount received, if any, from this investment will depend on the outcome of the bankruptcy proceedings.

On November 6, 2009, a CPP participant, United Commerce Bank, was closed by its regulators. The Treasury Department had invested approximately $298.7 million in senior preferred stock and received a warrant for the purchase of the common stock. The value of these shares, including the warrant, reflected in these financial statements is approximately $22.5 million as of September 30, 2009. The ultimate amount received, if any, from this investment will depend on the outcome of the receivership.

In November 2009, a CPP participant, Pacific Coast National Bank, was closed by its regulators. The Treasury Department had invested approximately $4.1 million in senior preferred stock and received a warrant for pre-

ferred stock in the amount of $0.2 million. The value of these shares, including the warrant, reflected in these financial statements is approximately $0.15 million as of September 30, 2009. The ultimate amount received, if any, from this investment will depend on the outcome of the receivership.

On December 11, 2009, the Treasury Department announced that it priced a secondary public offering of 88,401,697 warrants to purchase common stock of JPMorgan Chase & Co. at $10.75 per warrant. The net proceeds to the Treasury Department are expected to be approximately $936 million. These proceeds are in addition to the dividend payments received on the related preferred stock. Closing is expected to occur on or about December 16, 2009.

## Legal Contingency

### Cobell, et al. v. Salazar

On December 8, 2009, a settlement was announced related to the claims raised in this lawsuit, as well as other claims for the mismanagement of assets and land. The settlement is contingent on the passage of new legislation to authorize the settlement terms and court approval, which would not occur until March 2010 at the earliest. If Congress enacts authorizing legislation, the Government will pay $12 million immediately to fund notice to the class. If the court approves the settlement after notice to the class, the government will pay an additional $1.4 billion from the Judgment Fund to settle the claims for an historical accounting and for mismanagement of assets and land. The Government will also make available an additional sum of $2 billion from the Judgment Fund to purchase numerous small interests in land from Native Americans, as well as for other purposes.  It has not been determined which federal agency will be assigned responsibility for the payment through the Judgment Fund.

FHFA 1056

## REQUIRED SUPPLEMENTAL INFORMATION (UNAUDITED)

### INTRODUCTION

This section provides the Required Supplemental Information as prescribed by Office of Management and Budget (OMB) Circular No. A-136, *Financial Reporting Requirements*.

### Other Claims for Refunds

The Treasury Department has estimated that $11.0 billion may be payable as other claims for tax refunds. This estimate represents amounts (principal and interest) that may be paid for claims pending judicial review by the federal courts or internally. The total estimated payout (including principal and interest) for claims pending judicial review by the federal courts is $4.7 billion and by appeals is $6.3 billion.

### Federal Taxes Receivable, Net

In accordance with SFFAS No. 7, *Accounting for Revenue and Other Financing Sources and Concepts for Reconciling Budgetary and Financial Accounting*, some unpaid tax assessments do not meet the criteria for financial statement recognition as discussed in Note 1 to the financial statements. Although compliance assessments and write-offs are not considered receivables under federal accounting standards, they represent legally enforceable claims of the U.S. Government. There is, however, a significant difference in the collection potential between compliance assessments and receivables.

The components of the total unpaid assessments at September 30, 2009, were as follows (in billions):

| | |
|---|---:|
| Total Unpaid Assessments | $ 308 |
| Less: Compliance Assessments | (75) |
| Write Offs | (105) |
| **Gross Federal Taxes Receivable** | **$ 128** |
| Less: Allowance for Doubtful Accounts | (99) |
| **Federal Taxes Receivables, Net** | **$ 29** |

To eliminate double counting, the compliance assessments reported above exclude trust fund recovery penalties, totaling $3 billion, assessed against officers and directors of businesses who were involved in the non-remittance of federal taxes withheld from their employees. The related unpaid assessments of those businesses are reported as taxes receivable or write-offs, but the Treasury Department may also recover portions of those businesses' unpaid assessments from any and all individual officers and directors against whom a trust fund recovery penalty is assessed.

### Internal Revenue Service (IRS)

The unpaid assessments balance represents assessments resulting from taxpayers filing returns without sufficient payment, as well as from the IRS's enforcement programs such as examination, under-reporter, substitute for return, and combined annual wage reporting. A significant portion of this balance is not considered a receivable. Also, a substantial portion of the amounts considered receivables is largely uncollectible.

FHFA 1057

Under federal accounting standards, unpaid assessments require taxpayer or court agreement to be considered federal taxes receivable. Assessments not agreed to by taxpayers or the courts are considered compliance assessments and are not considered federal taxes receivable. Due to the lack of agreement, these compliance assessments are less likely to have future collection potential than those unpaid assessments that are considered federal taxes receivable.

Assessments with little or no future collection potential are called write-offs. Write-offs principally consist of amounts owed by deceased, bankrupt, or defunct taxpayers, including many failed financial institutions liquidated by the Federal Deposit Insurance Corporation (FDIC) and the former Resolution Trust Corporation (RTC). As noted above, write-offs have little or no future collection potential, but statutory provisions require that these assessments be maintained until the statute for collection expires.

### Alcohol and Tobacco Tax and Trade Bureau (TTB)

As an agent of the Federal Government and as authorized by 26 U.S.C., the TTB collects excise taxes from alcohol, tobacco, firearms, and ammunition industries. In addition, special occupational taxes are collected from certain alcohol and tobacco businesses. During fiscal year 2009, TTB collected nearly $20.6 billion in taxes, interest, and other revenues.

Substantially all of the taxes collected by TTB net of related refund disbursements are remitted to the General Fund of the U.S. Government. The Department of Treasury further distributes this revenue to Federal agencies in accordance with various laws and regulations. The firearms and ammunition excise taxes are an exception. Those revenues are remitted to the Fish and Wildlife Restoration Fund under provisions of the *Pittman-Robertson Act of 1937*.

### Deferred Maintenance

In fiscal year 2009, the Treasury Department had no material amounts of deferred maintenance costs to report on vehicles, buildings, and structures owned by the Treasury Department.

Deferred maintenance applies to owned PP&E. Deferred maintenance is maintenance that was not performed when it should have been, or was scheduled to be, and is put off or delayed for a future period. Maintenance is defined as the act of keeping capitalized assets in an "acceptable condition" to serve their required mission. It includes preventive maintenance, normal repairs, replacement of parts and structural components, and other activities needed to preserve the asset so that it continues to provide acceptable services and achieves its expected useful life. Maintenance excludes activities aimed at expanding the capacity or significantly upgrading the assets to a different form than it was originally intended (i.e., activities related to capitalized improvements, modernization, and/or restoration).

Logistic personnel use condition assessment surveys and/or the total life-cycle cost methods to determine deferred maintenance and acceptable operating condition of an asset. Periodic condition assessments, physical inspections, and review of manufacturing and engineering specifications, work orders, and building and other structure logistics reports can be used under these methodologies.

## Fiscal Year 2009 Statement of Budgetary Resources Disaggregated by Sub-organization Accounts (in millions):

| Budgetary Resources | Engraving and Printing | Bureau of the Public Debt | Departmental Offices | Fin. Crimes Enforcement Network | Financial Management Service | Internal Revenue Service |
|---|---|---|---|---|---|---|
| Unobligated balance brought forward | $ 96 | $ 175 | $ 282,340 | $ 18 | $ 240 | $ 682 |
| Recoveries prior year unpaid obligations | 0 | 81 | 7,841 | 2 | 14 | 95 |
| Budget Authority: | | | | | | |
| Appropriations | 0 | 463,484 | 450,242 | 92 | 26,417 | 11,851 |
| Borrowing authority | 0 | 0 | 548,735 | 0 | 0 | 0 |
| Spending authority offsetting collections: | | | | | | |
| Earned: Collected | 502 | 208 | 279,849 | 15 | 228 | 149 |
| Change in receivable federal | (18) | (14) | 1 | 0 | 5 | (19) |
| Change in unfilled customer order: | | | | | | |
| Advance received | 1 | 0 | (16) | 0 | 0 | 0 |
| Without advance from federal sources | 0 | (152) | 28,939 | 1 | (1) | 5 |
| Subtotal | 485 | 463,526 | 1,307,750 | 108 | 26,649 | 11,986 |
| Non-expenditure transfers, net | 0 | (3) | (149) | 0 | (21) | 130 |
| Temporarily not available | 0 | (5) | 7 | 0 | 0 | 0 |
| Permanently not available | 0 | (80,108) | (184,490) | 0 | (6,991) | (112) |
| Total Budgetary Resources | $ 581 | $ 383,666 | $1,413,299 | $ 128 | $ 19,891 | $ 12,781 |
| Status of Budgetary Resources | | | | | | |
| Obligations incurred | | | | | | |
| Direct | $ 0 | $ 383,379 | $ 967,769 | $ 96 | $ 19,390 | $ 11,791 |
| Reimbursable | 535 | 195 | 355 | 7 | 228 | 114 |
| Subtotal | 535 | 383,574 | 968,124 | 103 | 19,618 | 11,905 |
| Unobligated Balance | | | | | | |
| Apportioned | 46 | 64 | 368,489 | 20 | 254 | 380 |
| Exempt from apportionment | 0 | 15 | 43,370 | 0 | 9 | 0 |
| Subtotal | 46 | 79 | 411,859 | 20 | 263 | 380 |
| Unobligated balance not available | 0 | 13 | 33,316 | 5 | 10 | 496 |
| Total Status of Budgetary Resources | $ 581 | $ 383,666 | $1,413,299 | $ 128 | $ 19,891 | $ 12,781 |
| Relationship Obligations to Outlays | | | | | | |
| Obligated balance, net (Note 1) | | | | | | |
| Unpaid obligations brought forward | $ 103 | $ 159 | $ 54,795 | $ 13 | $ 329 | $ 1,436 |
| Uncollected customer payments Federal sources brought forward | (47) | (189) | (16) | (3) | (33) | (47) |
| Total unpaid obligated balance, net | 56 | (30) | 54,779 | 10 | 296 | 1,389 |
| Obligations incurred, net | 535 | 383,574 | 968,123 | 103 | 19,618 | 11,905 |
| Gross Outlays | (523) | (383,578) | (830,165) | (100) | (19,594) | (11,625) |
| Recoveries prior year unpaid obligations | 0 | (81) | (7,841) | (2) | (14) | (95) |
| Change uncollected customer payments | 18 | 166 | (28,940) | (1) | (4) | 14 |
| Obligated balance net, end of period | | | | | | |
| Unpaid obligations | 115 | 75 | 184,910 | 15 | 339 | 1,621 |
| Uncollected customer payments federal | (29) | (24) | (28,954) | (5) | (37) | (33) |
| Total unpaid obligated balance, net | 86 | 51 | 155,956 | 10 | 302 | 1,588 |
| Net Outlays | | | | | | |
| Gross outlays | 523 | 383,578 | 830,165 | 100 | 19,594 | 11,625 |
| Offsetting collections | (503) | (208) | (277,552) | (15) | (228) | (149) |
| Distributed offsetting receipts | 0 | (31,250) | (12,154) | 0 | (451) | (759) |
| Net Outlays | $ 20 | $ 352,120 | $ 540,459 | $ 85 | $ 18,915 | $ 10,717 |

## Fiscal Year 2009 Statement of Budgetary Resources Disaggregated by Sub-organization Accounts (in millions):

| Budgetary Resources | U.S. Mint | Comptroller of the Currency | Office of Thrift Supervision | Alcohol Tobacco Tax & Trade | Budgetary Total | 9/30/2009 Non-Budgetary Financing |
|---|---|---|---|---|---|---|
| Unobligated balance brought forward | $ 51 | $ 734 | $ 292 | $ 2 | $ 260,173 | $ 24,457 |
| Recoveries prior year unpaid obligations | 55 | 0 | 4 | 4 | 8,097 | (1) |
| Budget Authority: | | | | | | |
| Appropriations | 0 | 0 | 0 | 99 | 952,185 | 0 |
| Borrowing authority | 0 | 0 | 0 | 0 | 493 | 548,242 |
| Spending authority offsetting collections: | | | | | | |
| Earned: Collected | 2,467 | 775 | 253 | 3 | 11,681 | 272,768 |
| Change in receivable federal | 0 | 0 | 0 | 1 | (44) | 0 |
| Change in unfilled customer order: | | | | | | |
| Advance received | (10) | 0 | (6) | 0 | (31) | 0 |
| Without advance from federal sources | 0 | 0 | 0 | 0 | (134) | 28,926 |
| Subtotal | 2,457 | 775 | 247 | 103 | 964,150 | 849,936 |
| Non-expenditure transfers, net | 0 | 0 | 0 | 0 | (43) | 0 |
| Temporarily not available | 0 | 0 | 0 | 0 | 2 | 0 |
| Permanently not available | (35) | 0 | 0 | (1) | (92,001) | (179,736) |
| **Total Budgetary Resources** | **$ 2,528** | **$ 1,509** | **$ 543** | **$ 108** | **$ 1,140,378** | **$ 694,656** |
| **Status of Budgetary Resources** | | | | | | |
| Obligations incurred | | | | | | |
| Direct | $ 0 | $ 0 | $ 0 | $ 101 | $ 729,697 | $ 652,829 |
| Reimbursable | 2,282 | 716 | 233 | 4 | 4,669 | 0 |
| Subtotal | 2,282 | 716 | 233 | 105 | 734,366 | 652,829 |
| Unobligated Balance | | | | | | |
| Apportioned | 246 | 0 | 0 | 2 | 349,889 | 19,612 |
| Exempt from apportionment | 0 | 793 | 310 | 0 | 44,497 | 0 |
| Subtotal | 246 | 793 | 310 | 2 | 394,386 | 19,612 |
| Unobligated balance not available | 0 | 0 | 0 | 1 | 11,626 | 22,215 |
| **Total Status of Budgetary Resources** | **$ 2,528** | **$ 1,509** | **$ 543** | **$ 108** | **$ 1,140,378** | **$ 694,656** |
| **Relationship Obligations to Outlays** | | | | | | |
| Obligated balance, net (Note 1) | | | | | | |
| Unpaid obligations brought forward | $ 260 | $ 166 | $ 44 | $ 19 | $ 57,314 | $ 10 |
| Uncollected customer payments Federal sources brought forward | (7) | (4) | 0 | 1 | (346) | (1) |
| Total unpaid obligated balance, net | 253 | 162 | 44 | 18 | 56,968 | 9 |
| Obligations incurred, net | 2,282 | 716 | 233 | 105 | 734,366 | 652,829 |
| Gross Outlays | (2,296) | (704) | (232) | (99) | (675,286) | (573,630) |
| Recoveries prior year unpaid obligations | (55) | 0 | (4) | (4) | (8,097) | 1 |
| Change uncollected customer payments | 0 | 0 | 0 | (1) | 178 | (28,926) |
| Obligated balance net, end of period | | | | | | |
| Unpaid obligations | 191 | 178 | 41 | 21 | 108,297 | 79,209 |
| Uncollected customer payments federal | (7) | (4) | 0 | (2) | (168) | (28,926) |
| Total unpaid obligated balance, net | 184 | 174 | 41 | 19 | 108,129 | 50,283 |
| Net Outlays | | | | | | |
| Gross outlays | 2,296 | 704 | 232 | 99 | 675,286 | 573,630 |
| Offsetting collections | (2,457) | (775) | (247) | (3) | (9,369) | (272,768) |
| Distributed offsetting receipts | 0 | 0 | 0 | 0 | (40,114) | (4,500) |
| **Net Outlays** | **$ (161)** | **$ (71)** | **$ (15)** | **$ 96** | **$ 625,803** | **$ 296,362** |

*This page left intentionally blank*

REQUIRED SUPPLEMENTAL INFORMATION (UNAUDITED)

# Part 3
# Other Accompanying Information



Appendix A — Other Accompanying Information (Unaudited)
Appendix B — Improper Payments Information Act and Recovery Auditing Act
Appendix C — Management and Performance Challenges and Responses
Appendix D — Material Weaknesses, Audit Follow-up, Financial Systems, and Recovery Act Risk Management
Appendix E — Glossary of Acronyms

# Appendix A:
# Other Accompanying Information (Unaudited)

This section provides Other Accompanying Information as prescribed by OMB Circular No. A-136, *Financial Reporting Requirements*.

## PROMPT PAYMENT

The *Prompt Payment Act* requires Federal agencies to make timely payments to vendors for supplies and services, to pay interest penalties when payments are made after the due date, and to take cash discounts only when they are economically justified. Treasury bureaus report Prompt Payment data on a monthly basis to the Department, and periodic quality control reviews are conducted by the bureaus to identify potential problems.



