| MATERIAL WEAKNESS DESCRIPTION |
|---|

**Treasury Departmental Offices - Financial Management Practices**

The Office of Accounting and Internal Control (AIC) has not fully developed sufficient internal control over the underlying financial data included in the consolidated balance sheet to ensure it is complete and accurate. This is due in part because the financial infrastructure for the financial reporting responsibilities of the Treasury Department is inadequately staffed for such a large and complex Executive Agency. Key elements:

- AIC has not developed clear, step-by-step procedures for performance of the financial statements analyses or clearly explained and presented the methology used for preparation of these analyses.
- AIC has not clearly documented procedure manuals or process flow documentation.
- Key senior financial management and budget staff positions were vacant during critical time periods
- Lack of continuity with historical knowledge and experience caused significant delays in audit deliverables as well as in addressing accounting issues.

| Actions Completed | What Remains to be Done |
|---|---|
| ✓ Initiated development of standard operating procedures and cross-training of staff on financial statement process | ○ Study existing analytical and review processes, then develop/revise policy and procedures |
| ✓ Filled AIC credit reform accountant and two senior accounting positions | ○ Fill two new AIC accountant positions |
| ✓ Obtained authorization for two additional staff accountant positions in AIC | ○ Review current funding, staffing, skill competencies, contract support, and training, and determine proper levels needed to fully perform daily operations |
| ✓ Filled three staff positions in the Office of Financial Management | ○ Based on results of review, hire additional staff, establish additional contract service support, and/or establish agreements with Treasury bureaus for detailees |
| ✓ Filled two Budget Execution positions | |
| ✓ Brought contractors aboard to assist with GSE transactions | ○ Provide additional training and guidance to staff |
| | ○ Targeted Downgrade/Closure: FY 2010 |

FHFA 1119

## AUDIT FOLLOW-UP ACTIVITIES

During fiscal year 2009, Treasury placed renewed emphasis on both the general administration of internal control issues throughout the Department and the timely resolution of findings and recommendations identified by the Office of the Inspector General (OIG), the Treasury Inspector General for Tax Administration (TIGTA), the Special Inspector General for the Troubled Asset Relief Program (SIG TARP), the Government Accountability Office, and external auditors. During the year, Treasury continued to implement enhancements to the tracking system called the "Joint Audit Management Enterprise System" (JAMES). JAMES is a Department-wide, interactive, web-based system accessible to the OIG, TIGTA, SIG TARP, bureau management, Departmental management, and others. The system tracks information on audit reports from issuance through completion of all corrective actions required to address findings and recommendations contained in an audit report. JAMES is the official system of record for Treasury's internal control program.

## POTENTIAL MONETARY BENEFITS

The *Inspector General Act Amendments of 1988*, Public Law 101-504, require the Inspectors General and the Secretaries of Executive Agencies and Departments to submit semiannual reports to the Congress on actions taken on audit reports issued that identify potential monetary benefits. The Department consolidates and analyzes all relevant information for inclusion in this report. The information contained in this section represents a consolidation of information provided separately by the OIG, TIGTA, and Department management.

In the course of their audits, the Inspectors General periodically identify questioned costs, make recommendations that funds be put to better use, and identify measures that demonstrate the value of audit recommendations to tax administration and business operations. "Questioned costs" include:

- a cost that is questioned because of an alleged violation of a provision of a law, regulation, contract, or other requirement governing the expenditure of funds

- a finding, at the time of the audit, that such costs are not supported by adequate documentation (i.e., an unsupported cost)

- a finding that expenditure of funds for the intended purpose is unnecessary or unreasonable

The Department regularly reviews progress made by the bureaus in realizing potential monetary benefits identified in audit reports, and coordinates with the auditors as necessary to ensure the consistency and integrity of information on monetary benefit recommendations being tracked.

The statistical data in the following summary table and charts represent audit report activity for the period from October 1, 2008 through September 30, 2009. The data reflect information on reports that identified potential monetary benefits issued by the OIG and TIGTA.

FHFA 1120

| AUDIT REPORT ACTIVITY WITH POTENTIAL MONETARY BENEFITS FOR WHICH MANAGEMENT HAS IDENTIFIED CORRECTIVE ACTIONS (OIG AND TIGTA) OCTOBER 1, 2008 THROUGH SEPTEMBER 30, 2009 (DOLLARS IN MILLIONS) | Disallowed Costs | | Better Used Funds | | Revenue Enhancements | | Totals | |
|---|---|---|---|---|---|---|---|---|
| | Reports | Dollars | Reports | Dollars | Reports | Dollars | Report Total | Total Dollars |
| Beginning Balance | 11 | $ 35.1 | 4[1] | $ 17.2[1] | 10 | $ 753.2 | 25 | $ 805.5 |
| New Reports | 9 | 2.9 | 5 | 9,058.9 | 11 | 2,766.2 | 25 | 11,828 |
| Total | 20 | 38.0 | 9 | 9,076.1 | 21 | 3,519.4 | 50 | 12,633.5 |
| Reports Closed | 10 | 1.1 | 3 | 8,917.0 | 10 | 983.1 | 23 | 9,901.2 |
| a. Realized or Actual | 6 | .7 | 1 | .1 | 3 | 12.2 | 10 | 13.0 |
| b. Unrealized - Written off | 5 | .4 | 2 | 8,916.9[2] | 7 | 970.9[3] | 14 | 9,888.2 |
| Ending Balance | 10 | $ 36.9 | 6 | $ 159.1 | 11 | $ 2,536.3 | 27 | $ 2,732.3 |

[1] The beginning balances for better used funds were adjusted to reflect TIGTA's removal of one report for $3.7 million.

[2] This category includes two reports, with $8,916.9 million written off, for which IRS management did not concur with TIGTA's projected benefits.

[3] This category includes four reports, with $939.3 million written off, for which IRS management was undecided or did not concur with TIGTA's projected benefits.

The following table provides a snapshot of OIG and TIGTA audit reports with significant recommendations reported in previous semiannual reports for which corrective actions had not been completed as of September 30, 2008, and September 30, 2009, respectively. OIG and TIGTA define as "significant" any recommendation open for more then one year. There were no "Undecided Audit Recommendations" during the same periods.

| SIGNIFICANT UNIMPLEMENTED RECOMMENDATIONS | 9/30/2008 | | 9/30/2009 | |
|---|---|---|---|---|
| | OIG | TIGTA | OIG | TIGTA |
| | No. of Reports | No. of Reports | No. of Reports | No. of Reports |
| Unimplemented | 6 | 40 | 8 | 26 |

The following table presents a summary of OIG and TIGTA audit reports that were open for more than a year with potential monetary benefits at the end of fiscal years 2007, 2008, and 2009.

| NUMBER OF REPORTS WITH POTENTIAL MONETARY BENEFITS OPEN FOR MORE THAN ONE YEAR | AFR Report Year | 9/30/2007 | 9/30/2008 | 9/30/2009 |
|---|---|---|---|---|
| OIG | No. of Reports | 1 | 1 | 0 |
| | $ Projected Benefits | $29.4 million | $29.4 million | $0 million |
| TIGTA | No. of Reports | 10 | 12 | 10 |
| | $ Projected Benefits | $ 66.5 million | $661.5 million | $673.8 million |

The following tables present a summary of TIGTA audit reports, broken out by year of report issuance, on which management decisions were made on or before September 30, 2008, but the final actions had not been taken as of September 30, 2009. (Note: There are no OIG audit reports for this category.)

**DETAILS OF THE AUDIT REPORTS WITH POTENTIAL MONETARY BENEFITS ON WHICH MANAGEMENT DECISIONS WERE MADE ON OR BEFORE SEPTEMBER 30, 2008, BUT FINAL ACTIONS HAVE NOT BEEN TAKEN AS OF SEPTEMBER 30, 2009 (DOLLARS IN THOUSANDS)**

| Bureau | Report Number | Report Issue Date | Brief Description | Disallowed Costs | Funds Put to Better Use | Revenue Enhance-ment | Total | Due Date |
|---|---|---|---|---|---|---|---|---|
| IRS | 2004-20-142 | 8/26/2004 | The IRS should ensure the Storage Strategy Study addresses the data storage capacity deficiency and recommends a cost-effective virtual tape system solution to reduce maintenance and tape shipping costs. | | 200.0 | | 200.0 | Due 12/31/2010 |
| **FY 2004** | **1** | | | | **200.0** | | **200.0** | |
| IRS | 2006-1c-142 | 9/25/2006 | The IRS Contracting Officer (CO) should use the results of the Defense Contract Auditing Agency (DCAA) report to fulfill his/her duties in awarding and administering contracts. | 32,373.8 | | | 32,373.8 | Delayed to 9/30/2010 |
| **FY 2006** | **1** | | | **32,373.8** | | | **32,373.8** | |
| IRS | 2007-1c-040 | 3/8/2007 | The IRS CO will work with DCAA and the contractor to resolve the questioned costs applicable to IRS contracts. | 103.6 | | | 103.6 | Due 2/15/2010 |
| IRS | 2007-1c-041 | 3/8/2007 | The IRS CO will work with DCAA and the contractor to resolve the questioned costs applicable to IRS contracts. | 2,247.0 | | | 2,247.0 | Due 3/15/2010 |
| IRS | 2007-30-062 | 3/30/2007 | Ensure the revised Form 4137 is used effectively to identify and assess the employer's share of Social Security and Medicare taxes on unreported tip income. | | | 541,124.0 | 541,124.0 | Delayed to 1/15/2010 |
| IRS | 2007-1c-149 | 9/24/2007 | The IRS CO will work with DCAA and the contractor to resolve the questioned costs applicable to IRS contracts. | 62.2 | | | 62.2 | Due 9/15/2010 |
| IRS | 2007-1c-154 | 9/24/2007 | The IRS CO will work with DCAA and the contractor to resolve the questioned costs applicable to IRS contracts. | 1.2 | | | 1.2 | Due 9/15/2010 |
| **FY 2007** | **5** | | | **2,414.0** | | **541,124.0** | **543,538.0** | |
| IRS | 2008-30-155 | 8/22/2008 | The IRS should revise computer programming to automatically reissue an undelivered refund check when an address change is reflected on a taxpayer's account. | | 36.2 | | 36.2 | Due 1/15/2010 |

*Continued on next page*

**DETAILS OF THE AUDIT REPORTS WITH POTENTIAL MONETARY BENEFITS ON WHICH MANAGEMENT DECISIONS WERE MADE ON OR BEFORE SEPTEMBER 30, 2008, BUT FINAL ACTIONS HAVE NOT BEEN TAKEN AS OF SEPTEMBER 30, 2009 (DOLLARS IN THOUSANDS)**

| Bureau | Report Number | Report Issue Date | Brief Description | Disallowed Costs | Funds Put to Better Use | Revenue Enhance-ment | Total | Due Date |
|--------|---------------|-------------------|------------------|------------------|-------------------------|----------------------|-------|----------|
| IRS | 2008-40-087 | 3/28/2008 | The IRS should develop and implement strategies to bring noncompliant taxpayers back into compliance. | | | 52,100.0 | 52,100.0 | Due 1/15/2010 |
| | | | The IRS should consider using the indicator shown on Form 5498 to identify taxpayers who are subject to required minimum distributions. | | | 94.4 | 94.4 | Due 1/15/2010 |
| IRS | 2008-40-167 | 8/29/2008 | The IRS should develop a process to identify those employers that do not adequately withhold taxes from their employees after receiving a lock-in letter. | | | 45,500.0 | 45,500.0 | Due 12/15/2009 |
| FY 2008 | 3 | | | | 36.2 | 97,694.4 | 97,730.6 | |
| TOTAL | 10 | | | 34,787.8 | 236.2 | 638,818.4 | 673,842.4 | |

FHFA 1123

## FINANCIAL MANAGEMENT SYSTEMS FRAMEWORK

### Overview

The Department of the Treasury's financial management systems structure consists of financial and mixed systems maintained by the Treasury bureaus and the Department-wide Financial Analysis and Reporting System (FARS). The bureau systems process and record the detailed financial transactions and submit summary-level data to FARS on a scheduled basis. FARS maintains the key financial data necessary for consolidated financial reporting. In addition, the FARS modules maintain data on performance management and the status of audit-based corrective actions. Under this systems structure, the bureaus are able to maintain financial management systems that meet their specific business requirements. On a scheduled basis, the required financial and performance data are submitted to FARS to meet Departmental analysis and reporting requirements. The Department uses FARS to produce its periodic financial and performance reports as well as the annual Agency Financial Report (AFR) and the Annual Performance Report (APR). This structured financial systems environment enables Treasury to receive an unqualified audit opinion and supports its required financial management reporting and analysis requirements.

The FARS structure consists of the following components:

- Bureau core and financial management systems - process and record detailed financial transactions
- Treasury Information Executive Repository (TIER) - consolidates bureau financial data
- CFO Vision - produces monthly financial statements and performs financial analysis
- Joint Audit Management Enterprise System (JAMES) - tracks information on audit findings, recommendations, and planned corrective actions
- Performance Reporting System (PRS) - tracks the status of key performance measures

Bureaus submit summary-level financial data to TIER on a monthly basis, within three business days of the month-end. These data are then used by CFO Vision to generate financial statements and reports on both a Department-wide and bureau-level basis. This structure enables the Department to produce its audited annual financial statements and monthly management reports. During fiscal year 2009, Treasury continued to upgrade its FARS applications to take advantage of improvements in system technology. This included completing the roll-out of CFO Vision to Treasury bureaus. CFO Vision provides the bureaus with direct system access for enhanced reporting capabilities and financial analysis.

The Department continues to eliminate redundant and outdated financial management systems with the goal of consolidating financial management activities to improve productivity. As of September 30, 2009, the number of financial management systems decreased to 55, down from 60 at the end of fiscal year 2008. This reduction is due in part to bureaus migrating to the Bureau of the Public Debt Administrative Resource Center (BPD ARC) for these services.

As part of the Department's enhancement effort, 14 Treasury bureaus and reporting entities are cross-serviced for core financial systems by BPD ARC. Cross-servicing enables these bureaus to have access to core financial systems without having to maintain the necessary technical and systems architectures. In an effort to continue to stream-line its financial systems environment, Treasury will work with the remaining bureaus to develop plans to migrate to Treasury's Shared Service Provider for core financial systems in accordance with the Financial Management

FHFA 1124

Line of Business requirements. In addition, as part of the Department's implementation of the e-Travel initiative, bureaus have eliminated their legacy travel systems.

In fiscal year 2009, to improve management's decision making process concerning the FARS applications projects, Treasury enhanced its risk management controls. Treasury identifies and monitors the risks and the potential threats to the FARS applications, surveys FARS customers to measure application satisfaction, and identifies areas needing improvement. The Department continues to modernize the capabilities of the FARS applications by implementing solutions to provide timely and useful financial and program data. FARS applications have been expanded to support new organizations and new functionality as the Department has assumed new responsibilities resulting from the recent economic conditions. For example, Treasury expanded the JAMES to support the initiatives of the Office of the Special Inspector General for Trouble Asset Relief Program (SIGTARP), the Internal Revenue Service/Taxpayer Advocate Service, and the Office of Financial Stability (OFS). To support OFS's financial reporting needs, the FARS application CFO Vision was modified to produce stand-alone financial statements for OFS. This expanded use of CFO Vision, combined with OFS's use of a cross-serviced core financial system provided by BPD ARC, reduces the need for OFS to develop or purchase its own core financial system.

## Continued Improvement

Treasury's target financial management systems structure continues to build upon the current FARS foundation. Over the years, FARS has been enhanced to support new financial and performance requirements. FARS continues to provide management with the appropriate tools needed to align with the Department's goals and objectives.

Treasury completed the rollout of CFO Vision to the bureaus, modified FARS to support the requirements of the new Troubled Asset Relief Program (TARP), enhanced TIER to support the month-end financial close and preparation of the monthly financial statements and reports, and established a disaster recovery site for the FARS applications to provide business continuity in case of an emergency or disaster.

The Internal Revenue Service (IRS) continued work on the Integrated Financial System (IFS). IFS is the IRS's administrative financial management system. It accounts for $11.5 billion in IRS funding and provides timely financial statements for budgeting, analysis, and government-wide reporting. Fiscal year 2009 IFS accomplishments include:

- Interfaced with GovTrip, the Department's automated travel system
- Significantly reduced user access to the mainframe by migrating legacy system reports to the business warehouse, retired legacy processes, and trained users on reporting capabilities
- Implemented automated tax withholding for employee tuition assistance, created employee invoices, and automatically posted all payments received through *pay.gov* (Treasury's secure electronic payments system to federal agencies)
- Updated contingency plans, and completed penetration and disaster recovery testing
- Exceeded the average system uptime target of 97 percent.

The IRS successfully deployed the Customer Account Data Engine (CADE), Release 4.2 in January 2009. CADE is used to electronically process tax returns. With the implementation of Release 4.2, capabilities were added to process prior year and decedent returns, remittances, estimated tax payments, requests for extensions, and

FHFA 1125

surname changes. In fiscal year 2009, CADE processed over 40 million returns, issued more than 34.9 million refunds using a modernized account database, and processed over 7 million payments totaling $58.6 billion. The IRS developed a comprehensive Audit Trail Plan and requirements for CADE, which are necessary to account for assets and processes across the IRS.

As previously indicated, BPD ARC cross-services 14 Treasury bureaus and reporting entities for core financial systems. In addition to the cross-servicing for core financial systems, Treasury bureaus are also cross-serviced for other financial management services, such as electronic travel and human resource processing. This cross-servicing has resulted in a reduction in the number of financial management systems maintained by the Department. In fiscal year 2009, BPD ARC's accomplishments include:

- Selected by OMB as one of four government Shared Service Centers to perform information technology system Certification and Accreditation work under the Information Systems Security Line of Business (ISSLOB) initiative
- Provided system and processing support to 14 of Treasury's bureaus for human resource management and travel management
- Utilized information technology services to implement best practices for managing IT operations and improving quality and support in a cost effective manner
- Conducted a customer satisfaction survey - two-thirds of the customer agencies responded and the results showed an overall customer satisfaction score of 89 percent
- Enhanced GovTrip, Treasury's electronic travel system, to improve audit and expense descriptions and added new functionality to support user needs and improve security
- Participated in the Department of the Treasury's annual continuity exercise to assess BPD ARC's ability to perform essential functions during various emergency scenarios, and identified areas for improvement

## FEDERAL FINANCIAL MANAGEMENT IMPROVEMENT ACT (FFMIA) COMPLIANCE

As of September 30, 2009, the Department of the Treasury's financial management systems were not in substantial compliance with FFMIA due to deficiencies with the IRS's financial management systems. The IRS has a remediation plan in place to correct the deficiencies. For each FFMIA recommendation, the remediation plan identifies specific remedies, target dates, responsible officials, and resource estimates required for completion. This plan is reviewed and updated quarterly.

The IRS made significant progress in fiscal year 2009 toward the financial management systems being in FFMIA compliance by implementing the final release of the Custodial Detail Database (CDDB). CDDB contains detailed records of IRS revenue, refunds, and unpaid assessments. It addresses an IRS material weakness by providing detail data to support custodial financial reporting and was used by GAO during the fiscal year 2009 financial statements audit.

The IRS developed and tested a replacement revenue accounting system that is planned for implementation in fiscal year 2010. This system was designed to incorporate the United States Standard General Ledger (USSGL); and add traceability between the revenue, refunds, and unpaid assessments summary record and the IRS processing system's detail records.

## RECOVERY ACT RISK MANAGEMENT ACTIVITIES

Upon the enactment of the Recovery Act in February 2009, just weeks after the new Administration took office, Treasury quickly designed and implemented a robust risk management program to support the Department's implementation of the Act. Following OMB's Recovery Act implementation guidance, Treasury required the programs' senior accountable officials in the bureaus to certify that they had taken the following actions for each Recovery Act program:

- Identified and documented program-specific risks

- Identified and documented applicable current process internal controls

- Determined the risk level (high, medium, or low) by using Treasury's Recovery Act risk and impact assessment questionnaire

- Determined additional controls needed, if any

- Developed (or updated existing) and implemented a risk mitigation plan for each program with a risk level of medium or high

- Performed ongoing monitoring and testing

Treasury created a Recovery Act Risk Management Council that meets monthly to discuss the progress and status of each bureau's Recovery Act risk management activities.

FHFA 1127

# Appendix E
## Glossary of Acronyms

| GLOSSARY OF ACRONYMS | |
| --- | --- |
| ABS | Asset-Backed Securities |
| AFR | Agency Financial Report |
| AGP | Asset Guarantee Program |
| AIFP | Automotive Industry Financing Program |
| AIG | American International Group |
| AIIP | Automotive Industry Investment Program |
| APR | Annual Performance Report |
| ARC | Administrative Resource Center |
| ASC | Accounting Standards Codification |
| ASM/CFO | Assistant Secretary for Management & Chief Financial Officer |
| BEP | Bureau of Engraving and Printing |
| BPD | Bureau of the Public Debt |
| BSA | Bank Secrecy Act |
| BSM | Business Systems Modernization |
| CADE | Customer Account Data Engine |
| CAP | Competitiveness Assessment Process |
| CAP | Capital Assessment Program |
| CBLI | Consumer and Business Lending Initiative |
| CDDB | Custodial Detail Database |
| CDE | Community Development Entities |
| CDFI | Community Development Financial Institutions |
| CDS | Credit Default Swaps |
| CFPA | Consumer Financial Protection Agency |
| CFO | Chief Financial Officer |
| CFS | Consolidated Financial Statements |
| CFTC | Commodities Futures Trading Commission |
| CMBS | Commercial Mortgage Backed Securities |
| CO | Contracting Officer |
| COP | Congressional Oversight Panel |
| CPP | Capital Purchase Program |
| CSRS | Civil Service Retirement System |
| CTF | Clean Technology Fund |
| | *(continued)* |

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| DASHR/CHCO | Office of the Deputy Assistant Secretary for Human Resources/Chief Human Capital Officer |
| DCAA | Defense Contract Auditing Agency |
| DCP | Office of D.C. Pensions |
| DIP | Debtor-in-Possession |
| DO | Departmental Offices |
| DHS | Department of Homeland Security |
| EESA | Emergency Economic Stability Act of 2008 |
| EFTPS | Electronic Federal Tax Payment System |
| EGTRRA | Economic Growth and Tax Relief Reconciliation Act |
| EITC | Earned Income Tax Credit |
| ESF | Exchange Stabilization Fund |
| Fannie Mae | Federal National Mortgage Association |
| FARS | Financial Analysis and Reporting System |
| FASAB | Federal Accounting Standards Advisory Board |
| FATF | Financial Action Task Force |
| FCDA | Foreign Currency Denominated Assets |
| FCRA | Federal Credit Reform Act |
| FDIC | Federal Deposit Insurance Corporation |
| FECA | Federal Employees' Compensation Act |
| FERS | Federal Employees' Retirement System |
| FEGLI | Federal Employees Group Life Insurance |
| FEHBP | Federal Employees Health Benefits Program |
| FFB | Federal Financing Bank |
| FFMIA | Federal Financial Management Improvement Act |
| FHFA | Federal Housing Finance Agency |
| FHLB | Federal Home Loan Bank |
| FinCEN | Financial Crimes Enforcement Network |
| FMFIA | Federal Managers' Financial Integrity Act |
| FMIS | Financial Management Information System |
| FMS | Financial Management Service |
| FRB | Federal Reserve Bank |
| FRBNY | Federal Reserve Bank of New York |
| Freddie Mac | Federal Home Loan Mortgage Corporation |
| FTO | Fine Troy Ounce |
| FY | Fiscal Year |
| G-7 | Group of Seven |

*(continued)*

FHFA 1129

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| G-20 | Group of Twenty |
| GAAP | Generally Accepted Accounting Principles |
| GAB | General Arrangement to Borrow |
| GAO | Government Accountability Office |
| GFRA | General Fund Receipt Account |
| GM | General Motors |
| GMAC | General Motors Acceptance Corporation |
| GSA | General Services Administration |
| GSE | Government Sponsored Enterprises |
| GSECF | Government Sponsored Enterprise Credit Facility |
| HAMP | Home Affordable Modification Program |
| HCTC | Health Coverage Tax Credit |
| HERA | Housing and Economic Recovery Act |
| HUD | Department of Housing and Urban Development |
| IAP | International Assistance Programs |
| IFS | Integrated Financial System |
| IMF | International Monetary Fund |
| IPIA | Improper Payments Information Act |
| IRACS | Interim Revenue Accounting Control System |
| IRS | Internal Revenue Service |
| IT | Information Technology |
| JAMES | Joint Audit Management Enterprise System |
| LIBOR-OIS | London Inter-Bank Offered Rate-Overnight Index Swap |
| MBS | Mortgage-Backed Securities |
| MDB | Multilateral Development Banks |
| MeF | Modernized Electronic File |
| MINT | U.S. Mint |
| MRADR | Market Risk Adjusted Discount Rate |
| MV&S | Modernization, Vision, and Strategy |
| NAB | New Arrangement to Borrow |
| NACA | Native American CDFI Assistance |
| NMTC | New Markets Tax Credit |
| NRC | National Revenue Center |
| NRP | National Research Program |
| OCC | Office of the Comptroller of the Currency |
| OFS | Office of Financial Stability |

*(continued)*

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| OIG | Office of Inspector General |
| OMB | Office of Management and Budget |
| ONI | Office of National Insurance |
| OPEB | Other Post Employment Benefits |
| OPM | Office of Personnel Management |
| ORB | Other Retirement Benefits |
| OTC | Over-the-Counter |
| OTS | Office of Thrift Supervision |
| PB | President's Budget |
| PCA | Planned Corrective Actions |
| PP&E | Property, Plant, and Equipment |
| PPIF | Public-Private Investment Fund |
| PPIP | Public-Private Investment Program |
| PSPA | Preferred Stock Purchase Agreements |
| QEO | Qualified Equity Offering |
| QFI | Qualified Financial Institution |
| RRACS | Redesign Revenue Accounting Control System |
| SAR | Suspicious Activity Report |
| SBA | Small Business Administration |
| SBR | Statement of Budgetary Resources |
| SCAP | Supervisory Capital Assessment Program |
| SDR | Special Drawing Rights |
| SEC | Securities and Exchange Commission |
| SED | Strategic Economic Dialogue |
| SFFAS | Statement of Federal Financial Accounting Standards |
| SFP | Supplementary Financing Program |
| SIGTARP | Special Inspector General for TARP |
| SOMA | System Open Market Account |
| SPSPA | Senior Preferred Stock Purchase Agreements |
| SPV | Special Purpose Vehicle |
| SSP | Shared Service Provider |
| SSP | Stable Share Price |
| TAIFF | Troubled Assets Insurance Financing Fund |
| TALF | Term Asset-Backed Securities Loan Facilities |
| TARP | Troubled Asset Relief Program |
| TFF | Treasury Forfeiture Fund |

*(continued)*

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| TIER | Treasury Information Executive Repository |
| TIGTA | Treasury Inspector General for Tax Administration |
| TIP | Targeted Investment Program |
| TIPS | Treasury Inflation-Protected Securities |
| TRES | Treasury Retail E-Services |
| TRIA | Terrorism Risk Insurance Act |
| TTB | Alcohol and Tobacco Tax and Trade Bureau |
| USSGL | United States Standard General Ledger |
| VITA | Volunteer Income Tax Assistance |

FHFA 1132

*This page left intentionally blank*

APPENDIX E — GLOSSARY OF ACRONYMS

FHFA 1133

# Website Information

| | |
|---|---|
| Treasury On-line | **www.treas.gov** |
| Alcohol and Tobacco Tax and Trade Bureau | **www.ttb.gov** |
| Community Development Financial Institutions Fund | **www.treas.gov/cdfi** |
| Comptroller of the Currency | **www.occ.treas.gov** |
| Bureau of Engraving & Printing | **www.bep.treas.gov** |
| Financial Crimes Enforcement Network | **www.treas.gov/fincen** |
| Financial Management Service | **www.fms.treas.gov** |
| Internal Revenue Service | **www.irs.gov** |
| U.S. Mint | **www.usmint.gov** |
| Bureau of the Public Debt | **www.publicdebt.treas.gov** |
| Office of Thrift Supervision | **www.ots.treas.gov** |
| The Financial Stability Plan | **www.financialstability.gov** |
| Help for America's Homeowners | **www.makinghomeaffordable.gov** |
| Recovery Act Spending | **www.recovery.gov** |

www.treas.gov

# Tab 16

## SECOND AMENDMENT TO AMENDED AND RESTATED
## SENIOR PREFERRED STOCK PURCHASE AGREEMENT

SECOND AMENDMENT dated as of December 24, 2009, to the AMENDED AND RESTATED SENIOR PREFERRED STOCK PURCHASE AGREEMENT dated as of September 26, 2008, between the UNITED STATES DEPARTMENT OF THE TREASURY ("Purchaser"), and FEDERAL NATIONAL MORTGAGE ASSOCIATION ("Seller"), acting through the Federal Housing Finance Agency (the "Agency") as its duly appointed conservator (the Agency in such capacity, "Conservator").

### Background

A.   Purchaser and Seller have heretofore entered into the Amended and Restated Senior Preferred Stock Purchase Agreement dated as of September 26, 2008 (the "Amended and Restated Agreement").

B.   In the Amended and Restated Agreement, Purchaser committed itself to provide to Seller, on the terms and conditions provided in the Amended and Restated Agreement, immediately available funds in an amount as determined from time to time as provided in the Amended and Restated Agreement, but in no event in an aggregate amount exceeding $100,000,000,000.

C.   Purchaser and Seller have heretofore entered into the Amendment dated as of May 6, 2009, to the Amended and Restated Agreement (the "First Amendment").

D.   In the First Amendment, Purchaser increased to $200,000,000,000 the maximum aggregate amount permitted to be provided to Seller under the Amended and Restated Agreement, and amended the terms of the Amended and Restated Agreement in certain other respects.

E.   Purchaser and Seller are each authorized to enter into this Second Amendment to the Amended and Restated Agreement ("this Second Amendment") (i) modifying the Treasury's funding commitment to Seller to provide it with additional funding in amounts not to exceed the new formulaic maximum amount specified herein, and (ii) amending the terms of the Amended and Restated Agreement, as previously amended, in certain other respects.

THEREFORE, for and in consideration of the mutual agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Purchaser and Seller agree as follows:

## Terms and Conditions

1.      **Definitions.**

Capitalized terms used and not defined in this Amendment shall have the respective meanings given such terms in the Amended and Restated Agreement, as amended by the First Amendment (the Amended and Restated Agreement, as amended by the First Amendment, being the "Existing Agreement").

2.      **Amendment to Section 1 (Relating to Definition of "Indebtedness").**

The definition of "Indebtedness" in Section 1 of the Existing Agreement is hereby amended to read as follows:

> *"Indebtedness"* of any Person means, for purposes of Section 5.5 only, without duplication, (a) all obligations of such Person for money borrowed by such Person, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services, other than trade accounts payable, (e) all Capital Lease Obligations of such Person, (f) obligations, whether contingent or liquidated, in respect of letters of credit (including standby and commercial), bankers' and similar instruments, and (g) any obligation of such Person, contingent or otherwise, guaranteeing or having the economic effect of guaranteeing and Indebtedness of the types set forth in clauses (a) through (f) payable by another Person other than Mortgage Guarantee Obligations (and, for the avoidance of doubt, without giving effect to any change that may be made hereafter in respect of Statement of Financial Accounting Standards No. 140, 166, or 167, or any similar accounting standard).  Indebtedness balances or amounts shall be measured at par value for purposes of Section 5.5 only.

3.      **Amendment to Section 1 (Relating to Definition of "Maximum Amount").**

The definition of "Maximum Amount" in Section 1 of the Existing Agreement is hereby amended to read as follows:

> *"Maximum Amount"* means, as of any date of determination, the greater of (a) $200,000,000,000 (two hundred billion dollars), or (b) $200,000,000,000 plus the cumulative total of Deficiency Amounts determined for calendar quarters in calendar years 2010, 2011, and 2012, less any Surplus Amount determined as of December 31, 2012, and in the case of either (a) or (b), less the aggregate amount of funding under the Commitment prior to such date.

4.      **Amendment to Section 1 (Relating to Definition of "Mortgage Assets").**

The definition of "Mortgage Assets" in Section 1 of the Existing Agreement is hereby amended to read as follows:

> *"Mortgage Assets"* of any Person means assets of such Person consisting of mortgages, mortgage loans, mortgage-related securities, participation

- 2 -

certificates, mortgage-backed commercial paper, obligations of real estate mortgage investment conduits and similar assets, in each case to the extent such assets would appear on the balance sheet of such Person in accordance with GAAP as in effect as of the date hereof (and, for the avoidance of doubt, without giving effect to any change that may be made hereafter in respect of Statement of Financial Accounting Standards No. 140, 166, or 167, or any similar accounting standard).  Mortgage Asset balances or amounts shall be measured at unpaid principal balance for purposes of Section 5.7 only.

5.     **Amendment to Section 1 (Adding Definition for New Defined Term  "Surplus Amount").**

Section 1 of the Existing Agreement is hereby amended by inserting after the definition of the term "Senior Preferred Stock" the following:

"*Surplus Amount*" means, as of the date of determination, the amount if any by which (a) the total assets of Seller (such assets excluding the Commitment and any unfunded amounts thereof) exceed (b) the total liabilities of Seller, in each case as reflected on the balance sheet of Seller as of the applicable date set forth in the Agreement, prepared in accordance with GAAP.

6.     **Amendment to Section 2.1 (Relating to the Commitment).**

Section 2.1 of the Existing Agreement is hereby amended to read as follows:

2.1 *Commitment.*  Purchaser hereby commits to provide to Seller, on the terms and conditions set forth herein, immediately available funds in an amount up to but not in excess of the Available Amount, as determined from time to time (the "Commitment"); provided, that in no event shall the aggregate amount funded under the Commitment exceed the greater of (a) $200,000,000,000 (two hundred billion dollars), or (b) $200,000,000,000 plus the cumulative total of Deficiency Amounts determined for calendar quarters in calendar years 2010, 2011, and 2012, less any Surplus Amount determined as of December 31, 2012. The liquidation preference of Senior Preferred Stock shall increase in connection with draws on the Commitment, as set forth in Section 3.3 below.

7.     **Amendment to Section 2.5 (Relating to Termination of Purchaser's Obligations).**

Section 2.5 of the Existing Agreement is hereby amended to read as follows:

2.5 *Termination of Purchaser's Obligations.*  Subject to earlier termination pursuant to Section 6.7, all of Purchaser's obligations under and in respect of the Commitment shall terminate upon the earliest of:  (a) if the Liquidation End Date shall have occurred, (i) the payment in full of Purchaser's obligations with respect to any valid request for funds pursuant to Section 2.4 or (ii) if there is no Deficiency Amount on the Liquidation End Date or if no such request pursuant to Section 2.4 has been made, the close of business on the 15th Business Day following the determination of the Deficiency Amount, if any, as of the Liquidation End Date; (b) the payment in full of, defeasance of or other reasonable provision for all liabilities of Seller, whether or not contingent, including payment of any amounts that may become payable on, or expiry of or other provision for, all Mortgage Guarantee Obligations and provision for

- 3 -

unmatured debts; and (c) the funding by Purchaser under the Commitment of an aggregate equal to the greater of (a) $200,000,000,000 (two hundred billion dollars), or (b) $200,000,000,000 plus the cumulative total of Deficiency Amounts determined for calendar quarters in calendar years 2010, 2011, and 2012, less any Surplus Amount determined as of December 31, 2012.  For avoidance of doubt, the Commitment shall *not* be terminable by Purchaser solely by reason of (i) the conservatorship, receivership or other insolvency proceeding of Seller or (ii) the Seller's financial condition or any adverse change in Seller's financial condition.

**8.**     **Amendment to Section 3.2 (Relating to Periodic Commitment Fee).**

Section 3.2 of the Existing Agreement is hereby amended to read as follows:

3.2. *Periodic Commitment Fee.* (a) Commencing March 31, 2011, Seller shall pay to Purchaser quarterly, on the last day of March, June, September and December of each calendar year (each a "Periodic Fee Date"), a periodic commitment fee (the "Periodic Commitment Fee"). The Periodic Commitment Fee shall accrue from January 1, 2011.

(b) The Periodic Commitment Fee is intended to fully compensate Purchaser for the support provided by the ongoing Commitment following December 31, 2010. The amount of the Periodic Commitment Fee shall be set not later than December 31, 2010 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect. The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; provided, that Purchaser may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

(c) At the election of Seller, the Periodic Commitment Fee may be paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock so that the aggregate liquidation preference of all such outstanding shares of Senior Preferred Stock is increased by an amount equal to the Periodic Commitment Fee. Seller shall deliver notice of such election not later than three (3) Business Days prior to each Periodic Fee Date. If the Periodic Commitment Fee is not paid in cash by 12:00 pm (New York time) on the applicable Periodic Fee Date (irrespective of Seller's election pursuant to this subsection), Seller shall be deemed to have elected to pay the Periodic Commitment Fee by adding the amount thereof to the liquidation preference of the Senior Preferred Stock, and the aggregate liquidation preference of the outstanding shares of Senior Preferred Stock shall thereupon be automatically increased, in the manner contemplated by the first sentence of this section, by an aggregate amount equal to the Periodic Commitment Fee then due.

**9.**     **Amendment to Section 5.7 (Relating to Owned Mortgage Assets).**

Section 5.7 of the Existing Agreement is hereby amended to read as follows:

5.7. *Mortgage Assets.* Seller shall not own, as of any applicable date, Mortgage Assets in excess of (i) on December 31, 2009, $900 billion, or (ii) on December 31 of each year thereafter, 90.0% of the aggregate amount of Mortgage Assets that Seller was permitted to own as of December 31 of the immediately

- 4 -

preceding calendar year; <u>provided</u>, that in no event shall Seller be required under this Section 5.7 to own less than $250 billion in Mortgage Assets.

**10.     <u>Existing Agreement to Continue, as Amended</u>.**

Except as expressly modified by this Second Amendment, the Existing Agreement shall continue in full force and effect.

**11.     <u>Effective Date</u>.**

This Second Amendment shall not become effective until it has been executed by both of Purchaser and Seller.  When this Second Amendment has been so executed, it shall become effective as of the date first above written.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION, by

Federal Housing Finance Agency,
its Conservator


Edward J. DeMarco
Acting Director


UNITED STATES DEPARTMENT
OF THE TREASURY


Timothy F. Geithner
Secretary of the Treasury

- 6 -

# Tab 17

## SECOND AMENDMENT TO AMENDED AND RESTATED
## SENIOR PREFERRED STOCK PURCHASE AGREEMENT

SECOND AMENDMENT dated as of December 24, 2009, to the AMENDED AND RESTATED SENIOR PREFERRED STOCK PURCHASE AGREEMENT dated as of September 26, 2008, between the UNITED STATES DEPARTMENT OF THE TREASURY ("Purchaser"), and FEDERAL HOME LOAN MORTGAGE CORPORATION ("Seller"), acting through the Federal Housing Finance Agency (the "Agency") as its duly appointed conservator (the Agency in such capacity, "Conservator").

### Background

A.  Purchaser and Seller have heretofore entered into the Amended and Restated Senior Preferred Stock Purchase Agreement dated as of September 26, 2008 (the "Amended and Restated Agreement").

B.  In the Amended and Restated Agreement, Purchaser committed itself to provide to Seller, on the terms and conditions provided in the Amended and Restated Agreement, immediately available funds in an amount as determined from time to time as provided in the Amended and Restated Agreement, but in no event in an aggregate amount exceeding $100,000,000,000.

C.  Purchaser and Seller have heretofore entered into the Amendment dated as of May 6, 2009, to the Amended and Restated Agreement (the "First Amendment").

D.  In the First Amendment, Purchaser increased to $200,000,000,000 the maximum aggregate amount permitted to be provided to Seller under the Amended and Restated Agreement, and amended the terms of the Amended and Restated Agreement in certain other respects.

E.  Purchaser and Seller are each authorized to enter into this Second Amendment to the Amended and Restated Agreement ("this Second Amendment") (i) modifying the Treasury's funding commitment to Seller to provide it with additional funding in amounts not to exceed the new formulaic maximum amount specified herein, and (ii) amending the terms of the Amended and Restated Agreement, as previously amended, in certain other respects.

THEREFORE, for and in consideration of the mutual agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Purchaser and Seller agree as follows:

## Terms and Conditions

1. <u>**Definitions.**</u>

Capitalized terms used and not defined in this Amendment shall have the respective meanings given such terms in the Amended and Restated Agreement, as amended by the First Amendment (the Amended and Restated Agreement, as amended by the First Amendment, being the "<u>Existing Agreement</u>").

2. <u>**Amendment to Section 1 (Relating to Definition of "Indebtedness").**</u>

The definition of "Indebtedness" in Section 1 of the Existing Agreement is hereby amended to read as follows:

*"Indebtedness"* of any Person means, for purposes of Section 5.5 only, without duplication, (a) all obligations of such Person for money borrowed by such Person, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services, other than trade accounts payable, (e) all Capital Lease Obligations of such Person, (f) obligations, whether contingent or liquidated, in respect of letters of credit (including standby and commercial), bankers' and similar instruments, and (g) any obligation of such Person, contingent or otherwise, guaranteeing or having the economic effect of guaranteeing and Indebtedness of the types set forth in clauses (a) through (f) payable by another Person other than Mortgage Guarantee Obligations (and, for the avoidance of doubt, without giving effect to any change that may be made hereafter in respect of Statement of Financial Accounting Standards No. 140, 166, or 167, or any similar accounting standard).  Indebtedness balances or amounts shall be measured at par value for purposes of Section 5.5 only.

3. <u>**Amendment to Section 1 (Relating to Definition of "Maximum Amount").**</u>

The definition of "Maximum Amount" in Section 1 of the Existing Agreement is hereby amended to read as follows:

*"Maximum Amount"* means, as of any date of determination, the greater of (a) $200,000,000,000 (two hundred billion dollars), or (b) $200,000,000,000 plus the cumulative total of Deficiency Amounts determined for calendar quarters in calendar years 2010, 2011, and 2012, less any Surplus Amount determined as of December 31, 2012, and in the case of either (a) or (b), less the aggregate amount of funding under the Commitment prior to such date.

4. <u>**Amendment to Section 1 (Relating to Definition of "Mortgage Assets").**</u>

The definition of "Mortgage Assets" in Section 1 of the Existing Agreement is hereby amended to read as follows:

*"Mortgage Assets"* of any Person means assets of such Person consisting of mortgages, mortgage loans, mortgage-related securities, participation

- 2 -

certificates, mortgage-backed commercial paper, obligations of real estate mortgage investment conduits and similar assets, in each case to the extent such assets would appear on the balance sheet of such Person in accordance with GAAP as in effect as of the date hereof (and, for the avoidance of doubt, without giving effect to any change that may be made hereafter in respect of Statement of Financial Accounting Standards No. 140, 166, or 167, or any similar accounting standard).  Mortgage Asset balances or amounts shall be measured at unpaid principal balance for purposes of Section 5.7 only.

5.      **Amendment to Section 1 (Adding Definition for New Defined Term  "Surplus Amount").**

Section 1 of the Existing Agreement is hereby amended by inserting after the definition of the term "Senior Preferred Stock" the following:

> "*Surplus Amount*" means, as of the date of determination, the amount if any by which (a) the total assets of Seller (such assets excluding the Commitment and any unfunded amounts thereof) exceed (b) the total liabilities of Seller, in each case as reflected on the balance sheet of Seller as of the applicable date set forth in the Agreement, prepared in accordance with GAAP.

6.      **Amendment to Section 2.1 (Relating to the Commitment).**

Section 2.1 of the Existing Agreement is hereby amended to read as follows:

> 2.1 *Commitment.*  Purchaser hereby commits to provide to Seller, on the terms and conditions set forth herein, immediately available funds in an amount up to but not in excess of the Available Amount, as determined from time to time (the "Commitment"); provided, that in no event shall the aggregate amount funded under the Commitment exceed the greater of (a) $200,000,000,000 (two hundred billion dollars), or (b) $200,000,000,000 plus the cumulative total of Deficiency Amounts determined for calendar quarters in calendar years 2010, 2011, and 2012, less any Surplus Amount determined as of December 31, 2012. The liquidation preference of Senior Preferred Stock shall increase in connection with draws on the Commitment, as set forth in Section 3.3 below.

7.      **Amendment to Section 2.5 (Relating to Termination of Purchaser's Obligations).**

Section 2.5 of the Existing Agreement is hereby amended to read as follows:

> 2.5 *Termination of Purchaser's Obligations.*  Subject to earlier termination pursuant to Section 6.7, all of Purchaser's obligations under and in respect of the Commitment shall terminate upon the earliest of:  (a) if the Liquidation End Date shall have occurred, (i) the payment in full of Purchaser's obligations with respect to any valid request for funds pursuant to Section 2.4 or (ii) if there is no Deficiency Amount on the Liquidation End Date or if no such request pursuant to Section 2.4 has been made, the close of business on the 15th Business Day following the determination of the Deficiency Amount, if any, as of the Liquidation End Date; (b) the payment in full of, defeasance of or other reasonable provision for all liabilities of Seller, whether or not contingent, including payment of any amounts that may become payable on, or expiry of or other provision for, all Mortgage Guarantee Obligations and provision for

- 3 -

unmatured debts; and (c) the funding by Purchaser under the Commitment of an aggregate equal to the greater of (a) $200,000,000,000 (two hundred billion dollars), or (b) $200,000,000,000 plus the cumulative total of Deficiency Amounts determined for calendar quarters in calendar years 2010, 2011, and 2012, less any Surplus Amount determined as of December 31, 2012.  For avoidance of doubt, the Commitment shall *not* be terminable by Purchaser solely by reason of (i) the conservatorship, receivership or other insolvency proceeding of Seller or (ii) the Seller's financial condition or any adverse change in Seller's financial condition.

8.   **Amendment to Section 3.2 (Relating to Periodic Commitment Fee).**

Section 3.2 of the Existing Agreement is hereby amended to read as follows:

3.2. *Periodic Commitment Fee*. (a) Commencing March 31, 2011, Seller shall pay to Purchaser quarterly, on the last day of March, June, September and December of each calendar year (each a "Periodic Fee Date"), a periodic commitment fee (the "Periodic Commitment Fee"). The Periodic Commitment Fee shall accrue from January 1, 2011.

(b) The Periodic Commitment Fee is intended to fully compensate Purchaser for the support provided by the ongoing Commitment following December 31, 2010. The amount of the Periodic Commitment Fee shall be set not later than December 31, 2010 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect. The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; provided, that Purchaser may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

(c) At the election of Seller, the Periodic Commitment Fee may be paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock so that the aggregate liquidation preference of all such outstanding shares of Senior Preferred Stock is increased by an amount equal to the Periodic Commitment Fee. Seller shall deliver notice of such election not later than three (3) Business Days prior to each Periodic Fee Date. If the Periodic Commitment Fee is not paid in cash by 12:00 pm (New York time) on the applicable Periodic Fee Date (irrespective of Seller's election pursuant to this subsection), Seller shall be deemed to have elected to pay the Periodic Commitment Fee by adding the amount thereof to the liquidation preference of the Senior Preferred Stock, and the aggregate liquidation preference of the outstanding shares of Senior Preferred Stock shall thereupon be automatically increased, in the manner contemplated by the first sentence of this section, by an aggregate amount equal to the Periodic Commitment Fee then due.

9.   **Amendment to Section 5.7 (Relating to Owned Mortgage Assets).**

Section 5.7 of the Existing Agreement is hereby amended to read as follows:

5.7. *Mortgage Assets*.  Seller shall not own, as of any applicable date, Mortgage Assets in excess of (i) on December 31, 2009, $900 billion, or (ii) on December 31 of each year thereafter, 90.0% of the aggregate amount of Mortgage Assets that Seller was permitted to own as of December 31 of the immediately

- 4 -

preceding calendar year; <u>provided</u>, that in no event shall Seller be required under this Section 5.7 to own less than $250 billion in Mortgage Assets.

**10.    <u>Existing Agreement to Continue, as Amended</u>.**

Except as expressly modified by this Second Amendment, the Existing Agreement shall continue in full force and effect.

**11.    <u>Effective Date</u>.**

This Second Amendment shall not become effective until it has been executed by both of Purchaser and Seller.  When this Second Amendment has been so executed, it shall become effective as of the date first above written.

FHFA 1146

FEDERAL HOME LOAN MORTGAGE
CORPORATION, by

Federal Housing Finance Agency,
its Conservator


Edward J. DeMarco
Acting Director


UNITED STATES DEPARTMENT
OF THE TREASURY


Timothy F. Geithner
Secretary of the Treasury

- 6 -

# Tab 18



## Congressional Budget Office

## Background Paper

# CBO's Budgetary Treatment of Fannie Mae and Freddie Mac

**January 2010**

THE CONGRESS OF THE UNITED STATES

Pub. No. 4023



# CBO's Budgetary Treatment of Fannie Mae and Freddie Mac

January 2010

The Congress of the United States ∎ Congressional Budget Office

FHFA 1150

# Note

Numbers in the text and tables of this report may not add up to totals because of rounding.



# Preface

After the U.S. government assumed control in 2008 of Fannie Mae and Freddie Mac—two federally chartered institutions that provide credit guarantees for almost half of the outstanding residential mortgages in the United States—the Congressional Budget Office (CBO) concluded that the institutions had effectively become government entities whose operations should be included in the federal budget. As a result, CBO incorporated estimates of the budgetary costs of the two entities in the baseline budget projections it published in 2009. This background paper describes CBO's budgetary treatment of Fannie Mae and Freddie Mac and the methods CBO used to estimate their costs. (CBO will issue new baseline projections for Fannie Mae and Freddie Mac in *The Budget and Economic Outlook* to be published in late January 2010.)

Damien Moore wrote the paper under the supervision of Kim Kowalewski and Robert Dennis. Kim Cawley, Chad Chirico, Peter Fontaine, Jeffrey Kling, Deborah Lucas, Joe Mattey, Larry Ozanne, and Aurora Swanson provided helpful comments on earlier drafts, as did Marvin Phaup of the Pew Economic Policy Group and James L. Blum. (The assistance of outside reviewers implies no responsibility for the final product, which rests solely with CBO.)

Chris Howlett edited the paper, and Kate Kelly proofread it. Maureen Costantino prepared the paper for publication, with assistance from Jeanine Rees. Lenny Skutnik produced the printed copies, Linda Schimmel coordinated the print distribution, and Simone Thomas prepared the electronic versions for CBO's Web site (www.cbo.gov).

Douglas W. Elmendorf

Douglas W. Elmendorf
Director

January 2010

FHFA 1153

# Contents

**Summary and Introduction**  *1*

**Background to Federal Conservatorship for Fannie Mae and Freddie Mac**  *4*

**New Treasury Authority and Resulting Federal Actions**  *6*

**CBO's Budget Projections for Fannie Mae and Freddie Mac**  *6*
    Estimating Subsidy Costs for Existing Business  *10*
    Estimating Subsidy Costs for New Business  *12*
    Comparison with Cash Budgetary Treatment  *13*

**Appendix: Projecting Mortgage Cash Flows and Valuing Mortgage Guarantees**  *15*


**Tables**

1.    The Treasury's Purchases of Preferred Stock from Fannie Mae and Freddie Mac Under the Conservatorship    7

2.    Summary of CBO's August 2009 Baseline Budget Projections for Fannie Mae and Freddie Mac    8


**Figure**

A-1.    Spread Between Interest Rates on Jumbo and Conforming Mortgages    22

# CBO's Budgetary Treatment of Fannie Mae and Freddie Mac

## Summary and Introduction

In September 2008, the Director of the Federal Housing Finance Agency placed into conservatorship two large government-sponsored enterprises, the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac).[1] At the same time, the Secretary of the Treasury took a major ownership interest in both entities. In taking those steps, federal officials were exercising authority provided in the Housing and Economic Recovery Act of 2008.[2] In the judgment of the Congressional Budget Office (CBO), those actions make Fannie Mae and Freddie Mac part of the government and imply that their operations should be reflected in the federal budget.

Fannie Mae and Freddie Mac were chartered by the Congress to provide liquidity and stability to the secondary market for residential mortgages (the market in which those mortgages are bought and sold). In carrying out their charters, the two entities purchase mortgage loans made by lenders and package them into mortgage-backed securities (MBSs), which can be sold to investors along with a guarantee that principal and interest on the underlying mortgages will be paid in full. The two entities also invest directly in mortgages and MBSs, which they hold in their portfolios. To fund those holdings, they issue debt securities that they sell in the international capital markets.[3]

Despite having a unique legal status and a long history linking them closely to the federal government, Fannie Mae and Freddie Mac have been considered private firms owned by their shareholders. Now, however, the federal government controls both entities and is operating them to fulfill the public purpose of supporting the housing and mortgage markets.[4] Moreover, both entities rely on federal backing to maintain

---

1. Conservatorship is the legal process by which an entity (in this case, the government) establishes control and oversight of a company to put it in a sound and solvent condition.

2. Public Law 110-289.

3. A debt security (such as a bill, bond, or note) represents a fixed amount of money that has been borrowed and must be repaid, usually at a specific rate of interest.

4. For more information about the various ways in which the federal government helps the housing market, see Congressional Budget Office, *An Overview of Federal Support for Housing,* Issue Brief (November 3, 2009).

FHFA 1156

their low-cost access to financial markets. Although they are not legally government agencies, and their employees are not civil servants, CBO believes it is appropriate and useful to policymakers to include their financial transactions alongside all other federal activities in the budget.[5]

In the baseline budget projections it published in 2009, CBO accounted for the cost of the entities' operations in the federal budget as if they were being conducted by a federal agency. That is, CBO's baseline treated the mortgages owned or guaranteed by Fannie Mae and Freddie Mac as loans and loan guarantees of the federal government. For the entities' new loan and guarantee commitments, CBO projected budget outlays equal to the estimated subsidy inherent in the commitments at the time they are made. For the entities' outstanding loans and guarantees at the start of fiscal year 2009, CBO recorded a subsidy equal to the shortfall between the current value of the mortgages and the liabilities used to fund them at the time the baseline projections were prepared.

Using the budgetary treatment of the transactions of the Troubled Asset Relief Program as a model, CBO calculated the subsidies for Fannie Mae and Freddie Mac by estimating the net cash flows associated with the two entities' mortgage commitments and converting those estimates into present values using discount rates that reflect the expected rate of return the government could earn on investments or securities of comparable risk. That procedure is conceptually equivalent to the methods that private companies use to compute the fair value of certain assets and liabilities under generally accepted accounting principles.[6] For the two entities' administrative costs, such as employees' salaries, CBO estimated and recorded costs separately on a cash basis, in keeping with the federal budget's treatment of other credit programs.

The operations of Fannie Mae and Freddie Mac added $291 billion to CBO's August 2009 baseline estimate of the federal deficit for fiscal year 2009 and $99 billion to the total deficit projected for the 2010–2019 period.[7] The estimate for 2009 recognized expected losses from transactions originated before the conservatorship, plus an

---

5. The Administration's Office of Management and Budget makes the ultimate decision about whether Fannie Mae and Freddie Mac will be included in the federal budget. Although the President's budget documents have not included the activities of Fannie Mae and Freddie Mac in the budget totals, they have provided financial information about the two entities for several years; see, for example, *Budget of the U.S. Government, Fiscal Year 2010: Appendix*, pp. 1339–1340.

6. The fair value of an asset is the price that would be received from selling the asset in an orderly transaction between market participants at the measurement date; see Financial Accounting Standards Board, *Financial Accounting Standards No. 157: Fair Value Measurements* (September 2006), p. 2.

7. When this report was written, the most recent baseline projections were the ones issued in August 2009; see Congressional Budget Office, *The Budget and Economic Outlook: An Update* (August 2009), Table 1-1 and Box 1-1. CBO will publish new baseline projections for Fannie Mae and Freddie Mac in *The Budget and Economic Outlook: Fiscal Years 2010 to 2020*, to be released in late January 2010.

additional subsidy for new mortgage commitments in 2009. Because of their federal backing, Fannie Mae and Freddie Mac provide capital and guarantees to the mortgage market at lower prices than private financial institutions can offer, which ultimately transfers risk from the two entities to taxpayers. The subsidy recorded for the entities' mortgage commitments captures the value of that federal backing.

The Administration has taken a different approach to recording the impact of Fannie Mae and Freddie Mac on the federal budget. In conjunction with the conservatorship, the Treasury signed agreements with the two entities intended to ensure that they could continue to support the mortgage market. In exchange for making direct cash infusions into the entities, the Treasury received shares of their preferred stock and warrants to purchase their common stock. The Administration's Office of Management and Budget (OMB) continues to treat Fannie Mae and Freddie Mac as outside the budget, and it records and projects outlays equal to the amount of those cash infusions. As a result, the Administration has not included in its budget figures subsidy costs that would be directly comparable to CBO's $291 billion estimate of such costs in 2009. Instead, because the Treasury provided a total of $95.6 billion in cash outlays to the two entities in fiscal year 2009, the government's final report of spending for 2009 included that amount, which is similar to CBO's August 2009 estimate of cash infusions for that year ($112 billion).[8] OMB has estimated that cash outlays from the Treasury to the two entities will total another $65 billion over the 2010–2019 period.[9]

In contrast, because CBO has concluded that Fannie Mae and Freddie Mac should be treated in the federal budget as government entities, it considers transactions between them and the Treasury to be effectively intragovernmental payments, which do not affect net federal outlays. Adding those transactions to the subsidy costs that CBO has estimated for the entities would amount to double-counting.

Neither CBO nor OMB incorporates debt securities or mortgage-backed securities issued by Fannie Mae and Freddie Mac in estimates of federal debt held by the public. In budget documents, debt held by the public is defined narrowly as including only debt issued directly by the Treasury. Excluding the two entities' debt is consistent with the exclusion of other federal obligations, such as those of the Tennessee Valley Authority or commitments made under federal loan guarantee programs. Moreover, CBO's treatment of the entities' debt does not constitute a statement about whether or not that debt should be considered federal debt. Such a determination depends on how narrowly or broadly one interprets the concept of federal debt and for what purpose. Nevertheless, recent events clearly indicate a strengthening of the federal government's commitment to the obligations of Fannie Mae and Freddie Mac.

---

8. See Department of the Treasury, *Combined Statement of Receipts, Outlays, and Balances of the United States Government* (November 2009).

9. See *Budget of the U.S. Government, Fiscal Year 2010: Analytical Perspectives, Supplemental Materials,* Table 27-1.

Budget projections for the two entities are inherently uncertain. Some key factors—such as how sensitive mortgage default rates are to changes in house prices, or what discount rates apply to certain cash flows—are difficult to estimate precisely. In addition, such projections are likely to vary considerably over time as the prices of various mortgage-related securities fluctuate and as the two entities realize mortgage losses. Updates to CBO's estimates of subsidy costs will reflect any changes in discount rates and expectations about future mortgage losses, as well as possible refinements in the underlying methodology.

## Background to Federal Conservatorship for Fannie Mae and Freddie Mac

Fannie Mae and Freddie Mac were federally chartered four decades ago as private companies with a public mission to provide liquidity and stability to the secondary market for residential mortgages. Their activities are largely confined to providing guarantees against credit losses on pools of conforming mortgages (loans that conform to certain underwriting criteria) and maintaining an investment portfolio of mortgages and MBSs funded by selling debt securities to the public.[10] Through those activities, the two entities help maintain an active secondary mortgage market and thereby help improve lenders' access to financing to make new loans. Together, the mortgages guaranteed or owned by Fannie Mae and Freddie Mac total approximately $5 trillion and account for almost half of all outstanding residential mortgages.

Historically, their federal charters have allowed the two entities to borrow at interest rates lower than those paid by comparable finance companies without such a charter and close to those paid by the Treasury. Investors viewed the charters as an implicit federal guarantee of the entities' debt obligations, despite the government's assertions to the contrary.[11] Reinforcing that view, Fannie Mae and Freddie Mac were subject to less onerous capital requirements than other regulated financial institutions.[12] The lower borrowing costs enjoyed by the two entities flowed to participants in the housing market in the form of lower mortgage rates and to the entities' stockholders in the form of higher profits.

---

10. Credit losses in this case refer to the losses experienced by a holder of a mortgage or MBS when a borrower defaults.

11. For previous discussions of the entities' federal support, see Congressional Budget Office, *Federal Subsidies and the Housing GSEs* (May 2001), and the statement of Douglas Holtz-Eakin, Director, Congressional Budget Office, before the Senate Committee on Banking, Housing, and Urban Affairs, *Regulation of the Housing Government-Sponsored Enterprises* (October 23, 2003).

12. Under the federal conservatorship, capital requirements for Fannie Mae and Freddie Mac have been suspended. The injections of cash from the Treasury in exchange for senior preferred stock ensure that, on the basis of generally accepted accounting principles, the entities have sufficient assets to cover their liabilities.

The activities of Fannie Mae and Freddie Mac carry several risks. In their guarantee business and their investment portfolios, the entities incur losses when property owners default on mortgages.[13] Their mortgage portfolios also expose the entities to interest rate risk and prepayment risk—that is, the possibility of losses when fluctuating interest rates and prepayments of mortgages create a gap between the value of the entities' asset portfolios and the value of the debt used to fund them.

Following the housing bust that began in 2007, Fannie Mae and Freddie Mac experienced unprecedented losses on mortgages and MBSs. Initial losses came from their holdings of "private-label" securities—MBSs issued by private companies without government backing. The entities' shift toward buying risky private-label securities had begun in 2001, but their holdings swelled significantly after 2004, especially those of Freddie Mac.[14] Some of the mortgage loans underlying those securities were made to low-income households and thus helped the entities meet their affordable-housing goals.

In early 2008, Fannie Mae and Freddie Mac held approximately $200 billion in private-label securities backed by risky subprime and Alt-A mortgages.[15] Declines in the value of those securities accounted for most of the entities' losses through mid-2008. The private companies that issued subprime and Alt-A securities made those securities acceptable to Fannie Mae and Freddie Mac by creating structures that required other investors to take the first losses on the underlying mortgages.[16] The value of those securities plummeted, however, with the prospect that losses on the underlying mortgages would exceed the protection provided by such structures.

At the beginning of 2008, the two entities also directly held or guaranteed more than $500 billion worth of mortgages that were comparable in risk to mortgages typically designated as subprime or Alt-A loans. Large losses are expected on those mortgages as well, but because the mortgages are not held in the form of securities, the losses

---

13. Some of those losses are borne by third parties: for example, when private insurers bear some of the credit losses on individual mortgages or mortgage pools, or when either Fannie Mae or Freddie Mac holds securities issued by the Government National Mortgage Association (Ginnie Mae), a wholly owned government corporation.

14. See Office of Federal Housing Enterprise Oversight, *Report to Congress 2008* (April 15, 2008).

15. Subprime and Alt-A mortgages are extended to borrowers who do not meet the qualifications for a prime mortgage (one extended to the least risky borrowers) because of one or more risk factors, such as a low credit rating, insufficient documentation of income, or the ability to make only a small down payment. Typically, Alt-A mortgages are offered to borrowers who have high credit scores but no proof of income, whereas subprime loans are offered to borrowers who have low credit scores (with or without income verification).

16. For a discussion of those financial instruments and how they contributed to the financial crisis, see Markus K. Brunnermeier, "Deciphering the Liquidity and Credit Crunch, 2007–2008," *Journal of Economic Perspectives,* vol. 23, no. 1 (Winter 2009), pp. 77–100.

recorded so far have been smaller and recognized later than for the securities.[17] In addition, Fannie Mae and Freddie Mac have experienced unprecedented loss rates on their conforming mortgages because of the severity of the economic downturn.

## New Treasury Authority and Resulting Federal Actions

In response to turmoil in the housing and mortgage markets, the Housing and Economic Recovery Act of 2008 gave the Treasury the power to buy an unlimited amount of securities from Fannie Mae and Freddie Mac if the Treasury Secretary determined that "such actions are necessary to (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer."[18] The unlimited authority was designed to reassure investors that the federal government was committed to maintaining the solvency of the two entities.[19]

With Fannie Mae and Freddie Mac facing substantial losses that threatened their solvency, the Federal Housing Finance Agency placed them into conservatorship in September 2008, giving control of the entities to the federal government. The Treasury used its authority to write "keep-well" agreements with the entities in which the Treasury would provide up to $100 billion in capital to each institution.[20] Those agreements were recently amended to allow unlimited capital infusions over the next three years. The infusions of capital are made on a quarterly basis in an amount equal to the negative equity (the extent to which the value of liabilities exceeds the value of assets) that each entity reports on its balance sheet. In exchange, the entities give the Treasury senior preferred stock that pays annual dividends of 10 percent. As part of the September 2008 agreements, the Treasury was also granted $1 billion in preferred stock from both Fannie Mae and Freddie Mac as well as warrants entitling the government to 79.9 percent of each entity's common shares. As of December 2009, the Treasury had injected a total of $110.6 billion into the two entities (see Table 1).

## CBO's Budget Projections for Fannie Mae and Freddie Mac

Consistent with the principles expressed by the 1967 President's Commission on Budget Concepts, CBO has concluded that Fannie Mae and Freddie Mac should now

---

17. Under generally accepted accounting principles, companies report holdings of securities, but not loans and guarantees, on a fair-value basis. Companies recognize income or loss over time as they change their estimates of the value of securities with fluctuations in market prices. However, financial institutions are not required to report the value of loans and guarantees on a fair-value basis, which typically results in the recognition of only those losses that are imminent.

18. Public Law 110-289, section 1117.

19. That authority also applies to the Federal Home Loan Banks, but to date they have not received any assistance under it.

20. A keep-well agreement is a contract between a guarantor and a beneficiary in which the guarantor agrees to provide necessary financing to the beneficiary for a predetermined period in exchange for compensation, such as an ownership stake in the beneficiary. Such agreements are intended to make the beneficiary appear more creditworthy.

**Table 1.**

# The Treasury's Purchases of Preferred Stock from Fannie Mae and Freddie Mac Under the Conservatorship

(By calendar year, in billions of dollars)

| Reporting Period | Fannie Mae | Freddie Mac | Total |
|---|---|---|---|
| **2008** | | | |
| Third quarter | 0 | 13.8 | 13.8 |
| Fourth quarter | 15.2 | 30.8 | 46.0 |
| **2009** | | | |
| First quarter | 19.0 | 6.1 | 25.1 |
| Second quarter | 10.7 | 0 | 10.7 |
| Third quarter | 15.0 | 0 | 15.0 |
| **Total** | **59.9** | **50.7** | **110.6** |

Source:   Congressional Budget Office.

Note:   Fannie Mae and Federal Mac were placed in federal conservatorship on September 6, 2008. The Treasury's purchases of their senior preferred stock are intended to offset the two entities' reported losses by injecting cash to help them maintain sufficient capital. The actual cash injections occur in the quarter after the reporting period used to calculate them.

be included in the federal budget. The commission's landmark report asserted that "The federal budget should, as a general rule, be comprehensive of the full range of federal activities. Borderline entities and transactions should be included in the budget unless there are exceptionally persuasive reasons for exclusion."[21] The commission identified several key questions to use in determining whether to include programs in the budget: "Who owns the agency? Who supplies its capital? Who selects its managers? Do the Congress and the President have control over the agency's program and budget, or are the agency's policies the responsibility of the Congress or the President only in some broad ultimate sense?" The report recommended that "Government-sponsored enterprises be omitted from the budget when such enterprises are completely privately owned." CBO believes that the federal government's current financial and operational relationship with Fannie Mae and Freddie Mac warrants their inclusion in the budget.

Consequently, in the baseline budget projections that it published in 2009, CBO accounted for the costs of the two entities' operations as if they were being conducted by a federal agency. In that accounting, the mortgages owned or guaranteed by Fannie Mae and Freddie Mac were treated as loans and guarantees of the federal government. CBO estimated budget outlays for the new loan and guarantee commitments projected to be made each year; those outlays were estimates of the lifetime subsidy

---

21. President's Commission on Budget Concepts, *Report of the President's Commission on Budget Concepts* (October 1967), pp. 25, 30.

**Table 2.**

# Summary of CBO's August 2009 Baseline Budget Projections for Fannie Mae and Freddie Mac

(By fiscal year, in billions of dollars)

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Subsidy Costs (Federal outlays)[a] | 291 [b] | 25 | 21 | 16 | 14 | 5 | 5 | 4 | 3 | 3 | 3 | 389 |
| Components of the Subsidy Estimate | | | | | | | | | | | | |
|   Mortgage commitments | [b] | 1,175 | 1,097 | 889 | 890 | 940 | 1,083 | 1,118 | 1,147 | 1,172 | 1,234 | n.a. |
|   Subsidy rate (Percent)[c] | 4.4 [b] | 1.9 | 1.5 | 1.2 | 1.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | n.a. |
| **Memorandum:** | | | | | | | | | | | | |
| Administrative Costs | 5 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 46 |
| Treasury Borrowing to Fund | | | | | | | | | | | | |
|   Purchases of Preferred Stock[d] | 112 | 25 | 17 | 8 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 163 |

Source:   Congressional Budget Office.

Note:   n.a. = not applicable.

a.   Includes subsidies for aid to homeowners provided through the Administration's Making Home Affordable plan.

b.   Includes all mortgage commitments made before fiscal year 2009 and new commitments made in 2009. The estimated subsidy on the preexisting commitments was $248 billion on $5 trillion of outstanding mortgages. The subsidy on new commitments was $43 billion on $1.6 trillion of new mortgage commitments in 2009.

c.   The subsidy rate is equal to federal outlays (excluding outlays for the Making Home Affordable plan) divided by new mortgage commitments.

d.   The Treasury's actual purchases of senior preferred stock in fiscal year 2009 totaled $95.6 billion. The Treasury has already committed to $15 billion in purchases for 2010.

inherent in the loan or guarantee commitments for that year (see Table 2). In addition, CBO projected the entities' administrative costs and the incremental Treasury borrowing that will be needed to fund the Treasury's purchases of preferred stock. In those projections, CBO assumed that federal conservatorship of the two entities would continue throughout the 10-year baseline projection period (at that time, through fiscal year 2019).

In its August 2009 baseline, CBO projected that the operations of Fannie Mae and Freddie Mac would have a total budgetary cost of $389 billion between 2009 and 2019. (That cost includes subsidies for assistance to homeowners under the Administration's Making Home Affordable plan.)[22] The bulk of the outlays ($291 billion) were estimated to occur in 2009. That figure reflects the recognition of substantial losses on the entire outstanding stock of mortgages held or guaranteed by Fannie Mae and Freddie Mac at that time. It closely corresponds to the entities' own estimates of the deterioration in their fair-value net worth—from a surplus of $7 billion in June 2008 for the two entities combined to a deficit of $258 billion in June 2009. CBO's much smaller estimate of outlays for 2010 and beyond (a total of $99 billion over 10 years) captures the cost of new mortgage commitments in those years, when a more stable mortgage market is expected to help reduce subsidy costs.

Although it anticipates that the mortgage market will eventually normalize, CBO expects the federal government to continue subsidizing that market through Fannie Mae and Freddie Mac throughout the projection period. In other words, although the entities' fees and other income on new commitments may be sufficient to cover average losses on those commitments, they are not high enough to fully cover the cost of the risks associated with the commitments. Before the conservatorship, CBO and others recognized that such subsidies existed, but those subsidies were never included in federal budget estimates.[23]

CBO's treatment of the cost of the entities' mortgage loan commitments is similar, though not identical to, the budgetary treatment of federal credit programs required by the Federal Credit Reform Act of 1990. Under that law, the budget records a subsidy cost for the loan commitments made by every federal credit program each year, including programs that make loans directly or guarantee loans made by third parties. The subsidy calculation measures the lifetime cost of the loan or guarantee as of the year of disbursement and counts that cost as a federal outlay in that year. The total budgetary cost is computed by projecting all federal cash flows associated with a cohort of loans or guarantees and discounting those cash flows to the year of

---

22. For information about that plan, see Congressional Budget Office, *The Budget and Economic Outlook: An Update,* Appendix B, Table B-3.

23. See Congressional Budget Office, *Federal Subsidies and the Housing GSEs*; and S. Wayne Passmore, *The GSE Implicit Subsidy and the Value of Government Ambiguity,* Finance and Economics Discussion Series Working Paper No. 2005-05 (Board of Governors of the Federal Reserve, January 2005), available at *www.federalreserve.gov/pubs/feds/2005/index.html.*

disbursement by applying discount rates that correspond to the interest rates on Treasury securities of comparable maturity. The direct federal administrative costs of those programs are generally excluded from the subsidy estimates and accounted for separately on a cash basis.

In the case of Fannie Mae's and Freddie Mac's mortgage commitments, CBO departs from that credit reform accounting by replacing the Treasury discount rates with discount rates that measure the cost of the risk inherent in those entities' credit obligations. In that approach, the budgetary cost is a "fair-value" estimate that measures what a private entity would need to be paid to voluntarily take on the commitments of Fannie Mae and Freddie Mac without any federal backing. Using such discount rates produces a broader measure of the cost of supporting the entities because it attaches a price to the cost of bearing the risk from the entities' losses. A similar approach is required by law to be used in estimating subsidies for the Troubled Assets Relief Program (it was also required by law to be used in estimating the cost of increasing the U.S. quota in the International Monetary Fund).[24]

CBO's estimate of subsidy costs for 2009 included a one-time charge for the shortfall between the value of the entities' assets and liabilities at the start of the conservatorship.[25] That one-time charge, $248 billion, accounted for more than 80 percent of the 2009 subsidy estimate; the rest, $43 billion, was the subsidy cost for new business conducted in 2009. CBO used slightly different methods to estimate the entities' existing and new commitments.

### Estimating Subsidy Costs for Existing Business

The subsidy cost for the entities' existing business at the beginning of the conservatorship is the difference between the values of their assets and their obligations (debt and other private claims on the entities' assets, including the value of any shareholder equity).[26] CBO used different methods to estimate that cost for different types of obligations. For the entities' preexisting credit obligations—mortgages they held directly or guaranteed—CBO estimated subsidy costs using an adjusted credit reform treatment, as described below. For the entities' other preexisting obligations—including holdings of private-label securities, financial-derivatives obligations, holdings of their

24. See section 123 of the Emergency Economic Stabilization Act of 2008 (part of Public Law 110-343) and title IV of the Supplemental Appropriations Act of 2009 (P.L. 111-32). In addition, CBO estimated the costs of a bill dealing with student loans on a fair-value basis; see Congressional Budget Office, *letter to the Honorable Judd Gregg on the subsidy costs of direct and guaranteed student loans* (July 27, 2009).

25. For reasons explained later in the paper, CBO did not attempt to make separate estimates of subsidies for future transactions involving those assets and liabilities.

26. Since the conservatorship, the claims of private shareholders have been reduced to negligible value, which simply leaves the difference between the value of assets and liabilities (net worth) as a claim held by taxpayers.

own and other federally backed MBSs, and the debt used to fund those obligations—CBO relied on the entities' own fair-value disclosures to estimate subsidy costs.[27]

CBO did not rely on fair-value disclosures to estimate the cost of assuming the entities' existing mortgage credit obligations because, in CBO's view, those disclosures systematically understate subsidy costs. The difference arises primarily because the entities assume that the prices they charge for assuming credit and other risk when they purchase mortgages represent fair values, whereas CBO believes that because of the entities' perceived government backing (whether implicit before the conservatorship or more explicit now), they purchase mortgages at above-market prices and thereby subsidize the mortgage market. That difference is most apparent for credit guarantees, where the fees charged by Fannie Mae and Freddie Mac are below those offered by private financial institutions. The resources to provide such subsidies arise from the entities' federal backing, which lowers their borrowing costs relative to those of private financial institutions exposed to similar investment risks.

CBO's estimate of the subsidy on the entities' existing mortgage credit obligations is based on the difference between the value of conforming MBSs, which includes the value of the credit guarantee, and the value of the pool of conforming mortgages underlying those MBSs, which have no credit guarantee.[28] CBO estimated the values of the MBSs and the underlying mortgages in two steps: first projecting their expected cash flows and then discounting the cash flows to present values using discount rates that capture their respective risk exposures.

To project cash flows associated with the MBSs and the underlying loan pools, CBO used standard empirical models of mortgage prepayments and defaults, calibrated to match current and projected market conditions.[29] In those models, given an initial set of characteristics about the mortgages, subsequent changes in the rate of prepayment are strongly influenced by prevailing interest rates, and an increase in the likelihood of mortgage default is largely driven by declining house prices. Combining CBO's projections of interest rates and house prices with estimates from the empirical literature of how sensitive prepayment and default rates are to changes in house prices and

---

27. A financial derivative is a financial instrument, such as an option or futures contract, whose value depends in part on the value and characteristics of an underlying asset, such as a stock, bond, or commodity.

28. CBO's methodology treats the exposures to credit losses on whole loans and loan guarantees equivalently.

29. See, for example, Yongheng Deng, John M. Quigley, and Robert van Order, "Mortgage Terminations, Heterogeneity, and the Exercise of Mortgage Options," *Econometrica,* vol. 68, no. 2 (2000); Michelle A. Danis and Anthony N. Pennington-Cross, *The Delinquency of Subprime Mortgages,* Working Paper No. 2005-022A (Federal Reserve Bank of St. Louis, March 2005), available at *http://ssrn.com/abstract=761804*; and Shane M. Sherlund, *The Past, Present, and Future of Subprime Mortgages,* Finance and Economics Discussion Series Working Paper No. 2008-63 (Board of Governors of the Federal Reserve, December 2008), available at *www.federalreserve.gov/pubs/feds/2008/index.html.*

interest rates allowed CBO to forecast mortgage cash flows for representative groups of the two entities' MBSs and mortgage pools. (For more details about that method, see the Appendix.) The projected cash flows of the MBSs mimic those of the underlying mortgage pools, with two exceptions: MBS holders do not suffer the losses experienced by the holders of a mortgage pool when borrowers default, and the cash flow of the mortgage pool includes the guarantee fees charged by the entities, which are not paid to MBS holders.

To discount the cash flows associated with the MBSs and mortgage pools, CBO applied different discount rates to account for the differing risks of those cash flows. Investing in either a loan pool or an MBS is riskier than investing in Treasury securities; hence, investors would require a risk premium—that is, a higher rate of return on the riskier investments than they could earn on Treasury securities. The mortgage pools in turn are riskier than the MBSs because the holders of a mortgage pool risk credit losses. The holders of MBSs are protected through the entities' guarantees from both the expected value of credit losses and the variability of potential losses. Thus, besides being compensated for expected credit losses, holders of a mortgage pool should demand a higher rate of return than that earned on the MBSs. The estimates of the required rates of return on the MBSs and mortgage pools are used to discount the corresponding cash flows. (A more detailed discussion of CBO's estimate of discount rates can be found in the Appendix.)

### Estimating Subsidy Costs for New Business

CBO projected the subsidy costs for Fannie Mae's and Freddie Mac's new mortgage purchases and guarantee commitments using a methodology similar to that used for the entities' existing business. The amount of new business projected for each year was based on CBO's forecast of total mortgage originations (which depended on its forecasts of interest rates and housing market conditions) and on the share of total originations expected to be held or guaranteed by the two entities. CBO then converted those cash flow projections into subsidies by discounting the relevant cash flows (including the guarantee fee income that the entities received and the guarantee claim payments that they made). The discount rates were estimated in the same way as for existing business, except that they were based on CBO's projections of interest rates and risk premiums at the time of the disbursements rather than on the 2009 values used for existing business. CBO assumed that in 2010, risk premiums would start to decline toward their historical averages.

For the two entities' guarantee business, CBO estimated that income from guarantee fees would remain a stable proportion of the dollar amount of the entities' outstanding guaranteed mortgages. CBO also projected that the entities would guarantee an increasing share of the mortgage market until the end of 2010 (about 60 percent), after which their share would gradually decline to the historical level (approximately 40 percent). In CBO's August 2009 economic forecast, the housing market begins to recover after 2010, at which time interest rates on nonconforming mortgages are expected to decline and the percentage of mortgages that are nonconforming is

expected to increase (though not completely to the precrisis percentage). CBO expects that in coming years, Fannie Mae and Freddie Mac will acquire or guarantee very few, if any, mortgages as risky as the subprime and Alt-A loans and securities in their current portfolios because of tighter underwriting standards.

Federal conservatorship has caused a shift in the recipients of the subsidy provided by the entities' federal backing. On one hand, the conservatorship has resulted in an increase in the subsidy provided to the mortgage market. The entities' guarantee fees as a percentage of outstanding mortgages have changed little from the levels seen before the crisis in the mortgage market, despite the higher risk of losses, and the entities are expected to continue to guarantee a large share of that market.

On the other hand, by giving the federal government a complete claim to the equity of Fannie Mae and Freddie Mac, the conservatorship has eliminated a source of profit to shareholders that had been associated with the entities' portfolio-funding strategy. The values of the entities' portfolio holdings of mortgages and MBSs have different sensitivities to interest rates than the debt and other liabilities used to fund them, which exposes the entities to potential losses. In exchange for bearing that risk, the entities earn additional income (a risk premium). Historically, shareholders received a disproportionate share of that risk premium because taxpayers were not compensated for their exposure to portfolio-related risks that stemmed from the entities' federal backing. That subsidy from taxpayers to shareholders has been significantly reduced because the government now has first claim to almost any amount of earnings on the entities' portfolios, which partially compensates for the risk of future losses.

CBO's estimates of the costs of new commitments do not include some sources of subsidy that are unrelated to the two entities' guarantee business. For instance, on mortgages held in their portfolios, a subsidy cost could arise if the entities overpaid for mortgages relative to the prepayment risk they assumed, or if they overpaid for derivatives used to hedge against interest rate risk and prepayment risk.

**Comparison with Cash Budgetary Treatment**
The Office of Management and Budget considers Fannie Mae and Freddie Mac to be nongovernmental entities for federal budgeting purposes. Consequently, OMB records the Treasury's cash infusions to the two entities as outlays in the budget. In fiscal year 2009, the budget recorded $95.6 billion in such outlays. OMB projects additional cash infusions totaling $65 billion between 2010 and 2019. If CBO adopted a similar cash treatment, its estimate of outlays for payments to the two entities would total about $51 billion over the 2010–2019 period (the sum of the estimated cash infusions for that period shown at the bottom of Table 2). The difference between those $65 billion and $51 billion cash estimates stems from differing assumptions and modeling choices.

CBO projected the cash infusions using estimates of the shortfall between the forecast value of the entities' assets and liabilities calculated according to generally accepted

accounting principles (GAAP). In CBO's projections, most of the infusions are expected to occur over the next few years, which reflects CBO's forecasts for the overall economy, financial markets, and mortgage markets. As the housing and mortgage markets recover, Fannie Mae and Freddie Mac are expected to generate revenues greater than their losses and other costs. However, in CBO's estimation, the two entities' current dividend commitments to the Treasury exceed their future earnings capacity, making losses on the Treasury's current and future holdings of their senior preferred stock likely.

The total amount that CBO projected for the Treasury's cash infusions from 2009 to 2019—$163 billion—falls well short of the $389 billion in subsidy outlays projected in CBO's baseline for that period. As an approximation, one can think of the infusion estimates as capturing only the expected cash shortfalls between the entities' fees and losses. The subsidy estimates, in comparison, incorporate both the expected cash shortfalls and the risk premium that a private investor would demand for bearing the risk that those shortfalls could be much larger than expected.

CBO projected that the entities' portfolio holdings would have a significant positive impact on their GAAP balance sheets (which would reduce the required cash infusions from the Treasury). The mismatch between the rates paid on those portfolio holdings and the debt used to fund them is expected to generate positive net income, which is attributable to the entities' federal backing.

Two key assumptions underlie the portfolio projections: that guarantee fees will hold steady at current rates, and that the combined portfolio holdings of Fannie Mae and Freddie Mac will remain at about $1.5 trillion until the end of fiscal year 2010 and then gradually decline, as the entities' agreements with the Treasury require. New purchases are assumed to be confined to conforming mortgages and to MBSs issued by the two entities or by Ginnie Mae, rather than subprime or Alt-A securities. CBO assumed that subprime and Alt-A mortgages that terminate early would default, be refinanced privately, or be refinanced through the Federal Housing Administration.

FHFA 1169

# Appendix:
# Projecting Mortgage Cash Flows and Valuing Mortgage Guarantees

The model that the Congressional Budget Office (CBO) uses to estimate the value of Fannie Mae's and Freddie Mac's exposure to losses on their mortgage credit business proceeds in several steps. First, CBO estimates the cash flows associated with the two entities' mortgage pools and mortgage-backed securities (MBSs). Those cash flows depend on changes in interest rates and house prices. Second, to establish the subsidy for each cohort of mortgages, CBO computes the net present value of those cash flows using discount rates that reflect the risk inherent in the flows. The subsidy for the pool of mortgage guarantees is the present value of the net losses to the entities, which is equal to the difference between the present values of the MBSs held by investors and of the mortgage pools held in trust by the entities. To the extent possible, CBO tries to calibrate its estimates of certain variables (such as mortgage loss rates and the value of assets and liabilities related to a guarantee) to estimates reported by the entities themselves.

The estimated subsidy costs in CBO's August 2009 baseline projections were computed using a simplified version of the model presented in this appendix. In the full model, cash flows are simulated with a series of equations that include fluctuating interest rates and house prices—variables that have been shown to be key drivers of mortgage cash flows. Accounting for the effect of those variables can be crucial in estimating the costs of certain policy proposals. In describing CBO's modeling methods, this appendix alerts readers to the aspects of the model that were simplified for the baseline estimates.

## Simulating Cash Flows in the Mortgage Portfolio

For Fannie Mae's and Freddie Mac's existing business at the time the baseline is prepared, CBO's model divides the entities' mortgage book into representative pools of mortgages by year of origination and loan type and projects baseline default and prepayment rates for each pool using simulations.[1] For the purposes of CBO's baseline calculations, the projected default rate for each pool takes into account the hump-shaped pattern of default typically experienced over the life of a mortgage cohort, the

---

1. The mortgage book consists of all mortgages directly held or guaranteed by the entities for which the entities bear the costs when borrowers default. The book does not include mortgages held indirectly through privately issued securities. For those securities, CBO relied on the entities' reported fair-value estimates.

experience with losses to date, a forecast of aggregate changes in house prices, and estimates of how sensitive default rates are to changes in those prices. The projected prepayment rate varies over time with CBO's forecast of interest rates. For new mortgages, CBO uses the same procedure but replaces actual levels of macroeconomic variables and mortgage characteristics with forecasts to determine the initial conditions and evolution of the simulation.

A mortgage pool is described by the type of loan (prime, Alt-A or exotic, or subprime), its vintage, the current loan-to-value ratio, and the amount of third-party mortgage insurance. Those features determine the expected path of cash flows over the remaining life of the loans, and simulations result in a distribution of paths around the expected one. Given a dollar amount of loan principal outstanding at the valuation date, $L_0$, and a remaining loan term of $n$ periods, the remaining outstanding principal evolves according to the following formula:

$$L_t = (1 + r_{t-1})(1 - d_t - p_t)L_{t-1} - R_t, \qquad t = 1,...,n \qquad (1)$$

where $t$ is the time elapsed since the valuation date, $r_t$ is the mortgage interest rate (which may vary over time), $d_t$ is the fraction of loans between $t-1$ and $t$ that enter default, $p_t$ is the fraction of loans that are prepaid between $t-1$ and $t$, and $R_t$ is the scheduled repayment at the start of period $t$. Repayments follow a standard amortization schedule based on a representative maturity:

$$R_t = \frac{r_{t-1}(1 - d_t - p_t)L_{t-1}}{1 - (1 + r_{t-1})^{t-n}} \qquad (2)$$

In principle, $r_t$, $d_t$, and $p_t$ could be randomly determined quantities that fluctuate from period to period. However, to simplify the calculations for the purposes of the baseline, CBO used deterministic interest rates and set deterministic time paths for prepayment (although both were adjusted for CBO's forecast of interest rates, which allows for the possibility that prepayment rates will vary by time and mortgage cohort).

**Default Rates**

For this analysis, default is defined as an event that causes Fannie Mae or Freddie Mac to suffer a loss on a mortgage it holds directly or to pay a claim on a mortgage it guarantees. In the full version of CBO's model, conditional default rates in year $t$ are specified as

$$d_t = 1 - (1 - d_{bt})^{\exp(\delta_0 + \delta_{SHORT}\Delta r_{St} + \delta_{LONG}\Delta r_{Lt} + \delta_{LTV}\Delta LTV_t)} \qquad (3)$$

The baseline default rate ($d_{bt}$) exhibits a hump-shaped pattern with the peak at about five years, which is derived from historical patterns of mortgage defaults. That baseline rate is adjusted for the characteristics of the mortgage pool and information conveyed by default experience to date ($\delta_0$), as well as for deviations of interest rates

(short-term rate $\Delta r_{St}$ and long-term rate $\Delta r_{Lt}$) and of loan-to-value ratios ($\Delta LTV_t$) from their trend paths. Empirically, the sensitivity to changes in loan-to-value ratios is by far the most important of the time-varying factors that determine default rates. Consequently, only that factor has been included in CBO's baseline projections. Changes in interest rates and unemployment have been shown to play some role in default rates, but neither is included in the baseline calculations.[2]

The current loan-to-value ratio, which affects the borrower's prepayment and default rates, is defined as

$$LTV_t = \frac{L_t}{h_t} \tag{4}$$

To simulate the path of house prices ($h_t$), CBO drew annual random shocks from a simple random-walk model of house prices, with the central drift tied to CBO's forecast of house prices and assumptions about aggregate and idiosyncratic volatility. That is,

$$h_{t+1} = h_t(1 + a_{t+1} + E_{t+1} + e_{t+1}) \tag{5}$$

where $h_{t+1}$ is next year's house price, $h_t$ is the current year's house price, $a_{t+1}$ is the forecast for growth in house prices between $t$ and $t+1$, $E_{t+1}$ is the aggregate shock to the house price index, and $e_{t+1}$ is the idiosyncratic shock to individual house prices that captures the price volatility for a representative home in the loan pool. The two shocks are independent random draws from normal distributions that have means of zero and fixed standard deviations.

### Losses on Defaulted Loans

When a default occurs, the loss to Fannie Mae or Freddie Mac equals the shortfall between the unpaid balance of the mortgage and the value of the house, after taking into account recovery costs and receipts from third-party insurance. Historically, the entities have reported loss rates in the range of 30 percent to 50 percent of the outstanding loan balance. Loss rates are likely to be higher, however, when the housing market is in decline. To capture the impact of a decline in house prices, CBO assumed that the amount the entities' would recover on a defaulted mortgage would be a fixed fraction of the appraised value of the house plus receipts from insurance.[3]

---

2. Although unemployment does not enter CBO's simulation model directly, its effects are implicit in the baseline adjustment ($\delta_0$), interest rates, and house prices (because interest rates and house prices are generally low when unemployment is high). In principle, other time-varying factors could be included in the specification of default and prepayment rates given sufficient data or other evidence from which to reliably estimate sensitivity parameters.

3. CBO used a representative interest rate from loans over the historical period, and it did not try to model any effect that changing interest rates might have on credit losses.

The entities partially protect themselves from losses by requiring borrowers who do not make a 20 percent down payment to take out mortgage insurance with third-party insurers. For example, a borrower with a 10 percent down payment might be required to hold mortgage insurance for 15 percent of the property amount, reducing the entities' exposure to losses to 75 percent of the amount borrowed.

Each period, the net loss to the entities is thus

$$d_t\{L_{t-1}(1 + r_t) - [L_{t-1}^{-}(1 + r_t)i_t + \alpha_t h_t]\} \qquad (6)$$

That is, of the fraction of loans that default each period, the entities pay the outstanding amount to the MBS holder $[L_{t-1}(1 + r_t)]$, recoup an insured amount from the third-party insurer $[L_{t-1}(1 + r_t)i_t$, where $i_t$ is the fraction insured], and recover a stream of payments whose present value is a fraction of the value of the house ($\alpha_t h_t$, where $\alpha_t$ is the fraction recovered).

### Prepayment Rates

In the full model, simulated prepayment rates for each segment of the entities' books obey the following equation:

$$p_t = 1 - (1 - p_{bt})^{\exp(\beta_0 + \beta_{SHORT}\Delta r_{St} + \beta_{LONG}\Delta r_{Lt} + \beta_{LTV}\Delta LTV_t)} \qquad (7)$$

That is, the rate of prepayment fluctuates around a baseline rate, $p_{bt}$, with an adjustment for the characteristics of the loan pool and its experience to the valuation date ($\beta_0$) and deviations driven by changes in short- and long-term interest rates or the current loan-to-value ratio away from their trend levels. The base conditional prepayment rate, $p_{bt}$, steadily rises with the age of the loan, reaching a plateau after five years, which is consistent with past studies of mortgage performance.

Although not included for CBO's baseline projections, the model can also incorporate the sensitivity of prepayment rates to interest rates and changes in property values. Previous empirical research has found that prepayment rates depend on interest rates.[4] A borrower has a strong incentive to refinance a loan if the refinance rate is sufficiently lower than the current contract interest rate.[5] That difference is captured by the pair of interest rates in the specification: the long-term rate ($r_{Lt}$) and the short-term rate ($r_{St}$), which are described below. Another finding is that prepayment rates decline with an increase in the current loan-to-value ratio ($LTV_t$). That outcome may

---

4.  See, for example, Eduardo S. Schwartz and Walter N. Torous, "Prepayment and the Valuation of Mortgage-Backed Securities," *Journal of Finance*, vol. 44, no. 2 (June 1989), pp. 375–392; and Yongheng Deng, John M. Quigley, and Robert van Order, "Mortgage Terminations, Heterogeneity, and the Exercise of Mortgage Options," *Econometrica*, vol. 68, no. 2 (March 2000), pp. 275–307.

5.  The decision to refinance can be less straightforward when variable-rate and fixed-rate mortgages are being compared.

reflect reduced opportunities to refinance a mortgage when the loan amount is close to or greater than the value of the home.

For its baseline projections, CBO did not use the full specification of the model; instead, it simply selected prepayment rates that reflected current market conditions. Mortgages originated before the housing downturn are expected to be prepaid at a slightly faster rate than seen in the past, whereas mortgages originated after the start of the downturn are expected to be prepaid at slower rates because borrowers are locking in historically low interest rates now. Note that for the purposes of valuing mortgage guarantees, precisely modeling prepayment is of secondary importance because the value of the guarantee is most sensitive to changes in default rates and assumptions about losses.

### Simulated Interest Rates and Discounting

For the baseline projections, interest rates ($r_t$, $r_{St}$, or $r_{Lt}$) in each period of the model are tied to CBO's forecasts of short- and long-term interest rates. In the full version of the model, interest rates can fluctuate randomly up or down. The projected or simulated interest rates are used to discount risk-free nominal cash flows of various maturities, such as the cash flows from Treasury securities. For cash flows affected by risk, such as the risk of default or prepayment, a premium is added (as explained at the end of this appendix). The mortgage contract rate is estimated from current and past relation-ships between mortgage interest rates and rates on Treasury securities.

## Valuing the Subsidy

In principle, the value of the federal subsidy for Fannie Mae's and Freddie Mac's MBS guarantees could be calculated as the net present value of the entities' gains or losses on those guarantees in each period. Obtaining the appropriate discount rate for those net gains or losses is difficult, however. There is no single traded asset whose cash flows mimic those of the entities' guarantees. Instead, the value of the subsidy for each guarantee is calculated from the difference between the values of the MBS and the underlying mortgage pool. Rates can be more readily established for each of those assets.

After Fannie Mae and Freddie Mac have packaged and sold MBSs, their remaining financial exposure—and therefore the subsidy provided by the federal government in covering net losses—exists through the MBS guarantees. As guarantor, the two enti-ties ensure that MBS holders receive timely payment of principal and interest on the underlying mortgages. Thus, the value of the subsidy can be computed as the differ-ence between the present value of the payments to MBS holders and the present value of payments from the underlying pool of mortgages. CBO uses the separate estimates of discount rates for MBS payments and for pool payments and applies them to the respective payment streams.

The stream of payments from the mortgage pool (net of various third-party servicing fees) is

$$R_{POOL,1}, R_{POOL,2}, R_{POOL,3}, \ldots \qquad (8)$$

Suppose the MBS payment stream is

$$R_{MBS,1}, R_{MBS,2}, R_{MBS,3}, \ldots \qquad (9)$$

When a borrower defaults, the entities remove that mortgage from the pool and pay the MBS holder the outstanding amount. Thus, in each period, the difference between the MBS payments and the payments from the pool (net of various fees and insurance payments) equals the losses incurred by the entities:

$$R_{MBS,t} = R_{POOL,t} + d_t\{L_{t-1}(1 + r_t) - [L_{t-1}(1 + r_t)i_t + \alpha_t h_t]\} \qquad (10)$$

Note that CBO made additional adjustments to those cash flows for guarantee fees, third-party insurance premiums, and other payments.

## Estimating Discount Rates

Because the loan-pool payments are risky, it is not appropriate simply to discount them using the risk-free discount rates from the interest rate simulation model. Instead, CBO values the cash flow stream in two pieces: the discounted value of the MBS payment stream minus the discounted value of the payment stream from the mortgage pool. The discount rate used for the MBS payment stream comes from the interest rate simulation, with an additional premium: the add-on required to equate the market price of the MBSs with the simulated net present value (when averaged across interest rate, prepayment, and default scenarios) of the stream of MBS payments. That premium reflects risks, or other MBS pricing anomalies, that could not be captured in the simulation model. Historically, the premium has ranged from a few hundredths of a percentage point at certain times to several percentage points at the height of the recent financial crisis.

The mortgage-pool payment stream has an additional exposure to market risk because of volatility in the size of mortgage losses. MBS investors face minimal credit risks; hence, a lower discount rate applies to the MBS payments. (That discount rate will be lower to the extent that the entities have capital to cushion losses or, failing that, investors have faith in the entities' federal backing.)

CBO used an estimate of the difference (or spread) between interest rates on jumbo and conforming mortgages as a proxy for the extra risk premium that would be required by an investor in the underlying mortgage pool. Fannie Mae and Freddie Mac purchase and securitize conforming mortgages from private lenders, but lenders must rely on private arrangements to fund jumbo mortgages (which exceed the size

FHFA 1175

limit on conforming mortgages). Thus, a major driver of the difference between interest rates on jumbo and conforming mortgages is the funding advantage of the two entities. However, other differences between jumbo and conforming loans that affect the interest rate spread must be accounted for, such as differing borrower characteristics, underwriting standards, and geographic concentrations.[6] In adjusting for those differences, CBO relied on the work of staff economists at the Federal Reserve Board whose findings suggest that approximately half of the mortgage rate spread has been attributable to factors other than the entities' funding advantage.[7]

The spread between conforming and jumbo rates averaged about 30 basis points (0.30 percentage points) from 2000 to 2007 (see Figure A-1). Since the onset of the financial crisis, however, the spread has been much greater, peaking at 180 basis points. That increase reflects the market risk of losses faced by holders of nonconforming mortgages. For the baseline projections published in January, March, and August 2009, CBO used the observed spread in January 2009, adjusted downward to account for differences between jumbo and conforming mortgages that are not related to the funding advantage of Fannie Mae and Freddie Mac. By November 2009, the jumbo-conforming spread had fallen from its peak to about 100 basis points.

For the entities' existing mortgages, CBO applied a risk premium of 70 basis points to all outstanding loans, regardless of their characteristics. For new mortgage commitments, CBO used its forecast of the adjusted spread in the year of the commitment. Those projected spreads are generally lower than the current spread, reflecting CBO's expectation that mortgage markets, interest rates, and spreads will gradually return to historical levels.

The choice of an appropriate risk premium for each mortgage pool is a critical input in CBO's valuation model. The estimate of the risk premium has varied considerably over time and is currently very high relative to past trends. Moreover, the methods used to disentangle the federal subsidy from other factors that drive the jumbo-

---

6. A further complication is that during the conservatorship, Fannie Mae and Freddie Mac may be directed to charge fees that are lower than they would charge otherwise. That would result in a larger jumbo-conforming spread, but the cost would already be accounted for in the entities' cash flows and should not count toward the risk premium. In the other direction, the jumbo-conforming spread may not be a complete measure of the federal subsidy because the jumbo market is indirectly subsidized through the federal benefits that commercial banks receive, such as deposit insurance. See, for example, Anthony B. Sanders, *Measuring the Benefits of Fannie Mae and Freddie Mac to Consumers: Between De Minimis and Small?* Wharton Financial Institutions Working Paper No. 05-36 (Philadelphia: University of Pennsylvania, July 2005), available at http://fic.wharton.upenn.edu/fic/papers/05/p0536.html.

7. See Wayne Passmore, Shane M. Sherlund, and Gillian Burgess, *The Effect of Housing Government-Sponsored Enterprises on Mortgage Rates,* Finance and Economics Discussion Series Working Paper No. 2005-06 (Board of Governors of the Federal Reserve, January 2005); and Shane M. Sherlund, *The Jumbo-Conforming Spread: A Semiparametric Approach,* Finance and Economics Discussion Series Working Paper No. 2008-1 (Board of Governors of the Federal Reserve, January 2008), both available at www.federalreserve.gov/pubs/feds/index.html.

**Figure A-1.**

## Spread Between Interest Rates on Jumbo and Conforming Mortgages

(Percentage points)



Source:   Congressional Budget Office based on data from Bloomberg L.P.

Note:   Conforming mortgages are loans eligible for sale to Fannie Mae or Freddie Mac because the original mortgage amount does not exceed an annually adjusted dollar limit (in much of the United States, $417,000 for a single-family home in 2009). Jumbo mortgages are loans that exceed the dollar limit for conforming mortgages.

conforming spread introduce another source of uncertainty. If, instead of 70 basis points, the risk premium was 50 basis points higher (or lower), the subsidy for the entities' existing business would be approximately $70 billion higher (or lower) than the $290 billion in CBO's August 2009 baseline. CBO continues to evaluate its projections of the risk premium and the methods used to compute them.

# Tab 19

# FEDERAL HOUSING FINANCE AGENCY



## NEWS RELEASE

| For Immediate Release<br>February 2, 2010 | **Contact:** | Corinne Russell<br>Stefanie Mullin | (202) 414-6921<br>(202) 414-6376 |

# FHFA Releases Letter on the Status of the Conservatorship of Fannie Mae and Freddie Mac

**Washington, DC –** Today Acting Director Edward J. DeMarco sent the following letter to Chairmen Frank and Dodd and Ranking Members Bachus and Shelby regarding the conservatorship of Fannie Mae and Freddie Mac.

*###*

*The Federal Housing Finance Agency regulates Fannie Mae, Freddie Mac and the 12 Federal Home Loan Banks. These government-sponsored enterprises provide more than $6.3 trillion in funding for the U.S. mortgage markets and financial institutions.*

 **FEDERAL HOUSING FINANCE AGENCY**
Office of the Director

February 2, 2010

Honorable Christopher Dodd
Chairman
Committee on Banking, Housing,
and Urban Affairs
United States Senate
Washington, DC 20510

Honorable Richard C. Shelby
Ranking Minority Member
Committee on Banking, Housing,
and Urban Affairs
United States Senate
Washington, DC 20510

The Honorable Barney Frank
Chairman
Committee on Financial Services
United States House of Representatives
Washington, DC 20515

Honorable Spencer Bachus
Ranking Minority Member
Committee on Financial Services
United States House of Representatives
Washington, DC 20515

Dear Chairmen and Ranking Members:

I am writing to update you on the conservatorships of Fannie Mae and Freddie Mac (the Enterprises). Recently there has been considerable speculation regarding how the future direction of the Enterprises' business activities interacts with their status in conservatorship. A key motivation for this letter is to provide greater clarity to policymakers and market participants on the Federal Housing Finance Agency's (FHFA) plans for the Enterprises' business activities while they operate in conservatorship.

The first part of the letter will review the establishment and purposes of the conservatorships, and how the conservatorships are operating. FHFA is focused on conserving the Enterprises' assets and meeting the goals of the conservatorship. The second part of the letter describes FHFA's views on the future direction of the Enterprises' business activities while they are in conservatorship, particularly: loan modifications and mitigating credit losses; retained portfolio; new products; and affordable housing mission.

**Background**

*Establishment and Purposes of the Conservatorships*

After careful analysis and in consultation with the Secretary of the Treasury and the Chairman of the Board of Governors of the Federal Reserve System, FHFA placed each Enterprise into conservatorship on September 6, 2008. At that time and pursuant to the statute, FHFA set forth the purpose and goals of conservatorship as follows:

> The purpose of appointing the Conservator is to preserve and conserve the Company's assets and property and to put the Company in a sound and solvent condition. The goals of the conservatorship are to help restore confidence in the Company, enhance its capacity to fulfill its mission, and mitigate the systemic risk that has contributed directly to the instability in the current market.

Critical to the establishment of the conservatorships were the actions taken at the same time by Treasury, consistent with its authority granted in the Housing and Economic Recovery Act of 2008 (HERA), to establish three funding facilities. Two of these – the liquidity facility and the mortgage-backed securities purchase facility – expired as scheduled at the end of last year. The third facility – the Senior Preferred Stock Purchase Agreements (PSPAs) – was structured to provide ongoing financial support to the Enterprises to ensure they remain active participants in the marketplace. The PSPAs work by ensuring that the Enterprises maintain a positive net worth, and Treasury's initial financial commitment was up to $100 billion per company. As explained at the time of the conservatorships by Treasury Secretary Paulson:

> These agreements support market stability by providing additional security and clarity to GSE debt holders – senior and subordinated – and support mortgage availability by providing additional confidence to investors in GSE mortgage backed securities. This commitment will eliminate any mandatory triggering of receivership and will ensure that the conserved entities have the ability to fulfill their financial obligations. It is more efficient than a one-time equity injection, because it will be used only as needed and on terms that Treasury has set.

In the face of a potentially catastrophic failure of our nation's housing finance system, these actions, along with the Federal Reserve's decision a few months later to purchase Enterprise debt and mortgage-backed securities, succeeded in maintaining an important measure of stability in the housing finance market. As nearly all other non-governmental participants in housing finance abandoned the market, the Enterprises in conservatorship, operating with the benefit of the PSPAs, have ensured that credit continues to flow to housing. As evidence of this, the Enterprises' share in financing or guaranteeing new single-family mortgage production rose from 54 percent in 2006 to 73 percent in 2008 and 78 percent in 2009 through September. The Enterprises have also played a significant role in multifamily housing finance with their market share growing from 33 percent in 2006 to 79 percent in 2008 and 64 percent in 2009 through September.

In February 2009, the Obama Administration reiterated the importance of the PSPAs in maintaining market confidence in the Enterprises by announcing an increase in the financial commitment to each company from $100 billion to $200 billion. The importance of maintaining market confidence in the Enterprises was further reiterated with a final adjustment to the financial commitment under the PSPAs on December 24, 2009. That adjustment increased the Treasury's financial commitment to each company to the greater of $200 billion or $200 billion plus cumulative net worth deficits experienced during 2010, 2011, and 2012, less any net worth surplus remaining as of December 31, 2012.

Since the establishment of the conservatorships, Fannie Mae has realized losses of $111 billion, and Freddie Mac has realized losses of $63 billion. These losses have exhausted the value of each company's shareholder equity and resulted in considerable draws from Treasury under the PSPAs. To date, Fannie Mae has drawn $59.9 billion and Freddie Mac has drawn $50.7 billion. These calls on taxpayer funds are troubling to all of us.

The PSPAs continue to serve their original intent – providing assurance to capital market investors in Enterprise debt and mortgage-backed securities that continued investments in such securities are sound. In that way, the Enterprises remain a stable source of funds for new home purchases and refinancings of existing mortgages. However, given the existing taxpayer outlays and the extraordinary public backing now in place, I believe that FHFA owes your committees and taxpayers a clear view on how the conservatorships are operating to limit losses and maximize recoveries in the future. I will turn to those issues next.

*Conservatorship Operations*

As conservator, FHFA has the powers of the management, boards, and shareholders of the Enterprises. However, the Enterprises continue to operate as business corporations. For example, they have chief executive officers and boards of directors, and must follow the laws and regulations governing financial disclosure, including requirements of the Securities and Exchange Commission. Like other corporate executives, the Enterprises' executive officers are subject to the legal responsibility to use sound and prudent business judgment in their stewardship of their companies.

At the inception of the conservatorships, FHFA made clear that the Enterprises would continue to be responsible for normal business activities and day-to-day operations. FHFA continues to exercise oversight as safety and soundness regulator and has a more active role as conservator. While FHFA has very broad authority, the focus of the conservatorships is not to manage every aspect of the Enterprises' operations. Instead, FHFA reconstituted the boards of directors at each Enterprise and charged the boards with ensuring normal corporate governance practices and procedures are in place. The new boards are responsible for carrying out normal board functions, but they remain subject to review and approval on critical matters by FHFA as

conservator. The Enterprises are large, complex companies, and this division of responsibilities represents the most efficient structure for carrying out FHFA's responsibilities as conservator.

The reconstituted boards at each company oversee their respective management teams and are functioning as boards should. Like FHFA, the boards are focused on conserving assets, minimizing corporate losses, ensuring the Enterprises continue to serve their mission, overseeing remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed.

In my view, maintaining and, where needed, strengthening these important private sector disciplines associated with each Enterprise's corporate infrastructure promotes the goals of the conservatorships and maximizes the government's options in a post-conservatorship world, including the opportunity to gain some return for taxpayers in a resolution of these companies. Any preservation of value in the Enterprises is directly related to maintaining the value of the intangible assets of these companies, including their human resources and business platforms.

There has been substantial executive management turnover at each Enterprise since the establishment of the conservatorships, starting with the replacement of each Enterprise's Chief Executive Officer (CEO) at the time the conservatorships were announced. At Fannie Mae, since conservatorship began, there have been two CEOs and new executives appointed to head almost every key business unit. Eight of the eleven highest paid employees pre-conservatorship are no longer with the company. At Freddie Mac, since conservatorship, there have been two CEOs and an Interim CEO. In just the past five months, after lengthy searches by the board, Freddie Mac has added a new Chief Operating Officer and a new Chief Financial Officer. The four highest paid employees at Freddie Mac pre-conservatorship are no longer with the company.

In short, the directors and senior executives tied to the financial collapse at each Enterprise are no longer with the companies. The senior executives who remain as well as those that were recently hired are essential to the Enterprises fulfilling the important goals of the conservatorships. As FHFA has stated since the outset of the conservatorships, it is critical to retain existing staff, including many senior managers, and critical to attract new executive management to fill the vacancies. The challenge of meeting this goal with companies in conservatorship is immense. The Enterprises operate with an uncertain future that will be the source of much public debate. As conservator, I believe it is critical to protect the taxpayer interests in the Enterprises by ensuring that each company has experienced, qualified people managing the day-to-day business operations in the midst of this uncertainty. Any other approach puts at risk the management of more than $5 trillion in mortgage holdings and guarantees that are supported by taxpayers through the PSPAs.

I will now turn to specific actions and issues pertinent to accomplishing the important goals of the conservatorships.

**Accomplishing Conservatorship Goals Going Forward**

*Loan Modifications and Mitigating Credit Losses*

Conserving the assets of the Enterprises requires, first and foremost, minimizing their credit losses from delinquent mortgages.  This is and will remain the central goal of FHFA and the Enterprises.

Furthermore, FHFA operates under a statutory mandate in the Emergency Economic Stabilization Act of 2008 (EESA), Section 110, to "implement a plan that seeks to maximize assistance for homeowners and use its authority to encourage the servicers of the underlying mortgages, and considering net present value to the taxpayer, to take advantage of the HOPE for Homeowners Program … or other available programs to minimize foreclosures."  This provision specifies loan modifications and tenant protections as part of the mandate and establishes a monthly reporting requirement for FHFA.  Our monthly reports pursuant to this requirement are sent to each of you and are on our website under Federal Property Managers Reports at http://www.fhfa.gov/Default.aspx?Page=172.

In pursuit of the goal of minimizing credit losses and fulfilling this statutory mandate,  FHFA and the Enterprises worked with the Administration a year ago to help develop and implement the Making Home Affordable program (MHA).  The Enterprises' participation in MHA is a critical step to minimizing their credit losses.  Loan modifications are often a lower cost resolution to a delinquent mortgage than is foreclosure.  Similarly, providing opportunities for borrowers to refinance into a more affordable mortgage helps mitigate future credit losses.  Since the Enterprises own or guarantee about half the mortgages in the country, efforts like MHA that provide stability to borrowers also serve to restore stability to housing markets, which directly benefits the Enterprises by reducing credit exposure.  The Enterprises also will continue to act as agents for Treasury in implementing the MHA loan modification program.  FHFA views this activity as consistent with the goals of the conservatorship and the EESA mandate.

FHFA will continue to ensure the Enterprises look to foreclosure alternatives, starting with loan modifications, to minimize credit losses.  I have communicated to each Enterprise the need for rigorous analytics in considering different forms of loss mitigation to ensure credit losses are being minimized.  Such analysis will also guide the Enterprises' participation in any potential new Administration efforts regarding foreclosure prevention.  The Enterprises' current and future efforts surrounding foreclosure prevention will focus on mitigating losses, which is fundamental to the FHFA's mandate to conserve assets.  And where there is no available, lower-cost alternative to foreclosure for a particular defaulted mortgage, my expectation is that the Enterprises will move to foreclose expeditiously.

*Retained Portfolios*

The December amendments to the PSPAs included a change to the Enterprises' retained portfolio limits.  Briefly, the change preserves the original PSPA requirement that the Enterprises begin shrinking their retained portfolios by ten percent per year, beginning this year.  But, rather than starting the reduction from the Enterprises' year-end 2009 balances, the reduction now begins from their maximum allowed balances ($900 billion) as of year-end 2009.  This means that each Enterprise may have a retained portfolio no greater than $810 billion by December 31, 2010.  Currently, each Enterprise is below that amount.

FHFA remains committed to the principle of reducing the retained portfolios as set forth in the PSPAs.  Consistent with the goals of conservatorship and in accord with the recent Treasury announcement, FHFA does not expect the Enterprises to be substantial buyers or sellers of mortgages, with an important exception.  As I stated in December, the increased flexibility provided with the retained portfolio amendment may be important for maintaining the Enterprises' capacity to purchase delinquent mortgages out of guaranteed mortgage-backed security pools.

Given the size of the Enterprises' current outstanding retained portfolios, and the potential volume of delinquent mortgages to be purchased out of guaranteed mortgage-backed security pools, it is my expectation that any net additions to their retained mortgage portfolios would be related to this activity.  I also expect that other private parties will begin to invest in new Enterprise mortgage-backed securities as the Federal Reserve gradually withdraws its purchase activity.  To aid in complying with the requirements of the PSPA portfolio limitations in light of these factors, I am instructing each Enterprise to develop a detailed plan for how it will manage its portfolio to stay within those limitations.

*New Products*

HERA established a requirement that FHFA implement a public review process for new products that may be undertaken by the Enterprises.  In July 2009, FHFA published an interim final rule implementing this provision.  To date, no new product submission has gone through this process.

After considering the statutory requirement and the goals of conservatorship, I have concluded that permitting the Enterprises to engage in new products is inconsistent with the goals of conservatorship.  Therefore, I am instructing the Enterprises not to submit such requests under the rule.

In view of the critical and substantial resource requirements of conserving assets and restoring financial health, combined with a recognition that the Enterprises operate today only with the support of taxpayers, I believe the Enterprises should concentrate on their existing core businesses, including minimizing credit losses.  I reach this conclusion as various proposals seek

Enterprise involvement that, even if within charter limitations, could require large expenditures of funds, entry into new business lines with little prior experience, or dedication of personnel already operating in a stressed environment. New products could also require new risk measuring tools, compliance procedures, and additional oversight from FHFA.

In short, the Enterprises will be limited to continuing their existing core business activities and taking actions necessary to advance the goals of the conservatorship. This type of limitation on new business activities is consistent with the standard regulatory approach for addressing companies that are financially troubled. And it is even more pertinent for the Enterprises given their uncertain future and reliance on taxpayer funds.

### *Affordable Housing Mission*

While the Enterprises are in conservatorship, FHFA expects them to continue to fulfill their core statutory purposes and that includes their support for affordable housing. One set of measures of the Enterprises' support for affordable housing comes through the housing goals, which Congress revised significantly in HERA.

Shortly, FHFA will publish for public comment a proposed rule setting the housing goals for 2010 and 2011. In that rule, FHFA will establish the framework for ensuring that the Enterprises' participation in the mortgage market includes support for the affordable housing segments of the market, consistent with their mission and with safety and soundness.

FHFA does not intend for the Enterprises to undertake uneconomic or high-risk activities in support of the goals nor does it intend for the state of conservatorship to be a justification for withdrawing support from these market segments. Under the conservatorships, the Enterprises have tightened their underwriting standards to avoid the poor quality mortgages that have contributed so much to their losses. Maintaining this type of sound underwriting discipline going forward is important for conserving assets and supporting the Enterprises' mission in a sustainable manner.

### Concluding Thoughts

The Enterprises' operating in conservatorship cannot be a long-term solution. When the conservatorships and Treasury's financial commitment were established in 2008, Secretary Paulson described the arrangement as a "time-out" to allow policymakers to further consider the role of the Federal government and the Enterprises in the future system of housing finance. There are a variety of options available for post-conservatorship outcomes, but the only one that FHFA may implement today under existing law is to reconstitute the two companies under their current charters.

I recognize that the Administration and Congress have difficult and important decisions to make in the coming months on the future structure of the housing finance system.  In my testimony before the Senate Banking Committee last October, I offered some of my own views on this subject.  Going forward, FHFA looks forward to offering its technical assistance to both the Administration and Congress in considering policy alternatives.

The purpose of this letter has been to clarify the goals of the conservatorships and how FHFA is striving to achieve these goals.  I also hope that this letter has helped to set the framework for how the Enterprises are operating in conservatorship as Congress considers the future structure of the housing finance system.  I welcome the opportunity to meet with you personally to further discuss the matters covered here.  As I believe the information contained here is also important to an improved public understanding of the conservatorships, I will be releasing this letter this afternoon.

Yours truly,

Edward J. DeMarco
Acting Director

# Tab 20

## U.S. DEPARTMENT OF THE TREASURY

Search

Advanced Search

| Home | Treasury For... | About | Resource Center | Services | Initiatives | Careers | Connect with Us |

Press Releases

Daily Guidance

Media Schedule and Advisories

News

Photos

Video, Audio, and Webcasts

Press Contacts

## Press Center

Home » Press Center » Press Releases » Secretary Timothy F. Geithner Written Testimony House Committee on Financial Services

### Secretary Timothy F. Geithner Written Testimony House Committee on Financial Services

3/23/2010

TG-603

**Introduction**

Promoting and maintaining stability in the housing market is critical to achieving economic recovery and sustainable long term growth. The Administration's broad housing policies, including support for the ongoing functions of the Government Sponsored Enterprises (GSEs), Fannie Mae and Freddie Mac, together with Treasury's and the Federal Reserve's purchases of mortgage-backed securities, have been crucial to restoring stability in the housing market and to maintaining the availability of mortgage credit. Private capital has not yet returned to provide the amount of funding that would be needed to allow families to get a mortgage to buy a new home or to sensibly refinance the house they already live in. Without the continued activity of the GSEs and the Federal Housing Administration (FHA) in the current environment, mortgage rates would be higher and homeowners would have a significantly harder time obtaining credit. While conservatorship, undertaken by the Federal Housing Finance Agency (FHFA) during the Bush Administration, pursuant to Congressional authorization under the Housing and Economic Recovery Act (HERA), and continued under the Obama Administration, was necessary, together we must begin the process of fundamental reassessment and reform.

The failure of Fannie Mae and Freddie Mac was part of a broader crisis that revealed structural flaws in the entire housing finance system. Housing markets are subject to booms and busts – a key issue is whether the system of housing finance acts to dampen such cycles or to worsen them. In this case the verdict is woefully clear. For many years, the housing finance system provided credit to households in a reliable and stable manner, setting appropriate standards for mortgage origination, and attracting diverse sources of capital though securitization. However, insufficient regulation and enforcement was unable to check increasingly lax underwriting, irresponsible lending and excessive risk taking. Increasing usage of complex products led to a growing misalignment of incentives facing mortgage brokers, originators, credit investors and borrowers. This fueled unsustainable debt levels and house price appreciation. The risk of a fall in home prices was ignored by most and there was too much leverage in every part of the system. These problems were worst in the least regulated non-bank sectors that fed private-label securitizations. Over time, problems associated with the absence of prudent underwriting standards and effective consumer protection migrated from these sectors to the more highly regulated channels of mortgage origination, including the banking sector.

The performance of the GSEs was symptomatic of this larger regulatory and oversight failure. They were allowed to earn private gains for many years, but ultimately the taxpayer subsidized their losses. They were allowed to expand and manage their investment portfolios without regard to the risk they posed to the system. Over time, the GSEs were permitted to guarantee riskier mortgages and mortgage-backed securities. They were not required to hold adequate capital and employed inadequate risk management.

The housing finance system cannot continue to operate as it has in the past. A staged reform process of the housing finance system must be undertaken to achieve comprehensive and effective reform that delivers a more stable housing market with stronger regulation, more effective consumer protections and a clearer role of government with less risk borne by the American taxpayer. Where guarantees or support is provided, it will be explicit and priced appropriately. There will be no ambiguity over the status or allowable activities of any private entity which enjoys any benefits or protections from the government.

Designing and implementing practical solutions to the problems in the housing finance system will not be simple. The residential housing market is one of the largest sectors in the US economy, and the US mortgage market is the second largest securities market in the world (after US Treasuries). For many American families, their home is their largest and most important financial investment. Over 67 percent of Americans live in their own home. The scale and complexity of the system and its problems require that reform be developed and implemented in a thoughtful and measured way to ensure that Americans have sustained access to affordable credit as the overall housing market continues to recover. Homebuilders, realtors, lenders and other market participants need stability in order to do their jobs.

As part of the reform process, the Administration intends to develop a comprehensive reform proposal for the GSEs role in the broader housing finance system through public consultation with a wide variety of constituents, market participants, academic experts, and consumer and community organizations. After reform, the GSEs will not exist in the same form as they did in the past. Private gains will no longer be subsidized by public losses, capital and underwriting standards will be appropriate, consumer protection will be strengthened and excessive risk-taking will be restrained.

While the form of the housing finance system will change, government has a key role to play in shaping the future of the nation's housing finance system and in setting housing policy goals. A new system must be designed to ensure that markets are more stable, consumers are protected, sustainable credit is widely accessible and important housing policies, such as affordable housing for low and moderate income families, are administered effectively and efficiently.

**The Housing Crisis**

Prior to considering any reform to the GSEs and the broader housing finance system, it is important to understand the circumstances that contributed to the current housing crisis.

While the structural problems in the mortgage finance market had been building for decades, it was not until the early part of the last decade that a combination of factors came together in a manner that set the country on a path towards an unsustainable housing and credit bubble. The forces that produce such bubbles are often present, but our system enabled and amplified them.

Beginning in the unregulated, non-bank sector, underwriting standards were greatly relaxed. Rather than lending primarily against the credit quality of the borrower and assessing ability to pay, lenders increasingly underwrote mortgages based on the current and future expected value of the home. Borrowers were able to buy homes with little or no down payment through the expanded use of private mortgage insurance and "piggyback" second-lien mortgages (second mortgages originated at the same time as a first-lien mortgage). In some cases, borrowers were sold complicated loans they did not understand and could not afford. Non-bank actors developed these strategies, but over time the banking sector quickly adopted these practices and took the system to scale. A race to the bottom ensued.

Lenders increasingly offered alternative, non-conforming or non-"prime" mortgages, such as Alt-A and subprime products. Although these products first became available in the 1980s and 1990s, their use in the conventional market ballooned in the decade that followed. Exotic products – pay-option ARMs, interest rate only loans, negative amortization, 2/28 "bullets" and other such products – left their niches and became widely used in the Alt-A and subprime markets. Higher fees, yield spread premiums and prepayment penalties and the expectation of quick sales or refinancings made these products economically attractive for lenders in ways they had not been in the past. Private label securitizations, driven by investors chasing yield, fueled increased supply of high-cost products. Opaque structures, inflated triple-A ratings by credit ratings agencies and lack of "skin in the game" in the "originate to distribute" model helped to foster bad lending practices. Combined subprime and Alt-A mortgage origination increased from $125 billion in 2000 to over $1 trillion in 2006. At their peak in 2005, subprime and Alt-A mortgages together represented 32 percent of total mortgage origination.

The rate of credit expansion and house price appreciation ultimately proved unsustainable and higher prices and interest rates undermined affordability. An unprecedented increase in residential construction outpaced demand. By the beginning of 2006, the cycle began to turn. As home prices began to fall, households struggled to refinance their adjustable rate loans before they reset. Subprime and Alt-A borrowers began to default in higher numbers – foreshadowing eventual failures in the prime market. Lenders and borrowers began to re-evaluate core assumptions.

up in the system and equity cushions at all levels (borrower, lender, securitizer, investor) were inadequate to absorb even modest amounts of losses. Leverage, and in many cases leverage on leverage, had been built on a flawed foundation of assumptions and a thin capital base that left little room for error in the case of market deterioration.

Rising interest rates most acutely affected subprime, Alt-A and other non-conforming loan products, as such products frequently carried variable rates or short-term teaser rates and payment terms that reset into more punitive levels. In many cases, the borrower's ability to pay had not been evaluated by the lender on the basis of these higher rates, and many borrowers were simply never capable of affording the mortgages they had been sold.

Securities backed by riskier mortgage products began to lose value as delinquency and default rates that had been historically low for many years began to increase, in some cases dramatically. When market values declined and these securities' ratings were downgraded, liquidations became commonplace and investors were often forced to sell these highly leveraged structured products. This further exacerbated the crisis.

According to FHFA/Haver Analytics, home prices that had risen by 85 percent in aggregate from 1997 to mid-2007, fell by 11 percent across the entire US by the end of 2009, of which three-fourths occurred in 2008 alone. In certain markets, home prices fell more than 25 percent. The subsequent contraction of credit across the financial system led to a further reduction of lending and liquidity and exacerbated home price declines.

The excess supply of housing stock fueled by the previous expansion continues to weigh on home prices. Lower home prices have contributed to tremendous loss of wealth and reduced consumer confidence and spending. Labor mobility has declined, as many homeowners owe nearly as much or often much more than their house is worth on the combination of their home mortgage and subsequent borrowing done through home equity loans (HELOCs), resulting in "home lock." Delinquencies and foreclosures have risen dramatically. Foreclosures have caused great harm to the social fabric of communities, particularly those in the most afflicted areas.

Vacant and foreclosed homes have a debilitating effect on neighborhoods and can lead to reduced property values, blight, and neighborhood decay. Studies have shown that spousal relationships, family unity, child behavior and academic performance all suffer in connection with home foreclosure. Furthermore, the lost stability of the ownership of a home and the stigma associated with home foreclosure in America is significant and can make recovering from a lost job, a divorce, an expensive medical event or another shock to an individual or family much harder. The housing crisis cannot be measured only in numbers and dollars, but must also take into account the real impact to Americans who are working hard to provide a better life for themselves and their families.

**Origins of the Crisis**

There are a large number of factors that contributed to the housing and credit bubble that emerged over the last ten years.

*Macroeconomic Conditions Supportive of Home Price Appreciation.* Coming out of the 2001 recession, the macroeconomic environment was conducive to a natural appreciation of home prices in the US. Accommodative interest rate policy and global imbalances combined to reduce financing and home ownership costs to historic lows for American households. Demand for housing in general increased due to higher rates of household formation. The start of this past decade was also marked by a psychological shift, as the declines in the equity market accompanying the end of the technology boom gave rise to the view that residential housing as an "asset class" was safer than other investment alternatives.

As home prices began to rise at an increasing pace at the start of this decade, a belief that prices would only go up and never come down became embedded in the minds of nearly all actors in the housing market – borrowers, lenders, brokers, investors, developers, regulators and policy-makers. Prior to late 2007, national housing prices in the United States had not declined on a sustained basis since the Great Depression. The lack of a meaningful contraction in home prices during the 2001 recession furthered the perception that housing was a lower volatility asset class, with limited downside risk.

*Flaws in the Securitization Market.* Two trends in financial innovation reinforced and intensified these fundamental macroeconomic factors. First, there was a rapid expansion of lending generally that allowed many borrowers to access greater amounts of credit than they could have previously. Lenders relied on increasingly complex underwriting tools that incorporated risk management scoring and pricing systems to lend to a broader range of households. Furthermore, issuers were able to shop the rating agencies for the best ratings on their securities – conflicts of interest helped drive ratings, and there were insufficient checks on rating agencies' behavior. In many cases profits realized from these subprime and Alt-A lending activities exceeded those derived from traditional consumer and business lending activities.

Second, the rapid growth of structured credit products provided mortgage brokers with more direct access to capital markets, reducing the traditional role of banks and thrifts as the primary originator of mortgages to consumers. Moreover, securitizers,

relationship with the borrower since they were not required to retain substantial risk in the products they sold to investors. Securitization, which moved core functions of lending off the balance sheets of major banks, came to represent nearly 50 percent of credit formation in the United States at its peak, with residential mortgages by far the largest credit product in this system. This parallel credit system, however, proved to be much less robust, more prone to manipulation and substantially more leveraged than the banks it replaced. The lack of proper transparency and clear rules and standards in the private-label securities (PLS) market made tracking and recognizing risk in the system difficult.

Reforming this key credit channel is important. The Administration's broader regulatory reform proposals include important provisions that reform the regulation of credit rating agencies, align incentives and create the basis for the preservation of securitization as a vital channel of credit provision going forward. Securitization, with the right standards and guidelines, can be an effective and sound source of credit formation and a method to allow for the broader distribution of mortgage risk beyond the banking sector.

*Errors in Risk Management.* Market participants made grave errors in risk measurement and management. They relied too much on the assumption that if diverse pools of mortgages were aggregated from borrowers across the country, problems affecting any one group of borrowers or limited to one part of the country would only represent a small loss to the broader pool of mortgages. And market participants assumed that by slicing these mortgage pools into different priority tranches they could create nearly riskless securities. This situation was exacerbated by

the faulty assumptions used by rating agencies, investors, and lenders to model and assess risk, in particular the correlation risk that arose due to lack of diversification. They assumed a period of nearly uninterrupted economic growth, rising home prices and increasing and continued access to credit for almost all borrowers. Investors and other market participants were too quick to assume that the positive performance of loan products during this period would continue going forward and that this stable environment would not end. Rating agencies also relied on models that were ill-equipped to assess risks or adjust for the lack of historical data on performance of many of these new types of loans. At a time when investors and ratings agencies should have increased their diligence with respect to the capacity and likelihood that borrowers could repay these loans, they did the opposite and condoned substantial reductions in underwriting and documentation standards. Even sophisticated market participants faced challenges assessing risk levels, as product complexity and several layers of intermediation obscured the full risks borne by lenders and investors.

*Failure of Regulatory Oversight.* Absent in most of this narrative was the involvement of effective regulatory oversight or supervision. Evidence of deteriorating underwriting standards and excessive risk-taking was present early in the housing boom. There were many organizations and institutions that had the authority to respond, but failed to act. The growth of the less regulated sectors of the housing finance system applied pressure on the regulated sector, which resulted in a race to the bottom. The level of regulation and its application was inconsistent among supervisors and permitted forum shopping by lenders. Securitizers and investors were essentially able to opt-out of the parts of the system with heavier regulation and use whatever underwriting they saw fit. Some federal regulators imposed different standards than others, so firms that were interested in offering some of the more exotic products, such as Option ARMs or low-documentation loans, generally structured themselves to take advantage of more permissive supervision regimes.

*Failures of Consumer Protection.* The system for protecting consumers in the mortgage market was, and remains, fundamentally flawed. Fragmented and uncoordinated regulation allowed bad practices to develop in the under-regulated nonbank sector of independent brokers and lenders. When banking agencies failed to respond in a coherent way, these bad practices spread to the banking sector, which in turn legitimized the practices of the independents. Supervision of bank mortgage lending was fragmented over four different agencies, slowing responses to problems and inviting regulatory arbitrage. These flaws remain in place and still need to be addressed.

*A Shift in Consumer Behavior.* Borrowers also bear responsibility for their decisions to take on more debt. Over the last 20 years, in part due to a generally stable macroeconomic environment, the American people became more comfortable maintaining larger balances of debt on their homes, cars and credit cards. Homes were refinanced more frequently, "equity extraction" products like home equity lines of credit were increasingly utilized and homes were purchased with little or no money down. While the liberalization of access to credit had many benefits, consumers' desire to maximize spending power while minimizing monthly payments contributed to the crisis.

**The Role of the GSEs in the Housing Crisis**

Fannie Mae was established in 1938 to create a secondary market for FHA-insured loans. Fannie Mae raised money in the capital markets and purchased FHA-insured loans from banks. This was a response to the failure of the many institutions that had held mortgage risk prior to the devastation of the Great Depression. After a period of fairly rapid growth, in 1954, Congress changed Fannie Mae's charter, effectively ordering it to liquidate its mortgage portfolio and focus solely on being a conduit for

on a gradual pull down of private ownership of the GSEs. In 1968, Congress established Fannie Mae as a government-sponsored enterprise: owned by private stockholders who elected a majority of the board of directors, but with a limited charter of activities that were mandated by Congress.

In 1970, Congress expanded the role and scope of the GSEs in the housing market by adjusting Fannie Mae's charter to allow it to purchase conventional mortgage loans (i.e., non-FHA, non-VA mortgages) and established Freddie Mac as a new government chartered entity within the Federal Home Loan Bank System to provide a second source of liquidity for conventional loans.

The two companies initially followed different business models: Fannie Mae focused on building a large portfolio of mortgage loans, while Freddie Mac focused principally on guaranteeing mortgages. In the mid-1980s, in response to large losses in its portfolio stemming from the same interest-rate exposures that led to the failure of many thrifts, Fannie Mae expanded its guarantee business. In 1992, Congress established the Office of Federal Housing Enterprise Oversight (OFHEO), set formal capital requirements for the GSEs for their guarantee and portfolio activities, and refined the missions of the GSEs, effectively equalizing their charters and range of business activities.

To some degree the role that the GSEs came to play was an extension of the original function of the FHA. However, their ability to properly serve this function was undermined over time by the unhealthy combination of their pursuit of profits and their misuse of the perception of government support, which was condoned by a wide range of regulators and oversight bodies.

For a long period of time, the GSEs supported a well-functioning, efficient mortgage market and the existence of their underwriting standards acted as a guideline for responsible underwriting by lenders. They played a central role in the development of securitization of conventional mortgages. They established appropriate benchmarks for conforming loans and brought transparency and standardization to the housing finance system. Borrowers, lenders and investors benefited from the deep, liquid markets which were formed.

However, the mortgage guarantee business, while profitable, did not provide the GSEs with the same ability to grow earnings as the retained portfolio business. The features of the government charters (e.g., line of credit with Treasury, public mission requirements, limited competition) and exemptions from certain tax and regulatory requirements created a perception of a special status conveyed by the US government on these companies. This perceived guarantee lowered funding costs substantially and made the portfolio business increasingly attractive relative to the guarantee business, particularly given the GSEs' statutory capital requirements, which were significantly lower than other private sector competitors. While the activities of the GSEs in theory should have resulted in lower borrowing costs for homeowners, a significant amount of the subsidy was not passed on to homeowners, but instead benefited GSE shareholders, managers, mortgage originators and other stakeholders.

As the housing boom picked up earlier in the decade and as private label securitization began to increase, the GSE's mortgage guarantee business continued to maintain reasonably strict underwriting standards. In some part, as a consequence, non-agency, or "private label", securitization took on a larger share of the market where standards were being relaxed, and, consequently, the market shares of the GSEs began to fall. With a smaller market share and less guarantee income, the GSEs sought to find a way to continue to provide attractive returns to shareholders. Rather than compete for market share with private securitizations in guaranteeing mortgages, the GSEs increasingly directed more of their capital and resources towards growing the more profitable retained portfolio business. As a result, they focused more intensively on portfolio growth and, as the housing bubble expanded, greatly increased their purchases of riskier assets for their portfolios, in part by using their affordable housing mission requirements to justify some of their subprime purchases. In 2000 the GSEs held very few private label securities backed by subprime or Alt-A loans; by 2007 these securities made up 23 percent of their combined mortgage security portfolios.

The GSE charters contained a fundamental misalignment of interests  As private companies, the GSEs had a fiduciary duty to maximize profits. However, at times this duty conflicted with their public mission, which was relegated to a subordinate role. As the private, unregulated market grew, the GSEs, driven by profit motivation and maintaining market share, followed the private market's exuberance and contributed to the broad trends that perpetuated the boom. The GSEs thus became a pro-cyclical source of capital to the housing market and contributed to the housing bubble.

For decades, the GSEs consistently lobbied for lenient oversight and lower capital requirements. Although there were several attempts to limit their scope and scale and risk profile, entrenched interests and aggressive lobbying thwarted these efforts and critical reforms were not instituted.

One such critical reform would have been requiring the GSEs to hold more capital to protect against losses. The GSEs were allowed to operate with significantly lower capital requirements than other private sector competitors. Federally-regulated banks are required to hold 4 percent capital against their mortgages. Fannie Mae and Freddie Mac, however, were only required to hold 2.5 percent capital against their on-balance sheet mortgage portfolio, and only 0.45 percent against mortgages they guaranteed. Furthermore, it became clear over time that the perception of federal backing enabled the GSEs to borrow at a thin spread over

Treasury Department . . . . . . . . . . . . . . positions of the GSEs and pushed out competition. These low capital requirements allowed Fannie Mae and Freddie Mac to use unsustainable amounts of leverage and resulted in severe under capitalization, making these enterprises extremely susceptible to shock, particularly given the undiversified nature of their business activities.

The bursting of the housing bubble was just such a shock. Similar to other market participants, the GSEs were unprepared for a fall in housing and mortgage-back securities prices. Even a credit event of this magnitude, however, would have been less disruptive to the GSEs if they had retained more of their profits and built up their capital base. However, the low statutory capital requirements had essentially allowed earnings to be distributed to shareholders and other stakeholders each year.

Many observers of the government's role in the housing finance sector rightly focus on the role of Fannie Mae and Freddie Mac, but a full perspective must also include an evaluation of the Federal Home Loan Bank System (FHLBs), FHA, and the Government National Mortgage Association (GNMA or Ginnie Mae). Each plays an important role in the housing finance market. While these institutions, not motivated by private profits, did do a better job of serving a counter-cyclical role, the crisis also exposed some of the flaws in these institutional structures. For example, some of the same incentive alignment issues became clear in the decisions by several of the FLHBs to make large investments in non-agency, subprime mortgage securities at the peak of the cycle. These decisions have greatly affected the health of several of the FHLBs.

The FHA (through GNMA) was largely driven out of the market during the credit boom due to its lower loan limits and stricter originator standards, and so the FHA's safer and more conservatively underwritten product for low down-payment borrowers--the 30 year fixed rate mortgage--was not used extensively. During this period, the FHA was adversely selected for loans to borrowers that included poor practices such as seller-financed down payments that resulted in no-money-down loans. Today, when the private market has pulled back from providing credit to the residential housing sector, FHA and GNMA (along with the GSEs in conservatorship) are playing an important countercyclical role. As broader reform is undertaken, it must be done with a view to the appropriate role of each of these institutions in the overall housing finance system.

**The Collapse of Freddie Mac and Fannie Mae and Conservatorship**

By the time the housing market began its collapse, extreme leverage was pervasive throughout the housing finance system – at the banks, at the GSEs, and with the homeowner. Almost every actor along the housing finance chain was overextended.

As long as housing prices continued to rise, the GSEs' exposure to risky non-prime loans remained manageable. With the bursting of the bubble, however, the underlying weaknesses and flaws of Fannie Mae and Freddie Mac emerged with force. In 2007, the GSEs reported combined losses of over $5 billion, the first full-year loss for Fannie Mae since 1985 and the first ever for Freddie Mac. The companies' share prices plummeted by 60 percent between July 2007 and July 2008. The GSEs ultimately reported combined 2008 losses in excess of $108 billion.

A collapse of Fannie Mae or Freddie Mac would have had devastating consequences for the housing finance system and the broader economy. These two entities are deeply interconnected with the broader global financial system, and the potential of their collapse would define the notion of systemic risk. Between the two entities, the GSEs guaranteed over $5 trillion of residential mortgage-backed securities, which represented nearly 50 percent of the overall residential mortgage market. They had over $1.7 trillion of debt securities outstanding, held equally among foreign and domestic investors. At a time when the foundations of the financial system were being deeply shaken by the broadening financial crisis, a collapse of either of these institutions would have caused a breakdown in the mortgage securities market, a significant worsening of the breakdown of confidence across the markets and a likely pull-back of foreign investment. In the end, as confidence eroded, the government was left with few viable policy alternatives.

As a result of the substantial deterioration in the housing markets, and Fannie Mae's and Freddie Mac's rapidly rising credit expenses and their growing inability to raise new capital and access debt markets, FHFA placed the GSEs into conservatorship on September 6, 2008 under the authority provided by HERA. In conjunction with that action, Treasury agreed to provide financial support to the GSEs through the establishment of Preferred Stock Purchase Agreements (PSPAs). While this action was undesirable, it was necessary and required. Both companies were severely undercapitalized and would not have been able to meet their obligations without the intervention and financial support of the government.

Prior to the actions taken in September 2008, investors in the GSEs had relied on the perception of backing by the government. Through the establishment of the PSPAs, the perception of government backing became explicit capital support, and as a result, the entities were stabilized sufficiently to play their current role in supporting recovery.

To continue the necessary support of the GSEs as the financial markets and economy recover, Treasury announced several changes in advance of HERA's expiration in December 2009. Treasury agreed to amend the cap on Treasury's funding commitment to each GSE, replacing the fixed $200 billion cap with a formulaic cap that increases above $200 billion by the amount of any cumulative reductions in net worth over 2010 through 2012 . . . . . . . . . . . . . . . . . . fixed

at the end of this year. Treasury will ease that oversight from that point. Fannie Mae and Freddie Mac were also provided some modest additional flexibility as they reduced their retained mortgage portfolios. Treasury also announced that it would end its program to purchase mortgage-backed securities (MBS) at the end of the 2009 and terminate a liquidity facility that had not been utilized.

Neither company was near the previous $200 billion per institution limit in December and neither is likely to exceed those caps even under a range of very conservative assumptions. These actions, however, were intended to provide greater certainty to the market going forward that, even in conditions that seem unlikely based on current trends, the GSEs in conservatorship will be able to continue to meet their obligations and play the vital role they are continuing to play during this current crisis. The change also ensures that each firm will have a more appropriate cap given their specific facts and circumstances at the end of 2012. By providing certainty to market participants for these extreme conditions, these actions are designed to improve market stability today, making such adverse conditions even less likely.

Additional flexibility was also provided in meeting the requirement that the companies reduce their retained mortgage portfolios over time. Fannie Mae and Freddie Mac are not expected to be active buyers of securities to increase the size of their retained mortgage portfolios in this period, but neither is it expected that active selling will be necessary to meet the required targets. Treasury remains firmly committed to ensuring that the GSE's retained portfolios are substantially reduced.

Taken together, these actions represent the most effective way to protect financial stability and enable these institutions to continue to play a vital role in the housing market during this crisis, including by securing the benefits of historically low mortgage rates on economic recovery, while limiting the long-term cost of the housing market collapse to the taxpayer. Indeed, the economy and the taxpayers would be far worse off if Treasury had not taken action during the Bush Administration in 2008 or if it did not continue that support going forward under this Administration.

The need for this level of intervention is both unfortunate and undesirable. However, without the decisive actions taken by the government and the specific support for the GSEs, the mortgage market would have halted, making it nearly impossible for Americans to buy or sell their homes or to refinance the mortgage on their existing home. The result would have been a much more wrenching decline in housing prices, a more severe foreclosure crisis and a deeper economic downturn.

The GSEs' securitization and guarantee activities continue to play an important role in housing finance today, and they have helped to stabilize the housing market during this crisis. As a result of the near complete absence of private capital in the mortgage origination market, the GSEs financed or guaranteed over 70 percent of new single-family mortgage originations in 2009, as compared to just under 40 percent in 2006. The FHA, the Department of Veterans Affairs (VA), and the Department of Agriculture (USDA) accounted for another 25 percent of originations in 2009.

Treasury and the Federal Reserve have also supported the secondary market through direct purchases of agency MBS (with approximately $200 billion and $1.2 trillion of purchases, respectively, in 2009).

Supporting the GSEs' ability to support the funding of new home purchases and the refinancing of existing mortgages will provide an important and valuable bridge that should allow necessary reforms to be executed in a time of greater housing market stability, something the Administration believes is essential to a successful transition.

**Clear Need for Reform of Housing Finance System and the Role of Government**

The housing finance system cannot continue to operate as it has in the past. The Administration has already put forth important proposals for the broader financial system as part of financial regulatory reform, which will help address many of the problems in the private residential mortgage credit markets. These proposals substantially enhance supervision, establish an agency dedicated to ensuring clear rules of the road for consumer financial markets and create new rules for the securitization market including a requirement that all originators retain some risk in the mortgages they underwrite. These are necessary reforms that will make the financial system safer for all Americans.

More, however, must be done to address the specific flaws of the housing finance system. Action is needed to ensure that markets are more stable, consumers are protected, credit is widely accessible and important housing policy objectives, such as affordable housing for low and moderate income families, are administered effectively and efficiently.

Government has a key role to play in that new system, but its role, and the role of the GSEs in particular, will be fundamentally different from the role played in the past. Private gains can no longer be supported by the umbrella of public protection, capital standards must be higher and excessive risk-taking must be appropriately restrained.

When considering the future role of government in housing finance and its organizational design, it is important to remember that Fannie Mae and Freddie Mac are only one part of a whole set of institutions that support housing finance, which also includes FHA, VA, USDA and GNMA, the Federal Home Loan Banks, commercial banks, thrifts, community banks, community

range of other stakeholders and market participants. Any restructuring of Fannie Mae and Freddie Mac must be done as part of a reform of the wider housing finance system and placed within the context of broader housing policy objectives to ensure that the functioning of the whole system is advanced.

Furthermore, as part of any broad review of government's role in the housing finance system, one must consider how other government programs and policies support housing. A reformed housing finance system should reflect a consideration of how these different policies and institutions are balanced to achieve overall housing policy objectives.

The Administration has defined a framework of objectives for reform of the mortgage finance system. A reformed housing finance system should deliver stability and efficiency to the housing market, while minimizing the risks and costs borne by the American taxpayer.

**Objectives of Reform**

In considering reform, the Administration will be guided by the view that a stable and well-functioning housing finance market should achieve the following objectives:

- *Widely available mortgage credit.* Mortgage credit should be available and distributed on an efficient basis to a wide range of borrowers, including those with low and moderate incomes, to support the purchase of homes they can afford. This credit should be available even when markets may be under stress, at rates that are not excessively volatile.
- *Housing affordability .* A well-functioning housing market should provide affordable housing options, both ownership and rental , for low- and moderate-income households. The government has a role in promoting the development and occupancy of affordable single- and multi-family residences for these families.
- *Consumer protection .* Consumers should have access to mortgage products that are easily understood, such as the 30-year fixed rate mortgage and conventional variable rate mortgages with straightforward terms and pricing. Effective consumer financial protection should keep unfair, abusive or deceptive practices out of the marketplace and help to ensure that consumers have the information they need about the costs, terms, and conditions of their mortgages.
- *Financial stability .* The housing finance system should distribute the credit and interest rate risk that results from mortgage lending in an efficient and transparent manner that minimizes risk to the broader financial and economic system and does not generate excess volatility. The mortgage finance system should not contribute to systemic risk or overly increase interconnectedness from the failure of any one institution.

The housing finance system could be redesigned in a variety of ways to meet these objectives. However, the Administration believes that any system that achieves these goals should be characterized by:

- *Alignment of incentives.* A well functioning mortgage finance system should align incentives for all actors – issuers, originators, brokers, ratings agencies and insurers – so that mortgages are originated and securitized with the goal of long-term viability rather than short term gains.
- *Avoidance of privatized gains funded by public losses .* If there is government support provided, such as a guarantee, it should earn an appropriate return for taxpayers and ensure that private sector gains and profits do not come at the expense of public losses. Moreover, if government support is provided, the role and risks assumed must be clear and transparent to all market participants and the American people.
- *Strong regulation.* A strong regulatory regime should (i) ensure capital adequacy throughout the mortgage finance chain, (ii) enforce strict underwriting standards and (iii) protect borrowers from unfair, abusive or deceptive practices. Regulators should have the ability and incentive to identify and proactively respond to problems that may develop in the mortgage finance system.
- *Standardization.* Standardization of mortgage products improves transparency and efficiency and should provide a sound basis in a reformed system for securitization that increases liquidity, helps to reduce rates for borrowers and promotes financial stability. The market should also have room for innovations to develop new products which can bring benefits for both lenders and borrowers.
- *Support for affordable single- and multifamily-housing.* Government support for multifamily housing is important and should continue in a future housing finance system to ensure that consumers have access to affordable rental options. The housing finance system must also support affordable and sustainable ownership options.
- *Diversified investor base and sources of funding.* Through securitization and other forms of intermediation, a well functioning mortgage finance system should be able to draw efficiently upon a wide variety of sources of capital and investment both to lower costs and to diversify risk.
- A *ccurate and transparent pricing .* If government guarantees are provided, they should be priced appropriately to reflect risks across the instruments guaranteed. If there is cross-subsidization in the housing finance system, care must be exercised to insure that it is transparent and fully consistent with the appropriate pricing of the guarantee and at a minimal cost to the American taxpayer.

...cts in the world, and benefits from certain innovations like the "to be announced" (or TBA) market. This liquidity has provided a variety of benefits to both borrowers and lenders, including lower borrowing costs, the ability to "lock in" a mortgage rate prior to completing the purchase of a home, flexibility in refinancing, the ability to pre-pay a mortgage at the borrowers' discretion and risk mitigation. This liquidity also further supports the goal of having well diversified sources of mortgage funding.

- *Clear mandates.* Institutions that have government support, charters or mandates should have clear goals and objectives. Affordable housing mandates and specific policy directives should be pursued directly and avoid commingling in general mandates, which are susceptible to distortion.

**Key Policy Choices for a New Housing Finance System**

Since the 1930s, the U.S. government has played an important role in housing finance. Today, significant support for housing and homeownership is now common across many different countries. Intervention in this market has been generally defended on two grounds: (i) some government support, particularly through the provision of guarantees or insurance, can contribute to financial stability and help reduce booms and busts in home prices and (ii) direct subsidies can support the social benefits of home ownership and the availability of affordable housing to low and moderate income families. Federal support for housing finance in the current system has at times conflated these two objectives. As part of any reform, it is important to ensure that the objectives and goals of government support are clear and well defined. Financial stability arguments have two components. First, stable access to mortgage credit is important for households and the economy. The largest financial asset for many households is the equity in their home. The housing sector also plays an important role in the overall economy. Residential construction is more volatile than other parts of the economy and consequently plays an important role in economic cycles. Changes in the value of real estate are an important source of variance for household wealth and consumption.

Second, housing finance can be severely affected when the financial system is disrupted. Mortgage loans are relatively small idiosyncratic credits. Underwriting mortgage loans responsibly, and investing in them, involves collecting and evaluating a substantial amount of information. A well functioning mortgage market requires institutions that develop and maintain the capacity to carry out this sort of analysis. When financial stress undermines existing financial institutions engaged in mortgage finance it can be difficult and take time to recreate that capacity.

The case for providing direct government support to stabilize mortgage credit would thus rest on the judgment that mortgage credit is particularly important to households and the economy overall. Moreover, the relative size of the housing market and high correlation of losses it can experience in times of financial distress means that government may be best suited to serve as a source of stability in a responsible manner. In the current crisis, mortgage credit that was not supported by either the GSEs or government programs collapsed highlighting the vulnerability of mortgage credit to financial stress. It is noteworthy that other forms of financial intermediation have fared much better (for example, the corporate bond market has recovered strongly over the past year). As the recent crisis has shown all too painfully, fluctuations in the supply of mortgages over boom and bust credit cycles can have a major impact on the economy. By supporting the availability of and access to mortgage credit, the government can ease the adverse effects of stress in the financial system on the broader economy.

Assuming government continues to play a meaningful role in the housing market for any of the reasons described above, there are a variety of mechanisms which could be employed to promote stability or convey a subsidy if desired.

In considering the various systems around the world, it is apparent that one of the key choices is whether or not government should provide explicit support or guarantees for the issuance individual mortgages or mortgage-backed securities to provide such stability. Government's involvement provides certainty in the value of the guarantee and can promote a stable supply of mortgage credit. Guarantees, together with appropriate regulation, can also form the foundation for promoting good underwriting standards, consumer protections, and the management of broad macroeconomic credit risk.

If some form of guarantee is to be explicitly provided or supported, a series of important questions would need to be answered about how best to achieve these objectives. First, what should be the appropriate scale and scope of those guarantees and which borrowers and mortgage products should be eligible? Guarantees on mortgage-backed securities could be provided on a full or partial basis and there are a variety of criteria such as loan size, loan-to-value ratio, credit score and income-to-debt service ratio which could be used to set eligibility and provide benchmarks for standardization. Second, how should any guarantees that are to be provided be priced? In order to protect taxpayers, guarantees should be priced in a way that appropriately reflects the underlying risk assumed by the government. Third, where support or a guarantee are not available or are purposefully limited, how will the risk which is retained in the mortgage finance chain be managed and supervised?

Finally, how should any organization that provides such guarantees be structured and how should guarantees be distributed? Clearly the governance structure of the GSEs in the past, in particular the unhealthy combination of private ownership and implicit government support, proved to be a mistake. Careful choices are needed about organizational design to ensure that those providing any guarantees have the appropriate incentives and expertise.

Many countries provide significant government support for housing finance, but they do so in a variety of ways. Several countries have GSE-like entities that guarantee and/or hold mortgages, but in no other country are they as large as they are in the United States. In a number of countries governments underwrite mortgage insurance. In some cases countries governments provide a regulatory framework and set standards that promote liquid mortgage markets. Securitization does not play a major role in housing finance in all other high-income countries, and where it does exist, it takes different forms. Many European countries use so-called covered bonds to channel credit to housing. This diversity of international practice in housing finance can provide useful insights and examples to consider.

**Transition to a New System**

Transition presents several important challenges. There is a large stock of investments on the balance sheets of the GSEs, and financial markets are depending on the ability of the GSEs, in their current form, to perform on their obligations. The GSEs and the federal government, through the FHA and GNMA, are playing a larger role in the housing finance market today than they have since the Great Depression. Conditions must be created so that private capital will return in a substantial manner to the housing market. There are important infrastructure, capabilities and human resources at the GSEs that have great value and should continue to serve the needs of the housing market as reform moves forward. Maintaining these capabilities and retaining these personnel through the transition is important.

In conjunction with the Treasury's commitment to supporting the GSEs while in conservatorship, it should be clear that the government is committed to ensuring that the GSEs have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations. The Administration will take care not to pursue policies or reforms in a way that would threaten to disrupt the function or liquidity of these securities or the ability of the GSEs to honor their obligations. The Administration recognizes the central importance the mortgage finance market plays in the broader capital markets and will ensure that this market is not allowed to be disrupted. Recent amendments to the Preferred Stock Purchase Agreements should leave no uncertainty about Treasury's commitment to support Fannie Mae and Freddie Mac as they continue to play a vital role in the housing market during the current crisis. Maintaining the current securitization operational flow, TBA liquidity, secondary MBS market liquidity and the ability of the GSEs to issue debt during the transition will remain key priorities for the Administration.

Government's role in the housing finance system and level of direct involvement will change, however, and the Administration is committed to encouraging private capital to return to the housing finance market. The substantial direct support for the housing markets that has been put in place will be allowed to fade as the market recovers and fully stabilizes. In addition, through regulatory reform and other supervisory actions, the Administration is committed to clarifying the framework for new securitizations to restart these important markets. These steps should create the room necessary for private markets to re-emerge.

An effective transition plan will seek to maintain the extensive infrastructure, knowledge, personnel and systems of Fannie Mae and Freddie Mac. Designing an effective transition plan that leverages these resources and minimizes market disruption will be a critical component of reform.

**Next Steps**

To achieve these goals, the Administration intends to develop a comprehensive reform proposal for delivery to Congress. To ensure that input is provided by all stakeholders, Treasury and HUD will submit a list of questions by April 15, 2010 for public comment and will seek responses from a wide variety of constituents, market participants, academic experts, and consumer and community organizations. These questions will ask participants to provide comment on their recommendations for, and comments on (i) the priorities for government housing policy, (ii) the role of government in the housing finance system, (iii) characteristics of mortgage products available to consumers, (iv) the best practices to ensure consumer protection, and (v) the most effective design of the housing finance system.

The Administration will seek to work closely with the Congress, on a bipartisan basis, prior to finalizing a comprehensive reform plan.

Given the importance of the long term stability of the housing market and the critical role the GSEs continue to play in the current financial circumstances, this approach to GSE reform, built upon significant input from various stakeholders, should form the basis for a strong bi-partisan solution, introduced, enacted and executed at a time of greater market stability.

###



**Initiatives**

Financial Stability

Housing Finance Reform

Making Home Affordable

Recovery

U.S. China Strategic and Economic Dialogue

Wall Street Reform

**Bureaus**

The Alcohol and Tobacco Tax and Trade Bureau

Bureau of Engraving & Printing

Bureau of the Fiscal Service

Community Development Financial Institutions Fund

Financial Crimes Enforcement Network (FinCEN)

Internal Revenue Service

Office of The Comptroller of The Currency

U.S. Mint

**Inspector General Sites**

Office of Inspector General (OIG)

Treasury Inspector General for Tax Administration (TIGTA)

Special Inspector General, Troubled Asset Relief Program (SIGTARP)

Report, Fraud Waste & Abuse

**Additional Resources**

Privacy Act

Small Business Contacts

Budget and Performance

TreasuryDirect.gov Securities/Bonds

Freedom of Information Act (FOIA)

No FEAR Act Data

**U.S. Government Shared Services**

HR Connect Program Office

Administrative Resource Center (ARC)- Bureau of the Public Debt

Treasury Direct Services for Governments

**Other Government Sites**

USA.gov

USAJOBS.gov

OPM.gov

MyMoney.gov

Data.gov

Forms.gov

Regulations.gov

PaymentAccuracy.gov

Business.USA.gov



*Required Plug-ins*

Privacy Policy | Google Privacy | Site Map | Site Policies and Notices | Accessibility | FAQs | Feedback | Careers | Contact Us

# Tab 21

Case 1:13-cv-01053-RCL   Document 24-8   Filed 12/17/13   Page 86 of 227



# Report to Congress

## 2009







# Federal Housing Finance Agency

1700 G Street, N.W., Washington, D.C. 20552-0003
Telephone: (202) 414-3800
www.fhfa.gov

May 25, 2010

Honorable Christopher Dodd
Chairman
Committee on Banking, Housing,
and Urban Affairs
United States Senate
Washington, D.C. 20510

Honorable Richard Shelby
Ranking Member
Committee on Banking, Housing,
and Urban Affairs
United States Senate
Washington, D.C. 20510

Honorable Barney Frank
Chairman
Committee on Financial Services
United States House of Representatives
Washington, D.C. 20515

Honorable Spencer Bachus
Ranking Member
Committee on Financial Services
United States House of Representatives
Washington, D.C. 20515

Dear Chairmen and Ranking Members:

I am pleased to transmit the Federal Housing Finance Agency's (FHFA's) *Report to Congress*, which presents the findings of the agency's 2009 annual examinations of Fannie Mae and Freddie Mac (Enterprises), the 12 Federal Home Loan Banks (FHLBanks) and the Office of Finance. This report meets the statutory requirements of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Housing and Economic Recovery Act of 2008 (HERA). The views in this report are those of FHFA and do not necessarily represent those of the President.

The Enterprises have been operating in conservatorship since September 2008. The purpose of conservatorship is to preserve and conserve each company's assets and property and to put the companies in a sound and solvent condition. The goals of the conservatorships are to help restore confidence in the companies, enhance their capacity to fulfill their mission, and mitigate the systemic risk that contributed directly to instability in financial markets. FHFA continues to exercise oversight as safety and soundness regulator and has a more active role as conservator.

Fannie Mae and Freddie Mac each remain critical supervisory concerns. The examination findings described in this report identify the key challenges facing each company, which include credit risk, operational risk, model risk, and the challenges of attracting and retaining key talent in conservatorship. Each company has made important progress during the past year, especially in the area of corporate governance and remediating deficiencies identified in previous examination reports. Throughout 2009, each company remained active in supporting the secondary mortgage market and, together, the Enterprises' mortgage purchase and guarantee activity in 2009 represented more than 76 percent of total single-family originations. While critical to supporting the ongoing functioning of the nation's housing finance system, the Enterprises would be unable to serve the mortgage market in the absence of the ongoing financial support provided by the U.S. Department of the Treasury.

Central to the goals of conservatorship is the mitigation of credit losses. Each Enterprise in 2009 and over the next several years has and will continue to realize credit losses from mortgages originated in the several years prior to conservatorship. While these past business decisions cannot be undone, each Enterprise, under the oversight and guidance of FHFA as conservator and regulator, is actively seeking ways to minimize these credit losses. The Enterprises' foreclosure prevention efforts are designed to be commercially reasonable, consistent with the goal of conservatorship to minimize losses, and compliant with the Emergency Economic Stabilization Act of 2008 mandate that FHFA as conservator pursue programs that "maximize assistance to homeowners." FHFA reports monthly to Congress on the full range of Enterprise foreclosure prevention activities.

Operational challenges remain a critical concern at each Enterprise. In February, I communicated to you my position that, in conservatorship, the Enterprises will be limited to continuing their existing core business activities and taking actions necessary to advance the goals of the conservatorship. The Enterprises operating in conservatorship cannot be a long-term solution. I look forward to working with the Administration and Congress on a complete review of, and legislative action on, the future of the housing finance system, including an ultimate resolution of the Enterprises' future.

The condition and performance of 6 of the 12 FHLBanks are less than adequate. At these FHLBanks, the principal supervisory issue is private-label mortgage-backed securities (MBS) investments. Half the FHLBanks incurred credit-related impairment charges of more than $200 million on private-label MBS in 2009. Four FHLBanks have negative accumulated other comprehensive income, mostly reflecting noncredit impairment on private-label MBS, in excess of their retained earnings, and this excess is large at two FHLBanks, Seattle and Boston. At the Seattle FHLBank, this condition has led me to use my discretionary authority to deem that FHLBank "undercapitalized" despite holding capital in excess of required regulatory minimums. During 2009, the FHLBanks collectively made substantial progress in improving the rigor and consistency of their analytics in determining the valuation of their private-label MBS.

The FHLBank System met its public purpose during the recent financial crisis. Advances grew rapidly in 2007 and 2008 in response to the growing liquidity crisis in financial markets, topping $1 trillion by September 2008. Since then, as the liquidity crisis has ebbed, bank deposits have grown, and loan demand has slowed, advances have been steadily declining from their peak, falling to $631 billion by year-end 2009. This trend has continued to date in 2010.

FHFA is looking for the FHLBank System to return to more traditional operations and activities, with a focus on the advances business, and a gradual reduction in investment portfolios not needed to support core business activities and safety and soundness. FHFA examinations of the FHLBanks' affordable housing and community investment programs found improvements at several FHLBanks in response to previous examination findings.

FHFA issued numerous proposed and final regulations in 2009 and this has continued into 2010. For example, recently published final rules allow community development financial institutions to become members of the FHLBanks and require Fannie Mae and Freddie Mac to report to FHFA anytime they discover they have purchased or sold a fraudulent loan or financial instrument. FHFA also published a proposed rule to promote the inclusion of women and minorities in all activities at Fannie Mae, Freddie Mac, and the FHLBanks. FHFA modified the Enterprises' housing goals for 2009 in light of market conditions. On February 26, 2010, FHFA published a proposed rule implementing HERA's new housing goal regime. FHFA also issued more than a half-dozen HERA-mandated reports to Congress, which are summarized in this report. In 2009, FHFA published more than a dozen research papers, mortgage market notes, and commissioned research papers on mortgage default assessment.

In November 2009, FHFA sent to you its second annual *Performance and Accountability Report* (PAR) detailing the agency's performance relative to its performance plan. I am pleased to report that our PAR again has been awarded the Certificate of Excellence in Accountability Reporting from the Association of Government Accountants.

FHFA is now about 21 months old. We continue to build the staff and operational infrastructure to carry out the responsibilities Congress gave to us in HERA. I am proud of the hard work and dedication of the FHFA staff in carrying out the agency's mission during a period of extraordinary financial stress and through the unprecedented conservatorships FHFA continues to oversee.

Yours truly,

*Edward J. DeMarco*

Edward J. DeMarco
Acting Director

FHFA 1202

# Federal Housing Finance Oversight Board Assessment

Section 1103 of the Housing and Economic Recovery Act (HERA) of 2008 requires that the Federal Housing Finance Agency (FHFA) Director's Annual Report to Congress include an assessment of the Federal Housing Finance Oversight Board or any of its members with respect to:

- The safety and soundness of the regulated entities;

- Any material deficiencies in the conduct of the operations of the regulated entities;

- The overall operational status of the regulated entities; and

- An evaluation of the performance of the regulated entities in carrying out their respective missions.

FHFA's annual report provides a detailed review of the issues described above for Fannie Mae and Freddie Mac (the Enterprises) and the Federal Home Loan Banks (FHLBanks).

## Enterprises

The Enterprises continue to operate under conservatorships established in 2008, with financial support from the U.S. Treasury Department through the Senior Preferred Stock Purchase Agreements established at the same time. In 2009, Treasury strengthened its financial commitment to the Enterprises under the preferred stock agreements to provide greater market confidence given the fragile state of the housing finance markets. In 2009, the Enterprises' losses totaled $93.6 billion, and draws under the preferred stock agreements associated with those losses totaled $66.1 billion. These losses and draws under the preferred stock agreements are the result of business decisions made by the Enterprises prior to entering into conservatorship.

A key measure of safety and soundness, levels of capital and capital adequacy, cannot be employed for the Enterprises while operating under conservatorship with financial support from Treasury. Both Enterprises have depleted all of their shareholders' equity, with the negative balances of those accounts being offset by Treasury's investments under the Preferred Stock Purchase Agreements.

When considering the safety and soundness of the Enterprises, it is important to consider and recognize the important differences between the book of business acquired prior to conservatorship and the book of business acquired since the beginning of conservatorship. A key factor leading up to conservatorship was the Enterprises' investments in private-label mortgage-backed securities (MBS). Declines in the market value of these investments along with subsequent impairments drove losses and reductions in net worth throughout 2008. Investments in private-label MBS were primarily responsible for eliminating Freddie Mac's preconservatorship net worth of $27 billion and played a significant role in the initial draws under the Preferred Stock Purchase Agreements. Given that Fannie Mae had less than half the amount of private-label MBS as Freddie Mac, the overall impact was similar but less severe.

Considering the guarantee book, almost all of the credit losses realized at Fannie Mae and Freddie Mac in 2009 were the result of mortgages originated prior to conservatorship, and the substantial majority of those losses were the result of mortgages originated in 2005, 2006, and 2007 during the height of the

home mortgage boom. Each Enterprise has and will continue to realize credit losses from mortgages originated in the several years prior to conservatorship. While these past business decisions cannot be undone, each Enterprise, under the oversight and guidance of FHFA as conservator and regulator, is actively seeking ways to minimize these credit losses and ensure that new business generated postconservatorship is profitable.

Since the Enterprises were placed into conservatorship, in accordance with guidance provided by FHFA to ensure conservation of assets and minimization of future loss, the Enterprises have tightened their underwriting standards. For example, FICO credit scores of mortgages guaranteed in 2006-2007 averaged around 715, while today they average around 750. Average loan-to-value (LTV) ratios have also decreased by about 5 percentage points in the postconservatorship time period (and 89 percent of new mortgages had an LTV ratio of 80 percent or less in 2009, as compared to 76 percent of new mortgages with LTV ratios of 80 percent or less in 2007). As a result, the overall performance on new mortgage guarantees has improved. Serious delinquency rates for the 2009 vintage are a fraction of the serious delinquency rates for the 2006-2008 vintages at comparable periods after origination.

Each Enterprise has also made changes in their national guarantee fee pricing to correct for the underpricing of credit risk in prior years and to reflect current risks in an environment of falling house prices and other factors. During 2009, in light of heightened mortgage delinquencies and forecasts for continued declines in house prices, the Enterprises updated their pricing models several times, as they had in 2008, to reflect changes in the market environment.

The Enterprises have made progress in addressing material operational deficiencies in 2009; however, the *Report of Examination* for each Enterprise assigns a composite rating of critical concerns and describes a number of areas where additional work is needed to correct ongoing operational deficiencies. In particular, progress in 2009 was made on addressing issues relating to corporate governance and liquidity management. Areas of concern and further work remain in the following areas: operational risk, which has increased along with the inherent rise of real estate owned and essential loss mitigation activities; credit risk, arising from increasing loss severities as well as deterioration in the health of key counterparties, particularly mortgage insurers; and the reliability of models used for risk management and key accounting estimates. FHFA remains focused on addressing these areas of concern in 2010.

In terms of mission, since being placed into conservatorship, the Enterprises have maintained an ongoing significant presence in the secondary mortgage market. The Enterprises currently serve a vital role in the housing market in helping to ensure that mortgage credit is available. Private capital has not yet returned to provide the amount of funding needed to allow families to get a mortgage in order to buy a new home or to sensibly refinance the house they already live in. In 2009, the Enterprises' share of single-family originations was 76 percent, up from 73 percent in 2008. Both Enterprises also continue to play an important role in efforts to limit preventable foreclosures, which are designed to mitigate Enterprise losses as well as enhance stability in housing markets and local communities, both of which are essential to stabilizing the Enterprises. FHFA has continued work on implementing new housing goals and duty to serve requirements that are mandated by Congress in HERA.

FHFA 1204

The Enterprises' operational status in conservatorship cannot be a permanent state for the Enterprises, and directing the Enterprises' operations in conservatorship presents its own set of challenges for FHFA. As debate continues over the design of the future housing finance system, FHFA remains focused on the fundamental purposes of the conservatorships: conserving the Enterprises' assets and maintaining their activities in the secondary mortgage market.

## FHLBanks

The FHLBanks' advance business continues to operate with no credit losses. In contrast, the quality of the FHLBanks' investments in private-label MBS remains a significant concern. Overall, the joint and several liability of FHLBank System debt enhances the safety and soundness of the System, but the actual and potential losses associated with these private-label MBS are a cause for safety and soundness concerns at certain FHLBanks. As of December 31, 2009, all 12 FHLBanks exceeded the minimum leverage ratio by having at least 4 percent capital-to-assets. The weighted average regulatory capital to assets ratio for the FHLBank System was 5.9 percent.

Material deficiencies are present at some individual FHLBanks. Since October 2007, the FHLBank of Chicago has operated under a consent order to cease and desist. The consent order suspended dividend payments and stock repurchases and redemptions. It also required the FHLBank to address certain supervisory concerns. The FHLBank of Chicago made improvements in risk management and cost controls, but its overall financial weakness remains a material deficiency. A continued deterioration of the FHLBank of Seattle's private-label MBS investments led to the FHLBank not meeting its risk-based capital requirement for part of 2009, and FHFA has deemed that FHLBank undercapitalized.

FHLBank investments in private-label MBS have adversely affected the overall operations of some FHLBanks—dividends have been suspended, as has their ability to repurchase or redeem stock. As noted, FHFA has taken action where needed to address this problem at certain FHLBanks and is closely monitoring the situation at other FHLBanks.

The FHLBanks met their mission of providing liquidity to their members, although the volume of advances declined significantly in 2009. The FHLBanks' Affordable Housing Program (AHP) continues to be a source of funds to support local affordable housing initiatives being funded by member institutions; however, the decline in FHLBank income has reduced AHP contributions. FHFA has continued work on implementing HERA-mandated housing goals for the FHLBanks.

Edward J. DeMarco
Chairman
Federal Housing Finance Oversight Board

Shaun Donovan
Secretary
U.S. Department of Housing and
Urban Development

Timothy F. Geithner
Secretary
U.S. Department of the Treasury

Mary L. Schapiro
Chairman
Securities and Exchange Commission

# FHFA Report to Congress

2009

## Contents

**Year in Review** .................................................1

   Resumption of Economic Growth ...........................1

   Stronger Housing and Mortgage Markets................3

   Government Support ...................................7

   Affordability and Originations Increase ................9

   Business Volumes .....................................12

**Report of Annual Examination of
Fannie Mae (Federal National
Mortgage Association)** ...............................15

   Examination Authority and Scope ........................15

   Examination Conclusions ...................................15

   Governance ...................................................16

   Solvency .....................................................20

   Earnings .......................................................21

   Credit Risk Management .................................25

   Market Risk Management .....................................31

   Operational Risk Management ..............................33

**Report of Annual Examination of Freddie Mac
(Federal Home Loan Mortgage Corporation)** .......39

   Examination Authority and Scope ........................39

   Examination Conclusions ...................................39

   Governance ...................................................40

   Solvency .....................................................44

   Earnings......................................................45

   Credit Risk Management .................................49

   Market Risk Management .....................................54

   Operational Risk Management ..............................56

**Report of Annual Examinations of
Federal Home Loan Banks** ...............................61

   Examination Authority and Scope .........................61

   Governance ...................................................61

   Financial Condition and Performance.................62

   Credit Risk Management ...............................65

   Market Risk Management .................................67

   Operational Risk Management ..............................69

   FHLBanks' Examination Conclusions .................70

   Office of Finance ....................................92

   Director Compensation...........................................93

**Accounting** ...................................................95

   Other-Than-Temporary Impairments...................95

   Consolidation Accounting ....................................96

   Looking Ahead ..............................................97

**Supervisory Actions** ...........................................99

   Conservatorship .............................................99

   Other Supervisory Actions .................................101

   Foreclosure Prevention.....................................102

**Housing Mission and Goals**...................................105

   Enterprise Affordable Housing Goals .................105

   FHLBanks' Affordable Housing Goals ...............106

   FHFA Outreach .............................................108

**Regulatory Guidance** .......................................109

   Regulations: Enterprises ....................................109

   Regulations: Federal Home Loan Banks.............109

   Regulations: Enterprises and
Federal Home Loan Banks ...............................111

   Regulations: Agency Operations .........................112

   Policy Guidance: Regulated Entities ...................112

   Policy Guidance and Regulatory Interpretations:
Federal Home Loan Banks............................112

**FHFA Research and Publications** .........................115

   Reports to Congress ...............................115

   House Price Index and Related Research ...........116

   Other Research Products .....................................118

**FHFA Operations and Performance**........................119

   Performance and Program Assessment...............119

   Financial Operations .............................................121

**Historical Data Tables** .............................123

FHFA 1206

## Figures

Figure 1 ● Monthly Unemployment Rates (seasonally adjusted) ......................................................1

Figure 2 ● Spread Between Three-Month LIBOR and Treasury Bill ................................................2

Figure 3 ● Treasury Yield Curve in 2009 ......................2

Figure 4 ● Mortgage Commitment Rates ......................3

Figure 5 ● Home Sales ....................................................4

Figure 6 ● FHFA House Price Index History for the United States ........................................................4

Figure 7 ● Four-Quarter Price Change in Purchase-Only Index by Census Division ...................5

Figure 8 ● Serious Delinquency Rates, 1998 – 2009....7

Figure 9 ● U.S. Composite Housing Affordability Index, 2000 – 2009 ..............................8

Figure 10 ● Single-Family Mortgage Originations........9

Figure 11 ● Single-Family Mortgage Originations by Market Segment ........................................................10

Figure 12 ● ARM Share of Conventional Nonjumbo Single-Family Loan Applications and Commitment Rates on 30-Year Fixed-Rate Mortgages ......................11

Figure 13 ● Loan-to-Value Ratios of Conventional Single-Family Mortgages and Percentage of Originations with LTV > 90% ......................................11

Figure 14 ● Enterprise Growth in Business Volume ..12

Figure 15 ● Enterprise MBS Issuance and Federal Reserve Net Purchases (billions)....................12

Figure 16 ● FHLBank Advances Outstanding ...........13

Figure 17 ● Fannie Mae Annual Net Income.............21

Figure 18 ● Fannie Mae Credit Loss Reserve .............22

Figure 19 ● Fannie Mae Earnings Detail ...................22

Figure 20 ● Fannie Mae Credit-Related Expenses and Losses ......................................................23

Figure 21 ● Fannie Mae Revenue ...............................23

Figure 22 ● Fannie Mae Net Interest Yield...................24

Figure 23 ● Fannie Mae Mark-to-Market Value Gains (Losses) ..............................................................24

Figure 24 ● Fannie Mae Quarterly Other-than-Temporary Impairment on Private-Label MBS .........30

Figure 25 ● Freddie Mac Annual Net Income ...........45

Figure 26 ● Freddie Mac Credit Loss Reserve.............45

Figure 27 ● Freddie Mac Earnings Detail...................46

Figure 28 ● Freddie Mac Credit-Related Expenses and Losses ......................................................46

Figure 29 ● Freddie Mac Revenue...............................47

Figure 30 ● Freddie Mac Net Interest Yield ...............47

Figure 31 ● Freddie Mac Mark-to-Market Value Gains (Losses) ..............................................................48

Figure 32 ● Freddie Mac Quarterly Other-than-Temporary Impairment on Private-Label MBS ........................................................53

Figure 33 ● Portfolio Composition of the Federal Home Loan Banks ..........................................62

Figure 34 ● Summary of Financial Data of the Federal Home Loan Banks ..........................................63

Figure 35 ● Summary of Ratings of FHLBank Private-Label MBS (Carrying Value)..........................64

Figure 36 ● FHLBank Values of Private-Label MBS ........................................................67

Figure 37 ● FHLBanks with Duration of Equity > 3.5 ...............................................................68

Figure 38 ● FHLBanks with 0.35 < Duration of Equity < 1.6 ...............................................................68

Figure 39 ● FHLBanks with Duration of Equity < 0.35...............................................................68

Figure 40 ● FHLBank Director Compensation in 2009 ................................................93

Figure 41 ● Illustration of Effects Before and After Impairment Guidance Changes.................96

Figure 42 ● Enterprises' Housing Goals and Performance for 2008 – 2009 ...........................105

Figure 43 ● AHP Aggregate Statutory Contributions by Year, 1990 – 2010 ........................107

# Year in Review

## Resumption of Economic Growth

The nation began to emerge in 2009 from one of the deepest economic recessions in decades. The economy continued to shrink during the first half of the year, but expanded in the second half. Economic output, as measured by real gross domestic product (GDP), increased at an annual rate of 2.2 percent in the third quarter and 5.9 percent in the fourth, the fastest pace of quarterly expansion in more than six years. That growth was boosted by a substantial slowdown in the rate at which businesses liquidated inventories, higher nonresidential fixed investment, and increased exports.

Improvements in the housing sector also helped to propel the economy forward. Specifically, real residential fixed investment, which had had a negative impact on GDP for 14 consecutive quarters prior to third quarter of 2009, had a positive effect on GDP in the second half of the year, driven in part by an increase in home sales. Low borrowing costs and the federal tax credit for first-time homebuyers contributed to the increase. GDP gains in the second half of the year slightly exceeded declines in the first half of the year. Real GDP for the full year contracted by 2.4 percent from 2008. It was the nation's worst year-over-

year economic performance since 1946. Consumer price inflation, as measured by the Consumer Price Index, accelerated during 2009 but remained moderate at 2.7 percent.

Despite the resurgence in economic activity in the United States in the second half of the year, labor market conditions remained stressed throughout 2009. The nation lost more than 4.7 million jobs during the year. Job losses occurred in most sectors of the economy—transportation, leisure/hospitality, finance/insurance, and, of course, construction. The unemployment rate was about 5 percent at the start of the recession in December 2007 and rose generally thereafter, peaking at 10.1 percent in October 2009, its highest level in more than two decades. The unemployment rate was 10 percent at the end of the year, up from 7.4 percent one year earlier. (See Figure 1.)

The depth of the recession sharply lowered federal tax receipts and elevated federal spending for fiscal year 2009. In addition, various new federal policies were implemented in response to the recession, including fiscal stimulus legislation enacted in February; aid for the financial, housing, and automotive sectors; and the expansion and extension of unemployment insurance benefits. As a result of those changes, the federal budget deficit for fiscal year 2009 doubled to over $1.4 trillion.

**Figure 1 • Monthly Unemployment Rates (seasonally adjusted)**



Source: Bureau of Labor Statistics

**Figure 2 • Spread Between Three-Month LIBOR and Treasury Bill**

Sources: Bloomberg Financial LP and Federal Reserve Board

Financial markets continued to be stressed during the first half of 2009 but improved later, along with broader economic measures. Major equity market indexes, which had fallen precipitously in late 2008, continued to decline in the first quarter of 2009 but began to recover in the second half and ended the year well above their year-end 2008 levels. Credit market conditions improved as well. The spread between the three-month London Interbank Offered Rate (LIBOR) and the three-month Treasury bill rate (the TED spread, a measure of interbank liquidity and credit risk) narrowed below precrisis levels. (See Figure 2.)

The Federal Reserve maintained the federal funds target rate in the range of zero to 25 basis points, established in December 2008. The one-year Constant Maturity Treasury yield remained below 1 percent throughout the year and averaged 0.47 percent for the year. Long-term interest rates, however, showed far more movement, responding to a number of factors, including the rising federal budget deficit and diminished fears of continuing recession. After falling to a low of 2.08 percent in 2008, the yield on the 10-year Constant Maturity Treasury rose in the first half of 2009 and ended the year at 3.85 percent, more than 150 basis points higher than at the end of

2008. (See Figure 3.) Because long-term interest rates rose more than short-term rates, the Treasury yield curve steepened. The gap between the yields on the 2- and 10-year Constant Maturity Treasury widened late in the year to more than 280 basis points, the highest on record.

Mortgage interest rates, which generally follow the trend of long-term Treasury rates, reached the lowest levels in decades during 2009. Massive Federal Reserve and Treasury purchases of mortgage-backed securities (MBS) under programs

**Figure 3 • Treasury Yield Curve in 2009**



Source: Federal Reserve Board

YEAR IN REVIEW

**Figure 4 • Mortgage Commitment Rates**



Source: Freddie Mac

announced in 2008 pushed the prices of MBS up, lowered yields, and kept rates down in the primary mortgage market. According to Freddie Mac's Primary Mortgage Market Survey®, the average commitment rate on 30-year fixed-rate mortgages generally continued the decline that started in the second half of 2008. Although the rate rose to 5.59 percent in June, it declined thereafter and averaged 5.04 percent for the year, almost a full percentage point below the average for 2008. The average commitment rate on one-year Treasury-indexed adjustable-rate mortgages (ARMs) averaged 4.7 percent for the year, 47 basis points lower than the year before. (See Figure 4.)

## Stronger Housing and Mortgage Markets

After a disastrous 2008, U.S. housing market activity began to stabilize in 2009. Single-family housing starts continued to decline, but they fell at a slower pace than in 2008. In 2009, 457,000 single-family dwellings were started, the lowest level on record. Sales of new homes dropped for

the fourth consecutive year, falling by 23 percent to the lowest annual sales volume on record. However, after declining for three consecutive years, total home sales reversed course and rose slightly, driven by an increase in sales of existing homes—the largest segment of the market—which rose 5 percent. (See Figure 5.)

The inventory of new and existing homes for sale declined in 2009 to 3.5 million units, or about 7.2 months' supply, down from 9.5 months' supply at the end of 2008. An $8,000 federal tax credit for first-time homebuyers contributed to increased sales in the housing market.

House prices declined further in 2009, but at a more modest pace than in the prior year. As measured in FHFA's national seasonally adjusted purchase-only house price index (HPI), which is estimated using sales price information from mortgages acquired by Fannie Mae and Freddie Mac (the Enterprises), U.S. prices fell 1.5 percent between the fourth quarters of 2008 and 2009. (See Figure 6.) In the prior four quarters, by contrast, the decline was 8.3 percent.

**Figure 5 • Home Sales**



Sources: National Association of Realtors and U.S. Census Bureau

**Figure 6 • FHFA House Price Index History for the United States**



Source: Federal Housing Finance Agency

FHFA 1211

Other commonly-cited metrics of house price trends also showed deceleration in the rate of decline. For example, the S&P/Case-Shiller quarterly U.S. index showed a 2.5 percent drop between the fourth quarters of 2008 and 2009, much smaller than the 18.3 percent decline in the prior four quarters. LoanPerformance's monthly HPI calculated a 5.3 percent decline between November of 2008 and 2009, as compared to 16.6 percent for the prior 12 months.

Significant regional disparities in the rate of price decline were evident in 2009. The Mountain Census Division, which includes Arizona, Nevada and the Rocky Mountain States, suffered by far the largest decline. (See Figure 7.) Prices fell 7.4

percent for the Census division as a whole, with Nevada (17.0 percent) and Arizona (13.0 percent) posting the largest drops between the fourth quarters of 2008 and 2009. The South Atlantic Census Division had the second largest price decline, primarily driven by conditions in Florida, where prices fell more than 8 percent. By contrast, most other southern states showed essentially flat prices. Some even saw prices increase—prices were up 2.5 percent in Virginia and 0.8 percent in South Carolina.

With low rates of unemployment relative to other areas of the country, the West South Central Division had the strongest regional housing market. Prices grew 1 percent in that division over the

**Figure 7 • Four-Quarter Price Change in Purchase-Only Index by Census Division Fourth Quarter 2008 through Fourth Quarter 2009**



Source: Federal Housing Finance Agency

year, led by Oklahoma's 3.8 percent increase. Those gains, though large relative to other regions, were still modest in absolute terms. As prices of other goods and services grew more rapidly during the year, real (inflation-adjusted) prices actually fell in the division as a whole.

As in 2008, many of the states that had seen the greatest house price run-ups during the housing boom were among those experiencing the greatest declines in 2009. Nevada, Arizona, Florida, Utah, and Idaho were among the fastest-appreciating areas in the middle part of the decade, but were among the 10 states with the largest price drops. Also consistent with 2008, many of the states with stronger markets were relatively rural—prices held up relatively well from the northern plains states through Texas.

Declining prices, relatively high unemployment, and significant negative equity in many areas combined to drive up single-family mortgage delinquencies across loan types and geographic areas in 2009. For single-family loans, the rate of serious delinquency—the number of active loans 90 days or more past due or in foreclosure—increased by more than 50 percent during the year. According to the Mortgage Bankers Association's National Delinquency Survey, the serious delinquency rate grew from 6.3 percent in the fourth quarter of 2008 to almost 9.7 percent in the fourth quarter of 2009. (See Figure 8.) The share of seriously delinquent subprime loans rose to more than 30 percent in the fourth quarter, up from 23.1 percent the year before. Since many subprime loans had defaulted before 2009 (and were no longer in the population of active loans), the growing rate of serious delinquencies was striking.

The rising rate of serious mortgage delinquency was geographically widespread. Every state in the country, including a state like Montana that had relatively low delinquency rates going into 2009, experienced increases in serious delinquencies. California, Arizona, Nevada, and Florida had the highest serious delinquency rates, as in 2008. During the fourth quarter of 2009, their rates ranged from 12.5 percent to 20.4 percent for all loans.

The serious delinquency rate for single-family mortgages held or securitized by Fannie Mae and Freddie Mac remained well below the rates for subprime and all loans reported by the Mortgage Bankers Association, just as in 2008. Nevertheless, serious delinquencies for Enterprise mortgages did grow significantly in 2009. The serious delinquency rate for Fannie Mae and Freddie Mac loans more than doubled during the year, exceeding the proportionate increases reported by the Mortgage Bankers Association. Between December 2008 and December 2009, the seriously delinquency rate increased from 2.4 percent to 5.4 percent for Fannie Mae mortgages and from 1.7 percent to 3.9 percent for Freddie Mac loans. (See Figure 8.)

One of the more noteworthy aspects of mortgage delinquencies during 2009 was the extraordinarily low rate at which delinquent loans "cured" (which means borrowers became current on their mortgages after being delinquent). Cure rates plummeted relative to rates in the earlier part of the decade. In August 2009, Fitch Ratings reported the overall cure rate for prime loans was well below 10 percent. According to that firm's data, cure rates from 2000 to 2006 were roughly 45 percent. Fitch also noted that cure rates for prime loans, which had previously been much higher than those for subprime and Alt-A loans, were very close to Alt-A and subprime cure rates in 2009.

Although foreclosure moratoria were in effect in some areas and single-family mortgage modification programs expanded during the year, the number of foreclosure filings in 2009 was very high. The foreclosure rate was relatively stable throughout the year, despite the rising serious mortgage delinquency rate. Quarterly foreclosure starts, when measured as a percentage of outstanding loans, varied from 1 percent to 1.5 per-

FHFA 1213

**Figure 8** • Serious Delinquency Rates, 1998–2009



Source: Mortgage Bankers Association

cent, according to the Mortgage Bankers Association. Foreclosure starts grew slightly during the year for all mortgage types except subprime loans. For those mortgages, the rate fell about a quarter percentage point, from approximately 4 percent of active loans to 3.7 percent.

## Government Support

Two new federal programs were initiated in March 2009 to address the problems of single-family mortgage delinquencies and defaults. The programs, the Home Affordable Modification Program (HAMP) and the Home Affordable Refinance Program (HARP), aim to provide relief to homeowners in financial distress and to allow homeowners to refinance. Under HAMP, the relief comes in the form of a modified mortgage with lower payments. HARP provides the ability to refinance an existing mortgage when such a refinancing would not have been feasible under normal underwriting criteria.

HAMP seeks to provide mortgage modifications to homeowners in financial hardship and whose mortgage payments comprised a relatively large share of their gross income. The program, which is restricted to mortgages on owner-occupied homes with unpaid balances of less than $729,750 for one-unit properties, provides incentives for loan servicers to reduce monthly payments to no more than 31 percent of gross monthly income. A well-defined sequence of modification levers (interest rate reductions, loan term extension, and principal forbearance) forms the framework for loan servicers to reduce loan payments to manageable levels. The program starts with a trial period so borrowers with modified mortgages can demonstrate their ability and inclination to pay the lower payment amounts. Mortgages only become permanently modified under HAMP upon completion of the trial period.

HAMP activity increased steadily through the last three quarters of 2009. The total number of trial

FHFA 1214

loan modifications extended under the program was approximately 242,000 at the end of June but grew to more than 1.16 million by the end of the year. Trial periods had been completed and permanent modifications extended to only 110,000 borrowers at year end. In many cases, servicers had not received adequate documentation, and in many others, servicers had not finished processing files.

Unlike HAMP, HARP does not require evidence of current hardship. To participate in HARP, homeowners must be current on their mortgage payments. HARP allows borrowers with little or negative equity to refinance their mortgages at existing mortgage rates, which were relatively low in 2009. The program, which covers borrowers whose mortgages were owned or guaranteed by Fannie Mae or Freddie Mac, was originally restricted to borrowers with current loan-to-value ratios of 105 percent or less. In the summer of 2009, FHFA authorized the Enterprises to expand the program to include mortgages with current loan-to-value ratios up to 125 percent.

HARP activity during the year tracked changes in mortgage rates, with the impact of rates becoming noticeable after a few months' lag. After a slow spring when the program was ramping up, borrowers refinanced more than 85,000 loans under HARP between June and August. HARP volumes fell in September to a little more than 23,000 and in October to nearly 18,000 loans as higher interest rates during the summer months had decreased the relative attractiveness of refinancing.

HARP loan volumes rebounded, however, in the final two months of the year. More than 34,000 loans were originated in December, the highest number of any other month in 2009. The relatively high volume was a product of steadily declining mortgage rates in the last half of 2009. The expansion in HARP eligibility also contributed. In November and December, more than 1,600 HARP loans were originated with current loan-to-value ratios of between 105 and 125 percent.

**Figure 9 • U.S. Composite Housing Affordability Index, 2000–2009**



Source: National Association of Realtors

**Figure 10 • Single-Family Mortgage Originations**



Source: *Inside Mortgage Finance* publications

## Affordability and Originations Increase

As a result of continued house price declines and very low mortgage rates, new homebuyers encountered a much more affordable housing market in 2009. As measured by the National Association of Realtors' composite housing affordability index, which reports the ratio of median household income to the income that would be required to buy a median-price home (where 100 indicates exactly the right amount of income), affordability continued to increase during the year. That index rose from 166.3 in December 2008 to 171.5 one year later. (See Figure 9.)

The higher value of the index mainly reflects a 12.5 percent decline during 2009 in the median price of existing single-family homes and lower mortgage interest rates. Despite greater affordability, the nation's homeownership rate, which peaked at 69.2 percent in the fourth quarter of 2004, declined to 67.2 percent in 2009, slightly below the rate at year-end 2008 and the lowest level since the first quarter of 2000. The rental

vacancy rate was 10.7 percent in the fourth quarter of 2009, up from 10.1 percent one year earlier.

The rising rental vacancy rate suggests the supply of rental housing greatly exceeds the demand. Factors that could be responsible for the rising rental vacancy rate include conversions of condominiums and other owner-occupied housing to rental units and renters doubling up due to rising rental costs or loss of employment. The vacancy rate for homes usually occupied by the owner declined to 2.7 percent from 2.9 percent the year before.

Falling house prices, declining mortgage interest rates, more distressed home sales, and the federal tax credit for new homebuyers resulted in a recovery in mortgage originations in 2009. According to *Inside Mortgage Finance*, after falling for three consecutive years, originations of single-family mortgages rose 21 percent in 2009 to $1.815 trillion. (See Figure 10.) But two market sectors that had been sizable earlier in the decade—subprime and Alt-A loans financed with private-label securitizations—showed even less activity in 2009 than in the previous year. (See Figure 11.)

FHFA 1216

**Figure 11 • Single-Family Mortgage Originations by Market Segment**



Source: *Inside Mortgage Finance* publications

Loans insured by the Federal Housing Administration increased to 21 percent of single-family mortgages originated in 2009, up from 17 percent in 2008, spurred by the continuation of more favorable lending programs. The Department of Veterans Affairs' share of originations also increased, rising to 4 percent in 2009. Both types of mortgages backed by the federal government accounted for a combined 25 percent of single-family originations in 2009, up from just 4 percent two years earlier. Hurt by capital constraints, private mortgage insurers saw their share of mortgage originations fall sharply in 2009, to 4.5 percent compared to 12.9 percent the year before.

Fixed-rate lending continued to dominate the single-family mortgage market in 2009. According to Freddie Mac's Primary Mortgage Market Survey®, applications for single-family ARMs remained at historic lows. The ARM share of applications for conventional nonjumbo loans dipped to 2 percent in the first quarter and increased gradually to

7 percent in the third. (See Figure 12.) According to Freddie Mac, consumers seeking ARMs in 2009 showed a preference for hybrid ARM products over the traditional one-year ARM indexed to the one-year Treasury yield. The 5/1 ARM, in particular, received the most interest. That product has a fixed rate for five years and adjusts annually thereafter.

Refinancings accounted for more than two-thirds of single-family mortgages originated in 2009. As in 2008, most borrowers who refinanced ARMs chose to convert those loans into fixed-rate mortgages, taking advantage of narrow spreads between fixed and adjustable mortgage rates. The credit quality of conventional fixed-rate originations continued to improve in 2009, with lower loan-to-value ratios resulting from more stringent underwriting standards. According to FHFA's Monthly Interest Rate Survey, the average loan-to-value ratio of single-family conventional, purchase-money mortgages fell to the lowest level since 2003 at 74.5 percent in 2009, down from

**Figure 12 •** ARM Share of Conventional Nonjumbo Single-Family Loan Applications and Commitment Rates on 30-Year Fixed-Rate Mortgages



Source: Freddie Mac's Primary Mortgage Market Survey®

**Figure 13 •** Loan-to-Value Ratios of Conventional Single-Family Mortgages and Percentage of Originations with LTV>90%



Source: FHFA Monthly Interest Rate Survey

FHFA 1218

76.7 percent in 2008 and 79.3 percent in 2007. The proportion of loans with loan-to-value ratios greater than 90 percent continued to decline, dropping sharply from the 2008 level of 18 percent to 8 percent in 2009. (See Figure 13.)

## Business Volumes

Fannie Mae and Freddie Mac continued to provide substantial liquidity to the secondary mortgage market in 2009. Enterprise new business acquisitions (defined to include cash purchases from lenders, swaps of whole loans for MBS, and purchases of MBS) represented more than 76 percent of total single-family originations, up from 73 percent in 2008. The Enterprises' high market share reflected the trend of a high level of conventional conforming loans in the primary market in 2009.



**Figure 14 • Enterprise Growth in Business Volume**

Sources: Fannie Mae and Freddie Mac



**Figure 15 • Enterprise MBS Issuance and Federal Reserve Net Purchases (billions)**

Sources: Fannie Mae, Freddie Mac, and Federal Reserve

FHFA 1219

YEAR IN REVIEW

**Figure 16 • FHLBank Advances Outstanding**



Source: Office of Finance, Federal Home Loan Bank System

Fannie Mae and Freddie Mac each reduced its mortgage asset holdings in 2009, primarily as a result of increasing liquidations. The composition of both Enterprises' mortgage asset investments also changed in 2009. At year end, Fannie Mae showed a slight decrease in its holdings of single-family loans, private-label MBS, and MBS it issued. Freddie Mac showed a noticeable decline in its holdings of private-label MBS, which was offset by a higher volume of whole loans. At year end, MBS guaranteed by Freddie Mac had declined to less than half of its mortgage asset holdings.

As a result of the increase in single-family mortgage originations in 2009, issuances of MBS guaranteed by each Enterprise increased sharply. Liquidations of outstanding MBS increased as well. Fannie Mae MBS issuances increased almost 50 percent. For the year, Fannie Mae showed an increase in its net MBS outstanding of 6.3 per-

cent, but that was less than the 8 percent increase the year before. (See Figure 14.) Freddie Mac increased its MBS issuances by about a third. For the year, Freddie Mac showed a 6.6 percent increase in its net MBS outstanding, up from growth of 1.5 percent in 2008.

The federal government was the dominant investor in Enterprise MBS in 2009. In January, the Federal Reserve began its $1.25 trillion program to purchase MBS guaranteed by the Enterprises and Ginnie Mae. Through January 6, 2010, the Federal Reserve had purchased $1.03 trillion net of Enterprise MBS. (See Figure 15.) Those purchases, which exceeded Enterprise issuances during several months, were concentrated in MBS backed by 30-year mortgages and included securities with a range of coupon rates. The MBS purchases by the Federal Reserve and the Treasury in 2009 occurred as foreign investment in Enterprise MBS declined. At the end of 2009,

FHFA 1220

the federal government was one of the largest holders of MBS guaranteed by the Enterprises and Ginnie Mae.

As a result of Fannie Mae's and Freddie Mac's MBS issuance activity, each Enterprise's book of business—mortgage assets held for investment plus MBS held by others—grew in 2009, though at a slower pace than in 2008. Fannie Mae grew its total book of business by 3.9 percent to $3.2 trillion, as compared with 8.2 percent the previous year. Freddie Mac's total book of business grew 2 percent to $2.3 trillion, as compared with 5 percent in 2008. Despite those slower growth rates, the Enterprises' share of the total mortgage market increased. Fannie Mae and Freddie Mac ended the year holding and guaranteeing the highest level of the nation's outstanding residential mortgage debt ever, approximately 47 percent.

The volume of advances extended by the Federal Home Loan Banks (FHLBanks) was down sharply in 2009. At year end, advances outstanding were down 32 percent to $631 billion, the lowest year-end volume since 2005—two years before the onset of the financial crisis. (See Figure 16.) A number of factors contributed to the decline in the volume of advances outstanding, including repayment of maturing short-term advances, reduced demand due to the economic recession, and FHLBank member institutions' access to cheaper alternative sources of funds, such as deposits.

# Report of the Annual Examination
## of Fannie Mae (Federal National Mortgage Association)

## Examination Authority

This Report of Examination contains the results and conclusions of FHFA's 2009 annual examination of the Federal National Mortgage Association (called Fannie Mae, or the Enterprise) performed under section 1317(a) of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 as amended (12 USC § 4517(a)). FHFA's annual examination program assesses the Enterprise's financial safety and soundness and overall risk management practices. The framework FHFA uses to report examination results and conclusions to the Board of Directors and Congress is known as GSEER, which stands for Governance, Solvency, Earnings, and Enterprise Risk (Enterprise Risk comprises credit, market, and operational risk management).

## 2009 Examination Scope

In 2009, FHFA focused on monitoring rapidly changing market conditions and the economy, as well as the response by management and the Board to these changes, and their effect on the Enterprise's risk profile and condition.

The remaining time was used for examination activities that assessed actions of the Board of Directors; quality of executive management; Enterprise-wide risk management and audit functions; accounting estimates and their effect on disclosures, earnings, and loss reserves; key model performance; loss mitigation activities, and counterparty exposure; liquidity, interest rate risk profiles and risk management practices; the internal control environment; remediating emerging operational problems relating to financial reporting and mortgage securitization; and risks in information technology, data quality, and business continuity.

## Rating

Fannie Mae's composite rating is **critical concerns**. Enterprises with critical safety and soundness concerns exhibit severe financial, nonfinancial, operational, or compliance weaknesses. An Enterprise with this rating requires more than normal supervision to ensure deficiencies are addressed. Definitions for all composite ratings can be found in FHFA's *DER Supervision Handbook*.

FHFA first assigned this rating at mid-year 2008, which was a contributing factor in the appointment of FHFA as conservator. The appointment of FHFA as conservator, Treasury financial support, Federal Reserve actions, and new management at the Enterprise have stabilized the Enterprise's condition. While the critical concerns rating at year-end 2009 reflects the fact that the Enterprise is not capable of currently operating without government assistance, FHFA also acknowledges the strides the Board, management, and staff of Fannie Mae have made under conservatorship to help stabilize the Enterprise and maintain its support of the secondary mortgage market.

## Examination Conclusions

Fannie Mae's composite critical concerns rating arises mainly from continuing credit losses experienced throughout 2009, as well as forecasted losses yet to be realized. FHFA expects those losses to be the result of increasing delinquencies on mortgages owned or guaranteed by the Enterprise and worsening loss severities due to depressed housing prices nationwide, but particularly in certain locales, such as California, Florida, Arizona, and Nevada. In addition, key counterparties weakened, particularly mortgage insurers (to which Fannie Mae is heavily exposed). The rate of serious delinquencies in the multifamily portfolio more than doubled in 2009.

FHFA 1222

It is not only credit risk that raises critical concerns. There is a high level of operational risk at Fannie Mae, as evidenced by operational incidents in mortgage securitization in 2009 and also in the area of financial reporting controls, where an accumulation of errors in estimates of credit losses resulted in a material weakness.

*It is not only credit risk that raises critical concerns. There is a high level of operational risk at Fannie Mae…*

Operational challenges were intensified by the Administration's Making Home Affordable (MHA) modification and refinance programs, other loss mitigation initiatives, and increasing volumes of real estate owned (REO). High turnover of executive and senior management in critical areas of loss mitigation and asset disposition is a concern, and the adequacy and level of staffing at the National Servicing Organization need to be strengthened.

Market risk is also a critical concern. The risks of funding a $773 billion mortgage portfolio with debt and derivatives are inherently large in normal times. But a stressed credit environment, along with government policies that significantly affect mortgage prices, has played havoc with mortgage prepayment models and rendered standard interest rate risk metrics unreliable without significant on-top adjustments from management, making more important the process of establishing appropriate limits for market risk. (When model results produce an unacceptable level of uncertainty, management often uses actual, observable results to alter model results "on top" to better reflect actual market activities.)

Indeed, several management interest rate risk limits were breached during 2009.

Liquidity was strengthened with purchases of Treasury bills to cover half of the Enterprise's 30-day net cash needs. Liquidity risk can be further reduced by continuing to implement practices recommended by an expert liquidity consultant recently retained by management.

Fannie Mae remains dependent on support from the U.S. Treasury. Financial results in 2009 worsened relative to the weak performance reported in 2008; net losses deepened to $72 billion from $58.7 billion in 2008. As a result, Fannie Mae's accumulated deficit (negative retained earnings) amounted to $90.2 billion at year-end 2009.

The Board of Directors and management achieved notable successes during 2009 but continue to face significant governance challenges. The Board is actively addressing the Enterprise's many problems and has adopted appropriate governance practices. Continuing changes in management and organizational structures pose challenges to forming a cohesive management team and adversely affect succession planning, which could expose the company to risk.

Model risk is the risk that model output does not match actual performance, and at Fannie Mae, this risk remains high. During 2009, management made substantial progress updating and improving key credit models, but challenges remain. House price forecasting models remain a concern and prepayment modeling continues to be challenging in this environment.

## Governance

Governance is rated **significant concerns**. The governance-related issues the Board and management are working to resolve are complex and require heightened supervision to monitor and evaluate.

## Board Supervision

In 2009, the Board of Directors achieved notable successes but continues to face significant challenges. The Board is actively addressing the Enterprise's many problems and has adopted appropriate governance practices. The Board and its committees are performing their duties and are working collaboratively with FHFA as conservator.

Abrupt change at the chief executive officer and executive levels is disruptive for any company, and such changes have been disruptive for the Enterprise. Fannie Mae has had a total of three chief executive officers, three chief financial officers, three chief risk officers, two general counsels and an interim general counsel, two executive vice presidents leading its single-family business, two executive vice presidents leading its capital markets group, and two chief technology officers, as well as departures by various other key members of senior management since the third quarter of 2008.

The chief executive officer resigned in April 2009 to become Assistant Secretary of the Treasury for Financial Stability, fewer than eight months after being appointed to the Enterprise by FHFA as conservator. The chief risk officer, general counsel, and the chief technology officer were new to the Enterprise in 2009, joining the company under the previous chief executive officer.

The Board has met its responsibility for hiring senior executive officers, subject to the conservator's reservations of authority under the November 2008 delegations of authority. But substantial changes at the senior executive level warrant close supervisory and Board attention.

The Board and management took steps to address the 2008 examination findings about shortcomings in reporting to the Board. Corrective actions included amendments to Board-level operating policies and procedures, improved quality and completeness in Board materials, and new dashboard-style reports.

Management, however, has not adopted corporate policies on Board reporting. Risk reporting continues to lack focus and does not concisely convey information about business unit risk. Several officers, notably the chief risk officer, are working closely with the Board and individual directors to enhance and refine risk reporting.

> *Abrupt change at the chief executive officer and executive levels is disruptive for any company, and such changes have been disruptive for the Enterprise.*

## Management Supervision

Enterprise management experienced significant change during the examination year. The chief executive officer and 10 of the 13 members of the senior executive team are either new to the company or in a new position. Moreover, in addition to uncertainties associated with the conservatorship, the Enterprise is in the midst of significant organizational change taking place in several divisions. This level of change poses a considerable challenge to the senior executive team and will receive close supervisory attention.

## Succession Planning/Human Capital Needs

In 2008, FHFA raised concerns about succession planning and strengthening management of the Enterprise. During 2009, management improved succession planning. Human resources staff actively identifies and develops internal personnel to fill key positions, which is increasingly

important in the wake of last year's management transition and staff attrition.

Executive and senior management are responsible for addressing the human capital needs of the respective divisions. Management has taken steps to address risks associated with losing people serving in important positions, known as "key person risk." But the Enterprise remains vulnerable to the loss of key employees serving in critical positions because of ongoing organizational changes, uncertainties over compensation-related matters, and the future status of the Enterprise.

## Reporting Practices

Executive and senior management continue to produce dense, highly detailed reports that may not facilitate efficient decision-making. This practice is pervasive among the business divisions, although certain divisions have enhanced reporting practices. FHFA instructed Enterprise management to evaluate and improve existing reporting practices.

Consistent with FHFA regulations and examination guidance and the Board's operating policies, management reports should facilitate decision-making by focusing attention on high-priority risks. Without cogent summaries and recommendations, the details may not serve the needs of directors, executives, and senior officers.

## Mortgage Fraud

Management implemented a framework for mortgage fraud detection and reporting, but it suffered from several weaknesses. FHFA required enhancements to mortgage fraud exposure reporting and revisions to the Enterprise's policies and procedures. Enterprise management has begun but not completed remediating these problems.

## Internal Audit

The previous chief audit executive did not effectively manage the department's resources and did not achieve the stated objectives of the department reorganization. The internal audit department experienced significant upheaval during the course of the year because of major changes in the chief audit executive and senior management personnel, expanded audit scope and staff, several internal investigations, and revised audit methodologies.

FHFA required the chief audit executive to address skills assessments, compliance with the Enterprise's code of conduct, audit committee approvals, and resource certification. The current chief audit executive is now addressing those issues. In addition, the internal audit department completed a revised audit plan approved by the audit committee of the Board and reviewed by FHFA.

## Enterprise-wide Risk Management

The Enterprise risk management division experienced significant change during 2009. The company hired a new chief risk officer during the first half of 2009, and the chief risk officer began restructuring the risk function. The result was significant change in senior management and division personnel, assigned responsibilities, risk identification, and risk management practices.

Change on this scale is disruptive and can expose the company to gaps in risk management resulting from uncertainties among personnel about the scope of their duties and responsibilities. Restructuring and repopulating the division is in the long-term interests of the Enterprise, even though full implementation of the chief risk officer's initiative will take time to complete.

FHFA 1225

A DECADE OF FINANCIAL FRAGILITY EXPERIENCED BY FANNIE MAE

## Accounting and Disclosure

The Enterprise will need to continue to provide a high level of resources and executive support to the accounting and controls area to ensure accurate accounting estimates, comply with financial reporting requirements, and fulfill the information needs of the conservator. The Enterprise had to deal with a combination of intense market forces, major changes to generally accepted accounting principles, and new government policies and programs with unknown financial impacts.

Accounting policy and financial reporting issues of 2009 included:

**Policy coordination and disclosure.** As a result of the conservatorship, FHFA initiated a collaborative process designed to address areas where new accounting policies should be coordinated and made consistent between Fannie Mae and Freddie Mac. FHFA expects that the level of cooperation provided this past year will continue.

The earliest example of this collaborative process was the resolution of whether the Enterprises' financial guarantees would continue to be eligible for a scope exception from the derivative accounting literature. The Enterprise worked with FHFA to address this important issue. Subsequently, the process was used to successfully address various issues that arose in connection with consolidation accounting.

Fannie Mae and Freddie Mac provided comment letters to the Financial Accounting Standards Board (FASB) after getting FHFA input in the context of the conservatorship. These coordinated efforts were important to ensuring appropriate consistent application of accounting policies at both Enterprises. Given the challenges facing the Enterprise and the conservatorship, disclosure risk has increased. Prior to releasing its quarterly and annual filings, Fannie Mae addressed FHFA's comments on its disclosures.

**External audit.** FHFA meets regularly with Deloitte & Touche LLP to address control weaknesses and other significant accounting and auditing issues. Management identified a material weakness in disclosure controls and procedures that was confirmed by Deloitte. As explained in the Form 10-K, through performance of various audit procedures and activities, including meetings with FHFA, Deloitte was able to complete its audit and issue an unqualified opinion on the 2009 financial statements, although the material weakness made necessary an adverse opinion on the company's internal controls over financial reporting.

**Consolidation project.** In 2009, the Enterprise made significant progress in adopting the new consolidation accounting standard issued by FASB. But due to the project's size, time line, and complexity, some risk remained at year end in connection with timely and controlled implementation of the project.

The new accounting standard requires the consolidation of a majority of loans held in Enterprise-guaranteed MBS trusts, which until January 1, 2010, were accounted for on an off-balance sheet basis. It also eliminates the need for recognizing an adjustment to fair value when delinquent loans are removed from a trust. Enterprise management worked effectively with FHFA and Freddie Mac to identify and address significant policy application differences. This included drafting several letters and preparing presentations for Securities and Exchange Commission (SEC) and FASB staff, which simplified the implementation and reduced the risk to the tight implementation time line. FHFA continued to monitor this project to its conclusion with the issuance of financial statements at the end of the first quarter of 2010.

**Credit loss reserves.** Safety and soundness require a high degree of transparency to ensure that drivers of credit losses have been appropriately factored in to reserve computations. Although the current volatile credit environment makes

FHFA 1226

accurate accounting estimates difficult, the Enterprise has made progress towards that goal. During 2009, Fannie Mae implemented a new credit loss reserve model that improves transparency for the major credit loss drivers and assumptions. But loss mitigation data quality and computational issues arose related to loans in trial modification during 2009.

**Fair-value accounting and disclosures for investment securities**. Accounting policy and disclosure risk has been reduced in this area. During 2009, Fannie Mae enhanced its fair-value disclosures in line with the new FASB guidance. FHFA noted opportunities to enhance disclosure and income statement presentation enhancement after reviewing the Enterprise's first efforts to adopt the new other-than-temporary impairment standard. The disclosures have since been improved and the income statement presentation has been appropriately revised. FHFA did not note any other significant issues with the Enterprise's application of the new standard.

The related FASB guidance regarding accounting for other-than-temporary impairment reduced by billions of dollars the Enterprise's reported net loss for 2009 and permitted recapture of a portion of losses previously recorded in other-than-temporary impairment.

**Low-income housing tax credits and deferred tax assets.** During the course of the year, there was uncertainty surrounding the fair value of the Enterprise's investments in low income housing tax credit entities. Fair value of these investments rested on the value of the tax credits to the Enterprise, either on its own tax return or through sale to a potential buyer.

Fannie Mae is not expected to have any taxable income in the foreseeable future. So, on February 18, 2010, after extensive discussions with the Treasury Department, FHFA informed Fannie Mae that it may not sell or transfer the investments. The Enterprise has since written off the value of the investments.

The Enterprise also had a deferred tax asset on its balance sheet at year end related to unrealized losses recorded for certain available-for-sale securities. FHFA's review of the process for accounting for the deferred tax asset indicated the carrying amount was appropriate based on management's assertions.

## Solvency

FHFA previously determined that capital classifications would be suspended during conservatorship. Consequently, throughout 2009, FHFA did not issue a capital classification for Fannie Mae. During conservatorship, Fannie Mae's positive net worth capital position (in terms of generally accepted accounting principles, or GAAP) has been supported by the United States Treasury under the Senior Preferred Stock Purchase Agreement.

The preferred stock agreement was amended twice during 2009. In May, the first amendment increased (1) the cap on the Treasury draw from $100 billion to $200 billion; (2) the mortgage asset limit by $50 billion to $900 billion; and (3) the maximum indebtedness from 110 percent of indebtedness at June 30, 2008, to 120 percent of the total mortgage asset limit. This amendment also included other technical changes to the initial agreement.

In December 2009, the second amendment allowed the cap to increase to cover the greater of $200 billion or $200 billion plus cumulative net worth deficits experienced during 2010, 2011, and 2012, less any net worth surplus remaining as of December 31, 2012. The amendment also required the annual 10 percent reductions in the mortgage asset limit be calculated based on that limit, rather than the actual mortgage asset balance on December 31 of the preceding year (resulting in a portfolio limit of $810 billion at December 31, 2010). Additionally, the second amendment postponed until 2011 the implementation of a quarterly commitment fee to be paid by Fannie Mae to Treasury and included other technical changes.

During 2009, FHFA worked with Fannie Mae's capital team to reestablish the practice of completing quarterly capital plans, which had been suspended for the first two quarters of the conservatorship. Fannie Mae has submitted quarterly capital plans since the second quarter of 2009.

The plans have included Fannie Mae's discussions of its continuing development of an economic capital model and issues related to the process of emerging from conservatorship. These are ongoing efforts, and FHFA has noted improvements in the plans each quarter.

FHFA has requested that management continue to incorporate enhancements and improvements to the capital plan. FHFA staff met several times with Fannie Mae's staff during 2009 to discuss and review modeling methodologies under consideration. These regular meetings will continue in 2010 as FHFA develops a new stress test model and incorporates lessons learned from all parties in the development process.

Under the terms of the Treasury agreement, total draws through December 31, 2009, on the Treasury's Senior Preferred commitment totaled $59.9 billion. Fannie Mae requested a $15.3 billion draw from the Treasury for the period ending December 31, 2009, increasing its total draw to $75.2 billion.

Significant credit-related expenses were the primary contributing factors for the need to draw on the Treasury facility. In addition, in 2009, Fannie Mae's draws were increased by the decision to write off the low income housing tax credit investments on the financial statements. Draws in 2010 will be reduced somewhat because of the initial transition adjustment from adopting the consolidation accounting standard on January 1, 2010.

## Earnings

Fannie Mae's financial performance, absent financial support from the U.S. Treasury, is rated **critical concerns**. Net losses deepened in 2009 to $72 billion from $58.7 billion in 2008, illustrating some of the challenges the Enterprise faces in returning to financial health. Fannie Mae's accumulated deficit (negative retained earnings) increased to $90.2 billion at year-end 2009. (See Figure 17.)

Continued widespread economic difficulties contributed to significant increases in mortgage delinquencies. The steep increase in delinquencies raised expectations of future credit losses, driving substantial increases in loan loss reserves.

Management increased the loan loss reserve by $40 billion during the year to $65 billion at the end of 2009, increasing credit-related expenses from already elevated levels in 2008. (See Figure 18.)

Substantially higher credit-related expenses and losses more than offset strong revenue growth, lower mark-to-market losses, and lower tax expenses. (See Figure 19.)

**Figure 17 • Fannie Mae Annual Net Income**



Source: Fannie Mae Form 10-K

**Figure 18 • Fannie Mae Credit Loss Reserve**



Source: Fannie Mae Form 10-K

**Figure 19 • Fannie Mae Earnings Detail**



Sources: Federal Housing Finance Agency and Fannie Mae Form 10-K

REPORT OF FEDERAL HOUSING ENTERPRISE OVERSIGHT · FANNIE MAE

**Figure 20** • **Fannie Mae Credit-Related Expenses and Losses**



Source: Fannie Mae Form 10-K

## Credit-Related Expenses and Losses

Credit-related expenses and losses continued to dominate financial performance, overshadowing positive changes in other components of earnings. The provision for credit losses doubled in 2009 to $52.1 billion; this was the primary driver of increases in credit-related expenses. In addition, modifying mortgages increased accounting losses on loans purchased from MBS trusts by $18 billion. (See Figure 20.)

## Revenue

Earnings benefited from growth in net interest income on portfolio investments, which offset a slight decrease in guarantee fee income. Net interest income increased by $5.7 billion, or 65 percent, over the prior year, primarily because the cost of debt funding was lower in 2009. (See Figure 21.)

Lower benchmark Treasury rates and lower debt

**Figure 21** • **Fannie Mae Revenue**



Source: Fannie Mae Form 10-K

FHFA 1230

spreads to Treasury, attributed to the Federal Reserve's purchases of Enterprise debt, decreased the cost of debt funding.

In the credit guarantee business, Fannie Mae's efforts to improve the credit quality of the guarantee book resulted in lower guarantee income as higher quality loans with lower guarantee fees accounted for a greater proportion of new business. (See Figure 22.) Lower guarantee income was also largely driven by lower amortization of deferred income in 2009, as a sharp decline in interest rates in the fourth quarter of 2008 accelerated recognition of deferred amounts into income.

The shift in the mix of new business offset growth in the volume of credit guarantees. Fannie Mae sustained a high market share of MBS issuance because issuers of private-label MBS did not return to the secondary mortgage market during the year.

## Mark-to-Market Gains/Losses

A decline in mark-to-market losses mitigated net losses in 2009. (See Figure 23.) Derivative losses were $9.1 billion lower in 2009 at $6.4 billion as interest rates remained relatively stable in 2009. A

**Figure 22 • Fannie Mae Net Interest Yield**



Source: Fannie Mae Form 10-K

steep drop in interest rates during the second half of 2008 caused substantial mark-to-market derivatives losses in the prior year.

The Federal Reserve's purchases of MBS during 2009 tightened credit spreads, resulting in higher prices for these securities. Prices of commercial MBS also improved during the year. Consequently, Fannie Mae reported trading gains of $3.7 billion

**Figure 23 • Fannie Mae Mark-to-Market Value Gains (Losses)**



Source: Fannie Mae Form 10-K

FHFA 1231

in 2009, compared to trading losses of $7 billion reported for 2008, when commercial MBS prices plummeted.

## Security Impairments

Security impairments increased substantially in 2009 to $9.9 billion from $7 billion in the prior year; however, earnings in 2009 benefited from a change in impairment accounting policies effective April 1, 2009. Starting with the second quarter of 2009, only the credit portion of other-than-temporary impairments was recognized in earnings.

## Other Expenses

In the fourth quarter of 2009, Fannie Mae wrote off the carrying value of its low income housing tax credit partnership investments, recording an impairment charge of $5 billion due to the inability to sell or transfer these investments.

## Provision for Federal Income Taxes

Financial results in 2009 were helped by a tax benefit of $1 billion in 2009, a result of the Enterprise's ability to carry back 2009 net operating losses to prior years. By contrast, in 2008, Fannie Mae reported a provision for federal income taxes of $13.7 billion after establishing a partial valuation allowance against deferred tax assets in the third quarter of 2008.

## Summary

Fannie Mae's financial flexibility remains limited without support from the Treasury Department. The need to build loan loss reserves, charges to purchase delinquent loans out of trusts, and impairments of private-label MBS were the primary drivers of Fannie Mae's increase in accumulated deficit (negative retained earnings) of $63 billion in 2009.

## Outlook

2010 is likely to be another difficult year for financial results. In the short-term earnings are likely to be influenced by a material decline in revenue and significant uncertainty about credit-related expenses.

Changes in accounting for securitizations and special purpose entities (consolidation accounting requirements) are expected to reduce revenue in 2010 as Fannie Mae stops accruing interest income on loans that are 60-plus days delinquent. Credit losses are likely to remain substantial as delinquent loans transition to some form of resolution, in some instances triggering charge-offs. Consequently, financial results will be greatly affected by the by success or failure of loss mitigation initiatives.

# Credit Risk Management

Credit risk remains rated **critical concerns** as economic conditions continue to affect credit performance in the single- and multifamily business units and the number of weakened and failed counterparties grows. Levels of seriously delinquent single-family mortgages, REO properties, and credit losses rapidly increased during 2009 as a result of historic house price declines and rising unemployment.

Weakened multifamily market fundamentals, including continued unemployment, rising vacancy rates and increased rent concessions are pressuring the net operating income of property owners and their ultimate ability to service existing debt. Reduced multifamily property values, reflected in rising capitalization rates, have made refinancing more difficult. Both the single- and multifamily business units have substantially increased loan loss reserves because of expectations of future credit losses.

During 2009, the Enterprise enhanced its risk management function, especially in the areas of business unit reporting, corporate credit policies

and credit delegations of authority. Business unit risk officers (single- and multifamily) reporting to Enterprise risk management appropriately escalate key issues for discussion by the corporate credit risk committee.

Underwriting and eligibility changes that became effective in 2008 and early 2009 have positively affected the quality of new acquisitions. Credit and portfolio management has developed servicing protocols, initiatives and pilots to minimize credit losses. Credit and portfolio management has maintained a greater on-site presence with servicers.

*The governance process to approve and vet new initiatives needs to be enhanced. High turnover of executive and senior management in the critical areas of loss mitigation and asset disposition is troubling.*

Opportunities for further improvement still exist, however. The governance process to approve and vet new initiatives needs to be enhanced. High turnover of executive and senior management in the critical areas of loss mitigation and asset disposition is troubling. Additionally, examination findings indicate that the level of staffing at the National Servicing Organization (NSO) needs to be increased to deal with rising delinquencies.

Multifamily is proactively monitoring at-risk loans that mature in the near term and may face difficulty refinancing. Management is appropriately focused on the level of problem assets. Examination findings indicate that watch list assets are well managed by qualified individuals with significant commercial lending or workout experience, but a need exists for improved infor-

mation technology investments to more effectively support the asset management function. Efforts are underway to identify an appropriate asset management system to allow for better efficiency and reporting on the multifamily book. Risk management took steps to improve its identification of counterparty exposure and implemented measures to mitigate that exposure, including requests for collateral.

## Single-Family Loans

The seriously delinquent rate of single-family loans increased from 2.42 percent to 5.38 percent from the end of 2008 to year-end 2009, an increase of 122 percent. Certain risk segments are driving the increase in seriously delinquent loans, including Alt-A, interest-only, loans made in 2006 and 2007, and loans from California, Florida, Nevada, Arizona, and Michigan.

The current economic environment is also pressuring performance of more traditional mortgages, including loans with lower combined original loan-to-value ratios, higher credit scores, fixed rate amortization and more seasoned loans that were expected to have a lower propensity for default. The 2008 vintage of loans, also showing signs of stress, had a seriously delinquent rate of 3.98 percent at year end. The rapid increase in the seriously delinquent rates is also attributable to Home Affordable trial modifications that have not been converted to permanent modifications. Loans in trial modifications are classified as delinquent until they convert to permanent status, even when the borrower's payments are current.

Single-family credit losses doubled from $6.5 billion at the end of 2008 to $13.4 billion at year-end 2009. Credit losses are concentrated primarily in California, Nevada, Arizona, Florida, and select Midwest states (Illinois, Indiana, Michigan, and Ohio), which accounted for approximately 72 percent of credit losses in 2009. Moreover, the 2005 to 2008 vintage loans accounted for approximately 90 percent of credit losses in 2009.

FHFA 1233

REO inventory increased from 63,538 properties at year-end 2008 to 86,155 properties at the end of 2009, a 36 percent increase. The 2009 increase in REO is substantially less than the 88 percent increase in 2008. The slowed acceleration in REO inventory growth is a result of HAMP efforts, as well as growing aged inventory of seriously delinquent mortgages that have been slow to transition to alternative foreclosure options or other liquidation processes.

Management has significantly increased staffing at the National Underwriting Center to aid in file reviews for compliance with charter requirements and selling and servicing guide requirements. Enforcement of outstanding repurchases by seller-servicers is critical to managing credit losses.

The single-family loan loss reserve increased steadily during 2009, rising from $24.6 billion at year-end 2008 to $62.8 billion at the end of 2009, an increase of 155 percent. In the fourth quarter of 2009, the newly developed Econometric Loss Reserve Model was used to establish the quarterly provision for the loan loss reserves. The model is used to determine the loan loss reserve provision for the retained portfolio, as well as the guarantee loans in MBS. It estimates probability of default at the loan level given several factors, including origination year, mark-to-market loan-to-value, delinquency status, and loan product type. This has minimized the use of on-top model adjustments and enhanced model granularity and transparency. Management worked during 2009 to address outstanding issues related to the 2008 loan loss reserve targeted examination. FHFA continues to evaluate the effectiveness of these remediation efforts.

In 2009, actions to improve performance of new purchases, including the release of the Desktop Underwriter 8.0 system, changes to project standards, underwriting, and eligibility positively affected the quality of new acquisitions. In March 2009, the single-family unit rolled out a new selling guide that incorporated announcements

through March 2009 and is organized and written in a more user-friendly way. The unit also has initiated the "Loan Quality Initiative," a plan focused on enhancing data validation capabilities to strengthen loan quality at delivery.

The Enterprise has undertaken significant efforts to minimize credit losses and support MHA and other administration programs. Saving borrowers from default and keeping them in their houses when possible is an effective means of reducing credit losses. In order to do this, the Enterprise is instilling greater discipline among servicers by increasing servicer management and engagement, establishing "high touch" servicing protocols for working with their seriously delinquent borrowers, and increasing their reviews of delinquent loans to help identify loans that fall short of their underwriting and eligibility requirements.

During 2009, the Enterprise devoted a significant amount of resources to HAMP in support of servicer execution and as program administration agent for Treasury. High turnover of executive and senior management in critical areas of loss mitigation and asset disposition creates concerns.

In 2009, credit portfolio management experienced key staffing departures, including the former NSO senior vice president and other NSO vice presidents and directors. The National Property Disposition Center and National Underwriting Center groups within credit portfolio management also experienced senior level attrition. Most senior positions have been filled permanently, but management needs to continue to focus on retaining talent in key leadership roles. By the end of the year, credit portfolio management had hired an executive vice president, while NSO added more than 150 new full-time employees and contractors. In addition, the National Property Disposition Center and National Underwriting Center added more than 230 new full-time employees and contractors.

Credit portfolio management has been active in developing and piloting additional workout

options, including foreclosure alternatives, rental options for REO, and a compliment of REO financing options. Credit portfolio management is also focused on recovering cash from lenders on representation and warranty violations and collections on defaulted loans from mortgage insurance companies.

In June 2009, the government programs and new initiatives team was formed. The team is responsible for initiating, developing, and launching new homeowner retention and foreclosure alternative solutions that are ultimately deployed by servicers. As the government programs and new initiatives team continues to staff and build out its infrastructure to support the development of pilots and new initiatives, it is crucial that policies and procedures be documented to support a sound governance structure.

> *As the government programs and new initiatives team continues to staff and build out its infrastructure to support the development of pilots and new initiatives, it is crucial that policies and procedures be documented to support a sound governance structure.*

During late September and early October 2009, FHFA conducted a targeted examination of NSO. The examination focused on the level and adequacy of staffing at NSO given recent reorganizations in that area, including a review of NSO policies, procedures, and plans to ensure the NSO is adequately staffed and able to carry out its mission of reducing defaults.

Staffing at NSO needs to be increased to deal with rising delinquencies. The current staffing model needs enhancing and should incorporate forecasted workloads into required staffing needs at least six months into the future. A comprehensive training program incorporating the needs of new and existing employees should be developed to combat high levels of attrition. Policies and procedures are needed for new groups within credit portfolio management, including government programs and new initiatives. Management must develop comprehensive policy and procedures to cover the transfer of servicing to specialty servicing. A lack of adequate staffing stresses Enterprise operations and also adversely affects the ability to monitor the performance of servicers as key players in reducing delinquencies and ultimately credit losses.

## Multifamily

Credit risk in the multifamily business line continues to rise as market fundamentals weaken. Vacancy rates rose above 8 percent and are mainly attributable to increased levels of completions over the past few years and continuing historic levels of unemployment. Property owners lowered rents by as much as 6.3 percent to maintain occupancy levels, and this has had a negative effect on net operating income and the ability for property owners to service existing debt.

In addition, concessions rose to more than 7 percent by year-end 2009. Capitalization rates are increasing and were 7.4 percent by year end. The combination of these factors resulted in lower property values, making it difficult for owners to sell or refinance and affecting multifamily production volume.

Weakening market fundamentals negatively affected the performance of the multifamily book. The rate of serious delinquency more than doubled in 2009, rising from 0.3 percent at the end of 2008 to 0.63 percent at year-end 2009.

The rise in delinquencies, watch list assets, and REO inventories is likely to continue into 2010. A

rise in losses, defaults, and other problem assets, along with increasing capitalization rates, necessitated additional provisions to the multifamily portion of the loss reserve. The Enterprise increased its loan loss reserve for multifamily credit by $2 billion to cover these expected increases. For 2009, actual credit losses were $220 million.

To assess the Enterprise's ability to manage the increasing level of problem assets, FHFA examined the asset management function. The examination found that oversight of watch list assets is well managed by qualified individuals with significant commercial lending and workout experience. The risk rating engine closely aligns with systems used by other large financial institutions.

Although the asset management infrastructure is well established, it remains hampered by automated systems that need to be upgraded or replaced. The need for better information technology systems for higher risk assets is a result of the Enterprise's failure to invest sufficient resources to support the business unit in providing and reporting on reliable and accurate data in an efficient manner. Given the current and expected level of problem assets, the Board and management must support this critical function by ensuring the business unit has the resources, such as staffing, technology, and premises, to manage the volume of problem assets. Loss mitigation has secured approval to increase staffing for watch list and special asset management by as much as 50 percent in 2010.

Fannie Mae is monitoring at-risk loans with maturity risk. These loans may not have the ability to either pay out or refinance because of declines in property value or financial capacity. If the Enterprise cannot find acceptable solutions for these maturing credits, it may be faced with greater levels of REO.

The Enterprise is challenged with maximizing the value of its balance sheet. In 2009, it proposed to sell the majority of its low income housing tax

credit portfolio. Treasury denied the proposal under the provisions of the Senior Preferred Stock Purchase Agreement, and FHFA subsequently advised the Enterprise that Treasury's decision precluded further consideration of its proposal to sell its low income housing tax credits.

Management and staffing are a concern. In 2009, the senior vice president of multifamily resigned from Fannie Mae. To date, the position has not been filled, although that function is effectively being handled by others. Given the emerging problems in multifamily, the Enterprise must ensure that a qualified successor is identified and key roles have adequate back-up personnel.

## Counterparty Risk Management

Counterparty credit risk continued to increase throughout 2009 as the ailing economy affected many counterparties from both the single-family and multifamily business lines. These counterparties included mortgage originators, servicers, and insurers. The rise in unemployment and the continued decline in house prices are significant economic factors that left many homeowners unable to refinance their mortgages or make mortgages payments, and many rental property owners had to lower rents and raise concessions to counter the effects of rising vacancy rates. Consequently, capital dissipated in many financial institutions resulting in a high number of bank failures. Moreover, mortgage insurers are using extreme capital preservation tactics, and other counterparties filed for bankruptcy.

The Enterprise has not avoided the impact of stressed counterparties, but it has improved its identification of counterparty exposure and often took measures to protect that exposure. These measures include requiring counterparties to provide collateral against the exposed amount of risk, transferring some servicing portfolios to "high-touch" servicers, and controlling the exposure from funds left in accounts with collected mortgage payments. The Enterprise also increased its

quality control review of mortgages resulting in increased repurchase requests. Repayment periods are lagging for many seller-servicers because of their own financial difficulties.

Mortgage insurers remain troubled and continue to face rating downgrades. These insurers use rescissions to help manage their losses, increasing financial pressure to seller-servicers, especially those already financially challenged. Stressed mortgage insurers and seller-servicers ultimately may negatively affect Fannie Mae.

Counterparty credit risk management carefully evaluates all bifurcation plans from insurers, and its objective when reviewing any bifurcation plan is to ensure that the old company is not left with an undue level of risk. Counterparty credit risk management also is in the process of updating its mortgage insurer eligibility guidelines and working with new entrants into this industry.

## Private-Label MBS

Fannie Mae recorded credit losses in the form of other-than-temporary impairments during 2009

on its $89.8 billion private-label MBS portfolio, including commercial MBS and mortgage revenue bonds. The $9.8 billion loss for 2009 includes the recapture of the loss through retained earnings as a result of a change in accounting standards. Despite significant price volatility during the year, improved liquidity during the fourth quarter of 2009 resulted in net mark-to-market gains on the private-label MBS of $1.5 billion and commercial MBS of $3.1 billion. (See Figure 24.)

At year-end 2009, Fannie Mae's $89.8 billion private-label MBS, commercial MBS, and mortgage revenue bond portfolios reflected deteriorating credit performance. Although almost all of these securities were rated triple-A at purchase, $42.2 billion were rated below investment grade at year-end 2009.

In 2007, FHFA limited a pilot program that allowed Fannie Mae to purchase private-label MBS rated below triple-A to $750 million rather than the $3 billion limit Fannie Mae initially requested. The limited portfolio experienced significant losses, so in 2009, Fannie Mae sold the entire private-label MBS subportfolio originally rated below triple-A at a significant loss.

The following practices mitigate FHFA's other-than-temporary impairment concerns:

- The capital market risk management private-label MBS group continued vigorous loss mitigation activities by aggressively pursuing loan put-backs based on fraud and misrepresentation.

- In December 2009, FHFA approved management's remediation plan relating to private-label MBS policy and loss mitigation. This plan includes escalation procedures, reporting improvements, and improved coordination and communication between capital markets risk management and capital markets traders on market conditions and identification of opportunities to sell private-label MBS.

**Figure 24 • Fannie Mae Quarterly Other-than-Temporary Impairment on Private-Label MBS ($ millions)**



Source: Fannie Mae

# Market Risk Management

Market risk is rated **critical concerns**. The rating is based on (1) a high level of duration, convexity, and volatility risk; (2) extreme volatility of market interest rates and the mortgage basis; (3) unprecedented model uncertainty arising from government housing programs decreasing the reliability of its interest rate risk estimates; (4) and several weaknesses in risk management practices.

## Liquidity and Funding Risks

The risk associated with Fannie Mae's liquidity and debt funding activities has diminished but continues to be a significant concern. Fannie Mae continuously accessed short-term, long-term, and callable debt at favorable levels during 2009 but likely would not have had this funding access without government support. Agency debt purchases by the Federal Reserve significantly reduced debt spreads beginning in the first quarter of 2009. No formal government liquidity backstop now exists that would enable the company to convert its unencumbered collateral to cash.

Partial resolution of accounting and operational issues enabled the securitization of $95 billion of loans out of portfolio during 2009, which was significantly higher than 2008. As a result, Fannie Mae has sufficient liquidity plus unencumbered MBS collateral to cover its one-year debt rollover. Securitization of substantially all the remaining whole loan asset classes will improve overall liquidity.

Fannie Mae significantly reduced its ratio of short-term debt to total debt. Fannie Mae also maintained the FHFA-required minimum 21 calendar day positive net cash position. However, FHFA increased the minimum position to 30 calendar days in late 2009.

Fannie Mae's liquidity risk management practices have improved but continue to be a significant concern. Organizational changes and disagreements with FHFA on the size of the liquidity portfolio delayed management's development of an acceptable remediation plan. In December, FHFA accepted management's revised liquidity risk management remediation plan including recommendations from an outside consultant (a recognized liquidity risk expert) and expects full remediation by March 31, 2011.

*The risk associated with Fannie Mae's liquidity and debt funding activities has diminished but continues to be a significant concern. Fannie Mae continuously accessed short-term, long-term, and callable debt at favorable levels during 2009 but likely would not have had this funding access without government support.*

The following management actions mitigated FHFA's concerns and improved liquidity risk management:

- Management segregated and sold illiquid securities that did not qualify for liquidity risk management. During 2009, management reduced the relatively illiquid investment portfolio by about half.

- Management has begun purchasing Treasury Bills as part of the other investment portfolio and is taking other steps to improve liquidity and credit risk

FHFA 1238

in that portfolio to ensure it is sufficient to cover 30 calendar days of Fannie Mae's net cash needs, as required by FHFA.

## Interest Rate Risk Management

Interest rate risk management remained a challenge in 2009 because of high volatility in rates and the mortgage basis, as well as continuing declines in home values. External conditions significantly impeded Fannie Mae's ability to accurately measure and manage interest rate risk exposures —uncertainty about borrower response to government housing and stimulus programs rendered model results less reliable and required more on-top adjustments by management.

Although several operating risk limits were breached during the year, the Enterprise operated well within Board-approved limits. Management did not remediate to FHFA's satisfaction findings from the 2008 *Report of Examination* about Board interest rate risk limits. In light of the absence of capital and earnings together with model uncertainty, FHFA continues to have critical concerns regarding the duration, convexity, and volatility limits and exposures.

FHFA is concerned about the following management weaknesses:

- Management needs to strengthen governance of the on-top adjustment process. For example, metrics given to the Board to show compliance with limits did not reflect management's on-top adjustments.

- The 2009 Board limits allow for a high degree of optionality risk. FHFA believes a tighter Board limit framework will guard against sudden, sizeable rebalancing needs to bring its risk positions back within operating limits in times of severe market stress.

- In light of the Enterprise's conservatorship status, management's

range of operating limits for duration exposure should be in a significantly tighter range in 2010. In December 2009, the Enterprise exceeded operating limits for duration. A sudden rise in rates together with a significant mortgage basis widening and management's on-top adjustments to compensate for anticipated changes to the production prepayment model resulted in a breach of operating limits. In response, management sold a significant amount of MBS. Tighter operating limits and more frequent rebalancing to a neutral position reduce the need for such large-scale rebalancing efforts.

The following management practices mitigated FHFA's concerns about interest rate risk management:

- Enterprise risk management's oversight of market risk activities improved during 2009 as a result of more effective communication between the risk management and capital markets business units. The asset and liability committee provided an effective forum for discussing the relevance of recent market events, overseeing capital markets transactions, and asset and liability management.

- Fannie Mae constructively explored potential interest rate swap clearinghouses and has adopted an action plan to centrally clear and settle derivative interest rate swap contracts.

## Retained Portfolio Management

During 2009, the Enterprise's retained portfolio decreased by $14.8 billion, ending the year with an unpaid principal balance of $772.5 billion. Liquidity of the retained portfolio improved because the agency MBS portfolio increased from 41 percent to 52 percent of the retained portfolio's composition, due primarily to the

Enterprise's securitization of almost $95 billion of single-family whole loans held in portfolio and a significant year-end mortgage roll position.

The whole loan portfolio is less liquid; at $281 billion, it represents about 36 percent of retained portfolio assets. Liquidity of the retained portfolio will likely worsen during 2010 as accounting changes allow the Enterprise to take advantage of substantial economic incentives to purchase mortgage loans that are 120-plus days delinquent out of MBS pools guaranteed by Fannie Mae.

The Enterprise continues to hold a significant amount of whole loans in the retained portfolio that cannot be securitized with the current operational infrastructure (including reverse mortgages, which have substantial liquidity, modeling, and reputational risks). Management postponed, or suspended, previous plans to securitize multifamily whole loans, reverse mortgages, interest-only mortgages and adjustable-rate mortgages.

## Operational Risk Management

Operational risk management is rated **critical concerns**. The weak financial condition of the Enterprise and the poor credit market created a more complex and riskier operating environment. Significant organizational changes at senior levels, new industry initiatives, and the increase in delinquent loans and REO also created significant operational risk to the Enterprise.

This risk was exacerbated by the implementation of a new consolidation accounting standard, a $125 million initiative involving the creation of new accounting for 18 million loans in more than 140 various systems. In addition, the Enterprise played an enormous role in developing and implementing initiatives to mitigate loan losses, including the Administration's MHA program and the housing finance agency liquidity program. Rapid development cycles, coupled with the breadth and depth of these programs, further increased operational risks. Accumulation of several financial reporting errors during 2009 result-

ed in a material weakness in financial reporting disclosure controls and procedures.

Enterprise operations and technology experienced continuous organizational and executive leadership changes over the past two years, due in part to the tumultuous external environment and turnover in the chief executive and chief operating officer positions. Organizational changes included new executive positions: executive vice president of operations and technology, chief information officer, chief information security officer, chief audit executive, chief risk officer and lead executive for operational risk management. The Enterprise also encountered operational incidents and recognized a need to resolve system development life cycle deficiencies while concurrently pursuing strategies to enhance information technology and internal controls and reduce operating expenses.

Progress towards enhancing the control environment was limited, but management achieved several key milestones. Management successfully retired a major legacy system, met internal goals of outlining a reference model and strategic planning for a future information technology architecture design, and introduced a new Enterprise operations and technology governance framework. Management also successfully implemented the new consolidation accounting initiative, a significant accomplishment, although important work remains to be done in 2010.

The Enterprise remains in the early stages of implementing an operational risk oversight function. The Enterprise failed to develop and implement a robust operational risk oversight program within three years of the 2006 consent order and experienced three lead executive changes for the oversight function during the period. Executive management is sponsoring several initiatives to strengthen the environment, such as the process improvement initiative, future technology architecture, a loan quality improvement initiative and beginning risk control self-assessments, a major accomplishment if done correctly. These initia-

tives are in early stages. Management expects the operational risk oversight program to be fully implemented by the end of 2010.

## Internal Controls

Internal controls are a significant concern. The combination of external and internal changes, numerous organizational changes, and the impact of the numerous initiatives on internal controls increased risks to internal controls in 2009.

> *Internal controls are a significant concern. The combination of external and internal changes, numerous organizational changes, and the impact of the numerous initiatives on internal controls increased risks to internal controls in 2009.*

The need to develop and implement critical initiatives, such as the MHA program and consolidation accounting requirements, along with unprecedented default and foreclosure rates, added additional stress. These initiatives are being developed under aggressive schedules with fixed deadlines and require significant resources and complex technology solutions. For example, the consolidation accounting requirements employed 148 system/process implementations and 54 end-user computing system deployments. As administrator for the MHA program, Fannie Mae is responsible for developing the system for all mortgage loans in the program, a significant effort.

Limited progress towards enhancing internal controls was noted through the year, and the Enterprise remains highly dependent on manual and end-user computing controls. Several significant high-profile operational incidents, such as the miscalculation of weighted average maturity values in the disclosure files for August and inadvertent inclusion of loans with liquated balances for select single-family MBS pools, suggest internal controls may be overstressed.

Through the process improvement initiative, executive management identified 12 core business processes. For these processes, management intends to perform thorough business process mapping and assign ownership of each process to a specific executive. The intended outcomes are increased accountability, stronger internal controls, and enhanced efficiencies through process reengineering. The loan quality initiative is intended to improve loan quality data at origination. These various initiatives to enhance the internal control environment are commendable but still in early stages.

## Information Technology

The information technology environment is a critical supervisory concern, due to the deficiencies in systems development life cycle, significant operational errors, continuing organizational changes, and risks associated with successfully implementing a number of high profile projects, such as MHA and consolidation accounting. The executive vice president of operations and technology manages these priorities while also attempting to enhance the technology and internal control environments, remediate critical matters requiring attention (MRAs), reduce operating expenses, and ensure business continuity.

Several significant high-profile operational incidents that occurred over the past few quarters illustrate the increased stress on information technology and internal weaknesses. Deficiencies associated with the systems development life

cycle are cited as the root causes of these errors, and FHFA issued three MRAs to spur improvements and strengthen compliance.

Fannie Mae implemented a new system development life cycle process in January 2009 that incorporated industry best practices and standards. A root cause analysis highlighted a number of deficiencies where technology and the business units did not comply with the requirements. These deficiencies were further exacerbated by a lack of clear process ownership and accountability.

As an interim measure, the executive vice president of operations and technology and deputy chief financial officer now require executive review and sign-off for all key code changes, which has significantly reduced the number of new code requests. In addition, there were issues with reliability of loss mitigation data that caused problems in accounting.

As an added challenge, there have been continuous organizational and leadership changes in operations and technology. These changes were driven, in part, by rapid change in the structure, leadership, and direction of the company over the past two years. Several technology executives were hired within the last year. In addition, the Enterprise named a new vice president of technology infrastructure and operations, and the former senior vice president of technology infrastructure and operations transitioned to senior vice president of mortgage operations. The new executives are highly qualified, but continuous change in leadership has severely affected progress.

The Enterprise responded to MRAs issued in information security by hiring a chief information security officer. The Enterprise will need to continue to develop an Enterprise-wide information security framework aligned with industry standards, adequate staffing, governance, and reporting. The Enterprise is making plans to move in this direction for 2010.

To enhance the information technology environment, the executive vice president of operations and technology has outlined the future technology architecture. In the initial steps, all information technology proposals will be accepted or rejected based on whether or not the initiatives are consistent with the planned design. This concept is still in the early stages of development and will be a multiyear initiative to fully implement. FHFA expects more tangible plans and milestones for tracking progress in 2010.

*The information technology environment is a critical supervisory concern, due to the deficiencies in systems development life cycle, significant operational errors, continuing organizational changes, and risks associated with successfully implementing a number of high profile projects, such as MHA and consolidation accounting.*

## Data Management

Fannie Mae's data management program remains a significant supervisory concern, due to observed weaknesses in the areas of data architecture, data governance and data quality management. Fannie Mae responded to FHFA's concerns by developing an information management strategy document, providing data architecture planning documents, and establishing a new governance framework, but considerable remediation work remains.

Short-term risks have increased, because several members of the operations and technology executive team are new to Fannie Mae and several individuals with institutional knowledge are transitioning to other areas in the Enterprise. Documents provided by the new executive team are encouraging, but it will require time to develop and implement a comprehensive plan to remediate deficiencies. FHFA expects the Enterprise to resolve six MRAs in data management in 2010.

## Operational Risk Management

The operational risk management program at Fannie Mae is a critical concern. Fannie Mae has yet to establish an effective operational risk oversight program that meets the expectations described in FHFA's September 2009 Enterprise Guidance on Operational Risk Management. Weaknesses continued in the overall effectiveness of governance and oversight, risk reporting, program design, and program implementation, as evidenced by significant, high-profile operational events during the year.

FHFA expects four operational risk management MRAs to be resolved in 2010. The new leadership has made progress in building a foundation. FHFA anticipates the new organizational structure to have significant impact on the Enterprise by the end of 2010.

## Model Risk Management

Model risk, the risk that model output does not match actual performance, remains high. At the start of 2009 some of Fannie Mae's key credit models, such as its loan loss reserve and loss forecasting models, were outdated and performing poorly. Most credit models, such as automated underwriting and guarantee fee pricing applications, were current and performing well. Over the year management made substantial progress to update and improve models.

House price forecasting models remain a concern.

The house price forecast process has at times produced flawed local market forecasts, and the forecast review process has not been sufficient to ensure these flawed forecasts were appropriately adjusted before being used in key applications.

Prepayment models posed significant risk during the year because of an unusually wide primary-secondary spread, house price volatility, the lack of credit availability, and uncertainty around the impact of MHA programs. Prepayment models have continued to predict faster than actual speeds across all major products during the year because the timing and magnitude of the effects of MHA programs are extremely difficult to predict.

Prepayment model uncertainty results in shorter than actual durations requiring on-top adjustments to key risk metrics. During the year, management was active in responding to the changing environment and deteriorating model performance; Fannie Mae updated key prepayment models several times to better model the effect of government programs and to better capture prepayment speeds in a credit-constrained and volatile house price environment.

The downturn in the housing market has spurred an effort to construct loss mitigation and property disposition models. Fannie Mae needs to maintain adequate staff to develop models that can assist in managing the dramatic increase in delinquencies and foreclosures seen in the current credit crisis.

Credit-related modeling issues and challenges include the following:

- Flawed local house price forecasts reduced the five-year credit loss forecast by $10 billion, about 10 percent of the estimate, and generated substantial instability in market risk metrics. Both issues initially required on-top adjustments and were later addressed by adding a dampening process to local forecasts.

- Despite the release of new models in the guarantee fee pricing application in August 2009, the application used to produce a fair value balance sheet continues to use much older versions of the models. The loss severity model consistently under-predicted actual loss severity by 28 percent to 30 percent over the past two years. Although the total difference in estimates between the new and old models was only 2 percent to 3 percent, these models (new and old) represent different views along risk dimensions and give conflicting signals. The problem arises from different technology architectures that require a model to be recoded for the financial reporting application. Fannie Mae plans to hire five additional model developers to address this issue, though resolution will take time.

- The new updated loss reserve model was used to generate the fourth quarter loss reserve. The model used for most of 2009 relied heavily on historical information at the expense of current information and did not include current delinquency status or current loan-to-value information.

- The new loss forecast model is a migration model and considers an extensive list of credit drivers, such as credit score, loan product, current loan-to-value, house price growth rate, age, and current delinquency status for estimating default. The Enterprise re-estimated delinquency, default, and prepayment models recently with updated data that includes the current housing crisis, which improved model performance.

- The business analysis and decisions unit devoted substantial resources from other important model tasks to develop the net present value model used in HAMP.

Market risk modeling challenges include the following:

- Modeling prepayments is difficult in a market where many borrowers are credit challenged and the impact of government and Enterprise loan modification programs is uncertain.

- Information technology infrastructure needs improvement so that model updates can be more timely and well-controlled.

- Modeling interest rates is difficult in a market dominated by government policy decisions affecting not only Treasury rates but also spreads on MBS.

## Model Controls and Governance

Enterprise risk management's responsibility for model risk oversight is not sufficiently comprehensive, focusing too narrowly on independent model validation but not adequately covering other aspects of model risk management. Fannie Mae has made good progress on independent credit model performance tracking, but this process is not yet fully mature. Internal audit needs to expand its role in assessing model risk.

The model audit function within internal audit has not been adequately led or staffed, given the increase in model risk. Fannie Mae recently authorized a vice president of model audit position, along with several more junior positions that will nearly double total group resources. Once hiring is complete, staffing should be adequate.

Fannie Mae is in the process of addressing the weaknesses in model change management control and model governance identified in a recent FHFA targeted examination. The additional control being implemented and the expansion of the

model governance role should help mitigate concerns in these areas. This important model control will not function optimally until it has been fully designed, implemented, and has matured—and that will take some time.

*Model risk oversight needs to strengthen Enterprise-wide oversight of model performance tracking. In 2009, FHFA had concerns about monitoring and timely remediation of long-outstanding model validation issues.*

Though progress continues, the business analysis and decisions unit has had the automated credit model performance tracking process under development for some time, and completion is not expected until the third quarter of 2010. Application level performance tracking is still under development. As a result, dissemination of information on the performance of critical credit models and applications has not been adequate.

Within Enterprise risk management, independent model validation is strong, but other dimensions of model risk oversight are still under development. An internal audit of the model risk oversight function revealed weaknesses and gaps in governance of the model life cycle process. Model risk oversight needs to strengthen Enterprise-wide oversight of model performance tracking. In 2009, FHFA had concerns about monitoring and timely remediation of long-outstanding model validation issues.

Enterprise risk management adopted a model change governance procedure on an interim basis during 2009. The expedited model adjustment procedure allowed a business unit, with concurrence from any part of Enterprise risk management, to approve a model change, even if model developers and model risk oversight did not agree. In such a case, escalation to Enterprise risk officer would be required. This procedure has recently been amended.

Model risk oversight plans to improve compliance with risk reporting requirements. Past presentations to the Board's risk policy and control committee did not include analyses of sensitivities of key risk and return metrics to changes in model assumptions, which the policy required.

Work remains to be done on the model inventory and compliance repository, including improving the quality of the data and building an automated interface to decrease the amount of manual interventions. Additional system functionality may need to be developed to support the expanded model risk oversight scope, including the continuous monitoring and assessment of models and application performance reviews.

Model risk oversight's ability to enforce implementation deadline dates and model version control remains a concern as competing priorities and technical and technology platform issues continue to hamper timely implementation of version upgrades across applications.

Model risk oversight and finance are strengthening and clarifying policy and procedural guidelines governing model on-top adjustments. To ensure uniformity of practice across the Enterprise, additional policy guidance may be needed on model usage when there are upcoming model updates with significant financial reporting impacts, but which are not expected to be implemented in time for the financial reporting cycle.

FHFA 1245

# Report of the Annual Examination of Freddie Mac (Federal Home Loan Mortgage Corporation)

## Examination Authority

This Report of Examination contains the results and conclusions of FHFA's 2009 annual examination of the Federal Home Loan Mortgage Corporation (called Freddie Mac, or the Enterprise) performed under section 1317(a) of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 as amended (12 USC § 4517(a)). FHFA's annual examination program assesses the Enterprise's financial safety and soundness and overall risk management practices. The framework FHFA uses to report examination results and conclusions to the Board of Directors and Congress is known as GSEER, which stands for Governance, Solvency, Earnings, and Enterprise Risk (Enterprise Risk comprises credit, market, and operational risk management).

### 2009 Examination Scope

In 2009, FHFA focused on monitoring rapidly changing market conditions and the economy, as well as the response by management and the Board to these changes and their effect on the Enterprise's risk profile and condition.

The remaining time was used in examination activities that assessed actions of the Board of Directors; quality of executive management; Enterprise-wide risk management and audit functions; accounting estimates and their effect on disclosures, earnings, and loss reserves; key model performance; loss mitigation activities and counterparty exposure; liquidity; interest rate risk profiles and risk management practices; the internal control environment; and risks in information technology, data quality, and business continuity.

### Rating

Freddie Mac's composite rating is **critical concerns**. Enterprises with critical safety and soundness concerns exhibit severe financial, nonfinancial, operational or compliance weaknesses. Enterprises with this rating require more than normal supervision to ensure deficiencies are addressed. Definitions for all composite ratings can be found in FHFA's Supervision Handbook.

FHFA first assigned this rating at midyear 2008, which was a contributing factor to the appointment of FHFA as conservator. The appointment of FHFA as conservator, combined with Treasury financial support, Federal Reserve actions, and new management at the Enterprise have stabilized the Enterprise's condition. While the critical concerns rating at year-end 2009 reflects the fact that the Enterprise is not capable of currently operating without government assistance, FHFA also acknowledges the strides that the Board, management and staff of Freddie Mac have made under conservatorship to help stabilize the Enterprise and maintain its support of the secondary mortgage market.

## Examination Conclusions

Freddie Mac's **critical concerns** rating arises mainly from continuing losses experienced throughout 2009, as well as forecasted losses yet to be realized. FHFA expects those losses to be the result of increasing delinquencies on mortgages owned or guaranteed by the Enterprise and worsening loss severities due to depressed housing prices nationwide, but particularly certain locales, such as California, Florida, Arizona, Nevada and Michigan. In addition, key counterparties have weakened, particularly mortgage insurers, and the demise of some counterparties has exposed prob-

lems in the management of counterparty risk.

These problems have been compounded by a high level of operational risk at Freddie Mac exacerbated by competing priorities related to completing critical finance and accounting projects, implementation of the Administration's MHA modification and refinance programs and other loss mitigation initiatives, and increasing volumes of real estate owned.

> *Significant challenges remain as the executive officers seek to strengthen upper and middle management, because the company is vulnerable to problems associated with losing people in important positions, which is known as "key person risk."*

The Board of Directors and the chief executive officer achieved notable successes during the examination year in retaining senior executives, succession planning, and strengthening management. For the first time in several years, the Enterprise has incumbents in the positions of chief executive officer, chief operating officer, and chief financial officer. In addition, management successfully remediated several outstanding problems from previous examinations. Significant challenges remain as the executive officers seek to strengthen upper and middle management, because the company is vulnerable to problems associated with losing people in important positions, which is known as "key person risk."

Freddie Mac's financial flexibility remains limited without support from the U.S. Treasury. Financial results in 2009 improved substantially relative to the prior year, because of gains from interest rate derivatives, improvements in prices of MBS, and a change in accounting for security impairments. High provisions for credit losses to build loan loss reserves, impairments of private-label MBS, and charges to purchase delinquent loans out of trusts led to an increase of $10.7 billion in Freddie Mac's accumulated deficit (negative retained earnings) in 2009.

Freddie Mac must continue to provide adequate resources and executive support for accounting and financial reporting controls to ensure accurate accounting estimates, comply with financial reporting requirements and fulfill FHFA's information needs as conservator.

Market risk remains a critical concern, largely driven by historically high volatility of market interest rates and the mortgage basis, unprecedented prepayment model uncertainty, weaknesses in liquidity, and private-label MBS risk management.

Model risk is the risk that model output does not match actual performance, and at Freddie Mac, this risk remains high. House prices are uncertain as a result of unprecedented levels of REO and seriously delinquent properties and the unknown effects of government programs, such as MHA, federal income tax credits, and Federal Reserve MBS purchases. The output of important models, including default, severity, and prepayment models, are greatly affected by house price forecasts. As a result, the applications that use these to produce credit pricing, loss forecast, and various accounting estimates have become more uncertain since the mortgage market crisis began.

## Governance

Governance is rated **significant concerns**. The governance-related issues the Board and management are working to resolve are complex and require heightened supervision to monitor and evaluate.

## Board Supervision

In 2009, the Board of Directors and the chief executive officer achieved notable successes in retaining senior executives, succession planning, and strengthening management. For the first time in several years, the Enterprise has incumbents in the positions of chief executive officer, chief operating officer, and chief financial officer. Significant challenges remain as the executive officers seek to strengthen upper and middle management. As a consequence, the company is vulnerable to key person risk and to a lack of depth at the mid-management levels.

The corporate policy for reporting is sufficient to inform management of the Board's expectations regarding providing it information. The legal division appropriately executes its assigned responsibilities under the policy. Management is in the process of redesigning existing reporting practices and content to conform with corporate policy.

## Management Supervision

Although improvements were made during the examination year, the Enterprise continues to face problems in allocating roles and responsibilities, authorities, and accountability. Management adopted written policies and procedures for this but has not completed the actual implementation of those policies and procedures.

## Succession Planning/Human Capital Needs

Succession planning efforts are appropriate, and leadership talent reviews are consistent with professional practice. Executive and senior managers are responsible for addressing the human capital needs of their respective divisions. Throughout the examination period, the Enterprise faced significant people risk in several divisions. Although management has undertaken steps to address risks associated with losing people serving in important positions, known as "key person risk," the Enterprise remains vulnerable to the loss of

employees partly because of uncertainties over compensation-related matters and the future status of the Enterprises.

## Reporting Practices

Executive and senior management responsible for designing and producing reports continue to produce dense, highly detailed reports that may not facilitate efficient decision-making. This practice is pervasive among the business divisions examined, and exists at the executive management level, as well as the Board and Board committee levels.

FHFA instructed Enterprise management to evaluate and improve existing reporting practices. Notable improvements have been made to several Board and management reports, including risk reports, and some corporate credit reports. Improvements to management reports enhanced decision-making because they focused the reader's attention on high priority risks and led to timely, informed judgments. In contrast, dense, highly detailed reports do not facilitate efficient decision-making. Without cogent analysis and recommendations, the details may not serve the needs of directors and senior officers.

## Internal Audit

Internal audit significantly expanded the scope of its activities in 2009, an achievement made possible by successfully increasing its staff by 59 percent and effectively managing resources. Expansion was necessary to achieve an increased number of audit objectives, including implementing an augmented model risk audit program, MHA-related work, internal investigations, validating remediations of material weaknesses and significant deficiencies, and closing matters requiring attention. In addition, internal audit tested nearly 40 percent of the required Sarbanes-Oxley Section 404 key controls in 2009, and the independent auditor was able to rely on a substantial amount of this work.

FHFA 1248

Organizational expansion on this scale poses risks, and must be well managed to avoid disruptions in the timely delivery of quality audit services. FHFA has not detected clear evidence of disruption, but internal audit finished about half of its follow-up reports assessing management's corrective actions of major and critical audit findings late.

## Enterprise-wide Risk Management

Enterprise management continues to struggle with assigning accountability and developing an organizational structure that facilitates the effective execution of defined roles and responsibilities of the chief enterprise risk officer. During 2009, the Board acted on an FHFA recommendation and authorized the creation of a new chief credit officer position. Although FHFA instructed that the chief credit officer position not displace or otherwise substitute for the existing credit risk oversight function, the practical impact of the new unit left a gap in the credit risk oversight function within the Enterprise Risk Management division. Subsequently, Enterprise management has struggled to clarify the roles, functions, and authorities between the chief credit officer and the credit, market, and model risk oversight functions in enterprise risk oversight.

Management currently is implementing a series of enhancements to Freddie Mac's Enterprise risk management framework and practices based on an evaluation by an independent consultant. The chief credit officer and chief enterprise risk officer must function collaboratively to present the Board of Directors with a comprehensive assessment of the risks to the Enterprise and identify strategies to address those risks. It is essential for the chief enterprise risk officer function to provide an opinion on the overall risk to the Enterprise that is independent of the business divisions.

## Counterparty Risk Management—Taylor, Bean & Whitaker

In November, Freddie Mac filed a Form 8-K disclosing the Enterprise's initial estimates of potential exposure to the seller/servicer Taylor, Bean & Whitaker Mortgage Corporation, which had filed for bankruptcy on August 4, 2009. In December 2009, FHFA initiated a special examination to look into the circumstances that led to Freddie Mac's termination of Taylor, Bean as an eligible seller-servicer and resulted in substantial financial exposures to Taylor, Bean, its affiliates, and related entities. Management currently estimates a potential exposure to Taylor, Bean, its affiliates, and related entities of approximately $1.3 billion. Yet, managers noted in the company's most recent Form 10-K that they are unable to estimate the total exposure related to Taylor, Bean's bankruptcy. The amount of related additional losses could be significant.

## Accounting and Disclosure

The Enterprise must continue to provide adequate resources and executive support for accounting and financial reporting controls to ensure accurate accounting estimates, comply with financial reporting requirements, and fulfill the information needs of the conservator. In 2009, the Enterprise had to deal with a combination of challenging market forces, major changes to generally accepted accounting principles, and new government programs with unknown financial impacts. Absence of permanent leadership made overcoming these challenges more difficult in the accounting and finance area at Freddie Mac, but it has since been resolved.

Accounting policy and financial reporting issues of 2009 were as follows:

**Policy coordination and disclosure.** As a result of the conservatorship, FHFA initiated a collaborative process designed to address areas where new accounting policies should be coordinated and made consistent between Fannie Mae and

FHFA 1249

Freddie Mac. FHFA expects that the level of increased coordination will continue. Coordination proceeded more smoothly, most noted in the various issues that arose in connection with consolidation accounting.

Fannie Mae and Freddie Mac provided letters to the SEC and Financial Accounting Standards Board after getting FHFA input in the context of the conservatorship. These coordinated efforts were necessary to ensure consistent application of accounting policies at both Enterprises. Given the challenges facing the Enterprise and the conservatorship, disclosure risk has increased. Prior to releasing its quarterly and annual filings, Freddie Mac addressed FHFA's comments on its disclosures.

**External audit.** FHFA meets regularly with independent audit firm PricewaterhouseCoopers LLC (PwC) to address control weaknesses and other significant accounting and auditing issues and to discuss FHFA's risk-focused review of selected PwC audit documents. Management identified a material weakness in disclosure controls and procedures that was confirmed by PwC. As explained in the Form 10-K, through performance of various auditing procedures and activities, including meetings with FHFA, PwC was able to complete its audit and issue an unqualified opinion on the 2009 financial statements, although the material weakness made necessary an adverse opinion on Freddie Mac's internal controls over financial reporting.

**Consolidation project.** In 2009, the Enterprise made significant progress in adopting the new consolidation accounting standard issued by FASB. But due to the project's size, time line, and complexity, some risk remained at year end in connection with timely and controlled implementation of the project.

The new accounting standard requires the consolidation of a majority of loans held in Enterprise-guaranteed MBS trusts, which until January 1, 2010, were accounted for on an off-balance sheet basis. It also eliminates the need for recognizing

an adjustment to fair value when delinquent loans are removed from a trust. Enterprise management worked effectively with FHFA and Fannie Mae to identify and address significant policy application differences. This included drafting several letters and preparing presentations for SEC and FASB staff, which simplified the implementation and reduced the risk to the tight implementation time line. FHFA continued to monitor this project to its conclusion with the issuance of financial statements at the end of the first quarter of 2010.

**Credit loss reserves.** Safety and soundness require a high degree of transparency to ensure that drivers of credit losses have been appropriately factored into reserve computations. Although the current volatile credit environment makes accurate accounting estimates difficult, the Enterprise has made progress towards that goal. In this connection, the Enterprise implemented a new credit loss reserve model that improves transparency of the major credit loss drivers and assumptions. During the year certain methodology, data quality, and computational issues arose, including length of the loan impairment window, the accuracy of the methodology used to determine loss severity for loans in certain structured transactions (called T-deals, structures in which Freddie Mac guarantees private-label MBS), and the quality of delinquency data related to loans serviced by some counterparties. These issues were resolved quickly. FHFA expects continued refinement of this process.

**Low-income housing tax credits and deferred tax assets.** At year-end 2009, there was uncertainty surrounding the fair value of Freddie Mac's investments in low-income housing tax credit entities. Fair value of these investments rested on the value of the tax credits to the Enterprise, either on its own tax return or through sale to a potential buyer. Freddie Mac is not expected to have any taxable income in the foreseeable future, so on February 18, 2010, FHFA, after extensive discussions with the Treasury Department, informed Freddie Mac that it may not sell or transfer the

investments. The Enterprise has since written off the value of the investments. The Enterprise also had a significant deferred tax asset on its balance sheet at year end related to unrealized losses recorded for certain available-for-sale securities. FHFA's review of the process for accounting for the deferred tax asset indicated the carrying amount was appropriate based on management's assertions.

## Solvency

FHFA previously determined that capital classifications would be suspended during conservatorship. Consequently, throughout 2009, FHFA did not issue a capital classification of Freddie Mac.

During conservatorship, Freddie Mac's positive GAAP net worth capital position has been supported by the United States Treasury under the Senior Preferred Stock Purchase Agreement.

The preferred stock agreement was amended twice during 2009. In May, the first amendment increased the cap on the Treasury draws from $100 billion to $200 billion, increased the mortgage asset limit by $50 billion to $900 billion, increased the maximum indebtedness from 110 percent of indebtedness at June 30, 2008, to 120 percent of the prior year's mortgage asset limit, and included other technical changes.

In December 2009, the second amendment allowed the cap to increase to cover the greater of $200 billion or $200 billion plus cumulative net worth deficits experienced during 2010, 2011, and 2012, less any net worth surplus remaining as of December 31, 2012. The amendment also required the annual 10 percent reductions in the mortgage asset limit be calculated based on the mortgage asset limit rather than the actual mortgage asset balance on December 31 of the preceding year (resulting in a portfolio limit of $810 billion at December 31, 2010), postponed until 2011 the implementation of a quarterly commitment fee to be paid by Freddie Mac to Treasury, and included other technical changes.

During 2009, FHFA worked with Freddie Mac's capital team to reestablish the practice of completing quarterly capital plans, a practice that had been suspended for the first two quarters under conservatorship. Freddie Mac has submitted quarterly capital plans since the second quarter of 2009. The plans have included Freddie Mac's discussions of its continuing development of an economic capital model and issues relating to the process of emerging from conservatorship. FHFA has noted improvement in the plans each quarter and has requested that management continue to incorporate enhancements and improvements to the capital plan.

FHFA staff met several times with Freddie Mac's staff during 2009 to discuss and review modeling methodologies under consideration. These regular meetings will continue in 2010 as FHFA develops a new stress test model and incorporates lessons learned from all parties in the development process.

Under the terms of the Treasury agreement, total draws through December 31, 2009, on the Treasury's Senior Preferred commitment were $50.7 billion. Freddie Mac did not request a draw for the periods ending June 30, September 30, and December 31, 2009.

Freddie Mac maintained positive GAAP net worth after the $6.1 billion capital injection from Treasury to eliminate its net worth deficit at March 31, 2009. The positive GAAP net worth resulted from mark-to-market gains in available-for-sale securities and the one-time effect of adopting new accounting guidance related to other-than-temporary impairment that offset the negative effects of high credit expenses and senior preferred dividends. GAAP net worth for 2009 was reduced when Freddie Mac wrote off the remaining value of its low income housing tax credit investments. Draws in 2010 will be increased by the initial transition adjustment from adopting the new consolidation accounting standard on January 1, 2010.

ANNUAL REPORT TO CONGRESS • 2009 • APPENDIX • FREDDIE MAC

# Earnings

Freddie Mac's financial performance, absent financial support from the US Treasury, is rated **critical concerns.** Net losses decreased substantially in 2009 to $21.6 billion from $50.1 billion in 2008. Freddie Mac's accumulated deficit (negative retained earnings) increased to $33.9 billion at year-end 2009. (See Figure 25.)

Continued widespread economic difficulties contributed to significant increases in mortgage delinquencies. Increasing delinquency rates for prime and nonprime borrowers contributed to increases in provisions for credit losses to build loan loss reserves in advance of expected charge-offs associated with the growing volume of delinquent loans. Freddie Mac's loan loss reserve increased by $18.3 billion during the year to $33.9 billion at the end of 2009. (See Figure 26.)

## Credit-Related Expenses and Losses

Freddie Mac's credit-related expenses and losses increased in 2009, primarily because of the provi-

**Figure 25 •  Freddie Mac Annual Net Income**



Source: Freddie Mac Form 10-K

sion for credit losses, which grew by $13.1 billion to $29.5 billion. (See Figure 28.) Higher credit-related expenses and losses eclipsed positive changes in all other major components of earn-

**Figure 26 •  Freddie Mac Credit Loss Reserve**



Source: Freddie Mac Form 10-K

FHFA 1252

**Figure 27 • Freddie Mac Earnings Detail**



Sources: Federal Housing Finance Agency and Freddie Mac Form 10-K

ings. Relative to last year, earnings benefited from strong revenue growth, a shift to mark-to-market gains from mark-to-market losses, lower security impairments, lower administrative expenses and a tax benefit.

Accounting losses resulting from Freddie Mac's purchases of delinquent loans from participation certificate pools increased by $3.2 billion to $4.4 billion, driven by higher volumes of purchased delinquent loans, which contributed to the

increase in credit-related expenses/losses. Changes to consolidation accounting policies in 2010 will significantly reduce this item going forward.

REO operations expense declined during the year to about $300 million from $1.1 billion in 2008, in spite of higher acquisition volumes of fore-closed properties in 2009. Stabilizing fair values of REO properties in the second half of the year reduced disposition losses and holding period write-down adjustments, and mitigated property

**Figure 28 • Freddie Mac Credit-Related Expenses and Losses**



Source: Freddie Mac Form 10-K

FHFA 1253

**Figure 29 ● Freddie Mac Revenue**



Source: Freddie Mac Form 10-K

maintenance expense, resulting in lower overall REO operations expense for 2009.

## Revenue

Revenue was positively influenced by strong expansion in net interest yield, which doubled during the year driven by lower funding costs. (See Figure 29.) Net interest income increased by $10.3 billion, or 151 percent, over the prior year, offsetting decreases in management and guarantee income and income on the guarantee obligation. (See Figure 30.)

Lower benchmark Treasury rates and lower debt spreads to Treasuries, attributed to the Federal Reserve's purchases of Enterprise debt, led to a decrease in the cost of debt funding.

Freddie Mac's efforts to tighten credit quality shifted the mix of new business in 2009 to relatively higher quality loans with lower guarantee fees, which reduced the risk of that vintage but lessened income from the credit guarantee business.

Income from the amortization of the guarantee obligation was lower in 2009 compared to 2008, a year when rapid declines in house prices and

prepayments accelerated income recognition.

Trust management expenses associated with shortfalls in interest payments on participation certificates, resulting from higher volumes of loan refinancing, exceeded trust management income during 2009. Trust management income was negatively affected in 2009 by lower returns caused by low short-term interest rates.

**Figure 30 ● Freddie Mac Net Interest Yield**



Source: Freddie Mac Form 10-K

**Figure 31 • Freddie Mac Mark-to-Market Value Gains (Losses)**



Source: Freddie Mac Form 10-K

## Mark-to-Market Gains/Losses

Mark-to-market gains of $6.3 billion during 2009 primarily related to derivatives, trading securities, and the guarantee asset boosted financial results. (See Figure 31.) Derivative losses were $13.1 billion lower in 2009 at $1.9 billion. In contrast to the substantial declines in interest rates during the latter half of 2008, rates remained relatively stable in 2009.

A more stable interest rate environment and tighter credit spreads on participation certificates also contributed to gains of $3.3 billion on the guarantee asset in 2009, improving earnings by $10.4 billion relative to last year. Gains on trading securities increased by $3.9 billion as prices of agency participation certificates benefited from the Federal Reserve's purchases. Together these three items improved pretax earnings by $27.4 billion.

## Security Impairments

Compared to 2008, security impairments declined by $6.5 billion to $11.2 billion in 2009, though performance of collateral underlying private-label securities worsened during 2009. Security impairments benefited from a change in accounting policy effective April 1, 2009. Starting with the second quarter of 2009, only the credit portion of other-than-temporary impairments was recognized in earnings.

## Other Expenses

In the fourth quarter of 2009, Freddie Mac wrote down the carrying value of low income housing tax credit partnership investments to zero, recording an impairment charge of $3.4 billion due to the inability to sell or transfer these investments.

## Provision for Federal Income Taxes

Financial results in 2009 were aided by a tax benefit of $800 million, stemming from the Enterprise's ability to carry back 2009 net operating losses to prior years. In contrast, in 2008, Freddie Mac reported a provision for federal income taxes of $5.6 billion after establishing a partial valuation allowance against deferred tax assets in the third quarter of 2008.

## Summary

Freddie Mac's financial flexibility remains limited without support from the Treasury department. Financial results in 2009 improved substantially relative to the prior year, driven by a more stable interest rate environment, improvements in prices of agency MBS and certain categories of private-label MBS, and a change in accounting for security impairments. In spite of these changes, high provisions for credit losses to build loan loss reserves, impairments of private-label MBS and charges to purchase delinquent loans out of trusts led to an increase in Freddie Mac's accumulated deficit (negative retained earnings) of $10.7 billion in 2009.

## Outlook

2010 is likely to be another difficult year for financial results. In the short-term, earnings are likely to be influenced by a modest decline in revenue and significant uncertainty about credit-related expenses.

The amendments to the accounting standards for transfers of financial assets and consolidation of variable interest entities are expected to reduce net interest income modestly in 2010 as Freddie Mac stops accruing interest income on loans that are 90-plus days delinquent. In theory, the accounting change should not impact the economics of the transaction over the life of a loan because lower revenue from stopped interest on delinquent loans should be offset by lower charge-offs at foreclosure or higher revenue if the loan reperforms. There is a timing difference for reporting earnings between the reduction in revenue at 90 days delinquent and the charge-off, which occurs, on average, a year later. Credit losses are likely to remain substantial as delinquent loans transition to some form of resolution, in some instances triggering charge-offs. Consequently, financial results will be significantly influenced by the success or failure of loss mitigation initiatives.

## Credit Risk Management

Credit risk remains rated **critical concerns** as economic conditions continue to stress credit performance in the single-family and multifamily business units and the number of troubled, weakened, and failed counterparties grows. The effectiveness of credit and counterparty risk management remains problematic in several areas.

*Credit losses are likely to remain substantial as delinquent loans transition to some form of resolution, in some instances triggering charge-offs. Consequently, financial results will be significantly influenced by the success or failure of loss mitigation initiatives.*

Levels of seriously delinquent single-family mortgages, REO properties, and credit losses rapidly increased during 2009 as a result of historic house price declines and rising unemployment. Weakened multifamily market fundamentals, including rising vacancy rates and increased concessions, are pressuring property owners' net operating income and ultimate ability to service existing debt. Reduced multifamily property values, reflected in rising capitalization rates, have made refinancing more difficult. Both the single- and multifamily business units have substantially increased levels of loan loss reserves because of expectations of future credit losses.

FHFA 1256

In 2008 the Enterprise established an independent credit function with approval authority led by a chief credit officer. In March 2009, it formally established the corporate credit risk committee, along with subcommittees for single-family credit, multifamily credit, house price appreciation, loan loss reserve and loss forecast, nonagency credit, counterparty ratings and policy. The corporate credit risk committee and its subcommittees worked in 2009 to develop standard credit management reporting packages.

The establishment of a governance process for credit risk management is positive. It will take time to assess the overall quality of the credit organization—the actions of senior management and the efficacy of its organizational structure, reporting lines, delegations of authority, and management reporting will have to be observed.

The Enterprise is focused on minimizing credit losses. Single family has supported MHA and other administration programs, including the housing finance agency initiative, and additional resources have been dedicated to the default asset management function. Further, several initiatives have been launched around loss mitigation, including modifications, foreclosure alternatives, and asset disposition. Multifamily is proactively monitoring at-risk loans that mature over the next eight quarters but may face difficulty refinancing.

Certain functions including the multifamily asset management function must be strengthened to manage the increasing level of problem assets. The Enterprise needs to make improvements to its overall counterparty credit risk management function to ensure early identification of troubled counterparties and articulation of robust action plans.

## Single-Family Loans

The seriously delinquent rate of single-family loans increased from 1.83 percent to 3.98 percent from year-end 2008 to year-end 2009, an increase of 118 percent. Certain segments of the book are

driving the increase, including Alt-A, initial interest, loans made in 2006 and 2007, and loans from California, Florida, Nevada, Arizona, and Michigan. The current economic environment is also pressuring performance of more traditional mortgages, including loans with lower combined original loan-to-value ratios, higher credit scores, fixed-rate amortization and more seasoned loans that were expected to have a lower propensity for default.

Single-family credit losses increased 109 percent from $3.8 billion at year-end 2008 to $7.9 billion at year-end 2009. Credit losses in California, Nevada, Arizona, and Florida accounted for 63 percent of credit losses in the fourth quarter of 2009.

REO inventory increased from 29,233 properties at year-end 2008 to 44,745 properties at year-end 2009, a 53 percent increase. This increase in REO is substantially less than the 104 percent increase from 2007 to 2008. The slowed acceleration in REO inventory growth is a result of HAMP efforts to give homeowners who have the ability and willingness to remain in their homes the opportunity to modify their mortgages, as well as lengthening foreclosure timelines in many jurisdictions and constraints on the capacity of some servicers to complete foreclosures.

The single-family loan loss reserve has increased steadily since the second quarter of 2008, from $5.8 billion to $33 billion in the fourth quarter of 2009. A newly developed loan loss reserve model has been used since the second quarter of 2009 to establish quarterly loan loss provisions and has minimized the use of on-top model adjustments. Management worked during 2009 to address MRAs related to the 2008 loan loss reserve targeted examination. A recent failure of the severity calculation relating to T-deals was identified by management during the fourth quarter. Remediation action was quickly initiated and in process at year-end 2009.

FHFA 1257

Actions to improve the credit performance of new purchases, which became effective in the second half of 2008 and early 2009, have had a positive effect. In addition, the single-family business unit developed a multiyear strategic plan focused on enhancing data validation capabilities to strengthen loan quality at delivery.

The Enterprise has undertaken significant efforts to minimize credit losses and support MHA and other administration programs. In 2009, the Enterprise devoted a significant amount number of resources to HAMP in support of servicer execution and as compliance agent for Treasury.

The reorganization of the default asset management department in April 2009 improved Freddie Mac's ability to manage its defaulted portfolio by hiring more managers, team leads, and group leads to provide more oversight and guidance to servicers and vendors. As of year-end 2009, default asset management had a staff of 322 full-time equivalents, complimented by a strategy that leverages outsourced resources as needed.

The default fulfillment operations group was initially set up to help realize HAMP documentation requirements, but the company ultimately expanded it to include traditional modification programs. Default asset management employed a group of vendors to address servicer weaknesses and gaps stemming from extraordinary work-out volumes and unique HAMP program specifications, including documentation requirements and borrower qualification functions. The group of vendors addresses servicer needs including training, door-knocking campaigns to improve borrower contact, receiving in-bound borrower calls, and initiating out-bound borrower calls. These activities are resulting in improved statistics.

The number of loans with actions taken has increased from 16,990 in January 2009 to 34,873 as of December 2009 and the ratio of workouts to REO at year-end improved to 51 percent from 37.5 percent in July 2009. Recognizing the vulner-

ability associated with reliance on a single vendor, the REO unit within default asset management contracted with a second vendor to manage REO properties. Management also established the default asset management operating committee to ensure that appropriate Freddie Mac resources are identified and applied to default asset management and loss mitigation activities and strategies.

> *To reduce defaults in the single-family book of business, the Enterprise has introduced a number of pilots and initiatives including loss avoidance solutions, loss prevention, loss mitigation, and loss recovery solutions.*

To reduce defaults in the single-family book of business, the Enterprise has introduced a number of pilots and initiatives including loss avoidance solutions, loss prevention, loss mitigation, and loss recovery solutions. The initiatives include refinancing high-risk loans, contracting with strategic vendors to manage the aged modification pipeline, facilitating short sale approvals, REO rental programs, and developing pilot programs to test servicing transfer feasibility.

## Multifamily

Credit risk in the multifamily business unit continues to rise as market fundamentals weaken. Vacancy rates are near 8 percent and are mainly attributable to historic levels of unemployment. Property owners lowered rents by as much as 2 percent to 3 percent to maintain occupancy levels, but this has a negative effect on net operating income and the ability for property owners to service existing debt. In addition, concessions

rose to almost 8 percent of market rents. Capitalization rates are increasing and above 7 percent by year-end 2009, resulting in lower property values that make it difficult for owners to sell or refinance, affecting multifamily production volume.

To assess the Enterprise's ability to manage the increasing level of problem assets, FHFA conducted a targeted examination of the asset management function. The examination found the function must be strengthened, although FHFA recognizes that the multifamily business unit has begun to address some of the issues identified. Specifically, the examination noted concerns with risk rating systems, policies and procedures, and staffing levels.

The rise in watch list assets and REO inventories is expected to continue in 2010. Credit losses increased in 2009 and may continue increasing, which has necessitated additional provisions to the allowance for loan losses. The Enterprise increased its loan loss reserve for multifamily credit to $830 million at year-end 2009 from $277 million at year-end 2008 to cover these expected increases. For 2009, actual credit losses were $41 million.

Freddie Mac is monitoring at-risk loans that mature in the next eight quarters. These loans are rescored for debt service coverage and loan-to-value based on forecasted capitalization rates and note rates at maturity to assess future refinance ability. These high-risk maturing loans are assigned to asset resolution for management.

The Enterprise is challenged with maximizing the value of its balance sheet. In 2009, multifamily began an initiative to sell its low income housing tax credits. Freddie Mac could not use the credits because it does not have taxable income to offset them. In November 2009, pursuant to Treasury's refusal to consent to Freddie Mac's low income housing tax credit portfolio disposition, FHFA advised the Enterprise that Treasury's decision precluded further consideration of its proposal to sell its low income housing tax credits.

Subsequently, on February 18, 2010, FHFA informed Freddie Mac that it may not sell or transfer its low income housing tax credit investments. As a result, the Enterprise has written off the value of these investments.

## Counterparty Risk Management

Counterparty credit risk continued to increase throughout 2009 as the ailing economy affected many counterparties including mortgage originators, servicers, and insurers. The rise in unemployment and the continued adverse trends in house

> *To assess the Enterprise's ability to manage the increasing level of problem assets, FHFA conducted a targeted examination of the asset management function…Specifically, the examination noted concerns with risk rating systems, policies and procedures, and staffing levels.*

price depreciation are significant economic factors that left many homeowners unable to refinance their mortgages or continue to make contractual mortgage payments. Consequently, capital dissipated in many financial institutions resulting in record bank failures. Moreover, with regard to other mortgage market participants, mortgage insurers are using aggressive capital preservation tactics, and other counterparties filed for bankruptcy.

The Enterprise has not avoided the impact of stressed counterparties. During the summer of

FHFA 1259

2009, Taylor, Bean, & Whitaker, formerly a top 10 seller-servicer declared bankruptcy, and its subsidiary bank, Platinum Bank, closed. Colonial Bank, a warehouse lender and custodian for Taylor, Bean, also closed.

Freddie Mac has faced several counterparty problems in recent years. The Enterprise is attempting to identify and manage counterparty problems early on. For example, exposure to one large seller/servicer has been a concern, but Freddie Mac reached an agreement on outstanding selling representation and warrant exposure. The Enterprise is improving in its identification of troubled counterparties but needs to ensure that robust and measurable action plans are in place to address problems.

The organizational structure of counterparty credit risk must be strengthened, and the newly hired vice president of counterparty credit risk management is currently working on doing this. FHFA urges senior management and Board to support the needed changes to the organizational structure. Among the changes planned are strengthening of the various credit committee structures, assessing the skill levels of the credit analysts, and the realignment of personnel. Credit analyses warrant strengthening to include benchmarking to industry standards.

The management of counterparty risk has never been more critical or challenging than in recent years. FHFA urges the Board to continue to provide counterparty credit risk management with the resources it needs to effectively identify and control counterparty exposure.

Mortgage insurers remain troubled and continue to face rating downgrades. These insurers use rescissions to help manage their losses, increasing financial pressure to seller-servicers, especially those already financially challenged. Stressed mortgage insurers and seller-servicers ultimately may negatively affect Freddie Mac.

To respond, mortgage insurers are focusing on business preservation. Tightening their credit standards has neither helped the housing recovery nor supported new home purchases, although it preserves capital. Many insurers successfully pressed state regulators and legislators to relax capital limitations allowing them to continue to write new business. Freddie Mac diligently evaluates new proposals by mortgage insurers.

## Private-Label MBS

Freddie Mac recorded credit losses in the form of other-than-temporary impairments during 2009 on its $175.6 billion private-label MBS portfolio. (See Figure 32.) The $11 billion loss for 2009 includes the effect of favorable changes to impairment accounting rules during the first quarter of 2009. Despite significant price volatility during the year, improved liquidity during the fourth quarter of 2009 resulted in net mark-to-market gains on commercial MBS of $6.3 billion. Net mark-to-market losses on residential private-label MBS were $546 million.

**Figure 32 • Freddie Mac Quarterly Other-than-Temporary Impairment on Private-Label MBS ($ Millions)**



Source: Freddie Mac

At year-end 2009, Freddie Mac's $175.6 billion private-label MBS and commercial MBS portfolios reflected deteriorating credit performance. Although substantially all of these securities were rated triple-A at purchase, $84.2 billion were rated below investment grade at year-end 2009. Management did not purchase private-label MBS or commercial MBS during 2009.

The following management practices represent weaknesses:

- Policies for private-label MBS and commercial MBS lack meaningful and enforceable limits and oversight roles and responsibilities for the chief credit officer. Management expects to have approved policies in place by the end of the first quarter of 2010 that include authority for the chief credit officer to force securities sales and limit purchases based on prepurchase analysis.

- Absence of an effective private-label MBS policy impedes loss mitigation efforts because management is not required by policy to focus resources or produce loss mitigation results.

The following management actions mitigated FHFA's concerns:

- During the fourth quarter, Freddie Mac hired a director with significant private-label MBS experience to draft the policy and direct reporting, monitoring, and loss mitigation efforts for the chief credit officer.

- Management improved private-label MBS and commercial MBS reporting.

# Market Risk Management

Market risk is rated **critical concerns.** The rating is based on (1) a high level of duration, convexity,

and volatility risk relative to minimal capital and earnings, (2) historically high volatility of market interest rates and the mortgage basis; (3) unprecedented model uncertainty arising from government housing programs increasing the uncertainty of its interest rate risk estimates; and (4) several weaknesses in liquidity and private-label MBS risk management practices.

## Liquidity and Funding Risks

The risk associated with Freddie Mac's liquidity and debt funding activities improved during 2009, but it continues to be a significant concern. Freddie Mac continuously accessed short-term, long-term and callable debt at favorable levels during 2009 but likely would not have had this funding access without government support. Agency debt purchases by the Federal Reserve significantly reduced debt spreads beginning in the first quarter of 2009.

The risk profile of Freddie Mac's liquidity and funding activities has been stable and has shown signs of improvement, but global financial market fragility highlights the criticality of liquidity risk. No formal government liquidity backstop now exists that would enable the Enterprise to convert its unencumbered collateral to cash.

Freddie Mac reduced its ratio of short-term debt to total debt during 2009. Freddie Mac also maintained the FHFA-required minimum 21 calendar day positive net cash position. However, FHFA increased the minimum position to 30 calendar days in late 2009.

Freddie Mac's liquidity risk management practices have improved but continue to be a significant concern. For example:

- Freddie Mac's long-term cash forecasting process needs improvement. In November 2009, Freddie Mac discovered its liquidity cash flow report (designed to address the issue of cash management raised in FHFA's 2008 *Report of*

*Examination*) did not properly reflect projected cash inflows and outflows for interest on debt and derivatives, resulting in a significant cash management 365-day forecasting error.

- Failure to operate within established liquidity and contingency risk management guidelines inhibited management's ability to effectively manage and monitor liquidity risk. In 2009, Enterprise management sought to make a significant investment in illiquid asset-backed commercial paper. FHFA's examination revealed it would have resulted in a high-risk, inappropriate investment for the liquidity portfolio had the transaction been consummated as management initially planned.

The following management activities improved Freddie Mac's liquidity risk management:

- Management increased the size of the liquidity and contingency portfolio during 2009.

- Management did not allow illiquid nonmortgage investments to be included in calculations of metrics for liquidity risk management. During 2009, management significantly reduced the balance of relatively illiquid nonmortgage investments.

- At year-end 2009, Freddie Mac had already met FHFA's new 30-day liquidity coverage requirement (communicated by FHFA on December 14, 2009). Freddie Mac also met the March 15, 2010, deadline for increasing the mix of Treasury Bills in its liquidity and contingency portfolio to reduce counterparty credit risk.

## Interest Rate Risk Management

Interest rate risk management remained a challenge in 2009 because of high volatility in rates and the mortgage basis, as well as continuing declines in home values. External conditions significantly impeded Freddie Mac's ability to accurately measure and manage interest rate risk exposures—uncertainty about borrower response to government housing and stimulus programs decreased the reliability of interest rate risk estimates and required more on-top-adjustments by management.

As adjustments to model results became more frequent and required reconciliation between model projections and actual prepayments, management strengthened governance and increased transparency over on-top adjustments to production metrics. For example, Freddie Mac revised its prepayment model three times in 2009 and effectively governed the on-top adjustments prior to model implementation.

The Enterprise operated well within Board approved limits and management effectively remediated periodic breaches of management limits. Management responded constructively to FHFA concerns raised in the 2008 *Report of Examination* by lowering Board limits in a timely manner to reflect the absence of capital and earnings in conservatorship. Given the absence of capital and earnings together with model uncertainty, FHFA continues to have critical concerns regarding duration, convexity, and volatility exposures.

FHFA also found the following management practices helped mitigate some concerns about exposures relative to capital, earnings, and model uncertainty:

- Freddie Mac management appropriately governs on-top adjustments and ensures that executive management understands the use of on-top adjustments prior to corrective model implementation.

FHFA 1262

- Market risk oversight maintains an effective independent analytical view on exposures and on-top adjustments arising from model uncertainty.

- Freddie Mac constructively explored potential interest rate swap clearinghouses and has adopted an action plan to centrally clear and settle derivatives interest rate swap contracts.

## Retained Portfolio Management

During 2009, Freddie Mac's retained portfolio decreased by $49 billion ending with an unpaid principal balance of $755 billion. The average monthly run-off was $12 billion. As of December 31, 2009, the retained portfolio's composition remained stable with agency MBS comprising 58 percent, and nonagency MBS and whole loans representing the balance. Net whole loan balances increased by 20 percent during 2009 to $139 billion. Whole loan mortgage asset classes are less liquid than agency securities. Liquidity of the retained portfolio will likely worsen during 2010 because accounting changes allow Freddie Mac to take advantage of substantial economic incentives to purchase 120-plus days delinquent loans out of pools.

# Operational Risk Management

Operational risk management is rated **critical concerns**. The weak financial condition of the Enterprise and the uncertain market created a more complex and riskier operating environment. Significant organizational changes at senior levels, new industry initiatives, and the increase in delinquent loans and REO also increased the level of operational risk at the Enterprise.

During the last part of 2009, the need to allocate resources to two major accounting initiatives— implementation of consolidation accounting and Sarbanes Oxley 404 compliance—slowed other important work, including a project to improve the Enterprise's information technology infra-

structure. Increased REO volumes are stressing operating processes, systems, and the information technology environment at the Enterprise.

In addition, the Enterprise played a significant industry role in developing and implementing initiatives to mitigate loan losses, such as serving the compliance function for the MHA program and the state housing finance agency program. Rapid development cycles, coupled with the breadth and depth of the programs, further increased operational risks in internal controls and information technology.

During the year, there were major positive changes in the senior management team, including new chief executive, operating, and financial officers, but changes in the operating environment increased operational risks.

## Internal Controls

During 2009, significant demands and complexity in systems development required to implement key corporate priorities contributed to the increased level of risk in the internal control environment. The implementation of new controls, many of which are manual, and the compressed testing window for the new controls added an additional layer of operational risk.

In 2009, the Enterprise achieved the longtime corporate goal of completing its first comprehensive evaluation of internal controls over financial reporting in accordance with Sarbanes Oxley section 404. In turn, PwC completed its first report on internal controls over financial reporting. Despite a number of challenges, including the departure of a key leader during the third quarter, Freddie Mac demonstrated continuous progress throughout the year.

Mortgage defaults continue to increase and strain legacy processing systems in default asset management. Management is aware of the challenge and plans to ensure appropriate safeguards are in place to support this critical area.

The Enterprise faced challenging and complex requirements to implement consolidation accounting. The implementation led to the creation of a number of new controls being implemented within a short timeframe. Freddie Mac will test the new controls along with other Sarbanes Oxley controls during 2010.

Programs designed to assist distressed borrowers and prevent foreclosures were challenging and created additional layers of internal control stress and operational risks. The company integrated these programs into existing manual and automated loan refinance processes. The company continues to rely on inflexible manual processes and legacy systems to handle the increased volume of refinance transactions. The Enterprise is managing these operational risks by closely supervising the processes.

## Information Technology

The Freddie Mac operations and technology unit managed successfully to meet major corporate priorities, which though necessary, delayed initiatives needed to upgrade the legacy infrastructure. Inflexibility in the legacy Enterprise infrastructure creates inability to efficiently complete initiatives such as MHA without requiring additional resources, manual processes, workarounds, and longer completion time frames.

Resources devoted to the other corporate priorities impeded the Enterprise's ability to focus on rebuilding the information technology infrastructure. Relying on legacy systems

- inhibits efficiency
- increases data quality risks
- increases risks as new end-user computing systems are developed to make up for inflexible technology
- stresses internal controls
- leads to key person dependency and increased operational risk at the company

Overall, the Enterprise made significant information technology improvements, such as strengthening information security and improving systems development life cycle methodology. Improvements to the system development method in conjunction with the associated quality control function have improved reliability of project deployments.

> *FHFA remains concerned about the layers of operational risk but recognizes the Enterprise is in the early stages of implementing a multiyear initiative to address some of the issues created by the legacy systems.*

FHFA remains concerned about the layers of operational risk but recognizes the Enterprise is in the early stages of implementing a multiyear initiative to address some of the issues created by the legacy systems.

## Data Management

During 2009, the Enterprise continued to make progress on data quality initiatives, as demonstrated by regular monthly reporting on seller-supplied data, in-depth studies of potential problem data areas (product codes and housing goals reporting) and significant advances in validating data models and data dictionaries. In addition, the Enterprise implemented a new data governance framework. The Enterprise also substantially reduced the number of corrections needed for risky data.

The Enterprise should continue its progress to improve data quality in 2010, and it should develop and implement best practices in data management. Being in conservatorship and waiting for decisions about what will happen to the company after conservatorship complicates long-term strategic planning and implementation.

## Operational Risk Management

Freddie Mac is building, refining, and enhancing foundation operational risk management program components at an acceptable pace. The operational risk management unit satisfactorily informs senior management, the Board of Directors and FHFA of existing and emerging operational risks, as well as operational loss events at Freddie Mac. Overall, the operational risk unit made satisfactory progress in operational risk reporting, governance, as well as fostering a culture attentive to operational risk across the Enterprise.

The major pillars of an operational risk management program described in FHFA's September 2009 Enterprise Guidance on Operational Risk Management are in place and functioning. Freddie Mac continues to develop and improve its program. Operational risk reporting is useful and takes an Enterprise-wide view. Operational incidents are being reported in a timely manner and a root-cause analysis process is in place. The scenario analysis work stimulates good dialogue and interaction with the business units. The Enterprise continues work related to establishing a risk-based operational risk capital charge.

In 2009, the Enterprise enhanced the program by refining a process to identify and report loss events as operational risk events, credit risk events or market risk events, which creates more internal attention and more accurately reflects the related capital measurements. The operational risk unit also led the Enterprise to evaluate REO risk and self-insurance strategies, which exemplifies a proactive risk management process.

## Model Risk Management

At the start of 2009, some of Freddie Mac's key credit models, such as its loan loss reserve, loss forecasting, and guarantee fee pricing models were outdated. Others were current and performing well. During the year, management made substantial progress to update and improve these models. For example, the company deployed the new loan loss reserve model, used for loss reserves and loss forecasting, during the second quarter of 2009.

Model risk, the risk that model output does not match actual performance, remains high. An emerging source of this risk is house price forecasts, which have a dramatic impact on key credit and market risk metrics because they have become especially uncertain. Key sources of uncertainty are unprecedented levels of REO and seriously delinquent properties and the unknown effect of government programs such as MHA, federal income tax credits, and Federal Reserve MBS purchases. The output of important models, including default, severity, and prepayment models, are greatly affected by house price forecasts. As a result, the applications that use these to produce credit pricing and loss forecast and other accounting estimates have become more uncertain.

The volatile economic environment led to significant model risk during the year because of an unusually wide primary-secondary spread, house price volatility, the lack of credit availability, and the uncertainty of the impact of MHA programs. Prepayment models continued to predict faster than actual speeds across all major products during the year because the timing and magnitude of the effects of MHA are extremely difficult to predict.

During the year, management has been active in responding to the changing environment. Freddie Mac updated key prepayment models several times to attempt to better model the effect of government programs and capture prepayment

speeds in a credit-constrained and volatile house price environment. After Freddie Mac released new prepayment models with improved modeling of house prices, credit factors, and structural changes for adjustable-rate mortgages, prepayment models started to perform reasonably well and to outperform some of the major dealer benchmarks.

The downturn in the housing market has spurred an effort to construct loss mitigation and property disposition models. Freddie Mac will need to maintain adequate staff to develop models that can assist in managing the dramatic increase in delinquencies and foreclosures seen in the current credit crisis.

Credit-related modeling issues and challenges include the following:

- Freddie Mac's house price forecast is conservative and may elevate model guarantee fee and loss forecasts. The scope of the committee responsible for the review and approval of the forecast was not sufficiently comprehensive and key elements of the forecast were not being evaluated. Management has remediated this issue, and it is being evaluated by internal audit.

- The current default model used for guarantee fee pricing was estimated in 2005 with old data. Although several calibrations were made to the default model coefficients over time to improve performance, this model needs to be updated with current data. Freddie Mac is working on a comprehensive re-estimation.

- The company implemented the new loan loss reserve model in the second quarter, replacing an outdated legacy system. The new model is a substantial improvement over the old model and produces

reasonable results. It incorporates updated information as well as data on key credit drivers, such as delinquency status and current market loan-to-value ratios. The new loan loss reserve model is also now being used as the core model for creating credit loss forecasts.

- The Enterprise is faced with an increasing number of borrowers who either do not qualify for or will fail the MHA modification program trial. The Enterprise is pursuing development of its own version of a net present value model to help make future loss mitigation decisions.

- An emerging issue is the need to enhance analytics used to evaluate servicer performance. In the current environment, the demands on servicers have shifted from mainly payment collection to loss mitigation. As a result, the Enterprise now has to develop methods to adequately evaluate each servicer's ability to implement and execute loss mitigation programs.

FHFA's market risk modeling observations include the following:

- Modeling prepayments is difficult in a market where many borrowers are credit challenged and the impact of government and Enterprise loan modification programs is uncertain.

- Modeling interest rates is difficult in a market dominated by government policy decisions affecting not only Treasury rates but also spreads on MBS.

## Model Controls and Governance

Model controls and governance improved in 2009 as substantial resources were devoted to addressing model governance issues. The model risk oversight function within the Enterprise risk oversight division conducts effective model reviews, although there are questions as to how effectively the workload is prioritized, managed, and reported. The model audit function within internal audit clarified and expanded its scope and brought in significant resources to achieve coverage of the Enterprise's increased level of model risk. The following examples illustrate model audit function improvements in 2009:

- In early 2009, internal audit responded in a comprehensive manner to FHFA's concerns that the model audit function was understaffed in light of the significant increase in model risk. Internal audit surveyed the industry to determine an appropriate Enterprise-wide model risk management framework and its role within that framework. Internal audit increased staffing, expanded and accelerated certain model audit activities, and began a planning process to reframe the Enterprise-wide model risk assessment process.

- Internal audit's new model risk assessment framework, to be fully implemented in 2010, incorporates three layers of model risk management and oversight. To improve cooperation and coordination, internal audit sought "buy-in" from other areas for the revised and expanded process.

- The company significantly expanded the model audit plan in 2009 to allow the group to benchmark the quality of model risk management. In order to complete the expanded plan, several qualified personnel and subject matter experts have been added to the team. In-depth model audits yielded enhancements to the modeling processes.

- The loss severity of T-deals was understated in the fourth quarter due to a calculation error. The error has been remediated, and a root-cause analysis has been completed.

- In the face of increased demands for model reviews in 2009, model risk oversight shifted its model review focus toward financial reporting models and away from other operational models. There were questions regarding how the unit prioritized, managed, and reported on the status of that work.

FHFA 1267

# Report of Examinations
# of the Federal Home Loan Banks

## Examination Authority and Scope

Section 20 of the Federal Home Loan Bank Act (12 USC 1440) requires examinations of each FHLBank at least annually. FHFA's Division of FHLBank Regulation is responsible for carrying out on-site examinations and ongoing supervision of the FHLBank System. The FHLBank System includes the Office of Finance and 12 FHLBanks: Boston, New York, Pittsburgh, Atlanta, Cincinnati, Indianapolis, Chicago, Des Moines, Dallas, Topeka, San Francisco, and Seattle.

Through its examinations, data analysis, and risk monitoring activities, the division identifies matters requiring corrective action by the FHLBanks and monitors steps to correct deficiencies. The examination program promotes the continued safe and sound condition of each FHLBank and the achievement of their housing finance and community investment mission. In 2009, FHFA examined all FHLBanks and the Office of Finance. On-site comprehensive annual examinations normally take 5 to 15 weeks. In addition, FHFA examiners visit FHLBanks between examinations. The agency has designated an examiner-in-charge who communicates regularly with FHLBank management for each FHLBank and the Office of Finance.

FHFA examiners use a risk-based approach to supervision. Examinations focus on the principal risks at the particular FHLBank. Examinations assess the role of the FHLBank's Board and management in overseeing the FHLBank's activities; evaluate the quality and effectiveness of risk management at the FHLBank; and review the FHLBank's financial condition and performance.

In addition to examiners, analysts, accountants, economists, and modelers participate in the examinations.

FHFA's Division of FHLBank Regulation's supervisory program also includes off-site monitoring and analysis activities of the FHLBank, such as reviews of monthly and quarterly financial information submitted in call reports and available in the FHLBanks' securities filings. The division also monitors the debt issuance activities carried out by the Office of Finance, a joint office of the FHLBanks, and tracks financial market trends. The division reviews FHLBank documents, such as the Board of Directors' packages for each FHLBank, and analyzes responses to a wide array of periodic and ad hoc information and data requests, including an annual survey of FHLBank collateral and collateral management practices and periodic data on the FHLBanks' holdings of private-label MBS. In 2009, the division conducted a horizontal review of collateral practices and secured lending at the FHLBanks.

## Governance

Effective corporate governance at the FHLBanks involves engaged, capable, and experienced directors and senior management; a coherent strategy and business plan; effective and appropriate risk limits and controls; and strong lines of responsibility and accountability. Those attributes exist to a degree among the FHLBanks, but the 2009 examinations identified several governance shortcomings. Some FHLBanks paid insufficient attention to the credit risk associated with private-label MBS and relied too heavily on credit ratings in making investment decisions. Many did not adjust their retained earnings targets in response to deterioration in the credit quality of their private-label MBS holdings.

In some FHLBanks, the Board of Directors did not ensure risks be overseen on an enterprise-wide basis, leading to incomplete separation between risk taking and risk management, reporting, and control. In a few instances, shortcomings in staffing and resources allocated to the Affordable Housing Program (AHP) reflected Board and management inattention to the program and the information management systems needed to support an effective AHP. A number of FHLBanks allocated insufficient resources to information technology.

In general, operation of the Boards of Directors of the FHLBanks improved during 2009, reflecting efforts made by the FHLBanks to address previously identified deficiencies. It will take some time at a few FHLBanks to recover fully from the effects of decisions made in previous years, particularly decisions by some FHLBanks to invest in private-label MBS in 2005-2008.

## Financial Condition and Performance

The financial condition and performance of the FHLBanks generally deteriorated in 2009, principally due to their exposure to private-label MBS and declines in advance volume. Net income increased in 2009 from the depressed levels recorded in 2008, but the improvement is largely attributable to changes in generally accepted accounting principles in the United States governing accounting for other-than-temporary impairment on certain investment securities. Four FHLBanks recorded a loss for the year. At year-end 2009, all FHLBanks met the minimum statutory leverage capital requirement of 4 percent of total assets.

The FHLBanks ended 2009 with total assets of $1.02 trillion, down from $1.35 trillion at the end of 2008. The decline in assets recorded in 2009 was almost entirely attributable to a decrease in loans to member institutions (advances). Advances remain the largest balance-

**Figure 33 • Portfolio Composition of the Federal Home Loan Banks**



Source: Federal Housing Finance Agency

sheet item of the FHLBanks, at $631 billion at year end. The figure represents a $298 billion decrease from the year-end 2008 balance of $929 billion.

Mortgage loans held by the FHLBanks were $71.4 billion at the end of 2009, down from $87.4 billion one year earlier. Mortgage loans have been trending downward since the middle of 2004 when mortgage balances were $115.9 billion. The FHLBanks acquired $8 billion of mortgage loans in 2009. Repayments and prepayments were $21.5 billion.

The stabilization of economic conditions during 2009 resulted in a more favorable funding environment for the FHLBanks relative to 2008. Although the principal amount of FHLBank debt outstanding fell by $322.6 billion during the year due to lower advance demand, access to the capital markets improved as spreads relative to LIBOR reached historically favorable levels.

Net income for 2009 was $1.86 billion, up from the 2008 level of $1.21 billion. Although total interest income of the FHLBanks declined by $24.69 billion, total interest expense fell by an

## Figure 34 • Summary of Financial Data of the Federal Home Loan Banks

(Dollar amounts in millions)

| Selected Statement of Condition Data at December 31 | 2009 | 2008 | 2007 | 2006 | 2005 |
|---|---|---|---|---|---|
| Advances | 631,159 | 928,638 | 875,061 | 640,681 | 619,860 |
| Mortgage loans held for portfolio (net) | 71,437 | 87,361 | 91,610 | 97,976 | 105,240 |
| Investments | 284,351 | 305,913 | 297,058 | 270,319 | 266,453 |
| Total assets | 1,015,583 | 1,349,053 | 1,271,800 | 1,015,304 | 997,387 |
| Consolidated obligations (net) | 934,876 | 1,258,267 | 1,178,916 | 934,214 | 915,901 |
| Total capital stock | 44,982 | 49,551 | 50,253 | 42,001 | 42,043 |
| Retained earnings | 6,033 | 2,936 | 3,689 | 3,144 | 2,600 |
| Total capital | 42,809 | 51,530 | 53,597 | 44,986 | 44,480 |
| **Selected Statement of Income Data for the year ended December 31** | **2009** | **2008** | **2007** | **2006** | **2005** |
| Total interest income | 20,909 | 45,595 | 57,024 | 50,541 | 35,420 |
| Total interest expense | 15,477 | 40,352 | 52,507 | 46,248 | 31,213 |
| Net interest income | 5,432 | 5,243 | 4,517 | 4,293 | 4,207 |
| Provision (reversal) for credit losses | 18 | 11 | 3 | -1 | 1 |
| Net interest income after loss provision | 5,414 | 5,232 | 4,514 | 4,294 | 4,206 |
| Total other income (loss) | -1,786 | -2,350 | 127 | 3 | -60 |
| Total other expense | 943 | 1,076 | 792 | 743 | 729 |
| Affordable Housing Program | 258 | 188 | 318 | 295 | 282 |
| REFCORP | 572 | 412 | 704 | 647 | 625 |
| Total assessments | 830 | 600 | 1,022 | 942 | 907 |
| Cumulative effect of change in accounting principles before assessments | | | | | 15 |
| Net income | 1,855 | 1,206 | 2,827 | 2,612 | 2,525 |
| **Selected Other Data for the year ended December 31** | **2009** | **2008** | **2007** | **2006** | **2005** |
| Cash and stock dividends | 641 | 1,975 | 2,282 | 2,069 | 1,669 |
| Weighted average dividend rate | 1.21% | 3.80% | 5.22% | 4.40% | 4.06% |
| Return on average equity | 3.95% | 2.17% | 6.01% | 5.80% | 5.84% |
| Return on average assets | 0.16% | 0.09% | 0.26% | 0.26% | 0.26% |

Source: Federal Housing Finance Agency

**Figure 35 • Summary of Ratings of FHLBank Private-Label MBS (Carrying Value)**



Source: Federal Housing Finance Agency

even larger amount generating higher net interest income on a smaller asset base. As a result, the return on average assets was 0.16 percent, compared to 0.09 percent in 2008. The net interest spread, which is the difference between the weighted average yield on assets and the weighted average cost of liabilities, increased to 0.39 percent for 2009, up from 0.24 percent in 2008.

Holdings of private-label MBS are currently the most significant factor affecting the financial condition and performance of the FHLBanks. As of December 31, 2009, the FHLBanks held $104 billion of agency MBS and $48 billion of private-label MBS. During 2009, the quality of the FHLBanks' private-label MBS portfolio deteriorated, as measured by a decline in market value and an increase in the number of bonds downgraded by a Nationally Recognized Statistical Rating Organization.

An FHLBank must hold sufficient regulatory capital to meet the greater of either the leverage capital requirement or risk-based capital requirements. The only exception is the FHLBank of Chicago, which has not yet converted the capital structure authorized by the Gramm-Leach-Bliley Act of 1999. The Chicago FHLBank is operating under a cease and desist order that includes a minimum capital level and a minimum capital-to-assets ratio, and the FHLBank complies with those capital requirements.

The FHLBanks' regulatory capital generally consists of the amounts paid by member institutions for FHLBank capital stock and the retained earnings of the FHLBank. As of December 31, 2009, all 12 FHLBanks exceeded the minimum leverage ratio by having at least 4 percent capital-to-assets. The FHLBanks' regulatory capital at December 31, 2009, was $60.2 billion, consisting of $45 billion of capital stock, $6.1 billion of retained earnings, and $9.1 billion of other regulatory capital. This was principally mandatorily redeemable capital stock, which arises typically out of capital stock redemption requests by members or any capital stock held by a nonmember, including the Federal Deposit Insurance Corporation as a receiver for former members. The weighted average regulatory capital to assets ratio for the FHLBank System was 5.92 percent.

One FHLBank, the FHLBank of Seattle, did not meet its minimum risk-based capital requirement as of March 31, 2009, and June 30, 2009, because other-than-temporary impairment charges reduced total capital and the continued depreciation of its private-label MBS increased its market risk capital requirement. As a result, FHFA deemed the FHLBank undercapitalized. The FHLBank did meet its minimum risk-based capital requirement as of September 30, 2009; however, the Director, using his discretionary authority, deemed the FHLBank "undercapitalized" under the agency's prompt corrective action rule.

At the end of 2009, the FHLBanks had 8,066 members—1,146 savings associations, 5,707 commercial banks, 1,003 credit unions, and 210 insurance companies. Approximately 70 percent of members are also FHLBank borrowers.

FHFA 1271

## Credit Risk Management

Credit risk is moderately high and stable, and credit risk management is generally adequate, but needs improvement. In 2009, financial and mortgage market instability affected the value of certain assets, particularly private-label MBS, and led to an increase in financial institution failures, including some FHLBank member institutions. Counterparty risk is elevated and stable, as federal government initiatives and programs soothe domestic credit markets. The collateral commonly pledged by members — mortgage loans and mortgage-backed assets — continue to be difficult to value. In response, FHLBanks have generally increased collateral "haircuts," which are protective reductions in borrowing capacity, to mitigate heightened credit risk on advances.

FHFA 2009 examinations concluded the FHLBanks of Boston, Pittsburgh, Chicago, San Francisco, and Seattle have high levels of credit risk. The remaining seven FHLBanks have moderate levels of credit risk. Examinations also concluded that the FHLBanks of Boston, New York, Pittsburgh, and Atlanta have weak credit risk management, and the remaining eight FHLBanks have adequate credit risk management. FHLBanks need more frequent and conservative assessments of member condition, and better quantitative support for collateral haircuts.

Advances carry low credit risk. To obtain an advance, members must pledge eligible collateral with a market value that exceeds the amount of the advance. The FHLBanks either (1) perfect a blanket lien on all or a portion of the member's assets; (2) require the member to list specific assets as collateral; or (3) take delivery of the collateral. If a member's financial condition deteriorates, collateral status normally changes from blanket to listing to delivery. FHLBanks typically adjust collateral haircuts depending on the quality of the pledged assets and the financial condition of a member. In addition, all FHLBanks take delivery of all securities pledged as collateral, and most require insurance companies and some other members to deliver collateral. Although examinations identified deficiencies in collateral management practices at several FHLBanks, no FHLBank has ever incurred a loss on an advance to a member institution.

### Insurance Companies and FHLBanks

**Insurance companies are assuming a more important role as FHLBank members.**

At the end of 2009, there were 210 insurance company members with aggregate advances of $48.3 billion. This compares with 111 insurance company members with advances of $11.5 billion at the end of 2005. Insurance company members play a particularly important role at the FHLBanks of New York, Indianapolis, Des Moines, and Topeka.

The credit risk issue presented by insurance companies is primarily in the treatment of collateral if an insurance company member were to be liquidated. When a commercial bank or savings association member is liquidated, the FDIC is appointed receiver. FDIC pays off the advance, and the FHLBank releases the collateral. The process is similar when the National Credit Union Administration is appointed receiver for a failed credit union member.

Insurance companies have no federal regulator. Treatment of collateral upon the liquidation of an insurance company is a matter of state law. FHLBanks take possession of the collateral pledged by insurance company members, but uncertainty arises because a state insurance commissioner could assert claim to that collateral if the insurance company fails, especially since secured borrowing by insurance companies is not commonplace.

FHFA 1272

## FHLBanks and the Challenges of Private-Label MBS

Private-label MBS are a significant supervisory issue facing a number of the FHLBanks.

Private-label MBS are residential mortgage-backed securities where the underlying loans or pools of loans are not guaranteed by the Enterprises (Fannie Mae and Freddie Mac) or Ginnie Mae (the Government National Mortgage Association). Although all the private-label MBS held by the FHLBanks had a triple-A rating at the time of purchase, the FHLBanks have incurred credit charges on some of these securities. As of December 31, 2009, FHLBanks held 52 percent prime, 44 percent Alt-A, and 4 percent subprime securities. One-fourth of aggregate holdings were triple-A rated and one-half were below investment grade.

During 2009, FHLBanks incurred credit-related other-than-temporary impairment of $2.4 billion and noncredit-related other-than-temporary impairment of $9 billion on $48.1 billion of private-label MBS. In 2008, FHLBanks incurred total other-than-temporary impairment charges of $2 billion. Under new 2009 GAAP rules, FHLBanks were able to recover the almost $1.9 billion of estimated 2008 noncredit-related impairment charges from retained earnings to accumulated other comprehensive income.

At December 31, 2009, private-label MBS amounted to 4.7 percent of the assets of the FHLBanks. The FHLBanks of Cincinnati and Des Moines had inconsequential holdings of private-label MBS. Five of the FHLBanks incurred credit-related impairment on private-label MBS of $21 million or less in 2009; six FHLBanks incurred credit-related impairment charges of more than $200 million.

Accumulated other comprehensive income reflects mostly the noncredit impairment on private-label MBS. Eight FHLBanks have accumulated other comprehensive losses less than their retained earnings. This means these FHLBanks would still have positive retained earnings if all existing noncredit losses were recategorized and charged to earnings. Accumulated other comprehensive income is large relative to retained earnings for the FHLBanks of Boston and Seattle.

Deterioration in the quality of the FHLBanks' private-label MBS, as measured by adverse rating actions and other-than-temporary impairment charges, continued in 2009. The FHLBanks of Boston, Pittsburgh, Atlanta, Chicago, Indianapolis, San Francisco, and Seattle have sufficient holdings of downgraded or impaired private-label MBS to warrant heightened supervisory attention.

The FHLBanks have mortgage loan holdings of $71 billion at the end of 2009, down from $87.4 billion at the end of 2008. These portfolios do not present significant credit risk. The loans are fixed-rate amortizing loans, well-seasoned, written to traditional underwriting standards, have high credit scores and relatively low loan-to-value ratios, and are credit enhanced either by the member who sold the loan to the FHLBank or by supplemental mortgage insurance. At the end of 2009, only 0.52 percent of these portfolios were on nonaccrual status, although that figure is up from 0.19 percent in 2008. Foreclosures outstanding at the end of the fourth quarter of 2009 were $540 million, up from $164 million at the fourth quarter of 2008, and net charge-offs were $345,000 compared to $31,000 a year ago.

FHFA 1273

**Figure 36 ● FHLBank Values of Private-Label MBS**

As of December 31, 2009 (Dollar amounts in millions)

| FHLBank | Total Assets | PLMBS Carrying Value | PLMBS Fair Value | 2009 Credit OTTI | 2009 Noncredit OTTI | AOCI/Retained Earnings |
|---|---|---|---|---|---|---|
| Boston | 62,487 | 2,160 | 2,070 | 444 | 885 | 7.16 |
| New York | 114,461 | 1,064 | 978 | 21 | 120 | 0.21 |
| Pittsburgh | 65,291 | 5,925 | 5,517 | 229 | 1,058 | 1.78 |
| Atlanta | 151,311 | 11,551 | 10,680 | 316 | 915 | 0.85 |
| Cincinnati | 71,387 | 187 | 187 | 0 | 0 | 0.02 |
| Indianapolis | 46,599 | 2,506 | 2,439 | 60 | 352 | 0.94 |
| Chicago | 88,074 | 2,444 | 2,603 | 437 | 945 | 0.93 |
| Des Moines | 64,657 | 69 | 61 | 0 | 0 | 0.07 |
| Dallas | 65,092 | 501 | 433 | 4 | 76 | 0.19 |
| Topeka | 42,632 | 1,861 | 1,673 | 1 | 8 | 0.03 |
| San Francisco | 192,862 | 16,291 | 14,840 | 608 | 3,513 | 2.89 |
| Seattle | 51,094 | 3,511 | 3,026 | 311 | 1,101 | 17.18 |
| Total | 1,015,947 | 48,070 | 44,507 | 2,431 | 8,975 | 1.36 |

Source: FHFA
Note: The noncredit other-than-temporary impairment reflects the amount recording on the Statement of Income. The amount of noncredit impairment in accumulated other comprehensive income will differ from this amount if there are subsequent market value changes in private-label MBS categorized as available-for-sale.

## Market Risk Management

Mortgage assets continue to be the greatest source of market risk for the FHLBanks. Mortgage assets are typically longer-dated instruments than most other FHLBank assets, have less predictable cash flows, and, in the case of private-label MBS, have experienced the greatest swings in market value. At the end of 2009, FHLBanks held, in market value terms, whole loan mortgages equal to $74 billion and mortgage securities equal to $151 billion (down from $91 billion and $153 billion at the end of 2008).

Chicago, Indianapolis, and Des Moines had the largest whole loan portfolios at the end of 2008, both in dollar volume and as a percentage of assets, but each substantially reduced its holdings during 2009. Only Cincinnati and Topeka had net increases in whole mortgage loans during 2009.

Although the FHLBanks with declining mortgage portfolios should ultimately have an easier time managing market risk, they face potential asset and liability mismatches during the transition. Some FHLBanks with significant mortgage holdings hedge the market risk by extensive use of callable bonds, often with American call options,

to fund those assets. Other FHLBanks, Chicago in particular, use a more complicated hedging strategy that involves using interest-rate swaps, swaptions (options to enter into interest-rate swaps), and options.

The System's market value of equity, which is the estimated market value of the System's assets less the market value of its liabilities, was $49.2 billion at the end of 2007, or 90 percent of the book value of equity and 96 percent of par value of the FHLBanks' capital stock. By the end of 2008, the market value of equity had decreased to $30.5 billion, or 53 percent of the book value of equity and 54 percent of par stock.

During 2009, the market value of equity recovered to $46.8 billion, or 92 percent of the book value of equity and 88 percent of par stock. The vast majority of these market value fluctuations are explained by fluctuations in the value of the System's mortgage-related assets, as mortgage rates increased substantially relative to other rates in late 2008 and early 2009, then fell dramatically through the remainder of 2009. A significant slow-down in mortgage prepayment speeds also led to an increase in the market value of equity.

The market value of equity relative to book value

FHFA 1274

**Figure 37 • FHLBanks with Duration of Equity > 3.5**
x-axis = size of interest rate shock, y-axis = % change in MVE



Source: FHLBanks

**Figure 38 • FHLBanks with 0.35 < Duration of Equity < 1.6**
x-axis = size of interest rate shock, y-axis = % change in MVE



Source: FHLBanks

**Figure 39 • FHLBanks with Duration of Equity < 0.35**
x-axis = size of interest rate shock, y-axis = % change in MVE



Source: FHLBanks

of equity is often an indicator of future income relative to market returns, and the market value of equity relative to par stock is an indicator of the FHLBanks' abilities to redeem stock at par.

Figures 37 through 39 show the sensitivity of the FHLBanks' market value of equity to changes in market rates based on results provided by the FHLBanks. For rate increases, the assumption is that all market rates increase by the same amount (50, 100, or 200 basis points). For rate decreases, because of the extremely low interest rates on instruments with short maturities, the assumption is that all rates fall by the same amount (50 or 100 basis points). The exception is they are restricted from falling below zero.

These graphs divide the FHLBanks into three groups of four based on their effective durations of equity. Duration of equity is calculated as the estimated change in market value of equity for a hypothetical 50 basis point increase in rates plus the change in market value of equity for a hypothetical 50 basis point decrease in rates.

The sensitivity measures used here include adjusted sensitivities for Atlanta, Boston, Chicago, Pittsburgh, and San Francisco. For these FHLBanks, the adjustment is to offset the effects of heavily discounted private-label MBS on their risk metrics. Significant holdings of heavily discounted private-label MBS can distort risk metrics by causing models to overstate gains in falling rate environments and losses in rising rate scenarios. By these measures, the duration of equity for the System was 1.26 years at the end of 2009.

The FHLBanks depicted in Figure 37 estimate losses in market value of equity of greater than 5 percent for a rate increase of 200 basis points and small gains for a rate decrease of 50 basis points. The FHLBanks depicted in Figure 38 estimate smaller market value of equity losses if rates were to rise and no significant change in market value of equity if rates were to fall. Finally, the FHLBanks depicted in Figure 39 estimate insignificant changes in market value of equity if rates were to fall or rise. Overall, the sensitivity of market value of equity to changing interest rates is small relative to recent periods.

At the end of the third quarter of 2009, for example, five FHLBanks estimated market value of equity losses of greater than 5 percent for a 200 basis point rate increase, and two estimated market value of equity losses of greater than 2.5 percent for a 100 basis point rate decrease. Uncertainty about private-label MBS adjustments related to market risk metrics, prepayment speeds, and the effects of extremely low interest rates at short maturities all serve to increase model risk. Consequently, FHFA has less confidence than usual in the FHLBanks' reported results.

## Operational Risk Management

Operational risk is the risk of losses due to failures of integral processes or systems, fraud, human error, or external events. High levels of operational risk may lead to reporting errors to members, investors, and regulators. In 2009, the FHLBanks did not suffer operational failures that caused substantial losses.

The FHLBanks are large financial institutions with inherent operational risk magnified by manual processes and user-developed applications. They need to use financial models, enterprise resource systems, and ledger accounting systems under adequate supervision and have appropriate policies or procedures. Over the past several years, examiners have frequently criticized the number of user-developed applications at the FHLBanks, their critical role in management information systems, and the generally slow pace at some FHLBanks in replacing them with better solutions.

The FHLBanks have addressed certain FHLBank system-level operational risks by adopting internal controls effective in detecting and preventing operational concerns. All FHLBanks have sufficient business continuity plans and back-up locations, though, in some cases, the back-up location is only several miles away. Examiners regularly evaluate these plans.

Affordable housing and community investment activities present the potential for operational risk that could affect an FHLBank's reputation. FHFA's examinations have recently cited concerns about inadequate management information systems, slow project completions, backlog in project monitoring, and shortcomings in the administration of set-aside funds.

# FHLBanks' Examination Conclusions

## FHLBank of Boston

### Overview

The FHLBank of Boston is the ninth largest FHLBank with total assets of $62.5 billion. The overall condition of the FHLBank of Boston presents supervisory concerns, primarily because of the significant challenges associated with its private-label MBS portfolio. Credit-related losses on this portfolio led to annual net losses in 2008 and 2009, and the FHLBank of Boston faces the risk of additional impairment charges going forward. The FHLBank of Boston restricted dividend payouts and excess stock repurchases throughout 2009 to preserve capital. Retained earnings remain insufficient relative to potential losses. The challenges within the private-label MBS portfolio reflect weaknesses in corporate governance and risk management.

Since FHFA's 2009 on-site examination, which ended in June, the FHLBank of Boston employed a new president to work through the challenges and developed a capital stabilization and operating growth plan. However, overcoming weakness in the existing private-label MBS portfolio and returning the FHLBank to a safe and sound condition will take years and will come only with the Board's and management's energy and efforts.

### Condition and Performance

The FHLBank of Boston's financial condition and performance are weak. The FHLBank of Boston's total asset base declined 22 percent year-over-year due to a sharp reduction in advances to its largest members. At year-end 2009, advances were down 34 percent from December 2008 and down 43 percent from the record high in October 2008 and have returned to precrisis levels. While the FHLBank of Boston maintained strong core earnings, they have not been sufficient to offset mounting other-than-temporary impairment charges.

As of December 31, 2009, the par value of Boston's private-label MBS portfolio was $3.6 billion and the fair value was $2.1 billion. Boston had the lowest ratio of fair value to par value in the System (58 percent), partly due to credit-related factors. Boston's private-label MBS portfolio performed poorly during the year and it had the second highest ratio of total other-than-temporary impairment to beginning year par value (30 percent) and the highest ratio of credit-related other-than-temporary impairment to beginning year par value. As of December 31, 2009, 75 percent of Boston's private-label MBS was below investment grade, the second-highest share of below-investment-grade MBS in the System.

A significant factor in the performance of the FHLBank of Boston's portfolio was its large holdings of Alt-A securities, which accounted for 85 percent of its private-label MBS, the highest share in the System. In 2009, the FHLBank of Boston recognized $444.1 million in credit-related impairment charges.

The Board and management face significant challenges in managing the private-label MBS portfolio. The FHLBank of Boston's financial condition is the result of investment in assets with unacceptably high levels of credit risk and failure to maintain retained earnings to mitigate that risk. Risk in the private-label MBS portfolio exposes the FHLBank of Boston to continuing impairment charges. The FHLBank of Boston's retained earnings must increase substantially to support this level of risk.

The Board ceased dividend payments and stock repurchases, but these actions have not been sufficient to restore retained earnings to an adequate level in an acceptable period. As of December 31,

2009, the FHLBank of Boston met all its capital requirements.

## Risk Management

Faced with excessive risk in the private-label MBS portfolio, the FHLBank of Boston has limited ability to absorb other risks. The FHLBank of Boston has not adjusted its market risk metrics to account for possible distortion from the unusually large private-label MBS option-adjusted spreads. Unadjusted risk metrics could lead to poor decisions. The FHLBank of Boston has not properly measured or established limits for the amount of basis, refunding, and reset risk it is currently undertaking with its pooled funding strategy. Monitoring of credit risk in the private-label MBS portfolio has improved since the 2008 examination, but the FHLBank of Boston needs to enhance the monitoring of credit exposure to members.

In the area of information technology, FHFA noted several concerns, including project failure, incomplete and late implementation of critical systems, inadequate project priorities, and insufficient information technology reporting to management committees and the Board.

Since the 2009 examination, the FHLBank of Boston has addressed more than 85 percent of supervisory findings. FHFA's preliminary review indicates the FHLBank of Boston has given attention to and made progress on addressing deficiencies.

### Examination Assessment

|  | Level of Risk | Quality of Management |
|---|---|---|
| **Market Risk** | Moderate | Adequate |
| **Credit Risk** | High | Weak |
| **Operational Risk** | Moderate | Weak |
| **Corporate Governance** |  | Weak |

### Affordable Housing Program

The FHLBank of Boston satisfactorily addressed AHP issues raised during the 2008 examination.

## Par Value vs. Carrying Value

**Par value** is the face value or unpaid principal balance on a mortgage-backed security.

Par value is expected to decrease over the life of MBS as principal on the underlying collateral is paid down. Par value does not reflect other-than-temporary impairment. The amortized cost basis of MBS is the par value adjusted for discounts, premiums, and credit-related impairment.

**The carrying value** of the MBS depends on whether the FHLBank designates the security as held-to-maturity or available-for-sale.

If held-to-maturity, the carrying value is approximately equal to the amortized cost basis adjusted for noncredit-related other-than-temporary impairment. If available-for-sale, the carrying value of the MBS mirrors its fair value, which is an estimate of the amount that could reasonably be expected for an investment in a current sale between a willing buyer and a willing seller. Another name for that is the market value.

The examination focused on housing needs identification and prioritization. The Boston FHLBank identified combating the foreclosure crisis, promoting energy-efficient housing, and developing affordable housing for first-time and workforce homebuyers as critical housing issues and set out to address them through its AHP competitive or set-aside programs. Due to Boston's weak financial performance in 2008, funds were limited because no statutory contributions were available for the 2009 program year, which substantially reduced opportunities to award AHP subsidies. Boston was able to provide limited competitive and set-aside program funding through subsidy recaptures, repayments, and deobligations from previously approved subsidy awards.

## FHLBank of New York

### Overview

The FHLBank of New York is the third largest FHLBank with total assets of $114 billion. The FHLBank of New York's overall condition and performance reflect historically strong earnings, a relatively low risk profile, adequate retained earnings, and a favorable earnings outlook. The FHLBank has weathered the economic crisis better than other FHLBanks.

### Condition and Performance

The FHLBank of New York's financial condition and performance are strong. The FHLBank's portfolio consists of 82 percent advances, 1 percent mortgages, and 14 percent investments. It has the highest percentage of advances in the System, and its $1 billion of private-label MBS represent 1 percent of its total assets, among the lowest in the System. The FHLBank is well capitalized, with a 4.9 percent capital-to-assets ratio, and its retained earnings are $689 million or 0.6 percent of total assets.

New York's return on equity for 2009 was the second highest in the System. The FHLBank of New York achieved net income in 2009 of $571 million—more than double the net income level of $259 million in 2008. Earnings in 2010 will likely decline because of maturing advances originated at very wide spreads and some funding put in place when agency funding spreads relative to LIBOR were very wide. The FHLBank's market-to-book value of equity is 104 percent, the second highest in the System.

New York's private-label MBS portfolio totaled $1.2 billion in par value and $978 million in fair value as of December 31, 2009. Although the majority of New York's private-label MBS were subprime, only 20 percent were rated below investment grade. The FHLBank also had limited other-than-temporary impairment exposure with the ratio of total and credit other-than-temporary impairment to beginning year par value of 8 percent and 1 percent.

Insurance companies have become increasingly important to the FHLBank of New York. The district's insurance company borrowings of $19 billion are the largest in dollars and the fourth largest as measured by percentage of total district advances.

### Risk Management

Although the FHLBank of New York's level of credit risk is moderate, credit risk management needs improvement. The FHLBank of New York has not yet fully addressed several areas criticized at the previous examination. The FHLBank of New York has not independently validated or sufficiently analyzed collateral haircuts and on-site collateral review procedures need strengthening to accurately assess subprime and nontraditional collateral. In addition, the member credit risk model has flaws, which may prevent timely action if a member's financial condition deteriorates rapidly. The FHLBank of New York does not conduct credit analyses for large borrowers or counterparties frequently enough.

FHFA identified new weaknesses in commercial and multifamily on-site collateral reviews and in practices regarding participation loans and large loans used as collateral. Specifically, the FHLBank of New York's on-site reviews for commercial and multifamily real estate loans are not timely, and the FHLBank of New York overrode commercial and multifamily collateral review results for two large member borrowers without appropriate justification. In addition, the FHLBank of New York needs to improve procedures for accepting large loans and participation loans in light of potential difficulties in a liquidation scenario.

Since the on-site examination, the FHLBank of New York informed FHFA that it has revised pro-

cedures regarding member and counterparty credit analysis and the member credit risk model and considers remediation on these weaknesses complete. The FHLBank of New York also has told FHFA it is in the process of addressing the remaining weaknesses. FHFA will review the remediation efforts in the 2010 examination.

### Examination Assessment

|  | Level of Risk | Quality of Management |
|---|---|---|
| **Market Risk** | Moderate | Adequate |
| **Credit Risk** | Moderate | Weak |
| **Operational Risk** | Moderate | Adequate |
| **Corporate Governance** |  | Adequate |

### Affordable Housing Program

The FHLBank of New York addressed or is in the process of satisfactorily addressing AHP issues raised during the 2008 examination and is evaluating options for upgrading or replacing its AHP management information system. The 2009 examination focused on housing needs identification and prioritization. New York identified promotion of economic diversity, mixed-income housing, affordable workforce rental housing, homeless housing, owner-occupied housing rehabilitation, smart growth, and response to natural disasters as critical housing issues and set out to address them through the FHLBank of New York's AHP competitive or set-aside programs.

## FHLBank of Pittsburgh

### Overview

The FHLBank of Pittsburgh is the sixth largest FHLBank with total assets of $65.3 billion. The FHLBank of Pittsburgh faces substantial challenges. The key challenges facing the FHLBank of Pittsburgh include possible exposure to additional impairment charges on its private-label MBS portfolio, inadequate retained earnings relative to the risks facing the FHLBank of Pittsburgh, a depressed market value of equity, and a shrinking asset base. Other-than-temporary impairment charges on the FHLBank of Pittsburgh's private-label MBS portfolio severely limited net income in 2008 and resulted in a net loss in 2009, which has restricted the FHLBank of Pittsburgh's ability to increase retained earnings and weakened its capital position. To respond to FHFA's concerns about the adequacy of its capital base, the FHLBank of Pittsburgh submitted a capital stabilization plan to FHFA and suspended dividends and excess stock repurchases in 2009.

### Condition and Performance

The FHLBank of Pittsburgh's financial condition and performance are weak. A large decline in advance activity caused the FHLBank of Pittsburgh's total assets to decline by 28 percent year-over-year. Advances have fallen 34 percent since December 2008 and 48 percent from a record high in January 2008. Pittsburgh has the second highest member concentration in the System, with its top 10 borrowers accounting for approximately 73 percent of all advances, and these members have accounted for the majority of the declines.

As of December 31, 2009, Pittsburgh's private-label MBS portfolio stood at $6.9 billion in par value and $5.5 billion in fair value. Although only one-third of Pittsburgh's private-label MBS holdings were Alt-A, those holdings accounted for more than half of Pittsburgh's 2009 credit other-than-temporary impairment.

The FHLBank of Pittsburgh's private-label MBS portfolio accounts for approximately 9 percent of its total assets. In 2009, credit-related impairment charges on the portfolio amounted to $229 million and led to an annual net loss of $37 million. Additional credit losses on the portfolio are possible and will continue to limit earnings in the near term. The Board and management face significant challenges related to the private-label MBS portfolio and its effects on the FHLBank of Pittsburgh's financial condition.

### Risk Management

The overall risk profile of the FHLBank of Pittsburgh is high, due in large part to past Board and management risk taking in the securities portfolio, advances and collateral risk management functions, and market risk strategies. The level of risk in the private-label MBS portfolio remains high because of credit weaknesses in the underlying collateral that have resulted in low fair values for the securities. The risk is increasing as the economic and real estate environment remains weak, exposing the FHLBank of Pittsburgh to potential additional impairment charges.

The Board and management recognize the need to change and have set in motion several corrective initiatives. Actions include reassessing the FHLBank of Pittsburgh's risk appetite and focus; moving toward a simplified business model; hiring a new chief operating officer, chief risk officer, and chief credit officer; changing leadership in the capital markets function; developing a capital stabilization plan; and hiring a consultant to review enterprise risk management and the inter-nal audit function. Collectively, these actions reflect the Board and management's commitment to return the FHLBank of Pittsburgh to sound financial health and condition.

### Examination Assessment

| | Level of Risk | Quality of Management |
|---|---|---|
| **Market Risk** | High | Adequate |
| **Credit Risk** | High | Weak |
| **Operational Risk** | Moderate | Adequate |
| **Corporate Governance** | | Weak |

### Affordable Housing Program

The FHLBank of Pittsburgh satisfactorily addressed the AHP issues raised during the 2008 examination. The 2009 examination focused on housing needs identification and prioritization. Pittsburgh identified extremely low-income, special needs, homelessness, workforce, rural, elderly housing development, and aging housing stock rehabilitation as critical housing issues and set out to address them through the FHLBank of Pittsburgh's AHP competitive program. Due to Pittsburgh's financial performance in 2008, the FHLBank of Pittsburgh had limited funds from statutory contributions for the 2009 program year, thereby sharply reducing subsidy award opportunities. Among other measures, Pittsburgh also responded to current conditions by reducing the maximum project award to diversify competitive program awards.

## FHLBank of Atlanta

### Overview

Atlanta is the second largest FHLBank with assets of $151.3 billion. The FHLBank of Atlanta's assets fell by 27 percent in 2009, compared with a 25 percent decline for the overall System, due primarily to a shrinking portfolio of outstanding advances. Approximately 34 percent of the FHLBank of Atlanta's advances are outstanding to one member. Other assets have also been shrinking, but at a slower pace than advances.

Several aspects of the FHLBank of Atlanta's condition and performance are weak. FHFA's principal concern is $12.3 billion of private-label MBS that have generated other-than-temporary impairment and market value losses. In response, management conserved capital in 2009 by limiting capital redemptions and paying no dividend in the first and second quarters of the year. The FHLBank of Atlanta reported a return on equity of 3.6 percent and a return on assets of 0.16 percent in 2009, which was in line with the overall System return on equity of 3.9 percent and a System return on assets of 0.16 percent.

### Condition and Performance

The FHLBank of Atlanta's financial condition and performance are weak principally due to other-than-temporary impairment on its private-label MBS portfolio coupled with high net income volatility. Net income from core operations exceeded impairment charges by a factor of two in 2009. Net income was $283 million in 2009, up 11 percent from 2008 because of decreased non-recurrent expenses that offset higher impairment of private-label MBS. Accounting rules require breaking out of certain hedging activities from net interest income, which increased gains on hedging activities and lowered net interest income in 2009.

Atlanta has the second largest private-label MBS portfolio in the System, with par and fair values of $12.7 billion and $10.7 billion. Fair value relative to par value increased from 76 percent at the beginning of 2009 to 84 percent at year end. The improvement in the market in 2009 for prime securities, which comprised nearly 90 percent of Atlanta's holdings, explains some of this improvement. Atlanta's portfolio of prime securities did not fully insulate it from difficulties. Although all of the FHLBank's private-label MBS were triple-A rated at the time of purchase, 40 percent of its prime securities are currently rated below investment grade. The share of credit to total other-than-temporary impairment in 2009 for Atlanta's private-label MBS portfolio was nearly 25 percent.

Atlanta's capital position has improved since the end of 2008 due to capital retention. Total regulatory capital has risen to 6.1 percent of assets at December 31, 2009, from 4.3 percent of assets at December 31, 2008. Retained earnings have risen to 0.58 percent of assets from 0.21 percent of assets a year earlier.

### Risk Management

Credit and collateral management do not adequately mitigate and control the increasing level of credit risk caused by declining market values of real estate collateral. The 2010 examination focus is on improving corporate governance over credit risk management and oversight.

Credit risk management had maintained certain collateral valuations without documented support and despite lower valuation indications from the two models the FHLBank of Atlanta typically uses. These are significant shortcomings because model results indicated significant additional collateral was necessary for certain members to fully secure their advances. Board reporting of these exceptions has been inadequate. Forty-four members failed during 2009, but all advances to those members were adequately collateralized.

Additionally, the FHLBank of Atlanta failed to correct fully four weaknesses from previous examinations—FHFA cited two at more than one examination. These repeat findings, along with the management practices that led to instances of inadequate collateralization for advances, represent corporate governance failures.

### Examination Assessment

| | Level of Risk | Quality of Management |
|---|---|---|
| **Market Risk** | Moderate | Adequate |
| **Credit Risk** | Moderate | Weak |
| **Operational Risk** | Moderate | Adequate |
| **Corporate Governance** | | Weak |

### Affordable Housing Program

Over the last two years, the FHLBank of Atlanta has significantly strengthened administration of its AHP. Changes include new management, staffing additions, adoption of staff performance and accountability standards, enhanced policies and operating procedures, and an upgraded AHP management information system. During the 2009 examination, FHFA directed management's attention to address the relatively large portfolio of older incomplete AHP projects. Since the 2009 examination, the FHLBank of Atlanta has developed a plan to address these projects.

Atlanta identified combating predatory lending and the foreclosure crisis as critical housing issues and set out to address them through the FHLBank of Atlanta's AHP competitive and set-aside programs. Atlanta responded to current conditions by developing a scoring criterion that promotes foreclosure recovery through neighborhood stabilization programs.

## FHLBank of Cincinnati

### Overview

The FHLBank of Cincinnati is the fourth largest FHLBank with $71.4 billion in assets. The FHLBank of Cincinnati's whole mortgage loan portfolio increased in 2009, constituting a larger portion of the balance sheet. The FHLBank of Cincinnati continued a strong income trend in 2009, reporting its second largest annual net income in the last nine years. Although Cincinnati is exposed to market and credit risk in the mortgage portfolio, the FHLBank of Cincinnati's overall condition and performance are adequate.

### Condition and Performance

The FHLBank of Cincinnati's financial condition and performance are adequate. The FHLBank of Cincinnati's balance sheet declined due to advances falling by 33.5 percent to $35.8 billion.

Reflecting the decline in advances and total assets, mortgage assets (whole loan mortgages and MBS) increased significantly to 29 percent of assets, the second highest in the System. MBS declined by $1.4 billion in 2009. The MBS are heavily concentrated in federally guaranteed agency securities, with minimal exposure to private-label MBS of only $187 million. All holdings of private-label MBS date from 2003 or earlier and remain rated triple-A.

Regulatory capital levels declined in absolute terms because of the large decline in advances and the associated redemption of capital stock but rose in percentage terms and remain well above regulatory minimums. Excess capital stock—member stock investment beyond the requirements for membership and activity—continues to increase as advances decline, reaching more than one-third of capital stock outstanding.

FHFA 1283

Cincinnati remained profitable in 2009, with net income of $268 million, a return on equity of 6.38 percent, and a return on assets of 32 basis points. Net interest spread was 36 basis points, in line with System averages and the highest in the last nine years. The improvement is attributable to increased proportions of higher-margin assets such as mortgages, favorable conditions in the debt markets, and the calling of some higher-coupon callable bonds. The FHLBank of Cincinnati paid a dividend of 4.63 percent in 2009.

The FHLBank of Cincinnati faces some challenges over the next few years, including the possibility of a continued decline in member advance activity and a stressed regional economy. The FHLBank of Cincinnati has a large liquidity portfolio that limits earnings and exposes the FHLBank of Cincinnati to unsecured credit risk. Cincinnati has a history of managing market and credit risk adequately, but the increased concentration in mortgage assets poses risk management challenges as mortgage optionality is difficult to hedge. Profitability trends remain strong and above System averages, which increases retained earnings and allows the FHLBank of Cincinnati to continue to pay dividends. Capital levels are adequate and are likely to remain so because the FHLBank of Cincinnati has few private-label MBS, and it has recorded no impairments in these securities.

### Risk Management

FHFA's primary supervisory concerns are in credit and collateral risk management and governance. The FHLBank of Cincinnati needed to improve counterparty credit analysis, collateral haircuts, collateral valuation, member liquidation collateral plans, and the risk rating credit model. Governance concerns include the effectiveness of a Board committee structure, sufficiency of audit processes, information technology, and lack of a limit for subprime and nontraditional mortgage collateral.

The FHLBank of Cincinnati has achieved substantial progress in addressing prior examination findings. For example, the Board has adopted a risk limit for mortgage-related assets and has implemented adequate oversight for information technology policies and strategies. In addition, the FHLBank of Cincinnati has instituted corrective action relating to collateral haircuts and has improved advances pricing controls.

### Examination Assessment

| | Level of Risk | Quality of Management |
|---|---|---|
| **Market Risk** | Moderate | Strong |
| **Credit Risk** | Moderate | Adequate |
| **Operational Risk** | Moderate | Adequate |
| **Corporate Governance** | | Adequate |

### Affordable Housing Program

Since the 2008 examination, the FHLBank of Cincinnati strengthened administration of its AHP. Changes include reorganization of functional responsibilities and an AHP management information system upgrade. Management also has improved project monitoring and taken more aggressive measures to move projects toward completion or withdrawal. During the 2009 examination, FHFA directed management to continue to reduce project delays and enhance monitoring of owner-occupied rehabilitation projects to ensure appropriate use of funds and program effectiveness. Management has taken steps to address these issues.

The examination also considered housing needs identification and prioritization. Cincinnati identified special needs housing and combating the foreclosure crisis as critical housing issues and set out to address them through the FHLBank of Cincinnati's AHP competitive or set-aside programs.

## FHLBank of Indianapolis

### Overview

The FHLBank of Indianapolis is the second smallest FHLBank with total assets of $46.6 billion. Indianapolis carries $2.5 billion in private-label MBS, representing 46 percent of its MBS portfolio. The FHLBank of Indianapolis is heavily concentrated in mortgage assets (whole loans and MBS) at 27 percent of assets. The FHLBank of Indianapolis remained profitable despite a drop in net income, mainly from credit-related other-than-temporary impairment on private-label MBS. Indianapolis could face further losses from the private-label MBS portfolio, as well as credit and market risk from other mortgage-related assets. Overall condition is adequate.

### Condition and Performance

The FHLBank of Indianapolis's financial condition and performance are adequate. The FHLBank of Indianapolis's balance sheet contracted as advances declined 28 percent to $22.4 billion. In absolute terms, whole mortgage loan assets declined, but because of balance sheet contraction, whole loan mortgage balances increased to more than 15 percent of assets, the second highest in the System.

The $5.5 billion MBS portfolio includes $2.5 billion of private-label MBS—approximately 35 percent are rated triple-A, while more than 21 percent are under negative rating action and 44 percent are rated below investment grade. Indianapolis recognized $353 million in non-credit-related impairment on private-label MBS, which lowered its GAAP capital levels. The private-label MBS portfolio continues to drag down both earnings and capital levels.

Despite the drag on earnings, the FHLBank of Indianapolis was profitable in 2009 and was able to increase retained earnings, partially offsetting impairments. Indianapolis recorded net income of $120 million and a net interest spread of 41 basis points, in line with the rest of the System. Higher-yielding mortgage assets provided wider margins in 2009, offsetting the decline in discount note funding advantages dating from late 2008. The FHLBank of Indianapolis had $60 million in credit-related other-than-temporary impairment losses, the primary factor for the decline in net income between 2008 and 2009. The FHLBank of Indianapolis paid a dividend of 2.83 percent.

Regulatory capital levels increased in absolute and percentage terms and are well above regulatory minimums. Excess capital stock—member capital investment in excess of required membership and activity—has risen significantly, reaching almost half of outstanding capital stock. Included in total regulatory capital of $2.8 billion is mandatorily redeemable capital stock of $756 million. Most of this represents capital stock held by former members that were acquired by out-of-district institutions.

Advances continue to decline within the FHLBank of Indianapolis's district, which is experiencing economic weaknesses. As advances decline, the FHLBank of Indianapolis faces the capital management decision of either redeeming capital stock or leveraging it by purchasing investments. The FHLBank of Indianapolis maintains a large liquidity portfolio. The liquidity portfolio also limits earnings and exposes the FHLBank of Indianapolis to unsecured credit risk. Mortgage asset concentration has increased. Higher mortgage asset concentration raises market and credit risk concerns, although the FHLBank of Indianapolis generally has a history of managing mortgage risk adequately.

FHFA 1285

## Risk Management

The FHLBank of Indianapolis has addressed examination concerns related to its risk management oversight structure and process and the adequacy of staffing. In particular, the FHLBank of Indianapolis began the process of separating its risk management function from operating business units, and it has hired an outside consultant to identify gaps in staffing needs and succession planning.

Credit risk is moderate but increasing because of private-label MBS exposure and poor economic conditions in the FHLBank of Indianapolis's district, which has negatively affected member financial condition. The risk in lending to insurance companies is elevated. The FHLBank of Indianapolis has addressed the deteriorating condition of members by taking greater control of collateral and increasing attention to member monitoring.

The FHLBank of Indianapolis's market value of equity rebounded to 108 percent of the book value of equity at year-end 2009 from just 55 percent one year earlier, due in significant part to a marked increase in mortgage loan and security valuations.

The FHLBank of Indianapolis has not incurred losses due to failed internal processes or systems, but staff turnover, particularly in the accounting and information technology areas, increases operational risk. The FHLBank of Indianapolis is addressing deficiencies in operational risk oversight and reporting.

### Examination Assessment

| | Level of Risk | Quality of Management |
|---|---|---|
| **Market Risk** | Moderate | Adequate |
| **Credit Risk** | Moderate | Adequate |
| **Operational Risk** | Moderate | Adequate |
| **Corporate Governance** | | Adequate |

## Affordable Housing Program

In 2009, the FHLBank of Indianapolis satisfactorily addressed AHP issues FHFA raised during the 2008 examination. The 2009 examination focused on housing needs identification and prioritization. Indianapolis identified combating the foreclosure crisis and assisting homeowners in refinancing unaffordable mortgages as critical housing issues and set out to address them through the FHLBank of Indianapolis's AHP competitive and set-aside programs. Among other measures, Indianapolis also responded to current conditions by increasing the per-unit AHP subsidy limits and requiring face-to-face homeownership counseling for households receiving a subsidy.

## FHLBank of Chicago

### Overview

The FHLBank of Chicago is the fourth largest FHLBank with assets of $88.1 billion. The FHLBank of Chicago has been subject to a consent order to cease and desist since October 10, 2007, which prohibits the redemption or repurchase of capital stock at the FHLBank of Chicago absent regulatory approval. In addition, the FHLBank of Chicago remains the only FHLBank that has not converted its capital structure to comply with the Gramm-Leach-Bliley Act of 1999.

In 2009, the FHLBank of Chicago posted a $65 million net loss and recognized $437 million in other-than-temporary impairment on its income statement from its private-label MBS portfolio. Overall, the FHLBank of Chicago demonstrated continued improvement in risk management and cost controls in 2009; however, earnings and the FHLBank of Chicago's franchise present serious challenges in the immediate future. The FHLBank of Chicago's condition remains a supervisory concern.

### Condition and Performance

The FHLBank of Chicago's financial condition and performance are weak. Although the FHLBank of Chicago is the fourth largest FHLBank by asset size, it has one of the smallest advance balances—$24.1 billion—and the lowest ratio of advances to assets (27.4 percent). Since the beginning of 2009, the FHLBank of Chicago lost nearly $14 billion of advance balances due to member mergers and diminished member demand. With increased repayments, mortgage balances declined by $8.3 billion to $23.8 billion—27.1 percent of total assets. To maintain operating leverage in the face of declining advances and mortgage balances, the FHLBank of Chicago increased it investments by $15.6 billion

to $36.8 billion (41.8 percent of total assets) over the past 12 months. As of December 31, 2009, the par value of Chicago's private-label MBS portfolio was $3.9 billion and its fair value was $2.6 billion. Chicago's private-label MBS portfolio performed poorly during the year as evidenced by credit rating downgrades and other-than-temporary impairment. By the end of the year, 87 percent of its holdings were below investment grade.

In 2009, the FHLBank of Chicago had a $65 million net loss, compared to a $119 million net loss in 2008. The lower loss relative to 2008 was primarily due to a $371 million increase in net interest income partially offset by a $204 million increase in other-than-temporary impairment recognized on its income statement and $22 million of losses on securities. The FHLBank of Chicago benefited from changes in the beginning of 2009 to accounting rules allowing financial institutions to recognize only the credit portion of other-than-temporary impairment losses on their income statement for securities categorized as held-to-maturity or available-for-sale.

The FHLBank of Chicago will continue to face serious challenges to its financial condition in future years. Potential future credit losses on its private-label MBS and funding challenges on its existing mortgage portfolio will continue to pressure earnings. In addition, the decline in advances—its core business—to 27.4 percent of assets suggests the FHLBank of Chicago will have to shrink its asset base considerably in the future. The consent order to cease and desist, which effectively prevents member capital from leaving the FHLBank of Chicago, maintains the short-term financial viability of the FHLBank of Chicago. FHFA does not know when the consent order can be lifted to allow normal operations.

### Risk Management

Market risk management practices are weak and

the FHLBank of Chicago has not satisfied FHFA's concerns regarding risk management and hedging policies and procedures included in Article III of the cease and desist order. The FHLBank of Chicago's current hedging practices have not adequately protected it from potential market changes. The FHLBank of Chicago's interest rate risk management practices have not mitigated its exposure to a declining interest rate environment. Hedging practices that delay recognizing current period hedging costs into future periods cause concern because of the focus on current performance at the expense of earnings performance in future years.

Changes to the FHLBank of Chicago's business model may hamper future operating performance as the FHLBank of Chicago becomes an advance-focused institution. The FHLBank of Chicago's operating expense ratio is the highest of all FHLBanks and more than double the System average. Management has taken initial steps to reduce operating expenses, including moving to lower-cost office space, but should further reduce operating expenses to reflect costs of a much smaller institution in the future.

Ending the FHLBank of Chicago's on-balance sheet acquired member assets program has also resulted in a significant level of high cost carry-over debt associated with funding this portfolio. Because of the adverse effect of this expensive debt, FHFA permitted the purchase of certain government-guaranteed student loan asset-backed securities to achieve higher spreads. This extraordinary step has allowed the FHLBank of Chicago to realize higher spread income, but further expansion of these investments in precluded because the FHLBank of Chicago has reached the limits of this authorization.

Income generated from the FHLBank of Chicago's core business is inadequate to absorb material losses in the FHLBank of Chicago's private-label MBS portfolio. Total credit losses for the private-label MBS portfolio for 2009 were $437 million.

Potential losses in the FHLBank of Chicago's accumulated other comprehensive income were nearly equal to the FHLBank of Chicago's retained earnings and reflect the FHLBank of Chicago's weak financial condition.

The FHLBank of Chicago has submitted a capital plan to FHFA, which is reviewing the plan in light of the Chicago FHLBank's capital composition and its overall financial condition and prospects.

The FHLBank of Chicago's Board appointed a new president in May 2008. The new management team has been more responsive to FHFA requests for information and exhibited a greater willingness to address supervisory concerns; however corporate governance practices remain weak, as evidenced by the FHLBank of Chicago's inability to address to FHFA's satisfaction concerns about its hedging practices. Although management has committed to address weaknesses identified at the most recent examination, compliance with Article III of the cease and desist order has not been adequate. The FHLBank of Chicago's Board needs to work with management to improve the timeliness of corrective actions, address FHFA's concerns about hedging and market risk management, and improve transparency of Board reporting, particularly hedging practices and results. The FHLBank of Chicago's efforts to implement a new system of records have not been timely and oversight of that process has been weak.

We have also noted weaknesses in management succession planning and the development of appropriate policies and procedures.

**Examination Assessment**

|  | Level of Risk | Quality of Management |
|---|---|---|
| **Market Risk** | High | Weak |
| **Credit Risk** | High | Adequate |
| **Operational Risk** | High | Adequate |
| **Corporate Governance** |  | Weak |

## Affordable Housing Program

Because of other significant concerns at this institution, FHFA reviews of AHP and community investment activities have been limited in recent years. The 2009 examination, however, identified a number of deficiencies with respect to analysis, timeliness, and executive oversight in both the competitive and set-aside programs.

The examination also focused on Chicago's housing needs identification and prioritization. Chicago identified increasing homeownership, reducing homelessness, combating the foreclosure crisis, and assisting homeowners in refinancing unaffordable mortgages as critical housing issues and set out to address them through the FHLBank of Chicago's AHP competitive or set-aside programs. Due to Chicago's weak financial performance in 2008, it had no statutory contributions available for 2009, but the Board of Directors approved a voluntary contribution of $3 million. Chicago also applied funds from subsidy recaptures, repayments, and deobligations from previously awarded projects to the AHP funding pool in 2009.

## FHLBank of Des Moines

### Overview

The FHLBank of Des Moines is the eighth largest FHLBank with assets of $64.7 billion. Its overall condition is adequate. The FHLBank of Des Moines's risk profile and financial performance both improved as the year progressed, though the FHLBank of Des Moines still needs to demonstrate long-term earnings stability. Des Moines has minimal exposure to private-label MBS and did not incur any impairment losses in 2009.

### Condition and Performance

The FHLBank of Des Moines's financial condition and performance are adequate. The FHLBank of Des Moines's mortgage loan portfolio, historically the greatest source of market risk and earnings volatility at the FHLBank of Des Moines, declined $3 billion, or 28 percent, primarily due to a $2.1 billion sale of mortgage loans during the second quarter. Advances declined 15 percent during the year, following the overall System trend. The Des Moines advance business remains the most concentrated among insurance companies relative to all other FHLBanks.

Des Moines had the smallest private-label MBS investment portfolio in 2009. As of December 2009, the par value of its holdings was $68 million and the fair value was $61 million. The ratio of fair value to par value (90 percent) is the second highest in the System. Des Moines' private-label MBS holdings did not suffer any other-than-temporary impairment charges in 2009, and its entire private-label MBS portfolio was investment grade as of December 31, 2009.

The FHLBank of Des Moines incurred a loss for the first quarter of 2009 as adverse market movements during the peak of the economic crisis negatively affected the interest-rate spread between the FHLBank of Des Moines' assets and liabilities. Subsequent quarters were stronger, and the FHLBank of Des Moines was able to build retained earnings while paying a dividend greater than the System average.

The market value of FHLBank of Des Moines equity relative to the par value of its capital stock improved in 2009, as did the FHLBank of Des Moines's sensitivity to downward movements in interest rates. The FHLBank of Des Moines lifted its moratorium on the repurchase of capital stock in December.

**Risk Management**

The FHLBank of Des Moines's level of operational risk is moderate. Most lines of business rely on user-developed applications and other manual processes. The FHLBank of Des Moines is phasing out major user-developed applications, such as those used for financial reporting and management analytics, and implementing better integrated applications into the production environment. The FHLBank of Des Moines is refining technology governance processes and fine-tuning its information technology strategic plan to better align project priorities to business needs. Improving operational risk reporting will allow management to identify risk points for remediation.

Market risk is moderate but improving. The FHLBank of Des Moines has the System's third largest mortgage loan portfolio of $7.7 billion. As previously noted, total mortgage loans declined by $3 billion in 2009, largely due to the sale of $2.1 billion in loans. The FHLBank of Des Moines spent $89 million in 2009 to extinguish $900 million in higher-cost debt and replace it with lower-cost debt. These actions served to substantially reduce exposure to changes in interest rates and stabilize net interest income.

The level of credit risk is moderate but increasing, as evidenced by a rise in member failures and a higher percentage of members on the FHLBank of Des Moines's watch list. All outstanding balances with failed members were paid in full. The FHLBank of Des Moines has a concentration of advances to insurance company members with $14.1 billion outstanding, representing 40 percent of total advances. The quality of credit risk management is improving, although some areas such as collateral management require further enhancement.

**Examination Assessment**

| | Level of Risk | Quality of Management |
|---|---|---|
| **Market Risk** | Moderate | Adequate |
| **Credit Risk** | Moderate | Adequate |
| **Operational Risk** | Moderate | Adequate |
| **Corporate Governance** | | Adequate |

**Affordable Housing Program**

The FHLBank of Des Moines satisfactorily addressed the AHP issues raised during the 2008 examination. The 2009 examination focused on housing needs identification and prioritization. Des Moines identified homelessness, Native American and rural housing development, and aging housing stock rehabilitation as critical housing issues and set out to address them through the FHLBank of Des Moines's AHP competitive or set-aside programs.

## FHLBank of Dallas

### Overview

The FHLBank of Dallas is the seventh largest FHLBank with assets of $65.1 billion. Its overall condition and performance are adequate. Dallas is advance-centered and consistently operates under a strategy of principally distributing the benefits of membership through advances pricing instead of dividends. The FHLBank of Dallas' overall risk remains low because it holds a large proportion of advances, a small private-label MBS portfolio, and uses a funding strategy that limits market risk exposures.

### Condition and Performance

The FHLBank of Dallas's financial condition and performance are adequate. The FHLBank of Dallas' portfolio consists of 73 percent advances, 0.4 percent mortgages, and 26 percent investments. Fluctuations in advances drove the changes in total assets during 2009. Both advances and total assets declined $14 billion during the year. Advance balances fell to $47 billion as of December 2009, a 31 percent decline from record highs of $68 billion in September 2008. The FHLBank of Dallas holds approximately $501 million in private-label MBS, and it recognized a total of $80 million of other-than-temporary impairment in 2009, $4 million of which was credit related. The FHLBank of Dallas' retained earnings increased by 65 percent to $356 million, or 0.55 percent of total assets, as of December 2009. Dallas continued to outperform the System as a whole in return on assets and return on equity measures.

The main challenges for the FHLBank of Dallas continue to be declining advances and high member advance concentration. In addition, the FHLBank of Dallas has a pricing strategy of low advance rates that implies rather low levels of net interest income and dividends, and may give rise to situations where even relatively modest income or expense fluctuations, often solely attributable to accounting factors and not core earnings capacity, can generate a quarter of negative net earnings.

### Risk Management

There has been significant turnover in the FHLBank of Dallas' Risk Management Department, particularly in the chief risk officer position. The FHLBank of Dallas has had six chief risk officers since June 2005, the most recent serving from February 2009 to January 2010. The FHLBank of Dallas operated with an interim director of market risk from November 2008 until March 2010 and operated without a director of credit risk from August 2009 to January 2010.

The FHLBank of Dallas faces some interest rate risk because many of the floating-rate MBS it purchases have limits on how much the interest rate can change that would come into play if short-term interest rates increase more than 600 basis points from current levels. The FHLBank of Dallas purchases caps to manage its interest-rate risk associated with such securities. Reports to the Board of Directors, however, do not discuss to examiners' satisfaction the role that cap risk plays in the FHLBank of Dallas' overall interest-rate risk position. In addition, the Board has not established adequate income sensitivity limits to control the effects of cap risk on income volatility. FHFA also noted deficiencies in the FHLBank of Dallas' income simulation model as a tool for measuring income sensitivity across stressed rate scenarios and in cap analysis and valuation processes.

Credit risk in the advance book and private-label MBS portfolio has increased due to continuing deterioration in the national economy, as well as in the FHLBank of Dallas' district. As a result, the FHLBank of Dallas has tightened credit underwriting on advances to some members. The FHLBank of Dallas has a significant concentration of credit to its major advance customer—representing 39 percent of the FHLBank of Dallas' advances as of December 31, 2009. Although the acquirer of this member has decided to retain the customer's membership in the FHLBank of Dallas, the future borrowing relationship with this customer continues to be uncertain after its recent acquisition, and there remains the risk of significant balance sheet shrinkage. The FHLBank of Dallas' private-label MBS portfolio represents less than 1 percent of total assets and credit-related losses have been modest to date.

The FHLBank of Dallas needs to address certain credit risk management weaknesses. In particular, while advances to insurance company members represent less than 1 percent of total advances, the FHLBank of Dallas must be able to ensure it could promptly liquidate securities collateral if an insurance company member were placed into receivership. The securities haircuts implicitly assume such a timely liquidation would occur. The FHLBank of Dallas must also include insurance company members in its credit monitoring process.

The FHLBank of Dallas' tracking and trending of operational errors is too limited, it does not have a fully independent information security officer, and its operational risk assessments are inadequate. In addition, the FHLBank of Dallas has not sufficiently analyzed whether the distance from the FHLBank of Dallas to the disaster recovery site is sufficient or whether it would be feasible to relocate the disaster recovery site to another location.

## Examination Assessment

|  | Level of Risk | Quality of Management |
|---|---|---|
| **Market Risk** | Moderate | Adequate |
| **Credit Risk** | Moderate | Adequate |
| **Operational Risk** | Moderate | Adequate |
| **Corporate Governance** |  | Adequate |

## Affordable Housing Program

The FHLBank of Dallas satisfactorily addressed the issues relating to AHP raised during the 2008 examination. The 2009 examination focused on housing needs identification and prioritization. Dallas identified first-time homebuyer assistance, single-family and rental housing rehabilitation, mixed-income housing, Native American housing development, and foreclosure relief as critical housing issues and set out to address them through the FHLBank of Dallas' AHP competitive or set-aside programs. The Board of Directors approved $2 million in voluntary contributions to provide additional funds for the FHLBank of Dallas' 2009 set-aside programs to meet high demand for AHP funding.

## FHLBank of Topeka

### Overview

The FHLBank of Topeka is the smallest FHLBank with $42.6 billion in total assets. The FHLBank of Topeka's whole loan mortgage portfolio grew during 2009, becoming a larger share of the balance sheet. The FHLBank of Topeka also holds a greater portion of its assets in investments than the System average. Topeka has modest exposure to private-label MBS. The FHLBank of Topeka's condition and performance are adequate, although it remains exposed to market risk in its mortgage portfolio and credit risk in its unsecured investment portfolio.

### Condition and Performance

The FHLBank of Topeka's condition and performance are adequate. The FHLBank of Topeka's balance sheet shrank considerably in 2009 with total assets declining 27 percent year-over-year. The primary driver of the shrinking balance sheet was advances, which declined 38 percent to $22.3 billion. The FHLBank of Topeka's whole loan mortgage portfolio grew to 7.8 percent of total assets, in line with the System average. Total investments increased to 38.3 percent of total assets, the third highest ratio in the System. The FHLBank of Topeka maintains a strong capital position relative to other FHLBanks. Retained earnings of $355 million are 0.83 percent of assets, the highest ratio in the System. The FHLBank of Topeka remains in compliance with regulatory and risk-based capital requirements.

Topeka's private-label MBS portfolio stood at $1.9 billion par value as of year-end 2009, with a fair value relative to par value of 89 cents on the dollar. Topeka's private-label MBS portfolio has incurred minimal other-than-temporary impairment charges of less than 1 percent of beginning year par value. Prime securities represented 83 percent of Topeka's holdings and only 16 percent of Topeka's private-label MBS were below investment grade.

Topeka reported net income of $237 million in 2009, up significantly from $28 million in 2008. Return on equity and return on assets were the highest in the System and well above System averages. Net interest spread was greater than the System average. The FHLBank of Topeka benefited as higher-yielding assets such as mortgages and MBS became larger portions of the balance sheet and funding costs remained low. Net income was also boosted by gains on derivatives, which were primarily the result of accounting effects that reversed losses taken in 2008. Topeka paid dividends at an annualized rate of 2.57 percent.

The primary challenge facing the FHLBank of Topeka going forward is its declining advance portfolio. A relatively large unsecured investment portfolio exposes the FHLBank of Topeka to credit risk and creates earnings volatility due to accounting treatment of securities classified as trading.

### Risk Management

The FHLBank of Topeka's risk governance, monitoring, and control functions generally operate independent of one another and do not give the Board and senior management a comprehensive perspective of the FHLBank of Topeka's risk profile. The existing process is generally compliance driven and has not evolved into a framework of risk-return management fully integrated into strategic planning, business processes, performance measurement, and incentive compensation. The FHLBank of Topeka has not designated a chief risk officer. As a result, accountability for risk identification is unclear.

Front-line business decisions continue to exhibit strong risk-adjusted returns, but risk governance and independent risk oversight processes are weak and lack the maturity level appropriate for a systemically important organization.

Ineffective risk oversight is a root cause of AHP and market risk deficiencies. The FHLBank of Topeka's governance and administration of both the competitive application and homeownership set-aside programs remain weak.

Inaccurate spreads and imprecise valuation methodologies reduce confidence in the precision of management's risk metrics. Further, the FHLBank of Topeka's model validation program lacks sufficient scope, analyses, and testing to be effective.

**Examination Assessment**

|  | Level of Risk | Quality of Management |
| --- | --- | --- |
| **Market Risk** | Moderate | Adequate |
| **Credit Risk** | Moderate | Adequate |
| **Operational Risk** | Moderate | Adequate |
| **Corporate Governance** |  | Weak |

**Affordable Housing Program**

The 2008 examination identified a number of deficiencies in the administration of the FHLBank of Topeka's AHP. Matters improved during 2009, but remediation efforts continue.

AHP administration continues to lack sufficient analyses, timeliness, and management tools to operate effectively. Since the 2008 examination, the Board of Directors hired a consultant to review all policies, procedures, and practices and make recommendations to achieve consistency, regulatory compliance, and efficiency in the administration of the FHLBank of Topeka's AHP. Staffing additions and replacement of the anti-quated AHP management information system are also underway. These improvements are in the early stages, so the FHLBank of Topeka has yet to reap their benefits and fully address program defi-ciencies.

The 2009 examination also considered housing needs identification and prioritization. Topeka identified elderly, rural, and workforce housing development, down-payment assistance, and aging housing stock rehabilitation as critical housing issues and set out to address them through the FHLBank of Topeka's AHP competi-tive and set-aside programs. Among other meas-ures, Topeka responded to current conditions by reducing the maximum project award amounts to diversify the competitive program.

## FHLBank of San Francisco

### Overview

San Francisco is the largest FHLBank, with assets of $192.9 billion as of December 31, 2009. The FHLBank of San Francisco's assets fell by 40 percent in 2009, versus a 25 percent decline for the overall System, due primarily to a sharp reduction in advances to its largest borrowers.

The FHLBank of San Francisco's condition and performance are weak overall, principally because of the potential for losses on its $16.3 billion pri-vate-label MBS portfolio. In response, manage-ment boosted capital levels in 2009 by limiting capital repurchases and only paying dividends in the third quarter. The FHLBank of San Francisco reported a return on equity of 5.8 percent and a

return on assets of 0.21 percent in 2009, which were slightly higher than the overall System averages.

## Condition and Performance

The size and credit characteristics of its private-label MBS portfolio are the main reasons for the assessment that the FHLBank of San Francisco's financial condition and performance are weak. At $20.5 billion par value and $14.8 billion fair value, San Francisco had the largest private-label MBS investment portfolio in the System in 2009. Consequently, San Francisco's other-than-temporary impairments for 2009 were the largest in the System—San Francisco had $608 million in credit-related impairments and $4.1 billion total. Relative to par value at the beginning of 2009, San Francisco's credit-related other-than-temporary impairment was below the System-wide average (2 percent for San Francisco and 3 percent System-wide). Three-fourths of San Francisco's private-label MBS were Alt-A, and these holdings accounted for nearly the entire credit other-than-temporary impairment charges in 2009. In addition, 53 percent of its private-label MBS were below investment grade as of December 31, 2009.

A 43 percent drop in advances drove the overall decline in the FHLBank of San Francisco's assets in 2009. This follows a 54 percent increase in advances from June 30, 2007, to September 30, 2008, when the FHLBanks provided liquidity to many members as the financial crisis unfolded. San Francisco's outstanding advances are highly concentrated among its three largest borrowers. Two of the FHLBank of San Francisco's three largest members were purchased by nonmember institutions, and the third has scaled back its mortgage business, which has led to a sharper decline in San Francisco's advances than found in the overall System. Macroeconomic factors also contributed to the decline in advances as at most FHLBanks.

The FHLBank of San Francisco reported net income of $515 million in 2009, which was up from net income of $461 million in 2008 as higher net interest income and a reversal of large hedging losses in 2008 offset sizeable credit-related impairment on private-label MBS.

San Francisco's capital position has improved but remains a supervisory concern. Retained earnings rose to $1.2 billion at December 31, 2009, which is up sharply from only $176 million at December 31, 2008. After implementing the new impairment accounting rules, the FHLBank of San Francisco recorded an increase in retained earnings of $570 million on January 1, 2009. Negative accumulated other comprehensive income, most of which reflects noncredit losses on impaired private-label MBS, was $3.6 billion, however, calling into question the adequacy of retained earnings during 2009.

The continuing deterioration in the private-label MBS portfolio, large credit-related and noncredit other-than-temporary impairment losses on private-label MBS, growing but still inadequate retained earnings, a concentration of advances to large members, weak earnings, and a depressed market value of equity contribute to FHFA's concerns about the FHLBank of San Francisco's credit risk and financial condition and performance. In addition, further declines in the level of advances would reduce the FHLBank of San Francisco's future earnings potential. This, and possibly more credit and noncredit-related other-than-temporary impairment charges on some private-label MBS, would erode the FHLBank of San Francisco's ability to reach adequate retained earnings, particularly if the FHLBank of San Francisco expects to distribute more than nominal quarterly dividends. It will take some time before the FHLBank of San Francisco can achieve its current retained earnings target, and it could be later if greater than anticipated credit other-than-temporary impairment charges arise or if further reductions in the values of private-label MBS cause the retained earnings target to increase more in the months ahead.

## Risk Management

Credit risk is high and increasing as the FHLBank of San Francisco's private-label MBS portfolio continues to deteriorate as the FHLBank of San Francisco recorded impairment charges in each quarter of 2009. As of December 31, 2009, the FHLBank of San Francisco's private-label MBS portfolio with an amortized cost of $19.9 billion included noncredit other-than-temporary impairment of $3.6 billion and gross unrealized losses of $5.5 billion. The FHLBank of San Francisco booked credit-related other-than-temporary impairment of $116 million for the fourth quarter of 2009. In addition, FHFA classified $15.9 billion of the FHLBank of San Francisco's private-label MBS portfolio as substandard assets. While advances are fully collateralized, the FHLBank of San Francisco has a high concentration of advances to large members with recently declining advances balances, and it has an increasing number of members on its watch list.

In May 2009, organizational restructuring entailed both enterprise risk management and internal audit under the oversight of one senior vice president. This reporting structure potentially could compromise internal audit's independence, and FHFA concluded the reporting structure should change. The FHLBank of San Francisco separated this reporting structure in the fall of 2009. FHFA also found minutes of the credit committee, a key management committee, were not up-to-date; and a primary collateral model was not validated, as required by FHLBank of San Francisco policy.

Operational risk likely will increase as the FHLBank of San Francisco begins testing and implementing a new recordkeeping system for advances to members to replace an antiquated system over the next 12 to 24 months. In early 2009, stress in the credit markets increased transactional and accounting risk due to a higher than normal volume of member advance-related funding and hedging transactions. Management intends to enhance major business functions and streamline transactional processing and financial reporting through the front/back office replacement project. This project will replace some production systems with an integrated suite of applications designed to streamline processing and better adapt to evolving business needs. Implementation of the front/back office project will take up to two years, with the first phase targeting treasury and mortgage finance scheduled for implementation in the first quarter of 2011.

## Examination Assessment

|  | Level of Risk | Quality of Management |
|---|---|---|
| **Market Risk** | Moderate | Strong |
| **Credit Risk** | High | Adequate |
| **Operational Risk** | Moderate | Adequate |
| **Corporate Governance** |  | Adequate |

## Affordable Housing Program

The FHLBank of San Francisco satisfactorily addressed AHP issues raised during the 2008 examination. The 2009 examination focused on housing needs identification and prioritization. San Francisco identified rural and special needs housing development, refinancing and restructuring of unaffordable mortgages, and first-time homebuyer assistance as critical housing issues and set out to address them through the FHLBank of San Francisco's AHP competitive program or set-aside programs. San Francisco also responded to the economic downturn by increasing the maximum project award to offset reduced funding from other sources, such as low-income housing tax credit investors. In addition, San Francisco increased the maximum member award and removed the geographic restrictions for the set-aside programs.

## FHLBank of Seattle

### Overview

The FHLBank of Seattle is the tenth largest FHLBank with assets of $51.1 billion. The FHLBank of Seattle continues to present serious issues. Losses in the FHLBank of Seattle's private-label MBS portfolio strained capital and risk limits, and member failures during the global financial crisis greatly reduced outstanding advances—the FHLBank of Seattle's core business. FHFA deemed the FHLBank of Seattle undercapitalized for most of 2009, primarily because of inadequate levels of retained earnings and increased risks to capital from private-label MBS. The FHLBank of Seattle met all of its capital requirements at year end, though it failed its risk-based capital requirements for the first and second quarters of 2009. The depreciation in its private-label MBS portfolio and large volumes of stock acquired by nonmember institutions through mergers depress its GAAP capital.

### Condition and Performance

The FHLBank of Seattle's financial condition and performance are weak. Advances declined 40 percent in 2009 as loans to Washington Mutual (now JP Morgan Chase), once the FHLBank of Seattle's largest borrower, rolled off after the acquisition of the large thrift by JP Morgan Chase. The FHLBank of Seattle's private-label MBS portfolio continues to generate credit losses and keep the FHLBank of Seattle's market value of equity depressed relative to the par value of capital stock. As of December 31, 2009, the par value of Seattle's private-label MBS portfolio was $4.7 billion, with a ratio of fair value to par value of 64 percent. Seattle had the highest share of option ARM securities (53 percent) in the System and the third highest share of Alt-A private-label MBS (71 percent) in the System. The Alt-A holdings were the sole source of credit other-than-temporary impairment in 2009.

The financial condition and performance of the FHLBank of Seattle have deteriorated because of weaknesses in the value of private-label MBS acquired between the second half of 2005 and the first half of 2008. The FHLBank of Seattle lost $162 million in 2009, driven by $311 million in credit-related other-than-temporary impairment charges. Including the fourth quarter of 2009, the FHLBank of Seattle has reported six consecutive quarterly losses. Additional quarterly losses are possible given the poor quality of the FHLBank of Seattle's private-label MBS portfolio.

The FHLBank of Seattle suspended capital distributions in 2004. Some holders of Seattle capital stock were unable to redeem their shares in 2009, despite having waited the traditional five-year redemption period. The FHLBank of Seattle and its members may face a prolonged period of no dividends, a low and possibly declining level of retained earnings, a low market value of equity, and continued suspension of capital stock redemptions.

The FHLBank of Seattle has not fully addressed all prior examination findings. Despite criticisms of investment practices in prior examinations, the FHLBank of Seattle was slow to recognize the magnitude of credit risk in its private-label MBS portfolio and continued to invest in private-label MBS backed by high-risk, nontraditional mortgage assets through March 2008. Beginning in the fourth quarter of 2008, the FHLBank of Seattle has recognized quarterly other-than-temporary impairment charges resulting in net operating losses, low level of retained earnings, and a significant level of negative accumulated other comprehensive income. Impairment of the private-label MBS portfolio has remained high, resulting in the FHLBank of Seattle periodically failing to meet its risk-based capital requirement and indicating that more credit losses are possible and could be substantial.

As of March 31, 2009, FHFA determined that the FHLBank of Seattle was undercapitalized under

the prompt corrective action rule. That rule required the FHLBank of Seattle to submit a capital restoration plan, which it submitted on August 21, 2009. FHFA determined the FHLBank of Seattle's initial plan did not satisfy the requirements of the rule and was deficient in other respects. While the FHLBank satisfied, by a small margin, all capital requirements as of September 30, 2009, FHFA's Acting Director used his discretionary authority to maintain the undercapitalized classification. The FHLBank of Seattle has submitted a revised plan. The FHLBank of Seattle is unable to pay dividends or repurchase stock, actions designed to preserve capital, but which could harm the franchise value of the FHLBank of Seattle.

The FHLBank of Seattle's advance portfolio has declined significantly since it peaked in 2008. The fall in advances has reduced the FHLBank of Seattle's earnings capacity to about $25 million to $30 million per quarter. Even absent additional other-than-temporary impairment credit charges, it may take a long time for the FHLBank of Seattle to build retained earnings to a suitable level. The FHLBank of Seattle's current retained earnings balance of $53 million, which is 8.56 percent of the target level, compares unfavorably to the balance before the crisis of $190 million and the current negative level of accumulated other comprehensive income of $905 million.

### Risk Management

The FHLBank of Seattle needs to improve its ability to perform intensive income scenario analyses to better understand the risk profile of the institution and ensure that returns are commensurate with risk taken. As recommended during prior examinations, the FHLBank of Seattle also must complete portfolio segment performance analyses to measure the contribution to profitability of various asset classes, including determining the realized spread on the advance portfolio.

The FHLBank of Seattle deferred investment in technology for an extended period of time, resulting in antiquated information systems. In response

to examination findings, the FHLBank of Seattle is in the process of modifying its plans to overhaul its information system to include security and infrastructure needs. As a result, the completion date for the overhaul is extended from 2012 to 2014.

### Examination Assessment

|  | Level of Risk | Quality of Management |
|---|---|---|
| **Market Risk** | Moderate | Adequate |
| **Credit Risk** | High | Weak |
| **Operational Risk** | Moderate | Adequate |
| **Corporate Governance** |  | Weak |

### Affordable Housing Program

Administration of the FHLBank of Seattle's AHP has improved. The FHLBank of Seattle extended deployment of the new AHP management information system to 2010, but when operational, it will likely add considerable efficiencies and reporting capabilities to department operations. During the 2009 examination, FHFA directed management's attention to address a persistent program monitoring backlog. That backlog should be eliminated by the middle of 2010 and FHFA will review it at the 2010 examination.

The 2009 examination also considered housing needs identification and prioritization. Seattle identified special needs and Native American housing development, first-time homebuyer assistance, and affordable housing stock preservation as critical housing issues and set out to address them through the FHLBank of Seattle's AHP competitive and set-aside programs. Due to Seattle's weak financial performance in 2008, funds were limited. Losses in 2008 meant that no statutory contributions were available for the 2009 program year, severely reducing opportunities for awarding funds to projects meeting identified housing needs in the districts. Seattle was able to provide limited competitive and set-aside program funding through use of subsidy recaptures, repayments, and deobligations from previously approved subsidy awards.

## Office of Finance

The Office of Finance, a joint office of the FHLBanks, is charged with issuing and servicing consolidated obligations on behalf of the FHLBanks. Located in Reston, Virginia, the Office of Finance issues consolidated obligations when requested by one or more FHLBanks. It has no portfolio of its own and faces virtually no credit or market risks. The Office of Finance has approximately 85 employees and assesses the FHLBanks for the cost of its operations.

In 2009, the Office of Finance issued $508 billion of bonds in 5,123 separate transactions. It issued $1.5 trillion of nonovernight discount notes. Overnight discount notes outstanding averaged $23.2 billion. The Office of Finance prepares and distributes the combined financial reports used in the offering and sale of consolidated obligations. Overall, operations and management of the Office of Finance are adequate.

Corporate governance is adequate because of policies and practices developed and implemented by the Board and management. These policies include debt issuance processes, operational risk exception analyses, and disaster recovery and business continuity programs. Turnover in key management positions, including the chief operating and chief human resources officers, created uncertainty, given the scope of the chief operating officer's responsibilities and the then unresolved status of weaknesses in human resources planning. The chief operating officer also oversees a broad range of critical functions, including information technology, capital markets (short-term and term funding), operations (debt services), marketing and corporate communication, research and project management, and human resources. The chief operating officer resigned in August 2009 but agreed to remain until the end of February 2010. A new chief operating officer began in March 2010.

The Office of Finance has a moderate level of operational risk and adequate risk management. Operational risk related to the Office of Finance's accounting, financial, and regulatory reporting responsibilities is moderate and decreasing. Automated processes mitigate some of the risk. Remediation of the weaknesses related to matters identified at the 2008 examination further reduced the level of operational risk. Since the 2008 examination, management established a process and program for standard data definitions; opened a second back-up site in Chicago in June 2009 that provides replication of data within five minutes; and implemented an online information technology security awareness training program mandatory for all staff biannually.

Operational risk management is adequate. In addition to the remediation of the 2008 operational weaknesses, Office of Finance management established a stronger operational risk exception management process. FHFA cited the lack of this process as a weakness in the 2008 examination. Office of Finance management responded by enhancing its processes for risk controls self-assessment, enterprise risk policy, risk event tracking and root cause analysis, and notification criteria. In addition, the Office of Finance purchased enterprise risk management software to support tracking and reporting of these issues. The Office of Finance was installing this software and migrating data during the 2009 examination.

### Examination Assessment

| | Level of Risk | Quality of Management |
|---|---|---|
| **Operational Risk** | Moderate | Adequate |
| **Corporate Governance** | | Adequate |

FHFA 1299

# Director Compensation

The FHLBanks have Boards of Directors ranging in size from 14 to 19 directors, all of whom are elected by the member institutions. A majority of the Board members are directors or officers of member institutions, while the remainder (not fewer than 40 percent) are independent, meaning they are not officers of an FHLBank nor directors, officers, or employees of any of the FHLBank's member institutions.

From 1999 to 2008, the annual salaries of FHLBank directors were subject to statutory caps. With the enactment of the Housing and Economic Recovery Act (HERA) in July 2008, Congress repealed the statutory caps and authorized the FHLBanks to pay reasonable compensation to their directors.

For 2009, most FHLBanks set the maximum annual compensation at: $60,000 for a chairperson; $55,000 for a vice chairperson; $50,000 to $55,000 for a committee chairperson; and $45,000 for all other directors. At Cincinnati and Indianapolis, the compensation limits differed slightly. At Cincinnati, the maximum annual compensation was $60,000 for any single director. Directors who served on the audit committee were paid an additional $5,000 in annual compensation. At Indianapolis, additional annual committee chair fees ($5,000 or $10,000 per committee chair position, depending on the committee) beyond the maximum amounts may be earned depending on committee chair assignments throughout the year. In practice, Indianapolis directors hold no more than one committee chair assignment.

The total fees paid by the 12 FHLBanks and the Office of Finance to directors during 2009 were $9.5 million, ranging from a low of $569,328 at San Francisco to a high of $903,125 at Indianapolis. The chairperson at 11 of the FHLBanks received $60,000, the maximum

**Figure 40 • FHLBank Director Compensation in 2009**



| | BOS | NYK | PIT | ATL | CIN | IND | CHI | DSM | DAL | TOP | SFR | SEA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Minimum | 22,500 | 45,000 | 45,000 | 45,000 | 45,000 | 40,625 | 11,250 | 45,000 | 40,000 | 45,000 | 5,145 | 18,739 |
| Maximum | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 50,397 | 55,000 |
| Average | 46,129 | 47,500 | 50,964 | 45,938 | 48,788 | 46,563 | 44,706 | 47,188 | 47,187 | 49,615 | 39,179 | 44,587 |

Source: FHFA

Note: One of the directors of FHLBank San Francisco requested not to be compensated. This graph does not reflect any unpaid fees.

amount set by most FHLBanks. The chairperson at Indianapolis received $65,000 ($60,000 for being the Board chair and $5,000 for being the chair of the executive/governance committee) and the chairperson at the Office of Finance received $58,000. A director other than the chairperson received on average between $39,179 and $50,964 in compensation during 2009. (See Figure 40.)

In Figure 40, variation among directors appears to be high at Boston, Chicago, San Francisco, and Seattle. At these four FHLBanks, some directors served on the Board for less than a year, and, at Seattle, one director refused to accept the 2009 increase in director fees (the minimum amount represents the capped fees for other directors in 2008).

FHFA 1301

# Accounting

In 2009, as expected losses on mortgage assets mounted, accounting standards that companies applied to measure these losses gained increased attention. Financial institutions were under pressure to provide a transparent view of asset values in their financial statements. Yet, many of these institutions argued that certain accounting standards, particularly those governing fair value measurements and impairment of investment securities, were unduly punitive. Some in the banking industry expressed the view that accounting standards required them to recognize losses in excess of what would likely ever be realized as markets for some financial instruments became inactive.

In response to the issue, the Financial Accounting Standards Board debated, took comment, and ultimately modified relevant accounting guidance.

Although the debate over fair-value measurement got the most public attention, the most significant story in 2009 regarding fair value was not what changed in accounting guidance, but what *did not* change. FASB considered changing core concepts around fair-value measurements in inactive markets, but the board ultimately preserved the precepts that (1) fair values should be based on market participant inputs and (2) the objective of fair-value measurements is to identify an exit price—meaning an estimate of what an asset could be *sold for* on the measurement date. The eventual changes in fair-value measurement guidance did not have a significant impact on the entities FHFA regulates, because their processes for determining fair value were relatively robust and did not require major changes.

Two accounting changes did have significant impacts on FHFA's regulated entities: other-than-temporary impairments of debt securities (impairments) and consolidation accounting.

## Other-Than-Temporary Impairments

On April 9, 2009, FASB issued updated accounting guidance to improve presentation of and disclosures around impairments. The new guidance made several changes to impairment accounting. It changed the threshold for recognizing impairments to one that compares expected future cash flows to those expected at purchase. The previous model considered events that had occurred that made future losses probable.

The guidance also made it easier for an entity to assert its intent regarding impaired instruments and changed how impairments are presented in the income statement by allowing the preparer to divide impairments between net income and other comprehensive income[1] based on its best estimate of the credit loss it actually expects to incur. The previous guidance required a company to write the instrument down to its fair value through net income. The new guidance requires only the present value of expected cash flow shortfalls (credit loss) be written off through net income and the balance (the fair-value loss minus the credit loss) be recorded in other comprehensive income. (See Figure 41.) This change had a significant impact on the entities FHFA regulates, increasing net income (or reducing net losses) by billions of dollars in 2009.

---

[1] Other comprehensive income is not generally reported on the face of the income statement, although such reporting is permitted. Net income is the more widely recognized measure of earnings.

**Figure 41 •** Illustration of Effects Before and After Impairment Guidance Changes

| | Before 2009 Impairment Guidance Change | After 2009 Impairment Guidance Change |
|---|---|---|
| Total other-than-temporary impairment losses | (100) | (100) |
| Less portion of loss recognized in other comprehensive income | N/A | 75 |
| Net other-than-temporary impairment recognized in net income | (100) | (25) |

While the new guidance reduced the loss recognized in net income, the full write-down to fair value is still reflected on the balance sheet and in GAAP equity. The difference between the write-down taken through net income and the full fair value decline travels through other comprehensive income and is ultimately recognized on the balance sheet in a special equity account known as accumulated other comprehensive income, which is generally excluded from regulatory capital measures. Accumulated losses reflected in this category, while part of the GAAP measure of shareholders' equity, generally do not affect regulatory capital.

The new guidance also permitted entities to effectively recover the portion of prior impairment losses not identified as credit-related through a transition provision that reclassified noncredit portion of prior other-than-temporary impairment from retained earnings to accumulated other comprehensive income. This change increased several of the FHLBanks' regulatory capital ratios.

The impairment guidance also significantly expanded disclosures. Companies must now disclose the methodology and key assumptions they apply to measure the credit portion of impairments. A period-to-period reconciliation or "roll forward" of credit impairment also must be disclosed to make clear the cumulative credit impairment recognized on impaired assets.

FHFA participated in FASB's formal comment process and discussed the issues with other regulators, FASB staff, and large accounting firms. The FHLBanks adopted the guidance in the first quarter of 2009. Fannie Mae and Freddie Mac adopted it in the second quarter.

## Consolidation Accounting

FASB also issued long-awaited amendments to accounting standards relating to transfers of financial assets and consolidation of variable interest entities.[2] This change was the culmination of years of work, but the economic crisis hastened its passage. The existing rules were blamed for allowing financial institutions to hide risk using off-balance sheet vehicles. The new guidance, finalized in June 2009 and effective in 2010, requires many previously off-balance sheet securitization structures to be recognized on the balance sheet.

The amendments removed from GAAP the concept of a qualifying special purpose entity and related scope exception from the consolidation provisions applicable to variable interest entities. FASB based the consolidation decision on whether a controlling interest is held in a passive entity. The literature also changed from a quantitative to a qualitative assessment and required ongoing reassessments to determine if companies must consolidate variable interest entities. This differs greatly from previous rules, which only required companies to make a consolidation determination for variable interest entities when specific events occurred. The amendments also included many new disclosure requirements in the interest of transparency for investors.

---

[2]   Variable interest entity is an accounting term. For FHFA's regulated entities, the most common are the various securitization structures Fannie Mae and Freddie Mac issue and purchase.

FHFA participated in FASB's review process for the amendments throughout the year and worked with the standards board, the SEC, the Enterprises, and their external auditors to find practical solutions to complex accounting issues arising from the new guidance.

The combined effect of these standards is that Fannie Mae and Freddie Mac must consolidate most of the MBS they guarantee. The loans contained in consolidated MBS will be reflected directly as assets on the balance sheets of Fannie Mae and Freddie Mac, and bond holders' MBS interests will be reflected as secured borrowings. Before FASB set the new amendments, Fannie Mae and Freddie Mac accounted for most of their guarantee businesses off-balance sheet, under the qualifying special purpose entity exemption. Unlike the Enterprises, the FHLBanks do not participate in securitization and guarantee programs.

Adopting this complex standard has had a major impact on the Enterprises' accounting models, disclosures, and operations. It significantly increases the size of the balance sheet adding more than $4 trillion of assets and liabilities between the two Enterprises. The guidance changed the basis for reporting certain assets and liabilities, which reduced shareholders' equity by approximately $12 billion for Freddie Mac but increased it by approximately $2 billion to $4 billion for Fannie Mae, effective January 1, 2010. These transition adjustments could affect first quarter 2010 incremental draws on the preferred stock agreements with Treasury.

The Enterprises' income statements will also change significantly. All interest from guaranteed loans will be recognized as the Enterprises' interest income, and the interest paid to MBS investors will be recognized as their interest expense. Guarantee fees (formerly reported separately) will be largely absorbed into the net interest margin.

## Looking Ahead

In 2009, FASB made significant changes to the accounting models employed by the entities FHFA regulates, and 2010 could bring still more changes. FASB and the International Accounting Standards Board are working toward a single set of global accounting standards, though the two boards have reached tentative conclusions in their respective deliberations that differ. The current focus of both boards is on accounting for financial instruments, which will likely have major consequences for FHFA's regulated entities and lead to further changes.

Under FASB's tentative decisions, most financial assets would be carried at fair value on the balance sheet with changes in fair value each period being recorded either in earnings or in other comprehensive income. The international standards board permits historic cost accounting for some instruments. A company's balance sheet and income statement could differ substantially under these two approaches. FHFA will continue to monitor these issues as the two standard setting boards reconcile their differences.

FHFA 1304

FHFA 1305

# Supervisory Actions

## Conservatorship

The statutory role of FHFA as conservator requires FHFA to take actions to preserve and conserve the assets of the Enterprises and restore them to safety and soundness. To fulfill the statutory mandate of conservator, FHFA must follow governance and risk management practices associated with private-sector disciplines.

FHFA, as conservator, has allowed the companies to continue to operate as ongoing business concerns within certain well-controlled parameters. FHFA has also directed the companies to respond to the dynamic needs of the distressed housing market. As conservator, FHFA recognizes that using existing core competencies, infrastructure, and mortgage market expertise of the two Enterprises will help to stabilize the housing market, as well as provide time for policy makers to decide how to remodel housing finance in the United States.

As conservator, FHFA focused in 2009—and continues to focus in 2010—on restoring confidence in the Enterprises, enhancing their capacity to fulfill their missions, mitigating losses, and addressing systemic risks that contributed directly to instability in the housing market.

## Treasury and Federal Reserve Support

During 2009, Treasury and the Federal Reserve provided unprecedented support to the mortgage markets. Specifically, Treasury completed its mortgage security purchase program. The liquidity facility was not used, and Treasury allowed it to expire at year end. The Federal Reserve committed to purchase up to $1.25 trillion MBS by March 31, 2010, and through January 6, 2010, the Federal Reserve had purchased $1.02 trillion of Enterprise MBS and $125.5 billion in Enterprise debt. As anticipated, both purchase facilities have been allowed to gradually wind down.

The Preferred Stock Purchase Agreements between Treasury and the Enterprises, which commenced with the establishment of the conservatorships in September 2008, were designed to ensure each Enterprise maintained positive net worth. The critical role of the agreements was reaffirmed twice in 2009 with modifications to the original agreement. In February 2009, the Administration again emphasized the importance of the agreements in maintaining market confidence in the Enterprises by announcing an increase in the financial commitment to each company from $100 billion to $200 billion.

On December 24, 2009, Treasury reaffirmed this commitment and amended the agreements to cover the greater of $200 billion or $200 billion plus cumulative net worth deficits experienced during 2010, 2011, and 2012, less any net worth surplus remaining as of December 31, 2012. This latest change was designed to quell any market uncertainty and ensure the Enterprises remain a stable source of funds for new home purchases and refinancing of existing mortgages. This amendment also assured capital market investors that Enterprise securities are sound investments.

Through December 31, 2009, losses at the two Enterprises required them to draw $125.9 billion (combined) from the U.S. Treasury under the preferred stock facility. This direct financial support allowed the Enterprises to sustain the mortgage market and help restore stability to the housing market.

## Conservatorship Governance

FHFA, as conservator, has consistently made clear the Enterprises will continue to be responsible for normal business activities and day-to-day operations, seeking conservator approval and guidance as needed. In 2009, both companies focused on conserving assets, minimizing corporate losses, meeting their mission, remediating identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed.

During 2009, FHFA, as conservator, directed the Enterprises at times to align their business practices in support of the housing market. At other times, FHFA allowed the companies to focus on individual practices providing competitive advantages to each.

Despite adverse market conditions in 2009, the Enterprises were able to provide both stability and liquidity to the housing market. Both FHFA, as conservator, and the Enterprises undertook a number of activities in 2009 related to the conservatorship.

## FHFA's Actions as Conservator

**Boards of Directors**—FHFA, as conservator, regularly attends Board and committee meetings at both Enterprises. During 2009, each Board and its committees met regularly, overseeing business decisions and corporate governance matters and consulting with FHFA when appropriate.

**Executive Compensation and Management**—As conservator, FHFA believes it is critical to protect taxpayer interests in the Enterprises by ensuring that each company has experienced, qualified people managing day-to-day business operations. The directors and senior executives tied to the financial collapse at each Enterprise are no longer with the companies. Senior executives who remain, as well as those who were recently hired, are essential to the Enterprises being able to fulfill the important goals of the conservator

ships. It is critical to retain existing staff and attract new executive management to fill vacancies.

FHFA worked closely with each Enterprise's Board to develop a set of compensation policies. All executive management compensation decisions were subject to consultation with Treasury through Treasury's Special Master of Troubled Assets Relief Program (TARP) Executive Compensation. FHFA's overall objective was to structure the Enterprise compensation program as Treasury had done for banks that received funds under TARP, but FHFA also considered additional complexities unique to Freddie Mac and Fannie Mae.

FHFA also implemented a "claw back" provision that was reviewed by the Special Master, and its provisions go further than the claw back used for TARP institutions. Claw backs allow FHFA to reclaim previously given monies or benefits if it is later determined that management fell short through either adverse action or inaction. FHFA prevented excessive perquisites by eliminating tax gross-ups (money provided to an employee for taxes they owe on relocation expenses), reducing relocation expenses, and amending retirement packages for select individuals.

**Conservatorship Directives**—Under the Housing and Economic Recovery Act of 2008 (HERA), while in conservatorship, some Enterprise actions or decisions require either explicit approval or no objection from FHFA. FHFA communicated on a number of decisions during 2009 including establishing corporate goals that tie directly to compensation decisions, reappointing  Directors, banning new products not related to loss mitigation, providing approvals for changes in accounting policy, authorizing sales and disposition of assets, guiding settlement of contractual obligations and various legal decisions, appointing external auditors, and overseeing charitable activities. Under the Preferred Stock Purchase Agreement, some decisions require Treasury approval, and FHFA has worked with Treasury and the Enterprises as needed.

## Enterprise Actions in Conservatorship

**Making Home Affordable**—As agents of the Treasury, Freddie Mac and Fannie Mae are serving the principle implementation role of the Administration's foreclosure prevention initiative. MHA includes a refinance component and a loan modification program, both designed to reduce preventable foreclosures. Both Enterprises devoted significant resources to MHA programs, Fannie Mae as program administrator, and Freddie Mac in the role of compliance agent.

**Support for the Market**—The Enterprises provided more than $1.372 trillion combined in liquidity to keep the single- and multifamily mortgage markets operating in 2009. The Enterprises' share in financing or guaranteeing new single-family mortgage production was 76 percent in 2009. During 2009, Freddie Mac and Fannie Mae together issued approximately $1 trillion in new MBS. In addition, Fannie Mae and Freddie Mac provided funding and liquidity for single-family and multifamily counterparties during periods when traditional funding sources were scarce.

**Mortgage Interest Rate Stability**—The Enterprises' continued mortgage securitization activity in the market, combined with substantial Federal Reserve and Treasury MBS purchases, maintained single-family mortgage rates at historic lows throughout 2009 and kept multifamily rates stable to provide financing for rental housing.

**Loss Mitigation**—In addition to MHA, the Enterprises focused significant resources in 2009 on loss mitigation activities, working with servicers to provide borrowers foreclosure prevention options, such as payment reductions, payment forbearance, and foreclosure moratoria. Both Enterprises continued to offer alternatives including rental options, deeds in lieu of foreclosure and short sales.

**Outreach Efforts**—Both Enterprises aggressively implemented a number of community outreach efforts, including borrower assistance centers, call centers, website updates, and grants to nonprofit organizations with proven mortgage modification programs and effective counseling services. The Enterprises also educated servicers on the initiatives and helped many build capacity to support the volume of requests from distressed borrowers.

**Housing Finance Agency Support**—Since the financial crisis of 2008, state and local housing finance agencies (HFAs) had largely been unable to raise new funds, and faced high costs of liquidity for their variable rate debt. During 2009, Treasury, FHFA, and the Enterprises worked to develop a new initiative aimed at supporting HFAs. The initiative has two parts—a $15 billion new issue bond program to support new HFA mortgage lending and an $8.2 billion temporary credit and liquidity program to lower the cost of outstanding HFA variable rate debt. The Enterprises executed 134 separate transactions with 93 state and local HFAs in December.

**Remediating Known Weaknesses**—FHFA is closely monitoring actions the Enterprises' Boards and management are taking to correct weaknesses cited in the 2008 and 2009 annual *Report(s) of Examination* of Fannie Mae and Freddie Mac. Progress continues, but the Enterprises still need to make additional efforts to remediate all the identified weaknesses.

## Other Supervisory Actions

**Federal Home Loan Bank of Chicago**—The Federal Home Loan Bank of Chicago continues to operate under a consent cease and desist order, originally entered into in October 2007 and amended in July 2008, which prohibits the FHLBank of Chicago from redeeming or repurchasing capital stock without the agency's consent, and requires the development of satisfactory capital and risk-management plans.

**Federal Home Loan Bank of Seattle**—The FHLBank of Seattle failed to meet its risk-based capital requirement in each of the first two quarters of 2009, resulting in a capital classification of undercapitalized. It met all capital requirements in the third quarter. However, in November 2009, FHFA exercised its discretion to reaffirm the Federal Home Loan Bank of Seattle's classification as undercapitalized under the prompt corrective action provisions of the Federal Housing Enterprises Financial Safety and Soundness Act on account of risks of further deterioration in the FHLBank of Seattle's portfolio of private-label MBS and the absence of acceptable plans for addressing those risks. That supervisory action continued statutory restrictions on the FHLBank of Seattle's ability to redeem or repurchase capital stock and a mandate to submit a capital restoration plan for the agency's review and approval.

**Compensation Matters**—During 2009, in carrying out its oversight responsibilities as conservator for the Enterprises, FHFA reviewed and rendered decisions on numerous compensation-related proposed actions. These included new compensation structures and amounts for all executive officers at both Enterprises, offers for 7 new officers, 9 promotions, 7 termination terms for 13 deputy officers, executive scorecards for incentive pay, and all compensation disclosures.

The new structures lowered executive officer pay by an average of 40 percent from preconservatorship levels, sharply reduced executive perquisites, and included recapture provisions in certain circumstances. They were designed in consultation with the Special Master of TARP Executive Compensation to use the same general structure as pay packages approved for executives at financial institutions that received exceptional TARP assistance.

Also during 2009, the agency issued an advisory bulletin to the Federal Home Loan Banks on principles for executive compensation and reviewed more than 35 requests from the FHLBanks

regarding compensation actions involving new hires, termination benefits, incentive compensation plans, and other nonsalary compensation. The agency also reviewed 2009 performance year (annual and long-term) compensation recommendations and 2010 salary adjustments for executive officers at the 12 FHLBanks. Two of the FHLBanks (Boston and Chicago) did not pay any performance-based bonuses to their top executive officers for the 2009 performance year.

## Foreclosure Prevention

FHFA encouraged the Enterprises to lead foreclosure prevention efforts to stabilize housing and financial markets. Both Enterprises are devoting significant resources to programs aimed at reducing default rates, preventing avoidable foreclosures, and when necessary, allowing graceful exits from the home.

Throughout 2009, FHFA helped develop and implement the Administration's program designed to help at-risk homeowners avoid foreclosure. Under an MHA program agreement with Treasury, the Enterprises play key roles as financial agents in carrying out the Administration's objectives. Fannie Mae has assumed the role of MHA program administrator and Freddie Mac serves as MHA compliance agent.

### Fannie Mae as Program Administrator

Under the MHA Program, Fannie Mae assumed the responsibility of program administrator, overseeing the implementation and execution of new programs. Fannie Mae's role includes designing and implementing standardized MHA programs, serving as record keeper and pipeline manager and coordinating with the paying agent for disbursement of Treasury incentives. Fannie Mae provided guidance to borrowers and servicers, developed websites, and trained servicers. It also launched outreach events in some of the hardest-hit cities across America, maintained call centers,

and issued reports to inform the public about the program. In 2009, Fannie Mae:

- Issued 10 MHA supplemental directives, including guidelines for HAMP, home price decline incentives, second-lien modifications, data collection and reporting, borrower notices, and foreclosure alternatives (including short sales and deeds in lieu of foreclosure).

- Registered and executed servicer participation agreements with more than 100 servicers of non-Enterprise loans under HAMP (portfolio loans and loans in private-label MBS).

- Led a large-scale campaign with the top seven servicers to convert HAMP trial period plans to permanent modifications.

- Organized or attended 155 borrower outreach events, including 20 Treasury events that attracted more than 22,000 homeowners.

### Freddie Mac as Compliance Agent

Under its agreement with Treasury, Freddie Mac is responsible for monitoring the compliance of all participating mortgage servicers of non-Enterprise loans with the servicer participation agreement and MHA guidelines.

Through year-end 2009, Freddie Mac's MHA-Compliance department conducted on-site compliance reviews at 11 of the nation's largest servicers. MHA-Compliance reviews whether servicers are properly applying Treasury's HAMP guidelines and the related net present value model and audits incentive payments made to borrowers, servicers, and investors for program compliance.

Review results help servicers improve their processes and take corrective actions where necessary. MHA-Compliance directly communicates review results to Treasury, which can then make

adjustments to program policy to make HAMP more effective and efficient. In serious cases with noncompliant servicers, MHA-Compliance consults with Treasury on appropriate courses of action.

As more trial period plans are converted to permanent modifications, MHA-Compliance has increasingly focused on whether loan files are adequately documented and the borrower and modification terms meet HAMP guidelines. Loan file reviews include "second looks" at declined modification requests to ensure borrowers were appropriately reviewed for HAMP and the decline decision was accurate.

### Home Affordable Modifications

HAMP offers modifications to borrowers who demonstrate hardship, are able to pay the mortgage at modified terms, and are willing to keep the property. Borrowers must successfully make modified payments for a trial period of at least three months before a permanent modification is granted.

Borrowers who demonstrate a reasonable chance of successfully performing on a loan with modified terms are given the opportunity to keep their homes. To create a more affordable payment, a modification may include a combination of capitalization, interest rate reduction, term extension, principal forbearance, or principal forgiveness.

The number of permanent modifications lagged behind expectations in 2009, with only about 10 percent of trial plans being converted to permanent modifications. As a result, Treasury adjusted HAMP guidelines and extended the timeframe for borrowers to document their eligibility and financial situation for permanent modifications. The trial period plan-to-permanent modification conversion rate is expected to improve significantly in 2010—particularly since the program will now require verified rather than stated income to enter into a trial period plan.

FHFA 1310

Both Enterprises require all eligible borrowers to be considered for HAMP before other modifications or foreclosure alternatives. For delinquent borrowers who are ineligible for HAMP, the Enterprises consider other modification options or provide the borrowers with a foreclosure alternative (such as a short sale or deed in lieu of foreclosure) if sustaining homeownership proves impossible.

## Home Affordable Refinances

Declining home values made it impossible for many families to refinance to more affordable payments. HARP allows homeowners whose home values have fallen to take advantage of historically low interest rates by refinancing their mortgages. HARP is available to eligible borrowers whose mortgages are owned by Freddie Mac or Fannie Mae. Borrowers may enter into a refinance through any approved lender.

Homeowners may refinance as much as 125 percent of their home's current value. In some cases, HARP refinances are complicated by the need to transfer mortgage insurance coverage from the paid-off loan to the new loan. As with all refinance activity, the volume of HARP refinance loans is affected by the interest rate environment.

Of the 2.5 million borrowers who refinanced their mortgages with Fannie Mae financing in 2009, 329,000 refinanced through Fannie Mae's streamlined process, including 104,000 Fannie Mae borrowers who refinanced through HARP.

Of the 1.7 million borrowers who refinanced their mortgages with Freddie Mac financing in 2009, 169,000 refinanced through Freddie Mac's streamlined process, including 86,000 Freddie Mac borrowers who refinanced through HARP.

According to the U.S. Treasury, borrowers who refinanced saved an estimated $150 per month on average and more than $6.8 billion total over the first year.

## Other Actions Taken by the Enterprises

When a borrower with a Fannie Mae- or Freddie Mac-owned loan does not qualify for HAMP, the Enterprises may other offer work-out options through servicers. In 2009, Fannie Mae provided more than 75,000 borrowers with alternative modification plans and helped another 164,000 borrowers keep their homes through repayment plans, payment forbearance, or other means. Freddie Mac provided more than 45,000 borrowers with alternative modification options and another 55,000 with other ways to save their homes.

In 2009, Fannie Mae provided alternatives to about 39,000 borrowers whose economic hardships precluded them from staying in their homes. Freddie Mac provided alternatives to 19,000 borrowers. These borrowers took advantage of various options, including rental strategies, deeds in lieu of foreclosure, and preforeclosure or short sales.

### Public Transparency

FHFA promotes transparency in the Enterprises' foreclosure prevention and refinance activities. In November 2008, FHFA began publishing a monthly *Foreclosure Prevention Report* that chronicles the Enterprises' loan modification and other foreclosure prevention activities. In August 2009, FHFA began publishing a monthly *Refinance Report* that summarizes the Enterprises mortgage refinance activities, including HARP refinances. These reports together form the key elements of FHFA's monthly *Federal Property Managers Report* to Congress, which FHFA began producing in December 2008, as required by Section 110 of the Emergency Economic Stabilization Act of 2008.

FHFA 1311

# Housing Mission and Goals

## Enterprise Affordable Housing Goals

Under HERA, the housing goals established by the Department of Housing and Urban Development (HUD) for 2008 carried over to 2009, subject to modification by FHFA after reviewing market conditions and the financial conditions of the Enterprises. FHFA initiated that review in the fourth quarter of 2008, and determined that, with one exception, the housing goals and subgoals established by HUD were not feasible for 2009. In March 2009, FHFA announced it had determined all three home purchase subgoals established by HUD and two of the overall goals for 2008 were infeasible. By proposed rule published May 1, 2009, and final rule

published August 10, 2009, FHFA adjusted the housing goals and most subgoals downward from the levels established by HUD for the years 2005 through 2008 and gave goals credit for qualifying loan modifications under HAMP. (See Figure 42.)

For 2009, FHFA determined that both Enterprises missed the underserved areas goal and their special affordable multifamily subgoals. Freddie Mac was likely to also miss its special affordable goal and its undeserved areas home purchase subgoal. In December 2009, FHFA wrote to the Enterprises requesting detailed reasons for their likely failures to meet these goals and subgoals, a determination process that continued into 2010. In January, 2010 the Enterprises provided a detailed explanation regarding the missed goals.

In 2009, FHFA began developing a proposed rule

**Figure 42 • Enterprises' Housing Goals and Performance for 2008–2009**

| Category | 2008 Goal/Subgoal | 2008 Performance | | 2009 Goal/Subgoal | 2009 Performance[1] | |
|---|---|---|---|---|---|---|
| | | Fannie Mae | Freddie Mac | | Fannie Mae | Freddie Mac |
| **Overall Goals[2]** | | | | | | |
| Low-mod income | 56% | 53.7% | 51.5% | 43% | 47.7% | 44.7% |
| Underserved areas | 39% | 39.4% | 37.7% | 32% | 28.8% | 26.7% |
| Special affordable | 27% | 26.4% | 23.1% | 18% | 20.8% | 17.7% |
| **Home Purchase Subgoals[3]** | | | | | | |
| Low-mod income | 47% | 38.8% | 39.3% | 40% | 51.8% | 48.4% |
| Underserved areas | 34% | 30.4% | 30.2% | 30% | 31.1% | 27.9% |
| Special affordable | 18% | 13.6% | 15.1% | 14% | 23.2% | 20.6% |
| **Special Affordable Multifamily Subgoals ($b.)** | | | | | | |
| Fannie Mae | $5.49 | $13.31 | NA | $6.56 | $6.47 | NA |
| Freddie Mac | $3.92 | NA | $7.49 | $4.60 | NA | $3.69 |

[1]   Performance as reported by the Enterprises official 2009 performance will be determined by FHFA after review of Enterprise loan-level data.
      Goals for 2009 included credit for qualifying loan modifications.

[2]   Minimum percentage of all dwelling units financed by each Enterprise.

[3]   Minimum percentage of all home purchase mortgages on owner-occupied properties financed by each Enterprise in all metropolitan statistical areas.

on substantial revisions to the housing goals that go into effect in 2010. HERA requires four single-family goals and one multifamily special afford-able goal for 2010 and beyond. For single-family purchase money mortgages, there will be goals based on three types of families—those who are classified as low- or very low-income and those residing in low-income areas. The statute also requires a low-income, single-family refinance goal, as well as multifamily special affordable goals for low-income families and subgoals for very low-income families.

HERA also requires the Enterprises to lead the market in developing loan products and flexible underwriting guidelines for the secondary market for mortgages for low-, very low-, and moderate-income families for manufactured housing, affordable housing preservation, and rural housing (this is part of the Enterprises' "duty to serve").

FHFA published an Advance Notice of Proposed Rulemaking on August 4, 2009, and requested public comment on standards for evaluating the Enterprises' duty to serve these markets. FHFA received and evaluated more than 100 comments and began preparations for publishing a pro-posed rule.

## FHLBanks Affordable Housing Goals

Beginning in 2009, HERA required FHFA to estab-lish interim housing goals for the FHLBanks based on their mortgage purchases. The purpose of the housing goals is to ensure FHLBanks are serving very low and low-income families and families residing in low-income areas. FHLBanks currently purchase single-family whole loans through their acquired mortgage asset programs.

To develop recommendations for the proposed interim target housing goals, FHFA analyzed the FHLBanks' mortgage purchase activity. FHFA intends to propose interim target housing goals that will be consistent with the single-family housing goals for the Enterprises, according to the statutory intent of HERA, while taking into account unique characteristics of the FHLBanks. A proposed rule would include a volume threshold to ensure an FHLBank has significant mortgage purchase volume before the FHLBank is subject to interim target housing goals.

## FHLBanks' Targeted Affordable Housing and Community Investment Activities

The FHLBanks administer three targeted housing and community investment programs: AHP, the Community Investment Program (CIP), and the Community Investment Cash Advances (CICA) program. Using these, FHLBanks finance targeted community investment projects and expand homeownership and rental opportunities for low- or moderate-income households (80 percent of area median income or below) and middle-income households (115 percent of area median income).

**AHP Regulatory Initiatives**—In 2009, FHFA approved and implemented initiatives to enhance regulation of AHP, CIP, and CICA programs. The initiatives included:

**FHLBank Mortgage Refinancing Authority**—HERA amended the Federal Home Loan Bank Act, adding a provision requiring FHFA to allow FHLBanks to use subsidy funds from their AHP homeownership set-aside programs to refinance low- and moderate-income households' first mortgage loans on primary residences until July 30, 2010. In August 2009, FHFA published an interim final rule that allows an FHLBank to use up to two-thirds of its homeownership set-aside allocation (up to 35 percent of its statutory con-tribution) to assist households that qualify for refinancing under eligible federal, state or local government targeted refinancing programs when additional subsidy is needed to bring down the household's mortgage debt-to-income ratio to an affordable level or to bring down the mortgage principal to meet a maximum loan-to-value ratio.

FHFA 1313

HOUSING MISSION AND GOALS

**FHLBank Affordable Housing Program—**
FHFA's August 2009 interim final rule also included amendments to the affordable housing program and the competitive application program to enhance AHP's capacity to respond to changes in the wake of the current economic and housing crisis. The interim final rule amended the method an FHLBank may use to account for accelerating future year AHP contributions for use in the current year. The interim final rule also gave FHLBanks more opportunities to use AHP subsidies to assist in the purchase and rehabilitation of foreclosed properties as well as to establish other priorities for the awarding of AHP subsidies.

**AHP, CIP, and CICA Program Data Integrity Review—**In 2009, FHFA held on-site data integrity reviews at all 12 FHLBanks to validate the 2008 AHP, CIP, and CICA program data submissions to FHFA and clarify reporting requirements in the agency's data reporting manual. The reviews also verified whether the new AHP, CIP, and CICA databases, completed in 2008, accurately captured and reported program data.

## Affordable Housing Program

The FHLBank Act requires each of the 12 FHLBanks to establish an AHP to be used for the construction, purchase, or rehabilitation of housing addressing a wide range of needs. AHP funds help subsidize the cost of owner-occupied housing targeted to households with incomes at or below 80 percent of area median income, and rental housing that reserves at least 20 percent of the units for households with incomes at or below 50 percent of area median income. The subsidy may be in the form of a grant or a subsidized interest rate on an advance from an FHLBank to a member.

The FHLBank Act requires each FHLBank to contribute annually at least 10 percent of its previous year's net earnings to AHP, with a minimum annual combined contribution by the 12 FHLBanks of $100 million. From 1990 to 2009,

the FHLBanks contributed more than $3.3 billion to AHP. (See Figure 43.) In 2010, FHFA expects approximately $252 million in AHP subsidies to be available nationwide, compared to more than $188 million in 2009, an increase of 34 percent.

In 2009, each FHLBank administered two AHPs, a competitive application program and at least one homeownership set-aside program. An FHLBank may set aside annually up to the greater of $4.5 million or 35 percent of the FHLBank's annual statutory AHP contribution to assist low- or moderate-income households in purchasing or rehabilitating homes, provided that at least one-third of the FHLBank's aggregate annual set-aside contribution is allocated to first-time homebuyers. Homeownership set-aside programs are voluntary. In 2009, four FHLBanks also offered refinancing set-aside programs.

**Figure 43 • AHP Aggregate Statutory Contributions by Year, 1990 – 2010**

| AHP Statutory Contributions By Year (amounts in thousands of dollars) | |
|---|---|
| 1990 | 78,783 |
| 1991 | 59,515 |
| 1992 | 50,000 |
| 1993 | 50,019 |
| 1994 | 75,022 |
| 1995 | 100,000 |
| 1996 | 104,103 |
| 1997 | 119,741 |
| 1998 | 136,217 |
| 1999 | 169,190 |
| 2000 | 199,446 |
| 2001 | 246,298 |
| 2002 | 219,125 |
| 2003 | 167,385 |
| 2004 | 217,498 |
| 2005 | 226,752 |
| 2006 | 282,989 |
| 2007 | 293,830 |
| 2008 | 319,091 |
| 2009 | 188,363 |
| 2010 | 252,507 |

## AHP Competitive Application Program

Under the competitive application program, an FHLBank's member financial institutions submit applications to the FHLBank on behalf of one or more sponsors of eligible housing projects. Projects must meet certain statutory and regulatory requirements to be eligible for AHP funding under this program.

## AHP Homeownership Set-Aside Program

An FHLBank may establish one or more AHP homeownership set-aside programs. Members obtain the set-aside funds from the FHLBank and use them for grants of up to $15,000 to eligible households. In 2009, a majority of the set-aside disbursements were used for down payment and closing cost assistance.

## Community Investment Program and Community Investment Cash Advances Programs

CIP and other CICA programs offer funding, including low-cost long-term funding, for members and housing associates to use for financing community investment projects for targeted beneficiaries or targeted income levels. Members may use CICA funds for loan originations, loan participations, revolving loan funds, and purchases of low-income housing tax credits and mortgage securities.

In 2009, the FHLBanks provided more than $3 billion in CIP and CICA funds for community investment and mixed-use projects and more than $1 billion in CIP advances for housing. To help during the mortgage crisis, some FHLBanks made special CIP advances available to members to assist households facing mortgage delinquency or foreclosure to restructure or refinance their mortgages.

## FHFA Outreach

In 2009, FHFA emphasized regular outreach to public stakeholders about the missions of the Enterprises and the FHLBanks to relay information on FHFA actions and initiatives and to gather information on current housing and community investment conditions and issues.

In December 2009, FHFA held its first Affordable Housing and Community Investment Forum in Washington, D.C. During the forum, a group of housing and community investment experts from around the nation exchanged information and ideas regarding issues and market conditions that FHFA's Office of Housing Mission and Goals will consider in implementing the Enterprises' duty to serve requirement for rural and manufactured housing. FHFA plans future forums with various industry experts to assist FHFA in its policymaking for the missions of the Enterprises and the FHLBanks.

In December 2009, FHFA also held a meeting for the chairs and vice chairs of the advisory councils of the FHLBanks. The advisory councils advise the FHLBanks on affordable housing and community investment conditions and FHLBank programs in the respective districts. The advisory council leaders who attended the meeting gave FHFA input on district housing needs and issues and on how the FHLBanks' AHP, CIP and CICA programs were working in their districts.

# Regulatory Guidance

## Regulations: Enterprises

### Flood Insurance

On January 15, 2009, FHFA published a final rule, Flood Insurance, in the *Federal Register*. The final rule codifies the authority and responsibility of FHFA to oversee and enforce the statutory requirements affecting the operations of the Enterprises under the Flood Disaster Protection Act of 1973, as amended, and to effect congressionally mandated adjustments to the civil money penalties applicable to violations.

### Portfolio Holdings

On January 30, 2009, FHFA published an interim final rule, Portfolio Holdings, in the *Federal Register*, and requested comment. The comment period ended June 1, 2009. The interim final rule incorporates the limits on the portfolio holdings of the Enterprises that are established in their Senior Preferred Stock Purchase Agreements with the Treasury.

### 2009 Enterprise Transition Affordable Housing Goals

On August 10, 2009, FHFA published a final rule, 2009 Enterprise Transition Housing Goals, in the *Federal Register*. The final rule adjusts downward the overall housing goals for the Enterprises for 2009. The final rule permits loans owned or guaranteed by an Enterprise and modified in accordance with the Administration's Making Home Affordable Program to be treated as mortgage purchases and count for purposes of the housing goals. In addition, the final rule excludes purchases of jumbo conforming loans from counting toward the 2009 housing goals.

### Prior Approval for Enterprise Products

On July 2, 2009, FHFA published an interim final rule, Prior Approval for Enterprise Products, in the *Federal Register*, and requested comment. The comment period ended August 31, 2009. The interim final rule establishes a process for obtaining prior approval from the FHFA Director for a new product and providing prior notice to the Director of a new activity.

### Duty to Serve Underserved Markets for Enterprises

On August 4, 2009, FHFA published an Advance Notice of Proposed Rulemaking, Duty to Serve Underserved Markets for Enterprises, in the *Federal Register*, for public notice and comment. FHFA is required, beginning in 2010, to establish a manner for evaluating the Enterprises' compliance with the new statutory duty to serve three underserved markets—manufactured housing, affordable housing preservation, and rural areas. FHFA sought comments on the characteristics and types of Enterprise transactions and activities that should be considered and how such transactions and activities should be evaluated and rated. The comment period ended September 18, 2009.

## Regulations: Federal Home Loan Banks

### Capital Classifications and Critical Capital Levels for the Federal Home Loan Banks

On August 4, 2009, FHFA published a final rule, Capital Classifications and Critical Capital Levels for the Federal Home Loan Banks, in the *Federal Register*. The final rule defines the critical capital levels for the FHLBanks, establishes the criteria for

FHFA 1316

capital classifications, and implements FHFA's prompt corrective action authority over the FHLBanks.

> *The interim final rule authorizes the FHLBanks to provide the existing Affordable Housing Program subsidy through their members to assist in the refinancing of low- or moderate-income households' mortgages under certain federal, state, and local programs for targeted refinancing.*

## Affordable Housing Program Amendment:  Federal Home Loan Bank Mortgage Refinancing Authority

On August 4, 2009, FHFA published an interim final rule, Affordable Housing Program Amendments:  Federal Home Loan Bank Mortgage Refinancing Authority, in the *Federal Register*, and requested comment. The interim final rule authorizes the FHLBanks to provide the existing Affordable Housing Program subsidy through their members to assist in the refinancing of low- or moderate-income households' mortgages under certain federal, state, and local programs for targeted refinancing. The interim rule authorizes such subsidies to those qualifying under the Hope for Homeowners program and other federal and state government programs, including the Administration's Making Home Affordable Refinancing program.

## Federal Home Loan Bank Boards of Directors:  Eligibility and Elections

On October 7, 2009, FHFA published a final rule, Federal Home Loan Bank Boards of Directors: Eligibility and Elections, in the *Federal Register*. The final regulation sets forth requirements regarding the eligibility and election of individuals serving on the Boards of Directors of the 12 FHLBanks. On December 1, 2009, FHFA published a proposed amendment to the final rule in the *Federal Register* to amend the process by which successor directors are chosen after an FHLBank directorship is redesignated to a new state prior to the end of the term as a result of the annual designation of FHLBank directorships. The final rule was published in the *Federal Register* on April 5, 2010, as part of the rule titled Federal Home Loan Bank Boards of Directors: Eligibility, Elections, Compensation and Expenses.

## Federal Home Loan Bank Membership for Community Development Financial Institutions

On May 15, 2009, FHFA published the proposed regulation, Federal Home Loan Bank Membership for Community Development Financial Institutions, in the *Federal Register* for public notice and comment. The final rule was published on January 5, 2010. The final rule amended the membership regulations to authorize nonfederally insured, CDFI Fund-certified community development financial institutions to become members of an FHLBank. The final rule also sets forth the eligibility and procedural requirements for CDFIs that wish to become members of an FHLBank.

## Board of Directors of Federal Home Loan Bank System Office of Finance

On August 4, 2009, FHFA published the proposed regulation, Board of Directors of Federal Home Loan Bank System Office of Finance, in the

*Federal Register* for public notice and comment. A notice of extension of the comment period was published in the *Federal Register* on October 2, 2009. The comment period ended November 4, 2009.

The proposed rule would require an increase in the size of the Board of Directors of the Office of Finance and require that it be composed of the 12 FHLBank presidents and 3 to 5 independent directors. In addition, it would set a method for electing independent directors, set qualification for these directors, provide that those directors compose the audit committee of the Board, and require that audit committee to oversee the production of the FHLBank System's combined financial reports and to ensure the financial information of the 12 FHLBanks is combined in those reports using common accounting policies.

The final rule was published in the *Federal Register* on May 3, 2010.

## Federal Home Loan Bank Directors' Compensation and Expenses

On October 23, 2009, FHFA published the proposed regulation, Federal Home Loan Bank Directors' Compensation and Expenses, in the *Federal Register* for public notice and comment. The proposed rule would allow each FHLBank to pay its directors reasonable compensation and expenses, subject to the authority of the FHFA Director to prohibit compensation or expenses that the Director determines are not reasonable. The comment period ended December 7, 2009. The final rule was published in the *Federal Register* on April 5, 2010, as part of the rule titled Federal Home Loan Bank Boards of Director' Eligibility, Elections, Compensation and Expenses.

# Regulations:  Enterprises and Federal Home Loan Banks

## Executive Compensation

On June 5, 2009, FHFA published a proposed rule, Executive Compensation, in the *Federal Register* for public notice and comment. The proposed rule would set forth requirements and processes with respect to compensation provided to executive officers by regulated entities and the Office of Finance. The comment period ended November 4, 2009.

## Reporting of Fraudulent Financial Instruments

On June 27, 2009, FHFA published a proposed rule, Reporting of Fraudulent Financial Instruments, in the *Federal Register* for public notice and comment. The comment period ended August 17, 2009. The proposed rule would require the regulated entities to report to FHFA any fraudulent financial instruments that they purchased or sold. It would also require the regulated entities to establish and maintain internal controls, procedures, and training programs to ensure that any such fraudulent instruments are detected and reported. The final rule was published in the *Federal Register* on January 27, 2010.

## Golden Parachute and Indemnification Payments

On June 29, 2009, FHFA published an amendment to the final rule, Golden Parachute and Indemnification Payments, in the *Federal Register* for public notice and comment. The comment period ended July 29, 2009. The proposed amendment would address in more detail prohibited and permissible golden parachute payments that a regulated entity may make to an affiliated party.

## Record Retention

On August 4, 2009, FHFA published a proposed rule, Record Retention, in the *Federal Register* for public notice and comment. The comment period ended October 5, 2009.

The proposed rule would require the regulated entities and the Office of Finance to establish and maintain a record retention program to ensure that records are readily accessible for examination and other supervisory purposes.

*The final rule implements the Privacy Act of 1974, as amended. It provides the policies and procedures whereby individuals may obtain notification whether an FHFA system of records contains information about them and, if so, how to access or amend a record under the Privacy Act.*

## Regulations:  Agency Operations

### Privacy Act Implementation

On July 14, 2009, FHFA published a final rule, Privacy Act Implementation, in the *Federal Register*. The final rule implements the Privacy Act of 1974, as amended. It provides the policies and procedures whereby individuals may obtain notification whether an FHFA system of records con-

tains information about them and, if so, how to access or amend a record under the Privacy Act.

## Postemployment Restriction for Senior Examiners

On October 5, 2009, FHFA published a final rule, Postemployment Restriction for Senior Examiners, in the *Federal Register*. The final rule sets forth postemployment restrictions for senior examiners of FHFA.

## Policy Guidance: Regulated Entities

### Accounting Practices

On October 27, 2009, FHFA issued the *Examination Guidance for Accounting Practices*. The guidance sets forth examination guidance and standards relating to the accounting practices of the Fannie Mae, Freddie Mac, and the FHLBanks consistent with the safety and soundness responsibilities of FHFA. It replaces the 2006 Accounting Examination Guidance of the FHFA predecessor agency, the Office of Federal Housing Enterprise Oversight (OFHEO), and provides a consistent approach across the entities regulated by FHFA.

## Policy Guidance and Regulatory Interpretations: Federal Home Loan Banks

### Student Loans as Collateral

On June 4, 2009, FHFA issued Regulatory Interpretation 2009-RI-01 stating that, as a result of changes in the statutory framework of the federal student loan guarantee program, federally guaranteed student loans are eligible to be posted as collateral for FHLBank advances.

## Disclosure of Preliminary Capital Classifications

On July 20, 2009, FHFA issued an Advisory Bulletin 2009-AB-01 to the Federal Home Loan Banks and the Office of Finance. The bulletin advised that because the notification to the FHLBank of its preliminary classification is the first step in an ongoing supervisory process to establish capital classification, FHFA believes the preliminary capital classification is a form of supervisory correspondence that should be treated as unpublished information under 12 C.F.R. Part 911. The bulletin further advised that disclosure of information regarding preliminary capital classifications should take account of whether the information is important to inform the user of the information of material developments at the FHLBank.

## Data Reporting Requirements: Mortgages Purchased by Federal Home Loan Banks

On August 28, 2009, FHFA issued an order requiring the FHLBanks to provide to FHFA data regarding their purchased mortgage loans as required by the Acquired Member Assets Data Reporting Instructions.

## Resident Services Coordinator Expenses in Affordable Housing Program Projects

On September 11, 2009, FHFA issued a regulatory interpretation, 2009-RI-02, relating to resident services coordinator expenses in AHP projects. In response to a query from an FHLBank, FHFA concluded that under the AHP regulation, AHP subsidy for rental housing may be used only for the purchase, construction, or rehabilitation of such housing, and not for a rental project's operating expenses. Accordingly, because the expense of employing a resident services coordinator is an operating expense of the project, it is not eligible for AHP subsidy.

## Principles of Executive Compensation at the Federal Home Loan Banks and the Office of Finance

On October 27, 2009, FHFA issued Advisory Bulletin 2009-AB-02, Principles of Executive Compensation at the Federal Home Loan Banks and the Office of Finance. The bulletin set forth principles that the FHFA Director will consider when evaluation compensation at the FHLBanks and the Office of Finance. The bulletin sets forth five principles:

(1) Executive compensation must be reasonable and comparable to that offered to executives in similar positions at other comparable financial institutions.

(2) Executive incentive compensation should be consistent with sound risk management and preservation of the par value of the FHLBank's capital stock.

(3) A significant percentage of an executive's incentive-based compensation should be tied to longer-term performance and outcome indicators.

(4) A significant percentage of an executive's incentive-based compensation should be deferred and made contingent upon performance over several years.

(5) The Board of Directors of each FHLBank and the Office of Finance should promoted accountability and transparency in the process of setting compensation.

FHFA 1320

## Redemption of Stock by Undercapitalized Federal Home Loan Banks

On December 14, 2009, FHFA issued Regulatory Interpretation 2009-RI-03, which states that an FHLBank designated undercapitalized under the prompt corrective action provisions of the Federal Housing Enterprises Safety and Soundness Act and FHFA's implementing regulations may not redeem capital stock, subject to very narrow exceptions.

## Validation and Documentation of Models and Related Controls on Internal Processes

On December 15, 2009, FHFA issued Advisory Bulletin 2009-AB-03, Validation and Documentation of Models and Related Controls on Internal Processes, to the FHLBanks and the Office of Finance. The bulletin replaces Advisory Bulletin 2006-AB-02. The earlier bulletin focused on market risk models. This bulletin explicitly includes credit risk models and also addresses the validation of externally managed vendor models, internally managed vendor models, and the importance of validating and documenting the controls over models and their use. It also discusses model validation and documentation in the case of a model that is jointly used by several FHLBanks.

FHFA 1321

# FHFA Research and Publications

During 2009, FHFA focused its research plans and activities on studies and reports required by statute and on analyzing topics that helped the agency achieve its strategic goals. FHFA's three strategic goals were to:

- Enhance supervision to ensure that Fannie Mae, Freddie Mac, and the FHLBanks operate in a safe and sound manner, are adequately capitalized, and comply with legal requirements;

- Promote homeownership and affordable housing and support an efficient secondary mortgage market; and

- Through conservatorship, preserve and conserve the assets and property of Fannie Mae and Freddie Mac, and enhance their abilities to fulfill their mission.

FHFA placed a priority in 2009 on preparing reports to Congress required by HERA and on understanding trends in house prices and deteriorating housing market conditions. In addition, FHFA analyzed the risk and capital adequacy of the housing government-sponsored enterprises to improve the public's understanding of the mortgage finance system.

FHFA published reports and papers and posted information on its website (www.fhfa.gov). FHFA researchers also presented papers and led discussions at professional and industry conferences on topics related to housing finance and regulation of the Enterprises.

## Reports to Congress

In 2009, FHFA submitted the following seven reports to Congress, as required by HERA:

1. HERA requires FHFA to conduct an ongoing study of the guarantee fees charged by Fannie Mae and Freddie and to submit annual reports to Congress, based on aggregated data collected from the Enterprises regarding the amounts of the fees and the criteria used by the Enterprises to determine them.

   In July, FHFA submitted its first annual report in fulfillment of that requirement, *Fannie Mae and Freddie Mac Single-Family Guarantee Fees in 2007 and 2008* focusing on fees charged by the Enterprises for guaranteeing conventional single-family mortgages—loans that are not insured or guaranteed by the federal government and which finance properties with four or fewer residential units.

2. HERA required FHFA to conduct a one-time study of "ways to improve the overall default risk evaluation used with respect to residential mortgage loans" and to report to Congress on the results of that study. To aid in the preparation of the report, FHFA and the Federal Deposit Insurance Corporation's Center for Financial Research jointly selected seven papers for a public symposium on "Improving Assessment of the Default Risk of Single-Family Mortgages" held in September. In October, FHFA submitted to Congress a report, *Default Risk Evaluation in the Single-Family Mortgage Market*, which summarized and evaluated the papers in the context of previous research and of the comments provided by attendees at the symposium. The seven papers were included in the appendices to the report.

3. HERA requires FHFA to submit annually to Congress a report on the housing

activities of Fannie Mae and Freddie Mac. FHFA submitted its first such report in October 2009. That report provided information required in the law regarding Enterprise housing goal performance in 2008, reviewed the status of rulemaking regarding housing goals for 2009 and future years, and provided information on other aspects of FHFA and Enterprise activities.

4.  HERA required FHFA to conduct a one-time study on securitization of home mortgage loans purchased or to be purchased by the FHLBanks from member financial institutions under their acquired member assets programs and to report to Congress on the results of that study. In July, FHFA submitted to Congress a report on *Securitization of Mortgage Loans by the Federal Home Loan Bank System*. The report details the results of FHFA's study and includes policy recommendations based on the agency's analysis of the feasibility of the FHLBanks issuing MBS and of the benefits and risks associated with such a program.

5.  HERA requires FHFA to submit annually to Congress a report on the collateral pledged to the FHLBanks to secure advances. In January, FHFA released its first *Report on Collateral Securing Advances at the Federal Home Loan Banks*, containing the results of FHFA's 2008 collateral data survey. In July, FHFA released its second report in fulfillment of the requirement, detailing the results of the 2009 survey.

6.  HERA requires FHFA to report to Congress on the extent to which loans and securities used as collateral for the Federal Home Loan Bank advances are consistent with the interagency guidance on nontraditional mortgage products. In

July, FHFA published its *Report on Federal Home Loan Bank Collateral for Advances and Interagency Guidance on Nontraditional Mortgage Products*.

7.  HERA required FHFA to provide to Congress, within 180 days of HERA's enactment, FHFA's 2007 report to the Federal Home Loan Banks' Advisory Councils on the Banks' activities in support of community development and low-income housing. The Federal Home Loan Bank Act requires FHFA to submit that report annually to the Advisory Councils. Accordingly, in January 2009 FHFA submitted to Congress its *2007 Report of the Low-Income Housing and Community Development Activities of the Federal Home Loan Bank System*.

## House Price Index and Related Research

Continuing to expand the suite of house price indexes FHFA offers for public use, the agency released a number of new house price index series in 2009. Until the first quarter of the year, FHFA's set of "purchase-only" indexes, which are estimated using sales price information from purchase-money mortgages, did not include indexes for Metropolitan Statistical Areas. Responding to public demand, FHFA began releasing purchase-only series for the 25 largest metropolitan areas in the United States with the first quarter release. Seasonally adjusted and unadjusted versions of statistical area purchase-only series were made available for download on the FHFA website.

With the same release, FHFA also began producing seasonally adjusted editions of its state purchase-only indexes. For many states, seasonal factors can have very strong influences on quarterly price trends, so the new series, as with the metropolitan-area seasonally adjusted series, could provide a clearer picture of recent price developments.

FHFA's Office of Policy Analysis and Research continued evaluating ways the agency could improve HPI in 2009. One issue was assessing the appropriate weighting system to be used to form the national index. In 2009 as well as today, the change in the national HPI is set equal to the weighted average quarterly change for the nine Census Divisions. Computing the national change with measures for smaller geographic areas yielded certain advantages. For example, using state (as opposed to Census Division) measures would potentially mitigate biases that arise when relative sales volumes within Census Divisions are correlated with home price trends.

To address a growing number of requests for information on the impact of foreclosure sales on FHFA's index, FHFA in May released a research paper, *The Impact of Distressed Sales on Repeat-Transactions House Price Indexes*, which evaluated the impact of distressed sales on measurements of price trends in California. The research used address-level data on notice of default filings in that state to identify distressed sales, which would include sales of real estate owned as well as short sales.

By comparing the standard HPI to an index calculated after distressed sales were omitted, the analysis found small but measureable effects. The decline in house prices since the peak in California was found to be about 5 percent less severe when distressed sales were omitted from the estimation dataset. Interestingly, the research also found that this effect was actually larger than the effect distressed sales were having on an index based on county recorder data. That result was inconsistent with prior conjectures that suggested county-recorder-based indexes were showing larger price declines than HPI because of the relatively strong effects of distressed sales.

A mortgage market note published in May focused on California as well, but presented a broad analysis of contemporary housing and mortgage market conditions in the state. In addition to price trends, the note discussed trends in sales volumes, inventories of for-sale properties, evidence of "shadow inventory," and mortgage delinquencies and defaults. The research indicated that market conditions in the state, though quite weak, were no longer significantly deteriorating. The note cited stemming the rate of foreclosure as an important element to house price recovery in that state.

> *The research indicated that market conditions in (California), though quite weak, were no longer significantly deteriorating.*

In light of the depth and breadth of the housing bust in California and elsewhere, FHFA in June released another research paper, *A Brief Examination of Previous House Price Declines*. The research paper provided summary statistics for the depth and duration of prior downturns for Census Divisions, states, and Metropolitan Statistical Areas. When measured in inflation-adjusted terms, prior busts were shown to have been associated with very slow recovery periods. Price increases during recovery periods tended to be much more modest than the rate of price decline exhibited during housing busts.

The paper also analyzed inflation-adjusted price trends in some areas that had notable declines in the 1980s and 1990s, including California and Texas. Because some mortgage decisions tend to involve analysis of nominal (instead of inflation-adjusted) prices, the paper concluded with statistics on the depth and duration of prior busts when assessed in nominal terms. The basic findings of that investigation were fundamentally the same as for the inflation-adjusted series.

FHFA 1324

## Other Research Products

FHFA published several other research products in 2009. A research paper, *Housing and Mortgage Markets and the Housing Government-Sponsored Enterprises in 2008*, released in December, reviewed developments in the housing sector, activity in the primary and secondary mortgage markets, and the financial performance of Fannie Mae and Freddie Mac in 2008. The paper is the most recent in an annual series.

In addition to the mortgage market note related to housing and mortgage market conditions in California, FHFA published two other mortgage market notes and twice updated a mortgage market note published in the previous year. In July, FHFA published a note on the capital of the FHLBanks. That note, which explains the different measures of capital, capital requirements, and capital classifications for those institutions, provided data for each FHLBank and for the system as a whole as of year end 2005 through 2008 and for the first quarter of 2009.

In August, FHFA released a mortgage market note that discussed the evolution of residential mortgage insurance in the United States, explored recent mortgage insurance trends, and reviewed how Fannie Mae and Freddie Mac use private mortgage insurance. In February and again in July, FHFA updated *U.S. Treasury Support for Fannie and Freddie Mac*, a mortgage market note first published in December 2008 that outlines the various facilities introduced by the Treasury Department to support the Enterprises in conservatorship.

As in past years, FHFA reported a Monthly Interest Rate Survey of purchase-money mortgages and publicized its estimates of single-family mortgages originated and outstanding and the Enterprises' combined share of residential mortgage debt outstanding.

FHFA 1325

# FHFA Operations and Performance

## Performance and Program Assessment

FY 2009 was FHFA's first full year in operation. FHFA made substantial progress in establishing the infrastructure, policies and processes needed to organize and run a new federal agency while meeting the challenges of overseeing the Enterprises, all 12 FHLBanks, and the Office of Finance. This included integrating staff and cultures from three agencies (the former Federal Housing Finance Board [FHFB], the former OFHEO, and HUD). FHFA also combined the personnel and financial systems of its two predecessor agencies (FHFB and OFHEO) and established an information technology infrastructure to serve the agency.

On November 16, 2009, FHFA published its annual *Performance and Accountability Report* (PAR) detailing the agency's FY 2009 performance. For the second straight year, FHFA's PAR received the prestigious Certificate for Excellence in Accountability Reporting (CEAR) award from the Association of Government Accountants. The CEAR award recognizes outstanding accountability reporting and is the highest form of recognition in federal government management reporting.

FHFA exceeded, achieved, or substantially achieved 66 percent of its 61 performance measures in FY 2009. There were several factors affecting FHFA's performance in 2009, including the conservatorships of the Enterprises and the overall nationwide decline in the housing and mortgage markets.

In 2009, FHFA expanded its use of financial and performance information in managing program operations. FHFA integrated its budget and performance development and made significant program improvements. The Government Accountability Office audited the agency's financial statements and issued a clean audit opinion with no material weaknesses. The Office of Personnel

Management also conducted a delegated examination unit review in the third quarter of FY 2009 and identified no material weaknesses.

During FY 2009, FHFA's Executive Committee on Internal Controls met quarterly to oversee and make recommendations to the Director on the effectiveness of FHFA's internal controls. The executive committee completed its annual OMB Circular A-123 review of internal controls over financial reporting, effectiveness of operations, and compliance with laws and regulations. The committee established assessment teams that concluded with reasonable assurance that the agency had effective controls in place during FY 2009.

During FY 2009, FHFA made significant accomplishments. Highlights of FHFA's FY 2009 key activities and accomplishments are as follows:

## Mission Highlights

- Conducted continuous supervision activities and targeted reviews at Fannie Mae and Freddie Mac.

- Examined all 12 FHLBanks and the Office of Finance for safety and soundness.

- Completed all scheduled AHP examinations and on-site visitations during FY 2009.

- Worked with the FHLBanks to adopt a common platform for accounting for private-label MBS, which contributed to greater standardization and coordination of the FHLBanks in valuing their private-label MBS holdings and determining other-than-temporary impairment.

- Provided new accounting guidance that gave examiners criteria to assess risks posed by a regulated entity's accounting, internal control over financial reporting, and audit functions. The new guidance promotes

consistency in implementation of generally accepted accounting principles to enhance transparency.

- Published the first annual report on guarantee fees charged by the Enterprises for conventional single-family mortgages—loans the federal government does not insure or guarantee that finance properties with four or fewer residential units. The report, issued on July 30, 2009, covered single-family fees for loans acquired by the Enterprises in 2007 and 2008.

- Published two reports related to collateral securing advances at the FHLBanks. The first report analyzed collateral data as of December 31, 2008, by type and FHLBank district. The second report studied the extent to which loans and securities used as collateral to support FHLBank advances were consistent with the interagency guidance issued by federal banking regulators on nontraditional mortgage products and subprime lending.

- Published an Advance Notice of Proposed Rulemaking to begin the process of establishing a manner for evaluating and rating whether and to what extent the Enterprises have complied with their duty to serve. HERA amended the Federal Housing Enterprises Safety and Soundness Act of 1992, establishing a duty for the Enterprises to serve three underserved markets—manufactured housing, affordable housing preservation, and rural areas—to increase the liquidity of mortgage investments and improve the distribution of investment capital available for mortgage financing in those markets.

- Helped develop the Administration's MHA program, which has helped at-risk homeowners avoid foreclosure. Two principal elements of the program are HARP, which provides access to low-cost refinancing for loans owned by the Enterprises, and HAMP, which establishes a national standard for loan modifications.

- Published final regulations on golden parachute payments on July 14, 2009, and capital classifications and prompt corrective action on August 4, 2009.

- Published an executive compensation proposed rule that sets forth requirements and processes with respect to compensation provided to executive officers by the Enterprises, FHLBanks, and the Office of Finance, consistent with FHFA's safety and soundness responsibilities under HERA.

- Established affordable housing goals and published the final rule on August 10, 2009.

- Developed the agency's median house price index and draft paper describing the approach for estimating median prices.

### Administrative Highlights

- Transferred former OFHEO, FHFB, and certain HUD employees to FHFA.

- Contracted with the Treasury Department's Bureau of Public Debt Administrative Resource Center to implement a single integrated accounting service for FHFA.

- Coordinated the programming and systems changes with the National Finance Center to establish a unified payroll and processing system.

FHFA 1327

- Worked to unify FHFA information technology infrastructure operations.

- Published FHFA's first strategic and human capital plans.

- Established an Office of Internal Audit to carry out audit functions.

## Financial Operations

HERA authorized FHFA to collect annual assessments from the regulated entities to pay its costs and expenses and maintain a working capital fund. Under HERA, annual assessments are allocated based on the cost and expenses of the agency's operations for supervision of the Enterprises and the FHLBanks.

In FY 2009, FHFA's operating budget was $120.8 million. During FY 2009, FHFA recovered $6 million in unspent prior year obligations and had a $900,000 reduction in the costs of reimbursable agreements from the legacy agencies. Total budget resources were $125.9 million as a result. FHFA obligated all but $9.7 million of that amount. Excluding $3 million for the working capital fund, $6.7 million in unobligated funding was credited to FY 2010 assessments. The agency's highest cost outlay was for payroll expenses. Funded payroll expenses were $77.4 million for FY 2009, which included the full-year cost of 414 full-time equivalents. During FY 2009, FHFA focused on hiring and retaining staff to ensure effective oversight of the regulated entities.

### Unified Financial Operations

FHFA contracted with the Treasury Department's Bureau of Public Debt to provide accounting services for the agency, effective July 1, 2009. The transition to the Bureau of Public Debt provides the agency with an integrated system for its accounting, procurement, and travel activities. Combining the financial accounting functions of OFHEO and FHFB was an important step toward completing the transition to an operationally unified agency.

### Unqualified Audit Opinions in FY 2009

In its first full year of operations, the Government Accountability Office gave FHFA an unqualified clean audit opinion on its FY 2009 financial statements. This was a noteworthy achievement in light of the tremendous change associated with developing and establishing the infrastructure for a new agency. The Government Accountability Office identified no material weaknesses in internal controls or instances of noncompliance with laws or regulations.

FHFA 1328

FHFA 1329

# Historical Data Tables



# Historical Data Tables • Contents

Table 1 • Fannie Mae Mortgage Purchases ................125

Table 1a • Fannie Mae Mortgage Purchases
Detail by Type of Loan...........................................126

Table 1b • Fannie Mae Purchases of
Mortgage-Related Securities – Part 1 .................127

Table 1b • Fannie Mae Purchases of
Mortgage-Related Securities, –
Part 2, Private-Label Detail ..................................128

Table 2 • Fannie Mae MBS Issuances.........................129

Table 3 • Fannie Mae Earnings....................................130

Table 4 • Fannie Mae Balance Sheet ..........................131

Table 4a • Fannie Mae Total
MBS Outstanding Detail ....................................132

Table 5 • Fannie Mae Mortgage Assets Detail............133

Table 5a • Fannie Mae Mortgage
Assets Detail –Whole Loans ...............................134

Table 5b • Fannie Mae Mortgage Assets Detail –
Part 1, Mortgage-Related Securities.....................135

Table 5b • Fannie Mae Mortgage
Assets Detail –Part 2, Mortgage-Related
Securities, Private-Label Detail ...........................136

Table 5b • Fannie Mae Mortgage
Assets Detail –Part 3,
Mortgage-Related Securities ........................................137

Table 6 • Fannie Mae Financial Derivatives ..............138

Table 7 • Fannie Mae Nonmortgage Investments ....139

Table 8 • Fannie Mae Mortgage Asset Quality ..........140

Table 9 • Fannie Mae Capital ......................................141

Table 10 • Freddie Mac Mortgage Purchases.............142

Table 10a • Freddie Mac Mortgage
Purchases Detail by Type of Loan........................143

Table 10b • Freddie Mac Purchases
of Mortgage-Related Securities – Part 1 ..............144

Table 10b • Freddie Mac Purchases of
Mortgage-Related Securities –
Part 2, Private-Label Detail ..................................145

Table 11 • Freddie Mac MBS Issuances .....................146

Table 12 • Freddie Mac Earnings ................................147

Table 13 • Freddie Mac Balance Sheet........................148

Table 13a • Freddie Mac Total
MBS Outstanding Detail .....................................149

Table 14 • Freddie Mac Mortgage Assets Detail ........150

Table 14a • Freddie Mac Mortgage Assets Detail –
Whole Loans .........................................................151

Table 14b • Freddie Mac Mortgage Assets Detail –
Part 1, Mortgage-Related Securities.....................152

Table 14b • Freddie Mac Mortgage Assets Detail –
Part 2, Mortgage-Related Securities,
Private-Label Detail ..............................................153

Table 14b • Freddie Mac Retained Mortgage
Assets Detail – Part 3,
Mortgage-Related Securities ...............................154

Table 15 • Freddie Mac Financial Derivatives............155

Table 16 • Freddie Mac Nonmortgage Investments..156

Table 17 • Freddie Mac Mortgage Asset Quality........157

Table 18 • Freddie Mac Capital ..................................158

Table 19 • Federal Home Loan Banks
Combined Statement of Income .........................159

Table 20 • Federal Home Loan Banks
Combined Balance Sheet ....................................160

Table 21 • Federal Home Loan Banks Net Income....161

Table 22 • Federal Home Loan Banks
Advances Outstanding.........................................162

Table 23 • Federal Home Loan Banks
Regulatory Capital ...............................................163

Table 24 • Loan Limits ................................................164

Table 25 • Mortgage Interest Rates ...........................165

Table 26 • Housing Market Activity............................166

Table 27 • Weighted Repeat Sales
House Price Index (Annual Data) ......................167

FHFA 1331

## Table 1. Fannie Mae Mortgage Purchases

| Period | Business Activity ($ in Millions) | | | |
|---|---|---|---|---|
| | Purchases | | | |
| | Single-Family[1] ($) | Multifamily[1] ($) | Total Mortgages[1] ($) | Mortgage-Related Securities[2] ($) |
| 4Q09 | 130,595 | 4,723 | 135,318 | 34,034 |
| 3Q09 | 180,037 | 5,335 | 185,372 | 61,451 |
| 2Q09 | 220,571 | 6,066 | 226,637 | 60,115 |
| 1Q09 | 169,050 | 3,788 | 172,838 | 5,962 |
| Annual Data | | | | |
| 2009 | 700,253 | 19,912 | 720,165 | 161,562 |
| 2008 | 582,947 | 34,288 | 617,235 | 77,523 |
| 2007 | 659,366 | 45,302 | 704,668 | 69,236 |
| 2006 | 524,379 | 20,646 | 545,025 | 102,666 |
| 2005 | 537,004 | 21,485 | 558,489 | 62,232 |
| 2004 | 588,119 | 16,386 | 604,505 | 176,385 |
| 2003 | 1,322,193 | 31,196 | 1,353,389 | 408,606 |
| 2002 | 804,192 | 16,772 | 820,964 | 268,574 |
| 2001 | 567,673 | 19,131 | 586,804 | 209,124 |
| 2000 | 227,069 | 10,377 | 237,446 | 129,716 |
| 1999 | 316,136 | 10,012 | 326,148 | 169,905 |
| 1998 | 354,920 | 11,428 | 366,348 | 147,260 |
| 1997 | 159,921 | 6,534 | 166,455 | 50,317 |
| 1996 | 164,456 | 6,451 | 170,907 | 46,743 |
| 1995 | 126,003 | 4,966 | 130,969 | 36,258 |
| 1994 | 158,229 | 3,839 | 162,068 | 25,905 |
| 1993 | 289,826 | 4,135 | 293,961 | 6,606 |
| 1992 | 248,603 | 2,956 | 251,559 | 5,428 |
| 1991 | 133,551 | 3,204 | 136,755 | 3,080 |
| 1990 | 111,007 | 3,180 | 114,187 | 1,451 |
| 1989 | 80,510 | 4,325 | 84,835 | Not Applicable Before 1990 |
| 1988 | 64,613 | 4,170 | 68,783 | |
| 1987 | 73,942 | 1,733 | 75,675 | |
| 1986 | 77,223 | 1,877 | 79,100 | |
| 1985 | 42,543 | 1,200 | 43,743 | |
| 1984 | 27,713 | 1,106 | 28,819 | |
| 1983 | 26,339 | 140 | 26,479 | |
| 1982 | 25,929 | 10 | 25,939 | |
| 1981 | 6,827 | 2 | 6,829 | |
| 1980 | 8,074 | 27 | 8,101 | |
| 1979 | 10,798 | 9 | 10,807 | |
| 1978 | 12,302 | 3 | 12,305 | |
| 1977 | 4,650 | 134 | 4,784 | |
| 1976 | 3,337 | 295 | 3,632 | |
| 1975 | 3,646 | 674 | 4,320 | |
| 1974 | 4,746 | 2,273 | 7,019 | |
| 1973 | 4,170 | 2,082 | 6,252 | |
| 1972 | 2,596 | 1,268 | 3,864 | |
| 1971 | 2,742 | 1,298 | 4,040 | |

Source: Fannie Mae

[1] Includes lender-originated mortgage-backed securities (MBS) issuances, cash purchases, and capitalized interest. Based on unpaid principal balances and excludes mortgage loans and securities traded but not yet settled.

[2] Not included in total mortgage purchases. Includes purchases of Fannie Mae MBS held for investment and mortgage-related securities traded but not yet settled. Based on unpaid principal balances. Activity does not include dollar roll transactions.

## Table 1a. Fannie Mae Mortgage Purchases Detail by Type of Loan

| | Purchases ($ in Millions)[1] | | | | | | | | | | | |
| | Single-Family Mortgages | | | | | | | Multifamily Mortgages | | | | |
| | Conventional | | | | FHA/VA/RD | | | Total Single-Family Mortgages ($) | | | | Total Mortgage Purchases ($) |
| Period | Fixed-Rate[2] ($) | Adjustable-Rate ($) | Seconds ($) | Total ($) | Fixed-Rate[3] ($) | Adjustable-Rate ($) | Total ($) | | Conventional ($) | FHA/RD[3] ($) | Total Multi-family Mortgages ($) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4Q09 | 118,183 | 10,937 | 0 | 129,120 | 243 | 1,232 | 1,475 | 130,595 | 4,329 | 394 | 4,723 | 135,318 |
| 3Q09 | 171,345 | 6,613 | 0 | 177,958 | 352 | 1,727 | 2,079 | 180,037 | 5,335 | 0 | 5,335 | 185,372 |
| 2Q09 | 212,729 | 3,513 | 0 | 216,242 | 280 | 4,049 | 4,329 | 220,571 | 6,066 | 0 | 6,066 | 226,637 |
| 1Q09 | 161,506 | 2,045 | 0 | 163,551 | 261 | 5,238 | 5,499 | 169,050 | 3,787 | 1 | 3,788 | 172,838 |
| Annual Data | | | | | | | | | | | | |
| 2009 | 663,763 | 23,108 | 0 | 686,871 | 1,136 | 12,246 | 13,382 | 700,253 | 19,517 | 395 | 19,912 | 720,165 |
| 2008 | 517,643 | 46,910 | 6 | 564,589 | 1,174 | 17,184 | 18,358 | 582,947 | 34,288 | 0 | 34,288 | 617,235 |
| 2007 | 583,253 | 64,133 | 34 | 647,420 | 1,237 | 10,709 | 11,946 | 659,366 | 45,302 | 0 | 45,302 | 704,668 |
| 2006 | 429,930 | 85,313 | 130 | 515,373 | 1,576 | 7,430 | 9,006 | 524,379 | 20,644 | 2 | 20,646 | 545,025 |
| 2005 | 416,720 | 111,935 | 116 | 528,771 | 2,285 | 5,948 | 8,233 | 537,004 | 21,343 | 142 | 21,485 | 558,489 |
| 2004 | 527,456 | 46,772 | 51 | 574,279 | 9,967 | 3,873 | 13,840 | 588,119 | 13,684 | 2,702 | 16,386 | 604,505 |
| 2003 | 1,236,045 | 64,980 | 93 | 1,301,118 | 18,032 | 3,043 | 21,075 | 1,322,193 | 28,071 | 3,125 | 31,196 | 1,353,389 |
| 2002 | 738,177 | 48,617 | 40 | 786,834 | 15,810 | 1,548 | 17,358 | 804,192 | 15,089 | 1,683 | 16,772 | 820,964 |
| 2001 | 534,115 | 25,648 | 1,137 | 560,900 | 5,671 | 1,102 | 6,773 | 567,673 | 17,849 | 1,282 | 19,131 | 586,804 |
| 2000 | 187,236 | 33,809 | 726 | 221,771 | 4,378 | 920 | 5,298 | 227,069 | 9,127 | 1,250 | 10,377 | 237,446 |
| 1999 | 293,188 | 12,138 | 1,198 | 306,524 | 8,529 | 1,084 | 9,613 | 316,137 | 8,858 | 1,153 | 10,011 | 326,148 |
| 1998 | 334,367 | 14,273 | 1 | 348,641 | 5,768 | 511 | 6,279 | 354,920 | 10,844 | 584 | 11,428 | 366,348 |
| 1997 | 136,329 | 21,095 | 3 | 157,427 | 2,062 | 432 | 2,494 | 159,921 | 5,936 | 598 | 6,534 | 166,455 |
| 1996 | 146,154 | 15,550 | 3 | 161,707 | 2,415 | 334 | 2,749 | 164,456 | 6,199 | 252 | 6,451 | 170,907 |
| 1995 | 104,901 | 17,978 | 9 | 122,888 | 3,009 | 106 | 3,115 | 126,003 | 4,677 | 289 | 4,966 | 130,969 |
| 1994 | 139,815 | 16,340 | 8 | 156,163 | 1,953 | 113 | 2,066 | 158,229 | 3,620 | 219 | 3,839 | 162,068 |
| 1993 | 274,402 | 14,420 | 29 | 288,851 | 855 | 120 | 975 | 289,826 | 3,919 | 216 | 4,135 | 293,961 |
| 1992 | 226,332 | 21,001 | 136 | 247,469 | 1,055 | 79 | 1,134 | 248,603 | 2,845 | 111 | 2,956 | 251,559 |
| 1991 | 114,321 | 17,187 | 705 | 132,213 | 1,300 | 38 | 1,338 | 133,551 | 3,183 | 21 | 3,204 | 136,755 |
| 1990 | 95,011 | 14,528 | 654 | 110,193 | 799 | 15 | 814 | 111,007 | 3,165 | 15 | 3,180 | 114,187 |
| 1989 | 60,794 | 17,692 | 521 | 79,007 | 1,489 | 14 | 1,503 | 80,510 | 4,309 | 16 | 4,325 | 84,835 |
| 1988 | 35,767 | 27,492 | 433 | 63,692 | 823 | 98 | 921 | 64,613 | 4,149 | 21 | 4,170 | 68,783 |
| 1987 | 60,434 | 10,675 | 139 | 71,248 | 2,649 | 45 | 2,694 | 73,942 | 1,463 | 270 | 1,733 | 75,675 |
| 1986 | 58,251 | 7,305 | 498 | 66,054 | 11,155 | 14 | 11,169 | 77,223 | 1,877 | 0 | 1,877 | 79,100 |
| 1985 | 29,993 | 10,736 | 871 | 41,600 | 927 | 16 | 943 | 42,543 | 1,200 | 0 | 1,200 | 43,743 |
| 1984 | 17,998 | 8,049 | 937 | 26,984 | 729 | 0 | 729 | 27,713 | 1,106 | 0 | 1,106 | 28,819 |
| 1983 | 18,136 | 4,853 | 1,408 | 24,397 | 1,942 | 0 | 1,942 | 26,339 | 128 | 12 | 140 | 26,479 |
| 1982 | 19,311 | 3,210 | 1,552 | 24,073 | 1,856 | 0 | 1,856 | 25,929 | 0 | 10 | 10 | 25,939 |
| 1981 | 4,260 | 107 | 176 | 4,543 | 2,284 | 0 | 2,284 | 6,827 | 0 | 2 | 2 | 6,829 |
| 1980 | 2,802 | 0 | 0 | 2,802 | 5,272 | 0 | 5,272 | 8,074 | 0 | 27 | 27 | 8,101 |
| 1979 | 5,410 | 0 | 0 | 5,410 | 5,388 | 0 | 5,388 | 10,798 | 0 | 9 | 9 | 10,807 |
| 1978 | 5,682 | 0 | 0 | 5,682 | 6,620 | 0 | 6,620 | 12,302 | 0 | 3 | 3 | 12,305 |
| 1977 | 2,366 | 0 | 0 | 2,366 | 2,284 | 0 | 2,284 | 4,650 | 0 | 134 | 134 | 4,784 |
| 1976 | 2,513 | 0 | 0 | 2,513 | 824 | 0 | 824 | 3,337 | 0 | 295 | 295 | 3,632 |
| 1975 | 547 | 0 | 0 | 547 | 3,099 | 0 | 3,099 | 3,646 | 0 | 674 | 674 | 4,320 |
| 1974 | 1,128 | 0 | 0 | 1,128 | 3,618 | 0 | 3,618 | 4,746 | 0 | 2,273 | 2,273 | 7,019 |
| 1973 | 939 | 0 | 0 | 939 | 3,231 | 0 | 3,231 | 4,170 | 0 | 2,082 | 2,082 | 6,252 |
| 1972 | 55 | 0 | 0 | 55 | 2,541 | 0 | 2,541 | 2,596 | 0 | 1,268 | 1,268 | 3,864 |
| 1971 | 0 | 0 | 0 | 0 | 2,742 | 0 | 2,742 | 2,742 | 0 | 1,298 | 1,298 | 4,040 |

Source: Fannie Mae

[1]  Includes lender-originated MBS issuances, cash purchases, and capitalized interest. Based on unpaid principal balances; excludes mortgage loans traded but not yet settled.

[2]  Includes balloon and energy loans.

[3]  Includes loans guaranteed by USDA Rural Development programs.

FHFA 1333

HISTORICAL DATA TABLES

## Table 1b. Fannie Mae Purchases of Mortgage-Related Securities – Part 1

| Period | Fannie Mae Securities | | | | Others' Securities | | | | | | | | Total Private-Label[2] ($) | Mortgage Revenue Bonds ($) | Total Mortgage-Related Securities ($) |
| | Single-Family | | Multi-family ($) | Total Fannie Mae[2] ($) | Freddie Mac | | | | Ginnie Mae | | | | | | |
| | | | | | Single-Family | | Multi-family ($) | Total Freddie Mac ($) | Single-Family | | Multi-family ($) | Total Ginnie Mae ($) | | | |
| | Fixed Rate[2] ($) | Adjustable-Rate ($) | | | Fixed-Rate ($) | Adjustable-Rate ($) | | | Fixed-Rate ($) | Adjustable-Rate ($) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4Q09 | 14,173 | 51 | 1,229 | 15,453 | 18,573 | 0 | 0 | 18,573 | 8 | 0 | 0 | 8 | 0 | 0 | 34,034 |
| 3Q09 | 24,270 | 19 | 1,611 | 25,900 | 34,061 | 23 | 0 | 34,084 | 1,467 | 0 | 0 | 1,467 | 0 | 0 | 61,451 |
| 2Q09 | 49,221 | 213 | 1,308 | 50,742 | 9,217 | 135 | 0 | 9,352 | 20 | 0 | 0 | 20 | 0 | 1 | 60,115 |
| 1Q09 | 4,525 | 43 | 1,383 | 5,951 | 10 | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 0 | 1 | 5,962 |
| **Annual Data** | | | | | | | | | | | | | | | |
| 2009 | 92,189 | 326 | 5,531 | 98,046 | 61,861 | 158 | 0 | 62,019 | 1,495 | 0 | 0 | 1,495 | 0 | 2 | 161,562 |
| 2008 | 56,894 | 10,082 | 1,023 | 67,999 | 3,649 | 3,168 | 0 | 6,817 | 0 | 128 | 0 | 128 | 2,295 | 284 | 77,523 |
| 2007 | 16,126 | 8,277 | 506 | 24,909 | 2,017 | 4,055 | 0 | 6,072 | 0 | 35 | 0 | 35 | 37,435 | 785 | 69,236 |
| 2006 | 23,177 | 14,826 | 429 | 38,432 | 1,044 | 5,108 | 0 | 6,152 | 77 | 0 | 0 | 77 | 57,787 | 218 | 102,666 |
| 2005 | 8,273 | 6,344 | 888 | 15,505 | 121 | 3,449 | 0 | 3,570 | 0 | 0 | 0 | 0 | 41,369 | 1,788 | 62,232 |
| 2004 | 42,214 | 21,281 | 1,159 | 64,654 | 6,546 | 8,228 | 0 | 14,774 | 0 | 0 | 0 | 0 | 90,833 | 6,124 | 176,385 |
| 2003 | 341,461 | 5,842 | 1,225 | 348,528 | 19,340 | 502 | 0 | 19,842 | 36 | 0 | 0 | 36 | 34,032 | 6,168 | 408,606 |
| 2002 | 238,711 | 4,219 | 1,572 | 244,502 | 7,856 | 101 | 0 | 7,957 | 4,425 | 0 | 0 | 4,425 | 7,416 | 4,273 | 268,574 |
| 2001 | Not Available | Not Available | Not Available | 180,582 | Not Available | Not Available | Not Available | 20,072 | Not Available | Not Available | Not Available | 333 | 3,513 | 4,624 | 209,124 |
| 2000 | Before 2002 | Before 2002 | Before 2002 | 104,904 | Before 2002 | Before 2002 | Before 2002 | 10,171 | Before 2002 | Before 2002 | Before 2002 | 2,493 | 8,466 | 3,682 | 129,716 |
| 1999 | | | | 125,498 | | | | 6,861 | | | | 17,561 | 16,511 | 3,474 | 169,905 |
| 1998 | | | | 104,728 | | | | 21,274 | | | | 2,738 | 15,721 | 2,799 | 147,260 |
| 1997 | | | | 39,033 | | | | 2,119 | | | | 3,508 | 4,188 | 1,469 | 50,317 |
| 1996 | | | | 41,263 | | | | 779 | | | | 2,197 | 777 | 1,727 | 46,743 |
| 1995 | | | | 30,432 | | | | 2,832 | | | | 20 | 752 | 2,222 | 36,258 |
| 1994 | | | | 21,660 | | | | 571 | | | | 2,321 | 0 | 1,353 | 25,905 |
| 1993 | | | | 6,275 | | | | 0 | | | | 0 | 0 | 331 | 6,606 |
| 1992 | | | | 4,930 | | | | 0 | | | | 0 | 0 | 498 | 5,428 |
| 1991 | | | | 2,384 | | | | 0 | | | | 0 | 0 | 696 | 3,080 |
| 1990 | | | | 977 | | | | 0 | | | | 0 | 0 | 474 | 1,451 |

Source: Fannie Mae

[1] Includes purchases of Fannie Mae MBS held for investment. Activity does not include dollar roll transactions. Based on unpaid principal balances; excludes mortgage-related securities traded but not yet settled.

[2] Certain amounts previously reported as Fannie Mae fixed-rate securities have been reclassified as private-label securities.

## Table 1b. Fannie Mae Purchases of Mortgage-Related Securities – Part 2, Private-Label Detail

| Period | Purchases ($ in Millions)[1] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Private-Label | | | | | | | | |
| | Single-Family | | | | | | | | |
| | Manufactured Housing ($) | Subprime | | Alt-A | | Other | | Multifamily ($) | Total Private-Label ($) |
| | | Fixed-Rate ($) | Adjustable-Rate ($) | Fixed-Rate ($) | Adjustable-Rate ($) | Fixed-Rate ($) | Adjustable-Rate ($) | | |
| 4Q09 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3Q09 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2Q09 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1Q09 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Annual Data | | | | | | | | | |
| 2009 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2008 | 0 | 0 | 637 | 175 | 0 | 0 | 987 | 496 | 2,295 |
| 2007 | 0 | 343 | 15,628 | 38 | 5,250 | 0 | 178 | 15,998 | 37,435 |
| 2006 | 0 | 0 | 35,606 | 1,504 | 10,469 | 0 | 518 | 9,690 | 57,787 |
| 2005 | 0 | 0 | 24,469 | 3,574 | 12,535 | 118 | 571 | 102 | 41,369 |
| 2004 | 0 | 176 | 66,827 | 7,064 | 14,935 | 221 | 1,509 | 101 | 90,833 |
| 2003 | 0 | 0 | 25,769 | 7,734 | 370 | 98 | 0 | 61 | 34,032 |
| 2002 | 56 | 181 | 4,963 | 1,756 | 0 | 43 | 381 | 36 | 7,416 |
| 2001 | Not Available | Not Available | Not Available | Not Available | Not Available | Not Available | Not Available | Not Available | 3,513 |
| 2000 | Before 2002 | Before 2002 | Before 2002 | Before 2002 | Before 2002 | Before 2002 | Before 2002 | Before 2002 | 8,466 |
| 1999 | | | | | | | | | 16,511 |
| 1998 | | | | | | | | | 15,721 |
| 1997 | | | | | | | | | 4,188 |
| 1996 | | | | | | | | | 777 |
| 1995 | | | | | | | | | 752 |

Source: Fannie Mae

[1] Based on unpaid principal balances and includes mortgage loans and mortgage-related securities traded but not yet settled. Certain amounts previously reported for years prior to 2007 have changed as a result of the reclassification of certain securities.

FHFA 1335

## Table 2. Fannie Mae MBS Issuances

| Period | Business Activity ($ in Millions) | | | |
|---|---|---|---|---|
| | MBS Issuances[1] | | | |
| | Single-Family MBS ($) | Multifamily MBS ($) | Total MBS ($) | Multiclass MBS[2] ($) |
| **4Q09** | 131,789 | 4,691 | 136,480 | 34,148 |
| **3Q09** | 196,515 | 4,627 | 201,142 | 29,333 |
| **2Q09** | 311,171 | 4,740 | 315,911 | 23,392 |
| **1Q09** | 151,943 | 2,377 | 154,320 | 13,973 |
| **Annual Data** | | | | |
| **2009** | 791,418 | 16,435 | 807,853 | 100,846 |
| **2008** | 536,951 | 5,862 | 542,813 | 67,559 |
| **2007** | 622,458 | 7,149 | 629,607 | 112,563 |
| **2006** | 476,161 | 5,543 | 481,704 | 124,856 |
| **2005** | 500,759 | 9,379 | 510,138 | 123,813 |
| **2004** | 545,635 | 6,847 | 552,482 | 94,686 |
| **2003** | 1,196,730 | 23,336 | 1,220,066 | 260,919 |
| **2002** | 731,133 | 12,497 | 743,630 | 170,795 |
| **2001** | 514,621 | 13,801 | 528,422 | 139,403 |
| **2000** | 204,066 | 7,596 | 211,662 | 39,544 |
| **1999** | 292,192 | 8,497 | 300,689 | 55,160 |
| **1998** | 315,120 | 11,028 | 326,148 | 84,147 |
| **1997** | 143,615 | 5,814 | 149,429 | 85,415 |
| **1996** | 144,201 | 5,668 | 149,869 | 30,780 |
| **1995** | 106,269 | 4,187 | 110,456 | 9,681 |
| **1994** | 128,385 | 2,237 | 130,622 | 73,365 |
| **1993** | 220,485 | 959 | 221,444 | 210,630 |
| **1992** | 193,187 | 850 | 194,037 | 170,205 |
| **1991** | 111,488 | 1,415 | 112,903 | 112,808 |
| **1990** | 96,006 | 689 | 96,695 | 68,291 |
| **1989** | 66,489 | 3,275 | 69,764 | 41,715 |
| **1988** | 51,120 | 3,758 | 54,878 | 17,005 |
| **1987** | 62,067 | 1,162 | 63,229 | 9,917 |
| **1986** | 60,017 | 549 | 60,566 | 2,400 |
| **1985** | 23,142 | 507 | 23,649 | Not Issued Before 1986 |
| **1984** | 13,087 | 459 | 13,546 | |
| **1983** | 13,214 | 126 | 13,340 | |
| **1982** | 13,970 | Not Issued Before 1983 | 13,970 | |
| **1981** | 717 | | 717 | |

Source: Fannie Mae

[1]  Lender-originated MBS plus issuances from Fannie Mae's portfolio. Based on unpaid principal balances and excludes mortgage-related securities traded but not yet settled.

[2]  Beginning in 2006, includes grantor trusts and Real Estate Mortgage Investment Conduits (REMICs) as well as stripped MBS backed by Fannie Mae certificates.

## Table 3. Fannie Mae Earnings

| Period | Earnings ($ in Millions) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Net Interest Income[1] ($) | Guarantee Fee Income ($) | Average Guarantee Fee (basis points) | Administrative Expenses ($) | Credit-Related Expenses[2] ($) | Net Income (Loss) ($) | Return on Equity[3] (%) |
| 4Q09 | 3,697 | 1,877 | 28.1 | 612 | 11,920 | (15,175) | N/M |
| 3Q09 | 3,830 | 1,923 | 29.1 | 562 | 21,960 | (18,872) | N/M |
| 2Q09 | 3,735 | 1,659 | 25.5 | 510 | 18,784 | (14,754) | N/M |
| 1Q09 | 3,248 | 1,752 | 27.4 | 523 | 20,872 | (23,168) | N/M |
| Annual Data | | | | | | | |
| 2009 | 14,510 | 7,211 | 27.6 | 2,207 | 73,536 | (71,969) | N/M |
| 2008 | 8,782 | 7,621 | 31.0 | 1,979 | 29,809 | (58,707) | N/M |
| 2007 | 4,581 | 5,071 | 23.7 | 2,669 | 5,012 | (2,050) | (8.3) |
| 2006 | 6,752 | 4,250 | 22.2 | 3,076 | 783 | 4,059 | 11.3 |
| 2005 | 11,505 | 4,006 | 22.3 | 2,115 | 428 | 6,347 | 19.5 |
| 2004 | 18,081 | 3,784 | 21.8 | 1,656 | 363 | 4,967 | 16.6 |
| 2003 | 19,477 | 3,432 | 21.9 | 1,454 | 353 | 8,081 | 27.6 |
| 2002 | 18,426 | 2,516 | 19.3 | 1,156 | 273 | 3,914 | 15.2 |
| 2001 | 8,090 | 1,482 | 19.0 | 1,017 | 78 | 5,894 | 39.8 |
| 2000 | 5,674 | 1,351 | 19.5 | 905 | 94 | 4,448 | 25.6 |
| 1999 | 4,894 | 1,282 | 19.3 | 800 | 127 | 3,912 | 25.2 |
| 1998 | 4,110 | 1,229 | 20.2 | 708 | 261 | 3,418 | 25.2 |
| 1997 | 3,949 | 1,274 | 22.7 | 636 | 375 | 3,056 | 24.6 |
| 1996 | 3,592 | 1,196 | 22.4 | 560 | 409 | 2,725 | 24.1 |
| 1995 | 3,047 | 1,086 | 22.0 | 546 | 335 | 2,144 | 20.9 |
| 1994 | 2,823 | 1,083 | 22.5 | 525 | 378 | 2,132 | 24.3 |
| 1993 | 2,533 | 961 | 21.3 | 443 | 305 | 1,873 | 25.3 |
| 1992 | 2,058 | 834 | 21.2 | 381 | 320 | 1,623 | 26.5 |
| 1991 | 1,778 | 675 | 21.0 | 319 | 370 | 1,363 | 27.7 |
| 1990 | 1,593 | 536 | 21.1 | 286 | 310 | 1,173 | 33.7 |
| 1989 | 1,191 | 408 | 21.3 | 254 | 310 | 807 | 31.1 |
| 1988 | 837 | 328 | 21.6 | 218 | 365 | 507 | 25.2 |
| 1987 | 890 | 263 | 22.1 | 197 | 360 | 376 | 23.5 |
| 1986 | 384 | 175 | 23.8 | 175 | 306 | 105 | 9.5 |
| 1985 | 139 | 112 | 25.6 | 142 | 206 | (7) | (0.7) |
| 1984 | (90) | 78 | 26.2 | 112 | 86 | (71) | (7.4) |
| 1983 | (9) | 54 | 26.3 | 81 | 48 | 49 | 5.1 |
| 1982 | (464) | 16 | 27.2 | 60 | 36 | (192) | (18.9) |
| 1981 | (429) | 0 | 25.0 | 49 | (28) | (206) | (17.2) |
| 1980 | 21 | Not Available | Not Available | 44 | 19 | 14 | 0.9 |
| 1979 | 322 | Before 1981 | Before 1981 | 46 | 35 | 162 | 11.3 |
| 1978 | 294 | | | 39 | 36 | 209 | 16.5 |
| 1977 | 251 | | | 32 | 28 | 165 | 15.3 |
| 1976 | 203 | | | 30 | 25 | 127 | 13.8 |
| 1975 | 174 | | | 27 | 16 | 115 | 14.1 |
| 1974 | 142 | | | 23 | 17 | 107 | 14.7 |
| 1973 | 180 | | | 18 | 12 | 126 | 20.3 |
| 1972 | 138 | | | 13 | 5 | 96 | 18.8 |
| 1971 | 49 | | | 15 | 4 | 61 | 14.4 |

Source: Fannie Mae

N/M = not meaningful

[1] Interest income net of interest expense. Beginning November 2006, fees received from the interest earned on cash flows between the date of remittance of mortgage and other payments to Fannie Mae by servicers and the date of distribution of these payments to MBS investors are excluded from "Net Interest Income."

[2] Credit-related expenses include provision for credit losses and foreclosed property expense (income).

[3] Net income (loss) available to common stockholders divided by average outstanding common equity.

## Table 4. Fannie Mae Balance Sheet

| End of Period | Balance Sheet ($ in Millions) | | | | | | | Mortgage-Backed Securities Outstanding ($ in Millions) | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Assets[1] ($) | Total Mortgage Assets[2] ($) | Nonmortgage Investments[3] ($) | Debt Outstanding ($) | Shareholders' Equity (Deficit) ($) | Core Capital[4] ($) | Fair Value of Net Assets ($) | Total MBS Outstanding[5] ($) | Multiclass MBS Outstanding[6] ($) |
| 4Q09 | 869,141 | 745,271 | 57,782 | 774,554 | (15,281) | (74,540) | (98,701) | 2,432,789 | 480,057 |
| 3Q09 | 890,275 | 775,422 | 44,596 | 802,990 | (14,960) | (58,226) | (90,294) | 2,416,391 | 470,788 |
| 2Q09 | 911,382 | 773,017 | 41,556 | 833,110 | (10,602) | (38,480) | (101,928) | 2,366,633 | 470,170 |
| 1Q09 | 919,638 | 765,214 | 63,908 | 854,001 | (18,929) | (31,848) | (110,177) | 2,326,109 | 475,685 |
| Annual Data | | | | | | | | | |
| 2009 | 869,141 | 745,271 | 57,782 | 774,554 | (15,281) | (74,540) | (98,701) | 2,432,789 | 480,057 |
| 2008 | 912,404 | 767,989 | 71,550 | 870,393 | (15,314) | (8,641) | (105,150) | 2,289,459 | 481,137 |
| 2007 | 882,547 | 723,620 | 86,875 | 796,299 | 44,011 | 45,373 | 35,799 | 2,118,909 | 490,692 |
| 2006 | 843,936 | 726,434 | 56,983 | 767,046 | 41,506 | 41,950 | 43,699 | 1,777,550 | 456,970 |
| 2005 | 834,168 | 736,803 | 46,016 | 764,010 | 39,302 | 39,433 | 42,199 | 1,598,918 | 412,060 |
| 2004 | 1,020,934 | 925,194 | 47,839 | 953,111 | 38,902 | 34,514 | 40,094 | 1,408,047 | 368,567 |
| 2003 | 1,022,275 | 919,589 | 59,518 | 961,280 | 32,268 | 26,953 | 28,393 | 1,300,520 | 398,516 |
| 2002 | 904,739 | 820,627 | 39,376 | 841,293 | 31,899 | 20,431 | 22,130 | 1,040,439 | 401,406 |
| 2001 | 799,948 | 706,347 | 65,982 | 763,467 | 18,118 | 25,182 | 22,675 | 863,445 | 392,457 |
| 2000 | 675,224 | 607,731 | 52,347 | 642,682 | 20,838 | 20,827 | 20,677 | 706,722 | 334,508 |
| 1999 | 575,308 | 523,103 | 37,299 | 547,619 | 17,629 | 17,876 | 20,525 | 679,145 | 335,514 |
| 1998 | 485,146 | 415,434 | 58,515 | 460,291 | 15,453 | 15,465 | 14,885 | 637,143 | 361,613 |
| 1997 | 391,673 | 316,592 | 64,596 | 369,774 | 13,793 | 13,793 | 15,982 | 579,138 | 388,360 |
| 1996 | 351,041 | 286,528 | 56,606 | 331,270 | 12,773 | 12,773 | 14,556 | 548,173 | 339,798 |
| 1995 | 316,550 | 252,868 | 57,273 | 299,174 | 10,959 | 10,959 | 11,037 | 513,230 | 353,528 |
| 1994 | 272,508 | 220,815 | 46,335 | 257,230 | 9,541 | 9,541 | 10,924 | 486,345 | 378,733 |
| 1993 | 216,979 | 190,169 | 21,396 | 201,112 | 8,052 | 8,052 | 9,126 | 471,306 | 381,865 |
| 1992 | 180,978 | 156,260 | 19,574 | 166,300 | 6,774 | Not Applicable | 9,096 | 424,444 | 312,369 |
| 1991 | 147,072 | 126,679 | 9,836 | 133,937 | 5,547 | Before 1993 | Not Available | 355,284 | 224,806 |
| 1990 | 133,113 | 114,066 | 9,868 | 123,403 | 3,941 | | Before 1992 | 288,075 | 127,278 |
| 1989 | 124,315 | 107,981 | 8,338 | 116,064 | 2,991 | | | 216,512 | 64,826 |
| 1988 | 112,258 | 100,099 | 5,289 | 105,459 | 2,260 | | | 170,097 | 26,660 |
| 1987 | 103,459 | 93,665 | 3,468 | 97,057 | 1,811 | | | 135,734 | 11,359 |
| 1986 | 99,621 | 94,123 | 1,775 | 93,563 | 1,182 | | | 95,568 | Not Issued |
| 1985 | 99,076 | 94,609 | 1,466 | 93,985 | 1,009 | | | 54,552 | Before 1987 |
| 1984 | 87,798 | 84,135 | 1,840 | 83,719 | 918 | | | 35,738 | |
| 1983 | 78,383 | 75,247 | 1,689 | 74,594 | 1,000 | | | 25,121 | |
| 1982 | 72,981 | 69,356 | 2,430 | 69,614 | 953 | | | 14,450 | |
| 1981 | 61,578 | 59,629 | 1,047 | 58,551 | 1,080 | | | 717 | |
| 1980 | 57,879 | 55,589 | 1,556 | 54,880 | 1,457 | | | Not Issued | |
| 1979 | 51,300 | 49,777 | 843 | 48,424 | 1,501 | | | Before 1981 | |
| 1978 | 43,506 | 42,103 | 834 | 40,985 | 1,362 | | | | |
| 1977 | 33,980 | 33,252 | 318 | 31,890 | 1,173 | | | | |
| 1976 | 32,393 | 31,775 | 245 | 30,565 | 983 | | | | |
| 1975 | 31,596 | 30,820 | 239 | 29,963 | 861 | | | | |
| 1974 | 29,671 | 28,666 | 466 | 28,168 | 772 | | | | |
| 1973 | 24,318 | 23,589 | 227 | 23,003 | 680 | | | | |
| 1972 | 20,346 | 19,652 | 268 | 19,239 | 559 | | | | |
| 1971 | 18,591 | 17,886 | 349 | 17,672 | 460 | | | | |

Source: Fannie Mae

1 Beginning in 1998, the guarantee liability for Fannie Mae MBS held as investments is classified as a liability.

2 Gross mortgage assets net of unamortized purchase premiums, discounts, and cost basis adjustments and, beginning in 2002, fair-value adjustments on available-for-sale and trading securities, as well as impairments on available-for-sale securities. Excludes the allowance for loan losses on loans held for investment. The amounts for 1999 through 2001 include certain loans held for investment previously classified as nonmortgage investments.

3 Data reflect unpaid principal balance net of unamortized purchase premiums, discounts, and cost basis adjustments, as well as fair-value adjustments and impairments on available-for-sale and trading securities. Since 2005, advances to lenders are not included. Amounts for periods prior to 2005 may include or consist of advances to lenders. Prior to 1982, the majority of nonmortgage investments consisted of U.S. government securities and agency securities.

4 The sum of (a) the stated value of outstanding common stock (common stock less Treasury stock); (b) the stated value of outstanding noncumulative perpetual preferred stock; (c) paid-in capital; and (d) retained earnings (accumulated deficit). Core capital excludes accumulated other comprehensive income (loss) and senior preferred stock.

5 Unpaid principal balance of Fannie Mae MBS held by third-party investors. Includes guaranteed whole loan REMICs and private-label wraps not included in grantor trusts. The principal balance of resecuritized Fannie Mae MBS is included only once.

6 Beginning in 2005, consists of securities guaranteed by Fannie Mae that are backed by Ginnie Mae collateral, grantor trusts, and REMICs, as well as stripped MBS backed by Fannie Mae certificates.

## Table 4a. Fannie Mae Total MBS Outstanding Detail

| End of Period | Single-Family Mortgages ($ in Millions) [1] | | | | | | | Multifamily Mortgages ($ in Millions) [1] | | | Total MBS Outstanding ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Conventional | | | | FHA/VA | | | | | Total Multi-family ($) | |
| | Fixed-Rate ($) | Adjustable-Rate ($) | Seconds ($) | Total ($) | Fixed-Rate ($) | Adjustable-Rate ($) | Total ($) | Conventional ($) | FHA/RD ($) | | |
| 4Q09 | 2,190,357 | 179,655 | 25 | 2,370,037 | 15,026 | 171 | 15,197 | 46,628 | 927 | 47,555 | 2,432,789 |
| 3Q09 | 2,180,295 | 180,420 | 26 | 2,360,741 | 11,830 | 180 | 12,010 | 43,018 | 622 | 43,640 | 2,416,391 |
| 2Q09 | 2,125,900 | 187,173 | 28 | 2,313,101 | 12,190 | 193 | 12,383 | 40,443 | 706 | 41,149 | 2,366,633 |
| 1Q09 | 2,078,956 | 195,789 | 30 | 2,274,775 | 12,448 | 205 | 12,653 | 37,855 | 736 | 38,591 | 2,326,019 |
| Annual Data | | | | | | | | | | | |
| 2009 | 2,190,357 | 179,655 | 25 | 2,370,037 | 15,026 | 171 | 15,197 | 46,628 | 927 | 47,555 | 2,432,789 |
| 2008 | 2,035,020 | 203,206 | 31 | 2,238,257 | 12,903 | 214 | 13,117 | 37,298 | 787 | 38,085 | 2,289,459 |
| 2007 | 1,850,150 | 214,245 | 0 | 2,064,395 | 14,982 | 275 | 15,257 | 38,218 | 1,039 | 39,257 | 2,118,909 |
| 2006 | 1,484,147 | 230,667 | 0 | 1,714,814 | 18,615 | 454 | 19,069 | 42,184 | 1,483 | 43,667 | 1,777,550 |
| 2005 | 1,290,354 | 232,689 | 0 | 1,523,043 | 23,065 | 668 | 23,733 | 50,346 | 1,796 | 52,142 | 1,598,918 |
| 2004 | 1,243,343 | 75,722 | 0 | 1,319,065 | 31,389 | 949 | 32,336 | 47,386 | 9,260 | 56,646 | 1,408,047 |
| 2003 | 1,112,849 | 87,373 | 0 | 1,200,222 | 36,139 | 1,268 | 37,407 | 53,720 | 9,171 | 62,891 | 1,300,520 |
| 2002 | 875,260 | 75,430 | 0 | 950,690 | 36,057 | 1,247 | 37,304 | 47,025 | 5,420 | 52,445 | 1,040,439 |
| 2001 | 752,211 | 60,842 | 772 | 813,825 | 4,519 | 1,207 | 5,726 | 42,713 | 1,181 | 43,894 | 863,445 |
| 2000 | 599,999 | 61,495 | 1,165 | 662,659 | 6,778 | 1,298 | 8,076 | 35,207 | 780 | 35,987 | 706,722 |
| 1999 | 586,069 | 51,474 | 1,212 | 638,755 | 7,159 | 1,010 | 8,169 | 31,518 | 703 | 32,221 | 679,145 |
| 1998 | 545,680 | 56,903 | 98 | 602,681 | 5,340 | 587 | 5,927 | 28,378 | 157 | 28,535 | 637,143 |
| 1997 | 483,982 | 70,106 | 7 | 554,095 | 3,872 | 213 | 4,085 | 20,824 | 134 | 20,958 | 579,138 |
| 1996 | 460,866 | 65,682 | 9 | 526,557 | 4,402 | 191 | 4,593 | 16,912 | 111 | 17,023 | 548,173 |
| 1995 | 431,755 | 63,436 | 13 | 495,204 | 5,043 | 91 | 5,134 | 12,579 | 313 | 12,892 | 513,230 |
| 1994 | 415,692 | 55,780 | 18 | 471,490 | 5,628 | 0 | 5,628 | 8,908 | 319 | 9,227 | 486,345 |
| 1993 | 405,383 | 49,987 | 28 | 455,398 | 7,549 | 0 | 7,549 | 8,034 | 325 | 8,359 | 471,306 |
| 1992 | 360,619 | 45,718 | 43 | 406,380 | 9,438 | 0 | 9,438 | 8,295 | 331 | 8,626 | 424,444 |
| 1991 | 290,038 | 45,110 | 89 | 335,237 | 11,112 | 0 | 11,112 | 8,599 | 336 | 8,935 | 355,284 |
| 1990 | 225,981 | 42,443 | 121 | 268,545 | 11,380 | 0 | 11,380 | 7,807 | 343 | 8,150 | 288,075 |
| 1989 | Not Available | Not Available | Not Available | Not Available | Not Available | Not Available | Not Available | Not Available | Not Available | Not Available | 216,512 |
| 1988 | Before 1990 | Before 1990 | Before 1990 | Before 1990 | Before 1990 | Before 1990 | Before 1990 | Before 1990 | Before 1990 | Before 1990 | 170,097 |
| 1987 | | | | | | | | | | | 135,734 |
| 1986 | | | | | | | | | | | 95,568 |
| 1985 | | | | | | | | | | | 54,552 |
| 1984 | | | | | | | | | | | 35,738 |
| 1983 | | | | | | | | | | | 25,121 |
| 1982 | | | | | | | | | | | 14,450 |
| 1981 | | | | | | | | | | | 717 |

Source: Fannie Mae

[1] Unpaid principal balance of Fannie Mae MBS held by third-party investors. Includes guaranteed whole loan REMICs and private-label wraps not included in grantor trusts. The principal balance of resecuritized Fannie Mae MBS is included only once.

FHFA 1339