***Reducing costs of maintaining existing financing for HFAs***. Through Fannie Mae and Freddie Mac, the TCLP provides replacement credit and liquidity facilities to HFAs that help reduce the costs of maintaining existing financing for the HFAs. Treasury backstops the replacement liquidity by purchasing a participation interest in the GSE temporary credit and liquidity facilities for the HFAs using HERA authority.

***Program sized to meet demand***. HFAs submitted detailed program participation requests to Treasury for the TCLP.  No allocation process was required because requests came in at a total below the program cap.

***Protecting Taxpayers***. The HFAs pay the GSEs and Treasury a fee designed to cover risk posed by the HFA. Additionally the recently announced extension of the program will require participating HFAs to submit a plan for Treasury's approval demonstrating how it will reduce risk borne by the taxpayer under the program.

***Temporary solution, with incentives for HFAs to quickly transition back to market financing***. The fee for HFAs to use the TCLP increases over time to encourage the HFAs to transition to private market financing alternatives as quickly as possible. This process will be accelerated by the required submission and approval of plans from the HFAs demonstrating how they will exit the program.

***Terms designed to facilitate sustainable business models for housing agencies***. The liquidity facilities under the TCLP program are only available for outstanding bonds.

### 3.1.4 – Temporary Credit and Liquidity Program Budget and Performance Report and Plan

*Description of Performance:*
Treasury continues to monitor the housing markets as well as other factors affecting HFAs. Through FY 2012 and possibly into FY 2013, Treasury will review and revise plans submitted by HFAs that wish to extend their facilities in order to minimize risk going forward.  Continued market surveillance and monitoring of participating HFAs will take place in FY 2013.  No additional assistance beyond December 31, 2009 is currently permitted under law.

# Tab 44

# FEDERAL HOUSING FINANCE AGENCY



## NEWS RELEASE

| | | |
|---|---|---|
| For Immediate Release | **Contact:** Corinne Russell | (202) 649-3032 |
| February 21, 2012 | Stefanie Johnson | (202) 649-3030 |

## FHFA Sends Congress Strategic Plan for Fannie Mae and Freddie Mac Conservatorships

**Washington, DC –** Federal Housing Finance Agency (FHFA) Acting Director Edward J. DeMarco today sent to Congress a strategic plan for the next phase of the conservatorships of Fannie Mae and Freddie Mac (the Enterprises).  The plan builds on the Acting Director's February 2010 letter to Congress on the conservatorships and sets forth objectives and steps FHFA is taking or will take to meet FHFA's obligations as conservator.  Fannie Mae and Freddie Mac were placed into conservatorships Sept. 6, 2008 and have since received more than $180 billion in taxpayer support.

FHFA identifies three strategic goals for the next phase of the conservatorships:

- **Build.**  Build a new infrastructure for the secondary mortgage market;
- **Contract.**  Gradually contract the Enterprises' dominant presence in the marketplace while simplifying and shrinking their operations; and
- **Maintain.**   Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

"With the conservatorships operating for more than three years and no near-term resolution in sight, it is time to update and extend the goals and directions of the conservatorships," DeMarco wrote.  "FHFA is contemplating next steps to build an infrastructure for the secondary mortgage market that is consistent with existing policy proposals and will support any outcome of the leading legislative proposals.  FHFA looks forward to working with Congress and the Administration on a resolution of the conservatorships and a comprehensive review of the nation's housing finance system," said DeMarco.

Link to February 2010 letter

### ###

*The Federal Housing Finance Agency regulates Fannie Mae, Freddie Mac and the 12 Federal Home Loan Banks. These government-sponsored enterprises provide more than $5.7 trillion in funding for the U.S. mortgage markets and financial institutions.*



# Federal Housing Finance Agency

## Constitution Center

400 7th Street, S.W.
Washington, D.C. 20024
Telephone: (202) 649-3800
Facsimile: (202) 649-1071
www.fhfa.gov

February 21, 2012

The Honorable Timothy Johnson
Chairman
Committee on Banking, Housing,
and Urban Affairs
United States Senate
Washington, DC 20510

The Honorable Richard C. Shelby
Ranking Minority Member
Committee on Banking, Housing,
and Urban Affairs
United States Senate
Washington, DC 20510

The Honorable Spencer Bachus
Chairman
Committee on Financial Services
United States House of Representatives
Washington, DC 20515

The Honorable Barney Frank
Ranking Minority Member
Committee on Financial Services
United States House of Representatives
Washington, DC 20515

Dear Chairmen and Ranking Members:

I am pleased to transmit a strategic plan for the conservatorships of Fannie Mae and Freddie Mac (the Enterprises) that sets forth objectives and steps the Federal Housing Finance Agency (FHFA) is taking or will take to meet the agency's obligations as conservator.

In February 2010, I sent a letter to the then Chairmen and Ranking Members of FHFA's oversight committees to explain the goals of the conservatorships and how FHFA was seeking to meet those goals. That letter focused on the establishment and purposes of the conservatorships, and the activities of the Enterprises under conservatorship.

The conservatorships of Fannie Mae and Freddie Mac have now been in place since September 2008. With the conservatorships operating for more than three years and no near-term resolution in sight, it is time to update and extend the goals and directions of the conservatorships. FHFA is contemplating next steps to build an infrastructure for the secondary mortgage market that is consistent with existing policy proposals and will support any outcome of the leading legislative proposals.

In the attached strategic plan, FHFA identifies three strategic goals for the next phase of the conservatorships:

- Build. Build a new infrastructure for the secondary mortgage market;

- ■ Contract.  Gradually contract the Enterprises' dominant presence in the marketplace while simplifying and shrinking their operations; and
- ■ Maintain.   Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

The strategic plan reviews each of these goals and describes actions FHFA is planning or is already taking to accomplish them.  FHFA looks forward to working with Congress and the Administration on a resolution of the conservatorships and a comprehensive review of the nation's housing finance system.

I would be pleased to speak with you about these matters and answer any questions you may have.  I believe the information contained in this letter will help mortgage industry participants and the public better understand the role of FHFA as conservator of Fannie Mae and Freddie Mac.  Accordingly, I intend to release this plan at noon today.

Yours truly,

// s //

Edward J. DeMarco
Acting Director

Attachment



# A Strategic Plan for Enterprise Conservatorships:

# The Next Chapter in a Story that Needs an Ending

## February 21, 2012

FHFA 2682

## *Summary*

Since establishing conservatorships for Fannie Mae and Freddie Mac (the Enterprises) in 2008, the Federal Housing Finance Agency (FHFA) and the Enterprises have focused on three key goals:

- mitigating Enterprise losses, which ultimately accrue to taxpayers;
- ensuring families have access to mortgages to buy a home or refinance an existing mortgage; and
- offering borrowers in trouble on their mortgage an opportunity to modify their loan or otherwise avoid foreclosure.

Two years ago, FHFA sent Congress a letter setting forth the agency's understanding of its conservatorship obligations and how it planned to fulfill those obligations. It is time to update and extend that plan in view of the status of the Enterprises and the country's housing system today. In particular, with the conservatorships operating for more than three years and no near-term resolution in sight, it is time to assess the goals and directions of the conservatorships.

This assessment has been made in light of FHFA's statutory mandate to "take such action as may be necessary to put [Fannie Mae and Freddie Mac] in a sound and solvent condition." FHFA also needs to make sure strategic decisions about the Enterprises' future are in accord with the statutory purpose of the conservator for "reorganizing, rehabilitating, or winding up the affairs of a regulated entity."

This strategic plan outlines the steps FHFA has taken and will be taking to address these challenges. The plan sets forth three strategic goals for the next phase of conservatorship:

1.   **Build.**  Build a new infrastructure for the secondary mortgage market.

2.   **Contract.**  Gradually contract the Enterprises' dominant presence in the marketplace while simplifying and shrinking their operations.

3.   **Maintain.**  Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

The strategic plan explores each of these goals and identifies particular actions FHFA is contemplating, or already taking, to accomplish them.

The first goal – building a new infrastructure – recognizes that the country would be without a secondary market for non-government-insured mortgages without the Enterprises. No private sector infrastructure exists today that is capable of securitizing the $100 billion per month in new mortgages being originated. Simply shutting down the Enterprises would drive up interest rates and limit mortgage availability. This goal establishes the steps FHFA and the Enterprises will take to create that necessary infrastructure, including a securitization platform and national

2

standards for mortgage securitization that Congress and market participants may use to develop the mortgage market of the future.

The second goal – contracting Enterprise operations – describes steps that FHFA plans to take to gradually shift mortgage credit risk from the Enterprises to private investors and eliminate the direct funding of mortgages by the Enterprises.  This goal is consistent with the fundamental goals of the conservatorship, of the Enterprises operating in a sound and solvent condition, and of limiting future risk exposure in the face of uncertainty.

The third goal – maintaining foreclosure prevention efforts and credit availability – recognizes that the work begun three years ago is not finished.  Programs and strategies to ensure ongoing mortgage credit availability, assist troubled homeowners, and minimize taxpayer losses while restoring stability to housing markets continue to require energy, focus, and resources.

Achieving these strategic goals will fulfill the legal requirements Congress assigned FHFA as conservator and also prepare the foundation for a new, stronger housing finance system in the future.  Although that future may not include Fannie Mae and Freddie Mac, at least as they are known today, this important work in conservatorship can be a lasting, positive legacy for the country and its housing system.

Properly implemented, this strategic plan should benefit:

- Homeowners, by ensuring continued emphasis on foreclosure prevention and credit availability;
- Taxpayers, by furthering efforts to limit losses from past activities while simplifying risk management and reducing future risk exposure;
- Market participants, by creating a path by which the Enterprises' role in the mortgage market is gradually reduced while maintaining market stability and liquidity; and
- Lawmakers, by building a foundation on which they may develop new legal frameworks and institutional arrangements for a sound and resilient secondary mortgage market of the future.

The public interest is best served by ensuring that Fannie Mae and Freddie Mac have the best available corporate leaders to carry out the work necessary to meet the critical goals set forth here.  The managers and staff at each company also have critical roles to play since the numerous activities and changes necessary to accomplish the strategic goals will require substantial effort by many people at Fannie Mae and Freddie Mac.

The early chapters of the conservatorship story focused on market functioning and loss mitigation.  More recent chapters have covered renewed efforts to enhance refinancing opportunities and real estate owned (REO) disposition.  The strategic goals and performance objectives set forth here provide an outline for the next chapter of the story, one that focuses in earnest on building a secondary mortgage market infrastructure that will live beyond the

<div align="center">3</div>

Enterprises.  This next chapter will also see a gradual reduction in the Enterprises' dominant position in holding mortgage credit risk as private capital is encouraged back into that role.

The final chapter, though, remains the province of lawmakers.  Fannie Mae and Freddie Mac were chartered by Congress and by law, only Congress can abolish or modify those charters and set forth a vision for a new secondary market structure.

One critical point:  The steps envisioned in this strategic plan are consistent with each of the housing finance reform frameworks set forth in the white paper produced last year by the U.S. Department of the Treasury and the U.S. Department of Housing and Urban Development as well as with the leading congressional proposals introduced to-date.  This plan envisions actions by the Enterprises that will help establish a new secondary mortgage market, while leaving open all options for Congress and the Administration regarding the resolution of the conservatorships and the degree of government involvement in supporting the secondary mortgage market in the future.

4

# A Strategic Plan for Enterprise Conservatorships:

# The Next Chapter in a Story that Needs an Ending

## Introduction

The Housing and Economic Recovery Act of 2008 (HERA), which created the Federal Housing Finance Agency (FHFA), granted the Director of FHFA discretionary authority to appoint FHFA conservator or receiver of the Enterprises "for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity."[1]

On September 6, 2008, well over three years ago, FHFA exercised that authority, placing the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) (together, the Enterprises) into conservatorships. FHFA has since overseen the largest, most complex conservatorships in history.

Two years ago, FHFA sent Congress a letter setting forth the agency's understanding of its conservatorship obligations and how it planned to fulfill those obligations. It is time to update and extend that plan in view of the status of the Enterprises and the country's housing system today.

The two companies have received more than $180 billion in taxpayer support. The benefit to the country from maintaining their operations has been to ensure the secondary mortgage market continues to function. During this time, the Enterprises have completed more than 2 million foreclosure prevention actions, including more than 1 million loan modifications and they have refinanced more than 10 million mortgages. Together they are guaranteeing roughly $100 billion per month in new mortgage production, representing about 3 of every 4 mortgages being originated. But the Enterprises' ongoing operations are entirely dependent on taxpayer support provided through the Senior Preferred Stock Purchase Agreements with the U.S. Department of the Treasury.

The future of the Enterprises and the housing finance system continues to be the subject of many questions and much debate. A new structure for housing finance requires congressional action,

---

[1] Housing and Economic Recovery Act of 2008, Section 1367 (a)(2), amending the Federal Housing Enterprises Financial Safety and Soundness Act, 12 USC 4617(a)(2).

but no clear legislative consensus has emerged from the Administration or Congress.  In the meantime, like other large, complex financial institutions, the Enterprises require strategic direction though they face an uncertain future.  Market participants are also seeking answers about the future.

This strategic plan provides lawmakers and the public with an outline for how FHFA as conservator intends to guide the Enterprises over the next few years.  FHFA has developed this plan because of the following:

- The Enterprises' boards of directors and management teams can more readily fulfill the goals of conservatorship with a clear and transparent course of action.
- As investors in the Enterprises today, taxpayers deserve a plan on how their continued support will be used.
- Proposals for rebuilding the secondary mortgage market vary in their reliance on government credit guarantees but most assume some sort of securitization infrastructure to take the place of the Enterprises or assume the Enterprises' securitization infrastructures are used in some way in the future.
- Lawmakers have asked FHFA for ideas on a stable transition from a secondary market dominated by the Enterprises to one that could operate without them.
- FHFA committed to provide a strategic plan for the next stage of the conservatorships in response to a request from the Chairman of the House Financial Services Subcommittee on Oversight and Investigations in December 2011.

As with any strategic plan, this document is not a step-by-step guide.  Rather, it sets forth certain broad objectives that are consistent with FHFA's legal mandate and the policy direction that has emerged from the Administration and Congress.  Importantly, this plan is consistent with each of the housing finance reform frameworks set forth in the white paper produced last year by Treasury and the U.S. Department of Housing and Urban Development (HUD) and with the leading congressional proposals introduced to-date.  This plan envisions actions by the Enterprises that will help establish a new secondary mortgage market, while leaving open all options for Congress and the Administration regarding the resolution of the conservatorships and the degree of government involvement in supporting the secondary mortgage market in the future.

FHFA remains committed to its obligation to ensure a stable and liquid secondary mortgage market while preserving and conserving Enterprise assets to minimize taxpayer losses.  FHFA looks forward to continuing to work with Congress and the Administration on a resolution of the conservatorships and a comprehensive review of the country's housing finance system.

## Background:  The Early Chapters of the Conservatorship Story

### The Law

As conservator and regulator, FHFA has three legal obligations that direct the agency's activities and decisions involving the Enterprises.

First, HERA specified two conservator powers, stating that the agency may "take such action as may be

(i)        necessary to put the regulated entity in a sound and solvent condition; and

(ii)       appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity."[2]

FHFA has reported on numerous occasions that, with taxpayers providing the capital supporting Enterprise operations, this "preserve and conserve" mandate directs FHFA to minimize losses on behalf of taxpayers.

Second, although each Enterprises is in conservatorship, without statutory changes their mission of supporting a stable and liquid mortgage market remains the same as before the conservatorships.  FHFA has a statutory responsibility to ensure each Enterprise "operates in a safe and sound manner"[3] and that "the operations and activities of each regulated entity foster liquid, efficient, competitive, and resilient national housing finance markets."[4]

Third, under the Emergency Economic Stabilization Act of 2008 (EESA), FHFA has a statutory responsibility to "implement a plan that seeks to maximize assistance for homeowners and use its authority to encourage the servicers of the underlying mortgages, and considering net present value to the taxpayer, to take advantage of … available programs to minimize foreclosures."[5]

---

[2] 12 USC 4617(b)(2)(D)

[3] 12 USC 4513(a)(1)(B)(i)

[4] 12 USC 4513(a)(1)(B)(ii)

[5] 12 USC 5220(b)(1)

FHFA 2688

### Conservatorship Goals

In 2008, the immediate objectives of conservatorship were to help restore confidence in the companies, enhance their capacity to fulfill their mission, and mitigate the systemic risk that contributed directly to instability in financial markets.  Because the private mortgage securitization market had already retreated and there were no other effective secondary market mechanisms in place, the Enterprises' continued operations were necessary for most Americans to obtain a mortgage or refinance an existing mortgage.

Since 2008, several government efforts have kept the country's housing finance system functioning, including:

- the Treasury Department's financial backstop of Enterprise debt and mortgage-backed securities (MBS);
- Treasury's and the Federal Reserve's MBS purchases;
- FHFA's and the Enterprises' actions to ensure the continued functioning of the secondary mortgage market; and
- the Federal Housing Administration's (FHA) rapidly growing market presence.

As a result, credit has remained available, albeit with more restrictive underwriting terms, and more than 10 million Americans have refinanced Fannie Mae and Freddie Mac mortgages.

During these years, these same government agencies together with the Enterprises and other market participants undertook a series of efforts to help families avoid foreclosure through loan modification programs and foreclosure alternatives.  For FHFA and the Enterprises, these efforts directly relate to the "preserve and conserve" mandate because such activities are designed to reduce credit losses on mortgages originated primarily in the years before conservatorship.  In addition, these efforts are consistent with FHFA's other mandates, including the EESA mandate to maximize assistance for homeowners.  Since conservatorship began, the Enterprises have completed more than two million foreclosure prevention actions, including more than one million loan modifications.

Today, loss mitigation efforts focus on helping households as early as possible when they become delinquent on their mortgages, and employing innovative strategies for returning foreclosed properties back to the market.  The continued high level of mortgage delinquencies shows that more is left to do, but several programs now exist to address these challenges.  FHFA and the Enterprises will remain vigilant in ensuring that appropriate assistance and support is offered to all homeowners in distress through loan modifications and other foreclosure avoidance tools.

Three years into conservatorship, it is time to update and extend the goals of conservatorship in light of FHFA's statutory mandate and the market environment that has evolved since 2008.  As noted, the operations of the Enterprises in conservatorship are unlike anything the country has experienced.  The conservatorship structure was designed to allow a temporary period for an institution to stabilize and return to the market or to lead to an orderly disposition of a firm.

8

Unlike the banking industry, there are not thousands of potential firms ready to step into the business of mortgage securitization.  Indeed, outside of the securitization available through the Government National Mortgage Association (Ginnie Mae) for loans primarily backed by FHA, there is little else in place today to assume the secondary market functions served by the Enterprises.

### What Needs to Be Done Now

Policymakers need to address the future structure of housing finance, which would allow for a smooth transition from today's market.  Without action by Congress, FHFA must continue to look to the existing statutory provisions that guide the conservatorships.  In particular, FHFA must consider what it means to "take such action as may be necessary to put [Fannie Mae and Freddie Mac] in a sound and solvent condition" when it is clear that the draws the companies have taken from the Treasury are so large they cannot be repaid under any foreseeable scenarios.

Without further statutory direction, FHFA views the mandate to restore the Enterprises to a sound and solvent condition as best accomplished not only through aggressive loss mitigation efforts, but also by reducing the risk exposure of the companies, through appropriate underwriting and pricing of mortgages.  Such actions are consistent with what would be expected of a private company operating without government support.  At the same time, the unanticipated length of the conservatorships poses additional risks for taxpayers and markets not contemplated by HERA.  FHFA views those risks as best managed by contracting the Enterprises' footprint in the marketplace.

To achieve these outcomes, FHFA will need to make strategic decisions regarding the Enterprises' level of participation in the market while developing ways for the taxpayers to ultimately derive value, consistent with FHFA's "preserve and conserve" mandate.

## Reviewing the Existing Landscape:  Considerations for Moving Forward

In view of FHFA's statutory mandates and in light of the current environment, it is necessary to define new goals for the Enterprises operating in conservatorship.  Key issues and circumstances FHFA faces include the following:

- The Enterprises' losses are of such magnitude that the companies cannot repay taxpayers in any foreseeable scenario.

- The operational infrastructures at each company are working but require substantial investment to support future business.  The question is whether to improve the current infrastructure or to consider this an opportunity to build something new.

9

- In the absence of other comparable market infrastructure, minimizing future taxpayer losses and ensuring market liquidity and stability requires preserving the Enterprises as working companies. But some of the things this approach requires, such as retaining some semblance of private sector pay comparability, have generated concerns because the companies receive substantial taxpayer assistance.

- Although the housing finance system cannot be called healthy, it is stable and functioning, albeit with substantial ongoing government support.

- Congress and the Administration have not reached consensus on how to resolve the conservatorships and define a path for housing finance. Legislative proposals have begun to emerge, but enactment soon appears unlikely.

Absence of consensus on a resolution of the conservatorships does not imply a lack of consensus on general direction. Both the Administration and Congress have expressed discomfort with the level of government involvement in the mortgage market and a desire for greater private sector participation and risk-taking. A central issue remains: whether a government guarantee is essential to a functioning mortgage market. On other market issues, some consensus has emerged on what is needed to fix the problems we have witnessed over the past several years. At a minimum there is a desire for greater standardization and more equitable and transparent treatment of borrowers and investors in mortgage origination, mortgage servicing, and securities disclosure.

Over the past two years, FHFA has initiated several long-term improvements to the housing finance system that address shortcomings in the current system, meet the goal of reducing taxpayer exposures, and provide flexibility for lawmakers as they move toward legislative action on housing finance. These improvements include the following:

- The Uniform Mortgage Data Program will improve the consistency, quality, and uniformity of data collected at the beginning of the lending process. Developing standard terms, definitions, and industry standard data reporting protocols will decrease costs for originators and appraisers and reduce repurchase risk. It will allow new entrants to use industry standards rather than having to develop their own proprietary data systems to compete with other systems already in the market. Common data definitions, electronic data capture, and standardized data protocols will improve efficiency, lower costs and enhance risk monitoring. Standardizing data will be a key building block of housing finance reform.

- The Joint Servicing Compensation Initiative is considering alternatives for future mortgage servicing compensation for single-family mortgage loans. The goals of any changes to the current Enterprise model of compensation will be improving service for borrowers, reducing financial risk to servicers, and providing flexibility for guarantors to better manage non-performing loans, while promoting continued liquidity in the "To Be Announced" mortgage securities market. More broadly, the goals of the initiative are to consider changes to the servicing compensation structure that would improve competition

10

in the market for mortgage servicing and which could be replicated across any form of housing finance reform.

- The <u>Servicing Alignment Initiative</u> has produced a single, consistent set of protocols for servicing Enterprise mortgages from the moment they first become delinquent. This initiative responds to concerns about how delinquent mortgages have been serviced and it simplifies the rules for mortgage servicers by giving them just one set of procedures to follow whether a mortgage is owned by Fannie Mae or Freddie Mac. The first phase of this initiative has already been implemented. Developed in consultation with the federal banking agencies and state attorneys general, the new requirements could serve as the basis for establishing broad national mortgage servicing standards.

- The <u>Loan-Level Disclosures Initiative</u> will produce loan-level investor disclosures on Enterprise MBS, both at the time of origination and throughout a security's life. Improving MBS disclosures will help establish consistency and quality of data. With better information, private investors can efficiently measure and price mortgage credit risk, which will likely be a hallmark of any form of housing finance reform.

## Writing the Next Chapter: Setting the Strategic Goals

Looking ahead, three broad goals will define the focus of the conservatorships for the next few years:

1. **Build.** Build a new infrastructure for the secondary mortgage market.

2. **Contract.** Gradually contract the Enterprises' dominant presence in the marketplace while simplifying and shrinking their operations.

3. **Maintain.** Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

Achieving these strategic goals will fulfill the legal requirements Congress assigned FHFA as conservator and also prepare the foundation for a new, stronger housing finance system in the future. Although that future may not include Fannie Mae and Freddie Mac, at least as they are known today, this important work in conservatorship can be a lasting, positive legacy for the country and its housing system.

Properly implemented, this strategic plan should benefit:

- Homeowners, by ensuring continued emphasis on foreclosure prevention and credit availability;

11

- Taxpayers, by furthering efforts to limit losses from past activities while simplifying risk management and reducing future risk exposure;
- Market participants, by creating a path by which the Enterprises' role in the mortgage market is gradually reduced while maintaining market stability and liquidity; and
- Lawmakers, by building a foundation on which they may develop new legal frameworks and institutional arrangements for a sound and resilient secondary mortgage market of the future.

### *Strategic Goal 1:*  **Building a New Infrastructure**

The absence of any meaningful secondary mortgage market mechanisms beyond the Enterprises and Ginnie Mae is a dilemma for policymakers expecting to replace the Enterprises.  This fact was a key motivation for the conservatorships and for the Treasury support agreements in the first place.  Without an alternative market infrastructure that investors could rely on, new mortgages would have been largely unavailable if the Enterprises suddenly had been shut down.

The elements for rebuilding the market system are known and work on them can begin without knowing whether there will be a government guarantee apart from FHA in the mortgage market of the future.   In fact, the four initiatives FHFA and the Enterprises have already begun would be essential to any new infrastructure.

A secondary mortgage market infrastructure without Fannie Mae and Freddie Mac would likely include the following elements:

- A framework to connect capital markets investors to homeowners – specifically, a securitization platform that bundles mortgages into any of an array of securities structures and provides all the operational support to process and track the payments from borrowers through to the investors.

- A standardized pooling and servicing agreement that replaces the Enterprises' current Servicer Participation Agreement and corrects the many shortcomings found in the pooling and servicing agreements used in the private-label MBS market before the housing bubble burst.

- Transparent servicing requirements that set forth requirements for mortgage servicers' responsibilities to borrowers and investors across a spectrum of issues including delinquent loan servicing, solicitation for refinance or loan modifications, and servicing transfers.

- A servicing compensation structure that promotes competition for, rather than concentration of, mortgage servicing.  Such a structure would take full account of

12

mortgage servicers' costs and requirements, and consider the appropriate interaction between origination and servicing revenue.

- Detailed, timely, and reliable loan-level data for mortgage investors at the time a security is issued and throughout the life of the security. Such transparency is a prerequisite for private capital to bear a meaningful portion of mortgage credit risk.

- A sound, efficient system for document custody and electronic registration of mortgages, notes, titles, and liens that respects local property laws but also enhances the liquidity of mortgages so that borrowers may benefit from a liquid secondary market for buying and selling mortgages. Such a system should be especially attuned to privacy and security issues while providing full transparency where required by law or in the interest of borrowers.

- An open architecture for all these elements, to facilitate entry to and exit from the marketplace and an ability to adapt to emerging technologies and legal requirements over time.

Securitization Platform

Beyond the initiatives FHFA and the Enterprises have begun, a cornerstone to building for the future is a new securitization platform. While competing securitization platforms may emerge in the future, back-office operations arguably lend themselves to a public utility construct, at least in the early stages of building a new secondary mortgage market infrastructure. The economies of scale are substantial as are the potential market benefits of standardization to a single securitization platform. Neither Enterprise has a securitization infrastructure capable of becoming a market utility today. Taking on that role would require substantial investment of both human capital and information technology resources.

Both Enterprises would have to draw from the American taxpayer to make such a long-term infrastructure investment, so it makes more sense to do this only once. FHFA will determine how Fannie Mae and Freddie Mac can work together to build a single securitization platform that would replace their current separate proprietary systems.

In the intermediate term, a single platform would allow for a single mortgage-backed security. Accomplishing this objective will take time. FHFA and the Enterprises will provide market participants with ample time to adjust to the new structure in order to minimize disruptions and uncertainty. Ensuring, indeed enhancing, liquidity for mortgage-backed securities will be a central objective.

For the platform to have long-term value, it should have an open architecture that will permit multiple future issuers of mortgage-backed securities to access the platform and it should be flexible enough to permit a wide array of securities and mortgage structures. Since this platform could become a type of public utility (in effect) that would outlast the Enterprises as we know them today, input from all market stakeholders will be sought.

FHFA 2694

The intended outcome of such an important infrastructure investment is to provide a sound securitization platform on which to rebuild the country's secondary mortgage market. The platform itself will be one way American taxpayers realize a return on their substantial investment in the Enterprises while also making it possible to retire the Enterprises' proprietary systems and programs from the marketplace. The platform will be designed to issue securities supported with or without a government guarantee.

<u>Pooling and Servicing Agreements</u>

Beyond building the operational infrastructure to issue mortgage-backed securities, building for the future also requires developing and implementing standards for underwriting, disclosures, servicing and other considerations. Creating a robust and standardized pooling and servicing agreement is key. The strategic goal is to learn from the Enterprises' existing practices and the shortcomings identified in the private-label mortgage-backed securities market and to solicit broad public input to build a better standard for the future. Input from investors and a careful review of applicable Securities and Exchange Commission rules and best practices will be essential.

As with the securitization platform, the goal is not to rebuild Fannie Mae and Freddie Mac but rather to leverage the experience and human capital expertise at these firms to build a new infrastructure for the future. The goal is not a proprietary system but rather an open system that promotes competition and transparency while forming a basis for a stable, liquid, and efficient secondary mortgage market.

Developing these standards will not only correct past problems, it will make the existing system better. We know how past shortcomings have harmed borrowers and investors. Since the point of a secondary mortgage market is to operate an infrastructure that most efficiently brings investor capital to individual families seeking to finance a home, standards must be more transparent and accessible for both of these "end-users."

### *Strategic Goal 2:*  **Contracting Enterprise Operations**

Since entering conservatorship in September 2008, Fannie Mae and Freddie Mac have bought or guaranteed roughly three of every four mortgages originated in the country. Mortgages guaranteed by FHA make up most of the rest. Reducing the Enterprises' position in the marketplace and doing so in a safe and sound manner, in the absence of other comparable private-sector players operating in this market, is the second strategic goal.

The Enterprises operate three lines of business: a single-family mortgage credit guarantee business, a multifamily mortgage credit guarantee business, and a capital markets business that finances single-family and multifamily mortgages by issuing debt securities in the capital markets.

FHFA 2695

Single-Family Credit Guarantees

The first strategic goal sets forth a plan for moving away from each company's proprietary securitization platform but it does not address the mortgage credit insurance business.  It is that business for which the securitization platform provides the architecture for delivering the Enterprise guarantee to investors.  Establishing a path for shifting mortgage credit risk from the Enterprises (and, thereby, taxpayers) to private investors is central to the second goal.

Gradually shifting mortgage credit risk from Fannie Mae and Freddie Mac to private investors could be accomplished in several ways.  The following are under consideration or already being implemented:

- Increase guarantee fee pricing.  Continued gradual increases in the Enterprises' guarantee fee (or, g-fee) pricing may move their pricing structure closer to the level one might expect to see if mortgage credit risk was borne solely by private capital.  In September 2011, FHFA announced its intention to continue a path of gradual price increases based on risk and the cost of capital.  In December 2011, in the Temporary Payroll Tax Cut Continuation Act of 2011, Congress directed FHFA to increase guarantee fees by at least an average of 10 basis points and further directed that FHFA consider the cost of private capital and the risk of loss in setting guarantee fees.  Congress also encouraged FHFA to require guarantee fee changes that reduce cross-subsidization of relatively risky loans and eliminate differences in fees across lenders that are not clearly based on cost or risk.

- Establish loss-sharing arrangements.  Most Enterprise mortgage securitization yields securities fully guaranteed by the Enterprises.  Alternative securities structures could result in private investors bearing some or all of the credit risk.  FHFA is considering various approaches, including senior-subordinated security structures.

- Expand reliance on mortgage insurance.  As required by law, most mortgages purchased or guaranteed by the Enterprises with less than 20 percent borrower equity in the property have private mortgage insurance in the first-credit-loss position.  While some mortgage insurers are facing financial challenges as a result of housing market conditions, others may have the capital capacity to insure a portion of the mortgage credit risk currently retained by the Enterprises.  This could be accomplished through deeper mortgage insurance coverage on individual loans or through pool-level insurance policies.

Multifamily Credit Guarantees

Unlike the single-family credit guarantee business, each Enterprise's multifamily business has weathered the housing crisis and generated positive cash flow.  In contrast to their common approach to their single-family businesses, Fannie Mae and Freddie Mac do not take the same approach to their multifamily businesses.  For a significant portion of its business, Fannie Mae shares multifamily credit risk with loan originators through its delegated underwriting program.  For a significant and increasing portion of its business, Freddie Mac shares multifamily credit

FHFA 2696

risk with investors by issuing classes of securities backed by multifamily mortgages where the investor bears the credit risk.  Both approaches are broadly accepted in the marketplace.

Rising rental rates and declining vacancy and delinquency rates reflect, in part, the shift of some households from home ownership to renting as well as other demographic trends.  The demand for Enterprise employees with expertise in this specialized market is also strong; both companies have lost key personnel to other market participants.

Multifamily lending has played an important role in how the Enterprises have fulfilled past affordable housing mandates, but the activity itself is more akin to other commercial real estate lending than to the Enterprises' single-family businesses.  In conservatorship, the Enterprises have seen their market share grow in the multifamily sector but they do not dominate that market as they do in single-family.

Given these conditions, generating potential value for taxpayers and contracting the Enterprises' multifamily market footprint should be approached differently from single-family, and it may be accomplished using a much different and more direct method. To evaluate how to accomplish the second strategic goal in the multifamily business, each Enterprise will undertake a market analysis of the viability of its multifamily operations without government guarantees.  This will require market reviews of their respective business models and the likely viability of those models operating on a stand-alone basis after attracting private capital and adjusting pricing, if needed, to attract and retain that capital.

<u>Capital Markets</u>

Before conservatorship, many Enterprise observers and analysts thought capital market activities to be each company's source of greatest profits, controversy and risk.  With the numerous subsidies inherent in the government-sponsored enterprise (GSE) charters granted by Congress, the Enterprises have long been able to borrow money in the capital markets by issuing debt securities at interest rates approaching those of Treasury securities.  They did this not by virtue of their financial strength and strong capital base, but because of a broad perception in the marketplace that the government would not let the companies default on their obligations.  With this borrowing advantage, which was unavailable to other investors, the Enterprises issued debt to buy mortgages, including their own MBS, in competition with private investors.

The Enterprises fund their retained portfolios through their capital markets operations, which need to continually monitor and hedge the interest rate risk inherent in mortgages, including the risk that changing interest rates could lead to either sudden mortgage prepayments or a slowdown in mortgage prepayments.  Interest rate risk overwhelmed the savings and loan industry in the 1980s and made Fannie Mae technically insolvent in the early 1980s.  Although capital markets operations were not the leading contributor to the losses that led the Enterprises into conservatorship and the accompanying taxpayer support, it remains a complex business activity requiring specialized and expert risk managers.

Today, this business line is already on a gradual wind-down path.  The Treasury support agreements require the Enterprises to shrink their retained mortgage portfolios at a rate of 10 percent per year.  Most mortgages the Enterprises add to their retained portfolios today are delinquent mortgages removed from their mortgage-backed securities.  Each Enterprise also has certain legacy assets from before conservatorship, including private-label MBS, for which there is little or no liquidity in the marketplace.  Thus, over time the Enterprises' retained portfolios are becoming smaller, but also less liquid.

Maximizing returns for taxpayers on the $1.4 trillion in mortgage assets currently owned and financed by the Enterprises is a key element of FHFA's mandate as conservator.  The gradual wind-down of the retained portfolios since 2009 has led FHFA to consider strategic sales of assets that maximize value for the conservatorships.  But depressed market prices for many of these assets, particularly when tied to market illiquidity rather than a permanent decline in asset value, argues for holding some of them for a longer period to minimize taxpayer loss.

In view of the need to retain capital market expertise to operate this business, accomplishing the second strategic goal for this line of business has two basic options:  retain each company's in-house capital markets expertise to continue to manage these portfolios to maximize value while managing risk or retain a third-party investment firm(s) to manage each company's portfolio.  The first is less disruptive but retains human capital risk, especially in view of proposed legislation on Enterprise compensation.  The second option would hasten the shrinkage in Enterprise headcount but is likely to be the more costly, and it poses new control and oversight challenges for FHFA.

### *Strategic Goal 3:*  Maintaining Foreclosure Prevention Efforts and Credit Availability

Amidst the building up and winding down activities defined by the first two strategic goals, there remains a critical third goal:  ensuring ongoing stability and liquidity in the marketplace for new mortgages and mortgage refinancing, and continuing the critical tasks of foreclosure prevention and loss mitigation.  This third goal has been central to the conservatorships since they began and it continues to be essential today.

Together, the Enterprises purchase or guarantee roughly $100 billion in home purchase and refinanced mortgages each month.  Market confidence in the Enterprises' ongoing ability to provide this stable, liquid flow of mortgage-backed securities to investors is essential to stabilizing house prices and ensuring stability in the value of nearly $3.9 trillion in outstanding Enterprise mortgage-backed securities.

Other ongoing Enterprise activities that must be continued and enhanced include:

- Successful implementation of the Home Affordable Refinance Program (HARP), including the significant program changes announced in October 2011.

17

- Continued implementation of the Servicing Alignment Initiative, including its rigorous approach to loss mitigation through loan modifications and other means by reaching out to borrowers at the first signs of distress.

- Renewed focus on short sales, deeds-in-lieu, and deeds-for-lease options that enable households and the Enterprises to avoid foreclosure.  The frictions and barriers to more successful use of these tools should be identified and removed using the same renewed focus brought to HARP last year.  Enhanced use of these foreclosure avoidance tools may have important benefits for borrowers, neighborhoods, and taxpayers.  Given the large backlog of pending foreclosures, renewed focus on these alternatives is a near-term priority.

- Further development and implementation of the real estate owned (REO) disposition initiative announced by FHFA last year.  Adding creative strategies for placing foreclosed homes back into the marketplace, including efforts to convert properties into rental units, remains a promising path to reduce losses and to stabilize house prices and neighborhoods hit hard by the housing crisis.

Beyond these sensible strategies to assist homeowners and reduce taxpayer losses, achieving the third strategic goal will require FHFA and the Enterprises to work harder to resolve certain long-standing concerns in the marketplace that may be suppressing a more robust recovery and limiting credit availability.  Each of these will be particularly challenging to resolve as they are essential to conservatorship efforts to minimize losses and to put the Enterprises in a more sound and solvent condition to manage the new business being taken on with taxpayer support.

First, representations and warranties are a long-standing means for enhancing liquidity in the mortgage origination process while protecting the Enterprises from loans not underwritten to prescribed standards.  Representations and warranties are a loan originator's assurance to an Enterprise that a mortgage sold to the Enterprise has been underwritten as specified by contract, and, if that is found not to be the case, the originator undertakes responsibility for buying the loan back at par.  Enforcing these claims ensures the Enterprises are compensated for losses that are the legal responsibility of another party.  Still, such enforcement is costly and some have argued it has delayed market recovery because it led to new mortgage originations being underwritten to stricter standards than the Enterprises require.

FHFA and the Enterprises will respond to this market concern by aligning and making policies for representations and warranties more transparent (consistent with the first strategic goal).  As noted earlier, a long-term goal associated with the Uniform Mortgage Data Program is to reduce representation and warranty risk through up-front monitoring of loan quality.  In conjunction with this initiative and, in the interim, defining more clearly under what conditions representations and warranties will be employed to put back mortgages is an objective under the third strategic goal.  Completing the resolution of outstanding "put back" requests is a related objective.

18

Second, FHFA has filed 18 separate lawsuits in connection with alleged securities law violations in private-label mortgage-backed securities purchased by the Enterprises.  Speedy resolution of these claims would also help restore some vibrancy to the mortgage market and put claims related to past deficiencies to rest.


## Accomplishing the Strategic Goals:  Human Capital and Business Realities

No business endeavor can be successful without careful consideration of human capital.  The numerous activities and changes necessary to accomplish the three strategic goals described here cannot be accomplished solely by legislation or declaration.  They require substantial effort by many people at both Fannie Mae and Freddie Mac.

The boards and executives responsible for the business decisions that resulted in the Enterprises entering conservatorship and subsequent taxpayer support are long gone.  Nearly every current top executive at each company either joined the company *after* the conservatorships were established or were promoted from within to replace departed executives.  It is also worth noting that shareholders of each Enterprise effectively have already lost their entire investment.

The public interest is best served by ensuring that Fannie Mae and Freddie Mac have the best available corporate leaders to carry out the work necessary to meet the critical goals set forth here.  FHFA and the Enterprises' boards of directors currently are engaged in a search for a new chief executive officer (CEO) for each company.  We are seeking accomplished corporate leaders willing to undertake the unique challenge of running a large, complex financial institution while fulfilling the public goals described here in an uncertain legislative environment.  FHFA and the boards are seeking highly qualified executives willing to take on these daunting challenges as a form of public service, despite the ongoing criticism of the companies and their executives.  The success of these new CEOs will depend directly on the stability and experience of the executive teams and staff already in place at each company.  Disrupting what has taken more than three years to achieve will only add to taxpayer losses and threaten the fragile housing recovery.

FHFA and the Enterprise boards of directors have taken seriously the concerns raised by members of Congress and the public regarding executive compensation.  For 2012, work on a new compensation structure that eliminates bonuses is nearly complete.  The new structure will be all salary, some paid currently, but a larger portion will be deferred.  The deferred salary will be at-risk, meaning it may be reduced (but not increased) from the target amount, and reductions would be based on shortcomings in achieving individual performance goals and corporate conservatorship goals tied to this strategic plan.

Mid-level managers and rank and file staff have been held to a pay freeze the past two years.  Yet retention of these staff is at least as important as retaining senior management.  The day-to-day running of the businesses and the countless decisions that result in gains or losses are made

<center>19</center>

in these ranks.  Even with the great uncertainty as to the future of their companies, many Enterprise staff have remained committed to the important work taking place there.

When the conservatorships were created, FHFA made clear to Enterprise employees, Congress, and the public that retaining corporate managers and staff was essential to the work of the conservatorships.  Conservatorship did not turn once-private companies into government agencies, nor their workers into government employees.  As with everything else with these conservatorships, there has been a challenging yet critical balancing required.

In addition to the senior managers and staff, the Enterprises' boards of directors have played, and continue to play, an important role in assisting Enterprise management and FHFA.  Board members themselves are engaged in a form of public service while retaining fiduciary responsibility as board members, and they too face unique challenges as boards of companies in government conservatorship.

From FHFA's standpoint, part of what is being preserved and conserved at the Enterprises is the processes and procedures, including business decision-making and requirements, of private financial institutions.  These are critical to safe and sound operations, and can be disrupted by a failure at the senior management or operational staff  levels.  Each board's oversight of its Enterprise helps to preserve and reinforce among managers and staff these important private-sector disciplines.  Each board's review and consideration of risk management practices, key business decisions, human capital management, and other key functions greatly assists FHFA in its regulatory and conservatorship responsibilities by providing the discipline and rigor expected of corporate boards.  In these ways, the boards help FHFA enhance the corporate value at each Enterprise for ultimate disposition by Congress.

## Conservatorship:  Writing the Final Chapter

The early chapters of the conservatorship story focused on market functioning and loss mitigation.  More recent chapters have covered renewed efforts to enhance refinancing opportunities and REO disposition.  The strategic goals and performance objectives set forth here provide an outline for the next chapter of conservatorship, one that focuses in earnest on building a secondary mortgage market infrastructure that will live beyond the Enterprises themselves.  This next chapter will also see a gradual reduction in the Enterprises' dominant position in holding mortgage credit risk as private capital is encouraged back into that role.

The final chapter, though, remains the province of lawmakers.  Fannie Mae and Freddie Mac were chartered by Congress and by law, only Congress can abolish or modify those charters.  The strategic plan set forth here will move the housing finance system forward and enhance the foundation on which Congress can make decisions about the role of government in the future of the country's housing finance system.  Congress then can decide on the disposition of the Enterprises and their business operations.

FHFA 2701

This plan does not anticipate Fannie Mae and Freddie Mac continuing as they existed before conservatorship.  And though the Enterprises may well cease to exist at some point in the future, at least as they are known today, the country's $10 trillion single-family mortgage market will not go away.  Therefore, an orderly transition to a new structure is needed.

Ensuring the ongoing liquidity and stability of the market, and establishing new conduits that connect local mortgage originators with the capacity of global capital market investors, will require new institutions and legal frameworks.  The executives and employees of Fannie Mae and Freddie Mac are well situated to begin the process of building for that future and they can be expected to remain key contributors to housing finance in whatever new companies and institutional arrangements arise to replace Fannie Mae and Freddie Mac.  Getting the most value for taxpayers and bringing stability and liquidity to housing finance during this long transition remain the overriding objectives of FHFA as conservator.

21

# Tab 45

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2011**

**Commission File Number: 001-34139**

# Federal Home Loan Mortgage Corporation

*(Exact name of registrant as specified in its charter)*

### Freddie Mac

| | | | |
|---|---|---|---|
| **Federally chartered corporation** | **8200 Jones Branch Drive** | **52-0904874** | **(703) 903-2000** |
| *(State or other jurisdiction of incorporation or organization)* | **McLean, Virginia 22102-3110** | *(I.R.S. Employer Identification No.)* | *(Registrant's telephone number, including area code)* |
| | *(Address of principal executive offices, including zip code)* | | |

### Securities registered pursuant to Section 12(b) of the Act: None

### Securities registered pursuant to Section 12(g) of the Act:

Voting Common Stock, no par value per share (OTC: FMCC)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCI)
5% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCKK)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCG)
5.1% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCH)
5.79% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCK)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCL)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCM)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCN)
5.81% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCO)
6% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCP)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCJ)
5.7% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCKP)
Variable Rate, Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCCS)
6.42% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCCT)
5.9% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKO)
5.57% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKM)
5.66% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKN)
6.02% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKL)
6.55% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKI)
Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKJ)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   ☒ Yes   ☐ No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                    Accelerated filer ☒
Non-accelerated filer (Do not check if a smaller reporting company) ☐                    Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of the common stock held by non-affiliates computed by reference to the price at which the common equity was last sold on June 30, 2011 (the last business day of the registrant's most recently completed second fiscal quarter) was $227.4 million.

As of February 27, 2012, there were 649,733,472 shares of the registrant's common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**: None

# TABLE OF CONTENTS

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 45 |
| Item 1B. | Unresolved Staff Comments | 77 |
| Item 2. | Properties | 77 |
| Item 3. | Legal Proceedings | 77 |
| Item 4. | Mine Safety Disclosures | 77 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 78 |
| Item 6. | Selected Financial Data | 81 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 82 |
| | Mortgage Market and Economic Conditions, and Outlook | 82 |
| | Consolidated Results of Operations | 85 |
| | Consolidated Balance Sheets Analysis | 108 |
| | Risk Management | 127 |
| | Liquidity and Capital Resources | 174 |
| | Fair Value Measurements and Analysis | 182 |
| | Off-Balance Sheet Arrangements | 187 |
| | Contractual Obligations | 188 |
| | Critical Accounting Policies and Estimates | 189 |
| | Risk Management and Disclosure Commitments | 192 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 194 |
| Item 8. | Financial Statements and Supplementary Data | 199 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 315 |
| Item 9A. | Controls and Procedures | 315 |
| Item 9B. | Other Information | 318 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 322 |
| Item 11. | Executive Compensation | 330 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 358 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 360 |
| Item 14. | Principal Accounting Fees and Services | 365 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 366 |

| | |
|---|---|
| **SIGNATURES** | 367 |
| **GLOSSARY** | 368 |
| **EXHIBIT INDEX** | E-1 |

## MD&A TABLE REFERENCE

| Table | Description | Page |
|-------|-------------|------|
| — | Selected Financial Data | 81 |
| 1 | Total Single-Family Loan Workout Volumes | 4 |
| 2 | Single-Family Credit Guarantee Portfolio Data by Year of Origination | 7 |
| 3 | Credit Statistics, Single-Family Credit Guarantee Portfolio | 8 |
| 4 | Mortgage-Related Investments Portfolio | 26 |
| 5 | Affordable Housing Goals for 2010 and 2011 and Results for 2010 | 35 |
| 6 | Affordable Housing Goals and Results for 2009 | 36 |
| 7 | Quarterly Common Stock Information | 78 |
| 8 | Mortgage Market Indicators | 82 |
| 9 | Summary Consolidated Statements of Income and Comprehensive Income | 85 |
| 10 | Average Balance, Net Interest Income, and Rate/Volume Analysis | 86 |
| 11 | Net Interest Income | 87 |
| 12 | Derivative Gains (Losses) | 91 |
| 13 | Other Income | 93 |
| 14 | Non-Interest Expense | 94 |
| 15 | REO Operations Expense, REO Inventory, and REO Dispositions | 95 |
| 16 | Composition of Segment Mortgage Portfolios and Credit Risk Portfolios | 98 |
| 17 | Segment Earnings and Key Metrics — Investments | 99 |
| 18 | Segment Earnings and Key Metrics — Single-Family Guarantee | 102 |
| 19 | Segment Earnings Composition — Single-Family Guarantee Segment | 103 |
| 20 | Segment Earnings and Key Metrics — Multifamily | 106 |
| 21 | Investments in Available-For-Sale Securities | 109 |
| 22 | Investments in Trading Securities | 109 |
| 23 | Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets | 110 |
| 24 | Additional Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets | 111 |
| 25 | Total Mortgage-Related Securities Purchase Activity | 112 |
| 26 | Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics | 114 |
| 27 | Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans | 115 |
| 28 | Net Impairment of Available-For-Sale Mortgage-Related Securities Recognized in Earnings | 116 |
| 29 | Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS | 118 |
| 30 | Mortgage Loan Purchase and Other Guarantee Commitment Activity | 120 |
| 31 | Derivative Fair Values and Maturities | 121 |
| 32 | Changes in Derivative Fair Values | 122 |
| 33 | Reconciliation of the Par Value and UPB to Total Debt, Net | 123 |
| 34 | Other Short-Term Debt | 124 |
| 35 | Freddie Mac Mortgage-Related Securities | 125 |
| 36 | Freddie Mac Mortgage-Related Securities by Class Type | 126 |
| 37 | Issuances and Extinguishments of Debt Securities of Consolidated Trusts | 126 |
| 38 | Changes in Total Equity (Deficit) | 127 |
| 39 | Repurchase Request Activity | 130 |
| 40 | Loans Released from Repurchase Obligations | 131 |
| 41 | Mortgage Insurance by Counterparty | 134 |
| 42 | Bond Insurance by Counterparty | 135 |
| 43 | Non-Agency Mortgage-Related Securities Covered by Primary Bond Insurance | 136 |
| 44 | Derivative Counterparty Credit Exposure | 138 |
| 45 | Characteristics of the Single-Family Credit Guarantee Portfolio | 142 |
| 46 | Single-Family Loans Scheduled Payment Change to Include Principal by Year at December 31, 2011 | 145 |
| 47 | Serious Delinquency Rates by Year of Payment Change to Include Principal | 145 |
| 48 | Single-Family Scheduled Adjustable-Rate Resets by Year at December 31, 2011 | 146 |
| 49 | Serious Delinquency Rates by Year of First Rate Reset | 146 |
| 50 | Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio | 149 |
| 51 | Single-Family Home Affordable Modification Program Volume | 153 |
| 52 | Single-Family Refinance Loan Volume | 155 |
| 53 | Single-Family Loan Workouts, Serious Delinquency, and Foreclosures Volumes | 157 |
| 54 | Reperformance Rates of Modified Single-Family Loans | 158 |

| Table | Description | Page |
|-------|-------------|------|
| 55 | Single-Family Serious Delinquency Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 159 |
| 56 | Credit Concentrations in the Single-Family Credit Guarantee Portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . . | 160 |
| 57 | Single-Family Credit Guarantee Portfolio by Attribute Combinations . . . . . . . . . . . . . . . . . . . . . . . . . . | 161 |
| 58 | Single-Family Credit Guarantee Portfolio by Year of Loan Origination . . . . . . . . . . . . . . . . . . . . . . . . | 163 |
| 59 | Multifamily Mortgage Portfolio — by Attribute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 164 |
| 60 | Non-Performing Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 166 |
| 61 | REO Activity by Region . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 167 |
| 62 | Credit Loss Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 169 |
| 63 | Single-Family Charge-offs and Recoveries by Region . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 170 |
| 64 | Loan Loss Reserves Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 170 |
| 65 | Single-Family Impaired Loans with Specific Reserve Recorded . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 171 |
| 66 | Single-Family Credit Loss Sensitivity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 171 |
| 67 | Other Debt Security Issuances by Product, at Par Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 178 |
| 68 | Other Debt Security Repurchases, Calls, and Exchanges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 179 |
| 69 | Freddie Mac Credit Ratings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 180 |
| 70 | Summary of Assets and Liabilities at Fair Value on a Recurring Basis . . . . . . . . . . . . . . . . . . . . . . . . . | 183 |
| 71 | Summary of Change in the Fair Value of Net Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 186 |
| 72 | Contractual Obligations by Year at December 31, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 189 |
| 73 | PMVS Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 198 |
| 74 | Derivative Impact on PMVS-L (50 bps) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 199 |
| 75 | 2012 Program Target Compensation Amounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 320 |
| 76 | Board of Directors Committee Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 326 |
| 77 | 2011 Semi-Monthly Base Salary, Deferred Base Salary, Target Opportunity, and Target TDC . . . . . . . . . . | 335 |
| 78 | Achievement of Performance Measures for the Performance-Based Portion of Deferred Base Salary . . . . . . | 336 |
| 79 | 2011 Deferred Base Salary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 338 |
| 80 | Achievement of Performance Measures for First Installment of 2011 Target Opportunity . . . . . . . . . . . . . | 338 |
| 81 | Achievement of Performance Measures for Second Installment of 2010 Target Opportunity . . . . . . . . . . . . | 339 |
| 82 | 2011 Target Opportunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 340 |
| 83 | 2011 Target TDC Compared to the Approved 2011 Actual TDC . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 341 |
| 84 | Named Executive Officer Individual Performance Summaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 342 |
| 85 | Summary Compensation Table — 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 347 |
| 86 | Grants of Plan-Based Awards — 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 348 |
| 87 | Outstanding Equity Awards at Fiscal Year-End — 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 349 |
| 88 | Option Exercises and Stock Vested — 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 349 |
| 89 | Pension Benefits — 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 350 |
| 90 | Non-Qualified Deferred Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 353 |
| 91 | Potential Payments Upon Termination of Employment or Change-in-Control as of December 31, 2011 . . . . | 355 |
| 92 | Board Compensation — 2011 Non-Employee Director Compensation Levels . . . . . . . . . . . . . . . . . . . . . | 357 |
| 93 | 2011 Director Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 357 |
| 94 | Stock Ownership by Directors, Executive Officers, and Greater-Than-5% Holders . . . . . . . . . . . . . . . . . . | 358 |
| 95 | Equity Compensation Plan Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 359 |
| 96 | Auditor Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 365 |

## FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

Page

Report of Independent Registered Public Accounting Firm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200
Freddie Mac Consolidated Statements of Income and Comprehensive Income . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
Freddie Mac Consolidated Balance Sheets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
Freddie Mac Consolidated Statements of Equity (Deficit) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204
Freddie Mac Consolidated Statements of Cash Flows . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205
Note 1: Summary of Significant Accounting Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206
Note 2: Conservatorship and Related Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221
Note 3: Variable Interest Entities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227
Note 4: Mortgage Loans and Loan Loss Reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232
Note 5: Individually Impaired and Non-Performing Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237
Note 6: Real Estate Owned . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244
Note 7: Investments in Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245
Note 8: Debt Securities and Subordinated Borrowings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255
Note 9: Financial Guarantees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 259
Note 10: Retained Interests in Mortgage-Related Securitizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261
Note 11: Derivatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262
Note 12: Freddie Mac Stockholders' Equity (Deficit) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 266
Note 13: Income Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270
Note 14: Segment Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 273
Note 15: Regulatory Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281
Note 16: Concentration of Credit and Other Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282
Note 17: Fair Value Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 290
Note 18: Legal Contingencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 306
Note 19: Selected Financial Statement Line Items . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311
Quarterly Selected Financial Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315

## PART I

*This Annual Report on Form 10-K includes forward-looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward-looking statements are made as of the date of this Form 10-K and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date of this Form 10-K. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in "BUSINESS — Forward-Looking Statements," and "RISK FACTORS" in this Form 10-K.*

*Throughout this Form 10-K, we use certain acronyms and terms that are defined in the "GLOSSARY."*

## ITEM 1. BUSINESS

### Conservatorship

We continue to operate under the direction of FHFA, as our Conservator. We are also subject to certain constraints on our business activities imposed by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement. We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition, and results of operations.

As our Conservator, FHFA succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets. FHFA, as Conservator, has directed and will continue to direct certain of our business activities and strategies. FHFA has delegated certain authority to our Board of Directors to oversee, and to management to conduct, day-to-day operations. The directors serve on behalf of, and exercise authority as directed by, the Conservator.

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist. We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near-term. We have no ability to predict the outcome of these deliberations.

A number of bills have been introduced in Congress that would bring about changes in the business model of Freddie Mac and Fannie Mae. In addition, on February 11, 2011, the Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, and states that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

On February 2, 2012, the Administration announced that it expects to provide more detail concerning approaches to reform the U.S. housing finance market in the spring, and that it plans to begin exploring options for legislation more intensively with Congress. On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the conservatorships of Freddie Mac and Fannie Mae. For more information on current legislative and regulatory initiatives, see "Regulation and Supervision — *Legislative and Regulatory Developments.*"

Our business objectives and strategies have in some cases been altered since we were placed into conservatorship, and may continue to change. Based on our charter, other legislation, public statements from Treasury and FHFA officials, and guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives. Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a

manner that serves our public mission and other non-financial objectives. However, these changes to our business objectives and strategies may not contribute to our profitability. Some of these changes increase our expenses, while others require us to forego revenue opportunities in the near-term. In addition, the objectives set forth for us under our charter and by our Conservator, as well as the restrictions on our business under the Purchase Agreement, have adversely impacted and may continue to adversely impact our financial results, including our segment results. For example, our current business objectives reflect, in part, direction given to us by the Conservator. These efforts are expected to help homeowners and the mortgage market and may help to mitigate future credit losses. However, some of our activities are expected to have an adverse impact on our near- and long-term financial results. The Conservator and Treasury also did not authorize us to engage in certain business activities and transactions, including the purchase or sale of certain assets, which we believe might have had a beneficial impact on our results of operations or financial condition, if executed. Our inability to execute such transactions may adversely affect our profitability, and thus contribute to our need to draw additional funds under the Purchase Agreement.

We had a net worth deficit of $146 million as of December 31, 2011, and, as a result, FHFA, as Conservator, will submit a draw request, on our behalf, to Treasury under the Purchase Agreement in the amount of $146 million. Upon funding of the draw request: (a) our aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $72.3 billion; and (b) the corresponding annual cash dividend owed to Treasury will increase to $7.23 billion. Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all. The aggregate liquidation preference of the senior preferred stock and our related dividend obligations will increase further if we receive additional draws under the Purchase Agreement or if any dividends or quarterly commitment fees payable under the Purchase Agreement are not paid in cash. The amounts we are obligated to pay in dividends on the senior preferred stock are substantial and will have an adverse impact on our financial position and net worth. We expect to make additional draws under the Purchase Agreement in future periods.

Our annual dividend obligation on the senior preferred stock exceeds our annual historical earnings in all but one period. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will regularly generate net income or comprehensive income in excess of our annual dividends payable to Treasury. As a result, there is significant uncertainty as to our long-term financial sustainability. Continued cash payment of senior preferred dividends, combined with potentially substantial quarterly commitment fees payable to Treasury under the Purchase Agreement, will have an adverse impact on our future financial condition and net worth. The payment of dividends on our senior preferred stock in cash reduces our net worth. For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury.

For more information on our current business objectives, see "Executive Summary — *Our Primary Business Objectives*." For more information on the conservatorship and government support for our business, see "Executive Summary — *Government Support for Our Business*" and "Conservatorship and Related Matters."

## Executive Summary

*You should read this Executive Summary in conjunction with our MD&A and consolidated financial statements and related notes for the year ended December 31, 2011.*

### Overview

Freddie Mac is a GSE chartered by Congress in 1970 with a public mission to provide liquidity, stability, and affordability to the U.S. housing market. We have maintained a consistent market presence since our inception, providing mortgage liquidity in a wide range of economic environments. During the worst housing and financial crisis since the Great Depression, we are working to support the recovery of the housing market and the nation's economy by providing essential liquidity to the mortgage market and helping to stem the rate of foreclosures. We believe our actions are helping communities across the country by providing America's families with access to mortgage funding at low rates while helping distressed borrowers keep their homes and avoid foreclosure, where feasible.

### Summary of Financial Results

Our financial performance in 2011 was impacted by the ongoing weakness in the economy, including in the mortgage market, and by a significant reduction in long-term interest rates and changes in OAS levels. Our total comprehensive income (loss) was $(1.2) billion and $282 million for 2011 and 2010, respectively, consisting of:

(a) $5.3 billion and $14.0 billion of net loss, respectively; and (b) $4.0 billion and $14.3 billion of total other comprehensive income, respectively.

Our total equity (deficit) was $(146) million at December 31, 2011, reflecting our total comprehensive income of $1.5 billion for the fourth quarter of 2011 and our dividend payment of $1.7 billion on our senior preferred stock on December 30, 2011. To address our deficit in net worth, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement for $146 million. Following receipt of the draw, the aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $72.3 billion.

During 2011, we paid cash dividends to Treasury of $6.5 billion on our senior preferred stock. We received cash proceeds of $8.0 billion from draws under Treasury's funding commitment during 2011 related to quarterly deficits in equity at December 31, 2010, June 30, 2011, and September 30, 2011.

### Our Primary Business Objectives

Under conservatorship, we are focused on the following primary business objectives: (a) meeting the needs of the U.S. residential mortgage market by making home ownership and rental housing more affordable by providing liquidity to mortgage originators and, indirectly, to mortgage borrowers; (b) working to reduce the number of foreclosures and helping to keep families in their homes, including through our role in FHFA and other governmental initiatives, such as the FHFA-directed servicing alignment initiative, HAMP and HARP, as well as our own workout and refinancing initiatives; (c) minimizing our credit losses; (d) maintaining sound credit quality of the loans we purchase and guarantee; and (e) strengthening our infrastructure and improving overall efficiency while also focusing on retention of key employees.

Our business objectives reflect, in part, direction we have received from the Conservator. We also have a variety of different, and potentially competing, objectives based on our charter, other legislation, public statements from Treasury and FHFA officials, and other guidance and directives from our Conservator. For more information, see "Conservatorship and Related Matters — *Impact of Conservatorship and Related Actions on Our Business.*" We are in discussions with FHFA regarding their strategic plan for Freddie Mac and Fannie Mae. See "Regulation and Supervision — *Legislative and Regulatory Developments — FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships*" for further information.

We believe our risks related to employee turnover are increasing. Uncertainty surrounding our future business model, organizational structure, and compensation structure has contributed to increased levels of voluntary employee turnover. Disruptive levels of turnover at both the executive and employee levels could lead to breakdowns in many of our operations. As a result of the increasing risk of employee turnover, we are exploring options to enter into various strategic arrangements with outside firms to provide operational capability and staffing for key functions, if needed. However, these or other efforts to manage this risk to the enterprise may not be successful.

### Providing Mortgage Liquidity and Conforming Loan Availability

We provide liquidity and support to the U.S. mortgage market in a number of important ways:

- Our support enables borrowers to have access to a variety of conforming mortgage products, including the prepayable 30-year fixed-rate mortgage, which historically has represented the foundation of the mortgage market.

- Our support provides lenders with a constant source of liquidity for conforming mortgage products. We estimate that we, Fannie Mae, and Ginnie Mae collectively guaranteed more than 90% of the single-family conforming mortgages originated during 2011.

- Our consistent market presence provides assurance to our customers that there will be a buyer for their conforming loans that meet our credit standards. We believe this liquidity provides our customers with confidence to continue lending in difficult environments.

- We are an important counter-cyclical influence as we stay in the market even when other sources of capital have withdrawn.

During 2011 and 2010, we guaranteed $304.6 billion and $384.6 billion in UPB of single-family conforming mortgage loans, respectively, representing more than 1.4 million and 1.8 million borrowers, respectively, who purchased homes or refinanced their mortgages.

Borrowers typically pay a lower interest rate on loans acquired or guaranteed by Freddie Mac, Fannie Mae, or Ginnie Mae. Mortgage originators are generally able to offer homebuyers and homeowners lower mortgage rates on conforming loan products, including ours, in part because of the value investors place on GSE-guaranteed mortgage-related securities. Prior to 2007, mortgage markets were less volatile, home values were stable or rising, and there were many sources of

mortgage funds. We estimate that, for 20 years prior to 2007, the average effective interest rates on conforming, fixed-rate single-family mortgage loans were about 30 basis points lower than on non-conforming loans. Since 2007, we estimate that, at times, interest rates on conforming, fixed-rate loans, excluding conforming jumbo loans, have been lower than those on non-conforming loans by as much as 184 basis points. In December 2011, we estimate that borrowers were paying an average of 56 basis points less on these conforming loans than on non-conforming loans. These estimates are based on data provided by HSH Associates, a third-party provider of mortgage market data. Future increases in our management and guarantee fee rates, such as those required under the recently enacted Temporary Payroll Tax Cut Continuation Act of 2011, may reduce the difference in rates between conforming and non-conforming loans over time. For more information, see "Regulation and Supervision — *Legislative and Regulatory Developments — Legislated Increase to Guarantee Fees.*"

### Reducing Foreclosures and Keeping Families in Homes

We are focused on reducing the number of foreclosures and helping to keep families in their homes. In addition to our participation in HAMP, we introduced several new initiatives during the last few years to help eligible borrowers keep their homes or avoid foreclosure, including our relief refinance mortgage initiative. During 2011 and 2010, we helped more than 208,000 and 275,000 borrowers, respectively, either stay in their homes or sell their properties and avoid foreclosure through HAMP and our various other workout initiatives.

On April 28, 2011, FHFA announced a new set of aligned standards for servicing non-performing loans owned or guaranteed by Freddie Mac and Fannie Mae. The servicing alignment initiative provides for consistent ongoing processes for non-HAMP loan modifications. We implemented most aspects of this initiative in 2011. We believe that the servicing alignment initiative will ultimately change, among other things, the way servicers communicate and work with troubled borrowers, bring greater consistency and accountability to the servicing industry, and help more distressed homeowners avoid foreclosure. For information on changes to mortgage servicing and foreclosure practices that could adversely affect our business, see "Regulation and Supervision — *Legislative and Regulatory Developments — Developments Concerning Single-Family Servicing Practices.*"

In addition to these loan workout initiatives, our relief refinance opportunities, including HARP (which is the portion of our relief refinance initiative for loans with LTV ratios above 80%), are a significant part of our effort to keep families in their homes. Relief refinance loans have been provided to more than 480,000 borrowers with LTV ratios above 80% since the initiative began in 2009, including nearly 185,000 such loans during 2011.

The table below presents our single-family loan workout activities for the last five quarters.

### Table 1 — Total Single-Family Loan Workout Volumes[(1)]

| | For the Three Months Ended | | | | |
|---|---|---|---|---|---|
| | 12/31/2011 | 09/30/2011 | 06/30/2011 | 03/31/2011 | 12/31/2010 |
| | (number of loans) | | | | |
| Loan modifications ............................................ | 19,048 | 23,919 | 31,049 | 35,158 | 37,203 |
| Repayment plans ............................................. | 8,008 | 8,333 | 7,981 | 9,099 | 7,964 |
| Forbearance agreements[(2)] ..................................... | 3,867 | 4,262 | 3,709 | 7,678 | 5,945 |
| Short sales and deed in lieu of foreclosure transactions ................... | 12,675 | 11,744 | 11,038 | 10,706 | 12,097 |
| Total single-family loan workouts ................................. | 43,598 | 48,258 | 53,777 | 62,641 | 63,209 |

(1) Based on actions completed with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment, and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent or effective, such as loans in modification trial periods. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period.

(2) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.

We continue to directly assist troubled borrowers through targeted outreach, loan workouts, and other efforts. Highlights of these efforts include the following:

- We completed 208,274 single-family loan workouts during 2011, including 109,174 loan modifications (HAMP and non-HAMP) and 46,163 short sales and deed in lieu of foreclosure transactions.

- Based on information provided by the MHA Program administrator, our servicers had completed 152,519 loan modifications under HAMP from the introduction of the initiative in 2009 through December 31, 2011 and, as of December 31, 2011, 12,802 loans were in HAMP trial periods (this figure only includes borrowers who made at least their first payment under the trial period).

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to allow more borrowers to participate in the program and benefit from refinancing their home mortgages. The Acting Director of FHFA stated that the goal of pursuing these changes is to create refinancing opportunities for more borrowers whose mortgages are owned or guaranteed by Freddie Mac and Fannie Mae while reducing risk for these entities and bringing a measure of stability to housing markets. The revisions to HARP enable us to expand the assistance we provide to homeowners by making their mortgage payments more affordable through one or more of the following ways: (a) a reduction in payment; (b) a reduction in rate; (c) movement to a more stable mortgage product type (*i.e.*, from an adjustable-rate mortgage to a fixed-rate mortgage); or (d) a reduction in amortization term.

In November 2011, Freddie Mac and Fannie Mae issued guidance with operational details about the HARP changes to mortgage lenders and servicers after receiving information from FHFA about the fees that we may charge associated with the refinancing program. Since industry participation in HARP is not mandatory, we anticipate that implementation schedules will vary as individual lenders, mortgage insurers, and other market participants modify their processes. It is too early to estimate how many eligible borrowers are likely to refinance under the revised program.

For more information about HAMP, our new non-HAMP standard loan modification, other loan workout programs, HARP and our relief refinance mortgage initiative, and other initiatives to help eligible borrowers keep their homes or avoid foreclosure, see "MD&A — RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program.*"

### *Minimizing Credit Losses*

To help minimize the credit losses related to our guarantee activities, we are focused on:

- pursuing a variety of loan workouts, including foreclosure alternatives, in an effort to reduce the severity of losses we experience over time;

- managing foreclosure timelines to the extent possible, given the increasingly lengthy foreclosure process in many states;

- managing our inventory of foreclosed properties to reduce costs and maximize proceeds; and

- pursuing contractual remedies against originators, lenders, servicers, and insurers, as appropriate.

We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses. We require our single-family seller/servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure.

Our servicers pursue repayment plans and loan modifications for borrowers facing financial or other hardships since the level of recovery (if a loan reperforms) may often be much higher than with foreclosure or foreclosure alternatives. In cases where these alternatives are not possible or successful, a short sale transaction typically provides us with a comparable or higher level of recovery than what we would receive through property sales from our REO inventory. In large part, the benefit of short sales arises from the avoidance of costs we would otherwise incur to complete the foreclosure and dispose of the property, including maintenance and other property expenses associated with holding REO property, legal fees, commissions, and other selling expenses of traditional real estate transactions. The foreclosure process is a lengthy one in many jurisdictions with significant associated costs to complete, including, in times of home value decline, foregone recovery we might receive from an earlier sale.

We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans, and represent and warrant that those loans have been originated under specified underwriting standards. If we subsequently discover that the representations and warranties were breached (*i.e.*, contractual standards were not followed), we can exercise certain contractual remedies to mitigate our actual or potential credit losses. These contractual remedies include requiring the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan. The amount we expect to collect on outstanding repurchase requests is significantly less than the UPB of the loans subject to the repurchase requests primarily because many of these requests will likely be satisfied by the seller/servicers reimbursing us for realized credit losses. Some of these requests also may be rescinded in the course of the contractual appeals process. As of December 31, 2011, the UPB of loans subject to repurchase requests issued to our single-family seller/servicers was approximately $2.7 billion, and approximately 39% of these requests were outstanding for more than four months since issuance of our initial repurchase request (this figure includes repurchase requests for

which appeals were pending). Of the total amount of repurchase requests outstanding at December 31, 2011, approximately $1.2 billion were issued due to mortgage insurance rescission or mortgage insurance claim denial.

Our credit loss exposure is also partially mitigated by mortgage insurance, which is a form of credit enhancement. Primary mortgage insurance is required to be purchased, typically at the borrower's expense, for certain mortgages with higher LTV ratios. As of December 31, 2011, we had mortgage insurance coverage on loans that represent approximately 13% of the UPB of our single-family credit guarantee portfolio. We received payments under primary and other mortgage insurance of $2.5 billion and $1.8 billion in 2011 and 2010, respectively, which helped to mitigate our credit losses. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Table 4.5 — Recourse and Other Forms of Credit Protection" for more detail. The financial condition of many of our mortgage insurers continued to deteriorate in 2011. We expect to receive substantially less than full payment of our claims from Triad Guaranty Insurance Corp., Republic Mortgage Insurance Company, and PMI Mortgage Insurance Co., which are three of our mortgage insurance counterparties. We believe that certain other of our mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as those claims emerge. Our loan loss reserves reflect our estimates of expected insurance recoveries related to probable incurred losses. As of December 31, 2011, only six insurance companies remained as eligible insurers for Freddie Mac loans, which means that, in the future, our mortgage insurance exposure will be concentrated among a smaller number of counterparties.

See "MD&A — RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for further information on our agreements with our seller/servicers and our exposure to mortgage insurers.

*Maintaining Sound Credit Quality of New Loan Purchases and Guarantees*

We continue to focus on maintaining credit policies, including our underwriting standards, that allow us to purchase and guarantee loans made to qualified borrowers that we believe will provide management and guarantee fee income, over the long-term, that exceeds our expected credit-related and administrative expenses on such loans.

The credit quality of the single-family loans we acquired in 2011 (excluding relief refinance mortgages, which represented approximately 26% of our single-family purchase volume during 2011) is significantly better than that of loans we acquired from 2005 through 2008, as measured by early delinquency rate trends, original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income. As of December 31, 2011 and December 31, 2010, approximately 51% and 39%, respectively, of our single-family credit guarantee portfolio consisted of mortgage loans originated after 2008 (including relief refinance mortgages), which have experienced lower serious delinquency trends in the early years of their terms than loans originated in 2005 through 2008.

The improvement in credit quality of loans we have purchased during the last three years (excluding relief refinance mortgages) is primarily the result of the combination of: (a) changes in our credit policies, including changes in our underwriting standards; (b) fewer purchases of loans with higher risk characteristics; and (c) changes in mortgage insurers' and lenders' underwriting practices.

Our underwriting procedures for relief refinance mortgages are limited in many cases, and such procedures generally do not include all of the changes in underwriting standards we have implemented in the last several years. As a result, relief refinance mortgages generally reflect many of the credit risk attributes of the original loans. However, borrower participation in our relief refinance mortgage initiative may help reduce our exposure to credit risk in cases where borrower payments under their mortgages are reduced, thereby strengthening the borrower's potential to make their mortgage payments.

Approximately 92% of our single-family purchase volume in 2011 consisted of fixed-rate amortizing mortgages. Approximately 78% and 80% of our single-family purchase volumes in 2011 and 2010, respectively, were refinance mortgages, including approximately 33% and 35%, respectively, of these loans that were relief refinance mortgages, based on UPB.

There is an increase in borrower default risk as LTV ratios increase, particularly for loans with LTV ratios above 80%. Over time, relief refinance mortgages with LTV ratios above 80% (HARP loans) may not perform as well as relief refinance mortgages with LTV ratios of 80% and below because of the continued high LTV ratios of these loans. In addition, relief refinance mortgages may not be covered by mortgage insurance for the full excess of their UPB over 80%. Approximately 12% of our single-family purchase volume in both 2011 and 2010 was relief refinance mortgages with LTV ratios above 80%. Relief refinance mortgages of all LTV ratios comprised approximately 11% and 7% of the UPB in our total single-family credit guarantee portfolio at December 31, 2011 and 2010, respectively.

The table below presents the composition, loan characteristics, and serious delinquency rates of loans in our single-family credit guarantee portfolio, by year of origination at December 31, 2011.

**Table 2 — Single-Family Credit Guarantee Portfolio Data by Year of Origination[1]**

| Year of Origination | % of Portfolio | Average Credit Score[2] | Original LTV Ratio[3] | Current LTV Ratio[4] | Current LTV Ratio >100%[4][5] | Serious Delinquency Rate[6] |
|---|---|---|---|---|---|---|
| | | | | At December 31, 2011 | | |
| 2011 | 14% | 755 | 70% | 70% | 5% | 0.06% |
| 2010 | 19 | 754 | 70 | 71 | 6 | 0.25 |
| 2009 | 18 | 753 | 69 | 72 | 6 | 0.52 |
| 2008 | 7 | 725 | 74 | 92 | 36 | 5.65 |
| 2007 | 10 | 705 | 77 | 113 | 61 | 11.58 |
| 2006 | 7 | 710 | 75 | 112 | 56 | 10.82 |
| 2005 | 8 | 716 | 73 | 96 | 39 | 6.51 |
| 2004 and prior | 17 | 719 | 71 | 61 | 9 | 2.83 |
| Total | 100% | 735 | 72 | 80 | 20 | 3.58 |

(1)  Based on the loans remaining in the portfolio at December 31, 2011, which totaled $1,746 billion, rather than all loans originally guaranteed by us and originated in the respective year.

(2)  Based on FICO score of the borrower as of the date of loan origination and may not be indicative of the borrowers' creditworthiness at December 31, 2011. Excludes approximately $10 billion in UPB of loans where the FICO scores at origination were not available at December 31, 2011.

(3)  See endnote (4) to "Table 45 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios.

(4)  We estimate current market values by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination. See endnote (5) of "Table 45 — Characteristics of the Single-Family Credit Guarantee Portfolio" for additional information on our calculation of current LTV ratios.

(5)  Calculated as a percentage of the aggregate UPB of loans with LTV ratios greater than 100% in relation to the total UPB of loans in the category.

(6)  See "MD&A — RISK MANAGEMENT— Credit Risk— *Mortgage Credit Risk — Single-family Mortgage Credit Risk —* Delinquencies" for further information about our reported serious delinquency rates.

Mortgages originated after 2008, including relief refinance mortgages, represent a growing proportion of our single-family credit guarantee portfolio. The UPB of loans originated in 2005 to 2008 within our single-family credit guarantee portfolio continues to decline due to liquidations, which include prepayments, refinancing activity, foreclosure alternatives, and foreclosure transfers. We currently expect that, over time, the replacement (other than through relief refinance activity) of the 2005 to 2008 vintages, which have a higher composition of loans with higher-risk characteristics, should positively impact the serious delinquency rates and credit-related expenses of our single-family credit guarantee portfolio. However, the rate at which this replacement is occurring slowed beginning in 2010, due primarily to a decline in the volume of home purchase mortgage originations and delays in the foreclosure process. See "Table 19 — Segment Earnings Composition — Single-Family Guarantee Segment" for an analysis of the contribution to Segment Earnings (loss) by loan origination year.

*Strengthening Our Infrastructure and Improving Overall Efficiency*

We are working to both enhance the quality of our infrastructure and improve our efficiency in order to preserve the taxpayers' investment. We are focusing our resources primarily on key projects, many of which will likely take several years to fully implement, and on making significant improvements to our systems infrastructure in order to: (a) implement mandatory initiatives from FHFA or other governmental bodies; (b) replace legacy hardware or software systems at the end of their lives and to strengthen our disaster recovery capabilities; and (c) improve our data collection and administration as well as our ability to assist in the servicing of loans.

We continue to actively manage our general and administrative expenses, while also continuing to focus on retaining key talent. Our general and administrative expenses declined in 2011 compared to 2010, largely due to a reduction in the number of our employees. We do not expect that our general and administrative expenses for 2012 will continue to decline, in part due to the continually changing mortgage market, an environment in which we are subject to increased regulatory oversight and mandates and strategic arrangements that we may enter into with outside firms to provide operational capability and staffing for key functions, if needed.

**Single-Family Credit Guarantee Portfolio**

The UPB of our single-family credit guarantee portfolio declined approximately 3.5% and 5.0% during 2011 and 2010, respectively, as the amount of single-family loan liquidations has exceeded new loan purchase and guarantee activity in the last two years. We believe this is due, in part, to declines in the amount of single-family mortgage debt outstanding in the market and increased competition from Ginnie Mae and FHA/VA. Although the number of seriously delinquent loans declined in both 2010 and 2011, our delinquency rates were higher than they otherwise would have been, because the size of our portfolio has declined and therefore these rates are calculated on a smaller base of loans at the end of each period. The table below provides certain credit statistics for our single-family credit guarantee portfolio.

*Freddie Mac*

**Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio**

| | As of | | | | |
| --- | --- | --- | --- | --- | --- |
| | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 |
| Payment status — | | | | | |
| One month past due | 2.02% | 1.94% | 1.92% | 1.75% | 2.07% |
| Two months past due | 0.70% | 0.70% | 0.67% | 0.65% | 0.78% |
| Seriously delinquent[1] | 3.58% | 3.51% | 3.50% | 3.63% | 3.84% |
| Non-performing loans (in millions)[2] | $120,514 | $119,081 | $114,819 | $115,083 | $115,478 |
| Single-family loan loss reserve (in millions)[3] | $ 38,916 | $ 39,088 | $ 38,390 | $ 38,558 | $ 39,098 |
| REO inventory (in properties) | 60,535 | 59,596 | 60,599 | 65,159 | 72,079 |
| REO assets, net carrying value (in millions) | $  5,548 | $  5,539 | $  5,834 | $  6,261 | $  6,961 |
| | For the Three Months Ended | | | | |
| | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 |
| | (in units, unless noted) | | | | |
| Seriously delinquent loan additions[1] | 95,661 | 93,850 | 87,813 | 97,646 | 113,235 |
| Loan modifications[4] | 19,048 | 23,919 | 31,049 | 35,158 | 37,203 |
| Foreclosure starts ratio[5] | 0.54% | 0.56% | 0.55% | 0.58% | 0.73% |
| REO acquisitions | 24,758 | 24,378 | 24,788 | 24,707 | 23,771 |
| REO disposition severity ratio:[6] | | | | | |
| California | 44.6% | 45.5% | 44.9% | 44.5% | 43.9% |
| Arizona | 46.7% | 48.7% | 51.3% | 50.8% | 49.5% |
| Florida | 50.1% | 53.3% | 52.7% | 54.8% | 53.0% |
| Nevada | 54.2% | 53.2% | 55.4% | 53.1% | 53.1% |
| Illinois | 51.2% | 50.5% | 49.4% | 49.5% | 49.4% |
| Total U.S. | 41.2% | 41.9% | 41.7% | 43.0% | 41.3% |
| Single-family credit losses (in millions) | $  3,209 | $  3,440 | $  3,106 | $  3,226 | $  3,086 |

(1) See "MD&A — RISK MANAGEMENT— Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Delinquencies*" for further information about our reported serious delinquency rates.
(2) Consists of the UPB of loans in our single-family credit guarantee portfolio that have undergone a TDR or that are seriously delinquent. As of December 31, 2011 and December 31, 2010, approximately $44.4 billion and $26.6 billion in UPB of TDR loans, respectively, were no longer seriously delinquent.
(3) Consists of the combination of: (a) our allowance for loan losses on mortgage loans held for investment; and (b) our reserve for guarantee losses associated with non-consolidated single-family mortgage securitization trusts and other guarantee commitments.
(4) Represents the number of completed modifications under agreement with the borrower during the quarter. Excludes forbearance agreements, repayment plans, and loans in modification trial periods.
(5) Represents the ratio of the number of loans that entered the foreclosure process during the respective quarter divided by the number of loans in the single-family credit guarantee portfolio at the end of the quarter. Excludes Other Guarantee Transactions and mortgages covered under other guarantee commitments.
(6) States presented represent the five states where our credit losses have been greatest during 2011. Calculated as the amount of our losses recorded on disposition of REO properties during the respective quarterly period, excluding those subject to repurchase requests made to our seller/servicers, divided by the aggregate UPB of the related loans. The amount of losses recognized on disposition of the properties is equal to the amount by which the UPB of the loans exceeds the amount of sales proceeds from disposition of the properties. Excludes sales commissions and other expenses, such as property maintenance and costs, as well as applicable recoveries from credit enhancements, such as mortgage insurance.

In discussing our credit performance, we often use the terms "credit losses" and "credit-related expenses." These terms are significantly different. Our "credit losses" consist of charge-offs and REO operations income (expense), while our "credit-related expenses" consist of our provision for credit losses and REO operations income (expense).

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $73.2 billion, and have recorded an additional $4.3 billion in losses on loans purchased from PC trusts, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred and, thus, have not yet been provisioned for, we believe that, as of December 31, 2011, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations.

The quarterly number of seriously delinquent loan additions declined during the first half of 2011; however, we experienced a small increase in the quarterly number of seriously delinquent loan additions during the second half of 2011. As of December 31, 2011 and December 31, 2010, the percentage of seriously delinquent loans that have been delinquent for more than six months was 70% and 66%, respectively. Several factors, including delays in the foreclosure process, have resulted in loans remaining in serious delinquency for longer periods than prior to 2008, particularly in states that require a judicial foreclosure process. The credit losses and loan loss reserves associated with our single-family credit guarantee portfolio remained elevated in 2011, due in part to:

- Losses associated with the continued high volume of foreclosures and foreclosure alternatives. These actions relate to the continued efforts of our servicers to resolve our large inventory of seriously delinquent loans. Due to the length of time necessary for servicers either to complete the foreclosure process or pursue foreclosure alternatives

on seriously delinquent loans in our portfolio, we expect our credit losses will continue to remain high even if the volume of new serious delinquencies declines.

- Continued negative impact of certain loan groups within the single-family credit guarantee portfolio, such as those underwritten with certain lower documentation standards and interest-only loans, as well as other 2005 through 2008 vintage loans. These groups continue to be large contributors to our credit losses.

- Cumulative declines in national home prices during the last five years, based on our own index. As a result of these price declines, approximately 20% of loans in our single-family credit guarantee portfolio, based on UPB, had estimated current LTV ratios in excess of 100% (underwater loans) as of December 31, 2011.

- Deterioration in the financial condition of many of our mortgage insurers, which reduced our estimates of expected recoveries from these counterparties.

Some of our loss mitigation activities create fluctuations in our delinquency statistics. For example, loans that we report as seriously delinquent before they enter a modification trial period continue to be reported as seriously delinquent until the modifications become effective and the loans are removed from delinquent status by our servicers. See "MD&A — RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Credit Performance — Delinquencies*" for further information about factors affecting our reported delinquency rates.

*Government Support for our Business*

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The $200 billion cap on Treasury's funding commitment will increase as necessary to eliminate any net worth deficits we may have during 2010, 2011, and 2012. We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

To address our net worth deficit of $146 million at December 31, 2011, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $146 million. FHFA will request that we receive these funds by March 31, 2012. Upon receipt of the draw request: (a) our aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $72.3 billion; and (b) the corresponding annual cash dividend owed to Treasury will increase to $7.23 billion.

We pay cash dividends to Treasury at an annual rate of 10%. During 2011, we paid dividends to Treasury of $6.5 billion. We received cash proceeds of $8.0 billion from draws under Treasury's funding commitment during 2011. Through December 31, 2011, we paid aggregate cash dividends to Treasury of $16.5 billion, an amount equal to 23% of our aggregate draws received under the Purchase Agreement. As of December 31, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock exceeded our annual historical earnings in all but one period.

We expect to request additional draws under the Purchase Agreement in future periods. Over time, our dividend obligation to Treasury will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived. Treasury waived the fee for all quarters of 2011 and the first quarter of 2012, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. The amount of the quarterly commitment fee has not yet been established and could be substantial.

There continues to be significant uncertainty in the current mortgage market environment, and continued high levels of unemployment, weakness in home prices, and adverse changes in interest rates, mortgage security prices, and spreads could lead to additional draws. For discussion of other factors that could result in additional draws, see "RISK FACTORS — Conservatorship and Related Matters — *We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition*."

On August 5, 2011, S&P lowered the long-term credit rating of the U.S. government to "AA+" from "AAA" and assigned a negative outlook to the rating. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating. While this could adversely affect our liquidity and the supply and cost of debt financing available to us in the future, we have not yet experienced such adverse effects. For more

information, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Other Debt Securities — Credit Ratings*."

Neither the U.S. government nor any other agency or instrumentality of the U.S. government is obligated to fund our mortgage purchase or financing activities or to guarantee our securities or other obligations.

For more information on the Purchase Agreement, see "Conservatorship and Related Matters."

### Consolidated Financial Results — 2011 versus 2010

Net loss was $5.3 billion and $14.0 billion for the years ended December 31, 2011 and 2010, respectively. Key highlights of our financial results include:

- Net interest income for the year ended December 31, 2011 increased to $18.4 billion from $16.9 billion for the year ended December 31, 2010, mainly due to lower funding costs, partially offset by a decline in the average balances of mortgage-related assets.

- Provision for credit losses for the year ended December 31, 2011 decreased to $10.7 billion, compared to $17.2 billion for the year ended December 31, 2010. The provision for credit losses in 2011 reflects a decline in the rate at which single-family loans transition into serious delinquency or are modified, but was partially offset by our lowered expectations for mortgage insurance recoveries, which is due to the continued deterioration in the financial condition of the mortgage insurance industry in 2011.

- Non-interest income (loss) was $(10.9) billion for the year ended December 31, 2011, compared to $(11.6) billion for the year ended December 31, 2010, largely driven by substantial derivative losses in both periods. However, there was a significant decline in net impairments of available-for-sale securities recognized in earnings during the year ended December 31, 2011 compared to the year ended December 31, 2010.

- Non-interest expense was $2.5 billion and $2.9 billion in the years ended December 31, 2011 and 2010, respectively, as we had higher expenses in 2010 than in 2011 associated with transfers and terminations of mortgage servicing, primarily related to Taylor, Bean & Whitaker Mortgage Corp., or TBW.

- Total comprehensive income (loss) was $(1.2) billion for the year ended December 31, 2011 compared to $282 million for the year ended December 31, 2010. Total comprehensive income (loss) for the year ended December 31, 2011 was driven by the $5.3 billion net loss, partially offset by a reduction in gross unrealized losses related to our available-for-sale securities.

## Our Business

We conduct business in the U.S. residential mortgage market and the global securities market, subject to the direction of our Conservator, FHFA, and under regulatory supervision of FHFA, the SEC, HUD, and Treasury. The size of the U.S. residential mortgage market is affected by many factors, including changes in interest rates, home ownership rates, home prices, the supply of housing and lender preferences regarding credit risk and borrower preferences regarding mortgage debt. The amount of residential mortgage debt available for us to purchase and the mix of available loan products are also affected by several factors, including the volume of mortgages meeting the requirements of our charter (which is affected by changes in the conforming loan limit determined by FHFA), our own preference for credit risk reflected in our purchase standards and the mortgage purchase and securitization activity of other financial institutions. We conduct our operations solely in the U.S. and its territories, and do not generate any revenue from or have assets in geographic locations outside of the U.S. and its territories.

Our charter forms the framework for our business activities, the initiatives we bring to market and the services we provide to the nation's residential housing and mortgage industries. Our charter also determines the types of mortgage loans that we are permitted to purchase. Our statutory mission as defined in our charter is to:

- provide stability in the secondary market for residential mortgages;

- respond appropriately to the private capital market;

- provide ongoing assistance to the secondary market for residential mortgages (including activities relating to mortgages for low- and moderate-income families, involving a reasonable economic return that may be less than the return earned on other activities); and

- promote access to mortgage credit throughout the U.S. (including central cities, rural areas, and other underserved areas).

Our charter does not permit us to originate mortgage loans or lend money directly to consumers in the primary mortgage market. We provide liquidity, stability and affordability to the U.S. housing market primarily by providing our credit guarantee for residential mortgages originated by mortgage lenders and investing in mortgage loans and mortgage-related securities. We use mortgage securitization as an integral part of our activities. Mortgage securitization is a process by which we purchase mortgage loans that lenders originate, and pool these loans into guaranteed mortgage securities that are sold in global capital markets, generating proceeds that support future loan origination activity by lenders. The primary Freddie Mac guaranteed mortgage-related security is the single-class PC. We also aggregate and resecuritize mortgage-related securities that are issued by us, other GSEs, HFAs, or private (non-agency) entities, and issue other single-class and multiclass mortgage-related securities to third-party investors. We also enter into certain other guarantee commitments for mortgage loans, HFA bonds under the HFA initiative, and multifamily housing revenue bonds held by third parties.

Our charter limits our purchases of single-family loans to the conforming loan market. The conforming loan market is defined by loans originated with UPBs at or below limits determined annually based on changes in FHFA's housing price index, a method established and maintained by FHFA for determining the national average single-family home price. Since 2006, the base conforming loan limit for a one-family residence has been set at $417,000, and higher limits have been established in certain "high-cost" areas (currently, up to $625,500 for a one-family residence). Higher limits also apply to two- to four-family residences and for mortgages secured by properties in Alaska, Guam, Hawaii, and the U.S. Virgin Islands.

Beginning in 2008, pursuant to a series of laws, our loan limits in certain high-cost areas were increased temporarily above the limits that otherwise would have been applicable (up to $729,750 for a one-family residence). The latest of these increases expired on September 30, 2011. We refer to loans that we have purchased with UPB exceeding the base conforming loan limit (*i.e.*, $417,000) as conforming jumbo loans.

Our charter generally prohibits us from purchasing first-lien single-family mortgages if the outstanding UPB of the mortgage at the time of our purchase exceeds 80% of the value of the property securing the mortgage unless we have one of the following credit protections:

- mortgage insurance from a mortgage insurer that we determine is qualified on the portion of the UPB of the mortgage that exceeds 80%;

- a seller's agreement to repurchase or replace any mortgage that has defaulted; or

- retention by the seller of at least a 10% participation interest in the mortgage.

Under our charter, our mortgage purchase operations are confined, so far as practicable, to mortgages that we deem to be of such quality, type and class as to meet generally the purchase standards of other private institutional mortgage investors. This is a general marketability standard.

Our charter requirement for credit protection on mortgages with LTV ratios greater than 80% does not apply to multifamily mortgages or to mortgages that have the benefit of any guarantee, insurance or other obligation by the U.S. or any of its agencies or instrumentalities (*e.g.*, the FHA, the VA or the USDA Rural Development).

As part of HARP under the MHA Program, we may purchase single-family mortgages that refinance borrowers whose mortgages we currently own or guarantee without obtaining additional credit enhancement in excess of that already in place for any such loan, even if the LTV ratio of the new loan is above 80%.

**Our Business Segments**

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Single-family Guarantee, Investments, and Multifamily. Certain activities that are not part of a reportable segment are included in the All Other category.

We evaluate segment performance and allocate resources based on a Segment Earnings approach. Beginning January 1, 2010, we revised our method for presenting Segment Earnings to reflect changes in how management measures and assesses the financial performance of each segment and the company as a whole. For more information on our segments, including financial information, see "MD&A — CONSOLIDATED RESULTS OF OPERATIONS — Segment Earnings" and "NOTE 14: SEGMENT REPORTING."

*Single-Family Guarantee Segment*

The Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary

mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related security in exchange for management and guarantee fees.

### Our Customers

Our customers are predominantly lenders in the primary mortgage market that originate mortgages for homeowners. These lenders include mortgage banking companies, commercial banks, savings banks, community banks, credit unions, HFAs, and savings and loan associations.

We acquire a significant portion of our mortgages from several large lenders. These lenders are among the largest mortgage loan originators in the U.S. Since 2007, the mortgage industry has consolidated significantly and a smaller number of large lenders originate most single-family mortgages. As a result, mortgage origination volume during 2011 was concentrated in a smaller number of institutions. During 2011, two mortgage lenders (Wells Fargo Bank, N.A. and JPMorgan Chase Bank, N.A.) each accounted for more than 10% of our single-family mortgage purchase volume and collectively accounted for approximately 40% of our single-family mortgage purchase volume. Our top ten lenders accounted for approximately 82% of our single-family mortgage purchase volume during 2011.

Our customers also service loans in our single-family credit guarantee portfolio. A significant portion of our single-family mortgage loans are serviced by several of our large customers. Because we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, our business and financial results could be adversely affected. For information about our relationships with our customers, see "MD&A — RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Single-Family Mortgage Seller/Servicers.*"

### Our Competition

Historically, our principal competitors have been Fannie Mae, Ginnie Mae and FHA/VA, and other financial institutions that retain or securitize mortgages, such as commercial and investment banks, dealers, and thrift institutions. Since 2008, most of our competitors, other than Fannie Mae, Ginnie Mae, and FHA/VA, have ceased their activities in the residential mortgage securitization business or severely curtailed these activities relative to their previous levels. We compete on the basis of price, products, the structure of our securities, and service. Competition to acquire single-family mortgages can also be significantly affected by changes in our credit standards.

Ginnie Mae, which became a more significant competitor beginning in 2009, guarantees the timely payment of principal and interest on mortgage-related securities backed by federally insured or guaranteed loans, primarily those insured by FHA or guaranteed by VA. Ginnie Mae maintained a significant market share in 2011 and 2010, in large part due to favorable pricing of loans insured by FHA, the increase in the FHA loan limit and the availability, through FHA, of a mortgage product for borrowers seeking greater than 80% financing who could not otherwise qualify for a conventional mortgage.

The conservatorship, including direction provided to us by our Conservator, and the restrictions on our activities under the Purchase Agreement may affect our ability to compete in the business of securitizing mortgages. On multiple occasions, FHFA has directed us and Fannie Mae to confer and suggest to FHFA possible uniform approaches to particular business and accounting issues and problems. In most such cases, FHFA subsequently directed us and Fannie Mae to adopt a specific uniform approach. It is possible that in some areas FHFA could require us and Fannie Mae to take a uniform approach that, because of differences in our respective businesses, could place Freddie Mac at a competitive disadvantage to Fannie Mae. For more information, see "RISK FACTORS — Conservatorship and Related Matters — *FHFA directives that we and Fannie Mae adopt uniform approaches in some areas could have an adverse impact on our business or on our competitive position with respect to Fannie Mae.*"

### Overview of the Mortgage Securitization Process

Mortgage securitization is a process by which we purchase mortgage loans that lenders originate, and pool these loans into mortgage securities that are sold in global capital markets. The following diagram illustrates how we support

mortgage market liquidity when we create PCs through mortgage securitizations. These PCs can be sold to investors or held by us or our customers:



## Mortgage Securitizations

The U.S. residential mortgage market consists of a primary mortgage market that links homebuyers and lenders and a secondary mortgage market that links lenders and investors. We participate in the secondary mortgage market by purchasing mortgage loans and mortgage-related securities for investment and by issuing guaranteed mortgage-related securities. In the Single-family Guarantee segment, we purchase and securitize "single-family mortgages," which are mortgages that are secured by one- to four-family properties.

In general, the securitization and Freddie Mac guarantee process works as follows: (a) a lender originates a mortgage loan to a borrower purchasing a home or refinancing an existing mortgage loan; (b) we purchase the loan from the lender and place it with other mortgages into a security that is sold to investors (this process is referred to as "pooling"); (c) the lender may then use the proceeds from the sale of the loan or security to originate another mortgage loan; (d) we provide a credit guarantee, for a fee (generally a portion of the interest collected on the mortgage loan), to those who invest in the security; (e) the borrower's monthly payment of mortgage principal and interest (net of a servicing fee and our management and guarantee fee) is passed through to the investors in the security; and (f) if the borrower stops making monthly payments — because a family member loses a job, for example — we step in and, pursuant to our guarantee, make the applicable payments to investors in the security. In the event a borrower defaults on the mortgage, our servicer works with the borrower to find a solution to help them stay in the home, or sell the property and avoid foreclosure, through our many different workout options. If this is not possible, we ultimately foreclose and sell the home.

The terms of single-family mortgages that we purchase or guarantee allow borrowers to prepay these loans, thereby allowing borrowers to refinance their loans when mortgage rates decline. Because of the nature of long-term, fixed-rate mortgages, borrowers with these mortgages are protected against rising interest rates, but are able to take advantage of declining rates through refinancing. When a borrower prepays a mortgage that we have securitized, the outstanding balance of the security owned by investors is reduced by the amount of the prepayment. Unscheduled reductions in loan principal, regardless of whether they are voluntary or involuntary (*e.g.* foreclosure), result in prepayments of security balances. Consequently, the owners of our guaranteed securities are subject to prepayment risk on the related mortgage

loans, which is principally that the investor will receive an unscheduled return of the principal, and therefore may not earn the rate of return originally expected on the investment.

We guarantee these mortgage-related securities in exchange for compensation, which consists primarily of a combination of management and guarantee fees paid on a monthly basis as a percentage of the UPB of the underlying loans and initial upfront payments referred to as delivery fees. We may also make upfront payments to buy-up the monthly management and guarantee fee rate, or receive upfront payments to buy-down the monthly management and guarantee fee rate. These fees are paid in conjunction with the formation of a PC to provide for a uniform coupon rate for the mortgage pool underlying the issued PC.

We enter into mortgage purchase volume commitments with many of our single-family customers in order to have a supply of loans for our guarantee business. These commitments provide for the lenders to deliver to us a certain volume of mortgages during a specified period of time. Some commitments may also provide for the lender to deliver to us a minimum percentage of their total sales of conforming loans. The purchase and securitization of mortgage loans from customers under these contracts have pricing schedules for our management and guarantee fees that are negotiated at the outset of the contract with initial terms that may range from one month to one year. We call these transactions "flow" activity and they represent the majority of our purchase volumes. The remainder of our purchases and securitizations of mortgage loans occurs in "bulk" transactions for which purchase prices and management and guarantee fees are negotiated on an individual transaction basis. Mortgage purchase volumes from individual customers can fluctuate significantly. If a mortgage lender fails to meet its contractual commitment, we have a variety of contractual remedies, which may include the right to assess certain fees. Our mortgage purchase contracts contain no penalty or liquidated damages clauses based on our inability to take delivery of presented mortgage loans. However, if we were to fail to meet our contractual commitment, we could be deemed to be in breach of our contract and could be liable for damages in a lawsuit.

We seek to issue guarantees on our PCs with fee terms that we believe will, over the long-term, provide management and guarantee fee income that exceeds our anticipated credit-related and administrative expenses on the underlying loans. Historically, we have varied our guarantee and delivery fee pricing for different customers, mortgage products, and mortgage or borrower underwriting characteristics based on our assessment of credit risk and loss mitigation related to single-family loans. However, on December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than 10 basis points above the average guarantee fees charged in 2011 on single-family mortgage-backed securities. Under the law, the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by the companies. See "Regulation and Supervision — *Legislative and Regulatory Developments*" for further information on the impact of this new law. For more information on fees, see "MD&A — RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Other Credit Risk Management Activities*."

For information on how we account for our securitization activities, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES."

*Securitization Activities*

The types of mortgage-related securities we issue and guarantee include the following:

• PCs;

• REMICs and Other Structured Securities; and

• Other Guarantee Transactions.

*PCs*

Our PCs are single-class pass-through securities that represent undivided beneficial interests in trusts that hold pools of mortgages we have purchased. Holding single-family loans in the form of PCs rather than as unsecuritized loans gives us greater flexibility in managing the composition of our mortgage portfolio, as it is generally easier to purchase and sell PCs than unsecuritized mortgage loans, and allows more cost effective interest-rate risk management. For our fixed-rate PCs, we guarantee the timely payment of principal and interest. For our single-family ARM PCs, we guarantee the timely payment of the weighted average coupon interest rate for the underlying mortgage loans. We also guarantee the full and final payment of principal for ARM PCs; however, we do not guarantee the timely payment of principal on ARM PCs. We issue most of our single-family PCs in transactions in which our customers provide us with mortgage loans in

exchange for PCs. We refer to these transactions as guarantor swaps. The following diagram illustrates a guarantor swap transaction:

## Guarantor Swap



We also issue PCs in exchange for cash. The following diagram illustrates an exchange for cash in a "cash auction" of PCs:

## Cash Auction of PCs



Institutional and other fixed-income investors, including pension funds, insurance companies, securities dealers, money managers, commercial banks and foreign central banks, purchase our PCs. Treasury and the Federal Reserve have also purchased mortgage-related securities issued by us, Fannie Mae and Ginnie Mae under their purchase programs. The most recent of these programs ended in March 2010. During 2011, the Federal Reserve took several actions designed to support an economic recovery and maintain historically low interest rates, including resumption of purchases of agency securities, which impacted and will continue to impact the demand for and value of our PCs in the market.

PCs differ from U.S. Treasury securities and other fixed-income investments in two ways. First, single-family PCs can be prepaid at any time. Homeowners have the right to prepay their mortgage at any time (known as the prepayment option), and homeowner mortgage prepayments are passed through to the PC holder. Consequently, our securities implicitly have a call option that significantly reduces the average life of the security from the contractual loan maturity. As a result, our PCs generally provide a higher nominal yield than certain other fixed-income products. Second, unlike U.S. Treasury securities, PCs are not backed by the full faith and credit of the United States.

In addition, in our Single-family Guarantee segment we historically sought to support the liquidity of the market for our PCs and the relative price performance of our PCs to comparable Fannie Mae securities through a variety of activities, including the resecuritization of PCs into REMICs and Other Structured Securities. Other strategies may include: (a) encouraging sellers to pool mortgages that they deliver to us into PC pools with a larger and more diverse population

of mortgages; (b) influencing the volume and characteristics of mortgages delivered to us by tailoring our loan eligibility guidelines and other means; and (c) engaging in portfolio purchase and retention activities. Beginning in 2012, under guidance from FHFA we expect to curtail mortgage-related investments portfolio purchase and retention activities that are undertaken for the primary purpose of supporting the price performance of our PCs, which may result in a significant decline in the market share of our single-family guarantee business, lower comprehensive income, and a more rapid decline in the size of our total mortgage portfolio. See *"Investments Segment — PC Support Activities"* and "RISK FACTORS — Competitive and Market Risks — *Any decline in the price performance of or demand for our PCs could have an adverse effect on the volume and profitability of our new single-family guarantee business"* for additional information about our support of market liquidity for PCs.

*REMICs and Other Structured Securities*

We issue single-class and multiclass securities. Single-class securities involve the straight pass-through of all of the cash flows of the underlying collateral to holders of the beneficial interests. Our primary multiclass securities qualify for tax treatment as REMICs. Multiclass securities divide all of the cash flows of the underlying mortgage-related assets into two or more classes designed to meet the investment criteria and portfolio needs of different investors by creating classes of securities with varying maturities, payment priorities and coupons, each of which represents a beneficial ownership interest in a separate portion of the cash flows of the underlying collateral. Usually, the cash flows are divided to modify the relative exposure of different classes to interest-rate risk, or to create various coupon structures. The simplest division of cash flows is into principal-only and interest-only classes. Other securities we issue can involve the creation of sequential payment and planned or targeted amortization classes. In a sequential payment class structure, one or more classes receive all or a disproportionate percentage of the principal payments on the underlying mortgage assets for a period of time until that class or classes are retired, following which the principal payments are directed to other classes. Planned or targeted amortization classes involve the creation of classes that have relatively more predictable amortization schedules across different prepayment scenarios, thus reducing prepayment risk, extension risk, or both.

Our REMICs and Other Structured Securities represent beneficial interests in pools of PCs and/or certain other types of mortgage-related assets. We create these securities primarily by using PCs or previously issued REMICs and Other Structured Securities as the underlying collateral. Similar to our PCs, we guarantee the payment of principal and interest to the holders of tranches of our REMICs and Other Structured Securities. We do not charge a management and guarantee fee for these securities if the underlying collateral is already guaranteed by us since no additional credit risk is introduced. Because the collateral underlying nearly all of our single-family REMICs and Other Structured Securities consists of other mortgage-related securities that we guarantee, there are no concentrations of credit risk in any of the classes of these securities that are issued, and there are no economic residual interests in the related securitization trust. The following diagram provides a general example of how we create REMICs and Other Structured Securities.

## REMICs and Other Structured Securities



We issue many of our REMICs and Other Structured Securities in transactions in which securities dealers or investors sell us mortgage-related assets or we use our own mortgage-related assets (*e.g.,* PCs and REMICs and Other Structured Securities) in exchange for the REMICs and Other Structured Securities. The creation of REMICs and Other Structured Securities allows for setting differing terms for specific classes of investors, and our issuance of these securities can expand the range of investors in our mortgage-related securities to include those seeking specific security attributes. For REMICs and Other Structured Securities that we issue to third parties, we typically receive a transaction, or

resecuritization, fee. This transaction fee is compensation for facilitating the transaction, as well as future administrative responsibilities.

*Other Guarantee Transactions*

We also issue mortgage-related securities to third parties in exchange for non-Freddie Mac mortgage-related securities. We refer to these as Other Guarantee Transactions. The non-Freddie Mac mortgage-related securities are transferred to trusts that were specifically created for the purpose of issuing securities, or certificates, in the Other Guarantee Transactions. The following diagram illustrates an example of an Other Guarantee Transaction:

## Other Guarantee Transaction



OGTC = Other Guarantee Transaction Certificates

Other Guarantee Transactions can generally be segregated into two different types. In one type, we purchase only senior tranches from a non-Freddie Mac senior-subordinated securitization, place the senior tranches into securitization trusts, and issue Other Guarantee Transaction certificates guaranteeing the principal and interest payments on those certificates. In this type of transaction, our credit risk is reduced by the structural credit protections from the related subordinated tranches, which we do not guarantee. In the second type, we purchase single-class pass-through securities, place them in securitization trusts, and issue Other Guarantee Transaction certificates guaranteeing the principal and interest payments on those certificates. Our Other Guarantee Transactions backed by single-class pass-through securities do not benefit from structural or other credit enhancement protections.

Although Other Guarantee Transactions generally have underlying mortgage loans with varying risk characteristics, we do not issue tranches that have concentrations of credit risk beyond those embedded in the underlying assets, as all cash flows of the underlying collateral are passed through to the holders of the securities and there are no economic residual interests in the securitization trusts. Additionally, there may be other credit enhancements and structural features retained by the seller, such as excess interest or overcollateralization, that provide credit protection to our interests, and reduce the likelihood that we will have to perform under our guarantee of the senior tranches. In exchange for providing our guarantee, we may receive a management and guarantee fee or other delivery fees, if the underlying collateral is not already guaranteed by us.

In 2010 and 2009, we entered into transactions under Treasury's NIBP with HFAs, for the partial guarantee of certain single-family and multifamily HFA bonds, which were Other Guarantee Transactions with significant credit enhancement provided by Treasury. While we did not engage in any of these transactions in 2011, we continue to participate in and

support this program and these guarantees remain outstanding. The securities issued by us pursuant to the NIBP were purchased by Treasury. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Housing Finance Agency Initiative" for further information.

For information about the amount of mortgage-related securities we have issued, see "Table 35 — Freddie Mac Mortgage-Related Securities." For information about the relative performance of mortgages underlying these securities, refer to our "MD&A — RISK MANAGEMENT — Credit Risk" section.

*Single-Family PC Trust Documents*

We establish trusts for all of our issued PCs pursuant to our PC master trust agreement. In accordance with the terms of our PC trust documents, we have the option, and in some instances the requirement, to remove specified mortgage loans from the trust. To remove these loans, we pay the trust an amount equal to the current UPB of the mortgage, less any outstanding advances of principal that have been distributed to PC holders. Our payments to the trust are distributed to the PC holders at the next scheduled payment date. From time to time, we reevaluate our practice of removing delinquent loans from PCs and alter it if circumstances warrant. Our practice is to remove mortgages that are 120 days or more delinquent from pools underlying our PCs when:

- the mortgages have been modified;

- foreclosure sales occur;

- the mortgages are delinquent for 24 months; or

- the cost of guarantee payments to PC holders, including advances of interest at the PC coupon rate, exceeds the expected cost of holding the nonperforming loans.

In February 2010, we began the practice of removing substantially all 120 days or more delinquent single-family mortgage loans from our issued PCs. This change in practice was made based on a determination that the cost of guarantee payments to the security holders will exceed the cost of holding unsecuritized non-performing loans on our consolidated balance sheets. The cost of holding unsecuritized non-performing loans on our consolidated balance sheets was significantly affected by our January 1, 2010 adoption of amendments to certain accounting guidance and changing economics pursuant to which the recognized cost of removing most delinquent loans from PC trusts was less than the recognized cost of continued guarantee payments to security holders. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Adopted Accounting Guidance" for additional information.

In accordance with the terms of our PC trust documents, we are required to remove a mortgage loan (or, in some cases, substitute a comparable mortgage loan) from a PC trust in the following situations:

- if a court of competent jurisdiction or a federal government agency, duly authorized to oversee or regulate our mortgage purchase business, determines that our purchase of the mortgage was unauthorized and a cure is not practicable without unreasonable effort or expense, or if such a court or government agency requires us to repurchase the mortgage;

- if a borrower exercises its option to convert the interest rate from an adjustable-rate to a fixed-rate on a convertible ARM; and

- in the case of balloon-reset loans, shortly before the mortgage reaches it's scheduled balloon-reset date.

*The To Be Announced Market*

Because our fixed-rate single-family PCs are considered to be homogeneous, and are issued in high volume and are highly liquid, they generally trade on a "generic" basis by PC coupon rate, also referred to as trading in the TBA market. A TBA trade in Freddie Mac securities represents a contract for the purchase or sale of PCs to be delivered at a future date; however, the specific PCs that will be delivered to fulfill the trade obligation, and thus the specific characteristics of the mortgages underlying those PCs, are not known (*i.e.*, "announced") at the time of the trade, but only shortly before the trade is settled. The use of the TBA market increases the liquidity of mortgage investments and improves the distribution of investment capital available for residential mortgage financing, thereby helping us to accomplish our statutory mission. The Securities Industry and Financial Markets Association publishes guidelines pertaining to the types of mortgages that are eligible for TBA trades. Certain of our PC securities are not eligible for TBA trades, including those backed by: (a) relief refinance mortgages with LTV ratios greater than 105%; and (b) previously modified mortgage loans where the borrower has missed one or more monthly payments in a twelve month period.

*Underwriting Requirements and Quality Control Standards*

We use a process of delegated underwriting for the single-family mortgages we purchase or securitize. In this process, our contracts with seller/servicers describe mortgage underwriting standards and the seller/servicers represent and warrant to us that the mortgages sold to us meet these standards. In our contracts with individual seller/servicers, we may waive or modify selected underwriting standards. Through our delegated underwriting process, mortgage loans and the borrowers' ability to repay the loans are evaluated using several critical risk characteristics, including, but not limited to, the borrower's credit score and credit history, the borrower's monthly income relative to debt payments, the loan's original LTV ratio, the documentation level, the number of borrowers, the type of mortgage product, and the occupancy type of the loan. We subsequently review a sample of these loans and, if we determine that any loan is not in compliance with our contractual standards, we may require the seller/servicer to repurchase that mortgage. In lieu of a repurchase, we may agree to allow a seller/servicer to indemnify us against loss in the event of a default by the borrower or enter into some other remedy. During 2011 and 2010, we reviewed a significant number of loans that defaulted in order to assess the sellers' compliance with our purchase contracts. For more information on our seller/servicers' repurchase obligations, including recent performance under those obligations, see "MD&A — RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Single-family Mortgage Seller/Servicers*."

The majority of our single-family mortgage purchase volume is evaluated using an automated underwriting software tool, either our tool (Loan Prospector), the seller/servicers' own tool, or Fannie Mae's tool. The percentage of our single-family mortgage purchase flow activity volume evaluated by the loan originator using Loan Prospector prior to being purchased by us was 41%, 39%, and 45% during 2011, 2010, and 2009, respectively. Beginning in 2009, we added a number of additional credit standards for loans evaluated by other underwriting tools to improve the quality of loans we purchase that are evaluated using these other tools. Consequently, we do not currently believe that the use of a tool other than Loan Prospector significantly increases our loan performance risk.

*Other Guarantee Commitments*

In certain circumstances, we provide our guarantee of mortgage-related assets held by third parties, in exchange for a guarantee fee, without securitizing the related assets. For example, we provide long-term standby commitments to certain of our single-family customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements. In addition, during 2010 and 2009, we issued guarantees under the TCLFP on securities backed by HFA bonds as part of the HFA Initiative. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Housing Finance Agency Initiative" for further information.

*Credit Enhancements*

Our charter requires that single-family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests. Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. In addition, we employ other types of credit enhancements to further manage certain credit risk, including indemnification agreements, collateral pledged by lenders and subordinated security structures. We also have pool insurance covering certain single-family loans, though we did not purchase any pool insurance on single-family loans during 2011 or 2010.

*Loss Mitigation and Loan Workout Activities*

Loan workout activities are a key component of our loss mitigation strategy for managing and resolving troubled assets and lowering credit losses. Our single-family loss mitigation strategy emphasizes early intervention by servicers in delinquent mortgages and provides alternatives to foreclosure. Other single-family loss mitigation activities include providing our single-family servicers with default management tools designed to help them manage non-performing loans more effectively and to assist borrowers in retaining home ownership where possible, or facilitate foreclosure alternatives when continued homeownership is not an option. Loan workouts are intended to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by reducing or eliminating a portion of the costs related to foreclosed properties and avoiding the additional credit losses that likely would be incurred in a REO sale.

Our loan workouts include:

- Forbearance agreements, where reduced payments or no payments are required during a defined period, generally less than one year. They provide additional time for the borrower to return to compliance with the original terms of the mortgage or to implement another loan workout. During 2011, the average time period granted for completed

short-term forbearance agreements was between two and four months. In January 2012, we announced new unemployment forbearance terms, which permit forbearance of up to 12 months for unemployed borrowers.

- Repayment plans, which are contractual plans to make up past due amounts. They mitigate our credit losses because they assist borrowers in returning to compliance with the original terms of their mortgages. During 2011, the average time period granted for completed repayment plans was between two and five months.

- Loan modifications, which may involve changing the terms of the loan, or adding outstanding indebtedness, such as delinquent interest, to the UPB of the loan, or a combination of both. We require our servicers to examine the borrower's capacity to make payments under the new terms by reviewing the borrower's qualifications, including income. During 2011, we granted principal forbearance but did not utilize principal forgiveness for our loan modifications. Principal forbearance is a change to a loan's terms to designate a portion of the principal as non-interest -bearing. A borrower may only receive one HAMP modification, and loans may be modified once under other Freddie Mac loan modification programs. However, we reserve the right to approve subsequent non-HAMP loan modifications to the same borrower, based on the borrower's individual facts and circumstances.

- Short sale and deed in lieu of foreclosure transactions.

In addition to these loan workout initiatives, our relief refinance opportunities, including HARP (which is the portion of our relief refinance initiative for loans with LTV ratios above 80%), are a significant part of our effort to keep families in their homes.

In 2009, we began participating in HARP, which gives eligible homeowners (whose monthly payments are current) with existing loans owned or guaranteed by us or Fannie Mae an opportunity to refinance into loans with more affordable monthly payments and/or fixed-rate terms. Only borrowers with Freddie Mac owned or guaranteed mortgages are eligible for our relief refinance mortgage initiative, which is our implementation of HARP. Through December 2011, under HARP, eligible borrowers who had mortgages with current LTV ratios above 80% and up to 125% were allowed to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place. On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers who can benefit from refinancing their home mortgages. The revisions to HARP are available to borrowers with loans that were sold to Freddie Mac and Fannie Mae on or before May 31, 2009 and who have current LTV ratios above 80%. The program enhancements include:

- eliminating certain risk-based fees for borrowers who refinance into shorter-term mortgages, and lowering fees for other borrowers;

- removing the 125% LTV ratio ceiling for fixed-rate mortgages;

- eliminating the requirement for lenders to provide us with certain representations and warranties that they would ordinarily be required to commit to in selling loans to us;

- eliminating the need for a new property appraisal where there is a reliable automated valuation model estimate provided by the purchasing GSE; and

- extending the end date for HARP until December 31, 2013.

See "MD&A — RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program*" for additional information on our implementation of HARP through our relief refinance mortgage initiative. For more information regarding credit risk, see "MD&A — RISK MANAGEMENT — Credit Risk," "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES," and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS."

### Investments Segment

The Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans, which are funded by other debt issuances and hedged using derivatives. In our Investments segment, we also provide funding and hedging management services to the Single-family Guarantee and Multifamily segments. In the Investments segment, we are not currently a substantial buyer or seller of mortgage assets.

### Our Customers

Our customers for our debt securities predominantly include insurance companies, money managers, central banks, depository institutions, and pension funds. Within the Investments segment, we buy securities through various market sources. We also invest in performing single-family mortgage loans, which we intend to aggregate and securitize. We

purchase a significant portion of these loans from several lenders, as discussed in "*Single-Family Guarantee Segment — Our Customers.*"

### Our Competition

Historically, our principal competitors have been Fannie Mae and other financial institutions that invest in mortgage-related securities and mortgage loans, such as commercial and investment banks, dealers, thrift institutions, and insurance companies. The conservatorship, including direction provided to us by our Conservator and the restrictions on our activities under the Purchase Agreement has affected and will continue to affect our ability to compete in the business of investing in mortgage-related securities and mortgage loans.

We compete for low-cost debt funding with Fannie Mae, the FHLBs and other institutions. Competition for debt funding from these entities can vary with changes in economic, financial market and regulatory environments.

### Assets

Historically, we have primarily been a buy-and-hold investor in mortgage-related securities and single-family performing mortgage loans. We may sell assets to reduce risk, provide liquidity, and improve our returns. However, due to limitations under the Purchase Agreement and those imposed by FHFA, our ability to acquire and sell mortgage assets is significantly constrained. For more information, see "Conservatorship and Related Matters" and "MD&A — CONSOLIDATED RESULTS OF OPERATIONS — Segment Earnings — *Segment Earnings-Results — Investments.*"

We may enter into a variety of transactions to improve investment returns, including: (a) dollar roll transactions, which are transactions in which we enter into an agreement to purchase and subsequently resell (or sell and subsequently repurchase) agency securities; (b) purchases of agency securities (including agency REMICs); and (c) purchases of performing single-family mortgage loans. In addition, we may create REMICs from existing agency securities and sell tranches that are in demand by investors to reduce our asset balance, while conserving value for the taxpayer. We estimate our expected investment returns using an OAS approach, which is an estimate of the yield spread between a given financial instrument and a benchmark (LIBOR, agency or Treasury) yield curve. In this approach, we consider potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as the prepayment option. Additionally, in this segment we hold reperforming and modified single-family mortgage loans related to our single-family business. For our liquidity needs, we maintain a portfolio comprised primarily of cash and cash equivalents, non-mortgage-related securities, and securities purchased under agreements to resell.

### Debt Financing

We fund our investment activities by issuing short-term and long-term debt. The conservatorship, and the resulting support we receive from Treasury, has enabled us to access debt funding on terms sufficient for our needs. While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available under the Purchase Agreement after 2012. Additionally, the Purchase Agreement limits the amount of indebtedness we can incur.

For more information, see "Conservatorship and Related Matters" and "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity."

### Risk Management

Our Investments segment has responsibility for managing our interest rate risk and certain liquidity risks. Derivatives are an important part of our risk management strategy. We use derivatives primarily to: (a) regularly adjust or rebalance our funding mix in response to changes in the interest-rate characteristics of our mortgage-related assets; (b) hedge forecasted issuances of debt; (c) synthetically create callable and non-callable funding; and (d) hedge foreign-currency exposure. For more information regarding our use of derivatives, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK" and "NOTE 11: DERIVATIVES." For information regarding our liquidity management, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES."

### PC Support Activities

Our PCs are an integral part of our mortgage purchase program. Our Single-family Guarantee segment purchases many of our mortgages by issuing PCs in exchange for those mortgage loans in guarantor swap transactions. We also issue PCs backed by mortgage loans that we purchased for cash. Our competitiveness in purchasing single-family

mortgages from our seller/servicers, and thus the volume and profitability of new single-family business, can be directly affected by the relative price performance of our PCs and comparable Fannie Mae securities.

Historically, we sought to support the liquidity of the market for our PCs and the relative price performance of our PCs to comparable Fannie Mae securities through a variety of activities conducted by our Investments segment, including the purchase and sale of Freddie Mac and other agency mortgage-related securities (*e.g.*, dollar roll transactions), as well as through the issuance of REMICs and Other Structured Securities. Our purchases and sales of mortgage-related securities and our issuances of REMICs and Other Structured Securities influence the relative supply and demand for these securities, helping to support the price performance of our PCs. Depending upon market conditions, including the relative prices, supply of and demand for our mortgage-related securities and comparable Fannie Mae securities, as well as other factors, there may be substantial variability in any period in the total amount of securities we purchase or sell, and in the success of our efforts to support the liquidity and price performance of our mortgage-related securities. Historically, we incurred costs to support the liquidity and price performance of our securities, including engaging in transactions below our target rate of return. We may increase, reduce or discontinue these or other related activities at any time, which could affect the liquidity and price performance of our mortgage-related securities. Beginning in 2012, under guidance from FHFA we expect to curtail mortgage-related investments portfolio purchase and retention activities that are undertaken for the primary purpose of supporting the price performance of our PCs, which may result in a significant decline in the market share of our single-family guarantee business, lower comprehensive income, and a more rapid decline in the size of our total mortgage portfolio. For more information, see "RISK FACTORS — Competitive and Market Risks — *Any decline in the price performance of or demand for our PCs could have an adverse effect on the volume and profitability of our new single-family guarantee business.*"

### Multifamily Segment

The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans and non-agency CMBS that we purchased for investment, our purchases of such multifamily mortgage loans for investment have declined significantly since 2010, and our purchases of CMBS have declined significantly since 2008. The only CMBS that we have purchased since 2008 have been senior, mezzanine, and interest-only tranches related to certain of our securitization transactions, and these purchases have not been significant. Currently, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization. We guarantee the senior tranches of these securitizations in Other Guarantee Transactions. Our Multifamily segment also issues Other Structured Securities, but does not issue REMIC securities. Our Multifamily segment also enters into other guarantee commitments for multifamily HFA bonds and housing revenue bonds held by third parties. Historically, we issued multifamily PCs, but this activity has been insignificant in recent years.

The multifamily property market is affected by local and regional economic factors, such as employment rates, construction cycles, and relative affordability of single-family home prices, all of which influence the supply and demand for multifamily properties and pricing for apartment rentals. Our multifamily loan volume is largely sourced through established institutional channels where we are generally providing post-construction financing to larger apartment project operators with established performance records.

Our lending decisions are largely based on the assessment of the property's ability to provide rents that will generate sufficient operating cash flows to support payment of debt service obligations as measured by the expected DSCR and the loan amount relative to the value of the property as measured by the LTV ratio. Multifamily mortgages generally are without recourse to the borrower (*i.e.*, the borrower is not personally liable for any deficiency remaining after foreclosure and sale of the property), except in the event of fraud or certain other specified types of default. Therefore, repayment of the mortgage depends on the ability of the underlying property to generate cash flows sufficient to cover the related debt obligations. That in turn depends on conditions in the local rental market, local and regional economic conditions, the physical condition of the property, the quality of property management, and the level of operating expenses.

Prior to 2010, our Multifamily segment also reflected results from our investments in LIHTC partnerships formed for the purpose of providing equity funding for affordable multifamily rental properties. In these investments, we provided equity contributions to partnerships designed to sponsor the development and ongoing operations for low- and moderate-income multifamily apartments. We planned to realize a return on our investment through reductions in income tax expense that result from federal income tax credits and the deductibility of operating losses generated by the partnerships. However, we no longer make investments in such partnerships because we do not expect to be able to use the underlying federal income tax credits or the operating losses generated from the partnerships as a reduction to our taxable income

because of our inability to generate sufficient taxable income or to sell these interests to third parties. See "NOTE 3: VARIABLE INTEREST ENTITIES" for additional information.

*Our Customers*

We acquire a significant portion of our multifamily mortgage loans from several large seller/servicers. For 2011, our top two multifamily sellers, CBRE Capital Markets, Inc. and NorthMarq Capital, LLC, each accounted for more than 10% of our multifamily purchase volume, and together accounted for approximately 32% of our multifamily purchase volume. Our top 10 multifamily lenders represented an aggregate of approximately 81% of our multifamily purchase volume for 2011.

A significant portion of our multifamily mortgage loans are serviced by several of our large customers. See "MD&A — RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk* — Seller/Servicers" for additional information.

*Our Competition*

Historically, our principal competitors have been Fannie Mae, FHA, and other financial institutions that retain or securitize multifamily mortgages, such as commercial and investment banks, dealers, thrift institutions, and insurance companies. During 2009, many of our competitors, other than Fannie Mae and FHA, significantly curtailed their activities in the multifamily mortgage business relative to their previous levels. Beginning in 2010, some market participants began to re-emerge in the multifamily market, and we have faced increased competition from some other institutional investors. We compete on the basis of price, products, structure and service.

*Underwriting Requirements and Quality Control Standards*

Our process and standards for underwriting multifamily mortgages differ from those used for single-family mortgages. Unlike single-family mortgages, we generally do not use a delegated underwriting process for the multifamily mortgages we purchase or securitize. Instead, we typically underwrite and evaluate each mortgage prior to purchase. This process includes review of third-party appraisals and cash flow analysis. Our underwriting standards focus on loan quality measurement based, in part, on the LTV ratio and DSCR at origination. The DSCR is one indicator of future credit performance. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation. Our standards for multifamily loans specify maximum original LTV ratio and minimum DSCR that vary based on the loan characteristics, such as loan type (new acquisition or supplemental financing), loan term (intermediate or longer-term), and loan features (interest-only or amortizing, fixed- or variable-rate). Since the beginning of 2009, our multifamily loans are generally underwritten with requirements for a maximum original LTV ratio of 80% and a DSCR of greater than 1.25. In certain circumstances, our standards for multifamily loans allow for certain types of loans to have an original LTV ratio over 80% and/or a DSCR of less than 1.25, typically where this will serve our mission and contribute to achieving our affordable housing goals. In cases where we commit to purchase or guarantee a permanent loan upon completion of construction or rehabilitation, we generally require additional credit enhancements, because underwriting for these loans typically requires estimates of future cash flows for calculating the DSCR that is expected after construction or rehabilitation is completed.

We issue other guarantee commitments under which we guarantee payments under multifamily mortgages that back tax-exempt bonds issued by state or local HFAs. In addition, we issue other guarantee commitments guaranteeing payments on securities backed by such bonds. We underwrite the mortgages in these cases in the same manner as for mortgages that we purchase.

Multifamily seller/servicers make representations and warranties to us about the mortgage and about certain information submitted to us in the underwriting process. We have the right to require that a seller/servicer repurchase a multifamily mortgage for which there has been a breach of representation or warranty. However, because of our evaluation of underwriting information for most multifamily properties prior to purchase, repurchases have been rare.

We generally require multifamily seller/servicers to service mortgage loans they have sold to us in order to mitigate potential losses. This includes property monitoring tasks beyond those typically performed by single-family servicers. We do not oversee servicing with respect to multifamily loans we have securitized (*i.e.*, those underlying our Other Guarantee Transactions) as that oversight task is performed by subordinated bondholders. For loans over $1 million and where we have servicing oversight, servicers must generally submit an annual assessment of the mortgaged property to us based on the servicer's analysis of financial and other information about the property. In situations where a borrower or property is in distress, the frequency of communications with the borrower may be increased. Because the activities of multifamily

seller/servicers are an important part of our loss mitigation process, we rate their performance regularly and may conduct on-site reviews of their servicing operations in an effort to confirm compliance with our standards.

For loans for which we oversee servicing, if a borrower is in distress, we may offer a workout option to the borrower. For example, we may modify the terms of a multifamily mortgage loan, which gives the borrower an opportunity to bring the loan current and retain ownership of the property. These arrangements are made with the expectation that we will recover our initial investment or minimize our losses. We do not enter into these arrangements in situations where we believe we would experience a loss in the future that is greater than or equal to the loss we would experience if we foreclosed on the property at the time of the agreement.

## Conservatorship and Related Matters

### Overview and Entry into Conservatorship

We have been operating under conservatorship, with FHFA acting as our conservator, since September 6, 2008. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition and results of operations.

On September 7, 2008, the then Secretary of the Treasury and the then Director of FHFA announced several actions taken by Treasury and FHFA regarding Freddie Mac and Fannie Mae. These actions included the execution of the Purchase Agreement, pursuant to which we issued to Treasury both senior preferred stock and a warrant to purchase common stock. At that time, FHFA set forth the purpose and goals of the conservatorship as follows: "The purpose of appointing the Conservator is to preserve and conserve the company's assets and property and to put the company in a sound and solvent condition. The goals of the conservatorship are to help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their mission, and mitigate the systemic risk that has contributed directly to the instability in the current market." We refer to the Purchase Agreement and the warrant as the "Treasury Agreements."

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist. We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near-term. We have no ability to predict the outcome of these deliberations. On February 2, 2012, the Administration announced that it expects to provide more detail concerning approaches to reform the U.S. housing finance market in the spring, and that it plans to begin exploring options for legislation more intensively with Congress. On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the conservatorships of Freddie Mac and Fannie Mae.

We receive substantial support from Treasury and FHFA, as our Conservator and regulator, and are dependent upon their continued support in order to continue operating our business. This support includes our ability to access funds from Treasury under the Purchase Agreement, which is critical to: (a) keeping us solvent; (b) allowing us to focus on our primary business objectives under conservatorship; and (c) avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions. During 2011, the Federal Reserve took several actions designed to support an economic recovery and maintain historically low interest rates, including resumption of purchases of agency securities, which impacted and will continue to impact the demand for and value of our PCs in the market.

Our annual dividend obligation on the senior preferred stock exceeds our annual historical earnings in all but one period. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will regularly generate net income or comprehensive income in excess of our annual dividends payable to Treasury. As a result, there is significant uncertainty as to our long-term financial sustainability.

For a description of certain risks to our business relating to the conservatorship and Treasury Agreements, see "RISK FACTORS."

### Supervision of Our Company During Conservatorship

Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director of Freddie Mac with respect to Freddie Mac and its assets, and succeeded to the title to all books, records and assets of Freddie Mac held by any other legal custodian or third party. Under conservatorship, we have additional heightened supervision and direction from our regulator, FHFA, which is also acting as our Conservator.

During the conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and to management to conduct, day-to-day operations so that the company can continue to operate in the ordinary course of

business. The directors serve on behalf of, and exercise authority as directed by, the Conservator. The Conservator retains the authority to withdraw or revise its delegations of authority at any time. The Conservator also retained certain significant authorities for itself, and did not delegate them to the Board. For more information on limitations on the Board's authority during conservatorship, see "DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE — Authority of the Board and Board Committees."

Because the Conservator succeeded to the powers, including voting rights, of our stockholders, who therefore do not currently have voting rights of their own, we do not expect to hold stockholders' meetings during the conservatorship, nor will we prepare or provide proxy statements for the solicitation of proxies.

We describe the powers of our Conservator in detail below under "Powers of the Conservator."

### *Impact of Conservatorship and Related Actions on Our Business*

We conduct our business subject to the direction of FHFA as our Conservator. While the conservatorship has benefited us through, for example, improved access to the debt markets because of the support we receive from Treasury, we are also subject to certain constraints on our business activities by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement.

While in conservatorship, we can, and have continued to, enter into and enforce contracts with third parties. The Conservator continues to direct the efforts of the Board of Directors and management to address and determine the strategic direction for the company. While the Conservator has delegated certain authority to management to conduct day-to-day operations, many management decisions are subject to review and approval by FHFA and Treasury. In addition, management frequently receives directions from FHFA on various matters involving day-to-day operations.

Our business objectives and strategies have in some cases been altered since we were placed into conservatorship, and may continue to change. Based on our charter, other legislation, public statements from Treasury and FHFA officials and guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives, including:

- minimizing our credit losses;

- conserving assets;

- providing liquidity, stability and affordability in the mortgage market;

- continuing to provide additional assistance to the struggling housing and mortgage markets;

- managing to a positive stockholders' equity and reducing the need to draw funds from Treasury pursuant to the Purchase Agreement; and

- protecting the interests of taxpayers.

These objectives create conflicts in strategic and day-to-day decision making that will likely lead to suboptimal outcomes for one or more, or possibly all, of these objectives. We regularly receive direction from our Conservator on how to pursue these objectives, including direction to focus our efforts on assisting homeowners in the housing and mortgage markets. Given the important role the Administration and our Conservator have placed on Freddie Mac in addressing housing and mortgage market conditions and our public mission, we may be required to take additional actions that could have a negative impact on our business, operating results or financial condition. Because we expect many of these objectives and related initiatives to result in significant costs, there is significant uncertainty as to the ultimate impact these initiatives will have on our future capital or liquidity needs. Certain of these objectives are expected to help homeowners and the mortgage market and may help to mitigate future credit losses. However, some of our initiatives are expected to have an adverse impact on our near- and long-term financial results.

Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a manner that serves our public mission and other non-financial objectives, but may not contribute to profitability. Our efforts to help struggling homeowners and the mortgage market, in line with our mission, may help to mitigate credit losses, but in some cases may increase our expenses or require us to forego revenue opportunities in the near term. As a result, in some cases the objective of reducing the need to draw funds from Treasury will be subordinated as we provide this assistance. There is significant uncertainty as to the ultimate impact that our efforts to aid the housing and mortgage markets will have on our future capital or liquidity needs and we cannot estimate whether, and the extent to which, costs we incur in the near term as a result of these efforts, which for the most part we are not reimbursed for, will be offset by the prevention or reduction of potential future costs.

The Conservator and Treasury also did not authorize us to engage in certain business activities and transactions, including the purchase or sale of certain assets, which we believe might have had a beneficial impact on our results of operations or financial condition, if executed. Our inability to execute such transactions may adversely affect our profitability, and thus contribute to our need to draw additional funds from Treasury.

The Conservator has stated that it is taking actions in support of the objectives of a gradual transition to greater private capital participation in housing finance and greater distribution of risk to participants other than the government.

These actions and objectives create risks and uncertainties that we discuss in "RISK FACTORS." For more information on the impact of conservatorship and our current business objectives, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" and "Executive Summary — *Our Primary Business Objectives.*"

### Limits on Investment Activity and Our Mortgage-Related Investments Portfolio

The conservatorship has significantly impacted our investment activity. Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $729 billion as of December 31, 2011 and may not exceed $656.1 billion as of December 31, 2012. FHFA has indicated that such portfolio reduction targets should be viewed as minimum reductions and has encouraged us to reduce the mortgage-related investments portfolio at a faster rate than required, consistent with FHFA guidance, safety and soundness and the goal of conserving and preserving assets. We are also subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury. We are working with FHFA to identify ways to prudently accelerate the rate of contraction of the portfolio.

The table below presents the UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation.

### Table 4 — Mortgage-Related Investments Portfolio[1]

| | December 31, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| Investments segment — Mortgage investments portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $449,273 | $481,677 |
| Single-family Guarantee segment — Single-family unsecuritized mortgage loans[2] . . . . . . . . . . . . . . . . | 62,469 | 69,766 |
| Multifamily segment — Mortgage investments portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 141,571 | 145,431 |
| Total mortgage-related investments portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $653,313 | $696,874 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Represents unsecuritized seriously delinquent single-family loans managed by the Single-family Guarantee segment.

FHFA has stated that we will not be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio. FHFA also stated that, given the size of our current mortgage-related investments portfolio and the potential volume of delinquent mortgages to be removed from PC pools, it expects that any net additions to our mortgage-related investments portfolio would be related to that activity. We expect that our holdings of unsecuritized single-family loans will continue to increase during 2012 due to the revisions to HARP, which will result in our purchase of mortgage loans with LTV ratios greater than 125%, as we have not yet implemented a securitization process for such loans.

Our mortgage-related investments portfolio includes assets that are less liquid than agency securities, including unsecuritized performing single-family mortgage loans, multifamily mortgage loans, CMBS, and housing revenue bonds. Our less liquid assets collectively represented approximately 32% of the UPB of the portfolio at December 31, 2011, as compared to 30% as of December 31, 2010. Our mortgage-related investments portfolio also includes illiquid assets, including unsecuritized seriously delinquent and modified single-family mortgage loans which we removed from PC trusts, and our investments in non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans. Our illiquid assets collectively represented approximately 29% of the UPB of the portfolio at December 31, 2011, as compared to 27% as of December 31, 2010. The changing composition of our mortgage-related investments portfolio to a greater proportion of illiquid assets may influence our decisions regarding funding and hedging. The description above of the liquidity of our assets is based on our own internal expectations given current market conditions. Changes in market conditions could continue to affect the liquidity of our assets at any given time.

### Powers of the Conservator

Under the GSE Act, the conservatorship provisions applicable to Freddie Mac are based generally on federal banking law. As discussed below, FHFA has broad powers when acting as our conservator. For more information on the GSE Act, see "Regulation and Supervision."

*General Powers of the Conservator*

Upon its appointment, the Conservator immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director of Freddie Mac with respect to Freddie Mac and its assets. The Conservator also succeeded to the title to all books, records and assets of Freddie Mac held by any other legal custodian or third party.

Under the GSE Act, the Conservator may take any actions it determines are necessary and appropriate to carry on our business, support public mission objectives, and preserve and conserve our assets and property. The Conservator's powers include the ability to transfer or sell any of our assets or liabilities (subject to certain limitations and post-transfer notice provisions for transfers of qualified financial contracts, as defined below under "Special Powers of the Conservator — *Security Interests Protected; Exercise of Rights Under Qualified Financial Contracts*") without any approval, assignment of rights or consent of any party. The GSE Act, however, provides that mortgage loans and mortgage-related assets that have been transferred to a Freddie Mac securitization trust must be held for the beneficial owners of the trust and cannot be used to satisfy our general creditors.

Under the GSE Act, in connection with any sale or disposition of our assets, the Conservator must conduct its operations to maximize the NPV return from the sale or disposition of such assets, to minimize the amount of any loss realized in the resolution of cases, and to ensure adequate competition and fair and consistent treatment of offerors. The Conservator is required to maintain a full accounting of the conservatorship and make its reports available upon request to stockholders and members of the public.

We remain liable for all of our obligations relating to our outstanding debt and mortgage-related securities. FHFA has stated that our obligations will be paid in the normal course of business during the conservatorship.

*Special Powers of the Conservator*

*Disaffirmance and Repudiation of Contracts*

Under the GSE Act, the Conservator may disaffirm or repudiate contracts (subject to certain limitations for qualified financial contracts) that we entered into prior to its appointment as Conservator if it determines, in its sole discretion, that performance of the contract is burdensome and that disaffirmance or repudiation of the contract promotes the orderly administration of our affairs. The GSE Act requires FHFA to exercise its right to disaffirm or repudiate most contracts within a reasonable period of time after its appointment as Conservator. In a final rule published in June 2011, FHFA defines a reasonable period of time following appointment of a conservator or receiver to be 18 months. The Conservator has advised us that it has no intention of repudiating any guarantee obligation relating to Freddie Mac's mortgage-related securities because it views repudiation as incompatible with the goals of the conservatorship. We can, and have continued to, enter into, perform and enforce contracts with third parties.

*Limitations on Enforcement of Contractual Rights by Counterparties*

The GSE Act provides that the Conservator may enforce most contracts entered into by us, notwithstanding any provision of the contract that provides for termination, default, acceleration, or exercise of rights upon the appointment of, or the exercise of rights or powers by, a conservator.

*Security Interests Protected; Exercise of Rights Under Qualified Financial Contracts*

Notwithstanding the Conservator's powers under the GSE Act described above, the Conservator must recognize legally enforceable or perfected security interests, except where such an interest is taken in contemplation of our insolvency or with the intent to hinder, delay or defraud us or our creditors. In addition, the GSE Act provides that no person will be stayed or prohibited from exercising specified rights in connection with qualified financial contracts, including termination or acceleration (other than solely by reason of, or incidental to, the appointment of the Conservator), rights of offset, and rights under any security agreement or arrangement or other credit enhancement relating to such contract. The term qualified financial contract means any securities contract, commodity contract, forward contract, repurchase agreement, swap agreement, and any similar agreement as determined by FHFA by regulation, resolution or order.

*Avoidance of Fraudulent Transfers*

Under the GSE Act, the Conservator may avoid, or refuse to recognize, a transfer of any property interest of Freddie Mac or of any of our debtors, and also may avoid any obligation incurred by Freddie Mac or by any debtor of Freddie Mac, if the transfer or obligation was made: (a) within five years of September 6, 2008; and (b) with the intent to hinder, delay, or defraud Freddie Mac, FHFA, the Conservator or, in the case of a transfer in connection with a qualified financial

contract, our creditors. To the extent a transfer is avoided, the Conservator may recover, for our benefit, the property or, by court order, the value of that property from the initial or subsequent transferee, other than certain transfers that were made for value, including satisfaction or security of a present or antecedent debt, and in good faith. These rights are superior to any rights of a trustee or any other party, other than a federal agency, under the U.S. bankruptcy code.

*Modification of Statutes of Limitations*

Under the GSE Act, notwithstanding any provision of any contract, the statute of limitations with regard to any action brought by the Conservator is: (a) for claims relating to a contract, the longer of six years or the applicable period under state law; and (b) for tort claims, the longer of three years or the applicable period under state law, in each case, from the later of September 6, 2008 or the date on which the cause of action accrues. In addition, notwithstanding the state law statute of limitation for tort claims, the Conservator may bring an action for any tort claim that arises from fraud, intentional misconduct resulting in unjust enrichment, or intentional misconduct resulting in substantial loss to us, if the state's statute of limitations expired not more than five years before September 6, 2008.

*Suspension of Legal Actions*

Under the GSE Act, in any judicial action or proceeding to which we are or become a party, the Conservator may request, and the applicable court must grant, a stay for a period not to exceed 45 days.

*Treatment of Breach of Contract Claims*

Under the GSE Act, any final and unappealable judgment for monetary damages against the Conservator for breach of an agreement executed or approved in writing by the Conservator will be paid as an administrative expense of the Conservator.

*Attachment of Assets and Other Injunctive Relief*

Under the GSE Act, the Conservator may seek to attach assets or obtain other injunctive relief without being required to show that any injury, loss or damage is irreparable and immediate.

*Subpoena Power*

The GSE Act provides the Conservator, with the approval of the Director of FHFA, with subpoena power for purposes of carrying out any power, authority or duty with respect to Freddie Mac.

**Treasury Agreements**

The Reform Act granted Treasury temporary authority (through December 31, 2009) to purchase any obligations and other securities issued by Freddie Mac on such terms and conditions and in such amounts as Treasury may determine, upon mutual agreement between Treasury and Freddie Mac. Pursuant to this authority, Treasury entered into several agreements with us, as described below.

<u>*Purchase Agreement and Related Issuance of Senior Preferred Stock and Common Stock Warrant*</u>

*Purchase Agreement*

On September 7, 2008, we, through FHFA, in its capacity as Conservator, and Treasury entered into the Purchase Agreement. The Purchase Agreement was subsequently amended and restated on September 26, 2008, and further amended on May 6, 2009 and December 24, 2009. Pursuant to the Purchase Agreement, on September 8, 2008 we issued to Treasury: (a) one million shares of Variable Liquidation Preference Senior Preferred Stock (with an initial liquidation preference of $1 billion), which we refer to as the senior preferred stock; and (b) a warrant to purchase, for a nominal price, shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis at the time the warrant is exercised, which we refer to as the warrant. The terms of the senior preferred stock and warrant are summarized in separate sections below. We did not receive any cash proceeds from Treasury as a result of issuing the senior preferred stock or the warrant. However, deficits in our net worth have made it necessary for us to make substantial draws on Treasury's funding commitment under the Purchase Agreement. As a result, the aggregate liquidation preference of the senior preferred stock has increased from $1.0 billion as of September 8, 2008 to $72.2 billion at December 31, 2011 (this figure reflects the receipt of funds requested in the draw to address our net worth deficit as of September 30, 2011). Our dividend obligation on the senior preferred stock, based on that liquidation preference, is $7.22 billion, which exceeds our annual earnings in all but one period.

The senior preferred stock and warrant were issued to Treasury as an initial commitment fee in consideration of the initial commitment from Treasury to provide up to $100 billion (subsequently increased to $200 billion) in funds to us

<div align="center">28</div>

<div align="right">*Freddie Mac*</div>

under the terms and conditions set forth in the Purchase Agreement. Under the Purchase Agreement, the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011 and 2012. If we do not have a capital surplus (*i.e.*, positive net worth) at the end of 2012, then the amount of funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 31, 2009). In the event we have a capital surplus at the end of 2012, then the amount of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as follows:

- If the year-end 2012 surplus is lower than the cumulative draws needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

- If the year-end 2012 surplus exceeds the cumulative draws for 2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws.

In addition to the issuance of the senior preferred stock and warrant, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury. Under the Purchase Agreement, the fee is to be determined in an amount mutually agreed to by us and Treasury with reference to the market value of Treasury's funding commitment as then in effect, and reset every five years. We may elect to pay the quarterly commitment fee in cash or add the amount of the fee to the liquidation preference of the senior preferred stock. Treasury may waive the quarterly commitment fee for up to one year at a time, in its sole discretion, based on adverse conditions in the U.S. mortgage market. The fee was originally scheduled to begin accruing on January 1, 2010 (with the first fee payable on March 31, 2010), but was delayed until January 1, 2011 (with the first fee payable on March 31, 2011) pursuant to an amendment to the Purchase Agreement. Treasury waived the fee for all quarters of 2011 and the first quarter of 2012, but has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. Treasury stated that it would reevaluate whether the quarterly commitment fee should be set in the second quarter of 2012. Absent Treasury waiving the commitment fee in the second quarter of 2012, this quarterly commitment fee will begin accruing on April 1, 2012 and must be paid each quarter for as long as the Purchase Agreement is in effect. The amount of the fee has not yet been determined and could be substantial.

The Purchase Agreement provides that, on a quarterly basis, we generally may draw funds up to the amount, if any, by which our total liabilities exceed our total assets, as reflected on our GAAP balance sheet for the applicable fiscal quarter (referred to as the deficiency amount), provided that the aggregate amount funded under the Purchase Agreement may not exceed Treasury's commitment. The Purchase Agreement provides that the deficiency amount will be calculated differently if we become subject to receivership or other liquidation process. The deficiency amount may be increased above the otherwise applicable amount upon our mutual written agreement with Treasury. In addition, if the Director of FHFA determines that the Director will be mandated by law to appoint a receiver for us unless our capital is increased by receiving funds under the commitment in an amount up to the deficiency amount (subject to the maximum amount that may be funded under the agreement), then FHFA, in its capacity as our Conservator, may request that Treasury provide funds to us in such amount. The Purchase Agreement also provides that, if we have a deficiency amount as of the date of completion of the liquidation of our assets, we may request funds from Treasury in an amount up to the deficiency amount (subject to the maximum amount that may be funded under the agreement). Any amounts that we draw under the Purchase Agreement will be added to the liquidation preference of the senior preferred stock. No additional shares of senior preferred stock are required to be issued under the Purchase Agreement. As a result, the expiration on December 31, 2009 of Treasury's temporary authority to purchase obligations and other securities issued by Freddie Mac did not affect Treasury's funding commitment under the Purchase Agreement.

Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all. The amounts payable for dividends on the senior preferred stock are substantial and will have an adverse impact on our financial position and net worth. The payment of dividends on our senior preferred stock in cash reduces our net worth. For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury. It is unlikely that, over the long-term, we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury, although we may experience period-to-period variability in earnings and comprehensive income. As a result, we expect to make additional draws in future periods.

The Purchase Agreement provides that the Treasury's funding commitment will terminate under any of the following circumstances: (a) the completion of our liquidation and fulfillment of Treasury's obligations under its funding commitment at that time; (b) the payment in full of, or reasonable provision for, all of our liabilities (whether or not

contingent, including mortgage guarantee obligations); and (c) the funding by Treasury of the maximum amount of the commitment under the Purchase Agreement. In addition, Treasury may terminate its funding commitment and declare the Purchase Agreement null and void if a court vacates, modifies, amends, conditions, enjoins, stays or otherwise affects the appointment of the Conservator or otherwise curtails the Conservator's powers. Treasury may not terminate its funding commitment under the Purchase Agreement solely by reason of our being in conservatorship, receivership or other insolvency proceeding, or due to our financial condition or any adverse change in our financial condition.

The Purchase Agreement provides that most provisions of the agreement may be waived or amended by mutual written agreement of the parties; however, no waiver or amendment of the agreement is permitted that would decrease Treasury's aggregate funding commitment or add conditions to Treasury's funding commitment if the waiver or amendment would adversely affect in any material respect the holders of our debt securities or Freddie Mac mortgage guarantee obligations.

In the event of our default on payments with respect to our debt securities or Freddie Mac mortgage guarantee obligations, if Treasury fails to perform its obligations under its funding commitment and if we and/or the Conservator are not diligently pursuing remedies in respect of that failure, the holders of these debt securities or Freddie Mac mortgage guarantee obligations may file a claim in the United States Court of Federal Claims for relief requiring Treasury to fund to us the lesser of: (a) the amount necessary to cure the payment defaults on our debt and Freddie Mac mortgage guarantee obligations; and (b) the lesser of: (i) the deficiency amount; and (ii) the maximum amount of the commitment less the aggregate amount of funding previously provided under the commitment. Any payment that Treasury makes under those circumstances will be treated for all purposes as a draw under the Purchase Agreement that will increase the liquidation preference of the senior preferred stock.

The Purchase Agreement has an indefinite term and can terminate only in limited circumstances, which do not include the end of the conservatorship. The Purchase Agreement therefore could continue after the conservatorship ends.

*Issuance of Senior Preferred Stock*

Shares of the senior preferred stock have a par value of $1, and have a stated value and initial liquidation preference equal to $1,000 per share. The liquidation preference of the senior preferred stock is subject to adjustment. Dividends that are not paid in cash for any dividend period will accrue and be added to the liquidation preference of the senior preferred stock. In addition, any amounts Treasury pays to us pursuant to its funding commitment under the Purchase Agreement and any quarterly commitment fees that are not paid in cash to Treasury nor waived by Treasury will be added to the liquidation preference of the senior preferred stock. As described below, we may make payments to reduce the liquidation preference of the senior preferred stock in limited circumstances.

Treasury, as the holder of the senior preferred stock, is entitled to receive, when, as and if declared by our Board of Directors, cumulative quarterly cash dividends at the annual rate of 10% per year on the then-current liquidation preference of the senior preferred stock. Through December 31, 2011, we have paid cash dividends of $16.5 billion at the direction of the Conservator. If at any time we fail to pay cash dividends in a timely manner, then immediately following such failure and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be 12% per year.

The senior preferred stock is senior to our common stock and all other outstanding series of our preferred stock, as well as any capital stock we issue in the future, as to both dividends and rights upon liquidation. The senior preferred stock provides that we may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the senior preferred stock unless: (a) full cumulative dividends on the outstanding senior preferred stock (including any unpaid dividends added to the liquidation preference) have been declared and paid in cash; and (b) all amounts required to be paid with the net proceeds of any issuance of capital stock for cash (as described in the following paragraph) have been paid in cash. Shares of the senior preferred stock are not convertible. Shares of the senior preferred stock have no general or special voting rights, other than those set forth in the certificate of designation for the senior preferred stock or otherwise required by law. The consent of holders of at least two-thirds of all outstanding shares of senior preferred stock is generally required to amend the terms of the senior preferred stock or to create any class or series of stock that ranks prior to or on parity with the senior preferred stock.

We are not permitted to redeem the senior preferred stock prior to the termination of Treasury's funding commitment set forth in the Purchase Agreement; however, we are permitted to pay down the liquidation preference of the outstanding shares of senior preferred stock to the extent of: (a) accrued and unpaid dividends previously added to the liquidation

preference and not previously paid down; and (b) quarterly commitment fees previously added to the liquidation preference and not previously paid down. In addition, if we issue any shares of capital stock for cash while the senior preferred stock is outstanding, the net proceeds of the issuance must be used to pay down the liquidation preference of the senior preferred stock; however, the liquidation preference of each share of senior preferred stock may not be paid down below $1,000 per share prior to the termination of Treasury's funding commitment. Following the termination of Treasury's funding commitment, we may pay down the liquidation preference of all outstanding shares of senior preferred stock at any time, in whole or in part. If, after termination of Treasury's funding commitment, we pay down the liquidation preference of each outstanding share of senior preferred stock in full, the shares will be deemed to have been redeemed as of the payment date.

*Issuance of Common Stock Warrant*

The warrant gives Treasury the right to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis on the date of exercise. The warrant may be exercised in whole or in part at any time on or before September 7, 2028, by delivery to us of: (a) a notice of exercise; (b) payment of the exercise price of $0.00001 per share; and (c) the warrant. If the market price of one share of our common stock is greater than the exercise price, then, instead of paying the exercise price, Treasury may elect to receive shares equal to the value of the warrant (or portion thereof being canceled) pursuant to the formula specified in the warrant. Upon exercise of the warrant, Treasury may assign the right to receive the shares of common stock issuable upon exercise to any other person.

As of March 9, 2012, Treasury has not exercised the warrant.

<u>*Covenants Under Treasury Agreements*</u>

The Purchase Agreement and warrant contain covenants that significantly restrict our business activities. For example, as a result of these covenants, we can no longer obtain additional equity financing (other than pursuant to the Purchase Agreement) and we are limited in the amount and type of debt financing we may obtain.

*Purchase Agreement Covenants*

The Purchase Agreement provides that, until the senior preferred stock is repaid or redeemed in full, we may not, without the prior written consent of Treasury:

- declare or pay any dividend (preferred or otherwise) or make any other distribution with respect to any Freddie Mac equity securities (other than with respect to the senior preferred stock or warrant);

- redeem, purchase, retire or otherwise acquire any Freddie Mac equity securities (other than the senior preferred stock or warrant);

- sell or issue any Freddie Mac equity securities (other than the senior preferred stock, the warrant and the common stock issuable upon exercise of the warrant and other than as required by the terms of any binding agreement in effect on the date of the Purchase Agreement);

- terminate the conservatorship (other than in connection with a receivership);

- sell, transfer, lease or otherwise dispose of any assets, other than dispositions for fair market value: (a) to a limited life regulated entity (in the context of a receivership); (b) of assets and properties in the ordinary course of business, consistent with past practice; (c) in connection with our liquidation by a receiver; (d) of cash or cash equivalents for cash or cash equivalents; or (e) to the extent necessary to comply with the covenant described below relating to the reduction of our mortgage-related investments portfolio;

- issue any subordinated debt;

- enter into a corporate reorganization, recapitalization, merger, acquisition or similar event; or

- engage in transactions with affiliates unless the transaction is: (a) pursuant to the Purchase Agreement, the senior preferred stock or the warrant; (b) upon arm's length terms; or (c) a transaction undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence on the date of the Purchase Agreement.

These covenants also apply to our subsidiaries.

The Purchase Agreement also provides that we may not own mortgage assets with UPB in excess of: (a) $900 billion on December 31, 2009; or (b) on December 31 of each year thereafter, 90% of the aggregate amount of mortgage assets we are permitted to own as of December 31 of the immediately preceding calendar year, provided that we are not

required to own less than $250 billion in mortgage assets. Under the Purchase Agreement, we also may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are permitted to own on December 31 of the immediately preceding calendar year. The mortgage asset and indebtedness limitations are determined without giving effect to the changes to the accounting guidance for transfers of financial assets and consolidation of VIEs, under which we consolidated our single-family PC trusts and certain of our Other Guarantee Transactions in our financial statements as of January 1, 2010.

In addition, the Purchase Agreement provides that we may not enter into any new compensation arrangements or increase amounts or benefits payable under existing compensation arrangements of any named executive officer or other executive officer (as such terms are defined by SEC rules) without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury.

As of March 9, 2012, we believe we were in compliance with the covenants under the Purchase Agreement.

*Warrant Covenants*

The warrant we issued to Treasury includes, among others, the following covenants: (a) we may not permit any of our significant subsidiaries to issue capital stock or equity securities, or securities convertible into or exchangeable for such securities, or any stock appreciation rights or other profit participation rights; (b) we may not take any action to avoid the observance or performance of the terms of the warrant and we must take all actions necessary or appropriate to protect Treasury's rights against impairment or dilution; and (c) we must provide Treasury with prior notice of specified actions relating to our common stock, such as setting a record date for a dividend payment, granting subscription or purchase rights, authorizing a recapitalization, reclassification, merger or similar transaction, commencing a liquidation of the company or any other action that would trigger an adjustment in the exercise price or number or amount of shares subject to the warrant.

As of March 9, 2012, we believe we were in compliance with the covenants under the warrant.

### Effect of Conservatorship and Treasury Agreements on Existing Stockholders

The conservatorship, the Purchase Agreement and the senior preferred stock and warrant issued to Treasury have materially limited the rights of our common and preferred stockholders (other than Treasury as holder of the senior preferred stock) and had a number of adverse effects on our common and preferred stockholders. See "RISK FACTORS — Conservatorship and Related Matters — *The conservatorship and investment by Treasury has had, and will continue to have, a material adverse effect on our common and preferred stockholders.*"

As described above, the conservatorship and Treasury Agreements also impact our business in ways that indirectly affect our common and preferred stockholders. By their terms, the Purchase Agreement, senior preferred stock and warrant will continue to exist even if we are released from the conservatorship. For a description of the risks to our business relating to the conservatorship and Treasury Agreements, see "RISK FACTORS."

## Regulation and Supervision

In addition to our oversight by FHFA as our Conservator, we are subject to regulation and oversight by FHFA under our charter and the GSE Act, which was modified substantially by the Reform Act. We are also subject to certain regulation by other government agencies.

### Federal Housing Finance Agency

FHFA is an independent agency of the federal government responsible for oversight of the operations of Freddie Mac, Fannie Mae and the FHLBs. The Director of FHFA is appointed by the President and confirmed by the Senate for a five-year term, removable only for cause. In the discussion below, we refer to Freddie Mac and Fannie Mae as the "enterprises."

The Federal Housing Finance Oversight Board, or the Oversight Board, is responsible for advising the Director of FHFA with respect to overall strategies and policies. The Oversight Board consists of the Director of FHFA as Chairperson, the Secretary of the Treasury, the Chair of the SEC and the Secretary of HUD.

Under the GSE Act, FHFA has safety and soundness authority that is comparable to, and in some respects, broader than that of the federal banking agencies. The GSE Act also provides FHFA with powers that, even if we were not in conservatorship, include the authority to raise capital levels above statutory minimum levels, regulate the size and content of our mortgage-related investments portfolio, and approve new mortgage products.

FHFA is responsible for implementing the various provisions of the GSE Act that were added by the Reform Act. In general, we remain subject to existing regulations, orders and determinations until new ones are issued or made.

*Receivership*

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are less than our obligations for a period of 60 days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has also advised us that, if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination.

In addition, we could be put into receivership at the discretion of the Director of FHFA at any time for other reasons, including conditions that FHFA has already asserted existed at the time the then Director of FHFA placed us into conservatorship. These include: (a) a substantial dissipation of assets or earnings due to unsafe or unsound practices; (b) the existence of an unsafe or unsound condition to transact business; (c) an inability to meet our obligations in the ordinary course of business; (d) a weakening of our condition due to unsafe or unsound practices or conditions; (e) critical undercapitalization; (f) the likelihood of losses that will deplete substantially all of our capital; or (g) by consent.

On June 20, 2011, FHFA published a final rule that addresses conservatorship and receivership operations of Freddie Mac, Fannie Mae and the FHLBs. The final rule establishes a framework to be used by FHFA when acting as conservator or receiver, supplementing and clarifying statutory authorities. Among other provisions, the final rule indicates that FHFA will not permit payment of securities litigation claims during conservatorship and that claims by current or former shareholders arising as a result of their status as shareholders would receive the lowest priority of claim in receivership. In addition, the final rule indicates that administrative expenses of the conservatorship will also be deemed to be administrative expenses of a subsequent receivership and that capital distributions may not be made during conservatorship, except as specified in the final rule.

*Capital Standards*

FHFA has suspended capital classification of us during conservatorship in light of the Purchase Agreement. The existing statutory and FHFA-directed regulatory capital requirements are not binding during the conservatorship. We continue to provide our submission to FHFA on minimum capital. FHFA continues to publish relevant capital figures (minimum capital requirement, core capital, and GAAP net worth) but does not publish our critical capital, risk-based capital or subordinated debt levels during conservatorship.

On October 9, 2008, FHFA also announced that it will engage in rulemaking to revise our minimum capital and risk-based capital requirements. The GSE Act provides that FHFA may increase minimum capital levels from the existing statutory percentages either by regulation or on a temporary basis by order. On March 3, 2011, FHFA issued a final rule setting forth procedures and standards for such a temporary increase in minimum capital levels. FHFA may also, by regulation or order, establish capital or reserve requirements with respect to any product or activity of an enterprise, as FHFA considers appropriate. In addition, under the GSE Act, FHFA must, by regulation, establish risk-based capital requirements to ensure the enterprises operate in a safe and sound manner, maintaining sufficient capital and reserves to support the risks that arise in their operations and management. In developing the new risk-based capital requirements, FHFA is not bound by the risk-based capital standards in effect prior to the amendment of the GSE Act by the Reform Act.

Our regulatory minimum capital is a leverage-based measure that is generally calculated based on GAAP and reflects a 2.50% capital requirement for on-balance sheet assets and 0.45% capital requirement for off-balance sheet obligations. Pursuant to regulatory guidance from FHFA, our minimum capital requirement was not automatically affected by our January 1, 2010 adoption of amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs. Specifically, upon adoption of this accounting guidance, FHFA directed us, for purposes of minimum capital, to continue reporting our PCs held by third parties and other aggregate off-balance sheet obligations using a 0.45% capital requirement. Notwithstanding this guidance, FHFA reserves the authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities.

For additional information, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Capital Resources" and "NOTE 15: REGULATORY CAPITAL." Also, see "RISK FACTORS — Legal and Regulatory Risks" for more information.

### New Products

The GSE Act requires the enterprises to obtain the approval of FHFA before initially offering any product, subject to certain exceptions. The GSE Act provides for a public comment process on requests for approval of new products. FHFA may temporarily approve a product without soliciting public comment if delay would be contrary to the public interest. FHFA may condition approval of a product on specific terms, conditions and limitations. The GSE Act also requires the enterprises to provide FHFA with written notice of any new activity that we or Fannie Mae consider not to be a product.

On July 2, 2009, FHFA published an interim final rule on prior approval of new products, implementing the new product provisions for us and Fannie Mae in the GSE Act. The rule establishes a process for Freddie Mac and Fannie Mae to provide prior notice to the Director of FHFA of a new activity and, if applicable, to obtain prior approval from the Director if the new activity is determined to be a new product. On August 31, 2009, Freddie Mac and Fannie Mae filed joint public comments on the interim final rule with FHFA. FHFA has stated that permitting us to engage in new products is inconsistent with the goals of conservatorship and has instructed us not to submit such requests under the interim final rule. This could have an adverse effect on our business and profitability in future periods. We cannot currently predict when or if FHFA will permit us to engage in new products under the interim final rule, nor when the rule will be finalized.

### Affordable Housing Goals

We are subject to annual affordable housing goals. In light of these housing goals, we may make adjustments to our mortgage loan sourcing and purchase strategies, which could further increase our credit losses. These strategies could include entering into some purchase and securitization transactions with lower expected economic returns than our typical transactions. We at times relax some of our underwriting criteria to obtain goal-qualifying mortgage loans and make additional investments in higher risk mortgage loan products that we believe are more likely to serve the borrowers targeted by the goals, but have not done so to the same extent since 2010.

If the Director of FHFA finds that we failed to meet a housing goal and that achievement of the housing goal was feasible, the GSE Act states that the Director may require the submission of a housing plan with respect to the housing goal for approval by the Director. The housing plan must describe the actions we would take to achieve the unmet goal in the future. FHFA has the authority to take actions against us, including issuing a cease and desist order or assessing civil money penalties, if we: (a) fail to submit a required housing plan or fail to make a good faith effort to comply with a plan approved by FHFA; or (b) fail to submit certain data relating to our mortgage purchases, information or reports as required by law. See "RISK FACTORS — Legal and Regulatory Risks — *We may make certain changes to our business in an attempt to meet the housing goals and subgoals set for us by FHFA that may increase our losses.*"

Effective beginning calendar year 2010, the Reform Act requires that FHFA establish, by regulation, four single-family housing goals, one multifamily special affordable housing goal and requirements relating to multifamily housing for very low-income families. Our housing goals for 2010 and 2011, as established by FHFA, are described below. FHFA has not yet established our housing goals for 2012.

#### Affordable Housing Goals for 2010 and 2011 and Results for 2010

On September 14, 2010, FHFA published in the Federal Register a final rule establishing new affordable housing goals for Freddie Mac and Fannie Mae for 2010 and 2011. The final rule was effective on October 14, 2010. The rule establishes four goals and one subgoal for single-family owner-occupied housing, one multifamily special affordable housing goal, and one multifamily special affordable housing subgoal. Three of the single-family housing goals and the subgoal target purchase money mortgages for: (a) low-income families; (b) very low-income families; and/or (c) families that reside in low-income areas. The single-family housing goals also include one that targets refinancing mortgages for low-income families. The multifamily special affordable housing goal targets multifamily rental housing affordable to low-income families. The multifamily special affordable housing subgoal targets multifamily rental housing affordable to very low-income families.

The single-family goals are expressed as a percentage of the total number of eligible mortgages underlying our total single-family mortgage purchases. The multifamily goals are expressed in terms of minimum numbers of units financed.

With respect to the single-family goals, the rule includes: (a) an assessment of performance as compared to the actual share of the market that meets the criteria for each goal; and (b) a benchmark level to measure performance. Where our performance on a single-family goal falls short of the benchmark for a goal, we still could achieve the goal if our performance meets or exceeds the actual share of the market that meets the criteria for the goal for that year. For example, if the actual market share of mortgages to low-income families relative to all mortgages originated to finance

owner-occupied single-family properties is lower than the 27% benchmark rate, we would still satisfy this goal if we achieve that actual market percentage.

The rule makes a number of changes to the previous counting methods for goals credit, including prohibiting housing goals credit for purchases of private-label securities. However, the rule allows credit under the low-income refinance goal for permanent MHA Program loan modifications. The rule also states that FHFA does not intend for the enterprises to undertake economically adverse or high-risk activities in support of the goals, nor does it intend for the enterprises' state of conservatorship to be a justification for withdrawing support from these important market segments.

Our housing goals for 2010 and 2011 and results for 2010 are set forth in the table below.

**Table 5 — Affordable Housing Goals for 2010 and 2011 and Results for 2010**

| | Goals for 2010 and 2011 | Market Level for 2010[1] | Results for 2010[2] |
|---|---|---|---|
| Single-family purchase money goals (benchmark levels): | | | |
| Low-income | 27% | 27.2% | 26.8% |
| Very low-income | 8% | 8.1% | 7.9% |
| Low-income areas[3] | 24% | 24.0% | 23.0% |
| Low-income areas subgoal | 13% | 12.1% | 10.4% |
| Single-family refinance low-income goal (benchmark level) | 21% | 20.2% | 22.0% |
| Multifamily low-income goal (in units) | 161,250 | N/A | 161,500 |
| Multifamily low-income subgoal (in units) | 21,000 | N/A | 29,656 |

(1) Determined by FHFA based on its analysis of market data for 2010.
(2) In February 2012, at the direction of FHFA, we revised our single-family results for 2010 to exclude mortgages underlying certain HFA bonds.
(3) FHFA will annually set the benchmark level for the low-income areas goal based on the benchmark level for the low-income areas subgoal, plus an adjustment factor reflecting the additional incremental share of mortgages for moderate-income families in designated disaster areas in the most recent year for which such data is available. For 2010 and 2011, FHFA set the benchmark level for the low-income areas goal at 24% for both periods.

We previously reported that we did not achieve the benchmark levels for the single-family low-income areas goal and the related low-income areas subgoal for 2010 and that we did achieve the benchmark levels for the single-family low-income purchase and very low-income purchase goals. In February 2012, at the direction of FHFA, we revised our single-family results for 2010 to exclude mortgages underlying certain HFA bonds. FHFA determined that the resulting small shortfalls were not sufficient to require reopening its previous determination that the single-family low-income purchase and very low-income purchase goals had been met. FHFA has informed us that, given that 2010 is the first year under which FHFA utilized the benchmark or market level for the housing goals and that we continue to operate under conservatorship, FHFA will not be requiring housing plans for goals that we did not achieve.

We expect to report our performance with respect to the 2011 affordable housing goals in March 2012. At this time, based on preliminary information, we believe we met the single-family refinance low-income goal and both multifamily goals, and believe we failed to meet the FHFA benchmark level for the single-family purchase-money goals and the subgoal for 2011. In such cases, FHFA regulations allow us to achieve a goal if our qualifying share matches that of the market, as measured by the Home Mortgage Disclosure Act. Because the Home Mortgage Disclosure Act data for 2011 will not be released until September 2012, FHFA will not be able to make a final determination on our performance until that time. If we fail to meet both the FHFA benchmark level and the market level, we may enter into discussions with FHFA concerning whether these goals were infeasible under the terms of the GSE Act, due to market and economic conditions and our financial condition. For more information, see "EXECUTIVE COMPENSATION — Compensation Discussion and Analysis — *Executive Management Compensation Program — Determination of the Performance-Based Portion of 2011 Deferred Base Salary*."

We anticipate that the difficult market conditions and our financial condition will continue to affect our affordable housing activities in 2012. However, we view the purchase of mortgage loans that are eligible to count toward our affordable housing goals to be a principal part of our mission and business and we are committed to facilitating the financing of affordable housing for low- and moderate-income families. See also "RISK FACTORS — Legal and Regulatory Risks — *We may make certain changes to our business in an attempt to meet the housing goals and subgoals set for us by FHFA that may increase our losses.*"

*Duty to Serve Underserved Markets*

The GSE Act establishes a duty for Freddie Mac and Fannie Mae to serve three underserved markets (manufactured housing, affordable housing preservation and rural areas) by developing loan products and flexible underwriting guidelines to facilitate a secondary market for mortgages for very low-, low- and moderate-income families in those markets. Effective for 2010 and subsequent years, FHFA is required to establish a manner for annually: (a) evaluating whether and

to what extent Freddie Mac and Fannie Mae have complied with the duty to serve underserved markets; and (b) rating the extent of compliance.

On June 7, 2010, FHFA published in the Federal Register a proposed rule regarding the duty of Freddie Mac and Fannie Mae to serve the underserved markets. Comments were due on July 22, 2010. We provided comments on the proposed rule to FHFA, but we cannot predict the contents of any final rule that FHFA may release, or the impact that the final rule will have on our business or operations.

*Affordable Housing Goals and Results for 2009*

Prior to 2010, we were subject to affordable housing goals related to mortgages for low- and moderate-income families, low-income families living in low-income areas, very low-income families and families living in defined underserved areas. These goals were set as a percentage of the total number of dwelling units underlying our total mortgage purchases. The goal relating to low-income families living in low-income areas and very low-income families was referred to as the "special affordable" housing goal. This special affordable housing goal also included a multifamily annual minimum dollar volume target of qualifying multifamily mortgage purchases. In addition, from 2005 to 2009, we were subject to three subgoals that were expressed as percentages of the total number of mortgages we purchased that financed the purchase of single-family, owner-occupied properties located in metropolitan areas.

Our housing goals and results for 2009 are set forth in the table below.

### Table 6 — Affordable Housing Goals and Results for 2009[1]

|  | Goal | Results |
|---|---|---|
| Housing goals and actual results |  |  |
| Low- and moderate-income goal | 43% | 44.7% |
| Underserved areas goal[2] | 32 | 26.8 |
| Special affordable goal[3] | 18 | 17.8 |
| Multifamily special affordable volume target (in billions)[2] | $4.60 | $3.69 |
| Home purchase subgoals and actual results: |  |  |
| Low- and moderate-income subgoal | 40% | 48.4% |
| Underserved areas subgoal[3] | 30 | 27.9 |
| Special affordable subgoal | 14 | 20.6 |

(1) An individual mortgage may qualify for more than one of the goals or subgoals. Each of the goal and subgoal percentages and each of our percentage results is determined independently and cannot be aggregated to determine a percentage of total purchases that qualifies for these goals or subgoals.
(2) These goals were determined to be infeasible.
(3) FHFA concluded that achievement by us of these goals and subgoals was feasible, but decided not to require us to submit a housing plan.

<u>*Affordable Housing Allocations*</u>

The GSE Act requires us to set aside in each fiscal year an amount equal to 4.2 basis points for each dollar of the UPB of total new business purchases, and allocate or transfer such amount to: (a) HUD to fund a Housing Trust Fund established and managed by HUD; and (b) a Capital Magnet Fund established and managed by Treasury. FHFA has the authority to suspend our allocation upon finding that the payment would contribute to our financial instability, cause us to be classified as undercapitalized or prevent us from successfully completing a capital restoration plan. In November 2008, FHFA advised us that it has suspended the requirement to set aside or allocate funds for the Housing Trust Fund and the Capital Magnet Fund until further notice.

<u>*Prudential Management and Operations Standards*</u>

The GSE Act requires FHFA to establish prudential standards, by regulation or by guideline, for a broad range of operations of the enterprises. These standards must address internal controls, information systems, independence and adequacy of internal audit systems, management of interest rate risk exposure, management of market risk, liquidity and reserves, management of asset and investment portfolio growth, overall risk management processes, investments and asset acquisitions, management of credit and counterparty risk, and recordkeeping. FHFA may also establish any additional operational and management standards the Director of FHFA determines appropriate.

On June 20, 2011, FHFA published a proposed rule that would establish prudential standards, in the form of guidelines, relating to the management and operations of Freddie Mac, Fannie Mae, and the FHLBs. This proposed rule implements certain Reform Act amendments to the GSE Act. The proposed standards address a number of business, controls, and risk management areas. The standards specify the possible consequences for any entity that fails to meet any of the standards or otherwise fails to comply (including submission of a corrective plan, limits on asset growth, increases in capital, limits on dividends and stock redemptions or repurchases, a minimum level of retained earnings or any other action that the FHFA Director determines will contribute to bringing the entity into compliance with the standards). In

addition, a failure to meet any standard also may constitute an unsafe or unsound practice, which may form the basis for FHFA initiating an administrative enforcement action. Because FHFA proposes to adopt the standards as guidelines, as authorized by the Reform Act, FHFA may modify, revoke or add to the standards at any time by order.

<u>Portfolio Activities</u>

The GSE Act requires FHFA to establish, by regulation, criteria governing portfolio holdings to ensure the holdings are backed by sufficient capital and consistent with the enterprises' mission and safe and sound operations. In establishing these criteria, FHFA must consider the ability of the enterprises to provide a liquid secondary market through securitization activities, the portfolio holdings in relation to the mortgage market and the enterprises' compliance with the prudential management and operations standards prescribed by FHFA.

On December 28, 2010, FHFA issued a final rule adopting the portfolio holdings criteria established in the Purchase Agreement, as it may be amended from time to time, for so long as we remain subject to the Purchase Agreement.

See "Conservatorship and Related Matters — *Impact of Conservatorship and Related Activities on Our Business*" for additional information on restrictions to our portfolio activities.

<u>Anti-Predatory Lending</u>

Predatory lending practices are in direct opposition to our mission, our goals and our practices. We have instituted anti-predatory lending policies intended to prevent the purchase or assignment of mortgage loans with unacceptable terms or conditions or resulting from unacceptable practices. These policies include processes related to the delivery and validation of loans sold to us. In addition to the purchase policies we have instituted, we promote consumer education and financial literacy efforts to help borrowers avoid abusive lending practices and we provide competitive mortgage products to reputable mortgage originators so that borrowers have a greater choice of financing options.

<u>Subordinated Debt</u>

FHFA directed us to continue to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital levels. As a result, the terms of any of our subordinated debt that provide for us to defer payments of interest under certain circumstances, including our failure to maintain specified capital levels, are no longer applicable. In addition, the requirements in the agreement we entered into with FHFA in September 2005 with respect to issuance, maintenance, and reporting and disclosure of Freddie Mac subordinated debt have been suspended during the term of conservatorship and thereafter until directed otherwise. See "NOTE 15: REGULATORY CAPITAL — Subordinated Debt Commitment" for more information regarding subordinated debt.

**Department of Housing and Urban Development**

HUD has regulatory authority over Freddie Mac with respect to fair lending. Our mortgage purchase activities are subject to federal anti-discrimination laws. In addition, the GSE Act prohibits discriminatory practices in our mortgage purchase activities, requires us to submit data to HUD to assist in its fair lending investigations of primary market lenders with which we do business and requires us to undertake remedial actions against such lenders found to have engaged in discriminatory lending practices. In addition, HUD periodically reviews and comments on our underwriting and appraisal guidelines for consistency with the Fair Housing Act and the anti-discrimination provisions of the GSE Act.

**Department of the Treasury**

Treasury has significant rights and powers with respect to our company as a result of the Purchase Agreement. In addition, under our charter, the Secretary of the Treasury has approval authority over our issuances of notes, debentures and substantially identical types of unsecured debt obligations (including the interest rates and maturities of these securities), as well as new types of mortgage-related securities issued subsequent to the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989. The Secretary of the Treasury has performed this debt securities approval function by coordinating GSE debt offerings with Treasury funding activities. In addition, our charter authorizes Treasury to purchase Freddie Mac debt obligations not exceeding $2.25 billion in aggregate principal amount at any time.

The Reform Act granted the Secretary of the Treasury authority to purchase any obligations and securities issued by us and Fannie Mae until December 31, 2009 on such terms and conditions and in such amounts as the Secretary may determine, provided that the Secretary determined the purchases were necessary to provide stability to the financial markets, prevent disruptions in the availability of mortgage finance, and protect taxpayers. See "Conservatorship and Related Matters — *Treasury Agreements*."

*Securities and Exchange Commission*

We are subject to the financial reporting requirements applicable to registrants under the Exchange Act, including the requirement to file with the SEC annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K. Although our common stock is required to be registered under the Exchange Act, we continue to be exempt from certain federal securities law requirements, including the following:

- Securities we issue or guarantee are "exempted securities" under the Securities Act and may be sold without registration under the Securities Act;

- We are excluded from the definitions of "government securities broker" and "government securities dealer" under the Exchange Act;

- The Trust Indenture Act of 1939 does not apply to securities issued by us; and

- We are exempt from the Investment Company Act of 1940 and the Investment Advisers Act of 1940, as we are an "agency, authority or instrumentality" of the U.S. for purposes of such Acts.

*Legislative and Regulatory Developments*

We discuss certain significant legislative and regulatory developments below. For more information regarding these and other legislative and regulatory developments that could impact our business, see "RISK FACTORS — Conservatorship and Related Matters" and "— Legal and Regulatory Risks."

*Administration Report on Reforming the U.S. Housing Finance Market*

On February 11, 2011, the Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance sector in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, stating that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements. These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations and financial condition.

As discussed below in "*Legislated Increase to Guarantee Fees*," we have recently been directed by FHFA to raise our guarantee fees. We cannot currently predict the extent to which our business will be impacted by this increase in guarantee fees. In addition, as discussed below in "Conforming Loan Limits," the temporary high-cost area loan limits expired on September 30, 2011.

We cannot predict the extent to which the other recommendations in the report will be implemented or when any actions to implement them may be taken. However, we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term.

*FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships*

On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the conservatorships of Freddie Mac and Fannie Mae. The plan sets forth objectives and steps FHFA is taking or will take to meet FHFA's obligations as Conservator. FHFA states that the steps envisioned in the plan are consistent with each of the housing finance reform frameworks set forth in the report delivered by the Administration to Congress in February 2011, as well as with the leading congressional proposals introduced to date. FHFA indicates that the plan leaves open all options for Congress and

the Administration regarding the resolution of the conservatorships and the degree of government involvement in supporting the secondary mortgage market in the future.

FHFA's plan provides lawmakers and the public with an outline of how FHFA as Conservator intends to guide Freddie Mac and Fannie Mae over the next few years, and identifies three strategic goals:

- **Build.** Build a new infrastructure for the secondary mortgage market;

- **Contract.** Gradually contract Freddie Mac and Fannie Mae's dominant presence in the marketplace while simplifying and shrinking their operations; and

- **Maintain.** Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

The first of these goals establishes the steps FHFA, Freddie Mac, and Fannie Mae will take to create the necessary infrastructure, including a securitization platform and national standards for mortgage securitization, that Congress and market participants may use to develop the secondary mortgage market of the future. As part of this process, FHFA would determine how Freddie Mac and Fannie Mae can work together to build a single securitization platform that would replace their current separate proprietary systems.

The second goal describes steps that FHFA plans to take to gradually shift mortgage credit risk from Freddie Mac and Fannie Mae to private investors and eliminate the direct funding of mortgages by the enterprises. The plan states that the goal of gradually shifting mortgage credit risk from Freddie Mac and Fannie Mae to private investors could be accomplished, in the case of single-family credit guarantees, in several ways, including increasing guarantee fees, establishing loss-sharing arrangements and expanding reliance on mortgage insurance. To evaluate how to accomplish the goal of contracting enterprise operations in the multifamily business, the plan states that Freddie Mac and Fannie Mae will each undertake a market analysis of the viability of its respective multifamily operations without government guarantees.

For the third goal, the plan states that programs and strategies to ensure ongoing mortgage credit availability, assist troubled homeowners, and minimize taxpayer losses while restoring stability to housing markets continue to require energy, focus, and resources. The plan states that activities that must be continued and enhanced include: (a) successful implementation of HARP, including the significant program changes announced in October 2011; (b) continued implementation of the Servicing Alignment Initiative; (c) renewed focus on short sales, deeds-in-lieu, and deeds-for-lease options that enable households and Freddie Mac and Fannie Mae to avoid foreclosure; and (d) further development and implementation of the REO disposition initiative announced by FHFA in 2011.

### Legislated Increase to Guarantee Fees

On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than 10 basis points above the average guarantee fees charged in 2011 on single-family mortgage-backed securities. Under the law, the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by the companies.

FHFA has announced that, effective April 1, 2012, the guarantee fee on all single-family residential mortgages sold to Freddie Mac and Fannie Mae will increase by 10 basis points. In early 2012, FHFA will further analyze whether additional guarantee fee increases are necessary to ensure the new requirements are being met. If so, FHFA will announce plans for further guarantee fee increases or other fee adjustments that may then be implemented gradually over a two-year implementation window, taking into consideration risk levels and conditions in financial markets. FHFA will monitor closely the increased guarantee fees imposed as a result of the new law throughout its effective period.

Our business and financial condition will not benefit from the increases in guarantee fees under this law, as we must remit the proceeds from such increases to Treasury. It is currently unclear what effect this increase or any further guarantee fee increases or other fee adjustments associated with this law will have on the future profitability and operations of our single-family guarantee business, or on our ability to raise guarantee fees that may be retained by us. While we continue to assess the impact of this law, we currently believe that implementation of this law will present operational and accounting challenges for us.

### Legislation Related to Reforming Freddie Mac and Fannie Mae

Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near-term. Congress continues to hold hearings and consider legislation on the future state of Freddie Mac and Fannie Mae. On February 2, 2012, the Administration announced that it expects to provide more

detail concerning approaches to reform the U.S. housing finance market in the spring, and that it plans to begin exploring options for legislation more intensively with Congress.

Several bills were introduced in Congress in 2011 that would comprehensively reform the secondary mortgage market and address the future state of Freddie Mac and Fannie Mae. None of the bills have been scheduled for further consideration in the Senate. In the House, several of these bills were approved by the House Financial Services Subcommittee on Capital Markets and Government-Sponsored Enterprises. Most recently, this subcommittee approved a bill in December 2011 that would reform the secondary mortgage market by facilitating continued standardization and uniformity in mortgage securitization. Under several of the bills, our charter would be revoked and we would be wound down or placed into receivership. Such legislation could impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent an explicit guarantee of our existing and ongoing liabilities by the U.S. government.

The House Financial Services Subcommittee on Capital Markets and Government-Sponsored Enterprises approved a number of other bills in 2011 that would limit the companies' operations or alter FHFA or Treasury's authority over the companies, including bills that would require advance approval by the Secretary of the Treasury and notice to Congress for all debt issuances by the companies; require FHFA to direct the companies to increase guarantee fees; repeal our affordable housing goals; prohibit the companies from initially offering new products during conservatorship or receivership; accelerate reductions in our mortgage-related investments portfolio; require that Freddie Mac and Fannie Mae mortgages be treated the same as other mortgages for purposes of risk retention requirements in the Dodd-Frank Act; grant the FHFA Inspector General direct access to our records and employees; authorize FHFA, as receiver, to revoke the charters of Freddie Mac and Fannie Mae; prevent Treasury from lowering the dividend payment under the Purchase Agreement; abolish the Affordable Housing Trust Fund, the Capital Magnet Fund, and the HOPE Reserve Fund; require disposition of non-mission critical assets; apply the Freedom of Information Act to Freddie Mac and Fannie Mae; and set a cap on the funds received under the Purchase Agreement.

In 2011, the Financial Services Committee of the House of Representatives approved a bill that would generally put our employees on the federal government pay scale, and in 2012 both the House and the Senate approved legislation that would prohibit senior executives from receiving bonuses during conservatorship. In February 2012, legislative proposals were introduced in the Senate that would, among other items, cap the compensation and benefits of executive officers and employees of Freddie Mac and Fannie Mae so they cannot exceed the amounts paid to the highest compensated executive or employee at the federal financial institution regulatory agencies; and require executive officers, under certain circumstances, to return to Treasury any compensation earned that exceeds the regulatory agencies' rate of compensation. If this or similar legislation were to become law, many of our employees would experience a sudden and sharp decrease in compensation. The Acting Director of FHFA stated on November 15, 2011 that this "would certainly risk a substantial exodus of talent, the best leaving first in many instances. [Freddie Mac and Fannie Mae] likely would suffer a rapidly growing vacancy list and replacements with lesser skills and no experience in their specific jobs. A significant increase in safety and soundness risks and in costly operational failures would, in my opinion, be highly likely." The Acting Director noted that "[s]hould the risks I fear materialize, FHFA might well be forced to limit [Freddie Mac and Fannie Mae's] business activities. Some of the business [Freddie Mac and Fannie Mae] would be unable to undertake might simply not occur, with potential disruption in housing markets and the economy."

Some of the bills discussed above, if enacted, would materially affect the role of the company, our business model and our structure, and could have an adverse effect on our financial results and operations as well as our ability to retain and recruit management and other valuable employees. A number of the bills would adversely affect our ability to conduct business under our current business model, including by subjecting us to new requirements that could increase costs, reduce revenues and limit or prohibit current business activities.

We cannot predict whether or when any of the bills discussed above might be enacted. We also expect additional bills relating to Freddie Mac and Fannie Mae to be introduced and considered by Congress in 2012.

For more information on the potential impacts of legislative developments on compensation and employee retention, see "RISK FACTORS — Conservatorship and Related Matters — *The conservatorship and uncertainty concerning our future has had, and will likely continue to have, an adverse effect on the retention, recruitment and engagement of management and other employees, which could have a material adverse effect on our ability to operate our business*" and "MD&A — RISK MANAGEMENT — Operational Risks."

*Dodd-Frank Act*

The Dodd-Frank Act, which was signed into law on July 21, 2010, significantly changed the regulation of the financial services industry, including by creating new standards related to regulatory oversight of systemically important financial companies, derivatives, capital requirements, asset-backed securitization, mortgage underwriting, and consumer financial protection. The Dodd-Frank Act has directly affected and will continue to directly affect the business and operations of Freddie Mac by subjecting us to new and additional regulatory oversight and standards, including with respect to our activities and products. We may also be affected by provisions of the Dodd-Frank Act and implementing regulations that affect the activities of banks, savings institutions, insurance companies, securities dealers, and other regulated entities that are our customers and counterparties.

Implementation of the Dodd-Frank Act is being accomplished through numerous rulemakings, many of which are still in process. Accordingly, it is difficult to assess fully the impact of the Dodd-Frank Act on Freddie Mac and the financial services industry at this time. The final effects of the legislation will not be known with certainty until these rulemakings are complete. The Dodd-Frank Act also mandates the preparation of studies on a wide range of issues, which could lead to additional legislation or regulatory changes.

Recent developments with respect to Dodd-Frank rulemakings that may have a significant impact on Freddie Mac include the following:

- Designation as a systemically important nonbank financial company — The Financial Stability Oversight Council, or FSOC, is expected to announce during 2012 which nonbank financial companies are systemically important. The Federal Reserve has recently proposed rules to implement the enhanced supervisory and prudential requirements that would apply to designated nonbank financial companies. The proposal includes rules to implement Dodd-Frank requirements related to risk-based capital and leverage, liquidity, single-counterparty credit limits, overall risk management and risk committees, stress tests, and debt-to-equity limits for certain covered companies. The proposed rules also would implement Dodd-Frank requirements related to early remediation of financial distress of a designated nonbank financial company. In addition, a recently adopted final rule requires designated nonbank financial companies to submit annual resolution plans that describe the company's strategy for rapid and orderly resolution in bankruptcy during times of financial distress. If Freddie Mac is designated as a systemically important nonbank financial company, we could be subject to these and other additional oversight and prudential standards.

- Derivatives Rulemakings — The U.S. Commodity Futures Trading Commission, or CFTC, has promulgated a number of final rules implementing the Dodd-Frank Act's provisions relating to derivatives. However, the CFTC has yet to finalize many of the more significant derivative-related rules, including rules addressing the definition of "major swap participant" and margin requirements for uncleared swaps. The Dodd-Frank Act imposes certain new requirements on all swaps counterparties, including requirements addressing recordkeeping and reporting. If Freddie Mac qualifies as a major swap participant, it will be subject to increased and additional requirements, such as those relating to registration and business conduct. The eventual final rules on margin might increase the costs of our swaps transactions. According to the CFTC's tentative schedule, the CFTC expects to finalize the major swap participant definition rule in the first quarter of 2012, but it does not expect to consider final rules on margin (and numerous other topics) until later in 2012.

We continue to review and assess the impact of rulemakings and other activities under the Dodd-Frank Act. For more information, see "RISK FACTORS — Legal and Regulatory Risks — *The Dodd-Frank Act and related regulation may adversely affect our business activities and financial results.*"

*Conforming Loan Limits*

Beginning in 2008, pursuant to a series of laws, our loan limits in certain high-cost areas were increased temporarily above the limits that otherwise would be applicable (up to $729,750 for a one-family residence). On September 30, 2011, the latest of these increases was permitted to expire. Accordingly, our permanent high-cost area loan limits apply with respect to loans originated on or after October 1, 2011 in high-cost areas (currently, up to $625,500 for a one-family residence). A new law reinstated higher conforming loan limits for FHA-insured mortgages through 2013. However, these reinstated higher limits do not apply to Freddie Mac and Fannie Mae.

*Developments Concerning Single-Family Servicing Practices*

There have been a number of regulatory developments in recent periods impacting single-family mortgage servicing and foreclosure practices, including those discussed below. It is possible that these developments will result in significant changes to mortgage servicing and foreclosure practices that could adversely affect our business. New compliance

requirements placed on servicers as a result of these developments could expose Freddie Mac to financial risk as a result of further extensions of foreclosure timelines if home prices remain weak or decline. We may need to make additional significant changes to our practices, which could increase our operational risk. It is difficult to predict other impacts on our business of these changes, though such changes could adversely affect our credit losses and costs of servicing, and make it more difficult for us to transfer mortgage servicing rights to a successor servicer should we need to do so. The regulatory developments and changes include the following:

- On April 13, 2011, the OCC, the Federal Reserve, the FDIC, and the Office of Thrift Supervision entered into consent orders with 14 large servicers regarding their foreclosure and loss mitigation practices. These institutions service the majority of the single-family mortgages we own or guarantee. The consent orders required the servicers to submit comprehensive action plans relating to, among other items, use of foreclosure documentation, staffing of foreclosure and loss mitigation activities, oversight of third parties, use of the Mortgage Electronic Registration System, or the MERS System, and communications with borrowers. We will not be able to assess the impact of these actions on our business until the servicers' comprehensive action plans are publicly available.

- On April 28, 2011, FHFA announced a new set of aligned standards for servicing delinquent mortgages owned or guaranteed by Freddie Mac and Fannie Mae. We implemented most aspects of this initiative effective October 1, 2011. We have also implemented a new standard modification initiative that replaced our previous non-HAMP modification program beginning January 1, 2012. See "MD&A — RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program*." FHFA has also directed us and Fannie Mae to work on a joint initiative to consider alternatives for future mortgage servicing structures and servicing compensation. The development of further alternatives could impact our ability to conduct current initiatives. For more information, see "RISK FACTORS — Legal and Regulatory Risks — *Legislative or regulatory actions could adversely affect our business activities and financial results*."

- On June 30, 2011, the OCC issued Supervisory Guidance regarding the OCC's expectations for the oversight and management of mortgage foreclosure activities by national banks. The Supervisory Guidance contains several elements from the consent orders with the 14 major servicers that will now be applied to all national banks. In the Supervisory Guidance, the OCC directed all national banks to conduct a self-assessment of foreclosure management practices by September 30, 2011. Additionally, the Guidance sets forth foreclosure management standards that mirror the broad categories of the servicing guidelines contained in the consent orders.

- On October 19, 2011, FHFA announced that it has directed Freddie Mac and Fannie Mae to transition away from current foreclosure attorney network programs and move to a system where mortgage servicers select qualified law firms that meet certain minimum, uniform criteria. The changes will be implemented after a transition period in which input will be taken from servicers, regulators, lawyers, and other market participants. We cannot predict the scope or timing of these changes, or the extent to which our business will be impacted by them.

- Several localities have adopted ordinances that would expand the responsibilities and liability for registering and maintaining vacant properties to servicers and assignees. These laws could significantly expand mortgage costs and liabilities in those areas. On December 8, 2011, FHFA directed Freddie Mac and Fannie Mae to take certain actions with respect to a municipal ordinance of the City of Chicago, and, on December 12, 2011, FHFA, on its own behalf and as conservator for Freddie Mac and Fannie Mae, filed a lawsuit against the City of Chicago to prevent enforcement of the ordinance.

- On February 9, 2012, a coalition of state attorneys general and federal agencies announced that it had entered into a settlement with five large seller/servicers concerning certain issues related to mortgage servicing practices. While the settlement includes changes to mortgage servicing practices, it is too early to determine if these changes will have a significant effect on us. The settlement does not involve loans owned or guaranteed by us.

For more information on operational risks related to these developments in mortgage servicing, see "MD&A — RISK MANAGEMENT — Operational Risks."

### Administration Plan to Help Responsible Homeowners and Heal the Housing Market

In his January 24, 2012 State of the Union Address, President Obama called for action to help responsible borrowers and support a housing market recovery. The Administration subsequently put forth a "Plan to Help Responsible Homeowners and Heal the Housing Market." We have implemented, or are in the process of implementing, several aspects of the Administration's plan, such as the changes to HAMP discussed in "MD&A — RISK MANAGEMENT — Credit

Risk — *Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program — Home Affordable Modification Program.*" A number of other aspects of the plan could affect Freddie Mac, including those discussed below.

The plan calls for Congress to pass legislation to establish a broad based mortgage refinancing plan. The broad based refinancing plan includes provisions to further streamline the refinancing process for borrowers with loans guaranteed by Freddie Mac and Fannie Mae. It would also provide underwater borrowers who participate in HARP with the choice of taking the benefit of the reduced interest rate in the form of lower monthly payments, or applying that savings to rebuilding equity in their homes. The plan would require us to change certain existing processes and could increase our costs. To date, no legislation has been introduced in Congress with respect to this plan.

The plan states that the mortgage servicing system would benefit from a single set of strong federal standards, and indicates that the Administration will work closely with regulators, Congress and stakeholders to create a more robust and comprehensive set of rules related to mortgage servicing. These rules would include standards for assisting at-risk homeowners.

### Employees

At February 27, 2012, we had 4,859 full-time and 62 part-time employees. Our principal offices are located in McLean, Virginia.

### Available Information

#### SEC Reports

We file reports and other information with the SEC. In view of the Conservator's succession to all of the voting power of our stockholders, we have not prepared or provided proxy statements for the solicitation of proxies from stockholders since we entered into conservatorship, and do not expect to do so while we remain in conservatorship. We make available free of charge through our website at www.freddiemac.com our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all other SEC reports and amendments to those reports as soon as reasonably practicable after we electronically file the material with, or furnish it to, the SEC. In addition, materials that we filed with the SEC are available for review and copying at the SEC's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains an internet site (www.sec.gov) that contains reports, proxy and information statements, and other information regarding companies that file electronically with the SEC.

We are providing our website addresses and the website address of the SEC here or elsewhere in this annual report on Form 10-K solely for your information. Information appearing on our website or on the SEC's website is not incorporated into this annual report on Form 10-K.

#### Information about Certain Securities Issuances by Freddie Mac

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

Freddie Mac's securities offerings are exempted from SEC registration requirements. As a result, we are not required to and do not file registration statements or prospectuses with the SEC with respect to our securities offerings. To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars (or supplements thereto) that we post on our website or in a current report on Form 8-K, in accordance with a "no-action" letter we received from the SEC staff. In cases where the information is disclosed in an offering circular posted on our website, the document will be posted on our website within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

The website address for disclosure about our debt securities is www.freddiemac.com/debt. From this address, investors can access the offering circular and related supplements for debt securities offerings under Freddie Mac's global debt facility, including pricing supplements for individual issuances of debt securities.

Disclosure about the mortgage-related securities we issue, some of which are off-balance sheet obligations, can be found at www.freddiemac.com/mbs. From this address, investors can access information and documents about our mortgage-related securities, including offering circulars and related offering circular supplements.

**Forward-Looking Statements**

We regularly communicate information concerning our business activities to investors, the news media, securities analysts, and others as part of our normal operations. Some of these communications, including this Form 10-K, contain "forward-looking statements," including statements pertaining to the conservatorship, our current expectations and objectives for our efforts under the MHA Program, the servicing alignment initiative and other programs to assist the U.S. residential mortgage market, future business plans, liquidity, capital management, economic and market conditions and trends, market share, the effect of legislative and regulatory developments, implementation of new accounting guidance, credit losses, internal control remediation efforts, and results of operations and financial condition on a GAAP, Segment Earnings, and fair value basis. Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. Forward-looking statements are often accompanied by, and identified with, terms such as "objective," "expect," "trend," "forecast," "anticipate," "believe," "intend," "could," "future," "may," "will," and similar phrases. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties, including those described in the "RISK FACTORS" section of this Form 10-K and:

- the actions FHFA, Treasury, the Federal Reserve, the SEC, HUD, the Administration, Congress, and our management may take;

- the impact of the restrictions and other terms of the conservatorship, the Purchase Agreement, the senior preferred stock, and the warrant on our business, including our ability to pay: (a) the dividend on the senior preferred stock; and (b) any quarterly commitment fee that we are required to pay to Treasury under the Purchase Agreement;

- our ability to maintain adequate liquidity to fund our operations, including following any changes in the support provided to us by Treasury or FHFA, a change in the credit ratings of our debt securities or a change in the credit rating of the U.S. government;

- changes in our charter or applicable legislative or regulatory requirements, including any restructuring or reorganization in the form of our company, whether we will remain a stockholder-owned company or continue to exist and whether we will be wound down or placed under receivership, regulations under the GSE Act, the Reform Act, or the Dodd-Frank Act, regulatory or legislative actions taken to implement the Administration's plan to reform the housing finance system, regulatory or legislative actions that require us to support non-mortgage market initiatives, changes to affordable housing goals regulation, reinstatement of regulatory capital requirements, or the exercise or assertion of additional regulatory or administrative authority;

- changes in the regulation of the mortgage and financial services industries, including changes caused by the Dodd-Frank Act, or any other legislative, regulatory, or judicial action at the federal or state level;

- enforcement actions against mortgage servicers and other mortgage industry participants by federal or state authorities;

- the scope of various initiatives designed to help in the housing recovery (including the extent to which borrowers participate in the recently expanded HARP program, the MHA Program and new non-HAMP standard loan modification initiative), and the impact of such programs on our credit losses, expenses, and the size and composition of our mortgage-related investments portfolio;

- the impact of any deficiencies in foreclosure documentation practices and related delays in the foreclosure process;

- the ability of our financial, accounting, data processing, and other operating systems or infrastructure, and those of our vendors to process the complexity and volume of our transactions;

- changes in accounting or tax guidance or in our accounting policies or estimates, and our ability to effectively implement any such changes in guidance, policies, or estimates;

- changes in general regional, national, or international economic, business, or market conditions and competitive pressures, including changes in employment rates and interest rates, and changes in the federal government's fiscal and monetary policy;

- changes in the U.S. residential mortgage market, including changes in the rate of growth in total outstanding U.S. residential mortgage debt, the size of the U.S. residential mortgage market, and home prices;

- our ability to effectively implement our business strategies, including our efforts to improve the supply and liquidity of, and demand for, our products, and restrictions on our ability to offer new products or engage in new activities;

- our ability to recruit, retain, and engage executive officers and other key employees;

- our ability to effectively identify and manage credit, interest-rate, operational, and other risks in our business, including changes to the credit environment and the levels and volatilities of interest rates, as well as the shape and slope of the yield curves;

- the effects of internal control deficiencies and our ability to effectively identify, assess, evaluate, manage, mitigate, or remediate control deficiencies and risks, including material weaknesses and significant deficiencies, in our internal control over financial reporting and disclosure controls and procedures;

- incomplete or inaccurate information provided by customers and counterparties;

- consolidation among, or adverse changes in the financial condition of, our customers and counterparties;

- the failure of our customers and counterparties to fulfill their obligations to us, including the failure of seller/ servicers to meet their obligations to repurchase loans sold to us in breach of their representations and warranties, and the potential cost and difficulty of legally enforcing those obligations;

- changes in our judgments, assumptions, forecasts, or estimates regarding the volume of our business and spreads we expect to earn;

- the availability of options, interest-rate and currency swaps, and other derivative financial instruments of the types and quantities, on acceptable terms, and with acceptable counterparties needed for investment funding and risk management purposes;

- changes in pricing, valuation or other methodologies, models, assumptions, judgments, estimates and/or other measurement techniques, or their respective reliability;

- changes in mortgage-to-debt OAS;

- the potential impact on the market for our securities resulting from any purchases or sales by the Federal Reserve or Treasury of Freddie Mac debt or mortgage-related securities;

- adverse judgments or settlements in connection with legal proceedings, governmental investigations, and IRS examinations;

- volatility of reported results due to changes in the fair value of certain instruments or assets;

- the development of different types of mortgage servicing structures and servicing compensation;

- preferences of originators in selling into the secondary mortgage market;

- changes to our underwriting or servicing requirements (including servicing alignment efforts under the servicing alignment initiative), our practices with respect to the disposition of REO properties, or investment standards for mortgage-related products;

- investor preferences for mortgage loans and mortgage-related and debt securities compared to other investments;

- borrower preferences for fixed-rate mortgages versus ARMs;

- the occurrence of a major natural or other disaster in geographic areas in which our offices or portions of our total mortgage portfolio are concentrated;

- other factors and assumptions described in this Form 10-K, including in the "MD&A" section;

- our assumptions and estimates regarding the foregoing and our ability to anticipate the foregoing factors and their impacts; and

- market reactions to the foregoing.

Forward-looking statements speak only as of the date they are made, and we undertake no obligation to update any forward-looking statements we make to reflect events or circumstances occurring after the date of this Form 10-K.

## ITEM 1A. RISK FACTORS

Investing in our securities involves risks, including the risks described below and in "BUSINESS," "MD&A," and elsewhere in this Form 10-K. These risks and uncertainties could, directly or indirectly, adversely affect our business, financial condition, results of operations, cash flows, strategies and/or prospects.

**Conservatorship and Related Matters**

***The future status and role of Freddie Mac is uncertain and could be materially adversely affected by legislative and regulatory action that alters the ownership, structure, and mission of the company.***

The Acting Director of FHFA stated on November 15, 2011 that "the long-term outlook is that neither [Freddie Mac nor Fannie Mae] will continue to exist, at least in its current form, in the future." Future legislation will likely materially affect the role of the company, our business model, our structure, and future results of operations. Some or all of our functions could be transferred to other institutions, and we could cease to exist as a stockholder-owned company or at all. If any of these events were to occur, our shares could further diminish in value, or cease to have any value, and there can be no assurance that our stockholders would receive any compensation for such loss in value.

On February 11, 2011, the Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, stating that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements.

A number of bills were introduced in the Senate and House in 2011 concerning the future state of Freddie Mac and Fannie Mae. Several of these bills take a comprehensive approach that would wind down Freddie Mac and Fannie Mae (or completely restructure the companies), while other bills would revise the companies' operations in a limited manner. Congress also held hearings related to the long-term future of housing finance, including the role of Freddie Mac and Fannie Mae. We expect additional legislation relating to Freddie Mac and Fannie Mae to be introduced and considered by Congress; however, we cannot predict whether or when any such legislation will be enacted. On February 2, 2012, the Administration announced that it expects to provide more detail concerning approaches to reform the U.S. housing finance market in the spring, and that it plans to begin exploring options for legislation more intensively with Congress. On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the conservatorships of Freddie Mac and Fannie Mae.

For more information on the Administration's February 2011 report, GSE reform legislation, and FHFA's strategic plan, see "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments*."

In addition to legislative actions, FHFA has expansive regulatory authority over us, and the manner in which FHFA will use its authority in the future is unclear. FHFA could take a number of regulatory actions that could materially adversely affect our company, such as changing or reinstating our current capital requirements, which are not binding during conservatorship, or imposing additional restrictions on our portfolio activities or new initiatives.

***The conservatorship is indefinite in duration and the timing, conditions, and likelihood of our emerging from conservatorship are uncertain. Even if the conservatorship is terminated, we would remain subject to the Purchase Agreement, senior preferred stock, and warrant.***

FHFA has stated that there is no exact time frame as to when the conservatorship may end. Termination of the conservatorship (other than in connection with receivership) also requires Treasury's consent under the Purchase Agreement. There can be no assurance as to when, and under what circumstances, Treasury would give such consent. There is also significant uncertainty as to what changes may occur to our business structure during or following our conservatorship, including whether we will continue to exist. It is possible that the conservatorship will end with us being placed into receivership. The Acting Director of FHFA stated on September 19, 2011 that "it ought to be clear to everyone as this point, given [Freddie Mac and Fannie Mae's] losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that [Freddie Mac and Fannie Mae] will not be able to earn their way back to a condition that allows them to emerge from conservatorship."

In addition, Treasury has the ability to acquire almost 80% of our common stock for nominal consideration by exercising the warrant we issued to it pursuant to the Purchase Agreement. Consequently, the company could effectively remain under the control of the U.S. government even if the conservatorship was ended and the voting rights of common stockholders restored. The warrant held by Treasury, the restrictions on our business contained in the Purchase Agreement, and the senior status of the senior preferred stock issued to Treasury under the Purchase Agreement, if the senior

preferred stock has not been redeemed, also could adversely affect our ability to attract new private sector capital in the future should the company be in a position to seek such capital. Moreover, our draws under Treasury's funding commitment, the senior preferred stock dividend obligation, and commitment fees paid to Treasury (commitment fees have been waived through the first quarter of 2012) could permanently impair our ability to build independent sources of capital.

***We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition.***

We expect to request additional draws under the Purchase Agreement in future periods. Over time, our dividend obligation to Treasury on the senior preferred stock will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term. Dividends to Treasury on the senior preferred stock are cumulative and accrue at an annual rate of 10% (or 12% in any quarter in which dividends are not paid in cash) until all accrued dividends are paid in cash.

The size and timing of our future draws will be determined by our dividend obligation on the senior preferred stock and a variety of other factors that could adversely affect our net worth. These other factors include the following:

- how long and to what extent the U.S. economy and housing market, including home prices, remain weak, which could increase credit expenses and cause additional other-than-temporary impairments of the non-agency mortgage-related securities we hold;

- foreclosure prevention efforts and foreclosure processing delays, which could increase our expenses;

- competitiveness with other mortgage market participants, including Fannie Mae;

- adverse changes in interest rates, the yield curve, implied volatility or mortgage-to-debt OAS, which could increase realized and unrealized mark-to-fair value losses recorded in earnings or AOCI;

- required reductions in the size of our mortgage-related investments portfolio and other limitations on our investment activities that reduce the earnings capacity of our investment activities;

- quarterly commitment fees payable to Treasury, the amount of which has not yet been established and could be substantial (Treasury has waived the fee for all quarters of 2011 and the first quarter of 2012). Treasury has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment;

- adverse changes in our funding costs or limitations in our access to public debt markets;

- establishment of additional valuation allowances for our remaining net deferred tax asset;

- changes in accounting practices or guidance;

- effects of the MHA Program and other government initiatives, including any future requirements to reduce the principal amount of loans;

- losses resulting from control failures, including any control failures because of our inability to retain staff;

- limitations on our ability to develop new products, enter into new lines of business, or increase guarantee and related fees;

- introduction of additional public mission-related initiatives that may adversely impact our financial results; or

- changes in business practices resulting from legislative and regulatory developments or direction from our Conservator.

Under the Purchase Agreement, the $200 billion cap on Treasury's funding commitment will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011, and 2012. Although additional draws under the Purchase Agreement will allow us to remain solvent and avoid mandatory receivership, they will also increase the liquidation preference of, and the dividends we owe on, the senior preferred stock. Based on the aggregate liquidation preference of the senior preferred stock of $72.3 billion (which amount includes the funds requested to address our net worth deficit as of December 31, 2011), Treasury is entitled to annual cash dividends of $7.23 billion, which exceeds our annual historical earnings in all but one period. Increases in the already substantial liquidation preference and senior preferred stock dividend obligation, along with limited flexibility to redeem the senior preferred stock, will adversely affect our results of operations and financial condition and add to the significant uncertainty regarding our long-term financial sustainability. This may also cause further negative publicity about our company.

***Our business objectives and strategies have in some cases been significantly altered since we were placed into conservatorship, and may continue to change, in ways that negatively affect our future financial condition and results of operations.***

FHFA, as Conservator, has directed the company to focus on managing to a positive stockholders' equity. At the direction of the Conservator, we have made changes to certain business practices that are designed to provide support for the mortgage market in a manner that serves our public mission and other non-financial objectives but may not contribute to our goal of managing to a positive stockholders' equity. Some of these changes have increased our expenses or caused us to forego revenue opportunities. For example, FHFA has directed that we implement various initiatives under the MHA Program. We expect to incur significant costs associated with the implementation of these initiatives and we cannot currently estimate whether, or the extent to which, costs incurred in the near term from these initiatives may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives. On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers whose monthly payments are current and who can benefit from refinancing their home mortgages. There can be no assurance that the revisions to HARP will be successful in achieving these objectives or that any benefits from the revised program will exceed our costs. The Conservator and Treasury have also not authorized us to engage in certain business activities and transactions, including the purchase or sale of certain assets, which we believe might have had a beneficial impact on our results of operations or financial condition, if executed. Our inability to execute such initiatives and transactions may adversely affect our profitability. Other agencies of the U.S. government, as well as Congress, also have an interest in the conduct of our business. We do not know what actions they may request us to take.

In view of the conservatorship and the reasons stated by FHFA for its establishment, it is likely that our business model and strategic objectives will continue to change, possibly significantly, including in pursuit of our public mission and other non-financial objectives. Among other things, we could experience significant changes in the size, growth, and characteristics of our guarantee activities, and we could further change our operational objectives, including our pricing strategy in our core mortgage guarantee business. The conservatorship has significantly impacted our investment activity, and we may face further restrictions on this activity. Accordingly, our strategic and operational focus may not always be consistent with the generation of net income. It is possible that we will make material changes to our capital strategy and to our accounting policies, methods, and estimates. In addition, we may be directed to engage in initiatives that are operationally difficult or costly to implement, or that adversely affect our financial results. For example, FHFA has directed us to take various actions in support of the objectives of a gradual transition to greater private capital participation in housing finance and greater distribution of risk to participants other than the government, such as developing security structures that allow for private sector risk sharing.

On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than 10 basis points above the average guarantee fees charged in 2011 on single-family mortgage-backed securities. Under the law, the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by the companies. It is currently unclear what effect this increase or any further guarantee fee increases or other fee adjustments associated with this law will have on the future profitability and operations of our single-family guarantee business, or on our ability to raise guarantee fees that may be retained by us. While we continue to assess the impact of this law on us, we currently believe that implementation of this law will present operational and accounting challenges for us.

FHFA has stated that it has focused Freddie Mac and Fannie Mae on their existing core business, including minimizing credit losses, and taking actions necessary to advance the goals of the conservatorship, and is not permitting Freddie Mac and Fannie Mae to offer new products or enter into new lines of business. FHFA stated that the focus of the conservatorship is on conserving assets, minimizing corporate losses, ensuring Freddie Mac and Fannie Mae continue to serve their mission, overseeing remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed. These and other restrictions imposed by FHFA could adversely affect our financial results in future periods.

As our Conservator, FHFA possesses all of the powers of our stockholders, officers, and directors. During the conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and to management to conduct, day-to-day operations so that the company can continue to operate in the ordinary course of business. FHFA has the ability to withdraw or revise its delegations of authority and override actions of our Board of Directors at any time. The directors serve on behalf of, and exercise authority as directed by, the Conservator. In addition, FHFA has the

power to take actions without our knowledge that could be material to investors and could significantly affect our financial performance.

These changes and other factors could have material adverse effects on, among other things, our portfolio growth, net worth, credit losses, net interest income, guarantee fee income, net deferred tax assets, and loan loss reserves, and could have a material adverse effect on our future results of operations and financial condition. In light of the significant uncertainty surrounding these changes, there can be no assurances regarding when, or if, we will return to profitability.

***We have a variety of different, and potentially competing, objectives that may adversely affect our financial results and our ability to maintain positive net worth.***

Based on our charter, other legislation, public statements from Treasury and FHFA officials and guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives. These objectives include: (a) minimizing our credit losses; (b) conserving assets; (c) providing liquidity, stability, and affordability in the mortgage market; (d) continuing to provide additional assistance to the struggling housing and mortgage markets; (e) managing to a positive stockholders' equity and reducing the need to draw funds from Treasury pursuant to the Purchase Agreement; and (f) protecting the interests of the taxpayers. These objectives create conflicts in strategic and day-to-day decision making that will likely lead to suboptimal outcomes for one or more, or possibly all, of these objectives. This could lead to negative publicity and damage our reputation. We may face increased operational risk from these competing objectives. Current portfolio investment and mortgage guarantee activities, liquidity support, loan modification and refinancing initiatives, and foreclosure forbearance initiatives, including our efforts under the MHA Program, are intended to provide support for the mortgage market in a manner that serves our public mission and other non-financial objectives under conservatorship, but may negatively impact our financial results and net worth.

***FHFA directives that we and Fannie Mae adopt uniform approaches in some areas could have an adverse impact on our business or on our competitive position with respect to Fannie Mae.***

FHFA is also Conservator of Fannie Mae, our primary competitor. On multiple occasions, FHFA has directed us and Fannie Mae to confer and suggest to FHFA possible uniform approaches to particular business and accounting issues and problems. It is likely that we will receive additional directives in the future. In most such cases, FHFA subsequently directed us and Fannie Mae to adopt a specific uniform approach. For example:

- In March 2009, FHFA directed Freddie Mac and Fannie Mae to adopt the HAMP program for modification of mortgages that they hold or guarantee, leading to a largely uniform approach to modifications for HAMP-eligible borrowers;

- In February 2010, FHFA directed Freddie Mac and Fannie Mae to work together to standardize definitions for mortgage delivery data;

- In January 2011, FHFA announced that it had directed Freddie Mac and Fannie Mae to work on a joint initiative, in coordination with HUD, to consider alternatives for future mortgage servicing structures and servicing compensation;

- In April 2011, FHFA announced a new set of aligned standards for servicing of non-performing loans owned or guaranteed by Freddie Mac and Fannie Mae, including a standard modification initiative for borrowers not eligible for HAMP modifications;

- In October 2011, through the revisions to the HARP initiative, FHFA directed us and Fannie Mae to align certain aspects of our and Fannie Mae's respective refinance initiatives; and

- In December 2011, FHFA announced that the guarantee fee on all single-family residential mortgages sold to Freddie Mac and Fannie Mae will increase by 10 basis points to fund the payroll tax cut, effective April 1, 2012. This increase is in connection with the implementation of the Temporary Payroll Tax Cut Continuation Act of 2011.

We cannot predict the impact on our business of these actions or any similar actions FHFA may require us and Fannie Mae to take in the future. It is possible that in some areas FHFA could require us and Fannie Mae to take a uniform approach that, because of differences in our respective businesses, could place Freddie Mac at a competitive disadvantage to Fannie Mae. We may be required to adopt approaches that are operationally difficult for us to implement. It also is possible that in some cases identifying, adopting and maintaining a uniform approach could entail higher costs than would a unilateral approach, and that when market conditions merit a change in a uniform approach, coordinating the change might entail additional cost and delay. If and when conservatorship ends, market acceptance of a uniform approach could make it difficult to depart from that approach even if doing so would be economically desirable.

**We are subject to significant limitations on our business under the Purchase Agreement that could have a material adverse effect on our results of operations and financial condition.**

The Purchase Agreement includes significant restrictions on our ability to manage our business, including limitations on the amount of indebtedness we may incur, the size of our mortgage-related investments portfolio, and the circumstances in which we may pay dividends, transfer certain assets, raise capital, and pay down the liquidation preference on the senior preferred stock. In addition, the Purchase Agreement provides that we may not enter into any new compensation arrangements or increase amounts or benefits payable under existing compensation arrangements of any executive officers without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury. In deciding whether or not to consent to any request for approval it receives from us under the Purchase Agreement, Treasury has the right to withhold its consent for any reason and is not required by the agreement to consider any particular factors, including whether or not management believes that the transaction would benefit the company. The limitations under the Purchase Agreement could have a material adverse effect on our future results of operations and financial condition.

**Our regulator may, and in some cases must, place us into receivership, which would result in the liquidation of our assets and terminate all rights and claims that our stockholders and creditors may have against our assets or under our charter; if we are liquidated, there may not be sufficient funds to pay the secured and unsecured claims of the company, repay the liquidation preference of any series of our preferred stock, or make any distribution to the holders of our common stock.**

We could be put into receivership at the discretion of the Director of FHFA at any time for a number of reasons, including conditions that FHFA has already asserted existed at the time the then Director of FHFA placed us into conservatorship. These include: a substantial dissipation of assets or earnings due to unsafe or unsound practices; the existence of an unsafe or unsound condition to transact business; an inability to meet our obligations in the ordinary course of business; a weakening of our condition due to unsafe or unsound practices or conditions; critical undercapitalization; the likelihood of losses that will deplete substantially all of our capital; or by consent. In addition, FHFA could be required to place us in receivership if Treasury is unable to provide us with funding requested under the Purchase Agreement to address a deficit in our net worth. For more information, see "— *If Treasury is unable to provide us with funding requested under the Purchase Agreement to address a deficit in our net worth, FHFA could be required to place us into receivership.*"

A receivership would terminate the conservatorship. The appointment of FHFA (or any other entity) as our receiver would terminate all rights and claims that our stockholders and creditors may have against our assets or under our charter arising as a result of their status as stockholders or creditors, other than the potential ability to be paid upon our liquidation. Unlike conservatorship, the purpose of which is to conserve our assets and return us to a sound and solvent condition, the purpose of receivership is to liquidate our assets and resolve claims against us.

In the event of a liquidation of our assets, there can be no assurance that there would be sufficient proceeds to pay the secured and unsecured claims of the company, repay the liquidation preference of any series of our preferred stock or make any distribution to the holders of our common stock. To the extent that we are placed into receivership and do not or cannot fulfill our guarantee to the holders of our mortgage-related securities, such holders could become unsecured creditors of ours with respect to claims made under our guarantee. Only after paying the secured and unsecured claims of the company, the administrative expenses of the receiver and the liquidation preference of the senior preferred stock, which ranks senior to our common stock and all other series of preferred stock upon liquidation, would any liquidation proceeds be available to repay the liquidation preference on any other series of preferred stock. Finally, only after the liquidation preference on all series of preferred stock is repaid would any liquidation proceeds be available for distribution to the holders of our common stock. The aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $72.3 billion upon funding of the draw request to address our net worth deficit as of December 31, 2011. The liquidation preference will increase further if, as we expect, we make additional draws under the Purchase Agreement. It will also increase if we do not pay dividends owed on the senior preferred stock in cash or if we do not pay the quarterly commitment fee to Treasury under the Purchase Agreement.

If we are placed into receivership or no longer operate as a going concern, we would no longer be able to assert that we will realize assets and satisfy liabilities in the normal course of business, and, therefore, our basis of accounting would change to liquidation-basis accounting. Under the liquidation basis of accounting, assets are stated at their estimated net realizable value and liabilities are stated at their estimated settlement amounts, which could adversely affect our net worth. In addition, the amounts in AOCI would be reclassified to earnings, which could also adversely affect our net worth.

***If Treasury is unable to provide us with funding requested under the Purchase Agreement to address a deficit in our net worth, FHFA could be required to place us into receivership.***

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are less than our obligations for a period of 60 calendar days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has also advised us that, if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination. If funding has been requested under the Purchase Agreement to address a deficit in our net worth, and Treasury is unable to provide us with such funding within the 60-day period specified by FHFA, FHFA would be required to place us into receivership if our assets remain less than our obligations during that 60-day period.

***The conservatorship and uncertainty concerning our future has had, and will likely continue to have, an adverse effect on the retention, recruitment, and engagement of management and other employees, which could have a material adverse effect on our ability to operate our business.***

Our ability to recruit, retain, and engage management and other employees with the necessary skills to conduct our business has been, and will likely continue to be, adversely affected by the conservatorship, the uncertainty regarding its duration, the potential for future legislative or regulatory actions that could significantly affect our existence and our role in the secondary mortgage market, and the negative publicity concerning the GSEs. Accordingly, we may not be able to retain or replace executives or other employees with the requisite institutional knowledge and the technical, operational, risk management, and other key skills needed to conduct our business effectively. We may also face increased operational risk if key employees leave the company.

The actions taken by Congress, Treasury, and the Conservator to date, or that may be taken by them or other government agencies in the future, may have an adverse effect on the retention and recruitment of senior executives, management, and other valuable employees. For example, we are subject to restrictions on the amount and type of compensation we may pay our executives under conservatorship. Also contributing to our concerns regarding executive retention risk is the aggregate level of compensation paid to our Section 16 executive officers, which for 2011 performance was significantly below the 25th percentile of market-based compensation. See "EXECUTIVE COMPENSATION" for more information. We cannot offer equity-based compensation, which is both common in our industry and provides a key incentive for employees to stay with the company. The Conservator directed us to maintain individual salaries and wage rates for all employees at 2010 levels for 2011 and 2012 (except in the case of promotions or significant changes in responsibilities). Given our current status, we cannot offer the prospects of even medium-term employment, much less long-term. Continued public condemnation of the company and its employees creates yet another obstacle to hiring and retaining the talent we need.

We are finding it difficult to retain and engage critical employees and attract people with the skills and experience we need. Voluntary attrition rates for high performing employees, those with specialized skill sets, and those responsible for controls over financial reporting have risen markedly since we were placed into conservatorship. This has led to concerns about staffing inadequacies, management depth, and employee engagement. Attracting qualified senior executives is particularly difficult. We operate in an environment in which virtually every business decision is closely scrutinized and subject to public criticism and review by various government authorities. Many executives are unwilling to work in such an environment for potentially significantly less than what they could earn elsewhere. A recovering economy is likely to put additional pressures on turnover in 2012, as other attractive opportunities may become available to people who we want to retain. The high and increasing level of scrutiny from FHFA and its Office of Inspector General and other regulators has also heightened stress levels throughout the organization and placed additional burdens on staff.

In 2011, the Financial Services Committee of the House of Representatives approved a bill that would generally put our employees on the federal government's pay scale, and in 2012 the House and Senate each approved legislation containing a provision that would prohibit senior executives from receiving bonuses during conservatorship. If this or similar legislation were to become law, many of our employees would experience a sudden and sharp decrease in compensation. The Acting Director of FHFA stated on November 15, 2011 that this "would certainly risk a substantial exodus of talent, the best leaving first in many instances. [Freddie Mac and Fannie Mae] likely would suffer a rapidly growing vacancy list and replacements with lesser skills and no experience in their specific jobs. A significant increase in safety and soundness risks and in costly operational failures would, in my opinion, be highly likely." The Acting Director

noted that "[s]hould the risks I fear materialize, FHFA might well be forced to limit [Freddie Mac and Fannie Mae's] business activities. Some of the business [Freddie Mac and Fannie Mae] would be unable to undertake might simply not occur, with potential disruption in housing markets and the economy." For more information on legislative developments affecting compensation, see "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments — Legislation Related to Reforming Freddie Mac and Fannie Mae*."

***The conservatorship and investment by Treasury has had, and will continue to have, a material adverse effect on our common and preferred stockholders.***

Prior to our entry into conservatorship, the market price for our common stock declined substantially. After our entry into conservatorship, the market price of our common stock continued to decline, and has been $1 or less per share since June 2010. As a result, the investments of our common and preferred stockholders lost substantial value, which they may never recover. There is significant uncertainty as to what changes may occur to our business structure during or following our conservatorship, including whether we will continue to exist. Therefore, it is likely that our shares could further diminish in value, or cease to have any value. The Acting Director of FHFA has stated that "[Freddie Mac and Fannie Mae's] equity holders retain an economic claim on the companies but that claim is subordinate to taxpayer claims. As a practical matter, taxpayers are not likely to be repaid in full, so [Freddie Mac and Fannie Mae] stock lower in priority is not likely to have any value."

The conservatorship and investment by Treasury has had, and will continue to have, other material adverse effects on our common and preferred stockholders, including the following:

- *No voting rights during conservatorship.*   The rights and powers of our stockholders are suspended during the conservatorship and our common stockholders do not have the ability to elect directors or to vote on other matters.

- *No longer managed to maximize stockholder returns.*   Because we are in conservatorship, we are no longer managed with a strategy to maximize stockholder returns. FHFA has stated that it has focused Freddie Mac and Fannie Mae on their existing core business, including minimizing credit losses, and taking actions necessary to advance the goals of the conservatorship. FHFA stated that it is not permitting Freddie Mac and Fannie Mae to offer new products or enter into new lines of business. FHFA stated that the focus of the conservatorship is on conserving assets, minimizing corporate losses, ensuring Freddie Mac and Fannie Mae continue to serve their mission, overseeing remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed.

- *Priority of Senior Preferred Stock.*   The senior preferred stock ranks senior to the common stock and all other series of preferred stock as to both dividends and distributions upon dissolution, liquidation or winding up of the company.

- *Dividends have been eliminated.*   The Conservator has eliminated dividends on Freddie Mac common and preferred stock (other than dividends on the senior preferred stock) during the conservatorship. In addition, under the terms of the Purchase Agreement, dividends may not be paid to common or preferred stockholders (other than on the senior preferred stock) without the consent of Treasury, regardless of whether or not we are in conservatorship.

- *Warrant may substantially dilute investment of current stockholders.*   If Treasury exercises its warrant to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis, the ownership interest in the company of our then existing common stockholders will be substantially diluted. It is possible that stockholders, other than Treasury, will not own more than 20.1% of our total common stock for the duration of our existence. Under our charter, bylaws and applicable law, 20.1% is insufficient to control the outcome of any vote that is presented to the common stockholders. Accordingly, existing common stockholders have no assurance that, as a group, they will be able to control the election of our directors or the outcome of any other vote after the time, if any, that the conservatorship ends.

**Competitive and Market Risks**

***Our investment activity is significantly limited under the Purchase Agreement and by FHFA, which will likely reduce our earnings from investment activities over time and result in greater reliance on our guarantee activities to generate revenue.***

We are subject to significant limitations on our investment activity, which will adversely affect the earnings capacity of our mortgage-related investments portfolio over time. These limitations include: (a) a requirement to reduce the size of

our mortgage-related investments portfolio; and (b) significant constraints on our ability to purchase or sell mortgage assets.

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $729 billion as of December 31, 2011 and may not exceed $656.1 billion as of December 31, 2012. Our mortgage-related investments portfolio has contracted considerably since we entered into conservatorship, and we are working with FHFA to identify ways to prudently accelerate the rate of contraction of the portfolio. Our ability to take advantage of opportunities to purchase or sell mortgage assets at attractive prices has been, and likely will continue to be, limited. In addition, we can provide no assurance that the cap on our mortgage-related investments portfolio will not, over time, force us to sell mortgage assets at unattractive prices, particularly given the potential in coming periods for continued high volumes of loan modifications and removal of seriously delinquent loans, both of which result in the removal of mortgage loans from our PCs for our mortgage-related investments portfolio. We expect that our holdings of unsecuritized single-family loans will continue to increase in 2012 due to the recent revisions to HARP, which will result in our purchase of mortgage loans with LTV ratios greater than 125%, as we have not yet implemented a securitization process for such loans. For more information on the various restrictions and limitations on our investment activity and our mortgage-related investments portfolio, see "BUSINESS — Conservatorship and Related Matters — *Impact of Conservatorship and Related Actions on Our Business — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio*."

These limitations will reduce the earnings capacity of our mortgage-related investments portfolio business and require us to place greater emphasis on our guarantee activities to generate revenue. However, under conservatorship, our ability to generate revenue through guarantee activities may be limited, as we may be required to adopt business practices that provide support for the mortgage market in a manner that serves our public mission and other non-financial objectives, but that may negatively impact our future financial results from guarantee activities. The combination of the restrictions on our business activities under the Purchase Agreement and FHFA regulation, combined with our potential inability to generate sufficient revenue through our guarantee activities to offset the effects of those restrictions, may have an adverse effect on our results of operations and financial condition. There can be no assurance that the current profitability levels on our new single-family business would be sufficient to attract new private sector capital in the future, should the company be in a position to seek such capital. We generally must obtain FHFA's approval in order to increase pricing in our guarantee business, and there can be no assurance FHFA will approve any such request. On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Our business and financial condition will not benefit from the increases in guarantee fees under this law, as we must remit the proceeds from such increases to Treasury. It is currently unclear what effect this will have on our ability to raise guarantee fees that may be retained by us. For more information, see "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments — Legislated Increase to Guarantee Fees.*"

***We are subject to mortgage credit risks, including mortgage credit risk relating to off-balance sheet arrangements; increased credit costs related to these risks could adversely affect our financial condition and/or results of operations.***

Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage we own or guarantee, exposing us to the risk of credit losses and credit-related expenses. We are primarily exposed to mortgage credit risk with respect to the single-family and multifamily loans that we own or guarantee and hold on our consolidated balance sheets. We are also exposed to mortgage credit risk with respect to securities and guarantee arrangements that are not reflected as assets on our consolidated balance sheets. These relate primarily to: (a) Freddie Mac mortgage-related securities backed by multifamily loans; (b) certain Other Guarantee Transactions; and (c) other guarantee commitments, including long-term standby commitments and liquidity guarantees.

Significant factors that affect the level of our single-family mortgage credit risk include the credit profile of the borrower (*e.g.*, credit score, credit history, and monthly income relative to debt payments), documentation level, the number of borrowers, the features of the mortgage loan, occupancy type, the type of property securing the mortgage, the LTV ratio of the loan, and local and regional economic conditions, including home prices and unemployment rates. Our credit losses will remain high for the foreseeable future due to the substantial number of mortgage loans in our single-family credit guarantee portfolio on which borrowers owe more than their home is currently worth, as well as the substantial inventory of seriously delinquent loans.

While mortgage interest rates remained low in 2011, many borrowers may not have been able to refinance into lower interest mortgages or reduce their monthly payments through mortgage modifications due to substantial declines in home values, market uncertainty, and continued high unemployment rates. Therefore, there can be no assurance that continued

low mortgage interest rates or efforts to modify and refinance mortgages pursuant to the MHA Program (including pursuant to the revisions to HARP announced in October 2011) and to modify mortgages under our other loss mitigation initiatives will reduce our overall mortgage credit risk.

We also continue to have significant amounts of mortgage loans in our single-family credit guarantee portfolio with certain characteristics, such as Alt-A, interest-only, option ARMs, loans with original LTV ratios greater than 90%, and loans where borrowers had FICO scores less than 620 at the time of origination, that expose us to greater credit risk than do other types of mortgage loans. As of December 31, 2011, loans with one or more of the above characteristics comprised approximately 20% of our single-family credit guarantee portfolio. See "Table 50 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio" for more information.

Beginning in 2008, the conforming loan limits were significantly increased for mortgages originated in certain "high cost" areas (the initial increases applied to loans originated after July 1, 2007). Due to our relative lack of experience with these "conforming jumbo" loans, purchases pursuant to the high cost conforming loan limits may also expose us to greater credit risks.

The level of our multifamily mortgage credit risk is affected by the mortgaged property's ability to generate rental income from which debt service can be paid. That ability in turn is affected by rental market conditions (*e.g.*, rental and vacancy rates), the physical condition of the property, the quality of the property's management, and the level of operating costs. For certain multifamily mortgage products, we utilize other forms of credit enhancement, such as subordination through Other Guarantee Transactions, which are intended to reduce our risk exposure.

A risk we continue to monitor is that multifamily borrowers will default if they are unable to refinance their loans at an affordable rate. This risk is particularly important with respect to multifamily loans because such loans generally have a balloon payment and typically have a shorter contractual term than single-family mortgages. Borrowers may be less able to refinance their obligations during periods of rising interest rates or weak economic conditions, which could lead to default if the borrower is unable to find affordable refinancing. However, of the $116.1 billion in UPB of loans in our multifamily mortgage portfolio as of December 31, 2011, only approximately 3% and 5% will reach their maturity during 2012 and 2013, respectively.

***We are exposed to significant credit risk related to the subprime, Alt-A, and option ARM loans that back the non-agency mortgage-related securities we hold.***

Our investments in non-agency mortgage-related securities include securities that are backed by subprime, Alt-A, and option ARM loans. As of December 31, 2011, such securities represented approximately 54% of our total investments in non-agency mortgage-related securities. Since 2007, mortgage loan delinquencies and credit losses in the U.S. mortgage market have substantially increased, particularly in the subprime, Alt-A, and option ARM sectors of the residential mortgage market. In addition, home prices have declined significantly, after extended periods during which home prices appreciated. As a result, the fair value of these investments has declined significantly since 2007, and we have recorded substantial other-than-temporary impairments, which has adversely impacted stockholders equity (deficit). In addition, most of these investments do not trade in a liquid secondary market and the size of our holdings relative to normal market activity is such that, if we were to attempt to sell a significant quantity of these securities, the pricing in such markets could be significantly disrupted and the price we ultimately realize may be materially lower than the value at which we carry these investments on our consolidated balance sheets.

We could experience additional GAAP losses due to other-than-temporary impairments on our investments in these non-agency mortgage-related securities if, among other things: (a) interest rates change; (b) delinquency and loss rates on subprime, Alt-A, and option ARM loans increase; (c) there is a further decline in actual or forecasted home prices; or (d) there is a deterioration in servicing performance. In addition, the fair value of these investments may decline further due to additional ratings downgrades or market events. Any credit enhancements covering these securities, including subordination and other structural enhancements, may not prevent us from incurring losses. During 2011, we continued to experience the erosion of structural credit enhancements on many securities backed by subprime first lien, option ARM, and Alt-A loans due to poor performance of the underlying mortgages. The financial condition of bond insurers also continued to deteriorate in 2011. See "MD&A — CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for information about the credit ratings for these securities and the extent to which these securities have been downgraded.

***Certain strategies to mitigate our losses as an investor in non-agency mortgage-related securities may adversely affect our relationships with some of our largest seller/servicers.***

On September 2, 2011, FHFA announced that, as Conservator for Freddie Mac and Fannie Mae, it had filed lawsuits against 17 financial institutions and related defendants alleging: (a) violations of federal securities laws; and (b) in certain lawsuits, common law fraud in the sale of residential non-agency mortgage-related securities to Freddie Mac and Fannie Mae. These institutions include some of our largest seller/servicers and counterparties. FHFA, as Conservator, filed a similar lawsuit against UBS Americas, Inc. and related defendants on July 27, 2011. FHFA seeks to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in certain residential non-agency mortgage-related securities issued by these financial institutions.

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non-agency mortgage-related securities we hold, and are engaged in other efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. For example, FHFA, as Conservator of Freddie Mac and Fannie Mae, has issued subpoenas to various entities seeking loan files and other transaction documents related to non-agency mortgage-related securities in which the two enterprises invested. FHFA stated that the documents will enable it to determine whether issuers of these securities and others are liable to Freddie Mac and Fannie Mae for certain losses they have suffered on the securities. We are assisting FHFA in this effort.

These and other loss mitigation efforts may lead to further disputes with some of our largest seller/servicers and counterparties that may result in further litigation. This could adversely affect our relationship with any such company and could, for example, result in the loss of some or all of our business with a large seller/servicer. The effectiveness of these loss mitigation efforts is highly uncertain and any potential recoveries may take significant time to realize. For more information, see "MD&A — RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Non-Agency Mortgage-Related Security Issuers*."

***The credit losses we experience in future periods as a result of the housing and economic downturn are likely to be larger, perhaps substantially larger, than our current loan loss reserves.***

Our loan loss reserves, as reflected on our consolidated balance sheets, do not reflect the total of all future credit losses we will ultimately incur with respect to our single-family and multifamily mortgage loans, including those underlying our financial guarantees. Rather, pursuant to GAAP, our reserves only reflect probable losses we believe we have already incurred as of the balance sheet date. Accordingly, although we believe that our credit losses may exceed the amounts we have already reserved for loans currently identified as impaired, and that additional credit losses will be incurred in the future due to the housing and economic downturn, we are not permitted under GAAP to reflect the potential impact of these future trends in our loan loss reserves. As a result of the depth and extent of the housing and economic downturn, there is significant uncertainty regarding the full extent of future credit losses. Therefore, such credit losses are likely to be larger, perhaps substantially larger, than our current loan loss reserves. Additional credit losses we incur in future periods will adversely affect our business, results of operations, financial condition, liquidity, and net worth.

***Further declines in U.S. home prices or other adverse changes in the U.S. housing market could negatively impact our business and increase our losses.***

Throughout 2011, the U.S. housing market continued to experience adverse trends, including continued price depreciation, continued high serious delinquency and default rates, and extended foreclosure timelines. Low volumes of home sales and the continued large supply of unsold homes placed further downward pressure on home prices. These conditions, coupled with continued high unemployment, led to continued high loan delinquencies and provisioning for loan losses. Our credit losses remained high in 2011, in part because home prices have experienced significant cumulative declines in many geographic areas in recent years. We expect that national average home prices will continue to remain weak and will likely decline over the near term, which could result in a continued high rate of serious delinquencies or defaults and a level of credit-related losses higher than our expectations when our guarantees were issued.

We prepare internal forecasts of future home prices, which we use for certain business activities, including: (a) hedging prepayment risk; (b) setting fees for new guarantee business; and (c) portfolio activities. It is possible that home price declines could be significantly greater than we anticipate, or that a sustained recovery in home prices would not begin until much later than we anticipate, which could adversely affect our performance of these business activities. For example, this could cause the return we earn on new single-family guarantee business to be less than expected. This could also result in higher losses due to other-than-temporary impairments on our investments in non-agency mortgage-related securities than would otherwise be recognized in earnings. Government programs designed to strengthen the

U.S. housing market, such as the MHA Program, may fail to achieve expected results, and new programs could be instituted that cause our credit losses to increase. For more information, see "MD&A — RISK MANAGEMENT — Credit Risk."

Our business volumes are closely tied to the rate of growth in total outstanding U.S. residential mortgage debt and the size of the U.S. residential mortgage market. Total residential mortgage debt declined approximately 1.8% in the first nine months of 2011 (the most recent data available) compared to a decline of approximately 3.2% in 2010. If total outstanding U.S. residential mortgage debt were to continue to decline, there could be fewer mortgage loans available for us to purchase, and we could face more competition to purchase a smaller number of loans.

While multifamily market fundamentals (*i.e.*, vacancy rates and effective rents) improved during 2011, there can be no assurance that this trend will continue. Certain local multifamily markets exhibit relatively weak fundamentals, especially some of those hit hardest by residential home price declines. Any further softening of the broader economy could have negative impacts on multifamily markets, which could cause delinquencies and credit losses relating to our multifamily activities to increase beyond our current expectations.

***Our refinance volumes could decline if interest rates rise, which could cause our overall new mortgage-related security issuance volumes to decline.***

We continued to experience a high percentage of refinance mortgages in our purchase volume during 2011 due to continued low interest rates and the impact of our relief refinance mortgages. Interest rates have been at historically low levels for an extended period of time. Overall originations of refinance mortgages, and our purchases of them, will likely decrease if interest rates rise and home prices remain at depressed levels. Originations of refinance mortgages will also likely decline after the Home Affordable Refinance Program expires in December 2013. In addition, many eligible borrowers have already refinanced at least once during this period of low interest rates, and therefore may be unlikely to do so again in the near future. It is possible that our overall mortgage-related security issuance volumes could decline if our volumes of purchase money mortgages do not increase to offset any such decrease in refinance mortgages. This could adversely affect the amount of revenue we receive from our guarantee activities.

***We could incur significant credit losses and credit-related expenses in the event of a major natural disaster or other catastrophic event in geographic areas in which portions of our total mortgage portfolio and REO holdings are concentrated.***

We own or guarantee mortgage loans and own REO properties throughout the United States. The occurrence of a major natural or environmental disaster (such as an earthquake, hurricane, tsunami, or widespread damage caused to the environment by commercial entities), terrorist attack, pandemic, or similar catastrophic event in a regional geographic area of the United States could negatively impact our credit losses and credit-related expenses in the affected area.

The occurrence of a catastrophic event could negatively impact a geographic area in a number of different ways, depending on the nature of the event. A catastrophic event that either damaged or destroyed residential real estate underlying mortgage loans we own or guarantee or negatively impacted the ability of homeowners to continue to make principal and interest payments on mortgage loans we own or guarantee could increase our serious delinquency rates and average loan loss severity in the affected region or regions, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. Such an event could also damage or destroy REO properties we own. While we attempt to maintain a geographically diverse portfolio, there can be no assurance that a catastrophic event, depending on its magnitude, scope and nature, will not generate significant credit losses and credit-related expenses. We may not have insurance coverage for some of these catastrophic events. In some cases, we may be prohibited by state law from requiring such insurance as a condition to our purchasing or guaranteeing loans.

***We depend on our institutional counterparties to provide services that are critical to our business, and our results of operations or financial condition may be adversely affected if one or more of our institutional counterparties do not meet their obligations to us.***

We face the risk that one or more of the institutional counterparties that has entered into a business contract or arrangement with us may fail to meet its obligations. We face similar risks with respect to contracts or arrangements we benefit from indirectly or that we enter into on behalf of our securitization trusts. Our primary exposures to institutional counterparty risk are with:

- mortgage seller/servicers;
- mortgage insurers;

- issuers, guarantors or third-party providers of other credit enhancements (including bond insurers);

- counterparties to short-term lending and other investment-related agreements and cash equivalent transactions, including such agreements and transactions we manage for our PC trusts;

- derivative counterparties;

- hazard and title insurers;

- mortgage investors and originators; and

- document custodians and funds custodians.

Many of our counterparties provide several types of services to us. In some cases, our business with institutional counterparties is concentrated. The concentration of our exposure to our counterparties increased in recent periods due to industry consolidation and counterparty failures, and we continue to face challenges in reducing our risk concentrations with counterparties. Efforts we take to reduce exposure to financially weakened counterparties could further increase our exposure to other individual counterparties. In the future, our mortgage insurance exposure will be concentrated among a smaller number of counterparties. A significant failure by a major institutional counterparty could harm our business and financial results in a variety of ways, including by adversely affecting our ability to conduct operations efficiently and at cost-effective rates, and have a material adverse effect on our investments in mortgage loans, investments in securities, our derivative portfolio or our credit guarantee activities. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information.

Some of our counterparties may become subject to serious liquidity problems affecting their businesses, either temporarily or permanently, which may adversely affect their ability to meet their obligations to us. In recent periods, challenging market conditions have adversely affected the liquidity and financial condition of our counterparties. These trends may continue. In particular, we believe all of our derivative portfolio and cash and other investments portfolio counterparties are exposed to fiscally troubled European countries. It is possible that continued adverse developments in the Eurozone could significantly impact such counterparties. In turn, this could adversely affect their ability to meet their obligations to us.

In the past few years, some of our largest seller/servicers have experienced ratings downgrades and liquidity constraints, and certain large lenders have failed. These challenging market conditions could also increase the likelihood that we will have disputes with our counterparties concerning their obligations to us, especially with respect to counterparties that have experienced financial strain and/or have large exposures to us. See "MD&A — RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for additional information regarding our credit risks to certain categories of counterparties and how we seek to manage them.

The servicing of mortgage loans backing our single-family non-agency mortgage-related securities investments is concentrated in a small number of institutions. We could experience losses on these investments from servicing performance deterioration should one of these institutions come under financial distress. Furthermore, Freddie Mac's rights as a non-agency mortgage-related securities investor to transfer servicing are limited.

***Our financial condition or results of operations may be adversely affected if mortgage seller/servicers fail to repurchase loans sold to us in breach of representations and warranties or fail to honor any related indemnification or recourse obligations.***

We require seller/servicers to make certain representations and warranties regarding the loans they sell to us. If loans are sold to us in breach of those representations and warranties, we have the contractual right to require the seller/servicer to repurchase those loans from us. In lieu of repurchase, we may agree to allow a seller/servicer to indemnify us against losses on such mortgages or otherwise compensate us for the risk of continuing to hold the mortgages. Sometimes a seller/servicer sells us mortgages with recourse, meaning that the seller/servicer agrees to repurchase any mortgage that is delinquent for more than a specified period (usually 120 days), regardless of whether there has been a breach of representations and warranties.

Some of our seller/servicers have failed to fully perform their repurchase obligations due to lack of financial capacity, while others, including many of our larger seller/servicers, have not fully performed their repurchase obligations in a timely manner. As of December 31, 2011 and 2010, the UPB of loans subject to repurchase requests based on breaches of representations and warranties issued to our single-family seller/servicers was approximately $2.7 billion and $3.8 billion, respectively. As of December 31, 2011, approximately $1.2 billion of such loans were subject to repurchase requests issued due to mortgage insurance rescission or mortgage insurance claim denial.

Our contracts require that a seller/servicer repurchase a mortgage within 30 days after we issue a repurchase request, unless the seller/servicer avails itself of an appeal process provided for in our contracts, in which case the deadline for repurchase is extended until we decide the appeal. As of December 31, 2011 and 2010, approximately 39% and 34%, respectively, of these repurchase requests were outstanding more than four months since issuance of our repurchase request (these figures included repurchase requests for which appeals were pending).

The amount we collect on these requests and others we may make in the future could be significantly less than the UPB of the loans subject to the repurchase requests primarily because we expect many of these requests will likely be satisfied by reimbursement of our realized credit losses by seller/servicers, instead of repurchase of loans at their UPB, or may be rescinded in the course of the contractual appeals process. Based on our historical loss experience and the fact that many of these loans are covered by credit enhancement, we expect the actual credit losses experienced by us should we fail to collect on these repurchase requests will also be less than the UPB of the loans. We may also enter into agreements with seller/servicers to resolve claims for repurchases. The amounts we receive under any such agreements may be less than the losses we ultimately incur.

Our credit losses may increase to the extent our seller/servicers do not fully perform their repurchase obligations. Enforcing repurchase obligations of seller/servicers who have the financial capacity to perform those obligations could also negatively impact our relationships with such customers and could result in the loss of some or all of our business with such customers, which could negatively impact our ability to retain market share. It may be difficult, expensive, and time-consuming to legally enforce a seller/servicer's repurchase obligations, in the event a seller/servicer continues to fail to perform such obligations.

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP. We may face greater exposure to credit and other losses on these HARP loans because we are not requiring lenders to provide us with certain representations and warranties on these HARP loans. For more information, see "MD&A — RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program* — Home Affordable Refinance Program and Relief Refinance Mortgage Initiative."

We also have exposure to seller/servicers with respect to mortgage insurance. When a mortgage insurer rescinds coverage or denies or curtails a claim, we may require the seller/servicer to repurchase the mortgage or to indemnify us for additional loss. The volume of rescissions, claim denials, and curtailments by mortgage insurers remains high.

### *We face the risk that seller/servicers may fail to perform their obligations to service loans in our single-family and multifamily mortgage portfolios or that their servicing performance could decline.*

Our seller/servicers have a significant role in servicing loans in our single-family credit guarantee portfolio, which includes an active role in our loss mitigation efforts. Therefore, a decline in their performance could impact our credit performance (including through missed opportunities for mortgage modifications), which could adversely affect our financial condition or results of operations and have a significant impact on our ability to mitigate credit losses. The risk of such a decline in performance remains high. The high levels of seriously delinquent loan volume, the ongoing weak conditions of the mortgage market, and the number and variety of additions and changes to HAMP and our other loan modification and loss mitigation initiatives have placed a strain on the loss mitigation resources of many of our seller/servicers. This has also increased the operational complexity of the servicing function, as well as the risk that errors will occur. A number of seller/servicers have had to address issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, which has further strained their resources. There have also been a number of regulatory developments that have increased, or could increase, the complexity of the servicing function. It is also possible that we could be directed to introduce additional changes to the servicing function that increase its complexity, such as new or revised loan modification or loss mitigation initiatives or new compensation arrangements. Our expected ability to partially mitigate losses through loan modifications and other alternatives to foreclosure is a factor we consider in determining our allowance for loan losses. Therefore, the inability to realize the anticipated benefits of our loss mitigation plans could cause our losses to be significantly higher than those currently estimated. Weak economic conditions continue to affect the liquidity and financial condition of many of our seller/servicers, including some of our largest seller/servicers. Any efforts we take to attempt to improve our servicers' performance could adversely affect our relationships with such servicers, many of which also sell loans to us.

If a servicer does not fulfill its servicing obligations (including its repurchase or other responsibilities), we may seek partial or full recovery of the amounts that such servicer owes us, such as by attempting to sell the applicable mortgage servicing rights to a different servicer and applying the proceeds to such owed amounts, or by contracting the servicing responsibilities to a different servicer and retaining the net servicing fee. The ongoing weakness in the housing market has negatively affected the market for mortgage servicing rights, which increases the risk that we might not receive a

sufficient price for such rights or that we may be unable to find buyers who: (a) have sufficient capacity to service the affected mortgages in compliance with our servicing standards; (b) are willing to assume the representations and warranties of the former servicer regarding the affected mortgages (which we typically require); and (c) have sufficient capacity to service all of the affected mortgages. Increased industry consolidation, bankruptcies of mortgage bankers or bank failures may also make it more difficult for us to sell such rights, because there may not be sufficient capacity in the market, particularly in the event of multiple failures. This option may be difficult to accomplish with respect to our larger seller/servicers due to operational and capacity challenges of transferring a large servicing portfolio. The financial stress on servicers and increased costs of servicing may lead to strategic defaults (*i.e.*, defaults done deliberately as a financial strategy, and not involuntarily) by servicers, which would also require us to seek a successor servicer.

Our seller/servicers also have a significant role in servicing loans in our multifamily mortgage portfolio. We are exposed to the risk that multifamily seller/servicers could come under financial pressure, which could potentially cause degradation in the quality of the servicing they provide us including their monitoring of each property's financial performance and physical condition. This could also, in certain cases, reduce the likelihood that we could recover losses through lender repurchases, recourse agreements, or other credit enhancements, where applicable.

See "MD&A — RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Single-family Mortgage Seller/ Servicers*" and "— *Multifamily Mortgage Seller/Servicers*" for additional information on our institutional credit risk related to our mortgage seller/servicers.

### *Our financial condition or results of operations may be adversely affected by the financial distress of our counterparties to derivatives, funding, and other transactions.*

We use derivatives for several purposes, including to regularly adjust or rebalance our funding mix in response to changes in the interest-rate characteristics of our mortgage-related assets and to hedge forecasted issuances of debt. The relative concentration of our derivative exposure among our primary derivative counterparties remains high. This concentration increased in the last several years due to industry consolidation and the failure of certain counterparties, and could further increase. Three of our derivative counterparties each accounted for greater than 10% of our net uncollateralized exposure, excluding commitments, at December 31, 2011. For a further discussion of our exposure to derivative counterparties, see "MD&A — RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Derivative Counterparties*" and "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS."

Some of our derivative and other capital markets counterparties have experienced various degrees of financial distress in the past few years, including liquidity constraints, credit downgrades, and bankruptcy. Our financial condition and results of operations may be adversely affected by the financial distress of these derivative and other capital markets counterparties to the extent that they fail to meet their obligations to us. For example, our OTC derivative counterparties are required to post collateral in certain circumstances to cover our net exposure to them on derivative contracts. We may incur losses if the collateral held by us cannot be liquidated at prices that are sufficient to cover the amount of such exposure.

Our ability to engage in routine derivatives, funding, and other transactions could be adversely affected by the actions of other financial institutions. Financial services institutions are interrelated as a result of trading, clearing, counterparty, or other relationships. As a result, defaults by, or even rumors or questions about, one or more financial services institutions, or the financial services industry generally, could lead to market-wide disruptions in which it may be difficult for us to find acceptable counterparties for such transactions.

We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures. Thus, if our access to the derivative markets were disrupted, it may become more difficult or expensive to fund our business activities and achieve the funding mix we desire, which could adversely affect our business and results of operations.

### *Our credit losses and other-than-temporary impairments recognized in earnings could increase if our mortgage or bond insurers become insolvent or fail to perform their obligations to us.*

We are exposed to risk relating to the potential insolvency of or non-performance by mortgage insurers that insure single-family mortgages we purchase or guarantee and bond insurers that insure certain of the non-agency mortgage-related securities we hold. The weakened financial condition and liquidity position of these counterparties increases the risk that these entities will fail to fully reimburse us for claims under insurance policies. This risk could increase if home prices deteriorate further or if the economy worsens.

As a guarantor, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligations to reimburse us for claims. Thus, if any of our mortgage insurers that provide credit enhancement fails to fulfill its obligation, we could experience increased credit losses. In addition, if a regulator determined that a mortgage insurer lacked sufficient capital to pay all claims when due, the regulator could take action that might impact the timing and amount of claim payments made to us. We independently assess the financial condition, including the claims-paying resources, of each of our mortgage insurers. Based on our analysis of the financial condition of a mortgage insurer and pursuant to our eligibility requirements for mortgage insurers, we could take action against a mortgage insurer intended to protect our interests that may impact the timing and amount of claims payments received from that insurer. We expect to receive substantially less than full payment of our claims from Triad Guaranty Insurance Corp., Republic Mortgage Insurance Company and PMI Mortgage Insurance Co. We also believe that certain other of our mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as such claims emerge.

In the event one or more of our bond insurers were to become insolvent, it is likely that we would not collect all of our claims from the affected insurer. This would impact our ability to recover certain unrealized losses on our investments in non-agency mortgage-related securities, and could contribute to net impairment of available-for-sale securities recognized in earnings. We evaluate the expected recovery from primary bond insurance policies as part of our impairment analysis for our investments in securities. If a bond insurer's performance with respect to its obligations on our investments in securities is worse than expected, this could contribute to additional net impairment of those securities. In addition, the fair values of our securities may further decline, which could also have a material adverse effect on our results and financial condition. We expect to receive substantially less than full payment from several of our bond insurers, including Ambac Assurance Corporation and Financial Guaranty Insurance Company, due to adverse developments concerning these companies. Ambac Assurance Corporation and Financial Guaranty Insurance Company are currently not paying any of their claims. We believe that some of our other bond insurers may also lack sufficient ability to fully meet all of their expected lifetime claims-paying obligations to us as such claims emerge.

For more information on developments concerning our mortgage insurers and bond insurers, see "MD&A — RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Mortgage Insurers" and "— Bond Insurers*."

***If mortgage insurers were to further tighten their standards or fall out of compliance with regulatory capital requirements, the volume of high LTV ratio mortgages available for us to purchase could be reduced, which could reduce our overall volume of new business. Mortgage insurance standards could constrain our future ability to purchase loans with LTV ratios over 80%.***

Our charter requires that single-family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests. Our purchases of mortgages with LTV ratios above 80% (other than relief refinance mortgages) have declined in recent years, in part because mortgage insurers tightened their eligibility requirements with respect to the issuance of insurance on new mortgages with such higher LTV ratios. If mortgage insurers further restrict their eligibility requirements for such loans, or if we are no longer willing or able to obtain mortgage insurance from these counterparties under terms we find reasonable, and we are not able to avail ourselves of suitable alternative methods of obtaining credit enhancement for these loans, we may be further restricted in our ability to purchase or securitize loans with LTV ratios over 80% at the time of purchase. This could further reduce our overall volume of new business. This could also negatively impact our ability to participate in a significant segment of the mortgage market (*i.e.*, loans with LTV ratios over 80%) should we seek, or be directed, to do so.

If a mortgage insurance company were to fall out of compliance with regulatory capital requirements and not obtain appropriate waivers, it could become subject to regulatory actions that restrict its ability to write new business in certain, or in some cases all, states. During the third quarter of 2011, Republic Mortgage Insurance Company and PMI Mortgage Insurance Co. were prohibited from writing new business by their primary state regulators and neither writes new business in any state any longer. Given the difficulties in the mortgage insurance industry, we believe it is likely that other companies may be unable to meet regulatory capital requirements.

A mortgage insurer may attempt a corporate restructuring designed to enable it to continue to write new business through a new entity in the event the insurer falls out of compliance with regulatory capital requirements. However, there can be no assurance that an insurer would be able to accomplish such a restructuring, as the restructured entity would be required to satisfy regulatory requirements as well as our own conditions. These restructuring plans generally involve contributing capital to a subsidiary or affiliate. This could result in less liquidity available to the existing mortgage insurer to pay claims on its existing book of business, and an increased risk that the mortgage insurer would not pay its claims in full in the future. We monitor the claim paying ability of our mortgage insurers. As these restructuring plans are presented

to us for review, we attempt to determine whether the insurers' plans make available sufficient resources to meet their obligations to policyholders of the insurance entities involved in the restructuring. However, there can be no assurance that any such restructuring will enable payment in full of all claims in the future. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses — *Single-Family Loans*" for more information.

***We could incur increased credit losses if our seller/servicers enter into arrangements with mortgage insurers for settlement of future rescission activity and such agreements could potentially reduce the ability of mortgage insurers to pay claims to us.***

Under our contracts with our seller/servicers, the rescission or denial of mortgage insurance on a loan is grounds for us to make a repurchase request to the seller/servicer. At least one of our largest servicers has entered into arrangements with two of our mortgage insurance counterparties under which the servicer pays and/or indemnifies the insurer in exchange for the mortgage insurer agreeing not to issue mortgage insurance rescissions or denials of coverage on Freddie Mac mortgages. When such an agreement is in place, we are unable to make repurchase requests based solely on a rescission of insurance or denial of coverage. Thus, there is a risk that we will experience higher credit losses if we do not independently identify other areas of noncompliance with our contractual requirements and require lenders to repurchase the loans we own. Additionally, there could be a negative financial impact on our mortgage insurers' ability to pay their other obligations to us if the payments they receive from the seller/servicers are insufficient to compensate them for the insurance claims paid that would have otherwise been denied. As guarantor of the insured loans, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligation to reimburse us for claims, and this could increase our credit losses. In April 2011, we issued an industry letter to our servicers reminding them that they may not enter into these types of agreements without our consent. Several of our servicers have asked us to consent to these types of agreements. We are evaluating these requests on a case by case basis.

***The loss of business volume from key lenders could result in a decline in our market share and revenues.***

Our business depends on our ability to acquire a steady flow of mortgage loans. We purchase a significant percentage of our single-family mortgages from several large mortgage originators. During 2011 and 2010, approximately 82% and 78%, respectively, of our single-family mortgage purchase volume was associated with our ten largest customers. During 2011, two mortgage lenders (Wells Fargo Bank, N.A. and JPMorgan Chase Bank, N.A.) each accounted for more than 10% of our single-family mortgage purchase volume and collectively accounted for approximately 40% of our single-family mortgage purchase volume. Similarly, we acquire a significant portion of our multifamily mortgage loans from several large lenders.

We enter into mortgage purchase volume commitments with many of our single-family customers that provide for the customers to deliver to us a certain volume of mortgages during a specified period of time. Some commitments may also provide for the lender to deliver to us a minimum percentage of their total sales of conforming loans. There is a risk that we will not be able to enter into new commitments with our key single-family customers that will maintain mortgage purchase volume following the expiration of our existing commitments with them. Since 2007, the mortgage industry has consolidated significantly and a smaller number of large lenders originate most single-family mortgages. The loss of business from any one of our major lenders could adversely affect our market share and our revenues. Many of our seller/servicers also have tightened their lending criteria in recent years, which has reduced their loan volume, thus reducing the volume of loans available for us to purchase.

***Ongoing weak business and economic conditions in the U.S. and abroad may adversely affect our business and results of operations.***

Our business and results of operations are significantly affected by general business and economic conditions, including conditions in the international markets for our investments or our mortgage-related and debt securities. These conditions include employment rates, fluctuations in both debt and equity capital markets, the value of the U.S. dollar as compared to foreign currencies, the strength of the U.S. financial markets and national economy and the local economies in which we conduct business, and the economies of other countries that purchase our mortgage-related and debt securities. Concerns about fiscal challenges in several Eurozone economies intensified during 2011, creating significant uncertainty in the financial markets and potential increased risk exposure for our counterparties and for us. There is also significant uncertainty regarding the strength of the U.S. economic recovery. If the U.S. economy remains weak, we could experience continued high serious delinquencies and credit losses, which will adversely affect our results of operations and financial condition.

The mortgage credit markets continue to be impacted by a decrease in availability of corporate credit and liquidity within the mortgage industry, causing disruptions to normal operations of major mortgage servicers and, at times, originators, including some of our largest customers. This has also contributed to significant volatility, wide credit spreads and a lack of price transparency, and the potential for further consolidation within the financial services industry.

***Competition from banking and non-banking companies may harm our business.***

Competition in the secondary mortgage market combined with a decline in the amount of residential mortgage debt outstanding may make it more difficult for us to purchase mortgages. Furthermore, competitive pricing pressures may make our products less attractive in the market and negatively impact our financial results. Increased competition from Fannie Mae, Ginnie Mae, and FHA/VA may alter our product mix, lower volumes, and reduce revenues on new business. FHFA is also Conservator of Fannie Mae, our primary competitor, and FHFA's actions as Conservator of both companies could affect competition between us and Fannie Mae. It is possible that FHFA could require us and Fannie Mae to take a common approach that, because of differences in our respective businesses, could place Freddie Mac at a competitive disadvantage to Fannie Mae. Efforts we may make or may be directed to make to increase the profitability of new single-family guarantee business, such as by tightening credit standards or raising guarantee fees, could cause our market share to decrease and the volume of our single-family guarantee business to decline. Historically, we also competed with other financial institutions that retain or securitize mortgages, such as commercial and investment banks, dealers, thrift institutions, and insurance companies. While many of these institutions have ceased or substantially reduced their activities in the secondary market for single-family mortgages since 2008, it is possible that these institutions will reenter the market.

Beginning in 2010, some market participants began to re-emerge in the multifamily market, and we have faced increased competition from other institutional investors.

We could be prevented from competing efficiently and effectively by competitors who use their patent portfolios to prevent us from using necessary business processes and products, or to require us to pay significant royalties to use those processes and products.

***Our investment activities may be adversely affected by limited availability of financing and increased funding costs.***

The amount, type and cost of our funding, including financing from other financial institutions and the capital markets, directly impacts our interest expense and results of operations. A number of factors could make such financing more difficult to obtain, more expensive or unavailable on any terms, both domestically and internationally, including:

- termination of, or future restrictions or other adverse changes with respect to, government support programs that may benefit us;

- reduced demand for our debt securities;

- competition for debt funding from other debt issuers; and

- downgrades in our credit ratings or the credit ratings of the U.S. government.

Our ability to obtain funding in the public debt markets or by pledging mortgage-related securities as collateral to other financial institutions could cease or change rapidly, and the cost of available funding could increase significantly due to changes in market confidence and other factors. For example, in the fall of 2008, we experienced significant deterioration in our access to the unsecured medium- and long-term debt markets, and were forced to rely on short-term debt to fund our purchases of mortgage assets and refinance maturing debt and to rely on derivatives to synthetically create the substantive economic equivalent of various debt funding structures.

We follow certain liquidity management practices and procedures. However, in the event we were unable to obtain funding from the public debt markets, there can be no assurance that such practices and procedures would provide us with sufficient liquidity to meet ongoing cash obligations for an extended period.

Since 2008, the ratings on the non-agency mortgage-related securities we hold backed by Alt-A, subprime, and option ARM loans have decreased, limiting their availability as a significant source of liquidity for us through sales or use as collateral in secured lending transactions. In addition, adverse market conditions have negatively impacted our ability to enter into secured lending transactions using agency securities as collateral. These trends are likely to continue in the future.

The composition of our mortgage-related investments portfolio has changed significantly since we entered into conservatorship, as our holdings of single-family whole loans have significantly increased and our holdings of agency

*Freddie Mac*

mortgage-related securities have significantly declined. This changing composition presents heightened liquidity risk, which influences management's decisions regarding funding and hedging.

### Government Support

Changes or perceived changes in the government's support of us could have a severe negative effect on our access to the debt markets and our debt funding costs. Under the Purchase Agreement, the $200 billion cap on Treasury's funding commitment will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011, and 2012. While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available to us under the Purchase Agreement after 2012. The cost of our debt funding could increase if debt investors believe that the risk that we could be placed into receivership is increasing. In addition, under the Purchase Agreement, without the prior consent of Treasury, we may not increase our total indebtedness above a specified limit or become liable for any subordinated indebtedness. For more information, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Actions of Treasury and FHFA*."

We do not currently have a liquidity backstop available to us (other than draws from Treasury under the Purchase Agreement and Treasury's ability to purchase up to $2.25 billion of our obligations under its permanent statutory authority) if we are unable to obtain funding from issuances of debt or other conventional sources. At present, we are not able to predict the likelihood that a liquidity backstop will be needed, or to identify the alternative sources of liquidity that might be available to us if needed, other than from Treasury as referenced above.

### Demand for Debt Funding

The willingness of domestic and foreign investors to purchase and hold our debt securities can be influenced by many factors, including changes in the world economy, changes in foreign-currency exchange rates, regulatory and political factors, as well as the availability of and preferences for other investments. If investors were to divest their holdings or reduce their purchases of our debt securities, our funding costs could increase and our business activities could be curtailed. The willingness of investors to purchase or hold our debt securities, and any changes to such willingness, may materially affect our liquidity, business and results of operations.

### Competition for Debt Funding

We compete for low-cost debt funding with Fannie Mae, the FHLBs, and other institutions. Competition for debt funding from these entities can vary with changes in economic, financial market, and regulatory environments. Increased competition for low-cost debt funding may result in a higher cost to finance our business, which could negatively affect our financial results. An inability to issue debt securities at attractive rates in amounts sufficient to fund our business activities and meet our obligations could have an adverse effect on our business, liquidity, financial condition, and results of operations. See "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Other Debt Securities*" for a description of our debt issuance programs.

Our funding costs may also be affected by changes in the amount of, and demand for, debt issued by Treasury.

### Line of Credit

We maintain a secured intraday line of credit to provide additional intraday liquidity to fund our activities through the Fedwire system. This line of credit requires us to post collateral to a third party. In certain circumstances, this secured counterparty may be able to repledge the collateral underlying our financing without our consent. In addition, because the secured intraday line of credit is uncommitted, we may not be able to continue to draw on it if and when needed.

***Any downgrade in the credit ratings of the U.S. government would likely be followed by a downgrade in our credit ratings. A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business.***

Nationally recognized statistical rating organizations play an important role in determining, by means of the ratings they assign to issuers and their debt, the availability and cost of funding. Our credit ratings are important to our liquidity. We currently receive ratings from three nationally recognized statistical rating organizations (S&P, Moody's, and Fitch) for our unsecured borrowings. These ratings are primarily based on the support we receive from Treasury, and therefore are affected by changes in the credit ratings of the U.S. government.

On August 2, 2011, President Obama signed the "Budget and Control Act of 2011" which raised the U.S. government's statutory debt limit. The raising of the statutory debt limit and details outlined in the legislation to reduce the deficit resulted in actions on the ratings of the U.S. government and our debt, including: (a) on August 5, 2011, S&P lowered the long-term credit rating of the United States to "AA+" from "AAA" and assigned a negative outlook to the rating; and (b) on August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating. As a result of this downgrade, we posted additional collateral to certain derivative counterparties in accordance with the terms of the collateral agreements with such counterparties. For more information, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Credit Ratings*."

S&P, Moody's, and Fitch have indicated that additional actions on the U.S. government's ratings could occur if steps toward a credible deficit reduction plan are not taken or if the U.S. experiences a weaker than expected economic recovery. Any downgrade in the credit ratings of the U.S. government would be expected to be followed or accompanied by a downgrade in our credit ratings.

In addition to a downgrade in the credit ratings of or outlook on the U.S. government, a number of events could adversely affect our debt credit ratings, including actions by governmental entities or others, changes in government support for us, additional GAAP losses, and additional draws under the Purchase Agreement. Such actions could lead to major disruptions in the mortgage market and to our business due to lower liquidity, higher borrowing costs, lower asset values, and higher credit losses, and could cause us to experience much greater net losses and net worth deficits. The full range and extent of the adverse effects to our business that would result from any such ratings downgrades and market disruptions cannot be predicted with certainty. However, we expect that they could: (a) adversely affect our liquidity and cause us to limit or suspend new business activities that entail outlays of cash; (b) make new issuances of debt significantly more costly, or potentially prohibitively expensive, and adversely affect the supply of debt financing available to us; (c) reduce the value of our guarantee to investors and adversely affect our ability to issue our guaranteed mortgage-related securities; (d) reduce the value of Treasury and agency mortgage securities we hold; (e) increase the cost of mortgage financing for borrowers, thereby reducing the supply of mortgages available to us to purchase; (f) adversely affect home prices, reducing the value of our REO and likely leading to additional borrower defaults on mortgage loans we guarantee; and (g) trigger additional collateral requirements under our derivatives contracts.

***Any decline in the price performance of or demand for our PCs could have an adverse effect on the volume and profitability of our new single-family guarantee business.***

Our PCs are an integral part of our mortgage purchase program. We purchase many mortgages by issuing PCs in exchange for them in guarantor swap transactions. We also issue PCs backed by mortgage loans that we purchased for cash. Our competitiveness in purchasing single-family mortgages from our seller/servicers, and thus the volume and profitability of new single-family business, can be directly affected by the relative price performance of our PCs and comparable Fannie Mae securities. Increasing demand for our PCs helps support the price performance of our PCs, which in turn helps us compete with Fannie Mae and others in purchasing mortgages.

Our PCs have typically traded at a discount to comparable Fannie Mae securities, which creates an incentive for customers to conduct a disproportionate share of their guarantor business with Fannie Mae and negatively impacts the economics of our business. Various factors, including market conditions and the relative rates at which the underlying mortgages prepay, affect the price performance of our PCs. The changes to HARP (announced by FHFA on October 24, 2011) could adversely affect the price performance of our PCs, to the extent they cause the loans underlying our PCs to refinance at a faster rate than loans underlying comparable Fannie Mae securities (or cause the perception that loans underlying our PCs will refinance at a faster rate). While we employ a variety of strategies to support the price performance of our PCs and may consider further strategies, any such strategies may fail or adversely affect our business or we may cease such activities if deemed appropriate. We may incur costs to support the liquidity and price performance of our securities. In certain circumstances, we compensate customers for the difference in price between our PCs and comparable Fannie Mae securities. However, this could adversely affect the profitability and market share of our single-family guarantee business.

Beginning in 2012, under guidance from FHFA we expect to curtail mortgage-related investments portfolio purchase and retention activities that are undertaken for the primary purpose of supporting the price performance of our PCs, which may result in a significant decline in the market share of our single-family guarantee business, lower comprehensive income, and a more rapid decline in the size of our total mortgage portfolio. If these developments occur, it may be difficult and expensive for us to reverse or mitigate them through PC price support activities, should we desire or be directed to do so. For more information, see "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Securitization Activities*" and "— *Investments Segment — PC Support Activities*."

FHFA 2771

We may be unable to maintain a liquid and deep market for our PCs, which could also adversely affect the price performance of PCs. A significant reduction in the volume of mortgage loans that we securitize could reduce the liquidity of our PCs.

***Mortgage fraud could result in significant financial losses and harm to our reputation.***

We rely on representations and warranties by seller/servicers about the characteristics of the single-family mortgage loans we purchase and securitize, and we do not independently verify most of the information that is provided to us before we purchase the loan. This exposes us to the risk that one or more of the parties involved in a transaction (such as the borrower, seller, broker, appraiser, title agent, loan officer, lender or servicer) will engage in fraud by misrepresenting facts about a mortgage loan or a borrower. While we subsequently review a sample of these loans to determine if such loans are in compliance with our contractual standards, there can be no assurance that this would detect or deter mortgage fraud, or otherwise reduce our exposure to the risk of fraud. We are also exposed to fraud by third parties in the mortgage servicing function, particularly with respect to sales of REO properties, single-family short sales, and other dispositions of non-performing assets. We may experience significant financial losses and reputational damage as a result of such fraud.

***The value of mortgage-related securities guaranteed by us and held as investments may decline if we were unable to perform under our guarantee or if investor confidence in our ability to perform under our guarantee were to diminish.***

A portion of our investments in mortgage-related securities are securities guaranteed by us. Our valuation of these securities is consistent with GAAP and the legal structure of the guarantee transaction. These securities include the Freddie Mac assets transferred to the securitization trusts that serve as collateral for the mortgage-related securities issued by the trusts (*i.e.*, (a) multifamily PCs; (b) REMICs and Other Structured Securities; and (c) certain Other Guarantee Transactions). The valuation of our guaranteed mortgage-related securities necessarily reflects investor confidence in our ability to perform under our guarantee and the liquidity that our guarantee provides. If we were unable to perform under our guarantee or if investor confidence in our ability to perform under our guarantee were to diminish, the value of our guaranteed securities may decline, thereby reducing the value of the securities reported on our consolidated balance sheets, which could have an adverse affect on our financial condition and results of operations. This could also adversely affect our ability to sell or otherwise use these securities for liquidity purposes.

***Changes in interest rates could negatively impact our results of operations, stockholders' equity (deficit) and fair value of net assets.***

Our investment activities and credit guarantee activities expose us to interest rate and other market risks. Changes in interest rates, up or down, could adversely affect our net interest yield. Although the yield we earn on our assets and our funding costs tend to move in the same direction in response to changes in interest rates, either can rise or fall faster than the other, causing our net interest yield to expand or compress. For example, due to the timing of maturities or rate reset dates on variable-rate instruments, when interest rates rise, our funding costs may rise faster than the yield we earn on our assets. This rate change could cause our net interest yield to compress until the effect of the increase is fully reflected in asset yields. Changes in the slope of the yield curve could also reduce our net interest yield.

Our GAAP results can be significantly affected by changes in interest rates, and adverse changes in interest rates could increase our GAAP net loss or deficit in total equity (deficit) materially. For example, changes in interest rates affect the fair value of our derivative portfolio. Since we generally record changes in fair values of our derivatives in current income, such changes could significantly impact our GAAP results. While derivatives are an important aspect of our management of interest-rate risk, they generally increase the volatility of reported net income (loss), because, while fair value changes in derivatives affect net income, fair value changes in several of the types of assets and liabilities being hedged do not affect net income. We could record substantial gains or losses from derivatives in any period, which could significantly contribute to our overall results for the period and affect our net equity (deficit) as of the end of such period. It is difficult for us to predict the amount or direction of derivative results. Additionally, increases in interest rates could increase other-than-temporary impairments on our investments in non-agency mortgage-related securities.

Changes in interest rates may also affect prepayment assumptions, thus potentially impacting the fair value of our assets, including our investments in mortgage-related assets. When interest rates fall, borrowers are more likely to prepay their mortgage loans by refinancing them at a lower rate. An increased likelihood of prepayment on the mortgages underlying our mortgage-related securities may adversely impact the value of these securities.

When interest rates increase, our credit losses from ARM and interest-only ARM loans may increase as borrower payments increase at their reset dates, which increases the borrower's risk of default. Rising interest rates may also reduce the opportunity for these borrowers to refinance into a fixed-rate loan.

Interest rates can fluctuate for a number of reasons, including changes in the fiscal and monetary policies of the federal government and its agencies, such as the Federal Reserve. Federal Reserve policies directly and indirectly influence the yield on our interest-earning assets and the cost of our interest-bearing liabilities. The availability of derivative financial instruments (such as options and interest rate and foreign currency swaps) from acceptable counterparties of the types and in the quantities needed could also affect our ability to effectively manage the risks related to our investment funding. Our strategies and efforts to manage our exposures to these risks may not be effective. In particular, in recent periods, a number of factors have made it more difficult for us to estimate future prepayments, including uncertainty regarding default rates, unemployment, loan modifications, the impact of FHFA-directed changes to HARP (announced in October 2011), and the volatility and impact of home price movements on mortgage durations. This could make it more difficult for us to manage prepayment risk, and could cause our hedging-related losses to increase. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK" for a description of the types of market risks to which we are exposed and how we seek to manage those risks.

### *Changes in OAS could materially impact our fair value of net assets and affect future results of operations and stockholders' equity (deficit).*

OAS is an estimate of the incremental yield spread between a given security and an agency debt yield curve. This includes consideration of potential variability in the security's cash flows resulting from any options embedded in the security, such as prepayment options. The OAS between the mortgage and agency debt sectors can significantly affect the fair value of our net assets. The fair value impact of changes in OAS for a given period represents an estimate of the net unrealized increase or decrease in the fair value of net assets arising from net fluctuations in OAS during that period. We do not attempt to hedge or actively manage the impact of changes in mortgage-to-debt OAS.

Changes in market conditions, including changes in interest rates or liquidity, may cause fluctuations in OAS. A widening of the OAS on a given asset, which typically causes a decline in the current fair value of that asset, may cause significant mark-to-fair value losses, and may adversely affect our financial results and stockholders' equity (deficit), but may increase the number of attractive investment opportunities in mortgage loans and mortgage-related securities. Conversely, a narrowing or tightening of the OAS typically causes an increase in the current fair value of that asset, but may reduce the number of attractive investment opportunities in mortgage loans and mortgage-related securities. Consequently, a tightening of the OAS may adversely affect our future financial results and stockholders' equity (deficit). See "MD&A — FAIR VALUE MEASUREMENTS AND ANALYSIS — Consolidated Fair Value Balance Sheets Analysis — *Discussion of Fair Value Results*" for a more detailed description of the impacts of changes in mortgage-to-debt OAS.

While wider spreads might create favorable investment opportunities, we are limited in our ability to take advantage of any such opportunities due to various restrictions on our mortgage-related investments portfolio activities. See "BUSINESS — Conservatorship and Related Matters — *Impact of Conservatorship and Related Actions on Our Business — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio*."

### *We could experience significant reputational harm, which could affect the future of our company, if our efforts under the MHA Program and other initiatives to support the U.S. residential mortgage market do not succeed.*

We are focused on the servicing alignment initiative, the MHA Program and other initiatives to support the U.S. residential mortgage market. If these initiatives do not achieve their desired results, or are otherwise perceived to have failed to achieve their objectives, we may experience damage to our reputation, which may impact the extent of future government support for our business and government decisions with respect to the future status and role of Freddie Mac.

### *Negative publicity causing damage to our reputation could adversely affect our business prospects, financial results, or net worth.*

Reputation risk, or the risk to our financial results and net worth from negative public opinion, is inherent in our business. Negative public opinion could adversely affect our ability to keep and attract customers or otherwise impair our customer relationships, adversely affect our ability to obtain financing, impede our ability to hire and retain qualified personnel, hinder our business prospects, or adversely impact the trading price of our securities. Perceptions regarding the practices of our competitors, our seller/servicers or the financial services and mortgage industries as a whole, particularly as they relate to the current housing and economic downturn, may also adversely impact our reputation. Adverse reputation impacts on third parties with whom we have important relationships may impair market confidence or investor confidence in our business operations as well. In addition, negative publicity could expose us to adverse legal and regulatory consequences, including greater regulatory scrutiny or adverse regulatory or legislative changes, and could

affect what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist. These adverse consequences could result from perceptions concerning our activities and role in addressing the housing and economic downturn, concern about our compensation practices, concerns about deficiencies in foreclosure documentation practices or our actual or alleged action or failure to act in any number of areas, including corporate governance, regulatory compliance, financial reporting and disclosure, purchases of products perceived to be predatory, safeguarding or using nonpublic personal information, or from actions taken by government regulators in response to our actual or alleged conduct.

***The servicing alignment initiative, MHA Program, and other efforts to reduce foreclosures, modify loan terms and refinance mortgages, including HARP, may fail to mitigate our credit losses and may adversely affect our results of operations or financial condition.***

The servicing alignment initiative, MHA Program, and other loss mitigation activities are a key component of our strategy for managing and resolving troubled assets and lowering credit losses. However, there can be no assurance that any of our loss mitigation strategies will be successful and that credit losses will not continue to escalate. The costs we incur related to loan modifications and other activities have been, and will likely continue to be, significant because we bear the full cost of the monthly payment reductions related to modifications of loans we own or guarantee, and all applicable servicer and borrower incentives. We are not reimbursed for these costs by Treasury. For information on our loss mitigation activities, see "MD&A — RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program*."

We could be required or elect to make changes to our implementation of our other loss mitigation activities that could make these activities more costly to us, both in terms of credit expenses and the cost of implementing and operating the activities. For example, we could be required to, or elect to, use principal reduction to achieve reduced payments for borrowers. This could further increase our losses, as we could bear the full costs of such reductions.

A significant number of loans are in the trial period of HAMP or the trial period of our new non-HAMP standard loan modification. For information on completion rates for HAMP and non-HAMP modifications, see "MD&A — RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program*." A number of loans will fail to complete the applicable trial period or qualify for our other loss mitigation programs. For these loans, the trial period will have effectively delayed the foreclosure process and could increase our losses, to the extent the prices we ultimately receive for the foreclosed properties are less than the prices we could have received had we foreclosed upon the properties earlier, due to continued home price declines. These delays in foreclosure could also cause our REO operations expense to increase, perhaps substantially.

Mortgage modification initiatives, particularly any future focus on principal reductions (which at present we do not offer to borrowers), have the potential to change borrower behavior and mortgage underwriting. Principal reductions may create an incentive for borrowers that are current to become delinquent in order to receive a principal reduction. This, coupled with the phenomenon of widespread underwater mortgages, could significantly affect borrower attitudes towards homeownership, the commitment of borrowers to making their mortgage payments, the way the market values residential mortgage assets, the way in which we conduct business and, ultimately, our financial results.

Depending on the type of loss mitigation activities we pursue, those activities could result in accelerating or slowing prepayments on our PCs and REMICs and Other Structured Securities, either of which could affect the pricing of such securities.

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers whose monthly payments are current and who can benefit from refinancing their home mortgages. The Acting Director of FHFA stated that the goal of pursuing these changes is to create refinancing opportunities for more borrowers whose mortgages are owned or guaranteed by Freddie Mac and Fannie Mae, while reducing risk for Freddie Mac and Fannie Mae and bringing a measure of stability to housing markets. However, there can be no assurance that the revisions to HARP will be successful in achieving these objectives or that any benefits from the revised program will exceed our costs. We may face greater exposure to credit and other losses on these HARP loans because we are not requiring lenders to provide us with certain representations and warranties on these HARP loans. In addition, changes in expectations of mortgage prepayments could result in declines in the fair value of our investments in certain agency securities and lower net interest yields over time on other mortgage-related investments. The ultimate impact of the HARP revisions on our financial results will be driven by the level of borrower participation and the volume of loans with high LTV ratios that we acquire under the program. Over time, relief refinance mortgages with LTV ratios above 80% may not perform as well as relief refinance mortgages with LTV ratios of 80% and below because of the continued high LTV ratios of these loans. There is an increase in borrower default risk as LTV ratios increase, particularly

for loans with LTV ratios above 80%. In addition, relief refinance mortgages may not be covered by mortgage insurance for the full excess of their UPB over 80%.

We are devoting significant internal resources to the implementation of the servicing alignment initiative and the MHA Program, which has, and will continue to, increase our expenses. The size and scope of these efforts may also limit our ability to pursue other business opportunities or corporate initiatives.

***We may experience further write-downs and losses relating to our assets, including our investment securities, net deferred tax assets, REO properties or mortgage loans, that could materially adversely affect our business, results of operations, financial condition, liquidity and net worth.***

We experienced significant losses and write-downs relating to certain of our assets during the past several years, including significant declines in market value, impairments of our investment securities, market-based write-downs of REO properties, losses on non-performing loans removed from PC pools, and impairments on other assets. The fair value of our assets may be further adversely affected by continued weakness in the economy, further deterioration in the housing and financial markets, additional ratings downgrades, or other events.

We increased our valuation allowance for our net deferred tax assets by $2.3 billion during 2011. The future status and role of Freddie Mac could be affected by actions of the Conservator, and legislative and regulatory action that alters the ownership, structure, and mission of the company. The uncertainty of these developments could materially affect our operations, which could in turn affect our ability or intent to hold investments until the recovery of any temporary unrealized losses. If future events significantly alter our current outlook, a valuation allowance may need to be established for the remaining deferred tax asset.

Due to the ongoing weaknesses in the economy and in the housing and financial markets, we may experience additional write-downs and losses relating to our assets, including those that are currently AAA-rated, and the fair values of our assets may continue to decline. This could adversely affect our results of operations, financial condition, liquidity, and net worth.

***There may not be an active, liquid trading market for our equity securities. Our equity securities are not likely to have any value beyond the short-term.***

Our common stock and classes of preferred stock that previously were listed and traded on the NYSE were delisted from the NYSE effective July 8, 2010, and now trade on the OTC market. The market price of our common stock declined significantly between June 16, 2010, the date we announced our intention to delist these securities, and July 8, 2010, the first day the common stock traded exclusively on the OTC market, and may decline further. Trading volumes on the OTC market have been, and will likely continue to be, less than those on the NYSE, which would make it more difficult for investors to execute transactions in our securities and could make the prices of our securities decline or be more volatile. The Acting Director of FHFA has stated that "[Freddie Mac and Fannie Mae's] equity holders retain an economic claim on the companies but that claim is subordinate to taxpayer claims. As a practical matter, taxpayers are not likely to be repaid in full, so [Freddie Mac and Fannie Mae] stock lower in priority is not likely to have any value."

## Operational Risks

***We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process.***

We have been, and will likely continue to be, adversely affected by delays in the foreclosure process, which could increase our expenses.

The average length of time for foreclosure of a Freddie Mac loan significantly increased in recent years, and may continue to increase. A number of factors have contributed to this increase, including: (a) the increasingly lengthy foreclosure process in many states; and (b) concerns about deficiencies in seller/servicers' conduct of the foreclosure process. More recently, regulatory developments impacting mortgage servicing and foreclosure practices have also contributed to these delays. For more information on these developments, see "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments — Developments Concerning Single-Family Servicing Practices*."

Delays in the foreclosure process could cause our credit losses to increase for a number of reasons. For example, properties awaiting foreclosure could deteriorate until we acquire ownership of them through foreclosure. This would increase our expenses to repair and maintain the properties when we do acquire them. Such delays may also adversely affect the values of, and our losses on, the non-agency mortgage-related securities we hold. Delays in the foreclosure

process may also adversely affect trends in home prices regionally or nationally, which could also adversely affect our financial results.

It also is possible that mortgage insurance claims could be reduced if delays caused by servicers' deficient foreclosure practices prevent servicers from completing foreclosures within required timelines defined by mortgage insurers. Mortgage insurance companies establish foreclosure timelines that vary by state and range between 30 and 960 days.

Delays in the foreclosure process could create fluctuations in our single-family credit statistics. For example, our realization of credit losses, which consists of REO operations income (expense) plus charge-offs, net, could be delayed because we typically record charge-offs at the time we take ownership of a property through foreclosure. Delays could also temporarily increase the number of seriously delinquent loans that remain in our single-family mortgage portfolio, which could result in higher reported serious delinquency rates and a larger number of non-performing loans than would otherwise have been the case.

In the fall of 2010, several large seller/servicers announced issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings. These announcements raised various concerns relating to foreclosure practices. A number of our seller/servicers, including several of our largest ones, temporarily suspended foreclosure proceedings in certain states while they evaluated and addressed these issues. While the larger servicers generally resumed foreclosure proceedings in early 2011, single-family mortgages in our portfolio have continued to experience significant delays in the foreclosure process in 2011, as compared to periods before these issues arose, particularly in states that require a judicial foreclosure process. These and other factors could also delay sales of our REO properties. In addition, a group consisting of state attorneys general and state bank and mortgage regulators is reviewing foreclosure practices. We have terminated the eligibility of several law firms to serve as counsel in foreclosures of Freddie Mac mortgages, due to issues with respect to the firms' foreclosure practices. It is possible that additional deficiencies in foreclosure practices will be identified.

We have incurred, and will continue to incur, expenses related to deficiencies in foreclosure documentation practices and the costs of remediating them, which may be significant. These expenses include costs related to terminating the eligibility of certain law firms and other incremental costs. We may also incur costs if we become involved in litigation or investigations relating to these issues. It will take time for seller/servicers to complete their evaluations of these issues and implement remedial actions. The integrity of the foreclosure process is critical to our business, and our financial results could be adversely affected by deficiencies in the conduct of that process.

***Issues related to mortgages recorded through the MERS System could delay or disrupt foreclosure activities and have an adverse effect on our business.***

The Mortgage Electronic Registration System, or the MERS® System, is an electronic registry that is widely used by seller/servicers, Freddie Mac, and other participants in the mortgage finance industry, to maintain records of beneficial ownership of mortgages. The MERS System is maintained by MERSCORP, Inc., a privately held company, the shareholders of which include a number of organizations in the mortgage industry, including Freddie Mac, Fannie Mae, and certain seller/servicers, mortgage insurance companies, and title insurance companies.

Mortgage Electronic Registration Systems, Inc., or MERS, a wholly-owned subsidiary of MERSCORP, Inc., has the ability to serve as a nominee for the owner of a mortgage loan and in that role become the mortgagee of record for the loan in local land records. Freddie Mac seller/servicers may choose to use MERS as a nominee. Approximately 42% of the loans Freddie Mac owns or guarantees were registered in MERS' name as of December 31, 2011; the beneficial ownership and the ownership of the servicing rights related to those loans are tracked in the MERS System.

In the past, Freddie Mac servicers had the option of initiating foreclosures in MERS' name. On March 23, 2011, we informed our servicers that they no longer may initiate foreclosures in MERS' name for those mortgages owned or guaranteed by us and registered with MERS that are referred to foreclosure on or after April 1, 2011. As of April 1, 2011, foreclosure of mortgages owned or guaranteed by us for which MERS serves as nominee is accomplished by MERS assigning the record ownership of the mortgage to the servicer, and the servicer initiating foreclosure in its own name. Many of our servicers were following this procedure before the March 23 announcement.

MERS has also been the subject of numerous lawsuits challenging foreclosures on mortgages for which MERS is mortgagee of record as nominee for the beneficial owner. For example, on February 3, 2012, the Attorney General of the State of New York filed a lawsuit against MERSCORP, Inc., MERS and several large banks alleging, among other items, that the creation and use of the MERS System has resulted in a wide range of deceptive and fraudulent foreclosure filings in New York state and federal courts. It is possible that adverse judicial decisions, regulatory proceedings or action, or

legislative action related to MERS, could delay or disrupt foreclosure of mortgages that are registered on the MERS System. Publicity concerning regulatory or judicial decisions, even if such decisions were not adverse, or MERS-related concerns about the integrity of the assignment process, could adversely affect the mortgage industry and negatively impact public confidence in the foreclosure process, which could lead to legislative or regulatory action. Because MERS often executes legal documents in connection with foreclosure proceedings, it is possible that investigations by governmental authorities and others into deficiencies in foreclosure practices may negatively impact MERS and the MERS System.

Federal or state legislation or regulatory action could prevent us from using the MERS System for mortgages that we currently own, guarantee, and securitize and for mortgages acquired in the future, or could create additional requirements for the transfer of mortgages that could affect the process for and costs of acquiring, transferring, servicing, and foreclosing mortgages. Such legislation or regulatory action could increase our costs or otherwise adversely affect our business. For example, we could be required to transfer mortgages out of the MERS System. There is also uncertainty regarding the extent to which seller/servicers will choose to use the MERS System in the future.

Failures by MERS to apply prudent and effective process controls and to comply with legal and other requirements in the foreclosure process could pose legal and operational risks for us. We may also face significant reputational risk due to our ties to MERS, as we are a shareholder of MERSCORP, Inc., and a Freddie Mac officer serves on the board of directors of both entities.

We cannot predict the impact that such events or actions may have on our business. On April 13, 2011, the Office of the Comptroller of the Currency, the Federal Reserve, the FDIC, the Office of Thrift Supervision, and FHFA entered into a consent order with MERS and MERSCORP, Inc., which stated that such federal regulators had identified certain deficiencies and unsafe or unsound practices by MERS and MERSCORP, Inc. that present financial, operational, compliance, legal, and reputational risks to MERSCORP, Inc. and MERS, and to its participating members, including Freddie Mac. The consent order requires MERS and MERSCORP, Inc. to, among other things, create and submit plans to ensure that MERS and MERSCORP, Inc. (a): are operated in a safe and sound manner and have adequate financial strength and staff; (b) improve communications with MERSCORP, Inc. shareholders and members; (c) intensify the monitoring of and response to litigation; and (d) establish processes to ensure data quality and strengthen certain aspects of corporate governance. The federal banking regulators have also indicated that MERSCORP, Inc. should take action to simplify its governance structure, which could involve us giving up certain governance rights. It is unclear what changes will ultimately be made and whether there will be any consequent impact on Freddie Mac's relationship with and rights with respect to the two entities.

***Weaknesses in internal control over financial reporting and in disclosure controls could result in errors and inadequate disclosures, affect operating results, and cause investors to lose confidence in our reported results.***

We face continuing challenges because of deficiencies in our controls. Control deficiencies could result in errors, and lead to inadequate or untimely disclosures, and affect operating results. Control deficiencies could also cause investors to lose confidence in our reported financial results, which may have an adverse effect on the trading price of our securities. For information about our ineffective disclosure controls and two material weaknesses in internal control over financial reporting, see "CONTROLS AND PROCEDURES."

There are a number of factors that may impede our efforts to establish and maintain effective disclosure controls and internal control over financial reporting, including: (a) the nature of the conservatorship and our relationship with FHFA; (b) the complexity of, and significant changes in, our business activities and related GAAP requirements; (c) significant employee and management turnover; (d) internal reorganizations; (e) uncertainty regarding the sustainability of newly established controls; (f) data quality or servicing-related issues; and (g) the uncertain impacts of the ongoing housing and economic downturn on the results of our models, which are used for financial accounting and reporting purposes. Disruptive levels of employee turnover could negatively impact our internal control environment, including internal control over financial reporting, and ability to issue timely financial statements. During 2011, we experienced significant changes to our internal control environment as a result of resignations, terminations, or changes in responsibility. We cannot be certain that our efforts to improve and maintain our internal control over financial reporting will ultimately be successful.

Effectively designed and operated internal control over financial reporting provides only reasonable assurance that material errors in our financial statements will be prevented or detected on a timely basis. A failure to maintain effective internal control over financial reporting increases the risk of a material error in our reported financial results and delay in our financial reporting timeline. Depending on the nature of a control failure and any required remediation, ineffective controls could have a material adverse effect on our business.

***We face risks and uncertainties associated with the internal models that we use for financial accounting and reporting purposes, to make business decisions, and to manage risks. Market conditions have raised these risks and uncertainties.***

We make significant use of business and financial models for financial accounting and reporting purposes and to manage risk. We face risk associated with our use of models. First, there is inherent uncertainty associated with model results. Second, we could fail to properly implement, operate, or use our models. Either of these situations could adversely affect our financial statements and our ability to manage risks.

We use market-based information as inputs to our models. However, it can take time for data providers to prepare information, and thus the most recent information may not be available for the preparation of our financial statements. When market conditions change quickly and in unforeseen ways, there is an increased risk that the inputs reflected in our models are not representative of current market conditions.

The severe deterioration of the housing and credit markets beginning several years ago and, more recently, the extended period of economic weakness and uncertainty has increased the risks associated with our use of models. For example, certain economic events or the implementation of government policies could create increased model uncertainty as models may not fully capture these events, which makes it more difficult to assess model performance and requires a higher degree of management judgment. Our models may not perform as well in situations for which there are few or no recent historical precedents. We have adjusted our models in response to recent events, but there remains considerable uncertainty about model results.

Models are inherently imperfect predictors of actual results. Our models rely on various assumptions that may be incorrect, including that historical experience can be used to predict future results. It has been more difficult to predict the behaviors of the housing and credit capital markets and market participants over the past several years, due to, among other factors: (a) the uncertainty concerning trends in home prices; (b) the lack of historical evidence about the behavior of deeply underwater borrowers, the effect of an extended period of extremely low interest rates on prepayments, and the impact of widespread loan refinancing and modification programs (such as HARP and HAMP), including the potential for the extensive use of principal reductions; and (c) the impact of the concerns about deficiencies in foreclosure documentation practices and related delays in the foreclosure process.

We face the risk that we could fail to implement, operate, or adjust or use our models properly. This risk may be increasing due to our difficulty in attracting and retaining employees with the necessary experience and skills. For example, the assumptions underlying a model could be invalid, or we could apply a model to events or products outside the model's intended use. We may fail to code a model correctly or we could use incorrect data. The complexity and interconnectivity of our models create additional risk regarding the accuracy of model output. While we have processes and controls in place designed to mitigate these risks, there can be no assurances that such processes and controls will be successful.

Management often needs to exercise judgment to interpret or adjust modeled results to take into account new information or changes in conditions. The dramatic changes in the housing and credit capital markets in recent years have required frequent adjustments to our models and the application of greater management judgment in the interpretation and adjustment of the results produced by our models. This further increases both the uncertainty about model results and the risk of errors in the implementation, operation, or use of the models.

We face the risk that the valuations, risk metrics, amortization results, loan loss reserve estimations, and security impairment charges produced by our internal models may be different from actual results, which could adversely affect our business results, cash flows, fair value of net assets, business prospects, and future financial results. For example, our models may under-predict the losses we will suffer in various aspects of our business. Changes in, or replacements of, any of our models or in any of the assumptions, judgments, or estimates used in the models may cause the results generated by the model to be materially different from those generated by the prior model. The different results could cause a revision of previously reported financial condition or results of operations, depending on when the change to the model, assumption, judgment, or estimate is implemented. Any such changes may also cause difficulties in comparisons of the financial condition or results of operations of prior or future periods.

Due to increased uncertainty about model results, we also face increased risk that we could make poor business decisions in areas where model results are an important factor, including loan purchases, management and guarantee fee pricing, asset and liability management, market risk management, and quality-control sampling strategies for loans in our single-family credit guarantee portfolio. Furthermore, any strategies we employ to attempt to manage the risks associated with our use of models may not be effective. See "MD&A — CRITICAL ACCOUNTING POLICIES AND ESTIMATES" and "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" for more information on our use of models.

***Changes in our accounting policies, as well as estimates we make, could materially affect how we report our financial condition or results of operations.***

Our accounting policies are fundamental to understanding our financial condition and results of operations. Certain of our accounting policies, as well as estimates we make, are "critical," as they are both important to the presentation of our financial condition and results of operations and they require management to make particularly difficult, complex or subjective judgments and estimates, often regarding matters that are inherently uncertain. Actual results could differ from our estimates and the use of different judgments and assumptions related to these policies and estimates could have a material impact on our consolidated financial statements. For a description of our critical accounting policies, see "MD&A — CRITICAL ACCOUNTING POLICIES AND ESTIMATES."

From time to time, the FASB and the SEC change the financial accounting and reporting guidance that govern the preparation of our financial statements. These changes are beyond our control, can be difficult to predict and could materially impact how we report our financial condition and results of operations. We could be required to apply new or revised guidance retrospectively, which may result in the revision of prior period financial statements by material amounts. The implementation of new or revised accounting guidance could result in material adverse effects to our stockholders' equity (deficit) and result in or contribute to the need for additional draws under the Purchase Agreement.

FHFA may require us to change our accounting policies to align more closely with those of Fannie Mae. FHFA may also require us and Fannie Mae to have the same independent public accounting firm. Either of these events could significantly increase our expenses and require a substantial time commitment of management.

See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for more information.

***A failure in our operational systems or infrastructure, or those of third parties, could impair our liquidity, disrupt our business, damage our reputation, and cause losses.***

Shortcomings or failures in our internal processes, people, or systems could lead to impairment of our liquidity, financial loss, errors in our financial statements, disruption of our business, liability to customers, further legislative or regulatory intervention, or reputational damage. Servicing and loss mitigation processes are currently under considerable stress, which increases the risk that we may experience further operational problems in the future. Our core systems and technical architecture include many legacy systems and applications that lack scalability and flexibility, which increases the risk of system failure. While we are working to enhance the quality of our infrastructure, we have had difficulty in the past conducting large-scale infrastructure improvement projects.

Our business is highly dependent on our ability to process a large number of transactions on a daily basis and manage and analyze significant amounts of information, much of which is provided by third parties. The transactions we process are complex and are subject to various legal, accounting, and regulatory standards. The types of transactions we process and the standards relating to those transactions can change rapidly in response to external events, such as the implementation of government-mandated programs and changes in market conditions. Our financial, accounting, data processing, or other operating systems and facilities may fail to operate properly or become disabled, adversely affecting our ability to process these transactions. The information provided by third parties may be incorrect, or we may fail to properly manage or analyze it. The inability of our systems to accommodate an increasing volume of transactions or new types of transactions or products could constrain our ability to pursue new business initiatives or change or improve existing business activities.

Our employees could act improperly for their own gain and cause unexpected losses or reputational damage. While we have processes and systems in place designed to prevent and detect fraud, there can be no assurance that such processes and systems will be successful.

We also face the risk of operational failure or termination of any of the clearing agents, exchanges, clearinghouses, or other financial intermediaries we use to facilitate our securities and derivatives transactions. Any such failure or termination could adversely affect our ability to effect transactions, service our customers, and manage our exposure to risk.

Most of our key business activities are conducted in our principal offices located in McLean, Virginia and represent a concentrated risk of people, technology, and facilities. Despite the contingency plans and local recovery facilities we have in place, our ability to conduct business would be adversely impacted by a disruption in the infrastructure that supports our business and the geographical area in which we are located. Potential disruptions may include outages or disruptions to electrical, communications, transportation, or other services we use or that are provided to us. If a disruption occurs and our employees are unable to occupy our offices or communicate with or travel to other locations, our ability to

service and interact with our customers or counterparties may deteriorate and we may not be able to successfully implement contingency plans that allow us to carry out critical business functions at an acceptable level.

Due to the concentrated risk and inadequate distribution of resources nationally, we are also exposed to the risk that a catastrophic event, such as a terrorist event or natural disaster, could result in a significant business disruption and an inability to process transactions through normal business processes. Any measures we take to mitigate this risk may not be sufficient to respond to the full range of catastrophic events that may occur.

Freddie Mac management has determined that current business recovery capabilities would not be effective in the event of a catastrophic regional business event and could result in a significant business disruption and inability to process transactions through normal business processes. While management has developed a remediation plan to address the current capability gaps, any measures we take to mitigate this risk may not be sufficient to respond to the full range of catastrophic events that may occur.

***We have experienced significant management changes, internal reorganizations, and turnover of key staff, which could increase our operational and control risks and have a material adverse effect on our ability to do business and our results of operations.***

Internal reorganizations, inability to retain key executives and staff members, and our efforts to reduce administrative expenses may increase the stress on existing processes, leading to operational or control failures and harm to our financial performance and results of operations. A number of senior officers left the company in 2011, including our Chief Operating Officer, our Executive Vice President — Single-Family Credit Guarantee, our Executive Vice President — Investments and Capital Markets and Treasurer, our Executive Vice President — Multifamily, our Senior Vice President — Operations & Technology, our Executive Vice President — General Counsel & Corporate Secretary, our Executive Vice President — Chief Credit Officer, and our Senior Vice President — Interim General Counsel & Corporate Secretary. On October 26, 2011, FHFA announced that our Chief Executive Officer has expressed his desire to step down in 2012. We also experienced several significant internal reorganizations in 2011 and significant employee turnover.

The magnitude of these changes and the short time interval in which they have occurred, particularly during the ongoing housing and economic downturn, add to the risks of operational or control failures, including a failure in the effective operation of our internal control over financial reporting or our disclosure controls and procedures. Control failures could result in material adverse effects on our financial condition and results of operations. Disruptive levels of turnover among both executives and other employees could lead to breakdowns in any of our operations, affect our ability to execute ongoing business activities, cause delays and disruptions in the implementation of FHFA-directed and other important business initiatives, delay or disrupt critical technology and other projects, and erode our business, modeling, internal audit, risk management, information security, financial reporting, legal, compliance, and other capabilities. For more information, see "MD&A — RISK MANAGEMENT — Operational Risks" and "CONTROLS AND PROCEDURES."

In addition, management attention may be diverted from regular business concerns by these and future reorganizations and the continuing need to operate under the framework of conservatorship.

***We may not be able to protect the security of our systems or the confidentiality of our information from cyber attack and other unauthorized access, disclosure, and disruption.***

Our operations rely on the secure receipt, processing, storage, and transmission of confidential and other information in our computer systems and networks and with our business partners. Like many corporations and government entities, from time to time we have been, and likely will continue to be, the target of cyber attacks. Because the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently and often are not recognized until launched against a target, and because some techniques involve social engineering attempts addressed to employees who may have insufficient knowledge to recognize them, we may be unable to anticipate these techniques or to implement adequate preventative measures. While we have invested significant resources in our information security program, there is a risk that it could prove to be inadequate to protect our computer systems, software, and networks.

Our computer systems, software, and networks may be vulnerable to internal or external cyber attack, unauthorized access, computer viruses or other malicious code, computer denial of service attacks, or other attempts to harm our systems or misuse our confidential information. Our employees may be vulnerable to social engineering efforts that cause a breach in our security that otherwise would not exist as a technical matter. If one or more of such events occur, this potentially could jeopardize or result in the unauthorized disclosure, misuse or corruption of confidential and other information, including nonpublic personal information and other sensitive business data, processed, stored in, or transmitted through, our computer systems and networks, or otherwise cause interruptions or malfunctions in our

operations or the operations of our customers or counterparties. This could result in significant losses or reputational damage, adversely affect our relationships with our customers and counterparties, and adversely affect our ability to purchase loans, issue securities or enter into and execute other business transactions. We could also face regulatory action. Internal or external attackers may seek to steal, corrupt or disclose confidential financial assets, intellectual property, and other sensitive information. We may be required to expend significant additional resources to modify our protective measures or to investigate and remediate vulnerabilities or other exposures, and we may be subject to litigation and financial losses that are not fully insured.

***We rely on third parties for certain important functions, including some that are critical to financial reporting, our mortgage-related investment activity, and mortgage loan underwriting. Any failures by those vendors could disrupt our business operations.***

We outsource certain key functions to external parties, including: (a) processing functions for trade capture, market risk management analytics, and financial instrument valuation; (b) custody and recordkeeping for our mortgage-related investments; (c) processing functions for mortgage loan underwriting and servicing; (d) certain services we provide to Treasury in our role as program compliance agent under HAMP; and (e) certain technology infrastructure and operations. We may enter into other key outsourcing relationships in the future. If one or more of these key external parties were not able to perform their functions for a period of time, at an acceptable service level, or for increased volumes, our business operations could be constrained, disrupted, or otherwise negatively impacted. Our use of vendors also exposes us to the risk of a loss of intellectual property or of confidential information or other harm. We may also be exposed to reputational harm, to the extent vendors do not conduct their activities under appropriate ethical standards. Financial or operational difficulties of an outside vendor could also hurt our operations if those difficulties interfere with the vendor's ability to provide services to us.

***Our risk management efforts may not effectively mitigate the risks we seek to manage.***

We could incur substantial losses and our business operations could be disrupted if we are unable to effectively identify, manage, monitor and mitigate operational risks, interest rate and other market risks and credit risks related to our business. Our risk management policies, procedures and techniques may not be sufficient to mitigate the risks we have identified or to appropriately identify additional risks to which we are subject. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK" and "MD&A — RISK MANAGEMENT" for a discussion of our approach to managing certain of the risks we face.

### Legal and Regulatory Risks

***The Dodd-Frank Act and related regulation may adversely affect our business activities and financial results.***

The Dodd-Frank Act, which was signed into law on July 21, 2010, significantly changed the regulation of the financial services industry and could affect us in substantial and unforeseeable ways and have an adverse effect on our business, results of operations, financial condition, liquidity, and net worth. For example, the Dodd-Frank Act and related future regulatory changes could impact the value of assets that we hold, require us to change certain of our business practices, impose significant additional costs on us, limit the products we offer, require us to increase our regulatory capital, or make it more difficult for us to retain and recruit management and other employees. We will also face a more complicated regulatory environment due to the Dodd-Frank Act and related future regulatory changes, which will increase compliance costs and could divert management attention or other resources. The Dodd-Frank Act and related future regulatory changes will also significantly affect many aspects of the financial services industry and potentially change the business practices of our customers and counterparties; it is possible that any such changes could adversely affect our business and financial results.

Implementation of the Dodd-Frank Act is being accomplished through numerous rulemakings, many of which are still in process. The final effects of the legislation will not be known with certainty until these rulemakings are complete. The Dodd-Frank Act also mandates the preparation of studies of a wide range of issues, which could lead to additional legislative or regulatory changes. It could be difficult for us to comply with any future regulatory changes in a timely manner, due to the potential scope and number of such changes, which could limit our operations and expose us to liability.

The long-term impact of the Dodd-Frank Act and related future regulatory changes on our business and the financial services industry will depend on a number of factors that are difficult to predict, including our ability to successfully implement any changes to our business, changes in consumer behavior, and our competitors' and customers' responses to the Dodd-Frank Act and related future regulatory changes.

*Freddie Mac*

Examples of aspects of the Dodd-Frank Act that may significantly affect us include the following:

- The new Financial Stability Oversight Council could designate Freddie Mac as a non-bank financial company to be subject to supervision and regulation by the Federal Reserve. If this occurs, the Federal Reserve will have authority to examine Freddie Mac and we may be required to meet more stringent prudential standards than those applicable to other non-bank financial companies. New prudential standards could include requirements related to risk-based capital and leverage, liquidity, single-counterparty credit limits, overall risk management and risk committees, stress tests, and debt-to-equity limits, among other requirements.

- The Dodd-Frank Act will have a significant impact on the derivatives market. Large derivatives users, which may include Freddie Mac, will be subject to extensive new oversight and regulation. These new regulatory standards could impose significant additional costs on us related to derivatives transactions and it may become more difficult for us to enter into desired hedging transactions with acceptable counterparties on favorable terms.

- The Dodd-Frank Act will create new standards and requirements related to asset-backed securities, including requiring securitizers and potentially originators to retain a portion of the underlying loans' credit risk. Any such new standards and requirements could weaken or remove incentives for financial institutions to sell mortgage loans to us.

- The Dodd-Frank Act and related future regulatory changes could negatively impact the volume of mortgage originations, and thus adversely affect the number of mortgages available for us to purchase or guarantee.

- Under the Dodd-Frank Act, new minimum mortgage underwriting standards will be required for residential mortgages, including a requirement that lenders make a reasonable and good faith determination based on "verified and documented information" that the consumer has a "reasonable ability to repay" the mortgage. The Act requires regulators to establish a class of qualified loans that will receive certain protections from legal liability, such as the borrower's right to rescind the loan and seek damages. Mortgage originators and assignees, including Freddie Mac, may be subject to increased legal risk for loans that do not meet these requirements.

- Under the Dodd-Frank Act, federal regulators, including FHFA, are directed to promulgate regulations, to be applicable to financial institutions, including Freddie Mac, that will prohibit incentive-based compensation structures that the regulators determine encourage inappropriate risks by providing excessive compensation or benefits or that could lead to material financial loss. It is possible that any such regulations will have an adverse effect on our ability to retain and recruit management and other employees, as we may be at a competitive disadvantage as compared to other potential employers not subject to these or similar regulations.

For more information on the Dodd-Frank Act, see "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments*."

### *Legislative or regulatory actions could adversely affect our business activities and financial results.*

In addition to the Dodd-Frank Act discussed in the immediately preceding risk factor, and possible GSE reform discussed in "Conservatorship and Related Matters — *The future status and role of Freddie Mac is uncertain and could be materially adversely affected by legislative and regulatory action that alters the ownership, structure, and mission of the company*," our business initiatives may be directly adversely affected by other legislative and regulatory actions at the federal, state, and local levels. We could be negatively affected by legislation or regulatory action that changes the foreclosure process of any individual state. For example, various states and local jurisdictions have implemented mediation programs designed to bring servicers and borrowers together to negotiate workout options. These actions could delay the foreclosure process and increase our expenses, including by potentially delaying the final resolution of seriously delinquent mortgage loans and the disposition of non-performing assets. We could also be affected by any legislative or regulatory changes that would expand the responsibilities and liability of servicers and assignees for maintaining vacant properties prior to foreclosure. These laws and regulatory changes could significantly expand mortgage costs and liabilities. We could be affected by any legislative or regulatory changes to existing bankruptcy laws or proceedings or foreclosure processes, including any changes that would allow bankruptcy judges to unilaterally change the terms of mortgage loans. We could be affected by legislative or regulatory changes that permit or require principal reductions, including through the bankruptcy process. Our business could also be adversely affected by any modification, reduction, or repeal of the federal income tax deductibility of mortgage interest payments.

Pursuant to the Temporary Payroll Tax Cut Continuation Act of 2011, FHFA has been directed to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than 10 basis points above the average guarantee fees charged in 2011 on single-family mortgage-backed securities to fund the payroll tax cut. If we are found to be out of compliance

with this requirement of the Act for two consecutive years, we will be precluded from providing any guarantee for a period to be determined by FHFA, but in no case less than one year.

Legislation or regulatory actions could indirectly adversely affect us to the extent such legislation or actions affect the activities of banks, savings institutions, insurance companies, securities dealers, and other regulated entities that constitute a significant part of our customer base or counterparties, or could indirectly affect us to the extent that they modify industry practices. Legislative or regulatory provisions that create or remove incentives for these entities to sell mortgage loans to us, purchase our securities or enter into derivatives, or other transactions with us could have a material adverse effect on our business results and financial condition.

The Basel Committee on Banking Supervision is in the process of substantially revising capital guidelines for financial institutions and has finalized portions of the so-called "Basel III" guidelines, which would set new capital and liquidity requirements for banks. Phase-in of Basel III is expected to take several years and there is significant uncertainty about how regulators might implement these guidelines or how the resulting regulations might impact us. For example, it is possible that any new regulations on the capital treatment of mortgage servicing rights, risk-based capital requirements for credit risk, and liquidity treatment of our debt and guarantee obligations could adversely affect our business results and financial condition.

***We may make certain changes to our business in an attempt to meet the housing goals and subgoals set for us by FHFA that may increase our losses.***

We may make adjustments to our mortgage loan sourcing and purchase strategies in an effort to meet our housing goals and subgoals, including changes to our underwriting standards and the expanded use of targeted initiatives to reach underserved populations. For example, we may purchase loans that offer lower expected returns on our investment and increase our exposure to credit losses. Doing so could cause us to forgo other purchase opportunities that we would expect to be more profitable. If our current efforts to meet the goals and subgoals prove to be insufficient, we may need to take additional steps that could further increase our losses. FHFA has not yet published a final rule with respect to our duty to serve underserved markets. However, it is possible that we could also make changes to our business in the future in response to this duty. If we do not meet our housing goals or duty to serve requirements, and FHFA finds that the goals or requirements were feasible, we may become subject to a housing plan that could require us to take additional steps that could have an adverse effect on our results of operations and financial condition.

***We are involved in legal proceedings, governmental investigations, and IRS examinations that could result in the payment of substantial damages or otherwise harm our business.***

We are a party to various legal actions, including litigation in the U.S. Tax Court as result of a dispute of certain tax matters with the IRS related to our 1998 through 2005 federal income tax returns. In addition, certain of our current and former directors, officers, and employees are involved in legal proceedings for which they may be entitled to reimbursement by us for costs and expenses of the proceedings. The defense of these or any future claims or proceedings could divert management's attention and resources from the needs of the business. We may be required to establish reserves and to make substantial payments in the event of adverse judgments or settlements of any such claims, investigations, proceedings, or examinations. Any legal proceeding, governmental investigation, or examination issue, even if resolved in our favor, could result in negative publicity or cause us to incur significant legal and other expenses. Furthermore, developments in, outcomes of, impacts of, and costs, expenses, settlements, and judgments related to these legal proceedings and governmental investigations and examinations may differ from our expectations and exceed any amounts for which we have reserved or require adjustments to such reserves. We are also cooperating with other investigations, such as the review being conducted by state attorneys general and state bank and mortgage regulators into foreclosure practices. These proceedings could divert management's attention or other resources. See "LEGAL PROCEEDINGS" and "NOTE 18: LEGAL CONTINGENCIES" for information about our pending legal proceedings and "NOTE 13: INCOME TAXES" for information about our litigation with the IRS relating to potential additional income taxes and penalties for the 1998 to 2005 tax years and other tax-related matters.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

None.

## ITEM 2. PROPERTIES

Our principal offices consist of five office buildings in McLean, Virginia. We own four of the office buildings, comprising approximately 1.3 million square feet. We occupy the fifth building, comprising approximately 200,000 square feet, under a lease from a third party.

## ITEM 3. LEGAL PROCEEDINGS

We are involved as a party to a variety of legal proceedings arising from time to time in the ordinary course of business. See "NOTE 18: LEGAL CONTINGENCIES" for more information regarding our involvement as a party to various legal proceedings.

## ITEM 4. MINE SAFETY DISCLOSURES

Not applicable.

*Freddie Mac*

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

**Market Information**

Our common stock, par value $0.00 per share, trades in the OTC market and is quoted on the OTC Bulletin Board under the ticker symbol "FMCC." As of February 27, 2012, there were 649,733,472 shares of our common stock outstanding.

On July 8, 2010, our common stock and 20 previously-listed classes of preferred securities were delisted from the NYSE. We delisted such securities pursuant to a directive by the Conservator. The classes of preferred stock that were previously listed on the NYSE also now trade in the OTC market.

The table below sets forth the high and low prices of our common stock on the NYSE and the high and low bid information for our common stock on the OTC Bulletin Board for the indicated periods. The OTC Bulletin Board quotations reflect inter-dealer prices, without retail mark-up, mark-down, or commission, and may not necessarily represent actual transactions.

**Table 7 — Quarterly Common Stock Information**

|  | High | Low |
|---|---|---|
| **2011 Quarter Ended**[1] |  |  |
| December 31 | $0.27 | $0.18 |
| September 30 | 0.41 | 0.24 |
| June 30 | 0.54 | 0.34 |
| March 31 | 1.00 | 0.13 |
| **2010 Quarter Ended** |  |  |
| December 31[1] | $0.50 | $0.29 |
| September 30[2] | 0.44 | 0.24 |
| June 30[3] | 1.68 | 0.40 |
| March 31[3] | 1.52 | 1.12 |

(1) Based on bid information for our common stock on the OTC Bulletin Board.
(2) Based on the prices of our common stock on the NYSE prior to July 8, 2010 and bid information for our common stock on the OTC Bulletin Board on and after July 8, 2010.
(3) Based on the prices of our common stock on the NYSE.

**Holders**

As of February 27, 2012, we had 2,104 common stockholders of record.

**Dividends and Dividend Restrictions**

We did not pay any cash dividends on our common stock during 2011 or 2010.

Our payment of dividends is subject to the following restrictions:

*Restrictions Relating to the Conservatorship*

As Conservator, FHFA announced on September 7, 2008 that we would not pay any dividends on Freddie Mac's common stock or on any series of Freddie Mac's preferred stock (other than the senior preferred stock). FHFA has instructed our Board of Directors that it should consult with and obtain the approval of FHFA before taking actions involving dividends.

*Restrictions Under the Purchase Agreement*

The Purchase Agreement prohibits us and any of our subsidiaries from declaring or paying any dividends on Freddie Mac equity securities (other than with respect to the senior preferred stock or warrant) without the prior written consent of Treasury.

*Restrictions Under the GSE Act*

Under the GSE Act, FHFA has authority to prohibit capital distributions, including payment of dividends, if we fail to meet applicable capital requirements. Under the GSE Act, we are not permitted to make a capital distribution if, after making the distribution, we would be undercapitalized, except the Director of FHFA may permit us to repurchase shares if the repurchase is made in connection with the issuance of additional shares or obligations in at least an equivalent amount and will reduce our financial obligations or otherwise improve our financial condition. If FHFA classifies us as undercapitalized, we are not permitted to make a capital distribution that would result in our being reclassified as

significantly undercapitalized or critically undercapitalized. If FHFA classifies us as significantly undercapitalized, approval of the Director of FHFA is required for any dividend payment; the Director may approve a capital distribution only if the Director determines that the distribution will enhance the ability of the company to meet required capital levels promptly, will contribute to the long-term financial safety-and-soundness of the company, or is otherwise in the public interest. Our capital requirements have been suspended during conservatorship.

### Restrictions Under our Charter

Without regard to our capital classification, we must obtain prior written approval of FHFA to make any capital distribution that would decrease total capital to an amount less than the risk-based capital level or that would decrease core capital to an amount less than the minimum capital level. As noted above, our capital requirements have been suspended during conservatorship.

### Restrictions Relating to Subordinated Debt

During any period in which we defer payment of interest on qualifying subordinated debt, we may not declare or pay dividends on, or redeem, purchase or acquire, our common stock or preferred stock. Our qualifying subordinated debt provides for the deferral of the payment of interest for up to five years if either: (a) our core capital is below 125% of our critical capital requirement; or (b) our core capital is below our statutory minimum capital requirement, and the Secretary of the Treasury, acting on our request, exercises his or her discretionary authority pursuant to Section 306(c) of our charter to purchase our debt obligations. FHFA has directed us to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital levels. As a result, the terms of any of our subordinated debt that provide for us to defer payments of interest under certain circumstances, including our failure to maintain specified capital levels, are no longer applicable. As noted above, our capital requirements have been suspended during conservatorship.

### Restrictions Relating to Preferred Stock

Payment of dividends on our common stock is also subject to the prior payment of dividends on our 24 series of preferred stock and one series of senior preferred stock, representing an aggregate of 464,170,000 shares and 1,000,000 shares, respectively, outstanding as of December 31, 2011. Payment of dividends on all outstanding preferred stock, other than the senior preferred stock, is subject to the prior payment of dividends on the senior preferred stock. We paid dividends on the senior preferred stock during 2011 at the direction of the Conservator, as discussed in "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Dividend Obligation on the Senior Preferred Stock*" and "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT) — Dividends Declared During 2011." We did not declare or pay dividends on any other series of preferred stock outstanding in 2011.

## Recent Sales of Unregistered Securities

The securities we issue are "exempted securities" under the Securities Act of 1933, as amended. As a result, we do not file registration statements with the SEC with respect to offerings of our securities.

Following our entry into conservatorship, we suspended the operation of, and ceased making grants under, equity compensation plans. Previously, we had provided equity compensation under these plans to employees and members of our Board of Directors. Under the Purchase Agreement, we cannot issue any new options, rights to purchase, participations, or other equity interests without Treasury's prior approval. However, grants outstanding as of the date of the Purchase Agreement remain in effect in accordance with their terms.

No stock options were exercised during the three months ended December 31, 2011. However, restrictions lapsed on 10,729 restricted stock units.

See "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" for more information.

## Issuer Purchases of Equity Securities

We did not repurchase any of our common or preferred stock during the three months ended December 31, 2011. Additionally, we do not currently have any outstanding authorizations to repurchase common or preferred stock. Under the Purchase Agreement, we cannot repurchase our common or preferred stock without Treasury's prior consent, and we may only purchase or redeem the senior preferred stock in certain limited circumstances set forth in the Certificate of Creation,

Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Liquidation Preference Senior Preferred Stock.

**Transfer Agent and Registrar**

Computershare Trust Company, N.A.
P.O. Box 43078
Providence, RI 02940-3078
Telephone: 781-575-2879
http://www.computershare.com/investors

## ITEM 6. SELECTED FINANCIAL DATA[1]

The selected financial data presented below should be reviewed in conjunction with MD&A and our consolidated financial statements and related notes for the year ended December 31, 2011.

| | At or For The Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2011 | 2010 | 2009 | 2008 | 2007 |
| | (dollars in millions, except share-related amounts) | | | | |
| **Statements of Income and Comprehensive Income Data** | | | | | |
| Net interest income | $ 18,397 | $ 16,856 | $ 17,073 | $ 6,796 | $ 3,099 |
| Provision for credit losses | (10,702) | (17,218) | (29,530) | (16,432) | (2,854) |
| Non-interest income (loss) | (10,878) | (11,588) | (2,732) | (29,175) | (275) |
| Non-interest expense | (2,483) | (2,932) | (7,195) | (5,753) | (5,959) |
| Net loss attributable to Freddie Mac | (5,266) | (14,025) | (21,553) | (50,119) | (3,094) |
| Total comprehensive income (loss) attributable to Freddie Mac | (1,230) | 282 | (2,913) | (70,483) | (5,786) |
| Net loss attributable to common stockholders | (11,764) | (19,774) | (25,658) | (50,795) | (3,503) |
| Net loss per common share: | | | | | |
| Basic | (3.63) | (6.09) | (7.89) | (34.60) | (5.37) |
| Diluted | (3.63) | (6.09) | (7.89) | (34.60) | (5.37) |
| Cash dividends per common share | — | — | — | 0.50 | 1.75 |
| Weighted average common shares outstanding (in thousands):[2] | | | | | |
| Basic | 3,244,896 | 3,249,369 | 3,253,836 | 1,468,062 | 651,881 |
| Diluted | 3,244,896 | 3,249,369 | 3,253,836 | 1,468,062 | 651,881 |
| **Balance Sheets Data** | | | | | |
| Mortgage loans held-for-investment, at amortized cost by consolidated trusts (net of allowances for loan losses) | $1,564,131 | $1,646,172 | $ — | $ — | $ — |
| Total assets | 2,147,216 | 2,261,780 | 841,784 | 850,963 | 794,368 |
| Debt securities of consolidated trusts held by third parties | 1,471,437 | 1,528,648 | — | — | — |
| Other debt | 660,546 | 713,940 | 780,604 | 843,021 | 738,557 |
| All other liabilities | 15,379 | 19,593 | 56,808 | 38,576 | 28,906 |
| Total Freddie Mac stockholders' equity (deficit) | (146) | (401) | 4,278 | (30,731) | 26,724 |
| **Portfolio Balances**[3] | | | | | |
| Mortgage-related investments portfolio[4] | $ 653,313 | $ 696,874 | $ 755,272 | $ 804,762 | $ 720,813 |
| Total Freddie Mac mortgage-related securities[4] | 1,624,684 | 1,712,918 | 1,854,813 | 1,807,553 | 1,701,207 |
| Total mortgage portfolio[5] | 2,075,394 | 2,164,859 | 2,250,539 | 2,207,476 | 2,102,676 |
| Non-performing assets[6] | 129,152 | 125,405 | 104,984 | 46,620 | 16,119 |
| **Ratios**[7] | | | | | |
| Return on average assets[8][12] | (0.2)% | (0.6)% | (2.5)% | (6.1)% | (0.4)% |
| Non-performing assets ratio[9] | 6.8 | 6.4 | 5.2 | 2.4 | 0.9 |
| Return on common equity[10][12] | N/A | N/A | N/A | N/A | (21.0) |
| Equity to assets ratio[11][12] | — | (0.2) | (1.6) | (0.2) | 3.4 |

(1) See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for information regarding our accounting policies and the impact of new accounting policies on our consolidated financial statements. Effective January 1, 2010, we adopted amendments to the accounting guidance for transfers of financial assets and the consolidation of VIEs. This had a significant impact on our consolidated financial statements. Consequently, our results for 2010 and 2011 are not comparable with the results for prior years. For more information, see "NOTE 19: SELECTED FINANCIAL STATEMENT LINE ITEMS."

(2) Includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement for periods after 2007. This warrant is included in basic loss per share, because it is unconditionally exercisable by the holder at a cost of $0.00001 per share.

(3) Represents the UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(4) See "Table 35 — Freddie Mac Mortgage-Related Securities" for the composition of this line item.

(5) See "Table 16 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios" for the composition of our total mortgage portfolio.

(6) See "Table 60 — Non-Performing Assets" for a description of our non-performing assets.

(7) The dividend payout ratio on common stock is not presented because we are reporting a net loss attributable to common stockholders for all periods presented.

(8) Ratio computed as net income (loss) attributable to Freddie Mac divided by the simple average of the beginning and ending balances of total assets.

(9) Ratio computed as non-performing assets divided by the ending UPB of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities.

(10) Ratio computed as net income (loss) attributable to common stockholders divided by the simple average of the beginning and ending balances of total Freddie Mac stockholders' equity (deficit), net of preferred stock (at redemption value). Ratio is not presented for periods in which the simple average of the beginning and ending balances of total Freddie Mac stockholders' equity (deficit) is less than zero.

(11) Ratio computed as the simple average of the beginning and ending balances of total Freddie Mac stockholders' equity (deficit) divided by the simple average of the beginning and ending balances of total assets.

(12) To calculate the simple averages for 2010, the beginning balances of total assets and total Freddie Mac stockholders' equity are based on the January 1, 2010 balances, so that both the beginning and ending balances reflect the January 1, 2010 changes in accounting principles related to VIEs.

*Freddie Mac*

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this MD&A in conjunction with "BUSINESS — Executive Summary" and our consolidated financial statements and related notes for the year ended December 31, 2011.*

### MORTGAGE MARKET AND ECONOMIC CONDITIONS, AND OUTLOOK

#### Mortgage Market and Economic Conditions

##### *Overview*

Despite some improvements in the national unemployment rate, the housing market continued to experience challenges during 2011 due primarily to continued weakness in the employment market and a significant inventory of seriously delinquent loans and REO properties in the market. The U.S. real gross domestic product rose by 1.6% during 2011, compared to 3.1% during 2010, according to the Bureau of Economic Analysis estimates released on January 27, 2012. The national unemployment rate was 8.5% in December 2011, compared to 9.4% in December 2010, based on data from the U.S. Bureau of Labor Statistics. In the data underlying the unemployment rate, there was employment growth (net new jobs added to the economy) in each month during 2011, which shows evidence of a slow, but steady positive trend for the economy and the housing market.

The table below provides important indicators for the U.S. residential mortgage market.

#### Table 8 — Mortgage Market Indicators

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2011 | 2010 | 2009 |
| Home sale units (in thousands)[1] | 4,564 | 4,513 | 4,715 |
| Home price change[2] | (3.0)% | (5.9)% | (2.3)% |
| Single-family originations (in billions)[3] | $ 1,350 | $ 1,630 | $ 1,840 |
| ARM share[4] | 12% | 10% | 7% |
| Refinance share[5] | 79% | 80% | 73% |
| U.S. single-family mortgage debt outstanding (in billions)[6] | $10,336 | $10,522 | $10,866 |
| U.S. multifamily mortgage debt outstanding (in billions)[6] | $ 841 | $ 838 | $ 847 |

(1) Includes sales of new and existing homes in the U.S. Source: National Association of Realtors news release dated February 22, 2012 (sales of existing homes) and U.S. Census Bureau news release dated February 24, 2012 (sales of new homes).

(2) Calculated internally using estimates of changes in single-family home prices by state, which are weighted using the property values underlying our single-family credit guarantee portfolio to obtain a national index. The depreciation rate for each year presented incorporates property value information on loans purchased by both Freddie Mac and Fannie Mae through December 31, 2011 and the percentage change will be subject to revision based on more recent purchase information. Other indices of home prices may have different results, as they are determined using different pools of mortgage loans and calculated under different conventions than our own.

(3) Source: Inside Mortgage Finance estimates of originations of single-family first-and second liens dated January 27, 2012.

(4) ARM share of the dollar amount of total mortgage applications. Source: Mortgage Bankers Association Mortgage Applications Survey. Data reflect annual average of weekly figures.

(5) Refinance share of the number of conventional mortgage applications. Source: Mortgage Bankers Association's Mortgage Applications Survey. Data reflect annual average of weekly figures.

(6) Source: Federal Flow of Funds Accounts of the United States dated December 8, 2011. The outstanding amounts for 2011 presented above reflect balances as of September 30, 2011.

##### *Single-Family Housing Market*

We believe the number of potential home buyers in the market, combined with the volume of homes offered for sale, will determine the direction of home prices. Within the industry, existing home sales are important for assessing the rate at which the mortgage market might absorb the inventory of listed, but unsold, homes in the U.S. (including listed REO properties). Additionally, we believe new home sales can be an indicator of certain economic trends, such as the potential for growth in gross domestic product and total U.S. mortgage debt outstanding. Based on data from the National Association of Realtors, sales of existing homes in 2011 were 4.26 million, increasing from 4.19 million during 2010. The National Association of Realtors report states that distressed and all-cash sales comprised a historically high volume of existing home sales in 2011. Investors typically represent the bulk of all-cash transactions. Based on data from the U.S. Census Bureau and HUD, new home sales in 2011 were approximately 304,000 homes, decreasing approximately 6% from 323,000 homes in 2010. The relative level of mortgage interest rates is also a factor that impacts home sale demand because lower interest rates result in more affordable housing for borrowers. During 2011, the Federal Reserve took several actions designed to support an economic recovery and maintain historically low interest rates, which impacted and will likely continue to impact single-family mortgage market activity, including the volume of mortgage refinancing.

*Freddie Mac*

The recently expanded and streamlined HARP initiative, together with interest rates that we expect to remain at historically low levels through much of 2012, may result in a high level of refinancing, particularly for borrowers that are underwater on their current loans. These changes in HARP allow eligible borrowers whose monthly payments are current to refinance and obtain substantially lower interest rates and monthly payments, which may reduce future defaults and help lower the volume of distressed sales in some markets. For information on this initiative, and its potential impact on our business and results, see "RISK FACTORS — Competitive and Market Risks — *The servicing alignment initiative, MHA Program and other efforts to reduce foreclosures, modify loan terms and refinance mortgages, including HARP, may fail to mitigate our credit losses and may adversely affect our results of operations or financial condition*," and "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program.*"

We estimate that home prices decreased approximately 3.0% nationwide during 2011. This estimate is based on our own index of mortgage loans in our single-family credit guarantee portfolio. Other indices of home prices may have different results, as they are determined using different pools of mortgage loans and calculated under different conventions than our own.

The serious delinquency rate of our single-family loans declined during 2011, but remained near historically high levels. The Mortgage Bankers Association reported in its National Delinquency Survey that delinquency rates on all single-family loans in the survey declined to 7.7% as of December 31, 2011, down from 8.6% at year-end 2010. Residential loan performance has been generally worse in areas with higher unemployment rates and where declines in property values have been more significant during the last five years. In its survey, the Mortgage Bankers Association presents delinquency rates both for mortgages it classifies as subprime and for mortgages it classifies as prime conventional. The delinquency rates of subprime mortgages are markedly higher than those of prime conventional loan products in the Mortgage Bankers Association survey; however, the delinquency experience in prime conventional mortgage loans during the last four years has been significantly worse than in any year since the 1930s.

Based on data from the Federal Reserve's Flow of Funds Accounts, there was a sustained and significant increase in single-family mortgage debt outstanding from 2001 to 2006. This increase in mortgage debt was driven by increasing sales of new and existing single-family homes during this same period. As reported by FHFA in its Conservator's Report on the Enterprises' Financial Condition, dated June 13, 2011, the market share of mortgage-backed securities issued by the GSEs and Ginnie Mae declined significantly from 2001 to 2006 while the market share of non-GSE securities peaked. Non-traditional mortgage types, such as interest-only, Alt-A, and option ARMs, also increased in market share during these years, which we believe introduced greater risk into the market. We believe these shifts in market activity, in part, help explain the significant differentiation in delinquency performance of securitized non-GSE and GSE mortgage loans as discussed below.

Based on the National Delinquency Survey's data, we estimate that we owned or guaranteed approximately 24% of the outstanding single-family mortgages in the U.S. at December 31, 2011, based on number of loans. At December 31, 2011, we held or guaranteed approximately 414,000 seriously delinquent single-family loans, representing approximately 11% of the seriously delinquent single-family mortgages in the market as of that date. We estimate that loans backing non-GSE securities comprised approximately 9% of the single-family mortgages in the U.S. and represented approximately 29% of the seriously delinquent single-family mortgages at September 30, 2011 (based on the latest information available). As of December 31, 2011, we held non-GSE single-family mortgage-related securities with a UPB of $79.8 billion as investments.

The foreclosure process continues to experience delays, due to a number of factors. This has caused the average length of time for foreclosure of a Freddie Mac loan to increase significantly in recent years. Delays in the foreclosure process may also adversely affect trends in home prices regionally or nationally. For more information, see "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" and "BUSINESS — Regulation and Supervision — Legislative and Regulatory Developments — *Developments Concerning Single-Family Servicing Practices.*"

### Multifamily Housing Market

Multifamily market fundamentals continued to improve on a national level during 2011. This improvement continues a trend of favorable movements in key indicators such as vacancy rates and effective rents that generally began in early 2010. Vacancy rates and effective rents are important to loan performance because multifamily loans are generally repaid from the cash flows generated by the underlying property and these factors significantly influence those cash flows. These improving fundamentals and perceived optimism about demand for multifamily housing has contributed to lower capitalization rates which has improved property values in most markets. However, the broader economy continues to be

challenged by persistently high unemployment, which has prevented a more comprehensive recovery of the multifamily housing market.

**Outlook**

Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties. For example, a number of factors could cause the actual performance of the housing and mortgage markets and the U.S. economy during 2012 to be significantly worse than we expect, including adverse changes in consumer confidence, national or international economic conditions and changes in the federal government's fiscal policies. See "FORWARD-LOOKING STATEMENTS" for additional information.

*Overview*

We continue to expect key macroeconomic drivers of the economy — such as interest rates, income growth, employment, and inflation — to affect the performance of the housing and mortgage markets in 2012. Consumer confidence measures, while up from recession lows, remain below long-term averages and suggest that households will likely continue to be cautious in home buying. As a result of the continued high unemployment rate and relative low levels of consumer confidence, we expect that the single-family housing market will likely continue to remain weak in 2012. We also expect rates on fixed-rate single-family mortgages to remain historically low in 2012, which, combined with the changes to HARP, may help to extend the recent high level of refinancing activity (relative to new purchase lending activity). Lastly, many large financial institutions continued to experience delays in the foreclosure process for single-family loans throughout 2011. To the extent a large volume of loans complete the foreclosure process in a short period of time, the resulting REO inventory could have a negative impact on the housing market.

We expect that home sales volume in 2012 will be only modestly higher than in 2011. While home prices remain at significantly lower levels from their peak in most areas, estimates of the inventory of unsold homes, including those held by financial institutions and distressed borrowers, remain high. Due to these and other factors, our expectation for home prices, based on our own index, is that national average home prices will continue to remain weak and will likely decline over the near term before a long-term recovery in housing begins.

*Single-Family*

We expect our provision for credit losses and charge-offs will likely remain elevated in 2012. This is due in part to the substantial number of underwater mortgage loans in our single-family credit guarantee portfolio, as well as the substantial inventory of seriously delinquent loans. For the near term, we also expect:

- loss severity of REO dispositions and short sales to remain relatively high, as market conditions, such as home prices and the rate of home sales, continue to remain weak;

- non-performing assets, which include loans classified as TDRs, to continue to remain high;

- the volume of loan workouts to remain high; and

- continued high volume of loans in the foreclosure process as well as prolonged foreclosure timelines.

*Multifamily*

The most recent market data available continues to reflect improving national apartment fundamentals, including decreasing vacancy rates and increasing effective rents. However, some geographic areas in which we have investments in multifamily loans, including the states of Arizona, Georgia, and Nevada, continue to exhibit weaker than average fundamentals that increase our risk of future losses. We own or guarantee loans in these states that we believe are at risk of default. We expect our multifamily delinquency rate to remain relatively stable in 2012.

Recent market data shows a significant increase in multifamily loan activity, compared to 2010 and 2009, and reflects that the multifamily sector has experienced greater stability and improvement in market fundamentals and investor demand than other real estate sectors. We remained a constant source of liquidity in the multifamily market. Excluding CMBS and non-Freddie Mac mortgage-related securities, we estimate that we owned or guaranteed approximately 12.2% of outstanding mortgage loans in the market as of September 30, 2011, compared to 11.8% as of December 31, 2010. Our purchase and guarantee of multifamily loans increased approximately 32% to $20.3 billion in 2011, compared to $15.4 billion in 2010. We expect our purchase and guarantee activity to continue to increase, but at a more moderate pace, in 2012.

*Freddie Mac*

## CONSOLIDATED RESULTS OF OPERATIONS

The following discussion of our consolidated results of operations should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported results of operations.

### Change in Accounting Principles

Our adoption of amendments to the accounting guidance applicable to the accounting for transfers of financial assets and the consolidation of VIEs had a significant impact on our consolidated financial statements and other financial disclosures beginning in the first quarter of 2010.

The cumulative effect of these changes in accounting principles was a net decrease of $11.7 billion to total equity (deficit) as of January 1, 2010, which included changes to the opening balances of retained earnings (accumulated deficit) and AOCI. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," "NOTE 3: VARIABLE INTEREST ENTITIES," and "NOTE 19: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information regarding these changes.

As these changes in accounting principles were applied prospectively, our results of operations for the years ended December 31, 2011 and 2010 (on both a GAAP and Segment Earnings basis), which reflect the consolidation of trusts that issue our single-family PCs and certain Other Guarantee Transactions, are not directly comparable with the results of operations for the year ended December 31, 2009, which reflect the accounting policies in effect during that time (*i.e.*, when the majority of the securitization entities were accounted for off-balance sheet).

### Table 9 — Summary Consolidated Statements of Income and Comprehensive Income

| | Year Ended December 31, | | |
|---|---:|---:|---:|
| | **2011** | **2010** | **2009** |
| | (in millions) | | |
| Net interest income | $ 18,397 | $ 16,856 | $ 17,073 |
| Provision for credit losses | (10,702) | (17,218) | (29,530) |
| Net interest income (loss) after provision for credit losses | 7,695 | (362) | (12,457) |
| Non-interest income (loss): | | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (219) | (164) | — |
| Gains (losses) on retirement of other debt | 44 | (219) | (568) |
| Gains (losses) on debt recorded at fair value | 91 | 580 | (404) |
| Derivative gains (losses) | (9,752) | (8,085) | (1,900) |
| Impairment of available-for-sale securities: | | | |
| Total other-than-temporary impairment of available-for-sale securities | (2,101) | (1,778) | (23,125) |
| Portion of other-than-temporary impairment recognized in AOCI | (200) | (2,530) | 11,928 |
| Net impairment of available-for-sale securities recognized in earnings | (2,301) | (4,308) | (11,197) |
| Other gains (losses) on investment securities recognized in earnings | (896) | (1,252) | 5,965 |
| Other income | 2,155 | 1,860 | 5,372 |
| Total non-interest income (loss) | (10,878) | (11,588) | (2,732) |
| Non-interest expense: | | | |
| Administrative expenses | (1,506) | (1,597) | (1,685) |
| REO operations expense | (585) | (673) | (307) |
| Other expenses | (392) | (662) | (5,203) |
| Total non-interest expense | (2,483) | (2,932) | (7,195) |
| Loss before income tax benefit | (5,666) | (14,882) | (22,384) |
| Income tax benefit | 400 | 856 | 830 |
| Net loss | (5,266) | (14,026) | (21,554) |
| Other comprehensive income, net of taxes and reclassification adjustments: | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | 3,465 | 13,621 | 17,825 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 509 | 673 | 773 |
| Changes in defined benefit plans | 62 | 13 | 42 |
| Total other comprehensive income, net of taxes and reclassification adjustments | 4,036 | 14,307 | 18,640 |
| Comprehensive income (loss) | (1,230) | 281 | (2,914) |
| Less: Comprehensive loss attributable to noncontrolling interest | — | 1 | 1 |
| Total comprehensive income (loss) attributable to Freddie Mac | $ (1,230) | $ 282 | $ (2,913) |

### Net Interest Income

The table below summarizes our net interest income and net interest yield and provides an attribution of changes in annual results to changes in interest rates or changes in volumes of our interest-earning assets and interest-bearing liabilities. Average balance sheet information is presented because we believe end-of-period balances are not

representative of activity throughout the periods presented. For most components of the average balances, a daily weighted average balance was calculated for the period. When daily weighted average balance information was not available, a simple monthly average balance was calculated.

## Table 10 — Average Balance, Net Interest Income, and Rate/Volume Analysis

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2011** | | | **2010** | | | **2009** | | |
| | Average Balance[1][2] | Interest Income (Expense)[1] | Average Rate | Average Balance[1][2] | Interest Income (Expense)[1] | Average Rate | Average Balance[1][2] | Interest Income (Expense)[1] | Average Rate |
| | | | | (dollars in millions) | | | | | |
| **Interest-earning assets:** | | | | | | | | | |
| Cash and cash equivalents . . . . . . . . . . . . | $ 45,381 | $ 34 | 0.07% | $ 48,803 | $ 77 | 0.16% | $ 55,764 | $ 193 | 0.35% |
| Federal funds sold and securities purchased under agreements to resell . . . . . . . . . . . | 27,557 | 33 | 0.12 | 46,739 | 79 | 0.17 | 28,524 | 48 | 0.17 |
| Mortgage-related securities: | | | | | | | | | |
| Mortgage-related securities[3] | 442,284 | 20,357 | 4.60 | 526,748 | 25,366 | 4.82 | 675,167 | 32,563 | 4.82 |
| Extinguishment of PCs held by Freddie Mac. . . . . . . . . . . . . . . . . . . . . | (162,600) | (7,665) | (4.71) | (213,411) | (11,182) | (5.24) | — | — | — |
| Total mortgage-related securities, net . . . . | 279,684 | 12,692 | 4.54 | 313,337 | 14,184 | 4.53 | 675,167 | 32,563 | 4.82 |
| Non-mortgage-related securities[3] . . . . . . . . | 24,587 | 99 | 0.40 | 27,995 | 191 | 0.68 | 16,471 | 727 | 4.42 |
| Mortgage loans held by consolidated trusts[4][5] . . . . . . . . . . . . . . . . . . | 1,627,956 | 77,158 | 4.74 | 1,722,387 | 86,698 | 5.03 | — | — | — |
| Unsecuritized mortgage loans[4][6] . . . . . . . . | 244,134 | 9,124 | 3.74 | 206,116 | 8,727 | 4.23 | 127,429 | 6,815 | 5.35 |
| Total interest-earning assets . . . . . . . . | $2,249,299 | $ 99,140 | 4.41 | $2,365,377 | $109,956 | 4.65 | $903,355 | $ 40,346 | 4.47 |
| **Interest-bearing liabilities:** | | | | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac . . . . . . . . . . . | $1,643,939 | $(74,784) | (4.55) | $1,738,330 | $(86,398) | (4.97) | $ — | $ — | — |
| Extinguishment of PCs held by Freddie Mac . . | (162,600) | 7,665 | 4.71 | (213,411) | 11,182 | 5.24 | — | — | — |
| Total debt securities of consolidated trusts held by third parties . . . . . . . . . . . . . . | 1,481,339 | (67,119) | (4.53) | 1,524,919 | (75,216) | (4.93) | — | — | — |
| Other debt: | | | | | | | | | |
| Short-term debt . . . . . . . . . . . . . . . . | 186,304 | (331) | (0.18) | 219,654 | (552) | (0.25) | 287,259 | (2,234) | (0.78) |
| Long-term debt[7] . . . . . . . . . . . . . . . | 503,842 | (12,538) | (2.49) | 543,306 | (16,363) | (3.01) | 557,184 | (19,916) | (3.57) |
| Total other debt . . . . . . . . . . . . . . . | 690,146 | (12,869) | (1.86) | 762,960 | (16,915) | (2.22) | 844,443 | (22,150) | (2.62) |
| Total interest-bearing liabilities . . . . . . | 2,171,485 | (79,988) | (3.68) | 2,287,879 | (92,131) | (4.03) | 844,443 | (22,150) | (2.62) |
| Expense related to derivatives[8] . . . . . . . . | — | (755) | (0.04) | — | (969) | (0.04) | — | (1,123) | (0.13) |
| Impact of net non-interest-bearing funding . . . . | 77,814 | — | 0.13 | 77,498 | — | 0.13 | 58,912 | — | 0.17 |
| Total funding of interest-earning assets . . . . | $2,249,299 | $(80,743) | (3.59) | $2,365,377 | $(93,100) | (3.94) | $903,355 | $(23,273) | (2.58) |
| Net interest income/yield . . . . . . . . . . . | | $ 18,397 | 0.82 | | $ 16,856 | 0.71 | | $ 17,073 | 1.89 |

*Freddie Mac*

| | 2011 vs. 2010 Variance Due to | | | 2010 vs. 2009 Variance Due to | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Rate[9] | Volume[9] | Total Change | Rate[9] | Volume[9] | Total Change |
| | | | (in millions) | | | |
| **Interest-earning assets:** | | | | | | |
| Cash and cash equivalents | $ (33) | $ (10) | $ (43) | $ (83) | $ (33) | $ (116) |
| Federal funds sold and securities purchased under agreements to resell | (19) | (27) | (46) | (1) | 32 | 31 |
| Mortgage-related securities: | | | | | | |
| Mortgage-related securities[3] | (1,082) | (3,927) | (5,009) | (50) | (7,147) | (7,197) |
| Extinguishment of PCs held by Freddie Mac | 1,042 | 2,475 | 3,517 | — | (11,182) | (11,182) |
| Total mortgage-related securities, net | (40) | (1,452) | (1,492) | (50) | (18,329) | (18,379) |
| Non-mortgage-related securities[3] | (71) | (21) | (92) | (850) | 314 | (536) |
| Mortgage loans held by consolidated trusts[4][5] | (4,921) | (4,619) | (9,540) | — | 86,698 | 86,698 |
| Unsecuritized mortgage loans[4][6] | (1,097) | 1,494 | 397 | (1,641) | 3,553 | 1,912 |
| Total interest-earning assets | $(6,181) | $(4,635) | $(10,816) | $(2,625) | $72,235 | $ 69,610 |
| **Interest-bearing liabilities:** | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $ 7,077 | $ 4,537 | $ 11,614 | $ — | $(86,398) | $(86,398) |
| Extinguishment of PCs held by Freddie Mac | (1,042) | (2,475) | (3,517) | — | 11,182 | 11,182 |
| Total debt securities of consolidated trusts held by third parties | 6,035 | 2,062 | 8,097 | — | (75,216) | (75,216) |
| Other debt: | | | | | | |
| Short-term debt | 145 | 76 | 221 | 1,248 | 434 | 1,682 |
| Long-term debt[7] | 2,697 | 1,128 | 3,825 | 3,068 | 485 | 3,553 |
| Total other debt | 2,842 | 1,204 | 4,046 | 4,316 | 919 | 5,235 |
| Total interest-bearing liabilities | 8,877 | 3,266 | 12,143 | 4,316 | (74,297) | (69,981) |
| Expense related to derivatives[8] | 214 | — | 214 | 154 | — | 154 |
| Total funding of interest-earning assets | $ 9,091 | $ 3,266 | $ 12,357 | $ 4,470 | $(74,297) | $(69,827) |
| Net interest income | $ 2,910 | $(1,369) | $ 1,541 | $ 1,845 | $ (2,062) | $ (217) |

(1) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) We calculate average balances based on amortized cost.
(3) Interest income (expense) includes accretion of the portion of impairment charges recognized in earnings where we expect a significant improvement in cash flows.
(4) Non-performing loans, where interest income is generally recognized when collected, are included in average balances.
(5) Loan fees, primarily consisting of delivery fees, included in interest income for mortgage loans held by consolidated trusts were $405 million, $127 million, and $0 million for 2011, 2010, and 2009, respectively.
(6) Loan fees, primarily consisting of delivery fees and multifamily prepayment fees, included in unsecuritized mortgage loan interest income were $223 million, $130 million, and $78 million for 2011, 2010, and 2009, respectively.
(7) Includes current portion of long-term debt.
(8) Represents changes in fair value of derivatives in closed cash flow hedge relationships that were previously deferred in AOCI and have been reclassified to earnings as the associated hedged forecasted issuance of debt affects earnings.
(9) Rate and volume changes are calculated on the individual financial statement line item level. Combined rate/volume changes were allocated to the individual rate and volume change based on their relative size.

The table below summarizes components of our net interest income.

## Table 11 — Net Interest Income

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2011 | 2010 | 2009 |
| | | (in millions) | |
| Contractual amounts of net interest income[1] | $18,448 | $17,743 | $18,937 |
| Amortization income (expense), net:[2] | | | |
| Accretion of impairments on available-for-sale securities[3] | 115 | 392 | 1,180 |
| Asset-related amortization income (expense), net: | | | |
| Mortgage loans held by consolidated trusts | (1,942) | (712) | — |
| Unsecuritized mortgage loans | 182 | 311 | 233 |
| Mortgage-related securities | (239) | (272) | (1,345) |
| Other assets | (122) | (23) | — |
| Asset-related amortization expense, net | (2,121) | (696) | (1,112) |
| Debt-related amortization income (expense), net: | | | |
| Debt securities of consolidated trusts | 3,383 | 1,152 | — |
| Other long-term debt securities | (673) | (766) | (809) |
| Debt-related amortization income (expense), net | 2,710 | 386 | (809) |
| Total amortization income (expense), net | 704 | 82 | (741) |
| Expense related to derivatives[4] | (755) | (969) | (1,123) |
| Net interest income | $18,397 | $16,856 | $17,073 |

(1) Includes the reversal of interest income accrued, net of interest received on a cash basis, related to mortgage loans that are on non-accrual status.
(2) Represents amortization related to premiums, discounts, deferred fees and other adjustments to the carrying value of our financial instruments, and the reclassification of previously deferred balances from AOCI for certain derivatives in closed cash flow hedge relationships related to individual debt issuances and mortgage purchase transactions.
(3) The portion of the impairment charges recognized in earnings where we expect a significant improvement in cash flows is recognized as net interest income. Upon our adoption of an amendment to the accounting guidance for investments in debt and equity securities on April 1, 2009, previously recognized non-credit-related other-than-temporary impairments are no longer accreted into net interest income.
(4) Represents changes in fair value of derivatives in closed cash flow hedge relationships that were previously deferred in AOCI and have been reclassified to earnings as the associated hedged forecasted issuance of debt affects earnings.

Net interest income and net interest yield increased $1.5 billion and 11 basis points, respectively, during the year ended December 31, 2011, compared to the year ended December 31, 2010. The primary driver underlying the increases was lower funding costs from the replacement of debt at lower rates. This factor was partially offset by the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations and limited purchase activity.

Net interest income decreased by $217 million during the year ended December 31, 2010, compared to the year ended December 31, 2009, primarily due to: (a) the reduction in the average balance of higher-yielding mortgage-related assets due to liquidations and limited purchase activity; and (b) higher interest expense on seriously delinquent mortgage loans. These factors were partially offset by: (a) lower funding costs from the replacement of debt at lower rates and favorable rate resets on floating-rate debt; and (b) the inclusion of amounts previously classified as management and guarantee income. Net interest yield declined substantially during the year ended December 31, 2010, compared to the year ended December 31, 2009, because the net interest yield of the assets held in our consolidated single-family trusts was lower than the net interest yield of PCs previously included in net interest income and our balance of non-performing mortgage loans increased.

We do not recognize interest income on non-performing loans that have been placed on non-accrual status, except when cash payments are received. We refer to this interest income that we do not recognize as foregone interest income. Foregone interest income and reversals of previously recognized interest income, net of cash received, related to non-performing loans was $4.0 billion, $4.7 billion, and $349 million during the years ended December 31, 2011, 2010, and 2009, respectively. The reduction during the year ended December 31, 2011 compared to the year ended December 31, 2010, was primarily due to the decreased volume of non-performing loans on non-accrual status.

The increase during the year ended December 31, 2010 compared to the year ended December 31, 2009 was primarily due to our adoption of amendments to the accounting guidance related to the accounting for transfers of financial assets and consolidation of VIEs. Prior to adoption of these amendments and subsequent consolidation of certain trusts, we did not reverse interest income on non-performing loans for loans held by the trusts, and the forgone interest income on non-performing loans of the trusts did not reduce net interest income or net interest yield, since it was accounted for through a charge to provision for credit losses.

During the year ended December 31, 2011, spreads on our debt and our access to the debt markets remained favorable relative to historical levels. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity."

The objectives set for us under our charter and conservatorship, restrictions in the Purchase Agreement and restrictions imposed by FHFA have negatively impacted, and will continue to negatively impact, our net interest income. For example, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. This decline in asset balances will likely cause a corresponding reduction in our interest income over time. For more information on the various restrictions and limitations on our investment activity and our mortgage-related investments portfolio, see "BUSINESS — Conservatorship and Related Matters — *Impact of Conservatorship and Related Actions on Our Business — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio.*"

**Provision for Credit Losses**

We maintain loan loss reserves at levels we believe appropriate to absorb probable incurred losses on mortgage loans held-for-investment and loans underlying our financial guarantees. Increases in our loan loss reserves are generally reflected in earnings through the provision for credit losses.

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $73.2 billion, and have recorded an additional $4.3 billion in losses on loans purchased from our PCs, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred, and thus have not been provisioned for, we believe that, as of December 31, 2011, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for certain quarterly credit statistics for our single-family credit guarantee portfolio.

Our provision for credit losses was $10.7 billion in 2011 compared to $17.2 billion in 2010. The provision for credit losses in 2011 reflects a decline in the rate at which single-family loans transition into serious delinquency or are modified, but was partially offset by our lowered expectations for mortgage insurance recoveries, which is due to the

continued deterioration in the financial condition of the mortgage insurance industry in 2011. The provision for credit losses declined to $17.2 billion in 2010 compared to $29.5 billion in 2009, and reflected a decline in the rate at which delinquent loans transitioned into serious delinquency, partially offset by a higher volume of loan modifications that were classified as TDRs in 2010, compared to 2009. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for further information on our mortgage insurance counterparties. We identified a prior period error in the second quarter of 2010 that impacted our provision for credit losses and allowance for loan losses. The cumulative effect, net of taxes, of this error corrected in 2010 was $1.2 billion, of which $0.9 billion related to the year ended December 31, 2009.

During 2011, our charge-offs, net of recoveries for single-family loans, exceeded the amount of our provision for credit losses. Our charge-offs in 2011 remained elevated, but reflect suppression of activity due to delays in the foreclosure process and continuing weak market conditions, such as home prices and the rate of home sales. We believe the level of our charge-offs will continue to remain high and may increase in 2012.

We continued to experience a high volume of completed loan modifications classified as TDRs during 2011, but the volume of such modifications was less than the volume during 2010. See "Table 54 — Reperformance Rates of Modified Single-Family Loans" for information on the performance of our modified loans. As of December 31, 2011 and December 31, 2010, the UPB of our single-family non-performing loans was $120.5 billion and $115.5 billion, respectively. These amounts include $44.4 billion and $26.6 billion, respectively, of single-family TDRs that are reperforming (*i.e.*, less than three months past due). TDRs remain categorized as non-performing throughout the remaining life of the loan regardless of whether the borrower makes payments which return the loan to a current payment status after modification. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, our loan loss reserves balance, and our non-performing assets.

We adopted an amendment to the accounting guidance related to the classification of loans as TDRs in the third quarter of 2011, which significantly increases the population of problem loans subject to our workout activities that we account for and disclose as TDRs. The impact of this change in guidance on our financial results for 2011 was not significant. We expect that the number of loans that newly qualify as TDRs in 2012 will remain high, primarily because we anticipate that the majority of our modifications, both completed and those still in trial periods, will be considered TDRs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for additional information on our TDR loans, including our implementation of changes to the accounting guidance related to the classification of loans as TDRs.

While the total number of seriously delinquent loans declined approximately 10% and 7% during 2011 and 2010, respectively, in part due to a significant volume of loan modifications (upon completion of a modification, a delinquent single-family loan is given a current payment status), our serious delinquency rate remains high compared to historical levels due to the continued weakness in home prices, persistently high unemployment, extended foreclosure timelines and foreclosure suspensions in many states, and continued challenges faced by servicers processing large volumes of problem loans. Our seller/servicers have an active role in our loan workout activities, including under the servicing alignment initiative and the MHA Program, and a decline in their performance could result in a failure to realize the anticipated benefits of our loss mitigation plans. The decline in size of our single-family credit guarantee portfolio in 2011 caused our serious delinquency rate to be higher than it otherwise would have been because this rate is calculated on a smaller base of loans at year end.

Our provision for credit losses and amount of charge-offs in the future will be affected by a number of factors, including: (a) the actual level of mortgage defaults; (b) the impact of the MHA Program and other loss mitigation efforts; (c) any government actions or programs that impact the ability of troubled borrowers to obtain modifications, including legislative changes to bankruptcy laws; (d) changes in property values; (e) regional economic conditions, including unemployment rates; (f) delays in the foreclosure process, including those related to the concerns about deficiencies in foreclosure documentation practices; (g) third-party mortgage insurance coverage and recoveries; and (h) the realized rate of seller/servicer repurchases. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for additional information on seller/servicer repurchase obligations.

Our provision (benefit) for credit losses associated with our multifamily mortgage portfolio was $(196) million and $99 million for 2011 and 2010, respectively. Our loan loss reserves associated with our multifamily mortgage portfolio were $545 million and $828 million as of December 31, 2011 and December 31, 2010, respectively. The decline in loan loss reserves for multifamily loans in 2011 was driven primarily by positive market trends in vacancy rates and effective rents, as well as stabilizing or improved property values. However, some states in which we have investments in

multifamily mortgage loans, including Nevada, Arizona, and Georgia, continue to exhibit weaker than average apartment fundamentals.

**Non-Interest Income (Loss)**

*Gains (Losses) on Extinguishment of Debt Securities of Consolidated Trusts*

When we purchase PCs that have been issued by consolidated PC trusts, we extinguish a pro rata portion of the outstanding debt securities of the related consolidated trusts. We recognize a gain (loss) on extinguishment of the debt securities to the extent the amount paid to extinguish the debt security differs from its carrying value. For the years ended December 31, 2011 and 2010, we extinguished debt securities of consolidated trusts with a UPB of $75.4 billion and $17.8 billion, respectively (representing our purchase of single-family PCs with a corresponding UPB amount). The increase in purchases of single-family PCs was due to an increased volume of dollar roll transactions to support the market and pricing of our single-family PCs. Losses on extinguishment of these debt securities of consolidated trusts were $219 million and $164 million for the years ended December 31, 2011 and 2010, respectively. The losses during 2011 and 2010 were primarily due to the repurchase of our debt securities at higher net purchase premiums driven by a decrease in interest rates during the periods. See "Table 25 — Total Mortgage-Related Securities Purchase Activity" for additional information regarding purchases of mortgage-related securities, including those issued by consolidated PC trusts.

*Gains (Losses) on Retirement of Other Debt*

We repurchase or call our outstanding other debt securities from time to time when we believe it is economically beneficial and to manage the mix of liabilities funding our assets. When we repurchase or call outstanding debt securities, or holders put outstanding debt securities to us, we recognize a gain or loss to the extent the amount paid to redeem the debt security differs from its carrying value. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for more information regarding our accounting policies related to debt retirements.

Gains (losses) on retirement of other debt were $44 million, $(219) million, and $(568) million during the years ended December 31, 2011, 2010, and 2009, respectively. We recognized gains on debt retirements during 2011, compared to losses during 2010, because we purchased debt with lower associated discounts in 2011 relative to the comparable periods in 2010. We recognized fewer losses on debt retirement during 2010 compared to 2009 primarily due to decreased losses on calls and puts in 2010 compared to 2009. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Other Debt Securities — Other Debt Retirement Activities*."

*Gains (Losses) on Debt Recorded at Fair Value*

Gains (losses) on debt recorded at fair value primarily relate to changes in the fair value of our foreign-currency denominated debt. During 2011 and 2010, we recognized gains on debt recorded at fair value of $91 million and $580 million, respectively, primarily due to a combination of the U.S. dollar strengthening relative to the Euro and changes in interest rates. During 2009, we recognized losses on debt recorded at fair value of $404 million primarily due to the U.S. dollar weakening relative to the Euro. We mitigate changes in the fair value of our foreign-currency denominated debt by using foreign currency swaps and foreign-currency denominated interest-rate swaps.

*Derivative Gains (Losses)*

The table below presents derivative gains (losses) reported in our consolidated statements of income and comprehensive income. See "NOTE 11: DERIVATIVES — Table 11.2 — Gains and Losses on Derivatives" for information about gains and losses related to specific categories of derivatives. Changes in fair value and interest accruals on derivatives not in hedge accounting relationships are recorded as derivative gains (losses) in our consolidated statements of income and comprehensive income. At December 31, 2011, 2010, and 2009, we did not have any derivatives in hedge accounting relationships; however, there are amounts recorded in AOCI related to discontinued cash flow hedges. Amounts recorded in AOCI associated with these closed cash flow hedges are reclassified to earnings when the forecasted transactions affect earnings. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the forecasted transaction is reclassified into earnings immediately.

While derivatives are an important aspect of our strategy to manage interest-rate risk, they generally increase the volatility of reported net income (loss) because, while fair value changes in derivatives affect net income (loss), fair value changes in several of the types of assets and liabilities being hedged do not affect net income (loss).

**Table 12 — Derivative Gains (Losses)**

| | Derivative Gains (Losses) | | |
| | Year Ended December 31, | | |
| | 2011 | 2010 | 2009 |
| | (in millions) | | |
|---|---|---|---|
| Interest-rate swaps | $(10,367) | $(7,679) | $ 13,611 |
| Option-based derivatives[1] | 7,176 | 4,843 | (10,686) |
| Other derivatives[2] | (1,529) | (755) | (882) |
| Accrual of periodic settlements[3] | (5,032) | (4,494) | (3,943) |
| Total | $ (9,752) | $(8,085) | $ (1,900) |

(1) Primarily includes purchased call and put swaptions and purchased interest-rate caps and floors.
(2) Includes futures, foreign-currency swaps, commitments, swap guarantee derivatives, and credit derivatives. Foreign-currency derivatives are defined as swaps in which net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars. Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.
(3) Includes imputed interest on zero-coupon swaps.

Gains (losses) on derivatives not accounted for in hedge accounting relationships are principally driven by changes in: (a) interest rates and implied volatility; and (b) the mix and volume of derivatives in our derivative portfolio.

Our mix and volume of derivatives change from period to period as we respond to changing interest rate environments. We use receive- and pay-fixed interest-rate swaps to adjust the interest-rate characteristics of our debt funding in order to more closely match changes in the interest-rate characteristics of our mortgage-related assets. A receive-fixed swap results in our receipt of a fixed interest-rate payment from our counterparty in exchange for a variable-rate payment. Conversely, a pay-fixed swap requires us to make a fixed interest-rate payment to our counterparty in exchange for a variable-rate payment. Receive-fixed swaps increase in value and pay-fixed swaps decrease in value when interest rates decrease (with the opposite being true when interest rates increase).

We use swaptions and other option-based derivatives to adjust the interest-rate characteristics of our debt in response to changes in the expected lives of our investments in mortgage-related assets. Purchased call and put swaptions, where we make premium payments, are options for us to enter into receive- and pay-fixed swaps, respectively. Conversely, written call and put swaptions, where we receive premium payments, are options for our counterparty to enter into receive and pay-fixed swaps, respectively. The fair values of both purchased and written call and put swaptions are sensitive to changes in interest rates and are also driven by the market's expectation of potential changes in future interest rates (referred to as "implied volatility"). Purchased swaptions generally become more valuable as implied volatility increases and less valuable as implied volatility decreases. Recognized losses on purchased options in any given period are limited to the premium paid to purchase the option plus any unrealized gains previously recorded. Potential losses on written options are unlimited.

We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures. For example, the combination of a series of short-term debt issuances over a defined period and a pay-fixed interest-rate swap with the same maturity as the last debt issuance is the substantive economic equivalent of a long-term fixed-rate debt instrument of comparable maturity. Similarly, the combination of non-callable debt and a call swaption with the same maturity as the noncallable debt is the substantive economic equivalent of callable debt. For a discussion regarding our ability to issue debt, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Other Debt Securities*."

During 2011, we recognized losses on derivatives of $9.8 billion, primarily due to declines in long-term swap interest rates. Specifically, during 2011, we recognized fair value losses on our pay-fixed swap positions of $23.0 billion, partially offset by fair value gains on our receive-fixed swaps of $12.6 billion. We also recognized fair value gains of $7.2 billion during 2011 on our option-based derivatives, resulting from gains on our purchased call swaptions as interest rates decreased. Additionally, we recognized losses of $5.0 billion related to the accrual of periodic settlements during 2011 due to our net pay-fixed swap position and a declining interest rate environment during the year.

During 2010, declining long-term swap interest rates resulted in a loss on derivatives of $8.1 billion. Specifically, the decrease in long-term swap interest rates resulted in fair value losses on our pay-fixed swaps of $17.5 billion, partially offset by fair value gains on our receive-fixed swaps of $9.7 billion. We recognized fair value gains of $4.8 billion on our option-based derivatives, resulting from gains on our purchased call swaptions primarily due to the declines in interest rates during 2010. Additionally, we recognized losses of $4.5 billion related to the accrual of periodic settlements during 2010 due to our net pay-fixed swap position and a declining interest rate environment during the year.

During 2009, the mix and volume of our derivative portfolio were impacted by fluctuations in swap interest rates, resulting in a loss on derivatives of $1.9 billion. Long-term swap interest rates and implied volatility both increased during

2009. As a result of these factors, we recorded gains on our pay-fixed swap positions, partially offset by losses on our receive-fixed swaps, resulting in a $13.6 billion net gain. We also recorded losses of $10.7 billion on option-based derivatives, primarily on our purchased call swaptions, as the impact of the increasing swap interest rates more than offset the impact of higher implied volatility.

### Investment Securities-Related Activities

Since January 1, 2010, as a result of our adoption of amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs, we no longer account for the single-family PCs and certain Other Guarantee Transactions we hold as investments in securities. Instead, we now recognize the underlying mortgage loans on our consolidated balance sheets through consolidation of the related trusts. Our adoption of these amendments resulted in a decrease in our investments in securities of $286.5 billion on January 1, 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for additional information.

#### Impairments of Available-For-Sale Securities

We recorded net impairments of available-for-sale securities recognized in earnings, which were related to non-agency mortgage-related securities, of $2.3 billion, $4.3 billion, and $11.2 billion during the years ended December 31, 2011, 2010, and 2009. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — Mortgage-Related Securities — Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities" and "NOTE 7: INVESTMENTS IN SECURITIES" for information regarding the accounting principles for investments in debt and equity securities and the other-than-temporary impairments recorded during the years ended December 31, 2011, 2010, and 2009.

#### Other Gains (Losses) on Investment Securities Recognized in Earnings

Other gains (losses) on investment securities recognized in earnings primarily consists of gains (losses) on trading securities. We recognized $(1.0) billion, $(1.3) billion, and $4.9 billion related to gains (losses) on trading securities during the years ended December 31, 2011, 2010, and 2009.

Trading securities mainly include Treasury securities, agency fixed-rate and variable-rate pass-through mortgage-related securities, and agency REMICs, including inverse floating-rate, interest-only and principal-only securities. With the exception of principal-only securities, our agency securities, classified as trading, were at a net premium (i.e. have higher net fair value than UPB) as of December 31, 2011. Gains (losses) on trading securities do not include the interest earned on these assets, which is recorded as part of net interest income. Additionally, our securities classified as trading are managed in the overall context of our interest-rate risk management strategy and framework. However, the impacts of changes in fair value of related derivatives and other debt are not recognized in other gains (losses) on investment securities recognized in earnings on our consolidated statements of income and comprehensive income.

During the years ended December 31, 2011 and 2010, the losses on trading securities were primarily due to the movement of securities with unrealized gains towards maturity. The decreased losses during the year ended December 31, 2011, compared to the year ended December 31, 2010, was primarily due to higher fair value gains at the end of 2011 as a result of a decline in longer-term interest rates.

At December 31, 2009, the fair value of our investments in trading securities was $222.3 billion, compared to $58.8 billion and $60.3 billion at December 31, 2011 and 2010, respectively. The significant reduction in the fair value of our investments in trading securities was primarily due to our adoption of amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs, as noted above. The larger balance in our investments in trading securities during 2009, combined with tightening OAS levels, contributed to the gains on these trading securities. In addition, during the year ended December 31, 2009, we sold agency securities classified as trading with an aggregate UPB of approximately $148.7 billion, which generated realized gains of $1.7 billion.

For a further discussion of our interest-rate risk management strategy and framework, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISKS."

### Other Income

Other income includes items associated with our guarantee activities on non-consolidated trusts, including management and guarantee income, gains (losses) on guarantee asset, income on guarantee obligation, gains (losses) on sale of mortgage loans, and trust management income (expense). Upon consolidation of our single-family PC trusts and certain Other Guarantee Transactions commencing January 1, 2010, guarantee-related items no longer have a material impact on our results and are therefore included in other income on our consolidated statements of income and

comprehensive income. The management and guarantee income recognized during 2011 and 2010 was earned from our non-consolidated securitization trusts and other mortgage credit guarantees which had an aggregate UPB of $56.9 billion and $44.0 billion as of December 31, 2011 and 2010, respectively, compared to $1.87 trillion as of December 31, 2009. For additional information on the impact of consolidation of our single-family PC trusts and certain Other Guarantee Transactions, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 19: SELECTED FINANCIAL STATEMENT LINE ITEMS."

The table below summarizes the significant components of other income.

**Table 13 — Other Income**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | (in millions) | | |
| Other income: | | | |
| Management and guarantee income[1] | $ 170 | $ 143 | $ 3,033 |
| Gains (losses) on guarantee asset | (78) | (61) | 3,299 |
| Income on guarantee obligation | 153 | 135 | 3,479 |
| Gains (losses) on sale of mortgage loans | 411 | 267 | 745 |
| Lower-of-cost-or-fair-value adjustments on held-for-sale mortgage loans[2] | — | — | (679) |
| Gains (losses) on mortgage loans recorded at fair value | 418 | (249) | (190) |
| Recoveries on loans impaired upon purchase | 473 | 806 | 379 |
| Low-income-housing tax credit partnerships[3] | — | — | (4,155) |
| Trust management income (expense)[2] | — | — | (761) |
| All other | 608 | 819 | 222 |
| Total other income | $2,155 | $1,860 | $ 5,372 |

(1) Most of our guarantee related income in 2011 and 2010 relates to securitized multifamily mortgage loans where we have not consolidated the securitization trusts on our consolidated balance sheets.

(2) Upon consolidation of our single-family PC trusts and certain Other Guarantee Transactions on January 1, 2010, we no longer incur trust management income and expenses and no longer incur lower-of-cost-or-fair-value adjustments on single-family mortgage loans since all of our single-family mortgage loans are classified as held-for-investment rather than held-for-sale.

(3) We wrote down the carrying value of our LIHTC investments to zero as of December 31, 2009, as we will not be able to realize any value for these assets either through reductions to our taxable income and related tax liabilities or through a sale to a third party. See "NOTE 3: VARIABLE INTEREST ENTITIES" for further information.

Other income increased to $2.2 billion for the year ended December 31, 2011, compared to $1.9 billion for the year ended December 31, 2010, primarily due to gains on mortgage loans recorded at fair value in 2011, compared to losses on mortgage loans recorded at fair value in 2010, which was partially offset by lower recoveries on loans impaired upon purchase and a decline in all other income in 2011. We recognized gains on mortgage loans recorded at fair value during 2011, compared to losses in 2010, as a result of declines in interest rates and higher balances of loans recorded at fair value during 2011.

*Gains (Losses) on Sale of Mortgage Loans*

In 2011 and 2010, we recognized $411 million and $267 million, respectively, in gains (losses) on sale of mortgage loans with associated UPB of $13.7 billion and $6.6 billion, respectively. All gains (losses) on sales of mortgage loans in 2011 and 2010 relate to multifamily mortgage loans.

Gains (losses) on sale of mortgage loans declined to $267 million in 2010 from $745 million in 2009, primarily due to our adoption of amendments to the accounting guidance applicable to the accounting for transfers of financial assets and the consolidation of VIEs, as all single-family loans are consolidated on our balance sheets and are no longer recognized as sales when we issue our PCs.

*Lower-of-Cost-or-Fair-Value Adjustments on Held-for-Sale Mortgage Loans*

We recognized lower-of-cost-or-fair-value adjustments of $(679) million in 2009. Due to our adoption of amendments to the accounting guidance applicable to the accounting for transfers of financial assets and the consolidation of VIEs, all single-family mortgage loans on our consolidated balance sheet were reclassified as held-for-investment on January 1, 2010. Consequently, beginning in 2010, we no longer record lower-of-cost-or-fair-value adjustments on single-family mortgage loans. During 2009, we transferred $10.6 billion of single-family mortgage loans from held-for-sale to held-for-investment. Upon transfer, we evaluated the lower of cost or fair value for each individual loan. We recognized approximately $438 million of losses associated with these transfers during 2009, representing the unrealized losses of certain loans on the dates of transfer; however, we were not permitted to similarly recognize any unrealized gains on individual loans at the time of transfer.

*Recoveries on Loans Impaired upon Purchase*

Recoveries on loans impaired upon purchase represent the recapture into income of previously recognized losses associated with purchases of delinquent loans from our PCs in conjunction with our guarantee activities. Recoveries occur when a non-performing loan is repaid in full or when at the time of foreclosure the estimated fair value of the acquired property, less costs to sell, exceeds the carrying value of the loan. For impaired loans where the borrower has made required payments that return the loan to less than three months past due, the recovery amounts are instead recognized as interest income over time as periodic payments are received.

During 2011, 2010, and 2009, we recognized recoveries on loans impaired upon purchase of $473 million, $806 million and $379 million, respectively. Our recoveries on loans impaired upon purchase declined in 2011, compared to 2010, due to a lower volume of foreclosure transfers and payoffs associated with loans impaired upon purchase. Recoveries on impaired loans increased in 2010, compared to 2009, due to a higher volume of short sales and foreclosure transfers, combined with improvements in home prices in certain geographical areas during 2010.

Commencing January 1, 2010, we no longer recognize losses on loans purchased from PC pools related to our single-family PC trusts and certain Other Guarantee Transactions due to adoption of the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs. Our recoveries in 2011 and 2010 principally relate to impaired loans purchased prior to January 1, 2010, due to the change in accounting guidance effective on that date. Consequently, our recoveries on loans impaired upon purchase will generally continue to decline over time. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information about the impact of adoption of these accounting changes.

*All Other*

All other income declined to $608 million during the year ended December 31, 2011, compared to $819 million during the year ended December 31, 2010, primarily due to: (a) gains recognized in 2010 due to the recognition of income related to mortgage-servicing rights associated with TBW, one of our former seller/servicers; and (b) the correction in 2011 of certain prior period accounting errors not material to our financial statements.

All other income increased to $819 million in 2010 from $222 million in 2009, primarily due to the recognition of income related to mortgage-servicing rights associated with TBW, and penalties and other fees on single-family seller servicers, including penalties arising from failures to complete foreclosures within required time periods, and to a lesser extent, recognition of expected loss recoveries from certain legal claims.

**Non-Interest Expense**

The table below summarizes the components of non-interest expense.

**Table 14 — Non-Interest Expense**

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2011** | **2010** | **2009** |
|  | (in millions) | | |
| Administrative expenses:[1] |  |  |  |
| Salaries and employee benefits | $ 832 | $ 895 | $ 912 |
| Professional services | 270 | 297 | 344 |
| Occupancy expense | 62 | 64 | 68 |
| Other administrative expense | 342 | 341 | 361 |
| Total administrative expenses | 1,506 | 1,597 | 1,685 |
| REO operations expense | 585 | 673 | 307 |
| Other expenses | 392 | 662 | 5,203 |
| Total non-interest expense | $2,483 | $2,932 | $7,195 |

(1) Commencing in the first quarter of 2011, we reclassified certain expenses from other expenses to professional services expense. Prior period amounts have been reclassified to conform to the current presentation.

*Administrative Expenses*

Administrative expenses decreased in 2011 compared to 2010, largely due to a reduction in the number of employees as part of our ongoing focus on cost reduction measures. Administrative expenses decreased in 2010 compared to 2009, in part due to our focus on cost reduction measures in 2010, particularly on professional services costs. We do not expect that our general and administrative expenses for 2012 will continue to decline, in part due to the continually changing mortgage market, an environment in which we are subject to increased regulatory oversight and mandates and strategic

arrangements that we may enter into with outside firms to provide operational capability and staffing for key functions, if needed.

### REO Operations Expense

The table below presents the components of our REO operations expense, and REO inventory and disposition information.

**Table 15 — REO Operations Expense, REO Inventory, and REO Dispositions**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | (dollars in millions) | | |
| REO operations expense: | | | |
| Single-family: | | | |
| REO property expenses[1] | $ 1,205 | $ 1,163 | $ 708 |
| Disposition (gains) losses, net[2] | 179 | 102 | 749 |
| Change in holding period allowance, dispositions | (456) | (286) | (427) |
| Change in holding period allowance, inventory[3] | 302 | 497 | (185) |
| Recoveries[4] | (634) | (800) | (558) |
| Total single-family REO operations expense | 596 | 676 | 287 |
| Multifamily REO operations expense (income) | (11) | (3) | 20 |
| Total REO operations expense | $ 585 | $ 673 | $ 307 |
| REO inventory (in properties), at December 31: | | | |
| Single-family | 60,535 | 72,079 | 45,047 |
| Multifamily | 20 | 14 | 5 |
| Total | 60,555 | 72,093 | 45,052 |
| REO property dispositions (in properties): | | | |
| Single-family | 110,175 | 101,206 | 69,400 |
| Multifamily | 19 | 9 | 6 |
| Total | 110,194 | 101,215 | 69,406 |

(1) Consists of costs incurred to acquire, maintain or protect a property after it is acquired in a foreclosure transfer, such as legal fees, insurance, taxes, and cleaning and other maintenance charges.
(2) Represents the difference between the disposition proceeds, net of selling expenses, and the fair value of the property on the date of the foreclosure transfer.
(3) Represents the (increase) decrease in the estimated fair value of properties that were in inventory during the period.
(4) Includes recoveries from primary mortgage insurance, pool insurance and seller/servicer repurchases.

REO operations expense was $585 million in 2011, as compared to $673 million in 2010 and $307 million in 2009. The decline in REO operations expense in 2011, compared to 2010, was primarily due to the impact of a less significant decline in home prices in certain geographical areas with significant REO activity resulting in lower write-downs of single-family REO inventory during 2011, partially offset by lower recoveries on REO properties during 2011. Lower recoveries on REO properties in 2011, compared to 2010, were primarily due to reduced recoveries from mortgage insurers, in part due to the continued deterioration in the financial condition of the mortgage insurance industry, and a decline in reimbursements of losses from seller/servicers associated with repurchase requests on loans on which we have foreclosed. The increase in REO operations expense in 2010, compared to 2009, is a result of higher REO property expenses and holding period write-downs that were partially offset by lower disposition losses and increased recoveries. We expect REO property expenses to continue to remain high in 2012 due to expected continued high levels of single-family REO acquisitions and inventory.

In 2011, we believe the volume of our single-family REO acquisitions was less than it otherwise would have been due to delays in the foreclosure process, particularly in states that require a judicial foreclosure process. The acquisition slowdown, coupled with high disposition levels, led to an approximate 16% reduction in REO property inventory during 2011. While we expect the delays to ease in 2012, we also expect the length of the foreclosure process will remain above historical levels. For more information on how delays in the foreclosure process could adversely affect our REO operations expense, see "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process.*" See "RISK MANAGEMENT— Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

### Other Expenses

Other expenses were $0.4 billion, $0.7 billion, and $5.2 billion in 2011, 2010, and 2009, respectively. Other expenses in 2011 and 2010 consist primarily of HAMP servicer incentive fees, costs related to terminations and transfers of mortgage servicing, and other miscellaneous expenses. Other expenses were lower in 2011 compared to 2010, primarily

due to lower expenses associated with transfers and terminations of mortgage servicing, primarily related to TBW, partially offset by higher servicer incentive fees associated with HAMP during 2011. Other expenses declined significantly from 2009 to 2010 due to reduction of losses on loans purchased, which was due to the change in accounting guidance for consolidation of VIEs we implemented on January 1, 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Adopted Accounting Guidance" and "NOTE 19: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information.

### Income Tax Benefit

For 2011, 2010, and 2009, we reported income tax benefit of $0.4 billion, $0.9 billion, and $0.8 billion, respectively, resulting in effective tax rates of 7%, 6%, and 4%, respectively. Our effective tax rate differed from the federal statutory tax rate of 35% primarily due to the establishment of a valuation allowance against a portion of our net deferred tax assets. Our income tax benefits represent amounts related to the amortization of net deferred losses on pre-2008 closed cash flow hedges, as well as the current tax benefits associated with our ability to carry back net operating tax losses generated in 2008 and 2009. See "NOTE 13: INCOME TAXES" for additional information.

### Total Comprehensive Income (Loss)

Our total comprehensive income (loss) was $(1.2) billion, $0.3 billion, and $(2.9) billion for the years ended December 31, 2011, 2010, and 2009, respectively, consisting of: (a) $(5.3) billion, $(14.0) billion, and $(21.6) billion of net income (loss), respectively; and (b) $4.0 billion, $14.3 billion, and $18.6 billion of total other comprehensive income, respectively. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Total Equity (Deficit)" for additional information regarding total other comprehensive income (loss).

### Segment Earnings

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. Certain activities that are not part of a reportable segment are included in the All Other category.

The Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans, which are funded by other debt issuances and hedged using derivatives. In our Investments segment, we also provide funding and hedging management services to the Single-family Guarantee and Multifamily segments. The Investments segment reflects changes in the fair value of the Multifamily segment assets that are associated with changes in interest rates. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses.

The Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related securities in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less credit-related expenses, administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses.

The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans and non-agency CMBS that we purchased for investment, our purchases of such multifamily mortgage loans for investment have declined significantly since 2010, and our purchases of CMBS have declined significantly since 2008. The only CMBS that we have purchased since 2008 have been senior, mezzanine, and interest-only tranches related to certain of our securitization transactions, and these purchases have not been significant. Currently, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization. We guarantee the senior tranches of these securitizations in Other Guarantee Transactions. Our Multifamily segment also issues Other Structured Securities, but does not issue REMIC securities. Our Multifamily segment also enters into other guarantee commitments for multifamily HFA bonds and housing revenue bonds held by third parties. Historically, we issued multifamily PCs, but this activity has been insignificant in recent years. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less credit-related expenses, administrative expenses, and allocated funding costs. In addition, the Multifamily segment reflects gains on sale of

mortgages and the impact of changes in fair value of CMBS and held-for-sale loans associated only with factors other than changes in interest rates, such as liquidity and credit.

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. The financial performance of our Single-family Guarantee segment and Multifamily segment are measured based on each segment's contribution to GAAP net income (loss). Our Investments segment is measured on its contribution to GAAP total comprehensive income (loss), which consists of the sum of its contribution to: (a) GAAP net income (loss); and (b) GAAP total other comprehensive income, net of taxes. The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

The All Other category consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods. The All Other category also includes the deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward and, in 2009, the write-down of our LIHTC investments.

In presenting Segment Earnings, we make significant reclassifications to certain financial statement line items in order to reflect a measure of net interest income on investments and a measure of management and guarantee income on guarantees that is in line with how we manage our business. We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of income and comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments.

As a result of these reclassifications and allocations, Segment Earnings for our reportable segments differs significantly from, and should not be used as a substitute for, net income (loss) as determined in accordance with GAAP. Our definition of Segment Earnings may differ from similar measures used by other companies. However, we believe that Segment Earnings provides us with meaningful metrics to assess the financial performance of each segment and our company as a whole.

Beginning January 1, 2010, we revised our method for presenting Segment Earnings to reflect changes in how management measures and assesses the performance of each segment and the company as a whole. This change in method, in conjunction with our implementation of the amendments to the accounting guidance relating to transfers of financial assets and the consolidation of VIEs, resulted in significant changes to our presentation of Segment Earnings. Segment Earnings for 2009 do not include changes to the guarantee asset, guarantee obligation, or other items that were eliminated or changed as a result of our implementation of the aforementioned amendments to the accounting guidance, as these amendments were applied prospectively consistent with our GAAP results. As a result, our Segment Earnings results for 2011 and 2010 are not directly comparable with the results for 2009. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information regarding the consolidation of certain of our securitization trusts.

See "NOTE 14: SEGMENT REPORTING" for further information regarding our segments, including the descriptions and activities of the segments and the reclassifications and allocations used to present Segment Earnings.

The table below provides information about our various segment mortgage portfolios at December 31, 2011, 2010, and 2009. For a discussion of each segment's portfolios, see "*Segment Earnings — Results*."

### Table 16 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios[1]

| | December 31, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| **Segment mortgage portfolios:** | | |
| *Investments — Mortgage investments portfolio:* | | |
| Single-family unsecuritized mortgage loans[2] | $ 109,190 | $ 79,097 |
| Freddie Mac mortgage-related securities | 220,659 | 263,152 |
| Non-agency mortgage-related securities | 86,526 | 99,639 |
| Non-Freddie Mac agency securities | 32,898 | 39,789 |
| *Total Investments — Mortgage investments portfolio* | 449,273 | 481,677 |
| *Single-family Guarantee — Managed loan portfolio:*[3] | | |
| Single-family unsecuritized mortgage loans[4] | 62,469 | 69,766 |
| Single-family Freddie Mac mortgage-related securities held by us | 220,659 | 261,508 |
| Single-family Freddie Mac mortgage-related securities held by third parties | 1,378,881 | 1,437,399 |
| Single-family other guarantee commitments[5] | 11,120 | 8,632 |
| *Total Single-family Guarantee — Managed loan portfolio* | 1,673,129 | 1,777,305 |
| *Multifamily — Guarantee portfolio:*[3] | | |
| Multifamily Freddie Mac mortgage related securities held by us | 3,008 | 2,095 |
| Multifamily Freddie Mac mortgage related securities held by third parties | 22,136 | 11,916 |
| Multifamily other guarantee commitments[5] | 9,944 | 10,038 |
| *Total Multifamily — Guarantee portfolio* | 35,088 | 24,049 |
| *Multifamily — Mortgage investments portfolio*[3] | | |
| Multifamily investment securities portfolio | 59,260 | 59,548 |
| Multifamily loan portfolio | 82,311 | 85,883 |
| *Total Multifamily — Mortgage investments portfolio* | 141,571 | 145,431 |
| *Total Multifamily portfolio* | 176,659 | 169,480 |
| Less : Freddie Mac single-family and certain multifamily securities[6] | (223,667) | (263,603) |
| *Total mortgage portfolio* | $2,075,394 | $2,164,859 |
| **Credit risk portfolios:**[7] | | |
| *Single-family credit guarantee portfolio:* | | |
| Single-family mortgage loans, on-balance sheet | $1,733,215 | $1,799,256 |
| Non-consolidated Freddie Mac mortgage-related securities | 10,735 | 11,268 |
| Other guarantee commitments | 11,120 | 8,632 |
| Less: HFA-related guarantees[8] | (8,637) | (9,322) |
| Less: Freddie Mac mortgage-related securities backed by Ginnie Mae certificates[8] | (779) | (857) |
| *Total single-family credit guarantee portfolio* | $1,745,654 | $1,808,977 |
| *Multifamily mortgage portfolio:* | | |
| Multifamily mortgage loans, on-balance sheet | $ 82,311 | $ 85,883 |
| Non-consolidated Freddie Mac mortgage-related securities | 25,144 | 14,011 |
| Other guarantee commitments | 9,944 | 10,038 |
| Less: HFA-related guarantees[8] | (1,331) | (1,551) |
| *Total multifamily mortgage portfolio* | $ 116,068 | $ 108,381 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Excludes unsecuritized seriously delinquent single-family loans managed by the Single-family Guarantee segment. However, the Single-family Guarantee segment continues to earn management and guarantee fees associated with unsecuritized single-family loans in the Investments segment's mortgage investments portfolio.
(3) The balances of the mortgage-related securities in these portfolios are based on the UPB of the security, whereas the balances of our single-family credit guarantee and multifamily mortgage portfolios presented in this report are based on the UPB of the mortgage loans underlying the related security. The differences in the loan and security balances result from the timing of remittances to security holders, which is typically 45 or 75 days after the mortgage payment cycle of fixed-rate and ARM PCs, respectively.
(4) Represents unsecuritized seriously delinquent single-family loans managed by the Single-family Guarantee segment.
(5) Represents the UPB of mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.
(6) Freddie Mac single-family mortgage-related securities held by us are included in both our Investments segment's mortgage investments portfolio and our Single-family Guarantee segment's managed loan portfolio, and Freddie Mac multifamily mortgage-related securities held by us are included in both the multifamily investment securities portfolio and the multifamily guarantee portfolio. Therefore, these amounts are deducted in order to reconcile to our total mortgage portfolio.
(7) Represents the UPB of loans for which we present characteristics, delinquency data, and certain other statistics in this report. See "GLOSSARY" for further description.
(8) We exclude HFA-related guarantees and our resecuritizations of Ginnie Mae certificates from our credit risk portfolios and most related statistics because these guarantees do not expose us to meaningful amounts of credit risk due to the credit enhancement provided on them by the U.S. government.

*Segment Earnings — Results*

*Investments*

The table below presents the Segment Earnings of our Investments segment.

**Table 17 — Segment Earnings and Key Metrics — Investments[1]**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | (dollars in millions) | | |
| Segment Earnings: | | | |
| Net interest income | $ 7,339 | $ 6,192 | $ 8,090 |
| Non-interest income (loss): | | | |
| Net impairment of available-for-sale securities | (1,833) | (3,819) | (9,870) |
| Derivative gains (losses) | (3,597) | (1,859) | 4,695 |
| Gains (losses) on trading securities | (993) | (1,386) | 4,885 |
| Gains (losses) on sale of mortgage loans | 28 | (76) | 617 |
| Gains (losses) on mortgage loans recorded at fair value | 501 | 34 | (46) |
| Other non-interest income (loss) | 1,266 | 1,023 | (774) |
| Total non-interest income (loss) | (4,628) | (6,083) | (493) |
| Non-interest expense: | | | |
| Administrative expenses | (398) | (455) | (515) |
| Other non-interest expense | (2) | (18) | (33) |
| Total non-interest expense | (400) | (473) | (548) |
| Segment adjustments[2] | 661 | 1,358 | — |
| Segment Earnings before income tax benefit (expense) | 2,972 | 994 | 7,049 |
| Income tax benefit (expense) | 394 | 259 | (572) |
| Segment Earnings, net of taxes, including noncontrolling interest | 3,366 | 1,253 | 6,477 |
| Less: Net income — noncontrolling interest | — | (2) | (1) |
| Segment Earnings, net of taxes | 3,366 | 1,251 | 6,476 |
| Total other comprehensive income, net of taxes | 3,107 | 10,226 | 11,329 |
| Total comprehensive income | $ 6,473 | $ 11,477 | $ 17,805 |
| Key metrics — Investments: | | | |
| *Portfolio balances:* | | | |
| Average balances of interest-earning assets:[3][4][5] | | | |
| Mortgage-related securities[6] | $386,115 | $465,048 | $600,562 |
| Non-mortgage-related investments[7] | 97,519 | 123,537 | 100,759 |
| Unsecuritized single-family loans | 94,894 | 59,028 | 49,013 |
| Total average balances of interest-earning assets | $578,528 | $647,613 | $750,334 |
| *Return:* | | | |
| Net interest yield — Segment Earnings basis | 1.27% | 0.96% | 1.08% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 14: SEGMENT REPORTING — Table 14.2 — Segment Earnings and Reconciliation to GAAP Results."
(2) For a description of our segment adjustments, see "NOTE 14: SEGMENT REPORTING — Segment Earnings."
(3) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(4) Excludes non-performing single-family mortgage loans.
(5) We calculate average balances based on amortized cost.
(6) Includes our investments in single-family PCs and certain Other Guarantee Transactions, which have been consolidated under GAAP on our consolidated balance sheet since January 1, 2010.
(7) Includes the average balances of interest-earning cash and cash equivalents, non-mortgage-related securities, and federal funds sold and securities purchased under agreements to resell.

Segment Earnings for our Investments segment increased by $2.1 billion to $3.4 billion in 2011, compared to $1.3 billion in 2010. Comprehensive income for our Investments segment decreased by $5.0 billion to $6.5 billion in 2011, compared to $11.5 billion in 2010.

During 2011, the UPB of the Investments segment mortgage investments portfolio decreased by 6.7%. We held $253.6 billion of agency securities and $86.5 billion of non-agency mortgage-related securities as of December 31, 2011, compared to $302.9 billion of agency securities and $99.6 billion of non-agency mortgage-related securities as of December 31, 2010. The decline in UPB of agency securities is due mainly to liquidations, including prepayments and selected sales. The decline in UPB of non-agency mortgage-related securities is due mainly to the receipt of monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral, representing a partial return of our investments in these securities. Since the beginning of 2007, we have incurred actual principal cash shortfalls of $1.5 billion on impaired non-agency mortgage-related securities in the Investments segment. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for additional information regarding our mortgage-related securities.

Segment Earnings net interest income increased $1.1 billion, and Segment Earnings net interest yield increased 31 basis points during 2011, compared to 2010. The primary driver was lower funding costs, primarily due to the replacement of debt at lower rates. These lower funding costs were partially offset by the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations and limited purchase activity.

Segment Earnings non-interest income (loss) was $(4.6) billion in 2011, compared to $(6.1) billion in 2010. This improvement in non-interest loss was mainly due to decreased net impairment of available-for-sale securities and decreased losses on trading securities, partially offset by increased derivative losses.

Impairments recorded in our Investments segment decreased by $2.0 billion during 2011, compared to 2010, primarily due to the impact of lower interest rates in 2011 resulting in a benefit from expected structural credit enhancements on the securities. The impact of lower interest rates was partially offset by the impact of declines in forecasted home prices. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities — Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*" for additional information on our impairments.

We recorded losses on trading securities of $(1.0) billion during 2011, compared to $(1.4) billion during 2010. Losses in both periods are primarily due to the movement of securities with unrealized gains towards maturity. These losses were partially offset by larger fair value gains in 2011, due to a more significant decline in long-term interest rates, compared to 2010.

We recorded derivative gains (losses) for this segment of $(3.6) billion during 2011, compared to $(1.9) billion during 2010. While derivatives are an important aspect of our strategy to manage interest-rate risk, they generally increase the volatility of reported Segment Earnings, because while fair value changes in derivatives affect Segment Earnings, fair value changes in several of the types of assets and liabilities being hedged do not affect Segment Earnings. During 2011 and 2010, swap interest rates decreased, resulting in fair value losses on our pay-fixed swaps, partially offset by fair value gains on our receive-fixed swaps and purchased call swaptions. See "Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for additional information on our derivatives.

Our Investments segment's total other comprehensive income was $3.1 billion in 2011. Net unrealized losses in AOCI on our available-for-sale securities decreased by $2.6 billion during 2011, primarily attributable to the impact of declining interest rates, resulting in fair value gains on our agency securities, and the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities, partially offset by the impact of widening OAS levels on our single-family non-agency mortgage-related securities. The changes in fair value of CMBS, excluding impacts from the changes in interest rates, are reflected in the Multifamily segment.

Segment Earnings for our Investments segment decreased by $5.2 billion to $1.3 billion in 2010, compared to $6.5 billion in 2009. Comprehensive income for our Investments segment decreased by $6.3 billion to $11.5 billion in 2010, compared to $17.8 billion in 2009.

Segment Earnings net interest income and net interest yield decreased $1.9 billion and 12 basis points, respectively, during 2010, compared to 2009. The primary driver underlying these decreases was a decrease in the average balance of mortgage-related securities, partially offset by a decrease in funding costs as a result of the replacement of higher-cost long-term debt at lower rates.

Segment Earnings non-interest loss increased $5.6 billion in 2010, compared to 2009. Included in other non-interest income (loss) are gains (losses) on trading securities of $(1.4) billion in 2010, compared to $4.9 billion in 2009. In 2010, the losses on trading securities was primarily due to the movement of securities with unrealized gains towards maturity, particularly interest-only securities, partially offset by fair value gains on our non-interest-only securities classified as trading primarily due to decreased interest rates. The net gains on trading securities during 2009 related primarily to tightening OAS levels.

We recorded derivative gains (losses) for this segment of $(1.9) billion during 2010, compared to $4.7 billion during 2009. During 2010, swap interest rates decreased, resulting in fair value losses on our pay-fixed swaps, partially offset by fair value gains on our receive-fixed swaps and purchased call swaptions. During 2009, longer-term swap interest rates increased, resulting in fair value gains on our pay-fixed swaps, partially offset by fair value losses on our receive-fixed swaps.

Impairments recorded in our Investments segment decreased by $6.1 billion during 2010, compared to 2009. Impairments for 2010 and 2009 are not comparable because the adoption of the amendment to the accounting guidance for investments in debt and equity securities on April 1, 2009 significantly impacted both the identification and measurement of other-than-temporary impairments.

*Freddie Mac*

Our Investments segment's total other comprehensive income was $10.2 billion during 2010. Net unrealized losses in AOCI on our available-for-sale securities decreased by $9.5 billion during 2010, primarily attributable to the impact of declining interest rates, resulting in fair value gains on our agency, single-family non-agency, and CMBS mortgage-related securities. In addition, the impact of widening OAS levels on our single-family non-agency mortgage-related securities during these periods was offset by fair value gains related to the movement of securities with unrealized losses towards maturity and the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities.

For a discussion of items that may impact our Investments segment net interest income over time, see "BUSINESS — Conservatorship and Related Matters — *Impact of Conservatorship and Related Actions on Our Business — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio*" and "Net Interest Income."

*Freddie Mac*

*Single-Family Guarantee*

The table below presents the Segment Earnings of our Single-family Guarantee segment.

**Table 18 — Segment Earnings and Key Metrics — Single-Family Guarantee[1]**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2011 | 2010 | 2009 |
| | (dollars in millions) | | |
| Segment Earnings: | | | |
| Net interest income (expense) | $ (23) | $ 72 | $ 307 |
| Provision for credit losses | (12,294) | (18,785) | (29,102) |
| Non-interest income: | | | |
| Management and guarantee income | 3,647 | 3,635 | 3,448 |
| Other non-interest income | 1,216 | 1,351 | 721 |
| Total non-interest income | 4,863 | 4,986 | 4,169 |
| Non-interest expense: | | | |
| Administrative expenses | (888) | (930) | (949) |
| REO operations expense | (596) | (676) | (287) |
| Other non-interest expense | (321) | (578) | (4,854) |
| Total non-interest expense | (1,805) | (2,184) | (6,090) |
| Segment adjustments[2] | (699) | (953) | — |
| Segment Earnings (loss) before income tax (expense) benefit | (9,958) | (16,864) | (30,716) |
| Income tax (expense) benefit | (42) | 608 | 3,573 |
| Segment Earnings (loss), net of taxes | (10,000) | (16,256) | (27,143) |
| Total other comprehensive income (loss), net of taxes | 30 | 6 | 19 |
| Total comprehensive income (loss) | $ (9,970) | $(16,250) | $(27,124) |
| Reconciliation to GAAP net income (loss): | | | |
| Segment Earnings (loss), net of taxes | $(10,000) | $(16,256) | $(27,143) |
| Credit guarantee-related adjustments | — | — | 5,941 |
| Tax-related adjustments | — | — | (2,080) |
| Total reconciling items, net of taxes | — | — | 3,861 |
| Net income (loss) attributable to Freddie Mac | $(10,000) | $(16,256) | $(23,282) |
| Key metrics — Single-family Guarantee: | | | |
| *Balances and Volume (in billions, except rate):* | | | |
| Average balance of single-family credit guarantee portfolio and HFA guarantees | $ 1,801 | $ 1,861 | $ 1,848 |
| Issuance — Single-family credit guarantees[3] | $ 305 | $ 385 | $ 472 |
| Fixed-rate products — Percentage of purchases[4] | 92% | 95% | 99% |
| Liquidation rate — Single-family credit guarantees[5] | 24% | 29% | 24% |
| *Management and Guarantee Fee Rate (in bps):* | | | |
| Contractual management and guarantee fees | 13.7 | 13.5 | 13.9 |
| Amortization of delivery fees | 6.5 | 6.0 | 4.8 |
| Segment Earnings management and guarantee income | 20.2 | 19.5 | 18.7 |
| *Credit:* | | | |
| Serious delinquency rate, at end of period | 3.58% | 3.84% | 3.98% |
| REO inventory, at end of period (number of properties) | 60,535 | 72,079 | 45,047 |
| Single-family credit losses, in bps[6] | 72.0 | 75.8 | 42.7 |
| *Market:* | | | |
| Single-family mortgage debt outstanding (total U.S. market, in billions)[7] | $ 10,336 | $ 10,522 | $ 10,866 |
| 30-year fixed mortgage rate[8] | 4.0% | 4.9% | 5.1% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 14: SEGMENT REPORTING — Table 14.2 — Segment Earnings and Reconciliation to GAAP Results."
(2) For a description of our segment adjustments, see "NOTE 14: SEGMENT REPORTING — Segment Earnings."
(3) Based on UPB.
(4) Excludes Other Guarantee Transactions.
(5) Represents principal repayments relating to loans underlying Freddie Mac mortgage-related securities and other guarantee commitments including those related to our removal of seriously delinquent and modified mortgage loans and balloon/reset mortgage loans out of PC pools.
(6) Calculated as the amount of single-family credit losses divided by the sum of the average carrying value of our single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees.
(7) Source: Federal Reserve Flow of Funds Accounts of the United States of America dated December 8, 2011. The outstanding amount for December 31, 2011 reflects the balance as of September 30, 2011.
(8) Based on Freddie Mac's Primary Mortgage Market Survey rate for the last week in the period, which represents the national average mortgage commitment rate to a qualified borrower exclusive of any fees and points required by the lender. This commitment rate applies only to financing on conforming mortgages with LTV ratios of 80%.

Segment Earnings (loss) for our Single-family Guarantee segment improved to $(10.0) billion in 2011 compared to $(16.3) billion in 2010, primarily due to a decline in Segment Earnings provision for credit losses.

Segment Earnings (loss) for our Single-family Guarantee segment improved to $(16.3) billion in 2010 compared to $(27.1) billion in 2009, primarily due to a decline in our Segment Earnings provision for credit losses.

The table below provides summary information about the composition of Segment Earnings (loss) for this segment for the years ended December 31, 2011 and 2010.

**Table 19 — Segment Earnings Composition — Single-Family Guarantee Segment**

| | Year Ended December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Segment Earnings Management and Guarantee Income[1] | | Credit Expenses[2] | | Net Amount[4] |
| | Amount | Average Rate[3] | Amount | Average Rate[3] | |
| | (dollars in millions, rates in bps) | | | | |
| Year of origination:[5] | | | | | |
| 2011 | $ 362 | 21.2 | $ (56) | 3.9 | $ 306 |
| 2010 | 763 | 22.4 | (197) | 5.6 | 566 |
| 2009 | 713 | 20.6 | (207) | 5.8 | 506 |
| 2008 | 382 | 23.4 | (771) | 56.9 | (389) |
| 2007 | 368 | 18.6 | (4,365) | 239.1 | (3,997) |
| 2006 | 227 | 17.7 | (3,439) | 252.6 | (3,212) |
| 2005 | 257 | 17.5 | (2,125) | 136.4 | (1,868) |
| 2004 and prior | 575 | 18.7 | (1,730) | 50.9 | (1,155) |
| Total | $3,647 | 20.2 | $(12,890) | 95.4 | $ (9,243) |
| Administrative expenses | | | | | (888) |
| Net interest income (expense) | | | | | (23) |
| Other non-interest income and expenses, net | | | | | 154 |
| Segment Earnings (loss), net of taxes | | | | | $(10,000) |

| | Year Ended December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Segment Earnings Management and Guarantee Income[1] | | Credit Expenses[2] | | Net Amount[4] |
| | Amount | Average Rate[3] | Amount | Average Rate[3] | |
| | (dollars in millions, rates in bps) | | | | |
| Year of origination:[5] | | | | | |
| 2010 | $ 418 | 23.8 | $ (109) | 6.2 | $ 309 |
| 2009 | 837 | 19.3 | (367) | 8.4 | 470 |
| 2008 | 554 | 29.5 | (2,151) | 114.3 | (1,597) |
| 2007 | 493 | 21.2 | (7,170) | 307.2 | (6,677) |
| 2006 | 289 | 16.5 | (5,847) | 332.6 | (5,558) |
| 2005 | 313 | 15.8 | (2,644) | 132.8 | (2,331) |
| 2004 and prior | 731 | 16.3 | (1,173) | 26.1 | (442) |
| Total | $3,635 | 19.6 | $(19,461) | 104.7 | $(15,826) |
| Administrative expenses | | | | | (930) |
| Net interest income (expense) | | | | | 72 |
| Other non-interest income and expenses, net | | | | | 428 |
| Segment Earnings (loss), net of taxes | | | | | $(16,256) |

(1) Includes amortization of delivery fees of $1.2 billion and $1.1 billion for 2011 and 2010, respectively.
(2) Consists of the aggregate of the Segment Earnings provision for credit losses and Segment Earnings REO operations expense. Historical rates of average credit expenses may not be representative of future results.
(3) Calculated as the amount of Segment Earnings management and guarantee income or credit expenses, respectively, divided by the sum of the average carrying values of the single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees.
(4) Calculated as Segment Earnings management and guarantee income less credit expenses.
(5) Segment Earnings management and guarantee income is presented by year of guarantee origination, whereas credit expenses are presented based on year of loan origination.

For the years ended December 31, 2011 and 2010, the guarantee-related revenue from mortgage guarantees we issued after 2008 exceeded the credit-related and administrative expenses associated with these guarantees. We currently believe our management and guarantee fee rates for guarantee issuances after 2008, when coupled with the higher credit quality of the mortgages within our new guarantee issuances, will provide management and guarantee fee income, over the long term, that exceeds our expected credit-related and administrative expenses associated with the underlying loans. Nevertheless, various factors, such as continued high unemployment rates, further declines in home prices, or negative impacts of HARP loans originated in recent years (which may not perform as well as other refinance mortgages, due in part to the high LTV ratios of the loans), could require us to incur expenses on these loans beyond our current expectations. Our management and guarantee fee income associated with guarantee issuances in 2005 through 2008 has not been adequate to cover the credit and administrative expenses associated with such loans, primarily due to the high rate of defaults on the loans originated in those years coupled with a high volume of refinancing since 2008. High levels of refinancing and delinquency since 2008 have significantly reduced the balance of performing loans from those years

*Freddie Mac*

that remain in our portfolio and consequently reduced management and guarantee income associated with loans originated in 2005 through 2008 (we do not recognize Segment Earnings management and guarantee income on non-accrual mortgage loans). We also believe that the management and guarantee fees associated with originations after 2008 will not be sufficient to offset the future expenses associated with our 2005 to 2008 guarantee issuances for the foreseeable future. Consequently, we expect to continue reporting net losses for the Single-family Guarantee segment in 2012.

Segment Earnings management and guarantee income increased slightly in 2011, as compared to 2010, primarily due to an increase in amortization of delivery fees, partially offset by a lower average balance of the single-family credit guarantee portfolio during 2011. Segment Earnings management and guarantee income increased slightly in 2010 compared to 2009, primarily due to an increase in amortization of delivery fees. The increase in amortization of delivery fees in 2011 and 2010 was due to the effect of declining interest rates during these years, which increased both actual refinance activity and our expectation of future refinancing activity.

The UPB of the Single-family Guarantee managed loan portfolio was $1.7 trillion at December 31, 2011, compared to $1.8 trillion and $1.9 trillion at December 31, 2010 and 2009, respectively. The declines in 2011 and 2010 reflect that the amount of single-family loan liquidations has exceeded new loan purchase and guarantee activity, which we believe is due, in part, to declines in the amount of single-family mortgage debt outstanding in the market and increased competition from Ginnie Mae and FHA/VA. Our loan purchase and guarantee activity in 2011 was at the lowest level we have experienced in the last several years. The liquidation rate on our securitized single-family credit guarantees was approximately 24%, 29%, and 24% for 2011, 2010, and 2009, respectively. We expect the size of our Single-family Guarantee managed loan portfolio will decline slightly during 2012.

Refinance volumes continued to be high during 2011 due to continued low interest rates, and, based on UPB, represented 78% of our single-family mortgage purchase volume during 2011 compared to 80% of our single-family mortgage purchase volume during 2010. Relief refinance mortgages comprised approximately 33% and 35% of our total refinance volume during 2011 and 2010, respectively. Over time, relief refinance mortgages with LTV ratios above 80% may not perform as well as relief refinance mortgages with LTV ratios of 80% and below because of the continued high LTV ratios of these loans. There is an increase in borrower default risk as LTV ratios increase, particularly for loans with LTV ratios above 80%. In addition, relief refinance mortgages may not be covered by mortgage insurance for the full excess of their UPB over 80%. Approximately 12% of our single-family purchase volume in both 2011 and 2010 was relief refinance mortgages with LTV ratios above 80%. Relief refinance mortgages of all LTV ratios comprised approximately 11% and 7% of the UPB in our total single-family credit guarantee portfolio at December 31, 2011 and 2010, respectively.

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers whose monthly payments are current and who can benefit from refinancing their home mortgages. For more information about our relief refinance mortgage initiative, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program.*"

Similar to our purchases in 2009 and 2010, the credit quality of the single-family loans we acquired in 2011 (excluding relief refinance mortgages) is significantly better than that of loans we acquired from 2005 through 2008, as measured by early delinquency rate trends, original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income. Mortgages originated after 2008, including relief refinance mortgages, represent a growing proportion of our single-family credit guarantee portfolio. The UPB of loans originated in 2005 to 2008 within our single-family credit guarantee portfolio continues to decline due to liquidations, which include prepayments, refinancing activity, foreclosure alternatives, and foreclosure transfers. We currently expect that, over time, the replacement (other than through relief refinance activity) of the 2005 to 2008 vintages, which have a higher composition of loans with higher-risk characteristics, should positively impact the serious delinquency rates and credit-related expenses of our single-family credit guarantee portfolio. However, the rate at which this replacement is occurring slowed beginning in 2010, due primarily to a decline in the volume of home purchase mortgage originations and delays in the foreclosure process.

Provision for credit losses for the Single-family Guarantee segment was $12.3 billion, $18.8 billion, and $29.1 billion in 2011, 2010, and 2009, respectively. The provision for credit losses in 2011 reflects a decline in the rate at which single-family loans transition into serious delinquency or are modified, but was partially offset by our lowered expectations for mortgage insurance recoveries, which is due to the continued deterioration in the financial condition of the mortgage insurance industry in 2011. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for further information on our mortgage insurance counterparties. Segment Earnings provision for credit losses declined in

2010, compared to 2009, primarily due to a decline in the rate at which delinquent loans transitioned into serious delinquency, partially offset by a higher volume of loan modifications that were classified as TDRs in 2010.

We adopted an amendment to the accounting guidance on the classification of loans as TDRs in 2011, which significantly increases the population of loans we account for and disclose as TDRs. The impact of this change in guidance on our financial results for 2011 was not significant. We expect that the number of loans that newly qualify as TDRs in 2012 will remain high, primarily because we anticipate that the majority of our modifications, both completed and those still in trial periods, will be considered TDRs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for additional information on our TDR loans, including our implementation of changes to the accounting guidance on the classification of loans as TDRs.

Single-family credit losses as a percentage of the average balance of the single-family credit guarantee portfolio and HFA-related guarantees were 72.0 basis points, 75.8 basis points, and 42.7 basis points for 2011, 2010, and 2009, respectively. Charge-offs, net of recoveries, associated with single-family loans were $12.4 billion, $13.4 billion, and $7.6 billion in 2011, 2010, and 2009, respectively. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk*" for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, and our non-performing assets.

The serious delinquency rate on our single-family credit guarantee portfolio was 3.58%, 3.84%, and 3.98% as of December 31, 2011, 2010, and 2009, respectively, and declined during 2011 due to a high volume of loan modifications and foreclosure transfers, as well as a slowdown in new serious delinquencies. Our serious delinquency rate remains high compared to historical levels, reflecting continued stress in the housing and labor markets and extended foreclosure timelines. The decline in size of our single-family credit guarantee portfolio in 2011 caused our serious delinquency rate to be higher than it otherwise would have been because this rate is calculated on a smaller base of loans at year end.

Segment Earnings other non-interest income was $1.2 billion, $1.4 billion, and $0.7 billion in 2011, 2010, and 2009, respectively. The decline in 2011, compared to 2010, was primarily due to lower recoveries on loans impaired upon purchase due to a lower volume of foreclosure transfers and loan payoffs associated with these loans. The increase in Segment Earnings other non-interest income in 2010 compared to 2009 was primarily due to higher recoveries on loans impaired upon purchase driven by a higher volume of short sales and foreclosure transfers associated with these loans.

Segment Earnings REO operations expense was $0.6 billion, $0.7 billion, and $0.3 billion in 2011, 2010, and 2009, respectively. The decrease in 2011, compared to 2010, was primarily due to the impact of a less significant decline in home prices in certain geographical areas with significant REO activity resulting in lower write-downs of single-family REO inventory during 2011, partially offset by lower recoveries on REO properties during 2011. Lower recoveries on REO properties in 2011, compared to 2010, are primarily due to reduced recoveries from mortgage insurers, in part due to the continued deterioration in the financial condition of the mortgage insurance industry, and a decline in reimbursements of losses from seller/servicers associated with repurchase requests on loans on which we have foreclosed. The increase in Segment Earnings REO operations expense in 2010, compared to 2009, is primarily a result of higher REO property expenses and holding period write-downs that were partially offset by lower disposition losses and increased recoveries.

Our REO inventory (measured in number of properties) declined 16% during 2011 due to an increase in the volume of REO dispositions and slowdowns in REO acquisition volume associated with delays in the foreclosure process. Dispositions of REO increased 9% in 2011 compared to 2010, based on the number of properties sold. We continued to experience high REO disposition severity ratios on sales of our REO inventory during 2011. We believe our single-family REO acquisition volume and single-family credit losses in 2011 have been less than they otherwise would have been due to delays in the single-family foreclosure process, particularly in states that require a judicial foreclosure process. See "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" for further information.

Segment Earnings other non-interest expense was $0.3 billion, $0.6 billion, and $4.9 billion in 2011, 2010, and 2009, respectively. The decline in 2011, compared to 2010, was primarily due to lower expenses associated with transfers and terminations of mortgage servicing. The decline in 2010, compared to 2009, was primarily due to a decline in losses on loans purchased that resulted from changes in accounting guidance for consolidation of VIEs we implemented on January 1, 2010.

*Multifamily*

The table below presents the Segment Earnings of our Multifamily segment.

**Table 20 — Segment Earnings and Key Metrics — Multifamily[1]**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| | (dollars in millions) | | |
| **Segment Earnings:** | | | |
| Net interest income | $ 1,200 | $ 1,114 | $ 856 |
| (Provision) benefit for credit losses | 196 | (99) | (574) |
| Non-interest income (loss): | | | |
| Management and guarantee income | 127 | 101 | 90 |
| Net impairment of available-for-sale securities | (353) | (96) | (137) |
| Derivative gains (losses) | 3 | 6 | (27) |
| Gains (losses) on sale of mortgage loans | 383 | 343 | 156 |
| Gains (losses) on mortgage loans recorded at fair value | (83) | (283) | (144) |
| Other non-interest income (loss) | 125 | 177 | (474) |
| Total non-interest income (loss) | 202 | 248 | (536) |
| Non-interest expense: | | | |
| Administrative expenses | (220) | (212) | (221) |
| REO operations income (expense) | 11 | 3 | (20) |
| Other non-interest expense | (69) | (66) | (18) |
| Total non-interest expense | (278) | (275) | (259) |
| Segment Earnings (loss) before income tax benefit (expense) | 1,320 | 988 | (513) |
| Income tax benefit (expense) | (1) | (26) | — |
| Segment Earnings (loss), net of taxes, including noncontrolling interest | 1,319 | 962 | (513) |
| Less: Net (income) loss — noncontrolling interest | — | 3 | 2 |
| Segment Earnings (loss), net of taxes | 1,319 | 965 | (511) |
| Total other comprehensive income, net of taxes | 899 | 4,075 | 7,292 |
| Total comprehensive income | $ 2,218 | $ 5,040 | $ 6,781 |
| **Reconciliation to GAAP net income (loss):** | | | |
| Segment Earnings (loss), net of taxes[2] | $ 1,319 | $ 965 | $ (511) |
| Credit guarantee-related adjustments[2] | — | — | 7 |
| Fair value-related adjustments[3] | — | — | (3,761) |
| Tax-related adjustments[3] | — | — | 1,313 |
| Total reconciling items, net of taxes | — | — | (2,441) |
| Net income (loss) attributable to Freddie Mac | $ 1,319 | $ 965 | $ (2,952) |
| **Key metrics — Multifamily:** | | | |
| *Balances and Volume:* | | | |
| Average balance of Multifamily loan portfolio | $ 83,593 | $ 83,163 | $ 78,371 |
| Average balance of Multifamily guarantee portfolio | $ 29,861 | $ 21,787 | $ 16,203 |
| Average balance of Multifamily investment securities portfolio | $ 61,296 | $ 61,332 | $ 63,797 |
| Multifamily new loan purchase and other guarantee commitment volume[4] | $ 20,325 | $ 14,800 | $ 16,556 |
| Multifamily units financed from new volume activity[4] | 320,753 | 233,952 | 258,072 |
| Multifamily Other Guarantee Transaction issuance[4] | $ 11,722 | $ 5,694 | $ 1,979 |
| *Yield and Rate:* | | | |
| Net interest yield — Segment Earnings basis | 0.83% | 0.77% | 0.55% |
| Average Management and guarantee fee rate, in bps[5] | 42.4 | 50.1 | 53.3 |
| *Credit:* | | | |
| Delinquency rate: | | | |
| Credit-enhanced loans, at period end | 0.52% | 0.85% | 1.03% |
| Non-credit-enhanced loans, at period end | 0.11% | 0.12% | 0.07% |
| Total delinquency rate, at period end[6] | 0.22% | 0.26% | 0.20% |
| Allowance for loan losses and reserve for guarantee losses, at period end | $ 545 | $ 828 | $ 831 |
| Allowance for loan losses and reserve for guarantee losses, in bps | 46.4 | 75.3 | 82.1 |
| Credit losses, in bps[7] | 6.3 | 9.6 | 4.4 |
| REO inventory, at net carrying value | $ 133 | $ 107 | $ 31 |
| REO inventory, at period end (number of properties) | 20 | 14 | 5 |

(1) For reconciliations of Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 14: SEGMENT REPORTING — Table 14.2 — Segment Earnings and Reconciliation to GAAP Results."

(2) Consists primarily of amortization and valuation adjustments pertaining to the guarantee assets and guarantee obligation, which were excluded from segment earnings in 2009.

(3) Fair value-related adjustments in 2009 consist principally of the write-down of our investment in LIHTC partnerships in 2009. Tax-related adjustments in 2009 consist of the establishment of a partial valuation allowance against our deferred tax assets that are not included in Multifamily Segment Earnings.

(4) Excludes our guarantees issued under the HFA initiative.

(5) Represents Multifamily Segment Earnings — management and guarantee income, excluding prepayment and certain other fees, divided by the sum of the average balance of the multifamily guarantee portfolio and the average balance of guarantees associated with the HFA initiative, excluding certain bonds under the NIBP.

(6) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Multifamily Mortgage Credit Risk*" for information on our reported multifamily delinquency rate.

(7) Calculated as the amount of multifamily credit losses divided by the sum of the average carrying value of our multifamily loan portfolio and the average balance of the multifamily guarantee portfolio, including multifamily HFA initiative guarantees.

Our purchase and guarantee of multifamily loans, excluding HFA-related guarantees, increased approximately 37% to $20.3 billion for 2011, compared to $14.8 billion and $16.6 billion during 2010 and 2009, respectively. We completed Other Guarantee Transactions, excluding HFA-related guarantees, of $11.7 billion, $5.7 billion, and $2.0 billion in UPB of multifamily loans in 2011, 2010, and 2009, respectively. The UPB of the total multifamily portfolio increased to $176.7 billion at December 31, 2011 from $169.5 billion at December 31, 2010, primarily due to increased issuance of Other Guarantee Transactions, partially offset by maturities and other repayments of multifamily held-for-investment mortgage loans. We expect our purchase and guarantee activity to continue to increase, but at a more moderate pace, in 2012.

Segment Earnings for our Multifamily segment increased to $1.3 billion in 2011, compared to $965 million in 2010, primarily due to improvement in provision (benefit) for credit losses and lower losses on mortgage loans recorded at fair value, partially offset by higher security impairments on the CMBS portfolio. Our total comprehensive income for our Multifamily segment was $2.2 billion in 2011, consisting of: (a) Segment Earnings of $1.3 billion; and (b) $0.9 billion of total other comprehensive income, which was mainly attributable to changes in fair value of available-for-sale CMBS in 2011.

Segment Earnings (loss) for our Multifamily segment increased to $965 million for 2010 compared to $(511) million for 2009, primarily due to increased net interest income and lower provision for credit losses in 2010. Our total comprehensive income for our Multifamily segment was $5.0 billion in 2010, consisting of: (a) Segment Earnings of $965 million; and (b) $4.1 billion of total other comprehensive income, primarily resulting from improved fair values on available-for-sale CMBS. Our total comprehensive income for our Multifamily segment was $6.8 billion in 2009, consisting of: (a) Segment Earnings (loss) of $(0.5) billion; and (b) $7.3 billion of total other comprehensive income.

Segment Earnings net interest income increased to $1.2 billion in 2011 from $1.1 billion in 2010, primarily due to lower funding costs on allocated debt in 2011. Net interest yield was 83 and 77 basis points in 2011 and 2010, respectively. Segment Earnings net interest income increased $258 million, or 30%, for 2010 compared to 2009, due to lower funding costs on allocated debt in 2010, which declined principally due to the removal of the LIHTC investments from the Multifamily segment in the fourth quarter of 2009. See "NOTE 3: VARIABLE INTEREST ENTITIES" for further information on our LIHTC investments. Net interest income was also positively impacted in 2010 by an increase in prepayment fees driven by an increase in refinancing in 2010, as compared to 2009. As a result, net interest yield was 77 basis points in 2010, an improvement of 22 basis points from 2009.

Segment Earnings non-interest income (loss) was $202 million, $248 million, and $(536) million in 2011, 2010, and 2009, respectively. The decline in 2011 was primarily driven by higher security impairments on CMBS, partially offset by lower losses recognized on mortgage loans recorded at fair value primarily reflecting improving market factors, such as credit and liquidity. Segment Earnings gains (losses) on mortgage loans recorded at fair value are presented net of changes in fair value due to changes in interest rates. The improvement in Segment Earnings non-interest income (loss) in 2010, compared to 2009, was primarily due to the absence of LIHTC partnership losses and higher gains recognized on the sale of loans through securitization in 2010.

While our Multifamily Segment Earnings management and guarantee income increased 26% in 2011, compared to 2010, the average rate realized on our guarantee portfolio declined to 42 basis points in 2011 from 50 basis points in 2010. The decline in our average rate in 2011 reflects the impact from our increased volume of Other Guarantee Transactions, which have lower credit risk associated with our guarantee (and thus we charge a lower rate) relative to other issued guarantees because these transactions contain significant levels of credit enhancement through subordination.

Multifamily credit losses as a percentage of the combined average balance of our multifamily loan and guarantee portfolios were 6.3, 9.6, and 4.4 basis points in 2011, 2010, and 2009, respectively. Our Multifamily segment recognized a provision (benefit) for credit losses of $(196) million, $99 million, and $574 million in 2011, 2010, and 2009, respectively. Our loan loss reserves associated with our multifamily mortgage portfolio were $545 million, $828 million, and $831 million as of December 31, 2011, 2010, and 2009, respectively. The decline in our loan loss reserves in 2011 was driven by positive trends in vacancy rates and effective rents, as well as stabilizing or improved property values.

The credit quality of the multifamily mortgage portfolio remains strong, as evidenced by low delinquency rates and credit losses, and we believe reflects prudent underwriting practices. The delinquency rate for loans in the multifamily mortgage portfolio was 0.22%, 0.26%, and 0.20% as of December 31, 2011, 2010, and 2009, respectively. As of December 31, 2011, more than half of the multifamily loans that were two or more monthly payments past due, measured both in terms of number of loans and on a UPB basis, had credit enhancements that we currently believe will mitigate our expected losses on those loans. We expect our multifamily delinquency rate to remain relatively stable in 2012. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Multifamily Mortgage Credit Risk*" for further

information about our reported multifamily delinquency rates and credit enhancements on multifamily loans. For further information on delinquencies, including geographical and other concentrations, see "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS."

## CONSOLIDATED BALANCE SHEETS ANALYSIS

The following discussion of our consolidated balance sheets should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also, see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported financial position.

### Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell

Cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and other liquid assets discussed in "Investments in Securities — *Non-Mortgage-Related Securities*," are important to our cash flow and asset and liability management, and our ability to provide liquidity and stability to the mortgage market. We use these assets to help manage recurring cash flows and meet our other cash management needs. We consider federal funds sold to be overnight unsecured trades executed with commercial banks that are members of the Federal Reserve System. Securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities.

The short-term assets on our consolidated balance sheets also include those related to our consolidated VIEs, which are comprised primarily of restricted cash and cash equivalents at December 31, 2011. These short-term assets, related to our consolidated VIEs, decreased by $9.2 billion from December 31, 2010 to December 31, 2011, primarily due to a relative decline in the level of refinancing activity.

Excluding amounts related to our consolidated VIEs, we held $28.4 billion and $37.0 billion of cash and cash equivalents, $0 billion and $1.4 billion of federal funds sold, and $12.0 billion and $15.8 billion of securities purchased under agreements to resell at December 31, 2011 and 2010, respectively. The aggregate decrease in these assets was primarily driven by a decline in funding needs for debt redemptions. In addition, excluding amounts related to our consolidated VIEs, we held on average $32.4 billion and $33.0 billion of cash and cash equivalents and $13.2 billion and $19.1 billion of federal funds sold and securities purchased under agreements to resell during the three months and year ended December 31, 2011, respectively.

Beginning in the third quarter of 2011, we changed the composition of our portfolio of liquid assets to hold more cash and overnight investments given the market's concerns about the potential for a downgrade in the credit ratings of the U.S. government and the potential that the U.S. would exhaust its borrowing authority under the statutory debt limit. For more information regarding liquidity management and credit ratings, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity."

### Investments in Securities

The two tables below provide detail regarding our investments in securities as of December 31, 2011, 2010 and 2009. The tables do not include our holdings of single-family PCs and certain Other Guarantee Transactions as of December 31, 2011 and 2010. For information on our holdings of such securities, see "Table 16 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios."

**Table 21 — Investments in Available-For-Sale Securities**

| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| | | | (in millions) | |
| **December 31, 2011** | | | | |
| Available-for-sale mortgage-related securities: | | | | |
| Freddie Mac | $ 74,711 | $ 6,429 | $     (48) | $ 81,092 |
| Subprime | 41,347 | 60 | (13,408) | 27,999 |
| CMBS | 53,637 | 2,574 | (548) | 55,663 |
| Option ARM | 9,019 | 15 | (3,169) | 5,865 |
| Alt-A and other | 13,659 | 32 | (2,812) | 10,879 |
| Fannie Mae | 19,023 | 1,303 | (4) | 20,322 |
| Obligations of states and political subdivisions | 7,782 | 108 | (66) | 7,824 |
| Manufactured housing | 820 | 6 | (60) | 766 |
| Ginnie Mae | 219 | 30 | — | 249 |
| Total investments in available-for-sale mortgage-related securities | $220,217 | $10,557 | $(20,115) | $210,659 |
| **December 31, 2010** | | | | |
| Available-for-sale mortgage-related securities: | | | | |
| Freddie Mac | $ 80,742 | $ 5,142 | $    (195) | $ 85,689 |
| Subprime | 47,916 | 1 | (14,056) | 33,861 |
| CMBS | 58,455 | 1,551 | (1,919) | 58,087 |
| Option ARM | 10,726 | 16 | (3,853) | 6,889 |
| Alt-A and other | 15,561 | 58 | (2,451) | 13,168 |
| Fannie Mae | 23,025 | 1,348 | (3) | 24,370 |
| Obligations of states and political subdivisions | 9,885 | 31 | (539) | 9,377 |
| Manufactured housing | 945 | 13 | (61) | 897 |
| Ginnie Mae | 268 | 28 | — | 296 |
| Total investments in available-for-sale mortgage-related securities | $247,523 | $ 8,188 | $(23,077) | $232,634 |
| **December 31, 2009** | | | | |
| Available-for-sale mortgage-related securities: | | | | |
| Freddie Mac | $215,198 | $ 9,410 | $ (1,141) | $223,467 |
| Subprime | 56,821 | 2 | (21,102) | 35,721 |
| CMBS | 61,792 | 15 | (7,788) | 54,019 |
| Option ARM | 13,686 | 25 | (6,475) | 7,236 |
| Alt-A and other | 18,945 | 9 | (5,547) | 13,407 |
| Fannie Mae | 34,242 | 1,312 | (8) | 35,546 |
| Obligations of states and political subdivisions | 11,868 | 49 | (440) | 11,477 |
| Manufactured housing | 1,084 | 1 | (174) | 911 |
| Ginnie Mae | 320 | 27 | — | 347 |
| Total available-for-sale mortgage-related securities | 413,956 | 10,850 | (42,675) | 382,131 |
| Available-for-sale non-mortgage-related securities: | | | | |
| Asset-backed securities | 2,444 | 109 | — | 2,553 |
| Total available-for-sale non-mortgage-related securities | 2,444 | 109 | — | 2,553 |
| Total investments in available-for-sale securities | $416,400 | $10,959 | $(42,675) | $384,684 |

**Table 22 — Investments in Trading Securities**

| | December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | (in millions) | | |
| Mortgage-related securities: | | | |
| Freddie Mac | $16,047 | $13,437 | $170,955 |
| Fannie Mae | 15,165 | 18,726 | 34,364 |
| Ginnie Mae | 156 | 172 | 185 |
| Other | 164 | 31 | 28 |
| Total mortgage-related securities | 31,532 | 32,366 | 205,532 |
| Non-mortgage-related securities: | | | |
| Asset-backed securities | 302 | 44 | 1,492 |
| Treasury bills | 100 | 17,289 | 14,787 |
| Treasury notes | 24,712 | 10,122 | — |
| FDIC-guaranteed corporate medium-term notes | 2,184 | 441 | 439 |
| Total non-mortgage-related securities | 27,298 | 27,896 | 16,718 |
| Total fair value of investments in trading securities | $58,830 | $60,262 | $222,250 |

*Non-Mortgage-Related Securities*

   Our investments in non-mortgage-related securities provide an additional source of liquidity. We held investments in non-mortgage-related securities classified as trading of $27.3 billion and $27.9 billion as of December 31, 2011 and 2010,

*Freddie Mac*

respectively. While balances may fluctuate from period to period, we continue to meet required liquidity and contingency levels.

### Mortgage-Related Securities

We are primarily a buy-and-hold investor in mortgage-related securities, which consist of securities issued by Fannie Mae, Ginnie Mae, and other financial institutions. We also invest in our own mortgage-related securities. However, the single-family PCs and certain Other Guarantee Transactions we purchase as investments are not accounted for as investments in securities because we recognize the underlying mortgage loans on our consolidated balance sheets through consolidation of the related trusts.

The table below provides the UPB of our investments in mortgage-related securities classified as available-for-sale or trading on our consolidated balance sheets. The table below does not include our holdings of our own single-family PCs and certain Other Guarantee Transactions. For further information on our holdings of such securities, see "Table 16 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios."

### Table 23 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets

| | December 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Fixed Rate | Variable Rate[1] | Total | Fixed Rate | Variable Rate[1] | Total |
| | (in millions) | | | | | |
| Freddie Mac mortgage-related securities:[2] | | | | | | |
| Single-family | $ 72,795 | $ 9,753 | $ 82,548 | $ 79,955 | $ 8,118 | $ 88,073 |
| Multifamily | 1,216 | 1,792 | 3,008 | 339 | 1,756 | 2,095 |
| Total Freddie Mac mortgage-related securities | 74,011 | 11,545 | 85,556 | 80,294 | 9,874 | 90,168 |
| Non-Freddie Mac mortgage-related securities: | | | | | | |
| Agency securities:[3] | | | | | | |
| Fannie Mae: | | | | | | |
| Single-family | 16,543 | 15,998 | 32,541 | 21,238 | 18,139 | 39,377 |
| Multifamily | 52 | 76 | 128 | 228 | 88 | 316 |
| Ginnie Mae: | | | | | | |
| Single-family | 253 | 104 | 357 | 296 | 117 | 413 |
| Multifamily | 16 | — | 16 | 27 | — | 27 |
| Total Non-Freddie Mac agency securities | 16,864 | 16,178 | 33,042 | 21,789 | 18,344 | 40,133 |
| Non-agency mortgage-related securities: | | | | | | |
| Single-family:[4] | | | | | | |
| Subprime | 336 | 48,696 | 49,032 | 363 | 53,855 | 54,218 |
| Option ARM | — | 13,949 | 13,949 | — | 15,646 | 15,646 |
| Alt-A and other | 2,128 | 14,662 | 16,790 | 2,405 | 16,438 | 18,843 |
| CMBS | 19,735 | 34,375 | 54,110 | 21,401 | 37,327 | 58,728 |
| Obligations of states and political subdivisions[5] | 7,771 | 22 | 7,793 | 9,851 | 26 | 9,877 |
| Manufactured housing | 831 | 129 | 960 | 930 | 150 | 1,080 |
| Total non-agency mortgage-related securities[6] | 30,801 | 111,833 | 142,634 | 34,950 | 123,442 | 158,392 |
| Total UPB of mortgage-related securities | $121,676 | $139,556 | 261,232 | $137,033 | $151,660 | 288,693 |
| Premiums, discounts, deferred fees, impairments of UPB and other basis adjustments | | | (12,363) | | | (11,839) |
| Net unrealized (losses) on mortgage-related securities, pre-tax | | | (6,678) | | | (11,854) |
| Total carrying value of mortgage-related securities | | | $242,191 | | | $265,000 |

(1) Variable-rate mortgage-related securities include those with a contractual coupon rate that, prior to contractual maturity, is either scheduled to change or is subject to change based on changes in the composition of the underlying collateral.

(2) When we purchase REMICs and Other Structured Securities and certain Other Guarantee Transactions that we have issued, we account for these securities as investments in debt securities as we are investing in the debt securities of a non-consolidated entity. We do not consolidate our resecuritization trusts since we are not deemed to be the primary beneficiary of such trusts. We are subject to the credit risk associated with the mortgage loans underlying our Freddie Mac mortgage-related securities. Mortgage loans underlying our issued single-family PCs and certain Other Guarantee Transactions are recognized on our consolidated balance sheets as held-for-investment mortgage loans, at amortized cost. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" for further information.

(3) Agency securities are generally not separately rated by nationally recognized statistical rating organizations, but have historically been viewed as having a level of credit quality at least equivalent to non-agency mortgage-related securities AAA-rated or equivalent.

(4) For information about how these securities are rated, see "Table 29 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS."

(5) Approximately 37% and 50% of these securities held at December 31, 2011 and 2010, respectively, were AAA-rated as of those dates, based on the lowest rating available.

(6) Credit ratings for most non-agency mortgage-related securities are designated by no fewer than two nationally recognized statistical rating organizations. Approximately 21% and 23% of total non-agency mortgage-related securities held at December 31, 2011 and 2010, respectively, were AAA-rated as of those dates, based on the UPB and the lowest rating available.

The table below provides the UPB and fair value of our investments in mortgage-related securities classified as available-for-sale or trading on our consolidated balance sheets.

**Table 24 — Additional Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets**

| | December 31, 2011 | | December 31, 2010 | |
| | UPB | Fair Value | UPB | Fair Value |
|---|---|---|---|---|
| | (in millions) | | | |
| Agency pass-through securities[1] | $ 24,283 | $ 26,193 | $ 31,184 | $ 33,459 |
| Agency REMICs and Other Structured Securities: | | | | |
|   Interest-only securities[2] | — | 2,863 | — | 3,800 |
|   Principal-only securities[3] | 3,569 | 3,344 | 4,631 | 4,067 |
|   Inverse floating-rate securities[4] | 4,839 | 6,826 | 3,512 | 4,478 |
|   Other Structured Securities | 85,907 | 93,805 | 90,974 | 96,886 |
|     Total agency securities | 118,598 | 133,031 | 130,301 | 142,690 |
| Non-agency securities[5] | 142,634 | 109,160 | 158,392 | 122,310 |
| Total mortgage-related securities | $261,232 | $242,191 | $288,693 | $265,000 |

(1) Represents an undivided beneficial interest in trusts that hold pools of mortgages.
(2) Represents securities where the holder receives only the interest cash flows.
(3) Represents securities where the holder receives only the principal cash flows.
(4) Represents securities where the holder receives interest cash flows that change inversely with the reference rate (*i.e.* higher cash flows when interest rates are low and lower cash flows when interest rates are high). Additionally, these securities receive a portion of principal cash flows associated with the underlying collateral.
(5) Includes fair values of $2 million and $5 million of interest-only securities at December 31, 2011 and December 31, 2010, respectively.

The total UPB of our investments in mortgage-related securities on our consolidated balance sheets decreased from $288.7 billion at December 31, 2010 to $261.2 billion at December 31, 2011, while the fair value of these investments decreased from $265.0 billion at December 31, 2010 to $242.2 billion at December 31, 2011. The reduction resulted from our purchase activity remaining less than liquidations, consistent with our efforts to reduce our mortgage-related investments portfolio, as described in "BUSINESS — Conservatorship and Related Matters — *Impact of Conservatorship and Related Actions on Our Business — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio*." The UPB and fair value of inverse floating-rate securities increased as we created new inverse floating-rate securities from existing mortgage-related securities that were on our consolidated balance sheets. We create inverse floating-rate securities and other REMICs and sell tranches that are in demand by investors to reduce our asset balance, while conserving value for the taxpayer. These securities are managed in the overall context of our interest-rate risk management strategy and framework.

The table below summarizes our mortgage-related securities purchase activity for 2011, 2010 and 2009. The purchase activity includes single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated. Effective January 1, 2010, purchases of single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated are recorded as an extinguishment of debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

**Table 25 — Total Mortgage-Related Securities Purchase Activity[1]**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| | | (in millions) | |
| Non-Freddie Mac mortgage-related securities purchased for resecuritization: | | | |
| Ginnie Mae Certificates | $ 77 | $ 69 | $ 56 |
| Non-agency mortgage-related securities purchased for Other Guarantee Transactions[2] | 11,527 | 9,579 | 10,189 |
| Total non-Freddie Mac mortgage-related securities purchased for resecuritization | 11,604 | 9,648 | 10,245 |
| Non-Freddie Mac mortgage-related securities purchased as investments in securities: | | | |
| *Agency securities:* | | | |
| *Fannie Mae:* | | | |
| Fixed-rate | 5,835 | — | 43,298 |
| Variable-rate | 2,297 | 373 | 2,697 |
| Total Fannie Mae | 8,132 | 373 | 45,995 |
| *Ginnie Mae fixed-rate* | — | — | 27 |
| Total agency securities | 8,132 | 373 | 46,022 |
| Non-agency mortgage-related securities: | | | |
| *CMBS:* | | | |
| Fixed-rate | 14 | — | — |
| Variable-rate | 179 | 40 | — |
| Total CMBS | 193 | 40 | — |
| *Obligations of states and political subdivisions fixed-rated* | — | — | 180 |
| Total non-agency mortgage-related securities | 193 | 40 | 180 |
| *Total non-Freddie Mac mortgage-related securities purchased as investments in securities* | 8,325 | 413 | 46,202 |
| Total non-Freddie Mac mortgage-related securities purchased | $ 19,929 | $10,061 | $ 56,447 |
| Freddie Mac mortgage-related securities purchased: | | | |
| *Single-family:* | | | |
| Fixed-rate | $ 94,543 | $40,462 | $176,974 |
| Variable-rate | 5,057 | 923 | 5,414 |
| *Multifamily:* | | | |
| Fixed-rate | 355 | 271 | — |
| Variable-rate | 117 | 111 | — |
| *Total Freddie Mac mortgage-related securities purchased* | $100,072 | $41,767 | $182,388 |

(1) Based on UPB. Excludes mortgage-related securities traded but not yet settled.
(2) Purchases in 2011 and 2010 include HFA bonds we acquired and resecuritized under the NIBP. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for further information on this component of the HFA Initiative.

During the year ended December 31, 2011, we increased our participation in dollar roll transactions, primarily to support the market and pricing of our PCs. When these transactions involve our consolidated PC trusts, the purchase and sale represents an extinguishment and issuance of debt securities, respectively, and impacts our net interest income and recognition of gain or loss on the extinguishment of debt on our consolidated statements of income and comprehensive income. These transactions can cause short-term fluctuations in the balance of our mortgage-related investments portfolio. The increase in our purchases of agency securities in 2011, reflected in "Table 25 — Total Mortgage-Related Securities Purchase Activity" is attributed primarily to these transactions. For more information, see "RISK FACTORS — Competitive and Market Risks — *Any decline in the price performance of or demand for our PCs could have an adverse effect on the volume and profitability of our new single-family guarantee business.*"

*Unrealized Losses on Available-For-Sale Mortgage-Related Securities*

At December 31, 2011, our gross unrealized losses, pre-tax, on available-for-sale mortgage-related securities were $20.1 billion, compared to $23.1 billion at December 31, 2010. The decrease was primarily due to gains on our agency securities and CMBS as a result of the impact of declining rates and the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities, partially offset by losses on our single-family non-agency mortgage-related securities primarily due to widening OAS levels. We believe the unrealized losses related to these securities at December 31, 2011 were mainly attributable to poor underlying collateral performance, limited liquidity and large risk premiums in the market for residential non-agency mortgage-related securities. All available-for-sale securities in an unrealized loss position are evaluated to determine if the impairment is other-than-temporary. See "Total Equity (Deficit)" and "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding unrealized losses on our available-for-sale securities.

<u>*Higher-Risk Components of Our Investments in Mortgage-Related Securities*</u>

As discussed below, we have exposure to subprime, option ARM, interest-only, and Alt-A and other loans as part of our investments in mortgage-related securities as follows:

- *Single-family non-agency mortgage-related securities:* We hold non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans.

- *Single-family Freddie Mac mortgage-related securities:* We hold certain Other Guarantee Transactions as part of our investments in securities. There are subprime and option ARM loans underlying some of these Other Guarantee Transactions. For more information on single-family loans with certain higher-risk characteristics underlying our issued securities, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*."

*Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, and Alt-A Loans*

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. Since the first quarter of 2008, we have not purchased any non-agency mortgage-related securities backed by subprime, option ARM, or Alt-A loans. The two tables below present information about our holdings of our available-for-sale non-agency mortgage-related securities backed by subprime, option ARM and Alt-A loans.

FHFA 2820

**Table 26 — Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics[1]**

|  | As of | | | | |
|---|---|---|---|---|---|
|  | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 |
|  | (dollars in millions) | | | | |
| UPB: | | | | | |
| Subprime first lien[2] | $48,644 | $49,794 | $51,070 | $52,403 | $53,756 |
| Option ARM | 13,949 | 14,351 | 14,778 | 15,232 | 15,646 |
| Alt-A[3] | 14,260 | 14,643 | 15,059 | 15,487 | 15,917 |
| Gross unrealized losses, pre-tax:[4] | | | | | |
| Subprime first lien[2] | $13,401 | $14,132 | $13,764 | $12,481 | $14,026 |
| Option ARM | 3,169 | 3,216 | 3,099 | 3,170 | 3,853 |
| Alt-A[3] | 2,612 | 2,468 | 2,171 | 1,941 | 2,096 |
| Present value of expected future credit losses:[5] | | | | | |
| Subprime first lien[2] | $ 6,746 | $ 5,414 | $ 6,487 | $ 6,612 | $ 5,937 |
| Option ARM | 4,251 | 4,434 | 4,767 | 4,993 | 4,850 |
| Alt-A[3] | 2,235 | 2,204 | 2,310 | 2,401 | 2,469 |
| Collateral delinquency rate:[6] | | | | | |
| Subprime first lien[2] | 42% | 42% | 42% | 44% | 45% |
| Option ARM | 44 | 44 | 44 | 44 | 44 |
| Alt-A[3] | 25 | 25 | 26 | 26 | 27 |
| Average credit enhancement:[7] | | | | | |
| Subprime first lien[2] | 21% | 22% | 23% | 24% | 25% |
| Option ARM | 7 | 8 | 10 | 11 | 12 |
| Alt-A[3] | 7 | 7 | 8 | 8 | 9 |
| Cumulative collateral loss:[8] | | | | | |
| Subprime first lien[2] | 22% | 21% | 20% | 19% | 18% |
| Option ARM | 17 | 16 | 15 | 14 | 13 |
| Alt-A[3] | 8 | 8 | 7 | 7 | 6 |

(1) See "*Ratings of Non-Agency Mortgage-Related Securities*" for additional information about these securities.

(2) Excludes non-agency mortgage-related securities backed exclusively by subprime second liens. Certain securities identified as subprime first lien may be backed in part by subprime second lien loans, as the underlying loans of these securities were permitted to include a small percentage of subprime second lien loans.

(3) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.

(4) Represents the aggregate of the amount by which amortized cost, after other-than-temporary impairments, exceeds fair value measured at the individual lot level.

(5) Represents our estimate of future contractual cash flows that we do not expect to collect, discounted at the effective interest rate implicit in the security at the date of acquisition. This discount rate is only utilized to analyze the cumulative credit deterioration for securities since acquisition and may be lower than the discount rate used to measure ongoing other-than-temporary impairment to be recognized in earnings for securities that have experienced a significant improvement in expected cash flows since the last recognition of other-than-temporary impairment recognized in earnings.

(6) Determined based on the number of loans that are two monthly payments or more past due that underlie the securities using information obtained from a third-party data provider.

(7) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by bond insurance, overcollateralization and other forms of credit enhancement.

(8) Based on the actual losses incurred on the collateral underlying these securities. Actual losses incurred on the securities that we hold are significantly less than the losses on the underlying collateral as presented in this table, as non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements.

For purposes of our cumulative credit deterioration analysis, our estimate of the present value of expected future credit losses on our total portfolio of non-agency mortgage-related securities (which are set forth in "Table 23 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets") decreased to $14.0 billion at December 31, 2011 from $14.3 billion at December 31, 2010. All of these amounts have been reflected in our net impairment of available-for-sale securities recognized in earnings in this period or prior periods. The decrease in the present value of expected future credit losses was primarily due to the impact of lower interest rates in 2011 resulting in a benefit from expected structural credit enhancements on the securities. The impact of lower interest rates was partially offset by the impact of declines in forecasted home prices.

*Freddie Mac*

**Table 27 — Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans[1]**

| | Three Months Ended | | | | |
|---|---|---|---|---|---|
| | 12/31/2011 | 9/30/2011 | 6/30/2011 (in millions) | 3/31/2011 | 12/31/2010 |
| **Principal repayments and cash shortfalls:[2]** | | | | | |
| Subprime: | | | | | |
| Principal repayments | $1,159 | $1,287 | $1,341 | $1,361 | $1,512 |
| Principal cash shortfalls | 7 | 6 | 10 | 14 | 6 |
| Option ARM: | | | | | |
| Principal repayments | $ 298 | $ 318 | $ 331 | $ 315 | $ 347 |
| Principal cash shortfalls | 103 | 109 | 123 | 100 | 111 |
| Alt-A and other: | | | | | |
| Principal repayments | $ 385 | $ 425 | $ 464 | $ 452 | $ 537 |
| Principal cash shortfalls | 80 | 81 | 84 | 81 | 62 |

(1) See "*Ratings of Non-Agency Mortgage-Related Securities*" for additional information about these securities.
(2) In addition to the contractual interest payments, we receive monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral of these securities representing a partial return of our investment in these securities.

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non-agency mortgage-related securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. The effectiveness of our efforts is highly uncertain and any potential recoveries may take significant time to realize.

In June 2011, Bank of America Corporation announced that it, BAC Home Loans Servicing, LP, Countrywide Financial Corporation and Countrywide Home Loans, Inc. entered into a settlement agreement with The Bank of New York Mellon, as trustee, to resolve certain claims with respect to a number of Countrywide first-lien and second-lien residential mortgage-related securitization trusts. Bank of America indicated that the settlement is subject to final court approval and certain other conditions. There can be no assurance that final court approval of the settlement will be obtained or that all conditions will be satisfied. Bank of America noted that, given the number of investors and the complexity of the settlement, it is not possible to predict the timing or ultimate outcome of the court approval process, which could take a substantial period of time. We have investments in certain of these Countrywide securitization trusts and would expect to benefit from this settlement, if final court approval is obtained. For more information, see "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS."

On September 2, 2011, FHFA announced that, as Conservator for Freddie Mac and Fannie Mae, it had filed lawsuits against 17 financial institutions and related defendants alleging: (a) violations of federal securities laws; and (b) in certain lawsuits, common law fraud in the sale of residential non-agency mortgage-related securities to Freddie Mac and Fannie Mae. FHFA, as Conservator, filed a similar lawsuit against UBS Americas, Inc. and related defendants on July 27, 2011. FHFA seeks to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in certain residential non-agency mortgage-related securities issued by these financial institutions.

Since the beginning of 2007, we have incurred actual principal cash shortfalls of $1.5 billion on impaired non-agency mortgage-related securities, of which $193 million and $823 million related to the three months and year ended December 31, 2011, respectively. Many of the trusts that issued non-agency mortgage-related securities we hold were structured so that realized collateral losses in excess of structural credit enhancements are not passed on to investors until the investment matures. We currently estimate that the future expected principal and interest shortfalls on non-agency mortgage-related securities we hold will be significantly less than the fair value declines experienced on these securities.

The investments in non-agency mortgage-related securities we hold backed by subprime, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements. Bond insurance is an additional credit enhancement covering some of the non-agency mortgage-related securities. These credit enhancements are the primary reason we expect our actual losses, through principal or interest shortfalls, to be less than the underlying collateral losses in the aggregate. It is difficult to estimate the point at which structural credit enhancements will be exhausted and we will incur actual losses. During the year ended December 31, 2011, we continued to experience the erosion of structural credit enhancements on many securities backed by subprime, option ARM, and Alt-A loans due to poor performance of the underlying collateral. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Bond Insurers*."

*Freddie Mac*

*Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*

The table below provides information about the mortgage-related securities for which we recognized other-than-temporary impairments in earnings.

**Table 28 — Net Impairment of Available-For-Sale Mortgage-Related Securities Recognized in Earnings**

| | Net Impairment of Available-For-Sale Securities Recognized in Earnings | | | | |
|---|---|---|---|---|---|
| | Three Months Ended | | | | |
| | 12/31/2011 | 9/30/2011 | 6/30/2011 (in millions) | 3/31/2011 | 12/31/2010 |
| Subprime:[1] | | | | | |
| 2006 & 2007 | $472 | $ 29 | $ 67 | $ 717 | $1,192 |
| Other years | 8 | 2 | 3 | 17 | 15 |
| Total subprime | 480 | 31 | 70 | 734 | 1,207 |
| Option ARM: | | | | | |
| 2006 & 2007 | 40 | 15 | 43 | 232 | 585 |
| Other years | 19 | 4 | 22 | 49 | 83 |
| Total option ARM | 59 | 19 | 65 | 281 | 668 |
| Alt-A: | | | | | |
| 2006 & 2007 | 22 | 29 | 16 | 15 | 204 |
| Other years | 21 | 10 | 15 | 23 | 161 |
| Total Alt-A | 43 | 39 | 31 | 38 | 365 |
| Other loans | 3 | 41 | 1 | 2 | 7 |
| Total subprime, option ARM, Alt-A and other loans | 585 | 130 | 167 | 1,055 | 2,247 |
| CMBS | 8 | 27 | 183 | 135 | 19 |
| Manufactured housing | 2 | 4 | 2 | 3 | 4 |
| Total available-for-sale mortgage-related securities | $595 | $161 | $352 | $1,193 | $2,270 |

(1) Includes all first and second liens.

We recorded net impairment of available-for-sale mortgage-related securities recognized in earnings of $595 million and $2.3 billion during the three months and year ended December 31, 2011, respectively, compared to $2.3 billion and $4.3 billion during the three months and year ended December 31, 2010, respectively. We recorded these impairments because our estimate of the present value of expected future credit losses on certain individual securities increased during the periods. These impairments include $585 million and $1.9 billion of impairments related to securities backed by subprime, option ARM, and Alt-A and other loans during the three months and year ended December 31, 2011, respectively, compared to $2.2 billion and $4.2 billion during the three months and year ended December 31, 2010, respectively. In addition, during the year ended December 31, 2011, these impairments include recognition of the fair value declines related to certain investments in CMBS of $181 million as an impairment charge in earnings, as we have the intent to sell these securities. For more information, see "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-for-Sale Securities."

While it is reasonably possible that collateral losses on our available-for-sale mortgage-related securities where we have not recorded an impairment charge in earnings could exceed our credit enhancement levels, we do not believe that those conditions were likely at December 31, 2011. Based on our conclusion that we do not intend to sell our remaining available-for-sale mortgage-related securities in an unrealized loss position and it is not more likely than not that we will be required to sell these securities before a sufficient time to recover all unrealized losses and our consideration of other available information, we have concluded that the reduction in fair value of these securities was temporary at December 31, 2011 and have recorded these fair value losses in AOCI.

The credit performance of loans underlying our holdings of non-agency mortgage-related securities has declined since 2007. This decline has been particularly severe for subprime, option ARM, and Alt-A and other loans. Economic factors negatively impacting the performance of our investments in non-agency mortgage-related securities include high unemployment, a large inventory of seriously delinquent mortgage loans and unsold homes, tight credit conditions, and weak consumer confidence during recent years. In addition, subprime, option ARM, and Alt-A and other loans backing the securities we hold have significantly greater concentrations in the states that are undergoing the greatest economic stress, such as California and Florida. Loans in these states undergoing economic stress are more likely to become seriously delinquent and the credit losses associated with such loans are likely to be higher than in other states.

We rely on bond insurance, including secondary coverage, to provide credit protection on some of our investments in non-agency mortgage-related securities. We have determined that there is substantial uncertainty surrounding certain bond insurers' ability to pay our future claims on expected credit losses related to our non-agency mortgage-related security investments. This uncertainty contributed to the impairments recognized in earnings during the years ended December 31,

2011 and 2010. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Bond Insurers*" and "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

Our assessments concerning other-than-temporary impairment require significant judgment and the use of models, and are subject to potentially significant change. In addition, changes in the performance of the individual securities and in mortgage market conditions may also affect our impairment assessments. Depending on the structure of the individual mortgage-related security and our estimate of collateral losses relative to the amount of credit support available for the tranches we own, a change in collateral loss estimates can have a disproportionate impact on the loss estimate for the security. Additionally, servicer performance, loan modification programs and backlogs, bankruptcy reform and other forms of government intervention in the housing market can significantly affect the performance of these securities, including the timing of loss recognition of the underlying loans and thus the timing of losses we recognize on our securities. Impacts related to changes in interest rates may also affect our losses due to the structural credit enhancements on our investments in non-agency mortgage-related securities. Foreclosure processing suspensions can also affect our losses. For example, while defaulted loans remain in the trusts prior to completion of the foreclosure process, the subordinate classes of securities issued by the securitization trusts may continue to receive interest payments, rather than absorbing default losses. This may reduce the amount of funds available for the tranches we own. Given the extent of the housing and economic downturn, it is difficult to estimate the future performance of mortgage loans and mortgage-related securities with high assurance, and actual results could differ materially from our expectations. Furthermore, various market participants could arrive at materially different conclusions regarding estimates of future cash shortfalls.

For more information on risks associated with the use of models, see "RISK FACTORS — Operational Risks — *We face risks and uncertainties associated with the internal models that we use for financial accounting and reporting purposes, to make business decisions, and to manage risks. Market conditions have raised these risks and uncertainties*." For more information on how delays in the foreclosure process, including delays related to concerns about deficiencies in foreclosure documentation practices, could adversely affect the values of, and the losses on, the non-agency mortgage-related securities we hold, see "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*."

For information regarding our efforts to mitigate losses on our investments in non-agency mortgage-related securities, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*."

*Ratings of Non-Agency Mortgage-Related Securities*

The table below shows the ratings of non-agency mortgage-related securities backed by subprime, option ARM, Alt-A and other loans, and CMBS held at December 31, 2011 based on their ratings as of December 31, 2011, as well as those held at December 31, 2010 based on their ratings as of December 31, 2010 using the lowest rating available for each security.

**Table 29 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS**

| Credit Ratings as of December 31, 2011 | UPB | Percentage of UPB | Amortized Cost | Gross Unrealized Losses | Bond Insurance Coverage[1] |
|---|---|---|---|---|---|
| | | | (dollars in millions) | | |
| **Subprime loans:** | | | | | |
| AAA-rated | $ 1,000 | 2% | $ 1,000 | $ (115) | $ 23 |
| Other investment grade | 2,643 | 5 | 2,643 | (399) | 383 |
| Below investment grade[2] | 45,389 | 93 | 37,704 | (12,894) | 1,641 |
| Total | $ 49,032 | 100% | $ 41,347 | $(13,408) | $2,047 |
| **Option ARM loans:** | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 76 | 1 | 76 | (8) | 76 |
| Below investment grade[2] | 13,873 | 99 | 8,943 | (3,161) | 39 |
| Total | $ 13,949 | 100% | $ 9,019 | $ (3,169) | $ 115 |
| **Alt-A and other loans:** | | | | | |
| AAA-rated | $ 350 | 2% | $ 348 | $ (20) | $ 6 |
| Other investment grade | 2,237 | 13 | 2,260 | (371) | 310 |
| Below investment grade[2] | 14,203 | 85 | 11,053 | (2,421) | 2,139 |
| Total | $ 16,790 | 100% | $ 13,661 | $ (2,812) | $2,455 |
| **CMBS:** | | | | | |
| AAA-rated | $ 25,499 | 47% | $ 25,540 | $ (22) | $ 42 |
| Other investment grade | 25,421 | 47 | 25,394 | (346) | 1,585 |
| Below investment grade[2] | 3,190 | 6 | 2,851 | (180) | 1,697 |
| Total | $ 54,110 | 100% | $ 53,785 | $ (548) | $3,324 |
| **Total subprime, option ARM, Alt-A and other loans, and CMBS:** | | | | | |
| AAA-rated | $ 26,849 | 20% | $ 26,888 | $ (157) | $ 71 |
| Other investment grade | 30,377 | 23 | 30,373 | (1,124) | 2,354 |
| Below investment grade[2] | 76,655 | 57 | 60,551 | (18,656) | 5,516 |
| Total | $133,881 | 100% | $117,812 | $(19,937) | $7,941 |
| Total investments in mortgage-related securities | $261,232 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 51% | | | | |
| **Credit Ratings as of December 31, 2010** | | | | | |
| **Subprime loans:** | | | | | |
| AAA-rated | $ 2,085 | 4% | $ 2,085 | $ (199) | $ 31 |
| Other investment grade | 3,407 | 6 | 3,408 | (436) | 449 |
| Below investment grade[2] | 48,726 | 90 | 42,423 | (13,421) | 1,789 |
| Total | $ 54,218 | 100% | $ 47,916 | $(14,056) | $2,269 |
| **Option ARM loans:** | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 139 | 1 | 140 | (18) | 129 |
| Below investment grade[2] | 15,507 | 99 | 10,586 | (3,835) | 50 |
| Total | $ 15,646 | 100% | $ 10,726 | $ (3,853) | $ 179 |
| **Alt-A and other loans:** | | | | | |
| AAA-rated | $ 1,293 | 7% | $ 1,301 | $ (87) | $ 7 |
| Other investment grade | 2,761 | 15 | 2,765 | (362) | 368 |
| Below investment grade[2] | 14,789 | 78 | 11,498 | (2,002) | 2,443 |
| Total | $ 18,843 | 100% | $ 15,564 | $ (2,451) | $2,818 |
| **CMBS:** | | | | | |
| AAA-rated | $ 28,007 | 48% | $ 28,071 | $ (52) | $ 42 |
| Other investment grade | 26,777 | 45 | 26,740 | (676) | 1,655 |
| Below investment grade[2] | 3,944 | 7 | 3,653 | (1,191) | 1,704 |
| Total | $ 58,728 | 100% | $ 58,464 | $ (1,919) | $3,401 |
| **Total subprime, option ARM, Alt-A and other loans, and CMBS:** | | | | | |
| AAA-rated | $ 31,385 | 21% | $ 31,457 | $ (338) | $ 80 |
| Other investment grade | 33,084 | 23 | 33,053 | (1,492) | 2,601 |
| Below investment grade[2] | 82,966 | 56 | 68,160 | (20,449) | 5,986 |
| Total | $147,435 | 100% | $132,670 | $(22,279) | $8,667 |
| Total investments in mortgage-related securities | $288,693 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 51% | | | | |

(1) Represents the amount of UPB covered by bond insurance. This amount does not represent the maximum amount of losses we could recover, as the bond insurance also covers interest.

(2) Includes securities with S&P credit ratings below BBB– and certain securities that are no longer rated.

**Mortgage Loans**

The UPB of mortgage loans on our consolidated balance sheet declined to $1.8 trillion as of December 31, 2011 from $1.9 trillion as of December 31, 2010. This decline reflects that the amount of single-family loan liquidations has exceeded new loan purchase and guarantee activity in 2011, which we believe is due, in part, to declines in the amount of single-family mortgage debt outstanding in the market and increased competition from Ginnie Mae and FHA/VA. Our single-family loan purchase and guarantee activity in 2011 was at the lowest level we have experienced in the last several years. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further detail about the mortgage loans on our consolidated balance sheets.

The UPB of unsecuritized single-family mortgage loans increased by $22.8 billion to $171.7 billion at December 31, 2011 from $148.9 billion at December 31, 2010, primarily due to our continued removal of seriously delinquent and modified loans from the mortgage pools underlying our PCs. Based on the amount of the recorded investment of these loans, approximately $72.4 billion, or 4.2%, of the single-family mortgage loans on our consolidated balance sheet as of December 31, 2011 were seriously delinquent, as compared to $84.2 billion, or 4.7%, as of December 31, 2010. This decline was primarily due to modifications, foreclosure transfers, and short sale activity. The majority of these seriously delinquent loans are unsecuritized, and were removed by us from our PC trusts. As guarantor, we have the right to remove mortgages that back our PCs from the underlying loan pools under certain circumstances. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information on our removal of single-family loans from PC trusts. We expect that our holdings of unsecuritized single-family loans will continue to increase in 2012 due to the recent revisions to HARP, which will result in our purchase of mortgages with LTV ratios greater than 125%, as we have not yet implemented a securitization process for such loans. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program*" for additional information on HARP.

The UPB of unsecuritized multifamily mortgage loans was $82.3 billion at December 31, 2011 and $85.9 billion at December 31, 2010. Our multifamily loan activity in 2011 primarily consisted of purchases of loans intended for securitization and subsequently sold through Other Guarantee Transactions. We expect to continue to purchase and subsequently securitize multifamily loans, which supports liquidity for the multifamily market and affordability for multifamily rental housing, as our primary multifamily business strategy.

We maintain an allowance for loan losses on mortgage loans that we classify as held-for-investment on our consolidated balance sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage-related securities backed by multifamily loans, certain single-family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risk. Collectively, we refer to our allowance for loan losses and our reserve for guarantee losses as our loan loss reserves. Our loan loss reserves were $39.5 billion and $39.9 billion at December 31, 2011 and 2010, respectively, including $38.9 billion and $39.1 billion, respectively, related to single-family loans. At December 31, 2011 and 2010, our loan loss reserves, as a percentage of our total mortgage portfolio, excluding non-Freddie Mac securities, was 2.1% and 2.0%, respectively, and as a percentage of the UPB associated with our non-performing loans was 32.0% and 33.7%, respectively. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Loan Loss Reserves*" for more information about our loan loss reserves.

The table below summarizes our purchase and guarantee activity in mortgage loans. This activity consists of: (a) mortgage loans underlying consolidated single-family PCs issued in the period (regardless of whether such securities are held by us or third parties); (b) single-family and multifamily mortgage loans purchased, but not securitized, in the period; and (c) mortgage loans underlying our mortgage-related financial guarantees issued in the period, which are not consolidated on our balance sheets.

**Table 30 — Mortgage Loan Purchase and Other Guarantee Commitment Activity**[1]

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2011** | | **2010** | | **2009** | |
| | **UPB Amount** | **% of Total** | **UPB Amount** | **% of Total** | **UPB Amount** | **% of Total** |
| | | | (dollars in millions) | | | |
| Mortgage loan purchases and guarantee issuances: | | | | | | |
| Single-family: | | | | | | |
| 30-year or more amortizing fixed-rate | $194,746 | 57% | $258,621 | 64% | $392,291 | 80% |
| 20-year amortizing fixed-rate | 21,378 | 6 | 23,852 | 6 | 11,895 | 2 |
| 15-year amortizing fixed-rate | 78,543 | 23 | 83,025 | 21 | 64,590 | 13 |
| Adjustable-rate[2] | 25,685 | 8 | 16,534 | 4 | 2,809 | 1 |
| Interest-only[3] | — | — | 909 | <1 | 845 | <1 |
| HFA bonds | — | — | 2,469 | 1 | 802 | <1 |
| FHA/VA and other governmental | 441 | <1 | 968 | <1 | 2,118 | 1 |
| *Total single-family*[4] | 320,793 | 94 | 386,378 | 96 | 475,350 | 97 |
| Multifamily[5] | 20,325 | 6 | 15,372 | 4 | 16,571 | 3 |
| *Total mortgage loan purchases and other guarantee commitment activity*[5] | $341,118 | 100% | $401,750 | 100% | $491,921 | 100% |
| Percentage of mortgage purchases and other guarantee commitment activity with credit enhancements[6] | 8% | | 9% | | 8% | |

(1) Based on UPB. Excludes mortgage loans traded but not yet settled. Excludes the removal of seriously delinquent loans and balloon/reset mortgages out of PC trusts. Includes other guarantee commitments associated with mortgage loans. See endnote (5) for further information.

(2) Includes amortizing ARMs with 1-, 3-, 5-, 7-, and 10-year initial fixed-rate periods. We did not purchase any option ARM loans during the years ended December 31, 2011, 2010, or 2009.

(3) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed-rate and variable-rate interest-only loans.

(4) Includes $27.7 billion, $23.9 billion, and $26.3 billion of mortgage loans in excess of $417,000, which we refer to as conforming jumbo mortgages, for the years ended December 31, 2011, 2010, and 2009 respectively.

(5) Includes issuances of other guarantee commitments on single-family loans of $4.4 billion, $5.7 billion, and $2.4 billion and issuances of other guarantee commitments on multifamily loans of $1.0 billion, $1.7 billion, and $0.5 billion during the years ended December 31, 2011, 2010, and 2009, respectively, which include our unsecuritized guarantees of HFA bonds under the TCLFP in 2010 and 2009.

(6) See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for further details on credit enhancement of mortgage loans in our multifamily mortgage and single-family credit guarantee portfolios.

See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" and "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS — Table 16.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio" for information about mortgage loans in our single-family credit guarantee portfolio that we believe have higher-risk characteristics.

**Derivative Assets and Liabilities, Net**

The composition of our derivative portfolio changes from period to period as a result of derivative purchases, terminations, or assignments prior to contractual maturity, and expiration of the derivatives at their contractual maturity. We classify net derivative interest receivable or payable, trade/settle receivable or payable, and cash collateral held or posted on our consolidated balance sheets in derivative assets, net and derivative liabilities, net. See "NOTE 11: DERIVATIVES" for additional information regarding our derivatives.

The table below shows the fair value for each derivative type, the weighted average fixed rate of our pay-fixed and receive-fixed swaps, and the maturity profile of our derivative positions reconciled to the amounts presented on our consolidated balance sheets as of December 31, 2011. A positive fair value in the table below for each derivative type is the estimated amount, prior to netting by counterparty, that we would be entitled to receive if the derivatives of that type were terminated. A negative fair value for a derivative type is the estimated amount, prior to netting by counterparty, that we would owe if the derivatives of that type were terminated.

**Table 31 — Derivative Fair Values and Maturities**

| | | | December 31, 2011 | | | |
|---|---|---|---|---|---|---|
| | Notional or Contractual Amount[2] | Total Fair Value[3] | Fair Value[1] | | | |
| | | | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| **Interest-rate swaps:** | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $195,716 | $ 10,651 | $    22 | $    390 | $ 2,054 | $ 8,185 |
| Weighted average fixed rate[4] | | | 1.17% | 1.03% | 2.26% | 3.35% |
| Forward-starting swaps[5] | 16,092 | 2,239 | | | | 2,239 |
| Weighted average fixed rate[4] | | | —% | —% | —% | 3.96% |
| Total receive-fixed | 211,808 | 12,890 | 22 | 390 | 2,054 | 10,424 |
| Basis (floating to floating) | 2,750 | (2) | — | (6) | 4 | |
| Pay-fixed: | | | | | | |
| Swaps | 276,564 | (31,565) | (62) | (1,319) | (6,108) | (24,076) |
| Weighted average fixed rate[4] | | | 1.59% | 2.20% | 3.13% | 3.84% |
| Forward-starting swaps[5] | 12,771 | (2,923) | | | | (2,923) |
| Weighted average fixed rate[4] | | | —% | —% | —% | 5.16% |
| Total pay-fixed | 289,335 | (34,488) | (62) | (1,319) | (6,108) | (26,999) |
| Total interest-rate swaps | 503,893 | (21,600) | (40) | (935) | (4,050) | (16,575) |
| **Option-based:** | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 76,275 | 12,975 | 5,348 | 3,895 | 816 | 2,916 |
| Written | 27,525 | (2,932) | (118) | (2,556) | (258) | — |
| Put swaptions | | | | | | |
| Purchased | 70,375 | 638 | 24 | 49 | 166 | 399 |
| Written | 500 | (2) | (2) | — | — | — |
| Other option-based derivatives[6] | 38,549 | 2,254 | — | — | — | 2,254 |
| Total option-based | 213,224 | 12,933 | 5,252 | 1,388 | 724 | 5,569 |
| Futures | 41,281 | 5 | 5 | — | — | — |
| Foreign-currency swaps | 1,722 | 97 | 34 | 63 | — | — |
| Commitments[7] | 14,318 | (56) | (56) | — | — | — |
| Swap guarantee derivatives | 3,621 | (37) | — | (1) | (1) | (35) |
| Subtotal | 778,059 | (8,658) | $5,195 | $   515 | $(3,327) | $(11,041) |
| Credit derivatives | 10,190 | (4) | | | | |
| Subtotal | 788,249 | (8,662) | | | | |
| Derivative interest receivable (payable), net | | (1,069) | | | | |
| Trade/settle receivable (payable), net | | 1 | | | | |
| Derivative cash collateral (held) posted, net | | 9,413 | | | | |
| Total | $788,249 | $   (317) | | | | |

(1) Fair value is categorized based on the period from December 31, 2011 until the contractual maturity of the derivative.
(2) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged. Notional or contractual amounts are not recorded as assets or liabilities on our consolidated balance sheets.
(3) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net, and includes derivative interest receivable or (payable), net, trade/settle receivable or (payable), net and derivative cash collateral (held) or posted, net.
(4) Represents the notional weighted average rate for the fixed leg of the swaps.
(5) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to thirteen years as of December 31, 2011.
(6) Primarily includes purchased interest-rate caps and floors.
(7) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

At December 31, 2011, the net fair value of our total derivative portfolio was $(317) million, as compared to $(1.1) billion at December 31, 2010. During the year ended December 31, 2011, the fair value of our total derivative portfolio increased primarily due to additional cash collateral we posted to our counterparties during this period, partially offset by the impact of declines in interest rates. See "NOTE 11: DERIVATIVES" for the notional or contractual amounts and related fair values of our total derivative portfolio by product type at December 31, 2011 and 2010, as well as derivative collateral posted and held.

The table below summarizes the changes in derivative fair values.

**Table 32 — Changes in Derivative Fair Values**

| | 2011[1] | 2010[2] |
|---|---|---|
| | (in millions) | |
| Beginning balance, at January 1 — Net asset (liability) | $(6,560) | $(2,267) |
| Net change in: | | |
| Commitments[3] | (36) | (31) |
| Credit derivatives | (11) | (8) |
| Swap guarantee derivatives | (1) | (2) |
| Other derivatives:[4] | | |
| Changes in fair value | (3,383) | (3,508) |
| Fair value of new contracts entered into during the period[5] | 594 | 444 |
| Contracts realized or otherwise settled during the period | 735 | (1,188) |
| Ending balance, at December 31 — Net asset (liability) | $(8,662) | $(6,560) |

(1) Refer to "Table 31 — Derivative Fair Values and Maturities" for a reconciliation of net fair value to the amounts presented on our consolidated balance sheets as of December 31, 2011.
(2) At December 31, 2010, fair value in this table excludes derivative interest receivable or (payable), net of $(820) million, trade/settle receivable or (payable), net of $1 million, and derivative cash collateral posted, net of $6.3 billion.
(3) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.
(4) Includes fair value changes for interest-rate swaps, option-based derivatives, futures, and foreign-currency swaps.
(5) Consists primarily of cash premiums paid or received on options.

See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for a description of gains (losses) on our derivative positions.

## REO, Net

We acquire properties, which are recorded as REO assets on our consolidated balance sheets, typically as a result of borrower default on mortgage loans that we own, or for which we have issued our financial guarantee. The balance of our REO, net, declined to $5.7 billion at December 31, 2011 from $7.1 billion at December 31, 2010. We believe the volume of our single-family REO acquisitions in 2011 was less than it otherwise would have been due to delays in the foreclosure process, particularly in states that require a judicial foreclosure process. While we expect the delays to ease in 2012, we also expect these delays will remain above historical levels. We also expect our REO inventory to remain at elevated levels, as we have a large inventory of seriously delinquent loans in our single-family credit guarantee portfolio, many of which will likely complete the foreclosure process and transition to REO during 2012 as our servicers work through their foreclosure-related issues. To the extent a large volume of loans completes the foreclosure process in a short period of time, the resulting REO inventory could have a negative impact on the housing market. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

## Deferred Tax Assets, Net

We recognize deferred tax assets and liabilities based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates. We record valuation allowances to reduce our net deferred tax assets when it is more likely than not that a tax benefit will not be realized. The realization of our net deferred tax assets is dependent upon the generation of sufficient taxable income or, with respect to the portion of our deferred tax assets related to our available-for-sale securities, our intent and ability to hold such securities to the recovery of any temporary unrealized losses. On a quarterly basis, we consider all evidence currently available, both positive and negative, in determining whether, based on the weight of that evidence, the net deferred tax assets will be realized or whether a valuation allowance is necessary.

After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, and related difficulty in forecasting future profit levels, we continue to record a valuation allowance on a portion of our net deferred tax assets as of December 31, 2011 and 2010. Our valuation allowance increased by $2.3 billion during 2011 to $35.7 billion, primarily attributable to an increase in temporary differences during the period. As of December 31, 2011, after consideration of the valuation allowance, we had a net deferred tax asset of $3.5 billion, primarily representing the tax effect of unrealized losses on our available-for-sale securities. We believe the deferred tax asset related to these unrealized losses is more likely than not to be realized because of our assertion that we have the intent and ability to hold our available-for-sale securities until any temporary unrealized losses are recovered.

*IRS Examinations*

Prior to 2011, the IRS completed its examinations of tax years 1998 to 2007. We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2007 tax years, principally related to questions of timing and potential penalties regarding our tax accounting method for certain hedging transactions. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the 1998 to 2005 Statutory Notices. We paid the tax assessed in the Statutory Notice received for the years 2006 to 2007 of $36 million and will seek a refund through the administrative process, which could include filing suit in Federal District Court. We believe appropriate reserves have been provided for settlement on reasonable terms. For additional information, see "NOTE 13: INCOME TAXES."

## Other Assets

Other assets consist of the guarantee asset related to non-consolidated trusts and other guarantee commitments, accounts and other receivables, and other miscellaneous assets. Other assets decreased to $10.5 billion as of December 31, 2011 from $10.9 billion as of December 31, 2010 primarily because of a decrease in other receivables related to mortgage insurers and credit enhancements due to a decline in default volume. See "NOTE 19: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information.

## Total Debt, Net

PCs and Other Guarantee Transactions issued by our consolidated trusts and held by third parties are recognized as debt securities of consolidated trusts held by third parties on our consolidated balance sheets. Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated trusts. The debt securities of our consolidated trusts may be prepaid without penalty at any time.

Other debt consists of unsecured short-term and long-term debt securities we issue to third parties to fund our business activities. It is classified as either short-term or long-term based on the contractual maturity of the debt instrument. See "LIQUIDITY AND CAPITAL RESOURCES" for a discussion of our management activities related to other debt.

The table below reconciles the par value of other debt and the UPB of debt securities of consolidated trusts held by third parties to the amounts shown on our consolidated balance sheets.

### Table 33 — Reconciliation of the Par Value and UPB to Total Debt, Net

| | December 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| | (in millions) | |
| Total debt: | | |
| Other debt: | | |
| Par value | $ 674,314 | $ 728,217 |
| Unamortized balance of discounts and premiums[1] | (13,891) | (14,529) |
| Hedging-related and other basis adjustments[2] | 123 | 252 |
| Subtotal | 660,546 | 713,940 |
| Debt securities of consolidated trusts held by third parties: | | |
| UPB | 1,452,476 | 1,517,001 |
| Unamortized balance of discounts and premiums | 18,961 | 11,647 |
| Subtotal | 1,471,437 | 1,528,648 |
| Total debt, net | $2,131,983 | $2,242,588 |

(1) Primarily represents unamortized discounts on zero-coupon debt.
(2) Primarily represents deferrals related to debt instruments that were in hedge accounting relationships, and changes in the fair value attributable to instrument-specific interest-rate and credit risk related to foreign-currency denominated debt.

The table below summarizes our other short-term debt.

**Table 34 — Other Short-Term Debt**

| | 2011 | | | | |
|---|---|---|---|---|---|
| | December 31, | | Average Outstanding During the Year | | Maximum Balance, Net Outstanding at Any Month End |
| | Balance, Net[1] | Weighted Average Effective Rate[2] | Balance, Net[3] | Weighted Average Effective Rate[4] | |
| | (dollars in millions) | | | | |
| Reference Bills® securities and discount notes . . . . . . . . . | $161,149 | 0.11% | $181,209 | 0.17% | $196,126 |
| Medium-term notes . . . . . . . . . . . . . . . . . . . . . . . . . . . | 250 | 0.24 | 826 | 0.23 | 2,564 |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . . . . . . . . . . . . . . . . | — | — | 13 | 0.16 | — |
| Other short-term debt . . . . . . . . . . . . . . . . . . . . . . . . . | $161,399 | 0.11 | | | |

| | 2010 | | | | |
|---|---|---|---|---|---|
| | December 31, | | Average Outstanding During the Year | | Maximum Balance, Net Outstanding at Any Month End |
| | Balance, Net[1] | Weighted Average Effective Rate[2] | Balance, Net[3] | Weighted Average Effective Rate[4] | |
| | (dollars in millions) | | | | |
| Reference Bills® securities and discount notes . . . . . . . . . | $194,742 | 0.24% | $213,465 | 0.25% | $240,037 |
| Medium-term notes . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,364 | 0.31 | 1,955 | 0.34 | 3,661 |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . . . . . . . . . . . . . . . . | — | — | 72 | 0.30 | — |
| Other short-term debt . . . . . . . . . . . . . . . . . . . . . . . . . | $197,106 | 0.25 | | | |

| | 2009 | | | | |
|---|---|---|---|---|---|
| | December 31, | | Average Outstanding During the Year | | Maximum Balance, Net Outstanding at Any Month End |
| | Balance, Net[1] | Weighted Average Effective Rate[2] | Balance, Net[3] | Weighted Average Effective Rate[4] | |
| | (dollars in millions) | | | | |
| Reference Bills® securities and discount notes . . . . . . . . . | $227,611 | 0.26% | $261,020 | 0.70% | $340,307 |
| Medium-term notes . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,560 | 0.69 | 19,372 | 1.10 | 34,737 |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . . . . . . . . . . . . . . . . | — | — | 33 | 0.29 | — |
| Other short-term debt . . . . . . . . . . . . . . . . . . . . . . . . . | $238,171 | 0.28 | | | |

(1) Represents par value, net of associated discounts and premiums, of which $0.2 billion, $0.9 billion, and $0.5 billion of short-term debt represents the fair value of debt securities with the fair value option elected at December 31, 2011, 2010, and 2009, respectively.
(2) Represents the approximate weighted average effective rate for each instrument outstanding at the end of the period, which includes the amortization of discounts or premiums and issuance costs.
(3) Represents par value, net of associated discounts, premiums, and issuance costs. Issuance costs are reported in the other assets caption on our consolidated balance sheets.
(4) Represents the approximate weighted average effective rate during the period, which includes the amortization of discounts or premiums and issuance costs.

The table below presents the UPB for Freddie Mac issued mortgage-related securities by the underlying mortgage product type.

## Table 35 — Freddie Mac Mortgage-Related Securities[1]

| | December 31, 2011 | | | December 31, 2010 | | | December 31, 2009 |
|---|---|---|---|---|---|---|---|
| | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total | Total |
| | (in millions) | | | | | | |
| Single-family: | | | | | | | |
| 30-year or more amortizing fixed-rate . . . | $1,123,105 | $ — | $1,123,105 | $1,213,448 | $ — | $1,213,448 | $1,318,053 |
| 20-year amortizing fixed-rate . . . . . . . . | 68,584 | — | 68,584 | 65,210 | — | 65,210 | 57,705 |
| 15-year amortizing fixed-rate . . . . . . . . | 252,563 | — | 252,563 | 248,702 | — | 248,702 | 241,721 |
| Adjustable-rate[2] . . . . . . . . . . . . . . . . | 69,402 | — | 69,402 | 61,269 | — | 61,269 | 68,428 |
| Interest-only[3] . . . . . . . . . . . . . . . . . | 59,007 | — | 59,007 | 79,835 | — | 79,835 | 131,529 |
| FHA/VA and other governmental . . . . . | 3,267 | — | 3,267 | 3,369 | — | 3,369 | 1,343 |
| *Total single-family* . . . . . . . . . . . . . . | 1,575,928 | — | 1,575,928 | 1,671,833 | — | 1,671,833 | 1,818,779 |
| Multifamily . . . . . . . . . . . . . . . . . . . . | — | 4,496 | 4,496 | — | 4,603 | 4,603 | 5,085 |
| *Total single-family and multifamily* . . . | 1,575,928 | 4,496 | 1,580,424 | 1,671,833 | 4,603 | 1,676,436 | 1,823,864 |
| Other Guarantee Transactions: | | | | | | | |
| HFA bonds:[4] | | | | | | | |
| Single-family . . . . . . . . . . . . . . . . | — | 6,118 | 6,118 | — | 6,168 | 6,168 | 3,113 |
| Multifamily . . . . . . . . . . . . . . . . . | — | 966 | 966 | — | 1,173 | 1,173 | 391 |
| Total HFA bonds . . . . . . . . . . . . . | — | 7,084 | 7,084 | — | 7,341 | 7,341 | 3,504 |
| Other: | | | | | | | |
| Single-family[5] . . . . . . . . . . . . . . | 12,877 | 3,838 | 16,715 | 15,806 | 4,243 | 20,049 | 23,841 |
| Multifamily . . . . . . . . . . . . . . . . . | — | 19,682 | 19,682 | — | 8,235 | 8,235 | 2,655 |
| Total Other Guarantee Transactions . . . | 12,877 | 23,520 | 36,397 | 15,806 | 12,478 | 28,284 | 26,496 |
| REMICs and Other Structured Securities backed by Ginnie Mae Certificates[6] . . . | — | 779 | 779 | — | 857 | 857 | 949 |
| Total Freddie Mac Mortgage-Related Securities . . . . . . . . . . . . . . . . . . . . | $1,588,805 | $35,879 | $1,624,684 | $1,687,639 | $25,279 | $1,712,918 | $1,854,813 |
| Less: Repurchased Freddie Mac Mortgage-Related Securities[7] . . . . . . . . . . . . . . | (136,329) | | | (170,638) | | | |
| Total UPB of debt securities of consolidated trusts held by third parties . . . . . . . . . | $1,452,476 | | | $1,517,001 | | | |

(1) 2011 and 2010 amounts are based on UPB of the securities and excludes mortgage-related debt traded, but not yet settled. 2009 amounts are based on UPB of the mortgage loans underlying our mortgage-related financial guarantees.
(2) Includes $1.2 billion, $1.3 billion, and $1.4 billion in UPB of option ARM mortgage loans as of December 31, 2011, 2010, and 2009, respectively. See endnote (5) for additional information on option ARM loans that back our Other Guarantee Transactions.
(3) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed- and variable-rate interest-only loans.
(4) Consists of bonds we acquired and resecuritized under the NIBP.
(5) Backed by non-agency mortgage-related securities that include prime, FHA/VA, and subprime mortgage loans and also include $7.3 billion, $8.4 billion, and $9.6 billion in UPB of securities backed by option ARM mortgage loans at December 31, 2011, 2010, and 2009, respectively.
(6) Backed by FHA/VA loans.
(7) Represents the UPB of repurchased Freddie Mac mortgage-related securities that are consolidated on our balance sheets and includes certain remittance amounts associated with our security trust administration that are payable to third-party mortgage-related security holders. Our holdings of non-consolidated Freddie Mac mortgage-related securities are presented in "Table 23 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets."

Excluding Other Guarantee Transactions, the percentage of amortizing fixed-rate single-family loans underlying our consolidated trust debt securities, based on UPB, was approximately 92% at both December 31, 2011 and 2010. The majority of newly issued Freddie Mac single-family mortgage-related securities during 2011 were backed by refinance mortgages. During 2011, the UPB of Freddie Mac mortgage-related securities issued by consolidated trusts declined approximately 5.9%, as the volume of our new issuances has been less than the volume of liquidations of these securities. The UPB of multifamily Other Guarantee Transactions, excluding HFA-related securities, increased to $19.7 billion as of December 31, 2011 from $8.2 billion as of December 31, 2010, due to increased multifamily loan securitization activity.

The table below presents additional details regarding our issued and guaranteed mortgage-related securities.

**Table 36 — Freddie Mac Mortgage-Related Securities by Class Type**[1]

| | December 31, | | |
| --- | --- | --- | --- |
| | 2011 | 2010 | 2009 |
| | (in millions) | | |
| *Held by Freddie Mac:* | | | |
| Single-class | $ 125,271 | $ 157,752 | $ 255,171 |
| Multiclass | 98,396 | 105,851 | 119,444 |
| *Total held by Freddie Mac*[2] | 223,667 | 263,603 | 374,615 |
| *Held by third parties:* | | | |
| Single-class | 949,301 | 1,020,200 | 1,031,869 |
| Multiclass | 451,716 | 429,115 | 448,329 |
| *Total held by third parties* | 1,401,017 | 1,449,315 | 1,480,198 |
| **Total Freddie Mac mortgage-related securities**[2] | $1,624,684 | $1,712,918 | $1,854,813 |

(1) Based on UPB of the securities and excludes mortgage-related securities traded, but not yet settled.
(2) Beginning January 1, 2010, includes single-family single-class and certain multiclass securities held by us, which are recorded as extinguishments of debt securities of consolidated trusts on our consolidated balance sheets. Prior to 2010, all Freddie Mac mortgage-related securities held by us were accounted for as investments in securities on our consolidated balance sheets. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for a discussion of our significant accounting policies related to our investments in securities and debt securities of consolidated trusts.

The table below presents issuances and extinguishments of the debt securities of our consolidated trusts during 2011 and 2010, as well as the UPB of consolidated trusts held by third parties.

**Table 37 — Issuances and Extinguishments of Debt Securities of Consolidated Trusts**[1]

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| | (in millions) | |
| Beginning balance of debt securities of consolidated trusts held by third parties | $1,517,001 | $1,564,093 |
| Issuances to third parties of debt securities of consolidated trusts: | | |
| Issuances based on underlying mortgage product type: | | |
| 30-year or more amortizing fixed-rate | 177,951 | 255,101 |
| 20-year amortizing fixed-rate | 19,250 | 24,293 |
| 15-year amortizing fixed-rate | 76,917 | 78,316 |
| Adjustable-rate | 25,675 | 15,869 |
| Interest-only | 152 | 845 |
| FHA/VA | 160 | 1,429 |
| Debt securities of consolidated trusts retained by us at issuance | (10,910) | (15,725) |
| Net issuances of debt securities of consolidated trusts | 289,195 | 360,128 |
| Reissuances of debt securities of consolidated trusts previously held by us[2] | 80,485 | 51,209 |
| Total issuances to third parties of debt securities of consolidated trusts | 369,680 | 411,337 |
| Extinguishments, net[3] | (434,205) | (458,429) |
| Ending balance of debt securities of consolidated trusts held by third parties | $1,452,476 | $1,517,001 |

(1) Based on UPB.
(2) Represents our sales of PCs and certain Other Guarantee Transactions previously held by us.
(3) Represents: (a) UPB of our purchases from third parties of PCs and Other Guarantee Transactions issued by our consolidated trusts; (b) principal repayments related to PCs and Other Guarantee Transactions issued by our consolidated trusts; and (c) certain remittance amounts associated with our trust security administration that are payable to third-party mortgage-related security holders as of December 31, 2011 and 2010.

## Other Liabilities

Other liabilities consist of the guarantee obligation, the reserve for guarantee losses on non-consolidated trusts and other mortgage-related financial guarantees, servicer liabilities, accounts payable and accrued expenses, and other miscellaneous liabilities. Other liabilities decreased to $6.0 billion as of December 31, 2011 from $8.1 billion as of December 31, 2010 primarily because of a decrease in: (a) credit loss-related liabilities, largely due to short sale adjustments related to accrued estimated losses on unsettled transactions; and (b) servicer advanced interest liabilities, due to a decrease in seriously delinquent loans during the year ended December 31, 2011. See "NOTE 19: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information.

**Total Equity (Deficit)**

The table below presents the changes in total equity (deficit) and certain capital-related disclosures.

**Table 38 — Changes in Total Equity (Deficit)**

| | Three Months Ended | | | | | Twelve Months Ended |
|---|---|---|---|---|---|---|
| | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 | 12/31/2011 |
| | (in millions) | | | | | |
| Beginning balance | $(5,991) | $(1,478) | $ 1,237 | $ (401) | $ (58) | $ (401) |
| Net income (loss) | 619 | (4,422) | (2,139) | 676 | (113) | (5,266) |
| Other comprehensive income (loss), net of taxes: | | | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | 701 | (80) | 903 | 1,941 | 1,097 | 3,465 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 118 | 124 | 135 | 132 | 153 | 509 |
| Changes in defined benefit plans | 68 | 2 | 1 | (9) | 19 | 62 |
| Total comprehensive income (loss) | 1,506 | (4,376) | (1,100) | 2,740 | 1,156 | (1,230) |
| Capital draw funded by Treasury | 5,992 | 1,479 | — | 500 | 100 | 7,971 |
| Senior preferred stock dividends declared | (1,655) | (1,618) | (1,617) | (1,605) | (1,603) | (6,495) |
| Other | 2 | 2 | 2 | 3 | 4 | 9 |
| Total equity (deficit)/Net worth | $ (146) | $(5,991) | $(1,478) | $ 1,237 | $ (401) | $ (146) |
| Aggregate draws under the Purchase Agreement (as of period end)[1] | $71,171 | $65,179 | $63,700 | $63,700 | $63,200 | $71,171 |
| Aggregate senior preferred stock dividends paid to Treasury in cash (as of period end) | $16,521 | $14,866 | $13,248 | $11,631 | $10,026 | $16,521 |
| Percentage of dividends paid to Treasury in cash to aggregate draws (as of period end) | 23% | 23% | 21% | 18% | 16% | 23% |

(1) Does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received.

We requested a total of $7.6 billion and $13.0 billion in draws from Treasury under the Purchase Agreement to eliminate quarterly equity deficits for 2011 and 2010, respectively. In addition, we paid cash dividends to Treasury of $6.5 billion and $5.7 billion during 2011 and 2010, respectively.

Net unrealized losses on our available-for-sale securities in AOCI decreased by $701 million and $3.5 billion during the three months and year ended December 31, 2011, respectively. The decrease for the three months ended December 31, 2011 was primarily due to the impact of tightening OAS levels on our CMBS. The decrease for the year ended December 31, 2011 was primarily due to gains on our agency securities and CMBS as a result of the impact of declining rates and the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities, partially offset by losses on our single-family non-agency mortgage-related securities due to widening OAS levels. Net unrealized losses on our closed cash flow hedge relationships in AOCI decreased by $118 million and $509 million during the three months and year ended December 31, 2011, respectively, primarily attributable to the reclassification of losses into earnings related to our closed cash flow hedges as the originally forecasted transactions affected earnings.

## RISK MANAGEMENT

Our investment and credit guarantee activities expose us to three broad categories of risk: (a) credit risk; (b) interest-rate risk and other market risk; and (c) operational risk. See "RISK FACTORS" for additional information regarding these and other risks.

Risk management is a critical aspect of our business. We manage risk through a framework whereby our executive management is responsible for independent risk evaluation. Within this framework, executive management monitors performance against our risk management strategies and established risk limits and reporting thresholds, identifies and assesses potential issues and provides oversight regarding changes in business processes and activities.

Overall, the legal, political and regulatory influences on the financial services industry and the capital markets have increased and created significant challenges and, as a result, we believe that our risk profile increased in 2011. Drivers of this increase are: (a) mandated participation in government-sponsored assistance programs; (b) continued deterioration of the mortgage insurer sector, resulting in further concentration issues; and (c) weakened global macro-economic conditions and increased market volatility.

Internally, our environment has also contributed to a higher risk profile. We have observed: (a) a significant increase in people risk due to the uncertainty of the future of our company; (b) an increase in operational risk due to employee turnover, key person dependencies, and the level and pace of organizational change within our company; and (c) an

inadequacy of our business continuity and disaster recovery plans that may inhibit our ability to return to normal business operations in the event of a disaster event.

We expect legal, political and regulatory influences to continue to increase in 2012, which could increase uncertainty in the mortgage industry, increase our operational and people risks, and increase the uncertainty associated with the use of our models.

## Credit Risk

We are subject primarily to two types of credit risk: institutional credit risk and mortgage credit risk. Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will fail to meet its obligations. Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage we own or guarantee. We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment.

### Institutional Credit Risk

Since 2008, challenging market conditions have adversely affected the liquidity and financial condition of our counterparties. The concentration of our exposure to our counterparties increased beginning in 2008 due to industry consolidation and counterparty failures.

Our exposure to single-family mortgage seller/servicers remained high during 2011 with respect to their repurchase obligations arising from breaches of representations and warranties made to us for loans they underwrote and sold to us. We rely on our single-family seller/servicers to perform loan workout activities as well as foreclosures on loans that they service for us. Our credit losses could increase to the extent that our seller/servicers do not fully perform these obligations in a timely manner. The financial condition of the mortgage insurance industry continued to deteriorate during 2011, and the substantial majority of our mortgage insurance exposure is concentrated with four counterparties all of which are under significant financial stress. In addition, our exposure to derivatives counterparties remains highly concentrated as compared to historical levels.

We continue to face challenges in reducing our risk concentrations with counterparties. Efforts we make to reduce exposure to financially weakened counterparties could further increase our exposure to other individual counterparties or increase concentration risk overall. The failure of any of our significant counterparties to meet their obligations to us could have a material adverse effect on our results of operations, financial condition, and our ability to conduct future business. For more information, see "RISK FACTORS — Competitive and Market Risks — *We depend on our institutional counterparties to provide services that are critical to our business, and our results of operations or financial condition may be adversely affected if one or more of our institutional counterparties do not meet their obligations to us.*"

### Non-Agency Mortgage-Related Security Issuers

Our investments in securities expose us to institutional credit risk to the extent that servicers, issuers, guarantors, or third parties providing credit enhancements become insolvent or do not perform their obligations. Our investments in non-Freddie Mac mortgage-related securities include both agency and non-agency securities. However, agency securities have historically presented minimal institutional credit risk due to the guarantee provided by those institutions, and the U.S. government's support of those institutions.

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non-agency mortgage-related securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. The effectiveness of our efforts is highly uncertain and any potential recoveries may take significant time to realize.

In June 2011, Bank of America Corporation announced that it, BAC Home Loans Servicing, LP, Countrywide Financial Corporation and Countrywide Home Loans, Inc. entered into a settlement agreement with The Bank of New York Mellon, as trustee, to resolve certain claims with respect to a number of Countrywide first-lien and second-lien residential mortgage-related securitization trusts. Bank of America indicated that the settlement is subject to final court approval and certain other conditions. There can be no assurance that final court approval of the settlement will be obtained or that all conditions will be satisfied. Bank of America noted that, given the number of investors and the complexity of the settlement, it is not possible to predict the timing or ultimate outcome of the court approval process, which could take a substantial period of time. We have investments in certain of these Countrywide securitization trusts and would expect to benefit from this settlement, if final court approval is obtained. For more information, see "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS."

On September 2, 2011, FHFA announced that, as Conservator for Freddie Mac and Fannie Mae, it had filed lawsuits against 17 financial institutions and related defendants alleging: (a) violations of federal securities laws; and (b) in certain lawsuits, common law fraud in the sale of residential non-agency mortgage-related securities to Freddie Mac and Fannie Mae. FHFA, as Conservator, filed a similar lawsuit against UBS Americas, Inc. and related defendants on July 27, 2011. FHFA seeks to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in certain residential non-agency mortgage-related securities issued by these financial institutions.

See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for additional information on credit risk associated with our investments in mortgage-related securities, including higher-risk components and impairment charges we recognized in the years ended December 31, 2011, 2010, and 2009 related to these investments. For information about institutional credit risk associated with our investments in non-mortgage-related securities, see "NOTE 7: INVESTMENTS IN SECURITIES — Table 7.9 — Trading Securities" as well as "Cash and Other Investments Counterparties" below.

### Single-family Mortgage Seller/Servicers

We acquire a significant portion of our single-family mortgage purchase volume from several large lenders, or seller/servicers. Our top 10 single-family seller/servicers provided approximately 82% of our single-family purchase volume during 2011. Wells Fargo Bank, N.A. and JPMorgan Chase Bank, N.A. accounted for 28% and 13%, respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume in 2011.

We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans, and represent and warrant that those loans have been originated under specified underwriting standards. If we subsequently discover that the representations and warranties were breached (*i.e.*, that contractual standards were not followed), we can exercise certain contractual remedies to mitigate our actual or potential credit losses. These contractual remedies include the ability to require the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan. As part of our expansion of HARP, we have agreed not to require lenders to provide us with certain representations and warranties that they would ordinarily be required to commit to in selling loans to us. As a result, we may face greater exposure to credit and other losses on these HARP loans. For more information, see "*Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program — Home Affordable Refinance Program.*"

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our mortgage seller/servicers, including non-performance of their repurchase obligations arising from breaches of the representations and warranties made to us for loans they underwrote and sold to us or failure to honor their recourse and indemnification obligations to us. Pursuant to their repurchase obligations, our seller/servicers are obligated to repurchase mortgages sold to us when there has been a breach of the representations and warranties made to us with respect to the mortgages. In lieu of repurchase, we may choose to allow a seller/servicer to indemnify us against losses realized on such mortgages or otherwise compensate us for the risk of continuing to hold the mortgages. In some cases, the ultimate amounts of recovery payments we have received from seller/servicers may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations. If a seller/servicer does not satisfy its repurchase or indemnification obligations with respect to a loan, we will be subject to the full range of credit risks posed by the loan if the loan fails to perform, including the risk that a mortgage insurer may deny or rescind coverage on the loan (if the loan is insured) and the risk that we will incur credit losses on the loan through the workout or foreclosure process.

Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts, in which case the deadline for repurchase is extended until we decide the appeal. Some of our seller/servicers have failed to fully perform their repurchase obligations due to lack of financial capacity, while others, including many of our larger seller/servicers, have not fully performed their repurchase obligations in a timely manner. The table below provides a summary of our repurchase request activity for 2011, 2010, and 2009.

**Table 39 — Repurchase Request Activity**[1]

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| | | (in millions) | |
| Beginning balance | $ 3,807 | $ 4,201 | $ 3,608 |
| New requests issued | 9,172 | 16,498 | 12,364 |
| Requests collected[2] | (4,490) | (7,467) | (5,326) |
| Requests cancelled[3] | (5,707) | (9,298) | (4,776) |
| Other[4] | (66) | (127) | (1,669) |
| Ending Balance | $ 2,716 | $ 3,807 | $ 4,201 |

(1) Beginning and ending balances represent the UPB of the loans associated with the repurchase requests. New requests issued and requests cancelled represent the amount of the request, while requests collected represent cash payment received.

(2) Requests collected include payments received upon fulfillment of the repurchase request, reimbursement of losses for requests associated with foreclosed mortgage loans, negotiated settlements, and other alternative remedies.

(3) Consists primarily of those requests that were resolved by the servicer providing missing documentation or a successful appeal of the request.

(4) Other includes items that affect the UPB of the loan while the repurchase request is outstanding, such as changes in UPB due to payments made on the loan. Also includes requests deemed uncollectible due to counterparty failures.

As shown in the table above, the amount of new repurchase requests declined from $16.5 billion in 2010 to $9.2 billion in 2011. This decline reflects: (a) a lower volume of loan reviews performed in 2011 relating to loans originated in 2008 and prior years; (b) the reduction in the number of loans originated in 2005 to 2008, including those with higher risk characteristics, within our single-family credit guarantee portfolio; and (c) the increase in the number of loans covered by negotiated agreements (as discussed below) or originated by counterparties that defaulted in recent years.

The UPB of loans subject to open repurchase requests declined to approximately $2.7 billion as of December 31, 2011 from $3.8 billion as of December 31, 2010 because the combined volume of requests collected and cancelled exceeded the volume of new request issuances. As measured by UPB, approximately 39% and 34% of the repurchase requests outstanding at December 31, 2011 and December 31, 2010, respectively, were outstanding for four months or more since issuance of the initial request (these figures include repurchase requests for which appeals were pending). As of December 31, 2011, two of our largest seller/servicers had aggregate repurchase requests outstanding, based on UPB, of $1.4 billion, and approximately 48% of these requests were outstanding for four months or more since issuance of the initial request. The amount we expect to collect on the outstanding requests is significantly less than the UPB of the loans subject to repurchase requests primarily because many of these requests will likely be satisfied by reimbursement of our realized credit losses by seller/servicers, instead of repurchase of loans at their UPB. Some of these requests also may be rescinded in the course of the contractual appeal process. Based on our historical loss experience and the fact that many of these loans are covered by credit enhancements, we expect the actual credit losses experienced by us should we fail to collect on these repurchase requests will also be less than the UPB of the loans.

Mortgage insurance rescission repurchase requests tend to be outstanding longer than other repurchase requests for a number of reasons, including: (a) lenders do not agree with the basis used by the mortgage insurers to rescind coverage; (b) the mortgage insurers' appeals process for rescissions can be lengthy (as long as one year or more); (c) lenders expect us to suspend repurchase enforcement until after the appeal decision by the mortgage insurer is made (although this is not our practice); and (d) in certain cases, we have agreed to consider a repurchase alternative that would allow certain of our seller/servicers to provide us a commitment for the amount of lost mortgage insurance coverage in lieu of a full repurchase. Until a decision on such a repurchase alternative is made, we temporarily suspend the collection efforts for outstanding repurchases associated with mortgage insurance rescission for these seller/servicers. Of the total amount of repurchase requests outstanding at December 31, 2011, approximately $1.2 billion were issued due to mortgage insurance rescission or mortgage insurance claim denial. Our actual credit losses could increase should the mortgage insurance coverage not be reinstated and we fail to collect on these repurchase requests.

During 2010 and 2009, we entered into agreements with certain of our seller/servicers to release specified loans from certain repurchase obligations in exchange for one-time cash payments. In a memorandum to the FHFA Office of Inspector General dated September 19, 2011, FHFA stated that in 2011 it had "suspended certain future repurchase agreements with seller/servicers concerning their repurchase obligations pending the outcome" of a review by Freddie Mac of its loan sampling methodology. We are in discussions with FHFA concerning our review of our sampling methodology. We cannot predict when this process will be completed or whether or when FHFA will terminate or revise its suspension. It is possible that our loan sampling methodology could change in ways that increase our repurchase request volumes with our seller/servicers. During 2011, we expanded our reviews of defaulted loans to include certain loans that were previously excluded from our review process.

In order to resolve outstanding repurchase requests on a more timely basis with our single-family seller/servicers in the future, we have begun to require certain of our larger seller/servicers to commit to plans for completing repurchases,

with financial consequences or with stated remedies for non-compliance, as part of the annual renewals of our contracts with them. As of December 31, 2011, our 13 largest seller/servicers, which hold more than 81% of all outstanding repurchase requests, are subject to the revised contract terms. We continue to review loans and pursue our rights to issue repurchase requests to our counterparties, as appropriate.

Our estimate of recoveries from seller/servicer repurchase obligations is considered in our allowance for loan losses as of December 31, 2011 and December 31, 2010; however, our actual recoveries may be different than our estimates. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" for further information. We believe we have appropriately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at December 31, 2011 and December 31, 2010; however, our actual losses may exceed our estimates.

The table below summarizes the percentage of our single-family credit guarantee portfolio by year of loan origination that is subject to agreements releasing loans from certain repurchase obligations, including TBW and other defaulted counterparties. Since January 1, 2009, we have entered into three negotiated agreements (including the agreements with GMAC and Bank of America discussed below) and have released repurchase obligations with 27 other seller/servicers who were either no longer in operation or no longer approved as our seller/servicers, at December 31, 2011.

**Table 40 — Loans Released from Repurchase Obligations**[1]

| | As of December 31, 2011 | |
|---|---|---|
| Year of origination: | UPB | Percentage of Single-family Credit Guarantee Portfolio |
| | (in billions) | |
| Negotiated agreements: | | |
| 2008 | $ 21.8 | 1.2% |
| 2007 | 48.2 | 2.8 |
| 2006 | 38.0 | 2.2 |
| 2005 | 34.5 | 2.0 |
| 2004 and prior | 23.4 | 1.3 |
| Subtotal | 165.9 | 9.5 |
| Other released loans:[2] | | |
| 2011 and 2010 | 0.3 | <0.1 |
| 2009 | 11.5 | 0.7 |
| 2008 | 10.4 | 0.6 |
| 2007 | 16.3 | 0.9 |
| 2006 | 8.8 | 0.5 |
| 2005 | 6.3 | 0.4 |
| 2004 and prior | 3.3 | 0.2 |
| Total | $222.8 | 12.8% |

(1) Consists of all loans released from certain repurchase obligations since January 1, 2009.
(2) Consists of loans associated with seller/servicers who were either no longer in business or no longer approved as our seller/servicers at, December 31, 2011. We received or, in some cases, expect to receive cash totaling approximately $0.1 billion from the FDIC or other third parties for the release of related loans from servicing obligations for defaulted seller/servicers.

GMAC Mortgage, LLC and Residential Funding Company, LLC (collectively GMAC), indirect subsidiaries of Ally Financial Inc. (formerly, GMAC Inc.), are seller/servicers that together serviced and subserviced for an affiliated entity approximately 4% of the single-family loans in our single-family credit guarantee portfolio as of December 31, 2011. In March 2010, we entered into an agreement with GMAC, under which they made a one-time payment to us for the partial release of repurchase obligations relating to loans sold to us prior to January 1, 2009. The partial release does not affect any of GMAC's potential repurchase obligations for loans sold to us by GMAC after January 1, 2009, nor does it affect the ability to recover amounts associated with failure to comply with our servicing requirements. This agreement did not have a material impact on our 2011 or 2010 consolidated statements of income and comprehensive income. Ally Financial Inc. recently stated that the protracted period of adverse developments in the mortgage finance and credit markets has adversely affected Residential Capital LLC's business, liquidity, and its capital position and has raised substantial doubt about Residential Capital LLC's ability to continue as a going concern. Residential Capital LLC is the parent company of Residential Funding Company, LLC, one of our mortgage servicers. For information on our exposure to institutional counterparties, see "RISK FACTORS — Competitive and Market Risks — *We depend on our institutional counterparties to provide services that are critical to our business, and our results of operations or financial condition may be adversely affected if one or more of our institutional counterparties do not meet their obligations to us.*"

On December 31, 2010, we entered into an agreement with Bank of America, N.A., and two of its affiliates, BAC Home Loans Servicing, LP and Countrywide Home Loans, Inc., to resolve our currently outstanding and future claims for repurchases arising from the breach of representations and warranties on certain loans purchased by us from Countrywide

Home Loans, Inc. and Countrywide Bank FSB. Under the terms of the agreement, we received a $1.28 billion cash payment in consideration for releasing Bank of America and its two affiliates from current and future repurchase requests arising from loans sold to us by the Countrywide entities for which the first regularly scheduled monthly payments were due on or before December 31, 2008. The UPB of the loans in this portfolio as of December 31, 2010, was approximately $114 billion. The agreement applies only to certain claims for repurchase based on breaches of representations and warranties and the agreement contains specified limitations and does not cover loans sold to us or serviced for us by other Bank of America entities. This agreement did not have a material impact on our 2011 or 2010 consolidated statements of income and comprehensive income.

On August 24, 2009, TBW filed for bankruptcy. Prior to that date, we had terminated TBW's status as a seller/servicer of our loans. We had exposure to TBW with respect to its loan repurchase obligations. We also had exposure with respect to certain borrower funds that TBW held for the benefit of Freddie Mac. TBW received and processed such funds in its capacity as a servicer of loans owned or guaranteed by Freddie Mac. TBW maintained certain bank accounts, primarily at Colonial Bank, to deposit such borrower funds and to provide remittance to Freddie Mac. Colonial Bank was placed into receivership by the FDIC in August 2009.

On or about June 14, 2010, we filed a proof of claim in the TBW bankruptcy aggregating $1.78 billion. Of this amount, approximately $1.15 billion related to current and projected repurchase obligations and approximately $440 million related to funds deposited with Colonial Bank, or with the FDIC as its receiver, which were attributable to mortgage loans owned or guaranteed by us and previously serviced by TBW. The remaining $190 million represented miscellaneous costs and expenses incurred in connection with the termination of TBW's status as a seller/servicer of our loans.

In June 2011, with the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. At the time of settlement, we estimated our uncompensated loss exposure to TBW to be approximately $0.7 billion. This estimated exposure largely relates to outstanding repurchase claims that have already been substantially provided for in our financial statements through our provision for loan losses. Our ultimate losses could exceed our recorded estimate. Potential changes in our estimate of uncompensated loss exposure or the potential for additional claims as discussed below could cause us to record additional losses in the future.

We understand that Ocala Funding, LLC, which is a wholly owned subsidiary of TBW, or its creditors, may file an action to recover certain funds paid to us prior to the TBW bankruptcy. However, no actions against Freddie Mac related to Ocala have been initiated in bankruptcy court or elsewhere to recover assets. We are also involved in an adversary proceeding in bankruptcy court brought by certain underwriters at Lloyds, London and London Market Insurance Companies against TBW, Freddie Mac, and other parties. For more information on these matters, including terms of the TBW settlement, see "NOTE 18: LEGAL CONTINGENCIES — Taylor, Bean & Whitaker Bankruptcy."

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top three single-family loan servicers, Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A., together serviced approximately 49% of our single-family mortgage loans as of December 31, 2011. Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A. serviced approximately 26%, 12%, and 11%, respectively, of our single-family mortgage loans, as of December 31, 2011. Because we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, our business and financial results could be adversely affected.

During the second half of 2010, a number of our single-family servicers, including several of our largest, announced that they were evaluating the potential extent of issues relating to the possible improper execution of documents associated with foreclosures of loans they service, including those they service for us. Some of these companies temporarily suspended foreclosure proceedings in certain states in which they do business. While these servicers generally resumed foreclosure proceedings in the first quarter of 2011, the rate at which they are effecting foreclosures has been slower than prior to the suspensions. See "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" for further information.

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loan workout efforts, including under the MHA Program and the recent servicing alignment initiative, and therefore, we also have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans. In addition, during 2011, there have been several regulatory developments that have

affected and will continue to significantly impact our single-family mortgage servicers. For more information on regulatory and other developments in mortgage servicing, and how these developments may impact our business, see "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments — Developments Concerning Single-Family Servicing Practices*."

While we have legal remedies against seller/servicers who fail to comply with our contractual servicing requirements, we are exposed to institutional credit risk in the event of their insolvency or if, for other causes, seller/servicers fail to perform their obligations to repurchase affected mortgages, or (at our option) indemnify us for losses resulting from any breach, or pay damages for any breach. In the event a seller/servicer does not fulfill its repurchase or other responsibilities, we may seek partial recovery of amounts owed by the seller/servicer by transferring the applicable mortgage servicing rights of the seller/servicer to a different servicer. However, this option may be difficult to accomplish with respect to our largest seller/servicers due to the operational and capacity challenges of transferring a large servicing portfolio. In 2011, we changed most of our servicing standards to permit full or partial termination of loan servicing in order to transfer portions of the servicing portfolios to new servicers.

*Multifamily Mortgage Seller/Servicers*

As of December 31, 2011, our top three multifamily servicers, Berkadia Commercial Mortgage LLC, CBRE Capital Markets, Inc., and Wells Fargo Bank, N.A., each serviced more than 10% of our multifamily mortgage portfolio, and together serviced approximately 40% of our multifamily mortgage portfolio. For 2011, our top two multifamily sellers, CBRE Capital Markets, Inc. and NorthMarq Capital, LLC, accounted for 20% and 12%, respectively, of our multifamily purchase volume. Our top 10 multifamily lenders represented an aggregate of approximately 81% of our multifamily purchase volume for 2011.

In our multifamily business, we are exposed to the risk that multifamily seller/servicers could come under financial pressure, which could potentially cause degradation in the quality of the servicing they provide us, including their monitoring of each property's financial performance and physical condition. This could also, in certain cases, reduce the likelihood that we could recover losses through lender repurchases, recourse agreements or other credit enhancements, where applicable. This risk primarily relates to multifamily loans that we hold on our consolidated balance sheets where we retain all of the related credit risk. We monitor the status of all our multifamily seller/servicers in accordance with our counterparty credit risk management framework.

*Mortgage Insurers*

We have institutional credit risk relating to the potential insolvency of, or non-performance by, mortgage insurers that insure single-family mortgages we purchase or guarantee. As a guarantor, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligations to reimburse us for claims. If any of our mortgage insurers that provide credit enhancement fail to fulfill their obligation, we could experience increased credit losses.

We attempt to manage this risk by establishing eligibility standards for mortgage insurers and by monitoring our exposure to individual mortgage insurers. Our monitoring includes performing regular analysis of the estimated financial capacity of mortgage insurers under different adverse economic conditions. In addition, state insurance authorities regulate mortgage insurers and we periodically meet with certain state authorities to discuss their views. We also monitor the mortgage insurers' credit ratings, as provided by nationally recognized statistical rating organizations, and we periodically review the methods used by such organizations. None of our mortgage insurers had a rating higher than BBB as of February 27, 2012. In evaluating the likelihood that an insurer will have the ability to pay our expected claims, we consider our own analysis of the insurer's financial capacity, any downgrades in the insurer's credit rating, and various other factors.

As part of the estimate of our loan loss reserves, we evaluate the recovery and collectability related to mortgage insurance policies for mortgage loans that we hold on our consolidated balance sheets as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities or covered by other guarantee commitments. We believe that many of our mortgage insurers are not sufficiently capitalized to withstand the stress of the current weak economic environment. Additionally, a number of our mortgage insurers have exceeded risk to capital ratios required by their state insurance regulators. In many cases, such states have issued waivers to allow the companies to continue writing new business in their states. Most waivers are temporary in duration or contain other conditions that the companies may be unable to continue to meet due to their weakened condition or other factors. As a result of these and other factors, we reduced our expectations of recovery from several of these insurers in determining our allowance for loan losses associated with our single-family loans on our consolidated balance sheet as of December 31, 2011.

The table below summarizes our exposure to mortgage insurers as of December 31, 2011. In the event that a mortgage insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses resulting from such failure. As of December 31, 2011, most of the coverage outstanding from mortgage insurance shown in the table below is attributed to primary policies rather than pool insurance policies.

**Table 41 — Mortgage Insurance by Counterparty**

| | | | As of December 31, 2011 | | |
|---|---|---|---|---|---|
| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | Primary Insurance[2] | Pool Insurance[2] | Coverage Outstanding[3] |
| | | | (in billions) | | |
| Mortgage Guaranty Insurance Corporation (MGIC) | B | Negative | $ 48.0 | $28.3 | $12.2 |
| Radian Guaranty Inc. | B | Negative | 36.2 | 7.0 | 10.0 |
| Genworth Mortgage Insurance Corporation | B | Negative | 29.9 | 0.8 | 7.5 |
| United Guaranty Residential Insurance Co. | BBB | Stable | 28.4 | 0.2 | 7.0 |
| PMI Mortgage Insurance Co. (PMI)[4] | CCC– | Negative | 24.0 | 1.3 | 6.1 |
| Republic Mortgage Insurance Company (RMIC)[5] | Not Rated | N/A | 19.5 | 1.9 | 4.9 |
| Triad Guaranty Insurance Corp[6] | Not Rated | N/A | 8.2 | 0.7 | 2.1 |
| CMG Mortgage Insurance Co. | BBB | Negative | 3.0 | 0.1 | 0.7 |
| Essent Guaranty, Inc. | Not Rated | N/A | 0.8 | — | 0.1 |
| Total | | | $198.0 | $40.3 | $50.6 |

(1) Latest rating available as of February 27, 2012. Represents the lower of S&P and Moody's credit ratings and outlooks. In this table, the rating and outlook of the legal entity is stated in terms of the S&P equivalent.

(2) Represents the amount of UPB at the end of the period for our single-family credit guarantee portfolio covered by the respective insurance type. These amounts are based on our gross coverage without regard to netting of coverage that may exist to the extent an affected mortgage is covered under both types of insurance. See "Table 4.5 — Recourse and Other Forms of Credit Protection" in "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further information.

(3) Represents the remaining aggregate contractual limit for reimbursement of losses under policies of both primary and pool insurance. These amounts are based on our gross coverage without regard to netting of coverage that may exist to the extent an affected mortgage is covered under both types of insurance.

(4) Beginning in October 2011, PMI began paying valid claims 50% in cash and 50% in deferred payment obligations under order of its state regulator.

(5) In January 2012, RMIC began paying valid claims 50% in cash and 50% in deferred payment obligations under order of its state regulator.

(6) Beginning in June 2009, Triad began paying valid claims 60% in cash and 40% in deferred payment obligations under order of its state regulator.

We received proceeds of $2.5 billion and $1.8 billion during the years ended December 31, 2011 and 2010, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers, net of associated reserves, of $1.0 billion and $1.5 billion as of December 31, 2011 and December 31, 2010, respectively.

The UPB of single-family loans covered by pool insurance declined approximately 29% during 2011, primarily due to prepayments and other liquidation events. We did not purchase pool insurance on single-family loans in 2011. Our pool insurance policies generally have coverage periods that range from 10 to 12 years. In many cases, we entered into these agreements to cover higher-risk mortgage product types delivered to us through bulk transactions. As of December 31, 2011, pool insurance policies that will expire: (a) during 2012 covered approximately $2.4 billion in UPB of loans, and the remaining contractual limit for reimbursement of losses on such loans was approximately $0.2 billion; and (b) between 2013 and 2018 covered approximately $35.0 billion in UPB of loans, and the remaining contractual limit for reimbursement of losses on such loans was approximately $0.8 billion. The remaining pool insurance policies, for which the remaining contractual limit for reimbursement of losses was approximately $0.9 billion, expire after 2018. Any losses in excess of the contractual limit will be borne by us. These figures include coverage under our pool insurance policies based on the stated coverage amounts under such policies. As noted below, we do not expect to receive full payment of our claims from several of these counterparties.

Based on information we received from MGIC, we understand that MGIC may challenge our future claims under certain of their pool insurance policies. We believe that our pool insurance policies with MGIC provide us with the right to obtain recoveries for losses up to the aggregate limit indicated in the table above. However, MGIC's interpretation of these policies would result in claims coverage approximately $0.6 billion lower than the amount of coverage outstanding set forth in the table above. We expect this difference to increase but not to exceed approximately $0.7 billion.

In August 2011, we suspended PMI and its affiliates and RMIC and its affiliates as approved mortgage insurers, making loans insured by either company (except relief refinance loans with pre-existing insurance) ineligible for sale to Freddie Mac. Both of these companies ceased writing new business during the third quarter of 2011, and have been put under state supervision. PMI instituted a partial claim payment plan in October 2011, under which claim payments will be made 50% in cash, with the remaining amount deferred as a policyholder claim. RMIC instituted a partial claim payment plan in January 2012, under which claim payments will be made 50% in cash and 50% in deferred payment obligations for an initial period not to exceed one year. We and FHFA are in discussions with the state regulators of PMI and RMIC

concerning future payments of our claims. It is not yet clear how the state regulators of PMI and RMIC will administer their respective deferred payment plans.

Triad is continuing to pay claims 60% in cash and 40% in deferred payment obligations under orders of its state regulator. To date, the state regulator has not allowed Triad to begin paying its deferred payment obligations, and it is uncertain when or if Triad will be permitted to do so. If Triad, PMI, and RMIC do not pay their deferred payment obligations, we would lose a significant portion of the coverage from these counterparties shown in the table above.

Given the difficulties in the mortgage insurance industry, we believe it is likely that other companies may also exceed their regulatory capital limit in the future. In addition to Triad, RMIC, and PMI, we believe that certain other of our mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as those claims emerge. In the future, we believe our mortgage insurance exposure will likely be concentrated among a smaller number of counterparties.

At least one of our largest servicers entered into arrangements with two of our mortgage insurance counterparties for settlement of future rescission activity for certain mortgage loans. Under such agreements, servicers pay and/or indemnify mortgage insurers in exchange for the mortgage insurers agreeing not to issue mortgage insurance rescissions and /or denials of coverage related to origination defects on Freddie Mac-owned mortgages. For loans covered by these agreements, we may be at risk of additional loss to the extent we do not independently uncover loan defects and require lender repurchase for loans that otherwise would have resulted in mortgage insurance rescission. Additionally, this type of activity could adversely affect our mortgage insurers' ability to pay in some economic scenarios. In April 2011, we issued an industry letter to our servicers reminding them that they may not enter into these types of agreements without our consent. Several of our servicers have asked us to consent to these types of agreements. We are evaluating these requests on a case-by-case basis. For more information, see "RISK FACTORS — Competitive and Market Risks — *We could incur increased credit losses if our seller/servicers enter into arrangements with mortgage insurers for settlement of future rescission activity and such agreements could potentially reduce the ability of mortgage insurers to pay claims to us.*"

### *Bond Insurers*

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering certain of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. Bond insurance exposes us to the risk that the bond insurer will be unable to satisfy claims.

The table below presents our coverage amounts of bond insurance, including secondary coverage, for the non-agency mortgage-related securities we hold. In the event a bond insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses related to such a failure.

### Table 42 — Bond Insurance by Counterparty

| | | | As of December 31, 2011 | |
| | Credit Rating[1] | Credit Rating Outlook[1] | Coverage Outstanding[2] | Percent of Total[2] |
| Counterparty Name | | | (dollars in billions) | |
|---|---|---|---|---|
| Ambac Assurance Corporation (Ambac)[3] | Not rated | N/A | $  4.3 | 44% |
| Financial Guaranty Insurance Company (FGIC)[3] | Not rated | N/A | 1.8 | 19 |
| MBIA Insurance Corp. | B– | Under Review | 1.3 | 14 |
| Assured Guaranty Municipal Corp. | AA– | Stable | 1.1 | 11 |
| National Public Finance Guarantee Corp. | BBB | Developing | 1.1 | 11 |
| Syncora Guarantee Inc.[3] | CC | Developing | 0.1 | 1 |
| Radian Guaranty Inc. (Radian) | B | Negative | <0.1 | — |
| Total | | | $  9.7 | 100% |

(1) Latest ratings available as of February 27, 2012. Represents the lower of S&P and Moody's credit ratings. In this table, the rating and outlook of the legal entity is stated in terms of the S&P equivalent.
(2) Represents the remaining contractual limit for reimbursement of losses, including lost interest and other expenses, on non-agency mortgage-related securities.
(3) Ambac, FGIC, and Syncora Guarantee Inc. are currently operating under regulatory supervision.

We monitor the financial strength of our bond insurers in accordance with our risk management policies. Some of our larger bond insurers are in runoff mode where no new business is being issued. We expect to receive substantially less than full payment of our claims from several of our bond insurers, including Ambac and FGIC, due to adverse developments concerning these companies. Ambac and FGIC are currently not paying any of their claims. We believe that we will likely receive substantially less than full payment of our claims from some of our other bond insurers, because we believe they also lack sufficient ability to fully meet all of their expected lifetime claims-paying obligations to us as such

claims emerge. In the event one or more of our other bond insurers were to become subject to a regulatory order or insolvency proceeding, our ability to recover certain unrealized losses on our mortgage-related securities would be negatively impacted. We considered our expectations regarding our bond insurers' ability to meet their obligations in making our impairment determinations at December 31, 2011 and December 31, 2010. See "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-For-Sale Securities" for additional information regarding impairment losses on securities covered by bond insurers.

The table below shows the non-agency mortgage-related securities we hold that were covered by primary bond insurance at December 31, 2011 and December 31, 2010.

### Table 43 — Non-Agency Mortgage-Related Securities Covered by Primary Bond Insurance

| | Ambac | | FGIC | | MBIA Insurance Corp | | AGMC[1] | | Other[2] | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UPB[3] | Gross Unrealized Losses[4] | UPB[3] | Gross Unrealized Losses[4] | UPB[3] | Gross Unrealized Losses[4] | UPB[3] | Gross Unrealized Losses[4] | UPB[3] | Gross Unrealized Losses[4] | UPB[3] | Gross Unrealized Losses[4] |
| | | | | | (in millions) | | | | | | | |
| **At December 31, 2011** | | | | | | | | | | | | |
| First lien subprime | $ 619 | $(169) | $ 831 | $(230) | $ 8 | $ (1) | $ 404 | $ (91) | $ — | $ — | $1,862 | $ (491) |
| Second lien subprime | 39 | — | 185 | — | — | — | — | — | — | — | 185 | — |
| Option ARM | 39 | — | — | — | — | — | 76 | (8) | — | — | 115 | (8) |
| Alt-A and other[5] | 993 | (87) | 743 | (56) | 366 | (3) | 289 | (81) | 64 | (3) | 2,455 | (230) |
| Manufactured housing | 87 | (14) | — | — | 139 | (6) | — | — | — | — | 226 | (20) |
| CMBS | 2,195 | (86) | — | — | — | — | — | — | 1,129 | (38) | 3,324 | (124) |
| Obligations of states and political subdivisions | 363 | (11) | 38 | (1) | 197 | (5) | 319 | (3) | 17 | (2) | 934 | (22) |
| Total | $4,296 | $(367) | $1,797 | $(287) | $710 | $(15) | $1,088 | $(183) | $1,210 | $ (43) | $9,101 | $ (895) |
| **At December 31, 2010** | | | | | | | | | | | | |
| First lien subprime | $ 676 | $(207) | $ 924 | $(322) | $ 12 | $ (1) | $ 427 | $ (99) | $ 3 | $ — | $2,042 | $ (629) |
| Second lien subprime | — | — | 227 | (12) | — | — | — | — | — | — | 227 | (12) |
| Option ARM | 50 | — | — | — | — | — | 129 | (16) | — | — | 179 | (16) |
| Alt-A and other[5] | 1,150 | (186) | 832 | (93) | 425 | (29) | 340 | (82) | 71 | (1) | 2,818 | (391) |
| Manufactured housing | 97 | (11) | — | — | 154 | (15) | — | — | — | — | 251 | (26) |
| CMBS | 2,206 | (277) | — | — | — | — | — | — | 1,195 | (159) | 3,401 | (436) |
| Obligations of states and political subdivisions | 419 | (44) | 38 | (2) | 234 | (19) | 366 | (18) | 17 | (3) | 1,074 | (86) |
| Total | $4,598 | $(725) | $2,021 | $(429) | $825 | $(64) | $1,262 | $(215) | $1,286 | $(163) | $9,992 | $(1,596) |

(1) Assured Guaranty Municipal Corp. was formerly known as Financial Security Assurance.
(2) Represents insurance provided by Syncora Guarantee Inc., Radian Group, Inc., and CIFG Holdings Ltd, and includes certain exposures to bonds insured by NPFGC, formerly known as MBIA Insurance Corp. of Illinois, which is a subsidiary of MBIA Inc., the parent company of MBIA Insurance Corp.
(3) Represents the amount of UPB covered by insurance coverage. This amount does not represent the maximum amount of losses we could recover, as the insurance also covers unpaid interest.
(4) Represents the amount of gross unrealized losses at the respective reporting date on the securities with insurance.
(5) The majority of the Alt-A and other loans covered by bond insurance are securities backed by home equity lines of credit.

### Cash and Other Investments Counterparties

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank. As of December 31, 2011 and December 31, 2010, there were $68.5 billion and $91.6 billion, respectively, of cash and other non- mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information on counterparty credit ratings and concentrations within our cash and other investments.

### Document Custodians

We use third-party document custodians to provide loan document certification and custody services for the loans that we purchase and securitize. In many cases, our seller/servicer customers or their affiliates also serve as document custodians for us. Our ownership rights to the mortgage loans that we own or that back our PCs and REMICs and Other Structured Securities could be challenged if a seller/servicer intentionally or negligently pledges or sells the loans that we purchased or fails to obtain a release of prior liens on the loans that we purchased, which could result in financial losses to us. When a seller/servicer or one of its affiliates acts as a document custodian for us, the risk that our ownership interest in the loans may be adversely affected is increased, particularly in the event the seller/servicer were to become insolvent. We seek to mitigate these risks through legal and contractual arrangements with these custodians that identify

our ownership interest, as well as by establishing qualifying standards for document custodians and requiring transfer of the documents to our possession or to an independent third-party document custodian if we have concerns about the solvency or competency of the document custodian.

### Derivative Counterparties

We execute OTC derivatives and exchange-traded derivatives and are exposed to institutional credit risk with respect to both types of derivative transactions. We are an active user of exchange-traded derivatives, such as Treasury and Eurodollar futures, and are required to post initial and maintenance margin with our clearing firm in connection with such transactions. The posting of this margin exposes us to institutional credit risk in the event that our clearing firm or the exchange's clearinghouse fail to meet their obligations. However, the use of exchange-traded derivatives lessens our institutional credit risk exposure to individual counterparties because a central counterparty is substituted for individual counterparties, and changes in the value of open exchange-traded contracts are settled daily via payments made through the financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk to individual counterparties because transactions are executed and settled directly between us and each counterparty, exposing us to potential losses if a counterparty fails to meet its contractual obligations. When our net position with a counterparty in OTC derivatives subject to a master netting agreement has a market value above zero (*i.e.*, it is an asset reported as derivative assets, net on our consolidated balance sheets), the counterparty is obligated to deliver collateral in the form of cash, securities, or a combination of both, in an amount equal to that market value (less a small unsecured "threshold" amount) as necessary to satisfy its net obligation to us under the master agreement.

The Dodd-Frank Act will require central clearing and trading on exchanges or comparable trading facilities of many types of derivatives. Pursuant to the Dodd-Frank Act, the U.S. Commodity Futures Trading Commission, or CFTC, is in the process of determining the types of derivatives that must be subject to this requirement. See "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments — Dodd-Frank Act*" for more information. We continue to work with the Chicago Mercantile Exchange and others to implement a central clearing platform for interest rate derivatives. We will be exposed to institutional credit risk with respect to the Chicago Mercantile Exchange or other comparable exchanges or trading facilities in the future, to the extent we use them to clear and trade derivatives, and to the members of such clearing organizations that execute and submit our transactions for clearing.

We seek to manage our exposure to institutional credit risk related to our OTC derivative counterparties using several tools, including:

- review of external rating analyses;
- strict standards for approving new derivative counterparties;
- ongoing monitoring and internal analysis of our positions with, and credit rating of, each counterparty;
- managing diversification mix among counterparties;
- master netting agreements and collateral agreements; and
- stress-testing to evaluate potential exposure under possible adverse market scenarios.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

All of our OTC derivative counterparties are major financial institutions and are experienced participants in the OTC derivatives market. However, a large number of OTC derivative counterparties had credit ratings of A+ or below as of February 27, 2012. We require counterparties with credit ratings of A+ or below to post collateral if our net exposure to them on derivative contracts exceeds $1 million. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information.

The relative concentration of our derivative exposure among our primary derivative counterparties remains high. This concentration has increased significantly since 2008 due to industry consolidation and the failure of certain counterparties, and could further increase. The table below summarizes our exposure to our derivative counterparties, which represents the net positive fair value of derivative contracts, related accrued interest and collateral held by us from our counterparties, after netting by counterparty as applicable (*i.e.*, net amounts due to us under derivative contracts which are recorded as derivative assets). In addition, we have derivative liabilities where we post collateral to counterparties. Pursuant to certain collateral agreements we have with derivative counterparties, the amount of collateral that we are required to post is based on the credit rating of our long-term senior unsecured debt securities from S&P or Moody's. The

lowering or withdrawal of our credit rating by S&P or Moody's may increase our obligation to post collateral, depending on the amount of the counterparty's exposure to Freddie Mac with respect to the derivative transactions. At December 31, 2011, our collateral posted exceeded our collateral held. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Derivative Assets and Liabilities, Net" and "Table 31 — Derivative Fair Values and Maturities" for a reconciliation of fair value to the amounts presented on our consolidated balance sheets as of December 31, 2011, which includes both cash collateral held and posted by us, net.

## Table 44 — Derivative Counterparty Credit Exposure

| | | | As of December 31, 2011 | | | |
|---|---|---|---|---|---|---|
| Rating[1] | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
| | | | (dollars in millions) | | | |
| AA– | 5 | $ 73,277 | $ 536 | $ 19 | 5.0 | $10 million or less |
| A+ | 6 | 337,013 | 2,538 | 1 | 5.8 | $1 million or less |
| A | 5 | 208,416 | 12 | 51 | 6.2 | $1 million or less |
| A– | 2 | 89,284 | — | — | 5.5 | $1 million or less |
| Subtotal[7] | 18 | 707,990 | 3,086 | 71 | 5.8 | |
| Futures and clearinghouse-settled derivatives | | 43,831 | 8 | 8 | | |
| Commitments[8] | | 14,318 | 38 | 38 | | |
| Swap guarantee derivatives | | 3,621 | — | — | | |
| Other derivatives[9] | | 18,489 | 1 | 1 | | |
| Total derivatives | | $788,249 | $3,133 | $118 | | |

| | | | As of December 31, 2010 | | | |
|---|---|---|---|---|---|---|
| Rating[1] | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
| | | | (dollars in millions) | | | |
| AA | 3 | $ 53,975 | $ — | $ — | 6.8 | $10 million or less |
| AA– | 4 | 270,694 | 1,668 | 29 | 6.4 | $10 million or less |
| A+ | 7 | 441,004 | 460 | 1 | 6.2 | $1 million or less |
| A | 3 | 177,277 | 16 | 2 | 5.2 | $1 million or less |
| Subtotal[7] | 17 | 942,950 | 2,144 | 32 | 6.1 | |
| Futures and clearinghouse-settled derivatives | | 215,983 | 6 | 6 | | |
| Commitments[8] | | 14,292 | 103 | 103 | | |
| Swap guarantee derivatives | | 3,614 | — | — | | |
| Other derivatives[9] | | 28,657 | 2 | 2 | | |
| Total derivatives | | $1,205,496 | $2,255 | $143 | | |

(1) We use the lower of S&P and Moody's ratings to manage collateral requirements. In this table, the rating of the legal entity is stated in terms of the S&P equivalent.
(2) Based on legal entities. Affiliated legal entities are reported separately.
(3) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged.
(4) For each counterparty, this amount includes derivatives with a positive fair value (recorded as derivative assets, net), including the related accrued interest receivable/payable, when applicable. For counterparties included in the subtotal, positions are shown netted at the counterparty level including accrued interest receivable/payable and trade/settle fees.
(5) Calculated as Total Exposure at Fair Value less cash collateral held as determined at the counterparty level. Includes amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level. For derivatives settled through an exchange or clearinghouse, excludes consideration of maintenance margin posted by our counterparty.
(6) Counterparties are required to post collateral when their exposure exceeds agreed-upon collateral posting thresholds. These thresholds are typically based on the counterparty's credit rating and are individually negotiated.
(7) Consists of OTC derivative agreements for interest-rate swaps, option-based derivatives (excluding certain written options), foreign-currency swaps, and purchased interest-rate caps.
(8) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.
(9) Consists primarily of certain written options and certain credit derivatives. Written options do not present counterparty credit exposure, because we receive a one-time up-front premium in exchange for giving the holder the right to execute a contract under specified terms, which generally puts us in a liability position.

Over time, our exposure to individual counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps varies depending on changes in fair values, which are affected by changes in period-end interest rates, the implied volatility of interest rates, foreign-currency exchange rates, and the amount of derivatives held. If all of our counterparties for these derivatives defaulted simultaneously on December 31, 2011, the combined amount of our uncollateralized and overcollateralized exposure to these counterparties, or our maximum loss for accounting purposes after applying netting agreements and collateral, would have been approximately

$71 million. Our similar exposure as of December 31, 2010 was $32 million. Three counterparties each accounted for greater than 10% and collectively accounted for 97% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at December 31, 2011. These counterparties were HSBC Bank USA, Royal Bank of Scotland, and UBS AG., all of which were rated "A" or above by S&P as of February 27, 2012.

Approximately 99% of our counterparty credit exposure for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps was collateralized at December 31, 2011 (excluding amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level). The remaining exposure was primarily due to exposure amounts below the applicable counterparty collateral posting threshold, as well as market movements during the time period between when a derivative was marked to fair value and the date we received the related collateral. In some instances, these market movements result in us having provided collateral that has fair value in excess of our obligation, which represents our overcollateralization exposure. Collateral is typically transferred within one business day based on the values of the related derivatives.

In the event a derivative counterparty defaults, our economic loss may be higher than the uncollateralized exposure of our derivatives if we are not able to replace the defaulted derivatives in a timely and cost-effective fashion. We could also incur economic loss if the collateral held by us cannot be liquidated at prices that are sufficient to recover the amount of such exposure. We monitor the risk that our uncollateralized exposure to each of our OTC counterparties for interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps will increase under certain adverse market conditions by performing daily market stress tests. These tests, which involve significant management judgment, evaluate the potential additional uncollateralized exposure we would have to each of these derivative counterparties on OTC derivatives contracts assuming certain changes in the level and implied volatility of interest rates and certain changes in foreign currency exchange rates over a brief time period. Our actual exposure could vary significantly from amounts forecasted by these tests.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives for accounting purposes, was $38 million and $103 million at December 31, 2011 and December 31, 2010, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis in an effort to ensure that they continue to meet our internal risk-management standards.

*Selected European Sovereign and Non-Sovereign Exposures*

The sovereign debt of Spain, Italy, Ireland, Portugal, and Greece (which we refer to herein as "troubled European countries") and the credit status of financial institutions with significant exposure to the troubled European countries has been adversely impacted due to weaknesses in the economic and fiscal situations of those countries. Moody's and Standard & Poor's recently downgraded a number of European countries, including Italy, Spain, and Portugal. We are monitoring our exposures to these countries and institutions.

As of December 31, 2011, we did not hold any debt issued by the governments of these troubled European countries and did not hold any financial instruments entered into with sovereign governments in those countries. As of that date, we also did not hold any debt issued by corporations or financial institutions domiciled in these troubled European countries and did not hold any other financial instruments entered into with corporations or financial institutions domiciled in those countries. For purposes of this discussion, we consider an entity to be domiciled in a country if its parent entity is headquartered in that country.

Our derivative portfolio and cash and other investments portfolio counterparties include a number of major European and non-European financial institutions. Many of these institutions operate in Europe, and we believe that all of these financial institutions have direct or indirect exposure to these troubled European countries. For many of these institutions, their direct and indirect exposures to these troubled European countries change on a daily basis. We monitor our major counterparties' exposures to troubled European countries, and adjust our exposures and risk limits to individual counterparties accordingly. Our exposures to derivative portfolio and cash and other investments portfolio counterparties are described in "Derivative Counterparties," "Cash and Other Investments Counterparties" and "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS."

In recent months, we have taken a number of actions designed to reduce our exposures to certain derivative portfolio and cash and other investments portfolio counterparties due to their exposure to troubled European countries, including substantially reducing our derivative exposure limits, our limits on the amount of unsecured overnight deposits, and our

limits for asset-backed commercial paper. For certain repurchase counterparties, we have reduced the credit limit and restricted the term of such transactions to overnight. We have also ceased investing in prime money funds that could hold substantial amounts of the non-U.S. sovereign debt.

It is possible that continued adverse developments in Europe could significantly impact our counterparties that have direct or indirect exposure to troubled European countries. In turn, this could adversely affect their ability to meet their obligations to us. For more information, see "RISK FACTORS — Competitive and Market Risks — *We depend on our institutional counterparties to provide services that are critical to our business, and our results of operations or financial condition may be adversely affected if one or more of our institutional counterparties do not meet their obligations to us.*"

### Mortgage Credit Risk

We are exposed to mortgage credit risk principally in our single-family credit guarantee and multifamily mortgage portfolios because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment. We are also exposed to mortgage credit risk related to our investments in non-Freddie Mac mortgage-related securities. For information about our holdings of these securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities.*"

Single-family mortgage credit risk is primarily influenced by the credit profile of the borrower of the mortgage (*e.g.*, credit score, credit history, and monthly income relative to debt payments), documentation level, the number of borrowers, the features of the mortgage itself, the purpose of the mortgage, occupancy type, property type, the LTV ratio, and local and regional economic conditions, including home prices and unemployment rates. Multifamily mortgage credit risk is primarily influenced by multifamily market conditions (*e.g.*, rental and vacancy rates), the quality of the property's management, the features of the mortgage itself, the LTV ratio, the property's operating cash flow, and the local and regional economic conditions.

All mortgages that we purchase or guarantee have an inherent risk of default. To manage our mortgage credit risk in our single-family credit guarantee and multifamily mortgage portfolios, we focus on three key areas: underwriting standards and quality control process; portfolio diversification; and portfolio management activities, including loss mitigation and use of credit enhancements.

### Single-Family Mortgage Credit Risk

Through our delegated underwriting process, single-family mortgage loans and the borrowers' ability to repay the loans are evaluated using several critical risk characteristics, including, but not limited to, the borrower's credit score and credit history, the borrower's monthly income relative to debt payments, the original LTV ratio, the type of mortgage product and the occupancy type of the loan. As part of our quality control process, after our purchase of the loans, we review the underwriting documentation for a sample of loans for compliance with our contractual standards. The most common underwriting deficiencies found in our reviews in 2011 are related to insufficient income and inadequate or missing documentation to support borrower qualification. The next most common deficiency is inaccurate data entered into Loan Prospector, our automated underwriting system. We are continuing to perform quality control sampling for loans we purchased in 2011 and have not yet compiled our results.

We meet with our larger seller/servicers with deficiencies from our performing loan sampling to help ensure they make appropriate changes to their underwriting process. In addition, for all of our largest seller/servicers, we actively manage the current quality of loan originations by providing monthly written and oral communications regarding loan defect rates and the drivers of those defects as identified in our performing loan quality control sampling reviews. If necessary, we work with seller/servicers to develop an appropriate plan of corrective action. For loans with identified underwriting deficiencies, we may require immediate repurchase or allow performing loans to remain in our portfolio subject to our continued right to issue a repurchase request to the seller/servicers, depending on the facts and circumstances. Our right to request repurchase by seller/servicers is intended to protect us against deficiencies in underwriting by our seller/servicers. While this protection is intended to reduce our mortgage credit risk, it increases our institutional risk exposure to seller/servicers. See "*Institutional Credit Risk — Single-Family Mortgage Seller/Servicers*" for further information on repurchase requests. Our contracts with some seller/servicers give us the right to levy financial penalties when mortgage loans delivered to us fail to meet our aggregate loan quality metrics. See "BUSINESS — Our Business" and "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Underwriting Requirements and Quality Control Standards*" for information about our charter requirements for single-family loan purchases, delegated underwriting, and our quality control monitoring. See "BUSINESS— Regulation and Supervision —

Federal Housing Finance Agency — *Affordable Housing Goals*" for a discussion of factors that may cause us to purchase loans that do not meet our normal standards.

We were significantly adversely affected by deteriorating conditions in the single-family housing and mortgage markets during 2008 and 2009. During 2005 to 2007, financial institutions substantially increased origination and securitization of certain higher risk mortgage loans, such as subprime, option ARM, interest-only and Alt-A, and these loans comprised a much larger proportion of origination and securitization issuance volumes during 2006 and 2007, and to a lesser extent in 2005, as compared to prior or subsequent years. During this time, we increased our participation in the market for these products through our purchases of non-agency mortgage-related securities and through our loan securitization and guarantee activities. Our expanded participation in these products was driven by a combination of competing objectives and pressures, including meeting our affordable housing goals, competition, the desire to maintain or increase market share, and generating returns for investors. The mortgage market has changed considerably since 2007. Financial institutions have tightened their underwriting standards, which has significantly reduced the amount of subprime, option ARM, interest-only, and Alt-A loans being originated.

Conditions in the mortgage market continued to remain challenging during 2011. Most single-family mortgage loans, especially those originated from 2005 through 2008, have been affected by the compounding pressures on household wealth caused by significant declines in home values that began in 2006 and the ongoing weak employment environment. Our serious delinquency rates remained high in 2011 compared to historical levels, as discussed in "Credit Performance — Delinquencies." The UPB of our single-family non-performing loans remained at high levels during 2011.

*Characteristics of the Single-Family Credit Guarantee Portfolio*

The average UPB of loans in our single-family credit guarantee portfolio was approximately $151,000 and $150,000 at December 31, 2011 and December 31, 2010, respectively. Our single-family mortgage purchases and other guarantee commitment activity in 2011 decreased by 17% to $320.8 billion, as compared to $386.4 billion in 2010. Approximately 92% of the single-family mortgages we purchased in 2011 were fixed-rate amortizing mortgages, based on UPB. Approximately 78% of the single-family mortgages we purchased in 2011 were refinance mortgages, including approximately 26% that were relief refinance mortgages, based on UPB.

The table below provides additional characteristics of single-family mortgage loans purchased during 2011, 2010, and 2009, and of our credit guarantee portfolio at December 31, 2011, 2010, and 2009.

**Table 45 — Characteristics of the Single-Family Credit Guarantee Portfolio[1]**

| | Percent of Purchases During The Year Ended December 31, | | | Portfolio[2] at December 31, | | |
|---|---|---|---|---|---|---|
| | 2011 | 2010 | 2009 | 2011 | 2010 | 2009 |
| **Original LTV Ratio Range[3][4]** | | | | | | |
| 60% and below | 30% | 31% | 34% | 23% | 23% | 23% |
| Above 60% to 70% | 17 | 17 | 18 | 16 | 16 | 16 |
| Above 70% to 80% | 44 | 45 | 41 | 42 | 43 | 45 |
| Above 80% to 90% | 5 | 4 | 5 | 9 | 9 | 8 |
| Above 90% to 100% | 4 | 3 | 2 | 8 | 8 | 8 |
| Above 100% | <1 | <1 | <1 | 2 | 1 | — |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average original LTV ratio | 67% | 67% | 66% | 72% | 71% | 71% |
| **Estimated Current LTV Ratio Range[5]** | | | | | | |
| 60% and below | | | | 25% | 27% | 28% |
| Above 60% to 70% | | | | 12 | 12 | 12 |
| Above 70% to 80% | | | | 18 | 17 | 16 |
| Above 80% to 90% | | | | 15 | 16 | 16 |
| Above 90% to 100% | | | | 10 | 10 | 10 |
| Above 100% to 110% | | | | 6 | 6 | 6 |
| Above 110% to 120% | | | | 4 | 4 | 4 |
| Above 120% | | | | 10 | 8 | 8 |
| Total | | | | 100% | 100% | 100% |
| Weighted average estimated current LTV ratio: | | | | | | |
| Relief refinance mortgages[6] | | | | 79% | 78% | 85% |
| All other mortgages | | | | 80% | 78% | 77% |
| Total mortgages | | | | 80% | 78% | 77% |
| **Credit Score[3][7]** | | | | | | |
| 740 and above | 74% | 73% | 73% | 55% | 53% | 50% |
| 700 to 739 | 17 | 17 | 18 | 21 | 21 | 22 |
| 660 to 699 | 7 | 7 | 7 | 14 | 15 | 16 |
| 620 to 659 | 2 | 2 | 2 | 7 | 7 | 8 |
| Less than 620 | <1 | 1 | <1 | 3 | 3 | 3 |
| Not available | <1 | <1 | <1 | 1 | 1 | 1 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average credit score: | | | | | | |
| Relief refinance mortgages[6] | | | | 744 | 745 | 738 |
| All other mortgages | | | | 734 | 732 | 729 |
| Total mortgages | | | | 735 | 733 | 730 |
| **Loan Purpose** | | | | | | |
| Purchase | 22% | 20% | 20% | 30% | 31% | 35% |
| Cash-out refinance | 18 | 21 | 26 | 27 | 29 | 30 |
| Other refinance[8] | 60 | 59 | 54 | 43 | 40 | 35 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Property Type** | | | | | | |
| Detached/townhome[9] | 94% | 94% | 94% | 92% | 92% | 92% |
| Condo/Co-op | 6 | 6 | 6 | 8 | 8 | 8 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Occupancy Type** | | | | | | |
| Primary residence | 92% | 93% | 93% | 91% | 91% | 91% |
| Second/vacation home | 4 | 4 | 5 | 5 | 5 | 5 |
| Investment | 4 | 3 | 2 | 4 | 4 | 4 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

(1) Purchases and ending balances are based on the UPB of the single-family credit guarantee portfolio. Other Guarantee Transactions with ending balances of $2 billion at December 31, 2011, 2010, and 2009, are excluded from portfolio balance data since these securities are backed by non-Freddie Mac issued securities for which the loan characteristics data was not available.

(2) Includes loans acquired under our relief refinance initiative, which began in 2009.

(3) Purchases columns exclude mortgage loans acquired under our relief refinance initiative. See "Table 52 — Single-Family Refinance Loan Volume" for further information on the LTV ratios of these loans.

(4) Original LTV ratios are calculated as the amount of the mortgage we guarantee including the credit-enhanced portion, divided by the lesser of the appraised value of the property at the time of mortgage origination or the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation because we generally do not receive data about them. The existence of a second lien mortgage reduces the borrower's equity in the home and, therefore, can increase the risk of default.

(5) Current LTV ratios are management estimates, which are updated on a monthly basis. Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination. Estimated current LTV ratio range is not applicable to purchase activity, and excludes any secondary financing by third parties.

(6) Relief refinance mortgages comprised approximately 11%, 7%, and 2% of our single-family credit guarantee portfolio by UPB as of December 31, 2011, 2010, and 2009, respectively.

(7) Credit score data is based on FICO scores. Although we obtain updated credit information on certain borrowers after the origination of a mortgage, such as those borrowers seeking a modification, the scores presented in this table represent only the credit score of the borrower at the time of loan origination.

(8) Other refinance transactions include: (a) refinance mortgages with "no cash-out" to the borrower; and (b) refinance mortgages for which the delivery data provided was not sufficient for us to determine whether the mortgage was a cash-out or a no cash-out refinance transaction.

(9) Includes manufactured housing and homes within planned unit development communities. The UPB of manufactured housing mortgage loans purchased during 2011, 2010, and 2009, was $376 million, $403 million, and $607 million, respectively.

*Freddie Mac*

Loan-to-Value Ratio

An important safeguard against credit losses on mortgage loans in our single-family credit guarantee portfolio is provided by the borrowers' equity in the underlying properties. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or sell the property for an amount at or above the balance of the outstanding mortgage loan. There is an increase in borrower default risk as LTV ratios increase, particularly for loans with LTV ratios above 80%. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and, based upon historical information, is more likely to default than other borrowers due to limits in the ability to sell or refinance. The UPB of mortgages in our single-family credit guarantee portfolio with estimated current LTV ratios greater than 100% was 20% and 18% as of December 31, 2011 and December 31, 2010, respectively. The serious delinquency rate for single-family loans with estimated current LTV ratios greater than 100% was 12.8% and 14.9% as of December 31, 2011 and December 31, 2010, respectively. Due to declines in home prices since 2006, we estimate that as of December 31, 2011, approximately 49% of the loans originated in 2005 through 2008 that remained in our single-family credit guarantee portfolio as of that date had current LTV ratios greater than 100%. In recent years, loans with current LTV ratios greater than 100% contributed disproportionately to our credit losses. As of December 31, 2011 and December 31, 2010, for the loans in our single-family credit guarantee portfolio with greater than 80% estimated current LTV ratios, the borrowers had a weighted average credit score at origination of 724 and 721, respectively.

Credit Score

Credit scores are a useful measure for assessing the credit quality of a borrower. Credit scores are numbers reported by credit repositories, based on statistical models, that summarize an individual's credit record. FICO scores are the most commonly used credit scores today. FICO scores are ranked on a scale of approximately 300 to 850 points. Statistically, borrowers with higher credit scores are more likely to repay or have the ability to refinance than those with lower scores. We only obtain credit scores of borrowers at the time of origination and do not typically receive updated data on borrower credit scores after origination. Credit scores presented within this Annual Report on Form 10-K are at the time of origination and may not be indicative of borrowers' creditworthiness at December 31, 2011.

Loan Purpose

Mortgage loan purpose indicates how the borrower intends to use the funds from a mortgage loan. In a purchase transaction, the funds are used to acquire a property. In a cash-out refinance transaction, in addition to paying off existing mortgage liens, the borrower obtains additional funds that may be used for other purposes, including paying off subordinate mortgage liens and providing unrestricted cash proceeds to the borrower. In other refinance transactions, the funds are used to pay off existing mortgage liens and may be used in limited amounts for certain specified purposes; such refinances are generally referred to as "no cash-out" or "rate and term" refinances. The percentage of home purchase loans in our loan acquisition volume remained at low levels during 2011. Historically low interest rates contributed to high refinance activity in 2011, though it declined from 2010 levels. Cash-out refinancings generally have had a higher risk of default than mortgages originated in no cash-out, or rate and term, refinance transactions.

Property Type

Townhomes and detached single-family houses are the predominant type of single-family property. Condominiums are a property type that historically experiences greater volatility in home prices than detached single-family residences. Condominium loans in our single-family credit guarantee portfolio have a higher percentage of first-time homebuyers and homebuyers whose purpose is for investment or for a second home. In practice, investors and second home borrowers often seek to finance the condominium purchase with loans having a higher original LTV ratio than other borrowers. Approximately 36% of the condominium loans within our single-family credit guarantee portfolio are in California, Florida, and Illinois, which are among the states that have been most adversely affected by the economic recession and housing downturn. Condominium loans comprised 15% of our credit losses during both years ended December 31, 2011 and 2010, while these loans comprised 8% of our single-family credit guarantee portfolio at both dates.

Occupancy Type

Borrowers may purchase a home as a primary residence, second/vacation home or investment property that is typically a rental property. Mortgage loans on properties occupied by the borrower as a primary residence tend to have a lower credit risk than mortgages on investment properties or secondary residences.

Geographic Concentration

Local economic conditions can affect borrowers' ability to repay loans and the value of the collateral underlying the loans. Because our business involves purchasing mortgages from every geographic region in the U.S., we maintain a geographically diverse single-family credit guarantee portfolio. While our single-family credit guarantee portfolio's geographic distribution was relatively stable in recent years and remains broadly diversified across these regions, we were negatively impacted by overall home price declines in each region since 2006. Our credit losses continue to be greatest in those states that experienced significant decreases in property values since 2006, such as California, Florida, Nevada and Arizona. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" for more information concerning the distribution of our single-family credit guarantee portfolio by geographic region.

Attribute Combinations

Certain combinations of loan characteristics often can indicate a higher degree of credit risk. For example, single-family mortgages with both high LTV ratios and borrowers who have lower credit scores typically experience higher rates of serious delinquency and default. We estimate that there were $11.1 billion and $11.8 billion at December 31, 2011 and December 31, 2010, respectively, of loans in our single-family credit guarantee portfolio with both original LTV ratios greater than 90% and FICO scores less than 620 at the time of loan origination. Certain mortgage product types, including interest-only or option ARM loans, that have additional higher risk characteristics, such as lower credit scores or higher LTV ratios, will also have a higher rate of default than those same products without these characteristics. The presence of a second lien mortgage can also increase the risk that a borrower will default. A second lien mortgage reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of December 31, 2011 and December 31, 2010, approximately 15% and 14% of loans in our single-family credit guarantee portfolio had second lien financing by third parties at the time of origination of the first mortgage, and we estimate that these loans comprised 17% and 19%, respectively, of our seriously delinquent loans, based on UPB. However, borrowers are free to obtain second lien financing after origination and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages.

*Single-Family Mortgage Product Types*

Product mix affects the credit risk profile of our total mortgage portfolio. The primary mortgage products in our single-family credit guarantee portfolio are first lien, fixed-rate mortgage loans. In general, 15-year amortizing fixed-rate mortgages exhibit the lowest default rate among the types of mortgage loans we securitize and purchase, due to the accelerated rate of principal amortization on these mortgages and the credit profiles of borrowers who seek and qualify for them. In a rising interest rate environment, balloon/reset and ARM borrowers typically default at a higher rate than fixed-rate borrowers. However, during recent years, when interest rates have generally declined, our delinquency and default rates on adjustable-rate and balloon/reset mortgage loans on a relative basis have been as high as, or higher than, fixed-rate loans because these borrowers are also susceptible to declining housing and economic conditions and/or had other higher-risk characteristics. Interest-only and option ARM loans are higher-risk mortgage products based on the features of these types of loans. Interest-only loans feature an increase in the monthly payment at the date of first reset (*i.e.*, when the monthly payment begins to include principal), while option ARMs feature initial periods during which the borrower has various options as to the amount of each monthly payment, until a specified date, when the terms are recast. See "*Other Categories of Single-Family Mortgage Loans*" below for additional information on higher-risk mortgages in our single-family credit guarantee portfolio.

In recent years, including 2011, we experienced a high volume of loan modifications, as troubled borrowers were able to take advantage of the various programs that we offered. The majority of our loan modifications result in new terms that include fixed interest rates after modification. However, our HAMP loan modifications result in an initial interest rate that subsequently adjusts to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate products for presentation within this Form 10-K and elsewhere in our reporting even though they have a rate adjustment provision because the change in rate is determined at the time of modification rather than at a future date.

The following paragraphs provide information on the interest-only, option ARM, adjustable-rate, and conforming jumbo loans in our single-family credit guarantee portfolio. Interest-only and option ARM loans have experienced significantly higher serious delinquency rates than fixed-rate amortizing mortgage products.

Interest-Only Loans

Interest-only loans have an initial period during which the borrower pays only interest, and at a specified date the monthly payment increases to begin reflecting repayment of principal. Interest-only loans represented approximately 4% and 5% of the UPB of our single-family credit guarantee portfolio at December 31, 2011 and December 31, 2010, respectively. We purchased a limited number of interest-only loans after 2008 and fully discontinued purchasing such loans on September 1, 2010.

The table below presents information for single-family mortgage loans in our single-family credit guarantee portfolio, excluding Other Guarantee Transactions, at December 31, 2011 that contain interest-only payment terms. The reported balances in the table below are aggregated by interest-only loan product type and categorized by the year in which the loan begins to require payments of principal. At December 31, 2011, approximately 11% of these interest-only loans are scheduled to begin requiring payments of principal in 2012 or 2013. The timing of the actual change in payment terms may differ from those presented due to a number of factors, including refinancing.

**Table 46 — Single-Family Loans Scheduled Payment Change to Include Principal by Year at December 31, 2011[1]**

| | 2011 and Prior | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 and Beyond | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | | |
| ARM/interest-only | $13,002 | $4,725 | $3,498 | $1,673 | $4,207 | $7,400 | $19,526 | $54,031 |
| Fixed/interest-only | — | — | — | 15 | 377 | 2,229 | 15,321 | 17,942 |
| Total | $13,002 | $4,725 | $3,498 | $1,688 | $4,584 | $9,629 | $34,847 | $71,973 |

(1) Based on the UPBs of mortgage products that contain interest-only provisions and that begin amortization of principal in each of the years shown. These reported balances are based on the UPB of the underlying mortgage loans and do not reflect the publicly-available security balances we use to report the composition of our PCs and REMICs and Other Structured Securities. Excludes: (a) mortgage loans underlying Other Guarantee Transactions; and (b) any mortgage loans which completed a modification before the end of the respective period and for which the terms of the loan were changed to an amortizing loan product.

The table below presents the trend of serious delinquency information for single-family interest-only mortgage loans in our single-family credit guarantee portfolio, excluding Other Guarantee Transactions, categorized by the year in which the loan begins to require payments of principal. Loans where the year of payment change is 2011 or prior have already changed to require payments of principal as of December 31, 2011; loans where the year of payment change is 2012 or later still require only payments of interest as of December 31, 2011 and will not require payments of principal until a future period.

**Table 47 — Serious Delinquency Rates by Year of Payment Change to Include Principal[1]**

| | As of December 31, | | |
|---|---|---|---|
| Year of payment change: | 2011 | 2010 | 2009 |
| 2009 and prior | 7.19% | 8.66% | 10.34% |
| 2010 | 10.38 | 12.73 | 10.68 |
| 2011 | 18.96 | 19.65 | 16.95 |
| 2012 and after | 18.63 | 19.11 | 18.49 |

(1) Based on loans remaining in the single-family guarantee portfolio as of December 31, 2011, 2010, and 2009, rather than all loans guaranteed by us and originated in the respective year. Excludes mortgage loans which completed a modification before the end of the respective period and for which the terms of the loan were changed to an amortizing loan product.

As shown in the table above, the serious delinquency rates of interest-only loans that experienced a change in payment to include principal during the last three years were not significantly impacted in the year the loan began the amortization of principal. We believe that the higher serious delinquency rates for interest-only loans with payment changes in 2010 and after (compared to those interest-only loans with payment changes in 2009 and prior) reflect that those borrowers have been more negatively impacted by the ongoing adverse economic conditions, including declines in home prices, than interest-only loans that experienced payment changes in earlier years.

In recent years, interest-only loans experienced high serious delinquency rates well before reaching the dates at which the loans begin to require amortization of principal. We believe that interest-only loan performance during the last three years was more adversely affected by changes in employment, home prices, and other regional and macro-economic conditions, than the increase in the borrower's monthly payment (when the loans begin to require payments of principal). In addition, a number of these loans were categorized as Alt-A, due to reduced documentation standards at the time of loan origination. The overall serious delinquency rate for all interest-only loans in our single-family credit guarantee portfolio was 17.6% as of December 31, 2011. Approximately 82% of all interest-only loans in our single-family credit guarantee portfolio had not yet begun amortization of principal and 69% of all interest-only loans in our single-family credit guarantee portfolio had current LTV ratios greater than 100% as of December 31, 2011. Since a substantial portion

of these loans were originated in 2005 through 2008 and are located in geographical areas that have been most impacted by declines in home prices since 2006, we believe that the serious delinquency rate for interest-only loans will remain high in 2012.

Option ARM Loans

Most option ARM loans have initial periods during which the borrower has various options as to the amount of each monthly payment, until a specified date, when the terms are recast. At both December 31, 2011 and December 31, 2010, option ARM loans represented less than 1% of the UPB of our single-family credit guarantee portfolio. Included in this exposure was $7.3 billion and $8.4 billion of option ARM securities underlying certain of our Other Guarantee Transactions at December 31, 2011 and December 31, 2010, respectively. While we have not categorized these option ARM securities as either subprime or Alt-A securities for presentation within this Form 10-K and elsewhere in our reporting, they could exhibit similar credit performance to collateral identified as subprime or Alt-A. We have not purchased option ARM loans in our single-family credit guarantee portfolio since 2007. For information on our exposure to option ARM loans through our holdings of non-agency mortgage-related securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Adjustable-Rate Mortgage Loans

The table below presents information for single-family mortgage loans in our single-family credit guarantee portfolio, excluding Other Guarantee Transactions, at December 31, 2011 that contain adjustable payment terms. The reported balances in the table below are aggregated by product type and categorized by year of the next scheduled contractual reset date. At December 31, 2011, approximately 59% of these loans have interest rates that are scheduled to reset in 2012 or 2013. The timing of the actual reset dates may differ from those presented due to a number of factors, including prepayments or exercising of provisions within the terms of the mortgage (certain of which could delay or accelerate the timing of the reset date).

**Table 48 — Single-Family Scheduled Adjustable-Rate Resets by Year at December 31, 2011[1]**

| | 2012 | 2013 | 2014 | 2015 | 2016 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | |
| ARMs/amortizing | $29,540 | $ 2,557 | $2,103 | $ 8,329 | $14,802 | $12,838 | $ 70,169 |
| ARMs/interest-only[2] | 33,650 | 7,825 | 3,611 | 2,805 | 2,531 | 3,609 | 54,031 |
| Balloon/resets | 384 | 62 | 11 | 9 | <1 | 2 | 468 |
| Total | $63,574 | $10,444 | $5,725 | $11,143 | $17,333 | $16,449 | $124,668 |

(1) Based on the UPBs of mortgage products that contain adjustable-rate interest provisions and are scheduled to reset during the periods specified above. These reported balances are based on the UPB of the underlying mortgage loans and do not reflect the publicly-available security balances we use to report the composition of our PCs and REMICs or Other Structured Securities. Excludes: (a) mortgage loans underlying Other Guarantee Transactions since rate reset information is not available to us for these loans; and (b) any amortizing ARM loans which completed a modification before the end of the respective period and for which the terms of the loan were changed to a fixed-rate loan product.

(2) Reflects the UPB of interest-only loans that reset in each of the years shown. We report loans in the interest-only category if their original terms include interest-only provisions for a pre-determined period of time before the monthly payment changes to include amortization of principal. Includes $13.0 billion of loans that were interest-only at origination that have converted to include amortization of principal as of December 31, 2011.

The table below presents serious delinquency information for single-family adjustable-rate mortgage loans in our single-family credit guarantee portfolio, excluding Other Guarantee Transactions, categorized by the year in which the loan first had an interest rate reset. Loans where the year of first interest rate reset is 2011 or prior have already had one or more interest rate resets as of December 31, 2011; loans where the year of first interest rate reset is 2012 or later have not yet had an interest rate reset as of December 31, 2011 and will not have an interest rate reset until a future period.

**Table 49 — Serious Delinquency Rates by Year of First Rate Reset[1]**

| | As of December 31, | | |
|---|---|---|---|
| Year of payment change: | 2011 | 2010 | 2009 |
| 2009 and prior | 3.48% | 3.70% | 4.45% |
| 2010 | 7.63 | 9.90 | 8.38 |
| 2011 | 17.50 | 18.01 | 17.31 |
| 2012 and after | 10.16 | 13.24 | 14.62 |

(1) Based on loans remaining in the single-family credit guarantee portfolio as of December 31, 2011, 2010, and 2009, rather than all loans guaranteed by us and originated in the respective year. Excludes mortgage loans which completed a modification before the end of the respective period and for which the terms of the loan were changed to a fixed-rate loan product.

As shown in the table above, the trend in serious delinquency rates of adjustable-rate loans that experienced an interest rate reset during the last three years has not been significantly impacted by the change in interest rate of the loan.

Except for interest-only loans that began to amortize at the reset date, there were not significant increases to the borrowers' payments when these loans reached their first reset dates because market interest rates have generally declined in recent years. Interest-only loans are a higher-risk mortgage product, which feature an increase in the monthly payment at the date of first reset which is not solely related to the contractual interest rate (*i.e.*, when the monthly payment begins to include principal). In recent years, ARM loans have experienced high serious delinquency rates well before reaching dates at which the loans have reached their first rate reset. We believe that ARM loan performance during the last three years has been more adversely affected by changes in employment, home prices, and other regional and macro-economic conditions, than by changes in the interest rates of the loans. See "RISK FACTORS —  Competitive and Market Risks — *Changes in interest rates could negatively impact our results of operations, stockholders' equity (deficit) and fair value of net assets*" for additional information. Since a substantial portion of ARM loans were originated in 2005 through 2008 and are located in geographical areas that have been most impacted by declines in home prices since 2006, we believe that the serious delinquency rate for ARM loans will continue to remain high in 2012.

Conforming Jumbo Loans

We purchased $27.7 billion and $23.9 billion of conforming jumbo loans during the years ended December 31, 2011 and 2010, respectively. The UPB of conforming jumbo loans in our single-family credit guarantee portfolio as of December 31, 2011 and December 31, 2010 was $49.8 billion and $37.8 billion, respectively. The average size of these loans was approximately $545,000 and $548,000 at December 31, 2011 and December 31, 2010, respectively. See "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments*" for further information on the conforming loan limits.

*Other Categories of Single-Family Mortgage Loans*

While we have classified certain loans as subprime or Alt-A for purposes of the discussion below and elsewhere in this Form 10-K, there is no universally accepted definition of subprime or Alt-A, and our classification of such loans may differ from those used by other companies. For example, some financial institutions may use FICO scores to delineate certain residential mortgages as subprime. In addition, we do not rely primarily on these loan classifications to evaluate the credit risk exposure relating to such loans in our single-family credit guarantee portfolio. For a definition of the subprime and Alt-A single-family loans and securities in this Form 10-K, see "GLOSSARY."

Subprime Loans

Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see "*Higher Risk Loans in the Single-Family Credit Guarantee Portfolio*" and "Table 57 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for further information). In addition, we estimate that approximately $2.3 billion and $2.5 billion of security collateral underlying our Other Guarantee Transactions at December 31, 2011 and December 31, 2010, respectively, were identified as subprime based on information provided to us when we entered into these transactions.

We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions. At December 31, 2011 and December 31, 2010, we held $49.0 billion and $54.2 billion, respectively, in UPB of non-agency mortgage-related securities backed by subprime loans. These securities were structured to provide credit enhancements, and 7% and 10% of these securities were investment grade at December 31, 2011 and December 31, 2010, respectively. The credit performance of loans underlying these securities deteriorated significantly beginning in 2008. For more information on our exposure to subprime mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Alt-A Loans

Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. The UPB of Alt-A loans in our single-family credit guarantee portfolio declined to $94.3 billion as of December 31, 2011 from $115.5 billion as of December 31, 2010. The UPB of our Alt-A loans declined in 2011 primarily due to refinancing into other mortgage products, foreclosure transfers, and other liquidation events. As of December 31, 2011, for Alt-A loans in our single-

family credit guarantee portfolio, the average FICO score at origination was 718. Although Alt-A mortgage loans comprised approximately 5% of our single-family credit guarantee portfolio as of December 31, 2011, these loans represented approximately 28% of our credit losses during 2011.

During the first quarter of 2011, we identified approximately $0.6 billion in UPB of single-family loans underlying certain Other Guarantee Transactions that had been previously reported in both the Alt-A and subprime categories. Commencing March 31, 2011, we no longer report these loans as Alt-A (but continue to report them as subprime) and we revised the prior periods to conform to the current period presentation.

We did not purchase any new single-family Alt-A mortgage loans in our single-family credit guarantee portfolio during 2011. Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. However, in the event we purchase a refinance mortgage in one of these programs and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-K and our other financial reports because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. From the time the relief refinance initiative began in 2009 to December 31, 2011, we purchased approximately $15.3 billion of relief refinance mortgages that were previously categorized as Alt-A loans in our portfolio, including $5.1 billion during 2011.

We also hold investments in non-agency mortgage-related securities backed by single-family Alt-A loans. At December 31, 2011 and December 31, 2010, we held investments of $16.8 billion and $18.8 billion, respectively, of non-agency mortgage-related securities backed by Alt-A and other mortgage loans and 15% and 22%, respectively, of these securities were categorized as investment grade. The credit performance of loans underlying these securities deteriorated significantly since the beginning of 2008 and continued to deteriorate during 2011. We categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. For more information on our exposure to Alt-A mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Higher-Risk Loans in the Single-Family Credit Guarantee Portfolio

The table below presents information about certain categories of single-family mortgage loans within our single-family credit guarantee portfolio that we believe have certain higher-risk characteristics. These loans include categories based on product type and borrower characteristics present at origination. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Mortgage loans with higher LTV ratios have a higher risk of default, especially during housing and economic downturns, such as the one the U.S. has experienced since 2007.

**Table 50 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio[1]**

| | As of December 31, 2011 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | (dollars in billions) | | | |
| Loans with one or more specified characteristics | $342.9 | 105% | 7.2% | 9.3% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 94.3 | 107 | 8.8 | 11.9 |
| Interest-only[6] | 72.0 | 120 | 0.2 | 17.6 |
| Option ARM[7] | 8.4 | 119 | 5.5 | 20.5 |
| Original LTV ratio greater than 90%, non-relief refinance mortgages[8] | 107.9 | 108 | 8.1 | 8.5 |
| Original LTV ratio greater than 90%, relief refinance mortgages[8] | 59.3 | 104 | 0.1 | 1.3 |
| Lower FICO scores at origination (less than 620)[8] | 55.6 | 93 | 13.4 | 12.9 |

| | As of December 31, 2010 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | (dollars in billions) | | | |
| Loans with one or more specified characteristics | $368.8 | 100% | 5.5% | 10.3% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 115.5 | 99 | 5.7 | 12.2 |
| Interest-only[6] | 95.4 | 112 | 0.5 | 18.4 |
| Option ARM[7] | 9.4 | 115 | 3.1 | 21.2 |
| Original LTV ratio greater than 90%, non-relief refinance mortgages[8] | 117.8 | 105 | 6.3 | 9.1 |
| Original LTV ratio greater than 90%, relief refinance mortgages[8] | 36.5 | 101 | 0.1 | 0.7 |
| Lower FICO scores at origination (less than 620)[8] | 61.2 | 89 | 10.4 | 13.9 |

(1) Categories are not additive and a single loan may be included in multiple categories if more than one characteristic is associated with the loan. Loans with a combination of these characteristics will have an even higher risk of default than those with an individual characteristic.

(2) See endnote (5) to "Table 45 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of current LTV ratios.

(3) Represents the percentage of loans based on loan count in our single-family credit guarantee portfolio that have been modified under agreement with the borrower, including those with no changes in the interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan. Excludes loans underlying certain Other Guarantee Transactions for which data was not available.

(4) See "Portfolio Management Activities-Credit Performance-Delinquencies" for further information about our reported serious delinquency rates.

(5) Loans within the Alt-A category continue to remain in that category following modification, even though the borrower may have provided full documentation of assets and income to complete the modification.

(6) The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post-modification), primarily due to delays in processing.

(7) Loans within the option ARM category continue to remain in that category following modification, even though the modified loan no longer provides for optional payment provisions.

(8) See endnotes (4) and (7) to "Table 45 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios and our use of FICO scores, respectively.

Loans with one or more of the above characteristics comprised approximately 20% of our single-family credit guarantee portfolio as of both December 31, 2011 and 2010. The total UPB of loans in our single-family credit guarantee portfolio with one or more of these characteristics declined approximately 7% to $343 billion as of December 31, 2011 from $369 billion as of December 31, 2010. This decline was principally due to liquidations resulting from prepayments, refinancing activity, and liquidations resulting from foreclosure events and foreclosure alternatives, but was partially offset by increases in loans with original LTV ratios greater than 90% due to our relief refinance mortgage activity in 2011. The serious delinquency rates associated with these loans declined to 9.3% as of December 31, 2011 from 10.3% as of December 31, 2010.

*Credit Enhancements*

The portfolio information below excludes our holdings of non-Freddie Mac mortgage-related securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities*" for credit enhancement and other information about our investments in non-Freddie Mac mortgage-related securities.

Our charter requires that single-family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests. However, as discussed below, under HARP, we allow eligible borrowers who have mortgages with high current LTV ratios to refinance their mortgages without obtaining new mortgage insurance in excess of what was already in place. Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. In addition, for some mortgage loans, we elect to share the default risk by transferring a portion of that risk to various third parties through a variety of other credit enhancements.

At December 31, 2011 and December 31, 2010, our single-family credit-enhanced mortgages represented 14% and 15%, respectively, of our single-family credit guarantee portfolio, excluding those backing Ginnie Mae Certificates and

HFA bonds guaranteed by us under the HFA initiative. Freddie Mac securities backed by Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative are excluded because we consider the incremental credit risk to which we are exposed to be insignificant.

We had recoveries (excluding reimbursements for our expenses) of $2.8 billion and $3.4 billion that reduced our charge-offs of single-family loans during the years ended December 31, 2011 and 2010, respectively. These amounts include $1.8 billion and $2.1 billion during the years ended December 31, 2011 and 2010, respectively, in recoveries associated with our primary and pool mortgage insurance policies and other credit enhancements. We had additional recoveries from credit enhancements that provided reimbursement for and reduced our expenses by $0.3 billion during both 2011 and 2010. During 2011 and 2010, the credit enhancement coverage for our single-family loan purchases was lower than in periods before 2009 and earlier, primarily as a result of high refinance activity. Refinance loans (other than relief refinance mortgages) typically have lower LTV ratios, and are more likely to have an LTV ratio below 80% and not require credit protection as specified in our charter. In addition, we have been purchasing significant amounts of relief refinance mortgages. These mortgages allow for the refinance of existing loans guaranteed by us under terms such that we may not have mortgage insurance for some or all of the UPB of the mortgage in excess of 80% of the value of the property for certain of these loans.

Our ability and desire to expand or reduce the portion of our total mortgage portfolio covered by credit enhancements will depend on: (a) our evaluation of the credit quality of new business purchase opportunities; (b) the risk profile of our portfolio; (c) the credit worthiness of potential counterparties; and (d) the future availability of effective credit enhancements at prices that permit an attractive return. While the use of credit enhancements reduces our exposure to mortgage credit risk, it increases our exposure to institutional credit risk. As guarantor, we remain responsible for the payment of principal and interest if mortgage insurance or other credit enhancements do not provide full reimbursement for covered losses. Our credit losses could increase if an entity that provides credit enhancement fails to fulfill its obligation, as this would reduce the amount of our credit loss recoveries.

Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio and is typically provided on a loan-level basis. Primary mortgage insurance transfers varying portions of the credit risk associated with a mortgage to a third-party insurer. Generally, in order to file a claim under a primary mortgage insurance policy, the insured loan must be in default and the borrower's interest in the underlying property must have been extinguished, such as through a foreclosure action. The mortgage insurer has a prescribed period of time within which to process a claim and make a determination as to its validity and amount.

Other prevalent types of credit enhancements that we use are lender recourse (under which we may require a lender to repurchase a loan upon default) and indemnification agreements (under which we may require a lender to reimburse us for credit losses realized on mortgages), as well as pool insurance. Pool insurance provides insurance on a pool of loans up to a stated aggregate loss limit. In addition to a pool-level loss coverage limit, some pool insurance contracts may have limits on coverage at the loan level. In certain instances, the cumulative losses we have incurred as of December 31, 2011 combined with our expectations of potential future claims may exceed the maximum limit of loss allowed by the policy.

In order to file a claim under a pool insurance policy, we generally must have finalized the primary mortgage claim, disposed of the foreclosed property, and quantified the net loss payable to us with respect to the insured loan to determine the amount due under the pool insurance policy. Certain pool insurance policies have specified loss deductibles that must be met before we are entitled to recover under the policy. We have institutional credit risk relating to the potential insolvency or non-performance of mortgage insurers that insure mortgages we purchase or guarantee. See *"Institutional Credit Risk — Mortgage Insurers"* for further discussion about pool insurance coverage and our mortgage loan insurers.

Certain of our single-family Other Guarantee Transactions utilize subordinated security structures as a form of credit enhancement. At December 31, 2011 and 2010, the UPB of single-family Other Guarantee Transactions with subordination coverage at origination was $3.3 billion and $3.9 billion, and the subordination coverage on these securities was $647 million and $825 million, respectively. At December 31, 2011 and 2010, the average serious delinquency rate on single-family Other Guarantee Transactions with subordination coverage was 20.9% and 21.1%, respectively.

See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for additional information about credit protection and other forms of credit enhancements covering loans in our single-family credit guarantee portfolio as of December 31, 2011 and December 31, 2010.

*Other Credit Risk Management Activities*

To compensate us for higher levels of risk in some mortgage products, we may charge upfront delivery fees above a base management and guarantee fee, which are calculated based on credit risk factors such as the mortgage product type,

loan purpose, LTV ratio and other loan or borrower characteristics. We implemented several increases in delivery fees that became effective in 2009 applicable to single-family mortgages with certain higher-risk loan characteristics. We implemented additional delivery fee increases that become effective March 1, 2011 (or later, as outstanding contracts permitted) for single-family loans with higher LTV ratios. These fee increases do not apply to relief refinance mortgages with LTV ratios greater than 80% and with settlement dates on or after July 1, 2011. Given the uncertainty of the housing market in recent years, during 2011 and 2010, we entered into arrangements with certain existing customers at their renewal dates that allow us to change credit and pricing terms more quickly than in the past. In response to a July 2011 request from FHFA, we have incorporated into our agreements with single-family sellers the ability to change our management and guarantee fees upon 90 days or less notice to sellers, if directed to do so by FHFA.

On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than 10 basis points above the average guarantee fees charged in 2011 on single-family mortgage-backed securities. For more information, see "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments — Legislated Increase to Guarantee Fees*."

*Single-Family Loan Workouts and the MHA Program*

Loan workout activities are a key component of our loss mitigation strategy for managing and resolving troubled assets and lowering credit losses. Our loan workouts consist of: (a) forbearance agreements; (b) repayment plans; (c) loan modifications; and (d) foreclosure alternatives (short sales or deed in lieu of foreclosure transactions). Our single-family loss mitigation strategy emphasizes early intervention by servicers in delinquent mortgages and provides alternatives to foreclosure. Other single-family loss mitigation activities include providing our single-family servicers with default management tools designed to help them manage non-performing loans more effectively and to assist borrowers in retaining home ownership where possible, or facilitate foreclosure alternatives when continued homeownership is not an option. See "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Loss Mitigation and Loan Workout Activities*" for a general description of our loan workouts.

Loan workouts are intended to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by reducing or eliminating a portion of the costs related to foreclosed properties and avoiding the additional credit losses that likely would be incurred in a REO sale. While we incur costs in the short term to execute our loan workout initiatives, we believe that, overall, these initiatives could reduce our ultimate credit losses over the long term.

HAMP and our new non-HAMP standard loan modification are important components of our loan workout program and have many similar features, including the initial incentive fees paid to servicers upon completion of a modification. Both of these loan modification initiatives are intended to provide borrowers the opportunity to obtain more affordable monthly payments and to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our credit losses by reducing or eliminating a portion of the costs related to foreclosed properties. However, we cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP and our new non-HAMP standard loan modification may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures.

Our seller/servicers have a significant role in servicing loans in our single-family credit guarantee portfolio, which includes an active role in our loss mitigation efforts. Therefore, a decline in their performance could impact the overall quality of our credit performance (including through missed opportunities for mortgage modifications), which could adversely affect our financial condition or results of operations and have significant impacts on our ability to mitigate credit losses. The risk of such a decline in performance remains high. For more information, see "RISK FACTORS — Competitive and Market Risks — *We face the risk that seller/servicers may fail to perform their obligations to service loans in our single-family and multifamily mortgage portfolios or that their servicing performance could decline*."

We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses. We require our single-family seller/servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure. During 2011, we helped more than 208,000 borrowers either stay in their homes or sell their properties and avoid foreclosures through our various workout programs, including HAMP, and we completed approximately 122,000 foreclosures.

The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts, and set market standards. Participation in the MHA Program is an integral part of our mission of providing stability to the housing market. Through our participation in this program, we help borrowers maintain home ownership. Some of the key initiatives of this program include HAMP and HARP, which are discussed below.

Home Affordable Modification Program

HAMP commits U.S. government, Freddie Mac and Fannie Mae funds to help eligible homeowners avoid foreclosures and keep their homes through mortgage modifications, where possible. Under this program, we offer loan modifications to financially struggling homeowners with mortgages on their primary residences that reduce the monthly principal and interest payments on their mortgages. HAMP requires that each borrower complete a trial period during which the borrower will make monthly payments based on the estimated amount of the modification payments. Trial periods are required for at least three months. After the final trial-period payment is received by our servicer and the borrower has provided necessary documentation, the borrower and servicer will enter into the modification. We bear the costs of these activities, including the cost of any monthly payment reductions.

Pursuant to the servicing alignment initiative, we changed some of the processes and procedures for our loans under HAMP to match the new processes and procedures for the servicing alignment initiative. Certain other features of HAMP include the following:

- Under HAMP, the goal is to reduce the borrowers' monthly mortgage payments to 31% of gross monthly income, which may be achieved through a combination of methods, including interest rate reductions, term extensions, and principal forbearance. Although HAMP contemplates that some servicers will also make use of principal reduction to achieve reduced payments for borrowers, we have only used forbearance and have not used principal reduction in modifying our loans.

- For HAMP modifications with a trial period beginning on or after October 1, 2011, servicers are paid incentive fees on a tiered structure, ranging from $400 to $1,600, based on the severity of the delinquency at the start of the trial period. Prior to October 1, 2011, servicers were paid a $1,000 incentive fee when they modified a loan and an additional $500 incentive fee if the loan was current when it entered the trial period. In addition, servicers receive up to $1,000 for any modification that reduces a borrower's monthly payment by 6% or more, in each of the first three years after the modification, as long as the modified loan remains current.

- Borrowers whose loans are modified through HAMP accrue monthly incentive payments that are applied annually to reduce up to $1,000 of their principal per year, for five years, as long as they are making timely payments under the modified loan terms.

- HAMP applies to loans originated on or before January 1, 2009.

On January 27, 2012, Treasury announced enhancements to HAMP, including extending the end date to December 31, 2013, expanding the program's eligibility criteria for modifications, increasing incentives paid to investors who engage in principal reduction, and extending to the GSEs the opportunity to receive investor incentives for principal reduction. Treasury has not yet published details about the incentives that will be available to the GSEs. FHFA announced that the GSEs will extend their use of HAMP until December 31, 2013, and continue to offer the standard modification under the servicing alignment initiative. FHFA noted that Treasury's expanded eligibility criteria for HAMP modifications are consistent with our standard non-HAMP modification.

FHFA announced that it has been asked to consider the newly available HAMP incentives for principal reduction. FHFA previously released an analysis concluding that principal forgiveness does not provide benefits that are greater than principal forbearance as a loss mitigation tool. FHFA stated that its assessment of the investor incentives now being offered by Treasury will follow its previous analysis, including consideration of the eligible universe, operational costs to implement such changes, and potential borrower incentive effects.

*Freddie Mac*

The table below presents the number of single-family loans that completed modification or were in trial periods under HAMP as of December 31, 2011 and December 31, 2010.

**Table 51 — Single-Family Home Affordable Modification Program Volume[1]**

| | As of December 31, 2011 | | As of December 31, 2010 | |
|---|---|---|---|---|
| | Amount[2] | Number of Loans | Amount[2] | Number of Loans |
| | (dollars in millions) | | | |
| Completed HAMP modifications[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $33,681 | 152,519 | $23,635 | 107,073 |
| Loans in the HAMP trial period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 2,790 | 12,802 | $ 4,905 | 22,352 |

(1) Based on information reported by our servicers to the MHA Program administrator.
(2) For loans in the HAMP trial period, this reflects the loan balance prior to modification. For completed HAMP modifications, the amount represents the balance of loans after modification under HAMP.
(3) Completed HAMP modifications are those where the borrower has made the last trial period payment, has provided the required documentation to the servicer and the modification has become effective. Amounts presented represent completed HAMP modifications with effective dates since our implementation of HAMP in 2009 through December 31, 2011 and December 31, 2010, respectively.

As of December 31, 2011, the borrower's monthly payment was reduced on average by an estimated $565, which amounts to an average of $6,780 per year, and a total of $1.0 billion in annual reductions for all of our completed HAMP modifications (these amounts are calculated by multiplying the number of completed modifications by the average reduction in monthly payment, and have not been adjusted to reflect the actual performance of the loans following modification). Except in limited instances, each borrower's reduced payment will remain in effect for a minimum of five years, and borrowers whose interest rates were adjusted below market levels will have their interest rate and payment gradually increased after the fifth year to a rate consistent with the market rate at the time of modification. We bear the cost associated with the borrowers' payment reductions. Although mortgage investors under the MHA Program are entitled to certain subsidies from Treasury for reducing the borrowers' monthly payments from 38% to 31% of the borrower's income, we do not receive such subsidies on modified mortgages owned or guaranteed by us.

A standard trial period plan is three months in duration. Our servicers are permitted to add an interim month, which will be reported as a fourth trial period month. In addition, our servicers are authorized to extend a trial period for up to an additional two months when the borrower is in bankruptcy in order to provide additional time to have the mortgage removed from the bankruptcy plan, which is a pre-requisite to a modification under HAMP. The number of our loans in the HAMP trial period declined to 12,802 as of December 31, 2011 from 22,352 as of December 31, 2010. A large number of borrowers entered into HAMP trial period plans when the program was initially introduced in 2009. Significantly fewer new borrowers entered into HAMP trial period plans beginning in the second half of 2010, when we changed the income documentation requirements as discussed below. We expect fewer borrowers will initiate HAMP modification during 2012 than 2011, because a large number of the delinquent borrowers that were eligible for the program have already completed the trial period or attempted to do so, but failed.

To address documentation issues experienced when the program began, guidelines for HAMP provide that, beginning with trial periods that became effective on or after June 1, 2010, borrowers must provide income documentation before entering into a HAMP trial period. Prior to the June 1, 2010 changes to HAMP, we experienced approximately a 38% modification completion rate under the program. Given the changes made to the program effective June 1, 2010, we have since experienced a modification completion rate in excess of 80%. When a borrower's HAMP trial period is cancelled, the loan is considered for our other workout activities.

Approximately 40% of our loans in the HAMP trial period as of December 31, 2011 have been in the trial period for more than the minimum duration of three months. Based on information provided by the program administrator, the average length of the trial period for loans in the program as of December 31, 2011 was five months. For more information on our redefault rates on these loans, see "Table 54 — Reperformance Rates of Modified Single-Family Loans."

HAMP is one modification option for single-family loans, but we also have completed a large volume of modifications through our non-HAMP loan modification initiatives.

The costs we incur related to HAMP have been, and will likely continue to be, significant for the following reasons:

- Except for certain Other Guarantee Transactions and loans underlying our other guarantee commitments, we bear the full cost of the monthly payment reductions related to modifications of loans we own or guarantee and all servicer and borrower incentives, and we will not receive a reimbursement of these costs from Treasury. We paid $184 million of servicer incentives during 2011, as compared to $178 million of such incentives during 2010. As of December 31, 2011, we accrued $77 million for both initial and recurring servicer incentives not yet due. We paid $111 million of borrower incentives during 2011, as compared to $64 million of these incentives during 2010.

*Freddie Mac*

As of December 31, 2011, we accrued $60 million for borrower incentives not yet due. We also have the potential to incur additional servicer incentives and borrower incentives as long as the borrower remains current on a loan modified under HAMP.

- Under HAMP, we typically provide concessions to borrowers, which generally include interest rate reductions and often also provide for forbearance (but not forgiveness) of principal.

- Some borrowers will fail to complete the HAMP trial period and others will default on their HAMP modified loans. For those borrowers who redefault or who do not complete the trial period and do not qualify for another loan workout, HAMP will have delayed the resolution of the loans through the foreclosure process. If home prices decline while these events take place, such delay in the foreclosure process may increase the losses we recognize on these loans, to the extent the prices we ultimately receive for the foreclosed properties are less than the prices we could have received had we foreclosed upon the properties earlier.

- Non-GSE mortgages modified under HAMP include mortgages backing our investments in non-agency mortgage-related securities. Such modifications reduce the monthly payments due from affected borrowers, and thus reduce the payments we receive on these securities (to the extent the payment reductions have not been absorbed by subordinated investors or by other credit enhancement).

Servicing Alignment Initiative and Non-HAMP Modifications

In February 2011, FHFA directed Freddie Mac and Fannie Mae to develop consistent requirements, policies, and processes for the servicing of non-performing loans. This directive was designed to create greater consistency in servicing practices and to build on the best practices of each of the GSEs. In April 2011, pursuant to this directive, FHFA announced a new set of aligned standards (known as the servicing alignment initiative) for servicing non-performing loans owned or guaranteed by Freddie Mac and Fannie Mae that are designed to help servicers do a better job of communicating and working with troubled borrowers and to bring greater accountability to the servicing industry. We announced our detailed requirements for this initiative on June 30, 2011, with implementation beginning for loans that were delinquent as of October 1, 2011. These standards provide for earlier and more frequent communication with delinquent borrowers, consistent requirements for collecting documents from borrowers, consistent timelines for responding to borrowers, and consistent timelines for processing foreclosures. These standards are expected to result in greater alignment of servicer processes for both HAMP and most non-HAMP workouts.

Under these new servicing standards, we will pay incentives to servicers that exceed certain performance standards with respect to servicing delinquent loans. We will also assess compensatory fees from servicers if they do not achieve a minimum performance benchmark with respect to servicing delinquent loans. These incentives may result in our payment of increased fees to our seller/servicers, the cost of which may be at least partially mitigated by the compensatory fees paid to us by our servicers that do not perform as required.

As part of the servicing alignment initiative, we began implementation of a new non-HAMP standard loan modification initiative. This new standard modification replaced our previous non-HAMP modification initiative beginning January 1, 2012. The new standard modification requires a three-month trial period. Servicers were permitted to begin offering standard modification trial period plans with effective dates on or after October 1, 2011. A modest number of borrowers entered trial periods under our standard non-HAMP modification initiative as of December 31, 2011. We expect to experience a temporary decline in completed modification volume in the first half of 2012, below what otherwise would be expected, as servicers transition borrowers to the new standard modification initiative and borrowers complete the trial period. This new standard modification program is expected to result in a higher volume of modifications where we partially forbear (but do not forgive) principal until the borrower sells the home or refinances or pays off the mortgage. The standard modification provides an extension of the loan's term to 480 months. In addition, the new modification initiative currently provides for a standard modified interest rate of 5% (though FHFA could change this in the future). This new initiative also provides for a servicer incentive fee schedule for non-HAMP modifications, comparable to the HAMP servicer incentive fee structure, effective October 1, 2011. The incentive fees are intended to provide greater incentives to our servicers to modify loans earlier in the delinquency, which may cause the servicer incentive costs associated with our modification activities to increase in the future. The standard modification does not include borrower incentive payments or recurring servicer incentive fees after the initial servicer incentive payment.

We expect that the costs we incur related to our new non-HAMP standard loan modifications will likely be significant. These costs will be similar to those described above under "Home Affordable Modification Program" relating to: (a) bearing the full cost of monthly payment reductions; (b) paying initial incentive fees to servicers; (c) providing concessions to borrowers; and (d) the potential for delaying the resolution of loans through the foreclosure process. While

we incur costs in the short-term to execute our non-HAMP standard modifications, we believe that, overall, our non-HAMP standard modification could reduce our ultimate credit losses over the long-term.

<u>Home Affordable Refinance Program and Relief Refinance Mortgage Initiative</u>

HARP gives eligible homeowners (whose monthly payments are current) with existing loans that are owned or guaranteed by us or Fannie Mae an opportunity to refinance into loans with more affordable monthly payments and/or fixed-rate terms. Through December 2011, under HARP, eligible borrowers who had mortgages with current LTV ratios above 80% and up to 125% were allowed to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place. Beginning December 2011, HARP was expanded to allow eligible borrowers who have mortgages with current LTV ratios above 125% to refinance under the program.

Our underwriting procedures for relief refinance mortgages are limited in many cases, and such procedures generally do not include all of the changes in underwriting standards we have implemented in the last several years. As a result, relief refinance mortgages generally reflect many of the credit risk attributes of the original loans. However, borrower participation in our relief refinance mortgage initiative may help reduce our exposure to credit risk in cases where borrower payments under their mortgages are reduced, thereby strengthening the borrower's potential to make their mortgage payments.

Part of the relief refinance mortgage initiative is our implementation of HARP, and relief refinance options are also available for certain non-HARP loans. HARP is targeted at borrowers with current LTV ratios above 80%; however, our relief refinance initiative also allows borrowers with LTV ratios of 80% and below to participate. Over time, relief refinance mortgages with LTV ratios above 80% (HARP loans) may not perform as well as other refinance mortgages because of the continued high LTV ratios of these loans. Our relief refinance initiative is only for qualifying mortgage loans that we already hold or guarantee. We continue to bear the credit risk for refinanced loans under this program, to the extent that such risk is not covered by existing mortgage insurance or other existing credit enhancements. The implementation of the relief refinance mortgage initiative resulted in a higher volume of purchases than we would expect in the absence of the program.

The table below presents the composition of our purchases of refinanced single-family loans during the year ended December 31, 2011 and 2010.

**Table 52 — Single-Family Refinance Loan Volume**[1]

| | Year Ended December 31, 2011 | | | Year Ended December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Amount | Number of Loans | Percent | Amount | Number of Loans | Percent |
| | | | (dollars in millions) | | | |
| Relief refinance mortgages: | | | | | | |
| Above 105% LTV ratio | $ 8,174 | 36,307 | 3.1% | $ 3,977 | 16,667 | 1.1% |
| Above 80% to 105% LTV ratio | 31,566 | 148,643 | 12.6 | 43,906 | 192,650 | 13.1 |
| 80% and below LTV ratio | 42,304 | 267,633 | 22.6 | 57,766 | 323,851 | 22.0 |
| Total relief refinance mortgages | $ 82,044 | 452,583 | 38.3% | $105,649 | 533,168 | 36.2% |
| Total refinance loan volume[2] | $246,913 | 1,183,304 | 100.0% | $303,060 | 1,470,786 | 100.0% |

(1) Consists of all single-family refinance mortgage loans that we either purchased or guaranteed during the period, excluding those associated with other guarantee commitments and Other Guarantee Transactions.
(2) Consists of relief refinance mortgages and other refinance mortgages.

Relief refinance mortgages comprised approximately 33% and 35% of our total refinance volume during 2011 and 2010, respectively. Relief refinance mortgages with LTV ratios above 80% represented approximately 12% of our total single-family credit guarantee portfolio purchases during both 2011 and 2010. Relief refinance mortgages comprised approximately 11% and 7% of the UPB in our total single-family credit guarantee portfolio as of December 31, 2011 and December 31, 2010, respectively. As of December 31, 2011, the serious delinquency rates for relief refinance loans with: (a) LTV ratios of 80% or less; (b) LTV ratios from 80% to 100%; (c) LTV ratios of more than 100%; and (d) total relief refinance mortgage loans for all LTV ratios were 0.2%, 0.9%, 1.5%, and 0.6%, respectively.

On October 24, 2011 FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers whose monthly payments are current and who can benefit from refinancing their home mortgages. The Acting Director of FHFA stated that the goal of pursuing these changes is to create refinancing opportunities for more borrowers whose mortgages are owned or guaranteed by Freddie Mac and Fannie Mae while reducing risk for these entities and bringing a measure of stability to housing markets. The revisions to HARP enable us to expand the assistance we may provide to homeowners by making their mortgage payments more affordable through one or more of the following ways: (a) a reduction in payment; (b) a reduction in rate; (c) movement to a more stable

mortgage product type (*i.e.*, from an ARM to a fixed-rate mortgage); or (d) a reduction in amortization term. See "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Loss Mitigation and Loan Workout Activities*" for additional information about recent changes to HARP.

In November 2011, Freddie Mac and Fannie Mae issued guidance with operational details about the HARP changes to mortgage lenders and servicers after receiving information from FHFA about the fees that we may charge associated with the refinancing program. Since industry participation in HARP is not mandatory, we anticipate that implementation schedules will vary as individual lenders, mortgage insurers and other market participants modify their processes. It is too early to estimate how many eligible borrowers are likely to refinance under the revised program.

The revisions to HARP will help to reduce our exposure to credit risk to the extent that HARP refinancing strengthen the borrowers' capacity to repay their mortgages and, in some cases, reduce the payments under their mortgages. These revisions to HARP could also reduce our credit losses to the extent that the revised program contributes to bringing stability to the housing market. However, we may face greater exposure to credit and other losses on these HARP loans because we are not requiring lenders to provide us with certain representations and warranties on the refinanced HARP loans. We could also experience declines in the fair values of certain agency security investments classified as available-for-sale or trading resulting from changes in expectations of mortgage prepayments and lower net interest yields over time on other mortgage-related investments. As a result, there can be no assurance that the benefits from the revised program will exceed our costs. See "RISK FACTORS — Competitive and Market Risks — *The servicing alignment initiative, MHA Program and other efforts to reduce foreclosures, modify loan terms and refinance mortgages, including HARP, may fail to mitigate our credit losses and may adversely affect our results of operations or financial condition*" for additional information.

## Home Affordable Foreclosure Alternatives Program

HAFA is designed to permit borrowers who meet basic HAMP eligibility requirements to sell their homes in short sales, if such borrowers did not qualify for or participate in a HAMP trial period, failed to complete their HAMP trial period, or defaulted on their HAMP modification. HAFA also provides a process for borrowers to convey title to their homes through a deed in lieu of foreclosure. HAFA took effect in April 2010 and ends on December 31, 2013. We began our implementation of this program in August 2010. We completed a small number of HAFA transactions on our single-family mortgage loans during 2011.

## Hardest Hit Fund

In 2010, the federal government created the Hardest Hit Fund, which provides funding for state HFAs to create unemployment assistance initiatives to help homeowners in those states that have been hit hardest by the housing crisis and economic downturn. To the extent our borrowers participate in the HFA unemployment assistance programs and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency. Based on information provided to us by our seller/servicers, we believe participation in these programs by our borrowers has been limited through December 31, 2011.

## Compliance Agent

We are the compliance agent for Treasury for certain foreclosure avoidance activities under HAMP by mortgage holders other than Freddie Mac and Fannie Mae. Among other duties, as the program compliance agent, we conduct examinations and review servicer compliance with the published requirements for the program. Some of these examinations are on-site, and others involve off-site documentation reviews. We report the results of our examination findings to Treasury. Based on the examinations, we may also provide Treasury with advice, guidance and lessons learned to improve operation of the program.

The table below presents volumes of single-family loan workouts, serious delinquency, and foreclosures for 2011, 2010, and 2009.

**Table 53 — Single-Family Loan Workouts, Serious Delinquency, and Foreclosures Volumes[1]**

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2011** | | **2010** | | **2009** | |
| | Number of Loans | Loan Balances | Number of Loans | Loan Balances | Number of Loans | Loan Balances |
| | | | (dollars in millions) | | | |
| Home retention actions: | | | | | | |
| Loan modifications[2] | | | | | | |
| with no change in terms[3] | 4,371 | $ 778 | 4,639 | $ 799 | 5,866 | $ 1,008 |
| with term extension | 16,354 | 3,011 | 20,664 | 3,602 | 15,596 | 2,500 |
| with reduction of contractual interest rate and, in certain cases, term extension | 68,584 | 15,231 | 114,686 | 25,277 | 40,915 | 8,605 |
| with rate reduction, term extension and principal forbearance | 19,865 | 5,319 | 30,288 | 7,915 | 2,667 | 621 |
| Total loan modifications[4] | 109,174 | 24,339 | 170,277 | 37,593 | 65,044 | 12,734 |
| Repayment plans[5] | 33,421 | 4,787 | 31,210 | 4,523 | 33,725 | 4,711 |
| Forbearance agreements[6] | 19,516 | 3,821 | 34,594 | 7,156 | 14,628 | 2,848 |
| Total home retention actions: | 162,111 | 32,947 | 236,081 | 49,272 | 113,397 | 20,293 |
| Foreclosure alternatives: | | | | | | |
| Short sale | 45,623 | 10,524 | 38,773 | 9,109 | 18,890 | 4,481 |
| Deed in lieu of foreclosure transactions | 540 | 94 | 402 | 63 | 329 | 56 |
| Total foreclosure alternatives | 46,163 | 10,618 | 39,175 | 9,172 | 19,219 | 4,537 |
| Total single-family loan workouts | 208,274 | $43,565 | 275,256 | $58,444 | 132,616 | $24,830 |
| Seriously delinquent loan additions | 374,970 | | 502,710 | | 597,188 | |
| Single-family foreclosures[7] | 121,751 | | 142,877 | | 90,436 | |
| Seriously delinquent loans, at period end | 414,134 | | 462,439 | | 498,829 | |

(1) Based on completed actions with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment and forbearance activities for which the borrower has started the required process, but the actions have not been permanent or effective, such as loans in modification trial periods. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period (see endnote 6).

(2) As a result of our adoption of an amendment to the accounting guidance on the classification of loans as TDRs, which became effective in the third quarter of 2011, the population of loans we account for as TDRs significantly increased due to the inclusion of loans that were not previously considered TDRs, including those loans that were subject to workout activities that occurred during the first half of 2011. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information.

(3) Under this modification type, past due amounts are added to the principal balance and reamortized based on the original contractual loan terms.

(4) Includes completed loan modifications under HAMP; however, the number of such completions differs from that reported by the MHA Program administrator in part due to differences in the timing of recognizing the completions by us and the administrator.

(5) Represents the number of borrowers as reported by our seller/servicers that have completed the full term of a repayment plan for past due amounts. Excludes the number of borrowers that are actively repaying past due amounts under a repayment plan, which totaled 21,382 and 23,151 borrowers as of December 31, 2011 and 2010, respectively.

(6) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.

(7) Represents the number of our single-family loans that complete foreclosure transfers, including third-party sales at foreclosure auction in which ownership of the property is transferred directly to a third-party rather than to us.

We experienced declines in home retention actions, particularly loan modifications, in 2011 compared to 2010, primarily due to declines in the number of seriously delinquent loan additions and in borrower participation in HAMP in 2011. A large number of borrowers entered into HAMP trial period plans when the program was initially introduced in 2009, and completed or terminated their modifications in 2010. Significantly fewer borrowers entered into HAMP trial period plans beginning in the second half of 2010 when we changed the income documentation requirements. The UPB of loans in our single-family credit guarantee portfolio for which we have completed a loan modification increased to $69 billion as of December 31, 2011 from $52 billion as of December 31, 2010. The number of modified loans in our single-family credit guarantee portfolio continued to increase and such loans comprised approximately 2.9% and 2.1% of our single-family credit guarantee portfolio as of December 31, 2011 and December 31, 2010, respectively. The estimated current LTV ratio for all modified loans in our single-family credit guarantee portfolio was 123% and the serious delinquency rate on these loans was 17.2% as of December 31, 2011.

Foreclosure alternative volume increased 18% in 2011, compared to 2010, and we expect the volume of foreclosure alternatives to remain high in 2012 primarily because we offer incentives to servicers to complete short sales instead of foreclosures. We plan to introduce additional initiatives in 2012 designed to help more distressed borrowers avoid foreclosure through short sale and deed in lieu of foreclosure transactions.

The table below presents the reperformance rate of modified single-family loans in each of the last eight quarterly periods.

**Table 54 — Reperformance Rates of Modified Single-Family Loans[1]**

| HAMP loan modifications: | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 |
|---|---|---|---|---|---|---|---|---|
| Time since modification- | | | | | | | | |
| 3 to 5 months | 96% | 96% | 95% | 94% | 93% | 94% | 95% | 94% |
| 6 to 8 months | | 93 | 93 | 92 | 92 | 91 | 93 | 93 |
| 9 to 11 months | | | 90 | 89 | 90 | 89 | 90 | 90 |
| 12 to 14 months | | | | 87 | 87 | 87 | 88 | 88 |
| 15 to 17 months | | | | | 85 | 85 | 86 | 86 |
| 18 to 20 months | | | | | | 83 | 84 | 85 |
| 21 to 23 months | | | | | | | 82 | 82 |
| 24 to 26 months | | | | | | | | 81 |

| Non-HAMP loan modifications: | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 |
|---|---|---|---|---|---|---|---|---|
| Time since modification- | | | | | | | | |
| 3 to 5 months | 92% | 92% | 93% | 94% | 93% | 93% | 94% | 90% |
| 6 to 8 months | | 85 | 86 | 89 | 90 | 86 | 87 | 82 |
| 9 to 11 months | | | 81 | 83 | 85 | 82 | 80 | 75 |
| 12 to 14 months | | | | 78 | 81 | 78 | 77 | 69 |
| 15 to 17 months | | | | | 77 | 74 | 74 | 66 |
| 18 to 20 months | | | | | | 70 | 70 | 64 |
| 21 to 23 months | | | | | | | 66 | 61 |
| 24 to 26 months | | | | | | | | 58 |

| Total (HAMP and Non-HAMP): | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 |
|---|---|---|---|---|---|---|---|---|
| Time since modification- | | | | | | | | |
| 3 to 5 months | 94% | 95% | 95% | 94% | 93% | 94% | 95% | 92% |
| 6 to 8 months | | 90 | 90 | 90 | 91 | 90 | 92 | 88 |
| 9 to 11 months | | | 86 | 86 | 88 | 87 | 88 | 84 |
| 12 to 14 months | | | | 82 | 84 | 85 | 86 | 80 |
| 15 to 17 months | | | | | 81 | 82 | 84 | 78 |
| 18 to 20 months | | | | | | 79 | 81 | 76 |
| 21 to 23 months | | | | | | | 79 | 73 |
| 24 to 26 months | | | | | | | | 71 |

(1) Represents the percentage of loans that are current or less than three monthly payments past due as well as those paid-in-full or repurchased. Excludes loans in modification trial periods.

(2) Loan modifications are recognized as completed in the quarterly period in which the servicer has reported the modification as effective and the agreement has been accepted by us, which in certain cases may be delayed by a backlog in servicer processing of modifications. In the second quarter of 2011, we revised the calculation of reperformance rates to better account for re-modified loans (*i.e.*, those where a borrower has received a second modification). The revised calculation reflects the status of each modification separately. In the case of a remodified loan where the borrower is performing, the previous modification would be presented as being in default in the applicable period.

The redefault rate is the percentage of our modified loans that became seriously delinquent, transitioned to REO, or completed a loss-producing foreclosure alternative, and is the inverse of the reperformance rate. As of December 31, 2011, the redefault rate for all of our single-family loan modifications (including those under HAMP) completed during the first nine months of 2011, and full years 2010, 2009, and 2008 was 10%, 20%, 50%, and 67%, respectively. Many of the borrowers that received modifications in 2008 and 2009 were negatively affected by worsening economic conditions, including high unemployment rates during the last several years. As of December 31, 2011, the redefault rate for loans modified under HAMP in the first nine months of 2011, and full years 2010 and 2009 was approximately 7%, 16% and 19%, respectively. These redefault rates may not be representative of the future performance of modified loans, including those modified under HAMP. We believe the redefault rate for loans modified in the last three years, including those modified under HAMP, is likely to increase, particularly since the housing and economic environments remain challenging.

*Credit Performance*

Delinquencies

We report single-family serious delinquency rate information based on the number of loans that are three monthly payments or more past due or in the process of foreclosure, as reported by our servicers. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as delinquent as long as the borrower is current under the modified terms. Single-family loans for which the borrower is subject to a forbearance agreement will continue to reflect the past due status of the borrower. To the extent our borrowers participate in the HFA unemployment assistance initiatives and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency.

FHFA 2865

Our single-family delinquency rates include all single-family loans that we own, that back Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by either Ginnie Mae Certificates or HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancements provided on them by the U.S. government.

Some of our workout and other loss mitigation activities create fluctuations in our delinquency statistics. For example, single-family loans that we report as seriously delinquent before they enter a trial period under HAMP or our new non-HAMP standard modification continue to be reported as seriously delinquent for purposes of our delinquency reporting until the modifications become effective and the loans are removed from delinquent status by our servicers. However, under our previous non-HAMP modifications, the borrower would return to a current payment status sooner, because these modifications did not have trial periods. Consequently, the volume, timing, and type of loan modifications impact our reported serious delinquency rate. As discussed above in "*Single-Family Loan Workouts and the MHA Program*," the new non-HAMP standard loan modification initiative includes a trial period comparable to that of our HAMP modification initiative. In addition, there may be temporary timing differences, or lags, in the reporting of payment status and modification completion due to differing practices of our servicers that can affect our delinquency reporting.

Our serious delinquency rates have been affected by delays, including those due to temporary actions to suspend foreclosure transfers of occupied homes, increases in foreclosure process timeframes, process requirements of HAMP, general constraints on servicer capacity (which affects the rate at which servicers modify or foreclose upon loans), and court backlogs (in states that require a judicial foreclosure process). These delays lengthen the period of time in which loans remain in seriously delinquent status, as the delays extend the time it takes for seriously delinquent loans to be modified, foreclosed upon or otherwise resolved and thus transition out of seriously delinquent status. As a result, we believe our single-family serious delinquency rates were higher in 2011 and 2010 than they otherwise would have been. As of December 31, 2011 and 2010, the percentage of seriously delinquent loans that have been delinquent for more than six months was 70% and 66%, respectively.

The table below presents serious delinquency rates for our single-family credit guarantee portfolio.

### Table 55 — Single-Family Serious Delinquency Rates

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2011 | | 2010 | | 2009 | |
| | Percentage of Portfolio | Serious Delinquency Rate | Percentage of Portfolio | Serious Delinquency Rate | Percentage of Portfolio | Serious Delinquency Rate |
| Single-family: | | | | | | |
| Non-credit-enhanced............................ | 86% | 2.84% | 85% | 3.01% | 84% | 3.02% |
| Credit-enhanced................................ | 14 | 8.03 | 15 | 8.27 | 16 | 8.68 |
| Total single-family credit guarantee portfolio[1] .......... | 100% | 3.58 | 100% | 3.84 | 100% | 3.98 |

(1) As of December 31, 2011, 2010, and 2009, approximately 68%, 61%, and 49%, respectively, of the single-family loans reported as seriously delinquent were in the process of foreclosure.

Serious delinquency rates of our single-family credit guarantee portfolio declined to 3.58% as of December 31, 2011 from 3.84% as of December 31, 2010. Our serious delinquency rate remains high compared to historical levels, reflecting continued stress in the housing and labor markets. The improvement in our single-family serious delinquency rate during 2011 was primarily due to a high volume of loan modifications and foreclosure transfers, as well as a slowdown in new serious delinquencies. See "Table 54 — Reperformance Rates of Modified Single-Family Loans" for information on the performance of modified loans. Although the number of seriously delinquent loans declined in both 2010 and 2011, the decline in the size of our single-family credit guarantee portfolio in 2011 caused our delinquency rates to be higher than they otherwise would have been, because these rates are calculated on a smaller base of loans at the end the year.

Serious delinquency rates for interest-only and option ARM products, which together represented approximately 5% of our total single-family credit guarantee portfolio at December 31, 2011, were 17.6% and 20.5%, at December 31, 2011, compared with 18.4% and 21.2%, respectively, at December 31, 2010. Serious delinquency rates of single-family 30-year, fixed rate amortizing loans, a more traditional mortgage product, were approximately 3.9% and 4.0% at December 31, 2011 and 2010, respectively.

The tables below present serious delinquency rates categorized by borrower and loan characteristics, including geographic region and origination year, which indicate that certain concentrations of loans have been more adversely affected by declines in home prices since 2006. In certain states, our single-family serious delinquency rates have remained persistently high. As of December 31, 2011, single-family loans in Arizona, California, Florida, and Nevada

comprised 25% of our single-family credit guarantee portfolio, and the serious delinquency rate of loans in these states was 6.2%. During the year ended December 31, 2011, we also continued to experience high serious delinquency rates on single-family loans originated between 2005 and 2008. We purchased significant amounts of loans with higher-risk characteristics in those years. In addition, those borrowers are more susceptible to the declines in home prices since 2006 than those homeowners that have built up equity in their homes over time.

The table below presents credit concentrations for certain loan groups in our single-family credit guarantee portfolio.

**Table 56 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio**

| | As of December 31, 2011 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio[1] | Percentage Modified[2] | Serious Delinquency Rate |
| | (dollars in billions) | | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada . . . . . . . . . . . . . . . | $ 38 | $ 406 | $ 444 | 93% | 4.6% | 6.2% |
| All other states . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 56 | 1,246 | 1,302 | 75 | 2.5 | 2.9 |
| Year of origination: | | | | | | |
| 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 250 | 250 | 70 | — | 0.1 |
| 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 324 | 324 | 71 | <0.1 | 0.3 |
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | <1 | 315 | 315 | 72 | 0.1 | 0.5 |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | 113 | 120 | 92 | 4.4 | 5.7 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 | 138 | 167 | 113 | 10.2 | 11.6 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25 | 99 | 124 | 112 | 9.3 | 10.8 |
| 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 | 124 | 142 | 96 | 5.1 | 6.5 |
| 2004 and prior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 | 289 | 304 | 61 | 2.5 | 2.8 |

| | As of December 31, 2010 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio[1] | Percentage Modified[2] | Serious Delinquency Rate |
| | (dollars in billions) | | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada . . . . . . . . . . . . . . . | $ 47 | $ 410 | $ 457 | 91% | 3.3% | 7.1% |
| All other states . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 69 | 1,283 | 1,352 | 73 | 1.9 | 3.0 |
| Year of origination: | | | | | | |
| 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 323 | 323 | 70 | — | 0.1 |
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 391 | 391 | 70 | <0.1 | 0.3 |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 | 149 | 159 | 86 | 2.2 | 4.9 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 | 172 | 208 | 104 | 6.2 | 11.6 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31 | 125 | 156 | 104 | 5.8 | 10.5 |
| 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21 | 156 | 177 | 91 | 3.3 | 6.0 |
| 2004 and prior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 | 377 | 395 | 58 | 1.7 | 2.5 |

| | 2011 | | | 2010 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Alt-A | Non Alt-A | Total | Alt-A | Non Alt-A | Total |
| | (in millions) | | | (in millions) | | |
| **Credit Losses** | | | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada . . . . . . . . . . . . . . . | $2,641 | $5,081 | $7,722 | $3,708 | $4,950 | $8,658 |
| All other states . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,050 | 4,209 | 5,259 | 1,438 | 3,964 | 5,402 |
| Year of origination: | | | | | | |
| 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 2 | 2 | — | — | — |
| 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 62 | 62 | — | <1 | <1 |
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | <1 | 177 | 177 | <1 | 63 | 63 |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 102 | 903 | 1,005 | 116 | 777 | 893 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,455 | 3,245 | 4,700 | 1,905 | 2,836 | 4,741 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,314 | 2,328 | 3,642 | 1,920 | 2,340 | 4,260 |
| 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 713 | 1,566 | 2,279 | 1,091 | 1,701 | 2,792 |
| 2004 and prior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 107 | 1,007 | 1,114 | 114 | 1,197 | 1,311 |

(1) See endnote (5) to "Table 45 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of estimated current LTV ratios.

(2) Represents the percentage of loans, based on loan count in our single-family credit guarantee portfolio, that have been modified under agreement with the borrower, including those with no changes in interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan.

The table below presents statistics for combinations of certain characteristics of the mortgages in our single-family credit guarantee portfolio as of December 31, 2011 and December 31, 2010.

*Freddie Mac*

FHFA 2867

## Table 57 — Single-Family Credit Guarantee Portfolio by Attribute Combinations

December 31, 2011

| | Current LTV Ratio ≤ 80[1] | | Current LTV Ratio of > 80 to 100[1] | | Current LTV > 100[1] | | Current LTV Ratio All Loans[1] | | |
|---|---|---|---|---|---|---|---|---|---|
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
| **By Product Type** | | | | | | | | | |
| **FICO scores < 620:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 0.9% | 8.1% | 0.8% | 13.4% | 1.0% | 23.7% | 2.7% | 16.6% | 14.2% |
| 15- year amortizing fixed-rate | 0.2 | 4.2 | <0.1 | 10.1 | <0.1 | 17.6 | 0.2 | 1.2 | 4.7 |
| ARMs/adjustable rate[4] | 0.1 | 10.8 | <0.1 | 17.2 | <0.1 | 25.4 | 0.1 | 9.8 | 15.4 |
| Interest-only[5] | <0.1 | 16.0 | <0.1 | 22.4 | 0.1 | 34.9 | 0.1 | 0.4 | 30.3 |
| Other[6] | <0.1 | 3.6 | <0.1 | 7.4 | 0.1 | 14.1 | 0.1 | 4.2 | 5.6 |
| Total FICO scores < 620 | 1.2 | 7.0 | 0.8 | 13.5 | 1.2 | 24.1 | 3.2 | 13.4 | 12.9 |
| **FICO scores of 620 to 659:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 2.0 | 5.2 | 1.5 | 8.9 | 2.0 | 18.4 | 5.5 | 11.5 | 10.1 |
| 15- year amortizing fixed-rate | 0.6 | 2.5 | <0.1 | 6.1 | <0.1 | 15.1 | 0.6 | 0.6 | 2.8 |
| ARMs/adjustable rate[4] | 0.1 | 5.5 | 0.1 | 11.7 | 0.1 | 23.6 | 0.3 | 2.0 | 12.6 |
| Interest-only[5] | <0.1 | 10.4 | 0.1 | 18.6 | 0.3 | 31.7 | 0.4 | 0.3 | 27.2 |
| Other[6] | <0.1 | 2.8 | <0.1 | 4.8 | <0.1 | 5.5 | <0.1 | 1.4 | 4.5 |
| Total FICO scores of 620 to 659 | 2.7 | 4.4 | 1.7 | 9.1 | 2.4 | 19.4 | 6.8 | 8.9 | 9.4 |
| **FICO scores of >= 660:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 34.6 | 1.0 | 20.3 | 2.4 | 12.4 | 9.2 | 67.3 | 2.7 | 2.8 |
| 15- year amortizing fixed-rate | 13.1 | 0.4 | 1.0 | 1.1 | 0.2 | 6.0 | 14.3 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 2.5 | 1.1 | 0.8 | 4.3 | 0.8 | 14.8 | 4.1 | 0.5 | 4.5 |
| Interest-only[5] | 0.4 | 3.7 | 0.7 | 9.2 | 2.5 | 20.7 | 3.6 | 0.2 | 16.2 |
| Other[6] | <0.1 | 2.0 | <0.1 | 2.0 | 0.1 | 2.0 | 0.1 | 0.5 | 2.0 |
| Total FICO scores >= 660 | 50.6 | 0.8 | 22.8 | 2.6 | 16.0 | 10.8 | 89.4 | 1.9 | 2.6 |
| FICO scores not available | 0.3 | 4.8 | 0.2 | 11.9 | 0.1 | 21.4 | 0.6 | 5.5 | 8.9 |
| **All FICO scores:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 37.7 | 1.6 | 22.5 | 3.4 | 15.6 | 11.5 | 75.8 | 4.1 | 3.9 |
| 15- year amortizing fixed-rate | 13.8 | 0.6 | 1.1 | 1.5 | 0.2 | 7.3 | 15.1 | 0.1 | 0.7 |
| ARMs/adjustable rate[4] | 2.7 | 1.8 | 1.0 | 5.5 | 0.9 | 16.4 | 4.6 | 1.0 | 5.5 |
| Interest-only[5] | 0.5 | 4.4 | 0.8 | 10.5 | 2.8 | 22.2 | 4.1 | 0.2 | 17.6 |
| Other[6] | 0.1 | 8.9 | 0.1 | 8.4 | 0.2 | 8.4 | 0.4 | 6.8 | 8.6 |
| Total single-family credit guarantee portfolio[7] | 54.8% | 1.3% | 25.5% | 3.6% | 19.7% | 12.8% | 100.0% | 2.9% | 3.6% |
| **By Region[8]** | | | | | | | | | |
| **FICO scores < 620:** | | | | | | | | | |
| North Central | 0.2% | 6.3% | 0.2% | 11.7% | 0.2% | 20.1% | 0.6% | 13.4% | 12.0% |
| Northeast | 0.4 | 9.3 | 0.2 | 19.0 | 0.3 | 28.9 | 0.9 | 14.3 | 14.9 |
| Southeast | 0.2 | 7.9 | 0.2 | 13.9 | 0.3 | 29.5 | 0.7 | 15.9 | 15.9 |
| Southwest | 0.2 | 5.1 | 0.1 | 11.0 | 0.1 | 19.5 | 0.4 | 9.4 | 8.0 |
| West | 0.2 | 4.6 | 0.1 | 9.1 | 0.3 | 19.5 | 0.6 | 16.2 | 11.8 |
| Total FICO scores < 620 | 1.2 | 7.0 | 0.8 | 13.5 | 1.2 | 24.1 | 3.2 | 13.4 | 12.9 |
| **FICO scores of 620 to 659:** | | | | | | | | | |
| North Central | 0.5 | 4.0 | 0.3 | 8.2 | 0.5 | 15.1 | 1.3 | 8.7 | 8.4 |
| Northeast | 0.8 | 5.8 | 0.5 | 12.9 | 0.4 | 23.3 | 1.7 | 9.1 | 10.3 |
| Southeast | 0.5 | 5.2 | 0.3 | 9.5 | 0.6 | 24.1 | 1.4 | 9.1 | 12.2 |
| Southwest | 0.5 | 3.1 | 0.3 | 7.0 | 0.1 | 13.6 | 0.9 | 5.9 | 5.1 |
| West | 0.4 | 3.1 | 0.3 | 6.8 | 0.8 | 17.6 | 1.5 | 12.0 | 10.0 |
| Total FICO scores of 620 to 659 | 2.7 | 4.4 | 1.7 | 9.1 | 2.4 | 19.4 | 6.8 | 8.9 | 9.4 |
| **FICO scores >=660:** | | | | | | | | | |
| North Central | 8.5 | 0.7 | 4.7 | 2.3 | 2.8 | 7.4 | 16.0 | 1.6 | 2.0 |
| Northeast | 14.9 | 1.0 | 5.7 | 3.9 | 2.0 | 12.6 | 22.6 | 1.6 | 2.3 |
| Southeast | 7.1 | 1.2 | 3.9 | 2.8 | 3.8 | 14.4 | 14.8 | 2.1 | 4.2 |
| Southwest | 7.4 | 0.6 | 2.7 | 2.0 | 0.4 | 6.2 | 10.5 | 0.9 | 1.1 |
| West | 12.7 | 0.5 | 5.8 | 1.7 | 7.0 | 10.1 | 25.5 | 2.9 | 3.0 |
| Total FICO scores >= 660 | 50.6 | 0.8 | 22.8 | 2.6 | 16.0 | 10.8 | 89.4 | 1.9 | 2.6 |
| Total FICO scores not available | 0.3 | 4.8 | 0.2 | 11.9 | 0.1 | 21.4 | 0.6 | 5.5 | 8.9 |
| **All FICO scores:** | | | | | | | | | |
| North Central | 9.1 | 1.0 | 5.3 | 3.2 | 3.6 | 9.5 | 18.0 | 2.6 | 2.9 |
| Northeast | 16.1 | 1.6 | 6.4 | 5.3 | 2.7 | 15.8 | 25.2 | 2.7 | 3.4 |
| Southeast | 7.9 | 1.8 | 4.4 | 4.0 | 4.7 | 16.8 | 17.0 | 3.4 | 5.5 |
| Southwest | 8.2 | 1.1 | 3.2 | 3.1 | 0.6 | 9.4 | 12.0 | 1.8 | 1.8 |
| West | 13.5 | 0.7 | 6.2 | 2.1 | 8.1 | 11.3 | 27.8 | 3.8 | 3.6 |
| Total single-family credit guarantee portfolio[7] | 54.8% | 1.3% | 25.5% | 3.6% | 19.7% | 12.8% | 100.0% | 2.9% | 3.6% |

| | December 31, 2010 | | | | | | | |
| | Current LTV Ratio ≤ 80%[1] | | Current LTV Ratio of > 80 to 100%[1] | | Current LTV > 100%[1] | | Current LTV Ratio All Loans[1] | | |
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
|---|---|---|---|---|---|---|---|---|---|
| **By Product Type** | | | | | | | | | |
| **FICO scores < 620:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 1.1% | 8.6% | 0.8% | 15.1% | 0.9% | 27.5% | 2.8% | 12.9% | 15.1% |
| 15- year amortizing fixed-rate | 0.2 | 4.6 | <0.1 | 11.8 | <0.1 | 22.2 | 0.2 | 1.8 | 5.1 |
| ARMs/adjustable rate[4] | 0.1 | 12.2 | <0.1 | 18.4 | <0.1 | 28.6 | 0.1 | 7.6 | 16.9 |
| Interest only[5] | <0.1 | 17.6 | 0.1 | 25.3 | 0.1 | 39.9 | 0.2 | 0.9 | 33.3 |
| Other[6] | <0.1 | 3.7 | <0.1 | 8.5 | 0.1 | 13.2 | 0.1 | 3.1 | 5.6 |
| Total FICO scores < 620 | 1.4 | 7.6 | 0.9 | 15.3 | 1.1 | 27.9 | 3.4 | 10.4 | 13.9 |
| **FICO scores of 620 to 659:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 2.4 | 5.2 | 1.7 | 9.8 | 1.8 | 20.5 | 5.9 | 8.3 | 10.3 |
| 15- year amortizing fixed-rate | 0.6 | 2.6 | <0.1 | 7.3 | <0.1 | 16.6 | 0.6 | 0.9 | 3.0 |
| ARMs/adjustable rate[4] | 0.1 | 6.0 | 0.1 | 13.5 | 0.1 | 25.9 | 0.3 | 1.5 | 13.6 |
| Interest only[5] | <0.1 | 10.9 | 0.2 | 20.6 | 0.3 | 35.6 | 0.5 | 0.9 | 29.2 |
| Other[6] | <0.1 | 2.6 | <0.1 | 5.4 | <0.1 | 5.3 | <0.1 | 1.0 | 4.3 |
| Total FICO scores of 620 to 659 | 3.1 | 4.5 | 2.0 | 10.3 | 2.2 | 22.0 | 7.3 | 6.5 | 9.9 |
| **FICO scores of >= 660:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 36.5 | 1.0 | 20.0 | 2.8 | 10.4 | 10.4 | 66.9 | 1.9 | 2.8 |
| 15- year amortizing fixed-rate | 12.5 | 0.4 | 0.9 | 1.4 | 0.1 | 7.3 | 13.5 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 1.9 | 1.6 | 0.8 | 5.4 | 0.8 | 17.0 | 3.5 | 0.4 | 5.6 |
| Interest only[5] | 0.7 | 3.7 | 1.2 | 10.3 | 2.8 | 23.1 | 4.7 | 0.4 | 16.7 |
| Other[6] | <0.1 | 2.1 | <0.1 | 2.0 | 0.1 | 1.3 | 0.1 | 0.4 | 1.7 |
| Total FICO scores >= 660 | 51.6 | 0.8 | 22.9 | 3.1 | 14.2 | 12.6 | 88.7 | 1.3 | 2.7 |
| FICO scores not available | 0.4 | 4.6 | 0.1 | 11.9 | 0.1 | 23.7 | 0.6 | 4.1 | 8.8 |
| **All FICO scores:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 40.2 | 1.6 | 22.6 | 3.9 | 13.2 | 13.1 | 76.0 | 2.9 | 4.0 |
| 15- year amortizing fixed-rate | 13.3 | 0.6 | 0.9 | 2.0 | 0.2 | 8.8 | 14.4 | 0.2 | 0.8 |
| ARMs/adjustable rate[4] | 2.1 | 2.4 | 1.0 | 7.0 | 0.9 | 18.7 | 4.0 | 0.8 | 6.7 |
| Interest only[5] | 0.7 | 4.5 | 1.3 | 11.7 | 3.2 | 24.9 | 5.2 | 0.5 | 18.4 |
| Other[6] | 0.2 | 9.3 | 0.1 | 8.6 | 0.1 | 7.3 | 0.4 | 5.2 | 8.6 |
| Total single-family credit guarantee portfolio[7] | 56.5% | 1.4% | 25.9% | 4.3% | 17.6% | 14.9% | 100.0% | 2.1% | 3.8% |
| **By Region[8]** | | | | | | | | | |
| **FICO scores < 620:** | | | | | | | | | |
| North Central | 0.2% | 7.1% | 0.2% | 13.7% | 0.2% | 22.5% | 0.6% | 10.9% | 13.0% |
| Northeast | 0.5 | 9.4 | 0.3 | 19.9 | 0.2 | 30.5 | 1.0 | 10.7 | 14.5 |
| Southeast | 0.2 | 8.4 | 0.2 | 15.5 | 0.3 | 31.9 | 0.7 | 10.7 | 16.4 |
| Southwest | 0.3 | 5.9 | 0.1 | 12.7 | 0.1 | 24.1 | 0.5 | 7.6 | 9.2 |
| West | 0.2 | 5.6 | 0.1 | 13.5 | 0.3 | 28.0 | 0.6 | 12.3 | 15.8 |
| Total FICO scores < 620 | 1.4 | 7.6 | 0.9 | 15.3 | 1.1 | 27.9 | 3.4 | 10.4 | 13.9 |
| **FICO scores of 620 to 659:** | | | | | | | | | |
| North Central | 0.6 | 4.3 | 0.4 | 9.6 | 0.4 | 16.6 | 1.4 | 6.6 | 8.9 |
| Northeast | 0.9 | 5.4 | 0.6 | 13.7 | 0.3 | 23.2 | 1.8 | 6.4 | 9.6 |
| Southeast | 0.5 | 5.3 | 0.4 | 10.0 | 0.6 | 25.5 | 1.5 | 6.6 | 12.1 |
| Southwest | 0.6 | 3.4 | 0.3 | 8.1 | 0.1 | 15.3 | 1.0 | 4.5 | 5.6 |
| West | 0.5 | 3.5 | 0.3 | 9.6 | 0.8 | 23.7 | 1.6 | 8.5 | 12.7 |
| Total FICO scores of 620 to 659 | 3.1 | 4.5 | 2.0 | 10.3 | 2.2 | 22.0 | 7.3 | 6.5 | 9.9 |
| **FICO scores of >= 660:** | | | | | | | | | |
| North Central | 8.9 | 0.7 | 4.9 | 2.8 | 2.3 | 7.9 | 16.1 | 1.2 | 2.1 |
| Northeast | 15.0 | 1.0 | 5.6 | 4.4 | 1.5 | 12.0 | 22.1 | 1.1 | 2.1 |
| Southeast | 7.4 | 1.2 | 4.1 | 3.0 | 3.6 | 15.1 | 15.1 | 1.4 | 4.1 |
| Southwest | 7.3 | 0.7 | 2.9 | 2.3 | 0.3 | 6.8 | 10.5 | 0.7 | 1.2 |
| West | 13.0 | 0.6 | 5.4 | 2.7 | 6.5 | 13.8 | 24.9 | 2.1 | 3.9 |
| Total FICO scores >= 660 | 51.6 | 0.8 | 22.9 | 3.1 | 14.2 | 12.6 | 88.7 | 1.3 | 2.7 |
| FICO scores not available | 0.4 | 4.6 | 0.1 | 11.9 | 0.1 | 23.7 | 0.6 | 4.1 | 8.8 |
| **All FICO scores:** | | | | | | | | | |
| North Central | 9.6 | 1.2 | 5.6 | 3.9 | 3.0 | 10.5 | 18.2 | 2.0 | 3.1 |
| Northeast | 16.6 | 1.6 | 6.4 | 6.0 | 2.0 | 15.4 | 25.0 | 1.9 | 3.2 |
| Southeast | 8.2 | 1.9 | 4.7 | 4.3 | 4.5 | 17.8 | 17.4 | 2.4 | 5.6 |
| Southwest | 8.2 | 1.2 | 3.4 | 3.6 | 0.5 | 10.9 | 12.1 | 1.5 | 2.1 |
| West | 13.9 | 0.9 | 5.8 | 3.4 | 7.6 | 15.5 | 27.3 | 2.7 | 4.7 |
| Total single-family credit guarantee portfolio[7] | 56.5% | 1.4% | 25.9% | 4.3% | 17.6% | 14.9% | 100.0% | 2.1% | 3.8% |

(1) The current LTV ratios are our estimates. See endnote (5) to "Table 45 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information.

(2) Based on UPB of the single-family credit guarantee portfolio.

(3) See endnote (2) to "Table 56 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio".

(4) Includes balloon/resets and option ARM mortgage loans.

(5) Includes both fixed rate and adjustable rate loans. The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category(post-modification), primarily due to delays in processing.

(6) Consist of FHA/VA and other government guaranteed mortgages.

(7) The total of all FICO scores categories may not sum due to the inclusion of loans where FICO scores are not available in the respective totals for all loans. See endnote (7) to "Table 45 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information about our use of FICO scores.

(8) Presentation with the following regional designation: West (AK, AZ, CA, GU,HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA,RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast(AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); and Southwest (AR, CO, KS, LA, MO,NE, NM, OK, TX, WY).

The table below presents delinquency and default rate information for loans in our single-family credit guarantee portfolio based on year of origination.

**Table 58 — Single-Family Credit Guarantee Portfolio by Year of Loan Origination**

| | As of December 31, 2011 | | As of December 31, 2010 | | As of December 31,2009 | |
| --- | --- | --- | --- | --- | --- | --- |
| Year of Loan Origination | Percentage of Portfolio | Foreclosure and Short Sale Rate[1] | Percentage of Portfolio | Foreclosure and Short Sale Rate[1] | Percentage of Portfolio | Foreclosure and Short Sale Rate[1] |
| 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14% | —% | —% | —% | —% | —% |
| 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 | 0.05 | 18 | — | — | — |
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 | 0.17 | 21 | 0.04 | 23 | — |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | 2.23 | 9 | 1.26 | 12 | 0.37 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 | 7.49 | 11 | 4.92 | 14 | 2.24 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | 6.95 | 9 | 5.00 | 11 | 2.70 |
| 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 4.07 | 10 | 2.95 | 12 | 1.63 |
| 2000 through 2004 . . . . . . . . . . . . . . . . . . . . | 17 | 1.04 | 22 | 0.88 | 28 | 0.69 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100% | | 100% | | 100% | |

(1) Calculated for each year of origination as the number of loans that have proceeded to foreclosure transfer or short sale and resulted in a credit loss, excluding any subsequent recoveries during the period from origination to December 31, 2011, 2010, and 2009, respectively, divided by the number of loans in our single-family credit guarantee portfolio originated in that year.

The UPB of loans originated after 2008 comprised 51% of our portfolio as of December 31, 2011, including 11% of our portfolio that were relief refinance mortgages (regardless of LTV ratio). At December 31, 2011, approximately 32% of our single-family credit guarantee portfolio consisted of mortgage loans originated from 2005 through 2008. Loans originated from 2005 through 2008 have experienced higher serious delinquency rates in the earlier years of their terms as compared to our historical experience. We attribute this serious delinquency performance to a number of factors, including: (a) the expansion of credit terms under which loans were underwritten during these years; (b) an increase in the origination and our purchase of interest-only and Alt-A mortgage products in these years; and (c) an environment of persistently high unemployment, decreasing home sales, and broadly declining home prices in the period following the loans' origination. Interest-only and Alt-A products have higher inherent credit risk than traditional fixed-rate mortgage products.

*Multifamily Mortgage Credit Risk*

Portfolio diversification, particularly by product and geographical area, is an important aspect of our strategy to manage mortgage credit risk for multifamily loans. We monitor a variety of mortgage loan characteristics that may affect the default experience on our multifamily mortgage portfolio, such as the LTV ratio, DSCR, geographic location and loan maturity. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" for more information about the loans in our multifamily mortgage portfolio. We also monitor the performance and risk concentrations of our multifamily loans and the underlying properties throughout the life of the loan.

The table below provides certain attributes of our multifamily mortgage portfolio at December 31, 2011 and 2010.

*Freddie Mac*

**Table 59 — Multifamily Mortgage Portfolio — by Attribute**

| | UPB [1] at | | Delinquency Rate [2] at | |
|---|---|---|---|---|
| | December 31, 2011 | December 31, 2010 | December 31, 2011 | December 31, 2010 |
| **Original LTV ratio [3]** | (dollars in billions) | | | |
| Below 75% | $ 78.8 | $ 72.0 | 0.10% | 0.08% |
| 75% to 80% | 30.9 | 29.8 | 0.08 | 0.24 |
| Above 80% | 6.4 | 6.6 | 2.34 | 2.30 |
| Total | $116.1 | $108.4 | 0.22% | 0.26% |
| Weighted average LTV ratio at origination | 70% | 70% | | |
| **Maturity Dates** | | | | |
| 2011 | N/A | $ 2.3 | N/A | 0.97% |
| 2012 | $ 3.0 | 4.1 | 1.35% | 0.82 |
| 2013 | 5.6 | 6.8 | — | — |
| 2014 | 7.6 | 8.5 | 0.03 | 0.02 |
| 2015 | 11.0 | 12.0 | 0.17 | 0.09 |
| Beyond 2015 | 88.9 | 74.7 | 0.22 | 0.29 |
| Total | $116.1 | $108.4 | 0.22% | 0.26% |
| **Year of Acquisition or Guarantee [4]** | | | | |
| 2004 and prior | $ 12.4 | $ 15.9 | 0.40% | 0.31% |
| 2005 | 7.2 | 7.9 | 0.20 | — |
| 2006 | 10.8 | 11.6 | 0.25 | 0.25 |
| 2007 | 19.8 | 20.8 | 0.74 | 0.97 |
| 2008 | 20.6 | 23.0 | 0.09 | 0.03 |
| 2009 | 13.8 | 15.2 | — | — |
| 2010 | 12.7 | 14.0 | — | — |
| 2011 | 18.8 | N/A | — | N/A |
| Total | $116.1 | $108.4 | 0.22% | 0.26% |
| **Current Loan Size Distribution** | | | | |
| Above $25 million | $ 42.8 | $ 39.6 | 0.06% | 0.07% |
| Above $5 million to $25 million | 64.0 | 59.4 | 0.31 | 0.38 |
| $5 million and below | 9.3 | 9.4 | 0.31 | 0.37 |
| Total | $116.1 | $108.4 | 0.22% | 0.26% |
| **Legal Structure** | | | | |
| Unsecuritized loans | $ 82.3 | $ 85.9 | 0.10% | 0.11% |
| Non-consolidated Freddie Mac mortgage-related securities | 24.2 | 12.8 | 0.64 | 1.30 |
| Other guarantee commitments | 9.6 | 9.7 | 0.18 | 0.23 |
| Total | $116.1 | $108.4 | 0.22% | 0.26% |
| **Credit Enhancement** | | | | |
| Credit-enhanced | $ 31.6 | $ 20.9 | 0.52% | 0.85% |
| Non-credit-enhanced | 84.5 | 87.5 | 0.11 | 0.12 |
| Total | $116.1 | $108.4 | 0.22% | 0.26% |

(1) Beginning in the second quarter of 2011, we exclude non-consolidated mortgage-related securities for which we do not provide our guarantee. The prior period has been revised to conform to the current period presentation.

(2) See "Delinquencies" below for more information about our multifamily delinquency rates.

(3) Original LTV ratios are calculated as the UPB of the mortgage, divided by the lesser of the appraised value of the property at the time of mortgage origination or, except for refinance loans, the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.

(4) Based on either: (a) the year of acquisition, for loans recorded on our consolidated balance sheets; or (b) the year that we issued our guarantee, for the remaining loans in our multifamily mortgage portfolio.

Our multifamily mortgage portfolio consists of product types that are categorized based on loan terms. Multifamily loans may be interest-only or amortizing, fixed or variable rate, or may switch between fixed and variable rate over time. However, our multifamily loans generally have balloon maturities ranging from five to ten years. Amortizing loans reduce our credit exposure over time because the UPB declines with each mortgage payment. Fixed-rate loans may also create less risk for us because the borrower's payments are determined at origination, and, therefore, the risk that the monthly mortgage payment could increase if interest rates rise as with a variable-rate mortgage is eliminated. As of both December 31, 2011 and 2010, approximately 85% of the multifamily loans on our consolidated balance sheets had fixed interest rates while the remaining loans had variable interest rates.

Because most multifamily loans require a significant lump sum (*i.e.*, balloon) payment of unpaid principal at maturity, the inability to refinance or pay off the loan at maturity is a serious concern for us. Borrowers may be less able to refinance their obligations during periods of rising interest rates, which could lead to default if the borrower is unable to find affordable refinancing. Loan size at origination does not generally indicate the degree of a loan's risk, but it does indicate our potential exposure to default.

While we believe the underwriting practices we employ for our multifamily loan portfolio are prudent, the ongoing weak economic conditions in the U.S. negatively impacted multifamily rental properties. Our delinquency rates have remained relatively low compared to other industry participants, which we believe to be, in part, the result of our underwriting standards versus those used by others in the industry.

Although property values increased in recent quarters, they are still below the highs of a few years ago and are lower than when many of the loans were originally underwritten, particularly in areas where economic conditions remain weak. As a result, if property values do not continue to improve, borrowers may experience significant difficulty refinancing as their loans approach maturity, which could increase borrower defaults or increase modification volumes. Of the $116.1 billion in UPB of our multifamily mortgage portfolio as of December 31, 2011, only 3% and 5% will mature during 2012 and 2013, respectively, and the remaining 92% will mature in 2014 and beyond.

In certain cases, we may provide short-term loan extensions of up to 12 months for certain borrowers. Modifications and extensions of loans are performed in an effort to minimize our losses. During the year ended December 31, 2011, we extended and modified unsecuritized multifamily loans totaling $391 million in UPB, compared with $816 million during the year ended December 31, 2010. Multifamily unsecuritized loan modifications during the year ended December 31, 2011 included: (a) $99 million in UPB for short-term loan extensions; and (b) $292 million in UPB for loan modifications. Where we have granted a concession to borrowers experiencing financial difficulties, we account for these loans as TDRs. When we execute a modification classified as a TDR, the loan is then classified as nonperforming for the life of the loan regardless of its delinquency status. At December 31, 2011, we had $893 million of multifamily loan UPB classified as TDRs on our consolidated balance sheets.

We use credit enhancements to mitigate risk of loss on certain multifamily mortgages and housing revenue bonds. Historically, we required credit enhancements on loans in situations where we delegated the underwriting process for the loan to the seller/servicer, which provides first loss coverage on the mortgage loan. We may also require credit enhancements during construction or rehabilitation in cases where we commit to purchase or guarantee a permanent loan upon completion and in cases where occupancy has not yet reached a level that produces the operating income that was the basis for underwriting the mortgage. Additionally, certain Other Guarantee Transactions issued by our Multifamily segment have related subordinated classes, that we do not guarantee, that provide credit loss protection to the senior classes that we guarantee. Subordinated classes are allocated credit losses prior to the senior classes. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections and other forms of credit enhancements covering loans in our multifamily mortgage portfolio as of December 31, 2011 and 2010.

*Delinquencies*

Our multifamily delinquency rates include all multifamily loans that we own, that are collateral for Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancement provided by the U.S. government. We report multifamily delinquency rates based on UPB of mortgage loans that are two monthly payments or more past due or in the process of foreclosure, as reported by our servicers. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as delinquent as long as the borrower is current under the modified terms. In addition, multifamily loans are not counted as delinquent if the borrower has entered into a forbearance agreement and is abiding by the terms of the agreement, whereas single-family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower, if applicable.

Our delinquency rates for multifamily loans are positively impacted to the extent we have been successful in working with troubled borrowers to modify their loans prior to becoming delinquent or by providing temporary relief through loan modifications, including short-term extensions. Some geographic areas, including the states of Arizona, Georgia, and Nevada, continue to exhibit weaker than average fundamentals that increase our risk of future losses. We own or guarantee loans in these states that are non-performing, or we believe are at risk of default. For further information regarding concentrations in our multifamily mortgage portfolio, including regional geographic composition, see "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS."

*Freddie Mac*

Our multifamily mortgage portfolio delinquency rate declined to 0.22% at December 31, 2011 from 0.26% at December 31, 2010. Our delinquency rate for credit-enhanced loans was 0.52% and 0.85% at December 31, 2011 and 2010, respectively, and for non-credit-enhanced loans was 0.11% and 0.12% at December 31, 2011 and 2010, respectively. As of December 31, 2011, more than one-half of our multifamily loans that were two monthly payments or more past due, measured both in terms of number of loans and on a UPB basis, had credit enhancements that we currently believe will mitigate our expected losses on those loans.

*Non-Performing Assets*

Non-performing assets consist of single-family and multifamily loans that have undergone a TDR, single-family seriously delinquent loans, multifamily loans that are three or more payments past due or in the process of foreclosure, and REO assets, net. Non-performing assets also include multifamily loans that are deemed impaired based on management judgment. We place non-performing loans on non-accrual status when we believe the collectability of interest and principal on a loan is not reasonably assured, unless the loan is well secured and in the process of collection. When a loan is placed on non-accrual status, any interest income accrued but uncollected is reversed. Thereafter, interest income is recognized only upon receipt of cash payments. We did not accrue interest on any loans three monthly payments or more past due in 2011 or 2010.

We classify TDRs as those loans where we have granted a concession to a borrower that is experiencing financial difficulties. TDRs remain categorized as non-performing throughout the remaining life of the loan regardless of whether the borrower makes payments which return the loan to a current payment status after modification. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for further information about our TDRs.

The table below provides detail on non-performing loans and REO assets on our consolidated balance sheets and non-performing loans underlying our financial guarantees.

**Table 60 — Non-Performing Assets[1]**

| | December 31, | | | | |
|---|---|---|---|---|---|
| | 2011 | 2010 | 2009 | 2008 | 2007 |
| | (dollars in millions) | | | | |
| Non-performing mortgage loans — on balance sheet: | | | | | |
| Single-family TDRs: | | | | | |
| Reperforming (*i.e.*, less than three monthly payments past due) | $ 44,440 | $ 26,612 | $ 711 | $ 484 | $ 282 |
| Seriously delinquent | 11,639 | 3,144 | 477 | 163 | 67 |
| Multifamily TDRs[2] | 893 | 911 | 229 | 150 | 167 |
| Total TDRs | 56,972 | 30,667 | 1,417 | 797 | 516 |
| Other single-family non-performing loans[3] | 63,205 | 84,272 | 12,106 | 5,590 | 5,842 |
| Other multifamily non-performing loans[4] | 1,819 | 1,750 | 1,196 | 197 | 188 |
| Total non-performing mortgage loans — on balance sheet | 121,996 | 116,689 | 14,719 | 6,584 | 6,546 |
| Non-performing mortgage loans — off-balance sheet: | | | | | |
| Single-family loans | 1,230 | 1,450 | 85,395 | 36,718 | 7,786 |
| Multifamily loans | 246 | 198 | 178 | 63 | 51 |
| Total non-performing mortgage loans — off-balance sheet | 1,476 | 1,648 | 85,573 | 36,781 | 7,837 |
| Real estate owned, net | 5,680 | 7,068 | 4,692 | 3,255 | 1,736 |
| Total non-performing assets | $129,152 | $125,405 | $104,984 | $46,620 | $16,119 |
| Loan loss reserves as a percentage of our non-performing mortgage loans | 32.0% | 33.7% | 33.8% | 36.0% | 19.6% |
| Total non-performing assets as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | 6.8% | 6.4% | 5.2% | 2.4% | 0.9% |

(1) Mortgage loan amounts are based on UPB and REO, net is based on carrying values.
(2) As of December 31, 2011, approximately $872 million in UPB of these loans were current.
(3) Represents loans recognized by us on our consolidated balance sheets, including loans removed from PC trusts due to the borrower's serious delinquency.
(4) Of this amount, $1.8 billion, $1.6 billion, and $1.1 billion of UPB were current at December 31, 2011, December 31, 2010, and December 31, 2009 respectively.

The amount of non-performing assets increased to $129.2 billion as of December 31, 2011, from $125.4 billion at December 31, 2010, primarily due to a significant increase in single-family loans classified as TDRs, which was substantially offset by a decline in the rate at which loans transitioned into serious delinquency. The UPB of loans categorized as TDRs increased to $57.0 billion at December 31, 2011 from $30.7 billion at December 31, 2010, largely due to a continued high volume of loan modifications during 2011 in which we extended the term of the loan, decreased the contractual interest rate, deferred the balance on which contractual interest is computed, or made a combination of these changes. TDRs during 2011 include HAMP and non-HAMP loan modifications as well as loans in modification trial periods and certain other loss mitigation actions. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING

POLICIES," and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for information about our implementation of an amendment to the accounting guidance on classification of loans as TDRs in 2011. In 2011, our non-HAMP modifications comprised a greater portion of our completed loan modification volume and the volume of HAMP modifications declined, compared to 2010 activity. We expect our non-performing assets, including loans deemed to be TDRs, to remain at elevated levels in 2012.

The table below provides detail by region for REO activity. Our REO activity consists almost entirely of single-family residential properties. Consequently, our regional REO acquisition trends generally follow a pattern that is similar to, but lags, that of regional serious delinquency trends of our single-family credit guarantee portfolio. See "Table 57 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for information about regional serious delinquency rates.

### Table 61 — REO Activity by Region[1]

|  | December 31, | | |
|---|---|---|---|
|  | **2011** | **2010** | **2009** |
|  | (number of properties) | | |
| **REO Inventory** | | | |
| Beginning property inventory | 72,093 | 45,052 | 29,346 |
| Adjustment to beginning balance[2] | — | 1,340 | — |
| Properties acquired by region: | | | |
| Northeast | 6,970 | 11,022 | 7,529 |
| Southeast | 23,195 | 35,409 | 19,255 |
| North Central | 26,259 | 29,550 | 19,946 |
| Southwest | 12,861 | 14,092 | 8,942 |
| West | 29,371 | 36,843 | 29,440 |
| Total properties acquired | 98,656 | 126,916 | 85,112 |
| Properties disposed by region: | | | |
| Northeast | (8,883) | (8,490) | (5,663) |
| Southeast | (28,310) | (26,082) | (15,678) |
| North Central | (25,971) | (22,349) | (15,549) |
| Southwest | (13,099) | (11,044) | (7,142) |
| West | (33,931) | (33,250) | (25,374) |
| Total properties disposed | (110,194) | (101,215) | (69,406) |
| Ending property inventory | 60,555 | 72,093 | 45,052 |

(1) See endnote (8) to "Table 57 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for a description of these regions.
(2) Represents REO assets associated with previously non-consolidated mortgage trusts recognized upon adoption of the amendment to the accounting guidance for consolidation of VIEs on January 1, 2010.

After having increased 60% in 2010, our REO property inventory declined 16% in 2011. The decline in 2011 is primarily due to a decline in the volume of single-family foreclosures caused by delays in the foreclosure process, combined with continued strong levels of REO disposition activity during the period. The increase in 2010 was due, in part, to increased levels of foreclosures associated with borrowers that did not qualify for or did not successfully complete a modification or short sale. The average length of time for foreclosure of a Freddie Mac loan significantly increased in recent years due to temporary suspensions, delays, and other factors. During 2011 and 2010, the nationwide average for completion of a foreclosure (as measured from the date of the last scheduled payment made by the borrower) on our single-family delinquent loans, excluding those underlying our Other Guarantee Transactions, was 506 days and 446 days, respectively, which included: (a) an average of 633 days and 551 days, respectively, for foreclosures completed in states that require a judicial foreclosure process; and (b) an average of 449 days and 384 days, respectively, for foreclosures completed in states that do not require a judicial foreclosure process. We experienced significant variability in the average time for foreclosure by state in 2011. For example, during 2011, the average time for completion of foreclosures associated with loans in our single-family credit guarantee portfolio, excluding Other Guarantee Transactions, was 375 days in Michigan and 841 days in Florida.

We expect the pace of our REO acquisitions will continue to be affected by delays in the foreclosure process in 2012. However, we expect the volume of our REO acquisitions will likely remain elevated, as we have a large inventory of seriously delinquent loans in our single-family credit guarantee portfolio, many of which will likely complete the foreclosure process and transition to REO during 2012 as our servicers continue to work through their foreclosure-related issues. This inventory of seriously delinquent loans arose due to various factors and events that have lengthened the problem loan resolution process and delayed the transition of such loans to a workout or foreclosure transfer (and then, to REO). These factors and events include the effect of HAMP, suspensions of foreclosure transfers, and the increasingly lengthy foreclosure process in many states.

Our single-family REO acquisitions in 2011 were most significant in the states of California, Michigan, Georgia, Florida, and Arizona, which collectively represented 43% of total REO acquisitions based on the number of properties. These states collectively represented 48% of total REO acquisitions in 2010. The states with the most properties in our REO inventory as of December 31, 2011 were Michigan and California. At December 31, 2011, our REO inventory in Michigan and California comprised 12% and 10%, respectively, of total REO property inventory, based on the number of properties.

We are limited in our REO disposition efforts by the capacity of the market to absorb large numbers of foreclosed properties. An increasing portion of our REO acquisitions are: (a) located in jurisdictions that require a period of time after foreclosure during which the borrower may reclaim the property; or (b) occupied and we have either retained the tenant under an existing lease or begun the process of eviction. All of these factors resulted in an increase in the aging of our inventory. During the period when the borrower may reclaim the property, or we are completing the eviction process, we are not able to market the property. As of December 31, 2011, 2010, and 2009, approximately 33%, 28%, and 35%, respectively, of our REO properties were not marketable due to the above conditions. Our temporary suspension of certain REO sales during the fourth quarter of 2010 (for up to three months) due to concerns about deficiencies in foreclosure documentation practices also caused the average holding period to increase. Primarily for these reasons, the average holding period of our REO properties increased in the last two years, though it varies significantly in different states. Excluding any post-foreclosure period during which borrowers may reclaim a foreclosed property, the average holding period associated with our REO dispositions during the years ended December 31, 2011 and 2010 was 197 days and 155 days, respectively. As of December 31, 2011 and 2010, the percentage of our single-family REO property inventory that had been held for sale longer than one year was 7.1% and 3.4%, respectively. We continue to actively market these properties through our established initiatives.

The percentage of interest-only and Alt-A loans in our single-family credit guarantee portfolio, based on UPB, was approximately 4% and 5%, respectively, at December 31, 2011 and was 8% on a combined basis. The percentage of our REO acquisitions in 2011 that had been financed by either of these loan types represented approximately 30% of our total REO acquisitions, based on loan amount prior to acquisition.

We began to expand our methods for REO sales during 2010, including the expanded use of REO auctions and bulk sale transactions of properties in certain geographical areas. Although auction and bulk sales are potentially available for use in all geographical areas, these methods of REO disposition have to date only been used for our more difficult to sell or highly distressed inventory. As a result, in 2011, auction and bulk sales represented an insignificant portion of our REO dispositions. In addition, in certain locations we have offered REO properties for purchase by Neighborhood Stabilization Program grant recipients prior to listing the properties for sale to the general public. For the first 15 days following listing, we also offer most of our REO properties exclusively to Neighborhood Stabilization Program grant recipients and purchasers who intend to occupy the properties.

On August 10, 2011, FHFA, in consultation with Treasury and HUD, announced a request for information seeking input on new options for sales and rentals of single-family REO properties held by Freddie Mac, Fannie Mae and FHA. According to the announcement, the objective of the request for information was to help address current and future REO inventory. The request for information solicited alternatives for maximizing value to taxpayers and increasing private investment in the housing market, including approaches that support rental and affordable housing needs. We are participating in discussions with FHFA and other agencies with respect to this initiative. It is too early to determine the impact this initiative may have on the levels of our REO property inventory, the process for disposing of REO property or our REO operations expense.

*Credit Loss Performance*

Many loans that are seriously delinquent, or in foreclosure, result in credit losses. The table below provides detail on our credit loss performance associated with mortgage loans and REO assets on our consolidated balance sheets and underlying our non-consolidated mortgage-related financial guarantees.

**Table 62 — Credit Loss Performance**

| | December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | (dollars in millions) | | |
| **REO** | | | |
| REO balances, net: | | | |
| Single-family | $ 5,548 | $ 6,961 | $ 4,661 |
| Multifamily | 132 | 107 | 31 |
| Total | $ 5,680 | $ 7,068 | $ 4,692 |
| REO operations (income) expense: | | | |
| Single-family | $ 596 | $ 676 | $ 287 |
| Multifamily | (11) | (3) | 20 |
| Total | $ 585 | $ 673 | $ 307 |
| **Charge-offs** | | | |
| Single-family: | | | |
| Charge-offs, gross[1] (including $14.7 billion, $16.2 billion, and $9.4 billion relating to loan loss reserves, respectively) | $15,149 | $16,746 | $ 9,661 |
| Recoveries[2] | (2,764) | (3,362) | (2,088) |
| Single-family, net | $12,385 | $13,384 | $ 7,573 |
| Multifamily: | | | |
| Charge-offs, gross[1] (including $75 million, $104 million, and $21 million relating to loan loss reserves, respectively) | $ 83 | $ 104 | $ 21 |
| Recoveries[2] | (1) | (1) | — |
| Multifamily, net | $ 82 | $ 103 | $ 21 |
| Total Charge-offs: | | | |
| Charge-offs, gross[1] (including $14.8 billion, $16.3 billion, and $9.4 billion relating to loan loss reserves, respectively) | $15,232 | $16,850 | $ 9,682 |
| Recoveries[2] | (2,765) | (3,363) | (2,088) |
| Total Charge-offs, net | $12,467 | $13,487 | $ 7,594 |
| **Credit Losses[3]** | | | |
| Single-family | $12,981 | $14,060 | $ 7,860 |
| Multifamily | 71 | 100 | 41 |
| Total | $13,052 | $14,160 | $ 7,901 |
| Total (in bps)[4] | 68.1 | 72.2 | 40.7 |

(1) Represent the carrying amount of a loan that has been discharged in order to remove the loan from our consolidated balance sheets at the time of resolution, regardless of when the impact of the credit loss was recorded on our consolidated statements of income and comprehensive income through the provision for credit losses or losses on loans purchased. Charge-offs primarily result from foreclosure transfers and short sales and are generally calculated as the recorded investment of a loan at the date it is discharged less the estimated value in final disposition or actual net sales in a short sale.
(2) Recoveries of charge-offs primarily result from foreclosure transfers and short sales on loans where a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements.
(3) Excludes foregone interest on non-performing loans, which reduces our net interest income but is not reflected in our total credit losses. In addition, excludes other market-based credit losses: (a) incurred on our investments in mortgage loans and mortgage-related securities; and (b) recognized in our consolidated statements of income and comprehensive income.
(4) Calculated as credit losses divided by the average carrying value of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates.

Our credit loss performance metric generally measures losses at the conclusion of the loan and related collateral resolution process. There is a significant lag in time from the implementation of problem loan workout activities until the final resolution of seriously delinquent mortgage loans and REO assets. Our credit loss performance is based on our charge-offs and REO expenses. We primarily record charge-offs at the time we take ownership of a property through foreclosure and at the time of settlement of foreclosure alternative transactions. Single-family charge-offs, gross, for 2011 and 2010 were $15.1 billion and $16.7 billion, respectively, and were associated with approximately $31.5 billion and $33.9 billion, respectively, in UPB of loans. Our net charge-offs in 2011 remained elevated, but reflect suppression of activity due to delays in the foreclosure process and continuing weak market conditions. We expect our charge-offs and credit losses to remain high in 2012 and they may increase over 2011 levels, due to the large number of single-family non-performing loans that will likely be resolved as our servicers work through their foreclosure-related issues and because market conditions, such as home prices and the rate of home sales, continue to remain weak.

Our credit losses during 2011 continued to be disproportionately high in those states that experienced significant declines in property values since 2006, such as California, Florida, Nevada, and Arizona, which collectively comprised approximately 60% of our total credit losses in 2011. Due to declines in property values since 2006, we continued to experience high REO disposition severity ratios on sales of our REO inventory during 2011. In addition, although Alt-A loans comprised approximately 5% and 6% of our single-family credit guarantee portfolio at December 31, 2011 and 2010, respectively, these loans accounted for approximately 28% and 37% of our credit losses in 2011 and 2010,

respectively. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for information on REO disposition severity ratios, and see "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information about our credit losses.

The table below provides detail by region for charge-offs. Regional charge-off trends generally follow a pattern that is similar to, but lags, that of regional serious delinquency trends.

### Table 63 — Single-Family Charge-offs and Recoveries by Region[1]

| | Year Ended December 31, | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2011 | | | 2010 | | | 2009 | | |
| | Charge-offs, gross | Recoveries[2] | Charge-offs, net | Charge-offs, gross | Recoveries[2] | Charge-offs, net | Charge-offs, gross | Recoveries[2] | Charge-offs, net |
| | | | | | (in millions) | | | | |
| Northeast . . . . . . | $ 1,033 | $ (226) | $ 807 | $ 1,367 | $ (318) | $ 1,049 | $ 854 | $ (194) | $ 660 |
| Southeast . . . . . . | 3,210 | (693) | 2,517 | 4,311 | (1,005) | 3,306 | 2,124 | (557) | 1,567 |
| North Central . . . | 2,502 | (615) | 1,887 | 2,638 | (694) | 1,944 | 1,502 | (393) | 1,109 |
| Southwest . . . . . . | 777 | (243) | 534 | 761 | (288) | 473 | 484 | (169) | 315 |
| West . . . . . . . . . | 7,627 | (987) | 6,640 | 7,669 | (1,057) | 6,612 | 4,697 | (775) | 3,922 |
| Total . . . . . . . . | $15,149 | $(2,764) | $12,385 | $16,746 | $(3,362) | $13,384 | $9,661 | $(2,088) | $7,573 |

(1) See endnote (8) to "Table 57 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for a description of these regions.
(2) Recoveries of charge-offs primarily result from foreclosure transfers and short sales on loans where a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements.

*Loan Loss Reserves*

We maintain mortgage-related loan loss reserves at levels we believe appropriate to absorb probable incurred losses on mortgage loans held-for-investment on our consolidated balance sheets and those underlying Freddie Mac mortgage-related securities and other guarantee commitments. Determining the loan loss reserves is complex and requires significant management judgment about matters that involve a high degree of subjectivity. See "CRITICAL ACCOUNTING POLICIES AND ESTIMATES — Allowance for Loan Losses and Reserve for Guarantee Losses" for further information.

The table below summarizes our loan loss reserves activity for held-for-investment mortgage loans recognized on our consolidated balance sheets and underlying Freddie Mac mortgage-related securities and other guarantee commitments, in total.

### Table 64 — Loan Loss Reserves Activity[1]

| | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2011 | 2010 | 2009 | 2008 | 2007 |
| | | (dollars in millions) | | | |
| Total loan loss reserves: | | | | | |
| Beginning balance . . . . . . . . . . . . . . . . | $ 39,926 | $ 33,857 | $15,618 | $ 2,822 | $ 619 |
| Adjustments to beginning balance[2] . . . . . . . . . . . . . . . . . | — | (186) | — | — | — |
| Provision for credit losses . . . . . . . . . . . . . . . . . | 10,702 | 17,218 | 29,530 | 16,432 | 2,854 |
| Charge-offs, gross[3] . . . . . . . . . . . . . . . . . | (14,810) | (16,322) | (9,402) | (3,072) | (376) |
| Recoveries[4] . . . . . . . . . . . . . . . . . | 2,765 | 3,363 | 2,088 | 779 | 239 |
| Transfers, net[5] . . . . . . . . . . . . . . . . . | 878 | 1,996 | (3,977) | (1,343) | (514) |
| Ending balance . . . . . . . . . . . . . . . . . | $ 39,461 | $ 39,926 | $33,857 | $15,618 | $2,822 |
| Components of loan loss reserves: | | | | | |
| Single-family . . . . . . . . . . . . . . . . . | $ 38,916 | $ 39,098 | $33,026 | $15,341 | $2,760 |
| Multifamily . . . . . . . . . . . . . . . . . | $ 545 | $ 828 | $ 831 | $ 277 | $ 62 |
| Total loan loss reserve, as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities . . . . . . . . . . . . . . . . . | 2.08% | 2.03% | 1.69% | 0.81% | 0.16% |

(1) Consists of reserves for loans held-for-investment and those underlying Freddie Mac mortgage-related securities and other guarantee commitments.
(2) Adjustments relate to the adoption of amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Adopted Accounting Guidance" for further information.
(3) Charge-offs related to loan loss reserves represent the amount of a loan that has been discharged to remove the loan from our consolidated balance sheet due to either foreclosure transfer or a short sale or deed in lieu of foreclosure transaction. Charge-offs exclude $422 million, $528 million, $280 million, $377 million, and $156 million for the years ended December 31, 2011, 2010, 2009, 2008, and 2007, respectively, related to certain loans purchased under financial guarantees and reflected within losses on loans purchased on our consolidated statements of income and comprehensive income.
(4) Recoveries of charge-offs primarily result from foreclosure alternatives and REO acquisitions on loans where: (a) a share of default risk has been assumed by mortgage insurers, servicers or other third parties through credit enhancements; or (b) we received a reimbursement of our losses from a seller/servicer associated with a repurchase request on a loan that experienced a foreclosure transfer or a foreclosure alternative.
(5) Consist primarily of: (a) amounts related to agreements with seller/servicers where the transfer relates to recoveries received under these agreements to compensate us for previously incurred and recognized losses; (b) the transfer of a proportional amount of the recognized reserves for guarantee losses associated with loans purchased from non-consolidated Freddie Mac mortgage-related securities and other guarantee commitments; and (c) net amounts attributable to recapitalization of past due interest on modified mortgage loans. See "Institutional Credit Risk — Single-family Mortgage Seller/Servicers" for more information about our agreements with our seller/servicers.

*Freddie Mac*

We adopted an amendment to the accounting guidance related to the classification of loans as TDRs in the third quarter of 2011, which significantly increases the population of problem loans subject to our workout activities that we account for and disclose as TDRs. The impact of this change in guidance on our financial results for 2011 was not significant because the loan loss reserve associated with those loans determined on a collective basis prior to their classification as TDRs was not materially different from the loan loss reserve of the loans determined on an individual basis upon classification as TDRs at the time of the adoption of this amendment. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for additional information on our accounting policies for loan loss reserves and TDR loans, including our implementation of changes to the accounting guidance related to the classification of loans as TDRs.

The table below summarizes our allowance for loan loss activity for individually impaired single-family mortgage loans on our consolidated balance sheets for which we have recorded a specific reserve.

**Table 65 — Single-Family Impaired Loans with Specific Reserve Recorded**

| | As of December 31, 2011 | |
| --- | --- | --- |
| | # of Loans | Amount |
| | | (in millions) |
| TDRs (recorded investment): | | |
| December 31, 2010 balance | 128,241 | $ 28,440 |
| New additions | 136,316 | 27,791 |
| Repayments | (4,655) | (1,243) |
| Loss events[1] | (7,607) | (1,537) |
| Other | 454 | 43 |
| December 31, 2011 balance | 252,749 | 53,494 |
| Other (recorded investment)[2] | 25,565 | 2,433 |
| December 31, 2011 balance | 278,314 | 55,927 |
| Total single-family impaired loans-allowance for loan losses | | (15,100) |
| Net investment | | $ 40,827 |

(1) Consists of foreclosure transfer or foreclosures alternative, such as a deed in lieu of foreclosure or short sale transaction.
(2) Consists of loans impaired upon purchase which experienced further deterioration in borrower credit.

See "CONSOLIDATED RESULTS OF OPERATIONS — Provision for Credit Losses," for a discussion of our provision for credit losses and charge-off activity.

*Credit Risk Sensitivity*

Under a 2005 agreement with FHFA, then OFHEO, we are required to disclose the estimated increase in the NPV of future expected credit losses for our single-family credit guarantee portfolio over a ten year period as the result of an immediate 5% decline in home prices nationwide, followed by a stabilization period and return to the base case. This sensitivity analysis is hypothetical and may not be indicative of our actual results. We do not use this analysis for determination of our reported results under GAAP. As shown in the table below, our credit loss sensitivity declined in the last half of 2011, primarily due to the effects of a decline in mortgage interest rates, which affected recent and future expectations of refinancing activity.

**Table 66 — Single-Family Credit Loss Sensitivity**

| | Before Receipt of Credit Enhancements[1] | | After Receipt of Credit Enhancements[2] | |
| --- | --- | --- | --- | --- |
| | NPV[3] | NPV Ratio[4] | NPV[3] | NPV Ratio[4] |
| | | (dollars in millions) | | |
| At: | | | | |
| December 31, 2011 | $ 8,328 | 47.7 bps | $7,842 | 44.9 bps |
| September 30, 2011 | $ 8,824 | 49.5 bps | $8,229 | 46.1 bps |
| June 30, 2011 | $10,203 | 56.5 bps | $9,417 | 52.2 bps |
| March 31, 2011 | $ 9,832 | 54.2 bps | $8,999 | 49.6 bps |
| December 31, 2010 | $ 9,926 | 54.9 bps | $9,053 | 50.0 bps |

(1) Assumes that none of the credit enhancements currently covering our mortgage loans has any mitigating impact on our credit losses.
(2) Assumes we collect amounts due from credit enhancement providers after giving effect to certain assumptions about counterparty default rates.
(3) Based on the single-family credit guarantee portfolio, excluding REMICs and Other Structured Securities backed by Ginnie Mae Certificates.
(4) Calculated as the ratio of NPV of increase in credit losses to the single-family credit guarantee portfolio, defined in note (3) above.

**Interest Rate and Other Market Risks**

For a discussion of our interest rate and other market risks, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

**Operational Risks**

Risk types have become increasingly inter-related such that an operational breakdown can result in a credit- or market- related event or loss. Operational risks are inherent in all of our business activities and can become apparent in various ways, including accounting or operational errors, business interruptions, fraud, and failures of the technology used to support our business activities. Our risk of operational failure may be increased by vacancies or turnover in officer and key business unit positions and failed or inadequate internal controls. These operational risks may expose us to financial loss, interfere with our ability to sustain timely and reliable financial reporting, or result in other adverse consequences.

We have faced challenges with respect to managing servicers and credit loss mitigation due to a number of factors, including high volumes of seriously delinquent loans and inadequate systems. Implementation of the revised HARP initiative will place additional strain on existing systems, processes, and key resources. On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. While we continue to assess the impact of this law on us, we currently believe that implementation of this law will present operational and accounting challenges for us. For more information, see, "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments*." We may also face increased operational risk due to the requirement that we and Fannie Mae align certain single-family mortgage servicing practices for non-performing loans. On April 28, 2011, FHFA announced a new set of aligned standards for servicing by Freddie Mac and Fannie Mae. Implementing this servicing alignment initiative has become a top priority for the company, but may pose significant short-term operational challenges in data management and place additional strain on existing systems, processes, and key resources, particularly if the requirements were to change or new requirements were to be imposed on servicers whether through government directives or servicer settlements with the state attorneys general. See "Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program*" for more information. There also have been a number of other regulatory developments in recent periods impacting single-family mortgage servicing and foreclosure practices, including top servicers entering into consent orders with federal banking regulators. The servicing model for single-family mortgages may face further significant changes in the future. As a result, we may be required to make additional significant changes to our practices, which could further increase our operational risk. See "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments — Developments Concerning Single-Family Servicing Practices*" for more information.

Our business decision-making, risk management, and financial reporting are highly dependent on our use of models. In recent periods, external market factors have increasingly contributed to a growing risk associated with the use of these models. For example, certain economic events or the implementation of government policies could create increased model uncertainty as models may not fully capture these events, which makes it more difficult to assess model performance and requires a higher degree of management judgment. We have taken certain actions to mitigate this risk to the extent possible, including additional efforts in the area of model oversight and governance pertaining to clarifying roles, aligning model resources, and providing more transparency to management over model issues and changes.

Our primary business processing and financial accounting systems lack sufficient flexibility to handle all the complexities of, and changes in, our business transactions and related accounting policies and methods. This requires us to rely more extensively on spreadsheets and other end-user computing systems. These systems are likely to have a higher risk of operational failure and error than our primary systems, which are subject to our information technology general controls. We believe we are mitigating this risk through active monitoring of, and improvements to, controls over the development and use of end-user computing systems.

In order to manage the risk of inaccurate or unreliable valuations of our financial instruments, we engage in an ongoing internal review of our valuations. We perform analysis of valuations on a monthly basis to confirm the reasonableness of the valuations. For more information on the controls in our valuation process, see "FAIR VALUE MEASUREMENTS AND ANALYSIS — Fair Value Measurements — *Controls over Fair Value Measurement*."

Our risks related to employee turnover are increasing. Throughout 2011 and early 2012, Congress continued to publicly debate our: (a) current primary business objectives and whether we should be doing more to help distressed homeowners; (b) future business structure following conservatorship, including whether we will continue to exist; and (c) current compensation structure, including whether senior executives should be entitled to bonuses or whether all employees should be placed on the government pay scale. Moreover, the Administration has called for a "wind down" of the GSEs, an ongoing development our employees follow closely. The visible public debate regarding the future role of the GSEs continues within the media and Congress.

Uncertainty surrounding our future business model, organizational structure, and compensation structure is adversely impacting our internal control environment. We believe these factors are also contributing to increased levels of voluntary

employee turnover, including 17% voluntary turnover at our Senior and Executive Vice President levels in 2011. Additionally, the Conservator directed us to maintain individual salaries and wage rates for all employees at 2010 levels for 2011 and 2012 (except in the case of promotions or significant changes in responsibilities). In 2011, we made certain significant reorganizations which included targeted divisional staff reductions in an effort to manage general and administrative expenses. All of these activities impact our ability to retain our employees and compensate them for their work. Disruptive levels of turnover at both the executive and employee levels could lead to breakdowns in many of our operations that impact our ability to: (a) serve our mission and meet our objectives; (b) manage credit and other risks related to our $2.1 trillion total mortgage portfolio (including interest rate and other market risks related to our $653 billion mortgage-related investment portfolio); (c) reduce the need to draw funds from Treasury; and (d) issue timely financial statements.

We are finding it difficult to retain and engage critical employees and attract people with the skills and experience we need. Because we maintain succession plans for our senior management positions, we were able to quickly fill some of these positions vacated in 2011, or eliminate them through reorganizations. However, such alternatives are limited and may not be available to address future senior management departures. While we update our succession plans regularly, in many areas we have already executed these plans and we may need to search outside the company for replacements to fill these senior positions. We face increased difficulty filling senior positions given the uncertainty around compensation. We operate in an environment in which virtually every business decision is closely scrutinized and subject to public criticism and review by various government authorities. Many executives are unwilling to work in such an environment for potentially significantly less than what they could earn elsewhere. Accordingly, we may not be able to retain or replace executives or other employees with the requisite institutional knowledge and the technical, operational, risk management, and other key skills needed to conduct our business effectively.

As a result of the increasing risk of employee turnover, we are exploring options to enter into various strategic arrangements with outside firms to provide operational capability and staffing for key functions, if needed. Should we experience significant turnover in key areas, we may need to exercise these strategic arrangements and significantly increase the number of outside firms and consultants used in our business operations, limit certain business activities, and/or increase our operational costs. However, these or other efforts to manage this risk to the enterprise may not be successful.

A recovering economy is likely to put additional pressures on turnover in 2012, as other attractive opportunities may become available to people who we want to retain. For more information on these matters, including the potential impacts of the risks related to employee retention, see "RISK FACTORS — Conservatorship and Related Matters — *The conservatorship and uncertainty concerning our future has had, and will likely continue to have, an adverse effect on the retention, recruitment and engagement of management and other employees, which could have a material adverse effect on our ability to operate our business,*" "— Operational Risks — *Weaknesses in internal control over financial reporting and in disclosure controls could result in errors and inadequate disclosures, affect operating results, and cause investors to lose confidence in our reported results*" and "*— We have experienced significant management changes, internal reorganizations, and turnover of key staff, which could increase our operational and control risks and have a material adverse effect on our ability to do business and our results of operations.*"

Freddie Mac management has determined that current business recovery capabilities may not be effective in the event of a catastrophic regional business event and could result in a significant business disruption and inability to process transactions through normal business processes. While management has developed a remediation plan to address the current capability gaps, any measures we take to mitigate this risk may not be sufficient to respond to the full range of catastrophic events that may occur. The remediation plan is designed to improve Freddie Mac's ability to recover an acceptable level of critical business functionality within predetermined time frames to address regional business disruptions, such as a terrorist event, natural disaster, loss of infrastructure services, denial of access, and/or a pandemic. For more information, see "RISK FACTORS — Operational Risks — *A failure in our operational systems or infrastructure, or those of third parties, could impair our liquidity, disrupt our business, damage our reputation, and cause losses.*"

Our operations rely on the secure receipt, processing, storage, and transmission of confidential and other information in our computer systems and networks and with our business partners. Like many corporations and government entities, from time to time we have been, and likely will continue to be, the target of cyber attacks. Because the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently and often are not recognized until launched against a target, and because some techniques involve social engineering attempts addressed to employees who may have insufficient knowledge to recognize them, we may be unable to anticipate these techniques or to implement adequate preventative measures. While we have invested significant resources in our information security

program, there is a risk that it could prove to be inadequate to protect our computer systems, software, and networks. For additional information, see "RISK FACTORS — Operational Risks — *We may not be able to protect the security of our systems or the confidentiality of our information from cyber attack and other unauthorized access, disclosure, and disruption*."

Management, including the company's Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our internal control over financial reporting and our disclosure controls and procedures as of December 31, 2011. As of December 31, 2011, we had two material weaknesses in our internal control over financial reporting causing us to conclude that both our internal control over financial reporting and disclosure controls and procedures were not effective as of December 31, 2011, at a reasonable level of assurance.

- The first material weakness relates to our inability to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our consolidated financial statements. We have not been able to update our disclosure controls and procedures to provide reasonable assurance that information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure. Given the structural nature of this weakness, we believe it is likely that we will not remediate this material weakness while we are under conservatorship. We consider this situation to be a material weakness in our internal control over financial reporting.

- The second material weakness relates to our inability to effectively manage information technology changes and maintain adequate controls over information security monitoring, resulting from increased levels of employee turnover. As discussed above, we are finding it difficult to retain and engage critical employees and attract people with the skills and experience we need. In most areas, we have been able to leverage succession plans and reassign responsibilities to maintain sound internal control over financial reporting. However, in the fourth quarter of 2011, we experienced a significant increase in the number of control breakdowns within certain areas of our information technology division, specifically within groups responsible for information change management and information security. We identified deficiencies in the following areas: (a) approval and monitoring of changes to certain technology applications and infrastructure; (b) monitoring of select privileged user activities; and (c) monitoring user activities performed on certain technology hardware systems. These control breakdowns could have impacted applications which support our financial reporting processes. Increased levels of employee turnover contributed to ineffective management oversight of controls in these areas resulting in these deficiencies. We believe that these issues aggregate to a material weakness in our internal control over financial reporting. We also consider this material weakness to cause our disclosure controls and procedures to be ineffective.

In view of the mitigating actions we have undertaken related to these material weaknesses, we believe that our consolidated financial statements for the year ended December 31, 2011 have been prepared in conformity with GAAP. For additional information, see "CONTROLS AND PROCEDURES."

## LIQUIDITY AND CAPITAL RESOURCES

### Liquidity

Our business activities require that we maintain adequate liquidity to fund our operations, which may include the need to make payments of principal and interest on our debt securities, including securities issued by our consolidated trusts, and otherwise make payments related to our guarantees of mortgage assets; make payments upon the maturity, redemption or repurchase of our debt securities; make net payments on derivative instruments; pay dividends on our senior preferred stock; purchase mortgage-related securities and other investments; purchase mortgage loans; and remove modified or seriously delinquent loans from PC trusts.

We fund our cash requirements primarily by issuing short-term and long-term debt. Other sources of cash include:

- receipts of principal and interest payments on securities or mortgage loans we hold;

- other cash flows from operating activities, including the management and guarantee fees we receive in connection with our guarantee activities (excluding those we must remit to Treasury pursuant to the Temporary Payroll Tax Cut Continuation Act of 2011 commencing in April 2012);

- borrowings against mortgage-related securities and other investment securities we hold; and

- sales of securities we hold.

We have also received substantial amounts of cash from Treasury pursuant to draws under the Purchase Agreement, which are made to address deficits in our net worth. We received $8.0 billion in cash from Treasury during 2011 pursuant to draws under the Purchase Agreement.

We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

As a result of the potential that the U.S. would exhaust its borrowing authority under the statutory debt limit and market concerns regarding the potential for a downgrade in the credit rating of the U.S. government, beginning in the third quarter of 2011, we changed the composition of our portfolio of liquid assets to hold more cash and overnight investments. On August 5, 2011, S&P lowered the long-term credit rating of the U.S. government to "AA+" from "AAA" and assigned a negative outlook to the rating. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating. While this could adversely affect our liquidity, and the supply and cost of debt financing available to us in the future, we have not yet experienced such adverse effects. For more information, see "*Other Debt Securities — Credit Ratings*" and "RISK FACTORS — Competitive and Market Risks — *Any downgrade in the credit ratings of the U.S. government would likely be followed by a downgrade in our credit ratings. A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business.*"

We may require cash in order to fulfill our mortgage purchase commitments. Historically, we fulfilled our purchase commitments related to our mortgage purchase flow business primarily by swap transactions, whereby our customers exchanged mortgage loans for PCs, rather than using cash. However, it is at the discretion of the seller, subject to limitations imposed by the contract governing the commitment, whether the purchase commitment is fulfilled through a swap transaction or with cash. We provide liquidity to our seller/servicers through our cash purchase program. Loans purchased through the cash purchase program can be sold to investors through a cash auction of PCs, and, in the interim, are carried as mortgage loans on our consolidated balance sheets. See "OFF-BALANCE SHEET ARRANGEMENTS" for additional information regarding our mortgage purchase commitments.

We make extensive use of the Fedwire system in our business activities. The Federal Reserve requires that we fully fund our account in the Fedwire system to the extent necessary to cover cash payments on our debt and mortgage-related securities each day, before the Federal Reserve Bank of New York, acting as our fiscal agent, will initiate such payments. We routinely use an open line of credit with a third party, which provides intraday liquidity to fund our activities through the Fedwire system. This line of credit is an uncommitted intraday loan facility. As a result, while we expect to continue to use the facility, we may not be able to draw on it, if and when needed. This line of credit requires that we post collateral that, in certain circumstances, the secured party has the right to repledge to other third parties, including the Federal Reserve Bank. As of December 31, 2011, we pledged approximately $10.5 billion of securities to this secured party. See "NOTE 7: INVESTMENTS IN SECURITIES — Collateral Pledged" for further information.

Depending on market conditions and the mix of derivatives we employ in connection with our ongoing risk management activities, our derivative portfolio can be either a net source or a net use of cash. For example, depending on the prevailing interest-rate environment, interest-rate swap agreements could cause us either to make interest payments to counterparties or to receive interest payments from counterparties. Purchased options require us to pay a premium while written options allow us to receive a premium.

We are required to pledge collateral to third parties in connection with secured financing and daily trade activities. In accordance with contracts with certain derivative counterparties, we post collateral to those counterparties for derivatives in a net loss position, after netting by counterparty, above agreed-upon posting thresholds. See "NOTE 7: INVESTMENTS IN SECURITIES — Collateral Pledged" for information about assets we pledge as collateral.

We are involved in various legal proceedings, including those discussed in "LEGAL PROCEEDINGS," which may result in a use of cash in order to settle claims or pay certain costs.

For more information on our short- and long-term liquidity needs, see "CONTRACTUAL OBLIGATIONS."

## *Liquidity Management*

Maintaining sufficient liquidity is of primary importance and we continually strive to enhance our liquidity management practices and policies. Under these practices and policies, we maintain an amount of cash and cash equivalent reserves in the form of liquid, high quality short-term investments that is intended to enable us to meet ongoing cash obligations for an extended period, in the event we do not have access to the short- or long-term unsecured debt markets. We also actively manage the concentration of debt maturities and closely monitor our monthly maturity profile.

Our liquidity management policies provide for us to:

- maintain funds sufficient to cover our maximum cash liquidity needs for at least the following 35 calendar days, assuming no access to the short- or long-term unsecured debt markets. At least 50% of such amount, which is based on the average daily 35-day cash liquidity needs of the preceding three months, must be held: (a) in U.S. Treasury securities with remaining maturities of five years or less or other U.S. government-guaranteed securities with remaining maturities of one year or less; or (b) as uninvested cash at the Federal Reserve Bank of New York;

- limit the proportion of debt maturing within the next year. We actively manage the composition of short-and long-term debt, as well as our patterns of redemption of callable debt, to manage the proportion of effective short-term debt to reduce the risk that we will be unable to refinance our debt as it comes due; and

- maintain unencumbered collateral with a value greater than or equal to the largest projected cash shortfall on any one day over the following 365 calendar days, assuming no access to the short- and long-term unsecured debt markets. This is based on a daily forecast of all existing contractual cash obligations over the following 365 calendar days.

Throughout 2011, we complied with all requirements under our liquidity management policies. Furthermore, the majority of the funds used to cover our short-term cash liquidity needs was invested in short-term assets with a rating of A-1/P-1 or AAA or was issued by a counterparty with that rating. In the event of a downgrade of a position or counterparty, as applicable, below minimum rating requirements, our credit governance policies require us to exit from the position within a specified period.

We also continue to manage our debt issuances to remain in compliance with the aggregate indebtedness limits set forth in the Purchase Agreement.

We are monitoring events related to troubled European countries and have taken a number of actions designed to reduce our exposures, including exposures related to certain derivative portfolio and cash and other investments portfolio counterparties. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Selected European Sovereign and Non-Sovereign Exposures*."

To facilitate cash management, we forecast cash outflows. These forecasts help us to manage our liabilities with respect to asset purchases and runoff, when financial markets are not in crisis. For further information on our management of interest-rate risk associated with asset and liability management, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

Notwithstanding these practices and policies, our ability to maintain sufficient liquidity, including by pledging mortgage-related and other securities as collateral to other financial institutions, could cease or change rapidly and the cost of the available funding could increase significantly due to changes in market confidence and other factors. For more information, see "RISK FACTORS — Competitive and Market Risks — *Our investment activities may be adversely affected by limited availability of financing and increased funding costs.*"

### Actions of Treasury and FHFA

Since our entry into conservatorship, Treasury and FHFA have taken a number of actions that affect our cash requirements and ability to fund those requirements. The conservatorship, and the resulting support we received from Treasury, has enabled us to access debt funding on terms sufficient for our needs.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The Purchase Agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011, and 2012. If we do not have a capital surplus (*i.e.*, positive net worth) at the end of 2012, then the amount of funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 31, 2009). In the event we have a capital surplus at the end of 2012, then the amount of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as follows:

- If the year-end 2012 surplus is lower than the cumulative draws needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

- If the year-end 2012 surplus exceeds the cumulative draws for 2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws.

While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available to us under the Purchase Agreement after 2012. The costs of our debt funding could also increase due to the downgrades discussed above or in the event of any future downgrades in our credit ratings or the credit ratings of the U.S. government. Upon funding of the draw request that FHFA will submit to eliminate our net worth deficit at December 31, 2011, our aggregate funding received from Treasury under the Purchase Agreement will increase to $71.3 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. Our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million.

We are required to pay a quarterly commitment fee to Treasury under the Purchase Agreement, as discussed below in "*Dividend Obligation on the Senior Preferred Stock.*"

The GSE Act requires us to set aside or allocate monies each year to certain funds managed by HUD and Treasury. However, FHFA has suspended this requirement. For more information, see "BUSINESS — Regulation and Supervision — *Federal Housing Finance Agency — Affordable Housing Allocations.*"

For more information on these matters, see "BUSINESS — Conservatorship and Related Matters" and "— Regulation and Supervision."

### Dividend Obligation on the Senior Preferred Stock

Following funding of the draw request related to our net worth deficit at December 31, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $7.22 billion to $7.23 billion, which exceeds our annual historical earnings in all but one period. The senior preferred stock accrues quarterly cumulative dividends at a rate of 10% per year or 12% per year in any quarter in which dividends are not paid in cash until all accrued dividends have been paid in cash. We paid dividends of $6.5 billion in cash on the senior preferred stock during 2011 at the direction of our Conservator. Through December 31, 2011, we paid aggregate cash dividends to Treasury of $16.5 billion, an amount equal to 23% of our aggregate draws received under the Purchase Agreement. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth and will increasingly drive future draws. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived. Treasury waived the fee for all quarters of 2011 and the first quarter of 2012, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. The amount of the fee has not yet been established and could be substantial.

The payment of dividends on our senior preferred stock in cash reduces our net worth. For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury. Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all.

As discussed in "Capital Resources," we expect to make additional draws under the Purchase Agreement in future periods. Further draws will increase the liquidation preference of and the dividends we owe on the senior preferred stock.

### Other Debt Securities

We fund our business activities primarily through the issuance of short- and long-term debt. The investor base for our debt is predominantly institutional. Competition for funding can vary with economic, financial market, and regulatory environments. Historically, we have mainly competed for funds in the debt issuance markets with Fannie Mae and the FHLBs. We repurchase or call our outstanding debt securities from time to time to help support the liquidity and predictability of the market for our debt securities and to manage our mix of liabilities funding our assets.

To fund our business activities, we depend on the continuing willingness of investors to purchase our debt securities. We expect that, over time, the reduction in our mortgage-related investments portfolio will reduce our funding needs. Changes or perceived changes in the government's support of us could have a severe negative effect on our access to the debt markets and on our debt funding costs. In addition, any change in applicable legislative or regulatory exemptions, including those described in "BUSINESS — Regulation and Supervision," could adversely affect our access to some debt investors, thereby potentially increasing our debt funding costs.

Spreads on our debt and our access to the debt markets remained favorable relative to historical levels during the three months and year ended December 31, 2011, due largely to support from the U.S. government. As a result, we were able to replace certain higher cost debt with lower cost debt. Our short-term debt was 24% of outstanding other debt at December 31, 2011 as compared to 28% at December 31, 2010. Beginning in the fourth quarter of 2011, we started issuing a higher percentage of long-term debt. This allows us to take advantage of attractive long-term rates while decreasing our reliance on interest-rate swaps, which may lessen the volatility of derivative gains (losses) on our consolidated statements of income and comprehensive income. For more information about derivative gains (losses), see "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — *Derivative Gains (Losses)*."

Because of the debt limit under the Purchase Agreement, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Our debt cap under the Purchase Agreement was $972 billion in 2011 and declined to $874.8 billion on January 1, 2012. As of December 31, 2011, we estimate that the par value of our aggregate indebtedness totaled $674.3 billion, which was approximately $297.7 billion below the applicable debt cap. As of December 31, 2010, we estimate that the par value of our aggregate indebtedness totaled $728.2 billion, which was approximately $351.8 billion below the then applicable limit of $1.08 trillion. Our aggregate indebtedness is calculated as the par value of other debt. We disclose the amount of our indebtedness on this basis monthly under the caption "Other Debt Activities — Total Debt Outstanding" in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC.

### Other Debt Issuance Activities

The table below summarizes the par value of other debt securities we issued, based on settlement dates, during 2011 and 2010.

**Table 67 — Other Debt Security Issuances by Product, at Par Value[1]**

| | Year Ended December 31, | |
| --- | ---: | ---: |
| | **2011** | **2010** |
| | (in millions) | |
| Other short-term debt: | | |
| Reference Bills® securities and discount notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $412,165 | $481,853 |
| Medium-term notes — callable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 1,500 |
| Medium-term notes — non-callable[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 450 | 1,364 |
| Total other short-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 412,615 | 484,717 |
| Other long-term debt: | | |
| Medium-term notes — callable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 172,464 | 219,847 |
| Medium-term notes — non-callable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 77,810 | 74,487 |
| U.S. dollar Reference Notes® securities — non-callable . . . . . . . . . . . . . . . . . . . . . . . . . . | 47,500 | 36,500 |
| Total other long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 297,774 | 330,834 |
| Total other debt issued . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $710,389 | $815,551 |

(1) Excludes federal funds purchased and securities sold under agreements to repurchase, and lines of credit. Also excludes debt securities of consolidated trusts held by third parties.

(2) Includes $450 million and $1.4 billion of medium-term notes — non-callable issued for the years ended December 31, 2011 and 2010, respectively, which were related to debt exchanges.

### Other Short-Term Debt

We fund our operating cash needs, in part, by issuing Reference Bills® securities and other discount notes, which are short-term instruments with maturities of one year or less that are sold on a discounted basis, paying only principal at maturity. Our Reference Bills® securities program consists of large issues of short-term debt that we auction to dealers on a regular schedule. We issue discount notes with maturities ranging from one day to one year in response to investor demand and our cash needs. Short-term debt also includes certain medium-term notes that have original maturities of one year or less.

### Other Long-Term Debt

We issue debt with maturities greater than one year primarily through our medium-term notes program and our Reference Notes® securities program.

*Medium-term Notes*

We issue a variety of fixed- and variable-rate medium-term notes, including callable and non-callable fixed-rate securities, zero-coupon securities and variable-rate securities, with various maturities ranging up to 30 years. Medium-term

*Freddie Mac*

notes with original maturities of one year or less are classified as short-term debt. Medium-term notes typically contain call provisions, effective as early as three months or as long as ten years after the securities are issued.

*Reference Notes® Securities*

Reference Notes® securities are regularly issued, U.S. dollar denominated, non-callable fixed-rate securities, which we generally issue with original maturities ranging from two through ten years. Prior to 2005, we issued €Reference Notes® securities denominated in Euros, which remain outstanding. We hedge our exposure to changes in foreign-currency exchange rates by entering into swap transactions that convert foreign-currency denominated obligations to U.S. dollar-denominated obligations. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks — *Sources of Interest-Rate Risk and Other Market Risks*" for more information.

<u>Subordinated Debt</u>

During 2011 and 2010, we did not call or issue any Freddie SUBS® securities. At December 31, 2011 and 2010, the balance of our subordinated debt outstanding was $0.4 billion and $0.7 billion, respectively. Our subordinated debt in the form of Freddie SUBS® securities is a component of our risk management and disclosure commitments with FHFA. See "RISK MANAGEMENT AND DISCLOSURE COMMITMENTS" for a discussion of changes affecting our subordinated debt as a result of our placement in conservatorship and the Purchase Agreement, and the Conservator's suspension of certain requirements relating to our subordinated debt. Under the Purchase Agreement, we may not issue subordinated debt without Treasury's consent.

<u>Other Debt Retirement Activities</u>

We repurchase, call, or exchange our outstanding medium- and long-term debt securities from time to time to help support the liquidity and predictability of the market for our other debt securities and to manage our mix of liabilities funding our assets. When our debt securities become seasoned or one-time call options on our debt securities expire, they may become less liquid, which could cause their price to decline. By repurchasing debt securities, we help preserve the liquidity of our debt securities and improve their price performance, which helps to reduce our funding costs over the long-term. Our repurchase activities also help us manage the funding mismatch, or duration gap, created by changes in interest rates. For example, when interest rates decline, the expected lives of our investments in mortgage-related securities decrease, reducing the need for long-term debt. We use a number of different means to shorten the effective weighted average lives of our outstanding debt securities and thereby manage the duration gap, including retiring long-term debt through repurchases or calls; changing our debt funding mix between short- and long-term debt; or using derivative instruments, such as entering into receive-fixed swaps or terminating or assigning pay-fixed swaps. From time to time, we may also enter into transactions in which we exchange newly issued debt securities for similar outstanding debt securities held by investors.

The table below provides the par value, based on settlement dates, of other debt securities we repurchased, called, and exchanged during 2011 and 2010.

**Table 68 — Other Debt Security Repurchases, Calls, and Exchanges**[1]

| | Year Ended December 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (in millions) | |
| Repurchases of outstanding €Reference Notes® securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $    258 | $    262 |
| Repurchases of outstanding medium-term notes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,064 | 5,301 |
| Calls of callable medium-term notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 185,489 | 256,256 |
| Exchanges of medium-term notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 450 | 1,364 |

(1) Excludes debt securities of consolidated trusts held by third parties.

*Credit Ratings*

Our ability to access the capital markets and other sources of funding, as well as our cost of funds, is highly dependent upon our credit ratings. The table below indicates our credit ratings as of February 27, 2012.

**Table 69 — Freddie Mac Credit Ratings**

| | Nationally Recognized Statistical Rating Organization | | |
|---|---|---|---|
| | **S&P** | **Moody's** | **Fitch** |
| Senior long-term debt[1] . . . . . . . . . . . . . . . . . . . . . . . . | AA+ | Aaa | AAA |
| Short-term debt[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A-1+ | P-1 | F1+ |
| Subordinated debt[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . | A | Aa2 | AA– |
| Preferred stock[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C | Ca | C/RR6 |
| Outlook . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Negative (for senior long-term debt and subordinated debt) | Negative (for senior long-term debt and subordinated debt) | Negative (for AAA-rated long-term Issuer Default Rating) |

(1) Consists of medium-term notes, U.S. dollar Reference Notes® securities and €Reference Notes® securities.
(2) Consists of Reference Bills® securities and discount notes.
(3) Consists of Freddie SUBS® securities.
(4) Does not include senior preferred stock issued to Treasury.

Our credit ratings are primarily based on the support we receive from Treasury, and therefore are affected by changes in the credit ratings of the U.S. government.

On November 21, 2011, the Joint Select Committee (formed as a result of the Budget and Control Act of 2011) announced that efforts to reach a deficit reduction agreement had been unsuccessful. Subsequent to this announcement, on November 28, 2011, Fitch affirmed the U.S. government's long-term Issuer Default Rating, or IDR, at "AAA" and revised the rating outlook to negative from stable. On this date, Fitch also affirmed the ratings on our senior long-term debt, short-term debt, subordinated debt, and preferred stock, while affirming our "AAA" IDR and revising the outlook on this rating to negative from stable.

For information about other ratings actions in 2011 and factors that could lead to future ratings actions and the potential impact of a downgrade in our credit ratings, see "RISK FACTORS — Competitive and Market Risks — *Any downgrade in the credit ratings of the U.S. government would likely be followed by a downgrade in our credit ratings. A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business.*"

A security rating is not a recommendation to buy, sell or hold securities. It may be subject to revision or withdrawal at any time by the assigning rating organization. Each rating should be evaluated independently of any other rating.

**Cash and Cash Equivalents, Federal Funds Sold, Securities Purchased Under Agreements to Resell, and Non-Mortgage-Related Securities**

Excluding amounts related to our consolidated VIEs, we held $67.8 billion in the aggregate of cash and cash equivalents, securities purchased under agreements to resell, and non-mortgage-related securities at December 31, 2011. These investments are important to our cash flow and asset and liability management and our ability to provide liquidity and stability to the mortgage market. At December 31, 2011, our non-mortgage-related securities primarily consisted of FDIC-guaranteed corporate medium-term notes and Treasury notes that we could sell to provide us with an additional source of liquidity to fund our business operations. For additional information on these assets, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell" and "— Investments in Securities — *Non-Mortgage-Related Securities*."

**Mortgage Loans and Mortgage-Related Securities**

We invest principally in mortgage loans and mortgage-related securities, certain categories of which are largely unencumbered and highly liquid. Our primary source of liquidity among these mortgage assets is our holdings of agency securities. In addition, our unsecuritized performing single-family mortgage loans are also a potential source of liquidity. Our holdings of CMBS are less liquid than agency securities. Our holdings of non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans are not liquid due to market conditions and the continued poor credit quality of the underlying assets. Our holdings of unsecuritized seriously delinquent and modified single-family mortgage loans are also illiquid.

We are subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury. See "BUSINESS — Conservatorship and Related Matters — *Impact of Conservatorship and Related Actions on Our Business — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio*" for more information on these limits and on the relative liquidity of our mortgage assets.

## Cash Flows

Our cash and cash equivalents decreased $8.6 billion to $28.4 billion during 2011 and decreased $27.7 billion to $37.0 billion during 2010. Cash flows provided by operating activities during 2011 and 2010 were $10.3 billion and $10.8 billion, respectively, primarily driven by cash proceeds from net interest income. Cash flows provided by investing activities during 2011 and 2010 were $373.7 billion and $385.6 billion, respectively, primarily resulting from net proceeds received as a result of repayments of single-family held-for-investment mortgage loans. Cash flows used for financing activities during 2011 and 2010 were $392.6 billion and $424.1 billion, respectively, largely attributable to funds used to repay debt securities of consolidated trusts held by third parties.

Our cash and cash equivalents increased approximately $19.4 billion during 2009 to $64.7 billion at December 31, 2009. Cash flows provided by operating activities during 2009 were $1.3 billion, which primarily related to cash proceeds from net interest income, partially offset by net cash proceeds used to purchase held-for-sale mortgage loans. Cash flows provided by investing activities during 2009 were $47.6 billion, primarily resulting from net proceeds related to sales and maturities of our available-for-sale securities, partially offset by a net increase in trading securities. Cash flows used for financing activities for 2009 were $29.5 billion, largely attributable to repayments of short-term debt, partially offset by $36.9 billion received from Treasury under the Purchase Agreement.

## Capital Resources

Our entry into conservatorship resulted in significant changes to the assessment of our capital adequacy and our management of capital. On October 9, 2008, FHFA announced that it was suspending capital classification of us during conservatorship in light of the Purchase Agreement. FHFA continues to monitor our capital levels, but the existing statutory and FHFA-directed regulatory capital requirements are not binding during conservatorship. We continue to provide submissions to FHFA on minimum capital. See "NOTE 15: REGULATORY CAPITAL" for our minimum capital requirement, core capital, and GAAP net worth results as of December 31, 2011 and 2010. In addition, notwithstanding our failure to maintain required capital levels, FHFA directed us to continue to make interest and principal payments on our subordinated debt. For more information, see "BUSINESS — Regulation and Supervision — *Federal Housing Finance Agency — Subordinated Debt*."

Under the Purchase Agreement, Treasury made a commitment to provide us with funding, under certain conditions, to eliminate deficits in our net worth. The Purchase Agreement provides that, if FHFA determines as of quarter end that our liabilities have exceeded our assets under GAAP, Treasury will contribute funds to us in an amount equal to the difference between such liabilities and assets; a higher amount may be drawn if Treasury and Freddie Mac mutually agree that the draw should be increased beyond the level by which liabilities exceed assets under GAAP. In each case, the amount of the draw cannot exceed the maximum aggregate amount that may be funded under the Purchase Agreement.

We are focusing our risk and capital management, consistent with the objectives of conservatorship, on, among other things, maintaining a positive balance of GAAP equity in order to reduce the likelihood that we will need to make additional draws on the Purchase Agreement with Treasury. Our business objectives and strategies have in some cases been altered since we were placed into conservatorship, and may continue to change. Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a manner that serves public policy and other non-financial objectives. In this regard, we are focused on serving our mission, helping families keep their homes, and stabilizing the economy by playing a vital role in the Administration's housing programs. However, these changes to our business objectives and strategies may conflict with maintaining positive GAAP equity.

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. Obtaining funding from Treasury pursuant to its commitment under the Purchase Agreement enables us to avoid being placed into receivership by FHFA. At December 31, 2011, our liabilities exceeded our assets under GAAP by $146 million. Accordingly, we must obtain funding from Treasury pursuant to its commitment under the Purchase Agreement in order to avoid being placed into receivership by FHFA. FHFA, as Conservator, will submit a draw request to Treasury under the Purchase Agreement in the amount of $146 million, which we expect to receive by March 31, 2012. See "BUSINESS — Regulation and Supervision — *Federal Housing Finance Agency — Receivership*" for additional information on mandatory receivership.

We expect to make further draws under the Purchase Agreement in future periods. Given the substantial senior preferred stock dividend obligation to Treasury, which will increase with additional draws, senior preferred stock dividend payments will increasingly drive our future draw requests. The size and timing of our future draws will be determined by the dividend obligation and a variety of other factors that could adversely affect our net worth. For more information, see

"RISK FACTORS — Conservatorship and Related Matters — *We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition*."

For more information on the Purchase Agreement, its effect on our business and capital management activities, factors that could adversely affect the size and timing of further draws, and the potential impact of making additional draws, see "Liquidity — *Dividend Obligation on the Senior Preferred Stock*," "BUSINESS — Executive Summary — *Government Support for Our Business*" and "RISK FACTORS."

## FAIR VALUE MEASUREMENTS AND ANALYSIS

### Fair Value Measurements

Fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The accounting guidance for fair value measurements and disclosures establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value based on the inputs a market participant would use at the measurement date. Observable inputs reflect market data obtained from independent sources. Unobservable inputs reflect assumptions based on the best information available under the circumstances. Unobservable inputs are used to measure fair value to the extent that observable inputs are not available, or in situations where there is little, if any, market activity for an asset or liability at the measurement date. We use valuation techniques that seek to maximize the use of observable inputs, where available, and minimize the use of unobservable inputs.

The three levels of the fair value hierarchy under the accounting guidance for fair value measurements and disclosures are described below:

- Level 1: Quoted prices (unadjusted) in active markets that are accessible at the measurement date for identical assets or liabilities;

- Level 2: Quoted prices for similar assets and liabilities in active markets; quoted prices for identical or similar assets and liabilities in markets that are not active; inputs other than quoted market prices that are observable for the asset or liability; and inputs that are derived principally from or corroborated by observable market data for substantially the full term of the assets or liabilities; and

- Level 3: Unobservable inputs for the asset or liability that are supported by little or no market activity and that are significant to the fair values.

We categorize assets and liabilities measured and reported at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation process used to derive their fair values and our judgment regarding the observability of the related inputs. Those judgments are based on our knowledge and observations of the markets relevant to the individual assets and liabilities and may vary based on current market conditions. In applying our judgments, we review ranges of third party prices and transaction volumes, and hold discussions with dealers and pricing service vendors to understand and assess the extent of market benchmarks available and the judgments or modeling required in their processes. Based on these factors, we determine whether the inputs are observable and whether the principal markets are active or inactive.

Our Level 1 financial instruments consist of exchange-traded derivatives, Treasury bills, and Treasury notes, where quoted prices exist for the exact instrument in an active market.

Our Level 2 instruments generally consist of high credit quality agency securities, CMBS, non-mortgage-related asset-backed securities, FDIC-guaranteed corporate medium-term notes, interest-rate swaps, option-based derivatives, and foreign-currency denominated debt. These instruments are generally valued through one of the following methods: (a) dealer or pricing service inputs with the value derived by comparison to recent transactions involving similar securities and adjusting for differences in prepayment or liquidity characteristics; or (b) modeled through an industry standard modeling technique that relies upon observable inputs such as discount rates and prepayment assumptions.

Our Level 3 assets primarily consist of non-agency mortgage-related securities. The non-agency mortgage-related securities market continued to be illiquid during 2011, with low transaction volumes, wide credit spreads, and limited transparency. We value the non-agency mortgage-related securities we hold based primarily on prices received from pricing services and dealers. The techniques used by these pricing services and dealers to develop the prices generally are either: (a) a comparison to transactions involving instruments with similar collateral and risk profiles; or (b) industry standard modeling, such as a discounted cash flow model. For a large majority of the securities we value using dealers and pricing services, we obtain multiple independent prices, which are non-binding both to us and our counterparties.

When multiple prices are received, we use the median of the prices. The models and related assumptions used by the dealers and pricing services are owned and managed by them. However, we have an understanding of their processes used to develop the prices provided to us based on our ongoing due diligence. We periodically have discussions with our dealers and pricing service vendors to maintain a current understanding of the processes and inputs they use to develop prices. We make no adjustments to the individual prices we receive from third party pricing services or dealers for non-agency mortgage-related securities beyond calculating median prices and discarding certain prices that are determined not to be valid based on our validation processes. See "*Controls over Fair Value Measurement*" for information on our validation processes.

Our valuation process and related fair value hierarchy assessments require us to make judgments regarding the liquidity of the marketplace. These judgments are based on the volume of securities traded in the marketplace, the width of bid/ask spreads and dispersion of prices on similar securities. As previously mentioned, the non-agency mortgage-related security markets continued to be illiquid during 2011. We continue to utilize the prices on such securities provided to us by various pricing services and dealers and believe that the procedures executed by the pricing services and dealers, combined with our internal verification and analytical processes, help ensure that the prices used to develop our financial statements are in accordance with the accounting guidance for fair value measurements and disclosures.

The prices provided to us consider the existence of credit enhancements, including bond insurance coverage, and the current lack of liquidity in the marketplace. We also consider credit risk in the valuation of our assets and liabilities, with the credit risk of the counterparty considered in asset valuations and our own institutional credit risk considered in liability valuations. See "*Consideration of Credit Risk in Our Valuation*" for more information.

We periodically evaluate our valuation techniques and may change them to improve our fair value estimates, to accommodate market developments or to compensate for changes in data availability and reliability or other operational constraints. We review a range of market quotes from pricing services or dealers and perform analysis of internal valuations on a monthly basis to confirm the reasonableness of the valuations.

The table below summarizes our assets and liabilities measured at fair value on a recurring basis at December 31, 2011 and 2010.

**Table 70 — Summary of Assets and Liabilities at Fair Value on a Recurring Basis**

| | December 31, | | | |
| | 2011 | | 2010 | |
| | Total GAAP Recurring Fair Value | Percentage in Level 3 | Total GAAP Recurring Fair Value | Percentage in Level 3 |
| | (dollars in millions) | | | |
| **Assets:** | | | | |
| Investments in securities: | | | | |
| Available-for-sale, at fair value | $210,659 | 28% | $232,634 | 30% |
| Trading, at fair value | 58,830 | 4 | 60,262 | 5 |
| Mortgage loans: | | | | |
| Held-for-sale, at fair value | 9,710 | 100 | 6,413 | 100 |
| Derivative assets, net[1] | 118 | — | 143 | — |
| Other assets: | | | | |
| Guarantee asset, at fair value | 752 | 100 | 541 | 100 |
| All other, at fair value | 151 | 100 | 235 | 100 |
| Total assets carried at fair value on a recurring basis[1] | $280,220 | 23 | $300,228 | 25 |
| **Liabilities:** | | | | |
| Debt securities recorded at fair value | $ 3,015 | —% | $ 4,443 | —% |
| Derivative liabilities, net[1] | 435 | — | 1,209 | 3 |
| Total liabilities carried at fair value on a recurring basis[1] | $ 3,450 | — | $ 5,652 | 2 |

(1) Percentages by level are based on gross fair value of derivative assets and derivative liabilities before counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

*Changes in Level 3 Recurring Fair Value Measurements*

At December 31, 2011 and 2010, we measured and recorded at fair value on a recurring basis, assets of $72.5 billion and $80.0 billion, respectively, or approximately 23% and 25% of total assets carried at fair value on a recurring basis, using significant unobservable inputs (Level 3), before the impact of counterparty and cash collateral netting. Our Level 3 assets at December 31, 2011 primarily consist of non-agency mortgage-related securities. At December 31, 2011 and 2010, we also measured and recorded at fair value on a recurring basis, Level 3 derivative liabilities of $0.1 billion and $0.8 billion, or less than 1% and 2%, respectively, of total liabilities carried at fair value on a recurring basis, before the impact of counterparty and cash collateral netting.

During 2011, the fair value of our Level 3 assets decreased due to: (a) monthly remittances of principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) the widening of OAS levels on these securities. During 2011, we had a net transfer into Level 3 assets of $267 million, resulting from a change in valuation method for certain mortgage-related securities due to a lack of relevant price quotes from dealers and third-party pricing services.

During 2010, our Level 3 assets decreased by $81.7 billion primarily due to the transfer of the majority of CMBS from Level 3 to Level 2 and our adoption of amendments to the accounting guidance applicable to the accounting for transfers of financial assets and the consolidation of VIEs. During 2010, the CMBS market continued to improve and we observed significantly less variability in fair value quotes received from dealers and third-party pricing services. In the fourth quarter of 2010 we determined that these market conditions stabilized to a degree that we believe indicates unobservable inputs are no longer significant to the fair values of these securities. As a result, we transferred $51.3 billion of CMBS from Level 3 to Level 2. The adoption of the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs resulted in the elimination of $28.8 billion in our Level 3 assets on January 1, 2010, including: (a) certain mortgage-related securities issued by our consolidated trusts that are held by us; and (b) the guarantee asset for guarantees issued to our consolidated trusts. In addition, we transferred $0.4 billion of other Level 3 assets to Level 2 during 2010, resulting from improved liquidity and availability of price quotes received from dealers and third-party pricing services.

See "NOTE 17: FAIR VALUE DISCLOSURES — Table 17.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs" for the Level 3 reconciliation. For discussion of types and characteristics of mortgage loans underlying our mortgage-related securities, see "Table 23 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets" and "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk.*"

### Consideration of Credit Risk in Our Valuation

We consider credit risk in the valuation of our assets and liabilities through consideration of credit risk of the counterparty in asset valuations and through consideration of our own institutional credit risk in liability valuations on our GAAP consolidated balance sheets.

We consider credit risk in our valuation of investments in securities based on fair value measurements that are largely the result of price quotes received from multiple dealers or pricing services. Some of the key valuation drivers of such fair value measurements can include the collateral type, collateral performance, credit quality of the issuer, tranche type, weighted average life, vintage, coupon, and interest rates. We also make adjustments for items such as credit enhancements or other types of subordination and liquidity, where applicable. In cases where internally developed models are used, we maximize the use of market-based inputs or calibrate such inputs to market data.

We also consider credit risk when we evaluate the valuation of our derivative positions. The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. For derivatives that are in an asset position, we hold collateral against those positions in accordance with agreed upon thresholds. The amount of collateral held depends on the credit rating of the counterparty and is based on our credit risk policies. Similarly, for derivatives that are in a liability position, we post collateral to counterparties in accordance with agreed upon thresholds. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Derivative Counterparties*" for a discussion of our counterparty credit risk.

See "NOTE 17: FAIR VALUE DISCLOSURES — Valuation Methods and Assumptions Subject to Fair Value Hierarchy" for additional information regarding the valuation of our assets and liabilities.

### Controls over Fair Value Measurement

We employ control processes to validate the techniques and models we use to determine fair value. These processes are designed to help ensure that fair value measurements are appropriate and reliable. These control processes include review and approval of new transaction types, price verification, and review of valuation judgments, methods, models, process controls, and results. Groups within our Finance and Enterprise Risk Management divisions, independent of our trading and investing function, execute, validate, and review the valuation process. Additionally, the Valuation & Finance Model Committee (Valuation Committee), which includes senior representation from business areas and our Enterprise Risk Management and Finance divisions, participates in the review and validation process.

Our control process includes performing monthly independent verification of fair value measurements by comparing the methodology driven price to other market source data (to the extent available), and uses independent analytics to determine if assigned fair values are reasonable. This review covers all categories of products with increased attention to higher risk/impact valuations. Validation processes are intended to help ensure that the individual prices we receive from third parties are consistent with our observations of the marketplace and prices that are provided to us by other dealers or pricing services. Where applicable, prices are back-tested by comparing the settlement prices to our fair value measurements. Analytical procedures include automated checks of prices for reasonableness based on variations from prices in previous periods, comparisons of prices to internally calculated expected prices, based on market moves, and relative value and yield comparisons based on specific characteristics of securities. To the extent that we determine that a price is outside of established parameters, we will further examine the price, including follow up discussions with the specific pricing service or dealer and ultimately will not use that price if we are not able to determine that the price is valid. These processes are executed prior to the use of the prices in our financial statements.

Where models are employed to assist in the measurement of fair value, all changes made to those models during the periods presented are put through the corporate model change governance process and material changes are reviewed by the Valuation Committee. Inputs used by those models are regularly updated for changes in the underlying data, assumptions, or market conditions.

### Consolidated Fair Value Balance Sheets Analysis

Our consolidated fair value balance sheets present our estimates of the fair value of our financial assets and liabilities. See "NOTE 17: FAIR VALUE DISCLOSURES — Table 17.6 — Consolidated Fair Value Balance Sheets" for our fair value balance sheets. In conjunction with the preparation of our consolidated fair value balance sheets, we use a number of financial models. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks," "RISK FACTORS" and "RISK MANAGEMENT — Operational Risks" for information concerning the risks associated with these models.

During 2011 and 2010, our fair value results were impacted by several improvements in our approach for estimating the fair value of certain financial instruments. See "CRITICAL ACCOUNTING POLICIES AND ESTIMATES," "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 17: FAIR VALUE DISCLOSURES" for more information on fair values.

### *Key Components of Changes in Fair Value of Net Assets*

Our attribution of changes in the fair value of net assets relies on models, assumptions, and other measurement techniques that evolve over time. The following are the key components of the attribution analysis:

#### *Core Spread Income*

Core spread income on our investments in mortgage loans and mortgage-related securities is a fair value estimate of the net current period accrual of income from the spread between our mortgage-related investments and our debt, calculated on an option-adjusted basis. OAS is an estimate of the yield spread between a given financial instrument and a benchmark (LIBOR, agency or Treasury) yield curve, after consideration of potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as prepayment options.

#### *Changes in Mortgage-To-Debt OAS*

The fair value of our net assets can be significantly affected from period to period by changes in the net OAS between the mortgage and agency debt sectors. The fair value impact of changes in OAS for a given period represents an estimate of the net unrealized increase or decrease in fair value of net assets arising from net fluctuations in OAS during that period. We do not attempt to hedge or actively manage the basis risk represented by the impact of changes in mortgage-to-debt OAS because we generally hold a substantial portion of our mortgage assets for the long-term and we do not believe that periodic increases or decreases in the fair value of net assets arising from fluctuations in OAS will significantly affect the long-term value of our investments in mortgage loans and mortgage-related securities.

#### *Asset-Liability Management Return*

Asset-liability management return represents the estimated net increase or decrease in the fair value of net assets resulting from net exposures related to the market risks we actively manage. We do not hedge all of the interest-rate risk that exists at the time a mortgage is purchased or that arises over its life. The market risks to which we are exposed as a result of our investment activities that we actively manage include duration and convexity risks, yield curve risk and volatility risk.

We seek to manage these risk exposures within prescribed limits as part of our overall investment strategy. Taking these risk positions and managing them within prudent limits is an integral part of our investment activity. We expect that the net exposures related to market risks we actively manage will generate fair value returns, although those positions may result in a net increase or decrease in fair value for a given period. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" for more information.

### Core Management and Guarantee Fees, Net

Core management and guarantee fees, net represents a fair value estimate of the annual income of our credit guarantee activities, based on current credit guarantee characteristics and market conditions. This estimate considers both contractual management and guarantee fees collected over the life of the credit guarantees and credit-related delivery fees collected up front when pools are formed, and associated costs and obligations, which include default costs.

### Change in the Fair Value of Credit Guarantee Activities

Change in the fair value of credit guarantee activities represents the estimated impact on the fair value of the credit guarantee business resulting from increases in the amount of such business we conduct plus the effect of changes in interest rates, projections of the future credit outlook and other market factors (*e.g.*, impact of the passage of time on cash flow discounting). Our estimated fair value of credit guarantee activities will change as credit conditions change.

We generally do not hedge changes in the fair value of our existing credit guarantee activities, with two exceptions discussed below. While periodic changes in the fair value of credit guarantee activities may have a significant impact on the fair value of net assets, we believe that changes in the fair value of our existing credit guarantee activities are not the best indication of long-term fair value expectations because such changes do not reflect our expectation that, over time, replacement business will largely replenish management and guarantee fee income lost because of prepayments. However, to the extent that projections of the future credit outlook reflected in the changes in fair value are realized, our fair value results may be affected.

We hedge interest rate exposure related to net buy-ups (up front payments we make that increase the management and guarantee fee that we will receive over the life of the pool) and float (expected gains or losses resulting from our mortgage security program remittance cycles). These value changes are considered in asset-liability management return (described above) because they relate to hedged positions. The change in the fair value of credit guarantee activities includes the impact of changes in interest rates and other market factors on the unhedged portion of the projected cash flows from the credit guarantee business.

### Discussion of Fair Value Results

The table below summarizes the change in the fair value of net assets for 2011 and 2010.

### Table 71 — Summary of Change in the Fair Value of Net Assets

|  | 2011 | 2010 |
| --- | --- | --- |
|  | (in billions) | |
| Beginning balance | $(58.6) | $(62.5) |
| Changes in fair value of net assets, before capital transactions | (21.3) | (2.9) |
| Capital transactions: | | |
| Dividends and share issuances, net[1] | 1.5 | 6.8 |
| Ending balance | $(78.4) | $(58.6) |

(1) Includes the funds received from Treasury of $8.0 billion and $12.5 billion for 2011 and 2010, respectively, under the Purchase Agreement, which increased the liquidation preference of our senior preferred stock.

During 2011, the fair value of net assets, before capital transactions, decreased by $21.3 billion, compared to a $2.9 billion decrease during 2010. The decrease in the fair value of net assets, before capital transactions, during 2011, was primarily due to: (a) a decrease in the fair value of our single-family loans due to our fourth quarter 2011 change in estimate discussed below, coupled with a decline in seasonally adjusted home prices in the continued weak credit environment; and (b) unrealized losses from the widening of OAS levels on our single-family non-agency mortgage-related securities. The decrease in fair value was partially offset by a tightening of OAS levels on our agency securities and high estimated core spread income.

During the fourth quarter of 2011, our fair value results as presented in our consolidated fair value balance sheets were affected by a change in estimate which increased the implied capital costs included in our valuation of single-family mortgage loans due to a change in the estimation of a risk premium assumption embedded in our modeled valuation of such loans. This change in estimate led to a $14.2 billion decrease in our fair value measurement of mortgage loans.

During 2010, the decrease in the fair value of net assets, before capital transactions, was primarily due to: (a) an increase in the risk premium related to our single-family loans as higher capital was applied reflecting the continued weak and uncertain credit environment; and (b) a change in the estimation of a risk premium assumption embedded in our model to apply credit costs, which led to a $6.9 billion decrease in our fair value measurement of mortgage loans. The decrease in fair value was partially offset by high estimated core spread income and an increase in the fair value of our investments in residential and commercial mortgage-related securities driven by the tightening of OAS levels.

When the OAS on a given asset widens, the fair value of that asset will typically decline, all other market factors being equal. However, we believe such OAS widening has the effect of increasing the likelihood that, in future periods, we will recognize income at a higher spread on this existing asset. The reverse is true when the OAS on a given asset tightens — current period fair values for that asset typically increase due to the tightening in OAS, while future income recognized on the asset is more likely to be earned at a reduced spread. However, as market conditions change, our estimate of expected fair value gains and losses from OAS may also change, and the actual core spread income recognized in future periods could be significantly different from current estimates.

## OFF-BALANCE SHEET ARRANGEMENTS

We enter into certain business arrangements that are not recorded on our consolidated balance sheets or may be recorded in amounts that differ from the full contract or notional amount of the transaction. These off-balance sheet arrangements may expose us to potential losses in excess of the amounts recorded on our consolidated balance sheets.

### Securitization Activities and Other Guarantee Commitments

We have certain off-balance sheet arrangements related to our securitization activities involving guaranteed mortgages and mortgage-related securities, though most of our securitization activities are on-balance sheet. Our off-balance sheet arrangements related to these securitization activities primarily consisted of: (a) Freddie Mac mortgage-related securities backed by multifamily loans; and (b) certain single-family Other Guarantee Transactions. We also have off-balance sheet arrangements related to other guarantee commitments, including long-term standby commitments and liquidity guarantees.

We guarantee the payment of principal and interest on Freddie Mac mortgage-related securities we issue and on mortgage loans covered by our other guarantee commitments. Therefore, our maximum potential off-balance sheet exposure to credit losses relating to these securitization activities and the other guarantee commitments is primarily represented by the UPB of the underlying loans and securities, which was $56.9 billion, $43.9 billion, and $1.5 trillion at December 31, 2011, 2010, and 2009, respectively. Our off-balance sheet arrangements related to securitization activity have been significantly reduced from historical levels due to accounting guidance for transfers of financial assets and the consolidation of VIEs, which we adopted on January 1, 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Adopted Accounting Guidance" and "NOTE 9: FINANCIAL GUARANTEES" for more information on our off-balance sheet securitization activities and other guarantee commitments.

We provide long-term standby commitments to certain of our customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements. These other guarantee commitments totaled $8.6 billion, $5.5 billion, and $5.1 billion of UPB at December 31, 2011, 2010, and 2009, respectively. We also had other guarantee commitments outstanding with respect to multifamily housing revenue bonds of $9.6 billion, $9.7 billion, and $9.2 billion in UPB at December 31, 2011, 2010, and 2009, respectively. These other guarantee commitments allow us to expand our support to the housing markets in certain circumstances where securitization is not warranted or practicable. In addition, as of December 31, 2011, 2010, and 2009, we issued other guarantee commitments on HFA bonds under the TCLFP with UPB of $2.9 billion, $3.5 billion, and $0.8 billion respectively.

As part of the guarantee arrangements pertaining to certain multifamily housing revenue bonds and securities backed by multifamily housing revenue bonds, we provided commitments to advance funds, commonly referred to as "liquidity guarantees," totaling $12.0 billion, $12.6 billion, and $12.4 billion at December 31, 2011, 2010, and 2009, respectively. These guarantees require us to advance funds to third parties that enable them to repurchase tendered bonds or securities that are unable to be remarketed. Any repurchased securities are pledged to us to secure funding until the securities are remarketed. We hold cash and cash equivalents in excess of these commitments to advance funds. At December 31, 2011, 2010, and 2009, there were no liquidity guarantee advances outstanding. Advances under our liquidity guarantees would typically mature in 60 to 120 days. In addition, as part of the HFA initiative, we, together with Fannie Mae, provide liquidity guarantees for certain variable-rate single-family and multifamily housing revenue bonds, under which Freddie Mac generally is obligated to purchase 50% of any tendered bonds that cannot be remarketed within five business days. For more information on the HFA Initiative, including our participation in the TCLFP, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Housing Finance Agency Initiative."

Our exposure to losses on the transactions described above would be partially mitigated by the recovery we would receive through exercising our rights to the collateral backing the underlying loans and the available credit enhancements, which may include recourse and primary insurance with third parties. In addition, we provide for incurred losses each period on these guarantees within our provision for credit losses.

## Other Agreements

We own interests in numerous entities that are considered to be VIEs for which we are not the primary beneficiary and which we do not consolidate in accordance with the accounting guidance for the consolidation of VIEs. These VIEs relate primarily to our investment activity in mortgage-related assets and non-mortgage assets, and include LIHTC partnerships, certain Other Guarantee Transactions, and certain asset-backed investment trusts. Our consolidated balance sheets reflect only our investment in the VIEs, rather than the full amount of the VIEs' assets and liabilities. See "NOTE 3: VARIABLE INTEREST ENTITIES" for additional information related to our variable interests in these VIEs.

As part of our credit guarantee business, we routinely enter into forward purchase and sale commitments for mortgage loans and mortgage-related securities. Some of these commitments are accounted for as derivatives. Their fair values are reported as either derivative assets, net or derivative liabilities, net on our consolidated balance sheets. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Derivative Counterparties.*" We also have purchase commitments primarily related to our mortgage purchase flow business, which we principally fulfill by issuing PCs in swap transactions, and, to a lesser extent, commitments to purchase or guarantee multifamily mortgage loans that are not accounted for as derivatives and are not recorded on our consolidated balance sheets. These non-derivative commitments totaled $271.8 billion, $220.7 billion and $325.9 billion, in notional value at December 31, 2011, 2010, and 2009, respectively.

In connection with the execution of the Purchase Agreement, we, through FHFA, in its capacity as Conservator, issued a warrant to Treasury to purchase 79.9% of our common stock outstanding on a fully diluted basis on the date of exercise. See "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" for further information.

## CONTRACTUAL OBLIGATIONS

The table below provides aggregated information about the listed categories of our contractual obligations as of December 31, 2011. These contractual obligations affect our short- and long-term liquidity and capital resource needs. The table includes information about undiscounted future cash payments due under these contractual obligations, aggregated by type of contractual obligation, including the contractual maturity profile of our debt securities (other than debt securities of consolidated trusts held by third parties). The timing of actual future payments may differ from those presented due to a number of factors, including discretionary debt repurchases. Our contractual obligations include other purchase obligations that are enforceable and legally binding. For purposes of this table, purchase obligations are included through the termination date specified in the respective agreement, even if the contract is renewable. Many of our purchase agreements for goods or services include clauses that would allow us to cancel the agreement prior to the expiration of the contract within a specified notice period; however, this table includes these obligations without regard to such termination clauses (unless we have provided the counterparty with actual notice of our intention to terminate the agreement).

In the table below, the amounts of future interest payments on debt securities outstanding at December 31, 2011 are based on the contractual terms of our debt securities at that date. These amounts were determined using the key assumptions that: (a) variable-rate debt continues to accrue interest at the contractual rates in effect at December 31, 2011 until maturity; and (b) callable debt continues to accrue interest until its contractual maturity. The amounts of future interest payments on debt securities presented do not reflect certain factors that will change the amounts of interest payments on our debt securities after December 31, 2011, such as: (a) changes in interest rates; (b) the call or retirement of any debt securities; and (c) the issuance of new debt securities. Accordingly, the amounts presented in the table do not represent a forecast of our future cash interest payments or interest expense.

The table below excludes certain obligations that could significantly affect our short- and long-term liquidity and capital resource needs. These items, which are listed below, have generally been excluded because the amount and timing of the related future cash payments are uncertain:

- future payments related to debt securities of consolidated trusts held by third parties, because the amount and timing of such payments are generally contingent upon the occurrence of future events and are therefore uncertain. These payments generally include payments of principal and interest we make to the holders of our guaranteed mortgage-related securities in the event a loan underlying a security becomes delinquent. We also remove

mortgages from pools underlying our PCs in certain circumstances, including when loans are 120 days or more delinquent, and retire the associated PC debt;

- any future cash payments associated with the liquidation preference of the senior preferred stock, as well as the quarterly commitment fee and the dividends on the senior preferred stock because the timing and amount of any such future cash payments are uncertain. As of December 31, 2011, the aggregate liquidation preference of the senior preferred stock was $72.2 billion and our annual dividend obligation was $7.22 billion. See "BUSINESS — Conservatorship and Related Matters — *Treasury Agreements*" for additional information;

- future cash settlements on derivative agreements not yet accrued, because the amount and timing of such payments are dependent upon changes in the underlying financial instruments in response to items such as changes in interest rates and foreign exchange rates and are therefore uncertain;

- future dividends on the preferred stock we have issued (other than the senior preferred stock), because dividends on these securities are non-cumulative;

- the guarantee arrangements pertaining to multifamily housing revenue bonds, where we provided commitments to advance funds, commonly referred to as "liquidity guarantees," because the amount and timing of such payments are generally contingent upon the occurrence of future events and are therefore uncertain; and

- future cash contributions to our Pension Plan, as we have not yet determined whether to make a cash contribution in 2012.

### Table 72 — Contractual Obligations by Year at December 31, 2011

| | Total | 2012 | 2013 | 2014 | 2015 | 2016 | Thereafter |
|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | |
| Long-term debt[1] | $512,871 | $127,798 | $142,943 | $87,453 | $33,897 | $45,526 | $75,254 |
| Short-term debt[1] | 161,443 | 161,443 | — | — | — | — | — |
| Interest payable[2] | 55,882 | 17,189 | 7,806 | 6,062 | 4,685 | 3,683 | 16,457 |
| Other liabilities reflected on our consolidated balance sheet: | | | | | | | |
| Other contractual liabilities[3][4][5] | 680 | 492 | 11 | 11 | 9 | 8 | 149 |
| Purchase obligations: | | | | | | | |
| Purchase commitments[6] | 11,434 | 11,434 | — | — | — | — | 2 |
| Other purchase obligations | 545 | 461 | 50 | 17 | 9 | 6 | 2 |
| Operating lease obligations | 43 | 12 | 12 | 10 | 4 | 3 | 2 |
| Total specified contractual obligations | $742,898 | $318,829 | $150,822 | $93,553 | $38,604 | $49,226 | $91,864 |

(1) Represents par value. Callable debt is included in this table at its contractual maturity. Excludes debt securities of consolidated trusts held by third parties. For additional information about our debt, see "NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS."

(2) Includes estimated future interest payments on our short-term and long-term debt securities as well as the accrual of periodic cash settlements of derivatives, netted by counterparty. Also includes accrued interest payable recorded on our consolidated balance sheet, which consists primarily of the accrual of interest for our PCs and certain Other Guarantee Transactions, and the accrual of interest on short-term and long-term debt.

(3) Accrued obligations related to our defined benefit plans, defined contribution plans, and executive deferred compensation plan are included in the Total and 2012 columns. However, the timing of payments due under these obligations is uncertain.

(4) Other contractual liabilities include future cash payments due under our contractual obligations to make delayed equity contributions to LIHTC partnerships and payables to the consolidated trusts established for the administration of cash remittances received related to the underlying assets of Freddie Mac mortgage-related securities.

(5) As of December 31, 2011, we have recorded tax liabilities for unrecognized tax benefits totaling $1.4 billion and allocated interest of $266 million. These amounts have been excluded from this table because we cannot estimate the years in which these liabilities may be settled. See "NOTE 13: INCOME TAXES" for additional information.

(6) Purchase commitments represent our obligations to purchase mortgage loans and mortgage-related securities from third parties. The majority of purchase commitments included in this caption are accounted for as derivatives in accordance with the accounting guidance for derivatives and hedging.

### CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in conformity with GAAP requires us to make a number of judgments, estimates and assumptions that affect the reported amounts within our consolidated financial statements. Certain of our accounting policies, as well as estimates we make, are critical, as they are both important to the presentation of our financial condition and results of operations and require management to make difficult, complex, or subjective judgments and estimates, often regarding matters that are inherently uncertain. Actual results could differ from our estimates and the use of different judgments and assumptions related to these policies and estimates could have a material impact on our consolidated financial statements.

Our critical accounting policies and estimates relate to: (a) allowances for loan losses and reserve for guarantee losses; (b) fair value measurements; (c) impairment recognition on investments in securities; and (d) realizability of net deferred tax assets. For additional information about our critical accounting policies and estimates and other significant accounting policies, including recently issued accounting guidance, including guidance that we have not yet adopted and

that will likely affect our consolidated financial statements, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES."

**Allowance for Loan Losses and Reserve for Guarantee Losses**

The allowance for loan losses and the reserve for guarantee losses represent estimates of incurred credit losses. The allowance for loan losses pertains to all single-family and multifamily loans classified as held-for-investment on our consolidated balance sheets, whereas the reserve for guarantee losses relates to single-family and multifamily loans underlying our non-consolidated Freddie Mac mortgage-related securities and other guarantee commitments. We use the same methodology to determine our allowance for loan losses and reserve for guarantee losses, as the relevant factors affecting credit risk are the same. Determining the appropriateness of the loan loss reserves is a complex process that is subject to numerous estimates and assumptions requiring significant management judgment about matters that involve a high degree of subjectivity. Our process involves a greater degree of management judgment than prior to this period of housing and mortgage market instability.

We estimate credit losses related to homogeneous pools of loans in accordance with the accounting guidance for contingencies. Loans that we evaluate for individual impairment are measured in accordance with the subsequent measurement requirements of the accounting guidance for receivables.

We believe the level of our loan loss reserves is reasonable based on internal reviews of the factors and methodologies used. No single statistic or measurement determines the appropriateness of the loan loss reserves. Changes in one or more of the estimates or assumptions used to calculate the loan loss reserves could have a material impact on the loan loss reserves and provision for credit losses.

*Single-Family Loan Loss Reserves*

Single-family loans are aggregated into pools based on similar risk characteristics and measured collectively using a statistically based model that evaluates a variety of factors affecting collectability, including but not limited to: current LTV ratios, a loan's product type, delinquency/default status and history, and geographic location. Inputs used by the model are regularly updated for changes in the underlying data, assumptions, and market conditions. We consider the output of this model, together with other information such as expected future levels of loan modifications and expected repurchases of loans by seller/servicers as a result of their non-compliance with our underwriting standards, the adequacy of third-party credit enhancements, and the effects of macroeconomic variables such as rates of unemployment and the effects of home price changes on borrower behavior. The inability to realize the benefits of our loss mitigation plans, a lower realized rate of seller/servicer repurchases, further declines in home prices, further deterioration in the financial condition of our mortgage insurance counterparties, or delinquency rates that exceed our current projections would cause our losses to be significantly higher than those currently estimated.

There is significant risk and uncertainty associated with our estimate of losses incurred on our single-family loans. The process for determining the estimate is complex. It uses models and requires us to make judgments about matters that are difficult to predict, the most significant of which are the probability of default and estimated loss severity. We regularly evaluate the underlying estimates and models we use when determining loan loss reserves and update our assumptions to reflect our historical experience and current view of economic factors. See "RISK FACTORS — Operational Risks — *We face risks and uncertainties associated with the internal models that we use for financial accounting and reporting purposes, to make business decisions and to manage risks. Market conditions have raised these risks and uncertainties*."

Individually impaired single-family loans include loans that have undergone a TDR and are measured for impairment as the excess of our recorded investment in the loan over the present value of the expected future cash flows. Our expectation of future cash flows incorporates many of the judgments indicated above.

*Multifamily Loan Loss Reserves*

To determine loan loss reserves for the multifamily loan portfolio, including determining which loans are individually impaired, we consider all available evidence including, but not limited to, operating cash flows from the underlying property as represented by its current DSCR, the fair value of collateral underlying the loans, evaluation of the repayment prospects, the adequacy of third-party credit enhancements, year of origination, certain macroeconomic data, and available economic data related to multifamily real estate, including apartment vacancy and rental rates.

Multifamily loans evaluated collectively for impairment are aggregated into book year vintages and measured by benchmarking published historical commercial mortgage data to those vintages based upon some of the factors listed above.

Individually impaired multifamily loans are measured for impairment based on the fair value of the underlying collateral, as reduced by estimated disposition costs, as multifamily loans are generally collateral-dependent and most multifamily loans are non-recourse to the borrower. Non-recourse means generally that the cash flows of the underlying property (including any associated credit enhancements) serve as the source of funds for repayment of the loan.

### Fair Value Measurements

Assets and liabilities within our consolidated financial statements measured at fair value include: (a) mortgage-related and non-mortgage related securities; (b) mortgage loans held-for-sale; (c) derivative instruments; (d) debt securities denominated in foreign currencies and certain other debt; and (e) REO. The accounting guidance for fair value measurements and disclosures establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value based on the inputs a market participant would use at the measurement date. Fair value measurements under this hierarchy are distinguished by quoted market prices, observable inputs, and unobservable inputs. The measurement of fair value requires management to make judgments and assumptions and the process for determining fair value using unobservable inputs is generally more subjective and involves a higher degree of management judgment and assumptions than the measurement of fair value using observable inputs. These judgments and assumptions may have a significant effect on our measurements of fair value, and the use of different judgments and assumptions, as well as changes in market conditions, could have a material effect on our consolidated statements of income and comprehensive income as well as our consolidated fair value balance sheets. For information regarding our fair value methods and assumptions, see "NOTE 17: FAIR VALUE DISCLOSURES" and "FAIR VALUE MEASUREMENTS AND ANALYSIS" for additional information regarding fair value hierarchy and measurements.

### Impairment Recognition on Investments in Securities

We recognize impairment losses on available-for-sale securities within our consolidated statements of income and comprehensive income as net impairment of available-for-sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other-than-temporary.

We conduct quarterly reviews to evaluate each available-for-sale security that has an unrealized loss for other-than-temporary impairment. An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis. We recognize other-than-temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security. If we do not intend to sell the security and we believe it is not more likely than not that we will be required to sell prior to recovery of its unrealized loss, we recognize only the credit component of other-than-temporary impairment in earnings and the amounts attributable to all other factors are recognized, net of tax, in AOCI. The credit component represents the amount by which the present value of cash flows expected to be collected from the security is less than the amortized cost basis of the security.

The evaluation of whether unrealized losses on available-for-sale securities are other-than-temporary requires significant management judgments and assumptions and consideration of numerous factors. We perform an evaluation on a security-by-security basis considering all available information. The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment. For information regarding important factors, judgments and assumptions, see "NOTE 7: INVESTMENTS IN SECURITIES — Impairment Recognition on Investments in Securities."

For the majority of our available-for-sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other-than-temporary and is recorded within our consolidated statements of income and comprehensive income as net impairment of available-for-sale securities recognized in earnings.

See "NOTE 7: INVESTMENTS IN SECURITIES — Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position" for the length of time our available-for-sale securities have been in an unrealized loss position. Also see "NOTE 7: INVESTMENTS IN SECURITIES — Table 7.3 — Significant Modeled Attributes for Certain Non-Agency Mortgage-Related Securities" for the modeled default rates and severities that were used to determine whether our senior interests in certain non-agency mortgage-related securities would experience a cash shortfall. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for more information on impairment recognition on securities.

We believe our judgments and assumptions used in our evaluation of other-than-temporary impairment are reasonable. However, different judgments or assumptions could have resulted in materially different recognition of other-than-temporary impairment. It is possible that the losses we ultimately realize could be significantly higher or lower than the losses we have recognized in our financial results to date.

### Realizability of Deferred Tax Assets, Net

We use the asset and liability method to account for income taxes pursuant to the accounting guidance for income taxes. Under this method, deferred tax assets and liabilities are recognized based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates. Valuation allowances are recorded to reduce net deferred tax assets when it is more likely than not that a tax benefit will not be realized. The realization of these net deferred tax assets is dependent upon the generation of sufficient taxable income in available carryback years from current operations and unrecognized tax benefits, and upon our intent and ability to hold available-for-sale debt securities until the recovery of any temporary unrealized losses. On a quarterly basis, we determine whether a valuation allowance is necessary. In so doing, we consider all evidence currently available, both positive and negative, in determining whether, based on the weight of that evidence, it is more likely than not that the net deferred tax assets will be realized.

The consideration of this evidence requires significant estimates, assumptions, and judgments, particularly about our future financial condition and results of operations and our intent and ability to hold available-for-sale debt securities with temporary unrealized losses until recovery. As discussed in "RISK FACTORS," the conservatorship and related matters fundamentally affecting our control, management, and operations are likely to affect our future financial condition and results of operations. These events have resulted in a variety of uncertainties regarding our future operations, our business objectives and strategies, and our future profitability, the impact of which cannot be reliably forecasted at this time. As such, any changes in these estimates, assumptions or judgments may have a material effect on our financial position and results of operations.

We determined that, as of September 30, 2008, it was more likely than not that we would not realize the portion of our net deferred tax assets that is dependent upon the generation of future taxable income. This determination was driven by the events and the resulting uncertainties as of that date. Those conditions continued to exist as of December 31, 2011. As a result, we continue to maintain a valuation allowance against these net deferred tax assets at December 31, 2011. It is possible that, in future periods, the uncertainties regarding our future operations and profitability could be resolved such that it could become more likely than not that these net deferred tax assets would be realized due to the generation of sufficient taxable income. If that were to occur, we would assess the need for a reduction of the valuation allowance, which could have a material effect on our financial position and results of operations in the period of the reduction.

Also, we determined that a valuation allowance is not necessary for the portion of our net deferred tax assets that is dependent upon our intent and ability to hold available-for-sale debt securities until the recovery of any temporary unrealized losses. These temporary unrealized losses have only impacted AOCI, not income from continuing operations or our taxable income, nor will they impact income from continuing operations or taxable income if they are held to maturity. As such, the realization of this deferred tax asset is not dependent upon the generation of sufficient taxable income but rather on our intent and ability to hold these securities until recovery of these unrealized losses which may be at maturity. Our conclusion that these unrealized losses are temporary and that we have the intent and ability to hold these securities until recovery requires significant estimates, assumptions, and judgments, as described above in "Impairment Recognition on Investments in Securities." Any changes in these estimates, assumptions, or judgments in future periods may result in the recognition of an other-than-temporary impairment, which would result in some of this deferred tax asset not being realized and may have a material effect on our financial position and results of operations. For more information see "NOTE 13: INCOME TAXES."

## RISK MANAGEMENT AND DISCLOSURE COMMITMENTS

In October 2000, we announced our adoption of a series of commitments designed to enhance market discipline, liquidity and capital. In September 2005, we entered into a written agreement with FHFA, then OFHEO, that updated these commitments and set forth a process for implementing them. A copy of the letters between us and OFHEO dated September 1, 2005 constituting the written agreement has been filed as an exhibit to our Registration Statement on Form 10, filed with the SEC on July 18, 2008, and is available on the Investor Relations page of our web site at www.freddiemac.com/investors/sec_filings/index.html.

In November 2008, FHFA suspended our periodic issuance of subordinated debt disclosure commitment during the term of conservatorship and thereafter until directed otherwise. In March 2009, FHFA suspended the remaining disclosure

commitments under the September 1, 2005 agreement until further notice, except that: (a) FHFA will continue to monitor our adherence to the substance of the liquidity management and contingency planning commitment through normal supervision activities; and (b) we will continue to provide interest-rate risk and credit risk disclosures in our periodic public reports.

For the year ended December 31, 2011, our duration gap averaged zero months, PMVS-L averaged $359 million and PMVS-YC averaged $21 million. Our 2011 monthly average duration gap, PMVS results and related disclosures are provided in our Monthly Volume Summary reports, which are available on our web site, www.freddiemac.com/investors/volsum and in current reports on Form 8-K we file with the SEC. For disclosures concerning credit risk sensitivity, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Credit Risk Sensitivity.*"

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

**Interest-Rate Risk and Other Market Risks**

*Sources of Interest-Rate Risk and Other Market Risks*

Our investments in mortgage loans and mortgage-related securities expose us to interest-rate risk and other market risks arising primarily from the uncertainty as to when borrowers will pay the outstanding principal balance of mortgage loans and mortgage-related securities, known as prepayment risk, and the resulting potential mismatch in the timing of our receipt of cash flows related to our assets versus the timing of payment of cash flows related to our liabilities used to fund those assets. For the vast majority of our mortgage-related investments, the mortgage borrower has the option to make unscheduled payments of additional principal or to completely pay off a mortgage loan at any time before its scheduled maturity date (without having to pay a prepayment penalty) or make principal payments in accordance with their contractual obligation. We use derivatives as an important part of our strategy to manage interest-rate and prepayment risk. When determining to use derivatives to mitigate our exposures, we consider a number of factors, including cost, efficiency, exposure to counterparty risks, and our overall risk management strategy. See "MD&A — RISK MANAGEMENT" and "RISK FACTORS" for a discussion of our market risk exposure, including those related to derivatives, institutional counterparties, and other market risks.

Our credit guarantee activities also expose us to interest-rate risk because changes in interest rates can cause fluctuations in the fair value of our existing credit guarantees. We generally do not hedge these changes in fair value except for interest-rate exposure related to net buy-ups and float. Float, which arises from timing differences between when the borrower makes principal payments on the loan and the reduction of the PC balance, can lead to significant interest expense if the interest rate paid to a PC investor is higher than the reinvestment rate earned by the securitization trusts on payments received from mortgage borrowers and paid to us as trust management income.

The principal types of interest-rate risk and other market risks to which we are exposed are described below.

*Duration Risk and Convexity Risk*

Duration is a measure of a financial instrument's price sensitivity to changes in interest rates (expressed in percentage terms). We compute each instrument's duration by applying an interest-rate shock, both upward and downward, to the LIBOR curve and evaluating the impact on the instrument's fair value. As interest rates have reached historically low levels, the methodology previously used by management to calculate duration and convexity began to produce risk sensitivities that were increasingly unstable and not representative of expected price movements. In order to alleviate the instability, we changed the shift size required to calculate duration and convexity from 50 basis points to 25 basis points beginning November 14, 2011. The effect of this change on our duration and convexity measures was not material. Convexity is a measure of how much a financial instrument's duration changes as interest rates change. Similar to the duration calculation, we compute each instrument's convexity by applying the shock, both upward and downward, to the LIBOR curve and evaluating the impact on the duration. Currently, short-term interest rates are at historically low levels and, at some points, the LIBOR curve is less than 25 basis points (and less than 50 basis points that was the threshold before the November 14, 2011 change). As a result, the basis point shock to the LIBOR curve described above is bounded by zero. Our convexity risk primarily results from prepayment risk.

We seek to manage duration risk and convexity risk through asset selection and structuring (that is, by acquiring or structuring mortgage-related securities with attractive prepayment and other characteristics), by issuing a broad range of both callable and non-callable debt instruments, and by using interest-rate derivatives and written options. Managing the impact of duration risk and convexity risk is the principal focus of our daily market risk management activities. These risks are encompassed in our PMVS and duration gap risk measures, discussed in greater detail below. We use prepayment models to determine the estimated duration and convexity of mortgage assets for our PMVS and duration gap measures. When interest rates decline, mortgage asset prices tend to rise, but the rise is limited by the increased likelihood of prepayments, which exposes us to negative convexity. Through the use of our models, we estimate on a weekly basis the negative convexity profile of our portfolio over a wide range of interest rates. This process is designed to help us to identify the particular interest rate scenarios where the convexity of our portfolio appears to be most negative, and therefore the particular interest rate scenario where the interest rate price sensitivity of our financial instruments appears to be most acute. We use this information to develop hedging strategies that are customized to provide interest-rate risk protection for the specific interest rate environment where we believe we are most exposed to negative convexity risk. This strategy allows us to select hedging instruments that are expected to be most efficient for our portfolio, thereby reducing the overall cost of interest rate hedging activities.

By managing our convexity profile over a wide range of interest rates, we are able to hedge prepayment risk for particular interest rate scenarios. As a result, the intensity and frequency of our ongoing risk management actions is relatively constant over a wide range of interest rate environments. Our approach to convexity risk management focuses our portfolio rebalancing activities for the specific interest rate scenario where market and interest rate volatility appear to be most pronounced. This approach to convexity risk reduces our ongoing rebalancing activity to a relatively low level compared to the overall daily trading volume of interest-rate swaps and Treasury futures.

The expected loss in portfolio market value is an estimate of the sensitivity to changes in interest rates of the fair value of all interest-earning assets, interest-bearing liabilities, and derivatives on a pre-tax basis. When we calculate the expected loss in portfolio market value and duration gap, we also take into account the cash flows related to certain credit guarantee-related items, including net buy-ups and expected gains or losses due to net interest from float. In making these calculations, we do not consider the sensitivity to interest-rate changes of the following assets and liabilities:

- *Credit guarantee activities.*   We do not consider the sensitivity of the fair value of credit guarantee activities to changes in interest rates except for the guarantee-related items mentioned above (*i.e.*, net buy-ups and float), because we believe the expected benefits from replacement business provide an adequate hedge against interest-rate changes over time.

- *Other assets with minimal interest-rate sensitivity.*   We do not include other assets, primarily non-financial instruments such as fixed assets and REO, because we estimate their impact on PMVS and duration gap to be minimal.

### Yield Curve Risk

Yield curve risk is the risk that non-parallel shifts in the yield curve (such as a flattening or steepening) will adversely affect the fair value of net assets and ultimately adversely affect GAAP total equity (deficit). Because changes in the shape, or slope, of the yield curve often arise due to changes in the market's expectation of future interest rates at different points along the yield curve, we evaluate our exposure to yield curve risk by examining potential reshaping scenarios at various points along the yield curve. We manage yield curve risk with the use of derivatives. Our yield curve risk under a specified yield curve scenario is reflected in our PMVS-YC disclosure.

### Volatility Risk

Volatility risk is the risk that changes in the market's expectation of the magnitude of future variations in interest rates will adversely affect the fair value of net assets and ultimately adversely affect GAAP total equity (deficit). Volatility risk arises from the prepayment risk that is inherent in mortgages or mortgage-related securities. Volatility risk is the risk that the homeowner's prepayment option will gain or lose value as the expected volatility of future interest rates changes. In general, as expected future interest rate volatility increases, the homeowner's prepayment option increases in value, thus negatively impacting the value of the mortgage security backed by the underlying mortgages. We manage volatility risk by maintaining a portfolio of callable debt and option-based interest rate derivatives that have relatively long option terms. We actively manage and monitor our volatility risk exposure over a range of changing interest rate scenarios; however, we do not eliminate our volatility risk exposure completely.

### Basis Risk

Basis risk is the risk that interest rates in different market sectors will not move in tandem and will adversely affect the fair value of net assets and ultimately adversely affect GAAP total equity (deficit). This risk arises principally because we generally hedge mortgage-related investments with debt securities. As principally a buy-and-hold investor, we do not actively manage overall basis risk, also referred to as mortgage-to-debt OAS risk or spread risk, arising from funding mortgage-related investments with our debt securities. See "MD&A — FAIR VALUE MEASUREMENTS AND ANALYSIS — Key Components of Changes in Fair Value of Net Assets — *Changes in Mortgage-To-Debt OAS*" for additional information. We also incur basis risk when we use LIBOR- or Treasury-based instruments in our risk management activities.

### Model Risk

Proprietary models, including mortgage prepayment models, interest rate models, and mortgage default models, are an integral part of our investment framework. As market conditions change rapidly, as they have since 2007, the assumptions that we use in our models for our sensitivity analyses may not keep pace with these market changes. As such, these analyses are not intended to provide precise forecasts of the effect a change in market interest rates would have on the estimated fair values of our net assets. We actively manage our model risk by reviewing the performance of

<div align="center">195</div>

<div align="right">*Freddie Mac*</div>

our models. To improve the accuracy of our models, changes to the underlying assumptions or modeling techniques are made on a periodic basis. Model development and model testing are reviewed and approved independently by our Enterprise Risk Management division. Model performance is also reported regularly through a series of internal management committees. See "MD&A — RISK MANAGEMENT — Operational Risks" and "RISK FACTORS — Operational Risks — *We face risks and uncertainties associated with the internal models that we use for financial accounting and reporting purposes, to make business decisions and to manage risks. Market conditions have raised these risks and uncertainties*" for a discussion of the developments and risks associated with our use of models. Given the importance of models to our investment management practices, model changes undergo a rigorous review process. As a result, it is common for model changes to take several months to complete. Given the time consuming nature of the model change review process, it is sometimes necessary for risk management purposes for management to make adjustments to our interest-rate risk statistics that reflect the expected impact of the pending model change. These adjustments are included in our PMVS and duration gap disclosures.

### Foreign-Currency Risk

Foreign-currency risk is the risk that fluctuations in currency exchange rates (*e.g.*, Euros to the U.S. dollar) will adversely affect the fair value of net assets and ultimately adversely affect GAAP total equity (deficit). We are exposed to foreign-currency risk because we have debt denominated in currencies other than the U.S. dollar, our functional currency. We mitigate virtually all of our foreign-currency risk by entering into swap transactions that effectively convert foreign-currency denominated obligations into U.S. dollar-denominated obligations.

### Interest-Rate Risk Management Strategy and Framework

Although we cannot hedge all of our exposure to changes in interest rates, this exposure is subject to established limits and is monitored through our risk management process. We employ a risk management strategy that seeks to substantially match the duration characteristics of our assets and liabilities. Through our asset and liability management process, we seek to mitigate interest-rate risk by issuing a wide variety of callable and non-callable debt products. The prepayment option held by mortgage borrowers drives the fair value of our mortgage assets such that the combined fair value of our mortgage assets and non-callable debt will decline if interest rates move significantly in either direction. We seek to mitigate much of our exposure to changes in interest rates by funding a significant portion of our mortgage portfolio with callable debt. When interest rates change, our option to redeem this debt offsets a large portion of the fair value change driven by the mortgage prepayment option. However, because the mortgage prepayment option is not fully hedged by callable debt, the combined fair value of our mortgage assets and debt will be affected by changes in interest rates.

To further reduce our exposure to changes in interest rates, we hedge a significant portion of the remaining prepayment risk with option-based derivatives. These derivatives primarily consist of call swaptions, which tend to increase in value as interest rates decline, and put swaptions, which tend to increase in value as interest rates increase. We also seek to manage interest-rate risk by changing the effective interest terms of the portfolio, primarily using interest-rate swaps, which we refer to as rebalancing. For further discussion of why we use derivatives and the types of derivatives we use, see "NOTE 11: DERIVATIVES."

Our approach to managing interest-rate risk is designed to be disciplined and comprehensive. Our objective is to minimize our interest-rate risk exposure across a range of interest-rate scenarios. To do this, we analyze the interest-rate sensitivity of financial assets and liabilities at the instrument level on a daily basis and across a variety of interest rate scenarios. For risk management purposes, the interest-rate characteristics of each instrument are determined daily based on market prices and internal models. The fair values of our assets, liabilities and derivatives are primarily based on either third party prices, or observable market-based inputs. These fair values, whether direct from third parties or derived from observable inputs, are reviewed and validated by groups that are separate from our trading and investing function. See "MD&A — FAIR VALUE MEASUREMENTS AND ANALYSIS — Fair Value Measurements — *Controls over Fair Value Measurement.*"

Annually, the Business and Risk Committee of our Board of Directors establishes certain Board limits for interest-rate risk measures, and if we exceed these limits we are required to notify the Business and Risk Committee and address the limit overage. These limits encompass a range of interest-rate risks that include duration risk, convexity risk, volatility risk, and yield curve risk associated with our use of various financial instruments, including derivatives. Also on an annual basis, our Enterprise Risk Management division establishes management limits and makes recommendations with respect to the limits to be established at the Board level. These limits are reviewed by our Enterprise Risk Management Committee, which is responsible for reviewing performance as compared to the established limits. The management limits

are set at values below those set at the Board level, which is intended to allow us to follow a series of predetermined actions in the event of a breach of the management limits and helps ensure proper oversight to reduce the possibility of exceeding the Board limits. We also establish management limits that do not have corresponding Board limits.

***Portfolio Market Value Sensitivity and Measurement of Interest-Rate Risk***

*PMVS and Duration Gap*

Our primary interest-rate risk measures are PMVS and duration gap. PMVS is an estimate of the change in the market value of our net assets and liabilities from an instantaneous 50 basis point shock to interest rates, assuming no rebalancing actions are undertaken and assuming the mortgage-to-LIBOR basis does not change. (The shock used for calculating PMVS is not the same as the shock used for calculating duration and convexity, described above under *"Duration Risk and Convexity Risk."*) PMVS is measured in two ways, one measuring the estimated sensitivity of our portfolio market value to parallel movements in interest rates (PMVS-Level or PMVS-L) and the other to nonparallel movements (PMVS-YC).

- We calculate our exposure to changes in interest rates using effective duration. Effective duration measures the percentage change in the price of financial instruments from a 1% change in interest rates. Financial instruments with positive duration increase in value as interest rates decline. Conversely, financial instruments with negative duration increase in value as interest rates rise.

- Together, duration and convexity provide a measure of an instrument's overall price sensitivity to changes in interest rates. We utilize the aggregate duration and convexity risk of all interest-rate sensitive instruments on a daily basis to estimate the two PMVS metrics. The duration and convexity measures are used to estimate PMVS under the following formula:

  PMVS = −[*Duration*] multiplied by [rate shock] plus [0.5 multiplied by *Convexity*] multiplied by [rate shock]$^2$

  In the equation, [rate shock] represents the interest-rate change expressed in percentage terms. For example, a 50 basis point adverse change will be expressed as 0.5%. The result of this formula is the percentage of sensitivity to the change in rate, which is expressed as: PMVS = (0.5 Duration) + (0.125 Convexity).

- To estimate PMVS-L, an instantaneous parallel 50 basis point shock is applied to the yield curve, as represented by the US swap curve, holding all spreads to the swap curve constant. This shock is applied to the duration and convexity of all interest-rate sensitive financial instruments. The resulting change in market value for the aggregate portfolio is computed for both the up rate and down rate shock and the change in market value in the more adverse scenario of the up and down rate shocks is the PMVS. In cases where both the up rate and down rate shock results in a positive impact, the PMVS is zero. Because this process uses a parallel, or level, shock to interest rates, we refer to this measure as PMVS-L.

- To estimate sensitivity related to the shape of the yield curve, a yield curve steepening and flattening of 25 basis points is applied to the duration of all interest-rate sensitive instruments. The resulting change in market value for the aggregate portfolio is computed for both the steepening and flattening yield curve scenarios. The more adverse yield curve scenario is then used to determine the PMVS-yield curve. Because this process uses a non-parallel shock to interest rates, we refer to this measure as PMVS-YC.

- Duration gap measures the difference in price sensitivity to interest rate changes between our assets and liabilities, and is expressed in months relative to the market value of assets. For example, assets with a six month duration and liabilities with a five month duration would result in a positive duration gap of one month. A duration gap of zero implies that the duration of our assets equals the duration of our liabilities. As a result, the change in the value of assets from an instantaneous move in interest rates, either up or down, would be expected to be accompanied by an equal and offsetting change in the value of liabilities, thus leaving the fair value of equity unchanged. A positive duration gap indicates that the duration of our assets exceeds the duration of our liabilities which, from a net perspective, implies that the fair value of equity will increase in value when interest rates fall and decrease in value when interest rates rise. A negative duration gap indicates that the duration of our liabilities exceeds the duration of our assets which, from a net perspective, implies that the fair value of equity will increase in value when interest rates rise and decrease in value when interest rates fall. Multiplying duration gap (expressed as a percentage of a year) by the fair value of our assets will provide an indication of the change in the fair value of our equity to be expected from a 1% change in interest rates.

The 50 basis point shift and 25 basis point change in slope of the LIBOR yield curve used for our PMVS measures reflect reasonably possible near-term changes that we believe provide a meaningful measure of our interest-rate risk

sensitivity. Our PMVS measures assume instantaneous shocks. Therefore, these PMVS measures do not consider the effects on fair value of any rebalancing actions that we would typically expect to take to reduce our risk exposure.

*Limitations of Market Risk Measures*

Our PMVS and duration gap estimates are determined using models that involve our best judgment of interest-rate and prepayment assumptions. Accordingly, while we believe that PMVS and duration gap are useful risk management tools, they should be understood as estimates rather than as precise measurements. While PMVS and duration gap estimate our exposure to changes in interest rates, they do not capture the potential impact of certain other market risks, such as changes in volatility, basis, and foreign-currency risk. The impact of these other market risks can be significant.

There are inherent limitations in any methodology used to estimate exposure to changes in market interest rates. Our sensitivity analyses for PMVS and duration gap contemplate only certain movements in interest rates and are performed at a particular point in time based on the estimated fair value of our existing portfolio. These sensitivity analyses do not consider other factors that may have a significant effect on our financial instruments, most notably business activities and strategic actions that management may take in the future to manage interest-rate risk. As such, these analyses are not intended to provide precise forecasts of the effect a change in market interest rates would have on the estimated fair value of our net assets.

In addition, it has been more difficult in recent years to measure and manage the interest-rate risk related to mortgage assets as risk for prepayment model error remains high due to uncertainty regarding default rates, unemployment, loan modification, and the volatility and impact of home price movements on mortgage durations. Mis-estimation of prepayments could result in hedging-related losses.

*PMVS Results*

The table below provides duration gap, estimated point-in-time and minimum and maximum PMVS-L and PMVS-YC results, and an average of the daily values and standard deviation for the years ended December 31, 2011 and 2010. The table below also provides PMVS-L estimates assuming an immediate 100 basis point shift in the LIBOR yield curve. We do not hedge the entire prepayment risk exposure embedded in our mortgage assets. The interest-rate sensitivity of a mortgage portfolio varies across a wide range of interest rates. Therefore, the difference between PMVS at 50 basis points and 100 basis points is non-linear. Our PMVS-L (50 basis points) exposure at the end of December 31, 2011 was $465 million; approximately half was driven by our duration exposure and the other half was driven by our negative convexity exposure. The PMVS-L at December 31, 2011 declined compared to December 31, 2010 primarily due to a decline in our negative convexity exposure as long-term rates significantly declined. On an average basis for the year, our PMVS-L (50 basis points) was $359 million, which was primarily driven by our negative convexity exposure on our mortgage assets.

**Table 73 — PMVS Results**

| | PMVS-YC | PMVS-L | |
|---|---|---|---|
| | 25 bps | 50 bps | 100 bps |
| | | (in millions) | |
| Assuming shifts of the LIBOR yield curve: | | | |
| December 31, 2011 | $ 7 | $465 | $1,349 |
| December 31, 2010 | $35 | $588 | $1,884 |

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2011 | | | 2010 | | |
| | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps |
| | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | |
| Average | (0.0) | $21 | $359 | 0.0 | $23 | $338 |
| Minimum | (1.0) | $— | $ — | (0.7) | $— | $ — |
| Maximum | 1.2 | $94 | $721 | 0.7 | $83 | $668 |
| Standard deviation | 0.3 | $15 | $126 | 0.3 | $18 | $179 |

Derivatives have historically enabled us to keep our interest-rate risk exposure at consistently low levels in a wide range of interest-rate environments. The table below shows that the PMVS-L risk levels for the periods presented would generally have been higher if we had not used derivatives. The derivative impact on our PMVS-L (50 basis points) was $(2.0) billion at December 31, 2011, a decline of $1.0 billion from December 31, 2010. The decline was primarily driven by a decline in long-term rates, which resulted in lower duration and convexity exposures on our mortgage assets, without a full offsetting impact from our existing debt and derivative portfolios. In order to remain within our risk management limits, we rebalanced our portfolio with receive-fixed swaps, which lowered our derivative duration exposure.

**Table 74 — Derivative Impact on PMVS-L (50 bps)**

| | Before Derivatives | After Derivatives | Effect of Derivatives |
|---|---|---|---|
| | | (in millions) | |
| At: | | | |
| December 31, 2011.......................................................... | $2,470 | $465 | $(2,005) |
| December 31, 2010.......................................................... | $3,614 | $588 | $(3,026) |

### Duration Gap Results

We actively measure and manage our duration gap exposure on a daily basis. In addition to duration gap management, we also measure and manage the price sensitivity of our portfolio to eleven different specific interest rate changes from three months to 30 years. The price sensitivity of an instrument to specific changes in interest rates is known as the instrument's key rate duration risk. By managing our duration exposure both in aggregate through duration gap and to specific changes in interest rates through key rate duration, we expect to limit our exposure to interest rate changes for a wide range of interest rate yield curve scenarios. Our average duration gap, rounded to the nearest month, for the months of December 2011 and 2010 was zero months in both periods. Our average duration gap, rounded to the nearest month, during the years ended December 31, 2011 and 2010 was zero months in both periods.

The disclosure in our Monthly Volume Summary reports, which are available on our website at www.freddiemac.com and in current reports on Form 8-K we file with the SEC, reflects the average of the daily PMVS-L, PMVS-YC and duration gap estimates for a given reporting period (a month, quarter or year).

### Derivative-Related Risks

Our use of derivatives exposes us to credit risk with respect to our counterparties to derivative transactions. Through counterparty selection, all derivative transactions are executed in a manner that seeks to control and reduce counterparty credit exposure. In order to attempt to minimize the potential replacement cost should a derivative counterparty fail, we utilize derivative counterparty limits. Board-level counterparty limits are approved by the Board's Business and Risk Committee. Management and Board counterparty limits, which include current exposure and potential exposure in a stress scenario, are monitored by members of our Enterprise Risk Management division, which is responsible for establishing and monitoring credit and counterparty risk tolerances for our business activities and reporting to the Business and Risk Committee as appropriate. See "MD&A — RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Derivative Counterparties*" for information on derivative counterparty credit risk.

Our use of derivatives also exposes us to derivative market liquidity risk, which is the risk that we may not be able to enter into or exit out of derivative transactions at a reasonable cost. A lack of sufficient capacity or liquidity in the derivatives market could limit our risk management activities, increasing our exposure to interest-rate risk. To help maintain continuous access to derivative markets, we use a variety of products and transact with a number of different derivative counterparties. In addition to OTC derivatives, we also use exchange-traded derivatives, asset securitization activities, callable debt, and short-term debt to rebalance our portfolio.

The Dodd-Frank Act will require that, in the future, many types of derivatives be centrally cleared and traded on exchanges or comparable trading facilities. See "MD&A — RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Derivative Counterparties*" for additional information on this requirement and our use of a central clearing platform for interest rate derivatives.

### ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of Freddie Mac:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income and comprehensive income, of equity (deficit), and of cash flows present fairly, in all material respects, the financial position of Freddie Mac, a stockholder-owned government-sponsored enterprise, and its subsidiaries at December 31, 2011 and 2010, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2011 in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2011, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) because material weaknesses in internal control over financial reporting related to: (1) disclosure controls and procedures that do not provide adequate mechanisms for information known to the Federal Housing Finance Agency ("FHFA") that may have financial statement disclosure ramifications to be communicated to management, and (2) controls and procedures that do not provide adequate mechanisms for managing information technology changes and monitoring information security existed as of that date. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The material weaknesses referred to above are described in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A. We considered these material weaknesses in determining the nature, timing, and extent of audit tests applied in our audit of the 2011 consolidated financial statements, and our opinion regarding the effectiveness of the Company's internal control over financial reporting does not affect our opinion on those consolidated financial statements. The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in management's report referred to above. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

We have also audited in accordance with auditing standards generally accepted in the United States of America the supplemental consolidated fair value balance sheets of the Company as of December 31, 2011 and 2010. As described in "Note 17: Fair Value Disclosures", the supplemental consolidated fair value balance sheets have been prepared by management to present relevant financial information that is not provided by the historical-cost consolidated balance sheets and is not intended to be a presentation in conformity with accounting principles generally accepted in the United States of America. In addition, the supplemental consolidated fair value balance sheets do not purport to present the net realizable, liquidation, or market value of the Company as a whole. Furthermore, amounts ultimately realized by the Company from the disposal of assets or amounts required to settle obligations may vary significantly from the fair values presented. In our opinion, the supplemental consolidated fair value balance sheets referred to above present fairly, in all material respects, the information set forth therein as described in "Note 17: Fair Value Disclosures".

As discussed in "Note 2: Conservatorship and Related Matters", in September 2008, the Company was placed into conservatorship by the FHFA. The U.S. Department of Treasury ("Treasury") has committed financial support to the Company and management continues to conduct business operations pursuant to the delegated authorities from FHFA during conservatorship. The Company is dependent upon the continued support of Treasury and FHFA.

As discussed in "Note 1: Summary of Significant Accounting Policies", the Company adopted as of January 1, 2010, amendments to the accounting guidance for transfers of financial assets and the consolidation of variable interest entities, which changed, among other things, how it evaluates securitization trusts for purposes of consolidation.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP
McLean, Virginia
March 9, 2012

## FREDDIE MAC
## CONSOLIDATED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | (in millions, except share-related amounts) | | |
| *Interest income* | | | |
| Mortgage loans: | | | |
| Held by consolidated trusts | $ 77,158 | $ 86,698 | $ — |
| Unsecuritized | 9,124 | 8,727 | 6,815 |
| Total mortgage loans | 86,282 | 95,425 | 6,815 |
| Investments in securities | 12,791 | 14,375 | 33,290 |
| Other | 67 | 156 | 241 |
| Total interest income | 99,140 | 109,956 | 40,346 |
| *Interest expense* | | | |
| Debt securities of consolidated trusts | (67,119) | (75,216) | — |
| Other debt | (12,869) | (16,915) | (22,150) |
| Total interest expense | (79,988) | (92,131) | (22,150) |
| Expense related to derivatives | (755) | (969) | (1,123) |
| *Net interest income* | 18,397 | 16,856 | 17,073 |
| Provision for credit losses | (10,702) | (17,218) | (29,530) |
| *Net interest income (loss) after provision for credit losses* | 7,695 | (362) | (12,457) |
| *Non-interest income (loss)* | | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (219) | (164) | — |
| Gains (losses) on retirement of other debt | 44 | (219) | (568) |
| Gains (losses) on debt recorded at fair value | 91 | 580 | (404) |
| Derivative gains (losses) | (9,752) | (8,085) | (1,900) |
| Impairment of available-for-sale securities: | | | |
| Total other-than-temporary impairment of available-for-sale securities | (2,101) | (1,778) | (23,125) |
| Portion of other-than-temporary impairment recognized in AOCI | (200) | (2,530) | 11,928 |
| Net impairment of available-for-sale securities recognized in earnings | (2,301) | (4,308) | (11,197) |
| Other gains (losses) on investment securities recognized in earnings | (896) | (1,252) | 5,965 |
| Other income | 2,155 | 1,860 | 5,372 |
| *Non-interest income (loss)* | (10,878) | (11,588) | (2,732) |
| *Non-interest expense* | | | |
| Salaries and employee benefits | (832) | (895) | (912) |
| Professional services | (270) | (297) | (344) |
| Occupancy expense | (62) | (64) | (68) |
| Other administrative expenses | (342) | (341) | (361) |
| Total administrative expenses | (1,506) | (1,597) | (1,685) |
| Real estate owned operations expense | (585) | (673) | (307) |
| Other expenses | (392) | (662) | (5,203) |
| *Non-interest expense* | (2,483) | (2,932) | (7,195) |
| Loss before income tax benefit | (5,666) | (14,882) | (22,384) |
| Income tax benefit | 400 | 856 | 830 |
| *Net loss* | (5,266) | (14,026) | (21,554) |
| Other comprehensive income, net of taxes and reclassification adjustments: | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | 3,465 | 13,621 | 17,825 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 509 | 673 | 773 |
| Changes in defined benefit plans | 62 | 13 | 42 |
| Total other comprehensive income, net of taxes and reclassification adjustments | 4,036 | 14,307 | 18,640 |
| Comprehensive income (loss) | (1,230) | 281 | (2,914) |
| Less: Comprehensive loss attributable to noncontrolling interest | — | 1 | 1 |
| *Total comprehensive income (loss) attributable to Freddie Mac* | $ (1,230) | $ 282 | $ (2,913) |
| *Net loss* | $ (5,266) | $ (14,026) | $ (21,554) |
| Less: Net loss attributable to noncontrolling interest | — | 1 | 1 |
| *Net loss attributable to Freddie Mac* | (5,266) | (14,025) | (21,553) |
| Preferred stock dividends | (6,498) | (5,749) | (4,105) |
| *Net loss attributable to common stockholders* | $ (11,764) | $ (19,774) | $ (25,658) |
| Net loss per common share: | | | |
| Basic | $ (3.63) | $ (6.09) | $ (7.89) |
| Diluted | $ (3.63) | $ (6.09) | $ (7.89) |
| Weighted average common shares outstanding (in thousands): | | | |
| Basic | 3,244,896 | 3,249,369 | 3,253,836 |
| Diluted | 3,244,896 | 3,249,369 | 3,253,836 |

*The accompanying notes are an integral part of these consolidated financial statements.*

## FREDDIE MAC
## CONSOLIDATED BALANCE SHEETS

|  | December 31, 2011 | December 31, 2010 |
|---|---|---|
|  | (in millions, except share-related amounts) | |
| **Assets** | | |
| Cash and cash equivalents (includes $2 and $1, respectively, related to our consolidated VIEs) . . . . . . . | $ 28,442 | $ 37,012 |
| Restricted cash and cash equivalents (includes $27,675 and $7,514, respectively, related to our consolidated VIEs) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28,063 | 8,111 |
| Federal funds sold and securities purchased under agreements to resell (includes $0 and $29,350, respectively, related to our consolidated VIEs) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,044 | 46,524 |
| *Investments in securities:* | | |
| Available-for-sale, at fair value (includes $204 and $817, respectively, pledged as collateral that may be repledged) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 210,659 | 232,634 |
| Trading, at fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 58,830 | 60,262 |
| *Total investments in securities* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 269,489 | 292,896 |
| *Mortgage loans:* | | |
| Held-for-investment, at amortized cost: | | |
| By consolidated trusts (net of allowances for loan losses of $8,351 and $11,644, respectively) . . . . . | 1,564,131 | 1,646,172 |
| Unsecuritized (net of allowances for loan losses of $30,912 and $28,047, respectively) . . . . . . . . . . | 207,418 | 192,310 |
| Total held-for-investment mortgage loans, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,771,549 | 1,838,482 |
| Held-for-sale, at lower-of-cost-or-fair-value (includes $9,710 and $6,413 at fair value, respectively) . . . | 9,710 | 6,413 |
| *Total mortgage loans, net* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,781,259 | 1,844,895 |
| Accrued interest receivable (includes $6,242 and $6,895, respectively, related to our consolidated VIEs) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8,062 | 8,713 |
| Derivative assets, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 118 | 143 |
| Real estate owned, net (includes $60 and $118, respectively, related to our consolidated VIEs) . . . . . . . | 5,680 | 7,068 |
| Deferred tax assets, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,546 | 5,543 |
| Other assets (Note 19) (includes $6,083 and $6,001, respectively, related to our consolidated VIEs) . . . . | 10,513 | 10,875 |
| *Total assets* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,147,216 | $2,261,780 |
| **Liabilities and equity (deficit)** | | |
| *Liabilities* | | |
| Accrued interest payable (includes $5,943 and $6,502, respectively, related to our consolidated VIEs) . . . | $ 8,898 | $ 10,286 |
| *Debt, net:* | | |
| Debt securities of consolidated trusts held by third parties . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,471,437 | 1,528,648 |
| Other debt (includes $3,015 and $4,443 at fair value, respectively) . . . . . . . . . . . . . . . . . . . . . . . | 660,546 | 713,940 |
| *Total debt, net* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,131,983 | 2,242,588 |
| Derivative liabilities, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 435 | 1,209 |
| Other liabilities (Note 19) (includes $3 and $172, respectively, related to our consolidated VIEs) . . . . . . | 6,046 | 8,098 |
| *Total liabilities* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,147,362 | 2,262,181 |
| Commitments and contingencies (Notes 9, 11, and 18) | | |
| *Equity (deficit)* | | |
| Senior preferred stock, at redemption value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 72,171 | 64,200 |
| Preferred stock, at redemption value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,109 | 14,109 |
| Common stock, $0.00 par value, 4,000,000,000 shares authorized, 725,863,886 shares issued and 649,725,302 shares and 649,179,789 shares outstanding, respectively . . . . . . . . . . . . . . . . . . . . . | — | — |
| Additional paid-in capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 7 |
| Retained earnings (accumulated deficit) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (74,525) | (62,733) |
| *AOCI, net of taxes, related to:* | | |
| Available-for-sale securities (includes $10,334 and $10,740, respectively, related to net unrealized losses on securities for which other-than-temporary impairment has been recognized in earnings) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (6,213) | (9,678) |
| Cash flow hedge relationships . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,730) | (2,239) |
| Defined benefit plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (52) | (114) |
| *Total AOCI, net of taxes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (7,995) | (12,031) |
| Treasury stock, at cost, 76,138,584 shares and 76,684,097 shares, respectively . . . . . . . . . . . . . . . . | (3,909) | (3,953) |
| *Total equity (deficit)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (146) | (401) |
| *Total liabilities and equity (deficit)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,147,216 | $2,261,780 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

# FREDDIE MAC
## CONSOLIDATED STATEMENTS OF EQUITY (DEFICIT)

Freddie Mac Stockholders' Equity (Deficit)

| | Shares Outstanding | | | Senior Preferred Stock, at Redemption Value | Preferred Stock, at Redemption Value | Common Stock, at Par Value | Additional Paid-In Capital | Retained Earnings (Accumulated Deficit) | AOCI, Net of Tax | Treasury Stock, at Cost | Noncontrolling Interest | Total Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Senior Preferred Stock | Preferred Stock | Common Stock | | | | | | | | | |
| | | | | | (in millions) | | | | | | | |
| **Balance as of December 31, 2008** | 1 | 464 | 647 | $14,800 | $14,109 | $— | $19 | $(23,191) | $(32,357) | $(4,111) | $97 | $(30,634) |
| Cumulative effect of change in accounting principle | — | — | — | — | — | — | — | 14,996 | (9,931) | — | — | 5,065 |
| *Comprehensive income (loss):* | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (21,553) | — | — | (1) | (21,554) |
| Other comprehensive income (loss), net of taxes | — | — | — | — | — | — | — | — | 18,640 | — | — | 18,640 |
| *Comprehensive income (loss)* | — | — | — | — | — | — | — | (21,553) | 18,640 | — | (1) | (2,914) |
| Increase in liquidation preference | — | — | — | 36,900 | — | — | — | — | — | — | — | 36,900 |
| Stock-based compensation | — | — | — | — | — | — | 58 | — | — | — | — | 58 |
| Income tax benefit from stock-based compensation | — | — | — | — | — | — | 7 | — | — | — | — | 7 |
| Common stock issuances | — | — | 2 | — | — | — | (90) | — | — | 92 | — | 2 |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 63 | (63) | — | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (4,105) | — | — | — | (4,105) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (5) | — | — | — | (5) |
| Dividends and other | — | — | — | — | — | — | — | — | — | — | (2) | (2) |
| **Ending balance at December 31, 2009** | 1 | 464 | 649 | $51,700 | $14,109 | $— | $57 | $(33,921) | $(23,648) | $(4,019) | $94 | $4,372 |
| **Balance as of December 31, 2009** | 1 | 464 | 649 | $51,700 | $14,109 | $— | $57 | $(33,921) | $(23,648) | $(4,019) | $94 | $4,372 |
| Cumulative effect of change in accounting principle | — | — | — | — | — | — | — | (9,011) | (2,690) | — | (2) | (11,703) |
| Balance as of January 1, 2010 | 1 | 464 | 649 | 51,700 | 14,109 | — | 57 | (42,932) | (26,338) | (4,019) | 92 | (7,331) |
| *Comprehensive income (loss):* | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (14,025) | — | — | (1) | (14,026) |
| Other comprehensive income (loss), net of taxes | — | — | — | — | — | — | — | — | 14,307 | — | — | 14,307 |
| *Comprehensive income (loss)* | — | — | — | — | — | — | — | (14,025) | 14,307 | — | (1) | 281 |
| Increase in liquidation preference | — | — | — | 12,500 | — | — | — | — | — | — | — | 12,500 |
| Stock-based compensation | — | — | — | — | — | — | 24 | — | — | — | — | 24 |
| Income tax benefit from stock-based compensation | — | — | — | — | — | — | 1 | — | — | — | — | 1 |
| Common stock issuances | — | — | — | — | — | — | (67) | — | — | 66 | — | (1) |
| Noncontrolling interest purchase | — | — | — | — | — | — | (31) | — | — | — | (89) | (120) |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 23 | (23) | — | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (5,749) | — | — | — | (5,749) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (4) | — | — | — | (4) |
| Dividends and other | — | — | — | — | — | — | — | — | — | — | (2) | (2) |
| **Ending balance at December 31, 2010** | 1 | 464 | 649 | $64,200 | $14,109 | $— | $7 | $(62,733) | $(12,031) | $(3,953) | $— | $(401) |
| **Balance as of December 31, 2010** | 1 | 464 | 649 | $64,200 | $14,109 | $— | $7 | $(62,733) | $(12,031) | $(3,953) | $— | $(401) |
| *Comprehensive income (loss):* | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (5,266) | — | — | — | (5,266) |
| Other comprehensive income (loss), net of taxes | — | — | — | — | — | — | — | — | 4,036 | — | — | 4,036 |
| *Comprehensive income (loss)* | — | — | — | — | — | — | — | (5,266) | 4,036 | — | — | (1,230) |
| Increase in liquidation preference | — | — | — | 7,971 | — | — | — | — | — | — | — | 7,971 |
| Stock-based compensation | — | — | — | — | — | — | 11 | — | — | — | — | 11 |
| Income tax benefit from stock-based compensation | — | — | — | — | — | — | 1 | — | — | — | — | 1 |
| Common stock issuances | — | — | 1 | — | — | — | (44) | — | — | 44 | — | — |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 28 | (28) | — | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (6,495) | — | — | — | (6,495) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (3) | — | — | — | (3) |
| **Ending balance at December 31, 2011** | 1 | 464 | 650 | $72,171 | $14,109 | $— | $3 | $(74,525) | $(7,995) | $(3,909) | $— | $(146) |

*The accompanying notes are an integral part of these consolidated financial statements.*

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | | Year Ended December 31, | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| | | (in millions) | |
| **Cash flows from operating activities** | | | |
| Net loss | $ (5,266) | $ (14,026) | $ (21,554) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | |
| Derivative losses (gains) | 4,721 | 3,591 | (2,046) |
| Asset related amortization — premiums, discounts, and basis adjustments | 2,063 | 326 | 163 |
| Debt related amortization — premiums and discounts on certain debt securities and basis adjustments | (1,629) | 1,127 | 3,959 |
| Net discounts paid on retirements of debt | (713) | (1,959) | (4,303) |
| Net premiums received from issuance of debt securities of consolidated trusts | 4,091 | 3,888 | — |
| Losses on extinguishment of debt securities of consolidated trusts and other debt | 175 | 383 | 568 |
| Provision for credit losses | 10,702 | 17,218 | 29,530 |
| Losses on investment activity | 2,368 | 5,542 | 5,356 |
| (Gains) losses on debt recorded at fair value | (91) | (580) | 404 |
| Deferred income tax benefit | (117) | (670) | (670) |
| Purchases of held-for-sale mortgage loans | (16,550) | (10,330) | (101,976) |
| Sales of mortgage loans acquired as held-for-sale | 14,027 | 6,728 | 88,094 |
| Repayments of mortgage loans acquired as held-for-sale | 54 | 21 | 3,050 |
| Change in: | | | |
| Accrued interest receivable | 651 | 832 | (1,193) |
| Accrued interest payable | (1,080) | (1,700) | (1,324) |
| Income taxes payable | (281) | 662 | 312 |
| Other, net | (2,805) | (233) | 2,918 |
| *Net cash provided by operating activities* | 10,320 | 10,820 | 1,288 |
| **Cash flows from investing activities** | | | |
| Purchases of trading securities | (47,977) | (55,509) | (250,411) |
| Proceeds from sales of trading securities | 33,734 | 17,771 | 153,093 |
| Proceeds from maturities of trading securities | 14,545 | 40,389 | 69,025 |
| Purchases of available-for-sale securities | (12,171) | (6,542) | (15,346) |
| Proceeds from sales of available-for-sale securities | 2,643 | 2,645 | 22,259 |
| Proceeds from maturities of available-for-sale securities | 34,316 | 44,398 | 86,702 |
| Purchases of held-for-investment mortgage loans | (44,129) | (68,180) | (23,606) |
| Repayments of mortgage loans acquired as held-for-investment | 369,981 | 425,298 | 6,862 |
| (Increase) decrease in restricted cash | (19,952) | 7,399 | 426 |
| Net proceeds from (payments of) mortgage insurance and acquisitions and dispositions of real estate owned | 12,665 | 13,093 | (4,690) |
| Net decrease (increase) in federal funds sold and securities purchased under agreements to resell | 34,480 | (32,023) | 3,150 |
| Derivative premiums and terminations and swap collateral, net | (4,447) | (3,075) | 99 |
| Purchase of noncontrolling interest | — | (23) | — |
| *Net cash provided by investing activities* | 373,688 | 385,641 | 47,563 |
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of debt securities of consolidated trusts held by third parties | 96,042 | 96,253 | — |
| Repayments of debt securities of consolidated trusts held by third parties | (436,320) | (461,084) | — |
| Proceeds from issuance of other debt | 1,024,323 | 1,115,097 | 1,333,859 |
| Repayments of other debt | (1,078,500) | (1,180,935) | (1,395,806) |
| Increase in liquidation preference of senior preferred stock | 7,971 | 12,500 | 36,900 |
| Repurchase of REIT preferred stock | — | (100) | — |
| Payment of cash dividends on senior preferred stock | (6,495) | (5,749) | (4,105) |
| Excess tax benefits associated with stock-based awards | 1 | 1 | 1 |
| Payments of low-income housing tax credit partnerships notes payable | (50) | (115) | (343) |
| *Net cash used in financing activities* | (392,578) | (424,132) | (29,494) |
| Net (decrease) increase in cash and cash equivalents | (8,570) | (27,671) | 19,357 |
| Cash and cash equivalents at beginning of year | 37,012 | 64,683 | 45,326 |
| *Cash and cash equivalents at end of year* | $ 28,442 | $ 37,012 | $ 64,683 |
| **Supplemental cash flow information** | | | |
| Cash paid (received) for: | | | |
| Debt interest | $ 84,370 | $ 95,468 | $ 25,169 |
| Net derivative interest carry | 4,791 | 4,305 | 2,274 |
| Income taxes | (1) | (848) | (472) |
| Non-cash investing and financing activities: | | | |
| Held-for-sale mortgage loans securitized and retained as trading and available-for-sale securities | — | — | 1,088 |
| Underlying mortgage loans related to guarantor swap transactions | 280,621 | 324,004 | — |
| Debt securities of consolidated trusts held by third parties established for guarantor swap transactions | 280,621 | 324,004 | — |
| Transfers from held-for-investment mortgage loans to held-for-sale mortgage loans | — | 196 | 435 |
| Transfers from held-for-sale mortgage loans to held-for-investment mortgage loans | — | — | 10,336 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Freddie Mac was chartered by Congress in 1970 to stabilize the nation's residential mortgage market and expand opportunities for home ownership and affordable rental housing. Our statutory mission is to provide liquidity, stability and affordability to the U.S. housing market. We are a GSE regulated by FHFA, the SEC, HUD, and the Treasury, and are currently operating under the conservatorship of FHFA. For more information on the roles of FHFA and the Treasury, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS."

We are involved in the U.S. housing market by participating in the secondary mortgage market. We do not participate directly in the primary mortgage market. Our participation in the secondary mortgage market includes providing our credit guarantee for mortgages originated by mortgage lenders in the primary mortgage market and investing in mortgage loans and mortgage-related securities.

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Single-family Guarantee, Investments, and Multifamily. Our Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related securities in exchange for management and guarantee fees. Our Investments segment reflects results from our investment, funding, and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans, which are funded by debt issuances and hedged using derivatives. Our Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. In our Multifamily segment, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization. See "NOTE 14: SEGMENT REPORTING" for additional information.

Under conservatorship, we are focused on the following primary business objectives: (a) meeting the needs of the U.S. residential mortgage market by making home ownership and rental housing more affordable by providing liquidity to mortgage originators and, indirectly, to mortgage borrowers; (b) working to reduce the number of foreclosures and helping to keep families in their homes, including through our role in FHFA and other governmental initiatives, such as the FHFA-directed servicing alignment initiative, HAMP and HARP, as well as our own workout and refinancing initiatives; (c) minimizing our credit losses; (d) maintaining sound credit quality of the loans we purchase and guarantee; and (e) strengthening our infrastructure and improving overall efficiency while also focusing on retention of key employees. We also have a variety of different, and potentially competing, objectives based on our charter, other legislation, public statements from Treasury and FHFA officials, and other guidance and directives from our Conservator. For information regarding these objectives, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Business Objectives."

Throughout our consolidated financial statements and related notes, we use certain acronyms and terms which are defined in the "GLOSSARY."

### Basis of Presentation

The accompanying consolidated financial statements have been prepared in accordance with GAAP and include our accounts as well as the accounts of other entities in which we have a controlling financial interest. All intercompany balances and transactions have been eliminated.

Our current accounting policies are described below. We are operating under the basis that we will realize assets and satisfy liabilities in the normal course of business as a going concern and in accordance with the delegation of authority from FHFA to our Board of Directors and management. Certain amounts in prior periods' consolidated financial statements have been reclassified to conform to the current presentation.

We evaluate the materiality of identified errors in the financial statements using both an income statement, or "rollover," and a balance sheet, or "iron-curtain," approach, based on relevant quantitative and qualitative factors. Net loss includes certain adjustments to correct immaterial errors related to previously reported periods.

We recorded the cumulative effect of certain miscellaneous errors related to previously reported periods as corrections in the year ended December 31, 2011. We concluded that these errors are not material individually or in the aggregate to our previously issued consolidated financial statements for any of the periods affected, or to our earnings for the full year ended December 31, 2011, or to the trend of earnings. The impact to earnings, net of taxes, for the year ended December 31, 2011 was $0.4 billion.

*Freddie Mac*

## Use of Estimates

The preparation of financial statements requires us to make estimates and assumptions that affect: (a) the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements; and (b) the reported amounts of revenues and expenses and gains and losses during the reporting period. Management has made significant estimates in preparing the financial statements, including, but not limited to, establishing the allowance for loan losses and reserve for guarantee losses, valuing financial instruments and other assets and liabilities, assessing impairments on investments, and assessing the realizability of net deferred tax assets. Actual results could be different from these estimates.

## Consolidation and Equity Method of Accounting

The consolidated financial statements include our accounts and those of our subsidiaries. The net earnings attributable to the noncontrolling interests in our consolidated subsidiaries are reported separately in the consolidated statements of income and comprehensive income as comprehensive (income) loss attributable to noncontrolling interest. All material intercompany transactions have been eliminated in consolidation.

For each entity with which we are involved, we determine whether the entity should be consolidated in our financial statements. We consolidate entities in which we have a controlling financial interest. The method for determining whether a controlling financial interest exists varies depending on whether the entity is a VIE or non-VIE. A VIE is an entity: (a) that has a total equity investment at risk that is not sufficient to finance its activities without additional subordinated financial support provided by another party; or (b) where the group of equity holders does not have: (i) the power, through voting rights or similar rights, to direct the activities of an entity that most significantly impact the entity's economic performance; (ii) the obligation to absorb the entity's expected losses; or (iii) the right to receive the entity's expected residual returns.

Our policy is to consolidate VIEs in which we hold a controlling financial interest and are therefore deemed to be the primary beneficiary. An enterprise has a controlling financial interest in, and thus is deemed to be the primary beneficiary of, a VIE if it has both: (a) the power to direct the activities of the VIE that most significantly impact its economic performance; and (b) exposure to losses or benefits of the VIE that could potentially be significant to the VIE. We perform ongoing assessments to determine if we are the primary beneficiary of the VIEs with which we are involved and, as such, conclusions may change over time as the nature and extent of our involvement changes.

Historically, we were exempt from applying the accounting guidance applicable to consolidation of VIEs to the majority of our securitization trusts, as well as certain of our investment securities issued by third parties, because they had been designed to meet the definition of a QSPE. Upon the effective date of the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs, the concept of a QSPE and the related scope exception from the consolidation provisions applicable to VIEs were removed from GAAP; consequently, all of our securitization trusts, as well as our investment securities issued by third parties that had previously been QSPEs, became subject to a consolidation assessment. The results of our consolidation assessments on certain types of securitization trusts are explained in the paragraphs that follow.

We use securitization trusts in our securities issuance process that are VIEs. We are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions. See "NOTE 3: VARIABLE INTEREST ENTITIES" for more information. When we transfer assets into a VIE that we consolidate at the time of the transfer (or shortly thereafter), we recognize the assets and liabilities of the VIE at the amounts that would have been recognized if they had not been transferred, and no gain or loss is recognized on these transfers. For all other VIEs that we consolidate, we recognize the assets and liabilities of the VIE at fair value, and we recognize a gain or loss for the difference between: (a) the fair value of the consideration paid and the fair value of any noncontrolling interests held by third parties; and (b) the net amount, as measured on a fair value basis, of the assets and liabilities consolidated.

For entities that are not VIEs, the usual condition of a controlling financial interest is ownership of a majority voting interest in an entity. We use the equity method of accounting for entities over which we have the ability to exercise significant influence, but not control.

## Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities

### Overview

When we securitize single-family mortgages that we purchase, we issue mortgage-related securities called PCs that can be sold to investors or held by us. Guarantor swaps are transactions where financial institutions exchange mortgage loans for PCs backed by these mortgage loans. Multilender swaps are similar to guarantor swaps, except that formed PC

pools include loans that are contributed by more than one party. We issue PCs through various swap-based exchanges significantly more often than through cash-based exchanges. We issue REMICs and Other Structured Securities in transactions in which securities dealers or investors sell us mortgage-related assets in exchange for REMICs and Other Structured Securities. We also issue Other Guarantee Transactions to third parties in exchange for non-Freddie Mac mortgage-related securities.

### PCs

Our PCs are pass-through debt securities that represent undivided beneficial interests in a pool of mortgages held by a securitization trust. For our fixed-rate PCs, we guarantee the timely payment of interest and principal. For our ARM PCs, we guarantee the timely payment of the weighted average coupon interest rate for the underlying mortgage loans. We do not guarantee the timely payment of principal for ARM PCs; however, we do guarantee the full and final payment of principal.

Various types of fixed income investors purchase our PCs, including pension funds, insurance companies, securities dealers, money managers, commercial banks, and foreign central banks. PCs differ from U.S. Treasury securities and certain other fixed-income investments in two primary ways. First, they can be prepaid at any time because homeowners may pay off the underlying mortgages at any time prior to a loan's maturity. Because homeowners have the right to prepay their mortgage, the securities implicitly have a call option that significantly reduces the average life of the security as compared to the contractual maturity of the underlying loans. Consequently, mortgage-related securities generally provide a higher nominal yield than certain other fixed-income products. Second, PCs are not backed by the full faith and credit of the United States, as are U.S. Treasury securities. However, we guarantee the payment of interest and principal on all of our PCs, as discussed above.

In return for providing our guarantee of the payment of principal and interest, we earn a management and guarantee fee that is paid to us over the life of an issued PC, representing a portion of the interest collected on the underlying loans.

### PC Trusts

Prior to January 1, 2010, our PC trusts met the definition of QSPEs and were not consolidated. Effective January 1, 2010, the concept of a QSPE was removed from GAAP and entities previously considered QSPEs were required to be evaluated for consolidation. Based on our evaluation, we determined that we are the primary beneficiary of trusts that issue our single-family PCs. Therefore, effective January 1, 2010, we consolidated on our balance sheet the assets and liabilities of these trusts at their UPB, with accrued interest, allowance for credit losses or other-than-temporary impairments recognized as appropriate, using the practical expedient permitted upon adoption since we determined that calculation of carrying values was not practical. Other assets and liabilities that were consolidated effective January 1, 2010 that either did not have a UPB or were required to be carried at fair value were measured at fair value. As a result of this consolidation, we have recognized on our consolidated balance sheets the mortgage loans underlying our issued single-family PCs as mortgage loans held-for-investment by consolidated trusts, at amortized cost. We also recognized the corresponding single-family PCs held by third parties on our consolidated balance sheets as debt securities of consolidated trusts held by third parties. After January 1, 2010, the assets and liabilities of trusts that we consolidate are recorded at either their: (a) carrying value if the underlying assets are contributed by us to the trust; or (b) fair value for those securitization trusts established for our guarantor swap program. Refer to "Mortgage Loans" and "Debt Securities Issued" below for further information on the subsequent accounting treatment of these assets and liabilities, respectively.

### REMICs and Other Structured Securities

Our REMICs and Other Structured Securities use resecuritization trusts that meet the definition of a VIE. REMICs and Other Structured Securities represent beneficial interests in groups of PCs and other types of mortgage-related assets. We create these securities primarily by using PCs or previously issued mortgage-related securities as collateral. Similar to our PCs, we guarantee the payment of principal and interest to the holders of the tranches of our REMICs and Other Structured Securities. However, for REMICs and Other Structured Securities where we have already guaranteed the underlying assets, there is no incremental exposure to credit loss assumed by us.

With respect to the resecuritization trusts used for REMICs and Other Structured Securities whose underlying assets are PCs, we do not have rights to receive benefits or obligations to absorb losses that could potentially be significant to the trusts because we have already provided a guarantee on the underlying assets. Additionally, our involvement with these trusts does not provide us with any power that would enable us to direct the significant economic activities of these entities. Although we may be exposed to prepayment risk through our ownership of the securities issued by these trusts, we do not have the ability through our involvement with the trust to impact the economic risks to which we are exposed.

As a result, we have concluded that we are not the primary beneficiary of, and therefore do not consolidate, the resecuritization trusts used for REMICs and Other Structured Securities whose underlying assets are PCs unless we hold substantially all of the outstanding beneficial interests that have been issued by the trust and are therefore considered the primary beneficiary of the trust.

We receive a transaction fee from third parties for issuing REMICs and Other Structured Securities in exchange for PCs or other mortgage-related assets. We defer the portion of the transaction fee that is equal to the estimated value of our future administrative responsibilities for issued REMICs and Other Structured Securities. These responsibilities include ongoing trustee services, administration of pass-through amounts, paying agent services, tax reporting, and other required services. We estimate the value of these future responsibilities based on quotes from third-party vendors who perform each type of service and, where quotes are not available, based on our estimates of what those vendors would charge. The remaining portion of the transaction fee relates to compensation earned in connection with structuring-related services we rendered to third parties and is allocated between REMICs and Other Structured Securities we retain, if any, and the REMICs and Other Structured Securities acquired by third parties, based on the relative fair value of the securities. The portion of the fee allocated to any REMICs and Other Structured Securities we retain is deferred as a carrying value adjustment and is amortized into interest income using the effective interest method over the contractual lives of these securities. The fee allocated to REMICs and Other Structured Securities acquired by third parties is recognized immediately in earnings as other income.

### Other Guarantee Transactions

Other Guarantee Transactions are mortgage-related securities that we issue to third parties in exchange for non-Freddie Mac mortgage-related securities. Other Guarantee Transactions typically involve us purchasing either the senior tranches from a non-Freddie Mac senior-subordinated securitization or single-class pass-through securities, placing the acquired assets into a securitization trust, providing a guarantee of the principal and interest of the acquired assets and issuing securities backed by these assets. To the extent that we are deemed to be the primary beneficiary of such a securitization trust, we recognize the mortgage loans underlying the Other Guarantee Transaction as mortgage loans held-for-investment, at amortized cost. Correspondingly, we recognize the issued securities held by third parties as debt securities of consolidated trusts. However, to the extent we are not deemed to be the primary beneficiary of such a securitization trust, we recognize a guarantee asset, to the extent a management and guarantee fee is charged, and we recognize a guarantee obligation at fair value. We do not receive transaction fees, apart from our management and guarantee fee, for these transactions.

### Purchases and Sales of Freddie Mac Mortgage-Related Securities

#### PCs

When we purchase PCs that have been issued by consolidated PC trusts, we extinguish the outstanding debt securities of the related consolidated trust. We recognize a gain (loss) on extinguishment of the debt securities to the extent the amount paid to redeem the debt differs from carrying value, adjusted for any related purchase commitments accounted for as derivatives.

When we sell PCs that have been issued by consolidated PC trusts, we recognize a liability to the third-party beneficial interest holders of the related consolidated trust as debt securities of consolidated trusts held by third parties. That is, our sale of PCs issued by consolidated PC trusts is accounted for as the issuance of debt, not as the sale of investment securities.

#### Single-Class REMICs and Other Structured Securities

Our mortgage-related securities that we classify as REMICs and Other Structured Securities may be single-class or multiclass resecuritization transactions. In REMICs and Other Structured Securities that are single-class securities, the collateral includes PCs and single-class REMICs and Other Structured Securities. We do not consolidate these resecuritization trusts as we are not deemed to be the primary beneficiary of such trusts. Our single-class REMICs and Other Structured Securities pass through all of the cash flows of the underlying PCs directly to the holders of the securities and are deemed to be substantially the same as the underlying PCs. As a result, when we purchase single-class REMICs and Other Structured Securities, we extinguish a pro rata portion of the outstanding debt securities of the related PC trust on our consolidated balance sheets.

When we sell single-class REMICs and Other Structured Securities, we recognize a liability to the third-party beneficial interest holders of the related consolidated PC trust as debt securities of consolidated trusts held by third

FHFA 2916

parties. That is, our sale of single-class REMICs and Other Structured Securities is accounted for as the issuance of debt, not as the sale of investment securities.

*Multiclass REMICs and Other Structured Securities*

In multiclass REMICs and Other Structured Securities, the collateral includes PCs and REMICs and Other Structured Securities. Generally, PCs serve as the primary type of collateral for these resecuritizations. We do not consolidate these resecuritization trusts as we are not deemed to be the primary beneficiary of such trusts unless we hold substantially all of the outstanding beneficial interests that have been issued by the trust and are therefore considered to be the primary beneficiary. In our multiclass REMICs and Other Structured Securities, the cash flows of the underlying PCs are divided (*e.g.*, stripped and/or time tranched). Due primarily to this division of cash flows, these securities are not deemed to be substantially the same as the underlying PCs. As a result, when we purchase multiclass REMICs and Other Structured Securities, we record these securities as investments in debt securities rather than as the extinguishment of debt since we are investing in the debt securities of a non-consolidated entity. See "Investments in Securities" for further information regarding our accounting for investments in multiclass REMICs and Other Structured Securities. The purchase of these securities is generally funded through the issuance of unsecured debt to third parties.

We recognize, as assets, both the investment in the multiclass REMICs and Other Structured Securities and the mortgage loans backing the PCs held by the trusts which underlie the multiclass REMICs and Other Structured Securities. Additionally, we recognize, as liabilities, the unsecured debt issued to third parties to fund the purchase of the multiclass REMICs and Other Structured Securities as well as the debt issued to third parties of the PC trusts we consolidate which underlie the multiclass REMICs and Other Structured Securities. This results in recognition of interest income from both assets and interest expense from both liabilities.

When we sell multiclass REMICs and Other Structured Securities, we account for the transfer in accordance with the accounting guidance for transfers of financial assets. To the extent the transfer of multiclass REMICs and Other Structured Securities qualifies as a sale, we de-recognize all assets sold and recognize all assets obtained and liabilities incurred. Any gain (loss) on the sale of multiclass REMICs and Other Structured Securities is reflected in our consolidated statements of income and comprehensive income as a component of other gains (losses) on investment securities. To the extent the transfer of multiclass REMICs and Other Structured Securities does not qualify as a sale, we account for the transfer as a financing transaction and recognize a liability for the proceeds received from third parties in the transfer.

**Other Guarantee Commitments**

In certain circumstances we also provide our guarantee of mortgage-related assets held by third parties without our securitization of the related assets. For example, we provide long-term standby commitments to certain of our single-family customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements. In addition, during 2009 and 2010, we issued guarantees under the TCLFP on securities backed by HFA bonds as part of the HFA Initiative.

**Cash and Cash Equivalents**

Highly liquid investment securities that have an original maturity of three months or less are accounted for as cash equivalents. In addition, cash collateral that we have the right to use for general corporate purposes and that we obtain from counterparties to derivative contracts is recorded as cash and cash equivalents.

**Restricted Cash and Cash Equivalents**

Cash collateral accepted from counterparties that we do not have the right to use for general corporate purposes is recorded as restricted cash in our consolidated balance sheets. Restricted cash includes cash remittances received on the underlying assets of our consolidated trusts, which are deposited into a separate custodial account. These cash remittances include both scheduled and unscheduled principal and interest payments. The cash remittances are segregated in the separate custodial account until they are remitted to the PC, REMIC and Other Structured Securities holders on their respective security payment dates, and are not commingled with our general operating funds. As securities administrator, we invest the cash held in the custodial account, pending distribution to our PC, REMIC, and Other Structured Securities holders, in short-term investments and are entitled to the interest income earned on these short-term investments, which is recorded as interest income, other on our consolidated statements of income and comprehensive income.

**Mortgage Loans**

Upon acquisition, we classify a loan as either held-for-sale or held-for-investment. Mortgage loans that we have the ability and intent to hold for the foreseeable future are classified as held-for-investment. Historically, we classified

mortgage loans that we purchased to use as collateral for future PC and other mortgage-related security issuances as held-for-sale because we intended to securitize the loans in transactions that qualified for derecognition from our consolidated financial statements and did not have the intent to hold these loans for the foreseeable future. Effective January 1, 2010 we were required to consolidate our single-family PC trusts and certain Other Guarantee Transactions, and, therefore, recognized the loans underlying these securities on our consolidated balance sheets. These consolidated entities do not have the ability to sell mortgage loans and generally are only permitted to hold such loans for the settlement of the corresponding obligations of these entities. As such, loans we acquire and which we intend to securitize using an entity we will consolidate will generally be classified as held-for-investment prior to and subsequent to their securitization, in accordance with our intent and ability to hold such loans for the foreseeable future.

Held-for-investment mortgage loans are reported in our consolidated balance sheets at their outstanding UPB, net of deferred fees and other cost basis adjustments (including unamortized premiums and discounts, delivery fees and other pricing adjustments). These deferred items are amortized into interest income over the contractual lives of the loans using the effective interest method. We recognize interest income on an accrual basis except when we believe the collection of principal or interest is not probable. If the collection of principal and interest is not probable, we cease the accrual of interest income.

Mortgage loans not classified as held-for-investment are classified as held-for-sale. Held-for-sale loans are reported at lower-of-cost-or-fair-value on our consolidated balance sheets. Any excess of a held-for-sale loan's cost over its fair value is recognized as a valuation allowance in other income on our consolidated statement of income and comprehensive income, with changes in this valuation allowance also being recorded in other income. Premiums, discounts, and other cost basis adjustments recognized upon acquisition on single-family loans classified as held-for-sale are deferred and not amortized. We have elected the fair value option for multifamily mortgage loans held for sale that we intend to securitize and sell to investors. See "NOTE 17: FAIR VALUE DISCLOSURES — Fair Value Election — *Multifamily Held-For-Sale Mortgage Loans with Fair Value Option Elected*." Thus, these multifamily mortgage loans are measured at fair value on a recurring basis, with subsequent gains or losses related to sales or changes in fair value reported in other income in our consolidated statements of income and comprehensive income.

Cash flows related to mortgage loans held by our consolidated trusts are classified as either investing activities (*e.g.*, principal repayments) or operating activities (*e.g.*, interest payments received from borrowers included within net income (loss)). In addition, cash flows related to purchases of mortgage loans held-for-sale are classified in operating activities. When mortgage loans held-for-sale are sold or securitized, proceeds from the sale or securitization and any related gain or loss are classified in operating activities.

**Allowance for Loan Losses and Reserve for Guarantee Losses**

The allowance for loan losses and the reserve for guarantee losses represent estimates of incurred credit losses. The allowance for loan losses pertains to all single-family and multifamily loans classified as held-for-investment on our consolidated balance sheets whereas the reserve for guarantee losses relates to single-family and multifamily loans underlying our non-consolidated Freddie Mac mortgage-related securities and other guarantee commitments. Total held-for-investment mortgage loans, net are shown net of the allowance for loan losses on our consolidated balance sheets. The reserve for guarantee losses is included within other liabilities on our consolidated balance sheets. We recognize incurred losses by recording a charge to the provision for credit losses on our consolidated statements of income and comprehensive income. Determining the appropriateness of the loan loss reserves is a complex process that is subject to numerous estimates and assumptions requiring significant judgment about matters that involve a high degree of subjectivity.

We estimate credit losses related to homogeneous pools of loans in accordance with the accounting guidance for contingencies. Accordingly, we maintain an allowance for loan losses on mortgage loans held-for-investment when it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated. Loans that we evaluate for individual impairment are measured in accordance with the subsequent measurement requirements of the accounting guidance for receivables.

For both the single-family and multifamily portfolios, we charge off (in full or in part) our recorded investment in a loan in the period it is determined that the loan (or a portion thereof) is uncollectible, which generally occurs at final disposition of the loan. However, if losses are evident prior to final disposition, earlier recognition of a charge-off is required by our policies. We also consider charge-offs for certain very small balance loans and upon the occurrence of certain events such as natural disasters. A charge-off is also recorded if we realize a specific credit loss upon the modification of a loan in a TDR. We do not have any established threshold in terms of days past due beyond which we partially or fully charge-off loans.

*Single-Family Loans*

We determine single-family loan loss reserves both on a collective and individual basis. For further discussion on individually impaired single-family loans, refer to "Impaired Loans" below.

We estimate loan loss reserves on homogeneous pools of single-family loans using a statistically based model that evaluates a variety of factors affecting collectability. The homogeneous pools of single-family mortgage loans are determined based on common underlying characteristics, including current LTV ratios and trends in home prices, loan product type and geographic region. In determining the loan loss reserves for single-family loans at the balance sheet date, we evaluate key inputs and factors including, but not limited to:

- current LTV ratios and historical trends in home prices;
- loan product type;
- delinquency/default status and history;
- actual and estimated rates of collateral loss severity for similar loans;
- geographic location;
- loan age;
- sourcing channel;
- occupancy type;
- UPB at origination;
- expected ability to partially mitigate losses through loan modification or other alternatives to foreclosure;
- expected proceeds from mortgage insurance contracts that are contractually attached to a loan or other credit enhancements that were entered into contemporaneous with and in contemplation of a guarantee or loan purchase transaction;
- expected repurchases of mortgage loans by sellers under their obligations to repurchase loans that are inconsistent with certain representations and warranties made at the time of sale;
- counterparty credit of mortgage insurers and seller/servicers;
- pre-foreclosure real estate taxes and insurance;
- estimated selling costs should the underlying property ultimately be sold; and
- trends in the timing of foreclosures.

Freddie Mac relies upon third-parties to provide primary servicing for the performing and non-performing loan portfolio. At loan delivery, the seller provides us with the loan data, which includes loan characteristics and underwriting information. Each month, the servicers provide us with monthly loan level servicing data, including delinquency and loss information.

Certain loan servicing data is reported to us on a real-time basis, such as loan pay-offs and foreclosure events. However, certain monthly servicing data, including delinquency status, is delivered on a one-month delay. For example, December loan delinquency data delivered to Freddie Mac at the end of December or beginning of January reflects the loan delinquency status related to the December 1 payment cycle. We incorporate the delinquency status data into our allowance for loan loss calculation generally without adjustment for the one month delay.

Our single-family loan loss reserve default models are estimated based on the most recent 12 months of actual borrower behavior reflected in status and delinquency data reported by our servicers. The data provides a loan level history of delinquency, foreclosures, foreclosure alternatives, modifications, and repurchases. Our single-family loan loss reserve severity is estimated from the most recent three months of sales experience realized on our distressed property dispositions and the most recent six months of mortgage insurance recoveries and pre-foreclosure expenses on our distressed properties including REO, short sales, and third-party sales. We use historical trends in home prices in our single-family loan loss reserve process, primarily through the use of estimated current total LTV ratios in our default models and through the use of recent home price sales experience in our severity estimate. However, we do not use a forecast of trends in home prices in our single-family loan loss reserve process.

Our loan loss reserves reflect our best current estimates of incurred losses. Our loan loss reserve estimate includes projections related to strategic loss mitigation activities, including loan modifications for troubled borrowers, and projections of recoveries through repurchases by seller/servicers of defaulted loans due to failure to follow contractual

underwriting requirements at the time of the loan origination. For loans where foreclosure is probable, impairment is measured on an aggregate basis based upon an estimate of the underlying collateral value. At an individual loan level, our estimate also considers the effect of historical home price changes on borrower behavior and the impact of our loss mitigation actions, including our loan modification efforts. We apply estimated proceeds from primary mortgage insurance that is contractually attached to a loan and other credit enhancements entered into contemporaneous with and in contemplation of a guarantee or loan purchase transaction as a recovery of our recorded investment in a charged-off loan, up to the amount of loss recognized as a charge-off. Proceeds from credit enhancements received in excess of our recorded investment in charged-off loans are recorded as a decrease to REO operations expense in our consolidated statements of income and comprehensive income when received.

Our reserve estimate also reflects our best projection of delinquencies we believe are likely to occur as a result of loss events that have occurred through December 31, 2011 and 2010, respectively. However, the continued weakness in the national housing market, the uncertainty in other macroeconomic factors, and uncertainty of the success of modification efforts under HAMP and other loan workout programs, make forecasting of delinquency rates inherently imprecise.

We validate and update the model and factors to capture changes in actual loss experience, as well as the effects of changes in underwriting practices and in our loss mitigation strategies. We also consider macroeconomic and other factors that impact the quality of the loans underlying our portfolio including regional housing trends, applicable home price indices, unemployment and employment dislocation trends, consumer credit statistics and the extent of third party insurance. We determine our loan loss reserves based on our assessment of these factors.

### *Multifamily Loans*

For multifamily loans identified as impaired, we individually determine the specific loan loss reserves. Refer to "Impaired Loans" below for further discussion on individually impaired multifamily loans. Multifamily loans evaluated collectively for impairment are aggregated into book year vintages and measured by benchmarking published historical commercial mortgage data to those vintages based upon available economic data related to multifamily real estate, including apartment vacancy and rental rates.

### Non-Performing Loans

Non-performing loans consist of single-family and multifamily loans that have undergone a TDR, single-family seriously delinquent loans, multifamily loans that are three or more payments past due or in the process of foreclosure, and multifamily loans that are deemed impaired based upon management judgment. We place mortgage loans on non-accrual status when we believe collectability of interest and principal is not reasonably assured, which generally occurs when a loan is three monthly payments past due, unless the loan is well secured and in the process of collection based upon an individual loan assessment. A loan is considered past due if a full payment of principal and interest is not received within one month of its due date. When a loan is placed on non-accrual status, any interest income accrued but uncollected is reversed. Thereafter, interest income is recognized only upon receipt of cash payments.

A non-accrual mortgage loan may be returned to accrual status when the collectability of principal and interest is reasonably assured. For single-family loans, we determine that collectability is reasonably assured when we have received payment of principal and interest such that the loan becomes less than three monthly payments past due. For multifamily loans, the collectability of principal and interest is considered reasonably assured based on a quantitative and qualitative analysis of the factors specific to the loan being assessed. Upon a loan's return to accrual status, all previously reversed interest income is recognized and amortization of any basis adjustments into interest income is resumed.

### Impaired Loans

We consider a loan to be impaired when it is probable, based on current information, that we will not receive all amounts due (including both principal and interest) in accordance with the contractual terms of the original loan agreement. This assessment is made taking into consideration any more than insignificant delays in the timing of our expected receipt of these amounts.

### *Single-Family*

Individually impaired single-family loans include loans that have undergone a TDR. Impairment and interest income recognition are discussed separately in the paragraphs that follow. All other single-family loans are aggregated and measured collectively for impairment based on similar risk characteristics. Collective impairment is measured as described above in the "Allowance for Loan Losses and Reserve for Guarantee Losses — Single-Family Loans" section of this note.

*Freddie Mac*

If we determine that foreclosure on the underlying collateral is probable, we measure impairment based upon the fair value of the collateral, as reduced by estimated disposition costs and adjusted for estimated proceeds from insurance and similar sources.

### Multifamily

Multifamily impaired loans include TDRs, loans three monthly payments or more past due, and loans that are deemed impaired based on management judgment. Factors considered by management in determining whether a loan is impaired include, but are not limited to, the underlying property's operating performance as represented by its current DSCR, available credit enhancements, current LTV ratio, management of the underlying property, and the property's geographic location. Multifamily loans are measured individually for impairment based on the fair value of the underlying collateral, as reduced by estimated disposition costs, as the repayment of these loans is generally provided from the cash flows of the underlying collateral and any associated credit-enhancement. Except for cases of fraud and certain other types of borrower defaults, most multifamily loans are non-recourse to the borrower so generally the cash flows of the underlying property (including any associated credit enhancements) serve as the source of funds for repayment of the loan. Interest income recognition on non-TDR multifamily impaired loans is subject to our non-accrual policy as discussed in "Non-Performing Loans."

### Troubled Debt Restructurings

Both single-family and multifamily loans which experience a modification to their contractual terms which results in a concession being granted to a borrower experiencing financial difficulties are considered TDRs. A concession is deemed granted when, as a result of the restructuring, we do not expect to collect all amounts due, including interest accrued, at the original contractual interest rate. As appropriate, we also consider other qualitative factors in determining whether a concession is deemed granted, including whether the borrower's modified interest rate is consistent with that of a non-troubled borrower. We do not consider restructurings that result in a delay in payment that is insignificant to be a concession. We generally consider a delay in monthly amortizing payments of three months or less to be insignificant. We generally consider all other delays in payment, including balloon payments, to be more than insignificant. A concession typically includes one or more of the following being granted to the borrower: (a) loans in trial periods where the expected permanent modification will change our expectation of collecting all amounts due at the original contract rate; (b) a delay in payment that is more than insignificant; (c) a reduction in the contractual interest rate; (d) interest forbearance for a period of time that is not insignificant or forgiveness of accrued but uncollected interest amounts; and (e) a reduction in the principal amount of the loan. On July 1, 2011, we adopted an amendment to the accounting guidance related to the classification of loans as TDRs. This amendment clarified when a restructuring such as a loan modification is considered a TDR. For additional information, see "Recently Adopted Accounting Guidance — *A Creditor's Determination of Whether a Restructuring is a Troubled Debt Restructuring,*" below.

Impairment of a loan having undergone a TDR is measured as the excess of our recorded investment in the loan over the present value of the expected future cash flows, discounted at the loan's original effective interest rate for fixed-rate loans or at the loan's effective interest rate prior to modification for ARM loans. Our expectation of future cash flows incorporates, among other items, an estimated probability of default which is based on a number of market factors as well as the characteristics of the loan, such as past due status. Subsequent to the modification date, interest income is recognized at the modified interest rate, subject to our non-accrual policy as discussed in "Non-Performing Loans" above, with all other changes in the present value of expected future cash flows being recognized as a component of the provision for credit losses in our consolidated statement of income and comprehensive income.

## Investments in Securities

Investments in securities consist primarily of mortgage-related securities. We classify securities as "available-for-sale" or "trading." We currently do not classify any securities as "held-to-maturity," although we may elect to do so in the future. In addition, we elected the fair value option for certain available-for-sale mortgage-related securities, including investments in securities that: (a) can contractually be prepaid or otherwise settled in such a way that we may not recover substantially all of our initial recorded investment; or (b) are not of high credit quality at the acquisition date and are identified as within the scope of the accounting guidance for investments in beneficial interests in securitized financial assets. Subsequent to our election, these securities were classified as trading securities. Securities classified as available-for-sale and trading are reported at fair value with changes in fair value included in AOCI and other gains (losses) on investment securities, respectively. See "NOTE 17: FAIR VALUE DISCLOSURES" for more information on how we determine the fair value of securities.

We record purchases and sales of securities that are specifically exempt from the requirements of derivatives and hedge accounting on a trade date basis. Securities underlying forward purchases and sales contracts that are not exempt from the requirements of derivatives and hedge accounting are recorded on the expected settlement date with a corresponding commitment recorded on the trade date.

When we purchase REMICs and Other Structured Securities and certain Other Guarantee Transactions that we have issued, we account for these securities as investments in debt securities, as we are investing in the debt securities of a non-consolidated entity. We consolidate the trusts that issue these securities when we hold substantially all of the outstanding beneficial interests issued by the trusts. We recognize interest income on the securities and interest expense on the debt we issued. See "Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities — *Purchases and Sales of Freddie Mac Mortgage-Related Securities*" for additional information on accounting for purchases of PCs and beneficial interests issued by resecuritization trusts.

In connection with transfers of financial assets that qualified as sales prior to the adoption of the amendments to the accounting guidance on transfers of financial assets and the consolidation of VIEs, we may have retained individual securities not transferred to third parties upon the completion of a securitization transaction. These securities may have been backed by mortgage-related assets purchased from our customers, PCs, and REMICs and Other Structured Securities. The securities we acquired in these transactions were classified as available-for-sale or trading and are considered guaranteed investments. Therefore, the fair values of these securities reflect that they are considered to be of high credit quality and the securities are not subject to credit-related impairments. They are subject to the credit risk associated with the underlying collateral. Therefore, our exposure to credit losses on collateral underlying our retained securitization interests was recorded within our reserve for guarantee losses.

For most of our investments in securities, interest income is recognized using the effective interest method. Deferred items, including premiums, discounts, and other basis adjustments, are amortized into interest income over the contractual lives of the securities.

For certain investments in securities, interest income is recognized using the prospective effective interest method. We specifically apply this accounting to beneficial interests in securitized financial assets that: (a) can contractually be prepaid or otherwise settled in such a way that we may not recover substantially all of our recorded investment; (b) are not of high credit quality at the acquisition date; or (c) have been determined to be other-than-temporarily impaired. We recognize as interest income (over the life of these securities) the excess of all estimated cash flows attributable to these interests over their book value using the effective interest method. We update our estimates of expected cash flows periodically and recognize changes in the calculated effective interest rate on a prospective basis.

We recognize impairment losses on available-for-sale securities within our consolidated statements of income and comprehensive income as net impairment of available-for-sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other-than-temporary. On April 1, 2009, we prospectively adopted an amendment to the accounting guidance for investments in debt and equity securities. This amendment changed the recognition, measurement, and presentation of other-than-temporary impairment for debt securities.

We conduct quarterly reviews to identify and evaluate each available-for-sale security that has an unrealized loss for other-than-temporary impairment. An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis.

We recognize other-than-temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security. If we do not intend to sell the security and it is not more likely than not that we will be required to sell the security prior to recovery of its unrealized loss, we recognize only the credit component of other-than-temporary impairment in earnings and the amounts attributable to all other factors are recognized, net of tax, in AOCI. The credit component represents the amount by which the present value of cash flows expected to be collected from the security is less than the amortized cost basis of the security. The evaluation of whether unrealized losses on available-for-sale securities are other-than-temporary contemplates numerous factors. We perform an evaluation on a security-by-security basis considering all available information and our analysis is refined where the current fair value or other characteristics of the security warrant. The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment. See "NOTE 7: INVESTMENTS IN SECURITIES — Impairment Recognition on Investments in Securities" for a discussion of important factors we consider in our evaluation.

For the majority of our available-for-sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery

<div style="text-align: center;">215</div>

<div style="text-align: right;"><em>Freddie Mac</em></div>

of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other than temporary and is recorded within our consolidated statements of income and comprehensive income as net impairment of available-for-sale securities recognized in earnings.

We elected the fair value option for available-for-sale securities identified as within the scope of the accounting guidance for investments in beneficial interests in securitized financial assets to better reflect the valuation changes that occur subsequent to impairment write-downs recorded on these instruments. By electing the fair value option for these instruments, we reflect valuation changes through our consolidated statements of income and comprehensive income in the period they occur, including increases in value. For additional information on our election of the fair value option, see "NOTE 17: FAIR VALUE DISCLOSURES."

Gains and losses on the sale of securities are included in other gains (losses) on investment securities recognized in earnings, including those gains (losses) reclassified into earnings from AOCI. We use the specific identification method for determining the cost basis of a security in computing the gain or loss.

For securities classified as trading or available-for-sale and those securities where we elected the fair value option, we classify the cash flows as investing activities because we hold these securities for investment purposes. In cases where the transfer of available-for-sale securities represents a secured borrowing, we classify the related cash flows as financing activities.

**Repurchase and Resale Agreements and Dollar Roll Transactions**

We enter into repurchase and resale agreements primarily as an investor or to finance certain of our security positions. Such transactions are accounted for as secured financings because the transferor does not relinquish control over the transferred assets.

We also engage in dollar roll transactions whereby we enter into an agreement to sell and subsequently repurchase (or purchase and subsequently resell) agency securities. When these transactions involve securities issued by consolidated entities, they are treated as issuances and extinguishments of debt. When these transactions involve securities issued by entities we do not consolidate, they are treated as purchases and sales as the security initially transferred is not required to be the same or substantially the same as the security subsequently returned.

**Debt Securities Issued**

Debt securities that we issue are classified on our consolidated balance sheets as either debt securities of consolidated trusts held by third parties or other debt.

As a result of the adoption of the amendments to the accounting guidance on transfers of financial assets and the consolidation of VIEs, we consolidated our single-family PC trusts and certain Other Guarantee Transactions in our financial statements commencing January 1, 2010. Consequently, PCs and Other Guarantee Transactions issued by the consolidated trusts and held by third parties are recognized as debt securities of consolidated trusts held by third parties on our consolidated balance sheets. The debt securities of our consolidated trusts are prepayable without penalty at any time. Other debt represents short-term and long-term debt securities that we issue to third parties to fund our general business activities.

Both debt of our consolidated trusts and other debt, except for certain debt for which we elected the fair value option, are reported at amortized cost. Deferred items, including premiums, discounts, and hedging-related basis adjustments are reported as a component of total debt, net. Issuance costs are reported as a component of other assets. These items are amortized and reported through interest expense using the effective interest method over the contractual life of the related indebtedness. Amortization of premiums, discounts, and issuance costs begins at the time of debt issuance. Amortization of hedging-related basis adjustments is initiated upon the discontinuation of the related hedge relationship.

We elected the fair value option on foreign-currency denominated debt and certain other debt securities. The change in fair value for debt recorded at fair value is reported as gains (losses) on debt recorded at fair value in our consolidated statements of income and comprehensive income. Upfront costs and fees on foreign-currency denominated debt are recognized in earnings as incurred and not deferred. For additional information on our election of the fair value option, see "NOTE 17: FAIR VALUE DISCLOSURES."

When we purchase a PC or a REMIC and Other Structured Security that is a single-class security from a third party, we extinguish the debt of the related PC trusts and recognize a gain or loss related to the difference between the amount paid to redeem the debt security and its carrying value, adjusted for any related purchase commitments accounted for as derivatives, in earnings as a component of gains (losses) on extinguishment of debt securities of consolidated trusts. Cash

flows related to debt securities issued by our consolidated trusts are classified as either financing activities (*e.g.*, repayment of principal to PC holders) or operating activities (*e.g.*, interest payments to PC holders included within net income (loss)). Other than interest paid, cash flows related to other debt are classified as financing activities. Interest paid on other debt is classified as operating activities.

When we repurchase or call outstanding other debt, we recognize a gain or loss related to the difference between the amount paid to redeem the debt security and the carrying value in earnings as a component of gains (losses) on retirement of other debt. Contemporaneous transfers of cash between us and a creditor in connection with the issuance of a new debt security and satisfaction of an existing debt security are accounted for as either an extinguishment or a modification of an existing debt security. If the debt securities have substantially different terms, the transaction is accounted for as an extinguishment of the existing debt security. The issuance of a new debt security is recorded at fair value, fees paid to the creditor are expensed and fees paid to third parties are deferred and amortized into interest expense over the life of the new debt security using the effective interest method. If the terms of the existing debt security and the new debt security are not substantially different, the transaction is accounted for as a modification of the existing debt. Fees paid to the creditor are deferred and amortized over the life of the modified unsecured debt security using the effective interest method and fees paid to third parties are expensed as incurred.

**Derivatives**

Derivatives are reported at their fair value on our consolidated balance sheets. Derivatives in a net asset position, including net derivative interest receivable or payable, are reported as derivative assets, net. Similarly, derivatives in a net liability position, including net derivative interest receivable or payable, are reported as derivative liabilities, net. We offset fair value amounts recognized for the right to reclaim cash collateral or the obligation to return cash collateral against fair value amounts recognized for derivative instruments executed with the same counterparty under a master netting agreement. Changes in fair value and interest accruals on derivatives are recorded as derivative gains (losses) in our consolidated statements of income and comprehensive income.

We evaluate whether financial instruments that we purchase or issue contain embedded derivatives. In accordance with an amendment to derivatives and hedging accounting guidance regarding certain hybrid financial instruments, we elected to measure newly acquired or issued financial instruments that contain embedded derivatives at fair value, with changes in fair value recorded in our consolidated statements of income and comprehensive income. At December 31, 2011 and 2010, we did not have any embedded derivatives that were bifurcated and accounted for as freestanding derivatives.

At December 31, 2011 and 2010, we did not have any derivatives in hedge accounting relationships; however, there are amounts recorded in AOCI related to discontinued cash flow hedges which are recognized in earnings as the originally forecasted transactions affect earnings. If it becomes probable the originally forecasted transaction will not occur, the associated deferred gain or loss in AOCI would be reclassified to earnings immediately.

In the consolidated statements of cash flows, cash flows related to the acquisition and termination of derivatives, other than forward commitments, are generally classified in investing activities. Cash flows related to forward commitments are classified within the section of the consolidated statements of cash flows in accordance with the cash flows of the financial instruments to which they relate.

**REO**

REO is initially recorded at fair value less costs to sell and is subsequently carried at the lower of cost or fair value less costs to sell. When we acquire REO, losses arise when the carrying basis of the loan (including accrued interest) exceeds the fair value of the foreclosed property, net of estimated costs to sell and expected recoveries through credit enhancements. Losses are charged off against the allowance for loan losses at the time of REO acquisition. REO gains arise and are recognized immediately in earnings when the fair value of the foreclosed property less costs to sell plus expected recoveries through credit enhancements exceeds the carrying basis of the loan (including all amounts due from the borrower). Amounts we expect to receive from third-party insurance or other credit enhancements are recorded as receivables when REO is acquired. The receivable is adjusted when the actual claim is filed and is reported as a component of other assets on our consolidated balance sheets. Material development and improvement costs relating to REO are capitalized. Operating expenses specifically identifiable with an REO property are included in REO operations income (expense); all other expenses are recognized within other administrative expenses in our consolidated statement of income and comprehensive income. Estimated declines in REO fair value that result from ongoing valuation of the properties are provided for and charged to REO operations income (expense) when identified. Any gains and losses from REO dispositions are included in REO operations income (expense).

### Income Taxes

We use the asset and liability method of accounting for income taxes under GAAP. Under this method, deferred tax assets and liabilities are recognized based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates as well as tax net operating loss and tax credit carryforwards. To the extent tax laws change, deferred tax assets and liabilities are adjusted, when necessary, in the period that the tax change is enacted. Valuation allowances are recorded to reduce net deferred tax assets when it is more likely than not that a tax benefit will not be realized. The realization of these net deferred tax assets is dependent upon the generation of sufficient taxable income in available carryback years, from current operations and from unrecognized tax benefits, and upon our intent and ability to hold available-for-sale debt securities until the recovery of any temporary unrealized losses. On a quarterly basis, our management determines whether a valuation allowance is necessary. In so doing, our management considers all evidence currently available, both positive and negative, in determining whether, based on the weight of that evidence, it is more likely than not that the net deferred tax assets will be realized. Our management determined that, as of December 31, 2011 and 2010, it was more likely than not that we would not realize the portion of our net deferred tax assets that is dependent upon the generation of future taxable income. This determination was driven by events and the resulting uncertainties that existed as of December 31, 2011 and 2010. For more information about the evidence that management considers and our determination of the need for a valuation allowance, see "NOTE 13: INCOME TAXES."

Income tax benefit (expense) includes: (a) deferred tax benefit (expense), which represents the net change in the deferred tax asset or liability balance during the year plus any change in a valuation allowance; and (b) current tax benefit (expense), which represents the amount of tax currently payable to or receivable from a tax authority including any related interest and penalties plus amounts accrued for unrecognized tax benefits (also including any related interest and penalties). Income tax benefit (expense) excludes the tax effects related to adjustments recorded to equity.

Regarding tax positions taken or expected to be taken (and any associated interest and penalties), we recognize a tax position so long as it is more likely than not that it will be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. We measure the tax position at the largest amount of benefit that is greater than 50% likely of being realized upon ultimate settlement. See "NOTE 13: INCOME TAXES" for additional information.

### Earnings Per Common Share

We have participating securities related to options and restricted stock units with dividend equivalent rights that receive dividends as declared on an equal basis with common shares but are not obligated to participate in undistributed net losses. These participating securities consist of: (a) vested and unvested options to purchase common stock; and (b) restricted stock units that earn dividend equivalents at the same rate when and as declared on common stock. Consequently, in accordance with accounting guidance for earnings per share, we use the "two-class" method of computing earnings per share. The "two-class" method is an earnings allocation formula that determines earnings per share for common stock and participating securities based on dividends declared and participation rights in undistributed earnings.

Basic earnings per common share is computed as net income available to common stockholders divided by the weighted average common shares outstanding for the period. The weighted average common shares outstanding for our basic earnings per share calculation includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. This warrant is included since it is unconditionally exercisable by the holder at a minimal cost of $0.00001 per share. Diluted earnings per common share is determined using the weighted average number of common shares during the period, adjusted for the dilutive effect of common stock equivalents. Dilutive common stock equivalents reflect the assumed net issuance of additional common shares pursuant to certain of our stock-based compensation plans that could potentially dilute earnings per common share. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for further information on the warrant for our common stock issued to Treasury as part of the Purchase Agreement.

Diluted loss per common share is computed as net loss attributable to common stockholders divided by weighted average common shares outstanding — diluted for the period, which considers the effect of dilutive common equivalent shares outstanding. For periods with net income, the effect of dilutive common equivalent shares outstanding includes: (a) the weighted average shares related to stock options; and (b) the weighted average of restricted shares and restricted stock units. Such items are included in the calculation of weighted average common shares outstanding — diluted during periods of net income, when the assumed conversion of the share equivalents has a dilutive effect. Such items are excluded from the weighted average common shares outstanding — basic.

**Comprehensive Income**

Comprehensive income is the change in equity, on a net of tax basis, resulting from transactions and other events and circumstances from non-owner sources during a period. It includes all changes in equity during a period, except those resulting from investments by stockholders. We define comprehensive income as consisting of net income (loss) plus changes in: (a) the unrealized gains and losses on available-for-sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans.

**Recently Adopted Accounting Guidance**

*A Creditor's Determination of Whether a Restructuring is a Troubled Debt Restructuring*

On July 1, 2011, we adopted an amendment to the accounting guidance related to the classification of loans as TDRs, which clarifies when a restructuring such as a loan modification is considered a TDR. This amendment clarifies the guidance regarding a creditor's evaluation of whether a debtor is experiencing financial difficulty and whether a creditor has granted a concession to a debtor for purposes of determining if a restructuring constitutes a TDR.

Both single-family and multifamily loans that experience restructurings resulting in a concession being granted to a borrower experiencing financial difficulties are considered TDRs. The amendment provides guidance to determine whether a borrower is experiencing financial difficulties, which is largely consistent with the guidance for debtors. As we had previously analogized to the guidance for debtors, this change does not have a significant impact on our determination of whether a borrower is experiencing financial difficulties. Pursuant to this amendment, a concession is deemed to have been granted when, as a result of the restructuring, we do not expect to collect all amounts due, including interest accrued, at the original contractual interest rate. The amendment also specifies that a concession shall not be determined by comparing the borrower's pre-restructuring effective interest rate to the post-restructuring effective interest rate. These changes result in a significant impact on our determination of whether a concession has been granted.

The amendment was effective for interim and annual periods beginning on or after June 15, 2011 and applied as of July 1, 2011 to restructurings occurring on or after January 1, 2011. As of September 30, 2011, the total recorded investment in loans identified as TDRs during the third quarter of 2011 which relate to modifications or agreements entered into between January 1, 2011 and June 30, 2011 was $7.5 billion, and the allowance for credit losses related to those loans was $1.7 billion. We recognized additional provision for credit losses of $0.2 billion during the third quarter of 2011 due to the population of restructurings occurring in the first half of 2011 that are now considered TDRs.

Please refer to "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for further disclosures regarding our loan restructurings accounted for and disclosed as TDRs and for discussion regarding how modifications and other loss mitigation activities are factored into our allowance for loan losses.

*Accounting for Transfers of Financial Assets and Consolidation of VIEs*

On January 1, 2010, we prospectively adopted amendments to the accounting guidance applicable to the accounting for transfers of financial assets and the consolidation of VIEs. The amendment for transfers of financial assets was applicable on a prospective basis to new transfers, while the amendment relating to consolidation of VIEs was applied prospectively to all entities within its scope as of the date of adoption.

We use securitization trusts in our securities issuance process. Prior to January 1, 2010, these trusts met the definition of QSPEs and were not subject to consolidation. Effective January 1, 2010, the concept of a QSPE was removed from GAAP and entities previously considered QSPEs were required to be evaluated for consolidation. Based on our consolidation evaluation, we determined that we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions. As a result, a large portion of our off-balance sheet assets and liabilities prior to January 1, 2010 have been consolidated. Effective January 1, 2010, we consolidated these trusts and recognized the assets and liabilities at their UPB, with accrued interest, allowance for credit losses or other-than-temporary impairments recognized as appropriate, using the practical expedient permitted upon adoption since we determined that calculation of historical carrying values was not practical. Other newly consolidated assets and liabilities that either do not have a UPB or are required to be carried at fair value were measured at fair value. See "Consolidation and Equity Method of Accounting" above for a discussion of our assessment to determine whether we are considered the primary beneficiary of a trust and thus need to consolidate it. As such, we recognized on our consolidated balance sheets the mortgage loans underlying our issued single-family PCs and certain Other Guarantee Transactions as mortgage loans held-for-investment by consolidated trusts, at amortized cost. We also recognized the corresponding single-family PCs and certain Other Guarantee Transactions held by third parties on our consolidated balance sheets as debt securities of consolidated trusts held by third parties. After January 1, 2010, new consolidations of trust assets and liabilities are recorded at either their:

(a) carrying value if the underlying assets are contributed by us to the trust and consolidated at the time of transfer; or (b) fair value for the assets and liabilities that are consolidated under the securitization trusts established for our guarantor swap program.

In light of the consolidation of our single-family PC trusts and certain Other Guarantee Transactions as discussed above, effective January 1, 2010 we elected to change the amortization method for deferred items (*e.g.*, premiums, discounts, and other basis adjustments) related to mortgage loans and investments in securities. We made this change to align the amortization method for these assets with the amortization method for deferred items associated with the related liabilities. As a result of this change, deferred items are amortized into interest income using an effective interest method over the contractual lives of these assets instead of the estimated life that was used for periods prior to 2010. It was impracticable to retrospectively apply this change to prior periods, so we recognized this change as a cumulative effect adjustment to the opening balance of retained earnings (accumulated deficit), and future amortization of these deferred items will be recognized using this new method. The effect of the change in the amortization method for deferred items was immaterial to our consolidated financial statements in 2010.

The cumulative effect of these changes in accounting principles was a net decrease of $11.7 billion to total equity (deficit) as of January 1, 2010, which includes changes to the opening balances of retained earnings (accumulated deficit) and AOCI. This net decrease was driven principally by: (a) the elimination of unrealized gains resulting from the extinguishment of PCs held as investment securities upon consolidation of the PC trusts, representing the difference between the UPB of the loans underlying the PC trusts and the fair value of the PCs, including premiums, discounts, and other basis adjustments; (b) the elimination of the guarantee asset and guarantee obligation established for guarantees issued to securitization trusts we consolidated; and (c) the application of our non-accrual policy to single-family seriously delinquent mortgage loans consolidated as of January 1, 2010.

### Change in the Impairment Model for Debt Securities

On April 1, 2009 we prospectively adopted an amendment to the accounting guidance for investments in debt and equity securities, which provided additional guidance on accounting for and presenting impairment losses on debt securities. This amendment changed the recognition, measurement and presentation of other-than-temporary impairment for debt securities, and was intended to bring greater consistency to the timing of impairment recognition and provide greater clarity to investors about the credit and non-credit components of impaired debt securities not expected to be sold. It also changed: (a) the method for determining whether an other-than-temporary impairment exists; and (b) the amount of an impairment charge to be recorded in earnings.

As a result of the adoption, we recognized a cumulative-effect adjustment, net of tax, of $15.0 billion to our opening balance of retained earnings (accumulated deficit) on April 1, 2009, with a corresponding adjustment of $(9.9) billion, net of tax, to AOCI. The cumulative adjustment reclassified the non-credit component of previously recognized other-than-temporary impairments from retained earnings to AOCI. The difference between these adjustments of $5.1 billion primarily represented the release of the valuation allowance previously recorded against the deferred tax asset that was no longer required upon adoption of this amendment. See "NOTE 7: INVESTMENTS IN SECURITIES" for further disclosures regarding our investments in securities and other-than-temporary impairments.

### Recently Issued Accounting Guidance, Not Yet Adopted Within These Consolidated Financial Statements

### Fair Value Measurement

In May 2011, the FASB issued amendments to the accounting guidance pertaining to fair value measurement and disclosure. These amendments provide both: (a) clarification about the FASB's intent about the application of existing fair value measurement and disclosure requirements; and (b) changes to some of the principles or requirements for measuring fair value or for disclosing information about fair value measurements. These amendments are effective for interim and annual periods beginning after December 15, 2011 and are to be applied prospectively, with early adoption not permitted by public companies. We do not expect that the adoption of these amendments will have a material impact on our consolidated financial statements.

### Reconsideration of Effective Control for Repurchase Agreements

In April 2011, the FASB issued an amendment to the guidance for transfers and servicing with regard to repurchase agreements and other agreements that both entitle and obligate a transferor to repurchase or redeem financial assets before their maturity. This amendment removes the criterion related to collateral maintenance from the transferor's assessment of effective control. It focuses the assessment of effective control on the transferor's rights and obligations with respect to the transferred financial assets and not whether the transferor has the practical ability to perform in accordance with those

rights or obligations. The amendment is effective for interim and annual periods beginning on or after December 15, 2011. We do not expect that the adoption of this amendment will have a material impact on our consolidated financial statements.

## NOTE 2: CONSERVATORSHIP AND RELATED MATTERS

### Entry Into Conservatorship

On September 6, 2008, the Director of FHFA placed us into conservatorship. On September 7, 2008, Treasury and FHFA announced several actions regarding Freddie Mac and Fannie Mae. These actions included the execution of the Purchase Agreement, pursuant to which we issued to Treasury both senior preferred stock and a warrant to purchase common stock.

### Business Objectives

We continue to operate under the direction of FHFA, as our Conservator. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition and results of operations. Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets. The Conservator also succeeded to the title to all books, records, and assets of Freddie Mac held by any other legal custodian or third party. During the conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and management to conduct, day-to-day operations so that the company can continue to operate in the ordinary course of business. The directors serve on behalf of, and exercise authority as directed by, the Conservator.

We are also subject to certain constraints on our business activities by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent.

While in conservatorship, we can, and have continued to, enter into and enforce contracts with third parties. The Conservator continues to direct the efforts of the Board of Directors and management to address and determine the strategic direction for the company. While the Conservator has delegated certain authority to management to conduct day-to-day operations, many management decisions are subject to review and approval by FHFA and Treasury. In addition, management frequently receives directions from FHFA on various matters involving day-to-day operations.

FHFA has stated that it has focused Freddie Mac and Fannie Mae on their existing core business, including minimizing credit losses, and taking actions necessary to advance the goals of conservatorship, and is not permitting Freddie Mac and Fannie Mae to offer new products or enter into new lines of business. Our business objectives and strategies have, in some cases, been altered since we were placed into conservatorship, and may continue to change. These changes to our business objectives and strategies may not contribute to our profitability. Based on our charter, other legislation, public statements from Treasury and FHFA officials and other guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives, including:

- minimizing credit losses;
- conserving assets;
- providing liquidity, stability and affordability in the mortgage market;
- continuing to provide additional assistance to the struggling housing and mortgage markets;
- maintaining a positive stockholders' equity and reducing the need to draw funds from Treasury pursuant to the Purchase Agreement; and
- protecting the interests of taxpayers.

The Conservator has stated that it is taking actions in support of the objectives of gradual transition to greater private capital participation in housing finance and greater distribution of risk to participants other than the government. The Conservator has also stated that it is focusing on retaining value in the business operations of Freddie Mac and Fannie Mae, overseeing remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed.

These objectives create conflicts in strategic and day-to-day decision making that will likely lead to suboptimal outcomes for one or more, or possibly all, of these objectives. We regularly receive direction from our Conservator on how to pursue our objectives under conservatorship, including direction to focus our efforts on assisting homeowners in the housing and mortgage markets. The Conservator and Treasury have also not authorized us to engage in certain

business activities and transactions, including the purchase or sale of certain assets, which we believe might have had a beneficial impact on our results of operations or financial condition, if executed. Our inability to execute such transactions may adversely affect our profitability, and thus contribute to our need to draw additional funds from Treasury. However, we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

The Acting Director of FHFA stated that FHFA does not expect we will be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio. We are also subject to limits on the amount of assets we can sell from our mortgage-related investments portfolio in any calendar month without review and approval by FHFA and, if FHFA determines, Treasury.

Given the important role the Administration and our Conservator have placed on Freddie Mac in addressing housing and mortgage market conditions and our public mission, we may be required to take additional actions that could have a negative impact on our business, operating results, or financial condition. Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a manner that serves our public mission and other non-financial objectives, but may not contribute to our profitability. Some of these changes increase our expenses, while others require us to forego revenue opportunities in the near term. In addition, the objectives set forth for us under our charter and by our Conservator, as well as the restrictions on our business under the Purchase Agreement, have adversely impacted and may continue to adversely impact our financial results, including our segment results. For example, our efforts to help struggling homeowners and the mortgage market, in line with our public mission, may help to mitigate our credit losses, but in some cases may increase our expenses or require us to forgo revenue opportunities in the near term. There is significant uncertainty as to the ultimate impact that our efforts to aid the housing and mortgage markets, including our efforts in connection with the MHA Program, will have on our future capital or liquidity needs. We are allocating significant internal resources to the implementation of the various initiatives under the MHA Program and to the servicing alignment initiative as directed by FHFA on April 28, 2011, which has increased, and will continue to increase, our expenses. We cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives.

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist. The Acting Director of FHFA stated on September 19, 2011 that "it ought to be clear to everyone at this point, given [Freddie Mac and Fannie Mae's] losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that [Freddie Mac and Fannie Mae] will not be able to earn their way back to a condition that allows them to emerge from conservatorship." The Acting Director of FHFA stated on November 15, 2011 that "the long-term outlook is that neither [Freddie Mac nor Fannie Mae] will continue to exist, at least in its current form, in the future." We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near-term. We have no ability to predict the outcome of these deliberations.

On February 11, 2011, the Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, and states that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including

increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements. These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations, and financial condition.

The temporary high-cost area limits expired on September 30, 2011. In addition, as discussed below, we have been directed to increase our guarantee fees. We cannot predict the extent to which the other recommendations in the report will be implemented or when any actions to implement them may be taken.

On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than 10 basis points above the average guarantee fees charged in 2011 on single-family mortgage-backed securities. Under the law, the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by the companies. The law also permits FHFA to determine a schedule for guarantee fee increases over a two-year period.

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers whose monthly payments are current and who can benefit from refinancing their home mortgages. The revisions to HARP will be available to borrowers with loans that were sold to Freddie Mac and Fannie Mae on or before May 31, 2009 and who have current LTV ratios above 80%.

In November 2011, Freddie Mac and Fannie Mae issued guidance with operational details about the HARP changes to mortgage lenders and servicers after receiving information from FHFA about the fees that we may charge associated with the refinancing program. Because industry participation in HARP is not mandatory, we anticipate that implementation schedules will vary as individual lenders, mortgage insurers and other market participants modify their processes. It is too early to estimate how many eligible borrowers are likely to refinance under the revised program.

## Purchase Agreement

### Overview

The Conservator, acting on our behalf, entered into the Purchase Agreement on September 7, 2008. The Purchase Agreement was subsequently amended and restated on September 26, 2008, and further amended on May 6, 2009 and December 24, 2009. Under the December 2009 amendment to the Purchase Agreement, the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011 and 2012. If we do not have a capital surplus (*i.e.*, positive net worth) at the end of 2012, then the amount of funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 31, 2009). In the event we have a capital surplus at the end of 2012, then the amount of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as follows:

- If the year-end 2012 surplus is lower than the cumulative draws needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

- If the year-end 2012 surplus exceeds the cumulative draws for 2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws.

The Purchase Agreement requires Treasury, upon the request of the Conservator, to provide funds to us after any quarter in which we have a negative net worth (that is, our total liabilities exceed our total assets, as reflected on our GAAP balance sheet). In addition, the Purchase Agreement requires Treasury, upon the request of the Conservator, to provide funds to us if the Conservator determines, at any time, that it will be mandated by law to appoint a receiver for us unless we receive these funds from Treasury. In exchange for Treasury's funding commitment, we issued to Treasury, as an aggregate initial commitment fee: (a) one million shares of Variable Liquidation Preference Senior Preferred Stock (with an initial liquidation preference of $1 billion), which we refer to as the senior preferred stock; and (b) a warrant to purchase, for a nominal price, shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis at the time the warrant is exercised, which we refer to as the warrant. We received no other consideration from Treasury for issuing the senior preferred stock or the warrant.

Under the terms of the Purchase Agreement, Treasury is entitled to a dividend of 10% per year, paid on a quarterly basis (which increases to 12% per year if not paid timely and in cash) on the aggregate liquidation preference of the senior preferred stock, consisting of the initial liquidation preference of $1 billion plus funds we receive from Treasury and any dividends and commitment fees not paid in cash. To the extent we draw on Treasury's funding commitment, the

liquidation preference of the senior preferred stock is increased by the amount of funds we receive. The senior preferred stock is senior in liquidation preference to our common stock and all other series of preferred stock.

In addition to the issuance of the senior preferred stock and warrant, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury. Under the Purchase Agreement, the fee is to be determined in an amount mutually agreed to by us and Treasury with reference to the market value of Treasury's funding commitment as then in effect, and reset every five years. We may elect to pay the quarterly commitment fee in cash or add the amount of the fee to the liquidation preference of the senior preferred stock. Treasury may waive the quarterly commitment fee for up to one year at a time, in its sole discretion, based on adverse conditions in the U.S. mortgage market. The fee was originally scheduled to begin accruing on January 1, 2010 (with the first fee payable on March 31, 2010), but was delayed until January 1, 2011 (with the first fee payable on March 31, 2011) pursuant to an amendment to the Purchase Agreement. Treasury waived the fee for all quarters of 2011 and the first quarter of 2012, but has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. Treasury stated that it would reevaluate whether the quarterly commitment fee should be set in the second quarter of 2012. Absent Treasury waiving the commitment fee in the second quarter of 2012, this quarterly commitment fee will begin accruing on April 1, 2012 and must be paid each quarter for as long as the Purchase Agreement is in effect. The amount of the fee has not yet been determined and could be substantial.

Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all. The aggregate liquidation preference of the senior preferred stock and our related dividend obligations will increase further if we receive additional draws under the Purchase Agreement or if any dividends or quarterly commitment fees payable under the Purchase Agreement are not paid in cash. The amounts payable for dividends on the senior preferred stock are substantial and will have an adverse impact on our financial position and net worth.

The payment of dividends on our senior preferred stock in cash reduces our net worth. For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury. It is unlikely that, over the long-term, we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury, although we may experience period-to-period variability in earnings and comprehensive income. As a result, we expect to make additional draws in future periods.

The Purchase Agreement includes significant restrictions on our ability to manage our business, including limiting the amount of indebtedness we can incur and capping the size of our mortgage-related investments portfolio. While the senior preferred stock is outstanding, we are prohibited from paying dividends (other than on the senior preferred stock) or issuing equity securities without Treasury's consent.

The Purchase Agreement has an indefinite term and can terminate only in limited circumstances, which do not include the end of the conservatorship. The Purchase Agreement therefore could continue after the conservatorship ends. Treasury has the right to exercise the warrant, in whole or in part, at any time on or before September 7, 2028.

### Purchase Agreement Covenants

The Purchase Agreement provides that, until the senior preferred stock is repaid or redeemed in full, we may not, without the prior written consent of Treasury:

- declare or pay any dividend (preferred or otherwise) or make any other distribution with respect to any Freddie Mac equity securities (other than with respect to the senior preferred stock or warrant);

- redeem, purchase, retire or otherwise acquire any Freddie Mac equity securities (other than the senior preferred stock or warrant);

- sell or issue any Freddie Mac equity securities (other than the senior preferred stock, the warrant and the common stock issuable upon exercise of the warrant and other than as required by the terms of any binding agreement in effect on the date of the Purchase Agreement);

- terminate the conservatorship (other than in connection with a receivership);

- sell, transfer, lease or otherwise dispose of any assets, other than dispositions for fair market value: (a) to a limited life regulated entity (in the context of a receivership); (b) of assets and properties in the ordinary course of business, consistent with past practice; (c) in connection with our liquidation by a receiver; (d) of cash or cash equivalents for cash or cash equivalents; or (e) to the extent necessary to comply with the covenant described below relating to the reduction of our mortgage-related investments portfolio;

*Freddie Mac*

- issue any subordinated debt;

- enter into a corporate reorganization, recapitalization, merger, acquisition or similar event; or

- engage in transactions with affiliates unless the transaction is: (a) pursuant to the Purchase Agreement, the senior preferred stock or the warrant; (b) upon arm's length terms; or (c) a transaction undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence on the date of the Purchase Agreement.

The covenants also apply to our subsidiaries.

The Purchase Agreement also provides that we may not own mortgage assets with a UPB in excess of: (a) $900 billion on December 31, 2009; or (b) on December 31 of each year thereafter, 90% of the aggregate amount of mortgage assets we are permitted to own as of December 31 of the immediately preceding calendar year, provided that we are not required to own less than $250 billion in mortgage assets. Under the Purchase Agreement, we also may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are permitted to own on December 31 of the immediately preceding calendar year. The mortgage asset and indebtedness limitations are determined without giving effect to any change in the accounting guidance related to transfers of financial assets and consolidation of VIEs or any similar accounting guidance. Therefore, these limitations were not affected by our implementation of the changes to the accounting guidance for transfers of financial assets and consolidation of VIEs, under which we consolidated our single-family PCs and certain Other Guarantee Transactions in our financial statements as of January 1, 2010.

In addition, the Purchase Agreement provides that we may not enter into any new compensation arrangements or increase amounts or benefits payable under existing compensation arrangements of any named executive officer or other executive officer (as such terms are defined by SEC rules) without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury.

### Warrant Covenants

The warrant we issued to Treasury includes, among others, the following covenants: (a) our SEC filings under the Exchange Act will comply in all material respects as to form with the Exchange Act and the rules and regulations thereunder; (b) we may not permit any of our significant subsidiaries to issue capital stock or equity securities, or securities convertible into or exchangeable for such securities, or any stock appreciation rights or other profit participation rights; (c) we may not take any action that will result in an increase in the par value of our common stock; (d) we may not take any action to avoid the observance or performance of the terms of the warrant and we must take all actions necessary or appropriate to protect Treasury's rights against impairment or dilution; and (e) we must provide Treasury with prior notice of specified actions relating to our common stock, such as setting a record date for a dividend payment, granting subscription or purchase rights, authorizing a recapitalization, reclassification, merger or similar transaction, commencing a liquidation of the company or any other action that would trigger an adjustment in the exercise price or number or amount of shares subject to the warrant.

### Termination Provisions

The Purchase Agreement provides that the Treasury's funding commitment will terminate under any of the following circumstances: (a) the completion of our liquidation and fulfillment of Treasury's obligations under its funding commitment at that time; (b) the payment in full of, or reasonable provision for, all of our liabilities (whether or not contingent, including mortgage guarantee obligations); and (c) the funding by Treasury of the maximum amount of the commitment under the Purchase Agreement. In addition, Treasury may terminate its funding commitment and declare the Purchase Agreement null and void if a court vacates, modifies, amends, conditions, enjoins, stays or otherwise affects the appointment of the Conservator or otherwise curtails the Conservator's powers. Treasury may not terminate its funding commitment under the Purchase Agreement solely by reason of our being in conservatorship, receivership or other insolvency proceeding, or due to our financial condition or any adverse change in our financial condition.

### Waivers and Amendments

The Purchase Agreement provides that most provisions of the agreement may be waived or amended by mutual written agreement of the parties; however, no waiver or amendment of the agreement is permitted that would decrease Treasury's aggregate funding commitment or add conditions to Treasury's funding commitment if the waiver or amendment would adversely affect in any material respect the holders of our debt securities or Freddie Mac mortgage guarantee obligations.

FHFA 2932

*Third-party Enforcement Rights*

In the event of our default on payments with respect to our debt securities or Freddie Mac mortgage guarantee obligations, if Treasury fails to perform its obligations under its funding commitment and if we and/or the Conservator are not diligently pursuing remedies in respect of that failure, the holders of these debt securities or Freddie Mac mortgage guarantee obligations may file a claim in the United States Court of Federal Claims for relief requiring Treasury to fund to us the lesser of: (a) the amount necessary to cure the payment defaults on our debt and Freddie Mac mortgage guarantee obligations; and (b) the lesser of: (i) the deficiency amount; and (ii) the maximum amount of the commitment less the aggregate amount of funding previously provided under the commitment. Any payment that Treasury makes under those circumstances will be treated for all purposes as a draw under the Purchase Agreement that will increase the liquidation preference of the senior preferred stock.

### Impact of the Purchase Agreement and FHFA Regulation on the Mortgage-Related Investments Portfolio

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $729 billion as of December 31, 2011 and may not exceed $656.1 billion as of December 31, 2012. The UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation, was $653.3 billion at December 31, 2011. The annual 10% reduction in the size of our mortgage-related investments portfolio is calculated based on the maximum allowable size of the mortgage-related investments portfolio, rather than the actual UPB of the mortgage-related investments portfolio, as of December 31 of the preceding year. The limitation is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs.

### Government Support for our Business

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

Significant recent developments with respect to the support we received from the government during 2011 include the following:

- we received $8.0 billion in funding from Treasury under the Purchase Agreement in 2011, which increased the aggregate liquidation preference of the senior preferred stock to $72.2 billion as of December 31, 2011; and

- we paid dividends of $6.5 billion in cash on the senior preferred stock to Treasury at the direction of the Conservator.

To address our net worth deficit of $146 million at December 31, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $146 million, and will request that we receive these funds by March 31, 2012. Our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. Following funding of the draw request related to our net worth deficit at December 31, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $7.22 billion to $7.23 billion, which exceeds our annual historical earnings in all but one period.

Through December 31, 2011, we paid $16.5 billion in cash dividends in the aggregate on the senior preferred stock. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth. In addition, cash payment of quarterly commitment fees payable to Treasury will negatively impact our future net worth over the long-term. Treasury waived the fee for all quarters of 2011 and the first quarter of 2012. The amount of the fee has not yet been established and could be substantial. As a result of additional draws and other factors: (a) the liquidation preference of, and the dividends we owe on, the senior preferred stock would increase and, therefore, we may need additional draws from Treasury in order to pay our dividend obligations; and (b) there is significant uncertainty as to our long-term financial sustainability.

See "NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS" and "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" for more information on the terms of the conservatorship and the Purchase Agreement.

### Housing Finance Agency Initiative

On October 19, 2009, we entered into a Memorandum of Understanding with Treasury, FHFA, and Fannie Mae, which sets forth the terms under which Treasury and, as directed by FHFA, we and Fannie Mae, would provide assistance,

through three separate initiatives, to state and local HFAs so that the HFAs can continue to meet their mission of providing affordable financing for both single-family and multifamily housing. The parties agreed to certain modifications to the initiatives on November 23, 2011. FHFA directed us and Fannie Mae to participate in the HFA initiative on a basis that is consistent with the goals of being commercially reasonable and safe and sound. Treasury's participation in these assistance initiatives does not affect the amount of funding that Treasury can provide to Freddie Mac under the terms of the Purchase Agreement.

From October 19, 2009 to December 31, 2009, we, Treasury, Fannie Mae, and participating HFAs entered into definitive agreements setting forth the respective parties' obligations under this initiative. The initiatives are as follows:

- TCLFP — In December 2009, on a 50-50 pro rata basis, Freddie Mac and Fannie Mae agreed to provide $8.2 billion of credit and liquidity support, including outstanding interest at the date of the guarantee, for variable rate demand obligations, or VRDOs, previously issued by HFAs. This support was provided through the issuance of guarantees, which provide credit enhancement to the holders of such VRDOs and also create an obligation to provide funds to purchase any VRDOs that are put by their holders and are not remarketed. Treasury provided a credit and liquidity backstop on the TCLFP. These guarantees replaced existing liquidity facilities from other providers. The guarantees are scheduled to expire on or before December 31, 2012. However, Treasury has given TCLFP participants the option to extend their individual TCLFP facilities for an additional three years to December 31, 2015. This option must be exercised in 2012.

- NIBP — In December 2009, on a 50-50 pro rata basis, Freddie Mac and Fannie Mae agreed to issue in total $15.3 billion of partially guaranteed pass-through securities backed by new single-family and certain new multifamily housing bonds issued by HFAs. Treasury purchased all of the pass-through securities issued by Freddie Mac and Fannie Mae. This initiative provides financing for HFAs to issue new housing bonds.

Treasury will bear the initial losses of principal up to 35% of total principal for these two initiatives combined, and thereafter Freddie Mac and Fannie Mae each will be responsible only for losses of principal on the securities that it issues to the extent that such losses are in excess of 35% of all losses under both initiatives. Treasury will bear all losses of unpaid interest. Under both initiatives, we and Fannie Mae were paid fees at the time bonds were securitized and also will be paid ongoing fees.

The third initiative under the HFA initiative is described below:

- *Multifamily Credit Enhancement Initiative.*   Using existing housing bond credit enhancement products, Freddie Mac is providing a guarantee of new housing bonds issued by HFAs, which Treasury purchased from the HFAs. Treasury will not be responsible for a share of any losses incurred by us in this initiative.

### Related Parties as a Result of Conservatorship

As a result of our issuance to Treasury of the warrant to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding, on a fully diluted basis, we are deemed a related party to the U.S. government. Except for the transactions with Treasury discussed above in "Business Objectives," "Government Support for our Business" and "Housing Finance Agency Initiative" as well as in "NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS," and "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)," no transactions outside of normal business activities have occurred between us and the U.S. government during the year ended December 31, 2011. In addition, we are deemed related parties with Fannie Mae as both we and Fannie Mae have the same relationships with FHFA and Treasury. All transactions between us and Fannie Mae have occurred in the normal course of business.

### NOTE 3: VARIABLE INTEREST ENTITIES

We use securitization trusts in our securities issuance process, and are required to evaluate the trusts for consolidation on an ongoing basis. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Consolidation and Equity Method of Accounting" for further information regarding the consolidation of certain VIEs.

Based on our evaluation of whether we hold a controlling financial interest in these VIEs, we determined that we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions. Therefore, we consolidate on our balance sheet the assets and liabilities of these trusts. In addition to our PC trusts, we are involved with numerous other entities that meet the definition of a VIE, as discussed below.

**VIEs for which We are the Primary Beneficiary**

*Single-family PC Trusts*

Our single-family PC trusts issue pass-through securities that represent undivided beneficial interests in pools of mortgages held by these trusts. For our fixed-rate PCs, we guarantee the timely payment of interest and principal. For our ARM PCs, we guarantee the timely payment of the weighted average coupon interest rate for the underlying mortgage loans and the full and final payment of principal; we do not guarantee the timely payment of principal on ARM PCs. In exchange for providing this guarantee, we may receive a management and guarantee fee and up-front delivery fees. We issue most of our single-family PCs in transactions in which our customers exchange mortgage loans for PCs. We refer to these transactions as guarantor swaps.

PCs are designed so that we bear the credit risk inherent in the loans underlying the PCs through our guarantee of principal and interest payments on the PCs. The PC holders bear the interest rate or prepayment risk on the mortgage loans and the risk that we will not perform on our obligation as guarantor. For purposes of our consolidation assessments, our evaluation of power and economic exposure with regard to PC trusts focuses on credit risk because the credit performance of the underlying mortgage loans was identified as the activity that most significantly impacts the economic performance of these entities. We have the power to impact the activities related to this risk in our role as guarantor and master servicer.

Specifically, in our role as master servicer, we establish requirements for how mortgage loans are serviced and what steps are to be taken to avoid credit losses (*e.g.,* modification, foreclosure). Additionally, in our capacity as guarantor, we have the ability to remove defaulted mortgage loans out of the PC trust to help manage credit losses. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for further information regarding our removal of mortgage loans out of PC trusts. These powers allow us to direct the activities of the VIE (*i.e.,* the PC trust) that most significantly impact its economic performance. In addition, we determined that our guarantee to each PC trust to provide principal and interest payments obligates us to absorb losses that could potentially be significant to the PC trusts. Accordingly, we concluded that we are the primary beneficiary of our single-family PC trusts.

At December 31, 2011 and 2010, we were the primary beneficiary of, and therefore consolidated, single-family PC trusts with assets totaling $1.6 trillion and $1.7 trillion, respectively, as measured using the UPB of issued PCs. The assets of each PC trust can be used only to settle obligations of that trust. In connection with our PC trusts, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancement. We also have credit protection for certain of our PC trusts that issue PCs backed by loans or certificates of federal agencies (such as FHA, VA, and USDA). See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for additional information regarding third-party credit enhancements related to our PC trusts.

*Other Guarantee Transactions*

Other Guarantee Transactions are mortgage-related securities that we issue to third parties in exchange for non-Freddie Mac mortgage-related securities. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" for information on the nature of Other Guarantee Transactions. The degree to which our involvement with securitization trusts that issue Other Guarantee Transactions provides us with power to direct the activities that most significantly impact the economic performance of these VIEs (*e.g.,* the ability to direct the servicing of the underlying assets of these entities) and obligation to absorb losses that could potentially be significant to the VIEs (*e.g.,* the existence of third party credit enhancements) varies by transaction. For all Other Guarantee Transactions, our variable interest in these VIEs represents some form of credit guarantee, whether covering all the issued beneficial interests or only the most senior ones. The nature of our credit guarantee typically determines whether we have power over the activities that most significantly impact the economic performance of the VIE.

For those Other Guarantee Transactions where our credit guarantee is in a first loss position to absorb credit losses on the underlying assets of these entities as of the reporting date, we would also have the ability to direct servicing of the underlying assets, which is the power to direct the activities that most significantly impact the economic performance of these VIEs. As a result, we would be the primary beneficiary, and we would consolidate the VIE. For those Other Guarantee Transactions in which our credit guarantee is not in a first loss position to absorb credit losses on the underlying assets of these entities as of the reporting date (*i.e.,* our credit guarantee is in a secondary loss position), we would not have the ability to direct servicing of the underlying assets, so we would not be the primary beneficiary, and we would not consolidate the VIE.

*Freddie Mac*

Our consolidation determination took into consideration the specific facts and circumstances of our involvement with each of these entities. As a result, we have concluded that we are the primary beneficiary of certain Other Guarantee Transactions with underlying assets totaling $12.9 billion and $15.8 billion at December 31, 2011 and 2010, respectively. For those Other Guarantee Transactions that we do consolidate, the investors in these securities have recourse only to the assets of those VIEs.

*Consolidated VIEs*

The table below represents the carrying amounts and classification of the assets and liabilities of consolidated VIEs on our consolidated balance sheets.

**Table 3.1 — Assets and Liabilities of Consolidated VIEs**

| Consolidated Balance Sheets Line Item | December 31, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| Cash and cash equivalents | $ 2 | $ 1 |
| Restricted cash and cash equivalents | 27,675 | 7,514 |
| Federal funds sold and securities purchased under agreements to resell | — | 29,350 |
| Mortgage loans held-for-investment by consolidated trusts | 1,564,131 | 1,646,172 |
| Accrued interest receivable | 6,242 | 6,895 |
| Real estate owned, net | 60 | 118 |
| Other assets | 6,083 | 6,001 |
| Total assets of consolidated VIEs | $1,604,193 | $1,696,051 |
| Accrued interest payable | $ 5,943 | $ 6,502 |
| Debt securities of consolidated trusts held by third parties | 1,471,437 | 1,528,648 |
| Other liabilities | 3 | 172 |
| Total liabilities of consolidated VIEs | $1,477,383 | $1,535,322 |

**VIEs for which We are not the Primary Beneficiary**

The table below represents the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Our involvement with VIEs for which we are not the primary beneficiary generally takes one of two forms: (a) purchasing an investment in these entities; or (b) providing a guarantee to these entities. Our maximum exposure to loss for those VIEs in which we have purchased an investment is calculated as the maximum potential charge that we would recognize in earnings if that investment were to become worthless. This amount does not include other-than-temporary impairments or other write-downs that we previously recognized through earnings. Our maximum exposure to loss for those VIEs for which we have provided a guarantee represents the contractual amounts that could be lost under the guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements. We do not believe the maximum exposure to loss disclosed in the table below is representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation, including possible recoveries under credit enhancement arrangements.

**Table 3.2 — Variable Interests in VIEs for which We are not the Primary Beneficiary**

| | December 31, 2011 | | | | |
| | Asset-Backed Investment Trusts[1] | Mortgage-Related Security Trusts | | Unsecuritized Multifamily Loans[3] | Other[1][4] |
| | | Freddie Mac Securities[2] | Non-Freddie Mac Securities[1] | | |
| | | (in millions) | | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents. . . . . . . . . . . . . . . . . . . . . . . . . . | $ 447 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents. . . . . . . . . . . . . . . . . | — | 53 | — | 33 | 167 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value. . . . . . . . . . . . . . . . . . . . | — | 81,092 | 121,743 | — | — |
| Trading, at fair value . . . . . . . . . . . . . . . . . . . . . . . . | 302 | 16,047 | 15,473 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized . . . . . . . . . . . . . . . . | — | — | — | 72,295 | — |
| Held-for-sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | 9,710 | — |
| Accrued interest receivable . . . . . . . . . . . . . . . . . . . . . . . | — | 471 | 420 | 353 | 6 |
| Derivative assets, net . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | 1 |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 432 | 1 | 375 | 434 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net . . . . . . . . . . . . . . . . . . . . . . . | — | (1) | — | — | (42) |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (585) | — | (39) | (675) |
| **Maximum Exposure to Loss** | $ 749 | $36,438 | $153,620 | $ 82,766 | $11,198 |
| **Total Assets of Non-Consolidated VIEs[5]**. . . . . . . . . . . . . | $16,748 | $41,740 | $921,219 | $134,145 | $25,616 |
| | December 31, 2010 | | | | |
| | Asset-Backed Investment Trusts[1] | Mortgage-Related Security Trusts | | Unsecuritized Multifamily Loans[3] | Other[1][4] |
| | | Freddie Mac Securities[2] | Non-Freddie Mac Securities[1] | | |
| | | (in millions) | | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents. . . . . . . . . . . . . . . . . . . . . . . . . . | $ 9,909 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents. . . . . . . . . . . . . . . . . | — | 52 | — | 34 | 464 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value. . . . . . . . . . . . . . . . . . . . | — | 85,689 | 137,568 | — | — |
| Trading, at fair value . . . . . . . . . . . . . . . . . . . . . . . . | 44 | 13,437 | 18,914 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized . . . . . . . . . . . . . . . . | — | — | — | 78,448 | — |
| Held-for-sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | 6,413 | — |
| Accrued interest receivable . . . . . . . . . . . . . . . . . . . . . . . | — | 419 | 717 | 372 | 5 |
| Derivative assets, net . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | 2 |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 277 | 6 | 23 | 381 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net . . . . . . . . . . . . . . . . . . . . . . . | — | (2) | — | — | (41) |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (408) | (3) | (36) | (1,034) |
| **Maximum Exposure to Loss** | $ 9,953 | $26,392 | $ 176,533 | $ 85,290 | $11,375 |
| **Total Assets of Non-Consolidated VIEs[5]**. . . . . . . . . . . . . | $129,479 | $29,368 | $1,036,975 | $138,330 | $25,875 |

(1) For our involvement with non-consolidated asset-backed investment trusts, non-Freddie Mac security trusts and certain other VIEs where we do not provide a guarantee, our maximum exposure to loss is computed as the carrying amount if the security is classified as trading or the amortized cost if the security is classified as available-for-sale for our investments and related assets recorded on our consolidated balance sheets, including any unrealized amounts recorded in AOCI for securities classified as available-for-sale.

(2) Freddie Mac securities include our variable interests in single-family multiclass REMICs and Other Structured Securities, multifamily PCs, multifamily Other Structured Securities, and Other Guarantee Transactions that we do not consolidate. For our variable interests in non-consolidated Freddie Mac security trusts for which we have provided a guarantee, our maximum exposure to loss is the outstanding UPB of the underlying mortgage loans or securities that we have guaranteed, which is the maximum contractual amount under such guarantees. However, our investments in single-family REMICs and Other Structured Securities that are not consolidated do not give rise to any additional exposure to credit loss as we already consolidate the underlying collateral.

(3) For unsecuritized multifamily loans, our maximum exposure to loss is based on the UPB of these loans, as adjusted for loan level basis adjustments, any associated allowance for loan losses, accrued interest receivable, and fair value adjustments on held-for-sale loans.

(4) For other non-consolidated VIEs where we have provided a guarantee, our maximum exposure to loss is the contractual amount that could be lost under the guarantee if the counterparty or borrower defaulted, without consideration of possible recoveries under credit enhancement arrangements.

(5) Represents the remaining UPB of assets held by non-consolidated VIEs using the most current information available, where our continuing involvement is significant. We do not include the assets of our non-consolidated trusts related to single-family REMICs and Other Structured Securities in this amount as we already consolidate the underlying collateral of these trusts on our consolidated balance sheets.

### Asset-Backed Investment Trusts

We invest in a variety of short-term non-mortgage-related, asset-backed investment trusts. These short-term investments represent interests in trusts consisting of a pool of receivables or other financial assets, typically credit card receivables, auto loans, or student loans. These trusts act as vehicles to allow originators to securitize assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters

of the securities offering create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our asset-backed investments.

At December 31, 2011 and 2010, we had investments in 11 and 23 asset-backed investment trusts in which we had a variable interest but were not considered the primary beneficiary, respectively. Our investments in these asset-backed investment trusts as of December 31, 2011 were made in 2011. At both December 31, 2011 and 2010, we were not the primary beneficiary of any such trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. As such, our investments in these asset-backed investment trusts are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES." Our investments in these trusts totaled $0.7 billion and $10.0 billion as of December 31, 2011 and 2010, respectively, and are included as cash and cash equivalents, available-for-sale securities or trading securities on our consolidated balance sheets. At both December 31, 2011 and 2010, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment.

### Mortgage-Related Security Trusts

#### Freddie Mac Securities

Freddie Mac securities related to our variable interests in non-consolidated VIEs primarily consist of our REMICs and Other Structured Securities and Other Guarantee Transactions. REMICs and Other Structured Securities are created by using PCs or previously issued REMICs and Other Structured Securities as collateral. Our involvement with the resecuritization trusts that issue these securities does not provide us with rights to receive benefits or obligations to absorb losses nor does it provide any power that would enable us to direct the most significant activities of these VIEs because the ultimate underlying assets are PCs for which we have already provided a guarantee (*i.e.*, all significant rights, obligations and powers are associated with the underlying PC trusts). As a result, we have concluded that we are not the primary beneficiary of these resecuritization trusts.

Other Guarantee Transactions are created by using non-Freddie Mac mortgage-related securities as collateral. At both December 31, 2011 and 2010, our involvement with certain Other Guarantee Transactions does not provide us with the power to direct the activities that most significantly impact the economic performance of these VIEs. As a result, we hold a variable interest in, but are not the primary beneficiary of, certain Other Guarantee Transactions.

For non-consolidated REMICs and Other Structured Securities and Other Guarantee Transactions, our investments are primarily included in either available-for-sale securities or trading securities on our consolidated balance sheets. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" for additional information on accounting for purchases of PCs and beneficial interests issued by resecuritization trusts. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

#### Non-Freddie Mac Securities

We invest in a variety of mortgage-related securities issued by third-parties, including non-Freddie Mac agency securities, CMBS, other private-label securities backed by various mortgage-related assets, and obligations of states and political subdivisions. These investments typically represent interests in trusts that consist of a pool of mortgage-related assets and act as vehicles to allow originators to securitize those assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the securities offering create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our non-Freddie Mac securities.

Our investments in these non-Freddie Mac securities at December 31, 2011 were made between 1994 and 2011. We are not generally the primary beneficiary of non-Freddie Mac securities trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. We were not the primary beneficiary of any significant non-Freddie Mac securities trusts as of December 31, 2011 and 2010. Our investments in non-consolidated non-Freddie Mac mortgage-related securities are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES." At both December 31, 2011 and 2010, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

*Unsecuritized Multifamily Loans*

We purchase loans made to various multifamily real estate entities. We primarily purchase such loans for securitization, and to a lesser extent, investment purposes. These real estate entities are primarily single-asset entities (typically partnerships or limited liability companies) established to acquire, construct, rehabilitate, or refinance residential properties, and subsequently to operate the properties as residential rental real estate. The loans we acquire usually are, at origination, equal to 80% or less of the value of the related underlying property. The remaining 20% of value is typically funded through equity contributions by the partners or members of the borrower entity. In certain cases, the 20% not funded through the loan we acquire also includes subordinate loans or mezzanine financing from third-party lenders.

We held more than 7,000 unsecuritized multifamily loans at both December 31, 2011 and 2010. The UPB of our investments in these loans was $82.3 billion and $85.9 billion as of December 31, 2011 and 2010, respectively, and was included in unsecuritized held-for-investment mortgage loans, at amortized cost, and held-for-sale mortgage loans at fair value on our consolidated balance sheets. We are not generally the primary beneficiary of the multifamily real estate borrowing entities because the loans we acquire are passive in nature and do not provide us with the power to direct the activities of these entities that most significantly impact their economic performance. However, when a multifamily loan becomes delinquent, we may become the primary beneficiary of the borrowing entity depending upon the structure of this entity and the rights granted to us under the governing legal documents. At both December 31, 2011 and 2010, the amount of unsecuritized multifamily loans for which we could be considered the primary beneficiary of the underlying borrowing entity was not material. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for more information.

*Other*

Our involvement with other VIEs includes our investments in LIHTC partnerships, certain other mortgage-related guarantees, and certain short-term default and other guarantee commitments that we account for as derivatives:

- *Investments in LIHTC Partnerships:*   We hold equity investments in various LIHTC partnerships that invest in lower-tier or project partnerships that are single asset entities. In February 2010, the Acting Director of FHFA, after consultation with Treasury, informed us that we may not sell or transfer our investments in LIHTC assets and that he sees no other disposition options. As a result, we wrote down the carrying value of our LIHTC investments to zero as of December 31, 2009, as we will not be able to realize any value from these investments either through reductions to our taxable income and related tax liabilities or through a sale to a third party.

- *Certain other mortgage-related guarantees:*   We have other guarantee commitments outstanding on multifamily housing revenue bonds that were issued by third parties. As part of certain other mortgage-related guarantees, we also provide commitments to advance funds, commonly referred to as "liquidity guarantees," which require us to advance funds to enable third parties to purchase variable-rate multifamily housing revenue bonds, or certificates backed by such bonds, that cannot be remarketed within five business days after they are tendered by their holders.

- *Certain short-term default and other guarantee commitments accounted for as derivatives*:   Our involvement in these VIEs includes our guarantee of the performance of interest-rate swap contracts in certain circumstances and credit derivatives we issued to guarantee the payments on multifamily loans or securities.

At December 31, 2011 and 2010, we were the primary beneficiary of one and three, respectively, real estate entities that invest in credit-enhanced multifamily housing revenue bonds that were not deemed to be material. We were not the primary beneficiary of the remainder of other VIEs because our involvement in these VIEs is passive in nature and does not provide us with the power to direct the activities of the VIEs that most significantly impact their economic performance. See Table 3.2 for the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Also see "NOTE 9: FINANCIAL GUARANTEES" for additional information about our involvement with the VIEs related to mortgage-related guarantees and short-term default and other guarantee commitments discussed above.

## NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES

We own both single-family mortgage loans, which are secured by one to four family residential properties, and multifamily mortgage loans, which are secured by properties with five or more residential rental units. For a discussion of our significant accounting policies regarding our mortgage loans and loan loss reserves, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES."

*Freddie Mac*

The table below summarizes the types of loans on our consolidated balance sheets as of December 31, 2011 and 2010.

### Table 4.1 — Mortgage Loans

| | December 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Unsecuritized | Held by Consolidated Trusts | Total | Unsecuritized | Held by Consolidated Trusts | Total |
| | | | (in millions) | | | |
| **Single-family:**[1] | | | | | | |
| Fixed-rate | | | | | | |
| Amortizing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $153,177 | $1,418,751 | $1,571,928 | $126,561 | $1,493,206 | $1,619,767 |
| Interest-only . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,184 | 14,758 | 17,942 | 4,161 | 19,616 | 23,777 |
| Total fixed-rate . . . . . . . . . . . . . . . . . . . . . . | 156,361 | 1,433,509 | 1,589,870 | 130,722 | 1,512,822 | 1,643,544 |
| Adjustable-rate | | | | | | |
| Amortizing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,428 | 68,362 | 71,790 | 3,625 | 59,851 | 63,476 |
| Interest-only . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,376 | 43,655 | 54,031 | 13,018 | 58,792 | 71,810 |
| Total adjustable-rate . . . . . . . . . . . . . . . . . | 13,804 | 112,017 | 125,821 | 16,643 | 118,643 | 135,286 |
| Other Guarantee Transactions backed by non-Freddie Mac securities . . . . . . . . . . . . . . . . . . . . . . . . | — | 12,776 | 12,776 | — | 15,580 | 15,580 |
| FHA/VA and other governmental . . . . . . . . . . . . . | 1,494 | 3,254 | 4,748 | 1,498 | 3,348 | 4,846 |
| Total single-family . . . . . . . . . . . . . . . . . . . . . . | 171,659 | 1,561,556 | 1,733,215 | 148,863 | 1,650,393 | 1,799,256 |
| **Multifamily:**[1] | | | | | | |
| Fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 69,647 | — | 69,647 | 72,679 | — | 72,679 |
| Adjustable-rate . . . . . . . . . . . . . . . . . . . . . . . . . | 12,661 | — | 12,661 | 13,201 | — | 13,201 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | — | 3 | 3 | — | 3 |
| Total multifamily . . . . . . . . . . . . . . . . . . . . . . | 82,311 | — | 82,311 | 85,883 | — | 85,883 |
| Total UPB of mortgage loans . . . . . . . . . . . . . . . . . | 253,970 | 1,561,556 | 1,815,526 | 234,746 | 1,650,393 | 1,885,139 |
| Deferred fees, unamortized premiums, discounts and other cost basis adjustments . . . . . . . . . . . . . . . | (6,125) | 10,926 | 4,801 | (7,665) | 7,423 | (242) |
| Lower of cost or fair value adjustments on loans held-for-sale[2] . . . . . . . . . . . . . . . . . . . . . . . . . | 195 | — | 195 | (311) | — | (311) |
| Allowance for loan losses on mortgage loans held-for-investment . . . . . . . . . . . . . . . . . . . . . . . . . | (30,912) | (8,351) | (39,263) | (28,047) | (11,644) | (39,691) |
| Total mortgage loans, net . . . . . . . . . . . . . . . . . . | $217,128 | $1,564,131 | $1,781,259 | $198,723 | $1,646,172 | $1,844,895 |
| **Mortgage loans, net:** | | | | | | |
| Held-for-investment . . . . . . . . . . . . . . . . . . . . . . | $207,418 | $1,564,131 | $1,771,549 | $192,310 | $1,646,172 | $1,838,482 |
| Held-for-sale . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9,710 | — | 9,710 | 6,413 | — | 6,413 |
| Total mortgage loans, net . . . . . . . . . . . . . . . . . . | $217,128 | $1,564,131 | $1,781,259 | $198,723 | $1,646,172 | $1,844,895 |

(1) Based on UPB and excluding mortgage loans traded, but not yet settled.
(2) Consists of fair value adjustments associated with mortgage loans for which we have made a fair value election.

During 2011 and 2010, we purchased $316.3 billion and $380.7 billion, respectively, in UPB of single-family mortgage loans and $2.7 billion and $3.2 billion, respectively, in UPB of multifamily loans that were classified as held-for-investment at purchase. Our sales of multifamily mortgage loans occur primarily through the issuance of multifamily Other Guarantee Transactions. See "NOTE 9: FINANCIAL GUARANTEES" for more information. We did not sell a significant amount of held-for-investment loans during 2011. We did not have significant reclassifications of mortgage loans into held-for-sale in 2011.

### Credit Quality of Mortgage Loans

We evaluate the credit quality of single-family loans using different criteria than the criteria we use to evaluate multifamily loans. The current LTV ratio is one key factor we consider when estimating our loan loss reserves for single-family loans. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and, based upon historical information, is more likely to default than other borrowers due to limits in the ability to sell or refinance. A second lien mortgage also reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of December 31, 2011 and 2010, approximately 15% and 14%, respectively, of loans in our single-family credit guarantee portfolio had second lien financing by third parties at the time of origination of the first mortgage, and we estimate that these loans comprised 17% and 19%, respectively, of our seriously delinquent loans, based on UPB. However, borrowers are free to obtain second lien financing after origination, and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien

mortgages. For further information about concentrations of risk associated with our single-family and multifamily mortgage loans, see "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS."

The table below presents information on the estimated current LTV ratios of single-family loans on our consolidated balance sheets, all of which are held-for-investment. Our current LTV ratio estimates are based on available data through December of each year presented.

### Table 4.2 — Recorded Investment of Held-For-Investment Mortgage Loans, by LTV Ratio

| | As of December 31, 2011 | | | | As of December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Estimated Current LTV Ratio[1] | | | | Estimated Current LTV Ratio[1] | | | |
| | <= 80 | >80 to 100 | > 100[2] | Total | <= 80 | >80 to 100 | > 100[2] | Total |
| | (in millions) | | | | | | | |
| Single-family loans: | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[3] . . . . . . | $641,698 | $383,320 | $247,468 | $1,272,486 | $ 704,882 | $393,853 | $216,388 | $1,315,123 |
| 15-year amortizing fixed-rate . . . . | 238,287 | 18,280 | 2,966 | 259,533 | 233,422 | 16,432 | 2,523 | 252,377 |
| Adjustable-rate[3][4] . . . . . . . . . . | 43,728 | 13,826 | 9,180 | 66,734 | 34,252 | 13,273 | 9,149 | 56,674 |
| Alt-A, interest-only, and option ARM[5] . . . . . . . . . . . . . . . . | 30,589 | 29,251 | 79,418 | 139,258 | 45,068 | 44,540 | 85,213 | 174,821 |
| Total single-family loans . . . . . . . . | $954,302 | $444,677 | $339,032 | 1,738,011 | $1,017,624 | $468,098 | $313,273 | 1,798,995 |
| Multifamily loans . . . . . . . . . . . . . | | | | 72,801 | | | | 79,178 |
| Total recorded investment of held-for-investment loans . . . . . . . . . . | | | | $1,810,812 | | | | $1,878,173 |

(1) The current LTV ratios are management estimates, which are updated on a monthly basis. Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since that time. The value of a property at origination is based on the sales price for purchase mortgages and third-party appraisal for refinance mortgages. Changes in market value are derived from our internal index which measures price changes for repeat sales and refinancing activity on the same properties using Freddie Mac and Fannie Mae single-family mortgage acquisitions, including foreclosure sales. Estimates of the current LTV ratio include the credit-enhanced portion of the loan and exclude any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.
(2) The serious delinquency rate for the total of single-family mortgage loans with estimated current LTV ratios in excess of 100% was 12.8% and 14.9% as of December 31, 2011 and December 31, 2010, respectively.
(3) The majority of our loan modifications result in new terms that include fixed interest rates after modification. However, our HAMP loan modifications result in an initial interest rate that subsequently adjusts to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate for presentation even though they have a rate adjustment provision, because the change in rate is determined at the time of the modification rather than at a future date.
(4) Includes balloon/reset mortgage loans and excludes option ARMs.
(5) We discontinued purchases of Alt-A loans on March 1, 2009 (or later, as customers' contracts permitted), and interest-only loans effective September 1, 2010, and have not purchased option ARM loans since 2007. Modified loans within the Alt-A category remain as such, even though the borrower may have provided full documentation of assets and income to complete the modification. Modified loans within the option ARM category remain as such even though the modified loan no longer provides for optional payment provisions.

For information about the payment status of single-family and multifamily mortgage loans, including the amount of such loans we deem impaired, see "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS." For a discussion of certain indicators of credit quality for the multifamily loans on our consolidated balance sheets, see "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS — Multifamily Mortgage Portfolio."

### Allowance for Loan Losses and Reserve for Guarantee Losses, or Loan Loss Reserve

We maintain an allowance for loan losses on mortgage loans that we classify as held-for-investment on our consolidated balance sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage-related securities backed by multifamily loans, certain single-family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risk.

The table below summarizes loan loss reserve activity.

**Table 4.3 — Detail of Loan Loss Reserves**

| | Year Ended December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2011 | | | | 2010 | | | |
| | Allowance for Loan Losses | | Reserve for Guarantee Losses[1] | Total | Allowance for Loan Losses | | Reserve for Guarantee Losses[1] | Total |
| | Unsecuritized | Held By Consolidated Trusts | | | Unsecuritized | Held By Consolidated Trusts | | |
| | (in millions) | | | | | | | |
| *Single-family:* | | | | | | | | |
| Beginning balance . . . . . . . . | $ 27,317 | $ 11,644 | $137 | $ 39,098 | $    693 | $     — | $ 32,333 | $ 33,026 |
| Adjustments to beginning balance[2] . . . . . . . . . . . | — | — | — | — | — | 32,006 | (32,192) | (186) |
| Provision for credit losses . . . | 2,796 | 8,059 | 43 | 10,898 | 7,532 | 9,540 | 47 | 17,119 |
| Charge-offs[3] . . . . . . . . . . . | (13,756) | (970) | (9) | (14,735) | (12,856) | (3,351) | (11) | (16,218) |
| Recoveries[3] . . . . . . . . . . . | 2,618 | 146 | — | 2,764 | 2,647 | 715 | — | 3,362 |
| Transfers, net[4][5] . . . . . . . . | 11,431 | (10,528) | (12) | 891 | 29,301 | (27,266) | (40) | 1,995 |
| Ending balance . . . . . . . . . . | $ 30,406 | $  8,351 | $159 | $ 38,916 | $ 27,317 | $ 11,644 | $    137 | $ 39,098 |
| *Multifamily:* | | | | | | | | |
| Beginning balance . . . . . . . . | $    730 | $     — | $ 98 | $    828 | $    748 | $     — | $    83 | $    831 |
| Provision (benefit) for credit losses . . . . . . . . . . . . . . . | (152) | — | (44) | (196) | 84 | — | 15 | 99 |
| Charge-offs[3] . . . . . . . . . . | (73) | — | (2) | (75) | (103) | — | (1) | (104) |
| Recoveries[3] . . . . . . . . . . . | 1 | — | — | 1 | 1 | — | — | 1 |
| Transfers, net[5] . . . . . . . . . | — | — | (13) | (13) | — | — | 1 | 1 |
| Ending balance . . . . . . . . . . | $    506 | $     — | $ 39 | $    545 | $    730 | $     — | $    98 | $    828 |
| *Total:* | | | | | | | | |
| Beginning balance . . . . . . . . | $ 28,047 | $ 11,644 | $235 | $ 39,926 | $  1,441 | $     — | $ 32,416 | $ 33,857 |
| Adjustments to beginning balance[2] . . . . . . . . . . . | — | — | — | — | — | 32,006 | (32,192) | (186) |
| Provision for credit losses . . . | 2,644 | 8,059 | (1) | 10,702 | 7,616 | 9,540 | 62 | 17,218 |
| Charge-offs[3] . . . . . . . . . . . | (13,829) | (970) | (11) | (14,810) | (12,959) | (3,351) | (12) | (16,322) |
| Recoveries[3] . . . . . . . . . . . | 2,619 | 146 | — | 2,765 | 2,648 | 715 | — | 3,363 |
| Transfers, net[4][5] . . . . . . . . | 11,431 | (10,528) | (25) | 878 | 29,301 | (27,266) | (39) | 1,996 |
| Ending balance . . . . . . . . . . | $ 30,912 | $  8,351 | $198 | $ 39,461 | $ 28,047 | $ 11,644 | $    235 | $ 39,926 |
| Total loan loss reserve as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities . . | | | | 2.08% | | | | 2.03% |

(1) All of these loans are collectively evaluated for impairments. Our reserve for guarantee losses is included in other liabilities.

(2) Adjustments relate to the adoption of amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Adopted Accounting Guidance" for further information.

(3) Charge-offs represent the amount of a loan that has been discharged to remove the loan from our consolidated balance sheet principally due to either foreclosure transfers or short sales. Charge-offs exclude $422 million and $528 million for the years ended December 31, 2011 and 2010, respectively, related to certain loans purchased under financial guarantees and recorded as losses on loans purchased within other expenses on our consolidated statements of income and comprehensive income. We record charge-offs and recoveries on loans held by consolidated trusts when a loss event (such as a foreclosure transfer or foreclosure alternative) occurs on a loan while it remains in a consolidated trust. Recoveries of charge-offs primarily result from foreclosure alternatives and REO acquisitions on loans where: (a) a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements; or (b) we received a reimbursement of our losses from a seller/servicer associated with a repurchase request on a loan that experienced a foreclosure transfer or a foreclosure alternative.

(4) In February 2010, we began the practice of removing substantially all 120 days or more delinquent single-family mortgage loans from our PC trusts. We removed $44.1 billion and $127.5 billion in UPB of loans from PC trusts during the years ended December 31, 2011 and 2010, respectively. As a result, loan loss reserves associated with loans removed from PC trusts were transferred from the allowance for loan losses — held by consolidated trusts into the allowance for loan losses — unsecuritized.

(5) For the years ended December 31, 2011 and 2010, consists of: (a) approximately $10.5 billion and $27.5 billion, respectively, of reclassified single-family reserves related to our removal of loans previously held by consolidated trusts (as discussed in endnote (4) above); (b) approximately $1.1 billion and $1.1 billion, respectively, attributable to recapitalization of past due interest on modified mortgage loans; (c) $(258) million and $757 million, respectively, related to agreements with seller/servicers where the transfer relates to recoveries received under these agreements to compensate us for estimated credit losses; and (d) $48 million and $100 million, respectively, of other transfers.

*Freddie Mac*

The table below presents our allowance for loan losses and our recorded investment in mortgage loans, held-for-investment, by impairment evaluation methodology.

### Table 4.4 — Net Investment in Mortgage Loans

| | December 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Single-family | Multifamily | Total | Single-family | Multifamily | Total |
| | | | (in millions) | | | |
| *Recorded investment:* | | | | | | |
| Collectively evaluated | $1,677,974 | $70,131 | $1,748,105 | $1,762,490 | $76,541 | $1,839,031 |
| Individually evaluated | 60,037 | 2,670 | 62,707 | 36,505 | 2,637 | 39,142 |
| Total recorded investment | 1,738,011 | 72,801 | 1,810,812 | 1,798,995 | 79,178 | 1,878,173 |
| *Ending balance of the allowance for loan losses:* | | | | | | |
| Collectively evaluated | (23,657) | (260) | (23,917) | (30,477) | (382) | (30,859) |
| Individually evaluated | (15,100) | (246) | (15,346) | (8,484) | (348) | (8,832) |
| Total ending balance of the allowance | (38,757) | (506) | (39,263) | (38,961) | (730) | (39,691) |
| Net investment in mortgage loans | $1,699,254 | $72,295 | $1,771,549 | $1,760,034 | $78,448 | $1,838,482 |

A significant number of unsecuritized single-family mortgage loans on our consolidated balance sheets are individually evaluated for impairment and substantially all single-family mortgage loans held by our consolidated trusts are collectively evaluated for impairment. The ending balance of the allowance for loan losses associated with our held-for-investment unsecuritized mortgage loans represented approximately 13.0% and 12.7% of the recorded investment in such loans at December 31, 2011 and 2010, respectively. The ending balance of the allowance for loan losses associated with mortgage loans held by our consolidated trusts represented approximately 0.5% and 0.7% of the recorded investment in such loans as of December 31, 2011 and 2010, respectively.

### Credit Protection and Other Forms of Credit Enhancement

In connection with many of our mortgage loans held-for-investment and other mortgage-related guarantees, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancements.

The table below presents the UPB of loans on our consolidated balance sheets or underlying our financial guarantees with credit protection and the maximum amounts of potential loss recovery by type of credit protection.

### Table 4.5 — Recourse and Other Forms of Credit Protection[1]

| | UPB at | | Maximum Coverage[2] at | |
|---|---|---|---|---|
| | December 31, 2011 | December 31, 2010 | December 31, 2011 | December 31, 2010 |
| | | (in millions) | | |
| Single-family: | | | | |
| Primary mortgage insurance | $198,007 | $217,133 | $48,741 | $52,899 |
| Lender recourse and indemnifications | 8,798 | 10,064 | 8,453 | 9,566 |
| Pool insurance[3] | 26,754 | 37,868 | 1,855 | 2,687 |
| HFA indemnification[4] | 8,637 | 9,322 | 3,023 | 3,263 |
| Subordination[5] | 3,281 | 3,889 | 647 | 825 |
| Other credit enhancements | 133 | 223 | 99 | 118 |
| Total | $245,610 | $278,499 | $62,818 | $69,358 |
| Multifamily: | | | | |
| HFA indemnification[4] | $ 1,331 | $ 1,551 | $ 466 | $ 543 |
| Subordination[5] | 23,636 | 12,252 | 3,359 | 1,414 |
| Other credit enhancements | 8,334 | 9,004 | 2,554 | 2,930 |
| Total | $ 33,301 | $ 22,807 | $ 6,379 | $ 4,887 |

(1) Includes the credit protection associated with unsecuritized mortgage loans, loans held by our consolidated trusts as well as our non-consolidated mortgage guarantees and excludes FHA/VA and other governmental loans. Except for subordination coverage, these amounts exclude credit protection associated with $16.6 billion and $19.8 billion in UPB of single-family loans underlying Other Guarantee Transactions as of December 31, 2011 and December 31, 2010, respectively, for which the information was not available.

(2) Except for subordination, this represents the remaining amount of loss recovery that is available subject to terms of counterparty agreements.

(3) Maximum coverage amounts presented have been limited to the remaining UPB at period end. Prior period amounts have been revised to conform to current period presentation. Excludes approximately $13.5 billion and $19.7 billion in UPB at December 31, 2011 and 2010, respectively, where the related loans are also covered by primary mortgage insurance.

(4) Represents the amount of potential reimbursement of losses on securities we have guaranteed that are backed by state and local HFA bonds, under which Treasury bears initial losses on these securities up to 35% of those issued under the HFA initiative on a combined basis. Treasury will also bear losses of unpaid interest.

(5) Represents Freddie Mac issued mortgage-related securities with subordination protection, excluding those backed by HFA bonds. Excludes mortgage-related securities where subordination coverage was exhausted or maximum coverage amounts were limited to the remaining UPB at that date. Prior period amounts have been revised to conform to current period presentation.

Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. Pool insurance contracts generally provide insurance on a group, or pool, of mortgage loans up to a stated aggregate loss limit. We did not buy pool insurance in 2011 or 2010. In recent periods, we also reached the maximum limit of recovery on certain of these contracts. For information about counterparty risk associated with mortgage insurers, see "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS — Mortgage Insurers."

We also have credit protection for certain of the mortgage loans on our consolidated balance sheets that are covered by insurance or partial guarantees issued by federal agencies (such as FHA, VA, and USDA). The total UPB of these loans was $4.7 billion and $4.8 billion as of December 31, 2011 and 2010, respectively.

## NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS

### Individually Impaired Loans

Individually impaired single-family loans include performing and non-performing TDRs, as well as loans acquired under our financial guarantees with deteriorated credit quality. Individually impaired multifamily loans include TDRs, loans three monthly payments or more past due, and loans that are impaired based on management judgment. For a discussion of our significant accounting policies regarding impaired and non-performing loans, which are applied consistently for multifamily loans and single-family loan classes, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES."

Total loan loss reserves consist of a specific valuation allowance related to individually impaired mortgage loans, and a general reserve for other probable incurred losses. Our recorded investment in individually impaired mortgage loans and the related specific valuation allowance are summarized in the table below by product class (for single-family loans).

### Table 5.1 — Individually Impaired Loans

| | Balance at December 31, 2011 | | | | For The Year Ended December 31, 2011 | |
| --- | --- | --- | --- | --- | --- | --- |
| | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | Interest Income Recognized |
| | | | (in millions) | | | |
| Single-family — | | | | | | |
| *With no specific allowance recorded* [1]: | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] . . . . . . . . . . . | $ 7,073 | $ 3,200 | $ — | $ 3,200 | $ 3,352 | $ 336 |
| 15-year amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . . . . . . . | 57 | 23 | — | 23 | 26 | 7 |
| Adjustable rate[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 | 6 | — | 6 | 7 | 1 |
| Alt-A, interest-only, and option ARM[4] . . . . . . . . . . . . . . . | 1,987 | 881 | — | 881 | 940 | 72 |
| Total with no specific allowance recorded . . . . . . . . . . . . . . . . . | 9,130 | 4,110 | — | 4,110 | 4,325 | 416 |
| *With specific allowance recorded:*[5] | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] . . . . . . . . . . . | 44,672 | 43,533 | (11,253) | 32,280 | 35,707 | 889 |
| 15-year amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . . . . . . . | 367 | 347 | (43) | 304 | 230 | 12 |
| Adjustable rate[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 280 | 268 | (59) | 209 | 155 | 5 |
| Alt-A, interest-only, and option ARM[4] . . . . . . . . . . . . . . . | 12,103 | 11,779 | (3,745) | 8,034 | 9,391 | 173 |
| Total with specific allowance recorded . . . . . . . . . . . . . . . . . . . | 57,422 | 55,927 | (15,100) | 40,827 | 45,483 | 1,079 |
| *Combined single-family:* | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] . . . . . . . . . . . | 51,745 | 46,733 | (11,253) | 35,480 | 39,059 | 1,225 |
| 15-year amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . . . . . . . | 424 | 370 | (43) | 327 | 256 | 19 |
| Adjustable rate[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 293 | 274 | (59) | 215 | 162 | 6 |
| Alt-A, interest-only, and option ARM[4] . . . . . . . . . . . . . . . | 14,090 | 12,660 | (3,745) | 8,915 | 10,331 | 245 |
| Total single-family[6] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $66,552 | $60,037 | $(15,100) | $44,937 | $49,808 | $1,495 |
| Multifamily — | | | | | | |
| *With no specific allowance recorded* [7] . . . . . . . . . . . . . . . . . | $ 1,049 | $ 1,044 | $ — | $ 1,044 | $ 1,427 | $ 65 |
| *With specific allowance recorded* . . . . . . . . . . . . . . . . . . . . . | 1,644 | 1,626 | (246) | 1,380 | 1,920 | 81 |
| Total multifamily . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 2,693 | $ 2,670 | $ (246) | $ 2,424 | $ 3,347 | $ 146 |
| Total single-family and multifamily . . . . . . . . . . . . . . . . . . . . . | $69,245 | $62,707 | $(15,346) | $47,361 | $53,155 | $1,641 |

| | Balance at December 31, 2010 | | | | For The Year Ended December 31, 2010 | |
|---|---|---|---|---|---|---|
| | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | Interest Income Recognized |
| | (in millions) | | | | | |
| **Single-family —** | | | | | | |
| *With no specific allowance recorded* [1]: | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] . . . . . . . . . . . | $ 8,462 | $ 3,721 | $ — | $ 3,721 | $ 4,046 | $ 521 |
| 15-year amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . . . . . . . | 119 | 50 | — | 50 | 58 | 7 |
| Adjustable rate[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 | 9 | — | 9 | 12 | 1 |
| Alt-A, interest-only, and option ARM[4] . . . . . . . . . . . . . . . . . | 2,525 | 1,098 | — | 1,098 | 1,220 | 114 |
| Total with no specific allowance recorded . . . . . . . . . . . . . . . . . | 11,126 | 4,878 | — | 4,878 | 5,336 | 643 |
| *With specific allowance recorded:*[5] | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] . . . . . . . . . . . | 25,504 | 24,502 | (6,283) | 18,219 | 15,128 | 561 |
| 15-year amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . . . . . . . | 229 | 198 | (17) | 181 | 175 | 10 |
| Adjustable rate[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 168 | 153 | (23) | 130 | 114 | 5 |
| Alt-A, interest-only, and option ARM[4] . . . . . . . . . . . . . . . . . | 7,035 | 6,774 | (2,161) | 4,613 | 3,753 | 116 |
| Total with specific allowance recorded . . . . . . . . . . . . . . . . . . . . | 32,936 | 31,627 | (8,484) | 23,143 | 19,170 | $ 692 |
| *Combined single-family:* | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] . . . . . . . . . . . | 33,966 | 28,223 | (6,283) | 21,940 | 19,174 | 1,082 |
| 15-year amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . . . . . . . | 348 | 248 | (17) | 231 | 233 | 17 |
| Adjustable rate[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 188 | 162 | (23) | 139 | 126 | 6 |
| Alt-A, interest-only, and option ARM[4] . . . . . . . . . . . . . . . . . | 9,560 | 7,872 | (2,161) | 5,711 | 4,973 | 230 |
| Total single-family[6] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $44,062 | $36,505 | $(8,484) | $28,021 | $24,506 | $1,335 |
| **Multifamily —** | | | | | | |
| *With no specific allowance recorded* [7] . . . . . . . . . . . . . . . . . . | $ 734 | $ 729 | $ — | $ 729 | $ 847 | $ 33 |
| *With specific allowance recorded* . . . . . . . . . . . . . . . . . . . . . . . | 1,927 | 1,908 | (348) | 1,560 | 2,112 | 74 |
| Total multifamily . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 2,661 | $ 2,637 | $ (348) | $ 2,289 | $ 2,959 | $ 107 |
| Total single-family and multifamily . . . . . . . . . . . . . . . . . . . . . | $46,723 | $39,142 | $(8,832) | $30,310 | $27,465 | $1,442 |

(1) Individually impaired loans with no specific related valuation allowance primarily represent mortgage loans purchased out of PC pools and accounted for in accordance with the accounting guidance for loans and debt securities acquired with deteriorated credit quality that have not experienced further deterioration.
(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."
(3) Includes balloon/reset mortgage loans and excludes option ARMs.
(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."
(5) Consists primarily of mortgage loans classified as TDRs.
(6) As of December 31, 2011 and 2010, includes $57.4 billion and $32.9 billion, respectively, of UPB associated with loans for which we have recorded a specific allowance, and $9.1 billion and $11.1 billion, respectively, of UPB associated with loans that have no specific allowance recorded. See endnote (1) for additional information.
(7) Individually impaired multifamily loans with no specific related valuation allowance primarily represent those loans for which the collateral value is sufficiently in excess of the loan balance to result in recovery of the entire recorded investment if the property were foreclosed upon or otherwise subject to disposition.

The average recorded investment in individually impaired loans for the year ended December 31 2009, was approximately $10.7 billion.

We recognized interest income on individually impaired loans of $0.8 billion for the year ended December 31, 2009. Interest income foregone on individually impaired loans was approximately $1.6 billion, $0.8 billion, and $0.3 billion for the years ended December 31, 2011, 2010, and 2009, respectively.

## Mortgage Loan Performance

We do not accrue interest on loans three months or more past due.

*Freddie Mac*

FHFA 2945

The table below presents the recorded investment of our single-family and multifamily mortgage loans, held-for-investment, by payment status.

### Table 5.2 — Payment Status of Mortgage Loans[1]

| | December 31, 2011 | | | | | |
|---|---|---|---|---|---|---|
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $1,191,809 | $24,964 | $ 9,006 | $46,707 | $1,272,486 | $46,600 |
| 15-year amortizing fixed-rate[2] | 256,306 | 1,499 | 361 | 1,367 | 259,533 | 1,361 |
| Adjustable-rate[3] | 63,929 | 724 | 239 | 1,842 | 66,734 | 1,838 |
| Alt-A, interest-only, and option ARM[4] | 109,967 | 4,617 | 2,172 | 22,502 | 139,258 | 22,473 |
| Total single-family | 1,622,011 | 31,804 | 11,778 | 72,418 | 1,738,011 | 72,272 |
| Total multifamily | 72,715 | 2 | 15 | 69 | 72,801 | 1,882 |
| Total single-family and multifamily | $1,694,726 | $31,806 | $11,793 | $72,487 | $1,810,812 | $74,154 |

| | December 31, 2010 | | | | | |
|---|---|---|---|---|---|---|
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $1,226,874 | $26,442 | $10,203 | $51,604 | $1,315,123 | $51,507 |
| 15-year amortizing fixed-rate[2] | 248,572 | 1,727 | 450 | 1,628 | 252,377 | 1,622 |
| Adjustable-rate[3] | 53,205 | 826 | 335 | 2,308 | 56,674 | 2,303 |
| Alt-A, interest-only, and option ARM[4] | 137,395 | 5,701 | 3,046 | 28,679 | 174,821 | 28,620 |
| Total single-family | 1,666,046 | 34,696 | 14,034 | 84,219 | 1,798,995 | 84,052 |
| Total multifamily | 79,044 | 41 | 7 | 86 | 79,178 | 1,751 |
| Total single-family and multifamily | $1,745,090 | $34,737 | $14,041 | $84,305 | $1,878,173 | $85,803 |

(1) Based on recorded investment in the loan. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as past due as long as the borrower is current under the modified terms. The payment status of a loan may be affected by temporary timing differences, or lags, in the reporting of this information to us by our servicers.
(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."
(3) Includes balloon/reset mortgage loans and excludes option ARMs.
(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

We have the option under our PC agreements to remove mortgage loans from the loan pools that underlie our PCs under certain circumstances to resolve an existing or impending delinquency or default. Since the first quarter of 2010, our practice generally has been to remove loans from PC trusts when the loans have been delinquent for 120 days or more. As of December 31, 2011, there were $3.0 billion in UPB of loans underlying our PCs that were 120 days or more delinquent, and that met our criteria for removing the loan from the consolidated trust. Generally, we remove these delinquent loans from the PC trust, and thereby extinguish the related PC debt, at the next scheduled PC payment date, unless the loans proceed to foreclosure transfer, complete a foreclosure alternative or are paid in full by the borrower before such date.

When we remove mortgage loans from consolidated trusts, we reclassify the loans from mortgage loans held-for-investment by consolidated trusts to unsecuritized mortgage loans held-for-investment and record an extinguishment of the corresponding portion of the debt securities of the consolidated trusts. We removed $44.1 billion and $127.5 billion in UPB of loans from PC trusts or associated with other guarantee commitments during the years ended December 31, 2011 and 2010, respectively.

The table below summarizes the delinquency rates of mortgage loans within our single-family credit guarantee and multifamily mortgage portfolios.

### Table 5.3 — Delinquency Rates[1]

| | December 31, 2011 | December 31, 2010 |
|---|---|---|
| *Single-family:* | | |
| Non-credit-enhanced portfolio: | | |
|   Serious delinquency rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.80% | 2.97% |
|   Total number of seriously delinquent loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 273,184 | 296,921 |
| Credit-enhanced portfolio: | | |
|   Serious delinquency rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7.56% | 7.83% |
|   Total number of seriously delinquent loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 120,622 | 144,116 |
|   Total portfolio, excluding Other Guarantee Transactions | | |
|     Serious delinquency rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.46% | 3.73% |
|     Total number of seriously delinquent loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 393,806 | 440,513 |
| Other Guarantee Transactions:[2] | | |
|   Serious delinquency rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10.54% | 9.86% |
|   Total number of seriously delinquent loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20,328 | 21,926 |
| Total single-family: | | |
|   Serious delinquency rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.58% | 3.84% |
|   Total number of seriously delinquent loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 414,134 | 462,439 |
| *Multifamily:*[3] | | |
| Non-credit-enhanced portfolio: | | |
|   Delinquency rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.11% | 0.12% |
|   UPB of delinquent loans (in millions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 93 | $ 106 |
| Credit-enhanced portfolio: | | |
|   Delinquency rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.52% | 0.85% |
|   UPB of delinquent loans (in millions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 166 | $ 182 |
| Total Multifamily: | | |
|   Delinquency rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.22% | 0.26% |
|   UPB of delinquent loans (in millions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 259 | $ 288 |

(1) Single-family mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as seriously delinquent if the borrower is less than three monthly payments past due under the modified terms. Serious delinquencies on single-family mortgage loans underlying certain REMICs and Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments may be reported on a different schedule due to variances in industry practice.

(2) Other Guarantee Transactions generally have underlying mortgage loans with higher risk characteristics, but some Other Guarantee Transactions may provide inherent credit protections from losses due to underlying subordination, excess interest, overcollateralization and other features.

(3) Multifamily delinquency performance is based on UPB of mortgage loans that are two monthly payments or more past due or those in the process of foreclosure and includes multifamily Other Guarantee Transactions. Excludes mortgage loans whose contractual terms have been modified under an agreement with the borrower as long as the borrower is less than two monthly payments past due under the modified contractual terms.

We continue to implement a number of initiatives to modify and restructure loans, including the MHA Program. Our implementation of the MHA Program, for our loans, includes the following: (a) an initiative to allow mortgages currently owned or guaranteed by us to be refinanced without obtaining additional credit enhancement beyond that already in place for the loan (our relief refinance mortgage, which is our implementation of HARP); (b) an initiative to modify mortgages for both homeowners who are in default and those who are at risk of imminent default (HAMP); and (c) an initiative designed to permit borrowers who meet basic HAMP eligibility requirements to sell their homes in short sales or to complete a deed in lieu of foreclosure transaction (HAFA). As part of accomplishing certain of these initiatives, we pay various incentives to servicers and borrowers. We bear the full costs associated with these loan workout and foreclosure alternatives on mortgages that we own or guarantee and do not receive a reimbursement for any component from Treasury. These initiatives slowed the rate of growth in single-family REO assets on our consolidated balance sheets during 2011 and 2010; however, the number and amount of individually impaired loans increased due to higher volumes of TDRs. We cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives. As discussed below, we recently introduced a new non-HAMP standard loan modification process that replaced our previous non-HAMP modification initiative.

### Troubled Debt Restructurings

On July 1, 2011, we adopted an amendment to the accounting guidance for receivables, which clarifies the guidance regarding a creditor's evaluation of when a restructuring is considered a TDR. While our adoption of this amendment did not have an impact on how we account for TDRs, it did have a significant impact on the population of loans that we account for as TDRs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Adopted Accounting Guidance" for further information on our implementation of this guidance.

### *Single-Family TDRs*

We rely on our single-family servicers to contact borrowers who are in default and to identify a loan workout, or other alternative to foreclosure, in accordance with our requirements. We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses. We require our single-family servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure. We receive information related to loan workouts, such as modifications and loans in a modification trial period, and other alternatives to foreclosure from our servicers at the loan level on at least a monthly basis. For loans in a modification trial period under HAMP, we do not receive the terms of the expected completed modification until the modification is completed. For these loans, we only receive notification that they are in a modification trial period under HAMP. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" for more detail.

Repayment plans are agreements with the borrower that give the borrower a defined period of time to reinstate the mortgage by paying regular payments plus an additional agreed upon amount in repayment of the past due amount. These agreements are considered TDRs if they result in a delay in payment that is considered to be more than insignificant.

Forbearance agreements are agreements between the servicer and the borrower where reduced payments or no payments are required during a defined period. These agreements are considered TDRs if they result in a delay in payment that is considered to be more than insignificant.

In the case of borrowers considered for modifications, our servicers obtain information on income, assets, and other borrower obligations to determine modified loan terms. Under HAMP, the goal of a single-family loan modification is to reduce the borrower's monthly mortgage payments to 31% of the borrower's gross monthly income, which may be achieved through a combination of methods, including: (a) interest rate reductions; (b) term extensions; and (c) principal forbearance. Principal forbearance is when a portion of the principal is non-interest-bearing, but this does not represent principal forgiveness. Although HAMP contemplates that some servicers will also make use of principal forgiveness to achieve reduced payments for borrowers, we have only used forbearance of principal and have not used principal forgiveness in modifying our loans.

HAMP requires that each borrower complete a trial period during which the borrower will make monthly payments based on the estimated amount of the modification payments. Trial periods are required for at least three months. After the final trial-period payment is received by our servicer, the borrower and servicer enter into the modification. With the adoption of the new accounting guidance for TDRs in the third quarter of 2011, we began to consider restructurings under HAMP as TDRs at the inception of the trial period if the expected modification will result in a change in our expectation to collect all amounts due at the original contract rate.

Our HAMP and non-HAMP modification initiatives are available for borrowers experiencing what is generally expected to be a longer-term financial hardship. Historically, for our non-HAMP modifications, our single-family servicers have generally taken an approach to modifying the loan's terms in the following order of priority until the borrower's monthly payment amount is reduced to a sustainable level given the borrower's individual circumstances: (a) extend the term of the loan; and (b) reduce the interest rate of the loan. As discussed below, this non-HAMP modification initiative has been replaced by the standard modification effective January 1, 2012.

In April 2011, FHFA announced a new set of aligned standards for servicing non-performing loans owned or guaranteed by Freddie Mac and Fannie Mae. As part of the servicing alignment initiative, we implemented a new non-HAMP standard loan modification initiative. This new standard modification replaced our previous non-HAMP modification initiative beginning January 1, 2012. The new standard modification requires a three month trial period. Servicers began offering standard modification trial period plans with effective dates on or after October 1, 2011. We consider restructurings under this initiative as TDRs at the inception of the trial period if the expected modification will result in a change in our expectation to collect all amounts due at the original contract rate.

In the table below, we provide information about our single-family loans that were initially classified as TDRs in 2011.

### Table 5.4 — Single-Family TDRs, by Type

| | Year Ended December 31, 2011 | | |
| | Number of Loans | Pre-TDR Recorded Investment | Percentage of Recorded Investment |
|---|---|---|---|
| | (in millions, except for number of loans) | | |
| **Type of completed loan modification:** | | | |
| No change in terms[1][2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,084 | $ 674 | 2% |
| Extension of term[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,137 | 2,290 | 8 |
| Reduction of contractual interest rate and, in certain cases, extension of term . . . . . . . . . . . . . . . | 51,592 | 10,569 | 38 |
| Rate reduction, extension of term, and principal forbearance . . . . . . . . . . . . . . . . . . . . . . . . | 13,645 | 3,314 | 12 |
| Subtotal - loan modification activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 83,458 | 16,847 | 60 |
| **Other activity:** | | | |
| Loans that entered into a modification trial period[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25,513 | 5,353 | 19 |
| Forbearance agreement[2][4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22,100 | 4,198 | 15 |
| Repayment plan[2][5] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,787 | 1,699 | 6 |
| Subtotal - other activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 58,400 | 11,250 | 40 |
| Total single-family TDRs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 141,858 | $28,097 | 100% |

(1) Under this modification type, past due amounts are added to the principal balance and reamortized based on the original contractual loan terms.
(2) Represents only those agreements or plans that result in more than an insignificant delay, which is generally considered by us as more than three monthly payments under the original terms.
(3) Represents loans that entered into a trial period for modification. Beginning in the third quarter of 2011, we began to classify loans as TDRs when they entered a trial period rather than at the time the trial period is completed. As of December 31, 2011, 15,368 of these loans had completed the trial period and received a modification, 2,389 of these loans terminated the trial period without successful modification, and 7,756 loans remained in a trial period.
(4) As of December 31, 2011, there were 6,615 loans that completed a forbearance agreement or began the modification process, 9,705 loans that had experienced a loss event or returned to a delinquent payment status, and 5,780 loans that remained in forbearance.
(5) As of December 31, 2011, there were 3,220 loans that completed a repayment plan or began the modification process, 5,012 loans that experienced a loss event or terminated their plan and remained delinquent, and 2,555 loans where the borrowers were continuing their repayment plan (actively repaying past due amounts under the plan).

For information on how we determine our allowance for loan losses, including how payment defaults are considered in this determination, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES."

The table above presents completed loan modification activity based on the following types of modification:

• No change in terms: This involves the addition of past due amounts, including delinquent monthly principal and interest payments, to the remaining principal balance and allows for amortization of such past due amounts over the loan's remaining original contractual life with no other change in terms. These modifications are considered TDRs if they result in a delay in payment that is considered to be more than insignificant.

• Extension of term: This involves resetting the contractual life of the loan to a longer term, and the longer amortization period generally results in a reduced monthly payment compared to the pre-modified terms. These modifications are considered TDRs if they result in a delay in payment that is considered to be more than insignificant.

• Reduction of contractual interest rate: These modifications are considered TDRs as they result in a concession being granted to the borrower as we do not expect to collect all amounts due, including accrued interest at the original contractual interest rate.

• Principal forbearance: This involves the separation of a portion of the principal balance, which is not amortized nor used in determining the amount of monthly interest. No interest accrues on this portion of the principal and repayment is delayed until either the final payoff of the mortgage, the maturity date, or the transfer of the property. Accordingly, this reduces the monthly payment amount compared to the pre-modified terms. These modifications are considered TDRs as they result in a concession being granted to the borrower as we do not expect to collect all amounts due, including accrued interest at the original contractual interest rate.

During the year ended December 31, 2011, the average term extension was 96 months and the average interest rate reduction was 2.7% on completed modifications classified as TDRs.

### Multifamily TDRs

The assessment as to whether a multifamily loan restructuring is considered a TDR contemplates the unique facts and circumstances of each loan. This assessment considers qualitative factors such as whether the borrower's modified interest

*Freddie Mac*

rate is consistent with that of a borrower having a similar credit profile at the time of modification. In certain cases, for maturing loans we may provide short-term loan extensions of up to 12 months with no changes to the effective borrowing rate. In other cases we may make more significant modifications of terms for borrowers experiencing financial difficulty, such as reducing the interest rate or extending the maturity for longer than 12 months. In cases where we do modify the contractual terms of the loan, the changes in terms may be similar to those of single-family loans, such as an extension of the term, reduction of contractual rate, principal forbearance, or some combination of these features.

### TDR Activity and Performance

The table below provides additional information about both our single-family and multifamily TDR activity during the year ended December 31, 2011, based on the original category of the loan before modification. Our presentation of TDR activity includes all loans that were newly classified as a TDR during the respective periods. Prior to classification as a TDR, these loans were previously evaluated for impairment, including our estimation for loan losses, on a collective basis. Loans classified as a TDR in one period may be subject to further action (such as a modification or remodification) in a subsequent period. In such cases, the subsequent activity would not be reflected in the table below since the loan would already have been classified as a TDR.

### Table 5.5 — TDR Activity, by Segment

|  | Year Ended December 31, 2011 | |
| --- | --- | --- |
|  | # of Loans | Post-TDR Recorded Investment |
|  | (in millions, except for number of loans) | |
| *Single-family* |  |  |
| 20 and 30-year or more, amortizing fixed-rate | 100,948 | $19,263 |
| 15-year amortizing fixed-rate | 6,529 | 651 |
| Adjustable-rate[(1)] | 3,287 | 657 |
| Alt-A, interest-only, and option ARM | 31,094 | 8,355 |
| Total Single-family | 141,858 | 28,926 |
| *Multifamily* | 23 | 254 |
| Total | 141,881 | $29,180 |

(1) Includes balloon/reset mortgage loans.

The aggregate recorded investment of single-family loans classified as TDRs during 2011 was higher post-modification (as shown in the table above) than the aggregate recorded investment of the pre-modified loans (as shown in Table 5.4 — Single-Family TDRs, by Type) since past due amounts are added to the principal balance at the time of restructuring.

The measurement of impairment for TDRs is based on the excess of our recorded investment in the loans over the present value of the loans' expected future cash flows. Generally, restructurings that are TDRs have a higher allowance for loan losses than restructurings that are not considered TDRs because TDRs involve a concession being granted to the borrower. Our process for determining the appropriate allowance for loan losses for both single-family and multifamily loans considers the impact that our loss mitigation activities, such as loan restructurings, have on probabilities of default. For single-family loans evaluated individually and collectively for impairment that have been modified, the probability of default is adversely impacted by the incidence of redefault that we have experienced on similar loans that have completed a modification. For multifamily loans, the incidence of redefault on loans that have been modified does not directly impact the allowance for loan losses as our multifamily loans are generally evaluated individually for impairment which is based on the fair value of the underlying collateral and contemplates the unique facts and circumstances of the loan. The process for determining the appropriate allowance for loan losses for multifamily loans evaluated collectively for impairment considers the incidence of redefault on loans that have completed a modification.

The table below presents the performance of our TDR modifications based on the original category of the loan before restructuring. Modified loans within the Alt-A category continue to remain in that category, even though the borrower may have provided full documentation of assets and income before completing the modification. Modified loans within the option ARM category continue to remain in that category even though the modified loan no longer provides for optional payment provisions. Substantially all of our completed single-family loan modifications classified as a TDR during 2011 resulted in a modified loan with a fixed interest rate or one that is fixed below market for five years and then gradually adjusts to a market rate (determined at the time of modification) and remains fixed at that new rate for the

remaining term. The table below reflects only performance of completed modifications and excludes loans subject to other loss mitigation activity that were classified as TDRs.

**Table 5.6 — Payment Defaults of Completed TDR Modifications, by Segment[1]**

| | Year Ended December 31, 2011 | |
| | # of Loans | Post-TDR Recorded Investment[2] |
| | (in millions, except number of loans modified) | |
| *Single-family* | | |
|   20 and 30-year or more, amortizing fixed-rate | 23,592 | $4,417 |
|   15-year amortizing fixed-rate | 890 | 91 |
|   Adjustable-rate | 519 | 111 |
|   Alt-A, interest-only, and option ARM | 5,794 | 1,529 |
| Total single-family | 30,795 | $6,148 |
| *Multifamily* | 7 | $ 18 |

(1) Represents TDR loans that experienced a payment default during the period and had completed a modification event in the twelve months prior to the payment default. A payment default occurs when a borrower either: (a) became two or more months delinquent; or (b) completed a loss event, such as a short sale or foreclosure. We only include payment defaults for a single loan once during each quarterly period; however, a single loan will be reflected more than once if the borrower experienced another payment default in a subsequent quarter.

(2) Represents the recorded investment at the end of the period in which the loan was modified and does not represent the recorded investment as of December 31, 2011.

During 2011, there were 2,163 loans with other loss mitigation activities (*i.e.*, repayment plan, forbearance agreement, or trial period modifications) initially classified as TDRs, with a post-TDR recorded investment of $371 million, that returned to a current payment status, and then subsequently became two months delinquent. In addition, during 2011, there were 3,109 loans with other loss mitigation activities initially classified as TDRs, with a post-TDR recorded investment of $520 million that subsequently experienced a loss event, such as a short sale or a foreclosure transfer.

### NOTE 6: REAL ESTATE OWNED

We obtain REO properties: (a) when we are the highest bidder at foreclosure sales of properties that collateralize non-performing single-family and multifamily mortgage loans owned by us; or (b) when a delinquent borrower chooses to transfer the mortgaged property to us in lieu of going through the foreclosure process. Upon acquiring single-family properties, we establish a marketing plan to sell the property as soon as practicable by either listing it with a sales broker or by other means, such as arranging a real estate auction. Upon acquiring multifamily properties, we may operate them using third-party property-management firms for a period to stabilize value and then sell the properties through commercial real estate brokers. However, certain jurisdictions require a period of time after foreclosure during which the borrower may reclaim the property. During the period when the borrower may reclaim the property, or we are completing the eviction process, we are not able to market the property and this extends our holding period for these properties. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for a discussion of our significant accounting policies for REO.

The table below provides a summary of the change in the carrying value of our combined single-family and multifamily REO balances. For the periods presented in the table below, the weighted average holding period for our disposed properties was less than one year.

**Table 6.1 — REO**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| | (in millions) | | |
| Beginning balance — REO, gross | $ 7,908 | $ 5,125 | $ 4,216 |
| Adjustments to beginning balance[1] | — | 158 | — |
| Additions | 9,591 | 13,211 | 9,420 |
| Dispositions | (11,255) | (10,586) | (8,511) |
| Ending balance — REO, gross | 6,244 | 7,908 | 5,125 |
| Beginning balance, valuation allowance | (840) | (433) | (961) |
| Adjustment to beginning balance[1] | — | (11) | — |
| Change in valuation allowance | 276 | (396) | 528 |
| Ending balance, valuation allowance | (564) | (840) | (433) |
| Ending balance — REO, net | $ 5,680 | $ 7,068 | $ 4,692 |

(1) Adjustment to the beginning balance related to the adoption of new accounting guidance for transfers of financial assets and consolidation of VIEs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information.

The REO balance, net at December 31, 2011 and December 31, 2010 associated with single-family properties was $5.5 billion and $7.0 billion, respectively, and the balance associated with multifamily properties was $133 million and $107 million, respectively. The West region represented approximately 30% and 29% of our single-family REO additions during the years ended December 31, 2011 and 2010, respectively, based on the number of properties, and the North Central region represented approximately 27% and 23% of our single-family REO additions during these periods. Our single-family REO inventory consisted of 60,535 properties and 72,079 properties at December 31, 2011 and December 31, 2010, respectively. The pace of our REO acquisitions slowed beginning in the fourth quarter of 2010 due to delays in the foreclosure process. These delays in foreclosures continued in 2011, particularly in states that require a judicial foreclosure process. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS — Seller/Servicers" for information about regional concentration of our portfolio as well as further details about delays in the single-family foreclosure process.

Our REO operations expenses includes REO property expenses, net losses incurred on disposition of REO properties, adjustments to the holding period allowance associated with REO properties to record them at the lower of their carrying amount or fair value less the estimated costs to sell, and recoveries from insurance and other credit enhancements. An allowance for estimated declines in the REO fair value during the period properties are held reduces the carrying value of REO property. Excluding holding period valuation adjustments, we recognized losses of $165 million and $93 million on REO dispositions during 2011 and 2010, respectively. We increased our valuation allowance for properties in our REO inventory by $304 million and $498 million in 2011 and 2010, respectively.

REO property acquisitions that result from extinguishment of our mortgage loans held on our consolidated balance sheets are treated as non-cash transfers. The amount of non-cash acquisitions of REO properties during the years ended December 31, 2011, 2010, and 2009 was $8.7 billion, $12.3 billion, and $0.9 billion, respectively.

## NOTE 7: INVESTMENTS IN SECURITIES

The table below summarizes amortized cost, estimated fair values, and corresponding gross unrealized gains and gross unrealized losses for available-for-sale securities by major security type. At December 31, 2011 and 2010, all available-for-sale securities are mortgage-related securities.

**Table 7.1 — Available-For-Sale Securities**

| December 31, 2011 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| | | | (in millions) | |
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 74,711 | $ 6,429 | $     (48) | $ 81,092 |
| Subprime | 41,347 | 60 | (13,408) | 27,999 |
| CMBS | 53,637 | 2,574 | (548) | 55,663 |
| Option ARM | 9,019 | 15 | (3,169) | 5,865 |
| Alt-A and other | 13,659 | 32 | (2,812) | 10,879 |
| Fannie Mae | 19,023 | 1,303 | (4) | 20,322 |
| Obligations of states and political subdivisions | 7,782 | 108 | (66) | 7,824 |
| Manufactured housing | 820 | 6 | (60) | 766 |
| Ginnie Mae | 219 | 30 | — | 249 |
| Total available-for-sale securities | $220,217 | $10,557 | $(20,115) | $210,659 |
| **December 31, 2010** | | | | |
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 80,742 | $ 5,142 | $    (195) | $ 85,689 |
| Subprime | 47,916 | 1 | (14,056) | 33,861 |
| CMBS | 58,455 | 1,551 | (1,919) | 58,087 |
| Option ARM | 10,726 | 16 | (3,853) | 6,889 |
| Alt-A and other | 15,561 | 58 | (2,451) | 13,168 |
| Fannie Mae | 23,025 | 1,348 | (3) | 24,370 |
| Obligations of states and political subdivisions | 9,885 | 31 | (539) | 9,377 |
| Manufactured housing | 945 | 13 | (61) | 897 |
| Ginnie Mae | 268 | 28 | — | 296 |
| Total available-for-sale securities | $247,523 | $ 8,188 | $(23,077) | $232,634 |

**Available-For-Sale Securities in a Gross Unrealized Loss Position**

The table below shows the fair value of available-for-sale securities in a gross unrealized loss position, and whether they have been in that position less than 12 months, or 12 months or greater, including the non-credit-related portion of other-than-temporary impairments which have been recognized in AOCI.

**Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position**

| December 31, 2011 | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | |
| | | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total | | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total | | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total |
| | (in millions) | | | | | | | | | | | |
| Available-for-sale securities: | | | | | | | | | | | | |
| Freddie Mac | $2,196 | $ — | $ (4) | $ (4) | $ 1,884 | $ — | $ (44) | $ (44) | $ 4,080 | $ — | $ (48) | $ (48) |
| Subprime | 8 | (1) | — | (1) | 27,742 | (10,785) | (2,622) | (13,407) | 27,750 | (10,786) | (2,622) | (13,408) |
| CMBS | 997 | (20) | (41) | (61) | 3,573 | (9) | (478) | (487) | 4,570 | (29) | (519) | (548) |
| Option ARM | 95 | (13) | — | (13) | 5,743 | (3,067) | (89) | (3,156) | 5,838 | (3,080) | (89) | (3,169) |
| Alt-A and other | 1,197 | (114) | (4) | (118) | 9,070 | (2,088) | (606) | (2,694) | 10,267 | (2,202) | (610) | (2,812) |
| Fannie Mae | 1,144 | — | (2) | (2) | 14 | — | (2) | (2) | 1,158 | — | (4) | (4) |
| Obligations of states and political subdivisions | 292 | — | (6) | (6) | 2,157 | — | (60) | (60) | 2,449 | — | (66) | (66) |
| Manufactured housing | 197 | (5) | — | (5) | 345 | (44) | (11) | (55) | 542 | (49) | (11) | (60) |
| Total available-for-sale securities in a gross unrealized loss position | $6,126 | $(153) | $(57) | $(210) | $50,528 | $(15,993) | $(3,912) | $(19,905) | $56,654 | $(16,146) | $(3,969) | $(20,115) |

| December 31, 2010 | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | |
| | | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total | | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total | | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total |
| | (in millions) | | | | | | | | | | | |
| Available-for-sale securities: | | | | | | | | | | | | |
| Freddie Mac | $2,494 | $— | $ (70) | $ (70) | $ 1,880 | $ — | $ (125) | $ (125) | $ 4,374 | $ — | $ (195) | $ (195) |
| Subprime | 6 | — | — | — | 33,839 | (10,041) | (4,015) | (14,056) | 33,845 | (10,041) | (4,015) | (14,056) |
| CMBS | 2,950 | — | (51) | (51) | 8,894 | (844) | (1,024) | (1,868) | 11,844 | (844) | (1,075) | (1,919) |
| Option ARM | 3 | (1) | — | (1) | 6,838 | (3,744) | (108) | (3,852) | 6,841 | (3,745) | (108) | (3,853) |
| Alt-A and other | 42 | — | (3) | (3) | 12,025 | (1,846) | (602) | (2,448) | 12,067 | (1,846) | (605) | (2,451) |
| Fannie Mae | 54 | — | — | — | 14 | — | (3) | (3) | 68 | — | (3) | (3) |
| Obligations of states and political subdivisions | 3,953 | — | (163) | (163) | 3,402 | — | (376) | (376) | 7,355 | — | (539) | (539) |
| Manufactured housing | 8 | (1) | — | (1) | 507 | (45) | (15) | (60) | 515 | (46) | (15) | (61) |
| Total available-for-sale securities in a gross unrealized loss position | $9,510 | $(2) | $(287) | $(289) | $67,399 | $(16,520) | $(6,268) | $(22,788) | $76,909 | $(16,522) | $(6,555) | $(23,077) |

(1) Represents the gross unrealized losses for securities for which we have previously recognized other-than-temporary impairments in earnings.
(2) Represents the gross unrealized losses for securities for which we have not previously recognized other-than-temporary impairments in earnings.

At December 31, 2011, total gross unrealized losses on available-for-sale securities were $20.1 billion. The gross unrealized losses relate to 1,625 individual lots representing 1,556 separate securities, including securities with non-credit-related other-than-temporary impairments recognized in AOCI. We purchase multiple lots of individual securities at different times and at different costs. We determine gross unrealized gains and gross unrealized losses by specifically evaluating investment positions at the lot level; therefore, some of the lots we hold for a single security may be in an unrealized gain position while other lots for that security may be in an unrealized loss position, depending upon the amortized cost of the specific lot.

**Impairment Recognition on Investments in Securities**

We recognize impairment losses on available-for-sale securities within our consolidated statements of income and comprehensive income as net impairment of available-for-sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other-than-temporary.

We conduct quarterly reviews to evaluate each available-for-sale security that has an unrealized loss for other-than-temporary impairment. An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis. We recognize other-than-temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security. If we do not intend to sell the security and we believe it is not more likely than not that we will be required to sell prior to recovery of its unrealized loss, we recognize only the credit component of other-than-temporary impairment in earnings and the amounts attributable to all other factors are recognized in AOCI. The credit component represents the amount by which the present value of expected future cash flows to be collected from the security is less than the amortized cost basis of the security. The present value of expected future cash flows represents our estimate of future contractual cash flows that we expect to collect, discounted at the effective interest rate implicit in the security at the date of acquisition or the effective interest rate determined based on significantly improved cash flows subsequent to initial impairment.

Our net impairment of available-for-sale securities recognized in earnings on our consolidated statements of income and comprehensive income for the years ended December 31, 2011, 2010, and 2009, includes amounts related to certain securities where we have previously recognized other-than-temporary impairments through AOCI, but upon the

recognition of additional credit losses, these amounts were reclassified out of non-credit losses in AOCI and charged to earnings. In certain instances, we recognized credit losses in excess of unrealized losses in AOCI.

The determination of whether unrealized losses on available-for-sale securities are other-than-temporary requires significant management judgments and assumptions and consideration of numerous factors. We perform an evaluation on a security-by-security basis considering all available information. The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment. Important factors include, but are not limited to:

- whether we intend to sell the security and it is not more likely than not that we will be required to sell the security before sufficient time elapses to recover all unrealized losses;

- loan level default modeling for single-family residential mortgages that considers individual loan characteristics, including current LTV ratio, FICO score, and delinquency status, requires assumptions about future home prices and interest rates, and employs internal default models and prepayment assumptions. The modeling for CMBS employs third-party models that require assumptions about the economic conditions in the areas surrounding each individual property; and

- security loss modeling combining the modeled performance of the underlying collateral relative to its current and projected credit enhancements to determine the expected cash flows for each evaluated security.

For the majority of our available-for-sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other-than-temporary and is recorded within our consolidated statements of income and comprehensive income as net impairment of available-for-sale securities recognized in earnings.

See "Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position" for the length of time our available-for-sale securities have been in an unrealized loss position. Also see "Table 7.3 — Significant Modeled Attributes for Certain Available-For-Sale Non-Agency Mortgage-Related Securities" for the modeled default rates and severities that were used to determine whether our senior interests in certain non-agency mortgage-related securities would experience a cash shortfall.

### Freddie Mac and Fannie Mae Securities

We record the purchase of mortgage-related securities issued by Fannie Mae as investments in securities in accordance with the accounting guidance for investments in debt and equity securities. In contrast, our purchase of mortgage-related securities that we issued (*e.g.*, PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions) is recorded as either investments in securities or extinguishment of debt securities of consolidated trusts depending on the nature of the mortgage-related security that we purchase. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" for additional information.

We hold these investments in securities that are in an unrealized loss position at least to recovery and typically to maturity. As the principal and interest on these securities are guaranteed and we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses, we consider these unrealized losses to be temporary.

### Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans

We believe the unrealized losses on the non-agency mortgage-related securities we hold are a result of poor underlying collateral performance, limited liquidity, and large risk premiums. We consider securities to be other-than-temporarily impaired when future credit losses are deemed likely.

Our review of the securities backed by subprime, option ARM, and Alt-A and other loans includes loan level default modeling and analyses of the individual securities based on underlying collateral performance, including the collectability of amounts from bond insurers. In the case of bond insurers, we also consider factors such as the availability of capital, generation of new business, pending regulatory action, credit ratings, security prices, and credit default swap levels traded on the insurers. We consider loan level information including estimated current LTV ratios, FICO scores, and other loan level characteristics. We also consider the differences between the loan level characteristics of the performing and non-performing loan populations. For additional information regarding bond insurers, see "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers."

The table below presents the modeled default rates and severities, without regard to subordination, that are used to determine whether our senior interests in certain available-for-sale non-agency mortgage-related securities will experience a cash shortfall. Our proprietary default model incorporates assumptions about future home prices, as defaults and severities are modeled at the loan level and then aggregated. The model uses projections of future home prices at the state level. Assumptions about voluntary prepayment rates are also an input to the model and are discussed below.

**Table 7.3 — Significant Modeled Attributes for Certain Available-For-Sale Non-Agency Mortgage-Related Securities**

| | | | December 31, 2011 | | |
|---|---|---|---|---|---|
| | | | | Alt-A[1] | |
| | Subprime First Lien[2] | Option ARM | Fixed Rate | Variable Rate | Hybrid Rate |
| | | | (dollars in millions) | | |
| **Issuance Date** | | | | | |
| 2004 and prior: | | | | | |
| UPB . . . . . . . . . . . . . . . . . . . . . . . . . | $ 1,218 | $   117 | $  867 | $  512 | $2,195 |
| Weighted average collateral defaults[3] . . . . . . . . . | 36% | 33% | 8% | 43% | 24% |
| Weighted average collateral severities[4] . . . . . . . . . | 56% | 55% | 47% | 52% | 41% |
| Weighted average voluntary prepayment rates[5] . . . . . . . . . | 6% | 7% | 19% | 7% | 8% |
| Average credit enhancement[6] . . . . . . . . . . . . . . . | 43% | 15% | 14% | 18% | 15% |
| 2005: | | | | | |
| UPB . . . . . . . . . . . . . . . . . . . . . . . . . | $ 6,293 | $ 2,882 | $1,206 | $  840 | $3,944 |
| Weighted average collateral defaults[3] . . . . . . . . . | 55% | 51% | 24% | 53% | 38% |
| Weighted average collateral severities[4] . . . . . . . . . | 67% | 63% | 55% | 59% | 50% |
| Weighted average voluntary prepayment rates[5] . . . . . . . . . | 4% | 6% | 14% | 7% | 8% |
| Average credit enhancement[6] . . . . . . . . . . . . . . . | 52% | 12% | 3% | 26% | 5% |
| 2006: | | | | | |
| UPB . . . . . . . . . . . . . . . . . . . . . . . . . | $19,823 | $ 6,661 | $  549 | $1,127 | $1,183 |
| Weighted average collateral defaults[3] . . . . . . . . . | 65% | 63% | 37% | 61% | 50% |
| Weighted average collateral severities[4] . . . . . . . . . | 72% | 69% | 61% | 68% | 57% |
| Weighted average voluntary prepayment rates[5] . . . . . . . . . | 7% | 6% | 13% | 9% | 8% |
| Average credit enhancement[6] . . . . . . . . . . . . . . . | 15% | 3% | 7% | (1)% | 1% |
| 2007: | | | | | |
| UPB . . . . . . . . . . . . . . . . . . . . . . . . . | $21,310 | $ 4,289 | $  159 | $1,354 | $  324 |
| Weighted average collateral defaults[3] . . . . . . . . . | 62% | 58% | 53% | 60% | 60% |
| Weighted average collateral severities[4] . . . . . . . . . | 73% | 69% | 69% | 67% | 67% |
| Weighted average voluntary prepayment rates[5] . . . . . . . . . | 7% | 7% | 11% | 9% | 8% |
| Average credit enhancement[6] . . . . . . . . . . . . . . . | 17% | 11% | 11% | (7)% | —% |
| Total: | | | | | |
| UPB . . . . . . . . . . . . . . . . . . . . . . . . . | $48,644 | $13,949 | $2,781 | $3,833 | $7,646 |
| Weighted average collateral defaults[3] . . . . . . . . . | 61% | 59% | 24% | 56% | 37% |
| Weighted average collateral severities[4] . . . . . . . . . | 72% | 68% | 58% | 64% | 51% |
| Weighted average voluntary prepayment rates[5] . . . . . . . . . | 6% | 6% | 15% | 8% | 8% |
| Average credit enhancement[6] . . . . . . . . . . . . . . . | 21% | 7% | 8% | 5% | 7% |

(1) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.

(2) Excludes non-agency mortgage-related securities backed exclusively by subprime second liens. Certain securities identified as subprime first lien may be backed in part by subprime second lien loans, as the underlying loans of these securities were permitted to include a small percentage of subprime second lien loans.

(3) The expected cumulative default rate expressed as a percentage of the current collateral UPB.

(4) The expected average loss given default calculated as the ratio of cumulative loss over cumulative default for each security.

(5) The security's voluntary prepayment rate represents the average of the monthly voluntary prepayment rate weighted by the security's outstanding UPB.

(6) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by bond insurance, overcollateralization and other forms of credit enhancement. Negative values are shown when collateral losses that have yet to be applied to the tranches exceed the remaining credit enhancement, if any.

In evaluating the non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans for other-than-temporary impairment, we noted that the percentage of securities that were AAA-rated and the percentage that were investment grade declined significantly since acquisition. While these ratings have declined, the ratings themselves are not determinative that a loss is more or less likely. While we consider credit ratings in our analysis, we believe that our detailed security-by-security analyses provide a more consistent view of the ultimate collectability of contractual amounts due to us. As such, we have impaired securities with current ratings ranging from CCC to AAA and have determined that other securities within the same ratings were not other-than-temporarily impaired. However, we carefully consider individual ratings, especially those below investment grade, including changes since December 31, 2011.

*Freddie Mac*

Our analysis is subject to change as new information regarding delinquencies, severities, loss timing, prepayments, and other factors becomes available. While it is reasonably possible that, under certain conditions, collateral losses on our remaining available-for-sale securities for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of December 31, 2011.

### Commercial Mortgage-Backed Securities

CMBS are exposed to stresses in the commercial real estate market. We use external models to identify securities that may have an increased risk of failing to make their contractual payments. We then perform an analysis of the underlying collateral on a security-by-security basis to determine whether we will receive all of the contractual payments due to us. During the year ended December 31, 2011, we recognized the unrealized fair value losses related to certain investments in CMBS of $181 million as an impairment charge in earnings because we have the intent to sell these securities. While it is reasonably possible that, under certain conditions, collateral losses on our CMBS for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of December 31, 2011. We do not intend to sell the remaining CMBS and it is not more likely than not that we will be required to sell such securities before recovery of the unrealized losses.

### Obligations of States and Political Subdivisions

These investments consist of housing revenue bonds. We believe the unrealized losses on obligations of states and political subdivisions are primarily a result of movements in interest rates and liquidity and risk premiums. We have determined that the impairment of these securities is temporary based on our conclusion that we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses. We believe that any credit risk related to these securities is minimal because of the issuer guarantees provided on these securities.

### Bond Insurance

We rely on bond insurance, including secondary coverage, to provide credit protection on some of our non-agency mortgage-related securities. Circumstances in which it is likely a principal and interest shortfall will occur and there is substantial uncertainty surrounding a bond insurer's ability to pay all future claims can give rise to recognition of other-than-temporary impairment recognized in earnings. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

**Other-Than-Temporary Impairments on Available-for-Sale Securities**

The table below summarizes our net impairments of available-for-sale securities recognized in earnings by security type.

**Table 7.4 — Net Impairment of Available-For-Sale Securities Recognized in Earnings**[1]

| | Net Impairment of Available-For-Sale Securities Recognized in Earnings For The Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | | (in millions) | |
| Available-for-sale securities: | | | |
| Subprime | $(1,315) | $(1,769) | $ (6,526) |
| Option ARM | (424) | (1,395) | (1,726) |
| Alt-A and other | (198) | (1,020) | (2,572) |
| CMBS[2] | (353) | (97) | (137) |
| Manufactured housing | (11) | (27) | (51) |
| Total other-than-temporary impairments on mortgage-related securities | (2,301) | (4,308) | (11,012) |
| Non-mortgage-related securities: | | | |
| Asset-backed securities | — | — | (185) |
| Total other-than-temporary impairments on non-mortgage-related securities | — | — | (185) |
| Total other-than-temporary impairments on available-for-sale securities | $(2,301) | $(4,308) | $(11,197) |

(1) As a result of the adoption of an amendment to the accounting guidance for investments in debt and equity securities on April 1, 2009, net impairment of available-for-sale securities recognized in earnings for the nine months ended December 31, 2009 (which is included in the year ended December 31, 2009) and the years ended December 31, 2011 and 2010 includes credit-related other-than-temporary impairments and other-than-temporary impairments on securities which we intend to sell or it is more likely than not that we will be required to sell. In contrast, net impairment of available-for-sale securities recognized in earnings for the three months ended March 31, 2009 (which is included in the year ended December 31, 2009) includes both credit-related and non-credit-related other-than-temporary impairments as well as other-than-temporary impairments on securities for which we could not assert the positive intent and ability to hold until recovery of the unrealized losses.

(2) Includes $181 million of other-than-temporary impairments recognized in earnings for the year ended December 31, 2011, as we have the intent to sell the related securities before recovery of its amortized cost basis.

The table below presents the changes in the unrealized credit-related other-than-temporary impairment component of the amortized cost related to available-for-sale securities: (a) that we have written down for other-than-temporary impairment; and (b) for which the credit component of the loss is recognized in earnings. The credit-related other-than-temporary impairment component of the amortized cost represents the difference between the present value of expected future cash flows, including the estimated proceeds from bond insurance, and the amortized cost basis of the security prior to considering credit losses. The beginning balance represents the other-than-temporary impairment credit loss component related to available-for-sale securities for which other-than-temporary impairment occurred prior to January 1, 2011, but will not be realized until the securities are sold, written off, or mature. Net impairment of available-for-sale securities recognized in earnings is presented as additions in two components based upon whether the current period is: (a) the first time the debt security was credit-impaired; or (b) not the first time the debt security was credit-impaired. The credit loss component is reduced if we sell, intend to sell or believe we will be required to sell previously credit-impaired available-for-sale securities. Additionally, the credit loss component is reduced by the amortization resulting from significant increases in cash flows expected to be collected that are recognized over the remaining life of the security.

**Table 7.5 — Other-Than-Temporary Impairments Related to Credit Losses on Available-For-Sale Securities**[1]

| | Year Ended December 31, 2011 |
|---|---|
| | (in millions) |
| Credit-related other-than-temporary impairments on available-for-sale securities recognized in earnings: | |
| Beginning balance — remaining credit losses to be realized on available-for-sale securities held at the beginning of the period where other-than-temporary impairments were recognized in earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $15,049 |
| Additions: | |
| Amounts related to credit losses for which an other-than-temporary impairment was not previously recognized . . . . . . . . | 80 |
| Amounts related to credit losses for which an other-than-temporary impairment was previously recognized . . . . . . . . . . . | 2,070 |
| Reductions: | |
| Amounts related to securities which were sold, written off or matured . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (957) |
| Amounts previously recognized in other comprehensive income that were recognized in earnings because we intend to sell the security or it is more likely than not that we will be required to sell the security before recovery of its amortized cost basis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (161) |
| Amounts related to amortization resulting from significant increases in cash flows expected to be collected that are recognized over the remaining life of the security . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (93) |
| Ending balance — remaining credit losses to be realized on available-for-sale securities held at period end where other-than-temporary impairments were recognized in earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $15,988 |

(1) Excludes other-than-temporary impairments on securities that we intend to sell or it is more likely than not that we will be required to sell before recovery of the unrealized losses.

## Realized Gains and Losses on Sales of Available-For-Sale Securities

The table below illustrates the gross realized gains and gross realized losses received from the sale of available-for-sale securities.

**Table 7.6 — Gross Realized Gains and Gross Realized Losses on Sales of Available-For-Sale Securities**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | (in millions) | | |
| **Gross realized gains** | | | |
| Mortgage-related securities: | | | |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 77 | $27 | $ 879 |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 | 54 | 2 |
| CMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 37 | — | — |
| Obligations of states and political subdivisions . . . . . . . . . . . . . . . . . . . | 11 | 3 | 2 |
| Total mortgage-related securities gross realized gains . . . . . . . . . . . . . . . . . . . . . | 139 | 84 | 883 |
| Non-mortgage-related securities: | | | |
| Asset-backed securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 10 | 313 |
| Total non-mortgage-related securities gross realized gains . . . . . . . . . . . . . . . . . | — | 10 | 313 |
| Gross realized gains . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 139 | 94 | 1,196 |
| **Gross realized losses** | | | |
| Mortgage related securities:[1] | | | |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (1) | (113) |
| CMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (81) | — | — |
| Option ARM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (6) | — |
| Total mortgage-related securities gross realized losses . . . . . . . . . . . . . . . . . . . . | (81) | (7) | (113) |
| Gross realized losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (81) | (7) | (113) |
| Net realized gains (losses) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 58 | $87 | $1,083 |

(1) These individual sales do not change our conclusion that we do not intend to sell the majority of our remaining mortgage-related securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses.

**Maturities and Weighted Average Yield of Available-For-Sale Securities**

The table below summarizes the remaining contractual maturities of available-for-sale securities and weighted average yield of available-for-sale securities.

**Table 7.7 — Maturities and Weighted Average Yield of Available-For-Sale Securities[1]**

| December 31, 2011 | Amortized Cost | Fair Value | Weighted Average Yield[2] |
|---|---|---|---|
| | (dollars in millions) | | |
| Available-for-sale securities: | | | |
| Due within 1 year or less | $      40 | $      40 | 4.84% |
| Due after 1 through 5 years | 1,208 | 1,259 | 5.34 |
| Due after 5 through 10 years | 5,269 | 5,540 | 5.07 |
| Due after 10 years | 213,700 | 203,820 | 3.59 |
| Total available-for-sale securities | $220,217 | $210,659 | 3.63 |

(1) Maturity information provided is based on contractual maturities, which may not represent expected life as obligations underlying these securities may be prepaid at any time without penalty.

(2) The weighted average yield is calculated based on a yield for each individual lot held at December 31, 2011 excluding any fully taxable-equivalent adjustments related to tax exempt sources of interest income. The numerator for the individual lot yield consists of the sum of: (a) the year-end interest coupon rate multiplied by the year-end UPB; and (b) the annualized amortization income or expense calculated for December 2011 (excluding the accretion of non-credit-related other-than-temporary impairments and any adjustments recorded for changes in the effective rate). The denominator for the individual lot yield consists of the year-end amortized cost of the lot excluding effects of other-than-temporary impairments on the UPB of impaired lots.

**AOCI Related to Available-For-Sale Securities**

The table below presents the changes in AOCI related to available-for-sale securities. The net unrealized holding gains represent the net fair value adjustments recorded on available-for-sale securities throughout the periods presented, after the effects of our federal statutory tax rate of 35%. The net reclassification adjustment for net realized losses represents the amount of those fair value adjustments, after the effects of our federal statutory tax rate of 35%, that have been recognized in earnings due to a sale of an available-for-sale security or the recognition of an impairment loss.

**Table 7.8 — AOCI Related to Available-For-Sale Securities**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| | | (in millions) | |
| Beginning balance | $(9,678) | $(20,616) | $(28,510) |
| Adjustment to initially apply the adoption of amendments to accounting guidance for transfers of financial assets and the consolidation of VIEs[1] | — | (2,683) | — |
| Adjustment to initially apply the adoption of an amendment to the accounting guidance for investments in debt and equity securities[2] | — | — | (9,931) |
| Net unrealized holding gains[3] | 2,007 | 10,876 | 11,250 |
| Net reclassification adjustment for net realized losses[4][5] | 1,458 | 2,745 | 6,575 |
| Ending balance | $(6,213) | $ (9,678) | $(20,616) |

(1) Net of tax benefit of $1.4 billion for the year ended December 31, 2010.

(2) Net of tax benefit of $5.3 billion for the year ended December 31, 2009.

(3) Net of tax expense of $1.1 billion, $5.9 billion and $6.1 billion for the years ended December 31, 2011, 2010 and 2009, respectively.

(4) Net of tax benefit of $785 million, $1.5 billion, and $3.5 billion for the years ended December 31, 2011, 2010, and 2009, respectively.

(5) Includes the reversal of previously recorded unrealized losses that have been recognized on our consolidated statements of income and comprehensive income as impairment losses on available-for-sale securities of $1.5 billion, $2.8 billion, and $7.3 billion, net of taxes, for the years ended December 31, 2011, 2010, and 2009, respectively.

**Trading Securities**

The table below summarizes the estimated fair values by major security type for trading securities.

**Table 7.9 — Trading Securities**

| | December 31, | |
|---|---:|---:|
| | 2011 | 2010 |
| | (in millions) | |
| Mortgage-related securities: | | |
| Freddie Mac | $16,047 | $13,437 |
| Fannie Mae | 15,165 | 18,726 |
| Ginnie Mae | 156 | 172 |
| Other | 164 | 31 |
| Total mortgage-related securities | 31,532 | 32,366 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 302 | 44 |
| Treasury bills | 100 | 17,289 |
| Treasury notes | 24,712 | 10,122 |
| FDIC-guaranteed corporate medium-term notes | 2,184 | 441 |
| Total non-mortgage-related securities | 27,298 | 27,896 |
| Total fair value of trading securities | $58,830 | $60,262 |

Trading securities mainly include Treasury securities, agency fixed-rate and variable-rate pass-through mortgage-related securities, and agency REMICs, including inverse floating rate, interest-only and principal-only securities. With the exception of principal-only securities, our agency securities, classified as trading, were at a net premium (*i.e.*, have higher net fair value than UPB) as of December 31, 2011.

For the years ended December 31, 2011, 2010, and 2009, we recorded net unrealized gains (losses) on trading securities held at those dates of $(1.0) billion, $(1.4) billion, and $4.3 billion, respectively.

Total trading securities include $1.9 billion and $2.5 billion, respectively, of hybrid financial assets as defined by the derivative and hedging accounting guidance regarding certain hybrid financial instruments as of December 31, 2011 and 2010. Gains (losses) on trading securities on our consolidated statements of income and comprehensive income include $(109) million and $(53) million, respectively, related to these hybrid financial securities for the years ended December 31, 2011 and 2010.

**Collateral Pledged**

*Collateral Pledged to Freddie Mac*

Our counterparties are required to pledge collateral for securities purchased under agreements to resell transactions, and most derivative instruments are subject to collateral posting thresholds generally related to a counterparty's credit rating. We consider the types of securities being pledged to us as collateral when determining how much we lend related to securities purchased under agreements to resell transactions. Additionally, we subsequently and regularly review the market values of these securities compared to amounts loaned in an effort to minimize our exposure to losses. We had cash and cash equivalents pledged to us related to derivative instruments of $3.2 billion and $2.2 billion at December 31, 2011 and 2010, respectively. Although it is our practice not to repledge assets held as collateral, a portion of the collateral may be repledged based on master agreements related to our derivative instruments. At December 31, 2011 and 2010, we did not have collateral in the form of securities pledged to and held by us under these master agreements. Also at December 31, 2011 and 2010, we did not have securities pledged to us for securities purchased under agreements to resell transactions that we had the right to repledge. From time to time we may obtain pledges of collateral from certain seller/servicers as additional security for their obligations to us, including their obligations to repurchase mortgages sold to us in breach of representations and warranties. This collateral may take the form of cash, cash equivalents, or agency securities.

In addition, we hold cash and cash equivalents as collateral in connection with certain of our multifamily guarantees and mortgage loans as credit enhancements. The cash and cash equivalents held as collateral related to these transactions at December 31, 2011 and 2010 was $246 million and $550 million, respectively.

*Collateral Pledged by Freddie Mac*

We are required to pledge collateral for margin requirements with third-party custodians in connection with secured financings and derivative transactions with some counterparties. The level of collateral pledged related to our derivative instruments is determined after giving consideration to our credit rating. As a result of S&P's downgrade of our senior long-term debt credit rating from AAA to AA+ on August 8, 2011, we posted additional collateral to certain derivative

counterparties in accordance with the terms of the collateral agreements with such counterparties. As of December 31, 2011, we had one secured, uncommitted intraday line of credit with a third party in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs, in connection with our use of the Fedwire system. In certain circumstances, the line of credit agreement gives the secured party the right to repledge the securities underlying our financing to other third parties, including the Federal Reserve Bank. We pledge collateral to meet our collateral requirements under the line of credit agreement upon demand by the counterparty.

The table below summarizes all securities pledged as collateral by us, including assets that the secured party may repledge and those that may not be repledged.

**Table 7.10 — Collateral in the Form of Securities Pledged**

| | December 31, | |
| --- | --- | --- |
| | **2011** | **2010** |
| | (in millions) | |
| Securities pledged with the ability for the secured party to repledge: | | |
| Debt securities of consolidated trusts held by third parties[1] | $10,293 | $ 9,915 |
| Available-for-sale securities | 204 | 817 |
| Securities pledged without the ability for the secured party to repledge: | | |
| Debt securities of consolidated trusts held by third parties[1] | 88 | 5 |
| Total securities pledged | $10,585 | $10,737 |

(1) Represents PCs held by us in our Investments segment mortgage investments portfolio and pledged as collateral which are recorded as a reduction to debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

*Securities Pledged with the Ability of the Secured Party to Repledge*

At December 31, 2011, we pledged securities with the ability of the secured party to repledge of $10.5 billion, of which $10.5 billion was collateral posted in connection with our secured uncommitted intraday line of credit with a third party as discussed above.

At December 31, 2010, we pledged securities with the ability of the secured party to repledge of $10.7 billion, of which $10.5 billion was collateral posted in connection with our secured uncommitted intraday line of credit with a third party as discussed above.

There were no borrowings against the line of credit at December 31, 2011 or 2010. The remaining $25 million and $0.2 billion of collateral posted with the ability of the secured party to repledge at December 31, 2011 and 2010, respectively, was posted in connection with our margin account related to futures transactions.

*Securities Pledged without the Ability of the Secured Party to Repledge*

At December 31, 2011 and 2010, we pledged securities without the ability of the secured party to repledge of $88 million and $5 million, respectively, at a clearinghouse in connection with the trading and settlement of securities.

*Collateral in the Form of Cash Pledged*

At December 31, 2011, we pledged $12.7 billion of collateral in the form of cash and cash equivalents, all but $133 million of which related to our derivative agreements as we had $12.7 billion of such derivatives in a net loss position. At December 31, 2010, we pledged $8.5 billion of collateral in the form of cash and cash equivalents, all but $40 million of which related to our derivative agreements as we had $9.3 billion of such derivatives in a net loss position. The remaining $133 million and $40 million was posted at clearinghouses in connection with our securities and other derivative transactions at December 31, 2011 and 2010, respectively.

### NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS

Debt securities that we issue are classified on our consolidated balance sheets as either debt securities of consolidated trusts held by third parties or other debt. We issue other debt to fund our operations.

Under the Purchase Agreement, without the prior written consent of Treasury, we may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are allowed to own on December 31 of the immediately preceding calendar year. Because of this debt limit, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Under the Purchase Agreement, the amount of our "indebtedness" is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs. Therefore, "indebtedness" does not include

debt securities of consolidated trusts held by third parties. We also cannot become liable for any subordinated indebtedness without the prior consent of Treasury.

Our debt cap under the Purchase Agreement was $972.0 billion in 2011 and declined to $874.8 billion on January 1, 2012. As of December 31, 2011, we estimate that the par value of our aggregate indebtedness totaled $674.3 billion, which was approximately $297.7 billion below the applicable debt cap. Our aggregate indebtedness is calculated as the par value of other debt.

In the tables below, the categories of short-term debt (due within one year) and long-term debt (due after one year) are based on the original contractual maturity of the debt instruments classified as other debt.

The table below summarizes the interest expense and the balances of total debt, net per our consolidated balance sheets.

## Table 8.1 — Total Debt, Net

| | Interest Expense For The Year Ended December 31, | | | Balance, Net[1] | |
| | 2011 | 2010 | 2009 | December 31, 2011 | December 31, 2010 |
| | (in millions) | | | (in millions) | |
|---|---|---|---|---|---|
| Other debt: | | | | | |
| Short-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 331 | $ 552 | $ 2,234 | $ 161,399 | $ 197,106 |
| Long-term debt: | | | | | |
| Senior debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,505 | 16,317 | 19,754 | 498,779 | 516,123 |
| Subordinated debt . . . . . . . . . . . . . . . . . . . . . . . . . | 33 | 46 | 162 | 368 | 711 |
| Total long-term debt . . . . . . . . . . . . . . . . . . . . . . . | 12,538 | 16,363 | 19,916 | 499,147 | 516,834 |
| Total other debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,869 | 16,915 | 22,150 | 660,546 | 713,940 |
| Debt securities of consolidated trusts held by third parties . . . . . . . . . | 67,119 | 75,216 | — | 1,471,437 | 1,528,648 |
| Total debt, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $79,988 | $92,131 | $22,150 | $2,131,983 | $2,242,588 |

(1) Represents par value, net of associated discounts, premiums, and hedge-related basis adjustments, with $0.2 billion and $0.9 billion, respectively, of other short-term debt, and $2.8 billion and $3.6 billion, respectively, of other long-term debt that represents the fair value of debt securities with the fair value option elected at December 31, 2011 and 2010.

During 2011, 2010, and 2009, we recognized fair value gains (losses) of $91 million, $581 million, and $(405) million, respectively, on our foreign-currency denominated debt, of which $40 million, $461 million, and $(209) million, respectively, are gains (losses) related to our net foreign-currency translation.

**Other Short-Term Debt**

As indicated in "Table 8.2 — Other Short-Term Debt", a majority of other short-term debt consisted of Reference Bills® securities and discount notes, paying only principal at maturity. Reference Bills® securities, discount notes, and medium-term notes are unsecured general corporate obligations. Certain medium-term notes that have original maturities of one year or less are classified as other short-term debt.

The table below summarizes the balances and effective interest rates for other short-term debt.

## Table 8.2 — Other Short-Term Debt

| | December 31, 2011 | | | December 31, 2010 | | |
| | Par Value | Balance, Net[1] | Weighted Average Effective Rate[2] | Par Value | Balance, Net[1] | Weighted Average Effective Rate[2] |
| | (dollars in millions) | | | | | |
|---|---|---|---|---|---|---|
| Reference Bills® securities and discount notes . . . . | $161,193 | $161,149 | 0.11% | $194,875 | $194,742 | 0.24% |
| Medium-term notes . . . . . . . . . . . . . . . . . . . . . | 250 | 250 | 0.24 | 2,364 | 2,364 | 0.31 |
| Other short-term debt . . . . . . . . . . . . . . . . . . . | $161,443 | $161,399 | 0.11 | $197,239 | $197,106 | 0.25 |

(1) Represents par value, net of associated discounts and premiums.
(2) Represents the weighted average effective rate that remains constant over the life of the instrument, which includes the amortization of discounts or premiums and issuance costs.

**Federal Funds Purchased and Securities Sold Under Agreements to Repurchase**

Securities sold under agreements to repurchase are effectively collateralized borrowing transactions where we sell securities with an agreement to repurchase such securities. These agreements require the underlying securities to be delivered to the dealers who are the counterparties to the transactions. Federal funds purchased are unsecuritized borrowings from commercial banks that are members of the Federal Reserve System. At both December 31, 2011 and 2010, we had no balances in federal funds purchased and securities sold under agreements to repurchase.

**Other Long-Term Debt**

The table below summarizes our other long-term debt.

**Table 8.3 — Other Long-Term Debt**

| | Contractual Maturity[1] | December 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|---|
| | | Par Value | Balance, Net[2] | Weighted Average Effective Rate[3] | Par Value | Balance, Net[2] | Weighted Average Effective Rate[3] |
| | | | | (dollars in millions) | | | |
| Other long-term debt: | | | | | | | |
| Other senior debt:[4] | | | | | | | |
| Fixed-rate: | | | | | | | |
| Medium-term notes — callable[5] . . . . . | 2012 - 2037 | $ 96,958 | $ 96,938 | 1.78% | $107,328 | $107,272 | 2.60% |
| Medium-term notes — non-callable . . . . | 2012 - 2028 | 41,303 | 41,470 | 1.33 | 31,107 | 31,335 | 1.73 |
| U.S. dollar Reference Notes® securities — non-callable . . . . . . . . | 2012 - 2032 | 238,145 | 238,244 | 3.17 | 239,497 | 239,486 | 3.69 |
| €Reference Notes® securities — non-callable . . . . . . . . . . . . . . . . . . . . . | 2012 - 2014 | 1,722 | 1,766 | 4.76 | 2,021 | 2,131 | 4.72 |
| Variable-rate: | | | | | | | |
| Medium-term notes — callable[6] . . . . . | 2012 - 2028 | 21,230 | 21,229 | 2.40 | 32,404 | 32,403 | 2.81 |
| Medium-term notes — non-callable . . . . | 2012 - 2026 | 86,010 | 86,019 | 0.26 | 91,332 | 91,346 | 0.57 |
| Zero-coupon: | | | | | | | |
| Medium-term notes — callable . . . . . . . | 2033 - 2041 | 12,475 | 3,281 | 5.39 | 12,191 | 2,971 | 5.69 |
| Medium-term notes — non-callable . . . . | 2012 - 2039 | 14,475 | 9,753 | 4.67 | 14,189 | 9,035 | 5.07 |
| Hedging-related basis adjustments . . . . . . | | N/A | 79 | | N/A | 144 | |
| Total other senior debt . . . . . . . . . . . . . . | | 512,318 | 498,779 | | 530,069 | 516,123 | |
| Other subordinated debt: | | | | | | | |
| Fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . | 2016 - 2018 | 221 | 218 | 6.59 | 578 | 575 | 5.74 |
| Zero-coupon . . . . . . . . . . . . . . . . . . . . . . | 2019 | 332 | 150 | 10.51 | 331 | 136 | 10.51 |
| Total other subordinated debt. . . . . . . . . | | 553 | 368 | | 909 | 711 | |
| Total other long-term debt . . . . . . . . . . . . . . | | $512,871 | $499,147 | 2.27 | $530,978 | $516,834 | 2.78 |

(1) Represents contractual maturities at December 31, 2011.
(2) Represents par value of long-term debt securities and subordinated borrowings, net of associated discounts or premiums and hedge-related basis adjustments.
(3) Represents the weighted average effective rate that remains constant over the life of the instrument, which includes the amortization of discounts or premiums, issuance costs, and hedging-related basis adjustments.
(4) For debt denominated in a currency other than the U.S. dollar, the outstanding balance is based on the exchange rate at December 31, 2011 and 2010, respectively.
(5) Includes callable FreddieNotes® securities of $2.9 billion and $5.4 billion at December 31, 2011 and 2010, respectively.
(6) Includes callable FreddieNotes® securities of $1.3 billion and $7.0 billion at December 31, 2011 and 2010, respectively.

A portion of our other long-term debt is callable. Callable debt gives us the option to redeem the debt security at par on one or more specified call dates or at any time on or after a specified call date.

**Debt Securities of Consolidated Trusts Held by Third Parties**

Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated securitization trusts (*i.e.*, single-family PC trusts and certain Other Guarantee Transactions).

The table below summarizes the debt securities of consolidated trusts held by third parties based on underlying mortgage product type.

### Table 8.4 — Debt Securities of Consolidated Trusts Held by Third Parties[1]

| | December 31, 2011 | | | | December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Contractual Maturity[2] | UPB | Balance, Net[3] | Weighted Average Coupon[2] | Contractual Maturity[2] | UPB | Balance, Net[3] | Weighted Average Coupon[2] |
| | | (dollars in millions) | | | | (dollars in millions) | | |
| Single-family: | | | | | | | | |
| 30-year or more, fixed-rate . . . . . . . . . . . . . | 2012 - 2048 | $1,034,680 | $1,047,556 | 4.92% | 2011 - 2048 | $1,110,943 | $1,118,994 | 5.03% |
| 20-year fixed-rate . . . . . . . | 2012 - 2032 | 67,323 | 68,502 | 4.53 | 2012 - 2031 | 63,941 | 64,752 | 4.78 |
| 15-year fixed-rate . . . . . . . | 2012 - 2027 | 242,077 | 246,023 | 4.09 | 2011 - 2026 | 227,269 | 229,510 | 4.41 |
| Adjustable-rate . . . . . . . . | 2012 - 2047 | 60,544 | 61,395 | 3.18 | 2011 - 2047 | 50,904 | 51,351 | 3.69 |
| Interest-only[4] . . . . . . . . . | 2026 - 2041 | 45,807 | 45,884 | 4.91 | 2026 - 2040 | 61,773 | 61,830 | 5.30 |
| FHA/VA . . . . . . . . . . . . . . | 2012 - 2041 | 2,045 | 2,077 | 5.67 | 2011 - 2040 | 2,171 | 2,211 | 5.88 |
| Total debt securities of consolidated trusts held by third parties[5] . . . . . . . . . | | $1,452,476 | $1,471,437 | | | $1,517,001 | $1,528,648 | |

(1) Debt securities of consolidated trusts held by third parties are prepayable without penalty.
(2) Based on the contractual maturity and interest rate of debt securities of our consolidated trusts held by third parties.
(3) Represents par value, net of associated discounts, premiums, and other basis adjustments.
(4) Includes interest-only securities and interest-only mortgage loans that allow the borrowers to pay only interest for a fixed period of time before the loans begin to amortize.
(5) The effective rate for debt securities of consolidated trusts held by third parties was 4.22% and 4.57% as of December 31, 2011 and 2010, respectively.

The table below summarizes the contractual maturities of other long-term debt securities and debt securities of consolidated trusts held by third parties at December 31, 2011.

### Table 8.5 — Contractual Maturity of Other Long-Term Debt and Debt Securities of Consolidated Trusts Held by Third Parties

| Annual Maturities | Par Value[1][2] |
|---|---|
| | (in millions) |
| Other debt: | |
| 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 127,798 |
| 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 142,943 |
| 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 87,453 |
| 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33,897 |
| 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 45,526 |
| Thereafter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 75,254 |
| Debt securities of consolidated trusts held by third parties[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,452,476 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,965,347 |
| Net discounts, premiums, hedge-related and other basis adjustments[4] . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,237 |
| Total debt securities of consolidated trusts held by third parties and other long-term debt . . . . . . . . . . . . . . . . . . . . . . | $1,970,584 |

(1) Represents par value of long-term debt securities and subordinated borrowings and UPB of debt securities of our consolidated trusts held by third parties.
(2) For other debt denominated in a currency other than the U.S. dollar, the par value is based on the exchange rate at December 31, 2011.
(3) Contractual maturities of debt securities of consolidated trusts held by third parties may not represent expected maturity as they are prepayable at any time without penalty.
(4) Other basis adjustments primarily represent changes in fair value attributable to instrument-specific credit risk and interest-rate risk related to other foreign-currency denominated debt.

### Lines of Credit

At both December 31, 2011 and 2010, we had one secured, uncommitted intraday line of credit with a third party totaling $10 billion. We use this line of credit regularly to provide us with additional liquidity to fund our intraday payment activities through the Fedwire system in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs. No amounts were drawn on this line of credit at December 31, 2011 or 2010. We expect to continue to use the current facility to satisfy our intraday financing needs; however, as the line is uncommitted, we may not be able to draw on it if and when needed.

### Subordinated Debt Interest and Principal Payments

In a September 23, 2008 statement concerning the conservatorship, the Director of FHFA stated that we would continue to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital

levels. As a result, the terms of any of our subordinated debt that provide for us to defer payments of interest under certain circumstances, including our failure to maintain specified capital levels, are no longer applicable.

## NOTE 9: FINANCIAL GUARANTEES

When we securitize single-family mortgages that we purchase, we issue mortgage-related securities that can be sold to investors or held by us. During the years ended December 31, 2011 and 2010, we issued and guaranteed $300.2 billion and $375.9 billion, respectively, in UPB of Freddie Mac mortgage-related securities backed by single-family mortgage loans (excluding those backed by HFA bonds).

Beginning January 1, 2010, we no longer recognize a financial guarantee for such arrangements as we instead recognize both the mortgage loans and the debt securities of these securitization trusts on our consolidated balance sheets. The table below presents our maximum potential exposure, our recognized liability, and the maximum remaining term of our financial guarantees that are not consolidated on our balance sheets.

### Table 9.1 — Financial Guarantees

| | December 31, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Maximum Exposure[1] | Recognized Liability | Maximum Remaining Term | Maximum Exposure[1] | Recognized Liability | Maximum Remaining Term |
| | (dollars in millions, terms in years) | | | | | |
| Non-consolidated Freddie Mac securities[2] ............... | $35,879 | $ 300 | 42 | $25,279 | $202 | 41 |
| Other guarantee commitments[3] ........................ | 21,064 | 487 | 37 | 18,670 | 427 | 38 |
| Derivative instruments ............................... | 37,737 | 2,977 | 34 | 37,578 | 301 | 35 |
| Servicing-related premium guarantees ................... | 151 | — | 5 | 172 | — | 5 |

(1) Maximum exposure represents the contractual amounts that could be lost under the non-consolidated guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements, such as recourse provisions, third-party insurance contracts, or from collateral held or pledged. The maximum exposure disclosed above is not representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation. The maximum exposure for our liquidity guarantees is not mutually exclusive of our default guarantees; therefore, these amounts are included within the maximum exposure of non-consolidated Freddie Mac securities and other guarantee commitments.
(2) As of December 31, 2011 and December 31, 2010, the UPB of non-consolidated Freddie Mac securities associated with single-family mortgage loans was $10.7 billion and $11.3 billion, respectively. The remaining balances relate to multifamily mortgage loans.
(3) As of December 31, 2011 and December 31, 2010, the UPB of other guarantee commitments associated with single-family mortgage loans was $11.1 billion and $8.6 billion, respectively. The remaining balances relate to multifamily mortgage loans.

### Non-Consolidated Freddie Mac Securities

We issue three types of mortgage-related securities: (a) PCs; (b) REMICs and Other Structured Securities; and (c) Other Guarantee Transactions. We guarantee the payment of principal and interest on these securities, which are backed by pools of mortgage loans, irrespective of the cash flows received from the borrowers. Commencing January 1, 2010, only our guarantees issued to non-consolidated securitization trusts are accounted for in accordance with the accounting guidance for guarantees (*i.e.*, a guarantee asset and guarantee obligation are recognized).

Our securities issued in resecuritizations of our PCs and other previously issued REMICs and Other Structured Securities are not consolidated as they do not give rise to any additional exposure to credit loss as we already consolidate the underlying collateral. The securities issued in these resecuritizations consist of single-class and multiclass securities backed by PCs, REMICs, interest-only strips, and principal-only strips. Since these resecuritizations do not increase our credit-risk, no guarantee asset or guarantee obligation is recognized for these transactions and they are excluded from the table above.

We recognize a guarantee asset, guarantee obligation and a reserve for guarantee losses, as necessary, for securities issued by non-consolidated securitization trusts and other guarantee commitments for which we are exposed to incremental credit risk. Our guarantee obligation represents the recognized liability, net of cumulative amortization, associated with our guarantee of multifamily PCs and certain Other Guarantee Transactions issued to non-consolidated securitization trusts. In addition to our guarantee obligation, we recognize a reserve for guarantee losses, which is included within other liabilities on our consolidated balance sheets, which totaled $0.2 billion at December 31, 2011 and 2010, respectively. For many of the loans underlying our non-consolidated guarantees, there are credit protections from third parties, including subordination, covering a portion of our exposure. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections on loans we guarantee. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information about our accounting for financial guarantees.

During 2011 we issued approximately $11.8 billion, compared to $5.9 billion in 2010, in UPB of non-consolidated Freddie Mac securities primarily backed by multifamily mortgage loans, for which a guarantee asset and guarantee

obligation were recognized. During 2010, we also issued $3.9 billion in UPB of non-consolidated Other Guarantee Transactions backed by HFA bonds as part of the NIBP, for which a guarantee asset and guarantee obligation were recognized.

In connection with transfers of financial assets to non-consolidated securitization trusts that are accounted for as sales and for which we have incremental credit risk, we recognize our guarantee obligation in accordance with the accounting guidance for guarantees. Additionally, we may retain an interest in the transferred financial assets (*e.g.*, a beneficial interest issued by the securitization trust). See "NOTE 10: RETAINED INTERESTS IN MORTGAGE-RELATED SECURITIZATIONS" for further information on these retained interests.

## Other Guarantee Commitments

We provide long-term standby commitments to certain of our customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements. During 2011 and 2010, we issued and guaranteed $4.4 billion and $3.2 billion, respectively, in UPB of long-term standby commitments. These other guarantee commitments totaled $8.6 billion and $5.5 billion of UPB at December 31, 2011 and December 31, 2010, respectively. We also had other guarantee commitments on multifamily housing revenue bonds that were issued by HFAs of $9.6 billion and $9.7 billion in UPB at December 31, 2011 and December 31, 2010, respectively. In addition, as of December 31, 2011, and 2010, respectively, we had issued guarantees under the TCLFP on securities backed by HFA bonds with UPB of $2.9 billion, and $3.5 billion, respectively.

## Derivative Instruments

Derivative instruments include written options, written swaptions, interest-rate swap guarantees, and short-term default guarantee commitments accounted for as credit derivatives. See "NOTE 11: DERIVATIVES" for further discussion of these derivative guarantees.

We guarantee the performance of interest-rate swap contracts in two circumstances. First, we guarantee that a borrower will perform under an interest-rate swap contract linked to a borrower's ARM. And second, in connection with our issuance of certain REMICs and Other Structured Securities, which are backed by tax-exempt bonds, we guarantee that the sponsor of the transaction will perform under the interest-rate swap contract linked to the senior variable-rate certificates that we issued.

We also have issued REMICs and Other Structured Securities with stated final maturities that are shorter than the stated maturity of the underlying mortgage loans. If the underlying mortgage loans to these securities have not been purchased by a third party or fully matured as of the stated final maturity date of such securities, we will sponsor an auction of the underlying assets. To the extent that purchase or auction proceeds are insufficient to cover unpaid principal amounts due to investors in such REMICs and Other Structured Securities, we are obligated to fund such principal. Our maximum exposure on these guarantees represents the outstanding UPB of the REMICs and Other Structured Securities subject to stated final maturities.

## Servicing-Related Premium Guarantees

We provide guarantees to reimburse servicers for premiums paid to acquire servicing in situations where the original seller is unable to perform under its separate servicing agreement. The liability associated with these agreements was not material at December 31, 2011 and 2010.

## Other Indemnifications

In connection with certain business transactions, we may provide indemnification to counterparties for claims arising out of breaches of certain obligations (*e.g.*, those arising from representations and warranties) in contracts entered into in the normal course of business. Our assessment is that the risk of any material loss from such a claim for indemnification is remote and there are no significant probable and estimable losses associated with these contracts. In addition, we provided indemnification for litigation defense costs to certain former officers who are subject to ongoing litigation. See "NOTE 18: LEGAL CONTINGENCIES" for further information on ongoing litigation. The recognized liabilities on our consolidated balance sheets related to indemnifications were not significant at December 31, 2011 and 2010.

As part of the guarantee arrangements pertaining to multifamily housing revenue bonds, we provided commitments to advance funds, commonly referred to as "liquidity guarantees." These guarantees require us to advance funds to enable others to repurchase any tendered tax-exempt and related taxable bonds that are unable to be remarketed. Any such advances are treated as loans and are secured by a pledge to us of the repurchased securities until the securities are

remarketed. We hold cash and cash equivalents on our consolidated balance sheets for the amount of these commitments. No advances under these liquidity guarantees were outstanding at December 31, 2011 and 2010.

**Securitization Trusts**

We established securitization trusts for the administration of cash remittances received on the underlying assets of our PCs and REMICs and Other Structured Securities. As described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," we recognize the cash held by our consolidated single-family PC trusts and certain Other Guarantee Transactions as restricted cash and cash equivalents on our consolidated balance sheets. We receive fees as master servicer, issuer, trustee and administrator for our consolidated PCs and REMICs and Other Structured Securities. Such amounts are recorded within net interest income. These fees are derived from interest earned on principal and interest cash flows held in restricted cash and cash equivalents between the time funds are remitted to the trust by servicers and the date of distribution to our PCs and REMICs and Other Structured Securities holders. These fees are offset by interest expense we incur when a borrower prepays a mortgage, but the full amount of interest for the month is due to the PC investor. We recognized net trust management income (expense) of $0 million during 2011 and 2010 (on our non-consolidated trusts), and $(761) million during 2009 (on all trusts), on our consolidated statements of income and comprehensive income.

## NOTE 10: RETAINED INTERESTS IN MORTGAGE-RELATED SECURITIZATIONS

Beginning January 1, 2010, in accordance with the amendment to the accounting guidance for consolidation of VIEs, we consolidated our single-family PC trusts and certain Other Guarantee Transactions. As a result, a large majority of our transfers of financial assets that historically qualified as sales (*e.g.*, the transfer of mortgage loans to our single-family PC trusts) are no longer treated as such because the financial assets are transferred to a consolidated entity. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information regarding the impacts of consolidation of our single-family PC trusts and certain Other Guarantee Transactions.

Certain of our transfers of financial assets to non-consolidated trusts and third parties may continue to qualify as sales. In connection with our transfers of financial assets that qualify as sales, we may retain certain interests in the transferred assets. Our retained interests are primarily beneficial interests issued by non-consolidated securitization trusts (*e.g.*, multifamily PCs and multiclass resecuritization securities). These interests are included in investments in securities on our consolidated balance sheets. In addition, our guarantee asset recognized in connection with non-consolidated securitization transactions also represents a retained interest. For more information about our retained interests in mortgage-related securitizations, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities." These transfers and our resulting retained interests are not significant to our consolidated financial statements in 2011 and 2010.

Our exposure to credit losses on the loans underlying our retained securitization interests is recorded within our reserve for guarantee losses. For further information regarding our charge-offs and other activity associated with our reserve for guarantee losses on loans for which we have provided our guarantee, see "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES."

**Retained Interests, Guarantee Asset**

During 2009, the fair values of our guarantee asset associated with single-family loans at the time of securitization and subsequent fair value measurements at the end of a period were primarily estimated using third-party information. Consequently, we derived our assumptions by determining those implied by our valuation estimates, with the internal rate of return, or discount rate, adjusted where necessary to align our internal models with estimated fair values determined using third-party information. However, prepayment rates are presented based on our internal models and were not similarly adjusted. For the portion of our guarantee asset that was valued by obtaining dealer quotes on proxy securities, we derived the assumptions from the prices we were provided. For the year ended December 31, 2009, we estimate the average internal rate of return, prepayment rates and weighted average lives used in measuring the fair value of our guarantee asset associated with single-family loans were 13.8%, 26.4%, and 3.3 years, respectively. These estimates represent the average assumptions used both at the end of the period as well as the valuation assumptions at guarantee issuance during the year on a combined basis. Our estimate of the average internal rate of return represents a UPB weighted average of the discount rates implied by a model which employs multiple interest rate scenarios versus a single assumption.

**Cash Flows Associated with Non-Consolidated Trusts**

We receive proceeds in securitizations accounted for as sales for those securities sold to third parties. Subsequent to these securitizations, we receive cash flows related to interest income and repayment of principal on the securities we retain for investment. Regardless of whether our issued mortgage-related security is sold to third parties or held by us for investment, we are obligated to make cash payments to acquire foreclosed properties and certain delinquent or impaired mortgages under our financial guarantees. In addition to the securitization and sale transactions discussed below, the cash flows on retained interests related to securitizations accounted for as sales during 2009 consisted of: (a) cash receipts associated with our guarantee asset of $2.9 billion; (b) cash receipts associated with principal and interest on our retained interests of $21.4 billion; and (c) cash payments associated with delinquent or foreclosed loans and required purchase of balloon mortgages of $26.3 billion. In addition, we are obligated under our guarantee to make up any shortfalls in principal and interest to the holders of our securities. See "NOTE 9: FINANCIAL GUARANTEES" for additional information on these payments in 2009. Cash flows associated with our retained interests in 2011 and 2010 were not significant.

**Gains and Losses on Securitizations Accounted for as Sales**

The gain or loss on a securitization that qualifies as a sale is determined, in part, based on the carrying amounts of the financial assets sold. The carrying amounts of the assets sold are allocated between those sold to third parties and those held as retained interests based on their relative fair value at the date of sale. We recognized net pre-tax gains (losses) on transfers of mortgage loans, PCs and REMICs and Other Structured Securities that were accounted for as sales of approximately $1.5 billion for the year ended December 31, 2009. These transactions were not significant in 2011 and 2010 due to the changes in the accounting guidance for consolidation of VIEs that became effective January 1, 2010.

## NOTE 11: DERIVATIVES

**Use of Derivatives**

We use derivatives primarily to:

- hedge forecasted issuances of debt;

- synthetically create callable and non-callable funding;

- regularly adjust or rebalance our funding mix in response to changes in the interest-rate characteristics of our mortgage-related assets; and

- hedge foreign-currency exposure.

*Hedge Forecasted Debt Issuances*

When we commit to purchase mortgage investments, such commitments are typically for a future settlement ranging from two weeks to three months after the date of the commitment. To facilitate larger and more predictable debt issuances that contribute to lower funding costs, we use interest-rate derivatives to economically hedge the interest-rate risk exposure from the time we commit to purchase a mortgage to the time the related debt is issued.

*Create Synthetic Funding*

We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures. For example, the combination of a series of short-term debt issuances over a defined period and a pay-fixed interest rate swap with the same maturity as the last debt issuance is the substantive economic equivalent of a long-term fixed-rate debt instrument of comparable maturity. Similarly, the combination of non-callable debt and a call swaption, or option to enter into a receive-fixed interest rate swap, with the same maturity as the non-callable debt, is the substantive economic equivalent of callable debt. These derivatives strategies increase our funding flexibility and allow us to better match asset and liability cash flows, often reducing overall funding costs.

*Adjust Funding Mix*

We generally use interest-rate swaps to mitigate contractual funding mismatches between our assets and liabilities. We also use swaptions and other option-based derivatives to adjust the contractual terms of our debt funding in response to changes in the expected lives of our investments in mortgage-related assets. As market conditions dictate, we take rebalancing actions to keep our interest-rate risk exposure within management-set limits. In a declining interest-rate environment, we typically enter into receive-fixed interest rate swaps or purchase Treasury-based derivatives to shorten the duration of our funding to offset the declining duration of our mortgage assets. In a rising interest-rate environment, we

typically enter into pay-fixed interest rate swaps or sell Treasury-based derivatives in order to lengthen the duration of our funding to offset the increasing duration of our mortgage assets.

### Foreign-Currency Exposure

We use foreign-currency swaps to eliminate virtually all of our exposure to fluctuations in exchange rates related to our foreign-currency denominated debt by entering into swap transactions that effectively convert foreign-currency denominated obligations into U.S. dollar-denominated obligations.

### Types of Derivatives

We principally use the following types of derivatives:

- LIBOR- and Euribor-based interest-rate swaps;

- LIBOR- and Treasury-based options (including swaptions);

- LIBOR- and Treasury-based exchange-traded futures; and

- Foreign-currency swaps.

In addition to swaps, futures and purchased options, our derivative positions include the following:

### Written Options and Swaptions

Written call and put swaptions are sold to counterparties allowing them the option to enter into receive- and pay-fixed interest rate swaps, respectively. Written call and put options on mortgage-related securities give the counterparty the right to execute a contract under specified terms, which generally occurs when we are in a liability position. We use these written options and swaptions to manage convexity risk over a wide range of interest rates. Written options lower our overall hedging costs, allow us to hedge the same economic risk we assume when selling guaranteed final maturity REMICs with a more liquid instrument, and allow us to rebalance the options in our callable debt and REMICs portfolios. We may, from time to time, write other derivative contracts such as caps, floors, interest-rate futures and options on buy-up and buy-down commitments.

### Commitments

We routinely enter into commitments that include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts. Most of these commitments are considered derivatives and therefore are subject to the accounting guidance for derivatives and hedging.

### Swap Guarantee Derivatives

In connection with some of the guarantee arrangements pertaining to multifamily housing revenue bonds and multifamily pass-through certificates, we may also guarantee the sponsor's or the borrower's obligations as a counterparty on any related interest-rate swaps used to mitigate interest-rate risk, which are accounted for as swap guarantee derivatives.

### Credit Derivatives

We entered into credit-risk sharing agreements for certain credit enhanced multifamily housing revenue bonds held by third parties in exchange for a monthly fee. In addition, we have purchased mortgage loans containing debt cancellation contracts, which provide for mortgage debt or payment cancellation for borrowers who experience unanticipated losses of income dependent on a covered event. The rights and obligations under these agreements have been assigned to the servicers. However, in the event the servicer does not perform as required by contract, under our guarantee, we would be obligated to make the required contractual payments.

For a discussion of our significant accounting policies related to derivatives, please see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Derivatives."

## Derivative Assets and Liabilities at Fair Value

The table below presents the location and fair value of derivatives reported in our consolidated balance sheets.

### Table 11.1 — Derivative Assets and Liabilities at Fair Value

| | At December 31, 2011 | | | At December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Notional or Contractual Amount | Derivatives at Fair Value | | Notional or Contractual Amount | Derivatives at Fair Value | |
| | | Assets[1] | Liabilities[1] | | Assets[1] | Liabilities[1] |
| | | | (in millions) | | | |
| **Total derivative portfolio** | | | | | | |
| *Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging*[2] | | | | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed | $211,808 | $ 12,998 | $  (108) | $ 324,590 | $  6,952 | $ (3,267) |
| Pay-fixed | 289,335 | 19 | (34,507) | 394,294 | 3,012 | (24,210) |
| Basis (floating to floating) | 2,750 | 5 | (7) | 2,375 | 6 | (2) |
| Total interest-rate swaps | 503,893 | 13,022 | (34,622) | 721,259 | 9,970 | (27,479) |
| Option-based: | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 76,275 | 12,975 | — | 114,110 | 8,391 | — |
| Written | 27,525 | — | (2,932) | 11,775 | — | (244) |
| Put Swaptions | | | | | | |
| Purchased | 70,375 | 638 | — | 59,975 | 1,404 | — |
| Written | 500 | — | (2) | 6,000 | — | (8) |
| Other option-based derivatives[3] | 38,549 | 2,256 | (2) | 47,234 | 1,460 | (10) |
| Total option-based | 213,224 | 15,869 | (2,936) | 239,094 | 11,255 | (262) |
| Futures | 41,281 | 5 | — | 212,383 | 3 | (170) |
| Foreign-currency swaps | 1,722 | 106 | (9) | 2,021 | 172 | — |
| Commitments[4] | 14,318 | 38 | (94) | 14,292 | 103 | (123) |
| Credit derivatives | 10,190 | 1 | (5) | 12,833 | 12 | (5) |
| Swap guarantee derivatives | 3,621 | — | (37) | 3,614 | — | (36) |
| Total derivatives not designated as hedging instruments | 788,249 | 29,041 | (37,703) | 1,205,496 | 21,515 | (28,075) |
| Netting adjustments[5] | | (28,923) | 37,268 | | (21,372) | 26,866 |
| Total derivative portfolio, net | $788,249 | $   118 | $  (435) | $1,205,496 | $   143 | $ (1,209) |

(1) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net.
(2) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.
(3) Primarily includes purchased interest-rate caps and floors.
(4) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.
(5) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $9.4 billion and $1 million, respectively, at December 31, 2011. The net cash collateral posted and net trade/settle receivable were $6.3 billion and $1 million, respectively, at December 31, 2010. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(1.1) billion and $(0.8) billion at December 31, 2011 and 2010, respectively, which was mainly related to interest-rate swaps that we have entered into.

The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable and net trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net asset position are reported as derivative assets, net. Similarly, derivatives in a net liability position are reported as derivative liabilities, net. Cash collateral we obtained from counterparties to derivative contracts that has been offset against derivative assets at December 31, 2011 and 2010 was $3.2 billion and $2.2 billion, respectively. Cash collateral we posted to counterparties to derivative contracts that has been offset against derivative liabilities at December 31, 2011 and 2010 was $12.6 billion and $8.5 billion, respectively. We are subject to collateral posting thresholds based on the credit rating of our long-term senior unsecured debt securities from S&P or Moody's. The lowering or withdrawal of our credit rating by S&P or Moody's may increase our obligation to post collateral, depending on the amount of the counterparty's exposure to Freddie Mac with respect to the derivative transactions. As a result of S&P's downgrade of Freddie Mac's credit rating of our long-term senior unsecured debt from AAA to AA+ on August 8, 2011, we posted additional collateral to certain derivative counterparties in accordance with the terms of the derivative agreements.

The aggregate fair value of all derivative instruments with credit-risk-related contingent features that were in a liability position on December 31, 2011, was $12.7 billion for which we posted collateral of $12.6 billion in the normal course of business. If the credit-risk-related contingent features underlying these agreements had been triggered on December 31, 2011, we would have been required to post an additional $0.1 billion of collateral to our counterparties.

At December 31, 2011 and 2010, there were no amounts of cash collateral that were not offset against derivative assets, net or derivative liabilities, net, as applicable. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information related to our derivative counterparties.

**Gains and Losses on Derivatives**

The table below presents the gains and losses on derivatives reported in our consolidated statements of income and comprehensive income.

**Table 11.2 — Gains and Losses on Derivatives**

| Derivatives in Cash Flow Hedging Relationships[1][2] | Amount of Gain or (Loss) Reclassified from AOCI into Earnings (Effective Portion) | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | 2011 | 2010 | 2009 |
| | (in millions) | | |
| Closed cash flow hedges[3] | $ (758) | $ (1,010) | $ (1,165) |

| Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging[5] | Derivative Gains (Losses)[4] | | |
|---|---|---|---|
| | Year Ended December 31, | | |
| | 2011 | 2010 | 2009 |
| | (in millions) | | |
| Interest-rate swaps: | | | |
| Receive-fixed | | | |
| Foreign-currency denominated | $ (49) | $ (119) | $ 64 |
| U.S. dollar denominated | 12,686 | 9,825 | (13,337) |
| Total receive-fixed swaps | 12,637 | 9,706 | (13,273) |
| Pay-fixed | (22,999) | (17,450) | 27,078 |
| Basis (floating to floating) | (5) | 65 | (194) |
| Total interest-rate swaps | (10,367) | (7,679) | 13,611 |
| Option based: | | | |
| Call swaptions | | | |
| Purchased | 10,234 | 6,548 | (10,566) |
| Written | (2,337) | (199) | 248 |
| Put swaptions | | | |
| Purchased | (1,614) | (1,621) | 323 |
| Written | 14 | 82 | (321) |
| Other option-based derivatives[6] | 879 | 33 | (370) |
| Total option-based | 7,176 | 4,843 | (10,686) |
| Futures | (154) | (210) | (300) |
| Foreign-currency swaps[7] | (41) | (468) | 138 |
| Commitments[8] | (1,340) | (85) | (708) |
| Credit derivatives | — | 5 | (4) |
| Swap guarantee derivatives | 3 | 3 | (20) |
| Other[9] | 3 | — | 12 |
| Subtotal | (4,720) | (3,591) | 2,043 |
| Accrual of periodic settlements:[10] | | | |
| Receive-fixed interest-rate swaps[11] | 4,173 | 6,381 | 5,817 |
| Pay-fixed interest-rate swaps | (9,241) | (10,909) | (9,964) |
| Foreign-currency swaps | 22 | 19 | 89 |
| Other | 14 | 15 | 115 |
| Total accrual of periodic settlements | (5,032) | (4,494) | (3,943) |
| Total | $ (9,752) | $ (8,085) | $ (1,900) |

(1) Derivatives that meet specific criteria may be accounted for as cash flow hedges. Net deferred gains and losses on closed cash flow hedges (i.e., where the derivative is either terminated or redesignated) are also included in AOCI until the related forecasted transaction affects earnings or is determined to be probable of not occurring.

(2) No amounts of gains or (losses) were recognized in AOCI on derivatives (effective portion) and in other income (ineffective portion and amount excluded from effectiveness testing).

(3) Amounts reported in AOCI related to changes in the fair value of commitments to purchase securities that were designated as cash flow hedges are recognized as basis adjustments to the related assets, which are amortized in earnings as interest income. Amounts linked to interest payments on long-term debt are recorded in other debt interest expense and amounts not linked to interest payments on long-term debt are recorded in expense related to derivatives.

(4) Gains (losses) are reported as derivative gains (losses) on our consolidated statements of income and comprehensive income.

(5) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.

(6) Primarily includes purchased interest-rate caps and floors.

(7) Foreign-currency swaps are defined as swaps in which the net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars.

(8) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

(9) Related to the bankruptcy of Lehman Brothers Holdings, Inc., or Lehman.

(10) For derivatives not in qualifying hedge accounting relationships, the accrual of periodic cash settlements is recorded in derivative gains (losses) on our consolidated statements of income and comprehensive income.

(11) Includes imputed interest on zero-coupon swaps.

FHFA 2972

## Hedge Designation of Derivatives

At December 31, 2011 and 2010, we did not have any derivatives in hedge accounting relationships; however, there are deferred net losses recorded in AOCI related to closed cash flow hedges. As shown in "Table 11.3 — AOCI Related to Cash Flow Hedge Relationships", the total AOCI related to derivatives designated as cash flow hedges was a loss of $1.7 billion and $2.2 billion at December 31, 2011 and 2010, respectively, composed of deferred net losses on closed cash flow hedges. Closed cash flow hedges involve derivatives that have been terminated or are no longer designated as cash flow hedges. Fluctuations in prevailing market interest rates have no impact on the deferred portion of AOCI relating to losses on closed cash flow hedges.

The previous deferred amount related to closed cash flow hedges remains in our AOCI balance and will be recognized into earnings over the expected time period for which the forecasted transactions impact earnings. Over the next 12 months, we estimate that approximately $415 million, net of taxes, of the $1.7 billion of cash flow hedge losses in AOCI at December 31, 2011 will be reclassified into earnings. The maximum remaining length of time over which we have hedged the exposure related to the variability in future cash flows on forecasted transactions, primarily forecasted debt issuances, is 22 years. However, over 70% and 90% of AOCI relating to closed cash flow hedges at December 31, 2011 will be reclassified to earnings over the next five and ten years, respectively.

The table below presents the changes in AOCI related to derivatives designated as cash flow hedges. Net reclassifications of losses to earnings represents the AOCI amount that was recognized in earnings as the originally hedged forecasted transactions affected earnings, unless it was deemed probable that the forecasted transaction would not occur. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the hedge related to the forecasted transaction would be reclassified into earnings immediately.

### Table 11.3 — AOCI Related to Cash Flow Hedge Relationships

|  | Year Ended December 31, | | |
|  | 2011 | 2010 | 2009 |
| --- | --- | --- | --- |
|  | (in millions) | | |
| Beginning balance[1] | $(2,239) | $(2,905) | $(3,678) |
| Cumulative effect of change in accounting principle[2] | — | (7) | — |
| Net reclassifications of losses to earnings[3] | 509 | 673 | 773 |
| Ending balance[1] | $(1,730) | $(2,239) | $(2,905) |

(1) Represents net deferred gains and losses on closed (i.e., terminated or redesignated) cash flow hedges.
(2) Represents adjustment to initially apply the accounting guidance for accounting for transfers of financial assets and consolidation of VIEs, as well as a change in the amortization method for certain related deferred items. Net of tax benefit of $4 million for the year ended December 31, 2010.
(3) Net of tax benefit of $249 million, $337 million, and $392 million for the years ended December 31, 2011, 2010, and 2009, respectively.

## NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)

### Issuance of Senior Preferred Stock

Pursuant to the Purchase Agreement described in "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS," we issued one million shares of senior preferred stock to Treasury on September 8, 2008. The senior preferred stock was issued to Treasury in partial consideration of Treasury's commitment to provide funds to us under the Purchase Agreement.

Shares of the senior preferred stock have a par value of $1, and have a stated value and initial liquidation preference equal to $1,000 per share. The liquidation preference of the senior preferred stock is subject to adjustment. Dividends that are not paid in cash for any dividend period will accrue and be added to the liquidation preference of the senior preferred stock. In addition, any amounts Treasury pays to us pursuant to its funding commitment under the Purchase Agreement and any quarterly commitment fees that are not paid in cash to Treasury nor waived by Treasury will be added to the liquidation preference of the senior preferred stock. As described below, we may make payments to reduce the liquidation preference of the senior preferred stock in limited circumstances.

Treasury, as the holder of the senior preferred stock, is entitled to receive, when, as and if declared by our Board of Directors, cumulative quarterly cash dividends at the annual rate of 10% per year on the then-current liquidation preference of the senior preferred stock. Total dividends paid in cash during 2011, 2010, and 2009 at the direction of the Conservator were $6.5 billion, $5.7 billion, and $4.1 billion, respectively. If at any time we fail to pay cash dividends in a timely manner, then immediately following such failure and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be 12% per year.

The senior preferred stock ranks ahead of our common stock and all other outstanding series of our preferred stock, as well as any capital stock we issue in the future, as to both dividends and rights upon liquidation. The senior preferred stock provides that we may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any Freddie Mac common stock or other securities ranking junior to the senior preferred stock unless: (a) full cumulative dividends on the outstanding senior preferred stock (including any unpaid dividends added to the liquidation preference) have been declared and paid in cash; and (b) all amounts required to be paid with the net proceeds of any issuance of capital stock for cash (as described in the following paragraph) have been paid in cash. Shares of the senior preferred stock are not convertible. Shares of the senior preferred stock have no general or special voting rights, other than those set forth in the certificate of designation for the senior preferred stock or otherwise required by law. The consent of holders of at least two-thirds of all outstanding shares of senior preferred stock is generally required to amend the terms of the senior preferred stock or to create any class or series of stock that ranks prior to or on parity with the senior preferred stock.

We are not permitted to redeem the senior preferred stock prior to the termination of Treasury's funding commitment set forth in the Purchase Agreement; however, we are permitted to pay down the liquidation preference of the outstanding shares of senior preferred stock to the extent of: (a) accrued and unpaid dividends previously added to the liquidation preference and not previously paid down; and (b) quarterly commitment fees previously added to the liquidation preference and not previously paid down. In addition, if we issue any shares of capital stock for cash while the senior preferred stock is outstanding, the net proceeds of the issuance must be used to pay down the liquidation preference of the senior preferred stock; however, the liquidation preference of each share of senior preferred stock may not be paid down below $1,000 per share prior to the termination of Treasury's funding commitment. Following the termination of Treasury's funding commitment, we may pay down the liquidation preference of all outstanding shares of senior preferred stock at any time, in whole or in part. If, after termination of Treasury's funding commitment, we pay down the liquidation preference of each outstanding share of senior preferred stock in full, the shares will be deemed to have been redeemed as of the payment date.

The table below provides a summary of our senior preferred stock outstanding at December 31, 2011.

### Table 12.1 — Senior Preferred Stock

| | Draw Date | Shares Authorized | Shares Outstanding | Total Par Value | Initial Liquidation Preference Price per Share | Total Liquidation Preference[1] | Redeemable On or After[2] |
|---|---|---|---|---|---|---|---|
| | | (in millions, except initial liquidation preference price per share) | | | | | |
| Senior preferred stock:[3] | | | | | | | |
| 10% | September 8, 2008[4] | 1.00 | 1.00 | $1.00 | $1,000 | $ 1,000 | N/A |
| 10%[5] | November 24, 2008 | — | — | — | N/A | 13,800 | N/A |
| 10%[5] | March 31, 2009 | — | — | — | N/A | 30,800 | N/A |
| 10%[5] | June 30, 2009 | — | — | — | N/A | 6,100 | N/A |
| 10%[5] | June 30, 2010 | — | — | — | N/A | 10,600 | N/A |
| 10%[5] | September 30, 2010 | — | — | — | N/A | 1,800 | N/A |
| 10%[5] | December 30, 2010 | — | — | — | N/A | 100 | N/A |
| 10%[5] | March 31, 2011 | — | — | — | N/A | 500 | N/A |
| 10%[5] | September 30, 2011 | — | — | — | N/A | 1,479 | N/A |
| 10%[5] | December 30, 2011 | — | — | — | N/A | 5,992 | N/A |
| Total, senior preferred stock . . . | | 1.00 | 1.00 | $1.00 | | $72,171 | |

(1) Amounts stated at redemption value.
(2) In accordance with the Purchase Agreement, until the senior preferred stock is repaid or redeemed in full, we may not, without the prior written consent of Treasury, redeem, purchase, retire or otherwise acquire any Freddie Mac equity securities (other than the senior preferred stock or warrant).
(3) Dividends on the senior preferred stock are cumulative, and the dividend rate is 10% per year. However, if at any time we fail to pay cash dividends in a timely manner, then immediately following such failure and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends, the dividend rate will be 12% per year.
(4) We did not receive any cash proceeds from Treasury as a result of issuing the initial liquidation preference.
(5) Represents an increase in the liquidation preference of our senior preferred stock due to the receipt of funds from Treasury.

We received $500 million in March 2011, $1.5 billion in September 2011, and $6.0 billion in December 2011 pursuant to draw requests that FHFA submitted to Treasury on our behalf to address the deficits in our net worth as of December 31, 2010, June 30, 2011, and September 30, 2011, respectively. In addition, we had a deficit in net worth of $146 million as of December 31, 2011. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Government Support for our Business" for additional information regarding the draw request that FHFA, as Conservator, will submit on our behalf to Treasury to address our deficit in net worth. The aggregate liquidation preference on the senior preferred stock owned by Treasury was $72.2 billion and $64.2 billion as of December 31, 2011 and December 31, 2010, respectively. See "NOTE 15: REGULATORY CAPITAL" for additional information.

**Common Stock Warrant**

Pursuant to the Purchase Agreement described in "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS," on September 7, 2008, we, through FHFA, in its capacity as Conservator, issued a warrant to purchase common stock to Treasury. The warrant was issued to Treasury in partial consideration of Treasury's commitment to provide funds to us under the terms set forth in the Purchase Agreement.

The warrant gives Treasury the right to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis on the date of exercise. The warrant may be exercised in whole or in part at any time on or before September 7, 2028, by delivery to us of: (a) a notice of exercise; (b) payment of the exercise price of $0.00001 per share; and (c) the warrant. If the market price of one share of our common stock is greater than the exercise price, then, instead of paying the exercise price, Treasury may elect to receive shares equal to the value of the warrant (or portion thereof being canceled) pursuant to the formula specified in the warrant. Upon exercise of the warrant, Treasury may assign the right to receive the shares of common stock issuable upon exercise to any other person.

We account for the warrant in permanent equity. At issuance on September 7, 2008, we recognized the warrant at fair value, and we do not recognize subsequent changes in fair value while the warrant remains classified in equity. We recorded an aggregate fair value of $2.3 billion for the warrant as a component of additional paid-in-capital. We derived the fair value of the warrant using a modified Black-Scholes model. If the warrant is exercised, the stated value of the common stock issued will be reclassified to common stock in our consolidated balance sheets. The warrant was determined to be in-substance non-voting common stock, because the warrant's exercise price of $0.00001 per share is considered non-substantive (compared to the market price of our common stock). As a result, the warrant is included in the computation of basic and diluted earnings (loss) per share. The weighted average shares of common stock outstanding for the years ended December 31, 2011, 2010, and 2009, respectively, included shares of common stock that would be issuable upon full exercise of the warrant issued to Treasury.

**Preferred Stock**

The table below provides a summary of our preferred stock outstanding at December 31, 2011. We have the option to redeem our preferred stock on specified dates, at their redemption price plus dividends accrued through the redemption date. However, without the consent of Treasury, we are restricted from making payments to purchase or redeem preferred stock as well as paying any preferred dividends, other than dividends on the senior preferred stock. In addition, all 24 classes of preferred stock are perpetual and non-cumulative, and carry no significant voting rights or rights to purchase additional Freddie Mac stock or securities. Costs incurred in connection with the issuance of preferred stock are charged to additional paid-in capital.

**Table 12.2 — Preferred Stock**

| | Issue Date | Shares Authorized | Shares Outstanding | Total Par Value | Redemption Price per Share | Total Outstanding Balance[1] | Redeemable On or After[2] | OTC Symbol[3] |
|---|---|---|---|---|---|---|---|---|
| | | (in millions, except initial liquidation preference price per share) | | | | | | |
| *Preferred stock:* | | | | | | | | |
| 1996 Variable-rate[4] . . . . | April 26, 1996 | 5.00 | 5.00 | $ 5.00 | $50.00 | $ 250 | June 30, 2001 | FMCCI |
| 5.81% . . . . . . . . . . . . . . | October 27, 1997 | 3.00 | 3.00 | 3.00 | 50.00 | 150 | October 27, 1998 | (5) |
| 5% . . . . . . . . . . . . . . . . | March 23, 1998 | 8.00 | 8.00 | 8.00 | 50.00 | 400 | March 31, 2003 | FMCKK |
| 1998 Variable-rate[6] . . . . | September 23 and 29, 1998 | 4.40 | 4.40 | 4.40 | 50.00 | 220 | September 30, 2003 | FMCCG |
| 5.10% . . . . . . . . . . . . . . | September 23, 1998 | 8.00 | 8.00 | 8.00 | 50.00 | 400 | September 30, 2003 | FMCCH |
| 5.30% . . . . . . . . . . . . . . | October 28, 1998 | 4.00 | 4.00 | 4.00 | 50.00 | 200 | October 30, 2000 | (5) |
| 5.10% . . . . . . . . . . . . . . | March 19, 1999 | 3.00 | 3.00 | 3.00 | 50.00 | 150 | March 31, 2004 | (5) |
| 5.79% . . . . . . . . . . . . . . | July 21, 1999 | 5.00 | 5.00 | 5.00 | 50.00 | 250 | June 30, 2009 | FMCCK |
| 1999 Variable-rate[7] . . . . | November 5, 1999 | 5.75 | 5.75 | 5.75 | 50.00 | 287 | December 31, 2004 | FMCCL |
| 2001 Variable-rate[8] . . . . | January 26, 2001 | 6.50 | 6.50 | 6.50 | 50.00 | 325 | March 31, 2003 | FMCCM |
| 2001 Variable-rate[9] . . . . | March 23, 2001 | 4.60 | 4.60 | 4.60 | 50.00 | 230 | March 31, 2003 | FMCCN |
| 5.81% . . . . . . . . . . . . . . | March 23, 2001 | 3.45 | 3.45 | 3.45 | 50.00 | 173 | March 31, 2011 | FMCCO |
| 6% . . . . . . . . . . . . . . . . | May 30, 2001 | 3.45 | 3.45 | 3.45 | 50.00 | 173 | June 30, 2006 | FMCCP |
| 2001 Variable-rate[10] . . . . | May 30, 2001 | 4.02 | 4.02 | 4.02 | 50.00 | 201 | June 30, 2003 | FMCCJ |
| 5.70% . . . . . . . . . . . . . . | October 30, 2001 | 6.00 | 6.00 | 6.00 | 50.00 | 300 | December 31, 2006 | FMCKP |
| 5.81% . . . . . . . . . . . . . . | January 29, 2002 | 6.00 | 6.00 | 6.00 | 50.00 | 300 | March 31, 2007 | (5) |
| 2006 Variable-rate[11] . . . . | July 17, 2006 | 15.00 | 15.00 | 15.00 | 50.00 | 750 | June 30, 2011 | FMCCS |
| 6.42% . . . . . . . . . . . . . . | July 17, 2006 | 5.00 | 5.00 | 5.00 | 50.00 | 250 | June 30, 2011 | FMCCT |
| 5.90% . . . . . . . . . . . . . . | October 16, 2006 | 20.00 | 20.00 | 20.00 | 25.00 | 500 | September 30, 2011 | FMCKO |
| 5.57% . . . . . . . . . . . . . . | January 16, 2007 | 44.00 | 44.00 | 44.00 | 25.00 | 1,100 | December 31, 2011 | FMCKM |
| 5.66% . . . . . . . . . . . . . . | April 16, 2007 | 20.00 | 20.00 | 20.00 | 25.00 | 500 | March 31, 2012 | FMCKN |
| 6.02% . . . . . . . . . . . . . . | July 24, 2007 | 20.00 | 20.00 | 20.00 | 25.00 | 500 | June 30, 2012 | FMCKL |
| 6.55% . . . . . . . . . . . . . . | September 28, 2007 | 20.00 | 20.00 | 20.00 | 25.00 | 500 | September 30, 2017 | FMCKI |
| 2007 Fixed-to-floating rate[12] . . . . . . . . . . . . | December 4, 2007 | 240.00 | 240.00 | 240.00 | 25.00 | 6,000 | December 31, 2012 | FMCKJ |
| Total, preferred stock . . | | 464.17 | 464.17 | $464.17 | | $14,109 | | |

(1) Amounts stated at redemption value.
(2) In accordance with the Purchase Agreement, until the senior preferred stock is repaid or redeemed in full, we may not, without the prior written consent of Treasury, redeem, purchase, retire or otherwise acquire any Freddie Mac equity securities (other than the senior preferred stock or warrant).
(3) Preferred stock trades exclusively through the OTC market unless otherwise noted.
(4) Dividend rate resets quarterly and is equal to the sum of three-month LIBOR plus 1% divided by 1.377, and is capped at 9.00%.
(5) Issued through private placement.
(6) Dividend rate resets quarterly and is equal to the sum of three-month LIBOR plus 1% divided by 1.377, and is capped at 7.50%.
(7) Dividend rate resets on January 1 every five years after January 1, 2005 based on a five-year Constant Maturity Treasury rate, and is capped at 11.00%. Optional redemption on December 31, 2004 and on December 31 every five years thereafter.
(8) Dividend rate resets on April 1 every two years after April 1, 2003 based on the two-year Constant Maturity Treasury rate plus 0.10%, and is capped at 11.00%. Optional redemption on March 31, 2003 and on March 31 every year thereafter.
(9) Dividend rate resets on April 1 every year based on 12-month LIBOR minus 0.20%, and is capped at 11.00%. Optional redemption on March 31, 2003 and on March 31 every year thereafter.
(10) Dividend rate resets on July 1 every two years after July 1, 2003 based on the two-year Constant Maturity Treasury rate plus 0.20%, and is capped at 11.00%. Optional redemption on June 30, 2003 and on June 30 every two years thereafter.
(11) Dividend rate resets quarterly and is equal to the sum of three-month LIBOR plus 0.50% but not less than 4.00%.
(12) Dividend rate is set at an annual fixed rate of 8.375% from December 4, 2007 through December 31, 2012. For the period beginning on or after January 1, 2013, dividend rate resets quarterly and is equal to the higher of: (a) the sum of three-month LIBOR plus 4.16% per annum; or (b) 7.875% per annum. Optional redemption on December 31, 2012, and on December 31 every five years thereafter.

## Stock-Based Compensation

Following the implementation of the conservatorship in September 2008, we suspended the operation of our ESPP, and are no longer making grants under our 2004 Employee Plan or our Directors' Plan. We collectively refer to the 2004 Employee Plan and the 1995 Employee Plan as the Employee Plans. Under the Purchase Agreement, we cannot issue any new options, rights to purchase, participations or other equity interests without Treasury's prior approval. However, grants outstanding as of the date of the Purchase Agreement remain in effect in accordance with their terms.

We did not repurchase or issue any of our common shares or non-cumulative preferred stock during 2011 and 2010, except for issuances of treasury stock as reported on our consolidated statements of equity (deficit) relating to stock-based compensation granted prior to conservatorship. Common stock delivered under these stock-based compensation plans consists of treasury stock or shares acquired in market transactions on behalf of the participants. During 2011, restrictions lapsed on 851,131 restricted stock units and 37,630 restricted stock units were forfeited. At December 31, 2011, 491,363 restricted stock units remained outstanding. In addition, there were 41,160 shares of restricted stock outstanding at both December 31, 2011 and 2010. During 2011, no stock options were exercised and 1,160,820 stock options were forfeited or expired. At December 31, 2011, 2,021,632 stock options were outstanding.

For purposes of the earnings-per-share calculation, antidilutive potential common shares excluded from the computation of dilutive potential common shares were 3,383,185, 5,290,347, and 7,541,077 at December 31, 2011, 2010, and 2009, respectively.

*Freddie Mac*

**Dividends Declared During 2011**

No common dividends were declared in 2011. During 2011, we paid dividends of $6.5 billion in cash on the senior preferred stock at the direction of our Conservator. We did not declare or pay dividends on any other series of Freddie Mac preferred stock outstanding during 2011.

On March 30, 2010, our REIT subsidiaries paid preferred stock dividends for one quarter, consistent with approval from Treasury and direction from FHFA. During 2010, each of our two REIT subsidiaries was eliminated via a merger transaction and no other preferred or common stock dividends were paid by the REITs during the year ended December 31, 2010.

**Delisting of Common Stock and Preferred Stock from NYSE**

On July 8, 2010, we delisted our common and 20 previously-listed classes of preferred securities from the NYSE pursuant to a directive by FHFA, our Conservator.

Our common stock and the classes of preferred stock that were previously listed on the NYSE are traded exclusively in the OTC market. Shares of our common stock now trade under the ticker symbol FMCC. We expect that our common stock and the previously listed classes of preferred stock will continue to trade in the OTC market so long as market makers demonstrate an interest in trading the common and preferred stock.

## NOTE 13: INCOME TAXES

**Income Tax Benefit**

We are exempt from state and local income taxes. The table below presents the components of our income tax benefit for 2011, 2010, and 2009.

**Table 13.1 — Federal Income Tax Benefit**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2011** | **2010** | **2009** |
| | (in millions) | | |
| Current income tax benefit | $283 | $186 | $160 |
| Deferred income tax benefit | 117 | 670 | 670 |
| Total income tax benefit[1] | $400 | $856 | $830 |

(1) Does not reflect: (a) the deferred tax effects of unrealized (gains) losses on available-for-sale securities, the tax effects of net (gains) losses related to the effective portion of derivatives designated in cash flow hedge relationships, and the tax effects of certain changes in our defined benefit plans which are reported as part of AOCI; (b) certain stock-based compensation tax effects reported as part of additional paid-in capital; and (c) the tax effect of the cumulative effect of change in accounting principles.

A reconciliation between our federal statutory income tax rate and our effective tax rate for 2011, 2010, and 2009 is presented in the table below.

**Table 13.2 — Reconciliation of Statutory to Effective Tax Rate**

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2011** | | **2010** | | **2009** | |
| | **Amount** | **Percent** | **Amount** | **Percent** | **Amount** | **Percent** |
| | (dollars in millions) | | | | | |
| Statutory corporate tax rate | $ 1,983 | 35.0% | $ 5,209 | 35.0% | $ 7,834 | 35.0% |
| Tax-exempt interest | 179 | 3.2 | 213 | 1.4 | 252 | 1.1 |
| Tax credits | 566 | 10.0 | 585 | 3.9 | 594 | 2.7 |
| Unrecognized tax benefits and related interest/contingency reserves | (21) | (0.4) | (12) | (0.1) | (12) | (0.1) |
| Valuation allowance | (2,325) | (41.0) | (5,155) | (34.6) | (7,860) | (35.1) |
| Other | 18 | 0.3 | 16 | 0.1 | 22 | 0.1 |
| Effective tax rate | $ 400 | 7.1% | $ 856 | 5.7% | $ 830 | 3.7% |

In 2011, 2010, and 2009, our effective tax rate differs from the statutory tax rate of 35% primarily due to the establishment of a valuation allowance against a portion of our net deferred tax assets. Our income tax benefits recognized in 2011, 2010, and 2009 represent amounts related to the amortization of net deferred losses on pre-2008 closed cash flow hedges, as well as the current tax benefits associated with our ability to carry back net operating losses generated in 2008 and 2009.

**Deferred Tax Assets, Net**

The sources and tax effects of temporary differences that give rise to significant deferred tax assets and liabilities for the years ended December 31, 2011 and 2010 are presented in the table below.

**Table 13.3 — Deferred Tax Assets, Net**

|  | 2011 | 2010 |
|---|---|---|
|  | (in millions) | |
| Deferred tax assets: | | |
| Deferred fees | $ 3,957 | $ 1,561 |
| Basis differences related to derivative instruments | 4,903 | 4,630 |
| Credit related items and allowance for loan losses | 12,398 | 17,850 |
| Unrealized (gains) losses related to available-for-sale securities | 3,345 | 5,211 |
| LIHTC and AMT credit carryforward | 2,885 | 2,360 |
| Net operating loss carryforward, net of unrecognized tax benefits | 18,053 | 12,122 |
| Other items, net | 172 | 268 |
| Total deferred tax assets | 45,713 | 44,002 |
| Deferred tax liabilities: | | |
| Basis differences related to assets held for investment[1] | (6,367) | (4,886) |
| Basis differences related to debt | (140) | (192) |
| Total deferred tax liability | (6,507) | (5,078) |
| Valuation allowance[2] | (35,660) | (33,381) |
| Deferred tax assets, net | $ 3,546 | $ 5,543 |

(1) The deferred tax liability balance for basis differences related to assets held for investment includes a basis adjustment on seriously delinquent loans. This deferred tax liability offsets a portion of the deferred tax asset for credit related items and allowance for loan losses.

(2) The valuation allowance as of December 31, 2010 includes $3.1 billion related to the adoption of the accounting guidance for transfers of financial assets and consolidation of VIEs.

We use the asset and liability method to account for income taxes in accordance with the accounting guidance for income taxes. Under this method, deferred tax assets and liabilities are recognized based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates. Valuation allowances are recorded to reduce net deferred tax assets when it is more likely than not that a tax benefit will not be realized. The realization of our net deferred tax assets is dependent upon the generation of sufficient taxable income in available carryback years from current operations and unrecognized tax benefits, and upon our intent and ability to hold available-for-sale debt securities until the recovery of any temporary unrealized losses.

After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, and related difficulty in forecasting future profit levels, we continue to record a valuation allowance on a portion of our net deferred tax assets as of December 31, 2011 and 2010. Our valuation allowance increased by $2.3 billion during 2011 to $35.7 billion, primarily attributable to an increase in temporary differences during the period. As of December 31, 2011, after consideration of the valuation allowance, we had a net deferred tax asset of $3.5 billion, primarily representing the tax effect of unrealized losses on our available-for-sale securities. We believe the deferred tax asset related to these unrealized losses is more likely than not to be realized because of our assertion that we have the intent and ability to hold our available-for-sale securities until any temporary unrealized losses are recovered.

As of December 31, 2011, we had a net operating loss carryforward of $51.6 billion and a LIHTC carryforward of $2.9 billion that will expire over multiple years beginning in 2030 and 2027, respectively. Our AMT credit carryforward of $4 million will not expire.

**Unrecognized Tax Benefits**

**Table 13.4 — Unrecognized Tax Benefits**

|  | 2011 | 2010 | 2009 |
|---|---|---|---|
|  | (in millions) | | |
| Balance at January 1 | $1,220 | $ 805 | $636 |
| Changes based on tax positions in prior years | 130 | 372 | (34) |
| Changes based on tax positions in current years | 6 | 48 | 203 |
| Decreases in unrecognized tax benefits due to settlements with taxing authorities | (1) | (5) | — |
| Balance at December 31 | $1,355 | $1,220 | $805 |

At December 31, 2011, we had total unrecognized tax benefits, exclusive of interest, of $1.4 billion. This amount relates to tax positions for which ultimate deductibility is highly certain, but for which there is uncertainty as to the

timing of such deductibility. If favorably resolved, $1.2 billion of unrecognized tax benefits would have a positive impact on the effective tax rate due to the reversal of the valuation allowance established against deferred tax assets created by the uncertain tax positions. This favorable impact would be offset by a $201 million tax expense related to the establishment of a valuation allowance against credits that have been carried forward. A valuation allowance has not been recorded against this amount because a portion of the unrecognized tax benefits was used as a source of taxable income in our realization assessment of our net deferred tax assets.

We continue to recognize interest and penalties, if any, in income tax expense. The net accrued interest receivable was approximately $254 million at December 31, 2011, a $9 million change from December 31, 2010. Amounts included in total accrued interest relate to: (a) unrecognized tax benefits; (b) pending claims with the IRS for open tax years; (c) the tax benefit related to the settlement for tax years 1985 to 1997; and (d) the impact of payments made to the IRS in prior years in anticipation of potential tax deficiencies. Included in the $254 million of net accrued interest receivable as of December 31, 2011 and $245 million as of December 31, 2010, is interest payable of approximately $266 million and $248 million, respectively, which is allocable to unrecognized tax benefits. We have accrued no amounts for penalties during 2011, 2010, or 2009.

The period for assessment under the statute of limitations for federal income tax purposes is open on corporate income tax returns filed for tax years 1998 to 2010. We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2007 tax years, principally related to questions of timing and potential penalties regarding our tax accounting method for certain hedging transactions. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices for tax years 1998 to 2005. The IRS responded to our petition with the U.S. Tax Court on December 21, 2010. On July 6, 2011, the U.S. Tax Court issued a Notice Setting Case for Trial and a Standing Pretrial Order. The trial date set forth in the Notice was December 12, 2011. On September 7, 2011, a joint motion for continuance was filed with the U.S. Tax Court. The joint motion was granted and on October 11, 2011 the parties submitted a status report and the court set a revised trial date of November 5, 2012. We paid the tax assessed in the Statutory Notice received in December 2011 for the years 2006 to 2007 of $36 million and will seek a refund through the administrative process, which could include filing suit in Federal District Court.

We believe appropriate reserves have been provided for settlement on reasonable terms. However, changes could occur in the gross balance of unrecognized tax benefits that could have a material impact on income tax expense in the period the issue is resolved if the outcome reached is not in our favor and the assessment is in excess of the amount currently reserved. In light of the revised trial date, the fact that no settlement discussions have occurred for an extended period of time, and the information currently available, we do not believe it is reasonably possible that the issue will be resolved within the next 12 months.

For a discussion of our significant accounting policies related to income taxes, please see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Income Taxes."

## NOTE 14: SEGMENT REPORTING

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for additional information about the conservatorship.

We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of income and comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments. These reclassifications and allocations are described in "Segment Earnings."

We do not consider our assets by segment when evaluating segment performance or allocating resources. We conduct our operations solely in the U.S. and its territories. Therefore, we do not generate any revenue from geographic locations outside of the U.S. and its territories.

### Segments

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. The chart below provides a summary of our three reportable segments and the All Other category. As reflected in the chart, certain activities that are not part of a reportable segment are included in the All Other category. The All Other category consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods. Items included in the All Other category consist of: (a) the deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward; and (b) in 2009, the write-down of our LIHTC investments. Other items previously recorded in the All Other category prior to the revision to our method for presenting Segment Earnings on January 1, 2010, as discussed below, have been allocated to our three reportable segments.

| Segment | Description | Activities/Items |
|---|---|---|
| Investments | The Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans, which are funded by other debt issuances and hedged using derivatives. In our Investments segment, we also provide funding and hedging management services to the Single-family Guarantee and Multifamily segments. The Investments segment reflects changes in the fair value of the Multifamily segment assets that are associated with changes in interest rates. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses. | • Investments in mortgage-related securities and single-family performing mortgage loans<br>• Investments in asset-backed securities<br>• All other traded instruments / securities, excluding CMBS and multifamily housing revenue bonds<br>• Debt issuances<br>• All asset / liability management returns<br>• Guarantee buy-ups / buy-downs, net of execution gains / losses<br>• Cash and liquidity management<br>• Deferred tax asset valuation allowance<br>• Allocated administrative expenses and taxes |
| Single-Family Guarantee | The Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related security in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less credit-related expenses, administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses. | • Management and guarantee fees on PCs, including those retained by us, and single-family mortgage loans in the mortgage investments portfolio<br>• Up-front credit delivery fees<br>• Adjustments for security performance<br>• Credit losses on all single-family assets<br>• Expected net float income or expense on the single-family credit guarantee portfolio<br>• Deferred tax asset valuation allowance<br>• Allocated debt costs, administrative expenses and taxes |
| Multifamily | The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans and non-agency CMBS that we purchased for investment, our purchases of such multifamily mortgage loans for investment have declined significantly since 2010, and our purchases of CMBS have declined significantly since 2008. The only CMBS that we have purchased since 2008 have been senior, mezzanine, and interest-only tranches related to certain of our securitization transactions, and these purchases have not been significant. Currently, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization. We guarantee the senior tranches of these securitizations in Other Guarantee Transactions. Our Multifamily segment also issues Other Structured Securities, but does not issue REMIC securities. Our Multifamily segment also enters into other guarantee commitments for multifamily HFA bonds and housing revenue bonds held by third parties. Historically, we issued multifamily PCs, but this activity has been insignificant in recent years. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less credit-related expenses, administrative expenses, and allocated funding costs. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in fair value of CMBS and held-for-sale loans associated only with factors other than changes in interest rates, such as liquidity and credit. | • Multifamily mortgage loans held-for-sale and associated securitization activities<br>• Investments in CMBS, multifamily housing revenue bonds, and multifamily mortgage loans held-for-investment<br>• Allocated debt costs, administrative expenses and taxes<br>• Other guarantee commitments on multifamily HFA bonds and housing revenue bonds<br>• LIHTC and valuation allowance<br>• Deferred tax asset valuation allowance |
| All Other | The All Other category consists of material corporate-level expenses that are:(a) infrequent in nature; and(b) based on management decisions outside the control of the management of our reportable segments. | • LIHTC write-down<br>• Tax settlements, as applicable<br>• Legal settlements, as applicable<br>• The deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward. |

**Segment Earnings**

Beginning January 1, 2010, we revised our method for presenting Segment Earnings to reflect changes in how management measures and assesses the performance of each segment and the company as a whole. This change in method, in conjunction with our implementation of changes in accounting guidance relating to transfers of financial assets and the consolidation of VIEs, resulted in significant changes to our presentation of Segment Earnings. Under the revised method, the financial performance of our Single-family Guarantee segment and Multifamily segment are measured based on each segment's contribution to GAAP net income (loss). Our Investments segment is measured on its contribution to GAAP total comprehensive income (loss), which consists of the sum of its contribution to: (a) GAAP net income (loss); and (b) GAAP total other comprehensive income, net of taxes. Beginning January 1, 2010, under the revised method, the sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac.

Segment Earnings for 2009 reflects the changes in our method of measuring and assessing the performance of our reportable segments described above. However, Segment Earnings for 2009 does not include changes to the guarantee asset, guarantee obligation or other items that were eliminated or changed as a result of our implementation of the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs adopted on January 1, 2010, as this change was applied prospectively consistent with our GAAP results. Consequently, our Segment Earnings results for 2011 and 2010 are not directly comparable with the results for 2009. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" for further information regarding the consolidation of certain of our securitization trusts.

The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac. However, the accounting principles we apply to present certain financial statement line items in Segment Earnings for our reportable segments, in particular Segment Earnings net interest income and management and guarantee income, differ significantly from those applied in preparing the comparable line items in our consolidated financial statements prepared in accordance with GAAP. Accordingly, the results of such line items differ significantly from, and should not be used as a substitute for, the comparable line items as determined in accordance with GAAP. For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "Table 14.2 — Segment Earnings and Reconciliation to GAAP Results."

Many of the reclassifications, adjustments and allocations described below relate to the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs. These amendments require us to consolidate our single-family PC trusts and certain Other Guarantee Transactions, which makes it difficult to view the results of the three operating segments from a GAAP perspective. For example, as a result of the amendments, the net guarantee fee earned on mortgage loans held by our consolidated trusts is included in net interest income on our GAAP consolidated statements of income and comprehensive income. Previously, we separately recorded the guarantee fee on our GAAP consolidated statements of income and comprehensive income as a component of non-interest income. Through the reclassifications described below, we move the net guarantee fees earned on mortgage loans into Segment Earnings management and guarantee income.

***Investment Activity-Related Reclassifications***

In preparing certain line items within Segment Earnings, we make various reclassifications to earnings determined under GAAP related to our investment activities, including those described below. Through these reclassifications, we move certain items into or out of net interest income so that, on a Segment Earnings basis, net interest income reflects how we measure the effective interest on securities held in our mortgage investments portfolio and our cash and other investments portfolio.

We use derivatives extensively in our investment activity. The reclassifications described below allow us to reflect, in Segment Earnings net interest income, the costs associated with this use of derivatives.

- The accrual of periodic cash settlements of all derivatives is reclassified in Segment Earnings from derivative gains (losses) into net interest income to fully reflect the periodic cost associated with the protection provided by these contracts.

- Up-front cash paid or received upon the purchase or writing of swaptions and other option contracts is reclassified in Segment Earnings prospectively on a straight-line basis from derivative gains (losses) into net interest income

over the contractual life of the instrument to fully reflect the periodic cost associated with the protection provided by these contracts.

Amortization related to certain items is not relevant to how we measure the economic yield earned on the securities held in our investments portfolio. Therefore, as described below, we reclassify these items in Segment Earnings from net interest income to non-interest income.

- Amortization related to derivative commitment basis adjustments associated with mortgage-related and non-mortgage-related securities is reclassified in Segment Earnings from net interest income to non-interest income.

- Amortization related to accretion of other-than-temporary impairments on non-mortgage-related securities held in our cash and other investments portfolio is reclassified in Segment Earnings from net interest income to non-interest income.

- Amortization related to premiums and discounts associated with PCs and Other Guarantee Transactions issued by our consolidated trusts that we previously held and subsequently transferred to third parties is reclassified in Segment Earnings from net interest income to non-interest income. The amortization is related to deferred gains (losses) on transfers of these securities.

### Credit Guarantee Activity-Related Reclassifications

In preparing certain line items within Segment Earnings, we make various reclassifications to earnings determined under GAAP related to our credit-guarantee activities, including those described below. All credit guarantee-related income and costs are included in Segment Earnings management and guarantee income.

- Net guarantee fee is reclassified in Segment Earnings from net interest income to management and guarantee income.

- Implied management and guarantee fee related to unsecuritized mortgage loans held in the mortgage investments portfolio is reclassified in Segment Earnings from net interest income to management and guarantee income.

- The portion of the amount reversed for accrued but uncollected interest upon placing loans on a non-accrual status that relates to guarantee fees is reclassified in Segment Earnings from net interest income to management and guarantee income. The remaining portion of the allowance for lost interest is reclassified in Segment Earnings from net interest income to provision for credit losses. Under GAAP-basis earnings and Segment Earnings, the guarantee fee is not accrued on loans three monthly payments or more past due.

### Segment Adjustments

In presenting Segment Earnings net interest income and management and guarantee income, we make adjustments to better reflect how management measures and assesses the performance of each segment and the company as a whole. These adjustments relate to amounts that, effective January 1, 2010, are no longer reflected in net income (loss) as determined in accordance with GAAP as a result of the adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. These adjustments are reversed through the segment adjustments line item within Segment Earnings, so that Segment Earnings (loss) for each segment equals GAAP net income (loss) attributable to Freddie Mac for each segment. Segment adjustments consist of the following:

- We adjust our Segment Earnings net interest income for the Investments segment to include the amortization of cash premiums and discounts and buy-up and buy-down fees on the consolidated Freddie Mac mortgage-related securities we purchase as investments. As of December 31, 2011, the unamortized balance of such premiums and discounts and buy-up and buy-down fees was $1.6 billion. These adjustments are necessary to reflect the economic yield realized on investments in consolidated Freddie Mac mortgage-related securities purchased at a premium or discount or with buy-up or buy-down fees.

- We adjust our Segment Earnings management and guarantee income for the Single-family Guarantee segment to include the amortization of delivery fees recorded in periods prior to the January 1, 2010 adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. As of December 31, 2011, the unamortized balance of such fees was $2.2 billion. We consider such fees to be part of the effective rate of the guarantee fee on guaranteed mortgage loans. This adjustment is necessary in order to better reflect the realization of revenue associated with guarantee contracts over the life of the underlying loans.

*Segment Allocations*

The results of each reportable segment include directly attributable revenues and expenses. Administrative expenses that are not directly attributable to a segment are allocated to our segments using various methodologies, depending on the nature of the expense (*i.e.*, semi-direct versus indirect). Net interest income for each segment includes allocated debt funding costs related to certain assets of each segment. These allocations, however, do not include the effects of dividends paid on our senior preferred stock. The tax credits generated by the LIHTC partnerships and any valuation allowance on these tax credits are allocated to the Multifamily segment. The deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward is allocated to the "All Other" category. All remaining taxes are calculated based on a 35% federal statutory rate as applied to pre-tax Segment Earnings.

The table below presents Segment Earnings by segment.

### Table 14.1 — Summary of Segment Earnings and Total Comprehensive Income (Loss)[1]

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2011** | **2010** | **2009** |
| | (in millions) | | |
| Segment Earnings (loss), net of taxes: | | | |
| Investments | $ 3,366 | $ 1,251 | $ 6,476 |
| Single-family Guarantee | (10,000) | (16,256) | (27,143) |
| Multifamily | 1,319 | 965 | (511) |
| All Other | 49 | 15 | (4,240) |
| Total Segment Earnings (loss), net of taxes | (5,266) | (14,025) | (25,418) |
| Reconciliation to GAAP net income (loss) attributable to Freddie Mac: | | | |
| Credit guarantee-related adjustments[2] | — | — | 5,948 |
| Tax-related adjustments | — | — | (2,083) |
| Total reconciling items, net of taxes | — | — | 3,865 |
| Net income (loss) attributable to Freddie Mac | $ (5,266) | $(14,025) | $(21,553) |
| Total comprehensive income (loss) of segments: | | | |
| Investments | $ 6,473 | $ 11,477 | $ 17,805 |
| Single-family Guarantee | (9,970) | (16,250) | (27,124) |
| Multifamily | 2,218 | 5,040 | 6,781 |
| All Other | 49 | 15 | (4,240) |
| Total comprehensive income (loss) of segments | (1,230) | 282 | (6,778) |
| Reconciliation to GAAP net income (loss) attributable to Freddie Mac: | | | |
| Credit guarantee-related adjustments[2] | — | — | 5,948 |
| Tax-related adjustments | — | — | (2,083) |
| Total reconciling items, net of taxes | — | — | 3,865 |
| Total comprehensive income (loss) attributable to Freddie Mac | $ (1,230) | $ 282 | $ (2,913) |

(1) Beginning January 1, 2010, the sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

(2) Consists primarily of amortization and valuation adjustments related to the guarantee asset and guarantee obligation which are excluded from Segment Earnings and cash compensation exchanged at the time of securitization, excluding buy-up and buy-down fees, which is amortized into earnings. These reconciling items exist in periods prior to 2010 as the amendment to the accounting guidance for transfers of financial assets and consolidation of VIEs was applied prospectively on January 1, 2010.

The table below presents detailed financial information by financial statement line item for our reportable segments and All Other.

## Table 14.2 — Segment Earnings and Reconciliation to GAAP Results

### Year Ended December 31, 2011

| | Investments | Single-family Guarantee | Multifamily | All Other | Total Segment Earnings (Loss), Net of Taxes | Reclassifications[1] | Segment Adjustments[2] | Total Reconciling Items | Total per Consolidated Statements of Income and Comprehensive Income |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in millions) | | | | |
| Net interest income | $ 7,339 | $ (23) | $1,200 | $— | $ 8,516 | $ 9,220 | $ 661 | $ 9,881 | $ 18,397 |
| (Provision) benefit for credit losses | — | (12,294) | 196 | — | (12,098) | 1,396 | | 1,396 | (10,702) |
| Non-interest income (loss): | | | | | | | | | |
| Management and guarantee income[3] | — | 3,647 | 127 | — | 3,774 | (2,905) | (699) | (3,604) | 170 |
| Net impairment of available-for-sale securities recognized in earnings | (1,833) | — | (353) | — | (2,186) | (115) | — | (115) | (2,301) |
| Derivative gains (losses) | (3,597) | — | 3 | — | (3,594) | (6,158) | — | (6,158) | (9,752) |
| Gains (losses) on trading securities | (993) | — | 39 | — | (954) | — | — | — | (954) |
| Gains (losses) on sale of mortgage loans | 28 | — | 383 | — | 411 | — | — | — | 411 |
| Gains (losses) on mortgage loans recorded at fair value | 501 | — | (83) | — | 418 | — | — | — | 418 |
| Other non-interest income (loss) | 1,266 | 1,216 | 86 | — | 2,568 | (1,438) | — | (1,438) | 1,130 |
| Non-interest expense: | | | | | | | | | |
| Administrative expenses | (398) | (888) | (220) | — | (1,506) | — | — | — | (1,506) |
| REO operations income (expense) | — | (596) | 11 | — | (585) | — | — | — | (585) |
| Other non-interest expense | (2) | (321) | (69) | — | (392) | — | — | — | (392) |
| Segment adjustments[2] | 661 | (699) | — | — | (38) | — | 38 | 38 | — |
| Income tax (expense) benefit | 394 | (42) | (1) | 49 | 400 | — | — | — | 400 |
| Net income (loss) | 3,366 | (10,000) | 1,319 | 49 | (5,266) | | | | (5,266) |
| Total other comprehensive income, net of taxes | 3,107 | 30 | 899 | — | 4,036 | | | | 4,036 |
| Comprehensive income (loss) | $ 6,473 | $ (9,970) | $2,218 | $49 | $ (1,230) | $ — | $ — | $ — | $ (1,230) |

### Year Ended December 31, 2010

| | Investments | Single-family Guarantee | Multifamily | All Other | Total Segment Earnings (Loss), Net of Taxes | Reclassifications[1] | Segment Adjustments[2] | Total Reconciling Items | Total per Consolidated Statements of Income and Comprehensive Income |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in millions) | | | | |
| Net interest income | $ 6,192 | $ 72 | $1,114 | $— | $ 7,378 | $ 8,120 | $1,358 | $ 9,478 | $ 16,856 |
| Provision for credit losses | — | (18,785) | (99) | — | (18,884) | 1,666 | | 1,666 | (17,218) |
| Non-interest income (loss): | | | | | | | | | |
| Management and guarantee income[3] | — | 3,635 | 101 | — | 3,736 | (2,640) | (953) | (3,593) | 143 |
| Net impairment of available-for-sale securities recognized in earnings | (3,819) | — | (96) | — | (3,915) | (393) | — | (393) | (4,308) |
| Derivative gains (losses) | (1,859) | — | 6 | — | (1,853) | (6,232) | — | (6,232) | (8,085) |
| Gains (losses) on trading securities | (1,386) | — | 47 | — | (1,339) | — | — | — | (1,339) |
| Gains (losses) on sale of mortgage loans | (76) | — | 343 | — | 267 | — | — | — | 267 |
| Gains (losses) on mortgage loans recorded at fair value | 34 | — | (283) | — | (249) | — | — | — | (249) |
| Other non-interest income (loss) | 1,023 | 1,351 | 130 | — | 2,504 | (521) | — | (521) | 1,983 |
| Non-interest expense: | | | | | | | | | |
| Administrative expenses | (455) | (930) | (212) | — | (1,597) | — | — | — | (1,597) |
| REO operations income (expense) | — | (676) | 3 | — | (673) | — | — | — | (673) |
| Other non-interest expense | (18) | (578) | (66) | — | (662) | — | — | — | (662) |
| Segment adjustments[2] | 1,358 | (953) | — | — | 405 | — | (405) | (405) | — |
| Income tax (expense) benefit | 259 | 608 | (26) | 15 | 856 | — | — | — | 856 |
| Net income (loss) | 1,253 | (16,256) | 962 | 15 | (14,026) | | | | (14,026) |
| Less: net (income) loss — noncontrolling interests | (2) | — | 3 | — | 1 | | | | 1 |
| Net income (loss) attributable to Freddie Mac | 1,251 | (16,256) | 965 | 15 | (14,025) | | | | (14,025) |
| Total other comprehensive income, net of taxes | 10,226 | 6 | 4,075 | — | 14,307 | | | | 14,307 |
| Total comprehensive income (loss) attributable to Freddie Mac | $11,477 | $(16,250) | $5,040 | $15 | $ 282 | $ — | $ — | $ — | $ 282 |

| | Investments | Single-family Guarantee | Multifamily | All Other | Total Segment Earnings (Loss), Net of Taxes | Reclassifications[3] | Credit Guarantee-related Adjustments[4] | Tax-related Adjustments | Total Reconciling Items | Total per Consolidated Statements of Income and Comprehensive Income |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (in millions) | | | | |
| Net interest income | $ 8,090 | $ 307 | $ 856 | $ — | $ 9,253 | $ 7,799 | $ 21 | $ — | $ 7,820 | $ 17,073 |
| Provision for credit losses | — | (29,102) | (574) | — | (29,676) | 140 | 6 | — | 146 | (29,530) |
| Non-interest income (loss): | | | | | | | | | | |
| Management and guarantee income[3] | | 3,448 | 90 | — | 3,538 | 440 | (945) | — | (505) | 3,033 |
| Net impairment of available-for-sale securities recognized in earnings | (9,870) | — | (137) | — | (10,007) | (1,190) | — | — | (1,190) | (11,197) |
| Derivative gains (losses) | 4,695 | — | (27) | — | 4,668 | (6,568) | — | — | (6,568) | (1,900) |
| Gains (losses) on trading securities | 4,885 | — | (3) | — | 4,882 | — | — | — | — | 4,882 |
| Gains (losses) on sale of mortgage loans | 617 | — | 156 | — | 773 | — | (28) | — | (28) | 745 |
| Gains (losses) on mortgage loans recorded at fair value | (46) | — | (144) | — | (190) | — | — | — | — | (190) |
| Other non-interest income (loss) | (774) | 721 | (471) | (3,653) | (4,177) | (1,011) | 7,083 | — | 6,072 | 1,895 |
| Non-interest expense: | | | | | | | | | | |
| Administrative expenses | (515) | (949) | (221) | — | (1,685) | — | — | — | — | (1,685) |
| REO operations expense | — | (287) | (20) | — | (307) | — | — | — | — | (307) |
| Other non-interest expense | (33) | (4,854) | (18) | (109) | (5,014) | — | (189) | — | (189) | (5,203) |
| Income tax (expense) benefit | (572) | 3,573 | — | (478) | 2,523 | 390 | — | (2,083) | (1,693) | 830 |
| Net income (loss) | 6,477 | (27,143) | (513) | (4,240) | (25,419) | — | 5,948 | (2,083) | 3,865 | (21,554) |
| Less: net (income) loss — noncontrolling interests | (1) | — | 2 | — | 1 | — | — | — | — | 1 |
| Net income (loss) attributable to Freddie Mac | 6,476 | (27,143) | (511) | (4,240) | (25,418) | — | 5,948 | (2,083) | 3,865 | (21,553) |
| Total other comprehensive income, net of taxes | 11,329 | 19 | 7,292 | — | 18,640 | — | — | — | — | 18,640 |
| Total comprehensive income (loss) attributable to Freddie Mac | $17,805 | $(27,124) | $6,781 | $(4,240) | $ (6,778) | $ — | $5,948 | $(2,083) | $ 3,865 | $ (2,913) |

*Year Ended December 31, 2009*

(1) See "Segment Earnings — *Investment Activity-Related Reclassifications*" and "— *Credit Guarantee Activity-Related Reclassifications*" for information regarding these reclassifications.

(2) See "Segment Earnings — *Segment Adjustments*" for additional information regarding these adjustments.

(3) Management and guarantee income total per consolidated statements of income and comprehensive income is included in other income on our GAAP consolidated statements of income and comprehensive income.

(4) Consists primarily of amortization and valuation adjustments pertaining to the guarantee asset and guarantee obligation which are excluded from Segment Earnings and cash compensation exchanged at the time of securitization, excluding buy-up and buy-down fees, which is amortized into earnings. These reconciling items exist in periods prior to 2010 as the amendment to the accounting guidance for transfers of financial assets and consolidation of VIEs was applied prospectively on January 1, 2010.

The table below presents total comprehensive income (loss) by segment.

**Table 14.3 — Total Comprehensive Income (Loss) of Segments[1]**

Year Ended December 31, 2011

| | Net Income (Loss) – Freddie Mac | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | Total Other Comprehensive Income (Loss) Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 3,366 | $2,573 | $508 | $26 | $3,107 | $ 6,473 |
| Single-family Guarantee | (10,000) | — | — | 30 | 30 | (9,970) |
| Multifamily | 1,319 | 892 | 1 | 6 | 899 | 2,218 |
| All Other | 49 | — | — | — | — | 49 |
| Total per consolidated statements of income and comprehensive income | $ (5,266) | $3,465 | $509 | $62 | $4,036 | $(1,230) |

Year Ended December 31, 2010

| | Net Income (Loss) – Freddie Mac | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | Total Other Comprehensive Income (Loss) Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 1,251 | $ 9,547 | $673 | $ 6 | $10,226 | $ 11,477 |
| Single-family Guarantee | (16,256) | — | — | 6 | 6 | (16,250) |
| Multifamily | 965 | 4,074 | — | 1 | 4,075 | 5,040 |
| All Other | 15 | — | — | — | — | 15 |
| Total per consolidated statements of income and comprehensive income | $(14,025) | $13,621 | $673 | $13 | $14,307 | $   282 |

Year Ended December 31, 2009

| | Net Income (Loss) – Freddie Mac | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | Total Other Comprehensive Income (Loss) Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 6,476 | $10,536 | $774 | $19 | $11,329 | $ 17,805 |
| Single-family Guarantee | (27,143) | — | — | 19 | 19 | (27,124) |
| Multifamily | (511) | 7,289 | (1) | 4 | 7,292 | 6,781 |
| All Other | (4,240) | — | — | — | — | (4,240) |
| Total Segment Earnings (loss), net of taxes | (25,418) | 17,825 | 773 | 42 | 18,640 | (6,778) |
| Reconciliation to GAAP net income (loss) attributable to Freddie Mac: | | | | | | |
| Credit guarantee-related adjustments | 5,948 | — | — | — | — | 5,948 |
| Tax-related adjustments | (2,083) | — | — | — | — | (2,083) |
| Total reconciling items, net of taxes | 3,865 | — | — | — | — | 3,865 |
| Total per consolidated statements of income and comprehensive income | $(21,553) | $17,825 | $773 | $42 | $18,640 | $ (2,913) |

(1) Beginning January 1, 2010, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

## NOTE 15: REGULATORY CAPITAL

On October 9, 2008, FHFA announced that it was suspending capital classification of us during conservatorship in light of the Purchase Agreement. FHFA continues to closely monitor our capital levels, but the existing statutory and FHFA-directed regulatory capital requirements are not binding during conservatorship. We continue to provide our submission to FHFA on minimum capital, however we no longer provide our submission of risk-based capital to FHFA.

Our regulatory minimum capital is a leverage-based measure that is generally calculated based on GAAP and reflects a 2.50% capital requirement for on-balance sheet assets and 0.45% capital requirement for off-balance sheet obligations. Based upon our adoption of amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs, we determined that, under the new consolidation guidance, we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions and, therefore, effective January 1, 2010, we consolidated on our balance sheet the assets and liabilities of these trusts. Pursuant to regulatory guidance from FHFA, our minimum capital requirement was not automatically affected by adoption of these amendments. Specifically, upon adoption of these amendments, FHFA directed us, for purposes of minimum capital, to continue reporting single-family PCs and certain Other Guarantee Transactions held by third parties using a 0.45% capital requirement. FHFA reserves the authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities. On March 3, 2011, FHFA issued a final rule setting forth procedures and standards in the event FHFA were to make such a temporary increase in minimum capital levels.

### Regulatory Capital Standards

The GSE Act established minimum, critical, and risk-based capital standards for us, however per guidance received from FHFA we no longer are required to submit risk-based capital reports to FHFA.

Prior to our entry into conservatorship, those standards determined the amounts of core capital that we were to maintain to meet regulatory capital requirements. Core capital consisted of the par value of outstanding common stock (common stock issued less common stock held in treasury), the par value of outstanding non-cumulative, perpetual preferred stock, additional paid-in capital and retained earnings (accumulated deficit), as determined in accordance with GAAP.

### *Minimum Capital*

The minimum capital standard required us to hold an amount of core capital that was generally equal to the sum of 2.50% of aggregate on-balance sheet assets and approximately 0.45% of the sum of our PCs held by third parties and other aggregate off-balance sheet obligations.

### *Critical Capital*

The critical capital standard required us to hold an amount of core capital that was generally equal to the sum of 1.25% of aggregate on-balance sheet assets and approximately 0.25% of the sum of our PCs held by third parties and other aggregate off-balance sheet obligations.

### Performance Against Regulatory Capital Standards

The table below summarizes our minimum capital requirements and deficits and net worth.

### Table 15.1 — Net Worth and Minimum Capital

|  | December 31, 2011 | December 31, 2010 |
|---|---|---|
|  | (in millions) | |
| GAAP net worth[1] | $ (146) | $ (401) |
| Core capital (deficit)[2][3] | $(64,322) | $(52,570) |
| Less: Minimum capital requirement[2] | 24,405 | 25,987 |
| Minimum capital surplus (deficit)[2] | $(88,727) | $(78,557) |

(1) Net worth (deficit) represents the difference between our assets and liabilities under GAAP.
(2) Core capital and minimum capital figures for December 31, 2011 are estimates. FHFA is the authoritative source for our regulatory capital.
(3) Core capital excludes certain components of GAAP total equity (deficit) (*i.e.*, AOCI, liquidation preference of the senior preferred stock) as these items do not meet the statutory definition of core capital.

Following our entry into conservatorship, we have focused our risk and capital management, consistent with the objectives of conservatorship, on, among other things, maintaining a positive balance of GAAP equity in order to reduce the likelihood that we will need to make additional draws on the Purchase Agreement with Treasury. The Purchase Agreement provides that, if FHFA determines as of quarter end that our liabilities have exceeded our assets under GAAP, Treasury will contribute funds to us in an amount equal to the difference between such liabilities and assets.

*Freddie Mac*

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has advised us that, if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination. If funding has been requested under the Purchase Agreement to address a deficit in our net worth, and Treasury is unable to provide us with such funding within the 60-day period specified by FHFA, FHFA would be required to place us into receivership if our assets remain less than our obligations during that 60-day period.

To address our net worth deficit of $146 million at December 31, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $146 million, and will request that we receive these funds by March 31, 2012. Our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. Upon funding of this draw request, our aggregate funding received from Treasury under the Purchase Agreement will increase to $71.3 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. As a result of the additional $146 million draw request, the aggregate liquidation preference on the senior preferred stock owned by Treasury will increase from $72.2 billion at December 31, 2011 to $72.3 billion. We paid a quarterly dividend of $1.6 billion, $1.6 billion, $1.6 billion, and $1.7 billion on the senior preferred stock in cash on March 31, 2011, June 30, 2011, September 30, 2011, and December 30, 2011, respectively, at the direction of the Conservator. Following funding of the draw request related to our net worth deficit at December 31, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $7.22 billion to $7.23 billion, which exceeds our annual historical earnings in all but one period.

### Subordinated Debt Commitment

In October 2000, we announced our adoption of a series of commitments designed to enhance market discipline, liquidity and capital. In September 2005, we entered into a written agreement with FHFA that updated those commitments and set forth a process for implementing them. FHFA, as Conservator of Freddie Mac, has suspended the requirements in the September 2005 agreement with respect to issuance, maintenance and reporting and disclosure of Freddie Mac subordinated debt during the term of conservatorship and thereafter until directed otherwise.

## NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS

### Single-family Credit Guarantee Portfolio

Our business activity is to participate in and support the residential mortgage market in the United States, which we pursue by both issuing guaranteed mortgage securities and investing in mortgage loans and mortgage-related securities.

The table below summarizes the concentration by year of origination and geographical area of the approximately $1.7 trillion and $1.8 trillion UPB of our single-family credit guarantee portfolio at December 31, 2011 and 2010, respectively. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" and "NOTE 7: INVESTMENTS IN SECURITIES" for more information about credit risk associated with loans and mortgage-related securities that we hold.

**Table 16.1 — Concentration of Credit Risk — Single-Family Credit Guarantee Portfolio**

| | December 31, 2011 | | December 31, 2010 | | Percent of Credit Losses[1] Year Ended | |
| | Percentage of Portfolio[2] | Serious Delinquency Rate[3] | Percentage of Portfolio[2] | Serious Delinquency Rate[3] | December 31, 2011 | December 31, 2010 |
|---|---|---|---|---|---|---|
| **Year of Origination** | | | | | | |
| 2011 | 14% | 0.1% | N/A | N/A | — | N/A |
| 2010 | 19 | 0.3 | 18% | 0.1% | <1% | — |
| 2009 | 18 | 0.5 | 21 | 0.3 | 1 | <1% |
| 2008 | 7 | 5.7 | 9 | 4.9 | 8 | 7 |
| 2007 | 10 | 11.6 | 11 | 11.6 | 36 | 34 |
| 2006 | 7 | 10.8 | 9 | 10.5 | 28 | 30 |
| 2005 | 8 | 6.5 | 10 | 6.0 | 18 | 20 |
| 2004 and prior | 17 | 2.8 | 22 | 2.5 | 9 | 9 |
| Total | 100% | 3.6% | 100% | 3.8% | 100% | 100% |
| **Region[4]** | | | | | | |
| West | 28% | 3.6% | 27% | 4.7% | 53% | 48% |
| Northeast | 25 | 3.4 | 25 | 3.2 | 7 | 8 |
| North Central | 18 | 2.9 | 18 | 3.1 | 16 | 15 |
| Southeast | 17 | 5.5 | 18 | 5.6 | 20 | 25 |
| Southwest | 12 | 1.8 | 12 | 2.1 | 4 | 4 |
| Total | 100% | 3.6% | 100% | 3.8% | 100% | 100% |
| **State[5]** | | | | | | |
| California | 16% | 3.4% | 16% | 4.9% | 29% | 26% |
| Florida | 6 | 10.9 | 6 | 10.5 | 13 | 19 |
| Illinois | 5 | 4.7 | 5 | 4.6 | 5 | 5 |
| Georgia | 3 | 3.3 | 3 | 4.1 | 4 | 3 |
| Michigan | 3 | 2.3 | 3 | 3.0 | 4 | 5 |
| Arizona | 2 | 4.3 | 3 | 6.1 | 11 | 11 |
| Nevada | 1 | 9.8 | 1 | 11.9 | 7 | 6 |
| All other | 64 | 2.8 | 63 | 2.8 | 27 | 25 |
| Total | 100% | 3.6% | 100% | 3.8% | 100% | 100% |

(1) Credit losses consist of the aggregate amount of charge-offs, net of recoveries, and REO operations expense in each of the respective periods and exclude foregone interest on non-performing loans and other market-based losses recognized on our consolidated statements of income and comprehensive income.

(2) Based on the UPB of our single-family credit guarantee portfolio, which includes unsecuritized single-family mortgage loans held by us on our consolidated balance sheets and those underlying Freddie Mac mortgage-related securities, or covered by our other guarantee commitments.

(3) Serious delinquencies on mortgage loans underlying certain REMICs and Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments may be reported on a different schedule due to variances in industry practice.

(4) Region designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

(5) States presented based on those with the highest percentage of credit losses during the year ended December 31, 2011. Our top seven states based on the highest percentage of UPB as of December 31, 2011 are: California (16%), Florida (6%), Illinois (5%), New York (5%), Texas (4%), New Jersey (4%), and Virginia (4%), and comprised 44% of our single-family credit guarantee portfolio as of December 31, 2011.

## Credit Performance of Certain Higher Risk Single-Family Loan Categories

Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. However, there is no universally accepted definition of subprime or Alt-A. Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation mortgage standards. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as Alt-A in the table below because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred.

Although we do not categorize single-family mortgage loans we purchase or guarantee as prime or subprime, we recognize that there are a number of mortgage loan types with certain characteristics that indicate a higher degree of credit risk. For example, a borrower's credit score is a useful measure for assessing the credit quality of the borrower.

Statistically, borrowers with higher credit scores are more likely to repay or have the ability to refinance than those with lower scores.

Presented below is a summary of the serious delinquency rates of certain higher-risk categories of single-family loans in our single-family credit guarantee portfolio. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Loans with a combination of these attributes will have an even higher risk of delinquency than those with isolated characteristics.

**Table 16.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio[1]**

| | Percentage of Portfolio[1] | | Serious Delinquency Rate | |
|---|---|---|---|---|
| | December 31, 2011 | December 31, 2010 | December 31, 2011 | December 31, 2010 |
| Interest-only | 4% | 5% | 17.6% | 18.4% |
| Option ARM | <1 | 1 | 20.5 | 21.2 |
| Alt-A[2] | 5 | 6 | 11.9 | 12.2 |
| Original LTV ratio greater than 90%[3] | 10 | 9 | 6.7 | 7.8 |
| Lower FICO scores at origination (less than 620) | 3 | 3 | 12.9 | 13.9 |

(1) Based on UPB.
(2) Alt-A loans may not include those loans that were previously classified as Alt-A and that have been refinanced as either a relief refinance mortgage or in another refinance mortgage initiative.
(3) Based on our first lien exposure on the property. Includes the credit-enhanced portion of the loan and excludes any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, increases the risk of default.

The percentage of borrowers in our single-family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 20% and 18% at December 31, 2011 and December 31, 2010, respectively. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and is more likely to default than other borrowers. The serious delinquency rate for single-family loans with estimated current LTV ratios greater than 100% was 12.8% and 14.9% as of December 31, 2011 and December 31, 2010, respectively.

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on these categories and other concentrations in our investments in securities.

**Multifamily Mortgage Portfolio**

The table below summarizes the concentration of multifamily mortgages in our multifamily mortgage portfolio by certain attributes. Information presented for multifamily mortgage loans includes certain categories based on loan or borrower characteristics present at origination. The table includes a presentation of each category in isolation. A single loan may fall within more than one category (for example, a non-credit enhanced loan may also have an original LTV ratio greater than 80%).

**Table 16.3 — Concentration of Credit Risk — Multifamily Mortgage Portfolio**

| | December 31, 2011 | | December 31, 2010 | |
|---|---|---|---|---|
| | UPB[1] | Delinquency Rate[2] | UPB[1] | Delinquency Rate[2] |
| | | (in billions) | | |
| **State[3]** | | | | |
| California | $ 20.2 | 0.02% | $ 19.3 | 0.06% |
| Texas | 14.0 | 0.46 | 12.7 | 0.52 |
| New York | 9.6 | — | 9.2 | — |
| Florida | 7.1 | 0.05 | 6.4 | 0.56 |
| Virginia | 6.3 | — | 5.6 | — |
| Maryland | 5.7 | — | 5.3 | — |
| All other states | 53.2 | 0.35 | 49.9 | 0.35 |
| Total | $116.1 | 0.22% | $108.4 | 0.26% |
| **Region[4]** | | | | |
| Northeast | $ 33.1 | 0.01% | $ 31.1 | —% |
| West | 29.9 | 0.07 | 28.3 | 0.07 |
| Southwest | 22.4 | 0.44 | 20.2 | 0.61 |
| Southeast | 20.7 | 0.65 | 19.2 | 0.59 |
| North Central | 10.0 | 0.01 | 9.6 | 0.30 |
| Total | $116.1 | 0.22% | $108.4 | 0.26% |
| **Category[5]** | | | | |
| Original LTV ratio greater than 80% | $ 6.4 | 2.34% | $ 6.6 | 2.30% |
| Original DSCR below 1.10 | 2.8 | 2.58 | 3.2 | 1.22 |
| Non-credit enhanced loans | 84.5 | 0.11 | 87.5 | 0.12 |

(1) Beginning in the second quarter of 2011, we exclude non-consolidated mortgage-related securities for which we do not provide our guarantee. The prior period has been revised to conform to the current period presentation.
(2) Based on the UPB of multifamily mortgages two monthly payments or more delinquent or in foreclosure.
(3) Represents the six states with the highest geographic concentration by UPB at December 31, 2011.
(4) See endnote (4) to "Table 16.1 — Concentration of Credit Risk — Single-family Credit Guarantee Portfolio" for a description of these regions.
(5) These categories are not mutually exclusive and a loan in one category may also be included within another.

One indicator of risk for mortgage loans in our multifamily mortgage portfolio is the amount of a borrower's equity in the underlying property. A borrower's equity in a property decreases as the LTV ratio increases. Higher LTV ratios negatively affect a borrower's ability to refinance or sell a property for an amount at or above the balance of the outstanding mortgage. The DSCR is another indicator of future credit performance. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

Our multifamily mortgage portfolio includes certain loans for which we have credit enhancement. Credit enhancement significantly reduces our exposure to a potential credit loss. As of December 31, 2011, more than one-half of the multifamily loans that were two monthly payments or more past due, measured both in terms of number of loans and on a UPB basis, had credit enhancements that we currently believe will mitigate our expected losses on those loans. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for additional information about credit enhancements on multifamily loans.

We estimate that the percentage of loans in our multifamily mortgage portfolio with a current LTV ratio of greater than 100% was approximately 5% and 8% at December 31, 2011 and December 31, 2010, respectively, and our estimate of the current average DSCR for these loans was 1.1 at both December 31, 2011 and December 31, 2010. We estimate that the percentage of loans in our multifamily mortgage portfolio with a current DSCR less than 1.0 was 5% and 7% at December 31, 2011 and December 31, 2010, respectively, and the average current LTV ratio of these loans was 107% and 108%, respectively. Our estimates of current DSCRs are based on the latest available income information for these properties and our assessments of market conditions. Our estimates of the current LTV ratios for multifamily loans are based on values we receive from a third-party service provider as well as our internal estimates of property value, for which we may use changes in tax assessments, market vacancy rates, rent growth and comparable property sales in local areas as well as third-party appraisals for a portion of the portfolio. We periodically perform our own valuations or obtain third-party appraisals in cases where a significant deterioration in a borrower's financial condition has occurred, the borrower has applied for refinancing, or in certain other circumstances where we deem it appropriate to reassess the property value. Although we use the most recently available results of our multifamily borrowers to estimate a property's value, there may be a significant lag in reporting, which could be six months or more, as they complete their results in the normal course of business. Our internal estimates of property valuation are derived using techniques that include income capitalization, discounted cash flows, sales comparables, or replacement costs.

**Seller/Servicers**

We acquire a significant portion of our single-family mortgage purchase volume from several large seller/servicers with whom we have entered into mortgage purchase volume commitments that provide for the lenders to deliver us up to a certain volume of mortgages during a specified period of time. Our top 10 single-family seller/servicers provided approximately 82% of our single-family purchase volume during the year ended December 31, 2011. Wells Fargo Bank, N.A. and JPMorgan Chase Bank, N.A., accounted for 28% and 13%, respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume during the year ended December 31, 2011. We are exposed to the risk that we could lose purchase volume to the extent these arrangements are terminated without replacement from other lenders.

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our seller/servicers of their obligations to repurchase mortgages or (at our option) indemnify us in the event of: (a) breaches of the representations and warranties they made when they sold the mortgages to us; or (b) failure to comply with our servicing requirements. Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts. As of December 31, 2011 and 2010, the UPB of loans subject to our repurchase requests issued to our single-family seller/servicers was approximately $2.7 billion and $3.8 billion, and approximately 39% and 34% of these requests, respectively, were outstanding for more than four months since issuance of our initial repurchase request as measured by the UPB of the loans subject to the requests (these figures included repurchase requests for which appeals were pending). As of December 31, 2011, two of our largest seller/servicers had aggregate repurchase requests outstanding, based on UPB, of $1.4 billion, and approximately 48% of these requests were outstanding for four months or more since issuance of the initial request. During 2011 and 2010, we recovered amounts that covered losses with respect to $4.4 billion and $6.4 billion, respectively, of UPB on loans subject to our repurchase requests.

GMAC Mortgage, LLC and Residential Funding Company, LLC (collectively GMAC), indirect subsidiaries of Ally Financial Inc. (formerly, GMAC Inc.), are seller/servicers that together serviced and subserviced for an affiliated entity approximately 4% of the single-family loans in our single-family credit guarantee portfolio as of December 31, 2011. In March 2010, we entered into an agreement with GMAC, under which they made a one-time payment to us for the partial release of repurchase obligations relating to loans sold to us prior to January 1, 2009. The partial release does not affect any of GMAC's potential repurchase obligations for loans sold to us by GMAC after January 1, 2009, nor does it affect the ability to recover amounts associated with failure to comply with our servicing requirements. The agreement did not have a material impact on our 2011 or 2010 consolidated statements of income and comprehensive income.

On December 31, 2010, we entered into an agreement with Bank of America, N.A., and two of its affiliates, BAC Home Loans Servicing, LP and Countrywide Home Loans, Inc., to resolve our currently outstanding and future claims for repurchases arising from the breach of representations and warranties on certain loans purchased by us from Countrywide Home Loans, Inc. and Countrywide Bank FSB. Under the terms of the agreement, we received a $1.28 billion cash payment in consideration for releasing Bank of America and its two affiliates from current and future repurchase requests arising from loans sold to us by the Countrywide entities for which the first regularly scheduled monthly payments were due on or before December 31, 2008. The UPB of the loans in this portfolio, as of December 31, 2010, was approximately $114 billion. The agreement applies only to certain claims for repurchase based on breaches of representations and warranties and the agreement contains specified limitations and does not cover loans sold to us or serviced for us by other Bank of America entities. This agreement did not have a material impact on our 2011 or 2010 consolidated statements of income and comprehensive income.

On August 24, 2009, one of our single-family seller/servicers, Taylor, Bean & Whitaker Mortgage Corp., or TBW, filed for bankruptcy and announced its plan to wind down its operations. We had exposure to TBW with respect to its loan repurchase obligations. We also had exposure with respect to certain borrower funds that TBW held for the benefit of Freddie Mac. TBW received and processed such funds in its capacity as a servicer of loans owned or guaranteed by Freddie Mac. TBW maintained certain bank accounts, primarily at Colonial Bank, to deposit such borrower funds and to provide remittance to Freddie Mac. Colonial Bank was placed into receivership by the FDIC in August 2009.

With the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. The settlement was filed with the bankruptcy court on June 22, 2011. The court approved the settlement and confirmed TBW's proposed plan of liquidation on July 21, 2011, which became effective on August 10, 2011. See "NOTE 18: LEGAL CONTINGENCIES" for additional information on the settlement, our claims arising from TBW's bankruptcy, and potential claims by Ocala Funding, LLC, which is a wholly-owned subsidiary of TBW, or Ocala's creditors.

As previously disclosed, we joined an investor group that delivered a notice of non-performance in 2010 to The Bank of New York Mellon, as Trustee, and Countrywide Home Loans Servicing LP (now known as BAC Home Loans Servicing, LP), related to the possibility that certain mortgage pools backing certain mortgage-related securities issued by Countrywide Financial Corporation and related entities include mortgages that may have been ineligible for inclusion in the pools due to breaches of representations or warranties.

On June 29, 2011, Bank of America Corporation announced that it, BAC Home Loans Servicing, LP, Countrywide Financial Corporation and Countrywide Home Loans, Inc. entered into a settlement agreement with The Bank of New York Mellon, as trustee, to resolve all outstanding and potential claims related to alleged breaches of representations and warranties (including repurchase claims), substantially all historical loan servicing claims and certain other historical claims with respect to 530 Countrywide first-lien and second-lien residential mortgage-related securitization trusts. Bank of America indicated that the settlement is subject to final court approval and certain other conditions, including the receipt of a private letter ruling from the IRS. There can be no assurance that final court approval of the settlement will be obtained or that all conditions will be satisfied. Bank of America noted that, given the number of investors and the complexity of the settlement, it is not possible to predict the timing or ultimate outcome of the court approval process, which could take a substantial period of time. We have investments in certain of these Countrywide securitization trusts and would expect to benefit from this settlement, if final court approval is obtained.

In connection with the settlement, Bank of America Corporation entered into an agreement with the investor group. Under this agreement, the investor group agreed, among other things, to use reasonable best efforts and to cooperate in good faith to effectuate the settlement, including to obtain final court approval. Freddie Mac was not a party to this agreement, but agreed to retract any previously delivered notices of non-performance upon final court approval of the settlement.

The Bank of New York Mellon, as trustee, filed the settlement in state court in New York and planned to seek approval at a hearing, which approval would bind all investors in the related trusts. The court directed that any objections to the settlement be filed no later than August 30, 2011. On August 30, 2011, FHFA announced that, in its capacity as conservator, it had filed an appearance and conditional objection regarding the settlement, in order to obtain any additional pertinent information developed in the matter. In the announcement, FHFA, as conservator, stated that it is aware of no basis upon which it would raise a substantive objection to the settlement at this time, but that it believes it prudent not only to receive additional information as it continues its due diligence of the settlement, but also to reserve its capability to voice a substantive objection in the unlikely event that necessity should arise.

On August 26, 2011, the case was removed to Federal court. The trustee filed a motion to remand the case back to state court. On October 19, 2011, the Federal court denied the trustee's motion to remand. The trustee appealed this decision. On February 27, 2012, the federal appellate court reversed the district court and ordered the case to be remanded back to state court.

On September 2, 2011, FHFA announced that, as Conservator for Freddie Mac and Fannie Mae, it had filed lawsuits against 17 financial institutions and related defendants alleging: (a) violations of federal securities laws; and (b) in certain lawsuits, common law fraud in the sale of residential non-agency mortgage-related securities to Freddie Mac and Fannie Mae. FHFA, as Conservator, filed a similar lawsuit against UBS Americas, Inc. and related defendants on July 27, 2011. FHFA seeks to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in certain residential non-agency mortgage-related securities issued by these financial institutions.

The ultimate amounts of recovery payments we receive from seller/servicers may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations. Our estimate of probable incurred losses for exposure to seller/servicers for their repurchase obligations is considered in our allowance for loan losses as of December 31, 2011 and 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" for further information. We believe we have appropriately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at December 31, 2011 and 2010; however, our actual losses may exceed our estimates.

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loss mitigation efforts, including under the servicing alignment initiative and the MHA Program, and therefore, we have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans.

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top three single-family loan servicers, Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A., together

serviced approximately 49% of our single-family mortgage loans as of December 31, 2011. Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A. serviced approximately 26%, 12%, and 11%, respectively, of our single-family mortgage loans, as of December 31, 2011. Since we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, it could have an adverse impact on our business and financial results.

During the second half of 2010, a number of our seller/servicers, including several of our largest ones, temporarily suspended foreclosure proceedings in some or all states in which they do business. These seller/servicers announced these suspensions were necessary while they evaluated and addressed issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, including affidavits. While these servicers generally resumed foreclosure proceedings in the first quarter of 2011, the rate at which they are effecting foreclosures has been slower than prior to the suspensions. See "NOTE 6: REAL ESTATE OWNED" for additional information.

As of December 31, 2011 our top three multifamily servicers, Berkadia Commercial Mortgage LLC, CBRE Capital Markets, Inc., and Wells Fargo Bank, N.A., each serviced more than 10% of our multifamily mortgage portfolio and together serviced approximately 40% of our multifamily mortgage portfolio.

In our multifamily business, we are exposed to the risk that multifamily seller/servicers could come under financial pressure, which could potentially cause degradation in the quality of the servicing they provide us, including their monitoring of each property's financial performance and physical condition. This could also, in certain cases, reduce the likelihood that we could recover losses through lender repurchases, recourse agreements, or other credit enhancements, where applicable. This risk primarily relates to multifamily loans that we hold on our consolidated balance sheets where we retain all of the related credit risk. We monitor the status of all our multifamily seller/servicers in accordance with our counterparty credit risk management framework.

## Mortgage Insurers

We have institutional credit risk relating to the potential insolvency of or non-performance by mortgage insurers that insure single-family mortgages we purchase or guarantee. We evaluate the recovery and collectability from insurance policies for mortgage loans that we hold for investment as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities or covered by other guarantee commitments as part of the estimate of our loan loss reserves. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" for additional information. As of December 31, 2011, these insurers provided coverage, with maximum loss limits of $50.6 billion, for $238.3 billion of UPB, in connection with our single-family credit guarantee portfolio. Our top five mortgage insurer counterparties, Mortgage Guaranty Insurance Corporation (or MGIC), Radian Guaranty Inc., Genworth Mortgage Insurance Corporation, United Guaranty Residential Insurance Co., and PMI Mortgage Insurance Co. (or PMI) each accounted for more than 10% and collectively represented approximately 84% of our overall mortgage insurance coverage at December 31, 2011. All our mortgage insurance counterparties are rated BBB or below as of February 27, 2012, based on the lower of the S&P or Moody's rating scales and stated in terms of the S&P equivalent.

We received proceeds of $2.5 billion and $1.8 billion during 2011 and 2010, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers of $1.8 billion and $2.3 billion as of December 31, 2011 and 2010, respectively. The balance of our outstanding accounts receivable from mortgage insurers, net of associated reserves, was approximately $1.0 billion and $1.5 billion as of December 31, 2011 and 2010, respectively.

In August 2011, we suspended RMIC and its affiliates, and PMI and its affiliates, as approved mortgage insurers for Freddie Mac loans, making loans insured by either company ineligible for sale to Freddie Mac. Both of these companies ceased writing new business during the third quarter of 2011, and have been put under state supervision. PMI instituted a partial claim payment plan in October 2011, under which claim payments will be made 50% in cash, with the remaining amount deferred as a policyholder claim. RMIC instituted a partial claim payment plan in January 2012, under which claim payments will be made 50% in cash and 50% in deferred payment obligations for an initial period not to exceed one year. We and FHFA are in discussions with the state regulators of PMI and RMIC concerning future payments of our claims. It is not yet clear how the state regulators of PMI and RMIC will administer their respective deferred payment plans. In the future, our mortgage insurance exposure will likely be concentrated among a smaller number of mortgage insurer counterparties.

Triad Guaranty Insurance Corp., or Triad, is continuing to pay claims 60% in cash and 40% in deferred payment obligations under orders of its state regulator. To date, the state regulator has not allowed Triad to begin paying its deferred payment obligations and it is uncertain when or if Triad will be permitted to do so.

**Bond Insurers**

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering some of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. At December 31, 2011, we had coverage, including secondary policies, on non-agency mortgage-related securities totaling $9.7 billion of UPB. At December 31, 2011, our top five bond insurers, Ambac Assurance Corporation (or Ambac), Financial Guaranty Insurance Company (or FGIC), MBIA Insurance Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corp., each accounted for more than 10% of our overall bond insurance coverage and collectively represented approximately 99% of our total coverage.

We evaluate the expected recovery from primary bond insurance policies as part of our impairment analysis for our investments in securities. FGIC and Ambac are currently not paying any claims. In addition, if a bond insurer fails to meet its obligations on our investments in securities, then the fair values of our securities may further decline, which could have a material adverse effect on our results and financial condition. We recognized other-than-temporary impairment losses during 2011 and 2010 related to investments in mortgage-related securities covered by bond insurance as a result of our uncertainty over whether or not certain insurers will meet our future claims in the event of a loss on the securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on our evaluation of impairment on securities covered by bond insurance.

**Cash and Other Investments Counterparties**

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank. As of December 31, 2011 and 2010, including amounts related to our consolidated VIEs, there were $68.5 billion and $91.6 billion, respectively, of cash and other non- mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. As of December 31, 2011, these included:

- $3.6 billion of cash equivalents invested in 16 counterparties that had short-term credit ratings of A-1 or above on the S&P or equivalent scale;

- $12.0 billion of securities purchased under agreements to resell with three counterparties that had short-term S&P ratings of A-1 or above; and

- $52.3 billion of cash deposited with the Federal Reserve Bank (as a non-interest-bearing deposit).

**Derivative Portfolio**

*Derivative Counterparties*

Our use of OTC derivatives and exchange-traded derivatives exposes us to institutional credit risk. The requirement that we post initial and maintenance margin with our clearing firm in connection with exchange-traded derivatives such as futures contracts exposes us to institutional credit risk in the event that our clearing firm or the exchange's clearinghouse fail to meet their obligations. However, the use of exchange-traded derivatives lessens our institutional credit risk exposure to individual counterparties, because a central counterparty is substituted for individual counterparties and changes in the value of open exchange-traded contracts are settled daily via payments through the financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk to individual counterparties because transactions are executed and settled between us and each counterparty, exposing us to potential losses if a counterparty fails to meet its contractual obligations.

Our use of OTC interest-rate swaps, option-based derivatives, and foreign-currency swaps is subject to rigorous internal credit and legal reviews. All of our OTC derivatives counterparties are major financial institutions and are experienced participants in the OTC derivatives market.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

*Master Netting and Collateral Agreements*

We use master netting and collateral agreements to reduce our credit risk exposure to our active OTC derivative counterparties for interest-rate swaps, option-based derivatives, and foreign-currency swaps. Master netting agreements provide for the netting of amounts receivable and payable from an individual counterparty, which reduces our exposure to a single counterparty in the event of default. On a daily basis, the market value of each counterparty's derivatives outstanding is calculated to determine the amount of our net credit exposure, which is equal to derivatives in a net gain position by counterparty after giving consideration to collateral posted. Our collateral agreements require most counterparties to post collateral for the amount of our net exposure to them above the applicable threshold. Bilateral collateral agreements are in place for all of our active OTC derivative counterparties. Collateral posting thresholds are tied to a counterparty's credit rating. Derivative exposures and collateral amounts are monitored on a daily basis using both internal pricing models and dealer price quotes. Collateral is typically transferred within one business day based on the values of the related derivatives. This time lag in posting collateral can affect our net uncollateralized exposure to derivative counterparties.

Collateral posted by a derivative counterparty is typically in the form of cash, although U.S. Treasury securities, Freddie Mac mortgage-related securities, or our debt securities may also be posted. In the event a counterparty defaults on its obligations under the derivatives agreement and the default is not remedied in the manner prescribed in the agreement, we have the right under the agreement to direct the custodian bank to transfer the collateral to us or, in the case of non-cash collateral, to sell the collateral and transfer the proceeds to us.

Our uncollateralized exposure to counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest-rate caps, after applying netting agreements and collateral, was $71 million and $32 million at December 31, 2011 and 2010, respectively. In the event that all of our counterparties for these derivatives were to have defaulted simultaneously on December 31, 2011, our maximum loss for accounting purposes would have been approximately $71 million. Three counterparties each accounted for greater than 10% and collectively accounted for 97% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at December 31, 2011. These counterparties were HSBC Bank USA, Royal Bank of Scotland, and UBS AG, all of which were rated "A" or above by S&P as of February 27, 2012.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives, was $38 million and $103 million at December 31, 2011 and 2010, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis to ensure that they continue to meet our internal risk-management standards.

## NOTE 17: FAIR VALUE DISCLOSURES

### Fair Value Hierarchy

The accounting guidance for fair value measurements and disclosures establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. Fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Observable inputs reflect market data obtained from independent sources. Unobservable inputs reflect assumptions based on the best information available under the circumstances. We use valuation techniques that seek to maximize the use of observable inputs, where available, and minimize the use of unobservable inputs.

The three levels of the fair value hierarchy are described below:

- Level 1: Quoted prices (unadjusted) in active markets that are accessible at the measurement date for identical assets or liabilities;

- Level 2: Quoted prices for similar assets and liabilities in active markets; quoted prices for identical or similar assets and liabilities in markets that are not active; inputs other than quoted market prices that are observable for the asset or liability; and inputs that are derived principally from or corroborated by observable market data for substantially the full term of the assets; and

- Level 3: Unobservable inputs for the asset or liability that are supported by little or no market activity and that are significant to the fair values.

Assets and liabilities are classified in their entirety within the fair value hierarchy based on the lowest level input that is significant to the fair value measurement. The table below sets forth by level within the fair value hierarchy assets and liabilities measured and reported at fair value on a recurring basis in our consolidated balance sheets at December 31, 2011 and 2010.

**Table 17.1 — Assets and Liabilities Measured at Fair Value on a Recurring Basis**

| | Fair Value at December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Total |
| | | | (in millions) | | |
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $ — | $ 79,044 | $ 2,048 | $ — | $ 81,092 |
| Subprime | — | — | 27,999 | — | 27,999 |
| CMBS | — | 51,907 | 3,756 | — | 55,663 |
| Option ARM | — | — | 5,865 | — | 5,865 |
| Alt-A and other | — | 11 | 10,868 | — | 10,879 |
| Fannie Mae | — | 20,150 | 172 | — | 20,322 |
| Obligations of states and political subdivisions | — | — | 7,824 | — | 7,824 |
| Manufactured housing | — | — | 766 | — | 766 |
| Ginnie Mae | — | 237 | 12 | — | 249 |
| Total available-for-sale securities, at fair value | — | 151,349 | 59,310 | — | 210,659 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | | 14,181 | 1,866 | — | 16,047 |
| Fannie Mae | | 14,627 | 538 | — | 15,165 |
| Ginnie Mae | | 134 | 22 | — | 156 |
| Other | — | 74 | 90 | — | 164 |
| Total mortgage-related securities | — | 29,016 | 2,516 | — | 31,532 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 302 | — | — | 302 |
| Treasury bills | 100 | | — | — | 100 |
| Treasury notes | 24,712 | | — | — | 24,712 |
| FDIC-guaranteed corporate medium-term notes | — | 2,184 | — | — | 2,184 |
| Total non-mortgage-related securities | 24,812 | 2,486 | — | — | 27,298 |
| Total trading securities, at fair value | 24,812 | 31,502 | 2,516 | — | 58,830 |
| Total investments in securities | 24,812 | 182,851 | 61,826 | — | 269,489 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | | | 9,710 | — | 9,710 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | — | 12,976 | 46 | — | 13,022 |
| Option-based derivatives | 1 | 15,868 | — | — | 15,869 |
| Other | 5 | 110 | 35 | — | 150 |
| Subtotal, before netting adjustments | 6 | 28,954 | 81 | — | 29,041 |
| Netting adjustments[1] | — | — | — | (28,923) | (28,923) |
| Total derivative assets, net | 6 | 28,954 | 81 | (28,923) | 118 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 752 | — | 752 |
| All other, at fair value | — | — | 151 | — | 151 |
| Total other assets | — | — | 903 | — | 903 |
| Total assets carried at fair value on a recurring basis | $24,818 | $211,805 | $72,520 | $(28,923) | $280,220 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ — | $ 3,015 | $ — | $ — | $ 3,015 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | — | 34,601 | 21 | — | 34,622 |
| Option-based derivatives | 1 | 2,934 | 1 | — | 2,936 |
| Other | | 103 | 42 | — | 145 |
| Subtotal, before netting adjustments | 1 | 37,638 | 64 | — | 37,703 |
| Netting adjustments[1] | — | — | — | (37,268) | (37,268) |
| Total derivative liabilities, net | 1 | 37,638 | 64 | (37,268) | 435 |
| Total liabilities carried at fair value on a recurring basis | $ 1 | $ 40,653 | $ 64 | $(37,268) | $ 3,450 |

|  | Fair Value at December 31, 2010 | | | | |
|---|---|---|---|---|---|
|  | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Total |
|  | | | (in millions) | | |
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $ — | $ 83,652 | $ 2,037 | $ — | $ 85,689 |
| Subprime | — | — | 33,861 | — | 33,861 |
| CMBS | — | 54,972 | 3,115 | — | 58,087 |
| Option ARM | — | — | 6,889 | — | 6,889 |
| Alt-A and other | — | 13 | 13,155 | — | 13,168 |
| Fannie Mae | — | 24,158 | 212 | — | 24,370 |
| Obligations of states and political subdivisions | — | — | 9,377 | — | 9,377 |
| Manufactured housing | — | — | 897 | — | 897 |
| Ginnie Mae | — | 280 | 16 | — | 296 |
| Total available-for-sale securities, at fair value | — | 163,075 | 69,559 | — | 232,634 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | — | 11,138 | 2,299 | — | 13,437 |
| Fannie Mae | — | 17,872 | 854 | — | 18,726 |
| Ginnie Mae | — | 145 | 27 | — | 172 |
| Other | — | 11 | 20 | — | 31 |
| Total mortgage-related securities | — | 29,166 | 3,200 | — | 32,366 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 44 | — | — | 44 |
| Treasury bills | 17,289 | — | — | — | 17,289 |
| Treasury notes | 10,122 | — | — | — | 10,122 |
| FDIC-guaranteed corporate medium-term notes | — | 441 | — | — | 441 |
| Total non-mortgage-related securities | 27,411 | 485 | — | — | 27,896 |
| Total trading securities, at fair value | 27,411 | 29,651 | 3,200 | — | 60,262 |
| Total investments in securities | 27,411 | 192,726 | 72,759 | — | 292,896 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | — | — | 6,413 | — | 6,413 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | — | 9,921 | 49 | — | 9,970 |
| Option-based derivatives | — | 11,255 | — | — | 11,255 |
| Other | 3 | 266 | 21 | — | 290 |
| Subtotal, before netting adjustments | 3 | 21,442 | 70 | — | 21,515 |
| Netting adjustments[1] | — | — | — | (21,372) | (21,372) |
| Total derivative assets, net | 3 | 21,442 | 70 | (21,372) | 143 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 541 | — | 541 |
| All other, at fair value | — | — | 235 | — | 235 |
| Total other assets | — | — | 776 | — | 776 |
| Total assets carried at fair value on a recurring basis | $27,414 | $214,168 | $80,018 | $(21,372) | $300,228 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ — | $ 4,443 | $ — | $ — | $ 4,443 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | — | 26,856 | 623 | — | 27,479 |
| Option-based derivatives | 8 | 252 | 2 | — | 262 |
| Other | 170 | 28 | 136 | — | 334 |
| Subtotal, before netting adjustments | 178 | 27,136 | 761 | — | 28,075 |
| Netting adjustments[1] | — | — | — | (26,866) | (26,866) |
| Total derivative liabilities, net | 178 | 27,136 | 761 | (26,866) | 1,209 |
| Total liabilities carried at fair value on a recurring basis | $ 178 | $ 31,579 | $ 761 | $(26,866) | $ 5,652 |

(1) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $9.4 billion and $1 million, respectively, at December 31, 2011. The net cash collateral posted and net trade/settle receivable were $6.3 billion and $1 million, respectively, at December 31, 2010. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(1.1) billion and $(0.8) billion at December 31, 2011 and 2010, respectively, which was mainly related to interest rate swaps that we have entered into.

**Recurring Fair Value Changes**

For the year ended December 31, 2011, we did not have any significant transfers between Level 1 and Level 2 assets or liabilities.

Our Level 3 items mainly consist of non-agency mortgage-related securities. Level 3 measurements consist of assets and liabilities that are supported by little or no market activity where observable inputs generally are not available. The fair value of these assets and liabilities is measured using significant inputs that are considered unobservable. Unobservable inputs reflect assumptions based on the best information available under the circumstances. We use valuation techniques that seek to maximize the use of observable inputs, where available, and minimize the use of unobservable inputs. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy" for additional information about the valuation methods and assumptions used in our fair value measurements.

During 2011, the fair value of our Level 3 assets decreased primarily due to: (a) monthly remittances of principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) the widening of OAS levels on single-family non-agency mortgage-related securities. During 2011, we had a net transfer into Level 3 assets of $267 million, resulting from a change in valuation method for certain mortgage-related securities due to a lack of relevant price quotes from dealers and third-party pricing services.

During 2010, our Level 3 assets decreased by $81.7 billion primarily due to the transfer of the majority of CMBS from Level 3 to Level 2 and our adoption of new accounting guidance applicable to the accounting for transfers of financial assets and consolidation of VIEs. During 2010, the CMBS market continued to improve and we observed significantly less variability in fair value quotes received from dealers and third-party pricing services. In the fourth quarter of 2010 we determined that these market conditions stabilized to a degree that we believe indicates that unobservable inputs are no longer significant to the fair values of these securities and, as a result, we transferred $51.3 billion of CMBS from Level 3 to Level 2. The adoption of amendments to the accounting guidance applicable to the accounting for transfers of financial assets and the consolidation of VIEs resulted in the elimination of $28.8 billion in our Level 3 assets on January 1, 2010, including: (a) certain mortgage-related securities issued by our consolidated trusts that are held by us; and (b) the guarantee asset for guarantees issued to our consolidated trusts. In addition, we transferred $0.4 billion of other Level 3 assets to Level 2 during 2010, resulting from improved liquidity and availability of price quotes received from dealers and third-party pricing services.

The table below provides a reconciliation of the beginning and ending balances for assets and liabilities measured at fair value using significant unobservable inputs (Level 3).

**Table 17.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs**

For The Year Ended December 31, 2011

(in millions)

| | Balance, January 1, 2011 | Realized and unrealized gains (losses) | | | Purchases | Issuances | Sales | Settlements, net[5] | Net transfers in and/or out of Level 3[6] | Balance, December 31, 2011 | Unrealized gains (losses) still held[7] |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Included in earnings[1][2][3][4] | Included in other comprehensive income[1] | Total | | | | | | | |
| **Investments in securities:** | | | | | | | | | | | |
| **Available-for-sale, at fair value:** | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | $ 2,037 | $ — | $ 83 | $ 83 | $ 119 | $ — | $ — | $ (92) | $ (99) | $ 2,048 | $ — |
| Subprime | 33,861 | (1,315) | 707 | (608) | — | — | — | (5,254) | — | 27,999 | (1,315) |
| CMBS | 3,115 | (152) | 802 | 650 | — | — | (67) | (1,115) | 173 | 3,756 | (162) |
| Option ARM | 6,889 | (424) | 684 | 260 | — | — | — | (1,284) | — | 5,865 | (424) |
| Alt-A and other | 13,155 | (198) | (387) | (585) | — | — | — | (1,702) | — | 10,868 | (198) |
| Fannie Mae | 212 | — | 2 | 2 | — | — | — | (37) | (5) | 172 | |
| Obligations of states and political subdivisions | 9,377 | 13 | 550 | 563 | — | — | (609) | (1,507) | — | 7,824 | |
| Manufactured housing | 897 | (11) | (6) | (17) | — | — | — | (114) | — | 766 | (11) |
| Ginnie Mae | 16 | — | (1) | (1) | — | — | — | (3) | — | 12 | |
| Total available-for-sale mortgage-related securities | 69,559 | (2,087) | 2,434 | 347 | 119 | — | (676) | (10,108) | 69 | 59,310 | (2,110) |
| **Trading, at fair value:** | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | 2,299 | (832) | — | (832) | 492 | 25 | (92) | (213) | 187 | 1,866 | (834) |
| Fannie Mae | 854 | (340) | — | (340) | 137 | — | (81) | (43) | 11 | 538 | (340) |
| Ginnie Mae | 27 | (1) | — | (1) | — | — | — | (4) | — | 22 | (1) |
| Other | 20 | — | — | — | — | 91 | (18) | (3) | — | 90 | — |
| Total trading mortgage-related securities | 3,200 | (1,173) | — | (1,173) | 629 | 116 | (191) | (263) | 198 | 2,516 | (1,175) |
| Mortgage loans: | | | | | | | | | | | |
| Held-for-sale, at fair value | 6,413 | 828 | — | 828 | 16,550 | (46) | (14,027) | (54) | 2 | 9,710 | 214 |
| Net derivatives[8] | (691) | 907 | — | 907 | — | — | — | (155) | 2 | 17 | 165 |
| Other assets: | | | | | | | | | | | |
| Guarantee asset[9] | 541 | (25) | — | (25) | — | 288 | — | (52) | — | 752 | (25) |
| All other | 235 | (84) | — | (84) | — | — | — | — | — | 151 | (84) |
| Total other assets | 776 | (109) | — | (109) | — | 288 | — | (52) | — | 903 | (109) |

*Freddie Mac*

**For The Year Ended December 31, 2010**

| | Balance, December 31, 2009 | Cumulative effect of change in accounting principle[10] | Balance, January 1, 2010 | Realized and unrealized gains (losses) | | | Purchases, issuances, sales, and settlements, net[5] | Net transfers in and/or out of Level 3[6] | Balance, December 31, 2010 | Unrealized gains (losses) still held[7] |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Included in earnings[1][2][3][4] | Included in comprehensive income[1] | Total | | | | |
| | | | | | (In millions) | | | | | |
| **Investments in securities:** | | | | | | | | | | |
| **Available-for-sale, at fair value:** | | | | | | | | | | |
| **Mortgage-related securities:** | | | | | | | | | | |
| Freddie Mac | $ 20,807 | $(18,775) | $ 2,032 | $ 5 | $ 5 | 10 | $ (5) | $ — | $ 2,037 | $ — |
| Subprime | 35,721 | — | 35,721 | (1,769) | 7,046 | 5,277 | (7,137) | — | 33,861 | (1,769) |
| CMBS | 54,019 | — | 54,019 | — | 369 | 369 | — | (51,273) | 3,115 | — |
| Option ARM | 7,236 | — | 7,236 | (1,402) | 2,611 | 1,209 | (1,556) | — | 6,889 | (1,395) |
| Alt-A and other | 13,391 | — | 13,391 | (1,020) | 3,128 | 2,108 | (2,344) | — | 13,155 | (1,020) |
| Fannie Mae | 338 | — | 338 | (5) | — | (5) | (134) | 13 | 212 | — |
| Obligations of states and political subdivisions | 11,477 | — | 11,477 | 4 | (123) | (119) | (1,981) | — | 9,377 | — |
| Manufactured housing | 911 | — | 911 | (27) | 126 | 99 | (113) | — | 897 | (27) |
| Ginnie Mae | 4 | — | 4 | — | (1) | (1) | (5) | 18 | 16 | — |
| Total available-for-sale mortgage-related securities | 143,904 | (18,775) | 125,129 | (4,214) | 13,161 | 8,947 | (13,275) | (51,242) | 69,559 | (4,211) |
| **Trading, at fair value:** | | | | | | | | | | |
| **Mortgage-related securities:** | | | | | | | | | | |
| Freddie Mac | 2,805 | (5) | 2,800 | (777) | | (777) | 659 | (383) | 2,299 | (799) |
| Fannie Mae | 1,343 | — | 1,343 | (449) | | (449) | (38) | (2) | 854 | (449) |
| Ginnie Mae | 27 | — | 27 | 1 | | 1 | (1) | — | 27 | — |
| Other | 28 | (1) | 27 | (1) | | (1) | (4) | (2) | 20 | — |
| Total trading mortgage-related securities | 4,203 | (6) | 4,197 | (1,226) | | (1,226) | 616 | (387) | 3,200 | (1,248) |
| **Mortgage loans:** | | | | | | | | | | |
| Held-for-sale, at fair value | 2,799 | — | 2,799 | (1) | | (1) | 3,615 | — | 6,413 | (308) |
| Net derivatives[8] | (430) | — | (430) | (141) | | (141) | (120) | — | (691) | (619) |
| **Other assets:** | | | | | | | | | | |
| Guarantee asset[9] | 10,444 | (10,024) | 420 | (24) | | (24) | 145 | — | 541 | (24) |
| All other | — | — | — | 55 | | 55 | 180 | — | 235 | 55 |
| Total other assets | 10,444 | (10,024) | 420 | 31 | | 31 | 325 | — | 776 | 31 |

(1) Changes in fair value for available-for-sale investments are recorded in AOCI, while gains and losses from sales and losses are recorded in other gains (losses) on investments on our consolidated statements of income and comprehensive income. For mortgage-related securities classified as trading, the realized and unrealized gains (losses) are recorded in other gains (losses) on investments on our consolidated statements of income and comprehensive income.

(2) Changes in fair value of derivatives are recorded in derivative gains (losses) on our consolidated statements of income and comprehensive income for those not designated as accounting hedges.

(3) Changes in fair value of the guarantee asset are recorded in other income on our consolidated statements of income and comprehensive income.

(4) For held-for-sale mortgage loans with fair value option elected, gains (losses) on fair value changes and sale of mortgage loans are recorded in other income on our consolidated statements of income and comprehensive income.

(5) For non-agency mortgage-related securities, primarily represents principal repayments.

(6) Transfer in and/or out of Level 3 during the period is disclosed as if the transfer occurred at the beginning of the period.

(7) Represents the amount of total gains or losses for the period, included in earnings, attributable to the change in unrealized gains (losses) related to assets and liabilities classified as Level 3 that were still held at December 31, 2011 and 2010, respectively. Included in these amounts are credit-related other-than-temporary impairments recorded on available-for-sale securities.

(8) Net derivatives include derivative assets and derivative liabilities prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

(9) We estimate that all amounts recorded for unrealized gains and losses on our guarantee asset relate to those amounts still in position. The amounts reflected as included in earnings represent the periodic fair value changes of our guarantee asset.

(10) Represents adjustment to adopt the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs.

*Freddie Mac*

FHFA 3002

**Non-recurring Fair Value Changes**

Certain assets are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances. We consider the fair value measurement related to these assets to be non-recurring. These fair value measurements usually result from the write-down of individual assets to current fair value amounts due to impairments.

The fair value of impaired multifamily held-for-investment mortgage loans is generally based on the value of the underlying property. Given the relative illiquidity in the markets for these impaired loans, and differences in contractual terms of each loan, we classified these loans as Level 3 in the fair value hierarchy. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Mortgage Loans, Held-for-Investment*" for additional details.

REO is initially measured at its fair value less costs to sell. In subsequent periods, REO is reported at the lower of its carrying amount or fair value less costs to sell. Subsequent measurements of fair value less costs to sell are estimated values based on relevant current and historical factors, which are considered to be unobservable inputs. As a result, REO is classified as Level 3 under the fair value hierarchy. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *REO, Net*" for additional details.

The table below presents assets measured and reported at fair value on a non-recurring basis in our consolidated balance sheets by level within the fair value hierarchy at December 31, 2011 and 2010, respectively.

**Table 17.3 — Assets Measured at Fair Value on a Non-Recurring Basis**

| | Fair Value at December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Total Gains (Losses)[3] |
| | (in millions) | | | | |
| **Assets measured at fair value on a non-recurring basis:** | | | | | |
| Mortgage loans:[1] | | | | | |
| Held-for-investment ................................. | $— | $— | $1,380 | $1,380 | $ (16) |
| REO, net[2] ......................................... | — | — | 3,146 | 3,146 | (118) |
| Total assets measured at fair value on a non-recurring basis ....... | $— | $— | $4,526 | $4,526 | $(134) |

| | Fair Value at December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Total Gains (Losses)[3] |
| | (in millions) | | | | |
| **Assets measured at fair value on a non-recurring basis:** | | | | | |
| Mortgage loans:[1] | | | | | |
| Held-for-investment ................................. | $— | $— | $1,560 | $1,560 | $(183) |
| REO, net[2] ......................................... | — | — | 5,606 | 5,606 | (290) |
| Total assets measured at fair value on a non-recurring basis ....... | $— | $— | $7,166 | $7,166 | $(473) |

(1) Represents carrying value and related write-downs of loans for which adjustments are based on the fair value amounts. These loans include impaired multifamily mortgage loans that are classified as held-for-investment and have a related valuation allowance.

(2) Represents the fair value and related losses of foreclosed properties that were measured at fair value subsequent to their initial classification as REO, net. The carrying amount of REO, net was written down to fair value of $3.1 billion, less estimated costs to sell of $221 million (or approximately $2.9 billion) at December 31, 2011. The carrying amount of REO, net was written down to fair value of $5.6 billion, less estimated costs to sell of $406 million (or approximately $5.2 billion) at December 31, 2010.

(3) Represents the total net gains (losses) recorded on items measured at fair value on a non-recurring basis as of December 31, 2011 and 2010, respectively.

**Fair Value Election**

We elected the fair value option for certain types of securities, multifamily held-for-sale mortgage loans, foreign-currency denominated debt, and certain other debt.

*Certain Available-for-Sale Securities with Fair Value Option Elected*

We elected the fair value option for certain available-for-sale mortgage-related securities to better reflect the natural offset these securities provide to fair value changes recorded historically on our guarantee asset at the time of our election. In addition, upon adoption of the accounting guidance for the fair value option, we elected this option for available-for-sale securities within the scope of the accounting guidance for investments in beneficial interests in securitized financial assets to better reflect any valuation changes that would occur subsequent to impairment write-downs previously recorded on these instruments. By electing the fair value option for these instruments, we reflect valuation changes through our consolidated statements of income and comprehensive income in the period they occur, including any increases in value.

For mortgage-related securities and investments in securities that were selected for the fair value option and subsequently classified as trading securities, the change in fair value is recorded in other gains (losses) on investment securities recognized in earnings in our consolidated statements of income and comprehensive income. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding the net unrealized gains (losses) on trading securities, which include gains (losses) for other items that are not selected for the fair value option. Related interest income continues to be reported as interest income in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" for additional information about the measurement and recognition of interest income on investments in securities.

### Debt Securities with Fair Value Option Elected

We elected the fair value option for foreign-currency denominated debt and certain other debt securities. In the case of foreign-currency denominated debt, we have entered into derivative transactions that effectively convert these instruments to U.S. dollar denominated floating rate instruments. The fair value changes on these derivatives were recorded in derivative gains (losses) in our consolidated statements of income and comprehensive income. We elected the fair value option on these debt instruments to better reflect the economic offset that naturally results from the debt due to changes in interest rates. We also elected the fair value option for certain other debt securities containing potential embedded derivatives that required bifurcation.

The changes in fair value of debt securities with the fair value option elected were $91 million, $580 million, and $(404) million for the years ended December 31, 2011, 2010, and 2009, respectively, which were recorded in gains (losses) on debt recorded at fair value in our consolidated statements of income and comprehensive income. The changes in fair value related to fluctuations in exchange rates and interest rates were $89 million, $583 million, and $(204) million for the years ended December 31, 2011, 2010, and 2009, respectively. The remaining changes in the fair value of $2 million, $(3) million, and $(200) million were attributable to changes in credit risk for the years ended December 31, 2011, 2010, and 2009 respectively.

The change in fair value attributable to changes in credit risk was primarily determined by comparing the total change in fair value of the debt to the total change in fair value of the interest-rate and foreign-currency derivatives used to hedge the debt. Any difference in the fair value change of the debt compared to the fair value change in the derivatives is attributed to credit risk.

The difference between the aggregate fair value and aggregate UPB for long-term debt securities with fair value option elected was $43 million and $108 million at December 31, 2011 and 2010, respectively. Related interest expense continues to be reported as interest expense in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Debt Securities Issued" for additional information about the measurement and recognition of interest expense on debt securities issued.

### Multifamily Held-For-Sale Mortgage Loans with Fair Value Option Elected

We elected the fair value option for multifamily mortgage loans that were purchased for securitization. Through this channel, we acquire loans that we intend to securitize and sell to CMBS investors. While this is consistent with our overall strategy to expand our multifamily business, it differs from our previous buy-and-hold strategy with respect to multifamily loans held-for-investment. Therefore, these multifamily mortgage loans were classified as held-for-sale mortgage loans in our consolidated balance sheets to reflect our intent to sell in the future.

We recorded $828 million, $(1) million, and $(81) million from the change in fair value in gains (losses) on mortgage loans recorded at fair value in other income in our consolidated statements of income and comprehensive income for the years ended December 31, 2011, 2010, and 2009 respectively. The changes in fair value of these loans were primarily attributable to changes in interest rates and other non-credit related items such as liquidity. The changes in fair value attributable to credit risk were not material given that these loans were generally originated within the past six to twelve months and have not seen a change in their credit characteristics.

The difference between the aggregate fair value and the aggregate UPB for multifamily held-for-sale loans with the fair value option elected was $195 million and $(311) million at December 31, 2011 and 2010, respectively. Related interest income continues to be reported as interest income in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" for additional information about the measurement and recognition of interest income on our mortgage loans.

**Valuation Methods and Assumptions Subject to Fair Value Hierarchy**

We categorize assets and liabilities that we measure and report at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation process used to derive the fair value and our judgment regarding the observability of the related inputs.

*Investments in Securities*

<u>Agency Securities</u>

Fixed-rate agency securities are valued based on dealer-published quotes for a base TBA security, adjusted to reflect the measurement date as opposed to a forward settlement date ("carry") and pay-ups for specified collateral. The base TBA price varies based on agency, term, coupon, and settlement month. The carry adjustment converts forward settlement date prices to spot or same-day settlement date prices such that the fair value is estimated as of the measurement date, and not as of the forward settlement date. The carry adjustment uses our internal prepayment and interest rate models. A pay-up is added to the base TBA price for characteristics that are observed to be trading at a premium versus TBAs; this currently includes seasoning and low-loan balance attributes. Haircuts are applied to a small subset of positions that are less liquid and are observed to trade at a discount relative to TBAs; this includes securities that are not eligible for delivery into TBA trades.

Adjustable-rate agency securities are valued based on the median of prices from multiple pricing services. The key valuation drivers used by the pricing services include the interest rate cap structure, term, agency, remaining term, and months-to-next coupon reset, coupled with prevailing market conditions, namely interest rates.

Because fixed-rate and adjustable-rate agency securities are generally liquid and contain observable pricing in the market, they generally are classified as Level 2.

Multiclass structures are valued using a variety of methods, depending on the product type. The predominant valuation methodology uses the median prices from multiple pricing services. This method is used for structures for which there is typically significant, relevant market activity. Some of the key valuation drivers used by the pricing services are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. Other tranche types that are more challenging to price are valued using the median prices from multiple dealers. These include structured interest-only, structured principal-only, inverse floating-rate, and inverse interest-only structures. Some of the key valuation drivers used by the dealers are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. In addition, there is a subset of tranches for which there is a lack of relevant market activity that are priced using a proxy relationship where the position is matched to the closest dealer-priced tranche, then valued by calculating an OAS using our proprietary prepayment and interest rate models from the dealer-priced tranche. If necessary, our judgment is applied to estimate the impact of differences in prepayment uncertainty or other unique cash flow characteristics related to that particular security. We then determine the fair values for these securities by using the estimated OAS as an input to the valuation calculation in conjunction with interest-rate and prepayment models to calculate the NPV of the projected cash flows. These positions typically have smaller balances and are more difficult for dealers to value. There is also a subset of positions for which prices are published on a daily basis; these include trust interest-only and trust principal-only strips. These are fairly liquid tranches and are quoted on a regular settlement date basis. In order to align the regular settlement date price with the balance sheet date, the OAS is calculated based on the published prices. Then the tranche is valued using that OAS applied to the balance sheet date.

Multiclass agency securities are classified as Level 2 or 3 depending on the significance of the inputs that are not observable.

<u>Commercial Mortgage-Backed Securities</u>

CMBS are valued based on the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the collateral type, collateral performance, capital structure, issuer, credit enhancement, coupon, and weighted average life, coupled with the observed spread levels on trades of similar securities. The weighted average coupon of the collateral underlying our CMBS investments was 5.7% as of both December 31, 2011 and 2010. The weighted-average life of the collateral underlying our CMBS investments was 3.7 years and 4.3 years, respectively, as of December 31, 2011 and 2010. Many of these securities have significant prepayment lockout periods or penalty periods that limit the window of potential prepayment to a relatively narrow band. These securities are primarily classified as Level 2.

*Subprime, Option ARM, and Alt-A and Other (Mortgage-Related)*

These private-label investments are valued using either the median of multiple dealer prices or the median prices from multiple pricing services. Some of the key valuation drivers used by the dealers and pricing services include the product type, vintage, collateral performance, capital structure, credit enhancements, and coupon, coupled with interest rates and spreads observed on trades of similar securities, where possible. The market for non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans is highly illiquid, resulting in wide price ranges as well as wide credit spreads. These securities are primarily classified as Level 3.

The table below presents the fair value of subprime, option ARM, and Alt-A and other investments we held by origination year.

**Table 17.4 — Fair Value of Subprime, Option ARM, and Alt-A and Other Investments by Origination Year**

| Year of Origination | Fair Value at | |
|---|---|---|
| | December 31, 2011 | December 31, 2010 |
| | (in millions) | |
| 2004 and prior | $ 4,287 | $ 4,998 |
| 2005 | 10,411 | 13,126 |
| 2006 | 16,155 | 19,333 |
| 2007 | 13,890 | 16,461 |
| 2008 and beyond | — | — |
| Total | $44,743 | $53,918 |

*Obligations of States and Political Subdivisions*

These primarily represent housing revenue bonds, which are valued by taking the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the structure of the bond, call terms, cross-collateralization features, and tax-exempt features coupled with municipal bond rates, credit ratings, and spread levels. These securities are unique, resulting in low trading volumes and are classified as Level 3 in the fair value hierarchy.

*Manufactured Housing*

Securities backed by loans on manufactured housing properties are dealer-priced and we arrive at the fair value by taking the median of multiple dealer prices. Some of the key valuation drivers include the collateral's performance and vintage. These securities are classified as Level 3 in the fair value hierarchy because key inputs are unobservable in the market due to low levels of liquidity.

*Asset-Backed Securities (Non-Mortgage-Related)*

These private-label non-mortgage-related securities are valued based on prices from pricing services. Some of the key valuation drivers include the discount margin, subordination level, and prepayment speed, coupled with interest rates. They are classified as Level 2 because of their liquidity and tight pricing ranges.

*Treasury Bills and Treasury Notes*

Treasury bills and Treasury notes are classified as Level 1 in the fair value hierarchy since they are actively traded and price quotes are widely available at the measurement date for the exact security we are valuing.

*FDIC-Guaranteed Corporate Medium-Term Notes*

Since these securities carry the FDIC guarantee, they are considered to have no credit risk. They are valued based on yield analysis. They are classified as Level 2 because of their high liquidity and tight pricing ranges.

**Mortgage Loans, Held-for-Sale**

Mortgage loans, held-for-sale represent multifamily mortgage loans with the fair value option elected. Thus, all held-for-sale mortgage loans are measured at fair value on a recurring basis.

The fair value of multifamily mortgage loans is generally based on market prices obtained from a third-party pricing service provider for similar actively traded mortgages, adjusted for differences in loan characteristics and contractual terms. The pricing service aggregates observable price points from two markets: agency and non-agency. The agency market consists of purchases made by the GSEs of loans underwritten by our counterparties in accordance with our guidelines while the non-agency market generally consists of secondary market trades between banks and other financial institutions of loans that were originated and initially held in portfolio by these institutions. The pricing service blends the

observable price data obtained from these two distinct markets into a final composite price based on the expected probability that a given loan will trade in one of these two markets. This estimated probability is largely a function of the loan's credit quality, as determined by its current LTV ratio and DSCR. The result of this blending technique is that lower credit quality loans receive a lower percentage of agency price weighting and higher credit quality loans receive a higher percentage of agency price weighting.

Given the relative illiquidity in the marketplace for multifamily mortgage loans and differences in contractual terms, these loans are classified as Level 3 in the fair value hierarchy.

### *Mortgage Loans, Held-for-Investment*

Mortgage loans, held-for-investment measured at fair value on a non-recurring basis represent impaired multifamily mortgage loans, which are not measured at fair value on an ongoing basis but have been written down to fair value due to impairment. The valuation technique we use to measure the fair value of impaired multifamily mortgage loans, held-for-investment is based on the value of the underlying property and may include assessment of third-party appraisals, environmental, and engineering reports that we compare with relevant market performance to arrive at a fair value. Our valuation technique incorporates one or more of the following methods: income capitalization, discounted cash flow, sales comparables, and replacement cost. We consider the physical condition of the property, rent levels, and other market drivers, including input from sales brokers and the property manager. We classify impaired multifamily mortgage loans, held-for-investment as Level 3 in the fair value hierarchy as their valuation includes significant unobservable inputs.

### *Derivative Assets, Net*

Derivative assets largely consist of interest-rate swaps, option-based derivatives, futures, and forward purchase and sale commitments that we account for as derivatives. The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable, trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net unrealized gain position are reported as derivative assets, net. Similarly, derivatives in a net unrealized loss position are reported as derivative liabilities, net.

### *Interest-Rate Swaps and Option-Based Derivatives*

The fair values of interest-rate swaps are determined by using the appropriate yield curves to discount the expected cash flows of both the fixed and variable rate components of the swap contracts. In doing so, we first observe publicly available market spot interest rates, such as money market rates, Eurodollar futures contracts and LIBOR swap rates. The spot curves are translated to forward curves using internal models. From the forward curves, the periodic cash flows are calculated on the pay and receive side of the swap and discounted back at the relevant forward rates to arrive at the fair value of the swap. Since the fair values of the swaps are determined by using observable inputs from active markets, these are generally classified as Level 2 under the fair value hierarchy.

Option-based derivatives include call and put swaptions and other option-based derivatives, the majority of which are European options. The fair values of the European call and put swaptions are calculated by using market observable interest rates and dealer-supplied interest rate volatility grids as inputs to our option-pricing models. Within each grid, prices are determined based on the option term of the underlying swap and the strike rate of the swap. Derivatives with embedded American options are valued using dealer-provided pricing grids. The grids contain prices corresponding to specified option terms of the underlying swaps and the strike rate of the swaps. Interpolation is used to calculate prices for positions for which specific grid points are not provided. Derivatives with embedded Bermudan options are valued based on prices provided directly by counterparties. Swaptions are classified as Level 2 under the fair value hierarchy. Other option-based derivatives include exchange-traded options that are valued by exchange-published daily closing prices. Therefore, exchange-traded options are classified as Level 1 under the fair value hierarchy. Other option-based derivatives also include purchased interest-rate cap and floor contracts that are valued by using observable market interest rates and cap and floor rate volatility grids obtained from dealers, and cancellable interest rate swaps that are valued by using dealer prices. Cap and floor contracts are classified as Level 2 and cancellable interest rate swaps with fair values using significant unobservable inputs are classified as Level 3 under the fair value hierarchy.

The table below shows the fair value, prior to counterparty and cash collateral netting adjustments, for our interest-rate swaps and option-based derivatives and the maturity profile of our derivative positions. It also provides the weighted-average fixed rates of our pay-fixed and receive-fixed swaps. As of December 31, 2011 and 2010 our option-based derivatives had a remaining weighted-average life of 5.0 years and 4.5 years, respectively.

**Table 17.5 — Fair Values and Maturities for Interest-Rate Swaps and Option-Based Derivatives**

| | Notional or Contractual Amount | Total Fair Value[2] | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
|---|---|---|---|---|---|---|
| | | | (dollars in millions) | | | |
| **Interest-rate swaps:** | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $195,716 | $ 10,651 | $    22 | $    390 | $ 2,054 | $  8,185 |
| Weighted average fixed rate[3] | | | 1.17% | 1.03% | 2.26% | 3.35% |
| Forward-starting swaps[4] | 16,092 | 2,239 | — | — | — | 2,239 |
| Weighted average fixed rate[3] | | | | | | 3.96% |
| Basis (floating to floating) | 2,750 | (2) | — | (6) | 4 | — |
| Pay-fixed: | | | | | | |
| Swaps | 276,564 | (31,565) | (62) | (1,319) | (6,108) | (24,076) |
| Weighted-average fixed rate[3] | | | 1.59% | 2.20% | 3.13% | 3.84% |
| Forward-starting swaps[4] | 12,771 | (2,923) | — | — | — | (2,923) |
| Weighted average fixed rate[3] | | | | | | 5.16% |
| Total interest-rate swaps | $503,893 | $(21,600) | $   (40) | $  (935) | $(4,050) | $(16,575) |
| **Option-based derivatives:** | | | | | | |
| Call swaptions | $103,800 | $ 10,043 | $5,230 | $ 1,339 | $    558 | $  2,916 |
| Put swaptions | 70,875 | 636 | 22 | 49 | 166 | 399 |
| Other option-based derivatives[5] | 38,549 | 2,254 | — | — | — | 2,254 |
| Total option-based | $213,224 | $ 12,933 | $5,252 | $ 1,388 | $    724 | $  5,569 |

| | Notional or Contractual Amount | Total Fair Value[2] | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
|---|---|---|---|---|---|---|
| | | | (dollars in millions) | | | |
| **Interest-rate swaps:** | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $302,178 | $  3,314 | $  137 | $  534 | $ 1,269 | $  1,374 |
| Weighted-average fixed rate[3] | | | 1.54% | 1.12% | 2.39% | 3.66% |
| Forward-starting swaps[4] | 22,412 | 371 | — | 123 | (9) | 257 |
| Weighted-average fixed rate[5] | | | | 3.47% | 1.88% | 4.19% |
| Basis (floating to floating) | 2,375 | 4 | — | — | 4 | — |
| Pay-fixed: | | | | | | |
| Swaps | 338,035 | (17,189) | (273) | (1,275) | (3,297) | (12,344) |
| Weighted average fixed rate[3] | | | 3.11% | 2.21% | 3.04% | 4.02% |
| Forward-starting swaps[4] | 56,259 | (4,009) | — | — | — | (4,009) |
| Weighted average fixed rate[3] | | | | | | 4.54% |
| Total interest-rate swaps | $721,259 | $(17,509) | $ (136) | $  (618) | $(2,033) | $(14,722) |
| **Option-based derivatives:** | | | | | | |
| Call swaptions | $125,885 | $  8,147 | $2,754 | $ 2,661 | $ 1,246 | $  1,486 |
| Put swaptions | 65,975 | 1,396 | 136 | 451 | 226 | 583 |
| Other option-based derivatives[5] | 47,234 | 1,450 | (8) | — | (1) | 1,459 |
| Total option-based | $239,094 | $ 10,993 | $2,882 | $ 3,112 | $ 1,471 | $  3,528 |

(1) Fair value is categorized based on the period from December 31, 2011 and 2010, respectively, until the contractual maturity of the derivatives.
(2) Represents fair value for each product type, prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable adjustments.
(3) Represents the notional weighted average rate for the fixed leg of the swaps.
(4) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to thirteen years.
(5) Primarily includes purchased interest rate caps and floors.

*Other Derivatives*

    Other derivatives mainly consist of exchange-traded futures, foreign-currency swaps, certain forward purchase and sale commitments, and credit derivatives. The fair value of exchange-traded futures is based on end-of-day observed closing prices obtained from third-party pricing services; therefore, they are classified as Level 1 under the fair value hierarchy. The fair value of foreign-currency swaps is determined by using the appropriate yield curves to calculate and discount the expected cash flows for the swap contracts; therefore, they are classified as Level 2 under the fair value hierarchy since the fair values are determined through models that use observable inputs from active markets.

    Certain purchase and sale commitments are also considered to be derivatives and are classified as Level 2 or Level 3 under the fair value hierarchy, depending on the fair value hierarchy classification of the purchased or sold item, whether a security or loan. Such valuation techniques are further discussed in the *"Investments in Securities"* section above and "Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy — *Mortgage Loans*."

Credit derivatives primarily include purchased credit default swaps and certain short-term default guarantee commitments, which are valued using prices from the respective counterparty and verified using third-party dealer credit default spreads at the measurement date. We classify credit derivatives as Level 3 under the fair value hierarchy due to the inactive market and significant divergence among prices obtained from the dealers.

<u>Consideration of Credit Risk in Our Valuation of Derivatives</u>

The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. Additionally, the fair value of derivative liabilities considers the impact of our institutional credit risk. Based on this evaluation, and because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, our fair value of derivatives is not adjusted for credit risk. Substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" for a discussion of our counterparty credit risk.

**Other Assets, Guarantee Asset**

Our guarantee asset is valued either through obtaining dealer quotes on similar securities or through an expected cash flow approach. Because of the broad range of liquidity discounts applied by dealers to these similar securities and because the expected cash flow valuation approach uses significant unobservable inputs, we classified the guarantee asset as Level 3.

**REO, Net**

REO is carried at the lower of its carrying amount or fair value less costs to sell. The fair value of REO is calculated using an internal model that considers state and collateral level data to produce an estimate of fair value based on REO dispositions in the most recent three months. We use the actual disposition prices on REO and the current loan UPB to estimate the current fair value of REO. Certain adjustments, such as state specific adjustments, are made to the estimated fair value, as applicable. Due to the use of unobservable inputs, REO is classified as Level 3 under the fair value hierarchy.

**Debt Securities Recorded at Fair Value**

We elected the fair value option for foreign-currency denominated debt instruments and certain other debt securities. See "Fair Value Election — *Debt Securities with Fair Value Option Elected*" for additional information. We determine the fair value of these instruments by obtaining multiple quotes from dealers. Since the prices provided by the dealers consider only observable data such as interest rates and exchange rates, these fair values are classified as Level 2 under the fair value hierarchy.

**Derivative Liabilities, Net**

See discussion under *"Derivative Assets, Net"* above.

**Consolidated Fair Value Balance Sheets**

The supplemental consolidated fair value balance sheets in the table below present our estimates of the fair value of our financial assets and liabilities at December 31, 2011 and 2010. The valuations of financial instruments on our consolidated fair value balance sheets are in accordance with the accounting guidance for fair value measurements and disclosures and the accounting guidance for financial instruments. The consolidated fair value balance sheets do not purport to present our net realizable, liquidation, or market value as a whole. Furthermore, amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary significantly from the fair values presented.

During the fourth quarter of 2011, our fair value results as presented in our consolidated fair value balance sheets were affected by a change in estimate which increased the implied capital costs included in our model to our valuation of single-family mortgage loans due to a change in the estimation of a risk premium assumption embedded in our modeled valuation of such loans. This change in estimate led to a $14.2 billion decrease in our fair value measurement of mortgage loans.

During the second quarter of 2010, our fair value results as presented in our consolidated fair value balance sheets were affected by a change in the estimation of a risk premium assumption embedded in our model to apply credit costs, which led to a $6.9 billion decrease in our fair value measurement of mortgage loans. For more information concerning our approach to valuation related to our mortgage loans, see "Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy — *Mortgage Loans.*"

**Table 17.6 — Consolidated Fair Value Balance Sheets**

| | December 31, 2011 | | December 31, 2010 | |
|---|---|---|---|---|
| | Carrying Amount[1] | Fair Value | Carrying Amount[1] | Fair Value |
| | (in billions) | | | |
| **Assets** | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 28.4 | $ 28.4 | $ 37.0 | $ 37.0 |
| Restricted cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28.1 | 28.1 | 8.1 | 8.1 |
| Federal funds sold and securities purchased under agreements to resell . . . . . . . . . . . . . . . . | 12.0 | 12.0 | 46.5 | 46.5 |
| *Investments in securities:* | | | | |
| Available-for-sale, at fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 210.7 | 210.7 | 232.6 | 232.6 |
| Trading, at fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 58.8 | 58.8 | 60.3 | 60.3 |
| *Total investments in securities* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 269.5 | 269.5 | 292.9 | 292.9 |
| *Mortgage loans:* | | | | |
| Mortgage loans held by consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,564.2 | 1,598.2 | 1,646.2 | 1,667.5 |
| Unsecuritized mortgage loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 217.1 | 205.9 | 198.7 | 191.5 |
| *Total mortgage loans* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,781.3 | 1,804.1 | 1,844.9 | 1,859.0 |
| Derivative assets, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.1 | 0.1 | 0.1 | 0.1 |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27.8 | 28.5 | 32.3 | 37.2 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,147.2 | $2,170.7 | $2,261.8 | $2,280.8 |
| **Liabilities** | | | | |
| *Debt, net:* | | | | |
| Debt securities of consolidated trusts held by third parties . . . . . . . . . . . . . . . . . . . . . . . | $1,471.4 | $1,552.5 | $1,528.7 | $1,589.5 |
| Other debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 660.6 | 681.2 | 713.9 | 729.7 |
| *Total debt, net* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,132.0 | 2,233.7 | 2,242.6 | 2,319.2 |
| Derivative liabilities, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.4 | 0.4 | 1.2 | 1.2 |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14.9 | 15.0 | 18.4 | 19.0 |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,147.3 | 2,249.1 | 2,262.2 | 2,339.4 |
| **Net assets** | | | | |
| Senior preferred stockholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 72.2 | 72.2 | 64.2 | 64.2 |
| Preferred stockholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14.1 | 0.6 | 14.1 | 0.3 |
| Common stockholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (86.4) | (151.2) | (78.7) | (123.1) |
| Total net assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (0.1) | (78.4) | (0.4) | (58.6) |
| Total liabilities and net assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,147.2 | $2,170.7 | $2,261.8 | $2,280.8 |

(1) Equals the amount reported on our GAAP consolidated balance sheets.

## Limitations

Our consolidated fair value balance sheets do not capture all elements of value that are implicit in our operations as a going concern because our consolidated fair value balance sheets only capture the values of the current investment and securitization portfolios as of the dates presented. For example, our consolidated fair value balance sheets do not capture the value of new investment and securitization business that would likely replace prepayments as they occur, nor do they include any estimation of intangible or goodwill values. Thus, the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets does not represent an estimate of our net realizable, liquidation or market value as a whole.

The fair value of certain financial instruments is based on our assumed current principal exit market as of the dates presented. As new markets are developed, our assumed principal exit market may change. The use of different assumptions and methodologies to determine the fair values of certain financial instruments, including the use of different principal exit markets, could have a material impact on the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets.

We report certain assets and liabilities that are not financial instruments (such as property and equipment and REO), as well as certain financial instruments that are not covered by the disclosure requirements in the accounting guidance for financial instruments, such as pension liabilities, at their carrying amounts in accordance with GAAP on our consolidated fair value balance sheets. We believe these items do not have a significant impact on our overall fair value results. Other non-financial assets and liabilities on our GAAP consolidated balance sheets represent deferrals of costs and revenues that are amortized in accordance with GAAP, such as deferred debt issuance costs and deferred fees. Cash receipts and payments related to these items are generally recognized in the fair value of net assets when received or paid, with no basis reflected on our fair value balance sheets.

**Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy**

The following are valuation assumptions and methods for items not subject to the fair value hierarchy either because they are not measured at fair value other than on the fair value balance sheet or are only measured at fair value at inception.

*Cash and Cash Equivalents*

Cash and cash equivalents largely consist of highly liquid investment securities with an original maturity of three months or less used for cash management purposes, as well as cash held at financial institutions and cash collateral posted by our derivative counterparties. Given that these assets are short-term in nature with limited market value volatility, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value.

*Federal Funds Sold and Securities Purchased Under Agreements to Resell*

Federal funds sold and securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities and federal funds sold. Given that these assets are short-term in nature, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value.

*Mortgage Loans*

Single-family mortgage loans are not subject to the fair value hierarchy since they are classified as held-for-investment and recorded at amortized cost. Certain multifamily mortgage loans are subject to the fair value hierarchy since these are either recorded at fair value with the fair value option elected or they are held for investment and recorded at fair value upon impairment, which is based upon the fair value of the collateral as multifamily loans are collateral-dependent.

<u>Single-Family Loans</u>

We determine the fair value of single-family mortgage loans as an estimate of the price we would receive if we were to securitize those loans, as we believe this represents the principal market for such loans. This principal market assumption applies to both loans held by consolidated trusts and unsecuritized loans and excludes single-family loans for which a contractual modification has been completed. Our estimate of fair value is based on comparisons to actively traded mortgage-related securities with similar characteristics. We adjust to reflect the excess coupon (implied management and guarantee fee) and credit obligation related to performing our guarantee.

To calculate the fair value, we begin with a security price derived from benchmark security pricing for similar actively traded mortgage-related securities, adjusted for yield, credit, and liquidity differences. This security pricing process is consistent with our approach for valuing similar securities retained in our investment portfolio or issued to third parties. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Investments in Securities*."

We estimate the present value of the additional cash flows, which consist of the implied management and guarantee fees in excess of the coupon on the mortgage-related securities. Our approach for estimating the fair value of the implied management and guarantee fees at December 31, 2011 used third-party market data as practicable. The valuation approach for the majority of implied management and guarantee fees relates to fixed-rate loan products with coupons at or near current market rates and involves obtaining dealer quotes on hypothetical securities constructed with collateral characteristics from our single-family credit guarantee portfolio. The remaining portion of the implied management and guarantee fees relates to underlying loan products for which comparable market prices were not readily available. These relate specifically to ARM products, highly seasoned loans, and fixed-rate loans with coupons that are not consistent with current market rates. For this portion of the single-family credit guarantee portfolio, the implied management and guarantee fees are valued using an expected cash flow approach, leveraging the market information received on the more liquid portion of the population and including only those cash flows expected to result from our contractual right to receive management and guarantee fees.

The implied management and guarantee fee for single-family mortgage loans is also net of the related credit and other costs (such as general and administrative expense) and benefits (such as credit enhancements) inherent in our guarantee obligation. We use delivery and guarantee fees charged by us as a market benchmark for all guaranteed loans that would qualify for purchase under current underwriting standards (used for the majority of the guaranteed loans, but accounts for a small share of the overall fair value of the guarantee obligation). For loans that do not qualify for purchase based on current underwriting standards, we use our internal credit models, which incorporate factors such as loan characteristics, loan performance status information, expected losses, and risk premiums without further adjustment (used

for less than a majority of the guaranteed loans, but accounts for the largest share of the overall fair value of the guarantee obligation).

For single-family mortgage loans for which a contractual modification has been approved, we estimate fair value based on our estimate of prices we would receive if we were to sell these loans in the whole loan market, as this represents our current principal market for modified loans. These prices are obtained from multiple dealers who reference market activity, where available, for modified loans and use internal models and their judgment to determine default rates, severity rates, and risk premiums.

The fair value of single-family mortgage loans is a fair value measurement with limited market benchmarks and significant unobservable inputs. In determining the fair value of single-family mortgage loans, valuation outcomes can vary widely based on management judgments and decisions used in determining: (a) a principal exit market; (b) modeling assumptions; and (c) inputs used to determine variables including risk premiums, credit costs, security pricing, and implied management and guarantee fees. Specifically, the valuation of single-family mortgage loans could change significantly based on changes in our assumptions about the probability of default, severity, home prices, and risk premium.

### Multifamily Loans

For a discussion of the techniques used to determine the fair value of held-for-sale, and both impaired and non-impaired held-for-investment multifamily loans, see "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Mortgage Loans, Held-for-Investment*" and *"— Mortgage Loans, Held-for-Sale,"* respectively.

### Other Assets

Most of our other assets are not financial instruments required to be valued at fair value under the accounting guidance for disclosures about the fair value of financial instruments, such as property and equipment. For most of these non-financial instruments in other assets, we use the carrying amounts from our GAAP consolidated balance sheets as the reported values on our consolidated fair value balance sheets, without any adjustment. These assets represent an insignificant portion of our GAAP consolidated balance sheets.

We adjust the GAAP-basis deferred taxes reflected on our consolidated fair value balance sheets to include estimated income taxes on the difference between our consolidated fair value balance sheets net assets attributable to common stockholders, including deferred taxes from our GAAP consolidated balance sheets, and our GAAP consolidated balance sheets equity attributable to common stockholders. To the extent the adjusted deferred taxes are a net asset, this amount is included in other assets. In addition, if our net deferred tax assets on our consolidated fair value balance sheets, calculated as described above, exceed our net deferred tax assets on our GAAP consolidated balance sheets that have been reduced by a valuation allowance, our net deferred tax assets on our consolidated fair value balance sheets are limited to the amount of our net deferred tax assets on our GAAP consolidated balance sheets. If the adjusted deferred taxes are a net liability, this amount is included in other liabilities.

Accrued interest receivable is one of the components included within other assets on our consolidated fair value balance sheets. On our GAAP consolidated balance sheets, we reverse accrued but uncollected interest income when a loan is placed on non-accrual status. There is no such reversal performed for the fair value of accrued interest receivable disclosed on our consolidated fair value balance sheets. Rather, we include in our fair value disclosure the amount we deem to be collectible. As a result, there is a difference between the accrued interest receivable GAAP-basis carrying amount and its fair value disclosed on our consolidated fair value balance sheets.

### Total Debt, Net

Total debt, net represents debt securities of consolidated trusts held by third parties and other debt that we issued to finance our assets. On our consolidated GAAP balance sheets, total debt, net, excluding debt securities for which the fair value option has been elected, is reported at amortized cost, which is net of deferred items, including premiums, discounts, and hedging-related basis adjustments.

For fair value balance sheet purposes, we use the dealer-published quotes for a base TBA security, adjusted for the carry and pay-up price adjustments, to determine the fair value of the debt securities of consolidated trusts held by third parties. The valuation techniques we use are similar to the approach we use to value our investments in agency securities for GAAP purposes. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Investments in Securities — Agency Securities*" for additional information regarding the valuation techniques we use.

Other debt includes both non-callable and callable debt, as well as short-term zero-coupon discount notes. The fair value of the short-term zero-coupon discount notes is based on a discounted cash flow model with market inputs. The valuation of other debt securities represents the proceeds that we would receive from the issuance of debt and is generally based on market prices obtained from broker/dealers or reliable third-party pricing service providers. We elected the fair value option for foreign-currency denominated debt and certain other debt securities and reported them at fair value on our GAAP consolidated balance sheets. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Debt Securities Recorded at Fair Value*" for additional information.

### *Other Liabilities*

Other liabilities consist of accrued interest payable on debt securities, the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities, the reserve for guarantee losses on non-consolidated trusts, servicer advanced interest payable and certain other servicer liabilities, accounts payable and accrued expenses, payables related to securities, and other miscellaneous liabilities. We believe the carrying amount of these liabilities is a reasonable approximation of their fair value, except for the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities. The technique for estimating the fair value of our guarantee obligation related to the credit component of the loan's fair value is described in the "Mortgage Loans — Single-Family Loans" section.

As discussed in "Other Assets," other liabilities may include a deferred tax liability adjusted for fair value balance sheet purposes.

### *Net Assets Attributable to Senior Preferred Stockholders*

Our senior preferred stock held by Treasury in connection with the Purchase Agreement is recorded at the stated liquidation preference for purposes of the consolidated fair value balance sheets. As the senior preferred stock is restricted as to its redemption, we consider the liquidation preference to be the most appropriate measure for purposes of the consolidated fair value balance sheets.

### *Net Assets Attributable to Preferred Stockholders*

To determine the preferred stock fair value, we use a market-based approach incorporating quoted dealer prices.

### *Net Assets Attributable to Common Stockholders*

Net assets attributable to common stockholders is equal to the difference between the fair value of total assets and the sum of total liabilities reported on our consolidated fair value balance sheets, less the value of net assets attributable to senior preferred stockholders and the fair value attributable to preferred stockholders.

## NOTE 18: LEGAL CONTINGENCIES

We are involved as a party in a variety of legal and regulatory proceedings arising from time to time in the ordinary course of business including, among other things, contractual disputes, personal injury claims, employment-related litigation and other legal proceedings incidental to our business. We are frequently involved, directly or indirectly, in litigation involving mortgage foreclosures. From time to time, we are also involved in proceedings arising from our termination of a seller/servicer's eligibility to sell mortgages to, and/or service mortgages for, us. In these cases, the former seller/servicer sometimes seeks damages against us for wrongful termination under a variety of legal theories. In addition, we are sometimes sued in connection with the origination or servicing of mortgages. These suits typically involve claims alleging wrongful actions of seller/servicers. Our contracts with our seller/servicers generally provide for indemnification against liability arising from their wrongful actions with respect to mortgages sold to or serviced for Freddie Mac.

Litigation and claims resolution are subject to many uncertainties and are not susceptible to accurate prediction. In accordance with the accounting guidance for contingencies, we reserve for litigation claims and assessments asserted or threatened against us when a loss is probable and the amount of the loss can be reasonably estimated.

In 2011, we paid approximately $8 million for the advancement of legal fees and expenses of current and former officers and directors pursuant to our indemnification obligations to them. These fees and expenses related to some of the matters described below and to certain shareholder derivative lawsuits that were dismissed in April and May 2011. This figure does not include certain administrative support costs and certain costs related to document production and storage.

**Putative Securities Class Action Lawsuits**

*Ohio Public Employees Retirement System ("OPERS") vs. Freddie Mac, Syron, et al.* This putative securities class action lawsuit was filed against Freddie Mac and certain former officers on January 18, 2008 in the U.S. District Court for the Northern District of Ohio purportedly on behalf of a class of purchasers of Freddie Mac stock from August 1, 2006 through November 20, 2007. The plaintiff alleges that the defendants violated federal securities laws by making false and misleading statements concerning our business, risk management and the procedures we put into place to protect the company from problems in the mortgage industry. On April 10, 2008, the Court appointed OPERS as lead plaintiff and approved its choice of counsel. On September 2, 2008, defendants filed motions to dismiss plaintiff's amended complaint. On November 7, 2008, the plaintiff filed a second amended complaint, which removed certain allegations against Richard Syron, Anthony Piszel, and Eugene McQuade, thereby leaving insider-trading allegations against only Patricia Cook. The second amended complaint also extends the damages period, but not the class period. The plaintiff seeks unspecified damages and interest, and reasonable costs and expenses, including attorney and expert fees. On November 19, 2008, the Court granted FHFA's motion to intervene in its capacity as Conservator. On April 6, 2009, defendants filed motions to dismiss the second amended complaint. On December 21, 2011, the plaintiff filed a notice advising the Court of a non-prosecution agreement entered into between Freddie Mac and the SEC on December 15, 2011 (discussed below in "Government Investigations and Inquiries"), and stating its intention to file a motion for leave to amend its complaint. On January 23, 2012, the Court denied defendants' motions to dismiss and set a briefing schedule for plaintiff's motion for leave to amend its complaint. On February 13, 2012, plaintiff filed motion for leave to amend, which seeks leave to file a third amended complaint.

At present, it is not possible for us to predict the probable outcome of this lawsuit or any potential impact on our business, financial condition, or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the following factors, among others: the inherent uncertainty of pre-trial litigation; and the fact that the parties have not yet briefed and the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

*Kuriakose vs. Freddie Mac, Syron, Piszel and Cook.* Another putative class action lawsuit was filed against Freddie Mac and certain former officers on August 15, 2008 in the U.S. District Court for the Southern District of New York for alleged violations of federal securities laws purportedly on behalf of a class of purchasers of Freddie Mac stock from November 21, 2007 through August 5, 2008. The plaintiffs claim that defendants made false and misleading statements about Freddie Mac's business that artificially inflated the price of Freddie Mac's common stock, and seek unspecified damages, costs, and attorneys' fees. On February 6, 2009, the Court granted FHFA's motion to intervene in its capacity as Conservator. On May 19, 2009, plaintiffs filed an amended consolidated complaint, purportedly on behalf of a class of purchasers of Freddie Mac stock from November 20, 2007 through September 7, 2008. Freddie Mac filed a motion to dismiss the complaint on February 24, 2010. On March 30, 2011, the Court granted without prejudice Freddie Mac's motion to dismiss all claims, and allowed the plaintiffs the option to file a new complaint, which they did on July 15, 2011. The defendants have filed motions to dismiss the second amended consolidated complaint. On February 17, 2012, plaintiff served a motion seeking leave to file a third amended consolidated complaint based on the non-prosecution agreement entered into between Freddie Mac and the SEC on December 15, 2011.

At present, it is not possible for us to predict the probable outcome of this lawsuit or any potential impact on our business, financial condition, or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the following factors, among others: the inherent uncertainty of pre-trial litigation; the fact that the Court has not yet ruled upon the defendants' motions to dismiss the second amended complaint or plaintiffs' motion seeking leave to file a third amended complaint; and the fact that the parties have not yet briefed and the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

**Energy Lien Litigation**

On July 14, 2010, the State of California filed a lawsuit against Freddie Mac, Fannie Mae, FHFA, and others in the U.S. District Court for the Northern District of California, alleging that Freddie Mac and Fannie Mae committed unfair business practices in violation of California law by asserting that property liens arising from government-sponsored energy initiatives such as California's Property Assessed Clean Energy, or PACE, program cannot take priority over a mortgage to

be sold to Freddie Mac or Fannie Mae. The lawsuit contends that the PACE programs create liens superior to such mortgages and that, by affirming Freddie Mac and Fannie Mae's positions, FHFA has violated the National Environmental Policy Act, or NEPA, and the Administrative Procedure Act, or APA. The complaint seeks declaratory and injunctive relief, costs and such other relief as the court deems proper.

Similar complaints have been filed by other parties. On July 26, 2010, the County of Sonoma filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging similar violations of California law, NEPA, and the APA. In a filing dated September 23, 2010, the County of Placer moved to intervene in the Sonoma County lawsuit as a party plaintiff seeking to assert similar claims, which motion was granted on November 1, 2010. On October 1, 2010, the City of Palm Desert filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA in the Northern District of California. On October 8, 2010, Leon County and the Leon County Energy Improvement District filed a similar complaint against Fannie Mae, Freddie Mac, FHFA, and others in the Northern District of Florida. On October 12, 2010, FHFA filed a motion before the Judicial Panel on Multi-District Litigation seeking an order transferring these cases as well as a related case filed only against FHFA, for coordination or consolidation of pretrial proceedings. This motion was denied on February 8, 2011. On October 14, 2010, the defendants filed a motion to dismiss the lawsuits pending in the Northern District of California. Also on October 14, 2010, the County of Sonoma filed a motion for preliminary injunction seeking to enjoin the defendants from giving any force or effect in Sonoma County to certain directives by FHFA regarding energy retrofit loan programs and other related relief. On October 26, 2010, the Town of Babylon filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA, as well as the Office of the Comptroller of the Currency, in the U.S. District Court for the Eastern District of New York.

The defendants filed motions to dismiss these lawsuits. The courts have entered stipulated orders dismissing the individual officers of Freddie Mac and Fannie Mae from the cases. On December 17, 2010, the judge handling the cases in the Northern District of California requested a position statement from the United States, which was filed on February 8, 2011. On June 13, 2011, the complaint filed by the Town of Babylon was dismissed. On August 11, 2011, the Town of Babylon filed a notice of appeal to the U.S. Court of Appeals for the Second Circuit. On August 26, 2011, the California federal court granted in part defendants' motion to dismiss, leaving only plaintiffs' APA and NEPA claims against FHFA. The California federal district court cases were thereafter consolidated and the plaintiffs in those cases filed a joint motion for summary judgment on January 23, 2012. FHFA cross-moved for summary judgment on February 27, 2012.

Sonoma County's motion for preliminary injunction was granted in part, requiring FHFA to provide a notice and comment period with regard to its directives. FHFA filed an appeal of the injunction on September 15, 2011, and the District Court granted FHFA a 10-day stay of the injunction to allow FHFA to request a further stay from the U.S. Court of Appeals for the Ninth Circuit, which occurred on October 11, 2011. By order dated December 20, 2011, the Ninth Circuit denied the request for a stay with respect to the notice and comment period. Accordingly, on January 26, 2012, FHFA issued an advance notice of proposed rulemaking and notice of intent to prepare an environmental impact statement.

On October 17, 2011 the City of Palm Desert voluntarily dismissed any remaining claims it might have had against Freddie Mac. The complaint filed by Leon County was dismissed by the Court on September 30, 2011. Leon County filed a notice of appeal to the U.S. Court of Appeals for the Eleventh Circuit on November 28, 2011.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matters due to the following factors, among others: the inherent uncertainty of pre-trial litigation; and the fact that the appeals filed by the Town of Babylon and Leon County are still pending.

**Government Investigations and Inquiries**

On December 15, 2011, the SEC and Freddie Mac entered into a non-prosecution agreement related to an investigation by the SEC's Division of Enforcement into possible violations of the federal securities laws by Freddie Mac and others that occurred prior to Freddie Mac's entry into conservatorship, arising from, among other things, public statements concerning Freddie Mac's exposure to subprime and Alt-A mortgages.

Under the non-prosecution agreement, without admitting or denying liability, Freddie Mac has agreed to accept responsibility for its conduct and to not dispute, contest, or contradict a set of factual statements in the non-prosecution agreement, except in legal proceedings in which the SEC is not a party. Freddie Mac also has agreed to cooperate fully and truthfully in the SEC's investigation and any other related enforcement litigation or proceeding to which the SEC is a