party. In addition, Freddie Mac agreed to cooperate fully and truthfully in any other related official investigation or proceeding by any U.S. federal agency.

The non-prosecution agreement provides that, subject to the full, truthful, and continuing cooperation of Freddie Mac and its compliance with all obligations, prohibitions and undertakings in the non-prosecution agreement, the SEC agrees not to bring any enforcement action or proceeding against Freddie Mac arising from the SEC's investigation.

The non-prosecution agreement does not require Freddie Mac to pay any monetary penalty or other amount. The agreement indicates that, in entering into the non-prosecution agreement, the SEC recognizes the unique circumstances presented by Freddie Mac's current status, including the financial support provided to Freddie Mac by Treasury, the role of FHFA as Freddie Mac's conservator, and the costs that may be imposed on U.S. taxpayers.

On December 16, 2011, the SEC announced that it had charged three former executives of Freddie Mac with securities laws violations. These executives are former Chairman of the Board and CEO Richard F. Syron, former Executive Vice President and Chief Business Officer Patricia L. Cook, and former Executive Vice President for the single-family guarantee business Donald J. Bisenius.

**Related Third Party Litigation and Indemnification Requests**

On December 15, 2008, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York against certain former Freddie Mac officers and others styled *Jacoby vs. Syron, Cook, Piszel, Banc of America Securities LLC, JP Morgan Chase & Co., and FTN Financial Markets*. The complaint, as amended on December 17, 2008, contends that the defendants made material false and misleading statements in connection with Freddie Mac's September 2007 offering of non-cumulative, non-convertible, perpetual fixed-rate preferred stock, and that such statements "grossly overstated Freddie Mac's capitalization" and "failed to disclose Freddie Mac's exposure to mortgage-related losses, poor underwriting standards and risk management procedures." The complaint further alleges that Syron, Cook, and Piszel made additional false statements following the offering. Freddie Mac is not named as a defendant in this lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the Underwriting Agreement in this case, including reimbursement of fees and disbursements of their legal counsel. The case is currently dormant and we believe plaintiff may have abandoned it.

By letter dated October 17, 2008, Freddie Mac received formal notification of a putative class action securities lawsuit, *Mark vs. Goldman, Sachs & Co., J.P. Morgan Chase & Co., and Citigroup Global Markets Inc.*, filed on September 23, 2008, in the U.S. District Court for the Southern District of New York, regarding the company's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock.

On January 29, 2009, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York styled *Kreysar vs. Syron, et al.* On April 30, 2009, the Court consolidated the Mark case with the Kreysar case, and the plaintiffs filed a consolidated class action complaint on July 2, 2009. The consolidated complaint alleged that three former Freddie Mac officers, certain underwriters and Freddie Mac's auditor violated federal securities laws by making material false and misleading statements in connection with the company's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock. The complaint further alleged that certain defendants and others made additional false statements following the offering. The complaint named as defendants Syron, Piszel, Cook, Goldman, Sachs & Co., JPMorgan Securities Inc., Banc of America Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Morgan Stanley & Co. Incorporated, UBS Securities LLC and PricewaterhouseCoopers LLP.

After the Court dismissed, without prejudice, the plaintiffs' consolidated complaint, amended consolidated complaint, and second consolidated complaint, the plaintiffs filed a third amended consolidated complaint against PricewaterhouseCoopers LLP, Syron and Piszel, omitting Cook and the underwriter defendants, on November 14, 2010. On January 11, 2011, the Court granted the remaining defendants' motion to dismiss the complaint with respect to PricewaterhouseCoopers LLP, but denied the motion with respect to Syron and Piszel. On April 4, 2011, Piszel filed a motion for partial judgment on the pleadings. The Court granted that motion on April 28, 2011. The plaintiffs moved for class certification on June 30, 2011, but withdrew this motion on July 5, 2011. The plaintiffs again moved for class certification on August 30, 2011, which motion remains pending.

Freddie Mac is not named as a defendant in the consolidated lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the underwriting agreement in this case, including reimbursement of fees and disbursements of their legal counsel. At present, it is not possible for us to predict the probable outcome of the lawsuit or any potential impact on our business, financial condition or results of operations.

In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the inherent uncertainty of pre-trial litigation and the fact that the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

On July 6, 2011, plaintiffs filed a lawsuit in the U.S. District Court for Massachusetts styled *Liberty Mutual Insurance Company, Peerless Insurance Company, Employers Insurance Company of Wausau, Safeco Corporation and Liberty Life Assurance Company of Boston vs. Goldman, Sachs & Co.* The complaint alleges that Goldman, Sachs & Co. made materially misleading statements and omissions in connection with Freddie Mac's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock. Freddie Mac is not named as a defendant in this lawsuit.

In an amended complaint dated February 17, 2012, Western and Southern Life Insurance Company and others asserted claims against GS Mortgage Securities Corp., Goldman Sachs Mortgage Company and Goldman Sachs & Co. in the Court of Common Pleas, Hamilton County, Ohio. The amended complaint asserts, among other things, that "Goldman Sachs" is liable to plaintiffs under the Ohio Securities Act for alleged misstatements and omissions in connection with $6 billion of preferred stock issued by Freddie Mac on December 4, 2007. Freddie Mac is not named as a defendant in this lawsuit.

### Lehman Bankruptcy

On September 15, 2008, Lehman filed a chapter 11 bankruptcy petition in the Bankruptcy Court for the Southern District of New York. Thereafter, many of Lehman's U.S. subsidiaries and affiliates also filed bankruptcy petitions (collectively, the "Lehman Entities"). Freddie Mac had numerous relationships with the Lehman Entities which give rise to several claims. On September 22, 2009, Freddie Mac filed proofs of claim in the Lehman bankruptcies aggregating approximately $2.1 billion. On April 14, 2010, Lehman filed its chapter 11 plan of liquidation and disclosure statement, providing for the liquidation of the bankruptcy estate's assets over the next three years. The plan and disclosure statement were subsequently modified several times. Hearings to consider confirmation of the plan were conducted on December 6, 2011 and, on that date, the plan was confirmed by the court. The plan sets aside $1.2 billion to be available for payment in full of our priority claim relating to losses incurred on short-term lending transactions with certain Lehman Entities if it is ultimately allowed as a priority claim, but leaves open for subsequent litigation whether our claim of priority status is proper. In the event that this claim is not ultimately accorded priority status, it will be treated as a senior unsecured claim under the plan, pursuant to which Freddie Mac would be entitled to receive an estimated distribution of approximately 21% (or approximately $250 million) over the next three years. The plan also provides that general unsecured claims, such as our claim relating to repurchase obligations of $868 million, will be entitled to a distribution of approximately 19.9% of the allowed amount, if any. The plan does not adjudge or allow our unsecured repurchase obligations claim, but permits claims allowance proceedings to continue. Finally, the plan entitles Freddie Mac to a distribution of approximately 39% (or about $6.4 million) payable over the next three years on our allowed claim exceeding $16 million relating to losses on derivative transactions.

### Taylor, Bean & Whitaker Bankruptcy

On August 24, 2009, TBW filed for bankruptcy in the Bankruptcy Court for the Middle District of Florida. Prior to that date, Freddie Mac had terminated TBW's status as a seller/servicer of loans. On or about June 14, 2010, Freddie Mac filed a proof of claim in the TBW bankruptcy aggregating $1.78 billion. Of this amount, about $1.15 billion related to current and projected repurchase obligations and about $440 million related to funds deposited with Colonial Bank, or with the FDIC as its receiver, which were attributable to mortgage loans owned or guaranteed by us and previously serviced by TBW. The remaining $190 million represented miscellaneous costs and expenses incurred in connection with the termination of TBW's status as a seller/servicer.

With the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. The settlement, which is discussed below, was filed with the bankruptcy court on June 22, 2011. The court approved the settlement and confirmed TBW's proposed plan of liquidation on July 21, 2011, which became effective on August 10, 2011.

Under the terms of the settlement, we have been granted an unsecured claim in the TBW bankruptcy estate in the amount of $1.022 billion, largely representing our claims to past and future loan repurchase exposures. We estimate that this claim may result in a distribution to us of approximately $40-45 million, which is based on the plan of liquidation

and disclosure statement filed with the court by TBW indicating that general unsecured creditors are likely to receive a distribution of 3.3 to 4.4 cents on the dollar. The settlement provides that $6 million of this amount is to be paid to certain creditors of TBW. In addition, pursuant to the settlement, we have received net proceeds of $156 million through December 31, 2011 relating to various funds on deposit, net of amounts we were required to assign or pay to other parties. The settlement also allows for our sale of TBW-related mortgage servicing rights and provides a formula for determining the amount of the proceeds, if any, to be allocated to third parties that have asserted interests in those rights. During the year ended December 31, 2011, we recognized a $0.2 billion gain, primarily representing the difference between the amounts we assigned, or paid, to TBW and their creditors and the liability recorded on our consolidated balance sheet.

At the time of settlement, we estimated our uncompensated loss exposure to TBW to be approximately $0.7 billion. This estimated exposure largely relates to outstanding repurchase claims that have already been substantially provided for in our financial statements through our provision for loan losses. Our ultimate losses could exceed our recorded estimate. Potential changes in our estimate of uncompensated loss exposure or the potential for additional claims as discussed below could cause us to record additional losses in the future.

We understand that Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, or its creditors, may file an action to recover certain funds paid to us prior to the TBW bankruptcy. However, no actions against Freddie Mac related to Ocala have been initiated in bankruptcy court or elsewhere to recover assets. Based on court filings and other information, we understand that Ocala or its creditors may attempt to assert fraudulent transfer and other possible claims totaling approximately $840 million against us related to funds that were allegedly transferred from Ocala to Freddie Mac custodial accounts. We also understood that Ocala might attempt to make claims against us asserting ownership of a large number of loans that we purchased from TBW. The order approving the settlement provides that nothing in the settlement shall be construed to limit, waive or release Ocala's claims against Freddie Mac, except for TBW's claims and claims arising from the allocation of the loans discussed above to Freddie Mac.

On or about May 14, 2010, certain underwriters at Lloyds, London and London Market Insurance Companies brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage bankers bonds providing fidelity and errors and omissions insurance coverage. Several excess insurers on the bonds thereafter filed similar claims in that action. Freddie Mac has filed a proof of loss under the bonds, but we are unable at this time to estimate our potential recovery, if any, thereunder. Discovery is proceeding.

**IRS Litigation**

We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2007 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices for the 1998 to 2005 tax years. We paid the tax assessed in the Statutory Notice received for the years 2006 to 2007 of $36 million and will seek a refund through the administrative process, which could include filing suit in Federal District Court. We believe appropriate reserves have been provided for settlement on reasonable terms. For information on this matter, see "NOTE 13: INCOME TAXES."

## NOTE 19: SELECTED FINANCIAL STATEMENT LINE ITEMS

As discussed in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," we adopted amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs effective January 1, 2010. As a result of this change in accounting principles, certain line items on our consolidated statements of income and comprehensive income, consolidated balance sheets, and consolidated statements of cash flows are no longer material to our 2011 and 2010 consolidated results of operations, financial position, and cash flows.

As this change in accounting principles was applied prospectively, the results of operations for the years ended December 31, 2011 and 2010 reflect the consolidation of our single-family PC trusts and certain Other Guarantee Transactions while the results of operations for the year ended December 31, 2009 reflect the accounting policies in effect at that time, *i.e.*, these securitization entities were accounted for off-balance sheet.

**Impacts on Consolidated Statements of Income and Comprehensive Income**

Prospective adoption of these changes in accounting principles also significantly impacted the presentation of our consolidated statements of income and comprehensive income. These impacts are discussed below:

*Line Items No Longer Separately Presented*

Line items that are no longer separately presented on our consolidated statements of income and comprehensive income include:

- Management and guarantee income — we no longer recognize management and guarantee income on PCs and Other Guarantee Transactions issued by trusts that we have consolidated; rather, the portion of the interest collected on the underlying loans that represents our management and guarantee fee is recognized as part of interest income on mortgage loans. We continue to recognize management and guarantee income related to our other guarantee commitments and guarantees issued to non-consolidated entities in other income;

- Gains (losses) on guarantee asset and income on guarantee obligation — we no longer recognize a guarantee asset and a guarantee obligation for guarantees issued to trusts that we have consolidated; therefore, we also no longer recognize gains (losses) on guarantee asset and income on guarantee obligation for such trusts. However, we continue to recognize a guarantee asset and a guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities and the corresponding gains (losses) on guarantee asset and income on guarantee obligation, which are recorded in other income;

- Losses on loans purchased — we no longer recognize the acquisition of loans from PC trusts that we have consolidated as a purchase with an associated loss, as these loans are already reflected on our consolidated balance sheet. Instead, when we acquire a loan from these entities, we reclassify the loan from mortgage loans held-for-investment by consolidated trusts to unsecuritized mortgage loans held-for-investment and record the cash tendered as an extinguishment of the related PC debt within debt securities of consolidated trusts held by third parties. We continue to recognize losses on loans purchased related to our other guarantee commitments and losses from purchases of loans from non-consolidated entities in other expenses;

- Recoveries of loans impaired upon purchase — as these acquisitions of loans from PC trusts that we have consolidated are no longer treated as purchases for accounting purposes, there will be no recoveries of such loans related to consolidated VIEs that require recognition in our consolidated statements of income and comprehensive income; and

- Trust management income — we no longer recognize trust management income from the single-family PC trusts that we consolidate; rather, such amounts are now recognized in net interest income.

*Line Items Significantly Impacted and Still Separately Presented*

Line items that were significantly impacted and that continue to be separately presented on our consolidated statements of income and comprehensive income include:

- Interest income on mortgage loans — we now recognize interest income on the mortgage loans underlying PCs and Other Guarantee Transactions issued by trusts that we consolidate, which includes the portion of interest that was historically recognized as management and guarantee income. Upfront credit-related and other fees received in connection with such loans historically were treated as a component of the related guarantee obligation; prospectively, these fees are treated as basis adjustments to the loans to be amortized over their respective lives as a component of interest income on mortgage loans;

- Interest income on investments in securities — we no longer recognize interest income on our investments in the PCs and Other Guarantee Transactions issued by trusts that we consolidate, as we now recognize interest income on the mortgage loans underlying PCs and Other Guarantee Transactions issued by trusts that we consolidate;

- Interest expense — we now recognize interest expense on PCs and Other Guarantee Transactions that were issued by trusts that we consolidate and are held by third parties; and

- Other gains (losses) on investments — we no longer recognize other gains (losses) on investments for single-family PCs and certain Other Guarantee Transactions because those securities are no longer accounted for as investments by us as a result of our consolidation of the related trusts.

**Impacts on Consolidated Statements of Cash Flows**

The adoption of these changes in accounting principles also significantly impacted the presentation of our consolidated statements of cash flows. At transition when we consolidated our single-family PCs and certain Other Guarantee Transactions, there was significant non-cash activity.

The table below highlights the significant line items that are no longer disclosed separately on our consolidated statements of income and comprehensive income.

**Table 19.1 — Line Items No Longer Disclosed Separately on Our Consolidated Statements of Income and Comprehensive Income**

|  | For The Year Ended December 31, | | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
|  | (in millions) | | |
| Other income: | | | |
| Management and guarantee income | $ 170 | $ 143 | $ 3,033 |
| Gains (losses) on guarantee asset | (78) | (61) | 3,299 |
| Income on guarantee obligation | 153 | 135 | 3,479 |
| Gains (losses) on sale of mortgage loans | 411 | 267 | 745 |
| Lower-of-cost-or-fair-value adjustments on held-for-sale mortgage loans | — | — | (679) |
| Gains (losses) on mortgage loans recorded at fair value | 418 | (249) | (190) |
| Recoveries on loans impaired upon purchase | 473 | 806 | 379 |
| Low-income housing tax credit partnerships | — | — | (4,155) |
| Trust management income (expense) | — | — | (761) |
| All other | 608 | 819 | 222 |
| Total other income per consolidated statements of income and comprehensive income | $2,155 | $1,860 | $ 5,372 |
| Other expenses: | | | |
| Losses on loans purchased | $ 10 | $ 25 | $ 4,754 |
| All other | 382 | 637 | 449 |
| Total other expenses per consolidated statements of income and comprehensive income | $ 392 | $ 662 | $ 5,203 |

The table below highlights the significant line items that are no longer disclosed separately on our consolidated balance sheets.

**Table 19.2 — Line Items No Longer Disclosed Separately on Our Consolidated Balance Sheets**

|  | December 31, 2011 | December 31, 2010 |
|---|---|---|
|  | (in millions) | |
| Other assets: | | |
| Guarantee asset | $ 752 | $ 541 |
| Accounts and other receivables | 8,350 | 8,734 |
| All other | 1,411 | 1,600 |
| Total other assets | $10,513 | $10,875 |
| Other liabilities: | | |
| Guarantee obligation | $ 787 | $ 625 |
| Servicer liabilities | 3,600 | 4,456 |
| Accounts payable and accrued expenses | 845 | 1,760 |
| All other | 814 | 1,257 |
| Total other liabilities | $ 6,046 | $ 8,098 |

The table below highlights the significant line items that are no longer disclosed separately on our consolidated statements of cash flows.

**Table 19.3 — Line Items No Longer Disclosed Separately on Our Consolidated Statements of Cash Flows**

|  | For The Year Ended December 31, | | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
|  | (in millions) | | |
| Adjustments to reconcile net loss to net cash from operating activities: | | | |
| Low-income housing tax credit partnerships | $ — | $ — | $ 4,155 |
| Losses on loans purchased | 10 | 25 | 4,754 |
| Change in: | | | |
| Due to PCs and REMICs and Other Structured Securities trusts | 8 | 14 | 250 |
| Guarantee asset, at fair value | (210) | (121) | (5,597) |
| Guarantee obligation | 158 | (17) | (183) |
| Other, net | (2,771) | (134) | (461) |
| Total other, net | $(2,805) | $(233) | $ 2,918 |

*Freddie Mac*

**END OF CONSOLIDATED FINANCIAL STATEMENTS AND ACCOMPANYING NOTES**

*Freddie Mac*

## QUARTERLY SELECTED FINANCIAL DATA
### (UNAUDITED)

| | 2011 | | | | |
|---|---|---|---|---|---|
| | 1Q | 2Q | 3Q | 4Q | Full-Year |
| | (in millions, except share-related amounts) | | | | |
| Net interest income | $ 4,540 | $ 4,561 | $ 4,613 | $ 4,683 | $ 18,397 |
| Provision for credit losses | (1,989) | (2,529) | (3,606) | (2,578) | (10,702) |
| Non-interest income (loss) | (1,252) | (3,857) | (4,798) | (971) | (10,878) |
| Non-interest expense | (697) | (546) | (687) | (553) | (2,483) |
| Income tax benefit (expense) | 74 | 232 | 56 | 38 | 400 |
| Net income (loss) attributable to Freddie Mac | $ 676 | $(2,139) | $(4,422) | $ 619 | $ (5,266) |
| Net loss attributable to common stockholders | $ (929) | $(3,756) | $(6,040) | $(1,039) | $(11,764) |
| Net loss per common share:[1] | | | | | |
| Basic | $ (0.29) | $ (1.16) | $ (1.86) | $ (0.32) | $ (3.63) |
| Diluted | $ (0.29) | $ (1.16) | $ (1.86) | $ (0.32) | $ (3.63) |

| | 2010 | | | | |
|---|---|---|---|---|---|
| | 1Q | 2Q[2] | 3Q | 4Q | Full-Year |
| | (in millions, except share-related amounts) | | | | |
| Net interest income | $ 4,125 | $ 4,136 | $ 4,279 | $ 4,316 | $ 16,856 |
| Provision for credit losses | (5,396) | (5,029) | (3,727) | (3,066) | (17,218) |
| Non-interest income (loss) | (4,854) | (3,627) | (2,646) | (461) | (11,588) |
| Non-interest expense | (667) | (479) | (828) | (958) | (2,932) |
| Income tax benefit (expense) | 103 | 286 | 411 | 56 | 856 |
| Net (income) loss attributable to noncontrolling interests | 1 | — | — | — | 1 |
| Net loss attributable to Freddie Mac | $(6,688) | $(4,713) | $(2,511) | $ (113) | $(14,025) |
| Net loss attributable to common stockholders | $(7,980) | $(6,009) | $(4,069) | $(1,716) | $(19,774) |
| Net loss per common share:[1] | | | | | |
| Basic | $ (2.45) | $ (1.85) | $ (1.25) | $ (0.53) | $ (6.09) |
| Diluted | $ (2.45) | $ (1.85) | $ (1.25) | $ (0.53) | $ (6.09) |

(1) Earnings (loss) per common share is computed independently for each of the quarters presented. Due to the use of weighted average common shares outstanding when calculating earnings (loss) per share, the sum of the four quarters may not equal the full-year amount. Earnings (loss) per common share amounts may not recalculate using the amounts shown in this table due to rounding.

(2) For a discussion of an error identified during the three months ended June 30, 2010, see "MD&A — CONSOLIDATED RESULTS OF OPERATIONS — Provision for Credit Losses."

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms and that such information is accumulated and communicated to management of the company, including the company's Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. In designing our disclosure controls and procedures, we recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and we must apply judgment in implementing possible controls and procedures.

Management, including the company's Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of December 31, 2011. As a result of management's evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of December 31, 2011, at a reasonable level of assurance due to the two material weaknesses in our internal control over financial reporting discussed below. For additional information related to these material weaknesses, see "Management's Report on Internal Control Over Financial Reporting."

Our disclosure controls and procedures did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws. We have not been able to update our disclosure controls and procedures to provide reasonable assurance that

information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure. Based on discussions with FHFA and the structural nature of this continuing weakness, it is likely that we will not remediate this weakness in our disclosure controls and procedures while we are under conservatorship.

In addition, based on our assessment as of December 31, 2011, we identified a material weakness related to our inability to effectively manage information technology changes and maintain adequate controls over information security monitoring, resulting from increased levels of employee turnover.

### Management's Report on Internal Control Over Financial Reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Internal control over financial reporting is a process designed by, or under the supervision of, our Chief Executive Officer and Chief Financial Officer and effected by the Board of Directors, management and other personnel to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. It is a process that involves human diligence and compliance and is, therefore, subject to lapses in judgment and breakdowns resulting from human error. It also can be circumvented by collusion or improper management override. Because of its limitations, there is a risk that internal control over financial reporting may not prevent or detect on a timely basis errors that could cause a material misstatement of the financial statements.

We assessed the effectiveness of our internal control over financial reporting as of December 31, 2011. In making our assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission, or COSO, in *Internal Control — Integrated Framework*. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis by a company's internal controls. Based on our assessment, we identified two material weaknesses related to: (a) our inability to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our consolidated financial statements; and (b) our inability to effectively manage information technology changes and maintain adequate controls over information security monitoring, resulting from increased levels of employee turnover.

We have been under conservatorship of FHFA since September 6, 2008. FHFA is an independent agency that currently functions as both our Conservator and our regulator with respect to our safety, soundness and mission. Because we are in conservatorship, some of the information that we may need to meet our disclosure obligations may be solely within the knowledge of FHFA. As our Conservator, FHFA has the power to take actions without our knowledge that could be material to investors and could significantly affect our financial performance. Although we and FHFA have attempted to design and implement disclosure policies and procedures that would account for the conservatorship and accomplish the same objectives as disclosure controls and procedures for a typical reporting company, there are inherent structural limitations on our ability to design, implement, test or operate effective disclosure controls and procedures under the current circumstances. As our Conservator and regulator, FHFA is limited in its ability to design and implement a complete set of disclosure controls and procedures relating to us, particularly with respect to current reporting pursuant to Form 8-K. Similarly, as a regulated entity, we are limited in our ability to design, implement, operate and test the controls and procedures for which FHFA is responsible. For example, FHFA may formulate certain intentions with respect to the conduct of our business that, if known to management, would require consideration for disclosure or reflection in our financial statements, but that FHFA, for regulatory reasons, may be constrained from communicating to management. As a result, we have concluded that this control deficiency constitutes a material weakness in our internal control over financial reporting.

We are finding it difficult to retain and engage critical employees and attract people with the skills and experience we need. In most areas, we have been able to leverage succession plans and reassign responsibilities to maintain sound internal control over financial reporting. However, in the fourth quarter of 2011, we experienced a significant increase in the number of control breakdowns within certain areas of our information technology division, specifically within groups responsible for information change management and information security. We identified deficiencies in the following areas: (a) approval and monitoring of changes to certain technology applications and infrastructure; (b) monitoring of select privileged user activities; and (c) monitoring user activities performed on certain technology hardware systems. These control breakdowns could have impacted applications which support our financial reporting processes. Increased

levels of employee turnover contributed to ineffective management oversight of controls in these areas resulting in these deficiencies. We believe that these issues aggregate to a material weakness in our internal control over financial reporting.

Because of these material weaknesses, we have concluded that our internal control over financial reporting was not effective as of December 31, 2011 based on the COSO criteria. PricewaterhouseCoopers LLP, an independent registered public accounting firm, audited the effectiveness of our internal control over financial reporting as of December 31, 2011 and also determined that our internal control over financial reporting was not effective. PricewaterhouseCoopers LLP's report appears in "FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA — REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM."

### Mitigating Actions Related to the Material Weaknesses in Internal Control Over Financial Reporting

As described under "Management's Report on Internal Control Over Financial Reporting," we have two material weaknesses in internal control over financial reporting as of December 31, 2011.

Given the structural nature of the material weakness related to our inability to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, we believe it is likely that we will not remediate this material weakness while we are under conservatorship. However, both we and FHFA have continued to engage in activities and employ procedures and practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws. These include the following:

- FHFA has established the Office of Conservatorship Operations, which is intended to facilitate operation of the company with the oversight of the Conservator.

- We provide drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also provide drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.

- FHFA personnel, including senior officials, review our SEC filings prior to filing, including this annual report on Form 10-K, and engage in discussions regarding issues associated with the information contained in those filings. Prior to filing this annual report on Form 10-K, FHFA provided us with a written acknowledgement that it had reviewed the annual report on Form 10-K, was not aware of any material misstatements or omissions in the annual report on Form 10-K, and had no objection to our filing the annual report on Form 10-K.

- The Acting Director of FHFA is in frequent communication with our Chief Executive Officer, typically meeting (in person or by phone) on a weekly basis.

- FHFA representatives hold frequent meetings, typically weekly, with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, capital markets management, external communications, and legal matters.

- Senior officials within FHFA's accounting group meet frequently, typically weekly, with our senior financial executives regarding our accounting policies, practices, and procedures.

We have performed the following mitigating actions regarding the material weakness related to our inability to effectively manage information technology changes and maintain adequate controls over information security monitoring, resulting from increased levels of employee turnover:

- Reviewed potential unauthorized changes to applications supporting our financial statements for proper approvals.

- Reviewed and approved user access capabilities for applications supporting our financial reporting processes.

- Maintained effective business process controls over financial reporting.

- Filled the vacant positions or reassigned responsibilities within the information change management and information security monitoring groups.

We also intend to take the following remediation actions related to this material weakness:

- Take select actions targeted to reduce employee attrition in key control areas.

- Assess staffing requirements to ensure appropriate staffing over information security controls and develop cross-training programs within these areas to mitigate the risk to the internal control environment should we continue to experience high levels of employee turnover.

- Improve automation capabilities for the identification and resolution of potential unauthorized system changes.

- Update our policies and procedures to document control processes.

- Provide additional training to IT individuals that execute or manage security controls.

- Explore options to enter into various strategic arrangements with outside firms to provide operational capability and staffing for these functions, if needed.

In view of our mitigating actions related to these material weaknesses, we believe that our consolidated financial statements for the year ended December 31, 2011 have been prepared in conformity with GAAP.

### Changes in Internal Control Over Financial Reporting During the Quarter Ended December 31, 2011

We evaluated the changes in our internal control over financial reporting that occurred during the quarter ended December 31, 2011 and concluded that the following matters have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Raymond G. Romano, Executive Vice President — Chief Credit Officer and John R. Dye, Senior Vice President — Interim General Counsel & Corporate Secretary, left the company during the fourth quarter of 2011. On October 26, 2011, FHFA announced that Charles E. Haldeman Jr., Chief Executive Officer, has expressed his desire to step down in 2012, and that the Board and FHFA will be developing a succession plan.

In addition, a number of senior officers left the company in earlier periods. We maintain succession plans for our senior management positions, which has enabled us to fill some of our vacant senior management positions quickly. However, we may not be able to continue to do so in the future. We have eliminated other vacant senior management positions through reorganizations. In addition, we have experienced elevated levels of voluntary turnover in the fourth quarter of 2011 and earlier periods, and expect this trend to continue as the public debate regarding the future role of the GSEs continues. We continue to have concerns about staffing inadequacies, management depth, and employee engagement. Disruptive levels of turnover at both the executive and employee levels could lead to breakdowns in any of our operations, affect our execution capabilities, cause delays in the implementation of critical technology and other projects, and erode our business, modeling, internal audit, risk management, information security, financial reporting, legal, compliance, and other capabilities.

Based on our assessment as of December 31, 2011, we identified a material weakness related to our inability to effectively manage information technology changes and maintain adequate controls over information security monitoring, resulting from increased levels of employee turnover. For additional information related to this material weakness, see "Management's Report on Internal Control Over Financial Reporting."

FHFA also announced on October 26, 2011, that two Board members, John A. Koskinen (Chairman) and Robert R. Glauber (Chairman, Governance and Nominating Committee), have reached the company's mandatory retirement age and would be stepping down from the Board. This occurred at the end of their then-current terms in March 2012. In order to promote a smooth transition, per FHFA's announcement, Christopher Lynch, previously the Chairman of the Audit Committee, assumed the position of Non-Executive Chairman of the Board effective at the December 2011 Board meeting. A third Board member, Laurence E. Hirsch, notified the company on October 18, 2011 that he would not seek re-election to the Board when his term expires. Mr. Hirsch's term expired in March 2012. In addition, on March 7, 2012, Clayton Rose (Chairman of the Audit Committee) notified the company that he will resign from the Board of Directors effective as of 6:00 pm Eastern Standard Time on March 9, 2012.

### ITEM 9B. OTHER INFORMATION

### Election of Directors

Upon the appointment of FHFA as our Conservator on September 6, 2008, the Conservator immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets, including, without limitation, the right of holders of our common stock to vote with respect to the election of directors and any other matter for which stockholder approval is required or deemed advisable.

On March 6, 2012, the Conservator executed a written consent re-electing each of the then-current directors as members of our Board of Directors, other than Messrs. Glauber, Hirsch, and Koskinen, effective as of that date. The individuals elected by the Conservator for another term as directors are listed below.

Linda B. Bammann
Carolyn H. Byrd
Charles E. Haldeman, Jr.
Christopher S. Lynch
Nicolas P. Retsinas
Clayton S. Rose
Eugene B. Shanks, Jr.
Anthony A. Williams

The terms of the directors elected under the March 6, 2012 consent will continue until the date of the next annual meeting of stockholders or the Conservator next elects directors by written consent, whichever occurs first.

On March 7, 2012, Clayton Rose notified the company that he will resign from the Board of Directors effective as of 6:00 pm Eastern Standard Time on March 9, 2012.

**2012 Executive Management Compensation Program**

On March 8, 2012, FHFA approved a new compensation structure for our Covered Officers with limited input from Freddie Mac's management and Compensation Committee. The 2012 Executive Management Compensation Program, or the 2012 Executive Compensation Program, is effective January 1, 2012. Compensation under the 2012 Executive Compensation Program consists solely of salary paid in cash, with two components — Base Salary and Deferred Salary — which are described in the table below. No portion of the 2012 Executive Compensation Program includes a bonus component.

| Element of Compensation | Description | Primary Compensation Objectives | Key Features |
|---|---|---|---|
| Base Salary | Earned and paid on a semi-monthly basis | To provide a fixed level of compensation to each Covered Officer for the responsibility level of his/her position | Cannot exceed $500,000 per year, except for the CEO and CFO, or other exceptions as approved by FHFA. |
| Deferred Salary | *Fixed Portion*. The fixed portion of Deferred Salary is earned semi-monthly during each quarter and paid on the last business day of the corresponding quarter of the following year | To encourage executive retention | The portion earned during 2012 but unpaid as of the date of termination is paid as described below. |
| | *At-Risk Portion*. The at-risk portion of Deferred Salary is earned and paid in the same manner as the fixed portion of Deferred Salary, but is subject to reduction based on corporate and individual performance | To encourage achievement of corporate and individual performance goals | The portion earned during 2012 but unpaid as of the date of termination is paid as described below.<br><br>The 2012 corporate objectives against which corporate performance will be measured for the named executives' 2012 at-risk deferred salary are described below under "2012 Conservatorship Scorecard."<br><br>Equal to 30% of Target TDC, half of which may be reduced based on corporate performance and half of which may be reduced based on individual performance. |

*Effect of Termination of Employment.* Base Salary ceases upon a Covered Officer's termination of employment. The treatment of Deferred Salary upon the termination of a Covered Officer for any reason other than for cause is as described below.

- *Deferred Salary — Fixed Portion.* The portion earned during 2012 but unpaid as of the date of termination is reduced by 2% for each full or partial month by which the Covered Officer's termination precedes January 31, 2014.

- *Deferred Salary — At-Risk Portion.* The portion earned during 2012 but unpaid as of the date of termination is paid in full, but remains subject to reduction for corporate and individual performance.

All Deferred Salary paid following a Covered Officer's termination of employment will be paid on the same quarterly schedule as if the Covered Officer had not terminated employment.

**2012 Target Total Direct Compensation**

In establishing each Named Executive Officer's 2012 Target TDC, the Compensation Committee reviewed 2011 data from the Comparator Group and two alternative survey sources. Specifically, for the positions of CEO, CFO, EVP — Single-Family Business, Operations and Technology and EVP — Chief Enterprise Risk Officer, the Compensation Committee, at the recommendation of Meridian Compensation Partners, LLC, or Meridian, reviewed competitive market compensation data from the Comparator Group. For the position of EVP — Chief Administrative Officer, the Compensation Committee, also at the recommendation of Meridian, reviewed competitive market data from surveys published by Aon Hewitt and McLagan, because no reasonable match was available in the Comparator Group.

In December 2011, the Compensation Committee applied the criteria described below under "EXECUTIVE COMPENSATION — Compensation Discussion and Analysis — Executive Management Compensation Program — *Elements of Compensation and Total Direct Compensation — Establishing Target TDC*" to either develop 2012 TDC recommendations for each of the Named Executive Officers or review recommendations presented by senior management.

The 2012 Target TDC recommendation for each of the Named Executive Officers was reviewed by FHFA. While the Compensation Committee's 2012 Target TDC recommendations for our Named Executive Officers, in the aggregate, were below the 25th percentile of the competitive market, FHFA instructed the Compensation Committee to reduce the Target TDC for each of the Named Executive Officers by 10%, with the exception of Ms. Wisdom. For Ms. Wisdom, 2012 Target TDC is unchanged from 2011 in consideration of the expansion in the scope of her responsibilities during 2011 resulting from the integration of the credit risk management function in her division. For Mr. Weiss and Ms. Wisdom, the Compensation Committee increased Base Salary by 10%, with an equal decrease in Deferred Salary, to create more consistent Base Salary levels for EVPs who have comparable levels of responsibility.

The following table sets forth the components of compensation on an annual basis for each of our Named Executive Officers.

**Table 75 — 2012 Program Target Compensation Amounts**

| Named Executive Officer | Title | 2012 Base Salary | 2012 Deferred Salary | | Target TDC |
|---|---|---|---|---|---|
| | | | Fixed Portion | At-Risk Portion | |
| Charles E. Haldeman, Jr. . . . | CEO | $900,000 | $2,880,000 | $1,620,000 | $5,400,000 |
| Ross J. Kari. . . . . . . . . . . | EVP — CFO | 675,000 | 1,530,000 | 945,000 | 3,150,000 |
| Anthony N. Renzi . . . . . . | EVP — Single-Family Business, Operations and Technology | 500,000 | 1,232,500 | 742,500 | 2,475,000 |
| Jerry Weiss . . . . . . . . . . | EVP — Chief Administrative Officer | 495,000 | 891,000 | 594,000 | 1,980,000 |
| Paige H. Wisdom . . . . . . . | EVP — Chief Enterprise Risk Officer | 467,500 | 757,500 | 525,000 | 1,750,000 |

**2012 Conservatorship Scorecard**

On March 8, 2012, FHFA instituted a scorecard for use in the new compensation program. The scorecard is applicable to both Freddie Mac and Fannie Mae and establishes the following objectives and performance targets/measures for 2012. These objectives and performance targets/measures will be used in determining the amount payable to Covered Officers with respect to one-half of the at-risk portion of 2012 Deferred Salary.

The scorecard scoring will be based not only on the ultimate accomplishment of results but also our cooperation, relative contribution and collaboration with the Board of Directors, FHFA, Fannie Mae, and market participants, as appropriate to the particular measure. FHFA will consider our creativity, collaboration, effectiveness, and commitment to the particular matter. Most goals have a target date of completion of December 31, 2012. However, if we are able to accomplish the goal earlier in the year that will be taken into consideration in the scoring to offset shortfalls elsewhere.

| Objectives | Weighting | Targets / Measures |
|---|---|---|
| **1. Build a New Infrastructure** | 30% | |
| • **Continued progress on, or completion of, mortgage market enhancement activities already underway**<br>  – Loan-level Disclosure in Mortgage Backed Security (MBS)<br>  – Uniform Mortgage Data Program (UMDP)<br><br><br><br><br><br><br>  – Seller Servicer Contract Harmonization | 15% | • Develop template for enhanced loan-level disclosures for single-family MBS that incorporates market standards and is consistent with maintaining liquidity in the to-be-announced market. Template to be submitted to Federal Housing Finance Agency (FHFA) by June 30, 2012.<br>• Meet articulated Uniform Mortgage Data Program (UMDP) timetables as follows:<br>  – Uniform Collateral Data Portal (UCDP) electronic appraisal submission requirement by March 19, 2012.<br>  – Uniform Loan Delivery Data (ULDD) format loan delivery data by July 23, 2012.<br>  – Deliver new ULDD data point in compliance with SEC Rule 15Ga-1 by November 30, 2012.<br>  – Notify market of optional ULDD data points, including those necessary to improve disclosure and for other business uses in 2012.<br>• Notify market of servicing data standard, including data necessary to improve disclosure, and agree on timetable for data collection to begin in 2013 by December 31, 2012.<br>• Develop plans that leverage uniform appraisal data and ULDD for enhanced risk management by December 31, 2012.<br>• Cooperate with FHFA implementation of portal to accept electronic appraisals.<br>• Appropriate resource allocation to seller-servicer contract harmonization and commitment to targeted timetables as outlined in FHFA directive. |
| • **Securitization Platform** | 10% | • In collaboration with FHFA and the other Enterprise, develop and finalize a plan by December 31, 2012 for the design and build of a single securitization platform that can serve both Enterprises and a post-conservatorship market with multiple future issuers. |
| • **Pooling and Servicing Agreements** | 5% | • Propose a model pooling and servicing agreement (PSA), collaborate with other Enterprise and FHFA on a specific proposal, seek public comment, and produce final recommendations for standard Enterprise trust documentation by December 31, 2012. |
| **2. Contract the Enterprises dominant presence in the marketplace while simplifying and shrinking certain operations.** | 30% | |
| • **Work with FHFA to evaluate options for meeting conservatorship goals, including shifting mortgage credit risk to private investors via assessment of:**<br>  – Multifamily line of business<br><br>  – Investment assets and nonperforming loans | 10% | • Undertake a market analysis by December 31, 2012, of the viability of multifamily business operations without government guarantees. Review the likely viability of these models operating on a stand-alone basis after attracting private capital and adjusting pricing if needed.<br>• Perform analysis of investments portfolio as described in the strategic plan by the fourth quarter of 2012 and make preparations for the competitive disposition of a pool of nonperforming assets by September 30, 2012.<br>• Review options with board of directors and FHFA and make appropriate recommendations for future actions.<br>• Implement plan agreed to by board and FHFA. |
| • **Risk Sharing** | 10% | • Initiate risk sharing transactions by September 30, 2012.<br>• Execute new risk sharing transactions beyond the traditional charter required mortgage insurance coverage.<br>• Propose timeline for continued growth in risk sharing through 2013. |
| • **Pricing**<br>  – Single-family Guarantee Fee Pricing Increases<br><br>  – Set plan to price for state law effects on mortgage credit losses given default | 10% | • Develop and begin implementing plan to increase guarantee fee pricing to more closely approximate the private sector.<br>• Set uniform pricing across loan sellers to extent practicable.<br>• Work with FHFA to develop appropriate risk-based pricing by state. State-level pricing grid to be completed by August 31, 2012. |
| **3. Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.** | 20% | |
| • **Loss Mitigation through continued implementation and enhancement of Servicer Alignment Initiative**<br>• **Short Sales**<br><br>• **Deeds-in-Lieu and Deeds-for-Lease** | 10% | • Enhance transparency of servicer requirements around foreclosure timelines and compensatory fees and publish applicable announcements by September 30, 2012.<br>• Enhance short sales programs that include efforts to identify program obstacles that impact utilization by June 30, 2012. Applicable lender announcements to foreclosure alternatives by September 30, 2012.<br>• Design, develop or enhance deed-in-lieu and deed-for-lease programs that include efforts to identify and resolve program obstacles that impact utilization by September 30, 2012. Applicable lender announcements to foreclosure alternatives by December 31, 2012. |
| • **Real Estate Owned Sales** | 10% | • Implement, as needed, loans to facilitate real estate owned (REO) sales program by June 30, 2012.<br>• Expand financing for small investors in REO properties by June 30, 2012.<br>• Initiate disposition pilot, either through financing or bulk sales, by September 30, 2012.<br>• Expand pilot programs and establish ongoing sales program, as agreed to with FHFA, during 2012. |
| **4. Manage Efficiently in Support of Conservatorship Goals** | 20% | |
| • **Conservatorship / Board Priorities** | 20% | • Work closely with FHFA toward concluding litigation associated with private label securities and whole loan repurchase claims, as appropriate.<br>• Prioritize and manage Enterprise operations in support of conservatorship goals and board directions.<br>• Adapt to evolving conservatorship requirements.<br>• Collaborate fully with FHFA and, when requested, the other Enterprise.<br>• Actively seek and consider public input on conservatorship-related projects, as requested.<br>• Effectively identify, communicate, and remediate situations that create risk for the conservatorships or avoidable taxpayer losses.<br>• Ensure corporate governance procedures are maintained, including timely reporting to the board and adhering to board mandates and expectations.<br>• Take steps to mitigate key person dependencies and maintain appropriate internal controls and risk management governance.<br>• Achieve milestones agreed to within the year with regard to accounting alignment. |

## PART III

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

**Background**

On September 6, 2008, the Director of FHFA appointed FHFA as our Conservator. Upon its appointment as Conservator, FHFA immediately succeeded to, among other things, the right of holders of our common stock to vote with respect to the election of directors. As a result, stockholders no longer have the ability to recommend director nominees or vote for the election of our directors. Accordingly, we will not solicit proxies, distribute a proxy statement to stockholders, or hold an annual meeting of stockholders in 2012. Instead, the Conservator has elected directors by a written consent in lieu of an annual meeting, as it has done in previous years.

**Directors**

On November 24, 2008, the Conservator reconstituted our Board of Directors and delegated certain powers to the Board while reserving certain powers of approval to itself. See "Authority of the Board and Board Committees." The Conservator determined that the Board is to have a non-executive Chairman, and is to consist of a minimum of nine and not more than 13 directors, with the Chief Executive Officer being the only corporate officer serving as a member of the Board.

On October 26, 2011, FHFA announced that Charles E. Haldeman, Jr. had informed the Board of his desire to step down from his position as CEO and Director of Freddie Mac in the coming year. The Board is conducting a search for a new CEO, in consultation with FHFA. An informal committee consisting of Nominating and Governance Committee members Eugene B. Shanks, Jr. (chair), Nicolas P. Retsinas and Carolyn H. Byrd, along with Non-Executive Chairman Christopher S. Lynch, is conducting the search on behalf of the Board. The executive search firm SpencerStuart has been retained to assist in the search.

FHFA also announced on October 26, 2011 that two members of the Freddie Mac Board of Directors, John A. Koskinen and Robert R. Glauber, have reached the company's mandatory retirement age and will not be eligible for re-election to the Board at the end of their current term. In anticipation of those retirements and to promote a smooth transition, Mr. Lynch, who previously served as chairman of the Board's Audit Committee, assumed the position of Non-Executive Chairman, effective December 2, 2011. A third Board member, Laurence E. Hirsch, notified the company on October 18, 2011 that he would not seek re-election to the Board when his term expired.

The Conservator executed a written consent, effective March 6, 2012, electing all of the then-current directors other than Messrs. Glauber, Hirsch and Koskinen to another term as our directors. The terms of those directors will end: (a) on the date of the next annual meeting of our stockholders; or (b) when the Conservator next elects directors by written consent, whichever occurs first. Currently, we have eight directors. The Board is conducting a search for individuals qualified to fill the remaining seats on the Board that are currently vacant.

Our Board seeks candidates for director who have achieved a high level of stature, success, and respect in their principal occupations. Each of our current directors was selected as a candidate because of his or her character, judgment, experience, and expertise. The qualifications of candidates also were evaluated in light of the requirement in our charter, as amended by the Reform Act, that our Board must at all times have at least one individual from the homebuilding, mortgage lending and real estate industries, and at least one person from an organization representing consumer or community interests or one person who has demonstrated a career commitment to the provision of housing for low-income households. Consistent with the examination guidance for corporate governance issued by FHFA, the factors considered also include the knowledge directors would have, as a group, in the areas of business, finance, accounting, risk management, public policy, mortgage lending, real estate, low-income housing, homebuilding, regulation of financial institutions, and any other areas that may be relevant to our safe and sound operation. Additionally, in accordance with the guidance issued by FHFA, we considered whether a candidate's other commitments, including the number of other board memberships held by the candidate, would permit the candidate to devote sufficient time to the candidate's duties and responsibilities as a director. See "CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE — Board Diversity" for additional information concerning the Board's consideration of diversity in identifying director nominees and candidates.

The following is a brief discussion of: the age and length of Board service of each director; each director's experience, qualifications, attributes, and/or skills that led to his or her selection as a director; and other biographical information about our directors, as of March 6, 2012:

- Linda B. Bammann joined the Board in December 2008. She is 55 years old. She is an experienced finance executive with in-depth knowledge of risk management gained from her previous employment and board memberships. Ms. Bammann's risk management experience enables her to contribute significantly to the Board's oversight of our enterprise risk management.

  Ms. Bammann was Executive Vice President, Deputy Chief Risk Officer for JPMorgan Chase & Co. from July 2004 until her retirement in January 2005. Prior to that, Ms. Bammann held several positions with Bank One Corporation beginning in 2000, including Executive Vice President and Chief Risk Management Officer from 2001 until Bank One's acquisition by JPMorgan Chase & Co. in July 2004. Ms. Bammann also was a member of Bank One's executive planning group. From 1992 to 2000, Ms. Bammann was a Managing Director with UBS Warburg LLC and predecessor firms. Ms. Bammann was a board member of the Risk Management Association, and chairperson of the Loan Syndications and Trading Association. Ms. Bammann currently is a director of Manulife Financial Corporation, where she is a member of the Risk Committee and the Management Resources and Compensation Committee, and of The Manufacturers Life Insurance Company, a subsidiary of Manulife Financial Corporation.

- Carolyn H. Byrd joined the Board in December 2008. She is 63 years old. She is an experienced finance executive who has held a variety of leadership positions. She also has significant public company audit committee experience. Ms. Byrd's internal audit and public company audit committee experience enables her to support the Board's oversight of our internal control over financial reporting and compliance matters.

  Ms. Byrd has been Chairman and Chief Executive Officer of GlobalTech Financial, LLC, a financial services company she founded, since 2000. From 1997 to 2000, Ms. Byrd was President of Coca-Cola Financial Corporation. From 1977 to 1997, Ms. Byrd held a variety of domestic and international positions with The Coca-Cola Company, including Chief of Internal Audits and Director of the Corporate Auditing Department. She is currently a director of AFC Enterprises, Inc., where she is a member of the Audit Committee and the Corporate Governance Committee and of Regions Financial Corporation, where she is a member of the Audit Committee and the Risk Committee. Ms. Byrd is a former member of the board of directors and audit committee member of Circuit City Stores, Inc. and RARE Hospitality International, Inc., and she also served on the board of directors of St. Paul Travelers Companies, Inc.

- Charles E. Haldeman, Jr. joined the Board in August 2009, upon the commencement of his employment as Chief Executive Officer of Freddie Mac. He is 63 years old. He is an experienced finance executive and leader of finance and investment organizations. Mr. Haldeman's experience as a leader of financial organizations enables him to provide valuable business and operating perspectives to the Board.

  Prior to joining Freddie Mac, Mr. Haldeman served as Chairman of Putnam Investment Management, LLC, the investment advisor for the Putnam Funds, from July 2008 through June 2009. He joined Putnam Investments in 2002 as Senior Managing Director and Co-Head of the investment division, was appointed President and Chief Executive Officer in November 2003, and served in that capacity until June 2008. He was a member of Putnam Funds' Board of Trustees from 2004 until July 2009, and was named President of the Putnam Funds in 2007. He served as a member of Putnam Investments' Board of Trustees from November 2003 until June 2009, where he served as a member of the audit committee. Prior to joining Putnam, Mr. Haldeman served as Chief Executive Officer of Delaware Investments from 2000 to 2002, and as chairman from 2001 to 2002. He was the President and Chief Operating Officer of United Asset Management Corporation from 1998 to 1999. Mr. Haldeman served as chairman of Dartmouth College's Board of Trustees from 2007 until 2010.

- Christopher S. Lynch joined the Board in December 2008. He is 54 years old. He is an experienced senior accounting executive who served as the lead audit signing partner and account executive for several large financial institutions with mortgage lending businesses. He also has significant public company audit committee experience and risk management experience. Mr. Lynch's extensive experience in finance, accounting and risk management enables him to provide valuable guidance to the Board on complex accounting and risk management issues, including in his roles as Non-Executive Chairman and member of our Audit Committee.

  Mr. Lynch has served as Non-Executive Chairman of Freddie Mac since December 2011. Mr. Lynch is an independent consultant providing a variety of services to financial intermediaries, including risk management, strategy, governance, financial and regulatory reporting and troubled-asset management. Prior to retiring from

KPMG LLP in May 2007, Mr. Lynch held a variety of leadership positions at KPMG, including National Partner in Charge — Financial Services, the U.S. firm's largest industry division. Mr. Lynch chaired KPMG's Americas Financial Services Leadership team, was a member of the Global Financial Services Leadership and the U.S. Industries Leadership teams and led the Banking & Finance practice. Mr. Lynch also served as a partner in KPMG's Department of Professional Practice and as a Practice Fellow at the Financial Accounting Standards Board. Mr. Lynch was the lead and audit signing partner for some of KPMG's largest financial services clients. Mr. Lynch also is a director of American International Group, Inc., where he is the Chair of the Audit Committee and a member of the Finance and Risk Management Committee. In addition, Mr. Lynch serves on the National Audit Committee Chair Advisory Council of the National Association of Corporate Directors.

• Nicolas P. Retsinas joined the Board in 2007. He is 65 years old. He is an experienced leader in the governmental and educational sectors, with in-depth knowledge of the mortgage lending and real estate industries. He also has represented consumer and community interests and has demonstrated a career commitment to the provision of housing for low-income households. Mr. Retsinas' public, private and academic experience, including his service on the boards of several not-for-profit organizations, enables him to bring to the Board broad knowledge and understanding of housing and consumer and community issues.

Mr. Retsinas is a senior lecturer in Real Estate at the Harvard Business School and is Director Emeritus of Harvard University's Joint Center for Housing Studies, where he served as Director from 1998 to 2010. He is also a lecturer in Housing Studies at the Graduate School of Design. Prior to his Harvard appointment, Mr. Retsinas served as Assistant Secretary for Housing — Federal Housing Commissioner at the United States Department of Housing and Urban Development from 1993 to 1998 and as Director of the Office of Thrift Supervision from 1996 to 1997. He served on the Board of the Federal Deposit Insurance Corporation from 1996 to 1997, the Federal Housing Finance Board from 1993 to 1998 and the Neighborhood Reinvestment Corporation from 1993 to 1998. Mr. Retsinas also formerly served on the Board of Trustees for the National Housing Endowment. Currently, Mr. Retsinas serves on the Board of Trustees for Enterprise Community Partners, on the Board of Directors of the Center for Responsible Lending, and as a member of the Bipartisan Policy Center's Housing Commission.

• Clayton S. Rose joined the Board in October 2010. He is 53 years old. He is a finance executive with leadership experience in finance and investment organizations, experience serving on and chairing public company audit committees, and academic experience focused on financial services and managerial ethics. Mr. Rose's leadership, operating and academic experience enables him to provide the Board with valuable guidance regarding business execution, corporate finance and capital markets, as well as financial reporting and controls oversight.

Mr. Rose is Professor of Management Practice at the Harvard Business School, and has been a member of its faculty since July 2007. He was awarded a PhD in sociology (with distinction) from the University of Pennsylvania in the same year. He was an adjunct professor at the Stern School of Business at New York University from 2002 to 2004, and at the Graduate School of Business at Columbia University from 2002 to 2006. In 2001, Mr. Rose served as Vice Chairman and Chief Operating Officer of JP Morgan, the investment bank of J.P. Morgan Chase & Co. Previously, he worked at J.P. Morgan & Co. Incorporated from 1981 to 2000, where, among other positions, he was head of the Global Investment Banking and the Global Equities Divisions and served as a member of the firm's executive committee. Mr. Rose is a member of the board of directors of XL Group plc, where he is a member of the Nominating, Governance and External Affairs Committee and the Risk and Finance Committee. He is a trustee of the Howard Hughes Medical Institute, where he has chaired the audit and compensation committee since March 2009, and is a director of Public/Private Ventures, where he has chaired the audit committee since October 2011. From November 2007 to March 2010, he served as Chairman of the board of managers of Highbridge Capital Management, an alternative investment management firm owned by JPMorgan Chase & Co. Mr. Rose previously served as a member of the boards of directors of Mercantile Bankshares Corporation from September 2003 to April 2007, where he served on the audit committee, and of Lexicon Pharmaceuticals, Inc. from July 2004 through September 2007, where he chaired the audit committee from March 2005 through September 2007. From October 2006 to October 2011, he was a trustee of the National Opinion Research Center at the University of Chicago, and chaired its audit committee.

• Eugene B. Shanks, Jr. joined the Board in December 2008. He is 64 years old. He is an experienced finance executive with leadership and risk management expertise. Mr. Shanks' leadership and risk management experience enables him to provide the Board with valuable guidance on risk management issues and our strategic direction.

Mr. Shanks is a Trustee of Vanderbilt University, a member of the Advisory Board of the Stanford Institute for Economic Policy Research, a director of ACE Limited, where he serves as a member of the Risk and Finance

Committee, a Senior Advisor to Bain and Company, and a founding director at The Posse Foundation. From November 2007 until August 2008, Mr. Shanks was a senior consultant to Trinsum Group, Incorporated, a strategic consulting and asset management company. From 1997 until its sale in 2002, Mr. Shanks was President and Chief Executive Officer of NetRisk, Inc., a risk management software and advisory services company he founded. From 1973 to 1978 and from 1980 to 1995, Mr. Shanks held a variety of positions with Bankers Trust New York Corporation, including head of Global Markets from 1986 to 1992 and President and Director from 1992 to 1995. From 1978 to 1980, he was Treasurer of Commerce Union Bank in Nashville, Tennessee.

- Anthony A. Williams joined the Board in December 2008. He is 60 years old. He is an experienced leader of state and local governments, with extensive knowledge concerning real estate and housing for low-income individuals. He also has significant experience in financial matters and is an experienced academic focusing on public management issues. Mr. Williams' leadership and operating experience in the public sector allows him to provide a unique perspective on state and local housing issues.

Mr. Williams is a Lecturer in Public Management at Harvard's Kennedy School of Government. Since January 2012 he has served as a Senior Fellow of the Government Practice at The Corporate Executive Board Company, and from January 2010 through December 2011, he served as the Executive Director of the Government Practice. Since September 2011, Mr. Williams has been affiliated with McKenna, Long & Aldridge, LLP, a law firm. From May 2009 until September 2011, Mr. Williams was affiliated with the law firm Arent Fox LLP. Prior to this, Mr. Williams served as the Chief Executive Officer of Primum Public Realty Trust, beginning in January 2007. Mr. Williams served as the Mayor of Washington, D.C. from 1999 to January 2007, and as its Chief Financial Officer from 1995 to 1998. In 2005, Mr. Williams served as Vice Chair of the Metropolitan Washington Council of Governments, and in 2004, Mr. Williams served as President of the National League of Cities. From 1993 to 1995, Mr. Williams was the first Chief Financial Officer for the U.S. Department of Agriculture. From 1991 to 1993, Mr. Williams was the Deputy State Comptroller of Connecticut. From 1989 to 1991, Mr. Williams was the Executive Director of the Community Development Agency of St. Louis, Missouri. From 1988 to 1989, Mr. Williams was an Assistant Director with the Boston Redevelopment Authority where he led the Department of Neighborhood Housing and Development, one of the Authority's four primary divisions. Mr. Williams also previously served as a director of Meruelo Maddux Properties, Inc., where he was a member of the Audit Committee and the Nominating and Corporate Governance Committee. Mr. Williams also is a member of the Board of Trustees of the Calvert Sage Fund and of each fund comprising the Calvert Multiple Funds.

## Authority of the Board and Board Committees

The directors serve on behalf of, and exercise authority as directed by, the Conservator. The Conservator has delegated to the Board and its committees authority to function in accordance with the duties and authorities set forth in applicable statutes, regulations and regulatory examination and policy guidance, and our Bylaws and Board committee charters, as such duties or authorities may be modified by the Conservator. The Conservator has instructed the Board that it should consult with and obtain the approval of the Conservator before taking action in the following areas:

- actions involving capital stock, dividends, the Purchase Agreement between us and Treasury, increases in risk limits, material changes in accounting policy, and reasonably foreseeable material increases in operational risk;

- creation of any subsidiary or affiliate or any substantial transaction between us and any of our subsidiaries or affiliates, except for transactions undertaken in the ordinary course (*e.g.*, the creation of a trust, REMIC, REIT, or similar vehicle);

- matters that relate to conservatorship, such as, but not limited to, the initiation of, and material actions in connection with, significant litigation addressing the actions or authority of the Conservator, repudiation of contracts, qualified financial contracts in dispute due to our conservatorship, and counterparties attempting to nullify or amend contracts due to our conservatorship;

- actions involving hiring, compensation, and termination benefits of directors and officers at the executive vice president level and above (including, regardless of title, executive positions with the functions of chief operating officer, chief financial officer, general counsel, chief business officer, chief investment officer, treasurer, chief compliance officer, chief risk officer, and chief/general/internal auditor);

- actions involving the retention and termination of external auditors and law firms serving as consultants to the Board;

- settlements in excess of $50 million of litigation, claims, regulatory proceedings, or tax-related matters;

- any merger with or purchase or acquisition of a business involving consideration in excess of $50 million; and

- any action that, in the reasonable business judgment of the Board at the time that the action is taken, is likely to cause significant reputation risk.

The Board has five standing committees: Audit; Business and Risk; Compensation; Coordinating; and Nominating and Governance. All standing committees other than the Coordinating Committee meet regularly. The membership of each committee as of March 6, 2012 is shown in the table below.

**Table 76 — Board of Directors Committee Membership**

| Director | Audit | Business and Risk | Compensation | Coordinating | Nominating and Governance |
|---|---|---|---|---|---|
| L. Bammann | | C | √ | √ | |
| C. Byrd | √ | | | | √ |
| C. Haldeman | | | | | |
| C. Lynch | √ | | √ | C | |
| N. Retsinas | | √ | | | √ |
| C. Rose | C | | √ | √ | |
| E. Shanks | | √ | | √ | C |
| A. Williams | √ | | C | √ | |

√ = Member of the Committee
C = Chairman of the Committee

Charters reflecting the duties of the committees have been adopted by the Board and approved by the Conservator. All of the charters of the standing committees are available on our website at www.freddiemac.com/governance/bd_committees.html.

Our Board has an independent Non-Executive Chairman, whose responsibilities include presiding over meetings of the Board, regularly scheduled executive sessions of the non-employee directors, and executive sessions including only the independent directors that occur at least once annually if any of the non-employee directors are not independent. Mr. Koskinen was initially appointed to the position of Non-Executive Chairman by the Conservator in September 2008. Mr. Koskinen served in that role in 2011 until Mr. Lynch was appointed Non-Executive Chairman on December 2, 2011.

### Communications with Directors

Interested parties wishing to communicate any concerns or questions about Freddie Mac to the Non-Executive Chairman of the Board or to our non-employee directors as a group may do so by U.S. mail, addressed to the Corporate Secretary, Freddie Mac, Mail Stop 200, 8200 Jones Branch Drive, McLean, VA 22102-3110. Communications may be addressed to a specific director or directors or to groups of directors, such as the independent or non-employee directors.

### Executive Officers

As of March 6, 2012, our executive officers are as follows:

| Name | Age | Year of Affiliation | Position |
|---|---|---|---|
| Charles E. Haldeman, Jr. | 63 | 2009 | Chief Executive Officer |
| Ross J. Kari | 53 | 2009 | Executive Vice President — Chief Financial Officer |
| Anthony N. Renzi | 48 | 2010 | Executive Vice President — Single-Family Business, Operations and Technology |
| Jerry Weiss | 54 | 2003 | Executive Vice President — Chief Administrative Officer |
| Paige H. Wisdom | 50 | 2008 | Executive Vice President — Chief Enterprise Risk Officer |
| David M. Brickman | 46 | 1999 | Senior Vice President — Multifamily |
| Devajyoti Ghose | 60 | 1997 | Senior Vice President — Investments and Capital Markets, and Treasurer |
| Timothy F. Kenny | 50 | 2007 | Senior Vice President — General Auditor |
| Robert D. Mailloux | 44 | 2002 | Senior Vice President — Corporate Controller & Principal Accounting Officer |
| Alicia S. Myara | 47 | 2008 | Vice President — Interim General Counsel & Corporate Secretary |
| Carol A. Wambeke | 52 | 1997 | Senior Vice President — Chief Compliance Officer |

The following is a brief biographical description of each executive officer who is not also a member of the Board.

Ross J. Kari was appointed Executive Vice President — Chief Financial Officer in October 2009. Mr. Kari joined us from Fifth Third Bancorp, a financial services firm, where he served as Executive Vice President and Chief Financial Officer beginning in November 2008. Previously, he served as Executive Vice President and Chief Financial Officer of Safeco Corporation, an insurance firm, from June 2006 to October 2008. Prior to that, Mr. Kari served as Executive Vice President and Chief Operating Officer of the Federal Home Loan Bank of San Francisco, a government sponsored enterprise and part of the Federal Home Loan Bank System, from February 2002 to June 2006. Mr. Kari is a member of the board of directors of KKR Financial Holdings LLC where he is the Chairman of the Audit Committee.

Anthony Renzi was appointed Executive Vice President — Single-Family Business, Operations and Technology in April 2011. In this position, Mr. Renzi has broad responsibilities over the single-family line of business, including the

administration, relationship and performance management of Freddie Mac Seller/Servicers; performance of Freddie Mac's guarantee book of business; sourcing, servicing and REO operations; and pricing and securitization operations. In addition, he is responsible for the management of the firm's enterprise technology. He joined us as Executive Vice President — Single-Family Portfolio Management in April 2010. Prior to joining us, Mr. Renzi served as chief operating officer of GMAC Residential Capital and president of GMAC Mortgage Corporation since 2008, and managed their operational and financial activities. From 2006 to 2008, he was chief operating officer of the Residential Finance Group, where he led servicing operations, risk management, and strategic sourcing. Prior to that, Mr. Renzi held a number of key executive positions at GMAC Mortgage.

Jerry Weiss was appointed Executive Vice President — Chief Administrative Officer in August 2010. In this role, Mr. Weiss manages the services and operations of Freddie Mac's Strategy; External Relations, including Government and Industry Relations; Public Relations and Corporate Marketing; Internal Communications; Human Resources; Models, Mission and Research; and Making Home Affordable — Compliance organizations. For a period subsequent to his appointment as Executive Vice President — Chief Administrative Officer, he also served as our Chief Compliance Officer from August 2010 until June 2011. Prior to August 2010, Mr. Weiss served as our Senior Vice President and Chief Compliance Officer and in various other senior management capacities since joining us in October 2003. Prior to joining us, Mr. Weiss worked from 1990 at Merrill Lynch Investment Managers, most recently as First Vice President and Global Head of Compliance. From 1982 to 1990, Mr. Weiss was with a national law practice in Washington, D.C., where he specialized in securities regulation and corporate finance matters.

Paige H. Wisdom was appointed Executive Vice President — Chief Enterprise Risk Officer in October 2010. In this role, Ms. Wisdom is responsible for providing overall leadership and direction for enterprise risk management and leads an integrated framework for managing credit risk, market risk, operational risk and all other aspects of risk across the organization. Prior to this, she served as our Senior Vice President — Chief Enterprise Risk Officer from April 2010 until October 2010. Prior to this appointment, she served as the Senior Vice President — Business Unit Chief Financial Officer from January 2008 until April 2010. From August 2004 until December 2007, Ms. Wisdom served as a Business Unit Chief Financial Officer at Bank of America for key businesses including Global Business and Financial Services; Business Lending; and Global Technology, Service and Fulfillment. Prior to joining Bank of America, Ms. Wisdom served at Bank One Corporation/JP Morgan from June 2000 until July 2004, as the Chief Financial Officer, Corporate Bank and Co-Head Credit Portfolio Management. Prior to that she served in capital markets positions at UBS/Warburg Dillon Read, Citibank Salomon Smith Barney, and Swiss Bank Corporation.

David M. Brickman was appointed Senior Vice President — Multifamily in July 2011. In this role, he is responsible for overall management of the Multifamily Division's business operations. From December 2008 until July 2011, he served as Vice President in charge of various units responsible for Multifamily Capital Markets operations. In his previous roles at Freddie Mac, Mr. Brickman led the multifamily pricing, costing and research teams, was responsible for the development and implementation of new quantitative pricing models and financial risk analysis frameworks for all multifamily programs, and helped design several of Freddie Mac's multifamily financing products, including the Capital Markets Execution. Prior to joining Freddie Mac in 1999, Mr. Brickman co-led the Mortgage Finance and Credit Analysis group in the consulting practice at Pricewaterhouse Coopers LLP.

Devajyoti Ghose was appointed Senior Vice President — Investments and Capital Markets, and Treasurer in May 2011. Prior to this, he served as Vice President — Asset Liability Management and Deputy Treasurer from October 2010 until May 2011. From December 2008 until October 2010, he served as Vice President in charge of various units responsible for Debt and Liquidity Management, Debt Portfolio Management and Single-Family Pricing and Analytics. From February 2005 until December 2008, Mr. Ghose served as Vice President — Convexity Management. Before that, he held various senior positions at Freddie Mac in which he was responsible for evaluating the risks and returns of Freddie Mac's guarantee fee business and developing valuation models for various fixed income securities including mortgage-related products, debentures and interest-rate derivatives. Prior to joining Freddie Mac in 1997, Mr. Ghose was an assistant professor in econometrics at the University of Arizona.

Timothy F. Kenny was appointed Senior Vice President — General Auditor in July 2008. Prior to this appointment, Mr. Kenny served as Vice President and Interim General Auditor starting in May 2008. Before that, he served as our Vice President — Assistant General Auditor from September 2007 to May 2008. From 2001 to 2007, Mr. Kenny was a Managing Director with BearingPoint, Inc. (formerly KPMG Consulting, Inc.) where he directed a large team of financial professionals on a variety of financial risk management consulting projects with Ginnie Mae, the Federal Housing Administration, private sector mortgage bankers and other federal credit agencies. He joined KPMG LLP, the predecessor organization to KPMG Consulting, in 1986, was promoted to a KPMG Audit Partner in 1997, and served in that position until the separation of KPMG Consulting from KPMG LLP in February 2001. From 2004 until 2008, Mr. Kenny was a

member of the board of directors of Farmer Mac, a government sponsored enterprise that has established a secondary market for agricultural loans.

Robert D. Mailloux was appointed Senior Vice President — Corporate Controller & Principal Accounting Officer in April 2010. Prior to holding his current position, Mr. Mailloux served as our Vice President — Acting Corporate Controller beginning in October 2008. Prior to that appointment, he served as Vice President — Multifamily & Corporate Segment Controller, from May 2008 until October 2008, and as Vice President — Corporate Financial Accounting from September 2004 until May 2008. Before that, Mr. Mailloux held the position of Director — Corporate Reporting and Analysis from March 2002 until September 2004. Before joining us, Mr. Mailloux served for 12 years at a leading accounting firm, where he managed a variety of large audit and consulting engagements in the financial services and real estate industries.

Alicia S. Myara was appointed Vice President — Interim General Counsel & Corporate Secretary in November 2011. In this role, Ms. Myara is responsible for managing the corporate governance, litigation, real estate, securities and other legal aspects of the company's business operations. She joined Freddie Mac in January 2008 as Vice President/Deputy General Counsel — Corporate Governance. She also serves as General Counsel and Secretary of the Freddie Mac Foundation. Prior to joining Freddie Mac, she spent ten years with Amtrak, a government-owned corporation providing intercity passenger rail service in the United States, serving as its General Counsel and Corporate Secretary from 2002 until 2006.

Carol A. Wambeke was appointed Senior Vice President — Chief Compliance Officer in June 2011. In this position, she manages Freddie Mac's compliance with legal and regulatory requirements and related controls that govern the company's business activities. Prior to this, Ms. Wambeke served as Vice President of Compliance & Regulatory Affairs from June 2008 until June 2011. In this role, she was responsible for coordinating regulatory-related activities across the company and advising management on regulatory concerns and initiatives. Prior to transferring to the Compliance Division, she was Vice President — Regulatory Reporting & Analysis from February 2005 to June 2008 and Vice President — Regulatory Capital Operations from March 2004 to February 2005. She joined Freddie Mac in 1997 as a senior economist and served in various positions prior to 2004 with responsibility for financial and housing economics and regulatory capital management.

## Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Exchange Act requires the directors and executive officers of a reporting company and persons who own more than 10% of a registered class of such company's equity securities to file reports of ownership and changes in ownership with the SEC. Based solely on a review of such reports, we believe that during 2011 all of our directors and executive officers complied with such reporting obligations.

## Codes of Conduct

We have separate codes of conduct applicable to all employees and to Board members that outline the principles, policies, and laws governing their activities. Upon joining us or our Board, all employees and directors, respectively, are required to sign acknowledgements that they have read the applicable code and agree to abide by it. In addition, all employees and directors must respond to an annual questionnaire concerning code compliance. The employee code also serves as the code of ethics for senior executives and financial officers required by the Sarbanes-Oxley Act and SEC regulations. Copies of our employee and director codes of conduct are available, and any amendments or waivers that would be required to be disclosed are posted, on our website at www.freddiemac.com.

## Audit Committee Financial Expert

We have a standing Audit Committee that satisfies the "audit committee" definition under Section 3(a)(58)(A) of the Exchange Act and the requirements of Rule 10A-3 under the Exchange Act. Although our stock was delisted from the NYSE in July 2010, certain of the corporate governance requirements of the NYSE Listed Company Manual, including those relating to audit committees, continue to apply to us because they are incorporated by reference in the FHFA corporate governance regulations. Our Audit Committee satisfies the "audit committee" requirements set forth in Sections 303A.06 and 303A.07 of the NYSE Listed Company Manual. The current members of the Audit Committee are Carolyn H. Byrd, Christopher S. Lynch, Clayton S. Rose and Anthony A. Williams, all of whom the Board determined in February 2012 are independent within the meaning of Rule 10A-3 under the Exchange Act and Section 303A.02 of the NYSE Listed Company Manual.

Mr. Rose has been a member of the Audit Committee since November 2011 and is currently its chairman. The Board determined in November 2011 and again in February 2012 that Mr. Rose meets the definition of an "audit committee financial expert" under SEC regulations.

## ITEM 11. EXECUTIVE COMPENSATION

**Executive Summary**

Our principal goal under conservatorship has been to keep the company functioning so we can continue to carry out our housing mission. We are particularly concerned about our ability to fulfill our mission if we are unable to attract and retain competent and experienced executives — a very real concern given the uncertainty surrounding our future business model, organizational structure, and compensation structure, which is adversely impacting our internal control environment. We believe these factors are also contributing to increased levels of voluntary employee turnover, including 17% voluntary turnover at our Senior and Executive Vice President levels in 2011. Additionally, the Conservator directed us to maintain individual salaries and wage rates for all employees at 2010 levels for 2011 and 2012 (except in the case of promotions or significant changes in responsibilities). In 2011, we made certain significant reorganizations which included targeted divisional staff reductions in an effort to manage general and administrative expenses. All of these activities impact our ability to retain our employees and compensate them for their work. Disruptive levels of turnover at both the executive and employee levels could lead to breakdowns in many of our operations that impact our ability to: (a) serve our mission and meet our objectives; (b) manage credit and other risks related to our $2.1 trillion total mortgage portfolio (including interest rate and other market risks related to our $653 billion mortgage-related investment portfolio); (c) reduce the need to draw funds from Treasury; and (d) issue timely financial statements.

We are finding it difficult to retain and engage critical employees and attract people with the skills and experience we need. Because we maintain succession plans for our senior management positions, we were able to quickly fill some of these positions vacated in 2011, or eliminate them through reorganizations. However, such alternatives are limited and may not be available to address future senior management departures. While we update our succession plans regularly, in many areas we have already executed these plans and we may need to search outside the company for replacements to fill these senior positions. We face increased difficulty filling senior positions given the uncertainty around compensation. We operate in an environment in which business decisions are closely scrutinized and subject to public criticism and review by various government authorities. Many executives are unwilling to work in such an environment for potentially significantly less than what they could earn elsewhere. Accordingly, we may not be able to retain or replace executives or other employees with the requisite institutional knowledge and the technical, operational, risk management, and other key skills needed to conduct our business effectively. A recovering economy is likely to put additional pressures on turnover in 2012, as other attractive opportunities may become available to people who we want to retain.

Also contributing to our concerns regarding executive retention risk is the aggregate level of compensation paid to our Section 16 executive officers, which for 2011 performance was significantly below the 25th percentile of market-based compensation. Any compensation changes that appear excessive, abrupt or arbitrary are likely to create heightened levels of operational risk. We anticipate that any significant adverse changes in executive compensation levels will result in numerous vacancies in senior positions that are important for our sound operation, since the incumbents in these positions possess significant business and leadership skills that are in demand elsewhere in the market at substantially higher levels of compensation. Filling vacancies at further reduced compensation levels with equally capable and experienced individuals is not likely — especially given the uncertainty and criticism surrounding the GSEs. In this environment, increased uncertainty and instability in the top ranks would likely cascade down to other officers and employees. The resulting loss of talent and institutional knowledge would cause an appreciable increase in the operational risk of the company.

In evaluating the potential impact of legislation to further reduce the pay of our executives and employees, the Acting Director of FHFA stated in his testimony to the U.S. Senate Committee on Banking, Housing and Urban Affairs on November 15, 2011 that:

> *"a sudden and sharp change in pay would certainly risk a substantial exodus of talent, the best leaving first in many instances. [The GSEs] likely would suffer a rapidly growing vacancy list and replacements with lesser skills and no experience in their specific jobs. A significant increase in safety and soundness risks and in costly operational failures would, in my opinion, be highly likely."*

As a result of the increasing risk of employee turnover, we are exploring options to enter into various strategic arrangements with outside firms to provide operational capability and staffing for key functions, if needed. Should we experience significant turnover in key areas, we may need to exercise these strategic arrangements and significantly increase the number of outside firms and consultants used in our business operations, limit certain business activities, and/or increase our operational costs. However, these or other efforts to manage the risks to the enterprise may not be successful.

**Compensation Discussion and Analysis**

This section contains information regarding our compensation programs and policies, as modified by direction we received from FHFA as Conservator. These programs and policies were applicable to the following individuals, who were determined to be our Named Executive Officers for the year ended December 31, 2011 under SEC rules.

- Charles E. Haldeman, Jr., Chief Executive Officer

- Ross J. Kari, Executive Vice President — Chief Financial Officer

- Anthony N. Renzi, Executive Vice President — Single-Family Business, Operations and Technology

- Jerry Weiss, Executive Vice President — Chief Administrative Officer

- Paige H. Wisdom, Executive Vice President — Chief Enterprise Risk Officer

***Executive Management Compensation Program***

<u>*Overview of Program Structure*</u>

The Executive Management Compensation Program, or the Executive Compensation Program, covers the compensation of Freddie Mac executives in the following positions, each a Covered Officer:

- Chief Executive Officer (CEO), Chief Operating Officer (COO), and Chief Financial Officer (CFO);

- All Executive Vice Presidents (EVPs); and

- All Senior Vice Presidents (SVPs).

Each Named Executive Officer is a Covered Officer.

The Executive Compensation Program is a result of collaboration and compromise with FHFA that reflects the principles established by Treasury's executive compensation guidelines for companies receiving federal assistance. Specifically, the Executive Compensation Program was designed to align executive pay with achievement of our mission of providing liquidity, stability, and affordability to a troubled mortgage market and with certain financial, infrastructure development and other corporate performance objectives established annually by our Board and approved by FHFA. These objectives reflect our responsibilities both under our charter and in conservatorship as determined by the Conservator. The Executive Compensation Program establishes strict recapture provisions that protect the interests of taxpayers. The Executive Compensation Program attempts to balance our need to retain critical executives and attract new executive talent while continuing to support the nation's housing recovery amidst the uncertainties regarding our future.

One key element of the Executive Compensation Program that differs from Treasury's executive compensation guidelines is that all compensation is delivered exclusively in cash. We cannot provide equity-based compensation to our employees under the terms of the Purchase Agreement with Treasury, unless such grants are approved by Treasury. In addition, uncertainty regarding our future status makes our common stock ineffective as a vehicle for delivering incentive compensation.

Participation in the Executive Compensation Program is contingent upon a Covered Officer agreeing to be bound by the terms of a recapture arrangement that has been approved by both the Compensation Committee and FHFA. A further discussion of the recapture arrangement is set forth below in "Other Executive Compensation Considerations — Recapture Policy."

Finally, although the Compensation Committee takes the lead role in considering and recommending executive compensation, FHFA has become increasingly involved in the process and has limited the Compensation Committee's flexibility in certain respects, as previously discussed. In addition, the following circumstances limit the Compensation Committee's authority during conservatorship:

- FHFA issued a directive on December 16, 2010 requiring the Compensation Committee to set 2011 Target TDC at a level that was either the same as or lower than each Named Executive Officer's 2010 Target TDC, absent a promotion or a significant change in responsibilities. On December 13, 2011, FHFA extended this directive for setting 2012 Target TDC and subsequently instructed the Compensation Committee to further reduce the compensation levels of senior management.

- When FHFA was appointed as our Conservator in September 2008, it assumed all of the rights, titles, powers, and privileges of the company and its stockholders, directors and management, including the authority to set executive compensation. Under the terms of the Purchase Agreement, FHFA is required to consult with Treasury on any increases in compensation or new compensation arrangements for our executive officers.

- Our directors serve on behalf of FHFA and exercise their authority as directed by FHFA. More information about the role of our directors is provided above in "Directors, Executive Officers, and Corporate Governance — Authority of the Board and Board Committees."

- FHFA has directed that our Board consult with and obtain FHFA's approval before taking any action involving compensation or termination benefits for any officer at the level of executive vice president and above and, regardless of title, executives who hold positions with the functions of chief operating officer, chief financial officer, general counsel, chief business officer, chief investment officer, treasurer, chief compliance officer, chief risk officer, and chief/general internal auditor.

- FHFA retains the authority not only to approve both the terms and amount of any compensation prior to payment to any of our executive officers, but also to modify any existing compensation arrangements.

Elements of Compensation and Total Direct Compensation

Under the Executive Compensation Program in effect for 2011, a Covered Officer's Target TDC consists of three elements — Semi-Monthly Base Salary, Deferred Base Salary, and a Target Incentive Opportunity. The Target TDC is established for each annual performance cycle, as explained in the next section. Under the 2011 Executive Compensation Program, two-thirds of a Covered Officer's Target TDC consists of the sum of the Semi-Monthly and Deferred Base Salaries, and one-third consists of the Target Incentive Opportunity. More information on the three elements of the Target TDC is provided below.

- Semi-Monthly Base Salary is paid in cash on a semi-monthly basis and provides a fixed level of compensation designed to fairly compensate each Named Executive Officer for the responsibility level of his/her position. Semi-Monthly Base Salary cannot exceed $500,000 per year, except for the CEO and CFO, or other exceptions as approved from time to time by FHFA.

- Deferred Base Salary is earned during one year but not paid until the corresponding quarter of the following year to provide an incentive for executive retention. Deferred Base Salary is provided in two portions:

    1. The fixed portion provides certainty as to amount and is not subject to increase or decrease on the basis of company performance; and

    2. The performance-based portion is subject to adjustment and provides incentives to the Covered Officers to achieve specific company performance measures.

    Each Named Executive Officer's Deferred Base Salary was initially divided equally between the fixed and performance-based portions. The fixed portion was earned during each quarter and paid in a fixed amount on the last business day of the corresponding quarter of the following calendar year. The performance-based portion is earned and paid on the same timetable as the fixed portion, but the Executive Compensation Program permits the amount actually paid to range from 0% to 125% based on the performance-based Deferred Base Salary funding level determined by the Compensation Committee with the approval of FHFA. Each Covered Officer's payment is equal to his or her target multiplied by the funding level and there is no individual differentiation. While the Executive Compensation Program allowed for an approved funding level for performance-based Deferred Base Salary greater than 100%, it was the intention of the Compensation Committee not to approve a funding level in excess of 100% while the company was in conservatorship.

- The Target Incentive Opportunity (Target Opportunity or TO) is a performance-based, long-term incentive award designed to provide incentives to the Covered Officers to achieve specific corporate performance measures. Each Covered Officer's target award is equal to one-third of his or her annual Target TDC. The TO is granted annually and earned over a two-year period based on the considerations discussed below. Half of each award is earned in the year granted, with the other half earned in the following year. Payment will occur no later than March 15 of the year following the year to which the annual performance measures are applicable. While the Executive Compensation Program allows for an approved funding level that exceeds 100%, it is the current intention of the Compensation Committee not to approve a funding level in excess of 100% while the company is in conservatorship. Each Named Executive Officer's TO payments, however, may range from 0% to 150% of target, based on an assessment of division and/or individual performance as determined by the Chief Executive Officer or, in the case of the Chief Executive Officer, the Board of Directors. The amount of each Named Executive Officer's TO payment is subject to the approval of both the Compensation Committee and FHFA. The individual differentiation of TO payments is discussed further in, "— Determination of Actual Target Opportunity."

Except in the limited circumstances described below (see "Potential Payments Upon Termination of Employment or Change-in-Control"), we will pay installments of TO and Deferred Base Salary awards only if the Named Executive Officer is employed by Freddie Mac on the scheduled payment date.

Effective January 1, 2012, FHFA approved a new compensation structure for our executives, the 2012 Executive Compensation Program. See "OTHER INFORMATION — 2012 Executive Management Compensation Program" above for additional information. It may be amended or replaced by FHFA or the Compensation Committee, subject to approval by FHFA after consulting with Treasury.

The following diagram depicts Target TDC, including each of the three elements of compensation, under the Executive Compensation Program in effect for 2011.



### Performance Measures for the Performance-Based Elements of Compensation

The performance measures for the performance-based portion of Deferred Base Salary, the first installment of the 2011 TO grant, and the second installment of the 2010 TO grant, together with a description of the assessment of actual performance against such measures, are presented below in "— Determination of the Performance-Based Portion of 2011 Deferred Base Salary" and "— Determination of Actual Target Opportunity." These performance measures, which were developed by management, the Compensation Committee, and FHFA, were chosen because we believe they reflect our priorities under conservatorship. They also generally require the participation and support of employees throughout the company.

### Determination of 2011 Target TDC for Named Executive Officers

#### Role of Compensation Consultants

As part of the annual process to determine the Target TDC for each of the Named Executive Officers, the Compensation Committee receives guidance from an independent compensation consultant that is selected by the Compensation Committee. In addition to the annual process to determine the Target TDC, the compensation consultant provides guidance during the course of the year on executive compensation matters and can be engaged for special projects, as needed, by either the Compensation Committee or the full Board.

The Compensation Committee has engaged Meridian Compensation Partners, LLC (Meridian) as its consultant since September 2010. Meridian was selected by the Compensation Committee without any recommendation by management. Meridian has not provided the Compensation Committee with any non-executive compensation services, nor has the firm provided any consulting services to our management.

#### Gathering Comparative Market Compensation Data

As part of its process to establish each Named Executive Officer's Target TDC under the Executive Compensation Program, the Compensation Committee reviewed the compensation of executives in comparable positions at companies that are either in a similar line of business or are otherwise comparable for purposes of recruiting and retaining

individuals with the requisite skills and capabilities. We refer to this group of companies as the Comparator Group. In September 2011, the Compensation Committee reviewed and discussed the composition of the Comparator Group with Meridian and determined that the following companies should be included in the Comparator Group used to establish target compensation levels for 2012:

| | | |
|---|---|---|
| Allstate | The Hartford | Prudential |
| American Express | JPMorgan Chase* | State Street |
| Bank of America* | MasterCard | SunTrust |
| Bank of New York Mellon | MetLife | U.S. Bancorp |
| Capital One | Northern Trust | Visa |
| Citigroup* | PNC | Wells Fargo* |
| Fannie Mae | | |

\* Compensation data to be used from these diversified banking firms is taken only from their mortgage or real estate divisions.

While the 2012 Comparator Group continues to include 19 companies, the Committee did make two changes to the composition of the Comparator Group in September 2011, adding Capital One and removing BlackRock. In both cases, these changes were made after considering several factors, including whether each company's business is in the same or a similar industry, whether we compete for executive talent and whether the company participates in the compensation survey we use to benchmark competitive market data for our senior executives.

In the event there is insufficient data from the Comparator Group for any of the Named Executive Officer positions, or if Meridian believes that additional data sources would strengthen the analysis of competitive market compensation levels, the Compensation Committee can use alternative survey sources to make these assessments. For 2011 and 2012 compensation, the alternative survey sources used by the Compensation Committee were compensation surveys published by McLagan and Aon Hewitt. In order to preserve confidentiality and encourage continuing participation, these consulting firms do not attribute the data in their surveys to the companies that participate in their surveys.

*Establishing Target TDC*

In establishing Target TDC levels for our Named Executive Officers, the Compensation Committee used as a guideline the market median, or 50th percentile, of the total direct compensation, consisting of base salary, annual incentive, and long-term incentive awards, paid to comparable positions at Comparator Group companies or in the alternative survey sources. The Compensation Committee's authority was limited to setting 2011 Target TDC at a level that was either the same as or lower than each Named Executive Officer's 2010 Target TDC, based on FHFA's directive that the company maintain individual salaries and wage rates at 2010 levels for 2011, absent a promotion or a significant change in responsibilities.

In establishing the Named Executive Officers' 2011 Target TDC, the Compensation Committee reviewed 2010 data from the Comparator Group and the alternative survey source. Specifically, for the positions of CEO, CFO and EVP — Chief Enterprise Risk Officer, the Compensation Committee reviewed competitive market data from the Comparator Group. For the EVP — Single-Family Business, Operations and Technology, the Compensation Committee reviewed competitive market data from a survey published by McLagan. For the EVP — Chief Administrative Officer, no reasonable match was available in either the Comparator Group or the alternative survey source and therefore the competitiveness of this position's Target TDC was evaluated by comparing the scope and breadth of the position's responsibilities with those of other executive-level positions within the company.

In December 2010, the Compensation Committee applied the criteria described above to either develop 2011 TDC recommendations for each of the Named Executive Officers or review recommendations presented by senior management and management's compensation consultant, Aon Hewitt. For Mr. Renzi, the December 2010 review related to his role as EVP — Single-Family Portfolio Management and the process was repeated at the time of his promotion into his current role in June 2011, at which time the Compensation Committee reviewed 2010 data from both the Comparator Group and a survey published by Aon Hewitt.

The 2011 Target TDC for each of the Named Executive Officers was reviewed and approved by FHFA.

The table below sets forth the approved 2011 Semi-Monthly Base Salary, Deferred Base Salary, TO, and Target TDC for our Named Executive Officers. These amounts represent compensation targets, not the actual amount of compensation paid for performance during 2011. As a result of FHFA's directive to freeze Semi-Monthly Base Salary and Target TDC at 2010 levels, the aggregate Target TDC for our Named Executive Officers is in the lowest quartile of total direct compensation paid to comparable positions at Comparator Group companies or, where applicable, in the alternative survey

sources. Information about the amounts actually paid during or with respect to performance during 2011 to these executives is set forth in Table 85.

**Table 77 — 2011 Semi-Monthly Base Salary, Deferred Base Salary, Target Opportunity, and Target TDC**

| Named Executive Officer | Title | 2011 Target TDC (Annualized) | | | |
|---|---|---|---|---|---|
| | | Semi-Monthly Base Salary | Deferred Base Salary | Target Opportunity | Target TDC |
| Charles E. Haldeman, Jr. . . . | CEO | $900,000 | $3,100,000 | $2,000,000 | $6,000,000 |
| Ross J. Kari. . . . . . . . . . . | EVP — CFO | 675,000 | 1,658,333 | 1,166,667 | 3,500,000 |
| Anthony N. Renzi  . . . . . . | EVP — Single-Family Business, Operations and Technology | 500,000 | 1,333,333 | 916,667 | 2,750,000 |
| Jerry Weiss . . . . . . . . . . | EVP — Chief Administrative Officer | 450,000 | 1,016,667 | 733,333 | 2,200,000 |
| Paige H. Wisdom . . . . . . . | EVP — Chief Enterprise Risk Officer | 425,000 | 741,667 | 583,333 | 1,750,000 |

(1) As discussed further in "Determination of Actual Target Opportunity," Mr. Haldeman will not receive the Target Opportunity installments applicable to his performance during 2011.

### *Determination of the Performance-Based Portion of 2011 Deferred Base Salary*

Over the course of 2011, the Compensation Committee received updates from management on our achievement against the performance objectives used to determine the funding level for the performance-based portion of Deferred Base Salary. In the fourth quarter of 2011, management presented the Compensation Committee with a final assessment against the performance objectives and concluded that we achieved most, but not all, of the performance objectives.

The table below presents the performance measures and management's assessment of our achievement against those performance objectives.

**Table 78 — Achievement of Performance Measures for the Performance-Based Portion of Deferred Base Salary**

| Performance Measure | Weighting | Key Factors Impacting Achievement Assessment |
|---|---|---|
| **Mission**<br>• Support loss mitigation and foreclosure prevention activities, including the Obama Administration's Making Home Affordable Program, as measured by the number of completed modifications and workouts of 60-day delinquencies;<br>• Provide a "satisfactory" Duty to Serve underserved markets and achieve an "in compliance" execution rating. Additionally, meet the 2011 affordable goals and subgoals (if feasible, as determined by FHFA); and<br>• Provide market support through Single-Family cash and guarantee purchases | 30% | • We completed over 109,000 HAMP and non-HAMP modifications, at the high end of the target range of 80,000 - 120,000. Additionally, we achieved the borrower outreach measure, which measures the number of workouts each month for 60-day delinquencies as a percent of the total 60-day delinquent population. We entered into workouts for 3.2% of such mortgages, above the high end of the target range of 2.5%-3.0%.<br>• With respect to the 2011 affordable goals, based on preliminary information, we believe we met the single-family refinance low-income goal and both multifamily goals. We did not meet the FHFA benchmark level for single-family purchase-money goals or subgoals for 2011.<br>• Single-family purchases as a percentage of agency volume were 28%, which was above plan (the target range was 23%-27%) due in part to increased refinance volumes during the low interest rate environment that existed throughout 2011. Our share of purchase volume tends to increase during periods when refinancing activity is high. |
| **Financial and Risk**<br>Meet targets for:<br>• Segment Earnings or Total Comprehensive Income;<br>• Internal return on economic capital on all new purchases;<br>• Underwriting quality on new single-family and multifamily purchases;<br>• Volume of short sales and deeds-in lieu of foreclosure; and<br>• Efficiency/administrative expenses | 30% | • For the segment earnings objective:<br>  – Single-Family: The loss of just under $10.0 billion for 2011 was within the target range of losses of $4 billion to $10 billion due to higher than anticipated credit-related expenses<br>  – Multifamily: Segment earnings of $1.3 billion were above the high end of the target range of $0.6 billion to $1.0 billion<br>  – Investments: Segment total comprehensive income of $6.5 billion was below the target range of $8 billion to $10 billion due primarily to higher than forecast mark-to-market losses on derivatives and available-for-sale mortgage securities;<br>• For the internal return on economic capital on new purchase objective:<br>  – Single-Family: The 17% internal return on economic capital exceeded the target range of 10%-14%<br>  – Multifamily: The 17% internal return on economic capital was within the target range of 16%-20%<br>  – Investments: Internal return on economic capital of 6% was below the target range of 10%-14% due to purchases made to improve PC performance;<br>• For the underwriting quality on new purchases:<br>  – Single-Family: Performance against this objective is measured using the cumulative default rate for the worst quintile of new purchases, which was 1.45%, easily achieving the target of 5% or less.<br>  – Multifamily: The weighted average amortizing debt coverage ratio on the worst 10% of new multifamily purchases of 1.25x slightly exceeded the target range of 1.20x-1.23x.<br>• We completed over 46,000 short sales and deeds-in-lieu of foreclosure during 2011, within the target range of 35,000-50,000.<br>• We met the objective of limiting 2011 administrative expenses - excluding costs associated with special policy and housing initiatives such as the Making Home Affordable program — to no more than $1.4 billion. Administrative expenses measured on this basis totaled $1.34 billion. |
| **Business Infrastructure**<br>• Maintain normal service and quality standards for existing technology and operations infrastructure;<br>• Complete deployment of all planned business infrastructure enhancements; and<br>• Complete all other planned information technology initiatives | 30% | • Performance indicators used to monitor service and quality standards demonstrate that those standards were met throughout 2011.<br>• All work was completed as planned for projects involving multifamily and finance transaction accounting. For single-family, many projects were completed as planned, but some were either canceled or were not completed during 2011. The high-cost, high-risk Single-Family Master Servicing projects were canceled to enable resources to address the Servicing Alignment Initiative.<br>• Achieved milestones and/or completed all other planned information technology initiatives. |
| **Accounting and Controls**<br>• Complete all planned controls remediation activities;<br>• Execute the 2011 internal audit plan; and<br>• Maintain effective controls over financial reporting (excluding the material weakness related to our disclosure controls and procedures) | 10% | • Many planned remediation activities were completed. Indicators of the progress made during 2011 include remediation of all Significant Deficiencies targeted at the beginning of the performance year, and reliance being placed on the work of our Internal Audit organization by our Conservator and our external auditors.<br>• Successfully completed 11 of the 12 objectives - including the three highest weighted objectives - in the annual internal audit plan.<br>• See the discussion below for information about events that occurred subsequent to the initial assessments by management and the Compensation Committee. |

During its presentation of our achievement against the performance measures, management presented additional considerations that the Compensation Committee might want to take into account when determining an appropriate funding level. These additional considerations were:

- Implementation of a new governance process for technology projects that management believes will significantly improve the company's ability to deliver critical projects and also resulted in the cancellation or deferral of a significant number of previously planned projects;

- Execution of the Servicing Alignment Initiative, a significant new FHFA directive that aligns GSE loss mitigation requirements and is intended to bring more consistency to the servicing industry and help more distressed homeowners avoid foreclosure;

- Implementation of the Servicing Success Program, which seeks to improve the company's management of servicer performance through defined metrics, benchmarks, requirements, financial incentives, and compensatory fees;

- Favorable results from a June 2011 survey of Multifamily Production and Asset Management customers (the results of a similar survey of Single-Family customers were not available in time to be considered by the Compensation Committee);

- Unfavorable impact on the Investments Segment's internal return on economic capital of purchases made during 2011 to support the performance of Freddie Mac PCs;

- Delay in developing a corporate investigations policy and procedure;

- Deficiencies in the company's business continuity strategy in the event of a regional business disruption; and

- The adverse effects of significant turnover among the company's senior executives during 2011.

Management then proposed a funding range for the performance-based portion of the Deferred Base Salary that it believed reflected our performance against the goals, taking into account the additional considerations. After reviewing and discussing management's final assessment against the performance goals, the Compensation Committee then discussed the additional considerations and determined that these should also be evaluated in determining the appropriate funding level for the performance-based portion of Deferred Base Salary. The Compensation Committee then developed a preliminary recommended funding level for the performance-based portion of Deferred Base Salary, which was then submitted to FHFA for review.

After the Compensation Committee's submission of its initial recommendation to FHFA, FHFA advised the company that certain mortgages preliminarily included in the company's calculation are not eligible to be counted toward affordable housing goals compliance. Consequently, we failed to meet the FHFA benchmark level for the single-family affordable purchase-money goals and subgoals for 2011.

In addition, subsequent to management's assessment of our achievement against the performance measures and the Compensation Committee's submission of its initial recommendation to FHFA, management determined that we did not maintain effective internal control over financial reporting and identified one new material weakness related to information technology. See "CONTROLS AND PROCEDURES" above. The Compensation Committee assessed 2011 performance against this and other performance measures based on the best information available at the time of the assessment.

Following FHFA's review of our performance, it instructed the Compensation Committee to reduce its recommended funding level in light of the required revisions to the affordable housing goal counting process, and indicated the maximum funding level it would approve. In accordance with FHFA's instruction, the Compensation Committee, without concurring with FHFA's determination, directed management to proceed using a funding level for the performance-based portion of the Deferred Base Salary of 87%, the maximum funding level that FHFA indicated it would approve.

The following chart compares the target and actual amounts of 2011 Deferred Base Salary for each Named Executive Officer. The actual amount earned, which is based exclusively on corporate performance and for which there is no individual differentiation, is scheduled to be paid in equal quarterly installments on the last business day of each calendar quarter of 2012.

**Table 79 — 2011 Deferred Base Salary**

| Named Executive Officer | Target 2011 Deferred Base Salary | | | Actual 2011 Deferred Base Salary | | |
|---|---|---|---|---|---|---|
| | Fixed Portion | Performance-Based Portion | Total Target Deferred Base Salary | Fixed Portion | Performance-Based Portion | Total Actual Deferred Base Salary |
| Mr. Haldeman . . . . . . . . . . . . . . . . . . . . . . . . . | $1,550,000 | $1,550,000 | $3,100,000 | $1,550,000 | $1,348,500 | $2,898,500 |
| Mr. Kari . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 829,167 | 829,166 | 1,658,333 | 829,167 | 721,375 | 1,550,542 |
| Mr. Renzi . . . . . . . . . . . . . . . . . . . . . . . . . . . | 592,614 | 592,613 | 1,185,227 | 592,614 | 515,574 | 1,108,188 |
| Mr. Weiss . . . . . . . . . . . . . . . . . . . . . . . . . . . | 508,334 | 508,333 | 1,016,667 | 508,334 | 442,249 | 950,583 |
| Ms. Wisdom . . . . . . . . . . . . . . . . . . . . . . . . . | 370,834 | 370,833 | 741,667 | 370,834 | 322,624 | 693,458 |

In order to receive the Deferred Base Salary that was earned during 2011, the Covered Officer must be employed by us on the payment date, subject to certain exceptions. If a Covered Officer is involuntarily terminated, any unpaid Deferred Base Salary will be forfeited unless the Compensation Committee recommends that the Covered Officer receive either all or a portion of the unpaid Deferred Base Salary and the Compensation Committee's recommendation is approved by FHFA after consulting with Treasury, as appropriate. Further, if a Covered Officer voluntarily terminates employment, any unpaid Deferred Base Salary will be forfeited.

*Determination of Actual Target Opportunity*

Over the course of 2011, the Compensation Committee received updates from management on our achievement against the performance objectives used to determine the funding level for the two TO installments. In the fourth quarter of 2011, management presented the Compensation Committee with a final assessment against the performance objectives used in determining the funding level for the two installments for which payment is based on performance during 2011.

For the first installment of the 2011 TO, management concluded that we would achieve most, but not all of the performance objectives. The table below presents the performance measures and management's assessment of our achievement against those performance measures for the first installment of the 2011 TO.

**Table 80 — Achievement of Performance Measures for First Installment of 2011 Target Opportunity**

| Performance Measure | Weighting | Key Factors Impacting Achievement Assessment |
|---|---|---|
| **Business Infrastructure** <br> • Transition greater than 95% of customers from legacy mortgage delivery and servicing systems; and, <br> • Achieve the 2011 goals associated with remediation of the identified deficiencies in the company's information technology infrastructure. | 40% | • 100% of customers were transitioned from the legacy servicing system two months prior to the year-end deadline. All customers also ended their use of the legacy mortgage delivery system during 2011; and, <br> • All 2011 information technology infrastructure goals were achieved by year-end. |
| **Financial Execution** <br> Conserve capital by limiting the 2011 draw from Treasury to no more than $8 billion. | 40% | The 2011 draw request from Treasury was $7.6 billion, at the high end of the target range of $0 to $8 billion. |
| **Mission** <br> Same as for the performance-based element of Deferred Base Salary. | 20% | Same as for the performance-based element of Deferred Base Salary. |

During its presentation of our achievement against the performance measures, management presented two additional considerations for the Compensation Committee to take into account when determining an appropriate funding level. These additional considerations were:

• The cancellation of certain key business infrastructure projects resulting from the implementation of the new governance process for technology projects; and

• Execution of the Servicing Alignment Initiative.

Management then proposed a funding range for the first installment of the 2011 TO that it believed reflected our performance, taking into account the additional considerations.

After reviewing and discussing management's final performance assessment against the specific performance goals, the Compensation Committee concurred with management's assessment. The Compensation Committee then discussed the

additional considerations and determined that these should also be included in determining the appropriate funding level for the first installment of the 2011 TO. The Compensation Committee then developed a preliminary recommended funding level for the 2011 TO first installment, which was then submitted to FHFA for review.

Following FHFA's review of our achievement against the performance objectives, it instructed the Compensation Committee to substantially reduce its recommended funding level in light of the following:

- The 2011 draw from Treasury was at the high end of the target range established at the beginning of the year; and

- As discussed above, required revisions in the affordable housing goal counting process, of which the company received notice after management's assessment and the Compensation Committee's original recommendation, resulted in our failure to meet the FHFA benchmark level for the single-family affordable purchase-money goals or subgoals for 2011.

FHFA informed the Compensation Committee of the maximum funding level that it would approve. In accordance with FHFA's instruction, the Compensation Committee, without concurring, directed management to implement a funding level for the 2011 TO first installment of 79%, the maximum funding level that FHFA indicated it would approve.

For the second installment of the 2010 TO, management concluded that we would achieve most, but not all, of the performance objectives. The table below presents the performance measures and management's assessment of our achievement against those performance measures for the second installment of the 2010 TO.

**Table 81 — Achievement of Performance Measures for Second Installment of 2010 Target Opportunity**

| Performance Measure | Weighting | Key Factors Impacting Achievement Assessment |
|---|---|---|
| **Mission**<br>Same as for performance-based element of Deferred Base Salary. | 35% | Same as for the performance-based element of Deferred Base Salary. |
| **Controls Remediation**<br>Strengthen the control environment, taking into consideration progress in remediating Significant Deficiencies, Material Weaknesses, Internal Audit critical and major issues and FHFA Matters Requiring Attention scheduled to be remediated during 2011. | 20% | Many planned remediation activities were completed. Indicators of the progress made during 2011 include remediation of all Significant Deficiencies targeted at the beginning of the performance year, and reliance being placed on the work of our internal audit organization by the Conservator and our external auditors. There also were fewer repeat controls findings. |
| **Financial Execution**<br>Same as for the new purchase financial execution objective applicable to the performance-based element of Deferred Base Salary and the Conserve Capital objective applicable to the first installment of the 2011 TO. | 20% | Same as for the new purchase financial execution objective applicable to the performance-based element of Deferred Base Salary and the Conserve Capital objective applicable to the first installment of the 2011 TO. |
| **Business Infrastructure**<br>• Complete the 2011 elements of the business infrastructure plan developed in 2010; and,<br>• Maintain normal service and quality standards for existing technology and operations infrastructure. | 25% | • All work was completed as planned for projects involving multifamily and finance transaction accounting. For single-family, many projects were completed as planned, but some were either cancelled or were not completed during 2011. The high-cost, high-risk Single-Family Master Servicing projects were canceled to enable resources to address the Servicing Alignment Initiative; and,<br>• Performance indicators used to monitor service and quality standards demonstrate that those standards were met throughout 2011. |

Management presented the same two additional considerations applicable to the first installment of the 2011 TO for the Compensation Committee's consideration when determining an appropriate funding level.

Management then proposed a funding range for the second installment of the 2010 TO that it believed reflected our performance, taking into account the additional considerations.

After reviewing and discussing management's final performance assessment against the specified performance measures, the Compensation Committee concurred with management's assessment. The Compensation Committee then

339                                                                                          *Freddie Mac*

discussed the additional considerations and determined that these should also be included in determining the appropriate funding level for the second installment of the 2010 TO. The Compensation Committee then developed a preliminary recommended funding level for the second installment of the 2010 TO, which was then submitted to FHFA for review.

Following FHFA's review of our performance, it instructed the Compensation Committee to reduce its recommended funding level in light of revisions to the affordable housing goal counting process discussed above and informed the Compensation Committee of the maximum funding level that it would approve. In accordance with FHFA's instruction, the Compensation Committee, without concurring with FHFA's determination, directed management to proceed using a funding level for the 2010 TO second installment of 84%, the maximum level that FHFA indicated it would approve.

For both TO installments, a portion of the available funds has been allocated to provide a cash award to approximately 500 employees in either administrative or professional staff roles who do not participate in our annual short-term incentive program. This decision was made to recognize the contributions of these employees who provide valuable core services to the company. In addition, these employees are generally in lower-paid roles with limited advancement opportunities and are thus more adversely impacted by FHFA's continuation of the directive to freeze salaries and wage rates at 2010 levels. This allocation reduced the funding level available for distribution for the first 2011 TO installment and the second 2010 TO installment to approximately 78% and 83%, respectively.

For both the second 2010 and first 2011 TO installments, the Compensation Committee concurred with the CEO's recommendations regarding how the remaining available TO funds should be allocated among the Covered Officers under the Executive Compensation Program, including the Named Executive Officers other than himself. The recommended allocation was made after considering the factors listed below.

- Each officer's performance against his/her individual 2011 performance objectives in terms of both business results and leadership effectiveness;

- The relative contributions of each officer in relation to the contributions of the other officers;

- Each of the Named Executive Officers either achieved or exceeded his/her 2011 individual performance objectives. The relatively narrow spread of the individual differentiation between the largest and smallest TO awards (expressed as a percentage of each Named Executive Officer's target) supports our continued emphasis of the need for highly coordinated, cross-functional collaboration; and

- The entire senior officer team accomplished a great deal in an extraordinarily difficult operating environment during 2011 and these accomplishments are especially significant considering the number of senior management departures during the year.

Mr. Haldeman informed the Compensation Committee that the company's best interests would be served if he was not a participant in the February 2012 TO allocation process, which would result in him not receiving payment of either TO installment. While the Committee felt that Mr. Haldeman's performance during 2011 merited payment of the TO installments, it also accepted his request that it should exclude him from the TO allocation process. After considering these and other factors, the Compensation Committee determined that Mr. Haldeman should not receive either TO installment. Mr. Haldeman will forfeit the remaining 2011 TO installment and any 2011 earned but unpaid Deferred Base Salary upon his planned departure from the company later this year.

The following chart summarizes the TO applicable to performance during 2011 for each of the Named Executive Officers and the amount that was approved by the Compensation Committee and FHFA and paid on February 16, 2012.

### Table 82 — 2011 Target Opportunity

| Named Executive Officer | 2011 First Installment | | 2010 Second Installment | |
|---|---|---|---|---|
| | Target | Actual | Target | Actual |
| Mr. Haldeman | $1,000,000 | $ — | $1,000,000 | $ — |
| Mr. Kari | 583,334 | 480,125 | 583,333 | 508,646 |
| Mr. Renzi | 414,773 | 308,416 | 176,136 | 138,807 |
| Mr. Weiss | 366,667 | 316,367 | 329,166 | 302,365 |
| Ms. Wisdom | 291,667 | 251,656 | 253,181 | 232,567 |

The 2010 second installment amount for Mr. Renzi reflects a pro-ration of his annual TO based on his date of hire in 2010.

*2011 Target TDC Compared to 2011 Actual TDC*

The following table shows 2011 Target TDC compared to the approved 2011 actual TDC for each of the Named Executive Officers. The amounts displayed in both the "Total Target" and "Total Actual" columns include the sum of

Semi- Monthly Base Salary, Deferred Base Salary and those amounts associated with the first installment of the 2011 TO and the second installment of the 2010 TO.

**Table 83 — 2011 Target TDC Compared to the Approved 2011 Actual TDC**

| Named Executive Officer | 2011 Semi-Monthly Base Salary | 2011 Deferred Base Salary | | Target Opportunity (2011 1st Installment and 2010 2nd Installment) | | Total[1] | |
|---|---|---|---|---|---|---|---|
| | | Target | Actual | Target | Actual | Target | Actual |
| Mr. Haldeman . . . . . . . . . . . . . . . . . . . | $900,000 | $3,100,000 | $2,898,500[2] | $2,000,000 | $       — | $6,000,000 | $3,798,500 |
| Mr. Kari . . . . . . . . . . . . . . . . . . . . . . . | 675,000 | 1,658,333 | 1,550,542 | 1,166,667 | 988,771 | 3,500,000 | 3,214,313 |
| Mr. Renzi . . . . . . . . . . . . . . . . . . . . . . | 473,864 | 1,185,227 | 1,108,188 | 590,909 | 447,223 | 2,250,000 | 2,029,275 |
| Mr. Weiss . . . . . . . . . . . . . . . . . . . . . . | 450,000 | 1,016,667 | 950,583 | 695,833 | 618,732 | 2,162,500 | 2,019,315 |
| Ms. Wisdom . . . . . . . . . . . . . . . . . . . . | 425,000 | 741,667 | 693,458 | 544,848 | 484,223 | 1,711,515 | 1,602,681 |

(1) The table does not include the second installment of each Named Executive Officer's 2011 TO that is scheduled to be paid in March 2013.
(2) Mr. Haldeman will forfeit any earned but unpaid Deferred Base Salary when he leaves the company.

## Named Executive Officer Individual Performance Objectives

Each Named Executive Officer is a member of the Management Committee, a group of our senior-most officers. In addition to shared corporate objectives, each Named Executive Officer also had individual performance objectives which are generally established at the beginning of the year by Mr. Haldeman or, in the case of Mr. Haldeman, the Board. The chart below describes those individual performance objectives, as well as the level of achievement against those objectives. Certain of the individual performance objectives were either corporate performance objectives or supported achievement of one or more of the corporate performance objectives. Achievement against the corporate performance objectives is discussed above in "Determination of the Performance-Based Portion of Deferred Base Salary" and "Determination of Actual Target Opportunity." The level of achievement against each Named Executive Officer's individual performance objectives is evaluated using two considerations — business results and leadership effectiveness — which are given equal weight.

**Table 84 — Named Executive Officer Individual Performance Summaries**

| Individual Performance Measures | Assessment of Performance |
| --- | --- |
| *Mr. Haldeman:*<br>• Lead the execution of objectives included in the corporate scorecard;<br>• Assist the Conservator's consideration of alternatives for the future of the U.S. housing and mortgage markets;<br>• Strengthen critical talent management processes, including development of the senior leadership team and completion of initiatives designed to increase employee engagement; and,<br>• Foster a risk management culture throughout the company, including providing visible support for risk management | During 2011, Mr. Haldeman continued to build strong and collaborative relationships, both within the company and with our Conservator. His leadership style has supported achievement of our business objectives as well as our Conservator's efforts to assess alternative future structures for the housing finance system. Under Mr. Haldeman's leadership during 2011, the company achieved most, but not all, of the corporate scorecard objectives. The company strengthened the talent management process by initiating a best-in-class leadership development program for all mid- and senior-level leaders, focusing the company on developing stronger leaders at multiple levels. Mr. Haldeman has continued to strengthen the risk management function by supporting a strategy to elevate the risk management processes and by fostering a risk-aware culture where every employee is a risk manager. |
| *Mr. Kari:*<br>• Maintain effective internal controls over financial reporting and complete the remediation of five separate significant deficiencies;<br>• Improve the readability and quality of public disclosures and earnings releases;<br>• Complete all finance-related business infrastructure deliverables included in the 2011 corporate scorecard;<br>• Identify and implement process improvements to make company processes more efficient and manage administrative expenses to achieve G&A expense targets; and,<br>• Improve engagement of finance division employees, with a specific focus on the division's leadership team. | Mr. Kari was a stabilizing leadership presence for employees in his division as well as his fellow Management Committee members during what was an especially challenging year at the company. He displays an openness for tackling difficult issues and consistently strives to improve support and partnership with the business. Under his leadership during 2011, business results for the finance organization were above plan and included enhancements to the readability and quality of the company's financial disclosures, and completing all of the finance-related business infrastructure deliverables not dependent on projects cancelled or delayed as part of implementing the new technology governance model. He also implemented improvements to internal processes, and eliminated redundancies that reduced expenses. Accounting efficiency continues to improve and the close and reporting processes have been streamlined. He demonstrated leadership capabilities by fostering an environment that values teamwork and collaboration over individual accomplishment and by implementing initiatives designed to improve employee engagement. While certain controls over financial reporting were strengthened during the year as a result of the remediation of several significant deficiencies, the company identified one new material weakness as of December 31, 2011. |
| Mr. Renzi was promoted to lead the single-family business, operations and technology organization. He assumed this role just as the FHFA-directed Servicing Alignment Initiative began. Accordingly, individual performance objectives for his new role were not established for him prior to the beginning of the year. In addition to his ongoing responsibilities associated with the sourcing and servicing of our single-family loan portfolio and management of our information technology operations and infrastructure, his areas of focus during 2011 included:<br>• Making organizational changes to enable us to become an industry-leading operation;<br>• Transforming our information technology organization, including implementing a process to more effectively manage maintenance of and enhancements to our technology infrastructure;<br>• Improving servicer performance management and loss mitigation activities;<br>• Effectively utilizing foreclosure alternatives to minimize losses on delinquent mortgages;<br>• Reducing REO vendor concentration risk; and<br>• Establishing a clear operating business plan that guides the business over the course of the next one to three years. | Mr. Renzi assumed a broadened role beginning in April 2011, which included being responsible for the single-family business, operations and technology organization. He assumed this role just as the FHFA-directed Servicing Alignment Initiative began. His leadership skill, mortgage finance industry expertise and focus on execution enabled him to drive the implementation of the policy and process changes related to that FHFA initiative. He has established a positive and motivating leadership presence within his new organization that has facilitated significant progress in the company's production sourcing and loss mitigation efforts. Upon assuming his current role, Mr. Renzi also identified critical changes needed to better support our mission. This led to, among other things, a reorganization of our largest division that has resulted in the realignment of groups previously spread across multiple organizations to improve business execution, better meet the needs of our customers and establish a clear operating business plan to help guide our business through the next 12 to 36 months. Under Mr. Renzi's leadership, a new servicing scorecard was developed to monitor servicer performance and a new framework for managing servicer performance was developed and implemented, both of which were instrumental in developing the Servicing Alignment Initiative. He also led the development of a new technology governance model, under which information technology was centralized and a new structure was established to identify, prioritize and develop critical information technology solutions to meet evolving business needs. He worked to reduce vendor concentration risk by adding two new REO sales vendors to improve marketing efforts, enhance pricing precision, reduce inventory cycle times and, in turn, loss severity levels. |
| *Mr. Weiss:*<br>• Develop a cohesive and efficient Chief Administrative Officer team that serves as a resource to both internal and external stakeholders on a variety of operational and policy issues;<br>• Integrate the Models division and enhance model governance;<br>• Oversee servicer compliance with the provisions of the Administration's Home Affordable Modification Program (HAMP);<br>• Make human resources processes more efficient and reduce costs where appropriate;<br>• Enhance talent development by launching a leadership development program for mid- and senior-level leaders; and<br>• Serve as a key liaison to FHFA. | Mr. Weiss's knowledge of the company, leadership skills and ability to manage multiple business initiatives led to a further increase in the scope of his responsibilities in 2011. He added the financial modeling organization to the other functions he leads, which now include MHA-C; human resources; external relations; government and industry relations; and corporate strategy and mission. Under his leadership during 2011, the strategy, public policy, government relations and communications teams worked together effectively to provide expertise, information and data to management, the Board and other parties on a variety of policy and procedural issues. Under Mr. Weiss' leadership, model governance, development, documentation, performance monitoring and prioritization have become more robust. He also successfully led the team responsible for overseeing servicers' compliance with the requirements of HAMP, as a financial agent of the U.S. Treasury. With respect to human resources matters, the company achieved significant business results, including implementing major changes to our employee benefits programs that will significantly reduce the future cost of those programs while still providing market-competitive benefits to employees, accelerating the compensation planning process to create efficiencies, and establishing a leadership development program for all mid- and senior-level leaders. Throughout the year, Mr. Weiss successfully guided the company's relationship with FHFA during a very challenging period. He served as both a liaison on a variety of sensitive matters that pertain to our unique current operating environment and a reliable resource on GSE policy and future state issues. |
| *Ms. Wisdom:*<br>• Strengthen the company's risk management capabilities;<br>• Lead the rebuilding of the corporate model oversight process and related model governance capabilities;<br>• Implement an enhanced new business initiative process; and,<br>• Improve engagement of enterprise risk management division employees, with a specific focus on the division's leadership team. | During 2011, Ms. Wisdom successfully led the enterprise risk function during a period of great change and has taken steps to significantly strengthen the function. She provides strong leadership and has proven capable at driving change across the organization while establishing collaborative relationships with key stakeholders. During 2011, she strengthened our risk management governance by simplifying and streamlining oversight and decision-making. As part of this effort, she integrated the credit risk management function into the risk management organization, establishing a unified risk management function. As a result, alignment with business units across the company was substantially improved, and the company's credit risk oversight was strengthened. Ms. Wisdom also successfully led an effort to rebuild the corporate model process and related governance, a cross-divisional effort involving stakeholders throughout the company. She redesigned and implemented a new governance structure associated with the execution of corporate new business initiatives that engages executive management earlier in the process, provides consistent communication, delivers comprehensive enterprise-wide risk assessments, and provides increased transparency. From an employee engagement perspective, she has provided numerous leadership and skills development opportunities for all levels of staff in her division and has increased her visibility — and thus the visibility of the risk management function — both internally and externally. |

## Written Agreements Relating to Employment of CEO and CFO

We have entered into: (a) a Memorandum Agreement; and (b) a recapture agreement with each of Messrs. Haldeman and Kari in connection with their employment as our executive officers. Copies of the Memorandum Agreement and the recapture agreement regarding Messrs. Haldeman and Kari were filed as Exhibits 10.1 and 10.2, respectively, to our Current Reports on Form 8-K filed on July 21 and September 24, 2009 with respect to each executive's employment with us.

The compensation provisions of each executive's Memorandum Agreement, in combination with provisions of the Executive Compensation Program, are summarized separately below. Additional information about the components of executive compensation is discussed above in "— Elements of Compensation and Total Direct Compensation."

Mr. Haldeman's compensation, as provided in his Memorandum Agreement, is as follows:

- A Semi-Monthly Base Salary of $900,000 per year;

- Deferred Base Salary in the amount of $3.1 million for each of 2009 and 2010, payable as described above; and

- A Target Opportunity in the amount of $2.0 million for each of 2009 and 2010, payable as described above.

Mr. Kari's compensation, as provided in his Memorandum Agreement, is as follows:

- A Semi-Monthly Base Salary of no less than $675,000 per year;

- Deferred Base Salary of $1,658,333 for each of 2009 and 2010, payable as described above;

- A Target Opportunity of $1,166,667 for each of 2009 and 2010, payable as described above; and

- A cash sign-on award of $1,950,000 in recognition of the annual incentive opportunity and unvested equity that Mr. Kari forfeited by leaving his previous employer. This award was paid in installments during Mr. Kari's first year of employment with us.

Their Memorandum Agreements provide that Messrs. Haldeman and Kari will receive the following additional forms of compensation during their employment with us:

- The opportunity to participate in all employee benefit plans offered to our senior executive officers, including our SERP, pursuant to the terms of these plans. For a description of these plans see "Compensation Tables" below; and

- If we terminate the employment of Mr. Haldeman or Mr. Kari for any reason other than cause (as defined in the Memorandum Agreement), he will be eligible to receive termination benefits pursuant to the terms of any then-applicable severance plan or policy, subject to the approval of FHFA. Executive Compensation Program participants, including Messrs. Haldeman and Kari, are not currently entitled to a guaranteed level of severance benefits upon any type of termination event other than death or disability. For additional information on compensation and benefits payable in the event of a termination of employment, see "Potential Payments Upon Termination of Employment or Change-in-Control" below.

We have also entered into recapture and restrictive covenant agreements with each of the executives. The recapture requirements included in these agreements, and the similar recapture requirements applicable to all other Covered Officers under the Recapture Policy, are described below under "Recapture Policy." The non-competition and non-solicitation provisions included in the restrictive covenant agreement are described in "Potential Payments Upon Termination of Employment or Change-in-Control."

We have also entered into indemnification agreements with certain of our current directors and executive officers, each, an indemnitee, including Messrs. Haldeman and Kari. With respect to indemnification agreements entered into with executive officers in or after August 2011, the form of agreement has been revised to provide that indemnification rights under the agreement would terminate if and when the executive officer remained with Freddie Mac after ceasing to report directly to the CEO with respect to any claims arising from matters occurring after the officer was no longer a direct CEO report. Similar indemnification rights would continue to be available to such executive officers under the Bylaws going forward.

The indemnification agreements provide that we will indemnify the indemnitee to the fullest extent permitted by our Bylaws and Virginia law. This obligation includes, subject to certain terms and conditions, indemnification against all liabilities and expenses (including attorneys' fees) actually and reasonably incurred by the indemnitee in connection with any threatened or pending action, suit or proceeding, except such liabilities and expenses as are incurred because of the indemnitee's willful misconduct or knowing violation of criminal law. The indemnification agreements provide that if requested by the indemnitee, we will advance expenses, subject to repayment by the indemnitee of any funds advanced if it is ultimately determined that the indemnitee is not entitled to indemnification. The rights to indemnification under the indemnification agreements are not exclusive of any other right the indemnitee may have under any statute, agreement or otherwise. Our obligations under the indemnification agreements will continue after the indemnitee is no longer a director or officer of the company with respect to any possible claims based on the fact that the indemnitee was a director or officer, and the indemnification agreements will remain in effect in the event the conservatorship is terminated. The indemnification agreements also provide that indemnification for actions instituted by FHFA will be governed by the standards set forth in FHFA's Notice of Proposed Rulemaking published in the Federal Register on November 14, 2008,

proposing an amendment to FHFA's interim final golden parachute payments regulation to address prohibited and permissible indemnification payments. In January 2009, FHFA issued final regulations relating to golden parachute payments. Under those final regulations, FHFA may limit golden parachute payments, and the regulations set forth factors to be considered by the Director of FHFA in acting upon his authority to limit these payments. A proposed rule was published by FHFA in June 2009 that has not yet been adopted in final form. In general, this proposal would give FHFA the authority to prohibit indemnification payments in cases involving administrative proceedings before FHFA or civil actions initiated by FHFA.

## Other Executive Compensation Considerations

### Perquisites

We believe that perquisites should be a minimal part of the compensation package for our Named Executive Officers. We provide certain perquisites because we believe there is a business-related benefit, including that the perquisites assist in attracting and retaining executive talent. None of the perquisites offered provide for a gross-up to cover the taxes due on the perquisite itself. Accordingly, the only perquisite provided to the Named Executive Officers during 2011 was reimbursement for assistance with personal financial planning, tax planning, and/or estate planning, up to an annual maximum benefit that varies by position.

Although available, none of the Named Executive Officers received the following perquisites during 2011:

- *Physical Examination.*   Reimbursement of up to $700 of expenses associated with a comprehensive annual physical exam that are not otherwise covered by the Named Executive Officer's medical insurance;

- *Relocation Benefits.*   Under our relocation program, we provide assistance in finding and moving into a new home and selling an existing home, temporary lodging, reimbursement of certain travel expenses, and a one-time payment to cover miscellaneous expenses; and,

- *Spousal Travel Expenses.*   Reimbursement of business-related spousal travel expenses.

Additionally, total annual perquisites for any Named Executive Officer cannot exceed $25,000 without FHFA approval.

### Supplemental Executive Retirement Plan

Our Named Executive Officers are eligible to participate in our Supplemental Executive Retirement Plan, or SERP. The SERP is designed to provide participants with the full amount of benefits to which they would have been entitled under our Pension Plan and Thrift/401(k) Savings Plan if those plans: (a) were not subject to certain limits on compensation that can be taken into account under the Internal Revenue Code; and (b) did not exclude from "compensation" amounts deferred under our Executive Deferred Compensation Plan and the Mandatory Executive Deferred Base Salary Plan.

On June 27, 2011, the SERP was amended, with the approval of FHFA. Under this amendment, which became effective January 1, 2012, eligibility for the "Pension SERP Benefit" (as defined in the SERP) will be limited, and Executives (as defined in the SERP) whose employment with the company commences after December 31, 2011 (or who are rehired after that date) will not be eligible for the Pension SERP Benefit. However, non-Executives employed as of December 31, 2011 who are subsequently promoted to Executive positions will be eligible for the Pension SERP Benefit. The 2011 amendment also revises the "Thrift/401(k) SERP Benefit" (as defined in the SERP). A copy of this amendment, which provides additional information about the changes made to the Thrift/401(k) SERP Benefit, was filed as Exhibit 10.1 to our current report on Form 8-K filed on June 28, 2011.

We provide a SERP because it helps us to remain competitive with the companies with which we compete for talent and thereby assists in attracting and retaining executive talent. For additional information regarding this benefit see "Compensation Tables" below.

### Recapture Policy

The Recapture Policy provides that certain compensation paid under the Executive Compensation Program will be subject to recapture if any of the following events occur subsequent to the date that the Named Executive Officer agreed to the terms of the Recapture Policy.

- *Payment Based on Materially Inaccurate Information* — If the Named Executive Officer obtains a bonus or incentive payment based on materially inaccurate financial statements or performance metrics.

- *Termination for Cause* — If the Named Executive Officer's employment is terminated for cause, as defined in the Recapture Policy.

- *Subsequent Determination of Cause* — If, within two years of the termination of the Named Executive Officer's employment, the Board makes a determination in good faith that circumstances existed at the time of the Named Executive Officer's termination that would have justified a termination for cause and that actions taken by the Named Executive Officer resulted in material business or reputational harm to us.

The additional event listed below is applicable only to Messrs. Haldeman and Kari.

- *Accounting Restatement Resulting from the Executive's Misconduct* — If misconduct by the CEO and/or the CFO necessitates the preparation of an accounting restatement due to material non-compliance with financial reporting requirements.

If any of these triggering events occur, the Board will determine whether more compensation was paid to the Named Executive Officer than would otherwise have been paid had we been aware of the triggering event or events at the time the compensation was paid or awarded. If a determination is made that we paid or awarded a Named Executive Officer more compensation than he or she otherwise would have received, the following elements of compensation will be subject to recapture: (a) Deferred Base Salary; (b) Target Opportunity; (c) any equity awards that vest after the adoption of the Executive Compensation Program; and (d) any termination benefits paid. Only compensation paid up to two years prior to the triggering event or the date of termination or compensation paid at the time of termination, as applicable, will be subject to recapture. Additionally, the occurrence of a triggering event may result in cancellation of any future payment obligations and/or any outstanding equity awards.

The amount of compensation recaptured will be determined by the Board, subject to the guidelines described above. Additional details are included in the Recapture Policy, which was filed as Exhibit 10.4 to our Current Report on Form 8-K filed on December 31, 2009. For the triggering event applicable only to Messrs. Haldeman and Kari, the compensation subject to recapture will be determined in accordance with Section 304 of the Sarbanes-Oxley Act.

### Stock Ownership and Hedging Policies

In November 2008, FHFA approved the suspension of our stock ownership guidelines because we had ceased paying our executives stock-based compensation. Also, the Purchase Agreement prohibits us from issuing any shares of our equity securities without the prior written consent of Treasury. The suspension of stock ownership requirements is expected to continue through the conservatorship and until we resume granting stock-based compensation.

All employees, including our Named Executive Officers, are prohibited from purchasing and selling derivative securities related to our equity securities, including warrants, puts and calls, or from dealing in any derivative securities other than pursuant to our stock-based benefit plans. All directors and employees (including the Named Executive Officers) are prohibited from transacting in options (other than options granted by us) or other hedging instruments as specified in our Insider Trading Policy. In addition, all directors and employees (including our Named Executive Officers) are prohibited from holding our securities in a margin account or pledging our securities as collateral for a loan.

### Section 162(m) Limits on the Tax Deductibility of Our Compensation Expenses

Section 162(m) of the Internal Revenue Code imposes a $1 million limit on the amount that a company may annually deduct for compensation to its CEO and certain other Named Executive Officers, unless, among other things, the compensation is "performance-based," as defined in section 162(m). Given the conservatorship and the desire to maintain flexibility to promote our corporate goals, the performance-based element of Deferred Base Salary and the Target Opportunity applicable to performance during 2011 are not structured to qualify as performance-based compensation under section 162(m).

### Compensation Committee Interlocks and Insider Participation

None of the members of the Board of Directors who served on the Compensation Committee during fiscal year 2011 were our officers or employees or had any relationship with us that would be required to be disclosed by us under Item 407(e)(4) of Regulation S-K.

### Compensation Committee Report

The Compensation Committee has reviewed and discussed the Compensation Discussion and Analysis with management and, based on such review and discussion, has recommended to the Board that the Compensation Discussion and Analysis be included in this Annual Report on Form 10-K.

This report is respectfully submitted by the members of the Compensation Committee of the Board.

Anthony A. Williams, Chairman
Linda B. Bammann
Christopher S. Lynch
Clayton S. Rose

**Compensation and Risk**

With respect to 2011, our management conducted an assessment of our compensation plans and programs that were in place during the year and that were applicable to employees at all levels, including the Executive Compensation Program in which our executives participate. The purpose of the assessment was to determine whether the design and operation of our compensation plans create incentives for employees to take inappropriate risks that are reasonably likely to have a material adverse effect on us. The assessment was conducted by members of our enterprise risk management and human resources teams, as well as by Aon Hewitt, management's compensation consultant.

The review included an evaluation of the mix of fixed and variable compensation; eligibility for participation in incentive programs, the process by which target compensation levels are established, the process for establishing performance objectives and for evaluating performance against those objectives, the methodology used to allocate the incentive funding among divisions, departments, and individual employees (including maximum individual payout levels); and the involvement of the Compensation Committee and FHFA in the compensation process. An evaluation was also made of the linkage between corporate and divisional performance objectives.

The assessment was discussed with the Compensation Committee in February 2012. Management's conclusion, with which the Compensation Committee concurred, is that our compensation policies and practices applicable during 2011 do not create risks that are reasonably likely to have a material adverse effect on us.

In March 2012, FHFA adopted a new Executive Compensation Program effective January 1, 2012. Management does not believe that this program will create inappropriate risk-taking incentives for employees. However, the Compensation Committee and management are concerned that this program may have an adverse effect on the company in future periods. Significant adverse changes in compensation levels could result in increased vacancies in positions that are important for our sound operation, since the incumbents in these positions possess significant business and leadership skills that are in demand elsewhere in the market at substantially higher levels of compensation. Resulting loss of talent and institutional knowledge would cause an appreciable increase in the operational risk of the company. See "EXECUTIVE COMPENSATION — Executive Summary" and "RISK FACTORS— ***The conservatorship and uncertainty concerning our future has had, and will likely continue to have, an adverse effect on the retention, recruitment, and engagement of management and other employees, which could have a material adverse effect on our ability to operate our business.***" We are finding it difficult to retain and engage critical employees and attract people with the skills and experience we need. Voluntary attrition rates for high performing employees, those with specialized skill sets, and those responsible for controls over financial reporting have risen markedly since we were placed into conservatorship. This has led to concerns about staffing inadequacies, management depth, and employee engagement. Attracting qualified senior executives is particularly difficult.

## Compensation Tables

The following tables set forth compensation information for our Named Executive Officers: our Chief Executive Officer, our Chief Financial Officer, and our three other most highly compensated executive officers who were serving as executive officers as of December 31, 2011.

### Table 85 — Summary Compensation Table — 2011

| | Year | Salary Paid During Year[1] | Salary Deferred[2] | Bonus[3] | Non-Equity Incentive Plan Compensation[4] Performance-Based Deferred Base Salary | Non-Equity Incentive Plan Compensation[4] Target Opportunity | Change in Pension Value and Nonqualified Deferred Compensation Earnings[5] | All Other Compensation[6] | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Charles E. Haldeman, Jr.** Chief Executive Officer | 2011 | $900,000 | $1,550,000 | $ — | $1,348,500 | $ — | $239,255 | $ 72,915 | $4,110,670 |
| | 2010 | 900,000 | 1,550,000 | — | 1,362,450 | 1,322,250 | 214,460 | 104,374 | 5,453,534 |
| | 2009 | 356,250 | 1,227,083 | — | — | 395,833 | — | 56,489 | 2,035,655 |
| **Ross J. Kari** EVP — Chief Financial Officer | 2011 | 675,000 | 829,167 | — | 721,375 | 988,771 | 118,428 | 55,292 | 3,388,033 |
| | 2010 | 675,000 | 829,167 | 1,462,500 | 728,838 | 676,133 | 69,742 | 391,276 | 4,832,656 |
| | 2009 | 151,010 | 370,999 | 487,500 | — | 130,502 | — | 69,290 | 1,209,301 |
| **Anthony N. Renzi** EVP — Single-Family Business, Operations and Technology | 2011 | 473,864 | 592,614 | — | 515,574 | 447,223 | 86,379 | 32,993 | 2,148,647 |
| **Jerry Weiss** EVP — Chief Administrative Officer | 2011 | 450,000 | 508,334 | — | 442,249 | 618,732 | 164,482 | 73,735 | 2,257,532 |
| **Paige H. Wisdom** EVP — Chief Enterprise Risk Officer | 2011 | 425,000 | 370,834 | — | 322,624 | 484,223 | 102,074 | 48,129 | 1,752,884 |

(1) The amounts shown represent Semi-Monthly Base Salary under the Executive Compensation Program as described in "Compensation Discussion and Analysis — Executive Management Compensation Program."

(2) The amounts shown represent the fixed portion of Deferred Base Salary earned under the terms of the Executive Compensation Program. The fixed portion of the 2011 Deferred Base Salary earned during each calendar quarter in 2011 will be paid in cash on the last business day of the corresponding quarter in 2012, provided the Named Executive Officer is employed by us on such payment date or in the event such officer dies, retires or has a long-term disability in 2012. The remaining portion of the 2011 Deferred Base Salary is reported in "Non-Equity Incentive Plan Compensation" because it is performance-based and the amount that is paid is variable.

Amounts shown as 2010 and 2009 Deferred Base Salary were earned during each calendar quarter in 2010 and 2009, respectively, and paid in cash on the last business day of the corresponding quarter in 2011 and 2010, respectively. The 2009 amount reported in this column for Mr. Haldeman has been revised to correct an error in the amount previously reported ($1,277,083).

(3) The amounts shown for Mr. Kari represent the portion of the cash sign-on bonus paid in 2010 and 2009, which he received in recognition of the forfeited annual incentive opportunity and unvested equity at his previous employer. See "Compensation Discussion and Analysis — Written Agreements Relating to Employment of CEO and CFO."

(4) The 2011 amounts reported reflect the portion of the 2011 and 2010 Target Opportunities that were earned for 2011 and paid on February 16, 2012 and the performance-based portion of the 2011 Deferred Base Salary earned during each calendar quarter in 2011, which is scheduled to be paid on the last business day of the corresponding quarter in 2012. See "Compensation Discussion and Analysis — Executive Management Compensation Program — Performance Measures for the Performance-Based Elements of Compensation."

As discussed further in "Compensation Discussion and Analysis — Determination of Actual Target Opportunity," Mr. Haldeman will not receive the TO installments applicable to his performance during 2011.

The 2010 amounts reported reflect the portion of the 2010 and 2009 Target Opportunities that were earned for 2010 and paid on February 18, 2011 and the performance-based portion of the 2010 Deferred Base Salary earned during each calendar quarter in 2010 and paid on the last business day of the corresponding quarter in 2011.

The 2009 amounts reported reflect the portion of the 2009 Target Opportunity that was earned for 2009 and paid on March 12, 2010.

(5) The amounts reported in this column reflect the actuarial increase in the present value of each Named Executive Officer's accrued benefits under our Pension Plan and the Pension SERP Benefit determined using the time periods and assumptions applied in our consolidated financial statements for the years ended December 31, 2009, 2010, and 2011, respectively.

With the exception of Mr. Weiss, the values reported include amounts that the Named Executive Officers are not currently entitled to receive because such amounts are not yet vested. The amounts reported do not include values associated with retiree medical benefits, which are generally available on the same terms to all employees. Deferred Base Salary under the Executive Compensation Program is not considered compensation eligible for deferral in accordance with the Executive Deferred Compensation Plan, or EDCP. The Executive Compensation Program does not provide for interest on Deferred Base Salary.

(6) Amounts reflect (i) matching contributions we made to our tax-qualified Thrift/401(k) Savings Plan; (ii) accruals we made pursuant to the Thrift/401(k) SERP Benefit; (iii) FlexDollars (described below); and (iv) perquisites and other personal benefits received. These amounts for 2011 are as follows:

| | Thrift/401(k) Savings Plan Contributions | Thrift/401(k) SERP Benefit Accruals | Total Flex Dollars | Perquisites |
|---|---|---|---|---|
| Mr. Haldeman | $ 6,750 | $47,250 | $18,915 | $— |
| Mr. Kari | 6,750 | 33,750 | 14,792 | — |
| Mr. Renzi | 4,350 | 18,082 | 10,561 | — |
| Mr. Weiss | 13,500 | 40,500 | 19,735 | — |
| Ms. Wisdom | 9,562 | 28,688 | 9,879 | — |

Employer contributions to the Thrift/401(k) Savings Plan are available on the same terms to all of our employees. We match up to the first 6% of eligible compensation at 100% of the employee's contributions, with the percentage matched dependent upon the employee's length of service. Employee contributions and our matching contributions are invested in accordance with the employee's investment elections and are immediately

*Freddie Mac*

FHFA 3054

vested. In addition, on a discretionary basis, we may make an additional contribution to our Thrift/401(k) Savings Plan, referred to as the "Basic Contribution," that is allocated on behalf of each eligible employee, based on a stated percentage of each employee's eligible compensation. When we make a Basic Contribution, it occurs after the end of the calendar year to which it relates. The formula for the contribution is 2% of pay up to the Social Security wage base, which was $106,800 for 2011, and 4% of pay above the Social Security wage base. Basic Contributions were approved and posted to employees' accounts in 2009 and 2010, but not in 2011. Basic Contributions received on or after January 1, 2008 are subject to a graded vesting schedule such that employees with less than five years of service are not fully vested in the Basic Contribution on the contribution date, but become vested at the rate of 20% per year over their first five years of service.

For additional information regarding the Thrift/401(k) SERP Benefit, see "Non-qualified Deferred Compensation" below. Amounts for the Thrift/401(k) Savings Plan contributions and Thrift/401(k) SERP Benefit accruals are presented without regard to vesting status. To be eligible for the portion of the Thrift/401(k) SERP Benefit attributable to matching contributions, the Named Executive Officer must contribute the maximum amount permitted under the terms of the Thrift/401(k) Savings Plan on a pre-tax basis throughout the entire period of the year in which the Named Executive Officer is eligible to make such contributions.

FlexDollars are provided under our Flexible Benefits Plan and are generally available on the same basis to all employees to offset costs related to medical, dental and vision coverage, group term life insurance, accidental death and personal loss insurance, and vacation purchase. FlexDollars can be used to offset the cost of other benefits and any unused FlexDollars are payable as taxable income.

Perquisites are valued at their aggregate incremental cost to us. During the years reported, the aggregate value of perquisites received by all Named Executive Officers other than Messrs. Haldeman and Kari was less than $10,000. In accordance with SEC rules, amounts shown under "All Other Compensation" do not include perquisites or personal benefits for a Named Executive Officer that, in the aggregate, amount to less than $10,000.

The amount shown in the "All Other Compensation" column for 2010 for Mr. Haldeman consists entirely of relocation expenses paid as part of the relocation benefit we agreed to provide when we hired him. The amount shown in the "All Other Compensation" column for 2010 for Mr. Kari consists of (a) relocation expenses of $369,484 paid as part of the relocation benefit we agreed to provide when we hired him; and (b) financial planning services. As part of our standard executive relocation program, we purchased Mr. Kari's former home at a price equal to the average of two independent appraisals, while the price at which the home ultimately sold was significantly lower because of a decline in the home's value between our purchase and the sale. SEC rules require that we include this difference as fiscal year 2010 compensation.

We calculated the incremental cost to us of providing each of Mr. Haldeman's and Mr. Kari's relocation expenses based on actual cost; that is, the total amount of expenses incurred by us in providing the benefit.

## Grants of Plan-Based Awards — 2011

The following table contains information concerning grants of plan-based awards to each of the Named Executive Officers during 2011. We are prohibited from issuing equity securities without Treasury's consent under the terms of the Purchase Agreement. Accordingly, no stock awards were granted during 2011. For a description of the performance and other measures used to determine payouts, see "Compensation Discussion & Analysis — Executive Management Compensation Program — Elements of Compensation and Total Direct Compensation — Deferred Base Salary," "Target Opportunity," "Performance Measures for the Performance-Based Elements of Compensation," "Determination of the Performance-Based Portion of 2011 Deferred Base Salary," and "Determination of Actual Target Opportunity."

### Table 86 — Grants of Plan-Based Awards — 2011

| Name | Award | Estimated Future Payouts Under Non-Equity Incentive Plan Awards[1] | | |
|---|---|---|---|---|
| | | Threshold | Target | Maximum |
| Mr. Haldeman | Target Opportunity[2] | $— | $2,000,000 | $3,000,000 |
| | Performance-Based Deferred Base Salary | — | 1,550,000 | 1,937,500 |
| | **Total** | — | 3,550,000 | 4,937,500 |
| Mr. Kari | Target Opportunity | — | 1,166,667 | 1,750,000 |
| | Performance-Based Deferred Base Salary | — | 829,166 | 1,036,458 |
| | **Total** | — | 1,995,833 | 2,786,458 |
| Mr. Renzi | Target Opportunity | — | 829,545 | 1,244,318 |
| | Performance-Based Deferred Base Salary | — | 592,613 | 740,766 |
| | **Total** | — | 1,422,158 | 1,985,084 |
| Mr. Weiss | Target Opportunity | — | 733,333 | 1,100,000 |
| | Performance-Based Deferred Base Salary | — | 508,333 | 635,416 |
| | **Total** | — | 1,241,666 | 1,735,416 |
| Ms. Wisdom | Target Opportunity | — | 583,333 | 875,000 |
| | Performance-Based Deferred Base Salary | — | 370,833 | 463,541 |
| | **Total** | — | 954,166 | 1,338,541 |

(1) The amounts reported reflect the Target Opportunity and the performance-based portion of the Deferred Base Salary granted in 2011. The Target Opportunity actually earned can range from 0% of target (reported in the Threshold column) up to a maximum of 150% of target (reported in the Maximum column). The performance-based portion of the Deferred Base Salary actually earned can range from 0% of target (reported in the Threshold column) up to a maximum of 125% of target (reported in the Maximum column). However, while the Executive Compensation Program allows for an approved funding level greater than 100%, it is the current intention of the Compensation Committee not to approve a funding level in excess of 100% while the company is in conservatorship. Actual amounts earned are reported in the "Non-Equity Incentive Plan Compensation" column of "Table 85 — Summary Compensation Table — 2011".

The 2011 Target Opportunity is scheduled to be paid in two installments, the first of which occurred on February 16, 2012, and the second of which is scheduled to occur no later than March 15, 2013. The performance-based portion of the 2011 Deferred Base Salary is payable in equal quarterly installments on the last business day of each quarter in 2012.

(2) As discussed further in "Compensation Discussion and Analysis — Determination of Actual Target Opportunity," Mr. Haldeman will not receive the TO installments applicable to his performance during 2011.

*Outstanding Equity Awards at Fiscal Year-End — 2011*

The following table shows outstanding equity awards held by the Named Executive Officers as of December 31, 2011.

### Table 87 — Outstanding Equity Awards at Fiscal Year-End — 2011

| Name | Award Type[1] | Grant Date | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | Option Exercise Price ($)[2] | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($)[4] |
|---|---|---|---|---|---|---|---|---|
| | | | Option Awards[3] | | | | Stock Awards[3] | |
| Mr. Haldeman . . . . | — | | — | — | $ — | — | — | $ — |
| Mr. Kari . . . . . . . | — | | — | — | | — | — | |
| Mr. Renzi . . . . . . | — | | — | — | | — | — | |
| Mr. Weiss . . . . . . | SO | 08/09/04 | 4,970 | — | 64.36 | 8/8/2014 | — | — |
| | SO | 05/06/05 | 5,640 | — | 62.69 | 5/5/2015 | — | — |
| | SO | 06/05/06 | 5,980 | — | 60.45 | 06/04/16 | — | — |
| | RSU | 03/07/08 | — | — | — | — | 5,726 | 1,214 |
| Ms. Wisdom . . . . | RSU | 03/07/08 | — | — | — | — | 8,270 | 1,753 |

(1) The rows labeled "SO" indicate stock options and the rows labeled "RSU" indicate restricted stock units.
(2) Consistent with the terms of our 2004 Employee Plan, the option exercise price was set at a price equal to the fair market value of our common stock on the grant date.
(3) Amounts reported in this table for RSUs represent the unvested portion of awards, while amounts reported in this table for options represent the unexercised portion of awards. The vesting schedules for the option and stock awards reported in this table are as follows:
  • Stock options granted on August 9, 2004 vested at a rate of 25% beginning on the first anniversary of the grant date, and 25% on April 1, 2006, April 1, 2007, and April 1, 2008.
  • Stock options granted on May 6, 2005 and June 5, 2006 vested at a rate of 25% annually beginning on the anniversary of the grant dates.
  • RSUs granted on March 7, 2008 vest at a rate of 25% annually beginning on the anniversary of the grant date.
(4) Market value is calculated by multiplying the number of RSUs held by each Named Executive Officer on December 31, 2011 by the closing price of our common stock on December 30, 2011 ($0.212), the last trading day of the year.

For information on alternative settlement provisions of RSU and stock option grants in the event of certain terminations, see "Table 91 — Potential Payments Upon Termination of Employment or Change-in-Control as of December 31, 2011" below.

*Option Exercises and Stock Vested — 2011*

The following table sets forth information concerning value realized upon the vesting of RSUs during 2011 by each of the Named Executive Officers. No Named Executive Officer exercised options in 2011.

### Table 88 — Option Exercises and Stock Vested — 2011

| Name | Number of shares Acquired on Vesting (#)[1] | Value Realized on Vesting ($)[2] |
|---|---|---|
| | Stock Awards | |
| Mr. Haldeman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | $ — |
| Mr. Kari . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — |
| Mr. Renzi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — |
| Mr. Weiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9,114 | 4,212 |
| Ms. Wisdom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9,949 | 5,002 |

(1) Amounts reported reflect the number of RSUs that vested during 2011 prior to our withholding of shares to satisfy applicable taxes.
(2) Amounts reported are calculated by multiplying the number of RSUs that vested during 2011 by the fair market value of our common stock on the date of vesting.

*Pension Benefits — 2011*

The following table shows the actuarial present value of the accumulated retirement benefits payable to each of the Named Executive Officers under our Pension Plan and the Pension SERP Benefit (the component of the SERP that relates

to the Pension Plan), computed as of December 31, 2011. A summary of the material terms of each plan follows the table, including information on early retirement.

**Table 89 — Pension Benefits — 2011**

| Name | Plan Name | Number of Years Credited Service(#)[1] | Present value of Accumulated Benefit ($)[2] | Payments During Last Fiscal Year ($) |
|------|-----------|:-:|--:|:-:|
| Mr. Haldeman | Pension Plan | 2.3 | $ 66,196 | $— |
|  | Pension SERP Benefit | 2.3 | 387,519 | — |
| Mr. Kari | Pension Plan | 2.2 | 39,779 | — |
|  | Pension SERP Benefit | 2.2 | 148,391 | — |
| Mr. Renzi | Pension Plan | 2 | 33,661 | — |
|  | Pension SERP Benefit | 2 | 52,718 | — |
| Mr. Weiss | Pension Plan | 8.2 | 184,141 | — |
|  | Pension SERP Benefit | 8.2 | 386,583 | — |
| Ms. Wisdom | Pension Plan | 4 | 74,916 | — |
|  | Pension SERP Benefit | 4 | 136,130 | — |

(1) Amounts reported represent the credited years of service for each Named Executive Officer as of December 31, 2011, under the Pension Plan and the Pension SERP Benefit, respectively.

(2) Amounts reported reflect the present value, expressed as a lump sum as of December 31, 2011, of each Named Executive Officer's benefits under the Pension Plan and the Pension SERP Benefit, respectively. Amounts reported are calculated assuming payment at the earliest unreduced retirement date, as specified in the Plans. For benefits earned through December 31, 2010, the Pension Plan provides an unreduced early retirement benefit at the earlier of: (a) age 62 and 15 years of service; and (b) age 65. The Pension SERP Benefit does not provide an early retirement benefit, therefore age 65 is the assumed commencement date. For Messrs. Haldeman, Kari and Renzi and Ms. Wisdom, the amounts shown include amounts, if any, in which the Named Executive Officers are not yet vested. Pension Plan and Pension SERP Benefits do not vest until the participant attains five years of vesting service, at which time the participant vests fully.

## Pension Plan

The Pension Plan is a tax-qualified, defined benefit pension plan that we maintain, covering substantially all employees who have attained age 21 and completed one year of service with us. Amendments were made to the Pension Plan, effective January 1, 2012, that limit participation in the Pension Plan to those individuals who were hired (or rehired) prior to January 1, 2012. Each of the current Named Executive Officers is eligible to participate in the Pension Plan. Pension Plan benefits are based on an employee's years of service and compensation, up to limits imposed by law. Specifically, the normal retirement benefit under the Pension Plan for service after December 31, 1988 is a monthly payment commencing at age 65 calculated as follows:

- 1% of the participant's highest average monthly compensation for the 36-consecutive month period during which the participant's compensation was the highest;

- multiplied by the participant's full and partial years of credited service under the Pension Plan.

For purposes of the Pension Plan, compensation includes the non-deferred base salary paid to each employee (which includes Semi-Monthly Base Salary under our Executive Compensation Program), as well as overtime pay, shift differentials, non-deferred bonuses paid under our corporate-wide annual bonus program or pursuant to a functional incentive plan (excluding the value of any stock options or cash equivalents), commissions and salary reductions under the Thrift/401(k) Savings Plan and the Flexible Benefits Plan, and qualified transportation benefits under Internal Revenue Code Section 132(f)(4). Compensation does not include, among other things, supplemental compensation plans providing temporary pay, deferrals under the Executive Compensation Program, or amounts paid after termination of employment other than amounts included in a final paycheck.

Notwithstanding the lump sum nature of the disclosure in the preceding table, for 2011 lump sum payments were not permitted under the Pension Plan if the present value of the accrued benefit would equal or exceed $25,000. The normal form of benefit under the Pension Plan is an annuity providing monthly payments for the life of the participant (and a survivor annuity for the participant's spouse if applicable). Optional forms of benefit payment are available. A benefit with an actuarial present value equal to or less than $5,000 may only be paid as a lump sum.

Throughout 2011, participants under the Pension Plan who terminate employment before age 55 with at least five years of service are considered "terminated vested" participants. Such participants may commence their benefit under the Pension Plan as early as age 55. The benefit is equal to the vested portion of the participant's accrued benefit, reduced by 1/180th for each of the first 60 months, and by 1/360th for each of the next 60 months, by which the commencement of such benefits precedes age 65.

An early retirement benefit is available to a participant who terminates employment on or after age 55 with at least five years of service. For service before January 1, 2011, this early retirement benefit is reduced by 3% for each year (prorated monthly for partial years) by which the commencement of such benefits precedes the earlier of: (a) the

participant's attainment of age 65; or (b) the participant's attainment of age 62 or later with at least 15 years of service. For service after December 31, 2010, the reduction is 5% for each year (prorated monthly for partial years) by which the commencement of benefits precedes the participant's attainment of age 65. For participants with service prior to January 1, 2011 and after December 31, 2010, the reductions are separately calculated, and the early retirement benefit is the sum of the two calculations. Death benefits are available provided the participant completed at least five years of service prior to death.

**Supplemental Executive Retirement Plan — Pension SERP Benefit**

The Pension SERP Benefit component of the SERP is designed to provide participants with the full amount of benefits to which they would have been entitled under the Pension Plan if that plan: (a) was not subject to certain limits on compensation that can be taken into account under the Internal Revenue Code; and (b) did not exclude from "compensation" Deferred Base Salary and amounts deferred under our EDCP. For example, the Pension Plan is only permitted under the Internal Revenue Code to consider the first $245,000 of an employee's compensation during 2011 for the purpose of determining the participant's compensation-based normal retirement benefit. Effective January 1, 2010, the SERP was amended to provide that the maximum covered compensation for purposes of the SERP, relative to a Covered Officer, may not exceed two times the Covered Officer's Semi-Monthly Base Salary. We believe the Pension SERP Benefit is an appropriate benefit because offering such a benefit helps us remain competitive with companies in the Comparator Group.

The Pension SERP Benefit is calculated as the participant's accrued annual benefit payable at age 65 (or current age, if greater) under the Pension Plan without application of the limits described in the preceding paragraph, less the participant's actual accrued benefit under the Pension Plan. The Pension SERP Benefit is vested for each participant to the same extent that the participant is vested in the corresponding benefit under the Pension Plan.

To be eligible for the Pension SERP Benefit for any year, the Named Executive Officer must be eligible to participate in the Pension Plan. Each of the Named Executive Officers is eligible to participate in the Pension Plan. Eligibility for the Pension SERP Benefit and the Pension Plan has been eliminated for employees (including executive officers) hired or rehired after January 1, 2012. See "Other Executive Compensation Considerations — Supplemental Executive Retirement Plan" above.

Pension SERP Benefits that vest on or after January 1, 2005 are generally distributed in a lump sum after separation from service and are payable 90 days after the end of the calendar year in which separation occurs. Subject to plan limitations and restrictions under Internal Revenue Code Section 409A, employees may elect that this portion of the Pension SERP Benefit be paid upon separation in the form of a single life annuity at age 65 or in reasonably equal annual installments over five, 10 or 15 years (including interest). Under IRS rules, distributions to so-called "key employees" (as defined by the IRS in regulations concerning Internal Revenue Code Section 409A) on account of separation from service may not commence earlier than six months from the key employee's separation from service. Payments under the SERP will be delayed if necessary to meet this requirement. In the case of death, the Pension SERP Benefit is distributed as a lump sum within 90 days of such event.

Pension SERP Benefits that vested prior to January 1, 2005 are generally distributed after separation from service (other than retirement) in the form of a single life annuity commencing at age 65. In the case of retirement, the vested pre-2005 Pension SERP Benefit is combined with the vested pre-2005 Thrift/401(k) SERP Benefit and is paid out in the form of a single life annuity payable at age 65 (or in a series of reasonably equal installments over 15 years commencing with retirement if actuarial estimates indicate that payment form would yield a longer period of payment). In the case of death, the vested pre-2005 Pension SERP Benefit is paid in the form of a lump sum within 90 days of such event.

**Non-qualified Deferred Compensation**

*Executive Deferred Compensation Plan*

The EDCP is a non-qualified plan and is unfunded (benefits are paid from our general assets). The EDCP has, in the past, allowed the Named Executive Officers to defer receipt of a portion of their annual base pay and cash bonus (and to defer settlement of RSUs granted between 2002 and 2007). In both December 2010 and December 2011, we advised participants in the EDCP that we are suspending deferrals of pay under the EDCP during calendar year 2011 and 2012. We will review future deferral options during the fourth quarter of 2012. None of the Named Executive Officers has a balance under the EDCP.

*Supplemental Executive Retirement Plan — Thrift/401(k) SERP Benefit*

The Thrift/401(k) SERP Benefit component of the SERP is an unfunded, nonqualified defined contribution plan designed to provide participants with the full amount of benefits that they would have been entitled to under the Thrift/401(k) Savings Plan if that plan: (a) was not subject to certain limits on compensation that can be taken into account under the Internal Revenue Code; and (b) did not exclude from compensation Deferred Base Salary and amounts deferred under our EDCP. For example, in 2011 under the Internal Revenue Code, only the first $245,000 of an employee's compensation is considered when determining our percentage-based matching contribution and the basic contribution for any participant in the Thrift/401(k) Savings Plan. Effective January 1, 2010, the SERP was amended to provide that the maximum covered compensation for purposes of the SERP, relative to a Covered Officer, may not exceed two times the Covered Officer's Semi-Monthly Base Salary. We believe the Thrift/401(k) SERP Benefit is an appropriate benefit because offering such a benefit helps us remain competitive with companies in the Comparator Group.

The Thrift/401(k) SERP Benefit equals the amount of the employer matching contributions and basic contribution for each Named Executive Officer that would have been made to the Thrift/401(k) Savings Plan during the year, based upon the participant's eligible compensation, without application of the above limits, less the amount of the matching contributions and basic contribution actually made to the Thrift/401(k) Savings Plan during the year. Participants are credited with earnings or losses in their Thrift/401(k) SERP Benefit accounts based upon each participant's individual direction of the investment of such notional amounts among the virtual investment funds available under the SERP. Such investment options are based upon and mirror the performance of the investment options available under the Thrift/401(k) Savings Plan. As of December 31, 2011, there were 21 investment options in which participants' notional amounts could be deemed invested.

To be eligible for the Thrift/401(k) SERP Benefit, the Named Executive Officer must be eligible for matching contributions and basic contributions under the Thrift/401(k) Savings Plan for part of the year. In addition, to be eligible for the portion of the Thrift/401(k) SERP Benefit attributable to employer matching contributions, the Named Executive Officer must contribute the maximum amount permitted under the terms of the Thrift/401(k) Savings Plan on a pre-tax basis throughout the entire portion of the year in which the Named Executive Officer is eligible to make such contributions. The portion of the Thrift/401(k) SERP Benefit that is attributable to employer matching contributions is vested when accrued, while the accrual relating to the basic contribution paid prior to 2008 is subject to five-year cliff vesting, the accrual relating to the basic contribution attributable to calendar years 2008-2011 is subject to five-year graded vesting of 20% per year, and the accrual relating to the new employer discretionary contribution (which will replace the basic contribution for 2012) will be subject to three-year cliff vesting. The Thrift/401(k) SERP Benefits that vest on or after January 1, 2005 are generally distributed in a lump sum payable 90 days after the end of the calendar year in which separation from service occurs. A six-month delay in commencement of distributions on account of separation from service applies to key employees, in accordance with Internal Revenue Code Section 409A. If the Named Executive Officer dies, the vested Thrift/401(k) SERP Benefit is paid in the form of a lump sum within 90 days of death.

Thrift/401(k) SERP Benefits that vested prior to January 1, 2005 are generally distributed after separation from service (other than retirement) in the form of three reasonably equal annual installments, starting in the first quarter of the calendar year following the year in which the separation from service occurs. In the case of retirement, the vested pre-2005 Thrift/401(k) SERP Benefit is combined with the vested pre-2005 Pension SERP Benefit and is payable in the form of a single life annuity at age 65 (or in a series of reasonably equal installments over 15 years commencing with retirement if actuarial estimates indicate that this payment form would yield a longer period of payment). In the case of death, the vested pre-2005 Thrift/401(k) SERP Benefit is paid in the form of a lump sum within 90 days of such event.

The following table shows the contributions, earnings, withdrawals and distributions, and accumulated balances under the Thrift/401(k) SERP Benefit for each Named Executive Officer. As of December 31, 2011, none of the Named Executive Officers was a participant in the EDCP.

**Table 90 — Non-Qualified Deferred Compensation**

| Name | Executive Contribution in Last FY ($)[1] | Freddie Mac Accruals in Last FY ($)[2] | Aggregate Earnings in Last FY ($)[3] | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at Last FYE ($)[4] |
|---|---|---|---|---|---|
| Mr. Haldeman | | | | | |
| Thrift/401(k) SERP Benefit . . . . . . . . . . . . . . . . . . . . . . | $— | $47,250 | $    38 | $— | $ 69,793 |
| Mr. Kari | | | | | |
| Thrift/401(k) SERP Benefit . . . . . . . . . . . . . . . . . . . . . . | — | 33,750 | 4 | — | 33,754 |
| Mr. Renzi | | | | | |
| Thrift/401(k) SERP Benefit . . . . . . . . . . . . . . . . . . . . . . | — | 18,082 | 2 | — | 18,084 |
| Mr. Weiss | | | | | |
| Thrift/401(k) SERP Benefit . . . . . . . . . . . . . . . . . . . . . . | — | 40,500 | (13,175) | — | 344,818 |
| Ms. Wisdom | | | | | |
| Thrift/401(k) SERP Benefit . . . . . . . . . . . . . . . . . . . . . . | — | 28,688 | 64 | — | 74,717 |

(1) The SERP does not allow for employee contributions.
(2) Amounts reported reflect our accruals under the Thrift/401(k) SERP Benefit during 2011. These amounts are also reported in the "All Other Compensation" column in "Table 85 — Summary Compensation Table — 2011".
(3) Amounts reported represent the total interest and other earnings credited to each Named Executive Officer under the Thrift/401(k) SERP Benefit.
(4) Amounts reported reflect the accumulated balances under the Thrift/401(k) SERP Benefit for each Named Executive Officer. Under the Thrift/401(k) SERP Benefit, matching contribution accruals vest immediately, whereas the basic contribution accruals relating to the basic contribution paid prior to 2008 are subject to cliff vesting of 100% at the end of five years and the accruals relating to the basic contribution paid in 2008 and later years are subject to five-year graded vesting of 20% per year. Messrs. Haldeman, Kari, and Renzi, and Ms. Wisdom have not met the five-year vesting requirement for the basic contribution. Mr. Weiss is fully vested in his account. The difference in the aggregate balance above and the vested balance is equal to the non-vested basic contribution plus earnings. The vested and non-vested components under the Thrift/401(k) SERP Benefit for each Named Executive Officer are as follows: (i) Mr. Haldeman: vested balance: $69,793; non-vested balance: $0; (ii) Mr. Kari: vested balance: $33,754; non-vested balance: $0; (iii) Mr. Renzi: vested balance: $18,084; non-vested balance: $0; (iv) Mr. Weiss: vested balance: $344,818; non-vested balance: $0; (v) Ms. Wisdom: vested balance: $71,469; non-vested balance: $3,248. Messrs. Haldeman, Kari and Renzi do not have an unvested balance since no basic contributions have been made since they joined the company. For a more detailed discussion of the matching contribution accruals and basic contribution accruals, see "Supplemental Executive Retirement Plan — Thrift/401(k) SERP Benefit" above.

The following 2010 Thrift/401(k) SERP Benefit accrual amounts were reported in the column "All Other Compensation" in the 2010 Summary Compensation Table as compensation for each Named Executive Officer for whom such accruals were made and reported during 2010 as follows: (a) Mr. Haldeman: $22,500; and (b) Mr. Kari: $0. See our Form 10-K filed on February 24, 2011. Messrs. Haldeman and Kari both had accruals of $0 during 2009 because, based on their hire dates, they were not eligible for Thrift/401(k) SERP Benefit accruals. See Amendment No. 2 to our Form 10-K filed on April 12, 2010. In addition, Messrs. Renzi and Weiss and Ms. Wisdom had Thrift/401(k) SERP Benefit accrual amounts of $0, $57,300 and $33,529 respectively for 2010, although this was not reported in the Summary Compensation Table because they were not Named Executive Officers for 2010.

## Potential Payments Upon Termination of Employment or Change-in-Control

We have entered into certain agreements and maintain certain plans that call for us to pay compensation to our Named Executive Officers in the event of a termination of employment with us. The compensation and benefits potentially payable to each Named Executive Officer if the officer had terminated his employment under various circumstances as of December 31, 2011 are described in the discussion and reported in the table below. For more information, see "Employment and Separation Agreements" below. FHFA reviewed the terms of the employment agreements for Messrs. Haldeman and Kari and approved the termination benefits set forth therein. The actual payment of any level of termination benefits is subject to FHFA review and approval.

We are not obligated to provide any additional compensation to our Named Executive Officers in connection with a change in control.

Each of our Named Executive Officers is subject to a restrictive covenant agreement with us. Each agreement provides that the Named Executive Officer will not seek employment with designated competitors for a specified period immediately following termination of employment, regardless of whether the executive's employment is terminated by the executive, by us, or by mutual agreement. The specified period is 24 months for Messrs. Haldeman and Kari and 12 months for Messrs. Renzi and Weiss and Ms. Wisdom. During the 12-month period immediately following termination, each executive also agrees not to: (a) solicit or recruit any of our managerial employees; (b) compete against us in any of our business activities; or (c) make disparaging remarks about us. The agreement also provides for confidentiality of information that constitutes trade secrets or proprietary or other confidential information.

As of December 31, 2011, Mr. Weiss had vested in his benefits under the Thrift/401(k) SERP Benefit and the Pension SERP Benefit, while Messrs. Haldeman, Kari and Renzi and Ms. Wisdom had not. The amounts presented in the table below do not include vested balances in the Thrift/401(k) SERP Benefit or vested benefits in the Pension SERP Benefit, because such vesting was not in connection with a termination or change-in-control. Amounts shown in the tables also do not include certain items available to all employees generally upon a termination event.

For RSUs, the value shown in the table is calculated on a grant-by-grant basis by multiplying the number of unvested RSUs by the closing price of our common stock on December 30, 2011. No value is included in the tables for stock options because the exercise prices for all such options held by Named Executive Officers are substantially higher than the closing price of our common stock on December 30, 2011.

*Potential Payments to Current Named Executive Officers*

The Executive Compensation Program addresses the treatment of Semi-Monthly Base Salary, Deferred Base Salary, and the Target Opportunity upon various termination events. In order to be eligible to receive any portion of a Target Opportunity installment payment, a Covered Officer must have been employed for a minimum of four whole calendar months during the performance year to which the award applies.

Additionally, none of the Covered Officers are guaranteed termination benefits upon any type of termination event other than death or disability and the actual payment of any level of termination benefits is subject to FHFA review and approval at the time of payment. The discussion that follows describes the termination benefits, if any, provided upon various types of termination events.

- *Death.*    Any earned but unpaid Deferred Base Salary or Target Opportunity installments will be paid as soon as administratively possible in the event of death. If, at the time of death, the funding level has not been determined, the award will remain outstanding until such determination is made. Payment will occur as soon as administratively possible following the determination of the funding level.

- *Disability.*    Treatment upon a Long-Term Disability (as defined in the Executive Compensation Program) is the same as upon death, except that payment of any Deferred Base Salary will occur in accordance with the approved payment schedule and not as soon as administratively possible following termination of employment.

- *Retirement.*    Treatment upon an eligible Retirement (as defined in the Executive Compensation Program) is the same as upon Long-Term Disability, except that only a pro-rata portion of a Target Opportunity installment payment will occur based on the number of whole months worked in the performance year during which the officer retires. No information is provided in the table below with respect to a termination of employment on account of a retirement because none of the Named Executive Officers was retirement-eligible under the Executive Compensation Program as of December 31, 2011.

- *Voluntary or For Cause.*    The Named Executive Officers are not entitled to any termination benefits in the event of a voluntary termination or a termination for cause and all earned but unpaid Deferred Base Salary and the unpaid portion of any outstanding Target Opportunity awards are forfeited.

- *Involuntary Termination Without Cause.*    The Named Executive Officers are not entitled to any termination benefits in the event of an involuntary termination without cause unless the Compensation Committee recommends that the Named Executive Officer receive termination benefits and the Committee's recommendation is approved by FHFA after consulting with Treasury, as appropriate. In determining whether to recommend payment of termination benefits and the amount of such benefits, the Compensation Committee will take into account one or more factors that it determines are relevant, including:

  - The facts and circumstances associated with the termination;

  - The performance and contributions of the Named Executive Officer during his or her tenure with us;

  - The amount of earned but unpaid Deferred Base Salary as of the date of termination; and

  - Our need to provide reasonable and competitive termination benefits in order to attract and retain high caliber executives during conservatorship.

Under interim guidance from FHFA, the amount of any termination benefits recommended by the Compensation Committee in the event of an involuntary termination without cause may not exceed $1 million and must also be limited to the greater of:

  - 100% of the Named Executive Officer's earned but unpaid Deferred Base Salary as of the date of termination; or,

  - 2/3rds of the Named Executive Officer's earned but unpaid Deferred Base Salary as of the date of termination plus a supplemental amount not to exceed 2/3rds of the Named Executive Officer's Semi-Monthly Base Salary.

The following table describes the potential payments as of December 31, 2011 upon termination of the Named Executive Officers employed as of that date that results from death or disability. There are no payments or benefits

payable upon termination of employment for other reasons or upon a change-in-control. Additionally, Semi-Monthly Base Salary is only payable through the date of death or a termination resulting from disability. The amounts presented in this table do not include vested balances in the Thrift/401(k) SERP Benefit, or vested benefits in the Pension SERP Benefit as of December 31, 2011, because such vesting was not in connection with a termination or change- in-control. Amounts shown in the table also do not include certain items available to all employees generally upon a termination event. Additional information is provided in the footnotes following the table.

**Table 91 — Potential Payments Upon Termination of Employment or Change-in-Control as of December 31, 2011**

| | Death | Disability |
|---|---|---|
| **Charles E. Haldeman, Jr.** | | |
| Compensation: | | |
| Deferred Base Salary[1] | $2,898,500 | $2,898,500 |
| Target Opportunity[2] | — | — |
| Benefits: | | |
| Non-Qualified Pension[3] | — | 387,519 |
| Total | $2,898,500 | $3,286,019 |
| **Ross J. Kari** | | |
| Compensation: | | |
| Deferred Base Salary[1] | $1,550,542 | $1,550,542 |
| Target Opportunity[2] | 988,771 | 988,771 |
| Benefits: | | |
| Non-Qualified Pension[3] | — | 148,391 |
| Total | $2,539,313 | $2,687,704 |
| **Anthony N. Renzi** | | |
| Compensation: | | |
| Deferred Base Salary[1] | $1,108,188 | $1,108,188 |
| Target Opportunity[2] | 447,223 | 447,223 |
| Benefits: | | |
| Non-Qualified Pension[3] | — | 52,718 |
| Total | $1,555,411 | $1,608,129 |
| **Jerry Weiss** | | |
| Compensation: | | |
| Deferred Base Salary[1] | $ 950,584 | $ 950,584 |
| Target Opportunity[2] | 618,732 | 618,732 |
| Equity Awards[4] | 1,214 | 1,214 |
| Total | $1,570,530 | $1,570,530 |
| **Paige H. Wisdom** | | |
| Compensation: | | |
| Deferred Base Salary[1] | $ 693,459 | $ 693,459 |
| Target Opportunity[2] | 484,223 | 484,223 |
| Equity Awards(4) | 1,753 | 1,753 |
| Benefits: | | |
| Non-Qualified Pension[3] | — | 136,130 |
| Non-Qualified Deferred Compensation[3] | — | 3,248 |
| Total | $1,179,435 | $1,318,813 |

(1) The amount reported as Deferred Base Salary is equal to any earned but unpaid Deferred Base Salary, adjusted to reflect the approved funding level.
(2) The amounts reported under Target Opportunity are equal to the first installment associated with the 2011 Target Opportunity and the second installment associated with the 2010 Target Opportunity. Both amounts have been adjusted to reflect the approved funding levels and the individual differentiation based on division and/or individual performance.
(3) The amounts reported under Non-Qualified Pension and Non-Qualified Deferred Compensation reflect the non-vested Pension SERP Benefit and the non-vested Thrift/401(k) SERP Benefit, respectively, as of December 31, 2011. Under the terms of the SERP, a participant continues to accrue service while disabled (as defined in the SERP).
(4) The amount reported under Equity Awards reflects the immediate vesting of the Named Executive Officer's outstanding RSU grants in the event of death or disability. Death also results in the immediate settlement of the outstanding RSUs, while a Disability event results in continued vesting of all grants in accordance with the vesting schedule outlined in the award agreement as if termination had not occurred. The values shown were calculated by multiplying the number of RSUs that will continue to vest by the closing price or our common stock on December 30, 2011 ($0.212), the last trading day of the year.

*Alternative Settlement Provisions for Equity Awards in the Event of Certain Terminations*

*RSUs*

The RSUs awarded to our employees, including our Named Executive Officers, contain alternative settlement provisions in the event of certain terminations, as follows:

• **Death.**   Immediate vesting and settlement occurs in the event of death.

- **Disability and Retirement.**   In the event of disability, normal retirement, or a retirement other than a normal retirement (all as defined in the 2004 Employee Plan), RSUs will vest immediately and will be settled in accordance with the vesting schedule outlined in the award agreement as if termination had not occurred. This treatment is subject to the executive's signing an agreement containing certain restrictive covenants to protect our business interests. Violation of any of the covenants results in the forfeiture of unsettled shares and the requirement to repay any after-tax gain realized from the settlement of shares within 12 months of the forfeiture event.

- **Involuntary Termination Without Cause.**   In the event of an involuntary termination other than for cause, the Compensation Committee may, contingent on approval from FHFA, provide for RSUs to vest immediately and settle in accordance with the vesting schedule outlined in the award agreement as if termination had not occurred. Under interim guidance provided by FHFA, this provision is limited to awards scheduled to vest within 12 months of the executive's termination date.

- **All Other Terminations.**   If the Named Executive Officer's employment is terminated for any reason other than those described above, all RSUs unvested as of the date of termination are forfeited.

<u>Stock Options</u>

The stock options granted to our employees, including our Named Executive Officers, all of which were exercisable as of December 31, 2011, include alternative settlement provisions in the event of certain terminations which are similar to the provisions for RSUs, with the following modifications:

- **Death.**   The stock options remain exercisable until the earlier of the original expiration date or three years after the date of termination in the event of death.

- **Disability.**   The stock options remain exercisable for the full balance of their term in the event of disability.

- **Retirement.**   In the event of retirement, as defined in the 2004 Employee Plan, stock options will remain exercisable for the full balance of their term, subject to the executive's signing an agreement containing the same restrictive covenants as described above for RSUs.

- **All Other Terminations.**   If the individual's employment is terminated for any reason other than those described above, the stock options remain exercisable until the earlier of the original expiration date or 90 days following termination.

## Employment and Separation Agreements

### Messrs. Haldeman and Kari

The various agreements entered into in connection with the employment of Messrs. Haldeman and Kari are summarized above. See "— Written Agreements Relating to Employment of CEO and CFO."

### Messrs. Renzi and Weiss and Ms. Wisdom

We do not have any continuing obligations under the letter agreements that were entered into with Mr. Renzi, Mr. Weiss and Ms. Wisdom at the time of their employment.

## Director Compensation

After we entered conservatorship, FHFA approved compensation for Board members in the form of cash retainers only, paid on a quarterly basis. Under the terms of the Purchase Agreement, without Treasury's consent, we are prohibited from making stock grants to directors while this agreement remains in effect. We do not maintain any pension or retirement plans for directors. Non-employee directors are reimbursed for reasonable out-of-pocket costs for attending each meeting of the Board or a Board committee of which they are a member.

The reasons for this shift toward compensation delivered entirely in cash were similar, in the case of director compensation, to some of those described above regarding the structural change in executive compensation (see "Overview — Executive Management Compensation Program — Overview of Program Structure"). However, the considerations underlying director and executive compensation differed in one key respect. There is no provision in the director compensation program for pay that varies depending on business results. While such incentive compensation is deemed appropriate to give management strong incentives to devise and execute business plans and achieve positive financial results, it is viewed in the case of directors as inconsistent with their oversight role.

Board compensation levels during conservatorship are shown in the table below.

## Table 92 — Board Compensation — 2011 Non-Employee Director Compensation Levels

**Board Service**

Cash Compensation

| | |
|---|---|
| Annual Retainer | $160,000 |
| Annual Retainer for Non-Executive Chairman | 290,000 |

**Committee Service** (Cash)

| | |
|---|---|
| Annual Retainer for Audit Committee Chair | $ 25,000 |
| Annual Retainer for Business and Risk Committee Chair | 15,000 |
| Annual Retainer for Committee Chairs (other than Audit or Business and Risk) | 10,000 |
| Annual Retainer for Audit Committee Members | 10,000 |

The following table summarizes the 2011 compensation provided to all persons who served as non-employee directors during 2011.

## Table 93 — 2011 Director Compensation

| Name | Fees Earned or Paid in Cash | Change in Pension Value and Nonqualified Deferred Compensation Earnings[5] | All Other Compensation[6] | Total |
|---|---|---|---|---|
| C. Lynch[1] | $193,356 | $ | $ — | $193,356 |
| J. Koskinen[2] | 290,000 | | 19,150 | 309,150 |
| L. Bammann | 175,000 | | 2,500 | 177,500 |
| C. Byrd | 170,000 | | 1,370 | 171,370 |
| R. Glauber[2][3][4] | 180,000 | | 20,000 | 200,000 |
| L. Hirsch | 160,000 | | 20,000 | 180,000 |
| N. Retsinas[3] | 160,000 | | 3,450 | 163,450 |
| C. Rose[1] | 163,736 | | — | 163,736 |
| E. Shanks, Jr[1] | 170,000 | | 20,000 | 190,000 |
| A. Williams[1] | 171,495 | | — | 171,495 |

(1) Amounts include additional compensation earned by the designated directors in their new roles on the Board beginning on the effective date of their appointments. Mr. Lynch's appointment was effective as of December 2, 2011; the appointments of the new Committee chairs were effective as of November 7, 2011. Their roles and additional compensation during 2011 are as follows: Mr. Lynch (Non-Executive Chairman) — $8,356; Mr. Rose (Audit Committee chair) — $3,736; and Mr. Williams (Compensation Committee chair) — $1,495. Mr. Shanks' 2011 compensation was not affected by the change in his responsibilities from Compensation Committee chair to chair of the Nominating and Governance Committee.

(2) Amounts shown reflect compensation actually paid to Messrs. Koskinen and Glauber during 2011. In accordance with established practice for payment of director compensation, annual retainers and committee fees are paid in advance at the beginning of each quarter. As a result of the changes in board assignments and responsibilities described in Note 1 above, the compensation earned by Messrs. Koskinen and Glauber during the fourth quarter of 2011 was less than the amounts paid to them at the beginning of the quarter. The overpayments were deducted from the amounts paid to those directors in January 2012, for the first quarter of 2012, as follows: Mr. Koskinen — $10,598; Mr. Glauber — $1,495.

(3) At December 31, 2011, the aggregate number of common shares underlying the outstanding RSU awards that had not vested and were held by each non-employee director was as follows: Mr. Glauber — 1,253 shares; and Mr. Retsinas — 1,253 shares.

(4) At December 31, 2011, the aggregate number of common shares underlying outstanding option awards, exercisable and unexercisable, held by each non-employee director was as follows: Mr. Glauber — 1,822 shares.

(5) We do not have any pension or retirement plans for our non-employee directors.

(6) In 2011, the Freddie Mac Foundation provided a dollar-for-dollar match to eligible organizations and institutions, up to an aggregate amount of $20,000 per director per calendar year. Matching contributions made to charities designated by the non-employee directors were as follows: Mr. Koskinen, $19,150; Ms. Bammann, $2,500; Ms. Byrd, $1,370; Mr. Glauber, $20,000; Mr. Hirsch, $20,000; Mr. Retsinas, $3,450; and Mr. Shanks, Jr., $20,000.

*Indemnification.* We have also made arrangements to indemnify our directors against certain liabilities which are similar to the terms on which our executive officers are indemnified. For a description of such terms, see "— Written Agreements Relating to Employment of CEO and CFO."

FHFA 3064

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

### Security Ownership

Our only class of voting stock is our common stock. (Upon its appointment as Conservator, FHFA immediately succeeded to the voting rights of holders of our common stock.) The following table shows the beneficial ownership of our common stock as of March 6, 2012 by our current directors, our Named Executive Officers, all of our directors and executive officers as a group, and holders of more than 5% of our common stock. Beneficial ownership is determined in accordance with SEC rules for computing the number of shares of common stock beneficially owned by a person and the percentage ownership of that person. As of March 6, 2012, each director and Named Executive Officer, and all of our directors and executive officers as a group, owned less than 1% of our outstanding common stock. The information presented below is based on information provided to us by the individuals or entities specified in the table.

**Table 94 — Stock Ownership by Directors, Executive Officers, and Greater-Than-5% Holders**

| Name | Position | Common Stock Beneficially Owned Excluding Stock Options[1] | Stock Options Exercisable Within 60 Days of March 6, 2012 | Total Common Stock Beneficially Owned |
|---|---|---|---|---|
| Linda B. Bammann . . . . . . . . . . . . . . . | Director | — | — | — |
| Carolyn H. Byrd . . . . . . . . . . . . . . . . | Director | — | — | — |
| Christopher S. Lynch . . . . . . . . . . . . . | Director | — | — | — |
| Nicolas P. Retsinas. . . . . . . . . . . . . . . | Director | 9,552[2] | — | 9,552 |
| Clayton S. Rose  . . . . . . . . . . . . . . . . | Director | — | — | — |
| Eugene B. Shanks, Jr.  . . . . . . . . . . . . . | Director | — | — | — |
| Anthony A. Williams . . . . . . . . . . . . . | Director | — | — | — |
| Charles E. Haldeman, Jr. . . . . . . . . . . . | Chief Executive Officer | — | — | — |
| Ross J. Kari . . . . . . . . . . . . . . . . . . . | EVP — Chief Financial Officer | — | — | — |
| Anthony N. Renzi . . . . . . . . . . . . . . . . | EVP — Single Family Business, Ops. and Tech. | — | — | — |
| Jerry Weiss. . . . . . . . . . . . . . . . . . . . | EVP — Chief Administrative Officer | 37,842[3] | 16,590 | 54,432 |
| Paige H. Wisdom. . . . . . . . . . . . . . . . . | EVP — Chief Enterprise Risk Officer | 25,458[4] | — | 25,458 |
| *All directors and executive officers as a group (18 persons)* | | *123,984[5]* | *35,548* | *159,532* |

| 5% Holder | Common Stock Beneficially Owned | Percent of Class |
|---|---|---|
| U.S. Department of the Treasury 1500 Pennsylvania Avenue, NW Washington, D.C. 20220 | Variable[6] | 79.9% |

(1) Includes shares of stock beneficially owned as of March 6, 2012. Also includes RSUs vesting within 60 days of March 6, 2012. An RSU represents a conditional contractual right to receive one share of our common stock at a specified future date. See "Executive Compensation — Compensation Discussion and Analysis" above for more information.
(2) Includes 5,613 RSUs and 150 dividend equivalents on RSUs.
(3) Includes 5,276 RSUs.
(4) Includes 8,270 RSUs.
(5) Includes 30,299 RSUs and 150 dividend equivalents on RSUs.
(6) In September 2008, we issued to Treasury a warrant to purchase, for one one-thousandth of a cent ($0.00001) per share, shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis at the time the warrant is exercised. The warrant may be exercised in whole or in part at any time until September 7, 2028. As of the date of this filing, Treasury has not exercised the warrant. The information above assumes Treasury beneficially owns no other shares of our common stock.

### Securities Authorized for Issuance Under Equity Compensation Plans

The following table provides information about our common stock that may be issued upon the exercise of options, warrants, and rights under our existing equity compensation plans at December 31, 2011. Our stockholders have approved the ESPP, the 2004 Employee Plan, the 1995 Employee Plan, and the Directors' Plan. We suspended the operation of these plans following our entry into conservatorship and are no longer granting awards under such plans.

**Table 95 — Equity Compensation Plan Information**

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by stockholders................. | 2,554,155[1] | $47.63[2] | 34,931,333[3] |
| Equity compensation plans not approved by stockholders .............. | None | N/A | None |

(1) Includes 532,523 restricted stock units and shares of restricted stock issued under the Directors' Plan and the Employee Plans.
(2) For the purpose of calculating this amount, the restricted stock units and shares of restricted stock are assigned a value of zero.
(3) Includes 27,466,099 shares, 5,845,739 shares, and 1,619,495 shares available for issuance under the 2004 Employee Plan, the ESPP and the Directors' Plan, respectively. No shares are available for issuance under the 1995 Employee Plan.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

**Policy Governing Related Person Transactions**

The Board has adopted a written policy governing the approval of related person transactions. This policy sets forth procedures for the review and approval or ratification of transactions involving related persons, which consist of any person who is, or was at any time since the beginning of our last completed fiscal year, a director, a director nominee, an executive officer, or an immediate family member of any of the foregoing persons.

Under authority delegated by the Board, our General Counsel and the Nominating and Governance Committee (or its Chair under certain circumstances), each, an Authorized Approver, are responsible for applying the Related Person Transactions Policy. Transactions covered by the Related Person Transactions Policy consist of any transaction, arrangement or relationship or series of similar transactions, arrangements or relationships, in which: (a) the aggregate amount involved exceeded or is expected to exceed $120,000; (b) we were or are expected to be a participant; and (c) any related person had or will have a direct or indirect material interest. The Related Person Transactions Policy includes a list of categories of transactions identified by the Board as having no significant potential for an actual conflict of interest or the appearance of a conflict or improper benefit to a related person, and thus not subject to review.

Our Legal Division assesses whether any proposed transaction involving a related person is covered by the Related Person Transactions Policy. If so, the transaction is reviewed by the appropriate Authorized Approver. In consultation with the Chair of the Nominating and Governance Committee, the General Counsel may refer any proposed transaction to the Nominating and Governance Committee for review and approval.

If possible, approval of a related person transaction is obtained prior to the effectiveness or consummation of the transaction. If advance approval of a related person transaction by the appropriate Authorized Approver is not feasible or otherwise not obtained, then the transaction is considered promptly by the appropriate Authorized Approver to determine whether ratification is warranted.

In determining whether to approve or ratify a related person transaction covered by the Related Person Transactions Policy, the appropriate Authorized Approver reviews and considers all relevant information which may include: (a) the nature of the related person's interest in the transaction; (b) the approximate total dollar value of, and extent of the related person's interest in, the transaction; (c) whether the transaction was or would be undertaken in the ordinary course of our business; (d) whether the transaction is proposed to be, or was, entered into on terms no less favorable to us than terms that could have been reached with an unrelated third party; and (e) the purpose, and potential benefits to us, of the transaction.

**Corporate Governance Guidelines**

In June 2011, the Board adopted our amended Corporate Governance Guidelines, or our Guidelines, which are available on our website at www.freddiemac.com/governance/pdf/gov_guidelines.pdf.

**Director Independence**

The non-employee members of the Board evaluated the independence, as defined in both Sections 4 and 5 of our Guidelines and in Section 303A.02 of the NYSE Listed Company Manual, of the members of our Board who have served in 2012, each of whom also served on our Board in 2011. In connection with that evaluation, the non-employee members of the Board determined that all current members of our Board (other than Charles E. Haldeman, Jr., our CEO) were independent during their service in 2011 and 2012. Mr. Haldeman is not considered an independent director because he is our CEO.

The non-employee members of the Board also concluded that all current members of the Audit Committee, the Compensation Committee, and the Nominating and Governance Committee are independent within the meaning of both Sections 4 and 5 of our Guidelines and Section 303A.02 of the NYSE Listed Company Manual. The non-employee members of the Board also determined that all current members of the Audit Committee are independent within the meaning of Rule 10A-3 promulgated under the Exchange Act, and Section 303A.06 of the NYSE Listed Company Manual.

In determining the independence of each Board member, the non-employee members of the Board reviewed the following categories or types of relationships, in addition to those specifically addressed by the standards contained in Section 5 of our Guidelines, to determine whether those relationships, either individually or when aggregated with other

relationships, would constitute a material relationship between the Director and us that would impair a Director's judgment as a member of the Board or create the perception or appearance of such an impairment:

- *Board Memberships With For-Profit Business Partners.*   Mses. Bammann and Byrd and Messrs. Glauber, Lynch, Retsinas, Rose and Shanks serve as directors of other companies that engage or have engaged in business with us resulting in payments between us and such companies during the past three fiscal years. After considering the nature and extent of the specific relationship between each of those companies and us, and the fact that these Board members are directors of these other companies rather than employees, the non-employee members of the Board concluded that those business relationships did not constitute material relationships between any of the Directors and us that would impair their independence as our Directors.

- *Board Memberships With Charitable Organizations To Which We Have Made Contributions.* Mr. Retsinas serves as a board member of a charitable organization that has received monetary contributions from us or the Freddie Mac Foundation. The total annual amount contributed was below the applicable threshold in our Guidelines that would require a specific determination that Mr. Retsinas is independent in spite of the contributions. The non-employee members of the Board considered the contributions and the nature of the organization and concluded that the relationship with the charitable organization did not constitute a material relationship between Mr. Retsinas and us that would impair his independence as our Director.

- *Board Members Who Are Executive Officers Or Employees Of Business Partners.* Mr. Williams was appointed as Executive Director of the Government Practice at The Corporate Executive Board Company in January 2010 and served in that role during 2011. In January 2012, Mr. Williams became a Senior Fellow of the Government Practice of CEB. CEB provides best practices research and analysis and executive education to corporations through memberships in various subject-matter interest groups organized and managed by CEB. Mr. Williams' responsibilities at CEB include contributing to and authoring literature; advising on the development of CEB's state and local government service strategy and its existing federal government service offerings; and promoting future CEB services. In 2009, 2010, 2011 and 2012 year-to-date, we paid CEB $362,100, $515,700, $447,500 and $492,400, respectively, for memberships in certain of CEB's subject-matter interest groups. Currently, we are a member of 14 CEB groups, and in 2009, 2010 and 2011 we were a member of 11, 12 and 13 groups, respectively. The annual amounts of our payments to CEB in 2009 and 2010 were substantially below 2% of CEB's annual revenues for the applicable years and the 2011 and 2012 payments are substantially less than 2% of CEB's 2010 revenues (the latest year for which CEB revenue is publicly available). Therefore, under our Guidelines, those annual payments do not preclude the non-employee members of the Board from concluding that Mr. Williams is independent. The non-employee members of the Board considered those payments and the nature and extent of the relationship between us and CEB and concluded that this business relationship did not constitute a material relationship between Mr. Williams and us that would impair Mr. Williams' independence as our Director.

- *Financial Relationships with For-Profit Business Partners.* Since 2005, Ms. Bammann has owned stock of JPMorgan Chase & Co., or JPMorgan. In the aggregate, this stock represents a material portion of her net worth. JPMorgan conducts significant business with Freddie Mac, including, among other things, as a single-family and multifamily seller/servicer, as an underwriter of our debt and mortgage securities and as a capital markets counterparty. In order to eliminate any potential conflict of interest that might arise as a result of this stock ownership, Ms. Bammann has agreed to recuse herself from discussing and acting upon any matters that are to be considered by the full Board or any of the committees of which she is a member (including the Business and Risk Committee, which she chairs), and that relate directly to JPMorgan, and that therefore might affect the value of her JPMorgan stock. The Audit Committee Chairman, in consultation with the Non-Executive Chairman, will address any questions that may arise regarding whether recusal from a particular discussion or action is appropriate.

In evaluating Ms. Bammann's independence in light of her ownership of JPMorgan stock, the non-employee members of the Board considered the nature and extent of Freddie Mac's business relationship with JPMorgan and any potential impact that her stock ownership might have on her independent judgment as a Freddie Mac director, taking into account the recusal arrangement. The non-employee members of the Board concluded that Ms. Bammann's recusal arrangement concerning JPMorgan would address any actual or potential conflicts of interest that might arise with respect to her ownership of JPMorgan stock. Accordingly, the non-employee members concluded that Ms. Bammann's ownership of JPMorgan stock does not constitute a material relationship between her and Freddie Mac that would impair her independence as a Freddie Mac Director.

Mr. Rose receives an annuity and retiree medical benefits from JPMorgan in connection with his retirement from that firm in 2001. The amount of Mr. Rose's annuity is fixed and does not depend in any way on JPMorgan's revenues or

profits. In evaluating the impact of Mr. Rose's annuity from JPMorgan on his independence, the non-employee members of the Board considered the structure of the annuity, the amount of the annuity as a percentage of Mr. Rose's annual adjusted gross income, the retiree medical benefits and Freddie Mac's business relationship with JPMorgan. The non-employee members of the Board also were informed that Mr. Rose had agreed to recuse himself from discussing or acting upon any matter to be considered by our Board that could threaten the viability of JPMorgan. The non-employee members of the Board concluded that Mr. Rose's JPMorgan annuity and retiree medical benefits do not constitute a material relationship between him and Freddie Mac that would impair his independence as a Freddie Mac Director.

## Board Diversity

The Board identifies Director nominees or candidates when the Conservator has requested that the Board identify candidates for the Conservator to consider for election by written consent and when there is a vacancy on the Board, at which time the Board may exercise the authority delegated to it by the Conservator to fill such vacancies, subject to review by the Conservator.

Our charter provides that our Board must at all times have at least one person from the homebuilding, mortgage lending, and real estate industries, and at least one person from an organization representing community or consumer interests or one person who has demonstrated a career commitment to the provision of housing for low-income households. In addition, the examination guidance for corporate governance issued by FHFA provides that in identifying individuals for nomination for election to the Board, the Board should consider the knowledge of such individuals, as a group, in the areas of business, finance, accounting, risk management, public policy, mortgage lending, real estate, low-income housing, homebuilding, regulation of financial institutions, and any other areas that may be relevant to our safe and sound operation.

In addition, the Board has adopted a formal policy (articulated in our Guidelines) with regard to the consideration of diversity in identifying director nominees and candidates. As articulated in the policy, the Board seeks to have a diversity of talent, perspectives, experience and cultures among its members, including minorities, women and individuals with disabilities, and considers such diversity in the candidate solicitation and nomination processes. The policy also states that the Board seeks to have a diversity of talent on the Board and that candidates are selected, in part, for their experience and expertise. The policy also explains that when identifying director nominees, the Nominating and Governance Committee considers, among other factors, our needs, the talents and skills then available on the Board, and, with respect to incumbent directors, their continued involvement in business and professional activities relevant to us, the skills and experience that should be represented on the Board, the availability of other individuals with desirable skills to join the Board, and the desire to maintain a diverse Board.

FHFA also has adopted a final rule regarding minority and women inclusion that became effective on January 28, 2011. The final rule implements section 1116 of HERA and requires us to, among other things, promote diversity and the inclusion of women, minorities, and individuals with disabilities in all activities, including in the election of directors, as required by these regulations.

## Board Leadership Structure and Role in Risk Oversight

The positions of Chief Executive Officer and Non-Executive Chairman of the Board are held by different individuals. This leadership structure was established by the Conservator when it appointed separate individuals to hold those two positions in September 2008. The examination guidance for corporate governance issued by FHFA provides that once separated, the functions of the Chief Executive Officer and the Non-Executive Chairman of the Board should remain separated until such time as the Director of FHFA determines otherwise.

The responsibility for risk oversight is shared by two committees of the Board, the Business and Risk Committee and the Audit Committee. The Business and Risk Committee is responsible for assisting the Board in the oversight, on an enterprise-wide basis, of our risk management framework, including management of credit risk (including counterparty risk), market risk (including interest rate and liquidity risk), model risk, operational risk, strategic risk, and reputation risk. The risk oversight responsibilities of the Audit Committee include reviewing: (a) management's guidelines and policies governing the processes for assessing and managing our risks; and (b) our major financial risk exposures (including but not limited to market, credit, and operational risks) and the steps management has taken to monitor and control such exposures.

The Business and Risk Committee and the Audit Committee generally meet in joint session at least quarterly to carry out their respective risk oversight responsibilities on behalf of the Board. The membership of those two committees collectively consists of all members of the Board except Messrs. Koskinen and Haldeman, who generally also have

attended the joint sessions. Copies of the Charters of the Audit Committee and the Business and Risk Committee are available on our website at http://www.freddiemac.com/governance/bd__committees.html.

The Chief Enterprise Risk Officer reports regularly to the joint meetings of the Business and Risk Committee and the Audit Committee. The Chief Enterprise Risk Officer also reports to the full Board as appropriate.

For a discussion of the Compensation Committee's conclusion that our compensation policies and practices do not create risks that are reasonably likely to have a material adverse effect on us, see "Executive Compensation — Compensation and Risk."

### Transactions with 5% Shareholders

As a result of our issuance to Treasury of the warrant to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding, on a fully diluted basis, we are deemed a related party to the U.S. government. Except for the transactions with Treasury discussed in "BUSINESS — Executive Summary — Government Support for our Business," "BUSINESS - Regulation and Supervision — Legislative and Regulatory Developments — Legislated Increase to Guarantee Fees," "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Related Parties as a Result of Conservatorship" as well as in "NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS," and "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)," no transactions outside of normal business activities have occurred between us and the U.S. government since the beginning of 2011.

FHFA, as conservator, approved the Purchase Agreement and our administrative role in the MHA Program and the Memorandum of Understanding with Treasury, FHFA, and Fannie Mae (see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Housing Finance Agency Initiative"). The remaining transactions described in the sections referenced above did not require review and approval under any of our policies and procedures relating to transactions with related persons.

In addition, we are deemed related parties with Fannie Mae as both we and Fannie Mae have the same relationships with FHFA and Treasury. All transactions between us and Fannie Mae have occurred in the normal course of business.

### Transactions with Institutions Related to Directors

In the ordinary course of business, we were a party during 2011, and expect to continue to be a party during 2012, to certain business transactions with institutions affiliated with members of our Board. Management believes that the terms and conditions of the transactions were no more and no less favorable to us than the terms of similar transactions with unaffiliated institutions to which we are, or expect to be, a party. The only such transaction that is required to be disclosed under SEC rules is described below.

Mr. Williams joined our Board in December 2008. In January of 2010, he was appointed Executive Director of the Government Practice at CEB and since January 2012 he has served as a Senior Fellow. CEB provides best practices research and analysis and executive education to corporations through memberships in various subject-matter interest groups organized and managed by CEB. Mr. Williams' responsibilities at CEB include contributing to and authoring literature; advising on the development of CEB's state and local government service strategy and its existing federal government service offerings; and promoting future CEB services. We purchased memberships in certain membership groups, and paid CEB approximately $447,500 and $492,400 for those memberships, in 2011 and 2012 year-to-date, respectively.

This transaction was not required to be reviewed, approved or ratified under our Related Person Transactions Policy because the Board concluded that our business relationship with CEB did not constitute a material relationship between Mr. Williams and us that would impair Mr. Williams' independence as our director.

### Transactions with Institutions Related to Executive Officers

Mr. Renzi joined us in April 2010 and currently serves as our Executive Vice President — Single Family Business, Operations and Technology. Prior to joining Freddie Mac, he served as the Chief Operating Officer of GMAC Residential Capital and as President of GMAC Mortgage Corporation. That employment ended in March 2010.

GMAC Residential Capital, LLC, GMAC Mortgage Corporation, GMAC Mortgage, LLC, and Residential Funding Company, LLC are all affiliated entities, and are now reorganized as subsidiaries of Ally Financial Inc., or Ally.

GMAC Mortgage, LLC, is a seller/servicer that sold mortgages to Freddie Mac with an aggregate unpaid principal balance of approximately $15.8 billion in 2011, and mortgages with an aggregate unpaid principal balance of approximately $1.2 billion through January 31, 2012.

GMAC Mortgage, LLC and Residential Funding Company, LLC (indirect subsidiaries of Ally) are seller/servicers that together serviced and subserviced for an affiliated entity approximately 3.6% of the single-family loans in our single-family credit guarantee portfolio as of December 31, 2011. In 2012, these entities continue to service and subservice our single-family loans in our single-family credit guarantee portfolio.

At the time Mr. Renzi joined us, he was entitled to payments from Ally consisting of unpaid deferred stock units granted during his employment. At that time, the remaining payments had an aggregate grant date value of approximately $860,000. The aggregate amount actually paid may be either higher or lower based on Ally's value. Payments are scheduled to be made in cash semi-monthly and will continue through March 2015.

In order to eliminate any potential conflict of interest, Mr. Renzi, in his capacity as an employee of Freddie Mac, has been, and will continue to be, recused from any transactions with or decisions relating to Ally or its affiliates through such time that he has received his last payment from Ally and its affiliates. Specifically, Mr. Renzi has been recused from serving as the final decision-maker, and from influencing final decisions, relating to: (a) any and all aspects of Freddie Mac's relationship with Ally or its affiliates pertaining to both performing and non-performing loan servicing; (b) any other business transactions with Ally or its affiliates or their status as a counterparty with us; or (c) reviews of Ally or its affiliates by our MHA — Compliance function under the Financial Agency Agreement with Treasury.

Mr. Renzi's relationship with Ally and its affiliates was not required to be reviewed, approved or ratified under our Related Person Transactions Policy because Mr. Renzi, in his capacity as an employee, is recused from any involvement in transactions with or decisions relating to Ally and its affiliates for the period that he is receiving payments on unpaid stock units. For this reason, Mr. Renzi does not have a material interest in our relationship with Ally or its affiliates.

**Conservatorship Agreements**

Treasury, FHFA, and the Board of Governors of the Federal Reserve System have taken a number of actions to support us during conservatorship, including entering into the Purchase Agreement, described in this Form 10-K. See "BUSINESS — Conservatorship and Related Matters — Treasury Agreements," "BUSINESS — Executive Summary — Government Support for our Business" and "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Related Parties as a Result of Conservatorship."

## ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES

### Description of Fees

The following is a description of fees billed to us by PricewaterhouseCoopers LLP, our independent public accountants, during 2011 and 2010.

### Table 96 — Auditor Fees[1]

|  | 2011 | 2010 |
|---|---|---|
| Audit Fees[2] | $25,617,867 | $29,484,646 |
| Audit-Related Fees[3] | 8,725 | 18,000 |
| Tax Fees[4] | 3,040,750 | 3,050,000 |
| All Other Fees[5] | 11,399 | 148,805 |
| Total | $28,678,741 | $32,701,451 |

(1) These fees represent amounts billed within the designated year and include reimbursable expenses of $283,246 and $436,051 for 2011 and 2010, respectively.

(2) Audit fees include fees and expenses billed by PricewaterhouseCoopers in connection with the SAS 100 quarterly reviews of our interim financial information and the audit of our annual consolidated financial statements. The audit fees billed during 2011 include fees and expenses related to the 2010 ($7,902,260) and 2011 ($17,727,006) audits. In addition to the amounts shown above, approximately $12.3 million of fees and reimbursable expenses will be billed in 2012 for the 2011 audit. The audit fees billed during 2010 include fees and expenses related to the 2009 ($8,839,260) and 2010 ($20,645,386) audits. Audit fees of $83,020 and $95,542 in 2011 and 2010, respectively, related to the Freddie Mac Foundation are excluded because these fees are incurred and paid separately by the Freddie Mac Foundation.

(3) The 2011 and 2010 audit-related fees resulted from renewals of our Comperio subscription ($8,725 and $18,000, respectively).

(4) The tax fees billed in 2011 related to non-audit tax compliance services including the preparation of the company's 2010 tax return. The tax fees billed in 2010 covered services related to the preparation of the company's 2009 tax returns, preparation of quarterly estimated tax calculations and other services related to improving Freddie Mac's annual tax compliance process ($3,000,000), as well as process documentation services and tax accounting method change services ($50,000).

(5) All other fees for 2011 and 2010 resulted from fees and expenses billed by PricewaterhouseCoopers for the performance of non-audit advisory services related to a preliminary assessment of certain aspects of the company's technology implementation ($11,399) and management's reorganization of our Finance Division ($148,805), respectively.

### Approval of Independent Auditor Services and Fees

As provided in its charter, the Audit Committee appoints, subject to FHFA approval, our independent public accounting firm and reviews the scope of the annual audit and pre-approves, subject (as required) to FHFA approval, all audit and non-audit services permitted under applicable law to be performed by the independent public accounting firm.

The Sarbanes-Oxley Act and related rules adopted by the SEC require that all services provided to companies subject to the reporting requirements of the Exchange Act by their independent auditors be pre-approved by their audit committee or by authorized members of the committee, with certain exceptions. The Audit Committee's charter requires that the Audit Committee pre-approve any audit services, and any non-audit services permitted under applicable law, to be performed by our independent auditors (or to designate one or more members of the Audit Committee to pre-approve such services and report such pre-approval to the Audit Committee).

Audit services that are within the scope of an auditor's engagement approved by the Audit Committee prior to the performance of those services are deemed pre-approved and do not require separate pre-approval. Audit services not within the scope of an Audit Committee-approved engagement, as well as permissible non-audit services, must be separately pre-approved by the Audit Committee.

When the Audit Committee pre-approves a service, the Audit Committee typically sets a dollar limit for such service. Management endeavors to obtain pre-approval of the Audit Committee, or of the Chairman of the Audit Committee (when the Chairman of the Audit Committee has been delegated such authority), before it incurs fees exceeding the dollar limit. If the Chairman of the Audit Committee approves the increase, the Chairman will report such approval at the Audit Committee's next scheduled meeting.

The pre-approval procedure is administered by our senior financial management, which reports throughout the year to the Audit Committee. The Audit Committee pre-approved all audit, audit-related, tax, and other services performed in 2010 and 2011.

**PART IV**

**ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

(a) Documents filed as part of this report:

(1) Consolidated Financial Statements

The consolidated financial statements required to be filed in this annual report on Form 10-K are included in Part II, Item 8.

(2) Financial Statement Schedules

None.

(3) Exhibits

An Exhibit Index has been filed as part of this annual report on Form 10-K beginning on page E-1 and is incorporated herein by reference.

FHFA 3073

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Federal Home Loan Mortgage Corporation

By: /s/  Charles E. Haldeman, Jr.

Charles E. Haldeman, Jr.
Chief Executive Officer

Date:  March 9, 2012

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Capacity | Date |
|---|---|---|
| /s/  Christopher S. Lynch*<br>Christopher S. Lynch | Non-Executive Chairman of the Board | March 9, 2012 |
| /s/  Charles E. Haldeman, Jr.<br>Charles E. Haldeman, Jr. | Chief Executive Officer and Director<br>(Principal Executive Officer) | March 9, 2012 |
| /s/  Ross J. Kari<br>Ross J. Kari | Executive Vice President — Chief Financial Officer<br>(Principal Financial Officer) | March 9, 2012 |
| /s/  Robert D. Mailloux<br>Robert D. Mailloux | Senior Vice President — Corporate Controller and<br>Principal Accounting Officer (Principal Accounting Officer) | March 9, 2012 |
| /s/  Linda B. Bammann*<br>Linda B. Bammann | Director | March 9, 2012 |
| /s/  Carolyn H. Byrd*<br>Carolyn H. Byrd | Director | March 9, 2012 |
| /s/  Nicolas P. Retsinas*<br>Nicolas P. Retsinas | Director | March 9, 2012 |
| /s/  Clayton S. Rose*<br>Clayton S. Rose | Director | March 9, 2012 |
| /s/  Eugene B. Shanks, Jr.*<br>Eugene B. Shanks, Jr. | Director | March 9, 2012 |
| /s/  Anthony A. Williams*<br>Anthony A. Williams | Director | March 9, 2012 |

*By: /s/  Ross J. Kari

Ross J. Kari
Attorney-in-Fact

*Freddie Mac*

FHFA 3074

# GLOSSARY

This Glossary includes acronyms and defined terms that are used throughout this Form 10-K.

**1995 Employee Plan** — 1995 Stock Compensation Plan, as amended

**2004 Employee Plan** — 2004 Stock Compensation Plan, as amended and restated June 6, 2008

**Administration** — Executive branch of the U.S. Government.

**Agency securities** — Generally refers to mortgage-related securities issued by the GSEs or government agencies.

**Alt-A loan** — Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. In determining our Alt-A exposure on loans underlying our single-family credit guarantee portfolio, we classified mortgage loans as Alt-A if the lender that delivers them to us classified the loans as Alt-A, or if the loans had reduced documentation requirements, as well as a combination of certain credit characteristics and expected performance characteristics at acquisition which, when compared to full documentation loans in our portfolio, indicate that the loan should be classified as Alt-A. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-K and our other financial reports because the new refinance loan replacing the original loan would not be identified by the servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. For non-agency mortgage-related securities that are backed by Alt-A loans, we categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions.

**AMT** — Alternative Minimum Tax

**AOCI** — Accumulated other comprehensive income (loss), net of taxes

**ARM** — Adjustable-rate mortgage — A mortgage loan with an interest rate that adjusts periodically over the life of the mortgage loan based on changes in a benchmark index.

**Board** — Board of Directors

**Bond insurers** — Companies that provide credit insurance principally covering securitized assets in both the primary issuance and secondary markets.

**BPS** — Basis points — One one-hundredth of 1%.   This term is commonly used to quote the yields of debt instruments or movements in interest rates.

**Cash and other investments portfolio** — Our cash and other investments portfolio is comprised of our cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and investments in non-mortgage-related securities.

**CD&A** — Compensation Discussion and Analysis

**CEB** — The Corporate Executive Board Company

**CEO** — Chief Executive Officer

**CFO** — Chief Financial Officer

**Charter** — The Federal Home Loan Mortgage Corporation Act, as amended, 12 U.S.C. § 1451 et seq.

**CMBS** — Commercial mortgage-backed security — A security backed by mortgages on commercial property (often including multifamily rental properties) rather than one-to-four family residential real estate. Although the mortgage pools underlying CMBS can include mortgages financing multifamily properties and commercial properties, such as office buildings and hotels, the classes of CMBS that we hold receive distributions of scheduled cash flows only from multifamily properties. Military housing revenue bonds are included as CMBS within investments-related disclosures. We have not identified CMBS as either subprime or Alt-A securities.

**Conforming loan/Conforming jumbo loan/Conforming loan limit** — A conventional single-family mortgage loan with an original principal balance that is equal to or less than the applicable conforming loan limit, which is a dollar amount cap on the size of the original principal balance of single-family mortgage loans we are permitted by law to purchase or securitize. The conforming loan limit is determined annually based on changes in FHFA's housing price index. Any decreases in the housing price index are accumulated and used to offset any future increases in the housing price index so that conforming loan limits do not decrease from year-to-year. Since 2006, the base conforming loan limit for a one-family residence has been set at $417,000, and higher limits have been established in certain "high-cost" areas (currently, up to $625,500 for a one-family residence). Higher limits also apply to two- to four-family residences, and for mortgages secured by properties in Alaska, Guam, Hawaii and the U.S. Virgin Islands.

Actual loan limits are set by FHFA for each county (or equivalent), and the loan limit for specific high-cost areas may be lower than the maximum amounts. We refer to loans that we have purchased with UPB exceeding the base conforming loan limit (*i.e.*, $417,000) as conforming jumbo loans.

Beginning in 2008, pursuant to a series of laws, our loan limits in certain high-cost areas were increased temporarily above the limits that otherwise would have been applicable (up to $729,750 for a one-family residence). The latest of these increases expired on September 30, 2011.

**Conservator** — The Federal Housing Finance Agency, acting in its capacity as conservator of Freddie Mac.

**Convexity** — A measure of how much a financial instrument's duration changes as interest rates change.

**Core spread income** — Refers to a fair value estimate of the net current period accrual of income from the spread between mortgage-related investments and debt, calculated on an option-adjusted basis.

**Covered Officer** — Those executives in the following positions, each of whom are compensated pursuant to the Executive Management Compensation Program: (a) Chief Executive Officer; (b) Chief Operating Officer; (c) Chief Financial Officer; (d) all Executive Vice Presidents; and (e) all Senior Vice Presidents. Each of the Named Executive Officers is a Covered Officer.

**Credit enhancement** — Any number of different financial arrangements that are designed to reduce credit risk by partially or fully compensating an investor in the event of certain financial losses. Examples of credit enhancements include mortgage insurance, overcollateralization, indemnification agreements, and government guarantees.

**Credit losses** — Consists of charge-offs and REO operations income (expense).

**Credit-related expenses** — Consists of our provision for credit losses and REO operations income (expense).

**Deed in lieu of foreclosure** — An alternative to foreclosure in which the borrower voluntarily conveys title to the property to the lender and the lender accepts such title (sometimes together with an additional payment by the borrower) in full satisfaction of the mortgage indebtedness.

**Delinquency** — A failure to make timely payments of principal or interest on a mortgage loan. For single-family mortgage loans, we generally report delinquency rate information for loans that are seriously delinquent. For multifamily loans, we report delinquency rate information based on the UPB of loans that are two monthly payments or more past due or in the process of foreclosure.

**Derivative** — A financial instrument whose value depends upon the characteristics and value of an underlying financial asset or index, such as a security or commodity price, interest or currency rates, or other financial indices.

**Directors' Plan** — 1995 Directors' Stock Compensation Plan, as amended and restated

**Dodd-Frank Act** — Dodd-Frank Wall Street Reform and Consumer Protection Act.

**DSCR** — Debt Service Coverage Ratio — An indicator of future credit performance for multifamily loans. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

**Duration** — Duration is a measure of a financial instrument's price sensitivity to changes in interest rates.

**Duration gap** — One of our primary interest-rate risk measures. Duration gap is a measure of the difference between the estimated durations of our interest rate sensitive assets and liabilities. We present the duration gap of our financial instruments in units expressed as months. A duration gap of zero implies that the change in value of our interest rate

sensitive assets from an instantaneous change in interest rates would be expected to be accompanied by an equal and offsetting change in the value of our debt and derivatives, thus leaving the net fair value of equity unchanged.

**EDCP** — Executive Deferred Compensation Plan

**Effective rent** — The average rent actually paid by the tenant over the term of a lease.

**ESPP** — Employee Stock Purchase Plan

**Euribor** — Euro Interbank Offered Rate

**EVP** — Executive Vice President

**Exchange Act** — Securities and Exchange Act of 1934, as amended

**Executive Compensation Program** — Executive Management Compensation Program, as amended and restated

**Fannie Mae** — Federal National Mortgage Association

**FASB** — Financial Accounting Standards Board

**FDIC** — Federal Deposit Insurance Corporation

**Federal Reserve** — Board of Governors of the Federal Reserve System

**FHA** — Federal Housing Administration

**FHFA** — Federal Housing Finance Agency — FHFA is an independent agency of the U.S. government established by the Reform Act with responsibility for regulating Freddie Mac, Fannie Mae, and the FHLBs.

**FHLB** — Federal Home Loan Bank

**FICO score** — A credit scoring system developed by Fair, Isaac and Co. FICO scores are the most commonly used credit scores today. FICO scores are ranked on a scale of approximately 300 to 850 points with a higher value indicating a lower likelihood of credit default.

**Fixed-rate mortgage** — Refers to a mortgage originated at a specific rate of interest that remains constant over the life of the loan.

**Foreclosure alternative** — A workout option pursued when a home retention action is not successful or not possible. A foreclosure alternative is either a short sale or deed in lieu of foreclosure.

**Foreclosure transfer** — Refers to our completion of a transaction provided for by the foreclosure laws of the applicable state, in which a delinquent borrower's ownership interest in a mortgaged property is terminated and title to the property is transferred to us or to a third party. State foreclosure laws commonly refer to such transactions as foreclosure sales, sheriff's sales, or trustee's sales, among other terms. When we, as mortgage holder, acquire a property in this manner, we pay for it by extinguishing some or all of the mortgage debt.

**Freddie Mac mortgage-related securities** — Securities we issue and guarantee, including PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions.

**GAAP** — Generally accepted accounting principles

**Ginnie Mae** — Government National Mortgage Association

**GSE Act** — The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Reform Act.

**GSEs** — Government sponsored enterprises — Refers to certain legal entities created by the U.S. government, including Freddie Mac, Fannie Mae, and the FHLBs.

**Guarantee fee** — The fee that we receive for guaranteeing the payment of principal and interest to mortgage security investors.

**Guidelines** — Corporate Governance Guidelines, as revised

**HAFA** — Home Affordable Foreclosures Alternative program — In 2009, the Treasury Department introduced the HAFA program to provide an option for HAMP-eligible homeowners who are unable to keep their homes. The HAFA program took effect on April 5, 2010 and we implemented it effective August 1, 2010.

**HAMP** — Home Affordable Modification Program — Refers to the effort under the MHA Program whereby the U.S. government, Freddie Mac and Fannie Mae commit funds to help eligible homeowners avoid foreclosure and keep their homes through mortgage modifications.

**HARP** — Home Affordable Refinance Program — Refers to the effort under the MHA Program that seeks to help eligible borrowers (whose monthly payments are current) with existing loans that are guaranteed by us or Fannie Mae to refinance into loans with more affordable monthly payments and/or fixed-rate terms. Through December 2011, under HARP, eligible borrowers who had mortgages with current LTV ratios above 80% and up to 125% were allowed to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place. Beginning December 2011, HARP was expanded to allow eligible borrowers who have mortgages with current LTV ratios above 125% to refinance under the program. The relief refinance initiative, under which we also allow borrowers with LTV ratios of 80% and below to participate, is our implementation of HARP for our loans.

**HFA** — State or local Housing Finance Agency

**HUD** — U.S. Department of Housing and Urban Development — Prior to the enactment of the Reform Act, HUD had general regulatory authority over Freddie Mac, including authority over our affordable housing goals and new programs. Under the Reform Act, FHFA now has general regulatory authority over us, though HUD still has authority over Freddie Mac with respect to fair lending.

**Implied volatility** — A measurement of how the value of a financial instrument changes due to changes in the market's expectation of potential changes in future interest rates. A decrease in implied volatility generally increases the estimated fair value of our mortgage assets and decreases the estimated fair value of our callable debt and options-based derivatives, while an increase in implied volatility generally has the opposite effect.

**Interest-only loan** — A mortgage loan that allows the borrower to pay only interest (either fixed-rate or adjustable-rate) for a fixed period of time before principal amortization payments are required to begin. After the end of the interest-only period, the borrower can choose to refinance the loan, pay the principal balance in total, or begin paying the monthly scheduled principal due on the loan.

**IRS** — Internal Revenue Service

**LIBOR** — London Interbank Offered Rate

**LIHTC partnerships** — Low-income housing tax credit partnerships — Prior to 2008, we invested as a limited partner in LIHTC partnerships, which are formed for the purpose of providing funding for affordable multifamily rental properties. These LIHTC partnerships invest directly in limited partnerships that own and operate multifamily rental properties that generate federal income tax credits and deductible operating losses.

**Liquidation preference** — Generally refers to an amount that holders of preferred securities are entitled to receive out of available assets, upon liquidation of a company. The initial liquidation preference of our senior preferred stock was $1.0 billion. The aggregate liquidation preference of our senior preferred stock includes the initial liquidation preference plus amounts funded by Treasury under the Purchase Agreement. In addition, dividends and periodic commitment fees not paid in cash are added to the liquidation preference of the senior preferred stock. We may make payments to reduce the liquidation preference of the senior preferred stock only in limited circumstances.

**LTV ratio** — Loan-to-value ratio — The ratio of the unpaid principal amount of a mortgage loan to the value of the property that serves as collateral for the loan, expressed as a percentage. Loans with high LTV ratios generally tend to have a higher risk of default and, if a default occurs, a greater risk that the amount of the gross loss will be high compared to loans with lower LTV ratios. We report LTV ratios based solely on the amount of the loan purchased or guaranteed by us, generally excluding any second lien mortgages (unless we own or guarantee the second lien).

**MD&A** — Management's Discussion and Analysis of Financial Condition and Results of Operations

**MHA Program** — Making Home Affordable Program — Formerly known as the Housing Affordability and Stability Plan, the MHA Program was announced by the Obama Administration in February 2009. The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. The MHA Program includes HARP and HAMP.

**Mortgage assets** — Refers to both mortgage loans and the mortgage-related securities we hold in our mortgage-related investments portfolio.

**Mortgage-related investments portfolio** — Our investment portfolio, which consists principally of mortgage-related securities and single-family and multifamily mortgage loans. The size of our mortgage-related investments portfolio under the Purchase Agreement is determined without giving effect to the January 1, 2010 change in accounting guidance related to transfers of financial assets and consolidation of VIEs. Accordingly, for purposes of the portfolio limit, when PCs and certain Other Guarantee Transactions are purchased into the mortgage-related investments portfolio, this is considered the acquisition of assets rather than the reduction of debt.

**Mortgage-to-debt OAS** — The net OAS between the mortgage and agency debt sectors. This is an important factor in determining the expected level of net interest yield on a new mortgage asset. Higher mortgage-to-debt OAS means that a newly purchased mortgage asset is expected to provide a greater return relative to the cost of the debt issued to fund the purchase of the asset and, therefore, a higher net interest yield. Mortgage-to-debt OAS tends to be higher when there is weak demand for mortgage assets and lower when there is strong demand for mortgage assets.

**MRA** — Matter requiring attention

**Multifamily mortgage** — A mortgage loan secured by a property with five or more residential rental units.

**Multifamily mortgage portfolio** — Consists of multifamily mortgage loans held by us on our consolidated balance sheets as well as those underlying non-consolidated Freddie Mac mortgage-related securities, and other guarantee commitments, but excluding those underlying our guarantees of HFA bonds under the HFA Initiative.

**Net worth (deficit)** — The amount by which our total assets exceed (or are less than) our total liabilities as reflected on our consolidated balance sheets prepared in conformity with GAAP.

**NIBP** — New Issue Bond Program is a component of the Housing Finance Agency Initiative in which we and Fannie Mae issued partially-guaranteed pass-through securities to Treasury that are backed by bonds issued by various state and local HFAs. The program provides financing for HFAs to issue new housing bonds. Treasury is obligated to absorb any losses under the program up to a certain level before we are exposed to any losses.

**NPV** — Net present value

**NYSE** — New York Stock Exchange

**OAS** — Option-adjusted spread — An estimate of the incremental yield spread between a particular financial instrument (*e.g.*, a security, loan or derivative contract) and a benchmark yield curve (*e.g.*, LIBOR or agency or U.S. Treasury securities). This includes consideration of potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as prepayment options.

**OCC** — Office of the Comptroller of the Currency

**OFHEO** — Office of Federal Housing Enterprise Oversight

**Option ARM loan** — Mortgage loans that permit a variety of repayment options, including minimum, interest-only, fully amortizing 30-year and fully amortizing 15-year payments. The minimum payment alternative for option ARM loans allows the borrower to make monthly payments that may be less than the interest accrued for the period. The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance. For our non-agency mortgage-related securities that are backed by option ARM loans, we categorize securities as option ARM if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM securities as either subprime or Alt-A securities.

**OTC** — Over-the-counter

**Other guarantee commitments** — Mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.

**Other Guarantee Transactions** — Transactions in which third parties transfer non-Freddie Mac mortgage-related securities to trusts specifically created for the purpose of issuing mortgage-related securities, or certificates, in the Other Guarantee Transactions.

**PCs** — Participation Certificates — Securities that we issue as part of a securitization transaction. Typically we purchase mortgage loans from parties who sell mortgage loans, place a pool of loans into a PC trust and issue PCs from that trust.

The PCs are generally transferred to the seller of the mortgage loans in consideration of the loans or are sold to third party investors if we purchased the mortgage loans for cash.

**Pension Plan** — Employees' Pension Plan

**Pension SERP Benefit** — The component of the SERP that relates to the Pension Plan.

**PMVS** — Portfolio Market Value Sensitivity — One of our primary interest-rate risk measures. PMVS measures are estimates of the amount of average potential pre-tax loss in the market value of our net assets due to parallel (PMVS-L) and non-parallel (PMVS-YC) changes in LIBOR.

**Primary mortgage market** — The market where lenders originate mortgage loans and lend funds to borrowers. We do not lend money directly to homeowners, and do not participate in this market.

**Purchase Agreement / Senior Preferred Stock Purchase Agreement** — An agreement the Conservator, acting on our behalf, entered into with Treasury on September 7, 2008, which was subsequently amended and restated on September 26, 2008 and further amended on May 6, 2009 and December 24, 2009.

**QSPE** — Qualifying Special Purpose Entity — A term used within the former accounting guidance on transfers and servicing of financial assets to describe a particular trust or other legal vehicle that was demonstrably distinct from the transferor, had significantly limited permitted activities and could only hold certain types of assets, such as passive financial assets. Prior to January 1, 2010, the securitization trusts that were used for the administration of cash remittances received on the underlying assets of our PCs and REMICs and Other Structured Securities were QSPEs and, as such, they were not consolidated.

**Recorded Investment** — The dollar amount of a loan recorded on our consolidated balance sheets, excluding any valuation allowance, such as the allowance for loan losses, but which does reflect direct write-downs of the investment. For mortgage loans, direct write-downs consist of valuation allowances associated with recording our initial investment in loans acquired with evidence of credit deterioration at the time of purchase. Recorded investment excludes accrued interest income.

**Reform Act** — The Federal Housing Finance Regulatory Reform Act of 2008, which, among other things, amended the GSE Act by establishing a single regulator, FHFA, for Freddie Mac, Fannie Mae, and the FHLBs.

**REIT** — Real estate investment trust — To maintain REIT status under the Internal Revenue Code, a REIT must distribute 90% of its taxable earnings to shareholders annually. During the second quarter of 2010, our majority-owned REIT subsidiaries were eliminated via a merger transaction.

**Relief refinance mortgage** — A single-family mortgage loan delivered to us for purchase or guarantee that meets the criteria of the Freddie Mac Relief Refinance Mortgage[SM] initiative. Part of this initiative is our implementation of HARP for our loans, and relief refinance options are also available for certain non-HARP loans. Although HARP is targeted at borrowers with current LTV ratios above 80%, our initiative also allows borrowers with LTV ratios of 80% and below to participate.

**REMIC** — Real Estate Mortgage Investment Conduit — A type of multiclass mortgage-related security that divides the cash flows (principal and interest) of the underlying mortgage-related assets into two or more classes that meet the investment criteria and portfolio needs of different investors.

**REMICs and Other Structured Securities** (or in the case of Multifamily securities, **Other Structured Securities**) — Single- and multiclass securities issued by Freddie Mac that represent beneficial interests in pools of PCs and certain other types of mortgage-related assets. REMICs and Other Structured Securities that are single-class securities pass through the cash flows (principal and interest) on the underlying mortgage-related assets. REMICs and Other Structured Securities that are multiclass securities divide the cash flows of the underlying mortgage-related assets into two or more classes designed to meet the investment criteria and portfolio needs of different investors. Our principal multiclass securities qualify for tax treatment as REMICs.

**REO** — Real estate owned — Real estate which we have acquired through foreclosure or through a deed in lieu of foreclosure.

**RSU** — Restricted stock unit

**S&P** — Standard & Poor's

**SEC** — Securities and Exchange Commission

**Secondary mortgage market** — A market consisting of institutions engaged in buying and selling mortgages in the form of whole loans (*i.e.*, mortgages that have not been securitized) and mortgage-related securities. We participate in the secondary mortgage market by purchasing mortgage loans and mortgage-related securities for investment and by issuing guaranteed mortgage-related securities, principally PCs.

**Senior preferred stock** — The shares of Variable Liquidation Preference Senior Preferred Stock issued to Treasury under the Purchase Agreement.

**Seriously delinquent** — Single-family mortgage loans that are three monthly payments or more past due or in the process of foreclosure as reported to us by our servicers.

**SERP** — Supplemental Executive Retirement Plan

**Short sale** — Typically an alternative to foreclosure consisting of a sale of a mortgaged property in which the homeowner sells the home at market value and the lender accepts proceeds (sometimes together with an additional payment or promissory note from the borrower) that are less than the outstanding mortgage indebtedness in full satisfaction of the loan.

**Single-family credit guarantee portfolio** — Consists of unsecuritized single-family loans, single-family loans held by consolidated trusts, and single-family loans underlying non-consolidated Other Guarantee Transactions and covered by other guarantee commitments. Excludes our REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates and our guarantees under the HFA Initiative.

**Single-family mortgage** — A mortgage loan secured by a property containing four or fewer residential dwelling units.

**Spread** — The difference between the yields of two debt securities, or the difference between the yield of a debt security and a benchmark yield, such as LIBOR.

**Strips** — Mortgage pass-through securities created by separating the principal and interest payments on a pool of mortgage loans. A principal-only strip entitles the security holder to principal cash flows, but no interest cash flows, from the underlying mortgages. An interest-only strip entitles the security holder to interest cash flows, but no principal cash flows, from the underlying mortgages.

**Subprime** — Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Subprime generally refers to the credit risk classification of a loan. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include, among other factors, a combination of high LTV ratios, low credit scores or originations using lower underwriting standards, such as limited or no documentation of a borrower's income. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk. Notwithstanding our historical characterizations of the single family credit guarantee portfolio, certain security collateral underlying our Other Guarantee Transactions have been identified as subprime based on information provided to Freddie Mac when the transactions were entered into. We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions.

**SVP** — Senior Vice President

**Swaption** — An option contract to enter into an interest-rate swap. In exchange for an option premium, a buyer obtains the right but not the obligation to enter into a specified swap agreement with the issuer on a specified future date.

**TBA** — To be announced

**TCLFP** — Temporary Credit and Liquidity Facility Program is a component of the Housing Finance Agency Initiative in which we and Fannie Mae issued credit guarantees to holders of variable-rate demand obligations issued by various state and local HFAs. Treasury is obligated to absorb any losses under the program up to a certain level before we are exposed to any losses. The program is scheduled to expire on December 31, 2012; however, Treasury has given participants the option to extend the program facility to December 31, 2015.

**TDC** — Total direct compensation

**TDR** — Troubled debt restructuring — A type of loan modification in which the changes to the contractual terms result in concessions to borrowers that are experiencing financial difficulties.

**Thrift/401(k) SERP Benefit** — The component of the SERP that relates to the Thrift/401(k) Savings Plan.

**TO** — Target Incentive Opportunity, or Target Opportunity

**Total comprehensive income (loss)** — Consists of net income (loss) plus total other comprehensive income (loss).

**Total other comprehensive income (loss)** — Consists of the after-tax changes in: (a) the unrealized gains and losses on available-for-sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans.

**Total mortgage portfolio** — Includes mortgage loans and mortgage-related securities held on our consolidated balance sheets as well as the balances of our non-consolidated issued and guaranteed single-class and multiclass securities, and other mortgage-related financial guarantees issued to third parties.

**Treasury** — U.S. Department of the Treasury

**UPB** — Unpaid principal balance

**USDA** — U.S. Department of Agriculture

**VA** — U.S. Department of Veteran Affairs

**VIE** — Variable Interest Entity — A VIE is an entity: (a) that has a total equity investment at risk that is not sufficient to finance its activities without additional subordinated financial support provided by another party; or (b) where the group of equity holders does not have: (i) the ability to make significant decisions about the entity's activities; (ii) the obligation to absorb the entity's expected losses; or (iii) the right to receive the entity's expected residual returns.

**Warrant** — Refers to the warrant we issued to Treasury on September 8, 2008 pursuant to the Purchase Agreement. The warrant provides Treasury the ability to purchase shares of our common stock equal to 79.9% of the total number of shares of Freddie Mac common stock outstanding on a fully diluted basis on the date of exercise.

**Workout, or loan workout** — A workout is either: (a) a home retention action, which is either a loan modification, repayment plan, or forbearance agreement; or (b) a foreclosure alternative, which is either a short sale or a deed in lieu of foreclosure.

**XBRL** — eXtensible Business Reporting Language

**Yield curve** — A graphical display of the relationship between yields and maturity dates for bonds of the same credit quality. The slope of the yield curve is an important factor in determining the level of net interest yield on a new mortgage asset, both initially and over time. For example, if a mortgage asset is purchased when the yield curve is inverted, with short-term rates higher than long-term rates, our net interest yield on the asset will tend to be lower initially and then increase over time. Likewise, if a mortgage asset is purchased when the yield curve is steep, with short-term rates lower than long-term rates, our net interest yield on the asset will tend to be higher initially and then decrease over time.

# EXHIBIT INDEX

| Exhibit No. | Description* |
|---|---|
| 3.1 | Federal Home Loan Mortgage Corporation Act (12 U.S.C. §1451 et seq.), as amended through July 21, 2010 (incorporated by reference to Exhibit 3.1 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2010, as filed on August 9, 2010) |
| 3.2 | Bylaws of the Federal Home Loan Mortgage Corporation, as amended and restated June 3, 2011 (incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K as filed on June 7, 2011) |
| 4.1 | Eighth Amended and Restated Certificate of Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Voting Common Stock (no par value per share) dated September 10, 2008 (incorporated by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K as filed on September 11, 2008) |
| 4.2 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Rate, Non-Cumulative Preferred Stock (par value $1.00 per share), dated April 23, 1996 (incorporated by reference to Exhibit 4.2 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.3 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.81% Non-Cumulative Preferred Stock (par value $1.00 per share), dated October 27, 1997 (incorporated by reference to Exhibit 4.3 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.4 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5% Non-Cumulative Preferred Stock (par value $1.00 per share), dated March 23, 1998 (incorporated by reference to Exhibit 4.4 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.5 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.1% Non-Cumulative Preferred Stock (par value $1.00 per share), dated September 23, 1998 (incorporated by reference to Exhibit 4.5 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.6 | Amended and Restated Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Rate, Non-Cumulative Preferred Stock (par value $1.00 per share), dated September 29, 1998 (incorporated by reference to Exhibit 4.6 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.7 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.3% Non-Cumulative Preferred Stock (par value $1.00 per share), dated October 28, 1998 (incorporated by reference to Exhibit 4.7 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.8 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.1% Non-Cumulative Preferred Stock (par value $1.00 per share), dated March 19, 1999 (incorporated by reference to Exhibit 4.8 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.9 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.79% Non-Cumulative Preferred Stock (par value $1.00 per share), dated July 21, 1999 (incorporated by reference to Exhibit 4.9 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.10 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Rate, Non-Cumulative Preferred Stock (par value $1.00 per share), dated November 5, 1999 (incorporated by reference to Exhibit 4.10 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.11 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Rate, Non-Cumulative Preferred Stock (par value $1.00 per share), dated January 26, 2001 (incorporated by reference to Exhibit 4.11 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |

*Freddie Mac*

| Exhibit No. | Description* |
| --- | --- |
| 4.12 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Rate, Non-Cumulative Preferred Stock (par value $1.00 per share), dated March 23, 2001 (incorporated by reference to Exhibit 4.12 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.13 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.81% Non-Cumulative Preferred Stock (par value $1.00 per share), dated March 23, 2001 (incorporated by reference to Exhibit 4.13 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.14 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Rate, Non-Cumulative Preferred Stock (par value $1.00 per share), dated May 30, 2001 (incorporated by reference to Exhibit 4.14 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.15 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 6% Non-Cumulative Preferred Stock (par value $1.00 per share), dated May 30, 2001 (incorporated by reference to Exhibit 4.15 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.16 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.7% Non-Cumulative Preferred Stock (par value $1.00 per share), dated October 30, 2001 (incorporated by reference to Exhibit 4.16 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.17 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.81% Non-Cumulative Preferred Stock (par value $1.00 per share), dated January 29, 2002 (incorporated by reference to Exhibit 4.17 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.18 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Rate, Non-Cumulative Perpetual Preferred Stock (par value $1.00 per share), dated July 17, 2006 (incorporated by reference to Exhibit 4.18 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.19 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 6.42% Non-Cumulative Perpetual Preferred Stock (par value $1.00 per share), dated July 17, 2006 (incorporated by reference to Exhibit 4.19 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.20 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.9% Non-Cumulative Perpetual Preferred Stock (par value $1.00 per share), dated October 16, 2006 (incorporated by reference to Exhibit 4.20 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.21 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.57% Non-Cumulative Perpetual Preferred Stock (par value $1.00 per share), dated January 16, 2007 (incorporated by reference to Exhibit 4.21 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.22 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 5.66% Non-Cumulative Perpetual Preferred Stock (par value $1.00 per share), dated April 16, 2007 (incorporated by reference to Exhibit 4.22 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.23 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 6.02% Non-Cumulative Perpetual Preferred Stock (par value $1.00 per share), dated July 24, 2007 (incorporated by reference to Exhibit 4.23 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.24 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of 6.55% Non-Cumulative Perpetual Preferred Stock (par value $1.00 per share), dated September 28, 2007 (incorporated by reference to Exhibit 4.24 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |

| Exhibit No. | Description* |
|---|---|
| 4.25 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock (par value $1.00 per share), dated December 4, 2007 (incorporated by reference to Exhibit 4.25 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 4.26 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Liquidation Preference Senior Preferred Stock (par value $1.00 per share), dated September 7, 2008 (incorporated by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K as filed on September 11, 2008) |
| 4.27 | Federal Home Loan Mortgage Corporation Global Debt Facility Agreement, dated February 25, 2011 (incorporated by reference to Exhibit 4.1 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2011, as filed on May 4, 2011) |
| 10.1 | Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan (as amended and restated as of June 6, 2008) (incorporated by reference to Exhibit 10.1 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.2 | First Amendment to the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan (incorporated by reference to Exhibit 10.2 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.3 | Second Amendment to the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan (incorporated by reference to Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2009, as filed on August 7, 2009)† |
| 10.4 | Form of Nonqualified Stock Option Agreement for executive officers under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for awards on and after March 4, 2005 but prior to January 1, 2006 (incorporated by reference to Exhibit 10.3 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.5 | Form of Nonqualified Stock Option Agreement for executive officers under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for awards on and after January 1, 2006 (incorporated by reference to Exhibit 10.4 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.6 | Form of Restricted Stock Units Agreement for executive officers under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for awards on and after March 4, 2005 (incorporated by reference to Exhibit 10.5 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.7 | Form of Restricted Stock Units Agreement for executive officers under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for supplemental bonus awards on March 7, 2008 (incorporated by reference to Exhibit 10.6 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.8 | Form of Performance Restricted Stock Units Agreement for executive officers under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for supplemental bonus awards on March 29, 2007 (incorporated by reference to Exhibit 10.7 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.9 | Form of Performance Restricted Stock Units Agreement for executive officers under the Federal Home Loan Mortgage Corporation 2004 Stock Compensation Plan for awards on March 7, 2008 (incorporated by reference to Exhibit 10.8 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.10 | Federal Home Loan Mortgage Corporation Global Amendment to Affected Stock Options under Nonqualified Stock Option Agreements and Separate Dividend Equivalent Rights, effective December 31, 2005 (incorporated by reference to Exhibit 10.9 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.11 | Federal Home Loan Mortgage Corporation Amendment to Restricted Stock Units Agreements and Performance Restricted Stock Units Agreements, dated December 31, 2008 (incorporated by reference to Exhibit 10.10 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2008, as filed on March 11, 2009)† |
| 10.12 | Federal Home Loan Mortgage Corporation 1995 Stock Compensation Plan (incorporated by reference to Exhibit 10.10 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |

| Exhibit No. | Description* |
|---|---|
| 10.13 | First Amendment to the Federal Home Loan Mortgage Corporation 1995 Stock Compensation Plan (incorporated by reference to Exhibit 10.11 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.14 | Second Amendment to the Federal Home Loan Mortgage Corporation 1995 Stock Compensation Plan (incorporated by reference to Exhibit 10.12 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.15 | Third Amendment to the Federal Home Loan Mortgage Corporation 1995 Stock Compensation Plan (incorporated by reference to Exhibit 10.13 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.16 | Form of Nonqualified Stock Option Agreement for executive officers under the Federal Home Loan Mortgage Corporation 1995 Stock Compensation Plan (incorporated by reference to Exhibit 10.14 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.17 | Form of Restricted Stock Units Agreement for executive officers under the Federal Home Loan Mortgage Corporation 1995 Stock Compensation Plan (incorporated by reference to Exhibit 10.15 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.18 | Federal Home Loan Mortgage Corporation Employee Stock Purchase Plan (as amended and restated as of January 1, 2005) (incorporated by reference to Exhibit 10.16 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.19 | Federal Home Loan Mortgage Corporation 1995 Directors' Stock Compensation Plan (as amended and restated June 8, 2007) (incorporated by reference to Exhibit 10.17 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.20 | Form of Nonqualified Stock Option Agreement for non-employee directors under the Federal Home Loan Mortgage Corporation 1995 Directors' Stock Compensation Plan for awards in 2006 (incorporated by reference to Exhibit 10.20 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.21 | Form of Restricted Stock Units Agreement for non-employee directors under the Federal Home Loan Mortgage Corporation 1995 Directors' Stock Compensation Plan for awards in 2006 (incorporated by reference to Exhibit 10.23 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.22 | Form of Restricted Stock Units Agreement for non-employee directors under the Federal Home Loan Mortgage Corporation 1995 Directors' Stock Compensation Plan for awards since 2006 (incorporated by reference to Exhibit 10.24 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.23 | Federal Home Loan Mortgage Corporation Directors' Deferred Compensation Plan (as amended and restated April 3, 1998) (incorporated by reference to Exhibit 10.25 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.24 | First Amendment to the Federal Home Loan Mortgage Corporation Directors' Deferred Compensation Plan (as amended and restated April 3, 1998) (incorporated by reference to Exhibit 10.27 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2008, as filed on March 11, 2009)† |
| 10.25 | Federal Home Loan Mortgage Corporation Executive Deferred Compensation Plan (as amended and restated effective January 1, 2008) (incorporated by reference to Exhibit 10.28 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.26 | First Amendment to the Federal Home Loan Mortgage Corporation Executive Deferred Compensation Plan (as amended and restated effective January 1, 2008) (incorporated by reference to Exhibit 10.6 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2008, as filed on November 14, 2008)† |
| 10.27 | 2009 Officer Short-Term Incentive Program (incorporated by reference to Exhibit 10.30 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2008, as filed on March 11, 2009)† |
| 10.28 | 2010 Vice President and Non-Officer Long-Term Incentive Award Program (incorporated by reference to Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2009, as filed on August 9, 2010)† |
| 10.29 | Officer Severance Policy, dated April 11, 2011 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2011, as filed on May 4, 2011)† |

| Exhibit No. | Description* |
|---|---|
| 10.30 | Federal Home Loan Mortgage Corporation Severance Plan (as restated and amended effective January 1, 1997) (incorporated by reference to Exhibit 10.31 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.31 | First Amendment to the Federal Home Loan Mortgage Corporation Severance Plan (incorporated by reference to Exhibit 10.32 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.32 | Federal Home Loan Mortgage Corporation Supplemental Executive Retirement Plan (as amended and restated effective January 1, 2008) (incorporated by reference to Exhibit 10.33 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.33 | First Amendment to the Federal Home Loan Mortgage Corporation Supplemental Executive Retirement Plan (As Amended and Restated January 1, 2008) (incorporated by reference to Exhibit 10.38 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2009, as filed on February 24, 2010)† |
| 10.34 | Second Amendment to the Federal Home Loan Mortgage Corporation Supplemental Executive Retirement Plan (as Amended and Restated January 1, 2008) (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K as filed on June 28, 2011)† |
| 10.35 | Federal Home Loan Mortgage Corporation Long-Term Disability Plan (incorporated by reference to Exhibit 10.34 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.36 | First Amendment to the Federal Home Loan Mortgage Corporation Long-Term Disability Plan (incorporated by reference to Exhibit 10.35 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.37 | Second Amendment to the Federal Home Loan Mortgage Corporation Long-Term Disability Plan (incorporated by reference to Exhibit 10.36 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008)† |
| 10.38 | Executive Management Compensation Program (as amended and restated as of June 2, 2011) (incorporated by reference to Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2011, as filed on August 8, 2011)† |
| 10.39 | Federal Home Loan Mortgage Corporation Mandatory Executive Deferred Base Salary Plan, Effective as of January 1, 2009 (incorporated by reference to Exhibit 10.45 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2009, as filed on February 24, 2010)† |
| 10.40 | First Amendment To The Federal Home Loan Mortgage Corporation Mandatory Executive Deferred Base Salary Plan (As Effective January 1, 2009) (incorporated by reference to Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2011, as filed on August 8, 2011)† |
| 10.41 | Executive Management Compensation Recapture Policy (incorporated by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K, as filed on December 24, 2009)† |
| 10.42 | Memorandum Agreement, dated July 20, 2009, between Freddie Mac and Charles E. Haldeman, Jr. (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, as filed on July 21, 2009)† |
| 10.43 | Recapture Agreement, dated July 21, 2009, between Freddie Mac and Charles E. Haldeman, Jr. (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, as filed on July 21, 2009)† |
| 10.44 | Restrictive Covenant and Confidentiality Agreement, dated July 21, 2009, between Freddie Mac and Charles E. Haldeman, Jr. (incorporated by reference to Exhibit 10.7 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2009, as filed on November 6, 2009)† |
| 10.45 | Memorandum Agreement, dated September 24, 2009, between Freddie Mac and Ross J. Kari (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, as filed on September 24, 2009)† |
| 10.46 | Recapture Agreement, dated September 24, 2009, between Freddie Mac and Ross J. Kari (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, as filed on September 24, 2009)† |
| 10.47 | Restrictive Covenant and Confidentiality Agreement, dated September 24, 2009, between Freddie Mac and Ross J. Kari (incorporated by reference to Exhibit 10.9 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2009, as filed on November 6, 2009)† |

| Exhibit No. | Description* |
|---|---|
| 10.48 | Restrictive Covenant and Confidentiality Agreement, dated April 14, 2010, between Freddie Mac and Anthony Renzi† |
| 10.49 | Restrictive Covenant and Confidentiality Agreement, dated October 15, 2004, between Freddie Mac and Jerry Weiss† |
| 10.50 | Restrictive Covenant and Confidentiality Agreement, dated December 19, 2007, between Freddie Mac and [Paige H. Wisdom]† |
| 10.51 | Description of non-employee director compensation (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K as filed on December 23, 2008)† |
| 10.52 | PC Master Trust Agreement dated January 4, 2012 |
| 10.53 | Form of Indemnification Agreement between the Federal Home Loan Mortgage Corporation and executive officers (for agreements with officers entered into prior to August 2011) and outside Directors (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K as filed on December 23, 2008)† |
| 10.54 | Form of Indemnification Agreement between the Federal Home Loan Mortgage Corporation and executive officers (for agreements with officers entered into beginning in August 2011)† |
| 10.55 | Consent of Defendant Federal Home Loan Mortgage Corporation with the Securities and Exchange Commission, dated September 18, 2007 (incorporated by reference to Exhibit 10.65 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 10.56 | Letters, dated September 1, 2005, setting forth an agreement between Freddie Mac and FHFA (incorporated by reference to Exhibit 10.67 to the Registrant's Registration Statement on Form 10 as filed on July 18, 2008) |
| 10.57 | Amended and Restated Senior Preferred Stock Purchase Agreement dated as of September 26, 2008, between the United States Department of the Treasury and Federal Home Loan Mortgage Corporation, acting through the Federal Housing Finance Agency as its duly appointed Conservator (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2008, as filed on November 14, 2008) |
| 10.58 | Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of May 6, 2009, between the United States Department of the Treasury and Federal Home Loan Mortgage Corporation, acting through the Federal Housing Finance Agency as its duly appointed Conservator (incorporated by reference to Exhibit 10.6 to the Registrant's Quarterly Report on Form 10-Q for the period ended March 31, 2009, as filed on May 12, 2009) |
| 10.59 | Second Amendment dated as of December 24, 2009, to the Amended and Restated Senior Preferred Stock Purchase Agreement dated as of September 26, 2008, between the United States Department of the Treasury and Federal Home Loan Mortgage Corporation, acting through the Federal Housing Finance Agency as its duly appointed Conservator (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, as filed on December 29, 2009) |
| 10.60 | Warrant to Purchase Common Stock, dated September 7, 2008 (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K as filed on September 11, 2008) |
| 10.61 | Memorandum of Understanding Among the Department of Treasury, the Federal Housing Finance Agency, the Federal National Mortgage Association, and the Federal Home Loan Mortgage Corporation, dated October 19, 2009 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, as filed on October 23, 2009) |
| 10.62 | Omnibus Consent to HFA Initiative Program Modifications, dated November 23, 2011, among the U.S. Department of the Treasury, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation and the Federal Housing Finance Agency |
| 12.1 | Statement re: computation of ratio of earnings to fixed charges and computation of ratio of earnings to combined fixed charges and preferred stock dividends |
| 24.1 | Powers of Attorney |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |

| Exhibit No. | Description* |
|---|---|
| 101.INS | XBRL Instance Document[1] |
| 101.SCH | XBRL Taxonomy Extension Schema[1] |
| 101.CAL | XBRL Taxonomy Extension Calculation[1] |
| 101.LAB | XBRL Taxonomy Extension Labels[1] |
| 101.PRE | XBRL Taxonomy Extension Presentation[1] |
| 101.DEF | XBRL Taxonomy Extension Definition[1] |

(1) The financial information contained in these XBRL documents is unaudited. The information in these exhibits shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Freddie Mac, except to the extent, if any, expressly set forth by specific reference in such filing.

* The SEC file numbers for the Registrant's Registration Statement on Form 10, Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K are 000-53330 and 001-34139.

† This exhibit is a management contract or compensatory plan or arrangement.

<div align="right">Exhibit 12.1</div>

# RATIO OF EARNINGS TO FIXED CHARGES AND
## RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS

| | 2011 | 2010 | 2009 | 2008 | 2007 |
|---|---|---|---|---|---|
| | | | (dollars in millions) | | |
| Net loss before income tax benefit (expense) and cumulative effect of changes in accounting principles | $ (5,666) | $(14,882) | $(22,384) | $(44,564) | $ (5,989) |
| Add: | | | | | |
| Low-income housing tax credit partnerships | — | — | 4,155 | 453 | 469 |
| Total interest expense | 79,988 | 92,131 | 22,150 | 33,332 | 38,482 |
| Interest factor in rental expenses | 4 | 5 | 7 | 8 | 7 |
| Earnings (loss), as adjusted | $74,326 | $ 77,254 | $  3,928 | $(10,771) | $32,969 |
| Fixed charges: | | | | | |
| Total interest expense | $79,988 | $ 92,131 | $ 22,150 | $ 33,332 | $38,482 |
| Interest factor in rental expenses | 4 | 5 | 7 | 8 | 7 |
| Capitalized interest | — | — | — | — | — |
| Total fixed charges | $79,992 | $ 92,136 | $ 22,157 | $ 33,340 | $38,489 |
| Senior preferred stock and preferred stock dividends[1] | 6,498 | 5,749 | 4,105 | 675 | 398 |
| Total fixed charges including preferred stock dividends | $86,490 | $ 97,885 | $ 26,262 | $ 34,015 | $38,887 |
| Ratio of earnings to fixed charges[2] | — | — | — | — | — |
| Ratio of earnings to combined fixed charges and preferred stock dividends[3] | — | — | — | — | — |

(1) Senior preferred stock and preferred stock dividends represent pre-tax earnings required to cover any senior preferred stock and preferred stock dividend requirements computed using our effective tax rate, whenever there is an income tax provision, for the relevant periods.

(2) Ratio of earnings to fixed charges is computed by dividing earnings (loss), as adjusted by total fixed charges. For the ratio to equal 1.00, earnings (loss), as adjusted must increase by $5.7 billion, $14.9 billion, $18.2 billion, $44.1 billion, and $5.5 billion for the years ended December 31, 2011, 2010, 2009, 2008, and 2007, respectively.

(3) Ratio of earnings to combined fixed charges and preferred stock dividends is computed by dividing earnings (loss), as adjusted by total fixed charges including preferred stock dividends. For the ratio to equal 1.00, earnings (loss), as adjusted must increase by $12.2 billion, $20.6 billion, $22.3 billion, $44.8 billion, and $5.9 billion for the years ended December 31, 2011, 2010, 2009, 2008, and 2007, respectively.

**Exhibit 31.1**

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Charles E. Haldeman, Jr., certify that:

1. I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2011 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 9, 2012

/s/ Charles E. Haldeman, Jr.

Charles E. Haldeman, Jr.
Chief Executive Officer

FHFA 3091

**Exhibit 31.2**

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Ross J. Kari, certify that:

1. I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2011 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  March 9, 2012

/s/  Ross J. Kari
_____
Ross J. Kari
Executive Vice President — Chief Financial Officer

FHFA 3092

**Exhibit 32.1**

## CERTIFICATION

### PURSUANT TO 18 U.S.C. SECTION 1350,

### AS ENACTED BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report on Form 10-K for the year ended December 31, 2011 of the Federal Home Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Charles E. Haldeman, Jr., Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Date:  March 9, 2012


/s/  Charles E. Haldeman, Jr.
_____

Charles E. Haldeman, Jr.
Chief Executive Officer

**Exhibit 32.2**

## CERTIFICATION

**PURSUANT TO 18 U.S.C. SECTION 1350,**

**AS ENACTED BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K for the year ended December 31, 2011 of the Federal Home Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Ross J. Kari, Executive Vice President — Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 9, 2012

/s/  Ross J. Kari
_____
Ross J. Kari
Executive Vice President — Chief Financial Officer



# Tab 46

**Securitization**

**Global Markets Research**

North America United States

**Deutsche Bank**

14 March 2012

# The Outlook
## In MBS and Securitized Products

**Resi: The path of US support for Fannie Mae, Freddie Mac....................Page 4**
*Unlimited US Treasury support for the agencies likely ends this year. Then a new and less certain path begins.*

**CRE: Could CMBS loans become fully recourse? ....................................Page 8**
*A recent court decision on a small loan which was securitized over ten years ago has the potential to challenge the main tenets of the CMBS market – the non-recourse nature of the loans.*

**Consumer ABS: Opportunities in equipment ABS ...............................Page 10**
*The strong price performance of high-quality equipment ABS has been supported by strengthening credit fundamentals in the sector*

**Relative Value / ALM Strategies**

**Servicer based opportunities and risks in the Consumer Relief Program
...........................................................................................................Page 12**
*What the settlement could mean for investors in non agency*

**Sector Analysis**

**Agency MBS: Putting a price on LTV.......................................................Page 15**
*HARP loans with the highest LTV still show the best value*

**Rates: Underwriting the recovery.........................................................Page 19**
*We continue to expect the Fed to "underwrite" the recovery by maintaining monetary stimulus though the balance of the year. This leaves us constructive and in the mode of buying dips.*

**Economics: Labor market begins to blossom ........................................Page 23**
*The February employment report was solid as both headline and private payrolls each topped 200k for the third month in a row*

## Market Update

**Research Team**

***Coordinators***
**Steven Abrahams**, Residential MBS
**Harris Trifon**, Commercial RE
**Elen Callahan**, Consumer ABS

***Residential MBS***
Steven Abrahams
(+1) 212 250-3125
steven.abrahams@db.com

Ying Shen
(+1) 212 250-1158
ying.shen@db.com

Doug Bendt
(+1) 212 250-5442
douglas.bendt@db.com

Richard Mele
(+1) 212 250-0031
richard.mele@db.com

Jeff Ryu
(+1) 212 250-3984
jeff.ryu@db.com

Jason Wu
(+1) 212 250-6157
jason.wu@db.com

***Commercial Real Estate***
Harris Trifon
(+1) 212 250-5893
harris.trifon@db.com

David Zhou
(+1) 212 250-1952
david-j.zhou@db.com

***Consumer and Esoteric ABS***
Elen Callahan
(+1) 212 250-8161
elen.callahan@db.com

Douglas W. Runte
(+1) 212 250-9319
douglas.runte@db.com

***Prepayment and Default Modeling***
Ying Shen
(+1) 212 250-1158
ying.shen@db.com

Jason Wu
(+1) 212 250-6157
jason.wu@db.com

***Portfolio Strategies***
Christopher Helwig
(+1) 212 250-3033
christopher.helwig@db.com

***Rates***
Dominic Konstam
(+1) 212 250-9753
dominic.konstam@db.com

***Economics***
Joseph LaVorgna
(+1) 212 250-7329
joseph.lavorgna@db.com

**MBS and Securitized Products**

> **Deutsche Bank 2012 MBS and Securitization Conference**
> **Tuesday, March 27, 2012, New York City**
> **Featured speakers: Rick Reider, BlackRock and Edward DeMarco, Federal Housing Finance Agency**
>
> **Call your sales representative for an invitation**

Deutsche Bank Securities Inc.

All prices are those current at the end of the previous trading session unless otherwise indicated. Prices are sourced from local exchanges via Reuters, Bloomberg and other vendors. Data is sourced from Deutsche Bank and subject companies. Deutsche Bank does and seeks to do business with companies covered in its research reports. Thus, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. DISCLOSURES AND ANALYST CERTIFICATIONS ARE LOCATED IN APPENDIX 1. MICA(P) 146/04/2011.

Deutsche Bank

# 2012 MBS and Securitization Conference

*Passion to Perform*

**Tuesday, March 27, 2012**

| Trump SoHo | SoHo Ballrooms, 3rd Floor |
|---|---|
| 246 Spring Street | New York, NY 10013 |

12:30 – 1:00 pm    **Registration**

1:00 – 5:00 pm     **Business Sessions**

**Welcome and Opening Remarks**
*Jeff Mayer*, Managing Director, Head of Corporate & Investment Bank North America, Deutsche Bank

**Keynote Speaker**
*Rick Rieder*, CIO, Fundamental Fixed Income Portfolios, BlackRock

**Europe, the US Economy & Beyond**
*Torsten Slok*, Managing Director, Chief International Economist, Deutsche Bank

**Securitized Credit Panel: The New Capital Paradigm**
Moderator:    *Harris Trifon*, Director, Head of Commercial Real Estate Debt Research, Deutsche Bank
Traders:      *Ben Solomon*, Managing Director, Head of US CMBS Secondary Trading, Deutsche Bank
             *Pius Sprenger*, Managing Director, Co-Head of Structured Products Trading, Deutsche Bank
Clients:      *Randy Robertson*, Head of Securitized Assets, BlackRock
             *Andy Solomon*, Head of Commercial Real Estate Debt, Angelo Gordon

**Networking Break**

**Agency MBS Panel: The New Impact of Regulation & Politics**
Moderator:    *Steve Abrahams*, Managing Director, Head of MBS and Securitization Research, Deutsche Bank
Traders:      *Chris Babu*, Managing Director, Co-Head of Agency CMO and Derivative Trading, Deutsche Bank
             *Troy Dixon*, Managing Director, Co-Head of Structured Products Trading, Deutsche Bank
Clients:      *Gary Kain*, President & CIO, American Capital Agency Corp.
             *Alan Galishoff*, Managing Director and Portolio Manager, Millennium Partners
             *Kurt Weisenfluh*, Head of US Rates and Agency Mortgages, BlackRock Model-Based Fixed Income Portfolio Management

**Perspectives from Washington, DC**
*Edward DeMarco*, Acting Director, Federal Housing Finance Agency

5:00 – 6:30 pm     **Networking Reception**
SoHi Room, 46th Floor



14 March 2012    The Outlook

**Deutsche Bank** 🔳

# Triple-A generic secondary market spread indications

| Data on this page as of 3/9/12 | 1yr | 2yr | 3yr | 5yr | 7yr | 10yr |
|---|---|---|---|---|---|---|
| **Average life bucket** | | | | | | |
| **US floating-rate spreads (bp) to LIBOR** | | | | | | |
| Credit cards (1-month) | -- | 7 | 10 | 23 | 30 | 40 |
| Student loan FFELP (3-month) | 20 | 35 | 45 | 70 | 95 | 115 |
| Student loan private credit (3-month) | -- | 150 | -- | -- | 325 | -- |
| Home equity loan (HEL) ARM Seq (Note: vs. 1, 3, 6yr) | 350 | -- | 750 | 975 | | |
| **US fixed-rate spreads (bp) to swaps** | | | | | | |
| Autos (Note: 1yr auto vs. EDSF) | 1 | 10 | 27 | -- | -- | -- |
| Wrapped auto (subprime) | -- | 85 | -- | -- | -- | -- |
| Credit cards | -- | 4 | 12 | 24 | 33 | 43 |
| CMBS cash AAA | -- | -- | -- | 175 | 185 | 155 |
| Home equity loan (HEL) | -- | 475 | 725 | 975 | 1000 | 1075 |
| Equipment | 10 | 25 | 35 | -- | -- | -- |
| **US fixed-rate spreads (bp) to Treasuries** | | | | | | |
| Autos | -- | 35.3 | 53.5 | -- | -- | -- |
| Credit cards | -- | 29.3 | 38.5 | 49.8 | 53.3 | 51 |
| Home equity loan (HEL) | -- | 500.3 | 751.5 | 1000.8 | 1020.3 | 1083 |
| **Agency (nominal spreads to Treasuries) (bp)** | | | | | | |
| Agency MBS - Curr Cpn (15yr) | -- | -- | -- | 112 | -- | -- |
| Agency MBS - Curr Cpn (30yr) (vs. 7.5yr) | -- | -- | -- | -- | 148 | -- |
| **Other (bp)** | | | | | | |
| Industrial single-A corporate spreads (to UST) | -- | 33.8 | 47.0 | 73.2 | -- | 111 |

# MBS, CMBS and ABS spread charts

**US floating-rate spreads (bp)**




Card and HEL ARM spreads to 1m LIBOR; student loan spreads to 3m LIBOR

**US fixed-rate spreads to swaps (bp)**



Three-year auto spreads are for prime benchmark autos

**US fixed-rate ABS spreads to Treasuries (bp)**



Spread charts reflect generic secondary triple-A levels for each asset class.
*Source for all is Deutsche Bank, except Corporates (to UST), which is Bloomberg Finance LP.*

**Agency MBS – CC LIBOR option adjusted spread (bp)**



**For detailed sector data, please refer to the companion document, *The Outlook: Data Addendum.***

FHFA 3098

**Deutsche Bank**

RESI

# The path of US support for Fannie Mae, Freddie Mac

December 31 of this year marks the scheduled end to unlimited US Treasury support for Fannie Mae and Freddie Mac.  Limited support begins the next day in amounts likely to be around $125 billion for Fannie Mae and $150 billion for Freddie Mac.  The agencies will need that support along with reserves and income to cover future losses on mortgage-backed securities, repay debt and pay dividends on preferred stock issued to the US Treasury. In his letter to Congress last month, the acting director of the Federal Housing Finance Agency wrote that "it is clear that the draws [Fannie Mae and Freddie Mac] have taken from the Treasury are so large they cannot be repaid under any foreseeable scenarios."  Both Fannie Mae and Freddie Mac have subsequently said that the need to pay dividends to Treasury creates "significant uncertainty about our long-term financial sustainability." That uncertainty puts both their MBS and debt at risk.

Many observers around the agency mortgage market have assumed that the US Treasury will extend unlimited support for Fannie Mae and Freddie Mac before the December 31 deadline.  Unlimited support would allow the agencies to continue covering dividends and any other costs.   But a close reading of the legislation that authorizes Treasury support suggests that Treasury may not be able to extend unlimited support without approval by Congress.  Although Treasury has not confirmed that interpretation, other senior government officials and executives of other government-sponsored enterprises similarly understand that Treasury cannot readily extend unlimited support.  That interpretation is also shared by a senior mortgage insurance executive and a Washington lawyer that has analyzed US support for the agencies. Given divisions in Congress over the future of the agencies and the lack of any legislative progress on reform, easy Congressional approval seems unlikely.

An inability to extend unlimited backing could force the Treasury to consider other means for relieving financial pressure on the agencies.  The most likely relief would come from suspending the annual 10% dividend that the agencies will owe to the Treasury on its holdings of preferred stock, which currently stand at $188 billion. That would likely allow the agencies to easily service their MBS and debt.  But it might also come with political costs.

Uncertainty over US financial backing for Fannie Mae and Freddie Mac and their ability to service securities could widen spreads and reduce liquidity in MBS and debt as expiration of unlimited support approaches.  It is a risk that all MBS portfolios need to anticipate.

**The authority for Treasury support**

Congress first gave the US Treasury authority to support Fannie Mae and Freddie Mac in the Housing and Economic Recovery Act of 2008, enacted July 30. Section 1117 of the bill gave the Treasury authority to buy unlimited amounts of Fannie Mae and Freddie Mac obligations but set a deadline for exercising that authority of December 31, 2009.

On September 7, 2008, the US put the agencies into conservatorship under the Federal Housing Finance Agency, and each agency signed a Senior Preferred Stock Purchase Agreement (PSPA) with the Treasury, which was restated and amended on September 26, 2008.  The restated agreement allowed each agency to draw up to $100 billion to cover any quarterly losses as calculated under GAAP.  With every draw, the agency would issue a like amount of preferred stock to the Treasury.  The preferred stock paid a 10% annual dividend.

On May 6, 2009, the agencies and the Treasury amended the PSPA again, this time raising the maximum draw to $200 billion.

Then on December 24, 2009, shortly before the unlimited purchase authority expired, the agencies and the Treasury amended the PSPA again.  This amended version authorized the Treasury to provide up to $200 billion of support for each agency and to cover an unlimited amount of losses in 2010, 2011 and 2012.  The agencies subsequently have interpreted the agreement as requiring Treasury to reduce the $200 billion in support available after 2012 by any amounts drawn in 2008 or 2009.  Since Fannie Mae drew $75.2 billion from the Treasury in those years, it's filings with the SEC show it expects to have $124.8 billion in support left.  Since Freddie Mac drew $50.7 billion, it expects to have $149.3 billion.

Since the agencies and the Treasury have modified the PSPA three times, many observers assume the parties could modify it again and extend unlimited loss coverage beyond 2012.  However, the original December 31, 2009, deadline for authorizing purchases looks likely to prevent

Deutsche Bank

that extension. The original legislation authorizing Treasury support and the PSPA both give the Treasury and the agencies broad rights to modify other parts of the existing agreement.  But extending purchase authority likely will take an act of Congress.

**Dividend pressure**

Limited US support for the agencies and the need to pay dividends to Treasury eventually could leave both agencies weakened. Fannie Mae has said that it does not expect to earn profits in excess of its annual dividend obligation "for the indefinite future." Freddie Mac has noted that it is unlikely to regularly generate enough income to cover its annual dividends to the Treasury. The PSPA requires the agencies to issue more preferred stock to the Treasury to cover any shortfall in dividend payments. As a result, the obligation to the Treasury grows as a compounded rate, something noted before by my colleague in rates strategy, Dan Sorid.

The timing for when Fannie Mae and Freddie Mac might exhaust Treasury support depends on the fixed amount available after 2012, the amount of preferred stock held by the Treasury and the ability of the agencies to cover the preferred dividend with revenue from guaranteeing MBS and from their investment portfolios.  Some of these things are easy to estimate while others require stylized assumptions.

The simplest but least likely scenario would require the agencies to cover their preferred dividends without access to revenue, which is substantial and likely to remain so beyond 2012. This scenario also assumes that the two agencies breakeven on all other activities. Nevertheless, this scenario shows the most potential stress on the agencies and sets a lower bound to Treasury support.  For Fannie Mae, the FHFA last October projected that the agency would cumulatively draw $142 billion in preferred stock by the end of 2012.  With an expected $124.8 billion in fixed support after 2012, servicing the preferred stock would exhaust Treasury support by the end of 2020 (Figure 1, No Income).  For Freddie Mac, the FHFA projected a cumulative draw of $76 billion.  With $149.3 billion in fixed support, the preferred dividend would exhaust support by the end of 2025 (Figure 2, No Income).



**Figure 1: The potential impact of preferred dividends on Treasury backstop for Fannie Mae**

- G-fee and Port Income
- G-fee Income Only
- No Income

*Source: FHFA, Deutsche Bank*



**Figure 2: The potential impact of preferred dividends on Treasury backstop for Freddie Mac**

Treasury support for Freddie Mac ($B)

- G-fee and Port Income
- G-fee Income Only
- No Income

*Source: FHFA, Deutsche Bank*

A more realistic scenario would allow the agencies to draw revenue from their guarantee and investment businesses.  Estimating that likely revenue requires a host of assumptions.

The guarantee businesses at both agencies look very healthy.  Both agencies hold sizable reserves against foreseeable losses, which reduce the burden on future revenue to cover those losses.  Fannie Mae holds $93.2 billion in reserves, and Freddie Mac $39.7 billion.  The quality of newly guaranteed loans also has increased dramatically, with both borrower credit score and debt-to-income ratio showing higher averages and higher lower bounds.  The average loan-to-value ratio ranges around 70.

14 March 2012    The Outlook

**Deutsche Bank**

Recent books of guarantees arguably are among the best ever written by the agencies. Both agencies also have raised new guarantee fees in recent years, even though recent changes to the Home Affordable Refinance Program have reduced some of them. Based on discussions with major servicers, the average new guarantee fee going to the agencies is approaching 40 bp. The FHFA plans to raise guarantee fees further. Nevertheless, both agencies hold large legacy guarantee books with lower average fees. For Fannie Mae, if it kept its balance of guaranteed loans and MBS steady at the current $3.1 trillion and took in a conservative 25 bp of fees with 8 bp of expenses for losses and administration, the revenue would extend the life of Treasury support from 2020 to 2023 (Figure 1, G-fee Income Only). For Freddie Mac, if its balance of guarantees stayed at the current $2.1 trillion, the life of Treasury support would extend from 2025 to 2030 (Figure 2, G-fee Income Only).

The investment portfolios at each agency face a different future. The PSPA requires each portfolio to shrink by 10% annually starting at $900 billion in 2010. The limit today has fallen to $729 billion. Traditionally, these portfolios have provided the bulk of agency revenue, often exceeding two-thirds of the total before the financial crisis. But much of that revenue depended on a spread between funding and assets unlikely to prevail in the future. The composition of the portfolio also has changed, with non-agency securities and unsecuritized loans making up a larger percentage. Revenues from the portfolios are probably hardest to estimate. One reasonable assumption is that the agencies keep the portfolio balances roughly in line with the required limits and that the portfolios deliver the roughly 60 bp of option-adjusted spread targeted in the past. For Fannie Mae, adding portfolio revenue under these assumptions to guarantee revenue further extends the life of Treasury support from 2025 to 2029 (Figure 1, G-fee and Portfolio Income). For Freddie Mac, the portfolio revenue extends Treasury support from 2030 to 2037 (Figure 2, G-fee and Portfolio Income).

**Market implications**

For MBS investors, diminishing Treasury support raises the risk that the agencies one day might face challenges in covering MBS losses. The high quality of current loans and the prospect of rising guarantee fees should allow the agencies to cover losses in most scenarios. The risk becomes greater in a housing market catastrophe, such as the one that started in the US after 2006. Although it is difficult to know how much support investors might consider enough, recent Sequoia Mortgage Trust securitizations provide one of the few benchmarks. SEMT 2011-2, for example, securitized fixed-rate loans with a

weighted average loan-to-value of 59, a credit score of 773 and a loan size of $799,000. Fitch, the only agency that reviewed the transaction, required subordination of 7.4% to rate the most senior class 'AAA.' On agency loans, the higher loan-to-value ratio and the lower average loan balance might require more subordination. For Fannie Mae, the $124.8 billion in support likely at the start of next year is equal to only 4.04% of its guaranteed loans and MBS. Including Fannie Mae's $93.2 billion in loss reserves, that percentage rises to 7.05%. For Freddie Mac, it's $149.3 billion in support amounts to 7.22% of guaranteed loans and MBS. Adding its $39.7 billion in reserves brings the percentage to 9.14%. Those percentages would likely fall along with remaining Treasury support as the agencies paid preferred dividends. Presumably, investors would begin trading agency MBS to progressively wider spreads.

Beyond MBS, concerns about Treasury support could also affect money markets, where the Fed's latest data show that agency MBS and CMOs collateralize $757 billion or 43.4% of total tri-party repo. Agency debt collateralizes another $117 billion or 6.7% of the total. Margin requirements and lending spreads might rise, reducing liquidity and further widening spreads in these products.

Investors in agency debt already differentiate shorter debt from longer. As late as mid-2007, all Fannie Mae and Freddie Mac debt traded at yields below the swap curve. Since the crisis started, only issues with maturities of five years or less have traded that tight. The prospect of falling Treasury support might lead MBS investors in the same direction.

**Possible solutions**

If Treasury and the agencies want to avoid the possible market implications of diminishing Treasury support, then the parties to the PSPA could elect to amend it and defer or reduce the dividend. Deferring the dividend would almost surely leave the agencies with enough guarantee and investment revenue to cover MBS losses and manage portfolio funding. If the dividend continued to accrue while deferred, it might still pose risk to the agencies if the US ever chose to reinstate payment. If the dividend did not accrue, then the agencies might build up enough capital over time to return full principal. Alternatively, the parties could reduce the dividend to a level that the agencies would be able to cover comfortably with guarantee and investment income. That level would likely vary for Fannie Mae and Freddie Mac, with Fannie Mae needing a larger reduction. Based on the stylized assumptions used here for projecting guarantee and investment revenue, a 5% dividend might be manageable for both agencies.

FHFA 3101

14 March 2012     The Outlook

**Deutsche Bank**

If deferring or reducing the preferred dividend proved politically unpalatable, then the agencies might have to consider selling parts of their investment portfolios now held at a gain.  That could slow the compounding of the preferred dividend in the near term, but it would also likely reduce investment revenues in the long term.  Beyond the impact on the agencies' balance sheet, sales could also put pressure on the secondary market to absorb the supply.

**Trading scenarios**

The political risks of deferring or reducing the PSPA dividend might lead the current administration to wait until after this year's elections to address the issues.  In the mean time, investor attention to US support for Fannie Mae and Freddie Mac will likely grow as the expiration of unlimited backing approaches.  Spreads and liquidity for the agencies' MBS and debt could become choppy.

Nevertheless, Fannie Mae and Freddie Mac remain critical to US mortgage finance, and Washington seems unlikely to risk weakening investor confidence in the safety of their MBS and debt.  The two agencies, for the nine months through September of last year, guaranteed more than 64% of all new mortgage originations.  With banks and other private capital likely to come back slowly to mortgage lending, policymakers almost certainly need Fannie Mae and Freddie Mac to help bridge the transition.  Look for Treasury and the agencies to restructure the PSPA dividend after the November elections, and for spreads and liquidity to improve sharply.

* * *

**The view in rates**

As the prospects of immediate crisis in Greece recede and the indications of steady if modest growth in the US continues, longer US yields should rise.  An end to QE2 without promise of QE3 should also nudge up yields.  My colleague Peter Hooper argues that the Fed is unlikely to launch QE3 unless unemployment rises or inflation expectations fall, neither of which seem likely.  Researchers from the Bank for International Settlements estimated on Monday that the Fed's current buy program ultimately will trim 10-year yields by 85 bp.  If the program ends, additions to the stock of 10-year Treasury debt should slowly lift yields.  Of course, there is ongoing risk of recession in Europe exceeding expectations and risk that continuing weakness in US housing keeps growth slow.  But forces for higher yields still look likely to prevail.

**The view in spread markets**

Most spread products, MBS included, continue to hold their ground because carry has trumped other risk factors.  But MBS have good prospects if rates do move higher.  In that case, actual mortgage rates to borrowers should move up very slowly as originators try to hold rates down and keep the pipeline full.  The last few weeks have started to show that trend.  That should reduce extension risk in MBS and help their performance relative to most rates benchmarks.

MBS investors still have time to position for HARP, which should push up prepayments sharply in March and April.  Preferences, among others:

- Long specified pools, short TBA
- Long 2010 and 2011 pools, short pre-May 2009
- Long 15-year TBA pools, short 30-year

**The view in mortgage credit**

The S&P/Case-Shiller 20-City Index finished 2011 at a new low, but most of that was the usual winter slowdown.  Prices should still slide in 2012, but declines in distressed inventory should ease some of the pressure on housing.

*Steven Abrahams (+1) 212 250-3125*

FHFA 3102

14 March 2012    The Outlook                                    **Deutsche Bank**

## CRE

# Could CMBS loans become fully recourse?

*Published concurrently with March 14, 2012, CMBS* A recent court decision on a small loan which was securitized over ten years ago has the potential to challenge the main tenets of the CMBS market – the non-recourse nature of the loans. Throughout the years there have been numerous examples of borrowers both large and small taking advantage of the non-recourse provision to remove them from underperforming properties or situations. In fact an argument could be made that the non-recourse provisions found in CMBS loan agreements has been one of the major reasons for the market's success over nearly the last two decades. In the note below, we trace through events which led to the court case in question, the case itself and the various scenarios which could play out from here.

### The property and workout process

The Cherryland Center loan ($8.7mm original balance) was securitized in the GMACC 2002-C3 transaction and carried a 6.28% interest rate. The collateral for the loan was a 164k sf anchored retail property in Traverse City, MI. The property like so many others got into trouble when the occupancy began to fall and pushed the DSCR below 1.0x. The full details of the workout process are detailed below.

Trust – The Borrower was liable for the deficiency because the non-recourse/SPE covenants were breached. The covenants required the Borrower to remain solvent and pay its debts. Therefore, because the Borrower became delinquent on the loan the covenants were breached.

Borrower – The covenants were not breached because the SPE term was not properly defined in the loan agreement and as a result, they maintained their status as an SPE and the Guaranty was not applicable. An alternative argument which was also used centered on the principle that the intent of the Guaranty was to prevent insolvency as a result of "bad boy" acts and not a decline in the value of the property.

Court of Appeals – sided with the Trust. They did not think that the loan agreement properly defined the SPE. The Court found that the list of covenants in the loan agreement were commonly found in other CMBS loan agreements and were considered SPE covenants. The Court analyzed loan documents with similar or identical provisions to the loan agreement in question as the basis for the decision. Regarding the Borrower's second argument (ie. intent), the Court rejected this as well because the documents only started that any failure to remain solvent was a violation and did not specify the manner an insolvency occurred.

### Potential paths

What happens next is impossible to say but there are a few possibilities. The first is that the Michigan Supreme Court agrees to take the case and eventually reverses the lower court's ruling. There is a briefing scheduled next week to discuss the merits of the case after which a decision will be made whether to proceed or not. Of course, the Court could also agree to take the case and agree with the current opinion. A third possibility is that a newly introduced bill becomes law and effectively nullifies the ruling. The fourth scenario and worst outcome from a borrowers perspective is similar cases are brought in other states and their courts agree with Michigan's.

| Workout Timeline | |
|---|---|
| **Date** | **Event** |
| Dec-08 | Transferred to special servicer, DSCR reported to be 1.11x |
| Jan-09 | Borrower indicates payment will not be made in 2009 |
| Sep-09 | Payment is not made as DSC turned negative |
| Nov-09 | Borrower requests interest-only payments in 2010 |
| Mar-10 | Servicer pursues foreclosure |
| Aug-10 | Asset is foreclosed on but former borrower contests receiver during 6 month statuary redemption |
| Sep-10 | McKinley appointed the receiver |
| Nov-10 | Occupancy drops from 83% to 36% |
| Jan-11 | Appraised value falls to $3.9mm from 4.95mm a year before and $12.3mm at issuance |
| Mar-11 | BOVs are ordered, redemption period ends |
| Jun-11 | Occupancy increased to 64%, property is listed for sale |
| Oct-11 | Occupancy increased to 82% when Big Lots moves in, asset declared non-recoverable |

Source: Deutsche Bank

### Legal Arguments

Once the asset fell into default, the Trust took the unique approach to secure proceeds through arguing the Borrower failed to keep the SPE solvent and was therefore liable for the deficiency judgment. Below is a short summary of the Wells Fargo Bank, NA v. Cherryland Mall Limited Partnership case.

Deutsche Bank Securities Inc.

FHFA 3103

14 March 2012    The Outlook

**Deutsche Bank**

Although there are a myriad of outcomes, *we view all of this as a positive for CMBS* investors, especially those invested further out the legacy credit curve. We believe *the fear of some CMBS loans turning into recourse will allow special servicers to exert much more leverage in the negotiation process.* More equity contributions on modified loans are likely and in some cases borrowers will come out of pocket to cure defaults or prevent defaults where it is viewed as a lower cost option (as opposed to letting a loan become delinquent and have a Trust pursue full recourse due to the Cherryland decision).

The subset of loans which are impacted for now is limited to those secured by properties in Michigan. However, the number of loans is actually smaller. Why? *The crux of the issue is how the loan agreements were written and each originator uses a slightly different template.* For example, the language in the loan agreement used at DB would not be open to the same outcome as the Cherryland case due to the way the SPE solvency covenant is defined. Specifically the clause states: *Borrower has been, is, and intends to remain solvent and Borrower has paid and intends to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets;* <u>*provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower.*</u>

While it is extremely difficult to estimate how much of the CMBS universe or even how many loans secured by Michigan properties use language most similar to the DB version or the Cherryland language (Archon was the originator), we can identify a potential sample. There are potentially at least $1B of loans which are at risk and if other states adopt a similar stance, perhaps upwards of $5B. Keep in mind, the delinquency rate on CMBS loans secured by Michigan properties is about 50% higher than the CMBS universe at over 13%. In the chart below we

detail the origination volumes and delinquent loan totals for the largest originators excluding DB. Depending on which of the scenarios outlined above comes to fruition, we will update our analysis and potential exposure list.



**Figure 3: Michigan CMBS origination volumes and delinquencies**

*Source: Deutsche Bank, Intex*

***Harris Trifon (+1) 212 250-5893***
***Dave Zhou (+1) 212 250-1952***

FHFA 3104

14 March 2012      The Outlook

**Deutsche Bank**

CONSUMER ABS

# Opportunities in equipment ABS

Equipment ABS has benefitted from the robust demand of new issue high-quality short ABS. This was particularly evident with the highly successful $998.8 million John Deere Owner Trust (JDOT) 2012-A, which was heavily subscribed and very broadly distributed. The deal was offered in four tranches and priced quite favorably compared to an earlier offering from the JDOT shelf (see Figure 4). Additionally, as a testament to the demand for paper in this sector, JDOT 2012-A compared very favorably to recently priced prime triple-A auto ABS. For example, the 2-year triple-A JDOT 2012-A priced 3bp tighter than a recently issued 2-year triple-A from Honda (HAROT 2012-1) and 4 bp tighter than the 3-year triple-A class from the same deal.

**Figure 4: JDOT 2012-A pricing strong market demand for ABS paper underpinned by strengthening credit fundamentals in the sector**

| Date | Deal | Cl | Ratings (M/S/F) | Size | OWAL | Index | Spd |
|------|------|-----|-----------------|------|------|-------|-----|
| 2/22/12 | JDOT 2012-A | A1 | P-1/-/F-1+ | 304 | 0.4 | ILibor | -24 |
|  |  | A2 | Aaa/-/AAA | 255 | 1.1 | EDSF | 8 |
|  |  | A3 | Aaa/-/AAA | 343 | 2.2 | ISwaps | 15 |
|  |  | A4 | Aaa/-/AAA | 97 | 3.3 | ISwaps | 24 |
| 4/13/11 | JDOT 2011-A | A1 | P-1/-/F-1+ | 334 | 0.4 | ILibor | -4 |
|  |  | A2 | Aaa/-/AAA | 333 | 1.1 | EDSF | 20 |
|  |  | A3 | Aaa/--/AAA | 340 | 2.2 | ISwaps | 25 |
|  |  | A4 | Aaa/-/AAA | 99 | 3.3 | ISwaps | 35 |

Source: Deutsche Bank, Thomson Reuters

Secondary market spreads on equipment ABS tightened for all credit ratings in 2011 and are currently at or near per-recession levels. For example, the secondary market offering spread on a generic triple-A 2-year tightened by 37% YOY and is currently at 25 bp, while a 2-year single-A trades a spread of 130 bp, which is about 4% tighter YOY. Both levels were last seen in 2007.

The strong price performance is also reflected in the shrinking spread differential between autos and

equipment ABS[1]. Figure 5 plots the pick-up from top-tier 3-year auto ABS to top-tier 3-year equipment ABS at various rating categories.

**Figure 5: The spread pick-up from auto ABS to equipment ABS shrank through 2011**



Source: Deutsche Bank

In certain cases secondary market spreads on autos are trading wider to comparable equipment ABS. Over the past 12 months the pick-up for double-A and triple-B rated bonds shrank by 52 bp and 35 bp, respectively, as this part of the curve has represented the sweet spot of strong credit fundamentals and healthy yield. Today double-A secondary equipment trades 2 bp through autos while triple-B equipment is flat to autos of similar tenor and rating[2]. Although performance has been stable, we think the current level of pick-up in these rating categories is not sustainable as the market is deeper and issuance volume much greater for auto ABS than for equipment ABS. For 3-year paper, we find the triple-A and single-A rating categories more compelling. The pick-up for triple-A and single-A bonds also tightened during this period, but to a lesser extent. Currently investors can pick up 30 bp by trading out of 3-year single-A autos and into comparable equipment ABS. The pick-up from triple-A autos to equipment is 10 bp.

The strong price performance has been underpinned by strengthening credit fundamentals in the sector, which in turn have been supported by a slowly recovering economy. Figure 6 charts the average losses of the

---

[1] Equipment lease ABS are compared to auto ABS because they, too, offer low prepayment risk and comparable average life and structure,

[2] Historically, equipment ABS has traded wider than autos given the size of the two markets. As of YE 2011, there were $118 billion of auto ABS outstanding. There were $14.9 billion of equipment ABS outstanding – Source: SIFMA

FHFA 3105

14 March 2012      The Outlook

**Deutsche Bank**

Equipment Leasing and Finance Association[3]'s Monthly Leasing Index. In January, average charge-offs as a percentage of net receivables fell to 0.5%, from 0.7% in December and from 0.9% one-year ago. This positive performance has been reflected in securitized pools. According to the Fitch Equipment ABS Index, total 60+ delinquencies for Fitch-rated equipment ABS stood at 27 bp in January 2012, a 72% decrease from the level one year ago. The three-month moving average for this metric currently stands at 25 bp.

**Figure 6: Average Losses (Charge-offs) as a % of net receivables - YOY comparison**



*Source: Equipment Leasing and Finance Association – Monthly Leasing and Finance Index January 2012*

We expect that collateral performance and issuance volume will continue to improve modestly and to the extent that the recovery and the improving tone in the US labor market continues. Figure 7 shows that overall new business volume for January 2012 was $5.1 billion, up 21% year-over year. Furthermore, recent data shows that while big companies are cautious about hiring, smaller companies are more optimistic (see Figure 8). This bodes well for an increase in the leasing and business activity of small businesses and for an increase in volume and collateral diversity in small and mid-ticket equipment lease ABS.

**Figure 7: New Business Volume ($ billion) - YOY Comparison**



*Source: Equipment Leasing and Finance Association – Monthly Leasing and Finance Index January 2012*

**Figure 8: Increased hiring of small businesses supports small & mid-ticket businesses**



*As found in the presentation Deutsche Bank, "US Employment Outlook: Labor Market on Sustained Improving Trend," March 2012. Source JOLTS, DB Global Markets Research*

In 2011, there were $10.2 billion of equipment ABS, a 31% increase over 2010's volume, but still well below the peak levels of 2003/2005 (see Figure 9). Volume was led by CNH, with 29% market share, GE Capital, with 27% and John Deere, with 11%. So far this year, we've seen $2.4 billion of new issue volume with ABS from John Deere, GE Capital and Volvo[4].

**Figure 9: Equipment ABS volume expanded by 31% in 2011. 2012 volume so far stays apace with 2011 YOY**



*Source: Deutsche Bank*

*Elen Callahan (+1) 212 250-8161*

---

[3] The Equipment Leasing and Finance Association's (ELFA) Monthly Leasing and Finance Index (MLFI-25), which reports economic activity for the $628 billion equipment finance sector.

[4] As of this writing, CNH Capital America LLC is in the market with its first public retail term ABS of the year.

14 March 2012      The Outlook

**Deutsche Bank**

## RELATIVE VALUE / ALM STRATEGIES

# Servicer based opportunities and risks in the Consumer Relief Program

The details of yesterday's filing in the foreclosure settlement were consistent with the points we outlined in last week's piece *Details of the AG Settlement Revealed*. Now that the dust has settled, we try to predict how servicers might apply principal modifications to isolate both potential opportunities and risks.

In setting forth a framework for these opportunities, we think there are three likely outcomes. The first outcome we will call investor positive where a servicer will modify portfolio loans exclusively. In the instance where the first lien resided in a securitized trust and a modified second lien was in portfolio the likely outcomes would be the following:

■ Bonds lower in the capital structure would benefit most from reperforming delinquent loans and writing down portfolio 2nd liens outside of the trust

■ Senior bonds in prime jumbo and Alt-a securitizations would benefit from lower severities on redefaults. Downside to senior investors would be that deals would be releveraged from a credit perspective by reperforming borrowers.

■ Subprime last cash flows would benefit from lower severities as result of modification of portfolio seconds, resulting in lower severities.

■ Subprime current pay bonds would be negatively impacted as loans would be removed from the DQ bucket, diminishing potential cashflow from liquidations available to deleverage those tranches.

The second outcome we will call investor negative where a servicer will modify loans in securitized trusts. In an investor negative construct the likely outcomes would be the following:

■ Bonds lower in the capital structure would be written down much faster as a result of principal reductions, significantly curtailing potential cash flow to those classes.

■ Senior bonds in prime jumbo and Alt-a will be negatively impacted. Wiping out subordinate tranches faster would preclude seniors from deleveraging as result of voluntary prepayments

■ Subprime seniors would be negatively impacted as the principal reductions would effectively be instantaneous liquidations at 100% severity.

The third outcome is a neutral or 'safe harbor' outcome, where there is likely little potential impact to bond holders.

Next we look at where potential opportunities may exist for investors to benefit from a potential "investor positive" construct. First we took the securitized private label balances by each of the five servicers and broke them down by collateral type and serious delinquency. Then for those loans greater than 60+ days delinquent we looked at what percentage of those loans had second liens behind them as seen in Figure 10 below. The rationale being if we are able to ascertain what servicers will likely modify only portfolio loans, then we can see what sectors are most exposed to those second liens that could be modified.

| Figure 10: Percentage of Second Liens behind Seriously delinquent securitized loans | | | | |
|---|---|---|---|---|
| | | UPB | 60+ | w 2nd | % of Total DQ w/2nd |
| Prime | Chase | 45,590 | 6,874 | 1,402 | 20% |
| | B of A | 25,594 | 4,412 | 840 | 19% |
| | Citi | 4,411 | 269 | 4 | 1% |
| | Wells | 51,744 | 5,354 | 1,899 | 35% |
| | GMAC | 5,320 | 442 | 132 | 30% |
| Alt-A | Chase | 38,462 | 12,279 | 3,330 | 27% |
| | B of A | 61,960 | 26,424 | 9,514 | 36% |
| | Citi | 3,896 | 691 | 83 | 12% |
| | Wells | 21,487 | 5,354 | 1,885 | 35% |
| | GMAC | 24,016 | 7,208 | 3,308 | 46% |
| Subprime | Chase | 28,004 | 12,562 | 3,683 | 29% |
| | B of A | 18,639 | 10,946 | 2,266 | 21% |
| | Citi | 55 | 3 | 0 | 6% |
| | Wells | 20,861 | 9,013 | 2,046 | 23% |
| | GMAC | 1,269 | 370 | 65 | 18% |

Source: Deutsche Bank, Core Logic

For reasons we will explain in greater detail below, we believe that Wells, Chase and Citi are likely to take an investor friendly approach to the modifications, while B of A could have a more investor negative approach, GMAC/Ally would likely be investor neutral.

Bonds backed by Wells' prime jumbo and Alt-a loans have the greatest percentage of 2nd liens behind them at 35%

FHFA 3107

followed by Chase subprime and Alt-a loans at 29% and 27% respectively. Given the dollar price leverage in Alt-a and subprime relative to prime jumbo, we would tend to favor expressing the investor friendly view in those asset classes.

In the analysis below we attempt to gauge potential servicer behavior.

**Investor Positive**

**Wells Fargo**

As stated last week, it appears based on the language in Wells 10-K that they will exclusively target portfolio loans. In the section of the release which references their obligations under the Consumer Relief Program, Wells explicitly states that the expanded principal reduction modifications on first and second liens will be executed on loans *"owned and serviced by Wells Fargo."* This appears to effectively remove any of the guess work around predicting their behavior with regards to the settlement and there should be some opportunity for investors given Wells' position.

While impossible to know for certain how the other servicers will approach the modifications, the data in Figure 11 below may provide some insight to potential behavior.

**Figure 11: Settlement Liability, Portfolio and Securitization Exposures by Servicer**

| | | Chase | B of A | Citi | Wells | GMAC |
|---|---|---|---|---|---|---|
| Total Servicing Platform | Borrower Relief Settlement Interest | $4,210 | $8,580 | $1,790 | $4,340 | $200 |
| | Principal Modification Settlement | $3,675 | $7,626 | $1,411 | $3,400 | $185 |
| | UPB of Total Servicing | 1,168,170 | 1,768,260 | 534,400 | 1,821,830 | 379,420 |
| | Non Agency & Portfolio | 731,274 | 1,055,298 | 307,066 | 931,502 | 225,755 |
| | Closed End Liens 30-99 Days DQ (Serviced) | 8,368 | 14,691 | 2,158 | 17,312 | 5,157 |
| | Closed End Liens > 90 Days DQ (Serviced) | 49,404 | 94,686 | 1,335 | 5,755 | 10,084 |
| Portfolio | 1-4 Family 1st Liens | 137,294 | 293,700 | 114,366 | 252,091 | 14,307 |
| | Open Ended HELs | 86,698 | 104,066 | 27,482 | 95,717 | 2,639 |
| | Closed End 2nds | 7,888 | 18,033 | 2,063 | 13,263 | 1,676 |
| | Total OBS Resi | 231,880 | 415,799 | 143,911 | 361,071 | 18,622 |
| | % of NPLs/ Total Loans | 7.75% | 4.30% | 4.44% | 3.91% | 1.15% |
| | Loan Loss Allowance | 27,609 | 33,873 | 30,115 | 19,372 | 722 |
| | % Loan Loss Reserves to Modification Amt | 13% | 23% | 5% | 18% | 26% |

Source: Deutsche Bank, SNL, FDIC

**JP Morgan Chase**

One other potentially likely candidate to modify portfolio loans would be JP/Chase. This is likely a result of two factors. First, JP has the largest percentage of nonperforming loans of the top five servicers with 7.75% of total loans in the nonperforming bucket. While It seems reasonable that given these modifications would result in

a positive NPV result for JP and that they would get credit towards the settlement for these modifications that there may be motivation to focus on portfolio loans rather than trust loans. Secondly, the $3.6 billion which JP must allocate to principal reductions is only 13% of their current loan loss allowance, leaving them potentially well positioned to focus on portfolio loans.

**Citi**

We maintain some reservations about Citi given the size of their settlement obligation relative to the total amount of delinquent non agency exposure. It is disproportionately large and therefore any level of trust modifications would likely have an impact on investors. That being said, given Citi's allowance of roughly $30 billion, they appear to be more than adequately reserved to focus on portfolio loans to fulfill their $1.4 billion principal modification obligation under the settlement.

**Investor Negative**

**Bank of America**

Of the five servicers, it appears on the surface that Bank of America may be the most likely to modify trust loans. As reported in the Wall Street Journal last Friday, B of A reached a separate deal with the agencies to provide deeper than anticipated principal reductions to reduce its penalties by up to $850 million. Their principal modification commitment of the settlement would be in excess of 23% of BAC's loan loss allowance as of December 31. While Wells was transparent with their intention to modify only portfolio loans in their 10K, Bank of America made no such assurances in their statement on Friday when the news was released about the magnitude of the principal reductions. Potential upside in Countrywide bonds from numerous lawsuits and repurchase clams could be significantly mitigated if not completely negated if B of A begins modifying loans in the trusts.

**Neutral**

**GMAC/Ally**

Given the rather nominal amount of principal modifications ($185 million) relative to the total outstanding exposure of GMAC serviced non agency loans, it is hard to imagine a scenario where either portfolio or trust mods would have a large scale impact on investors in those securities. That being said, the size of the settlement is significant relative to their overall loan loss allowance of $722 million.

FHFA 3108

**Deutsche Bank** 

**Conclusion**

There appear to be potential alpha opportunities resultant from the AG settlement. While the vast majority of Wells issuance was in the jumbo prime sector, lower dollar price WFMBS seniors and mezzanine cash flows could provide better than expected returns as underlying loans are deleveraged in the event of the extinguishment of second lien principal. Additionally, JPMAC shelf subprime could provide equally good if not better returns given the incrementally higher dollar price leverage in subprime. For now, we would proceed with caution on CWALT bonds until Bank of America's course of action becomes clearer.

***Christopher Helwig (+1) 212 250-3033***

14 March 2012     The Outlook                                                **Deutsche Bank**

## SECTOR ANALYSIS
# Putting a price on LTV

## Agency MBS

With the Home Affordable Refinance Program (HARP) likely to drive prepayments up sharply in the next few months, more pools backed by HARP loans will come flowing into the agency MBS market. The market already recognizes some of the value in these pools since HARP borrowers can only go through the program once, leaving them with limited refinancing opportunities afterwards. Within the MHA sector, higher LTV pools look attractive in valuation relative to lower LTV pools. Furthermore, MHA pools and CMOs appear to be attractive alternatives to rates and corporate debts.

**Limited refinancing options for HARP borrowers**

MHA pools have been issued since the summer of 2009, shortly after the launch of HARP. HARP allows a borrower with a high LTV to refinance through the program only if the loan was originated before May 31, 2009. Since every loan refinanced through HARP has an origination date that falls past the eligibility deadline, a borrower can only go through the program once. Since all HARP borrowers have estimated loan-to-value ratios above 80%, they face limited alternatives for refinancing a second time. And as the LTV of the HARP loan goes up, those alternatives approach zero.

As a result of limited refinancing options, HARP pools have prepaid slowly and consistently. Figure 12 shows the historical prepayments for 2010 MHA pools compared to the 2010 conventional cohorts. While low mortgage rates helped drive the 2010 conventional speeds up above 20 CPR for 4.0%s and 4.5%s late last year, prepayments on MHA pools remained in the single digits.

Some of the prepayment differences are due to the weaker credit profiles of MHA borrowers. For example, MHA borrowers tend to have slightly lower FICO scores as seen in Figure 13. For 2010 4.5%s, for example, average FICO on MHA pools range from 744 to 747, which is 11 to 14 points lower than the 758 credit score of the 2010 vintages. In addition, 4.5%s MHA pools tend to have higher gross WACs by a few basis points. However, those differences do not fully explain the large prepayment gap between the two, and the main driver of the prepayment differences looks to be from the limited refinancing alternatives of HARP borrowers.



**Figure 12: Prepayments for MHA pools have shown muted response to refinancing**

FN 30Y 2010 4.0%s



FN 30Y 2010 4.5%s



FN 30Y 2010 5.0%s

| | |
| --- | --- |
| —— MHA: 80-90 LTV | —— MHA: 90-95 LTV |
| — — MHA: 95-100 LTV | ····· MHA: 100-105 LTV |
| —■— CQ: 105+ LTV | - - - FNCL |

Source: CPRCDR, Deutsche Bank

Since MHA pools show a muted refinancing response to low mortgage rates, turnover plays a larger role in their prepayments. And within the turnover, default-related turnover makes up a large portion of their pay-downs due to weaker credit profiles of the borrowers. Based on Freddie Mac's supplemental data, buyouts made up 2% and 7% of Freddie Mac conventional 30-year 4.5%s and 5.0%s prepayments in February, respectively. Meanwhile, they were nearly 67% of prepayments for 4.5%s and 5.0%s in the Freddie Mac U6 program, which is comprised of 105% to 125% LTV HARP loans. Lower credit quality borrowers should lead to larger default-related turnover, as well as larger overall turnover, in MHA pools compared to conventionals. Thus, a better convexity profile of MHA pools comes from both the refinancing and the turnover side.

FHFA 3110

14 March 2012    The Outlook

**Deutsche Bank**

Figure 13: Collateral characteristics of MHA pools, 9 March 2012

| | Amt | WAC | WALA | WAOLS | | CPR hist | | |
|---|---|---|---|---|---|---|---|---|
| | ($BN) | (%) | (mth) | ($K) | FICO | 1M | 3M | 6M |
| **FN 30Y 2010 4.0%** | | | | | | | | |
| FNCL | 108.2 | 4.50 | 15 | 258 | 767 | 17.9 | 20.1 | 18.2 |
| MHA: 80-90 LTV | 2.9 | 4.50 | 15 | 276 | 761 | 4.9 | 6.1 | 5.6 |
| MHA: 90-95 LTV | 1.0 | 4.52 | 15 | 271 | 762 | 3.1 | 3.7 | 3.6 |
| MHA: 95-100 LTV | 0.4 | 4.53 | 15 | 267 | 760 | 2.7 | 2.7 | 3.1 |
| MHA: 100-105 LTV | 0.3 | 4.50 | 15 | 262 | 757 | 2.6 | 1.9 | 1.9 |
| CQ: 105+ LTV | 0.2 | 4.56 | 15 | 229 | 756 | 0.3 | 1.1 | 1.6 |
| **FN 30Y 2010 4.5%** | | | | | | | | |
| FNCL | 108.0 | 4.94 | 20 | 245 | 758 | 20.5 | 22.6 | 20.5 |
| MHA: 80-90 LTV | 2.5 | 4.92 | 16 | 268 | 747 | 4.3 | 6.9 | 6.2 |
| MHA: 90-95 LTV | 1.1 | 4.93 | 16 | 264 | 744 | 3.3 | 3.0 | 3.3 |
| MHA: 95-100 LTV | 0.9 | 4.97 | 16 | 260 | 745 | 5.2 | 4.4 | 4.1 |
| MHA: 100-105 LTV | 0.6 | 4.96 | 16 | 254 | 747 | 2.5 | 4.3 | 3.8 |
| CQ: 105+ LTV | 1.0 | 5.03 | 17 | 245 | 748 | 4.7 | 4.9 | 4.3 |
| **FN 30Y 2010 5.0%** | | | | | | | | |
| FNCL | 52.5 | 5.36 | 21 | 227 | 738 | 16.4 | 17.7 | 16.3 |
| MHA: 80-90 LTV | 0.5 | 5.37 | 16 | 268 | 721 | 8.4 | 7.4 | 6.9 |
| MHA: 90-95 LTV | 0.4 | 5.38 | 16 | 262 | 725 | 11.3 | 9.3 | 6.4 |
| MHA: 95-100 LTV | 0.4 | 5.38 | 17 | 260 | 726 | 6.4 | 6.4 | 6.2 |
| MHA: 100-105 LTV | 0.4 | 5.40 | 16 | 249 | 729 | 6.4 | 6.3 | 6.5 |
| CQ: 105+ LTV | 1.5 | 5.49 | 20 | 252 | 739 | 6.8 | 6.0 | 5.5 |

Source: Deutsche Bank

**Pay-ups on MHA have appreciated since last summer**

The market has warmed to this prepayment profile and the pay-up on MHA pools has appreciated as a result. Last summer, MHA pools traded at or below HLB levels but they have rallied higher since then (Figure 14). This is due to the strong call protection displayed by MHA pools during last fall's refi wave and better comfort with the prepayment behaviors of the borrowers. In addition, higher pay-ups also reflect the diminished risks from re-HARPing, given that the latest changes to the program have excluded this option, as well as recent weaknesses in TBA dollar rolls.

Figure 14: Pay-ups on MHA pools have appreciated to loan balance pool levels, 20 July 2011 – 1 March 2012



Source: Deutsche Bank

**High LTV MHA pools look attractive**

Within the MHA sector, HARP pools with the highest LTVs have the lowest actual-to-theoretical pay-up ratios and hence, show the best relative value (Figure 15). Theoretical pay-ups are computed by running MHA pools at same OAS as TBAs and then subtracting the resulting prices from the TBA price. Pools that show the lowest ratios of actual to theoretical pay-up offer the cheapest valuation. For 80-to-90 LTV MHA 4.5%s, the current pay-up of $1-26 is 339% of the theoretical pay-up of $0-17, while this ratio drops to 100% for 100-to-105 LTV MHA 4.5%s and to 80% for CQ 4.5%s.

The good relative value in the highest LTV pools arguably comes from MBS investors' reluctance to give up carry for convexity. Based on the model speed, TBA 4.5%s offer 2.65% yield for 3.0 years of negative convexity. In comparison, the CQ offers higher yield at 3.04% while having better convexity of -0.6 years.  Other 4.5% MHA pools fall in between those two.

14 March 2012    The Outlook

**Deutsche Bank**

**Figure 15: Fair valuations on MHA pool pay-up, 9 March 2012**

| MHA type | price | Actual Pay-up | Theo. Pay-up | % of Theo. value |
|---|---|---|---|---|
| FN 30Y 4.0% TBA | 105-03+ | | | |
| MHA: 80-90 LTV | 106-03+ | 1-00 | 0-13+ | 251% |
| MHA: 90-95 LTV | 106-11+ | 1-08 | 1-02 | 118% |
| MHA: 95-100 LTV | 106-13+ | 1-10 | 1-23 | 76% |
| MHA: 100-105 LTV | 106-19+ | 1-16 | 2-09 | 66% |
| CQ: 105+ LTV | 106-23+ | 1-20 | 3-07+ | 50% |
| FN 30Y 4.5% | 106-12+ | | | |
| MHA: 80-90 LTV | 108-06+ | 1-26 | 0-17 | 339% |
| MHA: 90-95 LTV | 108-18+ | 2-06 | 1-17 | 142% |
| MHA: 95-100 LTV | 108-24+ | 2-12 | 1-30+ | 122% |
| MHA: 100-105 LTV | 108-30+ | 2-18 | 2-18 | 100% |
| CQ: 105+ LTV | 109-04+ | 2-24 | 3-14+ | 80% |
| FN 30Y 5.0% | 107-28 | | | |
| MHA: 80-90 LTV | 109-24 | 1-28 | 1-28 | 100% |
| MHA: 90-95 LTV | 110-04 | 2-08 | 2-27 | 79% |
| MHA: 95-100 LTV | 110-10 | 2-14 | 3-09 | 74% |
| MHA: 100-105 LTV | 110-16 | 2-20 | 3-30 | 67% |
| CQ: 105+ LTV | 110-20 | 2-24 | 4-28+ | 56% |

*Source: YieldBook, Deutsche Bank*

Another approach to pool valuation is through comparison of carry offered by specified pools to TBAs. Monthly carry advantage of different MHA pools over TBA can be divided into pay-up levels to compute break-even months, which measures how quickly pay-ups will be returned. For CQ 4.5%s, monthly carry adds up to around 10.2/32s, or around 6/32s better than TBAs (Figure 16). At those levels, the monthly carry will recoup the pay-up in 15 months.

**MHA pools look attractive to rates and corporate debts**

MHA pools also look like good alternatives to high quality corporate debt. Indicative yields on AA seven-year corporate debt are at around 1.84%. In comparison, CQ 4.5%s yields around 3.04%, offering 120 bp of additional yield over the AA corporate with similar durations.  Given the better convexity profile of MHA pools compared to TBAs, this trade gives up on much less on convexity than it would have with TBAs.

**Figure 16: MHA pools offer carry advantage to TBAs**

| | PRICE | b/e CPR | Monthly Carry (32s) | Carry Adv. (32s) | Pay-up (32s) | b/e months |
|---|---|---|---|---|---|---|
| FN 4.0 TBA | 105.13 | 23.1 | 6.3 | | | |
| MHA: 80-90 LTV | 106.95 | 10.5 | 7.6 | 1.4 | 32 | 23 |
| MHA: 90-95 LTV | 107.32 | 6.4 | 8.4 | 2.1 | 40 | 19 |
| MHA: 95-100 LTV | 107.51 | 4.7 | 8.8 | 2.5 | 42 | 17 |
| MHA: 100-105 LTV | 107.70 | 3.7 | 8.9 | 2.6 | 48 | 18 |
| CQ: 105+ LTV | 107.88 | 3.2 | 8.9 | 2.7 | 52 | 19 |
| FN 4.5 TBA | 106.39 | 34.0 | 4.3 | | | |
| MHA: 80-90 LTV | 107.39 | 12.0 | 8.5 | 4.2 | 58 | 14 |
| MHA: 90-95 LTV | 107.64 | 7.6 | 9.4 | 5.1 | 70 | 14 |
| MHA: 95-100 LTV | 107.70 | 6.2 | 9.7 | 5.4 | 76 | 14 |
| MHA: 100-105 LTV | 107.89 | 5.0 | 9.9 | 5.6 | 82 | 15 |
| CQ: 105+ LTV | 108.02 | 3.5 | 10.2 | 5.9 | 88 | 15 |

*Source: Bloomberg Finance LP, Deutsche Bank*

CMOs off of HARP loans also look attractive to rates. Figure 17 highlights the total return profile of FHR 3996 TB, a 2.25% sequential off of Freddie Mac U6 4.5%s, compared to a duration-neutral portfolio of two-year and ten-year Treasuries. In a base case, the CMO returns around 2.5% for the year, or nearly 70 bp better than the duration-neutral portfolio of two-year and ten-year Treasuries (Figure 17). The return profile of CMO holds well in a 50 bp rally and 50 bp sell-off scenarios.

**Figure 17: One-year total return profile of sequential off of high LTV pools**



*Source: Yieldbook, Deutsche Bank*

Similar to other call-protected paper, one risk of owning MHA pools is in the rate sell-off; as refinancings slow, call-protection offered by MHA pools becomes less valuable. However, primary mortgage rates have been fairly sticky at around 4.0%, and the spread between primary and secondary mortgage rates widened to almost 100 bps

FHFA 3112



**Deutsche Bank**

from a longer-term average of 60 bps as rates have rallied. Thus, any rate sell-off will likely compress this spread first and primary mortgage rates will likely trail the sell-off in rates.

*Jeff Ryu (+1) 212 250-3984*

14 March 2012    The Outlook                                          **Deutsche Bank**

## SECTOR ANALYSIS
# Underwriting the recovery

### Rates

We continue to expect the Fed to "underwrite" the recovery by maintaining monetary stimulus though the balance of the year. This is much more likely to be accomplished through a "Twist2" program sterilized through reverse repo than it is via a new round of unsterilized asset purchases. The purpose of the policy tool is to crowd investors out of Treasuries and into riskier credit instruments. Credit growth shows signs of having accelerated, particularly in C&I loans, but the Fed will likely want to see a consistent pattern of credit creation before risking what might otherwise be a premature withdrawal of stimulus. We continue to see the greater risk to the recovery as being too little, rather than too much, policy accommodation.

From an historical perspective, current relative valuations of bonds and equities appear anomalous. If Treasuries are right, then equity values appear too high; if equities are right, then Treasury yields appear too low by as much as 50 bp. The risk to lower equities is a weaker balance sheet and potential additional precautionary savings. The risk to higher Treasury yields is that the incentive to invest in riskier credit instruments will be undermined, disrupting the portfolio balance channel. This too would likely ultimately undermine risky asset values. In a vacuum, one would expect the relative pricing anomaly to resolve itself through higher Treasury rates, lower equity valuations, or both. In the absence of resurgent credit creation, none of these are acceptable to the Fed. One might think of Twist2 as a third way for the Fed that maintains incentives for credit creation, provides some additional stimulus for the FOMC doves, yet placates the hawks on the FOMC by avoiding further expansion of the monetary base.

In the absence of credit creation, the larger monetary base coupled with a constant multiplier results in capital chasing the prices of the existing stock of assets higher. In the presence of credit creation, new assets are created at a more or less constant pricing structure. The risk of a premature withdrawal of stimulus – before credit creation is on stronger footing - is essentially that of a "levered" decrease in risky asset prices to their pre-stimulus levels.

One of the primary implications of this environment is that volatility should remain generally low, particularly at the long end of the curve. To trade back to the lows of the recent range, or indeed to trade to new lows, would

require activity data to roll over, or a new shock from Europe. We expect neither in the short run. At the same time, we expect the Fed to effectively cap yields in order to safeguard the economic incentives for further portfolio shifts into riskier assets.

There are headwinds to the Fed's task of maintaining the current yield structure. The first is the declining share of foreign ownership in the Treasury market. Foreign official ownership of the Treasury market fell 1.3% in Q4, and has fallen to 33% from the peak in mid 2009 – a decline of 5%. This is a reflection of slower growth and the resulting slower accumulation of reserves by structural current account surplus countries.



**Figure 18: Declining foreign official ownership of Treasuries**

*Source: Deutsche Bank*

It is likely that this is but the beginning of a more secular trend stemming from the resolution of structural imbalances. As public and private sector savings increase in the US, the current account deficit declines, and foreign accumulation of dollars slows, the Treasury market will transition from an internationally financed market to a domestically financed market.

This could prove disruptive, particularly given the apparent slowdown in China. A steady decrease in reserve accumulation, particularly if accompanied by an erosion of the dollar's share of reserve holdings, could create additional upward pressure on Treasury yields.

FHFA 3114

14 March 2012      The Outlook

**Deutsche Bank**

**Figure 19: Chinese reserve growth as function of real GDP growth**



Source: Deutsche Bank

**Figure 20: Cumulative Distribution of Prices, unconditional and conditioned on 3% ULC increase**



Source: Deutsche Bank

For this reason additional Fed ownership of the Treasury market, particularly at the long end of the curve, could prove beneficial as a smoothing mechanism as the US transitions to a domestically financed market.

We do not think that the concentration of risk on the Fed's balance sheet, and the likely losses that will result when rates can climb sustainably, is a limiting factor in Fed action. The Fed's net income more than doubled from the beginning of the financial crisis to the end of 2010 due to the increase in the size of the balance sheet, itself an artefact of achieving its dual mandate. By the same logic, losing that windfall – and likely even more – should similarly be construed as an externality of achieving the mandate.

A second potential headwind to the Fed is inflation. Payroll revisions and falling productivity have resulted in a significant increase in unit labor costs. However, ULC increases need not spill directly over into higher inflation. The key issue is pricing power. In the presence of pricing power, higher ULC could simply be passed along to consumers in the form of higher prices. However, in the absence of pricing power, if corporations attempt to defend profit margins, given higher ULC and falling productivity the reaction of corporations could be slow hiring or even reduced headcount.

Superficially, significant increases in ULCs do produce higher inflation. We analyzed this by looking at quarterly price and ULC data for unit gross value added data. 50% of quarterly y/y changes to prices in the quarter following the observation of ULC since 1970 were 2% or less. However, when one conditions the data on a 3% increase or greater in ULCs, 50% of the price increases in the next quarter were 6% or less. The data, however, depend heavily on the inflationary environment of the 1970s. We would argue that the 1970s were substantially different with regard to Fed credibility, wage indexing, and other considerations. Indeed, the Fed has more recently enhanced its credibility with an explicit target. Pricing power was far more muted (<2%) in 2000 and 2007-2008.

Turning to profitability, we repeat the same analysis. In the case of profits, historically 40% of the quarterly data consisted of decreases to profit margins, subject to the same lag as the price analysis. However, given a 3% increase in ULC, 60% of the time profit margins fell in the following quarter.

**Figure 21: Cumulative distribution of profits, unconditionally and conditioned on 3% increase in ULC**



Source: Deutsche Bank

FHFA 3115

**Deutsche Bank**

The risk scenario is that slower global growth and increased household savings limit the ability of corporations to pass along price increases to consumers, and in response corporations cut labor input in response to falling productivity and higher costs.   This could lengthen the time required for the economy to absorb excess capacity and actually extend the period for which the Fed must continue to underwrite credit creation and, more broadly, the recovery.

## Risk assets and the end of the Twist

One conundrum of recent financial market performance has been the stubbornly low level of Treasury yields amid solid performance of risk assets, in particular equities. Traditional portfolio theory argues that stocks and bonds tend to move in opposite directions. We believe the reason stocks have done well is precisely because interest rates on risk free assets are low. The Fed has driven investors out of Treasuries into spread product and equities through Operation Twist and Quantitative Easing. In the Twist program, the Fed is absorbing the duration equivalent of $54 billion a month in 10-year notes via long end buying, representing about 45% of the duration supply from the Treasury.

**Figure 22: 10yr Treasury yield around the end of prior QEs (end of QE date set to 0)**



*Source: Bloomberg Financial LP and Deutsche Bank*

Aggregate data on financial asset demand, shown in the table here from the Fed's Flow of Funds data that came out on Thursday, March 8, paint a less clear picture, as the Fed's duration takeout is not apparent merely from par values. It is notable, however, that among the net buyers of agency and corporate bonds are the duration-hungry pension/insurance sector, which added $68 billion in those two asset categories. (The figures shown here adjust the Flow of Funds data to include each sector's direct holdings of securities as well as indirect holdings via mutual fund investments.) Overall, Treasury assets

grew by more than $300 billion, with a large chunk absorbed by money market funds (classified in our table as "Other U.S. domestic"), which buy bills, and foreigners. Purchases and flows shown here do not differentiate between holdings of Treasury bills, notes, and bonds.

**Figure 23: S&P 500 index around the end of prior QEs (end of QE date set to 0)**



*Source: Bloomberg Financial LP and Deutsche Bank*

Asset prices nevertheless suggest that QE and the Twist have done their job in crowding investors out of risk free Treasuries into risk assets in search for higher yields. Corporate bonds, mortgages, and stocks have been the prime beneficiaries of the crowding out. US domestic bond fund investors who have an overweight in spread products have been rewarded in solid total return so far this year.

**Figure 24: Demand for U.S. assets over Operation Twist (Q4 '11)**

|  | Treasuries | AGY/MBS | Corp | Equity | Cash | Total |
|---|---|---|---|---|---|---|
| Fed | (1) | (37) | 0 | 0 | (0) | (3) |
| Households * | 51 | (33) | (23) | (101) | 137 | 32 |
| Banks | (7) | 52 | (17) | (2) | (23) | 4 |
| Pension, Insurance | 32 | 23 | 45 | (15) | (4) | 80 |
| Other US Domestic | 176 | (22) | (13) | 4 | 158 | 337 |
| Total Foreign | 75 | (7) | (26) | (11) | 82 | 113 |
| Private Foreign | 99 | 3 | (25) |  |  |  |
| Official Foreign | (24) | (10) | (1) |  |  |  |
| Total (FF) | 326 | (24) | (34) | (125) | 350 | 527 |

Source: Federal Reserve; Deutsche Bank; Note: Q4 '10 to Q4 '11 difference in Flow of Funds levels, except for equities, which reflect flows; * Additional assets allocated to each sector in proportion to mutual fund holdings. Cash entry for Federal Reserve reflects reserves, with an increase in reserves reflected as a decline in "cash", but is not used in  FoF cash total.

Following this logic, it's possible that we see some relative "crowding back" into Treasuries from other assets towards the end of the Twist. The stock market sell-off on Tuesday, March 6 reminded investors of how risky assets suffered towards the end of QE1 and QE2. The S&P 500 index had a local peak shortly after the Fed

FHFA 3116

**Deutsche Bank**

concluded QE1 MBS purchases (tapered), as well as QE2. TIPS breakevens drifted lower, and even deflation scare was priced in after QE1. MBS basis widened, particularly after QE2. Therefore, we believe it's crucial that the Fed continues the Twist in some format in the second half of this year to avoid a downturn in risk assets, as was the case at the end of QE1 and QE2. This becomes more important in light of the fiscal tightening that would take place if Bush-era tax rates were to rise by year end.

| Figure 25: Demand for U.S. assets over 2011 | | | | | | |
|---|---|---|---|---|---|---|
| | Treasuries | AGY/MBS | Corp | Equity | Cash | Total |
| Fed | 642 | (198) | 0 | (26) | (595) | (177) |
| Households * | (128) | (11) | (56) | (142) | 382 | 45 |
| Banks | (33) | 144 | (12) | 1 | 638 | 739 |
| Pension, Insurance | 122 | 65 | 202 | (48) | (2) | 339 |
| Other US Domestic | 172 | 3 | (63) | 9 | (677) | (557) |
| Total Foreign | 291 | (40) | (46) | (32) | 148 | 321 |
| *Private Foreign* | 171 | (28) | (44) | (16) | | 83 |
| *Official Foreign* | 120 | (12) | (3) | (16) | | 90 |
| Total (FF) | 1067 | (37) | 24 | (247) | 489 | 1297 |

Source: Federal Reserve; Deutsche Bank; Note: Q4 '10 to Q4 '11 difference in Flow of Funds levels, except for equities, which reflect flows; * Additional assets allocated to each sector in proportion to mutual fund holdings. Cash entry for Federal Reserve reflects reserves, with an increase in reserves reflected as a decline in "cash", but is not used in FoF cash total.

*Dominic Konstam (1) 212 250-9753*
*Alex Li (1) 212 250-5483*
*Aleksandar Kocic (1) 212 250 0376*
*Stuart Sparks (1) 212 250 0332*
*Daniel Sorid (1) 212 250 1407*
*Steven Zeng (1) 212 250 9373*

FHFA 3117

14 March 2012      The Outlook


Deutsche Bank

## SECTOR ANALYSIS
# Labor market begins to blossom

## Economics

*Summary:* The February employment report was solid as both headline and private payrolls each topped 200k for the third month in a row. Despite a 0.2% increase in the participation rate, the unemployment rate was steady at 8.3%. The factory workweek and temporary hiring, which are two leading indicators of the labor market, showed further advancement. Finally, the consistent pattern of upward revisions to private payrolls remained in place. This speaks of continued understatement of household wages and salaries.

**Employment gains are running at their fastest pace in nearly six years.** Nonfarm payrolls increased +227k in February after December and January were revised up by a cumulative 61k. The December and January increases now stand at +223k and +284k, respectively. The February gain therefore produces a three-month moving average of +245k, up from +221k previously. Excluding the government's temporary 2010 Census hires, the last three months have seen the strongest payroll gains since the three months ending May 2006 (+260k). Private payrolls were up +233k, after rising a revised +285k in January, as the rate of government job loss has slowed markedly over the past several months. This is due to a dramatic improvement in state and local tax revenue.

The gains in employment were fairly broad-based in February, although they were not as widespread as January when the diffusion index of private payrolls hit 70.3% (the highest reading since January 1998). The February diffusion index came in at a decent 57.9%, but the three-month moving average actually rose nearly one point to 64.0% from 63.2% previously. Goods employment was up +24k, led by a +31k increase in manufacturing, the fifth gain in a row and the 15th increase in the last 16 months. The 0.1 hour increase in the factory workweek to 41.9 hours lifted the series to its highest reading since January 1998. Combined with the aforementioned increase in manufacturing employment, the index of manufacturing hours increased +0.5% in February following a +0.9% increase in January. Rising factory jobs and hours point toward another solid gain in manufacturing production; and this in turn points to further large inventory building, an important catalyst for current quarter growth.

**Weather may not have been a factor.** The weakest part of the goods sector was construction, where employment declined -13k, the first decline since last October. This should mitigate some concern that unseasonably warm winter weather is temporarily lifting employment. Another leading indicator of the labor market, temp hiring, jumped 45k in February, the largest increase since January 2010

(+58K). Often, if companies are unsure about future economic demand, they employ "temps" before committing to more permanent hires. The fact that temp hiring is improving in an environment of healthier underlying job gains suggests to us that we could see a step-up in nonfarm payroll gains later this spring.

**Service-sector hiring is growing, too.** Private service-sector employment was up +209k after rising +202k previously. These are the first back-to-back 200k-plus gains since March-April 2011. In February, education and health services were up +71k while leisure and hospitality services rose +44k, and professional and business services excluding temps increased a decent +37k. However, there is some concern these service sector jobs in particular and the broad improvement in hiring will fade next quarter, similar to what happened last year and the year before. We are more sanguine for a couple of reasons. One, the economy is much healthier today than either last year or the year before. For example, initial jobless claims are hovering near four-year lows; corporate profits have attained new cyclical highs and households have had two more years to deleverage. Two, the European crisis flared up significantly in 2010 and to a similar extent in 2011, which also experienced massive global manufacturing supply disruptions owing to the Japanese tsunami/earthquake. Food and energy costs were also rising at a much faster rate last year. Barring another exogenous shock, we believe the labor market is finally on a sustainable upward path. The fact that employment gains are understated makes us even more confident in the outlook.

**Payroll gains are still undercounted.** Despite the ongoing upward revisions to private payrolls, we believe the numbers are still being undercounted. This is due to the fact that household employment is surging—it rose +428k in February and has risen almost 2 million in the past six months, about 800k faster than the 1.2 million increase in nonfarm payrolls. This meant that even though the labor force participation rate edged up 0.2 to 63.9%, because household unemployment reversed a string of declines and rose a small 48k, the unemployment rate was steady at 8.3%. Based on what we are seeing in claims, the unemployment rate is likely to resume its descent again next month. We expect average hourly earnings, which were up just 0.1% in February, the fourth such gain in a row, to turn higher, matching what has been a 3.5% gain already seen in total compensation per hour.

*Joseph A. LaVorgna (212) 250-7329*

FHFA 3118

Deutsche Bank 

# Appendix 1

## Important Disclosures

Additional information available upon request

**For disclosures pertaining to recommendations or estimates made on a security mentioned in this report, please see the most recently published company report or visit our global disclosure look-up page on our website at** http://gm.db.com/ger/disclosure/DisclosureDirectory.eqsr**.**

## Analyst Certification

The views expressed in this report accurately reflect the personal views of the undersigned lead analyst(s). In addition, the undersigned lead analyst(s) has not and will not receive any compensation for providing a specific recommendation or view in this report. Steve Abrahams/Harris Trifon/Elen Callahan

<div style="background:navy;color:white">Deutsche Bank debt rating key</div>

**Buy:** These bonds are expected to outperform other issues in the sector/industry group over the next three to six-month period.
**Hold:** These bonds are fairly valued currently. If owned, no need to sell, but we await events/ releases/ conditions that would make the bond attractive enough for us to upgrade. In the interim, the bond will likely perform as well as the average issue in the sector/industry group.
**Sell:** There exists a significant likelihood that these bonds will underperform relative to other issues in their sector/industry group, at least over the next three months.

FHFA 3119

**Deutsche Bank**

## Regulatory Disclosures

## 1. Important Additional Conflict Disclosures

Aside from within this report, important conflict disclosures can also be found at https://gm.db.com/equities under the "Disclosures Lookup" and "Legal" tabs. Investors are strongly encouraged to review this information before investing.

## 2. Short-Term Trade Ideas

Deutsche Bank equity research analysts sometimes have shorter-term trade ideas (known as SOLAR ideas) that are consistent or inconsistent with Deutsche Bank's existing longer term ratings. These trade ideas can be found at the SOLAR link at http://gm.db.com.

## 3. Country-Specific Disclosures

**Australia and New Zealand:** This research, and any access to it, is intended only for "wholesale clients" within the meaning of the Australian Corporations Act and New Zealand Financial Advisors Act respectively.

**Brazil:** The views expressed above accurately reflect personal views of the authors about the subject company(ies) and its(their) securities, including in relation to Deutsche Bank. The compensation of the equity research analyst(s) is indirectly affected by revenues deriving from the business and financial transactions of Deutsche Bank.

**EU countries:** Disclosures relating to our obligations under MiFID can be found at http://www.globalmarkets.db.com/riskdisclosures.

**Japan:** Disclosures under the Financial Instruments and Exchange Law: Company name - Deutsche Securities Inc. Registration number - Registered as a financial instruments dealer by the Head of the Kanto Local Finance Bureau (Kinsho) No. 117. Member of associations: JSDA, Type II Financial Instruments Firms Association, The Financial Futures Association of Japan, Japan Securities Investment Advisers Association. This report is not meant to solicit the purchase of specific financial instruments or related services. We may charge commissions and fees for certain categories of investment advice, products and services. Recommended investment strategies, products and services carry the risk of losses to principal and other losses as a result of changes in market and/or economic trends, and/or fluctuations in market value. Before deciding on the purchase of financial products and/or services, customers should carefully read the relevant disclosures, prospectuses and other documentation. "Moody's", "Standard & Poor's", and "Fitch" mentioned in this report are not registered credit rating agencies in Japan unless "Japan" or "Nippon" is specifically designated in the name of the entity.

**Malaysia:** Deutsche Bank AG and/or its affiliate(s) may maintain positions in the securities referred to herein and may from time to time offer those securities for purchase or may have an interest to purchase such securities. Deutsche Bank may engage in transactions in a manner inconsistent with the views discussed herein.

**Russia:** This information, interpretation and opinions submitted herein are not in the context of, and do not constitute, any appraisal or evaluation activity requiring a license in the Russian Federation.

## Risks to Fixed Income Positions

Macroeconomic fluctuations often account for most of the risks associated with exposures to instruments that promise to pay fixed or variable interest rates. For an investor that is long fixed rate instruments (thus receiving these cash flows), increases in interest rates naturally lift the discount factors applied to the expected cash flows and thus cause a loss. The longer the maturity of a certain cash flow and the higher the move in the discount factor, the higher will be the loss. Upside surprises in inflation, fiscal funding needs, and FX depreciation rates are among the most common adverse macroeconomic shocks to receivers. But counterparty exposure, issuer creditworthiness, client segmentation, regulation (including changes in assets holding limits for different types of investors), changes in tax policies, currency convertibility (which may constrain currency conversion, repatriation of profits and/or the liquidation of positions), and settlement issues related to local clearing houses are also important risk factors to be considered. The sensitivity of fixed income instruments to macroeconomic shocks may be mitigated by indexing the contracted cash flows to inflation, to FX depreciation, or to specified interest rates – these are common in emerging markets. It is important to note that the index fixings may – by construction – lag or mis-measure the actual move in the underlying variables they are intended to track. The choice of the proper fixing (or metric) is particularly important in swaps markets, where floating coupon rates (i.e., coupons indexed to a typically short-dated interest rate reference index) are exchanged for fixed coupons. It is also important to acknowledge that funding in a currency that differs from the currency in which the coupons to be received are denominated carries FX risk. Naturally, options on swaps (swaptions) also bear the risks typical to options in addition to the risks related to rates movements.

**Deutsche Bank** 

### David Folkerts-Landau
Managing Director
Global Head of Research

| Guy Ashton | Marcel Cassard | Stuart Parkinson |
|---|---|---|
| Head | Global Head | Associate Director |
| Global Research Product | Fixed Income Research | Company Research |

| Asia-Pacific | Germany | Americas | Europe |
|---|---|---|---|
| Fergus Lynch | Andreas Neubauer | Steve Pollard | Richard Smith |
| Regional Head | Regional Head | Regional Head | Regional Head |

#### Principal Locations

**Deutsche Bank AG
London**
1 Great Winchester Street
London EC2N 2EQ
Tel: (44) 20 7545 8000

**Deutsche Bank AG
New York**
60 Wall Street
New York, NY 10005
United States of America
Tel: (1) 212 250-2500

**Deutsche Bank AG
Hong Kong**
Filiale Hongkong
Intl. Commerce Centre
1 Austin Road West Kowloon,
Hong Kong
tel: (852) 2203 8888

**Deutsche Securities Inc.
Japan**
2-11-1 Nagatacho
Sanno Park Tower
Chiyoda-ku, Tokyo 100-6171
Tel: (81) 3 5156 6770

**Deutsche Bank AG
Frankfurt**
Große Gallusstraße 10-14
60272 Frankfurt am Main
Germany
Tel: (49) 69 910 00

**Deutsche Bank Ltd.**
Aurora business park
82 bld.2 Sadovnicheskaya street
Moscow, 115035
Russia
Tel: (7) 495 797-5000

**Deutsche Bank AG
Singapore**
One Raffles Quay
South Tower
Singapore 048583
Tel: (65) 6423 8001

**Deutsche Bank AG
Australia**
Deutsche Bank Place, Level 16
Corner of Hunter & Phillip Streets
Sydney NSW 2000
Tel: (61) 2 8258 1234

**Deutsche Bank Dubai**
Dubai International Financial Centre
The Gate, West Wing, Level 3
P.O. Box 504 902
Dubai City
Tel: (971) 4 3611 700

**Subscribers to research via email receive their electronic publication on average 1-2 working days earlier than the printed version.**

**If you would like to receive this or any other product via email please contact your usual Deutsche Bank representative.**

**Publication Address:**
Deutsche Bank AG
New York
60 Wall Street
New York, NY 10005
United States of America
Tel: (1) 212 250-2500

**Internet:**
http://gmr.db.com
Ask your usual contact for a username and password.

## Global Disclaimer

The information and opinions in this report were prepared by Deutsche Bank AG or one of its affiliates (collectively "Deutsche Bank"). The information herein is believed to be reliable and has been obtained from public sources believed to be reliable. Deutsche Bank makes no representation as to the accuracy or completeness of such information.

Deutsche Bank may engage in securities transactions, on a proprietary basis or otherwise, in a manner **inconsistent** with the view taken in this research report. In addition, others within Deutsche Bank, including strategists and sales staff, may take a view that is **inconsistent** with that taken in this research report.

Opinions, estimates and projections in this report constitute the current judgement of the author as of the date of this report. They do not necessarily reflect the opinions of Deutsche Bank and are subject to change without notice. Deutsche Bank has no obligation to update, modify or amend this report or to otherwise notify a recipient thereof in the event that any opinion, forecast or estimate set forth herein, changes or subsequently becomes inaccurate. Prices and availability of financial instruments are subject to change without notice. This report is provided for informational purposes only. It is not an offer or a solicitation of an offer to buy or sell any financial instruments or to participate in any particular trading strategy. Target prices are inherently imprecise and a product of the analyst judgement.

As a result of Deutsche Bank's March 2010 acquisition of BHF-Bank AG, a security may be covered by more than one analyst within the Deutsche Bank group. Each of these analysts may use differing methodologies to value the security; as a result, the recommendations may differ and the price targets and estimates of each may vary widely.

In August 2009, Deutsche Bank instituted a new policy whereby analysts may choose not to set or maintain a target price of certain issuers under coverage with a Hold rating. In particular, this will typically occur for "Hold" rated stocks having a market cap smaller than most other companies in its sector or region. We believe that such policy will allow us to make best use of our resources. Please visit our website at http://grm.db.com to determine the target price of any stock.

The financial instruments discussed in this report may not be suitable for all investors and investors must make their own informed investment decisions. Stock transactions can lead to losses as a result of price fluctuations and other factors. If a financial instrument is denominated in a currency other than an investor's currency, a change in exchange rates may adversely affect the investment. Past performance is not necessarily indicative of future results. Deutsche Bank may with respect to securities covered by this report, sell to or buy from customers on a principal basis, and consider this report in deciding to trade on a proprietary basis.

Unless governing law provides otherwise, all transactions should be executed through the Deutsche Bank entity in the investor's home jurisdiction. In the U.S. this report is approved and/or distributed by Deutsche Bank Securities Inc., a member of the NYSE, the NASD, NFA and SIPC. In Germany this report is approved and/or communicated by Deutsche Bank AG Frankfurt authorized by the BaFin. In the United Kingdom this report is approved and/or communicated by Deutsche Bank AG London, a member of the London Stock Exchange and regulated by the Financial Services Authority for the conduct of investment business in the UK and authorized by the BaFin. This report is distributed in Hong Kong by Deutsche Bank AG, Hong Kong Branch, in Korea by Deutsche Securities Korea Co. This report is distributed in Singapore by Deutsche Bank AG, Singapore Branch, and recipients in Singapore of this report are to contact Deutsche Bank AG, Singapore Branch in respect of any matters arising from, or in connection with, this report. Where this report is issued or promulgated in Singapore to a person who is not an accredited investor, expert investor or institutional investor (as defined in the applicable Singapore laws and regulations), Deutsche Bank AG, Singapore Branch accepts legal responsibility to such person for the contents of this report. In Japan this report is approved and/or distributed by Deutsche Securities Inc. The information contained in this report does not constitute the provision of investment advice. In Australia, retail clients should obtain a copy of a Product Disclosure Statement (PDS) relating to any financial product referred to in this report and consider the PDS before making any decision about whether to acquire the product. Deutsche Bank AG Johannesburg is incorporated in the Federal Republic of Germany (Branch Register Number in South Africa: 1998/003298/10). Additional information relative to securities, other financial products or issuers discussed in this report is available upon request. This report may not be reproduced, distributed or published by any person for any purpose without Deutsche Bank's prior written consent. Please cite source when quoting.

**Copyright © 2012 Deutsche Bank AG**

# Tab 47



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

UNDER SECRETARY

March 30, 2012

Edward DeMarco
Acting Director
Federal Housing Finance Agency
400 7th Street, SW
Washington, DC 20024

Dear Acting Director DeMarco:

As you know, in the letter to you dated December 21, 2011, Treasury communicated to you its waiver, for the first quarter of Calendar Year (CY) 2012, of the "Periodic Commitment Fee" (PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the second quarter of CY 2012, the PCF payable by each Enterprise. Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set. Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Mary J. Miller
Under Secretary for Domestic Finance

# Tab 48



# Federal Housing Finance Agency

# Conservator's Report
# on the Enterprises' Financial Performance

# Fourth Quarter 2011

Federal Housing Finance Agency

<div align="right">Conservator's Report on the<br>Enterprises' Financial Performance<br>Fourth Quarter 2011</div>

## Contents

Executive Summary……………………………………..….……………….…   3

1.  Mortgage Markets and the Enterprises' Market Presence…..……………   4

2.  Credit Quality of New Single-Family Business………………….…………   6

3.  Capital…………..…………….…………….……………......…………….…   9

4.  Single-Family Credit Guarantee Segment Results………..………………   11

5.  Investments and Capital Markets Segment Results…………………….…   14

6.  Loss Mitigation Activity..……………..…………………………….…...…..   16

7.  Comparison of Actual Results to Projections of the Enterprises' Financial
    Performance………………….……….…………..……………….………...   17

The purpose of this report is to provide an overview of key aspects of the financial condition of Fannie Mae and Freddie Mac (the Enterprises) during conservatorship. The data in this report are derived primarily from the Enterprises' SEC filings and other publicly available sources.  In some cases, FHFA adjusted the classification of certain data to provide comparability between the Enterprises.  In other cases, the Enterprises' reporting methodologies changed over time. Therefore, the data in this report may not exactly match published figures.

FHFA 3124

## Executive Summary

### Mortgage Markets and the Enterprises' Market Presence

Mortgage originations fell for the second consecutive year, as home purchase activity remains weak, despite historically low mortgage rates during 2011.  Sixty-five percent of all mortgage originations this year were due to refinance volume.  The Enterprises continue to dominate the MBS issuance market, accounting for 73 percent market share.

### Credit Quality of New Single-Family Business

The quality of new business remained high in 2011, as evidenced by average FICO credit scores greater than 750.  Both Enterprises have experienced a slight uptick in new business with LTVs greater than 90 percent.  This is primarily due to activity related to Enterprise refinance programs (including the Home Affordable Refinance Program) that support improving the housing market.

### Capital

Combined Treasury support as a result of poor financial performance in 2011 totaled $33.6 billion.  The Single-Family Credit Guarantee segment continues to drive overall losses as credit-related expenses remain relatively high.  The Investments segment results continued to be positive in 2011 driven by low funding costs as a result of the low interest rate environment, partially offset by fair value losses on derivatives.  The Single-Family Credit Guarantee segment and senior preferred dividends have been the main drivers of charges against capital since the end of 2007.

### Single-Family Credit Guarantee Segment Results

Credit-related expenses continue to drive Single-Family Credit Guarantee segment financial results for the Enterprises.  Enterprise combined revenue for this segment of $11 billion for the year was more than offset by $40 billion in credit-related expenses.  Credit-related expenses were driven by the provision for credit losses due to factors such as home price deterioration, newly delinquent loans, and lower expected recoveries from mortgage insurers.

### Investments and Capital Markets Segment Results

The Investments and Capital Markets segment continued to be a positive contributor to capital in 2011.  Funding costs remained low as a result of the interest rate environment, contributing to the $20 billion in total revenue generated by this segment for the year.

### Loss Mitigation Activity

Since conservatorship, the Enterprises have completed more than 2.1 million foreclosure prevention actions.  Approximately half of these actions, nearly 1.1 million in total, were permanent loan modifications.

### Projections of Financial Performance

The projected combined Treasury draws for the second half of 2011 ranged from $29 billion to $56 billion.  This compares to an actual combined draw of $19 billion.   The primary driver of the difference between actual and projected performance was lower than projected provisions for credit losses, particularly at Fannie Mae.  Lower provisions for credit losses were mainly driven by an improved book profile reflected in lower delinquencies.

Federal Housing Finance Agency

# 1 Mortgage Markets and the Enterprises' Market Presence

## 1.1 Primary Mortgage Market Trends—Mortgage Originations

- Mortgage originations fell for the second consecutive year despite historically low mortgage rates. Refinance volume continues to account for approximately two-thirds of mortgage originations. Home purchase activity in 2011 was at the lowest reported level since 2003.

## Figure 1.1 Mortgage Originations by Product Type *($ in billions)*





Source:
Inside Mortgage Finance



FHFA 3126

Federal Housing Finance Agency

<div align="right">
Conservator's Report on the
Enterprises' Financial Performance
Fourth Quarter 2011
</div>

1.2    Secondary Mortgage Market Trends—Mortgage-Backed Securities Issued

- The Enterprises' market share of mortgage-backed securities (MBS) issuances in 2011 rose to 73 percent, while Ginnie Mae's market presence remained relatively unchanged.  The Enterprises and Ginnie Mae continued to account for almost all issuances of mortgage-backed securities.

**Figure 1.2 Enterprises' Market Share – MBS Issuance Volume**



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Enterprises | 67% | 68% | 70% | 47% | 41% | 40% | 58% | 73% | 72% | 70% | 73% |
| Ginnie Mae | 13% | 9% | 8% | 7% | 4% | 4% | 5% | 22% | 25% | 26% | 25% |
| Total Agency | 80% | 77% | 78% | 54% | 45% | 44% | 63% | 95% | 97% | 96% | 98% |

Sources:
Inside Mortgage Finance, Inside MBS & ABS, Enterprises' Monthly Volume Summaries.
Issuance figures exclude MBS issued backed by assets previously held in the Enterprises' portfolios.

FHFA 3127

## 2   Credit Quality of New Single-Family Business

### 2.1   Credit Characteristics of the Enterprises' New Single-Family Business

- The credit quality of new Single-Family business remained high in 2011.  Purchases of non-traditional and higher-risk mortgages were very low, the average FICO credit score was over 750 at both Enterprises, and the average loan-to-value ratio (LTV) remained at or below 70 percent at both Enterprises.  The increase in the percentage of new business with LTVs greater than 90 percent in 2011 primarily relates to the Enterprises' refinance programs, including the Home Affordable Refinance Program.

### Figure 2.1 Characteristics of Single-Family Mortgage Acquisitions

(Categories overlap and are not additive)

| Percent of New Single-Family Business[1] | Fannie Mae | | | | | | Freddie Mac | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
| Alt-A[2] | 22% | 17% | 3% | 0% | 1% | 1% | 18% | 22% | 7% | 0% | 0% | 0% |
| Interest-Only | 15% | 15% | 6% | 1% | 1% | 1% | 17% | 21% | 6% | 0% | 0% | 0% |
| Credit Score <620 | 6% | 6% | 3% | 0% | 0% | 0% | 5% | 6% | 3% | 1% | 1% | 1% |
| LTV >90 Percent | 10% | 16% | 10% | 4% | 7% | 9% | 6% | 11% | 9% | 4% | 9% | 11% |
| | | | | | | | | | | | | |
| Average LTV | 73% | 75% | 72% | 67% | 68% | 69% | 73% | 74% | 71% | 67% | 69% | 70% |
| Average Credit Score | 716 | 716 | 738 | 761 | 762 | 762 | 720 | 718 | 734 | 756 | 755 | 755 |

Notes
[1] New business is defined as issuance of MBS/PC plus purchases of whole loans and does not include purchases of mortgage-related securities.
[2] Refer to sources for Alt-A definitions. Freddie Mac's 2010 figures include Alt-A purchases of $1.5 billion due to a long-term standby commitment termination and a subsequent PC issuance. There was no change to the Alt-A exposure on these mortgages as a result of these transactions. Fannie Mae newly originated Alt-A loans acquired in 2009 through 2011 consist of the refinancing of existing loans.

Sources:
Enterprises' Forms 10-K and 10-Q, credit supplements to SEC disclosures, and management reports.

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
Fourth Quarter 2011

## 2.2    Performance of Non-Traditional and Higher-Risk Mortgages (mostly purchased pre-conservatorship)

- Single-family serious delinquency rates (SDQ) remained high for the Enterprises' Single-Family credit guarantee portfolios; however, serious delinquency rates declined in 2011 for all product categories as delinquent loans were resolved through loss mitigation activities or foreclosure, and new loans with stronger credit profiles were acquired.  Additionally, the size of the portfolios declined in 2011, resulting in these rates being calculated on a smaller base of loans at the end of each period.  Non-traditional and higher-risk mortgages, which account for a relatively small portion of the credit guarantee portfolios, continue to show substantially higher serious delinquency rates than traditional mortgages.

### Figure 2.2 Single-Family Serious Delinquency Rates

| | Fannie Mae | | | | | Freddie Mac | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 4Q07 | 4Q08 | 4Q09 | 4Q10 | 4Q11 | 4Q07 | 4Q08 | 4Q09 | 4Q10 | 4Q11 |
| **Product Type[1]** | | | | | | | | | | |
| Alt-A | 2.2% | 7.0% | 15.6% | 13.9% | 12.4% | 1.9% | 5.6% | 12.3% | 12.2% | 11.9% |
| Interest-Only | 2.0% | 8.4% | 20.2% | 17.9% | 15.3% | 2.0% | 7.6% | 17.6% | 18.4% | 17.6% |
| **Credit Score** | | | | | | | | | | |
| <620 | 4.7% | 9.0% | 18.2% | 14.6% | 13.5% | 3.4% | 7.8% | 14.9% | 13.9% | 12.9% |
| **Loan-to-Value Ratio** | | | | | | | | | | |
| >90 Percent | 3.0% | 6.3% | 13.1% | 10.0% | 8.1% | 1.9% | 4.8% | 9.1% | 7.8% | 6.7% |
| **Risk-Layering** | | | | | | | | | | |
| Credit score <620 & LTV >90 Percent | 8.6% | 16.0% | 28.0% | 21.4% | 18.7% | 5.4% | 11.5% | 19.0% | 17.1% | 15.4% |
| **Total Single-Family** | 1.0% | 2.4% | 5.4% | 4.5% | 3.9% | 0.7% | 1.8% | 4.0% | 3.8% | 3.6% |

Notes
[1] Loans with multiple product features may be in more than one category. Refer to sources for Alt-A definition.

Sources:
Enterprises' Forms 10-K and 10-Q, credit supplements to SEC disclosures, and management reports.

Federal Housing Finance Agency

## 2.3   Performance of Post-Conservatorship Business

- While not necessarily indicative of the ultimate performance, the improved credit characteristics of the new post-conservatorship business is reflected in substantially lower cumulative default rates for the 2009 and 2010 vintages compared to the years leading up to conservatorship.

### Figure 2.3 Cumulative Default Rate by Origination Year





**Notes**
[1] Defaults include loan liquidations other than through voluntary pay-off or repurchase by lenders and include loan foreclosures, preforeclosure sales, sales to third parties and deeds-in-lieu of foreclosure. Cumulative Default Rate is the total number of single-family conventional loans in the guarantee book of business originated in the identified year that have defaulted, divided by the total number of single-family conventional loans in Fannie Mae's guarantee book of business originated in the identified year.

[2] Rates are calculated for each year of origination as the number of loans that have proceeded to foreclosure transfer or short sale and resulted in a credit loss, excluding any subsequent recoveries, divided by the number of loans in Freddie Mac's single-family credit guarantee portfolio originated in the identified year.

Time Since Origination

**Fannie Mae**[1]

| Vintage | Yr1Q4 | Yr 2Q4 |
|---|---|---|
| 2002 | 0.4 | 9.5 |
| 2003 | 0.4 | 7.1 |
| 2004 | 0.7 | 11.6 |
| 2005 | 0.7 | 14.0 |
| 2006 | 1.3 | 37.4 |
| 2007 | 3.0 | 78.9 |
| 2008 | 2.2 | 37.1 |
| 2009 | 0.1 | 4.3 |
| 2010 | 0.2 | 5.6 |

Time Since Origination

**Freddie Mac**[2]

| Vintage | Yr1Q4 | Yr2Q4 |
|---|---|---|
| 2002 | 0.3 | 7.7 |
| 2003 | 0.2 | 3.7 |
| 2004 | 0.4 | 5.2 |
| 2005 | 0.2 | 6.3 |
| 2006 | 0.6 | 25.2 |
| 2007 | 2.3 | 63.4 |
| 2008 | 2.1 | 36.4 |
| 2009 | 0.1 | 4.0 |
| 2010 | 0.1 | 5.4 |

Source:
Enterprises' quarterly credit supplements.

## 3.  Capital

### 3.1    Capital Changes: January 1, 2008 – December 31, 2011

- At the end of 2007, the Enterprises had $71 billion of combined capital.  From the end of 2007 through the fourth quarter of 2011, the Enterprises' combined charges against capital have totaled $266 billion, requiring Treasury support of $187 billion through draws under the Preferred Stock Purchase Agreements. The Single-Family Credit Guarantee segment has been the largest contributor to charges against capital, accounting for $215 billion, or 81 percent, of capital reduction to date.  Senior preferred dividends on Treasury draws accounted for $36 billion, or 14 percent, of capital reduction.

**Figure 3.1 Capital Changes: January 1, 2008 – December 31, 2011** *($ in billions)*

| | Fannie Mae | | Freddie Mac | | Combined | |
|---|---|---|---|---|---|---|
| Beginning Capital[1] | $44 | | $27 | | $71 | |
| Equity Issuance[2] | 7 | | 0 | | 7 | |
| Available Capital | $51 | | $27 | | $78 | |
| **Capital Change** | | | | | | |
| Single-Family Comprehensive Income (Loss)[3] | ($141) | *84%* | ($74) | *75%* | ($215) | *81%* |
| Multifamily Comprehensive Income (Loss)[3,4] | (5) | *3%* | 14 | *-14%* | 9 | *-3%* |
| Investments Comprehensive Income (Loss)[3,4] | 9 | *-5%* | (7) | *8%* | 2 | *-1%* |
| Consolidation Accounting Adjustment | 3 | *-2%* | (12) | *12%* | (8) | *3%* |
| Other | (13) | *8%* | (3) | *3%* | (16) | *6%* |
| Senior Preferred dividends | (20) | *12%* | (17) | *17%* | (36) | *14%* |
| Total Capital Change[5] | ($167) | *100%* | ($98) | *100%* | ($266) | *100%* |
| Capital deficit | ($116) | | ($71) | | ($187) | |
| Treasury Senior Preferred draw[6] | $116.1 | | $71.3 | | $187.5 | |

Notes
Totals may not sum due to rounding.
[1] Capital is defined as stockholders' equity.
[2] Fannie Mae's figure includes common and preferred stock issuance pre-conservatorship.
[3] Segment comprehensive income (loss) represents net income (loss) plus total other comprehensive income (loss) by segment.
[4] Freddie Mac includes net interest income on investments in multifamily loans, net interest income on commercial mortgage-backed securities, and non-interest rate risk-related unrealized gains (losses) on commercial mortgage-backed securities in Multifamily Comprehensive Income (Loss), while Fannie Mae includes these items in Investments comprehensive income. Investments comprehensive income includes the impact of accounting changes for security impairments.
[5] Included in total capital change for both Enterprises are losses attributable to the writedown of low income housing tax credits (LIHTC) investments to zero in the fourth quarter of 2009.  The writedown of these LIHTC losses for Fannie Mae and Freddie Mac were $5 billion and $3 billion, respectively, and are included in Other.  The establishment of a deferred tax asset valuation allowance, which reduced capital by $21 billion for Fannie Mae and $14 billion for Freddie Mac in 2008, is also contributing to the total capital change (valuation allowance has been allocated across segments).
[6] Total draws include amounts relating to the fourth quarter of 2011 to be received in the first quarter of 2012.

Sources:
Fannie Mae segment earnings per Fannie Mae SEC disclosures for the relevant time periods.
Freddie Mac's 2008 and 2009 comprehensive income (loss) by segment reflect revised methodology effective January 1, 2010.

The presentation on this page and other pages discussing segment results in this report reflect a change in reporting convention from prior reports.  The Single-Family Credit Guarantee segment and Multifamily segment figures for 2009, 2010 and 2011 have been revised to reflect net income (loss) plus total other comprehensive income (loss), instead of net income (loss) only. The Investments segment figures have been changed to reflect net income (loss) plus total other comprehensive income (loss) for the Investments segment only.  In reports prior to 1Q11, the Investments segment included net income (loss) plus other comprehensive income (loss) for all of the other segments. See figures 4.1 and 5.1 for detail of comprehensive income (loss) for Single-Family Credit Guarantee and Investments segments, respectively.

FHFA 3131

Federal Housing Finance Agency

<div align="right">
Conservator's Report on the
Enterprises' Financial Performance
Fourth Quarter 2011
</div>

## 3.2    Capital Changes: Fourth Quarter 2011

- During the fourth quarter of 2011, losses from the Single-Family Credit Guarantee segment coupled with senior preferred dividends, offset gains from the Investments segment, and drove overall negative contributions to capital at the combined Enterprises.

**Figure 3.2 Capital Changes: September 30, 2011 – December 31, 2011** *($ in billions)*

| | Fannie Mae | Freddie Mac | Combined |
|---|---|---|---|
| Available Capital[1] | $0 | $0 | $0 |
| **Capital Change** | | | |
| Single-Family Comprehensive Income (Loss)[2] | ($4) | ($2) | ($7) |
| Multifamily Comprehensive Income (Loss)[2] | 0 | 1 | 2 |
| Investments Comprehensive Income (Loss)[2] | 3 | 2 | 6 |
| Other | (1) | 0 | (1) |
| Capital increase (decrease) pre-dividends | ($2) | $2 | ($0) |
| Senior Preferred dividends | (3) | (2) | (4) |
| Total Capital Change | ($5) | ($0) | ($5) |
| Capital Deficit | ($5) | ($0) | ($5) |
| Treasury Senior Preferred draw[3] | $4.6 | $0.1 | $4.7 |

Sources:
Fannie Mae and Freddie Mac SEC disclosures for the quarter ended December 31, 2011.

Notes
  Totals may not sum due to rounding.
  [1] Capital is defined as stockholders' equity. Available capital is defined as beginning capital plus Treasury draw related to prior quarter's deficit.
  [2] Represents net income (loss) plus total other comprehensive income (loss) by segment. Freddie Mac includes net interest income on investments in multifamily loans, net interest income on commercial mortgage-backed securities, and non-interest rate risk-related unrealized gains (losses) on commercial mortgage-backed securities in Multifamily comprehensive income (loss), while Fannie Mae includes these items in Investments comprehensive income.
  [3] Reflects requested Treasury draws related to current quarter deficit, to be received during the next quarter. Enterprises' draw requests are rounded up to the nearest $1 million.

FHFA 3132

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
Fourth Quarter 2011

## 4. Single-Family Credit Guarantee Segment Results

### 4.1 Single-Family Credit Guarantee Segment Results

- Losses from the Single-Family Credit Guarantee segment declined in 2011, but remained high primarily driven by credit-related expenses, notably the provision for credit losses. Provisions for credit losses continue to be influenced by home price deterioration, newly delinquent loans, and lower expected recoveries from mortgage insurers.

### Figure 4.1 Single-Family Credit Guarantee Segment Results ($ in billions)

| | Fannie Mae | | | | | Freddie Mac | | | | | Combined 2008 - 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | Total | 2008 | 2009 | 2010 | 2011 | Total | |
| Revenue[1] | $9 | $9 | $2 | $6 | $26 | $5 | $4 | $5 | $5 | $19 | $45 |
| Provision for credit losses[2] | (26) | (50) | (25) | (26) | (127) | (16) | (29) | (19) | (12) | (77) | (203) |
| Foreclosed Property Expenses | (2) | (1) | (2) | (1) | (5) | (1) | (0) | (1) | (1) | (3) | (8) |
| Credit-related expenses | (28) | (51) | (26) | (27) | (132) | (17) | (29) | (19) | (13) | (79) | (211) |
| SOP 03-3 Losses[3] | (2) | (20) | (0) | (0) | (23) | (2) | (5) | (0) | (0) | (6) | (29) |
| Other expenses[4] | (2) | (3) | (2) | (3) | (10) | (1) | (1) | (2) | (2) | (6) | (16) |
| Pre-tax income (loss) | (22) | (65) | (27) | (24) | (138) | (15) | (31) | (17) | (10) | (73) | (211) |
| (Provision) benefit for taxes | (5) | 1 | 0 | 0 | (3) | (5) | 4 | 1 | (0) | (1) | (4) |
| Net income (loss) | ($27) | ($64) | ($27) | ($24) | ($142) | ($20) | ($27) | ($16) | ($10) | ($74) | ($215) |
| Other Comprehensive Income | - | 0 | 0 | - | 0 | - | 0 | 0 | 0 | 0 | 0 |
| Total Comprehensive Income (Loss)[5] | ($27) | ($64) | ($27) | ($24) | ($141) | ($20) | ($27) | ($16) | ($10) | ($74) | ($215) |

Notes
  Totals may not sum due to rounding.
  [1] Consists of guarantee fee income, trust management income, net interest income, and other income. Guarantee fee revenue of $7.5 billion for Fannie Mae in 2011 was offset by net interest expense of $2.4 billion primarily related to interest income not recognized for non-accrual loans.
  [2] The provision for credit losses is the recognition of estimated incurred losses and increases the loan loss reserve. Fannie Mae's figures have been adjusted to exclude losses on credit-impaired loans acquired from MBS trusts.
  [3] Losses on credit-impaired loans acquired from MBS/PC Trusts.
  [4] Consists of investment gains (losses), fair value losses (Fannie Mae), administrative expenses, other expenses, and at Freddie Mac, segment adjustments.
  [5] Represents segment earnings (loss) and, for periods after 2008, total comprehensive income (loss), net of taxes, for the Single-Family Credit Guarantee Segment.

Sources:
Fannie Mae segment earnings per Fannie Mae SEC disclosures for the relevant time periods. Effective in the first quarter 2010, Fannie Mae changed the presentation of segment financial information; prior periods were not revised. Freddie Mac segment comprehensive income (loss) for 2008 and 2009 reflect revised methodology effective January 1, 2010. Enterprise segment comprehensive income (loss) for 2010 and 2011 is not comparable with prior periods due to the adoption of accounting standards for consolidations, effective January 1, 2010.

11

Federal Housing Finance Agency

## 4.2    Loan Loss Reserves

- Loan loss reserves remained high at both Enterprises.  Differences in the magnitude of loan loss reserves stemmed from differences in the size and credit quality of the Enterprises' single-family credit guarantee portfolios.  Fannie Mae's single-family guarantee portfolio is larger than Freddie Mac's and has higher serious delinquency rates.

### Figure 4.2 Loan Loss Reserves *($ in billions)*

| | Fannie Mae | | | | | Freddie Mac | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Single-Family Loss Reserve | 2008 | 2009 | 2010 | 2011 | Total | 2008 | 2009 | 2010 | 2011 | Total |
| Beginning balance[1] | $3 | $24 | $62 | $60 | | $3 | $15 | $33 | $39 | |
|   Provision for credit losses[2,3] | 26 | 50 | 25 | 26 | 127 | 16 | 29 | 19 | 12 | 77 |
|   Charge-offs, net[3] | (5) | (13) | (21) | (18) | (56) | (2) | (7) | (13) | (12) | (34) |
|   Adoption of Accounting Standards | - | - | (11) | - | | - | - | (0) | - | |
|   Other | 0 | 0 | 5 | 3 | | (1) | (4) | 0 | (1) | |
| Ending balance[1] | $24 | $62 | $60 | $72 | | $15 | $33 | $39 | $39 | |
| **Credit Losses - Single-Family** | | | | | | | | | | |
| Charge-offs[3] | $5 | $13 | $21 | $18 | $56 | $2 | $7 | $13 | $12 | $34 |
| Other[4] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| Foreclosed Property Expense | 2 | 1 | 2 | 1 | 5 | 1 | 0 | 1 | 1 | 3 |
|   Total[3] | $6 | $13 | $23 | $18 | $61 | $4 | $8 | $14 | $13 | $39 |

Notes
  Totals may not sum due to rounding.
[1] Fannie Mae's loan loss reserve excludes amounts related to the allowance for accrued interest receivable and allowance for preforeclosure property taxes and insurance receivable.  Freddie Mac's loan loss reserve excludes amounts related to the allowance for accrued interest receivable and forgone interest on loans placed on non-accrual status.
[2] Freddie Mac's figures represent Segment Earnings provision for credit losses, which is generally higher than that recorded under GAAP, primarily due to recognized provision associated with forgone interest income on loans placed on non-accrual status, which is not recognized under GAAP.
[3] Fannie Mae's provision for credit losses have been adjusted to exclude losses on credit-impaired loans acquired from MBS trusts.  Additionally, the effect of losses from credit-impaired loans acquired from MBS trusts on charge-offs and foreclosed property expense has been reflected as an adjustment to total credit losses and charge-offs, net.
[4] Freddie Mac's figures include charge-offs related to certain loans purchased under financial guarantees.

Sources:
SEC disclosures for the relevant time periods.

Federal Housing Finance Agency

## 4.3   Credit Losses

- Non-traditional and higher-risk mortgages concentrated in the 2006 and 2007 vintages, and mortgages originated in California, Florida, Arizona and Nevada continue to account for a disproportionate share of credit losses (charge-offs and foreclosed property expenses).  However, the proportion of losses coming from non-traditional products continued to decline in 2011 as these vintages aged.

**Figure 4.3 Credit Losses** *(Percent of total credit losses)*

| | Fannie Mae | | | | | Freddie Mac | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | % of UPB as of Dec 31, 2008[1] | 2008 | 2009 | 2010 | 2011 | % of UPB as of Dec 31, 2008[1] | 2008 | 2009 | 2010 | 2011 |
| **by State** | | | | | | | | | | |
| California | 16% | 25% | 24% | 23% | 27% | 14% | 30% | 32% | 26% | 29% |
| Florida | 7% | 11% | 16% | 18% | 11% | 7% | 10% | 15% | 19% | 13% |
| Arizona | 3% | 8% | 11% | 10% | 12% | 3% | 9% | 11% | 11% | 11% |
| Nevada | 1% | 5% | 7% | 6% | 8% | 1% | 4% | 6% | 6% | 7% |
| **by Product[2]** | | | | | | | | | | |
| Alt-A | 11% | 46% | 40% | 33% | 27% | 10% | 50% | 44% | 37% | 28% |
| Interest-Only | 8% | 34% | 33% | 29% | 26% | 9% | 50% | 47% | 37% | 29% |
| **by Vintage** | | | | | | | | | | |
| 2006 | 14% | 35% | 31% | 29% | 28% | 15% | 41% | 35% | 30% | 28% |
| 2007 | 20% | 28% | 36% | 36% | 30% | 19% | 25% | 36% | 34% | 36% |
| 2008 | 16% | 1% | 5% | 7% | 6% | 15% | 0% | 5% | 7% | 8% |
| 2009 | N/A | N/A | 0% | 0% | 2% | N/A | N/A | 0% | 0% | 1% |
| 2010 | N/A | N/A | N/A | 0% | 1% | N/A | N/A | N/A | 0% | 0% |

Notes
[1] Represents each category's share of the respective Enterprise's single-family book of business, which is based on the unpaid principal balance of all single-family unsecuritized mortgages held by the Enterprises and those underlying Freddie Mac mortgage-related securities, or covered by the Enterprise's other guarantee commitments.
[2] Product categories overlap.

Sources:
Enterprises' Forms 10-K and 10-Q, credit supplements to SEC disclosures, and management reports.

## 5. Investments and Capital Markets Segment Results

### 5.1 Investments and Capital Markets Segment Results

- In 2011, the Investments and Capital Markets segment was a positive contributor to capital primarily driven by low funding costs as a result of the interest rate environment.  Both Enterprises experienced sizable derivative losses in 2011 due to the significant decrease in swap rates during the year.  These losses were partially offset by combined interest-rate related gains on  trading securities, reported in earnings, and available-for-sale (AFS) securities, reported in equity through accumulated other comprehensive income (AOCI).

### Figure 5.1 Investments and Capital Markets Segment Results *($ in billions)*

| | Fannie Mae | | | | | Freddie Mac | | | | | Combined 2008 - 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | Total | 2008 | 2009 | 2010 | 2011 | Total | |
| Revenue[1] | $8 | $13 | $13 | $13 | $47 | $3 | $8 | $6 | $7 | $24 | $71 |
| Derivatives gains (losses) | (15) | (6) | (3) | (7) | (31) | (13) | 5 | (2) | (4) | (14) | (45) |
| Trading gains (losses) | (7) | 4 | 3 | 0 | 0 | 1 | 5 | (1) | (1) | 3 | 4 |
| Other gains (losses)[2] | 2 | 1 | 4 | 3 | 10 | 2 | (0) | 1 | 2 | 4 | 14 |
| Other-than-temporary impairments | (7) | (10) | (1) | (0) | (18) | (17) | (10) | (4) | (2) | (33) | (51) |
| Other expenses[3] | (1) | (1) | (0) | (1) | (2) | (2) | (1) | 1 | 0 | (1) | (3) |
| Pre-tax income (loss) | (21) | 1 | 16 | 9 | 5 | (26) | 7 | 1 | 3 | (15) | (10) |
| (Provision) benefit for taxes[4] | (9) | (0) | 0 | 0 | (9) | (2) | (1) | 0 | 0 | (2) | (11) |
| Net income (loss) | ($29) | $1 | $16 | $9 | ($3) | ($28) | $6 | $1 | $3 | ($17) | ($20) |
| Unrealized gains (losses) on AFS[5] | (6) | 11 | 4 | 1 | 10 | (20) | 11 | 10 | 3 | 4 | 14 |
| Accounting change for Impairments | - | 3 | - | - | 3 | 0 | 5 | - | - | 5 | 8 |
| Total Comprehensive Income (Loss) | ($35) | $15 | $20 | $10 | $9 | ($48) | $23 | $11 | $6 | ($7) | $2 |

Notes
Totals may not sum due to rounding.
[1] Consists of guarantee fee expense, trust management income, net interest income, and other income.
[2] Figures consist of debt extinguishment losses, debt foreign exchange losses, debt fair-value losses, investment gains (losses), and hedged mortgage assets gains, net.
[3] Consists of administrative expenses, other expenses, and at Freddie Mac, segment adjustments.
[4] Includes extraordinary losses /noncontrolling interest.
[5] Amount for 2008 includes consolidated changes in unrealized gains (losses) on available for sale securities, net of taxes.  Effective April 2009, includes adjustments for other-than-temporary  impairments, net of taxes, included in accumulated other comprehensive  income due to a change in accounting standards for impairments.  At Freddie Mac, amount also includes the change in unrealized gains (losses), net of taxes, related to cash flow hedge relationships.

Sources:
Fannie Mae segment earnings per Fannie Mae SEC disclosures for the relevant time periods.  Effective in the first quarter 2010, Fannie Mae changed the presentation of segment financial information; prior periods were not revised.  Freddie Mac segment comprehensive income (loss) for 2008 and 2009 reflect revised methodology effective January 1, 2010.  Enterprise segment comprehensive income (loss) for 2010 and 2011 is not comparable with prior periods due to the adoption of accounting standards for consolidations effective January 1, 2010.

## 5.2    Security Impairments

- Security impairments in 2011 were below 2010 levels for both Enterprises.  Freddie Mac's non-agency portfolio is larger than Fannie Mae's, generally causing higher levels of security impairments.

**Figure 5.2 Security Impairments** *($ in billions)*

**Fannie Mae**

| Vintage[1] | 2008 | | | 2009 | | | 2010 | | | 2011 | | | Total 2008-2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | |
| Alt-A/Option ARM Alt-A | $3.0 | $1.8 | $4.8 | $1.7 | $2.3 | $4.0 | $0.2 | $0.1 | $0.3 | $0.2 | $0.3 | $0.6 | $9.7 |
| Subprime | 1.9 | - | 1.9 | 5.6 | 0.1 | 5.7 | 0.4 | 0.0 | 0.4 | (0.3) | (0.0) | (0.3) | 7.7 |
| Other | 0.0 | 0.2 | 0.2 | 0.0 | 0.2 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.5 |
| Total[2] | $4.9 | $2.0 | $7.0 | $7.3 | $2.6 | $9.9 | $0.6 | $0.2 | $0.7 | ($0.1) | $0.4 | $0.3 | $17.9 |

**Freddie Mac**

| Vintage[1] | 2008 | | | 2009 | | | 2010 | | | 2011 | | | Total 2008-2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | |
| Alt-A | $2.1 | $1.8 | $4.0 | $0.9 | $0.8 | $1.7 | $0.5 | $0.2 | $0.7 | $0.1 | $0.1 | $0.2 | $6.6 |
| Subprime | 3.4 | 0.2 | 3.6 | 6.4 | 0.1 | 6.5 | 1.7 | 0.0 | 1.8 | 1.3 | 0.0 | 1.3 | 13.2 |
| CMBS | - | - | - | 0.1 | 0.0 | 0.1 | 0.1 | 0.0 | 0.1 | 0.3 | 0.1 | 0.4 | 0.6 |
| Option ARM | 6.0 | 1.6 | 7.6 | 1.4 | 0.4 | 1.7 | 1.2 | 0.2 | 1.4 | 0.3 | 0.1 | 0.4 | 11.1 |
| Other | 1.1 | 0.4 | 1.4 | 0.8 | 0.1 | 0.9 | 0.3 | 0.1 | 0.3 | 0.0 | 0.0 | 0.1 | 2.7 |
| Total[2] | $12.6 | $4.0 | $16.6 | $9.6 | $1.5 | $11.0 | $3.8 | $0.5 | $4.3 | $2.0 | $0.3 | $2.3 | $34.2 |

Notes
Totals may not sum due to rounding.
[1] Vintage of private-label securities is based on security issue date.
[2] The adoption of an accounting standard for impairments in April 2009 required the Enterprises to begin recognizing only the credit portion of impairments in their statements of income and comprehensive income. This accounting standard did not require the Enterprises to revise previously recorded amounts in their statements of income and comprehensive income but did result in an equity increase of $5 billion and $3 billion for Freddie Mac and Fannie Mae, respectively, which is not reflected in Figure 5.2.  For the full year of 2008 and a portion of 2009, amounts include both credit and non-credit-related security impairments.

Sources:
Fannie Mae and Freddie Mac management reports.

Federal Housing Finance Agency

## 6.  Loss Mitigation Activity

- The Enterprises have traditionally worked with delinquent borrowers to mitigate credit losses in situations where the borrower demonstrates the willingness and ability to cure the delinquency.  Loss mitigation actions include home retention actions (loan modifications, repayment plans and forbearance plans), and home forfeiture actions (short sales and deeds-in-lieu).
- The Enterprises have completed more than 2.1 million foreclosure prevention actions since the start of conservatorship in September 2008.  Nearly 1.1 million of these actions have been permanent loan modifications.
- More information on the Enterprises' loss mitigation activities can be found in FHFA's Fourth Quarter 2011 Foreclosure Prevention & Refinance Report .

### Figure 6 Enterprises' Completed Foreclosure Prevention Actions

#### Completed Foreclosure Prevention Actions

|  | Full Year 2008 | Full Year 2009 | Full Year 2010 | Full Year 2011 | Conservatorship to Date[1] |
|---|---|---|---|---|---|
| **Home Retention Actions** | | | | | |
| Repayment Plans | 62,560 | 142,360 | 185,954 | 181,558 | 523,181 |
| Forbearance Plans | 5,692 | 25,227 | 63,024 | 34,423 | 124,790 |
| Charge-offs-in-lieu | 799 | 2,247 | 3,118 | 2,263 | 7,901 |
| HomeSaver Advance *(Fannie)* | 70,967 | 39,199 | 5,191 | - | 70,178 |
| Loan Modifications | 68,307 | 163,647 | 575,022 | 322,108 | 1,084,554 |
| **Total** | **208,325** | **372,680** | **832,309** | **540,352** | **1,810,604** |
| **Nonforeclosure - Home Forfeiture Actions** | | | | | |
| Short Sales | 15,704 | 55,447 | 107,953 | 115,237 | 284,829 |
| Deeds-in-lieu | 1,511 | 2,971 | 6,043 | 10,231 | 19,785 |
| **Total** | **17,215** | **58,418** | **113,996** | **125,468** | **304,614** |
| **Total Foreclosure Prevention Actions** | **225,540** | **431,098** | **946,305** | **665,820** | **2,115,218** |

[1] Since the first full quarter in conservatorship (4Q08).

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
Fourth Quarter 2011

## 7.  Comparison of Actual Results to Projections of the Enterprises' Financial Performance

### 7.1    Comparison of Actual Results to Projections of the Enterprises' Financial Performance

- FHFA published updated projections of the Enterprises' financial performance in October 2011. The purpose and approach of these projections can be found in FHFA's Projections of the Enterprises' Financial Performance, October 2011.

- October 2011 projections are not expected outcomes, but rather modeled projections in response to "what if" exercises based on assumptions about Enterprise operations, financial market conditions, and house prices.

- The combined projected Treasury draws for the Enterprises for the second half of 2011 ranged from $29 billion to $56 billion. The actual combined Treasury draw for the second half of 2011 was $19 billion.

- The primary driver of the difference was lower than projected credit-related expenses at Fannie Mae, mostly due to a lower provision for credit losses. The main driver of lower provisions for credit losses was an improved book profile reflected in lower delinquencies.

**Figure 7.1 Actual versus Projected Treasury Draws for the second half of 2011** *($ in billions)*

|  | Cumulative Treasury Draw | Projected Draw 2H11 Scenario 1 | | Projected Draw 2H11 Scenario 2 | | Projected Draw 2H11 Scenario 3 | | Actual Draw Second Half 2011 | |
|---|---|---|---|---|---|---|---|---|---|
|  | As of 6/30/2011 | Additional Draw | Cumulative Draw as of 12/31/2011 | Additional Draw | Cumulative Draw as of 12/31/2011 | Additional Draw | Cumulative Draw as of 12/31/2011 | Additional Draw | Cumulative Draw as of 12/31/2011 |
| Fannie Mae | $104 | $19 | $123 | $21 | $125 | $38 | $142 | $12 | $116 |
| Freddie Mac | 65 | 9 | 75 | 10 | 76 | 18 | 83 | 6 | 71 |
| Total | $169 | $29 | $198 | $32 | $201 | $56 | $225 | $19 | $188 |

Numbers may not foot due to rounding

FHFA 3139

7.2     Impact of Actual Results on Future Projections of the Enterprises' Financial Performance

- Mortgage defaults pushed out to later periods could reduce projected losses if home prices improve or increase projected losses if home prices worsen.
- The Enterprises' future financial performance is heavily dependent on the performance of the U.S. housing market. Trends observed in the second half of 2011 should not be used to extrapolate future projections.

# Tab 49

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-Q

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the quarterly period ended March 31, 2012**

**or**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the transition period from            to**

**Commission File Number: 001-34139**

# Federal Home Loan Mortgage Corporation
*(Exact name of registrant as specified in its charter)*

**Freddie Mac**

| **Federally chartered corporation** | **8200 Jones Branch Drive** McLean, Virginia 22102-3110 | **52-0904874** | **(703) 903-2000** |
|---|---|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(Address of principal executive offices, including zip code)* | *(I.R.S. Employer Identification No.)* | *(Registrant's telephone number, including area code)* |

Indicate by check mark whether the registrant:   (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days.   ☒ Yes    ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   ☒ Yes    ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                                                                 Accelerated filer ☒

Non-accelerated filer (Do not check if a smaller reporting company) ☐          Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   ☐ Yes    ☒ No

As of April 23, 2012, there were 650,033,623 shares of the registrant's common stock outstanding.

# TABLE OF CONTENTS

Page

**PART I — FINANCIAL INFORMATION**

Item 1.     Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     100

Item 2.     Management's Discussion and Analysis of Financial Condition and Results of Operations . . . . . . . . . . .       1

            Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .       1

            Selected Financial Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      12

            Consolidated Results of Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      13

            Consolidated Balance Sheets Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      30

            Risk Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      46

            Liquidity and Capital Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      80

            Fair Value Measurements and Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      85

            Off-Balance Sheet Arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      88

            Critical Accounting Policies and Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      89

            Forward-Looking Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      89

            Risk Management and Disclosure Commitments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      91

            Legislative and Regulatory Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      91

Item 3.     Quantitative and Qualitative Disclosures About Market Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      95

Item 4.     Controls and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      97

**PART II — OTHER INFORMATION**

Item 1.     Legal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     183

Item 1A.    Risk Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     183

Item 2.     Unregistered Sales of Equity Securities and Use of Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     183

Item 6.     Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     185

**SIGNATURES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     186

**GLOSSARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     187

**EXHIBIT INDEX** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     E-1

## MD&A TABLE REFERENCE

| Table | Description | Page |
|---|---|---|
| — | Selected Financial Data | 12 |
| 1 | Total Single-Family Loan Workout Volumes | 3 |
| 2 | Single-Family Credit Guarantee Portfolio Data by Year of Origination | 5 |
| 3 | Credit Statistics, Single-Family Credit Guarantee Portfolio | 6 |
| 4 | Mortgage-Related Investments Portfolio | 11 |
| 5 | Summary Consolidated Statements of Comprehensive Income | 13 |
| 6 | Net Interest Income/Yield and Average Balance Analysis | 14 |
| 7 | Derivative Gains (Losses) | 16 |
| 8 | Other Income | 17 |
| 9 | Non-Interest Expense | 18 |
| 10 | REO Operations Expense, REO Inventory, and REO Dispositions | 19 |
| 11 | Composition of Segment Mortgage Portfolios and Credit Risk Portfolios | 22 |
| 12 | Segment Earnings and Key Metrics — Investments | 23 |
| 13 | Segment Earnings and Key Metrics — Single-Family Guarantee | 25 |
| 14 | Segment Earnings Composition — Single-Family Guarantee Segment | 26 |
| 15 | Segment Earnings and Key Metrics — Multifamily | 29 |
| 16 | Investments in Securities | 31 |
| 17 | Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets | 32 |
| 18 | Additional Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets | 33 |
| 19 | Mortgage-Related Securities Purchase Activity | 34 |
| 20 | Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics | 35 |
| 21 | Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans | 36 |
| 22 | Net Impairment of Available-For-Sale Mortgage-Related Securities Recognized in Earnings | 37 |
| 23 | Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS | 39 |
| 24 | Mortgage Loan Purchase and Other Guarantee Commitment Activity | 41 |
| 25 | Derivative Fair Values and Maturities | 42 |
| 26 | Changes in Derivative Fair Values | 43 |
| 27 | Freddie Mac Mortgage-Related Securities | 44 |
| 28 | Issuances and Extinguishments of Debt Securities of Consolidated Trusts | 45 |
| 29 | Changes in Total Equity (Deficit) | 45 |
| 30 | Repurchase Request Activity | 47 |
| 31 | Mortgage Insurance by Counterparty | 50 |
| 32 | Bond Insurance by Counterparty | 51 |
| 33 | Derivative Counterparty Credit Exposure | 53 |
| 34 | Characteristics of the Single-Family Credit Guarantee Portfolio | 57 |
| 35 | Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio | 61 |
| 36 | Single-Family Home Affordable Modification Program Volume | 63 |
| 37 | Single-Family Refinance Loan Volume | 65 |
| 38 | Single-Family Loan Workouts, Serious Delinquency, and Foreclosures Volumes | 66 |
| 39 | Quarterly Percentages of Modified Single-Family Loans — Current and Performing | 67 |
| 40 | Single-Family Serious Delinquency Rates | 68 |
| 41 | Credit Concentrations in the Single-Family Credit Guarantee Portfolio | 69 |
| 42 | Single-Family Credit Guarantee Portfolio by Attribute Combinations | 70 |
| 43 | Single-Family Credit Guarantee Portfolio by Year of Loan Origination | 72 |
| 44 | Multifamily Mortgage Portfolio — by Attribute | 73 |
| 45 | Non-Performing Assets | 75 |
| 46 | REO Activity by Region | 76 |
| 47 | Credit Loss Performance | 78 |
| 48 | Single-Family Impaired Loans with Specific Reserve Recorded | 79 |
| 49 | Single-Family Credit Loss Sensitivity | 80 |
| 50 | Other Debt Security Issuances by Product, at Par Value | 83 |
| 51 | Other Debt Security Repurchases, Calls, and Exchanges | 83 |
| 52 | Freddie Mac Credit Ratings | 84 |
| 53 | Summary of Assets and Liabilities Measured at Fair Value on a Recurring Basis in Our Consolidated Balance Sheets | 86 |
| 54 | Summary of Change in the Fair Value of Net Assets | 87 |
| 55 | PMVS Results | 96 |
| 56 | Derivative Impact on PMVS-L (50 bps) | 96 |

## FINANCIAL STATEMENTS

| | Page |
|---|---|
| Freddie Mac Consolidated Statements of Comprehensive Income | 101 |
| Freddie Mac Consolidated Balance Sheets | 102 |
| Freddie Mac Consolidated Statements of Equity (Deficit) | 103 |
| Freddie Mac Consolidated Statements of Cash Flows | 104 |
| Note 1: Summary of Significant Accounting Policies | 105 |
| Note 2: Conservatorship and Related Matters | 106 |
| Note 3: Variable Interest Entities | 109 |
| Note 4: Mortgage Loans and Loan Loss Reserves | 114 |
| Note 5: Individually Impaired and Non-Performing Loans | 118 |
| Note 6: Real Estate Owned | 124 |
| Note 7: Investments in Securities | 126 |
| Note 8: Debt Securities and Subordinated Borrowings | 134 |
| Note 9: Financial Guarantees | 136 |
| Note 10: Derivatives | 138 |
| Note 11: Freddie Mac Stockholders' Equity (Deficit) | 142 |
| Note 12: Income Taxes | 143 |
| Note 13: Segment Reporting | 143 |
| Note 14: Regulatory Capital | 147 |
| Note 15: Concentration of Credit and Other Risks | 148 |
| Note 16: Fair Value Disclosures | 154 |
| Note 17: Legal Contingencies | 176 |
| Note 18: Significant Components of Other Assets and Other Liabilities on our Consolidated Balance Sheets | 182 |

# PART I — FINANCIAL INFORMATION

*We continue to operate under the conservatorship that commenced on September 6, 2008, under the direction of FHFA as our Conservator. The Conservator succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any shareholder, officer or director thereof, with respect to the company and its assets. The Conservator has delegated certain authority to our Board of Directors to oversee, and management to conduct, day-to-day operations. The directors serve on behalf of, and exercise authority as directed by, the Conservator. See "BUSINESS — Conservatorship and Related Matters" in our Annual Report on Form 10-K for the year ended December 31, 2011, or 2011 Annual Report, for information on the terms of the conservatorship, the powers of the Conservator, and related matters, including the terms of our Purchase Agreement with Treasury.*

*This Quarterly Report on Form 10-Q includes forward-looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward-looking statements are made as of the date of this Form 10-Q and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date of this Form 10-Q. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in: (a) "MD&A — FORWARD-LOOKING STATEMENTS" in this Form 10-Q and in the comparably captioned section of our 2011 Annual Report; and (b) the "BUSINESS" and "RISK FACTORS" sections of our 2011 Annual Report.*

*Throughout this Form 10-Q, we use certain acronyms and terms that are defined in the "GLOSSARY."*

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this MD&A in conjunction with our consolidated financial statements and related notes for the three months ended March 31, 2012 included in "FINANCIAL STATEMENTS," and our 2011 Annual Report.*

## EXECUTIVE SUMMARY

### Overview

Freddie Mac is a GSE chartered by Congress in 1970 with a public mission to provide liquidity, stability, and affordability to the U.S. housing market. We have maintained a consistent market presence since our inception, providing mortgage liquidity in a wide range of economic environments. We are working to support the recovery of the housing market and the nation's economy by providing essential liquidity to the mortgage market and helping to stem the rate of foreclosures. We believe our actions are helping communities across the country by providing America's families with access to mortgage funding at low rates while helping distressed borrowers keep their homes and avoid foreclosure, where feasible.

### *Summary of Financial Results*

Our financial performance in the first quarter of 2012 was impacted by the ongoing weakness in the economy, including in the mortgage market, and changes in interest rates. Our comprehensive income was $1.8 billion and $2.7 billion for the first quarters of 2012 and 2011, respectively, consisting of: (a) $577 million and $676 million of net income, respectively; and (b) $1.2 billion and $2.1 billion of total other comprehensive income, respectively.

Our total equity (deficit) was $(18) million at March 31, 2012, reflecting our comprehensive income of $1.8 billion for the first quarter of 2012 and our dividend payment of $1.8 billion on our senior preferred stock in March 2012. To address our deficit in net worth, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement for $19 million. Following receipt of the draw, the aggregate liquidation preference on the senior preferred stock owned by Treasury will be $72.3 billion.

### Our Primary Business Objectives

We are focused on the following primary business objectives: (a) developing mortgage market enhancements in support of a new infrastructure for the secondary mortgage market; (b) contracting the dominant presence of the GSEs in the marketplace; (c) providing credit availability for new or refinanced mortgages and maintaining foreclosure prevention activities; (d) minimizing our credit losses; (e) maintaining sound credit quality of the loans we purchase or guarantee; and (f) strengthening our infrastructure and improving overall efficiency while also focusing on retention of key employees.

Our business objectives reflect direction we have received from the Conservator. On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that established objectives, performance targets and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan for Freddie Mac and Fannie Mae. We are aligning our resources and internal business plans to meet the goals and objectives laid out in the 2012 conservatorship scorecard. See "LEGISLATIVE AND REGULATORY MATTERS — FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships and 2012 Conservatorship Scorecard." Based on our charter, other legislation, public statements from Treasury and FHFA officials, and other guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives. For more information, see "BUSINESS — Conservatorship and Related Matters — *Impact of Conservatorship and Related Actions on Our Business*" in our 2011 Annual Report.

### Developing Mortgage Market Enhancements in Support of a New Infrastructure for the Secondary Mortgage Market

In the first quarter of 2012, we continued our efforts to build value for the industry and build the infrastructure for a future housing finance system. These efforts include the implementation of the Uniform Mortgage Data Program, or UMDP, which provides us with the ability to collect additional data that we believe will improve our risk management practices. The UMDP creates standard terms and definitions to be used throughout the industry and establishes standard reporting protocols. The UMDP is a key building block in developing a future secondary mortgage market. In the first quarter of 2012, we completed a key milestone of the UMDP with the launch of the Uniform Collateral Data Portal for the electronic submission of appraisal reports for conventional mortgages. We are also working with FHFA and others to develop a plan for the design and building of a single securitization platform that can be used in a future secondary mortgage market. FHFA also directed us and Fannie Mae to discuss harmonizing our seller/servicer contracts.

### Contracting the Dominant Presence of the GSEs in the Marketplace

We continue to take steps toward the goal of gradually shifting mortgage credit risk from Freddie Mac to private investors, while simplifying and shrinking certain of our operations. In the case of single-family credit guarantees, we are exploring several ways to accomplish this goal, including increasing guarantee fees, establishing loss-sharing arrangements, and evaluating new risk-sharing transactions beyond the traditional charter-required mortgage insurance coverage. In addition, we are studying the steps necessary for our competitive disposition of certain investment assets, including non-performing loans. To evaluate how to accomplish the goal of contracting our operations in the multifamily business, we are conducting a market analysis of the viability of our multifamily operations without government guarantees.

### Providing Credit Availability for New or Refinanced Mortgages and Maintaining Foreclosure Prevention Activities

We provide liquidity and support to the U.S. mortgage market in a number of important ways:

- Our support enables borrowers to have access to a variety of conforming mortgage products, including the prepayable 30-year fixed-rate mortgage, which historically has represented the foundation of the mortgage market.

- Our support provides lenders with a constant source of liquidity for conforming mortgage products. We estimate that we, Fannie Mae, and Ginnie Mae collectively guaranteed more than 90% of the single-family conforming mortgages originated during the first quarter of 2012.

- Our consistent market presence provides assurance to our customers that there will be a buyer for their conforming loans that meet our credit standards. We believe this liquidity provides our customers with confidence to continue lending in difficult environments.

- We are an important counter-cyclical influence as we stay in the market even when other sources of capital have withdrawn.

During the first quarters of 2012 and 2011, we guaranteed $105.1 billion and $97.6 billion in UPB of single-family conforming mortgage loans, respectively, representing approximately 491,000 and 461,000 loans, respectively.

Borrowers typically pay a lower interest rate on loans acquired or guaranteed by Freddie Mac, Fannie Mae, or Ginnie Mae. Mortgage originators are generally able to offer homebuyers and homeowners lower mortgage rates on conforming loan products, including ours, in part because of the value investors place on GSE-guaranteed mortgage-related securities. Prior to 2007, mortgage markets were less volatile, home values were stable or rising, and there were many sources of mortgage funds. We estimate that, for 20 years prior to 2007, the average effective interest rates on conforming, fixed-rate single-family mortgage loans were about 30 basis points lower than on non-conforming loans. Since 2007, this gap has widened, and, we estimate that interest rates on conforming, fixed-rate loans, excluding conforming jumbo loans, have been lower than those on non-conforming loans by as much as 184 basis points. In March 2012, we estimate that

borrowers were paying an average of 54 basis points less on these conforming loans than on non-conforming loans. These estimates are based on data provided by HSH Associates, a third-party provider of mortgage market data.

We are focused on reducing the number of foreclosures and helping to keep families in their homes. In addition to our participation in HAMP, we introduced several new initiatives during the last few years to help eligible borrowers keep their homes or avoid foreclosure. Our relief refinance initiative, including HARP (which is the portion of our relief refinance initiative for loans with LTV ratios above 80%), is a significant part of our effort to keep families in their homes. Relief refinance loans have been provided to more than 565,000 borrowers with LTV ratios above 80% since the initiative began in 2009, including approximately 85,000 such loans during the first quarter of 2012.

A number of FHFA-directed changes to HARP were announced in late 2011. These changes are intended to allow more borrowers to participate in the program and benefit from refinancing their home mortgages. Since industry participation in HARP is not mandatory, implementation schedules have varied as individual lenders, mortgage insurers, and other market participants modify their processes. It is too early to estimate how many eligible borrowers are likely to refinance under the revised program.

We have also implemented the FHFA-directed servicing alignment initiative, which included a new non-HAMP standard loan modification initiative.

The table below presents our single-family loan workout activities for the last five quarters.

**Table 1 — Total Single-Family Loan Workout Volumes[1]**

| | For the Three Months Ended | | | | |
| | 03/31/2012 | 12/31/2011 | 09/30/2011 | 06/30/2011 | 03/31/2011 |
| | | | (number of loans) | | |
| Loan modifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13,677 | 19,048 | 23,919 | 31,049 | 35,158 |
| Repayment plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,575 | 8,008 | 8,333 | 7,981 | 9,099 |
| Forbearance agreements[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,656 | 3,867 | 4,262 | 3,709 | 7,678 |
| Short sales and deed in lieu of foreclosure transactions . . . . . . . . . . . . . . . . . . . | 12,245 | 12,675 | 11,744 | 11,038 | 10,706 |
| Total single-family loan workouts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40,153 | 43,598 | 48,258 | 53,777 | 62,641 |

(1) Based on actions completed with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment, and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent or effective, such as loans in modification trial periods. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period.
(2) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.

Highlights of our loan workout efforts include the following:

- We completed approximately 40,000 single-family loan workouts during the first quarter of 2012, including 13,677 loan modifications (HAMP and non-HAMP) and 12,245 short sales and deed in lieu of foreclosure transactions.

- Based on information provided by the MHA Program administrator, our servicers had completed 158,688 loan modifications under HAMP from the introduction of the initiative in 2009 through March 31, 2012.

- As of March 31, 2012, approximately 16,000 borrowers were in modification trial periods, consisting of approximately 5,000 borrowers in trial periods for our non-HAMP standard modification and approximately 11,000 borrowers in HAMP trial periods.

For more information about HAMP, the servicing alignment initiative and our non-HAMP standard loan modification, other loan workout programs, our relief refinance mortgage initiative (including HARP), and other initiatives to help eligible borrowers keep their homes or avoid foreclosure, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program.*"

### *Minimizing Our Credit Losses*

To help minimize the credit losses related to our guarantee activities, we are focused on:

- pursuing a variety of loan workouts, including foreclosure alternatives, in an effort to reduce the severity of losses we experience over time;

- managing foreclosure timelines to the extent possible, given the prolonged foreclosure process in many states;

- managing our inventory of foreclosed properties to reduce costs and maximize proceeds; and

- pursuing contractual remedies against originators, lenders, servicers, and insurers, as appropriate.

We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses. We require our single-family seller/servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure.

We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans, and represent and warrant that those loans have been originated under specified underwriting standards. If we subsequently discover that the representations and warranties were breached (*i.e.*, contractual standards were not followed), we can exercise certain contractual remedies to mitigate our actual or potential credit losses. These contractual remedies include the ability to require the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan. The amount we expect to collect on outstanding repurchase requests is significantly less than the UPB of the loans subject to the repurchase requests primarily because many of these requests will likely be satisfied by the seller/servicers reimbursing us for realized credit losses. Some of these requests also may be rescinded in the course of the contractual appeals process. As of March 31, 2012, the UPB of loans subject to repurchase requests issued to our single-family seller/servicers was approximately $3.2 billion, and approximately 38% of these requests were outstanding for more than four months since issuance of our initial repurchase request (this figure includes repurchase requests for which appeals were pending). Of the total amount of repurchase requests outstanding at March 31, 2012, approximately $1.2 billion were issued due to mortgage insurance rescission or mortgage insurance claim denial.

Our credit loss exposure is also partially mitigated by mortgage insurance, which is a form of credit enhancement. Primary mortgage insurance is required to be purchased, typically at the borrower's expense, for certain mortgages with higher LTV ratios. We received payments under primary and other mortgage insurance of $491 million and $587 million in the first quarters of 2012 and 2011, respectively, which helped to mitigate our credit losses. The financial condition of many of our mortgage insurers remained weak in the first quarter of 2012. We expect to receive substantially less than full payment of our claims from Triad Guaranty Insurance Corp., Republic Mortgage Insurance Company, and PMI Mortgage Insurance Co., which are three of our mortgage insurance counterparties. We believe that certain other of our mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as those claims emerge. Our loan loss reserves reflect our estimates of expected insurance recoveries related to probable incurred losses.

See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for further information on our agreements with our seller/servicers and our exposure to mortgage insurers.

### Maintaining Sound Credit Quality of the Loans We Purchase or Guarantee

We continue to focus on maintaining credit policies, including our underwriting standards, that allow us to purchase and guarantee loans made to qualified borrowers that we believe will provide management and guarantee fee income (excluding the amounts associated with the Temporary Payroll Tax Cut Continuation Act of 2011), over the long-term, that exceeds our expected credit-related and administrative expenses on such loans.

Approximately 95% of our single-family purchase volume in the first quarter of 2012 consisted of fixed-rate, first lien, amortizing mortgages. Approximately 87% and 85% of our single-family purchase volumes in the first quarters of 2012 and 2011, respectively, were refinance mortgages, and approximately 31% and 36%, respectively, of these refinance loans were relief refinance mortgages, based on UPB.

The credit quality of the single-family loans we acquired in the first quarter of 2012 (excluding relief refinance mortgages, which represented approximately 26% of our single-family purchase volume during the first quarter of 2012) is significantly better than that of loans we acquired from 2005 through 2008, as measured by original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income. The improvement in credit quality of loans we have purchased since 2008 (excluding relief refinance mortgages) is primarily the result of: (a) changes in our credit policies, including changes in our underwriting standards; (b) fewer purchases of loans with higher risk characteristics; and (c) changes in mortgage insurers' and lenders' underwriting practices.

Our underwriting procedures for relief refinance mortgages are limited in many cases, and such procedures generally do not include all of the changes in underwriting standards we have implemented in the last several years. As a result, relief refinance mortgages generally reflect many of the credit risk attributes of the original loans. However, borrower participation in our relief refinance mortgage initiative may help reduce our exposure to credit risk in cases where borrower payments under their mortgages are reduced, thereby strengthening the borrower's potential to make their mortgage payments.

Over time, relief refinance mortgages with LTV ratios above 80% (*i.e.*, HARP loans) may not perform as well as other refinance mortgages because the continued high LTV ratios of these loans increases the probability of default. In addition, relief refinance mortgages may not be covered by mortgage insurance for the full excess of their UPB over 80%. Approximately 16% and 15% of our single-family purchase volume in the first quarters of 2012 and 2011, respectively, was relief refinance mortgages with LTV ratios above 80%. Relief refinance mortgages of all LTV ratios comprised approximately 13% and 11% of the UPB in our total single-family credit guarantee portfolio at March 31, 2012 and December 31, 2011, respectively.

The table below presents the composition, loan characteristics, and serious delinquency rates of loans in our single-family credit guarantee portfolio, by year of origination at March 31, 2012.

**Table 2 — Single-Family Credit Guarantee Portfolio Data by Year of Origination[1]**

| | At March 31, 2012 | | | | | |
|---|---|---|---|---|---|---|
| | % of Portfolio | Average Credit Score[2] | Original LTV Ratio[3] | Current LTV Ratio[4] | Current LTV Ratio >100%[4],[5] | Serious Delinquency Rate[6] |
| **Year of Origination** | | | | | | |
| 2012 | 4% | 758 | 72% | 71% | 8% | —% |
| 2011 | 16 | 755 | 72 | 70 | 5 | 0.09 |
| 2010 | 18 | 754 | 71 | 72 | 6 | 0.32 |
| 2009 | 16 | 753 | 69 | 73 | 7 | 0.60 |
| 2008 | 6 | 724 | 74 | 93 | 37 | 5.94 |
| 2007 | 9 | 704 | 77 | 114 | 62 | 11.72 |
| 2006 | 7 | 709 | 75 | 112 | 57 | 10.92 |
| 2005 | 8 | 715 | 73 | 96 | 39 | 6.66 |
| 2004 and prior | 16 | 718 | 71 | 61 | 9 | 2.88 |
| Total | 100% | 736 | 72 | 80 | 20 | 3.51 |

(1) Based on the loans remaining in the portfolio at March 31, 2012, which totaled $1.7 trillion, rather than all loans originally guaranteed by us and originated in the respective year. Includes loans acquired under our relief refinance initiative, which began in 2009.
(2) Based on FICO score of the borrower as of the date of loan origination and may not be indicative of the borrowers' creditworthiness at March 31, 2012. Excludes less than 1% of loans in the portfolio because the FICO scores at origination were not available at March 31, 2012. As of March 31, 2011, average credit score for all relief refinance loans was 743, compared to an average of 735 for all other loans in the portfolio.
(3) See endnote (4) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios.
(4) We estimate current market values by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination. See endnote (5) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of current LTV ratios. As of March 31, 2011, the average current LTV ratio for all relief refinance loans was 80%.
(5) Calculated as a percentage of the aggregate UPB of loans with LTV ratios greater than 100% in relation to the total UPB of loans in the category.
(6) See "RISK MANAGEMENT— Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Delinquencies*" for further information about our reported serious delinquency rates.

As of March 31, 2012 and December 31, 2011, approximately 54% and 51%, respectively, of our single-family credit guarantee portfolio consisted of mortgage loans originated after 2008, which have experienced lower serious delinquency trends in the early years of their terms than loans originated in 2005 through 2008.

*Strengthening Our Infrastructure and Improving Overall Efficiency While Also Focusing On Retention of Key Employees*

We are working to both enhance the quality of our infrastructure and improve our efficiency in order to preserve the taxpayers' investment. We are focusing our resources primarily on key projects, many of which will likely take several years to fully implement, and on making significant improvements to our systems infrastructure in order to: (a) implement mandatory initiatives from FHFA or other governmental bodies; (b) replace legacy hardware or software systems at the end of their lives and to strengthen our disaster recovery capabilities; and (c) improve our data collection and administration as well as our ability to oversee the servicing of loans.

We continue to actively manage our general and administrative expenses, while also continuing to focus on retaining key talent. Our general and administrative expenses declined in the first quarter of 2012 compared to the first quarter of 2011, largely due to a reduction in the number of our employees and changes in our compensation plans. We currently expect that our general and administrative expenses for the full-year 2012 will be approximately equivalent to those we experienced in the full-year 2011, with lower salaries and employee benefits expense offset by increased professional services expense, in part due to: (a) the continually changing mortgage market; (b) an environment in which we are subject to increased regulatory oversight and mandates; and (c) strategic arrangements that we may enter into with outside firms to provide operational capability and staffing for key functions, if needed. We believe the initiatives we are pursuing under the 2012 conservatorship scorecard and other FHFA-mandated initiatives may require additional resources and affect our level of administrative expenses going forward.

We believe our risks related to employee turnover and low employee engagement remain elevated. Uncertainty surrounding our future business model, organizational structure, and compensation has contributed to elevated levels of voluntary employee turnover and low employee engagement. Disruptive levels of turnover at both the executive and non-executive levels and low employee engagement have contributed to a deterioration in our control environment and may lead to breakdowns in many of our operations. To help mitigate the uncertainty surrounding compensation, we introduced a new compensation program for employees. We continue to explore various strategic arrangements with outside firms to provide operational capability and staffing for key functions, if needed. However, these or other efforts to manage this risk to the enterprise may not be successful. For more information on the risks related to employee turnover, see "CONTROLS AND PROCEDURES," and for recent legislative and regulatory developments affecting these risks, see "LEGISLATIVE AND REGULATORY MATTERS — Legislative and Regulatory Developments Concerning Executive Compensation."

### Single-Family Credit Guarantee Portfolio

The UPB of our single-family credit guarantee portfolio declined approximately 1% during the first quarter of 2012, as the amount of single-family loan liquidations exceeded new loan purchase and guarantee activity. We believe this is due, in part, to declines in the amount of single-family mortgage debt outstanding in the market and our competitive position compared to other market participants. The table below provides certain credit statistics for our single-family credit guarantee portfolio.

### Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio

| | As of | | | | |
|---|---|---|---|---|---|
| | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 |
| Payment status — | | | | | |
| One month past due | 1.63% | 2.02% | 1.94% | 1.92% | 1.75% |
| Two months past due | 0.57% | 0.70% | 0.70% | 0.67% | 0.65% |
| Seriously delinquent[1] | 3.51% | 3.58% | 3.51% | 3.50% | 3.63% |
| Non-performing loans (in millions)[2] | $119,599 | $120,514 | $119,081 | $114,819 | $115,083 |
| Single-family loan loss reserve (in millions)[3] | $ 37,771 | $ 38,916 | $ 39,088 | $ 38,390 | $ 38,558 |
| REO inventory (in properties) | 59,307 | 60,535 | 59,596 | 60,599 | 65,159 |
| REO assets, net carrying value (in millions) | $  5,333 | $  5,548 | $  5,539 | $  5,834 | $  6,261 |

| | For the Three Months Ended | | | | |
|---|---|---|---|---|---|
| | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 |
| | (in units, unless noted) | | | | |
| Seriously delinquent loan additions[1] | 80,815 | 95,661 | 93,850 | 87,813 | 97,646 |
| Loan modifications[4] | 13,677 | 19,048 | 23,919 | 31,049 | 35,158 |
| Foreclosure starts ratio[5] | 0.53% | 0.54% | 0.56% | 0.55% | 0.58% |
| REO acquisitions | 23,805 | 24,758 | 24,378 | 24,788 | 24,707 |
| REO disposition severity ratio:[6] | | | | | |
| California | 44.2% | 44.6% | 45.5% | 44.9% | 44.5% |
| Arizona | 45.0% | 46.7% | 48.7% | 51.3% | 50.8% |
| Florida | 48.6% | 50.1% | 53.3% | 52.7% | 54.8% |
| Nevada | 56.5% | 54.2% | 53.2% | 55.4% | 53.1% |
| Illinois | 49.3% | 51.2% | 50.5% | 49.4% | 49.5% |
| Total U.S. | 40.3% | 41.2% | 41.9% | 41.7% | 43.0% |
| Single-family credit losses (in millions) | $  3,435 | $  3,209 | $  3,440 | $  3,106 | $  3,226 |

(1) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Delinquencies*" for further information about our reported serious delinquency rates.

(2) Consists of the UPB of loans in our single-family credit guarantee portfolio that have undergone a TDR or that are seriously delinquent. As of March 31, 2012 and December 31, 2011, approximately $46.1 billion and $44.4 billion in UPB of TDR loans, respectively, were no longer seriously delinquent.

(3) Consists of the combination of: (a) our allowance for loan losses on mortgage loans held for investment; and (b) our reserve for guarantee losses associated with non-consolidated single-family mortgage securitization trusts and other guarantee commitments.

(4) Represents the number of modification agreements with borrowers completed during the quarter. Excludes forbearance agreements, repayment plans, and loans in modification trial periods.

(5) Represents the ratio of the number of loans that entered the foreclosure process during the respective quarter divided by the number of loans in the single-family credit guarantee portfolio at the end of the quarter. Excludes Other Guarantee Transactions and mortgages covered under other guarantee commitments.

(6) States presented represent the five states where our credit losses were greatest during 2011 and the first quarter of 2012. Calculated as the amount of our losses recorded on disposition of REO properties during the respective quarterly period, excluding those subject to repurchase requests made to our seller/servicers, divided by the aggregate UPB of the related loans. The amount of losses recognized on disposition of the properties is equal to the amount by which the UPB of the loans exceeds the amount of sales proceeds from disposition of the properties. Excludes sales commissions and other expenses, such as property maintenance and costs, as well as applicable recoveries from credit enhancements, such as mortgage insurance.

In discussing our credit performance, we often use the terms "credit losses" and "credit-related expenses." These terms are significantly different. Our "credit losses" consist of charge-offs and REO operations income (expense), while our "credit-related expenses" consist of our provision for credit losses and REO operations income (expense).

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $75.0 billion, and have recorded an additional $4.2 billion in losses on loans

purchased from PC trusts, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred and, thus, have not yet been provisioned for, we believe that, as of March 31, 2012, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations.

Borrower payment performance (for all early stages of delinquency) improved at March 31, 2012, compared to December 31, 2011. In addition, the number of seriously delinquent loan additions declined during the first quarter of 2012. However, several factors, including delays in the foreclosure process, have resulted in loans remaining in serious delinquency for longer periods than prior to 2008, particularly in states that require a judicial foreclosure process. As of March 31, 2012 and December 31, 2011, the percentage of seriously delinquent loans that have been delinquent for more than six months was 73% and 70%, respectively.

The credit losses and loan loss reserves associated with our single-family credit guarantee portfolio remained elevated in the first quarter of 2012, due in part to:

- Losses associated with the continued high volume of foreclosures and foreclosure alternatives. These actions relate to the continued efforts of our servicers to resolve our large inventory of seriously delinquent loans. Due to the length of time necessary for servicers either to complete the foreclosure process or pursue foreclosure alternatives on seriously delinquent loans in our portfolio, we expect our credit losses will continue to remain high even if the volume of new serious delinquencies continues to decline.

- Continued negative impact of certain loan groups within the single-family credit guarantee portfolio, such as those underwritten with certain lower documentation standards and interest-only loans, as well as 2005 through 2008 vintage loans. These groups continue to be large contributors to our credit losses. Loans originated in 2005 through 2008 comprised approximately 30% and 36% of our single-family credit guarantee portfolio, based on UPB at March 31, 2012 and 2011, respectively; however, these loans accounted for approximately 88% and 91% of our credit losses during the three months ended March 31, 2012 and 2011, respectively.

- Cumulative decline in national home prices of 28% since June 2006, based on our own index. As a result of this price decline, approximately 20% of loans in our single-family credit guarantee portfolio, based on UPB, had estimated current LTV ratios in excess of 100% (*i.e.*, underwater loans) as of March 31, 2012.

- Weak financial condition of many of our mortgage insurers, which has reduced our estimates of expected recoveries from these counterparties.

Some of our loss mitigation activities create fluctuations in our delinquency statistics. For example, loans that we report as seriously delinquent before they enter a modification trial period continue to be reported as seriously delinquent until the modifications become effective and the loans are removed from delinquent status by our servicers. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Credit Performance — Delinquencies*" for further information about factors affecting our reported delinquency rates.

**Conservatorship and Government Support for our Business**

We have been operating under conservatorship, with FHFA acting as our conservator, since September 6, 2008. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition, and results of operations.

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

While the conservatorship has benefited us, we are subject to certain constraints on our business activities imposed by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement and by FHFA, as our Conservator.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The $200 billion cap on Treasury's funding commitment will increase as necessary to eliminate any net worth deficits we may have during 2010, 2011, and 2012. We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

We received cash proceeds of $146 million from our draw under Treasury's funding commitment during the first quarter of 2012 related to a quarterly deficit in equity at December 31, 2011. To address our net worth deficit of

$18 million at March 31, 2012, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $19 million. FHFA will request that we receive these funds by June 30, 2012. Upon funding of the draw request: (a) our aggregate liquidation preference on the senior preferred stock owned by Treasury will be $72.3 billion; and (b) the corresponding annual cash dividend owed to Treasury will be $7.23 billion.

We pay cash dividends to Treasury at an annual rate of 10%. Through March 31, 2012, we paid aggregate cash dividends to Treasury of $18.3 billion, an amount equal to 26% of our aggregate draws received under the Purchase Agreement. As of March 31, 2012, our annual cash dividend obligation to Treasury on the senior preferred stock exceeded our annual historical earnings in all but one period. As a result, we expect to make additional draws in future periods, even if our operating performance generates net income or comprehensive income.

Neither the U.S. government nor any other agency or instrumentality of the U.S. government is obligated to fund our mortgage purchase or financing activities or to guarantee our securities or other obligations.

For more information on conservatorship and the Purchase Agreement, see "BUSINESS — Conservatorship and Related Matters" in our 2011 Annual Report.

## Consolidated Financial Results

Net income was $577 million and $676 million for the first quarters of 2012 and 2011, respectively. Key highlights of our financial results include:

- Net interest income was $4.5 billion for both the first quarters of 2012 and 2011, reflecting the impact of a reduction in the average balances of our higher-yielding mortgage-related assets offset by lower funding costs in the first quarter of 2012 compared to the first quarter of 2011.

- Provision for credit losses for the first quarter of 2012 declined to $1.8 billion, compared to $2.0 billion for the first quarter of 2011. The provision for credit losses for the first quarter of 2012 reflects stabilizing expected loss severity on single-family loans and a decline in the number of seriously delinquent loan additions.

- Non-interest income (loss) was $(1.5) billion for the first quarter of 2012, compared to $(1.3) billion for the first quarter of 2011, largely driven by an increase in derivative losses, partially offset by a decline in net impairments of available-for-sale securities recognized in earnings during the first quarter of 2012 compared to the first quarter of 2011.

- Non-interest expense declined to $596 million in the first quarter of 2012, from $697 million in the first quarter of 2011, primarily due to a reduction in REO operations expense.

- Comprehensive income was $1.8 billion for the first quarter of 2012 compared to $2.7 billion for the first quarter of 2011. Comprehensive income for the first quarter of 2012 was driven by the $577 million net income and a reduction in net unrealized losses related to our available-for-sale securities.

## Mortgage Market and Economic Conditions

### Overview

The U.S. real gross domestic product rose by 2.2% on an annualized basis during the first quarter of 2012, compared to 1.6% during 2011, according to the Bureau of Economic Analysis. The national unemployment rate was 8.2% in March 2012, compared to 8.5% in December 2011, based on data from the U.S. Bureau of Labor Statistics. In the data underlying the unemployment rate, an average of over 210,000 monthly net new jobs were added to the economy during the first quarter of 2012, which shows evidence of a slow, but steady positive trend for the economy and the labor market.

### Single-Family Housing Market

The single-family housing market continued to experience challenges in the first quarter of 2012 primarily due to continued weakness in the employment market and a significant inventory of seriously delinquent loans and REO properties in the market.

Based on data from the National Association of Realtors, sales of existing homes in the first quarter of 2012 averaged 4.57 million (at a seasonally adjusted annual rate), increasing from 4.37 million in the fourth quarter of 2011. Based on data from the U.S. Census Bureau and HUD, new home sales in the first quarter of 2012 averaged 337,000 (at a seasonally adjusted annual rate) increasing approximately 4% from approximately 325,000 in the fourth quarter of 2011. We estimate that home prices remained relatively stable during the first quarter of 2012, with our nationwide index registering approximately a 0.3% decline from December 2011 through March 2012 without adjustment for seasonality. This estimate was based on our own price index of mortgage loans on one-family homes funded by us or Fannie Mae.

*Freddie Mac*

Other indices of home prices may have different results, as they are determined using different pools of mortgage loans and calculated under different conventions than our own.

The foreclosure process continues to experience delays, due to a number of factors, but particularly in states that require a judicial foreclosure process. Delays in the foreclosure process (and in certain cases the removal of such delays) may also adversely affect trends in home prices in certain geographic areas. There have been a number of regulatory developments in recent periods impacting single-family mortgage servicing and foreclosure practices. It is possible that these developments will result in significant changes to mortgage servicing and foreclosure practices that could adversely affect our business. For information on these matters, see "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" in our 2011 Annual Report and "LEGISLATIVE AND REGULATORY MATTERS — Developments Concerning Single-Family Servicing Practices."

### Multifamily Housing Market

Multifamily market fundamentals continued to improve on a national level during the first quarter of 2012. This improvement continues a trend of favorable movements in key indicators such as vacancy rates and effective rents that generally began in early 2010. Vacancy rates and effective rents are important to loan performance because multifamily loans are generally repaid from the cash flows generated by the underlying property and these factors significantly influence those cash flows. These improving fundamentals and perceived optimism in recent periods about demand for multifamily housing have contributed to improvement in property values in most markets.

### Mortgage Market and Business Outlook

Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties. For example, a number of factors could cause the actual performance of the housing and mortgage markets and the U.S. economy during the remainder of 2012 to be significantly worse than we expect, including adverse changes in consumer confidence, national or international economic conditions and changes in the federal government's fiscal policies. See "FORWARD-LOOKING STATEMENTS" for additional information.

### Overview

We continue to expect key macroeconomic drivers of the economy — such as income growth, employment, and inflation — will affect the performance of the housing and mortgage markets in the remainder of 2012. Since we expect that economic and job growth will likely be stronger in 2012 than in 2011, we believe that housing affordability will remain relatively high in 2012 for potential home buyers. We also expect that the volume of home sales will likely increase in 2012, compared to the volume in 2011, but still remain relatively weak compared to historical levels. Important factors that we believe will continue to negatively impact single-family housing demand are the relatively high unemployment rate and relatively low consumer confidence measures. Consumer confidence measures, while up from recession lows, remain below long-term averages and suggest that households will likely continue to be cautious in home buying. We also expect interest rates on fixed-rate single-family mortgages to remain historically low in 2012, which may extend the recent high level of refinancing (relative to new purchase lending activity). The recently expanded and streamlined HARP initiative may result in a high level of refinancing, particularly for borrowers that are underwater on their current loans. For information on this initiative, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program*."

While home prices remain at significantly lower levels from their peak in most areas, estimates of the inventory of unsold homes, including those held by financial institutions and financially distressed borrowers, remain high. To the extent a large volume of loans complete the foreclosure process in a short time period the resulting REO inventory could have a negative impact on the housing market. Due to these and other factors, our expectation for home prices, based on our own index, is that national average home prices will continue to remain weak and may decline on a seasonally adjusted basis over the near term before a long-term recovery in housing begins.

### Single-Family

Our provision for credit losses and charge-offs were elevated during the first quarter of 2012, and we expect they will likely remain elevated during the remainder of 2012. This is in part due to the substantial number of underwater mortgage

loans in our single-family credit guarantee portfolio, as well as the substantial inventory of seriously delinquent loans. For the near term, we also expect:

- REO disposition severity ratios to remain near their historical highs, as market conditions, such as home prices and the rate of home sales continue to remain weak;

- non-performing assets, which include loans, deemed TDRs, to continue to remain high;

- the volume of loan workouts to remain high; and

- continued high volume of loans in the foreclosure process as well as prolonged foreclosure timelines.

### *Multifamily*

The most recent market data available continues to reflect improving national apartment fundamentals, including decreasing vacancy rates and increasing effective rents. As a result, we expect our multifamily delinquency rate to remain relatively low during the remainder of 2012.

Our purchase and guarantee of multifamily loans increased to $5.8 billion for the first quarter of 2012, compared to $3.0 billion during the same period in 2011, as strong volumes from late in 2011 carried into the first quarter of 2012. However, we anticipate the growth in our purchase and guarantee volumes will slow for the remainder of the year, ultimately reflecting a more modest increase in 2012, compared to 2011.

### *Long-Term Financial Sustainability*

There is significant uncertainty as to our long-term financial sustainability. The Acting Director of FHFA stated on September 19, 2011 that "it ought to be clear to everyone at this point, given [Freddie Mac and Fannie Mae's] losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that [Freddie Mac and Fannie Mae] will not be able to earn their way back to a condition that allows them to emerge from conservatorship."

We expect to request additional draws under the Purchase Agreement in future periods. Over time, our dividend obligation to Treasury will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term.

There continues to be significant uncertainty in the current mortgage market environment, and continued high levels of unemployment, weakness in home prices, and adverse changes in interest rates, mortgage security prices, and spreads could lead to additional draws. For discussion of other factors that could result in additional draws, see "RISK FACTORS — Conservatorship and Related Matters — *We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition*" in our 2011 Annual Report.

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist. We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near-term. We have no ability to predict the outcome of these deliberations. For a discussion of FHFA's strategic plan for us, see "LEGISLATIVE AND REGULATORY MATTERS — FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships and 2012 Conservatorship Scorecard."

### Limits on Investment Activity and Our Mortgage-Related Investments Portfolio

The conservatorship has significantly impacted our investment activity. Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $729 billion as of December 31, 2011 and may not exceed $656.1 billion as of December 31, 2012. FHFA has indicated that such portfolio reduction targets should be viewed as minimum reductions and has encouraged us to reduce the mortgage-related investments portfolio at a faster rate than required, consistent with FHFA guidance, safety and soundness and the goal of conserving and preserving assets. We are also subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury. We are working with FHFA to identify ways to prudently accelerate the rate of contraction of the portfolio.

The table below presents the UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation.

**Table 4 — Mortgage-Related Investments Portfolio[1]**

|  | March 31, 2012 | December 31, 2011 |
|---|---|---|
|  | (in millions) | |
| Investments segment — Mortgage investments portfolio | $417,015 | $449,273 |
| Single-family Guarantee segment — Single-family unsecuritized mortgage loans[2] | 61,903 | 62,469 |
| Multifamily segment — Mortgage investments portfolio | 139,380 | 141,571 |
| Total mortgage-related investments portfolio | $618,298 | $653,313 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Represents unsecuritized seriously delinquent single-family loans managed by the Single-family Guarantee segment.

FHFA has stated that we will not be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio. FHFA also stated that, given the size of our current mortgage-related investments portfolio and the potential volume of delinquent mortgages to be removed from PC pools, it expects that any net additions to our mortgage-related investments portfolio would be related to that activity. We expect that our holdings of unsecuritized single-family loans could increase in the remainder of 2012.

We consider the liquidity of our assets in our mortgage-related investments portfolio based on three categories: (a) agency securities; (b) assets that are less liquid than agency securities; and (c) illiquid assets. Assets that are less liquid than agency securities include unsecuritized performing single-family mortgage loans, multifamily mortgage loans, CMBS, and housing revenue bonds. Our less liquid assets collectively represented approximately 33% of the UPB of the portfolio at March 31, 2012, as compared to 32% as of December 31, 2011. Illiquid assets include unsecuritized seriously delinquent and modified single-family mortgage loans which we removed from PC trusts, and our investments in non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans. Our illiquid assets collectively represented approximately 30% of the UPB of the portfolio at March 31, 2012, as compared to 29% as of December 31, 2011. The changing composition of our mortgage-related investments portfolio to a greater proportion of illiquid assets may influence our decisions regarding funding and hedging. The description above of the liquidity of our assets is based on our own internal expectations given current market conditions. Changes in market conditions could adversely affect the liquidity of our assets at any given time.

## SELECTED FINANCIAL DATA[1]

The selected financial data presented below should be reviewed in conjunction with MD&A and our consolidated financial statements and related notes for the three months ended March 31, 2012.

| | For the Three Months Ended March 31, | |
|---|---|---|
| | **2012** | **2011** |
| | **(dollars in millions, except share-related amounts)** | |
| **Statements of Comprehensive Income Data** | | |
| Net interest income | $ 4,500 | $ 4,540 |
| Provision for credit losses | (1,825) | (1,989) |
| Non-interest income (loss) | (1,516) | (1,252) |
| Non-interest expense | (596) | (697) |
| Net income | 577 | 676 |
| Comprehensive income | 1,789 | 2,740 |
| Net loss attributable to common stockholders | (1,227) | (929) |
| Net loss per common share: | | |
| Basic | (0.38) | (0.29) |
| Diluted | (0.38) | (0.29) |
| Cash dividends per common share | — | — |
| Weighted average common shares outstanding (in thousands):[2] | | |
| Basic | 3,241,502 | 3,246,985 |
| Diluted | 3,241,502 | 3,246,985 |

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| | **(dollars in millions)** | |
| **Balance Sheets Data** | | |
| Mortgage loans held-for-investment, at amortized cost by consolidated trusts (net of allowances for loan losses) | $1,555,067 | $1,564,131 |
| Total assets | 2,114,944 | 2,147,216 |
| Debt securities of consolidated trusts held by third parties | 1,481,622 | 1,471,437 |
| Other debt | 618,629 | 660,546 |
| All other liabilities | 14,711 | 15,379 |
| Total Freddie Mac stockholders' equity (deficit) | (18) | (146) |
| **Portfolio Balances**[3] | | |
| Mortgage-related investments portfolio | $ 618,298 | $ 653,313 |
| Total Freddie Mac mortgage-related securities[4] | 1,617,595 | 1,624,684 |
| Total mortgage portfolio[5] | 2,056,501 | 2,075,394 |
| Non-performing assets[6] | 127,951 | 129,152 |

| | For the Three Months Ended March 31, | |
|---|---|---|
| | **2012** | **2011** |
| **Ratios**[7] | | |
| Return on average assets[8] | 0.1% | 0.1% |
| Non-performing assets ratio[9] | 6.8 | 6.4 |
| Equity to assets ratio[10] | — | — |

(1) See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for information regarding our accounting policies and the impact of new accounting policies on our consolidated financial statements.

(2) Includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. This warrant is included in basic loss per share, because it is unconditionally exercisable by the holder at a cost of $0.00001 per share.

(3) Represents the UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(4) See "Table 27 — Freddie Mac Mortgage-Related Securities" for the composition of this line item.

(5) See "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios" for the composition of our total mortgage portfolio.

(6) See "Table 45 — Non-Performing Assets" for a description of our non-performing assets.

(7) The dividend payout ratio on common stock is not presented because we are reporting a net loss attributable to common stockholders for all periods presented.

(8) Ratio computed as net income divided by the simple average of the beginning and ending balances of total assets.

(9) Ratio computed as non-performing assets divided by the ending UPB of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities.

(10) Ratio computed as the simple average of the beginning and ending balances of total Freddie Mac stockholders' equity (deficit) divided by the simple average of the beginning and ending balances of total assets.

## CONSOLIDATED RESULTS OF OPERATIONS

The following discussion of our consolidated results of operations should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported results of operations.

### Impact of Legislated Increase to Guarantee Fees

Effective April 1, 2012, the guarantee fee on all single-family residential mortgages sold to Freddie Mac was increased by 10 basis points. Guarantee fees related to mortgage loans held by our consolidated trusts, including those attributable to the 10 basis point increase, will continue to be reported within our GAAP consolidated statements of comprehensive income in net interest income and the remittance of the additional fees to Treasury will be reported in non-interest expense. For additional information, see "LEGISLATIVE AND REGULATORY MATTERS — Legislated Increase to Guarantee Fees."

### Table 5 — Summary Consolidated Statements of Comprehensive Income

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (in millions) | |
| Net interest income | $ 4,500 | $ 4,540 |
| Provision for credit losses | (1,825) | (1,989) |
| Net interest income after provision for credit losses | 2,675 | 2,551 |
| Non-interest income (loss): | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (4) | 223 |
| Gains (losses) on retirement of other debt | (21) | 12 |
| Gains (losses) on debt recorded at fair value | (17) | (81) |
| Derivative gains (losses) | (1,056) | (427) |
| Impairment of available-for-sale securities: | | |
| Total other-than-temporary impairment of available-for-sale securities | (475) | (1,054) |
| Portion of other-than-temporary impairment recognized in AOCI | (89) | (139) |
| Net impairment of available-for-sale securities recognized in earnings | (564) | (1,193) |
| Other gains (losses) on investment securities recognized in earnings | (288) | (120) |
| Other income | 434 | 334 |
| Total non-interest income (loss) | (1,516) | (1,252) |
| Non-interest expense: | | |
| Administrative expenses | (337) | (361) |
| REO operations expense | (171) | (257) |
| Other expenses | (88) | (79) |
| Total non-interest expense | (596) | (697) |
| Income before income tax benefit | 563 | 602 |
| Income tax benefit | 14 | 74 |
| Net income | 577 | 676 |
| Other comprehensive income, net of taxes and reclassification adjustments: | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | 1,147 | 1,941 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 111 | 132 |
| Changes in defined benefit plans | (46) | (9) |
| Total other comprehensive income, net of taxes and reclassification adjustments | 1,212 | 2,064 |
| Comprehensive income | $ 1,789 | $ 2,740 |

## Net Interest Income

The table below presents an analysis of net interest income, including average balances and related yields earned on assets and incurred on liabilities.

### Table 6 — Net Interest Income/Yield and Average Balance Analysis

| | Three Months Ended March 31, | | | | | |
| | 2012 | | | 2011 | | |
| | Average Balance[1][2] | Interest Income (Expense)[1] | Average Rate | Average Balance[1][2] | Interest Income (Expense)[1] | Average Rate |
|---|---|---|---|---|---|---|
| | (dollars in millions) | | | | | |
| **Interest-earning assets:** | | | | | | |
| Cash and cash equivalents | $ 51,029 | $ 4 | 0.03% | $ 37,561 | $ 16 | 0.17% |
| Federal funds sold and securities purchased under agreements to resell | 26,057 | 9 | 0.14 | 47,861 | 18 | 0.15 |
| Mortgage-related securities: | | | | | | |
| Mortgage-related securities[3] | 383,227 | 4,363 | 4.55 | 456,972 | 5,316 | 4.65 |
| Extinguishment of PCs held by Freddie Mac | (125,363) | (1,441) | (4.60) | (167,528) | (2,063) | (4.93) |
| Total mortgage-related securities, net | 257,864 | 2,922 | 4.53 | 289,444 | 3,253 | 4.50 |
| Non-mortgage-related securities[3] | 28,464 | 16 | 0.23 | 29,309 | 30 | 0.41 |
| Mortgage loans held by consolidated trusts[4] | 1,559,823 | 17,468 | 4.48 | 1,650,567 | 20,064 | 4.86 |
| Unsecuritized mortgage loans[4] | 254,877 | 2,312 | 3.63 | 240,557 | 2,334 | 3.88 |
| Total interest-earning assets | $2,178,114 | $ 22,731 | 4.18 | $2,295,299 | $ 25,715 | 4.48 |
| **Interest-bearing liabilities:** | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $1,580,749 | $(16,694) | (4.22) | $1,665,608 | $(19,466) | (4.67) |
| Extinguishment of PCs held by Freddie Mac | (125,363) | 1,441 | 4.60 | (167,528) | 2,063 | 4.93 |
| Total debt securities of consolidated trusts held by third parties | 1,455,386 | (15,253) | (4.19) | 1,498,080 | (17,403) | (4.65) |
| Other debt: | | | | | | |
| Short-term debt | 149,130 | (40) | (0.11) | 194,822 | (115) | (0.24) |
| Long-term debt[5] | 496,644 | (2,776) | (2.23) | 518,034 | (3,450) | (2.66) |
| Total other debt | 645,774 | (2,816) | (1.74) | 712,856 | (3,565) | (2.00) |
| Total interest-bearing liabilities | 2,101,160 | (18,069) | (3.44) | 2,210,936 | (20,968) | (3.79) |
| Expense related to derivatives[6] | — | (162) | (0.03) | — | (207) | (0.04) |
| Impact of net non-interest-bearing funding | 76,954 | — | 0.12 | 84,363 | — | 0.14 |
| Total funding of interest-earning assets | $2,178,114 | $(18,231) | (3.35) | $2,295,299 | $(21,175) | (3.69) |
| Net interest income/yield | | $ 4,500 | 0.83 | | $ 4,540 | 0.79 |

(1) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) We calculate average balances based on amortized cost.
(3) Interest income (expense) includes accretion of the portion of impairment charges recognized in earnings where we expect a significant improvement in cash flows.
(4) Non-performing loans, where interest income is generally recognized when collected, are included in average balances.
(5) Includes current portion of long-term debt.
(6) Represents changes in fair value of derivatives in closed cash flow hedge relationships that were previously deferred in AOCI and have been reclassified to earnings as the associated hedged forecasted issuance of debt affects earnings.

Net interest income decreased by $40 million and net interest yield increased by 4 basis points during the three months ended March 31, 2012, compared to the three months ended March 31, 2011. The primary driver underlying the decrease in net interest income was the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations and limited purchase activity, partially offset by lower funding costs from the replacement of debt at lower rates. The increase in net interest yield was primarily due to the benefits of lower funding costs, partially offset by the negative impact of the reduction in the average balance of higher-yielding mortgage assets.

We do not recognize interest income on non-performing loans that have been placed on non-accrual status, except when cash payments are received. We refer to this interest income that we do not recognize as foregone interest income. Foregone interest income and reversals of previously recognized interest income, net of cash received, related to non-performing loans was $0.9 billion and $1.0 billion during the three months ended March 31, 2012 and 2011, respectively. This reduction was primarily due to the decreased volume of non-performing loans on non-accrual status.

During the three months ended March 31, 2012, spreads on our debt and our access to the debt markets remained favorable relative to historical levels. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity."

**Provision for Credit Losses**

We maintain loan loss reserves at levels we believe are appropriate to absorb probable incurred losses on mortgage loans held-for-investment and loans underlying our financial guarantees. Our loan loss reserves are increased through the provision for credit losses and are reduced by net charge-offs.

Our provision for credit losses declined to $1.8 billion in the first quarter of 2012, compared to $2.0 billion in the first quarter of 2011. The provision for credit losses for the first quarter of 2012 reflects stabilizing expected loss severity on single-family loans and a decline in the number of seriously delinquent loan additions, while the first quarter of 2011 reflects worsening expected loss severity and higher modification volumes offset by a decline in the rate at which seriously delinquent loans ultimately transition to a loss event.

During the first quarter of 2012, our charge-offs, net of recoveries for single-family loans, exceeded the amount of our provision for credit losses. Our charge-offs in the first quarter of 2012 were less than they otherwise would have been because of the suppression of loan and collateral resolution activity due to delays in the foreclosure process. We believe the level of our charge-offs will continue to remain high and may increase in the remainder of 2012.

As of March 31, 2012 and December 31, 2011, the UPB of our single-family non-performing loans was $119.6 billion and $120.5 billion, respectively. These amounts include $46.1 billion and $44.4 billion, respectively, of single-family TDRs that are reperforming (*i.e.*, less than three months past due). TDRs remain categorized as non-performing throughout the remaining life of the loan regardless of whether the borrower makes payments which return the loan to a current payment status after modification. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, our loan loss reserves balance, and our non-performing assets.

The total number of seriously delinquent loans declined approximately 3% and 6% during the first quarters of 2012 and 2011, respectively. However, our serious delinquency rate remains high compared to historical levels due to the continued weakness in home prices, persistently high unemployment, extended foreclosure timelines, and continued challenges faced by servicers processing large volumes of problem loans. Our seller/servicers have an active role in our loan workout activities, including under the servicing alignment initiative and the MHA Program, and a decline in their performance could result in a failure to realize the anticipated benefits of our loss mitigation plans.

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $75.0 billion, and have recorded an additional $4.2 billion in losses on loans purchased from our PCs, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred, and thus have not been provisioned for, we believe that, as of March 31, 2012, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for certain quarterly credit statistics for our single-family credit guarantee portfolio.

Our provision for credit losses and amount of charge-offs in the future will be affected by a number of factors, including: (a) the actual level of mortgage defaults; (b) the impact of the MHA Program and other loss mitigation efforts, including any requirement to utilize principal forgiveness in our loan modification initiatives; (c) any government actions or programs that impact the ability of troubled borrowers to obtain modifications, including legislative changes to bankruptcy laws; (d) changes in property values; (e) regional economic conditions, including unemployment rates; (f) delays in the foreclosure process, including those related to the concerns about deficiencies in foreclosure documentation practices; (g) third-party mortgage insurance coverage and recoveries; and (h) the realized rate of seller/servicer repurchases. In addition, in April 2012, FHFA issued an advisory bulletin that could have an impact on our provision for credit losses in the future; however, we are still assessing the operational and accounting impacts of the bulletin. See "LEGISLATIVE AND REGULATORY DEVELOPMENTS — FHFA Advisory Bulletin" for additional information. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for information on mortgage insurers and seller/servicer repurchase obligations.

We recognized a benefit for credit losses associated with our multifamily mortgage portfolio of $19 million and $60 million for the first quarters of 2012 and 2011, respectively. Our loan loss reserves associated with our multifamily mortgage portfolio were $525 million and $545 million as of March 31, 2012 and December 31, 2011, respectively. The decline in loan loss reserves for multifamily loans in the first quarter of 2012 was driven primarily by the increased seasoning of our portfolio and the lower level of estimated incurred credit losses based on our historical experience.

### Non-Interest Income (Loss)

#### Gains (Losses) on Extinguishment of Debt Securities of Consolidated Trusts

When we purchase PCs that have been issued by consolidated PC trusts, we extinguish a pro rata portion of the outstanding debt securities of the related consolidated trusts. We recognize a gain (loss) on extinguishment of the debt securities to the extent the amount paid to extinguish the debt security differs from its carrying value. Gains (losses) on extinguishment of debt securities of consolidated trusts were $(4) million and $223 million for the three months ended March 31, 2012 and 2011, respectively. For the three months ended March 31, 2012 and 2011, we extinguished debt securities of consolidated trusts with a UPB of $692 million and $24.8 billion, respectively (representing our purchase of single-family PCs with a corresponding UPB amount). The decrease in purchases of single-family PCs was primarily due to a lower volume of dollar roll transactions to support the market and pricing of our single-family PCs. See "Table 19 — Mortgage-Related Securities Purchase Activity" for additional information regarding purchases of mortgage-related securities, including those issued by consolidated PC trusts.

#### Gains (Losses) on Retirement of Other Debt

Gains (losses) on retirement of other debt were $(21) million and $12 million during the three months ended March 31, 2012 and 2011, respectively. We recognized losses on debt retirements in the first quarter of 2012 primarily due to write-offs of unamortized deferred issuance costs. We recognized gains on debt retirements in the first quarter of 2011 primarily due to the repurchase of other debt securities at a discount. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Other Debt Securities — Other Debt Retirement Activities*."

#### Gains (Losses) on Debt Recorded at Fair Value

Gains (losses) on debt recorded at fair value primarily relate to changes in the fair value of our foreign-currency denominated debt. During the first three months of 2012 and 2011, we recognized losses on debt recorded at fair value of $17 million and $81 million, respectively, primarily due to a combination of the U.S. dollar weakening relative to the Euro and changes in interest rates. We mitigate changes in the fair value of our foreign-currency denominated debt by using foreign currency swaps and foreign-currency denominated interest-rate swaps.

#### *Derivative Gains (Losses)*

The table below presents derivative gains (losses) reported in our consolidated statements of comprehensive income. See "NOTE 10: DERIVATIVES — Table 10.2 — Gains and Losses on Derivatives" for information about gains and losses related to specific categories of derivatives. Changes in fair value and interest accruals on derivatives not in hedge accounting relationships are recorded as derivative gains (losses) in our consolidated statements of comprehensive income. At March 31, 2012 and December 31, 2011, we did not have any derivatives in hedge accounting relationships; however, there are amounts recorded in AOCI related to discontinued cash flow hedges. Amounts recorded in AOCI associated with these closed cash flow hedges are reclassified to earnings when the forecasted transactions affect earnings. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the forecasted transaction is reclassified into earnings immediately.

While derivatives are an important aspect of our strategy to manage interest-rate risk, they generally increase the volatility of reported net income because, while fair value changes in derivatives affect net income, fair value changes in several of the types of assets and liabilities being hedged do not affect net income. Beginning in the fourth quarter of 2011, we started issuing a higher percentage of long-term debt. This allows us to take advantage of attractive long-term rates while decreasing our reliance on interest-rate swaps.

### Table 7 — Derivative Gains (Losses)

| | Derivative Gains (Losses) | |
| | Three Months Ended March 31, | |
| | 2012 | 2011 |
| | (in millions) | |
| Interest-rate swaps | $ 1,208 | $ 1,723 |
| Option-based derivatives[1] | (1,077) | (807) |
| Other derivatives[2] | (111) | (94) |
| Accrual of periodic settlements[3] | (1,076) | (1,249) |
| Total | $(1,056) | $ (427) |

(1) Primarily includes purchased call and put swaptions and purchased interest-rate caps and floors.
(2) Includes futures, foreign-currency swaps, commitments, swap guarantee derivatives, and credit derivatives.
(3) Includes imputed interest on zero-coupon swaps.

Gains (losses) on derivatives not accounted for in hedge accounting relationships are principally driven by changes in: (a) interest rates and implied volatility; and (b) the mix and volume of derivatives in our derivative portfolio.

During the three months ended March 31, 2012, we recognized losses on derivatives of $1.1 billion primarily due to losses related to the accrual of periodic settlements on interest-rate swaps as we were in a net pay-fixed swap position. We recognized fair value gains on our pay-fixed swaps of $3.8 billion, which were largely offset by: (a) fair value losses on our receive-fixed swaps of $2.6 billion; and (b) fair value losses on our option-based derivatives of $1.1 billion resulting from losses on our purchased call swaptions due to an increase in long-term interest rates. The fair value of derivatives during the three months ended March 31, 2012 reflects a decline in short-term interest rates and an increase in long-term interest rates compared to the three months ended March 31, 2011, when both short-term and long-term interest rates increased.

During the three months ended March 31, 2011, we recognized losses on derivatives of $0.4 billion primarily due to $1.2 billion of losses related to the accrual of periodic settlements on interest-rate swaps as we were in a net pay-fixed swap position, partially offset by the improvement in derivative fair values as interest rates increased. As a result, we recognized fair value gains of $4.0 billion on our pay-fixed swaps, partially offset by fair value losses on our receive-fixed swaps of $2.2 billion. We recognized fair value losses of $0.8 billion on our option-based derivatives, resulting from losses on our purchased call swaptions primarily due to the increase in interest rates.

### *Investment Securities-Related Activities*

#### *Impairments of Available-For-Sale Securities*

We recorded net impairments of available-for-sale securities recognized in earnings, which were related to non-agency mortgage-related securities, of $564 million and $1.2 billion during the three months ended March 31, 2012 and 2011, respectively. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities — Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*" and "NOTE 7: INVESTMENTS IN SECURITIES" for information regarding the accounting principles for investments in debt and equity securities and the other-than-temporary impairments recorded during the three months ended March 31, 2012 and 2011.

#### *Other Gains (Losses) on Investment Securities Recognized in Earnings*

Other gains (losses) on investment securities recognized in earnings primarily consists of gains (losses) on trading securities. Trading securities mainly include Treasury securities, agency fixed-rate and variable-rate pass-through mortgage-related securities, and agency REMICs, including inverse floating-rate, interest-only and principal-only securities. We recognized $(377) million and $(200) million related to gains (losses) on trading securities during the three months ended March 31, 2012 and 2011, respectively.

Losses in both periods are primarily due to the movement of securities with unrealized gains towards maturity. The losses during the three months ended March 31, 2011 were partially offset by larger fair value gains, compared to the three months ended March 31, 2012, due to a tightening of OAS levels on agency securities.

### *Other Income*

The table below summarizes the significant components of other income.

**Table 8 — Other Income**

|  | Three Months Ended March 31, | |
| --- | ---: | ---: |
|  | **2012** | **2011** |
|  | (in millions) | |
| Other income: | | |
| Gains (losses) on sale of mortgage loans | $ 40 | $ 95 |
| Gains (losses) on mortgage loans recorded at fair value | 139 | (33) |
| Recoveries on loans impaired upon purchase | 89 | 125 |
| Guarantee-related income, net[1] | 70 | 54 |
| All other | 96 | 93 |
| Total other income | $434 | $334 |

(1) Most of our guarantee-related income relates to securitized multifamily mortgage loans where we have not consolidated the securitization trusts on our consolidated balance sheets.

### Gains (Losses) on Sale of Mortgage Loans

In the first quarters of 2012 and 2011, we recognized $40 million and $95 million, respectively, of gains on sale of mortgage loans with associated UPB of $3.7 billion and $3.4 billion, respectively. All such amounts relate to our securitizations of multifamily loans which we had elected to carry at fair value while they were held on our consolidated balance sheet. We had lower gains on sale of mortgage loans in the first quarter of 2012, compared to the first quarter of 2011, as a significant portion of the improved fair value of the loans was instead recognized within gains (losses) on mortgage loans recorded at fair value during periods prior to the loans' securitization.

### Gains (Losses) on Mortgage Loans Recorded at Fair Value

In the first quarters of 2012 and 2011, we recognized $139 million and $(33) million, respectively, of gains (losses) on mortgage loans recorded at fair value. We held higher balances of multifamily loans on our consolidated balance sheets that were designated for subsequent securitization during the first quarter of 2012, compared to the first quarter of 2011 which, when combined with improving fair values on those loans, resulted in gains during the first quarter of 2012.

### Recoveries on Loans Impaired upon Purchase

Recoveries on loans impaired upon purchase represent the recapture into income of previously recognized losses associated with purchases of delinquent loans from our PCs in conjunction with our guarantee activities. Recoveries occur when a non-performing loan is repaid in full or when at the time of foreclosure the estimated fair value of the acquired property, less costs to sell, exceeds the carrying value of the loan. For impaired loans where the borrower has made required payments that return the loan to less than three months past due, the recovery amounts are instead recognized as interest income over time as periodic payments are received.

During the first quarters of 2012 and 2011, we recognized recoveries on loans impaired upon purchase of $89 million and $125 million, respectively. Our recoveries on loans impaired upon purchase declined in the first quarter of 2012, compared to the first quarter of 2011, due to a lower volume of foreclosure transfers and payoffs associated with loans impaired upon purchase.

### All Other

All other income consists primarily of transactional fees, fees assessed to our servicers, such as for technology use and late fees or other penalties, and other miscellaneous income.

## Non-Interest Expense

The table below summarizes the components of non-interest expense.

## Table 9 — Non-Interest Expense

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (in millions) | |
| Administrative expenses: | | |
| Salaries and employee benefits | $176 | $207 |
| Professional services | 71 | 56 |
| Occupancy expense | 14 | 15 |
| Other administrative expense | 76 | 83 |
| Total administrative expenses | 337 | 361 |
| REO operations expense | 171 | 257 |
| Other expenses | 88 | 79 |
| Total non-interest expense | $596 | $697 |

### Administrative Expenses

Administrative expenses decreased during the three months ended March 31, 2012 compared to the three months ended March 31, 2011, largely due to a reduction in salaries and employee benefits expense. We currently expect that our general and administrative expenses for the full-year 2012 will be approximately equivalent to those we experienced in the full-year 2011, with lower salaries and employee benefits expense offset by increased professional services expense, in part due to: (a) the continually changing mortgage market; (b) an environment in which we are subject to increased regulatory oversight and mandates; and (c) strategic arrangements that we may enter into with outside firms to provide operational capability and staffing for key functions, if needed. We believe the initiatives we are pursuing under the 2012

conservatorship scorecard and other FHFA-mandated initiatives may require additional resources and affect our level of administrative expenses going forward.

### REO Operations Expense

The table below presents the components of our REO operations expense, and REO inventory and disposition information.

**Table 10 — REO Operations Expense, REO Inventory, and REO Dispositions**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (dollars in millions) | |
| REO operations expense: | | |
| Single-family: | | |
| REO property expenses[1] | $ 378 | $ 308 |
| Disposition (gains) losses, net[2] | (78) | 126 |
| Change in holding period allowance, dispositions | (57) | (155) |
| Change in holding period allowance, inventory[3] | 1 | 151 |
| Recoveries[4] | (72) | (173) |
| Total single-family REO operations expense | 172 | 257 |
| Multifamily REO operations expense (income) | (1) | — |
| Total REO operations expense | $ 171 | $ 257 |
| REO inventory (in properties), at March 31: | | |
| Single-family | 59,307 | 65,159 |
| Multifamily | 16 | 15 |
| Total | 59,323 | 65,174 |
| REO property dispositions (in properties): | | |
| Single-family | 25,033 | 31,627 |
| Multifamily | 4 | 1 |
| Total | 25,037 | 31,628 |

(1) Consists of costs incurred to acquire, maintain or protect a property after it is acquired in a foreclosure transfer, such as legal fees, insurance, taxes, and cleaning and other maintenance charges.
(2) Represents the difference between the disposition proceeds, net of selling expenses, and the fair value of the property on the date of the foreclosure transfer.
(3) Represents the (increase) decrease in the estimated fair value of properties that were in inventory during the period.
(4) Includes recoveries from primary mortgage insurance, pool insurance and seller/servicer repurchases.

REO operations expense declined to $171 million in the first quarter of 2012, as compared to $257 million in the first quarter of 2011, primarily due to stabilizing home prices in certain geographical areas with significant REO activity, which resulted in gains on disposition of properties as well as lower write-downs of single-family REO inventory during the first quarter of 2012. However, we also experienced lower recoveries on REO properties during the first quarter of 2012, compared to the first quarter of 2011, primarily due to reduced recoveries from mortgage insurers, in part due to the continued weakness in the financial condition of our mortgage insurance counterparties, and a decline in reimbursements of losses from seller/servicers associated with repurchase requests.

Although our servicers have resumed the foreclosure process in most areas, we believe the volume of our single-family REO acquisitions during the first quarter of 2012 was less than it otherwise would have been due to delays in the foreclosure process, particularly in states that require a judicial foreclosure process. The lower acquisition rate, coupled with high disposition levels, led to a lower REO property inventory level at March 31, 2012, compared to March 31, 2011. We expect that the length of the foreclosure process will continue to remain above historical levels. See "RISK MANAGEMENT— Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

### Other Expenses

Other expenses were $88 million and $79 million in the first quarters of 2012 and 2011, respectively. Other expenses consist primarily of HAMP servicer incentive fees, costs related to terminations and transfers of mortgage servicing, and other miscellaneous expenses.

### Income Tax Benefit

For the three months ended March 31, 2012 and 2011, we reported an income tax benefit of $14 million and $74 million, respectively. See "NOTE 12: INCOME TAXES" for additional information.

**Comprehensive Income**

Our comprehensive income was $1.8 billion and $2.7 billion for the three months ended March 31, 2012 and 2011, respectively, consisting of: (a) $577 million and $676 million of net income, respectively; and (b) $1.2 billion and $2.1 billion of total other comprehensive income, respectively, primarily due to a reduction in net unrealized losses related to our available-for-sale securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Total Equity (Deficit)" for additional information regarding total other comprehensive income.

**Segment Earnings**

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. Certain activities that are not part of a reportable segment are included in the All Other category.

The Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans, which are funded by other debt issuances and hedged using derivatives. In our Investments segment, we also provide funding and hedging management services to the Single-family Guarantee and Multifamily segments. The Investments segment reflects changes in the fair value of the Multifamily segment assets that are associated with changes in interest rates. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses.

The Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related securities in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less credit-related expenses, administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses.

The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans and non-agency CMBS that we purchased for investment, our purchases of such multifamily mortgage loans for investment have declined significantly since 2010, and our purchases of CMBS have declined significantly since 2008. The only CMBS that we have purchased since 2008 have been senior, mezzanine, and interest-only tranches related to certain of our securitization transactions, and these purchases have not been significant. Currently, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization. We guarantee the senior tranches of these securitizations in Other Guarantee Transactions. Our Multifamily segment also issues Other Structured Securities, but does not issue REMIC securities. Our Multifamily segment also enters into other guarantee commitments for multifamily HFA bonds and housing revenue bonds held by third parties. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less credit-related expenses, administrative expenses, and allocated funding costs. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in fair value of CMBS and held-for-sale loans associated only with market factors other than changes in interest rates, such as liquidity and credit.

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. The financial performance of our Single-family Guarantee segment and Multifamily segment are measured based on each segment's contribution to GAAP net income (loss). Our Investments segment is measured on its contribution to GAAP comprehensive income (loss), which consists of the sum of its contribution to: (a) GAAP net income (loss); and (b) GAAP total other comprehensive income (loss), net of taxes. The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss). Likewise, the sum of comprehensive income (loss) for each segment and the All Other category equals GAAP comprehensive income (loss).

The All Other category consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods. The All Other category also includes the deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward.

In presenting Segment Earnings, we make significant reclassifications to certain financial statement line items in order to reflect a measure of net interest income on investments and a measure of management and guarantee income on guarantees that is in line with how we manage our business. We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments.

As a result of these reclassifications and allocations, Segment Earnings for our reportable segments differs significantly from, and should not be used as a substitute for, net income (loss) as determined in accordance with GAAP. Our definition of Segment Earnings may differ from similar measures used by other companies. However, we believe that Segment Earnings provides us with meaningful metrics to assess the financial performance of each segment and our company as a whole.

See "NOTE 14: SEGMENT REPORTING" in our 2011 Annual Report for further information regarding our segments, including the descriptions and activities of the segments and the reclassifications and allocations used to present Segment Earnings.

Beginning in 2012, under guidance from FHFA we began to curtail mortgage-related investments portfolio purchase and retention activities that are undertaken for the primary purpose of supporting the price performance of our PCs, which may result in a significant decline in the market share of our single-family guarantee business, lower comprehensive income, and a more rapid decline in the size of our total mortgage portfolio.

The table below provides information about our various segment mortgage portfolios at March 31, 2012 and December 31, 2011. For a discussion of each segment's portfolios, see "*Segment Earnings — Results.*"

### Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios[1]

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| | (in millions) | |
| **Segment mortgage portfolios:** | | |
| *Investments — Mortgage investments portfolio:* | | |
| Single-family unsecuritized mortgage loans[2] | $ 103,593 | $ 109,190 |
| Freddie Mac mortgage-related securities | 199,132 | 220,659 |
| Non-agency mortgage-related securities | 84,180 | 86,526 |
| Non-Freddie Mac agency securities | 30,110 | 32,898 |
| Total Investments — Mortgage investments portfolio | 417,015 | 449,273 |
| *Single-family Guarantee — Managed loan portfolio:*[3] | | |
| Single-family unsecuritized mortgage loans[4] | 61,903 | 62,469 |
| Single-family Freddie Mac mortgage-related securities held by us | 199,132 | 220,659 |
| Single-family Freddie Mac mortgage-related securities held by third parties | 1,390,328 | 1,378,881 |
| Single-family other guarantee commitments[5] | 12,498 | 11,120 |
| Total Single-family Guarantee — Managed loan portfolio | 1,663,861 | 1,673,129 |
| *Multifamily — Guarantee portfolio:* | | |
| Multifamily Freddie Mac mortgage related securities held by us | 2,614 | 3,008 |
| Multifamily Freddie Mac mortgage related securities held by third parties | 25,521 | 22,136 |
| Multifamily other guarantee commitments[5] | 9,856 | 9,944 |
| Total Multifamily — Guarantee portfolio | 37,991 | 35,088 |
| *Multifamily — Mortgage investments portfolio* | | |
| Multifamily investment securities portfolio | 56,891 | 59,260 |
| Multifamily loan portfolio | 82,489 | 82,311 |
| Total Multifamily — Mortgage investments portfolio | 139,380 | 141,571 |
| Total Multifamily portfolio | 177,371 | 176,659 |
| Less: Freddie Mac single-family and certain multifamily securities[6] | (201,746) | (223,667) |
| Total mortgage portfolio | $2,056,501 | $2,075,394 |
| **Credit risk portfolios:**[7] | | |
| *Single-family credit guarantee portfolio:*[3] | | |
| Single-family mortgage loans, on-balance sheet | $1,714,182 | $1,733,215 |
| Non-consolidated Freddie Mac mortgage-related securities | 10,437 | 10,735 |
| Other guarantee commitments | 12,498 | 11,120 |
| Less: HFA-related guarantees[8] | (8,142) | (8,637) |
| Less: Freddie Mac mortgage-related securities backed by Ginnie Mae certificates[8] | (748) | (779) |
| Total single-family credit guarantee portfolio | $1,728,227 | $1,745,654 |
| *Multifamily mortgage portfolio:* | | |
| Multifamily mortgage loans, on-balance sheet | $ 82,489 | $ 82,311 |
| Non-consolidated Freddie Mac mortgage-related securities | 28,155 | 25,144 |
| Other guarantee commitments | 9,856 | 9,944 |
| Less: HFA-related guarantees[8] | (1,235) | (1,331) |
| Total multifamily mortgage portfolio | $ 119,245 | $ 116,068 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Represents unsecuritized seriously delinquent single-family loans managed by the Single-family Guarantee segment. However, the Single-family Guarantee segment continues to earn management and guarantee fees associated with unsecuritized single-family loans in the Investments segment's mortgage investments portfolio.
(3) The balances of the mortgage-related securities in the Single-family Guarantee managed loan portfolio are based on the UPB of the security, whereas the balances of our single-family credit guarantee portfolio presented in this report are based on the UPB of the mortgage loans underlying the related security. The differences in the loan and security balances result from the timing of remittances to security holders, which is typically 45 or 75 days after the mortgage payment cycle of fixed-rate and ARM PCs, respectively.
(4) Represents unsecuritized seriously delinquent single-family loans managed by the Single-family Guarantee segment.
(5) Represents the UPB of mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.
(6) Freddie Mac single-family mortgage-related securities held by us are included in both our Investments segment's mortgage investments portfolio and our Single-family Guarantee segment's managed loan portfolio, and Freddie Mac multifamily mortgage-related securities held by us are included in both the multifamily investment securities portfolio and the multifamily guarantee portfolio. Therefore, these amounts are deducted in order to reconcile to our total mortgage portfolio.
(7) Represents the UPB of loans for which we present characteristics, delinquency data, and certain other statistics in this report. See "GLOSSARY" for further description.
(8) We exclude HFA-related guarantees and our resecuritizations of Ginnie Mae certificates from our credit risk portfolios and most related statistics because these guarantees do not expose us to meaningful amounts of credit risk due to the credit enhancement provided on them by the U.S. government.

*Segment Earnings — Results*

*Investments*

The table below presents the Segment Earnings of our Investments segment.

**Table 12 — Segment Earnings and Key Metrics — Investments[1]**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (dollars in millions) | |
| Segment Earnings: | | |
| Net interest income | $ 1,763 | $ 1,653 |
| Non-interest income (loss): | | |
| Net impairment of available-for-sale securities recognized in earnings | (496) | (1,029) |
| Derivative gains (losses) | 200 | 1,103 |
| Gains (losses) on trading securities | (398) | (234) |
| Gains (losses) on sale of mortgage loans | (14) | 12 |
| Gains (losses) on mortgage loans recorded at fair value | (38) | (83) |
| Other non-interest income | 513 | 541 |
| Total non-interest income (loss) | (233) | 310 |
| Non-interest expense: | | |
| Administrative expenses | (92) | (95) |
| Total non-interest expense | (92) | (95) |
| Segment adjustments[2] | 155 | 203 |
| Segment Earnings before income tax benefit | 1,593 | 2,071 |
| Income tax benefit | 35 | 66 |
| Segment Earnings, net of taxes | 1,628 | 2,137 |
| Total other comprehensive income, net of taxes | 335 | 1,126 |
| Comprehensive income | $ 1,963 | $ 3,263 |
| Key metrics: | | |
| *Portfolio balances:* | | |
| Average balances of interest-earning assets:[3][4] | | |
| Mortgage-related securities[5] | $330,593 | $399,113 |
| Non-mortgage-related investments[6] | 105,539 | 114,732 |
| Unsecuritized single-family loans[7] | 109,306 | 85,515 |
| Total average balances of interest-earning assets | $545,438 | $599,360 |
| *Return:* | | |
| Net interest yield — Segment Earnings basis (annualized) | 1.29% | 1.10% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 13: SEGMENT REPORTING — Table 13.2 — Segment Earnings and Reconciliation to GAAP Results."
(2) For a description of our segment adjustments, see "NOTE 14: SEGMENT REPORTING — Segment Earnings" in our 2011 Annual Report.
(3) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(4) We calculate average balances based on amortized cost.
(5) Includes our investments in single-family PCs and certain Other Guarantee Transactions, which have been consolidated under GAAP on our consolidated balance sheet since January 1, 2010.
(6) Includes the average balances of interest-earning cash and cash equivalents, non-mortgage-related securities, and federal funds sold and securities purchased under agreements to resell.
(7) Excludes unsecuritized seriously delinquent single-family mortgage loans.

Segment Earnings for our Investments segment decreased by $509 million to $1.6 billion during the three months ended March 31, 2012, compared to $2.1 billion during the three months ended March 31, 2011, primarily due to decreased derivative gains, partially offset by a decrease in net impairments of available-for-sale securities recognized in earnings. Comprehensive income for our Investments segment decreased by $1.3 billion to $2.0 billion during the three months ended March 31, 2012, compared to $3.3 billion during the three months ended March 31, 2011, primarily due to a smaller improvement in the fair value of available-for-sale securities.

During the three months ended March 31, 2012, the UPB of the Investments segment mortgage investments portfolio decreased at an annualized rate of 28.7%. We held $229.2 billion of agency securities and $84.2 billion of non-agency mortgage-related securities as of March 31, 2012, compared to $253.6 billion of agency securities and $86.5 billion of non-agency mortgage-related securities as of December 31, 2011. The decline in UPB of agency securities is due mainly to liquidations, including prepayments and selected sales. The decline in UPB of non-agency mortgage-related securities is due mainly to the receipt of monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral, representing a partial return of our investments in these securities. Since the beginning of 2007, we have incurred actual principal cash shortfalls of $1.8 billion on impaired non-agency mortgage-related securities in the Investments segment. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for additional information regarding our mortgage-related securities.

Segment Earnings net interest income and net interest yield increased by $110 million and 19 basis points, respectively, during the three months ended March 31, 2012, compared to the three months ended March 31, 2011. The primary driver was lower funding costs, primarily due to the replacement of debt at lower rates. These lower funding costs were partially offset by the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations and limited purchase activity.

Segment Earnings non-interest income (loss) was $(233) million during the three months ended March 31, 2012, compared to $310 million during the three months ended March 31, 2011. This change was mainly due to decreased derivative gains, partially offset by a decrease in net impairments of available-for-sale securities recognized in earnings.

Impairments recorded in our Investments segment were $496 million during the three months ended March 31, 2012, compared to $1.0 billion during the three months ended March 31, 2011. Impairments recorded in both periods were primarily due to our expectation of slower prepayments, which resulted in higher credit losses, on our non-agency mortgage-related securities. Increasing interest rates also contributed to the impairments recorded during the three months ended March 31, 2011, while lower interest rates during the three months ended March 31, 2012 resulted in a slight benefit from expected structural credit enhancements on the available-for-sale securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities — Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*" for additional information on our impairments.

We recorded losses on trading securities of $398 million during the three months ended March 31, 2012, compared to $234 million during the three months ended March 31, 2011. Losses in both periods were primarily due to the movement of securities with unrealized gains towards maturity. The losses during the three months ended March 31, 2011 were partially offset by larger fair value gains compared to the three months ended March 31, 2012, due to a tightening of OAS levels on agency securities.

We recorded derivative gains for this segment of $200 million during the three months ended March 31, 2012, compared to $1.1 billion during the three months ended March 31, 2011. While derivatives are an important aspect of our strategy to manage interest-rate risk, they generally increase the volatility of reported Segment Earnings, because while fair value changes in derivatives affect Segment Earnings, fair value changes in several of the types of assets and liabilities being hedged do not affect Segment Earnings. During both the three months ended March 31, 2012 and 2011, swap interest rate changes resulted in fair value gains on our pay-fixed swaps, largely offset by: (a) fair value losses on our receive-fixed swaps; and (b) fair value losses on our option-based derivatives resulting from losses on our purchased call swaptions, due to an increase in long-term interest rates. The fair value of derivatives during the three months ended March 31, 2012 reflects a decline in short-term interest rates and an increase in longer-term interest rates compared to the three months ended March 31, 2011, when both short-term and longer-term interest rates increased. See "Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for additional information on our derivatives.

Our Investments segment's total other comprehensive income was $335 million during the three months ended March 31, 2012, compared to $1.1 billion during the three months ended March 31, 2011. Net unrealized losses in AOCI on our available-for-sale securities decreased by $242 million during the three months ended March 31, 2012, primarily due to the impact of fair value gains related to the movement of non-agency mortgage-related securities with unrealized losses towards maturity and the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities, partially offset by fair value losses related to the movement of agency securities with unrealized gains towards maturity. Net unrealized losses in AOCI on our available-for-sale securities decreased by $1.0 billion during the three months ended March 31, 2011, primarily attributable to the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities. The changes in fair value of CMBS, excluding impacts from the changes in interest rates, are reflected in the Multifamily segment.

For a discussion of items that may impact our Investments segment net interest income over time, see "EXECUTIVE SUMMARY — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio."

*Single-Family Guarantee*

The table below presents the Segment Earnings of our Single-family Guarantee segment.

**Table 13 — Segment Earnings and Key Metrics — Single-Family Guarantee**[1]

|  | Three Months Ended March 31, | |
|  | 2012 | 2011 |
| --- | --- | --- |
|  | (dollars in millions) | |
| Segment Earnings: | | |
| Net interest income (expense) | $   (32) | $   100 |
| Provision for credit losses | (2,184) | (2,284) |
| Non-interest income: | | |
| Management and guarantee income | 1,011 | 870 |
| Other non-interest income | 181 | 211 |
| Total non-interest income | 1,192 | 1,081 |
| Non-interest expense: | | |
| Administrative expenses | (193) | (215) |
| REO operations expense | (172) | (257) |
| Other non-interest expense | (73) | (66) |
| Total non-interest expense | (438) | (538) |
| Segment adjustments[2] | (196) | (185) |
| Segment Earnings (loss) before income tax (expense) benefit | (1,658) | (1,826) |
| Income tax (expense) benefit | (17) | 6 |
| Segment Earnings (loss), net of taxes | (1,675) | (1,820) |
| Total other comprehensive income (loss), net of taxes | (23) | (4) |
| Comprehensive income (loss) | $(1,698) | $(1,824) |
| **Key metrics:** | | |
| *Balances and Volume (in billions, except rate):* | | |
| Average balance of single-family credit guarantee portfolio and HFA guarantees | $ 1,741 | $ 1,819 |
| Issuance — Single-family credit guarantees[3] | $   111 | $    96 |
| Fixed-rate products — Percentage of purchases[4] | 95% | 94% |
| Liquidation rate — Single-family credit guarantees (annualized)[5] | 30% | 28% |
| *Management and Guarantee Fee Rate (in bps, annualized):* | | |
| Contractual management and guarantee fees | 14.3 | 13.6 |
| Amortization of delivery fees | 8.9 | 5.5 |
| Segment Earnings management and guarantee income | 23.2 | 19.1 |
| *Credit:* | | |
| Serious delinquency rate, at end of period | 3.51% | 3.63% |
| REO inventory, at end of period (number of properties) | 59,307 | 65,159 |
| Single-family credit losses, in bps (annualized)[6] | 78.6 | 71.0 |
| *Market:* | | |
| Single-family mortgage debt outstanding (total U.S. market, in billions)[7] | $10,291 | $10,453 |
| 30-year fixed mortgage rate[8] | 4.0% | 4.9% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 13: SEGMENT REPORTING — Table 13.2 — Segment Earnings and Reconciliation to GAAP Results."
(2) For a description of our segment adjustments, see "NOTE 14: SEGMENT REPORTING — Segment Earnings" in our 2011 Annual Report.
(3) Based on UPB.
(4) Excludes Other Guarantee Transactions.
(5) Represents principal repayments relating to loans underlying Freddie Mac mortgage-related securities and other guarantee commitments, including those related to our removal of seriously delinquent and modified mortgage loans and balloon/reset mortgage loans out of PC pools.
(6) Calculated as the amount of single-family credit losses divided by the sum of the average carrying value of our single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees.
(7) Source: Federal Reserve Flow of Funds Accounts of the United States of America dated March 8, 2012. The outstanding amount for March 31, 2012 reflects the balance as of December 31, 2011.
(8) Based on Freddie Mac's Primary Mortgage Market Survey rate for the last week in the period, which represents the national average mortgage commitment rate to a qualified borrower exclusive of any fees and points required by the lender. This commitment rate applies only to financing on conforming mortgages with LTV ratios of 80%.

Segment Earnings (loss) for our Single-family Guarantee segment improved to $(1.7) billion in the first quarter of 2012 compared to $(1.8) billion in the first quarter of 2011, primarily due to an increase in management and guarantee income and a decline in Segment Earnings provision for credit losses.

The table below provides summary information about the composition of Segment Earnings (loss) for this segment for the three months ended March 31, 2012 and 2011.

**Table 14 — Segment Earnings Composition — Single-Family Guarantee Segment**

| | Three Months Ended March 31, 2012 | | | | |
| | Segment Earnings Management and Guarantee Income[1] | | Credit Expenses[2] | | Net Amount[4] |
| | Amount | Average Rate[3] | Amount | Average Rate[3] | |
| | (dollars in millions, rates in bps) | | | | |
| Year of origination:[5] | | | | | |
| 2012 | $ 17 | 13.9 | $ (4) | 2.6 | $ 13 |
| 2011 | 185 | 25.3 | (53) | 7.4 | 132 |
| 2010 | 195 | 26.1 | (103) | 13.4 | 92 |
| 2009 | 199 | 27.4 | (106) | 14.7 | 93 |
| 2008 | 86 | 25.1 | (204) | 73.5 | (118) |
| 2007 | 83 | 19.0 | (791) | 200.3 | (708) |
| 2006 | 53 | 18.9 | (463) | 157.2 | (410) |
| 2005 | 61 | 19.1 | (451) | 135.3 | (390) |
| 2004 and prior | 132 | 20.4 | (181) | 25.4 | (49) |
| Total | $1,011 | 23.2 | $(2,356) | 53.9 | $(1,345) |
| Administrative expenses | | | | | (193) |
| Net interest income (expense) | | | | | (32) |
| Other non-interest income and expenses, net | | | | | (105) |
| Segment Earnings (loss), net of taxes | | | | | $(1,675) |

| | Three Months Ended March 31, 2011 | | | | |
| | Segment Earnings Management and Guarantee Income[1] | | Credit Expenses[2] | | Net Amount[4] |
| | Amount | Average Rate[3] | Amount | Average Rate[3] | |
| | (dollars in millions, rates in bps) | | | | |
| Year of origination:[5] | | | | | |
| 2011 | $ 26 | 15.0 | $ (3) | 3.2 | $ 23 |
| 2010 | 184 | 20.6 | (52) | 5.6 | 132 |
| 2009 | 170 | 18.5 | (56) | 6.0 | 114 |
| 2008 | 110 | 24.6 | (228) | 61.6 | (118) |
| 2007 | 101 | 18.8 | (888) | 181.1 | (787) |
| 2006 | 59 | 17.0 | (788) | 215.2 | (729) |
| 2005 | 66 | 16.6 | (418) | 100.2 | (352) |
| 2004 and prior | 154 | 18.4 | (108) | 11.7 | 46 |
| Total | $ 870 | 19.1 | $(2,541) | 55.9 | $(1,671) |
| Administrative expenses | | | | | (215) |
| Net interest income (expense) | | | | | 100 |
| Other non-interest income and expenses, net | | | | | (34) |
| Segment Earnings (loss), net of taxes | | | | | $(1,820) |

(1) Includes amortization of delivery fees of $388 million and $252 million for first quarters of 2012 and 2011, respectively.
(2) Consists of the aggregate of the Segment Earnings provision for credit losses and Segment Earnings REO operations expense. Historical rates of average credit expenses may not be representative of future results. In the first quarter of 2012, we enhanced our method of allocating credit expenses by loan origination year. Prior period amounts have been revised to conform to the current period presentation.
(3) Calculated as the annualized amount of Segment Earnings management and guarantee income or credit expenses, respectively, divided by the sum of the average carrying values of the single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees.
(4) Calculated as Segment Earnings management and guarantee income less credit expenses.
(5) Segment Earnings management and guarantee income is presented by year of guarantee origination, whereas credit expenses are presented based on year of loan origination.

As of March 31, 2012, loans originated after 2008 have, on a cumulative basis, provided management and guarantee fee income that has exceeded the credit-related and administrative expenses associated with these loans. We currently believe our management and guarantee fee rates for guarantee issuances after 2008, when coupled with the higher credit quality of the mortgages within these new guarantee issuances, will provide management and guarantee fee income, over the long term, that exceeds our expected credit-related and administrative expenses associated with the underlying loans. Nevertheless, various factors, such as continued high unemployment rates, further declines in home prices, or negative impacts of HARP loans originated in recent years (which may not perform as well as other refinance mortgages, due in part to the high LTV ratios of the loans), could require us to incur expenses on these loans beyond our current expectations.

*Freddie Mac*

Based on our historical experience, we expect that the performance of the loans in an individual origination year will vary over time. The aggregate UPB of the loans from an origination year will decline over time due to repayments, refinancing, and other liquidation events, resulting in declining management and guarantee fee income from the loans in that origination year in future periods. In addition, we expect that the credit-related expenses related to the remaining loans in the origination year will increase over time, as some borrowers experience financial difficulties and default on their loans. As a result, there will likely be periods when an origination year is not profitable, though it may remain profitable on a cumulative basis.

Our management and guarantee fee income associated with guarantee issuances in 2005 through 2008 has not been adequate to cover the credit and administrative expenses associated with such loans, primarily due to the high rate of defaults on the loans originated in those years coupled with a high volume of refinancing since 2008. High levels of refinancing and delinquency since 2008 have significantly reduced the balance of performing loans from those years that remain in our portfolio and consequently reduced management and guarantee income associated with loans originated in 2005 through 2008 (we do not recognize Segment Earnings management and guarantee income on non-accrual mortgage loans). We also believe that the management and guarantee fees associated with originations after 2008 will not be sufficient to offset the future expenses associated with our 2005 to 2008 guarantee issuances for the foreseeable future. Consequently, we expect to continue reporting net losses for the Single-family Guarantee segment throughout 2012.

Segment Earnings management and guarantee income increased in the first quarter of 2012, as compared to the first quarter of 2011, primarily due to an increase in amortization of delivery fees. This was driven by a higher volume of delivery fees and the lower interest rate environment during the first quarter of 2012, which increased refinance activity.

The UPB of the Single-family Guarantee managed loan portfolio was $1.7 trillion at both March 31, 2012 and December 31, 2011. The annualized liquidation rate on our securitized single-family credit guarantees was approximately 30% and 28% for the first quarters of 2012 and 2011, respectively, and remained high in the first quarter of 2012 due to significant refinancing activity. We expect the size of our Single-family Guarantee managed loan portfolio will continue to decline during 2012.

Refinance volumes were high during the first quarter of 2012 due to continued low interest rates, and represented 87% of our single-family mortgage purchase volume during the first quarter of 2012, compared to 85% of our single-family mortgage purchase volume during the first quarter of 2011, based on UPB. Relief refinance mortgages comprised approximately 31% and 36% of our total refinance volume during the first quarters of 2012 and 2011, respectively. Over time, relief refinance mortgages with LTV ratios above 80% (*i.e.*, HARP loans) may not perform as well as other refinance mortgages because the continued high LTV ratios of these loans increases the probability of default. Based on our historical experience, there is an increase in borrower default risk as LTV ratios increase, particularly for loans with LTV ratios above 80%. In addition, relief refinance mortgages may not be covered by mortgage insurance for the full excess of their UPB over 80%. Approximately 16% and 15% of our single-family purchase volume in the first quarters of 2012 and 2011, respectively, was relief refinance mortgages with LTV ratios above 80%. Relief refinance mortgages of all LTV ratios comprised approximately 13% and 11% of the UPB in our total single-family credit guarantee portfolio at March 31, 2012 and December 31, 2011, respectively.

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers whose monthly payments are current and who can benefit from refinancing their home mortgages. For more information about our relief refinance mortgage initiative, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program.*"

Similar to our purchases in 2009 through 2011, the credit quality of the single-family loans we acquired in the first quarter of 2012 (excluding relief refinance mortgages) is significantly better than that of loans we acquired from 2005 through 2008, as measured by original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income. Mortgages originated after 2008, including relief refinance mortgages, represent more than half of the UPB of our single-family credit guarantee portfolio as of March 31, 2012, and their composition of that portfolio continues to grow.

Provision for credit losses for the Single-family Guarantee segment declined to $2.2 billion in the first quarter of 2012, compared to $2.3 billion in the first quarter of 2011. The provision for credit losses for the first quarter of 2012 reflects stabilizing expected loss severity and a decline in the number of seriously delinquent loan additions, while the first quarter of 2011 reflects worsening expected loss severity and higher modification volumes offset by a decline in the rate at which seriously delinquent loans ultimately transition to a loss event.

Single-family credit losses as a percentage of the average balance of the single-family credit guarantee portfolio and HFA-related guarantees were 79 basis points and 71 basis points for the first quarters of 2012 and 2011, respectively. Charge-offs, net of recoveries, associated with single-family loans were $3.3 billion and $3.0 billion in the first quarters of 2012 and 2011, respectively. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk*" for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, and our non-performing assets.

The serious delinquency rate on our single-family credit guarantee portfolio was 3.51% and 3.58% as of March 31, 2012 and December 31, 2011, respectively, and declined during the first quarter of 2012 primarily due to a high volume of foreclosure transfers and a slowdown in new serious delinquencies. Our serious delinquency rate remains high compared to historical levels due to the continued weakness in home prices, persistently high unemployment, extended foreclosure timelines, and continued challenges faced by servicers processing large volumes of problem loans. In addition, our serious delinquency rate was adversely impacted by the decline in the size of our single-family credit guarantee portfolio in the first quarter of 2012 because this rate is calculated on a smaller number of loans at the end of the period.

Segment Earnings REO operations expense was $172 million and $257 million in the first quarters of 2012, and 2011, respectively. The decrease in the first quarter of 2012, compared to the first quarter of 2011, was primarily due to stabilizing home prices in certain geographical areas with significant REO activity, which resulted in gains on disposition of properties as well as lower write-downs of single-family REO inventory during the first quarter of 2012. However, we experienced lower recoveries on REO properties during the first quarter of 2012, compared to the first quarter of 2011, primarily due to reduced recoveries from mortgage insurers due, in part to the continued weakness in the financial condition of our mortgage insurance counterparties, and a decline in reimbursements of losses from seller/servicers associated with repurchase requests.

Our REO inventory (measured in number of properties) declined 2% from December 31, 2011 to March 31, 2012 as the volume of single-family REO dispositions exceeded the volume of single-family REO acquisitions. We continued to experience high REO disposition severity ratios on sales of our REO inventory during the first quarter of 2012. We believe our single-family REO acquisition volume and single-family credit losses in the first quarter of 2012 have been less than they otherwise would have been due to delays in the single-family foreclosure process, particularly in states that require a judicial foreclosure process.

*Multifamily*

The table below presents the Segment Earnings of our Multifamily segment.

**Table 15 — Segment Earnings and Key Metrics — Multifamily[1]**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (dollars in millions) | |
| **Segment Earnings:** | | |
| Net interest income | $ 318 | $ 279 |
| (Provision) benefit for credit losses | 19 | 60 |
| Non-interest income (loss): | | |
| Management and guarantee income | 33 | 28 |
| Net impairment of available-for-sale securities recognized in earnings | (16) | (135) |
| Gains (losses) on sale of mortgage loans | 54 | 83 |
| Gains (losses) on mortgage loans recorded at fair value | 177 | 50 |
| Other non-interest income (loss) | 109 | 56 |
| Total non-interest income (loss) | 357 | 82 |
| Non-interest expense: | | |
| Administrative expenses | (52) | (51) |
| REO operations income (expense) | 1 | — |
| Other non-interest expense | (15) | (13) |
| Total non-interest expense | (66) | (64) |
| Segment Earnings before income tax benefit (expense) | 628 | 357 |
| Income tax benefit (expense) | (4) | 2 |
| Segment Earnings, net of taxes | 624 | 359 |
| Total other comprehensive income, net of taxes | 900 | 942 |
| Comprehensive income | $ 1,524 | $ 1,301 |
| **Key metrics:** | | |
| *Balances and Volume:* | | |
| Average balance of Multifamily loan portfolio | $83,130 | $85,779 |
| Average balance of Multifamily guarantee portfolio | $36,645 | $25,312 |
| Average balance of Multifamily investment securities portfolio | $58,028 | $62,842 |
| Multifamily new loan purchase and other guarantee commitment volume | $ 5,751 | $ 3,049 |
| Multifamily units financed from new volume activity | 86,431 | 52,641 |
| Multifamily Other Guarantee Transaction issuance | $ 3,139 | $ 2,906 |
| *Yield and Rate:* | | |
| Net interest yield — Segment Earnings basis (annualized) | 0.90% | 0.75% |
| Average Management and guarantee fee rate, in bps (annualized)[2] | 38.7 | 46.8 |
| *Credit:* | | |
| Delinquency rate: | | |
| Credit-enhanced loans, at period end | 0.39% | 0.75% |
| Non-credit-enhanced loans, at period end | 0.16% | 0.25% |
| Total delinquency rate, at period end[3] | 0.23% | 0.36% |
| Allowance for loan losses and reserve for guarantee losses, at period end | $ 525 | $ 747 |
| Allowance for loan losses and reserve for guarantee losses, in bps | 43.6 | 67.4 |
| Credit losses, in bps (annualized)[4] | — | 4.2 |
| REO inventory, at net carrying value | $ 121 | $ 115 |
| REO inventory, at period end (number of properties) | 16 | 15 |

(1) For reconciliations of Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 13: SEGMENT REPORTING — Table 13.2 — Segment Earnings and Reconciliation to GAAP Results."

(2) Represents Multifamily Segment Earnings — management and guarantee income, excluding prepayment and certain other fees, divided by the sum of the average balance of the multifamily guarantee portfolio and the average balance of guarantees associated with the HFA initiative, excluding certain bonds under the NIBP.

(3) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Multifamily Mortgage Credit Risk*" for information on our reported multifamily delinquency rate.

(4) Calculated as the amount of multifamily credit losses divided by the sum of the average carrying value of our multifamily loan portfolio and the average balance of the multifamily guarantee portfolio, including multifamily HFA initiative guarantees.

Segment Earnings for our Multifamily segment increased to $624 million in the first quarter of 2012, compared to $359 million in the first quarter of 2011, primarily due to lower impairment associated with available-for-sale CMBS and higher gains on mortgage loans recorded at fair value in the first quarter of 2012. Our comprehensive income for our Multifamily segment was $1.5 billion in the first quarter of 2012, consisting of: (a) Segment Earnings of $0.6 billion; and (b) $0.9 billion of total other comprehensive income, which was mainly attributable to favorable changes in fair value of available-for-sale CMBS in the first quarter of 2012.

Our multifamily loan purchase and guarantee volume increased to $5.8 billion for first quarter of 2012, compared to $3.0 billion during the first quarter of 2011, as strong volumes from late in 2011 carried into the first quarter of 2012. However, we anticipate the growth in our purchase and guarantee volumes will slow for the remainder of the year, ultimately reflecting a more modest increase in 2012, compared to 2011. We completed Other Guarantee Transactions of $3.1 billion and $2.9 billion in UPB of multifamily loans in the first quarters of 2012 and 2011, respectively. The UPB of the total multifamily portfolio increased slightly to $177.4 billion at March 31, 2012 from $176.7 billion at December 31, 2011.

Segment Earnings net interest income increased by $39 million, or 14%, to $318 million, in the first quarter of 2012 from $279 million in the first quarter of 2011, primarily due to the cumulative effect of new business volumes since 2008 which have higher yields relative to allocated funding costs. Net interest yield was 90 and 75 basis points in the first quarters of 2012 and 2011, respectively.

Segment Earnings non-interest income (loss) was $357 million and $82 million in the first quarters of 2012 and 2011, respectively. The increase in the first quarter of 2012 was primarily driven by lower security impairments on CMBS and increased gains recognized on mortgage loans recorded at fair value, reflecting favorable market spread movements and higher amounts of loans held for subsequent securitization. Segment Earnings gains (losses) on mortgage loans recorded at fair value are presented net of changes in fair value due to changes in interest rates.

While our Multifamily Segment Earnings management and guarantee income increased 18% in the first quarter of 2012 compared to the first quarter of 2011, the average management and guarantee fee rate on our guarantee portfolio declined to 39 basis points in the first quarter of 2012 from 47 basis points in the first quarter of 2011. The decline in our average management and guarantee fee rate in the first quarter of 2012 reflects the impact from our increased volume of Other Guarantee Transactions, which have lower credit risk associated with our guarantee (and thus we charge a lower rate) relative to other issued guarantees because these transactions contain significant levels of credit enhancement through subordination.

Multifamily credit losses as a percentage of the combined average balance of our multifamily loan and guarantee portfolios were 0 and 4 basis points in the first quarters of 2012 and 2011, respectively. Our Multifamily segment recognized a benefit for credit losses of $19 million and $60 million in the first quarters of 2012 and 2011, respectively. Our loan loss reserves associated with our multifamily mortgage portfolio were $525 million and $545 million as of March 31, 2012 and December 31, 2011, respectively. The decline in our loan loss reserves in the first quarter of 2012 was primarily driven by the increased seasoning of our portfolio and the lower level of estimated incurred credit losses based on our historical experience.

The credit quality of the multifamily mortgage portfolio remains strong, as evidenced by low delinquency rates and credit losses, which we believe reflects prudent underwriting practices. The delinquency rate for loans in the multifamily mortgage portfolio was 0.23% and 0.22%, as of March 31, 2012 and December 31, 2011, respectively. As of March 31, 2012, approximately half of the multifamily loans that were two or more monthly payments past due, measured on a UPB basis, had credit enhancements that we currently believe will mitigate our expected losses on those loans. We expect our multifamily delinquency rate to remain relatively low during the remainder of 2012. See "RISK MANAGEMENT — Credit Risk — Mortgage Credit Risk — Multifamily Mortgage Credit Risk" for further information about our reported multifamily delinquency rates and credit enhancements on multifamily loans. For further information on delinquencies, including geographical and other concentrations, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

## CONSOLIDATED BALANCE SHEETS ANALYSIS

The following discussion of our consolidated balance sheets should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also, see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported financial position.

### Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell

Cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and other liquid assets discussed in "Investments in Securities — Non-Mortgage-Related Securities," are important to our cash flow and asset and liability management, and our ability to provide liquidity and stability to the mortgage market. We use these assets to help manage recurring cash flows and meet our other cash management needs. We consider federal funds sold to be overnight unsecured trades executed with commercial banks that are members of the Federal Reserve System. Securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities.

The short-term assets on our consolidated balance sheets also include those related to our consolidated VIEs, which are comprised primarily of restricted cash and cash equivalents at March 31, 2012. These short-term assets, related to our consolidated VIEs, increased by $2.7 billion from December 31, 2011 to March 31, 2012, primarily due to an increase in the level of refinancing activity.

Excluding amounts related to our consolidated VIEs, we held $8.6 billion and $28.4 billion of cash and cash equivalents, no federal funds sold, and $21.3 billion and $12.0 billion of securities purchased under agreements to resell at March 31, 2012 and December 31, 2011, respectively. The aggregate decrease in these assets was primarily driven by a decline in funding needs for debt redemptions. In addition, excluding amounts related to our consolidated VIEs, we held on average $27.6 billion of cash and cash equivalents and $24.4 billion of federal funds sold and securities purchased under agreements to resell during the three months ended March 31, 2012.

For information regarding our liquidity management practices and policies, see "LIQUIDITY AND CAPITAL RESOURCES."

### Investments in Securities

The table below provides detail regarding our investments in securities as of March 31, 2012 and December 31, 2011. The table does not include our holdings of single-family PCs and certain Other Guarantee Transactions as of March 31, 2012 and December 31, 2011. For information on our holdings of such securities, see "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios."

### Table 16 — Investments in Securities

| | Fair Value | |
|---|---|---|
| | March 31, 2012 | December 31, 2011 |
| | (in millions) | |
| Investments in securities: | | |
| Available-for-sale: | | |
| Mortgage-related securities: | | |
| Freddie Mac[1] | $ 76,163 | $ 81,092 |
| Subprime | 27,145 | 27,999 |
| CMBS | 54,753 | 55,663 |
| Option ARM | 5,818 | 5,865 |
| Alt-A and other | 11,094 | 10,879 |
| Fannie Mae | 18,897 | 20,322 |
| Obligations of states and political subdivisions | 7,565 | 7,824 |
| Manufactured housing | 748 | 766 |
| Ginnie Mae | 239 | 249 |
| Total available-for-sale mortgage-related securities | 202,422 | 210,659 |
| Total investments in available-for-sale securities | 202,422 | 210,659 |
| Trading: | | |
| Mortgage-related securities: | | |
| Freddie Mac[1] | 14,504 | 16,047 |
| Fannie Mae | 13,692 | 15,165 |
| Ginnie Mae | 151 | 156 |
| Other | 153 | 164 |
| Total trading mortgage-related securities | 28,500 | 31,532 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 695 | 302 |
| Treasury bills | 3,000 | 100 |
| Treasury notes | 23,164 | 24,712 |
| FDIC-guaranteed corporate medium-term notes | 2,960 | 2,184 |
| Total trading non-mortgage-related securities | 29,819 | 27,298 |
| Total investments in trading securities | 58,319 | 58,830 |
| Total investments in securities | $260,741 | $269,489 |

(1) For information on the types of instruments that are included, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2011 Annual Report.

### *Non-Mortgage-Related Securities*

Our investments in non-mortgage-related securities provide an additional source of liquidity. We held investments in non-mortgage-related securities classified as trading of $29.8 billion and $27.3 billion as of March 31, 2012 and December 31, 2011, respectively. While balances may fluctuate from period to period, we continue to meet required liquidity and contingency levels.

### *Mortgage-Related Securities*

Our investments in mortgage-related securities consist of securities issued by Fannie Mae, Ginnie Mae, and other financial institutions. We also invest in our own mortgage-related securities. However, the single-family PCs and certain Other Guarantee Transactions we purchase as investments are not accounted for as investments in securities because we recognize the underlying mortgage loans on our consolidated balance sheets through consolidation of the related trusts.

The table below provides the UPB of our investments in mortgage-related securities classified as available-for-sale or trading on our consolidated balance sheets. The table below does not include our holdings of our own single-family PCs and certain Other Guarantee Transactions. For further information on our holdings of such securities, see "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios."

### Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets

| | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Fixed Rate | Variable Rate[1] | Total | Fixed Rate | Variable Rate[1] | Total |
| | (in millions) | | | | | |
| Freddie Mac mortgage-related securities:[2] | | | | | | |
| Single-family | $ 68,545 | $ 9,064 | $ 77,609 | $ 72,795 | $ 9,753 | $ 82,548 |
| Multifamily | 859 | 1,755 | 2,614 | 1,216 | 1,792 | 3,008 |
| Total Freddie Mac mortgage-related securities | 69,404 | 10,819 | 80,223 | 74,011 | 11,545 | 85,556 |
| Non-Freddie Mac mortgage-related securities: | | | | | | |
| Agency securities:[3] | | | | | | |
| Fannie Mae: | | | | | | |
| Single-family | 14,859 | 14,908 | 29,767 | 16,543 | 15,998 | 32,541 |
| Multifamily | 47 | 76 | 123 | 52 | 76 | 128 |
| Ginnie Mae: | | | | | | |
| Single-family | 243 | 100 | 343 | 253 | 104 | 357 |
| Multifamily | 16 | — | 16 | 16 | — | 16 |
| Total Non-Freddie Mac agency securities | 15,165 | 15,084 | 30,249 | 16,864 | 16,178 | 33,042 |
| Non-agency mortgage-related securities: | | | | | | |
| Single-family:[4] | | | | | | |
| Subprime | 332 | 47,519 | 47,851 | 336 | 48,696 | 49,032 |
| Option ARM | — | 13,508 | 13,508 | — | 13,949 | 13,949 |
| Alt-A and other | 2,047 | 14,272 | 16,319 | 2,128 | 14,662 | 16,790 |
| CMBS | 19,113 | 33,122 | 52,235 | 19,735 | 34,375 | 54,110 |
| Obligations of states and political subdivisions[5] | 7,448 | 22 | 7,470 | 7,771 | 22 | 7,793 |
| Manufactured housing | 797 | 138 | 935 | 831 | 129 | 960 |
| Total non-agency mortgage-related securities[6] | 29,737 | 108,581 | 138,318 | 30,801 | 111,833 | 142,634 |
| Total UPB of mortgage-related securities | $114,306 | $134,484 | 248,790 | $121,676 | $139,556 | 261,232 |
| Premiums, discounts, deferred fees, impairments of UPB and other basis adjustments | | | (12,724) | | | (12,363) |
| Net unrealized (losses) on mortgage-related securities, pre-tax | | | (5,144) | | | (6,678) |
| Total carrying value of mortgage-related securities | | | $230,922 | | | $242,191 |

(1) Variable-rate mortgage-related securities include those with a contractual coupon rate that, prior to contractual maturity, is either scheduled to change or is subject to change based on changes in the composition of the underlying collateral.

(2) When we purchase REMICs and Other Structured Securities and certain Other Guarantee Transactions that we have issued, we account for these securities as investments in debt securities since we are investing in the debt securities of a non-consolidated entity. We do not consolidate our resecuritization trusts since we are not deemed to be the primary beneficiary of such trusts. We are subject to the credit risk associated with the mortgage loans underlying our Freddie Mac mortgage-related securities. Mortgage loans underlying our issued single-family PCs and certain Other Guarantee Transactions are recognized on our consolidated balance sheets as held-for-investment mortgage loans, at amortized cost. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2011 Annual Report for further information.

(3) Agency securities are generally not separately rated by nationally recognized statistical rating organizations, but have historically been viewed as having a level of credit quality at least equivalent to non-agency mortgage-related securities AAA-rated or equivalent.

(4) For information about how these securities are rated, see "Table 23 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS."

(5) Consists of housing revenue bonds. Approximately 36% and 37% of these securities held at March 31, 2012 and December 31, 2011, respectively, were AAA-rated as of those dates, based on the UPB and the lowest rating available.

(6) Credit ratings for most non-agency mortgage-related securities are designated by no fewer than two nationally recognized statistical rating organizations. Approximately 21% of total non-agency mortgage-related securities held at both March 31, 2012 and December 31, 2011 were AAA-rated as of those dates, based on the UPB and the lowest rating available.

The table below provides the UPB and fair value of our investments in mortgage-related securities classified as available-for-sale or trading on our consolidated balance sheets.

**Table 18 — Additional Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets**

| | March 31, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
| | UPB | Fair Value | UPB | Fair Value |
| | (in millions) | | | |
| Agency pass-through securities[1] | $ 22,093 | $ 23,940 | $ 24,283 | $ 26,193 |
| Agency REMICs and Other Structured Securities: | | | | |
| Interest-only securities[2] | — | 2,725 | — | 2,863 |
| Principal-only securities[3] | 3,284 | 3,057 | 3,569 | 3,344 |
| Inverse floating-rate securities[4] | 4,439 | 6,165 | 4,839 | 6,826 |
| Other Structured Securities | 80,656 | 87,759 | 85,907 | 93,805 |
| Total agency securities | 110,472 | 123,646 | 118,598 | 133,031 |
| Non-agency securities[5] | 138,318 | 107,276 | 142,634 | 109,160 |
| Total mortgage-related securities | $248,790 | $230,922 | $261,232 | $242,191 |

(1) Represents an undivided beneficial interest in trusts that hold pools of mortgages.
(2) Represents securities where the holder receives only the interest cash flows.
(3) Represents securities where the holder receives only the principal cash flows.
(4) Represents securities where the holder receives interest cash flows that change inversely with the reference rate (*i.e.* higher cash flows when interest rates are low and lower cash flows when interest rates are high). Additionally, these securities receive a portion of principal cash flows associated with the underlying collateral.
(5) Includes fair values of $3 million and $2 million of interest-only securities at March 31, 2012 and December 31, 2011, respectively.

The total UPB of our investments in mortgage-related securities on our consolidated balance sheets decreased from $261.2 billion at December 31, 2011 to $248.8 billion at March 31, 2012, while the fair value of these investments decreased from $242.2 billion at December 31, 2011 to $230.9 billion at March 31, 2012. The reduction resulted from our purchase activity remaining less than liquidations, consistent with our efforts to reduce our mortgage-related investments portfolio, as described in "EXECUTIVE SUMMARY — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio."

The table below summarizes our mortgage-related securities purchase activity for the three months ended March 31, 2012 and 2011. The purchase activity includes single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated. Purchases of single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated are recorded as an extinguishment of debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

**Table 19 — Mortgage-Related Securities Purchase Activity**[1]

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (in millions) | |
| Non-Freddie Mac mortgage-related securities purchased for resecuritization: | | |
| Ginnie Mae Certificates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 5 | $ 16 |
| Non-agency mortgage-related securities purchased for Other Guarantee Transactions . . . . . . . . . . . . . . . . . . . . . | 3,124 | 2,879 |
| Total non-Freddie Mac mortgage-related securities purchased for resecuritization . . . . . . . . . . . . . . . . . . . . . . . . | 3,129 | 2,895 |
| Non-Freddie Mac mortgage-related securities purchased as investments in securities: | | |
| Agency securities: | | |
| *Fannie Mae:* | | |
| Fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 1,019 |
| Variable-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 50 | 168 |
| *Total agency securities* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 50 | 1,187 |
| Non-agency mortgage-related securities: | | |
| *CMBS:* | | |
| Variable-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 | — |
| *Total non-agency mortgage-related securities* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 | — |
| *Total non-Freddie Mac mortgage-related securities purchased as investments in securities* . . . . . . . . . . . . . . . . . | 60 | 1,187 |
| Total non-Freddie Mac mortgage-related securities purchased . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,189 | $ 4,082 |
| Freddie Mac mortgage-related securities purchased: | | |
| *Single-family:* | | |
| Fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,465 | $36,679 |
| Variable-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 132 | 2,542 |
| *Multifamily:* | | |
| Fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 25 |
| *Total Freddie Mac mortgage-related securities purchased* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,597 | $39,246 |

(1) Based on UPB. Excludes mortgage-related securities traded but not yet settled.

During the three months ended March 31, 2012, we reduced our participation in dollar roll transactions, which were primarily used to support the market and pricing of our PCs, as compared to the three months ended March 31, 2011. When these transactions involve our consolidated PC trusts, the purchase and sale represents an extinguishment and issuance of debt securities, respectively, and impacts our net interest income and recognition of gain or loss on the extinguishment of debt on our consolidated statements of comprehensive income. These transactions can cause short-term fluctuations in the balance of our mortgage-related investments portfolio. The purchases during the three months ended March 31, 2011 reflected in "Table 19 — Mortgage-Related Securities Purchase Activity" are attributed primarily to these transactions. For more information, see "BUSINESS — Our Business Segments — *Investments Segment — PC Support Activities*" and "RISK FACTORS — Competitive and Market Risks — *Any decline in the price performance of or demand for our PCs could have an adverse effect on the volume and profitability of our new single-family guarantee business*" in our 2011 Annual Report.

### *Unrealized Losses on Available-For-Sale Mortgage-Related Securities*

At March 31, 2012, our gross unrealized losses, pre-tax, on available-for-sale mortgage-related securities were $18.7 billion, compared to $20.1 billion at December 31, 2011. The decrease was primarily due to fair value gains related to the movement of non-agency mortgage-related securities with unrealized losses towards maturity and the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities. We believe the unrealized losses related to these securities at March 31, 2012 were mainly attributable to poor underlying collateral performance, limited liquidity and large risk premiums in the market for residential non-agency mortgage-related securities. All available-for-sale securities in an unrealized loss position are evaluated to determine if the impairment is other-than-temporary. See "Total Equity (Deficit)" and "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding unrealized losses on our available-for-sale securities.

### *Higher-Risk Components of Our Investments in Mortgage-Related Securities*

As discussed below, we have exposure to subprime, option ARM, interest-only, and Alt-A and other loans as part of our investments in mortgage-related securities as follows:

- *Single-family non-agency mortgage-related securities:* We hold non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans.

- *Single-family Freddie Mac mortgage-related securities:* We hold certain Other Guarantee Transactions as part of our investments in securities. There are subprime and option ARM loans underlying some of these Other Guarantee Transactions. For more information on single-family loans with certain higher-risk characteristics underlying our issued securities, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*."

*Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, and Alt-A Loans*

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. Since the first quarter of 2008, we have not purchased any non-agency mortgage-related securities backed by subprime, option ARM, or Alt-A loans. The two tables below present information about our holdings of our available-for-sale non-agency mortgage-related securities backed by subprime, option ARM and Alt-A loans.

**Table 20 — Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics**[1]

| | As of | | | | |
|---|---|---|---|---|---|
| | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 |
| | (dollars in millions) | | | | |
| UPB: | | | | | |
| Subprime first lien[2] | $47,478 | $48,644 | $49,794 | $51,070 | $52,403 |
| Option ARM | 13,508 | 13,949 | 14,351 | 14,778 | 15,232 |
| Alt-A[3] | 13,885 | 14,260 | 14,643 | 15,059 | 15,487 |
| Gross unrealized losses, pre-tax:[4] | | | | | |
| Subprime first lien[2] | $12,661 | $13,401 | $14,132 | $13,764 | $12,481 |
| Option ARM | 2,909 | 3,169 | 3,216 | 3,099 | 3,170 |
| Alt-A[3] | 2,094 | 2,612 | 2,468 | 2,171 | 1,941 |
| Present value of expected future credit losses:[5] | | | | | |
| Subprime first lien[2] | $ 7,325 | $ 6,746 | $ 5,414 | $ 6,487 | $ 6,612 |
| Option ARM | 3,908 | 4,251 | 4,434 | 4,767 | 4,993 |
| Alt-A[3] | 2,237 | 2,235 | 2,204 | 2,310 | 2,401 |
| Collateral delinquency rate:[6] | | | | | |
| Subprime first lien[2] | 42% | 42% | 42% | 42% | 44% |
| Option ARM | 43 | 44 | 44 | 44 | 44 |
| Alt-A[3] | 25 | 25 | 25 | 26 | 26 |
| Average credit enhancement:[7] | | | | | |
| Subprime first lien[2] | 20% | 21% | 22% | 23% | 24% |
| Option ARM | 6 | 7 | 8 | 10 | 11 |
| Alt-A[3] | 6 | 7 | 7 | 8 | 8 |
| Cumulative collateral loss:[8] | | | | | |
| Subprime first lien[2] | 23% | 22% | 21% | 20% | 19% |
| Option ARM | 18 | 17 | 16 | 15 | 14 |
| Alt-A[3] | 9 | 8 | 8 | 7 | 7 |

(1) See "*Ratings of Non-Agency Mortgage-Related Securities*" for additional information about these securities.

(2) Excludes non-agency mortgage-related securities backed exclusively by subprime second liens. Certain securities identified as subprime first lien may be backed in part by subprime second lien loans, as the underlying loans of these securities were permitted to include a small percentage of subprime second lien loans.

(3) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.

(4) Represents the aggregate of the amount by which amortized cost, after other-than-temporary impairments, exceeds fair value measured at the individual lot level.

(5) Represents our estimate of future contractual cash flows that we do not expect to collect, discounted at the effective interest rate implicit in the security at the date of acquisition. This discount rate is only utilized to analyze the cumulative credit deterioration for securities since acquisition and may be lower than the discount rate used to measure ongoing other-than-temporary impairment to be recognized in earnings for securities that have experienced a significant improvement in expected cash flows since the last recognition of other-than-temporary impairment recognized in earnings.

(6) Determined based on the number of loans that are two monthly payments or more past due that underlie the securities using information obtained from a third-party data provider.

(7) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by bond insurance, overcollateralization and other forms of credit enhancement.

(8) Based on the actual losses incurred on the collateral underlying these securities. Actual losses incurred on the securities that we hold are significantly less than the losses on the underlying collateral as presented in this table, as non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements.

For purposes of our cumulative credit deterioration analysis, our estimate of the present value of expected future credit losses on our non-agency mortgage-related securities increased to $14.2 billion at March 31, 2012 from $14.0 billion at December 31, 2011. All of these amounts have been reflected in our net impairment of available-for-sale

*Freddie Mac*

securities recognized in earnings in this period or prior periods. The increase in the present value of expected future credit losses was primarily due to our expectation of slower prepayments on our non-agency mortgage-related securities.

### Table 21 — Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans[1]

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 |
| | | | (in millions) | | |
| **Principal repayments and cash shortfalls:[2]** | | | | | |
| Subprime: | | | | | |
| Principal repayments | $1,175 | $1,159 | $1,287 | $1,341 | $1,361 |
| Principal cash shortfalls | 6 | 7 | 6 | 10 | 14 |
| Option ARM: | | | | | |
| Principal repayments | $ 272 | $ 298 | $ 318 | $ 331 | $ 315 |
| Principal cash shortfalls | 169 | 103 | 109 | 123 | 100 |
| Alt-A and other: | | | | | |
| Principal repayments | $ 374 | $ 385 | $ 425 | $ 464 | $ 452 |
| Principal cash shortfalls | 97 | 80 | 81 | 84 | 81 |

(1) See "*Ratings of Non-Agency Mortgage-Related Securities*" for additional information about these securities.
(2) In addition to the contractual interest payments, we receive monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral of these securities representing a partial return of our investment in these securities.

Since the beginning of 2007, we have incurred actual principal cash shortfalls of $1.8 billion on impaired non-agency mortgage-related securities, of which $275 million related to the three months ended March 31, 2012. Many of the trusts that issued non-agency mortgage-related securities we hold were structured so that realized collateral losses in excess of structural credit enhancements are not passed on to investors until the investment matures. We currently estimate that the future expected principal and interest shortfalls on non-agency mortgage-related securities we hold will be significantly less than the fair value declines experienced on these securities.

The investments in non-agency mortgage-related securities we hold backed by subprime, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements. Bond insurance is an additional credit enhancement covering some of the non-agency mortgage-related securities. These credit enhancements are the primary reason we expect our actual losses, through principal or interest shortfalls, to be less than the underlying collateral losses in the aggregate. It is difficult to estimate the point at which structural credit enhancements will be exhausted and we will incur actual losses. During the three months ended March 31, 2012, we continued to experience the erosion of structural credit enhancements on many securities backed by subprime, option ARM, and Alt-A loans due to poor performance of the underlying collateral. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Bond Insurers*."

*Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*

The table below provides information about the mortgage-related securities for which we recognized other-than-temporary impairments in earnings.

**Table 22 — Net Impairment of Available-For-Sale Mortgage-Related Securities Recognized in Earnings**

| | Net Impairment of Available-For-Sale Securities Recognized in Earnings | | | | |
|---|---|---|---|---|---|
| | Three Months Ended | | | | |
| | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 |
| | | | (in millions) | | |
| Subprime:[1] | | | | | |
| 2006 & 2007 | $433 | $472 | $ 29 | $ 67 | $ 717 |
| Other years | 8 | 8 | 2 | 3 | 17 |
| Total subprime | 441 | 480 | 31 | 70 | 734 |
| Option ARM: | | | | | |
| 2006 & 2007 | 32 | 40 | 15 | 43 | 232 |
| Other years | 16 | 19 | 4 | 22 | 49 |
| Total option ARM | 48 | 59 | 19 | 65 | 281 |
| Alt-A: | | | | | |
| 2006 & 2007 | 16 | 22 | 29 | 16 | 15 |
| Other years | 36 | 21 | 10 | 15 | 23 |
| Total Alt-A | 52 | 43 | 39 | 31 | 38 |
| Other loans | 5 | 3 | 41 | 1 | 2 |
| Total subprime, option ARM, Alt-A and other loans | 546 | 585 | 130 | 167 | 1,055 |
| CMBS | 16 | 8 | 27 | 183 | 135 |
| Manufactured housing | 2 | 2 | 4 | 2 | 3 |
| Total available-for-sale mortgage-related securities | $564 | $595 | $161 | $352 | $1,193 |

(1) Includes all first and second liens.

We recorded net impairment of available-for-sale mortgage-related securities recognized in earnings of $564 million during the three months ended March 31, 2012, compared to $1.2 billion during the three months ended March 31, 2011. We recorded these impairments because our estimate of the present value of expected future credit losses on certain individual securities increased during the period. These impairments include $546 million related to securities backed by subprime, option ARM, and Alt-A and other loans during the three months ended March 31, 2012, compared to $1.1 billion during the three months ended March 31, 2011. For more information, see "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-For-Sale Securities."

While it is reasonably possible that collateral losses on our available-for-sale mortgage-related securities where we have not recorded an impairment charge in earnings could exceed our credit enhancement levels, we do not believe that those conditions were likely at March 31, 2012. Based on our conclusion that we do not intend to sell our remaining available-for-sale mortgage-related securities in an unrealized loss position and it is not more likely than not that we will be required to sell these securities before a sufficient time to recover all unrealized losses and our consideration of other available information, we have concluded that the reduction in fair value of these securities was temporary at March 31, 2012 and have recorded these fair value losses in AOCI.

The credit performance of loans underlying our holdings of non-agency mortgage-related securities has declined since 2007. This decline has been particularly severe for subprime, option ARM, and Alt-A and other loans. Economic factors negatively impacting the performance of our investments in non-agency mortgage-related securities include high unemployment, a large inventory of seriously delinquent mortgage loans and unsold homes, tight credit conditions, and weak consumer confidence during recent years. In addition, subprime, option ARM, and Alt-A and other loans backing the securities we hold have significantly greater concentrations in the states that are undergoing the greatest economic stress, such as California and Florida. Loans in these states undergoing economic stress are more likely to become seriously delinquent and the credit losses associated with such loans are likely to be higher than in other states.

We rely on bond insurance, including secondary coverage, to provide credit protection on some of our investments in non-agency mortgage-related securities. We have determined that there is substantial uncertainty surrounding certain bond insurers' ability to pay our future claims on expected credit losses related to our non-agency mortgage-related security investments. This uncertainty contributed to the impairments recognized in earnings during the three months ended March 31, 2012 and 2011. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Bond Insurers*" and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

Our assessments concerning other-than-temporary impairment require significant judgment and the use of models, and are subject to potentially significant change. In addition, changes in the performance of the individual securities and in mortgage market conditions may also affect our impairment assessments. Depending on the structure of the individual mortgage-related security and our estimate of collateral losses relative to the amount of credit support available for the tranches we own, a change in collateral loss estimates can have a disproportionate impact on the loss estimate for the security. Additionally, servicer performance, loan modification programs and backlogs, bankruptcy reform and other forms of government intervention in the housing market can significantly affect the performance of these securities, including the timing of loss recognition of the underlying loans and thus the timing of losses we recognize on our securities. Impacts related to changes in interest rates may also affect our losses due to the structural credit enhancements on our investments in non-agency mortgage-related securities. Foreclosure processing suspensions can also affect our losses. For example, while defaulted loans remain in the trusts prior to completion of the foreclosure process, the subordinate classes of securities issued by the securitization trusts may continue to receive interest payments, rather than absorbing default losses. This may reduce the amount of funds available for the tranches we own. Given the extent of the housing and economic downturn, it is difficult to estimate the future performance of mortgage loans and mortgage-related securities with high assurance, and actual results could differ materially from our expectations. Furthermore, various market participants could arrive at materially different conclusions regarding estimates of future cash shortfalls.

For more information on risks associated with the use of models, see "RISK FACTORS — Operational Risks — *We face risks and uncertainties associated with the internal models that we use for financial accounting and reporting purposes, to make business decisions, and to manage risks. Market conditions have raised these risks and uncertainties*" in our 2011 Annual Report. For more information on how delays in the foreclosure process, including delays related to concerns about deficiencies in foreclosure documentation practices, could adversely affect the values of, and the losses on, the non-agency mortgage-related securities we hold, see "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" in our 2011 Annual Report.

For information regarding our efforts to mitigate losses on our investments in non-agency mortgage-related securities, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*."

*Ratings of Non-Agency Mortgage-Related Securities*

The table below shows the ratings of non-agency mortgage-related securities backed by subprime, option ARM, Alt-A and other loans, and CMBS held at March 31, 2012 based on their ratings as of March 31, 2012, as well as those held at December 31, 2011 based on their ratings as of December 31, 2011 using the lowest rating available for each security.

**Table 23 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS**

| Credit Ratings as of March 31, 2012 | UPB | Percentage of UPB | Amortized Cost | Gross Unrealized Losses | Bond Insurance Coverage[1] |
|---|---|---|---|---|---|
| | | (dollars in millions) | | | |
| **Subprime loans:** | | | | | |
| AAA-rated | $ 599 | 1% | $ 599 | $ (65) | $ 18 |
| Other investment grade | 2,292 | 5 | 2,292 | (291) | 383 |
| Below investment grade[2] | 44,960 | 94 | 36,859 | (12,310) | 1,603 |
| Total | $ 47,851 | 100% | $ 39,750 | $(12,666) | $2,004 |
| **Option ARM loans:** | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 63 | — | 63 | (6) | 63 |
| Below investment grade[2] | 13,445 | 100 | 8,651 | (2,903) | 36 |
| Total | $ 13,508 | 100% | $ 8,714 | $ (2,909) | $ 99 |
| **Alt-A and other loans:** | | | | | |
| AAA-rated | $ 109 | 1% | $ 109 | $ (6) | $ 6 |
| Other investment grade | 2,395 | 14 | 2,413 | (302) | 296 |
| Below investment grade[2] | 13,815 | 85 | 10,723 | (1,945) | 2,067 |
| Total | $ 16,319 | 100% | $ 13,245 | $ (2,253) | $2,369 |
| **CMBS:** | | | | | |
| AAA-rated | $ 25,479 | 49% | $ 25,517 | $ (17) | $ 41 |
| Other investment grade | 23,801 | 45 | 23,754 | (220) | 1,584 |
| Below investment grade[2] | 2,955 | 6 | 2,833 | (463) | 1,695 |
| Total | $ 52,235 | 100% | $ 52,104 | $ (700) | $3,320 |
| **Total subprime, option ARM, Alt-A and other loans, and CMBS:** | | | | | |
| AAA-rated | $ 26,187 | 20% | $ 26,225 | $ (88) | $ 65 |
| Other investment grade | 28,551 | 22 | 28,522 | (819) | 2,326 |
| Below investment grade[2] | 75,175 | 58 | 59,066 | (17,621) | 5,401 |
| Total | $129,913 | 100% | $113,813 | $(18,528) | $7,792 |
| Total investments in mortgage-related securities | $248,790 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 52% | | | | |

| Credit Ratings as of December 31, 2011 | UPB | Percentage of UPB | Amortized Cost | Gross Unrealized Losses | Bond Insurance Coverage[1] |
|---|---|---|---|---|---|
| **Subprime loans:** | | | | | |
| AAA-rated | $ 1,000 | 2% | $ 1,000 | $ (115) | $ 23 |
| Other investment grade | 2,643 | 5 | 2,643 | (399) | 383 |
| Below investment grade[2] | 45,389 | 93 | 37,704 | (12,894) | 1,641 |
| Total | $ 49,032 | 100% | $ 41,347 | $(13,408) | $2,047 |
| **Option ARM loans:** | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 76 | 1 | 76 | (8) | 76 |
| Below investment grade[2] | 13,873 | 99 | 8,943 | (3,161) | 39 |
| Total | $ 13,949 | 100% | $ 9,019 | $ (3,169) | $ 115 |
| **Alt-A and other loans:** | | | | | |
| AAA-rated | $ 350 | 2% | $ 348 | $ (20) | $ 6 |
| Other investment grade | 2,237 | 13 | 2,260 | (371) | 310 |
| Below investment grade[2] | 14,203 | 85 | 11,053 | (2,421) | 2,139 |
| Total | $ 16,790 | 100% | $ 13,661 | $ (2,812) | $2,455 |
| **CMBS:** | | | | | |
| AAA-rated | $ 25,499 | 47% | $ 25,540 | $ (22) | $ 42 |
| Other investment grade | 25,421 | 47 | 25,394 | (346) | 1,585 |
| Below investment grade[2] | 3,190 | 6 | 2,851 | (180) | 1,697 |
| Total | $ 54,110 | 100% | $ 53,785 | $ (548) | $3,324 |
| **Total subprime, option ARM, Alt-A and other loans, and CMBS:** | | | | | |
| AAA-rated | $ 26,849 | 20% | $ 26,888 | $ (157) | $ 71 |
| Other investment grade | 30,377 | 23 | 30,373 | (1,124) | 2,354 |
| Below investment grade[2] | 76,655 | 57 | 60,551 | (18,656) | 5,516 |
| Total | $133,881 | 100% | $117,812 | $(19,937) | $7,941 |
| Total investments in mortgage-related securities | $261,232 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 51% | | | | |

(1) Represents the amount of UPB covered by bond insurance. This amount does not represent the maximum amount of losses we could recover, as the bond insurance also covers interest.

(2) Includes securities with S&P equivalent credit ratings below BBB– and certain securities that are no longer rated.

**Mortgage Loans**

The UPB of mortgage loans on our consolidated balance sheets declined to $1.80 trillion as of March 31, 2012, as compared to $1.82 trillion as of December 31, 2011. This decline reflects that the amount of single-family loan liquidations has exceeded new loan purchase and guarantee activity, which we believe is due, in part, to declines in the amount of single-family mortgage debt outstanding in the market and our competitive position compared to other market participants.

The UPB of unsecuritized single-family mortgage loans declined by $6.2 billion to $165.5 billion at March 31, 2012, from $171.7 billion at December 31, 2011, primarily due to our net loan securitization volume exceeding the amount of delinquent loans we removed from PC trusts during the first quarter of 2012. We expect that our holdings of unsecuritized single-family loans could increase in the remainder of 2012.

Based on the amount of the recorded investment of single-family loans on our consolidated balance sheets, approximately $70.0 billion, or 4.1%, of these loans as of March 31, 2012 were seriously delinquent, as compared to $72.4 billion, or 4.2%, as of December 31, 2011. This decline was primarily due to modifications, foreclosure transfers, and short sale activity. The majority of these seriously delinquent loans are unsecuritized, and were removed by us from our PC trusts. As guarantor, we have the right to remove mortgages that back our PCs from the underlying loan pools under certain circumstances. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information on our removal of single-family loans from PC trusts.

The UPB of unsecuritized multifamily mortgage loans was $82.5 billion at March 31, 2012 and $82.3 billion at December 31, 2011. Our multifamily loan activity in the first quarters of 2012 and 2011 primarily consisted of purchases of loans intended for securitization and subsequent sale through Other Guarantee Transactions. To pursue our primary multifamily business strategy, we expect to continue to purchase and then securitize multifamily loans, which provides liquidity for the multifamily market, supports affordability for multifamily rental housing, and helps us manage our credit risks.

We maintain an allowance for loan losses on mortgage loans that we classify as held-for-investment on our consolidated balance sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage-related securities backed by multifamily loans, certain single-family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risk. Collectively, we refer to our allowance for loan losses and our reserve for guarantee losses as our loan loss reserves. Our loan loss reserves were $38.3 billion and $39.5 billion at March 31, 2012 and December 31, 2011, respectively, including $37.8 billion and $38.9 billion, respectively, related to single-family loans. At March 31, 2012 and December 31, 2011, our loan loss reserves, as a percentage of our total mortgage portfolio, excluding non-Freddie Mac securities, were 2.0% and 2.1%, respectively, and as a percentage of the UPB associated with our non-performing loans was 31.3% and 32.0%, respectively. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further detail about the mortgage loans and associated allowance for loan losses recorded on our consolidated balance sheets.

The table below summarizes our purchase and guarantee activity in mortgage loans. This activity consists of: (a) mortgage loans underlying consolidated single-family PCs issued in the period (regardless of whether such securities are held by us or third parties); (b) single-family and multifamily mortgage loans purchased, but not securitized, in the

period; and (c) mortgage loans underlying our mortgage-related financial guarantees issued in the period, which are not consolidated on our balance sheets.

**Table 24 — Mortgage Loan Purchase and Other Guarantee Commitment Activity[1]**

| | Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | UPB Amount | % of Total | UPB Amount | % of Total |
|---|---|---|---|---|
| | (dollars in millions) | | | |
| Mortgage loan purchases and guarantee issuances: | | | | |
| Single-family: | | | | |
| 30-year or more amortizing fixed-rate | $ 61,847 | 56% | $ 62,898 | 62% |
| 20-year amortizing fixed-rate | 8,410 | 8 | 6,715 | 7 |
| 15-year amortizing fixed-rate | 29,574 | 26 | 22,110 | 22 |
| Adjustable-rate[2] | 5,152 | 5 | 5,741 | 6 |
| FHA/VA and other governmental | 90 | <1 | 87 | <1 |
| *Total single-family[3]* | 105,073 | 95 | 97,551 | 97 |
| Multifamily | 5,751 | 5 | 3,049 | 3 |
| *Total mortgage loan purchases and other guarantee commitment activity[4]* | $110,824 | 100% | $100,600 | 100% |
| Percentage of mortgage purchases and other guarantee commitment activity with credit enhancements[5] | 9% | | 7% | |

(1) Based on UPB. Excludes mortgage loans traded but not yet settled. Excludes the removal of seriously delinquent loans and balloon/reset mortgages out of PC trusts. Includes other guarantee commitments associated with mortgage loans. See endnote (4) for further information.

(2) Includes amortizing ARMs with 1-, 3-, 5-, 7-, and 10-year initial fixed-rate periods. We did not purchase any option ARM loans during the first quarters of 2012 or 2011.

(3) Includes $8.6 billion and $7.3 billion of mortgage loans in excess of $417,000, which we refer to as conforming jumbo mortgages, for the first quarters of 2012 and 2011, respectively.

(4) Includes issuances of other guarantee commitments on single-family loans of $2.3 billion and $1.8 billion and issuances of other guarantee commitments on multifamily loans of $0.1 billion and $0.2 billion during the first quarters of 2012 and 2011, respectively.

(5) See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for further details on credit enhancement of mortgage loans in our multifamily mortgage and single-family credit guarantee portfolios.

See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Table 15.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio" for information about mortgage loans in our single-family credit guarantee portfolio that we believe have higher-risk characteristics.

## Derivative Assets and Liabilities, Net

The composition of our derivative portfolio changes from period to period as a result of derivative purchases, terminations, or assignments prior to contractual maturity, and expiration of the derivatives at their contractual maturity. We classify net derivative interest receivable or payable, trade/settle receivable or payable, and cash collateral held or posted on our consolidated balance sheets in derivative assets, net and derivative liabilities, net. See "NOTE 10: DERIVATIVES" for additional information regarding our derivatives.

The table below shows the fair value for each derivative type, the weighted average fixed rate of our pay-fixed and receive-fixed swaps, and the maturity profile of our derivative positions reconciled to the amounts presented on our consolidated balance sheets as of March 31, 2012. A positive fair value in the table below for each derivative type is the estimated amount, prior to netting by counterparty, that we would be entitled to receive if the derivatives of that type were

terminated. A negative fair value for a derivative type is the estimated amount, prior to netting by counterparty, that we would owe if the derivatives of that type were terminated.

## Table 25 — Derivative Fair Values and Maturities

| | Notional or Contractual Amount(2) | Total Fair Value(3) | Fair Value(1) | | | |
|---|---|---|---|---|---|---|
| | | | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $236,803 | $ 9,080 | $ 59 | $ 519 | $ 3,538 | $ 4,964 |
| Weighted average fixed rate(4) | | | 1.52% | 0.92% | 2.24% | 3.10% |
| Forward-starting swaps(5) | 11,650 | 792 | — | — | — | 792 |
| Weighted average fixed rate(4) | | | —% | —% | —% | 3.83% |
| Total receive-fixed | 248,453 | 9,872 | 59 | 519 | 3,538 | 5,756 |
| Basis (floating to floating) | 2,400 | 2 | (1) | — | 3 | — |
| Pay-fixed: | | | | | | |
| Swaps | 280,869 | (26,292) | (38) | (2,647) | (5,112) | (18,495) |
| Weighted average fixed rate(4) | | | 0.95% | 3.11% | 2.83% | 3.68% |
| Forward-starting swaps(5) | 15,704 | (1,490) | — | — | — | (1,490) |
| Weighted average fixed rate(4) | | | —% | —% | —% | 3.80% |
| Total pay-fixed | 296,573 | (27,782) | (38) | (2,647) | (5,112) | (19,985) |
| Total interest-rate swaps | 547,426 | (17,908) | 20 | (2,128) | (1,571) | (14,229) |
| Option-based: | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 52,500 | 7,766 | 1,789 | 3,382 | 555 | 2,040 |
| Written | 12,025 | (886) | (172) | (557) | (157) | — |
| Put swaptions | | | | | | |
| Purchased | 49,450 | 527 | 6 | 35 | 134 | 352 |
| Written | 250 | (5) | (5) | — | — | — |
| Other option-based derivatives(6) | 34,365 | 2,029 | — | — | — | 2,029 |
| Total option-based | 148,590 | 9,431 | 1,618 | 2,860 | 532 | 4,421 |
| Futures | 44,281 | (66) | (66) | — | — | — |
| Foreign-currency swaps | 1,179 | 84 | 59 | 25 | — | — |
| Commitments | 22,298 | (37) | (37) | — | — | — |
| Swap guarantee derivatives | 3,631 | (36) | — | (1) | (1) | (34) |
| Subtotal | 767,405 | (8,532) | $1,594 | $ 756 | $(1,040) | $ (9,842) |
| Credit derivatives | 9,338 | (4) | | | | |
| Subtotal | 776,743 | (8,536) | | | | |
| Derivative interest receivable (payable), net | | (1,089) | | | | |
| Trade/settle receivable (payable), net | | 299 | | | | |
| Derivative cash collateral (held) posted, net | | 9,212 | | | | |
| Total | $776,743 | $ (114) | | | | |

(1) Fair value is categorized based on the period from March 31, 2012 until the contractual maturity of the derivative.
(2) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged. Notional or contractual amounts are not recorded as assets or liabilities on our consolidated balance sheets.
(3) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net, and includes derivative interest receivable or (payable), net, trade/settle receivable or (payable), net and derivative cash collateral (held) or posted, net.
(4) Represents the notional weighted average rate for the fixed leg of the swaps.
(5) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to thirteen years as of March 31, 2012.
(6) Primarily includes purchased interest-rate caps and floors.

At March 31, 2012, the net fair value of our total derivative portfolio was $(114) million, as compared to $(317) million at December 31, 2011. During the three months ended March 31, 2012, the net fair value of our total derivative portfolio increased primarily due to the impact of an increase in long-term interest rates on our net pay-fixed swap portfolio, partially offset by the impact of the increase in long-term interest rates on our receive-fixed swap and option-based derivatives. See "NOTE 10: DERIVATIVES" for the notional or contractual amounts and related fair values of our total derivative portfolio by product type at March 31, 2012 and December 31, 2011, as well as derivative collateral posted and held.

The table below summarizes the changes in derivative fair values.

**Table 26 — Changes in Derivative Fair Values**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012[1] | 2011[2] |
| | (in millions) | |
| Beginning balance, at January 1 — Net asset (liability). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(8,662) | $(6,560) |
| Net change in: | | |
| Commitments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 | 20 |
| Credit derivatives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (5) |
| Swap guarantee derivatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | — |
| Other derivatives:[3] | | |
| Changes in fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 76 | 986 |
| Fair value of new contracts entered into during the period[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 233 |
| Contracts realized or otherwise settled during the period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 | (291) |
| Ending balance, at March 31 — Net asset (liability). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(8,536) | $(5,617) |

(1) Refer to "Table 25 — Derivative Fair Values and Maturities" for a reconciliation of net fair value to the amounts presented on our consolidated balance sheets as of March 31, 2012.

(2) At March 31, 2011, fair value in this table excludes derivative interest receivable or (payable), net of $(1.6) billion, trade/settle receivable or (payable), net of $3 million, and derivative cash collateral posted, net of $6.5 billion.

(3) Includes fair value changes for interest-rate swaps, option-based derivatives, futures, and foreign-currency swaps.

(4) Consists primarily of cash premiums paid or received on options.

See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for a description of gains (losses) on our derivative positions.

## REO, Net

We acquire properties, which are recorded as REO assets on our consolidated balance sheets, typically as a result of borrower default on mortgage loans that we own, or for which we have issued our financial guarantee. The balance of our REO, net, declined to $5.5 billion at March 31, 2012 from $5.7 billion at December 31, 2011. We believe the volume of our single-family REO acquisitions in the first quarter of 2012 was less than it otherwise would have been due to delays in the foreclosure process, particularly in states that require a judicial foreclosure process. We expect that the length of the foreclosure process will continue to remain above historical levels. Additionally, we expect our REO activity to remain at elevated levels, as we have a large inventory of seriously delinquent loans in our single-family credit guarantee portfolio. To the extent a large volume of loans completes the foreclosure process in a short period of time, the resulting REO inventory could have a negative impact on the housing market. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

## Deferred Tax Assets, Net

After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, related difficulty in forecasting future profit levels, and our assertion that we have the intent and ability to hold our available-for-sale securities until any temporary unrealized losses are recovered, we continue to record a valuation allowance on a portion of our net deferred tax assets. See "NOTE 12: INCOME TAXES" for additional information.

## Other Assets

Other assets consist of the guarantee asset related to non-consolidated trusts and other guarantee commitments, accounts and other receivables, and other miscellaneous assets. Other assets increased to $10.8 billion as of March 31, 2012 from $10.5 billion as of December 31, 2011 primarily due to an increase in servicer receivables resulting from an increase in the proceeds of mortgage loans paid off by borrowers at the end of the quarter that had not yet been remitted to us. See "NOTE 18: SIGNIFICANT COMPONENTS OF OTHER ASSETS AND OTHER LIABILITIES ON OUR CONSOLIDATED BALANCE SHEETS" for additional information.

## Total Debt, Net

PCs and Other Guarantee Transactions issued by our consolidated trusts and held by third parties are recognized as debt securities of consolidated trusts held by third parties on our consolidated balance sheets. Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated trusts. The debt securities of our consolidated trusts may be prepaid without penalty at any time.

Other debt consists of unsecured short-term and long-term debt securities we issue to third parties to fund our business activities. It is classified as either short-term or long-term based on the contractual maturity of the debt instrument. See "MD&A — LIQUIDITY AND CAPITAL RESOURCES" in our 2011 Annual Report for a discussion of our management activities related to other debt.

The table below presents the UPB for Freddie Mac issued mortgage-related securities by the underlying mortgage product type.

### Table 27 — Freddie Mac Mortgage-Related Securities[1]

| | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total |
| | (in millions) | | | | | |
| Single-family: | | | | | | |
| 30-year or more amortizing fixed-rate | $1,103,277 | $ — | 1,103,277 | $1,123,105 | $ — | $1,123,105 |
| 20-year amortizing fixed-rate | 72,108 | — | 72,108 | 68,584 | — | 68,584 |
| 15-year amortizing fixed-rate | 262,377 | — | 262,377 | 252,563 | — | 252,563 |
| Adjustable-rate[2] | 70,641 | — | 70,641 | 69,402 | — | 69,402 |
| Interest-only[3] | 55,253 | — | 55,253 | 59,007 | — | 59,007 |
| FHA/VA and other governmental | 3,139 | — | 3,139 | 3,267 | — | 3,267 |
| *Total single-family* | 1,566,795 | — | 1,566,795 | 1,575,928 | — | 1,575,928 |
| Multifamily | — | 4,458 | 4,458 | — | 4,496 | 4,496 |
| *Total single-family and multifamily* | 1,566,795 | 4,458 | 1,571,253 | 1,575,928 | 4,496 | 1,580,424 |
| Other Guarantee Transactions: | | | | | | |
| HFA bonds:[4] | | | | | | |
| Single-family | — | 5,950 | 5,950 | — | 6,118 | 6,118 |
| Multifamily | — | 933 | 933 | — | 966 | 966 |
| Total HFA bonds | — | 6,883 | 6,883 | — | 7,084 | 7,084 |
| Other: | | | | | | |
| Single-family[5] | 12,228 | 3,739 | 15,967 | 12,877 | 3,838 | 16,715 |
| Multifamily | — | 22,744 | 22,744 | — | 19,682 | 19,682 |
| Total Other Guarantee Transactions | 12,228 | 26,483 | 38,711 | 12,877 | 23,520 | 36,397 |
| REMICs and Other Structured Securities backed by Ginnie Mae Certificates[6] | — | 748 | 748 | — | 779 | 779 |
| Total Freddie Mac Mortgage-Related Securities | $1,579,023 | $38,572 | $1,617,595 | $1,588,805 | $35,879 | $1,624,684 |
| Less: Repurchased Freddie Mac Mortgage-Related Securities[7] | (119,658) | | | (136,329) | | |
| Total UPB of debt securities of consolidated trusts held by third parties | $1,459,365 | | | $1,452,476 | | |

(1) Amounts are based on UPB of the securities and exclude mortgage-related debt traded, but not yet settled.
(2) Includes $1.1 billion and $1.2 billion in UPB of option ARM mortgage loans as of March 31, 2012 and December 31, 2011, respectively. See endnote (5) for additional information on option ARM loans that back our Other Guarantee Transactions.
(3) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed- and variable-rate interest-only loans.
(4) Consists of bonds we acquired and resecuritized under the NIBP.
(5) Backed by non-agency mortgage-related securities that include prime, FHA/VA, and subprime mortgage loans and also include $7.1 billion and $7.3 billion in UPB of securities backed by option ARM mortgage loans at March 31, 2012 and December 31, 2011, respectively.
(6) Backed by FHA/VA loans.
(7) Represents the UPB of repurchased Freddie Mac mortgage-related securities that are consolidated on our balance sheets and includes certain remittance amounts associated with our security trust administration that are payable to third-party mortgage-related security holders. Our holdings of non-consolidated Freddie Mac mortgage-related securities are presented in "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets."

Excluding Other Guarantee Transactions, the percentage of amortizing fixed-rate single-family loans underlying our consolidated trust debt securities, based on UPB, was approximately 92% at both March 31, 2012 and December 31, 2011. Freddie Mac single-family mortgage-related securities that we issued during the three months ended March 31, 2012 were backed by a significant proportion of refinance securities. During the three months ended March 31, 2012, the UPB of Freddie Mac mortgage-related securities issued by consolidated trusts declined approximately 0.6%, as the volume of our new issuances has been less than the volume of liquidations of these securities. The UPB of multifamily Other Guarantee Transactions, excluding HFA-related securities, increased to $22.7 billion as of March 31, 2012 from $19.7 billion as of December 31, 2011, due to multifamily loan securitization activity.

The table below presents additional details regarding our issued and guaranteed mortgage-related securities.

### Table 28 — Issuances and Extinguishments of Debt Securities of Consolidated Trusts[1]

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (in millions) | |
| Beginning balance of debt securities of consolidated trusts held by third parties | $1,452,476 | $1,517,001 |
| Issuances to third parties of debt securities of consolidated trusts: | | |
| Issuances based on underlying mortgage product type: | | |
| 30-year or more amortizing fixed-rate | 64,041 | 61,791 |
| 20-year amortizing fixed-rate | 8,395 | 6,243 |
| 15-year amortizing fixed-rate | 30,672 | 19,866 |
| Adjustable-rate | 5,148 | 5,646 |
| Interest-only | — | 152 |
| FHA/VA | — | 160 |
| Debt securities of consolidated trusts retained by us at issuance | (2,905) | (6,345) |
| Net issuances of debt securities of consolidated trusts | 105,351 | 87,513 |
| Reissuances of debt securities of consolidated trusts previously held by us[2] | 11,642 | 24,576 |
| Total issuances to third parties of debt securities of consolidated trusts | 116,993 | 112,089 |
| Extinguishments, net[3] | (110,104) | (131,241) |
| Ending balance of debt securities of consolidated trusts held by third parties | $1,459,365 | $1,497,849 |

(1) Based on UPB.
(2) Represents our sales of PCs and certain Other Guarantee Transactions previously held by us.
(3) Represents: (a) UPB of our purchases from third parties of PCs and Other Guarantee Transactions issued by our consolidated trusts; (b) principal repayments related to PCs and Other Guarantee Transactions issued by our consolidated trusts; and (c) certain remittance amounts associated with our trust security administration that are payable to third-party mortgage-related security holders as of March 31, 2012 and 2011.

### Other Liabilities

Other liabilities consist of the guarantee obligation, the reserve for guarantee losses on non-consolidated trusts and other mortgage-related financial guarantees, servicer liabilities, accounts payable and accrued expenses, and other miscellaneous liabilities. Other liabilities increased to $6.3 billion as of March 31, 2012 from $6.0 billion as of December 31, 2011 primarily because of an increase in: (a) credit loss-related liabilities, largely due to third party sales adjustments for accrued estimated losses on unsettled foreclosure alternative transactions at quarter end; and (b) real estate services payable relating to estimated taxes and insurance on REO properties held in inventory at quarter end. See "NOTE 18: SIGNIFICANT COMPONENTS OF OTHER ASSETS AND OTHER LIABILITIES ON OUR CONSOLIDATED BALANCE SHEETS" for additional information.

### Total Equity (Deficit)

The table below presents the changes in total equity (deficit) and certain capital-related disclosures.

### Table 29 — Changes in Total Equity (Deficit)

| | Three Months Ended | | | | |
|---|---|---|---|---|---|
| | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 |
| | (in millions) | | | | |
| Beginning balance | $ (146) | $(5,991) | $(1,478) | $ 1,237 | $ (401) |
| Net income (loss) | 577 | 619 | (4,422) | (2,139) | 676 |
| Other comprehensive income (loss), net of taxes: | | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | 1,147 | 701 | (80) | 903 | 1,941 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 111 | 118 | 124 | 135 | 132 |
| Changes in defined benefit plans | (46) | 68 | 2 | 1 | (9) |
| Comprehensive income (loss) | 1,789 | 1,506 | (4,376) | (1,100) | 2,740 |
| Capital draw funded by Treasury | 146 | 5,992 | 1,479 | — | 500 |
| Senior preferred stock dividends declared | (1,807) | (1,655) | (1,618) | (1,617) | (1,605) |
| Other | — | 2 | 2 | 2 | 3 |
| Total equity (deficit)/Net worth | $ (18) | $ (146) | $(5,991) | $(1,478) | $ 1,237 |
| Aggregate draws under the Purchase Agreement (as of period end)[1] | $71,317 | $71,171 | $65,179 | $63,700 | $63,700 |
| Aggregate senior preferred stock dividends paid to Treasury in cash (as of period end) | $18,328 | $16,521 | $14,866 | $13,248 | $11,631 |
| Percentage of dividends paid to Treasury in cash to aggregate draws (as of period end) | 26% | 23% | 23% | 21% | 18% |

(1) Does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received.

We will request a $19 million draw from Treasury under the Purchase Agreement to eliminate the quarterly equity deficit as of March 31, 2012. In addition, we paid cash dividends to Treasury of $1.8 billion during the three months ended March 31, 2012.

Net unrealized losses on our available-for-sale securities in AOCI decreased by $1.1 billion during the three months ended March 31, 2012. The decrease for the three months ended March 31, 2012 was primarily due to the impact of fair value gains related to the movement of non-agency mortgage-related securities with unrealized losses towards maturity and the impact of tightening OAS levels on our CMBS. Net unrealized losses on our closed cash flow hedge relationships in AOCI decreased by $111 million during the three months ended March 31, 2012, respectively, primarily attributable to the reclassification of losses into earnings related to our closed cash flow hedges as the originally forecasted transactions affected earnings.

## RISK MANAGEMENT

Our investment and credit guarantee activities expose us to three broad categories of risk: (a) credit risk; (b) interest-rate risk and other market risk; and (c) operational risk. See "RISK FACTORS" in our 2011 Annual Report for additional information regarding these and other risks.

### Credit Risk

We are subject primarily to two types of credit risk: institutional credit risk and mortgage credit risk. Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will fail to meet its obligations. Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage we own or guarantee. We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment.

#### Institutional Credit Risk

Our exposure to single-family mortgage seller/servicers remained high during the first quarter of 2012 with respect to their repurchase obligations arising from breaches of representations and warranties made to us for loans they underwrote and sold to us. We rely on our single-family seller/servicers to perform loan workout activities as well as foreclosures on loans that they service for us. Our credit losses could increase to the extent that our seller/servicers do not fully perform these obligations in a timely manner. The financial condition of the mortgage insurance industry remained weak during the first quarter of 2012, and the substantial majority of our mortgage insurance exposure is concentrated with four counterparties, all of which are under significant financial stress. In addition, our exposure to derivatives counterparties remains highly concentrated as compared to historical levels. The failure of any of our significant counterparties to meet their obligations to us could have a material adverse effect on our results of operations, financial condition, and our ability to conduct future business.

##### Non-Agency Mortgage-Related Security Issuers

Our investments in securities expose us to institutional credit risk to the extent that servicers, issuers, guarantors, or third parties providing credit enhancements become insolvent or do not perform their obligations. Our investments in non-Freddie Mac mortgage-related securities include both agency and non-agency securities. However, agency securities have historically presented minimal institutional credit risk due to the guarantee provided by those institutions, and the U.S. government's support of those institutions.

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non-agency mortgage-related securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. The effectiveness of our efforts is highly uncertain and any potential recoveries may take significant time to realize. See "MD&A — RISK MANAGEMENT — Credit Risk — Institutional Credit Risk — Non-Agency Mortgage-Related Security Issuers" in our 2011 Annual Report for information about these efforts.

See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for information on credit risk associated with our investments in mortgage-related securities, including higher-risk components and impairment charges we recognized in the first quarters of 2012 and 2011 related to these investments. For information about institutional credit risk associated with our investments in non-mortgage-related securities, see "NOTE 7: INVESTMENTS IN SECURITIES — Table 7.9 — Trading Securities" as well as "Cash and Other Investments Counterparties" below.

*Single-family Mortgage Seller/Servicers*

We acquire a significant portion of our single-family mortgage purchase volume from several large lenders, or seller/servicers. Our top 10 single-family seller/servicers provided approximately 79% of our single-family purchase volume during the first quarter of 2012. Wells Fargo Bank, N.A. and U.S. Bank, N.A. accounted for 28% and 13%, respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume during the three months ended March 31, 2012. In recent periods, certain large seller/servicers curtailed their lending activities, which may impact the concentration of our purchase volume in the remainder of 2012.

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our mortgage seller/servicers, including non-performance of their repurchase obligations arising from breaches of the representations and warranties made to us for loans they underwrote and sold to us or failure to honor their recourse and indemnification obligations to us. We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans, and represent and warrant that those loans have been originated under specified underwriting standards. If we subsequently discover that the representations and warranties were breached (*i.e.*, that contractual standards were not followed), we can exercise certain contractual remedies to mitigate our actual or potential credit losses. These contractual remedies include the ability to require the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan. As part of our expansion of HARP, we have agreed not to require lenders to provide us with certain representations and warranties that they would ordinarily be required to commit to in selling loans to us. As a result, we may face greater exposure to credit and other losses on these HARP loans. For more information, see "*Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program — Home Affordable Refinance Program*."

Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts, in which case the deadline for repurchase is extended until we decide the appeal. In recent periods, some of our seller/servicers have failed to fully perform their repurchase obligations in a timely manner, and to a lesser extent, certain others have failed to perform on their obligations due to their weakened financial capacity. The table below provides a summary of our repurchase request activity for the three months ended March 31, 2012 and 2011.

**Table 30 — Repurchase Request Activity[1]**

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2012 | 2011 |
|  | (in millions) | |
| Beginning balance, December 31, | $ 2,716 | $ 3,807 |
| New requests issued | 2,625 | 2,801 |
| Requests collected[2] | (854) | (1,248) |
| Requests cancelled[3] | (1,224) | (1,902) |
| Other[4] | (34) | (15) |
| Ending balance, March 31, | $ 3,229 | $ 3,443 |

(1) Beginning and ending balances represent the UPB of the loans associated with the repurchase requests. New requests issued and requests cancelled represent the amount of the request, while requests collected represent the amount of cash payment received.

(2) Requests collected include payments received upon fulfillment of the repurchase request, reimbursement of losses for requests associated with foreclosed mortgage loans, negotiated settlements, and other alternative remedies.

(3) Consists primarily of those requests that were resolved by the servicer providing missing documentation or a successful appeal of the request.

(4) Other includes items that affect the UPB of the loan while the repurchase request is outstanding, such as changes in UPB due to payments made on the loan. Also includes requests deemed uncollectible due to the insolvency or other failure of the counterparty.

As shown in the table above, the UPB of loans subject to open repurchase requests increased to approximately $3.2 billion as of March 31, 2012 from $2.7 billion as of December 31, 2011 because the volume of new request issuances exceeded the combined volume of requests collected and cancelled. As measured by UPB, approximately 38% and 39% of the repurchase requests outstanding at March 31, 2012 and December 31, 2011, respectively, were outstanding for four months or more since issuance of the initial request (these figures include repurchase requests for which appeals were pending). As of March 31, 2012, two of our largest seller/servicers had aggregate repurchase requests outstanding, based on UPB, of $1.7 billion, and approximately 47% of these requests were outstanding for four months or more since issuance of the initial request. The amount we expect to collect on the outstanding requests is significantly less than the UPB of the loans subject to the repurchase requests primarily because many of these requests will likely be satisfied by reimbursement of our realized credit losses by seller/servicers, instead of repurchase of loans at their UPB. Some of these requests also may be rescinded in the course of the contractual appeal process. Based on our historical loss experience and the fact that many of these loans are covered by credit enhancements (*e.g.*, mortgage insurance), we expect the actual

*Freddie Mac*

credit losses experienced by us should we fail to collect on these repurchase requests will also be less than the UPB of the loans.

Repurchase requests related to mortgage insurance rescission and claim denial tend to be outstanding longer than other repurchase requests. Of the total amount of repurchase requests outstanding at both March 31, 2012 and December 31, 2011, approximately $1.2 billion were issued due to mortgage insurance rescission or mortgage insurance claim denial. Our actual credit losses could increase should the mortgage insurance coverage not be reinstated and we fail to collect on these repurchase requests.

During 2010 and 2009, we entered into agreements with certain of our seller/servicers to release specified loans from certain repurchase obligations in exchange for one-time cash payments. As of March 31, 2012, loans totaling $155.8 billion in UPB, representing 9% of our single-family credit guarantee portfolio, were subject to such negotiated agreements. In a memorandum to the FHFA Office of Inspector General dated September 19, 2011, FHFA stated that in 2011 it had "suspended certain future repurchase agreements with seller/servicers concerning their repurchase obligations pending the outcome" of a review by Freddie Mac of its loan sampling methodology. We did not enter into any agreements with seller/servicers concerning release of their repurchase obligations during 2011 or the first quarter of 2012. During the first quarter of 2012, we revised our loan sampling methodology for 2012. Our methodology in 2012 expands the coverage of our loan reviews as compared to our prior sampling methodology and may result in higher levels of repurchase requests. We are continuing to discuss our loan sampling methodology with FHFA. We cannot predict when this process will be completed or whether or when FHFA will terminate or revise its suspension with respect to our entering into agreements concerning repurchase obligations with seller/servicers. It is possible that our loan sampling methodology could further change in ways that further increase our repurchase request volumes with our seller/servicers.

We meet with our larger seller/servicers with deficiencies identified during our performing loan sampling to help ensure they make appropriate changes to their underwriting processes. In addition, for all of our largest seller/servicers, we actively manage the current quality of loan originations by providing monthly written and oral communications regarding loan defect rates and the drivers of those defects as identified in our performing loan quality control sampling reviews. If necessary, we work with seller/servicers to develop an appropriate plan of corrective action. Our contracts with some seller/servicers give us the right to levy certain compensatory fees when mortgage loans delivered to us fail to meet our aggregate loan quality metrics.

Our estimate of recoveries from seller/servicer repurchase obligations is considered in our allowance for loan losses as of March 31, 2012 and December 31, 2011; however, our actual recoveries may be different than our estimates. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2011 Annual Report for further information. We believe we have appropriately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at March 31, 2012 and December 31, 2011; however, our actual losses may exceed our estimates.

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top three single-family loan servicers, Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A. serviced approximately 26%, 12%, and 11%, respectively, of our single-family mortgage loans as of March 31, 2012, and together serviced approximately 49% of our single-family mortgage loans. Because we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, our business and financial results could be adversely affected. We also continue to be adversely affected by delays in the foreclosure process. See "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" in our 2011 Annual Report and "LEGISLATIVE AND REGULATORY MATTERS — Developments Concerning Single-Family Servicing Practices."

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loan workout efforts, including under the MHA Program and the recent servicing alignment initiative, and therefore, we also have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans. We significantly revised our monitoring program for servicer performance during 2011. In March 2012, we announced changes to our monitoring program in order to provide for the assessment of certain fees to compensate us for deficiencies in servicer performance. These fees will go into effect on June 1, 2012 and September 1, 2012.

*Multifamily Mortgage Seller/Servicers*

We are exposed to certain institutional credit risks arising from the potential non-performance by our multifamily mortgage servicers and our multifamily lenders, or customers. A significant portion of our multifamily mortgage loans are serviced by several large multifamily servicers. As of March 31, 2012, our top three multifamily servicers, Berkadia Commercial Mortgage LLC, CBRE Capital Markets, Inc., and Wells Fargo Bank, N.A., each serviced more than 10% of our multifamily mortgage portfolio, and together serviced approximately 40% of our multifamily mortgage portfolio. We acquire a significant portion of our multifamily purchase volume from several large customers. For the three months ended March 31, 2012, our top multifamily seller, CBRE Capital Markets, Inc., accounted for 26% of our multifamily purchase volume. Our top 10 multifamily lenders represented an aggregate of approximately 87% of our multifamily purchase volume for the three months ended March 31, 2012.

*Mortgage Insurers*

We have institutional credit risk relating to the potential insolvency of, or non-performance by, mortgage insurers that insure single-family mortgages we purchase or guarantee. As a guarantor, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligations to reimburse us for claims. If any of our mortgage insurers that provide credit enhancement fail to fulfill their obligation, we could experience increased credit losses.

As part of the estimate of our loan loss reserves, we evaluate the recovery and collectability related to mortgage insurance policies for mortgage loans that we hold on our consolidated balance sheets as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities or covered by other guarantee commitments. We also evaluate the collectability of outstanding receivables from these counterparties related to outstanding and unpaid claims. We believe that many of our mortgage insurers are not sufficiently capitalized to withstand the stress of the current weak economic environment. Additionally, a number of our mortgage insurers have exceeded risk to capital ratios required by their state insurance regulators. In many cases, such states have issued waivers to allow the companies to continue writing new business in their states. Most waivers are temporary in duration or contain other conditions that the companies may be unable to continue to meet due to their weakened condition or other factors. Given the difficulties in the mortgage insurance industry, we believe it is likely that other mortgage insurers may exceed their regulatory capital limit in the future. As a result of these and other factors, we reduced our estimates of recovery associated with the expected amount of our claims for several of these insurers in determining our allowance for loan losses associated with our single-family loans on our consolidated balance sheets at March 31, 2012 and December 31, 2011.

The table below summarizes our exposure to mortgage insurers as of March 31, 2012. In the event that a mortgage insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses resulting from such failure. Our most significant exposure to these insurers is through primary mortgage insurance, and, as of March 31, 2012, we had primary mortgage insurance coverage on loans that represent approximately 11% of the UPB of our single-family credit guarantee portfolio.

**Table 31 — Mortgage Insurance by Counterparty**

| | | | As of March 31, 2012 | | |
| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | Primary Insurance[2] | Pool Insurance[2] | Coverage Outstanding[3] |
|---|---|---|---|---|---|
| | | | | (in billions) | |
| Mortgage Guaranty Insurance Corporation (MGIC) . . . . . . . . . . . | B | Negative | $ 46.0 | $23.1 | $11.8 |
| Radian Guaranty Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | B | Negative | 35.8 | 6.6 | 9.9 |
| Genworth Mortgage Insurance Corporation . . . . . . . . . . . . . . . . . | B | Negative | 28.6 | 0.8 | 7.2 |
| United Guaranty Residential Insurance Co. . . . . . . . . . . . . . . . . . | BBB | Stable | 28.7 | 0.2 | 7.1 |
| PMI Mortgage Insurance Co. (PMI)[4] . . . . . . . . . . . . . . . . . . . . | CCC– | Negative | 22.5 | 0.8 | 5.7 |
| Republic Mortgage Insurance Company (RMIC)[5] . . . . . . . . . . . | Not Rated | N/A | 18.2 | 1.7 | 4.6 |
| Triad Guaranty Insurance Corp (Triad)[6] . . . . . . . . . . . . . . . . . | Not Rated | N/A | 7.7 | 0.5 | 1.9 |
| CMG Mortgage Insurance Co. . . . . . . . . . . . . . . . . . . . . . . . . . . | BBB | Negative | 3.0 | 0.1 | 0.7 |
| Essent Guaranty, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Not Rated | N/A | 1.3 | — | 0.3 |
| Total  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | $191.8 | $33.8 | $49.2 |

(1) Represents the rating and exposure for the corporate entity to which we have the greatest exposure. Coverage amounts may include coverage provided by consolidated affiliates and subsidiaries of the counterparty. Latest rating available as of April 23, 2012. Represents the lower of S&P and Moody's credit ratings and outlooks stated in terms of the S&P equivalent.

(2) Represents the amount of UPB at the end of the period for our single-family credit guarantee portfolio covered by the respective insurance type. These amounts are based on our gross coverage without regard to netting of coverage that may exist to the extent an affected mortgage is covered under both types of insurance. See "Table 4.5 — Recourse and Other Forms of Credit Protection" in "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further information.

(3) Represents the remaining aggregate contractual limit for reimbursement of losses under policies of both primary and pool insurance. These amounts are based on our gross coverage without regard to netting of coverage that may exist to the extent an affected mortgage is covered under both types of insurance.

(4) In October 2011, PMI began paying valid claims 50% in cash and 50% in deferred payment obligations under order of its state regulator.

(5) In January 2012, RMIC began paying valid claims 50% in cash and 50% in deferred payment obligations under order of its state regulator.

(6) In June 2009, Triad began paying valid claims 60% in cash and 40% in deferred payment obligations under order of its state regulator.

We received proceeds of $491 million and $587 million during the three months ended March 31, 2012 and 2011, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers, net of associated reserves, of $1.0 billion as of both March 31, 2012 and December 31, 2011.

The UPB of single-family loans covered by pool insurance declined approximately 15% during the three months ended March 31, 2012, primarily due to prepayments and other liquidation events. We did not purchase pool insurance on single-family loans during the three months ended March 31, 2012. In recent periods, we also reached the maximum limit of recovery on certain pool insurance policies.

Based on information we have received from MGIC, we understand that MGIC may challenge our current and future claims under certain of their pool insurance policies. We believe that our pool insurance policies with MGIC provide us with the right to obtain recoveries for losses up to the aggregate limit indicated in the table above. However, MGIC's interpretation of these policies would result in claims coverage approximately $0.6 billion lower than the amount of coverage outstanding set forth in the table above. This difference may increase, but we do not expect it to exceed approximately $0.7 billion.

In August 2011, we suspended PMI and its affiliates and RMIC and its affiliates as approved mortgage insurers, due to adverse developments concerning the companies. As a result, loans insured by either company (except relief refinance loans with pre-existing insurance) are ineligible for sale to Freddie Mac. Both PMI and RMIC recently instituted partial claim payment plans, under which claim payments will be made 50% in cash, with the remaining amount deferred. We and FHFA are in discussions with the state regulators of PMI and RMIC concerning future payments of our claims. It is not yet clear how the state regulators of PMI and RMIC will administer their respective deferred payment plans. In addition, to date, the state regulator has not allowed Triad to begin paying its deferred payment obligations, and it is uncertain when or if Triad will be permitted to do so. If Triad, PMI, and RMIC do not pay their deferred payment obligations, we would lose a significant portion of the coverage from these counterparties shown in the table above.

In addition to Triad, RMIC, and PMI, we believe that certain other of our mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as those claims emerge. In the future, we believe our mortgage insurance exposure will likely be concentrated among a smaller number of counterparties.

_Bond Insurers_

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering certain of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. Bond insurance exposes us to the risk that the bond insurer will be unable to satisfy claims.

_Freddie Mac_

The table below presents our coverage amounts of bond insurance, including secondary coverage, for the non-agency mortgage-related securities we hold. In the event a bond insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses related to such a failure.

**Table 32 — Bond Insurance by Counterparty**

| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | As of March 31, 2012 | |
| | | | Coverage Outstanding[2] | Percent of Total[2] |
| --- | --- | --- | --- | --- |
| | | | (dollars in billions) | |
| Ambac Assurance Corporation (Ambac)[3] | Not Rated | N/A | $ 4.2 | 45% |
| Financial Guaranty Insurance Company (FGIC)[3] | Not Rated | N/A | 1.7 | 18 |
| MBIA Insurance Corp. | B– | Under Review | 1.3 | 13 |
| Assured Guaranty Municipal Corp. | AA– | Negative | 1.1 | 11 |
| National Public Finance Guarantee Corp. | BBB | Negative | 1.1 | 12 |
| Syncora Guarantee Inc.[3] | CC | Developing | 0.1 | 1 |
| Radian Guaranty Inc. (Radian) | B | Negative | <0.1 | <1 |
| Total | | | $ 9.5 | 100% |

(1) Represents the rating and exposure for the corporate entity to which we have the greatest exposure, which in some cases is a holding company. Coverage amounts may include coverage provided by consolidated affiliates and subsidiaries of the counterparty. Latest ratings available as of April 23, 2012. Represents the lower of S&P and Moody's credit ratings stated in terms of the S&P equivalent.

(2) Represents the remaining contractual limit for reimbursement of losses, including lost interest and other expenses, on non-agency mortgage-related securities.

(3) Ambac, FGIC, and Syncora Guarantee Inc. are currently operating under regulatory supervision.

We monitor the financial strength of our bond insurers in accordance with our risk management policies. Some of our larger bond insurers are in runoff mode where no new business is being written. We expect to receive substantially less than full payment of our claims from several of our bond insurers, including Ambac and FGIC, due to adverse developments concerning these companies. Ambac and FGIC are currently not paying any of their claims. We believe that we will likely receive substantially less than full payment of our claims from some of our other bond insurers, because we believe they also lack sufficient ability to fully meet all of their expected lifetime claims-paying obligations to us as such claims emerge. In the event one or more of our other bond insurers were to become subject to a regulatory order or insolvency proceeding, our ability to recover certain unrealized losses on our mortgage-related securities would be negatively impacted. We considered our expectations regarding our bond insurers' ability to meet their obligations in making our impairment determinations at March 31, 2012 and December 31, 2011. See "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-For-Sale Securities" for additional information regarding impairment losses on securities covered by bond insurers.

*Cash and Other Investments Counterparties*

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily major financial institutions and the Federal Reserve Bank. As of March 31, 2012 and December 31, 2011, there were $60.7 billion and $68.5 billion, respectively, of cash and other non-mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information on counterparty credit ratings and concentrations within our cash and other investments.

*Derivative Counterparties*

We use exchange-traded derivatives and OTC derivatives and are exposed to institutional credit risk with respect to both types of derivatives. We are an active user of exchange-traded derivatives, such as Treasury and Eurodollar futures, and are required to post initial and maintenance margin with our clearing firm in connection with such transactions. The posting of this margin exposes us to institutional credit risk in the event that our clearing firm or the exchange's clearinghouse fail to meet their obligations. However, the use of exchange-traded derivatives lessens our institutional credit risk exposure to individual counterparties because a central counterparty is substituted for individual counterparties, and changes in the value of open exchange-traded contracts are settled daily via payments made through the financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk to individual counterparties because transactions are executed and settled directly between us and each counterparty, exposing us to potential losses if a counterparty fails to meet its contractual obligations. When our net position with a counterparty in OTC derivatives subject to a master netting agreement has a market value above zero (*i.e.*, it is an asset reported as

*Freddie Mac*

derivative assets, net on our consolidated balance sheets), the counterparty is obligated to deliver collateral in the form of cash, securities, or a combination of both, in an amount equal to that market value (less a small unsecured "threshold" amount) as necessary to satisfy its net obligation to us under the master agreement.

All of our OTC derivative counterparties are major financial institutions and are experienced participants in the OTC derivatives market. A large number of OTC derivative counterparties had credit ratings of A+, A, or A− as of April 23, 2012. We require counterparties with such credit ratings to post collateral if our net exposure to them on derivative contracts exceeds $1 million. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information.

The relative concentration of our derivative exposure among our primary derivative counterparties remains high. This concentration has increased significantly since 2008 primarily due to industry consolidation and the failure or weakening of certain counterparties, and could further increase. The table below summarizes our exposure to our derivative counterparties, which represents the net positive fair value of derivative contracts, related accrued interest and collateral held by us from our counterparties, after netting by counterparty as applicable (*i.e.*, net amounts due to us under derivative contracts which are recorded as derivative assets). In addition, we have derivative liabilities where we post collateral to counterparties. Pursuant to certain collateral agreements we have with derivative counterparties, the amount of collateral that we are required to post is based on the credit rating of our long-term senior unsecured debt securities from S&P or Moody's. The lowering or withdrawal of our credit rating by S&P or Moody's may increase our obligation to post collateral, depending on the amount of the counterparty's exposure to Freddie Mac with respect to the derivative transactions. At March 31, 2012, our collateral posted exceeded our collateral held. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Derivative Assets and Liabilities, Net" and "Table 25 — Derivative Fair Values and Maturities" for a reconciliation of fair value to the amounts presented on our consolidated balance sheets as of March 31, 2012, which includes both cash collateral held and posted by us, net.

**Table 33 — Derivative Counterparty Credit Exposure**

|  | | As of March 31, 2012 | | | | |
|---|---|---|---|---|---|---|
| Rating[1] | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
|  | | (dollars in millions) | | | | |
| AA– . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | $ 71,261 | $ 499 | $ 36 | 5.5 | $10 million or less |
| A+ . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | 307,792 | 1,668 | 25 | 6.2 | $1 million or less |
| A . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | 268,535 | 135 | 96 | 5.8 | $1 million or less |
| A– . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 42,942 | — | — | 6.4 | $1 million or less |
| Subtotal[7] . . . . . . . . . . . . . . . . . . . . | 19 | 690,530 | 2,302 | 157 | 6.0 | |
| Futures and clearinghouse-settled derivatives . . . . . . . . . . . . . . . . . . . . | | 44,581 | 2 | 2 | | |
| Commitments . . . . . . . . . . . . . . . . . . | | 22,298 | 22 | 22 | | |
| Swap guarantee derivatives . . . . . . . . . . | | 3,631 | — | — | | |
| Other derivatives[8] . . . . . . . . . . . . . . . | | 15,703 | 1 | 1 | | |
| Total derivatives . . . . . . . . . . . . . . . . | | $776,743 | $2,327 | $182 | | |

|  | | As of December 31, 2011 | | | | |
|---|---|---|---|---|---|---|
| Rating[1] | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
|  | | (dollars in millions) | | | | |
| AA– . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | $ 73,277 | $ 536 | $ 19 | 5.0 | $10 million or less |
| A+ . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | 337,013 | 2,538 | 1 | 5.8 | $1 million or less |
| A . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 208,416 | 12 | 51 | 6.2 | $1 million or less |
| A– . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 89,284 | — | — | 5.5 | $1 million or less |
| Subtotal[7] . . . . . . . . . . . . . . . . . . . . | 18 | 707,990 | 3,086 | 71 | 5.8 | |
| Futures and clearinghouse-settled derivatives . . . . . . . . . . . . . . . . . . . . | | 43,831 | 8 | 8 | | |
| Commitments . . . . . . . . . . . . . . . . . . | | 14,318 | 38 | 38 | | |
| Swap guarantee derivatives . . . . . . . . . . | | 3,621 | — | — | | |
| Other derivatives[8] . . . . . . . . . . . . . . . | | 18,489 | 1 | 1 | | |
| Total derivatives . . . . . . . . . . . . . . . . | | $788,249 | $3,133 | $118 | | |

(1) We use the lower of S&P and Moody's ratings to manage collateral requirements. In this table, the Moody's rating of the legal entity is stated in terms of the S&P equivalent.
(2) Based on legal entities.
(3) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged.
(4) For each counterparty, this amount includes derivatives with a positive fair value (recorded as derivative assets, net), including the related accrued interest receivable/payable, when applicable. For counterparties included in the subtotal, positions are shown netted at the counterparty level including accrued interest receivable/payable and trade/settle fees.
(5) Calculated as Total Exposure at Fair Value less cash collateral held as determined at the counterparty level. Includes amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level. For derivatives settled through an exchange or clearinghouse, excludes consideration of maintenance margin posted by our counterparty.
(6) Counterparties are required to post collateral when their exposure exceeds agreed-upon collateral posting thresholds. These thresholds are typically based on the counterparty's credit rating and are individually negotiated.
(7) Consists of OTC derivative agreements for interest-rate swaps, option-based derivatives (excluding certain written options), foreign-currency swaps, and purchased interest rate caps.
(8) Consists primarily of certain written options, and certain credit derivatives. Written options do not present counterparty credit exposure, because we receive a one-time up-front premium in exchange for giving the holder the right to execute a contract under specified terms, which generally puts us in a liability position.

Over time, our exposure to individual counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps varies depending on changes in fair values, which are affected by changes in period-end interest rates, the implied volatility of interest rates, foreign-currency exchange rates, and the amount of derivatives held. If all of our counterparties for these derivatives had defaulted simultaneously on March 31, 2012, the combined amount of our uncollateralized and overcollateralized exposure to these counterparties, or our maximum loss for accounting purposes after applying netting agreements and collateral, would have been approximately $157 million. Our similar exposure as of December 31, 2011 was $71 million. Four counterparties each accounted for greater than 10% and collectively accounted for 83% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at March 31, 2012. These counterparties were BNP Paribas, Deutsche Bank, A.G., Royal Bank of Scotland, and UBS AG., all of which were rated "A" or above by S&P as of April 23, 2012.

Approximately 97% of our counterparty credit exposure for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps was collateralized at March 31, 2012 (excluding amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level). The remaining exposure was primarily due to exposure amounts below the applicable counterparty collateral posting threshold,

as well as market movements during the time period between when a derivative was marked to fair value and the date we received the related collateral. In some instances, these market movements result in us having provided collateral that has fair value in excess of our obligation, which represents our overcollateralization exposure. Collateral is typically transferred within one business day based on the values of the related derivatives.

In the event a derivative counterparty defaults, our economic loss may be higher than the uncollateralized exposure of our derivatives if we are not able to replace the defaulted derivatives in a timely and cost-effective fashion. We could also incur economic loss if the collateral held by us cannot be liquidated at prices that are sufficient to recover the amount of such exposure. We monitor the risk that our uncollateralized exposure to each of our OTC counterparties for interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps will increase under certain adverse market conditions by performing daily market stress tests. These tests, which involve significant management judgment, evaluate the potential additional uncollateralized exposure we would have to each of these derivative counterparties on OTC derivatives contracts assuming certain changes in the level and implied volatility of interest rates and certain changes in foreign currency exchange rates over a brief time period. Our actual exposure could vary significantly from amounts forecasted by these tests.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives for accounting purposes, was $22 million and $38 million at March 31, 2012 and December 31, 2011, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis in an effort to ensure that they continue to meet our internal risk-management standards.

### Selected European Sovereign and Non-Sovereign Exposures

The sovereign debt of Spain, Italy, Ireland, Portugal, and Greece (which we refer to herein as the "troubled European countries") and the credit status of financial institutions with significant exposure to the troubled European countries has been adversely impacted due to weaknesses in the economic and fiscal situations of those countries. In recent periods, Moody's and S&P downgraded a number of European countries, including Italy, Spain, and Portugal. We are monitoring our exposures to these countries and institutions.

As of March 31, 2012, we did not hold any debt issued by the governments of the troubled European countries and did not hold any financial instruments entered into with sovereign governments in those countries. As of that date, we also did not hold any debt issued by corporations or financial institutions domiciled in the troubled European countries and did not hold any other financial instruments entered into with corporations or financial institutions domiciled in those countries. For purposes of this discussion, we consider an entity to be domiciled in a country if its parent entity is headquartered in that country.

Our derivative portfolio and cash and other investments portfolio counterparties include a number of major European and non-European financial institutions. Many of these institutions operate in Europe, and we believe that all of these financial institutions have direct or indirect exposure to the troubled European countries. For many of these institutions, their direct and indirect exposures to the troubled European countries change on a daily basis. We monitor our major counterparties' exposures to the troubled European countries, and adjust our exposures and risk limits to individual counterparties accordingly. Our exposures to derivative portfolio and cash and other investments portfolio counterparties are described in "Derivative Counterparties," "Cash and Other Investments Counterparties" and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

We took a number of actions in 2011 designed to reduce our exposures to certain derivative portfolio and cash and other investments portfolio counterparties due to their exposure to the troubled European countries, including substantially reducing our derivative exposure limits, our limits on the amount of unsecured overnight deposits, and our limits for asset-backed commercial paper. For certain repurchase counterparties, we reduced the credit limit and restricted the term of such transactions to overnight. We also ceased investing in prime money funds that could hold substantial amounts of non-U.S. sovereign debt.

It is possible that continued adverse developments in Europe could significantly impact our counterparties that have direct or indirect exposure to the troubled European countries. In turn, this could adversely affect their ability to meet their obligations to us. For more information, see "RISK FACTORS — Competitive and Market Risks — *We depend on our institutional counterparties to provide services that are critical to our business, and our results of operations or*

*financial condition may be adversely affected if one or more of our institutional counterparties do not meet their obligations to us"* in our 2011 Annual Report.

### Mortgage Credit Risk

We are exposed to mortgage credit risk principally in our single-family credit guarantee and multifamily mortgage portfolios because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment. We are also exposed to mortgage credit risk related to our investments in non-Freddie Mac mortgage-related securities. All mortgages that we purchase or guarantee have an inherent risk of default. For information about our holdings of these securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities.*"

#### Single-Family Mortgage Credit Risk

Single-family mortgage credit risk is primarily influenced by the credit profile of the borrower of the mortgage loan (*e.g.*, credit score, credit history, and monthly income relative to debt payments), documentation level, the number of borrowers, the features of the mortgage itself, the purpose of the mortgage, occupancy type, property type, the LTV ratio, and local and regional economic conditions, including home prices and unemployment rates. Through our delegated underwriting process, single-family mortgage loans and the borrowers' ability to repay the loans are evaluated using several critical risk characteristics, including, but not limited to, the borrower's credit score and credit history, the borrower's monthly income relative to debt payments, the original LTV ratio, the type of mortgage product, and the occupancy type of the loan.

In the first quarter of 2012, we continued our efforts to build value for the industry and build the infrastructure for a future housing finance system. These efforts include the implementation of the UMDP which provides us with the ability to collect additional data that we believe will improve our risk management practices. The UMDP creates standard terms and definitions to be used throughout the industry and establishes standard reporting protocols. The UMDP is a key building block in developing a future secondary mortgage market. In the first quarter of 2012, we completed a key milestone of the UMDP with the launch of the Uniform Collateral Data Portal for the electronic submission of appraisal reports for conventional mortgages. FHFA also directed us and Fannie Mae to discuss harmonizing our seller/servicer contracts.

As part of our quality control process, after our purchase of the loans, we review the underwriting documentation for a sample of loans for compliance with our contractual standards. The most common underwriting deficiencies found in our reviews during 2011 were related to insufficient income and inadequate or missing documentation to support borrower qualification. The next most common deficiency was inaccurate data entered into Loan Prospector, our automated underwriting system. We are continuing to perform quality control sampling for loans we purchased in 2011 and have not yet compiled our results.

For loans with identified underwriting deficiencies, we may require immediate repurchase or allow performing loans to remain in our portfolio subject to our continued right to issue a repurchase request to the seller/servicers, depending on the facts and circumstances. Our right to request repurchase by seller/servicers is intended to protect us against deficiencies in underwriting by our seller/servicers. While this protection is intended to reduce our mortgage credit risk, it increases our institutional risk exposure to seller/servicers. See "*Institutional Credit Risk — Single-Family Mortgage Seller/Servicers*" for further information on repurchase requests.

Conditions in the mortgage market improved in certain geographical areas but continued to remain challenging during the first quarter of 2012. Most single-family mortgage loans, especially those originated from 2005 through 2008, have been affected by the compounding pressures on household wealth caused by significant declines in home values that began in 2006 and the ongoing weak employment environment. As of March 31, 2012 and December 31, 2011, the serious delinquency rate for loans originated in 2005 through 2008 in our single-family credit guarantee portfolio was 8.93% and 8.75%, respectively, whereas the serious delinquency rate for loans originated in 2009 through 2011 was 0.34% and 0.30%, respectively. Our serious delinquency rates remained high in the first quarter of 2012 compared to historical levels, as discussed in "Credit Performance — Delinquencies." The UPB of our single-family non-performing loans remained at high levels during the first quarter of 2012.

*Characteristics of the Single-Family Credit Guarantee Portfolio*

The average UPB of loans in our single-family credit guarantee portfolio was approximately $151,000 at both March 31, 2012 and December 31, 2011. We purchased or guaranteed approximately 491,000 and 461,000 single-family loans totaling $105.1 billion and $97.6 billion of UPB during the first quarters of 2012 and 2011, respectively. Our single-family credit guarantee portfolio predominately consists of first-lien, fixed-rate mortgage loans secured by the borrower's primary residence. Our guarantees related to second-lien mortgage loans in the single-family credit guarantee portfolio are insignificant.

The percentage of home purchase loans in our loan acquisition volume continued to remain at low levels and refinance activity remained high during the first quarter of 2012. Approximately 95% of the single-family mortgages we purchased in the first quarter of 2012 were fixed-rate amortizing mortgages, based on UPB. Approximately 87% of the single-family mortgages we purchased in the first quarter of 2012 were refinance mortgages, and approximately 31% of these refinance mortgages were relief refinance mortgages, based on UPB.

The table below provides additional characteristics of single-family mortgage loans purchased during the first quarters of 2012 and 2011, and of our single-family credit guarantee portfolio at March 31, 2012 and December 31, 2011.

**Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio[1]**

| | Purchases During the Three Months Ended March 31, | | Portfolio Balance at[2] | |
| --- | --- | --- | --- | --- |
| | 2012 | 2011 | March 31, 2012 | December 31, 2011 |
| **Original LTV Ratio Range[3][4]** | | | | |
| 60% and below | 33% | 33% | 23% | 23% |
| Above 60% to 70% | 18 | 18 | 15 | 16 |
| Above 70% to 80% | 40 | 42 | 42 | 42 |
| Above 80% to 90% | 5 | 4 | 10 | 9 |
| Above 90% to 100% | 4 | 3 | 8 | 8 |
| Above 100% | <1 | <1 | 2 | 2 |
| Total | 100% | 100% | 100% | 100% |
| Weighted average original LTV ratio | 66% | 66% | 72% | 72% |
| **Estimated Current LTV Ratio Range[5]** | | | | |
| 60% and below | | | 25% | 25% |
| Above 60% to 70% | | | 12 | 12 |
| Above 70% to 80% | | | 18 | 18 |
| Above 80% to 90% | | | 15 | 15 |
| Above 90% to 100% | | | 10 | 10 |
| Above 100% to 110% | | | 6 | 6 |
| Above 110% to 120% | | | 4 | 4 |
| Above 120% | | | 10 | 10 |
| Total | | | 100% | 100% |
| Weighted average estimated current LTV ratio: | | | | |
| Relief refinance mortgages[6] | | | 80% | 79% |
| All other mortgages | | | 80% | 80% |
| Total mortgages | | | 80% | 80% |
| **Credit Score[3][7]** | | | | |
| 740 and above | 78% | 74% | 55% | 55% |
| 700 to 739 | 15 | 18 | 21 | 21 |
| 660 to 699 | 6 | 7 | 14 | 14 |
| 620 to 659 | 1 | 1 | 7 | 7 |
| Less than 620 | <1 | <1 | 3 | 3 |
| Total | 100% | 100% | 100% | 100% |
| Weighted average credit score: | | | | |
| Relief refinance mortgages[6] | 743 | 745 | 743 | 744 |
| All other mortgages | 763 | 758 | 735 | 734 |
| Total mortgages | 758 | 754 | 736 | 735 |
| **Loan Purpose** | | | | |
| Purchase | 13% | 15% | 29% | 30% |
| Cash-out refinance | 16 | 19 | 26 | 27 |
| Other refinance[8] | 71 | 66 | 45 | 43 |
| Total | 100% | 100% | 100% | 100% |
| **Property Type** | | | | |
| Detached/townhome[9] | 95% | 94% | 92% | 92% |
| Condo/Co-op | 5 | 6 | 8 | 8 |
| Total | 100% | 100% | 100% | 100% |
| **Occupancy Type** | | | | |
| Primary residence | 92% | 92% | 91% | 91% |
| Second/vacation home | 4 | 4 | 5 | 5 |
| Investment | 4 | 4 | 4 | 4 |
| Total | 100% | 100% | 100% | 100% |

(1) Purchases and ending balances are based on the UPB of the single-family credit guarantee portfolio. Other Guarantee Transactions with ending balances of $2 billion at March 31, 2012 and December 31, 2011, are excluded from portfolio balance data since these securities are backed by non-Freddie Mac issued securities for which the loan characteristics data was not available.

(2) Includes loans acquired under our relief refinance initiative, which began in 2009.

(3) Purchases columns exclude mortgage loans acquired under our relief refinance initiative, unless otherwise noted. See "Table 37 — Single-Family Refinance Loan Volume" for further information on the LTV ratios of these loans.

(4) Original LTV ratios are calculated as the amount of the mortgage we guarantee including the credit-enhanced portion, divided by the lesser of the appraised value of the property at the time of mortgage origination or the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation because we generally do not receive data about them. The existence of a second lien mortgage reduces the borrower's equity in the home and, therefore, can increase the risk of default.

(5) Current LTV ratios are management estimates, which are updated on a monthly basis. Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination. Estimated current LTV ratio range is not applicable to purchase activity, and excludes any secondary financing by third parties.

(6) Relief refinance mortgages of all LTV ratios comprised approximately 13% and 11% of our single-family credit guarantee portfolio by UPB as of March 31, 2012 and December 31, 2011, respectively.

(7) Credit score data is based on FICO scores. Although we obtain updated credit information on certain borrowers after the origination of a mortgage, such as those borrowers seeking a modification, the scores presented in this table represent the credit score of the borrower at the time of loan origination and may not be indicative of borrowers' creditworthiness at March 31, 2012. Excludes less than 1% of loans in the portfolio because the FICO scores at origination were not available at March 31, 2012.

(8) Other refinance transactions include: (a) refinance mortgages with "no cash-out" to the borrower; and (b) refinance mortgages for which the delivery data provided was not sufficient for us to determine whether the mortgage was a cash-out or a no cash-out refinance transaction.

(9) Includes manufactured housing and homes within planned unit development communities. The UPB of manufactured housing mortgage loans purchased during the three months ended March 31, 2012 and 2011, was $139 million and $123 million, respectively.

As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or sell the property for an amount at or above the balance of the outstanding mortgage loan. Based on our historical experience, there is an increase in borrower default risk as LTV ratios increase, particularly for loans with LTV ratios above 80%. The UPB of mortgages in our single-family credit guarantee portfolio with estimated current LTV ratios greater than 100% was 20% of the total at both March 31, 2012 and December 31, 2011, and the serious delinquency rate for these loans was 12.6% and 12.8%, respectively. Due to declines in home prices since 2006, we estimate that as of March 31, 2012 and December 31, 2011, approximately 50% and 49%, respectively, of the loans originated in 2005 through 2008 that remained in our single-family credit guarantee portfolio as of those dates had current LTV ratios greater than 100%. In recent years, loans with current LTV ratios greater than 100% have contributed disproportionately to our credit losses.

A second lien mortgage reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of both March 31, 2012 and December 31, 2011, approximately 15% of loans in our single-family credit guarantee portfolio had second lien financing by third parties at the time of origination of the first mortgage, and we estimate that these loans comprised 17% of our seriously delinquent loans at both dates, based on UPB. However, borrowers are free to obtain second lien financing after origination and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages.

Attribute Combinations

Certain combinations of loan characteristics often can indicate a higher degree of credit risk. For example, single-family mortgages with both high LTV ratios and borrowers who have lower credit scores typically experience higher rates of serious delinquency and default. We estimate that there were $11.2 billion and $11.1 billion at March 31, 2012 and December 31, 2011, respectively, of loans in our single-family credit guarantee portfolio with both original LTV ratios greater than 90% and FICO scores less than 620 at the time of loan origination. Certain mortgage product types, including interest-only or option ARM loans, that have additional higher risk characteristics, such as lower credit scores or higher LTV ratios, will also have a higher risk of default than those same products without these characteristics. See "Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for information about certain attribute combinations of single-family mortgage loans.

*Single-Family Mortgage Product Types*

Product mix affects the credit risk profile of our total mortgage portfolio. The primary mortgage products in our single-family credit guarantee portfolio are first lien, fixed-rate mortgage loans. In general, 15-year amortizing fixed-rate mortgages exhibit the lowest default rate among the types of mortgage loans we securitize and purchase, due to the accelerated rate of principal amortization on these mortgages and the credit profiles of borrowers who seek and qualify for them. In a rising interest rate environment, balloon/reset and ARM borrowers typically default at a higher rate than fixed-rate borrowers. However, in recent years, during which interest rates have generally remained relatively low, our delinquency and default rates on adjustable-rate and balloon/reset mortgage loans continue to be as high as, or higher than, those on fixed-rate loans because these borrowers also have been affected by declining housing and economic conditions and/or had other higher-risk characteristics. Interest-only and option ARM loans are higher-risk mortgage products based on the features of these types of loans. See "*Other Categories of Single-Family Mortgage Loans*" below for additional information on higher-risk mortgages in our single-family credit guarantee portfolio.

In recent periods, we experienced a high volume of loan modifications, as troubled borrowers were able to take advantage of the various programs that we offered. The majority of our loan modifications result in new terms that include predetermined interest rates for the remaining term of the loan. For example, our HAMP loan modifications result in an initial below-market interest rate that after five years gradually adjusts to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate products for presentation within this Form 10-Q and elsewhere in our reporting even though they have a rate adjustment provision because the future rates are determined at the time of modification rather than at a subsequent date.

The following paragraphs provide information on the interest-only, option ARM, and conforming jumbo loans in our single-family credit guarantee portfolio. Interest-only and option ARM loans have experienced significantly higher serious delinquency rates than fixed-rate amortizing mortgage products.

Interest-Only Loans

Interest-only loans have an initial period during which the borrower pays only interest, and at a specified date the monthly payment increases to begin reflecting repayment of principal. Interest-only loans represented approximately 4% of the UPB of our single-family credit guarantee portfolio at both March 31, 2012 and December 31, 2011. We fully discontinued purchasing such loans on September 1, 2010.

Option ARM Loans

Most option ARM loans have initial periods during which the borrower has various options as to the amount of each monthly payment, until a specified date, when the terms are recast. At both March 31, 2012 and December 31, 2011, option ARM loans represented less than 1% of the UPB of our single-family credit guarantee portfolio. Included in this exposure was $7.1 billion and $7.3 billion of option ARM securities underlying certain of our Other Guarantee Transactions at March 31, 2012 and December 31, 2011, respectively. While we have not categorized these option ARM securities as either subprime or Alt-A securities for presentation within this Form 10-Q and elsewhere in our reporting, they could exhibit similar credit performance to collateral identified as subprime or Alt-A. We have not purchased option ARM loans in our single-family credit guarantee portfolio since 2007. For information on our exposure to option ARM loans through our holdings of non-agency mortgage-related securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Conforming Jumbo Loans

We purchased $8.6 billion and $7.3 billion of conforming jumbo loans during the first quarters of 2012 and 2011, respectively. The UPB of conforming jumbo loans in our single-family credit guarantee portfolio as of March 31, 2012 and December 31, 2011 was $52.5 billion and $49.8 billion, respectively, or 3% of the UPB of our single-family credit guarantee portfolio at both dates. The average size of these loans was approximately $541,000 and $545,000 at March 31, 2012 and December 31, 2011, respectively. For loans originated after September 30, 2011, conforming jumbo loans on a one-family residence have UPB at origination that is greater than $417,000 and up to $625,500 in certain "high-cost" areas. See "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments*" in our 2011 Annual Report for further information on the conforming loan limits.

*Other Categories of Single-Family Mortgage Loans*

While we have classified certain loans as subprime or Alt-A for purposes of the discussion below and elsewhere in this Form 10-Q, there is no universally accepted definition of subprime or Alt-A, and our classification of such loans may differ from those used by other companies. For example, some financial institutions may use FICO scores to delineate certain residential mortgages as subprime. In addition, we do not rely primarily on these loan classifications to evaluate the credit risk exposure relating to such loans in our single-family credit guarantee portfolio. For a definition of the subprime and Alt-A single-family loans and securities in this Form 10-Q, see "GLOSSARY."

Subprime Loans

Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see "*Higher Risk Loans in the Single-Family Credit Guarantee Portfolio*" and "Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for further information). In addition, we estimate that approximately $2.2 billion and $2.3 billion of security collateral underlying our Other Guarantee Transactions at March 31, 2012 and December 31, 2011, respectively, were identified as subprime based on information provided to us when we entered into these transactions.

We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions. At March 31, 2012 and December 31, 2011, we held $47.9 billion and $49.0 billion, respectively, in UPB of non-agency mortgage-related securities backed by subprime loans. These securities were structured to provide credit enhancements, and 6% and 7% of these securities were investment grade at March 31, 2012 and December 31, 2011, respectively. The credit performance of loans underlying these securities has deteriorated significantly since 2008 and further deteriorated during the first quarter of 2012. For more information on our exposure to subprime mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Alt-A Loans

Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. The UPB of Alt-A loans in our single-family credit guarantee portfolio declined to $89.4 billion as of March 31, 2012 from $94.3 billion as of December 31, 2011. The UPB of our Alt-A loans declined in the first quarter of 2012 primarily due to refinancing into other mortgage products, foreclosure transfers, and other liquidation events. As of March 31, 2012, for Alt-A loans in our single-family credit guarantee portfolio, the average FICO score at origination was 717. Although Alt-A mortgage loans comprised approximately 5% of our single-family credit guarantee portfolio as of March 31, 2012, these loans represented approximately 24% of our credit losses during the first quarter of 2012.

Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. In the event we purchase a refinance mortgage in one of these programs and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. From the time the relief refinance initiative began in 2009 to March 31, 2012, we purchased approximately $16.7 billion of relief refinance mortgages that were previously categorized as Alt-A loans in our portfolio, including $1.4 billion during the first quarter of 2012.

We also hold investments in non-agency mortgage-related securities backed by single-family Alt-A loans. At March 31, 2012 and December 31, 2011, we held investments of $16.3 billion and $16.8 billion, respectively, of non-agency mortgage-related securities backed by Alt-A and other mortgage loans and 15% of these securities were categorized as investment grade at both dates. The credit performance of loans underlying these securities has deteriorated significantly since 2008 and experienced further deterioration during the first quarter of 2012. We categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. For more information on our exposure to Alt-A mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Higher-Risk Loans in the Single-Family Credit Guarantee Portfolio

The table below presents information about certain categories of single-family mortgage loans within our single-family credit guarantee portfolio that we believe have certain higher-risk characteristics. These loans include categories based on product type and borrower characteristics present at origination. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%).

**Table 35 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio[1]**

| | As of March 31, 2012 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | (dollars in billions) | | | |
| Loans with one or more specified characteristics | $342.2 | 105% | 7.3% | 9.0% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 89.4 | 107 | 9.4 | 11.8 |
| Interest-only[6] | 67.3 | 120 | 0.2 | 17.2 |
| Option ARM[7] | 8.1 | 117 | 6.1 | 19.6 |
| Original LTV ratio greater than 90%, non-HARP mortgages[8] | 105.2 | 107 | 8.4 | 8.3 |
| Original LTV ratio greater than 90%, HARP mortgages[8] | 70.0 | 105 | 0.1 | 1.3 |
| Lower FICO scores at origination (less than 620)[8] | 54.4 | 93 | 13.8 | 12.6 |

| | As of December 31, 2011 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | (dollars in billions) | | | |
| Loans with one or more specified characteristics | $342.9 | 105% | 7.2% | 9.3% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 94.3 | 107 | 8.8 | 11.9 |
| Interest-only[6] | 72.0 | 120 | 0.2 | 17.6 |
| Option ARM[7] | 8.4 | 119 | 5.5 | 20.5 |
| Original LTV ratio greater than 90%, non-HARP mortgages[8] | 107.9 | 108 | 8.1 | 8.5 |
| Original LTV ratio greater than 90%, HARP mortgages[8] | 59.3 | 104 | 0.1 | 1.3 |
| Lower FICO scores at origination (less than 620)[8] | 55.6 | 93 | 13.4 | 12.9 |

(1) Categories are not additive and a single loan may be included in multiple categories if more than one characteristic is associated with the loan. Loans with a combination of these characteristics will have an even higher risk of default than those with an individual characteristic.

(2) See endnote (5) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of current LTV ratios.

(3) Represents the percentage of loans based on loan count in our single-family credit guarantee portfolio that have been modified under agreement with the borrower, including those with no changes in the interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan. Excludes loans underlying certain Other Guarantee Transactions for which data was not available.

(4) See "Credit Performance — Delinquencies" for further information about our reported serious delinquency rates.

(5) Loans within the Alt-A category continue to remain in that category following modification, even though the borrower may have provided full documentation of assets and income to complete the modification.

(6) The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post-modification), primarily due to delays in processing.

(7) Loans within the option ARM category continue to remain in that category following modification, even though the modified loan no longer provides for optional payment provisions.

(8) See endnotes (4) and (7) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios and our presentation of FICO scores, respectively.

A significant portion of the loans in the higher-risk categories presented in the table above were originated in 2005 through 2008. Except for HARP loans with LTV ratios greater than 90%, we purchased a limited amount of loans in the higher-risk categories presented above since the beginning of 2009, and have fully discontinued purchases of Alt-A (effective March 1, 2009), interest-only (effective September 1, 2010), and option ARM (since 2007) loans. The UPB of loans originated in 2005 to 2008 within our single-family credit guarantee portfolio, which have a higher composition of loans with higher-risk characteristics, continues to decline primarily due to repayments and other liquidations, including completed foreclosure alternatives and foreclosure transfers. We currently expect that, over time, the replacement (other than through relief refinance activity) of the 2005 to 2008 vintages should positively impact the serious delinquency rates and credit-related expenses of our single-family credit guarantee portfolio. However, the rate at which this replacement is occurring remains slow, primarily due to low volumes of home purchase mortgage originations and delays in the foreclosure process. For the first quarter of 2012, loans originated in 2005 through 2008 in our single-family credit guarantee portfolio comprised approximately 88% of our credit losses.

Loans within one or more of the higher-risk categories presented in the table above comprised approximately 20% of our single-family credit guarantee portfolio as of both March 31, 2012 and December 31, 2011. The total UPB of loans in our single-family credit guarantee portfolio with one or more of these characteristics declined slightly to $342.2 billion as of March 31, 2012 from $342.9 billion as of December 31, 2011. This decline was principally due to repayments and other liquidations, including completed foreclosure alternatives and foreclosure transfers, but was substantially offset by increases in loans with original LTV ratios greater than 90% due to significant relief refinance mortgage activity during the first quarter of 2012. The serious delinquency rates associated with loans with one or more of the above characteristics declined to 9.0% as of March 31, 2012 from 9.3% as of December 31, 2011.

*Freddie Mac*

*Credit Enhancements*

The portfolio information below excludes our holdings of non-Freddie Mac mortgage-related securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities*" for credit enhancement and other information about our investments in non-Freddie Mac mortgage-related securities.

Our charter requires that single-family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests. However, as discussed below, under HARP, we allow eligible borrowers who have mortgages with high current LTV ratios to refinance their mortgages without obtaining new mortgage insurance in excess of what was already in place. Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. In addition, for some mortgage loans, we elect to share the default risk by transferring a portion of that risk to various third parties through a variety of other credit enhancements. Our credit losses could increase if an entity that provides credit enhancement fails to fulfill its obligation, as this would reduce the amount of our recoveries.

At March 31, 2012 and December 31, 2011, our credit-enhanced mortgages represented 13% and 14%, respectively, of our single-family credit guarantee portfolio, excluding those backing Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative. Freddie Mac securities backed by Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative are excluded because we consider the incremental credit risk to which we are exposed to be insignificant.

We recognized recoveries (excluding reimbursements for our expenses) of $515 million and $684 million that reduced our charge-offs of single-family loans during the three months ended March 31, 2012 and 2011, respectively. These amounts include $298 million and $435 million during the three months ended March 31, 2012 and 2011, respectively, in recognized recoveries associated with our primary and pool mortgage insurance policies. We recognized additional recoveries associated with our primary and pool mortgage insurance policies that reduced our single-family REO operations expenses by $23 million and $86 million for the three months ended March 31, 2012 and 2011, respectively. During the three months ended March 31, 2012 and 2011, the percentage of our single-family loan purchases with credit enhancement coverage was lower than in periods before 2009, primarily as a result of high refinance activity. Refinance loans (other than relief refinance mortgages) typically have lower LTV ratios, and are more likely to have an LTV ratio below 80% and not require credit protection as specified in our charter. In addition, we have been purchasing significant amounts of relief refinance mortgages. These mortgages allow for the refinance of existing loans guaranteed by us under terms such that we may not have mortgage insurance for some or all of the UPB of the mortgage in excess of 80% of the value of the property.

See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Credit Enhancements*" in our 2011 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for additional information about credit protection and other forms of credit enhancements covering loans in our single-family credit guarantee portfolio. See "Institutional Credit Risk" for information about our counterparties that provide credit enhancement on loans in our single-family credit guarantee portfolio.

*Single-Family Loan Workouts and the MHA Program*

Loan workout activities are a key component of our loss mitigation strategy for managing and resolving troubled assets and lowering credit losses. Our loan workouts consist of: (a) forbearance agreements; (b) repayment plans; (c) loan modifications; and (d) foreclosure alternatives (*e.g.*, short sales or deed in lieu of foreclosure transactions). Our single-family loss mitigation strategy emphasizes early intervention by servicers in delinquent mortgages and provides alternatives to foreclosure. Other single-family loss mitigation activities include providing our single-family servicers with default management tools designed to help them manage non-performing loans more effectively and to assist borrowers in maintaining home ownership where possible, or facilitate foreclosure alternatives when continued homeownership is not an option. See "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Loss Mitigation and Loan Workout Activities*" in our 2011 Annual Report for a general description of our loan workouts.

Loan workouts are intended to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by reducing or eliminating a portion of the costs related to foreclosed properties and avoiding the additional credit losses that likely would be incurred in a REO sale. While we incur costs in the short term to execute our loan workout initiatives, we believe that, overall, these initiatives could reduce our ultimate credit losses over the long term. During the three months ended March 31, 2012, we helped approximately 40,000 borrowers either stay in their homes or sell their properties and avoid foreclosures through our various workout programs, including HAMP, and we completed approximately 29,000 foreclosures. HAMP and our new non-HAMP standard loan modification

are important components of our loan workout program and have many similar features, including the initial incentive fees paid to servicers upon completion of a modification.

Our seller/servicers have a significant role in servicing loans in our single-family credit guarantee portfolio, which includes an active role in our loss mitigation efforts. Therefore, a decline in their performance could impact the overall quality of our credit performance (including through missed opportunities for mortgage modifications), which could adversely affect our financial condition or results of operations and have significant impacts on our ability to mitigate credit losses. The risk of such a decline in performance remains high.

The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts, and set market standards. Participation in the MHA Program is an integral part of our mission of providing stability to the housing market. Through our participation in this program, we help borrowers maintain home ownership. Some of the key initiatives of this program include HAMP and HARP, which are discussed below.

Home Affordable Modification Program

HAMP commits U.S. government, Freddie Mac and Fannie Mae funds to help eligible homeowners avoid foreclosures and keep their homes through mortgage modifications, where possible. Under this program, we offer loan modifications to financially struggling homeowners with mortgages on their primary residences that reduce the monthly principal and interest payments on their mortgages. HAMP requires that each borrower complete a trial period during which the borrower will make monthly payments based on the estimated amount of the modification payments. Trial periods are required for at least three months. After the final trial-period payment is received by our servicer and the borrower has provided necessary documentation, the borrower and servicer will enter into the modification. We bear the costs of these activities, including the cost of any monthly payment reductions. HAMP applies to loans originated on or before January 1, 2009.

On January 27, 2012, Treasury announced enhancements to HAMP, including extending the end date to December 31, 2013, expanding the program's eligibility criteria for modifications, increasing incentives paid to investors who engage in principal reduction, and extending to the GSEs the opportunity to receive investor incentives for principal reduction. Treasury has not yet published details about the incentives that will be available to the GSEs. FHFA announced that the GSEs will extend their use of HAMP until December 31, 2013, and continue to offer the standard modification under the servicing alignment initiative. FHFA noted that Treasury's expanded eligibility criteria for HAMP modifications are consistent with our standard non-HAMP modification.

FHFA announced that it has been asked to consider new HAMP incentives available to the GSEs for principal reduction. FHFA previously released an analysis concluding that principal forgiveness does not provide benefits that are greater than principal forbearance as a loss mitigation tool. FHFA stated that its assessment of the investor incentives now being offered by Treasury will follow its previous analysis, including consideration of the eligible universe, operational costs to implement such changes, and potential borrower incentive effects.

The table below presents the number of single-family loans that completed modification or were in trial periods under HAMP as of March 31, 2012 and December 31, 2011.

### Table 36 — Single-Family Home Affordable Modification Program Volume[1]

| | As of March 31, 2012 | | As of December 31, 2011 | |
|---|---|---|---|---|
| | Amount[2] | Number of Loans | Amount[2] | Number of Loans |
| | (dollars in millions) | | | |
| Completed HAMP modifications[3]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $35,011 | 158,688 | $33,681 | 152,519 |
| Loans in the HAMP trial period. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 2,359 | 11,038 | $ 2,790 | 12,802 |

(1) Based on information reported by our servicers to the MHA Program administrator.
(2) For loans in the HAMP trial period, this reflects the loan balance prior to modification. For completed HAMP modifications, the amount represents the balance of loans after modification under HAMP.
(3) Amounts presented represent completed HAMP modifications with effective dates since our implementation of HAMP in 2009 through March 31, 2012 and December 31, 2011, respectively.

As of March 31, 2012, the borrower's monthly payment was reduced on average by an estimated $565, which amounts to an average of $6,785 per year, and a total of $1.1 billion in annual reductions for all of our completed HAMP modifications (these amounts are calculated by multiplying the number of completed modifications by the average reduction in monthly payment, and have not been adjusted to reflect the actual performance of the loans following modification).

Approximately 32% of our loans in the HAMP trial period as of March 31, 2012 have been in the trial period for more than the minimum duration of three months. Based on information provided by the MHA Program administrator, the average length of the trial period for loans in the program as of March 31, 2012 was five months. When a borrower's HAMP trial period is cancelled, the loan is considered for our other workout activities. For information about the percentage of completed loan modifications that remained current, see "Table 39 — Quarterly Percentages of Modified Single-Family Loans — Current and Performing."

HAMP is one modification option for single-family loans, but we also have completed a large volume of modifications through our non-HAMP loan modification initiatives.

The costs we incur related to HAMP have been, and will likely continue to be, significant. We paid $46 million of servicer incentives during the first quarter of 2012, as compared to $39 million of such incentives during the first quarter of 2011. As of March 31, 2012, we accrued $79 million for both initial and recurring servicer incentives not yet due. We paid $30 million of borrower incentives during the first quarter of 2012, as compared to $21 million of these incentives during the first quarter of 2011. As of March 31, 2012, we accrued $63 million for borrower incentives not yet due. We also have the potential to incur additional servicer incentives and borrower incentives as long as the borrower remains current on a loan modified under HAMP. See "MD&A — RISK MANAGEMENT— Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program*" in our 2011 Annual Report for additional information about the costs associated with HAMP.

Servicing Alignment Initiative and Non-HAMP Standard Modifications

Under the direction of FHFA, we recently implemented a new set of standards for servicing non-performing loans owned or guaranteed by Freddie Mac that aligns with standards for loans owned or guaranteed by Fannie Mae. The servicing alignment initiative provides for consistent ongoing processes for non-HAMP loan modifications. We believe that the servicing alignment initiative will ultimately: (a) change, among other things, the way servicers communicate and work with troubled borrowers; (b) bring greater consistency and accountability to the servicing industry; and (c) help more distressed homeowners avoid foreclosure. We provided standards to our servicers under this initiative that require they initiate earlier and more frequent communication with delinquent borrowers, employ consistent requirements for collecting documents from borrowers, and follow consistent timelines for responding to borrowers, and consistent timelines for processing foreclosures. These standards are expected to result in greater alignment of servicer processes for both HAMP and most non-HAMP workouts.

Under these new servicing standards, we will pay incentives to servicers that exceed certain performance standards with respect to servicing delinquent loans. We will also assess compensatory fees from servicers if they do not achieve a minimum performance benchmark with respect to servicing delinquent loans. These incentives may result in our payment of increased fees to our seller/servicers, the cost of which may be at least partially mitigated by the compensatory fees paid to us by our servicers that do not perform as required.

As part of the servicing alignment initiative, we have implemented a new non-HAMP standard loan modification initiative. This standard modification replaced our previous non-HAMP modification initiative beginning January 1, 2012. The standard modification requires a three-month trial period. Servicers were permitted to begin offering standard modification trial period plans with effective dates on or after October 1, 2011. As of March 31, 2012, approximately 400 borrowers had completed this type of modification with aggregate UPB of $78 million, and approximately 5,000 borrowers were in the modification trial period. We experienced a decline in completed modification volume in the first quarter of 2012 and expect continued relatively low volumes in the second quarter of 2012, below what otherwise would be expected, as servicers transition to the new standard modification initiative and borrowers complete the trial period. We expect to complete a significant number of these non-HAMP standard loan modifications in the future and the costs we incur related to these modifications will likely be significant. See "MD&A — RISK MANAGEMENT— Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program*" in our 2011 Annual Report for information about the costs associated with our non-HAMP standard loan modifications. While we incur costs in the short-term to execute our non-HAMP standard modifications, we believe that, overall, our non-HAMP standard modifications could reduce our ultimate credit losses over the long-term.

Home Affordable Refinance Program and Relief Refinance Mortgage Initiative

Our relief refinance mortgage initiative, including HARP (which is the portion of our relief refinance initiative for loans with LTV ratios above 80%), gives eligible homeowners (whose monthly payments are current) with existing loans that are owned or guaranteed by us an opportunity to refinance into loans with more affordable monthly payments and/or

fixed-rate terms. HARP is targeted at borrowers with current LTV ratios above 80%; however, our relief refinance initiative also allows borrowers with LTV ratios of 80% and below to participate.

A number of FHFA-directed changes to HARP were announced in late 2011. These changes are intended to allow more borrowers to participate in the program and benefit from refinancing their home mortgages. These revisions to HARP will help to reduce our exposure to credit risk to the extent that HARP refinancing strengthens the borrowers' capacity to repay their mortgages and, in some cases, reduce the payments under their mortgages. These revisions to HARP could also reduce our credit losses to the extent that the revised program contributes to bringing stability to the housing market. However, we may face greater exposure to credit and other losses on these HARP loans because we are not requiring lenders to provide us with certain representations and warranties on the refinanced HARP loans. As of March 31, 2012, we had purchased approximately $5 billion in UPB of HARP loans with reduced representations and warranties. We could also experience declines in the fair values of certain agency security investments classified as available-for-sale or trading resulting from changes in expectations of mortgage prepayments and lower net interest yields over time on other mortgage-related investments.

We began purchasing HARP loans under the expanded program in January 2012. However, since industry participation in HARP is not mandatory, implementation schedules have varied as individual lenders, mortgage insurers and other market participants modify their processes. It is too early to estimate how many eligible borrowers are likely to refinance under the revised program. There can be no assurance that the benefits from the revised program will exceed our costs.

Our underwriting procedures for relief refinance mortgages are limited in many cases, and such procedures generally do not include all of the changes in underwriting standards we have implemented in the last several years. As a result, relief refinance mortgages generally reflect many of the credit risk attributes of the original loans. However, borrower participation in our relief refinance mortgage initiative may help reduce our exposure to credit risk in cases where borrower payments under their mortgages are reduced, thereby strengthening the borrowers' potential to make their mortgage payments.

Over time, relief refinance mortgages with LTV ratios above 80% (*i.e.*, HARP loans) may not perform as well as other refinance mortgages because the continued high LTV ratios of these loans increase the probability of default. Our relief refinance initiative is only for qualifying mortgage loans that we already hold or guarantee. We continue to bear the credit risk for refinanced loans under this program, to the extent that such risk is not covered by existing mortgage insurance or other existing credit enhancements.

The table below presents the composition of our purchases of refinanced single-family loans during the three months ended March 31, 2012 and 2011.

**Table 37 — Single-Family Refinance Loan Volume[1]**

| | Three Months Ended March 31, 2012 | | | Three Months Ended March 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Amount | Number of Loans | Percent[2] | Amount | Number of Loans | Percent[2] |
| | (dollars in millions) | | | | | |
| Relief refinance mortgages: | | | | | | |
| Above 125% LTV ratio | $ 476 | 2,217 | 0.5% | $ — | — | —% |
| Above 105% to 125% LTV ratio | 4,447 | 21,113 | 5.0 | 2,527 | 10,747 | 3.1 |
| Above 80% to 105% LTV ratio | 12,331 | 61,954 | 13.8 | 12,006 | 54,974 | 14.7 |
| 80% and below LTV ratio | 10,218 | 66,824 | 11.5 | 14,573 | 87,025 | 17.8 |
| Total relief refinance mortgages | $27,472 | 152,108 | 30.8% | $29,106 | 152,746 | 35.6% |
| Total refinance loan volume[3] | $89,278 | 416,497 | 100% | $81,757 | 390,008 | 100% |

(1) Consists of all single-family refinance mortgage loans that we either purchased or guaranteed during the period, excluding those associated with other guarantee commitments and Other Guarantee Transactions.
(2) Based on UPB.
(3) Consists of relief refinance mortgages and other refinance mortgages.

Relief refinance mortgages comprised approximately 31% and 36% of our total refinance volume in the first quarter of 2012 and 2011, respectively, based on UPB. Relief refinance mortgages with LTV ratios above 80% represented approximately 16% and 15% of our total single-family credit guarantee portfolio purchases during the three months ended March 31, 2012 and 2011, respectively. Relief refinance mortgages of all LTV ratios comprised approximately 13% and 11% of the UPB in our total single-family credit guarantee portfolio at March 31, 2012 and December 31, 2011, respectively. As of March 31, 2012, the serious delinquency rates for relief refinance loans were as follows: (a) 0.3% for loans with LTV ratios of 80% or less; (b) 0.9% for loans with LTV ratios from 80% to 100%; (c) 1.4% for loans with LTV ratios of more than 100%; and (d) and 0.6% for the total of all relief refinance mortgages.

Loan Workout Volumes and Modification Performance

The table below presents volumes of single-family loan workouts, serious delinquency, and foreclosures for the three months ended March 31, 2012 and 2011.

**Table 38 — Single-Family Loan Workouts, Serious Delinquency, and Foreclosures Volumes[1]**

| | Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | Number of Loans | Loan Balances | Number of Loans | Loan Balances |
| | | (dollars in millions) | | |
|---|---|---|---|---|
| Home retention actions: | | | | |
| Loan modifications | | | | |
| with no change in terms[2] | 446 | $ 82 | 1,265 | $ 219 |
| with term extension | 1,171 | 222 | 5,280 | 961 |
| with reduction of contractual interest rate and, in certain cases, term extension | 8,863 | 1,908 | 22,968 | 5,167 |
| with rate reduction, term extension and principal forbearance | 3,197 | 863 | 5,645 | 1,505 |
| Total loan modifications[3] | 13,677 | 3,075 | 35,158 | 7,852 |
| Repayment plans[4] | 10,575 | 1,477 | 9,099 | 1,286 |
| Forbearance agreements[5] | 3,656 | 692 | 7,678 | 1,526 |
| Total home retention actions | 27,908 | 5,244 | 51,935 | 10,664 |
| Foreclosure alternatives: | | | | |
| Short sale | 12,052 | 2,731 | 10,621 | 2,488 |
| Deed in lieu of foreclosure transactions | 193 | 33 | 85 | 15 |
| Total foreclosure alternatives | 12,245 | 2,764 | 10,706 | 2,503 |
| Total single-family loan workouts | 40,153 | $8,008 | 62,641 | $13,167 |
| Seriously delinquent loan additions | 80,815 | | 97,464 | |
| Single-family foreclosures[6] | 28,954 | | 31,087 | |
| Seriously delinquent loans, at period end | 400,787 | | 436,314 | |

(1) Based on completed actions with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent or effective, such as loans in modification trial periods. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period (see endnote 5).
(2) Under this modification type, past due amounts are added to the principal balance and reamortized based on the original contractual loan terms.
(3) Includes completed loan modifications under HAMP; however, the number of such completions differs from that reported by the MHA Program administrator in part due to differences in the timing of recognizing the completions by us and the administrator.
(4) Represents the number of borrowers as reported by our seller/servicers that have completed the full term of a repayment plan for past due amounts. Excludes the number of borrowers that are actively repaying past due amounts under a repayment plan, which totaled 19,981 and 20,592 borrowers as of March 31, 2012 and 2011, respectively.
(5) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.
(6) Represents the number of our single-family loans that complete foreclosure transfers, including third-party sales at foreclosure auction in which ownership of the property is transferred directly to a third-party rather than to us.

We experienced declines in most home retention actions, particularly loan modifications, in the first quarter of 2012 compared to the first quarter of 2011, primarily due to declines in the number of seriously delinquent loan additions and in borrower participation in HAMP. The implementation of the non-HAMP standard modification also negatively impacted the number of completed modifications in the first quarter of 2012, as servicers have had to transition borrowers to the new modification initiative and borrowers now need to complete a trial period before receiving the final modification. The decline in loan modifications during the first quarter of 2012 is also due to a reduction in the volume of loans transitioning to serious delinquency, compared to the fourth quarter of 2011, which has contributed to a reduction in the inventory of problem loans in our single-family credit guarantee portfolio. Foreclosure alternative volume increased 14% in the first quarter of 2012, compared to the first quarter of 2011, and we expect the volume of foreclosure alternatives to remain high in the remainder of 2012 primarily because we offer incentives to servicers to complete short sales instead of foreclosures. We plan to introduce additional initiatives during the remainder of 2012 designed to help more distressed borrowers avoid foreclosure through short sales and deed in lieu of foreclosure transactions.

The UPB of loans in our single-family credit guarantee portfolio for which we have completed a loan modification increased to $70 billion as of March 31, 2012 from $69 billion as of December 31, 2011. The number of modified loans in our single-family credit guarantee portfolio continued to increase and such loans comprised approximately 3.0% and 2.9% of our single-family credit guarantee portfolio as of March 31, 2012 and December 31, 2011, respectively. The estimated current LTV ratio for all modified loans in our single-family credit guarantee portfolio was 123% and the serious delinquency rate on these loans was 17.1% as of March 31, 2012. Approximately $42 billion in UPB of our

completed loan modifications at March 31, 2012 had provisions for reduced interest rates that remain fixed for the first five years of the modification and then increase at a rate of one percent per year (or such lesser amount as may be needed) until the interest rate has been adjusted to a market rate (determined at the time of the modification).

The table below presents the percentage of modified single-family loans that were current and performing in each of the last eight quarterly periods.

### Table 39 — Quarterly Percentages of Modified Single-Family Loans — Current and Performing[1]

| HAMP loan modifications: | Quarter of Loan Modification Completion[2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4Q 2011 | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 |
| Time since modification- | | | | | | | | |
| 3 to 5 months | 89% | 86% | 87% | 86% | 85% | 82% | 81% | 85% |
| 6 to 8 months | | 84 | 82 | 83 | 82 | 81 | 78 | 81 |
| 9 to 11 months | | | 82 | 79 | 78 | 78 | 79 | 78 |
| 12 to 14 months | | | | 80 | 76 | 76 | 76 | 79 |
| 15 to 17 months | | | | | 76 | 73 | 73 | 76 |
| 18 to 20 months | | | | | | 74 | 71 | 73 |
| 21 to 23 months | | | | | | | 72 | 71 |
| 24 to 26 months | | | | | | | | 72 |

| Non-HAMP loan modifications: | Quarter of Loan Modification Completion[2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4Q 2011 | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 |
| Time since modification- | | | | | | | | |
| 3 to 5 months | 78% | 73% | 76% | 78% | 80% | 77% | 73% | 75% |
| 6 to 8 months | | 70 | 67 | 69 | 71 | 74 | 66 | 65 |
| 9 to 11 months | | | 67 | 63 | 66 | 68 | 65 | 59 |
| 12 to 14 months | | | | 64 | 61 | 64 | 61 | 60 |
| 15 to 17 months | | | | | 63 | 61 | 56 | 56 |
| 18 to 20 months | | | | | | 62 | 54 | 52 |
| 21 to 23 months | | | | | | | 56 | 50 |
| 24 to 26 months | | | | | | | | 52 |

| Total (HAMP and Non-HAMP): | Quarter of Loan Modification Completion[2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4Q 2011 | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 |
| Time since modification- | | | | | | | | |
| 3 to 5 months | 86% | 81% | 83% | 83% | 82% | 80% | 79% | 83% |
| 6 to 8 months | | 79 | 77 | 77 | 76 | 78 | 75 | 78 |
| 9 to 11 months | | | 76 | 73 | 72 | 74 | 75 | 74 |
| 12 to 14 months | | | | 73 | 68 | 71 | 71 | 75 |
| 15 to 17 months | | | | | 69 | 68 | 68 | 72 |
| 18 to 20 months | | | | | | 69 | 66 | 69 |
| 21 to 23 months | | | | | | | 68 | 67 |
| 24 to 26 months | | | | | | | | 68 |

(1) In the first quarter of 2012, we revised this presentation to reflect the percentage of loans that are current and performing (less than one month past due) or have been paid in full. Excludes loans in foreclosure status and loans in modification trial periods. Prior period amounts have been revised to conform to current period presentation.

(2) Loan modifications are recognized as completed in the quarterly period in which the servicer has reported the modification as effective and the agreement has been accepted by us. For loans that have been re-modified (*e.g.*, where a borrower has received a new modification after defaulting on the prior modification) the rates reflect the status of each modification separately. For example, in the case of a remodified loan where the borrower is performing, the previous modification would be presented as being in default in the applicable period.

The redefault rate is the percentage of our modified loans that have become seriously delinquent (*i.e.*, three months or more delinquent or in foreclosure), transitioned to REO, or completed a loss-producing foreclosure alternative. As of March 31, 2012, the redefault rate for all of our single-family loan modifications (including those under HAMP) completed during 2011, 2010 and 2009 was 11%, 21%, and 51%, respectively. Many of the borrowers that received modifications in 2009 were negatively affected by worsening economic conditions, including high unemployment rates during the last several years. As of March 31, 2012, the redefault rate for loans modified under HAMP in 2011, 2010, and 2009 was approximately 8%, 18%, and 20%, respectively. These redefault rates may not be representative of the future performance of modified loans, including those modified under HAMP. We believe the redefault rate for loans modified in the last three years, including those modified under HAMP, is likely to increase, particularly since the housing and economic environments remain challenging.

*Credit Performance*

Delinquencies

We report single-family serious delinquency rate information based on the number of loans that are three monthly payments or more past due or in the process of foreclosure, as reported by our servicers. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as delinquent as long as the

borrower is current under the modified terms. Single-family loans for which the borrower is subject to a forbearance agreement will continue to reflect the past due status of the borrower. To the extent our borrowers participate in the HFA unemployment assistance initiatives and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency.

Our single-family delinquency rates include all single-family loans that we own, that back Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by either Ginnie Mae Certificates or HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancements provided on them by the U.S. government.

Some of our workout and other loss mitigation activities create fluctuations in our delinquency statistics. For example, single-family loans that we report as seriously delinquent before they enter a trial period under HAMP or our new non-HAMP standard modification continue to be reported as seriously delinquent for purposes of our delinquency reporting until the modifications become effective and the loans are removed from delinquent status by our servicers. However, under our previous non-HAMP modifications, the borrower would return to a current payment status sooner, because these modifications did not have trial periods. Consequently, the volume, timing, and type of loan modifications impact our reported serious delinquency rate. In addition, there may be temporary timing differences, or lags, in the reporting of payment status and modification completion due to differing practices of our servicers that can affect our delinquency reporting.

Our serious delinquency rates have been affected by delays, including those due to temporary actions to suspend foreclosure transfers of occupied homes, increases in foreclosure process timeframes, process requirements of HAMP, general constraints on servicer capacity (which affects the rate at which servicers modify or foreclose upon loans), and court backlogs (in states that require a judicial foreclosure process). These delays lengthen the period of time in which loans remain in seriously delinquent status, as the delays extend the time it takes for seriously delinquent loans to be modified, foreclosed upon or otherwise resolved and thus transition out of seriously delinquent status. As a result, we believe our single-family serious delinquency rates were higher in the first quarter of 2012 than they otherwise would have been. As of March 31, 2012 and December 31, 2011, the percentage of seriously delinquent loans that have been delinquent for more than six months was 73% and 70%, respectively.

The table below presents serious delinquency rates for our single-family credit guarantee portfolio.

**Table 40 — Single-Family Serious Delinquency Rates**

| | As of | | | |
|---|---|---|---|---|
| | March 31, 2012 | | December 31, 2011 | |
| | Percentage of Portfolio | Serious Delinquency Rate | Percentage of Portfolio | Serious Delinquency Rate |
| Single-family: | | | | |
| Non-credit-enhanced.................................................... | 87% | 2.80% | 86% | 2.84% |
| Credit-enhanced[1].................................................... | 13 | 8.02 | 14 | 8.03 |
| Total single-family credit guarantee portfolio[2] ............................. | 100% | 3.51 | 100% | 3.58 |

(1) See "Institutional Credit Risk" for information about our counterparties that provide credit enhancement on loans in our single-family credit guarantee portfolio.

(2) As of March 31, 2012 and December 31, 2011, approximately 71% and 68%, respectively, of the single-family loans reported as seriously delinquent were in the process of foreclosure.

Serious delinquency rates of our single-family credit guarantee portfolio declined to 3.51% as of March 31, 2012 from 3.58% as of December 31, 2011. Our serious delinquency rate remains high compared to historical levels due to continued weakness in home prices, persistently high unemployment, extended foreclosure timelines, and continued challenges faced by servicers processing large volumes of problem loans. In addition, our serious delinquency rate was adversely impacted by the decline in the size of our single-family credit guarantee portfolio in the first quarter of 2012 because this rate is calculated on a smaller number of loans at the end of the period.

Serious delinquency rates for interest-only and option ARM products, which together represented approximately 4% of our total single-family credit guarantee portfolio at March 31, 2012, were 17.2% and 19.6%, respectively, as compared with 17.6% and 20.5% at December 31, 2011. Serious delinquency rates of single-family 30-year, fixed rate amortizing loans, a more traditional mortgage product, were approximately 3.9% at both March 31, 2012 and December 31, 2011.

The tables below present serious delinquency rates categorized by borrower and loan characteristics, including geographic region and origination year, which indicate that certain concentrations of loans have been more adversely affected by declines in home prices and weak economic conditions since 2006. In certain states, our single-family serious

delinquency rates have remained persistently high. As of March 31, 2012, single-family loans in Arizona, California, Florida, and Nevada comprised 25% of our single-family credit guarantee portfolio, and the serious delinquency rate of loans in these states was 6.0%. During the three months ended March 31, 2012, we also continued to experience high serious delinquency rates on single-family loans originated between 2005 and 2008. We purchased significant amounts of loans with higher-risk characteristics in those years. In addition, those borrowers are more susceptible to the declines in home prices and weak economic conditions since 2006 than those homeowners that have built up equity in their homes over a longer period of time.

The table below presents credit concentrations for certain loan groups in our single-family credit guarantee portfolio.

## Table 41 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio

| | As of March 31, 2012 | | | | | |
|---|---|---|---|---|---|---|
| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio[1] | Percentage Modified[2] | Serious Delinquency Rate |
| | (dollars in billions) | | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $ 36 | $ 404 | $ 440 | 91% | 4.8% | 6.0% |
| All other states | 53 | 1,235 | 1,288 | 76 | 2.6 | 2.8 |
| Year of origination: | | | | | | |
| 2012 | — | 61 | 61 | 71 | — | — |
| 2011 | — | 281 | 281 | 70 | — | <0.1 |
| 2010 | — | 304 | 304 | 72 | <0.1 | 0.3 |
| 2009 | <1 | 285 | 285 | 73 | 0.1 | 0.6 |
| 2008 | 7 | 103 | 110 | 93 | 4.9 | 5.9 |
| 2007 | 27 | 129 | 156 | 114 | 11.0 | 11.7 |
| 2006 | 24 | 93 | 117 | 112 | 10.0 | 10.9 |
| 2005 | 17 | 115 | 132 | 96 | 5.5 | 6.7 |
| 2004 and prior | 14 | 268 | 282 | 61 | 2.6 | 2.9 |

| | As of December 31, 2011 | | | | | |
|---|---|---|---|---|---|---|
| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio[1] | Percentage Modified[2] | Serious Delinquency Rate |
| | (dollars in billions) | | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $ 38 | $ 406 | $ 444 | 93% | 4.6% | 6.2% |
| All other states | 56 | 1,246 | 1,302 | 75 | 2.5 | 2.9 |
| Year of origination: | | | | | | |
| 2011 | — | 250 | 250 | 70 | — | 0.1 |
| 2010 | — | 324 | 324 | 71 | <0.1 | 0.3 |
| 2009 | <1 | 315 | 315 | 72 | 0.1 | 0.5 |
| 2008 | 7 | 113 | 120 | 92 | 4.4 | 5.7 |
| 2007 | 29 | 138 | 167 | 113 | 10.2 | 11.6 |
| 2006 | 25 | 99 | 124 | 112 | 9.3 | 10.8 |
| 2005 | 18 | 124 | 142 | 96 | 5.1 | 6.5 |
| 2004 and prior | 15 | 289 | 304 | 61 | 2.5 | 2.8 |

| | Three Months Ended March 31, 2012 | | | Three Months Ended March 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Alt-A | Non Alt-A | Total | Alt-A | Non Alt-A | Total |
| | (in millions) | | | (in millions) | | |
| **Credit Losses** | | | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $561 | $1,318 | $1,879 | $737 | $1,247 | $1,984 |
| All other states | 269 | 1,287 | 1,556 | 273 | 969 | 1,242 |
| Year of origination: | | | | | | |
| 2012 | — | — | — | — | — | — |
| 2011 | — | 5 | 5 | — | — | — |
| 2010 | — | 32 | 32 | — | — | — |
| 2009 | — | 58 | 58 | <1 | 32 | 32 |
| 2008 | 27 | 273 | 300 | 28 | 222 | 250 |
| 2007 | 310 | 960 | 1,270 | 404 | 774 | 1,178 |
| 2006 | 294 | 588 | 882 | 364 | 568 | 932 |
| 2005 | 171 | 407 | 578 | 193 | 376 | 569 |
| 2004 and prior | 28 | 282 | 310 | 21 | 244 | 265 |

(1) See endnote (5) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of estimated current LTV ratios.

(2) Represents the percentage of loans, based on loan count, in our single-family credit guarantee portfolio that have been modified under agreement with the borrower, including those with no changes in interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan.

*Freddie Mac*

The table below presents statistics for combinations of certain characteristics of the mortgages in our single-family credit guarantee portfolio as of March 31, 2012 and December 31, 2011.

**Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations**

As of March 31, 2012

| | Current LTV Ratio ≤ 80[1] | | Current LTV Ratio of > 80 to 100[1] | | Current LTV > 100[1] | | Current LTV Ratio All Loans[1] | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
| **By Product Type** | | | | | | | | | |
| **FICO scores < 620:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 0.9% | 7.9% | 0.8% | 12.9% | 1.0% | 23.3% | 2.7% | 17.1% | 13.9% |
| 15- year amortizing fixed-rate | 0.2 | 4.1 | <0.1 | 9.1 | <0.1 | 16.4 | 0.2 | 1.2 | 4.5 |
| ARMs/adjustable rate[4] | 0.1 | 10.4 | <0.1 | 17.0 | <0.1 | 24.9 | 0.1 | 10.2 | 15.0 |
| Interest-only[5] | <0.1 | 14.8 | <0.1 | 22.4 | 0.1 | 34.1 | 0.1 | 0.4 | 29.7 |
| Other[6] | <0.1 | 3.8 | <0.1 | 6.1 | <0.1 | 12.5 | <0.1 | 4.4 | 5.5 |
| Total FICO scores < 620 | 1.2 | 6.9 | 0.8 | 13.0 | 1.1 | 23.5 | 3.1 | 13.8 | 12.6 |
| **FICO scores of 620 to 659:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 2.0 | 5.1 | 1.5 | 8.8 | 1.9 | 18.2 | 5.4 | 11.9 | 10.0 |
| 15- year amortizing fixed-rate | 0.5 | 2.4 | <0.1 | 6.4 | 0.1 | 14.3 | 0.6 | 0.6 | 2.8 |
| ARMs/adjustable rate[4] | 0.1 | 5.4 | 0.1 | 11.0 | 0.2 | 23.1 | 0.4 | 2.1 | 12.2 |
| Interest-only[5] | <0.1 | 10.7 | 0.1 | 17.6 | 0.2 | 30.7 | 0.3 | 0.3 | 26.4 |
| Other[6] | <0.1 | 2.2 | <0.1 | 4.6 | <0.1 | 4.2 | <0.1 | 1.6 | 3.6 |
| Total FICO scores of 620 to 659 | 2.6 | 4.3 | 1.7 | 9.0 | 2.4 | 19.1 | 6.7 | 9.3 | 9.3 |
| **FICO scores of ≥ 660:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 34.7 | 1.0 | 19.9 | 2.4 | 12.5 | 9.2 | 67.1 | 2.9 | 2.8 |
| 15- year amortizing fixed-rate | 13.7 | 0.4 | 1.0 | 1.1 | 0.2 | 5.3 | 14.9 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 2.6 | 1.1 | 0.8 | 4.0 | 0.8 | 14.3 | 4.2 | 0.5 | 4.2 |
| Interest-only[5] | 0.4 | 3.5 | 0.7 | 9.0 | 2.3 | 20.2 | 3.4 | 0.1 | 15.8 |
| Other[6] | <0.1 | 1.8 | <0.1 | 1.5 | 0.1 | 1.9 | 0.1 | 0.5 | 1.8 |
| Total FICO scores ≥ 660 | 51.4 | 0.8 | 22.4 | 2.6 | 15.9 | 10.6 | 89.7 | 2.0 | 2.5 |
| FICO scores not available | 0.3 | 4.8 | 0.1 | 12.2 | 0.1 | 21.7 | 0.5 | 5.7 | 8.9 |
| **All FICO scores:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 37.8 | 1.6 | 22.1 | 3.4 | 15.5 | 11.4 | 75.4 | 4.2 | 3.9 |
| 15- year amortizing fixed-rate | 14.4 | 0.6 | 1.1 | 1.5 | 0.2 | 6.5 | 15.7 | 0.1 | 0.7 |
| ARMs/adjustable rate[4] | 2.8 | 1.7 | 0.9 | 5.2 | 0.9 | 15.9 | 4.6 | 1.0 | 5.1 |
| Interest-only[5] | 0.4 | 4.3 | 0.8 | 10.2 | 2.7 | 21.6 | 3.9 | 0.2 | 17.2 |
| Other[6] | 0.1 | 9.0 | 0.1 | 8.2 | 0.2 | 8.2 | 0.4 | 7.0 | 8.6 |
| Total single-family credit guarantee portfolio[7] | 55.5% | 1.3% | 25.0% | 3.5% | 19.5% | 12.6% | 100.0% | 3.0% | 3.5% |
| **By Region[8]** | | | | | | | | | |
| **FICO scores < 620:** | | | | | | | | | |
| North Central | 0.2% | 6.0% | 0.2% | 10.8% | 0.2% | 18.9% | 0.6% | 13.7% | 11.3% |
| Northeast | 0.4 | 9.2 | 0.2 | 18.7 | 0.2 | 29.4 | 0.8 | 14.7 | 15.0 |
| Southeast | 0.2 | 7.7 | 0.2 | 13.6 | 0.3 | 28.7 | 0.7 | 14.3 | 15.5 |
| Southwest | 0.2 | 5.0 | 0.1 | 10.5 | 0.1 | 18.8 | 0.4 | 9.6 | 7.7 |
| West | 0.2 | 4.5 | 0.1 | 8.9 | 0.3 | 19.1 | 0.6 | 16.7 | 11.5 |
| Total FICO scores < 620 | 1.2 | 6.9 | 0.8 | 13.0 | 1.1 | 23.5 | 3.1 | 13.8 | 12.6 |
| **FICO scores of 620 to 659:** | | | | | | | | | |
| North Central | 0.4 | 3.8 | 0.3 | 7.9 | 0.5 | 14.5 | 1.2 | 8.9 | 8.0 |
| Northeast | 0.8 | 5.8 | 0.5 | 13.0 | 0.4 | 24.2 | 1.7 | 9.4 | 10.6 |
| Southeast | 0.5 | 5.2 | 0.3 | 9.4 | 0.6 | 23.7 | 1.4 | 9.5 | 12.0 |
| Southwest | 0.5 | 3.0 | 0.3 | 7.0 | 0.1 | 13.2 | 0.9 | 6.1 | 4.9 |
| West | 0.4 | 3.0 | 0.3 | 6.8 | 0.8 | 17.0 | 1.5 | 12.4 | 9.6 |
| Total FICO scores of 620 to 659 | 2.6 | 4.3 | 1.7 | 9.0 | 2.4 | 19.1 | 6.7 | 9.3 | 9.3 |
| **FICO scores ≥ 660:** | | | | | | | | | |
| North Central | 8.6 | 0.7 | 4.6 | 2.2 | 2.9 | 7.1 | 16.1 | 1.6 | 1.9 |
| Northeast | 14.9 | 1.0 | 5.7 | 3.9 | 2.1 | 13.1 | 22.7 | 1.7 | 2.4 |
| Southeast | 7.2 | 1.2 | 3.9 | 2.8 | 3.7 | 14.1 | 14.8 | 2.2 | 4.1 |
| Southwest | 7.5 | 0.6 | 2.6 | 1.9 | 0.4 | 6.0 | 10.5 | 0.9 | 1.1 |
| West | 13.2 | 0.5 | 5.6 | 1.7 | 6.8 | 9.9 | 25.6 | 3.0 | 2.9 |
| Total FICO scores ≥ 660 | 51.4 | 0.8 | 22.4 | 2.6 | 15.9 | 10.6 | 89.7 | 2.0 | 2.5 |
| Total FICO scores not available | 0.3 | 4.8 | 0.1 | 12.2 | 0.1 | 21.7 | 0.5 | 5.7 | 8.9 |
| **All FICO scores:** | | | | | | | | | |
| North Central | 9.2 | 1.0 | 5.1 | 3.1 | 3.6 | 9.1 | 17.9 | 2.7 | 2.8 |
| Northeast | 16.3 | 1.6 | 6.4 | 5.3 | 2.7 | 16.3 | 25.4 | 2.8 | 3.5 |
| Southeast | 7.9 | 1.8 | 4.4 | 4.0 | 4.7 | 16.5 | 17.0 | 3.5 | 5.4 |
| Southwest | 8.2 | 1.0 | 3.1 | 3.0 | 0.6 | 9.0 | 11.9 | 1.9 | 1.8 |
| West | 13.9 | 0.7 | 6.0 | 2.2 | 7.9 | 11.0 | 27.8 | 3.9 | 3.5 |
| Total single-family credit guarantee portfolio[7] | 55.5% | 1.3% | 25.0% | 3.5% | 19.5% | 12.6% | 100.0% | 3.0% | 3.5% |

| | As of December 31, 2011 | | | | | | | | |
| | Current LTV Ratio ≤ 80[1] | | Current LTV Ratio of > 80 to 100[1] | | Current LTV > 100[1] | | Current LTV Ratio All Loans | | |
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
|---|---|---|---|---|---|---|---|---|---|
| **By Product Type** | | | | | | | | | |
| **FICO scores < 620:** | | | | | | | | | |
| 20 and 30-year or more amortizing fixed-rate | 0.9% | 8.1% | 0.8% | 13.4% | 1.0% | 23.7% | 2.7% | 16.6% | 14.2% |
| 15-year amortizing fixed-rate | 0.2 | 4.2 | <0.1 | 10.1 | <0.1 | 17.6 | 0.2 | 1.2 | 4.7 |
| ARMs/adjustable rate[4] | 0.1 | 10.8 | <0.1 | 17.2 | <0.1 | 25.4 | 0.1 | 9.8 | 15.4 |
| Interest only[5] | <0.1 | 16.0 | <0.1 | 22.4 | 0.1 | 34.9 | 0.1 | 0.4 | 30.3 |
| Other[6] | <0.1 | 3.6 | <0.1 | 7.4 | 0.1 | 14.1 | 0.1 | 4.2 | 5.6 |
| Total FICO scores < 620 | 1.2 | 7.0 | 0.8 | 13.5 | 1.2 | 24.1 | 3.2 | 13.4 | 12.9 |
| **FICO scores of 620 to 659:** | | | | | | | | | |
| 20 and 30-year or more amortizing fixed-rate | 2.0 | 5.2 | 1.5 | 8.9 | 2.0 | 18.4 | 5.5 | 11.5 | 10.1 |
| 15-year amortizing fixed-rate | 0.6 | 2.5 | <0.1 | 6.1 | <0.1 | 15.1 | 0.6 | 0.6 | 2.8 |
| ARMs/adjustable rate[4] | 0.1 | 5.5 | 0.1 | 11.7 | 0.1 | 23.6 | 0.3 | 2.0 | 12.6 |
| Interest only[5] | <0.1 | 10.4 | 0.1 | 18.6 | 0.3 | 31.7 | 0.4 | 0.3 | 27.2 |
| Other[6] | <0.1 | 2.8 | <0.1 | 4.8 | <0.1 | 5.5 | <0.1 | 1.4 | 4.5 |
| Total FICO scores of 620 to 659 | 2.7 | 4.4 | 1.7 | 9.1 | 2.4 | 19.4 | 6.8 | 8.9 | 9.4 |
| **FICO scores of ≥ 660:** | | | | | | | | | |
| 20 and 30-year or more amortizing fixed-rate | 34.6 | 1.0 | 20.3 | 2.4 | 12.4 | 9.2 | 67.3 | 2.7 | 2.8 |
| 15-year amortizing fixed-rate | 13.1 | 0.4 | 1.0 | 1.1 | 0.2 | 6.0 | 14.3 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 2.5 | 1.1 | 0.8 | 4.3 | 0.8 | 14.8 | 4.1 | 0.5 | 4.5 |
| Interest only[5] | 0.4 | 3.7 | 0.7 | 9.2 | 2.5 | 20.7 | 3.6 | 0.2 | 16.2 |
| Other[6] | <0.1 | 2.0 | <0.1 | 2.0 | 0.1 | 2.0 | 0.1 | 0.5 | 2.0 |
| Total FICO scores ≥ 660 | 50.6 | 0.8 | 22.8 | 2.6 | 16.0 | 10.8 | 89.4 | 1.9 | 2.6 |
| FICO scores not available | 0.3 | 4.8 | 0.2 | 11.9 | 0.1 | 21.4 | 0.6 | 5.5 | 8.9 |
| **All FICO scores:** | | | | | | | | | |
| 20 and 30-year or more amortizing fixed-rate | 37.7 | 1.6 | 22.5 | 3.4 | 15.6 | 11.5 | 75.8 | 4.1 | 3.9 |
| 15-year amortizing fixed-rate | 13.8 | 0.6 | 1.1 | 1.5 | 0.2 | 7.3 | 15.1 | 0.1 | 0.7 |
| ARMs/adjustable rate[4] | 2.7 | 1.8 | 1.0 | 5.5 | 0.9 | 16.4 | 4.6 | 1.0 | 5.5 |
| Interest only[5] | 0.5 | 4.4 | 0.8 | 10.5 | 2.8 | 22.2 | 4.1 | 0.2 | 17.6 |
| Other[6] | 0.1 | 8.9 | 0.1 | 8.4 | 0.2 | 8.4 | 0.4 | 6.8 | 8.6 |
| Total single-family credit guarantee portfolio[7] | 54.8% | 1.3% | 25.5% | 3.6% | 19.7% | 12.8% | 100.0% | 2.9% | 3.6% |
| **By Region[8]** | | | | | | | | | |
| **FICO scores < 620:** | | | | | | | | | |
| North Central | 0.2% | 6.3% | 0.2% | 11.7% | 0.2% | 20.1% | 0.6% | 13.4% | 12.0% |
| Northeast | 0.4 | 9.3 | 0.2 | 19.0 | 0.3 | 28.9 | 0.9 | 14.3 | 14.9 |
| Southeast | 0.2 | 7.9 | 0.2 | 13.9 | 0.3 | 29.5 | 0.7 | 13.9 | 15.9 |
| Southwest | 0.2 | 5.1 | 0.1 | 11.0 | 0.1 | 19.5 | 0.4 | 9.4 | 8.0 |
| West | 0.2 | 4.6 | 0.1 | 9.1 | 0.3 | 19.5 | 0.6 | 16.2 | 11.8 |
| Total FICO scores < 620 | 1.2 | 7.0 | 0.8 | 13.5 | 1.2 | 24.1 | 3.2 | 13.4 | 12.9 |
| **FICO scores of 620 to 659:** | | | | | | | | | |
| North Central | 0.5 | 4.0 | 0.3 | 8.2 | 0.5 | 15.1 | 1.3 | 8.7 | 8.4 |
| Northeast | 0.8 | 5.8 | 0.5 | 12.9 | 0.4 | 23.3 | 1.7 | 9.1 | 10.3 |
| Southeast | 0.5 | 5.2 | 0.3 | 9.5 | 0.6 | 24.1 | 1.4 | 9.1 | 12.2 |
| Southwest | 0.5 | 3.1 | 0.3 | 7.0 | 0.1 | 13.6 | 0.9 | 5.9 | 5.1 |
| West | 0.4 | 3.1 | 0.3 | 6.8 | 0.8 | 17.6 | 1.5 | 12.0 | 10.0 |
| Total FICO scores of 620 to 659 | 2.7 | 4.4 | 1.7 | 9.1 | 2.4 | 19.4 | 6.8 | 8.9 | 9.4 |
| **FICO scores of ≥ 660:** | | | | | | | | | |
| North Central | 8.5 | 0.7 | 4.7 | 2.3 | 2.8 | 7.4 | 16.0 | 1.6 | 2.0 |
| Northeast | 14.9 | 1.0 | 5.7 | 3.9 | 2.0 | 12.6 | 22.6 | 1.6 | 2.3 |
| Southeast | 7.1 | 1.2 | 3.9 | 2.8 | 3.8 | 14.4 | 14.8 | 2.1 | 4.2 |
| Southwest | 7.4 | 0.6 | 2.7 | 2.0 | 0.4 | 6.2 | 10.5 | 0.9 | 1.1 |
| West | 12.7 | 0.5 | 5.8 | 1.7 | 7.0 | 10.1 | 25.5 | 2.9 | 3.0 |
| Total FICO scores ≥ 660 | 50.6 | 0.8 | 22.8 | 2.6 | 16.0 | 10.8 | 89.4 | 1.9 | 2.6 |
| Total FICO scores not available | 0.3 | 4.8 | 0.2 | 11.9 | 0.1 | 21.4 | 0.6 | 5.5 | 8.9 |
| **All FICO scores:** | | | | | | | | | |
| North Central | 9.1 | 1.0 | 5.3 | 3.2 | 3.6 | 9.5 | 18.0 | 2.6 | 2.9 |
| Northeast | 16.1 | 1.6 | 6.4 | 5.5 | 2.7 | 15.8 | 25.2 | 2.7 | 3.4 |
| Southeast | 7.9 | 1.8 | 4.4 | 4.0 | 4.7 | 16.8 | 17.0 | 3.4 | 5.5 |
| Southwest | 8.2 | 1.1 | 3.2 | 3.1 | 0.6 | 9.4 | 12.0 | 1.8 | 1.8 |
| West | 13.5 | 0.7 | 6.2 | 2.1 | 8.1 | 11.3 | 27.8 | 3.8 | 3.6 |
| Total single-family credit guarantee portfolio[7] | 54.8% | 1.3% | 25.5% | 3.6% | 19.7% | 12.8% | 100.0% | 2.9% | 3.6% |

(1) The current LTV ratios are our estimates. See endnote (5) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information.

(2) Based on UPB of the single-family credit guarantee portfolio.

(3) See endnote (2) to "Table 41 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio".

(4) Includes balloon/resets and option ARM mortgage loans.

(5) Includes both fixed rate and adjustable rate loans. The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post-modification), primarily due to delays in processing.

(6) Consist of FHA/VA and other government guaranteed mortgages.

(7) The total of all FICO scores categories may not sum due to the inclusion of loans where FICO scores are not available in the respective totals for all loans. See endnote (7) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information about our presentation of FICO scores.

(8) Presentation with the following regional designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); and Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

The table below presents delinquency and default rate information for loans in our single-family credit guarantee portfolio based on year of origination.

**Table 43 — Single-Family Credit Guarantee Portfolio by Year of Loan Origination**

| Year of Loan Origination | As of March 31, 2012 | | As of December 31, 2011 | |
|---|---|---|---|---|
| | Percentage of Portfolio | Foreclosure and Short Sale Rate[1] | Percentage of Portfolio | Foreclosure and Short Sale Rate[1] |
| 2012 | 4% | —% | N/A | N/A |
| 2011 | 16 | 0.01 | 14% | —% |
| 2010 | 18 | 0.08 | 19 | 0.05 |
| 2009 | 16 | 0.21 | 18 | 0.17 |
| 2008 | 6 | 2.49 | 7 | 2.23 |
| 2007 | 9 | 8.09 | 10 | 7.49 |
| 2006 | 7 | 7.41 | 7 | 6.95 |
| 2005 | 8 | 4.35 | 8 | 4.07 |
| 2000 through 2004 | 16 | 1.08 | 17 | 1.04 |
| Total | 100% | | 100% | |

(1) Calculated for each year of origination as the number of loans that have proceeded to foreclosure transfer or short sale and resulted in a credit loss, excluding any subsequent recoveries during the period from origination to March 31, 2012 and December 31, 2011, respectively, divided by the number of loans in our single-family credit guarantee portfolio originated in that year.

The UPB of loans originated after 2008 comprised 54% of our portfolio as of March 31, 2012, including 13% of our portfolio that were relief refinance mortgages (regardless of LTV ratio). At March 31, 2012, approximately 30% of our single-family credit guarantee portfolio consisted of mortgage loans originated from 2005 through 2008. Loans originated from 2005 through 2008 have experienced higher serious delinquency rates in the earlier years of their terms as compared to our historical experience. We attribute this serious delinquency performance to a number of factors, including: (a) the expansion of credit terms under which loans were underwritten during these years; (b) an increase in the origination and our purchase of interest-only and Alt-A mortgage products in these years; and (c) an environment of persistently high unemployment, decreasing home sales, and broadly declining home prices in the period following the loans' origination. Interest-only and Alt-A products have higher inherent credit risk than traditional fixed-rate mortgage products.

*Multifamily Mortgage Credit Risk*

To manage our multifamily mortgage portfolio credit risk, we focus on several key areas: (a) underwriting standards and quality control process; (b) selling significant portions of credit risk through subordination in our Other Guarantee Transactions; (c) portfolio diversification, particularly by product and geographical area; and (d) portfolio management activities, including loss mitigation and use of credit enhancements. We monitor the loan performance, the underlying properties and a variety of mortgage loan characteristics that may affect the default experience on our multifamily mortgage portfolio, such as the LTV ratio, DSCR, geographic location and loan maturity. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for more information about the loans in our multifamily mortgage portfolio.

The table below provides certain attributes of our multifamily mortgage portfolio at March 31, 2012 and December 31, 2011.

**Table 44 — Multifamily Mortgage Portfolio — by Attribute**

| | UPB at | | Delinquency Rate[1] at | |
|---|---|---|---|---|
| | March 31, 2012 | December 31, 2011 | March 31, 2012 | December 31, 2011 |
| | (dollars in billions) | | | |
| **Original LTV ratio[2]** | | | | |
| Below 75% | $ 81.2 | $ 78.8 | 0.10% | 0.10% |
| 75% to 80% | 31.6 | 30.9 | 0.14 | 0.08 |
| Above 80% | 6.4 | 6.4 | 2.23 | 2.34 |
| Total | $119.2 | $116.1 | 0.23% | 0.22% |
| Weighted average LTV ratio at origination | 70% | 70% | | |
| **Maturity Dates** | | | | |
| 2012 | $ 2.6 | $ 3.0 | 0.44% | 1.35% |
| 2013 | 5.2 | 5.6 | — | — |
| 2014 | 7.5 | 7.6 | 0.38 | 0.03 |
| 2015 | 10.9 | 11.0 | 0.17 | 0.17 |
| 2016 | 13.3 | 13.5 | 0.21 | 0.06 |
| Beyond 2016 | 79.7 | 75.4 | 0.23 | 0.25 |
| Total | $119.2 | $116.1 | 0.23% | 0.22% |
| **Year of Acquisition or Guarantee[3]** | | | | |
| 2004 and prior | $ 11.7 | $ 12.4 | 0.18% | 0.40% |
| 2005 | 7.1 | 7.2 | 0.34 | 0.20 |
| 2006 | 10.5 | 10.8 | 0.46 | 0.25 |
| 2007 | 19.7 | 19.8 | 0.66 | 0.74 |
| 2008 | 20.3 | 20.6 | 0.22 | 0.09 |
| 2009 | 13.5 | 13.8 | — | — |
| 2010 | 12.5 | 12.7 | — | — |
| 2011 | 18.2 | 18.8 | — | — |
| 2012 | 5.7 | N/A | — | N/A |
| Total | $119.2 | $116.1 | 0.23% | 0.22% |
| **Current Loan Size Distribution** | | | | |
| Above $25 million | $ 44.2 | $ 42.8 | 0.12% | 0.06% |
| Above $5 million to $25 million | 65.7 | 64.0 | 0.29 | 0.31 |
| $5 million and below | 9.3 | 9.3 | 0.25 | 0.31 |
| Total | $119.2 | $116.1 | 0.23% | 0.22% |
| **Legal Structure** | | | | |
| Unsecuritized loans | $ 82.4 | $ 82.3 | 0.16% | 0.10% |
| Non-consolidated Freddie Mac mortgage-related securities | 27.2 | 24.2 | 0.45 | 0.64 |
| Other guarantee commitments | 9.6 | 9.6 | 0.18 | 0.18 |
| Total | $119.2 | $116.1 | 0.23% | 0.22% |
| **Credit Enhancement** | | | | |
| Credit-enhanced | $ 34.7 | $ 31.6 | 0.39% | 0.52% |
| Non-credit-enhanced | 84.5 | 84.5 | 0.16 | 0.11 |
| Total | $119.2 | $116.1 | 0.23% | 0.22% |

(1) See "Delinquencies" below for more information about our multifamily delinquency rates.
(2) Original LTV ratios are calculated as the UPB of the mortgage, divided by the lesser of the appraised value of the property at the time of mortgage origination or, except for refinance loans, the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.
(3) Based on either: (a) the year of acquisition, for loans recorded on our consolidated balance sheets; or (b) the year that we issued our guarantee, for the remaining loans in our multifamily mortgage portfolio.

Our multifamily mortgage portfolio consists of product types that are categorized based on loan terms. Multifamily loans may be interest-only or amortizing, fixed or variable rate, or may switch between fixed and variable rate over time. However, our multifamily loans generally have balloon maturities ranging from five to ten years. Amortizing loans reduce our credit exposure over time because the UPB declines with each mortgage payment. Fixed-rate loans may also create less risk for us because the borrower's payments are determined at origination, and, therefore, the risk that the monthly mortgage payment could increase if interest rates rise is eliminated. As of both March 31, 2012 and December 31, 2011, approximately 85% of the multifamily loans on our consolidated balance sheets had fixed interest rates while the remaining loans had variable interest rates.

Because most multifamily loans require a significant lump sum (*i.e.*, balloon) payment of unpaid principal at maturity, the borrower's potential inability to refinance or pay off the loan at maturity is a serious concern for us. Borrowers may be less able to refinance their obligations during periods of rising interest rates, which could lead to default if the borrower is unable to find affordable refinancing. Loan size at origination does not generally indicate the degree of a loan's risk, but it does indicate our potential exposure to default.

We use credit enhancements to mitigate risk of loss on certain multifamily mortgages and housing revenue bonds. For example, we may require credit enhancements during construction or rehabilitation in cases where we commit to purchase or guarantee a permanent loan upon completion and in cases where occupancy has not yet reached a level that produces the operating income that was the basis for underwriting the property.

Our primary business strategy in the multifamily segment is to purchase multifamily mortgage loans for aggregation and then securitization. Currently, our most significant multifamily securitization activity involves our guarantee of the senior tranches of these securitizations in Other Guarantee Transactions. The subordinate tranches, that we do not guarantee, provide credit loss protection to the senior classes that we do guarantee. Subordinated classes are allocated credit losses prior to the senior classes. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections and other forms of credit enhancements covering loans in our multifamily mortgage portfolio as of March 31, 2012 and December 31, 2011.

Although property values increased in recent quarters, they are still below the highs of 2007 and are lower than when many of the loans were originally underwritten, particularly in areas where economic conditions remain weak. As a result, if property values do not continue to improve, borrowers may experience significant difficulty refinancing as their loans approach maturity, which could increase borrower defaults or increase modification volumes. Of the $119.2 billion in UPB of our multifamily mortgage portfolio as of March 31, 2012, approximately 87% will mature in 2015 and beyond.

In certain cases, we may provide short-term loan extensions of up to 12 months for certain borrowers. Modifications of loans (including short-term loan extensions) are performed in an effort to minimize our losses. During the three months ended March 31, 2012, we modified unsecuritized multifamily loans totaling $82 million in UPB, compared with $13 million during the three months ended March 31, 2011. Multifamily unsecuritized loan modifications in the first quarter 2012 included: (a) $14 million in UPB for short-term loan extensions; and (b) $68 million in UPB for other loan modifications. Where we have granted a concession to borrowers experiencing financial difficulties, we account for these loans as TDRs. When we execute a modification classified as a TDR, the loan is then classified as nonperforming for the life of the loan regardless of its delinquency status. At March 31, 2012, we had $848 million in UPB of multifamily loans classified as TDRs on our consolidated balance sheets.

*Delinquencies*

Our multifamily delinquency rates include all multifamily loans that we own, that are collateral for Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancement provided by the U.S. government. We report multifamily delinquency rates based on UPB of mortgage loans that are two monthly payments or more past due or in the process of foreclosure, as reported by our servicers. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as delinquent as long as the borrower is current under the modified terms. In addition, multifamily loans are not counted as delinquent if the borrower has entered into a forbearance agreement and is abiding by the terms of the agreement, whereas single-family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower, if applicable.

Our multifamily mortgage portfolio delinquency rate was 0.23% at March 31, 2012 and 0.22% at December 31, 2011. Our delinquency rate for credit-enhanced loans was 0.39% and 0.52% at March 31, 2012 and December 31, 2011, respectively, and for non-credit-enhanced loans was 0.16% and 0.11% at March 31, 2012 and December 31, 2011, respectively. As of March 31, 2012, approximately one-half of our multifamily loans that were two or more monthly payments past due, measured on a UPB basis, had credit enhancements that we currently believe will mitigate our expected losses on those loans.

Our delinquency rates have remained relatively low compared to other industry participants, which we believe to be, in part, the result of our prudent underwriting standards versus those used by others in the industry. Our delinquency rates for multifamily loans are positively impacted to the extent we have been successful in working with troubled borrowers to modify their loans prior to becoming delinquent or by providing temporary relief through loan modifications, including short-term extensions. The most recent market data available continues to reflect improving national apartment

fundamentals, including decreasing vacancy rates and increasing effective rents. As a result we expect our multifamily delinquency rate to remain relatively low during the remainder of 2012. For further information regarding concentrations in our multifamily mortgage portfolio, including regional geographic composition, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

*Non-Performing Assets*

Non-performing assets consist of single-family and multifamily loans that have undergone a TDR, single-family seriously delinquent loans, multifamily loans that are three or more payments past due or in the process of foreclosure, and REO assets, net. Non-performing assets also include multifamily loans that are deemed impaired based on management judgment. We place non-performing loans on non-accrual status when we believe the collectability of interest and principal on a loan is not reasonably assured, unless the loan is well secured and in the process of collection. When a loan is placed on non-accrual status, any interest income accrued but uncollected is reversed. Thereafter, interest income is recognized only upon receipt of cash payments. We did not accrue interest on any loans three monthly payments or more past due during the three months ended March 31, 2012 and 2011, respectively.

We classify TDRs as those loans where we have granted a concession to a borrower that is experiencing financial difficulties. TDRs remain categorized as non-performing throughout the remaining life of the loan regardless of whether the borrower makes payments which return the loan to a current payment status after modification. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for further information about our TDRs.

The table below provides detail on non-performing loans and REO assets on our consolidated balance sheets and non-performing loans underlying our financial guarantees.

**Table 45 — Non-Performing Assets**[1]

|  | March 31, 2012 | December 31, 2011 | March 31, 2011 |
|---|---|---|---|
|  | (dollars in millions) | | |
| Non-performing mortgage loans — on balance sheet: | | | |
| Single-family TDRs: | | | |
| Reperforming (*i.e.*, less than three monthly payments past due) | $ 46,118 | $ 44,440 | $ 32,205 |
| Seriously delinquent | 12,708 | 11,639 | 3,325 |
| Multifamily TDRs[2] | 848 | 893 | 897 |
| Total TDRs | 59,674 | 56,972 | 36,427 |
| Other non-accrual single-family loans[3] | 59,558 | 63,205 | 78,182 |
| Other non-accrual multifamily loans[4] | 1,782 | 1,819 | 1,874 |
| Total non-performing mortgage loans — on balance sheet | 121,014 | 121,996 | 116,483 |
| Non-performing mortgage loans — off-balance sheet: | | | |
| Single-family loans | 1,215 | 1,230 | 1,371 |
| Multifamily loans | 268 | 246 | 208 |
| Total non-performing mortgage loans — off-balance sheet | 1,483 | 1,476 | 1,579 |
| Real estate owned, net | 5,454 | 5,680 | 6,376 |
| Total non-performing assets | $127,951 | $129,152 | $124,438 |
| Loan loss reserves as a percentage of our non-performing mortgage loans | 31.3% | 32.0% | 33.3% |
| Total non-performing assets as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | 6.8% | 6.8% | 6.4% |

(1) Mortgage loan amounts are based on UPB and REO, net is based on carrying values.
(2) As of March 31, 2012, approximately $822 million in UPB of these loans were current.
(3) Represents loans recognized by us on our consolidated balance sheets, including loans removed from PC trusts due to the borrower's serious delinquency.
(4) Of this amount, $1.7 billion, $1.8 billion, and $1.7 billion of UPB were current at March 31, 2012, December 31, 2011, and March 31, 2011, respectively.

The amount of non-performing assets declined to $128.0 billion as of March 31, 2012, from $129.2 billion as of December 31, 2011, primarily due to a decline in the rate at which loans transitioned into serious delinquency during the first quarter of 2012 combined with continued high levels of foreclosures and REO dispositions. The UPB of loans categorized as TDRs increased to $59.7 billion at March 31, 2012 from $57.0 billion at December 31, 2011, largely due to the significant volume of loan modifications and loans entering a modification trial period during the first quarter of 2012. TDRs during the first quarter of 2012 include HAMP and non-HAMP loan modifications as well as loans in modification trial periods and certain other loss mitigation actions. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report, and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for information about TDRs, including our implementation of an amendment to the accounting

*Freddie Mac*

guidance on classification of loans as TDRs in the third quarter of 2011. We expect our non-performing assets, including loans deemed to be TDRs, to remain at elevated levels for the remainder of 2012.

The table below provides detail by region for REO activity. Our REO activity consists almost entirely of single-family residential properties. Consequently, our regional REO acquisition trends generally follow a pattern that is similar to, but lags, that of regional serious delinquency trends of our single-family credit guarantee portfolio. See "Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for information about regional serious delinquency rates.

### Table 46 — REO Activity by Region[1]

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (number of properties) | |
| **REO Inventory** | | |
| Beginning property inventory | 60,555 | 72,093 |
| Properties acquired by region: | | |
| Northeast | 1,825 | 1,485 |
| Southeast | 7,067 | 4,734 |
| North Central | 7,638 | 6,375 |
| Southwest | 2,770 | 3,113 |
| West | 4,505 | 9,002 |
| Total properties acquired | 23,805 | 24,709 |
| Properties disposed by region: | | |
| Northeast | (1,922) | (2,661) |
| Southeast | (6,287) | (9,214) |
| North Central | (6,837) | (7,292) |
| Southwest | (3,253) | (3,480) |
| West | (6,738) | (8,981) |
| Total properties disposed | (25,037) | (31,628) |
| Ending property inventory | 59,323 | 65,174 |

(1) See endnote (8) to "Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for a description of these regions.

Our REO inventory (measured in number of properties) declined 2% from December 31, 2011 to March 31, 2012 as the volume of single-family REO dispositions exceeded the volume of single-family REO acquisitions. We believe our single-family REO acquisition volume in the first quarter of 2012 has been less than it otherwise would have been due to delays in the single-family foreclosure process, particularly in states that require a judicial foreclosure process. The average length of time for foreclosure of a Freddie Mac loan significantly increased in recent years due to temporary suspensions, delays, and other factors. During the first quarters of 2012 and 2011, the nationwide average for completion of a foreclosure (as measured from the date of the last scheduled payment made by the borrower) on our single-family delinquent loans, excluding those underlying our Other Guarantee Transactions, was 603 days and 456 days, respectively, which included: (a) an average of 770 days and 548 days, respectively, for foreclosures completed in states that require a judicial foreclosure process; and (b) an average of 464 days and 425 days, respectively, for foreclosures completed in states that do not require a judicial foreclosure process. We continue to experience significant variability in the average time for foreclosure by state. For example, during the three months ended March 31, 2012, the average time for completion of foreclosures associated with loans in our single-family credit guarantee portfolio, excluding Other Guarantee Transactions, ranged from 336 days in Wyoming to 1,007 days in Florida. As of March 31, 2012, our serious delinquency rate for the aggregate of those states that require a judicial foreclosure and all other states was 4.37% and 2.62%, respectively, compared to 4.47% and 2.74%, respectively, as of December 31, 2011.

We expect the pace of our REO acquisitions will continue to be affected by delays in the foreclosure process for the remainder of 2012, particularly in states with a judicial foreclosure process. However, we expect the volume of our REO acquisitions will likely remain elevated, as we have a large inventory of seriously delinquent loans in our single-family credit guarantee portfolio. Our single-family REO acquisitions in the first quarter of 2012 were most significant in the states of Florida, Illinois, California, Michigan, and Georgia, which collectively represented 43% of total REO acquisitions based on the number of properties. The states with the most properties in our REO inventory as of March 31, 2012 were Michigan and Illinois, which comprised 12% and 10%, respectively, of total REO property inventory, based on the number of properties.

The percentage of interest-only and Alt-A loans in our single-family credit guarantee portfolio, based on UPB, was approximately 4% and 5%, respectively, at March 31, 2012 and was 8% on a combined basis. The percentage of our REO

acquisitions in the first quarter of 2012 that had been financed by either of these loan types represented approximately 26% of our total REO acquisitions, based on loan amount prior to acquisition.

We are limited in our single-family REO disposition efforts by the capacity of the market to absorb large numbers of foreclosed properties. A significant portion of our REO acquisitions are: (a) located in jurisdictions that require a period of time after foreclosure during which the borrower may reclaim the property; or (b) occupied and we have either retained the tenant under an existing lease or begun the process of eviction. All of these factors resulted in an increase in the aging of our inventory. During the period when the borrower may reclaim the property, or we are completing the eviction process, we are not able to market the property. As of March 31, 2012 and December 31, 2011, approximately 32% and 33%, respectively, of our REO properties were not marketable due to the above conditions. Though it varied significantly in different states, the average holding period of our single-family REO properties was little changed during the first quarter of 2012. Excluding any post-foreclosure period during which borrowers may reclaim a foreclosed property, the average holding period associated with our single-family REO dispositions during the first quarters of 2012 and 2011 was 201 days and 191 days, respectively. As of March 31, 2012 and December 31, 2011, the percentage of our single-family REO property inventory that had been held for sale longer than one year was 6.6% and 7.1%, respectively. We continue to actively market these properties through our established initiatives.

We also have a variety of alternative methods for REO sales that we employ from time to time, as appropriate, including bulk sales and auctions; however, we did not use bulk sales and auction sales represented an insignificant portion of our REO dispositions in the first quarter of 2012. We are continuing to participate in discussions with FHFA and other agencies on new options for sales and rentals of our single-family REO properties. It is too early to determine the impact any potential new initiatives may have on the levels of our REO property inventory, the process for disposing of REO property or our REO operations expense.

### Credit Loss Performance

Many loans that are seriously delinquent, or in foreclosure, result in credit losses. The table below provides detail on our credit loss performance associated with mortgage loans and REO assets on our consolidated balance sheets and underlying our non-consolidated mortgage-related financial guarantees.

**Table 47 — Credit Loss Performance**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (dollars in millions) | |
| REO | | |
| REO balances, net: | | |
| Single-family | $5,333 | $6,261 |
| Multifamily | 121 | 115 |
| Total | $5,454 | $6,376 |
| REO operations (income) expense: | | |
| Single-family | $ 172 | $ 257 |
| Multifamily | (1) | — |
| Total | $ 171 | $ 257 |
| Charge-offs | | |
| Single-family | | |
| Charge-offs, gross[1] (including $3.7 billion and $3.5 billion, relating to loan loss reserves, respectively) | $3,778 | $3,653 |
| Recoveries[2] | (515) | (684) |
| Single-family, net | $3,263 | $2,969 |
| Multifamily | | |
| Charge-offs, gross[1] (including $1 million and $12 million, relating to loan loss reserves, respectively) | $ 1 | $ 12 |
| Recoveries[2] | — | — |
| Multifamily, net | $ 1 | $ 12 |
| Total Charge-offs: | | |
| Charge-offs, gross[1] (including $3.7 billion and $3.6 billion, relating to loan loss reserves, respectively) | $3,779 | $3,665 |
| Recoveries[2] | (515) | (684) |
| Total Charge-offs, net | $3,264 | $2,981 |
| Credit Losses[3] | | |
| Single-family | $3,435 | $3,226 |
| Multifamily | — | 12 |
| Total | $3,435 | $3,238 |
| Total (in bps)[4] | 73.6 | 67.1 |

(1) Represent the carrying amount of a loan that has been discharged in order to remove the loan from our consolidated balance sheets at the time of resolution, regardless of when the impact of the credit loss was recorded on our consolidated statements of comprehensive income through the provision for credit losses or losses on loans purchased. Charge-offs primarily result from foreclosure transfers and short sales and are generally calculated as the recorded investment of a loan at the date it is discharged less the estimated value in final disposition or actual net sales in a short sale.
(2) Recoveries of charge-offs primarily result from foreclosure transfers and short sales on loans where a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements.
(3) Excludes foregone interest on non-performing loans, which reduces our net interest income but is not reflected in our total credit losses. In addition, excludes other market-based credit losses: (a) incurred on our investments in mortgage loans and mortgage-related securities; and (b) recognized in our consolidated statements of comprehensive income.
(4) Calculated as credit losses divided by the average carrying value of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates.

Our credit loss performance metric generally measures losses at the conclusion of the loan and related collateral resolution process. There is a significant lag in time from the implementation of problem loan workout activities until the final resolution of seriously delinquent mortgage loans and REO assets. Our credit loss performance is based on our charge-offs and REO expenses. We primarily record charge-offs at the time we take ownership of a property through foreclosure and at the time of settlement of foreclosure alternative transactions. Single-family charge-offs, gross, for the three months ended March 31, 2012 and 2011 were $3.8 billion and $3.7 billion, respectively, and were associated with approximately $7.4 billion and $8.0 billion, respectively, in UPB of loans. Our net charge-offs and credit losses in the first quarter of 2012 remained elevated, but were less than they otherwise would have been because of the suppression of loan and collateral resolution activity due to delays in the foreclosure process. We expect our charge-offs and credit losses to remain high in the remainder of 2012, and they may increase, due to the large number of single-family non-performing loans that will likely be resolved and because market conditions, such as home prices, continue to remain weak.

Our credit losses during the first quarter of 2012 continued to be disproportionately high in those states that experienced significant declines in property values since 2006, such as California, Florida, Nevada, and Arizona, which collectively comprised approximately 55% of our total credit losses during the three months ended March 31, 2012. Loans originated in 2005 through 2008 comprised approximately 30% and 36% of our single-family credit guarantee portfolio, based on UPB at March 31, 2012 and 2011, respectively; however, these loans accounted for approximately 88% and 91% of our credit losses during the three months ended March 31, 2012 and 2011, respectively. Due to declines in property values since 2006, we continued to experience high REO disposition severity ratios on sales of our REO inventory. In

*Freddie Mac*

addition, although Alt-A loans comprised approximately 5% and 6% of our single-family credit guarantee portfolio at March 31, 2012 and 2011, respectively, these loans accounted for approximately 24% and 31% of our credit losses during the three months ended March 31, 2012 and 2011, respectively. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for information on REO disposition severity ratios, and see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information about our credit losses.

*Loan Loss Reserves*

We maintain mortgage-related loan loss reserves at levels we believe appropriate to absorb probable incurred losses on mortgage loans held-for-investment on our consolidated balance sheets and those underlying Freddie Mac mortgage-related securities and other guarantee commitments. Determining the loan loss reserves is complex and requires significant management judgment about matters that involve a high degree of subjectivity. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for additional information on our accounting policies for loan loss reserves and TDR loans, including our implementation of changes to the accounting guidance related to the classification of loans as TDRs. In recent periods, the portion of our loan loss reserves attributable to individually impaired loans has increased while the portion of our loan loss reserves determined on a collective basis has declined. As of March 31, 2012 and December 31, 2011, the recorded investment of individually impaired single-family mortgage loans was $62.4 billion and $60.0 billion, respectively, and the loan loss reserves associated with these loans was $15.9 billion and $15.1 billion, respectively. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for additional information about our TDR loans.

The table below summarizes our allowance for loan loss activity for individually impaired single-family mortgage loans on our consolidated balance sheets for which we have recorded a specific reserve.

**Table 48 — Single-Family Impaired Loans with Specific Reserve Recorded**

|  | As of March 31, 2012 | |
| --- | --- | --- |
|  | # of Loans | Amount |
|  |  | (in millions) |
| TDRs (recorded investment): |  |  |
| December 31, 2011 balance | 252,749 | $ 53,494 |
| New additions | 19,380 | 3,642 |
| Repayments | (1,054) | (276) |
| Loss events[1] | (3,688) | (739) |
| Other | 552 | 65 |
| March 31, 2012 balance | 267,939 | 56,186 |
| Other (recorded investment)[2] | 24,308 | 2,289 |
| March 31, 2012 balance | 292,247 | 58,475 |
| Total allowance for loan losses of individually impaired single-family loans |  | (15,851) |
| Net investment |  | $ 42,624 |

(1) Consists of foreclosure transfer or foreclosures alternative, such as a deed in lieu of foreclosure or short sale transaction.
(2) Consists of loans impaired upon purchase which experienced further deterioration in borrower credit.

See "CONSOLIDATED RESULTS OF OPERATIONS — Provision for Credit Losses," for a discussion of our provision for credit losses and charge-off activity.

*Credit Risk Sensitivity*

Under a 2005 agreement with FHFA, then OFHEO, we are required to disclose the estimated increase in the NPV of future expected credit losses for our single-family credit guarantee portfolio over a ten year period as the result of an immediate 5% decline in home prices nationwide, followed by a stabilization period and return to the base case. This sensitivity analysis is hypothetical and may not be indicative of our actual results. We do not use this analysis for determination of our reported results under GAAP.

**Table 49 — Single-Family Credit Loss Sensitivity**

| | Before Receipt of Credit Enhancements[1] | | After Receipt of Credit Enhancements[2] | |
|---|---|---|---|---|
| | NPV[3] | NPV Ratio[4] | NPV[3] | NPV Ratio[4] |
| | | (dollars in millions) | | |
| At: | | | | |
| March 31, 2012 ........................................... | $ 8,568 | 49.6 bps | $8,095 | 46.8 bps |
| December 31, 2011 ........................................ | $ 8,328 | 47.7 bps | $7,842 | 44.9 bps |
| September 30, 2011 ....................................... | $ 8,824 | 49.5 bps | $8,229 | 46.1 bps |
| June 30, 2011 ............................................ | $10,203 | 56.5 bps | $9,417 | 52.2 bps |
| March 31, 2011 .......................................... | $ 9,832 | 54.2 bps | $8,999 | 49.6 bps |

(1) Assumes that none of the credit enhancements currently covering our mortgage loans has any mitigating impact on our credit losses.
(2) Assumes we collect amounts due from credit enhancement providers after giving effect to certain assumptions about counterparty default rates.
(3) Based on the single-family credit guarantee portfolio, excluding REMICs and Other Structured Securities backed by Ginnie Mae Certificates.
(4) Calculated as the ratio of NPV of increase in credit losses to the single-family credit guarantee portfolio, defined in note (3) above.

### Interest Rate and Other Market Risks

For a discussion of our interest rate and other market risks, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

### Operational Risks

We face significant levels of operational risk, due to a variety of factors, including: (a) employee turnover and low employee engagement; (b) the level and pace of organizational change within our company; (c) the complexity of our business operations; (d) weaknesses in our core systems; and (e) the fact that we face a variety of different, and potentially competing, business objectives and new FHFA-mandated activities. For more information on these matters and other operational risks that we face, see "MD&A — RISK MANAGEMENT — Operational Risks" and "RISK FACTORS — Operational Risks" in our 2011 Annual Report.

As a result of the elevated risk of employee turnover and low employee engagement, we continue to explore various strategic arrangements with outside firms to provide operational capability and staffing for key functions, if needed. Should we experience significant turnover in key areas, we may need to exercise these strategic arrangements and significantly increase the number of outside firms and consultants used in our business operations, limit certain business activities, and/or increase our operational costs. The use of outside firms and consultants could increase our operational risk in the near term as consultants become accustomed to new roles and responsibilities. These or other efforts to manage this risk to the enterprise may not be successful. To help mitigate the uncertainty surrounding compensation, we introduced a new compensation program for employees. For more information on recent legislative and regulatory developments affecting these risks, see "LEGISLATIVE AND REGULATORY MATTERS — Legislative and Regulatory Developments Concerning Executive Compensation."

Our Executive Vice President — Single-Family Business, Operations and Technology has informed us that he will resign from his position effective May 11, 2012.

Management, including the company's Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of March 31, 2012. As of March 31, 2012, we had two material weaknesses in our internal control over financial reporting causing us to conclude that our disclosure controls and procedures were not effective as of March 31, 2012, at a reasonable level of assurance. For additional information, see "CONTROLS AND PROCEDURES."

## LIQUIDITY AND CAPITAL RESOURCES

### Liquidity

Our business activities require that we maintain adequate liquidity to fund our operations, which may include the need to make payments of principal and interest on our debt securities, including securities issued by our consolidated trusts, and otherwise make payments related to our guarantees of mortgage assets; make payments upon the maturity, redemption or repurchase of our other debt securities; make net payments on derivative instruments; pay dividends on our senior preferred stock; purchase mortgage-related securities and other investments; purchase mortgage loans; and remove modified or seriously delinquent loans from PC trusts.

*Freddie Mac*

We fund our cash requirements primarily by issuing short-term and long-term debt. Other sources of cash include:

- receipts of principal and interest payments on securities or mortgage loans we hold;

- other cash flows from operating activities, including the management and guarantee fees we receive in connection with our guarantee activities (excluding those we must remit to Treasury pursuant to the Temporary Payroll Tax Cut Continuation Act of 2011, which commenced in April 2012);

- borrowings against mortgage-related securities and other investment securities we hold; and

- sales of securities we hold.

We have also received substantial amounts of cash from Treasury pursuant to draws under the Purchase Agreement, which are made to address deficits in our net worth. We received $146 million in cash from Treasury during the three months ended March 31, 2012 pursuant to a draw under the Purchase Agreement.

We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

### Liquidity Management

Maintaining sufficient liquidity is of primary importance and we continually strive to enhance our liquidity management practices and policies. Under these practices and policies, we maintain an amount of cash and cash equivalent reserves in the form of liquid, high quality short-term investments that is intended to enable us to meet ongoing cash obligations for an extended period, in the event we do not have access to the short- or long-term unsecured debt markets. We also actively manage the concentration of debt maturities and closely monitor our monthly maturity profile. For a discussion of our liquidity management practices and policies, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Liquidity Management*" in our 2011 Annual Report.

Throughout the three months ended March 31, 2012, we complied with all requirements under our liquidity management policies or FHFA guidance, as applicable. Furthermore, the majority of the funds used to cover our short-term cash liquidity needs was invested in short-term assets with a rating of A-1/P-1 or AAA or was issued by a counterparty with that rating. In the event of a downgrade of a position or counterparty, as applicable, below minimum rating requirements, our credit governance policies require us to exit from the position within a specified period.

We also continue to manage our debt issuances to remain in compliance with the aggregate indebtedness limits set forth in the Purchase Agreement.

We continue to monitor events related to the troubled European countries and took a number of actions in 2011 designed to reduce our exposures, including exposures related to certain derivative portfolio and cash and other investments portfolio counterparties. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Selected European Sovereign and Non-Sovereign Exposures.*"

To facilitate cash management, we forecast cash outflows. These forecasts help us to manage our liabilities with respect to asset purchases and runoff, when financial markets are not in crisis. For further information on our management of interest-rate risk associated with asset and liability management, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

Notwithstanding these practices and policies, our ability to maintain sufficient liquidity, including by pledging mortgage-related and other securities as collateral to other financial institutions, could cease or change rapidly and the cost of the available funding could increase significantly due to changes in market confidence and other factors. For more information, see "RISK FACTORS — Competitive and Market Risks — *Our investment activities may be adversely affected by limited availability of financing and increased funding costs*" in our 2011 Annual Report.

### Actions of Treasury and FHFA

Since our entry into conservatorship, Treasury and FHFA have taken a number of actions that affect our cash requirements and ability to fund those requirements. The conservatorship, and the resulting support we received from Treasury, has enabled us to access debt funding on terms sufficient for our needs.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The Purchase Agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011, and 2012. If we do not have a capital surplus (*i.e.*, positive net worth) at the end of 2012, then the amount of

*Freddie Mac*

funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 31, 2009). In the event we have a capital surplus at the end of 2012, then the amount of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as follows:

- If the year-end 2012 surplus is lower than the cumulative draws needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

- If the year-end 2012 surplus exceeds the cumulative draws for 2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws.

While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available to us under the Purchase Agreement after 2012. The costs of our debt funding could also increase in the event of any future downgrades in our credit ratings or the credit ratings of the U.S. government. Upon funding of the draw request that FHFA will submit to eliminate our net worth deficit at March 31, 2012, our aggregate funding received from Treasury under the Purchase Agreement will be $71.3 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. Our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million.

We are required to pay a quarterly commitment fee to Treasury under the Purchase Agreement, as discussed below in "*Dividend Obligation on the Senior Preferred Stock*."

For more information on these matters, see "BUSINESS — Conservatorship and Related Matters" and "— Regulation and Supervision" in our 2011 Annual Report.

### Dividend Obligation on the Senior Preferred Stock

Following funding of the draw request related to our net worth deficit at March 31, 2012, our annual cash dividend obligation to Treasury on the senior preferred stock will be $7.23 billion, which exceeds our annual historical earnings in all but one period. The senior preferred stock accrues quarterly cumulative dividends at a rate of 10% per year or 12% per year in any quarter in which dividends are not paid in cash until all accrued dividends have been paid in cash. We paid dividends of $1.8 billion in cash on the senior preferred stock during the three months ended March 31, 2012 at the direction of our Conservator. Through March 31, 2012, we paid aggregate cash dividends to Treasury of $18.3 billion, an amount equal to 26% of our aggregate draws received under the Purchase Agreement. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth and will increasingly drive future draws. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived. Treasury waived the fee for all quarters of 2011 and the first and second quarters of 2012, but has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. The amount of the fee has not yet been established and could be substantial.

The payment of dividends on our senior preferred stock in cash reduces our net worth. For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury. Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all.

As discussed in "Capital Resources," we expect to make additional draws under the Purchase Agreement in future periods. Further draws will increase the liquidation preference of and the dividends we owe on the senior preferred stock.

### Other Debt Securities

Spreads on our debt and our access to the debt markets remained favorable relative to historical levels during the three months ended March 31, 2012, due largely to support from the U.S. government. As a result, we were able to replace certain higher cost debt with lower cost debt. Our short-term debt was 22% of outstanding other debt at March 31, 2012 as compared to 24% at December 31, 2011. Beginning in the fourth quarter of 2011, we started issuing a higher percentage of long-term debt. This allows us to take advantage of attractive long-term rates while decreasing our reliance on interest-rate swaps.

Because of the debt limit under the Purchase Agreement, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Our debt cap under the Purchase Agreement is $874.8 billion in 2012 and will decline to $787.3 billion on January 1, 2013. As of March 31, 2012, we estimate that the par value of our aggregate indebtedness totaled $629.3 billion, which was approximately $245.5 billion below the applicable debt cap. As of December 31, 2011, we estimate that the par value of our aggregate indebtedness totaled $674.3 billion, which was approximately $297.7 billion below the then applicable limit of $972 billion. Our aggregate indebtedness is calculated as the par value of other debt. We disclose the amount of our indebtedness on this basis monthly under the caption "Other Debt Activities — Total Debt Outstanding" in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC.

*Other Debt Issuance Activities*

The table below summarizes the par value of other debt securities we issued, based on settlement dates, during the three months ended March 31, 2012 and 2011.

**Table 50 — Other Debt Security Issuances by Product, at Par Value[1]**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (in millions) | |
| Other short-term debt: | | |
| Reference Bills® securities and discount notes | $ 64,163 | $103,846 |
| Medium-term notes — non-callable[2] | — | 200 |
| Total other short-term debt | 64,163 | 104,046 |
| Other long-term debt: | | |
| Medium-term notes — callable | 37,498 | 37,801 |
| Medium-term notes — non-callable | 10,704 | 29,175 |
| U.S. dollar Reference Notes® securities — non-callable | 21,500 | 10,000 |
| Total other long-term debt | 69,702 | 76,976 |
| Total other debt issued | $133,865 | $181,022 |

(1) Excludes federal funds purchased and securities sold under agreements to repurchase, and lines of credit. Also excludes debt securities of consolidated trusts held by third parties.

(2) Includes $0 million and $200 million of medium-term notes — non-callable issued for the three months ended March 31, 2012 and 2011, respectively, which were related to debt exchanges.

*Other Debt Retirement Activities*

We repurchase, call, or exchange our outstanding medium- and long-term debt securities from time to time to help support the liquidity and predictability of the market for our other debt securities and to manage our mix of liabilities funding our assets.

The table below provides the par value, based on settlement dates, of other debt securities we repurchased, called, and exchanged during the three months ended March 31, 2012 and 2011.

**Table 51 — Other Debt Security Repurchases, Calls, and Exchanges[1]**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (in millions) | |
| Repurchases of outstanding medium-term notes | $ 1,697 | $ 2,738 |
| Calls of callable medium-term notes | 49,028 | 39,835 |
| Exchanges of medium-term notes | — | 200 |

(1) Excludes debt securities of consolidated trusts held by third parties.

*Credit Ratings*

Our ability to access the capital markets and other sources of funding, as well as our cost of funds, is highly dependent upon our credit ratings. The table below indicates our credit ratings as of April 23, 2012.

**Table 52 — Freddie Mac Credit Ratings**

| | Nationally Recognized Statistical Rating Organization | | |
| | S&P | Moody's | Fitch |
| --- | --- | --- | --- |
| Senior long-term debt[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | AA+ | Aaa | AAA |
| Short-term debt[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A-1+ | P-1 | F1+ |
| Subordinated debt[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A | Aa2 | AA– |
| Preferred stock[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C | Ca | C/RR6 |
| Outlook . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Negative (for senior long-term debt and subordinated debt) | Negative (for senior long-term debt and subordinated debt) | Negative (for AAA-rated long-term Issuer Default Rating) |

(1) Consists of medium-term notes, U.S. dollar Reference Notes® securities and €Reference Notes® securities.
(2) Consists of Reference Bills® securities and discount notes.
(3) Consists of Freddie SUBS® securities.
(4) Does not include senior preferred stock issued to Treasury.

For information about our ratings downgrade by S&P in 2011, factors that could lead to future ratings actions, and the potential impact of a downgrade in our credit ratings, see "RISK FACTORS — Competitive and Market Risks — *Any downgrade in the credit ratings of the U.S. government would likely be followed by a downgrade in our credit ratings. A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business*" in our 2011 Annual Report.

A security rating is not a recommendation to buy, sell or hold securities. It may be subject to revision or withdrawal at any time by the assigning rating organization. Each rating should be evaluated independently of any other rating.

*Cash and Cash Equivalents, Federal Funds Sold, Securities Purchased Under Agreements to Resell, and Non-Mortgage-Related Securities*

Excluding amounts related to our consolidated VIEs, we held $59.7 billion in the aggregate of cash and cash equivalents, securities purchased under agreements to resell, and non-mortgage-related securities at March 31, 2012. These investments are important to our cash flow and asset and liability management and our ability to provide liquidity and stability to the mortgage market. At March 31, 2012, our non-mortgage-related securities primarily consisted of FDIC-guaranteed corporate medium-term notes, Treasury bills, and Treasury notes that we could sell to provide us with an additional source of liquidity to fund our business operations. For additional information on these assets, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell" and "— Investments in Securities — *Non-Mortgage-Related Securities*."

*Mortgage Loans and Mortgage-Related Securities*

We invest principally in mortgage loans and mortgage-related securities, certain categories of which are largely unencumbered and highly liquid. Our primary source of liquidity among these mortgage assets is our holdings of agency securities. In addition, our unsecuritized performing single-family mortgage loans are also a potential source of liquidity. Our holdings of CMBS are less liquid than agency securities. Our holdings of non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans are not liquid due to market conditions and the continued poor credit quality of the underlying assets. Our holdings of unsecuritized seriously delinquent and modified single-family mortgage loans are also illiquid.

We are subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury. See "EXECUTIVE SUMMARY — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio" for more information on the relative liquidity of our mortgage assets.

**Cash Flows**

Our cash and cash equivalents decreased $19.9 billion to $8.6 billion during the three months ended March 31, 2012 and decreased $2.7 billion to $34.3 billion during the three months ended March 31, 2011. Cash flows provided by operating activities during the three months ended March 31, 2012 and 2011 were $1.4 billion and $4.2 billion, respectively, primarily driven by cash proceeds from net interest income. Cash flows provided by investing activities during the three months ended March 31, 2012 and 2011 were $102.0 billion and $96.2 billion, respectively, primarily

resulting from net proceeds received as a result of repayments of single-family held-for-investment mortgage loans. Cash flows used for financing activities during the three months ended March 31, 2012 and 2011 were $123.2 billion and $103.2 billion, respectively, largely attributable to funds used to repay debt of consolidated trusts held by third parties. In addition, during the three months ended March 31, 2012, our net repayments of other debt were $42.1 billion.

## Capital Resources

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. Obtaining funding from Treasury pursuant to its commitment under the Purchase Agreement enables us to avoid being placed into receivership by FHFA. At March 31, 2012, our liabilities exceeded our assets under GAAP by $18 million. Accordingly, we must obtain funding from Treasury pursuant to its commitment under the Purchase Agreement in order to avoid being placed into receivership by FHFA. FHFA, as Conservator, will submit a draw request to Treasury under the Purchase Agreement in the amount of $19 million, which we expect to receive by June 30, 2012. See "BUSINESS — Regulation and Supervision — *Federal Housing Finance Agency — Receivership*" in our 2011 Annual Report for additional information on mandatory receivership.

We expect to request additional draws under the Purchase Agreement in future periods. Over time, our dividend obligation to Treasury on the senior preferred stock will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if Treasury does not continue to waive the fee. See "Liquidity — *Dividend Obligation on the Senior Preferred Stock*" for more information.

The size and timing of our future draws will be determined by our dividend obligation on the senior preferred stock and a variety of other factors that could adversely affect our net worth. For more information on these other factors, see "RISK FACTORS — Conservatorship and Related Matters — *We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition*" in our 2011 Annual Report.

For more information on the Purchase Agreement, its effect on our business and capital management activities, and the potential impact of making additional draws, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Dividend Obligation on the Senior Preferred Stock*," "BUSINESS — Executive Summary — *Government Support for Our Business*" and "RISK FACTORS" in our 2011 Annual Report.

## FAIR VALUE MEASUREMENTS AND ANALYSIS

### Fair Value Measurements

Fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. For additional information regarding the fair value hierarchy and measurements and validation processes, see "MD&A — FAIR VALUE MEASUREMENTS AND ANALYSIS" in our 2011 Annual Report.

We categorize assets and liabilities measured and reported at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation processes used to derive their fair values and our judgment regarding the observability of the related inputs. Those judgments are based on our knowledge and observations of the markets relevant to the individual assets and liabilities and may vary based on current market conditions. In applying our judgments, we review ranges of third-party prices and transaction volumes, and hold discussions with dealers and pricing service vendors to understand and assess the extent of market benchmarks available and the judgments or modeling required in their processes. Based on these factors, we determine whether the inputs are observable and whether the principal markets are active or inactive.

Our Level 3 assets recorded at fair value primarily consist of non-agency mortgage-related securities. The non-agency mortgage-related securities market continued to be illiquid during the first quarter of 2012, with low transaction volumes, wide credit spreads, and limited transparency. We value the non-agency mortgage-related securities we hold based primarily on prices received from pricing services and dealers. The techniques used by these pricing services and dealers to develop the prices generally are either: (a) a comparison to transactions involving instruments with similar collateral and risk profiles; or (b) industry standard modeling, such as a discounted cash flow model. For a large majority of the securities we value using dealers and pricing services, we obtain multiple independent prices, which are non-binding both to us and our counterparties. When multiple prices are received, we use the median of the prices. The models and related

assumptions used by the dealers and pricing services are owned and managed by them. However, we have an understanding of their processes used to develop the prices provided to us based on our ongoing due diligence. We periodically have discussions with our dealers and pricing service vendors to maintain a current understanding of the processes and inputs they use to develop prices. We make no adjustments to the individual prices we receive from third-party pricing services or dealers for non-agency mortgage-related securities beyond calculating median prices and discarding certain prices that are determined not to be valid based on our validation processes.

The table below summarizes our assets and liabilities measured at fair value on a recurring basis in our consolidated balance sheets at March 31, 2012 and December 31, 2011.

**Table 53 — Summary of Assets and Liabilities Measured at Fair Value on a Recurring Basis in Our Consolidated Balance Sheets**

| | March 31, 2012 | | December 31, 2011 | |
| --- | --- | --- | --- | --- |
| | Total GAAP Recurring Fair Value | Percentage in Level 3 | Total GAAP Recurring Fair Value | Percentage in Level 3 |
| | (dollars in millions) | | | |
| **Assets:** | | | | |
| Investments in securities: | | | | |
| Available-for-sale, at fair value | $202,422 | 28% | $210,659 | 28% |
| Trading, at fair value | 58,319 | 4 | 58,830 | 4 |
| Mortgage loans: | | | | |
| Held-for-sale, at fair value | 11,337 | 100 | 9,710 | 100 |
| Derivative assets, net[1] | 182 | — | 118 | — |
| Other assets: | | | | |
| Guarantee asset, at fair value | 798 | 100 | 752 | 100 |
| All other, at fair value | 143 | 100 | 151 | 100 |
| Total assets carried at fair value on a recurring basis[1] | $273,201 | 25 | $280,220 | 23 |
| **Liabilities:** | | | | |
| Debt securities recorded at fair value | $ 2,221 | 100% | $ 3,015 | —% |
| Derivative liabilities, net[1] | 296 | — | 435 | — |
| Other liabilities: | | | | |
| All other, at fair value | 4 | 100 | — | — |
| Total liabilities carried at fair value on a recurring basis[1] | $ 2,521 | 7 | $ 3,450 | — |

(1)  Percentages by level are based on gross fair value of derivative assets and derivative liabilities before counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

### Changes in Level 3 Recurring Fair Value Measurements

At March 31, 2012 and December 31, 2011, we measured and recorded at fair value on a recurring basis, assets of $72.1 billion and $72.5 billion, respectively, or approximately 25% and 23% of total assets carried at fair value on a recurring basis, using significant unobservable inputs (Level 3), before the impact of counterparty and cash collateral netting. Our Level 3 assets at March 31, 2012 primarily consist of non-agency mortgage-related securities. At March 31, 2012 and December 31, 2011, we also measured and recorded at fair value on a recurring basis, Level 3 liabilities of $2.3 billion and $0.1 billion, or 7% and less than 1%, respectively, of total liabilities carried at fair value on a recurring basis, before the impact of counterparty and cash collateral netting. Our Level 3 liabilities at March 31, 2012 primarily consist of foreign-currency denominated and certain other debt securities recorded at fair value.

See "NOTE 16: FAIR VALUE DISCLOSURES — Recurring Fair Value Changes" for a discussion of changes in our Level 3 assets and liabilities and "— Table 16.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs" for the Level 3 reconciliation. For discussion of types and characteristics of mortgage loans underlying our mortgage-related securities, see "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets" and "RISK MANAGEMENT — *Credit Risk — Mortgage Credit Risk — Single-Family Mortgage Credit Risk.*"

### Consideration of Credit Risk in Our Valuation

We consider credit risk in the valuation of our assets and liabilities through consideration of credit risk of the counterparty in asset valuations and through consideration of our own institutional credit risk in liability valuations on our GAAP consolidated balance sheets.

We consider credit risk in our valuation of investments in securities based on fair value measurements that are largely the result of price quotes received from multiple dealers or pricing services. Some of the key valuation drivers of such fair value measurements can include the collateral type, collateral performance, credit quality of the issuer, tranche type,

weighted average life, vintage, coupon, and interest rates. We also make adjustments for items such as credit enhancements or other types of subordination and liquidity, where applicable. In cases where internally developed models are used, we maximize the use of market-based inputs or calibrate such inputs to market data.

We also consider credit risk when we evaluate the valuation of our derivative positions. The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. For derivatives that are in an asset position, we hold collateral against those positions in accordance with agreed upon thresholds. The amount of collateral held depends on the credit rating of the counterparty and is based on our credit risk policies. Similarly, for derivatives that are in a liability position, we post collateral to counterparties in accordance with agreed upon thresholds. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Derivative Counterparties*" for a discussion of our counterparty credit risk.

See "NOTE 16: FAIR VALUE DISCLOSURES — Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets" for additional information regarding the valuation of our assets and liabilities.

**Consolidated Fair Value Balance Sheets Analysis**

Our consolidated fair value balance sheets present our estimates of the fair value of our financial assets and liabilities. See "NOTE 16: FAIR VALUE DISCLOSURES — Table 16.7 — Consolidated Fair Value Balance Sheets" for our fair value balance sheets. In conjunction with the preparation of our consolidated fair value balance sheets, we use a number of financial models. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks," in this form 10-Q and our 2011 Annual Report, and "RISK FACTORS" and "RISK MANAGEMENT — Operational Risks" in our 2011 Annual Report for information concerning the risks associated with these models.

During the first quarter of 2012, our fair value results were impacted by several improvements in our approach for estimating the fair value of certain financial instruments. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report and "NOTE 16: FAIR VALUE DISCLOSURES" in this form 10-Q for more information on fair values.

*Discussion of Fair Value Results*

The table below summarizes the change in the fair value of net assets for the three months ended March 31, 2012 and 2011.

**Table 54 — Summary of Change in the Fair Value of Net Assets**

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2012** | **2011** |
|  | (in billions) | |
| Beginning balance | $(78.4) | $(58.6) |
| Changes in fair value of net assets, before capital transactions | (9.1) | 3.3 |
| Capital transactions: |  |  |
| Dividends and share issuances, net[1] | (1.7) | (1.1) |
| Ending balance | $(89.2) | $(56.4) |

(1) Includes the funds received from Treasury of $0.1 billion and $0.5 billion for the three months ended March 31, 2012 and 2011, respectively, under the Purchase Agreement, which increased the liquidation preference of our senior preferred stock.

During the first quarter of 2012, the fair value of net assets, before capital transactions, decreased by $9.1 billion, compared to a $3.3 billion increase during the first quarter of 2011. The decrease in the fair value of net assets, before capital transactions, during the first quarter of 2012 was primarily due to a decrease of $13.8 billion in the fair value of our single-family mortgage loans as the result of the adoption of an amendment to the guidance pertaining to fair value measurements and disclosure. This was coupled with a decline in expected home prices that had a negative impact on the fair value of our single-family mortgage loans. The decrease in fair value was partially offset by high core spread income and a tightening of OAS levels on our agency securities, CMBS securities, and multifamily loans. See "NOTE 16: FAIR VALUE DISCLOSURES — Consolidated Fair Value Balance Sheets" for additional details.

For loans that have been refinanced under HARP, we value our guarantee obligation using the delivery and guarantee fees currently charged by us under that initiative. If, subsequent to delivery, the refinanced loan no longer qualifies for

purchase based on current underwriting standards (such as becoming past due or being modified as a part of a troubled debt restructuring), the fair value of the guarantee obligation is then measured using our internal credit models or third-party market pricing. See "NOTE 16: FAIR VALUE DISCLOSURES — Valuation Methods and Assumptions for Assets and Liabilities Not Measured at Fair Value in Our Consolidated Balance Sheets, but for Which the Fair Value is Disclosed — Mortgage Loans — *Single-Family Loans*" for additional details.

During the first quarter of 2011, the increase in the fair value of net assets, before capital transactions was primarily due to high core spread income and an increase in the fair value of our investments in mortgage-related securities driven by tightening of OAS levels of agency mortgage-related securities and CMBS. The increase in fair value was partially offset by an increase in the risk premium related to our single-family loans due to the continued weak credit environment and tightening of OAS levels on other debt related to agency mortgage-related securities.

When the OAS on a given asset widens, the fair value of that asset will typically decline, all other market factors being equal. However, we believe such OAS widening has the effect of increasing the likelihood that, in future periods, we will recognize income at a higher spread on this existing asset. The reverse is true when the OAS on a given asset tightens — current period fair values for that asset typically increase due to the tightening in OAS, while future income recognized on the asset is more likely to be earned at a reduced spread. However, as market conditions change, our estimate of expected fair value gains and losses from OAS may also change, and the actual core spread income recognized in future periods could be significantly different from current estimates.

## OFF-BALANCE SHEET ARRANGEMENTS

We enter into certain business arrangements that are not recorded on our consolidated balance sheets or may be recorded in amounts that differ from the full contract or notional amount of the transaction. These off-balance sheet arrangements may expose us to potential losses in excess of the amounts recorded on our consolidated balance sheets.

### Securitization Activities and Other Guarantee Commitments

We have certain off-balance sheet arrangements related to our securitization activities involving guaranteed mortgages and mortgage-related securities, though most of our securitization activities are on-balance sheet. Our off-balance sheet arrangements related to these securitization activities primarily consist of: (a) Freddie Mac mortgage-related securities backed by multifamily loans; and (b) certain single-family Other Guarantee Transactions. We also have off-balance sheet arrangements related to other guarantee commitments, including long-term standby commitments and liquidity guarantees.

We guarantee the payment of principal and interest on Freddie Mac mortgage-related securities we issue and on mortgage loans covered by our other guarantee commitments. Therefore, our maximum potential off-balance sheet exposure to credit losses relating to these securitization activities and the other guarantee commitments is primarily represented by the UPB of the underlying loans and securities, which was $60.9 billion and $56.9 billion, at March 31,2012 and December 31, 2011, respectively. Our exposure to losses on securitization and other guarantee commitment activities would be partially mitigated by the recovery we would receive through exercising our rights to the collateral backing the underlying loans and the available credit enhancements, which may include recourse and primary insurance with third parties. We provide for incurred losses each period on these guarantees within our provision for credit losses. See "NOTE 9: FINANCIAL GUARANTEES" for more information on our off-balance sheet securitization activities and other guarantee commitments.

### Other Agreements

We own interests in numerous entities that are considered to be VIEs for which we are not the primary beneficiary and which we do not consolidate in accordance with the accounting guidance for the consolidation of VIEs. These VIEs relate primarily to our investment activity in mortgage-related assets and non-mortgage assets, and include LIHTC partnerships, certain Other Guarantee Transactions, and certain asset-backed investment trusts. Our consolidated balance sheets reflect only our investment in these VIEs, rather than the full amount of the VIEs' assets and liabilities. See "NOTE 3: VARIABLE INTEREST ENTITIES" for additional information related to our variable interests in these VIEs.

As part of our credit guarantee business, we routinely enter into forward purchase and sale commitments for mortgage loans and mortgage-related securities. Some of these commitments are accounted for as derivatives. Their fair values are reported as either derivative assets, net or derivative liabilities, net on our consolidated balance sheets. For more information, see "RISK MANAGEMENT — Credit Risk — Institutional Credit Risk — *Derivative Counterparties*." We also have purchase commitments primarily related to our mortgage purchase flow business, which we principally fulfill by issuing PCs in swap transactions, and, to a lesser extent, commitments to purchase or guarantee multifamily mortgage loans that are not accounted for as derivatives and are not recorded on our consolidated balance sheets. These non-

derivative commitments totaled $211.3 billion and $271.8 billion, in notional value at March 31, 2012 and December 31, 2011, respectively.

In connection with the execution of the Purchase Agreement, we, through FHFA, in its capacity as Conservator, issued a warrant to Treasury to purchase 79.9% of our common stock outstanding on a fully diluted basis on the date of exercise. See "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2011 Annual Report for further information.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in conformity with GAAP requires us to make a number of judgments, estimates and assumptions that affect the reported amounts within our consolidated financial statements. Certain of our accounting policies, as well as estimates we make, are critical, as they are both important to the presentation of our financial condition and results of operations and require management to make difficult, complex, or subjective judgments and estimates, often regarding matters that are inherently uncertain. Actual results could differ from our estimates and the use of different judgments and assumptions related to these policies and estimates could have a material impact on our consolidated financial statements.

Our critical accounting policies and estimates relate to: (a) allowances for loan losses and reserve for guarantee losses; (b) fair value measurements; (c) impairment recognition on investments in securities; and (d) realizability of net deferred tax assets. For additional information about our critical accounting policies and estimates and other significant accounting policies, including recently issued accounting guidance, see "MD&A — CRITICAL ACCOUNTING POLICIES AND ESTIMATES" in our 2011 Annual Report and "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in this Form 10-Q.

## FORWARD-LOOKING STATEMENTS

We regularly communicate information concerning our business activities to investors, the news media, securities analysts, and others as part of our normal operations. Some of these communications, including this Form 10-Q, contain "forward-looking statements," including statements pertaining to the conservatorship, our current expectations and objectives for our efforts under the MHA Program, the servicing alignment initiative and other programs to assist the U.S. residential mortgage market, future business plans, liquidity, capital management, economic and market conditions and trends, market share, the effect of legislative and regulatory developments, implementation of new accounting guidance, credit losses, internal control remediation efforts, and results of operations and financial condition on a GAAP, Segment Earnings, and fair value basis. Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. Forward-looking statements are often accompanied by, and identified with, terms such as "objective," "expect," "trend," "forecast," "anticipate," "believe," "intend," "could," "future," "may," "will," and similar phrases. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties, including those described in the "RISK FACTORS" section of our 2011 Annual Report, and:

- the actions FHFA, Treasury, the Federal Reserve, the SEC, HUD, the Administration, Congress, and our management may take, including actions related to implementing FHFA's strategic plan for Freddie Mac and Fannie Mae's conservatorships;

- the impact of the restrictions and other terms of the conservatorship, the Purchase Agreement, the senior preferred stock, and the warrant on our business, including our ability to pay: (a) the dividend on the senior preferred stock; and (b) any quarterly commitment fee that we are required to pay to Treasury under the Purchase Agreement;

- our ability to maintain adequate liquidity to fund our operations, including following any changes in the support provided to us by Treasury or FHFA, a change in the credit ratings of our debt securities or a change in the credit rating of the U.S. government;

- changes in our charter or applicable legislative or regulatory requirements, including any restructuring or reorganization in the form of our company, whether we will remain a stockholder-owned company or continue to exist and whether we will be wound down or placed under receivership, regulations under the GSE Act, the Reform Act, or the Dodd-Frank Act, regulatory or legislative actions taken to implement the Administration's plan to reform the housing finance system, regulatory or legislative actions that require us to support non-mortgage market initiatives, changes to affordable housing goals regulation, reinstatement of regulatory capital requirements, or the exercise or assertion of additional regulatory or administrative authority;

- changes in the regulation of the mortgage and financial services industries, including changes caused by the Dodd-Frank Act, or any other legislative, regulatory, or judicial action at the federal or state level;

- enforcement actions against mortgage servicers and other mortgage industry participants by federal or state authorities;

- the scope of various initiatives designed to help in the housing recovery (including the extent to which borrowers participate in the recently expanded HARP, the MHA Program and the non-HAMP standard loan modification initiative), and the impact of such programs on our credit losses, expenses, and the size and composition of our mortgage-related investments portfolio;

- the impact of any deficiencies in foreclosure documentation practices and related delays in the foreclosure process;

- the ability of our financial, accounting, data processing, and other operating systems or infrastructure, and those of our vendors to process the complexity and volume of our transactions;

- changes in accounting or tax guidance or in our accounting policies or estimates, and our ability to effectively implement any such changes in guidance, policies, or estimates;

- changes in general regional, national, or international economic, business, or market conditions and competitive pressures, including changes in employment rates and interest rates, and changes in the federal government's fiscal and monetary policy;

- changes in the U.S. residential mortgage market, including changes in the rate of growth in total outstanding U.S. residential mortgage debt, the size of the U.S. residential mortgage market, and home prices;

- our ability to effectively implement our business strategies, including any efforts to improve the supply and liquidity of, and demand for, our securities, and restrictions on our ability to offer new products or engage in new activities;

- our ability to recruit, retain, and engage executive officers and other key employees;

- our ability to effectively identify and manage credit, interest-rate, operational, and other risks in our business, including changes to the credit environment and the levels and volatilities of interest rates, as well as the shape and slope of the yield curves;

- the effects of internal control deficiencies and our ability to effectively identify, assess, evaluate, manage, mitigate, or remediate control deficiencies and risks, including material weaknesses and significant deficiencies, in our internal control over financial reporting and disclosure controls and procedures;

- incomplete or inaccurate information provided by customers and counterparties;

- consolidation among, or adverse changes in the financial condition of, our customers and counterparties;

- the failure of our customers and counterparties to fulfill their obligations to us, including the failure of seller/servicers to meet their obligations to repurchase loans sold to us in breach of their representations and warranties, and the potential cost and difficulty of legally enforcing those obligations;

- changes in our judgments, assumptions, forecasts, or estimates regarding the volume of our business and spreads we expect to earn;

- the availability of options, interest-rate and currency swaps, and other derivative financial instruments of the types and quantities, on acceptable terms, and with acceptable counterparties needed for investment funding and risk management purposes;

- changes in pricing, valuation or other methodologies, models, assumptions, judgments, estimates and/or other measurement techniques, or their respective reliability;

- changes in mortgage-to-debt OAS;

- the potential impact on the market for our securities resulting from any purchases or sales by the Federal Reserve of Freddie Mac debt or mortgage-related securities;

- adverse judgments or settlements in connection with legal proceedings, governmental investigations, and IRS examinations;

- volatility of reported results due to changes in the fair value of certain instruments or assets;

- the development of different types of mortgage servicing structures and servicing compensation;

- preferences of originators in selling into the secondary mortgage market;

- changes to our underwriting or servicing requirements (including servicing alignment efforts under the servicing alignment initiative), our practices with respect to the disposition of REO properties, or investment standards for mortgage-related products;

- investor preferences for mortgage loans and mortgage-related and debt securities compared to other investments;

- borrower preferences for fixed-rate mortgages versus ARMs;

- the occurrence of a major natural or other disaster in geographic areas in which our offices or portions of our total mortgage portfolio are concentrated;

- other factors and assumptions described in this Form 10-Q and our 2011 Annual Report, including in the "MD&A" sections;

- our assumptions and estimates regarding the foregoing and our ability to anticipate the foregoing factors and their impacts; and

- market reactions to the foregoing.

Forward-looking statements speak only as of the date they are made, and we undertake no obligation to update any forward-looking statements we make to reflect events or circumstances occurring after the date of this Form 10-Q.

## RISK MANAGEMENT AND DISCLOSURE COMMITMENTS

In October 2000, we announced our adoption of a series of commitments designed to enhance market discipline, liquidity and capital. In September 2005, we entered into a written agreement with FHFA, then OFHEO, that updated these commitments and set forth a process for implementing them. A copy of the letters between us and OFHEO dated September 1, 2005 constituting the written agreement has been filed as an exhibit to our Registration Statement on Form 10, filed with the SEC on July 18, 2008, and is available on the Investor Relations page of our web site at www.freddiemac.com/investors/sec_filings/index.html.

In November 2008, FHFA suspended our periodic issuance of subordinated debt disclosure commitment during the term of conservatorship and thereafter until directed otherwise. In March 2009, FHFA suspended the remaining disclosure commitments under the September 1, 2005 agreement until further notice, except that: (a) FHFA will continue to monitor our adherence to the substance of the liquidity management and contingency planning commitment through normal supervision activities; and (b) we will continue to provide interest-rate risk and credit risk disclosures in our periodic public reports.

For the three months ended March 31, 2012, our duration gap averaged zero months, PMVS-L averaged $223 million and PMVS-YC averaged $16 million. Our 2012 monthly average duration gap, PMVS results and related disclosures are provided in our Monthly Volume Summary reports, which are available on our web site, www.freddiemac.com/investors/volsum and in current reports on Form 8-K we file with the SEC. For disclosures concerning credit risk sensitivity, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Credit Risk Sensitivity*."

## LEGISLATIVE AND REGULATORY MATTERS

### Administration Report on Reforming the U.S. Housing Finance Market

On February 11, 2011, the Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, stating that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Administration's belief that, under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements. These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations and financial condition. Recent developments include the following:

- As discussed below in "Legislated Increase to Guarantee Fees," we recently raised our guarantee fees at the direction of FHFA.

- The temporary high-cost area loan limits expired on September 30, 2011.

- We are working with FHFA to identify ways to prudently accelerate the rate of contraction of our mortgage-related investments portfolio.

We cannot predict the extent to which the other recommendations in the report will be implemented or when any actions to implement them may be taken. However, we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. FHFA's strategic plan for us is described below.

**FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships and 2012 Conservatorship Scorecard**

On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the conservatorships of Freddie Mac and Fannie Mae. The plan sets forth objectives and steps FHFA is taking or will take to meet FHFA's obligations as Conservator. FHFA states that the steps envisioned in the plan are consistent with each of the housing finance reform frameworks set forth in the report delivered by the Administration to Congress in February 2011, as well as with the leading congressional proposals introduced to date. FHFA indicates that the plan leaves open all options for Congress and the Administration regarding the resolution of the conservatorships and the degree of government involvement in supporting the secondary mortgage market in the future.

FHFA's plan provides lawmakers and the public with an outline of how FHFA as Conservator intends to guide Freddie Mac and Fannie Mae over the next few years, and identifies three strategic goals:

- **Build.**   Build a new infrastructure for the secondary mortgage market;

- **Contract.**   Gradually contract Freddie Mac and Fannie Mae's dominant presence in the marketplace while simplifying and shrinking their operations; and

- **Maintain.**   Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

The first of these goals establishes the steps FHFA, Freddie Mac, and Fannie Mae will take to create the necessary infrastructure, including a securitization platform and national standards for mortgage securitization, that Congress and market participants may use to develop the secondary mortgage market of the future. As part of this process, FHFA would determine how Freddie Mac and Fannie Mae can work together to build a single securitization platform that would replace their current separate proprietary systems.

The second goal describes steps that FHFA plans to take to gradually shift mortgage credit risk from Freddie Mac and Fannie Mae to private investors and eliminate the direct funding of mortgages by the enterprises. The plan states that the goal of gradually shifting mortgage credit risk from Freddie Mac and Fannie Mae to private investors could be accomplished, in the case of single-family credit guarantees, in several ways, including increasing guarantee fees, establishing loss-sharing arrangements and expanding reliance on mortgage insurance. To evaluate how to accomplish the goal of contracting enterprise operations in the multifamily business, the plan states that Freddie Mac and Fannie Mae will each undertake a market analysis of the viability of its respective multifamily operations without government guarantees.

For the third goal, the plan states that programs and strategies to ensure ongoing mortgage credit availability, assist troubled homeowners, and minimize taxpayer losses while restoring stability to housing markets continue to require energy, focus, and resources. The plan states that activities that must be continued and enhanced include: (a) successful implementation of HARP, including the significant program changes announced by FHFA in October 2011; (b) continued implementation of the Servicing Alignment Initiative; (c) renewed focus on short sales, deeds-in-lieu, and deeds-for-lease options that enable households and Freddie Mac and Fannie Mae to avoid foreclosure; and (d) further development and implementation of the REO disposition initiative announced by FHFA in 2011.

On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that established objectives and performance targets and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan for

Freddie Mac and Fannie Mae. We are aligning our resources and internal business plans to meet the goals and objectives laid out in the 2012 conservatorship scorecard. See "OTHER INFORMATION — 2012 Conservatorship Scorecard" in our 2011 Annual Report for further information.

### Legislated Increase to Guarantee Fees

On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than 10 basis points above the average guarantee fees charged in 2011 on single-family mortgage-backed securities. Under the law, the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by the companies. Effective April 1, 2012, at the direction of FHFA, the guarantee fee on all single-family residential mortgages sold to Freddie Mac and Fannie Mae was increased by 10 basis points.

Our business and financial condition will not benefit from the increases in guarantee fees under this law, as we must remit the proceeds from such increases to Treasury. It is currently unclear what effect this increase or any further guarantee fee increases or other fee adjustments associated with this law will have on the future profitability and operations of our single-family guarantee business. FHFA has informed us that, if we raise fees for other purposes in 2012, we will be allowed to retain the related revenue.

### Legislation Related to Reforming Freddie Mac and Fannie Mae

Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near-term. Congress continues to hold hearings and consider legislation on the future state of Freddie Mac and Fannie Mae.

A number of bills were introduced in Congress in 2011 and early 2012 relating to reforming Freddie Mac, Fannie Mae, and the secondary mortgage market. See "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments — Legislation Related to Reforming Freddie Mac and Fannie Mae*" in our 2011 Annual Report. We cannot predict whether or when any of the bills discussed therein might be enacted. We expect additional bills relating to Freddie Mac and Fannie Mae to be introduced and considered by Congress during the remainder of 2012. On February 2, 2012, the Administration announced that it expects to provide more detail concerning approaches to reform the U.S. housing finance market in the spring, and that it plans to begin exploring options for legislation more intensively with Congress.

### Legislative and Regulatory Developments Concerning Executive Compensation

Congress, the Administration, and FHFA recently took significant action related to compensation at Freddie Mac. These developments followed extensive public debate in Congress concerning our compensation structure, including whether senior executives should be entitled to bonuses or whether all employees should be placed on the government pay scale.

- On April 4, 2012, the President signed the Stop Trading on Congressional Knowledge Act of 2012, or STOCK Act, which became effective immediately. The STOCK Act includes a provision that expressly prohibits senior executives at Freddie Mac and Fannie Mae from receiving bonuses during any period of conservatorship.

- On March 8, 2012, as we reported in our 2011 Annual Report, FHFA approved a new executive compensation program for Freddie Mac. FHFA stated that the new compensation program strikes the balance between prudent executive pay, including the elimination of bonuses, with the need to safeguard quality staffing in order to protect the taxpayers' investment and achieve the objectives in FHFA's 2012 conservatorship scorecard.

We believe our risks related to employee turnover and employee engagement remain elevated. It is uncertain how the developments discussed above will affect our ability to manage these risks.

### Dodd-Frank Act

The Dodd-Frank Act, which was signed into law on July 21, 2010, significantly changed the regulation of the financial services industry, including by creating new standards related to regulatory oversight of systemically important financial companies, derivatives, capital requirements, asset-backed securitization, mortgage underwriting, and consumer financial protection. The Dodd-Frank Act has directly affected and will continue to directly affect the business and operations of Freddie Mac by subjecting us to new and additional regulatory oversight and standards, including with respect to our activities and products. We may also be affected by provisions of the Dodd-Frank Act and implementing regulations that affect the activities of banks, savings institutions, insurance companies, securities dealers, and other regulated entities that are our customers and counterparties.

Implementation of the Dodd-Frank Act is being accomplished through numerous rulemakings, many of which are still in process. Accordingly, it is difficult to assess fully the impact of the Dodd-Frank Act on Freddie Mac and the financial services industry at this time. The final effects of the legislation will not be known with certainty until these rulemakings are complete. The Dodd-Frank Act also mandates the preparation of studies on a wide range of issues, which could lead to additional legislation or regulatory changes.

Recent developments with respect to Dodd-Frank rulemakings that may have a significant impact on Freddie Mac include several final rules on derivatives promulgated by the Commodity Futures Trading Commission, or CFTC.

- On April 18, 2012, the CFTC, in conjunction with the SEC (collectively, the "Commissions"), approved a joint final rule further defining certain swap-related terms, including "major swap participant" (MSP), the text of which was released on April 27, 2012. We are analyzing the final rule, but have not yet determined whether Freddie Mac meets the criteria of an MSP. If Freddie Mac meets the criteria of an MSP, we would be required to register with the CFTC, and we would face significant regulations, including those relating to reporting, recordkeeping, and business conduct standards.

- The CFTC also recently promulgated final rules on real-time public reporting of swap transaction data, which might increase the costs of our swaps transactions. Furthermore, the CFTC released final rules relating to recordkeeping, reporting, and clearing customer documentation, each of which may increase Freddie Mac's administrative and compliance costs.

We continue to review and assess the impact of rulemakings and other activities under the Dodd-Frank Act. For more information, see "RISK FACTORS — Legal and Regulatory Risks — *The Dodd-Frank Act and related regulation may adversely affect our business activities and financial results*" in our 2011 Annual Report.

### Developments Concerning Single-Family Servicing Practices

There have been a number of regulatory developments in recent periods impacting single-family mortgage servicing and foreclosure practices, including those discussed below and in "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments — Developments Concerning Single-Family Servicing Practices*" in our 2011 Annual Report. It is possible that these developments will result in significant changes to mortgage servicing and foreclosure practices that could adversely affect our business. New compliance requirements placed on servicers as a result of these developments could expose Freddie Mac to financial risk as a result of further extensions of foreclosure timelines if home prices remain weak or decline. We may need to make additional significant changes to our practices, which could increase our operational risk. It is difficult to predict other impacts on our business of these changes, though such changes could adversely affect our credit losses and costs of servicing, and make it more difficult for us to transfer mortgage servicing rights to a successor servicer should we need to do so. Recent regulatory developments and changes include the February 9, 2012 announcement from a coalition of state attorneys general and federal agencies that it had entered into a settlement with five large seller/servicers concerning certain issues related to mortgage servicing practices. Under the settlement, which is currently in effect, these companies agreed to changes in their mortgage servicing practices. Certain of these changes will apply to loans they service on our behalf.

For more information on operational risks related to these developments in mortgage servicing, see "MD&A — RISK MANAGEMENT — Operational Risks" in our 2011 Annual Report.

### Rule Concerning Private Transfer Fees

On March 16, 2012, FHFA issued a final rule that prohibits Freddie Mac, Fannie Mae, and the FHLBs from purchasing, investing, or otherwise dealing in mortgages on properties encumbered by certain types of private transfer fee covenants and in certain related securities. Private transfer fee covenants run with the land or bind current owners or their successors in title, and obligate the transferee or transferor of the property to pay a fee upon the transfer of the property. The rule becomes effective on July 16, 2012. The full impact of this regulation is unclear at this time.

### FHFA Advisory Bulletin

On April 9, 2012, FHFA issued an advisory bulletin, "Framework for Adversely Classifying Loans, Other Real Estate Owned, and Other Assets and Listing Assets for Special Mention," which was effective upon issuance and is applicable to Freddie Mac, Fannie Mae, and the FHLBs. The advisory bulletin establishes guidelines for adverse classification and identification of specified assets and off-balance sheet credit exposures. The Advisory Bulletin indicates that this guidance considers and is generally consistent with the *Uniform Retail Credit Classification and Account Management Policy* issued by the federal banking regulators in June 2000. Among other provisions, the advisory bulletin requires that we classify a single-family loan as "loss" when the loan is no more than 180 days delinquent. The advisory bulletin specifies that, once

a loan is classified as "loss," we generally are required to charge-off the portion of the loan balance that exceeds the fair value of the property, less cost to sell. The advisory bulletin also specifies that, if we subsequently receive full or partial payment of a previously charged-off loan, we may report a recovery of the amount, either through our loan loss reserves or as a reduction in REO operations expenses. The accounting methods outlined in FHFA's advisory bulletin are significantly different from our current methods of accounting for single-family loans that are 180 days or more delinquent. We are currently assessing the operational and accounting impacts of this advisory bulletin, and have not yet determined when we will implement this bulletin or its impact on our consolidated financial statements.

### ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

**Interest-Rate Risk and Other Market Risks**

Our investments in mortgage loans and mortgage-related securities expose us to interest-rate risk and other market risks arising primarily from the uncertainty as to when borrowers will pay the outstanding principal balance of mortgage loans and mortgage-related securities, known as prepayment risk, and the resulting potential mismatch in the timing of our receipt of cash flows related to our assets versus the timing of payment of cash flows related to our liabilities used to fund those assets. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" in our 2011 Annual Report for a discussion of our market risk exposures, including those related to derivatives, institutional counterparties, and other market risks.

*PMVS and Duration Gap*

Our primary interest-rate risk measures are PMVS and duration gap.

PMVS is an estimate of the change in the market value of our net assets and liabilities from an instantaneous 50 basis point shock to interest rates, assuming no rebalancing actions are undertaken and assuming the mortgage-to-LIBOR basis does not change. PMVS is measured in two ways, one measuring the estimated sensitivity of our portfolio market value to parallel movements in interest rates (PMVS-Level or PMVS-L) and the other to nonparallel movements (PMVS-YC).

Duration gap measures the difference in price sensitivity to interest rate changes between our assets and liabilities, and is expressed in months relative to the market value of assets. For example, assets with a six month duration and liabilities with a five month duration would result in a positive duration gap of one month. A duration gap of zero implies that the duration of our assets equals the duration of our liabilities. Multiplying duration gap (expressed as a percentage of a year) by the fair value of our assets will provide an indication of the change in the fair value of our equity to be expected from a 1% change in interest rates.

The 50 basis point shift and 25 basis point change in slope of the LIBOR yield curve used for our PMVS measures reflect reasonably possible near-term changes that we believe provide a meaningful measure of our interest-rate risk sensitivity. Our PMVS measures assume instantaneous shocks. Therefore, these PMVS measures do not consider the effects on fair value of any rebalancing actions that we would typically expect to take to reduce our risk exposure.

*Limitations of Market Risk Measures*

Our PMVS and duration gap estimates are determined using models that involve our best judgment of interest-rate and prepayment assumptions. Accordingly, while we believe that PMVS and duration gap are useful risk management tools, they should be understood as estimates rather than as precise measurements. While PMVS and duration gap estimate our exposure to changes in interest rates, they do not capture the potential impact of certain other market risks, such as changes in volatility, basis, and foreign-currency risk. The impact of these other market risks can be significant.

There are inherent limitations in any methodology used to estimate exposure to changes in market interest rates. Our sensitivity analyses for PMVS and duration gap contemplate only certain movements in interest rates and are performed at a particular point in time based on the estimated fair value of our existing portfolio. These sensitivity analyses do not consider other factors that may have a significant effect on our financial instruments, most notably business activities and strategic actions that management may take in the future to manage interest-rate risk. As such, these analyses are not intended to provide precise forecasts of the effect a change in market interest rates would have on the estimated fair value of our net assets.

In addition, it has been more difficult in recent years to measure and manage the interest-rate risk related to mortgage assets as risk for prepayment model error remains high due to uncertainty regarding default rates, unemployment, loan modification, and the volatility and impact of home price movements on mortgage durations. Misestimation of prepayments could result in hedging-related losses.

*Duration Gap and PMVS Results*

The table below provides duration gap, estimated point-in-time and minimum and maximum PMVS-L and PMVS-YC results, and an average of the daily values and standard deviation for the three months ended March 31, 2012 and 2011. The table below also provides PMVS-L estimates assuming an immediate 100 basis point shift in the LIBOR yield curve. We do not hedge the entire prepayment risk exposure embedded in our mortgage assets. The interest-rate sensitivity of a mortgage portfolio varies across a wide range of interest rates. Therefore, the difference between PMVS at 50 basis points and 100 basis points is non-linear. Our PMVS-L (50 basis points) exposure at March 31, 2012 was $339 million; approximately half was driven by our duration exposure and the other half was driven by our negative convexity exposure. The PMVS-L at March 31, 2012 declined compared to December 31, 2011 primarily due to a decline in our duration exposure. On an average basis for the three months ended March, 31, 2012, our PMVS-L (50 basis points) was $223 million, which was primarily driven by our negative convexity exposure on our mortgage assets.

## Table 55 — PMVS Results

|  | PMVS-YC | PMVS-L | |
| --- | --- | --- | --- |
|  | 25 bps | 50 bps | 100 bps |
|  | | (in millions) | |
| Assuming shifts of the LIBOR yield curve: | | | |
| March 31, 2012 | $14 | $339 | $1,051 |
| December 31, 2011 | $ 7 | $465 | $1,349 |

|  | Three Months Ended March 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | 2012 | | | 2011 | | |
|  | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps |
|  | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | |
| Average | 0.0 | $16 | $223 | (0.3) | $21 | $448 |
| Minimum | (0.3) | $ 1 | $130 | (1.0) | $— | $280 |
| Maximum | 0.6 | $57 | $379 | 0.4 | $51 | $721 |
| Standard deviation | 0.2 | $12 | $ 47 | 0.3 | $13 | $101 |

Derivatives have historically enabled us to keep our interest-rate risk exposure at consistently low levels in a wide range of interest-rate environments. The table below shows that the PMVS-L risk levels for the periods presented would generally have been higher if we had not used derivatives. The derivative impact on our PMVS-L (50 basis points) was $(1.2) billion at March 31, 2012, a decline of $0.8 billion from December 31, 2011. The decline was primarily driven by an increase in the percentage of long-term debt we have been issuing, beginning in the fourth quarter of 2011. This allows us to take advantage of attractive long-term interest rates while decreasing our reliance on interest-rate swaps. In order to remain within our risk management limits, we rebalanced our mortgage-related investments portfolio with receive-fixed swaps, which lowered our derivative duration exposure.

## Table 56 — Derivative Impact on PMVS-L (50 bps)

|  | Before Derivatives | After Derivatives | Effect of Derivatives |
| --- | --- | --- | --- |
|  | | (in millions) | |
| At: | | | |
| March 31, 2012 | $1,574 | $339 | $(1,235) |
| December 31, 2011 | $2,470 | $465 | $(2,005) |

The disclosure in our Monthly Volume Summary reports, which are available on our website at www.freddiemac.com and in current reports on Form 8-K we file with the SEC, reflects the average of the daily PMVS-L, PMVS-YC and duration gap estimates for a given reporting period (a month, quarter or year).

## ITEM 4. CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms and that such information is accumulated and communicated to management of the company, including the company's Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. In designing our disclosure controls and procedures, we recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and we must apply judgment in implementing possible controls and procedures.

Management, including the company's Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of March 31, 2012. As a result of management's evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of March 31, 2012, at a reasonable level of assurance due to the two material weaknesses in our internal control over financial reporting discussed below.

- The first material weakness relates to our inability to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our consolidated financial statements. We have not been able to update our disclosure controls and procedures to provide reasonable assurance that information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure. Based on discussions with FHFA and the structural nature of this continuing weakness, we believe it is likely that we will not remediate this material weakness while we are under conservatorship. We consider this situation to be a material weakness in our internal control over financial reporting.

- The second material weakness relates to our inability to effectively manage information technology changes and maintain adequate controls over information security monitoring, resulting from elevated levels of employee turnover. We are finding it difficult to retain and engage critical employees and attract people with the skills and experience we need. While we have been able to leverage succession plans and reassign responsibilities to maintain sound internal control over financial reporting in most areas, as a result of elevated levels of employee turnover, we experienced a significant increase in the number of control breakdowns within certain areas of our information technology division, specifically within groups responsible for information change management and information security. We identified deficiencies in the following areas: (a) approval and monitoring of changes to certain technology applications and infrastructure; (b) monitoring of select privileged user activities; and (c) monitoring user activities performed on certain technology hardware systems. These control breakdowns could have impacted applications which support our financial reporting processes. Elevated levels of employee turnover contributed to ineffective management oversight of controls in these areas resulting in these deficiencies. We believe that these issues aggregate to a material weakness in our internal control over financial reporting.

**Changes in Internal Control Over Financial Reporting During the Quarter Ended March 31, 2012**

We evaluated the changes in our internal control over financial reporting that occurred during the quarter ended March 31, 2012 and concluded that the following matters have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

We have experienced elevated levels of voluntary turnover in the first quarter of 2012 and earlier periods, and expect this trend to continue as the public debate regarding the future role of the GSEs continues. We continue to have concerns about staffing inadequacies, management depth, and low employee engagement. Disruptive levels of turnover at both the executive and non-executive levels have contributed to a deterioration in our control environment and may lead to breakdowns in any of our operations, affect our execution capabilities, cause delays in the implementation of critical technology and other projects, and erode our business, modeling, internal audit, risk management, information security, financial reporting, legal, compliance, and other capabilities. For more information on recent legislative and regulatory developments affecting these risks, see "MD&A — LEGISLATIVE AND REGULATORY MATTERS — Legislative and Regulatory Developments Concerning Executive Compensation."

Two Board members, John A. Koskinen (Chairman) and Robert R. Glauber (Chairman, Governance and Nominating Committee), reached the company's mandatory retirement age and stepped down from the Board in March 2012. In order

to promote a smooth transition, Christopher S. Lynch, previously the Chairman of the Audit Committee, assumed the position of Non-Executive Chairman of the Board effective at the December 2011 Board meeting. A third Board member, Laurence E. Hirsch, did not seek re-election to the Board when his term expired in March 2012. In addition, Clayton S. Rose (Chairman of the Audit Committee) resigned from the Board of Directors effective as of 6:00 pm Eastern Standard Time on March 9, 2012. Carolyn H. Byrd assumed the position of Chairperson of the Audit Committee effective March 15, 2012, on an interim basis. Subsequent to March 31, 2012, we were informed by Anthony N. Renzi, Executive Vice President — Single-Family Business, Operations and Technology, that he will resign from his position effective May 11, 2012.

**Mitigating Actions Related to the Material Weaknesses in Internal Control Over Financial Reporting**

As described under "Evaluation of Disclosure Controls and Procedures," we have two material weaknesses in internal control over financial reporting as of March 31, 2012 that we have not remediated.

Given the structural nature of the material weakness related to our inability to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, we believe it is likely that we will not remediate this material weakness while we are under conservatorship. However, both we and FHFA have continued to engage in activities and employ procedures and practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws. These include the following:

- FHFA has established the Office of Conservatorship Operations, which is intended to facilitate operation of the company with the oversight of the Conservator.

- We provide drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also provide drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.

- FHFA personnel, including senior officials, review our SEC filings prior to filing, including this quarterly report on Form 10-Q, and engage in discussions regarding issues associated with the information contained in those filings. Prior to filing this quarterly report on Form 10-Q, FHFA provided us with a written acknowledgement that it had reviewed the quarterly report on Form 10-Q, was not aware of any material misstatements or omissions in the quarterly report on Form 10-Q, and had no objection to our filing the quarterly report on Form 10-Q.

- The Acting Director of FHFA is in frequent communication with our Chief Executive Officer, typically meeting (in person or by phone) on a weekly basis.

- FHFA representatives hold frequent meetings, typically weekly, with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, capital markets management, external communications, and legal matters.

- Senior officials within FHFA's accounting group meet frequently, typically weekly, with our senior financial executives regarding our accounting policies, practices, and procedures.

We have performed the following mitigating actions regarding the material weakness related to our inability to effectively manage information technology changes and maintain adequate controls over information security monitoring, resulting from increased levels of employee turnover:

- Reviewed potential unauthorized changes to applications supporting our financial statements for proper approvals.

- Reviewed and approved user access capabilities for applications supporting our financial reporting processes.

- Maintained effective business process controls over financial reporting.

- Filled the vacant positions or reassigned responsibilities within the information change management group.

- Took select actions targeted to reduce employee attrition in key control areas.

- Continued to explore various strategic arrangements with outside firms to provide operational capability and staffing for these functions, if needed.

We also intend to take the following remediation actions related to this material weakness:

- Assess staffing requirements to ensure appropriate staffing over information security controls and develop cross-training programs within this area to mitigate the risk to the internal control environment should we continue to experience high levels of employee turnover.

- Fill the vacant positions or reassign responsibilities within the information security monitoring group.

- Improve automation capabilities for the identification and resolution of potential unauthorized system changes.

- Update our policies and procedures to document control processes.

- Provide, on an on-going basis, additional training to IT individuals that execute or manage change management and security controls.

In view of our mitigating actions related to these material weaknesses, we believe that our interim consolidated financial statements for the quarter ended March 31, 2012 have been prepared in conformity with GAAP.

**ITEM 1. FINANCIAL STATEMENTS**

FHFA 3244

## FREDDIE MAC
## CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME
### (UNAUDITED)

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (in millions, except share-related amounts) | |
| **Interest income** | | |
| Mortgage loans: | | |
| Held by consolidated trusts | $ 17,468 | $ 20,064 |
| Unsecuritized | 2,312 | 2,334 |
| Total mortgage loans | 19,780 | 22,398 |
| Investments in securities | 2,938 | 3,283 |
| Other | 13 | 34 |
| Total interest income | 22,731 | 25,715 |
| **Interest expense** | | |
| Debt securities of consolidated trusts | (15,253) | (17,403) |
| Other debt | (2,816) | (3,565) |
| Total interest expense | (18,069) | (20,968) |
| Expense related to derivatives | (162) | (207) |
| **Net interest income** | 4,500 | 4,540 |
| Provision for credit losses | (1,825) | (1,989) |
| **Net interest income after provision for credit losses** | 2,675 | 2,551 |
| **Non-interest income (loss)** | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (4) | 223 |
| Gains (losses) on retirement of other debt | (21) | 12 |
| Gains (losses) on debt recorded at fair value | (17) | (81) |
| Derivative gains (losses) | (1,056) | (427) |
| Impairment of available-for-sale securities: | | |
| Total other-than-temporary impairment of available-for-sale securities | (475) | (1,054) |
| Portion of other-than-temporary impairment recognized in AOCI | (89) | (139) |
| Net impairment of available-for-sale securities recognized in earnings | (564) | (1,193) |
| Other gains (losses) on investment securities recognized in earnings | (288) | (120) |
| Other income | 434 | 334 |
| **Non-interest income (loss)** | (1,516) | (1,252) |
| **Non-interest expense** | | |
| Salaries and employee benefits | (176) | (207) |
| Professional services | (71) | (56) |
| Occupancy expense | (14) | (15) |
| Other administrative expenses | (76) | (83) |
| Total administrative expenses | (337) | (361) |
| Real estate owned operations expense | (171) | (257) |
| Other expenses | (88) | (79) |
| **Non-interest expense** | (596) | (697) |
| Income before income tax benefit | 563 | 602 |
| Income tax benefit | 14 | 74 |
| **Net income** | 577 | 676 |
| Other comprehensive income, net of taxes and reclassification adjustments: | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | 1,147 | 1,941 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 111 | 132 |
| Changes in defined benefit plans | (46) | (9) |
| Total other comprehensive income, net of taxes and reclassification adjustments | 1,212 | 2,064 |
| **Comprehensive income** | $ 1,789 | $ 2,740 |
| **Net income** | $ 577 | $ 676 |
| Preferred stock dividends | (1,804) | (1,605) |
| **Net loss attributable to common stockholders** | $ (1,227) | $ (929) |
| Net loss per common share: | | |
| Basic | $ (0.38) | $ (0.29) |
| Diluted | $ (0.38) | $ (0.29) |
| Weighted average common shares outstanding (in thousands): | | |
| Basic | 3,241,502 | 3,246,985 |
| Diluted | 3,241,502 | 3,246,985 |

*The accompanying notes are an integral part of these consolidated financial statements.*

**FREDDIE MAC**
**CONSOLIDATED BALANCE SHEETS**
**(UNAUDITED)**

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| | (in millions, except share-related amounts) | |
| **Assets** | | |
| Cash and cash equivalents (includes $1 and $2, respectively, related to our consolidated VIEs) | $ 8,569 | $ 28,442 |
| Restricted cash and cash equivalents (includes $27,332 and $27,675, respectively, related to our consolidated VIEs) | 27,790 | 28,063 |
| Federal funds sold and securities purchased under agreements to resell (includes $3,000 and $0, respectively, related to our consolidated VIEs) | 24,349 | 12,044 |
| *Investments in securities:* | | |
| Available-for-sale, at fair value (includes $187 and $204, respectively, pledged as collateral that may be repledged) | 202,422 | 210,659 |
| Trading, at fair value | 58,319 | 58,830 |
| *Total investments in securities* | 260,741 | 269,489 |
| *Mortgage loans:* | | |
| Held-for-investment, at amortized cost: | | |
| By consolidated trusts (net of allowances for loan losses of $7,139 and $8,351, respectively) | 1,555,067 | 1,564,131 |
| Unsecuritized (net of allowances for loan losses of $30,925 and $30,912, respectively) | 199,945 | 207,418 |
| Total held-for-investment mortgage loans, net | 1,755,012 | 1,771,549 |
| Held-for-sale, at lower-of-cost-or-fair-value (includes $11,337 and $9,710 at fair value, respectively) | 11,337 | 9,710 |
| *Total mortgage loans, net* | 1,766,349 | 1,781,259 |
| Accrued interest receivable (includes $6,079 and $6,242, respectively, related to our consolidated VIEs) | 7,820 | 8,062 |
| Derivative assets, net | 182 | 118 |
| Real estate owned, net (includes $67 and $60, respectively, related to our consolidated VIEs) | 5,454 | 5,680 |
| Deferred tax assets, net | 2,929 | 3,546 |
| Other assets (Note 18) (includes $6,227 and $6,083, respectively, related to our consolidated VIEs) | 10,761 | 10,513 |
| *Total assets* | $2,114,944 | $2,147,216 |
| **Liabilities and equity (deficit)** | | |
| *Liabilities* | | |
| Accrued interest payable (includes $5,832 and $5,943, respectively, related to our consolidated VIEs) | $ 8,129 | $ 8,898 |
| *Debt, net:* | | |
| Debt securities of consolidated trusts held by third parties | 1,481,622 | 1,471,437 |
| Other debt (includes $2,221 and $3,015 at fair value, respectively) | 618,629 | 660,546 |
| *Total debt, net* | 2,100,251 | 2,131,983 |
| Derivative liabilities, net | 296 | 435 |
| Other liabilities (Note 18) (includes $2 and $3, respectively, related to our consolidated VIEs) | 6,286 | 6,046 |
| *Total liabilities* | 2,114,962 | 2,147,362 |
| Commitments and contingencies (Notes 9, 10, and 17) | | |
| *Equity (deficit)* | | |
| Senior preferred stock, at redemption value | 72,317 | 72,171 |
| Preferred stock, at redemption value | 14,109 | 14,109 |
| Common stock, $0.00 par value, 4,000,000,000 shares authorized, 725,863,886 shares issued and 650,033,623 shares and 649,725,302 shares outstanding, respectively | — | — |
| Additional paid-in capital | — | 3 |
| Retained earnings (accumulated deficit) | (75,775) | (74,525) |
| *AOCI, net of taxes, related to:* | | |
| Available-for-sale securities (includes $9,625 and $10,334, respectively, related to net unrealized losses on securities for which other-than-temporary impairment has been recognized in earnings) | (5,066) | (6,213) |
| Cash flow hedge relationships | (1,619) | (1,730) |
| Defined benefit plans | (98) | (52) |
| *Total AOCI, net of taxes* | (6,783) | (7,995) |
| Treasury stock, at cost, 75,830,263 shares and 76,138,584 shares, respectively | (3,886) | (3,909) |
| *Total equity (deficit)* | (18) | (146) |
| *Total liabilities and equity (deficit)* | $2,114,944 | $2,147,216 |

*The accompanying notes are an integral part of these consolidated financial statements.*

## FREDDIE MAC
## CONSOLIDATED STATEMENTS OF EQUITY (DEFICIT)
## (UNAUDITED)

| | Freddie Mac Stockholders' Equity (Deficit) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shares Outstanding | | | Senior Preferred Stock, at Redemption Value | Preferred Stock, at Redemption Value | Common Stock, at Par Value | Additional Paid-In Capital | Retained Earnings (Accumulated Deficit) | AOCI, Net of Tax | Treasury Stock, at Cost | Total Equity (Deficit) |
| | Senior Preferred Stock | Preferred Stock | Common Stock | | | (in millions) | | | | | |
| **Balance as of December 31, 2010** | 1 | 464 | 649 | $64,200 | $14,109 | $— | $ 7 | $(62,733) | $(12,031) | $(3,953) | $ (401) |
| *Comprehensive income:* | | | | | | | | | | | |
| Net income | — | — | — | — | — | — | — | 676 | — | — | 676 |
| Other comprehensive income, net of taxes | — | — | — | — | — | — | — | — | 2,064 | — | 2,064 |
| *Comprehensive income* | | | | | | | | 676 | 2,064 | | 2,740 |
| Increase in liquidation preference | — | — | — | 500 | — | — | — | — | — | — | 500 |
| Stock-based compensation | — | — | — | — | — | — | 6 | — | — | — | 6 |
| Common stock issuances | — | — | 1 | — | — | — | (41) | — | — | 41 | — |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 28 | (28) | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (1,605) | — | — | (1,605) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (3) | — | — | (3) |
| **Ending balance at March 31, 2011** | 1 | 464 | 650 | $64,700 | $14,109 | $— | $ — | $(63,693) | $ (9,967) | $(3,912) | $ 1,237 |
| **Balance as of December 31, 2011** | 1 | 464 | 650 | $72,171 | $14,109 | $— | $ 3 | $(74,525) | $ (7,995) | $(3,909) | $ (146) |
| *Comprehensive income:* | | | | | | | | | | | |
| Net income | — | — | — | — | — | — | — | 577 | — | — | 577 |
| Other comprehensive income, net of taxes | — | — | — | — | — | — | — | — | 1,212 | — | 1,212 |
| *Comprehensive income* | | | | | | | | 577 | 1,212 | | 1,789 |
| Increase in liquidation preference | — | — | — | 146 | — | — | — | — | — | — | 146 |
| Stock-based compensation | — | — | — | — | — | — | 1 | — | — | — | 1 |
| Common stock issuances | — | — | — | — | — | — | (23) | — | — | 23 | — |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 19 | (19) | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (1,807) | — | — | (1,807) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (1) | — | — | (1) |
| **Ending balance at March 31, 2012** | 1 | 464 | 650 | $72,317 | $14,109 | $— | $ — | $(75,775) | $ (6,783) | $(3,886) | $ (18) |

*The accompanying notes are an integral part of these consolidated financial statements.*

## FREDDIE MAC
## CONSOLIDATED STATEMENTS OF CASH FLOWS
## (UNAUDITED)

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (in millions) | |
| **Cash flows from operating activities** | | |
| Net income .................................................................. | $ 577 | $ 676 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Derivative gains ......................................................... | (19) | (822) |
| Asset related amortization — premiums, discounts, and basis adjustments ................ | 900 | 250 |
| Debt related amortization — premiums and discounts on certain debt securities and basis adjustments ........ | (1,030) | (190) |
| Net discounts paid on retirements of other debt ................................... | (136) | (251) |
| Net premiums received from issuance of debt securities of consolidated trusts ........... | 1,200 | 1,214 |
| Losses (gains) on extinguishment of debt securities of consolidated trusts and other debt ........ | 25 | (235) |
| Provision for credit losses ................................................. | 1,825 | 1,989 |
| Losses on investment activity .............................................. | 673 | 1,250 |
| Losses on debt recorded at fair value ........................................ | 17 | 81 |
| Deferred income tax benefit ............................................... | (54) | (65) |
| Purchases of held-for-sale mortgage loans .................................... | (5,367) | (2,164) |
| Sales of mortgage loans acquired as held-for-sale .............................. | 3,903 | 3,321 |
| Repayments of mortgage loans acquired as held-for-sale ......................... | 16 | 13 |
| Change in: | | |
| Accrued interest receivable ............................................ | 242 | 53 |
| Accrued interest payable .............................................. | (717) | (850) |
| Income taxes payable ................................................. | 147 | (8) |
| Other, net ............................................................. | (798) | (48) |
| *Net cash provided by operating activities* ....................................... | 1,404 | 4,214 |
| **Cash flows from investing activities** | | |
| Purchases of trading securities ............................................. | (6,126) | (19,192) |
| Proceeds from sales of trading securities ..................................... | 1,962 | 12,746 |
| Proceeds from maturities of trading securities ................................. | 4,237 | 4,609 |
| Purchases of available-for-sale securities ..................................... | — | (5,868) |
| Proceeds from sales of available-for-sale securities ............................. | 644 | 958 |
| Proceeds from maturities of available-for-sale securities ......................... | 8,901 | 9,540 |
| Purchases of held-for-investment mortgage loans ............................... | (16,726) | (11,180) |
| Repayments of mortgage loans acquired as held-for-investment ................... | 118,395 | 90,717 |
| Decrease in restricted cash ................................................ | 273 | 1,927 |
| Net proceeds from mortgage insurance and acquisitions and dispositions of real estate owned ....... | 2,831 | 3,413 |
| Net (increase) decrease in federal funds sold and securities purchased under agreements to resell ........... | (12,305) | 8,732 |
| Derivative premiums and terminations and swap collateral, net ...................... | (125) | (155) |
| *Net cash provided by investing activities* ...................................... | 101,961 | 96,247 |
| **Cash flows from financing activities** | | |
| Proceeds from issuance of debt securities of consolidated trusts held by third parties ........... | 30,641 | 27,152 |
| Repayments of debt securities of consolidated trusts held by third parties ................. | (110,135) | (130,729) |
| Proceeds from issuance of other debt ........................................ | 196,918 | 264,444 |
| Repayments of other debt .................................................. | (239,000) | (262,924) |
| Increase in liquidation preference of senior preferred stock ....................... | 146 | 500 |
| Payment of cash dividends on senior preferred stock ............................ | (1,807) | (1,605) |
| Excess tax benefits associated with stock-based awards .......................... | — | 1 |
| Payments of low-income housing tax credit partnerships notes payable ............... | (1) | (14) |
| *Net cash used in financing activities* ......................................... | (123,238) | (103,175) |
| Net decrease in cash and cash equivalents ..................................... | (19,873) | (2,714) |
| Cash and cash equivalents at beginning of period ............................... | 28,442 | 37,012 |
| *Cash and cash equivalents at end of period* ................................... | $ 8,569 | $ 34,298 |
| **Supplemental cash flow information** | | |
| Cash paid (received) for: | | |
| Debt interest ............................................................ | $ 20,285 | $ 22,479 |
| Net derivative interest carry ............................................... | 1,058 | 472 |
| Income taxes ............................................................ | (108) | (1) |
| Non-cash investing and financing activities: | | |
| Underlying mortgage loans related to guarantor swap transactions ................... | 89,741 | 85,035 |
| Debt securities of consolidated trusts held by third parties established for guarantor swap transactions ........... | 89,741 | 85,035 |

*The accompanying notes are an integral part of these consolidated financial statements.*

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Freddie Mac was chartered by Congress in 1970 to stabilize the nation's residential mortgage market and expand opportunities for home ownership and affordable rental housing. Our statutory mission is to provide liquidity, stability and affordability to the U.S. housing market. We are a GSE regulated by FHFA, the SEC, HUD, and the Treasury, and are currently operating under the conservatorship of FHFA. For more information on the roles of FHFA and the Treasury, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" in this Form 10-Q and in our Annual Report on our Form 10-K for the year ended December 31, 2011, or our 2011 Annual Report.

We are involved in the U.S. housing market by participating in the secondary mortgage market. We do not participate directly in the primary mortgage market. Our participation in the secondary mortgage market includes providing our credit guarantee for mortgages originated by mortgage lenders in the primary mortgage market and investing in mortgage loans and mortgage-related securities.

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Single-family Guarantee, Investments, and Multifamily. Our Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related securities in exchange for management and guarantee fees. Our Investments segment reflects results from our investment, funding, and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans, which are funded by debt issuances and hedged using derivatives. Our Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. In our Multifamily segment, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization. See "NOTE 13: SEGMENT REPORTING" for additional information.

We are focused on the following primary business objectives: (a) developing mortgage market enhancements in support of a new infrastructure for the secondary mortgage market; (b) contracting the dominant presence of the GSEs in the marketplace; (c) providing credit availability for new or refinanced mortgages and maintaining foreclosure prevention activities; (d) minimizing our credit losses; (e) maintaining sound credit quality of the loans we purchase or guarantee; and (f) strengthening our infrastructure and improving overall efficiency while also focusing on retention of key employees. Our business objectives reflect direction we have received from the Conservator. On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that established objectives, performance targets and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan for Freddie Mac and Fannie Mae. We are aligning our resources and internal business plans to meet the goals and objectives laid out in the 2012 conservatorship scorecard. Based on our charter, other legislation, public statements from Treasury and FHFA officials, and other guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives. For information regarding these objectives, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Business Objectives."

Throughout our consolidated financial statements and related notes, we use certain acronyms and terms which are defined in the "GLOSSARY."

### Basis of Presentation

The accompanying unaudited consolidated financial statements have been prepared in accordance with GAAP for interim financial information and include our accounts as well as the accounts of other entities in which we have a controlling financial interest. All intercompany balances and transactions have been eliminated. These unaudited consolidated financial statements should be read in conjunction with the audited consolidated financial statements and related notes in our 2011 Annual Report. We are operating under the basis that we will realize assets and satisfy liabilities in the normal course of business as a going concern and in accordance with the delegation of authority from FHFA to our Board of Directors and management. Certain financial statement information that is normally included in annual financial statements prepared in conformity with GAAP but is not required for interim reporting purposes has been condensed or omitted. Certain amounts in prior periods' consolidated financial statements have been reclassified to conform to the current presentation. In the opinion of management, all adjustments, which include only normal recurring adjustments, have been recorded for a fair statement of our unaudited consolidated financial statements.

We recorded the cumulative effect of certain miscellaneous errors related to previously reported periods as corrections in the first quarter of 2012. We concluded that these errors are not material individually or in the aggregate to

our previously issued consolidated financial statements for any of the periods affected, or to our estimated earnings for the full year ended December 31, 2012, or to the trend of earnings. The impact to earnings, net of taxes, for the quarter ended March 31, 2012 was $6 million.

## Use of Estimates

The preparation of financial statements requires us to make estimates and assumptions that affect: (a) the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements; and (b) the reported amounts of revenues and expenses and gains and losses during the reporting period. Management has made significant estimates in preparing the financial statements, including, but not limited to, establishing the allowance for loan losses and reserve for guarantee losses, valuing financial instruments and other assets and liabilities, assessing impairments on investments, and assessing the realizability of net deferred tax assets. Actual results could be different from these estimates.

## Earnings Per Common Share

Because we have participating securities, we use the "two-class" method of computing earnings per common share. Basic earnings per common share is computed as net income available to common stockholders divided by the weighted average common shares outstanding for the period. The weighted average common shares outstanding for the period includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury pursuant to the Purchase Agreement. This warrant is included since it is unconditionally exercisable by the holder at a minimal cost. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for further information.

Diluted earnings per common share is computed as net income attributable to common stockholders divided by the weighted average common shares outstanding during the period adjusted for the dilutive effect of common equivalent shares outstanding. For periods with net income, the calculation includes the effect of the following common equivalent shares outstanding: (a) the weighted average shares related to stock options; and (b) the weighted average of restricted shares and restricted stock units. During periods in which a net loss has been incurred, potential common equivalent shares outstanding are not included in the calculation because it would have an antidilutive effect. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Earnings Per Common Share" in our 2011 Annual Report for further discussion of our significant accounting policies regarding our calculation of earnings per common share.

## Recently Adopted Accounting Guidance

### Fair Value Measurement

On January 1, 2012, we adopted an amendment to the accounting guidance pertaining to fair value measurement and disclosure. This amendment provided: (a) clarification about the application of existing fair value measurement and disclosure requirements; and (b) changes to the guidance for measuring fair value and disclosing information about fair value measurements. The adoption of this amendment did not have a material impact on our consolidated financial statements.

### Reconsideration of Effective Control for Repurchase Agreements

On January 1, 2012, we adopted an amendment to the guidance for transfers and servicing with regard to repurchase agreements and other agreements that both entitle and obligate a transferor to repurchase or redeem financial assets before their maturity. This amendment removed the criterion related to collateral maintenance from the transferor's assessment of effective control. It focuses the assessment of effective control on the transferor's rights and obligations with respect to the transferred financial assets and not whether the transferor has the practical ability to perform in accordance with those rights or obligations. The adoption of this amendment did not have a material impact on our consolidated financial statements.

## NOTE 2: CONSERVATORSHIP AND RELATED MATTERS

### Business Objectives

We continue to operate under the conservatorship that commenced on September 6, 2008, conducting our business under the direction of FHFA, as our Conservator. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition and results of operations. Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets. The Conservator also succeeded to the title to all books, records, and assets of Freddie Mac held by any other legal custodian or third party. During the

conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and management to conduct, day-to-day operations so that the company can continue to operate in the ordinary course of business. The directors serve on behalf of, and exercise authority as directed by, the Conservator.

We are also subject to certain constraints on our business activities by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent. In addition, we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

While in conservatorship, we can, and have continued to, enter into and enforce contracts with third parties. The Conservator continues to direct the efforts of the Board of Directors and management to address and determine the strategic direction for the company. While the Conservator has delegated certain authority to management to conduct day-to-day operations, many management decisions are subject to review and approval by FHFA and Treasury. In addition, management frequently receives directions from FHFA on various matters involving day-to-day operations.

Our business objectives and strategies have, in some cases, been altered since we were placed into conservatorship, and may continue to change. These changes to our business objectives and strategies may not contribute to our profitability. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" in our 2011 Annual Report for further discussion.

On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the conservatorships of Freddie Mac and Fannie Mae. The plan sets forth objectives and steps FHFA is taking or will take to meet FHFA's obligations as Conservator. FHFA states that the steps envisioned in the plan are consistent with each of the housing finance reform frameworks set forth in the report delivered by the Administration to Congress in February 2011, as well as with the leading congressional proposals introduced to date. FHFA indicates that the plan leaves open all options for Congress and the Administration regarding the resolution of the conservatorships and the degree of government involvement in supporting the secondary mortgage market in the future.

FHFA's plan provides lawmakers and the public with an outline of how FHFA, as Conservator, intends to guide Freddie Mac and Fannie Mae over the next few years, and identifies three strategic goals:

- **Build.**  Build a new infrastructure for the secondary mortgage market;
- **Contract.**  Gradually contract Freddie Mac and Fannie Mae's dominant presence in the marketplace while simplifying and shrinking their operations; and
- **Maintain.**  Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that established objectives, performance targets, and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan. We are aligning our resources and internal business plans to meet the goals and objectives laid out in the 2012 conservatorship scorecard.

Given the important role the Administration and our Conservator have placed on Freddie Mac in addressing housing and mortgage market conditions and our public mission, we may be required to take additional actions that could have a negative impact on our business, operating results, or financial condition. Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a manner that serves our public mission and other non-financial objectives, but may not contribute to our profitability. Some of these changes increase our expenses, while others require us to forego revenue opportunities in the near term. In addition, the objectives set forth for us under our charter and by our Conservator, as well as the restrictions on our business under the Purchase Agreement, have adversely impacted and may continue to adversely impact our financial results, including our segment results. For example, our efforts to help struggling homeowners and the mortgage market, in line with our public mission, may help to mitigate our credit losses, but in some cases may increase our expenses or require us to forgo revenue opportunities in the near term. There is significant uncertainty as to the ultimate impact that our efforts to aid the housing and mortgage markets, including our efforts in connection with the MHA Program, will have on our future capital or liquidity needs. We are allocating significant internal resources to the implementation of the various initiatives under the MHA Program and to the servicing alignment initiative as directed by FHFA on April 28, 2011, which has increased, and will continue to increase, our expenses.

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist. The Acting Director of FHFA stated on September 19, 2011 that "it ought to

be clear to everyone at this point, given [Freddie Mac and Fannie Mae's] losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that [Freddie Mac and Fannie Mae] will not be able to earn their way back to a condition that allows them to emerge from conservatorship." The Acting Director of FHFA stated on November 15, 2011 that "the long-term outlook is that neither [Freddie Mac nor Fannie Mae] will continue to exist, at least in its current form, in the future." We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near-term. We have no ability to predict the outcome of these deliberations.

On February 11, 2011, the Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, and states that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements. These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations, and financial condition.

The temporary high-cost area limits expired on September 30, 2011. We are working with FHFA to identify ways to prudently accelerate the rate of contraction of our mortgage-related investments portfolio. In addition, as discussed below, we recently raised our guarantee fees at the direction of FHFA. We cannot predict the extent to which the other recommendations in the report will be implemented or when any actions to implement them may be taken.

On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than 10 basis points above the average guarantee fees charged in 2011 on single-family mortgage-backed securities. Under the law, the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by the companies. Effective April 1, 2012, at the direction of FHFA, the guarantee fee on all single-family residential mortgages sold to Freddie Mac and Fannie Mae was increased by 10 basis points.

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers whose monthly payments are current and who can benefit from refinancing their home mortgages. The revisions to HARP will be available to borrowers with loans that were sold to Freddie Mac and Fannie Mae on or before May 31, 2009 and who have current LTV ratios above 80%.

**Impact of the Purchase Agreement and FHFA Regulation and Other Restrictions on the Mortgage-Related Investments Portfolio**

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $729 billion as of December 31, 2011 and may not exceed $656.1 billion as of December 31, 2012. The UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation, was $618.3 billion at March 31, 2012. The annual 10% reduction in the size of our mortgage-related investments portfolio is calculated based on the maximum allowable size of the mortgage-related investments portfolio, rather than the actual UPB of the mortgage-related investments portfolio, as of December 31 of the preceding year. The limitation is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs. FHFA has stated that we will

not be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio. We are also subject to limits on the amount of assets we can sell from our mortgage-related investments portfolio in any calendar month without review and approval by FHFA and, if FHFA determines, Treasury.

**Government Support for our Business**

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

Significant recent developments with respect to the support we received from the government during the three months ended March 31, 2012 include the following:

- On March 30, 2012, we received $146 million in funding from Treasury under the Purchase Agreement, which increased the aggregate liquidation preference of the senior preferred stock to $72.3 billion as of March 31, 2012; and

- On March 30, 2012, we paid dividends of $1.8 billion in cash on the senior preferred stock to Treasury at the direction of the Conservator.

To address our net worth deficit of $18 million at March 31, 2012, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $19 million, and will request that we receive these funds by June 30, 2012. Our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. Following funding of the draw request related to our net worth deficit at March 31, 2012, our annual cash dividend obligation to Treasury on the senior preferred stock will be $7.23 billion, which exceeds our annual historical earnings in all but one period.

Through March 2012, we paid $18.3 billion in cash dividends in the aggregate on the senior preferred stock. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth. In addition, cash payment of quarterly commitment fees payable to Treasury will negatively impact our future net worth over the long-term. Treasury waived the fee for all quarters of 2011 and the first and second quarters of 2012. The amount of the fee has not yet been established and could be substantial. As a result of additional draws and other factors: (a) the liquidation preference of, and the dividends we owe on, the senior preferred stock would increase and, therefore, we may need additional draws from Treasury in order to pay our dividend obligations; and (b) there is significant uncertainty as to our long-term financial sustainability.

See "NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS" and "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2011 Annual Report for more information on the terms of the conservatorship and the Purchase Agreement.

## NOTE 3: VARIABLE INTEREST ENTITIES

We use securitization trusts in our securities issuance process, and are required to evaluate the trusts for consolidation on an ongoing basis. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Consolidation and Equity Method of Accounting" in our 2011 Annual Report for further information regarding the consolidation of certain VIEs.

Based on our evaluation of whether we hold a controlling financial interest in these VIEs, we determined that we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions. Therefore, we consolidate on our balance sheet the assets and liabilities of these trusts. In addition to our PC trusts, we are involved with numerous other entities that meet the definition of a VIE, as discussed below.

**VIEs for which We are the Primary Beneficiary**

*Single-family PC Trusts*

Our single-family PC trusts issue pass-through securities that represent undivided beneficial interests in pools of mortgages held by these trusts. For our fixed-rate PCs, we guarantee the timely payment of interest and principal. For our ARM PCs, we guarantee the timely payment of the weighted average coupon interest rate for the underlying mortgage loans and the full and final payment of principal; we do not guarantee the timely payment of principal on ARM PCs. In exchange for providing this guarantee, we may receive a management and guarantee fee and up-front delivery fees. We issue most of our single-family PCs in transactions in which our customers exchange mortgage loans for PCs. We refer to these transactions as guarantor swaps.

PCs are designed so that we bear the credit risk inherent in the loans underlying the PCs through our guarantee of principal and interest payments on the PCs. The PC holders bear the interest rate or prepayment risk on the mortgage loans and the risk that we will not perform on our obligation as guarantor. For purposes of our consolidation assessments, our evaluation of power and economic exposure with regard to PC trusts focuses on credit risk because the credit performance of the underlying mortgage loans was identified as the activity that most significantly impacts the economic performance of these entities. We have the power to impact the activities related to this risk in our role as guarantor and master servicer.

Specifically, in our role as master servicer, we establish requirements for how mortgage loans are serviced and what steps are to be taken to avoid credit losses (*e.g.*, modification, foreclosure). Additionally, in our capacity as guarantor, we have the ability to remove defaulted mortgage loans out of the PC trust to help manage credit losses. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for further information regarding our removal of mortgage loans out of PC trusts. These powers allow us to direct the activities of the VIE (*i.e.*, the PC trust) that most significantly impact its economic performance. In addition, we determined that our guarantee to each PC trust to provide principal and interest payments obligates us to absorb losses that could potentially be significant to the PC trusts. Accordingly, we concluded that we are the primary beneficiary of our single-family PC trusts.

At both March 31, 2012 and December 31, 2011, we were the primary beneficiary of, and therefore consolidated, single-family PC trusts with assets totaling $1.6 trillion, as measured using the UPB of issued PCs. The assets of each PC trust can be used only to settle obligations of that trust. In connection with our PC trusts, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancement. We also have credit protection for certain of our PC trusts that issue PCs backed by loans or certificates of federal agencies (such as FHA, VA, and USDA). See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for additional information regarding third-party credit enhancements related to our PC trusts.

### Other Guarantee Transactions

Other Guarantee Transactions are mortgage-related securities that we issue to third parties in exchange for non-Freddie Mac mortgage-related securities. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2011 Annual Report for information on the nature of Other Guarantee Transactions. The degree to which our involvement with securitization trusts that issue Other Guarantee Transactions provides us with power to direct the activities that most significantly impact the economic performance of these VIEs (*e.g.*, the ability to direct the servicing of the underlying assets of these entities) and obligation to absorb losses that could potentially be significant to the VIEs (*e.g.*, the existence of third-party credit enhancements) varies by transaction. For all Other Guarantee Transactions, our variable interest in these VIEs represents some form of credit guarantee, whether covering all the issued beneficial interests or only the most senior ones. The nature of our credit guarantee typically determines whether we have power over the activities that most significantly impact the economic performance of the VIE.

For those Other Guarantee Transactions where our credit guarantee is in a first loss position to absorb credit losses on the underlying assets of these entities as of the reporting date, we would also have the ability to direct servicing of the underlying assets, which is the power to direct the activities that most significantly impact the economic performance of these VIEs. As a result, we would be the primary beneficiary, and we would consolidate the VIE. For those Other Guarantee Transactions in which our credit guarantee is not in a first loss position to absorb credit losses on the underlying assets of these entities as of the reporting date (*i.e.*, our credit guarantee is in a secondary loss position), we would not have the ability to direct servicing of the underlying assets, so we would not be the primary beneficiary, and we would not consolidate the VIE.

Our consolidation determination took into consideration the specific facts and circumstances of our involvement with each of these entities. As a result, we have concluded that we are the primary beneficiary of certain Other Guarantee Transactions with underlying assets totaling $12.2 billion and $12.9 billion at March 31, 2012 and December 31, 2011, respectively. For those Other Guarantee Transactions that we do consolidate, the investors in these securities have recourse only to the assets of those VIEs.

*Consolidated VIEs*

The table below represents the carrying amounts and classification of the assets and liabilities of consolidated VIEs on our consolidated balance sheets.

**Table 3.1 — Assets and Liabilities of Consolidated VIEs**

| Consolidated Balance Sheets Line Item | March 31, 2012 | December 31, 2011 |
|---|---|---|
| | (in millions) | |
| Cash and cash equivalents | $ 1 | $ 2 |
| Restricted cash and cash equivalents | 27,332 | 27,675 |
| Federal funds sold and securities purchased under agreements to resell | 3,000 | — |
| Mortgage loans held-for-investment by consolidated trusts | 1,555,067 | 1,564,131 |
| Accrued interest receivable | 6,079 | 6,242 |
| Real estate owned, net | 67 | 60 |
| Other assets | 6,227 | 6,083 |
| Total assets of consolidated VIEs | $1,597,773 | $1,604,193 |
| Accrued interest payable | $ 5,832 | $ 5,943 |
| Debt securities of consolidated trusts held by third parties | 1,481,622 | 1,471,437 |
| Other liabilities | 2 | 3 |
| Total liabilities of consolidated VIEs | $1,487,456 | $1,477,383 |

## VIEs for which We are not the Primary Beneficiary

The table below represents the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Our involvement with VIEs for which we are not the primary beneficiary generally takes one of two forms: (a) purchasing an investment in these entities; or (b) providing a guarantee to these entities. Our maximum exposure to loss for those VIEs in which we have purchased an investment is calculated as the maximum potential charge that we would recognize in earnings if that investment were to become worthless. This amount does not include other-than-temporary impairments or other write-downs that we previously recognized through earnings. Our maximum exposure to loss for those VIEs for which we have provided a guarantee represents the contractual amounts that could be lost under the guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements. We do not believe the maximum exposure to loss disclosed in the table below is representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation, including possible recoveries under credit enhancement arrangements.

**Table 3.2 — Variable Interests in VIEs for which We are not the Primary Beneficiary**

| | March 31, 2012 | | | | |
|---|---|---|---|---|---|
| | | Mortgage-Related Security Trusts | | | |
| | Asset-Backed Investment Trusts[1] | Freddie Mac Securities[2] | Non-Freddie Mac Securities[1] | Unsecuritized Multifamily Loans[3] | Other[1][4] |
| | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 45 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents | — | 51 | — | 32 | 183 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value | — | 76,163 | 118,694 | — | — |
| Trading, at fair value | 695 | 14,504 | 13,986 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized | — | — | — | 70,874 | — |
| Held-for-sale | — | — | — | 11,337 | — |
| Accrued interest receivable | — | 440 | 409 | 349 | 6 |
| Derivative assets, net | — | — | — | — | 1 |
| Other assets | — | 455 | — | 467 | 418 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net | — | (5) | — | — | (41) |
| Other liabilities | — | (729) | (1) | (36) | (661) |
| **Maximum Exposure to Loss** | $ 740 | $39,143 | $146,731 | $ 83,059 | $11,142 |
| **Total Assets of Non-Consolidated VIEs[5]** | $26,002 | $44,843 | $853,285 | $136,229 | $22,467 |

| | December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | | Mortgage-Related Security Trusts | | | |
| | Asset-Backed Investment Trusts[1] | Freddie Mac Securities[2] | Non-Freddie Mac Securities[1] | Unsecuritized Multifamily Loans[3] | Other[1][4] |
| | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 447 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents | — | 53 | — | 33 | 167 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value | — | 81,092 | 121,743 | — | — |
| Trading, at fair value | 302 | 16,047 | 15,473 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized | — | — | — | 72,295 | — |
| Held-for-sale | — | — | — | 9,710 | — |
| Accrued interest receivable | — | 471 | 420 | 353 | 6 |
| Derivative assets, net | — | — | — | — | 1 |
| Other assets | — | 432 | 1 | 375 | 434 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net | — | (1) | — | — | (42) |
| Other liabilities | — | (585) | — | (39) | (675) |
| **Maximum Exposure to Loss** | $ 749 | $36,438 | $153,620 | $ 82,766 | $11,198 |
| **Total Assets of Non-Consolidated VIEs[5]** | $16,748 | $41,740 | $921,219 | $134,145 | $25,616 |

(1) For our involvement with non-consolidated asset-backed investment trusts, non-Freddie Mac security trusts and certain other VIEs where we do not provide a guarantee, our maximum exposure to loss is computed as the carrying amount if the security is classified as trading or the amortized cost if the security is classified as available-for-sale for our investments and related assets recorded on our consolidated balance sheets, including any unrealized amounts recorded in AOCI for securities classified as available-for-sale.

(2) Freddie Mac securities include our variable interests in single-family multiclass REMICs and Other Structured Securities, multifamily PCs, multifamily Other Structured Securities, and Other Guarantee Transactions that we do not consolidate. For our variable interests in non-consolidated Freddie Mac security trusts for which we have provided a guarantee, our maximum exposure to loss is the outstanding UPB of the underlying mortgage loans or securities that we have guaranteed, which is the maximum contractual amount under such guarantees. However, our investments in single-family REMICs and Other Structured Securities that are not consolidated do not give rise to any additional exposure to credit loss as we already consolidate the underlying collateral.

(3) For unsecuritized multifamily loans, our maximum exposure to loss is based on the UPB of these loans, as adjusted for loan level basis adjustments, any associated allowance for loan losses, accrued interest receivable, and fair value adjustments on held-for-sale loans.

(4) For other non-consolidated VIEs where we have provided a guarantee, our maximum exposure to loss is the contractual amount that could be lost under the guarantee if the counterparty or borrower defaulted, without consideration of possible recoveries under credit enhancement arrangements.

(5) Represents the remaining UPB of assets held by non-consolidated VIEs using the most current information available, where our continuing involvement is significant. We do not include the assets of our non-consolidated trusts related to single-family REMICs and Other Structured Securities in this amount as we already consolidate the underlying collateral of these trusts on our consolidated balance sheets.

### *Asset-Backed Investment Trusts*

We invest in a variety of short-term non-mortgage-related, asset-backed investment trusts. These short-term investments represent interests in trusts consisting of a pool of receivables or other financial assets, typically auto and equipment loans. These trusts act as vehicles to allow originators to securitize assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the securities

offering create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our asset-backed investments.

At March 31, 2012 and December 31, 2011, we had investments in 19 and 11 asset-backed investment trusts in which we had a variable interest but were not considered the primary beneficiary, respectively. Our investments in these asset-backed investment trusts as of March 31, 2012 were made in 2011 and 2012. At both March 31, 2012 and December 31, 2011, we were not the primary beneficiary of any such trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. As such, our investments in these asset-backed investment trusts are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report. Our investments in these trusts totaled $0.7 billion at both March 31, 2012 and December 31, 2011, and are included as cash and cash equivalents, available-for-sale securities, or trading securities on our consolidated balance sheets. At both March 31, 2012 and December 31, 2011, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment.

### *Mortgage-Related Security Trusts*

#### *Freddie Mac Securities*

Freddie Mac securities related to our variable interests in non-consolidated VIEs primarily consist of our REMICs and Other Structured Securities and Other Guarantee Transactions. REMICs and Other Structured Securities are created by using PCs or previously issued REMICs and Other Structured Securities as collateral. Our involvement with the resecuritization trusts that issue these securities does not provide us with rights to receive benefits or obligations to absorb losses nor does it provide any power that would enable us to direct the most significant activities of these VIEs because the ultimate underlying assets are PCs for which we have already provided a guarantee (*i.e.*, all significant rights, obligations and powers are associated with the underlying PC trusts). As a result, we have concluded that we are not the primary beneficiary of these resecuritization trusts.

Other Guarantee Transactions are created by using non-Freddie Mac mortgage-related securities as collateral. At both March 31, 2012 and December 31, 2011, our involvement with certain Other Guarantee Transactions does not provide us with the power to direct the activities that most significantly impact the economic performance of these VIEs. As a result, we hold a variable interest in, but are not the primary beneficiary of, certain Other Guarantee Transactions.

For non-consolidated REMICs and Other Structured Securities and Other Guarantee Transactions, our investments are primarily included in either available-for-sale securities or trading securities on our consolidated balance sheets. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2011 Annual Report for additional information on accounting for purchases of PCs and beneficial interests issued by resecuritization trusts. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

#### *Non-Freddie Mac Securities*

We invest in a variety of mortgage-related securities issued by third-parties, including non-Freddie Mac agency securities, CMBS, other private-label securities backed by various mortgage-related assets, and obligations of states and political subdivisions. These investments typically represent interests in trusts that consist of a pool of mortgage-related assets and act as vehicles to allow originators to securitize those assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the securities offering create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our non-Freddie Mac securities.

Our investments in these non-Freddie Mac securities at March 31, 2012 were made between 1994 and 2012. We are not generally the primary beneficiary of non-Freddie Mac securities trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. We were not the primary beneficiary of any significant non-Freddie Mac securities trusts as of March 31, 2012 or December 31, 2011. Our investments in non-consolidated non-Freddie Mac mortgage-related securities are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report. At both March 31, 2012 and December 31, 2011, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

*Unsecuritized Multifamily Loans*

We purchase loans made to various multifamily real estate entities. We primarily purchase such loans for securitization, and to a lesser extent, investment purposes. These real estate entities are primarily single-asset entities (typically partnerships or limited liability companies) established to acquire, construct, rehabilitate, or refinance residential properties, and subsequently to operate the properties as residential rental real estate. The loans we acquire usually are, at origination, equal to 80% or less of the value of the related underlying property. The remaining 20% of value is typically funded through equity contributions by the partners or members of the borrower entity. In certain cases, the 20% not funded through the loan we acquire also includes subordinate loans or mezzanine financing from third-party lenders.

We held more than 7,000 unsecuritized multifamily loans at both March 31, 2012 and December 31, 2011. The UPB of our investments in these loans was $82.5 billion and $82.3 billion as of March 31, 2012 and December 31, 2011, respectively, and was included in unsecuritized held-for-investment mortgage loans, at amortized cost, and held-for-sale mortgage loans at fair value on our consolidated balance sheets. We are not generally the primary beneficiary of the multifamily real estate borrowing entities because the loans we acquire are passive in nature and do not provide us with the power to direct the activities of these entities that most significantly impact their economic performance. However, when a multifamily loan becomes delinquent, we may become the primary beneficiary of the borrowing entity depending upon the structure of this entity and the rights granted to us under the governing legal documents. At both March 31, 2012 and December 31, 2011, the amount of unsecuritized multifamily loans for which we could be considered the primary beneficiary of the underlying borrowing entity was not material. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" in our 2011 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for more information.

*Other*

Our involvement with other VIEs includes our investments in LIHTC partnerships, certain other mortgage-related guarantees, and certain short-term default and other guarantee commitments that we account for as derivatives:

- *Investments in LIHTC Partnerships:*   We previously invested as a limited partner in various LIHTC partnerships that invest in lower-tier or project partnerships that are single asset entities. Our investments in these LIHTC partnerships are funded through non-recourse non-interest bearing notes payable. We wrote down the carrying value of our investments to zero as of December 31, 2009, as we will not be able to realize any value from these investments.

- *Certain other mortgage-related guarantees:*   We have other guarantee commitments outstanding on multifamily housing revenue bonds that were issued by third parties. As part of certain other mortgage-related guarantees, we also provide commitments to advance funds, commonly referred to as "liquidity guarantees," which require us to advance funds to enable third parties to purchase variable-rate multifamily housing revenue bonds, or certificates backed by such bonds, that cannot be remarketed within a specified number of days after they are tendered by their holders.

- *Certain short-term default and other guarantee commitments accounted for as derivatives*: Our involvement in these VIEs includes our guarantee of the performance of interest-rate swap contracts in certain circumstances and credit derivatives we issued to guarantee the payments on multifamily loans or securities.

At both March 31, 2012 and December 31, 2011, we were the primary beneficiary of one real estate entity that invests in multifamily property, related to a credit-enhanced multifamily housing revenue bond that was not deemed to be material. We were not the primary beneficiary of the remainder of other VIEs because our involvement in these VIEs is passive in nature and does not provide us with the power to direct the activities of the VIEs that most significantly impact their economic performance. See Table 3.2 for the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Also see "NOTE 9: FINANCIAL GUARANTEES" for additional information about our involvement with the VIEs related to mortgage-related guarantees and short-term default and other guarantee commitments discussed above.

## NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES

We own both single-family mortgage loans, which are secured by one to four family residential properties, and multifamily mortgage loans, which are secured by properties with five or more residential rental units. Our single-family loans are predominately first lien, fixed-rate mortgages secured by the borrower's primary residence. For a discussion of

our significant accounting policies regarding our mortgage loans and loan loss reserves, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report.

The table below summarizes the types of loans on our consolidated balance sheets as of March 31, 2012 and December 31, 2011.

**Table 4.1 — Mortgage Loans**

| | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Unsecuritized | Held by Consolidated Trusts | Total | Unsecuritized | Held by Consolidated Trusts | Total |
| | (in millions) | | | | | |
| Single-family:[1] | | | | | | |
| Fixed-rate | | | | | | |
| Amortizing . . . . . . . . . . . . . . . . . . . . . . . . . . . | $147,841 | $1,409,553 | $1,557,394 | $153,177 | $1,418,751 | $1,571,928 |
| Interest-only . . . . . . . . . . . . . . . . . . . . . . . . . | 3,077 | 13,575 | 16,652 | 3,184 | 14,758 | 17,942 |
| Total fixed-rate . . . . . . . . . . . . . . . . . . . . . | 150,918 | 1,423,128 | 1,574,046 | 156,361 | 1,433,509 | 1,589,870 |
| Adjustable-rate | | | | | | |
| Amortizing . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,292 | 69,406 | 72,698 | 3,428 | 68,362 | 71,790 |
| Interest-only . . . . . . . . . . . . . . . . . . . . . . . . . | 9,734 | 40,916 | 50,650 | 10,376 | 43,655 | 54,031 |
| Total adjustable-rate . . . . . . . . . . . . . . . . . . | 13,026 | 110,322 | 123,348 | 13,804 | 112,017 | 125,821 |
| Other Guarantee Transactions backed by non-Freddie Mac securities . . . . . . . . . . . . . . . . . . . . . . . . | — | 12,117 | 12,117 | — | 12,776 | 12,776 |
| FHA/VA and other governmental . . . . . . . . . . . . . | 1,552 | 3,119 | 4,671 | 1,494 | 3,254 | 4,748 |
| Total single-family . . . . . . . . . . . . . . . . . . . . . . . . | 165,496 | 1,548,686 | 1,714,182 | 171,659 | 1,561,556 | 1,733,215 |
| Multifamily:[1] | | | | | | |
| Fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 69,749 | — | 69,749 | 69,647 | — | 69,647 |
| Adjustable-rate . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,737 | — | 12,737 | 12,661 | — | 12,661 |
| Other governmental . . . . . . . . . . . . . . . . . . . . . . . | 3 | — | 3 | 3 | — | 3 |
| Total multifamily . . . . . . . . . . . . . . . . . . . . . . . . . | 82,489 | — | 82,489 | 82,311 | — | 82,311 |
| Total UPB of mortgage loans . . . . . . . . . . . . . . . . . . | 247,985 | 1,548,686 | 1,796,671 | 253,970 | 1,561,556 | 1,815,526 |
| Deferred fees, unamortized premiums, discounts and other cost basis adjustments . . . . . . . . . . . . . . . . | (5,984) | 13,520 | 7,536 | (6,125) | 10,926 | 4,801 |
| Lower of cost or fair value adjustments on loans held-for-sale[2] . . . . . . . . . . . . . . . . . . . . . . . . . | 206 | — | 206 | 195 | — | 195 |
| Allowance for loan losses on mortgage loans held-for-investment . . . . . . . . . . . . . . . . . . . . . . . . | (30,925) | (7,139) | (38,064) | (30,912) | (8,351) | (39,263) |
| Total mortgage loans, net . . . . . . . . . . . . . . . . . . . . | $211,282 | $1,555,067 | $1,766,349 | $217,128 | $1,564,131 | $1,781,259 |
| Mortgage loans, net: | | | | | | |
| Held-for-investment . . . . . . . . . . . . . . . . . . . . . . . | $199,945 | $1,555,067 | $1,755,012 | $207,418 | $1,564,131 | $1,771,549 |
| Held-for-sale . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11,337 | | 11,337 | 9,710 | | 9,710 |
| Total mortgage loans, net . . . . . . . . . . . . . . . . . . . . | $211,282 | $1,555,067 | $1,766,349 | $217,128 | $1,564,131 | $1,781,259 |

(1) Based on UPB and excluding mortgage loans traded, but not yet settled.
(2) Consists of fair value adjustments associated with mortgage loans for which we have made a fair value election.

During the three months ended March 31, 2012 and 2011, we purchased $102.8 billion and $95.7 billion, respectively, in UPB of single-family mortgage loans and $0.3 billion and $0.7 billion, respectively, in UPB of multifamily loans that were classified as held-for-investment as of the purchase date. Our sales of multifamily mortgage loans occur primarily through the issuance of multifamily Other Guarantee Transactions. See "NOTE 9: FINANCIAL GUARANTEES" for more information. We did not have any reclassifications of mortgage loans into held-for-sale during the three months ended March 31, 2012. We did not sell any held-for-investment loans during the three months ended March 31, 2012.

**Credit Quality of Mortgage Loans**

We evaluate the credit quality of single-family loans using different criteria than the criteria we use to evaluate multifamily loans. The current LTV ratio is one key factor we consider when estimating our loan loss reserves for single-family loans. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. A second lien mortgage also reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of both March 31, 2012 and December 31, 2011, approximately 15% of loans in our single-family credit guarantee portfolio had second lien financing by third parties at the time of origination of the first mortgage, and we estimate that these loans comprised 17% of our seriously delinquent loans at both dates, based on UPB. However,

borrowers are free to obtain second lien financing after origination, and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages. For further information about concentrations of risk associated with our single-family and multifamily mortgage loans, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

The table below presents information on the estimated current LTV ratios of single-family loans on our consolidated balance sheets, all of which are held-for-investment. Our current LTV ratio estimates are based on available data through the end of each respective period presented.

**Table 4.2 — Recorded Investment of Held-For-Investment Mortgage Loans, by LTV Ratio**

| | As of March 31, 2012 | | | | As of December 31, 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| | Estimated Current LTV Ratio[1] | | | | Estimated Current LTV Ratio[1] | | | |
| | <= 80 | >80 to 100 | > 100[2] | Total | <= 80 | >80 to 100 | > 100[2] | Total |
| | (in millions) | | | | | | | |
| Single-family loans: | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[3] . . . . . . . | $636,383 | $372,610 | $245,626 | $1,254,619 | $641,698 | $383,320 | $247,468 | $1,272,486 |
| 15-year amortizing fixed-rate[3] . . . | 246,130 | 18,425 | 3,241 | 267,796 | 238,287 | 18,280 | 2,966 | 259,533 |
| Adjustable-rate[4] . . . . . . . . . . . . . | 45,405 | 13,723 | 8,844 | 67,972 | 43,728 | 13,826 | 9,180 | 66,734 |
| Alt-A, interest-only, and option ARM[5] . . . . . . . . . . . . . . . . . | 28,353 | 27,011 | 75,962 | 131,326 | 30,589 | 29,251 | 79,418 | 139,258 |
| Total single-family loans . . . . . . . . | $956,271 | $431,769 | $333,673 | 1,721,713 | $954,302 | $444,677 | $339,032 | 1,738,011 |
| Multifamily loans . . . . . . . . . . . . . | | | | 71,363 | | | | 72,801 |
| Total recorded investment of held-for-investment loans . . . . . . . . . . . . . | | | | $1,793,076 | | | | $1,810,812 |

(1) The current LTV ratios are management estimates, which are updated on a monthly basis. Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since that time. The value of a property at origination is based on the sales price for purchase mortgages and third-party appraisal for refinance mortgages. Changes in market value are derived from our internal index which measures price changes for repeat sales and refinancing activity on the same properties using Freddie Mac and Fannie Mae single-family mortgage acquisitions, including foreclosure sales. Estimates of the current LTV ratio include the credit-enhanced portion of the loan and exclude any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.

(2) The serious delinquency rate for the total of single-family mortgage loans with estimated current LTV ratios in excess of 100% was 12.6% and 12.8% as of March 31, 2012 and December 31, 2011, respectively.

(3) The majority of our loan modifications result in new terms that include fixed interest rates after modification. However, our HAMP loan modifications result in an initial interest rate that subsequently adjusts gradually after five years to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate for presentation even though they have a rate adjustment provision, because the future rates are determined at the time of the modification rather than at a subsequent date.

(4) Includes balloon/reset mortgage loans and excludes option ARMs.

(5) We discontinued purchases of Alt-A loans on March 1, 2009 (or later, as customers' contracts permitted), and interest-only loans effective September 1, 2010, and have not purchased option ARM loans since 2007. Modified loans within the Alt-A category remain as such, even though the borrower may have provided full documentation of assets and income to complete the modification. Modified loans within the option ARM category remain as such even though the modified loan no longer provides for optional payment provisions.

For information about the payment status of single-family and multifamily mortgage loans, including the amount of such loans we deem impaired, see "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS." For a discussion of certain indicators of credit quality for the multifamily loans on our consolidated balance sheets, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Multifamily Mortgage Portfolio."

**Allowance for Loan Losses and Reserve for Guarantee Losses, or Loan Loss Reserve**

We maintain an allowance for loan losses on mortgage loans that we classify as held-for-investment on our consolidated balance sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage-related securities backed by multifamily loans, certain single-family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risk.

### Table 4.3 — Detail of Loan Loss Reserves

| | Three Months Ended March 31, | | | | | | | |
| | 2012 | | | | 2011 | | | |
| | Allowance for Loan Losses | | Reserve for Guarantee Losses[1] | Total | Allowance for Loan Losses | | Reserve for Guarantee Losses[1] | Total |
| | Unsecuritized | Held By Consolidated Trusts | | | Unsecuritized | Held By Consolidated Trusts | | |
| | (in millions) | | | | | | | |
| *Single-family:* | | | | | | | | |
| Beginning balance | $30,406 | $8,351 | $159 | $38,916 | $27,317 | $11,644 | $137 | $39,098 |
| Provision for credit losses | 269 | 1,533 | 42 | 1,844 | 407 | 1,631 | 11 | 2,049 |
| Charge-offs[2] | (3,425) | (249) | (3) | (3,677) | (3,304) | (242) | (1) | (3,547) |
| Recoveries[2] | 499 | 16 | — | 515 | 664 | 20 | — | 684 |
| Transfers, net[3] | 2,687 | (2,512) | (2) | 173 | 3,814 | (3,536) | (4) | 274 |
| Ending balance | $30,436 | $7,139 | $196 | $37,771 | $28,898 | $9,517 | $143 | $38,558 |
| *Multifamily:* | | | | | | | | |
| Beginning balance | $506 | $— | $39 | $545 | $730 | $— | $98 | $828 |
| Provision (benefit) for credit losses | (16) | — | (3) | (19) | (45) | — | (15) | (60) |
| Charge-offs[2] | (1) | — | — | (1) | (12) | — | — | (12) |
| Transfers, net[3] | — | — | — | — | — | — | (9) | (9) |
| Ending balance | $489 | $— | $36 | $525 | $673 | $— | $74 | $747 |
| *Total:* | | | | | | | | |
| Beginning balance | $30,912 | $8,351 | $198 | $39,461 | $28,047 | $11,644 | $235 | $39,926 |
| Provision (benefit) for credit losses | 253 | 1,533 | 39 | 1,825 | 362 | 1,631 | (4) | 1,989 |
| Charge-offs[2] | (3,426) | (249) | (3) | (3,678) | (3,316) | (242) | (1) | (3,559) |
| Recoveries[2] | 499 | 16 | — | 515 | 664 | 20 | — | 684 |
| Transfers, net[3] | 2,687 | (2,512) | (2) | 173 | 3,814 | (3,536) | (13) | 265 |
| Ending balance | $30,925 | $7,139 | $232 | $38,296 | $29,571 | $9,517 | $217 | $39,305 |
| Total loan loss reserve as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | | | | 2.03% | | | | 2.02% |

(1) Loans associated with our reserve for guarantee losses are those that underlie our non-consolidated securitization trusts and other guarantee commitments and are evaluated for impairment on a collective basis. Our reserve for guarantee losses is included in other liabilities on our consolidated balance sheets.

(2) Charge-offs represent the amount of a loan that has been discharged to remove the loan from our consolidated balance sheet principally due to either foreclosure transfers or short sales. Charge-offs exclude $101 million and $106 million for the three months ended March 31, 2012 and 2011, respectively, related to certain loans purchased under financial guarantees and recorded as losses on loans purchased within other expenses on our consolidated statements of comprehensive income. We record charge-offs and recoveries on loans held by consolidated trusts when a loss event (such as a foreclosure transfer or foreclosure alternative) occurs on a loan while it remains in a consolidated trust. Recoveries of charge-offs primarily result from foreclosure alternatives and REO acquisitions on loans where: (a) a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements; or (b) we received a reimbursement of our losses from a seller/servicer associated with a repurchase request on a loan that experienced a foreclosure transfer or a foreclosure alternative.

(3) For the three months ended March 31, 2012 and 2011, consists of: (a) approximately $2.5 billion and $3.5 billion, respectively, of reclassified single-family reserves related to our removal of loans previously held by consolidated trusts; (b) approximately $171 million and $296 million, respectively, attributable to recapitalization of past due interest on modified mortgage loans; (c) $- million and $48 million, respectively, related to agreements with seller/servicers where the transfer relates to recoveries received under these agreements to compensate us for estimated credit losses; and (d) $1 million and $25 million, respectively, of other transfers.

The table below presents our allowance for loan losses and our recorded investment in mortgage loans, held-for-investment, by impairment evaluation methodology.

### Table 4.4 — Net Investment in Mortgage Loans

| | March 31, 2012 | | | December 31, 2011 | | |
| | Single-family | Multifamily | Total | Single-family | Multifamily | Total |
| | (in millions) | | | | | |
| *Recorded investment:* | | | | | | |
| Collectively evaluated | $1,659,317 | $68,753 | $1,728,070 | $1,677,974 | $70,131 | $1,748,105 |
| Individually evaluated | 62,396 | 2,610 | 65,006 | 60,037 | 2,670 | 62,707 |
| Total recorded investment | 1,721,713 | 71,363 | 1,793,076 | 1,738,011 | 72,801 | 1,810,812 |
| *Ending balance of the allowance for loan losses:* | | | | | | |
| Collectively evaluated | (21,724) | (223) | (21,947) | (23,657) | (260) | (23,917) |
| Individually evaluated | (15,851) | (266) | (16,117) | (15,100) | (246) | (15,346) |
| Total ending balance of the allowance | (37,575) | (489) | (38,064) | (38,757) | (506) | (39,263) |
| Net investment in mortgage loans | $1,684,138 | $70,874 | $1,755,012 | $1,699,254 | $72,295 | $1,771,549 |

A significant number of unsecuritized single-family mortgage loans on our consolidated balance sheets are individually evaluated for impairment and substantially all single-family mortgage loans held by our consolidated trusts

are collectively evaluated for impairment. The ending balance of the allowance for loan losses associated with our held-for-investment unsecuritized mortgage loans represented approximately 13.4% and 13.0% of the recorded investment in such loans at March 31, 2012 and December 31, 2011, respectively. The ending balance of the allowance for loan losses associated with mortgage loans held by our consolidated trusts represented approximately 0.5% of the recorded investment in such loans as of both March 31, 2012 and December 31, 2011.

**Credit Protection and Other Forms of Credit Enhancement**

In connection with many of our mortgage loans held-for-investment and other mortgage-related guarantees, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancements.

The table below presents the UPB of loans on our consolidated balance sheets or underlying our financial guarantees with credit protection and the maximum amounts of potential loss recovery by type of credit protection.

**Table 4.5 — Recourse and Other Forms of Credit Protection[1]**

| | UPB at | | Maximum Coverage[2] at | |
|---|---|---|---|---|
| | March 31, 2012 | December 31, 2011 | March 31, 2012 | December 31, 2011 |
| | (in millions) | | | |
| Single-family: | | | | |
| Primary mortgage insurance | $191,829 | $198,007 | $47,380 | $48,741 |
| Lender recourse and indemnifications | 8,434 | 8,798 | 8,146 | 8,453 |
| Pool insurance[3] | 22,692 | 26,754 | 1,793 | 1,855 |
| HFA indemnification[4] | 8,142 | 8,637 | 3,323 | 3,323 |
| Subordination[5] | 3,196 | 3,281 | 614 | 647 |
| Other credit enhancements | 135 | 133 | 86 | 99 |
| Total | $234,428 | $245,610 | $61,342 | $63,118 |
| Multifamily: | | | | |
| HFA indemnification[4] | $ 1,235 | $ 1,331 | $ 699 | $ 699 |
| Subordination[5] | 26,670 | 23,636 | 3,948 | 3,359 |
| Other credit enhancements | 8,286 | 8,334 | 2,598 | 2,554 |
| Total | $ 36,191 | $ 33,301 | $ 7,245 | $ 6,612 |

(1) Includes the credit protection associated with unsecuritized mortgage loans, loans held by our consolidated trusts as well as our non-consolidated mortgage guarantees and excludes FHA/VA and other governmental loans. Except for subordination coverage, these amounts exclude credit protection associated with $15.9 billion and $16.6 billion in UPB of single-family loans underlying Other Guarantee Transactions as of March 31, 2012 and December 31, 2011, respectively, for which the information was not available.

(2) Except for subordination, this represents the remaining amount of loss recovery that is available subject to terms of counterparty agreements.

(3) Maximum coverage amounts presented have been limited to the remaining UPB at period end. Prior period amounts have been revised to conform to current period presentation. Excludes approximately $11.1 billion and $13.5 billion in UPB at March 31, 2012 and December 31, 2011, respectively, where the related loans are also covered by primary mortgage insurance.

(4) Represents the amount of potential reimbursement of losses on securities we have guaranteed that are backed by state and local HFA bonds, under which Treasury bears initial losses on these securities up to 35% of the original UPB issued under the HFA initiative on a combined program-wide basis. Treasury will also bear losses of unpaid interest.

(5) Represents Freddie Mac issued mortgage-related securities with subordination protection, excluding those backed by HFA bonds. Excludes mortgage-related securities where subordination coverage was exhausted or maximum coverage amounts were limited to the remaining UPB at that date. Prior period amounts have been revised to conform to current period presentation.

Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. Pool insurance contracts generally provide insurance on a group, or pool, of mortgage loans up to a stated aggregate loss limit. We did not buy pool insurance during the three months ended March 31, 2012. In recent periods, we also reached the maximum limit of recovery on certain pool insurance contracts. For information about counterparty risk associated with mortgage insurers, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Mortgage Insurers."

We also have credit protection for certain of the mortgage loans on our consolidated balance sheets that are covered by insurance or partial guarantees issued by federal agencies (such as FHA, VA, and USDA). The total UPB of these loans was $4.7 billion as of both March 31, 2012 and December 31, 2011.

## NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS

**Individually Impaired Loans**

Individually impaired single-family loans include performing and non-performing TDRs, as well as loans acquired under our financial guarantees with deteriorated credit quality. Individually impaired multifamily loans include TDRs, loans three monthly payments or more past due, and loans that are impaired based on management judgment. For a discussion of our significant accounting policies regarding impaired and non-performing loans, which are applied

consistently for multifamily loans and single-family loan classes, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report.

Total loan loss reserves consist of a specific valuation allowance related to individually impaired mortgage loans, and a general reserve for other probable incurred losses. Our recorded investment in individually impaired mortgage loans and the related specific valuation allowance are summarized in the table below by product class (for single-family loans).

## Table 5.1 — Individually Impaired Loans

| | Balance at March 31, 2012 | | | | For the Three Months Ended March 31, 2012 | |
|---|---|---|---|---|---|---|
| | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | Interest Income Recognized |
| | | | (in millions) | | | |
| Single-family — | | | | | | |
| *With no specific allowance recorded*[1]: | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . | $ 6,745 | $ 3,057 | $ — | $ 3,057 | $ 3,123 | $ 79 |
| 15-year amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . . . . . . . | 56 | 22 | — | 22 | 22 | 1 |
| Adjustable rate[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 | 6 | — | 6 | 5 | — |
| Alt-A, interest-only, and option ARM[4] . . . . . . . . . . . . . . . . . | 1,873 | 836 | — | 836 | 856 | 16 |
| Total with no specific allowance recorded . . . . . . . . . . . | 8,686 | 3,921 | | 3,921 | 4,006 | 96 |
| *With specific allowance recorded:*[5] | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . | 46,849 | 45,695 | (11,917) | 33,778 | 45,021 | 311 |
| 15-year amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . . . . . . . | 369 | 351 | (41) | 310 | 331 | 4 |
| Adjustable rate[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 290 | 278 | (58) | 220 | 257 | 2 |
| Alt-A, interest-only, and option ARM[4] . . . . . . . . . . . . . . . . . | 12,487 | 12,151 | (3,835) | 8,316 | 11,913 | 69 |
| Total with specific allowance recorded . . . . . . . . . . . . | 59,995 | 58,475 | (15,851) | 42,624 | 57,522 | 386 |
| *Combined single-family:* | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . | 53,594 | 48,752 | (11,917) | 36,835 | 48,144 | 390 |
| 15-year amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . . . . . . . | 425 | 373 | (41) | 332 | 353 | 5 |
| Adjustable rate[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 302 | 284 | (58) | 226 | 262 | 2 |
| Alt-A, interest-only, and option ARM[4] . . . . . . . . . . . . . . . . . | 14,360 | 12,987 | (3,835) | 9,152 | 12,769 | 85 |
| Total single-family[6] . . . . . . . . . . . . . . . . . . . . . . | $68,681 | $62,396 | $(15,851) | $46,545 | $61,528 | $482 |
| Multifamily — | | | | | | |
| *With no specific allowance recorded*[7] . . . . . . . . . . . . . . . . . . . . . | $ 839 | $ 835 | $ — | $ 835 | $ 838 | $ 11 |
| *With specific allowance recorded* . . . . . . . . . . . . . . . . . | 1,791 | 1,775 | (266) | 1,509 | 1,776 | 23 |
| Total multifamily . . . . . . . . . . . . . . . . . . . . . . . . . | $ 2,630 | $ 2,610 | $ (266) | $ 2,344 | $ 2,614 | $ 34 |
| Total single-family and multifamily . . . . . . . . . . . . . . | $71,311 | $65,006 | $(16,117) | $48,889 | $64,142 | $516 |

| | Balance at December 31, 2011 | | | | For the Three Months Ended March 31, 2011 | |
|---|---|---|---|---|---|---|
| | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | Interest Income Recognized |
| | | | (in millions) | | | |
| Single-family — | | | | | | |
| *With no specific allowance recorded*[1]: | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . | $ 7,073 | $ 3,200 | $ — | $ 3,200 | $ 3,585 | $ 92 |
| 15-year amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . . . . . . . | 57 | 23 | — | 23 | 45 | 2 |
| Adjustable rate[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 | 6 | — | 6 | 8 | — |
| Alt-A, interest-only, and option ARM[4] . . . . . . . . . . . . . . . . . | 1,987 | 881 | — | 881 | 1,037 | 21 |
| Total with no specific allowance recorded . . . . . . . . . . . | 9,130 | 4,110 | | 4,110 | 4,675 | 115 |
| *With specific allowance recorded:*[5] | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . | 44,672 | 43,533 | (11,253) | 32,280 | 27,638 | 176 |
| 15-year amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . . . . . . . | 367 | 347 | (43) | 304 | 178 | 3 |
| Adjustable rate[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 280 | 268 | (59) | 209 | 122 | 1 |
| Alt-A, interest-only, and option ARM[4] . . . . . . . . . . . . . . . . . | 12,103 | 11,779 | (3,745) | 8,034 | 7,406 | 33 |
| Total with specific allowance recorded . . . . . . . . . . . . | 57,422 | 55,927 | (15,100) | 40,827 | 35,344 | 213 |
| *Combined single-family:* | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . | 51,745 | 46,733 | (11,253) | 35,480 | 31,223 | 268 |
| 15-year amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . . . . . . . | 424 | 370 | (43) | 327 | 223 | 5 |
| Adjustable rate[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 293 | 274 | (59) | 215 | 130 | 1 |
| Alt-A, interest-only, and option ARM[4] . . . . . . . . . . . . . . . . . | 14,090 | 12,660 | (3,745) | 8,915 | 8,443 | 54 |
| Total single-family[6] . . . . . . . . . . . . . . . . . . . . . . | $66,552 | $60,037 | $(15,100) | $44,937 | $40,019 | $328 |
| Multifamily — | | | | | | |
| *With no specific allowance recorded*[7] . . . . . . . . . . . . . . . . . . . . . | $ 1,049 | $ 1,044 | $ — | $ 1,044 | $ 773 | $ 10 |
| *With specific allowance recorded* . . . . . . . . . . . . . . . . . | 1,644 | 1,626 | (246) | 1,380 | 1,972 | 24 |
| Total multifamily . . . . . . . . . . . . . . . . . . . . . . . . . | $ 2,693 | $ 2,670 | $ (246) | $ 2,424 | $ 2,745 | $ 34 |
| Total single-family and multifamily . . . . . . . . . . . . . . | $69,245 | $62,707 | $(15,346) | $47,361 | $42,764 | $362 |

(1) Individually impaired loans with no specific related valuation allowance primarily represent mortgage loans purchased out of PC pools and accounted for in accordance with the accounting guidance for loans and debt securities acquired with deteriorated credit quality that have not experienced further deterioration.

(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

(3) Includes balloon/reset mortgage loans and excludes option ARMs.

(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

(5) Consists primarily of mortgage loans classified as TDRs.

(6) As of March 31, 2012 and December 31, 2011 includes $60.0 billion and $57.4 billion, respectively, of UPB associated with loans for which we have recorded a specific allowance, and $8.7 billion and $9.1 billion, respectively, of UPB associated with loans that have no specific allowance recorded. See endnote (1) for additional information.

(7) Individually impaired multifamily loans with no specific related valuation allowance primarily represent those loans for which the collateral value is sufficiently in excess of the loan balance to result in recovery of the entire recorded investment if the property were foreclosed upon or otherwise subject to disposition.

*Freddie Mac*

Interest income foregone on individually impaired loans was approximately $530 million and $365 million for the three months ended March 31, 2012 and 2011 respectively.

**Mortgage Loan Performance**

We do not accrue interest on loans three months or more past due.

The table below presents the recorded investment of our single-family and multifamily mortgage loans, held-for-investment, by payment status.

**Table 5.2 — Payment Status of Mortgage Loans**[1]

| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
|---|---|---|---|---|---|---|
| | | | | **March 31, 2012** | | |
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $1,181,260 | $20,035 | $ 7,452 | $45,872 | $1,254,619 | $45,760 |
| 15-year amortizing fixed-rate[2] | 264,937 | 1,221 | 311 | 1,327 | 267,796 | 1,321 |
| Adjustable-rate[3] | 65,445 | 580 | 215 | 1,732 | 67,972 | 1,728 |
| Alt-A, interest-only, and option ARM[4] | 104,682 | 3,742 | 1,846 | 21,056 | 131,326 | 21,027 |
| Total single-family | 1,616,324 | 25,578 | 9,824 | 69,987 | 1,721,713 | 69,836 |
| Total multifamily | 71,206 | 27 | 26 | 104 | 71,363 | 1,853 |
| Total single-family and multifamily | $1,687,530 | $25,605 | $ 9,850 | $70,091 | $1,793,076 | $71,689 |
| | | | | **December 31, 2011** | | |
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $1,191,809 | $24,964 | $ 9,006 | $46,707 | $1,272,486 | $46,600 |
| 15-year amortizing fixed-rate[2] | 256,306 | 1,499 | 361 | 1,367 | 259,533 | 1,361 |
| Adjustable-rate[3] | 63,929 | 724 | 239 | 1,842 | 66,734 | 1,838 |
| Alt-A, interest-only, and option ARM[4] | 109,967 | 4,617 | 2,172 | 22,502 | 139,258 | 22,473 |
| Total single-family | 1,622,011 | 31,804 | 11,778 | 72,418 | 1,738,011 | 72,272 |
| Total multifamily | 72,715 | 2 | 15 | 69 | 72,801 | 1,882 |
| Total single-family and multifamily | $1,694,726 | $31,806 | $11,793 | $72,487 | $1,810,812 | $74,154 |

(1) Based on recorded investment in the loan. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as past due as long as the borrower is current under the modified terms. The payment status of a loan may be affected by temporary timing differences, or lags, in the reporting of this information to us by our servicers.
(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."
(3) Includes balloon/reset mortgage loans and excludes option ARMs.
(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

We have the option under our PC agreements to remove mortgage loans from the loan pools that underlie our PCs under certain circumstances to resolve an existing or impending delinquency or default. Our practice generally has been to remove loans from PC trusts when the loans have been delinquent for 120 days or more. As of March 31, 2012, there were $2.4 billion in UPB of loans underlying our PCs that were 120 days or more delinquent, and that met our criteria for removing the loan from the consolidated trust. Generally, we remove these delinquent loans from the PC trust, and thereby extinguish the related PC debt, at the next scheduled PC payment date, unless the loans proceed to foreclosure transfer, complete a foreclosure alternative or are paid in full by the borrower before such date.

When we remove mortgage loans from consolidated trusts, we reclassify the loans from mortgage loans held-for-investment by consolidated trusts to unsecuritized mortgage loans held-for-investment and record an extinguishment of the corresponding portion of the debt securities of the consolidated trusts. We removed $9.2 billion and $14.6 billion in UPB of loans from PC trusts (or purchased delinquent loans associated with other guarantee commitments) during the three months ended March 31, 2012 and 2011, respectively.

The table below summarizes the delinquency rates of mortgage loans within our single-family credit guarantee and multifamily mortgage portfolios.

**Table 5.3 — Delinquency Rates[1]**

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| *Single-family:* | | |
| Non-credit-enhanced portfolio: | | |
| Serious delinquency rate | 2.75% | 2.80% |
| Total number of seriously delinquent loans | 267,820 | 273,184 |
| Credit-enhanced portfolio: | | |
| Serious delinquency rate | 7.54% | 7.56% |
| Total number of seriously delinquent loans | 113,166 | 120,622 |
| Total portfolio, excluding Other Guarantee Transactions | | |
| Serious delinquency rate | 3.39% | 3.46% |
| Total number of seriously delinquent loans | 380,986 | 393,806 |
| Other Guarantee Transactions:[2] | | |
| Serious delinquency rate | 10.67% | 10.54% |
| Total number of seriously delinquent loans | 19,801 | 20,328 |
| Total single-family: | | |
| Serious delinquency rate | 3.51% | 3.58% |
| Total number of seriously delinquent loans | 400,787 | 414,134 |
| *Multifamily:*[3] | | |
| Non-credit-enhanced portfolio: | | |
| Delinquency rate | 0.16% | 0.11% |
| UPB of delinquent loans (in millions) | $ 139 | $ 93 |
| Credit-enhanced portfolio: | | |
| Delinquency rate | 0.39% | 0.52% |
| UPB of delinquent loans (in millions) | $ 137 | $ 166 |
| Total Multifamily: | | |
| Delinquency rate | 0.23% | 0.22% |
| UPB of delinquent loans (in millions) | $ 276 | $ 259 |

(1) Single-family mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as seriously delinquent if the borrower is less than three monthly payments past due under the modified terms. Serious delinquencies on single-family mortgage loans underlying certain REMICs and Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments may be reported on a different schedule due to variances in industry practice.

(2) Other Guarantee Transactions generally have underlying mortgage loans with higher risk characteristics, but some Other Guarantee Transactions may provide inherent credit protections from losses due to underlying subordination, excess interest, overcollateralization and other features.

(3) Multifamily delinquency performance is based on UPB of mortgage loans that are two monthly payments or more past due or those in the process of foreclosure and includes multifamily Other Guarantee Transactions. Excludes mortgage loans whose contractual terms have been modified under an agreement with the borrower as long as the borrower is less than two monthly payments past due under the modified contractual terms.

We continue to implement a number of initiatives to modify and restructure loans, including the MHA Program. As part of accomplishing certain of these initiatives, we pay various incentives to servicers and borrowers. We bear the full costs associated with these loan workout and foreclosure alternatives on mortgages that we own or guarantee and do not receive a reimbursement for any component from Treasury.

**Troubled Debt Restructurings**

On July 1, 2011, we adopted an amendment to the accounting guidance for receivables, which clarifies the guidance regarding a creditor's evaluation of when a restructuring is considered a TDR. While our adoption of this amendment did not have an impact on how we account for TDRs, it did have a significant impact on the population of loans that we account for as TDRs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Adopted Accounting Guidance" in our 2011 Annual Report for further information on our implementation of this guidance.

*Single-Family TDRs*

We require our single-family servicers to contact borrowers who are in default and to identify a loan workout in accordance with our requirements. We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses. We require our single-family servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/ servicers pursue other workout options before considering foreclosure. We receive information related to loan workouts, such as modifications and loans in a modification trial period, and other alternatives to foreclosure from our servicers at the loan level on at least a monthly basis. For loans in a modification trial period under HAMP, we do not receive the terms of the expected completed modification until the modification is completed. For these loans, we only receive notification that they are in a modification trial period under HAMP.

In the case of borrowers considered for modifications, our servicers obtain information on income, assets, and other borrower obligations to determine modified loan terms. Under HAMP, the goal of a single-family loan modification is to

reduce the borrower's monthly mortgage payments to a specified percentage of the borrower's gross monthly income, which may be achieved through a combination of methods, including: (a) interest rate reductions; (b) term extensions; and (c) principal forbearance. Principal forbearance is when a portion of the principal is non-interest-bearing, but this does not represent principal forgiveness. Although HAMP contemplates that some servicers will also make use of principal forgiveness to achieve reduced payments for borrowers, we have only used forbearance of principal and have not used principal forgiveness in modifying our loans. During the three months ended March 31, 2012, approximately 65% of completed modifications that were classified as TDRs involved interest rate reductions and term extensions, and approximately 23% involved principal forbearance in addition to interest rate reductions and term extensions. During the three months ended March 31, 2012, the average term extension was 93 months and the average interest rate reduction was 3.0% for completed modifications classified as TDRs.

### Multifamily TDRs

The assessment as to whether a multifamily loan restructuring is considered a TDR contemplates the unique facts and circumstances of each loan. This assessment considers qualitative factors such as whether the borrower's modified interest rate is consistent with that of a borrower having a similar credit profile at the time of modification. In certain cases, for maturing loans we may provide short-term loan extensions of up to one year with no changes to the effective borrowing rate. In other cases we may make more significant modifications of terms for borrowers experiencing financial difficulty, such as reducing the interest rate or extending the maturity for longer than one year. In cases where we do modify the contractual terms of the loan, the changes in terms may be similar to those of single-family loans, such as an extension of the term, reduction of contractual rate, principal forbearance, or some combination of these features.

### TDR Activity and Performance

The table below provides additional information about both our single-family and multifamily TDR activity during the three months ended March 31, 2012, based on the original category of the loan before the loan was classified as a TDR. Our presentation of TDR activity includes all loans that were newly classified as a TDR during the respective period. Prior to classification as a TDR, these loans were previously evaluated for impairment, including our estimation for loan losses, on a collective basis. Loans classified as a TDR in one period may be subject to further action (such as a modification or remodification) in a subsequent period. In such cases, the subsequent activity would not be reflected in the table below since the loan would already have been classified as a TDR.

### Table 5.4 — TDR Activity, by Segment

| | Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | # of Loans | Post-TDR Recorded Investment | # of Loans | Post-TDR Recorded Investment |
| | (in millions, except for number of loans) | | | |
| *Single-family* | | | | |
| 20 and 30-year or more, amortizing fixed-rate | 15,072 | $2,643 | 18,900 | $3,925 |
| 15-year amortizing fixed-rate | 962 | 87 | 856 | 98 |
| Adjustable-rate[1] | 451 | 85 | 497 | 107 |
| Alt-A, interest-only, and option ARM | 3,725 | 961 | 6,727 | 1,844 |
| Total Single-family | 20,210 | 3,776 | 26,980 | 5,974 |
| *Multifamily* | 4 | 22 | 2 | 3 |
| Total | 20,214 | $3,798 | 26,982 | $5,977 |

(1) Includes balloon/reset mortgage loans.

The measurement of impairment for TDRs is based on the excess of our recorded investment in the loans over the present value of the loans' expected future cash flows. Generally, restructurings that are TDRs have a higher allowance for loan losses than restructurings that are not considered TDRs because TDRs involve a concession being granted to the borrower. Our process for determining the appropriate allowance for loan losses for both single-family and multifamily loans considers the impact that our loss mitigation activities, such as loan restructurings, have on probabilities of default. For single-family loans evaluated individually and collectively for impairment that have been modified, the probability of default is impacted by the incidence of redefault that we have experienced on similar loans that have completed a modification. For multifamily loans, the incidence of redefault on loans that have been modified does not directly impact the allowance for loan losses as our multifamily loans are generally evaluated individually for impairment which is based on the fair value of the underlying collateral and contemplates the unique facts and circumstances of the loan. The process

for determining the appropriate allowance for loan losses for multifamily loans evaluated collectively for impairment considers the incidence of redefault on loans that have completed a modification.

The table below presents the volume of payment defaults of our TDR modifications based on the original category of the loan before restructuring. Modified loans within the Alt-A category continue to remain in that category, even though the borrower may have provided full documentation of assets and income before completing the modification. Modified loans within the option ARM category continue to remain in that category even though the modified loan no longer provides for optional payment provisions. Substantially all of our completed single-family loan modifications classified as a TDR during the three months ended March 31, 2012 resulted in a modified loan with a fixed interest rate. Approximately $42 billion in UPB of our completed loan modifications at March 31, 2012 had provisions for reduced interest rates that remain fixed for the first five years of the modification and then increase at a rate of one percent per year (or such lesser amount as may be needed) until the interest rate has been adjusted to a market rate (determined at the time of the modification). The table below reflects only performance of completed modifications and excludes loans subject to other loss mitigation activity that were classified as TDRs.

**Table 5.5 — Payment Defaults of Completed TDR Modifications, by Segment[1]**

| | Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | # of Loans | Post-TDR Recorded Investment[2] | # of Loans | Post-TDR Recorded Investment[2] |
| --- | --- | --- | --- | --- |
| | (in millions, except number of loans modified) | | | |
| *Single-family* | | | | |
| 20 and 30-year or more, amortizing fixed-rate | 4,888 | $ 919 | 5,609 | $1,074 |
| 15-year amortizing fixed-rate | 232 | 24 | 194 | 21 |
| Adjustable-rate | 98 | 22 | 123 | 26 |
| Alt-A, interest-only, and option ARM | 1,048 | 278 | 1,574 | 421 |
| Total single-family | 6,266 | $1,243 | 7,500 | $1,542 |
| *Multifamily* | 1 | $ 2 | — | $ — |

(1) Represents TDR loans that experienced a payment default during the period and had completed a modification event during the year preceding the payment default. A payment default occurs when a borrower either: (a) became two or more months delinquent; or (b) completed a loss event, such as a short sale or foreclosure. We only include payment defaults for a single loan once during each quarterly period; however, a single loan will be reflected more than once if the borrower experienced another payment default in a subsequent quarter.
(2) Represents the recorded investment at the end of the period in which the loan was modified and does not represent the recorded investment as of March 31, 2012.

During the three months ended March 31, 2012, there were 783 loans with other loss mitigation activities (*i.e.*, repayment plan, forbearance agreement, or trial period modifications) initially classified as TDRs, with a post-TDR recorded investment of $121 million that returned to a current payment status, and then subsequently became two months delinquent. In addition, during the three months ended March 31, 2012, there were 1,598 loans with other loss mitigation activities initially classified as TDRs, with a post-TDR recorded investment of $262 million that subsequently experienced a loss event, such as a short sale or a foreclosure transfer.

## NOTE 6: REAL ESTATE OWNED

We obtain REO properties: (a) when we are the highest bidder at foreclosure sales of properties that collateralize non-performing single-family and multifamily mortgage loans owned by us; or (b) when a delinquent borrower chooses to transfer the mortgaged property to us in lieu of going through the foreclosure process. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for a discussion of our significant accounting policies for REO.

The table below provides a summary of the change in the carrying value of our combined single-family and multifamily REO balances. For the periods presented in the table below, the weighted average holding period for our disposed properties was less than one year.

**Table 6.1 — REO**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (in millions) | |
| Beginning balance — REO, gross | $ 6,244 | $ 7,908 |
| Additions | 2,135 | 2,453 |
| Dispositions | (2,444) | (3,212) |
| Ending balance — REO, gross | 5,935 | 7,149 |
| Beginning balance, valuation allowance | (564) | (840) |
| Change in valuation allowance | 83 | 67 |
| Ending balance, valuation allowance | (481) | (773) |
| Ending balance — REO, net | $ 5,454 | $ 6,376 |

The REO balance, net at March 31, 2012 and December 31, 2011 associated with single-family properties was $5.3 billion and $5.5 billion, respectively, and the balance associated with multifamily properties was $121 million and $133 million, respectively. The North Central region represented approximately 32% and 26% of our single-family REO additions during the three months ended March 31, 2012 and 2011, respectively, based on the number of properties, and the Southeast region represented approximately 30% and 19% of our single-family REO additions during these periods. Our single-family REO inventory consisted of 59,307 properties and 60,535 properties at March 31, 2012 and December 31, 2011, respectively. The pace of our REO acquisitions slowed beginning in the fourth quarter of 2010 due to delays in the foreclosure process. These delays in foreclosures continued in the first quarter of 2012, particularly in states that require a judicial foreclosure process. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Seller/Servicers" for information about regional concentration of our portfolio as well as further details about delays in the single-family foreclosure process.

Our REO operations expenses include REO property expenses, net losses incurred on disposition of REO properties, adjustments to the holding period allowance associated with REO properties to record them at the lower of their carrying amount or fair value less the estimated costs to sell, and recoveries from insurance and other credit enhancements. An allowance for estimated declines in the REO fair value during the period properties are held reduces the carrying value of REO property. Excluding holding period valuation adjustments, we recognized gains of $80 million and losses of $126 million on REO dispositions during the three months ended March 31, 2012 and 2011, respectively. We increased our valuation allowance for properties in our REO inventory by $2 million and $151 million during the three months ended March 31, 2012 and 2011, respectively.

REO property acquisitions that result from extinguishment of our mortgage loans held on our consolidated balance sheets are treated as non-cash transfers. The amount of non-cash acquisitions of REO properties during the three months ended March 31, 2012 and 2011 was $1.9 billion and $2.3 billion, respectively.

## NOTE 7: INVESTMENTS IN SECURITIES

The table below summarizes amortized cost, estimated fair values, and corresponding gross unrealized gains and gross unrealized losses for available-for-sale securities by major security type. At March 31, 2012 and December 31, 2011, all available-for-sale securities are mortgage-related securities.

### Table 7.1 — Available-For-Sale Securities

| March 31, 2012 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| | | (in millions) | | |
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 70,422 | $ 5,790 | $ (49) | $ 76,163 |
| Subprime | 39,750 | 61 | (12,666) | 27,145 |
| CMBS | 51,976 | 3,477 | (700) | 54,753 |
| Option ARM | 8,714 | 13 | (2,909) | 5,818 |
| Alt-A and other | 13,243 | 104 | (2,253) | 11,094 |
| Fannie Mae | 17,648 | 1,252 | (3) | 18,897 |
| Obligations of states and political subdivisions | 7,459 | 132 | (26) | 7,565 |
| Manufactured housing | 795 | 7 | (54) | 748 |
| Ginnie Mae | 210 | 29 | — | 239 |
| Total available-for-sale securities | $210,217 | $10,865 | $(18,660) | $202,422 |
| **December 31, 2011** | | | | |
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 74,711 | $ 6,429 | $ (48) | $ 81,092 |
| Subprime | 41,347 | 60 | (13,408) | 27,999 |
| CMBS | 53,637 | 2,574 | (548) | 55,663 |
| Option ARM | 9,019 | 15 | (3,169) | 5,865 |
| Alt-A and other | 13,659 | 32 | (2,812) | 10,879 |
| Fannie Mae | 19,023 | 1,303 | (4) | 20,322 |
| Obligations of states and political subdivisions | 7,782 | 108 | (66) | 7,824 |
| Manufactured housing | 820 | 6 | (60) | 766 |
| Ginnie Mae | 219 | 30 | — | 249 |
| Total available-for-sale securities | $220,217 | $10,557 | $(20,115) | $210,659 |

## Available-For-Sale Securities in a Gross Unrealized Loss Position

The table below shows the fair value of available-for-sale securities in a gross unrealized loss position, and whether they have been in that position less than 12 months, or 12 months or greater, including the non-credit-related portion of other-than-temporary impairments which have been recognized in AOCI.

### Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position

| | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
| | | Gross Unrealized Losses | | | | Gross Unrealized Losses | | | | Gross Unrealized Losses | | |
| March 31, 2012 | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (in millions) | | | | | | |
| Available-for-sale securities: | | | | | | | | | | | | |
| Freddie Mac | $1,039 | $ — | $ (2) | $ (2) | $ 1,946 | $ — | $ (47) | $ (47) | $ 2,985 | $ — | $ (49) | $ (49) |
| Subprime | 36 | (4) | — | (4) | 26,865 | (10,239) | (2,423) | (12,662) | 26,901 | (10,243) | (2,423) | (12,666) |
| CMBS | 1,088 | (25) | (53) | (78) | 3,403 | (147) | (475) | (622) | 4,491 | (172) | (528) | (700) |
| Option ARM | 98 | (7) | — | (7) | 5,695 | (2,813) | (89) | (2,902) | 5,793 | (2,820) | (89) | (2,909) |
| Alt-A and other | 527 | (27) | — | (27) | 9,230 | (1,742) | (484) | (2,226) | 9,757 | (1,769) | (484) | (2,253) |
| Fannie Mae | 623 | — | (2) | (2) | 10 | — | (1) | (1) | 633 | — | (3) | (3) |
| Obligations of states and political subdivisions | 675 | — | (4) | (4) | 722 | — | (22) | (22) | 1,397 | — | (26) | (26) |
| Manufactured housing | 111 | (4) | — | (4) | 353 | (41) | (9) | (50) | 464 | (45) | (9) | (54) |
| Total available-for-sale securities in a gross unrealized loss position | $4,197 | $ (67) | $(61) | $(128) | $48,224 | $(14,982) | $(3,550) | $(18,532) | $52,421 | $(15,049) | $(3,611) | $(18,660) |

| | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
| | | Gross Unrealized Losses | | | | Gross Unrealized Losses | | | | Gross Unrealized Losses | | |
| December 31, 2011 | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (in millions) | | | | | | |
| Available-for-sale securities: | | | | | | | | | | | | |
| Freddie Mac | $2,196 | $ — | $ (4) | $ (4) | $ 1,884 | $ — | $ (44) | $ (44) | $ 4,080 | $ — | $ (48) | $ (48) |
| Subprime | 8 | (1) | — | (1) | 27,742 | (10,785) | (2,622) | (13,407) | 27,750 | (10,786) | (2,622) | (13,408) |
| CMBS | 997 | (20) | (41) | (61) | 3,573 | (9) | (478) | (487) | 4,570 | (29) | (519) | (548) |
| Option ARM | 95 | (13) | — | (13) | 5,743 | (3,067) | (89) | (3,156) | 5,838 | (3,080) | (89) | (3,169) |
| Alt-A and other | 1,197 | (114) | (4) | (118) | 9,070 | (2,088) | (606) | (2,694) | 10,267 | (2,202) | (610) | (2,812) |
| Fannie Mae | 1,144 | — | (2) | (2) | 14 | — | (2) | (2) | 1,158 | — | (4) | (4) |
| Obligations of states and political subdivisions | 292 | — | (6) | (6) | 2,157 | — | (60) | (60) | 2,449 | — | (66) | (66) |
| Manufactured housing | 197 | (5) | — | (5) | 345 | (44) | (11) | (55) | 542 | (49) | (11) | (60) |
| Total available-for-sale securities in a gross unrealized loss position | $6,126 | $(153) | $(57) | $(210) | $50,528 | $(15,993) | $(3,912) | $(19,905) | $56,654 | $(16,146) | $(3,969) | $(20,115) |

(1) Represents the gross unrealized losses for securities for which we have previously recognized other-than-temporary impairments in earnings.
(2) Represents the gross unrealized losses for securities for which we have not previously recognized other-than-temporary impairments in earnings.

At March 31, 2012, total gross unrealized losses on available-for-sale securities were $18.7 billion. The gross unrealized losses relate to 1,453 individual lots representing 1,387 separate securities, including securities with non-credit-related other-than-temporary impairments recognized in AOCI. We purchase multiple lots of individual securities at different times and at different costs. We determine gross unrealized gains and gross unrealized losses by specifically evaluating investment positions at the lot level; therefore, some of the lots we hold for a single security may be in an unrealized gain position while other lots for that security may be in an unrealized loss position, depending upon the amortized cost of the specific lot.

## Impairment Recognition on Investments in Securities

We recognize impairment losses on available-for-sale securities within our consolidated statements of comprehensive income as net impairment of available-for-sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other-than-temporary.

We conduct quarterly reviews to evaluate each available-for-sale security that has an unrealized loss for other-than-temporary impairment. An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis. We recognize other-than-temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security. If we do not intend to sell the security and we believe it is not more likely than not that we will be required to sell prior to recovery of its unrealized loss, we recognize only the credit component of other-than-temporary impairment in earnings and the amounts attributable to all other factors are recognized in AOCI. The credit component represents the amount by which the present value of expected future cash flows to be collected from the security is less than the amortized cost basis of the security. The present value of expected future cash flows represents our estimate of future contractual cash flows that

we expect to collect, discounted at the effective interest rate implicit in the security at the date of acquisition or the effective interest rate determined based on significantly improved cash flows subsequent to initial impairment.

Our net impairment of available-for-sale securities recognized in earnings on our consolidated statements of comprehensive income for the three months ended March 31, 2012 and 2011, includes amounts related to certain securities where we have previously recognized other-than-temporary impairments through AOCI, but upon the recognition of additional credit losses, these amounts were reclassified out of non-credit losses in AOCI and charged to earnings. In certain instances, we recognized credit losses in excess of unrealized losses in AOCI.

The determination of whether unrealized losses on available-for-sale securities are other-than-temporary requires significant management judgments and assumptions and consideration of numerous factors. We perform an evaluation on a security-by-security basis considering all available information. The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment. Important factors include, but are not limited to:

- whether we intend to sell the security and it is not more likely than not that we will be required to sell the security before sufficient time elapses to recover all unrealized losses;

- loan level default modeling for single-family residential mortgages that considers individual loan characteristics, including current LTV ratio, FICO score, and delinquency status, requires assumptions about future home prices and interest rates, and employs internal default models and prepayment assumptions. The modeling for CMBS employs third-party models that require assumptions about the economic conditions in the areas surrounding each individual property; and

- security loss modeling combining the modeled performance of the underlying collateral relative to its current and projected credit enhancements to determine the expected cash flows for each evaluated security.

For the majority of our available-for-sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other-than-temporary and is recorded within our consolidated statements of comprehensive income as net impairment of available-for-sale securities recognized in earnings.

See "Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position" for the length of time our available-for-sale securities have been in an unrealized loss position. Also see "Table 7.3 — Significant Modeled Attributes for Certain Available-For-Sale Non-Agency Mortgage-Related Securities" for the modeled default rates and severities that were used to determine whether our senior interests in certain non-agency mortgage-related securities would experience a cash shortfall.

### Freddie Mac and Fannie Mae Securities

We record the purchase of mortgage-related securities issued by Fannie Mae as investments in securities in accordance with the accounting guidance for investments in debt and equity securities. In contrast, our purchase of mortgage-related securities that we issued (*e.g.*, PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions) is recorded as either investments in securities or extinguishment of debt securities of consolidated trusts depending on the nature of the mortgage-related security that we purchase. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2011 Annual Report for additional information.

We hold these investments in securities that are in an unrealized loss position at least to recovery and typically to maturity. As the principal and interest on these securities are guaranteed and we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses, we consider these unrealized losses to be temporary.

### Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans

We believe the unrealized losses on the non-agency mortgage-related securities we hold are a result of poor underlying collateral performance, limited liquidity, and large risk premiums. We consider securities to be other-than-temporarily impaired when future credit losses are deemed likely.

Our review of the securities backed by subprime, option ARM, and Alt-A and other loans includes loan level default modeling and analyses of the individual securities based on underlying collateral performance, including the collectability of amounts from bond insurers. In the case of bond insurers, we also consider factors such as the availability of capital,

generation of new business, pending regulatory action, credit ratings, security prices, and credit default swap levels traded on the insurers. We consider loan level information including estimated current LTV ratios, FICO scores, and other loan level characteristics. We also consider the differences between the loan level characteristics of the performing and non-performing loan populations. For additional information regarding bond insurers, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers."

The table below presents the modeled default rates and severities, without regard to subordination, that are used to determine whether our senior interests in certain available-for-sale non-agency mortgage-related securities will experience a cash shortfall. Our proprietary default model incorporates assumptions about future home prices, as defaults and severities are modeled at the loan level and then aggregated. The model uses projections of future home prices at the state level. Assumptions about voluntary prepayment rates are also an input to the model and are discussed below.

**Table 7.3 — Significant Modeled Attributes for Certain Available-For-Sale Non-Agency Mortgage-Related Securities**

|  | | | March 31, 2012 | | |
|  | Subprime First Lien[2] | Option ARM | Alt-A[1] | | |
|  | | | Fixed Rate | Variable Rate | Hybrid Rate |
|  | | | (dollars in millions) | | |
| **Issuance Date** | | | | | |
| **2004 and prior:** | | | | | |
| UPB | $ 1,191 | $ 114 | $ 830 | $ 499 | $2,155 |
| Weighted average collateral defaults[3] | 35% | 37% | 9% | 49% | 29% |
| Weighted average collateral severities[4] | 55% | 50% | 43% | 48% | 38% |
| Weighted average voluntary prepayment rates[5] | 5% | 7% | 17% | 7% | 8% |
| Average credit enhancement[6] | 43% | 13% | 14% | 18% | 15% |
| **2005:** | | | | | |
| UPB | $ 5,959 | $ 2,795 | $1,169 | $ 816 | $3,870 |
| Weighted average collateral defaults[3] | 57% | 54% | 25% | 59% | 43% |
| Weighted average collateral severities[4] | 66% | 58% | 51% | 54% | 46% |
| Weighted average voluntary prepayment rates[5] | 4% | 6% | 12% | 6% | 7% |
| Average credit enhancement[6] | 52% | 11% | 2% | 25% | 5% |
| **2006:** | | | | | |
| UPB | $19,393 | $ 6,432 | $ 529 | $1,082 | $1,152 |
| Weighted average collateral defaults[3] | 67% | 67% | 38% | 66% | 56% |
| Weighted average collateral severities[4] | 71% | 64% | 57% | 62% | 53% |
| Weighted average voluntary prepayment rates[5] | 5% | 5% | 12% | 7% | 6% |
| Average credit enhancement[6] | 14% | 1% | 6% | (2)% | —% |
| **2007:** | | | | | |
| UPB | $20,935 | $ 4,167 | $ 156 | $1,319 | $ 308 |
| Weighted average collateral defaults[3] | 65% | 57% | 53% | 63% | 65% |
| Weighted average collateral severities[4] | 72% | 62% | 65% | 62% | 62% |
| Weighted average voluntary prepayment rates[5] | 5% | 6% | 10% | 8% | 6% |
| Average credit enhancement[6] | 16% | 10% | 10% | (8)% | —% |
| **Total:** | | | | | |
| UPB | $47,478 | $13,508 | $2,684 | $3,716 | $7,485 |
| Weighted average collateral defaults[3] | 64% | 61% | 24% | 61% | 42% |
| Weighted average collateral severities[4] | 71% | 62% | 53% | 59% | 47% |
| Weighted average voluntary prepayment rates[5] | 5% | 6% | 14% | 7% | 7% |
| Average credit enhancement[6] | 20% | 6% | 7% | 5% | 7% |

(1) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.

(2) Excludes non-agency mortgage-related securities backed exclusively by subprime second liens. Certain securities identified as subprime first lien may be backed in part by subprime second lien loans, as the underlying loans of these securities were permitted to include a small percentage of subprime second lien loans.

(3) The expected cumulative default rate expressed as a percentage of the current collateral UPB.

(4) The expected average loss given default calculated as the ratio of cumulative loss over cumulative default for each security.

(5) The security's voluntary prepayment rate represents the average of the monthly voluntary prepayment rate weighted by the security's outstanding UPB.

(6) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by bond insurance, overcollateralization and other forms of credit enhancement. Negative values are shown when collateral losses that have yet to be applied to the tranches exceed the remaining credit enhancement, if any.

In evaluating the non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans for other-than-temporary impairment, we noted that the percentage of securities that were AAA-rated and the percentage that were investment grade declined significantly since acquisition. While these ratings have declined, the ratings themselves are not determinative that a loss is more or less likely. While we consider credit ratings in our analysis, we believe that our detailed security-by-security analyses provide a more consistent view of the ultimate collectability of contractual amounts due to us.

Our analysis is subject to change as new information regarding delinquencies, severities, loss timing, prepayments, and other factors becomes available. While it is reasonably possible that, under certain conditions, collateral losses on our remaining available-for-sale securities for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of March 31, 2012.

### Commercial Mortgage-Backed Securities

CMBS are exposed to stresses in the commercial real estate market. We use external models to identify securities that may have an increased risk of failing to make their contractual payments. We then perform an analysis of the underlying collateral on a security-by-security basis to determine whether we will receive all of the contractual payments due to us. While it is reasonably possible that, under certain conditions, collateral losses on our CMBS for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of March 31, 2012. We do not intend to sell the remaining CMBS and it is not more likely than not that we will be required to sell such securities before recovery of the unrealized losses.

### Obligations of States and Political Subdivisions

These investments consist of housing revenue bonds. We believe the unrealized losses on obligations of states and political subdivisions are primarily a result of movements in interest rates and liquidity and risk premiums. We have determined that the impairment of these securities is temporary based on our conclusion that we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses. We believe that any credit risk related to these securities is minimal because of the issuer guarantees provided on these securities.

### Bond Insurance

We rely on bond insurance, including secondary coverage, to provide credit protection on some of our non-agency mortgage-related securities. Circumstances in which it is likely a principal and interest shortfall will occur and there is substantial uncertainty surrounding a bond insurer's ability to pay all future claims can give rise to recognition of other-than-temporary impairment recognized in earnings. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

### Other-Than-Temporary Impairments on Available-for-Sale Securities

The table below summarizes our net impairments of available-for-sale securities recognized in earnings by security type.

**Table 7.4 — Net Impairment of Available-For-Sale Securities Recognized in Earnings**

|  | Net Impairment of Available-For-Sale Securities Recognized in Earnings For the Three Months Ended March 31, | |
|  | 2012 | 2011 |
|  | (in millions) | |
| Available-for-sale securities: | | |
| Subprime | $(441) | $ (734) |
| Option ARM | (48) | (281) |
| Alt-A and other | (57) | (40) |
| CMBS | (16) | (135) |
| Manufactured housing | (2) | (3) |
| Total other-than-temporary impairments on available-for-sale securities | $(564) | $(1,193) |

The table below presents the changes in the unrealized credit-related other-than-temporary impairment component of the amortized cost related to available-for-sale securities: (a) that we have written down for other-than-temporary impairment; and (b) for which the credit component of the loss is recognized in earnings. The credit-related other-than-temporary impairment component of the amortized cost represents the difference between the present value of expected future cash flows, including the estimated proceeds from bond insurance, and the amortized cost basis of the security prior to considering credit losses. The beginning balance represents the other-than-temporary impairment credit loss component related to available-for-sale securities for which other-than-temporary impairment occurred prior to January 1, 2012, but will not be realized until the securities are sold, written off, or mature. Net impairment of available-for-sale securities recognized in earnings is presented as additions in two components based upon whether the current period is: (a) the first

time the debt security was credit-impaired; or (b) not the first time the debt security was credit-impaired. The credit loss component is reduced if we sell, intend to sell or believe we will be required to sell previously credit-impaired available-for-sale securities. Additionally, the credit loss component is reduced by the amortization resulting from significant increases in cash flows expected to be collected that are recognized over the remaining life of the security.

**Table 7.5 — Other-Than-Temporary Impairments Related to Credit Losses on Available-For-Sale Securities**

|  | Three Months Ended March 31, 2012 |
|---|---|
|  | (in millions) |
| Credit-related other-than-temporary impairments on available-for-sale securities recognized in earnings: |  |
| Beginning balance — remaining credit losses to be realized on available-for-sale securities held at the beginning of the period where other-than-temporary impairments were recognized in earnings | $15,988 |
| Additions: |  |
| Amounts related to credit losses for which an other-than-temporary impairment was not previously recognized | 13 |
| Amounts related to credit losses for which an other-than-temporary impairment was previously recognized | 551 |
| Reductions: |  |
| Amounts related to securities which were sold, written off or matured | (272) |
| Amounts previously recognized in other comprehensive income that were recognized in earnings because we intend to sell the security or it is more likely than not that we will be required to sell the security before recovery of its amortized cost basis | (14) |
| Amounts related to amortization resulting from significant increases in cash flows expected to be collected that are recognized over the remaining life of the security | (52) |
| Ending balance — remaining credit losses to be realized on available-for-sale securities held at period end where other-than-temporary impairments were recognized in earnings | $16,214 |

## Realized Gains and Losses on Sales of Available-For-Sale Securities

The table below illustrates the gross realized gains and gross realized losses received from the sale of available-for-sale securities.

**Table 7.6 — Gross Realized Gains and Gross Realized Losses on Sales of Available-For-Sale Securities**

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2012 | 2011 |
|  | (in millions) | |
| **Gross realized gains** |  |  |
| Mortgage-related securities: |  |  |
| Freddie Mac | $— | $77 |
| Fannie Mae | 12 | — |
| CMBS | 76 | — |
| Obligations of states and political subdivisions | 1 | 1 |
| Total mortgage-related securities gross realized gains | 89 | 78 |
| Non-mortgage-related securities: |  |  |
| Asset-backed securities | — | 2 |
| Total non-mortgage-related securities gross realized gains | — | 2 |
| Gross realized gains | 89 | 80 |
| **Gross realized losses** |  |  |
| Gross realized losses | — | — |
| Net realized gains (losses) | $89 | $80 |

## Maturities of Available-For-Sale Securities

The table below summarizes the remaining contractual maturities of available-for-sale securities.

**Table 7.7 — Maturities of Available-For-Sale Securities[1]**

| March 31, 2012 | Amortized Cost | Fair Value |
|---|---|---|
|  | (in millions) | |
| Available-for-sale securities: |  |  |
| Due within 1 year or less | $ 37 | $ 37 |
| Due after 1 through 5 years | 2,174 | 2,286 |
| Due after 5 through 10 years | 3,746 | 3,961 |
| Due after 10 years | 204,260 | 196,138 |
| Total available-for-sale securities | $210,217 | $202,422 |

(1) Maturity information provided is based on contractual maturities, which may not represent expected life as obligations underlying these securities may be prepaid at any time without penalty.

*Freddie Mac*

## AOCI Related to Available-For-Sale Securities

The table below presents the changes in AOCI related to available-for-sale securities. The net unrealized holding gains represent the net fair value adjustments recorded on available-for-sale securities throughout the periods presented, after the effects of our federal statutory tax rate of 35%. The net reclassification adjustment for net realized losses represents the amount of those fair value adjustments, after the effects of our federal statutory tax rate of 35%, that have been recognized in earnings due to a sale of an available-for-sale security or the recognition of an impairment loss.

### Table 7.8 — AOCI Related to Available-For-Sale Securities

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (in millions) | |
| Beginning balance | $(6,213) | $(9,678) |
| Net unrealized holding gains[1] | 838 | 1,216 |
| Net reclassification adjustment for net realized losses[2][3] | 309 | 725 |
| Ending balance | $(5,066) | $(7,737) |

(1) Net of tax expense of $451 million and $655 million for the three months ended March 31, 2012 and 2011, respectively.
(2) Net of tax benefit of $166 million and $390 million for the three months ended March 31, 2012 and 2011, respectively.
(3) Includes the reversal of previously recorded unrealized losses that have been recognized on our consolidated statements of comprehensive income as impairment losses on available-for-sale securities of $367 million and $775 million, net of taxes, for the three months ended March 31, 2012 and 2011, respectively.

## Trading Securities

The table below summarizes the estimated fair values by major security type for trading securities.

### Table 7.9 — Trading Securities

| | March 31, 2012 | December 31, 2011 |
| --- | --- | --- |
| | (in millions) | |
| Mortgage-related securities: | | |
| Freddie Mac | $14,504 | $16,047 |
| Fannie Mae | 13,692 | 15,165 |
| Ginnie Mae | 151 | 156 |
| Other | 153 | 164 |
| Total mortgage-related securities | 28,500 | 31,532 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 695 | 302 |
| Treasury bills | 3,000 | 100 |
| Treasury notes | 23,164 | 24,712 |
| FDIC-guaranteed corporate medium-term notes | 2,960 | 2,184 |
| Total non-mortgage-related securities | 29,819 | 27,298 |
| Total fair value of trading securities | $58,319 | $58,830 |

Trading securities mainly include Treasury securities, agency fixed-rate and variable-rate pass-through mortgage-related securities, and agency REMICs, including inverse floating rate, interest-only and principal-only securities. With the exception of principal-only securities, our agency securities, classified as trading, were at a net premium (*i.e.*, have higher net fair value than UPB) as of March 31, 2012.

For the three months ended March 31, 2012 and 2011, we recorded net unrealized losses on trading securities held at those dates of $0.4 billion and $0.2 billion, respectively.

Total trading securities include $1.7 billion and $1.9 billion, respectively, of hybrid financial assets as defined by the derivative and hedging accounting guidance regarding certain hybrid financial instruments as of March 31, 2012 and December 31, 2011. Gains (losses) on trading securities on our consolidated statements of comprehensive income include losses of $51 million and $41 million, respectively, related to these hybrid financial securities for the three months ended March 31, 2012 and 2011.

## Collateral Pledged

### Collateral Pledged to Freddie Mac

Our counterparties are required to pledge collateral for securities purchased under agreements to resell transactions, and most derivative instruments are subject to collateral posting thresholds generally related to a counterparty's credit rating. We consider the types of securities being pledged to us as collateral when determining how much we lend related to securities purchased under agreements to resell transactions. Additionally, we subsequently and regularly review the

*Freddie Mac*

market values of these securities compared to amounts loaned in an effort to minimize our exposure to losses. We had cash and cash equivalents pledged to us related to derivative instruments of $2.3 billion and $3.2 billion at March 31, 2012 and December 31, 2011, respectively. Although it is our practice not to repledge assets held as collateral, a portion of the collateral may be repledged based on master agreements related to our derivative instruments. At March 31, 2012 and December 31, 2011, we did not have collateral in the form of securities pledged to and held by us under these master agreements. Also at March 31, 2012 and December 31, 2011, we did not have securities pledged to us for securities purchased under agreements to resell transactions that we had the right to repledge. From time to time we may obtain pledges of collateral from certain seller/servicers as additional security for their obligations to us, including their obligations to repurchase mortgages sold to us in breach of representations and warranties. This collateral may take the form of cash, cash equivalents, or agency securities.

In addition, we hold cash and cash equivalents as collateral in connection with certain of our multifamily guarantees and mortgage loans as credit enhancements. The cash and cash equivalents held as collateral related to these transactions at March 31, 2012 and December 31, 2011 was $258 million and $246 million, respectively.

### *Collateral Pledged by Freddie Mac*

We are required to pledge collateral for margin requirements with third-party custodians in connection with secured financings and derivative transactions with some counterparties. The level of collateral pledged related to our derivative instruments is determined after giving consideration to our credit rating. As of March 31, 2012, we had one secured, uncommitted intraday line of credit with a third party in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs, in connection with our use of the Fedwire system. In certain circumstances, the line of credit agreement gives the secured party the right to repledge the securities underlying our financing to other third parties, including the Federal Reserve Bank. We pledge collateral to meet our collateral requirements under the line of credit agreement upon demand by the counterparty.

The table below summarizes all securities pledged as collateral by us, including assets that the secured party may repledge and those that may not be repledged.

### Table 7.10 — Collateral in the Form of Securities Pledged

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| | (in millions) | |
| Securities pledged with the ability for the secured party to repledge: | | |
| Debt securities of consolidated trusts held by third parties[1] | $10,373 | $10,293 |
| Available-for-sale securities | 187 | 204 |
| Securities pledged without the ability for the secured party to repledge: | | |
| Debt securities of consolidated trusts held by third parties[1] | 90 | 88 |
| Total securities pledged | $10,650 | $10,585 |

(1) Represents PCs held by us in our Investments segment mortgage investments portfolio and pledged as collateral which are recorded as a reduction to debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

### *Securities Pledged with the Ability of the Secured Party to Repledge*

At March 31, 2012, we pledged securities with the ability of the secured party to repledge of $10.6 billion, of which $10.5 billion is collateral posted in connection with our secured uncommitted intraday line of credit with a third party as discussed above.

At December 31, 2011, we pledged securities with the ability of the secured party to repledge of $10.5 billion, of which $10.5 billion was collateral posted in connection with our secured uncommitted intraday line of credit with a third party as discussed above.

The remaining $42 million and $25 million of collateral posted with the ability of the secured party to repledge at March 31, 2012 and December 31, 2011, respectively, was posted in connection with our margin account related to futures transactions.

### *Securities Pledged without the Ability of the Secured Party to Repledge*

At March 31, 2012 and December 31, 2011, we pledged securities, without the ability of the secured party to repledge, of $90 million and $88 million, respectively, at a clearinghouse in connection with the trading and settlement of securities.

*Collateral in the Form of Cash Pledged*

At March 31, 2012, we pledged $11.7 billion of collateral in the form of cash and cash equivalents, of which $11.5 billion related to our derivative agreements as we had $11.5 billion of such derivatives in a net loss position. At December 31, 2011, we pledged $12.7 billion of collateral in the form of cash and cash equivalents, of which $12.6 billion related to our derivative agreements as we had $12.7 billion of such derivatives in a net loss position. The remaining $192 million and $133 million was posted at clearinghouses in connection with our securities transactions at March 31, 2012 and December 31, 2011, respectively.

## NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS

Debt securities that we issue are classified on our consolidated balance sheets as either debt securities of consolidated trusts held by third parties or other debt. We issue other debt to fund our operations.

Under the Purchase Agreement, without the prior written consent of Treasury, we may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are allowed to own on December 31 of the immediately preceding calendar year. Because of this debt limit, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Under the Purchase Agreement, the amount of our "indebtedness" is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs. Therefore, "indebtedness" does not include debt securities of consolidated trusts held by third parties. We also cannot become liable for any subordinated indebtedness without the prior consent of Treasury.

Our debt cap under the Purchase Agreement is $874.8 billion in 2012 and will decline to $787.3 billion on January 1, 2013. As of March 31, 2012, we estimate that the par value of our aggregate indebtedness totaled $629.3 billion, which was approximately $245.5 billion below the applicable debt cap. Our aggregate indebtedness is calculated as the par value of other debt.

In the tables below, the categories of short-term debt (due within one year) and long-term debt (due after one year) are based on the original contractual maturity of the debt instruments classified as other debt.

The table below summarizes the interest expense and the balances of total debt, net per our consolidated balance sheets.

### Table 8.1 — Total Debt, Net

| | Interest Expense for the Three Months Ended March 31, | | Balance, Net[1] | |
| | 2012 | 2011 | March 31, 2012 | December 31, 2011 |
| | (in millions) | | (in millions) | |
|---|---|---|---|---|
| Other debt: | | | | |
| Short-term debt | $    40 | $   115 | $ 134,825 | $ 161,399 |
| Long-term debt: | | | | |
| Senior debt | 2,769 | 3,438 | 483,432 | 498,779 |
| Subordinated debt | 7 | 12 | 372 | 368 |
| Total long-term debt | 2,776 | 3,450 | 483,804 | 499,147 |
| Total other debt | 2,816 | 3,565 | 618,629 | 660,546 |
| Debt securities of consolidated trusts held by third parties | 15,253 | 17,403 | 1,481,622 | 1,471,437 |
| Total debt, net | $18,069 | $20,968 | $2,100,251 | $2,131,983 |

(1) Represents par value, net of associated discounts, premiums, and hedge-related basis adjustments, with $0 and $0.2 billion, respectively, of other short-term debt, and $2.2 billion and $2.8 billion, respectively, of other long-term debt that represents the fair value of debt securities with the fair value option elected at March 31, 2012 and December 31, 2011.

During the three months ended March 31, 2012 and 2011, we recognized fair value gains (losses) of $(17) million and $(81) million, respectively, on our foreign-currency denominated debt, of which $(19) million and $(117) million, respectively, are gains (losses) related to our net foreign-currency translation.

## Other Debt

The table below summarizes the balances and effective interest rates for other debt. We had no balances in federal funds purchased and securities sold under agreements to repurchase at either March 31, 2012 or December 31, 2011.

### Table 8.2 — Other Debt

| | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Par Value | Balance, Net[1] | Weighted Average Effective Rate[2] | Par Value | Balance, Net[1] | Weighted Average Effective Rate[2] |
| | | | (dollars in millions) | | | |
| Other short-term debt: | | | | | | |
| Reference Bills® securities and discount notes | $134,865 | $134,825 | 0.12% | $161,193 | $161,149 | 0.11% |
| Medium-term notes | — | — | — | 250 | 250 | 0.24 |
| Total other short-term debt | 134,865 | 134,825 | 0.12 | 161,443 | 161,399 | 0.11 |
| Other long-term debt: | | | | | | |
| Original maturities on or before December 31, | | | | | | |
| 2012 | 88,192 | 88,185 | 1.73% | 127,798 | 127,776 | 1.79% |
| 2013 | 126,809 | 126,659 | 1.57 | 142,943 | 142,759 | 1.46 |
| 2014 | 93,956 | 93,780 | 1.76 | 87,453 | 87,267 | 1.91 |
| 2015 | 44,335 | 44,356 | 2.28 | 33,897 | 33,870 | 2.89 |
| 2016 | 44,546 | 44,502 | 3.09 | 45,526 | 45,473 | 3.21 |
| Thereafter | 96,557 | 86,322 | 3.64 | 75,254 | 62,002 | 4.58 |
| Total other long-term debt[3] | 494,455 | 483,804 | 2.21 | 512,871 | 499,147 | 2.27 |
| Total other debt | $629,320 | $618,629 | | $674,314 | $660,546 | |

(1) Represents par value, net of associated discounts or premiums and hedge-related basis adjustments.
(2) Represents the weighted average effective rate that remains constant over the life of the instrument, which includes the amortization of discounts or premiums, issuance costs, and hedge-related basis adjustments.
(3) Balance, net for other long-term debt includes callable debt of $112.3 billion and $121.4 billion at March 31, 2012 and December 31, 2011, respectively.

### Debt Securities of Consolidated Trusts Held by Third Parties

Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated securitization trusts (*i.e.*, single-family PC trusts and certain Other Guarantee Transactions).

The table below summarizes the debt securities of consolidated trusts held by third parties based on underlying mortgage product type.

### Table 8.3 — Debt Securities of Consolidated Trusts Held by Third Parties[1]

| | March 31, 2012 | | | | December 31, 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| | Contractual Maturity[2] | UPB | Balance, Net[3] | Weighted Average Coupon[2] | Contractual Maturity[2] | UPB | Balance, Net[3] | Weighted Average Coupon[2] |
| | | (dollars in millions) | | | | (dollars in millions) | | |
| Single-family: | | | | | | | | |
| 30-year or more, fixed-rate | 2012 - 2048 | $1,027,889 | $1,042,879 | 4.83% | 2012 - 2048 | $1,034,680 | $1,047,556 | 4.92% |
| 20-year fixed-rate | 2012 - 2032 | 71,142 | 72,637 | 4.40 | 2012 - 2032 | 67,323 | 68,502 | 4.53 |
| 15-year fixed-rate | 2012 - 2027 | 253,146 | 257,850 | 3.94 | 2012 - 2027 | 242,077 | 246,023 | 4.09 |
| Adjustable-rate | 2012 - 2047 | 62,430 | 63,397 | 3.10 | 2012 - 2047 | 60,544 | 61,395 | 3.18 |
| Interest-only[4] | 2026 - 2041 | 42,803 | 42,874 | 4.79 | 2026 - 2041 | 45,807 | 45,884 | 4.91 |
| FHA/VA | 2012 - 2041 | 1,955 | 1,985 | 5.66 | 2012 - 2041 | 2,045 | 2,077 | 5.67 |
| Total debt securities of consolidated trusts held by third parties[5] | | $1,459,365 | $1,481,622 | | | $1,452,476 | $1,471,437 | |

(1) Debt securities of consolidated trusts held by third parties are prepayable without penalty.
(2) Based on the contractual maturity and interest rate of debt securities of our consolidated trusts held by third parties.
(3) Represents par value, net of associated discounts, premiums, and other basis adjustments.
(4) Includes interest-only securities and interest-only mortgage loans that allow the borrowers to pay only interest for a fixed period of time before the loans begin to amortize.
(5) The effective rate for debt securities of consolidated trusts held by third parties was 4.04% and 4.22% as of March 31, 2012 and December 31, 2011, respectively.

### Lines of Credit

At both March 31, 2012 and December 31, 2011, we had one secured, uncommitted intraday line of credit with a third party totaling $10 billion. We use this line of credit regularly to provide us with additional liquidity to fund our intraday payment activities through the Fedwire system in connection with the Federal Reserve's payments system risk

policy, which restricts or eliminates daylight overdrafts by the GSEs. No amounts were drawn on this line of credit at March 31, 2012 or December 31, 2011. We expect to continue to use the current facility to satisfy our intraday financing needs; however, as the line is uncommitted, we may not be able to draw on it if and when needed.

**Subordinated Debt Interest and Principal Payments**

The terms of certain of our subordinated debt securities provide for us to defer payments of interest in the event we fail to maintain specified capital levels. However, in a September 23, 2008 statement concerning the conservatorship, the Director of FHFA stated that we would continue to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital levels.

## NOTE 9: FINANCIAL GUARANTEES

When we securitize single-family mortgages that we purchase, we issue mortgage-related securities that can be sold to investors or held by us. During the three months ended March 31, 2012 and 2011, we issued and guaranteed $108.3 billion and $93.9 billion, respectively, in UPB of Freddie Mac mortgage-related securities backed by single-family mortgage loans (excluding those backed by HFA bonds).

Beginning January 1, 2010, we no longer recognize a financial guarantee for such arrangements as we instead recognize both the mortgage loans and the debt securities of these securitization trusts on our consolidated balance sheets. The table below presents our maximum potential exposure, our recognized liability, and the maximum remaining term of our financial guarantees that are not consolidated on our balance sheets.

### Table 9.1 — Financial Guarantees

| | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Maximum Exposure[1] | Recognized Liability | Maximum Remaining Term | Maximum Exposure[1] | Recognized Liability | Maximum Remaining Term |
| | (dollars in millions, terms in years) | | | | | |
| Non-consolidated Freddie Mac securities[2] . . . . . . . . . . . . . . | $38,572 | $321 | 41 | $35,879 | $  300 | 42 |
| Other guarantee commitments[3] . . . . . . . . . . . . . . . . . . . . . . . | 22,354 | 493 | 37 | 21,064 | 487 | 37 |
| Derivative instruments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19,998 | 931 | 33 | 37,737 | 2,977 | 34 |
| Servicing-related premium guarantees . . . . . . . . . . . . . . . . . . | 160 | — | 5 | 151 | — | 5 |

(1) Maximum exposure represents the contractual amounts that could be lost under the non-consolidated guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements, such as recourse provisions, third-party insurance contracts, or from collateral held or pledged. The maximum exposure disclosed above is not representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation. The maximum exposure for our liquidity guarantees is not mutually exclusive of our default guarantees on the same securities; therefore, these amounts are included within the maximum exposure of non-consolidated Freddie Mac securities and other guarantee commitments.

(2) As of March 31, 2012 and December 31, 2011, the UPB of non-consolidated Freddie Mac securities associated with single-family mortgage loans was $10.4 billion and $10.7 billion, respectively. The remaining balances relate to multifamily mortgage loans.

(3) As of March 31, 2012 and December 31, 2011, the UPB of other guarantee commitments associated with single-family mortgage loans was $12.5 billion and $11.1 billion, respectively. The remaining balances relate to multifamily mortgage loans.

**Non-Consolidated Freddie Mac Securities**

We issue three types of mortgage-related securities: (a) PCs; (b) REMICs and Other Structured Securities; and (c) Other Guarantee Transactions. We guarantee the payment of principal and interest on these securities, which are backed by pools of mortgage loans, irrespective of the cash flows received from the borrowers. Commencing January 1, 2010, only our guarantees issued to non-consolidated securitization trusts are accounted for in accordance with the accounting guidance for guarantees (*i.e.*, a guarantee asset and guarantee obligation are recognized).

Our single-family securities issued in resecuritizations of our PCs and other previously issued REMICs and Other Structured Securities are not consolidated as they do not give rise to any additional exposure to credit loss as we already consolidate the underlying collateral. The securities issued in these resecuritizations consist of single-class and multiclass securities backed by PCs, REMICs, interest-only strips, and principal-only strips. Since these resecuritizations do not increase our credit-risk, no guarantee asset or guarantee obligation is recognized for these transactions and they are excluded from the table above.

We recognize a guarantee asset, guarantee obligation and a reserve for guarantee losses, as necessary, for securities issued by non-consolidated securitization trusts and other guarantee commitments for which we are exposed to incremental credit risk. Our guarantee obligation represents the recognized liability, net of cumulative amortization, associated with our guarantee of multifamily PCs and certain Other Guarantee Transactions issued to non-consolidated securitization trusts. In addition to our guarantee obligation, we recognize a reserve for guarantee losses, which is included within other liabilities on our consolidated balance sheets, which totaled $0.2 billion at both March 31, 2012 and

December 31, 2011. For many of the loans underlying our non-consolidated guarantees, there are credit protections from third parties, including subordination, covering a portion of our exposure. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections on loans we guarantee. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for further information about our accounting for financial guarantees.

During the three months ended March 31, 2012 and 2011, we issued approximately $3.1 billion and $2.9 billion, respectively, in UPB of non-consolidated Freddie Mac securities primarily backed by multifamily mortgage loans, for which a guarantee asset and guarantee obligation were recognized.

In connection with transfers of financial assets to non-consolidated securitization trusts that are accounted for as sales and for which we have incremental credit risk, we recognize our guarantee obligation in accordance with the accounting guidance for guarantees. Additionally, we may retain an interest in the transferred financial assets (*e.g.*, a beneficial interest issued by the securitization trust).

### Other Guarantee Commitments

We provide long-term standby commitments to certain of our customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements. During the three months ended March 31, 2012 and 2011, we issued and guaranteed $2.3 billion and $1.8 billion, respectively, in UPB of long-term standby commitments. These other guarantee commitments totaled $10.3 billion and $8.6 billion of UPB at March 31, 2012 and December 31, 2011, respectively. We also had other guarantee commitments on multifamily housing revenue bonds that were issued by HFAs of $9.6 billion in UPB at March 31, 2012 and December 31, 2011. In addition, as of March 31, 2012, and December 31, 2011, respectively, we had issued guarantees under the TCLFP on securities backed by HFA bonds with UPB of $2.5 billion, and $2.9 billion, respectively.

### Derivative Instruments

Derivative instruments include written options, written swaptions, interest-rate swap guarantees, and short-term default guarantee commitments accounted for as credit derivatives. See "NOTE 10: DERIVATIVES" for further discussion of these derivative guarantees.

We guarantee the performance of interest-rate swap contracts in two circumstances. First, we guarantee that a borrower will perform under an interest-rate swap contract linked to a borrower's ARM. And second, in connection with our issuance of certain REMICs and Other Structured Securities, which are backed by tax-exempt bonds, we guarantee that the sponsor of the transaction will perform under the interest-rate swap contract linked to the senior variable-rate certificates that we issued.

We also have issued REMICs and Other Structured Securities with stated final maturities that are shorter than the stated maturity of the underlying mortgage loans. If the underlying mortgage loans to these securities have not been purchased by a third party or fully matured as of the stated final maturity date of such securities, we will sponsor an auction of the underlying assets. To the extent that purchase or auction proceeds are insufficient to cover unpaid principal amounts due to investors in such REMICs and Other Structured Securities, we are obligated to fund such principal. Our maximum exposure on these guarantees represents the outstanding UPB of the REMICs and Other Structured Securities subject to stated final maturities.

### Servicing-Related Premium Guarantees

We provide guarantees to reimburse servicers for premiums paid to acquire servicing in situations where the original seller is unable to perform under its separate servicing agreement. The liability associated with these agreements was not material at March 31, 2012 and December 31, 2011.

### Other Indemnifications

In connection with certain business transactions, we may provide indemnification to counterparties for claims arising out of breaches of certain obligations (*e.g.*, those arising from representations and warranties) in contracts entered into in the normal course of business. Our assessment is that the risk of any material loss from such a claim for indemnification is remote and there are no significant probable and estimable losses associated with these contracts. In addition, we provided indemnification for litigation defense costs to certain former officers who are subject to ongoing litigation. See "NOTE 17: LEGAL CONTINGENCIES" for further information on ongoing litigation. The recognized liabilities on our consolidated balance sheets related to indemnifications were not significant at March 31, 2012 and December 31, 2011.

As part of the guarantee arrangements pertaining to multifamily housing revenue bonds, we provided commitments to advance funds, commonly referred to as "liquidity guarantees." These guarantees require us to advance funds to enable others to repurchase any tendered tax-exempt and related taxable bonds that are unable to be remarketed. Any such advances are treated as loans and are secured by a pledge to us of the repurchased securities until the securities are remarketed. We hold cash and cash equivalents on our consolidated balance sheets for the amount of these commitments. No advances under these liquidity guarantees were outstanding at March 31, 2012 and December 31, 2011.

## NOTE 10: DERIVATIVES

### Use of Derivatives

We use derivatives primarily to:

- hedge forecasted issuances of debt;

- synthetically create callable and non-callable funding;

- regularly adjust or rebalance our funding mix in response to changes in the interest-rate characteristics of our mortgage-related assets; and

- hedge foreign-currency exposure.

### *Hedge Forecasted Debt Issuances*

When we commit to purchase mortgage investments, such commitments are typically for a future settlement ranging from two weeks to three months after the date of the commitment. To facilitate larger and more predictable debt issuances that contribute to lower funding costs, we use interest-rate derivatives to economically hedge the interest-rate risk exposure from the time we commit to purchase a mortgage to the time the related debt is issued.

### *Create Synthetic Funding*

We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures. For example, the combination of a series of short-term debt issuances over a defined period and a pay-fixed interest rate swap with the same maturity as the last debt issuance is the substantive economic equivalent of a long-term fixed-rate debt instrument of comparable maturity. Similarly, the combination of non-callable debt and a call swaption, or option to enter into a receive-fixed interest rate swap, with the same maturity as the non-callable debt, is the substantive economic equivalent of callable debt. These derivatives strategies increase our funding flexibility and allow us to better match asset and liability cash flows, often reducing overall funding costs.

### *Adjust Funding Mix*

We generally use interest-rate swaps to mitigate contractual funding mismatches between our assets and liabilities. We also use swaptions and other option-based derivatives to adjust the contractual terms of our debt funding in response to changes in the expected lives of our investments in mortgage-related assets. As market conditions dictate, we take rebalancing actions to keep our interest-rate risk exposure within management-set limits. In a declining interest-rate environment, we typically enter into receive-fixed interest rate swaps or purchase Treasury-based derivatives to shorten the duration of our funding to offset the declining duration of our mortgage assets. In a rising interest-rate environment, we typically enter into pay-fixed interest rate swaps or sell Treasury-based derivatives in order to lengthen the duration of our funding to offset the increasing duration of our mortgage assets.

### *Foreign-Currency Exposure*

We use foreign-currency swaps to eliminate virtually all of our exposure to fluctuations in exchange rates related to our foreign-currency denominated debt by entering into swap transactions that effectively convert foreign-currency denominated obligations into U.S. dollar-denominated obligations. Foreign-currency swaps are defined as swaps in which net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars.

### Types of Derivatives

We principally use the following types of derivatives:

- LIBOR- and Euribor-based interest-rate swaps;

- LIBOR- and Treasury-based options (including swaptions);

- LIBOR- and Treasury-based exchange-traded futures; and

138                                                                          *Freddie Mac*

• Foreign-currency swaps.

In addition to swaps, futures, and purchased options, our derivative positions include the following:

### Written Options and Swaptions

Written call and put swaptions are sold to counterparties allowing them the option to enter into receive- and pay-fixed interest rate swaps, respectively. Written call and put options on mortgage-related securities give the counterparty the right to execute a contract under specified terms, which generally occurs when we are in a liability position. We use these written options and swaptions to manage convexity risk over a wide range of interest rates. Written options lower our overall hedging costs, allow us to hedge the same economic risk we assume when selling guaranteed final maturity REMICs with a more liquid instrument, and allow us to rebalance the options in our callable debt and REMICs portfolios. We may, from time to time, write other derivative contracts such as interest-rate futures.

### Commitments

We routinely enter into commitments that include our: (a) commitments to purchase and sell investments in securities; (b) commitments to purchase mortgage loans; and (c) commitments to purchase and extinguish or issue debt securities of our consolidated trusts. Most of these commitments are considered derivatives and therefore are subject to the accounting guidance for derivatives and hedging.

### Swap Guarantee Derivatives

In connection with some of the guarantee arrangements pertaining to multifamily housing revenue bonds and multifamily pass-through certificates, we may also guarantee the sponsor's or the borrower's obligations as a counterparty on any related interest-rate swaps used to mitigate interest-rate risk, which are accounted for as swap guarantee derivatives.

### Credit Derivatives

We entered into credit-risk sharing agreements for certain credit enhanced multifamily housing revenue bonds held by third parties in exchange for a monthly fee. In addition, we have purchased mortgage loans containing debt cancellation contracts, which provide for mortgage debt or payment cancellation for borrowers who experience unanticipated losses of income dependent on a covered event. The rights and obligations under these agreements have been assigned to the servicers. However, in the event the servicer does not perform as required by contract, under our guarantee, we would be obligated to make the required contractual payments.

For a discussion of our significant accounting policies related to derivatives, please see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Derivatives" in our 2011 Annual Report.

## Derivative Assets and Liabilities at Fair Value

The table below presents the location and fair value of derivatives reported in our consolidated balance sheets.

### Table 10.1 — Derivative Assets and Liabilities at Fair Value

| | At March 31, 2012 | | | At December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Notional or Contractual Amount | Derivatives at Fair Value | | Notional or Contractual Amount | Derivatives at Fair Value | |
| | | Assets[1] | Liabilities[1] | | Assets[1] | Liabilities[1] |
| | | | (in millions) | | | |
| **Total derivative portfolio** | | | | | | |
| *Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging*[2] | | | | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed | $248,453 | $ 10,391 | $   (519) | $211,808 | $ 12,998 | $   (108) |
| Pay-fixed | 296,573 | 444 | (28,226) | 289,335 | 19 | (34,507) |
| Basis (floating to floating) | 2,400 | 4 | (2) | 2,750 | 5 | (7) |
| Total interest-rate swaps | 547,426 | 10,839 | (28,747) | 503,893 | 13,022 | (34,622) |
| Option-based: | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 52,500 | 7,766 | — | 76,275 | 12,975 | — |
| Written | 12,025 | — | (886) | 27,525 | — | (2,932) |
| Put Swaptions | | | | | | |
| Purchased | 49,450 | 527 | — | 70,375 | 638 | — |
| Written | 250 | — | (5) | 500 | — | (2) |
| Other option-based derivatives[3] | 34,365 | 2,029 | — | 38,549 | 2,256 | (2) |
| Total option-based | 148,590 | 10,322 | (891) | 213,224 | 15,869 | (2,936) |
| Futures | 44,281 | — | (66) | 41,281 | 5 | — |
| Foreign-currency swaps | 1,179 | 84 | — | 1,722 | 106 | (9) |
| Commitments | 22,298 | 22 | (59) | 14,318 | 38 | (94) |
| Credit derivatives | 9,338 | 1 | (5) | 10,190 | 1 | (5) |
| Swap guarantee derivatives | 3,631 | — | (36) | 3,621 | — | (37) |
| Total derivatives not designated as hedging instruments | 776,743 | 21,268 | (29,804) | 788,249 | 29,041 | (37,703) |
| Netting adjustments[4] | | (21,086) | 29,508 | | (28,923) | 37,268 |
| Total derivative portfolio, net | $776,743 | $    182 | $   (296) | $788,249 | $    118 | $   (435) |

(1) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net.
(2) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.
(3) Primarily includes purchased interest-rate caps and floors.
(4) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $9.2 billion and $299 million, respectively, at March 31, 2012. The net cash collateral posted and net trade/settle receivable were $9.4 billion and $1 million, respectively, at December 31, 2011. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(1.1) billion at both March 31, 2012 and December 31, 2011, which was mainly related to interest-rate swaps that we have entered into.

The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable and net trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net asset position are reported as derivative assets, net. Similarly, derivatives in a net liability position are reported as derivative liabilities, net. Cash collateral we obtained from counterparties to derivative contracts that has been offset against derivative assets at March 31, 2012 and December 31, 2011 was $2.3 billion and $3.2 billion, respectively. Cash collateral we posted to counterparties to derivative contracts that has been offset against derivative liabilities at March 31, 2012 and December 31, 2011 was $11.5 billion and $12.6 billion, respectively. We are subject to collateral posting thresholds based on the credit rating of our long-term senior unsecured debt securities from S&P or Moody's. The lowering or withdrawal of our credit rating by S&P or Moody's may increase our obligation to post collateral, depending on the amount of the counterparty's exposure to Freddie Mac with respect to the derivative transactions.

The aggregate fair value of all derivative instruments with credit-risk-related contingent features that were in a liability position on March 31, 2012, was $11.5 billion for which we posted collateral of $11.5 billion in the normal course of business. Since we were fully collateralized as of March 31, 2012, we would not have to post additional collateral on that day if credit-risk-related contingent features underlying these agreements were triggered.

At March 31, 2012 and December 31, 2011, there were no amounts of cash collateral that were not offset against derivative assets, net or derivative liabilities, net, as applicable. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information related to our derivative counterparties.

## Gains and Losses on Derivatives

The table below presents the gains and losses on derivatives reported in our consolidated statements of comprehensive income.

### Table 10.2 — Gains and Losses on Derivatives

| Derivatives in Cash Flow Hedging Relationships[1][2] | Amount of Gain or (Loss) Reclassified from AOCI into Earnings (Effective Portion) | |
|---|---|---|
| | Three Months Ended March 31, | |
| | 2012 | 2011 |
| | (in millions) | |
| Closed cash flow hedges[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (165) | $ (197) |

| Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging[5] | Derivative Gains (Losses)[4] | |
|---|---|---|
| | Three Months Ended March 31, | |
| | 2012 | 2011 |
| | (in millions) | |
| Interest-rate swaps: | | |
| Receive-fixed | | |
| Foreign-currency denominated . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (5) | $ (37) |
| U.S. dollar denominated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,583) | (2,204) |
| Total receive-fixed swaps . . . . . . . . . . . . . . . . . . . . . . . . . | (2,588) | (2,241) |
| Pay-fixed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,792 | 3,963 |
| Basis (floating to floating) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 1 |
| Total interest-rate swaps . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,208 | 1,723 |
| Option based: | | |
| Call swaptions | | |
| Purchased . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,194) | (684) |
| Written . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 370 | 38 |
| Put swaptions | | |
| Purchased . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (34) | (122) |
| Written . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 7 |
| Other option-based derivatives[6] . . . . . . . . . . . . . . . . . . . . . . . . . | (221) | (46) |
| Total option-based . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,077) | (807) |
| Futures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (65) | (41) |
| Foreign-currency swaps[7] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | 109 |
| Commitments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (57) | (164) |
| Credit derivatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 1 |
| Swap guarantee derivatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 1 |
| Subtotal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 | 822 |
| Accrual of periodic settlements:[8] | | |
| Receive-fixed interest-rate swaps[9] . . . . . . . . . . . . . . . . . . . . . . . . | 779 | 1,246 |
| Pay-fixed interest-rate swaps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,858) | (2,504) |
| Foreign-currency swaps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 4 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 5 |
| Total accrual of periodic settlements . . . . . . . . . . . . . . . . . . . | (1,076) | (1,249) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(1,056) | $ (427) |

(1) Derivatives that meet specific criteria may be accounted for as cash flow hedges. Net deferred gains and losses on closed cash flow hedges (*i.e.*, where the derivative is either terminated or redesignated) are also included in AOCI until the related forecasted transaction affects earnings or is determined to be probable of not occurring.
(2) No amounts of gains or (losses) were recognized in AOCI on derivatives (effective portion) and in other income (ineffective portion and amount excluded from effectiveness testing).
(3) Amounts reported in AOCI linked to interest payments on long-term debt are recorded in other debt interest expense and amounts not linked to interest payments on long-term debt are recorded in expense related to derivatives.
(4) Gains (losses) are reported as derivative gains (losses) on our consolidated statements of comprehensive income.
(5) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.
(6) Primarily includes purchased interest-rate caps and floors.
(7) Foreign-currency swaps are defined as swaps in which the net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars.
(8) For derivatives not in qualifying hedge accounting relationships, the accrual of periodic cash settlements is recorded in derivative gains (losses) on our consolidated statements of comprehensive income.
(9) Includes imputed interest on zero-coupon swaps.

## Hedge Designation of Derivatives

At March 31, 2012 and December 31, 2011, we did not have any derivatives in hedge accounting relationships; however, there are deferred net losses recorded in AOCI related to closed cash flow hedges. As shown in "Table 10.3 —

AOCI Related to Cash Flow Hedge Relationships," the total AOCI related to derivatives designated as cash flow hedges was a loss of $1.6 billion and $2.1 billion at March 31, 2012 and 2011, respectively, composed of deferred net losses on closed cash flow hedges. Closed cash flow hedges involve derivatives that have been terminated or are no longer designated as cash flow hedges. Fluctuations in prevailing market interest rates have no impact on the deferred portion of AOCI relating to losses on closed cash flow hedges.

The previous deferred amount related to closed cash flow hedges remains in our AOCI balance and will be recognized into earnings over the expected time period for which the forecasted transactions impact earnings. Over the next 12 months, we estimate that approximately $393 million, net of taxes, of the $1.6 billion of cash flow hedge losses in AOCI at March 31, 2012 will be reclassified into earnings. The maximum remaining length of time over which we have hedged the exposure related to the variability in future cash flows on forecasted transactions, primarily forecasted debt issuances, is 22 years. However, over 70% and 90% of AOCI relating to closed cash flow hedges at March 31, 2012 will be reclassified to earnings over the next five and ten years, respectively.

The table below presents the changes in AOCI related to derivatives designated as cash flow hedges. Net reclassifications of losses to earnings represents the AOCI amount that was recognized in earnings as the originally hedged forecasted transactions affected earnings, unless it was deemed probable that the forecasted transaction would not occur. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the hedge related to the forecasted transaction would be reclassified into earnings immediately.

**Table 10.3 — AOCI Related to Cash Flow Hedge Relationships**

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2012 | 2011 |
|  | (in millions) | |
| Beginning balance[1] | $(1,730) | $(2,239) |
| Net reclassifications of losses to earnings[2] | 111 | 132 |
| Ending balance[1] | $(1,619) | $(2,107) |

(1) Represents net deferred gains and losses on closed (*i.e.*, terminated or redesignated) cash flow hedges.
(2) Net of tax benefit of $54 million and $65 million for the three months ended March 31, 2012 and 2011, respectively.

## NOTE 11: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)

### Senior Preferred Stock

We received $146 million in March 2012 pursuant to draw requests that FHFA submitted to Treasury on our behalf to address the deficits in our net worth as of December 31, 2011. In addition, we had a deficit in net worth of $18 million as of March 31, 2012. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Government Support for our Business" for additional information regarding the draw request that FHFA, as Conservator, will submit on our behalf to Treasury to address our deficit in net worth. The aggregate liquidation preference on the senior preferred stock owned by Treasury was $72.3 billion and $72.2 billion as of March 31, 2012 and December 31, 2011, respectively. See "NOTE 14: REGULATORY CAPITAL" for additional information.

### Stock-Based Compensation

We did not repurchase or issue any of our common shares or non-cumulative preferred stock during the three months ended March 31, 2012, except for issuances of treasury stock as reported on our consolidated statements of equity (deficit) relating to stock-based compensation granted prior to conservatorship. Common stock delivered under these stock-based compensation plans consists of treasury stock or shares acquired in market transactions on behalf of the participants. During the three months ended March 31, 2012, restrictions lapsed on 460,846 restricted stock units, all of which were granted prior to conservatory. For a discussion regarding our stock-based compensation plans, see "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2011 Annual Report.

For purposes of the earnings-per-share calculation, all stock-based compensation plan options outstanding at March 31, 2012 and 2011 were out of the money and excluded from the computation of dilutive potential common shares for the three months ended March 31, 2012 and 2011, respectively. The weighted average common shares outstanding for the period includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury pursuant to the Purchase Agreement.

**Dividends Declared During 2012**

No common dividends were declared during the three months ended March 31, 2012. In March 2012, we paid dividends of $1.8 billion in cash on the senior preferred stock at the direction of our Conservator. We did not declare or pay dividends on any other series of Freddie Mac preferred stock outstanding during the three months ended March 31, 2012.

## NOTE 12: INCOME TAXES

**Income Tax Benefit**

For the three months ended March 31, 2012 and 2011, we reported an income tax benefit of $14 million and $74 million, respectively, resulting in effective tax rates of (2.5)% and (12.3)%, respectively. For the three months ended March 31, 2012, the tax benefit recorded is related to the amortization of net deferred losses on pre-2008 closed cash flow hedges offset by an expense for alternative minimum tax. We continue to be in a tax loss carryforward position. Our effective tax rate was different from the statutory rate of 35% primarily due to changes in the valuation allowance recorded against a portion of our net deferred tax assets.

**Deferred Tax Assets, Net**

Our valuation allowance decreased by $33 million during the first quarter of 2012 to $35.6 billion primarily due to a decrease in temporary differences. After consideration of the valuation allowance, we had a net deferred tax asset of $2.9 billion, primarily representing the tax effect of unrealized losses on our available-for-sale securities.

*IRS Examinations and Unrecognized Tax Benefits*

We believe appropriate reserves have been provided for settlement on reasonable terms related to questions of timing and potential penalties raised by the IRS during examinations of the 1998 to 2007 tax years regarding our tax accounting method for certain hedging transactions. However, changes could occur in the balance of unrecognized tax benefits that could have a material impact on income tax expense in the period the issue is resolved if the outcome reached is not in our favor and the assessment is in excess of the amount currently reserved. Considering the Tax Court trial date of November 13, 2012, the fact that no settlement discussions have occurred for an extended period of time, and the information currently available, we do not believe it is reasonably possible that this issue will be resolved within the next 12 months.

The IRS is currently auditing our income tax returns for tax years 2008 and 2009. We believe appropriate reserves have been provided for all income tax uncertainties. However, it is reasonably possible that the 2008 to 2009 audit cycle will be completed during the next 12 months, which could result in a decrease in the balance of unrecognized tax benefits by as much as $373 million.

For additional information, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 13: INCOME TAXES" in our 2011 Annual Report.

## NOTE 13: SEGMENT REPORTING

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for additional information about the conservatorship.

We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments. These reclassifications and allocations are described in "NOTE 14: SEGMENT REPORTING" in our 2011 Annual Report.

We do not consider our assets by segment when evaluating segment performance or allocating resources. We conduct our operations solely in the U.S. and its territories. Therefore, we do not generate any revenue from geographic locations outside of the U.S. and its territories.

**Segments**

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. The chart below provides a summary of our three

reportable segments and the All Other category. As reflected in the chart, certain activities that are not part of a reportable segment are included in the All Other category. The All Other category consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods.

| Segment | Description | Activities/Items |
|---|---|---|
| Investments | The Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans, which are funded by other debt issuances and hedged using derivatives. In our Investments segment, we also provide funding and hedging management services to the Single-family Guarantee and Multifamily segments. The Investments segment reflects changes in the fair value of the Multifamily segment assets that are associated with changes in interest rates. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses. | • Investments in mortgage-related securities and single-family performing mortgage loans<br>• Investments in asset-backed securities<br>• All other traded instruments / securities, excluding CMBS and multifamily housing revenue bonds<br>• Debt issuances<br>• All asset / liability management returns<br>• Guarantee buy-ups / buy-downs, net of execution gains / losses<br>• Cash and liquidity management<br>• Deferred tax asset valuation allowance<br>• Allocated administrative expenses and taxes |
| Single-Family Guarantee | The Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related security in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less credit-related expenses, administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses. | • Management and guarantee fees on PCs, including those retained by us, and single-family mortgage loans in the mortgage investments portfolio<br>• Up-front credit delivery fees<br>• Adjustments for security performance<br>• Credit losses on all single-family assets<br>• Expected net float income or expense on the single-family credit guarantee portfolio<br>• Deferred tax asset valuation allowance<br>• Allocated debt costs, administrative expenses and taxes |
| Multifamily | The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans and non-agency CMBS that we purchased for investment, our purchases of such multifamily mortgage loans for investment have declined significantly since 2010, and our purchases of CMBS have declined significantly since 2008. The only CMBS that we have purchased since 2008 have been senior, mezzanine, and interest-only tranches related to certain of our securitization transactions, and these purchases have not been significant. Currently, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization. We guarantee the senior tranches of these securitizations in Other Guarantee Transactions. Our Multifamily segment also issues Other Structured Securities, but does not issue REMIC securities. Our Multifamily segment also enters into other guarantee commitments for multifamily HFA bonds and housing revenue bonds held by third parties. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less credit-related expenses, administrative expenses, and allocated funding costs. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in fair value of CMBS and held-for-sale loans associated only with market factors other than changes in interest rates, such as liquidity and credit. | • Multifamily mortgage loans held-for-sale and associated securitization activities<br>• Investments in CMBS, multifamily housing revenue bonds, and multifamily mortgage loans held-for-investment<br>• Allocated debt costs, administrative expenses and taxes<br>• Other guarantee commitments on multifamily HFA bonds and housing revenue bonds<br>• LIHTC and valuation allowance<br>• Deferred tax asset valuation allowance |
| All Other | The All Other category consists of material corporate-level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments. | • Tax settlements, as applicable<br>• Legal settlements, as applicable<br>• The deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward. |

## Segment Earnings

The financial performance of our Single-family Guarantee segment and Multifamily segment are measured based on each segment's contribution to GAAP net income (loss). Our Investments segment is measured on its contribution to GAAP comprehensive income (loss), which consists of the sum of its contribution to: (a) GAAP net income (loss); and (b) GAAP total other comprehensive income (loss), net of taxes.

The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss). Likewise, the sum of comprehensive income (loss) for each segment and the All Other category equals GAAP comprehensive income (loss). However, the accounting principles we apply to present certain financial statement line items in Segment Earnings for our reportable segments, in particular Segment Earnings net interest income and management and guarantee income, differ significantly from those applied in preparing the comparable line items in our consolidated financial statements prepared in accordance with GAAP. Accordingly, the results of such line items differ significantly from, and should not be used as a substitute for, the comparable line items as determined in accordance with GAAP. For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "Table 13.2 — Segment Earnings and Reconciliation to GAAP Results."

### Segment Adjustments

In presenting Segment Earnings net interest income and management and guarantee income, we make adjustments to better reflect how management measures and assesses the performance of each segment and the company as a whole. These adjustments relate to amounts that, effective January 1, 2010, are no longer reflected in net income (loss) as determined in accordance with GAAP as a result of the adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. These adjustments are reversed through the segment adjustments line item within Segment Earnings, so that Segment Earnings (loss) for each segment equals GAAP net income (loss) for each segment. Segment adjustments consist of the following:

- We adjust our Segment Earnings net interest income for the Investments segment to include the amortization of cash premiums and discounts and buy-up and buy-down fees on the consolidated Freddie Mac mortgage-related securities we purchase as investments. As of March 31, 2012, the unamortized balance of such premiums and discounts and buy-up and buy-down fees was $1.3 billion. These adjustments are necessary to reflect the economic yield realized on investments in consolidated Freddie Mac mortgage-related securities purchased at a premium or discount or with buy-up or buy-down fees.

- We adjust our Segment Earnings management and guarantee income for the Single-family Guarantee segment to include the amortization of delivery fees recorded in periods prior to the January 1, 2010 adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. As of March 31, 2012, the unamortized balance of such fees was $2.0 billion. We consider such fees to be part of the effective rate of the guarantee fee on guaranteed mortgage loans. This adjustment is necessary in order to better reflect the realization of revenue associated with guarantee contracts over the life of the underlying loans.

The table below presents Segment Earnings by segment.

### Table 13.1 — Summary of Segment Earnings and Comprehensive Income (Loss)

| | Three Months Ended March 31, | |
| --- | ---: | ---: |
| | 2012 | 2011 |
| | (in millions) | |
| Segment Earnings (loss), net of taxes: | | |
| Investments | $ 1,628 | $ 2,137 |
| Single-family Guarantee | (1,675) | (1,820) |
| Multifamily | 624 | 359 |
| Total Segment Earnings, net of taxes | 577 | 676 |
| Net income | $ 577 | $ 676 |
| Comprehensive income (loss) of segments: | | |
| Investments | $ 1,963 | $ 3,263 |
| Single-family Guarantee | (1,698) | (1,824) |
| Multifamily | 1,524 | 1,301 |
| Comprehensive income of segments | 1,789 | 2,740 |
| Comprehensive income | $ 1,789 | $ 2,740 |

*Freddie Mac*

The table below presents detailed reconciliations between our GAAP financial statements and Segment Earnings by financial statement line item for our reportable segments and All Other.

## Table 13.2 — Segment Earnings and Reconciliation to GAAP Results

### Three Months Ended March 31, 2012

| | Investments | Single-family Guarantee | Multifamily | All Other | Total Segment Earnings (Loss), Net of Taxes (in millions) | Reclassifications[1] | Segment Adjustments[2] | Total Reconciling Items | Total per Consolidated Statements of Comprehensive Income |
|---|---|---|---|---|---|---|---|---|---|
| Net interest income | $ 1,763 | $ (32) | $ 318 | $— | $ 2,049 | $ 2,296 | $ 155 | $ 2,451 | $ 4,500 |
| (Provision) benefit for credit losses | — | (2,184) | 19 | — | (2,165) | 340 | — | 340 | (1,825) |
| Non-interest income (loss): | | | | | | | | | |
| Management and guarantee income[3] | — | 1,011 | 33 | — | 1,044 | (803) | (196) | (999) | 45 |
| Net impairment of available-for-sale securities recognized in earnings | (496) | — | (16) | — | (512) | (52) | — | (52) | (564) |
| Derivative gains (losses) | 200 | — | (1) | — | 199 | (1,255) | — | (1,255) | (1,056) |
| Gains (losses) on trading securities | (398) | — | 21 | — | (377) | — | — | — | (377) |
| Gains (losses) on sale of mortgage loans | (14) | — | 54 | — | 40 | — | — | — | 40 |
| Gains (losses) on mortgage loans recorded at fair value | (38) | — | 177 | — | 139 | — | — | — | 139 |
| Other non-interest income (loss) | 513 | 181 | 89 | — | 783 | (526) | — | (526) | 257 |
| Non-interest expense: | | | | | | | | | |
| Administrative expenses | (92) | (193) | (52) | — | (337) | — | — | — | (337) |
| REO operations income (expense) | — | (172) | 1 | — | (171) | — | — | — | (171) |
| Other non-interest expense | — | (73) | (15) | — | (88) | — | — | — | (88) |
| Segment adjustments[2] | 155 | (196) | — | — | (41) | — | 41 | 41 | — |
| Income tax (expense) benefit | 35 | (5) | (4) | — | 14 | — | — | — | 14 |
| Net income (loss) | 1,628 | (1,675) | 624 | — | 577 | — | — | — | 577 |
| Total other comprehensive income, net of taxes | 335 | (23) | 900 | — | 1,212 | — | — | — | 1,212 |
| Comprehensive income (loss) | $ 1,963 | $(1,698) | $1,524 | $— | $ 1,789 | $ — | $ — | $ — | $ 1,789 |

### Three Months Ended March 31, 2011

| | Investments | Single-family Guarantee | Multifamily | All Other | Total Segment Earnings (Loss), Net of Taxes (in millions) | Reclassifications[1] | Segment Adjustments[2] | Total Reconciling Items | Total per Consolidated Statements of Comprehensive Income |
|---|---|---|---|---|---|---|---|---|---|
| Net interest income | $ 1,653 | $ 100 | $ 279 | $— | $ 2,032 | $ 2,305 | $ 203 | $ 2,508 | $ 4,540 |
| (Provision) benefit for credit losses | — | (2,284) | 60 | — | (2,224) | 235 | — | 235 | (1,989) |
| Non-interest income (loss): | | | | | | | | | |
| Management and guarantee income[3] | — | 870 | 28 | — | 898 | (675) | (185) | (860) | 38 |
| Net impairment of available-for-sale securities recognized in earnings | (1,029) | — | (135) | — | (1,164) | (29) | — | (29) | (1,193) |
| Derivative gains (losses) | 1,103 | — | 2 | — | 1,105 | (1,532) | — | (1,532) | (427) |
| Gains (losses) on trading securities | (234) | — | 34 | — | (200) | — | — | — | (200) |
| Gains (losses) on sale of mortgage loans | 12 | — | 83 | — | 95 | — | — | — | 95 |
| Gains (losses) on mortgage loans recorded at fair value | (83) | — | 50 | — | (33) | — | — | — | (33) |
| Other non-interest income (loss) | 541 | 211 | 20 | — | 772 | (304) | — | (304) | 468 |
| Non-interest expense: | | | | | | | | | |
| Administrative expenses | (95) | (215) | (51) | — | (361) | — | — | — | (361) |
| REO operations expense | — | (257) | — | — | (257) | — | — | — | (257) |
| Other non-interest expense | — | (66) | (13) | — | (79) | — | — | — | (79) |
| Segment adjustments[2] | 203 | (185) | — | — | 18 | — | (18) | (18) | — |
| Income tax benefit | 66 | 6 | 2 | — | 74 | — | — | — | 74 |
| Net income (loss) | 2,137 | (1,820) | 359 | — | 676 | — | — | — | 676 |
| Total other comprehensive income, net of taxes | 1,126 | (4) | 942 | — | 2,064 | — | — | — | 2,064 |
| Comprehensive income (loss) | $ 3,263 | $(1,824) | $1,301 | $— | $ 2,740 | $ — | $ — | $ — | $ 2,740 |

(1) See "NOTE 14: SEGMENT REPORTING — Segment Earnings — *Investment Activity-Related Reclassifications*" and "*— Credit Guarantee Activity-Related Reclassifications*" in our 2011 Annual Report for information regarding these reclassifications.

(2) See "Segment Earnings — *Segment Adjustments*" for additional information regarding these adjustments.

(3) Management and guarantee income total per consolidated statements of comprehensive income is included in other income on our GAAP consolidated statements of comprehensive income.

The table below presents comprehensive income (loss) by segment.

**Table 13.3 — Comprehensive Income (Loss) of Segments**

| | Net Income (Loss) | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | Total Other Comprehensive Income (Loss), Net of Taxes | Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|
| | | **Three Months Ended March 31, 2012** | | | | |
| | | **Other Comprehensive Income (Loss), Net of Taxes** | | | | |
| | | (in millions) | | | | |
| Comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 1,628 | $ 242 | $111 | $(18) | $ 335 | $ 1,963 |
| Single-family Guarantee | (1,675) | — | — | (23) | (23) | (1,698) |
| Multifamily | 624 | 905 | — | (5) | 900 | 1,524 |
| Total per consolidated statements of comprehensive income | $ 577 | $1,147 | $111 | $(46) | $1,212 | $ 1,789 |
| | | **Three Months Ended March 31, 2011** | | | | |
| | | **Other Comprehensive Income (Loss), Net of Taxes** | | | | |
| | | (in millions) | | | | |
| Comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 2,137 | $ 999 | $131 | $ (4) | $1,126 | $ 3,263 |
| Single-family Guarantee | (1,820) | — | — | (4) | (4) | (1,824) |
| Multifamily | 359 | 942 | 1 | (1) | 942 | 1,301 |
| Total per consolidated statements of comprehensive income | $ 676 | $1,941 | $132 | $ (9) | $2,064 | $ 2,740 |

## NOTE 14: REGULATORY CAPITAL

On October 9, 2008, FHFA announced that it was suspending capital classification of us during conservatorship in light of the Purchase Agreement. FHFA continues to closely monitor our capital levels, but the existing statutory and FHFA-directed regulatory capital requirements are not binding during conservatorship. We continue to provide our submission to FHFA on minimum capital, however we no longer provide our submission of risk-based capital to FHFA.

Our regulatory minimum capital is a leverage-based measure that is generally calculated based on GAAP and reflects a 2.50% capital requirement for on-balance sheet assets and 0.45% capital requirement for off-balance sheet obligations. Based upon our adoption of amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs, we determined that, under the new consolidation guidance, we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions and, therefore, effective January 1, 2010, we consolidated on our balance sheet the assets and liabilities of these trusts. Pursuant to regulatory guidance from FHFA, our minimum capital requirement was not automatically affected by adoption of these amendments. Specifically, upon adoption of these amendments, FHFA directed us, for purposes of minimum capital, to continue reporting single-family PCs and certain Other Guarantee Transactions held by third parties using a 0.45% capital requirement. FHFA reserves the authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities. On March 3, 2011, FHFA issued a final rule setting forth procedures and standards in the event FHFA were to make such a temporary increase in minimum capital levels. The table below summarizes our minimum capital requirements and deficits and net worth.

**Table 14.1 — Net Worth and Minimum Capital**

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| | (in millions) | |
| GAAP net worth[1] | $ (18) | $ (146) |
| Core capital (deficit)[2][3] | $(65,552) | $(64,322) |
| Less: Minimum capital requirement[2] | 23,518 | 24,405 |
| Minimum capital surplus (deficit)[2] | $(89,070) | $(88,727) |

(1) Net worth (deficit) represents the difference between our assets and liabilities under GAAP.
(2) Core capital and minimum capital figures for March 31, 2012 are estimates. FHFA is the authoritative source for our regulatory capital.
(3) Core capital excludes certain components of GAAP total equity (deficit) (i.e., AOCI, liquidation preference of the senior preferred stock) as these items do not meet the statutory definition of core capital.

Following our entry into conservatorship, we have focused our risk and capital management, consistent with the objectives of conservatorship, on, among other things, maintaining a positive balance of GAAP equity in order to reduce the likelihood that we will need to make additional draws on the Purchase Agreement with Treasury. The Purchase Agreement provides that, if FHFA determines as of quarter end that our liabilities have exceeded our assets under GAAP, Treasury will contribute funds to us in an amount equal to the difference between such liabilities and assets.

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has advised us that, if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination. If funding has been requested under the Purchase Agreement to address a deficit in our net worth, and Treasury is unable to provide us with such funding within the 60-day period specified by FHFA, FHFA would be required to place us into receivership if our assets remain less than our obligations during that 60-day period.

To address our net worth deficit of $18 million at March 31, 2012, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $19 million, and will request that we receive these funds by June 30, 2012. Our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. Upon funding of this draw request, our aggregate funding received from Treasury under the Purchase Agreement will be $71.3 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. As a result of the additional $19 million draw request, the aggregate liquidation preference on the senior preferred stock owned by Treasury will be $72.3 billion at June 30, 2012. We paid a quarterly dividend of $1.8 billion on the senior preferred stock in cash in March 2012 at the direction of the Conservator. Following funding of the draw request related to our net worth deficit at March 31, 2012, our annual cash dividend obligation to Treasury on the senior preferred stock will be $7.23 billion, which exceeds our annual historical earnings in all but one period.

## NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS

**Single-family Credit Guarantee Portfolio**

Our business activity is to participate in and support the residential mortgage market in the United States, which we pursue by both issuing guaranteed mortgage securities and investing in mortgage loans and mortgage-related securities.

The table below summarizes the concentration by year of origination and geographical area of the approximately $1.7 trillion UPB of our single-family credit guarantee portfolio at both March 31, 2012 and December 31, 2011. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" and "NOTE 7: INVESTMENTS IN SECURITIES" for more information about credit risk associated with loans and mortgage-related securities that we hold.

**Table 15.1 — Concentration of Credit Risk — Single-Family Credit Guarantee Portfolio**

| | March 31, 2012 | | December 31, 2011 | | Percent of Credit Losses[1] Three Months Ended | |
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | March 31, 2012 | March 31, 2011 |
|---|---|---|---|---|---|---|
| **Year of Origination** | | | | | | |
| 2012 | 4% | —% | N/A | N/A | —% | N/A |
| 2011 | 16 | 0.1 | 14% | 0.1% | <1 | —% |
| 2010 | 18 | 0.3 | 19 | 0.3 | 1 | — |
| 2009 | 16 | 0.6 | 18 | 0.5 | 2 | 1 |
| 2008 | 6 | 5.9 | 7 | 5.7 | 9 | 8 |
| 2007 | 9 | 11.7 | 10 | 11.6 | 37 | 36 |
| 2006 | 7 | 10.9 | 7 | 10.8 | 25 | 29 |
| 2005 | 8 | 6.7 | 8 | 6.5 | 17 | 18 |
| 2004 and prior | 16 | 2.9 | 17 | 2.8 | 9 | 8 |
| Total | 100% | 3.5% | 100% | 3.6% | 100% | 100% |
| **Region[3]** | | | | | | |
| West | 28% | 3.5% | 28% | 3.6% | 45% | 56% |
| Northeast | 25 | 3.5 | 25 | 3.4 | 8 | 7 |
| North Central | 18 | 2.8 | 18 | 2.9 | 19 | 15 |
| Southeast | 17 | 5.4 | 17 | 5.5 | 24 | 18 |
| Southwest | 12 | 1.8 | 12 | 1.8 | 4 | 4 |
| Total | 100% | 3.5% | 100% | 3.6% | 100% | 100% |
| **State[4]** | | | | | | |
| California | 16% | 3.2% | 16% | 3.4% | 24% | 31% |
| Florida | 6 | 10.8 | 6 | 10.9 | 16 | 12 |
| Illinois | 5 | 4.5 | 5 | 4.7 | 8 | 4 |
| Georgia | 3 | 3.2 | 3 | 3.3 | 4 | 4 |
| Michigan | 3 | 2.1 | 3 | 2.3 | 4 | 5 |
| Arizona | 2 | 4.1 | 2 | 4.3 | 8 | 13 |
| Nevada | 1 | 9.1 | 1 | 9.8 | 7 | 5 |
| All other | 64 | 2.8 | 64 | 2.8 | 29 | 26 |
| Total | 100% | 3.5% | 100% | 3.6% | 100% | 100% |

(1) Credit losses consist of the aggregate amount of charge-offs, net of recoveries, and REO operations expense in each of the respective periods and exclude foregone interest on non-performing loans and other market-based losses recognized on our consolidated statements of comprehensive income.

(2) Based on the UPB of our single-family credit guarantee portfolio, which includes unsecuritized single-family mortgage loans held by us on our consolidated balance sheets and those underlying Freddie Mac mortgage-related securities, or covered by our other guarantee commitments.

(3) Region designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

(4) States presented are on those with the highest percentage of credit losses during the three months ended March 31, 2012. Our top seven states based on the highest percentage of UPB as of March 31, 2012 are: California (16%), Florida (6%), Illinois (5%), New York (5%), Texas (4%), New Jersey (4%), and Virginia (4%), which collectively comprised 44% of our single-family credit guarantee portfolio as of March 31, 2012.

## Credit Performance of Certain Higher Risk Single-Family Loan Categories

Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. However, there is no universally accepted definition of subprime or Alt-A. Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation mortgage standards. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as Alt-A in the table below because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred.

Although we do not categorize single-family mortgage loans we purchase or guarantee as prime or subprime, we recognize that there are a number of mortgage loan types with certain characteristics that indicate a higher degree of credit risk. For example, a borrower's credit score is a useful measure for assessing the credit quality of the borrower.

Statistically, borrowers with higher credit scores are more likely to repay or have the ability to refinance than those with lower scores.

Presented below is a summary of the serious delinquency rates of certain higher-risk categories of single-family loans in our single-family credit guarantee portfolio. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Loans with a combination of these attributes will have an even higher risk of delinquency than those with isolated characteristics.

**Table 15.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio[1]**

| | Percentage of Portfolio[1] | | Serious Delinquency Rate | |
|---|---|---|---|---|
| | March 31, 2012 | December 31, 2011 | March 31, 2012 | December 31, 2011 |
| Interest-only | 4% | 4% | 17.2% | 17.6% |
| Option ARM | <1 | <1 | 19.6 | 20.5 |
| Alt-A[2] | 5 | 5 | 11.8 | 11.9 |
| Original LTV ratio greater than 90%[3] | 10 | 10 | 6.3 | 6.7 |
| Lower FICO scores at origination (less than 620) | 3 | 3 | 12.6 | 12.9 |

(1) Based on UPB.
(2) Alt-A loans may not include those loans that were previously classified as Alt-A and that have been refinanced as either a relief refinance mortgage or in another refinance mortgage initiative.
(3) Based on our first lien exposure on the property. Includes the credit-enhanced portion of the loan and excludes any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, increases the risk of default.

The percentage of borrowers in our single-family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 20% at both March 31, 2012 and December 31, 2011. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. The serious delinquency rate for single-family loans with estimated current LTV ratios greater than 100% was 12.6% and 12.8% as of March 31, 2012 and December 31, 2011, respectively. Loans originated in the years of 2005 through 2008 have been more affected by declines in home prices since 2006 than loans originated in other years. Loans originated in 2005 through 2008 comprised approximately 30% and 36% of our single-family credit guarantee portfolio, based on UPB at March 31, 2012 and 2011, respectively; however, these loans accounted for approximately 88% and 91% of our credit losses during the three months ended March 31, 2012 and 2011, respectively.

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on these categories and other concentrations in our investments in securities.

**Multifamily Mortgage Portfolio**

The table below summarizes the concentration of multifamily mortgages in our multifamily mortgage portfolio by certain attributes. Information presented for multifamily mortgage loans includes certain categories based on loan or borrower characteristics present at origination. The table includes a presentation of each category in isolation. A single loan may fall within more than one category (for example, a non-credit enhanced loan may also have an original LTV ratio greater than 80%).

**Table 15.3 — Concentration of Credit Risk — Multifamily Mortgage Portfolio**

| | March 31, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
| | UPB | Delinquency Rate[1] | UPB | Delinquency Rate[1] |
| | (in billions) | | | |
| **State[2]** | | | | |
| California | $ 20.5 | 0.15% | $ 20.2 | 0.02% |
| Texas | 14.6 | 0.36 | 14.0 | 0.46 |
| New York | 10.1 | 0.10 | 9.6 | — |
| Florida | 7.4 | 0.05 | 7.1 | 0.05 |
| Virginia | 6.4 | — | 6.3 | — |
| Georgia | 5.9 | 1.40 | 5.6 | 1.99 |
| All other states | 54.3 | 0.17 | 53.3 | 0.14 |
| Total | $119.2 | 0.23% | $116.1 | 0.22% |
| **Region[3]** | | | | |
| Northeast | $ 33.9 | 0.10% | $ 33.1 | 0.01% |
| West | 30.4 | 0.19 | 29.9 | 0.07 |
| Southwest | 23.3 | 0.38 | 22.4 | 0.44 |
| Southeast | 21.4 | 0.43 | 20.7 | 0.65 |
| North Central | 10.2 | 0.01 | 10.0 | 0.01 |
| Total | $119.2 | 0.23% | $116.1 | 0.22% |
| **Category[4]** | | | | |
| Original LTV ratio greater than 80% | $ 6.4 | 2.23% | $ 6.4 | 2.34% |
| Original DSCR below 1.10 | 2.8 | 2.23 | 2.8 | 2.58 |
| Non-credit enhanced loans | 84.5 | 0.16 | 84.5 | 0.11 |

(1) Based on the UPB of multifamily mortgages two monthly payments or more delinquent or in foreclosure.
(2) Represents the six states with the highest geographic concentration by UPB at March 31, 2012.
(3) See endnote (4) to "Table 15.1 — Concentration of Credit Risk — Single-family Credit Guarantee Portfolio" for a description of these regions.
(4) These categories are not mutually exclusive and a loan in one category may also be included within another category.

One indicator of risk for mortgage loans in our multifamily mortgage portfolio is the amount of a borrower's equity in the underlying property. A borrower's equity in a property decreases as the LTV ratio increases. Higher LTV ratios negatively affect a borrower's ability to refinance or sell a property for an amount at or above the balance of the outstanding mortgage. The DSCR is another indicator of future credit performance. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

Our multifamily mortgage portfolio includes certain loans for which we have credit enhancement. Credit enhancement can significantly reduce our exposure to a potential credit loss. As of March 31, 2012, approximately one-half of the multifamily loans that were two monthly payments or more past due, based on UPB, had credit enhancements that we currently believe will mitigate our expected losses on those loans. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for additional information about credit enhancements on multifamily loans.

We estimate that the percentage of loans in our multifamily mortgage portfolio with a current LTV ratio of greater than 100% was approximately 4% and 5% at March 31, 2012 and December 31, 2011, respectively, and our estimate of the current average DSCR for these loans was 0.99 and 1.1, respectively. We estimate that the percentage of loans in our multifamily mortgage portfolio with a current DSCR less than 1.0 was 4% and 5% at March 31, 2012 and December 31, 2011, respectively, and the average current LTV ratio of these loans was 107% at both dates. Our estimates of current DSCRs are based on the latest available income information for these properties and our assessments of market conditions. Our estimates of the current LTV ratios for multifamily loans are based on values we receive from a third-party service provider as well as our internal estimates of property value, for which we may use changes in tax assessments, market vacancy rates, rent growth and comparable property sales in local areas as well as third-party appraisals for a portion of the portfolio. We periodically perform our own valuations or obtain third-party appraisals in cases where a significant deterioration in a borrower's financial condition has occurred, the borrower has applied for refinancing, or in certain other circumstances where we deem it appropriate to reassess the property value. Although we use the most recently available results of our multifamily borrowers to estimate a property's value, there may be a significant lag in reporting, which could be six months or more, as they complete their results in the normal course of business. Our internal estimates of property valuation are derived using techniques that include income capitalization, discounted cash flows, sales comparables, or replacement costs.

*Freddie Mac*

**Non-Agency Mortgage-Related Security Issuers**

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non-agency mortgage-related securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. Many of the parties from which we seek recovery under these efforts are also our seller/servicers. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" in our 2011 Annual Report for further information.

**Seller/Servicers**

We acquire a significant portion of our single-family mortgage purchase volume from several large seller/servicers with whom we have entered into mortgage purchase volume commitments that provide for the lenders to deliver us up to a certain volume of mortgages during a specified period of time. Our top 10 single-family seller/servicers provided approximately 79% of our single-family purchase volume during the three months ended March 31, 2012. Wells Fargo Bank, N.A. and U.S. Bank, N.A., accounted for 28%, and 13%, respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume during the three months ended March 31, 2012. We are exposed to the risk that we could lose purchase volume to the extent these arrangements are terminated without replacement from other lenders.

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our seller/servicers of their obligations to repurchase mortgages or (at our option) indemnify us in the event of: (a) breaches of the representations and warranties they made when they sold the mortgages to us; or (b) failure to comply with our servicing requirements. Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts. As of March 31, 2012 and December 31, 2011, the UPB of loans subject to our repurchase requests issued to our single-family seller/servicers was approximately $3.2 billion and $2.7 billion, and approximately 38% and 39% of these requests, respectively, were outstanding for more than four months since issuance of our initial repurchase request as measured by the UPB of the loans subject to the requests (these figures included repurchase requests for which appeals were pending). As of March 31, 2012, two of our largest seller/servicers had aggregate repurchase requests outstanding, based on UPB, of $1.7 billion, and approximately 47% of these requests were outstanding for four months or more since issuance of the initial request. During the three months ended March 31, 2012 and 2011, we recovered amounts that covered losses with respect to $0.8 billion and $1.2 billion, respectively, of UPB on loans subject to our repurchase requests.

The ultimate amounts of recovery payments we receive from seller/servicers may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations. Our estimate of probable incurred losses for exposure to seller/servicers for their repurchase obligations is considered in our allowance for loan losses as of March 31, 2012 and December 31, 2011. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2011 Annual Report for further information. We believe we have appropriately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at March 31, 2012 and December 31, 2011; however, our actual losses may exceed our estimates.

We are also exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loss mitigation efforts, including under the servicing alignment initiative and the MHA Program, and therefore, we have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans.

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top three single-family loan servicers, Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A. serviced approximately 26%, 12%, and 11%, respectively, of our single-family mortgage loans, as of March 31, 2012 and together serviced approximately 49% of our single-family mortgage loans. Since we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, it could have an adverse impact on our business and financial results.

As of March 31, 2012 our top three multifamily servicers, Berkadia Commercial Mortgage LLC, CBRE Capital Markets, Inc., and Wells Fargo Bank, N.A., each serviced more than 10% of our multifamily mortgage portfolio and together serviced approximately 40% of our multifamily mortgage portfolio.

**Mortgage Insurers**

We have institutional credit risk relating to the potential insolvency of, or non-performance by, mortgage insurers that insure single-family mortgages we purchase or guarantee. As of March 31, 2012, these insurers provided coverage, with maximum loss limits of $49.2 billion, for $225.6 billion of UPB, in connection with our single-family credit guarantee portfolio. Our top five mortgage insurer counterparties, Mortgage Guaranty Insurance Corporation , Radian Guaranty Inc., Genworth Mortgage Insurance Corporation, United Guaranty Residential Insurance Co., and PMI Mortgage Insurance Co. each accounted for more than 10% and collectively represented approximately 85% of our overall mortgage insurance coverage at March 31, 2012. All our mortgage insurance counterparties are rated BBB or below as of April 23, 2012, based on the lower of the S&P or Moody's rating scales and stated in terms of the S&P equivalent.

We received proceeds of $0.5 billion and $0.6 billion during the three months ended March 31, 2012 and 2011, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers of $1.8 billion as of both March 31, 2012 and December 31, 2011. The balance of our outstanding accounts receivable from mortgage insurers, net of associated reserves, was approximately $1.0 billion as of both March 31, 2012 and December 31, 2011.

**Bond Insurers**

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering some of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. At March 31, 2012, we had coverage, including secondary policies, on non-agency mortgage-related securities totaling $9.5 billion of UPB. At March 31, 2012, our top five bond insurers, Ambac Assurance Corporation (or Ambac), Financial Guaranty Insurance Company (or FGIC), MBIA Insurance Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corp., each accounted for more than 10% of our overall bond insurance coverage and collectively represented approximately 99% of our total coverage.

We evaluate the expected recovery from primary bond insurance policies as part of our impairment analysis for our investments in securities. FGIC and Ambac are currently not paying any claims. In addition, if a bond insurer fails to meet its obligations on our investments in securities, then the fair values of our securities may further decline, which could have a material adverse effect on our results and financial condition. We recognized other-than-temporary impairment losses during 2012 and 2011 related to investments in mortgage-related securities covered by bond insurance as a result of our uncertainty over whether or not certain insurers would be able to pay our future claims on expected credit losses on the securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on our evaluation of impairment on securities covered by bond insurance.

**Cash and Other Investments Counterparties**

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily major financial institutions and the Federal Reserve Bank. As of March 31, 2012 and December 31, 2011, including amounts related to our consolidated VIEs, there were $60.7 billion and $68.5 billion, respectively, of cash and other non-mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. As of March 31, 2012, these included:

- $4.9 billion of cash equivalents invested in 7 counterparties that had short-term credit ratings of A-1 or above on the S&P or equivalent scale;

- $24.3 billion of securities purchased under agreements to resell with 7 counterparties that had short-term S&P ratings of A-1 or above; and

- $30.3 billion of cash deposited with the Federal Reserve Bank (as a non-interest-bearing deposit).

**Derivative Portfolio**

*Derivative Counterparties*

Our use of exchange-traded derivatives and OTC derivatives exposes us to institutional credit risk. The requirement that we post initial and maintenance margin with our clearing firm in connection with exchange-traded derivatives such as futures contracts exposes us to institutional credit risk in the event that our clearing firm or the exchange's clearinghouse

fail to meet their obligations. However, the use of exchange-traded derivatives lessens our institutional credit risk exposure to individual counterparties, because a central counterparty is substituted for individual counterparties and changes in the value of open exchange-traded contracts are settled daily via payments through the financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk to individual counterparties because transactions are executed and settled between us and each counterparty, exposing us to potential losses if a counterparty fails to meet its contractual obligations.

Our use of OTC interest-rate swaps, option-based derivatives, and foreign-currency swaps is subject to rigorous internal credit and legal reviews. All of our OTC derivatives counterparties are major financial institutions and are experienced participants in the OTC derivatives market.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

### Master Netting and Collateral Agreements

We use master netting and collateral agreements to reduce our credit risk exposure to our active OTC derivative counterparties for interest-rate swaps, option-based derivatives, and foreign-currency swaps. Master netting agreements provide for the netting of amounts receivable and payable from an individual counterparty, which reduces our exposure to a single counterparty in the event of default. On a daily basis, the market value of each counterparty's derivatives outstanding is calculated to determine the amount of our net credit exposure, which is equal to derivatives in a net gain position by counterparty after giving consideration to collateral posted. Our collateral agreements require most counterparties to post collateral for the amount of our net exposure to them above the applicable threshold. Bilateral collateral agreements are in place for all of our active OTC derivative counterparties. Collateral posting thresholds are tied to a counterparty's credit rating. Derivative exposures and collateral amounts are monitored on a daily basis using both internal pricing models and dealer price quotes. Collateral is typically transferred within one business day based on the values of the related derivatives. This time lag in posting collateral can affect our net uncollateralized exposure to derivative counterparties.

Collateral posted by a derivative counterparty is typically in the form of cash, although U.S. Treasury securities, Freddie Mac mortgage-related securities, or our debt securities may also be posted. In the event a counterparty defaults on its obligations under the derivatives agreement and the default is not remedied in the manner prescribed in the agreement, we have the right under the agreement to direct the custodian bank to transfer the collateral to us or, in the case of non-cash collateral, to sell the collateral and transfer the proceeds to us.

Our uncollateralized exposure to counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest-rate caps, after applying netting agreements and collateral, was $157 million and $71 million at March 31, 2012 and December 31, 2011, respectively. In the event that all of our counterparties for these derivatives were to have defaulted simultaneously on March 31, 2012, our maximum loss for accounting purposes after applying netting agreements and collateral, would have been approximately $157 million. Four counterparties each accounted for greater than 10% and collectively accounted for 83% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at March 31, 2012. These counterparties were BNP Paribas, Deutsche Bank, A.G., Royal Bank of Scotland, and UBS AG, all of which were rated "A" or above by S&P as of April 23, 2012.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives, was $22 million and $38 million at March 31, 2012 and December 31, 2011, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis to ensure that they continue to meet our internal risk-management standards.

### NOTE 16: FAIR VALUE DISCLOSURES

#### Fair Value Hierarchy

The accounting guidance for fair value measurements and disclosures establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. Assets and liabilities are classified in their entirety within the fair value hierarchy based on the lowest level input that is significant to the fair value measurement.

During the first quarter of 2012, we adopted an amendment to the guidance pertaining to fair value measurements and disclosure. The amendment changed the definition of the principal market to the perspective of the overall market for the particular asset or liability being valued, with less emphasis on the perspective of the reporting entity. As a result of adopting this guidance, we made a change to our principal market assessment for certain single-family mortgage loans, primarily for loans that have not been modified and are delinquent four months or more or are in foreclosure. For these loans, we changed our principal market assessment to the whole loan market. The resulting impact was a decrease of $13.8 billion to our fair value of net assets on our fair value balance sheets.

During the fourth quarter of 2011, our fair value results as presented in our consolidated fair value balance sheets were affected by a change in estimate which increased the implied capital costs included in our valuation of single-family mortgage loans due to a change in the estimation of a risk premium assumption embedded in our modeled valuation of such loans. This change in estimate led to a $14.2 billion decrease in our fair value measurement of mortgage loans as of December 31, 2011.

The table below sets forth by level within the fair value hierarchy assets and liabilities measured and reported at fair value on a recurring basis in our consolidated balance sheets at March 31, 2012 and December 31, 2011.

### Table 16.1 — Assets and Liabilities Measured at Fair Value on a Recurring Basis

| | Fair Value at March 31, 2012 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Total |
| | | | (in millions) | | |
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . | $    — | $ 74,265 | $ 1,898 | $    — | $ 76,163 |
| Subprime . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 27,145 | — | 27,145 |
| CMBS . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 51,610 | 3,143 | — | 54,753 |
| Option ARM . . . . . . . . . . . . . . . . . . . . . | — | — | 5,818 | — | 5,818 |
| Alt-A and other . . . . . . . . . . . . . . . . . . . . | — | 10 | 11,084 | — | 11,094 |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . | — | 18,729 | 168 | — | 18,897 |
| Obligations of states and political subdivisions . . . . . | — | — | 7,565 | — | 7,565 |
| Manufactured housing . . . . . . . . . . . . . . . . | — | — | 748 | — | 748 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . | — | 228 | 11 | — | 239 |
| Total available-for-sale securities, at fair value . . . | — | 144,842 | 57,580 | — | 202,422 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . | — | 12,779 | 1,725 | — | 14,504 |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . | — | 13,214 | 478 | — | 13,692 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . | — | 131 | 20 | — | 151 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 140 | 13 | — | 153 |
| Total mortgage-related securities . . . . . . . . . . . | — | 26,264 | 2,236 | — | 28,500 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities . . . . . . . . . . . . . . . . . . | — | 695 | — | — | 695 |
| Treasury bills . . . . . . . . . . . . . . . . . . . . . . | 3,000 | — | — | — | 3,000 |
| Treasury notes . . . . . . . . . . . . . . . . . . . . . . | 23,164 | — | — | — | 23,164 |
| FDIC-guaranteed corporate medium-term notes . . . . | — | 2,960 | — | — | 2,960 |
| Total non-mortgage-related securities . . . . . . . | 26,164 | 3,655 | — | — | 29,819 |
| Total trading securities, at fair value . . . . . . . | 26,164 | 29,919 | 2,236 | — | 58,319 |
| Total investments in securities . . . . . . . . . . | 26,164 | 174,761 | 59,816 | — | 260,741 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value . . . . . . . . . . . . . . . . . . | — | — | 11,337 | — | 11,337 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps . . . . . . . . . . . . . . . . . . . . | 2 | 10,816 | 21 | — | 10,839 |
| Option-based derivatives . . . . . . . . . . . . . . . . . | — | 10,322 | — | — | 10,322 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 106 | 1 | — | 107 |
| Subtotal, before netting adjustments . . . . . . . . . . . | 2 | 21,244 | 22 | — | 21,268 |
| Netting adjustments[1] . . . . . . . . . . . . . . . . . | — | — | — | (21,086) | (21,086) |
| Total derivative assets, net . . . . . . . . . . . . . . . . . | 2 | 21,244 | 22 | (21,086) | 182 |
| Other assets: | | | | | |
| Guarantee asset, at fair value . . . . . . . . . . . . . . . . | — | — | 798 | — | 798 |
| All other, at fair value . . . . . . . . . . . . . . . . . . . . | — | — | 143 | — | 143 |
| Total other assets . . . . . . . . . . . . . . . . . . . . . | — | — | 941 | — | 941 |
| Total assets carried at fair value on a recurring basis . . . . . . . . . . . . . . . . . . . . . . . . . . | $26,166 | $196,005 | $72,116 | $(21,086) | $273,201 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value . . . . . . . . . . . . . . | $    — | $    — | $ 2,221 | $    — | $  2,221 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps . . . . . . . . . . . . . . . . . . . . | 2 | 28,739 | 6 | — | 28,747 |
| Option-based derivatives . . . . . . . . . . . . . . . . . | — | 890 | 1 | — | 891 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . | 66 | 55 | 45 | — | 166 |
| Subtotal, before netting adjustments . . . . . . . . . . . | 68 | 29,684 | 52 | — | 29,804 |
| Netting adjustments[1] . . . . . . . . . . . . . . . . . | — | — | — | (29,508) | (29,508) |
| Total derivative liabilities, net . . . . . . . . . . . . . . . . | 68 | 29,684 | 52 | (29,508) | 296 |
| Other liabilities: | | | | | |
| All other, at fair value . . . . . . . . . . . . . . . . . . . . | — | — | 4 | — | 4 |
| Total liabilities carried at fair value on a recurring basis . . . . . . . . . . . . . . . . . . . . . . . . . . | $    68 | $ 29,684 | $ 2,277 | $(29,508) | $  2,521 |

| | Fair Value at December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Total |
| | | | (in millions) | | |
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $  — | $ 79,044 | $ 2,048 | $  — | $ 81,092 |
| Subprime | — | — | 27,999 | — | 27,999 |
| CMBS | — | 51,907 | 3,756 | — | 55,663 |
| Option ARM | — | — | 5,865 | — | 5,865 |
| Alt-A and other | — | 11 | 10,868 | — | 10,879 |
| Fannie Mae | — | 20,150 | 172 | — | 20,322 |
| Obligations of states and political subdivisions | — | — | 7,824 | — | 7,824 |
| Manufactured housing | — | — | 766 | — | 766 |
| Ginnie Mae | — | 237 | 12 | — | 249 |
| Total available-for-sale securities, at fair value | — | 151,349 | 59,310 | — | 210,659 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | — | 14,181 | 1,866 | — | 16,047 |
| Fannie Mae | — | 14,627 | 538 | — | 15,165 |
| Ginnie Mae | — | 134 | 22 | — | 156 |
| Other | — | 74 | 90 | — | 164 |
| Total mortgage-related securities | — | 29,016 | 2,516 | — | 31,532 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 302 | — | — | 302 |
| Treasury bills | 100 | — | — | — | 100 |
| Treasury notes | 24,712 | — | — | — | 24,712 |
| FDIC-guaranteed corporate medium-term notes | — | 2,184 | — | — | 2,184 |
| Total non-mortgage-related securities | 24,812 | 2,486 | — | — | 27,298 |
| Total trading securities, at fair value | 24,812 | 31,502 | 2,516 | — | 58,830 |
| Total investments in securities | 24,812 | 182,851 | 61,826 | — | 269,489 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | — | — | 9,710 | — | 9,710 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | — | 12,976 | 46 | — | 13,022 |
| Option-based derivatives | 1 | 15,868 | — | — | 15,869 |
| Other | 5 | 110 | 35 | — | 150 |
| Subtotal, before netting adjustments | 6 | 28,954 | 81 | — | 29,041 |
| Netting adjustments[1] | — | — | — | (28,923) | (28,923) |
| Total derivative assets, net | 6 | 28,954 | 81 | (28,923) | 118 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 752 | — | 752 |
| All other, at fair value | — | — | 151 | — | 151 |
| Total other assets | — | — | 903 | — | 903 |
| Total assets carried at fair value on a recurring basis | $24,818 | $211,805 | $72,520 | $(28,923) | $280,220 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $  — | $ 3,015 | $  — | $  — | $ 3,015 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | — | 34,601 | 21 | — | 34,622 |
| Option-based derivatives | 1 | 2,934 | 1 | — | 2,936 |
| Other | — | 103 | 42 | — | 145 |
| Subtotal, before netting adjustments | 1 | 37,638 | 64 | — | 37,703 |
| Netting adjustments[1] | — | — | — | (37,268) | (37,268) |
| Total derivative liabilities, net | 1 | 37,638 | 64 | (37,268) | 435 |
| Total liabilities carried at fair value on a recurring basis | $  1 | $ 40,653 | $  64 | $(37,268) | $ 3,450 |

(1) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $9.2 billion and $299 million, respectively, at March 31, 2012. The net cash collateral posted and net trade/settle receivable were $9.4 billion and $1 million, respectively, at December 31, 2011. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(1.1) billion at both March 31, 2012 and December 31, 2011, which was mainly related to interest rate swaps that we have entered into.

**Recurring Fair Value Changes**

For the three months ended March 31, 2012, our transfers between Level 1 and Level 2 assets or liabilities were less than $1 million.

Our Level 3 items mainly consist of non-agency mortgage-related securities. See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets" for additional information about the valuation methods and assumptions used in our fair value measurements.

During the three months ended March 31, 2012, the fair value of our Level 3 assets decreased primarily due to: (a) principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) the net transfer out of Level 3 assets of $0.3 billion, resulting from a change in valuation method for certain mortgage-related securities due to improved liquidity and availability of price quotes from dealers and third-party pricing services. These decreases are partially offset by an increased volume of our multifamily held-for-sale mortgage loans that we expect to securitize in future periods.

During the three months ended March 31, 2012, the fair value of our Level 3 liabilities increased primarily due to the transfer of $3.0 billion of foreign-currency denominated and certain other debt securities recorded at fair value from Level 2 to Level 3 given the lack of market depth as evidenced by low transaction volumes in these securities.

During the three months ended March 31, 2011, the fair value of our Level 3 assets decreased by $2.0 billion, mainly attributable to: (a) principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) net securitizations of multifamily held-for-sale loans. In addition, we had a net transfer into Level 3 assets of $0.1 billion during the first quarter of 2011, resulting from a change in valuation method due to a lack of relevant price quotes from dealers and third-party pricing services.

The table below provides a reconciliation of the beginning and ending balances for assets and liabilities measured at fair value using significant unobservable inputs (Level 3).

## Table 16.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs

Three Months Ended March 31, 2012

(in millions)

Columns 3–5 ("Included in earnings", "Included in other comprehensive income", "Total") fall under the grouped header **Realized and unrealized gains (losses)**.

| | Balance, January 1, 2012 | Included in earnings [1][2][3][4] | Included in other comprehensive income [1] | Total | Purchases | Issues | Sales | Settlements, net [5] | Transfers into Level 3 [6] | Transfers out of Level 3 [6] | Balance, March 31, 2012 | Unrealized gains (losses) still held [7] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | | |
| Investments in securities: | | | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | | |
| Freddie Mac | $ 2,048 | $ — | $ (2) | $ (2) | $ | $— | $ — | $ (28) | $ — | $(120) | $ 1,898 | $ — |
| Subprime | 27,999 | (441) | 743 | 302 | | | | (1,156) | | | 27,145 | (441) |
| CMBS | 3,756 | 76 | (337) | (261) | | | (330) | (22) | | | 3,143 | |
| Option ARM | 5,865 | (48) | 258 | 210 | | | | (257) | | | 5,818 | (48) |
| Alt-A and other | 10,868 | (57) | 631 | 574 | | | | (358) | | | 11,084 | (57) |
| Fannie Mae | 172 | — | 1 | 1 | | | | (5) | | | 168 | |
| Obligations of states and political subdivisions | 7,824 | 1 | 63 | 64 | | | (7) | (316) | | | 7,565 | |
| Manufactured housing | 766 | (2) | 7 | 5 | | | | (23) | | | 748 | (2) |
| Ginnie Mae | 12 | — | — | — | | | | (1) | | | 11 | |
| Total available-for-sale mortgage-related securities | 59,310 | (471) | 1,364 | 893 | | | (337) | (2,166) | — | (120) | 57,580 | (548) |
| Trading, at fair value: | | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | | |
| Freddie Mac | 1,866 | 6 | — | 6 | — | 51 | (63) | (51) | 35 | (119) | 1,725 | 5 |
| Fannie Mae | 538 | 3 | | 3 | (4) | | 4 | (8) | | (55) | 478 | 3 |
| Ginnie Mae | 22 | | | | | | | (2) | | | 20 | |
| Other | 90 | | | | | | | (2) | | (75) | 13 | |
| Total trading mortgage-related securities | 2,516 | 9 | | 9 | (4) | 51 | (59) | (63) | 35 | (249) | 2,236 | 8 |
| Mortgage loans | 9,710 | 179 | | 179 | 5,367 | | (3,903) | (16) | | | 11,337 | 104 |
| Other assets: | | | | | | | | | | | | |
| Held-for-sale, at fair value | 752 | 1 | | 1 | | 62 | | (17) | | | 798 | 1 |
| Guarantee asset [8] | 151 | (8) | | (8) | | | | | | | 143 | (8) |
| All other | — | — | | — | | | | | | | — | |
| Total other assets | 903 | (7) | | (7) | | 62 | | (17) | | | 941 | (7) |
| **Liabilities** | | | | | | | | | | | | |
| Debt securities recorded at fair value | — | 18 | | 18 | | | | (812) | 3,015 | | 2,221 | (28) |
| Net derivatives [6] | (17) | 18 | | 18 | | | | (4) | | 33 | 30 | (12) |
| Other liabilities: | | | | | | | | | | | | |
| All other, at fair value | — | 4 | | 4 | | | | | | | 4 | (4) |

**Three Months Ended March 31, 2011**

| | Balance, January 1, 2011 | Realized and unrealized gains (losses) | | | Purchases | Issues | Sales | Settlements, net[5] | Net transfers in and/or out of Level 3[6] | Balance, March 31, 2011 | Unrealized gains (losses) still held[7] |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Included in earnings[1][2][3][4] | Included in other comprehensive income[1] | Total | | | | | | | |
| | | | (in millions) | | | | | | | | |
| **Investments in securities:** | | | | | | | | | | | |
| **Available-for-sale, at fair value:** | | | | | | | | | | | |
| **Mortgage-related securities:** | | | | | | | | | | | |
| Freddie Mac | $ 2,037 | $ — | $ — | $ — | $ — | $ — | $ — | $ (40) | $(101) | $ 1,896 | $ — |
| Subprime | 33,861 | (734) | 1,569 | 835 | — | — | — | (1,352) | — | 33,344 | (734) |
| CMBS | 3,115 | — | (23) | (23) | — | — | — | 1 | — | 3,093 | — |
| Option ARM | 6,889 | (281) | 692 | 411 | — | — | — | (311) | — | 6,989 | (281) |
| Alt-A and other | 13,155 | (40) | 238 | 198 | — | — | — | (429) | — | 12,924 | (40) |
| Fannie Mae | 212 | — | 1 | 1 | — | — | — | (13) | (5) | 195 | — |
| Obligations of states and political subdivisions | 9,377 | 1 | (1) | — | — | — | (37) | (465) | — | 8,875 | — |
| Manufactured housing | 897 | (3) | 12 | 9 | — | — | — | (28) | — | 878 | (3) |
| Ginnie Mae | 16 | — | — | — | — | — | — | (1) | — | 15 | — |
| Total available-for-sale mortgage-related securities | 69,559 | (1,057) | 2,488 | 1,431 | — | — | (37) | (2,638) | (106) | 68,209 | (1,058) |
| **Trading, at fair value; Mortgage-related securities:** | | | | | | | | | | | |
| Freddie Mac | 2,299 | 62 | — | 62 | 230 | — | (31) | (49) | 186 | 2,697 | 62 |
| Fannie Mae | 854 | 11 | — | 11 | — | — | — | (6) | 12 | 871 | 11 |
| Ginnie Mae | 27 | — | — | — | — | — | — | (1) | — | 26 | — |
| Other | 20 | — | — | — | — | — | — | (1) | — | 19 | — |
| Total trading mortgage-related securities | 3,200 | 73 | — | 73 | 230 | — | (31) | (57) | 198 | 3,613 | 73 |
| **Mortgage loans:** | | | | | | | | | | | |
| Held-for-sale, at fair value | 6,413 | 62 | — | 62 | 2,164 | — | (3,322) | (13) | — | 5,304 | (25) |
| Net derivatives[9] | (691) | (127) | — | (127) | — | (13) | — | 74 | — | (757) | (120) |
| **Other assets:** | | | | | | | | | | | |
| Guarantee asset[8] | 541 | (1) | — | (1) | — | 68 | — | (11) | — | 597 | (1) |
| All other | 235 | (5) | — | (5) | — | — | — | — | — | 230 | (5) |
| Total other assets | 776 | (6) | — | (6) | — | 68 | — | (11) | — | 827 | (6) |

(1) Changes in fair value for available-for-sale investments are recorded in AOCI, while gains and losses from sales are recorded in other gains (losses) on investments on our consolidated statements of comprehensive income. For mortgage-related securities classified as trading, the realized and unrealized gains (losses) are recorded in other gains (losses) on investments on our consolidated statements of comprehensive income.

(2) Changes in fair value of derivatives are recorded in derivative gains (losses) on our consolidated statements of comprehensive income for those not designated as accounting hedges.

(3) Changes in fair value of the guarantee asset are recorded in other income on our consolidated statements of comprehensive income.

(4) For held-for-sale mortgage loans with fair value option elected, gains (losses) on fair value changes and sale of mortgage loans are recorded in other income on our consolidated statements of comprehensive income.

(5) For non-agency mortgage-related securities, primarily represents principal repayments.

(6) Transfer in and/or out of Level 3 during the period is disclosed as if the transfer occurred at the beginning of the period.

(7) Represents the amount of total gains or losses for the period, included in earnings, attributable to the change in unrealized gains (losses) related to assets and liabilities classified as Level 3 that were still held at March 31, 2012 and 2011, respectively. Included in these amounts are credit-related other-than-temporary impairments recorded on available-for-sale securities.

(8) We estimate that all amounts recorded for unrealized gains and losses on our guarantee asset relate to those amounts still in position. The amounts reflected as included in earnings represent the periodic fair value changes of our guarantee asset.

(9) Net derivatives include derivative assets and derivative liabilities prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

**Non-recurring Fair Value Changes**

Certain assets are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances. We consider the fair value measurement related to these assets to be non-recurring. These assets include impaired held-for-investment multifamily mortgage loans and REO, net. These fair value measurements usually result from the write-down of individual assets to current fair value amounts due to impairments. See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets — *Mortgage Loans, Held-for-Investment*" and "— *REO, Net*" for additional details.

The table below presents assets measured and reported at fair value on a non-recurring basis in our consolidated balance sheets by level within the fair value hierarchy at March 31, 2012 and December 31, 2011, respectively.

**Table 16.3 — Assets Measured at Fair Value on a Non-Recurring Basis**

| | Fair Value at March 31, 2012 | | | | Fair Value at December 31, 2011 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| | | | | (in millions) | | | | |
| **Assets measured at fair value on a non-recurring basis:** | | | | | | | | |
| Mortgage loans:[1] | | | | | | | | |
| Held-for-investment . . . . . . | $— | $— | $1,469 | $1,469 | $— | $— | $1,380 | $1,380 |
| REO, net[2] . . . . . . . . . . . . | — | — | 2,303 | 2,303 | — | — | 3,146 | 3,146 |
| Total assets measured at fair value on a non-recurring basis . . . . . . . . . . . . . . . . | $— | $— | $3,772 | $3,772 | $— | $— | $4,526 | $4,526 |

| | Total Gains (Losses) | |
| --- | --- | --- |
| | Three Months Ended March 31,[3] | |
| | 2012 | 2011 |
| | (in millions) | |
| **Assets measured at fair value on a non-recurring basis:** | | |
| Mortgage loans:[1] | | |
| Held-for-investment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(26) | $ 11 |
| REO, net[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (15) | (135) |
| Total gains (losses) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(41) | $(124) |

_____
(1) Represents carrying value and related write-downs of loans for which adjustments are based on the fair value amounts. These loans include impaired multifamily mortgage loans that are classified as held-for-investment and have a related valuation allowance.
(2) Represents the fair value and related losses of foreclosed properties that were measured at fair value subsequent to their initial classification as REO, net. The carrying amount of REO, net was written down to fair value of $2.3 billion, less estimated costs to sell of $159 million (or approximately $2.1 billion) at March 31, 2012. The carrying amount of REO, net was written down to fair value of $3.1 billion, less estimated costs to sell of $221 million (or approximately $2.9 billion) at December 31, 2011.
(3) Represents the total net gains (losses) recorded on items measured at fair value on a non-recurring basis as of March 31, 2012 and 2011, respectively.

**Fair Value Election**

We elected the fair value option for certain types of securities, multifamily held-for-sale mortgage loans, foreign-currency denominated debt, and certain other debt.

***Certain Available-for-Sale Securities with Fair Value Option Elected***

We elected the fair value option for certain available-for-sale mortgage-related securities to better reflect the natural offset these securities provide to fair value changes recorded historically on our guarantee asset at the time of our election. In addition, upon adoption of the accounting guidance for the fair value option, we elected this option for available-for-sale securities within the scope of the accounting guidance for investments in beneficial interests in securitized financial assets to better reflect any valuation changes that would occur subsequent to impairment write-downs previously recorded on these instruments. By electing the fair value option for these instruments, we reflect valuation changes through our consolidated statements of comprehensive income in the period they occur, including any increases in value.

For mortgage-related securities and investments in securities that were selected for the fair value option and subsequently classified as trading securities, the change in fair value is recorded in other gains (losses) on investment securities recognized in earnings in our consolidated statements of comprehensive income. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding the net unrealized gains (losses) on trading securities, which include gains (losses) for other items that are not selected for the fair value option. Related interest

income continues to be reported as interest income in our consolidated statements of comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2011 Annual Report for additional information about the measurement and recognition of interest income on investments in securities.

### Debt Securities with Fair Value Option Elected

We elected the fair value option for foreign-currency denominated debt and certain other debt securities. In the case of foreign-currency denominated debt, we have entered into derivative transactions that effectively convert these instruments to U.S. dollar denominated floating rate instruments. The fair value changes on these derivatives were recorded in derivative gains (losses) in our consolidated statements of comprehensive income. We elected the fair value option on these debt instruments to better reflect the economic offset that naturally results from the debt due to changes in interest rates. We also elected the fair value option for certain other debt securities containing potential embedded derivatives that required bifurcation.

The changes in fair value of debt securities with the fair value option elected were $(17) million and $(81) million for the three months ended March 31, 2012 and 2011, respectively, which were recorded in gains (losses) on debt recorded at fair value in our consolidated statements of comprehensive income. The changes in fair value related to fluctuations in exchange rates and interest rates were $(4) million and $(72) million for the three months ended March 31, 2012 and 2011, respectively. The remaining changes in the fair value of $(13) million and $(9) million were attributable to changes in credit risk for the three months ended March 31, 2012 and 2011, respectively.

The change in fair value attributable to changes in credit risk was primarily determined by comparing the total change in fair value of the debt to the total change in fair value of the interest-rate and foreign-currency derivatives used to hedge the debt. Any difference in the fair value change of the debt compared to the fair value change in the derivatives is attributed to credit risk.

The difference between the aggregate fair value and aggregate UPB for long-term debt securities with fair value option elected was $42 million and $43 million at March 31, 2012 and December 31, 2011, respectively. Related interest expense continues to be reported as interest expense in our consolidated statements of comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Debt Securities Issued" in our 2011 Annual Report for additional information about the measurement and recognition of interest expense on debt securities issued.

### Multifamily Held-For-Sale Mortgage Loans with Fair Value Option Elected

We elected the fair value option for multifamily mortgage loans that were purchased for securitization. Through this channel, we acquire loans that we intend to securitize and sell to CMBS investors. While this is consistent with our overall strategy to expand our multifamily business, it differs from our previous buy-and-hold strategy with respect to multifamily loans held-for-investment. Therefore, these multifamily mortgage loans were classified as held-for-sale mortgage loans in our consolidated balance sheets to reflect our intent to sell in the future.

We recorded $179 million and $62 million from the change in fair value in gains (losses) on mortgage loans recorded at fair value in other income in our consolidated statements of comprehensive income for the three months ended March 31, 2012 and 2011, respectively. The changes in fair value of these loans were primarily attributable to changes in interest rates and other items such as liquidity. The changes in fair value attributable to instrument-specific credit risk were not material given that these loans were generally originated within the past 12 months and have not seen a change in their credit characteristics.

The difference between the aggregate fair value and the aggregate UPB for multifamily held-for-sale loans with the fair value option elected was $206 million and $195 million at March 31, 2012 and December 31, 2011, respectively. Related interest income continues to be reported as interest income in our consolidated statements of comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" in our 2011 Annual Report for additional information about the measurement and recognition of interest income on our mortgage loans.

### Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets

We categorize assets and liabilities that we measure and report at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation processes used to derive the fair value and our judgment regarding the observability of the related inputs.

*Investments in Securities*

*Agency Securities*

Fixed-rate agency securities are valued based on dealer-published quotes for a base TBA security, adjusted to reflect the measurement date as opposed to a forward settlement date ("carry") and pay-ups for specified collateral. The base TBA price varies based on agency, term, coupon, and settlement month. The carry adjustment converts forward settlement date prices to spot or same-day settlement date prices such that the fair value is estimated as of the measurement date, and not as of the forward settlement date. The carry adjustment uses our internal prepayment and interest rate models. A pay-up is added to the base TBA price for characteristics that are observed to be trading at a premium versus TBAs; this currently includes seasoning and low-loan balance attributes. Haircuts are applied to a small subset of positions that are less liquid and are observed to trade at a discount relative to TBAs; this includes securities that are not eligible for delivery into TBA trades.

Adjustable-rate agency securities are valued based on the median of prices from multiple pricing services. The key valuation drivers used by the pricing services include the interest rate cap structure, term, agency, remaining term, and months-to-next coupon reset, coupled with prevailing market conditions, namely interest rates.

Because fixed-rate and adjustable-rate agency securities are generally liquid and contain observable pricing in the market, they generally are classified as Level 2.

Multiclass structures are valued using a variety of methods, depending on the product type. The predominant valuation methodology uses the median prices from multiple pricing services. This method is used for structures for which there is typically significant, relevant market activity. Some of the key valuation drivers used by the pricing services are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. Other tranche types that are more challenging to price are valued using the median prices from multiple dealers. These include structured interest-only, structured principal-only, inverse floating-rate, and inverse interest-only structures. Some of the key valuation drivers used by the dealers are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. There is also a subset of positions for which prices are published on a daily basis; these include trust interest-only and trust principal-only strips. These are fairly liquid tranches and are quoted on a regular settlement date basis. In order to align the regular settlement date price with the balance sheet date, the OAS is calculated based on the published prices. Then the tranche is valued using that OAS applied to the balance sheet date.

Multiclass agency securities are classified as Level 2 or 3 depending on the significance of the inputs that are not observable.

In addition, there is a subset of tranches for which there is a lack of relevant market activity. These are priced using either a proxy relationship, where the position is matched to the closest dealer-priced tranche, and then valued by calculating an OAS using our proprietary prepayment and interest rate models, or the position will be valued via a hedge ratio pricing method. The subset of agency residential mortgage-related securities classified as Level 3 is valued using unobservable inputs, including those valued using either OAS or hedge ratio prices.

For the subset of our positions that uses an OAS approach, we determine the fair values for these securities by using the estimated OAS as an input to the valuation calculation in conjunction with interest-rate and prepayment models to calculate the NPV of the projected cash flows. These positions typically have smaller balances and are more difficult for dealers to value. The OAS-based prices are predominantly associated with interest-only and principal-only securities. Dealers publish regular settlement date prices for many of these securities, which provide the necessary starting point to create an OAS-based valuation as of the valuation date. These securities are sensitive to changes in prepayment expectations, interest rates, and changes in housing policy that could affect the level and timing of cash flows. In aggregate, as the cash flow streams are shortened (lengthened), the fair value of principal-only securities would increase (decrease) while interest-only securities would decrease (increase).

For a subset of agency residential mortgage-backed securities, a hedge ratio pricing method is utilized as current information about cash flows is not readily available. The hedge ratio pricing method calculates a current period price from the prior period valuation and the associated risk metrics. Specifically, the securities' risk metrics, such as key rate durations, convexity, and volatility duration, are coupled with the market changes associated with each such metric to estimate the price change corresponding to that metric. The sum of the individual adjustments is added to the prior period valuation to produce the final valuation. If necessary, our judgment is applied to estimate the impact of differences in prepayment uncertainty or other unique cash flow characteristics related to that particular security. These valuations are sensitive to the market changes, specifically interest rate, spread, and volatility changes. As interest rates and/or volatility increase (decrease), the fair values of these securities will typically decrease (increase).

*Commercial Mortgage-Backed Securities*

CMBS are valued primarily based on the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the collateral type, collateral performance, capital structure, issuer, credit enhancement, coupon, weighted average life, and interest rates, coupled with the observed spread levels on trades of similar securities. Many of these securities have significant prepayment lockout periods or penalty periods that limit the window of potential prepayment to a relatively narrow band. These securities are primarily classified as Level 2.

There is a subset of CMBS comprised of military housing revenue bonds that is valued using a hedge ratio pricing method, and classified as Level 3 in the fair value hierarchy. These valuations are sensitive to market changes, specifically changes in interest rates and OAS. As interest rates increase (decrease) and/or OAS widens (tightens), fair values will typically decrease (increase).

*Subprime, Option ARM, and Alt-A and Other (Mortgage-Related)*

These private-label investments are valued using either the median of multiple dealer prices or the median prices from multiple pricing services. Some of the key valuation drivers used by the dealers and pricing services include the product type, vintage, collateral performance, capital structure, credit enhancements, and coupon, coupled with interest rates and spreads observed on trades of similar securities, where possible. The market for non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans is illiquid, resulting in wide price ranges as well as wide credit spreads. These securities are primarily classified as Level 3.

The techniques used by these pricing services and dealers to develop the prices generally are either: (a) a comparison to transactions involving instruments with similar collateral and risk profiles; or (b) a discounted cash flow model. For a large majority of the securities we value using dealers and pricing services, we obtain multiple external prices, which are non-binding both to us and our counterparties. When multiple prices are received, we use the median of the prices. The models and related assumptions used by the dealers and pricing services are owned and managed by them. However, we have an understanding of their processes used to develop the prices provided to us based on our ongoing due diligence. We have discussions with our dealers and pricing service vendors at least annually and often more frequently to maintain a current understanding of the processes and inputs they use to develop prices. We make no adjustments to the individual prices we receive from third-party pricing services or dealers for non-agency mortgage-related securities beyond calculating median prices and discarding certain prices that are determined not to be valid based on our validation processes. See "Valuation Process and Controls Over Fair Value Measurement" for additional information regarding our validation processes.

The non-agency mortgage-related security markets continued to be illiquid during the first quarter of 2012. We continue to utilize the prices on such securities provided to us by various pricing services and dealers and believe that the procedures executed by the pricing services and dealers, combined with our internal verification and analytical processes, help ensure that the prices used to develop our financial statements are in accordance with the accounting guidance for fair value measurement and disclosure.

The fair value measurements of these assets are sensitive to changes in assumptions regarding probability of default, loss severity in the event of default, forecasts of home prices, or significant activity or developments in the non-agency securities market. Significant changes in any of those inputs in isolation may result in significantly higher or lower fair value measurements. Generally, a change in the assumption used for forecasts of home price changes is accompanied by directionally similar changes in the assumptions used for probability of default and loss severity. Positive (negative) reaction to portfolio sales could trigger changes in investor sentiment leading to higher (lower) fair values.

The table below presents the fair value of subprime, option ARM, and Alt-A and other investments we held by origination year.

**Table 16.4 — Fair Value of Subprime, Option ARM, and Alt-A and Other Investments by Origination Year**

| | Fair Value at | |
|---|---|---|
| Year of Origination | March 31, 2012 | December 31, 2011 |
| | (in millions) | |
| 2004 and prior | $ 4,294 | $ 4,287 |
| 2005 | 10,320 | 10,411 |
| 2006 | 15,899 | 16,155 |
| 2007 | 13,544 | 13,890 |
| 2008 and beyond | — | — |
| Total | $44,057 | $44,743 |

*Freddie Mac*

*Obligations of States and Political Subdivisions*

These primarily represent housing revenue bonds, which are valued by taking the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the structure of the bond, including call terms, cross-collateralization features, and tax-exempt features, coupled with municipal bond rates, credit ratings, and spread levels. These securities are unique, resulting in low trading volumes and are classified as Level 3 in the fair value hierarchy.

The investor base for most issues of municipal securities is fairly narrow, and within this investor base, there is only a subset that invests in housing revenue bonds, as these securities require an additional level of mortgage security expertise. Consequently, the market for these securities is fairly illiquid. These valuations are sensitive to trends in the broader municipal securities market, which includes credit risk. As market concerns associated with credit risk increase (decrease), the fair value of housing revenue bonds will generally decrease (increase). In addition, they also are subject to the same interest rate risk, prepayment risk, and house price levels as other non-agency mortgage-related securities. As interest rates increase (decrease) or projected home price forecasts decrease (increase), the fair value of housing revenue bonds will generally decrease (increase).

*Manufactured Housing*

Securities backed by loans on manufactured housing properties are dealer-priced and we arrive at the fair value by taking the median of multiple dealer prices. Some of the key valuation drivers include the overall market direction, the collateral's performance, and vintage. These securities are classified as Level 3 in the fair value hierarchy because key inputs are unobservable in the market due to low levels of liquidity.

The fair values of our manufactured housing securities rely on unobservable inputs as there is no new production, and outstanding securities are very thinly traded. In some instances, a security may be comprised of so few loans, that the concentration risk will further limit the number of potential investors. These private-label investments are valued using the median of multiple dealer prices. Due to the seasoned nature of these securities, their valuations tend to track overall market sentiment. The primary valuation driver for manufactured housing is market demand at a particular point in time. An increase (decrease) in selling activity will typically result in a decrease (increase) in fair values. A secondary driver of the overall fair value measurement is the macroeconomic drivers of the economy. As the broader economy improves (deteriorates), the fair values will tend to increase (decrease).

*Asset-Backed Securities (Non-Mortgage-Related)*

These private-label non-mortgage-related securities are valued based on prices from pricing services. Some of the key valuation drivers include the discount margin, subordination level, and prepayment speed, coupled with interest rates. They are classified as Level 2 because of their liquidity and tight pricing ranges.

*Treasury Bills and Treasury Notes*

Treasury bills and Treasury notes are classified as Level 1 in the fair value hierarchy since they are actively traded and price quotes are widely available at the measurement date for the exact security we are valuing.

*FDIC-Guaranteed Corporate Medium-Term Notes*

Since these securities carry the FDIC guarantee, they are considered to have no credit risk. They are valued based on yield analysis. They are classified as Level 2 because of their high liquidity and tight pricing ranges.

**Mortgage Loans, Held-for-Sale**

Mortgage loans, held-for-sale consist of multifamily mortgage loans with the fair value option elected. Thus, all held-for-sale mortgage loans are measured at fair value on a recurring basis.

The fair value of multifamily mortgage loans is generally based on market prices obtained from a third-party pricing service provider for similar actively traded mortgages, adjusted for differences in loan characteristics and contractual terms. The pricing service aggregates observable price points from two markets: agency and non-agency. The agency market consists of purchases made by the GSEs of loans underwritten by our counterparties in accordance with our guidelines while the non-agency market generally consists of secondary market trades between banks and other financial institutions of loans that were originated and initially held in portfolio by these institutions. The pricing service blends the observable price data obtained from these two distinct markets into a final composite price based on the expected probability that a given loan will trade in one of these two markets. This estimated probability is largely a function of the loan's credit quality, as determined by its current LTV ratio and DSCR. The result of this blending technique is that lower

credit quality loans receive a lower percentage of agency price weighting and higher credit quality loans receive a higher percentage of agency price weighting.

Given the relative illiquidity in the marketplace for multifamily mortgage loans and differences in contractual terms, these loans are classified as Level 3 in the fair value hierarchy.

These values are sensitive to changes in benchmark interest rates, market pricing spreads to benchmark interest rates for credit and liquidity risk factors, estimated prepayment speeds subsequent to the expiration of yield maintenance periods, and portfolio credit quality as represented by each loan's current estimated DSCR and LTV ratios. Significant increases in interest rates and credit and liquidity spreads and/or deterioration in portfolio credit quality (*e.g.*, increases in LTV ratios and/or decreases in DSCR) may result in significantly lower fair value measurement.

### Mortgage Loans, Held-for-Investment

Mortgage loans, held-for-investment measured at fair value on a non-recurring basis represent impaired multifamily mortgage loans, which are not measured at fair value on an ongoing basis but have been written down to fair value due to impairment. The valuation technique we use to measure the fair value of impaired multifamily mortgage loans, held-for-investment is based on the value of the underlying property and may include assessment of third-party appraisals, environmental, and engineering reports that we compare with relevant market performance to arrive at a fair value. Our valuation technique incorporates one or more of the following methods: income capitalization, discounted cash flow, sales comparables, and replacement cost. We consider the physical condition of the property, rent levels, and other market drivers, including input from sales brokers and the property manager. We classify impaired multifamily mortgage loans, held-for-investment as Level 3 in the fair value hierarchy as their valuation includes significant unobservable inputs.

### Derivative Assets, Net

Derivative assets largely consist of interest-rate swaps, option-based derivatives, futures, and forward purchase and sale commitments that we account for as derivatives. The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable, trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net unrealized gain position are reported as derivative assets, net. Similarly, derivatives in a net unrealized loss position are reported as derivative liabilities, net.

#### Interest-Rate Swaps and Option-Based Derivatives

The fair values of interest-rate swaps are determined by using the appropriate yield curves to discount the expected cash flows of both the fixed and variable rate components of the swap contracts. In doing so, we first observe publicly available market spot interest rates, such as money market rates, Eurodollar futures contracts and LIBOR swap rates. The spot curves are translated to forward curves using internal models. From the forward curves, the periodic cash flows are calculated on the pay and receive side of the swap and discounted back at the relevant forward rates to arrive at the fair value of the swap. Since the fair values of the swaps are determined by using observable inputs from active markets, these are generally classified as Level 2 under the fair value hierarchy.

Option-based derivatives include call and put swaptions and other option-based derivatives, the majority of which are European options. The fair values of the European call and put swaptions are calculated by using market observable interest rates and dealer-supplied interest rate volatility grids as inputs to our option-pricing models. Within each grid, prices are determined based on the option term of the underlying swap and the strike rate of the swap. Derivatives with embedded American options are valued using dealer-provided pricing grids. The grids contain prices corresponding to specified option terms of the underlying swaps and the strike rate of the swaps. Interpolation is used to calculate prices for positions for which specific grid points are not provided. Derivatives with embedded Bermudan options are valued based on prices provided directly by counterparties. Swaptions are classified as Level 2 under the fair value hierarchy. Other option-based derivatives include exchange-traded options that are valued by exchange-published daily closing prices. Therefore, exchange-traded options are classified as Level 1 under the fair value hierarchy. Other option-based derivatives also include purchased interest-rate cap and floor contracts that are valued by using observable market interest rates and cap and floor rate volatility grids obtained from dealers, and cancellable interest rate swaps that are valued by using dealer prices. Cap and floor contracts are classified as Level 2 and cancellable interest rate swaps with fair values using significant unobservable inputs are classified as Level 3 under the fair value hierarchy.

Cancelable swaps, which are interest rate swaps where one counterparty has the option to terminate on one or more payment dates, comprise the largest component of the Level 3 derivatives population. These positions are priced using counterparty prices. The cancelable swap valuation is largely driven by changes in interest rates and volatility. As we are

in a net receive-fixed position with respect to cancelable swaps, we are effectively short a call option. As a result, an increase (decrease) in interest rates will result in a decrease (increase) to the fair value measurement. An increase (decrease) in volatility will generally result in a decrease (increase) to the fair value measurement. These impacts are highly dependent on the specific terms of each deal and the degree to which the holder of the option is in the money or out of the money, as a decrease in interest rates will increase the likelihood that the counterparty will exercise the call option. In addition, changes in our creditworthiness could impact the valuation, with a deterioration (improvement) in credit decreasing (increasing) the fair value measurement.

The table below shows the fair value, prior to counterparty and cash collateral netting adjustments, for our interest-rate swaps and option-based derivatives and the maturity profile of our derivative positions. It also provides the weighted-average fixed rates of our pay-fixed and receive-fixed swaps. As of March 31, 2012 and December 31, 2011, our option-based derivatives had a remaining weighted-average life of 5.4 years and 5.0 years, respectively.

### Table 16.5 — Fair Values and Maturities for Interest-Rate Swaps and Option-Based Derivatives

| | | | March 31, 2012 | | | |
|---|---|---|---|---|---|---|
| | | | Fair Value[1] | | | |
| | Notional or Contractual Amount | Total Fair Value[2] | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| **Interest-rate swaps:** | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $236,803 | $ 9,080 | $ 59 | $ 519 | $ 3,538 | $ 4,964 |
| Weighted average fixed rate[3] | | | 1.52% | 0.92% | 2.24% | 3.10% |
| Forward-starting swaps[4] | 11,650 | 792 | — | — | — | 792 |
| Weighted-average fixed rate[3] | | | — | — | — | 3.83% |
| Basis (floating to floating) | 2,400 | 2 | (1) | — | 3 | — |
| Pay-fixed: | | | | | | |
| Swaps | 280,869 | (26,292) | (38) | (2,647) | (5,112) | (18,495) |
| Weighted-average fixed rate[3] | | | 0.95% | 3.11% | 2.83% | 3.68% |
| Forward-starting swaps[4] | 15,704 | (1,490) | — | — | — | (1,490) |
| Weighted-average fixed rate[3] | | | — | — | — | 3.80% |
| Total interest-rate swaps | $547,426 | $(17,908) | $ 20 | $(2,128) | $(1,571) | $(14,229) |
| **Option-based derivatives:** | | | | | | |
| Call swaptions | $ 64,525 | $ 6,880 | $1,617 | $ 2,825 | $ 398 | $ 2,040 |
| Put swaptions | 49,700 | 522 | 1 | 35 | 134 | 352 |
| Other option-based derivatives[5] | 34,365 | 2,029 | — | — | — | 2,029 |
| Total option-based | $148,590 | $ 9,431 | $1,618 | $ 2,860 | $ 532 | $ 4,421 |

| | | | December 31, 2011 | | | |
|---|---|---|---|---|---|---|
| | | | Fair Value[1] | | | |
| | Notional or Contractual Amount | Total Fair Value[2] | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| **Interest-rate swaps:** | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $195,716 | $ 10,651 | $ 22 | $ 390 | $ 2,054 | $ 8,185 |
| Weighted-average fixed rate[3] | | | 1.17% | 1.03% | 2.26% | 3.35% |
| Forward-starting swaps[4] | 16,092 | 2,239 | — | — | — | 2,239 |
| Weighted-average fixed rate[3] | | | — | — | — | 3.96% |
| Basis (floating to floating) | 2,750 | (2) | — | (6) | 4 | — |
| Pay-fixed: | | | | | | |
| Swaps | 276,564 | (31,565) | (62) | (1,319) | (6,108) | (24,076) |
| Weighted-average fixed rate[3] | | | 1.59% | 2.20% | 3.13% | 3.84% |
| Forward-starting swaps[4] | 12,771 | (2,923) | — | — | — | (2,923) |
| Weighted-average fixed rate[3] | | | — | — | — | 5.16% |
| Total interest-rate swaps | $503,893 | $(21,600) | $ (40) | $ (935) | $(4,050) | $(16,575) |
| **Option-based derivatives:** | | | | | | |
| Call swaptions | $103,800 | $ 10,043 | $5,230 | $ 1,339 | $ 558 | $ 2,916 |
| Put swaptions | 70,875 | 636 | 22 | 49 | 166 | 399 |
| Other option-based derivatives[5] | 38,549 | 2,254 | — | — | — | 2,254 |
| Total option-based | $213,224 | $ 12,933 | $5,252 | $ 1,388 | $ 724 | $ 5,569 |

(1) Fair value is categorized based on the period from March 31, 2012 and December 31, 2011, respectively, until the contractual maturity of the derivatives.
(2) Represents fair value for each product type, prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable adjustments.
(3) Represents the notional weighted average rate for the fixed leg of the swaps.
(4) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to thirteen years as of March 31, 2012.
(5) Primarily includes purchased interest rate caps and floors.

*Freddie Mac*

*Other Derivatives*

Other derivatives mainly consist of exchange-traded futures, foreign-currency swaps, certain forward purchase and sale commitments, and credit derivatives. The fair value of exchange-traded futures is based on end-of-day observed closing prices obtained from third-party pricing services; therefore, they are classified as Level 1 under the fair value hierarchy. The fair value of foreign-currency swaps is determined by using the appropriate yield curves to calculate and discount the expected cash flows for the swap contracts; therefore, they are classified as Level 2 under the fair value hierarchy since the fair values are determined through models that use observable inputs from active markets.

Certain purchase and sale commitments are also considered to be derivatives and are classified as Level 2 or Level 3 under the fair value hierarchy, depending on the fair value hierarchy classification of the purchased or sold item, whether a security or loan. Such valuation techniques are further discussed in the *"Investments in Securities"* section above and "Valuation Methods and Assumptions for Assets and Liabilities Not Measured at Fair Value in Our Consolidated Balance Sheets, but for Which the Fair Value is Disclosed — *Mortgage Loans*."

Credit derivatives primarily include short-term default guarantee commitments, which we value using a discounted cash flow approach and market-adjusted credit spreads. We classify fair value measurements related to credit derivatives as Level 3 under the fair value hierarchy because there are limited market benchmarks and significant unobservable inputs.

*Consideration of Credit Risk in Our Valuation of Derivatives*

The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. Additionally, the fair value of derivative liabilities considers the impact of our institutional credit risk. Based on this evaluation, and because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, our fair value of derivatives is not adjusted for credit risk. Substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for a discussion of our counterparty credit risk.

**Other Assets, Guarantee Asset and All Other Assets**

Our guarantee asset is valued either through obtaining dealer quotes on similar securities or through an expected cash flow approach. Because of the broad range of liquidity discounts applied by dealers to these similar securities and because the expected cash flow valuation approach uses significant unobservable inputs, we classified the guarantee asset as Level 3. Our guarantee asset is comprised mostly of guarantees on multifamily Freddie Mac securities. This asset is valued using a discounted cash flow approach that is sensitive to changes in benchmark interest rates and our current OAS to benchmark rates for the inception of new guarantees, which are in turn driven by changes in our view of credit risk and liquidity and changes in the credit profile of the guarantee portfolio. Significant increases in benchmark interest rates and credit and liquidity OAS and/or deterioration in portfolio credit quality may result in significantly lower fair value measurement.

All other assets at fair value consist of mortgage servicing rights, and are valued based on a valuation performed by a third-party vendor that specializes in valuing and brokering sales of mortgage servicing rights. These values are sensitive to changes in unobservable inputs, including: benchmark interest rates, cost of servicing performing and non-performing loans, estimated prepayment speeds and default rates, and expected ancillary income. Significant increases or decreases in any of these inputs may result in significantly different fair value measurements.

**REO, Net**

REO is initially measured at its fair value less costs to sell, and is subsequently measured at the lower of cost or fair value less costs to sell. The fair value of REO is determined using an internal model that considers state and collateral level data to produce an estimate of fair value based on REO dispositions in the most recent three months. We use the actual disposition prices on REO and the current loan UPB at the state level to estimate the current fair value of REO. Certain adjustments, such as state specific adjustments, are made to the estimated fair value, as applicable. Due to the use of unobservable inputs, REO is classified as Level 3 under the fair value hierarchy.

*Freddie Mac*

### Debt Securities Recorded at Fair Value

We elected the fair value option for foreign-currency denominated debt instruments and certain other debt securities. See "Fair Value Election — *Debt Securities with Fair Value Option Elected*" for additional information. We determine the fair value of these instruments by obtaining multiple quotes from dealers. Given the weakness in the market as evidenced by low transaction volumes in these securities, these fair values are classified as Level 3 in the fair value hierarchy at March 31, 2012.

Our foreign-currency denominated debt instruments are priced using counterparty dealer prices. The fair value measurement is dependent on forward interest rates and spot exchange rates for the foreign currency. As we are the debt issuer, an increase (decrease) in interest rates will result in a decrease (increase) in the fair value measurement, while the strengthening (weakening) of the foreign currency versus the U.S. dollar will increase (decrease) the fair value measurement.

Certain other debt securities represent our debt whose maturity can be lengthened at the option of the issuer. These products are callable in nature with an embedded option. In this case, the valuation behaves similarly to that of a callable bond. As we are the debt issuer, an increase (decrease) in interest rates will result in a decrease (increase) in the fair value measurement. An increase (decrease) in volatility will generally result in a decrease (increase) to fair value. These impacts are highly dependent on the specific terms of each deal and the degree to which the bond could be called back, as a decrease in interest rates will increase the likelihood that we will exercise our call option. In addition, changes in our creditworthiness could impact the valuation, with a deterioration (improvement) in credit reducing (increasing) the fair value measurement.

### Derivative Liabilities, Net

See discussion under *"Derivative Assets, Net"* above.

### Quantitative Information about Level 3 Fair Value Measurements for Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets

The table below provides valuation techniques, the range, and the weighted average of significant unobservable inputs for assets and liabilities measured at fair value on a recurring and non-recurring basis using unobservable inputs (Level 3) as of March 31, 2012.

**Table 16.6 — Quantitative Information about Level 3 Fair Value Measurements**

| | Total Fair Value | Level 3 Fair Value | Predominant Valuation Technique(s) | Type | Range | Weighted Average |
|---|---|---|---|---|---|---|
| | | | | March 31, 2012 | | |
| | | | | Unobservable Inputs[1] | | |
| | (dollars in millions) | | | | | |
| **Recurring fair value measurements** | | | | | | |
| *Assets* | | | | | | |
| Investments in securities | | | | | | |
| Available-for-sale, at fair value | | | | | | |
| Mortgage-related securities | | | | | | |
| Agency securities: | | | | | | |
| Freddie Mac . . . . . . . . . . . . . . | $ 76,163 | $ 1,898 | Hedge ratio | Effective duration[2] | 1.7 - 1.7 years | 1.7 years |
| Fannie Mae . . . . . . . . . . . . . . | 18,897 | 168 | Median of external sources | External pricing sources | $102.8 - $104.8 | $103.6 |
| | | | Single external source | External pricing source | $115.5 - $115.5 | $115.5 |
| Ginnie Mae . . . . . . . . . . . . . . | 239 | 11 | Discounted cash flows | | | |
| Subprime, option ARM, and Alt-A: | | | | | | |
| Subprime . . . . . . . . . . . . . . | 27,145 | 27,145 | Median of external sources | External pricing sources | $51.3 - $61.8 | $56.8 |
| Option ARM . . . . . . . . . . . . | 5,818 | 5,818 | Median of external sources | External pricing sources | $38.9 - $47.5 | $43.3 |
| Alt-A and other . . . . . . . . . . | 11,094 | 11,084 | Median of external sources | External pricing sources | $62.5 - $72.0 | $67.9 |
| CMBS. . . . . . . . . . . . . . . . . . . | 54,753 | 3,143 | Single external source | External pricing source | $88.0 - $88.0 | $88.0 |
| | | | Hedge ratio | Effective duration[2] | 9.5 - 15.3 years | 13.6 years |
| Obligation of states and political subdivisions . . . . . . . . . . . . | 7,565 | 7,565 | Median of external sources | External pricing sources | $101.0 - $102.0 | $101.5 |
| Manufactured housing . . . . . . . . . . . | 748 | 748 | Median of external sources | External pricing sources | $76.7 - $83.6 | $80.1 |
| Total available-for-sale mortgage-related securities . . . . . . . . . . | 202,422 | 57,580 | | | | |
| Trading, at fair value | | | | | | |
| Mortgage-related securities | | | | | | |
| Agency securities: | | | | | | |
| Freddie Mac . . . . . . . . . . . . . . | 14,504 | 1,725 | Discounted cash flows | OAS | (3,105) - 11,117 bps | 677 bps |
| Fannie Mae . . . . . . . . . . . . . . | 13,692 | 478 | Discounted cash flows | OAS | (105) - 10,065 bps | 859 bps |
| Ginnie Mae . . . . . . . . . . . . . . | 151 | 20 | Discounted cash flows | | | |
| Other . . . . . . . . . . . . . . . . . . . | 153 | 13 | Median of external sources | | | |
| | | | Discounted cash flows | | | |
| Total trading mortgage-related securities . . . . . . . . . . . . . . | 28,500 | 2,236 | | | | |
| Total investments in securities . . . . . . . . . . . . . | $230,922 | $59,816 | | | | |
| Mortgage loans: | | | | | | |
| Held-for-sale, at fair value . . . . . . . . . . | $ 11,337 | $11,337 | Discounted cash flows | DSCR | 1.25 - 5.94 | 1.79 |
| | | | | Current LTV | 12% - 80% | 70% |
| Other assets: | | | | | | |
| Guarantee asset, at fair value . . . . . . . . . | 798 | 798 | Discounted cash flows | OAS | 0 - 346 bps | 55 bps |
| All other, at fair value . . . . . . . . . . . . . | 143 | 143 | Discounted cash flows | Prepayment rate[3] | 8.85% - 40.45% | 20.06% |
| | | | | Servicing income per loan | 0.19% - 0.49% | 0.25% |
| | | | | Cost to service per loan | $74 - $354 | $131 |
| Total other assets . . . . . . . . . . . . . | $ 941 | $ 941 | | | | |
| *Liabilities* | | | | | | |
| Debt securities recorded at fair value . . . . . . | $ 2,221 | $ 2,221 | Median of external sources | External pricing sources | $103.2 - $103.9 | $103.6 |
| | | | Single external source | External pricing source | $100.0 - $100.0 | $100.0 |
| Net derivatives . . . . . . . . . . . . . . . . . . . . | 114 | 30 | Discounted cash flows | | | |
| | | | Counterparty marks | | | |
| All other, at fair value . . . . . . . . . . . . . . . | 4 | 4 | Discounted cash flows | | | |
| **Non-recurring fair value measurements** | | | | | | |
| Mortgage loans | | | | | | |
| Held-for-investment . . . . . . . . . . . . . . . | $ 1,469 | $ 1,469 | Income capitalization | Capitalization rates[4] | 5% - 10% | 7.1% |
| REO, net. . . . . . . . . . . . . . . . . . . . . . . . | 2,303 | 2,303 | Market comparable data[5] | Historical average sale proceeds by state per property[6] | $31,253 - $272,302 | $102,712 |

(1) Certain unobservable input types, range, and weighted average data are not disclosed in this table if they are associated with a class: (a) that has a Level 3 fair value measurement that is not considered material; or (b) where we have disclosed the predominant valuation technique with related unobservable inputs for the most significant portion of that class.
(2) Effective duration is used as a proxy to represent the aggregate impact of key rate durations.
(3) Represents the effective borrower prepayment and modeled foreclosure rate based upon the principal balance weighted expected life, derived from our prepayment model.
(4) The capitalization rate "Range" and "Weighted Average" represent those loans that are valued using the Income Capitalization approach, which is the predominant valuation technique used for this population. Certain loans in this population are valued using other techniques, and the capitalization rate for those is not represented in the "Range" or "Weighted Average" above.
(5) Represents internal models that use distressed property sales proceeds by state based on a three month average to measure the initial value of REO and the subsequent write-down to measure the current fair value for REO properties.
(6) Represents the average of three months of REO sales proceeds by state.

## Valuation Processes and Controls Over Fair Value Measurement

Groups within our Finance division, independent of our trading and investing function, execute, and validate the valuation processes. Our Enterprise Valuation Risk group, or EVR, provides independent risk governance over all valuation processes with the goal of verifying that reasonable fair values are used for financial reporting and risk management. EVR creates, maintains, and updates corporate-wide valuation control policies related to our valuation

processes, including providing notice to the business areas when updates are made and consulting with the business areas on policy implementation.

We employ control processes to validate the techniques and models we use to determine fair value including review and approval of new transaction types, valuation judgments, methods, models, process controls, and results. These processes are designed to help ensure that fair value measurements are appropriate, consistently applied, and reliable.

- Our control processes include performing monthly independent verification of fair value measurements by comparing the methodology driven price to other market source data (to the extent available), and using independent analytics to determine if assigned fair values are reasonable. This review covers all categories of products with increased attention given to higher risk/impact valuations.

- Our validation processes are intended to help ensure that the individual prices we receive from third parties are consistent with our observations of the marketplace and prices that are provided to us by other dealers or pricing services. Where applicable, prices are back-tested by comparing the settlement prices to our fair value measurements.

- Analytical procedures include automated checks of prices for reasonableness based on variations from prices in previous periods, comparisons of prices to internally calculated expected prices based on market moves, analysis of changes to pricing ranges, and relative value and yield comparisons based on specific characteristics of securities and our proprietary models.

Our valuation processes and related fair value hierarchy assessments require us to make judgments regarding the liquidity of the marketplace. These judgments are based on the volume of securities traded in the marketplace, the width of bid/ask spreads, and the dispersion of prices on similar securities.

Thresholds are set for each product class by EVR to identify exceptions that require further analysis. To the extent that we determine that a price is outside of established parameters, we will further examine the price, including follow up discussions with the specific pricing service or dealer and/or supplemental analytics and review, and ultimately will not use that price if we are unable to validate the price. These processes are executed prior to the completion of the financial statements.

Additionally, the Valuation & Finance Model Committee, or Valuation Committee, which includes senior representation from business areas and our Enterprise Risk Management and Finance divisions, provides senior management's governance over valuation methodologies and controls, and reviews exceptions and resolution from the review and validation processes.

Where models are employed to assist in the measurement of fair value, all changes made to those models during the periods presented are put through the corporate model change governance process and material changes are reviewed by the Valuation Committee. Inputs used by those models maximize the use of market based inputs, are regularly updated for changes in the underlying data, assumptions, valuation inputs, or market conditions, and are subject to the valuation controls noted above.

We also consider credit risk in the valuation of our assets and liabilities, with the credit risk of the counterparty considered in asset valuations and our own credit risk considered in liability valuations.

**Consolidated Fair Value Balance Sheets**

The supplemental consolidated fair value balance sheets in the table below present our estimates of the fair value of our financial assets and liabilities at March 31, 2012 and December 31, 2011. The valuations of financial instruments on our consolidated fair value balance sheets are in accordance with the accounting guidance for fair value measurements and disclosures and the accounting guidance for financial instruments. The consolidated fair value balance sheets do not purport to present our net realizable, liquidation, or market value as a whole. Furthermore, amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary significantly from the fair values presented.

**Table 16.7 — Consolidated Fair Value Balance Sheets**

| | March 31, 2012 | | | | | | December 31, 2011 | |
| | | Fair Value | | | | | | |
| | Carrying Amount[1] | Level 1 | Level 2 | Level 3 | Netting Adjustments | Total | Carrying Amount[1] | Fair Value |
| | | | | | (in billions) | | | |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . | $ 8.6 | $ 5.5 | $ 3.1 | $ — | $ — | $ 8.6 | $ 28.4 | $ 28.4 |
| Restricted cash and cash equivalents . . . . . . . . | 27.8 | — | 27.8 | — | — | 27.8 | 28.1 | 28.1 |
| Federal funds sold and securities purchased under agreements to resell . . . . . . . . . . . . . | 24.3 | — | 24.3 | — | — | 24.3 | 12.0 | 12.0 |
| *Investments in securities:* | | | | | | | | |
| Available-for-sale, at fair value . . . . . . . . . | 202.4 | — | 144.8 | 57.6 | — | 202.4 | 210.7 | 210.7 |
| Trading, at fair value . . . . . . . . . . . . . . . . | 58.3 | 26.2 | 29.9 | 2.2 | — | 58.3 | 58.8 | 58.8 |
| Total investments in securities . . . . . . . . . | 260.7 | 26.2 | 174.7 | 59.8 | — | 260.7 | 269.5 | 269.5 |
| *Mortgage loans:* | | | | | | | | |
| Mortgage loans held by consolidated trusts . . | 1,555.1 | — | 993.4 | 591.3 | — | 1,584.7 | 1,564.2 | 1,598.2 |
| Unsecuritized mortgage loans . . . . . . . . . . . | 211.2 | — | 29.7 | 160.0 | — | 189.7 | 217.1 | 205.9 |
| Total mortgage loans . . . . . . . . . . . . . . . | 1,766.3 | — | 1,023.1 | 751.3 | — | 1,774.4 | 1,781.3 | 1,804.1 |
| Derivative assets, net . . . . . . . . . . . . . . . . . | 0.2 | — | 21.3 | — | (21.1) | 0.2 | 0.1 | 0.1 |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . | 27.0 | 0.1 | 1.1 | 25.8 | — | 27.0 | 27.8 | 28.5 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . | $2,114.9 | $31.8 | $1,275.4 | $ 836.9 | $(21.1) | $2,123.0 | $2,147.2 | $2,170.7 |
| **Liabilities** | | | | | | | | |
| *Debt, net:* | | | | | | | | |
| Debt securities of consolidated trusts held by third parties . . . . . . . . . . . . . . . . . . . . . | $1,481.6 | $ — | $1,556.5 | $ 2.8 | $ — | $1,559.3 | $1,471.4 | $1,552.5 |
| Other debt . . . . . . . . . . . . . . . . . . . . . . . . | 618.6 | — | 615.8 | 21.1 | — | 636.9 | 660.6 | 681.2 |
| Total debt, net . . . . . . . . . . . . . . . . . . . . | 2,100.2 | — | 2,172.3 | 23.9 | — | 2,196.2 | 2,132.0 | 2,233.7 |
| Derivative liabilities, net . . . . . . . . . . . . . . | 0.3 | 0.1 | 29.7 | — | (29.5) | 0.3 | 0.4 | 0.4 |
| Other liabilities . . . . . . . . . . . . . . . . . . . . | 14.4 | — | 8.4 | 7.3 | — | 15.7 | 14.9 | 15.0 |
| Total liabilities . . . . . . . . . . . . . . . . . . . . | 2,114.9 | 0.1 | 2,210.4 | 31.2 | (29.5) | 2,212.2 | 2,147.3 | 2,249.1 |
| **Net assets** | | | | | | | | |
| Senior preferred stockholders . . . . . . . . . . . | 72.3 | — | — | 72.3 | — | 72.3 | 72.2 | 72.2 |
| Preferred stockholders . . . . . . . . . . . . . . . . | 14.1 | — | 0.6 | — | — | 0.6 | 14.1 | 0.6 |
| Common stockholders . . . . . . . . . . . . . . . . | (86.4) | — | — | (162.1) | — | (162.1) | (86.4) | (151.2) |
| Total net assets . . . . . . . . . . . . . . . . . . . . | — | — | 0.6 | (89.8) | — | (89.2) | (0.1) | (78.4) |
| Total liabilities and net assets . . . . . . . . . | $2,114.9 | $ 0.1 | $2,211.0 | $ (58.6) | $(29.5) | $2,123.0 | $2,147.2 | $2,170.7 |

(1) Equals the amount reported on our GAAP consolidated balance sheets.

### Limitations

Our consolidated fair value balance sheets do not capture all elements of value that are implicit in our operations as a going concern because our consolidated fair value balance sheets only capture the values of the current investment and securitization portfolios as of the dates presented. For example, our consolidated fair value balance sheets do not capture the value of new investment and securitization business that would likely replace prepayments as they occur, nor do they include any estimation of intangible or goodwill values. Thus, the fair value of net assets presented on our consolidated fair value balance sheets does not represent an estimate of our net realizable, liquidation, or market value as a whole.

The fair value of certain financial instruments is based on our assumed current principal exit market as of the dates presented. As new markets evolve, our assumed principal exit market may change. The use of different assumptions and methodologies to determine the fair values of certain financial instruments, including the use of different principal exit markets, could have a material impact on the fair value of net assets presented on our consolidated fair value balance sheets.

We report certain assets and liabilities that are not financial instruments (such as property and equipment and REO), as well as certain financial instruments that are not covered by the disclosure requirements in the accounting guidance for financial instruments, such as pension liabilities, at their carrying amounts in accordance with GAAP on our consolidated fair value balance sheets. We believe these items do not have a significant impact on our overall fair value results. Other non-financial assets and liabilities on our GAAP consolidated balance sheets represent deferrals of costs and revenues that are amortized in accordance with GAAP, such as deferred debt issuance costs and deferred fees. Cash receipts and payments related to these items are generally recognized in the fair value of net assets when received or paid, with no basis reflected on our fair value balance sheets.

*Freddie Mac*

**Valuation Methods and Assumptions for Assets and Liabilities Not Measured at Fair Value in Our Consolidated Balance Sheets, but for Which the Fair Value is Disclosed**

The following are valuation assumptions and methods for items not subject to the fair value hierarchy either because they are not measured at fair value other than on the fair value balance sheet or are only measured at fair value at inception.

### Cash and Cash Equivalents (including Restricted Cash and Cash Equivalents)

Cash and cash equivalents largely consist of highly liquid investment securities with an original maturity of three months or less used for cash management purposes, as well as cash held at financial institutions and cash collateral posted by our derivative counterparties. Given that these assets are short-term in nature with limited market value volatility, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value. Cash is classified as Level 1 except for restricted cash, which is classified as Level 2 primarily due to the restrictions on the cash. Cash equivalents that are highly liquid investments for which we can obtain unadjusted quoted prices are also classified as Level 1. Cash equivalents are primarily classified as Level 2 because we use observable inputs other than quoted prices to determine the fair value measurement.

### Federal Funds Sold and Securities Purchased Under Agreements to Resell

Federal funds sold and securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities and federal funds sold. Given that these assets are short-term in nature, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value. Federal funds sold and securities purchased under agreements to resell are classified as Level 2 because these are liquid, but there are no direct quotes available for our exact positions.

### Mortgage Loans

Single-family mortgage loans are classified as held-for-investment and recorded at amortized cost. Certain multifamily mortgage loans are recorded at fair value due to the election of the fair value option, or they are held for investment and recorded at fair value upon impairment, which is based upon the fair value of the collateral as multifamily loans are collateral-dependent.

<u>Single-Family Loans</u>

In determining the fair value of single-family mortgage loans, valuation outcomes can vary widely based on management judgments and decisions used in determining: (a) the principal market; (b) modeling assumptions, including default, severity, home prices, and risk premium; and (c) inputs used to determine variables including risk premiums, credit costs, security pricing, and implied management and guarantee fees. Our principal markets include the GSE securitization market and the whole loan market. To determine the principal market, we considered the market with the greatest volume and level of activity within the market, and our ability to access that market. In the absence of a market with active trading, we determined the market that would maximize the amount we would receive upon sale.

*GSE Securitization Market as Principal Market*

For single-family mortgage loans where we determined the principal market is the GSE securitization market, we estimate fair value based on the estimate of the price we would receive if we were to securitize these loans. This principal market assumption applies to both loans held by consolidated trusts and unsecuritized loans.

Our estimate of fair value is based on: (a) comparisons to actively traded mortgage-related securities with similar characteristics; (b) the excess coupon (implied management and guarantee fee); and (c) the credit obligation related to performing our guarantee.

The security price is derived from benchmark security pricing for similar actively traded mortgage-related securities, and is adjusted for yield, credit, and liquidity differences. This security pricing process is consistent with our approach for valuing similar securities retained in our investment portfolio or issued to third parties. See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets — *Investments in Securities*."

We derive the implied management and guarantee fees in excess of the coupon on the mortgage-related securities by estimating the present value of the additional cash flows from these elements. Our approach for estimating the fair value of the implied management and guarantee fees uses third-party market data as practicable. The valuation approach for the majority of implied management and guarantee fees relates to fixed-rate loan products with coupons at or near current market rates and involves obtaining dealer quotes on hypothetical securities constructed with collateral characteristics

from our single-family credit guarantee portfolio. The remaining portion of the implied management and guarantee fees relates to underlying loan products for which comparable market prices are not readily available. These relate specifically to ARM products, highly seasoned loans, and fixed-rate loans with coupons that are not consistent with current market rates. For this portion of the single-family credit guarantee portfolio, the implied management and guarantee fees are valued using an expected cash flow approach, leveraging the market information received on the more liquid portion of the population and including only those cash flows expected to result from our contractual right to receive management and guarantee fees.

The estimate of fair value is also net of the related credit and other costs (such as general and administrative expense) and benefits (such as credit enhancements) inherent in our guarantee obligation. We use delivery and guarantee fees charged by us as a market benchmark for all guaranteed loans that would qualify for purchase under current underwriting standards (used for the majority of the guaranteed loans, but accounts for a small share of the overall fair value of the guarantee obligation). For loans that do not qualify for purchase based on current underwriting standards, we use our internal credit models, which incorporate factors such as loan characteristics, loan performance status information, expected losses, and risk premiums without further adjustment (used for less than a majority of the guaranteed loans, but accounts for the largest share of the overall fair value of the guarantee obligation).

For loans that have been refinanced under HARP, we value our guarantee obligation using the delivery and guarantee fees currently charged by us under that initiative. If, subsequent to delivery, the refinanced loan no longer qualifies for purchase based on current underwriting standards (such as becoming past due or being modified as a part of a troubled debt restructuring), the fair value of the guarantee obligation is then measured using our internal credit models as described above, or third-party market pricing as described below.

The total compensation that we receive for the delivery of a HARP loan reflects the pricing that we are willing to offer because HARP is a part of a broader government program intended to provide assistance to homeowners and prevent foreclosures. When HARP ends, the beneficial pricing afforded to HARP loans will no longer be reflected in our delivery and guarantee fee pricing structure. If these benefits were not reflected in the pricing for these loans, the fair value of our mortgage loans would have decreased by $8.5 billion as of March 31, 2012. The total fair value of the loans in our portfolio that reflects the pricing afforded to HARP loans as of March 31, 2012 as presented in our consolidated fair value balance sheets is $117.9 billion.

### Whole Loan Market as Principal Market

For single-family mortgage loans where we determined the principal market is the whole loan market, we estimate fair value based on our estimate of prices we would receive if we were to sell these loans in the whole loan market. Prices for these loans are obtained from multiple dealers who reference market activity, where available, for deeply delinquent and modified loans and use internal models and their judgment to determine default rates, severity rates, home prices, and risk premiums.

### Level in the Fair Value Hierarchy

Single-family mortgage loans are classified as Level 2 or Level 3 depending on whether the inputs are observable. Single-family mortgage loans that would qualify for purchase under current underwriting standards are assigned to Level 2 as the key inputs used for the valuation of these loans such as TBA pricing, our externally-published credit pricing grids for delivery and guarantee fees, and third-party excess interest-only prices, are observable while modeled components comprise a small percentage of total value (*e.g.*, general and administrative expense, credit enhancement). Other single-family mortgage loans are classified in Level 3 if our credit cost is based on our internal credit model or if loans are valued using prices obtained from dealers. The internal model and the dealer prices are based on assumptions, which include significant unobservable inputs.

### Multifamily Loans

For a discussion of the techniques used to determine the fair value of held-for-sale, and both impaired and non-impaired held-for-investment multifamily loans, see "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets — *Mortgage Loans, Held-for-Investment*" and *"— Mortgage Loans, Held-for-Sale,"* respectively.

### Other Assets

Most of our other assets are not financial instruments required to be valued at fair value under the accounting guidance for disclosures about the fair value of financial instruments, such as property and equipment. For most of these non-financial instruments in other assets, we use the carrying amounts from our GAAP consolidated balance sheets as the

reported values on our consolidated fair value balance sheets, without any adjustment. These assets represent an insignificant portion of our GAAP consolidated balance sheets.

We adjust the GAAP-basis deferred taxes reflected on our consolidated fair value balance sheets to include estimated income taxes on the difference between our consolidated fair value balance sheets net assets attributable to common stockholders, including deferred taxes from our GAAP consolidated balance sheets, and our GAAP consolidated balance sheets equity attributable to common stockholders. To the extent the adjusted deferred taxes are a net asset, this amount is included in other assets. In addition, if our net deferred tax assets on our consolidated fair value balance sheets, calculated as described above, exceed our net deferred tax assets on our GAAP consolidated balance sheets that have been reduced by a valuation allowance, our net deferred tax assets on our consolidated fair value balance sheets are limited to the amount of our net deferred tax assets on our GAAP consolidated balance sheets. If the adjusted deferred taxes are a net liability, this amount is included in other liabilities.

Accrued interest receivable is one of the components included within other assets on our consolidated fair value balance sheets. On our GAAP consolidated balance sheets, we reverse accrued but uncollected interest income when a loan is placed on non-accrual status. There is no such reversal performed for the fair value of accrued interest receivable disclosed on our consolidated fair value balance sheets. Rather, we include in our fair value disclosure the amount we deem to be collectible. As a result, there is a difference between the accrued interest receivable GAAP-basis carrying amount and its fair value disclosed on our consolidated fair value balance sheets.

Other assets are classified primarily as Level 2 or Level 3 depending on whether unobservable inputs are significant to the fair value measurement.

### Total Debt, Net

Total debt, net represents debt securities of consolidated trusts held by third parties and other debt that we issued to finance our assets. On our consolidated GAAP balance sheets, total debt, net, excluding debt securities for which the fair value option has been elected, is reported at amortized cost, which is net of deferred items, including premiums, discounts, and hedging-related basis adjustments.

For fair value balance sheet purposes, we use the dealer-published quotes for a base TBA security, adjusted for the carry and pay-up price adjustments, to determine the fair value of the debt securities of consolidated trusts held by third parties. The valuation techniques we use are similar to the approach we use to value our investments in agency securities for GAAP purposes. See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets — *Investments in Securities — Agency Securities*" for additional information regarding the valuation techniques we use.

Other debt includes both non-callable and callable debt, as well as short-term zero-coupon discount notes. The fair value of the short-term zero-coupon discount notes is based on a discounted cash flow model with market inputs. The valuation of other debt securities represents the proceeds that we would receive from the issuance of debt and is generally based on market prices obtained from broker/dealers or reliable third-party pricing service providers. We elected the fair value option for foreign-currency denominated debt and certain other debt securities and reported them at fair value on our GAAP consolidated balance sheets. See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets — *Debt Securities Recorded at Fair Value*" for additional information.

The majority of our debt is classified in Level 2, as these are liquid securities and multiple pricing sources are generally available (through pricing and verification), historically with a tight price range including verification sources. A smaller population of debt, including debt where the fair value option is elected, is classified as Level 3 because these are illiquid securities with significant unobservable inputs and wide pricing ranges.

### Other Liabilities

Other liabilities consist of accrued interest payable on debt securities, the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities, the reserve for guarantee losses on non-consolidated trusts, servicer advanced interest payable and certain other servicer liabilities, accounts payable and accrued expenses, payables related to securities, and other miscellaneous liabilities. We believe the carrying amount of these liabilities is a reasonable approximation of their fair value, except for the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities. The technique for estimating the fair value of our

guarantee obligation related to the credit component of the loan's fair value is described in the "Mortgage Loans — Single-Family Loans" section.

As discussed in "Other Assets," other liabilities may include a deferred tax liability adjusted for fair value balance sheet purposes.

Other liabilities are classified primarily as Level 2 or Level 3 depending on whether unobservable inputs are significant to the fair value measurement.

### Net Assets Attributable to Senior Preferred Stockholders

Our senior preferred stock held by Treasury in connection with the Purchase Agreement is recorded at the stated liquidation preference for purposes of the consolidated fair value balance sheets, which is the same as the carrying value in our GAAP consolidated balance sheets, and does not reflect fair value. As the senior preferred stock is restricted as to its redemption, we consider the liquidation preference to be the most appropriate measure for purposes of the consolidated fair value balance sheets. Our senior preferred stock is classified as Level 3 because observable inputs are not available as this stock is not traded.

### Net Assets Attributable to Preferred Stockholders

To determine the preferred stock fair value, we use a market-based approach incorporating quoted dealer prices. Net Assets Attributable to Preferred Stockholders is classified as Level 2 because we receive multiple dealer quotes within a relatively narrow range, indicating an active market.

### Net Assets Attributable to Common Stockholders

Net assets attributable to common stockholders is equal to the difference between the fair value of total assets and total liabilities reported on our consolidated fair value balance sheets, less the value of net assets attributable to senior preferred stockholders and the fair value attributable to preferred stockholders. Our net assets attributable to common stockholders is classified as Level 3 because observable inputs are not available.

## NOTE 17: LEGAL CONTINGENCIES

We are involved as a party in a variety of legal and regulatory proceedings arising from time to time in the ordinary course of business including, among other things, contractual disputes, personal injury claims, employment-related litigation and other legal proceedings incidental to our business. We are frequently involved, directly or indirectly, in litigation involving mortgage foreclosures. From time to time, we are also involved in proceedings arising from our termination of a seller/servicer's eligibility to sell mortgages to, and/or service mortgages for, us. In these cases, the former seller/servicer sometimes seeks damages against us for wrongful termination under a variety of legal theories. In addition, we are sometimes sued in connection with the origination or servicing of mortgages. These suits typically involve claims alleging wrongful actions of seller/servicers. Our contracts with our seller/servicers generally provide for indemnification against liability arising from their wrongful actions with respect to mortgages sold to or serviced for Freddie Mac.

Litigation and claims resolution are subject to many uncertainties and are not susceptible to accurate prediction. In accordance with the accounting guidance for contingencies, we reserve for litigation claims and assessments asserted or threatened against us when a loss is probable and the amount of the loss can be reasonably estimated.

During the three months ended March 31, 2012, we paid approximately $2 million for the advancement of legal fees and expenses of current and former officers and directors pursuant to our indemnification obligations to them. These fees and expenses related to some of the matters described below and to certain shareholder derivative lawsuits that were dismissed in April and May 2011. This figure does not include certain administrative support costs and certain costs related to document production and storage.

**Putative Securities Class Action Lawsuits**

*Ohio Public Employees Retirement System ("OPERS") vs. Freddie Mac, Syron, et al.* This putative securities class action lawsuit was filed against Freddie Mac and certain former officers on January 18, 2008 in the U.S. District Court for the Northern District of Ohio purportedly on behalf of a class of purchasers of Freddie Mac stock from August 1, 2006 through November 20, 2007. The plaintiff alleges that the defendants violated federal securities laws by making false and misleading statements concerning our business, risk management and the procedures we put into place to protect the company from problems in the mortgage industry. On April 10, 2008, the Court appointed OPERS as lead plaintiff and approved its choice of counsel. On September 2, 2008, defendants filed motions to dismiss plaintiff's amended complaint.

On November 7, 2008, the plaintiff filed a second amended complaint, which removed certain allegations against Richard Syron, Anthony Piszel, and Eugene McQuade, thereby leaving insider-trading allegations against only Patricia Cook. The second amended complaint also extends the damages period, but not the class period. The plaintiff seeks unspecified damages and interest, and reasonable costs and expenses, including attorney and expert fees. On November 19, 2008, the Court granted FHFA's motion to intervene in its capacity as Conservator. On April 6, 2009, defendants filed motions to dismiss the second amended complaint. On January 23, 2012, the Court denied defendants' motions to dismiss and set a briefing schedule for plaintiff's motion for leave to amend its complaint. On February 13, 2012, plaintiff filed motion for leave to amend, which sought leave to file a third amended complaint and add allegations based on a non-prosecution agreement entered into between Freddie Mac and the SEC on December 15, 2011. On March 27, 2012, the Court granted the plaintiff's motion for leave to amend, and plaintiff filed its third amended complaint on March 28, 2012.

At present, it is not possible for us to predict the probable outcome of this lawsuit or any potential impact on our business, financial condition, or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the following factors, among others: the inherent uncertainty of pre-trial litigation; and the fact that the parties have not yet briefed and the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

*Kuriakose vs. Freddie Mac, Syron, Piszel and Cook.* Another putative class action lawsuit was filed against Freddie Mac and certain former officers on August 15, 2008 in the U.S. District Court for the Southern District of New York for alleged violations of federal securities laws purportedly on behalf of a class of purchasers of Freddie Mac stock from November 21, 2007 through August 5, 2008. The plaintiffs claim that defendants made false and misleading statements about Freddie Mac's business that artificially inflated the price of Freddie Mac's common stock, and seek unspecified damages, costs, and attorneys' fees. On February 6, 2009, the Court granted FHFA's motion to intervene in its capacity as Conservator. On May 19, 2009, plaintiffs filed an amended consolidated complaint, purportedly on behalf of a class of purchasers of Freddie Mac stock from November 20, 2007 through September 7, 2008. Freddie Mac filed a motion to dismiss the complaint on February 24, 2010. On March 30, 2011, the Court granted without prejudice Freddie Mac's motion to dismiss all claims, and allowed the plaintiffs the option to file a new complaint, which they did on July 15, 2011. The defendants have filed motions to dismiss the second amended consolidated complaint. On February 17, 2012, plaintiff served a motion seeking leave to file a third amended consolidated complaint based on the non-prosecution agreement entered into between Freddie Mac and the SEC on December 15, 2011.

At present, it is not possible for us to predict the probable outcome of this lawsuit or any potential impact on our business, financial condition, or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the following factors, among others: the inherent uncertainty of pre-trial litigation; the fact that the Court has not yet ruled upon the defendants' motions to dismiss the second amended complaint or plaintiffs' motion seeking leave to file a third amended complaint; and the fact that the parties have not yet briefed and the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

**Energy Lien Litigation**

On July 14, 2010, the State of California filed a lawsuit against Freddie Mac, Fannie Mae, FHFA, and others in the U.S. District Court for the Northern District of California, alleging that Freddie Mac and Fannie Mae committed unfair business practices in violation of California law by asserting that property liens arising from government-sponsored energy initiatives such as California's Property Assessed Clean Energy, or PACE, program cannot take priority over a mortgage to be sold to Freddie Mac or Fannie Mae. The lawsuit contends that the PACE programs create liens superior to such mortgages and that, by affirming Freddie Mac and Fannie Mae's positions, FHFA has violated the National Environmental Policy Act, or NEPA, and the Administrative Procedure Act, or APA. The complaint seeks declaratory and injunctive relief, costs and such other relief as the court deems proper.

Similar complaints have been filed by other parties. On July 26, 2010, the County of Sonoma filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging similar violations of California law, NEPA, and the APA. In a filing dated September 23, 2010, the County of Placer moved to intervene in the Sonoma County lawsuit as a party plaintiff seeking to assert similar claims, which motion was granted on November 1, 2010. On October 1, 2010, the City of Palm Desert filed a similar complaint against Fannie Mae,

Freddie Mac, and FHFA in the Northern District of California. On October 8, 2010, Leon County and the Leon County Energy Improvement District filed a similar complaint against Fannie Mae, Freddie Mac, FHFA, and others in the Northern District of Florida. On October 12, 2010, FHFA filed a motion before the Judicial Panel on Multi-District Litigation seeking an order transferring these cases as well as a related case filed only against FHFA, for coordination or consolidation of pretrial proceedings. This motion was denied on February 8, 2011. On October 14, 2010, the defendants filed a motion to dismiss the lawsuits pending in the Northern District of California. Also on October 14, 2010, the County of Sonoma filed a motion for preliminary injunction seeking to enjoin the defendants from giving any force or effect in Sonoma County to certain directives by FHFA regarding energy retrofit loan programs and other related relief. On October 26, 2010, the Town of Babylon filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA, as well as the Office of the Comptroller of the Currency, in the U.S. District Court for the Eastern District of New York.

The defendants filed motions to dismiss these lawsuits. The courts have entered stipulated orders dismissing the individual officers of Freddie Mac and Fannie Mae from the cases. On December 17, 2010, the judge handling the cases in the Northern District of California requested a position statement from the United States, which was filed on February 8, 2011. On June 13, 2011, the complaint filed by the Town of Babylon was dismissed. On August 11, 2011, the Town of Babylon filed a notice of appeal to the U.S. Court of Appeals for the Second Circuit. On August 26, 2011, the California federal court granted in part defendants' motion to dismiss, leaving only plaintiffs' APA and NEPA claims against FHFA. The California federal district court cases were thereafter consolidated and the plaintiffs in those cases filed a joint motion for summary judgment on January 23, 2012. FHFA cross-moved for summary judgment on February 27, 2012.

Sonoma County's motion for preliminary injunction was granted in part, requiring FHFA to provide a notice and comment period with regard to its directives. FHFA filed an appeal of the injunction on September 15, 2011, and the District Court granted FHFA a 10-day stay of the injunction to allow FHFA to request a further stay from the U.S. Court of Appeals for the Ninth Circuit, which occurred on October 11, 2011. By order dated December 20, 2011, the Ninth Circuit denied the request for a stay with respect to the notice and comment period. Accordingly, on January 26, 2012, FHFA issued an advance notice of proposed rulemaking and notice of intent to prepare an environmental impact statement. On April 26, 2012, the Ninth Circuit issued an order stating that "the stay of the preliminary injunction remains in effect" and that it "will take no action on [the California plaintiffs'] appeal until after a decision on the summary judgment motions is issued."

On October 17, 2011 the City of Palm Desert voluntarily dismissed any remaining claims it might have had against Freddie Mac. The complaint filed by Leon County was dismissed by the Court on September 30, 2011. Leon County filed a notice of appeal to the U.S. Court of Appeals for the Eleventh Circuit on November 28, 2011.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matters due to the following factors, among others: the inherent uncertainty of pre-trial litigation; and the fact that the appeals filed by the Town of Babylon and Leon County are still pending.

### Government Investigations and Inquiries

On December 16, 2011, the SEC announced that it had charged three former executives of Freddie Mac with securities laws violations. These executives are former Chairman of the Board and Chief Executive Officer Richard F. Syron, former Executive Vice President and Chief Business Officer Patricia L. Cook, and former Executive Vice President for the single-family guarantee business Donald J. Bisenius.

### Related Third Party Litigation and Indemnification Requests

On December 15, 2008, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York against certain former Freddie Mac officers and others styled *Jacoby vs. Syron, Cook, Piszel, Banc of America Securities LLC, JP Morgan Chase & Co., and FTN Financial Markets.* The complaint, as amended on December 17, 2008, contends that the defendants made material false and misleading statements in connection with Freddie Mac's September 2007 offering of non-cumulative, non-convertible, perpetual fixed-rate preferred stock, and that such statements "grossly overstated Freddie Mac's capitalization" and "failed to disclose Freddie Mac's exposure to mortgage-related losses, poor underwriting standards and risk management procedures." The complaint further alleges that Syron, Cook, and Piszel made additional false statements following the offering. Freddie Mac is not named as a defendant in this lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and

contribution under the Underwriting Agreement in this case, including reimbursement of fees and disbursements of their legal counsel. The case is currently dormant and we believe plaintiff may have abandoned it.

By letter dated October 17, 2008, Freddie Mac received formal notification of a putative class action securities lawsuit, *Mark vs. Goldman, Sachs & Co., J.P. Morgan Chase & Co., and Citigroup Global Markets Inc.,* filed on September 23, 2008, in the U.S. District Court for the Southern District of New York, regarding the company's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock.

On January 29, 2009, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York styled *Kreysar vs. Syron, et al.* On April 30, 2009, the Court consolidated the Mark case with the Kreysar case, and the plaintiffs filed a consolidated class action complaint on July 2, 2009. The consolidated complaint alleged that three former Freddie Mac officers, certain underwriters and Freddie Mac's auditor violated federal securities laws by making material false and misleading statements in connection with the company's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock. The complaint further alleged that certain defendants and others made additional false statements following the offering. The complaint named as defendants Syron, Piszel, Cook, Goldman, Sachs & Co., JPMorgan Securities Inc., Banc of America Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Morgan Stanley & Co. Incorporated, UBS Securities LLC and PricewaterhouseCoopers LLP.

After the Court dismissed, without prejudice, the plaintiffs' consolidated complaint, amended consolidated complaint, and second consolidated complaint, the plaintiffs filed a third amended consolidated complaint against PricewaterhouseCoopers LLP, Syron and Piszel, omitting Cook and the underwriter defendants, on November 14, 2010. On January 11, 2011, the Court granted the remaining defendants' motion to dismiss the complaint with respect to PricewaterhouseCoopers LLP, but denied the motion with respect to Syron and Piszel. On April 4, 2011, Piszel filed a motion for partial judgment on the pleadings. The Court granted that motion on April 28, 2011. The plaintiffs moved for class certification on June 30, 2011, but withdrew this motion on July 5, 2011. The plaintiffs again moved for class certification on August 30, 2011, which motion was denied on March 27, 2012. Plaintiffs moved for reconsideration of this denial on April 11, 2012.

Freddie Mac is not named as a defendant in the consolidated lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the underwriting agreement in this case, including reimbursement of fees and disbursements of their legal counsel. At present, it is not possible for us to predict the probable outcome of the lawsuit or any potential impact on our business, financial condition or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the inherent uncertainty of pre-trial litigation and the fact that plaintiffs may appeal the denial of class certification. Absent the certification of a specified class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

On July 6, 2011, plaintiffs filed a lawsuit in the U.S. District Court for Massachusetts styled *Liberty Mutual Insurance Company, Peerless Insurance Company, Employers Insurance Company of Wausau, Safeco Corporation and Liberty Life Assurance Company of Boston vs. Goldman, Sachs & Co*. The complaint alleges that Goldman, Sachs & Co. made materially misleading statements and omissions in connection with Freddie Mac's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock. Freddie Mac is not named as a defendant in this lawsuit.

In an amended complaint dated February 17, 2012, Western and Southern Life Insurance Company and others asserted claims against GS Mortgage Securities Corp., Goldman Sachs Mortgage Company and Goldman Sachs & Co. in the Court of Common Pleas, Hamilton County, Ohio. The amended complaint asserts, among other things, that "Goldman Sachs" is liable to plaintiffs under the Ohio Securities Act for alleged misstatements and omissions in connection with $6 billion of preferred stock issued by Freddie Mac on December 4, 2007. Freddie Mac is not named as a defendant in this lawsuit.

**Lehman Bankruptcy**

On September 15, 2008, Lehman filed a chapter 11 bankruptcy petition in the Bankruptcy Court for the Southern District of New York. Thereafter, many of Lehman's U.S. subsidiaries and affiliates also filed bankruptcy petitions (collectively, the "Lehman Entities"). Freddie Mac had numerous relationships with the Lehman Entities which give rise to several claims. On September 22, 2009, Freddie Mac filed proofs of claim in the Lehman bankruptcies aggregating

approximately $2.1 billion. On April 14, 2010, Lehman filed its chapter 11 plan of liquidation and disclosure statement, providing for the liquidation of the bankruptcy estate's assets over the next three years. The plan and disclosure statement were subsequently modified several times. Hearings to consider confirmation of the plan were conducted on December 6, 2011 and, on that date, the plan was confirmed by the court. The plan sets aside $1.2 billion to be available for payment in full of our priority claim relating to losses incurred on short-term lending transactions with certain Lehman Entities if it is ultimately allowed as a priority claim, but leaves open for subsequent litigation whether our claim of priority status is proper. In the event that this claim is not ultimately accorded priority status, it will be treated as a senior unsecured claim under the plan, pursuant to which Freddie Mac would be entitled to receive an estimated distribution of approximately 21% (or approximately $250 million) over the next three years. The plan also provides that general unsecured claims, such as our claim relating to repurchase obligations of $868 million, will be entitled to a distribution of approximately 19.9% of the allowed amount, if any. The plan does not adjudge or allow our unsecured repurchase obligations claim, but permits claims allowance proceedings to continue. Finally, the plan entitles Freddie Mac to a distribution of approximately 39% (or about $6.4 million) payable over the next three years on our allowed claim exceeding $16 million relating to losses on derivative transactions.

**Taylor, Bean & Whitaker Bankruptcy**

On August 24, 2009, TBW, which had been one of our single-family seller/servicers, filed for bankruptcy in the Bankruptcy Court for the Middle District of Florida. In 2011, with the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. See "NOTE 18: LEGAL CONTINGENCIES" in our 2011 Annual Report for information on the settlement.

We understand that Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, or its creditors, may file an action to recover certain funds paid to us prior to the TBW bankruptcy. However, no actions against Freddie Mac related to Ocala have been initiated in bankruptcy court or elsewhere to recover assets. Based on court filings and other information, we understand that Ocala or its creditors may attempt to assert fraudulent transfer and other possible claims totaling approximately $840 million against us related to funds that were allegedly transferred from Ocala to Freddie Mac custodial accounts. We also understood that Ocala might attempt to make claims against us asserting ownership of a large number of loans that we purchased from TBW. The order approving the settlement provides that nothing in the settlement shall be construed to limit, waive or release Ocala's claims against Freddie Mac, except for TBW's claims and claims arising from the allocation of funds discussed above to Freddie Mac.

On or about May 14, 2010, certain underwriters at Lloyds, London and London Market Insurance Companies brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage bankers bonds providing fidelity and errors and omissions insurance coverage. Several excess insurers on the bonds thereafter filed similar claims in that action. Freddie Mac has filed a proof of loss under the bonds, but we are unable at this time to estimate our potential recovery, if any, thereunder. Discovery is proceeding.

**IRS Litigation**

We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2007 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices for the 1998 to 2005 tax years. We paid the tax assessed in the Statutory Notice received for the years 2006 to 2007 of $36 million and will seek a refund through the administrative process, which could include filing suit in Federal District Court. A Tax Court trial date has been scheduled for November 13, 2012. We believe appropriate reserves have been provided for settlement on reasonable terms. For information on this matter, see "NOTE 12: INCOME TAXES."

**Lawsuits Involving Real Estate Transfer Taxes and Recordation Taxes**

On June 20, 2011, Oakland County (Michigan) and the Oakland County Treasurer filed a lawsuit against Freddie Mac and Fannie Mae in the U.S. District Court for the Eastern District of Michigan alleging that the enterprises failed to pay real estate transfer taxes on transfers of real property in Oakland County where the enterprises were the grantors. FHFA later intervened as Conservator for Freddie Mac and Fannie Mae. On November 10, 2011, Genesee County (Michigan) and the Genesee County Treasurer filed a class action lawsuit in the same court on behalf of itself and the other 82 Michigan Counties raising similar claims against FHFA (as Conservator), Freddie Mac, and Fannie Mae. The Court later certified the class, with two Michigan counties opting out. The Michigan Department of Attorney General and the Michigan Department of Treasury intervened in both actions against the defendants. In both actions, FHFA, Freddie Mac and Fannie Mae asserted that they were not liable for the transfer taxes based on statutory tax exemptions applicable to each. On March 23, 2012, the Court granted summary judgment against FHFA (as Conservator), Freddie Mac, and

Fannie Mae in both actions, determining that the statutory exemptions did not exempt them from Michigan's state and county transfer tax. On April 24, 2012, the plaintiffs in the Oakland County case sought leave to file a second amended complaint to cover purportedly taxable transactions where the enterprises received property as grantees through a Michigan Sheriff's deed or a deed in lieu of foreclosure. Also on April 24, 2012, FHFA (as Conservator), Freddie Mac, and Fannie Mae requested that the Court certify its March 23, 2012 orders granting plaintiffs summary judgment for an interlocutory appeal to the U.S. Court of Appeals for the Sixth Circuit and stay the actions pending resolution of any resulting appeal. On April 26, 2012, the plaintiffs in the Genesee County case sought leave to file an amended complaint to cover purportedly taxable transactions where the enterprises received property as grantees through a Michigan Sheriff's deed or a deed in lieu of foreclosure. The Court has not yet ruled on the defendants' motion for certification of an interlocutory appeal and motion for a stay, the Oakland plaintiffs' motion to file a second amended complaint or the Genesee plaintiffs' motion to file an amended complaint, nor has it addressed the amount of damages the plaintiffs contend are owed in either case.

On or about June 22, 2011, Curtis Hertel (individually and as Register of Deeds of Ingham County, Michigan) filed suit in Michigan state court against Freddie Mac, Fannie Mae and others alleging, among other things, that the defendants failed to pay real estate transfer taxes on transfers of real property in Ingham County where the enterprises were the grantors and grantees. FHFA later intervened as Conservator for Freddie Mac and Fannie Mae, and the Michigan Department of Attorney General and the Michigan Department of Treasury intervened against the enterprises. The defendants removed the case to the U.S. District Court for the Western District of Michigan and then filed motions to dismiss and/or for summary judgment. The Court dismissed plaintiff Hertel from the case concluding that Hertel was not a proper plaintiff, but the Court has not yet ruled on the enterprises' and FHFA's motion to dismiss and/or for summary judgment as to the claims asserted by the Michigan Department of Attorney General and the Michigan Department of Treasury.

The plaintiffs in the Oakland County, Genesee County, and Ingham County cases are all seeking a declaration that the enterprises' statutory exemptions do not cover recording taxes such as the Michigan transfer taxes, damages against the enterprises for unpaid state transfer taxes, as well as penalties, interest, pre-judgment interest, costs and attorneys' fees.

On May 10, 2010, Andrew Ludel and Robert Hager (on behalf of the District of Columbia and District of Columbia Recorder of Deeds) filed a lawsuit against Freddie Mac, Fannie Mae, and Wells Fargo Home Mortgage, Inc. in the D.C. Superior Court alleging that the enterprises violated the D.C. False Claims Act by failing to pay D.C. recordation taxes. Plaintiffs voluntarily dismissed the complaint on November 10, 2010, refiled the complaint on January 24, 2011, and filed a second amended complaint on March 8, 2011. The case was removed to the U.S. District Court for the District of Columbia on November 23, 2011. FHFA later intervened as Conservator for Freddie Mac and Fannie Mae. The enterprises and FHFA filed a motion to dismiss the complaint based on their respective statutory tax exemptions and the plaintiffs failure to adequately allege a false claims act violation. The Court has not yet ruled on the motion. The plaintiffs are seeking, among other things, treble damages on all recordation taxes not paid for a ten year period, plus penalties, interest, liquated penalties, pre-judgment interest, costs and attorneys' fees.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition or results of operation. In addition, we are unable to reasonably estimate the possible loss or range of possible loss with respect to these lawsuits due to the following factors, among others: (a) none of the plaintiffs have demanded a stated amount of damages they believe are due; (b) with respect to the Oakland County and Genesee County lawsuits, the scope of permissible claims has not yet been determined and discovery regarding the amount of damages is still in the early stages; and (c) with respect to the Ingham County and Ludel lawsuits, discovery regarding the amount of damages has not yet begun.

## NOTE 18: SIGNIFICANT COMPONENTS OF OTHER ASSETS AND OTHER LIABILITIES ON OUR CONSOLIDATED BALANCE SHEETS

The table below presents the significant components of other assets and other liabilities on our consolidated balance sheets.

**Table 18.1 — Significant Components of Other Assets and Other Liabilities on Our Consolidated Balance Sheets**

|  | March 31, 2012 | December 31, 2011 |
|---|---|---|
|  | (in millions) | |
| Other assets: | | |
| Guarantee asset | $    798 | $    752 |
| Accounts and other receivables | 8,616 | 8,350 |
| All other | 1,347 | 1,411 |
| Total other assets | $10,761 | $10,513 |
| Other liabilities: | | |
| Guarantee obligation | $    814 | $    787 |
| Servicer liabilities | 3,571 | 3,600 |
| Accounts payable and accrued expenses | 942 | 845 |
| All other | 959 | 814 |
| Total other liabilities | $ 6,286 | $ 6,046 |

## PART II OTHER INFORMATION

## ITEM 1. LEGAL PROCEEDINGS

We are involved as a party to a variety of legal proceedings arising from time to time in the ordinary course of business. See "NOTE 17: LEGAL CONTINGENCIES" for more information regarding our involvement as a party to various legal proceedings.

## ITEM 1A. RISK FACTORS

This Form 10-Q should be read together with the "RISK FACTORS" section in our 2011 Annual report, which describes various risks and uncertainties to which we are or may become subject. These risks and uncertainties could, directly or indirectly, adversely affect our business, financial condition, results of operations, cash flows, strategies, and/or prospects.

## ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

**Recent Sales of Unregistered Securities**

The securities we issue are "exempted securities" under the Securities Act of 1933, as amended. As a result, we do not file registration statements with the SEC with respect to offerings of our securities.

Following our entry into conservatorship, we suspended the operation of, and ceased making grants under, equity compensation plans. Previously, we had provided equity compensation under those plans to employees and members of our Board of Directors. Under the Purchase Agreement, we cannot issue any new options, rights to purchase, participations, or other equity interests without Treasury's prior approval. However, grants outstanding as of the date of the Purchase Agreement remain in effect in accordance with their terms.

No stock options were exercised during the three months ended March 31, 2012. However, restrictions lapsed on 460,846 restricted stock units.

See "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2011 Annual Report for more information.

**Dividend Restrictions**

Our payment of dividends on Freddie Mac common stock or any series of Freddie Mac preferred stock (other than senior preferred stock) is subject to certain restrictions as described in "MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES — Dividends and Dividend Restrictions" in our 2011 Annual Report.

**Information about Certain Securities Issuances by Freddie Mac**

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

Freddie Mac's securities offerings are exempted from SEC registration requirements. As a result, we are not required to and do not file registration statements or prospectuses with the SEC with respect to our securities offerings. To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars (or supplements thereto) that we post on our web site or in a current report on Form 8-K, in accordance with a "no-action" letter we received from the SEC staff. In cases where the information is disclosed in an offering circular posted on our web site, the document will be posted on our web site within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

The web site address for disclosure about our debt securities, other than debt securities of consolidated trusts, is www.freddiemac.com/debt. From this address, investors can access the offering circular and related supplements for debt securities offerings under Freddie Mac's global debt facility, including pricing supplements for individual issuances of debt securities.

*Freddie Mac*

Disclosure about the mortgage-related securities we issue, some of which are off-balance sheet obligations, can be found at www.freddiemac.com/mbs. From this address, investors can access information and documents about our mortgage-related securities, including offering circulars and related offering circular supplements.

## ITEM 6. EXHIBITS

The exhibits are listed in the Exhibit Index at the end of this Form 10-Q.

*Freddie Mac*

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

<div align="center">Federal Home Loan Mortgage Corporation</div>

By: <u>/s/  Charles E. Haldeman, Jr.</u>

Charles E. Haldeman, Jr.
Chief Executive Officer

Date:  May 3, 2012

By: <u>/s/  Ross J. Kari</u>

Ross J. Kari
Executive Vice President — Chief Financial Officer
(Principal Financial Officer)

Date:  May 3, 2012

FHFA 3330

# GLOSSARY

This Glossary includes acronyms and defined terms that are used throughout this Form 10-Q.

**Administration** — Executive branch of the U.S. Government.

**Agency securities** — Generally refers to mortgage-related securities issued by the GSEs or government agencies.

**Alt-A loan** — Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. In determining our Alt-A exposure on loans underlying our single-family credit guarantee portfolio, we classified mortgage loans as Alt-A if the lender that delivers the loans to us classified the loans as Alt-A, or if the loans had reduced documentation requirements, as well as a combination of certain credit characteristics and expected performance characteristics at acquisition which, when compared to full documentation loans in our portfolio, indicate that the loan should be classified as Alt-A. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. For non-agency mortgage-related securities that are backed by Alt-A loans, we categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions.

**AOCI** — Accumulated other comprehensive income (loss), net of taxes

**ARM** — Adjustable-rate mortgage — A mortgage loan with an interest rate that adjusts periodically over the life of the mortgage loan based on changes in a benchmark index.

**Board** — Board of Directors

**Bond insurers** — Companies that provide credit insurance principally covering securitized assets in both the primary issuance and secondary markets.

**BPS** — Basis points — One one-hundredth of 1%.   This term is commonly used to quote the yields of debt instruments or movements in interest rates.

**Cash and other investments portfolio** — Our cash and other investments portfolio is comprised of our cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and investments in non-mortgage-related securities.

**Charter** — The Federal Home Loan Mortgage Corporation Act, as amended, 12 U.S.C. § 1451 et seq.

**CMBS** — Commercial mortgage-backed security — A security backed by mortgages on commercial property (often including multifamily rental properties) rather than one-to-four family residential real estate. Although the mortgage pools underlying CMBS can include mortgages financing multifamily properties and commercial properties, such as office buildings and hotels, the classes of CMBS that we hold receive distributions of scheduled cash flows only from multifamily properties. Military housing revenue bonds are included as CMBS within investments-related disclosures. We have not identified CMBS as either subprime or Alt-A securities.

**Comprehensive income (loss)** — Consists of net income (loss) plus total other comprehensive income (loss).

**Conforming loan/Conforming jumbo loan/Conforming loan limit** — A conventional single-family mortgage loan with an original principal balance that is equal to or less than the applicable conforming loan limit, which is a dollar amount cap on the size of the original principal balance of single-family mortgage loans we are permitted by law to purchase or securitize. The conforming loan limit is determined annually based on changes in FHFA's housing price index. Any decreases in the housing price index are accumulated and used to offset any future increases in the housing price index so that conforming loan limits do not decrease from year-to-year. Since 2006, the base conforming loan limit for a one-family residence has been set at $417,000, and higher limits have been established in certain "high-cost" areas (currently, up to $625,500 for a one-family residence). Higher limits also apply to two- to four-family residences, and for mortgages secured by properties in Alaska, Guam, Hawaii and the U.S. Virgin Islands.

*Freddie Mac*

Actual loan limits are set by FHFA for each county (or equivalent), and the loan limit for specific high-cost areas may be lower than the maximum amounts. We refer to loans that we have purchased with UPB exceeding the base conforming loan limit (*i.e.*, $417,000) as conforming jumbo loans.

Beginning in 2008, pursuant to a series of laws, our loan limits in certain high-cost areas were increased temporarily above the limits that otherwise would have been applicable (up to $729,750 for a one-family residence). The latest of these increases expired on September 30, 2011.

**Conservator** — The Federal Housing Finance Agency, acting in its capacity as conservator of Freddie Mac.

**Convexity** — A measure of how much a financial instrument's duration changes as interest rates change.

**Core spread income** — Refers to a fair value estimate of the net current period accrual of income from the spread between mortgage-related investments and debt, calculated on an option-adjusted basis.

**Credit enhancement** — Any number of different financial arrangements that are designed to reduce credit risk by partially or fully compensating an investor in the event of certain financial losses. Examples of credit enhancements include mortgage insurance, overcollateralization, indemnification agreements, and government guarantees.

**Credit losses** — Consists of charge-offs and REO operations income (expense).

**Credit-related expenses** — Consists of our provision for credit losses and REO operations income (expense).

**Deed in lieu of foreclosure** — An alternative to foreclosure in which the borrower voluntarily conveys title to the property to the lender and the lender accepts such title (sometimes together with an additional payment by the borrower) in full satisfaction of the mortgage indebtedness.

**Delinquency** — A failure to make timely payments of principal or interest on a mortgage loan. For single-family mortgage loans, we generally report delinquency rate information for loans that are seriously delinquent. For multifamily loans, we report delinquency rate information based on the UPB of loans that are two monthly payments or more past due or in the process of foreclosure.

**Derivative** — A financial instrument whose value depends upon the characteristics and value of an underlying financial asset or index, such as a security or commodity price, interest or currency rates, or other financial indices.

**Dodd-Frank Act** — Dodd-Frank Wall Street Reform and Consumer Protection Act.

**DSCR** — Debt Service Coverage Ratio — An indicator of future credit performance for multifamily loans. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

**Duration** — Duration is a measure of a financial instrument's price sensitivity to changes in interest rates.

**Duration gap** — One of our primary interest-rate risk measures. Duration gap is a measure of the difference between the estimated durations of our interest rate sensitive assets and liabilities. We present the duration gap of our financial instruments in units expressed as months. A duration gap of zero implies that the change in value of our interest rate sensitive assets from an instantaneous change in interest rates would be expected to be accompanied by an equal and offsetting change in the value of our debt and derivatives, thus leaving the net fair value of equity unchanged.

**Effective rent** — The average rent actually paid by the tenant over the term of a lease.

**Euribor** — Euro Interbank Offered Rate

**Exchange Act** — Securities and Exchange Act of 1934, as amended

**Fannie Mae** — Federal National Mortgage Association

**FASB** — Financial Accounting Standards Board

**FDIC** — Federal Deposit Insurance Corporation

**Federal Reserve** — Board of Governors of the Federal Reserve System

**FHA** — Federal Housing Administration

**FHFA** — Federal Housing Finance Agency — FHFA is an independent agency of the U.S. government established by the Reform Act with responsibility for regulating Freddie Mac, Fannie Mae, and the FHLBs.

**FHLB** — Federal Home Loan Bank

**FICO score** — A credit scoring system developed by Fair, Isaac and Co. FICO scores are the most commonly used credit scores today. FICO scores are ranked on a scale of approximately 300 to 850 points with a higher value indicating a lower likelihood of credit default.

**Fixed-rate mortgage** — Refers to a mortgage originated at a specific rate of interest that remains constant over the life of the loan.

**Foreclosure alternative** — A workout option pursued when a home retention action is not successful or not possible. A foreclosure alternative is either a short sale or deed in lieu of foreclosure.

**Foreclosure transfer** — Refers to our completion of a transaction provided for by the foreclosure laws of the applicable state, in which a delinquent borrower's ownership interest in a mortgaged property is terminated and title to the property is transferred to us or to a third party. State foreclosure laws commonly refer to such transactions as foreclosure sales, sheriff's sales, or trustee's sales, among other terms. When we, as mortgage holder, acquire a property in this manner, we pay for it by extinguishing some or all of the mortgage debt.

**Freddie Mac mortgage-related securities** — Securities we issue and guarantee, including PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions.

**GAAP** — Generally accepted accounting principles

**Ginnie Mae** — Government National Mortgage Association

**GSE Act** — The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Reform Act.

**GSEs** — Government sponsored enterprises — Refers to certain legal entities created by the U.S. government, including Freddie Mac, Fannie Mae, and the FHLBs.

**Guarantee fee** — The fee that we receive for guaranteeing the payment of principal and interest to mortgage security investors.

**HAFA** — Home Affordable Foreclosures Alternative program — In 2009, the Treasury Department introduced the HAFA program to provide an option for HAMP-eligible homeowners who are unable to keep their homes. The HAFA program took effect on April 5, 2010 and we implemented it effective August 1, 2010.

**HAMP** — Home Affordable Modification Program — Refers to the effort under the MHA Program whereby the U.S. government, Freddie Mac and Fannie Mae commit funds to help eligible homeowners avoid foreclosure and keep their homes through mortgage modifications.

**HARP** — Home Affordable Refinance Program — Refers to the effort under the MHA Program that seeks to help eligible borrowers (whose monthly payments are current) with existing loans that are guaranteed by us or Fannie Mae to refinance into loans with more affordable monthly payments and/or fixed-rate terms. Through December 2011, under HARP, eligible borrowers who had mortgages sold to Freddie Mac or Fannie Mae on or before May 31, 2009 with current LTV ratios above 80% (and up to 125%) were allowed to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place. Beginning December 2011, HARP was expanded to allow eligible borrowers who have mortgages with current LTV ratios above 125% to refinance under the program. The relief refinance initiative, under which we also allow borrowers with LTV ratios of 80% and below to participate, is our implementation of HARP for our loans.

**HFA** — State or local Housing Finance Agency

**HUD** — U.S. Department of Housing and Urban Development — Prior to the enactment of the Reform Act, HUD had general regulatory authority over Freddie Mac, including authority over our affordable housing goals and new programs. Under the Reform Act, FHFA now has general regulatory authority over us, though HUD still has authority over Freddie Mac with respect to fair lending.

**Implied volatility** — A measurement of how the value of a financial instrument changes due to changes in the market's expectation of potential changes in future interest rates. A decrease in implied volatility generally increases the estimated

fair value of our mortgage assets and decreases the estimated fair value of our callable debt and options-based derivatives, while an increase in implied volatility generally has the opposite effect.

**Interest-only loan** — A mortgage loan that allows the borrower to pay only interest (either fixed-rate or adjustable-rate) for a fixed period of time before principal amortization payments are required to begin. After the end of the interest-only period, the borrower can choose to refinance the loan, pay the principal balance in total, or begin paying the monthly scheduled principal due on the loan.

**IRS** — Internal Revenue Service

**LIBOR** — London Interbank Offered Rate

**LIHTC partnerships** — Low-income housing tax credit partnerships — Prior to 2008, we invested as a limited partner in LIHTC partnerships, which are formed for the purpose of providing funding for affordable multifamily rental properties. These LIHTC partnerships invest directly in limited partnerships that own and operate multifamily rental properties that generate federal income tax credits and deductible operating losses.

**Liquidation preference** — Generally refers to an amount that holders of preferred securities are entitled to receive out of available assets, upon liquidation of a company. The initial liquidation preference of our senior preferred stock was $1.0 billion. The aggregate liquidation preference of our senior preferred stock includes the initial liquidation preference plus amounts funded by Treasury under the Purchase Agreement. In addition, dividends and periodic commitment fees not paid in cash are added to the liquidation preference of the senior preferred stock. We may make payments to reduce the liquidation preference of the senior preferred stock only in limited circumstances.

**LTV ratio** — Loan-to-value ratio — The ratio of the unpaid principal amount of a mortgage loan to the value of the property that serves as collateral for the loan, expressed as a percentage. Loans with high LTV ratios generally tend to have a higher risk of default and, if a default occurs, a greater risk that the amount of the gross loss will be high compared to loans with lower LTV ratios. We report LTV ratios based solely on the amount of the loan purchased or guaranteed by us, generally excluding any second lien mortgages (unless we own or guarantee the second lien).

**MD&A** — Management's Discussion and Analysis of Financial Condition and Results of Operations

**MHA Program** — Making Home Affordable Program — Formerly known as the Housing Affordability and Stability Plan, the MHA Program was announced by the Obama Administration in February 2009. The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. The MHA Program includes HARP and HAMP.

**Mortgage assets** — Refers to both mortgage loans and the mortgage-related securities we hold in our mortgage-related investments portfolio.

**Mortgage-related investments portfolio** — Our investment portfolio, which consists principally of mortgage-related securities and single-family and multifamily mortgage loans. The size of our mortgage-related investments portfolio under the Purchase Agreement is determined without giving effect to the January 1, 2010 change in accounting guidance related to transfers of financial assets and consolidation of VIEs. Accordingly, for purposes of the portfolio limit, when PCs and certain Other Guarantee Transactions are purchased into the mortgage-related investments portfolio, this is considered the acquisition of assets rather than the reduction of debt.

**Mortgage-to-debt OAS** — The net OAS between the mortgage and agency debt sectors. This is an important factor in determining the expected level of net interest yield on a new mortgage asset. Higher mortgage-to-debt OAS means that a newly purchased mortgage asset is expected to provide a greater return relative to the cost of the debt issued to fund the purchase of the asset and, therefore, a higher net interest yield. Mortgage-to-debt OAS tends to be higher when there is weak demand for mortgage assets and lower when there is strong demand for mortgage assets.

**Multifamily mortgage** — A mortgage loan secured by a property with five or more residential rental units.

**Multifamily mortgage portfolio** — Consists of multifamily mortgage loans held by us on our consolidated balance sheets as well as those underlying non-consolidated Freddie Mac mortgage-related securities, and other guarantee commitments, but excluding those underlying our guarantees of HFA bonds under the HFA Initiative.

**Net worth (deficit)** — The amount by which our total assets exceed (or are less than) our total liabilities as reflected on our consolidated balance sheets prepared in conformity with GAAP.

**NIBP** — New Issue Bond Program is a component of the Housing Finance Agency Initiative in which we and Fannie Mae issued partially-guaranteed pass-through securities to Treasury that are backed by bonds issued by various state and local HFAs. The program provides financing for HFAs to issue new housing bonds. Treasury is obligated to absorb any losses under the program up to a certain level before we are exposed to any losses.

**NPV** — Net present value

**OAS** — Option-adjusted spread — An estimate of the incremental yield spread between a particular financial instrument (*e.g.*, a security, loan or derivative contract) and a benchmark yield curve (*e.g.*, LIBOR or agency or U.S. Treasury securities). This includes consideration of potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as prepayment options.

**OFHEO** — Office of Federal Housing Enterprise Oversight. The predecessor to FHFA.

**Option ARM loan** — Mortgage loans that permit a variety of repayment options, including minimum, interest-only, fully amortizing 30-year and fully amortizing 15-year payments. The minimum payment alternative for option ARM loans allows the borrower to make monthly payments that may be less than the interest accrued for the period. The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance. For our non-agency mortgage-related securities that are backed by option ARM loans, we categorize securities as option ARM if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM securities as either subprime or Alt-A securities.

**OTC** — Over-the-counter

**Other guarantee commitments** — Mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.

**Other Guarantee Transactions** — Transactions in which third parties transfer non-Freddie Mac mortgage-related securities to trusts specifically created for the purpose of issuing mortgage-related securities, or certificates, in the Other Guarantee Transactions.

**PCs** — Participation Certificates — Securities that we issue as part of a securitization transaction. Typically we purchase mortgage loans from parties who sell mortgage loans, place a pool of loans into a PC trust and issue PCs from that trust. The PCs are generally transferred to the seller of the mortgage loans in consideration of the loans or are sold to third party investors if we purchased the mortgage loans for cash.

**PMVS** — Portfolio Market Value Sensitivity — One of our primary interest-rate risk measures. PMVS measures are estimates of the amount of average potential pre-tax loss in the market value of our net assets due to parallel (PMVS-L) and non-parallel (PMVS-YC) changes in LIBOR.

**Primary mortgage market** — The market where lenders originate mortgage loans and lend funds to borrowers. We do not lend money directly to homeowners, and do not participate in this market.

**Purchase Agreement / Senior Preferred Stock Purchase Agreement** — An agreement the Conservator, acting on our behalf, entered into with Treasury on September 7, 2008, which was subsequently amended and restated on September 26, 2008 and further amended on May 6, 2009 and December 24, 2009.

**Recorded Investment** — The dollar amount of a loan recorded on our consolidated balance sheets, excluding any valuation allowance, such as the allowance for loan losses, but which does reflect direct write-downs of the investment. For mortgage loans, direct write-downs consist of valuation allowances associated with recording our initial investment in loans acquired with evidence of credit deterioration at the time of purchase. Recorded investment excludes accrued interest income.

**Reform Act** — The Federal Housing Finance Regulatory Reform Act of 2008, which, among other things, amended the GSE Act by establishing a single regulator, FHFA, for Freddie Mac, Fannie Mae, and the FHLBs.

**Relief refinance mortgage** — A single-family mortgage loan delivered to us for purchase or guarantee that meets the criteria of the Freddie Mac Relief Refinance Mortgage℠ initiative. Part of this initiative is our implementation of HARP for our loans, and relief refinance options are also available for certain non-HARP loans. Although HARP is targeted at borrowers with current LTV ratios above 80%, our initiative also allows borrowers with LTV ratios of 80% and below to participate.

**REMIC** — Real Estate Mortgage Investment Conduit — A type of multiclass mortgage-related security that divides the cash flows (principal and interest) of the underlying mortgage-related assets into two or more classes that meet the investment criteria and portfolio needs of different investors.

**REMICs and Other Structured Securities** (or in the case of Multifamily securities, **Other Structured Securities**) — Single- and multiclass securities issued by Freddie Mac that represent beneficial interests in pools of PCs and certain other types of mortgage-related assets. REMICs and Other Structured Securities that are single-class securities pass through the cash flows (principal and interest) on the underlying mortgage-related assets. REMICs and Other Structured Securities that are multiclass securities divide the cash flows of the underlying mortgage-related assets into two or more classes designed to meet the investment criteria and portfolio needs of different investors. Our principal multiclass securities qualify for tax treatment as REMICs.

**REO** — Real estate owned — Real estate which we have acquired through foreclosure or through a deed in lieu of foreclosure.

**S&P** — Standard & Poor's

**SEC** — Securities and Exchange Commission

**Secondary mortgage market** — A market consisting of institutions engaged in buying and selling mortgages in the form of whole loans (*i.e.*, mortgages that have not been securitized) and mortgage-related securities. We participate in the secondary mortgage market by purchasing mortgage loans and mortgage-related securities for investment and by issuing guaranteed mortgage-related securities, principally PCs.

**Senior preferred stock** — The shares of Variable Liquidation Preference Senior Preferred Stock issued to Treasury under the Purchase Agreement.

**Seriously delinquent** — Single-family mortgage loans that are three monthly payments or more past due or in the process of foreclosure as reported to us by our servicers.

**Short sale** — Typically an alternative to foreclosure consisting of a sale of a mortgaged property in which the homeowner sells the home at market value and the lender accepts proceeds (sometimes together with an additional payment or promissory note from the borrower) that are less than the outstanding mortgage indebtedness in full satisfaction of the loan.

**Single-family credit guarantee portfolio** — Consists of unsecuritized single-family loans, single-family loans held by consolidated trusts, and single-family loans underlying non-consolidated Other Guarantee Transactions and covered by other guarantee commitments. Excludes our REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates and our guarantees under the HFA Initiative.

**Single-family mortgage** — A mortgage loan secured by a property containing four or fewer residential dwelling units.

**Spread** — The difference between the yields of two debt securities, or the difference between the yield of a debt security and a benchmark yield, such as LIBOR.

**Strips** — Mortgage pass-through securities created by separating the principal and interest payments on a pool of mortgage loans. A principal-only strip entitles the security holder to principal cash flows, but no interest cash flows, from the underlying mortgages. An interest-only strip entitles the security holder to interest cash flows, but no principal cash flows, from the underlying mortgages.

**Subprime** — Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Subprime generally refers to the credit risk classification of a loan. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include, among other factors, a combination of high LTV ratios, low credit scores or originations using lower underwriting standards, such as limited or no documentation of a borrower's income. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk. Notwithstanding our historical characterizations of the single family credit guarantee portfolio, certain security collateral underlying our Other Guarantee Transactions have been identified as subprime based on information provided to Freddie Mac when the transactions were entered into. We also categorize our investments in non-agency mortgage-related

*Freddie Mac*

securities as subprime if they were identified as such based on information provided to us when we entered into these transactions.

**Swaption** — An option contract to enter into an interest-rate swap. In exchange for an option premium, a buyer obtains the right but not the obligation to enter into a specified swap agreement with the issuer on a specified future date.

**TBA** — To be announced

**TCLFP** — Temporary Credit and Liquidity Facility Program is a component of the Housing Finance Agency Initiative in which we and Fannie Mae issued credit guarantees to holders of variable-rate demand obligations issued by various state and local HFAs. Treasury is obligated to absorb any losses under the program up to a certain level before we are exposed to any losses. The program is scheduled to expire on December 31, 2012; however, Treasury has given participants the option to extend the program facility to December 31, 2015.

**TDR** — Troubled debt restructuring — A type of loan modification in which the changes to the contractual terms result in concessions to borrowers that are experiencing financial difficulties.

**Total other comprehensive income (loss)** — Consists of the after-tax changes in: (a) the unrealized gains and losses on available-for-sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans.

**Total mortgage portfolio** — Includes mortgage loans and mortgage-related securities held on our consolidated balance sheets as well as the balances of our non-consolidated issued and guaranteed single-class and multiclass securities, and other mortgage-related financial guarantees issued to third parties.

**Treasury** — U.S. Department of the Treasury

**UPB** — Unpaid principal balance

**USDA** — U.S. Department of Agriculture

**VA** — U.S. Department of Veteran Affairs

**VIE** — Variable Interest Entity — A VIE is an entity: (a) that has a total equity investment at risk that is not sufficient to finance its activities without additional subordinated financial support provided by another party; or (b) where the group of equity holders does not have: (i) the ability to make significant decisions about the entity's activities; (ii) the obligation to absorb the entity's expected losses; or (iii) the right to receive the entity's expected residual returns.

**Warrant** — Refers to the warrant we issued to Treasury on September 8, 2008 pursuant to the Purchase Agreement. The warrant provides Treasury the ability to purchase shares of our common stock equal to 79.9% of the total number of shares of Freddie Mac common stock outstanding on a fully diluted basis on the date of exercise.

**Workout, or loan workout** — A workout is either: (a) a home retention action, which is either a loan modification, repayment plan, or forbearance agreement; or (b) a foreclosure alternative, which is either a short sale or a deed in lieu of foreclosure.

**XBRL** — eXtensible Business Reporting Language

**Yield curve** — A graphical display of the relationship between yields and maturity dates for bonds of the same credit quality. The slope of the yield curve is an important factor in determining the level of net interest yield on a new mortgage asset, both initially and over time. For example, if a mortgage asset is purchased when the yield curve is inverted, with short-term rates higher than long-term rates, our net interest yield on the asset will tend to be lower initially and then increase over time. Likewise, if a mortgage asset is purchased when the yield curve is steep, with short-term rates lower than long-term rates, our net interest yield on the asset will tend to be higher initially and then decrease over time.

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 10.1 | PC Master Trust Agreement dated January 4, 2012 (incorporated by reference to Exhibit 10.52 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2011, as filed on March 9, 2012) |
| 10.2 | Federal Home Loan Mortgage Corporation Global Debt Facility Agreement, dated March 9, 2012 |
| 12.1 | Statement re: computation of ratio of earnings to fixed charges and computation of ratio of earnings to combined fixed charges and preferred stock dividends |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101.INS | XBRL Instance Document[1] |
| 101.SCH | XBRL Taxonomy Extension Schema[1] |
| 101.CAL | XBRL Taxonomy Extension Calculation[1] |
| 101.LAB | XBRL Taxonomy Extension Labels[1] |
| 101.PRE | XBRL Taxonomy Extension Presentation[1] |
| 101.DEF | XBRL Taxonomy Extension Definition[1] |

[1] The financial information contained in these XBRL documents is unaudited. The information in these exhibits shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Freddie Mac, except to the extent, if any, expressly set forth by specific reference in such filing.

Exhibit 12.1

### RATIO OF EARNINGS TO FIXED CHARGES AND
### RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS

| | Three Months Ended March 31, | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2012 | 2011 | 2011 | 2010 | 2009 | 2008 | 2007 |
| | | | (dollars in millions) | | | | |
| Net income (loss) before income tax benefit (expense) and cumulative effect of changes in accounting principles . . . . | $   563 | $   602 | $ (5,666) | $(14,882) | $(22,384) | $(44,564) | $ (5,989) |
| Add: | | | | | | | |
| Low-income housing tax credit partnerships . . . . . . . . . . . | — | — | — | — | 4,155 | 453 | 469 |
| Total interest expense . . . . . . . . . . . . . . . . . . . . . . . . . | 18,069 | 20,968 | 79,988 | 92,131 | 22,150 | 33,332 | 38,482 |
| Interest factor in rental expenses . . . . . . . . . . . . . . . . . . | 1 | 1 | 4 | 5 | 7 | 8 | 7 |
| Earnings (loss), as adjusted . . . . . . . . . . . . . . . . . . . . . . . | $18,633 | $21,571 | $74,326 | $ 77,254 | $  3,928 | $(10,771) | $32,969 |
| Fixed charges: | | | | | | | |
| Total interest expense . . . . . . . . . . . . . . . . . . . . . . . . . | $18,069 | $20,968 | $79,988 | $ 92,131 | $ 22,150 | $ 33,332 | $38,482 |
| Interest factor in rental expenses . . . . . . . . . . . . . . . . . . | 1 | 1 | 4 | 5 | 7 | 8 | 7 |
| Capitalized interest . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | — | — |
| Total fixed charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $18,070 | $20,969 | $79,992 | $ 92,136 | $ 22,157 | $ 33,340 | $38,489 |
| Senior preferred stock and preferred stock dividends[1] . . . . | 1,804 | 1,605 | 6,498 | 5,749 | 4,105 | 675 | 398 |
| Total fixed charges including preferred stock dividends . . . . . | $19,874 | $22,574 | $86,490 | $ 97,885 | $ 26,262 | $ 34,015 | $38,887 |
| Ratio of earnings to fixed charges[2] . . . . . . . . . . . . . . . . . . | 1.03 | 1.03 | — | — | — | — | — |
| Ratio of earnings to combined fixed charges and preferred stock dividends[3] . . . . . . . . . . . . . . . . . . | — | — | — | — | — | — | — |

[1]  Senior preferred stock and preferred stock dividends represent pre-tax earnings required to cover any senior preferred stock and preferred stock dividend requirements computed using our effective tax rate, whenever there is an income tax provision, for the relevant periods.

[2]  Ratio of earnings to fixed charges is computed by dividing earnings (loss), as adjusted by total fixed charges. For the ratio to equal 1.00, earnings (loss), as adjusted must increase by $5.7 billion, $14.9 billion, $18.2 billion, $44.1 billion, and $5.5 billion for the years ended December 31, 2011, 2010, 2009, 2008, and 2007, respectively.

[3]  Ratio of earnings to combined fixed charges and preferred stock dividends is computed by dividing earnings (loss), as adjusted by total fixed charges including preferred stock dividends. For the ratio to equal 1.00, earnings (loss), as adjusted must increase by $1.2 billion, $1.0 billion, $12.2 billion, $20.6 billion, $22.3 billion, $44.8 billion, and $5.9 billion for the three months ended March 31, 2012 and 2011 and for the years ended December 31, 2011, 2010, 2009, 2008, and 2007, respectively.

**Exhibit 31.1**

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Charles E. Haldeman, Jr., certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2012 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  May 3, 2012

/s/  Charles E. Haldeman, Jr.
_____

Charles E. Haldeman, Jr.
Chief Executive Officer

FHFA 3340

**Exhibit 31.2**

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Ross J. Kari, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2012 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  May 3, 2012

/s/  Ross J. Kari
_____
Ross J. Kari
Executive Vice President — Chief Financial Officer

**Exhibit 32.1**

## CERTIFICATION

### PURSUANT TO 18 U.S.C. SECTION 1350,

### AS ENACTED BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report on Form 10-Q for the quarter ended March 31, 2012 of the Federal Home Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Charles E. Haldeman, Jr., Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:  May 3, 2012

/s/  Charles E. Haldeman, Jr.
_____
Charles E. Haldeman, Jr.
Chief Executive Officer

**Exhibit 32.2**

## CERTIFICATION

**PURSUANT TO 18 U.S.C. SECTION 1350,**

**AS ENACTED BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q for the quarter ended March 31, 2012 of the Federal Home Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Ross J. Kari, Executive Vice President — Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:  May 3, 2012

/s/  Ross J. Kari
_____

Ross J. Kari
Executive Vice President — Chief Financial Officer



# Tab 50

Table of Contents

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 10-Q

☑   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2012

OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from            to

Commission File No.: 0-50231

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | |
|---|---|
| **Federally chartered corporation** | **52-0883107** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

Registrant's telephone number, including area code:
**(202) 752-7000**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐            Accelerated filer ☑            Non-accelerated filer ☐            Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

As of March 31, 2012, there were 1,158,069,699 shares of common stock of the registrant outstanding.

Table of Contents

# TABLE OF CONTENTS

**Part I—Financial Information**                                                                                    1
Item 1.        Financial Statements
               Condensed Consolidated Balance Sheets                                                               84
               Condensed Consolidated Statements of Operations and Comprehensive Income (Loss)                     85
               Condensed Consolidated Statements of Cash Flows                                                     86
                    Note 1—Summary of Significant Accounting Policies                                              87
                    Note 2—Consolidations and Transfers of Financial Assets                                        91
                    Note 3—Mortgage Loans                                                                          94
                    Note 4—Allowance for Loan Losses                                                               101
                    Note 5—Investments in Securities                                                               105
                    Note 6—Financial Guarantees                                                                    112
                    Note 7—Acquired Property, Net                                                                  115
                    Note 8—Short-Term Borrowings and Long-Term Debt                                                116
                    Note 9—Derivative Instruments                                                                  117
                    Note 10—Segment Reporting                                                                      121
                    Note 11—Concentrations of Credit Risk                                                          124
                    Note 12—Fair Value                                                                             125
                    Note 13—Commitments and Contingencies                                                          151
Item 2.        Management's Discussion and Analysis of Financial Condition and Results of Operations               1
               Introduction                                                                                        1
               Executive Summary                                                                                   1
               Legislative and Regulatory Developments                                                            12
               Critical Accounting Policies and Estimates                                                         16
               Consolidated Results of Operations                                                                 17
               Business Segment Results                                                                           28
               Consolidated Balance Sheet Analysis                                                                36
               Supplemental Non-GAAP Information—Fair Value Balance Sheets                                        40
               Liquidity and Capital Management                                                                   44
               Off-Balance Sheet Arrangements                                                                     52
               Risk Management                                                                                    52
               Forward-Looking Statements                                                                         79
Item 3.        Quantitative and Qualitative Disclosures about Market Risk                                        155
Item 4.        Controls and Procedures                                                                           155
**PART II—Other Information**                                                                                    158
Item 1.        Legal Proceedings                                                                                 158
Item 1A.       Risk Factors                                                                                      159
Item 2.        Unregistered Sales of Equity Securities and Use of Proceeds                                       163
Item 3.        Defaults Upon Senior Securities                                                                   165
Item 4.        Mine Safety Disclosures                                                                           165
Item 5.        Other Information                                                                                  165
Item 6.        Exhibits                                                                                          165

i

Table of Contents

## MD&A TABLE REFERENCE

| Table | Description | Page |
|---|---|---|
| 1 | Treasury Draws and Dividend Payments | 4 |
| 2 | Selected Credit Characteristics of Single-Family Conventional Loans Held, by Acquisition Period | 6 |
| 3 | Credit Statistics, Single-Family Guaranty Book of Business | 8 |
| 4 | Level 3 Recurring Financial Assets at Fair Value | 17 |
| 5 | Summary of Condensed Consolidated Results of Operations | 18 |
| 6 | Analysis of Net Interest Income and Yield | 19 |
| 7 | Rate/Volume Analysis of Changes in Net Interest Income | 20 |
| 8 | Impact of Nonaccrual Loans on Net Interest Income | 21 |
| 9 | Fair Value Gains, Net | 21 |
| 10 | Total Loss Reserves | 23 |
| 11 | Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves) | 24 |
| 12 | Nonperforming Single-Family and Multifamily Loans | 26 |
| 13 | Credit Loss Performance Metrics | 27 |
| 14 | Single-Family Credit Loss Sensitivity | 28 |
| 15 | Single-Family Business Results | 29 |
| 16 | Multifamily Business Results | 30 |
| 17 | Capital Markets Group Results | 32 |
| 18 | Capital Markets Group's Mortgage Portfolio Activity | 34 |
| 19 | Capital Markets Group's Mortgage Portfolio Composition | 35 |
| 20 | Summary of Condensed Consolidated Balance Sheets | 36 |
| 21 | Summary of Mortgage-Related Securities at Fair Value | 37 |
| 22 | Analysis of Losses on Alt-A and Subprime Private-Label Mortgage-Related Securities | 38 |
| 23 | Credit Statistics of Loans Underlying Alt-A and Subprime Private-Label Mortgage-Related Securities (Including Wraps) | 39 |
| 24 | Comparative Measures—GAAP Change in Stockholders' Deficit and Non-GAAP Change in Fair Value of Net Assets (Net of Tax Effect) | 41 |
| 25 | Supplemental Non-GAAP Consolidated Fair Value Balance Sheets | 43 |
| 26 | Activity in Debt of Fannie Mae | 45 |
| 27 | Outstanding Short-Term Borrowings and Long-Term Debt | 47 |
| 28 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year | 48 |
| 29 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year | 49 |
| 30 | Cash and Other Investments Portfolio | 49 |
| 31 | Fannie Mae Credit Ratings | 50 |
| 32 | Composition of Mortgage Credit Book of Business | 53 |
| 33 | Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business | 55 |
| 34 | Delinquency Status of Single-Family Conventional Loans | 59 |
| 35 | Single-Family Serious Delinquency Rates | 60 |
| 36 | Single-Family Conventional Serious Delinquency Rate Concentration Analysis | 61 |
| 37 | Statistics on Single-Family Loan Workouts | 62 |
| 38 | Percentage of Loan Modifications That Were Current or Paid Off at One and Two Years Post-Modification | 63 |

ii

**Table of Contents**

| Table | Description | Page |
|---|---|---|
| 39 | Single-Family Foreclosed Properties | 64 |
| 40 | Single-Family Foreclosed Property Status | 65 |
| 41 | Multifamily Lender Risk-Sharing | 66 |
| 42 | Multifamily Guaranty Book of Business Key Risk Characteristics | 66 |
| 43 | Multifamily Concentration Analysis | 67 |
| 44 | Multifamily Foreclosed Properties | 68 |
| 45 | Repurchase Request Activity | 70 |
| 46 | Outstanding Repurchase Requests | 70 |
| 47 | Mortgage Insurance Coverage | 72 |
| 48 | Rescission Rates of Mortgage Insurance Claims | 73 |
| 49 | Estimated Mortgage Insurance Benefit | 74 |
| 50 | Unpaid Principal Balance of Financial Guarantees | 74 |
| 51 | Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve | 78 |
| 52 | Derivative Impact on Interest Rate Risk (50 Basis Points) | 79 |

iii

**Table of Contents**

## PART I—FINANCIAL INFORMATION

**Item 2.   Management's Discussion and Analysis of Financial Condition and Results of Operations**

*We have been under conservatorship, with the Federal Housing Finance Agency ("FHFA") acting as conservator, since September 6, 2008. As conservator, FHFA succeeded to all rights, titles, powers and privileges of the company, and of any shareholder, officer or director of the company with respect to the company and its assets. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. Our directors do not have any duties to any person or entity except to the conservator and, accordingly, are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS unless specifically directed to do so by the conservator. We describe the rights and powers of the conservator, key provisions of our agreements with the U.S. Department of the Treasury ("Treasury"), and their impact on shareholders in our Annual Report on Form 10-K for the year ended December 31, 2011 ("2011 Form 10-K") in "Business—Conservatorship and Treasury Agreements."*

*You should read this Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") in conjunction with our unaudited condensed consolidated financial statements and related notes and the more detailed information in our 2011 Form 10-K.*

*This report contains forward-looking statements that are based on management's current expectations and are subject to significant uncertainties and changes in circumstances. Please review "Forward-Looking Statements" for more information on the forward-looking statements in this report. Our actual results may differ materially from those reflected in these forward-looking statements due to a variety of factors including, but not limited to, those described in "Risk Factors" and elsewhere in this report and in "Risk Factors" in our 2011 Form 10-K.*

*You can find a "Glossary of Terms Used in This Report" in the "MD&A" of our 2011 Form 10-K.*

## INTRODUCTION

Fannie Mae is a government-sponsored enterprise ("GSE") that was chartered by Congress in 1938. Our public mission is to support liquidity and stability in the secondary mortgage market, where existing mortgage-related assets are purchased and sold, and increase the supply of affordable housing. Our charter does not permit us to originate loans and lend money directly to consumers in the primary mortgage market. Our most significant activity is securitizing mortgage loans originated by lenders into Fannie Mae mortgage-backed securities that we guarantee, which we refer to as Fannie Mae MBS. We also purchase mortgage loans and mortgage-related securities for our mortgage portfolio. We use the term "acquire" in this report to refer to both our guarantees and our purchases of mortgage loans. We obtain funds to support our business activities by issuing a variety of debt securities in the domestic and international capital markets.

We are a corporation chartered by the U.S. Congress. Our conservator, FHFA, is a U.S. government agency. Treasury owns our senior preferred stock and a warrant to purchase 79.9% of our common stock. Moreover, Treasury has made a commitment under a senior preferred stock purchase agreement to provide us with funds under specified conditions and, after 2012, up to a maximum amount, to maintain a positive net worth. The U.S. government does not guarantee our securities or other obligations.

Our common stock is traded in the over-the-counter market and quoted on the OTC Bulletin Board under the symbol "FNMA." Our debt securities are actively traded in the over-the-counter market.

## EXECUTIVE SUMMARY

The actions we have been taking since 2009 to provide liquidity and support to the market, grow a strong new book of business and minimize losses on loans we acquired prior to 2009 are having a positive impact on our business and our performance:

- *Financial Results.*   Despite ongoing weakness in the housing and mortgage markets, we experienced significant improvement in our financial results for the first quarter of 2012, as compared with the first

1

Table of Contents

quarter of 2011. As described under "Summary of Our Financial Performance for the First Quarter of 2012," we generated positive net worth for the quarter and were not required to draw funds from Treasury for the quarter under the senior preferred stock purchase agreement. We expect our financial results for 2012 to be significantly better than our 2011 results.

- *Strong New Book of Business.*    Single-family loans we have acquired since the beginning of 2009 constituted 56% of our single-family guaranty book of business as of March 31, 2012, while the single-family loans we acquired prior to 2009 shrank to 44% of our single-family book of business. We refer to the single-family loans we have acquired since the beginning of 2009 as our "new single-family book of business" and the single-family loans we acquired prior to 2009 as our "legacy book of business." As described below in "Our Strong New Book of Business," we expect that our new single-family book of business will be profitable over its lifetime.

- *Credit Performance.*    Our single-family serious delinquency rate has steadily declined each quarter since the first quarter of 2010, and was 3.67% as of March 31, 2012, compared with 5.47% as of March 31, 2010. See "Credit Performance" below for additional information about the credit performance of the mortgage loans in our single-family guaranty book of business.

- *Reducing Credit Losses and Helping Homeowners.*    We continued to execute on our strategies for reducing credit losses on our legacy book of business, which are described below under "Reducing Credit Losses on Our Legacy Book of Business." As part of our strategy to reduce defaults, we provided nearly 78,000 workouts to help homeowners retain their homes or otherwise avoid foreclosure in the first quarter of 2012.

- *Providing Liquidity and Support to the Mortgage Market.*    We continued to be a leading provider of liquidity to the mortgage market in the first quarter of 2012. As described below under "Providing Liquidity and Support to the Mortgage Market," we remained the largest single issuer of mortgage-related securities in the secondary mortgage market in the first quarter of 2012 and remained a constant source of liquidity in the multifamily market.

- *Helping to Build a New Housing Finance System.*    We also continued our work during the first quarter of 2012 to help build a new housing finance system, including pursuing the strategic goals identified by our conservator: build a new infrastructure for the secondary mortgage market; gradually contract our dominant presence in the marketplace while simplifying and shrinking our operations; and maintain foreclosure prevention activities and credit availability for new and refinanced mortgages. For more information on our strategic goals, see "Business—Executive Summary—Our Business Objectives and Strategy" in our 2011 Form 10-K and "Executive Compensation—Compensation Discussion and Analysis—2012 Executive Compensation Program—2012 Corporate Performance Objectives" in Amendment No. 1 on Form 10-K/A to our Annual Report on Form 10-K for the year ended December 31, 2011 (the "2011 Form 10-K/A").

**Providing Liquidity and Support to the Mortgage Market**

*Our Liquidity and Support Activities*

We provide liquidity and support to the U.S. mortgage market in a number of important ways:

- We serve as a stable source of liquidity for purchases of homes and financing of multifamily rental housing, as well as for refinancing existing mortgages. We provided approximately $2.6 trillion in liquidity to the mortgage market from January 1, 2009 through March 31, 2012 through our purchases and guarantees of loans, which enabled borrowers to refinance 7.4 million mortgages and purchase 2.1 million homes, and provided financing for over 1.2 million units of multifamily housing.

- We have strengthened our underwriting and eligibility standards to support sustainable homeownership. As a result, our new single-family book of business has a strong credit risk profile. Our support enables borrowers to have access to a variety of conforming mortgage products, including long-term, fixed-rate mortgages, such as the prepayable 30-year fixed-rate mortgage that protects homeowners from interest rate swings.

2