Percentage of Number of Invoices Paid Late



Total Dollar Amount of Invoices Paid (in millions)



Percentage of Dollar Amount of Interest Penalties Paid



Total Number of Invoices Paid (in thousands)



Percentage of Number of Interest Penalties Paid

## TAX GAP

Reducing the tax gap is at the heart of IRS' enforce-ment programs. The tax gap is the difference between what taxpayers should pay and what they actually pay due to not filing tax returns, not paying their reported tax liability on time, or failing to report their correct tax liability. The tax gap, about $345 billion based on updated fiscal year 2001 estimates, represents the amount of noncompliance with the tax laws. Underreporting tax liability accounts for 82 percent of the gap, with the remainder almost evenly divided between non-filing (8 percent) and underpaying (10 percent). The IRS remains committed to finding ways to increase compliance and reduce the tax gap, while minimizing the burden on the vast majority of taxpay-ers who pay their taxes accurately and on time.

The tax gap is the aggregate amount of tax (i.e., exclud-ing interest and penalties) that is imposed by the tax laws for any given tax year but is not paid voluntarily and timely. The tax gap arises from the three types of noncompliance: not filing required tax returns on time or at all (the non-filing gap), underreporting the cor-rect amount of tax on timely filed returns (the underre-porting gap), and not paying on time the full amount

reported on timely filed returns (the underpayment gap). Of these three components, only the underpay-ment gap is observed; the non-filing gap and the underreporting gap must be estimated. Each instance of noncompliance by a taxpayer contributes to the tax gap, whether or not the IRS detects it, and whether or not the taxpayer is even aware of the noncompliance. Obviously, some of the tax gap arises from intentional (willful) noncompliance, and some of it arises from unintentional mistakes.

The collection gap is the cumulative amount of tax, penalties, and interest that has been assessed over many years, but has not been paid by a certain point in time, and which the IRS expects to remain uncollectible. In essence, it represents the difference between the total balance of unpaid assessments and the net taxes receivable reported on the IRS' balance sheet. The tax gap and the collection gap are related and overlapping concepts, but they have significant differences. The collection gap is a cumulative balance sheet concept for a particular point in time, while the tax gap is like an income statement item for a single year. Moreover, the tax gap estimates include all noncompliance, while the collection gap includes only amounts that have been assessed (a small portion of all noncompliance).

## TAX BURDEN

The Internal Revenue Code provides for progressive rates of tax, whereby higher incomes are generally subject to higher rates of tax. The graphs below present the latest available information on income tax and adjusted gross income (AGI) for individuals by AGI level and for corporations by size of assets. For individuals, the information illustrates, in percentage terms, the tax burden borne by varying AGI levels. For corporations, the information illustrates, in percentage terms, the tax burden borne by these entities by various sizes of their total assets. The graphs are only representative of more detailed data and analysis available from the Statistics of Income (SOI) office.



Average Individual Income Tax Liability and Average Adjusted Gross Income (AGI) Tax Year 2007



Individual Income Tax Liability as a Percentage of AGI Tax Year 2007

### INDIVIDUAL INCOME TAX LIABILITY TAX YEAR 2007

| Adjusted Gross Income (AGI) | Number of taxable returns (in thousands) | AGI (in millions) | Total income tax (in millions) | Average AGI per return (in whole dollars) | Average income tax per return (in whole dollars) | Income tax as a percentage of AGI |
|---|---|---|---|---|---|---|
| Under $15,000 | 37,597 | $186,000 | $3,022 | $4,947 | $80 | 1.6% |
| $15,000 under $30,000 | 30,229 | 669,932 | 22,211 | 22,162 | 735 | 3.3% |
| $30,000 under $50,000 | 25,978 | 1,015,283 | 61,396 | 39,082 | 2,363 | 6.0% |
| $50,000 under $100,000 | 31,260 | 2,216,021 | 191,293 | 70,890 | 6,119 | 8.6% |
| $100,000 under $200,000 | 13,463 | 1,793,835 | 229,415 | 133,242 | 17,040 | 12.8% |
| $200,000 under $250,000 | 1,501 | 333,309 | 56,802 | 222,058 | 37,843 | 17.0% |
| $250,000 or more | 3,002 | 2,317,016 | 528,770 | 771,824 | 176,139 | 22.8% |
| Total | 143,030 | 8,531,396 | 1,092,909 | | | |



**Corporation Tax Liability as a Percentage of Taxable Income Tax Year 2006 Data**

| CORPORATION TAX LIABILITY TAX YEAR 2006 | | | |
|---|---|---|---|
| Total Assets (in thousands) | Income subject to tax (in millions) | Total income tax after credits (in millions) | Percentage of income tax after credits to taxable income |
| Zero Assets | $17,500 | $5,399 | 30.9% |
| $1 under $500 | 9,519 | 1,787 | 18.8% |
| $500 under $1,000 | 4,659 | 1,123 | 24.1% |
| $1,000 under $5,000 | 16,790 | 4,933 | 29.4% |
| $5,000 under $10,000 | 10,019 | 3,286 | 32.8% |
| $10,000 under $25,000 | 16,070 | 5,321 | 33.1% |
| $25,000 under $50,000 | 14,181 | 4,661 | 32.9% |
| $50,000 under $100,000 | 16,626 | 5,457 | 32.8% |
| $100,000 under $250,000 | 32,623 | 10,431 | 32.0% |
| $250,000 under $500,000 | 36,396 | 11,531 | 31.7% |
| $500,000 under $2,500,000 | 181,767 | 54,367 | 29.9% |
| $2,500,000 or more | 935,281 | 244,788 | 26.2% |
| Total | $1,291,431 | $353,084 | 27.3% |

# Appendix B:
# Improper Payments Information Act
# and Recovery Auditing Act

The *Improper Payments Information Act of 2002* (IPIA) requires agencies to review their programs and activities annually to identify those susceptible to significant improper payments. According to the Office of Management and Budget (OMB) Circular A-123, *Management's Responsibility for Internal Control*, Appendix C, Requirements for Effective Measurement and Remediation of Improper Payments (A-123, Appendix C), "significant" means that an estimated error rate and a dollar amount exceed the threshold of 2.5 percent and $10 million of total program funding. A-123, Appendix C also requires the agency to implement a corrective action plan that includes improper payment reduction targets.

The government-wide Chief Financial Officers Council developed an alternative for meeting IPIA requirements for federal programs that are so complex that developing an annual error rate is not feasible. Agencies may establish an annual estimate for a high-risk component of a complex program (e.g., a specific program population) with OMB approval. Agencies must also perform trend analyses to update the program's baseline error rate in the interim years between detailed program studies. When development of a statistically valid error rate is possible, the reduction targets are revised and become the basis for future trend analyses.

## I.   DESCRIPTION OF THE DEPARTMENT'S RISK ASSESSMENT(S) PERFORMED SUBSEQUENT TO COMPILING ITS FULL PROGRAM INVENTORY AND RISK-SUSCEPTIBLE PROGRAMS.

Each year, the Department develops a comprehensive inventory of the funding sources for all programs and activities and distributes it to the Treasury bureaus and offices. If program or activity funding is at least $10 million, Risk Assessments are required at the payment type level (e.g., payroll, contracts, vendors, travel, etc.). For those payment types resulting in high risk assessments that comprise at least 2.5 percent and $10 million of a total funding source, (1) statistical sampling must be performed to determine the actual improper payment rate, and (2) a corrective action plan must be developed and submitted to the Department and OMB for approval.

Responses to the Risk Assessments produce a score that falls into pre-determined categories of risk. The following table describes the actions required to be taken at each risk level:

| RISK LEVEL | REQUIRED ACTION(S) |
| --- | --- |
| High Risk > 2.5% Error Rate & > $10 Million | Corrective Action Plan |
| Medium Risk | Review Payment Controls for Improvement |
| Low Risk | No Further Action Required |

The Risk Assessments performed across the Department in fiscal year 2009 resulted in all programs and activities as low and medium risk susceptibility for improper payments except for the Internal Revenue Service's (IRS)

FHFA 1068

Earned Income Tax Credit (EITC) program. The EITC's high-risk status is well-documented, having been previously identified in the former Section 57 of OMB Circular A-11, *Preparation, Submission, and Execution of the Budget,* and has been deemed a complex program for the purposes of the IPIA.

## II.   DESCRIBE THE STATISTICAL SAMPLING PROCESS CONDUCTED TO ESTIMATE THE IMPROPER PAYMENT RATE FOR EACH PROGRAM IDENTIFIED.

## EARNED INCOME TAX CREDIT

The EITC is a refundable federal tax credit that offsets income taxes owed by low income workers and, if the credit exceeds the amount of taxes owed, provides a lump-sum payment to those who qualify.

The next section explains how the IRS currently develops its erroneous payment projections. The most recent projection is based on a tax year 2001 reporting compliance study that estimated the level of improper overclaims for fiscal year 2009 to range between $11.2 - $13.3 billion and 23 percent (lower bound) to 28 percent (upper bound) of approximately $48.1 billion in total program payments.

## NATIONAL RESEARCH PROGRAM (NRP) ANALYSIS

The complexity of the EITC program, the nature of tax processing, and the expense of compliance studies preclude statistical sampling on an annual basis to develop error rates for comparison to reduction targets. The estimates are based primarily on information from the National Research Program (NRP) reporting compliance study of individual income tax returns for tax year 2001—the most recent year for which compliance information from a statistically valid, random sample of individual tax returns is available. The approach is nearly identical to that used for earlier years. The difference is that the estimates make use of more recent EITC payment data from the President's fiscal year 2010 Budget.

Under the tax year 2001 NRP reporting compliance study, individual income tax returns filed during calendar year 2002 for tax year 2001 were randomly selected for examination.[1] This selection method allows the measures for the individual income tax return filing population to be estimated from the results of the NRP sample returns. Because one of the objectives of the NRP is to provide data for compliance measurement, NRP procedures and data collection differed from those followed in standard examination programs. NRP classification and examination procedures were more comprehensive in scope and depth than those for standard examination programs. These expanded procedures were designed to provide a more thorough determination of what taxpayers should have reported on their returns.

The tax year 2001 NRP individual income tax return study covered filers of all types of individual income tax returns. About 6,400 of the approximately 44,400 returns in the regular NRP sample were EITC claimants.[2] The NRP study results for this EITC claimant subset of NRP returns were the primary source of data for the improper payments estimates. Other data and information sources used for the estimates included the IRS Enforcement Revenue Information System (ERIS), which tracks assessments and collections from IRS enforcement-related activities; Treasury Department estimates of the effect of the EITC provisions in the Economic Growth and Tax

---

1   The NRP used a stratified, random sample design. Returns are grouped into predefined categories or "strata" and selected randomly within each stratum.
2   About 1,600 other returns (the "calibration sample") were included in the tax year 2001 NRP Individual Income Tax Study. These returns went through a somewhat different examination process and they were not used for these calculations.

*Relief Reconciliation Act of 2001* (EGTRRA) on erroneous EITC claims, and Treasury Department fiscal year 2010 EITC budget estimates.

Enacted in 2001, EGTRRA contains several provisions related to the EITC that became effective for tax year 2002. These provisions are believed to influence taxpayer behavior in a number of ways, among them increased claims and improved compliance for EITC claimants.[3] Since the improper payment rate is derived from pre-EGTRRA taxpayer behavior (tax year 2001), it must be adjusted to reflect the estimated impact of the EITC-related EGTRRA provisions. Treasury Department economists conducted an analysis of the EITC-related EGTRRA provisions, concluding that the provisions reduced EITC erroneous claims by about 13 percent and increased claims by about 5 percent.[4] To account for these effects, the NRP-based estimate of the improper payment rate for tax year 2001 was adjusted by reducing the of the *Amount of EITC Overclaimed* by 13 percent and increasing the *Amount of EITC Claimed on all Returns* by 5 percent.

The general approach for developing the fiscal year 2009 set of EITC improper payments estimates involved the following steps: (1) estimating an improper payment rate for tax year 2001 using the NRP data, (2) adjusting the tax year 2001 rate to reflect the estimated impact of the EITC-related EGTRRA provisions, (3) estimating EITC claims for fiscal year 2009 through fiscal year 2012 by projecting tax year 2001 claims forward using the growth rates implicit in Treasury Department budget outlay estimates, and (4) multiplying the adjusted improper payment rate by the estimated claims to calculate estimated improper payments for each fiscal year.

The error rate estimate from the EITC component of the tax year 2006 NRP study will be completed during fiscal year 2010. The updated error estimate will help inform business decisions about program administration and meets IPIA standards for measuring and reporting on improper payments.

## III.   DESCRIBE THE CORRECTIVE ACTION PLANS FOR REDUCING THE ESTIMATED RATE OF IMPROPER PAYMENTS FOR THE EITC PROGRAM.

The IRS uses a two-pronged approach to reduce erroneous EITC payments:

1. Continually seek opportunities to increase program efficiency within existing resources – in other words, make the base program better; and

2. Test potential business process enhancements to reduce error and then request implementation funding if the tests prove successful.

## BASE PROGRAM

In 2009, the IRS prevented more than $3.0 billion from being paid in error. The prevention activity is primarily focused in three areas:

- **Examinations** – the IRS identifies tax returns for examination and holds the EITC portion of the refund until an audit can be conducted. This is the only ongoing IRS audit program where exams are

---

3   For example, EGTRRA implemented a uniform definition of a "qualifying child" and simplified the rule for determining which taxpayer was eligible to claim the qualifying child in potentially ambiguous cases (the AGI tiebreaker rule). The simpler rules were expected to enhance compliance by reducing the number of claims arising from misinterpretation of the tax law and to increase the number of claims by those who were deterred by its complexity.
4   The estimates were in 1999 dollars.

conducted before a refund is released. The examination closures and enforcement revenue protected in the charts below do not include test initiatives.

- **Math Error** – this refers to an automated process in which the IRS identifies math or other statistical irregularities and automatically prepares an adjusted return for a taxpayer. Congressional approval is required for math error use.

- **Document Matching** – involves comparing income information provided by the taxpayer with matching information (e.g., W-2s, 1099s) from employers to identify discrepancies.

The chart below shows significant results from fiscal year 2004 through fiscal year 2010. In fiscal year 2009 alone, the IRS conducted over 500,000 examinations, issued 350,000 math error notices, and closed over 300,000 document matching reviews.

| COMPLIANCE ACTIVITIES (THOUSANDS) | FY04* | FY05* | FY06* | FY07 | FY08* | FY09** | FY10*** | FY04-FY10 Total |
|---|---|---|---|---|---|---|---|---|
| Examinations | 472,022 | 527,969 | 517,617 | 503,267 | 503,755 | 508,398 | 500,000 | 3,533,028 |
| Math Error Notices** | 624,590 | 515,890 | 460,316 | 393,263 | 432,797 | 350,000 | 350,000 | 3,126,856 |
| Document Matching | 300,000 | 324,419 | 364,020 | 394,217 | 377,327 | 314,469 | 325,000 | 2,399,452 |
| Amended Returns | | | | | 32,473 | 25,395 | 25,000 | 82,868 |

*Restated actual
**Preliminary estimates
***Estimate based on fiscal year 2009 preliminary data

These activities had a significant effect. Treasury projects that continued enforcement efforts will protect a total of $19 billion in revenue through fiscal year 2010.

| ENFORCEMENT REVENUE PROTECTED ($ BILLIONS) | FY04 | FY05* | FY06* | FY07* | FY08* | FY09** | FY10*** | FY04-FY10 Total |
|---|---|---|---|---|---|---|---|---|
| Examinations | 1.12 | 1.35 | 1.50 | 1.49 | 2.00 | 2.15 | 2.15 | 11.76 |
| Math Error Notices** | 0.62 | 0.52 | 0.46 | 0.41 | 0.44 | 0.38 | 0.38 | 3.21 |
| Document Matching | 0.25 | 0.53 | 0.60 | 0.73 | 0.74 | 0.63 | 0.65 | 4.13 |
| Amended Returns | | | | | 0.07 | 0.07 | 0.07 | 0.21 |
| TOTAL | 1.99 | 2.40 | 2.56 | 2.63 | 3.25 | 3.23 | 3.25 | 19.31 |

*Restated actual
**Preliminary estimates
***Estimate based on fiscal year 2009 preliminary data

FHFA 1071

## TESTING NEW BUSINESS PROCESSES

The IRS continues to build new solutions for existing business processes and to use other activities to combat program error including:

- Continuing the partnership with members from two key tax software associations to identify software enhancements and collaborative efforts that can help reduce EITC errors and assist preparers in meeting their EITC due diligence requirements

- Implementing an on-line training module for paid preparers on EITC preparer due diligence requirements and standards

- Further refining and completing activities associated with a suite of EITC paid preparer treatments, based on risk-based selections, including due diligence audits, visits by revenue and criminal investigation agents, streamlined injunctions, first-time paid preparer treatments to influence the accuracy of EITC returns filed, and analyzing short-term outcomes, including penalties and accuracy of returns.

## IV.  EITC IMPROPER PAYMENT REDUCTION OUTLOOK

The reduction outlook for EITC improper payments is as follows:

| Program | PY Outlays | PY % | PY $ | CY Outlays | CY IP% | CY IP$ | CY+1 Est Outlays | CY+1 IP% | CY+1 IP$ | CY+2 Est Outlays | CY+2 IP% | CY+2 IP$ | CY+3 Est Outlays | CY+3 IP% | CY+3 IP$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EITC Upper Bound Estimate | $47.6 | 28% | $13.1 | $48.1 | 28% | $13.3 | $60.7 | 28% | $16.8 | $58.5 | 28% | $16.2 | $49.4 | 28% | $13.7 |
| EITC Lower Bound Estimate | $47.6 | 23% | $11.1 | $48.1 | 23% | $11.2 | $60.7 | 23% | $14.2 | $58.5 | 23% | $13.6 | $49.4 | 23% | $11.5 |

Outlays: The amounts shown are projections of total payments for the EITC, estimated by the Office of Tax Analysis within the Department of the Treasury. Following prior methodology, the amount shown is the total EITC claimed.

IP % and IP$: These estimates follow the prior approach which provided a range for improper payments.

Note: The Improper Payment percentage and Estimated Outlay columns reflect a constant error rate pending the development of an annual error rate measurement.

CY+1 and CY+2 estimates include ARRA EITC provisions which expand EITC for families with three children and increase the beginning of the phaseout range for couples filing a joint return.

CY: Current year; PY: Prior year

# RECOVERY AUDITING ACT

## V.   TREASURY'S RECOVERY AUDITING PROGRAM

Section 831 of the *Defense Authorization Act* for fiscal year 2002 added a new subchapter to the U.S. Code (31 U.S.C 3561-3567), also known as the Recovery Auditing Act, that requires agencies that enter into contracts with a total value in excess of $500 million in a fiscal year to carry out a cost-effective program for identifying errors made in paying contractors and for recovering amounts erroneously paid to the contractors. A required element of such a program is the use of recovery audits and recovery activities. In accordance with OMB Circular A-123, *Management's Responsibility for Internal Control,* Appendix C, reporting on recovery auditing is required annually.

In fiscal year 2009, Treasury issued contracts totaling $5.0 billion. The annual Improper Payments Information Act Risk Assessment process includes a review of pre-payment controls that minimize the likelihood and occurrence of improper payments. For Recovery Auditing Act compliance, Treasury requires each bureau and office to review their post-payment controls and report on recovery auditing activities, contracts issued, improper payments made, and recoveries achieved. Bureaus and offices may use recovery auditing firms to perform many of the steps in their recovery auditing program and identify candidates for recovery action.

Treasury considers both pre-payment and post-payment reviews to identify payment errors a good management practice that should be included among basic payment controls. All of Treasury's bureaus use some form of recovery auditing techniques to identify improper payments during post-payment reviews. At times, bureaus may use the services of recovery auditors to help them identify payment anomalies and target areas for improvement. However, Treasury has extensive contract payment controls that are applied at the time each payment is processed, making recovery activity minimal. The low level of improper payments in 2009 did not require any Treasury bureau to develop a management improvement program under *Recovery Auditing Act* guidance.

| RECOVERY AUDITING INFORMATION FISCAL YEAR 2004 - FISCAL YEAR 2009 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Agency | Amount Subject to Review for CY Reporting | Actual Amount Reviewed and Reported CY | Amount Identified for Recovery CY | Amount Recovered CY* | Amount Identified for Recovery PY | Amount Recovered PY | Cumulative Amts. Identified for Recovery (CY+PYs) | Cumulative Amts. Recovered (CY+PYs) |
| Treasury | $5,254,751,759 | $4,661,539,275 | $1,475,232 | $1,357,672 | $825,279 | $839,818 | $6,733,805 | $5,500,579 |

Note: CY: Current year; PY: Prior year
* Includes amounts identified for recovery in prior years.

For fiscal year 2009, the total number of contracts subject to review was 34,855; the total number reviewed was 32,311, for a total program cost of approximately $1.2 million dollars.

## VI.  MANAGEMENT ACCOUNTABILITY

The Secretary of the Treasury has delegated responsibility for improper payments to the Assistant Secretary for Management/Chief Financial Officer (ASM/CFO). Improper payments fall under the Department's management and internal control program. A major component of the internal control program is risk assessments, which are an extension of each bureau's annual improper payment review process. Under Treasury Directive 40-04, *Treasury Internal (Management) Control Program*, executives and other managers are required to have management control responsibilities as part of their annual performance plans. With oversight mechanisms such as the Treasury CFO Council and the IRS's Financial and Management Controls Executive Steering Committee, managerial responsibility and accountability in all management and internal control areas are visible and well documented.

Improper payments also have been monitored for improvement as a significant deficiency under the Federal Managers' Financial Integrity Act. Executives who are responsible and accountable for reducing the level of EITC overclaims have been identified, while other senior and mid-level officials have responsibility for monitoring progress in this area as bureau and program internal control officers.

## VII.  RESOURCES REQUESTED IN THE FISCAL YEAR 2010 BUDGET SUBMISSION TO CONGRESS

The IRS fiscal year 2010 President's Budget submission included no new initiatives related directly to the EITC program.

## VIII. LIMITING STATUTORY AND REGULATORY BARRIERS

A number of factors serve as barriers to reducing overclaims in the EITC program. These include:

- Complexity of the tax law
- Structure of the Earned Income Tax Credit
- Confusion among eligible claimants
- High turnover of eligible claimants
- Unscrupulous return preparers
- Fraud

No one of these factors can be considered the primary driver of program error. Furthermore, the interaction among the factors makes addressing the credit's erroneous claims rate, while balancing the need to ensure the credit makes its way to taxpayers who are eligible, extremely difficult.

*This page left intentionally blank*

FHFA 1075

# Appendix C:
# Management and Performance Challenges and Responses

In accordance with the *Reports Consolidation Act of 2000*, the Inspectors General issue Semiannual Reports to Congress that identify specific management and performance challenges facing the Department. At the end of each fiscal year, the Treasury Office of Inspector General (OIG) and the Treasury Inspector General for Tax Administration (TIGTA) send an update of these management challenges to the Secretary and cite any new challenges for the upcoming fiscal year.

This Appendix contains the incoming management and performance challenges letters from OIG and TIGTA and the Secretary's responses describing actions taken and planned to address the challenges.

*This page left intentionally blank*

FHFA 1077



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.  20220

OFFICE OF
INSPECTOR GENERAL

October 29, 2009

## INFORMATION MEMORANDUM FOR SECRETARY GEITHNER

**FROM:**　　　　　Eric M. Thorson
　　　　　　　　　Inspector General

**SUBJECT:**　　　Management and Performance Challenges Facing
　　　　　　　　　the Department of the Treasury (OIG-CA-10-001)

In accordance with the Reports Consolidation Act of 2000, we are providing you with our perspective on the most serious management and performance challenges facing the Department of the Treasury.

This year, we are reporting one new challenge:

- Management of Recovery Act Programs

This challenge relates to the significant additional responsibilities and funding received by Treasury through the American Recovery and Reinvestment Act of 2009 (Recovery Act) for a variety of programs.

We also continue to report four challenges from last year:

- Management of Treasury's New Authorities Related to Distressed Financial Markets
- Regulation of National Banks and Thrifts
- Management of Capital Investments
- Anti-Money Laundering and Terrorist Financing/Bank Secrecy Act Enforcement

We removed two previously reported challenges:

- Corporate Management
- Information Security

### Challenge 1: Management of Treasury's New Authorities Related to Distressed Financial Markets

As we reported last year, Treasury, along with the Federal Reserve, the Federal Deposit Insurance Corporation (FDIC), and the Federal Housing Finance Agency, has taken unprecedented actions to address the current financial crisis. To assist in those efforts, Congress passed the Housing and Economic Recovery Act in July 2008, which gave Treasury broad new authorities to address the distressed financial condition of Fannie Mae and Freddie Mac. Less than 6 weeks later, the Federal Housing Finance Agency put both entities into conservatorship.

PART 3 · OTHER ACCOMPANYING INFORMATION

Page 2

Treasury agreed to purchase senior preferred stock in Fannie Mae and Freddie Mac, established a new secured line of credit available to them, and initiated a temporary program to purchase new mortgage-backed securities issued by them. According to Treasury data, as of June 30, 2009, Treasury had purchased $86.5 billion in preferred stock of the two entities to cover their continuing losses and maintain a positive net worth. Treasury also purchased $154.2 billion of mortgage-backed securities issued by Fannie Mae and Freddie Mac. Even with this assistance, both entities remain in a weakened financial condition and may require more assistance.

As the turmoil in the financial markets increased, Treasury and the Federal Reserve took additional actions to deal with the situation, including rescuing Bear Stearns and American International Group. Treasury also sought and obtained additional authorities through passage of the Emergency Economic Stabilization Act (EESA) in October 2008. EESA, commonly known as the Troubled Assets Relief Program (TARP), gave the Treasury Secretary $700 billion to, among other things, (1) purchase capital in qualifying U.S.-controlled financial institutions and (2) buy, maintain, and sell toxic mortgage-related assets from financial institutions. These authorities were intended to bolster credit availability and address other serious problems in U.S. and world financial markets.

After EESA was enacted, the Department aggressively moved forward to loosen the credit market by purchasing senior preferred stock in nine of the nation's largest financial institutions. Since then, hundreds of other financial institutions have also participated in the Capital Purchase Program (CPP). To date, some CPP participants have repurchased preferred shares and warrants totaling more than $70 billion. However, a small but growing number of CPP recipients are failing to make their 5 percent dividend payments due to Treasury.

The Department implemented a number of other mechanisms to carry out its other authorities and responsibilities under TARP, including the Public-Private Investment Program and the Home Affordable Modification Program. To administer TARP, Treasury established the Office of Financial Stability.

EESA established a special inspector general for TARP and imposed oversight and periodic reporting requirements on both the special inspector general and the Government Accountability Office (GAO). Under EESA, GAO is also responsible for performing the annual financial statement audit of TARP. Recently, GAO reported that at the 1-year mark, TARP in general and CPP in particular, along with other efforts by the Federal Reserve and FDIC, had made important contributions to help stabilize credit markets. However, GAO also reported that many challenges and uncertainties remain—for example, whether Treasury will fully recoup TARP assistance to the automobile industry and AIG, among others. GAO further noted that other programs, such as the Public-Private Investment Program and the Home Affordable Modification Program, still face implementation or operational challenges. GAO recommended that as Treasury considers further action under TARP, including whether to extend the program beyond December 31, 2009, the Department should evaluate the program in the broader context of efforts by the Federal Reserve and FDIC to stabilize the financial system.

Page 3

At the time of this writing, it should also be noted that the Department is working through several significant accounting issues involving some very complex TARP transactions. As a result, the Department, in consultation with our office and GAO, has requested an extension from the Office of Management and Budget for its fiscal year 2009 annual financial reporting submission.

As conditions improve, Treasury will need to work with its partners to disassemble the structure established to support recovery efforts and ensure that federal funds no longer needed for those efforts are returned in an orderly manner to the Treasury general fund.

**Challenge 2: Regulation of National Banks and Thrifts**

Since September 2007, 39 Treasury-regulated financial institutions have failed, with estimated losses to the deposit insurance fund exceeding $27 billion. Even more financial institutions are expected to fail over the next 2 years.

Although many factors have contributed to the turmoil in the financial markets, Treasury's Office of the Comptroller of the Currency (OCC) and Office of Thrift Supervision (OTS) did not identify early or force timely correction of unsafe and unsound practices by institutions under their supervision. The irresponsible lending practices of many institutions are now well-recognized—including reliance on risky products, such as option adjustable rate mortgages, and degradation of underwriting standards. At the same time, financial institutions engaged in other high-risk activities, including high asset concentrations in commercial real estate and overreliance on unpredictable brokered deposits to fund rapid growth. There have also been instances of certain ailing thrifts backdating capital contributions.

The banking industry will continue to be stressed over the next several years. In their 2009 interagency Shared National Credits (SNC) review, OCC, OTS, and the other federal banking regulators found that credit quality had deteriorated to record levels with respect to the $2.9 trillion in large ($20 million or more) loans and loan commitments held by U.S. bank organizations, foreign bank organizations, and nonbank entities such as securitization pools, hedge funds, insurance companies, and pension funds. The review, which covered $1.2 trillion of the $2.9 trillion SNC portfolio, identified total losses of $53 billion. That amount exceeded the combined losses reported in the previous eight SNC reviews and was nearly triple the amount of the previous high, identified in 2002. The next substantial stresses to financial markets may result from troubled credit card debt and further deterioration in commercial real estate loans and could significantly affect financial institutions that had limited exposure to the housing crisis.

Our office is mandated to review failures of Treasury-regulated financial institutions that result in material losses to the deposit insurance fund. Since 2007, we have completed 12 such reviews and are engaged in 19 others. These reviews identify the causes of the failures and assess supervision exercised over failed institutions. Both OCC and OTS have been responsive to our recommendations for improving supervision. For example, OTS has issued guidance addressing concentration issues and the appropriate accounting treatment for capital contributions. However,

Page 4

these reviews do not address the broader supervisory effectiveness of the federal banking regulators as a whole or the effectiveness of the supervisory structure. It is therefore essential that OCC and OTS continue to take a critical look at their supervisory processes to identify why those processes did not prevent or mitigate the practices that led to the current crisis and what can be done to better protect the financial health of the banking industry and consumers going forward.

Recognizing that the focus of EESA and the Recovery Act is on the current crisis, another consideration is the need to identify, monitor, and manage emerging domestic and global systemic economic risks. Moreover, these emerging risks may go beyond the current U.S. regulatory structure. As we reported last year, Treasury and its regulatory partners must continue to diligently monitor both regulated and unregulated products and markets for new systemic risks that may require action.

Finally, in response to the current crisis, both the administration and Congress are considering proposals for regulatory reform, ranging from the creation of a single financial regulator to a more limited approach calling for oversight councils composed of the existing regulators and consolidating OTS and OCC. (Consolidating OTS and OCC is a common feature of the proposals and has been advocated by the Department.) Also under consideration is transferring responsibility for consumer financial protection functions to a new regulatory agency. Although it is too soon to know which direction regulatory reform will take, Treasury, OCC, and OTS will need to work in concert with the other affected federal bank regulators to ensure a smooth and effective transition to the new regulatory structure that emerges.

## Challenge 3: Management of Recovery Act Programs

Treasury is responsible for overseeing an estimated $150 billion of Recovery Act funding and tax relief. Treasury's oversight responsibilities include grants for specified energy property in lieu of tax credits, grants to states for low-income housing projects in lieu of tax credits, increased Community Development Financial Institutions Fund grants and tax credits, economic recovery payments to social security beneficiaries and others, and payments to U.S. territories for distribution to their citizens. Many of these programs are new to Treasury and involve very large dollar amounts. As a result, Treasury faces immense challenges in ensuring that the programs achieve their intended purposes, provide for accountability and transparency, and are free from fraud and abuse.

It is estimated that Treasury's Recovery Act grants in lieu of tax credit programs—for specified energy property and to states for low-income housing projects—will cost almost $20 billion over their lives. Treasury has dedicated only a small number of staff to award and monitor these funds. We have concerns that the current staffing level is not commensurate with the size of these programs.

To date, we have issued two audit reports on Treasury's Recovery Act programs. The first, issued in August 2009, discussed progress made and additional steps necessary to operate the

Page 5

specified energy property program more effectively. The second, issued in October 2009, discussed our concerns with a survey the Department completed for the Recovery Accountability and Transparency Board on Recovery Act staffing levels, qualifications, and training. We concluded that the information provided in the survey response was unreliable. Although these two early audits identified problems, the Deputy Secretary and the Senior Accountability Officer (the Assistant Secretary for Management, Chief Financial Officer, and Chief Performance Officer) have shown a strong commitment to implementing an effective control structure over Recovery Act activities and strong support for our oversight effort. We will work with the Department and the Treasury Inspector General for Tax Administration to help ensure that appropriate controls are in place.

## Challenge 4: Management of Capital Investments

Managing large capital investments, particularly information technology investments, is a difficult challenge for any organization, whether public or private. In prior years, we have reported on a number of capital investment projects that either failed or had serious problems. Treasury is now making the transition to a new, mission-critical telecommunications system, TNet. The overall value of the TNet contract is estimated at $270 million. Treasury was originally to have begun the transition in February 2008. It is now expected to begin in December 2009, nearly 2 years late. In light of this delay, previously reported problems with large capital investments, and hundreds of millions of procurement dollars at risk, Treasury must exercise continuous vigilance in managing such investments.

## Challenge 5: Anti-Money Laundering and Terrorist Financing/Bank Secrecy Act Enforcement

Treasury faces unique challenges in carrying out its responsibilities under the Bank Secrecy Act (BSA) and USA Patriot Act to prevent and detect money laundering and terrorist financing. The Financial Crimes Enforcement Network (FinCEN) is the Treasury bureau responsible for administering BSA. However, a large number of other federal and state entities participate in efforts to ensure compliance with BSA, including the five federal banking regulators, the Internal Revenue Service, the Securities and Exchange Commission, the Department of Justice, and state regulators. Many of these entities also participate in efforts to ensure compliance with U.S. foreign sanction programs administered by Treasury's Office of Foreign Assets Control (OFAC).

Treasury faces significant challenges in coordinating the efforts of these multiple entities, many external to Treasury. FinCEN and OFAC have entered into memoranda of understanding with many federal and state regulators in an attempt to build a consistent and effective process. However, these instruments are nonbinding and carry no penalties for violations, and their overall effectiveness has not been independently assessed. Furthermore, the USA Patriot Act has increased the types of financial institutions required to file BSA reports. In fiscal year 2008, financial institutions filed approximately 18 million BSA reports.

Page 6

Although BSA reports are critical to law enforcement, past audits have shown that many contain incomplete or erroneous data and that examination coverage by financial institution regulators of BSA compliance has been limited. In a response to our 2008 management challenges letter, Secretary Paulson said that FinCEN had published interpretive guidance in fiscal year 2008 to address many issues, including common errors noted in suspicious activity reports. The response also stated that FinCEN, OCC, OTS, and other federal banking regulators had studied and made adjustments to the risk-based examination process. We have not had the opportunity to assess these or other recent changes.

Given the criticality of this management challenge to the Department's mission, we continue to consider BSA and OFAC programs as inherently high-risk. Adding to this risk in the current environment is the risk that financial institutions and their regulators may decrease their attention to BSA and OFAC program compliance as they address safety and soundness concerns. As the administration and Congress consider what could be sweeping changes to the financial regulatory structure, those changes must ensure that BSA and OFAC compliance examination coverage is sufficient. Mandatory work, particularly material loss reviews of failed banks and thrifts, prevented us from performing any audits in this area in fiscal year 2009 and we do not expect to provide significant audit coverage in this area in fiscal year 2010.

## Challenges Removed

We removed corporate management as an overarching management challenge, first identified as a challenge in 2004, because the Department has made significant progress in building up a sustainable corporate control structure. This progress was evident in the relatively smooth transition that occurred with the change in administrations this year. Treasury nevertheless remains a highly decentralized organization, and recent economic events have increased the number and complexity of its missions. Possible regulatory reforms could subject the Department's missions and structure to further change. In addition, Treasury has yet to fill many key leadership positions. Given these matters, senior leadership will need to ensure that the Department's corporate control structure remains strong and in place.

We removed information security as a management and performance challenge because Treasury has made significant strides in improving and institutionalizing its information security controls. We noted this progress in our two most recent annual Federal Information Security Management Act independent evaluations. Information security requires continued and strong management attention, however, so that policies remain current and practices do not deteriorate.

We would be pleased to discuss our views on these management and performance challenges in more detail.

cc: Daniel Tangherlini, Assistant Secretary for Management, Chief Financial Officer, and
    Chief Performance Officer



## DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C.

SECRETARY OF THE TREASURY

December 11, 2009

**MEMORANDUM FOR ERIC M. THORSON**
**INSPECTOR GENERAL**

FROM:                  Timothy F. Geithner

SUBJECT:               Management and Performance Challenges Facing the
                       Department of the Treasury

I am responding to your memorandum of October 29, 2009, describing your perspective on the most serious management and performance challenges facing the Department of the Treasury. The Department appreciates your independent assessment of progress in addressing these challenges.

Fiscal year (FY) 2009 brought a new management challenge, *Management of Recovery Act Programs*. The Department has established effective control structures to monitor the implementation of our Recovery Act programs to ensure they achieve their intended purposes, as well as to provide unprecedented accountability and transparency.

I want to thank you for recognizing our efforts in resolving *Corporate Management and Information Security* issues and for removing them from your listing of the Department's management challenges. We have taken, and will continue to take, appropriate actions to address those and remaining management challenges.

The Department is committed to remain vigilant about the risks associated with all of our programs and to adjust our strategies based on changing circumstances to achieve financial stability, economic security, and protection of the taxpayer. We look forward to working with you to further address these challenges.

## Challenge 1 – Treasury's New Authorities Related to Distressed Financial Markets

The financial system and the economy are showing signs of stability. The cost of borrowing has declined to pre-crisis levels for many businesses, states and local governments, the government sponsored enterprises (GSEs), and the banks. Housing markets have shown signs of stabilization, and home prices have ticked up in recent months, after three straight years of declines. The economy grew in the third quarter, and most private economists predict it will grow for the remainder of this year and next. That improvement in the economic and financial outlook since the spring reflects a broad and aggressive policy response that included the financial stability policies implemented under the Troubled Asset Relief Program (TARP), efforts to bolster confidence in the housing and mortgage markets under the Housing and Economic Reform Act (HERA), other financial stability policies implemented by the Federal Deposit Insurance Corporation and the Board of Governors of the Federal Reserve System (Federal Reserve), accommodative monetary policy, and the Obama Administration's fiscal stimulus package implemented under the American Recovery and Reinvestment Act of 2009.

Despite TARP's positive record to date, and the improving financial and economic outlook, significant challenges remain for the financial sector and our economy. While the economy is growing again, jobs are still being lost

and credit losses in some parts of the financial system are still accelerating. The pace of bank failures, which tends to lag economic cycles, remains elevated. Foreclosure rates also remain high. Bank lending continues to contract, with credit standards tight and demand still down. Small businesses rely heavily on such lending, as they do not have the ability to raise capital through debt issuance in securities markets. Further, commercial real estate losses weigh heavily on many banks, especially those that are small, impairing their ability to extend new loans. While a number of TARP initiatives have begun to wind down, Treasury continues to focus on stabilizing the housing markets as well as improving access to credit for small businesses. Based on the need for continuing work in these areas and also the need to ensure an orderly close out of the TARP Program, we have extended TARP authority to October 3, 2010. Following is additional information on actions we have taken and continue to take in addressing this challenge.

The Department of the Treasury's Office of Debt Management (ODM) has purchased over $200 billion in Mortgage Backed Securities (MBS) guaranteed by Fannie Mae and Freddie Mac through two expert asset managers, Barclays Global Investors and State Street Global Advisors. The Housing and Economic Recovery Act of 2008 granted Treasury the authority to make these purchases. That authority expires December 31, 2009. For increased transparency, the Department publishes aggregate information on its holdings of Agency MBS on FinancialStability.gov (***http://www.financialstability.gov/roadtostability/homeowner.html***). Treasury holds monthly executive committee meetings chaired by the Acting Under Secretary for Domestic Finance to discuss program implementation, and is actively seeking advanced risk management tools beyond those provided by the asset managers for the maintenance stage of the program. These tools will be in place by January 1, 2010.

We have tested the Government Sponsored Enterprises Credit Facility (GSECF) in a development environment and the Office of the Fiscal Assistant Secretary has established robust procedures for its use. The GSECF has not been used to date, nor do we expect it to be before its December 31, 2009 expiration date.

In October 2008, the Emergency Economic Stabilization Act authorized a total of $700 billion for Treasury to purchase or to insure troubled assets. Treasury used this authority to implement the Troubled Asset Relief Program (TARP) to strengthen the U.S. financial system, restore credit markets for businesses and consumers, and address foreclosures in the housing market. In fiscal year 2009, the Department rolled out eight programs: Capital Purchase Program; Targeted Investment Program; American International Group Investment Program (formerly known as the Systemically Significant Failing Institution Program); Automotive Industry Financing Program (including the Auto Suppliers Support Program and the Auto Warranty Program); Asset Guarantee Program; Term Asset-Backed Securities Loan Facility, as part of the Consumer and Business Lending Initiative; Public-Private Investment Program; and the Home Affordable Modification Program. As of September 30, 2009, over $521 billion had been designated for particular TARP programs. Of that amount, over $444 billion had been obligated to specific institutions under signed agreements, with over $365 billion of those funds already disbursed.

Treasury Departmental Offices and bureaus played a critical role in establishing a well-functioning Office of Financial Stability (OFS) to implement these programs. Over the past year, while aggressively implementing the programs listed above, OFS has grown into an organization of 212 full-time employees who support the TARP. Initially, several key Office of the Comptroller of the Currency (OCC) and Office of Thrift Supervision (OTS) personnel were detailed to OFS positions to provide assistance in setting up accounting, finance, and reporting systems. They also assisted in developing information technology, procurement, and risk management processes. The infrastructure put in place to support the TARP mitigates risk for the taxpayer. For each TARP operational

program, sound controls and oversight have been properly designed, planned, and implemented for the longer term.

TARP was designed as an emergency response to a major financial crisis.  Because financial conditions have begun to improve, Treasury has already started the process of exiting from some emergency programs.  Although Treasury and other government institutions have accomplished a great deal in a relatively short time, more work lies ahead.  As necessary, TARP will maintain capacity to address new developments until financial stability and economic health have been fully restored.

## Challenge 2 - Regulation of National Banks and Thrifts

Both the Administration and Congress are in the midst of reviewing numerous proposals for financial regulatory reform.  Treasury Departmental Offices, OCC, and OTS are working closely with other federal financial regulators to ensure a smooth transition to a new regulatory structure.  The Department also expects to devote resources in 2010 toward implementing the recommendations of its working groups on the conduct of financial supervision and regulation and on the regulatory capital regime.

*Regulation of National Banks*

In fiscal year 2009, 13 OCC-supervised and regulated national banks failed, with estimated losses to the deposit insurance fund totaling approximately $3.7 billion.  All 13 are community banks and the majority of these failures were the result of high concentrations in acquisition, development, and construction lending to the residential construction industry.  In addition to taking actions to address the recommendations contained in the four Material Loss Review reports issued by your office during fiscal year 2009, the OCC conducted its own reviews of the national bank failures.  Lessons learned included the need to reinforce adherence to OCC's policy on the timely use of and follow through on "Matters Requiring Attention," and the need to ensure that bank management and boards of directors provide effective oversight and adequate controls over risk.  The OCC reports that the results of these critical reviews were used to communicate areas of concern to examiners and to adjust supervisory processes to better protect the safety and soundness of the national banking system.

During fiscal year 2009, the OCC introduced a program for its large national bank population that emphasized more intensive, ongoing monitoring of bank liquidity, standardization of liquidity measures across institutions, and evaluation of banks' liquidity cushions and contingency plans in the regular course of their OCC supervision.

In June the federal banking agencies released for comment the proposed *Interagency Guidance on Funding and Liquidity Risk Management*, which would effectively extend the features of the OCC's program to all domestic financial institutions.  In September the federal banking agencies also released for comment proposed *Interagency Guidance on Correspondent Concentration Risks*.  More broadly, the OCC worked with other financial supervisors, both domestically and internationally, to identify areas where risk management practices at financial institutions and supervisory expectations or requirements need to be strengthened.  In this regard, the OCC is actively involved in efforts underway by the Basel Committee on Banking Supervision to strengthen and enhance international capital standards and liquidity risk management.  The Comptroller continued to serve as co-chairman of the Financial Stability Board's working group on provisioning.

In the area of consumer regulation and protection, the OCC issued guidance to national banks on the Credit Card Accountability Responsibility and Disclosure (CARD) Act of 2009; Final Rules and Guidelines to Promote

Accurate Reports about Consumers; and Final Rules and Guidelines Implementing Accuracy and Integrity Provisions of the Fair and Accurate Credit Transactions Act.  The OCC also issued Consumer Advisories.

The OCC's Bank Supervision Operating Plan describes several key objectives for 2010. Effective credit risk and liquidity risk management, as well as the quality of capital and level of regulatory capital to absorb unexpected losses are areas of focus.  Supervisory attention will also focus on corporate governance and compliance functions, the capability of bank management to manage risk, and the effective resolution of problem banks.  The OCC will also encourage banks to continue to meet the needs of credit worthy borrowers and comply with consumer compliance laws and regulations.

*Regulation of Thrifts*

During fiscal year 2009, 14 OTS-regulated thrifts were placed in receivership with estimated losses to the deposit insurance fund of approximately $11 billion.  Many of these failures were the result of poor risk management practices and excessive concentrations in high risk assets.

In addition to responding to Material Loss Review recommendations from your office, the OTS conducts internal reviews following the receivership of failed thrifts.  The objective of the internal assessment is to review the chronology of events leading to the failure, identify the causes of the failure, evaluate OTS supervision and enforcement activities, and provide recommendations for addressing the findings of the review.  The OTS completed seven such reviews in fiscal year 2009, and has made significant progress implementing the recommendations from these reviews.

During 2009, the OTS supplemented and improved staff guidance to address concentration risks, enforcement actions, capital contributions, downgraded securities, examination follow-up, and other key supervisory issues. The OTS also emphasized the importance of comprehensive loan modification programs to provide solutions for borrowers who cannot afford their current mortgage payments.  In August, the OTS released Thrift Bulletin 85, *Regulatory and Accounting Issues Related to Modifications and Troubled Debt Restructurings of 1-4 Residential Mortgage Loans*, to update thrift management on accounting and regulatory issues associated with loan modification programs.

Also in 2009, the OTS issued a final rule prohibiting a series of unfair credit card practices under the Agency's authority to issue regulations under Section Five of the Federal Trade Commission Act banning unfair and deceptive acts and practices.  The economic downturn will continue to have a significant affect on the performance of the thrift industry over the next several years.

To meet the challenges that will arise during fiscal year 2010, OTS has emphasized the following priorities in thrift supervision.  During each regular examination OTS staff will  review each thrift's operations to ensure it is properly managing any concentration risk in its portfolio, has sufficient capital commensurate with its operations, has appropriate and effective risk management controls, and has sufficient liquidity levels and contingency liquidity plans.  The OTS will continue to work on an inter-agency basis with the other federal banking regulators to ensure fair and balanced regulation that includes appropriate counter-cyclical and systemic risk measures.

*Reform efforts*

As part of a comprehensive package of financial regulatory reform, Treasury has proposed legislation to overhaul the structure of federal supervision and regulation, including consolidating the OCC and OTS into one

agency.  Treasury's proposals would also make sure that all financial firms that own banks are subject to robust consolidated supervision by closing gaps and loopholes in the Bank Holding Company Act and requiring thrift holding companies to become bank holding companies.  Other elements of the comprehensive reform include requiring all firms whose failure could threaten financial stability to submit to strong prudential supervision regardless of whether they own a bank; creating a Financial Services Oversight Council (FSOC) to monitor emerging threats; establishing a new Consumer Financial Protection Agency; and creating a resolution regime for large, highly interconnected financial firms to allow these firms to fail while protecting taxpayers and the economy.

Treasury also continues to work with the OCC, OTS, and other federal financial agencies to analyze lessons learned from the financial crisis and pursue appropriate reforms that do not require legislative action.  Following on the release of the Treasury's regulatory reform legislative proposals, Treasury is leading working groups on regulatory capital and on the future of financial supervision and regulation.  These working groups will make further proposals for strengthening the conduct of supervision and addressing shortcomings in rules and regulations.  The Treasury expects that implementing their recommendations will require the commitment of all of these agencies in the next two years.

## Challenge 3 – Management of Recovery Act Programs

Under the American Recovery and Reinvestment Act of 2009 (ARRA, or Recovery Act), Treasury administers grants, cash assistance in lieu of tax credits, economic recovery payments, and some 60 tax relief provisions which will deliver over $300 billion in relief to American families and businesses.

Treasury recognizes the immense challenges in managing its Recovery Act programs in a manner that ensures the programs achieve their intended purpose, provide for unprecedented accountability and transparency, and are free from fraud and abuse.

In implementing ARRA, the Department must ensure that we balance and meet the objectives of speed, quality and accountability.  To achieve these objectives, Treasury established a Recovery Act implementation team responsible for working with the program offices across the Department.  The Recovery Act team facilitates all Recovery Act implementation Department-wide and interfaces with the broader Recovery Act community.  As part of this broad responsibility, the team establishes internal processes, addresses external data requirements, manages risk inherent in Recovery Act implementation, and coordinates Treasury Recovery Act audits.  The team works closely with the Office of Management and Budget (OMB) and the Recovery Implementation Office to document progress on Recovery Act implementation and assists in implementing OIG/TIGTA/GAO recommendations.

Internally, the Recovery Act team developed detailed spend plans for its major programs and documents reporting responsibility for executing those initiatives.  Treasury monitors and reviews those spend plans with bureau and Senior-accountable officials.  This review focuses on items such as percent on-time performance for project activities, obligations and outlays versus plan, acquisition competition and contract types, performance measure actual values versus targets, and accountability metrics.  Corrective and preventive actions, established as a result of the reviews, are tracked for implementation. We also review risk assessments and the implementation of mitigation plans to minimize the probability of fraud and abuse.

Treasury keeps the public informed through both agency and bureau websites and press releases, and monitors timely submissions to both the Recovery.gov and Treas.gov Recovery Act web pages.

ARRA established a number of innovative new programs to ease the impact of the credit crunch on state and local government budgets. One such program, which has been implemented very successfully by the Department of the Treasury, is the Build America Bond program (BAB). BABs are taxable bonds issued by state and local governments with a 35 percent interest subsidy paid directly to the issuer by the federal government. This bond program has allowed states to raise capital needed for crucial infrastructure projects by attracting new investors to the municipal bond market and reducing the issuer's debt cost. $47 billion in Build America Bonds were issued from the program's inception in April 2009 through the end of October, representing 21 percent of all municipal issuances in that time frame. A total of 42 states have participated in the program with over 500 separate issues. In addition to giving issuers access to much needed capital, the program has succeeded in making municipal debt attractive to new investors such as pension funds and foreign investors. By bringing in new investors, BABs have relieved supply pressure and have helped reduce borrowing costs on traditional tax-exempt municipal debt.

You expressed concern that Treasury staffing for two of our Recovery Act programs (cash assistance to states for low-income housing projects in lieu of tax credits and cash assistance for specified energy property in lieu of tax credits) is not commensurate with the size of these programs. The Office of the Fiscal Assistant Secretary assembled a core staff of five full-time employees to manage these programs. Although this is a small staff in relation to the size of the programs, we are achieving success by ensuring that this staff has appropriate skill sets and by leveraging the skills and expertise of others, both within and outside the Department. Staff members from several other offices within Treasury, including the IRS, are devoting time to these two programs. Additionally, we entered into an Interagency Agreement with the Department of Energy to provide necessary technical expertise in implementing the energy cash assistance program. We successfully implemented both of these programs in five months and have made awards to date in excess of $4 billion.

We recognize that staffing needs may change over the life of the programs, particularly as we move into the post-award monitoring phase. We therefore will continue to evaluate workforce needs and make adjustments as necessary.

### Challenge 4 - Management of Capital Investments

The Department takes investment management very seriously and remains committed to improving the management of Information Technology (IT). In support of this commitment, the Department-level Executive Investment Review Board (E-Board), chaired by the Deputy Secretary and the Assistant Secretary for Management and Chief Financial Officer (ASM/CFO), met twice in fiscal year 2009. In support of the E-Board's efforts and to fulfill its IT Governance role, the Office of the Chief Information Officer (CIO) is actively engaged in the following activities:

*Infrastructure Optimization* – In July 2009, the Treasury E-Board endorsed a multi-faceted strategy for reducing the Department's IT infrastructure costs. To support this strategy, the Treasury CIO Council is developing a proposal of specific initiatives which will achieve cost savings by maximizing all infrastructure optimization and consolidation opportunities.

*Monthly Evaluation of IT Investments* – In July 2009, the Treasury CIO began monthly evaluations on the degree to which major IT investments met cost, schedule, and other performance goals.  This information is made possible via a website hosted by OMB.  The public transparency and increased frequency of assessments have resulted in increased executive attention to IT investment management, which in turn results in more consistent management of the Treasury IT budget.

*Oversight of the Treasury Network (TNet) Transition* – Recognizing the challenges associated with critical infrastructure investments, the Office of the CIO is actively overseeing the transition to Treasury's new consolidated wide area network project, TNet, and making a concerted effort to stay on schedule.

## Challenge 5 - Anti-Money Laundering and Terrorist Financing/Bank Secrecy Act Enforcement

The Department does face unique challenges in carrying out its responsibilities under the Bank Secrecy Act (BSA) and the USA PATRIOT Act to prevent and to detect money laundering and terrorist financing, and we are focused on executing our mission as effectively as possible to protect the integrity of the financial system.  The Financial Crimes Enforcement Network (FinCEN) has overall authority for BSA enforcement and compliance.

In the last several years, FinCEN has focused on effective and efficient administration, outreach, and engagement of existing industries covered by the BSA.  The subsequent paragraphs highlight the actions FinCEN, in coordination with other federal and state authorities, completed in fiscal year 2009 with regard to existing industries.  However, new payment systems and industries vulnerable to money laundering continually evolve, such as stored value cards, non-bank mortgage lenders, and hedge funds.  In fiscal year 2010 and beyond, FinCEN will expand BSA regulations to new industry sectors, consistent with the Administration's priorities.

In fiscal year 2009, FinCEN published a proposal simplifying the organizational structure of BSA requirements.  In addition, OCC, OTS, and FinCEN worked with other federal banking agencies to continue to enhance the Federal Financial Institutions Examination Council's *Bank Secrecy Act/Anti-Money Laundering Examination Manual*, first issued in 2005, with revisions to be issued in fiscal year 2010.  Following up on the success of this manual, FinCEN worked with the IRS and state regulators to develop a Money Services Business (MSB) examination manual, released in fiscal year 2009.  FinCEN facilitated the development of training materials on this manual, and fostered training for state examiners in fiscal year 2009, with further training scheduled in fiscal year 2010.  Additionally, FinCEN issued a final rule in fiscal year 2009 simplifying the appropriate exemption of customers from currency transaction reporting requirements.

To enhance the efficiency and effectiveness of the BSA regulatory framework, FinCEN also initiated several rulemaking proposals in fiscal year 2009, including issuing notices of proposed rulemaking to accomplish the following:

- help ensure suspicious activity reports (SARs) are subject to appropriate protection and simultaneously issued proposed guidance to expand the ability of financial institution to share SAR information within their organizational structures;
- revise the regulatory definition of MSBs to make the determination of which businesses qualify as MSBs more straightforward; and
- move to streamline mutual fund BSA requirements by allowing mutual funds to file currency transaction reports.

FHFA 1090

FinCEN also sought comment on a wide range of questions pertaining to the possible application of anti-money laundering (AML) program and SAR rules to non-bank residential mortgage lenders and originators.  In fiscal year 2010, FinCEN will continue working on these proposals, as well as regulations regarding stored value, as mandated by the CARD Act.

Outreach plays an important role in effectively administering the BSA.  The Bank Secrecy Act Advisory Group (BSAAG) serves as the principal forum to discuss BSA issues among regulators, law enforcement, and the industry.  FinCEN's Data Management Council enables government users of the BSA database to have a more direct role in providing advice about their information needs and helping FinCEN prioritize adjustments to the database.  In fiscal year 2009, FinCEN continued outreach to specific financial institutions, visiting several large MSBs.  We plan to conduct further outreach to additional industry segments in fiscal year 2010.

Active engagement with other regulators is also critical to meet our challenges.  FinCEN established 55 memoranda of understanding (MOU) with federal and state regulators to enhance the sharing of information derived from compliance examinations, and by signing a MOU with the Commodity Futures Trading Commission (CFTC) in fiscal year 2009, FinCEN has now finalized MOUs with all federal functional regulators. FinCEN shared analytic reports in the form of BSA data profiles with these federal and state regulators, and surveyed its MOU partners to determine the impact of the information exchanged; 82 percent of respondents indicated the information shared with them was valuable.  As these MOUs mature, the information exchanged will help FinCEN improve BSA examination consistency and compliance.  In fiscal year 2010, FinCEN will pursue MOUs with additional state regulators.

To enhance regulated financial industry understanding of and compliance with BSA requirements, in fiscal year 2009 FinCEN published a range of interpretive guidance, including guidance to financial institutions on filing SARs regarding loan modification and foreclosure rescue scams; guidance on the scope of permissible information sharing covered by Section 314(b) safe harbor of the USA PATRIOT Act, and an educational pamphlet on the currency transaction reporting requirements.  In fiscal year 2010, FinCEN will conduct strategic analytical studies and publish reports promoting both greater awareness of emerging money laundering trends, vulnerabilities, and avoidance of compliance expenditures that are not commensurate with actual risks.  These initiatives will include additional analysis on mortgage loan and loan modification fraud.

A primary strategy for meeting the goal of a safer, more transparent financial system includes effective examination for any potential money laundering, terrorist financing, and BSA issues in OTS and OCC-supervised institutions.  OTS and OCC continue to examine compliance with BSA, USA PATRIOT Act, and other anti-money laundering provisions through a process which consists of on-site examinations conducted every 12-18 months, supplemented by off-site monitoring and follow-up to address identified supervisory issues.  Additionally, in fiscal year 2009 FinCEN and the IRS continued implementing a strategy for developing and implementing a more effective BSA examination regime for non-bank financial institutions that the IRS examines.  Implementation of this strategy and other efforts, including enhancements to the non-compliance referral process, will continue through fiscal year 2010.

Challenge 5 also refers to Office of Foreign Assets Control (OFAC) programs and discusses OFAC MOUs with state and federal regulators.  It is true that financial institutions' OFAC compliance programs are critical to the implementation of sanctions, and OFAC will continue to work with regulators and the regulated community to ensure attention to OFAC compliance is not lessened in the current environment.  Substantively, the MOUs

Page 9

with Federal and State regulators are working as intended. OFAC keeps a financial institution's regulator fully informed about any apparent violation of OFAC regulations by that institution. This information is used to help the regulators develop the scope of the OFAC examination to which the institution should be subject. OFAC also requests and receives information from the regulators about the sufficiency of a financial institution's OFAC compliance program. This information is used as a factor in determining what level of enforcement action to take against a financial institution for an apparent violation of OFAC regulations. In addition to these formal requests, the regulators may contact OFAC if they have particular concerns about an institution.

cc: The Deputy Secretary
     Assistant Secretary for Management and Chief Financial Officer

PART 3 · OTHER ACCOMPANYING INFORMATION

*This page left intentionally blank*



**DEPARTMENT OF THE TREASURY**

WASHINGTON, D.C. 20220

INSPECTOR GENERAL
for TAX
ADMINISTRATION

October 15, 2009

MEMORANDUM FOR SECRETARY GEITHNER

FROM:        J. Russell George *J. Russell George*
             Inspector General

SUBJECT:     Management and Performance Challenges Facing the Internal
             Revenue Service for Fiscal Year 2010

The Reports Consolidation Act of 2000[1] requires that the Treasury Inspector General for
Tax Administration (TIGTA) summarize, for inclusion in the *Department of the Treasury
Accountability Report for Fiscal Year 2009*, its perspective on the most serious
management and performance challenges confronting the Internal Revenue
Service (IRS or Service). The top 10 challenges in order of priority are:

1. Modernization;
2. Security;
3. Tax Compliance Initiatives;
4. Implementing Tax Law Changes;
5. Providing Quality Taxpayer Service Operations;
6. Human Capital;
7. Erroneous and Improper Payments and Credits;
8. Globalization;
9. Taxpayer Protection and Rights; and
10. Leveraging Data to Improve Program Effectiveness and Reduce Costs.

TIGTA's assessment of the major IRS management challenge areas for Fiscal
Year 2010 has changed from the prior year. The changes include reorganizing the
priority of challenges four through nine, revising the titles of three challenges to better
reflect their current emphasis, and adding a new challenge entitled "Globalization."

Although not listed as challenges, two issues – tax law complexity and proposed
healthcare reform legislation – warrant additional consideration. While "Complexity of
the Tax Law" does not appear on this year's list of challenges because it has been
overtaken by other concerns, it remains a serious, underlying issue with wide-ranging
implications for both the IRS and taxpayers. Tax law complexity and frequent revisions
to the Internal Revenue Code make it more difficult for the IRS to explain and enforce

---

[1] 31 U.S.C. § 3516(d).

IRS MANAGEMENT CHALLENGES MEMORANDUM
Page Two

the tax laws and more costly for taxpayers who want to comply. However, as the IRS lacks the authority to enact changes to the tax law, it can do little but continue to react to the frequently changing Internal Revenue Code while the debate over many significant issues continues.

Similarly, numerous tax law changes are contained in the healthcare reform legislation presently working its way through Congress. The proposals include a number of provisions that could have a significant effect on the IRS in the coming year. As policies under consideration continue to look toward the Internal Revenue Code to effect changes, the IRS potentially faces the challenge of responding quickly by shifting resources and altering established plans. However, in doing so, there is some risk to the IRS's overall mission if the actions taken cause a decline in the quality and effectiveness of service or taxpayer perception.

The following is a discussion of each of the most serious management and performance challenges facing the IRS during Fiscal Year 2010.

### *Modernization*

The Business Systems Modernization Program (Modernization Program or Program) is a complex effort to modernize IRS technology and related business processes. It involves integrating thousands of hardware and software components while replacing outdated technology and maintaining the current tax system. The IRS originally estimated that the Modernization Program would last up to 15 years and incur contractor costs of approximately $8 billion.[2] The Program is now in its 11th year and has received approximately $2.7 billion for contractor services, plus an additional $353 million for internal IRS costs.

TIGTA reviews have identified weaknesses in program management processes throughout the life of the Modernization Program. While the IRS has improved its controls over these processes as the Program has continued to mature, several weaknesses continue to exist. Recent TIGTA audits have identified continued problems in requirements development and management, program management, contract management and security controls.

Although the Modernization Program has continued to help improve IRS operations, project development activities have not always implemented planned processes effectively or delivered all planned system capabilities. The past year's Program performance did not continue the trend of improvement it demonstrated in the prior three years. For example, from May 2008 to May 2009, five of the 17 project milestones scheduled for completion were significantly over budget, and three of 17 milestones were significantly behind schedule.

The Modernization Program has experienced significant and frequent turnover of high-level IRS and Program executives. Since the Program began in 1999, three

---

[2] Treasury Inspector General for Tax Administration, Ref. No. 2009-20-136, *Annual Assessment of the Business Systems Modernization Program* (2009).

IRS MANAGEMENT CHALLENGES MEMORANDUM
Page Three

Commissioners, five Chief Information Officers, and, recently, a Chief Technology Officer have overseen the Program. Many of these executives have made major changes to the Program's direction and strategies during their tenure. These changes in direction and strategy have made it challenging to achieve continuity and long-term success.

The IRS has recognized that it faces challenges in meeting the requirements of the next phase of project development and system integration. As a result, the IRS has stated that a strategy correction is needed to meet changing business needs, have a more agile information technology environment, and reduce risks with associated costs to build and maintain systems.

The immediate challenge recognized by the IRS is the future of the Customer Account Data Engine,[3] the acknowledged centerpiece of the Modernization Program. Since the IRS initiated the Customer Account Data Engine project in 1999, after spending $335 million in development costs, it has been able to process only about 30 percent of the individual income tax returns filed. Limitations in Customer Account Data Engine capabilities, including those reported by TIGTA and the Government Accountability Office (GAO) in previous years, have resulted in the IRS's effort to reengineer processing of individual taxpayer accounts and the ability to use downstream systems to improve customer service. With the pending changes and the yet to be determined implementation of a reengineered process, the risks to the success of the Modernization Program are significant.

Since 1995, the IRS has identified and reported the Modernization Program as a material weakness. The Program and processes have not progressed enough to eliminate the material weakness designation. Until the IRS is able to show consistent progress and improvement in the management of its Modernization Program and adequately addresses past TIGTA and GAO recommendations, the Program will remain a high risk for the IRS and will continue to be considered a material weakness.

## *Security*

Millions of taxpayers entrust the IRS with sensitive financial, personal, and other data that are processed by and stored on IRS computer systems. Reports of identity theft from both the private and public sectors have heightened awareness of the need to protect these data. The risk that taxpayers' identities could be stolen by exploiting security weaknesses in the IRS's computer systems continues to increase, as does the risk that IRS computer operations could be disrupted. Internal factors (such as the increased connectivity of computer systems and increased use of portable laptop

---

[3] The Customer Account Data Engine is the foundation for managing taxpayer accounts in the IRS Modernization plan. When completed, it will consist of databases and related applications that will replace the existing IRS Master File processing systems and will include applications for daily posting, settlement, maintenance, refund processing, and issue detection for taxpayer tax account and return data.

IRS MANAGEMENT CHALLENGES MEMORANDUM
Page Four

DEPARTMENT OF THE TREASURY • AGENCY FINANCIAL REPORT • FISCAL YEAR 2009

computers) and external factors (such as the volatile threat environment resulting from increased terrorist and hacker activity) require strong security controls.

Homeland Security Presidential Directive-20[4] requires Federal Government agencies to develop business continuity plans[5] to enable the recovery of critical functions after a disaster or emergency. To comply with the Directive, the IRS must develop and continually update its business continuity plans to protect employees and recover critical business processes, data, and information technology systems. The IRS must protect large amounts of sensitive taxpayer data in addition to more than 100,000 employees and contractors in more than 660 facilities throughout the country. In reviews of these plans,[6] we determined that the IRS's business continuity planning efforts have not been sufficient to ensure that critical business processes and systems may be efficiently restored in the event of a disaster. We also found a majority of the incident management, business resumption, and disaster recovery plans lacked detailed planning information and recovery strategies.

The Federal Information Security Management Act (FISMA)[7] requires each Federal Government agency to report annually to the Office of Management and Budget and to Congress on the effectiveness of its security programs and to perform an annual independent evaluation of its information security program and practices. The number of incidents reported by Federal agencies has increased dramatically over the past three fiscal years, from 5,503 incidents in 2006 to 16,843 incidents in 2008.[8] The IRS has made steady progress in complying with FISMA requirements since the law's enactment in 2002 and continues to place a high priority on efforts to improve its security program. However, the IRS needs to do more to adequately secure its systems and data. Past audits have shown that the most significant areas of concern are compliance with mandated security configurations, implementation of access controls for computer systems, and use of audit trails to detect computer intrusions and misuse.

The introduction of malware,[9] also known as malicious code or malicious software, into the IRS network continues to present a growing security concern. Although the IRS has

---

[4] *National Continuity Policy*, dated May 4, 2007 (also known as National Security Presidential Directive-51). This Directive establishes a comprehensive national policy on the continuity of Federal Government structures and operations.

[5] IRS business continuity plans include an Occupant Emergency Plan, which provides instructions to safely evacuate employees and visitors from a facility or shelter them in place; an Incident Management Plan, which addresses the overall command structure that would be implemented in an emergency; a Business Resumption Plan, which provides instructions for recovering and restoring disrupted business processes; and a Disaster Recovery Plan, which addresses recovery and restoration of information technology systems and data.

[6] Treasury Inspector General for Tax Administration, Ref. No. 2009-20-038, *Better Emergency Preparedness Planning Could Improve Business Continuity Efforts* (2009).

[7] Federal Information Security Management Act of 2002, 44 U.S.C. §§ 3541–3549.

[8] U.S. Government Accountability Office, GAO-09-701T, *Information Security: Agencies Make Progress in Implementation of Requirements, but Significant Weaknesses Persist* (2009).

[9] Malware refers to a program inserted into a computer with the intent of compromising the confidentiality, integrity, or availability of an organization's data, applications, or operating systems.

IRS MANAGEMENT CHALLENGES MEMORANDUM
Page Five

had success in preventing serious infections, the number of malware incidents within the IRS continues to rise. Malware is difficult to combat because it is delivered through commonly used applications and devices, such as e-mail, the Internet, and portable media devices. Without sufficient controls to prevent the introduction of malware, IRS computers and the sensitive taxpayer data stored on them are at risk of compromise that could result in identity theft and fraud.

Identity theft and phishing[10] schemes are also growing security concerns. TIGTA works closely with the IRS to identify and investigate these schemes. Attempts at identity theft and phishing related to Federal income taxes continue to rise with incidents growing more than seven times in 2008.[11] In its 2009-2013 Strategic Plan, the IRS identifies the explosion in electronic data, online interactions, and related security risks as a major trend expected to affect the Service over the next five years.

### *Tax Compliance Initiatives*

Another compelling challenge confronting the IRS is tax compliance. Tax compliance initiatives include the administration of tax regulations, collection of the correct amount of tax from businesses and individuals, and oversight of tax-exempt and government entities. Increasing voluntary compliance and reducing the Tax Gap[12] are currently the focus of many IRS initiatives. Nevertheless, the IRS is facing significant challenges in obtaining more complete and timely data, and developing the methods necessary to interpret the data.

#### Businesses and Individuals

The IRS estimated the gross Tax Gap for Tax Year (TY) 2001 to be approximately $345 billion. Underreporting of taxes, which is comprised of four major components (individual income tax, employment tax, corporate income tax, and estate and excise taxes), is estimated at $285 billion and accounts for the largest portion of the Tax Gap. Overall, the underreporting of individual income tax and employment tax constitute over 70 percent of the gross Tax Gap.

In August 2007, the Department of the Treasury and the IRS issued a report entitled *Reducing the Federal Tax Gap: A Report on Improving Voluntary Compliance*, which details the strategy being taken to address the Tax Gap by increasing voluntary compliance.[13] TIGTA provided an evaluation of this strategy in 2008 and reported that the long-term success of the strategy will, in large part, be dependent

---

[10] Phishing is the act of sending an e-mail to a user falsely claiming to be an established, legitimate enterprise in an attempt to scam the user into surrendering private information that could be used for identity theft.
[11] Internal Revenue Service Strategic Plan 2009-2013.
[12] The IRS defines the Tax Gap as the difference between the estimated amount taxpayers owe and the amount they voluntarily and timely paid for a tax year.
[13] An updated report providing an overview of efforts to close the Tax Gap was issued in July 2009.

on addressing several risk factors, including some that are beyond the control of the IRS.[14]

The IRS's Fiscal Year 2010 budget submission requests $603 million above its Fiscal Year 2009 enacted budget. More than half of this amount, $332 million, is intended for additional compliance initiatives that will target the Tax Gap. The IRS must continue to seek accurate measures for the various components of the Tax Gap and the effectiveness of the actions taken to reduce it. Broader strategies and better research are needed to determine what actions are most effective in addressing noncompliance.

### Tax-Exempt Entities

The IRS continues to face challenges in administering programs focused on ensuring that tax-exempt organizations comply with applicable laws and regulations to qualify for tax-exempt status. The number of organizations granted tax-exempt status each year continues to increase. With more than $15 trillion in assets currently controlled by tax-exempt organizations or held in tax-exempt retirement programs and financial instruments, the IRS recognized in its 2009-2013 Strategic Plan that it must provide more careful oversight and advisory support than ever before. In addition, the IRS's Fiscal Year 2010 budget submission recognizes the importance of maintaining a strong enforcement presence in the tax-exempt sector to ensure charitable organizations are not used for non-charitable or illegal purposes, including financing terrorist activities.

In a report issued in Fiscal Year 2009, we determined that the Federal Government is at risk of losing future tax revenue because the IRS has not developed or implemented the processes necessary to identify and address noncompliance with State volume cap limits for tax-exempt private activity bonds. Without these processes, tax-exempt private activity bonds could be issued in excess of federally mandated yearly State dollar limits without the IRS detecting and addressing the noncompliance.[15]

### *Implementing Tax Law Changes*

Each filing season tests the IRS's ability to implement tax law changes made by Congress. It is during the filing season that most individuals file their income tax returns and contact the IRS with questions about specific tax laws or filing procedures. Correctly implementing tax law changes is a continuing challenge because the IRS must identify the tax law changes; revise the various tax forms, instructions, and publications; and reprogram the computer systems used for processing returns. Changes to the tax laws have a major effect on how the IRS conducts its activities, what resources are required, and how much progress can be made on strategic goals.

---

[14] Treasury Inspector General for Tax Administration, Ref. No. 2008-30-094, *Additional Actions Are Needed to Effectively Address the Tax Gap* (2008).
[15] Treasury Inspector General for Tax Administration, Ref. No. 2009-10-097, *Future Tax Revenues Are at Risk Because Certain Tax-Exempt Bonds May Exceed Annual Dollar Limits Without Detection* (2009).

IRS MANAGEMENT CHALLENGES MEMORANDUM
Page Seven

Congress frequently changes the tax laws, so some level of change is a normal part of the IRS environment. However, certain types of changes and the timing of those changes can significantly affect the IRS in terms of the quality and effectiveness of its service and how taxpayers perceive the IRS. In its 2009-2013 Strategic Plan, the IRS identifies the increasing complexity of tax administration, which includes responding to new tax provisions and adjusting to expiring ones, as a major trend expected to affect the Service over the next five years.

### American Recovery and Reinvestment Act

The American Recovery and Reinvestment Act of 2009[16] (Recovery Act) was signed into law on February 17, 2009. The Recovery Act presents significant challenges to all Federal agencies as they move to implement provisions quickly while attempting to minimize risk and meet increased standards for transparency and accountability. With its numerous tax provisions, the Recovery Act poses significant challenges to the IRS as the Nation's tax collection agency and administrator of the tax laws. These provisions, which impact both individual and business taxpayers, will challenge the IRS as it attempts to implement the required changes over multiple filing seasons.

### Other Tax Law Changes

Other recent legislation that has affected the IRS includes the Housing and Economic Recovery Act of 2008,[17] the Emergency Economic Stabilization Act of 2008,[18] and the Economic Stimulus Act of 2008.[19] These three Acts contained numerous tax law changes that challenged the IRS during the 2009 Filing Season. Despite these challenges, the 2009 Filing Season was generally successful, although the Recovery Rebate Credit, part of the Economic Stimulus Act of 2008, did cause significant taxpayer confusion. Although the IRS initiated a number of efforts to educate and assist individuals in computing the Recovery Rebate Credit, the Credit still resulted in millions of taxpayer errors. Two significant issues that could affect the IRS's 2010 Filing Season include Alternative Minimum Tax relief and the proposed healthcare legislation.

### _Providing Quality Taxpayer Service Operations_

Since the late 1990's, the IRS has increased its delivery of quality customer service to taxpayers. In July 2005, Congress requested that the IRS develop a five-year plan, including an outline of which services the IRS should provide and how it will improve services for taxpayers. The IRS developed the plan – the Taxpayer Assistance Blueprint – which focuses on services that support the needs of individual filers who file

---

[16] Pub. L. No. 111-5, 123 Stat. 115.
[17] Pub. L. No. 110-289, 122 Stat. 2654.
[18] Pub. L. No. 110-343, 122 Stat. 3766.
[19] Pub. L. No. 110-185, 122 Stat. 613.

IRS MANAGEMENT CHALLENGES MEMORANDUM
Page Eight

or should file the Form 1040 series tax returns.[20]  The Blueprint includes performance measures, service improvement initiatives, and an implementation strategy for improving future service investment decisions. The IRS has begun implementing the initiatives, but many are dependent on future funding.

Despite having a plan in place to improve service, providing quality service to taxpayers remains a significant challenge for the IRS. For example, the Toll-Free Telephone Program only achieved a 58.8 percent Level of Service[21] during the 2009 Filing Season (through March 7, 2009) because of increased call demand for prior year Adjusted Gross Income and the Recovery Rebate Credit. Furthermore, the average speed to answer taxpayers' calls was 586 seconds (9.8 minutes), and the number of blocked calls during the 2009 Filing Season increased more than seven times over the 2008 Filing Season.[22] Taxpayer Assistance Centers[23] answered only 67 percent of tax law questions accurately and 82 percent of tax account[24] questions accurately.[25] Additionally, the Volunteer Program, which plays an increasingly important role in the IRS's efforts to improve taxpayer service and facilitate participation in the tax system, accurately prepared only 59 percent of TIGTA's test tax returns.

The Department of the Treasury and the IRS recognize that effective taxpayer service has a significant impact on voluntary tax compliance. Assisting taxpayers in preparing their returns by answering tax questions reduces the burden of notices and correspondence that taxpayers might have received if they made errors on their returns. Taxpayer service also reduces overall unintentional noncompliance and the need for compliance activity in the future. The IRS continues to focus on the importance of improving service by emphasizing it as one of the two main goals in its 2009-2013 Strategic Plan.

---

[20] The Form 1040 series tax returns include any IRS tax forms that begin with "1040" such as the U.S. Individual Income Tax Return (Form 1040), U.S. Individual Income Tax Return (Form 1040-A), and Income Tax Return for Single and Joint Filers With No Dependents (Form 1040EZ).

[21] Level of Service is the IRS's primary measure of providing taxpayers with access to an assistor. Level of Service reflects the relative success rate of taxpayers who call the 20 Customer Account Services toll-free telephone lines seeking assistance from an assistor. It measures the success rate of access to the telephone system using the number of calls answered by IRS assistors.

[22] A blocked call is one that cannot be connected immediately because either: 1) no circuit is available at the time the call arrives (i.e., the taxpayer receives a busy signal); or 2) the system is programmed to block calls from entering the queue when the queue backs up beyond a defined threshold (i.e., the taxpayer receives a recorded announcement to call back at a later time). The IRS refers to the latter type of blocked call as a courtesy disconnect. The IRS blocked more calls during the filing season rather than allow more callers to wait on hold.

[23] Taxpayer Assistance Centers are walk-in sites where taxpayers can obtain answers to both account and tax law questions, as well as receive assistance in preparing their tax returns.

[24] A tax account is a record of a taxpayer's tax and tax-related data recorded on the IRS's Master File database.

[25] Treasury Inspector General for Tax Administration, Ref. No. 2009-40-058, *Interim Results of the 2009 Filing Season* (2009).

## *Human Capital*

Since 2001, the GAO has designated strategic human capital management as a high-risk area within the Federal Government. In its 2009 update, the GAO reported that despite significant progress over the last few years the area remains a high risk because of a continuing need for a government-wide framework to advance human capital reform.[26]

The Commissioner of Internal Revenue (Commissioner) indicated his recognition of the need for greater attention to human capital. The Commissioner established the Workforce of Tomorrow Task Force to address recruitment and retention issues so that the IRS has the necessary leadership and workforce in place to address future challenges. Beginning in Fiscal Year 2008, TIGTA developed a broad audit strategy for addressing human capital at an IRS agency-wide level using the Human Capital Assessment and Accountability Framework[27] as a guide.

Like many other Federal Government agencies, the IRS has experienced workforce challenges over the past few years, including recruiting, training, and retaining employees, as well as an increasing number of employees who are eligible to retire. More than half of the IRS's employees and managers have reached age 50, and 39 percent of IRS executives are currently eligible for retirement. To fill the projected shortage in leadership, the IRS has stated that it must recruit one manager a day for the next 10 years. Furthermore, the rate at which new recruits in mission critical occupations are leaving the IRS during the first and second year of employment has increased since Fiscal Year 2005. The pending loss of institutional knowledge and expertise at all levels and the challenge of retaining a highly skilled workforce increase the risk that the IRS may not be able to achieve its mission.

The IRS's challenge of having the right people in the right place at the right time is made more difficult by many complex internal and external factors. The work performed by IRS employees continually requires greater expertise as tax laws become more complex, manual systems used to support tax administration become computer based, and attempts by taxpayers and tax practitioners to evade compliance with the tax laws become more sophisticated. The IRS must also compete with other Government agencies and private industry for the same human resources, complicated by the fact that younger generations of employees move between jobs more frequently than employees in the past. Furthermore, budget constraints, legislative changes, and economic shifts can create unforeseen challenges for the IRS in addressing its long-term human capital issues. In its 2009-2013 Strategic Plan, the IRS identifies human capital challenges as a major trend expected to affect the Service over the next five years.

---

[26] U.S. Government Accountability Office, GAO-09-271, *High Risk Series: An Update* (2009).
[27] The Framework was established by the United States Office of Personnel Management. It provides consolidated guidance for agencies to transform human capital management and understand what is to be done, how it can be done, and how to gauge progress and results. It also presents the expectations that guide the agency's assessment of human capital efforts.

IRS MANAGEMENT CHALLENGES MEMORANDUM
Page Ten

### _Erroneous and Improper Payments and Credits_

As defined by the Improper Payments Information Act of 2002,[28] an improper payment is any payment that should not have been made or that was made in an incorrect amount (including overpayments and underpayments) under statutory, contractual, administrative, or other legally applicable requirements.  It includes any payment to an ineligible recipient, any payment for an ineligible service, any duplicate payment, payments for services not received, and any payment that does not account for credit for applicable discounts.  For the IRS, improper and erroneous payments generally involve improperly paid refunds, tax return filing fraud, or overpayments to vendors or contractors.

### Refundable Credits

The IRS administers numerous refundable tax credits.  These refundable credits allow individual taxpayers to reduce their tax liability below zero and, thus, receive a tax refund even if no income tax was withheld or paid.  Two significant refundable credits are the Earned Income Tax Credit (EITC) and the Additional Child Tax Credit.  The recently enacted American Recovery and Reinvestment Act of 2009 also authorized several new refundable credits, examples of which include the Making Work Pay Credit and First-Time Homebuyer Credit.

The EITC remains the main refundable credit and continues to be vulnerable to a high rate of noncompliance, including incorrect or erroneous claims caused by taxpayer error and resulting from fraud.  The IRS has successfully developed a number of processes to identify erroneous EITC payments prior to issuance.  However, because compliance resources are limited and alternatives to traditional compliance methods have not been developed, the majority of the potentially erroneous EITC claims identified continue to be paid in error.  The IRS reports $10 billion to $12 billion annually in erroneous EITC payments.[29]

### Contract and Other Payments

Each year, the Federal Government spends billions of dollars to acquire goods and services.  In Fiscal Year 2008, Federal contracting outlays were more than $500 billion.  Similarly, contract spending by the IRS represents a significant outlay of Service funds.  Numerous past TIGTA audits have identified millions of dollars in questioned costs and several instances of contractor fraud.  A summary of our work in this area over a period of approximately four years concluded that an incomplete invoice verification process resulted in the IRS paying approximately $7.5 million in questionable contract charges.  In addition, an analysis of Defense Contract Audit

---

[28] Pub. L. No. 107-300, 116 Stat. 2350.
[29] Treasury Inspector General for Tax Administration, Ref. No. 2009-40-024, _The Earned Income Tax Credit Program Has Made Advances; However, Alternatives to Traditional Compliance Methods Are Needed to Stop Billions of Dollars in Erroneous Payments_ (2008).

IRS MANAGEMENT CHALLENGES MEMORANDUM
Page Eleven

Agency reports issued in Fiscal Years 2006 and 2007 identified approximately $167 million in questionable charges directly related to IRS contracts.[30]

### Globalization

The scope, complexity, and magnitude of the international financial system present significant enforcement challenges for the IRS. As technology continues to advance and cross-border transactions rise, the IRS faces the growing challenge created by economic globalization. Technological advances have provided opportunities for offshore investments that were once only possible for large corporations and wealthy individuals.

Taxpayers with international activities – individuals, businesses, and tax-exempt organizations – continue to grow in number and variety. Examples of this trend include: 1) United States-based corporations more than tripled their foreign profits between 1994 and 2004, from $89 billion to $298 billion, with 58 percent of those profits earned in low-tax or no-tax jurisdictions; 2) the number of multinational corporations worldwide has grown from an estimated 3,000 in 1990 to over 63,000 in 2007; 3) the total income reported for 2005 from active foreign corporations owned by United States taxpayers exceeded $1.8 trillion; and 4) the percentage of Americans' income originating from foreign sources doubled between 2001 and 2006.

The IRS is challenged by a lack of information reporting on many cross-border transactions. In addition, the varying legal requirements imposed by different jurisdictions result in the formation of complex business structures that make it difficult to determine the full scope and effect of cross-border transactions. However, over the past few years, the IRS has taken actions to better coordinate international tax compliance issues. In September 2007, the IRS announced a Service-wide Approach to International Tax Administration highlighted by three strategic goals: 1) improving taxpayer service; 2) enhancing enforcement and modernizing the IRS for improving voluntary compliance with international tax provisions; and 3) reducing the Tax Gap attributable to international transactions. In addition, the Commissioner has emphasized that international issues will be a top priority during his tenure. The IRS has also made other changes to its structure and processes, including increasing cooperation and outreach efforts to foreign governments. In its 2009-2013 Strategic Plan, the IRS identifies accelerating globalization as a major trend expected to affect the Service over the next five years.

### Taxpayer Protection and Rights

The IRS must ensure that tax compliance activities are balanced against the rights of taxpayers to receive fair and equitable treatment. The IRS continues to dedicate significant resources and attention to implementing the taxpayer rights provisions of the

---

[30] Treasury Inspector General for Tax Administration, Ref. No. 2008-10-092, *Procurement's Control Environment Was Ineffective and Did Not Prevent Overpayments to Contractors* (2008).

IRS MANAGEMENT CHALLENGES MEMORANDUM
Page Twelve

DEPARTMENT OF THE TREASURY • AGENCY FINANCIAL REPORT • FISCAL YEAR 2009

IRS Restructuring and Reform Act of 1998 (RRA 98).[31]  Annual audit reports are mandated for the following taxpayer rights provisions:

- Notice of Levy;
- Restrictions on the Use of Enforcement Statistics to Evaluate Employees;
- Fair Debt Collection Practices Act Violations;
- Notice of Lien;
- Seizures;
- Illegal Protestor Designations;
- Assessment Statute of Limitations;
- Restrictions on Directly Contacting Taxpayers Instead of Authorized Representatives; and
- Separated or Divorced Joint Filer Requests.

In general, the IRS has improved its compliance with these statutory taxpayer rights provisions.  The IRS has shown improvement over prior years when documenting that taxpayers were informed of their rights.  However, there were still instances in which there was no documentation in the related case files to show that taxpayers were advised of their rights regarding assessment statute extensions,[32] and the IRS did not always follow procedures for mailing notices to taxpayers or their representatives in Federal Tax Lien cases.[33]

Some IRS management information systems do not track cases that require mandatory annual audit coverage.[34]  Thus, neither TIGTA nor the IRS could evaluate the Service's compliance with certain RRA 98 provisions.

### _Leveraging Data to Improve Program Effectiveness and Reduce Costs_

While the IRS has made some progress in using its data to improve program effectiveness and reduce costs, this area continues to be a major challenge.  The IRS lacks a comprehensive, integrated system that provides accurate, relevant, and timely financial and operating data that describes performance measures, productivity, and associated costs of IRS programs.  In addition, the IRS cannot produce timely, accurate, and useful information needed for day-to-day decisions, which hinders its

---

[31] Pub. L. No. 105-206, 112 Stat. 685 (codified as amended in scattered sections of 2 U.S.C., 5 U.S.C. app., 16 U.S.C., 19 U.S.C., 22 U.S.C., 23 U.S.C., 26 U.S.C., 31 U.S.C., 38 U.S.C., and 49 U.S.C.).
[32] Treasury Inspector General for Tax Administration, Ref. No. 2009-30-113, _Fiscal Year 2009 Statutory Audit of Compliance With Notifying Taxpayers of Their Rights When Requested to Extend the Assessment Statute_ (2009).
[33] Treasury Inspector General for Tax Administration, Ref. No. 2009-30-089, _Additional Actions Are Needed to Protect Taxpayers' Rights During the Lien Due Process_ (2009).
[34] Treasury Inspector General for Tax Administration, Ref. No. 2009-30-046, _Fiscal Year 2009 Statutory Review of Disclosure of Collection Activity With Respect to Joint Returns_ (2009) and Treasury Inspector General for Tax Administration, Ref. No. 2009-30-054, _Fiscal Year 2009 Statutory Review of Restrictions on Directly Contacting Taxpayers_ (2009).

IRS MANAGEMENT CHALLENGES MEMORANDUM
Page Thirteen

ability to address financial management and operational issues to fulfill its responsibilities.

TIGTA and the GAO have continued to report that various IRS management information systems are insufficient to enable IRS management to measure costs, determine if performance goals have been achieved, or monitor progress in achieving program goals. In its most recent financial statement audit, the GAO noted that the IRS continues to face several key issues that represent material weaknesses in internal control, including not having current and reliable ongoing cost information to support management decision making and to prepare cost-based performance measures.[35] In addition, our analysis of the IRS's December 31, 2008, Federal Financial Management Improvement Act of 1996 (FFMIA)[36] remediation plan found that the IRS did not include remediation actions to address certain GAO findings and recommendations related to the IRS's noncompliance with the FFMIA. These findings and recommendations related to the IRS's Integrated Financial System, which provides the Service with an integrated accounting system to account for and control resources.[37]

## *Conclusion*

The above are the ten major management and performance challenges for the IRS in Fiscal Year 2010. TIGTA's Fiscal Year 2010 Annual Audit Plan contains our planned reviews and is organized by these challenges. If you have questions or wish to discuss TIGTA's views on the IRS's challenges in greater detail, please contact me at (202) 622-6500.

cc: Deputy Secretary
    Assistant Secretary for Management and Chief Financial Officer
    Commissioner of Internal Revenue

---

[35] U.S. Government Accountability Office, GAO-09-119, *Financial Audit: IRS's Fiscal Years 2008 and 2007 Financial Statements* (2009).
[36] Pub. L. No. 104-208, 110 Stat. 3009.
[37] Treasury Inspector General for Tax Administration, Ref. No. 2009-10-094, *The Internal Revenue Service's Federal Financial Management Improvement Act Remediation Plan As of December 31, 2008* (2009).

*This page left intentionally blank*



# DEPARTMENT OF THE TREASURY
## WASHINGTON, D.C.

SECRETARY OF THE TREASURY

December 11, 2009

**MEMORANDUM FOR J. RUSSELL GEORGE**
                   **TREASURY INSPECTOR GENERAL FOR**
                   **TAX ADMINISTRATION**

FROM:              Timothy F. Geithner

SUBJECT:           Response to Management and Performance Challenges Facing the
                   Internal Revenue Service

I am responding to your October 15, 2009, memorandum describing the most serious management and performance challenges facing the Internal Revenue Service (IRS). The Department appreciates your independent assessment of progress in addressing these challenges. This memorandum provides information on the actions completed in Fiscal Year (FY) 2009 and the actions planned for fiscal year 2010 to address these challenges.

## Challenge 1 - Modernization

In fiscal year 2009, IRS continued to execute on its long-term plan to modernize the technological underpinnings of the nation's tax system. The Customer Account Data Engine (CADE), Modernized e-File (MeF), and Account Management Services (AMS) modernization projects delivered the changes necessary for a successful tax filing season, supported implementation of the American Reinvestment and Recovery Act (ARRA) provisions, and provided audit trails to enhance the security posture of IRS systems.

Also in fiscal year 2009, the IRS enhanced its strategy to accelerate completion of a consolidated taxpayer account database, in part based on feedback from TIGTA. Contingent upon funding, the IRS plans to implement the new taxpayer account database for the 2012 filing season. The new database will support daily processing and result in faster refunds for all individual refund filers. Daily updating of individual taxpayer accounts by 2012 also will improve taxpayer service and accuracy, reduce interest paid on late refunds, improve data security, and create new tools to combat fraud and improve enforcement activities. Completion of the taxpayer account database is the prerequisite for other major initiatives, including significant expansion of online services and transactions and next generation of enforcement technologies.

## Challenge 2 - Security

In fiscal year 2009, the IRS expanded its efforts to detect and prevent security threats. By securing infrastructure, data, and applications, the IRS protected access to taxpayer information. For example, every laptop at the IRS is equipped with sophisticated disk encryption software to protect against unauthorized use of sensitive data.

The IRS also maintained an agency-wide information security program and made major enhancements to its Disaster Recovery Program to ensure the continuity and resiliency of IRS critical business processing systems. An Emergency Management and Preparedness Executive Steering Committee was established to direct an IRS-wide emergency management program, and the Physical Security and Emergency Preparedness office focuses on management of the IRS continuity planning program.

The IRS takes the issue of Identity Theft very seriously.  In fiscal year 2009, to preserve and enhance public confidence, the IRS established specialized units and dedicated toll-free telephone lines to provide guidance and assistance to taxpayers affected by identify theft.  In the first year, the IRS responded to more than 120,000 calls and opened nearly 34,000 cases of suspected identity theft for further investigation.  The IRS also placed markers on more than 231,300 taxpayer accounts to alert employees the account belongs to a substantiated identity theft victim.  In fiscal year 2009, the IRS sent nearly 79,600 letters to individuals to inform them their personal information was used by another individual to file a return or may have been compromised through phishing scams.  The IRS also eliminated the use of Social Security Numbers (SSNs) on more than 8 million forms, notices, and letters issued.  This is the first large-scale effort to eliminate and reduce the use of SSNs on taxpayer correspondence.  Over the next two to five years IRS will eliminate the use of SSNs on more than 90 million notices and forms sent to individual and business taxpayers.

To address the challenges of malicious code or software into the network, the Computer Security Incident Response Center (CSIRC) provides the IRS with a team of capable "first responders" organized, trained, and equipped to identify, contain, and eradicate cyber threats targeting IRS computing assets.  In fiscal year 2009, the IRS repelled more than 35 million unauthorized access attempts, with about one-third of this malicious activity originating from outside the United States.

In fiscal year 2010, the IRS will continue to develop and update its business and continuity plans to protect employees and to recover the critical business processes, data, and information technology systems.  A test and exercise program is in development that integrates all four business continuity plans used to prepare for, respond to, and recover from a disaster or emergency incident.

### Challenge 3 - Tax Compliance Initiatives

During fiscal year 2009, the IRS focused on targeting its enforcement efforts on high-risk categories of non-compliance to support the overall goal of reducing the tax gap.  In addition to the specific programs outlined below, the IRS continued work on a reporting compliance study for individual taxpayers that will provide updated and more accurate audit selection tools as the first of an ongoing series of individual studies using a rolling multi-year methodology.  Studies in subsequent tax years will allow the IRS to make more frequent updates to its voluntary compliance estimates.

The IRS has a seven-part, multi-year strategy to address the Tax Gap as presented in the July 2009 Tax Gap Report.  The strategy outlines a series of initiatives designed to reduce opportunities for tax evasion by implementing more stringent reporting requirements, making a commitment to providing more useful, up-to-date estimates of the tax gap, and continuing to make improvements in information technology to help make early detection and intervention efforts more effective.  Additional strategies include supporting a sustained focus in the areas of greatest risk including international enforcement, improved compliance programs for business and high-income individuals, and providing innovative on-line services and streamlined written communication to enhance taxpayer services.  Reform and simplification of the tax law includes the continuing effort to simplify tax forms and publications and taxpayer burden reduction actions.  The multi-pronged strategy also includes ensuring ethical standards of conduct for tax preparers to improve taxpayer compliance.

IRS actions to address compliance by businesses and individuals in fiscal year 2009 included expanded enforcement presence in the international field and continued pursuit of high net-worth noncompliant taxpayers.

The IRS also developed a tax preparer strategy to identify recommendations to ensure consistent standards for tax preparer qualifications, ethics and service. The recommendations will be developed from information obtained from a large and diverse constituent community that included those licensed by state and federal authorities, unlicensed tax preparers, software vendors, consumer groups and taxpayers. Over 450 taxpayers and tax professionals along with 600 employees responded to the IRS request for comments to help better leverage the tax return preparer community with the twin goals of increasing taxpayer compliance and ensuring uniform and high ethical standards of conduct for tax preparers.

In fiscal year 2010 the IRS will significantly expand international enforcement, implement significant new information reporting authorities into compliance programs, and move toward higher standards in the tax practitioner community.

## Challenge 4 – Implementing Tax Law Changes

The IRS is faced with implementing tax law changes each filing season. In response to recent revisions to the tax laws, the IRS helped taxpayers file correct tax returns by providing education and outreach through automation, face-to-face contact, and the media. In fiscal year 2009, taxpayers continued to use the IRS website, IRS.gov, in record numbers to get current information. Passage of the First-Time Homebuyer Credit and ARRA, as well as questions on the Recovery Rebate Credit resulted in the IRS providing real-time, updated information to taxpayers as they filed their returns.

The IRS also delivered outreach and education to the tax professional community, industry partners, and small business and self-employed taxpayers through a wide range of strategies, outreach products and communication vehicles such as Webinars, tax practitioner institutes, and National Tax Forums. In addition, the IRS website was expanded to include an online version of the Small Business Resource Guide and Small Business Tax Center; an interactive Spanish application for "How much was my Stimulus Payment?"; and a Spanish Tax Practitioner Tool Kit.

### American Recovery and Reinvestment Act

The IRS expedited completion of tax products to address ARRA provisions. Before enactment, the IRS initiated work on the tax-related provisions to ensure timely implementation, including releasing forms, schedules and guidance three days after enactment; developing new publications to explain the tax provisions to individual and business filers; and informing taxpayers of the tax credits they may be entitled to using multiple communication channels including press releases, television commercials, and updated information on the irs.gov website. For the first time, the IRS launched a YouTube video site and an ITunes podcast site to provide information on ARRA, tax tips, and how-to videos. This comprehensive approach to administering the provisions of ARRA allowed the IRS to meet taxpayer and stakeholder expectations for these important tax law changes.

### Other Tax Law Changes

Other recent legislation contained tax law changes, including the Housing and Economic Recovery Act of 2008; the Emergency Economic Stabilization Act of 2008; the Economic Stimulus Act of 2008; and the Worker, Retiree, and Employer Recovery Act of 2008. The IRS delivered a successful 2009 filing season despite the substantial number of legislative actions (500 actions affecting 203 tax products) required from these Acts.

Page 4

Although resources were strained, 95 percent of the critical individual filing season products and over 96 percent of the tax-exempt and business tax products were delivered timely.

The IRS provided taxpayers with online access to tax law information, including tax law changes, in an easily understandable format on IRS.gov.  In fiscal year 2009, taxpayers used the site to find out about the Rebate Recovery Credit.  More than 54 million taxpayers used the "Where's My Refund?" calculator to check on the status of their tax refund, an increase of 38 percent, and over 430,000 taxpayers used the Spanish version.  Over 650,000 taxpayers who did not receive a stimulus payment in 2008 used the new Recovery Rebate Credit calculator to help them determine if they were eligible for the credit, and if so, how much they could claim.

In fiscal year 2010, the IRS will continue to monitor proposed changes to the tax laws, including Alternative Minimum Tax relief and the proposed health-care legislation, and prepare accordingly to ensure taxpayers have the necessary forms and information for the filing season.

## Challenge 5 - Providing Quality Taxpayer Service Operations

In fiscal year 2009, the IRS continued the implementation of Taxpayer Assistance Blueprint (TAB) service improvements.  A new group was created to identify and coordinate enterprise-wide service improvements from the taxpayer's perspective.  The initiatives included the implementation of an online tool which provides taxpayers with tax- law information in an easily navigable format, the creation of 332 "talking Tax Forms" for visually impaired taxpayers, and the launch of Spanish versions of the Free File Program.

The IRS provided extensive media coverage and expanded electronic outreach activities to make taxpayers aware of new credits, deductions, and exclusions for which they qualified.  A second "Super Saturday" event was held in fiscal year 2009, and the IRS provided over 11,000 taxpayers with tax assistance and return preparation.  The event was the largest one-day outreach service event in IRS history.

The IRS also provided assistance to millions of taxpayers by expanding partnerships with nonprofit and community organizations, opening more than 12,100 free tax preparation sites nationwide.  Volunteers at these sites prepared over 3.0 million returns for low-income and elderly taxpayers.  The IRS also served 6.2 million taxpayers at the Taxpayer Assistance Centers (TACs).

In fiscal year 2010, the IRS will continue to provide quality taxpayer service by implementing additional improvements outlined in the TAB, including greater access to available services on non-workdays through events like "Super Saturday."  The IRS also will improve the taxpayer's filing experience by implementing new quality standards at the TACs and volunteer return preparation sites through reviews of selected prepared returns to determine accuracy.

## Challenge 6 - Human Capital

In fiscal year 2009, the IRS engaged in an extensive enforcement hiring initiative, resulting in an enforcement staffing increase of more than 3,000 employees.  To ensure coordination at all levels, the IRS established a governance structure to provide oversight of the hiring initiative and created a centralized office to coordinate all recruiting efforts. For the first time, candidates who applied for multiple jobs in different locations were ranked and interviewed only once, and competing organizations collaborated on selections to ensure the best-skilled

individual was hired for each position.  The IRS also increased its veteran hiring by 85 percent from 901 in fiscal year 2006 to 1,669 in fiscal year 2009 with targeted recruitment efforts.

The report of the IRS Workforce of Tomorrow (WOT) Task Force was released in August 2009.  The report included initiatives to improve the hiring process to ensure continued success in filling critical enforcement positions.  Highlights included creation of a detailed workforce planning model that can be embedded into the existing planning processes, a centralized recruiting organization and corporate recruiting strategy that ensures consistent brand messaging and engagement of local leaders, an enhanced hiring process implemented in phases that can cut hiring time by 50 percent,  reduction of managerial burden initiatives, enhanced training and support for managers, and a leadership development process to identify and develop leaders across the IRS.

In fiscal year 2010, the IRS will implement additional WOT recommendations, implement streamlined hiring, and pilot an accelerated leadership program for high potential candidates.

## Challenge 7 - Erroneous and Improper Credits and Payments

The IRS has a balanced and comprehensive plan, including compliance activities and systemic changes, to reduce improper payments.

### Refundable Credits

In fiscal year 2009, the IRS protected over $3.2 billion in revenue through EITC enforcement efforts, including examination of over 500,000 returns and 25,000 amended returns claiming EITC, 314,000 document matching reviews, and 300,000 math error process corrections.  The IRS also identified more than 123,000 fraudulent returns claiming over $361 million in refunds and stopped over $90 million in fraudulent claims using the Electronic Fraud Detection System (EFDS).

The IRS also completed activities associated with the EITC Return Preparer Study, including analyzing short-term outcomes from due diligence visits, developing new education and compliance notices, making phone calls to first-time EITC preparers to make sure they understand the program guidelines, and adjusting the timing of EITC paid preparer due diligence visits to clarify procedures.  These improvements resulted in a 5 percent increase in due diligence visits over 2008 and proposed penalties of $462,500.  Additionally, the IRS continued to identify and investigate high-impact EITC fraud and tax scheme promoters and identified research-based approaches to improve EITC participation and minimize taxpayer errors.

The manner and means by which individuals deploy fraudulent refund schemes are constantly evolving and are becoming more complex and sophisticated.  The Questionable Refund Program (QRP), a nationwide multifunctional program designed to identify fraudulent returns and to stop payment of fraudulent refunds, continued to show positive results.  In fiscal year 2009, the IRS identified over 414,000 potentially fraudulent returns claiming over $2.7 billion in total refunds and initiated 418 investigations with an 86.6 percent conviction rate, a 78.8 percent incarceration rate, and an 87.2 percent publicity rate on adjudicated cases.

In fiscal year 2010, the IRS will continue to identify and investigate EITC tax scheme promoters and preparers through improved data matching, while utilizing automated under-reporter data to identify outreach and education opportunities for identified patterns of noncompliance.  In addition, the IRS will improve the

accuracy of EITC returns by refining the due diligence audit process, conducting visits by revenue and criminal investigation agents, streamlined injunctions, and notice and phone contact treatments.

*Contract and Other Payments*

To properly account for contract spending, the IRS developed templates for documenting contract type decisions and rationale when Performance-Based Acquisition methods are not used.  In addition, a module entitled, "Types of Work Statements, Appropriate Contract Types and Risk," will be included in the annual Advance Acquisition Planning conference to emphasize the importance of the acquisition team selecting the appropriate contract type.  The IRS will continue to utilize the Contract Review Board established in fiscal year 2008 to review all information technology acquisitions meeting established dollar thresholds.

## Challenge 8 - Globalization

International compliance is a key challenge as reflected by its recent enforcement initiatives, as well as its prominence in the IRS Strategic Plan.

The IRS has placed unprecedented focus on detecting and bringing to justice those who hide assets overseas to avoid paying tax.  As part of an overall IRS strategy to improve offshore compliance, new initiatives were implemented to identify US taxpayers that engaged in offshore tax evasion schemes.

The IRS established an Offshore Voluntary Disclosures/Penalty Framework for taxpayers to voluntarily disclose their offshore activities.  The framework provides taxpayers the opportunity to calculate the total cost of resolving all offshore tax issues; become compliant with U.S. tax laws; make voluntary disclosures that will be used to further the IRS understanding of how foreign accounts and foreign entities are promoted to U.S. taxpayers as ways to avoid or evade tax; and provide data to be used in developing additional IRS strategies to inhibit promoters and facilitators from soliciting new clients.  Thousands of taxpayers with offshore accounts voluntarily came forward to disclose information as a result of this initiative.

In fiscal year 2010, the IRS will continue its focus on international tax enforcement.  In addition, the IRS will use audit results and intelligence from ongoing offshore initiatives to refine case identification and selection methods and to identify promoters, facilitators and participants in abusive offshore arrangements.  The IRS will also improve the way compliance risks are identified and addressed in large, complex global businesses and high wealth individuals.

## Challenge 9 - Taxpayer Protection and Rights

Taxpayer protection is a top priority for the IRS.  In fiscal year 2009, the IRS continued to monitor compliance with the taxpayer rights provisions of the IRS Restructuring and Reform Act of 1998 (RRA 98), including quarterly managerial certifications and annual independent reviews of the RRA 98 Section 1204 provisions.  The certification process serves to ensure management does not use enforcement statistics to evaluate employees and drive behavior in conflict with taxpayer rights.  As TIGTA indicated in its report, the IRS has shown improvement over prior years that taxpayers were informed of their rights.

In fiscal year 2009, the IRS also completed an oversight review/approval process for preparer penalties to ensure uniform and consistent application of penalties; continued efforts to remove or redact Social Security Numbers

from outgoing correspondence; and completed an analysis of excluding all Social Security Administration (SSA) recipients below certain income levels from the Federal Payment Levy Program.

Actions planned for fiscal year 2010 and beyond include the implementation of a low-income filter that will exclude taxpayers that are more likely to experience a hardship if included in the Federal Payment Levy Program.  The IRS also will identify parameters for contractors regarding the protection of taxpayer Personally Identifiable Information (PII) for inclusion in all publishing contracts.  Additionally, adoption of a broad set of recommendations around regulation of tax preparers will be at the forefront of IRS efforts.

### Challenge 10 – Leveraging Data to Improve Program Effectiveness and Reduce Costs

In fiscal year 2009, the IRS continued to make significant progress in financial management, particularly in the development and provision of cost information across multiple business units.  As a result, in its audit of the fiscal year 2009 IRS financial statements, GAO determined that the remaining issues regarding Financial Reporting no longer constituted a material weakness and that the remaining issues regarding Tax Revenue and Refunds no longer constituted a significant deficiency.

In fiscal year 2010, the IRS will continue its use of the managerial cost accounting system to conduct cost-benefit analyses that provide timely, accurate, and useful data for decision making by the major business units.

*This page left intentionally blank*

# Appendix D:
# Material Weaknesses, Audit Follow-Up,
# Financial Systems, and Recovery Act Risk Management

This section consists of detailed descriptions of Treasury's material weakness inventory, including a summary of actions taken and planned to resolve the weaknesses; tracking and follow-up activities related to Treasury's GAO, OIG, TIGTA, and the Special Inspector General for the Troubled Asset Relief Program audit inventory; an analysis of potential monetary benefits arising from audits performed by Treasury's Inspectors General; an update on Treasury's financial systems framework; and an overview of Treasury's risk management activities for the implementation of the *American Recovery and Reinvestment Act of 2009* (Recovery Act or ARRA).

## TREASURY'S MATERIAL WEAKNESSES

Management may declare audit findings or internal situations as a material weakness whenever a condition exists that may jeopardize the Treasury mission or continued operations. Reporting on material weaknesses is required in these instances by the *Federal Managers' Financial Integrity Act of 1982* (FMFIA) and the *Federal Financial Management Improvement Act of 1996* (FFMIA).

### FEDERAL MANAGERS' FINANCIAL INTEGRITY ACT OF 1982 (FMFIA)

The FMFIA requires agencies to establish and maintain internal control. The Secretary must annually evaluate and report on the controls (FMFIA Section 2) and financial systems (FMFIA Section 4 and FFMIA) that protect the integrity of federal programs. The requirements of the FMFIA serve as an umbrella under which other reviews, evaluations, and audits should be coordinated and considered to support management's assertion about the effectiveness of internal control over operations, financial reporting, and compliance with laws and regulations.

As of September 30, 2009, Treasury has five material weaknesses under Section 2 of the FMFIA, summarized as follows:

| SUMMARY OF FMFIA AND FFMIA MATERIAL WEAKNESSES | SECTION 2 | SECTION 4 | TOTAL |
|---|---|---|---|
| Balance at the Beginning of FY 2009 | 4 | 0 | 4 |
| Closures/Downgrades during FY 2009 | 0 | 0 | 0 |
| Reassessed during FY 2009 | 0 | 0 | 0 |
| New MW declared during FY 2009 | 1 | 0 | 1 |
| Balance at the End of FY 2009 | 5 | 0 | 5 |

Below are detailed descriptions of Treasury's five material weaknesses:

| MATERIAL WEAKNESS DESCRIPTION |
| --- |

**Internal Revenue Service - Improve Modernization Management Controls and Processes**

The IRS needs to improve its Business Systems Modernization program. Key elements:

- Assess the recommendations from the Special Studies and Reviews of the Business Modernization program and projects
- Implement and institutionalize procedures for validating contractor-developed costs and schedules
- Establish effective contract management practices
- Complete a human capital strategy
- Improve configuration management practices

| Actions Completed | What Remains to be Done |
| --- | --- |
| ✓ Deployed Release 4.2 of the Customer Account Data Engine (CADE) in January 2009. CADE added capabilities to process prior-year and decedent returns, remittances, estimated tax payments, requests for extensions, and surname changes<br><br>✓ Deployed Modernized e-File (MeF) release 5.5 that included the redesigned Form 990 (Return of Organization Exempt from Income Tax) in time for the filing season<br><br>✓ Completed the 2009 releases of Account Management Services (AMS) providing additional real-time changes to CADE | ○ Allow assessment time to observe long-term effect of actions completed and demonstrate sustained improved performance<br><br>○ Targeted Downgrade/Closure: FY 2011 |

| MATERIAL WEAKNESS DESCRIPTION |
| --- |

**Internal Revenue Service - Computer Security**

The IRS has various computer security controls that need improvement. Key elements:

- Adequately restrict electronic access to and within computer network operational components
- Adequately ensure that access to key computer application and systems is limited to authorized persons for authorized purposes
- Adequately configure system software to ensure the security and integrity of system programs, files, and data
- Appropriately delineate security roles and responsibilities within functional business operating and program units, as required by the Federal Information Security Management Act
- Appropriately segregate system administration and security administration responsibilities
- Sufficiently plan or test the activities required to restore certain critical business systems where unexpected events occur
- Effectively monitor key networks and systems to identify unauthorized activities and inappropriate system configurations
- Provide sufficient technical, security-related training to key personnel
- Certify and accredit 90 percent of all systems

| Actions Completed | What Remains to be Done |
| --- | --- |
| ✓ Security roles and responsibilities<br>✓ Security/System Administration segregation of duties<br>✓ Security training<br>✓ Certification and Accreditation | ○ Network access controls<br>○ Systems/Application controls<br>○ Systems software configuration access controls<br>○ Contingency planning<br>○ Audit trails<br>○ Targeted Downgrade/Closure: FY 2012 |

FHFA 1117

**MATERIAL WEAKNESS DESCRIPTION**

Internal Revenue Service - Financial Accounting of Revenue – Custodial

The IRS needs to have detail data to support custodial financial reporting of revenue. Key elements:

- Inability to provide detailed support for large types of revenue for employment and excise taxes
- Lack of effective custodial supporting systems/subsidiary detail
- Subsidiary ledger does not track and report one Trust Fund Recovery Penalty (TFRP) balance
- Untimely posting of TFRP assessments and untimely review of TFRP accounts
- Lack of a single, integrated general ledger to account for tax collection activities and the costs of conducting those activities
- IRS's general ledger for its custodial activities does not use the standard federal accounting classification structure

| Actions Completed | What Remains to be Done |
|---|---|
| ✓ Masterfile Custodial Detail Database (CDDB) Trace ID in production and the production of mismatch reports for the reconciliation process put in place | ○ Completion of CDDB Releases to provide a single, integrated subsidiary ledger using standard federal accounting classification structure |
| ✓ Completion of CDDB release to load frozen credits | ○ Targeted Downgrade/Closure: FY 2010 |
| ✓ Proper crediting of payments to all associated parties on TFRP accounts created since October 2001 | |

**MATERIAL WEAKNESS DESCRIPTION**

Financial Management Service - Consolidated Government-wide Financial Statements

The Federal Government does not have adequate systems, controls, and procedures to properly prepare the Consolidated Government-wide Financial Statements. Key elements:

- The government lacks a process to obtain information to effectively reconcile the reported excess of net costs over revenue with the budget deficit, and when applicable, a reported excess of revenue over net costs with a budget surplus
- Weaknesses in financial reporting procedures in internal control over the process for preparing the Consolidated Financial Statements

| Actions Completed | What Remains to be Done |
|---|---|
| ✓ Partially reconciled FY 2008 operating revenues with budget receipts | ○ Complete reconciliation of operating revenues to budget receipts |
| ✓ Developed a model to provide analysis of unreconciled transactions that affect the change in net position. | ○ Complete reciprocal category for the Treasury General Fund |
| ✓ Accounted for intra-governmental differences through formal consolidating and elimination accounting entries using all reciprocal fund categories including the General Fund | ○ Implement changes identified by the Office of the Fiscal Assistant Secretary as a result of its review of the Reporting Entity definitions per the Financial Accounting Standards |
| ✓ Federal agencies submit complete closing packages to GAO | ○ Include all disclosures as appropriate |
| ✓ Established traceability from agency footnotes to the Consolidated Financial Statements for completeness | ○ Include all loss contingencies as appropriate |
| | ○ Targeted Downgrade/Closure: FY 2012 |