Table of Contents

- We helped over 1,000,000 homeowners retain their homes or otherwise avoid foreclosure from January 1, 2009 through March 31, 2012, which helped to support neighborhoods, home prices and the housing market. Moreover, borrowers' ability to pay their modified loans has improved in recent periods as we have enhanced the structure of our modifications. One year after modification, 74% of the modifications we made in the first quarter of 2011 were current or paid off, compared with 65% of the modifications we made in the first quarter of 2010.

- We helped borrowers refinance loans through our Refi Plus™ initiative, which includes loans refinanced under the Obama Administration's Home Affordable Refinance Program ("HARP"). The Refi Plus initiative provides expanded refinance opportunities for eligible Fannie Mae borrowers. From April 1, 2009, the date we began accepting delivery of Refi Plus loans, through March 31, 2012, we have acquired approximately 2,000,000 loans refinanced under our Refi Plus initiative. Refinances delivered to us through Refi Plus in the first quarter of 2012 reduced borrowers' monthly mortgage payments by an average of $191. Some borrowers' monthly payments increased as they took advantage of the ability to refinance through Refi Plus to reduce the term of their loan, to switch from an adjustable-rate mortgage to a fixed rate mortgage, or to switch from an interest-only mortgage to a fully amortizing mortgage.

- We support affordability in the multifamily rental market. Over 85% of the multifamily units we financed from 2009 through 2011 were affordable to families earning at or below the median income in their area.

- In addition to purchasing and guaranteeing loans, we provide funds to the mortgage market through short-term financing and other activities. These activities are described in more detail in our 2011 Form 10-K in "Business—Business Segments—Capital Markets."

### *2012 Acquisitions and Market Share*

In the first quarter of 2012, we purchased or guaranteed approximately $221 billion in loans, measured by unpaid principal balance, which includes $14.2 billion in delinquent loans we purchased from our single-family MBS trusts. These activities enabled our lender customers to finance approximately 934,000 single-family conventional loans and loans for approximately 117,000 units in multifamily properties during the first quarter of 2012.

We remained the largest single issuer of mortgage-related securities in the secondary market during the first quarter of 2012, with an estimated market share of new single-family mortgage-related securities issuances of 51%. Our estimated market share of new single-family mortgage-related securities issuances was 54% in the fourth quarter of 2011 and 49% in the first quarter of 2011.

We remained a constant source of liquidity in the multifamily market. We owned or guaranteed approximately 21% of the outstanding debt on multifamily properties as of December 31, 2011 (the latest date for which information was available).

### Summary of Our Financial Performance for the First Quarter of 2012

We experienced a significant improvement in our financial results in the first quarter of 2012 compared with the first quarter of 2011, even though our results continued to be impacted by weakness in the housing and mortgage markets.

### *Total Comprehensive Income (Loss)*

We recognized total comprehensive income of $3.1 billion in the first quarter of 2012, consisting of net income of $2.7 billion and other comprehensive income of $362 million. In comparison, we recognized a total comprehensive loss of $6.3 billion in the first quarter of 2011, consisting of a net loss of $6.5 billion and other comprehensive income of $181 million.

The significant improvement in our financial results in the first quarter of 2012 compared with the first quarter of 2011 was due to an $8.7 billion decrease in our credit-related expenses, primarily driven by: (1) a less significant decline in home prices as the housing market continued to stabilize; we estimate that home prices declined by

Table of Contents

0.8% in the first quarter of 2012 compared with a 2.0% decline in the first quarter of 2011, which represented over half of the 2011 home price decline; (2) a 25% decline in our inventory of single-family real-estate owned ("REO") properties compared with the first quarter of 2011 coupled with improved sales prices on dispositions of our REO properties resulting from strong demand in markets with limited REO supply; and (3) lower single-family serious delinquency rates, which declined to 3.67% as of the end of the first quarter of 2012 from 4.27% as of the end of the first quarter of 2011. We discuss below our expectations regarding our future credit-related expenses and loss reserves.

See "Consolidated Results of Operations" for more information on our results.

### Net Worth

Our net worth of $268 million as of March 31, 2012 reflects our total comprehensive income of $3.1 billion largely offset by our payment to Treasury of $2.8 billion in senior preferred stock dividends during the first quarter of 2012.

In the first quarter of 2012, we received $4.6 billion in funds from Treasury to eliminate our net worth deficit as of December 31, 2011. As a result of our positive net worth as of March 31, 2012, we will not request a draw this quarter from Treasury under the senior preferred stock purchase agreement. The aggregate liquidation preference on the senior preferred stock remains at $117.1 billion, which requires an annualized dividend payment of $11.7 billion. The amount of this dividend payment exceeds our reported annual net income for every year since our inception. As of March 31, 2012, we have paid an aggregate of $22.6 billion to Treasury in dividends on the senior preferred stock.

Table 1 below displays our senior preferred stock dividend payments to Treasury and Treasury draws since entering conservatorship on September 6, 2008.

### Table 1:    Treasury Draws and Dividend Payments

| | 2008 | 2009 | 2010 | 2011 | 2012 (first quarter) | Cumulative Total |
|---|---|---|---|---|---|---|
| | | | | (Dollars in billions) | | |
| Treasury draws[1][2] | $15.2 | $ 60.0 | $15.0 | $25.9 | $      — | $ 116.1 |
| Senior preferred stock dividends [3] | — | 2.5 | 7.7 | 9.6 | 2.8 | 22.6 |
| Treasury draws less senior preferred stock dividends | $15.2 | $57.5 | $ 7.3 | $ 16.3 | $     (2.8) | $  93.5 |
| Cumulative percentage of senior preferred stock dividends to Treasury draws | 0.2% | 3.3% | 11.3% | 17.1% | 19.5% | 19.5% |

[1]   Represents the total draws received from Treasury and / or being requested based on our quarterly net worth deficits for the periods presented. Draw requests are funded in the quarter following each quarterly net worth deficit.

[2]   Treasury draws do not include the initial $1.0 billion liquidation preference of the senior preferred stock, for which we did not receive any cash proceeds.

[3]   Represents total quarterly cash dividends paid to Treasury during the periods presented based on an annual rate of 10% per year on the aggregate liquidation preference of the senior preferred stock.

### Total Loss Reserves

Our total loss reserves consist of (1) our allowance for loan losses, (2) our allowance for accrued interest receivable, (3) our allowance for preforeclosure property taxes and insurance receivables, and (4) our reserve for guaranty losses. Our total loss reserves, which reflect our estimate of the probable losses we have incurred in our guaranty book of business, including concessions we granted borrowers upon modification of their loans, decreased to $74.6 billion as of March 31, 2012 from $76.9 billion as of December 31, 2011. Our total loss reserve coverage to total nonperforming loans was 30% as of March 31, 2012, compared with 31% as of December 31, 2011.

4

Table of Contents

### *Our Expectations Regarding Future Loss Reserves and Credit-Related Expenses*

We expect the trends of stabilizing home prices and declining single-family serious delinquency rates to continue. As a result, we believe that our total loss reserves peaked as of December 31, 2011 and will not increase above $76.9 billion in the foreseeable future. We also believe that our credit-related expenses will be lower in 2012 than in 2011.

Although we expect these positive trends to continue, the amount of credit-related expenses we incur in future periods could vary significantly from period to period and may be affected by many different factors, such as those described below. Moreover, although we believe that our total loss reserves peaked as of December 31, 2011, we expect our loss reserves will remain significantly elevated relative to historical levels for an extended period because (1) we expect future defaults on loans that we acquired prior to 2009 and the resulting charge-offs will occur over a period of years and (2) a significant portion of our reserves represents concessions granted to borrowers upon modification of their loans and will remain in our reserves until the loans are fully repaid or default.

Our expectations regarding our future credit-related expenses and loss reserves are based on our current expectations and assumptions about many factors that are subject to change. Factors that could result in higher credit-related expenses and loss reserves than we currently expect include: a drop in actual or expected home prices; an increase in our serious delinquency rate; an increase in interest rates; an increase in unemployment rates; future legislative or regulatory requirements that have a significant impact on our business, such as a requirement that we implement a principal forgiveness program; future updates to our models relating to our loss reserves, including the assumptions used by these models; future changes to accounting policies relating to our loss reserves; significant changes in modification and foreclosure activity; changes in borrower behavior, such as an increasing number of underwater borrowers who strategically default on their mortgage loan; failures by our mortgage seller/servicers to fulfill their repurchase obligations to us; and many other factors, including those discussed in "Outlook—Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations" in this report and in "Risk Factors" in both this report and in our 2011 Form 10-K. Due to the large size of our guaranty book of business, even small changes in these factors could have a significant impact on our financial results for a particular period.

In addition, in April 2012, FHFA issued an Advisory Bulletin that could have an impact on the amount of our future credit-related expenses and loss reserves; however, we are still assessing the impact of the Advisory Bulletin. See "Legislative and Regulatory Developments —FHFA Advisory Bulletin Regarding Framework for Adversely Classifying Loans" for additional information.

### Our Strong New Book of Business

Since 2009, we have seen the effect of actions we took, beginning in 2008, to significantly strengthen our underwriting and eligibility standards and change our pricing to promote sustainable homeownership and stability in the housing market. Given their strong credit risk profile and based on their performance so far, we expect that the single-family loans we have acquired since the beginning of 2009, in the aggregate, will be profitable over their lifetime, by which we mean that we expect our fee income on these loans to exceed our credit losses and administrative costs for them. In contrast, we expect that the single-family loans we acquired from 2005 through 2008, in the aggregate, will not be profitable over their lifetime. Loans we have acquired since the beginning of 2009 comprised 56% of our single-family guaranty book of business as of March 31, 2012. Our 2005 through 2008 acquisitions are becoming a smaller percentage of our single-family guaranty book of business and, as shown in Table 2 below, have decreased to 29% of our single-family guaranty book of business as of March 31, 2012.

Our expectations regarding the ultimate performance of our loans are based on numerous expectations and assumptions, including those relating to expected changes in regional and national home prices, borrower behavior, public policy and other macroeconomic factors. If future conditions are more unfavorable than our expectations, the loans we acquired since the beginning of 2009 could become unprofitable. For example, home prices are a key factor affecting the profitability we expect. As home prices decline, the loan-to-value ("LTV") ratios on our loans increase, and both the probability of default and the estimated severity of loss increase. If

5

Table of Contents

home prices decline significantly from March 2012 levels, the loans we acquired since the beginning of 2009 could become unprofitable. See "Outlook—Home Price Declines" for our current expectations regarding home price declines. Also see "Outlook—Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations" in this report and "Risk Factors" in both this report and our 2011 Form 10-K for a discussion of factors that could cause our expectations regarding the performance of the loans in our new single-family book of business to change.

Table 2 below displays information regarding the credit characteristics of the loans in our single-family conventional guaranty book of business as of March 31, 2012 by acquisition period, which illustrates the improvement in the credit risk profile of loans we acquired beginning in 2009 compared with loans we acquired in 2005 through 2008.

**Table 2:   Selected Credit Characteristics of Single-Family Conventional Loans Held, by Acquisition Period**

| | As of March 31, 2012 | | | |
| --- | --- | --- | --- | --- |
| | % of Single-Family Conventional Guaranty Book of Business[1] | Current Estimated Mark-to-Market LTV Ratio[1] | Current Mark-to-Market LTV Ratio >100%[1][2] | Serious Delinquency Rate[3] |
| Year of Acquisition: | | | | |
| New Single-Family Book of Business: | | | | |
| 2012 | 7% | 70% | 4% | — |
| 2011 | 18 | 71 | 5 | 0.09% |
| 2010 | 16 | 73 | 7 | 0.36 |
| 2009 | 15 | 74 | 8 | 0.69 |
| Total New Single-Family Book of Business | 56 | 72 | 6 | 0.32 |
| Legacy Book of Business: | | | | |
| 2005-2008 | 29 | 105 | 48 | 9.25 |
| 2004 and prior | 15 | 61 | 9 | 3.31 |
| Total Single-Family Book of Business | 100% | 80% | 19% | 3.67% |

[1]   Calculated based on the aggregate unpaid principal balance of single-family loans for each category divided by the aggregate unpaid principal balance of loans in our single-family conventional guaranty book of business as of March 31, 2012.

[2]   The majority of loans in our new single-family book of business as of March 31, 2012 with mark-to-market LTV ratios over 100% were loans acquired under our Refi Plus initiative. See "Risk Management–Credit Risk Management–Single-Family Mortgage Credit Risk Management" for further information on Refi Plus.

[3]   The serious delinquency rate of loans acquired in 2012 is zero because they were originated so recently that most of them could not yet become seriously delinquent. The serious delinquency rates for loans acquired in more recent years will be higher after the loans have aged, but we do not expect them to approach the levels of the March 31, 2012 serious delinquency rates of loans in our legacy book of business.

The single-family loans that we acquired in the first quarter of 2012 had a weighted average FICO credit score at origination of 763 and an average original LTV ratio of 70%. Of the single-family loans we acquired in the first quarter of 2012, approximately 11% had an original LTV ratio greater than 90% and 1% had a FICO credit score at origination of less than 620. See Table 2 in our 2011 Form 10-K for information regarding the credit risk profile of the single-family conventional loans we acquired during specified previous periods.

Since 2009, our acquisitions have included a significant number of loans refinanced under our Refi Plus ᵀᴹ initiative, which provides expanded refinance opportunities for eligible Fannie Mae borrowers. Our acquisitions under Refi Plus include our acquisitions under HARP, which was established by the Administration to help borrowers who may otherwise be unable to refinance the mortgage loan on their primary residence due to a decline in home values. The approximately 239,000 loans we acquired under Refi Plus in the first quarter of 2012 constituted approximately 22% of our total single-family acquisitions for the period, measured by unpaid principal balance, compared with approximately 24% of total single-family acquisitions in all of 2011. Under

Table of Contents

Refi Plus we acquire refinancings of performing Fannie Mae loans that, in some cases, have higher LTV ratios and/or lower FICO credit scores than we generally require. As a result, while it is too early to determine the ultimate performance of these Refi Plus loans, they may not perform as well as the other loans we have acquired since the beginning of 2009. However, we expect Refi Plus loans will perform better than the loans they replace because Refi Plus loans reduce the borrowers' monthly payments or otherwise should provide more stability than the borrowers' old loans (for example, by refinancing into a mortgage with a fixed interest rate instead of an adjustable rate).

Whether the loans we acquire in the future will exhibit an overall credit profile similar to our more recent acquisitions will depend on a number of factors, including our future pricing and eligibility standards and those of mortgage insurers and the Federal Housing Administration ("FHA"), the percentage of loan originations representing refinancings, our future objectives, government policy, market and competitive conditions, and the volume and characteristics of loans we acquire under HARP.

See "Business—Executive Summary—Our Strong New Book of Business and Expected Losses on our Legacy Book of Business—Building a Strong New Single-Family Book of Business" in our 2011 Form 10-K for a more detailed discussion of the changes in the credit profile of our single-family acquisitions. In addition, see "MD&A—Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management" for more detail regarding the credit risk characteristics of our single-family guaranty book of business.

**Reducing Credit Losses on Our Legacy Book of Business**

To reduce the credit losses we ultimately incur on our legacy book of business, we have been focusing our efforts on the following strategies:

- Helping underwater and other eligible Fannie Mae borrowers refinance to a more sustainable loan through our Refi Plus initiative;

- Reducing defaults by offering borrowers solutions that enable them to keep their homes ("home retention solutions");

- Pursuing "foreclosure alternatives," which help borrowers avoid foreclosure and reduce the severity of the losses we incur overall;

- Efficiently managing timelines for home retention solutions, foreclosure alternatives, and foreclosures;

- Improving servicing standards and servicers' execution and consistency;

- Managing our REO inventory to minimize costs and maximize sales proceeds; and

- Pursuing contractual remedies from lenders, servicers and providers of credit enhancement.

See "Business—Executive Summary—Reducing Credit Losses on Our Legacy Book of Business" in our 2011 Form 10-K, as well as "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management" in both this report and our 2011 Form 10-K, for more information on the strategies and actions we are taking to minimize our credit losses.

**Credit Performance**

Table 3 presents information for each of the last five quarters about the credit performance of mortgage loans in our single-family guaranty book of business and our workouts. The term "workouts" refers to home retention solutions and foreclosure alternatives. The workout information in Table 3 does not reflect repayment plans and forbearances that have been initiated but not completed, nor does it reflect trial modifications that have not become permanent.

7

Table of Contents

**Table 3:   Credit Statistics, Single-Family Guaranty Book of Business** [1]

| | 2012 | 2011 | | | | |
|---|---|---|---|---|---|---|
| | Q1 | Full Year | Q4 | Q3 | Q2 | Q1 |
| | | | (Dollars in millions) | | | |
| **As of the end of each period:** | | | | | | |
| Serious delinquency rate [2] | 3.67% | 3.91% | 3.91% | 4.00% | 4.08% | 4.27% |
| Seriously delinquent loan count | 650,918 | 690,911 | 690,911 | 708,847 | 729,772 | 767,161 |
| Nonperforming loans [3] | $ 243,981 | $ 248,379 | $ 248,379 | $ 248,134 | $ 245,848 | $ 248,444 |
| Foreclosed property inventory: | | | | | | |
| Number of properties | 114,157 | 118,528 | 118,528 | 122,616 | 135,719 | 153,224 |
| Carrying value | $ 9,721 | $ 9,692 | $ 9,692 | $ 11,039 | $ 12,480 | $ 14,086 |
| Combined loss reserves [4] | $ 69,633 | $ 71,512 | $ 71,512 | $ 70,741 | $ 68,887 | $ 66,240 |
| Total loss reserves [5] | $ 73,119 | $ 75,264 | $ 75,264 | $ 73,973 | $ 73,116 | $ 70,466 |
| **During the period:** | | | | | | |
| Foreclosed property (number of properties): | | | | | | |
| Acquisitions [6] | 47,700 | 199,696 | 47,256 | 45,194 | 53,697 | 53,549 |
| Dispositions | (52,071) | (243,657) | (51,344) | (58,297) | (71,202) | (62,814) |
| Credit-related expenses [7] | $ 2,385 | $ 27,218 | $ 5,397 | $ 4,782 | $ 5,933 | $ 11,106 |
| Credit losses [8] | $ 4,955 | $ 18,346 | $ 4,548 | $ 4,384 | $ 3,810 | $ 5,604 |
| **Loan workout activity (number of loans):** | | | | | | |
| Home retention loan workouts [9] | 55,535 | 248,658 | 60,453 | 68,227 | 59,019 | 60,959 |
| Short sales and deeds-in-lieu of foreclosure | 22,213 | 79,833 | 22,231 | 19,306 | 21,176 | 17,120 |
| Total loan workouts | 77,748 | 328,491 | 82,684 | 87,533 | 80,195 | 78,079 |
| Loan workouts as a percentage of delinquent loans in our guaranty book of business [10] | 28.85% | 27.05% | 27.24% | 28.39% | 25.71% | 25.01% |

[1]   Our single-family guaranty book of business consists of (a) single-family mortgage loans held in our mortgage portfolio, (b) single-family mortgage loans underlying Fannie Mae MBS, and (c) other credit enhancements that we provide on single-family mortgage assets, such as long-term standby commitments. It excludes non-Fannie Mae mortgage-related securities held in our mortgage portfolio for which we do not provide a guaranty.

[2]   Calculated based on the number of single-family conventional loans that are three or more months past due and loans that have been referred to foreclosure but not yet foreclosed upon, divided by the number of loans in our single-family conventional guaranty book of business. We include all of the single-family conventional loans that we own and those that back Fannie Mae MBS in the calculation of the single-family serious delinquency rate.

[3]   Represents the total amount of nonperforming loans including troubled debt restructurings. A troubled debt restructuring is a restructuring of a mortgage loan in which a concession is granted to a borrower experiencing financial difficulty. We generally classify loans as nonperforming when the payment of principal or interest on the loan is two months or more past due.

[4]   Consists of the allowance for loan losses for loans recognized in our condensed consolidated balance sheets and the reserve for guaranty losses related to both single-family loans backing Fannie Mae MBS that we do not consolidate in our condensed consolidated balance sheets and single-family loans that we have guaranteed under long-term standby commitments. For additional information on the change in our loss reserves see "Consolidated Results of Operations—Credit-Related Expenses—Provision for Credit Losses."

[5]   Consists of (a) the combined loss reserves, (b) allowance for accrued interest receivable, and (c) allowance for preforeclosure property taxes and insurance receivables.

[6]   Includes acquisitions through deeds-in-lieu of foreclosure.

[7]   Consists of (a) the provision (benefit) for credit losses and (b) foreclosed property expense (income).

[8]   Consists of (a) charge-offs, net of recoveries and (b) foreclosed property expense, adjusted to exclude the impact of fair value losses resulting from credit-impaired loans acquired from MBS trusts.

8

Table of Contents

[9] Consists of (a) modifications, which do not include trial modifications or repayment plans or forbearances that have been initiated but not completed and (b) repayment plans and forbearances completed. See "Table 37: Statistics on Single-Family Loan Workouts" in "Risk Management—Credit Risk Management–Single-Family Mortgage Credit Risk Management–Problem Loan Management–Loan Workout Metrics" for additional information on our various types of loan workouts.

[10] Calculated based on annualized problem loan workouts during the period as a percentage of delinquent loans in our single-family guaranty book of business as of the end of the period.

Our single-family serious delinquency rate has decreased each quarter since the first quarter of 2010. The decrease in our serious delinquency rate is primarily the result of home retention solutions, foreclosure alternatives and completed foreclosures, as well as our acquisition of loans with stronger credit profiles since the beginning of 2009, as these loans are now 56% of our single-family guaranty book of business, resulting in a smaller percentage of our loans becoming seriously delinquent.

Although our single-family serious delinquency rate has decreased significantly since the first quarter of 2010, our serious delinquency rate and the period of time that loans remain seriously delinquent has been negatively affected in recent periods by the increase in the average number of days it is taking to complete a foreclosure. As described in "Business—Executive Summary—Reducing Credit Losses on Our Legacy Book of Business—Managing Timelines for Workouts and Foreclosures" in our 2011 Form 10-K, high levels of foreclosures, continuing issues in the servicer foreclosure process and changing legislative, regulatory and judicial requirements have lengthened the time it takes to foreclose on a mortgage loan in many states. We expect serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process, the volume of loan modifications, and the extent to which borrowers with modified loans continue to make timely payments. We expect the number of our single-family loans that are seriously delinquent to remain well above pre-2008 levels for years. In addition, given the large anticipated supply of single-family homes in the market, we anticipate that it will take a significant amount of time before our REO inventory is reduced to pre-2008 levels.

We provide additional information on our credit-related expenses in "Consolidated Results of Operations—Credit-Related Expenses" and on the credit performance of mortgage loans in our single-family book of business and our loan workouts in "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management."

**Housing and Mortgage Market and Economic Conditions**

Economic growth slowed in the first quarter of 2012 compared with the fourth quarter of 2011. The inflation-adjusted U.S. gross domestic product, or GDP, rose by 2.2% on an annualized basis in the first quarter of 2012, according to the Bureau of Economic Analysis advance estimate, compared with an increase of 3.0% in the fourth quarter of 2011. The overall economy gained an estimated 688,000 jobs in the first quarter. According to the U.S. Bureau of Labor Statistics, over the past 12 months ending in March 2012, the economy created 2.0 million non-farm jobs. The unemployment rate was 8.2% in March 2012, compared with 8.5% in December 2011. We expect that housing will start to recover if the employment market continues to improve.

Housing activity showed some improvement during the first quarter of 2012. Total existing home sales averaged 4.6 million units annualized in the first quarter of 2012, a 4.7% increase from the fourth quarter of 2011, according to data available through March 2012 from the National Association of REALTORS®. Sales of foreclosed homes and preforeclosure, or "short," sales (together, "distressed sales") accounted for 29% of existing home sales in March 2012, compared with 32% in December 2011 and 40% in March 2011. New single-family home sales strengthened during the quarter, averaging an annualized rate of 337,000 units, a 3.7% increase from the prior quarter.

The overall mortgage market serious delinquency rate, which has trended down since peaking in the fourth quarter of 2009, remained historically high at 7.7% as of December 31, 2011, according to the Mortgage Bankers Association National Delinquency Survey. According to the National Association of REALTORS® April 2012 Existing Home Sales Report, the months' supply of existing unsold homes was 6.3 months as of March 31, 2012, compared with 6.4 months as of December 31, 2011 and 8.5 months as of March 31, 2011. Properties that are

9

Table of Contents

vacant and held off the market, combined with a portion of properties backing seriously delinquent mortgages not currently listed for sale, represent a significant shadow inventory putting downward pressure on home prices.

We estimate that home prices on a national basis declined by 0.8% in the first quarter of 2012 and have declined by 23.9% from their peak in the third quarter of 2006. Our home price estimates are based on preliminary data and are subject to change as additional data become available. The decline in home prices over the past several years has left many homeowners with "negative equity" in their homes, which means their principal mortgage balance exceeds the current market value of their home. This increases the likelihood that borrowers will walk away from their mortgage obligations and that the loans will become delinquent and proceed to foreclosure. According to CoreLogic, approximately 11 million, or 23%, of all residential properties with mortgages were in a negative equity position in the fourth quarter of 2011. This potential supply also weighs on the supply/demand balance putting downward pressure on both home prices and rents. See "Risk Factors" in our 2011 Form 10-K for a description of risks to our business associated with the weak economy and housing market.

During the first quarter of 2012, the multifamily sector remained fairly stable and continued to benefit from ongoing rental demand, positive job growth and limited new apartment supply. Preliminary third-party data for the first quarter of 2012 indicates that the national multifamily vacancy rate for institutional investment-type apartment properties decreased to an estimated 6.0% as of March 31, 2012, compared to an estimated 6.3% as of December 31, 2011 and an estimated 7.0% as of March 31, 2011. In addition, asking rents increased in the first quarter of 2012 by an estimated 1% on a national basis. As indicated by data from Axiometrics, multifamily concession rates, the rental discount rate as a percentage of asking rents, declined during the first quarter to -2.7% as of March 2012, after having increased slightly during fourth quarter of 2011 to end the year at -3.5%. The increase in rental demand is also reflected in an estimated positive net absorption, or increase in the number of occupied rental units after deducting new supply added during the period, of more than 36,000 units during the first quarter, according to preliminary data from Reis, Inc.

### Outlook

*Overall Market Conditions.*   We expect weakness in the housing and mortgage markets to continue in 2012. The high level of delinquent mortgage loans will ultimately result in high levels of foreclosures, which is likely to add to the excess housing inventory.

We expect that single-family default and severity rates will remain high in 2012, but will be lower than in 2011. Despite signs of multifamily sector improvement at the national level, we expect multifamily foreclosures in 2012 to remain generally commensurate with 2011 levels as certain local markets and properties continue to exhibit weak fundamentals. Conditions may worsen if the unemployment rate increases on either a national or regional basis.

We expect that changes to HARP announced in October 2011 will result in our acquisition of more refinancings in 2012 than we would have acquired in the absence of the changes; however, we expect fewer refinancings overall in 2012 than in 2011. For a description of the changes to HARP announced in October 2011, see "Business—Making Home Affordable Program—Changes to the Home Affordable Refinance Program" in our 2011 Form 10-K. Our loan acquisitions also have been negatively affected by the decrease in the maximum size of loans we may acquire in specified high-cost areas from $729,750 to $625,500, which went into effect in the fourth quarter of 2011. As a result of these factors, we expect our loan acquisitions for 2012 will be lower than in 2011.

We estimate that total originations in the U.S. single-family mortgage market in 2012 will decrease from 2011 levels by approximately 8%, from an estimated $1.36 trillion to an estimated $1.26 trillion, and that the amount of originations in the U.S. single-family mortgage market that are refinancings will decline from approximately $900 billion to approximately $800 billion. Refinancings comprised approximately 83% of our single-family business volume in the first quarter of 2012, compared with approximately 76% for all of 2011.

*Home Price Declines.*   We estimate that U.S. home prices have declined by 23.9% from their peak in the third quarter of 2006. While the rate of decline in home prices has moderated in recent quarters, we expect that home prices on a national basis will decline further before stabilizing in 2013. We currently expect a peak-to-trough home price decline on a national basis ranging from 24% to 30%, but believe that it would take the occurrence of

10

Table of Contents

an additional adverse economic event to reach the high end of the range. Future home price changes may be very different from our estimates as a result of significant inherent uncertainty in the current market environment, including uncertainty about the effect of actions the federal government has taken and may take with respect to tax policies, mortgage finance programs and policies, and housing finance reform; the management of the Federal Reserve's MBS holdings; and the impact of those actions on home prices, unemployment and the general economic and interest rate environment. Because of these uncertainties, the actual home price decline we experience may differ significantly from these estimates. We also expect significant regional variation in home price declines and stabilization.

Our estimates of home price declines are based on our home price index, which is calculated differently from the S&P/Case-Shiller U.S. National Home Price Index and therefore results in different percentages for comparable declines. Our 24% to 30% peak-to-trough home price decline estimate corresponds to an approximate 34% to 41% peak-to-trough decline using the S&P/Case-Shiller index method. Our estimates differ from the S&P/Case-Shiller index in two principal ways: (1) our estimates weight expectations by number of properties, whereas the S&P/Case-Shiller index weights expectations based on property value, causing home price changes on higher priced homes to have a greater effect on the overall result; and (2) the S&P/Case-Shiller index includes sales of foreclosed homes while our estimates attempt to exclude foreclosed home sales, because we believe that differing maintenance practices and the forced nature of the sales make foreclosed home prices less representative of market values. We believe, however, that the impact of sales of foreclosed homes is indirectly reflected in our estimates as a result of their impact on the pricing of non-distressed sales. We estimate S&P/Case-Shiller comparison numbers by adjusting our internal home price estimates to compensate for the differences between our method and the S&P/Case-Shiller index method. In addition to these differences, our estimates are based on our own internally available data combined with publicly available data, and are therefore based on data collected nationwide, whereas the S&P/Case-Shiller index is based on publicly available data, which may be limited in certain geographic areas of the country. Our comparative calculations to the S&P/Case-Shiller index provided above are not adjusted to compensate for this data pool difference.

*Credit-Related Expenses and Credit Losses.*    Our credit-related expenses, which include our provision for credit losses, reflect our recognition of losses on our loans. Through our provision for credit losses, we recognize credit-related expenses on loans in the period in which we determine that we have incurred a probable loss on the loans as of the end of the period, or in which we have granted concessions to the borrowers. Accordingly, our credit-related expenses in each period are affected by changes in actual and expected home prices, borrower payment behavior, the types and volumes of loss mitigation activities and foreclosures we complete, and estimated recoveries from our lender and mortgage insurer counterparties. Our credit losses, which include our charge-offs, net of recoveries, reflect our realization of losses on our loans. We realize losses on loans, through our charge-offs, when foreclosure sales are completed or when we accept short sales or deeds-in-lieu of foreclosure.

We expect that our credit-related expenses will remain high in 2012 but that, overall, our credit-related expenses will be lower in 2012 than in 2011. In addition, we expect our credit losses to remain high in 2012. To the extent delays in foreclosures continue in 2012, our realization of some credit losses will be delayed. We further describe our outlook for credit-related expenses in "Summary of Our Financial Performance for the First Quarter of 2012—Our Expectations Regarding Future Loss Reserves and Credit-Related Expenses."

*Uncertainty Regarding our Future Status and Long-Term Financial Sustainability.*    There is significant uncertainty in the current market environment, and any changes in the trends in macroeconomic factors that we currently anticipate, such as home prices and unemployment, may cause our future credit-related expenses and credit losses to vary significantly from our current expectations. Although Treasury's funds under the senior preferred stock purchase agreement permit us to remain solvent and avoid receivership, the resulting dividend payments are substantial. We expect to request additional draws under the senior preferred stock purchase agreement in future periods, which will further increase the dividends we owe to Treasury on the senior preferred stock. We expect that, over time, our dividend obligation to Treasury will increasingly drive our future draws under the senior preferred stock purchase agreement. Although we may experience period-to-period volatility in earnings and comprehensive income, we do not expect to generate net income or comprehensive income in excess of our annual dividend obligation to Treasury over the long term. As a result of these factors, there is significant uncertainty about our long-term financial sustainability.

11

Table of Contents

In addition, there is significant uncertainty regarding the future of our company, including how long the company will continue to be in its current form, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. We expect this uncertainty to continue. In February 2011, Treasury and the Department of Housing and Urban Development ("HUD") released a report to Congress on reforming America's housing finance market. The report states that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. In February 2012, Treasury Secretary Geithner stated that the Administration intended to release new details in the spring of 2012 around approaches to housing finance reform, including winding down Fannie Mae and Freddie Mac, and to work with Congressional leaders to explore options for legislation, but that he does not expect housing finance reform legislation to be enacted in 2012.

We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding long-term reform of the GSEs. See "Legislative and Regulatory Developments" in this report and "Business—Legislative and Regulatory Developments" in our 2011 Form 10-K for discussions of recent legislative reform of the financial services industry and proposals for GSE reform that could affect our business. See "Risk Factors" in our 2011 Form 10-K for a discussion of the risks to our business relating to the uncertain future of our company.

*Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations.*     We present a number of estimates and expectations in this executive summary, including estimates and expectations regarding our future financial results, the profitability of single-family loans we have acquired, our single-family credit losses, our loss reserves and credit-related expenses, and our draws from and dividends to be paid to Treasury. These estimates and expectations are forward-looking statements based on our current assumptions regarding numerous factors, including future home prices and the future performance of our loans. Our future estimates of our performance, as well as the actual amounts, may differ materially from our current estimates and expectations as a result of: the timing and level of, as well as regional variation in, home price changes; changes in interest rates, unemployment rates and other macroeconomic variables; government policy; the length of time it takes to complete foreclosures; changes in generally accepted accounting principles ("GAAP"); credit availability; borrower behavior; the volume of loans we modify; the effectiveness of our loss mitigation strategies, management of our REO inventory and pursuit of contractual remedies; whether our counterparties meet their obligations to us; changes in the fair value of our assets and liabilities; impairments of our assets; and many other factors, including those discussed in "Risk Factors," "Forward-Looking Statements" and elsewhere in this report, and in "Risk Factors" in our 2011 Form 10-K. For example, if the economy were to enter a deep recession, we would expect actual outcomes to differ substantially from our current expectations.

## LEGISLATIVE AND REGULATORY DEVELOPMENTS

The information in this section updates and supplements information regarding legislative and regulatory developments set forth in "Business—Legislative and Regulatory Developments" and "Business—Our Charter and Regulation of Our Activities" in our 2011 Form 10-K.

### GSE Reform

Policymakers and others have focused significant attention in recent years on how to reform the nation's housing finance system, including what role, if any, the GSEs should play. The Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), which was signed into law in July 2010, calls for enactment of meaningful structural reforms of Fannie Mae and Freddie Mac. The Dodd-Frank Act also required the Treasury Secretary to submit a report to Congress with recommendations for ending the conservatorships of Fannie Mae and Freddie Mac.

In February 2011, Treasury and HUD released their report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions.

Table of Contents

The report identifies a number of policy steps that could be used to wind down Fannie Mae and Freddie Mac, reduce the government's role in housing finance and help bring private capital back to the mortgage market. These steps include (1) increasing guaranty fees, (2) gradually increasing the level of required down payments so that any mortgages insured by Fannie Mae or Freddie Mac eventually have at least a 10% down payment, (3) reducing conforming loan limits to those established in the Federal Housing Finance Regulatory Reform Act of 2008 (the "2008 Reform Act"), (4) encouraging Fannie Mae and Freddie Mac to pursue additional credit loss protection and (5) reducing Fannie Mae's and Freddie Mac's portfolios, consistent with Treasury's senior preferred stock purchase agreements with the companies.

In addition, the report outlines three potential options for a new long-term structure for the housing finance system following the wind-down of Fannie Mae and Freddie Mac. The first option would privatize housing finance almost entirely. The second option would add a government guaranty mechanism that could scale up during times of crisis. The third option would involve the government offering catastrophic reinsurance behind private mortgage guarantors. Each of these options assumes the continued presence of programs operated by FHA, the Department of Agriculture and the Veterans Administration to assist targeted groups of borrowers. The report does not state whether or how the existing infrastructure or human capital of Fannie Mae may be used in the establishment of such a reformed system. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. A copy of the report can be found on the Housing Finance Reform section of Treasury's Web site, www.Treasury.gov. We are providing Treasury's Web site address solely for your information, and information appearing on Treasury's Web site is not incorporated into this quarterly report on Form 10-Q.

In February 2012, Treasury Secretary Geithner stated that the Administration intended to release new details in the spring of 2012 around approaches to housing finance reform, including winding down Fannie Mae and Freddie Mac, and to work with Congressional leaders to explore options for legislation, but that he does not expect housing finance reform legislation to be enacted in 2012.

During 2011, Congress held hearings on the future status of Fannie Mae and Freddie Mac, and members of Congress offered legislative proposals relating to the future status of the GSEs. We expect hearings on GSE reform to continue in 2012 and additional legislation to be considered and proposals to be discussed, including proposals that would result in a substantial change to our business structure or that involve Fannie Mae's liquidation or dissolution. Several bills have been introduced that would place the GSEs into receivership after a period of time and either grant federal charters to new entities to engage in activities similar to those currently engaged in by the GSEs or leave secondary mortgage market activities to entities in the private sector. For example, legislation has been introduced in both the House of Representatives and the Senate that would require FHFA to make a determination within two years of enactment regarding whether the GSEs were financially viable and, if the GSEs were determined not to be financially viable, to place them into receivership. As drafted, these bills may upon enactment impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent the federal government providing an explicit guarantee of our existing and future liabilities.

In addition to bills that seek to resolve the status of the GSEs, numerous bills have been introduced and considered that could constrain the current operations of the GSEs or alter the existing authority that FHFA or Treasury has over the enterprises. For example, the Subcommittee on Capital Markets and Government Sponsored Enterprises of the House Financial Services Committee has approved bills that would:

- suspend current compensation packages and apply a government pay scale for GSE employees;

- require the GSEs to increase guaranty fees;

- subject GSE loans to the risk retention standards in the Dodd-Frank Act;

- require a quicker reduction of GSE portfolios than required under the senior preferred stock purchase agreement;

- require Treasury to pre-approve all GSE debt issuances;

- repeal the GSEs' affordable housing goals;

13

Table of Contents

- provide additional authority to FHFA's Inspector General;

- prohibit FHFA from approving any new GSE products during conservatorship or receivership, with certain exceptions;

- prevent Treasury from amending the senior preferred stock purchase agreement to reduce the current dividend rate on our senior preferred stock;

- abolish the Affordable Housing Trust Fund that the GSEs are required to fund except when such contributions have been temporarily suspended by FHFA;

- require FHFA to identify mission critical assets of the GSEs and require the GSEs to dispose of non-mission critical assets;

- cap the maximum aggregate amount of funds Treasury or any other agency or entity of the federal government can provide to the GSEs subject to certain qualifications;

- grant FHFA the authority to revoke the enterprises' charters following receivership under certain circumstances; and

- subject the GSEs to the Freedom of Information Act.

Of these bills that passed at a subcommittee level, the only one that has passed the full committee is the bill that would put GSE employees on a government pay scale. We expect additional legislation relating to the GSEs to be introduced and considered by Congress in 2012. We cannot predict the prospects for the enactment, timing or content of legislative proposals concerning the future status of the GSEs, their regulation or operations.

In sum, there continues to be uncertainty regarding the future of our company, including how long the company will continue to exist in its current form, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. See "Risk Factors" in our 2011 Form 10-K for a discussion of the risks to our business relating to the uncertain future of our company. Also see "Risk Factors" in this report for a discussion of how the uncertain future of our company may adversely affect our ability to retain and recruit well-qualified employees, including senior management.

**Compensation**

In April 2012, the Stop Trading on Congressional Knowledge Act (the "STOCK Act") was enacted, which includes a provision that prohibits senior executives at Fannie Mae and Freddie Mac from receiving bonuses during any period of conservatorship on or after the date of enactment of the law. Congress has also considered other legislation that would alter the compensation for Fannie Mae and Freddie Mac employees. In 2011, the House Financial Services Committee passed a bill that would place all Fannie Mae and Freddie Mac employees on a pay scale similar to that provided for federal government employees. Additional legislative proposals related to compensation for Fannie Mae and Freddie Mac employees may be considered by Congress in 2012.

If legislation is adopted that results in a significant reduction in compensation to our employees, it could cause a substantial number of our most skilled and experienced employees to leave and significantly impede our ability to retain and attract employees in a competitive marketplace, as we discuss in "Risk Factors."

**Enhanced Supervision and Prudential Standards under the Dodd-Frank Act**

The Dodd-Frank Act established the Financial Stability Oversight Council (the "FSOC"), chaired by the Secretary of the Treasury, to ensure that all financial companies whose failure could pose a threat to the financial stability of the United States—not just banks—will be subject to strong oversight. Under the Dodd-Frank Act, the FSOC is responsible for designating systemically important nonbank financial companies, while the Federal Reserve is to establish stricter prudential standards that will apply to certain bank holding companies and to systemically important nonbank financial companies. The Federal Reserve must establish standards related to risk-based capital, leverage limits, liquidity, credit concentrations, resolution plans, reporting credit exposures and other risk management measures. On December 20, 2011, the Board of Governors of the Federal Reserve

14

Table of Contents

System issued proposed rules addressing a number of these enhanced prudential standards. The Federal Reserve may also impose other standards related to contingent capital, enhanced public disclosure, short-term debt limits and other requirements as appropriate.

On April 11, 2012, the FSOC published a final rule and interpretive guidance describing the manner in which it intends to apply the statutory standards and procedures for determining whether a nonbank financial company will be subject to supervision by, and the prudential standards of, the Federal Reserve Board. The rule outlines the evaluation process that the FSOC intends to use in making these determinations. In making its determinations, factors the FSOC may consider include: company size, leverage, interconnectedness, liquidity risk, maturity mismatch, importance to the economic system, and the extent to which a company is already regulated.

Depending on the scope and final form of the Federal Reserve's enhanced standards, and the extent to which they apply to us if we are designated by the FSOC as a systemically important nonbank financial company, or to our customers and other counterparties, their adoption and application could increase our costs, pose operational challenges and adversely affect demand for our debt and Fannie Mae MBS.

**FHFA Advisory Bulletin Regarding Framework for Adversely Classifying Loans**

On April 9, 2012, FHFA issued an Advisory Bulletin, "Framework for Adversely Classifying Loans, Other Real Estate Owned, and Other Assets and Listing Assets for Special Mention," which was effective upon issuance and is applicable to Fannie Mae, Freddie Mac and the Federal Home Loan Banks. The Advisory Bulletin establishes guidelines for adverse classification and identification of specified assets and off-balance sheet credit exposures. The Advisory Bulletin indicates that this guidance considers and is generally consistent with the *Uniform Retail Credit Classification and Account Management Policy* issued by the federal banking regulators in June 2000.

Among other requirements, the Advisory Bulletin requires that we classify the portion of an outstanding single-family loan balance in excess of the fair value of the underlying property, less costs to sell, as "loss" when the loan is no more than 180 days delinquent, except in certain specified circumstances (such as properly secured loans with an LTV ratio equal to or less than 60%), and charge off the portion of the loan classified as "loss." The Advisory Bulletin also specifies that, if we subsequently receive full or partial payment of a previously charged-off loan, we may report a recovery of the amount, either through our loss reserves or as a reduction in our foreclosed property expenses.

The accounting methods outlined in FHFA's Advisory Bulletin are different from our current methods of accounting for single-family loans that are 180 days or more delinquent. As described in "Risk Factors," we believe that implementation of these changes in our accounting methods present significant operational challenges for us. We have not yet determined when we will implement the accounting changes specified in the Advisory Bulletin. We are currently assessing the impact of implementing these accounting changes on our future financial results.

For additional information on legislative and regulatory matters affecting us, refer to "Business—Legislative and Regulatory Developments" and "Business—Our Charter and Regulation of Our Activities" in our 2011 Form 10-K. Also see "Risk Factors" in this report and our 2011 Form 10-K for a discussion of risks relating to our business relating to legislative and regulatory matters.

15

**Table of Contents**

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in accordance with GAAP requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the condensed consolidated financial statements. Understanding our accounting policies and the extent to which we use management judgment and estimates in applying these policies is integral to understanding our financial statements. We describe our most significant accounting policies in "Note 1, Summary of Significant Accounting Policies" of this report and in our 2011 Form 10-K.

We evaluate our critical accounting estimates and judgments required by our policies on an ongoing basis and update them as necessary based on changing conditions. Management has discussed any significant changes in judgments and assumptions in applying our critical accounting policies with the Audit Committee of our Board of Directors. We have identified three of our accounting policies as critical because they involve significant judgments and assumptions about highly complex and inherently uncertain matters, and the use of reasonably different estimates and assumptions could have a material impact on our reported results of operations or financial condition. These critical accounting policies and estimates are as follows:

• Fair Value Measurement

• Total Loss Reserves

• Other-Than-Temporary Impairment of Investment Securities

See "MD&A—Critical Accounting Policies and Estimates" in our 2011 Form 10-K for a detailed discussion of these critical accounting policies and estimates. We provide below information about our Level 3 assets and liabilities as of March 31, 2012 as compared with December 31, 2011.

### Fair Value Measurement

The use of fair value to measure our assets and liabilities is fundamental to our financial statements and is a critical accounting estimate because we account for and record a portion of our assets and liabilities at fair value. In determining fair value, we use various valuation techniques. We describe the valuation techniques and inputs used to determine the fair value of our assets and liabilities and disclose their carrying value and fair value in "Note 12, Fair Value."

### *Fair Value Hierarchy—Level 3 Assets and Liabilities*

The assets and liabilities that we have classified as Level 3 consist primarily of financial instruments for which there is limited market activity and therefore little or no price transparency. As a result, the valuation techniques that we use to estimate the fair value of Level 3 instruments involve significant unobservable inputs, which generally are more subjective and involve a high degree of management judgment and assumptions. Our Level 3 assets and liabilities consist of certain mortgage-backed securities and residual interests, certain mortgage loans, certain acquired property, certain long-term debt arrangements and certain highly structured, complex derivative instruments.

Table 4 presents a comparison of the amount of financial assets carried in our condensed consolidated balance sheets at fair value on a recurring basis ("recurring assets") that were classified as Level 3 as of March 31, 2012 and December 31, 2011. The availability of observable market inputs to measure fair value varies based on changes in market conditions, such as liquidity. As a result, we expect the amount of financial instruments carried at fair value on a recurring basis and classified as Level 3 to vary each period.

16

Table of Contents

**Table 4:   Level 3 Recurring Financial Assets at Fair Value**

| | As of | |
|---|---|---|
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Trading securities | $      2,756 | $      4,238 |
| Available-for-sale securities | 27,853 | 29,492 |
| Mortgage loans | 2,271 | 2,319 |
| Other assets | 203 | 238 |
| Level 3 recurring assets | $      33,083 | $      36,287 |
| Total assets | $3,209,940 | $  3,211,484 |
| Total recurring assets measured at fair value | $  157,492 | $  156,552 |
| Level 3 recurring assets as a percentage of total assets | 1% | 1% |
| Level 3 recurring assets as a percentage of total recurring assets measured at fair value | 21% | 23% |
| Total recurring assets measured at fair value as a percentage of total assets | 5% | 5% |

Assets measured at fair value on a nonrecurring basis and classified as Level 3, which are not presented in the table above, primarily include mortgage loans and acquired property. The fair value of Level 3 nonrecurring assets totaled $28.5 billion as of March 31, 2012 and $69.0 billion for the year ended December 31, 2011.

Financial liabilities measured at fair value on a recurring basis and classified as Level 3 consisted of long-term debt with a fair value of $1.3 billion as of March 31, 2012 and $1.2 billion as of December 31, 2011, and other liabilities with a fair value of $159 million as of March 31, 2012 and $173 million as of December 31, 2011.

## CONSOLIDATED RESULTS OF OPERATIONS

The section below provides a discussion of our condensed consolidated results of operations for the periods indicated and should be read together with our condensed consolidated financial statements, including the accompanying notes.

Table 5 displays our condensed consolidated results of operations for the periods indicated.

17

Table of Contents

**Table 5:   Summary of Condensed Consolidated Results of Operations**

| | For the Three Months Ended March 31, | | |
| | 2012 | 2011 | Variance |
| --- | --- | --- | --- |
| | (Dollars in millions) | | |
| Net interest income | $5,197 | $ 4,960 | $  237 |
| Fee and other income | 375 | 237 | 138 |
| **Net revenues** | **$ 5,572** | **$ 5,197** | **$  375** |
| Investment gains, net | 116 | 75 | 41 |
| Net other-than-temporary impairments | (64) | (44) | (20) |
| Fair value gains, net | 283 | 289 | (6) |
| Administrative expenses | (564) | (605) | 41 |
| Credit-related expenses | | | |
| Provision for credit losses | (2,000) | (10,554) | 8,554 |
| Foreclosed property expense | (339) | (488) | 149 |
| Total credit-related expenses | (2,339) | (11,042) | 8,703 |
| Other non-interest expenses[1] | (286) | (339) | 53 |
| Income (loss) before federal income taxes | 2,718 | (6,469) | 9,187 |
| Provision for federal income taxes | — | (2) | 2 |
| **Net income (loss)** | **2,718** | **(6,471)** | **9,189** |
| Less: Net loss attributable to the noncontrolling interest | 1 | — | 1 |
| **Net income (loss) attributable to Fannie Mae** | **$ 2,719** | **$  (6,471)** | **$ 9,190** |
| Total comprehensive income (loss) attributable to Fannie Mae | $ 3,081 | $ (6,290) | $9,371 |

[1]  Consists of debt extinguishment (losses) gains, net and other expenses.

**Net Interest Income**

Table 6 displays an analysis of our net interest income, average balances, and related yields earned on assets and incurred on liabilities for the periods indicated. For most components of the average balances, we use a daily weighted average of amortized cost. When daily average balance information is not available, such as for mortgage loans, we use monthly averages. Table 7 displays the change in our net interest income between periods and the extent to which that variance is attributable to: (1) changes in the volume of our interest-earning assets and interest-bearing liabilities or (2) changes in the interest rates of these assets and liabilities.

18

Table of Contents

**Table 6:   Analysis of Net Interest Income and Yield**

| | For the Three Months Ended March 31, | | | | | |
| | 2012 | | | 2011 | | |
| | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid |
|---|---|---|---|---|---|---|
| | (Dollars in millions) | | | | | |
| Interest-earning assets: | | | | | | |
| Mortgage loans of Fannie Mae | $   378,344 | $  3,569 | 3.77% | $   405,820 | $  3,725 | 3.67% |
| Mortgage loans of consolidated trusts | 2,600,221 | 29,001 | 4.46 | 2,598,508 | 31,865 | 4.91 |
| Total mortgage loans | 2,978,565 | 32,570 | 4.37 | 3,004,328 | 35,590 | 4.74 |
| Mortgage-related securities | 288,449 | 3,458 | 4.80 | 334,057 | 4,245 | 5.08 |
| Elimination of Fannie Mae MBS held in portfolio | (186,214) | (2,305) | 4.95 | (214,370) | (2,793) | 5.21 |
| Total mortgage-related securities, net | 102,235 | 1,153 | 4.51 | 119,687 | 1,452 | 4.85 |
| Non-mortgage securities[1] | 68,936 | 23 | 0.13 | 79,719 | 45 | 0.23 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 37,485 | 13 | 0.14 | 13,743 | 7 | 0.20 |
| Advances to lenders | 5,050 | 25 | 1.96 | 4,089 | 21 | 2.05 |
| Total interest-earning assets | $ 3,192,271 | $ 33,784 | 4.23% | $3,221,566 | $ 37,115 | 4.61% |
| Interest-bearing liabilities: | | | | | | |
| Short-term debt[2] | $   133,307 | $    41 | 0.12% | $   138,848 | $    104 | 0.30% |
| Long-term debt | 578,155 | 3,185 | 2.20 | 631,917 | 4,196 | 2.66 |
| Total short-term and long-term funding debt | 711,462 | 3,226 | 1.81 | 770,765 | 4,300 | 2.23 |
| Debt securities of consolidated trusts | 2,666,552 | 27,666 | 4.15 | 2,652,024 | 30,648 | 4.62 |
| Elimination of Fannie Mae MBS held in portfolio | (186,214) | (2,305) | 4.95 | (214,370) | (2,793) | 5.21 |
| Total debt securities of consolidated trusts held by third parties | 2,480,338 | 25,361 | 4.09 | 2,437,654 | 27,855 | 4.57 |
| Total interest-bearing liabilities | $ 3,191,800 | $ 28,587 | 3.58% | $ 3,208,419 | $ 32,155 | 4.01% |
| Impact of net non-interest bearing funding | $     471 | | 0.00% | $   13,147 | | 0.02% |
| Net interest income/net interest yield | | $  5,197 | 0.65% | | $  4,960 | 0.62% |
| Net interest income/net interest yield of consolidated trusts [3] | | $  1,335 | 0.21% | | $  1,217 | 0.19% |

| | As of March 31, | |
| Selected benchmark interest rates[4] | 2012 | 2011 |
|---|---|---|
| 3-month LIBOR | 0.47% | 0.30% |
| 2-year swap rate | 0.58 | 1.00 |
| 5-year swap rate | 1.27 | 2.47 |
| 30-year Fannie Mae MBS par coupon rate | 3.06 | 4.30 |

[1]   Includes cash equivalents.

[2]   Includes federal funds purchased and securities sold under agreements to repurchase.

[3]   Net interest income of consolidated trusts represents interest income from mortgage loans of consolidated trusts less interest expense from debt securities of consolidated trusts. Net interest yield is calculated based on net interest income from consolidated trusts divided by average balance of mortgage loans of consolidated trusts.

[4]   Data from British Bankers' Association, Thomson Reuters Indices and Bloomberg L.P.

Table of Contents

**Table 7:   Rate/Volume Analysis of Changes in Net Interest Income**

| | For the Three Months Ended March 31, 2012 vs. 2011 | | |
| --- | --- | --- | --- |
| | Total Variance | Variance Due to:[1] | |
| | | Volume | Rate |
| | | (Dollars in millions) | |
| Interest income: | | | |
| Mortgage loans of Fannie Mae | $ (156) | $ (257) | $ 101 |
| Mortgage loans of consolidated trusts | (2,864) | 21 | (2,885) |
| Total mortgage loans | (3,020) | (236) | (2,784) |
| Mortgage-related securities | (787) | (556) | (231) |
| Elimination of Fannie Mae MBS held in portfolio | 488 | 354 | 134 |
| Total mortgage-related securities, net | (299) | (202) | (97) |
| Non-mortgage securities[2] | (22) | (5) | (17) |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 6 | 9 | (3) |
| Advances to lenders | 4 | 5 | (1) |
| Total interest income | (3,331) | (429) | (2,902) |
| Interest expense: | | | |
| Short-term debt[3] | (63) | (4) | (59) |
| Long-term debt | (1,011) | (337) | (674) |
| Total short-term and long-term funding debt | (1,074) | (341) | (733) |
| Debt securities of consolidated trusts | (2,982) | 167 | (3,149) |
| Elimination of Fannie Mae MBS held in portfolio | 488 | 354 | 134 |
| Total debt securities of consolidated trusts held by third parties | (2,494) | 521 | (3,015) |
| Total interest expense | (3,568) | 180 | (3,748) |
| Net interest income | $ 237 | $ (609) | $ 846 |

[1]   Combined rate/volume variances are allocated to both rate and volume based on the relative size of each variance.

[2]   Includes cash equivalents.

[3]   Includes federal funds purchased and securities sold under agreements to repurchase.

Net interest income increased in the first quarter of 2012, as compared with the first quarter of 2011, primarily due to lower interest expense on debt, which was partially offset by lower interest income on loans and securities. The primary drivers of these changes were:

- lower interest expense on funding debt due to lower funding needs and lower borrowing rates, which allowed us to continue to replace higher-cost debt with lower-cost debt;

- lower interest income on mortgage securities due to lower interest rates and a decrease in the balance of our mortgage securities, as we continue to manage our portfolio requirements; and

- lower interest income on mortgage loans we hold in our portfolio due to a decrease in average balance and new business acquisitions which continued to replace higher-yielding loans with loans issued at lower mortgage rates. The reduction in interest income was partially offset by a reduction in the amount of interest income not recognized for nonaccrual mortgage loans, due to a decline in the balance of nonaccrual loans in our condensed consolidated balance sheets as we continue to complete a high number of loan modifications and foreclosures.

Additionally, our net interest income and net interest yield were higher than they would have otherwise been in the first quarter of 2012 and 2011 because our debt funding needs were lower than would otherwise have been required as a result of funds we received from Treasury under the senior preferred stock purchase agreement. Further, dividends paid to Treasury are not recognized as interest expense.

Table 8 displays the interest income not recognized for loans on nonaccrual status and the resulting reduction in our net interest yield on total interest earning assets for the periods indicated.

Table of Contents

**Table 8:   Impact of Nonaccrual Loans on Net Interest Income**

| | For the Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | Interest Income not Recognized for Nonaccrual Loans[1] | Reduction in Net Interest Yield[2] | Interest Income not Recognized for Nonaccrual Loans[1] | Reduction in Net Interest Yield[2] |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| Mortgage loans of Fannie Mae | $   (982) | | $ (1,362) | |
| Mortgage loans of consolidated trusts | (180) | | (258) | |
| Total mortgage loans | $(1,162) | (15)bp | $ (1,620) | (20)bp |

[1]   Amount includes cash received for loans on nonaccrual status.

[2]   Calculated based on annualized interest income not recognized divided by total interest-earning assets, expressed in basis points.

For a discussion of the interest income from the assets we have purchased and the interest expense from the debt we have issued, see the discussion of our Capital Markets group's net interest income in "Business Segment Results."

**Fair Value Gains, Net**

Table 9 displays the components of our fair value gains and losses.

**Table 9:   Fair Value Gains, Net**

| | For the Three Months Ended March 31, | |
| | 2012 | 2011 |
|---|---|---|
| | (Dollars in millions) | |
| Risk management derivatives fair value gains (losses) attributable to: | | |
| Net contractual interest expense accruals on interest rate swaps | $   (374) | $   (635) |
| Net change in fair value during the period | 553 | 751 |
| Total risk management derivatives fair value gains, net | 179 | 116 |
| Mortgage commitment derivatives fair value (losses) gains, net | (205) | 23 |
| Total derivatives fair value (losses) gains, net | (26) | 139 |
| Trading securities gains, net | 284 | 225 |
| Other, net[1] | 25 | (75) |
| Fair value gains, net | $   283 | $   289 |

| | 2012 | 2011 |
|---|---|---|
| 5-year swap rate: | | |
| As of January 1 | 1.22% | 2.18% |
| As of March 31 | 1.27 | 2.47 |

[1]   Consists of debt fair value gains (losses), net, debt foreign exchange gains (losses), net, and mortgage loans fair value gains (losses), net.

We can expect high levels of period-to-period volatility in our results of operations and financial condition due to changes in market conditions that result in periodic fluctuations in the estimated fair value of financial instruments that we mark to market through our earnings. These instruments include trading securities and derivatives. The estimated fair value of our trading securities and derivatives may fluctuate substantially from

Table of Contents

period to period because of changes in interest rates, credit spreads and interest rate volatility, as well as activity related to these financial instruments. While the estimated fair value of our derivatives may fluctuate, some of the financial instruments that the derivatives hedge are not recorded at fair value in our condensed consolidated financial statements.

### Risk Management Derivatives Fair Value Gains, Net

Risk management derivative instruments are an integral part of our interest rate risk management strategy. We supplement our issuance of debt securities with derivative instruments to further reduce duration risk, which includes prepayment risk. We recorded risk management derivative fair value gains in the first quarter of 2012 and 2011 primarily as a result of an increase in the fair value of our pay-fixed derivatives due to an increase in swap rates. The gains in the first quarter of 2011 were partially offset by fair value losses due to time decay on our purchased options.

We present, by derivative instrument type, the fair value gains and losses on our derivatives for the three months ended March 31, 2012 and 2011 in "Note 9, Derivative Instruments."

### Mortgage Commitment Derivatives Fair Value (Losses) Gains, Net

We recognized fair value losses on our mortgage commitments in the first quarter of 2012 primarily due to losses on commitments to sell mortgage-related securities as a result of an increase in prices as interest rates decreased during the commitment period. We recognized fair value gains on our mortgage commitments in the first quarter of 2011 primarily due to gains on commitments to sell mortgage-related securities as a result of a decrease in prices as interest rates increased during the commitment period.

### Trading Securities Gains, Net

The gains from our trading securities in the first quarter of 2012 and 2011 were primarily driven by the narrowing of credit spreads on commercial mortgage-backed securities ("CMBS").

### Credit-Related Expenses

We refer to our provision for loan losses and our provision for guaranty losses collectively as our "provision for credit losses." Credit-related expenses consist of our provision for credit losses and foreclosed property expense.

### Provision for Credit Losses

Our total loss reserves provide for an estimate of credit losses incurred in our guaranty book of business, including concessions we granted borrowers upon modification of their loans, as of each balance sheet date. We establish our loss reserves through our provision for credit losses for losses that we believe have been incurred and will eventually be reflected over time in our charge-offs. When we determine that a loan is uncollectible, typically upon foreclosure, we record a charge-off against our loss reserves. We record recoveries of previously charged-off amounts as a reduction to charge-offs.

Table 10 displays the components of our total loss reserves and our total fair value losses previously recognized on loans purchased out of unconsolidated MBS trusts reflected in our condensed consolidated balance sheets. Because these fair value losses lowered our recorded loan balances, we have fewer inherent losses in our guaranty book of business and consequently require lower total loss reserves. For these reasons, we consider these fair value losses as an "effective reserve," apart from our total loss reserves, to the extent that we expect to realize these amounts as credit losses on the acquired loans in the future. As of March 31, 2012, we estimate that nearly two-thirds of this amount represents credit losses we expect to realize in the future and over one-third will eventually be recovered, either through net interest income for loans that cure or through foreclosed property income for loans where the sale of the collateral exceeds our recorded investment in the loan. We exclude these fair value losses from our credit loss calculation as described in "Credit Loss Performance Metrics."

22

Table of Contents

**Table 10:   Total Loss Reserves**

| | As of | |
|---|---|---|
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Allowance for loan losses | $ 70,109 | $ 72,156 |
| Reserve for guaranty losses[1] | 997 | 994 |
| Combined loss reserves | 71,106 | 73,150 |
| Allowance for accrued interest receivable | 2,223 | 2,496 |
| Allowance for preforeclosure property taxes and insurance receivable [2] | 1,282 | 1,292 |
| Total loss reserves | 74,611 | 76,938 |
| Fair value losses previously recognized on acquired credit impaired loans [3] | 15,609 | 16,273 |
| Total loss reserves and fair value losses previously recognized on acquired credit-impaired loans | $ 90,220 | $ 93,211 |

[1]   Amount included in "Other liabilities" in our condensed consolidated balance sheets.

[2]   Amount included in "Other assets" in our condensed consolidated balance sheets.

[3]   Represents the fair value losses on loans purchased out of previously unconsolidated MBS trusts reflected in our condensed consolidated balance sheets.

23

Table of Contents

The following table displays changes in the total allowance for loan losses, reserve for guaranty losses and the total combined loss reserves for the three months ended March 31, 2012 and 2011.

**Table 11:   Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves)**

| | For the Three Months Ended March 31, | | | | | |
| | 2012 | | | 2011 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | (Dollars in millions) | | | | | |
| **Changes in combined loss reserves:** | | | | | | |
| Allowance for loan losses[1]: | | | | | | |
| Beginning balance | $ 57,309 | $ 14,847 | $72,156 | $ 48,530 | $ 13,026 | $61,556 |
| Provision for loan losses | 1,383 | 597 | 1,980 | 7,159 | 3,428 | 10,587 |
| Charge-offs[2][3] | (4,533) | (263) | (4,796) | (5,705) | (448) | (6,153) |
| Recoveries | 421 | 65 | 486 | 530 | 952 | 1,482 |
| Transfers[4] | 2,201 | (2,201) | — | 3,207 | (3,207) | — |
| Other[5] | 220 | 63 | 283 | (13) | 98 | 85 |
| Ending balance[6] | $ 57,001 | $ 13,108 | $ 70,109 | $ 53,708 | $ 13,849 | $67,557 |
| Reserve for guaranty losses: | | | | | | |
| Beginning balance | $    994 | $    — | $    994 | $    323 | $    — | $    323 |
| Provision (benefit) for guaranty losses | 20 | — | 20 | (33) | — | (33) |
| Charge-offs | (51) | — | (51) | (35) | — | (35) |
| Recoveries | 34 | — | 34 | 2 | — | 2 |
| Ending balance | $    997 | $    — | $    997 | $    257 | $    — | $    257 |
| Combined loss reserves[1]: | | | | | | |
| Beginning balance | $ 58,303 | $ 14,847 | $ 73,150 | $ 48,853 | $ 13,026 | $61,879 |
| Total provision for credit losses | 1,403 | 597 | 2,000 | 7,126 | 3,428 | 10,554 |
| Charge-offs[2][3] | (4,584) | (263) | (4,847) | (5,740) | (448) | (6,188) |
| Recoveries | 455 | 65 | 520 | 532 | 952 | 1,484 |
| Transfers[4] | 2,201 | (2,201) | — | 3,207 | (3,207) | — |
| Other[5] | 220 | 63 | 283 | (13) | 98 | 85 |
| Ending balance[6] | $57,998 | $ 13,108 | $ 71,106 | $53,965 | $ 13,849 | $ 67,814 |

| | As of | |
| | March 31, 2012 | December 31, 2011 |
| **Allocation of combined loss reserves:** | | |
| Balance at end of each period attributable to: | | |
| Single-family | $69,633 | $ 71,512 |
| Multifamily | 1,473 | 1,638 |
| Total | $71,106 | $ 73,150 |
| **Single-family and multifamily combined loss reserves as a percentage of applicable guaranty book of business:** | | |
| Single-family | 2.44% | 2.52% |
| Multifamily | 0.75 | 0.84 |
| **Combined loss reserves as a percentage of:** | | |
| Total guaranty book of business | 2.33% | 2.41% |
| Recorded investment in nonperforming loans | 28.79 | 29.03 |

24

Table of Contents

[1] Includes an out-of-period adjustment of $548 million to increase the provision for loan losses for the three months ended March 31, 2012.

[2] Includes accrued interest of $273 million and $386 million for the three months ended March 31, 2012 and 2011, respectively.

[3] While we purchase the substantial majority of loans that are four or more months delinquent from our MBS trusts, we do not exercise this option to purchase loans during a forbearance period. Accordingly, charge-offs of consolidated trusts generally represent loans that remained in our consolidated trusts at the time of default.

[4] Includes transfers from trusts for delinquent loan purchases.

[5] Amounts represent the net activity recorded in our allowances for accrued interest receivable and preforeclosure property taxes and insurance receivable from borrowers. The provision for credit losses, charge-offs, recoveries and transfer activity included in this table reflects all changes for both the allowance for loan losses and the valuation allowances for accrued interest and preforeclosure property taxes and insurance receivable that relate to the mortgage loans.

[6] Includes $353 million and $412 million as of March 31, 2012 and 2011, respectively, for acquired credit-impaired loans.

Our provision for credit losses continues to be a key driver of our results for each period presented. The amount of our provision for credit losses varies from period to period based on changes in actual and expected home prices, borrower payment behavior, the types and volumes of loss mitigation activities and foreclosures completed, and actual and estimated recoveries from our lender and mortgage insurer counterparties. See "Risk Management— Credit Risk Management—Institutional Counterparty Credit Risk Management" for information on mortgage insurers and outstanding mortgage seller/servicer repurchase obligations. In addition, our provision for credit losses and our loss reserves can be impacted by updates to our allowance for loan loss models that we use to estimate our loss reserves.

In April 2012, FHFA issued an Advisory Bulletin that could have an impact on our provision for credit losses in the future; however, we are still assessing the impact of the Advisory Bulletin. See "Legislative and Regulatory Developments —FHFA Advisory Bulletin Regarding Framework for Adversely Classifying Loans" for additional information.

Our provision for credit losses significantly decreased in the first quarter of 2012 compared with the first quarter of 2011 primarily due to: (1) a less significant decline in home prices as the housing market continued to stabilize; we estimate that home prices declined by 0.8% in the first quarter of 2012 compared with a 2.0% decline in the first quarter of 2011, which represented over half of the 2011 home price decline; (2) improved sales prices on dispositions of our REO inventory resulting from strong demand in markets with limited REO supply; and (3) lower single-family serious delinquency rates, which declined to 3.67% as of the end of the first quarter of 2012 from 4.27% as of the end of the first quarter of 2011. We discuss our expectations regarding our future credit-related expenses and loss reserves in "Executive Summary—Summary of Our Financial Performance for the First Quarter of 2012 —Our Expectations Regarding Future Loss Reserves and Credit-Related Expenses."

We continue to experience high volumes of loan modifications involving concessions to borrowers, which are considered troubled debt restructurings ("TDRs"). Individual impairment for a TDR is based on the restructured loan's expected cash flows over the life of the loan, taking into account the effect of any concessions granted to the borrower, discounted at the loan's original effective interest rate. The allowance calculated for an individually impaired loan has generally been greater than the allowance that would be calculated under the collective reserve.

*Nonperforming Loans*

Our balance of nonperforming single-family loans remained high as of March 31, 2012 due to both high levels of delinquencies and an increase in TDRs. When a TDR occurs, the loan may return to a current status, but it will continue to be classified as a nonperforming loan as the loan is not performing in accordance with its original terms. Table 12 displays the composition of our nonperforming loans, which includes our single-family and multifamily held-for-investment and held-for-sale mortgage loans. For information on the impact of TDRs and other individually impaired loans on our allowance for loan losses, see "Note 3, Mortgage Loans."

25

**Table of Contents**

**Table 12:   Nonperforming Single-Family and Multifamily Loans**

| | As of | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| On-balance sheet nonperforming loans including loans in consolidated Fannie Mae MBS trusts: | | |
| Nonaccrual loans | $ 131,764 | $ 142,998 |
| Troubled debt restructurings on accrual status [1] | 115,069 | 108,797 |
| Total on-balance sheet nonperforming loans | 246,833 | 251,795 |
| Off-balance sheet nonperforming loans in unconsolidated | | |
| Fannie Mae MBS trusts [2] | 149 | 154 |
| Total nonperforming loans | 246,982 | 251,949 |
| Allowance for loan losses and allowance for accrued interest receivable related to individually impaired on-balance sheet nonperforming loans | (47,720) | (47,711) |
| Total nonperforming loans, net of allowance | $199,262 | $ 204,238 |
| Accruing on-balance sheet loans past due 90 days or more [3] | $     757 | $     768 |

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (Dollars in millions) | |
| Interest related to on-balance sheet nonperforming loans: | | |
| Interest income forgone [4] | $ 2,300 | $ 2,827 |
| Interest income recognized for the period [5] | 1,433 | 1,388 |

[1]  Includes HomeSaver Advance first-lien loans on accrual status.

[2]  Represents loans that would meet our criteria for nonaccrual status if the loans had been on-balance sheet.

[3]  Recorded investment in loans that, as of the end of each period, are 90 days or more past due and continuing to accrue interest. The majority of this amount consists of loans insured or guaranteed by the U.S. government and loans for which we have recourse against the seller in the event of a default.

[4]  Represents the amount of interest income we did not record but would have recorded during the period for on-balance sheet nonperforming loans as of the end of each period had the loans performed according to their original contractual terms.

[5]  Represents interest income recognized during the period for on-balance sheet loans classified as nonperforming as of the end of each period. Includes primarily amounts accrued while the loans were performing and cash payments received on nonaccrual loans.

*Foreclosed Property Expense*

Foreclosed property expense decreased in the first quarter of 2012 compared with the first quarter of 2011 primarily due to improved sales prices on dispositions of our REO properties resulting from strong demand in markets with limited REO supply, and a 25% decline in our inventory of single-family REO properties. We had fewer REO properties in the first quarter of 2012 compared with the first quarter of 2011, primarily driven by delays in the foreclosure process, which resulted in lower foreclosed property expense.

*Credit Loss Performance Metrics*

Our credit-related expenses should be considered in conjunction with our credit loss performance metrics. Our credit loss performance metrics, however, are not defined terms within GAAP and may not be calculated in the same manner as similarly titled measures reported by other companies. Because management does not view changes in the fair value of our mortgage loans as credit losses, we adjust our credit loss performance metrics for the impact associated with our acquisition of credit-impaired loans from unconsolidated MBS trusts. We also exclude interest forgone on nonperforming loans in our mortgage portfolio, other-than-temporary impairment losses resulting from deterioration in the credit quality of our mortgage-related securities and accretion of interest

26

Table of Contents

income on acquired credit-impaired loans from credit losses. We believe that credit loss performance metrics may be useful to investors as the losses are presented as a percentage of our book of business and have historically been used by analysts, investors and other companies within the financial services industry. Moreover, by presenting credit losses with and without the effect of fair value losses associated with the acquisition of credit-impaired loans, investors are able to evaluate our credit performance on a more consistent basis among periods.

Table 13 displays the components of our credit loss performance metrics as well as our average single-family and multifamily default rate and initial charge-off severity rate.

**Table 13:   Credit Loss Performance Metrics**

| | For the Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | Amount | Ratio[1] | Amount | Ratio[1] |
| | (Dollars in millions) | | | |
| Charge-offs, net of recoveries | $ 4,327 | 56.8bp | $ 4,704 | 61.2bp |
| Foreclosed property expense | 339 | 4.5 | 488 | 6.4 |
| Credit losses including the effect of fair value losses on acquired credit-impaired loans | 4,666 | 61.3 | 5,192 | 67.6 |
| Plus: Impact of acquired credit-impaired loans on charge-offs, foreclosed property expense [2] | 425 | 5.6 | 494 | 6.5 |
| Credit losses and credit loss ratio | $5,091 | 66.9bp | $5,686 | 74.1bp |
| Credit losses attributable to: | | | | |
|    Single-family | $4,955 | | $ 5,604 | |
|    Multifamily | 136 | | 82 | |
|     Total | $ 5,091 | | $5,686 | |
| Single-family default rate | | 0.41% | | 0.44% |
| Single-family initial charge-off severity rate[3] | | 33.43% | | 35.93% |
| Average multifamily default rate | | 0.15% | | 0.12% |
| Average multifamily initial charge-off severity rate[3] | | 43.95% | | 36.85% |

[1] Basis points are based on the annualized amount for each line item presented divided by the average guaranty book of business during the period.

[2] Includes fair value losses from acquired credit impaired loans.

[3] Single-family and multifamily rates exclude fair value losses on credit-impaired loans acquired from MBS trusts and any costs, gains or losses associated with REO after initial acquisition through final disposition; single-family rate excludes charge-offs from short sales.

Credit losses decreased in the first quarter of 2012 compared with the first quarter of 2011 primarily due to: (1) improved sales prices on dispositions of our REO property; and (2) lower REO acquisitions primarily due to delays in the foreclosure process.

Our 2009 through first quarter of 2012 vintages accounted for approximately 3% of our single-family credit losses for the first quarter of 2012. Credit losses on mortgage loans typically do not peak until the third through sixth years following origination; however, this range can vary based on many factors, including changes in macroeconomic conditions and foreclosure timelines. We provide more detailed credit performance information, including serious delinquency rates by geographic region and foreclosure activity, in "Risk Management—Credit Risk Management—Mortgage Credit Risk Management."

*Regulatory Hypothetical Stress Test Scenario*

Under a September 2005 agreement with FHFA's predecessor, the Office of Federal Housing Enterprise Oversight, we are required to disclose on a quarterly basis the present value of the change in future expected credit losses from our existing single-family guaranty book of business from an immediate 5% decline in single-

27

Table of Contents

family home prices for the entire United States followed by a return to the average of the possible growth rate paths used in our internal credit pricing models. The sensitivity results represent the difference between future expected credit losses under our base case scenario, which is derived from our internal home price path forecast, and a scenario that assumes an instantaneous nationwide 5% decline in home prices.

Table 14 displays the credit loss sensitivities as of the dates indicated for first-lien single-family whole loans we own or that back Fannie Mae MBS, before and after consideration of projected credit risk sharing proceeds, such as private mortgage insurance claims and other credit enhancements.

**Table 14:   Single-Family Credit Loss Sensitivity**[1]

| | As of | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Gross single-family credit loss sensitivity | $   23,861 | $   21,922 |
| Less: Projected credit risk sharing proceeds | (1,787) | (1,690) |
| Net single-family credit loss sensitivity | $   22,074 | $   20,232 |
| Outstanding single-family whole loans and loans underlying Fannie Mae MBS | $2,785,358 | $2,769,454 |
| Single-family net credit loss sensitivity as a percentage of outstanding single-family whole loans and Fannie Mae MBS | 0.79% | 0.73% |

[1]   Represents total economic credit losses, which consist of credit losses and forgone interest. Calculations are based on 97% of our total single-family guaranty book of business as of March 31, 2012 and December 31, 2011. The mortgage loans and mortgage-related securities that differ from are included in these estimates consist of: (a) single-family Fannie Mae MBS (whether held in our mortgage portfolio or held by third parties), excluding certain whole loan REMICs and private-label wraps; (b) single-family mortgage loans, excluding mortgages secured only by second liens, manufactured housing chattel loans and reverse mortgages; and (c) long-term standby commitments. We expect the inclusion in our estimates of the excluded products may impact the estimated sensitivities set forth in this table.

Because these sensitivities represent hypothetical scenarios, they should be used with caution. Our regulatory stress test scenario is limited in that it assumes an instantaneous uniform 5% nationwide decline in home prices, which is not representative of the historical pattern of changes in home prices. Changes in home prices generally vary on a regional, as well as a local, basis. In addition, these stress test scenarios are calculated independently without considering changes in other interrelated assumptions, such as unemployment rates or other economic factors, which are likely to have a significant impact on our future expected credit losses.

## BUSINESS SEGMENT RESULTS

Results of our three business segments are intended to reflect each segment as if it were a stand-alone business. Under our segment reporting structure, the sum of the results for our three business segments does not equal our condensed consolidated results of operations as we separate the activity related to our consolidated trusts from the results generated by our three segments. In addition, because we apply accounting methods that differ from our condensed consolidated results for segment reporting purposes, we include an eliminations/adjustments category to reconcile our business segment results and the activity related to our consolidated trusts to our condensed consolidated results of operations. We describe the management reporting and allocation process used to generate our segment results in our 2011 Form 10-K in "Notes to Consolidated Financial Statements—Note 14, Segment Reporting." We are working on reorganizing our company by function rather than by business in order to improve our operational efficiencies and effectiveness. In future periods, we may change some of our management reporting and how we report our business segment results.

In this section, we summarize our segment results for the first quarter of 2012 and 2011 in the tables below and provide a comparative discussion of these results. This section should be read together with our comparative discussion of our condensed consolidated results of operations in "Consolidated Results of Operations." See "Note 10, Segment Reporting" of this report for a reconciliation of our segment results to our condensed consolidated results.

28

Table of Contents

*Single-Family Business Results*

Table 15 displays the financial results of our Single-Family business for the periods indicated. The primary source of revenue for our Single-Family business is guaranty fee income. Expenses primarily include credit-related expenses, net interest loss and administrative expenses.

**Table 15:   Single-Family Business Results**

|  | For the Three Months Ended March 31, | | |
|  | 2012 | 2011 | Variance |
| --- | ---: | ---: | ---: |
|  | (Dollars in millions) | | |
| Net interest loss | $ (379) | $ (898) | $ 519 |
| Guaranty fee income[1] | 1,911 | 1,871 | 40 |
| Credit-related expenses[2] | (2,385) | (11,106) | 8,721 |
| Other expenses[3] | (415) | (586) | 171 |
| Loss before federal income taxes | (1,268) | (10,719) | 9,451 |
| Provision for federal income taxes | — | (2) | 2 |
| Net loss attributable to Fannie Mae | $ (1,268) | $ (10,721) | $9,453 |
| Single-family effective guaranty fee rate (in basis points) [4] | 26.8 | 26.0 | |
| Single-family average charged guaranty fee on new acquisitions (in basis points) [5] | 28.9 | 26.1 | |
| Average single-family guaranty book of business[6] | $2,850,007 | $2,881,300 | |
| Single-family Fannie Mae MBS issuances[7] | $ 196,755 | $ 166,673 | |

[1]   Guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive income (loss).

[2]   Consists of the provision for credit losses and foreclosed property expense.

[3]   Consists of investment gains, net, fair value losses, fee and other income, administrative expenses and other expenses.

[4]   Calculated based on annualized Single-Family segment guaranty fee income divided by the average single-family guaranty book of business, expressed in basis points.

[5]   Calculated based on the average contractual fee rate for our single-family guaranty arrangements entered into during the period plus the recognition of any upfront cash payments ratably over an estimated average life, expressed in basis points.

[6]   Consists of single-family mortgage loans held in our mortgage portfolio, single-family mortgage loans held by consolidated trusts, single-family Fannie Mae MBS issued from unconsolidated trusts held by either third parties or within our retained portfolio, and other credit enhancements that we provide on single-family mortgage assets. Excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

[7]   Reflects unpaid principal balance of Fannie Mae MBS issued and guaranteed by the Single-Family segment during the period.

Our average single-family guaranty book of business was relatively flat period over period despite our continued high market share because of the decline in U.S. residential mortgage debt outstanding. Our estimated market share of new single-family mortgage-related securities issuances, which excludes previously securitized mortgages, remained high at 51% for the first quarter of 2012 compared with 49% for the first quarter of 2011.

*Net Interest Loss*

Net interest loss for the Single-Family business segment primarily consists of: (1) the cost to reimburse the Capital Markets group for interest income not recognized for loans in our mortgage portfolio on nonaccrual status; (2) the cost to reimburse MBS trusts for interest income not recognized for loans in consolidated trusts on nonaccrual status; and (3) income from cash payments received on loans that have been placed on nonaccrual status.

29

Table of Contents

Net interest loss decreased in the first quarter of 2012 compared with the first quarter of 2011 primarily due to a significant decrease in interest income not recognized for loans on nonaccrual status as high loan workout volumes over the past several quarters have driven the decline in the number of loans on nonaccrual status.

*Credit-Related Expenses*

Credit-related expenses and credit losses in the Single-Family business represent the substantial majority of our consolidated totals. We provide a discussion of our credit-related expenses and credit losses in "Consolidated Results of Operations—Credit-Related Expenses."

**Multifamily Business Results**

Multifamily business results primarily reflect our multifamily guaranty business. Our multifamily business results also include activity relating to our low income housing tax credit ("LIHTC") and equity investments. Although we are no longer making new LIHTC or equity investments, we continue to make contractually required contributions for our legacy investments. Activity from multifamily products is also reflected in the Capital Markets group results, which include net interest income related to multifamily loans and securities, gains and losses from the sale of multifamily Fannie Mae MBS and re-securitizations, and other miscellaneous income. Estimated net interest income earned on multifamily mortgage loans and multifamily Fannie Mae MBS in the Capital Markets group results was $204 million for the three months ended March 31, 2012 and $230 million for the three months ended March 31, 2011.

Table 16 displays the financial results of our Multifamily business for the periods indicated. The primary sources of revenue for our Multifamily business are guaranty fee income and fee and other income. Expenses primarily include administrative expenses.

**Table 16:   Multifamily Business Results**

| | For the Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2012 | 2011 | Variance |
| | (Dollars in millions) | | |
| Guaranty fee income[1] | $ 243 | $ 209 | $ 34 |
| Fee and other income | 47 | 58 | (11) |
| Gains (losses) from partnership investments [2] | 11 | (12) | 23 |
| Credit-related income[3] | 46 | 64 | (18) |
| Other expenses[4] | (68) | (67) | (1) |
| Income before federal income taxes | 279 | 252 | 27 |
| Provision for federal income taxes | — | (5) | 5 |
| Net income attributable to Fannie Mae | $ 279 | $ 247 | $ 32 |
| Multifamily effective guaranty fee rate (in basis points) [5] | 49.6 | 44.0 | |
| Multifamily credit loss performance ratio (in basis points) [6] | 27.8 | 17.3 | |
| Average multifamily guaranty book of business[7] | $196,019 | $190,012 | |
| Multifamily new business volumes[8] | $ 7,159 | $ 5,024 | |
| Multifamily units financed from new business volumes | 117,000 | 83,000 | |
| Multifamily Fannie Mae MBS issuances[9] | $ 8,851 | $ 8,581 | |
| Multifamily Fannie Mae structured securities issuances (issued by Capital Markets group) [10] | $ 2,238 | $ 1,400 | |
| Additional net interest income earned on Fannie Mae multifamily mortgage loans and MBS (included in Capital Markets Group's results)[11] | $ 204 | $ 230 | |
| Average Fannie Mae multifamily mortgage loans and MBS in Capital Markets Group's portfolio [12] | $ 103,989 | $114,375 | |

30

Table of Contents

| | As of | |
|---|---|---|
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Multifamily serious delinquency rate | 0.37% | 0.59% |
| Percentage of multifamily guaranty book of business with credit enhancement | 90% | 90% |
| Fannie Mae percentage of total multifamily mortgage debt outstanding [13] | 21.2% | 21.0% |
| Multifamily Fannie Mae MBS outstanding [14] | $107,868 | $101,574 |

[1] Guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive income (loss).

[2] Gains (losses) from partnership investments are included in other expenses in our condensed consolidated statements of operations and comprehensive income (loss). Gains (losses) from partnership investments are reported using the equity method of accounting. As a result, net income (loss) attributable to noncontrolling interest from partnership investments is not included in income (loss) for the Multifamily segment.

[3] Consists of the benefit for credit losses and foreclosed property expense.

[4] Consists of net interest loss, investment gains, administrative expenses, and other expenses.

[5] Calculated based on annualized Multifamily segment guaranty fee income divided by the average multifamily guaranty book of business, expressed in basis points.

[6] Calculated based on the annualized Multifamily credit losses divided by the average multifamily guaranty book of business, expressed in basis points.

[7] Consists of multifamily mortgage loans held in our mortgage portfolio, multifamily mortgage loans held by consolidated trusts, multifamily Fannie Mae MBS issued from unconsolidated trusts held by either third parties or within our retained portfolio, and other credit enhancements that we provide on multifamily mortgage assets. Excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

[8] Reflects unpaid principal balance of multifamily Fannie Mae MBS issued (excluding portfolio securitizations) and multifamily loans purchased during the period.

[9] Reflects unpaid principal balance of multifamily Fannie Mae MBS issued during the period. Includes: (a) issuances of new MBS, (b) $1.6 billion and $3.5 billion of Fannie Mae portfolio securitization transactions for the three months ended March 31, 2012 and 2011, respectively, and (c) $163 million and $119 million of conversions of adjustable-rate loans to fixed-rate loans and discount MBS ("DMBS") to MBS for the three months ended March 31, 2012 and 2011, respectively.

[10] Reflects original unpaid principal balance of out-of-portfolio multifamily structured securities issuances by our Capital Markets Group.

[11] Interest expense estimate based on allocated duration-matched funding costs. Net interest income was reduced by guaranty fees allocated to Multifamily from the Capital Markets Group on multifamily loans in Fannie Mae's portfolio.

[12] Based on unpaid principal balance.

[13] Includes mortgage loans and Fannie Mae MBS issued and guaranteed by the Multifamily segment. Information as of March 31, 2012 is as of December 31, 2011 and is based on the Federal Reserve's December 2011 mortgage debt outstanding release, the latest date for which the Federal Reserve has estimated mortgage debt outstanding for multifamily residences. Information as of December 31, 2011 is as of September 30, 2011 and is based on the Federal Reserve's September 2011 mortgage debt outstanding release. Prior period amounts may have been changed to reflect revised historical data from the Federal Reserve.

[14] Includes $29.3 billion and $28.3 billion of Fannie Mae multifamily MBS held in the mortgage portfolio, the vast majority of which have been consolidated to loans in our condensed consolidated balance sheets, as of March 31, 2012 and December 31, 2011, respectively; and $1.4 billion of bonds issued by HFAs as of March 31, 2012 and December 31, 2011.

*Guaranty Fee Income*

Multifamily guaranty fee income increased in the first quarter of 2012 compared with the first quarter of 2011 primarily due to higher fees charged on new acquisitions. New acquisitions with higher guaranty fees have become an increasingly large part of our multifamily guaranty book of business.

*Credit-Related Income*

Multifamily credit-related income decreased in the first quarter of 2012 compared with the first quarter of 2011, primarily driven by a lower decrease in the reserve for guaranty losses than in the first quarter of 2011.

Table of Contents

Multifamily credit losses, which consist of net charge-offs and foreclosed property expense, were $136 million for the first quarter of 2012 compared with $82 million for the first quarter of 2011. Although national multifamily market fundamentals continued to improve in the first quarter of 2012, certain local markets and properties continued to underperform compared to the rest of the nation.

### Capital Markets Group Results

Table 17 displays the financial results of our Capital Markets group for the periods indicated. Following the table we discuss the Capital Markets group's financial results and describe the Capital Markets group's mortgage portfolio. For a discussion of the debt issued by the Capital Markets group to fund its investment activities, see "Liquidity and Capital Management." For a discussion of the derivative instruments that Capital Markets uses to manage interest rate risk, see "Consolidated Balance Sheet Analysis—Derivative Instruments" and "Risk Management—Market Risk Management, Including Interest Rate Risk Management—Derivative Instruments" in our 2011 Form 10-K and "Notes to Consolidated Financial Statements—Note 9, Derivative Instruments" in both this report and our 2011 Form 10-K. The primary sources of revenue for our Capital Markets group are net interest income and fee and other income. Expenses and other items that impact income or loss primarily include fair value gains and losses, investment gains and losses, allocated guaranty fee expense, other-than-temporary impairments and administrative expenses.

### Table 17:   Capital Markets Group Results

| | For the Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2012 | 2011 | Variance |
| | (Dollars in millions) | | |
| Net interest income[1] | $ 3,541 | $ 3,710 | $ (169) |
| Investment gains, net[2] | 1,007 | 870 | 137 |
| Net other-than-temporary impairments | (64) | (44) | (20) |
| Fair value gains, net[3] | 170 | 218 | (48) |
| Fee and other income | 180 | 75 | 105 |
| Other expenses[4] | (530) | (553) | 23 |
| Income before federal income taxes | 4,304 | 4,276 | 28 |
| Benefit for federal income taxes | — | 5 | (5) |
| Net income attributable to Fannie Mae | $ 4,304 | $ 4,281 | $ 23 |

[1] Includes contractual interest income, excluding recoveries, on nonaccrual loans received from the Single-Family segment of $1.4 billion and $2.0 billion for the three months ended March 31, 2012 and 2011, respectively. Capital Markets net interest income is reported based on the mortgage-related assets held in the segment's portfolio and excludes interest income on mortgage-related assets held by consolidated MBS trusts that are owned by third parties and the interest expense on the corresponding debt of such trusts.

[2] We include the securities that we own regardless of whether the trust has been consolidated in reporting of gains and losses on securitizations and sales of available-for-sale securities.

[3] Includes fair value gains or losses on derivatives and trading securities that we own, regardless of whether the trust has been consolidated.

[4] Includes allocated guaranty fee expense, debt extinguishment losses, net, administrative expenses, and other expenses. Gains or losses related to the extinguishment of debt issued by consolidated trusts are excluded from the Capital Markets group's results because purchases of securities are recognized as such.

### Net Interest Income

The Capital Markets group reports interest income and amortization of cost basis adjustments only on securities and loans that are held in our portfolio. For mortgage loans held in our mortgage portfolio, when interest income is no longer recognized in accordance with our nonaccrual accounting policy, the Capital Markets group

32

Table of Contents

recognizes interest income reimbursements that the group receives, for the contractual interest due on nonaccrual loans from the Single-Family and Multifamily businesses. These reimbursements decreased in the first quarter of 2012 due to the decrease of nonaccrual loans in our portfolio. The interest expense recognized on the Capital Markets group's statement of operations primarily relates to the cost of our funding debt which is reported as "Debt of Fannie Mae" in our condensed consolidated balance sheets. Net interest income also includes a cost of capital charge allocated among the three business segments.

The Capital Markets group's net interest income decreased in the first quarter of 2012 compared with the first quarter of 2011 primarily due to a decrease in the balance of mortgage-related securities and lower interest rates on loans in our mortgage portfolio. This decrease in interest income on our interest earning assets was partially offset by a decline in interest expense due to lower funding needs and lower borrowing rates, which allowed us to continue to replace higher-cost debt with lower-cost debt.

Our net interest income and net interest yield were higher than they would have otherwise been in the first quarter of 2012 and 2011 because our debt funding needs were lower than would otherwise have been required as a result of funds we received from Treasury under the senior preferred stock purchase agreement. Further, dividends paid to Treasury are not recognized as interest expense.

We supplement our issuance of debt securities with derivative instruments to further reduce duration risk, which includes prepayment risk. The effect of these derivatives, in particular the periodic net interest expense accruals on interest rate swaps, is not reflected in Capital Markets' net interest income but is included in our results as a component of "Fair value gains, net" and is displayed in "Table 9: Fair Value Gains, Net." If we had included the economic impact of adding the net contractual interest accruals on our interest rate swaps in our Capital Markets' interest expense, Capital Markets' net interest income would have decreased by $374 million in the first quarter of 2012 compared with a decrease of $635 million in the first quarter of 2011.

*Investment Gains, Net*

Investment gains increased in the first quarter of 2012 compared with the first quarter of 2011 due to a higher volume of securitizations and increased gains on sale of available-for-sale ("AFS") securities.

*Fair Value Gains, Net*

The derivatives fair value gains and losses that are reported for the Capital Markets group are consistent with the same gains and losses reported in our condensed consolidated results of operations. We discuss our derivatives fair value gains and losses in "Consolidated Results of Operations—Fair Value Gains, Net."

The gains on our trading securities for the segment during the first quarter of 2012 and 2011 were attributable to a narrowing of credit spreads on CMBS, partially offset by losses on agency MBS due to an increase in interest rates during the periods.

*The Capital Markets Group's Mortgage Portfolio*

The Capital Markets group's mortgage portfolio consists of mortgage loans and mortgage-related securities that we own. Mortgage-related securities held by Capital Markets include Fannie Mae MBS and non-Fannie Mae mortgage-related securities. The Fannie Mae MBS that we own are maintained as securities on the Capital Markets group's balance sheet. Mortgage-related assets held by consolidated MBS trusts are not included in the Capital Markets group's mortgage portfolio.

The amount of mortgage assets that we may own is restricted by our senior preferred stock purchase agreement with Treasury. By December 31 of each year, we are required to reduce our mortgage assets to 90% of the maximum allowable amount that we were permitted to own as of December 31 of the immediately preceding calendar year, until the amount of our mortgage assets reaches $250 billion. The maximum allowable amount of mortgage assets we may own was reduced to $729 billion as of December 31, 2011 and will be reduced to $656.1 billion as of December 31, 2012. As of March 31, 2012, we owned $691.7 billion in mortgage assets, compared with $708.4 billion as of December 31, 2011.

Table of Contents

Table 18 displays our Capital Markets group's mortgage portfolio activity for the periods indicated.

**Table 18:   Capital Markets Group's Mortgage Portfolio Activity**[1]

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (Dollars in millions) | |
| Mortgage loans: | | |
| Beginning balance | $ 398,271 | $ 427,074 |
| Purchases | 53,925 | 38,074 |
| Securitizations[2] | (38,372) | (23,983) |
| Liquidations[3] | (19,047) | (19,309) |
| Mortgage loans, ending balance | 394,777 | 421,856 |
| Mortgage securities: | | |
| Beginning balance | 310,143 | 361,697 |
| Purchases[4] | 4,971 | 5,090 |
| Securitizations[2] | 38,372 | 23,983 |
| Sales | (41,246) | (35,426) |
| Liquidations[3] | (15,354) | (19,582) |
| Mortgage securities, ending balance | 296,886 | 335,762 |
| Total Capital Markets mortgage portfolio | $691,663 | $757,618 |

[1]   Based on unpaid principal balance.
[2]   Includes portfolio securitization transactions that do not qualify for sale treatment under GAAP.
[3]   Includes scheduled repayments, prepayments, foreclosures and lender repurchases.
[4]   Includes purchases of Fannie Mae MBS issued by consolidated trusts.

34

Table of Contents

Table 19 displays the composition of the Capital Markets group's mortgage portfolio as of March 31, 2012 and December 31, 2011.

**Table 19:    Capital Markets Group's Mortgage Portfolio Composition** [1]

| | As of | |
|---|---|---|
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Capital Markets group's mortgage loans: | | |
| Single-family loans | | |
|    Government insured or guaranteed | $ 41,592 | $ 41,555 |
|    Conventional: | | |
|       Long-term, fixed-rate | 248,326 | 245,810 |
|       Intermediate-term, fixed-rate | 10,189 | 10,289 |
|       Adjustable-rate | 21,990 | 23,490 |
|       Total single-family conventional | 280,505 | 279,589 |
| Total single-family loans | 322,097 | 321,144 |
| Multifamily loans | | |
|    Government insured or guaranteed | 349 | 362 |
|    Conventional: | | |
|       Long-term, fixed-rate | 3,512 | 3,629 |
|       Intermediate-term, fixed-rate | 55,281 | 58,885 |
|       Adjustable-rate | 13,538 | 14,251 |
|       Total multifamily conventional | 72,331 | 76,765 |
| Total multifamily loans | 72,680 | 77,127 |
| Total Capital Markets group's mortgage loans | 394,777 | 398,271 |
| Capital Markets group's mortgage-related securities: | | |
|    Fannie Mae | 209,834 | 220,061 |
|    Freddie Mac | 13,504 | 14,509 |
|    Ginnie Mae | 1,015 | 1,043 |
|    Alt-A private-label securities | 19,056 | 19,670 |
|    Subprime private-label securities | 16,175 | 16,538 |
|    CMBS | 22,674 | 23,226 |
|    Mortgage revenue bonds | 10,518 | 10,899 |
|    Other mortgage-related securities | 4,110 | 4,197 |
| Total Capital Markets group's mortgage-related securities [2] | 296,886 | 310,143 |
| Total Capital Markets group's mortgage portfolio | $691,663 | $ 708,414 |

[1]  Based on unpaid principal balance.

[2]  The fair value of these mortgage-related securities was $303.8 billion and $316.5 billion as of March 31, 2012 and December 31, 2011, respectively.

The Capital Markets group's mortgage portfolio decreased as of March 31, 2012 compared with December 31, 2011 primarily due to liquidations, partially offset by purchases of delinquent loans from MBS trusts. The total unpaid principal balance of nonperforming loans in the Capital Markets group's mortgage portfolio was $236.2 billion as of March 31, 2012 and December 31, 2011. This population includes loans that have been modified and have been classified as TDRs, as well as unmodified delinquent loans that are on nonaccrual status in our condensed consolidated financial statements.

Table of Contents

We expect to continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other factors including the limit on the mortgage assets that we may own pursuant to the senior preferred stock purchase agreement. We purchased approximately 84,900 delinquent loans with an unpaid principal balance of $14.2 billion from our single-family MBS trusts in the first quarter of 2012. As of March 31, 2012, the total unpaid principal balance of all loans in single-family MBS trusts that were delinquent as to four or more consecutive monthly payments was $4.6 billion.

## CONSOLIDATED BALANCE SHEET ANALYSIS

The section below provides a discussion of our condensed consolidated balance sheets as of the dates indicated and should be read together with our condensed consolidated financial statements, including the accompanying notes.

Table 20 displays a summary of our condensed consolidated balance sheets as of March 31, 2012 and December 31, 2011.

**Table 20:   Summary of Condensed Consolidated Balance Sheets**

| | As of | | |
| --- | --- | --- | --- |
| | March 31, 2012 | December 31, 2011 | Variance |
| | (Dollars in millions) | | |
| **Assets** | | | |
| Cash and cash equivalents and federal funds sold and securities purchased under agreements to resell or similar arrangements | $ 37,049 | $ 63,539 | $(26,490) |
| Restricted cash | 55,921 | 50,797 | 5,124 |
| Investments in securities[1] | 149,585 | 151,780 | (2,195) |
| Mortgage loans: | | | |
| Of Fannie Mae | 377,257 | 380,379 | (3,122) |
| Of consolidated trusts | 2,616,577 | 2,590,398 | 26,179 |
| Allowance for loan losses | (70,109) | (72,156) | 2,047 |
| Mortgage loans, net of allowance for loan losses | 2,923,725 | 2,898,621 | 25,104 |
| Other assets[2] | 43,660 | 46,747 | (3,087) |
| Total assets | $ 3,209,940 | $ 3,211,484 | $ (1,544) |
| **Liabilities and equity (deficit)** | | | |
| Debt: | | | |
| Of Fannie Mae | $ 685,974 | $ 732,444 | $ (46,470) |
| Of consolidated trusts | 2,498,233 | 2,457,428 | 40,805 |
| Other liabilities[3] | 25,465 | 26,183 | (718) |
| Total liabilities | 3,209,672 | 3,216,055 | (6,383) |
| Senior preferred stock | 117,149 | 112,578 | 4,571 |
| Other deficit[4] | (116,881) | (117,149) | 268 |
| Total equity (deficit) | 268 | (4,571) | 4,839 |
| **Total liabilities and equity (deficit)** | $ 3,209,940 | $ 3,211,484 | $ (1,544) |

[1]  Includes $51.9 billion as of March 31, 2012 and $49.8 billion as of December 31, 2011 of non-mortgage-related securities that are included in our other investments portfolio, which we present in "Table 30: Cash and Other Investments Portfolio."

[2]  Consists of accrued interest receivable, net; acquired property, net; and other assets.

[3]  Consists of accrued interest payable and other liabilities.

[4]  Consists of preferred stock, common stock, accumulated deficit, accumulated other comprehensive loss, treasury stock, and noncontrolling interest.

FHFA 3384

Table of Contents

**Cash and Other Investments Portfolio**

Our cash and other investments portfolio consists of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell or similar arrangements, and investments in non-mortgage-related securities. See "Liquidity and Capital Management—Liquidity Management—Cash and Other Investments Portfolio" for additional information on our cash and other investments portfolio.

**Restricted Cash**

Restricted cash primarily includes unscheduled borrower payments received by the servicer or consolidated trusts due to be remitted to the MBS certificateholders in the subsequent month. Our restricted cash increased as of March 31, 2012 compared with the balance as of December 31, 2011 primarily due to an increase in refinance activity, resulting in an increase in unscheduled payments received.

**Investments in Mortgage-Related Securities**

Our investments in mortgage-related securities are classified in our condensed consolidated balance sheets as either trading or available-for-sale and are measured at fair value. Unrealized and realized gains and losses on trading securities are included as a component of "Fair value gains, net" and unrealized gains and losses on available-for-sale securities are included in "Other comprehensive income" in our condensed consolidated statements of operations and comprehensive income (loss). Realized gains and losses on available-for-sale securities are recognized when securities are sold in "Investment gains, net" in our condensed consolidated statements of operations and comprehensive income (loss). See "Note 5, Investments in Securities" for additional information on our investments in mortgage-related securities, including the composition of our trading and available-for-sale securities at amortized cost and fair value and the gross unrealized gains and losses related to our available-for-sale securities as of March 31, 2012 and December 31, 2011.

Table 21 displays the fair value of our investments in mortgage-related securities, including trading and available-for-sale securities, as of the dates indicated.

**Table 21:   Summary of Mortgage-Related Securities at Fair Value**

| | As of | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Mortgage-related securities: | | |
| Fannie Mae | $ 21,793 | $ 24,274 |
| Freddie Mac | 14,518 | 15,555 |
| Ginnie Mae | 1,152 | 1,189 |
| Alt-A private-label securities | 12,927 | 13,032 |
| Subprime private-label securities | 8,900 | 8,866 |
| CMBS | 24,485 | 24,437 |
| Mortgage revenue bonds | 10,407 | 10,978 |
| Other mortgage-related securities | 3,477 | 3,601 |
| Total | $97,659 | $101,932 |

*Investments in Private-Label Mortgage-Related Securities*

We classify private-label securities as Alt-A, subprime, multifamily or manufactured housing if the securities were labeled as such when issued. We have also invested in private-label subprime mortgage-related securities that we have resecuritized to include our guaranty ("wraps").

37

FHFA 3385

Table of Contents

The continued negative impact of the current economic environment, including sustained weakness in the housing market and high unemployment, has adversely affected the performance of our Alt-A and subprime private-label securities. The unpaid principal balance of our investments in Alt-A and subprime securities was $35.2 billion as of March 31, 2012, of which $29.5 billion was rated below investment grade. Table 22 displays the unpaid principal balance and the fair value of our investments in Alt-A and subprime private-label securities along with an analysis of the cumulative losses on these investments as of March 31, 2012. As of March 31, 2012 and December 31, 2011, we had realized actual cumulative principal shortfalls of approximately 6% of the total cumulative credit losses reported in this table and reflected in our condensed consolidated financial statements.

**Table 22:    Analysis of Losses on Alt-A and Subprime Private-Label Mortgage-Related Securities**

| | As of March 31, 2012 | | | | |
|---|---|---|---|---|---|
| | Unpaid Principal Balance | Fair Value | Total Cumulative Losses[1] | Noncredit Component[2] | Credit Component[3] |
| | | | (Dollars in millions) | | |
| Trading securities:[4] | | | | | |
| Alt-A private-label securities | $ 2,629 | $ 1,338 | $ (1,251) | $ (102) | $ (1,149) |
| Subprime private-label securities | 2,558 | 1,305 | (1,252) | (344) | (908) |
| Total | 5,187 | 2,643 | (2,503) | (446) | (2,057) |
| Available-for-sale securities:[4] | | | | | |
| Alt-A private-label securities | 16,427 | 11,589 | (5,409) | (1,306) | (4,103) |
| Subprime private-label securities | 13,617 | 7,595 | (6,061) | (1,668) | (4,393) |
| Total | 30,044 | 19,184 | (11,470) | (2,974) | (8,496) |
| Grand Total | $35,231 | $21,827 | $(13,973) | $ (3,420) | $ (10,553) |

[1] Amounts reflect the difference between the fair value and unpaid principal balance net of unamortized premiums, discounts and certain other cost basis adjustments.

[2] Represents the estimated portion of the total cumulative losses that is noncredit-related. We have calculated the credit component based on the difference between the amortized cost basis of the securities and the present value of expected future cash flows. The remaining difference between the fair value and the present value of expected future cash flows is classified as noncredit-related.

[3] For securities classified as trading, amounts reflect the estimated portion of the total cumulative losses that is credit-related. For securities classified as available-for-sale, amounts reflect the estimated portion of total cumulative other-than-temporary credit impairment losses, net of accretion, that are recognized in our condensed consolidated statements of operations and comprehensive income (loss).

[4] Excludes resecuritizations, or wraps, of private-label securities backed by subprime loans that we have guaranteed and hold in our mortgage portfolio as Fannie Mae securities.

Table 23 displays the 60 days or more delinquency rates and average loss severities for the loans underlying our Alt-A and subprime private-label mortgage-related securities for the most recent remittance period of the current reporting quarter. The delinquency rates and average loss severities are based on available data provided by Intex Solutions, Inc. ("Intex") and CoreLogic, LoanPerformance ("CoreLogic"). We also present the average credit enhancement and monoline financial guaranteed amount for these securities as of March 31, 2012. Based on the stressed condition of our non-governmental financial guarantors, we believe that all but one of these counterparties may not be able to fully meet their obligations to us in the future. See "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management—Financial Guarantors" for additional information on our financial guarantor exposure and the counterparty risk associated with our financial guarantors.

[Table of Contents](#)

**Table 23:   Credit Statistics of Loans Underlying Alt-A and Subprime Private-Label Mortgage-Related Securities (Including Wraps)**

| | As of March 31, 2012 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Unpaid Principal Balance | | | | | | Monoline Financial Guaranteed Amount[6] |
| | Trading | Available-for-Sale | Wraps[1] | ≥ 60 Days Delinquent[2][3] | Average Loss Severity[3][4] | Average Credit Enhancement[3][5] | |
| | | | | (Dollars in millions) | | | |
| **Private-label mortgage-related securities backed by:** [7] | | | | | | | |
| Alt-A mortgage loans: | | | | | | | |
| Option ARM Alt-A mortgage loans: | | | | | | | |
| 2004 and prior | $   — | $   469 | $   — | 30.0% | 60.3% | 15.3% | $   — |
| 2005 | | 1,267 | — | 40.7 | 62.9 | 37.3 | 241 |
| 2006 | — | 1,136 | — | 43.4 | 68.2 | 25.5 | 85 |
| 2007 | 1,819 | — | — | 44.3 | 65.2 | 54.7 | 602 |
| Other Alt-A mortgage loans: | | | | | | | |
| 2004 and prior | — | 5,885 | — | 10.3 | 54.4 | 12.4 | 12 |
| 2005 | 82 | 3,911 | 108 | 21.7 | 60.3 | 5.4 | — |
| 2006 | 60 | 3,646 | — | 26.3 | 60.9 | 0.6 | — |
| 2007 | 668 | — | 162 | 39.4 | 71.7 | 32.9 | 266 |
| 2008[8] | — | 113 | — | — | — | — | — |
| Total Alt-A mortgage loans: | 2,629 | 16,427 | 270 | | | | 1,206 |
| Subprime mortgage loans: | | | | | | | |
| 2004 and prior | — | 1,580 | 940 | 22.4 | 82.9 | 60.9 | 601 |
| 2005[8] | — | 163 | 1,221 | 39.5 | 79.0 | 57.4 | 223 |
| 2006 | — | 11,283 | — | 46.3 | 81.7 | 17.3 | 52 |
| 2007 | 2,558 | 591 | 5,326 | 45.9 | 77.3 | 21.5 | 173 |
| Total subprime mortgage loans: | 2,558 | 13,617 | 7,487 | | | | 1,049 |
| Total Alt-A and subprime mortgage loans: | $ 5,187 | $ 30,044 | $7,757 | | | | $ 2,255 |

[1]  Represents our exposure to private-label Alt-A and subprime mortgage-related securities that have been resecuritized (or wrapped) to include our guarantee.

[2]  Delinquency data provided by Intex, where available, for loans backing Alt-A and subprime private-label mortgage-related securities that we own or guarantee. The reported Intex delinquency data reflect information from March 2012 remittances for February 2012 payments. For consistency purposes, we have adjusted the Intex delinquency data, where appropriate, to include all bankruptcies, foreclosures and REO in the delinquency rates.

[3]  The average delinquency, severity and credit enhancement metrics are calculated for each loan pool associated with securities where Fannie Mae has exposure and are weighted based on the unpaid principal balance of those securities.

[4]  Severity data obtained from CoreLogic, where available, for loans backing Alt-A and subprime private-label mortgage-related securities that we own or guarantee. The CoreLogic severity data reflect information from March 2012 remittances for February 2012 payments. For consistency purposes, we have adjusted the severity data, where appropriate.

[5]  Average credit enhancement percentage reflects both subordination and financial guarantees. Reflects the ratio of the current amount of the securities that will incur losses in the securitization structure before any losses are allocated to securities that we own or guarantee. Percentage generally calculated based on the quotient of the total unpaid principal balance of all credit enhancements in the form of subordination or financial guarantee of the security divided by the total unpaid principal balance of all of the tranches of collateral pools from which credit support is drawn for the security that we own or guarantee. Beginning in March 2012, in calculating the weighted average credit enhancement percentage for bonds in the population that show negative credit enhancement in Intex due to under-collateralization, the negative credit enhancement amounts have been replaced with zero values.

[6]  Reflects amount of unpaid principal balance supported by financial guarantees from monoline financial guarantors.

39

Table of Contents

(7)   Vintages are based on series date and not loan origination date.

(8)   The unpaid principal balance includes private-label Real Estate Mortgage Investment Conduit ("REMIC") securities that have been resecuritized totaling $113 million for the 2008 vintage of other Alt-A loans and $14 million for the 2005 vintage of subprime loans. These securities are excluded from the delinquency, severity and credit enhancement statistics reported in this table.

### Mortgage Loans

The increase in mortgage loans, net of the allowance for loan losses, in the first quarter of 2012 was primarily driven by securitization activity from our lender swap and portfolio securitization programs. For additional information on our mortgage loans, see "Note 3, Mortgage Loans." For additional information on the mortgage loan purchase and sale activities reported by our Capital Markets group, see "Business Segment Results—Capital Markets Group Results."

### Debt

Debt of Fannie Mae is the primary means of funding our mortgage investments. We provide a summary of the activity of the debt of Fannie Mae and a comparison of the mix between our outstanding short-term and long-term debt in "Liquidity and Capital Management—Liquidity Management—Debt Funding." Also see "Note 8, Short-Term Borrowings and Long-Term Debt" for additional information on our outstanding debt.

Debt of consolidated trusts represents the amount of Fannie Mae MBS issued from consolidated trusts and held by third-party certificateholders. The increase in debt of consolidated trusts in the first quarter of 2012 was primarily driven by securitization activity from our lender swap and portfolio securitization programs.

### SUPPLEMENTAL NON-GAAP INFORMATION—FAIR VALUE BALANCE SHEETS

As part of our disclosure requirements with FHFA, we disclose on a quarterly basis supplemental non-GAAP consolidated fair value balance sheets, which reflect our assets and liabilities at estimated fair value.

Table 24 summarizes changes in our stockholders' equity (deficit) reported in our GAAP condensed consolidated balance sheets and in the estimated fair value of our net assets in our non-GAAP consolidated fair value balance sheets for the three months ended March 31, 2012. The estimated fair value of our net assets is calculated based on the difference between the fair value of our assets and the fair value of our liabilities, adjusted for noncontrolling interests. We use various valuation techniques to estimate fair value, some of which incorporate internal assumptions that are subjective and involve a high degree of management judgment. We describe the specific valuation techniques used to determine fair value and disclose the carrying value and fair value of our financial assets and liabilities in "Note 12, Fair Value."

Table of Contents

Table 24:   Comparative Measures—GAAP Change in Stockholders' Equity (Deficit) and Non-GAAP Change in Fair Value of Net Assets (Net of Tax Effect)

| | For the Three Months Ended March 31, 2012 |
|---|---|
| | (Dollars in millions) |
| **GAAP consolidated balance sheets:** | |
| Fannie Mae stockholders' deficit as of December 31, 2011 [1] | $ (4,624) |
| Total comprehensive income | 3,080 |
| Capital transactions: [2] | |
| Funds received from Treasury under the senior preferred stock purchase agreement | 4,571 |
| Senior preferred stock dividends | (2,819) |
| Capital transactions, net | 1,752 |
| Other | 2 |
| Fannie Mae stockholders' equity as of March 31, 2012 [1] | $ 210 |
| **Non-GAAP consolidated fair value balance sheets:** | |
| Estimated fair value of net assets as of December 31, 2011 | $ (127,848) |
| Capital transactions, net | 1,752 |
| Change in estimated fair value of net assets, excluding capital transactions | (11,549) |
| Decrease in estimated fair value of net assets, net | (9,797) |
| Estimated fair value of net assets as of March 31, 2012 | $ (137,645) |

[1] Our net worth, as defined under the senior preferred stock purchase agreement, is equivalent to the "Total equity (deficit)" amount reported in our condensed consolidated balance sheets. Our net worth, or total deficit, consists of "Total Fannie Mae's stockholders' equity (deficit)" and "Noncontrolling interest" reported in our condensed consolidated balance sheets.

[2] Represents capital transactions, which are reported in our condensed consolidated financial statements.

During the first quarter of 2012, the estimated fair value of our net assets, excluding capital transactions, decreased by $11.5 billion. We adopted ASU 2011-04, *Amendments to Achieve Common Fair Value Measurements and Disclosure Requirements in U.S. GAAP and IFRS* related to fair value measurement, which resulted in our determination to reflect the fair value of modified loans and certain delinquent loans in the principal markets for whole loans versus the GSE securitization market. This adoption resulted in a net decrease to fair value of $24.4 billion. This decrease was offset by an enhanced estimation process used to value HARP loans that resulted in an increase of $7.4 billion to the fair value of these loans.

Excluding the impact of the changes described above, the estimated fair value of our net assets, excluding capital transactions, increased primarily attributable to income from the spread between our mortgage assets and associated debt and derivatives as well as a tightening of the option-adjusted spread levels. These increases in fair value were partially offset by credit-related items due to declining actual home prices and an increase in interest rates which increased the weighted average life of the guaranty book of business.

### Cautionary Language Relating to Supplemental Non-GAAP Financial Measures

In reviewing our non-GAAP consolidated fair value balance sheets, there are a number of important factors and limitations to consider. The estimated fair value of our net assets is calculated as of a particular point in time based on our existing assets and liabilities. It does not incorporate other factors that may have a significant impact on our long-term fair value, including revenues generated from future business activities in which we expect to engage, the value from our foreclosure and loss mitigation efforts or the impact that legislation or potential regulatory actions may have on us. As a result, the estimated fair value of our net assets presented in our non-GAAP consolidated fair value balance sheets does not represent an estimate of our net realizable value, liquidation value or our market value as a whole. Amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary materially from the estimated fair values presented in our non-GAAP consolidated fair value balance sheets.

41

**Table of Contents**

In addition, the fair value of our net assets attributable to common stockholders presented in our fair value balance sheet does not represent an estimate of the value we expect to realize from operating the company or what we expect to draw from Treasury under the terms of our senior preferred stock purchase agreement, primarily because:

- The estimated fair value of our credit exposures significantly exceeds our projected credit losses as fair value takes into account certain assumptions about liquidity and required rates of return that a market participant may demand in assuming a credit obligation. Because we do not generally intend to have other parties assume the credit risk inherent in our book of business, and therefore would not be obligated to pay a market premium for its assumption, we do not expect the current market premium portion of our current estimate of fair value to impact future Treasury draws;

- The fair value balance sheet does not reflect amounts we expect to draw in the future to pay dividends on the senior preferred stock; and

- The fair value of our net assets reflects a point in time estimate of the fair value of our existing assets and liabilities, and does not incorporate the value associated with new business that may be added in the future.

The fair value of our net assets is not a measure defined within GAAP and may not be comparable to similarly titled measures reported by other companies.

**Supplemental Non-GAAP Consolidated Fair Value Balance Sheets**

We display our non-GAAP fair value balance sheets as of the dates indicated in Table 25.

42

Table of Contents

**Table 25:   Supplemental Non-GAAP Consolidated Fair Value Balance Sheets**

| | As of March 31, 2012 | | | As of December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | GAAP Carrying Value | Fair Value Adjustment[1] | Estimated Fair Value | GAAP Carrying Value | Fair Value Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | | |
| **Assets:** | | | | | | |
| Cash and cash equivalents | $ 77,970 | $ — | $ 77,970 | $ 68,336 | $ — | $ 68,336 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 15,000 | — | 15,000 | 46,000 | — | 46,000 |
| Trading securities | 75,806 | — | 75,806 | 74,198 | — | 74,198 |
| Available-for-sale securities | 73,779 | — | 73,779 | 77,582 | — | 77,582 |
| Mortgage loans: | | | | | | |
| Mortgage loans held for sale | 282 | 4 | 286 | 311 | 14 | 325 |
| Mortgage loans held for investment, net of allowance for loan losses: | | | | | | |
| Of Fannie Mae | 320,032 | (47,953) | 272,079 | 322,825 | (27,829) | 294,996 |
| Of consolidated trusts | 2,603,411 | 69,620[2] | 2,673,031[3] | 2,575,485 | 76,540[2] | 2,652,025[3] |
| Total mortgage loans | 2,923,725 | 21,671 | 2,945,396[4] | 2,898,621 | 48,725 | 2,947,346[4] |
| Advances to lenders | 3,548 | (89) | 3,459[5][6] | 5,538 | (118) | 5,420[5][6] |
| Derivative assets at fair value | 365 | — | 365[5][6] | 561 | — | 561[5][6] |
| Guaranty assets and buy-ups, net | 497 | 423 | 920[5][6] | 503 | 398 | 901[5][6] |
| Total financial assets | 3,170,690 | 22,005 | 3,192,695[7] | 3,171,339 | 49,005 | 3,220,344[7] |
| Credit enhancements | 453 | 2,396 | 2,849[5][6] | 455 | 2,550 | 3,005[5][6] |
| Other assets | 38,797 | (242) | 38,555[5][6] | 39,690 | (258) | 39,432[5][6] |
| Total assets | $ 3,209,940 | $ 24,159 | $ 3,234,099 | $ 3,211,484 | $ 51,297 | $ 3,262,781 |
| **Liabilities:** | | | | | | |
| Short-term debt: | | | | | | |
| Of Fannie Mae | $ 110,852 | $ 13 | $ 110,865 | $ 146,752 | $ 30 | $ 146,782 |
| Of consolidated trusts | 4,495 | — | 4,495 | 4,973 | — | 4,973 |
| Long-term debt: | | | | | | |
| Of Fannie Mae | 575,122[8] | 25,370 | 600,492 | 585,692[8] | 28,291 | 613,983 |
| Of consolidated trusts | 2,493,738[8] | 134,754[2] | 2,628,492 | 2,452,455[8] | 144,202[2] | 2,596,657 |
| Derivative liabilities at fair value | 522 | — | 522[9][10] | 916 | — | 916[9][10] |
| Guaranty obligations | 799 | 3,016 | 3,815[9][10] | 811 | 3,133 | 3,944[9][10] |
| Total financial liabilities | 3,185,528 | 163,153 | 3,348,681[7] | 3,191,599 | 175,656 | 3,367,255[7] |
| Other liabilities | 24,144 | (1,139) | 23,005[9][10] | 24,456 | (1,135) | 23,321[9][10] |
| Total liabilities | 3,209,672 | 162,014 | 3,371,686 | 3,216,055 | 174,521 | 3,390,576 |
| **Equity (deficit):** | | | | | | |
| Fannie Mae stockholders' equity (deficit): | | | | | | |
| Senior preferred[11] | 117,149 | — | 117,149 | 112,578 | — | 112,578 |
| Preferred | 19,130 | (18,252) | 878 | 19,130 | (18,163) | 967 |
| Common | (136,069) | (119,603) | (255,672) | (136,332) | (105,061) | (241,393) |
| Total Fannie Mae stockholders' equity (deficit)/non-GAAP fair value of net assets | $ 210 | $ (137,855) | $ (137,645) | $ (4,624) | $ (123,224) | $ (127,848) |
| Noncontrolling interest | 58 | — | 58 | 53 | — | 53 |
| Total equity (deficit) | 268 | (137,855) | (137,587) | (4,571) | (123,224) | (127,795) |
| Total liabilities and equity (deficit) | $ 3,209,940 | $ 24,159 | $ 3,234,099 | $ 3,211,484 | $ 51,297 | $ 3,262,781 |

**Explanation and Reconciliation of Non-GAAP Measures to GAAP Measures**

[1]   Each of the amounts listed as a "fair value adjustment" represents the difference between the carrying value included in our GAAP condensed consolidated balance sheets and our best judgment of the estimated fair value of the listed item.

[2]   Fair value of consolidated loans is impacted by credit risk, which has no corresponding impact on the consolidated debt.

[3]   Includes certain mortgage loans that we elected to report at fair value in our GAAP condensed consolidated balance sheets of $4.3 billion and $3.6 billion as of March 31, 2012 and December 31, 2011, respectively.

[4]   Performing loans had both a fair value and an unpaid principal balance of $2.8 trillion as of March 31, 2012 compared with a fair value of $2.8 trillion and an unpaid principal balance of $2.7 trillion as of December 31, 2011. Nonperforming loans, which for the purposes of our

43

Table of Contents

    non-GAAP fair value balance sheets consists of loans that are delinquent by one or more payments, had a fair value of $121.0 billion and an unpaid principal balance of $220.5 billion as of March 31, 2012 compared with a fair value of $128.9 billion and an unpaid principal balance of $226.5 billion as of December 31, 2011. See "Note 12, Fair Value" for additional information on valuation techniques for performing and nonperforming loans.

(5)    The following line items: (a) Advances to lenders; (b) Derivative assets at fair value; (c) Guaranty assets and buy-ups, net; (d) Credit enhancements; and (e) Other assets, together consist of the following assets presented in our GAAP condensed consolidated balance sheets: (a) Accrued interest receivable, net; (b) Acquired property, net; and (c) Other assets.

(6)    "Other assets" include the following GAAP condensed consolidated balance sheets line items: (a) Accrued interest receivable, net and (b) Acquired property, net. The carrying value of these items in our GAAP condensed consolidated balance sheets totaled $20.6 billion and $21.4 billion as of March 31, 2012 and December 31, 2011, respectively. "Other assets" in our GAAP condensed consolidated balance sheets include the following: (a) Advances to lenders; (b) Derivative assets at fair value; (c) Guaranty assets and buy-ups, net; and (d) Credit enhancements. The carrying value of these items totaled $4.9 billion and $7.1 billion as of March 31, 2012 and December 31, 2011, respectively.

(7)    We estimated the fair value of these financial instruments in accordance with the fair value accounting guidance as described in "Note 12, Fair Value."

(8)    Includes certain long-term debt instruments that we elected to report at fair value in our GAAP condensed consolidated balance sheets of $5.1 billion and $4.8 billion as of March 31, 2012 and December 31, 2011, respectively.

(9)    The following line items: (a) Derivative liabilities at fair value; (b) Guaranty obligations; and (c) Other liabilities, consist of the following liabilities presented in our GAAP condensed consolidated balance sheets: (a) Accrued interest payable and (b) Other liabilities.

(10)    "Other liabilities" include Accrued interest payable in our GAAP condensed consolidated balance sheets. The carrying value of this item in our GAAP condensed consolidated balance sheets totaled $12.4 billion and $12.6 billion as of March 31, 2012 and December 31, 2011, respectively. We assume that certain other liabilities, such as deferred revenues, have no fair value. Although we report the "Reserve for guaranty losses" as part of "Other liabilities" in our GAAP condensed consolidated balance sheets, it is incorporated into and reported as part of the fair value of our guaranty obligations in our non-GAAP supplemental consolidated fair value balance sheets. "Other liabilities" in our GAAP condensed consolidated balance sheets include the following: (a) Derivative liabilities at fair value and (b) Guaranty obligations. The carrying value of these items totaled $1.3 billion and $1.7 billion as of March 31, 2012 and December 31, 2011, respectively.

(11)    The amount included in "estimated fair value" of the senior preferred stock is the liquidation preference, which is the same as the GAAP carrying value, and does not reflect fair value.

## LIQUIDITY AND CAPITAL MANAGEMENT

### Liquidity Management

Our business activities require that we maintain adequate liquidity to fund our operations. Our liquidity risk management policy is designed to address our liquidity risk. Liquidity risk is the risk that we will not be able to meet our funding obligations in a timely manner. Liquidity risk management involves forecasting funding requirements, maintaining sufficient capacity to meet our needs based on our ongoing assessment of financial market liquidity and adhering to our regulatory requirements.

Our treasury function resides within the Capital Markets group and is responsible for implementing our liquidity and contingency planning strategies. We conduct liquidity contingency planning to prepare for an event in which our access to the unsecured debt markets becomes limited. We plan for alternative sources of liquidity that are designed to allow us to meet our cash obligations without relying upon the issuance of unsecured debt. While our liquidity contingency planning attempts to address stressed market conditions and our status under conservatorship and Treasury support arrangements, we believe that our liquidity contingency plan may be difficult or impossible to execute for a company of our size in our circumstances. See "Liquidity and Capital Management—Liquidity Management—Liquidity Risk Management Practices and Contingency Planning" in our 2011 Form 10-K for a discussion of our liquidity contingency plans. Also see "Risk Factors" in our 2011 Form 10-K for a description of the risks associated with our liquidity risk and liquidity contingency planning.

Our liquidity position could be adversely affected by many factors, both internal and external to our business, including: actions taken by our conservator, the Federal Reserve, U.S. Treasury or other government agencies; legislation relating to us or our business; a U.S. government payment default on its debt obligations; a downgrade in the credit ratings of our senior unsecured debt or the U.S government's debt from the major ratings organizations; a systemic event leading to the withdrawal of liquidity from the market; an extreme market-wide widening of credit spreads; public statements by key policy makers; a significant decline in our net worth; potential investor concerns about the adequacy of funding available to us under the senior preferred stock

Table of Contents

purchase agreement after 2012; loss of demand for our debt, or certain types of our debt, from a major group of investors; a significant credit event involving one of our major institutional counterparties; a sudden catastrophic operational failure in the financial sector; or elimination of our GSE status.

### Debt Funding

We fund our business primarily through the issuance of short-term and long-term debt securities in the domestic and international capital markets. Because debt issuance is our primary funding source, we are subject to "roll-over," or refinancing, risk on our outstanding debt.

We have a diversified funding base of domestic and international investors. Purchasers of our debt securities are geographically diversified and include fund managers, commercial banks, pension funds, insurance companies, foreign central banks, corporations, state and local governments, and other municipal authorities.

Although our funding needs may vary from quarter to quarter depending on market conditions, we currently expect our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirement of the senior preferred stock purchase agreement that we reduce our mortgage portfolio 10% per year until it reaches $250 billion.

### Fannie Mae Debt Funding Activity

Table 26 displays the activity in debt of Fannie Mae for the periods indicated. This activity excludes the debt of consolidated trusts and intraday loans. The reported amounts of debt issued and paid off during the period represent the face amount of the debt at issuance and redemption, respectively. Activity for short-term debt of Fannie Mae relates to borrowings with an original contractual maturity of one year or less while activity for long-term debt of Fannie Mae relates to borrowings with an original contractual maturity of greater than one year.

**Table 26:   Activity in Debt of Fannie Mae**

|  | For the Three Months Ended March 31, | |
|---|---|---|
|  | 2012 | 2011 |
|  | (Dollars in millions) | |
| Issued during the period: | | |
| Short-term: | | |
| Amount | $ 45,594 | $ 88,201 |
| Weighted-average interest rate | 0.11% | 0.15% |
| Long-term: | | |
| Amount | $ 59,464 | $ 51,737 |
| Weighted-average interest rate | 1.45% | 2.13% |
| Total issued: | | |
| Amount | $ 105,058 | $ 139,938 |
| Weighted-average interest rate | 0.87% | 0.88% |
| Paid off during the period: [1] | | |
| Short-term: | | |
| Amount | $ 81,506 | $ 93,031 |
| Weighted-average interest rate | 0.12% | 0.26% |
| Long-term: | | |
| Amount | $ 71,310 | $ 66,857 |
| Weighted-average interest rate | 2.51% | 2.82% |
| Total paid off: | | |
| Amount | $ 152,816 | $ 159,888 |
| Weighted-average interest rate | 1.24% | 1.33% |

[1] Consists of all payments on debt, including regularly scheduled principal payments, payments at maturity, payments resulting from calls and payments for any other repurchases. Calls and repurchases of zero-coupon debt are reported at original face value, which does not equal the amount of actual cash payment.

45

Table of Contents

Overall debt funding activity decreased in the first quarter of 2012 compared with the first quarter of 2011. As interest rates declined in the first quarter of 2012, we issued long-term debt with lower interest rates to replace redemptions of long-term debt with higher interest rates. This long-term debt activity, however, was more than offset by the decrease in our short-term debt activity as we redeemed more short-term debt than was issued during the quarter. Our debt funding activity is likely to continue to decline in future periods as the size of our mortgage portfolio decreases.

We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations. In February 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. For more information on GSE reform, see "Legislative and Regulatory Developments—GSE Reform" in this report and in our 2011 Form 10-K.

In addition, due to our reliance on the U.S. government's support, our access to debt funding or the cost of our debt funding could be materially adversely affected by a change or perceived change in the creditworthiness of the U.S. government. A downgrade in our credit ratings could reduce demand for our debt securities and increase our borrowing costs. See our discussion of credit ratings in "Risk Factors" in our 2011 Form 10-K for information about factors that may lead to the U.S. government's long-term debt rating being lowered, and "Credit Ratings" for further discussion of our dependence on our credit ratings.

Future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll-over risk and have a material adverse impact on our liquidity, financial condition and results of operations. See "Risk Factors" in our 2011 Form 10-K for a discussion of the risks we face relating to (1) the uncertain future of our company; (2) our reliance on the issuance of debt securities to obtain funds for our operations and the relative cost to obtain these funds; and (3) our liquidity contingency plans.

*Outstanding Debt*

Total outstanding debt of Fannie Mae includes short-term and long-term debt, excluding debt of consolidated trusts.

As of March 31, 2012, our outstanding short-term debt, based on its original contractual maturity, as a percentage of our total outstanding debt decreased to 16% from 20% as of December 31, 2011. For information on our outstanding debt maturing within one year, including the current portion of our long-term debt, as a percentage of our total debt, see "Maturity Profile of Outstanding Debt of Fannie Mae." In addition, the weighted-average interest rate on our long-term debt, based on its original contractual maturity, decreased to 2.32% as of March 31, 2012 from 2.42% as of December 31, 2011.

Pursuant to the terms of the senior preferred stock purchase agreement, we are prohibited from issuing debt without the prior consent of Treasury if it would result in our aggregate indebtedness exceeding our outstanding debt limit, which is 120% of the amount of mortgage assets we were allowed to own on December 31 of the immediately preceding calendar year. Our debt limit under the senior preferred stock purchase agreement was reduced to $874.8 billion in 2012. As of March 31, 2012, our aggregate indebtedness totaled $694.5 billion, which was $180.3 billion below our debt limit. The calculation of our indebtedness for purposes of complying with our debt limit reflects the unpaid principal balance and excludes debt basis adjustments and debt of consolidated trusts. Because of our debt limit, we may be restricted in the amount of debt we issue to fund our operations.

Table 27 displays information as of the dates indicated on our outstanding short-term and long-term debt based on its original contractual terms.

46

Table of Contents

**Table 27:   Outstanding Short-Term Borrowings and Long-Term Debt**[1]

| | As of | | | | | |
| | March 31, 2012 | | | December 31, 2011 | | |
| | Maturities | Outstanding | Weighted-Average Interest Rate | Maturities | Outstanding | Weighted-Average Interest Rate |
| --- | --- | --- | --- | --- | --- | --- |
| | | | (Dollars in millions) | | | |
| **Short-term debt:** | | | | | | |
| Fixed-rate: | | | | | | |
| Discount notes | — | $ 110,350 | 0.12% | — | $ 146,301 | 0.13% |
| Foreign exchange discount notes | — | 422 | 2.05 | — | 371 | 1.88 |
| Other[2] | — | 80 | 0.04 | — | 80 | 0.04 |
| Total short-term debt of Fannie Mae[3] | | 110,852 | 0.13 | | 146,752 | 0.13 |
| Debt of consolidated trusts | — | 4,495 | 0.11 | — | 4,973 | 0.09 |
| Total short-term debt | | $ 115,347 | 0.13% | | $ 151,725 | 0.13% |
| **Long-term debt:** | | | | | | |
| Senior fixed: | | | | | | |
| Benchmark notes and bonds | 2012 - 2030 | $275,342 | 2.67% | 2012 - 2030 | $277,146 | 2.81% |
| Medium-term notes[4] | 2012 - 2022 | 170,219 | 1.55 | 2012 - 2021 | 176,886 | 1.61 |
| Foreign exchange notes and bonds | 2021 - 2028 | 683 | 5.40 | 2021 - 2028 | 662 | 5.44 |
| Other[5][6] | 2012 - 2040 | 47,034 | 5.29 | 2012 - 2040 | 50,912 | 5.29 |
| Total senior fixed | | 493,278 | 2.53 | | 505,606 | 2.64 |
| Senior floating: | | | | | | |
| Medium-term notes[4] | 2012 - 2019 | 73,187 | 0.32 | 2012 - 2016 | 71,855 | 0.32 |
| Other[5][6] | 2020 - 2037 | 364 | 8.18 | 2020 - 2037 | 420 | 8.01 |
| Total senior floating | | 73,551 | 0.36 | | 72,275 | 0.35 |
| Subordinated fixed-rate: | | | | | | |
| Qualifying subordinated[7] | 2012 - 2014 | 4,894 | 5.08 | 2012 - 2014 | 4,894 | 5.08 |
| Subordinated debentures | 2019 | 2,984 | 9.91 | 2019 | 2,917 | 9.91 |
| Total subordinated fixed-rate | | 7,878 | 6.91 | | 7,811 | 6.88 |
| Secured borrowings[8] | 2021 - 2022 | 415 | 1.87 | — | — | |
| Total long-term debt of Fannie Mae[9] | | 575,122 | 2.32 | | 585,692 | 2.42 |
| Debt of consolidated trusts[6] | 2012 - 2052 | 2,493,738 | 4.04 | 2012 - 2051 | 2,452,455 | 4.18 |
| Total long-term debt | | $3,068,860 | 3.71% | | $3,038,147 | 3.84% |
| Outstanding callable debt of Fannie Mae[10] | | $177,972 | 2.05% | | $187,937 | 2.17% |

[1]   Outstanding debt amounts and weighted-average interest rates reported in this table include the effect of unamortized discounts, premiums and other cost basis adjustments. Reported amounts include fair value gains and losses associated with debt that we elected to carry at fair value. The unpaid principal balance of outstanding debt of Fannie Mae, which excludes unamortized discounts, premiums and other cost basis adjustments, and debt of consolidated trusts, totaled $693.8 billion and $741.6 billion as of March 31, 2012 and December 31, 2011, respectively.

[2]   Includes foreign exchange discount notes denominated in U.S. dollars.

[3]   Short-term debt of Fannie Mae consists of borrowings with an original contractual maturity of one year or less and, therefore, does not include the current portion of long-term debt. Reported amounts include a net discount and other cost basis adjustments of $40 million and $53 million as of March 31, 2012 and December 31, 2011, respectively.

47

Table of Contents

(4) Includes long-term debt with an original contractual maturity of greater than 1 year and up to 10 years, excluding zero-coupon debt.

(5) Includes long-term debt that is not included in other debt categories.

(6) Includes a portion of structured debt instruments that is reported at fair value.

(7) Consists of subordinated debt with an interest deferral feature.

(8) Represents remaining liability for transfer of financial assets from our condensed consolidated balance sheets that did not qualify as a sale.

(9) Long-term debt of Fannie Mae consists of borrowings with an original contractual maturity of greater than one year. Reported amounts include the current portion of long-term debt that is due within one year, which totaled $140.6 billion and $134.3 billion as of March 31, 2012 and December 31, 2011, respectively. Reported amounts also include unamortized discounts, premiums and other cost basis adjustments of $8.4 billion and $9.2 billion as of March 31, 2012 and December 31, 2011, respectively. The unpaid principal balance of long-term debt of Fannie Mae, which excludes unamortized discounts, premiums, fair value adjustments and other cost basis adjustments and amounts related to debt of consolidated trusts, totaled $583.4 billion and $594.8 billion as of March 31, 2012 and December 31, 2011, respectively.

(10) Consists of long-term callable debt of Fannie Mae that can be paid off in whole or in part at our option or the option of the investor at any time on or after a specified date. Includes the unpaid principal balance, and excludes unamortized discounts, premiums and other cost basis adjustments.

*Maturity Profile of Outstanding Debt of Fannie Mae*

Table 28 displays the maturity profile, as of March 31, 2012, of our outstanding debt maturing within one year, by month, including amounts we have announced for early redemption. Our outstanding debt maturing within one year, including the current portion of our long-term debt, decreased as a percentage of our total outstanding debt, excluding debt of consolidated trusts, to 37% as of March 31, 2012, compared with 38% as of December 31, 2011. The weighted-average maturity of our outstanding debt that is maturing within one year was 150 days as of March 31, 2012, compared with 158 days as of December 31, 2011.

**Table 28:    Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year**(1)



(1) Includes unamortized discounts, premiums and other cost basis adjustments of $101 million as of March 31, 2012. Excludes debt of consolidated trusts maturing within one year of $7.4 billion as of March 31, 2012.

48

Table of Contents

Table 29 displays the maturity profile, as of March 31, 2012, of the portion of our long-term debt that matures in more than one year, on a quarterly basis for one year and on an annual basis thereafter, excluding amounts we have announced for early redemption within one year. The weighted-average maturity of our outstanding debt maturing in more than one year was approximately 59 months as of March 31, 2012 and December 31, 2011.

**Table 29:   Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year[1]**



[1]   Includes unamortized discounts, premiums and other cost basis adjustments of $8.3 billion as of March 31, 2012. Excludes debt of consolidated trusts of $2.5 trillion as of March 31, 2012.

We intend to repay our short-term and long-term debt obligations as they become due primarily through proceeds from the issuance of additional debt securities.

### Cash and Other Investments Portfolio

Table 30 displays information on the composition of our cash and other investments portfolio as of the dates indicated.

**Table 30:   Cash and Other Investments Portfolio**

| | As of | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Cash and cash equivalents | $ 22,049 | $ 17,539 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 15,000 | 46,000 |
| Non-mortgage-related securities: | | |
| U.S. Treasury securities [1] | 50,030 | 47,737 |
| Asset-backed securities [2] | 1,896 | 2,111 |
| Total non-mortgage-related securities | 51,926 | 49,848 |
| Total cash and other investments | $ 88,975 | $ 113,387 |

[1]   Excludes $3.2 billion and $600 million of U.S. Treasury securities which are a component of cash equivalents as of March 31, 2012 and December 31, 2011, respectively, as these securities had a maturity at the date of acquisition of three months or less.

[2]   Includes securities primarily backed by credit cards loans and student loans.

Table of Contents

Our cash and other investments portfolio decreased from December 31, 2011 to March 31, 2012. The balance of our cash and other investments portfolio fluctuates based on changes in our cash flows, overall liquidity in the fixed income markets and our liquidity risk management policies and practices. See "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management—Issuers of Investments Held in our Cash and Other Investments Portfolio" for additional information on the risks associated with the assets in our cash and other investments portfolio.

### Credit Ratings

Our credit ratings from the major credit ratings organizations, as well as the credit ratings of the U.S. government, are primary factors that could affect our ability to access the capital markets and our cost of funds. In addition, our credit ratings are important when we seek to engage in certain long-term transactions, such as derivative transactions. Standard & Poor's Ratings Services ("S&P"), Moody's Investors Service ("Moody's") and Fitch Ratings Limited ("Fitch") have all indicated that, if they were to lower the sovereign credit ratings on the U.S, they would likely lower their ratings on the debt of Fannie Mae and certain other government-related entities. We cannot predict whether one or more of these ratings agencies will lower our debt ratings in the future. See "Risk Factors" in our 2011 Form 10-K for a discussion of the possibility of further downgrades and the risks to our business relating to a decrease in our credit ratings, which could include an increase in our borrowing costs, limits on our ability to issue debt, and additional collateral requirements under our derivatives contracts and other borrowing arrangements.

Table 31 displays the credit ratings issued by the three major credit rating agencies as of May 2, 2012.

**Table 31:   Fannie Mae Credit Ratings**

| | As of May 2, 2012 | | |
| --- | --- | --- | --- |
| | S&P | Moody's | Fitch |
| Long-term senior debt | AA+ | Aaa | AAA |
| Short-term senior debt | A-1+ | P-1 | F1+ |
| Qualifying subordinated debt | A | Aa2 | AA- |
| Preferred stock | C | Ca | C/RR6 |
| Bank financial strength rating | — | E+ | — |
| Outlook | Negative (for Long Term Senior Debt and Qualifying Subordinated Debt) | Negative (for Long Term Senior Debt and Qualifying Subordinated Debt) | Negative (for AAA rated Long Term Issuer Default Rating) |

### Cash Flows

*Three Months Ended March 31, 2012.*   Cash and cash equivalents increased from December 31, 2011 by $4.5 billion to $22.0 billion as of March 31, 2012. Net cash generated from investing activities totaled $157.5 billion, resulting primarily from proceeds received from repayments of loans held for investment. These net cash inflows were offset by net cash used in operating activities of $114 million and net cash used in financing activities of $152.9 billion primarily attributable to a significant amount of debt redemptions in excess of proceeds received from the issuance of debt as well as proceeds received from Treasury under the senior preferred stock purchase agreement.

*Three Months Ended March 31, 2011.*   Cash and cash equivalents increased from December 31, 2010 by $2.5 billion to $19.8 billion as of March 31, 2011. Net cash generated from investing activities totaled $123.8 billion, resulting primarily from proceeds received from repayments of loans held for investment. Net cash from operating activities totaled $2.6 billion. These net cash inflows were partially offset by net cash used in financing activities of $123.9 billion primarily attributable to a significant amount of debt redemptions in excess of proceeds received from the issuances of debt as well as proceeds received from Treasury under the senior preferred stock purchase agreement.

50

Table of Contents

**Capital Management**

*Regulatory Capital*

FHFA has announced that, during the conservatorship, our existing statutory and FHFA-directed regulatory capital requirements will not be binding and that FHFA will not issue quarterly capital classifications. We submit capital reports to FHFA and FHFA monitors our capital levels. The deficit of core capital over statutory minimum capital was $147.8 billion as of March 31, 2012 and $148.4 billion as of December 31, 2011.

*Senior Preferred Stock Purchase Agreement*

As a result of the covenants under the senior preferred stock purchase agreement, Treasury's ownership of the warrant to purchase up to 79.9% of the total shares of our common stock outstanding and the uncertainty regarding our future, we effectively no longer have access to equity funding except through draws under the senior preferred stock purchase agreement.

Under the senior preferred stock purchase agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. We have received a total of $116.1 billion from Treasury pursuant to the senior preferred stock purchase agreement as of March 31, 2012. The aggregate liquidation preference of the senior preferred stock, including the initial aggregate liquidation preference of $1.0 billion, remains at $117.1 billion.

While we had a positive net worth as of March 31, 2012, in some future periods we expect to have a net worth deficit and therefore will be required to obtain additional funding from Treasury pursuant to the senior preferred stock purchase agreement.

The senior preferred stock purchase agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any net worth deficiencies attributable to periods during 2010, 2011 and 2012. If we do not have a positive net worth as of December 31, 2012, then the amount of funding available under the senior preferred stock purchase agreement after 2012 will be $124.8 billion ($200 billion less $75.2 billion in cumulative draws for net worth deficiencies through December 31, 2009).

In the event we have a positive net worth as of December 31, 2012, then the amount of funding available after 2012 under the senior preferred stock purchase agreement will depend on the size of that positive net worth relative to the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, as follows:

- If our positive net worth as of December 31, 2012 is less than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less our positive net worth as of December 31, 2012.

- If our positive net worth as of December 31, 2012 is greater than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less the cumulative draws attributable to periods during 2010, 2011 and 2012.

As of May 9, 2012, the amount of the quarterly commitment fee payable by us to Treasury under the senior preferred stock purchase agreement had not been established; however, Treasury has waived the quarterly commitment fee under the senior preferred stock purchase agreement for each quarter of 2011 and the first and second quarters of 2012 due to the continued fragility of the U.S. mortgage market and Treasury's belief that imposing the commitment fee would not generate increased compensation for taxpayers. Treasury stated that it will reevaluate the situation during the next calendar quarter to determine whether the quarterly commitment fee should then be set.

*Dividends*

Our first quarter dividend of $2.8 billion was declared by the conservator and paid by us on March 30, 2012. The annualized dividend on the senior preferred stock remains at $11.7 billion based on the 10% dividend rate. The level of dividends on the senior preferred stock will increase in future periods if, as we expect, the conservator requests additional funds on our behalf from Treasury under the senior preferred stock purchase agreement.

51

Table of Contents

## OFF-BALANCE SHEET ARRANGEMENTS

Our maximum potential exposure to credit losses relating to our outstanding and unconsolidated Fannie Mae MBS and other financial guarantees is primarily represented by the unpaid principal balance of the mortgage loans underlying outstanding and unconsolidated Fannie Mae MBS and other financial guarantees of $61.5 billion as of March 31, 2012 and $62.0 billion as of December 31, 2011.

We also provide assistance to housing finance agencies ("HFAs") under the temporary credit and liquidity facilities programs in which Treasury has purchased participation interests. For a description of these programs, see "MD&A—Off-Balance Sheet Arrangements—Treasury Housing Finance Agency Initiative" in our 2011 Form 10-K.

## RISK MANAGEMENT

Our business activities expose us to the following three major categories of financial risk: credit risk, market risk (including interest rate and liquidity risk) and operational risk. We seek to actively monitor and manage these risks by using an established risk management framework. Our risk management framework is intended to provide the basis for the principles that govern our risk management activities. In addition to these financial risks, there is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, which we discuss in more detail in "Legislative and Regulatory Developments—GSE Reform" in this report and in "Risk Factors" in our 2011 Form 10-K. We are also subject to a number of other risks that could adversely impact our business, financial condition, earnings and cash flow, including model, legal and reputational risks that may arise due to a failure to comply with laws, regulations or ethical standards and codes of conduct applicable to our business activities and functions.

In this section we provide an update on our management of our major risk categories. For a more complete discussion of the financial risks we face and how we manage credit risk, market risk and operational risk, see "MD&A—Risk Management" in our 2011 Form 10-K and "Risk Factors" in our 2011 Form 10-K and in this report.

### Credit Risk Management

We are generally subject to two types of credit risk: mortgage credit risk and institutional counterparty credit risk. Mortgage credit risk is the risk that a borrower will fail to make required mortgage payments. Institutional counterparty credit risk is the risk that our institutional counterparties may fail to fulfill their contractual obligations to us, including seller/servicers who are obligated to repurchase loans from us or reimburse us for losses in certain circumstances.

#### *Mortgage Credit Risk Management*

We are exposed to credit risk on our mortgage credit book of business because we either hold mortgage assets, have issued a guaranty in connection with the creation of Fannie Mae MBS backed by mortgage assets or provided other credit enhancements on mortgage assets. While our mortgage credit book of business includes all of our mortgage-related assets, both on- and off-balance sheet, our guaranty book of business excludes non-Fannie Mae mortgage-related securities held in our portfolio for which we do not provide a guaranty. We provide information on the performance of non-Fannie Mae mortgage-related securities held in our portfolio, including the impairment that we have recognized on these securities, in "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities."

#### *Mortgage Credit Book of Business*

Table 32 displays the composition of our entire mortgage credit book of business as of the dates indicated. Our total single-family mortgage credit book of business accounted for 93% of our total mortgage credit book of business as of March 31, 2012 and December 31, 2011.

Table of Contents

**Table 32:   Composition of Mortgage Credit Book of Business**[1]

| | As of March 31, 2012 | | | As of December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Single-Family | Multifamily | Total | Single-Family | Multifamily | Total |
| | (Dollars in millions) | | | | | |
| Mortgage loans and Fannie Mae MBS[2] | $ 2,814,217 | $ 178,794 | $ 2,993,011 | $ 2,798,633 | $ 176,898 | $ 2,975,531 |
| Unconsolidated Fannie Mae MBS, held by third parties[3] | 17,276 | 1,654 | 18,930 | 17,910 | 1,702 | 19,612 |
| Other credit guarantees[4] | 26,154 | 16,407 | 42,561 | 25,824 | 16,582 | 42,406 |
| Guaranty book of business | $ 2,857,647 | $ 196,855 | $ 3,054,502 | $ 2,842,367 | $ 195,182 | $ 3,037,549 |
| Agency mortgage-related securities[5] | 14,486 | 33 | 14,519 | 15,522 | 33 | 15,555 |
| Other mortgage-related securities[6] | 41,829 | 30,704 | 72,533 | 43,019 | 31,511 | 74,530 |
| Mortgage credit book of business | $ 2,913,962 | $ 227,592 | $ 3,141,554 | $ 2,900,908 | $ 226,726 | $ 3,127,634 |
| **Guaranty Book of Business Detail:** | | | | | | |
| Conventional Guaranty Book of Business[7] | $ 2,785,819 | $ 194,560 | $ 2,980,379 | $ 2,769,919 | $ 192,797 | $ 2,962,716 |
| Government Guaranty Book of Business[8] | $ 71,828 | $ 2,295 | $ 74,123 | $ 72,448 | $ 2,385 | $ 74,833 |

[1]   Based on unpaid principal balance.

[2]   Consists of mortgage loans and Fannie Mae MBS recognized in our condensed consolidated balance sheets. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

[3]   Reflects unpaid principal balance of unconsolidated Fannie Mae MBS, held by third-party investors. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

[4]   Includes single-family and multifamily credit enhancements that we have provided and that are not otherwise reflected in the table.

[5]   Consists of mortgage-related securities issued by Freddie Mac and Ginnie Mae.

[6]   Consists primarily of mortgage-revenue bonds, manufactured housing bonds and CMBS.

[7]   Refers to mortgage loans and mortgage-related securities that are not guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies.

[8]   Refers to mortgage loans and mortgage-related securities guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies.

In the following sections, we discuss the mortgage credit risk of the single-family and multifamily loans in our guaranty book of business. The credit statistics reported below, unless otherwise noted, pertain generally to the portion of our guaranty book of business for which we have access to detailed loan-level information, which constituted approximately 99% of each of our single-family conventional guaranty book of business and our multifamily guaranty book of business, excluding defeased loans, as of March 31, 2012 and December 31, 2011. We typically obtain this data from the sellers or servicers of the mortgage loans in our guaranty book of business and receive representations and warranties from them as to the accuracy of the information. While we perform various quality assurance checks by sampling loans to assess compliance with our underwriting and eligibility criteria, we do not independently verify all reported information and we rely on lender representations regarding the accuracy of the characteristics of loans in our guaranty book of business. See "Risk Factors" in our 2011 Form 10-K for a discussion of the risk that we could experience mortgage fraud as a result of this reliance on lender representations.

53

Table of Contents

***Single-Family Mortgage Credit Risk Management***

Our strategy in managing single-family mortgage credit risk consists of four primary components: (1) our acquisition and servicing policies along with our underwriting and servicing standards, including the use of credit enhancements; (2) portfolio diversification and monitoring; (3) management of problem loans; and (4) REO management. These strategies may increase our expenses and may not be effective in reducing our credit-related expenses or credit losses. We provide information on our credit-related expenses and credit losses in "Consolidated Results of Operations—Credit-Related Expenses."

In evaluating our single-family mortgage credit risk, we closely monitor changes in housing and economic conditions and the impact of those changes on the credit risk profile of our single-family mortgage credit book of business. We regularly review and provide updates to our underwriting standards and eligibility guidelines that take into consideration changing market conditions. The credit risk profile of our single-family mortgage credit book of business is influenced by, among other things, the credit profile of the borrower, features of the loan, loan product type, the type of property securing the loan and the housing market and general economy. We focus more on loans that we believe pose a higher risk of default, which typically have been loans associated with higher mark-to-market LTV ratios, loans to borrowers with lower FICO credit scores and certain higher risk loan product categories, such as Alt-A loans. These and other factors affect both the amount of expected credit loss on a given loan and the sensitivity of that loss to changes in the economic environment.

Because we believe we have limited credit exposure on our government loans, the single-family credit statistics we focus on and report in the sections below generally relate to our single-family conventional guaranty book of business, which represents the substantial majority of our total single-family guaranty book of business.

Table 33 displays our single-family conventional business volumes and our single-family conventional guaranty book of business for the periods indicated, based on certain key risk characteristics that we use to evaluate the risk profile and credit quality of our single-family loans.

54

Table of Contents

**Table 33:   Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business** [1]

| | Percent of Single-Family Conventional Business Volume [2] For the Three Months Ended March 31, | | Percent of Single-Family Conventional Guaranty Book of Business [3][4] As of | |
| --- | --- | --- | --- | --- |
| | 2012 | 2011 | March 31, 2012 | December 31, 2011 |
| Original LTV ratio: [5] | | | | |
| <= 60% | 29% | 30% | 24% | 24% |
| 60.01% to 70% | 16 | 16 | 15 | 16 |
| 70.01% to 80% | 35 | 38 | 41 | 40 |
| 80.01% to 90% [6] | 9 | 8 | 10 | 10 |
| 90.01% to 100% [6] | 7 | 6 | 9 | 9 |
| Greater than 100% [6] | 4 | 2 | 1 | 1 |
| Total | 100% | 100% | 100% | 100% |
| Weighted average | 70% | 69% | 72% | 71% |
| Average loan amount | $ 214,216 | $ 213,710 | $ 156,697 | $   156,194 |
| Estimated mark-to-market LTV ratio: [7] | | | | |
| <= 60% | | | 25% | 26% |
| 60.01% to 70% | | | 12 | 12 |
| 70.01% to 80% | | | 18 | 18 |
| 80.01% to 90% | | | 16 | 16 |
| 90.01% to 100% | | | 10 | 10 |
| Greater than 100% | | | 19 | 18 |
| Total | | | 100% | 100% |
| Weighted average | | | 80% | 79% |
| Product type: | | | | |
| Fixed-rate: [8] | | | | |
| Long-term | 72% | 68% | 72% | 73% |
| Intermediate-term | 24 | 25 | 16 | 15 |
| Interest-only | * | * | 1 | 1 |
| Total fixed-rate | 96 | 93 | 89 | 89 |
| Adjustable-rate: | | | | |
| Interest-only | * | 1 | 3 | 3 |
| Other ARMs | 4 | 6 | 8 | 8 |
| Total adjustable-rate | 4 | 7 | 11 | 11 |
| Total | 100% | 100% | 100% | 100% |
| Number of property units: | | | | |
| 1 unit | 98% | 98% | 97% | 97% |
| 2-4 units | 2 | 2 | 3 | 3 |
| Total | 100% | 100% | 100% | 100% |
| Property type: | | | | |
| Single-family homes | 91% | 91% | 91% | 91% |
| Condo/Co-op | 9 | 9 | 9 | 9 |
| Total | 100% | 100% | 100% | 100% |

55

Table of Contents

| | Percent of Single-Family Conventional Business Volume[2] For the Three Months Ended March 31, | | Percent of Single-Family Conventional Guaranty Book of Business[3][4] As of | |
|---|---|---|---|---|
| | 2012 | 2011 | March 31, 2012 | December 31, 2011 |
| **Occupancy type:** | | | | |
| Primary residence | 89% | 89% | 89% | 89% |
| Second/vacation home | 4 | 5 | 5 | 5 |
| Investor | 7 | 6 | 6 | 6 |
| Total | 100% | 100% | 100% | 100% |
| **FICO credit score at origination:** | | | | |
| < 620 | 1% | *% | 3% | 3% |
| 620 to < 660 | 2 | 2 | 7 | 7 |
| 660 to < 700 | 6 | 7 | 13 | 13 |
| 700 to < 740 | 15 | 17 | 20 | 20 |
| >= 740 | 76 | 74 | 57 | 57 |
| Total | 100% | 100% | 100% | 100% |
| Weighted average | 763 | 762 | 739 | 738 |
| **Loan purpose:** | | | | |
| Purchase | 17% | 18% | 30% | 31% |
| Cash-out refinance | 16 | 19 | 26 | 27 |
| Other refinance | 67 | 63 | 44 | 42 |
| Total | 100% | 100% | 100% | 100% |
| **Geographic concentration:**[9] | | | | |
| Midwest | 15% | 15% | 15% | 15% |
| Northeast | 19 | 20 | 19 | 19 |
| Southeast | 19 | 20 | 23 | 24 |
| Southwest | 15 | 15 | 16 | 15 |
| West | 32 | 30 | 27 | 27 |
| Total | 100% | 100% | 100% | 100% |
| **Origination year:** | | | | |
| <= 2001 | | | 2% | 2% |
| 2002 | | | 2 | 2 |
| 2003 | | | 8 | 9 |
| 2004 | | | 5 | 5 |
| 2005 | | | 7 | 7 |
| 2006 | | | 6 | 7 |
| 2007 | | | 9 | 10 |
| 2008 | | | 6 | 7 |
| 2009 | | | 15 | 17 |
| 2010 | | | 17 | 18 |
| 2011 | | | 18 | 16 |
| 2012 | | | 5 | — |
| Total | | | 100% | 100% |

\*   Represents less than 0.5% of single-family conventional business volume or book of business.

[1]  We reflect second lien mortgage loans in the original LTV ratio calculation only when we own both the first and second lien mortgage loans or we own only the second lien mortgage loan. Second lien mortgage loans represented less than 0.5%

56

Table of Contents

of our single-family conventional guaranty book of business as of March 31, 2012 and December 31, 2011. Second lien mortgage loans held by third parties are not reflected in the original LTV or mark-to-market LTV ratios in this table.

(2)   Calculated based on unpaid principal balance of single-family loans for each category at time of acquisition. Single-family business volume refers to both single-family mortgage loans we purchase for our mortgage portfolio and single-family mortgage loans we guarantee.

(3)   Calculated based on the aggregate unpaid principal balance of single-family loans for each category divided by the aggregate unpaid principal balance of loans in our single-family conventional guaranty book of business as of the end of each period.

(4)   Our single-family conventional guaranty book of business includes jumbo-conforming and high-balance loans that represented 5% of our single-family conventional guaranty book of business as of March 31, 2012 and December 31, 2011. See "Business—Our Charter and Regulation of Our Activities —Charter Act—Loan Standards" and "Risk Management—Credit Risk Management—Single Family Mortgage Credit Risk Management—Credit Profile Summary" in our 2011 Form 10-K for additional information on loan limits.

(5)   The original LTV ratio generally is based on the original unpaid principal balance of the loan divided by the appraised property value reported to us at the time of acquisition of the loan. Excludes loans for which this information is not readily available.

(6)   We purchase loans with original LTV ratios above 80% to fulfill our mission to serve the primary mortgage market and provide liquidity to the housing system. Except as permitted under Refi Plus, our charter generally requires primary mortgage insurance or other credit enhancement for loans that we acquire that have an LTV ratio over 80%.

(7)   The aggregate estimated mark-to-market LTV ratio is based on the unpaid principal balance of the loan as of the end of each reported period divided by the estimated current value of the property, which we calculate using an internal valuation model that estimates periodic changes in home value. Excludes loans for which this information is not readily available.

(8)   Long-term fixed-rate consists of mortgage loans with maturities greater than 15 years, while intermediate-term fixed-rate has maturities equal to or less than 15 years. Loans with interest-only terms are included in the interest-only category regardless of their maturities.

(9)   Midwest consists of IL, IN, IA, MI, MN, NE, ND, OH, SD and WI. Northeast includes CT, DE, ME, MA, NH, NJ, NY, PA, PR, RI, VT and VI. Southeast consists of AL, DC, FL, GA, KY, MD, MS, NC, SC, TN, VA and WV. Southwest consists of AZ, AR, CO, KS, LA, MO, NM, OK, TX and UT. West consists of AK, CA, GU, HI, ID, MT, NV, OR, WA and WY.

*Credit Profile Summary*

The single-family loans we purchased or guaranteed in the first quarter of 2012 have a strong credit profile with a weighted average original LTV ratio of 70%, a weighted average FICO credit score of 763, and a product mix with a significant percentage of fully amortizing fixed-rate mortgage loans. Due to an increase in the volume of Refi Plus loans (including HARP loans) with higher LTV ratios, the weighted average LTV ratio at origination for our acquisitions in the first quarter of 2012 was higher than for our acquisitions in the first quarter of 2011.

Whether our future acquisitions will exhibit the same credit profile as our recent acquisitions depends on many factors, including our future pricing and eligibility standards, our future objectives, mortgage insurers' eligibility standards, our future volume of Refi Plus acquisitions, which typically include higher LTV ratios and lower FICO credit scores, and future market conditions. We expect the ultimate performance of all our loans will be affected by macroeconomic trends, including unemployment, the economy, and home prices.

The credit profile of our acquisitions has been influenced by historically low mortgage rates in recent periods, which has resulted in an increase in the percentage of acquisitions that are refinanced loans. Refinanced loans, which include Refi Plus loans, comprised 83% of our single-family acquisitions in the first quarter of 2012. Refinanced loans generally have a strong credit profile because refinancing indicates borrowers' ability to make their mortgage payment and desire to maintain homeownership, but it is uncertain if Refi Plus loans, which may have lower FICO credit scores and higher LTV ratios than we generally require, will ultimately perform as well as traditional refinanced loans. Under our Refi Plus initiative, which offers expanded refinance opportunities for eligible Fannie Mae borrowers and includes but is not limited to HARP, we allow our borrowers who have mortgage loans with current LTV ratios above 80% to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place. Refi Plus constituted approximately 22% of our total single-family acquisitions in the first quarter of 2012, compared with approximately 24% of total single-family

Table of Contents

acquisitions in all of 2011. It is too early to determine whether the ultimate performance of loans with higher risk characteristics refinanced under the Refi Plus program will be different than the performance of other refinanced loans; however, we do expect Refi Plus loans will perform better than the loans they replace because Refi Plus loans should reduce the borrowers' monthly payments or otherwise provide more sustainability than the borrowers' old loans (for example, by refinancing into a mortgage with a fixed interest rate instead of an adjustable rate). Approximately 20% of our total single-family conventional business volume for the first quarter of 2012 consisted of loans with LTV ratios higher than 80% at the time of purchase compared with 16% for the first quarter of 2011.

The prolonged and severe decline in home prices over the past several years has resulted in the overall estimated weighted average mark-to-market LTV ratio of our single-family conventional guaranty book of business to remain high at 80% as of March 31, 2012, and 79% as of December 31, 2011. The portion of our single-family conventional guaranty book of business with an estimated mark-to-market LTV ratio greater than 100% was 19% as of March 31, 2012, and 18% as of December 31, 2011. If home prices decline further, more loans may have mark-to-market LTV ratios greater than 100%, which increases the risk of delinquency and default.

*Alt-A and Subprime Loans*

Our exposure to Alt-A and subprime loans included in our single-family conventional guaranty book of business, as defined in this section, does not include (1) our investments in private-label mortgage-related securities backed by Alt-A and subprime loans or (2) resecuritizations, or wraps, of private-label mortgage-related securities backed by Alt-A mortgage loans that we have guaranteed. See "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities" for a discussion of our exposure to private-label mortgage-related securities backed by Alt-A and subprime loans. As a result of our decision to discontinue the purchase of newly originated Alt-A loans, except for those that represent the refinancing of an existing Fannie Mae loan, we expect our acquisitions of Alt-A mortgage loans to continue to be minimal in future periods and the percentage of the book of business attributable to Alt-A will continue to decrease over time. We are also not currently acquiring newly originated subprime loans.

We have classified a mortgage loan as Alt-A if the lender that delivered the loan to us classified the loan as Alt-A based on documentation or other features. We have classified a mortgage loan as subprime if the loan was originated by a lender specializing in subprime business or by a subprime division of a large lender; however, we exclude loans originated by these lenders from the subprime classification if we acquired the loans in accordance with our standard underwriting criteria, which typically require compliance by the seller with our Selling Guide (including standard representations and warranties) and/or evaluation of the loans through our Desktop Underwriter system. We apply our classification criteria in order to determine our Alt-A and subprime loan exposures; however, we have other loans with some features that are similar to Alt-A and subprime loans that we have not classified as Alt-A or subprime because they do not meet our classification criteria. The unpaid principal balance of Alt-A loans included in our single-family conventional guaranty book of business of $175.9 billion as of March 31, 2012, represented approximately 6.3% of our single-family conventional guaranty book of business. The unpaid principal balance of subprime loans included in our single-family conventional guaranty book of business of $5.6 billion as of March 31, 2012, represented approximately 0.2% of our single-family conventional guaranty book of business.

*Problem Loan Management*

Our problem loan management strategies are primarily focused on reducing defaults to avoid losses that would otherwise occur and pursuing foreclosure alternatives to attempt to minimize the severity of the losses we incur. If a borrower does not make required payments, or is in jeopardy of not making payments, we work with the servicers of our loans to offer workout solutions to minimize the likelihood of foreclosure as well as the severity of loss. Our loan workouts reflect our various types of home retention solutions, including loan modifications, repayment plans and forbearances, and foreclosure alternatives, including short sales and deeds-in-lieu of foreclosure. When appropriate, we seek to move to foreclosure expeditiously.

58

Table of Contents

Loan modifications involve changes to the original mortgage terms such as product type, interest rate, amortization term, maturity date and/or unpaid principal balance. Additionally, we currently offer up to twelve months of forbearance for those homeowners who are unemployed as an additional tool to help homeowners avoid foreclosure.

Foreclosure alternatives may be more appropriate if the borrower has experienced a significant adverse change in financial condition due to events such as unemployment or reduced income, divorce, or unexpected issues like medical bills and is therefore no longer able to make the required mortgage payments. Since the cost of foreclosure can be significant to both the borrower and Fannie Mae, to avoid foreclosure and satisfy the first-lien mortgage obligation, our servicers work with a borrower to sell their home prior to foreclosure in a short sale or accept a deed-in-lieu of foreclosure whereby the borrower voluntarily signs over the title to their property to the servicer. These alternatives are designed to reduce our credit losses while helping borrowers avoid having to go through a foreclosure.

In the following section, we present statistics on our problem loans, describe specific efforts undertaken to manage these loans and prevent foreclosures and provide metrics regarding the performance of our loan workout activities. Unless otherwise noted, single-family delinquency data is calculated based on number of loans. We include single-family conventional loans that we own and that back Fannie Mae MBS in the calculation of the single-family delinquency rate. Seriously delinquent loans are loans that are three or more monthly payments past due or in the foreclosure process. Percentage of book outstanding calculations are based on the unpaid principal balance of loans for each category divided by the unpaid principal balance of our total single-family guaranty book of business for which we have detailed loan-level information.

*Problem Loan Statistics*

The following table displays the delinquency status of loans in our single-family conventional guaranty book of business (based on number of loans) as of the dates indicated.

**Table 34:   Delinquency Status of Single-Family Conventional Loans**

| | As of | | |
|---|---|---|---|
| | March 31, 2012 | December 31, 2011 | March 31, 2011 |
| Delinquency status: | | | |
| 30 to 59 days delinquent | 1.78% | 2.17% | 1.93% |
| 60 to 89 days delinquent | 0.59 | 0.74 | 0.70 |
| Seriously delinquent | 3.67 | 3.91 | 4.27 |
| Percentage of seriously delinquent loans that have been delinquent for more than 180 days | 73% | 70% | 71% |

Our single-family serious delinquency rate has decreased each quarter since the first quarter of 2010. The decrease in our serious delinquency rate is primarily the result of home retention solutions, foreclosure alternatives and completed foreclosures, as well as our acquisition of loans with stronger credit profiles since the beginning of 2009, as these loans are now 56% of our single-family guaranty book of business, resulting in a smaller percentage of our loans becoming seriously delinquent.

Although our single-family serious delinquency rate has decreased significantly since the first quarter of 2010, our serious delinquency rate and the period of time that loans remain seriously delinquent have been negatively affected in recent periods by the increase in the average number of days it is taking to complete a foreclosure. Continuing issues in the servicer foreclosure process and changing legislative, regulatory and judicial requirements have lengthened the time it takes to foreclose on a mortgage loan in many states. In addition, servicers and states are dealing with the backlog of foreclosures resulting from these delays and from the elevated level of foreclosures resulting from the housing market downturn. Longer foreclosure timelines result in these loans remaining in our book of business for a longer time, which has caused our serious delinquency rate to decrease more slowly in the last year than it would have if the pace of foreclosures had been faster. We believe the changes in the foreclosure environment will continue to negatively affect our single-family serious

Table of Contents

delinquency rates, foreclosure timelines and credit-related expenses. We expect serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process, the volume of loan modifications and the extent to which borrowers with modified loans continue to make timely payments. We expect the number of our single-family loans that are seriously delinquent to remain well above pre-2008 levels for years.

Table 35 displays a comparison, by geographic region and by loans with and without credit enhancement, of the serious delinquency rates as of the dates indicated for single-family conventional loans in our single-family guaranty book of business. Serious delinquency rates vary by geographic region due to many factors including regional home prices, unemployment, economic conditions and state foreclosure timelines.

**Table 35:    Single-Family Serious Delinquency Rates**

| | As of | | | | | |
| | March 31, 2012 | | December 31, 2011 | | March 31, 2011 | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate |
|---|---|---|---|---|---|---|
| Single-family conventional delinquency rates by geographic region:[1] | | | | | | |
| Midwest | 15% | 3.39% | 15% | 3.73% | 15% | 3.99% |
| Northeast | 19 | 4.30 | 19 | 4.43 | 19 | 4.30 |
| Southeast | 23 | 5.36 | 24 | 5.68 | 24 | 6.08 |
| Southwest | 16 | 2.10 | 15 | 2.30 | 15 | 2.73 |
| West | 27 | 2.72 | 27 | 2.87 | 27 | 3.61 |
| Total single-family conventional loans | 100% | 3.67% | 100% | 3.91% | 100% | 4.27% |
| Single-family conventional loans: | | | | | | |
| Credit enhanced | 14% | 8.35% | 14% | 9.10% | 15% | 10.13% |
| Non-credit enhanced | 86 | 2.93 | 86 | 3.07 | 85 | 3.26 |
| Total single-family conventional loans | 100% | 3.67% | 100% | 3.91% | 100% | 4.27% |

[1]  See footnote 9 to "Table 33: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for states included in each geographic region.

While loans across our single-family guaranty book of business have been affected by the weak market conditions, loans in certain states, certain higher-risk loan categories, such as Alt-A loans and loans with higher mark-to-market LTVs, and our 2005 through 2008 loan vintages continue to exhibit higher than average delinquency rates and/or account for a disproportionate share of our credit losses. California, Florida, Arizona, Nevada and some states in the Midwest have experienced more significant declines in home prices coupled with unemployment rates that remain high.

Table 36 displays the serious delinquency rates and other financial information for our single-family conventional loans with some of these higher-risk characteristics as of the dates indicated. The reported categories are not mutually exclusive.

60

Table of Contents

**Table 36:   Single-Family Conventional Serious Delinquency Rate Concentration Analysis**

| | As of | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | March 31, 2012 | | | | December 31, 2011 | | | | March 31, 2011 | | | |
| | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] |
| | (Dollars in millions) | | | | | | | | | | | |
| **States:** | | | | | | | | | | | | |
| Arizona | $ 66,544 | 2% | 3.22% | 105% | $ 66,875 | 2% | 3.65% | 109% | $ 70,055 | 2% | 5.16% | 110% |
| California | 523,745 | 19 | 2.24 | 81 | 516,608 | 19 | 2.46 | 81 | 518,569 | 19 | 3.35 | 78 |
| Florida | 173,178 | 6 | 11.35 | 106 | 175,344 | 6 | 11.80 | 108 | 182,943 | 7 | 12.40 | 110 |
| Nevada | 28,405 | 1 | 7.06 | 138 | 28,766 | 1 | 7.42 | 138 | 30,856 | 1 | 9.40 | 133 |
| Select Midwest states [2] | 283,725 | 10 | 4.02 | 85 | 284,060 | 10 | 4.39 | 84 | 294,182 | 10 | 4.62 | 82 |
| All other states | 1,701,671 | 62 | 3.01 | 74 | 1,689,846 | 62 | 3.18 | 73 | 1,718,421 | 61 | 3.34 | 73 |
| **Product type:** | | | | | | | | | | | | |
| Alt-A | 175,908 | 6 | 12.03 | 103 | 182,236 | 7 | 12.43 | 101 | 203,709 | 7 | 13.45 | 100 |
| Subprime | 5,609 | * | 21.67 | 113 | 5,791 | * | 23.18 | 111 | 6,328 | * | 27.47 | 108 |
| **Vintages:** | | | | | | | | | | | | |
| 2005 | 178,996 | 7 | 7.23 | 97 | 190,521 | 7 | 7.27 | 95 | 222,662 | 8 | 7.17 | 93 |
| 2006 | 176,489 | 6 | 11.58 | 113 | 186,835 | 7 | 11.81 | 111 | 218,938 | 8 | 12.12 | 109 |
| 2007 | 253,587 | 9 | 12.27 | 114 | 269,012 | 10 | 12.62 | 112 | 315,420 | 11 | 13.08 | 109 |
| 2008 | 176,632 | 6 | 5.74 | 94 | 192,713 | 7 | 5.64 | 92 | 238,391 | 8 | 5.10 | 88 |
| All other vintages | 1,991,564 | 72 | 1.49 | 70 | 1,922,418 | 69 | 1.59 | 69 | 1,819,614 | 65 | 1.64 | 67 |
| **Estimated mark-to-market LTV ratio:** | | | | | | | | | | | | |
| Greater than 100%[1] | 515,774 | 19 | 12.77 | 130 | 493,762 | 18 | 13.76 | 131 | 499,432 | 18 | 15.72 | 130 |
| **Select combined risk characteristics:** | | | | | | | | | | | | |
| Original LTV ratio > 90% and FICO score < 620 | 18,663 | 1 | 16.83 | 117 | 18,992 | 1 | 18.67 | 115 | 20,656 | 1 | 20.20 | 113 |

\*   Percentage is less than 0.5%.

[1]   Second lien mortgage loans held by third parties are not included in the calculation of the estimated mark-to-market LTV ratios.

[2]   Consists of Illinois, Indiana, Michigan and Ohio.

*Loan Workout Metrics*

Table 37 displays statistics on our single-family loan workouts that were completed, by type, for the periods indicated. These statistics include loan modifications but do not include trial modifications or repayment and forbearance plans that have been initiated but not completed.

61

Table of Contents

**Table 37:   Statistics on Single-Family Loan Workouts**

| | For the Three Months Ended March 31, 2012 | | For the Three Months Ended March 31, 2011 | |
| --- | --- | --- | --- | --- |
| | Unpaid Principal Balance | Number of Loans | Unpaid Principal Balance | Number of Loans |
| | (Dollars in millions) | | | |
| Home retention solutions: | | | | |
|    Modifications | $ 8,881 | 46,671 | $10,668 | 51,043 |
|    Repayment plans and forbearances completed [1] | 1,292 | 8,864 | 1,374 | 9,916 |
| | 10,173 | 55,535 | 12,042 | 60,959 |
| Foreclosure alternatives: | | | | |
|    Short sales | 4,009 | 18,614 | 3,415 | 15,344 |
|    Deeds-in-lieu of foreclosure | 613 | 3,599 | 318 | 1,776 |
| | 4,622 | 22,213 | 3,733 | 17,120 |
| Total loan workouts | $14,795 | 77,748 | $15,775 | 78,079 |
| Loan workouts as a percentage of single-family guaranty book of business [2] | 2.07% | 1.75% | 2.18% | 1.73% |

[1]   Repayment plans reflect only those plans associated with loans that were 60 days or more delinquent. Forbearances reflect loans that were 90 days or more delinquent.

[2]   Calculated based on annualized loan workouts during the period as a percentage of our single-family guaranty book of business as of the end of the period.

The volume of home retention solutions completed in the first quarter of 2012 decreased compared with the first quarter of 2011, primarily due to a decline in the number of seriously delinquent loans in the first quarter of 2012, compared with the first quarter of 2011.

During the first quarter of 2012, we initiated approximately 41,100 trial modifications, including Home Affordable Modification Program ("HAMP") and non-HAMP, compared with approximately 49,700 trial modifications during the first quarter of 2011. We also initiated other types of workouts, such as repayment plans and forbearances. It is difficult to predict how many of these trial modifications and initiated plans will be completed.

HAMP guidance directs servicers either to cancel or to convert trial modifications after three or four monthly payments, depending on the borrower's circumstances. As of March 31, 2012, 54% of our HAMP trial modifications had been converted to permanent HAMP modifications since the inception of the program. The conversion rate for HAMP modifications since June 1, 2010, when servicers were required to perform a full verification of a borrower's eligibility prior to offering a HAMP trial modification, was 85% as of March 31, 2012. The average length of a trial period for HAMP modifications initiated after June 1, 2010 was four months.

In addition to our home retention solutions, we continue to focus on alternatives to foreclosure for borrowers who are unable to retain their homes. The number of foreclosure alternatives we agreed to during the first quarter of 2012 remained high as these are favorable solutions for a large number of borrowers. We expect the volume of our home retention solutions and foreclosure alternatives to remain high throughout the remainder of 2012.

We continue to work with our servicers to implement our home retention and foreclosure prevention initiatives. Our approach to workouts continues to focus on the large number of borrowers facing financial hardships. Accordingly, the vast majority of loan modifications we have completed since 2009 have been concentrated on deferring or lowering the borrowers' monthly mortgage payments to allow borrowers to work through their hardships.

FHFA 3410

Table of Contents

Table 38 displays the percentage of our loan modifications completed during the first quarter of 2011, 2010 and the second half of 2009 that were current or paid off one year after modification, as well as the percentage of our loan modifications completed during the first quarter of 2010 and the second half of 2009 that were current or paid off two years after modification. We implemented HAMP in early 2009, and thus did not complete a significant number of modifications under this program until the third quarter of 2009.

**Table 38:   Percentage of Loan Modifications That Were Current or Paid Off at One and Two Years Post-Modification**[1]

| | 2011 | | 2010 | | | | 2009 | |
|---|---|---|---|---|---|---|---|---|
| | Q1 | Q4 | Q3 | Q2 | Q1 | Q4 | Q3 |
| **One Year Post-Modification** | | | | | | | |
| HAMP Modifications | 77% | 74% | 74% | 74% | 76% | 73% | 71% |
| Non-HAMP Modifications | 69 | 67 | 67 | 65 | 55 | 50 | 39 |
| Total | 74 | 69 | 70 | 70 | 65 | 58 | 42 |
| **Two Years Post-Modification** | | | | | | | |
| HAMP Modifications | | | | | 70% | 67% | 64% |
| Non-HAMP Modifications | | | | | 52 | 48 | 37 |
| Total | | | | | 60 | 55 | 39 |

[1]   Excludes loans that were classified as subprime ARMs that were modified into fixed rate mortgages and were current at the time of modification. Modifications included permanent modifications, but do not reflect loans currently in trial modifications.

We began changing the structure of our non-HAMP modifications in 2010 to lower borrowers' monthly mortgage payments to a greater extent, which improved the performance of our non-HAMP modifications overall. In addition, because post-modification performance was greater for our HAMP modifications than for our non-HAMP modifications, we began in September 2010 to include trial periods for our non-HAMP modifications.

There is significant uncertainty regarding the ultimate long term success of our current modification efforts. We believe the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and income, and home prices. Modifications, even those with reduced monthly payments, may also not be sufficient to help borrowers with second liens and other significant non-mortgage debt obligations.   FHFA, other agencies of the U.S. government or Congress may ask us to undertake new initiatives to support the housing and mortgage markets should our current modification efforts ultimately not perform in a manner that results in the stabilization of these markets. See "Risk Factors" in our 2011 Form 10-K for a discussion of efforts we may be required or asked to undertake and their potential effect on us.

*REO Management*

Foreclosure and REO activity affect the amount of credit losses we realize in a given period. Table 39 displays our foreclosure activity, by region, for the periods indicated. Regional REO acquisition and charge-off trends generally follow a pattern that is similar to, but lags, that of regional delinquency trends.

63

Table of Contents

**Table 39:   Single-Family Foreclosed Properties**

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| Single-family foreclosed properties (number of properties): | | |
| Beginning of period inventory of single-family foreclosed properties (REO) [1] | 118,528 | 162,489 |
| Acquisitions by geographic area: [2] | | |
| Midwest | 14,713 | 11,285 |
| Northeast | 3,219 | 2,004 |
| Southeast | 15,470 | 10,976 |
| Southwest | 7,946 | 13,666 |
| West | 6,352 | 15,618 |
| Total properties acquired through foreclosure[1] | 47,700 | 53,549 |
| Dispositions of REO | (52,071) | (62,814) |
| End of period inventory of single-family foreclosed properties (REO) [1] | 114,157 | 153,224 |
| Carrying value of single-family foreclosed properties (dollars in millions) [3] | $  9,721 | $  14,086 |
| Single-family foreclosure rate[4] | 1.07% | 1.19% |

[1]   Includes acquisitions through deeds-in-lieu of foreclosure.

[2]   See footnote 9 to "Table 33: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for states included in each geographic region.

[3]   Excludes foreclosed property claims receivables, which are reported in our condensed consolidated balance sheets as a component of "Acquired property, net."

[4]   Estimated based on the annualized total number of properties acquired through foreclosure or deeds-in-lieu of foreclosure as a percentage of the total number of loans in our single-family guaranty book of business as of the end of each respective period.

The ongoing weak economy, as well as high unemployment rates, continues to result in a high level of mortgage loans that transition from delinquent to REO status, either through foreclosure or deed-in-lieu of foreclosure. Our foreclosure rates remain high; however, foreclosure levels were lower than they would have been during the first quarter of 2012 due to delays in the processing of foreclosures caused by continuing foreclosure process issues encountered by our servicers and changing legislative, regulatory and judicial requirements. The delay in foreclosures, as well as an increase in the number of dispositions of REO properties, has resulted in a decrease in the inventory of foreclosed properties since December 31, 2010.

We continue to manage our REO inventory to minimize costs and maximize sales proceeds. However, as we are unable to market and sell a higher portion of our inventory, the pace at which we can dispose of our properties slows, resulting in higher foreclosed property expenses related to costs associated with ensuring that the property is vacant and costs of maintaining the property.

Table 40 displays the current status of our single-family foreclosed property inventory, including the percentage of our inventory that we are unable to market, as of the dates indicated.

64

Table of Contents

**Table 40:   Single-Family Foreclosed Property Status**

| | Percent of Single-Family Foreclosed Properties As of | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| Available-for-sale | 22% | 28% |
| Offer accepted[1] | 20 | 17 |
| Appraisal stage[2] | 10 | 8 |
| Unable to market: | | |
| Redemption status[3] | 13 | 12 |
| Occupied status[4] | 14 | 15 |
| Rental property[5] | 8 | 7 |
| Properties being repaired | 5 | 6 |
| Other | 8 | 7 |
| Total unable to market | 48 | 47 |
| Total | 100% | 100% |

[1] Properties for which an offer has been accepted, but the property has not yet been sold.

[2] Properties that are pending appraisals and being prepared to be listed for sale.

[3] Properties that are within the period during which state laws allows the former mortgagor and second lien holders to redeem the property.

[4] Properties that are still occupied, and for which the eviction process is not yet complete.

[5] Properties with a tenant living in the home under our Tenant in Place or Deed for Lease programs.

In February 2012, FHFA announced the pilot of an REO initiative that will allow qualified investors to purchase pools of foreclosed properties from us with the requirement to rent the purchased properties for a specified number of years. The pilot will involve the sale of pools of various types of assets including rental properties, vacant properties and nonperforming loans with a focus on the hardest-hit areas. The first pilot transaction will involve the sale of approximately 2,500 properties located in eight geographic areas, including Atlanta, Chicago, Las Vegas, Los Angeles, Phoenix, and parts of Florida. We do not yet know whether this initiative will have a material impact on our future REO sales and REO inventory levels.

### Multifamily Mortgage Credit Risk Management

The credit risk profile of our multifamily mortgage credit book of business is influenced by the structure of the financing, the type and location of the property, the condition and value of the property, the financial strength of the borrower and lender, market and sub-market trends and growth, and the current and anticipated cash flows from the property. These and other factors affect both the amount of expected credit loss on a given loan and the sensitivity of that loss to changes in the economic environment. We provide information on our credit-related expenses and credit losses in "Business Segment Results —Multifamily Business Results."

#### Multifamily Acquisition Policy and Underwriting Standards

Our Multifamily business, together with our Enterprise Risk Management division, which provides independent risk oversight of the Multifamily business, is responsible for pricing and managing the credit risk on multifamily mortgage loans we purchase and on Fannie Mae MBS backed by multifamily loans (whether held in our portfolio or held by third parties). Our primary multifamily delivery channel is the Delegated Underwriting and Servicing, or DUS ®, program, which is comprised of multiple lenders that span the spectrum from large financial institutions to smaller independent multifamily lenders. Multifamily loans that we purchase or that back Fannie Mae MBS are either underwritten by a Fannie Mae-approved lender or subject to our underwriting review prior to closing, depending on the product type and/or loan size. Loans delivered to us by DUS lenders and their

FHFA 3413

Table of Contents

affiliates represented 86% of our multifamily guaranty book of business as of March 31, 2012 and December 31, 2011.

We use various types of credit enhancement arrangements for our multifamily loans, including lender risk-sharing, lender repurchase agreements, pool insurance, subordinated participations in mortgage loans or structured pools, cash and letter of credit collateral agreements, and cross-collateralization/cross-default provisions. The most prevalent form of credit enhancement on multifamily loans is lender risk-sharing. Lenders in the DUS program typically share in loan-level credit losses in one of two ways: (1) they bear losses up to the first 5% of unpaid principal balance of the loan and share in remaining losses up to a prescribed limit; or (2) they share up to one-third of the credit losses on an equal basis with us. Non-DUS lenders typically share or absorb credit losses based on a negotiated percentage of the loan or the pool balance.

Table 41 displays the percentage of the unpaid principal balance of loans in our multifamily guaranty book of business with lender risk-sharing and with no recourse to the lender as of the dates indicated.

**Table 41:   Multifamily Lender Risk-Sharing**

| | As of | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| Lender risk-sharing | | |
| DUS | 69% | 68% |
| Non-DUS negotiated | 10 | 11 |
| No recourse to the lender | 21 | 21 |

At the time of our purchase or guarantee of multifamily mortgage loans, we and our lenders rely significantly on sound underwriting standards, which often include third-party appraisals and cash flow analysis. Our standards for multifamily loans specify maximum original LTV and minimum original debt service coverage ratio ("DSCR") values that vary based on loan characteristics. Our experience has been that original LTV and DSCR values have been reliable indicators of future credit performance.

Table 42 displays original LTV and DSCR metrics for our multifamily guaranty book of business as of the dates indicated.

**Table 42:   Multifamily Guaranty Book of Business Key Risk Characteristics**

| | As of | | |
| --- | --- | --- | --- |
| | March 31, 2012 | December 31, 2011 | March 31, 2011 |
| Weighted average original LTV | 66% | 66% | 66% |
| Original LTV greater than 80% | 4 | 5 | 5 |
| Original DSCR less than or equal to 1.10 | 8 | 8 | 9 |

*Multifamily Portfolio Diversification and Monitoring*

Diversification within our multifamily mortgage credit book of business by geographic concentration, term-to-maturity, interest rate structure, borrower concentration, and credit enhancement coverage is an important factor that influences credit performance and helps reduce our credit risk.

We and our lenders monitor the performance and risk concentrations of our multifamily loans and the underlying properties on an ongoing basis throughout the life of the loan; at the loan, property, and portfolio level. We monitor loans with an estimated current DSCR below 1.0, as that is an indicator of heightened default risk. The percentage of loans in our multifamily guaranty book of business with a current DSCR ratio less than 1.0 was approximately 7% as of March 31, 2012 and December 31, 2011.

66

Table of Contents

*Problem Loan Management and Foreclosure Prevention*

The number of multifamily loans at risk of becoming seriously delinquent has continued to decrease in the first quarter of 2012, as early-stage delinquencies have decreased. Since delinquency rates are a lagging indicator, we expect to continue to incur additional credit losses. We periodically refine our underwriting standards in response to market conditions and enact proactive portfolio management and monitoring which are each designed to keep credit losses to a low level relative to our multifamily guaranty book of business.

*Problem Loan Statistics*

We classify multifamily loans as seriously delinquent when payment is 60 days or more past due. We include the unpaid principal balance of multifamily loans that we own or that back Fannie Mae MBS and any housing bonds for which we provide credit enhancement in the calculation of the multifamily serious delinquency rate.

Table 43 displays a comparison of our multifamily serious delinquency rates for loans acquired through DUS lenders versus loans acquired through non-DUS lenders and the percentage of total multifamily credit losses they represent.

**Table 43:   Multifamily Concentration Analysis**

| | As of | | | | | | Percentage of Multifamily Credit Losses For the Three Months Ended March 31, | |
| | March 31, 2012 | | December 31, 2011 | | March 31, 2011 | | | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | 2012 | 2011 |
|---|---|---|---|---|---|---|---|---|
| DUS small balance loans[1] | 8% | 0.42% | 8% | 0.45% | 8% | 0.68% | 4% | 8% |
| DUS non small balance loans[2] | 73 | 0.25 | 72 | 0.51 | 70 | 0.48 | 88 | 70 |
| Non-DUS small balance loans[1] | 8 | 1.22 | 9 | 1.38 | 10 | 1.41 | 8 | 15 |
| Non-DUS non small balance loans[2] | 11 | 0.55 | 11 | 0.57 | 12 | 0.88 | — | 7 |
| Total multifamily loans | 100 | 0.37 | 100 | 0.59 | 100 | 0.64 | 100 | 100 |

[1] Loans with original unpaid principal balances up to $3 million as well as loans in high cost markets with original unpaid principal balances up to $5 million.

[2] Loans with original unpaid principal balances greater than $3 million as well as loans in high cost markets with original unpaid principal balances greater than $5 million.

The multifamily serious delinquency rate decreased as of March 31, 2012 compared with December 31, 2011 as national multifamily market fundamentals continued to improve. The DUS loans in our guaranty book of business have lower delinquency rates when compared with the non-DUS loans in our guaranty book primarily due to the DUS model, which has several features that more closely align our interests with those of the lenders. Small balance non-DUS loans continue to represent a disproportionately large share of delinquencies, but they are generally covered by loss sharing arrangements that limit the credit losses we incur.

Multifamily loans with an original balance of up to $3 million nationwide or $5 million in high cost markets, which we refer to as small balance loans, acquired through non-DUS lenders continue to exhibit higher delinquencies than small balance loans acquired through DUS lenders. These small balance non-DUS loans account for 27% of our multifamily serious delinquencies and 8% of our multifamily guaranty book of business as of March 31, 2012 compared with 20% of our multifamily serious delinquencies and 9% of our multifamily guaranty book of business as of December 31, 2011. These small balance non-DUS loan acquisitions were most common in 2007 and 2008 and have not been a significant portion of our total multifamily acquisitions since 2008. Although our 2007 and early 2008 acquisitions were underwritten to our then-current credit standards and required borrower cash equity, they were acquired near the peak of multifamily housing values. During the second half of 2008, our underwriting standards were adjusted to reflect the evolving market trends at that time.

Table of Contents

In addition, Florida, Nevada, and Ohio have a disproportionately high share of seriously delinquent loans compared with their share of the multifamily guaranty book of business as a result of slow economic recovery in certain areas of these states. These states accounted for 36% of multifamily serious delinquencies but only 8% of the multifamily guaranty book of business as of March 31, 2012.

*REO Management*

Foreclosure and REO activity affect the level of our credit losses. Table 44 displays our held for sale multifamily REO activity for the periods indicated.

**Table 44:   Multifamily Foreclosed Properties**

| | For the Three Months Ended March 31, | |
|---|---|---|
| | **2012** | **2011** |
| Multifamily foreclosed properties (number of properties): | | |
| Beginning of period inventory of multifamily foreclosed properties (REO) | 260 | 222 |
| Total properties acquired through foreclosure | 61 | 50 |
| Disposition of REO | (58) | (37) |
| End of period inventory of multifamily foreclosed properties (REO) | 263 | 235 |
| Carrying value of multifamily foreclosed properties (dollars in millions) [1] | $646 | $576 |

[1]   Excludes DUS lender risk-sharing receivables, which are reported in our condensed consolidated balance sheets as a component of "Acquired property, net."

The increase in our multifamily foreclosed property inventory reflects the continuing stress on our multifamily guaranty book of business as certain local markets and properties continue to exhibit weak fundamentals, though national multifamily market fundamentals continued to improve in the first quarter of 2012.

**Institutional Counterparty Credit Risk Management**

We rely on our institutional counterparties to provide services and credit enhancements, including primary and pool mortgage insurance coverage, risk sharing agreements with lenders and financial guaranty contracts that are critical to our business. Institutional counterparty credit risk is the risk that these institutional counterparties may fail to fulfill their contractual obligations to us, including seller/servicers who are obligated to repurchase loans from us or reimburse us for losses in certain circumstances. Defaults by a counterparty with significant obligations to us could result in significant financial losses to us.

See "MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management" in our 2011 Form 10-K for additional information about our institutional counterparties, including counterparty risk we face from mortgage originators and investors, from debt security and mortgage dealers, and from document custodians.

*Mortgage Seller/Servicers*

Our primary exposures to institutional counterparty risk are with mortgage seller/servicers that service the loans we hold in our mortgage portfolio or that back our Fannie Mae MBS, as well as seller/servicers that are obligated to repurchase loans from us or reimburse us for losses in certain circumstances. We rely on mortgage seller/servicers to meet our servicing standards and fulfill their servicing and repurchase obligations.

68

Table of Contents

Our business with our mortgage seller/servicers is concentrated. Our ten largest single-family mortgage servicers, including their affiliates, serviced 74% of our single-family guaranty book of business as of March 31, 2012, compared to 75% as of December 31, 2011. Our largest mortgage servicer is Bank of America, N.A. which, together with its affiliates, serviced approximately 20% of our single-family guaranty book of business as of March 31, 2012, compared with 21% as of December 31, 2011. In addition, we had two other mortgage servicers, JPMorgan Chase Bank, N.A. and Wells Fargo Bank, N.A., that, with their affiliates, each serviced over 10% of our single-family guaranty book of business as of March 31, 2012 and December 31, 2011. In addition, Wells Fargo Bank serviced over 10% of our multifamily guaranty book of business as of March 31, 2012 and December 31, 2011. Although our business with our mortgage seller/servicers is concentrated, a number of our largest mortgage seller/servicer counterparties have recently reduced or eliminated their purchases of mortgage loans from mortgage brokers and correspondent lenders. As a result, we are acquiring an increasing portion of our business volume directly from smaller financial institutions and some of our servicing volume is shifting to smaller or non-traditional servicers that may not have the same financial strength or operational capacity as our largest servicers. See "Risk Factors" for a description of the risks to our business associated with a decrease in the concentration of our business with large institutions.

Because we delegate the servicing of our mortgage loans to mortgage servicers and do not have our own servicing function, servicers' lack of appropriate process controls or the loss of business from a significant mortgage servicer counterparty could pose significant risks to our ability to conduct our business effectively. Many of our largest servicer counterparties continue to reevaluate the effectiveness of their process controls. Many servicers are also subject to consent orders by their regulators that require the servicers to correct foreclosure process deficiencies and improve their servicing and foreclosure practices. This has resulted in extended foreclosure timelines and, therefore, additional holding costs for us, such as property taxes and insurance, repairs and maintenance, and valuation adjustments due to home price changes. See "Executive Summary" in our 2011 Form 10-K for a discussion of managing foreclosure timelines.

Our mortgage seller/servicers are obligated to repurchase loans or foreclosed properties, or reimburse us for losses if the foreclosed property has been sold, under certain circumstances, such as if it is determined that the mortgage loan did not meet our underwriting or eligibility requirements, if loan representations and warranties are violated or if mortgage insurers rescind coverage. We refer to our demands that seller/servicers meet these obligations collectively as "repurchase requests." The number of our repurchase requests remained high during the first quarter of 2012, and we expect that the amount of our outstanding repurchase requests will remain high. As the volume of repurchase requests increases, so does the risk that affected seller/servicers will not meet the terms of their repurchase obligations, and we may be unable to recover on all outstanding loan repurchase obligations resulting from seller/servicers' breaches of contractual obligations. Failure by a significant seller/servicer counterparty, or a number of seller/servicers, to fulfill repurchase obligations to us could result in a significant increase in our credit losses and have a material adverse effect on our results of operations and financial condition. In addition, actions we take to pursue our contractual remedies could increase our costs, reduce our revenues, or otherwise have a material adverse effect on our results of operations or financial condition. We estimate our allowance for loan losses assuming the benefit of repurchase demands only from those counterparties we determine have the financial capacity to fulfill this obligation. Accordingly, as of March 31, 2012, in estimating our allowance for loan losses we assumed no benefit from repurchase demands due to us from seller/servicers that lacked the financial capacity to honor their contractual obligations.

Table 45 displays repurchase request activity, measured by unpaid principal balance, during the three months ended March 31, 2012 and 2011. The dollar amounts of our outstanding repurchase requests provided below are based on the unpaid principal balance of the loans underlying the repurchase request issued, not the actual amount we have requested from the lenders. In some cases, we allow lenders to remit payment equal to our loss, including imputed interest, on the loan after we have disposed of the REO, which is less than the unpaid principal balance of the loan. As a result, we expect our actual cash receipts relating to these outstanding repurchase requests to be significantly lower than the unpaid principal balance of the loan. Amounts relating to repurchase requests originating from missing documentation or loan files are excluded from the total requests outstanding until the completion of a full underwriting review, once the documents and loan files are received.

69

Table of Contents

Table 45:   Repurchase Request Activity

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (Dollars in millions) | |
| Beginning outstanding repurchase requests | $ 10,400 | $ 5,007 |
| Issuances | 6,556 | 6,350 |
| Collections | (2,361) | (1,595) |
| Other resolutions[1] | (2,105) | (886) |
| Total successfully resolved | (4,466) | (2,481) |
| Cancellations | (337) | (227) |
| Ending outstanding repurchase requests | $ 12,153 | $ 8,649 |

[1] Includes repurchase requests that were successfully resolved through reimbursement of losses or other remedies such as, but not limited to, loan pricing adjustments, indemnification or future repurchase agreements, lender corrective action, or negotiated settlements.

Table 46 displays our top five mortgage seller/servicers by outstanding repurchase requests based on the unpaid principal balance of the loans underlying repurchase requests issued as of March 31, 2012 and December 31, 2011. Table 46 also displays the mortgage seller/servicers balance and percentage of our repurchase requests that were over 120 days outstanding, and the seller/servicers' repurchase requests outstanding over 120 days as a percentage of total repurchase requests outstanding over 120 days, as of March 31, 2012 and December 31, 2011.

Table 46:   Outstanding Repurchase Requests[1]

| | Outstanding Repurchase Requests as of | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | March 31, 2012 | | | | December 31, 2011 | | | |
| | Total Outstanding Balance[3] | Over 120 Days[2] | | | Total Outstanding Balance[3] | Over 120 Days[2] | | |
| | | Balance[3] | % | % of Total | | Balance[3] | % | % of Total |
| | (Dollars in millions) | | | | | | | |
| **Mortgage Seller/Servicer Counterparty:** | | | | | | | | |
| Bank of America, N.A. | $ 7,057 | $ 3,039 | 43% | 71% | $ 5,449 | $1,841 | 34% | 59% |
| JPMorgan Chase Bank, N.A. | 1,251 | 187 | 15 | 4 | 1,136 | 197 | 17 | 6 |
| CitiMortgage[4] | 955 | 249 | 26 | 6 | 917 | 226 | 25 | 7 |
| Wells Fargo Bank, N.A.[4] | 797 | 231 | 29 | 5 | 830 | 259 | 31 | 8 |
| SunTrust Bank, Inc.[4] | 380 | 75 | 20 | 2 | 430 | 40 | 9 | 1 |
| Other[5] | 1,713 | 478 | 28 | 12 | 1,638 | 576 | 35 | 19 |
| Total | $12,153 | $4,259 | | 100% | $ 10,400 | $3,139 | | 100% |

[1] Amounts relating to repurchase requests originating from missing documentation or loan files are excluded from the outstanding repurchase requests until the completion of a full underwriting review.

[2] Measured from either the original repurchase request date or, for lenders remitting after the property is disposed, the date of our final loss determination.

[3] Based on the unpaid principal balance of the loans underlying the repurchase request issued. In some cases, lenders remit payment equal to our loss on sale of the loan as REO, which includes imputed interest, and is significantly lower than the unpaid principal balance of the loan. Also includes repurchase requests resulting from the rescission of mortgage insurance coverage.

[4] Seller/servicer has entered into a plan with us to resolve certain outstanding repurchase requests and/or has posted collateral to us.

[5] Includes some seller/servicers that have entered into a plan with us to resolve outstanding repurchase requests and/or have posted collateral to us.

Table of Contents

We continue to aggressively pursue our contractual rights associated with outstanding repurchase requests. Failure by a seller/servicer to repurchase a loan or to otherwise make us whole for our losses may result in the imposition of certain sanctions including, but not limited to:

- requiring the posting of collateral,

- denying transfer of servicing requests or denying pledged servicing requests,

- modifying or suspending any contract or agreement with a lender, or

- suspending or terminating a lender or imposing some other formal sanction on a lender.

If we are unable to resolve these matters to our satisfaction, we may seek additional remedies. If we are unable to resolve our repurchase requests, either through collection or additional remedies, we will not recover the losses we have recognized from the associated loans.

Since the fourth quarter of 2011, Bank of America, the seller/servicer with which we have the most repurchase requests outstanding, slowed the pace of its repurchases. As a result of Bank of America's failure to honor its contractual obligations in a timely manner, the already high volume of our outstanding repurchase requests with Bank of America increased substantially. Measured by unpaid principal balance, Bank of America accounted for approximately 58% of our total outstanding repurchase requests as of March 31, 2012, compared with 52% as of December 31, 2011 and 41% as of December 31, 2010. Similarly, Bank of America accounted for 71% of our repurchase requests that had been outstanding for more than 120 days as of March 31, 2012, compared with 59% as of December 31, 2011 and 37% as of December 31, 2010. We are taking steps to address Bank of America's delays in honoring our repurchase requests. For example, we did not renew our existing loan delivery contract with Bank of America at the end of January 2012, which significantly restricts the types of loans it can deliver to us. Bank of America, however, can continue delivering loans to us under our Refi Plus initiative, including HARP loans. Bank of America's failure to honor repurchase obligations in a timely manner has not caused us to change our estimate of the amounts we expect to collect from them ultimately, and we continue to work with Bank of America to resolve these issues. If we collect less than the amount we expect from Bank of America, we may be required to seek additional funds from Treasury under our senior preferred stock purchase agreement. Table 46 above displays our top five mortgage seller/servicers by outstanding repurchase requests based on the unpaid principal balance of the loans underlying repurchase requests issued as of March 31, 2012. We do not expect the change in our loan delivery agreement with Bank of America to be material to our business or results of operations as Bank of America represented less than 5% of our loan delivery volume in the quarter ended December 31, 2011.

We are also exposed to the risk that a mortgage seller/servicer or another party involved in a mortgage loan transaction will engage in mortgage fraud by misrepresenting the facts about the loan. We have experienced financial losses in the past and may experience significant financial losses and reputational damage in the future as a result of mortgage fraud. See "Risk Factors" in our 2011 Form 10-K for additional discussion on risks of mortgage fraud to which we are exposed.

### *Mortgage Insurers*

We use several types of credit enhancement to manage our single-family mortgage credit risk, including primary and pool mortgage insurance coverage. Table 47 displays our maximum potential loss recovery for the primary and pool mortgage insurance coverage on single-family loans in our guaranty book of business and our unpaid principal balance covered by insurance for our mortgage insurer counterparties as of March 31, 2012 and December 31, 2011. The table includes our top nine mortgage insurer counterparties, which provided over 99% of our total mortgage insurance coverage on single-family loans in our guaranty book of business as of March 31, 2012 and December 31, 2011. See "Risk Management—Credit Risk Management—Institutional Counterparty Risk Management—Mortgage Insurers" in our 2011 Form 10-K for a discussion on the credit ratings of our mortgage insurers.

71

Table of Contents

**Table 47:   Mortgage Insurance Coverage**

| Counterparty:[3] | Maximum Coverage[1] | | | | Unpaid Principal Balance Covered By Insurance[2] | |
|---|---|---|---|---|---|---|
| | As of March 31, 2012 | | | As of December 31, 2011 | As of March 31, 2012 | As of December 31, 2011 |
| | Primary | Pool | Total | | | |
| | (Dollars in millions) | | | | | |
| Mortgage Guaranty Insurance Corporation | $19,736 | $1,555 | $21,291 | $ 21,479 | $ 87,833 | $ 89,872 |
| Radian Guaranty, Inc. | 15,660 | 333 | 15,993 | 15,505 | 65,630 | 63,534 |
| United Guaranty Residential Insurance Company | 14,936 | 129 | 15,065 | 14,579 | 61,199 | 59,233 |
| Genworth Mortgage Insurance Corporation | 13,540 | 58 | 13,598 | 13,628 | 54,822 | 54,893 |
| PMI Mortgage Insurance Co. | 10,374 | 238 | 10,612 | 11,128 | 45,428 | 47,734 |
| Republic Mortgage Insurance Company | 7,923 | 872 | 8,795 | 9,219 | 37,108 | 39,130 |
| Triad Guaranty Insurance Corporation | 2,390 | 637 | 3,027 | 3,150 | 11,924 | 12,400 |
| CMG Mortgage Insurance Company [4] | 1,968 | — | 1,968 | 1,951 | 8,314 | 8,241 |
| Essent Guaranty, Inc. | 601 | — | 601 | 395 | 2,556 | 1,685 |
| Others | 217 | — | 217 | 217 | 1,222 | 1,214 |
| Total | $ 87,345 | $ 3,822 | $91,167 | $ 91,251 | $376,036 | $377,936 |
| Total as a percentage of single-family guaranty book of business | | | 3% | 3% | 13% | 13% |

[1] Maximum coverage refers to the aggregate dollar amount of insurance coverage (that is, "risk in force") on single-family loans in our guaranty book of business and represents our maximum potential loss recovery under the applicable mortgage insurance policies.

[2] Represents the unpaid principal balance of single-family loans in our guaranty book of business covered under the applicable mortgage insurance policies (that is, "insurance in force").

[3] Insurance coverage amounts provided for each counterparty may include coverage provided by consolidated affiliates and subsidiaries of the counterparty.

[4] CMG Mortgage Insurance Company is a joint venture owned by PMI Mortgage Insurance Co. and CUNA Mutual Insurance Society.

As of May 9, 2012, one of our mortgage insurance counterparties, PMI Mortgage Insurance Co. ("PMI"), has publicly disclosed that it is now in receivership. Three of our mortgage insurance counterparties—Triad Guaranty Insurance Corporation ("Triad"), Republic Mortgage Insurance Company ("RMIC"), and PMI—have publicly disclosed that they are in run-off. A mortgage insurer that is in run-off continues to collect premiums and pay claims on its existing insurance business, but no longer writes new insurance. One mortgage insurer, Genworth Mortgage Insurance Corporation ("Genworth"), is currently operating pursuant to a waiver it received from its regulator of the state regulatory capital requirements applicable to its main insurance writing entity. An additional two of our mortgage insurers—Mortgage Guaranty Insurance Corporation ("MGIC") and Radian Guaranty, Inc. ("Radian")—have disclosed that, in the absence of additional capital contributions to their insurance writing entity, their capital might fall below state regulatory capital requirements in the future. In April 2012, Radian announced that it had entered into a reinsurance agreement with an external reinsurance provider to proactively manage its mortgage insurance risk-to-capital position. These six mortgage insurers provided a combined $73.3 billion, or 80%, of our risk in force mortgage insurance coverage of our single-family guaranty book of business as of March 31, 2012.

We are unable to determine how long our mortgage insurer counterparties that are operating under a waiver will continue to operate under a waiver, or that are currently below their state-imposed risk-to-capital limits will remain below these limits. If these mortgage insurers are not able to raise capital and they exceed their

Table of Contents

risk-to-capital limits, they will likely be forced into run-off or receivership unless they can secure and maintain a waiver from their state regulator. This would increase the risk that these mortgage insurers will fail to pay our claims under insurance policies, and could also cause the quality and speed of their claims processing to deteriorate.

The weak financial condition of many of our mortgage insurer counterparties increases the significant risk that these counterparties will fail to fulfill their obligations to pay our claims under insurance policies. If we determine that it is probable that we will not collect all of our claims from one or more of these mortgage insurer counterparties, it could result in an increase in our loss reserves, which could adversely affect our earnings, liquidity, financial condition and net worth.

We evaluate each of our mortgage insurer counterparties individually to determine whether or under what conditions it will remain eligible to insure new mortgages sold to us. Based on our evaluation, we may impose additional terms and conditions of approval on some of our mortgage insurers, including: limiting the volume and types of loans they may insure for us; requiring them to obtain our consent prior to entering into risk sharing arrangements with mortgage lenders; requiring them to meet certain financial conditions, such as maintaining a minimum level of policyholders' surplus, a maximum risk-to-capital ratio, a maximum combined ratio, or a minimum amount of acceptable liquid assets; or requiring that they secure parental or other capital support agreements.

The claims obligations of RMIC, PMI and Triad have been partially deferred pursuant to orders from their state regulators. State regulators could take additional corrective actions against RMIC and Triad, including placing them into receivership. While our remaining mortgage insurers have continued to pay claims owed to us in full, there can be no assurance that they will continue to do so given their current financial condition.

Some mortgage insurers have explored corporate restructurings designed to provide relief from risk-to-capital limits in certain states. We have approved several restructurings so that certain of our mortgage insurer counterparties or their subsidiaries could continue to write new business. Additionally, mortgage insurers continue to approach us with various proposed corporate restructurings that would require our approval of affiliated mortgage insurance writing entities.

The number of mortgage loans for which our mortgage insurer counterparties have rescinded coverage decreased but remained high in the first quarter of 2012. In those cases where the mortgage insurer has rescinded coverage, we require the seller/servicer to repurchase the loan or indemnify us against loss. The table below displays cumulative rescission rates as of March 31, 2012, by the period in which the claim was filed. We do not present information for claims filed in the most recent two quarters to allow sufficient time for a substantial percentage of the claims filed to be resolved.

**Table 48:   Rescission Rates of Mortgage Insurance Claims**

|  | As of March 31, 2012 | |
|---|---|---|
|  | Cumulative Rescission Rate[1] | Cumulative Claims Resolution Percentage[2] |
| **Primary mortgage insurance claims filed in:** |  |  |
| 2010 | 11% | 90 % |
| First nine months of 2011 | 8 | 6 5 |
| **Pool mortgage insurance claims filed in:** |  |  |
| 2010 | 14% | 9 9% |
| First nine months of 2011 | 10 | 91 |

[1]   Represents claims filed during the period that have been rescinded as of March 31, 2012, divided by total claims filed during the same period. Denied claims are excluded.

[2]   Represents claims filed during the period that have been resolved as of March 31, 2012, divided by the total claims filed during the same period. Claims resolved mainly consist of claims for which we have settled and claims for which coverage has been rescinded by the mortgage insurer.

Table of Contents

When we estimate the credit losses that are inherent in our mortgage loan portfolio and under the terms of our guaranty obligations, we also consider the recoveries that we will receive on primary mortgage insurance, as mortgage insurance recoveries would reduce the severity of the loss associated with defaulted loans. We evaluate the financial condition of our mortgage insurer counterparties and adjust the contractually due recovery amounts to ensure that only probable losses as of the balance sheet date are included in our loss reserve estimate. As a result, if our assessment of one or more of our mortgage insurer counterparties' ability to fulfill their respective obligations to us worsens, it could result in an increase in our loss reserves.

The following table displays our estimated benefit from mortgage insurer recoveries.

**Table 49:   Estimated Mortgage Insurance Benefit**

|  | As of | |
| --- | --- | --- |
|  | March 31, 2012 | December 31, 2011 |
|  | (Dollars in millions) | |
| Contractual mortgage insurance benefit | $ 15,237 | $ 15,099 |
| Less: Collectability adjustment[1] | 2,571 | 2,867 |
| Estimated benefit included in total loss reserves | $ 12,666 | $ 12,232 |

[1]  Represents an adjustment that reduces the contractual benefit for our assessment of our mortgage insurer counterparties' inability to fully pay the contractual mortgage insurance claims.

When an insured loan held in our mortgage portfolio subsequently goes into foreclosure, we charge off the loan, eliminating any previously-recorded loss reserves, and record REO and a mortgage insurance receivable for the claim proceeds deemed probable of recovery, as appropriate. However, if a mortgage insurer rescinds insurance coverage, the initial receivable becomes due from the mortgage seller/servicer. We had outstanding receivables of $3.7 billion as of March 31, 2012 and $3.6 billion as of December 31, 2011 related to amounts claimed on insured, defaulted loans that we have not yet received, of which $894 million as of March 31, 2012 and $639 million as of December 31, 2011 was due from our mortgage seller/servicers. We assessed the total outstanding receivables for collectibility, and they were recorded net of a valuation allowance of $786 million as of March 31, 2012 and $570 million as of December 31, 2011 in "Other assets." These mortgage insurance receivables are short-term in nature, having an average duration of approximately six months, and the valuation allowance reduces our claim receivable to the amount that we consider probable of collection. We received proceeds under our primary and pool mortgage insurance policies for single-family loans of $1.3 billion during the first quarter of 2012 compared with $1.6 billion during the first quarter of 2011.

*Financial Guarantors*

We are the beneficiary of financial guarantees on non-agency securities held in our investment portfolio and on non-agency securities that have been resecuritized to include a Fannie Mae guaranty and sold to third parties. Table 50 displays the total unpaid principal balance of guaranteed non-agency securities in our portfolio as of March 31, 2012 and December 31, 2011.

**Table 50:   Unpaid Principal Balance of Financial Guarantees**

|  | As of | |
| --- | --- | --- |
|  | March 31, 2012 | December 31, 2011 |
|  | (Dollars in millions) | |
| Alt-A private-label securities | $ 1,206 | $ 1,279 |
| Subprime private-label securities | 1,367 | 1,398 |
| Mortgage revenue bonds | 4,897 | 4,931 |
| Other mortgage-related securities | 311 | 317 |
| Non mortgage-related securities | — | 46 |
| Total | $ 7,781 | $ 7,971 |

74

Table of Contents

With the exception of Ambac Assurance Corporation ("Ambac"), none of our financial guarantor counterparties has failed to repay us for claims under guaranty contracts. Ambac provided coverage on $3.2 billion, or 41%, of our total non-governmental guarantees, as of March 31, 2012. However, based on the stressed financial condition of our non-governmental financial guarantor counterparties, we believe that all but one of these counterparties may not be able to fully meet their obligations to us in the future. We model our securities without assuming the benefit of non-governmental financial guarantees. We then adjust results for those external financial guarantees from guarantors that we determine are creditworthy, although we continue to seek collection of any amounts due to us from all counterparties. As of March 31, 2012, when modeling our securities for impairments we did not assume the benefit of external financial guarantees from any non-governmental counterparties. See "Note 5, Investments in Securities" for a further discussion of our model methodology and key inputs used to determine other-than-temporary-impairment.

We are also the beneficiary of financial guarantees included in securities issued by Freddie Mac, the federal government and its agencies that totaled $30.3 billion as of March 31, 2012 and $31.4 billion as of December 31, 2011.

_Lenders with Risk Sharing_

We enter into risk sharing agreements with lenders pursuant to which the lenders agree to bear all or some portion of the credit losses on the covered loans. Our maximum potential loss recovery from lenders under these risk sharing agreements on single-family loans was $12.3 billion as of March 31, 2012 and $12.8 billion as of December 31, 2011. As of March 31, 2012, 59% of our maximum potential loss recovery on single-family loans was from three lenders and as of December 31, 2011, 58% of our maximum potential loss recovery on single-family loans was from the same three lenders. Our maximum potential loss recovery from lenders under risk sharing agreements on DUS and non-DUS multifamily loans was $32.7 billion as of March 31, 2012 and $32.1 billion as of December 31, 2011. As of March 31, 2012 and December 31, 2011, 40% of our maximum potential loss recovery on multifamily loans was from three DUS lenders.

Unfavorable market conditions have adversely affected, and continue to adversely affect, the liquidity and financial condition of our lender counterparties. The percentage of single-family recourse obligations to lenders with investment grade credit ratings (based on the lower of S&P, Moody's and Fitch ratings) was 46% as of March 31, 2012 and December 31, 2011. The percentage of these recourse obligations to lender counterparties rated below investment grade was 26% as of March 31, 2012 and December 31, 2011. The remaining percentage of these recourse obligations were to lender counterparties that were not rated by rating agencies, which was 28% as of March 31, 2012 and December 31, 2011. Given the stressed financial condition of some of our lenders, we expect in some cases we will recover less, perhaps significantly less, than the amount the lender is obligated to provide us under our risk sharing arrangement with them. Depending on the financial strength of the counterparty, we may require a lender to pledge collateral to secure its recourse obligations.

As noted above in "Multifamily Credit Risk Management," our primary multifamily delivery channel is our DUS program, which is comprised of lenders that span the spectrum from large depositories to independent non-bank financial institutions. Approximately 42% as of March 31, 2012, and 51% as of December 31, 2011, of the unpaid principal balance of loans in our multifamily guaranty book of business serviced by our DUS lenders was from institutions with an external investment grade credit rating or a guarantee from an affiliate with an external investment grade credit rating.  Given the recourse nature of the DUS program, the lenders are bound by eligibility standards that dictate, among other items, minimum capital and liquidity levels, and the posting of collateral at a highly rated custodian to secure a portion of the lenders' future obligations. We actively monitor the financial condition of these lenders to help ensure the level of risk remains within our standards and to ensure required capital levels are maintained and are in alignment with actual and modeled loss projections.

_Custodial Depository Institutions_

A total of $65.5 billion in deposits for single-family payments were received and held by 284 institutions in the month of March 2012 and a total of $66.4 billion in deposits for single-family payments were received and held by 284 institutions in the month of December 2011. Of these total deposits, 93% as of March 31, 2012 and 92%

75

Table of Contents

as of December 31, 2011 were held by institutions rated as investment grade by S&P, Moody's and Fitch. Our transactions with custodial depository institutions is concentrated. Our ten largest custodial depository institutions held 93% of these deposits as of March 31, 2012 and 92% of these deposits as of December 31, 2011.

If a custodial depository institution were to fail while holding remittances of borrower payments of principal and interest due to us in our custodial account, we would be an unsecured creditor of the depository for balances in excess of the deposit insurance protection and might not be able to recover all of the principal and interest payments being held by the depository on our behalf, or there might be a substantial delay in receiving these amounts. If this were to occur, we would be required to replace these amounts with our own funds to make payments that are due to Fannie Mae MBS certificateholders. Accordingly, the insolvency of one of our principal custodial depository counterparties could result in significant financial losses to us. In the month of March 2012, approximately $5.9 billion or 9% of our total deposits for single-family payments received and held by these institutions was in excess of the deposit insurance protection limit compared with approximately $6.1 billion or 9% in the month of December 2011. These amounts can vary as they are calculated based on individual payments of mortgage borrowers and we must estimate which borrowers are paying their regular principal and interest payments and other types of payments, such as prepayments from refinancing or sales.

*Issuers of Investments Held in our Cash and Other Investments Portfolio*

Our cash and other investments portfolio consists of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell or similar arrangements, U.S. Treasury securities and asset-backed securities. Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank. We held no unsecured positions with financial institutions as of March 31, 2012 or December 31, 2011. See "Liquidity and Capital Management—Liquidity Management—Cash and Other Investments Portfolio" for more detailed information on our cash and other investments portfolio.

*Derivative Counterparty Credit Exposure*

Our derivative counterparty credit exposure relates principally to interest rate and foreign currency derivatives contracts. We estimate our exposure to credit loss on derivative instruments by calculating the replacement cost, on a present value basis, to settle at current market prices all outstanding derivative contracts in a net gain position at the counterparty level where the right of legal offset exists. For derivative instruments where the right of legal offset does not exist, we calculate the replacement cost of the outstanding derivative contracts in a gain position at the transaction level. The fair value of derivatives in a gain position is included in our condensed consolidated balance sheets in "Other assets." We manage our credit exposure by requiring counterparties to post collateral, which includes cash, U.S. Treasury securities, agency debt and agency mortgage-related securities.

Our net counterparty credit exposure on derivatives contracts decreased to $59 million as of March 31, 2012, from $96 million as of December 31, 2011. We had outstanding interest rate and foreign currency derivative transactions with 16 counterparties as of March 31, 2012 and December 31, 2011. Derivatives transactions with 10 of our counterparties accounted for approximately 95% of our total outstanding notional amount as of March 31, 2012, with each of these counterparties accounting for between approximately 6% and 16% of the total outstanding notional amount. As of March 31, 2012, we had outstanding notional amounts and master netting agreements with 16 counterparties.

See "Note 9, Derivative Instruments" for information on the outstanding notional amount and additional information on our risk management derivative contracts as of March 31, 2012 and December 31, 2011, as well as a discussion of our collateral requirements including the impact of decreases in our credit ratings on our collateral obligations under our derivatives contracts.

**Market Risk Management, Including Interest Rate Risk Management**

We are subject to market risk, which includes interest rate risk, spread risk and liquidity risk. These risks arise from our mortgage asset investments. Interest rate risk is the risk of loss in value or expected future earnings that may result from changes to interest rates. Spread risk is the resulting impact of changes in the spread between our

76

Table of Contents

mortgage assets and our debt and derivatives we use to hedge our position. Liquidity risk is the risk that we will not be able to meet our funding obligations in a timely manner. We describe our sources of interest rate risk exposure and our strategy for managing interest rate risk and spread risk in "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management" in our 2011 Form 10-K.

### Measurement of Interest Rate Risk

Below we present two quantitative metrics that provide estimates of our interest rate exposure: (1) fair value sensitivity of net portfolio to changes in interest rate levels and slope of yield curve; and (2) duration gap. The metrics presented are calculated using internal models that require standard assumptions regarding interest rates and future prepayments of principal over the remaining life of our securities. These assumptions are derived based on the characteristics of the underlying structure of the securities and historical prepayment rates experienced at specified interest rate levels, taking into account current market conditions, the current mortgage rates of our existing outstanding loans, loan age and other factors. On a continuous basis, management makes judgments about the appropriateness of the risk assessments and will make adjustments as necessary to properly assess our interest rate exposure and manage our interest rate risk. The methodologies used to calculate risk estimates are periodically changed on a prospective basis to reflect improvements in the underlying estimation process.

#### Interest Rate Sensitivity to Changes in Interest Rate Level and Slope of Yield Curve

As part of our disclosure commitments with FHFA, we disclose on a monthly basis the estimated adverse impact on the fair value of our net portfolio that would result from the following hypothetical situations:

- A 50 basis point shift in interest rates.
- A 25 basis point change in the slope of the yield curve.

In measuring the estimated impact of changes in the level of interest rates, we assume a parallel shift in all maturities of the U.S. LIBOR interest rate swap curve.

In measuring the estimated impact of changes in the slope of the yield curve, we assume a constant 7-year rate and a shift of 16.7 basis points for the 1-year rate and 8.3 basis points for the 30-year rate. We believe the aforementioned interest rate shocks for our monthly disclosures represent moderate movements in interest rates over a one-month period.

### Duration Gap

Duration gap measures the price sensitivity of our assets and liabilities to changes in interest rates by quantifying the difference between the estimated durations of our assets and liabilities. Our duration gap analysis reflects the extent to which the estimated maturity and repricing cash flows for our assets are matched, on average, over time and across interest rate scenarios to the estimated cash flows of our liabilities. A positive duration gap indicates that the duration of our assets exceeds the duration of our liabilities. We disclose duration gap on a monthly basis under the caption "Interest Rate Risk Disclosures" in our Monthly Summary, which is available on our website and announced in a press release.

The sensitivity measures presented in Table 51, which we disclose on a quarterly basis as part of our disclosure commitments with FHFA, are an extension of our monthly sensitivity measures. There are three primary differences between our monthly sensitivity disclosure and the quarterly sensitivity disclosure presented below: (1) the quarterly disclosure is expanded to include the sensitivity results for larger rate level shocks of plus or minus 100 basis points; (2) the monthly disclosure reflects the estimated pre-tax impact on the market value of our net portfolio calculated based on a daily average, while the quarterly disclosure reflects the estimated pre-tax impact calculated based on the estimated financial position of our net portfolio and the market environment as of the last business day of the quarter; and (3) the monthly disclosure shows the most adverse pre-tax impact on the market value of our net portfolio from the hypothetical interest rate shocks, while the quarterly disclosure includes the estimated pre-tax impact of both up and down interest rate shocks.

Table of Contents

In addition, Table 51 also provides the average, minimum, maximum and standard deviation for duration gap and for the most adverse market value impact on the net portfolio for non-parallel and parallel interest rate shocks for the three months ended March 31, 2012 and 2011.

**Table 51:   Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve** [1]

| | As of | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in billions) | |
| Rate level shock: | | |
| -100 basis points | $ 0.5 | $ 0.3 |
| -50 basis points | 0.1 | 0.1 |
| +50 basis points | — | (0.1) |
| +100 basis points | (0.3) | (0.4) |
| Rate slope shock: | | |
| -25 basis points (flattening) | — | — |
| +25 basis points (steepening) | — | 0.1 |

The duration gap for the three months ended March 31, 2012 averaged zero months which is similar to the results for the three months ended March 31, 2011.

| | For the Three Months Ended March 31, 2012 | | |
| --- | --- | --- | --- |
| | Duration Gap | Rate Slope Shock 25 Bps | Rate Level Shock 50 Bps |
| | | Exposure | |
| | (In months) | (Dollars in billions) | |
| Average | (0.1) | $ — | $ — |
| Minimum | (0.9) | — | — |
| Maximum | 0.4 | 0.1 | 0.2 |
| Standard deviation | 0.3 | — | 0.1 |

| | For the Three Months Ended March 31, 2011 | | |
| --- | --- | --- | --- |
| | Duration Gap | Rate Slope Shock 25 Bps | Rate Level Shock 50 Bps |
| | | Exposure | |
| | (In months) | (Dollars in billions) | |
| Average | 0.4 | $ 0.1 | $ 0.2 |
| Minimum | (0.4) | — | 0.1 |
| Maximum | 0.8 | 0.2 | 0.4 |
| Standard deviation | 0.2 | — | 0.1 |

[1]   Computed based on changes in LIBOR swap rates.

A majority of the interest rate risk associated with our mortgage-related securities and loans is hedged with our debt issuances, which includes callable debt. We use derivatives to help manage the residual interest rate risk exposure between our assets and liabilities. Derivatives have enabled us to keep our interest rate risk exposure at consistently low levels in a wide range of interest-rate environments. Table 52 displays an example of how derivatives impacted the net market value exposure for a 50 basis point parallel interest rate shock.

78

Table of Contents

**Table 52:   Derivative Impact on Interest Rate Risk (50 Basis Points)**

| | Before Derivatives | After Derivatives | Effect of Derivatives |
|---|---|---|---|
| | (Dollars in billions) | | |
| As of March 31, 2012 | $ (1.1) | $ — | $ 1.1 |
| As of December 31, 2011 | $ (1.3) | $ (0.1) | $ 1.2 |

*Other Interest Rate Risk Information*

The interest rate risk measures discussed above exclude the impact of changes in the fair value of our net guaranty assets resulting from changes in interest rates. We exclude our guaranty business from these sensitivity measures based on our current assumption that the guaranty fee income generated from future business activity will largely replace guaranty fee income lost due to mortgage prepayments.

In "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management—Measurement of Interest Rate Risk—Other Interest Rate Risk Information" in our 2011 Form 10-K, we provided additional interest rate sensitivities including separate disclosure of the potential impact on the fair value of our trading assets and other financial instruments. As of March 31, 2012, these sensitivities were relatively unchanged as compared with December 31, 2011. The fair value of our trading financial instruments and our other financial instruments as of March 31, 2012 and December 31, 2011 can be found in "Note 12, Fair Value."

*Liquidity Risk Management*

See "Liquidity and Capital Management—Liquidity Management" for a discussion on how we manage liquidity risk.

*Operational Risk Management*

See "Risk Management—Operational Risk Management" in our 2011 Form 10-K for more information on our framework for managing operational risk.

**FORWARD-LOOKING STATEMENTS**

This report includes statements that constitute forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934 (the "Exchange Act"). In addition, our senior management may from time to time make forward-looking statements orally to analysts, investors, the news media and others. Forward-looking statements often include words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," "forecast," "project," "would," "should," "could," "likely," "may," or similar words.

Among the forward-looking statements in this report are statements relating to:

- Our expectation that our financial results for 2012 will be significantly better than our 2011 results;

- Our expectation that housing will start to recover if the employment market continues to improve;

- Our expectation of high levels of period-to-period volatility in our results of operations and financial condition because our derivatives are recorded at fair value in our financial statements while some of the instruments they hedge are not recorded at fair value in our financial statements;

- Our expectation that the single-family loans we have acquired since the beginning of 2009, in the aggregate, will be profitable over their lifetime, by which we mean that we expect our fee income on these loans to exceed our credit losses and administrative costs for them;

- Our expectation that the single-family loans we acquired from 2005 through 2008, in the aggregate, will not be profitable over their lifetime;

79

Table of Contents

- Our expectation that the serious delinquency rates for single-family loans acquired in recent years will be higher after the loans have aged, but not as high as the March 31, 2012 serious delinquency rates of loans in our legacy book of business;

- Our expectations regarding the credit profile of loans we acquire in the future, and the factors that will influence their credit profile;

- Our expectation that the trends of stabilizing home prices and declining single-family serious delinquency rates will continue;

- Our belief that our total loss reserves peaked as of December 31, 2011 and will not increase above $76.9 billion in the foreseeable future;

- Our expectation that our loss reserves will remain significantly elevated relative to historical levels for an extended period because (1) we expect future defaults on loans we acquired prior to 2009 and the resulting charge-offs will occur over a period of years and (2) a significant portion of our reserves represents concessions granted to borrowers upon modification of their loans and will remain in our reserves until the loans are fully paid or default;

- Our expectation that it will take a significant amount of time before our REO inventory is reduced to pre-2008 levels;

- Our estimate that we will realize as credit losses nearly two-thirds of the fair value losses on loans purchased out of unconsolidated MBS trusts that are reflected in our condensed consolidated balance sheets, and eventually recover the remaining over one-third, either through net interest income for loans that cure or through foreclosed property income for loans where the sale of the collateral exceeds our recorded investment in the loan;

- Our belief that the changes in the foreclosure environment will continue to negatively affect our single-family serious delinquency rates, foreclosure timelines and credit-related expenses;

- Our expectation that serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process, the volume of loan modifications and the extent to which borrowers with modified loans continue to make timely payments;

- Our expectation that the number of our single-family loans that are seriously delinquent will remain well above pre-2008 levels for years;

- Our belief that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding;

- Our expectation that changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations;

- Our belief that our liquidity contingency plan may be difficult or impossible to execute for a company of our size in our circumstances;

- Our expectation that weakness in the housing and mortgage markets will continue in 2012;

- Our expectation that the high level of delinquent mortgage loans will ultimately result in high levels of foreclosures, which is likely to add to the excess housing inventory;

- Our expectation that single-family default and severity rates will remain high in 2012, but will be lower than in 2011;

- Our expectation that multifamily foreclosures in 2012 will remain generally commensurate with 2011 levels as certain local markets and properties continue to exhibit weak fundamentals;

- Our expectations that changes to HARP announced in October 2011 will result in our acquisition of more refinancings in 2012 than we would have acquired in the absence of the changes, but that we will acquire fewer refinancings overall in 2012 than in 2011;

80

FHFA 3428

Table of Contents

- Our expectation that our loan acquisitions for 2012 will be lower than in 2011;

- Our estimation that total originations in the U.S. single-family mortgage market in 2012 will decrease from 2011 levels by approximately 8%, from an estimated $1.36 trillion to an estimated $1.26 trillion, and that the amount of originations in the U.S. single-family mortgage market that are refinancings will decline from approximately $900 billion to approximately $800 billion;

- Our expectation that home prices on a national basis will decline further before stabilizing in 2013;

- Our expectation of a peak-to-trough home price decline on a national basis ranging from 24% to 30%, with the occurrence of an additional adverse economic event needed to reach the high end of the range;

- Our expectations regarding regional variations in home price declines and stabilization;

- Our expectation that our credit-related expenses will remain high in 2012 but that, overall, our credit-related expenses will be lower in 2012 than in 2011;

- Our expectation that our credit losses will remain high in 2012;

- Our expectation that our realization of some credit losses will be delayed to the extent delays in foreclosures continue in 2012;

- Our expectation that we will request additional draws under the senior preferred stock purchase agreement in future periods, which will further increase the dividends we owe to Treasury on the senior preferred stock;

- Our expectation that, over time, our dividend obligation to Treasury will increasingly drive our future draws under the senior preferred stock purchase agreement;

- Our expectation that, although we may experience period-to-period volatility in earnings and comprehensive income, we will not generate net income or comprehensive income in excess of our annual dividend obligation to Treasury over the long term;

- Our expectation that uncertainty regarding the future of our company will continue;

- Our expectation that we will continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other factors, including the limit on the mortgage assets that we may own pursuant to the senior preferred stock purchase agreement;

- Our expectation that Congressional hearings on GSE reform will continue in 2012 and additional legislation will be considered and proposals will be discussed, including proposals that would result in a substantial change to our business structure or that involve Fannie Mae's liquidation or dissolution;

- Our expectation that, as drafted, bills introduced in Congress that would require FHFA to make a determination within two years of enactment regarding whether the GSEs were financially viable and, if the GSEs were determined to be not financially viable, to place them into receivership may upon enactment impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent the federal government providing an explicit guarantee of our existing and future liabilities;

- Our expectation that our acquisitions of Alt-A mortgage loans (which are limited to refinancings of existing Fannie Mae loans) will continue to be minimal in future periods and the percentage of the book of business attributable to Alt-A will continue to decrease over time;

- Our belief that Refi Plus loans may not perform as well as the other loans we have acquired since the beginning of 2009;

- Our expectation that Refi Plus loans will perform better than the loans they replace because Refi Plus loans reduce the borrowers' monthly payments or otherwise should provide more stability than the borrowers' old loans (for example, by refinancing into a mortgage with a fixed interest rate instead of an adjustable rate).

81

Table of Contents

- Our expectation that the current market premium portion of our current estimate of the fair value of our book of business will not impact future Treasury draws, which is based on our intention generally not to have other parties assume the credit risk inherent in our book of business;

- Our expectation that, although our funding needs may vary from quarter to quarter depending on market conditions, our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirement of the senior preferred stock purchase agreement;

- Our expectation that our debt funding activity will likely continue to decline in future periods as the size of our mortgage portfolio decreases;

- Our intention to repay our short-term and long-term debt obligations as they become due primarily through proceeds from the issuance of additional debt securities;

- Our expectations regarding our credit ratings and their impact on us as set forth in "MD&A—Liquidity and Capital Management—Liquidity Management—Credit Ratings";

- Our expectation that the volume of our home retention solutions and foreclosure alternatives will remain high throughout the remainder of 2012;

- Our belief that the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and income, and home prices;

- Our expectation that the amount of our outstanding repurchase requests to seller/servicers will remain high, and that we may be unable to recover on all outstanding loan repurchase obligations resulting from seller/servicers' breaches of contractual obligations;

- Our expectation that the change in our loan delivery agreement with Bank of America will not be material to our business or results of operations;

- Our expectations regarding recoveries from our lenders under risk sharing arrangements, and the possibility that we may require a lender to pledge collateral to secure its recourse obligations;

- Our beliefs regarding whether our financial guarantor counterparties will be able to fully meet their obligations to us in the future;

- Our belief that we have limited credit exposure on government loans;

- Our expectation that the ultimate performance of all our loans will be affected by macroeconomic trends, including unemployment, the economy, and home prices;

- Our expectation that implementing recent Congressional and FHFA directives will increase our operational risk and may potentially result in one or more significant deficiencies or material weaknesses in our internal control over financial reporting in a future period; and

- Our belief that none of the seven lawsuits relating to the payment of transfer taxes described in "Note 13, Commitments and Contingencies" is likely to have a material impact on our business, either individually or in the aggregate.

Forward-looking statements reflect our management's expectations, forecasts or predictions of future conditions, events or results based on various assumptions and management's estimates of trends and economic factors in the markets in which we are active, as well as our business plans. They are not guarantees of future performance. By their nature, forward-looking statements are subject to risks and uncertainties. Our actual results and financial condition may differ, possibly materially, from the anticipated results and financial condition indicated in these forward-looking statements. There are a number of factors that could cause actual conditions, events or results to differ materially from those described in the forward-looking statements contained in this report, including, but not limited to, the following: the uncertainty of our future; legislative and regulatory changes affecting us; challenges we face in retaining and hiring qualified employees; the deteriorated credit performance of many loans in our guaranty book of business; the conservatorship and its effect on our business; the investment by Treasury and its effect on our business; adverse effects from activities we undertake to support the mortgage market and help borrowers; a decrease in our credit ratings; limitations on our ability to access the debt capital

82

Table of Contents

markets; further disruptions in the housing and credit markets; defaults by one or more institutional counterparties; our reliance on mortgage servicers; guidance by the Financial Accounting Standards Board ("FASB"); operational control weaknesses; our reliance on models; the level and volatility of interest rates and credit spreads; changes in the structure and regulation of the financial services industry; and those factors described in "Risk Factors" in this report and in our 2011 Form 10-K, as well as the factors described in "Executive Summary—Outlook—Factors that Could Cause Actual Results to be Materially Different from our Estimates and Expectations" in this report.

Readers are cautioned to place forward-looking statements in this report or that we make from time to time into proper context by carefully considering the factors discussed in "Risk Factors" in our 2011 Form 10-K and in this report. These forward-looking statements are representative only as of the date they are made, and we undertake no obligation to update any forward-looking statement as a result of new information, future events or otherwise, except as required under the federal securities laws.

83

Table of Contents

Item 1.    Financial Statements

## FANNIE MAE

### (In conservatorship)

### Condensed Consolidated Balance Sheets—(Unaudited)

(Dollars in millions, except share amounts)

| | | As of | |
| --- | ---: | ---: | ---: |
| | | March 31, 2012 | December 31, 2011 |
| **ASSETS** | | | |
| Cash and cash equivalents | $ | 22,049 | $ 17,539 |
| Restricted cash (includes $51,347 and $45,900, respectively, related to consolidated trusts) | | 55,921 | 50,797 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | | 15,000 | 46,000 |
| Investments in securities: | | | |
| Trading, at fair value | | 75,806 | 74,198 |
| Available-for-sale, at fair value (includes $1,091 and $1,191, respectively, related to consolidated trusts) | | 73,779 | 77,582 |
| Total investments in securities | | 149,585 | 151,780 |
| Mortgage loans: | | | |
| Loans held for sale, at lower of cost or fair value (includes $56 and $66, respectively, related to consolidated trusts) | | 282 | 311 |
| Loans held for investment, at amortized cost: | | | |
| Of Fannie Mae | | 377,031 | 380,134 |
| Of consolidated trusts (includes $4,292 and $3,611, respectively, at fair value and loans pledged as collateral that may be sold or repledged of $749 and $798, respectively) | | 2,616,521 | 2,590,332 |
| Total loans held for investment | | 2,993,552 | 2,970,466 |
| Allowance for loan losses | | (70,109) | (72,156) |
| Total loans held for investment, net of allowance | | 2,923,443 | 2,898,310 |
| Total mortgage loans | | 2,923,725 | 2,898,621 |
| Accrued interest receivable, net (includes $8,416 and $8,466, respectively, related to consolidated trusts) | | 10,018 | 10,000 |
| Acquired property, net | | 10,619 | 11,373 |
| Other assets (includes cash pledged as collateral of $1,159 and $1,109, respectively) | | 23,023 | 25,374 |
| Total assets | | $ 3,209,940 | $ 3,211,484 |
| **LIABILITIES AND EQUITY (DEFICIT)** | | | |
| Liabilities: | | | |
| Accrued interest payable (includes $9,227 and $9,302, respectively, related to consolidated trusts) | $ | 12,442 | $ 12,648 |
| Debt: | | | |
| Of Fannie Mae (includes $825 and $838, respectively, at fair value) | | 685,974 | 732,444 |
| Of consolidated trusts (includes $4,279 and $3,939, respectively, at fair value) | | 2,498,233 | 2,457,428 |
| Other liabilities (includes $581 and $629, respectively, related to consolidated trusts) | | 13,023 | 13,535 |
| Total liabilities | | 3,209,672 | 3,216,055 |
| Commitments and contingencies (Note 13) | | — | — |
| Fannie Mae stockholders' equity (deficit): | | | |
| Senior preferred stock, 1,000,000 shares are authorized, issued and outstanding | | 117,149 | 112,578 |
| Preferred stock, 700,000,000 shares are authorized—555,374,922 shares issued and outstanding | | 19,130 | 19,130 |
| Common stock, no par value, no maximum authorization—1,308,762,703 shares issued, and; 1,158,069,699 and 1,157,767,400 shares outstanding, respectively | | 687 | 687 |
| Accumulated deficit | | (128,482) | (128,381) |
| Accumulated other comprehensive loss | | (873) | (1,235) |
| Treasury stock, at cost, 150,693,004 and 150,995,303 shares, respectively | | (7,401) | (7,403) |
| Total Fannie Mae stockholders' equity (deficit) | | 210 | (4,624) |
| Noncontrolling interest | | 58 | 53 |
| Total equity (deficit) | | 268 | (4,571) |
| Total liabilities and equity (deficit) | | $ 3,209,940 | $ 3,211,484 |

See Notes to Condensed Consolidated Financial Statements

84

**Table of Contents**

**FANNIE MAE**

**(In conservatorship)**

**Condensed Consolidated Statements of Operations and Comprehensive Income (Loss)—(Unaudited)**

**(Dollars and shares in millions, except per share amounts)**

| | For the Three Months Ended March 31, | |
|---|---|---|
| | **2012** | **2011** |
| Interest income: | | |
| Trading securities | $ 449 | $ 284 |
| Available-for-sale securities | 727 | 1,213 |
| Mortgage loans (includes $29,001 and $31,865, respectively, related to consolidated trusts) | 32,570 | 35,590 |
| Other | 38 | 28 |
| Total interest income | 33,784 | 37,115 |
| Interest expense: | | |
| Short-term debt (includes $1 and $3, respectively, related to consolidated trusts) | 42 | 107 |
| Long-term debt (includes $25,360 and $27,852, respectively, related to consolidated trusts) | 28,545 | 32,048 |
| Total interest expense | 28,587 | 32,155 |
| Net interest income | 5,197 | 4,960 |
| Provision for credit losses | (2,000) | (10,554) |
| Net interest income (loss) after provision for credit losses | 3,197 | (5,594) |
| Investment gains, net | 116 | 75 |
| Other-than-temporary impairments | (80) | (57) |
| Noncredit portion of other-than-temporary impairments recognized in other comprehensive income | 16 | 13 |
| Net other-than-temporary impairments | (64) | (44) |
| Fair value gains, net | 283 | 289 |
| Debt extinguishment (losses) gains, net | (34) | 13 |
| Fee and other income | 375 | 237 |
| Non-interest income | 676 | 570 |
| Administrative expenses: | | |
| Salaries and employee benefits | 306 | 320 |
| Professional services | 168 | 189 |
| Occupancy expense | 43 | 42 |
| Other administrative expenses | 47 | 54 |
| Total administrative expenses | 564 | 605 |
| Foreclosed property expense | 339 | 488 |
| Other expenses | 252 | 352 |
| Total expenses | 1,155 | 1,445 |
| Income (loss) before federal income taxes | 2,718 | (6,469) |
| Provision for federal income taxes | — | 2 |
| Net income (loss) | 2,718 | (6,471) |
| Other comprehensive income: | | |
| Changes in unrealized losses on available-for-sale securities, net of reclassification adjustments and taxes | 355 | 179 |
| Other | 7 | 2 |
| Total other comprehensive income | 362 | 181 |
| Total comprehensive income (loss) | 3,080 | (6,290) |
| Less: Comprehensive loss attributable to the noncontrolling interest | 1 | — |
| Total comprehensive income (loss) attributable to Fannie Mae | $ 3,081 | $ (6,290) |
| Net income (loss) | $ 2,718 | $ (6,471) |
| Less: Net loss attributable to the noncontrolling interest | 1 | — |
| Net income (loss) attributable to Fannie Mae | 2,719 | (6,471) |
| Preferred stock dividends | (2,817) | (2,216) |
| Net loss attributable to common stockholders | $ (98) | $ (8,687) |
| Loss per share—Basic and Diluted | $ (0.02) | $ (1.52) |
| Weighted-average common shares outstanding—Basic and Diluted | 5,761 | 5,698 |

See Notes to Condensed Consolidated Financial Statements

85

Table of Contents

**FANNIE MAE**

**(In conservatorship)**

**Condensed Consolidated Statements of Cash Flows—(Unaudited)**

(Dollars in millions)

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| Net cash (used in) provided by operating activities | $ (114) | $ 2,566 |
| **Cash flows provided by investing activities:** | | |
| Purchases of trading securities held for investment | (226) | (185) |
| Proceeds from maturities and paydowns of trading securities held for investment | 756 | 522 |
| Proceeds from sales of trading securities held for investment | 413 | 409 |
| Purchases of available-for-sale securities | (9) | (44) |
| Proceeds from maturities and paydowns of available-for-sale securities | 2,929 | 3,851 |
| Proceeds from sales of available-for-sale securities | 401 | 498 |
| Purchases of loans held for investment | (38,276) | (15,745) |
| Proceeds from repayments of loans held for investment of Fannie Mae | 6,856 | 5,381 |
| Proceeds from repayments of loans held for investment of consolidated trusts | 174,954 | 121,533 |
| Net change in restricted cash | (5,124) | 26,948 |
| Advances to lenders | (26,131) | (15,646) |
| Proceeds from disposition of acquired property and short sales | 10,195 | 10,979 |
| Net change in federal funds sold and securities purchased under agreements to resell or similar agreements | 31,000 | (14,499) |
| Other, net | (208) | (163) |
| Net cash provided by investing activities | 157,530 | 123,839 |
| **Cash flows used in financing activities:** | | |
| Proceeds from issuance of debt of Fannie Mae | 167,848 | 163,776 |
| Payments to redeem debt of Fannie Mae | (214,701) | (183,073) |
| Proceeds from issuance of debt of consolidated trusts | 80,933 | 72,567 |
| Payments to redeem debt of consolidated trusts | (188,730) | (177,551) |
| Payments of cash dividends on senior preferred stock to Treasury | (2,819) | (2,216) |
| Proceeds from senior preferred stock purchase agreement with Treasury | 4,571 | 2,600 |
| Net change in federal funds purchased and securities sold under agreements to repurchase | — | 26 |
| Other, net | (8) | — |
| Net cash used in financing activities | (152,906) | (123,871) |
| **Net increase in cash and cash equivalents** | 4,510 | 2,534 |
| Cash and cash equivalents at beginning of period | 17,539 | 17,297 |
| Cash and cash equivalents at end of period | $ 22,049 | $ 19,831 |
| **Cash paid during the period for interest** | $ 30,590 | $ 32,689 |

See Notes to Condensed Consolidated Financial Statements

86

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**1.    Summary of Significant Accounting Policies**

*Organization*

We are a stockholder-owned corporation organized and existing under the Federal National Mortgage Association Charter Act (the "Charter Act" or our "charter"). We are a government-sponsored enterprise ("GSE"), and we are subject to government oversight and regulation. Our regulators include the Federal Housing Finance Agency ("FHFA"), the U.S. Department of Housing and Urban Development ("HUD"), the U.S. Securities and Exchange Commission ("SEC"), and the U.S. Department of the Treasury ("Treasury"). The U.S. government does not guarantee our securities or other obligations.

*Conservatorship*

On September 7, 2008, the Secretary of the Treasury and the Director of FHFA announced several actions taken by Treasury and FHFA regarding Fannie Mae, which included: (1) placing us in conservatorship and (2) the execution of a senior preferred stock purchase agreement by our conservator, on our behalf, and Treasury, pursuant to which we issued to Treasury both senior preferred stock and a warrant to purchase common stock.

Under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Federal Housing Finance Regulatory Reform Act of 2008, (together, the "GSE Act"), the conservator immediately succeeded to (1) all rights, titles, powers and privileges of Fannie Mae, and of any stockholder, officer or director of Fannie Mae with respect to Fannie Mae and its assets, and (2) title to the books, records and assets of any other legal custodian of Fannie Mae. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. The conservator retains the authority to withdraw its delegations at any time.

The conservator has the power to transfer or sell any asset or liability of Fannie Mae (subject to limitations and post-transfer notice provisions for transfers of qualified financial contracts) without any approval, assignment of rights or consent of any party. The GSE Act, however, provides that mortgage loans and mortgage-related assets that have been transferred to a Fannie Mae mortgage-backed securities ("MBS") trust must be held by the conservator for the beneficial owners of the Fannie Mae MBS and cannot be used to satisfy the general creditors of Fannie Mae. As of May 9, 2012, FHFA has not exercised this power.

Neither the conservatorship nor the terms of our agreements with Treasury change our obligation to make required payments on our debt securities or perform under our mortgage guaranty obligations. FHFA issued a rule establishing a framework for conservatorship and receivership operations for the GSEs, which became effective in 2011. The rule established procedures for conservatorship and receivership, and priorities of claims for contract parties and other claimants. This rule is part of FHFA's implementation of the powers provided by the Federal Housing Finance Regulatory Reform Act of 2008, and does not seek to anticipate or predict future conservatorships or receiverships.

FHFA has announced that, during the conservatorship, our existing statutory and FHFA-directed regulatory capital requirements will not be binding and that FHFA will not issue quarterly capital classifications. We submit capital reports to FHFA and FHFA monitors our capital levels. The deficit of core capital over statutory minimum capital was $147.8 billion as of March 31, 2012 and $148.4 billion as of December 31, 2011.

The conservatorship has no specified termination date and there continues to be uncertainty regarding the future of our company, including how long the company will continue to exist in its current form, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. Under the GSE Act, FHFA must place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations or if we have not been paying our debts, in either case, for a period of 60 days. In addition, the Director of FHFA

87

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

may place us in receivership at his discretion at any time for other reasons, including conditions that FHFA has already asserted existed at the time the former Director of FHFA placed us into conservatorship. Placement into receivership would have a material adverse effect on holders of our common stock, preferred stock, debt securities and Fannie Mae MBS. Should we be placed into receivership, different assumptions would be required to determine the carrying value of our assets, which could lead to substantially different financial results. We are not aware of any plans of FHFA to significantly change our business model or capital structure in the near-term.

### Impact of U.S. Government Support

We are dependent upon the continued support of Treasury to eliminate our net worth deficit, which avoids our being placed into receivership. Based on consideration of all the relevant conditions and events affecting our operations, including our dependence on the U.S. government, we continue to operate as a going concern and in accordance with our delegation of authority from FHFA.

Pursuant to the senior preferred stock purchase agreement, Treasury has committed to provide us with funding as described below to help us maintain a positive net worth thereby avoiding the mandatory receivership trigger described above. We have received a total of $116.1 billion from Treasury pursuant to the senior preferred stock purchase agreement as of March 31, 2012. The aggregate liquidation preference of the senior preferred stock, including the initial aggregate liquidation preference of $1.0 billion, remains at $117.1 billion.

The senior preferred stock purchase agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any net worth deficiencies attributable to periods during 2010, 2011, and 2012. If we do not have a positive net worth as of December 31, 2012, then the amount of funding available under the amended senior preferred stock purchase agreement after 2012 will be $124.8 billion ($200 billion less $75.2 billion in cumulative draws for net worth deficiencies through December 31, 2009).

In the event we have a positive net worth as of December 31, 2012, then the amount of funding available after 2012 under the amended senior preferred stock purchase agreement will depend on the size of that positive net worth relative to the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011, and 2012, as follows:

- If our positive net worth as of December 31, 2012 is less than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011, and 2012, then the amount of available funding will be $124.8 billion less our positive net worth as of December 31, 2012.

- If our positive net worth as of December 31, 2012 is greater than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011, and 2012, then the amount of available funding will be $124.8 billion less the cumulative draws attributable to periods during 2010, 2011, and 2012.

We were scheduled to begin paying a quarterly commitment fee to Treasury under the senior preferred stock purchase agreement beginning on March 31, 2011; however, Treasury waived the quarterly commitment fee for each quarter of 2011 and the first and second quarters of 2012 due to the continued fragility of the U.S. mortgage market and Treasury's belief that the imposition of the quarterly commitment fee would not generate increased compensation for taxpayers. In its notification to FHFA that it had waived the quarterly commitment fee for the second quarter of 2012, Treasury indicated that it will reevaluate the situation during the next calendar quarter to determine whether the quarterly commitment fee should then be set. The agreement provides that Treasury may waive the periodic commitment fee for up to one year at a time, in its sole discretion, based on adverse conditions in the U.S. mortgage market.

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

We fund our business primarily through the issuance of short-term and long-term debt securities in the domestic and international capital markets. Because debt issuance is our primary funding source, we are subject to "roll-over," or refinancing, risk on our outstanding debt. Our ability to issue long-term debt has been strong primarily due to actions taken by the federal government to support us and the financial markets.

We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations. In addition, due to our reliance on the U.S. government's support, our access to debt funding or the cost of debt funding also could be materially adversely affected by a change or perceived change in the creditworthiness of the U.S. government. A downgrade in our credit ratings could reduce demand for our debt securities and increase our borrowing costs. Standard & Poor's Ratings Services' ("S&P") downgrade of our credit rating on August 8, 2011, which was a result of a similar action on the U.S. government's sovereign credit rating, has not adversely affected our access to debt funding or the cost of our debt funding. Future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll-over risk and have a material adverse impact on our liquidity, financial condition and results of operations.

In February 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Obama Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. In February 2012, Treasury Secretary Geithner stated that the Administration intended to release new details in the spring of 2012 around approaches to housing finance reform including winding down Fannie Mae and Freddie Mac and to work with Congressional leaders to explore options for legislation, but that he does not expect housing finance reform legislation to be enacted in 2012. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs.

*Basis of Presentation*

The accompanying unaudited interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information and with the SEC's instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and note disclosures required by GAAP for complete consolidated financial statements. In the opinion of management, all adjustments of a normal recurring nature considered necessary for a fair presentation have been included. The accompanying condensed consolidated financial statements include our accounts as well as the accounts of other entities in which we have a controlling financial interest. All intercompany accounts and transactions have been eliminated. Results for the three months ended March 31, 2012 may not necessarily be indicative of the results for the year ending December 31, 2012. The unaudited interim condensed consolidated financial statements as of and for the three months ended March 31, 2012 should be read in conjunction with our audited consolidated financial statements and related notes included in our Annual Report on Form 10-K for the year ended December 31, 2011 ("2011 Form 10-K"), filed with the SEC on February 29, 2012.

*Related Parties*

As a result of our issuance to Treasury of the warrant to purchase shares of Fannie Mae common stock equal to 79.9% of the total number of shares of Fannie Mae common stock, we and Treasury are deemed related parties.

89

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

As of March 31, 2012, Treasury held an investment in our senior preferred stock with an aggregate liquidation preference of $117.1 billion. Our administrative expenses were reduced by $22 million and $35 million for the three months ended March 31, 2012 and 2011, respectively, due to reimbursements from Treasury and Freddie Mac for expenses incurred as program administrator for Treasury's Home Affordable Modification Program ("HAMP") and other initiatives under Treasury's Making Home Affordable Program.

During the three months ended March 31, 2011, we received a refund of $1.1 billion from the Internal Revenue Service ("IRS") related to the carryback of our 2009 operating loss to the 2008 and 2007 tax years.

Under the temporary credit and liquidity facilities ("TCLF") program, we had $2.6 billion and $3.0 billion outstanding, which include principal and interest, of three-year standby credit and liquidity support as of March 31, 2012 and December 31, 2011, respectively. Under the new issue bond ("NIB") program, we had $7.3 billion and $7.5 billion outstanding of pass-through securities backed by single-family and multifamily housing bonds issued by housing finance agencies ("HFAs") as of March 31, 2012 and December 31, 2011, respectively. Treasury will bear any initial losses of principal under the TCLF program and the NIB program up to 35% of the total original principal on a combined program-wide basis, and thereafter we will bear the losses of principal that are attributable to the TCLF and the securities we have issued. Treasury will also bear any losses of unpaid interest under the two programs. As of March 31, 2012, there had been no losses of principal or interest under the TCLF program or the NIB program.

FHFA's control of both us and Freddie Mac has caused us and Freddie Mac to be related parties. No transactions outside of normal business activities have occurred between us and Freddie Mac. As of March 31, 2012 and December 31, 2011, we held Freddie Mac mortgage-related securities with a fair value of $14.5 and $15.6 billion, respectively, and accrued interest receivable of $64 million and $69 million, respectively. We recognized interest income on these securities held by us of $153 million and $188 million for the three months ended March 31, 2012 and 2011, respectively. In addition, Freddie Mac may be an investor in variable interest entities that we have consolidated, and we may be an investor in variable interest entities that Freddie Mac has consolidated.

### Use of Estimates

Preparing condensed consolidated financial statements in accordance with GAAP requires management to make estimates and assumptions that affect our reported amounts of assets and liabilities, and disclosure of contingent assets and liabilities as of the dates of our condensed consolidated financial statements, as well as our reported amounts of revenues and expenses during the reporting periods. Management has made significant estimates in a variety of areas including, but not limited to, valuation of certain financial instruments, and other assets and liabilities, the allowance for loan losses and reserve for guaranty losses, and other-than-temporary impairment of investment securities. Actual results could be different from these estimates.

### Collateral

Our liability to third party holders of Fannie Mae MBS that arises as the result of a consolidation of a securitization trust is collateralized by the underlying loans and/or mortgage-related securities.

We had reverse repurchase agreements outstanding of $26.0 billion and $49.5 billion as of March 31, 2012 and December 31, 2011, respectively. The fair value of non-cash collateral we accepted was $26.1 billion and $50.1 billion as of March 31, 2012 and December 31, 2011, respectively, of which we were permitted to sell or repledge $20.0 billion as of March 31, 2012 and December 31, 2011. None of the underlying collateral was sold or repledged as of March 31, 2012 or December 31, 2011.

We had no repurchase agreements outstanding as of March 31, 2012 or December 31, 2011.

90

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Reclassifications*

To conform to our current period presentation, we have reclassified certain amounts reported in our condensed consolidated financial statements.

*Adoption of New Accounting Guidance*

Effective January 1, 2012, we prospectively adopted guidance issued by the Financial Accounting Standards Board ("FASB") related to fair value measurement. The new guidance does not expand the use of fair value; instead, it provides guidance about how fair value should be determined where it already is required or permitted under U.S. GAAP. The new fair value guidance changes certain fair value principles and clarifies the FASB's intent on certain items, including a clarification that the principal market should be determined based on the market the entity has access to with the greatest volume and level of activity for the asset or liability. It also expands the disclosures about fair value measurements. The adoption of this guidance did not have a material impact on our condensed consolidated financial statements; however, it required us to expand our fair value disclosures. See "Note 12, Fair Value," for additional information regarding the impact upon adoption of this guidance.

**2.    Consolidations and Transfers of Financial Assets**

We have interests in various entities that are considered to be variable interest entities ("VIEs"). The primary types of entities are securitization trusts guaranteed by us via lender swap and portfolio securitization transactions, mortgage and asset-backed trusts that were not created by us, as well as housing partnerships that are established to finance the acquisition, construction, development or rehabilitation of affordable multifamily and single-family housing. These interests include investments in securities issued by VIEs, such as Fannie Mae MBS created pursuant to our securitization transactions and our guaranty to the entity. We consolidate the substantial majority of our single-class securitization trusts because our role as guarantor and master servicer provides us with the power to direct matters (primarily the servicing of mortgage loans) that impact the credit risk to which we are exposed. In contrast, we do not consolidate single-class securitization trusts when other organizations have the power to direct these activities.

As of March 31, 2012, we consolidated certain VIEs that were not consolidated as of December 31, 2011, generally due to increases in the amount of the certificates issued by the entity that are held in our portfolio (for example, when we hold a substantial portion of the securities issued by Fannie Mae multi-class resecuritization trusts). As a result of consolidating these entities, which had combined total assets of $1.7 billion in unpaid principal balance as of March 31, 2012, we derecognized our investment in these entities and recognized the assets and liabilities of the consolidated entities at fair value.

As of March 31, 2012, we also deconsolidated certain VIEs that were consolidated as of December 31, 2011, generally due to decreases in the amount of the certificates issued by the entity that are held in our portfolio. As a result of deconsolidating these entities, which had combined total assets of $102 million in unpaid principal balance as of December 31, 2011, we derecognized the assets and liabilities of the entities and recognized at fair value our retained interests as securities in our condensed consolidated balance sheets.

*Unconsolidated VIEs*

We do not consolidate VIEs when we are not deemed to be the primary beneficiary. Our unconsolidated VIEs include securitization trusts, as well as other investment entities. The following table displays the carrying amount and classification of our assets and liabilities that relate to our involvement with unconsolidated VIEs as of March 31, 2012 and December 31, 2011, as well as our maximum exposure to loss and the total assets of those unconsolidated VIEs.

91

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | As of March 31, 2012 | | |
|---|---|---|---|
| | Mortgage-Backed Trusts | Asset-Backed Trusts | Limited Partnership Investments |
| | (Dollars in millions) | | |
| **Assets and liabilities recorded in our condensed consolidated balance sheets:** | | | |
| Assets: | | | |
|    Available-for-sale securities[1] | $ 65,640 | $ — | $ — |
|    Trading securities[1] | 23,824 | 1,896 | — |
|    Other assets | 271 | — | 118 |
| Other liabilities | (1,362) | — | (148) |
| **Net carrying amount** | $ 88,373 | $ 1,896 | $ (30) |
| **Maximum exposure to loss**[1] | $ 97,103 | $ 1,896 | $ 115 |
| **Total assets of unconsolidated VIEs**[1] | $ 609,941 | $ 244,148 | $ 12,058 |

| | As of December 31, 2011 | | |
|---|---|---|---|
| | Mortgage-Backed Trusts | Asset-Backed Trusts | Limited Partnership Investments |
| | (Dollars in millions) | | |
| **Assets and liabilities recorded in our condensed consolidated balance sheets:** | | | |
| Assets: | | | |
|    Available-for-sale securities[1] | $ 69,101 | $ — | $ — |
|    Trading securities[1] | 24,292 | 2,111 | — |
|    Other assets | 271 | — | 145 |
| Other liabilities | (1,347) | — | (153) |
| **Net carrying amount** | $ 92,317 | $ 2,111 | $ (8) |
| **Maximum exposure to loss**[1] | $ 100,146 | $ 2,111 | $ 137 |
| **Total assets of unconsolidated VIEs**[1] | $ 641,346 | $256,845 | $12,256 |

[1] Contains securities recognized in our condensed consolidated balance sheets due to consolidation of certain multi-class resecuritization trusts.

Our maximum exposure to loss generally represents the greater of our recorded investment in the entity or the unpaid principal balance of the assets covered by our guaranty. However, our securities issued by Fannie Mae multi-class resecuritization trusts that are not consolidated do not give rise to any additional exposure to loss as we already consolidate the underlying collateral.

**Transfers of Financial Assets**

We issue Fannie Mae MBS through portfolio securitization transactions by transferring pools of mortgage loans or mortgage-related securities to one or more trusts or special purpose entities. We are considered to be the transferor when we transfer assets from our own portfolio in a portfolio securitization transaction. For the three months ended March 31, 2012 and 2011, the unpaid principal balance of portfolio securitizations was $41.7 billion and $29.3 billion, respectively.

92

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table displays some key characteristics of the securities retained in unconsolidated portfolio securitization trusts.

| | Fannie Mae Single-class MBS & Fannie Mae Megas | REMICS & SMBS[1] |
|---|---|---|
| | (Dollars in millions) | |
| **As of March 31, 2012** | | |
| Unpaid principal balance | $ 556 | $ 11,138 |
| Fair value | 619 | 12,388 |
| Weighted-average coupon | 6.21% | 5.68% |
| Weighted-average loan age | 5.7 years | 4.2 years |
| Weighted-average maturity | 23.3 years | 16.9 years |
| **As of December 31, 2011** | | |
| Unpaid principal balance | $ 588 | $ 12,697 |
| Fair value | 654 | 14,043 |
| Weighted-average coupon | 6.21% | 5.86% |
| Weighted-average loan age | 5.4 years | 4.5 years |
| Weighted-average maturity | 23.5 years | 18.6 years |

[1]  Consists of Real Estate Mortgage Investment Conduits ("REMICs") and stripped mortgage-backed securities ("SMBS").

For the three months ended March 31, 2012 and 2011, the principal and interest received on retained interests was $694 million and $750 million, respectively.

*Managed Loans*

We define "managed loans" as on-balance sheet mortgage loans as well as mortgage loans that we have securitized in unconsolidated portfolio securitization trusts. The following table displays the unpaid principal balances of managed loans, including those managed loans that were delinquent as of March 31, 2012 and December 31, 2011.

| | As of | | | |
|---|---|---|---|---|
| | March 31, 2012 | | December 31, 2011 | |
| | Unpaid Principal Balance | Principal Amount of Delinquent Loans[1] | Unpaid Principal Balance | Principal Amount of Delinquent Loans[1] |
| | (Dollars in millions) | | | |
| Loans held for investment | | | | |
| Of Fannie Mae | $ 392,988 | $ 115,708 | $ 396,276 | $ 122,392 |
| Of consolidated trusts | 2,591,235 | 20,018 | 2,570,339 | 24,893 |
| Loans held for sale | 283 | 60 | 312 | 57 |
| Securitized loans | 2,307 | 72 | 2,273 | 71 |
| Total loans managed | $2,986,813 | $ 135,858 | $2,969,200 | $ 147,413 |

[1]  Represents the unpaid principal balance of loans held for investment, loans held for sale and securitized loans for which we are no longer accruing interest and loans 90 days or more delinquent which are continuing to accrue interest.

*Qualifying Sales of Portfolio Securitizations*

The majority of our portfolio securitization transactions do not qualify for sale treatment, as we consolidate the substantial majority of our single-class MBS trusts. We report assets and liabilities of consolidated trusts created via portfolio securitization transactions that do not qualify as sales in our condensed consolidated balance sheets.

93

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

We recognize assets obtained and liabilities incurred in qualifying sales of portfolio securitizations at fair value. Proceeds from the initial sale of securities from portfolio securitizations were $133 million and $108 million for the three months ended March 31, 2012 and 2011, respectively. Our continuing involvement in the form of guaranty assets and guaranty liabilities with assets that were transferred into unconsolidated trusts is not material to our condensed consolidated financial statements.

*Other Securitizations*

We also completed other portfolio securitization transactions that did not qualify as sales during the three months ended March 31, 2012 and were accounted for as secured borrowings. Proceeds from these transactions were $421 million and were recorded as long-term debt of Fannie Mae in our condensed consolidated balance sheet. As of March 31, 2012, the fair value of trading securities underlying these transactions was $213 million, and the unpaid principal balance of mortgage loans of consolidated trusts underlying these transactions was $239 million. The related assets have been transferred to MBS trusts and are restricted solely for the purpose of servicing the related MBS. We did not complete any securitizations of this type during the first quarter of 2011.

**3.    Mortgage Loans**

The following table displays our mortgage loans as of March 31, 2012 and December 31, 2011.

| | As of | | | | | |
| | March 31, 2012 | | | December 31, 2011 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | (Dollars in millions) | | | | | |
| Single-family | $320,635 | $ 2,485,077 | $2,805,712 | $319,496 | $ 2,470,533 | $ 2,790,029 |
| Multifamily | 72,580 | 106,214 | 178,794 | 77,026 | 99,872 | 176,898 |
| Total unpaid principal balance of mortgage loans | 393,215 | 2,591,291 | 2,984,506 | 396,522 | 2,570,405 | 2,966,927 |
| Cost basis and fair value adjustments, net | (15,958) | 25,286 | 9,328 | (16,143) | 19,993 | 3,850 |
| Allowance for loan losses for loans held for investment | (57,001) | (13,108) | (70,109) | (57,309) | (14,847) | (72,156) |
| Total mortgage loans | $320,256 | $ 2,603,469 | $2,923,725 | $ 323,070 | $2,575,551 | $ 2,898,621 |

During the three months ended March 31, 2012, we did not redesignate any loans from held for investment ("HFI") to held for sale ("HFS"). During the three months ended March 31, 2011, we redesignated loans with a carrying value of $561 million from HFI to HFS.

*Nonaccrual Loans*

We discontinue accruing interest on loans when we believe collectibility of principal or interest is not reasonably assured, which for single-family loans we have determined, based on our historical experience, to be when the loan becomes two months or more past due according to its contractual terms. We generally place multifamily loans on nonaccrual status when the loan is deemed to be individually impaired, unless the loan is well secured such that collectibility of principal and accrued interest is reasonably assured.

When a loan is placed on nonaccrual status, interest previously accrued but not collected becomes part of our recorded investment in the loan and is collectively reviewed for impairment. For single-family loans, we

94

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

recognize interest income for loans on nonaccrual status when cash is received. For multifamily loans, we apply any payment received on a cost recovery basis to reduce principal on the mortgage loan unless the loan is determined to be well secured.

We return a single-family loan to accrual status at the point that the borrower has made sufficient payments to reduce their delinquency below our nonaccrual threshold. For modified single-family loans, the loan is not returned to accrual status until the borrower successfully makes all required payments during the trial period (generally three to four months) and the modification is made permanent. We generally return a multifamily loan to accrual status when the borrower cures the delinquency of the loan or we otherwise determine that the loan is well secured such that collectibility is reasonably assured.

*Aging Analysis*

The following tables display an aging analysis of the total recorded investment in our HFI mortgage loans, excluding loans for which we have elected the fair value option, by portfolio segment and class as of March 31, 2012 and December 31, 2011.

| | As of March 31, 2012[1] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 30 - 59 Days Delinquent | 60 - 89 Days Delinquent | Seriously Delinquent[2] | Total Delinquent | Current | Total | Recorded Investment in Loans 90 Days or More Delinquent and Accruing Interest | Recorded Investment in Nonaccrual Loans |
| | (Dollars in millions) | | | | | | | |
| Single-family: | | | | | | | | |
| Primary[3] | $ 36,041 | $ 12,415 | $ 76,561 | $ 125,017 | $ 2,385,647 | $ 2,510,664 | $ 102 | $ 88,813 |
| Government[4] | 85 | 35 | 330 | 450 | 51,373 | 51,823 | 330 | — |
| Alt-A | 6,141 | 2,572 | 26,427 | 35,140 | 136,578 | 171,718 | 15 | 28,978 |
| Other[5] | 2,732 | 1,153 | 10,510 | 14,395 | 71,228 | 85,623 | 85 | 11,505 |
| Total single-family | 44,999 | 16,175 | 113,828 | 175,002 | 2,644,826 | 2,819,828 | 532 | 129,296 |
| Multifamily[6] | 159 | NA | 707 | 866 | 180,359 | 181,225 | 1 | 2,059 |
| Total | $ 45,158 | $ 16,175 | $ 114,535 | $ 175,868 | $ 2,825,185 | $ 3,001,053 | $ 533 | $ 131,355 |

| | As of December 31, 2011[1] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 30 - 59 Days Delinquent | 60 - 89 Days Delinquent | Seriously Delinquent[2] | Total Delinquent | Current | Total | Recorded Investment in Loans 90 Days or More Delinquent and Accruing Interest | Recorded Investment in Nonaccrual Loans |
| | (Dollars in millions) | | | | | | | |
| Single-family: | | | | | | | | |
| Primary[3] | $ 43,516 | $ 15,282 | $ 80,712 | $ 139,510 | $ 2,341,646 | $ 2,481,156 | $ 111 | $ 95,959 |
| Government[4] | 109 | 49 | 327 | 485 | 51,391 | 51,876 | 327 | — |
| Alt-A | 7,155 | 3,054 | 28,323 | 38,532 | 138,880 | 177,412 | 14 | 31,356 |
| Other[5] | 3,403 | 1,431 | 11,277 | 16,111 | 73,115 | 89,226 | 96 | 12,533 |
| Total single-family | 54,183 | 19,816 | 120,639 | 194,638 | 2,605,032 | 2,799,670 | 548 | 139,848 |
| Multifamily[6] | 210 | NA | 1,105 | 1,315 | 177,906 | 179,221 | — | 2,764 |
| Total | $ 54,393 | $ 19,816 | $ 121,744 | $ 195,953 | $ 2,782,938 | $ 2,978,891 | $ 548 | $ 142,612 |

FHFA 3443

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

[1] Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable.

[2] Single-family seriously delinquent loans are loans that are 90 days or more past due or in the foreclosure process. Multifamily seriously delinquent loans are loans that are 60 days or more past due.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A. Primarily consists of reverse mortgages which due to their nature are not aged and are included in the current column.

[5] Includes loans with higher-risk loan characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[6] Multifamily loans 60-89 days delinquent are included in the seriously delinquent column.

### Credit Quality Indicators

The following table displays the total recorded investment in our single-family HFI loans, excluding loans for which we have elected the fair value option, by class and credit quality indicator as of March 31, 2012 and December 31, 2011. The single-family credit quality indicator is updated quarterly.

| | As of | | | | | |
| | March 31, 2012[1][2] | | | December 31, 2011[1][2] | | |
| | Primary[3] | Alt-A | Other[4] | Primary[3] | Alt-A | Other[4] |
| | (Dollars in millions) | | | | | |
| Estimated mark-to-market LTV ratio:[5] | | | | | | |
| Less than or equal to 80% | $ 1,440,871 | $ 57,093 | $21,777 | $ 1,464,348 | $ 61,618 | $ 23,414 |
| Greater than 80% and less than or equal to 90% | 424,475 | 20,019 | 8,251 | 412,342 | 21,369 | 9,224 |
| Greater than 90% and less than or equal to 100% | 263,111 | 18,713 | 8,657 | 246,648 | 19,790 | 9,445 |
| Greater than 100% and less than or equal to 110% | 138,458 | 16,042 | 8,364 | 128,428 | 16,164 | 8,951 |
| Greater than 110% and less than or equal to 120% | 79,367 | 12,759 | 7,703 | 73,836 | 12,534 | 7,912 |
| Greater than 120% and less than or equal to 125% | 27,927 | 5,261 | 3,513 | 25,750 | 5,087 | 3,557 |
| Greater than 125% | 136,455 | 41,831 | 27,358 | 129,804 | 40,850 | 26,723 |
| Total | $2,510,664 | $171,718 | $85,623 | $2,481,156 | $177,412 | $89,226 |

[1] Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable.

[2] Excludes $51.8 billion and $51.9 billion as of March 31, 2012 and December 31, 2011, respectively, of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A loans. The segment class is primarily reverse mortgages for which we do not calculate an estimated mark-to-market LTV.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Includes loans with higher-risk loan characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[5] The aggregate estimated mark-to-market LTV ratio is based on the unpaid principal balance of the loan as of the end of each reported period divided by the estimated current value of the property, which we calculate using an internal valuation model that estimates periodic changes in home value.

96

**Table of Contents**

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table displays the total recorded investment in our multifamily HFI loans, excluding loans for which we have elected the fair value option, by credit quality indicator as of March 31, 2012 and December 31, 2011. The multifamily credit quality indicator is updated quarterly.

| | As of | |
| --- | --- | --- |
| | **March 31, 2012**[1] | **December 31, 2011**[1] |
| | (Dollars in millions) | |
| Credit risk profile by internally assigned grade: [2] | | |
| Green | $ 135,879 | $ 131,740 |
| Yellow[3] | 26,461 | 28,354 |
| Orange | 17,463 | 17,355 |
| Red | 1,422 | 1,772 |
| Total | $ 181,225 | $ 179,221 |

[1] Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable.

[2] Green (loan with acceptable risk); yellow (loan with signs of potential weakness); orange (loan with a well defined weakness that may jeopardize the timely full repayment); and red (loan with a weakness that makes timely collection or liquidation in full more questionable based on existing conditions and values).

[3] Includes approximately $6.2 billion and $6.9 billion of unpaid principal balance as of March 31, 2012 and December 31, 2011, respectively, classified as yellow due to no available financial information.

97

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Individually Impaired Loans*

Individually impaired loans include TDRs, acquired credit-impaired loans, and other multifamily loans regardless of whether we are currently accruing interest. The following tables display the total recorded investment, unpaid principal balance, and related allowance as of March 31, 2012 and December 31, 2011 and interest income recognized and average recorded investment for the three months ended March 31, 2012 and 2011 for individually impaired loans.

| | As of | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | March 31, 2012 | | | | December 31, 2011 | | | |
| | Unpaid Principal Balance | Total Recorded Investment[1] | Related Allowance for Loan Losses | Related Allowance for Accrued Interest Receivable | Unpaid Principal Balance | Total Recorded Investment[1] | Related Allowance for Loan Losses | Related Allowance for Accrued Interest Receivable |
| | (Dollars in millions) | | | | | | | |
| Individually impaired loans: | | | | | | | | |
| With related allowance recorded: | | | | | | | | |
| Single-family: | | | | | | | | |
| Primary[2] | $118,225 | $ 110,913 | $ 29,927 | $ 610 | $116,825 | $ 109,684 | $ 29,598 | $ 674 |
| Government[3] | 263 | 264 | 76 | 9 | 258 | 258 | 67 | 8 |
| Alt-A | 34,511 | 31,633 | 11,140 | 239 | 34,318 | 31,516 | 11,121 | 268 |
| Other[4] | 16,102 | 15,270 | 5,300 | 87 | 16,181 | 15,363 | 5,353 | 99 |
| Total single-family | 169,101 | 158,080 | 46,443 | 945 | 167,582 | 156,821 | 46,139 | 1,049 |
| Multifamily | 2,478 | 2,504 | 557 | 15 | 2,832 | 2,855 | 718 | 32 |
| Total individually impaired loans with related allowance recorded | 171,579 | 160,584 | 47,000 | 960 | 170,414 | 159,676 | 46,857 | 1,081 |
| With no related allowance recorded:[5] | | | | | | | | |
| Single-family: | | | | | | | | |
| Primary[2] | 9,171 | 6,535 | — | — | 9,370 | 6,471 | — | — |
| Government[3] | 28 | 21 | — | — | 25 | 17 | — | — |
| Alt-A | 2,928 | 1,523 | — | — | 3,056 | 1,538 | — | — |
| Other[4] | 650 | 363 | — | — | 680 | 367 | — | — |
| Total single-family | 12,777 | 8,442 | — | — | 13,131 | 8,393 | — | — |
| Multifamily | 1,648 | 1,661 | — | — | 1,759 | 1,771 | — | — |
| Total individually impaired loans with no related allowance recorded | 14,425 | 10,103 | — | — | 14,890 | 10,164 | — | — |
| Total individually impaired loans[6] | $ 186,004 | $ 170,687 | $ 47,000 | $ 960 | $185,304 | $ 169,840 | $ 46,857 | $ 1,081 |

98

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | For the Three Months Ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2012** | | | **2011** | | |
| | Average Recorded Investment | Total Interest Income Recognized[7] | Interest Income Recognized on a Cash Basis | Average Recorded Investment | Total Interest Income Recognized[7] | Interest Income Recognized on a Cash Basis |
| | (Dollars in millions) | | | | | |
| **Individually impaired loans:** | | | | | | |
| With related allowance recorded: | | | | | | |
| Single-family: | | | | | | |
| Primary[2] | $ 109,970 | $ 973 | $ 173 | $ 95,087 | $ 904 | $ 41 |
| Government[3] | 260 | 3 | — | 232 | 3 | — |
| Alt-A | 31,509 | 253 | 39 | 28,567 | 242 | 2 |
| Other[4] | 15,255 | 110 | 18 | 13,889 | 106 | 6 |
| Total single-family | 156,994 | 1,339 | 230 | 137,775 | 1,255 | 49 |
| Multifamily | 2,673 | 31 | — | 2,202 | 25 | 1 |
| Total individually impaired loans with related allowance recorded | 159,667 | 1,370 | 230 | 139,977 | 1,280 | 50 |
| With no related allowance recorded:[5] | | | | | | |
| Single-family: | | | | | | |
| Primary[2] | 6,608 | 184 | 54 | 7,139 | 108 | 57 |
| Government[3] | 20 | 2 | — | 12 | 1 | — |
| Alt-A | 1,558 | 51 | 15 | 1,863 | 33 | 19 |
| Other[4] | 374 | 19 | 7 | 513 | 8 | 4 |
| Total single-family | 8,560 | 256 | 76 | 9,527 | 150 | 80 |
| Multifamily | 1,714 | 21 | 1 | 754 | 15 | 3 |
| Total individually impaired loans with no related allowance recorded | 10,274 | 277 | 77 | 10,281 | 165 | 83 |
| Total individually impaired loans | $ 169,941 | $ 1,647 | $ 307 | $ 150,258 | $ 1,445 | $ 133 |

[1] Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable.

[2] Consists of mortgage loans that are not included in other loan classes.

[3] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A.

[4] Includes loans with higher-risk characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[5] The discounted cash flows or collateral value equals or exceeds the carrying value of the loan and, as such, no valuation allowance is required.

[6] Includes single-family loans restructured in a TDR with a recorded investment of $163.5 billion and $161.9 billion as of March 31, 2012 and December 31, 2011, respectively. Includes multifamily loans restructured in a TDR with a recorded investment of $992 million and $956 million as of March 31, 2012 and December 31, 2011, respectively.

[7] Total single-family interest income recognized of $1.6 billion for the three months ended March 31, 2012 consists of $1.2 billion of contractual interest and $387 million of effective yield adjustments. Total single-family interest income recognized of $1.4 billion for the three months ended March 31, 2011 consists of $1.1 billion of contractual interest and $352 million of effective yield adjustments.

99

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Troubled Debt Restructurings*

A modification to the contractual terms of a loan that results in granting a concession to a borrower experiencing financial difficulties is considered a TDR. In addition to formal loan modifications, we also engage in other loss mitigation activities with troubled borrowers, which include repayment plans and forbearance arrangements, both of which represent informal agreements with the borrower that do not result in the legal modification of the loan's contractual terms. We account for these informal restructurings as a TDR if we defer more than three missed payments. The substantial majority of the loan modifications we complete result in term extensions, interest rate reductions or a combination of both. During the three months ended March 31, 2012 and 2011, the average term extension of a modified loan was 128 and 64 months, respectively, and the average interest rate reduction was 2.28 and 3.53 percentage points, respectively.

The following table displays the number of loans and recorded investment in loans restructured in a TDR for the three months ended March 31, 2012 and 2011.

| | For the Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | Number of Loans | Recorded Investment[1] | Number of Loans | Recorded Investment[1] |
|---|---|---|---|---|
| | | (Dollars in millions) | | |
| Single-family | | | | |
|   Primary[2] | 26,884 | $ 4,587 | 36,765 | $ 6,824 |
|   Government[3] | 110 | 14 | 174 | 41 |
|   Alt-A | 4,645 | 967 | 7,498 | 1,681 |
|   Other[4] | 1,660 | 409 | 3,596 | 920 |
|     Total single-family | 33,299 | 5,977 | 48,033 | 9,466 |
| Multifamily | 13 | 68 | 10 | 66 |
| Total troubled debt restructurings | 33,312 | $ 6,045 | 48,043 | $ 9,532 |

[1] Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable. Based on the nature of our modification programs, which do not include principal or interest forgiveness, there is not a material difference between the recorded investment in our loans pre- and post- modification, therefore amounts represent recorded investment post-modification.

[2] Consists of mortgage loans that are not included in other loan classes.

[3] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A.

100

**Table of Contents**

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

[4] Includes loans with higher-risk characteristics, such as interest-only and negative-amortizing loans that are neither government nor Alt-A.

The following table displays the number of loans and recorded investment in loans that had a payment default for the three months ended March 31, 2012 and 2011 and were modified in a TDR in the twelve months prior to the payment default. For purposes of this disclosure, we define loans that had a payment default as single-family and multifamily loans with completed TDRs that liquidated during the period, either through foreclosure, deed-in-lieu of foreclosure or a short sale, single-family loans with completed modifications that are two or more months delinquent during the period or multifamily loans with completed modifications that are one or more months delinquent during the period.

| | For the Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2012 | | 2011 | |
| | Number of Loans | Recorded Investment[1] | Number of Loans | Recorded Investment[1] |
| | (Dollars in millions) | | | |
| **Single-family** | | | | |
| Primary[2] | 11,872 | $ 2,074 | 21,946 | $ 3,874 |
| Government[3] | 50 | 10 | 78 | 21 |
| Alt-A | 2,243 | 466 | 5,009 | 1,066 |
| Other[4] | 1,195 | 288 | 2,192 | 530 |
| Total single-family | 15,360 | 2,838 | 29,225 | 5,491 |
| Multifamily | 1 | 2 | 3 | 24 |
| Total TDRs that subsequently defaulted | 15,361 | $ 2,840 | 29,228 | $ 5,515 |

[1] Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable. Represents our recorded investment in the loan at time of payment default.

[2] Consists of mortgage loans that are not included in other loan classes.

[3] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A.

[4] Includes loans with higher-risk characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

## 4. Allowance for Loan Losses

Our allowance for loan losses is a valuation allowance that reflects an estimate of incurred credit losses related to our recorded investment in both single-family and multifamily HFI loans. This population includes both HFI loans held by Fannie Mae and by consolidated Fannie Mae MBS trusts. When calculating our loan loss allowance, we consider only our net recorded investment in the loan at the balance sheet date, which includes the loan's unpaid principal balance and accrued interest recognized while the loan was on accrual status and any applicable cost basis adjustments. We record charge-offs as a reduction to the allowance for loan losses when losses are confirmed through the receipt of assets in full satisfaction of a loan, such as the underlying collateral upon foreclosure or cash upon completion of a short sale.

We aggregate single-family HFI loans that are not individually impaired based on similar risk characteristics, for purposes of estimating incurred credit losses and establish a collective single-family loss reserve using an econometric model that derives an overall loss reserve estimate. We base our allowance and reserve methodology

101

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

on historical events and trends, such as loss severity (in event of default), default rates, and recoveries from mortgage insurance contracts and other credit enhancements. In addition, management performs a review of the observable data used in its estimate to ensure it is representative of prevailing economic conditions and other events existing as of the balance sheet date.

Individually impaired single-family loans currently include those restructured in a TDR and acquired credit-impaired loans. When a loan has been restructured, we measure impairment using a cash flow analysis discounted at the loan's original effective interest rate. However, if we expect to recover our recorded investment in an individually impaired loan through probable foreclosure of the underlying collateral, we measure impairment based on the fair value of the collateral, reduced by estimated disposal costs and adjusted for estimated proceeds from mortgage, flood, or hazard insurance or similar sources.

We identify multifamily loans for evaluation for impairment through a credit risk assessment process. Based on this evaluation, we determine for loans that are not in homogeneous pools whether or not a loan is individually impaired. If we determine that a multifamily loan is individually impaired, we generally measure impairment on that loan based on the fair value of the underlying collateral less estimated costs to sell the property. If we determine that an individual loan that was specifically evaluated for impairment is not individually impaired, we include the loan as part of a pool of loans with similar characteristics that are evaluated collectively for incurred losses.

102

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table displays changes in our single-family, multifamily, and total allowance for loan losses for the three months ended March 31, 2012 and 2011.

| | For the Three Months Ended March 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2012 | | | 2011 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | (Dollars in millions) | | | | | |
| **Single-family allowance for loan losses[1]:** | | | | | | |
| Beginning balance | $56,294 | $ 14,339 | $ 70,633 | $ 47,377 | $ 12,603 | $ 59,980 |
| Provision for loan losses[2] | 1,400 | 620 | 2,020 | 7,243 | 3,369 | 10,612 |
| Charge-offs[3][4] | (4,404) | (263) | (4,667) | (5,623) | (448) | (6,071) |
| Recoveries | 421 | 65 | 486 | 530 | 952 | 1,482 |
| Transfers[5] | 2,193 | (2,193) | — | 3,162 | (3,162) | — |
| Other[6] | 204 | 62 | 266 | (18) | 99 | 81 |
| Ending balance | $56,108 | $ 12,630 | $ 68,738 | $52,671 | $ 13,413 | $ 66,084 |
| **Multifamily allowance for loan losses:** | | | | | | |
| Beginning balance | $ 1,015 | $ 508 | $ 1,523 | $ 1,153 | $ 423 | $ 1,576 |
| (Benefit) provision for loan losses[2] | (17) | (23) | (40) | (84) | 59 | (25) |
| Charge-offs[3][4] | (129) | — | (129) | (82) | — | (82) |
| Transfers[5] | 8 | (8) | — | 45 | (45) | — |
| Other[6] | 16 | 1 | 17 | 5 | (1) | 4 |
| Ending balance | $ 893 | $ 478 | $ 1,371 | $ 1,037 | $ 436 | $ 1,473 |
| **Total allowance for loan losses[1]:** | | | | | | |
| Beginning balance | $ 57,309 | $ 14,847 | $72,156 | $ 48,530 | $ 13,026 | $61,556 |
| Provision for loan losses[2] | 1,383 | 597 | 1,980 | 7,159 | 3,428 | 10,587 |
| Charge-offs[3][4] | (4,533) | (263) | (4,796) | (5,705) | (448) | (6,153) |
| Recoveries | 421 | 65 | 486 | 530 | 952 | 1,482 |
| Transfers[5] | 2,201 | (2,201) | — | 3,207 | (3,207) | — |
| Other[6] | 220 | 63 | 283 | (13) | 98 | 85 |
| Ending balance[7] | $ 57,001 | $ 13,108 | $ 70,109 | $ 53,708 | $ 13,849 | $67,557 |

[1] Includes an out-of-period adjustment of $548 million to increase the provision for loan losses for the three months ended March 31, 2012.

[2] Provision for loan losses is included in provision for credit losses in our condensed consolidated statements of operations and comprehensive income (loss).

[3] While we purchase the substantial majority of loans that are four or more months delinquent from our MBS trusts, we do not exercise this option to purchase loans during a forbearance period. Accordingly, charge-offs of consolidated trusts generally represent loans that remained in our consolidated trusts at the time of default.

[4] Single-family charge-offs include accrued interest of $258 million and $377 million for the three months ended March 31, 2012 and 2011, respectively. Multifamily charge-offs include accrued interest of $15 million and $9 million for the three months ended March 31, 2012 and 2011, respectively. Total charge-offs include accrued interest of $273 million and $386 million for the three months ended March 31, 2012 and 2011, respectively.

[5] Includes transfers from trusts for delinquent loan purchases.

103

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

[6]  Amounts represent the net activity recorded in our allowances for accrued interest receivable and preforeclosure property taxes and insurance receivable from borrowers. The provision for loan losses, charge-offs, recoveries and transfer activity included in this table reflects all changes for both the allowance for loan losses and the valuation allowances for accrued interest and preforeclosure property taxes and insurance receivable that relate to the mortgage loans.

[7]  Total allowance for loan losses includes $353 million and $412 million as of March 31, 2012 and 2011, respectively, for acquired credit-impaired loans.

As of March 31, 2012, the allowance for accrued interest receivable for loans of Fannie Mae was $1.9 billion and for loans of consolidated trusts was $273 million. As of December 31, 2011, the allowance for accrued interest receivable for loans of Fannie Mae was $2.2 billion and for loans of consolidated trusts was $336 million.

The following table displays the allowance for loan losses and total recorded investment in our HFI loans, excluding loans for which we have elected the fair value option, by impairment or reserve methodology and portfolio segment as of March 31, 2012 and December 31, 2011.

| | As of | | | | | |
| | March 31, 2012 | | | December 31, 2011 | | |
| | Single-Family | Multifamily | Total | Single-Family | Multifamily | Total |
| | (Dollars in millions) | | | | | |
| Allowance for loan losses by segment: | | | | | | |
| Individually impaired loans | $ 46,091 | $ 556 | $ 46,647 | $ 45,765 | $ 717 | $ 46,482 |
| Collectively reserved loans | 22,295 | 814 | 23,109 | 24,494 | 805 | 25,299 |
| Acquired credit-impaired loans | 352 | 1 | 353 | 374 | 1 | 375 |
| Total allowance for loan losses | $ 68,738 | $ 1,371 | $ 70,109 | $ 70,633 | $ 1,523 | $ 72,156 |
| Recorded investment in loans by segment: [1] | | | | | | |
| Individually impaired loans | $ 163,487 | $ 4,121 | $ 167,608 | $ 161,942 | $ 4,579 | $ 166,521 |
| Collectively reserved loans | 2,653,306 | 177,060 | 2,830,366 | 2,634,456 | 174,595 | 2,809,051 |
| Acquired credit-impaired loans | 3,035 | 44 | 3,079 | 3,272 | 47 | 3,319 |
| Total recorded investment in loans | $2,819,828 | $181,225 | $ 3,001,053 | $2,799,670 | $179,221 | $ 2,978,891 |

[1]  Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable.

104

FHFA 3452

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

**5.   Investments in Securities**

*Trading Securities*

Trading securities are recorded at fair value with subsequent changes in fair value recorded as "Fair value gains, net" in our condensed consolidated statements of operations and comprehensive income (loss). The following table displays our investments in trading securities as of March 31, 2012 and December 31, 2011.

|  | As of | |
| --- | --- | --- |
|  | March 31, 2012 | December 31, 2011 |
|  | (Dollars in millions) | |
| Mortgage-related securities: | | |
| Fannie Mae | $ 7,168 | $ 7,424 |
| Freddie Mac | 2,575 | 2,732 |
| Ginnie Mae | 286 | 287 |
| Alt-A private-label securities | 1,338 | 1,349 |
| Subprime private-label securities | 1,305 | 1,280 |
| CMBS | 10,417 | 10,411 |
| Mortgage revenue bonds | 668 | 724 |
| Other mortgage-related securities | 123 | 143 |
| Total | 23,880 | 24,350 |
| Non-mortgage-related securities: | | |
| U.S. Treasury securities | 50,030 | 47,737 |
| Asset-backed securities | 1,896 | 2,111 |
| Total | 51,926 | 49,848 |
| Total trading securities | $ 75,806 | $ 74,198 |

The following table displays information about our net trading gains and losses for the three months ended March 31, 2012 and 2011.

|  | For the Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2012 | 2011 |
|  | (Dollars in millions) | |
| Net trading gains (losses): | | |
| Mortgage-related securities | $ 296 | $ 229 |
| Non-mortgage-related securities | (12) | (4) |
| Total | $ 284 | $ 225 |
| Net trading gains (losses) recorded in the period related to securities still held at period end: | | |
| Mortgage-related securities | $ 331 | $ 222 |
| Non-mortgage-related securities | (12) | (5) |
| Total | $ 319 | $ 217 |

105

Table of Contents

**FANNIE MAE**
(In conservatorship)
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
(UNAUDITED)

*Available-for-Sale Securities*

We measure available-for-sale ("AFS") securities at fair value with unrealized gains and losses recorded as a component of "Other comprehensive income," net of tax, and we record realized gains and losses from the sale of AFS securities in "Investment gains, net" in our condensed consolidated statements of operations and comprehensive income (loss).

The following table displays the gross realized gains, losses and proceeds on sales of AFS securities for the three months ended March 31, 2012 and 2011.

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (Dollars in millions) | |
| Gross realized gains | $ 18 | $ 60 |
| Gross realized losses | 9 | 6 |
| Total proceeds[1] | 268 | 390 |

[1] Excludes proceeds from the initial sale of securities from new portfolio securitizations included in "Note 2, Consolidations and Transfers of Financial Assets."

The following table displays the amortized cost, gross unrealized gains and losses, and fair value by major security type for AFS securities we held as of March 31, 2012 and December 31, 2011.

| | As of March 31, 2012 | | | | |
|---|---|---|---|---|---|
| | Total Amortized Cost[1] | Gross Unrealized Gains | Gross Unrealized Losses - OTTI[2] | Gross Unrealized Losses - Other[3] | Total Fair Value |
| | (Dollars in millions) | | | | |
| Fannie Mae | $ 13,501 | $1,141 | $ (2) | $ (15) | $14,625 |
| Freddie Mac | 11,053 | 890 | — | — | 11,943 |
| Ginnie Mae | 744 | 122 | | | 866 |
| Alt-A private-label securities | 12,895 | 219 | (1,325) | (200) | 11,589 |
| Subprime private-label securities | 9,263 | 35 | (1,296) | (407) | 7,595 |
| CMBS[4] | 13,612 | 491 | — | (35) | 14,068 |
| Mortgage revenue bonds | 9,793 | 138 | (79) | (113) | 9,739 |
| Other mortgage-related securities | 3,610 | 84 | (32) | (308) | 3,354 |
| Total | $ 74,471 | $ 3,120 | $ (2,734) | $(1,078) | $ 73,779 |

| | As of December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Total Amortized Cost[1] | Gross Unrealized Gains | Gross Unrealized Losses - OTTI[2] | Gross Unrealized Losses - Other[3] | Total Fair Value |
| | (Dollars in millions) | | | | |
| Fannie Mae | $15,486 | $1,381 | $ (3) | $ (14) | $16,850 |
| Freddie Mac | 11,906 | 917 | — | — | 12,823 |
| Ginnie Mae | 775 | 127 | | | 902 |
| Alt-A private-label securities | 13,314 | 233 | (1,618) | (246) | 11,683 |
| Subprime private-label securities | 9,556 | 17 | (1,534) | (453) | 7,586 |
| CMBS[4] | 13,949 | 181 | — | (104) | 14,026 |
| Mortgage revenue bonds | 10,172 | 202 | (56) | (64) | 10,254 |
| Other mortgage-related securities | 3,687 | 92 | (39) | (282) | 3,458 |
| Total | $ 78,845 | $ 3,150 | $ (3,250) | $(1,163) | $ 77,582 |

106

**Table of Contents**

<div align="center">

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

</div>

(1) Amortized cost includes unamortized premiums, discounts and other cost basis adjustments as well as the credit component of other-than-temporary impairments recognized in our condensed consolidated statements of operations and comprehensive income (loss).

(2) Represents the noncredit component of other-than-temporary impairment losses recorded in "Accumulated other comprehensive loss" as well as cumulative changes in fair value of securities for which we previously recognized the credit component of an other-than-temporary impairment.

(3) Represents the gross unrealized losses on securities for which we have not recognized an other-than-temporary impairment.

(4) Amortized cost includes $649 million and $686 million as of March 31, 2012 and December 31, 2011, respectively, of increase to the carrying amount from previous fair value hedge accounting.

The following table displays additional information regarding gross unrealized losses and fair value by major security type for AFS securities in an unrealized loss position that we held as of March 31, 2012 and December 31, 2011.

| | As of March 31, 2012 | | | |
|---|---|---|---|---|
| | Less Than 12 Consecutive Months | | 12 Consecutive Months or Longer | |
| | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value |
| | (Dollars in millions) | | | |
| Fannie Mae | $ (5) | $ 636 | $ (12) | $ 202 |
| Alt-A private-label securities | (41) | 1,339 | (1,484) | 6,534 |
| Subprime private-label securities | (28) | 389 | (1,675) | 6,599 |
| CMBS | (1) | 259 | (34) | 534 |
| Mortgage revenue bonds | (56) | 1,003 | (136) | 1,280 |
| Other mortgage-related securities | (12) | 499 | (328) | 1,614 |
| Total | $ (143) | $4,125 | $(3,669) | $16,763 |

| | As of December 31, 2011 | | | |
|---|---|---|---|---|
| | Less Than 12 Consecutive Months | | 12 Consecutive Months or Longer | |
| | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value |
| | (Dollars in millions) | | | |
| Fannie Mae | $ (4) | $ 519 | $ (13) | $ 208 |
| Alt-A private-label securities | (133) | 1,414 | (1,731) | 6,525 |
| Subprime private-label securities | (73) | 471 | (1,914) | 6,686 |
| CMBS | (20) | 1,458 | (84) | 2,790 |
| Mortgage revenue bonds | (4) | 114 | (116) | 1,971 |
| Other mortgage-related securities | (21) | 547 | (300) | 1,588 |
| Total | $ (255) | $4,523 | $ (4,158) | $19,768 |

<div align="center">107</div>

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Other-Than-Temporary Impairments*

We recognize the credit component of other-than-temporary impairments of our debt securities in "Net other-than-temporary impairments" and the noncredit component in "Other comprehensive income" in our condensed consolidated statements of operations and comprehensive income (loss) for those securities that we do not intend to sell and for which it is not more likely than not that we will be required to sell before recovery.

The fair value of our securities varies from period to period due to changes in interest rates, in the performance of the underlying collateral and in the credit performance of the underlying issuer, among other factors. As of March 31, 2012, $3.7 billion of the $3.8 billion of gross unrealized losses on AFS securities had existed for a period of 12 consecutive months or longer. Gross unrealized losses on AFS securities as of March 31, 2012 include unrealized losses on securities with other-than-temporary impairment in which a portion of the impairment remains in "Accumulated other comprehensive loss." The securities with unrealized losses for 12 consecutive months or longer, on average, had a fair value as of March 31, 2012 that was 82% of their amortized cost basis. Based on our review for impairments of AFS securities, which includes an evaluation of the collectibility of cash flows and any intent or requirement to sell the securities, we have concluded that we do not have an intent to sell and we believe it is not more likely than not that we will be required to sell the securities. Additionally, our projections of cash flows indicate that we will recover these unrealized losses over the lives of the securities.

The following table displays our net other-than-temporary impairments by major security type recognized in our condensed consolidated statements of operations and comprehensive income (loss) for the three months ended March 31, 2012 and 2011.

|  | For the Three Months Ended March 31, | |
|---|---|---|
|  | 2012 | 2011 |
|  | (Dollars in millions) | |
| Alt-A private-label securities | $ 43 | $ 37 |
| Subprime private-label securities | 19 | — |
| Other | 2 | 7 |
| Net other-than-temporary impairments | $ 64 | $ 44 |

The net other-than-temporary impairment charges recorded in the three months ended March 31, 2012 were primarily driven by a decrease in the expected cash flows on Alt-A and subprime securities.

108

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table displays activity related to the unrealized credit component on debt securities held by us and recognized in our condensed consolidated statements of operations and comprehensive income (loss) for the three months ended March 31, 2012 and 2011. A related unrealized noncredit component has been recognized in "Other comprehensive income."

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (Dollars in millions) | |
| Balance, January 1 | $8,915 | $8,215 |
| Additions for the credit component on debt securities for which OTTI was not previously recognized | — | 8 |
| Additions for credit losses on debt securities for which OTTI was previously recognized | 64 | 36 |
| Reductions for amortization resulting from changes in cash flows expected to be collected over the remaining life of the securities | (109) | (219) |
| Balance, March 31 | $ 8,870 | $ 8,040 |

As of March 31, 2012, those debt securities with other-than-temporary impairment for which we recognized in our condensed consolidated statements of operations and comprehensive income (loss) the amount of loss related to credit consisted predominantly of Alt-A and subprime securities. We evaluate Alt-A (including option adjustable rate mortgage ("ARM")) and subprime private-label securities for other-than-temporary impairment by discounting the projected cash flows from econometric models to estimate the portion of loss in value attributable to credit. Separate components of a third-party model project regional home prices, unemployment and interest rates. The model combines these factors with available current information regarding attributes of loans in pools backing the private-label mortgage-related securities to project prepayment speeds, conditional default rates, loss severities and delinquency rates. It incorporates detailed information on security-level subordination levels and cash flow priority of payments to project security level cash flows. We have recorded other-than-temporary impairments for the three months ended March 31, 2012 based on this analysis. For securities we determined were not other-than-temporarily impaired, we concluded that either the bond had no projected credit loss or if we projected a loss, that the present value of expected cash flows was greater than the security's cost basis.

109

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table displays the modeled attributes, including default rates and severities, which are used to determine whether our senior interests in certain non-agency mortgage-related securities will experience a cash shortfall as of March 31, 2012. Assumption of voluntary prepayment rates is also an input to the present value of expected losses.

| | | | As of March 31, 2012 | | |
| | | | Alt-A | | |
| | Subprime | Option ARM | Fixed Rate | Variable Rate | Hybrid Rate |
| | | | (Dollars in millions) | | |
| **Vintage Year** | | | | | |
| **2004 & Prior:** | | | | | |
| Unpaid principal balance | $ 1,580 | $ 469 | $ 3,237 | $ 474 | $ 2,174 |
| Weighted average collateral default[1] | 38.8% | 36.8% | 11.5% | 32.0% | 16.5% |
| Weighted average collateral severities[2] | 60.5 | 53.1 | 49.4 | 43.5 | 40.4 |
| Weighted average voluntary prepayment rates[3] | 6.5 | 10.9 | 12.4 | 9.1 | 12.6 |
| Average credit enhancement[4] | 51.5 | 14.6 | 12.2 | 22.7 | 10.2 |
| **2005** | | | | | |
| Unpaid principal balance | $ 163 | $ 1,267 | $ 1,139 | $ 513 | $ 2,259 |
| Weighted average collateral default[1] | 71.3% | 55.0% | 40.8% | 52.4% | 38.0% |
| Weighted average collateral severities[2] | 71.6 | 61.8 | 64.6 | 59.2 | 48.5 |
| Weighted average voluntary prepayment rates[3] | 2.3 | 6.3 | 8.5 | 7.5 | 9.1 |
| Average credit enhancement[4] | 65.6 | 23.7 | 1.1 | 15.9 | 5.0 |
| **2006** | | | | | |
| Unpaid principal balance | $ 11,283 | $ 1,136 | $ 507 | $ 1,534 | $ 1,605 |
| Weighted average collateral default[1] | 77.0% | 69.6% | 40.5% | 57.9% | 30.9% |
| Weighted average collateral severities[2] | 72.8 | 63.6 | 64.8 | 58.8 | 51.3 |
| Weighted average voluntary prepayment rates[3] | 2.2 | 3.6 | 7.6 | 6.3 | 9.9 |
| Average credit enhancement[4] | 16.6 | 18.2 | 0.5 | 1.0 | — |
| **2007 & After:** | | | | | |
| Unpaid principal balance | $ 591 | $ — | $ — | $ — | $ 113 |
| Weighted average collateral default[1] | 77.6% | N/A | N/A | N/A | 42.2% |
| Weighted average collateral severities[2] | 66.8 | N/A | N/A | N/A | 59.5 |
| Weighted average voluntary prepayment rates[3] | 1.8 | N/A | N/A | N/A | 8.4 |
| Average credit enhancement[4] | 32.4 | N/A | N/A | N/A | 25.3 |
| **Total** | | | | | |
| Unpaid principal balance | $ 13,617 | $ 2,872 | $ 4,883 | $ 2,521 | $ 6,151 |
| Weighted average collateral default[1] | 72.5% | 57.8% | 21.3% | 51.9% | 28.6% |
| Weighted average collateral severities[2] | 71.1 | 61.1 | 54.6 | 56.0 | 46.6 |
| Weighted average voluntary prepayment rates[3] | 2.7 | 5.9 | 11.0 | 7.0 | 10.6 |
| Average credit enhancement[4] | 21.9 | 20.1 | 8.4 | 8.1 | 5.9 |

[1] The expected remaining cumulative default rate of the collateral pool backing the securities, as a percentage of the current collateral unpaid principal balance, weighted by security unpaid principal balance.

[2] The expected remaining loss given default of the collateral pool backing the securities, calculated as the ratio of remaining cumulative loss divided by cumulative defaults, weighted by security unpaid principal balance.

[3] The average monthly voluntary prepayment rate, weighted by security unpaid principal balance.

[4] The average percent current credit enhancement provided by subordination of other securities. Excludes excess interest projections and monoline bond insurance.

110

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Maturity Information*

The following table displays the amortized cost and fair value of our AFS securities by major security type and remaining maturity, assuming no principal prepayments, as of March 31, 2012. Contractual maturity of mortgage-backed securities is not a reliable indicator of their expected life because borrowers generally have the right to prepay their obligations at any time.

| | | | As of March 31, 2012 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total Amortized Cost | Total Fair Value | One Year or Less | | After One Year Through Five Years | | After Five Years Through Ten Years | | After Ten Years | |
| | | | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
| | | | | | (Dollars in millions) | | | | | |
| Fannie Mae | $ 13,501 | $14,625 | $ — | $ — | $ 28 | $ 29 | $ 1,544 | $ 1,641 | $ 11,929 | $12,955 |
| Freddie Mac | 11,053 | 11,943 | 2 | 2 | 46 | 49 | 1,125 | 1,211 | 9,880 | 10,681 |
| Ginnie Mae | 744 | 866 | — | — | 1 | 1 | 4 | 5 | 739 | 860 |
| Alt-A private-label securities | 12,895 | 11,589 | — | — | 1 | 1 | 218 | 222 | 12,676 | 11,366 |
| Subprime private-label securities | 9,263 | 7,595 | — | — | — | — | — | — | 9,263 | 7,595 |
| CMBS | 13,612 | 14,068 | 62 | 64 | 8,248 | 8,588 | 5,003 | 5,133 | 299 | 283 |
| Mortgage revenue bonds | 9,793 | 9,739 | 58 | 59 | 346 | 355 | 729 | 744 | 8,660 | 8,581 |
| Other mortgage-related securities | 3,610 | 3,354 | — | — | — | — | — | 12 | 3,610 | 3,342 |
| Total | $ 74,471 | $73,779 | $ 122 | $125 | $ 8,670 | $ 9,023 | $ 8,623 | $8,968 | $ 57,056 | $55,663 |

*Accumulated Other Comprehensive Loss*

The following table displays our accumulated other comprehensive loss by major categories as of March 31, 2012 and December 31, 2011.

| | As of | |
|---|---|---|
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Net unrealized gains on available-for-sale securities for which we have not recorded other-than-temporary impairment, net of tax | $ 1,201 | $ 1,152 |
| Net unrealized losses on available-for-sale securities for which we have recorded other-than-temporary impairment, net of tax | (1,647) | (1,953) |
| Other losses | (427) | (434) |
| Accumulated other comprehensive loss | $ (873) | $ (1,235) |

111

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table displays the activity in other comprehensive income, net of tax, by major categories for the three months ended March 31, 2012 and 2011.

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (Dollars in millions) | |
| Comprehensive income (loss): | | |
| Net income (loss) | $2,718 | $(6,471) |
| Other comprehensive income (loss), net of tax: | | |
| Changes in net unrealized losses on available-for-sale securities (net of tax of $196 and $87, respectively) | 319 | 161 |
| Reclassification adjustment for other-than-temporary impairments recognized in net income (loss) (net of tax of $22 and $13, respectively) | 42 | 32 |
| Reclassification adjustment for gains included in net income (loss) (net of tax of $3 and $8, respectively) | (6) | (14) |
| Other | 7 | 2 |
| Other comprehensive income | 362 | 181 |
| Total comprehensive income (loss) | $ 3,080 | $(6,290) |

**6. Financial Guarantees**

We recognize a guaranty obligation for our obligation to stand ready to perform for our guarantees to unconsolidated trusts and other guaranty arrangements. These guarantees expose us to credit losses on the mortgage loans or, in the case of mortgage-related securities, the underlying mortgage loans of the related securities. The contractual terms of our guarantees range from 30 days to 40 years. However, the actual term of each guaranty may be significantly less than the contractual term based on the prepayment characteristics of the related mortgage loans.

For those guarantees recognized in our condensed consolidated balance sheets, our maximum potential exposure under these guarantees is primarily comprised of the unpaid principal balance of the underlying mortgage loans, which totaled $59.2 billion and $59.4 billion as of March 31, 2012 and December 31, 2011, respectively.

In addition, we had maximum potential exposure of $9.0 billion and $9.3 billion for other guarantees not recognized in our condensed consolidated balance sheets as of March 31, 2012 and December 31, 2011, respectively, which primarily represents the unpaid principal balance of loans underlying guarantees issued prior to the effective date of current accounting guidance on guaranty accounting.

The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees recognized in our condensed consolidated balance sheets was $14.1 billion as of March 31, 2012 and December 31, 2011. The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees not recognized in our condensed consolidated balance sheets was $3.9 billion and $4.0 billion as of March 31, 2012 and December 31, 2011, respectively. Recoverability of such credit enhancements and recourse is subject to, among other factors, our mortgage insurers' and financial guarantors' ability to meet their obligations to us.

The fair value of our guaranty obligations associated with the Fannie Mae MBS included in "Investments in securities" was $2.1 billion and $2.2 billion as of March 31, 2012 and December 31, 2011, respectively.

112

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

### Risk Characteristics of our Book of Business

We gauge our performance risk under our guaranty based on the delinquency status of the mortgage loans we hold in portfolio, or in the case of mortgage-backed securities, the mortgage loans underlying the related securities.

For single-family loans, management monitors the serious delinquency rate, which is the percentage of single-family loans three or more months past due or in the foreclosure process, and loans that have higher risk characteristics, such as high mark-to-market LTV ratios.

For multifamily loans, management monitors the serious delinquency rate, which is the percentage of loans 60 days or more past due and loans that have higher risk characteristics, to determine our overall credit quality indicator. Higher risk characteristics include, but are not limited to, original debt service coverage ratios ("DSCR") below 1.10, current DSCR below 1.0, and high original and current estimated LTV ratios. We stratify multifamily loans into different internal risk categories based on the credit risk inherent in each individual loan.

For single and multifamily loans, we use this information, in conjunction with housing market and economic conditions, to structure our pricing and our eligibility and underwriting criteria to reflect the current risk of loans with these higher-risk characteristics, and in some cases we decide to significantly reduce our participation in riskier loan product categories. Management also uses this data together with other credit risk measures to identify key trends that guide the development of our loss mitigation strategies.

The following tables display the current delinquency status and certain higher risk characteristics of our single-family conventional and total multifamily guaranty book of business as of March 31, 2012 and December 31, 2011.

| | As of March 31, 2012[1] | | | As of December 31, 2011[1] | | |
|---|---|---|---|---|---|---|
| | 30 Days Delinquent | 60 Days Delinquent | Seriously Delinquent[2] | 30 Days Delinquent | 60 Days Delinquent | Seriously Delinquent[2] |
| Percentage of single-family conventional guaranty book of business[3] | 1.64% | 0.59% | 4.19% | 1.98% | 0.73% | 4.47% |
| Percentage of single-family conventional loans[4] | 1.78 | 0.59 | 3.67 | 2.17 | 0.74 | 3.91 |

113

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | As of | | | |
|---|---|---|---|---|
| | March 31, 2012[1] | | December 31, 2011[1] | |
| | Percentage of Single-Family Conventional Guaranty Book of Business[3] | Percentage Seriously Delinquent [2][4] | Percentage of Single-Family Conventional Guaranty Book of Business[3] | Percentage Seriously Delinquent[2][4] |
| Estimated mark-to-market | | | | |
| loan-to-value ratio greater than 100% | 19% | 12.77% | 18% | 13.76% |
| **Geographical distribution:** | | | | |
| Arizona | 2 | 3.22 | 2 | 3.65 |
| California | 19 | 2.24 | 19 | 2.46 |
| Florida | 6 | 11.35 | 6 | 11.80 |
| Nevada | 1 | 7.06 | 1 | 7.42 |
| Select Midwest states[5] | 10 | 4.02 | 10 | 4.39 |
| All other states | 62 | 3.01 | 62 | 3.18 |
| **Product distribution:** | | | | |
| Alt-A | 6 | 12.03 | 7 | 12.43 |
| Subprime | * | 21.67 | * | 23.18 |
| **Vintages:** | | | | |
| 2005 | 7 | 7.23 | 7 | 7.27 |
| 2006 | 6 | 11.58 | 7 | 11.81 |
| 2007 | 9 | 12.27 | 10 | 12.62 |
| 2008 | 6 | 5.74 | 7 | 5.64 |
| All other vintages | 72 | 1.49 | 69 | 1.59 |

*  Represents less than 0.5% of the single-family conventional guaranty book of business.

[1]  Consists of the portion of our single-family conventional guaranty book of business for which we have detailed loan level information, which constituted approximately 99% of our total single-family conventional guaranty book of business as of March 31, 2012 and December 31, 2011.

[2]  Consists of single-family conventional loans that were three months or more past due or in the foreclosure process, as of the dates indicated.

[3]  Calculated based on the aggregate unpaid principal balance of single-family conventional loans for each category divided by the aggregate unpaid principal balance of loans in our single-family conventional guaranty book of business.

[4]  Calculated based on the number of single-family conventional loans that were delinquent divided by the total number of loans in our single-family conventional guaranty book of business.

[5]  Consists of Illinois, Indiana, Michigan, and Ohio.

| | As of | | | |
|---|---|---|---|---|
| | March 31, 2012[1][2] | | December 31, 2011[1][2] | |
| | 30 Days Delinquent | Seriously Delinquent[3] | 30 Days Delinquent | Seriously Delinquent[3] |
| Percentage of multifamily guaranty book of business | 0.09% | 0.37% | 0.11% | 0.59% |

114

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | As of | | | |
|---|---|---|---|---|
| | March 31, 2012[1][2] | | December 31, 2011[1][2] | |
| | Percentage of Multifamily Guaranty Book of Business | Percentage Seriously Delinquent[3] | Percentage of Multifamily Guaranty Book of Business | Percentage Seriously Delinquent[3] |
| **Original loan-to-value ratio:** | | | | |
| Greater than 80% | 4% | 0.75% | 5% | 2.51% |
| Less than or equal to 80% | 9 6 | 0.36 | 9 5 | 0.49 |
| **Original debt service coverage ratio:** | | | | |
| Less than or equal to 1.10 | 8 | 0.17 | 8 | 0.24 |
| Greater than 1.10 | 92 | 0.39 | 92 | 0.62 |
| **Current debt service coverage ratio** | | | | |
| less than 1.0[4] | 7 | 2.45 | 7 | 3.66 |

[1] Consists of the portion of our multifamily guaranty book of business for which we have detailed loan level information, which constituted approximately 99% of our total multifamily guaranty book of business as of March 31, 2012 and December 31, 2011, excluding loans that have been defeased.

[2] Calculated based on the aggregate unpaid principal balance of multifamily loans for each category divided by the aggregate unpaid principal balance of loans in our multifamily guaranty book of business.

[3] Consists of multifamily loans that were 60 days or more past due as of the dates indicated.

[4] Our estimates of current DSCRs are based on the latest available income information for these properties. Although we use the most recently available results of our multifamily borrowers, there is a lag in reporting, which typically can range from 6 to 18 months as they prepare their results in the normal course of business.

## 7. Acquired Property, Net

Acquired property, net consists of held for sale foreclosed property received in full satisfaction of a loan, net of a valuation allowance for declines in the fair value of the properties after initial acquisition. We classify properties as held for sale when we intend to sell the property and are actively marketing it for sale. The following table displays the activity in acquired property and the related valuation allowance for the three months ended March 31, 2012, and 2011.

| | For the Three Months Ended March 31, 2012 | | | For the Three Months Ended March 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Acquired Property | Valuation Allowance[1] | Acquired Property, Net | Acquired Property | Valuation Allowance[1] | Acquired Property, Net |
| | | | (Dollars in millions) | | | |
| Beginning balance, January 1 | $ 12,401 | $ (1,028) | $ 11,373 | $ 18,054 | $ (1,881) | $ 16,173 |
| Additions | 3,826 | (121) | 3,705 | 4,889 | (129) | 4,760 |
| Disposals | (4,818) | 518 | (4,300) | (6,015) | 730 | (5,285) |
| Write-downs, net of recoveries | — | (159) | (159) | — | (384) | (384) |
| Ending Balance, March 31 | $11,409 | $ (790) | $ 10,619 | $16,928 | $ (1,664) | $ 15,264 |

[1] Reflects activities in the valuation allowance for acquired properties held primarily by our single-family segment.

115

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

**8.   Short-Term Borrowings and Long-Term Debt**

*Short-Term Borrowings*

The following table displays our outstanding short-term borrowings (borrowings with an original contractual maturity of one year or less) and weighted-average interest rates of these borrowings as of March 31, 2012 and December 31, 2011.

| | As of | | | |
| | March 31, 2012 | | December 31, 2011 | |
| | Outstanding | Weighted-Average Interest Rate[1] | Outstanding | Weighted-Average Interest Rate[1] |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| Fixed-rate short-term debt: | | | | |
| Discount notes[2] | $ 110,350 | 0.12% | $ 146,301 | 0.13% |
| Foreign exchange discount notes[3] | 422 | 2.05 | 371 | 1.88 |
| Other[4] | 80 | 0.04 | 80 | 0.04 |
| Total short-term debt of Fannie Mae | 110,852 | 0.13 | 146,752 | 0.13 |
| Debt of consolidated trusts | 4,495 | 0.11 | 4,973 | 0.09 |
| Total short-term debt | $115,347 | 0.13% | $151,725 | 0.13% |

[1]   Includes the effects of discounts, premiums, and other cost basis adjustments.

[2]   Represents unsecured general obligations with maturities ranging from overnight to 360 days from the date of issuance.

[3]   Represents foreign exchange discount notes we issue in the Euro commercial paper market with maturities ranging from 5 to 360 days which enable investors to hold short-term investments in different currencies. We do not incur foreign exchange risk on these transactions, as we simultaneously enter into foreign currency swaps that have the effect of converting debt that we issue in foreign denominated currencies into U.S. dollars.

[4]   Includes foreign exchange discount notes denominated in U.S. dollars.

*Intraday Lines of Credit*

We periodically use secured and unsecured intraday funding lines of credit provided by several large financial institutions. We post collateral which, in some circumstances, the secured party has the right to repledge to third parties. As these lines of credit are uncommitted intraday loan facilities, we may be unable to draw on them if and when needed. We had secured uncommitted lines of credit of $25.0 billion and unsecured uncommitted lines of credit of $500 million as of March 31, 2012 and December 31, 2011. We had no borrowings outstanding from these lines of credit as of March 31, 2012.

*Long-Term Debt*

Long-term debt represents borrowings with an original contractual maturity of greater than one year. The following table displays our outstanding long-term debt as of March 31, 2012 and December 31, 2011.

116

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | | | As of | | | |
|---|---|---|---|---|---|---|
| | **March 31, 2012** | | | **December 31, 2011** | | |
| | **Maturities** | **Outstanding** | **Weighted-Average Interest Rate[1]** | **Maturities** | **Outstanding** | **Weighted-Average Interest Rate[1]** |
| | | | (Dollars in millions) | | | |
| Senior fixed: | | | | | | |
| Benchmark notes and bonds | 2012-2030 | $ 275,342 | 2.67% | 2012-2030 | $ 277,146 | 2.81% |
| Medium-term notes[2] | 2012-2022 | 170,219 | 1.55 | 2012-2021 | 176,886 | 1.61 |
| Foreign exchange notes and bonds | 2021-2028 | 683 | 5.40 | 2021-2028 | 662 | 5.44 |
| Other[3][4] | 2012-2040 | 47,034 | 5.29 | 2012-2040 | 50,912 | 5.29 |
| Total senior fixed | | 493,278 | 2.53 | | 505,606 | 2.64 |
| Senior floating: | | | | | | |
| Medium-term notes[2] | 2012-2019 | 73,187 | 0.32 | 2012-2016 | 71,855 | 0.32 |
| Other[3][4] | 2020-2037 | 364 | 8.18 | 2020-2037 | 420 | 8.01 |
| Total senior floating | | 73,551 | 0.36 | | 72,275 | 0.35 |
| Subordinated fixed: | | | | | | |
| Qualifying subordinated[5] | 2012-2014 | 4,894 | 5.08 | 2012-2014 | 4,894 | 5.08 |
| Subordinated debentures | 2019 | 2,984 | 9.91 | 2019 | 2,917 | 9.91 |
| Total subordinated fixed | | 7,878 | 6.91 | | 7,811 | 6.88 |
| Secured borrowings[6] | 2021-2022 | 415 | 1.87 | — | — | — |
| Total long-term debt of Fannie Mae[7] | | 575,122 | 2.32 | | 585,692 | 2.42 |
| Debt of consolidated trusts[4] | 2012-2052 | 2,493,738 | 4.04 | 2012-2051 | 2,452,455 | 4.18 |
| Total long-term debt | | $3,068,860 | 3.71% | | $ 3,038,147 | 3.84% |

[1]  Includes the effects of discounts, premiums and other cost basis adjustments.

[2]  Includes long-term debt with an original contractual maturity of greater than 1 year and up to 10 years, excluding zero-coupon debt.

[3]  Includes long-term debt that is not included in other debt categories.

[4]  Includes a portion of structured debt instruments that is reported at fair value.

[5]  Consists of subordinated debt issued with an interest deferral feature.

[6]  Represents remaining liability for transfer of financial assets from our condensed consolidated balance sheets that did not qualify as a sale.

[7]  Reported amounts include a net discount and other cost basis adjustments of $8.4 billion and $9.2 billion as of March 31, 2012 and December 31, 2011, respectively.

**9.   Derivative Instruments**

Derivative instruments are an integral part of our strategy in managing interest rate risk. Derivative instruments may be privately negotiated contracts, which are often referred to as over-the-counter derivatives, or they may be listed and traded on an exchange. We typically do not settle the notional amount of our risk management derivatives; rather, notional amounts provide the basis for calculating actual payments or settlement amounts. The derivatives we use for interest rate risk management purposes consist primarily of interest rate swaps, interest rate options and foreign currency swaps.

117

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

We enter into forward purchase and sale commitments that lock in the future delivery of mortgage loans and mortgage-related securities at a fixed price or yield. Certain commitments to purchase mortgage loans and purchase or sell mortgage-related securities meet the criteria of a derivative. We typically settle the notional amount of our mortgage commitments that are accounted for as derivatives.

We recognize all derivatives as either assets or liabilities in our condensed consolidated balance sheets at their fair value on a trade date basis. Fair value amounts, which are netted to the extent a legal right of offset exists and is enforceable by law at the counterparty level and are inclusive of the right or obligation associated with the cash collateral posted or received, are recorded in "Other assets" or "Other liabilities" in our condensed consolidated balance sheets.

***Notional and Fair Value Position of our Derivatives***

The following table displays the notional amount and estimated fair value of our asset and liability derivative instruments as of March 31, 2012 and December 31, 2011.

118

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | As of March 31, 2012 | | | | As of December 31, 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| | Asset Derivatives | | Liability Derivatives | | Asset Derivatives | | Liability Derivatives | |
| | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value |
| | (Dollars in millions) | | | | | | | |
| Risk management derivatives: | | | | | | | | |
| Swaps: | | | | | | | | |
| Pay-fixed | $ 33,300 | $ 241 | $ 173,007 | $(15,510) | $ 30,950 | $ 102 | $155,807 | $(17,391) |
| Receive-fixed | 194,880 | 7,742 | 55,442 | (230) | 170,668 | 8,118 | 59,027 | (93) |
| Basis | 4,532 | 118 | 14,141 | (7) | 382 | 122 | 9,240 | (44) |
| Foreign currency | 601 | 146 | 503 | (56) | 581 | 155 | 451 | (62) |
| Swaptions: | | | | | | | | |
| Pay-fixed | 37,850 | 154 | 17,875 | (206) | 48,600 | 165 | 47,750 | (194) |
| Receive-fixed | 24,395 | 4,129 | 17,875 | (1,843) | 33,695 | 6,371 | 47,750 | (3,238) |
| Other[1] | 7,752 | 59 | 437 | (5) | 8,214 | 52 | 75 | — |
| Total gross risk management derivatives | 303,310 | 12,589 | 279,280 | (17,857) | 293,090 | 15,085 | 320,100 | (21,022) |
| Accrued interest receivable (payable) | — | 1,081 | — | (1,455) | — | 920 | — | (1,238) |
| Netting adjustment[2] | — | (13,524) | — | 19,053 | — | (15,829) | — | 21,898 |
| Total net risk management derivatives | $ 303,310 | $ 146 | $279,280 | $ (259) | $ 293,090 | $ 176 | $ 320,100 | $ (362) |
| Mortgage commitment derivatives: | | | | | | | | |
| Mortgage commitments to purchase whole loans | $ 3,623 | $ 15 | $ 8,723 | $ (38) | $ 9,710 | $ 73 | $ 422 | $ — |
| Forward contracts to purchase mortgage-related securities | 23,609 | 69 | 26,436 | (100) | 32,707 | 309 | 2,570 | (6) |
| Forward contracts to sell mortgage-related securities | 41,663 | 135 | 35,231 | (125) | 1,370 | 3 | 54,656 | (548) |
| Total mortgage commitment derivatives | $68,895 | $ 219 | $ 70,390 | $ (263) | $ 43,787 | $ 385 | $ 57,648 | $ (554) |
| Derivatives at fair value | $372,205 | $ 365 | $349,670 | $ (522) | $336,877 | $ 561 | $ 377,748 | $ (916) |

[1] Includes interest rate caps, futures, swap credit enhancements and mortgage insurance contracts that we account for as derivatives. The mortgage insurance contracts have payment provisions that are not based on a notional amount.

[2] The netting adjustment represents the effect of the legal right to offset under legally enforceable master netting agreements to settle with the same counterparty on a net basis, as well as cash collateral posted and received. Cash collateral posted was $6.0 billion and $6.8 billion as of March 31, 2012 and December 31, 2011, respectively. Cash collateral received was $515 million and $779 million as of March 31, 2012 and December 31, 2011, respectively.

A majority of our derivative instruments contain provisions that require our senior unsecured debt to maintain a minimum credit rating from S&P and Moody's. If our senior unsecured debt were to fall below established thresholds in our governing agreements, which range from A- to BBB+, we could be required to provide additional collateral to or terminate transactions with certain counterparties. The aggregate fair value of all derivatives with credit-risk-related contingent features that were in a net liability position as of March 31, 2012 was $6.1 billion, for which we posted collateral of $6.0 billion in the normal course of business. Had all of the credit-risk-related contingency features underlying these agreements been triggered, an additional $87 million of collateral would have been required to be posted as collateral or to immediately settle our positions based on the individual agreements and our fair value position as of March 31, 2012.

119

**Table of Contents**

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The aggregate fair value of all derivatives with credit risk-related contingent features that were in a net liability position as of December 31, 2011 was $7.2 billion, for which we posted collateral of $6.8 billion in the normal course of business. Had all of the credit risk-related contingency features underlying these agreements been triggered, an additional $362 million would have been required to be posted as collateral or to immediately settle our positions based on the individual agreements and our fair value position as of December 31, 2011.

We record all derivative gains and losses, including accrued interest, in "Fair value gains, net" in our condensed consolidated statements of operations and comprehensive income (loss). The following table displays, by type of derivative instrument, the fair value gains and losses, net on our derivatives for the three months ended March 31, 2012 and 2011.

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (Dollars in millions) | |
| Risk management derivatives: | | |
| Swaps: | | |
| Pay-fixed | $1,175 | $ 602 |
| Receive-fixed | (918) | (256) |
| Basis | 38 | 19 |
| Foreign currency | 1 | 30 |
| Swaptions: | | |
| Pay-fixed | (22) | (55) |
| Receive-fixed | (94) | (233) |
| Other[1] | (1) | 9 |
| Total risk management derivatives fair value gains, net | 179 | 116 |
| Mortgage commitment derivatives fair value (losses) gains, net | (205) | 23 |
| Total derivatives fair value (losses) gains, net | $ (26) | $ 139 |

[1] Includes interest rate caps, futures, swap credit enhancements and mortgage insurance contracts.

*Derivative Counterparty Credit Exposure*

Our derivative counterparty credit exposure relates principally to interest rate and foreign currency derivative contracts. We are exposed to the risk that a counterparty in a derivative transaction will default on payments due to us. If there is a default, we may need to acquire a replacement derivative from a different counterparty at a higher cost or may be unable to find a suitable replacement. We estimate our exposure to credit loss on derivative instruments by calculating the replacement cost, on a present value basis, to settle at current market prices all outstanding derivative contracts in a net gain position at the counterparty level where the right of legal offset exists. For derivative instruments where the right of legal offset does not exist, we calculate the replacement cost of the outstanding derivative contracts in a gain position at the transaction level. We manage our exposure by requiring counterparties to post collateral, which includes cash, U.S. Treasury securities, agency debt and agency mortgage-related securities.

120

**Table of Contents**

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The table below displays our counterparty credit exposure on outstanding risk management derivative instruments in a gain position by counterparty credit ratings, as well as the notional amount outstanding and the number of counterparties for all risk management derivatives as of March 31, 2012 and December 31, 2011.

| | As of March 31, 2012 | | | | |
| | Credit Rating[1] | | | | |
| | AA+/AA/AA- | A+/A | Subtotal[2] | Other[3] | Total |
|---|---|---|---|---|---|
| | (Dollars in millions) | | | | |
| Credit loss exposure[4] | $ 5 | $ 392 | $ 397 | $ 54 | $ 451 |
| Less: Collateral held[5] | — | 392 | 392 | — | 392 |
| Exposure net of collateral | $ 5 | $ — | $ 5 | $ 54 | $ 59 |
| Additional information: | | | | | |
|   Notional amount | $ 63,771 | $511,039 | $574,810 | $7,780 | $582,590 |
|   Number of counterparties | 6 | 10 | 16 | | |

| | As of December 31, 2011 | | | | |
| | Credit Rating[1] | | | | |
| | AA+/AA/AA- | A+/A | Subtotal[2] | Other[3] | Total |
|---|---|---|---|---|---|
| | (Dollars in millions) | | | | |
| Credit loss exposure[4] | $ — | $ 885 | $ 885 | $ 51 | $ 936 |
| Less: Collateral held[5] | — | 840 | 840 | — | 840 |
| Exposure net of collateral | $ — | $ 45 | $ 45 | $ 51 | $ 96 |
| Additional information: | | | | | |
|   Notional amount | $ 63,294 | $546,967 | $610,261 | $2,929 | $613,190 |
|   Number of counterparties | 6 | 10 | 16 | | |

[1] We manage collateral requirements based on the lower credit rating of the legal entity, as issued by S&P and Moody's. The credit rating reflects the equivalent S&P's rating for any ratings based on Moody's scale.

[2] We had exposure to 2 and 4 counterparties for interest rate and foreign currency derivatives in a net gain position as of March 31, 2012 and December 31, 2011, respectively. Those interest rate and foreign currency derivatives had notional balances of $2.4 billion and $127.5 billion as of March 31, 2012 and December 31, 2011, respectively.

[3] Includes defined benefit mortgage insurance contracts and swap credit enhancements accounted for as derivatives where the right of legal offset does not exist. Also includes exchange-traded derivatives, such as futures and interest rate swaps, which are settled daily through a clearinghouse.

[4] Represents the exposure to credit loss on derivative instruments, which we estimate using the fair value of all outstanding derivative contracts in a gain position. We net derivative gains and losses with the same counterparty where a legal right of offset exists under an enforceable master netting agreement. This table excludes mortgage loan commitments accounted for as derivatives.

[5] Represents both cash and non-cash collateral posted by our counterparties to us. Does not include collateral held in excess of exposure. We reduce the value of non-cash collateral in accordance with the counterparty agreements to help ensure recovery of any loss through the disposition of the collateral.

**10.  Segment Reporting**

Our three reportable segments are: Single-Family, Multifamily, and Capital Markets. We use these three segments to generate revenue and manage business risk, and each segment is based on the type of business activities it performs. We are working on reorganizing our company by function rather than by business in order

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

to improve our operational efficiencies and effectiveness. In future periods, we may change some of our management reporting and how we report our business segment results.

Under our segment reporting, the sum of the results for our three business segments does not equal our condensed consolidated statements of operations and comprehensive income (loss), as we separate the activity related to our consolidated trusts from the results generated by our three segments. Our segment financial results include directly attributable revenues and expenses. Additionally, we allocate to each of our segments: (1) capital using FHFA minimum capital requirements adjusted for over- or under-capitalization; (2) indirect administrative costs; and (3) a provision or benefit for federal income taxes. In addition, we allocate intracompany guaranty fee income as a charge from the Single-Family and Multifamily segments to Capital Markets for managing the credit risk on mortgage loans held by the Capital Markets group. We also include an eliminations/adjustments category to reconcile our business segment results and the activity related to our consolidated trusts to net income (loss) in our condensed consolidated statements of operations and comprehensive income (loss).

The following tables display our segment results for the three months ended March 31, 2012 and 2011.

| | For the Three Months Ended March 31, 2012 | | | | | |
| | Business Segments | | | Other Activity/Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments[2] | Total Results |
| | (Dollars in millions) | | | | | |
| Net interest (loss) income | $ (379) | $ (7) | $3,541 | $ 1,569 | $ 473[3] | $5,197 |
| (Provision) benefit for credit losses | (2,053) | 53 | — | — | — | (2,000) |
| Net interest (loss) income after provision for credit losses | (2,432) | 46 | 3,541 | 1,569 | 473 | 3,197 |
| Guaranty fee income (expense) | 1,911 | 243 | (332) | (1,159)[5] | (601)[5] | 62[5] |
| Investment gains, net | 1 | 6 | 1,007 | 27 | (925)[6] | 116 |
| Net other-than-temporary impairments | — | — | (64) | — | — | (64) |
| Fair value (losses) gains, net | (1) | — | 170 | 52 | 62[7] | 283 |
| Debt extinguishment (losses) gains, net | — | — | (70) | 36 | — | (34) |
| Gains from partnership investments | — | 11 | — | — | (1) | 10[8] |
| Fee and other income (expense) | 200 | 47 | 180 | (108) | (6) | 313 |
| Administrative expenses | (380) | (64) | (120) | — | — | (564) |
| Foreclosed property expense | (332) | (7) | — | — | — | (339) |
| Other expenses | (235) | (3) | (8) | — | (16) | (262) |
| Net (loss) income | (1,268) | 279 | 4,304 | 417 | (1,014) | 2,718 |
| Less: Net loss attributable to noncontrolling interest | — | — | — | — | 1[9] | 1 |
| Net (loss) income attributable to Fannie Mae | $(1,268) | $ 279 | $ 4,304 | $ 417 | $ (1,013) | $2,719 |

122

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | For the Three Months Ended March 31, 2011 | | | | | |
| | Business Segments | | | Other Activity/Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/Adjustments[2] | Total Results |
| | | | (Dollars in millions) | | | |
|---|---|---|---|---|---|---|
| Net interest (loss) income | $ (898) | $ (9) | $ 3,710 | $ 1,574 | $ 583[3] | $ 4,960 |
| (Provision) benefit for credit losses [4] | (10,618) | 64 | — | — | — | (10,554) |
| Net interest (loss) income after provision for credit losses | (11,516) | 55 | 3,710 | 1,574 | 583 | (5,594) |
| Guaranty fee income (expense) | 1,871 | 209 | (399) | (1,110)[5] | (521)[5] | 50[5] |
| Investment gains (losses), net | 1 | 4 | 870 | (26) | (774)[6] | 75 |
| Net other-than-temporary impairments | — | — | (44) | — | — | (44) |
| Fair value gains (losses), net | — | — | 218 | (33) | 104[7] | 289 |
| Debt extinguishment (losses) gains, net | — | — | (24) | 37 | — | 13 |
| Losses from partnership investments | — | (12) | — | — | — | (12)[8] |
| Fee and other income (expense) | 147 | 58 | 75 | (92) | (1) | 187 |
| Administrative expenses | (416) | (68) | (121) | — | — | (605) |
| Foreclosed property expense | (488) | — | — | — | — | (488) |
| Other (expenses) income | (318) | 6 | (9) | — | (19) | (340) |
| (Loss) income before federal income taxes | (10,719) | 252 | 4,276 | 350 | (628) | (6,469) |
| (Provision) benefit for federal income taxes | (2) | (5) | 5 | — | — | (2) |
| Net (loss) income attributable to Fannie Mae | $ (10,721) | $ 247 | $ 4,281 | $ 350 | $ (628) | $ (6,471) |

[1] Represents activity related to the assets and liabilities of consolidated trusts in our condensed consolidated balance sheets.

[2] Represents the elimination of intercompany transactions occurring between the three business segments and our consolidated trusts, as well as other adjustments to reconcile to our consolidated results.

[3] Represents the amortization expense of cost basis adjustments on securities that we own in our portfolio that on a GAAP basis are eliminated.

[4] Prior period amounts have been reclassified to conform to the current period presentation.

[5] Represents the guaranty fees paid from consolidated trusts to the Single-Family and Multifamily segments. The adjustment to guaranty fee income in the Eliminations/Adjustments column represents the elimination of the amortization of deferred cash fees related to consolidated trusts that were re-established for segment reporting. Total guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive income (loss).

[6] Primarily represents the removal of realized gains and losses on sales of Fannie Mae MBS classified as available-for-sale securities that are issued by consolidated trusts and retained in the Capital Markets portfolio. The adjustment also includes the removal of securitization gains (losses) recognized in the Capital Markets segment relating to portfolio securitization transactions that do not qualify for sale accounting under GAAP.

[7] Represents the removal of fair value adjustments on consolidated Fannie Mae MBS classified as trading that are retained in the Capital Markets portfolio.

[8] Gains (losses) from partnership investments are included in other expenses in our condensed consolidated statements of operations and comprehensive income (loss).

[9] Represents the adjustment from equity method accounting to consolidation accounting for partnership investments that are consolidated in our condensed consolidated balance sheets.

123

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

**11.   Concentrations of Credit Risk**

*Mortgage Seller/Servicers.*   Mortgage servicers collect mortgage and escrow payments from borrowers, pay taxes and insurance costs from escrow accounts, monitor and report delinquencies, and perform other required activities on our behalf. Our mortgage seller/servicers are also obligated to repurchase loans or foreclosed properties, or reimburse us for losses if the foreclosed property has been sold, under certain circumstances, such as if it is determined that the mortgage loan did not meet our underwriting or eligibility requirements, if loan representations and warranties are violated or if mortgage insurers rescind coverage. Our business with mortgage servicers is concentrated. Our ten largest single-family mortgage servicers, including their affiliates, serviced 74% of our single-family guaranty book of business as of March 31, 2012, compared with 75% as of December 31, 2011. Our ten largest multifamily mortgage servicers, including their affiliates, serviced 66% of our multifamily guaranty book of business as of March 31, 2012, compared with 67% as of December 31, 2011.

If a significant seller/servicer counterparty, or a number of seller/servicers fails to meet its obligations to us, it could result in a significant increase in our credit losses and have a material adverse affect on our results of operations, liquidity, financial condition and net worth.

*Mortgage Insurers.*   Mortgage insurance "risk in force" represents our maximum potential loss recovery under the applicable mortgage insurance policies. We had total mortgage insurance coverage risk in force of $91.2 billion on the single-family mortgage loans in our guaranty book of business as of March 31, 2012 and December 31, 2011, which represented 3% of our single-family guaranty book of business. Our primary mortgage insurance coverage risk in force was $87.3 billion as of March 31, 2012 and December 31, 2011. Our pool mortgage insurance coverage risk in force was $3.8 billion and $3.9 billion as of March 31, 2012 and December 31, 2011, respectively. Nine mortgage insurance companies provided over 99% of our mortgage insurance as of March 31, 2012 and December 31, 2011.

As of May 9, 2012, one of our mortgage insurance counterparties, PMI Mortgage Insurance Co. ("PMI"), has publicly disclosed that it is now in receivership. Three of our mortgage insurance counterparties—Triad Guaranty Insurance Corporation ("Triad"), Republic Mortgage Insurance Company ("RMIC"), and PMI—have publicly disclosed that they are in run-off. One mortgage insurer, Genworth Mortgage Insurance Corporation ("Genworth"), is currently operating pursuant to a waiver it received from its regulator of the state regulatory capital requirements applicable to its main insurance writing entity. An additional two of our mortgage insurers—Mortgage Guaranty Insurance Corporation ("MGIC") and Radian Guaranty, Inc. ("Radian")—have disclosed that, in the absence of additional capital contributions to their insurance writing entity, their capital might fall below state regulatory capital requirements in the future. These six mortgage insurers provided a combined $73.3 billion, or 80%, of our risk in force mortgage insurance coverage of our single-family guaranty book of business as of March 31, 2012.

The current weakened financial condition of our mortgage insurer counterparties creates an increased risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies. If we determine that it is probable that we will not collect all of our claims from one or more of these mortgage insurer counterparties, it could result in an increase in our loss reserves, which could adversely affect our earnings, liquidity, financial condition and net worth.

Our total loss reserves incorporate an estimated recovery amount from mortgage insurance coverage. We evaluate the financial condition of our mortgage insurer counterparties and adjust the contractually due mortgage insurance benefit for collectability in order to ensure that our total loss reserves reflect probable losses as of the balance sheet date. The following table displays our estimated benefit from mortgage insurers as of March 31, 2012, and December 31, 2011 that reduce our total loss reserves.

124

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | As of | |
|---|---|---|
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Contractual mortgage insurance benefit | $ 15,237 | $ 15,099 |
| Less: Collectability adjustment[1] | 2,571 | 2,867 |
| Estimated benefit included in total loss reserves | $12,666 | $ 12,232 |

[1] Represents an adjustment that reduces the contractual benefit for our assessment of our mortgage insurer counterparties' inability to fully pay the contractual mortgage insurance claims.

We had outstanding receivables of $3.7 billion recorded in "Other assets" in our condensed consolidated balance sheets as of March 31, 2012 and $3.6 billion as of December 31, 2011 related to amounts claimed on insured, defaulted loans that we have not yet received, of which $894 million as of March 31, 2012 and $639 million as of December 31, 2011 was due from our mortgage seller/servicers. We assessed the total outstanding receivables for collectability, and they are recorded net of a valuation allowance of $786 million as of March 31, 2012 and $570 million as of December 31, 2011. These mortgage insurance receivables are short-term in nature, having an average duration of approximately six months, and the valuation allowance reduces our claim receivable to the amount which is considered probable of collection as of March 31, 2012 and December 31, 2011.

We received proceeds under our primary and pool mortgage insurance policies for single-family loans of $1.3 billion during the three months ended March 31, 2012 and $1.6 billion during the three months ended March 31, 2011.

*Derivatives Counterparties.*    For information on credit risk associated with our derivatives transactions refer to "Note 9, Derivative Instruments."

**12.   Fair Value**

We use fair value measurements for the initial recording of certain assets and liabilities and periodic remeasurement of certain assets and liabilities on a recurring or nonrecurring basis.

*Fair Value Measurement*

Fair value measurement guidance defines fair value, establishes a framework for measuring fair value and sets forth disclosures around fair value measurements. This guidance applies whenever other accounting guidance requires or permits assets or liabilities to be measured at fair value. The guidance establishes a three-level fair value hierarchy that prioritizes the inputs into the valuation techniques used to measure fair value. The fair value hierarchy gives the highest priority, Level 1, to measurements based on unadjusted quoted prices in active markets for identical assets or liabilities. The next highest priority, Level 2, is given to measurements of assets and liabilities based on limited observable inputs or observable inputs for similar assets and liabilities. The lowest priority, Level 3, is given to measurements based on unobservable inputs.

Effective January 1, 2012, we adopted new accounting guidance that requires enhanced disclosures about fair value measurement. Upon adoption of the new fair value guidance, we made changes to the principal markets that we use to estimate the fair value of the following categories of mortgage loans: (a) for loans that have been modified but have been reperforming for nine months or more, we changed to the whole loan market; (b) for loans that are one month delinquent, we changed to the GSE securitization market; and (c) for loans that are two months and three months delinquent, we changed to the whole loan market. The impact of making these changes to our principal markets was a net decrease in the estimated fair value of our loans of $24.4 billion as of March 31, 2012.

125

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

In addition, we enhanced our fair value estimation process for HARP loans as of March 31, 2012 to use the modified build-up approach, as described in "Fair Value of Financial Instruments – HARP Loans." Previously, we measured the fair value of these loans using our standard build-up approach.  The impact of this enhancement was an increase in the estimated fair value of HARP loans of $7.4 billion as of March 31, 2012.

*Recurring Changes in Fair Value*

The following tables display our assets and liabilities measured in our condensed consolidated balance sheets at fair value on a recurring basis subsequent to initial recognition, including instruments for which we have elected the fair value option as of March 31, 2012 and December 31, 2011.

126

Table of Contents

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | Fair Value Measurements as of March 31, 2012 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| **Recurring fair value measurements:** | | | | | |
| Assets: | | | | | |
| Cash equivalents[2] | $ 3,250 | $ — | $ — | $ — | $ 3,250 |
| Trading securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae | — | 7,079 | 89 | — | 7,168 |
| Freddie Mac | — | 2,573 | 2 | — | 2,575 |
| Ginnie Mae | — | 286 | — | — | 286 |
| Alt-A private-label securities | — | 769 | 569 | — | 1,338 |
| Subprime private-label securities | — | — | 1,305 | — | 1,305 |
| CMBS | — | 10,417 | — | — | 10,417 |
| Mortgage revenue bonds | — | — | 668 | — | 668 |
| Other | — | — | 123 | — | 123 |
| Non-mortgage-related securities: | | | | | |
| U.S. Treasury securities | 50,030 | — | — | — | 50,030 |
| Asset-backed securities | — | 1,896 | — | — | 1,896 |
| Total trading securities | 50,030 | 23,020 | 2,756 | — | 75,806 |
| Available-for-sale securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae | — | 14,588 | 37 | — | 14,625 |
| Freddie Mac | — | 11,932 | 11 | — | 11,943 |
| Ginnie Mae | — | 866 | — | — | 866 |
| Alt-A private-label securities | — | 4,453 | 7,136 | — | 11,589 |
| Subprime private-label securities | — | — | 7,595 | — | 7,595 |
| CMBS | — | 14,068 | — | — | 14,068 |
| Mortgage revenue bonds | — | 7 | 9,732 | — | 9,739 |
| Other | — | 12 | 3,342 | — | 3,354 |
| Total available-for-sale securities | — | 45,926 | 27,853 | — | 73,779 |
| Mortgage loans of consolidated trusts | — | 2,021 | 2,271 | — | 4,292 |
| Other assets: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps | — | 9,181 | 147 | — | 9,328 |
| Swaptions | — | 4,283 | — | — | 4,283 |
| Other | 5 | — | 54 | — | 59 |
| Netting adjustment | — | — | — | (13,524) | (13,524) |
| Mortgage commitment derivatives | — | 217 | 2 | — | 219 |
| Total other assets | 5 | 13,681 | 203 | (13,524) | 365 |
| Total assets at fair value | $ 53,285 | $ 84,648 | $ 33,083 | $ (13,524) | $157,492 |

127

**Table of Contents**

**FANNIE MAE**
**(In conservatory)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | Fair Value Measurements as of March 31, 2012 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | | | (Dollars in millions) | | |
| Liabilities: | | | | | |
| Long-term debt: | | | | | |
|   Of Fannie Mae: | | | | | |
|     Senior fixed | $ — | $ 426 | $ — | $ — | $ 426 |
|     Senior floating | — | — | 399 | — | 399 |
|     Total of Fannie Mae | — | 426 | 399 | | 825 |
|   Of consolidated trusts | — | 3,329 | 950 | — | 4,279 |
| Total long-term debt | — | 3,755 | 1,349 | — | 5,104 |
| Other liabilities: | | | | | |
|   Risk management derivatives: | | | | | |
|     Swaps | — | 17,116 | 142 | — | 17,258 |
|     Swaptions | — | 2,049 | — | — | 2,049 |
|     Other | 5 | — | — | — | 5 |
|     Netting adjustment | — | — | — | (19,053) | (19,053) |
|   Mortgage commitment derivatives | — | 246 | 17 | — | 263 |
| Total other liabilities | 5 | 19,411 | 159 | (19,053) | 522 |
|   Total liabilities at fair value | $ 5 | $23,166 | $ 1,508 | $ (19,053) | $ 5,626 |

128

Table of Contents

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | Fair Value Measurements as of December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | | | (Dollars in millions) | | |
| **Assets:** | | | | | |
| Cash equivalents[2] | $ 600 | $ — | $ — | $ — | $ 600 |
| Trading securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae | — | 5,687 | 1,737 | — | 7,424 |
| Freddie Mac | — | 2,732 | — | — | 2,732 |
| Ginnie Mae | — | 278 | 9 | — | 287 |
| Alt-A private-label securities | — | 1,004 | 345 | — | 1,349 |
| Subprime private-label securities | — | — | 1,280 | — | 1,280 |
| CMBS | — | 10,411 | — | — | 10,411 |
| Mortgage revenue bonds | — | — | 724 | — | 724 |
| Other | — | — | 143 | — | 143 |
| Non-mortgage-related securities: | | | | | |
| U.S. Treasury securities | 47,737 | — | — | — | 47,737 |
| Asset-backed securities | — | 2,111 | — | — | 2,111 |
| Total trading securities | 47,737 | 22,223 | 4,238 | — | 74,198 |
| Available-for-sale securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae | — | 15,904 | 946 | — | 16,850 |
| Freddie Mac | — | 12,811 | 12 | — | 12,823 |
| Ginnie Mae | — | 902 | — | — | 902 |
| Alt-A private-label securities | — | 4,427 | 7,256 | — | 11,683 |
| Subprime private-label securities | — | — | 7,586 | — | 7,586 |
| CMBS | — | 14,026 | — | — | 14,026 |
| Mortgage revenue bonds | — | 7 | 10,247 | — | 10,254 |
| Other | — | 13 | 3,445 | — | 3,458 |
| Total available-for-sale securities | — | 48,090 | 29,492 | — | 77,582 |
| Mortgage loans of consolidated trusts | | 1,292 | 2,319 | | 3,611 |
| Other assets: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps | — | 9,247 | 170 | — | 9,417 |
| Swaptions | — | 6,536 | — | — | 6,536 |
| Other | — | 1 | 51 | — | 52 |
| Netting adjustment | — | — | — | (15,829) | (15,829) |
| Mortgage commitment derivatives | — | 368 | 17 | — | 385 |
| Total other assets | — | 16,152 | 238 | (15,829) | 561 |
| Total assets at fair value | $ 48,337 | $ 87,757 | $ 36,287 | $ (15,829) | $156,552 |

129

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | Fair Value Measurements as of December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| Liabilities: | | | | | |
| Long-term debt: | | | | | |
|   Of Fannie Mae: | | | | | |
|     Senior fixed | $ — | $ 432 | $ — | $ — | $ 432 |
|     Senior floating | — | — | 406 | — | 406 |
|   Total of Fannie Mae | — | 432 | 406 | | 838 |
|   Of consolidated trusts | — | 3,174 | 765 | — | 3,939 |
| Total long-term debt | — | 3,606 | 1,171 | — | 4,777 |
| Other liabilities: | | | | | |
|   Risk management derivatives: | | | | | |
|     Swaps | — | 18,661 | 167 | — | 18,828 |
|     Swaptions | — | 3,432 | — | — | 3,432 |
|     Netting adjustment | — | — | — | (21,898) | (21,898) |
|   Mortgage commitment derivatives | — | 548 | 6 | | 554 |
| Total other liabilities | — | 22,641 | 173 | (21,898) | 916 |
|     Total liabilities at fair value | $ — | $ 26,247 | $ 1,344 | $ (21,898) | $ 5,693 |

[1] Derivative contracts are reported on a gross basis by level. The netting adjustment represents the effect of the legal right to offset under legally enforceable master netting agreements to settle with the same counterparty on a net basis, as well as cash collateral.

[2] Cash equivalents are comprised of U.S. Treasury Bills that are classified as Level 1.

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following tables display a reconciliation of all assets and liabilities measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the three months ended March 31, 2012 and 2011. The tables also display gains and losses due to changes in fair value, including both realized and unrealized gains and losses, recognized in our condensed consolidated statements of operations and comprehensive income (loss) for Level 3 assets and liabilities for the three months ended March 31, 2012 and 2011. When assets and liabilities are transferred between levels, we recognize the transfer as of the end of the period.

|  | | | Fair Value Measurements Using Significant Unobservable Inputs (Level 3) For the Three Months Ended March 31, 2012 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | | Total Gains or (Losses) (Realized/Unrealized) | | | | | | | | Net Unrealized Gains (Losses) Included in Net Income (Loss) Related to Assets and Liabilities Still Held as of March 31, 2012(5) |
|  | Balance, December 31, 2011 | Included in Net Income (Loss) | Included in Other Comprehensive Income(1) | Purchases(2) | Sales(2) | Issues(3) | Settlements(3) | Transfers out of Level 3(4) | Transfers into Level 3(4) | Balance, March 31, 2012 |
|  | | | | (Dollars in millions) | | | | | | | |
| **Trading securities:** | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae | $ 1,737 | $ 5 | $ — | $ — | $ (33) | $ — | $ (104) | $ (1,581) | $ 65 | $ 89 | $ — |
| Freddie Mac | — | — | — | — | — | — | — | — | 2 | 2 | — |
| Ginnie Mae | 9 | — | — | — | — | — | — | (9) | — | — | — |
| Alt-A private-label securities | 345 | 13 | — | — | — | — | (17) | — | 228 | 569 | 13 |
| Subprime private-label securities | 1,280 | 59 | — | — | — | — | (34) | — | — | 1,305 | 59 |
| Mortgage revenue bonds | 724 | (54) | — | — | — | — | (2) | — | — | 668 | (55) |
| Other | 143 | (19) | — | — | — | — | (1) | — | — | 123 | (19) |
| Total trading securities | $ 4,238 | $ 4 | $ — | $ — | $ (33) | $ — | $ (158) | $ (1,590) | $ 295 | $ 2,756 | $ (2) |
| **Available-for-sale securities:** | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae | $ 946 | $ — | $ (8) | $ 1 | $ (1) | $ — | $ (16) | $ (895) | $ 10 | $ 37 | $ — |
| Freddie Mac | 12 | — | — | — | — | — | (1) | — | — | 11 | — |
| Alt-A private-label securities | 7,256 | (17) | 166 | — | — | — | (262) | (985) | 978 | 7,136 | — |
| Subprime private-label securities | 7,586 | 35 | 303 | — | — | — | (329) | — | — | 7,595 | — |
| Mortgage revenue bonds | 10,247 | 2 | (137) | — | (24) | — | (356) | — | — | 9,732 | — |
| Other | 3,445 | 6 | (26) | — | — | — | (83) | — | — | 3,342 | — |
| Total available-for-sale securities | $ 29,492 | $ 26 | $ 298 | $ 1 | $ (25) | $ — | $ (1,047) | $ (1,880) | $ 988 | $ 27,853 | $ — |
| Mortgage loans of consolidated trusts | $ 2,319 | $ 73 | $ — | 245 | $ — | $ — | (59) | (318) | 11 | 2,271 | 17 |
| Net derivatives | 65 | 7 | — | — | — | (3) | (25) | — | — | 44 | 3 |
| Long-term debt: | | | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | | | |
| Senior floating | $ (406) | $ 7 | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ (399) | $ 7 |
| Of consolidated trusts | (765) | (9) | — | — | — | (267) | 28 | 110 | (47) | (950) | (8) |
| Total long-term debt | $ (1,171) | $ (2) | $ — | $ — | $ — | $ (267) | $ 28 | $ 110 | $ (47) | $ (1,349) | $ (1) |

131

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

Fair Value Measurements Using Significant Unobservable Inputs (Level 3)
For the Three Months Ended March 31, 2011

| | Balance, December 31, 2010 | Included in Net Income (Loss) | Included in Other Comprehensive Income[1] | Purchases[2] | Sales[2] | Settlements[3] | Transfers out of Level 3[4] | Transfers into Level 3[4] | Balance, March 31, 2011 | Net Unrealized Gains (Losses) Included in Net Income (Loss) Related to Assets and Liabilities Still Held as of March 31, 2011[5] |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (Dollars in millions) | | | | | | |
| Trading securities: | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | |
| Fannie Mae | $ 2,202 | $ (13) | $ — | $ — | $ (15) | $ (132) | $ (391) | $ — | $ 1,651 | $ (10) |
| Alt-A private-label securities | 20 | — | — | — | — | (45) | — | — | 20 | — |
| Subprime private-label securities | 1,581 | 11 | — | — | — | (45) | — | — | 1,547 | 11 |
| Mortgage revenue bonds | 609 | — | — | — | — | (3) | — | — | 606 | 3 |
| Other | 152 | 4 | — | — | — | (1) | — | — | 155 | 4 |
| Non-mortgage-related: | | | | | | | | | | |
| Asset-backed securities | 12 | — | — | — | — | (3) | (9) | 2 | 2 | — |
| Total trading securities | $ 4,576 | $ 2 | $ — | $ — | $ (15) | $ (184) | $ (400) | $ 2 | $ 3,981 | $ 8 |
| Available-for-sale securities: | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | |
| Fannie Mae | $ 114 | $ — | $ 4 | $ 416 | $ (15) | $ (2) | $ (101) | $ 130 | $ 546 | $ — |
| Freddie Mac | 3 | — | — | — | — | — | — | 9 | 12 | — |
| Alt-A private-label securities | 7,049 | (2) | 104 | — | — | (258) | (317) | 660 | 7,236 | — |
| Subprime private-label securities | 9,932 | 130 | (58) | — | — | (344) | — | — | 9,660 | — |
| Mortgage revenue bonds | 11,030 | (2) | 21 | — | (42) | (475) | — | — | 10,532 | — |
| Other | 3,806 | 1 | 71 | — | — | (102) | — | — | 3,776 | — |
| Total available-for-sale securities | $ 31,934 | $ 127 | $ 142 | $ 416 | $ (57) | $ (1,181) | $ (418) | $ 799 | $ 31,762 | $ — |
| Mortgage loans of consolidated trusts | $ 2,207 | $ 11 | $ — | $ 15 | $ — | $ (79) | $ (6) | $ 73 | $ 2,221 | $ 11 |
| Net derivatives | 104 | 14 | — | — | — | — | — | — | 118 | 5 |
| Long-term debt: | | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | | |
| Senior floating | $ (421) | $ (22) | $ — | $ — | $ — | $ 20 | $ — | $ — | $ (423) | $ (22) |
| Of consolidated trusts | (627) | (35) | — | — | — | 22 | 22 | (49) | (667) | (35) |
| Total long-term debt | $ (1,048) | $ (57) | $ — | $ — | $ — | $ 42 | $ 22 | $ (49) | $ (1,090) | $ (57) |

[1]   Gains (losses) included in other comprehensive income are included in "Changes in unrealized losses on available-for-sale securities, net of reclassification adjustments and taxes" in the condensed consolidated statement of operations and comprehensive income (loss).

[2]   Purchases and sales include activity related to the consolidation and deconsolidation of assets of securitization trusts.

132

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

(3)   Issues and settlements include activity related to the consolidation and deconsolidation of liabilities of securitization trusts.

(4)   Transfers out of Level 3 consisted primarily of Fannie Mae guaranteed mortgage-related securities and private-label mortgage-related securities backed by Alt-A loans. Prices for these securities were obtained from third-party vendors supported by market observable inputs. Transfers into Level 3 consisted primarily of private-label mortgage-related securities backed by Alt-A loans. Prices for these securities are based on inputs from a single source or inputs that were not readily observable.

(5)   Amount represents temporary changes in fair value. Amortization, accretion and other-than-temporary impairments are not considered unrealized and are not included in this amount.

The following tables display realized and unrealized gains and losses included in our condensed consolidated statements of operations and comprehensive income (loss) for the three months ended March 31, 2012 and 2011, for our Level 3 assets and liabilities measured in our condensed consolidated balance sheets at fair value on a recurring basis.

| | For the Three Months Ended March 31, 2012 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Interest Income | Fair Value Gains, net | Net Other-than-Temporary Impairments | Other | Total |
| | (Dollars in millions) | | | | |
| Total realized and unrealized gains (losses) included in net income (loss) | $ 66 | $ 87 | $ (51) | $ 6 | $108 |
| Net unrealized gains related to Level 3 assets and liabilities still held as of March 31, 2012 | $ — | $ 17 | $ — | $— | $ 17 |

| | For the Three Months Ended March 31, 2011 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Interest Income | Fair Value Gains, net | Net Other-than-Temporary-Impairments | Other | Total |
| | (Dollars in millions) | | | | |
| Total realized and unrealized gains (losses) included in net income (loss) | $135 | $ (24) | $ (17) | $ 3 | $ 97 |
| Net unrealized losses related to Level 3 assets and liabilities still held as of March 31, 2011 | $ — | $ (33) | $ — | $— | $ (33) |

133

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Nonrecurring Changes in Fair Value*

The following table displays assets and liabilities measured in our condensed consolidated balance sheets at fair value on a nonrecurring basis; that is, the instruments are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances (for example, when we evaluate for impairment) as of March 31, 2012.

| | Fair Value Measurements As of March 31, 2012 | | | |
| --- | --- | --- | --- | --- |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value |
| | (Dollars in millions) | | | |
| **Nonrecurring fair value measurements:** | | | | |
| Assets: | | | | |
| Single-family mortgage loans held for investment, at amortized cost: [1] | | | | |
| Of Fannie Mae | $ — | $ — | $ 22,180 | $ 22,180 |
| Of consolidated trusts | — | — | 274 | 274 |
| Multifamily mortgage loans held for investment, at amortized cost: | | | | |
| Of Fannie Mae | — | — | 1,539 | 1,539 |
| Acquired property, net: | | | | |
| Single-family | — | — | 4,009 | 4,009 |
| Multifamily | — | — | 61 | 61 |
| Other assets | — | — | 438 | 438 |
| Total nonrecurring fair value measurements | $ — | $ — | $ 28,501 | $ 28,501 |

[1] Excludes estimated recoveries from mortgage insurance proceeds.

134

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table displays assets and liabilities measured in our condensed consolidated balance sheets at fair value on a nonrecurring basis and the gains or losses recognized for these assets and liabilities for the three months ended March 31, 2011.

| | Fair Value Measurements For the Three Months Ended March 31, 2011 | | | | For the Three Months Ended March 31, 2011 |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value | Total Losses |
| | (Dollars in millions) | | | | |
| Assets: | | | | | |
| Mortgage loans held for sale, at lower of cost or fair value | $ — | $ 89 | $ 131 | $ 220 | $ (5) |
| Single-family mortgage loans held for investment, at amortized cost: | | | | | |
| Of Fannie Mae | — | — | 27,265 | 27,265[1] | (1,014) |
| Of consolidated trusts | — | — | 633 | 633[1] | (80) |
| Multifamily mortgage loans held for investment, at amortized cost: | | | | | |
| Of Fannie Mae | — | — | 1,028 | 1,028[1] | (80) |
| Acquired property, net: | | | | | |
| Single-family | — | — | 12,114 | 12,114[2] | (811) |
| Multifamily | — | — | 93 | 93[2] | (16) |
| Other assets | | | 1,402 | 1,402 | (30) |
| Total assets at fair value | $ — | $ 89 | $ 42,666 | $ 42,755 | $ (2,036) |

[1] Includes $1.3 billion of mortgage loans held for investment that were liquidated or transferred to foreclosed properties as of March 31, 2011.

[2] Includes $4.1 billion of acquired properties that were sold or transferred as of March 31, 2011.

The following table displays valuation techniques and the range and weighted-average of significant unobservable inputs for our Level 3 assets and liabilities measured at fair value on a recurring basis as of March 31, 2012.

135

**Table of Contents**

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | | | | | |
|---|---|---|---|---|---|
| | | Fair Value Measurements as of March 31, 2012 | | | |
| | **Valuation Techniques** | **Significant Unobservable Inputs(1)** | **Range(1)** | **Weighted-Average(1)** | **Fair Value** |
| | | (Dollars in millions) | | | |
| **Recurring fair value measurements:** | | | | | |
| Trading securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Agency(2) | Consensus | | | | $   91 |
| Alt-A private-label securities | Discounted Cash Flow | Default Rate (%) | 5.2 - 18.1 | 13.6 | |
| | | Prepayment Speed (%) | 0.1 - 2.6 | 1.2 | |
| | | Severity (%) | 65.0 - 70.0 | 68.9 | |
| | | Spreads (bps) | 558.0 - 682.0 | 638.9 | 278 |
| | Single Vendor | | | | 239 |
| | Other | | | | 52 |
| Total Alt-A private-label securities | | | | | 569 |
| Subprime private-label securities | Discounted Cash Flow | Default Rate (%) | 11.3 - 24.1 | 16.4 | |
| | | Prepayment Speed (%) | 0.0 - 8.3 | 1.5 | |
| | | Severity (%) | 80.0 | 80.0 | |
| | | Spreads (bps) | 597.0 - 790.0 | 653.8 | 543 |
| | Consensus | Default Rate (%) | 15.0 - 20.4 | 17.4 | |
| | | Prepayment Speed (%) | 0.0 - 5.3 | 2.2 | |
| | | Severity (%) | 80.0 | 80.0 | |
| | | Spreads (bps) | 595.0 - 786.0 | 644.2 | 387 |
| | Consensus | | | | 375 |
| Total subprime private-label securities | | | | | 1,305 |
| Mortgage revenue bonds | Discounted Cash Flow | Spreads (bps) | 250.0 - 375.0 | 313.4 | 612 |
| | Other | | | | 56 |
| Total mortgage revenue bonds | | | | | 668 |
| Other | Other | | | | 123 |
| Total trading securities | | | | | $2,756 |

136

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | | Fair Value Measurements as of March 31, 2012 | | | |
|---|---|---|---|---|---|
| | Valuation Techniques | Significant Unobservable Inputs[1] | Range[1] | Weighted-Average[1] | Fair Value |
| | | (Dollars in millions) | | | |
| Available-for-sale securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Agency[2] | Other | | | | $ 48 |
| Alt-A private-label securities | Consensus | Default Rate (%) | 0.0 - 13.1 | 1.8 | |
| | | Prepayment Speed (%) | 0.1 - 23.6 | 10.5 | |
| | | Severity (%) | 50.0 - 70.0 | 52.4 | |
| | | Spreads (bps) | 295.0 - 725.0 | 441.6 | 3,045 |
| | Consensus | | | | 1,501 |
| | Discounted Cash Flow | Default Rate (%) | 0.0 - 29.4 | 8.0 | |
| | | Prepayment Speed (%) | 0.0 - 40.6 | 4.9 | |
| | | Severity (%) | 50.0 - 70.0 | 58.5 | |
| | | Spreads (bps) | 308.0 - 786.0 | 548.7 | 2,010 |
| | Single Vendor | | | | 350 |
| | Single Vendor | Default Rate (%) | 2.5 - 22.0 | 12.4 | |
| | | Prepayment Speed (%) | 0.4 - 3.0 | 1.1 | |
| | | Severity (%) | 65.0 | 65.0 | |
| | | Spreads (bps) | 555.0 - 821.0 | 673.3 | 142 |
| | Other | | | | 88 |
| Total Alt-A private-label securities | | | | | 7,136 |
| Subprime private-label securities | Consensus | Default Rate (%) | 0.0 - 25.9 | 15.1 | |
| | | Prepayment Speed (%) | 0.0 - 13.4 | 1.9 | |
| | | Severity (%) | 65.0 - 80.0 | 76.9 | |
| | | Spreads (bps) | 0.0 - 834.0 | 658.1 | 2,795 |
| | Consensus | | | | 2,296 |
| | Discounted Cash Flow | Default Rate (%) | 0.0 - 27.5 | 16.9 | |
| | | Prepayment Speed (%) | 0.0 - 10.9 | 1.7 | |
| | | Severity (%) | 65.0 - 80.0 | 77.9 | |
| | | Spreads (bps) | 527.0 - 840.0 | 652.4 | 2,098 |
| | Other | | | | 406 |
| Total subprime private-label securities | | | | | 7,595 |
| Mortgage revenue bonds | Single Vendor | | | | 7,746 |
| | Discounted Cash Flow | Spreads (bps) | 143.0 - 375.0 | 299.9 | 1,766 |
| | Other | | | | 220 |
| Total mortgage revenue bonds | | | | | 9,732 |
| Other | Consensus | Default Rate (%) | 5.0 - 12.1 | 5.0 | |
| | | Prepayment Speed (%) | 3.0 - 5.0 | 3.0 | |
| | | Severity (%) | 65.0 - 85.0 | 84.9 | |
| | | Spreads (bps) | 572.0 - 792.0 | 662.3 | 827 |
| | Consensus | | | | 825 |
| | Discounted Cash Flow | Default Rate (%) | 0.2 - 5.0 | 4.8 | |
| | | Prepayment Speed (%) | 3.0 - 11.0 | 3.4 | |
| | | Severity (%) | 50.0 - 85.0 | 84.0 | |
| | | Spreads (bps) | 541.0 - 786.0 | 632.9 | 713 |
| | Single Vendor | | | | 195 |
| | Other | | | | 782 |
| Total Other | | | | | 3,342 |
| Total available-for-sale securities | | | | | $ 27,853 |

137

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | | | Fair Value Measurements as of March 31, 2012 | | |
|---|---|---|---|---|---|
| | Valuation Techniques | Significant Unobservable Inputs[1] | Range[1] | Weighted-Average[1] | Fair Value |
| | | (Dollars in millions) | | | |
| Mortgage loans of consolidated trusts: | | | | | |
| Single-family | Build-Up | Default Rate (%) | 0.1 - 97.2 | 16.0 | |
| | | Prepayment Speed (%) | 8.4 - 96.7 | 30.1 | |
| | | Severity (%) | 8.7 - 100.0 | 39.2 | $ 1,437 |
| | Discounted Cash Flow | Default Rate (%) | 2.4 - 9.2 | 6.6 | |
| | | Prepayment Speed (%) | 0.0 - 8.9 | 5.0 | |
| | | Severity (%) | 50.0 - 70.0 | 61.9 | |
| | | Spreads (bps) | 0.0 - 789.0 | 641.5 | 284 |
| | Consensus | | | | 216 |
| | Consensus | Default Rate (%) | 0.0 - 6.7 | 4.0 | |
| | | Prepayment Speed (%) | 0.0 - 32.5 | 4.9 | |
| | | Severity (%) | 65.0 - 70.0 | 66.5 | |
| | | Spreads (bps) | 516.0 - 772.0 | 678.8 | 145 |
| | Single Vendor | | | | 50 |
| Total single-family | | | | | 2,132 |
| Multifamily | Build-Up | Spreads (bps) | 88.0 - 357.4 | 172.2 | 139 |
| Total mortgage loans of consolidated trusts | | | | | $ 2,271 |
| Net derivatives | Dealer Mark | | | | $ 148 |
| | Internal Model | | | | (84) |
| | Other | | | | (20) |
| Total net derivatives | | | | | $ 44 |
| Long-term debt: | | | | | |
| Of Fannie Mae: | | | | | |
| Senior floating | Discounted Cash Flow | | | | $ (399) |
| Of consolidated trusts | Consensus | | | | (321) |
| | Consensus | Default Rate (%) | 0.0 - 6.7 | 4.0 | |
| | | Prepayment Speed (%) | 0.0 - 32.5 | 4.9 | |
| | | Severity (%) | 50.0 - 70.0 | 66.4 | |
| | | Spreads (bps) | 516.0 - 772.0 | 676.9 | (157) |
| | Discounted Cash Flow | Default Rate (%) | 2.4 - 10.0 | 5.8 | |
| | | Prepayment Speed (%) | 0.0 - 100.0 | 22.8 | |
| | | Severity (%) | 50.0 - 70.0 | 60.9 | |
| | | Spreads (bps) | 0.0 - 789.0 | 545.5 | (315) |
| | Single Vendor | | | | (96) |
| | Other | | | | (61) |
| Total of consolidated trusts | | | | | (950) |
| Total long-term debt | | | | | $(1,349) |

[1] Valuation techniques for which no unobservable inputs are disclosed generally reflect the use of third-party pricing services or dealers, and the range of unobservable inputs applied by these sources is not readily available or cannot be reasonably estimated. Where we have disclosed unobservable inputs for consensus and single vendor techniques, those inputs are based on our validations performed at the security level.

[2] Includes Fannie Mae and Freddie Mac securities.

138

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table displays valuation techniques for our Level 3 assets measured at fair value on a nonrecurring basis as of March 31, 2012. The significant unobservable inputs related to these techniques primarily relate to collateral dependent valuations. The related ranges and weighted averages are not meaningful when aggregated as they vary significantly from property to property.

| | Fair Value Measurements as of March 31, 2012 | |
| --- | --- | --- |
| | Valuation Techniques | Fair Value |
| | (Dollars in millions) | |
| **Nonrecurring fair value measurements:** | | |
| Level 3 Assets: | | |
| Single-family mortgage loans held for investment, at amortized cost: | | |
| Of Fannie Mae | Internal Model | $ 22,180 |
| Of consolidated trusts | Internal Model | 274 |
| Multifamily mortgage loans held for investment, at amortized cost: | | |
| Of Fannie Mae | Appraisals | 276 |
| | Broker Price Opinions | 488 |
| | Asset Manager Estimate | 740 |
| | Other | 35 |
| Total of Fannie Mae | | 1,539 |
| Acquired property, net: | | |
| Single-family | Accepted Offers | 1,092 |
| | Appraisals | 569 |
| | Walk Forwards | 1,202 |
| | Internal Model | 1,058 |
| | Other | 88 |
| Total single-family | | 4,009 |
| Multifamily | Accepted Offers | 16 |
| | Appraisals | 20 |
| | Broker Price Opinions | 25 |
| Total multifamily | | 61 |
| Other assets | Accepted Offers | 176 |
| | Appraisals | 36 |
| | Walk Forwards | 38 |
| | Internal Model | 77 |
| | Other | 111 |
| Total other assets | | 438 |
| Total nonrecurring assets at fair value | | $ 28,501 |

We use valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs. The following is a description of the valuation techniques we use for fair value measurement and disclosure as well as our basis of classifying these measurements as Level 1, Level 2 or Level 3 of the valuation hierarchy.

139

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Cash Equivalents, Trading Securities and Available-for-Sale Securities*—These securities are recorded in our condensed consolidated balance sheets at fair value on a recurring basis. Fair value is measured using quoted market prices in active markets for identical assets, when available. Securities, such as U.S. Treasury Bills, whose value is based on quoted market prices in active markets for identical assets are classified as Level 1 of the valuation hierarchy.

We classify securities as Level 2 of the valuation hierarchy if quoted market prices in active markets for identical assets are not available. To estimate fair value, we use vendor prices provided by as many as three third-party pricing services which are calibrated to the quoted market prices in active markets for similar securities. The single vendor valuation technique utilizes one vendor price to estimate fair value. The consensus valuation technique utilizes an average of two or more vendors' prices to estimate fair value. In the absence of prices provided by third-party pricing services supported by observable market data, fair values are estimated using quoted prices of securities with similar characteristics or a discounted cash flow technique that uses inputs such as default rates, prepayment speed, loss severity and spreads based on market assumptions where available. Such instruments are generally classified as Level 2 of the valuation hierarchy.

For all valuation techniques used for securities where there is limited activity or less transparency around these inputs to the valuation, these securities are classified as Level 3 of the valuation hierarchy.

For agency and private-label securities, an increase in unobservable prepayment speeds in isolation would generally result in an increase in fair value, and an increase in unobservable spreads, severity rates or default rates in isolation would generally result in a decrease in fair value. For mortgage revenue bonds classified as Level 3 of the valuation hierarchy, an increase in unobservable spreads would result in a decrease in fair value. Although the sensitivities of the fair value of our recurring Level 3 securities of the valuation hierarchy to various unobservable inputs are discussed above in isolation, interrelationships exist among these inputs such that a change in one unobservable input typically results in a change to one or more of the other inputs.

*Mortgage Loans Held for Investment*—The majority of HFI loans are reported in our condensed consolidated balance sheets at the principal amount outstanding, net of cost basis adjustments and an allowance for loan losses. We estimate the fair value of HFI loans using the build-up and consensus valuation techniques, as discussed below, for periodic disclosure of financial instruments as required by GAAP. For our remaining loans, which include those containing embedded derivatives that would otherwise require bifurcation and consolidated loans of senior-subordinated trust structures, we elect the fair value option and therefore, we record these loans at fair value in our condensed consolidated balance sheets. We measure these loans on a recurring basis using the build-up, consensus, discounted cash flow and single vendor price techniques. Certain impaired loans are measured at fair value on a nonrecurring basis by using the fair value of their underlying collateral. Specific techniques used include internal models, broker price opinions and appraisals.

A description of our valuation techniques is as follows:

Build-Up:   The fair value of performing loans represents an estimate of the prices we would receive if we were to securitize those loans and is determined based on comparisons to Fannie Mae MBS with similar characteristics, either on a pool or loan level. We use the observable market values of our Fannie Mae MBS determined primarily from third-party pricing services, quoted market prices in active markets for similar securities, and other observable market data as a base value. In the build-up valuation technique we start with the base value for our Fannie Mae MBS then we add or subtract the fair value of the associated guaranty asset, guaranty obligation ("GO") and master servicing arrangement. We set the GO equal to the estimated fair value we would receive if we were to issue our guaranty to an unrelated party in a stand-alone arm's length transaction at the measurement date. We estimate the fair value of the GO using our internal GO valuation models, which calculate the present value of expected cash flows based on management's best estimate of certain key

140

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

assumptions such as current mark-to-market LTV ratios, future house prices, default rates, severity rates and required rate of return. We may further adjust the model values based on our current market pricing when such transactions reflect credit characteristics that are similar to our outstanding GO. These loans are generally classified as Level 2 of the valuation hierarchy to the extent that significant inputs are observable. To the extent that unobservable inputs are significant, the loans are classified as Level 3 of the valuation hierarchy.

Consensus:    The fair value of single-family nonperforming loans represents an estimate of the prices we would receive if we were to sell these loans in the nonperforming whole-loan market. These nonperforming loans are either two or more months delinquent, in an open modification period, or in a closed modification state and have performed for twelve or fewer months. We calculate the fair value of nonperforming loans based on assumptions about key factors, including collateral value and mortgage insurance repayment. Collateral value is derived from the current estimated mark-to-market LTV ratio of the individual loan along with a state-level distressed property sales discount. Mortgage insurance is estimated by taking the loan-level coverage and adjusting it by the probability of repayment by the associated mortgage insurer. This probability is based on the credit rating of the mortgage insurance company. Using these assumptions, along with indicative bids for a representative sample of nonperforming loans, we estimate the fair value. The bids on sample loans are obtained from multiple active market participants. Fair value is estimated from the extrapolation of these indicative sample bids plus an amount for the recovery of any associated mortgage insurance estimated through our GO valuation models as described above. These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

Discounted Cash Flow:    We estimate the fair value of a portion of our senior-subordinated trust structures using discounted cash flow at the security level as a proxy for estimating loan fair value. This valuation technique uses unobservable inputs such as prepayment speeds, default rates, spreads, and loss severities to estimate the fair value of our securities. These inputs are weighted in a model that calculates the expected cash flow of the security which is used as the basis of fair value. These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

Single Vendor:    We estimate the fair value of a portion of our senior-subordinated trust structures using the single vendor valuation technique at the security level as a proxy for estimating loan fair value. This valuation technique estimates fair value based upon prices received from one specific vendor. These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

Internal Model:    We estimate the fair value of a portion of our single-family nonperforming loans using the value of the underlying collateral. The inputs into this internal model include property level data such as prior sales prices, tax assessment values, property characteristics, and historical foreclosure sales data. This internal model takes one of two approaches when valuing foreclosed properties. The first approach relies on comparable foreclosed property sales, where the value of the target property is the weighted average price of comparable foreclosed property sales. The weights in the comparable sales approach are determined by various factors such as geographic distance, transaction time, and the value difference. The second approach relies on model calibrations that consider the target property's attributes such as prior sales prices, tax assessment values, and property characteristics to derive the foreclosed property values. In the second approach, we build separate predictive models for each Metropolitan Statistical Area ("MSA"). Specifically, we use the data of prior sales prices, tax assessment values, property characteristics, and historical foreclosure sales to calibrate the models in each MSA. We can use the available data about that property and our MSA-level model to estimate the fair value for a given property. The majority of the internal model valuations come from the comparable sales approach. The determination of whether the internal model valuations in a particular geographic area should use the comparable sales approach or model calibration is based on the quarterly evaluation of these two approaches for valuation accuracy. The unobservable inputs used in this technique include model weights based upon

141

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

geographic distance, transaction time, and metropolitan statistics. When a physical address is not available, we estimate fair value using state-average foreclosed property values. These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

Appraisals:   For a portion of our multifamily loans, we use appraisals to estimate the fair value of the loan. There are three approaches used to estimate fair value of a specific property: (1) cost, (2) income capitalization and (3) sales comparison. This technique uses an average of the three estimates. The cost approach uses the insurable value as a basis. The unobservable inputs used in this model include the estimated cost to construct or replace multifamily properties in the closest localities available. The income capitalization approach estimates the fair value using the present value of the future cash flow expectations by applying an appropriate overall capitalization rate to the forecasted net operating income. The significant unobservable inputs used in this calculation include rental income, fees associated with rental income, expenses associated with the property including taxes, payroll, insurance and other items, and the capitalization rates which are determined through market extraction and DSCR. The sales comparison approach compares the prices paid for similar properties, the prices asked by owners and offers made. The unobservable inputs to this methodology include ratios of sales prices to annual gross income, price paid per unit and adjustments made based on financing, conditions of sale, and physical characteristics of the property. These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

Broker Price Opinion ("BPO"):   For a portion of our multifamily loans, we use BPO to estimate the fair value of the loan. This technique uses both current property value and the property value adjusted for stabilization. These approaches compute net operating income based on current rents and expenses and use a range of market capitalization rates to estimate property value. The unobservable inputs used in this technique are property net operating income and market capitalization rates to estimate property value. These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

Asset Manager Estimate ("AME"):   For a portion of our multifamily loans, AME is used to estimate the fair value of the loan. This technique uses the net operating income and tax assessments of the specific property as well as MSA-specific market capitalization rates and average per unit sales values to estimate property fair value. These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

An increase in prepayment speeds in isolation would generally result in an increase in the fair value of our mortgage loans classified as Level 3 of the valuation hierarchy, and an increase in severity rates, default rates, or spreads in isolation would generally result in a decrease in fair value. Although the sensitivities of the fair value of mortgage loans classified as Level 3 of the valuation hierarchy to various unobservable inputs are discussed above in isolation, interrelationships exist among these inputs such that a change in one unobservable input typically results in a change to one or more of the other inputs.

*Acquired Property, Net and Other Assets*—Acquired property, net represents foreclosed property received in full satisfaction of a loan net of a valuation allowance. Acquired property is initially recorded in our condensed consolidated balance sheets at its fair value less its estimated cost to sell. The initial fair value of foreclosed properties is determined using a hierarchy based on the reliability of available information. The hierarchy for single-family acquired property includes accepted offers, appraisals, broker price opinions and proprietary home price model values. The hierarchy for multifamily acquired property includes accepted offers, appraisals, and broker price opinions. We consider an accepted offer on a specific foreclosed property to be the best estimate of its fair value. If we have not accepted an offer on the property we use the highest available valuation methodology as described in our valuation hierarchy to determine fair value. While accepted offers represent an agreement in principle to transact, a significant portion of these agreements do not get executed for various reasons, and are therefore classified as Level 3 of the valuation hierarchy.

142

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

Third-party valuations can be obtained from either an appraisal or a broker price opinion. These valuations are kept current using a monthly walk forward process that updates them for any change in the value of the property. When accepted offers or third-party valuations are not available, we generally utilize the home price values determined using an internal model.

Subsequent to initial measurement, the foreclosed properties that we intend to sell are reported at the lower of the carrying amount or fair value less estimated costs to sell. Foreclosed properties classified as held for use, included in "Other Assets" in our condensed consolidated balance sheets, are depreciated and impaired when circumstances indicate that the carrying amount of the property is no longer recoverable. The fair values of our single-family foreclosed properties subsequent to initial measurement are determined using the same information hierarchy used for the initial fair value measurement.

The most commonly used techniques in our valuation of acquired property are proprietary home price model and appraisals (both current and walk forward). Based on the number of properties measured as of March 31, 2012, these methodologies comprised approximately 75% of our valuations, while accepted offers comprised approximately 23% of our valuations.

Acquired property is classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

A description of our valuation techniques to estimate the fair value of our acquired property is as follows.

*Single-family acquired property valuation techniques*

Appraisal:    An appraisal is an estimate of the value of a specific property by a certified or licensed appraiser, in accordance with the Uniform Standards of Professional Appraisal Practice. Data most commonly used is from the local Multiple Listing Service and includes properties currently listed for sale, properties under contract, and closed transactions. The appraiser performs an analysis that starts with these data points and then adjusts for differences between the comparable properties and the property being appraised, to arrive at an estimated value for the specific property. Adjustments are made for differences between comparable properties for unobservable inputs such as square footage, location, and condition of the property. The appraiser typically uses recent historical data for the estimate of value.

Broker Price Opinion:    This technique provides an estimate of what the property is worth based upon a real estate broker's knowledge. The broker uses research of pertinent data in the appropriate market, and a sales comparison approach that is similar to the appraisal process. The broker typically has insight into local market trends, such as the number of and terms of offers, lack of offers, increasing supply, shortage of inventory and overall interest in buying a home. This information, all of which is unobservable, is used along with recent and pending sales and current listings of similar properties to arrive at an estimate of value.

Appraisal and Broker Price Opinion Walk Forwards ("Walk Forwards"):    We use these techniques to adjust appraisal and broker price opinion valuations for changing market conditions by applying a walk forward factor based on local price movements since the time the third-party value was obtained. The majority of third-party values are updated by comparing the difference in our internal home price model from the month of the original appraisal/broker price opinion to the current period and by applying the resulting percentage change to the original value. If a price is not determinable through our internal home price model, we use our zip code level home price index to update the valuations.

Internal Model:    We use an internal model to estimate fair value for distressed properties. The valuation methodology and inputs used are described under "Mortgage Loans Held for Investment."

143

**Table of Contents**

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Multifamily acquired property valuation techniques*

<u>Appraisals:</u>   We use this method to estimate property values for distressed properties. The valuation methodology and inputs used are described under "Mortgage Loans Held for Investment."

<u>Broker Price Opinions:</u>   We use this method to estimate property values for distressed properties. The valuation methodology and inputs used are described under "Mortgage Loans Held for Investment."

*Derivatives Assets and Liabilities (collectively "Derivatives")* —Derivatives are recorded in our condensed consolidated balance sheets at fair value on a recurring basis. The valuation process for the majority of our risk management derivatives uses observable market data provided by third-party sources, resulting in Level 2 classification of the valuation hierarchy. Interest rate swaps are valued by referencing yield curves derived from observable interest rates and spreads to project and discount swap cash flows to present value. Option-based derivatives use a model that projects the probability of various levels of interest rates by referencing swaption and caplet volatilities provided by third party market makers/dealers. The projected cash flows of the underlying swaps of these option-based derivatives are discounted to present value using yield curves derived from observable interest rates and spreads. Exchange-traded futures are valued using market quoted prices, resulting in Level 1 classification of the valuation hierarchy. Certain highly complex structured swaps primarily use a single dealer mark due to lack of transparency in the market and may be modeled using observable interest rates and volatility levels as well as significant unobservable assumptions, resulting in Level 3 classification of the valuation hierarchy. Mortgage commitment derivatives use observable market data, quotes and actual transaction price levels adjusted for market movement, and are typically classified as Level 2 of the valuation hierarchy. Mortgage commitment derivatives that include adjustments for market movement that cannot be corroborated by observable market data are classified as Level 3 of the valuation hierarchy.

*Debt*—The majority of debt of Fannie Mae is recorded in our condensed consolidated balance sheets at the principal amount outstanding, net of cost basis adjustments. We elected the fair value option for certain structured debt instruments, which are recorded in our condensed consolidated balance sheets at fair value on a recurring basis.

We use third-party pricing services that reference observable market data such as interest rates and spreads to measure the fair value of debt, and thus classify that debt as Level 2 of the valuation hierarchy.

For structured debt instruments that are not valued by third-party pricing services, cash flows are evaluated taking into consideration any structured derivatives through which we have swapped out of the structured features of the notes. The resulting cash flows are discounted to present value using a yield curve derived from market prices observed for Fannie Mae Benchmark Notes and adjusted to reflect fair values at the offer side of the market. Market swaption volatilities are also referenced for the valuation of callable structured debt instruments. Since the derivatives considered in the valuations of these structured debt instruments are classified as Level 3 of the valuation hierarchy, the valuations of the structured debt instruments result in a Level 3 classification.

Certain consolidated MBS debt with embedded derivatives is recorded in our condensed consolidated balance sheets at fair value on a recurring basis. Consolidated MBS debt is traded in the market as MBS assets. Accordingly, we estimate the fair value of our consolidated MBS debt using quoted market prices in active markets for similar liabilities when traded as assets. The valuation methodology and inputs used in estimating the fair value of MBS assets are described under "Cash Equivalents, Trading Securities and Available-for-Sale Securities."

144

**Table of Contents**

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Valuation Control Processes*

We have control processes that are designed to ensure that our fair value measurements are appropriate and reliable, that they are based on observable inputs wherever possible and that our valuation approaches are consistently applied and the assumptions used are reasonable. Our control processes consist of a framework that provides for a segregation of duties and oversight of our fair value methodologies and valuations, as well as validation procedures.

The Pricing Group within our Finance Division is responsible for estimating the fair value of the majority of our financial assets and financial liabilities. These fair values are verified by our Price Verification Group, which is a control group separate from the group responsible for obtaining prices. Our Modeling and Analytics Group develops models that are used in estimating the fair value of assets and liabilities for financial reporting purposes. In addition, our Model Oversight Committee ("MOC") facilitates the cross-functional coordination and effectiveness of our modeling efforts in terms of research, model use and risk governance. The MOC is comprised of senior representatives from Underwriting and Pricing, Capital Markets, Credit Portfolio Management, Enterprise Risk Management, Finance and Modeling & Analytics and is chaired by our Chief Risk Officer. Our Model Risk Oversight Group is responsible for establishing risk management controls and for reviewing, validating and approving models used in the determination of fair value measurements for financial reporting. Fair value measurements for acquired property and collateral dependent loans are determined by other valuation groups in the Finance division.

Our Valuation Oversight Committee ("VOC") includes senior representation from our Capital Markets segment, our Enterprise Risk Office and our Finance division, and is responsible for providing overall governance for our valuation processes and results. The composition of the VOC is determined by the VOC chair, our Chief Financial Officer, with the objective of obtaining appropriate representation from finance, risk and select business units within Fannie Mae. Based on its review of valuation methodologies and fair value results for various financial instruments used for financial reporting, the VOC is responsible for advising the VOC Committee chair, who has the ultimate responsibility over all valuation processes and results. The VOC also reviews trend analysis for various financial assets and liabilities on a quarterly basis.

We use third-party vendor prices and dealer quotes to estimate fair value of some of our financial assets and liabilities. Third-party vendor prices are primarily used to estimate fair value for trading securities, available-for-sale securities, debt of Fannie Mae, and consolidated MBS debt. Our Pricing Group performs various review and validation procedures prior to utilizing these prices in our fair value estimation process. We verify selected prices, using a variety of methods, including corroborating the prices by reference to other independent market data, such as non-binding broker or dealer quotations, relevant benchmark indices, and prices of similar instruments. We also review prices for reasonableness based on variations from prices provided in previous periods, comparing prices to internally estimated prices, using primarily a discounted cash flow approach, and conducting relative value comparisons based on specific characteristics of securities.

We have discussions with the pricing services as part of our due diligence process in order to maintain a current understanding of the valuation processes and related assumptions and inputs that these vendors use in developing prices. The prices provided to us by third-party pricing services reflect the existence of market reliance upon credit enhancements, if any, and the current lack of liquidity in the marketplace. If we determine that a price provided to us is outside established parameters, we will further examine the price, including having follow-up discussions with the pricing service or dealer. If we conclude that a price is not valid, we will adjust the price for various factors, such as liquidity, bid-ask spreads and credit considerations. All of these procedures are executed before we use the prices in preparing our financial statements.

Our Price Verification Group is responsible for performing monthly independent price verification, primarily related to financial assets and financial liabilities that are priced by our Pricing Group. This is generally

145

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

accomplished by comparing the value that the Price Verification Group obtains through its own sources and methods with values provided by the Pricing Group. Alternatively, the Price Verification Group may perform reviews of the assumptions used by the Pricing Group to estimate the fair value of products we hold that have material estimation risk because observable market-based inputs do not exist. This group provides an update to the VOC on results, relevant market information and pricing trends, and significant valuation challenges and resolution of those challenges with the Pricing Group on a quarterly basis.

We have an internal property valuation function that utilizes an internal model to compare the values received on a property and assign a risk rating based on several factors including the deviation between the various values. Property valuations with risk ratings above a specified threshold are reviewed for reasonableness by a team of property valuation experts. The internal model that is used to assign a risk rating and the threshold specified is subject to VOC oversight. In addition, our Quality Control Group reviews the overall work performed and inspects a portion of the properties in major markets, for which the third-party valuations are obtained, in order to assess the quality of the valuations.

We calibrate the performance of our proprietary internal model using actual offers on our properties and recent observed transactions. The internal model's performance is reviewed on a monthly basis by the REO valuation team and is compared with the review performed by our Modeling and Analytics team on a quarterly basis. These review results are presented to the Model Risk Oversight Group, who performs a review and evaluation of the model performance on a quarterly basis. The results of the validation are also reviewed with the VOC on a quarterly basis.

Our Appraisal Review Group reviews appraisals to determine whether they have been performed in accordance with appraisal standards and the results are consistent with our observed transactions on similar properties. We and/or third-party servicers review broker price opinions to determine whether the values provided are consistent with our observed transactions on similar properties. We conduct quarterly portfolio reviews, annual audits and periodic reviews of the counterparties that provide services to review broker price opinions. In addition, valuation results and trend analyses are reviewed at least monthly by REO management.

146

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Fair Value of Financial Instruments*

The following table displays the carrying value and estimated fair value of our financial instruments as of March 31, 2012 and December 31, 2011. The fair value of financial instruments we disclose includes commitments to purchase multifamily and single-family mortgage loans which are off-balance sheet financial instruments that we do not record in our condensed consolidated balance sheets. The fair values of these commitments are included as "Mortgage loans held for investment, net of allowance for loan losses." The disclosure excludes certain financial instruments, such as plan obligations for pension and postretirement health care benefits, employee stock option and stock purchase plans, and also excludes all non-financial instruments. As a result, the fair value of our financial assets and liabilities does not represent the underlying fair value of our total consolidated assets and liabilities.

| | | Quoted Price in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjust-ment | Estimated Fair Value | December 31, 2011 | |
|---|---|---|---|---|---|---|---|---|
| | Carrying Value | | | | | | Carrying Value | Estimated Fair Value |
| | | | | As of March 31, 2012 (Dollars in millions) | | | | |
| **Financial assets:** | | | | | | | | |
| Cash and cash equivalents and restricted cash | $ 77,970 | $ 66,970 | $ 11,000 | $ — | $ — | $ 77,970 | $ 68,336 | $ 68,336 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 15,000 | — | 15,000 | — | — | 15,000 | 46,000 | 46,000 |
| Trading securities | 75,806 | 50,030 | 23,020 | 2,756 | — | 75,806 | 74,198 | 74,198 |
| Available-for-sale securities | 73,779 | — | 45,926 | 27,853 | — | 73,779 | 77,582 | 77,582 |
| Mortgage loans held for sale | 282 | — | 198 | 88 | — | 286 | 311 | 325 |
| Mortgage loans held for investment, net of allowance for loan losses: | | | | | | | | |
| Of Fannie Mae | 320,032 | — | 35,805 | 236,274 | — | 272,079 | 322,825 | 294,996 |
| Of consolidated trusts | 2,603,411 | — | 2,345,292 | 327,739 | — | 2,673,031 | 2,575,485 | 2,652,025 |
| Mortgage loans held for investment | 2,923,443 | — | 2,381,097 | 564,013 | — | 2,945,110 | 2,898,310 | 2,947,021 |
| Advances to lenders | 3,548 | — | 2,819 | 640 | — | 3,459 | 5,538 | 5,420 |
| Derivative assets at fair value | 365 | 5 | 13,681 | 203 | (13,524) | 365 | 561 | 561 |
| Guaranty assets and buy-ups | 497 | — | — | 920 | — | 920 | 503 | 901 |
| Total financial assets | $ 3,170,690 | $ 117,005 | $ 2,492,741 | $ 596,473 | $(13,524) | $ 3,192,695 | $ 3,171,339 | $ 3,220,344 |
| **Financial liabilities:** | | | | | | | | |
| Short-term debt: | | | | | | | | |
| Of Fannie Mae | $ 110,852 | $ — | $ 110,865 | $ — | $ — | $ 110,865 | $ 146,752 | $ 146,782 |
| Of consolidated trusts | 4,495 | — | — | 4,495 | — | 4,495 | 4,973 | 4,973 |
| Long-term debt: | | | | | | | | |
| Of Fannie Mae | 575,122 | — | 599,427 | 1,065 | — | 600,492 | 585,692 | 613,983 |
| Of consolidated trusts | 2,493,738 | — | 2,615,986 | 12,506 | — | 2,628,492 | 2,452,455 | 2,596,657 |
| Derivative liabilities at fair value | 522 | 5 | 19,411 | 159 | (19,053) | 522 | 916 | 916 |
| Guaranty obligations | 799 | — | — | 3,815 | — | 3,815 | 811 | 3,944 |
| Total financial liabilities | $3,185,528 | $ 5 | $ 3,345,689 | $ 22,040 | $(19,053) | $ 3,348,681 | $ 3,191,599 | $ 3,367,255 |

147

**Table of Contents**

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Financial Instruments for which fair value approximates carrying value—* We hold certain financial instruments that are not carried at fair value but for which the carrying value approximates fair value due to the short-term nature and negligible credit risk inherent in them. These financial instruments include cash and cash equivalents, the majority of advances to lenders and federal funds and securities sold/purchased under agreements to repurchase/resell (exclusive of dollar roll repurchase transactions).

*Federal funds and securities sold/purchased under agreements to repurchase/resell—* The carrying value for the majority of these specific instruments approximates the fair value due to the short-term nature and the negligible inherent credit risk, as they involve the exchange of liquid collateral. Were we to calculate the fair value of these instruments we would use observable inputs resulting in Level 2 classification.

*Mortgage Loans Held for Sale—* Loans are reported at the lower of cost or fair value in our condensed consolidated balance sheets. The valuation methodology and inputs used in estimating the fair value of HFS loans are the same as for our HFI loans and are described under "Fair Value Measurement –Mortgage Loans Held for Investment" and these loans are classified as Level 2 of the valuation hierarchy to the extent that significant inputs are observable. To the extent that significant inputs are unobservable, the loans are classified within Level 3 of the valuation hierarchy.

*Advances to Lenders—* The carrying value for the majority of our advances to lenders approximates fair value due to the short-term nature and the negligible inherent credit risk. Were we to calculate the fair value of these instruments we would use discounted cash flow models that use observable inputs such as spreads based on market assumptions, resulting in Level 2 classification.

Advances to lenders also include loans for which the carrying value does not approximate fair value. These loans do not qualify for Fannie Mae MBS securitization and are valued using market-based techniques including credit spreads, severities and prepayment speeds for similar loans, through third-party pricing services or through a model approach incorporating both interest rate and credit risk simulating a loan sale via a synthetic structure. We classify these valuations as Level 3 given that significant inputs are not observable or are determined by extrapolation of observable points.

*Guaranty Assets and Buy-ups—* Guaranty assets related to our portfolio securitizations are recorded in our condensed consolidated balance sheets at fair value on a recurring basis and are classified within Level 3 of the valuation hierarchy. Guaranty assets in lender swap transactions are recorded in our condensed consolidated balance sheets at the lower of cost or fair value. These assets, which are measured at fair value on a nonrecurring basis, are classified within Level 3 of the fair value hierarchy.

We estimate the fair value of guaranty assets based on the present value of expected future cash flows of the underlying mortgage assets using management's best estimate of certain key assumptions, which include prepayment speeds, forward yield curves, and discount rates commensurate with the risks involved. These cash flows are projected using proprietary prepayment, interest rate and credit risk models. Because guaranty assets are like an interest-only income stream, the projected cash flows from our guaranty assets are discounted using one-month LIBOR plus the option-adjusted spread ("OAS") for interest-only trust securities. The interest-only OAS is calibrated using prices of a representative sample of interest-only trust securities. We believe the remitted fee income is less liquid than interest-only trust securities and more like an excess servicing strip. We take a further discount of the present value for these liquidity considerations. This discount is based on market quotes from dealers.

The fair value of the guaranty assets includes the fair value of any associated buy-ups, which is estimated in the same manner as guaranty assets but is recorded separately as a component of "Other assets" in our condensed consolidated balance sheets.

148

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Guaranty Obligations*—The fair value of all guaranty obligations, measured subsequent to their initial recognition, is our estimate of a hypothetical transaction price we would receive if we were to issue our guaranty to an unrelated party in a standalone arm's-length transaction at the measurement date. These obligations are classified within Level 3. The valuation methodology and inputs used in estimating the fair value of the guaranty obligation are described under "Fair Value Measurement–Mortgage Loans Held for Investment–Build up."

*HARP Loans*—We measure the fair value of loans that are delivered under the Home Affordable Refinance Program ("HARP") using a modified build-up approach while the loan is performing. Under this modified approach, we set the credit component of the consolidated loans (i.e., the guaranty obligation) equal to the compensation we would currently receive for a loan delivered to us under the program because the total compensation for these loans is equal to their current exit price in the GSE securitization market. For a description of the build-up valuation methodology, refer to "Fair Value Measurement –Mortgage Loans Held for Investment." We will continue to use this pricing methodology as long as the HARP program is available to market participants. If, subsequent to delivery, the refinanced loan becomes past due or is modified as a part of a troubled debt restructuring, the fair value of the guaranty obligation is then measured consistent with other loans that have these characteristics.

The total compensation that we receive for the delivery of a HARP loan reflects the pricing that we are willing to offer because HARP is a part of a broader government program intended to provide assistance to homeowners and prevent foreclosures. If these benefits were not reflected in the pricing for these loans (that is, if the loans were valued using our standard build-up approach), the fair value disclosed in the table above would be lower by $7.4 billion as of March 31, 2012. The total fair value of the loans in our portfolio that have been refinanced under HARP as of March 31, 2012 as presented in the table above is $142.9 billion.

### Fair Value Option

We elected the fair value option for certain consolidated loans and debt instruments recorded in our condensed consolidated balance sheets. These instruments contain embedded derivatives that would otherwise require bifurcation. Under the fair value option, we elected to carry these instruments at fair value instead of bifurcating the embedded derivative from the respective loan or debt instrument.

We elected the fair value option for all long-term structured debt instruments that are issued in response to specific investor demand and have interest rates that are based on a calculated index or formula and are economically hedged with derivatives at the time of issuance. By electing the fair value option for these instruments, we are able to eliminate the volatility in our results of operations that would otherwise result from the accounting asymmetry created by recording these structured debt instruments at cost while recording the related derivatives at fair value.

We elected the fair value option for the financial assets and liabilities of the consolidated senior-subordinate trust structures. By electing the fair value option for these instruments, we are able to eliminate the volatility in our results of operations that would otherwise result from different accounting treatment between loans at cost and debt at cost.

Interest income for the mortgage loans is recorded in "Mortgage loans interest income" and interest expense for the debt instruments is recorded in "Long-term debt interest expense" in our condensed consolidated statements of operations and comprehensive income (loss).

149

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table displays the fair value and unpaid principal balance of the financial instruments for which we have made fair value elections as of March 31, 2012 and December 31, 2011.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | March 31, 2012 | | | December 31, 2011 | | |
| | Loans of Consolidated Trusts[1] | Long-Term Debt of Fannie Mae | Long-Term Debt of Consolidated Trusts[2] | Loans of Consolidated Trusts[1] | Long-Term Debt of Fannie Mae | Long-Term Debt of Consolidated Trusts[2] |
| | (Dollars in millions) | | | | | |
| Fair value | $ 4,292 | $ 825 | $ 4,279 | $ 3,611 | $ 838 | $ 3,939 |
| Unpaid principal balance | 4,758 | 712 | 4,391 | 4,122 | 712 | 4,012 |

[1] Includes nonaccrual loans with a fair value of $231 million and $195 million as of March 31, 2012 and December 31, 2011, respectively. The difference between unpaid principal balance and the fair value of these nonaccrual loans as of March 31, 2012 and December 31, 2011 is $232 million. Includes loans that are 90 days past due with a fair value of $382 million and $310 million as of March 31, 2012 and December 31, 2011, respectively. The difference between unpaid principal balance and the fair value of these 90 or more days past due loans as of March 31, 2012 and December 31, 2011 is $263 million and $262 million, respectively.

[2] Includes interest-only debt instruments with no unpaid principal balance and a fair value of $115 million as of March 31, 2012 and December 31, 2011.

*Changes in Fair Value under the Fair Value Option Election*

The following table displays fair value gains and losses, net, including changes attributable to instrument-specific credit risk, for loans and debt for which the fair value election was made. Amounts are recorded as a component of "Fair value gains, net" in our condensed consolidated statements of operations and comprehensive income (loss) for the three months ended March 31, 2012 and 2011.

| | For the Three Months Ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | | | 2011 | | |
| | Loans | Long-Term Debt | Total Gains (Losses) | Loans | Long-Term Debt | Total Gains (Losses) |
| | (Dollars in millions) | | | | | |
| Changes in instrument-specific credit risk | $ 66 | $ (2) | $ 64 | $(217) | $ (4) | $ (221) |
| Other changes in fair value | (65) | 60 | (5) | 65 | 33 | 98 |
| Fair value gains, net | $ 1 | $ 58 | $ 59 | $(152) | $ 29 | $ (123) |

In determining the changes in the instrument-specific credit risk for loans, the changes in the associated credit-related components of these loans, primarily the guaranty obligation, were taken into consideration with the overall change in the fair value of the loans for which we elected the fair value option for financial instruments. In determining the changes in the instrument-specific credit risk for debt, the changes in Fannie Mae debt spreads to LIBOR that occurred during the period were taken into consideration with the overall change in the fair value of the debt for which we elected the fair value option for financial instruments. Specifically, cash flows are evaluated taking into consideration any derivatives through which Fannie Mae has swapped out of the structured features of the notes and thus created a floating-rate LIBOR-based debt instrument. The change in value of these LIBOR-based cash flows based on the Fannie Mae yield curve at the beginning and end of the period represents the instrument-specific risk.

150

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

**13.   Commitments and Contingencies**

We are party to various types of legal actions and proceedings, including actions brought on behalf of various classes of claimants. We also are subject to regulatory examinations, inquiries and investigations and other information gathering requests. In some of the matters, indeterminate amounts are sought. Modern pleading practice in the U.S. permits considerable variation in the assertion of monetary damages or other relief. Jurisdictions may permit claimants not to specify the monetary damages sought or may permit claimants to state only that the amount sought is sufficient to invoke the jurisdiction of the trial court. This variability in pleadings, together with our and our counsel's actual experience in litigating or settling claims, leads us to conclude that the monetary relief that may be sought by plaintiffs bears little relevance to the merits or disposition value of claims.

On a quarterly and annual basis, we review relevant information about all pending legal actions and proceedings for the purpose of evaluating and revising our contingencies, reserves and disclosures.

Legal actions and proceedings of all types are subject to many uncertain factors that generally cannot be predicted with assurance. Accordingly, the outcome of any given matter and the amount or range of potential loss at particular points in time is frequently difficult to ascertain. Uncertainties can include how fact finders will evaluate documentary evidence and the credibility and effectiveness of witness testimony, and how trial and appellate courts will apply the law. Disposition valuations are also subject to the uncertainty of how opposing parties and their counsel view the evidence and applicable law. Further, FHFA adopted a regulation on June 20, 2011, which provides, in part, that while we are in conservatorship, FHFA will not pay claims by our current or former shareholders, unless the Director of FHFA determines it is in the interest of the conservatorship. The presence of this regulation and the Director of FHFA's assertion that FHFA will not pay claims asserted in certain cases discussed below while we are in conservatorship creates additional uncertainty in those cases.

We establish a reserve for those matters when a loss is probable and we can reasonably estimate the amount of such loss. Reserves have been established for certain of the matters noted below. These reserves did not have a material adverse effect on our financial statements. We note, however, that in light of the uncertainties involved in such actions and proceedings, there is no assurance that the ultimate resolution of these matters will not significantly exceed the reserves we have currently accrued.

For the remaining legal actions or proceedings, including those where there is only a reasonable possibility that a loss may be incurred, we are not currently able to estimate the reasonably possible losses or ranges of losses and we have not established a reserve with respect to those actions or proceedings. We are often unable to estimate the possible losses or ranges of losses, particularly for proceedings that are in their early stages of development, where plaintiffs seek substantial or indeterminate damages, where there may be novel or unsettled legal questions relevant to the proceedings, or where settlement negotiations have not occurred or progressed. Further, as noted above, FHFA's regulation and the Director of FHFA's assertion creates additional uncertainty with respect to certain cases.

Given the uncertainties involved in any action or proceeding, regardless of whether we have established a reserve, the ultimate resolution of certain of these matters may be material to our operating results for a particular period, depending on, among other factors, the size of the loss or liability imposed and the level of our net income or loss for that period. Based on our current knowledge with respect to the matters described below, we believe we have valid defenses to the claims in these proceedings and intend to defend these matters vigorously regardless of whether or not we have recorded a loss reserve.

In addition to the matters specifically described below, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that we do not expect will have a material impact on our business or financial condition. We have advanced fees and expenses of certain current and former officers and directors in connection with various legal proceedings pursuant to indemnification agreements.

151

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

### *In re Fannie Mae Securities Litigation*

Fannie Mae is a defendant in a consolidated class action lawsuit initially filed in 2004 and currently pending in the U.S. District Court for the District of Columbia. In the consolidated complaint filed on March 4, 2005, lead plaintiffs Ohio Public Employees Retirement System and State Teachers Retirement System of Ohio allege that we and certain former officers, as well as our former outside auditor, made materially false and misleading statements in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 promulgated thereunder. Plaintiffs contend that Fannie Mae's accounting statements were inconsistent with GAAP requirements relating to hedge accounting and the amortization of premiums and discounts, and seek unspecified compensatory damages, attorneys' fees, and other fees and costs. On January 7, 2008, the court defined the class as all purchasers of Fannie Mae common stock and call options and all sellers of publicly traded Fannie Mae put options during the period from April 17, 2001 through December 22, 2004. On October 17, 2008, FHFA, as conservator for Fannie Mae, intervened in this case. On August 18, 2011, the parties filed various motions for summary judgment, which are fully briefed.

On October 7, 2011, FHFA, as conservator, filed a motion to stay this case for the duration of our conservatorship based on a regulation FHFA adopted on June 20, 2011, which provides in part that while we are in conservatorship, FHFA will not pay claims by our current or former shareholders, unless the Director of FHFA determines it is in the interest of the conservatorship. The Acting Director of FHFA has determined it will not pay the claims asserted in this case while we are in conservatorship. FHFA maintains, therefore, that continuing litigation of this matter would be a waste of resources. FHFA's motion was denied on November 14, 2011. FHFA's regulation has been challenged by lead plaintiffs in a separate lawsuit also pending in the U.S. District Court for the District of Columbia.

In September and December 2010, plaintiffs served expert reports claiming damages to plaintiffs under various scenarios ranging cumulatively from $2.2 billion to $8.6 billion. Given the substantial and novel legal questions that remain, including those raised by FHFA's regulation and the Director of FHFA's determination, we are currently unable to estimate the reasonably possible loss or range of loss arising from this litigation.

### *2008 Class Action Lawsuits*

Fannie Mae is a defendant in two consolidated class actions filed in 2008 and currently pending in the U.S. District Court for the Southern District of New York – *In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. On February 11, 2009, the Judicial Panel on Multidistrict Litigation ordered that the cases be coordinated for pretrial proceedings.

Given the early status of these matters, the absence of a specified demand or claim by the plaintiffs, and the substantial and novel legal questions that remain, including those raised by FHFA's regulation and the Director of FHFA's determination, we are currently unable to estimate the reasonably possible loss or range of loss arising from these lawsuits.

### *In re Fannie Mae 2008 Securities Litigation*

In a consolidated complaint filed on June 22, 2009, lead plaintiffs Massachusetts Pension Reserves Investment Management Board and Boston Retirement Board (for common shareholders) and Tennessee Consolidated Retirement System (for preferred shareholders) allege that we, certain of our former officers, and certain of our underwriters violated Sections 12(a)(2) and 15 of the Securities Act of 1933. Lead plaintiffs also allege that we, certain of our former officers, and our outside auditor, violated Sections 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a) of the Securities Exchange Act of 1934. Lead plaintiffs seek various forms of relief, including rescission, damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief. On October 13, 2009, the Court entered an order allowing FHFA to intervene.

152

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

On November 24, 2009, the Court granted the defendants' motion to dismiss the Securities Act claims as to all defendants. On September 30, 2010, the Court granted in part and denied in part the defendants' motions to dismiss the Securities Exchange Act claims. As a result of the partial denial, some of the Securities Exchange Act claims remain pending against us and certain of our former officers. On October 14, 2010, we and certain other defendants filed motions for reconsideration of those portions of the Court's September 30, 2010 order denying in part the defendants' motions to dismiss. Fannie Mae filed its answer to the consolidated complaint on December 31, 2010. Defendants' motions for reconsideration were denied on April 11, 2011. On July 28, 2011, lead plaintiffs filed motions to certify a class of persons who, between November 8, 2006 and September 5, 2008, inclusive, purchased or acquired (a) Fannie Mae common stock and options or (b) Fannie Mae preferred stock.

On February 1, 2012, plaintiffs sought leave to amend their complaint to add new factual allegations and the court granted plaintiffs' motion. Briefing on the pending motions for class certification will be held in abeyance pending resolution of motions to dismiss the amended complaint. Plaintiffs filed an amended complaint on March 2, 2012 and added FHFA as a defendant. On April 4, 2012, defendants filed motions to dismiss the amended complaint.

*In re 2008 Fannie Mae ERISA Litigation*

In a consolidated complaint filed on September 11, 2009, plaintiffs allege that certain of our current and former officers and directors, including former members of Fannie Mae's Benefit Plans Committee and the Compensation Committee of Fannie Mae's Board of Directors, as fiduciaries of Fannie Mae's Employee Stock Ownership Plan ("ESOP"), breached their duties to ESOP participants and beneficiaries by investing ESOP funds in Fannie Mae common stock when it was no longer prudent to continue to do so. Plaintiffs purport to represent a class of participants and beneficiaries of the ESOP whose accounts invested in Fannie Mae common stock beginning April 17, 2007. The plaintiffs seek unspecified damages, attorneys' fees and other fees and costs, and injunctive and other equitable relief. On November 2, 2009, defendants filed motions to dismiss these claims. On November 2, 2011, we filed a letter notifying the court of two recent decisions by the U.S. Court of Appeals for the Second Circuit that are relevant to defendants' motions to dismiss. On February 1, 2012, plaintiffs sought leave to amend their complaint to add new factual allegations and the court granted plaintiffs' motion. Plaintiffs filed an amended complaint on March 2, 2012 adding two current Board members and CEO Michael J. Williams as defendants. On April 4, 2012, defendants filed motions to dismiss the amended complaint.

<u>*Comprehensive Investment Services v. Mudd, et al.*</u>

This individual securities action was originally filed on May 13, 2009, by plaintiff Comprehensive Investment Services, Inc. against certain of our former officers and directors, and certain of our underwriters in the U.S. District Court for the Southern District of Texas. On July 7, 2009, this case was transferred to the Southern District of New York for coordination with *In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. Plaintiff filed an amended complaint on May 11, 2011 against us, certain of our former officers, and certain of our underwriters. The amended complaint alleges violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; violations of Section 20(a) of the Securities Exchange Act of 1934; and violations of the Texas Business and Commerce Code, common law fraud, and negligent misrepresentation in connection with Fannie Mae's May 2008 $2.0 billion offering of 8.25% non-cumulative preferred Series T stock. Plaintiff seeks relief in the form of rescission, actual damages, punitive damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief. On July 11, 2011, defendants filed motions to dismiss the amended complaint. On February 1, 2012, plaintiff sought leave to amend its complaint to add new factual allegations and the court granted plaintiff's motion. Plaintiff filed an amended complaint on March 2, 2012. On April 4, 2012, defendants filed motions to dismiss the amended complaint.

153

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

Given the preliminary stage of this lawsuit, the absence of a specified demand or claim by the plaintiff, and the substantial and novel legal questions that remain, we are currently unable to estimate the reasonably possible loss or range of loss arising from this litigation.

_Smith v. Fannie Mae, et al._

This individual securities action was originally filed on February 25, 2010, by plaintiff Edward Smith against Fannie Mae and certain of its former officers as well as several underwriters in the U.S. District Court for the Central District of California. On April 12, 2010, this case was transferred to the Southern District of New York for coordination with _In re Fannie Mae 2008 Securities Litigation_ and _In re 2008 Fannie Mae ERISA Litigation_. Plaintiff filed an amended complaint on April 19, 2011, which alleges violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; violations of Section 20(a) of the Securities Exchange Act of 1934; common law fraud and negligence claims; and California state law claims for misrepresentation in connection with Fannie Mae's December 2007 $7.0 billion offering of 7.75% fixed-to-floating rate non-cumulative preferred Series S stock. Plaintiff seeks relief in the form of rescission, actual damages (including interest), and exemplary and punitive damages. On February 1, 2012, plaintiff sought leave to amend his complaint to add new factual allegations and the court granted plaintiff's motion. Plaintiff filed an amended complaint on March 2, 2012. On April 4, 2012, defendants filed motions to dismiss the amended complaint.

Given the preliminary stage of this lawsuit, the absence of a specified demand or claim by the plaintiff, and the substantial and novel legal questions that remain, we are currently unable to estimate the reasonably possible loss or range of loss arising from this litigation.

_Transfer Tax Litigation_

Seven lawsuits have been filed against us in four states challenging our right to claim an exemption under our charter from transfer taxes in connection with the recordation of deeds upon transfers of real property by sale or foreclosure. The plaintiff in one of these lawsuits seeks to represent a nationwide class of localities. If these lawsuits are decided against us, we may be required to pay past transfer taxes, damages, fees and/or costs. Although we believe that our charter provides us with an exemption from these taxes and therefore we have a valid defense in these lawsuits, in March 2012 a federal district court in Michigan held in two cases that we are not exempt from Michigan transfer taxes under our charter. We plan to appeal these two Michigan decisions. We believe that none of these seven lawsuits are likely to have a material impact on our business, either individually or in the aggregate; however, these lawsuits may lead to additional lawsuits relating to the more than thirty states that impose these taxes. We are currently unable to estimate the reasonably possible loss or range of losses arising from these lawsuits given the following factors: (a) taxing authorities may conclude that our charter provides us with an exemption from these taxes, (b) existing opinions from taxing authorities in some jurisdictions may preclude retroactive collection, (c) no plaintiff has demanded a stated amount of damages, and (d) the scope of permissible claims has not yet been determined in any jurisdiction.

154

Table of Contents

**Item 3.   Quantitative and Qualitative Disclosures about Market Risk**

Information about market risk is set forth in "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management."

**Item 4.   Controls and Procedures**

**Overview**

We are required under applicable laws and regulations to maintain controls and procedures, which include disclosure controls and procedures as well as internal control over financial reporting, as further described below.

**Evaluation of Disclosure Controls and Procedures**

*Disclosure Controls and Procedures*

Disclosure controls and procedures refer to controls and other procedures designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission ("SEC"). Disclosure controls and procedures include, without limitation, controls and procedures designed to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding our required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management was required to apply its judgment in evaluating and implementing possible controls and procedures.

*Evaluation of Disclosure Controls and Procedures*

As required by Rule 13a-15 under the Exchange Act, management has evaluated, with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures as in effect as of March 31, 2012, the end of the period covered by this report. As a result of management's evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective at a reasonable assurance level as of March 31, 2012 or as of the date of filing this report.

Our disclosure controls and procedures were not effective as of March 31, 2012 or as of the date of filing this report because they did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws. As a result, we were not able to rely upon the disclosure controls and procedures that were in place as of March 31, 2012 or as of the date of this filing, and we continue to have a material weakness in our internal control over financial reporting. This material weakness is described in more detail below under "Description of Material Weakness." Based on discussions with FHFA and the structural nature of the weakness in our disclosure controls and procedures, it is likely that we will not remediate this material weakness while we are under conservatorship.

**Description of Material Weakness**

The Public Company Accounting Oversight Board's Auditing Standard No. 5 defines a material weakness as a deficiency or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

155

Table of Contents

Management has determined that we continued to have the following material weakness as of March 31, 2012 and as of the date of filing this report:

- *Disclosure Controls and Procedures.*   We have been under the conservatorship of FHFA since September 6, 2008. Under the 2008 Reform Act, FHFA is an independent agency that currently functions as both our conservator and our regulator with respect to our safety, soundness and mission. Because of the nature of the conservatorship under the 2008 Reform Act, which places us under the "control" of FHFA (as that term is defined by securities laws), some of the information that we may need to meet our disclosure obligations may be solely within the knowledge of FHFA. As our conservator, FHFA has the power to take actions without our knowledge that could be material to our shareholders and other stakeholders, and could significantly affect our financial performance or our continued existence as an ongoing business. Although we and FHFA attempted to design and implement disclosure policies and procedures that would account for the conservatorship and accomplish the same objectives as a disclosure controls and procedures policy of a typical reporting company, there are inherent structural limitations on our ability to design, implement, test or operate effective disclosure controls and procedures. As both our regulator and our conservator under the 2008 Reform Act, FHFA is limited in its ability to design and implement a complete set of disclosure controls and procedures relating to Fannie Mae, particularly with respect to current reporting pursuant to Form 8-K. Similarly, as a regulated entity, we are limited in our ability to design, implement, operate and test the controls and procedures for which FHFA is responsible.

  Due to these circumstances, we have not been able to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our condensed consolidated financial statements. As a result, we did not maintain effective controls and procedures designed to ensure complete and accurate disclosure as required by GAAP as of March 31, 2012 or as of the date of filing this report. Based on discussions with FHFA and the structural nature of this weakness, it is likely that we will not remediate this material weakness while we are under conservatorship.

**Mitigating Actions Relating to Material Weakness**

As described above under "Description of Material Weakness," we continue to have a material weakness in our internal control over financial reporting relating to our disclosure controls and procedures. However, we and FHFA have engaged in the following practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws:

- FHFA has established the Office of Conservatorship Operations, which is intended to facilitate operation of the company with the oversight of the conservator.

- We have provided drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also have provided drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.

- FHFA personnel, including senior officials, have reviewed our SEC filings prior to filing, including this quarterly report on Form 10-Q for the quarter ended March 31, 2012 ("First Quarter 2012 Form 10-Q"), and engaged in discussions regarding issues associated with the information contained in those filings. Prior to filing our First Quarter 2012 Form 10-Q, FHFA provided Fannie Mae management with a written acknowledgement that it had reviewed the First Quarter 2012 Form 10-Q, and it was not aware of any material misstatements or omissions in the First Quarter 2012 Form 10-Q and had no objection to our filing the First Quarter 2012 Form 10-Q.

- The Acting Director of FHFA and our Chief Executive Officer have been in frequent communication, typically meeting on at least a bi-weekly basis.

- FHFA representatives attend meetings frequently with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, credit and market risk management, external communications and legal matters.

FHFA 3504

Table of Contents

- Senior officials within FHFA's Office of the Chief Accountant have met frequently with our senior finance executives regarding our accounting policies, practices and procedures.

**Changes in Internal Control over Financial Reporting**

*Overview*

Management has evaluated, with the participation of our Chief Executive Officer and Chief Financial Officer, whether any changes in our internal control over financial reporting that occurred during our last fiscal quarter have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Below we describe changes in our internal control over financial reporting since December 31, 2011 that management believes have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*Change in Management*

In the first quarter of 2012, Michael J. Williams, our President and Chief Executive Officer, announced that he will step down from his position when our Board of Directors names a successor.

157

Table of Contents

## PART II—OTHER INFORMATION

### Item 1. Legal Proceedings

The information in this item supplements and updates information regarding certain legal proceedings set forth in "Legal Proceedings" in our 2011 Form 10-K. We also provide information regarding material legal proceedings in "Note 13, Commitments and Contingencies," which is incorporated herein by reference. In addition to the matters specifically described or incorporated by reference in this item, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that do not have a material impact on our business. Litigation claims and proceedings of all types are subject to many factors that generally cannot be predicted accurately.

We record reserves for legal claims when losses associated with the claims become probable and the amounts can be reasonably estimated. The actual costs of resolving legal claims may be substantially higher or lower than the amounts reserved for those claims. For matters where the likelihood or extent of a loss is not probable or cannot be reasonably estimated, we do not recognize in our condensed consolidated financial statements the potential liability that may result from these matters. We presently cannot determine the ultimate resolution of the matters described below or incorporated by reference into this item or in our 2011 Form 10-K. We have recorded a reserve for legal claims related to those matters when we were able to determine a loss was both probable and reasonably estimable. If certain of these matters are determined against us, it could have a material adverse effect on our results of operations, liquidity and financial condition, including our net worth.

### Shareholder Derivative Litigation

Three shareholder derivative cases were filed at various times between June 2007 and June 2008 naming certain of our current and former directors and officers as defendants, and Fannie Mae as a nominal defendant. These cases were pending before the U.S. Court of Appeals for the District of Columbia Circuit: *Kellmer v. Raines, et al.* (filed June 29, 2007); *Middleton v. Raines, et al.* (filed July 6, 2007); and *Agnes v. Raines, et al.* (filed June 25, 2008). The cases relied on factual allegations that Fannie Mae's accounting statements were inconsistent with the GAAP requirements relating to hedge accounting and the amortization of premiums and discounts. *Agnes* relied on factual allegations that defendants wrongfully failed to disclose our exposure to the subprime mortgage crisis and that the Board improperly authorized the company to buy back $100 million in shares while the stock price was artificially inflated. Plaintiffs sought, on behalf of Fannie Mae, various forms of monetary and non-monetary relief, including unspecified money damages (including restitution, legal fees and expenses, disgorgement and punitive damages); corporate governance changes; an accounting; and attaching, impounding or imposing a constructive trust on the individual defendants' assets.

Pursuant to a June 25, 2009 order, FHFA, as our conservator, substituted itself for shareholder plaintiffs in all of these actions. On July 27, 2010, the U.S. District Court for the District of Columbia dismissed *Kellmer* and *Middleton* with prejudice and *Agnes* without prejudice. FHFA filed motions to reconsider the decisions dismissing *Kellmer* and *Middleton* with prejudice, and those motions were denied on October 22, 2010. FHFA appealed that denial on November 22, 2010. Plaintiffs Kellmer and Agnes also appealed the substitution and the dismissal orders. On January 20, 2011, the U.S. Court of Appeals for the District of Columbia Circuit issued an order in the *Kellmer* appeal granting FHFA's motions for the voluntary dismissal of defendants Kenneth M. Duberstein, Frederic Malek and Patrick Swygert. On that same day, in the *Middleton* appeal, the Court of Appeals issued an order granting FHFA's motions for the voluntary dismissal of defendants Stephen Ashley, Kenneth Duberstein, Thomas Gerrity, Ann Korologos, Frederic Malek, Donald Marron, Anne Mulcahy, Joe Pickett, Leslie Rahl, Patrick Swygert, and John Wulff. On March 30, 2012, the Court of Appeals affirmed the orders allowing FHFA to substitute itself for shareholder plaintiffs Kellmer and Agnes. Also, the Court of Appeals reversed the district court's dismissal with prejudice of the *Kellmer* and *Middleton* actions, and remanded with instructions for dismissal without prejudice.

### FHFA Private-Label Mortgage-Related Securities Litigation

In the third quarter of 2011, FHFA, as conservator for us and for Freddie Mac, filed 16 lawsuits on behalf of us and Freddie Mac against various financial institutions, their officers and affiliated and unaffiliated underwriters

158

Table of Contents

who were responsible for marketing and selling private-label mortgage-related securities to us. The lawsuits seek to recover losses we and Freddie Mac incurred on the securities. FHFA filed 13 of these lawsuits in the U.S. District Court for the Southern District of New York—against Bank of America Corp.; Barclays Bank PLC; Citigroup, Inc.; Credit Suisse Holdings (USA), Inc.; Deutsche Bank AG; First Horizon National Corporation; Goldman, Sachs & Co.; HSBC North America Holdings Inc.; JPMorgan Chase & Co.; Merrill Lynch & Co.; Nomura Holding America Inc.; SG Americas, Inc.; and UBS Americas Inc. ("UBS") and against certain related entities and individuals. Two lawsuits—against Countrywide Financial Corporation ("Countrywide") and Morgan Stanley—were filed in the Supreme Court of the State of New York for the County of New York, and one—against The Royal Bank of Scotland Group PLC ("RBS")—was filed in the U.S. District Court for the District of Connecticut. The lawsuit against UBS was filed on July 27, 2011, and all the others were filed on September 2, 2011. The lawsuits allege that the defendants violated federal securities laws and state common law by making material misstatements and omissions in the offering documents for the securities that were sold to Fannie Mae and Freddie Mac regarding the characteristics of the loans underlying the securities. The complaints also allege state securities law violations and some allege common law fraud. The complaints seek, among other things, rescission and recovery of consideration paid for the securities at issue in the lawsuits, monetary damages and, in certain cases, punitive damages for common law fraud.

Defendants in the two cases filed in New York state court removed those cases to the U.S. District Court for the Southern District of New York and FHFA filed motions to remand the cases back to state court. On February 7, 2012, the Joint Panel on Multidistrict Litigation transferred the Countrywide case to the U.S. District Court for the Central District of California for inclusion in a multidistrict proceeding involving other actions pending against Countrywide. On April 6, 2012, the court denied FHFA's motion to remand the Countrywide case.

On November 16, 2011, all of the cases pending in the Southern District of New York were transferred to one judge in the district, Judge Cote. The court stayed the time to answer or move to dismiss all of the cases except the UBS case. On December 21, 2011, FHFA filed an amended complaint in the UBS case. On January 20, 2012, defendants in the UBS case filed a motion to dismiss the amended complaint. On May 4, 2012, the court denied defendants' motion to dismiss in the UBS case with respect to the federal and state securities law claims and granted defendants' motion to dismiss with respect to the negligent misrepresentation claim.

On February 1, 2012, FHFA filed an amended complaint in the RBS case. On March 2, 2012, defendants in the RBS case filed a motion to dismiss the amended complaint.

## Item 1A.   Risk Factors

In addition to the information in this report, you should carefully consider the risks relating to our business that we identify in "Risk Factors" in our 2011 Form 10-K. This section supplements and updates that discussion. For a complete understanding of the subject, you should read both together. Please also refer to "MD&A—Risk Management" in this report and in our 2011 Form 10-K for more detailed descriptions of the primary risks to our business and how we seek to manage those risks.

The risks we face could materially adversely affect our business, results of operations, financial condition, liquidity and net worth, and could cause our actual results to differ materially from our past results or the results contemplated by forward-looking statements contained in this report. However, these are not the only risks we face. In addition to the risks we discuss below, we face risks and uncertainties not currently known to us or that we currently believe are immaterial.

***Our business and results of operations may be materially adversely affected if we are unable to retain and hire qualified employees.***

Our business processes are highly dependent on the talents and efforts of our employees. The conservatorship, the uncertainty of our future, limitations on employee compensation, the heightened scrutiny of our actions by Congress and regulators and the working environment created thereby, and negative publicity concerning the GSEs have had and are likely to continue to have an adverse effect on our ability to retain and recruit well-qualified employees. We have already had significant departures by various members of executive

159

Table of Contents

management since shortly before we entered into conservatorship in September 2008, including two Chief Executive Officers and three Chief Financial Officers. In addition, in January 2012, our current Chief Executive Officer announced that he will step down from his position when our Board of Directors names a successor. Further turnover in key management positions and challenges in integrating new management could harm our ability to manage our business effectively and ultimately adversely affect our financial performance.

Actions taken by Congress, FHFA and Treasury to date, or that may be taken by them or other government agencies in the future, may have an adverse effect on the retention and recruitment of senior executives, management, and other valuable employees. We are subject to significant restrictions on the amount and type of compensation we may pay our executives and other employees under conservatorship. For example, in April 2012, the STOCK Act was enacted, which includes a provision that prohibits senior executives at Fannie Mae and Freddie Mac from receiving bonuses during any period of conservatorship on or after the date of enactment of the law. In addition, FHFA has directed us to maintain individual salaries and wage rates for all employees at 2010 levels for 2011 and 2012 (except in the case of promotions or significant changes in responsibilities). We are also unable to offer equity-based compensation.

Congress has also considered other legislation that would alter the compensation for Fannie Mae and Freddie Mac employees. In 2011, the Financial Services Committee of the House of Representatives approved a bill that would put our employees on a federal government pay scale. If this or similar legislation were to become law, our employees could experience a sudden and sharp decrease in compensation. The Acting Director of FHFA stated on November 15, 2011 that this "would certainly risk a substantial exodus of talent, the best leaving first in many instances. [Fannie Mae and Freddie Mac] likely would suffer a rapidly growing vacancy list and replacements with lesser skills and no experience in their specific jobs. A significant increase in safety and soundness risks and in costly operational failures would, in my opinion, be highly likely." The Acting Director observed, "Should the risks I fear materialize, FHFA might well be forced to limit [Fannie Mae and Freddie Mac's] business activities. . . . Some of the business [Fannie Mae and Freddie Mac] would be unable to undertake might simply not occur, with potential disruption in housing markets and the economy."

We face competition from within the financial services industry and from businesses outside of the financial services industry for qualified employees. Additionally, an improving economy is likely to put additional pressures on turnover, as attractive opportunities become available to our employees. Our competitors for talent are able to provide market-based compensation and to link employees' pay to performance. The constraints on our compensation could adversely affect our ability to attract qualified candidates. While we engage in succession planning for our senior management and other critical positions and have been able to fill a number of important positions internally, our inability to offer market-based compensation may limit our ability to attract and retain qualified employees below the senior executive level that could fill our senior executive level positions if there is further turnover.

If we are unable to retain, promote and attract employees with the necessary skills and talent, we would face increased risks for operational failures. Our ability to conduct our business and our results of operations would likely be materially adversely affected.

***We expect our operational risk to increase as a result of recent FHFA and Congressional directives.***

We recently have been directed by FHFA and Congress to take specified actions that present significant operational challenges for us. We believe that implementing these directives will increase our operational risk and may potentially result in one or more significant deficiencies or material weaknesses in our internal control over financial reporting in a future period.

As described in "Business—Legislative and Regulatory Developments—Changes to Our Single-Family Guaranty Fee Pricing" in our 2011 Form 10-K, in December 2011, Congress enacted the Temporary Payroll Tax Cut Continuation Act of 2011 which, among other provisions, requires that we increase our single-family guaranty fees by at least 10 basis points and remit the additional revenue to Treasury. In addition, as described in "Legislative and Regulatory Developments—FHFA Advisory Bulletin Regarding Framework for Adversely Classifying Loans," in April 2012, FHFA issued supervisory guidance requiring that we change our method of accounting for delinquent loans. Each of these directives creates significant operational burdens and costs for us.

160

FHFA 3508

Table of Contents

We are also currently working on implementing a number of other FHFA initiatives that may increase our operational burdens and our costs, including those described in "Executive Compensation—Compensation Discussion and Analysis—2012 Executive Compensation Program—2012 Corporate Performance Objectives" of our 2011 Form 10-K/A.

While implementation of each individual directive creates operational challenges, implementing multiple directives significantly increases these challenges. Implementing these directives requires a substantial time commitment from management and the employees responsible for implementing the changes, which could adversely affect our ability to retain these employees. In addition, some of these directives require significant changes to our accounting methods and systems. Due to the operational complexity associated with these changes and the limited time periods for implementing them, we believe there is a significant risk that implementing these changes may result in one or more significant deficiencies or material weaknesses in our internal control over financial reporting in a future period. If this were to occur, we could experience material errors in our reported financial results.

In addition to the directives described above, FHFA, other agencies of the U.S. government or Congress may direct us to take additional actions in the future that could further increase our operational risk. For example, FHFA may require us to change our accounting policies to align more closely with those of Freddie Mac or we may be required to implement a principal forgiveness program.

### *Changes in accounting standards and policies can be difficult to predict and can materially impact how we record and report our financial results.*

Our accounting policies and methods are fundamental to how we record and report our financial condition and results of operations. From time to time, the FASB, the SEC or FHFA changes the financial accounting and reporting standards or the policies that govern the preparation of our financial statements. These changes can be difficult to predict and expensive to implement, and can materially impact how we record and report our financial condition and results of operations. We could be required to apply new or revised guidance retrospectively, which may result in the revision of prior period financial statements by material amounts. The implementation of new or revised accounting guidance could have a material adverse effect on our net worth and result in or contribute to the need for additional draws from Treasury under the senior preferred stock purchase agreement.

In addition, FHFA may require us to change our accounting policies to align more closely with those of Freddie Mac. FHFA may also require that we and Freddie Mac have the same independent public accounting firm. Either of these events could significantly increase our expenses and require a substantial amount of management's attention.

### *Given the deteriorated credit quality of many of our mortgage insurer counterparties, we may incur losses as a result of claims under our mortgage insurance policies not being paid in full or at all, and we may face business disruptions and increased concentration risk.*

We rely heavily on mortgage insurers to provide insurance against borrower defaults on single-family conventional mortgage loans with LTV ratios over 80% at the time of acquisition. The already weak financial condition of many of our mortgage insurer counterparties continued to deteriorate in the first quarter of 2012, which increased the risk that these counterparties will fail to fulfill their obligations to pay our claims under insurance policies.

As of May 9, 2012, three of our mortgage insurance counterparties—Triad, RMIC and PMI—have publicly disclosed that they are in run-off. A mortgage insurer that is in run-off continues to collect premiums on its existing insurance business, but no longer writes new insurance. This increases the risk that the mortgage insurer will fail to pay our claims under insurance policies, and could also cause the quality and speed of its claims processing to deteriorate. Triad, RMIC and PMI are currently paying only a portion of policyholder claims and deferring the remaining portion. As of May 9, 2012, Triad is paying only 60% of claims under its mortgage guaranty insurance policies and deferring the remaining 40%, and both PMI and RMIC are paying 50% of claims and deferring the remaining 50%. It is uncertain when, or if, regulators for Triad, RMIC or PMI will allow deferred policyholder claims to be paid or increase the amount paid on claims. In addition, PMI has publicly disclosed that it is in receivership.

Table of Contents

In addition to our three mortgage insurers in run-off, one mortgage insurer, Genworth, is currently operating pursuant to a waiver it received from its regulator of the state regulatory capital requirements applicable to its main insurance writing entity. An additional two of our mortgage insurance counterparties (MGIC and Radian) have disclosed that, in the absence of additional capital contributions to their insurance writing entity, their capital might fall below state regulatory capital requirements in the future. These three mortgage insurers, together with our three mortgage insurers in run-off, provided a combined $73.3 billion, or 80%, of our risk in force mortgage insurance coverage of our single-family guaranty book of business as of March 31, 2012. We do not know how long certain of our mortgage insurer counterparties will remain below their state-imposed risk-to-capital limits. If mortgage insurers are not able to raise capital and they exceed their risk-to-capital limits, they will likely be forced into run-off or receivership unless they can secure and maintain waivers from their state regulators.

Some mortgage insurers have explored corporate restructurings, which are intended to provide relief from risk-to-capital limits in certain states. A restructuring plan that would involve contributing capital to a subsidiary would result in less liquidity available to its parent company to pay claims on its existing book of business and an increased risk that its parent company will not pay its claims in full in the future.

Our loss reserves take into account our assessment of our mortgage insurer counterparties' ability to fulfill their obligations to us. If our assessment of their ability to pay claims deteriorates significantly, it could result in a significant increase in our loss reserves and our credit losses.

Many mortgage insurers stopped insuring new mortgages with higher LTV ratios or with lower borrower FICO credit scores or on select property types. As our charter generally requires us to obtain credit enhancement on single-family conventional mortgage loans with loan-to-value ratios over 80% at the time of purchase, an inability to find suitable credit enhancement may inhibit our ability to pursue new business opportunities, meet our housing goals and otherwise support the housing and mortgage markets. For example, where mortgage insurance or other credit enhancement is not available, we may be hindered in our ability to refinance loans into more affordable loans. In addition, access to fewer mortgage insurer counterparties will increase our concentration risk with the remaining mortgage insurers in the industry.

### Changes in the mortgage industry may negatively impact our business.

A number of our largest mortgage seller/servicer counterparties have reduced or eliminated their purchases of mortgage loans from mortgage brokers and correspondent lenders. As a result, we are acquiring an increasing portion of our business volume directly from smaller financial institutions that may not have the same financial strength as our largest counterparties. Our top five lender customers in terms of single-family business acquisition volume, in the aggregate, accounted for approximately 54% of our single-family business acquisition volume in the first quarter of 2012, compared with approximately 65% of our single-family business acquisition volume in the first quarter of 2011. In addition, only three of our top five lender customers for the first quarter of 2011 remained in our top five for the first quarter of 2012. Similarly, some of our servicing volume is shifting to smaller or non-traditional servicers. Our ten largest single-family mortgage servicers, including their affiliates, serviced 74% of our single-family guaranty book of business as of March 31, 2012, compared to 76% as of March 31, 2011. These smaller servicers may not have the same financial strength or operational capacity as our largest servicers, which could negatively affect their ability to service the loans on our behalf or to satisfy their repurchase or compensatory fee obligations. This decrease in the concentration of our business with large institutions could increase both our institutional counterparty credit risk and our mortgage credit risk, and could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth.

### If we become subject to state and local taxes on the transfer of real property in a large number of states, it would increase our costs going forward and could have an adverse effect on our financial results.

As of May 9, 2012, seven lawsuits have been filed against us in four states challenging our right to claim an exemption under our charter from transfer taxes in connection with the recordation of deeds upon transfers of real property by sale or foreclosure. The plaintiff in one of these lawsuits seeks to represent a nationwide class of localities. If these lawsuits are decided against us, we may be required to pay past transfer taxes, damages, fees and/or costs. In addition, we would be subject to payment of transfer taxes in these states going forward, which

162

Table of Contents

would increase our costs. Although we believe that our charter provides us with an exemption from these taxes and therefore we have a valid defense in these lawsuits, in March 2012, a federal district court in Michigan held in two cases that we are not exempt from Michigan transfer taxes under our charter. We plan to appeal these two Michigan decisions.

More than thirty states impose a tax on the transfer of real property by sale or foreclosure. Accordingly, additional lawsuits relating to state or local transfer taxes could be filed against us in the future. Also, various state taxing authorities from other jurisdictions could seek to impose these transfer taxes. If we were to become subject to real property transfer taxes in a large number of states and localities, and if we were required to pay a number of years of past transfer taxes in these states and localities, it would increase our costs going forward and could have an adverse effect on our financial results.

## Item 2.    Unregistered Sales of Equity Securities and Use of Proceeds

### Recent Sales of Unregistered Securities

Under the terms of our senior preferred stock purchase agreement with Treasury, we are prohibited from selling or issuing our equity interests, other than as required by (and pursuant to) the terms of a binding agreement in effect on September 7, 2008, without the prior written consent of Treasury.

We previously provided stock compensation to employees and members of the Board of Directors under the Fannie Mae Stock Compensation Plan of 1993 and the Fannie Mae Stock Compensation Plan of 2003 (the "Plans"). During the quarter ended March 31, 2012, 40,786 restricted stock units vested, as a result of which 26,989 shares of common stock were issued, and 13,797 shares of common stock that otherwise would have been issued were withheld by us in lieu of requiring the recipients to pay us the withholding taxes due upon vesting. All of these restricted stock units were granted prior to our entering into conservatorship. Restricted stock units granted under the Plans typically vest in equal annual installments over three or four years beginning on the first anniversary of the date of grant. Each restricted stock unit represents the right to receive a share of common stock at the time of vesting. As a result, restricted stock units are generally similar to restricted stock, except that restricted stock units do not confer voting rights on their holders. All restricted stock units were granted to persons who were employees or members of the Board of Directors of Fannie Mae.

The securities we issue are "exempted securities" under laws administered by the SEC to the same extent as securities that are obligations of, or are guaranteed as to principal and interest by, the United States, except that, under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Federal Housing Finance Regulatory Reform Act of 2008 (together, the "GSE Act"), our equity securities are not treated as exempted securities for purposes of Section 12, 13, 14 or 16 of the Exchange Act. As a result, our securities offerings are exempt from SEC registration requirements and we do not file registration statements or prospectuses with the SEC under the Securities Act of 1933 with respect to our securities offerings.

### Information about Certain Securities Issuances by Fannie Mae

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

Because the securities we issue are exempted securities under the Securities Act of 1933, we do not file registration statements or prospectuses with the SEC with respect to our securities offerings. To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars or prospectuses (or supplements thereto) that we post on our Web site or in a current report on Form 8-K that we file with the SEC, in accordance with a "no-action" letter we received from the SEC staff in 2004. In cases where the information is disclosed in a prospectus or offering circular posted on our Web site, the document will be posted on our Web site within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

163

Table of Contents

The Web site address for disclosure about our debt securities is www.fanniemae.com/debtsearch. From this address, investors can access the offering circular and related supplements for debt securities offerings under Fannie Mae's universal debt facility, including pricing supplements for individual issuances of debt securities.

Disclosure about our obligations pursuant to some of the MBS we issue, some of which may be off-balance sheet obligations, can be found at www.fanniemae.com/mbsdisclosure. From this address, investors can access information and documents about our MBS, including prospectuses and related prospectus supplements.

We are providing our Web site address solely for your information. Information appearing on our Web site is not incorporated into this report.

## Our Purchases of Equity Securities

The following table displays shares of our common stock we repurchased during the first quarter of 2012.

| Period | Total Number of Shares Purchased[1] | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Program[2] | Maximum Number of Shares that May Yet be Purchased Under the Program[2] |
|---|---|---|---|---|
| **2012** | | | | |
| January 1-31 | 169,738 | $ 0.23 | — | — |
| February 1-29 | 82 | 0.21 | — | — |
| March 1-31 | — | — | — | — |
| Total | 169,820 | | | |

[1] Consists of shares of common stock reacquired from employees to pay an aggregate of $38,386 in withholding taxes due upon the vesting of previously issued restricted stock.

[2] We do not have any publicly announced share repurchase programs under which we could purchase our common stock.

## Dividend Restrictions

Our payment of dividends is subject to the following restrictions:

*Restrictions Relating to Conservatorship.*    Our conservator announced on September 7, 2008 that we would not pay any dividends on the common stock or on any series of preferred stock, other than the senior preferred stock. In addition, FHFA's regulations relating to conservatorship and receivership operations, which became effective July 20, 2011, prohibit us from paying any dividends while in conservatorship unless authorized by the Director of FHFA. The Acting Director of FHFA directs us to make dividend payments on the senior preferred stock on a quarterly basis.

*Restrictions under Senior Preferred Stock Purchase Agreement.*    The senior preferred stock purchase agreement prohibits us from declaring or paying any dividends on Fannie Mae equity securities (other than the senior preferred stock) without the prior written consent of Treasury.

*Statutory Restrictions.*    Under the GSE Act, FHFA has authority to prohibit capital distributions, including payment of dividends, if we fail to meet our capital requirements. If FHFA classifies us as significantly undercapitalized, approval of the Director of FHFA is required for any dividend payment. Under the GSE Act, we are not permitted to make a capital distribution if, after making the distribution, we would be undercapitalized, except the Director of FHFA may permit us to repurchase shares if the repurchase is made in connection with the issuance of additional shares or obligations in at least an equivalent amount and will reduce our financial obligations or otherwise improve our financial condition.

*Restrictions Relating to Qualifying Subordinated Debt.*    During any period in which we defer payment of interest on qualifying subordinated debt, we may not declare or pay dividends on, or redeem, purchase or acquire, our common stock or preferred stock.

Table of Contents

*Restrictions Relating to Preferred Stock.*   Payment of dividends on our common stock is also subject to the prior payment of dividends on our preferred stock and our senior preferred stock. Payment of dividends on all outstanding preferred stock, other than the senior preferred stock, is also subject to the prior payment of dividends on the senior preferred stock.

**Item 3.   Defaults Upon Senior Securities**

None.

**Item 4.   Mine Safety Disclosures**

None.

**Item 5.   Other Information**

None.

**Item 6.   Exhibits**

An index to exhibits has been filed as part of this report beginning on page E-1 and is incorporated herein by reference.

165

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Federal National Mortgage Association

By:   /s/   Michael J. Williams
_____
Michael J. Williams
President and Chief Executive Officer

Date: May 9, 2012

By:   /s/   Susan R. McFarland
_____
Susan R. McFarland
Executive Vice President and
Chief Financial Officer

Date: May 9, 2012

166

FHFA 3514

**Table of Contents**

### INDEX TO EXHIBITS

| Item | Description |
|------|-------------|
| 3.1 | Fannie Mae Charter Act (12 U.S.C. § 1716 et seq.) as amended through July 30, 2008 (Incorporated by reference to Exhibit 3.1 to Fannie Mae's Annual Report on Form 10-K, filed February 24, 2011.) |
| 3.2 | Fannie Mae Bylaws, as amended through January 30, 2009 (Incorporated by reference to Exhibit 3.2 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.) |
| 10.43 | Termination Agreement and General Release, effective as of February 28, 2012, by and between David C. Hisey and Fannie Mae |
| 10.44 | Repayment Provisions For SEC Executive Officers, amended and restated as of March 8, 2012 |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101.INS | XBRL Instance Document* |
| 101.SCH | XBRL Taxonomy Extension Schema* |
| 101.LAB | XBRL Taxonomy Extension Labels* |
| 101.PRE | XBRL Taxonomy Extension Presentation* |
| 101.DEF | XBRL Taxonomy Extension Definition* |

\* The financial information contained in these XBRL documents is unaudited. The information in these exhibits shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Fannie Mae, except to the extent, if any, expressly set forth by specific reference in such filing.

E-1

**Table of Contents**



**FR010**

Exhibit 10.43

**CONFIDENTIAL**
**TERMINATION AGREEMENT AND GENERAL RELEASE**

This AGREEMENT AND GENERAL RELEASE (the "Agreement"), dated February 17, 2012, is made and entered into by and between David C. Hisey, ("you" or "Hisey") and Fannie Mae (collectively, the "Parties").

WHEREAS, you have been an at-will employee employed by Fannie Mae as Executive Vice President and Deputy Chief Financial Officer; and

WHEREAS, you have been informed that due to corporate changes, your position will be eliminated and your employment will terminate on Friday, February 24, 2012 (your "Termination Date"). You will continue to perform the duties of your position through your Termination Date, including, without limitation, providing support to Fannie Mae's Chief Financial Officer.

NOW, THEREFORE, in consideration of the mutual promises, covenants and undertakings as set forth in this Agreement, the sufficiency of which the Parties acknowledge, the Parties agree as follows:

1. <u>Fannie Mae Consideration</u>. In exchange for your promises, covenants and undertakings made in this Agreement, and contingent upon your execution of and compliance with the terms of this Agreement and your return of all Fannie Mae property, Fannie Mae will provide you with the following consideration:

(a) *Payments*: Following your Termination Date, you will receive cash payments totaling Nine Hundred Sixty-six Thousand, Six Hundred Twenty-five dollars ($966,625.00), which will be paid to you in three equal installments of Two Hundred Forty-one Thousand, Six Hundred Fifty-six dollars ($241,656.00), and one installment of Two Hundred Forty-one Thousand, Six Hundred Fifty-seven dollars ($241,657.00). The four cash payments represent each of your quarterly 2011 Deferred pay targets, with 50% of each target payment adjusted for 2011 corporate performance. You are not eligible for, and you will not receive, any other Deferred Pay, compensation, or Long-term Incentives, and you will not receive any payments other than the payments expressly provided for in this Paragraph 1(a). The amounts to be paid under this Paragraph 1(a) will be made at the same time other 2011 Deferred pay recipients receive their quarterly payouts in 2012, unless the payments to be made to you are required to be paid at another time pursuant to Paragraph 15(f) of this Agreement.

(b) *Outplacement*. You may receive officer-level outplacement services with an estimated value of eighteen thousand dollars ($18,000) from a firm chosen by Fannie Mae. The outplacement services must be used within twelve (12) months from the Termination Date and fees will be paid directly to the outplacement vendor. You may not receive cash in lieu of such outplacement services; and

(c) *COBRA Assistance*. If you elect to continue your medical and/or dental coverage under COBRA, Fannie Mae will pay a portion of the premium for up to eighteen (18) months from the Termination Date. You agree to notify Fannie Mae promptly if you become eligible for another

*David C. Hisey*
*February 17, 2012*
*Page 2 of 7*

comparable group plan during this eighteen month period. If you do become so eligible, Fannie Mae will cease its COBRA assistance to you and you agree to reimburse Fannie Mae for any payments made by Fannie Mae when you were eligible for such other comparable group plan, but before you provided the required notice to Fannie Mae. During the period covered by this Paragraph 1(c), you will pay the portion of the premium in the amount that you would have paid as an active employee, and Fannie Mae will pay the remainder of the premium. To activate coverage, you must timely complete and return the COBRA forms, which will be forwarded to you separately. If you fail to timely complete and return the COBRA forms you may lose your eligibility for COBRA coverage.

2. <u>Effective Date</u>. This Agreement will become effective and enforceable on the date you sign it (the "Effective Date"), unless you timely revoke it in accordance with Paragraph 13, below. You will have twenty-one (21) calendar days in which to consider, sign, and return this Agreement to Judith C. Dunn, Fannie Mae's Senior Vice President and Principal Deputy General Counsel. Your 21-day consideration period will begin on the day after you receive this Agreement. Your signed Agreement will not be accepted if it is not returned on time.

3. <u>Sufficient Consideration</u>. You agree that, absent your entry into, and compliance with, this Agreement, you would not be entitled to the consideration set forth in Paragraphs 1(a) through 1(c), above. Among other requirements for the payment of 2011 Deferred Pay, you understand that, absent this Agreement you would be required to be employed at the time of payment and therefore you would be ineligible for such payments. The consideration to be provided to you under this Agreement is solely in exchange for your promises in this Agreement, including your release of claims, and represents consideration to which you are otherwise not entitled.

4. <u>Vacation Pay/Benefits</u>. After your Termination Date, Fannie Mae will pay you a lump sum, less legally required deductions, for any accrued and unused vacation leave you may have under Fannie Mae policy. You will not be paid for any unused carryover leave. You will also receive all other benefits you are already entitled to as a result of your employment with Fannie Mae.

5. <u>Release of Claims</u>. You unconditionally release, waive, settle and forever discharge any and all suits, actions, and claims, known and unknown (including claims for damages, attorneys fees, expenses and/or costs) that you may have against Fannie Mae, including its past and present directors, agents, conservator and employees (in their individual or representative capacities), and any past, present or successor of the Fannie Mae pension or benefit plans and its officers, directors, trustees, administrators, fiduciaries, agents or employees, (collectively, the "Released Parties") for any actions, omissions or decisions, up to and including the date you sign this Agreement, directly or indirectly relating to your employment or termination from Fannie Mae. However, you do not waive any rights or claims that cannot be waived under applicable law and you do not waive any rights or claims associated with the performance of the provisions of this Agreement or that arise after you sign the Agreement. You agree that this release includes claims that you presently do not know of or suspect to exist, even if you would not have entered into this Agreement had you known of those claims. You also understand that this release means that you are giving up the right to sue Fannie Mae on any claim released.

*David C. Hisey*
*February 17, 2012*
*Page 3 of 7*

6. <u>Release Includes Claims Under Federal, State, Local and Common Law</u> .

    (a) You agree that your general release of the Released Parties in Paragraph 5 above is comprehensive and includes all claims and potential claims to the maximum extent permitted by law, and includes, but is not limited to: (i) releasable claims under any federal statute, ordinance, regulation or executive order, as amended, including, but not limited to, the Civil Rights Act of 1866, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, 42 U.S.C. Section 1981, the Equal Pay Act of 1963, the Lily Ledbetter Fair Pay Act of 2009, the Americans with Disabilities Act of 1990, the ADA Amendments Act of 2008, the Sarbanes-Oxley Act of 2002, the Dodd-Frank Act of 2010, all other federal whistleblower protection statutes, the Employee Retirement Income Security Act of 1974, the Rehabilitation Act of 1973, the Family and Medical Leave Act of 1993, the Worker Adjustment and Retraining Notification Act of 1988, Executive Order 11246, the Occupational Safety and Health Act of 1970 and the National Labor Relations Act; (ii) any claims under any state or local statute, ordinance or regulation, as amended, including, but not limited to, the District of Columbia Human Rights Act, the District of Columbia Family and Medical Leave Act, the District of Columbia Accrued Sick and Safe Leave Act, the Virginia Human Rights Law, the Maryland Fair Employment Practices Act, the California Fair Employment and Housing Act, and any state or local fair employment, human rights, leave, wage payment or civil rights statutes in the jurisdictions where you are (or were) assigned to work, and (iii) any claims under common law, including, but not limited to, claims for breach of contract, wrongful discharge, tort and equitable relief.

    (b) You knowingly and voluntarily waive any rights and claims under the Federal Age Discrimination in Employment Act of 1967, as amended, the Older Workers Benefit Protection Act of 1990, as amended, and under the specific statutes and laws stated in Paragraph 6 (a).

    (c) By signing this Agreement, you further affirm the following: (i) That you have reported to Fannie Mae's Offices of Ethics or Investigations any conduct or action by Fannie Mae (or its employees or agents, including you) which Fannie Mae may need to remediate, report, or investigate, or which may violate any law or any rights you may have; (ii) You have not suffered any work-related injury for which you have not already filed a claim; (iii) That you have been paid all wages that you are owed by Fannie Mae; and (iv) That you have fully complied with your reporting obligations under Fannie Mae's Code of Conduct and Fraud Risk Management Policy (including any amended version of these policies in effect during your employment).

    (d) You agree not to make any oral or written statement concerning your employment or termination from Fannie Mae to any third party that would tend to disparage, denigrate, ridicule or otherwise impugn Fannie Mae's reputation.

7. <u>No Complaints or Charges</u>. You represent that you have not filed any complaints or charges against Fannie Mae or any of the other Releasees with any federal, state, local court, administrative agency or arbitration forum. You waive any and all rights to recover in any lawsuit, judicial action or administrative or other proceeding relating to Fannie Mae brought on your behalf by the U.S. Equal Employment Opportunity Commission, the U.S. Department of Labor, the Office of Federal Contract Compliance Programs, the District of Columbia Commission on Human Rights, the District of

*David C. Hisey*
*February 17, 2012*
*Page 4 of 7*

Columbia Office of Human Rights, or any other federal, state or local administrative or fair employment rights enforcement agency. You agree that if any administrative agency or court maintains or assumes jurisdiction of any charge or complaint against any of the Releasees on your behalf, you will promptly request that agency or court to withdraw from the matter. By entering into this Agreement, you further withdraw any pending complaints and charges initiated by or relating to you in Fannie Mae's Office of Investigations.

8. <u>Cooperation</u>. You agree that you will fully cooperate with any investigation conducted by Fannie Mae, by its auditor, by the Federal Housing Finance Agency, or by any federal, state or local government authority relating to Fannie Mae. Nothing contained in this Agreement precludes you from communicating or cooperating with any federal, state or local governmental authority or from taking any action required by law. Fannie Mae agrees that it will not construe any assertion of privilege applicable to you individually as failure to cooperate. You understand that Fannie Mae's privileges may only be asserted or waived by Fannie Mae.

9. <u>Confidentiality</u>. In addition to your ethical obligations to preserve as confidential any information that is preserved by the attorney work-product privilege or attorney-client privilege (which, to the extent it pertains to Fannie Mae, you may not waive), you and your heirs, assigns and attorneys agree to keep confidential and not to disclose any of the terms, conditions, or any other details of this Agreement or any Confidential Information (as described in Fannie Mae's Confidential Information Policy) relating to your employment at Fannie Mae to any person or entity. However, you may make disclosure relating to this Agreement to the following individuals, provided that they also agree to keep the terms and conditions of this Agreement confidential: (i) to your attorney or other representative consulted by you to understand the interpretation, application or legal effect of this Agreement; (ii) to your family; or (iii) to the extent that such disclosure is required by law. You shall instruct those to whom you provide information about this Agreement pursuant to subparts (i)-(iii) of this paragraph that they are obligated to keep it confidential, except as required by law. In the event that you receive a request for disclosure of Confidential Information other than as set forth in subparts (i)-(iii), above, you shall promptly notify Fannie Mae and shall cooperate fully with Fannie Mae in responding or objecting to such request. As set forth in Paragraph 8 of this Agreement, this undertaking does not preclude you from fully cooperating with any action or investigation brought by a governmental authority.

10. <u>Continuing Obligations under the Code</u>. You acknowledge that you remain bound to the terms and conditions of the Code of Conduct, the Confidential Information Policy and the Intellectual Property Policy (collectively, the "Code") applicable to all current and former Fannie Mae employees. You also acknowledge your continuing obligations under the Code and applicable federal and state laws which prohibit you from disclosing Confidential Information to third parties, removing Confidential Information from Fannie Mae's premises (including by electronic forwarding outside of Fannie Mae's networks) or copying or duplicating Fannie Mae's Confidential Information.

11. <u>Non-Competition/No Rehire</u>. You agree that, for a period of twelve (12) months immediately following the Termination Date, you will not solicit or accept employment or act in any way, directly or indirectly, to solicit or obtain employment or work for Freddie Mac, whether such employment is to be as a Freddie Mac employee, consultant, or advisor. You also agree that you will not seek to do

*David C. Hisey*
*February 17, 2012*
*Page 5 of 7*

business (or do business) with Fannie Mae, either directly as an employee of Fannie Mae, or indirectly as a contractor, consultant or vendor working solely on Fannie Mae matters. You acknowledge that these restrictions (and the restrictions in your surviving other agreements, see Paragraph 15(e)) are necessary to protect Fannie Mae's legitimate business interests, including retaining its personnel and preserving confidentiality of proprietary information that you have acquired in the course of your employment with Fannie Mae, and that these restrictions do not improperly restrict your right or ability to earn a living. You understand and agree that Fannie Mae will stop payments under Paragraph 1(a) (and require the re-payment of any sums previously paid to you thereunder) if you violate, or attempt to violate any of the above restrictions.

12. <u>Time to Consider and Consult With an Attorney</u>. You confirm that you have been given at least twenty-one (21) calendar days to consider this Agreement, which time is sufficient and satisfies any notification requirements that may exist. You are hereby strongly advised to consult with an attorney before executing this Agreement and by signing this Agreement you confirm that you have had a fair and full opportunity to do so. You further understand that Fannie Mae is not responsible for any expenses you may incur in consulting an attorney.

13. <u>Revocation</u>. You may revoke your acceptance of this Agreement within seven (7) calendar days after you sign it. Revocation is effective only by providing written notice to Judith C. Dunn, Fannie Mae's Senior Vice President and Principal Deputy General Counsel, at 3900 Wisconsin Avenue, NW, Washington, DC 20016, or by email to judith_dunn@fanniemae.com. If you timely revoke your execution of this Agreement, the Agreement will be null and void, and your employment will remain terminated as of the Termination Date. A mailed revocation notice must be post-marked no later than the seventh (7th) day after the date you signed the Agreement.

14. <u>FHFA Approval</u>. The financial terms of this Agreement have been approved by the FHFA.

15. <u>Miscellaneous</u>. The following provisions also apply:

    (a) Any controversy, dispute or claim arising out of or relating to this Agreement, breach thereof, or any of the circumstances relating to any matter not released pursuant to Paragraphs 5 and 6, above, shall first be addressed through good faith negotiation. If the dispute cannot be settled through negotiation, the Parties agree to mutually binding arbitration administered by JAMS, or its successor, pursuant to its Employment Arbitration Rules & Procedures and subject to JAMS' Policy on Employment Arbitration Minimum Standards of Procedural Fairness. Judgment on the Award may be entered in any court having jurisdiction.

    (b) The laws of the jurisdiction where you were primarily assigned to work at the time of your termination shall govern this Agreement. Should any provision of this Agreement be declared or be determined by any arbitrator to be illegal or invalid, that provision will be deemed modified to the extent necessary to be valid and enforceable. Should such modification not be possible, any illegal or invalid part, term or provision will be deemed not to be a part of this Agreement and the validity of the remaining parts, terms and provisions will not be affected.

*David C. Hisey*
*February 17, 2012*
*Page 6 of 7*

(c) Except as provided otherwise in sub-paragraph (e) below regarding other written agreements between the Parties, this Agreement supersedes any prior written or oral employment agreement between you and Fannie Mae, and any such agreement is terminated effective upon execution of this Agreement. You and Fannie Mae understand and agree that the terms and conditions of this Agreement constitute your full and complete understandings, agreements and promises to each other, and that there are no oral or written understandings, agreements, promises or inducements made or offered with respect to the subject matter covered in this Agreement other than those set forth in writing in this Agreement, and this Agreement merges and supersedes any and all prior agreements, understandings and representations on the subject matter covered herein.

(d) No modification of this Agreement shall be valid unless in writing and signed by each of the Parties.

(e) The terms of the following types of prior written agreement(s) between the Parties (if any) shall remain in effect following the execution of this Agreement: Any Indemnification Agreement, any Agreement on Ideas, Inventions and Confidential Information, and any Director and Officer Insurance applicable to you and in effect during your employment. In the event of a conflict between the terms of this Agreement and the terms of any other surviving written agreement between the parties, this Agreement shall prevail. **The existing terms of the "Repayment Provisions that apply to SEC officers" shall continue to apply.** There are no oral agreements between the Parties that will remain in effect after execution of this Agreement.

(f) The cash payments described in Paragraph 1(a) above, will be subject to all legally required deductions. Federal taxes on these payments will be withheld at the IRS supplemental rate (which is currently 25% for most employees), and any applicable state and/or local taxes also will be withheld. These payments are not eligible earnings for the purpose of Fannie Mae's retirement plans. The employer paid portion of your COBRA benefit for months 13-18 will be a taxable benefit to you and you are responsible for any required taxes.

(ii) This Agreement is intended to comply with the requirements of Section 409A of the Code. To the extent any provisions of this Agreement are ambiguous, they shall be interpreted in a manner that renders the payment or benefit in question exempt from Section 409A of the Internal Revenue Code (if possible), or otherwise, compliant with Section 409A of the Code.

(g) By entering into this Agreement, the Company is not admitting to have violated any of your rights, or to have violated any of the duties or obligations owed to you, or to have engaged in any conduct in violation of the common law or the above-referenced statutes, ordinances, executive orders or regulations. You agree that except as necessary to enforce this Agreement, or as otherwise required by law, neither this Agreement, nor any of its terms shall be offered as evidence in any action or proceeding or utilized in any other matter whatsoever as an admission or concession of liability or wrongdoing of any nature by the Company.

*David C. Hisey*
*February 17, 2012*
*Page 7 of 7*

(h) This Agreement will be binding on you and Fannie Mae and upon your respective heirs, representatives, executors, trustees, directors, employees, successors and assigns, and will run to the benefit of you, Fannie Mae and each of the Releasees and the Parties' respective heirs, administrators, representatives, executors, trustees, directors, employees, successors and assigns.

16. Execution. You acknowledge and agree that your decision to enter into this Agreement is wholly knowing, voluntary and absent any pressure or undue influence by Fannie Mae. You further acknowledge that you have carefully read and fully understand all of the provisions of this Agreement, that you have had an opportunity to review it with your attorney, and that you intend to be legally bound by this Agreement.

**PLEASE READ CAREFULLY. THIS AGREEMENT AND GENERAL RELEASE CONTAINS A RELEASE OF KNOWN AND UNKNOWN CLAIMS.**

**FANNIE MAE:**

By: _____ /s/   Brian P. McQuaid _____
            Brian P. McQuaid
            Senior Vice President and
            Chief Human Resources Officer

Date _____ 2-28-2012 _____

**DAVID C. HISEY:**

_____ /s/   David C. Hisey _____
Signature

Date _____ 2-28-12 _____

Exhibit 10.44

**Repayment Provisions**
**For SEC Executive Officers**
**Amended and Restated as of March 8, 2012**

(1) <u>Termination for Cause</u>. For the purposes of these repayment provisions, Fannie Mae may terminate Executive for Cause if Fannie Mae determines that Executive has:

    (a) materially harmed Fannie Mae by, in connection with Executive's performance of his or her duties for Fannie Mae, engaging in gross misconduct or performing Executive's duties in a grossly negligent manner, or

    (b) been convicted of, or pleaded nolo contendere with respect to, a felony.

Fannie Mae, by written notice, may terminate Executive's employment at any time following the occurrence of an event described in (b).

Executive shall not be deemed to have been terminated for Cause following the occurrence of an event described in (a) unless Fannie Mae shall have provided: (i) reasonable notice to Executive setting forth Fannie Mae's intention to terminate for Cause, (ii) where remedial action is appropriate and feasible, a reasonable opportunity for such action, (iii) an opportunity for Executive, together with Executive's counsel, to be heard before the Board of Directors, and (iv) Executive with a notice of termination stating that Executive was guilty of the conduct set forth in this section and specifying the particulars thereof in detail.

(2) <u>Forfeiture Upon Termination for Cause</u>. Upon termination of Executive's employment with Fannie Mae for Cause, Executive shall immediately forfeit all Deferred Salary and Incentive Payments that as of the date of termination of Executive's employment (a) in the case of stock options, stock appreciation rights, restricted stock and stock units, have not yet vested, and (b) in the case of other awards, have not yet become payable (determined without giving effect to a voluntary election to defer the payment date). "Incentive Payment" means: (i) severance payments and bonus payments, (ii) stock options and stock appreciation rights, (iii) restricted stock and stock units, (iv) long-term awards whether or not vested, and (v) deferred cash awards. Deferred Salary means both the awards made under the deferred pay program established in 2009 and deferred salary under the executive compensation program established in 2012.

Page 1

(3) <u>Subsequent Determination of "Cause" for Termination of Employment</u>. If, after the termination of Executive's employment (other than an involuntary termination of employment by Fannie Mae for Cause) and within the "applicable determination period" as hereinafter defined, the Board of Directors determines and notifies Executive in writing that circumstances existed at the time of termination of Executive's employment that would have justified a termination for Cause, including for this purpose the occurrence of a felony for which Executive has subsequently been convicted or to which Executive has subsequently pleaded nolo contendere, and the officer's actions materially harmed the business or reputation of Fannie Mae, Executive shall repay or forfeit, as appropriate, any or all Deferred Salary and Incentive Payments to the extent the Board of Directors, acting in its discretion deems such forfeiture or repayment to be appropriate under the circumstances. The Board may require the forfeiture or repayment of Deferred Salary and any or all Incentive Payments (including amounts in the nature of dividends or other earnings in respect of the Incentive Payments) received by Executive such that Executive is in the same economic position (without regard to the effect of taxes) as if Executive had been terminated for Cause as of the date of Executive's termination of employment. For purposes of this Section (3) and for purposes of Section (4), "applicable determination period" means (i) in the case of Executive's conviction of or a plea of nolo contendere to a felony, the ninety-day period following the date on which the Board of Directors first learns of the conviction or plea, and (ii) in every other case, the twenty-four-month period commencing on the date of termination of Executive's employment. The Board of Directors shall provide Executive with: (I) notice in writing of the Board of Director's intent to invoke this forfeiture/repayment provision, which notice shall set forth in reasonable detail the circumstances pursuant to which the Board of Directors intends to invoke this provision, and (II) a chance to be heard before the Board of Directors, together with Executive's counsel, prior to the time the Board of Directors makes a final decision to invoke this provision.

Page 2

(4) <u>Effect of Willful Misconduct</u>.

(a) The provisions of this Section (4) shall apply if (i) Fannie Mae terminates Executive's employment under Section (1) or if the Board of Directors makes a determination within the "applicable determination period" under Section (3) that a basis for such a termination existed, and (ii) the basis for such termination or determination is an act described in Section (1)(a) consisting of willful misconduct by Executive in connection with Executive's performance of Executive's duties with the Corporation or a felony described in Section (1)(b) consisting of an act of willful misconduct in the performance of Executive's duties with Fannie Mae, in either case which, in the determination of the Board of Directors (made in connection with Fannie Mae's termination of Executive or the Board of Directors' determination under Section (3), as the case may be), has materially harmed the business or reputation of Fannie Mae. Misconduct is not considered willful unless it is done or omitted to be done by Executive in bad faith or without reasonable belief that Executive's action or omission was in the best interest of Fannie Mae.

(b) If Section (4)(a) applies, then in addition to any forfeiture or repayment required by the terms of Section (2) or Section (3) there shall also be forfeited or repaid, as the case may be, Other Incentive Payments to the extent the Board of Directors, acting in its discretion in connection with its termination of Executive or in connection with its determination under Section (3), as the case may be, deems such forfeiture or repayment to be appropriate under the circumstances. As used in the immediately preceding sentence, "Other Incentive Payments" means Deferred Salary and annual incentives or long-term awards, whether already paid or payable to Executive in the future but excluding any such amounts paid to Executive more than two (2) years prior to the date of the termination of Executive's employment.

(5) <u>Role of Compensation Committee</u>. In exercising its discretion or otherwise acting under Sections (1), (3), or (4) above, the Board of Directors shall consider the recommendation of the Compensation Committee.

(6) <u>FHFA's Authority</u>. Nothing in these repayment provisions limits FHFA's authority with respect to executives covered by these provisions.

(7) <u>Sarbanes-Oxley Act Reimbursement</u>. [To be included only for CEO and CFO.] Executive acknowledges that certain of his or her bonus or other incentive-based or equity-based compensation may be subject to a requirement that they be reimbursed to Fannie Mae in the event that Section 304 of the Sarbanes-Oxley Act of 2002 applies to that compensation, and Executive agrees to comply with the requirements of that section.

Page 3

(8) <u>Materially Inaccurate Financial Statements or Materially Inaccurate Performance Metric Criteria</u> . If the Executive has been granted Deferred Salary or Incentive Payments based on materially inaccurate financial statements (which includes but is not limited to, statements of earnings, revenues, or gains) or any other materially inaccurate performance metric criteria, the Executive shall forfeit or repay any amounts granted in excess of the amounts that the Board determines would likely have been granted using accurate metrics.

(9) These provisions, as amended and restated, are effective beginning with compensation for the 2012 performance year.

<div align="center">Page 4</div>

**Exhibit 31.1**

**CERTIFICATION**

**PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)**

I, Michael J. Williams, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2012 of Fannie Mae (formally, the Federal National Mortgage Association);

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   Michael J. Williams
_____
Michael J. Williams
President and Chief Executive Officer

Date: May 9, 2012

Exhibit 31.2

**CERTIFICATION**

**PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)**

I, Susan R. McFarland, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2012 of Fannie Mae (formally, the Federal National Mortgage Association);

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   Susan R. McFarland
_____
Susan R. McFarland
Executive Vice President and
Chief Financial Officer

Date: May 9, 2012

**Exhibit 32.1**

**CERTIFICATION**

In connection with the Quarterly Report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association) for the quarter ended March 31, 2012, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael J. Williams, President and Chief Executive Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350 that to my knowledge:

1.    The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae.

/s/ Michael J. Williams
Michael J. Williams
President and Chief Executive Officer

Date: May 9, 2012

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.

**Exhibit 32.2**

## CERTIFICATION

In connection with the Quarterly Report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association) for the quarter ended March 31, 2012, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Susan R. McFarland, Executive Vice President and Chief Financial Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350, that to my knowledge:

1.     The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2.     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae.

/s/ Susan R. McFarland
_____
Susan R. McFarland
Executive Vice President and
Chief Financial Officer

Date: May 9, 2012

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.

FHFA 3532

# Tab 51

# FEDERAL HOUSING FINANCE AGENCY
# OFFICE OF INSPECTOR GENERAL

## Fannie Mae and Freddie Mac:
## Where the Taxpayers' Money Went



**WHITE PAPER:  WPR-2012-02**              **DATED:  May 24, 2012**



# FEDERAL HOUSING FINANCE AGENCY
## OFFICE OF INSPECTOR GENERAL

# AT A GLANCE

## Fannie Mae and Freddie Mac:  Where the Taxpayers' Money Went

## Why FHFA-OIG Did This Evaluation

On July 30, 2008, the Housing and Economic Recovery Act (HERA) was enacted for the purpose of strengthening the regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) (collectively, the Enterprises).  Six weeks later, the Enterprises entered conservatorships overseen by the newly created Federal Housing Finance Agency (FHFA).  Shortly thereafter, the U.S. Department of the Treasury (Treasury) began making quarterly investments in the Enterprises to prevent their insolvency because they were rapidly losing billions of dollars.  By the end of 2011, U.S. taxpayers had invested nearly $185 billion in Fannie Mae and Freddie Mac.

Questions have arisen regarding why Fannie Mae and Freddie Mac required such federal intervention, how the Enterprises have used Treasury's extraordinary investment, and who may have benefited from it.  In this white paper, FHFA's Office of Inspector General (FHFA-OIG) attempts to answer these and other questions relating to Treasury's investments in the Enterprises.  Understanding the answers to these questions will be important for policy makers as they determine the future of the Enterprises and more generally the nation's housing and related financial markets.

## Discussion

When U.S. housing prices stopped their rapid rise and began declining nationwide in 2006-2007, homeowners started defaulting on their mortgages at accelerating rates.  At that time, Fannie Mae and

Freddie Mac owned or guaranteed mortgages worth more than $5 trillion, nearly half of the U.S. mortgage market.  They did not have adequate capital reserves to continue operating in the face of the growing losses on their mortgage portfolios.

In September 2008, the Enterprises entered conservatorships overseen by FHFA, and, to prevent their insolvency, Treasury began making quarterly capital contributions to each institution.  This money has been used primarily to cover losses stemming from single-family mortgage loans that the Enterprises had acquired from 2004 through 2008.  In addition, but to a lesser extent, Treasury's investments have covered payments of dividends to Treasury as well as losses from investments and other expenses.

Without assistance from Treasury, the Enterprises likely would not have been able to repay their debts or honor their mortgage-backed securities (MBS) guarantees.  Further, they would have been unable to finance new mortgages or create new MBS, two of the cornerstones of the U.S. housing finance system.

## Conclusion

U.S. government intervention protected the numerous creditors – both domestic and foreign – who had purchased bonds and MBS issued by Fannie Mae and Freddie Mac.  Allowing the Enterprises to meet their debt and guarantee obligations enabled them to continue to support the secondary market.  However, the cost of rescuing the Enterprises has been high, with total Treasury support for the Enterprises currently expected to range from a quarter to a third of a trillion dollars.

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ 3

ABBREVIATIONS ................................................................................................................. 5

PREFACE ............................................................................................................................... 6

BACKGROUND ..................................................................................................................... 7

    About the Enterprises ......................................................................................................... 7

        Provisions for Loan Losses in the Enterprises' Portfolios ........................................... 8

        MBS Guarantees ........................................................................................................ 9

        Defaults and Foreclosures ......................................................................................... 9

    The Financial Crisis and Its Effect on the Enterprises ..................................................... 10

        The Crisis ................................................................................................................... 10

            The Bubble Inflated .............................................................................................. 10

            The Bubble Burst ................................................................................................. 10

        The Impact ................................................................................................................. 11

        The Conservatorships ............................................................................................... 12

ENTERPRISE GAINS & LOSSES 2008-2011 .................................................................. 17

    Summary of Gains, Losses, and Use of Funds ................................................................ 17

        Single-Family ........................................................................................................... 19

            Retained Mortgage Loans .................................................................................... 19

            MBS Guarantees .................................................................................................. 19

        Multifamily ............................................................................................................... 20

        Investments ............................................................................................................... 21

            Private-Label MBS ............................................................................................... 21

            Derivatives ........................................................................................................... 23

        Other Losses ............................................................................................................. 23

        Accounting Adjustments ........................................................................................... 24

        Dividends to Treasury ............................................................................................... 24

PUTTING THE LOSSES IN PERSPECTIVE:  WINNERS AND LOSERS ............................. 25

    Losers:  Stockholders ................................................................................................ 25

    Winners:  Holders of Bonds and Guaranteed MBS .................................................. 25

OUTLOOK:  FORECASTING FUTURE GOVERNMENT PAYMENTS ............................. 27

SCOPE AND METHODOLOGY ............................................................................................ 28

APPENDIX ................................................................................................................................ 29

    The Mechanics of Treasury Financial Support of the Enterprises ......................... 29

        The Draw ................................................................................................................. 29

        How the Draw is Calculated ..................................................................................... 29

ADDITIONAL INFORMATION AND COPIES ..................................................................... 30

# ABBREVIATIONS

Fannie Mae .......................................................................... Federal National Mortgage Association

FHFA ................................................................................. Federal Housing Finance Agency

FHFA-OIG .................................... Federal Housing Finance Agency Office of Inspector General

Freddie Mac ..................................................... Federal Home Loan Mortgage Corporation

Ginnie Mae ............................................................. Government National Mortgage Association

HERA ............................................................. Housing and Economic Recovery Act of 2008

MBS ................................................................................................. Mortgage-Backed Securities

PSPAs ................................................................. Senior Preferred Stock Purchase Agreements

RMBS ............................................................... Residential Mortgage-Backed Securities

Treasury ...................................................................... U.S. Department of the Treasury

FHFA 3537

**Federal Housing Finance Agency**
**Office of Inspector General**
Washington, DC

---

# PREFACE

FHFA-OIG was established by HERA,[1] which amended the Inspector General Act of 1978.[2]
FHFA-OIG is authorized to conduct audits, investigations, and other studies of the programs and
operations of FHFA; to recommend policies that promote economy and efficiency in the
administration of such programs and operations; and to prevent and detect fraud and abuse in
them. This white paper provides an overview of the purposes of the government's extraordinary
investments in the Enterprises; the uses to which the proceeds of such investments have been
applied; and the prospects for repayment of the government's investments.

This white paper was written principally by Senior Investigative Evaluator Bruce McWilliams
and Senior Financial Analyst Alan Rhinesmith. Assistant Inspector General for Evaluations
David Frost and Senior Financial Analyst Timothy Lee contributed to its completion. FHFA-
OIG appreciates the assistance of FHFA and Enterprise staff in completing this paper. It has
been distributed to Congress, the Office of Management and Budget, and others and will be
posted on FHFA-OIG's website, www.fhfaoig.gov.


*George Grob*

George Grob
Deputy Inspector General for Evaluations
FHFA Office of Inspector General

---

[1] Public Law No. 110-289.

[2] Public Law No. 95-452.

# BACKGROUND

Following an unprecedented rise in housing prices, the housing market began collapsing in late 2006.  This had widespread, adverse impacts on those financial institutions heavily concentrated in mortgage financing, such as Fannie Mae and Freddie Mac.

To prevent the Enterprises' insolvency, Treasury invested approximately $185 billion in them from September 6, 2008 through the end of 2011.  Treasury's actions have resulted in controversy and questions have arisen concerning why Fannie Mae and Freddie Mac required such federal intervention, how the Enterprises have used Treasury's extraordinary investment, and who may have benefited from it.

In a nutshell, it is believed that the investment permitted Fannie Mae and Freddie Mac to avoid insolvency, which, given their dominant position in housing finance and the trillions of dollars of securities issued, could have caused the collapse of the U.S. housing finance system.  Additional consequences of Treasury's intervention include that the Enterprises' shareholders lost almost all their investments, but the Enterprises' bond holders and investors in guaranteed mortgage-backed securities (MBS) were protected.  More importantly, homeowners and other participants in the housing market directly benefited from Treasury's buttressing of the market.

## About the Enterprises

Fannie Mae and Freddie Mac provide liquidity to the housing finance system by supporting the secondary mortgage market.  The Enterprises purchase residential mortgages that meet their underwriting criteria from loan sellers.  The loan sellers can then use the sales proceeds to originate additional mortgages.  The Enterprises can hold the mortgages in their own investment portfolios or package them into MBS that are, in turn, sold to investors.  For a fee, the Enterprises guarantee the payment of mortgage principal and interest on the MBS they sell.

As depicted in Figure 1, to finance their purchase of billions of dollars of mortgage loans, the Enterprises:  (1) borrow funds from large individual, institutional, and foreign investors; and (2) create and sell MBS.

**Figure 1:  Overview of Enterprises and Role of FHFA**[3]



## Provisions for Loan Losses in the Enterprises' Portfolios

Inevitably, some homeowners will encounter difficulty making their mortgage payments.  If a homeowner stops making payments, the Enterprise has to account for the revenue shortfall related to an owned- or guaranteed-mortgage.  The Enterprises have established special accounts or reserves to cover losses incurred on loans they own in their investment portfolios.  They typically contribute to these accounts every quarter.  These quarterly contributions to reserves are called **provisions for loan**

> **Provision for Loan and Guarantee Losses**
> An accounting concept that refers to the reduction of current income to establish a reserve fund for mortgage losses.

---

[3] Source:  General Accountability Office, *Financial Audit: Federal Housing Finance Agency's Fiscal Years 2011 and 2010 Financial Statements*, Nov. 2011, Figure 4.

**losses** in that they provide against future losses.  Provisions for loan losses – and the reserves they fund – can be attributable to a specific loan or can be based on the general expectation that a portion of the loans in the portfolio as a whole will **default**.

## MBS Guarantees

With respect to **mortgage guarantees** associated with the MBS that Fannie Mae and Freddie Mac sell, they collect a monthly fee to ensure the payment of principal and interest to MBS investors.  This fee – spread over the life of the pool of loans that comprise a particular MBS – is intended to cover that small portion of loans that are expected to default.  And, similar to the practice for the loans they retain in their own portfolios, the Enterprises establish reserves for losses on the MBS portfolios they guarantee.[4]

## Defaults and Foreclosures

After a homeowner defaults on a loan that the Enterprises own or guarantee, a loan servicer – typically, a vendor hired to collect mortgage payments, set aside taxes and insurance premiums, forward principal and interest obligations to mortgage owners, and respond to payment defaults – may commence **foreclosure** on behalf of the Enterprises.  Foreclosure is designed to recover the proceeds of a defaulted loan through the sale of the mortgaged property.  Once the servicer has foreclosed on a loan and taken the title on the property, the Enterprise essentially erases – or **charges off** – the unpaid mortgage balance from its accounting records.  Following charge off, if the Enterprise sells the property to a third party, the sales price will offset losses.

The Enterprises aim to contribute to their loan loss and guarantee portfolio reserves sufficiently to cover these losses.  However, with the collapse of the housing market and the ensuing

> **Default**
> Occurs when a mortgagor misses one or more payments.
>
> **Mortgage Guarantees**
> Historically, the Enterprises purchased mortgages and securitized them, then provided a guarantee to investors that if the mortgagor defaulted, the Enterprise would make timely principal and interest payments to the securitization trust, which in turn would make payments to the security holder.

> **Foreclosure**
> The legal process used by a lender to obtain possession of a mortgaged property.
>
> **Charges Off**
> An accounting term describing the elimination of an asset, such as a mortgage loan, from a company's books.  It does not necessarily imply a reduction in the company's assets, depending on the allowance established for loan losses.

---

[4] Fannie Mae uses the term "guaranty fee," whereas Freddie Mac uses the term "management and guarantee fee." This report refers to them both as "guarantee fees."

financial crisis, losses on loans and payment on guarantee obligations vastly exceeded the Enterprises' abilities to cover their losses.

## The Financial Crisis and Its Effect on the Enterprises

### The Crisis

*The Bubble Inflated*

From 2001 until it reached its peak in 2006, the U.S. housing market experienced a rapid increase in real estate values.[5]  During this time, prices of single-family homes increased by an average of more than 12% annually.  Home price appreciation was accompanied by a rapid increase in mortgage indebtedness.  Total mortgage debt outstanding in the U.S. more than doubled, from $5.1 trillion in 2000 to $11.2 trillion in the second quarter of 2008.  This swift escalation of home prices and mortgage indebtedness is often referred to as the "housing bubble."

During the housing bubble, Fannie Mae's mortgage-related assets and guarantees increased from $1.3 trillion in 2000 to $3.1 trillion in 2008, or approximately 11% annually.  Likewise, Freddie Mac's mortgage-related assets and guarantees increased from $1 trillion in 2000 to $2.2 trillion in 2008, or 11% annually.

*The Bubble Burst*

In 2007, housing prices began to plummet and loan delinquencies and defaults significantly increased.  As reflected in Figure 2, after more than doubling over six years, home prices fell by 27% between 2006 and 2008.

---

[5] Over a longer period, between 1997 and 2006, home values increased 124%.

FHFA 3542

**Figure 2:  Average Single Family Residence Prices, 2000-2011**[6]



## The Impact

The collapse of housing prices had widespread adverse impacts on many sectors of the U.S. economy, particularly for those financial institutions and investors that were heavily concentrated in mortgage financing such as Fannie Mae and Freddie Mac.  The Enterprises had grown rapidly with only a thin capital cushion to provide protection against losses.  The capital they were required to hold to protect them from losses on their investment portfolio and guarantee obligations met regulatory standards but fell well below capital levels maintained by many large financial institutions.[7]  Hence, the Enterprises were ill-prepared for a sharp

---

[6] Standard and Poor's, *S&P/Case-Shiller Home Price Indices* (Instrument: Case-Shiller 20-City Composite Seasonally Adjusted, Frequency: Monthly) (online at www.standardandpoors.com/indices/sp-case-shiller-home-price-indices/en/us/?indexId=spusa-cashpidff--p-us----).

[7] In 2007, Federal Reserve Board Chairman Ben S. Bernanke said:

> Because of both regulatory requirements and the force of market discipline, banks hold much more capital than GSEs [government-sponsored enterprises] hold.  The very largest bank holding companies generally hold equity capital equal to 6 percent or more of assets, and the largest regional banks generally have capital ratios of about 8 percent.  (As I am sure you are keenly aware, community banks often have a capital-to-assets ratio exceeding 10 percent.)  In comparison, the GSEs hold capital equal to roughly 3.5 percent of assets.  The justification for the low capital holdings of GSEs relative to banks is unclear.  The largest banks are more diversified than the GSEs; and although banks likely assume greater credit risks, they probably are less subject to interest-rate risk than are GSEs.  Moreover, the recent experience of the GSEs suggests that they are subject to at least as much operational risk as the large banks.

Board of Governors of the Federal Reserve System, *Statement of Chairman Ben S. Bernanke* (Mar. 6, 2007) (online at www.federalreserve.gov/newsevents/speech/bernanke20070306a.htm).

FHFA 3543

nationwide decline in housing prices.  When housing prices for the United States overall fell by an average of 9% in 2007, the Enterprises' businesses began to come under increasing stress.  By early 2008, both institutions were experiencing financial difficulties and, as more and more homeowners became delinquent on their mortgages, their rates of seriously delinquent (i.e., 90 or more days delinquent) owned- or guaranteed-loans rapidly exceeded levels experienced during the preceding decade.

The financial crisis has produced unprecedented losses for the Enterprises.  Fannie Mae lost $5 billion in the second half of 2007 and another $4.5 billion through the first half of 2008.  Freddie Mac lost $3.7 billion in the second half of 2007 and $1 billion during the first half of 2008.  Subsequently, the collapse in the market for MBS in the fall of 2008 resulted in even larger losses for both entities.  For the full year 2008, Fannie Mae and Freddie Mac together recorded losses of more than $100 billion ($58.7 billion and $50.1 billion, respectively).  To put these losses into perspective, over the 37 year period from 1971 to mid-2008, Fannie Mae and Freddie Mac earned $95 billion, less than they lost in 2008 alone.  And, the losses continued; from 2008 through the end of the third quarter of 2011, the Enterprises lost $261 billion.[8]  In other words, the amount lost during the conservatorships is more than twice as large as the cumulative net income that the Enterprises reported as public companies.[9]

## The Conservatorships

In July 2008, HERA was enacted.  Among other things, HERA strengthened the regulator's ability to place the Enterprises in conservatorships and authorized it to place them into receiverships.[10]  Additionally, HERA empowered Treasury to provide financial assistance to Fannie Mae and Freddie Mac through the end of 2009.

---

[8] Federal Housing Finance Agency, *Conservator's Report on the Enterprises' Financial Condition, Third Quarter 2011*, at 9 (online at http://www.fhfa.gov/webfiles/22855/Conservator'sReport3Q2011F122111F.pdf) (accessed Apr. 16, 2012).  This is a comprehensive income figure (upon which Treasury investments are calculated); net income figures reported by the Enterprises may differ.

As depicted in Figure 5, the Enterprises' cumulative losses exceed the amount of Treasury's investment by $78 billion.  When the conservatorships commenced, the Enterprises had $78 billion in capital available, and this capital partially offset losses and the need for additional Treasury investment.

[9] Federal Housing Finance Agency, *FHFA Report to Congress 2010*, at 114, 131 (online at www.fhfa.gov/webfiles/21570/FHFA2010RepToCongress61311.pdf) (accessed Feb. 29, 2012).

[10] Under the previous statute governing federal oversight of the Enterprises, the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, Public Law No. 102-550, the Enterprises' regulator, Office of Federal Housing Enterprise Oversight, had the authority to place an Enterprise in conservatorship, but not receivership.

On September 6, 2008, Fannie Mae and Freddie Mac entered conservatorships overseen by FHFA.[11]  Among the key reasons FHFA cited for taking this action were concerns about the financial conditions of the Enterprises and their ability to raise capital and to continue funding themselves; FHFA also noted "the critical importance each company has in supporting the residential mortgage market in this country."[12]

At the same time, and in coordination with FHFA, Treasury exercised its authority under HERA to provide support to the Enterprises to ensure their solvency.  In taking this action, former Treasury Secretary Henry Paulson stated that Treasury had concluded – based on a thorough review of the financial conditions of the Enterprises, their projected abilities to withstand difficult market conditions, and the need to provide stability to unsettled financial markets – that it was necessary both to place them in conservatorships and to set up a process for providing financial support to them, as needed.[13]

Treasury's financial support has been in the form of purchases of senior preferred stock issued by the Enterprises in accordance with Senior Preferred Stock Purchase Agreements (PSPAs).  Under the terms of the PSPAs, whenever an Enterprise's liabilities exceed its assets (as determined using **Generally Accepted Accounting Principles (GAAP)**), Treasury provides sufficient cash to eliminate that deficit in exchange for an increase in the value of the senior preferred stock.[14]  The PSPAs thus provide the Enterprises a financial backstop.[15]  Since establishing the conservatorships, Treasury has made equity investments in the Enterprises almost every quarter and, by the end of 2011, the cumulative amount of such taxpayer investments stood at $185 billion, as shown in Figure 3.[16]

> **Generally Accepted Accounting Principles (GAAP)**
> A set of rules that is agreed upon by industry boards as common accounting practices.

---

[11] For a more complete discussion of the impact of placing the Enterprises in conservatorships, see *FHFA-OIG's Current Assessment of FHFA's Conservatorships of Fannie Mae and Freddie Mac* (WPR-2012-001, March 28, 2012) (available at www.fhfaoig.gov/Content/Files/WPR-2012-001.pdf).

[12] Federal Housing Finance Agency, *Statement of FHFA Director James B. Lockhart* (Sept. 7, 2008) (online at www.treasury.gov/press-center/press-releases/Documents/fhfa_statement_090708hp1128.pdf).

[13] U.S. Department of the Treasury, *Statement by Secretary Henry M. Paulson, Jr.* (Sept. 7, 2008) (online at www.treasury.gov/press-center/press-releases/Pages/hp1129.aspx).

[14] Federal Housing Finance Agency, *Mortgage Market Note U.S. Treasury Support for Fannie Mae and Freddie Mac*, at 3 (online at www.fhfa.gov/webfiles/15362/MMNote_10-1_revision_of_MMN_09-1A_01192010.pdf) (accessed on Feb. 29, 2012).

[15] *Id.*

[16] This figure, $185 billon, includes the $2 billion initial commitment fee.  Treasury was issued stock representing this fee as payment for agreeing to invest in the Enterprises as required.

FHFA 3545

Initially, the Enterprises were to receive from Treasury no more than $200 billion.  The PSPAs were subsequently revised to increase this amount to $400 billion.  The PSPAs were amended a third time to increase the investment ceiling to $400 billion over the amount actually drawn as of December 31, 2012 (less any positive equity – which is unlikely – at that date).  To illustrate, given the investment of $185 billion at the end of 2011, if no more cash were drawn before December 31, 2012, (and stockholder equity is zero or less on that date), then the ceiling will be $585 billion ($185 billion plus $400 billion).

**Figure 3:  Federal Government Support Since Conservatorship**[17]



As a condition of receiving financial support under the PSPAs, the Enterprises agreed to pay Treasury quarterly dividends.  The dividend amounts are based on a 10% annual rate on Treasury's outstanding investment.

The Enterprises' dividend obligations, which are exacerbated by the 10% annual rate, are so large that they have yet to earn enough to pay them annually.  Consequently, Treasury has had to advance additional sums to the Enterprises to pay dividends.  As of the end of 2011, Treasury's investment in the Enterprises, excluding the amount needed to fund the dividend payments, is

---

[17] Federal Housing Finance Agency, *Data as of January 2, 2012 on Treasury and Federal Reserve Purchase Programs for GSE and Mortgage-Related Securities*, at Table 1 (online at www.fhfa.gov/webfiles/23193/TSYSupport1312012.pdf) (accessed Mar. 9, 2012); and Federal Housing Finance Agency, *Mortgage Market Note, US Treasury Support for Fannie Mae and Freddie Mac*, page 3 (January 20, 2010).

FHFA 3546

$151 billion.[18]  (Treasury's investment of $185 billion also includes $32 billion in dividend advances and $2 billion in fees assessed against the Enterprises at the inception of the PSPAs.) According to FHFA and the Enterprises, the likelihood of the Enterprises ever earning enough to repay the full amount invested is remote.[19]  This is illustrated in Figure 4, which compares the current dividend amount to the Enterprises' net annual income since 1988.

**Figure 4:  Combined Enterprise Net Income vs. Current Treasury Dividend** [20]



On the basis of Treasury's outstanding investment of $185 billion and the annual dividend rate of 10% (paid quarterly at a rate of 2.5%), the Enterprises' current annual dividend payment is $19.2 billion.[21]  As depicted in Figure 4, even in their best year, 2002, when they earned

---

[18] Federal Housing Finance Agency, *Data as of January 2, 2012 on Treasury and Federal Reserve Purchase Programs for GSE and Mortgage-Related Securities*, at Table 2 (online at www.fhfa.gov/webfiles/23193/TSYSupport1312012.pdf) (accessed Mar. 9, 2012); Freddie Mac, 2011 10-K Report, at 127 (online at www.freddiemac.com/investors/sec_filings/index.html) (accessed Mar. 9, 2012); Fannie Mae, 2011 10-K Report, at 9 (online at www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2011/10k_2011.pdf) (accessed Mar. 9, 2012).

[19] The Acting FHFA Director noted in a September 2011 speech:  "It ought to be clear to everyone at this point, given the Enterprises' losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that the Enterprises will not be able to earn their way back to a condition that allows them to emerge from conservatorship."  Federal Housing Finance Agency, *Statement of Acting Director Edward J. DeMarco* (Sept. 19, 2011) (online at www.fhfa.gov/webfiles/ 22617/NCSpeech91911.pdf).  Similarly, in their 2011 annual public filings, both Enterprises independently reported that, "there is significant uncertainty as to our long-term financial sustainability."  Freddie Mac, 2011 10-K Report, at 24 (online at www.freddiemac.com/investors/sec_filings/index.html) (accessed Mar. 9, 2012); Fannie Mae, 2011 10-K Report, at 21 (online at www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2011/10k_2011.pdf) (accessed Mar. 9, 2012).

[20] Source: FHFA annual report to Congress, 2010, p. 113 and p. 114, Fannie 10-K, 2010 and Freddie 10-K, 2010; Fannie 10-Q, 3rd quarter, 2010 and Freddie 10-Q, 2010.

[21] If the computation were made once a year, then the 10% rate would be assessed against the balance, resulting in a payment of $18.5 billion.

$14 billion, the Enterprises failed to earn the $19.2 billion that would be needed to pay an annual dividend on Treasury's $185 billion investment as of the end of 2011.

# ENTERPRISE GAINS & LOSSES 2008-2011

## Summary of Gains, Losses, and Use of Funds

Large businesses like the Enterprises typically analyze financial performance of all of their business lines to gain an understanding of the dynamics of each particular segment of their operations.  As discussed in more detail below, and as summarized in Figure 5, with the exception of their multifamily business lines, the Enterprises suffered losses in all of their operations.

### Sources of Gains and Losses Between 2008 and Q3:2011[22][23]

| | |
|---|---|
| **Single Family Houses** | Loss |
| **Multifamily** | Gain |
| **Investments** | Loss |
| **Other** | Loss |
| **Accounting Adjustments** | Loss |
| **Dividends to Treasury** | Dividend Payment |

As discussed above, the Enterprises' cumulative losses as of the end of the third quarter of 2011 total $261 billion, but they had $78 billion in unobligated capital at the beginning of 2008. (Additionally, $2 billion in fees were assessed against the Enterprises at the inception of the PSPAs, and these fees are included in Treasury's $185 billion investment.)  This unobligated capital partially mitigated the need for Treasury investment.  Figure 5 quantifies the relative losses, dividend obligations, and gain on Enterprise operations, through the third quarter of 2011.

---

[22] FHFA publishes a quarterly conservator's report on Fannie Mae's and Freddie Mac's financial performance and condition, to enhance public understanding of their financial performance leading up to and during conservatorship, including the sources of Enterprise losses and capital deficits, and Enterprise loss mitigation activity.  See http://www.fhfa.gov/Default.aspx?Page=172.

[23] "Figure 3.1 Capital Changes: January 1, 2008-September 30, 2011" from FHFA, *Conservator's Report on the Enterprises' Financial Performance, Third Quarter 2011*, p. 9 (online at http://www.fhfa.gov/webfiles/16591/ConservatorsRpt82610.pdf).

**Figure 5: Enterprise Gains/Losses 2008 Through Q3:2011**[24][25]



Figure 5 clearly demonstrates that the bulk of the Enterprises' losses were incurred in its single-family business: owning and guaranteeing home mortgages. Moreover, the vast majority of the Enterprises' losses in their single-family business lines are attributable to single-family loans made from 2004 through 2008.

---

[24] Numbers do not total due to rounding.

[25] "Figure 3.1 Capital Changes: January 1, 2008-September 30, 2011" from FHFA, *Conservator's Report on the Enterprises' Financial Performance, Third Quarter 2011*, p. 9. (online at http://www.fhfa.gov/webfiles/16591/ConservatorsRpt82610.pdf).

## Single-Family

As discussed above, the Enterprises purchase single-family mortgages from lenders. The Enterprises then either hold the mortgages in their investment portfolios or package and sell them as MBS. The Enterprises typically guarantee payment of principal and interest on the MBS they sell in exchange for guarantee fees.

As shown in Figure 5, after accounting for revenues from new and existing loans (e.g., guarantee fees), the Enterprises' single-family business line had a net loss (i.e., expenses exceeding income) of $208 billion since 2008. As described below, and depicted in Figure 6, Fannie Mae's and Freddie Mac's loss-related expenses totaled $218 billion, and these expenses were predominantly associated with MBS guarantees.

*Retained Mortgage Loans*

During the conservatorships, the Enterprises accrued $86 billion in expenses (called "provisions") related to mortgage loans held on their books, as shown in Figure 6. However, this sum is affected by a recent accounting change. Prior to 2010, these losses related solely to those loans the Enterprises purchased from third-parties and immediately placed into their portfolios (without securitizing and selling them to investors). Beginning in 2010, changes in accounting rules required the Enterprises to account for loans they had guaranteed in the same way as loans they owned and held on their books. Thus, the Enterprises reduced their **reserve for MBS guarantee losses** and increased their reserves for retained mortgages losses.

> **Reserve for Guarantee Losses**
> An accounting phrase meaning to establish a reserve fund on the balance sheet in anticipation of future losses for loans guaranteed by the Enterprises. It has the effect of reducing income in the current period.

*MBS Guarantees*

The Enterprises expanded their MBS business rapidly beginning in the mid-1990s. By 2008, the amount of the Enterprises' guarantees on mortgages that were **securitized** into MBS was nearly seven times the amount held in their investment portfolios.[26] As the housing market collapsed and homeowners failed to make interest and principal payments for securitized loans, the Enterprises satisfied

> **Securitization**
> A process whereby a financial institution assembles pools of income-producing assets (such as loans) and then sells an interest in the assets' cash flows as securities to investors.

---

[26] Fannie Mae, *2008 10-K Report*, at 170 (online at www.fanniemae.com/ir/pdf/earnings/2008/form10k_022609.pdf) (accessed Mar. 12, 2012); Freddie Mac, *2008 10-K Report*, at 127 (online at www.freddiemac.com/investors/er/pdf/10k_031109.pdf) (accessed Mar. 29, 2012).

their guarantee obligations and made required periodic payments to MBS investors.  As shown in Figure 6, in spite of the 2010 accounting change, the Enterprises' provisions for losses related to their guarantee business totaled $132 billion through the third quarter of 2011.

**Figure 6:  Enterprise Provisions for Losses on MBS Guarantees vs. Retained Mortgages**[27]



## Multifamily

Like with their single-family business, the Enterprises participate in mortgages secured by multifamily buildings, acquiring, holding, or securitizing them into MBS.  As shown in Figure 5, results from this business segment contributed a gain of $7 billion from 2008 through the end of the third quarter of 2011.

---

[27] Information for Allowance for Loan Losses and Reserves for Guarantee Losses taken from annual and quarterly filings (form 10K and form 10Q) from Fannie Mae and Freddie Mac between 2008 and 2011.

## Investments

During the same time frame, investments contributed $4 billion in overall losses, as shown in Figure 5. Figure 7 shows, however, that the Enterprises lost $83 billion on their investments in 2008, and that since that time annual gains have partially offset the 2008 results.

**Figure 7: Investments Gains/(Losses) 2008 Through 3Q11**[28]



Investment results are largely comprised of private-label MBS and derivative performance.

*Private-Label MBS*

From 2004 through 2007, as reflected in Figure 8, the Enterprises bought substantial quantities of private-label MBS. Such securities typically offered higher yields than either their own such securities or the mortgages they held in their investment portfolios. Further, in part, the mortgages backing these securities often were issued to low- and moderate-income homebuyers, whom the Enterprises had a legislative mission to serve.[29]

---

[28] Results from the Enterprises' investments and capital markets activities include derivatives and agency securities in addition to private-label securities.

[29] Federal Reserve Board Chairman Ben S. Bernanke said, "By borrowing at this preferential rate and purchasing assets (including MBS) that pay returns considerably greater than the Treasury rate, the GSEs can enjoy profits of an effectively unlimited scale." Bernanke went on to say, "the GSE portfolio purchases may create benefits for home purchase mortgages extended to lower-income households, to low- and moderate-income first-time homebuyers, and to buyers of homes in lower-income neighborhoods." Board of Governors of the Federal Reserve System, *Statement*

FHFA 3553

**Figure 8:  New Acquisitions of Sub Prime and Other Private-Label Mortgage-Backed Securities,** (*by year of acquisition*)[30]



With the downturn in the overall housing market, the value of private-label MBS held by the Enterprises plummeted as well.  Freddie Mac noted in its financial statements for 2010, that the "decline has been particularly severe for subprime, **option [Adjustable Rate Mortgages (ARMs)]**, and Alt-A and other loans" held in MBS.[31]  Freddie Mac cited high unemployment, a large inventory of seriously delinquent mortgage loans and unsold homes, tight credit conditions, and weak consumer confidence as contributing to the poor performance of these securities.  Further,

> **Payment Option ARM or Option ARM**
> A special type of ARM that enabled the borrower to choose among various payments levels with each payment:  a 40-, 30-, or 15-year fully amortizing payment, an interest-only payment, or a negatively amortizing minimum payment.

---

*of Chairman Ben S. Bernanke* (Mar. 6, 2007) (online at www.federalreserve.gov/newsevents/speech/bernanke20070306a.htm).

[30] "Credit Statistics of Loan underlying Alt-A and Subprime Private-Label Mortgage-related Securities (including Wraps)", Fannie Mae Form 10-K, 2010, p124. and "Significant Modeled Attributes for Certain Non-Agency Mortgage-Related Securities", Freddie Mac Form 10-K 2010, p. 218.

[31] Freddie Mac, *2010 10-K Report*, at 96 (online at www.freddiemac.com/investors/er/pdf/10k_022411.pdf) (accessed Feb. 29, 2012).

subprime loans that back these securities have had significantly greater concentrations in states that have experienced the greatest distress during the economic downturn, such as California, Florida, Arizona, and Nevada.  Loans in these states have experienced among the highest delinquency rates and the credit losses associated with such loans have been among the highest in the country.[32]  Nonetheless, steep declines in the value of the Enterprises' private-label MBS in 2008 have been offset by income from them and partial recovery of MBS prices since then.

*Derivatives*

As the Enterprises accumulated investments in mortgages and MBS, they were exposed to significant risks affecting the value of their mortgage-related assets.  Like many sophisticated investors, they entered into **derivatives** contracts to manage interest rate risk.  Such **hedging** activities are intended to moderate the possible financial impact from these risk factors.  Derivatives function as a form of risk management such that when the value of the underlying asset declines, the value of the derivative contract rises and vice versa.  Changes in the value of these derivatives holdings are generally expected to offset fluctuations in the value of the Enterprises' portfolios of mortgages and MBS.  Thus, as MBS values have increased – and moderated the Enterprises' private-label MBS losses – the values of derivative contracts have declined.

> **Derivatives**
> Securities used to hedge interest rate or other risks related to holding a mortgage.
>
> **Hedging**
> The practice of taking an additional step, such as buying or selling a derivative, to reduce the risk of holding a certain investment, such as MBS.

## Other Losses

Losses attributable to the write down of low-income housing tax credits during the fourth quarter of 2009 are included in "Other Losses" shown in Figure 5.  Because the Enterprises currently are not generating taxable income, the credits, which they had previously acquired, have no practical present value to them.  Therefore, they sought Treasury's approval to sell their credits to entities that have net operating income and thus potential tax liability that the credits can offset.  Treasury denied their requests.  The write down of these credits for both Enterprises contributed $8 billion of the $16 billion loss.

---

[32] Freddie Mac, *2010 10-K Report*, at 96 (online at www.freddiemac.com/investors/er/pdf/10k_022411.pdf) (accessed Feb. 29, 2012).

## Accounting Adjustments

The Enterprises make changes to their accounting policies when they are required to do so. One such change in 2010 required them to report on their balance sheets the amount of mortgages outstanding that are included in MBS that they guaranteed. This resulted in a one-time $8 billion loss for the Enterprises, as shown in Figure 5.

## Dividends to Treasury

Through the third quarter of 2011, the Enterprises have paid Treasury $32 billion in dividends. Of course, as discussed above, Treasury advanced the dividend payments to the Enterprises.

FHFA 3556

# PUTTING THE LOSSES IN PERSPECTIVE: WINNERS AND LOSERS

As of the end of the last quarter prior to the conservatorships (i.e., June 30, 2008), the Enterprises had $1.6 trillion in short- and long-term outstanding debt; $3.7 trillion worth of MBS guarantees; and stockholders' equity of only $54 billion.  With mounting losses and without Treasury funding, it is likely the Enterprises would have found themselves with insufficient funds to make scheduled debt payments and satisfy MBS guarantee obligations.

## Losers:  Stockholders

According to the PSPAs, no dividends can be paid to preferred or common **shareholders** of the Enterprises (with the exception of Treasury) without Treasury's approval or until Treasury is fully repaid.  Additionally, Treasury received a warrant to purchase 80% of the Enterprises' stock for a nominal amount.  Both of these measures rendered the common shares of the Enterprises virtually worthless.  For example, Fannie Mae's shares closed at $4.74 on the Friday before conservatorship and as recently as of March 9, 2012, they traded for $0.32 per share on the OTC Bulletin Board (Fannie Mae's and Freddie Mac's shares are no longer traded on the New York Stock Exchange); similarly, Freddie Mac's shares, which closed at $5.10 on the Friday before conservatorship, have fallen to $0.326 per share as of March 9, 2012.  Other factors also have impaired the Enterprises' share prices.  Their share prices had deteriorated substantially before the conservatorships, and, had the Enterprises been forced to liquidate, common shareholders would not have received a return on their investment until all creditors and senior classes of shareholders had been paid in full.[33]

In short, the PSPAs give priority in repayment to Treasury ahead of any other preferred or common shareholders.  Thus, the preferred and common shareholders of Fannie Mae and Freddie Mac did not benefit by Treasury's actions.  They effectively lost their investments.

## Winners:  Holders of Bonds and Guaranteed MBS

Treasury's investment effectively made "explicit" the federal government's "implicit" guarantee of the Enterprises' debt.  Further, by placing the Enterprises in conservatorship and committing to making capital investments in them, FHFA and Treasury provided assurance that the Enterprises would, in turn, be able to make contractually required payments to future **creditors**.

---

[33] 12 U.S.C. § 4617(c).

FHFA 3557

Neither Enterprise publishes a comprehensive list of creditors.  However, foreign central banks, commercial banks, fund managers, insurance companies, state and local governments, corporate pensions, individuals, and nonprofit foundations invested in the Enterprises' debt and guaranteed MBS.  For example, in the year before the conservatorships, Fannie Mae sold bonds to the following categories of investors:  foreign central banks (44%), fund managers (26%), commercial banks (18%), insurance companies (6%), state and local governments (4%), retail (2%), and corporate pensions (1%).[34]

More importantly, allowing the Enterprises to meet their debt and guarantee obligations enabled them to continue to support the secondary market.  As the Congressional Research Service has noted:

> A failure or default by Fannie [Mae] or Freddie [Mac] would have severely disrupted financial markets around the world.  If the [Enterprises'] portfolios of mortgage loans and MBSs had to be liquidated, prices would plunge, the secondary market for mortgages would be decimated, and the supply of new mortgage credit might be severely restricted.  These market disruptions would have negative impacts on the economy as a whole.[35]

Further, since September 2008, the private sector has almost entirely abandoned the secondary mortgage market, and the Enterprises and Ginnie Mae have stepped up to fill the void.  In 2010, the Enterprises' and Ginnie Mae's guaranteed MBS comprised 96% of newly issued MBS.  Additionally, Treasury's intervention has provided assurance to future creditors and MBS investors that they, too, will get their money back if they transact business with the Enterprises.

> **Creditors vs. Shareholders**
> Creditors, also called lenders, expect to earn interest that will be paid according to contractual terms.
>
> Common shareholders are the owners of a company, can receive dividends if the company declares them, and can sell their shares to others.
>
> Preferred shareholders cannot vote on shareholder matters, but they receive preference over common shareholders if the company becomes insolvent and its assets are distributed.

---

[34] Fannie Mae, *Review of Funding Activities for 2009*, p. 2 (Dec. 2009).  (Figures do not add to 100% because of rounding.)

[35] Congressional Research Service, *Fannie Mae and Freddie Mac in Conservatorship* (Sept. 15, 2008).

# OUTLOOK: FORECASTING FUTURE GOVERNMENT PAYMENTS

From September 2008 through the end of 2011, Treasury invested $185 billion in the Enterprises, and FHFA projects three scenarios for the future capital draws by both Fannie Mae and Freddie Mac through the end of calendar year 2014.[36]  Under these projections, the amount of the additional payments that Treasury would make to each Enterprise depends on the outlook for home prices – e.g., whether prices continue to fall, if so, by how much and for how long – and when and how strongly circumstances turn around so prices begin to increase.  According to the most recent projections, which FHFA released in October 2011, additional taxpayer financing for the Enterprises ranges from $37 billion to as much as $128 billion through the end of 2014.[37]  In other words, total Treasury support for the Enterprises is currently expected to range from a low of $220 billion to a high of $311 billion.

---

[36] Federal Housing Finance Agency, *FHFA Releases Projections Showing Range of Potential Draws for Fannie Mae and Freddie Mac* (online at www.fhfa.gov/webfiles/19409/Projections_102110.pdf) (accessed Feb. 29, 2012). For this purpose, FHFA used three house price path projections with a "current baseline" in which the decline in house prices hits bottom in the first quarter of 2012 and then prices rise by 15% through the end of 2014; a second scenario in which near-term growth is stronger but prices end up at the same level as the baseline by the end of 2014; and a "deeper second recession" projection in which house prices bottom out in mid-2012 and then rise by 23%.

[37] However, the projections reported are not expected outcomes.  They are modeled projections in response to "what if" scenarios involving assumptions about Enterprise operations, loan performance, macroeconomic and financial market conditions, and house prices.  The projections do not define the full range of possible outcomes and actual outcomes may be very different.  This effort should be interpreted as an analysis of the sensitivity of future Enterprise capital draws to possible house price paths.

FHFA provided the Enterprises with key assumptions for each scenario.  The Enterprises used their respective internal models to project their financial results based on the assumptions provided by FHFA.  While this effort achieves a degree of comparability between the Enterprises, it does not allow for actions that the Enterprises might undertake in response to the economic conditions specified in the scenarios.  Those Enterprise-specific business changes could lead to results that differ from those presented in the projections.

# SCOPE AND METHODOLOGY

This is one in a series of audits, evaluations, and special reports reflecting FHFA-OIG's ongoing oversight and analysis of FHFA's conservatorships of the Enterprises.

The bases of the financial analysis were the tables included in the Enterprises' SEC filings, FHFA's Conservatorship Report of the Enterprises' Financial Performance, and other publicly available information.  To gain an understanding of the issues discussed herein, FHFA-OIG interviewed officials from the Office of the Financial Analysis, Modeling and Simulations, FHFA, as well as the Office of the Chief Accountant, FHFA.  FHFA-OIG also shared drafts of the report with FHFA, Fannie Mae, and Freddie Mac executives.

This report was prepared under the authority of the Inspector General Act of 1978, as amended, and in accordance with the Quality Standards for Inspection and Evaluation (January 2011), which were promulgated by the Council of the Inspectors General on Integrity and Efficiency. These standards require FHFA-OIG to plan and perform evaluations that obtain evidence sufficient to provide reasonable bases for its findings and recommendations.  FHFA-OIG believes that the analysis and conclusions contained in this report meet these standards.

The scope of this report is from January 2008 through September 2011.

FHFA-OIG appreciates the efforts of FHFA and its staff in providing information and access to necessary documents to accomplish this evaluation.

# APPENDIX

## The Mechanics of Treasury Financial Support of the Enterprises

### The Draw

With each quarter's public filings, FHFA reviews each Enterprise's financial report to determine if its liabilities exceed its assets. This condition is called "stockholders' deficit." If there is a stockholders' deficit, FHFA requests money from Treasury – called the Draw – to make up any such deficit. Treasury, in turn, receives a similar increase in the stated value (called the "liquidation preference") of the senior preferred shares purchased from the Enterprises at the inception of the conservatorships. Given this unique structure, Treasury is not *lending money to* the Enterprises as much as it is *investing in* them.

Under HERA, if the obligations of an Enterprise exceed its assets for more than 60 days, FHFA would appoint a receiver of an Enterprise.[38] If Treasury had not been providing funding during the conservatorships, the Enterprises, given their losses, would have entered receivership.

### How the Draw is Calculated

- According to the terms of the PSPA between Treasury and each Enterprise, the Enterprises were required to each issue $1 billion in senior preferred stock without a corresponding cash payment from Treasury. This was called the "initial commitment fee." Every time an Enterprise makes a Draw under the PSPA, the liquidation preference of the senior preferred stock increases by the same amount.

- Each quarter's Draw is based on the stockholders' deficit, if any, from the previous quarter.

- Up until the second quarter of 2011, the Draw was the stockholders' deficit rounded up to the nearest $100 million and paid in the following quarter. Beginning with the payment in the third quarter of 2011, the Draw was rounded up to the nearest million dollars.

---

[38] 12 U.S.C. § 4617(a)(4).

# ADDITIONAL INFORMATION AND COPIES

For additional copies of this report:

    Call FHFA-OIG at:  202-730-0880

    Fax your request to:  202-318-0238

    Visit the FHFA-OIG website at:  www.fhfaoig.gov

To report alleged fraud, waste, abuse, mismanagement, or any other kind of criminal or noncriminal misconduct relative to FHFA's programs or operations:

    Call our Hotline at:  1-800-793-7724

    Fax us the complaint directly to:  202-318-0358

    E-mail us at:  oighotline@fhfa.gov

    Write to us at:  FHFA Office of Inspector General
              Attn:  Office of Investigation – Hotline
              400 Seventh Street, S.W.
              Washington, DC  20024

FHFA 3562

# Tab 52

**Retained Portfolio PSPA Compliance Forecast**
**Actual 12/31/11 Balances; GSE estimates for 12/31/12; 12/31/13; 12/31/14 based on regularly provided RP forecasts**

| | PSPA 10% | PSPA 15% | PSPA 17.5% | PSPA 20% | Hybrid (Keep current PSPA caps for 2012 and 2013 then 20% per year) |
|---|---|---|---|---|---|
| 2012 | 656,000 | 656,000 | 656,000 | 656,000 | 656,000 |
| 2013 | 590,400 | 557,600 | 541,200 | 524,800 | 590,400 |
| 2014 | 531,360 | 473,960 | 446,490 | 419,840 | 472,320 |
| 2015 | 478,224 | 402,866 | 368,354 | 335,872 | 377,856 |
| 2016 | 430,402 | 342,436 | 303,892 | 268,698 | 302,285 |
| 2017 | 387,361 | 291,071 | 250,711 | 214,958 | 241,828 |
| 2018 | 348,625 | 247,410 | 206,837 | 171,966 | 193,462 |
| 2019 | 313,763 | 210,299 | 170,640 | 137,573 | 154,770 |
| 2020 | 282,386 | 178,754 | 140,778 | 110,059 | 123,816 |

| | | Forecast | | | | |
|---|---|---|---|---|---|---|
| Product | 12/31/11 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 |
| **UPB ($ in millions)** | | | | | | |
| Non-Agency PLS | 79,771 | 69,344 | 60,016 | 51,888 | 44,861 | 38,785 |
| Non-Agency CMBS | 54,110 | 51,334 | 48,801 | 46,326 | 43,976 | 41,745 |
| Non-Agency MRBs/Other | 8,753 | 8,328 | 8,010 | 7,695 | 7,392 | 7,101 |
| Distressed Non-modified | 47,362 | 45,306 | 42,590 | 35,112 | 28,947 | 23,865 |
| Reverse mortgage loans | - | - | - | - | - | - |
| Reverse securities | - | - | - | - | - | - |
| **Total Non-Core** | **189,996** | **174,312** | **159,417** | **141,020** | **125,176** | **111,496** |
| | | | | | | |
| Distressed - Modified SF | 71,044 | 67,960 | 63,885 | 52,668 | 43,421 | 35,797 |
| SF Performing Loans | 53,253 | 16,583 | 12,879 | 10,835 | 9,115 | 7,669 |
| MF Loans | 82,311 | 83,713 | 82,930 | 75,613 | 68,942 | 62,859 |
| Agency MBS/CMO (18% run-off) | 256,709 | 210,501 | 172,611 | 141,541 | 116,064 | 95,172 |
| **Total** | **653,313** | **553,068** | **491,722** | **421,678** | **362,717** | **312,993** |
| PSPA Cap | | 656,000 | 557,600 | 473,960 | 402,866 | 342,436 |
| 17.50% PSPA Cap | | 656,000 | 541,200 | 446,490 | 368,354 | 303,892 |
| Hybrid PSPA Cap | | 656,000 | 590,400 | 472,320 | 377,856 | 302,285 |

42% Securitize modified and add agencies divided by retained portfolio
30% Liquid agencies divided by retained portfolio

**Note: We did not have a break out for Distressed Modified vs Distressed non-modified from Freddie (so we used Fannie's 60% modified 40% non-modified)**

Fannie

| | | Forecast | | | | |
|---|---|---|---|---|---|---|
| Product | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 |
| **UPB ($ in millions)** | | | | | | |
| Non-Agency PLS | 39,000 | 37,522 | 35,938 | 34,421 | 32,968 | 31,576 |
| Non-Agency CMBS | 23,000 | 20,104 | 18,583 | 17,177 | 15,878 | 14,676 |
| Non-Agency MRBs/Other | 10,700 | 10,284 | 9,845 | 9,425 | 9,022 | 8,637 |
| Distressed - non-modified | 104,000 | 105,592 | 96,700 | 88,557 | 81,099 | 74,270 |
| Reverse Mortgage Loans | 41,400 | 40,537 | 39,586 | 38,657 | 37,750 | 36,865 |
| Reverse Securities | 10,500 | 10,403 | 10,123 | 9,851 | 9,585 | 9,327 |
| **Total Non-Core** | **228,600** | **224,442** | **210,775** | **198,087** | **186,303** | **175,352** |
| | | | | | | |
| Distressed - Modified SF | 153,000 | 143,688 | 138,060 | 132,652 | 127,457 | 122,464 |
| SF Performing Loans | 30,000 | 20,757 | 17,772 | 15,216 | 13,028 | 11,155 |
| MF Loans | 78,200 | 64,700 | 43,700 | 37,300 | 30,900 | 24,500 |
| Agency MBS/CMO (18% run-off) | 218,614 | 166,000 | 140,000 | 116,000 | 97,000 | 79,540 |
| **Total** | **708,414** | **619,587** | **550,307** | **499,256** | **454,688** | **413,011** |
| 15% PSPA Cap | | 656,000 | 557,600 | 473,960 | 402,866 | 342,436 |
| Over Cap | | | | 25,296 | 51,822 | 70,575 |
| 17.50% PSPA Cap | | 656,000 | 541,200 | 446,490 | 368,354 | 303,892 |
| Over Cap | | | 9,107 | 52,766 | 86,334 | 109,119 |
| Hybrid PSPA Cap | | 656,000 | 590,400 | 472,320 | 377,856 | 302,285 |
| Over Cap | | | | 26,936 | 76,832 | 110,726 |

49% Securitize modified and add agencies divided by retained portfolio
19% Liquid agencies divided by retained portfolio

For 15% PSPA Cap  To get to GREEN in 2014-2016, Assume sell $15B agency in 2014, $15B in 2015, and $10B in 2016
For 15% PSPA Cap  To get to GREEN in 2014-2016, Assume securitize and sell $10B distressed modified agency in 2014, 2015, 2016
For 17.5% PSPA Cap  Also, if Fannie approved as Ginnie Mae issuer, up to $40B reverse mortgages could be securitized and sold

**Note: Fannie provided estimates for 2012 and 2013 (we extrapolated for 2014, 2015 and 2016.)**
**Note: MF loans row includes some securitization goals as part of MRA remediation and run-off in 2014-2016 equal to 2012 run-off ($6.4B)**
**Note: We did have a break out for Distressed Modified vs Distressed non-modified from Fannie**
**Note: Fannie provided agency MBS forecast to FHFA on 5-24-12**

# Tab 53

Retained Portfolio PSPA Compliance Forecast
Actual 12/31/11 Balances; GSE estimates for 12/31/12; 12/31/13; 12/31/14 based on regularly provided RP forecasts

| | PSPA 10% | PSPA 15% | PSPA 17.5% | PSPA 20% | Hybrid (Keep current PSPA caps for 2012 and 2013 then 20% per year) |
|---|---|---|---|---|---|
| 2012 | 656,000 | 656,000 | 656,000 | 656,000 | 656,000 |
| 2013 | 590,400 | 557,600 | 541,200 | 524,800 | 590,400 |
| 2014 | 531,360 | 473,960 | 446,490 | 419,840 | 472,320 |
| 2015 | 478,224 | 402,866 | 368,354 | 335,872 | 377,856 |
| 2016 | 430,402 | 342,436 | 303,892 | 268,698 | 302,285 |
| 2017 | 387,361 | 291,071 | 250,711 | 214,958 | 241,828 |
| 2018 | 348,625 | 247,410 | 206,837 | 171,966 | 193,462 |
| 2019 | 313,763 | 210,299 | 170,640 | 137,573 | 154,770 |
| 2020 | 282,386 | 178,754 | 140,778 | 110,059 | 123,816 |

| | | Forecast | | | | |
|---|---|---|---|---|---|---|
| Product | 12/31/11 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 |
| **UPB ($ in millions)** | | | | | | |
| Non-Agency PLS | 79,771 | 69,344 | 60,016 | 51,888 | 44,861 | 38,785 |
| Non-Agency CMBS | 54,111 | 51,334 | 48,801 | 46,326 | 43,976 | 41,745 |
| Non-Agency MRBs/Other | 8,753 | 8,328 | 8,010 | 7,695 | 7,392 | 7,101 |
| Distressed Non-modified | 47,362 | 45,306 | 42,590 | 35,112 | 28,947 | 23,865 |
| Reverse mortgage loans | - | - | - | - | - | - |
| Reverse Securities | - | - | - | - | - | - |
| **Total Non-Core** | 189,996 | 174,312 | 159,417 | 141,020 | 125,176 | 111,496 |
| | | | | | | |
| Distressed Modified SF | 71,044 | 67,960 | 63,885 | 52,668 | 43,421 | 35,797 |
| SF Performing Loans | 53,253 | 16,583 | 12,879 | 10,835 | 9,115 | 7,669 |
| MF Loans | 82,311 | 83,713 | 82,930 | 75,613 | 68,942 | 62,859 |
| Agency MBS/CMO (18% run-off) | 256,709 | 210,501 | 172,611 | 141,541 | 116,064 | 95,172 |
| **Total** | 653,313 | 553,068 | 491,722 | 421,678 | 362,717 | 312,993 |
| PSPA Cap | | 656,000 | 557,600 | 473,960 | 402,866 | 342,436 |
| 17.50% PSPA Cap | | 656,000 | 541,200 | 446,490 | 368,354 | 303,892 |
| Hybrid PSPA Cap | | 656,000 | 590,400 | 472,320 | 377,856 | 302,285 |

MUCH EASIER TO SECURITIZE NON-MODIFIED RE-PERFORMERS THAN MODIFIED RE-PERFORMERS

42% Securitize modified and add agencies divided by retained portfolio

30% Liquid agencies divided by retained portfolio

**Note: We did not have a break out for Distressed Modified vs Distressed non-modified from Freddie (so we used Fannie's 60% modified 40% non-modified)**

Fannie

| | | Forecast | | | | |
|---|---|---|---|---|---|---|
| Product | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 |
| **UPB ($ in millions)** | | | | | | |
| Non-Agency PLS | 39,000 | 37,522 | 35,938 | 34,421 | 32,968 | 31,576 |
| Non-Agency CMBS | 23,000 | 20,104 | 18,583 | 17,177 | 15,878 | 14,676 |
| Non-Agency MRBs/Other | 10,700 | 10,284 | 9,845 | 9,425 | 9,022 | 8,637 |
| Distressed - non-modified | 104,000 | 105,592 | 96,700 | 88,557 | 81,099 | 74,270 |
| Reverse Mortgage Loans | 41,400 | 40,537 | 39,586 | 38,657 | 37,750 | 36,865 |
| Reverse Securities | 10,500 | 10,403 | 10,123 | 9,851 | 9,585 | 9,327 |
| **Total Non-Core** | 228,600 | 224,442 | 210,775 | 198,087 | 186,303 | 175,352 |
| | | | | | | |
| Distressed - Modified SF | 153,000 | 143,688 | 138,060 | 132,652 | 127,457 | 122,464 |
| SF Performing Loans | 30,000 | 20,757 | 17,772 | 15,216 | 13,028 | 11,155 |
| MF Loans | 78,200 | 64,700 | 43,700 | 37,300 | 30,900 | 24,500 |
| Agency MBS/CMO (18% run-off) | 218,614 | 166,000 | 140,000 | 116,000 | 97,000 | 79,540 |
| **Total** | 708,414 | 619,587 | 550,307 | 499,256 | 454,688 | 413,011 |
| 15% PSPA Cap | | 656,000 | 557,600 | 473,960 | 402,866 | 342,436 |
| Over Cap | | | | 25,296 | 51,822 | 70,575 |
| 17.50% PSPA Cap | | 656,000 | 541,200 | 446,490 | 368,354 | 303,892 |
| Over Cap | | | 9,107 | 52,766 | 86,334 | 109,119 |
| Hybrid PSPA Cap | | 656,000 | 590,400 | 472,320 | 377,856 | 302,285 |
| Over Cap | | | | 26,936 | 76,832 | 110,726 |

49% Securitize modified and add agencies divided by retained portfolio

19% Liquid agencies divided by retained portfolio

For 15% PSPA  To get to GREEN in 2014-2016, Assume sell $15B agency in 2014, $15B in 2015, and $10B in 2016
For 15% PSPA Cap  To get to GREEN in 2014-2016, Assume sell and sell $10B distressed modified agency in 2014, 2015, 2016
For 17.5% PSPA Cap  Also, if Fannie approved as Ginnie Mae issuer, up to $40B reverse mortgages could be securitized and sold

MUCH EASIER TO SECURITIZE NON-MODIFIED RE-PERFORMERS THAN MODIFIED RE-PERFORMERS

**Note: Fannie provided estimates for 2012 and 2013 (we extrapolated for 2014, 2015 and 2016.)**
**Note: MF loans row includes some securitization goals as part of MRA remediation and run-off in 2014-2016 equal to 2012 run-off ($6.4B)**
**Note: We did have a break out for Distressed Modified vs Distressed non-modified from Fannie**
**Note: Fannie provided agency MBS forecast to FHFA on 5-24-12**

FHFA 3564

# Tab 54

See TREASURY 3833-3862

# Tab 55



Federal Housing Finance Agency

Conservator's Report
on the Enterprises' Financial Performance

First Quarter 2012

# Contents

Executive Summary…………………………………..……………..…… 3

1. Mortgage Markets and the Enterprises' Market Presence….……………… 4

2. Credit Quality of New Single-Family Business……………………..……… 6

3. Capital…………..…………………….…………………..........……………... 9

4. Single-Family Credit Guarantee Segment Results……….……………… 11

5. Investments and Capital Markets Segment Results………………………… 14

6. Loss Mitigation Activity..…………...……………………….……..…. 16

7. Comparison of Actual Results to Projections of the Enterprises' Financial
   Performance………………………….………..……………….……….... 17

The purpose of this report is to provide an overview of key aspects of the financial condition of Fannie Mae and Freddie Mac (the Enterprises) during conservatorship. The data in this report are derived primarily from the Enterprises' SEC filings and other publicly available sources.  In some cases, FHFA adjusted the classification of certain data to provide comparability between the Enterprises.  In other cases, the Enterprises' reporting methodologies changed over time. Therefore, the data in this report may not exactly match published figures.

FHFA 3566

Federal Housing Finance Agency

<div align="right">

Conservator's Report on the
Enterprises' Financial Performance
First Quarter 2012
</div>

# Executive Summary

## Mortgage Markets and the Enterprises' Market Presence

Seventy-five percent of all mortgage originations in the first quarter of 2012 were due to refinance volume.  Refinance volumes surged during the first quarter of 2012, in response to a sustained period of record low mortgage rates, enhancements in the Home Affordable Refinance Program, and increased volume ahead of the 10 basis point guarantee fee increase in April 2012.  As a result, combined Enterprise MBS issuance share grew to 79% in the first quarter of 2012.

## Credit Quality of New Single-Family Business

The quality of new business remained high in the first quarter of 2012, as evidenced by average FICO credit scores around the 760 range.  Both Enterprises have experienced an increase in new business with LTVs greater than 90 percent.  This is primarily due to activity related to the Enterprises' refinance programs (including the Home Affordable Refinance Program) that support improving the housing market.

## Capital

Combined Treasury support as a result of poor financial performance fell to a total of $19 million in the first quarter of 2012, all of which pertains to Freddie Mac.  Losses in the Single-Family Credit Guarantee segment declined sizably, particularly at Fannie Mae, as a result of lower provisions for credit losses.   The Investments segment results continued to be positive in the first quarter of 2012 driven by low funding costs as a result of the low interest rate environment.  The Single-Family Credit Guarantee segment and senior preferred dividends have been the main drivers of charges against capital since the end of 2007.

## Single-Family Credit Guarantee Segment Results

Credit-related expenses continued to drive Single-Family Credit Guarantee segment financial results for the Enterprises.  However, losses decreased in the first quarter of 2012, driven by lower provisions for credit losses, particularly at Fannie Mae. Lower provisions for credit losses were driven by improvement in both REO disposition values and early stage delinquencies, as well as, the continued decrease in the seriously delinquent loan population.

## Investments and Capital Markets Segment Results

The Investments and Capital Markets segment was a positive contributor to capital in the first quarter of 2012, as both Enterprises continued to benefit from low funding costs as a result of the low interest rate environment.

## Loss Mitigation Activity

Since conservatorship, the Enterprises have completed approximately 2.3 million foreclosure prevention actions.  Half of these actions were permanent loan modifications.

## Projections of Financial Performance

The projected combined Treasury draws for the second half of 2011 and the first quarter of 2012 ranged from $33 billion to $74 billion.  This compares to an actual combined draw of $19 billion.   The primary driver of the difference between actual and projected performance was lower than projected provisions for credit losses, particularly at Fannie Mae.  Lower provisions for credit losses were mainly driven by an improved book profile reflected in lower delinquencies, combined with improvement in REO disposition values.

3

Federal Housing Finance Agency

<div align="right">Conservator's Report on the<br>Enterprises' Financial Performance<br>First Quarter 2012</div>

## 1   Mortgage Markets and the Enterprises' Market Presence

### 1.1    Primary Mortgage Market Trends—Mortgage Originations

- Seventy-five percent of all mortgage originations in the first quarter of 2012 were due to refinance volume.  Refinance volumes surged during the first quarter of 2012, in response to a sustained period of record low mortgage rates, enhancements to the Home Affordable Refinance Program (HARP), and increased volume ahead of the 10 basis point guarantee fee increase in April 2012.

**Figure 1.1 Mortgage Originations by Product Type** *($ in billions)*



Source:
Inside Mortgage Finance

4

Federal Housing Finance Agency

<div align="right">Conservator's Report on the<br>Enterprises' Financial Performance<br>First Quarter 2012</div>

**1.2    Secondary Mortgage Market Trends—Mortgage-Backed Securities Issued**

- The Enterprises' market share of mortgage-backed securities (MBS) issuances grew to 79 percent in the first quarter of 2012, as sellers delivered heavily ahead of the expected 10 basis point guarantee fee increase in April 2012.  Ginnie Mae's market share fell to 20 percent.  The Enterprises and Ginnie Mae continued to account for almost all issuances of mortgage-backed securities.

**Figure 1.2 Enterprises' Market Share – MBS Issuance Volume**



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 1Q12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Enterprises | 67% | 68% | 70% | 47% | 41% | 40% | 58% | 73% | 72% | 70% | 73% | 79% |
| Ginnie Mae | 13% | 9% | 8% | 7% | 4% | 4% | 5% | 22% | 25% | 26% | 25% | 20% |
| Total Agency | 80% | 77% | 78% | 54% | 45% | 44% | 63% | 95% | 97% | 96% | 98% | 99% |

Sources:
  Inside Mortgage Finance, Inside MBS & ABS, Enterprises' Monthly Volume Summaries.
  Issuance figures exclude MBS issued backed by assets previously held in the Enterprises' portfolios.

FHFA 3569

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
First Quarter 2012

## 2   Credit Quality of New Single-Family Business

### 2.1   Credit Characteristics of the Enterprises' New Single-Family Business

- The credit quality of new Single-Family business remained high in the first quarter of 2012.  Purchases of non-traditional and higher-risk mortgages were very low and the average FICO credit score remained around the 760 range at both Enterprises. Average loan-to-value ratios (LTVs) were near 70 percent at both Enterprises.  An increase in the percentage of new business with LTVs greater than 90 percent primarily relates to the Enterprises' refinance programs, including the Home Affordable Refinance Program.

**Figure 2.1 Characteristics of Single-Family Mortgage Acquisitions**

(Categories overlap and are not additive)

| Percent of New Single-Family Business[1] | Fannie Mae | | | | | | | Freddie Mac | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 1Q12 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 1Q12 |
| Alt-A[2] | 22% | 17% | 3% | 0% | 1% | 1% | 1% | 18% | 22% | 7% | 0% | 0% | 0% | 0% |
| Interest-Only | 15% | 15% | 6% | 1% | 1% | 1% | 0% | 17% | 21% | 6% | 0% | 0% | 0% | 0% |
| Credit Score <620 | 6% | 6% | 3% | 0% | 0% | 0% | 1% | 5% | 6% | 3% | 1% | 1% | 1% | 1% |
| LTV >90 Percent | 10% | 16% | 10% | 4% | 7% | 9% | 11% | 6% | 11% | 9% | 4% | 9% | 11% | 14% |
| Average LTV | 73% | 75% | 72% | 67% | 68% | 69% | 70% | 73% | 74% | 71% | 67% | 69% | 70% | 71% |
| Average Credit Score | 716 | 716 | 738 | 761 | 762 | 762 | 763 | 720 | 718 | 734 | 756 | 755 | 755 | 758 |

Notes
[1] New business is defined as issuance of MBS/PC plus purchases of whole loans and does not include purchases of mortgage-related securities.
[2] Refer to sources for Alt-A definitions. Freddie Mac's 2010 figures include Alt-A purchases of $1.5 billion due to a long-term standby commitment termination and a subsequent PC issuance. There was no change to the Alt-A exposure on these mortgages as a result of these transactions. Fannie Mae newly originated Alt-A loans acquired since 2009 consist of the refinancing of existing loans.

Sources:
Enterprises' Forms 10-K and 10-Q, credit supplements to SEC disclosures, and management reports.

Federal Housing Finance Agency

<div align="right">Conservator's Report on the<br>Enterprises' Financial Performance<br>First Quarter 2012</div>

### 2.2    Performance of Non-Traditional and Higher-Risk Mortgages (mostly purchased pre-conservatorship)

- Single-family serious delinquency rates remained high for the Enterprises' Single-Family credit guarantee portfolios; however, serious delinquency rates declined in the first quarter of 2012 for all product categories as delinquent loans were resolved through loss mitigation activities or foreclosure, and new loans with stronger credit profiles were acquired. Non-traditional and higher-risk mortgages, which account for a relatively small portion of the credit guarantee portfolios, continue to show substantially higher serious delinquency rates than traditional mortgages.

## Figure 2.2 Single-Family Serious Delinquency Rates

| Product Type[1] | Fannie Mae | | | | | | Freddie Mac | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4Q07 | 4Q08 | 4Q09 | 4Q10 | 4Q11 | 1Q12 | 4Q07 | 4Q08 | 4Q09 | 4Q10 | 4Q11 | 1Q12 |
| Alt-A | 2.2% | 7.0% | 15.6% | 13.9% | 12.4% | 12.0% | 1.9% | 5.6% | 12.3% | 12.2% | 11.9% | 11.8% |
| Interest-Only | 2.0% | 8.4% | 20.2% | 17.9% | 15.3% | 14.7% | 2.0% | 7.6% | 17.6% | 18.4% | 17.6% | 17.2% |
| **Credit Score** | | | | | | | | | | | | |
| <620 | 4.7% | 9.0% | 18.2% | 14.6% | 13.5% | 12.6% | 3.4% | 7.8% | 14.9% | 13.9% | 12.9% | 12.6% |
| **Loan-to-Value Ratio** | | | | | | | | | | | | |
| >90 Percent | 3.0% | 6.3% | 13.1% | 10.0% | 8.1% | 7.2% | 1.9% | 4.8% | 9.1% | 7.8% | 6.7% | 6.3% |
| **Risk-Layering** | | | | | | | | | | | | |
| Credit score <620 & LTV >90 Percent | 8.6% | 16.0% | 28.0% | 21.4% | 18.7% | 16.8% | 5.4% | 11.5% | 19.0% | 17.1% | 15.4% | 14.7% |
| **Total Single-Family** | 1.0% | 2.4% | 5.4% | 4.5% | 3.9% | 3.7% | 0.7% | 1.8% | 4.0% | 3.8% | 3.6% | 3.5% |

Notes
[1] Loans with multiple product features may be in more than one category. Refer to sources for Alt-A definition.

Sources:
Enterprises' Forms 10-K and 10-Q, credit supplements to SEC disclosures, and management reports.

Serious Delinquency - All loans in the process of foreclosure plus loans that are three or more payments delinquent (including loans in the process of bankruptcy).

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
First Quarter 2012

| 2.3 | Performance of Post-Conservatorship Business |

- While not necessarily indicative of the ultimate performance, the improved credit characteristics of the new post-conservatorship business is reflected in substantially lower cumulative default rates for the 2009 and 2010 vintages compared to the years leading up to conservatorship.

**Figure 2.3 Cumulative Default Rate by Origination Year**



| Fannie Mae[1] | | |
|---|---|---|
| Vintage | Yr1Q4 | Yr 2Q4 |
| 2002 | 0.4 | 9.5 |
| 2003 | 0.4 | 7.1 |
| 2004 | 0.7 | 11.6 |
| 2005 | 0.7 | 14.0 |
| 2006 | 1.3 | 37.4 |
| 2007 | 3.0 | 78.9 |
| 2008 | 2.2 | 37.1 |
| 2009 | 0.1 | 4.3 |
| 2010 | 0.2 | 5.6 |
| 2011 | 0.3 | NA |

| Freddie Mac[2] | | |
|---|---|---|
| Vintage | Yr1Q4 | Yr2Q4 |
| 2002 | 0.3 | 7.7 |
| 2003 | 0.2 | 3.7 |
| 2004 | 0.4 | 5.2 |
| 2005 | 0.2 | 6.3 |
| 2006 | 0.6 | 25.2 |
| 2007 | 2.3 | 63.4 |
| 2008 | 2.1 | 36.4 |
| 2009 | 0.1 | 4.0 |
| 2010 | 0.1 | 5.4 |
| 2011 | 0.2 | NA |

Notes
[1] Defaults include loan liquidations other than through voluntary pay-off or repurchase by lenders and include loan foreclosures, preforeclosure sales, sales to third parties and deeds-in-lieu of foreclosure. Cumulative Default Rate is the total number of single-family conventional loans in the guarantee book of business originated in the identified year that have defaulted, divided by the total number of single-family conventional loans in Fannie Mae's guarantee book of business originated in the identified year.
[2] Rates are calculated for each year of origination as the number of loans that have proceeded to foreclosure transfer or short sale and resulted in a credit loss, excluding any subsequent recoveries, divided by the number of loans in Freddie Mac's single-family credit guarantee portfolio originated in the identified year.

Source:
Enterprises' quarterly credit supplements.

8

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
First Quarter 2012

## 3.  Capital

### 3.1    Capital Changes: January 1, 2008 – March 31, 2012

- At the end of 2007, the Enterprises had $71 billion of combined capital.  From the end of 2007 through the first quarter of 2012, the Enterprises' combined charges against capital have totaled $265 billion, requiring Treasury support of approximately $187 billion through draws under the Senior Preferred Stock Purchase Agreements.  The Single-Family Credit Guarantee segment has been the largest contributor to charges against capital, accounting for $218 billion, or 82 percent, of capital reduction to date.  Senior preferred dividends on Treasury draws accounted for $41 billion, or 15 percent, of capital reduction.

**Figure 3.1 Capital Changes: January 1, 2008 – March 31, 2012** *($ in billions)*

| | Fannie Mae | | Freddie Mac | | Combined | |
|---|---|---|---|---|---|---|
| Beginning Capital[1] | $44 | | $27 | | $71 | |
| Equity Issuance[2] | 7 | | 0 | | 7 | |
| Available Capital | $51 | | $27 | | $78 | |
| **Capital Change** | | | | | | |
| Single-Family Comprehensive Income (Loss)[3] | ($143) | *85%* | ($75) | *77%* | ($218) | *82%* |
| Multifamily Comprehensive Income (Loss)[3,4] | (5) | *3%* | 16 | *-16%* | 10 | *-4%* |
| Investments Comprehensive Income (Loss)[3,4] | 14 | *-8%* | (5) | *6%* | 8 | *-3%* |
| Consolidation Accounting Adjustment | 3 | *-2%* | (12) | *12%* | (8) | *3%* |
| Other | (14) | *8%* | (3) | *3%* | (17) | *6%* |
| Senior Preferred dividends | (23) | *14%* | (18) | *19%* | (41) | *15%* |
| Total Capital Change[5] | ($167) | *100%* | ($98) | *100%* | ($265) | *100%* |
| Capital surplus (deficit) | ($116) | | ($71) | | ($187) | |
| Treasury Senior Preferred draw[6] | $116.1 | | $71.3 | | $187.5 | |

Notes
 Totals may not sum due to rounding.
 [1] Capital is defined as stockholders' equity.
 [2] Fannie Mae's figure includes common and preferred stock issuance pre-conservatorship.
 [3] Segment comprehensive income (loss) represents net income (loss) plus total other comprehensive income (loss) by segment.
 [4] Freddie Mac includes net interest income on investments in multifamily loans, net interest income on commercial mortgage- backed securities, and non-interest rate risk-related unrealized gains (losses) on commercial mortgage-backed securities in Multifamily Comprehensive Income (Loss), while Fannie Mae includes these items in Investments comprehensive income.  Investments comprehensive income includes the impact of accounting changes for security impairments.
 [5] Included in total capital change for both Enterprises are losses attributable to the writedown of low income housing tax credits (LIHTC) investments to zero in the fourth quarter of 2009.  The writedown of these LIHTC losses for Fannie Mae and Freddie Mac were $5 billion and $3 billion, respectively, and are included in Other.  The establishment of a deferred tax asset valuation allowance, which reduced capital by $21 billion for Fannie Mae and $14 billion for Freddie Mac in 2008, is also contributing to the total capital allowance (valuation allowance has been allocated across segments).
 [6] Total draws include amounts relating to the  first quarter of 2012 to be received in the second quarter of 2012.

Sources:
Fannie Mae segment earnings per Fannie Mae SEC disclosures for the relevant time periods.
Freddie Mac's 2008 and 2009 comprehensive income (loss) by segment reflect revised methodology effective January 1, 2010.

Federal Housing Finance Agency

| 3.2 | Capital Changes: First Quarter 2012 |
|---|---|

- During the first quarter of 2012, both Enterprises generated capital from the Investments segment and the Multifamily segment.  At Fannie Mae, positive contributions to capital from these segments more than offset losses from the Single-Family Credit Guarantee segment, and senior preferred dividends.  Freddie Mac ended the quarter with a capital deficit of $18 million.

**Figure 3.2 Capital Changes: December 31, 2011 – March 31, 2012** *($ in billions)*

| | Fannie Mae | Freddie Mac | Combined |
|---|---|---|---|
| Available Capital[1] | $0 | $0 | $0 |
| **Capital Change** | | | |
| Single-Family Comprehensive Income (Loss)[2] | ($1) | ($2) | ($3) |
| Multifamily Comprehensive Income (Loss)[2] | 0 | 2 | 2 |
| Investments Comprehensive Income (Loss)[2] | 5 | 2 | 7 |
| Other | (1) | 0 | (1) |
| Capital increase (decrease) pre-dividends | $3 | $2 | $5 |
| Senior Preferred dividends | (3) | (2) | (5) |
| Total Capital Change | $0 | ($0) | $0 |
| Capital Surplus (Deficit) | $0 | ($0) | $0 |
| Treasury Senior Preferred draw[3] | - | $0.0 | $0.0 |

Notes
 Totals may not sum due to rounding.
 [1] Capital is defined as stockholders' equity.  Available capital is defined as beginning capital plus Treasury draw related to prior quarter's deficit.
 [2] Represents net income (loss) plus total other comprehensive income (loss) by segment.  Freddie Mac includes net interest income on investments in multifamily loans, net interest income on commercial mortgage-backed securities, and non-interest rate risk-related unrealized gains (losses) on commercial mortgage-backed securities in Multifamily comprehensive income (loss), while Fannie Mae includes these items in Investments comprehensive income (loss).
 [3] Reflects requested Treasury draws related to current quarter deficit, to be received during the next quarter.  Enterprises' draw requests are rounded up to the nearest $1 million.

Sources:
Fannie Mae and Freddie Mac SEC disclosures for the quarter ended March 31, 2012.

Federal Housing Finance Agency

<div align="right">Conservator's Report on the<br>Enterprises' Financial Performance<br>First Quarter 2012</div>

## 4. Single-Family Credit Guarantee Segment Results

### 4.1 Single-Family Credit Guarantee Segment Results

- Losses from the Single-Family Credit Guarantee segment declined in the first quarter of 2012, as a result of lower credit-related expenses, notably the provision for credit losses. Provisions for credit losses decreased at both Enterprises driven by improvement in REO disposition values, improvement in early stage delinquencies, and the continued decrease in the seriously delinquent loan population.

**Figure 4.1 Single-Family Credit Guarantee Segment Results** *($ in billions)*

| | Fannie Mae | | | | | | Freddie Mac | | | | | | Combined 2008 - 1Q12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 1Q12 | Total | 2008 | 2009 | 2010 | 2011 | 1Q12 | Total | |
| Revenue[1] | $9 | $9 | $2 | $6 | $2 | $28 | $5 | $4 | $5 | $5 | $1 | $20 | $48 |
| Provision for credit losses[2] | (26) | (50) | (25) | (26) | (2) | (129) | (16) | (29) | (19) | (12) | (2) | (79) | (208) |
| Foreclosed Property Expenses | (2) | (1) | (2) | (1) | (0) | (5) | (1) | (0) | (1) | (1) | (0) | (3) | (8) |
| Credit-related expenses | (28) | (51) | (26) | (27) | (2) | (134) | (17) | (29) | (19) | (13) | (2) | (82) | (216) |
| SOP 03-3 Losses[3] | (2) | (20) | (0) | (0) | (0) | (23) | (2) | (5) | (0) | (0) | (0) | (6) | (29) |
| Other expenses[4] | (2) | (3) | (2) | (3) | (1) | (10) | (1) | (1) | (2) | (2) | (0) | (7) | (17) |
| Pre-tax income (loss) | (22) | (65) | (27) | (24) | (1) | (140) | (15) | (31) | (17) | (10) | (2) | (74) | (214) |
| (Provision) benefit for taxes | (5) | 1 | 0 | 0 | 0 | (3) | (5) | 4 | 1 | (0) | (0) | (1) | (4) |
| Net income (loss) | ($27) | ($64) | ($27) | ($24) | ($1) | ($143) | ($20) | ($27) | ($16) | ($10) | ($2) | ($75) | ($218) |
| Other Comprehensive Income | - | 0 | 0 | - | - | 0 | - | 0 | 0 | 0 | (0) | 0 | 0 |
| Total Comprehensive Income (Loss)[5] | ($27) | ($64) | ($27) | ($24) | ($1) | ($143) | ($20) | ($27) | ($16) | ($10) | ($2) | ($75) | ($218) |

Notes
Totals may not sum due to rounding.
[1] Consists of guarantee fee income, trust management income, net interest income, and other income. Guarantee fee revenue of $1.9 billion for Fannie Mae in the first quarter of 2012 was offset by net interest expense of $0.4 billion primarily related to interest income not recognized for non-accrual loans.
[2] The provision for credit losses is the recognition of estimated incurred losses and increases the loan loss reserve. Fannie Mae's figures have been adjusted to exclude losses on credit-impaired loans acquired from MBS trusts.
[3] Losses on credit-impaired loans acquired from MBS/PC Trusts.
[4] Consists of investment gains (losses), fair value losses (Fannie Mae), administrative expenses, other expenses, and at Freddie Mac, segment adjustments.
[5] Represents segment earnings (loss) and, for periods after 2008, total comprehensive income (loss), net of taxes, for the Single-Family Credit Guarantee Segment.

Sources:
Fannie Mae segment earnings per Fannie Mae SEC disclosures for the relevant time periods. Effective in the first quarter 2010, Fannie Mae changed the presentation of segment financial information; prior periods were not revised. Freddie Mac segment comprehensive income (loss) for 2008 and 2009 reflect revised methodology effective January 1, 2010. Enterprise segment comprehensive income (loss) since 2010 is not comparable with prior periods due to the adoption of accounting standards for consolidations, effective January 1, 2010.

Federal Housing Finance Agency

<div align="right">Conservator's Report on the<br>Enterprises' Financial Performance<br>First Quarter 2012</div>

| 4.2 | Loan Loss Reserves |
|---|---|

- Loan loss reserves decreased at both Enterprises during the first quarter of 2012, but remain high.  The decrease in loan loss reserves was driven by the decrease in the provision for credit losses, resulting in charge-offs exceeding the provision for credit losses at both Enterprises for the quarter.  Differences in the magnitude of loan loss reserves stemmed from differences in the size and credit quality of the Enterprises' single-family credit guarantee portfolios.  Fannie Mae's single-family credit guarantee portfolio is larger than Freddie Mac's and has higher serious delinquency rates.

**Figure 4.2 Loan Loss Reserves** *($ in billions)*

| | Fannie Mae | | | | | | Freddie Mac | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Single-Family Loss Reserve | 2008 | 2009 | 2010 | 2011 | 1Q12 | Total | 2008 | 2009 | 2010 | 2011 | 1Q12 | Total |
| Beginning balance[1] | $3 | $24 | $62 | $60 | $72 | | $3 | $15 | $33 | $39 | $39 | |
| Provision for credit losses[2,3] | 26 | 50 | 25 | 26 | 2 | 129 | 16 | 29 | 19 | 12 | 2 | 79 |
| Charge-offs, net[3] | (5) | (13) | (21) | (18) | (5) | (61) | (2) | (7) | (13) | (12) | (3) | (38) |
| Adoption of Accounting Standards | - | - | (11) | - | - | | - | - | (0) | - | - | |
| Other | 0 | 0 | 5 | 3 | 1 | | (1) | (4) | 0 | (1) | (0) | |
| Ending balance[1] | $24 | $62 | $60 | $72 | $70 | | $15 | $33 | $39 | $39 | $38 | |
| **Credit Losses - Single-Family** | | | | | | | | | | | | |
| Charge-offs[3] | $5 | $13 | $21 | $18 | $5 | $61 | $2 | $7 | $13 | $12 | $3 | $38 |
| Other[4] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 |
| Foreclosed Property Expense | 2 | 1 | 2 | 1 | 0 | 5 | 1 | 0 | 1 | 1 | 0 | 3 |
| Total[3] | $6 | $13 | $23 | $18 | $5 | $66 | $4 | $8 | $14 | $13 | $3 | $42 |

<u>Sources:</u>
SEC disclosures for the relevant time periods.

Notes
 Totals may not sum due to rounding.
[1] Fannie Mae's loan loss reserve excludes amounts related to the allowance for accrued interest receivable and allowance for preforeclosure property taxes and insurance receivable.  Freddie Mac's loan loss reserve excludes amounts related to the allowance for accrued interest receivable and forgone interest on loans placed on non-accrual status.
[2] Freddie Mac's figures represent Segment Earnings provision for credit losses, which is generally higher than that recorded under GAAP, primarily due to recognized provision associated with forgone interest income on loans placed on non-accrual status, which is not recognized under GAAP.
[3] Fannie Mae's provision for credit losses has been adjusted to exclude losses on credit-impaired loans acquired from MBS trusts. Additionally, the effect of losses from credit-impaired loans acquired from MBS trusts on charge-offs and foreclosed property expense has been reflected as an adjustment to total credit losses and charge-offs, net.
[4] Freddie Mac's figures include charge-offs related to certain loans purchased under financial guarantees.

FHFA 3576

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
First Quarter 2012

### 4.3   Credit Losses

- Non-traditional and higher-risk mortgages concentrated in the 2006 and 2007 vintages, and mortgages originated in California, Florida, Arizona and Nevada continue to account for a disproportionate share of credit losses (charge-offs and foreclosed property expenses).  However, the proportion of losses coming from non-traditional products continued to decline in the first quarter of 2012 as these vintages aged.

**Figure 4.3 Credit Losses** *(Percent of total credit losses)*

| | Fannie Mae | | | | | | Freddie Mac | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | % of UPB as of Dec 31, 2008[1] | 2008 | 2009 | 2010 | 2011 | 1Q12 | % of UPB as of Dec 31, 2008[1] | 2008 | 2009 | 2010 | 2011 | 1Q12 |
| **by State** | | | | | | | | | | | | |
| California | 16% | 25% | 24% | 23% | 27% | 20% | 14% | 30% | 32% | 26% | 29% | 24% |
| Florida | 7% | 11% | 16% | 18% | 11% | 20% | 7% | 10% | 15% | 19% | 13% | 16% |
| Arizona | 3% | 8% | 11% | 10% | 12% | 8% | 3% | 9% | 11% | 11% | 11% | 8% |
| Nevada | 1% | 5% | 7% | 6% | 8% | 5% | 1% | 4% | 6% | 6% | 7% | 7% |
| **by Product**[2] | | | | | | | | | | | | |
| Alt-A | 11% | 46% | 40% | 33% | 27% | 25% | 10% | 50% | 44% | 37% | 28% | 24% |
| Interest-Only | 8% | 34% | 33% | 29% | 26% | 23% | 9% | 50% | 47% | 37% | 29% | 24% |
| **by Vintage** | | | | | | | | | | | | |
| 2006 | 14% | 35% | 31% | 29% | 28% | 26% | 15% | 41% | 35% | 30% | 28% | 25% |
| 2007 | 20% | 28% | 36% | 36% | 30% | 35% | 19% | 25% | 36% | 34% | 36% | 37% |
| 2008 | 16% | 1% | 5% | 7% | 6% | 8% | 15% | 0% | 5% | 7% | 8% | 9% |
| 2009 | N/A | N/A | 0% | 0% | 2% | 2% | N/A | N/A | 0% | 0% | 1% | 2% |
| 2010 | N/A | N/A | N/A | 0% | 1% | 1% | N/A | N/A | N/A | 0% | 0% | 1% |

Notes
[1] Represents each category's share of the respective Enterprise's single-family book of business, which is based on the unpaid principal balance of all single-family unsecuritized mortgages held by the Enterprises and those underlying Freddie Mac mortgage-related securities, or covered by the Enterprise's other guarantee commitments.
[2] Product categories overlap.

Sources:
Enterprises' Forms 10-K and 10-Q, credit supplements to SEC disclosures, and management reports.

13

Federal Housing Finance Agency

<div align="right">
Conservator's Report on the
Enterprises' Financial Performance
First Quarter 2012
</div>

## 5.  Investments and Capital Markets Segment Results

### 5.1 Investments and Capital Markets Segment Results

- In the first quarter of 2012, the Investments and Capital Markets segment was a positive contributor to capital as both Enterprises continued to benefit from low funding costs as a result of the low interest rate environment.  Gains and losses on derivatives and trading securities during the quarter were muted.

**Figure 5.1 Investments and Capital Markets Segment Results** *($ in billions)*

| | Fannie Mae | | | | | | Freddie Mac | | | | | | Combined 2008 - 1Q12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 1Q12 | Total | 2008 | 2009 | 2010 | 2011 | 1Q12 | Total | |
| Revenue[1] | $8 | $13 | $13 | $13 | $3 | $50 | $3 | $8 | $6 | $7 | $2 | $26 | $77 |
| Derivatives gains (losses) | (15) | (6) | (3) | (7) | (0) | (31) | (13) | 5 | (2) | (4) | 0 | (13) | (45) |
| Trading gains (losses) | (7) | 4 | 3 | 0 | 0 | 0 | 1 | 5 | (1) | (1) | (0) | 3 | 3 |
| Other gains (losses)[2] | 2 | 1 | 4 | 3 | 1 | 11 | 2 | (0) | 1 | 2 | 0 | 5 | 16 |
| Other-than-temporary impairments | (7) | (10) | (1) | (0) | (0) | (18) | (17) | (10) | (4) | (2) | (0) | (33) | (51) |
| Other expenses[3] | (1) | (1) | (0) | (1) | (0) | (2) | (2) | (1) | 1 | 0 | 0 | (1) | (3) |
| Pre-tax income (loss) | (21) | 1 | 16 | 9 | 4 | 10 | (26) | 7 | 1 | 3 | 2 | (13) | (4) |
| (Provision) benefit for taxes[4] | (9) | (0) | 0 | 0 | - | (9) | (2) | (1) | 0 | 0 | 0 | (2) | (11) |
| Net income (loss) | ($29) | $1 | $16 | $9 | $4 | $1 | ($28) | $6 | $1 | $3 | $2 | ($15) | ($14) |
| | | | | | | | | | | | | | |
| Unrealized gains (losses) on AFS[5] | (6) | 11 | 4 | 1 | 0 | 10 | (20) | 11 | 10 | 3 | 0 | 5 | 15 |
| Accounting change for Impairments | - | 3 | - | - | - | 3 | 0 | 5 | - | - | - | 5 | 8 |
| Total Comprehensive Income (Loss) | ($35) | $15 | $20 | $10 | $5 | $14 | ($48) | $23 | $11 | $6 | $2 | ($5) | $8 |

Notes
  Totals may not sum due to rounding.
  [1] Consists of guarantee fee expense, trust management income, net interest income, and other income.
  [2] Figures consist of debt extinguishment losses, debt foreign exchange gains (losses), debt fair-value losses, investment gains (losses), and hedged mortgage assets gains, net.
  [3] Consists of administrative expenses, other expenses, and at Freddie Mac, segment adjustments.
  [4] Includes extraordinary losses /noncontrolling interest.
  [5] Amount for 2008 includes consolidated changes in unrealized gains (losses) on available for sale securities, net of taxes. Effective April 2009, includes adjustments for other-than-temporary impairments, net of taxes, included in accumulated other comprehensive income due to a change in accounting standards for impairments. At Freddie Mac, amount also includes the change in unrealized gains (losses), net of taxes, related to cash flow hedge relationships.

Sources:
Fannie Mae segment earnings per Fannie Mae SEC disclosures for the relevant time periods.  Effective in the first quarter 2010, Fannie Mae changed the presentation of segment financial information; prior periods were not revised.  Freddie Mac segment comprehensive income (loss) for 2008 and 2009 reflect revised methodology effective January 1, 2010.  Enterprise segment comprehensive income (loss) for 2010 and 2011 is not comparable with prior periods due to the adoption of accounting standards for consolidations effective January 1, 2010.

FHFA 3578

Federal Housing Finance Agency

### 5.2   Security Impairments

- Freddie Mac's non-agency portfolio is larger than Fannie Mae's, generally causing higher levels of security impairments.  A substantial portion of Freddie Mac's security impairments during the first quarter of 2012 was from 2006 and 2007 vintage subprime securities.

## Figure 5.2 Security Impairments *($ in billions)*

| Fannie Mae | 2008 | | | 2009 | | | 2010 | | | 2011 | | | 1Q12 | | | Total 2008- |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vintage[1] | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 1Q12 |
| Alt-A/Option ARM Alt-A | $3.0 | $1.8 | $4.8 | $1.7 | $2.3 | $4.0 | $0.2 | $0.1 | $0.3 | $0.2 | $0.3 | $0.6 | $0.0 | $0.0 | $0.0 | $9.7 |
| Subprime | 1.9 | - | 1.9 | 5.6 | 0.1 | 5.7 | 0.4 | 0.0 | 0.4 | (0.3) | (0.0) | (0.3) | 0.0 | 0.0 | 0.0 | 7.7 |
| Other | 0.0 | 0.2 | 0.2 | 0.0 | 0.2 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.5 |
| Total[2] | $4.9 | $2.0 | $7.0 | $7.3 | $2.6 | $9.9 | $0.6 | $0.2 | $0.7 | ($0.1) | $0.4 | $0.3 | $0.0 | $0.0 | $0.1 | $17.9 |

| Freddie Mac | 2008 | | | 2009 | | | 2010 | | | 2011 | | | 1Q12 | | | Total 2008- |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vintage[1] | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 1Q12 |
| Alt-A | $2.1 | $1.8 | $4.0 | $0.9 | $0.8 | $1.7 | $0.5 | $0.2 | $0.7 | $0.1 | $0.1 | $0.2 | $0.0 | $0.0 | $0.1 | $6.6 |
| Subprime | 3.4 | 0.2 | 3.6 | 6.4 | 0.1 | 6.5 | 1.7 | 0.0 | 1.8 | 1.3 | 0.0 | 1.3 | 0.4 | 0.0 | 0.4 | 13.7 |
| CMBS | - | - | - | 0.1 | 0.0 | 0.1 | 0.1 | 0.0 | 0.1 | 0.3 | 0.1 | 0.4 | 0.0 | 0.0 | 0.0 | 0.6 |
| Option ARM | 6.0 | 1.6 | 7.6 | 1.4 | 0.4 | 1.7 | 1.2 | 0.2 | 1.4 | 0.3 | 0.1 | 0.4 | 0.0 | 0.0 | 0.0 | 11.2 |
| Other | 1.1 | 0.4 | 1.4 | 0.8 | 0.1 | 0.9 | 0.3 | 0.1 | 0.3 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 2.7 |
| Total[2] | $12.6 | $4.0 | $16.6 | $9.6 | $1.5 | $11.0 | $3.8 | $0.5 | $4.3 | $2.0 | $0.3 | $2.3 | $0.5 | $0.1 | $0.6 | $34.7 |

Notes:
Totals may not sum due to rounding.
[1] Vintage of private-label securities is based on security issue date.
[2] The adoption of an accounting standard for impairments in April 2009 required the Enterprises to begin recognizing only the credit portion of impairments in their statements of income and comprehensive income. This accounting standard did not require the Enterprises to revise previously recorded amounts in their statements of income and comprehensive income but did result in an equity increase of $5 billion and $3 billion for Freddie Mac and Fannie Mae, respectively, which is not reflected in Figure 5.2.  For the full year of 2008 and a portion of 2009, amounts include both credit and non-credit-related security impairments.

Sources:
Fannie Mae and Freddie Mac management reports.

15

Federal Housing Finance Agency

## 6. Loss Mitigation Activity

- The Enterprises have traditionally worked with delinquent borrowers to mitigate credit losses in situations where the borrower demonstrates the willingness and ability to cure the delinquency.  Loss mitigation actions include home retention actions (loan modifications, repayment plans and forbearance plans), and home forfeiture actions (short sales and deeds-in-lieu).
- The Enterprises have completed approximately 2.3 million foreclosure prevention actions since the start of conservatorship in September 2008.  Half of these actions have been permanent loan modifications.
- More information on the Enterprises' loss mitigation activities can be found in FHFA's First Quarter 2012 Foreclosure Prevention Report.

**Figure 6 Enterprises' Completed Foreclosure Prevention Actions**

| | Full Year 2009 | Full Year 2010 | Full Year 2011 | 1Q12 | Conservatorship to Date[1] |
|---|---|---|---|---|---|
| **Home Retention Actions** | | | | | |
| Repayment Plans | 142,360 | 185,954 | 181,558 | 44,636 | 567,817 |
| Forbearance Plans | 25,227 | 63,024 | 34,423 | 6,248 | 131,038 |
| Charge-offs-in-lieu | 2,247 | 3,118 | 2,263 | 507 | 8,408 |
| HomeSaver Advance *(Fannie)* | 39,199 | 5,191 | - | - | 70,178 |
| Loan Modifications | 163,647 | 575,022 | 322,108 | 60,348 | 1,144,902 |
| **Total** | **372,680** | **832,309** | **540,352** | **111,739** | **1,922,343** |
| **Nonforeclosure - Home Forfeiture Actions** | | | | | |
| Short Sales | 55,447 | 107,953 | 115,237 | 30,601 | 315,430 |
| Deeds-in-lieu | 2,971 | 6,043 | 10,231 | 3,759 | 23,544 |
| **Total** | **58,418** | **113,996** | **125,468** | **34,360** | **338,974** |
| **Total Foreclosure Prevention Actions** | **431,098** | **946,305** | **665,820** | **146,099** | **2,261,317** |

[1] Since the first full quarter in conservatorship (4Q08).

Federal Housing Finance Agency

## 7. Comparison of Actual Results to Projections of the Enterprises' Financial Performance

### 7.1 Comparison of Actual Results to Projections of the Enterprises' Financial Performance

- FHFA published updated projections of the Enterprises' financial performance in October 2011. The purpose and approach of these projections can be found in FHFA's Projections of the Enterprises' Financial Performance, October 2011.
- October 2011 projections are not expected outcomes, but rather modeled projections in response to "what if" exercises based on assumptions about Enterprise operations, financial market conditions, and house prices.
- The combined projected Treasury draws for the Enterprises for the second half of 2011 and the first quarter of 2012 ranged from $33 billion to $74 billion. The actual combined Treasury draw for the second half of 2011 and the first quarter of 2012 was $19 billion.
- The primary driver of the difference was lower than projected credit-related expenses at Fannie Mae, mostly due to a lower provision for credit losses. The main drivers of lower provisions for credit losses was an improved book profile reflected in lower delinquencies coupled with higher REO disposition values.

**Figure 7.1 Actual versus Projected Treasury Draws through 1Q12** *($ in billions)*

| | Cumulative Treasury Draw | Projected Draw through 1Q12 Scenario 1 | | Projected Draw through 1Q12 Scenario 2 | | Projected Draw through 1Q12 Scenario 3 | | Actual Draw through 1Q12 | |
|---|---|---|---|---|---|---|---|---|---|
| | As of 6/30/2011 | Additional Draw | Cumulative Draw as of 3/31/2012 | Additional Draw | Cumulative Draw as of 3/31/2012 | Additional Draw | Cumulative Draw as of 3/31/2012 | Additional Draw | Cumulative Draw as of 3/31/2012 |
| Fannie Mae | $104 | $23 | $127 | $27 | $131 | $53 | $157 | $12 | $116 |
| Freddie Mac | 65 | 9 | 75 | 10 | 76 | 20 | 86 | 6 | 71 |
| Total | $169 | $33 | $202 | $37 | $206 | $74 | $243 | $19 | $187 |

Numbers may not foot due to rounding.

Federal Housing Finance Agency

| 7.2 | Impact of Actual Results on Future Projections of the Enterprises' Financial Performance |
|---|---|

- Mortgage defaults pushed out to later periods could reduce projected losses if home prices improve or increase projected losses if home prices worsen.
- The Enterprises' future financial performance is heavily dependent on the performance of the U.S. housing market. Trends observed in the second half of 2011 and the first half of 2012 should not be used to extrapolate future projections.

FHFA 3582

# Tab 56



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

UNDER SECRETARY

June 25, 2012

Edward DeMarco
Acting Director
Federal Housing Finance Agency
400 7th Street, SW
Washington, DC 20024

Dear Acting Director DeMarco:

As you know, in the letter to you dated March 30, 2012, Treasury communicated to you its waiver, for the second quarter of Calendar Year (CY) 2012, of the "Periodic Commitment Fee" (PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the third quarter of CY 2012, the PCF payable by each Enterprise. Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set. Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Mary Miller

# Tab 57

# Morningstar® Document Research℠

# FORM 10-Q

## FEDERAL HOME LOAN MORTGAGE CORP - FMCC

**Filed: August 07, 2012 (period: June 30, 2012)**

Quarterly report with a continuing view of a company's financial position

*The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.*

Table of Contents

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the quarterly period ended June 30, 2012**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the transition period from                    to**

**Commission File Number: 001-34139**

# Federal Home Loan Mortgage Corporation
### *(Exact name of registrant as specified in its charter)*

**Freddie Mac**

| | | | |
|---|---|---|---|
| **Federally chartered corporation** | **8200 Jones Branch Drive** | **52-0904874** | **(703) 903-2000** |
| *(State or other jurisdiction of incorporation or organization)* | *McLean, Virginia 22102-3110* *(Address of principal executive offices, including zip code)* | *(I.R.S. Employer Identification No.)* | *(Registrant's telephone number, including area code)* |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐     Accelerated filer ☒

Non-accelerated filer (Do not check if a smaller reporting company) ☐     Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of July 25, 2012, there were 650,033,623 shares of the registrant's common stock outstanding.

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

FHFA 3585

Table of Contents

## TABLE OF CONTENTS

| | Page |
|---|---|
| **PART 1 — FINANCIAL INFORMATION** | |
| Item 1.        Financial Statements | 105 |
| Item 2.        Management's Discussion and Analysis of Financial Condition and Results of Operations | 1 |
| Executive Summary | 1 |
| Selected Financial Data | 12 |
| Consolidated Results of Operations | 13 |
| Consolidated Balance Sheets Analysis | 34 |
| Risk Management | 50 |
| Liquidity and Capital Resources | 87 |
| Fair Value Measurements and Analysis | 92 |
| Off-Balance Sheet Arrangements | 9 5 |
| Critical Accounting Policies and Estimates | 9 5 |
| Forward-Looking Statements | 9 5 |
| Risk Management and Disclosure Commitments | 97 |
| Legislative and Regulatory Matters | 98 |
| Item 3.        Quantitative and Qualitative Disclosures About Market Risk | 100 |
| Item 4.        Controls and Procedures | 102 |
| **PART II — OTHER INFORMATION** | |
| Item 1.        Legal Proceedings | 197 |
| Item 1A.      Risk Factors | 197 |
| Item 2.        Unregistered Sales of Equity Securities and Use of Proceeds | 197 |
| Item 6.        Exhibits | 199 |
| **SIGNATURES** | 200 |
| **GLOSSARY** | 201 |
| **EXHIBIT INDEX** | E-1 |

i                                                              *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3586

Table of Contents

**MD&A TABLE REFERENCE**

| Table | Description | Page |
|---|---|---|
| — | Selected Financial Data | 12 |
| 1 | Total Single-Family Loan Workout Volumes | 2 |
| 2 | Single-Family Credit Guarantee Portfolio Data by Year of Origination | 5 |
| 3 | Credit Statistics, Single-Family Credit Guarantee Portfolio | 6 |
| 4 | Mortgage-Related Investments Portfolio | 11 |
| 5 | Summary Consolidated Statements of Comprehensive Income | 13 |
| 6 | Net Interest Income/Yield and Average Balance Analysis | 14 |
| 7 | Derivative Gains (Losses) | 17 |
| 8 | Other Income | 19 |
| 9 | Non-Interest Expense | 20 |
| 10 | REO Operations (Income) Expense, REO Inventory, and REO Dispositions | 21 |
| 11 | Composition of Segment Mortgage Portfolios and Credit Risk Portfolios | 24 |
| 12 | Segment Earnings and Key Metrics — Investments | 25 |
| 13 | Segment Earnings and Key Metrics — Single-Family Guarantee | 28 |
| 14 | Segment Earnings Composition — Single-Family Guarantee Segment | 29 |
| 15 | Segment Earnings and Key Metrics — Multifamily | 32 |
| 16 | Investments in Securities | 35 |
| 17 | Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets | 36 |
| 18 | Additional Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets | 37 |
| 19 | Mortgage-Related Securities Purchase Activity | 38 |
| 20 | Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics | 39 |
| 21 | Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans | 40 |
| 22 | Net Impairment of Available-For-Sale Mortgage-Related Securities Recognized in Earnings | 41 |
| 23 | Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS | 43 |
| 24 | Mortgage Loan Purchases and Other Guarantee Commitment Issuances | 45 |
| 25 | Derivative Fair Values and Maturities | 46 |
| 26 | Changes in Derivative Fair Values | 47 |
| 27 | Freddie Mac Mortgage-Related Securities | 48 |
| 28 | Issuances and Extinguishments of Debt Securities of Consolidated Trusts | 49 |
| 29 | Changes in Total Equity (Deficit) | 50 |
| 30 | Repurchase Request Activity | 52 |
| 31 | Mortgage Insurance by Counterparty | 55 |
| 32 | Bond Insurance by Counterparty | 56 |
| 33 | Derivative Counterparty Credit Exposure | 58 |
| 34 | Characteristics of the Single-Family Credit Guarantee Portfolio | 62 |
| 35 | Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio | 66 |
| 36 | Single-Family Home Affordable Modification Program Volume | 68 |
| 37 | Single-Family Relief Refinance Loans | 71 |
| 38 | Single-Family Loan Workouts, Serious Delinquency, and Foreclosures Volumes | 72 |
| 39 | Quarterly Percentages of Modified Single-Family Loans — Current and Performing | 73 |
| 40 | Single-Family Serious Delinquency Rates | 74 |
| 41 | Credit Concentrations in the Single-Family Credit Guarantee Portfolio | 76 |
| 42 | Single-Family Credit Guarantee Portfolio by Attribute Combinations | 77 |
| 43 | Single-Family Credit Guarantee Portfolio by Year of Loan Origination | 79 |
| 44 | Multifamily Mortgage Portfolio — by Attribute | 80 |
| 45 | Non-Performing Assets | 82 |
| 46 | REO Activity by Region | 83 |
| 47 | Credit Loss Performance | 85 |
| 48 | Single-Family Impaired Loans with Specific Reserve Recorded | 86 |
| 49 | Single-Family Credit Loss Sensitivity | 87 |
| 50 | Other Debt Security Issuances by Product, at Par Value | 90 |
| 51 | Other Debt Security Repurchases, Calls, and Exchanges | 90 |
| 52 | Freddie Mac Credit Ratings | 91 |
| 53 | Summary of Assets and Liabilities Measured at Fair Value on a Recurring Basis on Our Consolidated Balance Sheets | 93 |
| 54 | Summary of Change in the Fair Value of Net Assets | 94 |
| 55 | PMVS and Duration Gap Results | 102 |
| 56 | Derivative Impact on PMVS-L (50 bps) | 102 |

ii

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3587

Table of Contents

# FINANCIAL STATEMENTS

| | Page |
|---|---|
| Freddie Mac Consolidated Statements of Comprehensive Income | 106 |
| Freddie Mac Consolidated Balance Sheets | 107 |
| Freddie Mac Consolidated Statements of Equity (Deficit) | 108 |
| Freddie Mac Consolidated Statements of Cash Flows | 109 |
| Note 1: Summary of Significant Accounting Policies | 110 |
| Note 2: Conservatorship and Related Matters | 112 |
| Note 3: Variable Interest Entities | 115 |
| Note 4: Mortgage Loans and Loan Loss Reserves | 119 |
| Note 5: Individually Impaired and Non-Performing Loans | 124 |
| Note 6: Real Estate Owned | 129 |
| Note 7: Investments in Securities | 130 |
| Note 8: Debt Securities and Subordinated Borrowings | 139 |
| Note 9: Financial Guarantees | 141 |
| Note 10: Derivatives | 143 |
| Note 11: Freddie Mac Stockholders' Equity (Deficit) | 148 |
| Note 12: Income Taxes | 149 |
| Note 13: Segment Reporting | 149 |
| Note 14: Regulatory Capital | 157 |
| Note 15: Concentration of Credit and Other Risks | 158 |
| Note 16: Fair Value Disclosures | 164 |
| Note 17: Legal Contingencies | 190 |
| Note 18: Significant Components of Other Assets and Other Liabilities on our Consolidated Balance Sheets | 196 |

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3588

**Table of Contents**

## PART I — FINANCIAL INFORMATION

*We continue to operate under the conservatorship that commenced on September 6, 2008, under the direction of FHFA as our Conservator. The Conservator succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any shareholder, officer or director thereof, with respect to the company and its assets. The Conservator has delegated certain authority to our Board of Directors to oversee, and management to conduct, day-to-day operations. The directors serve on behalf of, and exercise authority as directed by, the Conservator. See "BUSINESS — Conservatorship and Related Matters" in our Annual Report on Form 10-K for the year ended December 31, 2011, or 2011 Annual Report, for information on the terms of the conservatorship, the powers of the Conservator, and related matters, including the terms of our Purchase Agreement with Treasury.*

*This Quarterly Report on Form 10-Q includes forward-looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward-looking statements are made as of the date of this Form 10-Q and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date of this Form 10-Q. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in: (a) the "FORWARD-LOOKING STATEMENTS" sections of this Form 10-Q, our 2011 Annual Report, and our Quarterly Report on Form 10-Q for the first quarter of 2012; and (b) the "RISK FACTORS" and "BUSINESS" sections of our 2011 Annual Report.*

*Throughout this Form 10-Q, we use certain acronyms and terms that are defined in the "GLOSSARY."*

### ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this MD&A in conjunction with our consolidated financial statements and related notes for the three and six months ended June 30, 2012 included in "FINANCIAL STATEMENTS," and our 2011 Annual Report.*

### EXECUTIVE SUMMARY

**Overview**

Freddie Mac is a GSE chartered by Congress in 1970 with a public mission to provide liquidity, stability, and affordability to the U.S. housing market. We have maintained a consistent market presence since our inception, providing mortgage liquidity in a wide range of economic environments. We are working to support the recovery of the housing market and the nation's economy by providing essential liquidity to the mortgage market and helping to stem the rate of foreclosures. We believe our actions are helping communities across the country by providing America's families with access to mortgage funding at low rates while helping distressed borrowers keep their homes and avoid foreclosure, where feasible.

***Summary of Financial Results***

We continue to be affected by the ongoing weakness in the economy. However, certain actions taken since early 2009, including our participation in HAMP and HARP, are helping to stabilize the housing market. During the six months ended June 30, 2012, we observed certain signs of stabilization in the housing market, which contributed to our improved financial results in the second quarter of 2012. Our comprehensive income for the second quarter of 2012 was $2.9 billion, consisting of $3.0 billion of net income and $(128) million of total other comprehensive income (loss). By comparison, our comprehensive income (loss) for the second quarter of 2011 was $(1.1) billion, consisting of $(2.1) billion of net income (loss) and $1.0 billion of total other comprehensive income (loss).

Our total equity was $1.1 billion at June 30, 2012, reflecting our comprehensive income of $2.9 billion for the second quarter of 2012 and our dividend payment of $1.8 billion on our senior preferred stock in June 2012. As a result of our positive net worth at June 30, 2012, there is no need for a draw from Treasury under the Purchase Agreement for the second quarter of 2012.

**Our Primary Business Objectives**

We are focused on the following primary business objectives: (a) providing credit availability for mortgages and maintaining foreclosure prevention activities; (b) minimizing our credit losses; (c) developing mortgage market enhancements in support of a new infrastructure for the secondary mortgage market; (d) contracting the dominant presence of

<div align="center">1</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3589

**Table of Contents**

the GSEs in the marketplace; (e) maintaining sound credit quality on the loans we purchase or guarantee; and (f) strengthening our infrastructure and improving overall efficiency while also focusing on retention of key employees.

Our business objectives reflect direction we have received from the Conservator. On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that establishes objectives, performance targets and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan for Freddie Mac and Fannie Mae. We continue to align our resources and internal business plans to meet the goals and objectives laid out in the 2012 conservatorship scorecard. See "LEGISLATIVE AND REGULATORY MATTERS — FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships and 2012 Conservatorship Scorecard." Based on our charter, other legislation, public statements from FHFA and Treasury officials, and other guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives. For more information, see "BUSINESS — Conservatorship and Related Matters — *Impact of Conservatorship and Related Actions on Our Business*" in our 2011 Annual Report.

### *Providing Credit Availability for Mortgages and Maintaining Foreclosure Prevention Activities*

Our consistent market presence provides lenders with a constant source of liquidity for conforming mortgage products even when other sources of capital have withdrawn. We believe this liquidity provides our customers with confidence to continue lending in difficult environments. We estimate that we, Fannie Mae, and Ginnie Mae collectively guaranteed more than 90% of the single-family conforming mortgages originated during the second quarter of 2012. We also enable mortgage originators to offer homebuyers and homeowners lower mortgage rates on conforming loan products, in part because of the value investors place on GSE-guaranteed mortgage-related securities. In June 2012, we estimate that borrowers were paying an average of 54 basis points less on these conforming loans than on non-conforming loans. These estimates are based on data provided by HSH Associates, a third-party provider of mortgage market data.

During the three and six months ended June 30, 2012, we guaranteed $88.7 billion and $193.7 billion in UPB of single-family conforming mortgage loans, representing approximately 433,000 and 924,000 loans, respectively.

We are focused on reducing the number of foreclosures and helping to keep families in their homes. Our relief refinance initiative, including HARP (which is the portion of our relief refinance initiative for loans with LTV ratios above 80%), is a significant part of our effort to keep families in their homes. HARP loans have been provided to more than 680,000 borrowers since the initiative began in 2009, including approximately 200,000 borrowers during the first half of 2012. Our loan workout programs, including HAMP, are designed to help borrowers experiencing hardship avoid foreclosure. Since 2009, we have helped more than 697,000 borrowers experiencing hardship complete a loan workout. We plan to introduce additional initiatives during the remainder of 2012 designed to help more struggling borrowers avoid foreclosure through short sales and deed in lieu of foreclosure transactions.

The table below presents our single-family loan workout activities for the last five quarters.

### Table 1 — Total Single-Family Loan Workout Volumes[1]

| | For the Three Months Ended | | | | |
|---|---|---|---|---|---|
| | 06/30/2012 | 03/31/2012 | 12/31/2011 | 09/30/2011 | 06/30/2011 |
| | (number of loans) | | | | |
| Loan modifications | 15,142 | 13,677 | 19,048 | 23,919 | 31,049 |
| Repayment plans | 8,712 | 10,575 | 8,008 | 8,333 | 7,981 |
| Forbearance agreements[2] | 4,738 | 3,656 | 3,867 | 4,262 | 3,709 |
| Short sales and deed in lieu of foreclosure transactions | 12,531 | 12,245 | 12,675 | 11,744 | 11,038 |
| Total single-family loan workouts | 41,123 | 40,153 | 43,598 | 48,258 | 53,777 |

(1) Based on actions completed with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment, and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent or effective, such as loans in modification trial periods. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period.

(2) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.

A number of FHFA-directed changes to HARP were announced in late 2011. These changes are intended to allow more borrowers to participate in the program and benefit from refinancing their home mortgages, including borrowers whose mortgages have LTV ratios above 125%. As a result, our purchases of HARP loans increased 76% in the first half of 2012,

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3590

Table of Contents

compared to the first half of 2011. Since industry participation in HARP is not mandatory, implementation schedules have varied as individual lenders, mortgage insurers, and other market participants modify their processes.

During 2011, we also completed the initial implementation of the FHFA-directed servicing alignment initiative, under which we and Fannie Mae are aligning certain standards for servicing non-performing loans owned or guaranteed by the companies. As part of this initiative, we introduced a new non-HAMP standard loan modification, which became mandatory for our servicers beginning January 1, 2012. Unlike our prior non-HAMP modifications, the new non-HAMP standard modifications have trial periods and the modifications are not completed until the completion of the trial periods.

As of June 30, 2012, approximately 26,000 borrowers were in modification trial periods, including approximately 15,000 borrowers in trial periods for our non-HAMP standard modification. Based on information provided by the MHA Program administrator, our servicers had completed 200,705 loan modifications under HAMP from the introduction of the initiative in 2009 through June 30, 2012.

### Minimizing Our Credit Losses

To help minimize the credit losses related to our guarantee activities, we are focused on:

• pursuing a variety of loan workouts, including foreclosure alternatives, in an effort to reduce the severity of losses we experience over time;

• managing foreclosure timelines to the extent possible, given the prolonged foreclosure process in many states;

• managing our inventory of foreclosed properties to reduce costs and maximize proceeds; and

• pursuing contractual remedies against originators, lenders, servicers, and insurers, as appropriate.

We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses. We require our single-family seller/servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure.

We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans, and represent and warrant that those loans have been originated under specified underwriting standards. If we subsequently discover that the representations and warranties were breached (i.e., contractual standards were not followed), we can exercise certain contractual remedies to mitigate our actual or potential credit losses. These contractual remedies include the ability to require the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan, after consideration of other recoveries, if any. The amount we expect to collect on outstanding repurchase requests is significantly less than the UPB of the loans subject to the repurchase requests primarily because many of these requests will likely be satisfied by the seller/servicers reimbursing us for realized credit losses. Some of these requests also may be rescinded in the course of the contractual appeals process. As of June 30, 2012, the UPB of loans subject to repurchase requests issued to our single-family seller/servicers was approximately $2.9 billion, and approximately 40% of these requests were outstanding for more than four months since issuance of our initial repurchase request (this figure includes repurchase requests for which appeals were pending). Of the total amount of repurchase requests outstanding at June 30, 2012, approximately $1.2 billion were issued due to mortgage insurance rescission or mortgage insurance claim denial.

Our credit loss exposure is also partially mitigated by mortgage insurance, which is a form of credit enhancement. Primary mortgage insurance is required to be purchased, typically at the borrower's expense, for certain mortgages with higher LTV ratios. Although we received payments under primary and other mortgage insurance of $1.0 billion and $1.3 billion in the six months ended June 30, 2012 and 2011, respectively, which helped to mitigate our credit losses, many of our mortgage insurers remain financially weak. We expect to receive substantially less than full payment of our claims from three of our mortgage insurance counterparties that are currently partially paying claims under orders of their state regulators. We believe that certain other of our mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as those claims emerge.

<div align="center">3</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

### Developing Mortgage Market Enhancements in Support of a New Infrastructure for the Secondary Mortgage Market

In the first half of 2012, we continued our efforts to build value for the industry and build the infrastructure for a future housing finance system. These efforts include the implementation of the Uniform Mortgage Data Program, or UMDP, which provides us with the ability to collect additional data that we believe will improve our risk management practices. In the first quarter of 2012, we completed a key milestone of the UMDP with the launch of the Uniform Collateral Data Portal for the electronic submission of appraisal reports for conventional mortgages. In the second quarter of 2012, we implemented the Uniform Loan Delivery Dataset, or ULDD, which provides for the efficient collection and use of consistent information about loan terms, collateral, and borrowers. We are also working with FHFA and others to develop a plan for the design and building of a single securitization platform that can be used in a future secondary mortgage market. We are continuing to work with FHFA and Fannie Mae to develop recommendations to align certain of the terms of the contracts we and Fannie Mae use with our respective single-family seller/servicers, as well as certain practices we follow in managing our respective business relationships with these companies.

### Contracting the Dominant Presence of the GSEs in the Marketplace

We continue to take steps toward the goal of gradually shifting mortgage credit risk from Freddie Mac to private investors, while simplifying and shrinking certain of our operations. In the case of single-family credit guarantees, we are exploring several ways to accomplish this goal, including increasing guarantee fees, establishing loss-sharing arrangements, and evaluating new risk-sharing transactions beyond the traditional charter-required mortgage insurance coverage. In addition, we are studying the steps necessary for our competitive disposition of certain investment assets, including non-performing loans. To evaluate how to accomplish the goal of contracting our operations in the multifamily business, we are conducting a market analysis of the viability of our multifamily operations without government guarantees. We also plan to continue to shift mortgage credit risk to private investors through our multifamily Other Guarantee Transactions.

### Maintaining Sound Credit Quality on the Loans We Purchase or Guarantee

We continue to focus on maintaining credit policies, including our underwriting standards, that allow us to purchase and guarantee loans made to qualified borrowers that we believe will provide management and guarantee fee income (excluding the amounts associated with the Temporary Payroll Tax Cut Continuation Act of 2011), over the long-term, that exceeds our expected credit-related and administrative expenses on such loans. Under this Act, we were required to raise our guarantee fees by 10 basis points, and the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by us.

HARP loans represented 8% of the UPB of our single-family credit guarantee portfolio as of June 30, 2012. Mortgages originated after 2008, including HARP loans, represented 57% of the UPB of our single-family credit guarantee portfolio as of June 30, 2012, while the single-family loans originated from 2005 through 2008 represented 28% of this portfolio. Relief refinance mortgages of all LTV ratios comprised approximately 14% and 11% of the UPB in our total single-family credit guarantee portfolio at June 30, 2012 and December 31, 2011, respectively.

Approximately 95% of the single-family mortgages we purchased in both the three and six months ended June 30, 2012 were fixed-rate, first lien amortizing mortgages, based on UPB. Approximately 81% and 84% of the single-family mortgages we purchased in the three and six months ended June 30, 2012, respectively, were refinance mortgages, and approximately 32% and 25%, respectively, of these refinance mortgages were HARP loans, based on UPB. Approximately 21% and 14% of our single-family purchase volume in the first half of 2012 and 2011, respectively, were relief refinance mortgages with LTV ratios above 80%.

The proportion of loans we purchased with original LTV ratios over 100% increased from approximately 5% of our single-family mortgage purchases (including relief refinance loans) in the first half of 2011 to 11% of our single-family mortgage purchases in the first half of 2012 due, in large part, to the changes in HARP announced in the fourth quarter of 2011, which allow borrowers with higher LTV ratios to refinance.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

The credit quality of the single-family loans we acquired in the first half of 2012 (excluding relief refinance mortgages, which represented approximately 30% of our single-family purchase volume during the first half of 2012) is significantly better than that of loans we acquired from 2005 through 2008 as measured by original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income. The improvement in credit quality of loans we have purchased since 2008 (excluding relief refinance mortgages) is primarily the result of: (a) changes in our credit policies, including changes in our underwriting standards; (b) fewer purchases of loans with higher risk characteristics; and (c) changes in mortgage insurers' and lenders' underwriting practices.

Our underwriting procedures for relief refinance mortgages are limited in many cases, and such procedures generally do not include all of the changes in underwriting standards we have implemented since 2008. As a result, relief refinance mortgages generally reflect many of the credit risk attributes of the original loans. However, borrower participation in our relief refinance mortgage initiative may help reduce our exposure to credit risk in cases where borrower payments under their mortgages are reduced, thereby strengthening the borrower's potential to make their mortgage payments.

Over time, relief refinance mortgages with LTV ratios above 80% (*i.e.*, HARP loans) may not perform as well as other refinance mortgages because the continued high LTV ratios of these loans increases the probability of default. In addition, relief refinance mortgages may not be covered by mortgage insurance for the full excess of their UPB over 80%.

The table below presents the composition, loan characteristics, and serious delinquency rates of loans in our single-family credit guarantee portfolio, by year of origination at June 30, 2012.

**Table 2 — Single-Family Credit Guarantee Portfolio Data by Year of Origination**[1]

| | | | At June 30, 2012 | | | | Six Months Ended June 30, 2012 |
|---|---|---|---|---|---|---|---|
| Year of Origination | Percent of Portfolio | Average Credit Score[2] | Original LTV Ratio[3] | Current LTV Ratio[4] | Current LTV Ratio >100%[4][5] | Serious Delinquency Rate[6] | Percent of Credit Losses |
| 2012 | 9% | 756 | 77% | 75% | 13% | —% | —% |
| 2011 | 16 | 754 | 71 | 69 | 5 | 0.13 | <1 |
| 2010 | 17 | 753 | 71 | 71 | 6 | 0.38 | 1 |
| 2009 | 15 | 752 | 69 | 72 | 6 | 0.68 | 2 |
| Combined-2009 to 2012 | 57 | 754 | 72 | 71 | 7 | 0.40 | 3 |
| 2008 | 6 | 722 | 74 | 92 | 35 | 6.30 | 9 |
| 2007 | 9 | 703 | 77 | 112 | 61 | 12.05 | 36 |
| 2006 | 6 | 708 | 75 | 110 | 56 | 11.20 | 26 |
| 2005 | 7 | 714 | 73 | 94 | 37 | 6.83 | 17 |
| Combined-2005 to 2008 | 28 | 711 | 75 | 103 | 48 | 9.21 | 88 |
| 2004 and prior | 15 | 717 | 71 | 59 | 8 | 2.98 | 9 |
| Total | 100% | 736 | 72 | 78 | 18 | 3.45 | 100% |

(1) Based on the loans remaining in the portfolio at June 30, 2012, which totaled $1.7 trillion, rather than all loans originally guaranteed by us and originated in the respective year. Includes loans acquired under our relief refinance initiative, which began in 2009.

(2) Based on FICO score of the borrower as of the date of loan origination and may not be indicative of the borrowers' creditworthiness at June 30, 2012. Excludes less than 1% of loans in the portfolio because the FICO scores at origination were not available. As of June 30, 2012, the average credit score for all relief refinance loans was 742, compared to an average of 735 for all other loans in the portfolio.

(3) See endnote (4) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios.

(4) We estimate current market values by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination. See endnote (5) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of current LTV ratios. As of June 30, 2012, the average current LTV ratio for all relief refinance loans was 82%.

(5) Calculated as a percentage of the aggregate UPB of loans with LTV ratios greater than 100% in relation to the total UPB of loans in the category.

(6) See "RISK MANAGEMENT— Credit Risk — Mortgage Credit Risk — Single-family Mortgage Credit Risk — Delinquencies" for further information about our reported serious delinquency rates.

### *Strengthening Our Infrastructure and Improving Overall Efficiency While Also Focusing On Retention of Key Employees*

We are working to both enhance the quality of our infrastructure and improve our efficiency in order to preserve the taxpayers' investment. We are focusing our resources primarily on key projects, many of which are related to FHFA mandated initiatives and will likely take several years to fully implement.

We continue to actively manage our general and administrative expenses, while also continuing to focus on retaining key talent. In the first half of 2012, to help mitigate the uncertainty surrounding compensation, we introduced a new compensation program for employees. Under the program, the majority of employees will have a more predictable income,

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3593

Table of Contents

as the program generally reduces the amount of compensation that is subject to variability. While uncertainty surrounding our future business model has contributed to employee turnover and low employee engagement, employee turnover moderated in the second quarter of 2012 compared to the same period of 2011. We are continuing to explore various strategic arrangements with outside firms to provide operational capability and staffing for key functions, as needed.

We believe the initiatives we are pursuing under the 2012 conservatorship scorecard and other FHFA-mandated initiatives will require additional resources and continue to affect our level of administrative expenses going forward.

### Single-Family Credit Guarantee Portfolio

The UPB of our single-family credit guarantee portfolio declined approximately 3% during the first half of 2012, as the amount of single-family loan liquidations exceeded new loan purchase and guarantee activity. We believe this is due, in part, to declines in the amount of single-family mortgage debt outstanding in the market and our competitive position compared to other market participants.

The table below provides certain credit statistics for our single-family credit guarantee portfolio.

### Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio

| | As of | | | | |
|---|---|---|---|---|---|
| | 6/30/2012 | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 |
| Payment status — | | | | | |
| One month past due | 1.79% | 1.63% | 2.02% | 1.94% | 1.92% |
| Two months past due | 0.60% | 0.57% | 0.70% | 0.70% | 0.67% |
| Seriously delinquent[1] | 3.45% | 3.51% | 3.58% | 3.51% | 3.50% |
| Non-performing loans (in millions)[2] | $ 118,463 | $ 119,599 | $ 120,514 | $ 119,081 | $ 114,819 |
| Single-family loan loss reserve (in millions)[3] | $ 35,298 | $ 37,771 | $ 38,916 | $ 39,088 | $ 38,390 |
| REO inventory (in properties) | 53,271 | 59,307 | 60,535 | 59,596 | 60,599 |
| REO assets, net carrying value (in millions) | $ 4,715 | $ 5,333 | $ 5,548 | $ 5,539 | $ 5,834 |

| | For the Three Months Ended | | | | |
|---|---|---|---|---|---|
| | 6/30/2012 | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 |
| | (in units, unless noted) | | | | |
| Seriously delinquent loan additions[1] | 75,904 | 80,815 | 95,661 | 93,850 | 87,813 |
| Loan modifications[4] | 15,142 | 13,677 | 19,048 | 23,919 | 31,049 |
| REO acquisitions | 20,033 | 23,805 | 24,758 | 24,378 | 24,788 |
| REO disposition severity ratio:[5] | | | | | |
| California | 41.6% | 44.2% | 44.6% | 45.5% | 44.9% |
| Arizona | 40.4% | 45.0% | 46.7% | 48.7% | 51.3% |
| Florida | 46.2% | 48.6% | 50.1% | 53.3% | 52.7% |
| Nevada | 54.3% | 56.5% | 54.2% | 53.2% | 55.4% |
| Illinois | 47.8% | 49.3% | 51.2% | 50.5% | 49.4% |
| Total U.S | 37.9% | 40.3% | 41.2% | 41.9% | 41.7% |
| Single-family provision for credit losses (in millions) | $ 177 | $ 1,844 | $ 2,664 | $ 3,643 | $ 2,542 |
| Single-family credit losses (in millions) | $ 2,858 | $ 3,435 | $ 3,209 | $ 3,440 | $ 3,106 |

(1) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Delinquencies*" for further information about our reported serious delinquency rates.

(2) Consists of the UPB of loans in our single-family credit guarantee portfolio that have undergone a TDR or that are seriously delinquent. As of June 30, 2012 and December 31, 2011, approximately $48.0 billion and $44.4 billion in UPB of TDR loans, respectively, were no longer seriously delinquent.

(3) Consists of the combination of: (a) our allowance for loan losses on mortgage loans held for investment; and (b) our reserve for guarantee losses associated with non-consolidated single-family mortgage securitization trusts and other guarantee commitments.

(4) Represents the number of modification agreements with borrowers completed during the quarter. Excludes forbearance agreements, repayment plans, and loans in modification trial periods.

(5) States presented represent the five states where our credit losses were greatest during 2011 and the six months ended June 30, 2012. Calculated as the amount of our losses recorded on disposition of REO properties during the respective quarterly period, excluding those subject to repurchase requests made to our seller/servicers, divided by the aggregate UPB of the related loans. The amount of losses recognized on disposition of the properties is equal to the amount by which the UPB of the loans exceeds the amount of sales proceeds from disposition of the properties. Excludes sales commissions and other expenses, such as property maintenance and costs, as well as applicable recoveries from credit enhancements, such as mortgage insurance.

In discussing our credit performance, we often use the terms "credit losses" and "credit-related expenses." These terms are significantly different. Our "credit losses" consist of charge-offs and REO operations income (expense), while our "credit-related expenses" consist of our provision for credit losses and REO operations income (expense).

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $75.2 billion, and have recorded an additional $4.1 billion in losses on loans purchased from PC trusts, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred and, thus, have

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

not yet been provisioned for, we believe that, as of June 30, 2012, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations.

Borrower payment performance (for all stages of delinquency) improved at June 30, 2012, compared to December 31, 2011. In addition, the number of seriously delinquent loan additions declined in each of the first two quarters of 2012. Excluding relief refinance loans, recent improvement in borrower payment performance reflects an improved credit profile of borrowers with loans originated since 2008. However, several factors, including the lengthening of the foreclosure process, have resulted in loans remaining in serious delinquency for longer periods than prior to 2008, particularly in states that require a judicial foreclosure process. As of June 30, 2012 and December 31, 2011, the percentage of seriously delinquent loans that have been delinquent for more than six months was 74% and 70%, respectively.

The credit losses and loan loss reserves associated with our single-family credit guarantee portfolio remained elevated in the first half of 2012, due, in part, to:

- Losses associated with the continued high volume of foreclosures and foreclosure alternatives. These actions relate to the continued efforts of our servicers to resolve our large inventory of seriously delinquent loans. Due to the length of time necessary for servicers either to complete the foreclosure process or pursue foreclosure alternatives on seriously delinquent loans in our portfolio, we expect our credit losses will continue to remain high even if the volume of new serious delinquencies continues to decline.

- Continued negative effect of certain loan groups within the single-family credit guarantee portfolio, such as those underwritten with certain lower documentation standards and interest-only loans, as well as 2005 through 2008 vintage loans. These groups continue to be large contributors to our credit losses.

- Cumulative decline in national home prices of 24% since June 2006, based on our own index. As a result of this price decline, approximately 18% of loans in our single-family credit guarantee portfolio, based on UPB, had estimated current LTV ratios in excess of 100% (i.e., underwater loans) as of June 30, 2012.

- Weak financial condition of many of our mortgage insurers, which has reduced our estimates of expected recoveries from these counterparties.

Some of our loss mitigation activities create fluctuations in our delinquency statistics. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Credit Performance — Delinquencies*" for further information about factors affecting our reported delinquency rates.

## Conservatorship and Government Support for our Business

We have been operating under conservatorship, with FHFA acting as our conservator, since September 6, 2008. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition, and results of operations.

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

While the conservatorship has benefited us, we are subject to certain constraints on our business activities imposed by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement and by FHFA, as our Conservator.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The $200 billion cap on Treasury's funding commitment will increase as necessary to eliminate any net worth deficits we may have during 2010, 2011, and 2012. We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

We received cash proceeds of $19 million in June 2012 from a draw under Treasury's funding commitment related to our quarterly deficit in equity at March 31, 2012. As a result, the aggregate liquidation preference of the senior preferred stock was $72.3 billion at June 30, 2012. At June 30, 2012, our assets exceeded our liabilities under GAAP; therefore there is no need for a draw from Treasury under the Purchase Agreement.

<div align="center">7</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We pay cash dividends to Treasury at an annual rate of 10%. Through June 30, 2012, we paid aggregate cash dividends to Treasury of $20.1 billion, an amount equal to 28% of our aggregate draws received under the Purchase Agreement. As of June 30, 2012, our annual cash dividend obligation to Treasury on the senior preferred stock of $7.2 billion exceeded our annual historical earnings in all but one period. As a result, we expect to make additional draws in future periods, even if our operating performance generates net income or comprehensive income.

Neither the U.S. government nor any other agency or instrumentality of the U.S. government is obligated to fund our mortgage purchase or financing activities or to guarantee our securities or other obligations.

For more information on conservatorship and the Purchase Agreement, see "BUSINESS — Conservatorship and Related Matters" in our 2011 Annual Report.

## Consolidated Financial Results

Net income (loss) was $3.0 billion and $(2.1) billion for the second quarters of 2012 and 2011, respectively. Key highlights of our financial results include:

- Net interest income for the second quarter of 2012 decreased to $4.4 billion from $4.6 billion in the second quarter of 2011, mainly due to the impact of a reduction in the average balances of our higher-yielding mortgage-related assets, partially offset by lower funding costs.

- Provision for credit losses for the second quarter of 2012 declined to $155 million, compared to $2.5 billion for the second quarter of 2011. The decrease in the provision for credit losses primarily reflects improvements in the number of newly impaired loans (largely due to a decline in the portion of our single-family credit guarantee portfolio originated in 2005 through 2008) and the positive impacts of an increase in national home prices.

- Non-interest income (loss) was $(751) million for the second quarter of 2012, compared to $(3.9) billion for the second quarter of 2011. The improvement was largely driven by a decrease in derivative losses during the second quarter of 2012 compared to the second quarter of 2011.

- Non-interest expense declined to $536 million in the second quarter of 2012, from $546 million in the second quarter of 2011.

- Comprehensive income (loss) was $2.9 billion for the second quarter of 2012 compared to $(1.1) billion for the second quarter of 2011. Comprehensive income for the second quarter of 2012 was driven by the $3.0 billion net income, partially offset by an increase in net unrealized losses related to our available-for-sale securities.

## Mortgage Market and Economic Conditions

### Overview

The U.S. real gross domestic product rose by 1.5% on an annualized basis during the second quarter of 2012, compared to 2.0% during the first quarter of 2012, according to the Bureau of Economic Analysis. The national unemployment rate was 8.2% in both June 2012 and March 2012, down from 8.5% in December 2011, based on data from the U.S. Bureau of Labor Statistics. In the data underlying the unemployment rate, an average of approximately 75,000 monthly net new jobs were added to the economy during the second quarter of 2012, which shows evidence of a slow, but steady positive trend for the economy and the labor market.

### Single-Family Housing Market

The single-family housing market exhibited certain signs of stabilization in the second quarter of 2012 despite continued weakness in the employment market and a significant inventory of seriously delinquent loans and REO properties in the market.

Based on data from the National Association of Realtors, sales of existing homes in the second quarter of 2012 averaged 4.54 million (at a seasonally adjusted annual rate), decreasing from 4.57 million in the first quarter of 2012. Based on data from the U.S. Census Bureau and HUD, new home sales in the second quarter of 2012 averaged approximately 363,000 (at a seasonally adjusted annual rate) increasing approximately 3.1% from approximately 352,000 in the first quarter of 2012. We estimate that home prices increased significantly during the second quarter of 2012, with our nationwide index registering approximately a 4.8% increase from March 2012 through June 2012 without seasonal adjustment. The second quarter of the

8                                                                                                                                *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

year has historically been a period of strong home sales and related home price increases, as compared to the other quarters of the year. From June 2011 through June 2012 our nationwide home price index increased 1.0% on an annual basis. These estimates were based on our own price index of mortgage loans on one-family homes funded by us or Fannie Mae. Other indices of home prices may have different results, as they are determined using different pools of mortgage loans and calculated under different conventions than our own.

The foreclosure process has lengthened significantly in recent years, due to a number of factors, but particularly in states that require a judicial foreclosure process. There have also been a number of legislative and regulatory developments in recent periods affecting single-family mortgage servicing and foreclosure practices. It is possible that these developments will result in significant changes to mortgage servicing and foreclosure practices that could adversely affect our business. For information on these matters, see "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" in our 2011 Annual Report and "LEGISLATIVE AND REGULATORY MATTERS — Developments Concerning Single-Family Servicing Practices."

### Multifamily Housing Market

Multifamily market fundamentals continued to improve on a national level during the second quarter of 2012. The multifamily sector experienced strong interest from prospective borrowers and investors and continued to outperform other components of the commercial real estate sector. As reported by Reis, Inc., the national apartment vacancy rate improved from 8.0% at the end of 2009 to 4.7% during the second quarter of 2012 representing the lowest level since the end of 2001. Vacancy rates and effective rents are important to loan performance because multifamily loans are generally repaid from the cash flows generated by the underlying property and these factors significantly influence those cash flows. We believe these improving fundamentals and optimism about demand for multifamily housing have contributed to improvement in property values in most markets.

### Mortgage Market and Business Outlook

Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Actual results may differ significantly from those described in or implied by forward-looking statements due to various factors and uncertainties. For example, a number of factors could cause the actual performance of the housing and mortgage markets and the U.S. economy during the remainder of 2012 to be significantly worse than we expect, including adverse changes in national or international economic conditions and changes in the federal government's fiscal or monetary policies. See "FORWARD-LOOKING STATEMENTS" for additional information.

### Overview

We continue to expect key macroeconomic drivers of the economy, such as income growth, employment, and inflation, will affect the performance of the housing and mortgage markets in the remainder of 2012. Since we expect that economic growth will likely be stronger and mortgage interest rates lower in 2012 than in 2011, we believe that housing affordability will remain relatively high in 2012 for potential home buyers. We also expect that the volume of home sales will likely continue to increase in 2012, compared to the volume in 2011, but still remain relatively weak compared to historical levels. Important factors that we believe will continue to negatively impact single-family housing demand are the high unemployment rate and relatively low consumer confidence measures. Consumer confidence measures, while up from recession lows, remain below long-term averages and suggest that households will likely continue to be cautious in home buying. We also expect to continue to experience a high level of refinancing activity in the near term, due to the impact of the expanded HARP initiative as well as the historically low interest rates on fixed-rate single-family mortgages. For information on the HARP initiative, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program*."

While home prices remain at significantly lower levels from their peak in most areas, declines in the market's inventory of vacant housing have supported stabilization in home prices in a number of metropolitan areas. To the extent a large volume of loans complete the foreclosure process in a short time period, the resulting increase in the market's inventory of homes for sale could have a negative impact on home prices. Due to these and other factors, our expectation for home prices,

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                                          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

based on our own index, is that national average home prices will continue to remain weak on an inflation-adjusted basis over the near term before a long-term recovery in housing begins.

### Single-Family

Our charge-offs remained high during the first half of 2012, and we expect they will likely remain high during the remainder of 2012. This is in part due to the substantial number of underwater mortgage loans in our single-family credit guarantee portfolio. For the near term, we also expect:

- REO disposition severity ratios to remain near their historical highs, though market conditions, such as home prices and the rate of home sales, have seen improvements in many key markets;

- the amount of non-performing assets and the volume of our loan workouts to continue to remain high; and

- continued high volume of loans in the foreclosure process as well as prolonged foreclosure timelines.

### Multifamily

The most recent market data available continues to reflect improving national apartment fundamentals, including decreasing vacancy rates and increasing effective rents. We expect further improvements in the rental market during the next twelve months due to increased rental demand. As a result of the positive market fundamentals and continuing strong portfolio performance, we expect our credit losses and delinquency rates to remain relatively low during the remainder of 2012.

We continued our strong support of the multifamily market and the nation's renters as evidenced by our $12.4 billion of multifamily purchase and guarantee volume in the first half of 2012, which provided financing for approximately 750 properties amounting to approximately 193,000 apartment units. The majority of these apartments were affordable to low and moderate income families. We expect an increase in our purchase and guarantee volumes for the full-year of 2012 when compared to 2011 levels as demand for multifamily financing remains strong as historically low interest rates are encouraging borrower interest.

### Long-Term Financial Sustainability

There is significant uncertainty as to our long-term financial sustainability. The Acting Director of FHFA stated on September 19, 2011 that "it ought to be clear to everyone at this point, given [Freddie Mac and Fannie Mae's] losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that [Freddie Mac and Fannie Mae] will not be able to earn their way back to a condition that allows them to emerge from conservatorship."

We expect to request additional draws under the Purchase Agreement in future periods. Over time, our dividend obligation to Treasury will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term.

There continues to be significant uncertainty in the current mortgage credit environment, and continued high levels of unemployment, weakness in home prices, and adverse changes in interest rates, mortgage security prices, and spreads could lead to additional draws. For discussion of other factors that could result in additional draws, see "RISK FACTORS —Conservatorship and Related Matters — *We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition*" in our 2011 Annual Report.

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist. We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near-term. We have no ability to predict the outcome of these deliberations. For a discussion of FHFA's strategic plan for us, see "LEGISLATIVE AND REGULATORY MATTERS — FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships and 2012 Conservatorship Scorecard."

10 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                                 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Limits on Investment Activity and Our Mortgage-Related Investments Portfolio**

The conservatorship has significantly impacted our investment activity. FHFA has stated that we will not be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio. However, from time to time we may purchase or retain mortgage-related investments based on a variety of factors which could improve the price of our PCs. Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $729 billion as of December 31, 2011 and may not exceed $656.1 billion as of December 31, 2012. FHFA has indicated that such portfolio reduction targets should be viewed as minimum reductions and has encouraged us to reduce the mortgage-related investments portfolio at a faster rate than required. We are also subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury.

The table below presents the UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation.

**Table 4 — Mortgage-Related Investments Portfolio[1]**

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| | (in millions) | |
| Investments segment — Mortgage investments portfolio | $ 386,404 | $ 449,273 |
| Single-family Guarantee segment — Single-family unsecuritized mortgage loans [2] | 60,053 | 62,469 |
| Multifamily segment — Mortgage investments portfolio | 134,822 | 141,571 |
| Total mortgage-related investments portfolio | $ 581,279 | $ 653,313 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Represents unsecuritized seriously delinquent single-family loans managed by the Single-family Guarantee segment.

We consider the liquidity of our assets in our mortgage-related investments portfolio based on three categories: (a) agency securities; (b) assets that are less liquid than agency securities; and (c) illiquid assets. Assets that are less liquid than agency securities include unsecuritized performing single-family mortgage loans, multifamily mortgage loans, CMBS, and housing revenue bonds. Our less liquid assets collectively represented approximately 31% of the UPB of the portfolio at June 30, 2012, compared to 32% as of December 31, 2011. Illiquid assets include unsecuritized seriously delinquent and modified single-family mortgage loans which we removed from PC trusts, and our investments in non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans. Our illiquid assets collectively represented approximately 32% of the UPB of the portfolio at June 30, 2012, as compared to 29% as of December 31, 2011. The elevated level of illiquid assets is primarily due to our removal of seriously delinquent and modified loans from PC trusts. The changing composition of our mortgage-related investments portfolio to a greater proportion of assets that are less liquid and illiquid may influence our decisions regarding funding and hedging. The description above of the relative liquidity of our assets is based on our own internal expectations given current market conditions. Changes in market conditions could adversely affect the liquidity of our assets at any given time.

11                                          *Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3599

Table of Contents

## SELECTED FINANCIAL DATA[(1)]

The selected financial data presented below should be reviewed in conjunction with MD&A and our consolidated financial statements and related notes for the three and six months ended June 30, 2012.

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (dollars in millions, except share-related amounts) | | | |
| **Statements of Comprehensive Income Data** | | | | |
| Net interest income | $ 4,386 | $ 4,561 | $ 8,886 | $ 9,101 |
| Provision for credit losses | (155) | (2,529) | (1,980) | (4,518) |
| Non-interest income (loss) | (751) | (3,857) | (2,267) | (5,109) |
| Non-interest expense | (536) | (546) | (1,132) | (1,243) |
| Net income (loss) | 3,020 | (2,139) | 3,597 | (1,463) |
| Comprehensive income (loss) | 2,892 | (1,100) | 4,681 | 1,640 |
| Net income (loss) attributable to common stockholders | 1,212 | (3,756) | (15) | (4,685) |
| Net income (loss) per common share: | | | | |
| Basic | 0.37 | (1.16) | — | (1.44) |
| Diluted | 0.37 | (1.16) | — | (1.44) |
| Cash dividends per common share | — | — | — | — |
| Weighted average common shares outstanding (in thousands): [(2)] | | | | |
| Basic | 3,239,711 | 3,244,967 | 3,240,627 | 3,245,970 |
| Diluted | 3,239,711 | 3,244,967 | 3,240,627 | 3,245,970 |

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| | (dollars in millions) | |
| **Balance Sheets Data** | | |
| Mortgage loans held-for-investment, at amortized cost by consolidated trusts (net of allowances for loan losses) | $ 1,532,939 | $ 1,564,131 |
| Total assets | 2,066,335 | 2,147,216 |
| Debt securities of consolidated trusts held by third parties | 1,468,613 | 1,471,437 |
| Other debt | 581,743 | 660,546 |
| All other liabilities | 14,893 | 15,379 |
| Total equity (deficit) | 1,086 | (146) |
| **Portfolio Balances**[(3)] | | |
| Mortgage-related investments portfolio | $ 581,279 | $ 653,313 |
| Total Freddie Mac mortgage-related securities[(4)] | 1,594,401 | 1,624,684 |
| Total mortgage portfolio[(5)] | 2,012,224 | 2,075,394 |
| Non-performing assets[(6)] | 126,228 | 129,152 |

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| **Ratios**[(7)] | | | | |
| Return on average assets[(8)] | 0.6% | (0.4)% | 0.3% | (0.1)% |
| Non-performing assets ratio[(9)] | 6.8 | 6.4 | 6.8 | 6.4 |
| Equity to assets ratio[(10)] | — | — | — | — |

(1)   See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for information regarding our accounting policies and the impact of new accounting policies on our consolidated financial statements.
(2)   Includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. This warrant is included in basic loss per share, because it is unconditionally exercisable by the holder at a cost of $0.00001 per share.
(3)   Represents the UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(4)   See "Table 27 — Freddie Mac Mortgage-Related Securities" for the composition of this line item.
(5)   See "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios" for the composition of our total mortgage portfolio.
(6)   See "Table 45 — Non-Performing Assets" for a description of our non-performing assets.
(7)   The dividend payout ratio on common stock is not presented because the amount of cash dividends per common share is zero for all periods presented. The return on common equity ratio is not presented because the simple average of the beginning and ending balances of total equity (deficit), net of preferred stock (at redemption value) is less than zero for all periods presented.
(8)   Ratio computed as net income divided by the simple average of the beginning and ending balances of total assets.
(9)   Ratio computed as non-performing assets divided by the ending UPB of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities.
(10)  Ratio computed as the simple average of the beginning and ending balances of total equity (deficit) divided by the simple average of the beginning and ending balances of total assets.

12

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## CONSOLIDATED RESULTS OF OPERATIONS

The following discussion of our consolidated results of operations should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported results of operations.

### Table 5 — Summary Consolidated Statements of Comprehensive Income

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| Net interest income | $ 4,386 | $ 4,561 | $8,886 | $ 9,101 |
| Provision for credit losses | (155) | (2,529) | (1,980) | (4,518) |
| Net interest income after provision for credit losses | 4,231 | 2,032 | 6,906 | 4,583 |
| Non-interest income (loss): | | | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (1) | (125) | (5) | 98 |
| Gains (losses) on retirement of other debt | (45) | 3 | (66) | 15 |
| Gains (losses) on debt recorded at fair value | 62 | (37) | 45 | (118) |
| Derivative gains (losses) | (882) | (3,807) | (1,938) | (4,234) |
| Impairment of available-for-sale securities: | | | | |
| Total other-than-temporary impairment of available-for-sale securities | (135) | (230) | (610) | (1,284) |
| Portion of other-than-temporary impairment recognized in AOCI | 37 | (122) | (52) | (261) |
| Net impairment of available-for-sale securities recognized in earnings | (98) | (352) | (662) | (1,545) |
| Other gains (losses) on investment securities recognized in earnings | (356) | 209 | (644) | 89 |
| Other income | 569 | 252 | 1,003 | 586 |
| Total non-interest income (loss) | (751) | (3,857) | (2,267) | (5,109) |
| Non-interest expense: | | | | |
| Administrative expenses | (401) | (384) | (738) | (745) |
| REO operations income (expense) | 30 | (27) | (141) | (284) |
| Other expenses | (165) | (135) | (253) | (214) |
| Total non-interest expense | (536) | (546) | (1,132) | (1,243) |
| Income (loss) before income tax benefit | 2,944 | (2,371) | 3,507 | (1,769) |
| Income tax benefit | 76 | 232 | 90 | 306 |
| Net income (loss) | 3,020 | (2,139) | 3,597 | (1,463) |
| Other comprehensive income (loss), net of taxes and reclassification adjustments: | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | (238) | 903 | 909 | 2,844 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 107 | 135 | 218 | 267 |
| Changes in defined benefit plans | 3 | 1 | (43) | (8) |
| Total other comprehensive income (loss), net of taxes and reclassification adjustments | (128) | 1,039 | 1,084 | 3,103 |
| Comprehensive income (loss) | $ 2,892 | $ (1,100) | $ 4,681 | $ 1,640 |

### Net Interest Income

The table below presents an analysis of net interest income, including average balances and related yields earned on assets and incurred on liabilities.

13

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 6 — Net Interest Income/Yield and Average Balance Analysis**

| | Three Months Ended June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | | | 2011 | | |
| | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate |
| | (dollars in millions) | | | | | |
| **Interest-earning assets:** | | | | | | |
| Cash and cash equivalents | $ 32,039 | $ 6 | 0.07% | $ 33,660 | $ 10 | 0.12% |
| Federal funds sold and securities purchased under agreements to resell | 37,995 | 15 | 0.16 | 32,227 | 8 | 0.09 |
| Mortgage-related securities: | | | | | | |
| Mortgage-related securities(3) | 358,279 | 4,038 | 4.51 | 450,575 | 5,215 | 4.63 |
| Extinguishment of PCs held by Freddie Mac | (111,351) | (1,275) | (4.58) | (166,318) | (1,966) | (4.73) |
| Total mortgage-related securities, net | 246,928 | 2,763 | 4.48 | 284,257 | 3,249 | 4.57 |
| Non-mortgage-related securities(3) | 24,779 | 14 | 0.22 | 26,078 | 26 | 0.39 |
| Mortgage loans held by consolidated trusts(4) | 1,538,134 | 16,806 | 4.37 | 1,643,680 | 19,782 | 4.81 |
| Unsecuritized mortgage loans(4) | 240,693 | 2,224 | 3.69 | 242,471 | 2,274 | 3.75 |
| Total interest-earning assets | $2,120,568 | $ 21,828 | 4.12 | $ 2,262,373 | $ 25,349 | 4.48 |
| **Interest-bearing liabilities:** | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $ 1,560,470 | $ (15,900) | (4.08) | $ 1,656,150 | $ (19,227) | (4.64) |
| Extinguishment of PCs held by Freddie Mac | (111,351) | 1,275 | 4.58 | (166,318) | 1,966 | 4.73 |
| Total debt securities of consolidated trusts held by third parties | 1,449,119 | (14,625) | (4.04) | 1,489,832 | (17,261) | (4.63) |
| Other debt: | | | | | | |
| Short-term debt | 128,860 | (43) | (0.13) | 194,153 | (95) | (0.19) |
| Long-term debt(5) | 464,966 | (2,617) | (2.25) | 500,587 | (3,238) | (2.59) |
| Total other debt | 593,826 | (2,660) | (1.79) | 694,740 | (3,333) | (1.92) |
| Total interest-bearing liabilities | 2,042,945 | (17,285) | (3.38) | 2,184,572 | (20,594) | (3.77) |
| Expense related to derivatives(6) | — | (157) | (0.03) | — | (194) | (0.03) |
| Impact of net non-interest-bearing funding | 77,623 | | 0.12 | 77,801 | | 0.13 |
| Total funding of interest-earning assets | $2,120,568 | $ (17,442) | (3.29) | $ 2,262,373 | $ (20,788) | (3.67) |
| Net interest income/yield | | $ 4,386 | 0.83 | | $ 4,561 | 0.81 |

| | Six Months Ended June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | | | 2011 | | |
| | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate |
| | (dollars in millions) | | | | | |
| **Interest-earning assets:** | | | | | | |
| Cash and cash equivalents | $ 41,535 | $ 10 | 0.05% | $ 35,611 | $ 26 | 0.14% |
| Federal funds sold and securities purchased under agreements to resell | 32,026 | 24 | 0.15 | 40,044 | 26 | 0.13 |
| Mortgage-related securities: | | | | | | |
| Mortgage-related securities(3) | 370,753 | 8,401 | 4.53 | 453,773 | 10,531 | 4.64 |
| Extinguishment of PCs held by Freddie Mac | (118,357) | (2,716) | (4.59) | (166,923) | (4,029) | (4.83) |
| Total mortgage-related securities, net | 252,396 | 5,685 | 4.50 | 286,850 | 6,502 | 4.53 |
| Non-mortgage-related securities(3) | 26,621 | 30 | 0.23 | 27,694 | 56 | 0.40 |
| Mortgage loans held by consolidated trusts(4) | 1,548,978 | 34,274 | 4.43 | 1,647,123 | 39,846 | 4.84 |
| Unsecuritized mortgage loans(4) | 247,785 | 4,536 | 3.66 | 241,514 | 4,608 | 3.82 |
| Total interest-earning assets | $ 2,149,341 | $ 44,559 | 4.15 | $2,278,836 | $ 51,064 | 4.48 |
| **Interest-bearing liabilities:** | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $ 1,570,609 | $ (32,594) | (4.15) | $ 1,660,879 | $ (38,693) | (4.66) |
| Extinguishment of PCs held by Freddie Mac | (118,357) | 2,716 | 4.59 | (166,923) | 4,029 | 4.83 |
| Total debt securities of consolidated trusts held by third parties | 1,452,252 | (29,878) | (4.11) | 1,493,956 | (34,664) | (4.64) |
| Other debt: | | | | | | |
| Short-term debt | 138,995 | (83) | (0.12) | 194,488 | (210) | (0.21) |
| Long-term debt(5) | 480,805 | (5,393) | (2.24) | 509,310 | (6,688) | (2.63) |
| Total other debt | 619,800 | (5,476) | (1.77) | 703,798 | (6,898) | (1.96) |
| Total interest-bearing liabilities | 2,072,052 | (35,354) | (3.41) | 2,197,754 | (41,562) | (3.78) |
| Expense related to derivatives(6) | — | (319) | (0.03) | — | (401) | (0.04) |
| Impact of net non-interest-bearing funding | 77,289 | | 0.12 | 81,082 | | 0.14 |
| Total funding of interest-earning assets | $ 2,149,341 | $ (35,673) | (3.32) | $2,278,836 | $ (41,963) | (3.68) |
| Net interest income/yield | | $ 8,886 | 0.83 | | $ 9,101 | 0.80 |

(1) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(2) We calculate average balances based on amortized cost.

(3) Interest income (expense) includes accretion of the portion of impairment charges recognized in earnings where we expect a significant improvement in cash flows.

(4) Non-performing loans, where interest income is generally recognized when collected, are included in average balances.

(5) Includes current portion of long-term debt.

(6) Represents changes in fair value of derivatives in closed cash flow hedge relationships that were previously deferred in AOCI and have been reclassified to earnings as the associated hedged forecasted issuance of debt affects earnings.

Net interest income decreased by $175 million and $215 million during the three and six months ended June 30, 2012, respectively, compared to the three and six months ended June 30, 2011. Net interest yield increased by two basis points and

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3602

Table of Contents

three basis points during the three and six months ended June 30, 2012, respectively, compared to the three and six months ended June 30, 2011. The primary driver underlying the decreases in net interest income was the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations, partially offset by lower funding costs from the replacement of debt at lower rates. The increases in net interest yield were primarily due to the benefits of lower funding costs, partially offset by the negative impact of the reduction in the average balance of higher-yielding mortgage-related assets.

We only recognize interest income on non-performing loans that have been placed on non-accrual status when cash payments are received. We refer to the interest income that we do not recognize as foregone interest income (i.e., interest income we would have recorded if the loans had been current in accordance with their original terms). Foregone interest income and reversals of previously recognized interest income, net of cash received, related to non-performing loans was $0.8 billion and $1.7 billion during the three and six months ended June 30, 2012, respectively, compared to $1.0 billion and $2.0 billion during the three and six months ended June 30, 2011, respectively. These reductions were primarily due to the decreased volume of non-performing loans on non-accrual status.

During the three and six months ended June 30, 2012, spreads on our debt and our access to the debt markets remained favorable relative to historical levels. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity."

**Provision for Credit Losses**

We maintain loan loss reserves at levels we believe are appropriate to absorb probable incurred losses on mortgage loans held-for-investment and loans underlying our financial guarantees. Our loan loss reserves are increased through the provision for credit losses and are reduced by net charge-offs. The provision for credit losses primarily reflects our estimate of incurred losses for newly impaired loans as well as changes in our estimates of loss for previously impaired loans based on the likelihood of ultimate transition to loss events and the expected severity rates of incurred losses.

Our provision for credit losses declined to $0.2 billion in the second quarter of 2012, compared to $2.5 billion in the second quarter of 2011, and was $2.0 billion in the first half of 2012 compared to $4.5 billion in the first half of 2011. The decrease in the provision for credit losses for the second quarter and first half of 2012 compared to the respective periods in 2011 primarily reflects improvements in the number of newly impaired loans (largely due to a decline in the portion of our single-family credit guarantee portfolio originated in 2005 through 2008) and lower estimated future losses due to the positive impact of an increase in national home prices. While national home prices exhibited strong growth in the second quarter of 2012, our expectation is that national average home prices will remain weak (on an inflation-adjusted basis) over the near term before a long-term recovery in housing begins. As such, we adjusted our estimated loss severity rates in the second quarter of 2012 to align with our expectations for near term home prices. Our provision for credit losses in the three and six months ended June 30, 2011 primarily reflected a decline in the rate at which delinquent loans transition into serious delinquency.

During the three and six months ended June 30, 2012, our charge-offs, net of recoveries for single-family loans exceeded the amount of our provision for credit losses. Our charge-offs in the first half of 2012 were less than they otherwise would have been because of the continued suppression of loan and collateral resolution activity due to the length of the foreclosure process. We believe the level of our charge-offs will continue to remain high for the remainder of 2012.

As of June 30, 2012 and December 31, 2011, the UPB of our single-family non-performing loans is $118.5 billion and $120.5 billion, respectively. These amounts include $48.0 billion and $44.4 billion, respectively, of single-family TDRs that are less than three months past due. However, TDRs remain categorized as non-performing throughout the remaining life of the loan regardless of whether the borrower makes payments, which return the loan to a current payment status after modification. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, our loan loss reserves balance, and our non-performing assets.

The total number of seriously delinquent loans declined approximately 7% during the first half of 2012. However, our serious delinquency rates remain high compared to the rates we experienced in years prior to 2009 due to the continued weakness in home prices in the last several years, persistently high unemployment, extended foreclosure timelines, and continued challenges faced by servicers processing large volumes of problem loans. Our seller/servicers have an active role

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                    Powered by Morningstar ® Document Research ℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3603

Table of Contents

in our loan workout activities, including under the servicing alignment initiative and the MHA Program, and a decline in their performance could result in a failure to realize the anticipated benefits of our loss mitigation plans.

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $75.2 billion, and have recorded an additional $4.1 billion in losses on loans purchased from our PCs, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred, and thus have not been provisioned for, we believe that, as of June 30, 2012, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for certain quarterly credit statistics for our single-family credit guarantee portfolio.

Our provision for credit losses and amount of charge-offs in the future will be affected by a number of factors. These factors include: (a) the actual level of mortgage defaults; (b) the effect of the MHA Program, the servicing alignment initiative, and other loss mitigation efforts, including any requirement to utilize principal forgiveness in our loan modification initiatives; (c) any government actions or programs that affect the ability of troubled borrowers to obtain modifications, including legislative changes to bankruptcy laws; (d) changes in property values; (e) regional economic conditions, including unemployment rates; (f) additional delays in the foreclosure process; (g) third-party mortgage insurance coverage and recoveries; and (h) the realized rate of seller/servicer repurchases. In addition, in April 2012, FHFA issued an advisory bulletin that could have an effect on our provision for credit losses in the future. The advisory bulletin specifies that, once a loan is classified as "loss," we generally are required to charge-off the portion of the loan balance that exceeds the fair value of the property, less cost to sell. We are currently assessing the operational and accounting impacts of this advisory bulletin and have not yet determined when or how we will implement this bulletin or its impact on our consolidated financial statements. See "LEGISLATIVE AND REGULATORY DEVELOPMENTS — FHFA Advisory Bulletin" for additional information. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for information on mortgage insurers and seller/servicer repurchase obligations.

We recognized a benefit for credit losses associated with our multifamily mortgage portfolio of $22 million and $13 million for the second quarters of 2012 and 2011, respectively, and $41 million and $73 million for the first half of 2012 and 2011, respectively. Our loan loss reserves associated with our multifamily mortgage portfolio were $496 million and $545 million as of June 30, 2012 and December 31, 2011, respectively. The decline in loan loss reserves for multifamily loans was driven primarily by an increase in property values underlying individually impaired loans.

**Non-Interest Income (Loss)**

*Gains (Losses) on Extinguishment of Debt Securities of Consolidated Trusts*

When we purchase PCs that have been issued by consolidated PC trusts, we extinguish a pro rata portion of the outstanding debt securities of the related consolidated trusts. We recognize a gain (loss) on extinguishment of the debt securities to the extent the amount paid to extinguish the debt security differs from its carrying value.

Losses on extinguishment of debt securities of consolidated trusts were $1 million and $125 million for the three months ended June 30, 2012 and 2011, respectively. For the three months ended June 30, 2012 and 2011, we extinguished debt securities of consolidated trusts with a UPB of $0.7 billion and $22.2 billion, respectively (representing our purchase of single-family PCs with a corresponding UPB amount). The losses during the three months ended June 30, 2011 were primarily due to the repurchase of debt securities of consolidated trusts at a larger net purchase premium driven by a decrease in interest rates during the period.

Gains (losses) on extinguishment of debt securities of consolidated trusts were $(5) million and $98 million for the six months ended June 30, 2012 and 2011, respectively. For the six months ended June 30, 2012 and 2011, we extinguished debt securities of consolidated trusts with a UPB of $1.4 billion and $47.0 billion, respectively (representing our purchase of single-family PCs with a corresponding UPB amount). The decrease in purchases of single-family PCs during the 2012 periods was primarily due to a lower volume of dollar roll transactions to support the market and pricing of our single-family PCs. The gains for the six months ended June 30, 2011 were due to the repurchases of debt securities of consolidated trusts at a net purchase discount during the first quarter of 2011 driven by an increase in interest rates during the period. See "Table 19 — Mortgage-Related Securities Purchase Activity" for additional information regarding purchases of mortgage-related securities, including those issued by consolidated PC trusts.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                                 Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3604

Table of Contents

### Gains (Losses) on Retirement of Other Debt

Gains (losses) on retirement of other debt were $(45) million and $3 million during the three months ended June 30, 2012 and 2011, respectively. Gains (losses) on retirement of other debt were $(66) million and $15 million during the six months ended June 30, 2012 and 2011, respectively. We recognized losses on debt retirements in the three and six months ended June 30, 2012 primarily due to write-offs of unamortized deferred issuance costs related to calls of other debt securities. We recognized gains on debt retirements in the six months ended June 30, 2011 primarily due to the repurchase of other debt securities at discounts. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Other Debt Securities — Other Debt Retirement Activities*."

### Gains (Losses) on Debt Recorded at Fair Value

Gains (losses) on debt recorded at fair value primarily relate to changes in the fair value of our foreign-currency denominated debt. For the three and six months ended June 30, 2012, we recognized gains on debt recorded at fair value of $62 million and $45 million, respectively, primarily due to a combination of the U.S. dollar strengthening relative to the Euro and changes in interest rates. For the three and six months ended June 30, 2011, we recognized losses on debt recorded at fair value of $37 million and $118 million, respectively, primarily due to the U.S. dollar weakening relative to the Euro. We mitigate changes in the fair value of our foreign-currency denominated debt by using foreign currency swaps and foreign-currency denominated interest-rate swaps.

### Derivative Gains (Losses)

The table below presents derivative gains (losses) reported in our consolidated statements of comprehensive income. See "NOTE 10: DERIVATIVES — Table 10.2 — Gains and Losses on Derivatives" for information about gains and losses related to specific categories of derivatives. Changes in fair value and interest accruals on derivatives not in hedge accounting relationships are recorded as derivative gains (losses) in our consolidated statements of comprehensive income. At June 30, 2012 and December 31, 2011, respectively, we did not have any derivatives in hedge accounting relationships; however, there are amounts recorded in AOCI related to discontinued cash flow hedges. Amounts recorded in AOCI associated with these closed cash flow hedges are reclassified to earnings when the forecasted transactions affect earnings. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the forecasted transaction is reclassified into earnings immediately.

While derivatives are an important aspect of our strategy to manage interest-rate risk, they generally increase the volatility of reported net income because, while fair value changes in derivatives affect net income, fair value changes in several of the types of assets and liabilities being hedged do not affect net income. Beginning in the fourth quarter of 2011, we began to increase the portion of our debt issued with longer-term maturities. This allows us to take advantage of attractive long-term rates while decreasing our reliance on interest-rate swaps.

### Table 7 — Derivative Gains (Losses)

| | Derivative Gains (Losses) | | | |
| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
|---|---|---|---|---|
| Interest-rate swaps | $ (2,506) | $ (3,749) | $(1,298) | $(2,026) |
| Option-based derivatives[1] | 2,276 | 1,602 | 1,199 | 795 |
| Other derivatives[2] | 310 | (308) | 199 | (402) |
| Accrual of periodic settlements[3] | (962) | (1,352) | (2,038) | (2,601) |
| Total | $ (882) | $ (3,807) | $(1,938) | $(4,234) |

(1) Primarily includes purchased call and put swaptions and purchased interest-rate caps and floors.
(2) Includes futures, foreign-currency swaps, commitments, swap guarantee derivatives, and credit derivatives.
(3) Includes imputed interest on zero-coupon swaps.

Gains (losses) on derivatives not accounted for in hedge accounting relationships are principally driven by changes in: (a) interest rates and implied volatility; and (b) the mix and volume of derivatives in our derivative portfolio.

During the three and six months ended June 30, 2012, we recognized losses on derivatives of $0.9 billion and $1.9 billion, respectively, due to losses related to the accrual of periodic settlements on interest-rate swaps as we were in a net pay-fixed swap position. We recognized fair value losses on our pay-fixed swaps of $8.0 billion and $4.2 billion,

<div align="center">17</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

respectively, which were largely offset by: (a) fair value gains on our receive-fixed swaps of $5.4 billion and $2.9 billion, respectively; and (b) fair value gains on our option-based derivatives of $2.3 billion and $1.2 billion, respectively, resulting from gains on our purchased call swaptions due to a decrease in longer-term interest rates. During the three and six months ended June 30, 2012, the effect of the decline in longer-term interest rates was partially mitigated due to a change in the mix of our derivatives portfolio, whereby we increased our holdings of receive-fixed swaps relative to pay-fixed swaps to rebalance our portfolio during a period of steadily declining interest rates and increased our issuances of debt with longer-term maturities.

During the three and six months ended June 30, 2011, we recognized losses on derivatives of $3.8 billion and $4.2 billion, respectively, primarily due to declines in interest rates in the second quarter. We recognized fair value losses on our pay-fixed swap positions of $7.3 billion and $3.3 billion, respectively, partially offset by fair value gains on our receive-fixed swaps of $3.6 billion and $1.3 billion, respectively. We also recognized fair value gains of $1.6 billion and $0.8 billion, respectively, on our option-based derivatives, resulting from gains on our purchased call swaptions as interest rates decreased during these periods. Additionally, we recognized losses related to the accrual of periodic settlements during the three and six months ended June 30, 2011 due to our net pay-fixed swap position in the current interest rate environment.

### Investment Securities-Related Activities

#### Impairments of Available-For-Sale Securities

We recorded net impairments of available-for-sale securities recognized in earnings, which were related to non-agency mortgage-related securities, of $98 million and $662 million during the three and six months ended June 30, 2012, respectively, compared to $352 million and $1.5 billion during the three and six months ended June 30, 2011, respectively. The decrease in net impairments recognized in earnings during the three and six months ended June 30, 2012 was primarily driven by improvements in forecasted home prices over the expected life of the securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities* — *Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*" and "NOTE 7: INVESTMENTS IN SECURITIES" for additional information.

#### Other Gains (Losses) on Investment Securities Recognized in Earnings

Other gains (losses) on investment securities recognized in earnings primarily consist of gains (losses) on trading securities. Trading securities mainly include Treasury securities, agency fixed-rate and variable-rate pass-through mortgage-related securities, and agency REMICs, including inverse floating-rate, interest-only and principal-only securities. We recognized $(400) million and $(777) million related to gains (losses) on trading securities during the three and six months ended June 30, 2012, respectively, compared to $274 million and $74 million during the three and six months ended June 30, 2011, respectively.

The losses on trading securities during the three and six months ended June 30, 2012 were primarily driven by changes in market prepayment expectations for our interest-only and inverse-floater investment securities, given recent low interest rates. The gains on trading securities during the three and six months ended June 30, 2011 were primarily due to the impact of a decline in interest rates coupled with a tightening of OAS levels on agency securities.

### Other Income

The table below summarizes the significant components of other income.

18                                                                                      *Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 8 — Other Income**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| Other income: | | | | |
| Gains (losses) on sale of mortgage loans | $ 44 | $ 161 | $ 84 | $ 256 |
| Gains (losses) on mortgage loans recorded at fair value | 201 | 136 | 340 | 103 |
| Recoveries on loans impaired upon purchase | 87 | 132 | 176 | 257 |
| Guarantee-related income, net[1] | 130 | 81 | 200 | 135 |
| All other | 107 | (258) | 203 | (165) |
| Total other income | $ 569 | $ 252 | $ 1,003 | $ 586 |

(1) Most of our guarantee-related income relates to securitized multifamily mortgage loans where we have not consolidated the securitization trusts on our consolidated balance sheets.

*Gains (Losses) on Sale of Mortgage Loans*

During the three months ended June 30, 2012 and 2011, we recognized $44 million and $161 million, respectively, of gains on sale of mortgage loans with associated UPB of $6.3 billion and $4.3 billion, respectively. During the six months ended June 30, 2012 and 2011, we recognized $84 million and $256 million, respectively, of gains on sale of mortgage loans with associated UPB of $10.0 billion and $7.7 billion, respectively. All such amounts relate to our securitizations of multifamily loans on our consolidated balance sheets, which we elected to carry at fair value. We had lower gains on sale of mortgage loans in the three and six months ended June 30, 2012, compared to the same periods of 2011, as a significant portion of the improved fair value of the loans was recognized within gains (losses) on mortgage loans recorded at fair value during periods prior to the loans' securitization.

*Gains (Losses) on Mortgage Loans Recorded at Fair Value*

During the three months ended June 30, 2012 and 2011, we recognized $201 million and $136 million, respectively, of gains on mortgage loans recorded at fair value, and we recognized $340 million and $103 million of such gains during the six months ended June 30, 2012 and 2011, respectively. All such amounts relate to multifamily loans which we had elected to carry at fair value and were designated for securitization. We held higher balances of these loans on our consolidated balance sheets during the three and six months ended June 30, 2012, compared to the same periods in 2011 which, when combined with improving fair values on those loans, resulted in higher gains during the 2012 periods.

*Recoveries on Loans Impaired upon Purchase*

Recoveries on loans impaired upon purchase represent the recapture into income of previously recognized losses associated with purchases of delinquent loans from our PCs in conjunction with our guarantee activities. Recoveries occur when a loan that was impaired upon purchase is repaid in full or when at the time of foreclosure the estimated fair value of the acquired property, less costs to sell, exceeds the carrying value of the loan. For impaired loans where the borrower has made required payments that return the loan to less than three months past due, the recovery amounts are recognized as interest income over time as periodic payments are received.

During the three months ended June 30, 2012 and 2011, we recognized recoveries on loans impaired upon purchase of $87 million and $132 million, respectively, and these recoveries were $176 million and $257 million during the six months ended June 30, 2012 and 2011, respectively. Our recoveries on loans impaired upon purchase declined in the second quarter and first half of 2012, compared to the same periods of 2011, due to a lower volume of foreclosure transfers and payoffs associated with loans impaired upon purchase.

*All Other*

All other income consists primarily of transactional fees, fees assessed to our servicers, such as for technology use and late fees or other penalties, and other miscellaneous income. All other income increased during the three and six months ended June 30, 2012, compared to the same periods in 2011, principally due to the correction of certain prior period accounting errors not material to our financial statements that were recorded during the second quarter of 2011. During the second quarter of 2011, our largest correction related to an error associated with the accrual of interest income for certain impaired mortgage-related securities during 2010 and 2009, which reduced other income during the three and six months ended June 30, 2011 by approximately $293 million.

19

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Non-Interest Expense**

The table below summarizes the components of non-interest expense.

**Table 9 — Non-Interest Expense**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| Administrative expenses: | | | | |
| Salaries and employee benefits | $ 227 | $ 219 | $ 403 | $ 426 |
| Professional services | 81 | 64 | 152 | 120 |
| Occupancy expense | 14 | 15 | 28 | 30 |
| Other administrative expense | 79 | 86 | 155 | 169 |
| Total administrative expenses | 401 | 384 | 738 | 745 |
| REO operations (income) expense | (30) | 27 | 141 | 284 |
| Other expenses | 165 | 135 | 253 | 214 |
| Total non-interest expense | $ 536 | $ 546 | $1,132 | $ 1,243 |

*Administrative Expenses*

Administrative expenses increased during the three months ended June 30, 2012 compared to the three months ended June 30, 2011, due to an increase in professional services expense and salaries and employee benefits expense. Professional services expense increased as a result of initiatives we are pursuing under the 2012 conservatorship scorecard and other FHFA-mandated initiatives. Salaries and employee benefits expense increased primarily because of a change in the timing of the recognition of compensation-related expenses as a result of our new compensation program for employees, which we introduced in the second quarter of 2012. During the six months ended June 30, 2012, administrative expenses decreased slightly compared to the six months ended June 30, 2011 as lower salaries and employee benefits expense and other administrative expenses more than offset higher professional services expense.

We currently expect that our general and administrative expenses for the full-year 2012 will be marginally higher than those we experienced in the full-year 2011, resulting from increased professional services expense, in part due to: (a) our need to respond to developments in the continually changing mortgage market; (b) an environment in which we are subject to increased regulatory oversight and mandates; and (c) strategic arrangements that we may enter into with outside firms to provide operational capability and staffing for key functions. We believe the initiatives we are pursuing under the 2012 conservatorship scorecard and other FHFA-mandated initiatives will require additional resources and continue to affect our level of administrative expenses going forward.

*REO Operations (Income) Expense*

The table below presents the components of our REO operations (income) expense, and REO inventory and disposition information.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3608

Table of Contents

**Table 10 — REO Operations (Income) Expense, REO Inventory, and REO Dispositions**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2012** | **2011** | **2012** | **2011** |
| | (dollars in millions) | | | |
| REO operations (income) expense: | | | | |
| Single-family: | | | | |
| REO property expenses[1][2] | $ 293 | $ 300 | $ 671 | $ 608 |
| Disposition (gains) losses, net[2] | (182) | 56 | (260) | 182 |
| Change in holding period allowance, dispositions | (33) | (129) | (90) | (284) |
| Change in holding period allowance, inventory[3] | (27) | 5 | (26) | 156 |
| Recoveries[4] | (85) | (197) | (157) | (370) |
| Total single-family REO operations (income) expense | (34) | 35 | 138 | 292 |
| Multifamily REO operations (income) expense | 4 | (8) | 3 | (8) |
| Total REO operations (income) expense | $ (30) | $ 27 | $ 141 | $ 284 |
| REO inventory (in properties), at June 30: | | | | |
| Single-family | 53,271 | 60,599 | 53,271 | 60,599 |
| Multifamily | 11 | 19 | 11 | 19 |
| Total | 53,282 | 60,618 | 53,282 | 60,618 |
| REO property dispositions (in properties): | | | | |
| Single-family | 26,069 | 29,348 | 51,102 | 60,975 |
| Multifamily | 7 | 7 | 11 | 8 |
| Total | 26,076 | 29,355 | 51,113 | 60,983 |

(1) Consists of costs incurred to maintain or protect a property after it is acquired in a foreclosure transfer, such as legal fees, insurance, taxes, and cleaning and other maintenance charges.

(2) Represents the difference between the disposition proceeds, net of selling expenses, and the fair value of the property on the date of the foreclosure transfer.

(3) Represents the (increase) decrease in the estimated fair value of properties that were in inventory during the period.

(4) Includes recoveries from primary mortgage insurance, pool insurance and seller/servicer repurchases.

REO operations (income) expense was $(30) million for the second quarter of 2012, as compared to $27 million during the second quarter of 2011 and was $141 million in the first half of 2012 compared to $284 million for the first half of 2011. The decline in expense for the 2012 periods was primarily due to improving home prices in certain geographical areas with significant REO activity, which resulted in gains on disposition of properties as well as lower write-downs of single-family REO inventory. Recoveries on REO properties also declined during the second quarter and first half of 2012, compared to the same periods of 2011. Lower recoveries on REO properties were primarily due to lower REO property volume, reduced recoveries from mortgage insurers, and a decline in reimbursements of losses from seller/servicers associated with repurchase requests.

We believe the volume of our single-family REO acquisitions during the first half of 2012 was less than it otherwise would have been due to: (a) the length of the foreclosure process, particularly in states that require a judicial foreclosure process; and (b) resource constraints on foreclosure activities for five larger servicers involved in a recent settlement with a coalition of state attorneys general and federal agencies. The lower acquisition rate, coupled with high disposition levels, led to a lower REO property inventory level at June 30, 2012, compared to December 31, 2011. We expect that the length of the foreclosure process will continue to remain above historical levels. Additionally, we expect our REO activity to remain at elevated levels, as we have a large inventory of seriously delinquent loans in our single-family credit guarantee portfolio. To the extent a large volume of loans completes the foreclosure process in a short period of time, the resulting REO inventory could have a negative effect on the housing market. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

**Other Expenses**

Other expenses were $165 million and $135 million in the second quarters of 2012 and 2011, respectively, and were $253 million and $214 million in the first half of 2012 and 2011, respectively. Other expenses consist primarily of HAMP servicer incentive fees, costs related to terminations and transfers of mortgage servicing, and other miscellaneous expenses.

**Income Tax Benefit**

For the three months ended June 30, 2012 and 2011, we reported an income tax benefit of $76 million and $232 million, respectively. For the six months ended June 30, 2012 and 2011, we reported an income tax benefit of $90 million and $306 million, respectively. See "NOTE 12: INCOME TAXES" for additional information.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Comprehensive Income (Loss)

Our comprehensive income (loss) was $2.9 billion and $4.7 billion for the three and six months ended June 30, 2012, respectively, consisting of: (a) $3.0 billion and $3.6 billion of net income, respectively; and (b) $(128) million and $1.1 billion of total other comprehensive income (loss), respectively, primarily due to a change in net unrealized losses related to our available-for-sale securities.

Our comprehensive income (loss) was $(1.1) billion and $1.6 billion for the three and six months ended June 30, 2011, respectively, consisting of: (a) $(2.1) billion and $(1.5) billion of net income (loss), respectively; and (b) $1.0 billion and $3.1 billion of total other comprehensive income, respectively, primarily due to a reduction in net unrealized losses related to our available-for-sale securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Total Equity (Deficit)" for additional information regarding total other comprehensive income.

### Segment Earnings

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. Certain activities that are not part of a reportable segment are included in the All Other category.

The Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans, which are funded by other debt issuances and hedged using derivatives. In our Investments segment, we also provide funding and hedging management services to the Single-family Guarantee and Multifamily segments. The Investments segment reflects changes in the fair value of the Multifamily segment CMBS and held-for-sale loans that are associated with changes in interest rates. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses.

The Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related securities in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less credit-related expenses, administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses.

The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans and non-agency CMBS that we purchased for investment, our purchases of such multifamily mortgage loans for investment have declined significantly since 2010, and our purchases of CMBS have declined significantly since 2008. The only CMBS that we have purchased since 2008 have been senior, mezzanine, and interest-only tranches related to certain of our securitization transactions, and these purchases have not been significant. Currently, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization. We guarantee the senior tranches of these securitizations in Other Guarantee Transactions. Our Multifamily segment also issues Other Structured Securities, but does not issue REMIC securities. Our Multifamily segment also enters into other guarantee commitments for multifamily HFA bonds and housing revenue bonds held by third parties. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less credit-related expenses, administrative expenses, and allocated funding costs. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in fair value of CMBS and held-for-sale loans associated only with market factors other than changes in interest rates, such as liquidity and credit.

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. The financial performance of our Single-family Guarantee segment and Multifamily segment are measured based on each segment's contribution to GAAP net income (loss). Our Investments segment is measured on its contribution to GAAP comprehensive income (loss), which consists of the sum of its contribution to: (a) GAAP net income (loss); and (b) GAAP total other comprehensive income (loss), net of taxes. The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss). Likewise, the sum of comprehensive income (loss) for each segment and the All Other category equals GAAP comprehensive income (loss).

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

FHFA 3610

**Table of Contents**

The All Other category consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods. The All Other category also includes the deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward.

In presenting Segment Earnings, we make significant reclassifications among certain financial statement line items in order to reflect a measure of net interest income on investments and a measure of management and guarantee income on guarantees that is in line with how we manage our business. We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments.

As a result of these reclassifications and allocations, Segment Earnings for our reportable segments differs significantly from, and should not be used as a substitute for, net income (loss) as determined in accordance with GAAP. Our definition of Segment Earnings may differ from similar measures used by other companies. However, we believe that Segment Earnings provides us with meaningful metrics to assess the financial performance of each segment and our company as a whole.

See "NOTE 14: SEGMENT REPORTING" in our 2011 Annual Report for further information regarding our segments, including the descriptions and activities of the segments and the reclassifications and allocations used to present Segment Earnings.

In the first half of 2012, under guidance from FHFA, we curtailed mortgage-related investments portfolio purchase and retention activities that are undertaken for the primary purpose of supporting the price performance of our PCs. We are evaluating possible strategies that could improve the price performance of our PCs.

<div align="center">23</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides information about our various segment mortgage portfolios at June 30, 2012 and December 31, 2011. For a discussion of each segment's portfolios, see "*Segment Earnings — Results*."

**Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios** [1]

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| | (in millions) | |
| **Segment mortgage portfolios:** | | |
| *Investments — Mortgage investments portfolio:* | | |
| Single-family unsecuritized mortgage loans [2] | $  92,462 | $  109,190 |
| Freddie Mac mortgage-related securities | 184,358 | 220,659 |
| Non-agency mortgage-related securities | 81,634 | 86,526 |
| Non-Freddie Mac agency securities | 27,950 | 32,898 |
| *Total Investments — Mortgage investments portfolio* | 386,404 | 449,273 |
| *Single-family Guarantee — Managed loan portfolio:* [3] | | |
| Single-family unsecuritized mortgage loans [4] | 60,053 | 62,469 |
| Single-family Freddie Mac mortgage-related securities held by us | 184,358 | 220,659 |
| Single-family Freddie Mac mortgage-related securities held by third parties | 1,376,822 | 1,378,881 |
| Single-family other guarantee commitments [5] | 13,691 | 11,120 |
| *Total Single-family Guarantee — Managed loan portfolio* | 1,634,924 | 1,673,129 |
| *Multifamily — Guarantee portfolio:* | | |
| Multifamily Freddie Mac mortgage related securities held by us | 2,633 | 3,008 |
| Multifamily Freddie Mac mortgage related securities held by third parties | 30,588 | 22,136 |
| Multifamily other guarantee commitments [5] | 9,844 | 9,944 |
| *Total Multifamily — Guarantee portfolio* | 43,065 | 35,088 |
| *Multifamily — Mortgage investments portfolio* | | |
| Multifamily investment securities portfolio | 55,225 | 59,260 |
| Multifamily loan portfolio | 79,597 | 82,311 |
| *Total Multifamily — Mortgage investments portfolio* | 134,822 | 141,571 |
| *Total Multifamily portfolio* | 177,887 | 176,659 |
| Less : Freddie Mac single-family and certain multifamily securities [6] | (186,991) | (223,667) |
| *Total mortgage portfolio* | $ 2,012,224 | $ 2,075,394 |
| **Credit risk portfolios:** [7] | | |
| *Single-family credit guarantee portfolio:* [3] | | |
| Single-family mortgage loans, on-balance sheet | $ 1,675,687 | $ 1,733,215 |
| Non-consolidated Freddie Mac mortgage-related securities | 9,929 | 10,735 |
| Other guarantee commitments | 13,691 | 11,120 |
| Less: HFA-related guarantees [8] | (7,751) | (8,637) |
| Less: Freddie Mac mortgage-related securities backed by Ginnie Mae certificates [8] | (709) | (779) |
| *Total single-family credit guarantee portfolio* | $ 1,690,847 | $ 1,745,654 |
| *Multifamily mortgage portfolio:* | | |
| Multifamily mortgage loans, on-balance sheet | $  79,597 | $  82,311 |
| Non-consolidated Freddie Mac mortgage-related securities | 33,221 | 25,144 |
| Other guarantee commitments | 9,844 | 9,944 |
| Less: HFA-related guarantees [8] | (1,206) | (1,331) |
| *Total multifamily mortgage portfolio* | $  121,456 | $  116,068 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Excludes unsecuritized seriously delinquent single-family loans managed by the Single-family Guarantee segment. However, the Single-family Guarantee segment continues to earn management and guarantee fees associated with unsecuritized single-family loans in the Investments segment's mortgage investments portfolio.
(3) The balances of the mortgage-related securities in the Single-family Guarantee managed loan portfolio are based on the UPB of the security, whereas the balances of our single-family credit guarantee portfolio presented in this report are based on the UPB of the mortgage loans underlying the related security. The differences in the loan and security balances result from the timing of remittances to security holders, which is typically 45 or 75 days after the mortgage payment cycle of fixed-rate and ARM PCs, respectively.
(4) Represents unsecuritized seriously delinquent single-family loans managed by the Single-family Guarantee segment.
(5) Represents the UPB of mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.
(6) Freddie Mac single-family mortgage-related securities held by us are included in both our Investments segment's mortgage investments portfolio and our Single-family Guarantee segment's managed loan portfolio, and Freddie Mac multifamily mortgage-related securities held by us are included in both the multifamily investment securities portfolio and the multifamily guarantee portfolio. Therefore, these amounts are deducted in order to reconcile to our total mortgage portfolio.
(7) Represents the UPB of loans for which we present characteristics, delinquency data, and certain other statistics in this report. See "GLOSSARY" for further description.
(8) We exclude HFA-related guarantees and our resecuritizations of Ginnie Mae certificates from our credit risk portfolios and most related statistics because these guarantees do not expose us to meaningful amounts of credit risk due to the credit enhancement provided on them by the U.S. government.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                                 Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3612

Table of Contents

*Segment Earnings — Results*

<u>Investments</u>

The table below presents the Segment Earnings of our Investments segment.

**Table 12 — Segment Earnings and Key Metrics — Investments** [1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (dollars in millions) | | | |
| Segment Earnings: | | | | |
| Net interest income | $ 1,559 | $ 1,826 | $ 3,322 | $ 3,479 |
| Non-interest income (loss): | | | | |
| Net impairment of available-for-sale securities recognized in earnings | (14) | (139) | (510) | (1,168) |
| Derivative gains (losses) | 236 | (2,156) | 436 | (1,053) |
| Gains (losses) on trading securities | (413) | 256 | (811) | 22 |
| Gains (losses) on sale of mortgage loans | 6 | 4 | (8) | 16 |
| Gains (losses) on mortgage loans recorded at fair value | 257 | 167 | 219 | 84 |
| Other non-interest income (loss) | 673 | (184) | 1,186 | 357 |
| Total non-interest income (loss) | 745 | (2,052) | 512 | (1,742) |
| Non-interest expense: | | | | |
| Administrative expenses | (108) | (101) | (200) | (196) |
| Other non-interest expense | — | (1) | — | (1) |
| Total non-interest expense | (108) | (102) | (200) | (197) |
| Segment adjustments [2] | 164 | 126 | 319 | 329 |
| Segment Earnings (loss) before income tax benefit | 2,360 | (202) | 3,953 | 1,869 |
| Income tax benefit | 108 | 212 | 143 | 278 |
| Segment Earnings, net of taxes | 2,468 | 10 | 4,096 | 2,147 |
| Total other comprehensive income, net of taxes | 27 | 633 | 362 | 1,759 |
| Comprehensive income | $ 2,495 | $ 643 | $ 4,458 | $ 3,906 |
| Key metrics: | | | | |
| *Portfolio balances:* | | | | |
| Average balances of interest-earning assets: [3][4] | | | | |
| Mortgage-related securities [5] | $308,287 | $ 393,361 | $ 319,439 | $ 396,238 |
| Non-mortgage-related investments [6] | 94,806 | 91,965 | 100,173 | 103,348 |
| Unsecuritized single-family loans [7] | 98,158 | 92,339 | 103,732 | 88,927 |
| Total average balances of interest-earning assets | $501,251 | $577,665 | $523,344 | $588,513 |
| *Return:* | | | | |
| Net interest yield — Segment Earnings basis (annualized) | 1.24% | 1.26% | 1.27% | 1.18% |

(1)  For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 13: SEGMENT REPORTING — Table 13.2 — Segment Earnings and Reconciliation to GAAP Results."

(2)  For a description of our segment adjustments, see "NOTE 14: SEGMENT REPORTING — Segment Earnings" in our 2011 Annual Report.

(3)  Excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(4)  We calculate average balances based on amortized cost.

(5)  Includes our investments in single-family PCs and certain Other Guarantee Transactions, which have been consolidated under GAAP on our consolidated balance sheet since January 1, 2010.

(6)  Includes the average balances of interest-earning cash and cash equivalents, non-mortgage-related securities, and federal funds sold and securities purchased under agreements to resell.

(7)  Excludes unsecuritized seriously delinquent single-family mortgage loans.

Segment Earnings for our Investments segment increased by $2.5 billion and $1.9 billion to $2.5 billion and $4.1 billion during the three and six months ended June 30, 2012, respectively, compared to $10 million and $2.1 billion during the three and six months ended June 30, 2011, respectively, primarily due to: (a) derivative gains during the three and six months ended June 30, 2012 versus losses during the three and six months ended June 30, 2011; (b) improvements in other non-interest income; and (c) a reduction in net impairments of available-for-sale securities recognized in earnings. These factors were partially offset by our recognition of losses on trading securities during the three and six months ended June 30, 2012 versus gains on trading securities during the three and six months ended June 30, 2011.

Comprehensive income for our Investments segment increased by $1.9 billion and $552 million to $2.5 billion and $4.5 billion during the three and six months ended June 30, 2012, respectively, compared to $643 million and $3.9 billion during the three and six months ended June 30, 2011, respectively, primarily due to higher Segment Earnings, partially offset by lower other comprehensive income, primarily due to a smaller improvement in the net unrealized loss position of AOCI.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3613

Table of Contents

During the three and six months ended June 30, 2012, the UPB of the Investments segment mortgage investments portfolio decreased at an annualized rate of 29.4% and 28.0%, respectively. We held $212.3 billion of agency securities and $81.6 billion of non-agency mortgage-related securities as of June 30, 2012, compared to $253.6 billion of agency securities and $86.5 billion of non-agency mortgage-related securities as of December 31, 2011. The decline in UPB of agency securities is due mainly to liquidations, including prepayments, and selected sales. Our selected sales during the six months ended June 30, 2012 were due to a variety of reasons, including the impact of tightening OAS levels on certain assets that we were able to sell at attractive levels. The decline in UPB of non-agency mortgage-related securities is due mainly to the receipt of principal remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral, representing a partial return of our investments in these securities. Since the beginning of 2007, we have incurred actual principal cash shortfalls of $2.1 billion on impaired non-agency mortgage-related securities in the Investments segment. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for additional information regarding our mortgage-related securities.

Segment Earnings net interest income decreased by $267 million and $157 million and net interest yield decreased by two basis points and increased by nine basis points during the three and six months ended June 30, 2012, respectively, compared to the three and six months ended June 30, 2011, respectively. The primary driver of the decreases in net interest yield during the three months ended June 30, 2012 and net interest income for both periods was the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations, partially offset by lower funding costs, primarily due to the replacement of debt at lower rates. The increase in net interest yield during the six months ended June 30, 2012 compared to the six months ended June 30, 2011 was primarily due to the lower funding costs outweighing the impact of the reduction in the average balance of higher-yielding mortgage-related assets.

Segment Earnings non-interest income (loss) was $745 million and $512 million during the three and six months ended June 30, 2012, respectively, compared to $(2.1) billion and $(1.7) billion during the three and six months ended June 30, 2011, respectively. This improvement was primarily due to: (a) derivative gains during the three and six months ended June 30, 2012 versus losses during the three and six months ended June 30, 2011; (b) improvements in other non-interest income; and (c) a reduction in net impairments of available-for-sale securities recognized in earnings. These factors were partially offset by our recognition of losses on trading securities during the three and six months ended June 30, 2012 versus gains on trading securities during the three and six months ended June 30, 2011.

Impairments recorded in our Investments segment were $14 million and $510 million during the three and six months ended June 30, 2012, respectively, compared to $139 million and $1.2 billion during the three and six months ended June 30, 2011. The decrease in net impairments recognized in earnings during the three and six months ended June 30, 2012 was primarily driven by improvements in forecasted home prices over the expected life of the securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities — Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*" for additional information on our impairments.

We recorded gains (losses) on trading securities of $(413) million and $(811) million during the three and six months ended June 30, 2012, respectively, compared to $256 million and $22 million during the three and six months ended June 30, 2011, respectively. The losses on trading securities during the three and six months ended June 30, 2012 were primarily driven by changes in market prepayment expectations for our interest-only and inverse-floater investment securities, given recent low interest rates. The gains on trading securities during the three and six months ended June 30, 2011 were primarily due to the impact of a decline in interest rates coupled with a tightening of OAS levels on agency securities.

While derivatives are an important aspect of our strategy to manage interest-rate risk, they generally increase the volatility of reported Segment Earnings, because while fair value changes in derivatives affect Segment Earnings, fair value changes in several of the types of assets and liabilities being hedged do not affect Segment Earnings. We recorded derivative gains (losses) for this segment of $236 million and $436 million during the three and six months ended June 30, 2012, respectively, compared to $(2.2) billion and $(1.1) billion during the three and six months ended June 30, 2011, respectively. During the three and six months ended June 30, 2012 and 2011, longer-term swap interest rates decreased, resulting in fair value losses on our pay-fixed swaps, partially offset by: (a) fair value gains on our receive-fixed swaps; and (b) fair value gains on our option-based derivatives resulting from gains on our purchased call swaptions. Increased derivative gains in 2012 resulted from a change in the mix of our derivatives portfolio, whereby we increased our holdings of receive-fixed swaps relative to pay-fixed swaps to rebalance our portfolio during a period of steadily declining interest rates and increased our issuances of debt with longer-term maturities. During the three and six months ended June 30, 2012, we recognized

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

gains on other derivative transactions, such as commitments to purchase mortgage loans. See "Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for additional information on our derivatives.

Other non-interest income (loss) for this segment was $673 million and $1.2 billion during the three and six months ended June 30, 2012, respectively, compared to $(184) million and $357 million during the three and six months ended June 30, 2011, respectively. The improvement in other non-interest income was primarily due to an increase in amortization income of basis adjustments resulting from the securitization and sales of retained mortgage loans and sales of Freddie Mac mortgage-related securities from our mortgage-related investments portfolio. In addition, during the three months ended June 30, 2011 we recorded certain prior period accounting errors not material to our financial statements. During the three months ended June 30, 2011, the largest correction related to an error associated with the accrual of interest income for certain impaired mortgage-related securities during 2010 and 2009, which reduced other non-interest income during the three and six months ended June 30, 2011 by approximately $293 million.

Our Investments segment's total other comprehensive income was $27 million and $362 million during the three and six months ended June 30, 2012, respectively, compared to $633 million and $1.8 billion during the three and six months ended June 30, 2011, respectively. Net unrealized losses in AOCI on our available-for-sale securities for this segment increased by $81 million and decreased by $161 million during the three and six months ended June 30, 2012, respectively. The increase in our net unrealized losses in AOCI during the three months ended June 30, 2012 was primarily due to the impact of widening OAS levels on our non-agency mortgage-related securities, partially offset by fair value gains related to the movement of non-agency mortgage-related securities with unrealized losses towards maturity and the impact of the decline in interest rates. The decrease in our net unrealized losses during the six months ended June 30, 2012, was primarily due to fair value gains related to the movement of non-agency mortgage-related securities with unrealized losses towards maturity and fair value gains due to the impact of the decline in interest rates, partially offset by the impact of widening OAS levels on our non-agency mortgage-related securities. Net unrealized losses in AOCI on our available-for-sale securities decreased by $498 million and $1.5 billion during the three and six months ended June 30, 2011, respectively, primarily due to the impact of fair value gains related to the movement of non-agency mortgage-related securities with unrealized losses towards maturity, the impact of declining rates on our agency securities, and the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities, partially offset by the impact of widening of OAS levels on our non-agency mortgage-related securities. The changes in fair value of CMBS, excluding impacts from the changes in interest rates which are included in the Investments segment, are reflected in the Multifamily segment.

For a discussion of items that may impact our Investments segment net interest income over time, see "EXECUTIVE SUMMARY — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio."

<div align="center">27</div>

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3615

Table of Contents

*Single-Family Guarantee*

The table below presents the Segment Earnings of our Single-family Guarantee segment.

**Table 13 — Segment Earnings and Key Metrics — Single-Family Guarantee** [1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (dollars in millions) | | | |
| **Segment Earnings:** | | | | |
| Net interest income (expense) | $ (1) | $ (30) | $ (33) | $ 70 |
| Provision for credit losses | (462) | (2,886) | (2,646) | (5,170) |
| Non-interest income: | | | | |
|   Management and guarantee income | 1,026 | 848 | 2,037 | 1,718 |
|   Other non-interest income | 171 | 208 | 352 | 419 |
|     Total non-interest income | 1,197 | 1,056 | 2,389 | 2,137 |
| Non-interest expense: | | | | |
|   Administrative expenses | (232) | (228) | (425) | (443) |
|   REO operations income (expense) | 34 | (35) | (138) | (292) |
|   Other non-interest expense | (82) | (106) | (155) | (172) |
|     Total non-interest expense | (280) | (369) | (718) | (907) |
| Segment adjustments [2] | (192) | (143) | (388) | (328) |
| Segment Earnings (loss) before income tax (expense) benefit | 262 | (2,372) | (1,396) | (4,198) |
| Income tax (expense) benefit | (21) | (14) | (38) | (8) |
| Segment Earnings (loss), net of taxes | 241 | (2,386) | (1,434) | (4,206) |
| Total other comprehensive income (loss), net of taxes | 1 | 1 | (22) | (3) |
| Comprehensive income (loss) | $ 242 | $(2,385) | $ (1,456) | $(4,209) |
| **Key metrics:** | | | | |
| *Balances and Volume (in billions, except rate):* | | | | |
|   Average balance of single-family credit guarantee portfolio and HFA guarantees | $ 1,706 | $ 1,816 | $ 1,723 | $ 1,817 |
|   Issuance - Single-family credit guarantees [3] | $ 100 | $ 62 | $ 210 | $ 158 |
|   Fixed-rate products - Percentage of purchases [4] | 95% | 90% | 95% | 93% |
|   Liquidation rate — Single-family credit guarantees (annualized) [5] | 32% | 17% | 31% | 23% |
| *Management and Guarantee Fee Rate (in bps, annualized):* | | | | |
|   Contractual management and guarantee fees [6] | 14.8 | 13.7 | 14.5 | 13.6 |
|   Amortization of delivery fees | 9.3 | 5.0 | 9.1 | 5.3 |
|   Segment Earnings management and guarantee income | 24.1 | 18.7 | 23.6 | 18.9 |
| *Credit:* | | | | |
|   Serious delinquency rate, at end of period | 3.45% | 3.50% | 3.45% | 3.50% |
|   REO inventory, at end of period (number of properties) | 53,271 | 60,599 | 53,271 | 60,599 |
|   Single-family credit losses, in bps (annualized) [7] | 66.7 | 68.4 | 72.7 | 69.7 |
| *Market:* | | | | |
|   Single-family mortgage debt outstanding (total U.S. market, in billions) [8] | $ 10,179 | $10,383 | $ 10,179 | $10,383 |
|   30-year fixed mortgage rate [9] | 3.7% | 4.5% | 3.7% | 4.5% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 13: SEGMENT REPORTING - Table 13.2 - Segment Earnings and Reconciliation to GAAP Results."
(2) For a description of our segment adjustments, see "NOTE 14: SEGMENT REPORTING - Segment Earnings" in our 2011 Annual Report.
(3) Based on UPB.
(4) Excludes Other Guarantee Transactions.
(5) Represents principal repayments relating to loans underlying Freddie Mac mortgage-related securities and other guarantee commitments, including those related to our removal of seriously delinquent and modified mortgage loans and balloon/reset mortgage loans out of PC pools.
(6) Results for the 2012 periods include the effect of the legislated 10 basis point increase in guarantee fees that became effective April 1, 2012.
(7) Calculated as the amount of single-family credit losses divided by the sum of the average carrying value of our single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees.
(8) Source: Federal Reserve Flow of Funds Accounts of the United States of America dated June 7, 2012. The outstanding amount for June 30, 2012 reflects the balance as of March 31, 2012.
(9) Based on Freddie Mac's Primary Mortgage Market Survey rate for the last week in the period, which represents the national average mortgage commitment rate to a qualified borrower exclusive of any fees and points required by the lender. This commitment rate applies only to financing on conforming mortgages with LTV ratios of 80%.

Segment Earnings (loss) for our Single-family Guarantee segment improved to $0.2 billion and $(1.4) billion for the three and six months ended June 30, 2012, respectively, compared to $(2.4) billion and $(4.2) billion for the three and six months ended June 30, 2011, respectively, primarily due to a decline in Segment Earnings provision for credit losses.

The table below provides summary information about the composition of Segment Earnings (loss) for this segment for the six months ended June 30, 2012 and 2011.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3616

Table of Contents

**Table 14 — Segment Earnings Composition — Single-Family Guarantee Segment**

| | Six Months Ended June 30, 2012 | | | | | |
| | Segment Earnings Management and Guarantee Income[1] | | Credit Expenses [2] | | | |
| | Amount | Average Rate[3] | Amount | Average Rate[3] | Net Amount[4] | |
| | (dollars in millions, rates in bps) | | | | | |
| Year of origination:[5] | | | | | | |
| 2012 | $ 78 | 16.4 | $ (23) | 4.3 | $ 55 | |
| 2011 | 368 | 25.9 | (106) | 7.5 | 262 | |
| 2010 | 386 | 26.8 | (178) | 11.9 | 208 | |
| 2009 | 382 | 27.7 | (160) | 11.6 | 222 | |
| 2008 | 174 | 26.5 | (161) | 30.7 | 13 | |
| 2007 | 165 | 19.6 | (883) | 117.7 | (718) | |
| 2006 | 105 | 19.4 | (525) | 93.9 | (420) | |
| 2005 | 121 | 19.7 | (584) | 91.8 | (463) | |
| 2004 and prior | 258 | 20.7 | (164) | 12.0 | 94 | |
| Total | $ 2,037 | 23.6 | $ (2,784) | 32.2 | $ (747) | |
| Administrative expenses | | | | | (425) | |
| Net interest income (expense) | | | | | (33) | |
| Other non-interest income and expenses, net | | | | | (229) | |
| Segment Earnings (loss), net of taxes | | | | | $ (1,434) | |

| | Six Months Ended June 30, 2011 | | | | | |
| | Segment Earnings Management and Guarantee Income[1] | | Credit Expenses [2] | | | |
| | Amount | Average Rate[3] | Amount | Average Rate[3] | Net Amount[4] | |
| | (dollars in millions, rates in bps) | | | | | |
| Year of origination:[5] | | | | | | |
| 2011 | $ 91 | 17.6 | $ (16) | 4.4 | $ 75 | |
| 2010 | 369 | 20.9 | (117) | 6.4 | 252 | |
| 2009 | 322 | 17.8 | (137) | 7.4 | 185 | |
| 2008 | 203 | 23.5 | (445) | 61.7 | (242) | |
| 2007 | 196 | 18.8 | (1,881) | 196.5 | (1,685) | |
| 2006 | 115 | 17.0 | (1,566) | 219.3 | (1,451) | |
| 2005 | 128 | 16.5 | (949) | 116.2 | (821) | |
| 2004 and prior | 294 | 18.0 | (351) | 19.5 | (57) | |
| Total | $ 1,718 | 18.9 | $ (5,462) | 60.2 | $ (3,744) | |
| Administrative expenses | | | | | (443) | |
| Net interest income (expense) | | | | | 70 | |
| Other non-interest income and expenses, net | | | | | (89) | |
| Segment Earnings (loss), net of taxes | | | | | $ (4,206) | |

(1) Includes amortization of delivery fees of $785 million and $476 million for the six months ended June 30, 2012 and 2011, respectively.
(2) Consists of the aggregate of the Segment Earnings provision for credit losses and Segment Earnings REO operations expense. Historical rates of average credit expenses may not be representative of future results. In the first quarter of 2012, we enhanced our method of allocating credit expenses by loan origination year. Prior period amounts have been revised to conform to the current period presentation.
(3) Calculated as the annualized amount of Segment Earnings management and guarantee income or credit expenses, respectively, divided by the sum of the average carrying values of the single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees. Segment Earnings management and guarantee income and average rate for the six months ended June 30, 2012 include the effect of the legislated 10 basis point increase in guarantee fees that became effective April 1, 2012.
(4) Calculated as Segment Earnings management and guarantee income less credit expenses.
(5) Segment Earnings management and guarantee income is presented by year of guarantee origination, whereas credit expenses are presented based on year of loan origination.

As of June 30, 2012, loans originated after 2008 have, on a cumulative basis, provided management and guarantee income that has exceeded the credit-related and administrative expenses associated with these loans. We currently believe our management and guarantee fee rates for guarantee issuances after 2008, when coupled with the higher credit quality of the mortgages within these new guarantee issuances, will provide management and guarantee fee income (excluding the amounts associated with the Temporary Payroll Tax Cut Continuation Act of 2011), over the long term, that exceeds our expected credit-related and administrative expenses associated with the underlying loans. Nevertheless, various factors, such as continued high unemployment rates, further declines in home prices, or negative impacts of HARP loans (which may not perform as well as other refinance mortgages, due in part to the high LTV ratios of the loans), could require us to incur expenses on these loans beyond our current expectations.

29

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Based on our historical experience, we expect that the performance of the loans in an individual origination year will vary over time. The aggregate UPB of the loans from an origination year will decline over time due to repayments, refinancing, and other liquidation events, resulting in declining management and guarantee fee income from the loans in that origination year in future periods. In addition, we expect that the credit-related expenses related to the remaining loans in the origination year will increase over time, as some borrowers experience financial difficulties and default on their loans. As a result, there will likely be periods when an origination year is not profitable, though it may remain profitable on a cumulative basis.

Our management and guarantee income associated with guarantee issuances in 2005 through 2008 has not been adequate to cover the credit and administrative expenses associated with such loans, primarily due to the high rate of defaults on the loans originated in those years coupled with the high volume of refinancing of these loans that has occurred since 2008. High levels of refinancing and delinquency since 2008 have significantly reduced the balance of performing loans from those years that remain in our portfolio and consequently reduced management and guarantee income associated with loans originated in 2005 through 2008 (we do not recognize Segment Earnings management and guarantee income on non-accrual mortgage loans). We also believe that the management and guarantee fees associated with originations after 2008 will not be sufficient to offset the future expenses associated with our 2005 to 2008 guarantee issuances for the foreseeable future. Consequently, we may report a net loss for the Single-family Guarantee segment for the full-year of 2012.

Segment Earnings management and guarantee income increased during the three and six months ended June 30, 2012, compared to the three and six months ended June 30, 2011, respectively, primarily due to an increase in amortization of delivery fees. This was driven by a higher volume of delivery fees in recent periods and a lower interest rate environment during the first half of 2012, which increased refinance activity.

Effective April 1, 2012, at the direction of FHFA, we increased the guarantee fee on single-family residential mortgages sold to Freddie Mac by 10 basis points under the Temporary Payroll Tax Cut Continuation Act of 2011. The proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by us. The receipt of these fees is recognized within Segment Earnings management and guarantee income, and the remittance of these fees to Treasury is reported in non-interest expense. We recognized $10 million of expense in the second quarter of 2012 (and a similar amount of income) associated with the legislated 10 basis point increase to single-family guarantee fees. While we expect these fees to become significant over time, the effect of the 10 basis point increase was not significant to the average rate of our aggregate Segment Earnings management and guarantee income in the second quarter of 2012. We will begin remitting the fees to Treasury on a quarterly basis in September 2012. As of June 30, 2012, there were approximately 432,000 loans totaling $88.3 billion in UPB in our single-family credit guarantee portfolio that are subject to the 10 basis point increase in guarantee fees associated with this legislation.

The UPB of the Single-family Guarantee managed loan portfolio was $1.6 trillion and $1.7 trillion at June 30, 2012 and December 31, 2011, respectively. The annualized liquidation rate on our securitized single-family credit guarantees was approximately 32% and 31% for the three and six months ended June 30, 2012, respectively, and remained high in the second quarter of 2012 due to recent declines in interest rates and, to a lesser extent, the impact of the expanded HARP initiative, that resulted in significant refinancing activity. Refinance activity has also resulted in an increase in our guarantee issuances from $158 billion in the first half of 2011 to $210 billion in the first half of 2012. However, we expect the size of our Single-family Guarantee managed loan portfolio will continue to decline during 2012.

Refinance volumes remained high during the second quarter of 2012 due to continued historically low interest rates and HARP, and represented 81% and 84% of our single-family mortgage purchase volume during the three and six months ended June 30, 2012, respectively, compared to 70% and 79% of our single-family mortgage purchase volume during the three and six months ended June 30, 2011, respectively, based on UPB. Relief refinance mortgages comprised approximately 35% and 36% of our total refinance volume during the first half of 2012 and 2011, respectively. Over time, relief refinance mortgages with LTV ratios above 80% (*i.e.*, HARP loans) may not perform as well as other refinance mortgages because the continued high LTV ratios of these loans increase the probability of default. Based on our historical experience, there is an increase in borrower default risk as LTV ratios increase, particularly for loans with LTV ratios above 80%. In addition, relief refinance mortgages may not be covered by mortgage insurance for the full excess of their UPB over 80%. Approximately 21% and 14% of our single-family purchase volume in the first half of 2012 and 2011, respectively, were relief refinance mortgages with LTV ratios above 80%. For more information about our relief refinance mortgage initiative, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program.*"

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3618

Table of Contents

The credit quality of the single-family loans we acquired beginning in 2009 (excluding relief refinance mortgages) is significantly better than that of loans we acquired from 2005 through 2008, as measured by original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income. HARP loans represented 8% of the UPB of our single-family credit guarantee portfolio as of June 30, 2012. Including HARP loans, mortgages originated after 2008 represent 57% of the UPB of our single-family credit guarantee portfolio as of June 30, 2012, and their composition of that portfolio continues to grow. Relief refinance mortgages of all LTV ratios comprised approximately 14% and 11% of the UPB in our total single-family credit guarantee portfolio at June 30, 2012 and December 31, 2011, respectively.

Provision for credit losses for the Single-family Guarantee segment declined to $0.5 billion and $2.6 billion for the three and six months ended June 30, 2012, respectively, compared to $2.9 billion and $5.2 billion for the three and six months ended June 30, 2011, respectively. The decrease in the Segment Earnings provision for credit losses for the second quarter and first half of 2012 compared to the respective periods in 2011 primarily reflects improvements in the number of newly impaired loans (largely due to a decline in the portion of our single-family credit guarantee portfolio originated in 2005 through 2008) and lower estimated future losses due to the positive impact of an increase in national home prices. While national home prices reflected strong growth in the second quarter of 2012, our expectation is that national average home prices will remain weak (on an inflation-adjusted basis) over the near term before a long-term recovery in housing begins. As such, we adjusted our estimated loss severity rates in the second quarter of 2012 to align with our expectations for near term home prices. Our Segment Earnings provision for credit losses in the three and six months ended June 30, 2011 primarily reflected a decline in the rate at which delinquent loans transition into serious delinquency. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for certain quarterly credit statistics for our single-family credit guarantee portfolio.

Single-family credit losses as a percentage of the average balance of the single-family credit guarantee portfolio and HFA-related guarantees were 73 basis points and 70 basis points for the six months ended June 30, 2012 and 2011, respectively. Charge-offs, net of recoveries, associated with single-family loans were $6.2 billion and $6.0 billion in the first half of 2012 and 2011, respectively. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk*" for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, and our non-performing assets.

The serious delinquency rate on our single-family credit guarantee portfolio was 3.45% and 3.58% as of June 30, 2012 and December 31, 2011, respectively, and declined during the first half of 2012 primarily due to a high volume of foreclosure transfers and a slowdown in new serious delinquencies. Our serious delinquency rate remains high compared to the rates we experienced in years prior to 2009, due to the continued weakness in home prices, persistently high unemployment, extended foreclosure timelines, and continued challenges faced by servicers processing large volumes of problem loans. In addition, our serious delinquency rate was adversely affected by the decline in the size of our single-family credit guarantee portfolio in the first half of 2012 because this rate is calculated on a smaller number of loans at the end of the period.

REO operations (income) expense for the Single-family Guarantee segment was $(34) million for the second quarter of 2012, as compared to $35 million during the second quarter of 2011 and $138 million in the first half of 2012 compared to $292 million for the first half of 2011. The decline in the 2012 periods, compared to the same periods of 2011, was primarily due to improving home prices in certain geographical areas with significant REO activity, which resulted in gains on disposition of properties as well as lower write-downs of single-family REO inventory. We also experienced lower recoveries on REO properties of $85 million for the second quarter of 2012, as compared to $197 million during the second quarter of 2011 and $157 million in the first half of 2012 compared to $370 million for the first half of 2011. Lower recoveries were primarily due to lower REO property volume, reduced recoveries from mortgage insurers, and a decline in reimbursements of losses from seller/servicers associated with repurchase requests.

Our REO inventory (measured in number of properties) declined 12% from December 31, 2011 to June 30, 2012 as the volume of single-family REO dispositions exceeded the volume of single-family REO acquisitions. Although there was an improvement in REO disposition severity during the first half of 2012, the REO disposition severity ratios on sales of our REO inventory remain high as compared to periods before 2008. We believe the volume of our single-family REO acquisitions during the first half of 2012 was less than it otherwise would have been due to: (a) the length of the foreclosure process, particularly in states that require a judicial foreclosure process; and (b) resource constraints on foreclosure activities for certain larger servicers involved in a recent settlement with a coalition of state attorneys general and federal agencies.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Multifamily*

The table below presents the Segment Earnings of our Multifamily segment.

**Table 15 — Segment Earnings and Key Metrics — Multifamily** [1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (dollars in millions) | | | |
| Segment Earnings: | | | | |
| Net interest income | $ 330 | $ 304 | $ 648 | $ 583 |
| (Provision) benefit for credit losses | 22 | 13 | 41 | 73 |
| Non-interest income (loss): | | | | |
| Management and guarantee income | 36 | 30 | 69 | 58 |
| Net impairment of available-for-sale securities recognized in earnings | (19) | (182) | (35) | (317) |
| Gains (losses) on sale of mortgage loans | 38 | 157 | 92 | 240 |
| Gains (losses) on mortgage loans recorded at fair value | (56) | (31) | 121 | 19 |
| Other non-interest income (loss) | 119 | (13) | 228 | 43 |
| Total non-interest income (loss) | 118 | (39) | 475 | 43 |
| Non-interest expense: | | | | |
| Administrative expenses | (61) | (55) | (113) | (106) |
| REO operations income (expense) | (4) | 8 | (3) | 8 |
| Other non-interest expense | (83) | (28) | (98) | (41) |
| Total non-interest expense | (148) | (75) | (214) | (139) |
| Segment Earnings before income tax benefit (expense) | 322 | 203 | 950 | 560 |
| Income tax benefit (expense) | (4) | (3) | (8) | (1) |
| Segment Earnings, net of taxes | 318 | 200 | 942 | 559 |
| Total other comprehensive income (loss), net of taxes | (156) | 405 | 744 | 1,347 |
| Comprehensive income | $ 162 | $ 605 | $ 1,686 | $ 1,906 |
| Key metrics: | | | | |
| *Balances and Volume:* | | | | |
| Average balance of Multifamily loan portfolio | $81,238 | $83,718 | $ 82,184 | $ 84,749 |
| Average balance of Multifamily guarantee portfolio | $ 41,368 | $29,014 | $ 39,007 | $ 27,163 |
| Average balance of Multifamily investment securities portfolio | $ 55,761 | $ 61,909 | $ 56,895 | $ 62,376 |
| Multifamily new loan purchase and other guarantee commitment volume | $ 6,661 | $ 4,513 | $ 12,412 | $ 7,561 |
| Multifamily units financed from new volume activity | 107,049 | 74,251 | 193,480 | 126,892 |
| Multifamily Other Guarantee Transaction issuance | $ 5,309 | $ 3,686 | $ 8,448 | $ 6,592 |
| *Yield and Rate:* | | | | |
| Net interest yield — Segment Earnings basis (annualized) | 0.96% | 0.83% | 0.93% | 0.79% |
| Average Management and guarantee fee rate, in bps (annualized) [2] | 36.2 | 43.0 | 37.4 | 44.7 |
| *Credit:* | | | | |
| Delinquency rate: | | | | |
| Credit-enhanced loans, at period end | 0.44% | 0.70% | 0.44% | 0.70% |
| Non-credit-enhanced loans, at period end | 0.19% | 0.19% | 0.19% | 0.19% |
| Total delinquency rate, at period end [3] | 0.27% | 0.31% | 0.27% | 0.31% |
| Allowance for loan losses and reserve for guarantee losses, at period end | $ 496 | $ 705 | $ 496 | $ 705 |
| Allowance for loan losses and reserve for guarantee losses, in bps | 40.4 | 62.8 | 40.4 | 62.8 |
| Credit losses, in bps (annualized) [4] | 3.8 | 7.6 | 1.9 | 5.9 |
| REO inventory, at net carrying value | $ 94 | $ 98 | $ 94 | $ 98 |
| REO inventory, at period end (number of properties) | 11 | 19 | 11 | 19 |

(1) For reconciliations of Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 13: SEGMENT REPORTING — Table 13.2 — Segment Earnings and Reconciliation to GAAP Results."

(2) Represents Multifamily Segment Earnings — management and guarantee income, excluding prepayment and certain other fees, divided by the sum of the average balance of the multifamily guarantee portfolio and the average balance of guarantees associated with the HFA initiative, excluding certain bonds not in the NIBP.

(3) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk - Multifamily Mortgage Credit Risk*" for information on our reported multifamily delinquency rate.

(4) Calculated as the amount of multifamily credit losses divided by the sum of the average carrying value of our multifamily loan portfolio and the average balance of the multifamily guarantee portfolio, including multifamily HFA initiative guarantees.

Segment Earnings for our Multifamily segment increased to $318 million and $942 million for the three and six months ended June 30, 2012, respectively, compared to $200 million and $559 million for the three and six months ended June 30, 2011, respectively. The improvement in the 2012 periods was primarily due to lower impairment associated with available-for-sale CMBS. In addition, we recognized higher gains on mortgage loans recorded at fair value in the first half of 2012 compared to the first half of 2011.

Comprehensive income for our Multifamily segment was $162 million and $1.7 billion for the three and six months ended June 30, 2012 respectively, consisting of: (a) Segment Earnings of $318 million and $942 million, respectively; and

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3620

**Table of Contents**

(b) ($156) million and $744 million, respectively, of total other comprehensive income (loss), which was mainly attributable to adverse changes in fair value of available-for-sale CMBS during the second quarter of 2012 and favorable changes in fair value during the first half of 2012.

Our multifamily loan purchase and guarantee volume increased to $6.7 billion for the second quarter of 2012, compared to $4.5 billion for the second quarter of 2011. We expect an increase in our purchase and guarantee volumes for the full-year of 2012 when compared to 2011 levels since demand for multifamily financing remains strong as historically low interest rates are encouraging borrower interest. We completed Other Guarantee Transactions of $5.3 billion and $8.4 billion in UPB of multifamily loans in the three and six months ended June 30, 2012, respectively, as compared to $3.7 billion and $6.6 billion in the three and six months ended June 30, 2011, respectively. The UPB of the total multifamily portfolio increased slightly to $177.9 billion at June 30, 2012 from $176.7 billion at December 31, 2011. During the first half of 2012, increased issuances of new guarantees were partially offset by higher liquidations.

Segment Earnings net interest income increased by $65 million, or 11%, to $648 million, in the six months ended June 30, 2012 from $583 million in the six months ended June 30, 2011, primarily due to the cumulative effect of new business volumes since 2008, which have higher yields relative to allocated funding costs. Net interest yield was 93 and 79 basis points for the six months ended June 30, 2012 and 2011, respectively.

Segment Earnings non-interest income (loss) was $118 million and $(39) million for the three months ended June 30, 2012 and 2011, respectively, and was $475 million and $43 million in the six months ended June 30, 2012 and 2011, respectively. The improvement in the second quarter and first half of 2012, compared to the same 2011 periods was primarily driven by lower security impairments on CMBS. In addition, we recognized higher gains on mortgage loans recorded at fair value in the first half of 2012 compared to the first half of 2011. Higher gains on mortgage loan fair values in the first half of 2012 reflect favorable market spread movements and higher amounts of loans held for subsequent securitization as compared to the first half of 2011. Segment Earnings gains (losses) on mortgage loans recorded at fair value are presented net of changes in fair value due to changes in interest rates.

Our Multifamily Segment Earnings management and guarantee income increased 19% in the first half of 2012 compared to the first half of 2011, reflecting the effect of an increased volume of Other Guarantee Transactions in recent periods. The average management and guarantee fee rate on our guarantee portfolio declined to 37.4 basis points for the first half of 2012 from 44.7 basis points for the first half of 2011, reflecting the effect of an increased volume of Other Guarantee Transactions, which have lower credit risk associated with our guarantee (and thus we receive a lower rate) relative to other issued guarantees because these transactions contain significant levels of credit enhancement through subordination.

Multifamily credit losses as a percentage of the combined average balance of our multifamily loan and guarantee portfolios were 3.8 and 7.6 basis points in the second quarters of 2012 and 2011, respectively. Our Multifamily segment recognized a benefit for credit losses of $22 million and $41 million in the three and six months ended June 30, 2012, respectively, compared to a benefit for credit losses of $13 million and $73 million in the three and six months ended June 30, 2011, respectively. Our loan loss reserves associated with our multifamily mortgage portfolio were $496 million and $545 million as of June 30, 2012 and December 31, 2011, respectively. The decline in our loan loss reserves in the first half of 2012 was primarily driven by an increase in property values underlying individually impaired loans.

As a result of the positive multifamily market fundamentals and our prudent underwriting standards and practices, the credit quality of the multifamily mortgage portfolio remains strong. Our portfolio performance continued to experience minimal credit losses due to low foreclosure activity and an increase in net operating income of multifamily properties in most regional areas. The delinquency rate for loans in the multifamily mortgage portfolio was 0.27% and 0.22%, as of June 30, 2012 and December 31, 2011, respectively. As of June 30, 2012, approximately half of the multifamily loans that were two or more monthly payments past due, measured on a UPB basis, had credit enhancements that we currently believe will mitigate our expected losses on those loans. We expect our multifamily delinquency rate to remain relatively low during the remainder of 2012. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Multifamily Mortgage Credit Risk*" for further information about our reported multifamily delinquency rates and credit enhancements on multifamily loans. For further information on delinquencies, including geographical and other concentrations, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3621

Table of Contents

## CONSOLIDATED BALANCE SHEETS ANALYSIS

The following discussion of our consolidated balance sheets should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also, see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported financial position.

### Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell

Cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and other liquid assets discussed in "Investments in Securities — *Non-Mortgage-Related Securities*," are important to our cash flow and asset and liability management, and our ability to provide liquidity and stability to the mortgage market. We use these assets to help manage recurring cash flows and meet our other cash management needs. We consider federal funds sold to be overnight unsecured trades executed with commercial banks that are members of the Federal Reserve System. Securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities.

The short-term assets on our consolidated balance sheets also include those related to our consolidated VIEs, which are comprised primarily of restricted cash and cash equivalents and securities purchased under agreements to resell at June 30, 2012. These short-term assets related to our consolidated VIEs increased by $0.5 billion from December 31, 2011 to June 30, 2012, primarily due to an increase in the level of refinancing activity.

Excluding amounts related to our consolidated VIEs, we held $19.2 billion and $28.4 billion of cash and cash equivalents, no federal funds sold, and $20.6 billion and $12.0 billion of securities purchased under agreements to resell at June 30, 2012 and December 31, 2011, respectively. The slight aggregate decrease in these assets was primarily driven by a decline in funding needs for debt redemptions. In addition, excluding amounts related to our consolidated VIEs, we held on average $20.5 billion and $24.1 billion of cash and cash equivalents and $21.5 billion and $23.0 billion of federal funds sold and securities purchased under agreements to resell during the three and six months ended June 30, 2012, respectively.

For information regarding our liquidity management practices and policies, see "LIQUIDITY AND CAPITAL RESOURCES."

### Investments in Securities

The table below provides detail regarding our investments in securities as of June 30, 2012 and December 31, 2011. The table does not include our holdings of single-family PCs and certain Other Guarantee Transactions as of June 30, 2012 and December 31, 2011. For information on our holdings of such securities, see "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios."

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                         Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3622

Table of Contents

**Table 16 — Investments in Securities**

| | Fair Value | |
|---|---|---|
| | June 30, 2012 | December 31, 2011 |
| | (in millions) | |
| Investments in securities: | | |
| Available-for-sale: | | |
| Mortgage-related securities: | | |
| Freddie Mac[1] | $ 73,224 | $ 81,092 |
| Subprime | 25,778 | 27,999 |
| CMBS | 52,982 | 55,663 |
| Option ARM | 5,428 | 5,865 |
| Alt-A and other | 10,733 | 10,879 |
| Fannie Mae | 17,689 | 20,322 |
| Obligations of states and political subdivisions | 7,308 | 7,824 |
| Manufactured housing | 726 | 766 |
| Ginnie Mae | 230 | 249 |
| Total available-for-sale mortgage-related securities | 194,098 | 210,659 |
| Total investments in available-for-sale securities | 194,098 | 210,659 |
| Trading: | | |
| Mortgage-related securities: | | |
| Freddie Mac[1] | 13,600 | 16,047 |
| Fannie Mae | 12,546 | 15,165 |
| Ginnie Mae | 147 | 156 |
| Other | 178 | 164 |
| Total trading mortgage-related securities | 26,471 | 31,532 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 526 | 302 |
| Treasury bills | 900 | 100 |
| Treasury notes | 18,140 | 24,712 |
| FDIC-guaranteed corporate medium-term notes | 1,399 | 2,184 |
| Total trading non-mortgage-related securities | 20,965 | 27,298 |
| Total investments in trading securities | 47,436 | 58,830 |
| Total investments in securities | $ 241,534 | $ 269,489 |

(1)   For information on the types of instruments that are included, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2011 Annual Report.

*Non-Mortgage-Related Securities*

Our investments in non-mortgage-related securities provide an additional source of liquidity. We held investments in non-mortgage-related securities classified as trading of $21.0 billion and $27.3 billion as of June 30, 2012 and December 31, 2011, respectively. While balances of these securities may fluctuate from period to period, we continue to meet required liquidity and contingency levels.

*Mortgage-Related Securities*

Our investments in mortgage-related securities consist of securities issued by Fannie Mae, Ginnie Mae, and other financial institutions. We also invest in our own mortgage-related securities. However, the single-family PCs and certain Other Guarantee Transactions we purchase as investments are not accounted for as investments in securities because we recognize the underlying mortgage loans on our consolidated balance sheets through consolidation of the related trusts.

The table below provides the UPB of our investments in mortgage-related securities classified as available-for-sale or trading on our consolidated balance sheets. The table below does not include our holdings of our own single-family PCs and certain Other Guarantee Transactions. For further information on our holdings of such securities, see "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios."

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                                     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets**

| | June 30, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Fixed Rate | Variable Rate [1] | Total | Fixed Rate | Variable Rate [1] | Total |
| | (in millions) | | | | | |
| Freddie Mac mortgage-related securities: [2] | | | | | | |
| Single-family | $ 63,110 | $ 10,883 | $ 73,993 | $ 72,795 | $ 9,753 | $ 82,548 |
| Multifamily | 943 | 1,690 | 2,633 | 1,216 | 1,792 | 3,008 |
| Total Freddie Mac mortgage-related securities | 64,053 | 12,573 | 76,626 | 74,011 | 11,545 | 85,556 |
| Non-Freddie Mac mortgage-related securities: | | | | | | |
| Agency securities: [3] | | | | | | |
| Fannie Mae: | | | | | | |
| Single-family | 13,517 | 14,105 | 27,622 | 16,543 | 15,998 | 32,541 |
| Multifamily | 37 | 67 | 104 | 52 | 76 | 128 |
| Ginnie Mae: | | | | | | |
| Single-family | 231 | 97 | 328 | 253 | 104 | 357 |
| Multifamily | 15 | — | 15 | 16 | — | 16 |
| Total Non-Freddie Mac agency securities | 13,800 | 14,269 | 28,069 | 16,864 | 16,178 | 33,042 |
| Non-agency mortgage-related securities: | | | | | | |
| Single-family: [4] | | | | | | |
| Subprime | 327 | 46,336 | 46,663 | 336 | 48,696 | 49,032 |
| Option ARM | — | 12,958 | 12,958 | — | 13,949 | 13,949 |
| Alt-A and other | 1,959 | 13,849 | 15,808 | 2,128 | 14,662 | 16,790 |
| CMBS | 18,519 | 32,087 | 50,606 | 19,735 | 34,375 | 54,110 |
| Obligations of states and political subdivisions [5] | 7,142 | 21 | 7,163 | 7,771 | 22 | 7,793 |
| Manufactured housing | 777 | 132 | 909 | 831 | 129 | 960 |
| Total non-agency mortgage-related securities [6] | 28,724 | 105,383 | 134,107 | 30,801 | 111,833 | 142,634 |
| Total UPB of mortgage-related securities | $106,577 | $132,225 | 238,802 | $121,676 | $139,556 | 261,232 |
| Premiums, discounts, deferred fees, impairments of UPB and other basis adjustments | | | (12,664) | | | (12,363) |
| Net unrealized (losses) on mortgage-related securities, pre-tax | | | (5,569) | | | (6,678) |
| Total carrying value of mortgage-related securities | | | $220,569 | | | $242,191 |

(1) Variable-rate mortgage-related securities include those with a contractual coupon rate that, prior to contractual maturity, is either scheduled to change or is subject to change based on changes in the composition of the underlying collateral.

(2) When we purchase REMICs and Other Structured Securities and certain Other Guarantee Transactions that we have issued, we account for these securities as investments in debt securities as we are investing in the debt securities of a non-consolidated entity. We do not consolidate our resecuritization trusts since we are not deemed to be the primary beneficiary of such trusts. We are subject to the credit risk associated with the mortgage loans underlying our Freddie Mac mortgage-related securities. Mortgage loans underlying our issued single-family PCs and certain Other Guarantee Transactions are recognized on our consolidated balance sheets as held-for-investment mortgage loans, at amortized cost. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2011 Annual Report for further information.

(3) Agency securities are generally not separately rated by nationally recognized statistical rating organizations, but have historically been viewed as having a level of credit quality at least equivalent to non-agency mortgage-related securities AAA-rated or equivalent.

(4) For information about how these securities are rated, see "Table 23 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS."

(5) Consists of housing revenue bonds. Approximately 36% and 37% of these securities held at June 30, 2012 and December 31, 2011, respectively, were AAA-rated as of those dates, based on the UPB and the lowest rating available.

(6) Credit ratings for most non-agency mortgage-related securities are designated by no fewer than two nationally recognized statistical rating organizations. Approximately 21% of total non-agency mortgage-related securities held at both June 30, 2012 and December 31, 2011 were AAA-rated as of those dates, based on the UPB and the lowest rating available.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3624

Table of Contents

The table below provides the UPB and fair value of our investments in mortgage-related securities classified as available-for-sale or trading on our consolidated balance sheets.

**Table 18 — Additional Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets**

|  | June 30, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
|  | UPB | Fair Value | UPB | Fair Value |
|  | (in millions) | | | |
| Agency pass-through securities[1] | $ 20,583 | $ 22,346 | $ 24,283 | $ 26,193 |
| Agency REMICs and Other Structured Securities: | | | | |
| Interest-only securities[2] | — | 2,371 | — | 2,863 |
| Principal-only securities[3] | 2,965 | 2,815 | 3,569 | 3,344 |
| Inverse floating-rate securities[4] | 4,005 | 5,675 | 4,839 | 6,826 |
| Other Structured Securities | 77,142 | 84,229 | 85,907 | 93,805 |
| Total agency securities | 104,695 | 117,436 | 118,598 | 133,031 |
| Non-agency securities[5] | 134,107 | 103,133 | 142,634 | 109,160 |
| Total mortgage-related securities | $238,802 | $ 220,569 | $261,232 | $ 242,191 |

(1) Represents an undivided beneficial interest in trusts that hold pools of mortgages.
(2) Represents securities where the holder receives only the interest cash flows.
(3) Represents securities where the holder receives only the principal cash flows.
(4) Represents securities where the holder receives interest cash flows that change inversely with the reference rate (i.e., higher cash flows when interest rates are low and lower cash flows when interest rates are high). Additionally, these securities receive a portion of principal cash flows associated with the underlying collateral.
(5) Includes fair values of $3 million and $2 million of interest-only securities at June 30, 2012 and December 31, 2011, respectively.

The total UPB of our investments in mortgage-related securities on our consolidated balance sheets decreased from $261.2 billion at December 31, 2011 to $238.8 billion at June 30, 2012, while the fair value of these investments decreased from $242.2 billion at December 31, 2011 to $220.6 billion at June 30, 2012. The reduction in UPB resulted from our purchase activity remaining less than liquidations, consistent with our efforts to reduce the size of our mortgage-related investments portfolio, as described in "EXECUTIVE SUMMARY — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio."

The table below summarizes our mortgage-related securities purchase activity for the three and six months ended June 30, 2012 and 2011. The purchase activity includes single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated. Our purchases of single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated are recorded as an extinguishment of debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3625

Table of Contents

### Table 19 — Mortgage-Related Securities Purchase Activity[1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2012** | **2011** | **2012** | **2011** |
| | (in millions) | | | |
| Non-Freddie Mac mortgage-related securities purchased for resecuritization: | | | | |
| Ginnie Mae Certificates | $ — | $ 56 | $ 5 | $ 72 |
| Non-agency mortgage-related securities purchased for Other Guarantee Transactions | 5,309 | 3,633 | 8,433 | 6,512 |
| Total non-Freddie Mac mortgage-related securities purchased for resecuritization | 5,309 | 3,689 | 8,438 | 6,584 |
| Non-Freddie Mac mortgage-related securities purchased as investments in securities: | | | | |
| Agency securities: | | | | |
| *Fannie Mae:* | | | | |
| Fixed-rate | — | 2,181 | — | 3,200 |
| Variable-rate | — | 60 | 50 | 228 |
| *Total agency securities* | — | 2,241 | 50 | 3,428 |
| Non-agency mortgage-related securities: | | | | |
| *CMBS:* | | | | |
| Fixed-rate | 10 | 14 | 10 | 14 |
| Variable-rate | 25 | 46 | 35 | 46 |
| *Total non-agency mortgage-related securities* | 35 | 60 | 45 | 60 |
| *Total non-Freddie Mac mortgage-related securities purchased as investments in securities* | 35 | 2,301 | 95 | 3,488 |
| Total non-Freddie Mac mortgage-related securities purchased | $ 5,344 | $ 5,990 | $ 8,533 | $10,072 |
| Freddie Mac mortgage-related securities purchased: | | | | |
| *Single-family:* | | | | |
| Fixed-rate | $ 9,001 | $ 24,304 | $12,466 | $60,983 |
| Variable-rate | 3,003 | 462 | 3,135 | 3,004 |
| *Multifamily:* | | | | |
| Fixed-rate | 39 | 26 | 39 | 51 |
| Variable-rate | — | 65 | — | 65 |
| *Total Freddie Mac mortgage-related securities purchased* | $12,043 | $ 24,857 | $15,640 | $64,103 |

(1) Based on UPB. Excludes mortgage-related securities traded but not yet settled

   During the three and six months ended June 30, 2012, we reduced our participation in dollar roll transactions, which were primarily used to support the market and pricing of our PCs, as compared to the three and six months ended June 30, 2011. Our purchases during the three and six months ended June 30, 2011 reflected in "Table 19 — Mortgage-Related Securities Purchase Activity" are attributed primarily to dollar roll transactions. When these transactions involve our consolidated PC trusts, the purchase and sale represents an extinguishment and issuance of debt securities, respectively, and impacts our net interest income and recognition of gain or loss on the extinguishment of debt on our consolidated statements of comprehensive income. These transactions can cause short-term fluctuations in the balance of our mortgage-related investments portfolio. For more information, see "BUSINESS — Our Business Segments — *Investments Segment — PC Support Activities*" and "RISK FACTORS — Competitive and Market Risks — *Any decline in the price performance of or demand for our PCs could have an adverse effect on the volume and profitability of our new single-family guarantee business* " in our 2011 Annual Report.

*Unrealized Losses on Available-For-Sale Mortgage-Related Securities*

   At June 30, 2012, our gross unrealized losses, pre-tax, on available-for-sale mortgage-related securities were $18.7 billion, compared to $20.1 billion at December 31, 2011. The decrease was primarily due to fair value gains related to: (a) the movement of our single-family non-agency mortgage-related securities with unrealized losses towards maturity; and (b) the impact of declining rates, partially offset by the impact of widening OAS levels on our single-family non-agency mortgage-related securities. We believe the unrealized losses related to these securities at June 30, 2012 were mainly attributable to poor underlying collateral performance, limited liquidity and large risk premiums in the market for residential non-agency mortgage-related securities. All available-for-sale securities in an unrealized loss position are evaluated to determine if the impairment is other-than-temporary. See "Total Equity (Deficit)" and "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding unrealized losses on our available-for-sale securities.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012       Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Higher-Risk Components of Our Investments in Mortgage-Related Securities*

As discussed below, we have exposure to subprime, option ARM, interest-only, and Alt-A and other loans as part of our investments in mortgage-related securities as follows:

- *Single-family non-agency mortgage-related securities*: We hold non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans.

- *Single-family Freddie Mac mortgage-related securities*: We hold certain Other Guarantee Transactions as part of our investments in securities. There are subprime and option ARM loans underlying some of these Other Guarantee Transactions. For more information on single-family loans with certain higher-risk characteristics underlying our issued securities, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*."

*Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, and Alt-A Loans*

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. Since the first quarter of 2008, we have not purchased any non-agency mortgage-related securities backed by subprime, option ARM, or Alt-A loans. The two tables below present information about our holdings of available-for-sale non-agency mortgage-related securities backed by subprime, option ARM and Alt-A loans.

**Table 20 — Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics** [1]

| | As of | | | | |
|---|---|---|---|---|---|
| | 6/30/2012 | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 |
| | (dollars in millions) | | | | |
| **UPB:** | | | | | |
| Subprime first lien [2] | $ 46,306 | $ 47,478 | $ 48,644 | $ 49,794 | $ 51,070 |
| Option ARM | 12,958 | 13,508 | 13,949 | 14,351 | 14,778 |
| Alt-A [3] | 13,471 | 13,885 | 14,260 | 14,643 | 15,059 |
| **Gross unrealized losses, pre-tax:** [4] | | | | | |
| Subprime first lien [2] | $ 12,810 | $ 12,661 | $ 13,401 | $ 14,132 | $ 13,764 |
| Option ARM | 2,997 | 2,909 | 3,169 | 3,216 | 3,099 |
| Alt-A [3] | 2,082 | 2,094 | 2,612 | 2,468 | 2,171 |
| **Present value of expected future credit losses:** [5] | | | | | |
| Subprime first lien [2] | $ 6,571 | $ 7,325 | $ 6,746 | $ 5,414 | $ 6,487 |
| Option ARM | 3,296 | 3,908 | 4,251 | 4,434 | 4,767 |
| Alt-A [3] | 1,956 | 2,237 | 2,235 | 2,204 | 2,310 |
| **Collateral delinquency rate:** [6] | | | | | |
| Subprime first lien [2] | 40% | 42% | 42% | 42% | 42% |
| Option ARM | 42 | 43 | 44 | 44 | 44 |
| Alt-A [3] | 24 | 25 | 25 | 25 | 26 |
| **Average credit enhancement:** [7] | | | | | |
| Subprime first lien [2] | 19% | 20% | 21% | 22% | 23% |
| Option ARM | 5 | 6 | 7 | 8 | 10 |
| Alt-A [3] | 5 | 6 | 7 | 7 | 8 |
| **Cumulative collateral loss:** [8] | | | | | |
| Subprime first lien [2] | 24% | 23% | 22% | 21% | 20% |
| Option ARM | 19 | 18 | 17 | 16 | 15 |
| Alt-A [3] | 9 | 9 | 8 | 8 | 7 |

(1) See "*Ratings of Non-Agency Mortgage-Related Securities*" for additional information about these securities.
(2) Excludes non-agency mortgage-related securities backed exclusively by subprime second liens. Certain securities identified as subprime first lien may be backed in part by subprime second lien loans, as the underlying loans of these securities were permitted to include a small percentage of subprime second lien loans.
(3) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.
(4) Represents the aggregate of the amount by which amortized cost, after other-than-temporary impairments, exceeds fair value measured at the individual lot level.
(5) Represents our estimate of the present value of future contractual cash flows that we do not expect to collect, discounted at the effective interest rate implicit in the security's contractual yield based on the initial acquisition cost. This discount rate is only utilized to analyze the cumulative credit deterioration for securities since acquisition and may be lower than the discount rate used to measure ongoing other-than-temporary impairment to be recognized in earnings for securities that have experienced a significant improvement in expected cash flows since the last recognition of other-than-temporary impairment recognized in earnings.
(6) Determined based on the number of loans that are two monthly payments or more past due that underlie the securities using information obtained from a third-party data provider.
(7) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of loss in the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by bond insurance, overcollateralization and other forms of credit enhancement.
(8) Based on the actual losses incurred on the collateral underlying these securities. Actual losses on the securities that we hold are significantly less than the losses on the underlying collateral as presented in this table, as non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

For purposes of our cumulative credit deterioration analysis, our estimate of the present value of expected future credit losses on our non-agency mortgage-related securities decreased to $12.8 billion at June 30, 2012 from $14.2 billion at March 31, 2012. All of these amounts have been reflected in our net impairment of available-for-sale securities recognized in earnings in this period or prior periods. The decrease in the present value of expected future credit losses was primarily due to: (a) the impact of declining forward interest rates resulting in a benefit from expected structural credit enhancements; and (b) improvements in forecasted home prices over the expected life of the securities. These factors were partially offset by an increase in expected loss severities resulting from lengthy foreclosure timelines.

The investments in non-agency mortgage-related securities we hold backed by subprime, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements. Bond insurance is an additional credit enhancement covering some of the non-agency mortgage-related securities. These credit enhancements are the primary reason we expect our actual losses, through principal or interest shortfalls, to be less than the underlying collateral losses in the aggregate. During the three and six months ended June 30, 2012, we continued to experience the erosion of structural credit enhancements on many securities backed by subprime, option ARM, and Alt-A loans due to poor performance of the underlying collateral. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Bond Insurers*."

**Table 21 — Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans** [1]

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | 6/30/2012 | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 |
| | (in millions) | | | | |
| Principal repayments and cash shortfalls: [2] | | | | | |
| Subprime: | | | | | |
| Principal repayments | $ 1,180 | $ 1,175 | $ 1,159 | $ 1,287 | $ 1,341 |
| Principal cash shortfalls | 7 | 6 | 7 | 6 | 10 |
| Option ARM: | | | | | |
| Principal repayments | $ 300 | $ 272 | $ 298 | $ 318 | $ 331 |
| Principal cash shortfalls | 234 | 169 | 103 | 109 | 123 |
| Alt-A and other: | | | | | |
| Principal repayments | $ 405 | $ 374 | $ 385 | $ 425 | $ 464 |
| Principal cash shortfalls | 106 | 97 | 80 | 81 | 84 |

(1) See "*Ratings of Non-Agency Mortgage-Related Securities*" for additional information about these securities.
(2) In addition to the contractual interest payments, we receive monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral of these securities representing a partial return of our investment in these securities.

Since the beginning of 2007, we have incurred actual principal cash shortfalls of $2.1 billion on impaired non-agency mortgage-related securities, of which $339 million and $614 million related to the three and six months ended June 30, 2012, respectively. Many of the trusts that issued non-agency mortgage-related securities we hold were structured so that realized collateral losses in excess of structural credit enhancements are not passed on to investors until the investment matures. We currently estimate that the future expected principal and interest shortfalls on non-agency mortgage-related securities we hold will be significantly less than the fair value declines experienced on these securities.

*Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*

The table below provides information about the mortgage-related securities for which we recognized other-than-temporary impairments in earnings.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 22 — Net Impairment of Available-For-Sale Mortgage-Related Securities Recognized in Earnings**

| | Net Impairment of Available-For-Sale Securities Recognized in Earnings | | | | |
| | Three Months Ended | | | | |
| | 6/30/2012 | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 |
| | (in millions) | | | | |
| Subprime:[1] | | | | | |
| 2006 & 2007 | $ 51 | $ 433 | $ 472 | $ 29 | $ 67 |
| Other years | 7 | 8 | 8 | 2 | 3 |
| Total subprime | 58 | 441 | 480 | 31 | 70 |
| Option ARM: | | | | | |
| 2006 & 2007 | 18 | 32 | 40 | 15 | 43 |
| Other years | — | 16 | 19 | 4 | 22 |
| Total option ARM | 18 | 48 | 59 | 19 | 65 |
| Alt-A: | | | | | |
| 2006 & 2007 | — | 16 | 22 | 29 | 16 |
| Other years | 1 | 36 | 21 | 10 | 15 |
| Total Alt-A | 1 | 52 | 43 | 39 | 31 |
| Other loans | 1 | 5 | 3 | 41 | 1 |
| Total subprime, option ARM, Alt-A and other loans | 78 | 546 | 585 | 130 | 167 |
| CMBS | 19 | 16 | 8 | 27 | 183 |
| Manufactured housing | 1 | 2 | 2 | 4 | 2 |
| Total available-for-sale mortgage-related securities | $ 98 | $ 564 | $ 595 | $ 161 | $ 352 |

(1) Includes all first and second liens.

We recorded net impairment of available-for-sale mortgage-related securities recognized in earnings of $98 million and $662 million during the three and six months ended June 30, 2012, respectively, compared to $352 million and $1.5 billion during the three and six months ended June 30, 2011, respectively. We recorded these impairments because our estimate of the present value of expected future credit losses on certain individual securities increased during the period. These impairments include $78 million and $624 million related to securities backed by subprime, option ARM, and Alt-A and other loans during the three and six months ended June 30, 2012, respectively, compared to $167 million and $1.2 billion during the three and six months ended June 30, 2011, respectively. During the three months ended June 30, 2011, we recognized the unrealized fair value losses of $154 million related to three investments in CMBS as a net impairment of available-for-sale securities recognized in earnings because we had the intent to sell these securities prior to the recovery of the unrealized losses. We did not recognize any net impairment of available-for-sale securities in earnings during the three months ended June 30, 2012 as a result of an intent to sell available-for-sale securities prior to the recovery of the unrealized losses. For more information, see "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-for-Sale Securities."

While it is reasonably possible that collateral losses on our available-for-sale mortgage-related securities where we have not recorded an impairment charge in earnings could exceed our credit enhancement levels, we do not believe that those conditions were likely at June 30, 2012. Based on our conclusion that we do not intend to sell our remaining available-for-sale mortgage-related securities in an unrealized loss position and it is not more likely than not that we will be required to sell these securities before a sufficient time to recover all unrealized losses and our consideration of other available information, we have concluded that the reduction in fair value of these securities was temporary at June 30, 2012 and have recorded these unrealized losses in AOCI.

The credit performance of loans underlying our holdings of non-agency mortgage-related securities has declined since 2007. This decline has been particularly severe for subprime, option ARM, and Alt-A and other loans. Economic factors negatively impacting the performance of our investments in non-agency mortgage-related securities include high unemployment, a large inventory of seriously delinquent mortgage loans and unsold homes, tight credit conditions, and weak consumer confidence during recent years. In addition, subprime, option ARM, and Alt-A and other loans backing the securities we hold have significantly greater concentrations in the states that are undergoing the greatest economic stress, such as California and Florida. Loans in these states undergoing economic stress are more likely to become seriously delinquent and the credit losses associated with such loans are likely to be higher than in other states.

We rely on bond insurance, including secondary coverage, to provide credit protection on some of our investments in non-agency mortgage-related securities. We have determined that there is substantial uncertainty surrounding certain bond insurers' ability to pay our future claims on expected credit losses related to our non-agency mortgage-related security

41

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

investments. This uncertainty contributed to the impairments recognized in earnings during the three and six months ended June 30, 2012 and 2011. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Bond Insurers*" and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

Our assessments concerning other-than-temporary impairment require significant judgment and the use of models, and are subject to potentially significant change as conditions evolve. In addition, changes in the performance of the individual securities and in mortgage market conditions may also affect our impairment assessments. Depending on the structure of the individual mortgage-related security and our estimate of collateral losses relative to the amount of credit support expected to be available for the tranches we own, a change in collateral loss estimates can have a disproportionate impact on the loss estimate for the security. Additionally, servicer performance, loan modification programs and backlogs, bankruptcy reform and other forms of government intervention in the housing market can significantly affect the performance of these securities, including the timing of loss recognition of the underlying loans and thus the timing of losses we recognize on our securities. Impacts related to changes in interest rates may also affect our losses due to the structural credit enhancements on our investments in non-agency mortgage-related securities. The lengthening of the foreclosure timelines that has occurred in recent years can also affect our losses. For example, while defaulted loans remain in the trusts prior to completion of the foreclosure process, the subordinate classes of securities issued by the securitization trusts may continue to receive interest payments, rather than absorbing default losses. This may reduce the amount of funds available for the tranches we own. Given the extent of the housing and economic downturn, it is difficult to estimate the future performance of mortgage loans and mortgage-related securities with high assurance, and actual results could differ materially from our expectations. Furthermore, various market participants could arrive at materially different conclusions regarding estimates of future cash shortfalls.

For more information on risks associated with the use of models, see "RISK FACTORS — Operational Risks — *We face risks and uncertainties associated with the internal models that we use for financial accounting and reporting purposes, to make business decisions, and to manage risks. Market conditions have raised these risks and uncertainties* " in our 2011 Annual Report. For more information on how the lengthening of foreclosure timelines could adversely affect the values of, and the losses on, the non-agency mortgage-related securities we hold, see "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" in our 2011 Annual Report.

For information regarding our efforts to mitigate losses on our investments in non-agency mortgage-related securities, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*."

*Ratings of Non-Agency Mortgage-Related Securities*

The table below shows the ratings of non-agency mortgage-related securities backed by subprime, option ARM, Alt-A and other loans, and CMBS held at June 30, 2012 based on their ratings as of June 30, 2012, as well as those held at December 31, 2011 based on their ratings as of December 31, 2011 using the lowest rating available for each security.

<div align="center">42</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 23 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS**

| Credit Ratings as of June 30, 2012 | UPB | Percentage of UPB | Amortized Cost | Gross Unrealized Losses | Bond Insurance Coverage (1) |
|---|---|---|---|---|---|
| | | | (dollars in millions) | | |
| **Subprime loans:** | | | | | |
| AAA-rated | $ 401 | 1% | $ 401 | $ (47) | $ 18 |
| Other investment grade | 2,289 | 5 | 2,289 | (280) | 376 |
| Below investment grade (2) | 43,973 | 94 | 35,842 | (12,488) | 1,559 |
| Total | $ 46,663 | 100% | $ 38,532 | $ (12,815) | $ 1,953 |
| **Option ARM loans:** | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 49 | — | 49 | (4) | 49 |
| Below investment grade (2) | 12,909 | 100 | 8,371 | (2,993) | 16 |
| Total | $ 12,958 | 100% | $ 8,420 | $ (2,997) | $ 65 |
| **Alt-A and other loans:** | | | | | |
| AAA-rated | $ 73 | —% | $ 74 | $ (4) | $ 6 |
| Other investment grade | 2,181 | 14 | 2,197 | (271) | 282 |
| Below investment grade (2) | 13,554 | 86 | 10,582 | (1,954) | 1,996 |
| Total | $ 15,808 | 100% | $ 12,853 | $ (2,229) | $ 2,284 |
| **CMBS:** | | | | | |
| AAA-rated | $ 24,846 | 49% | $ 24,882 | $ (9) | $ 42 |
| Other investment grade | 22,876 | 45 | 22,826 | (156) | 1,582 |
| Below investment grade (2) | 2,884 | 6 | 2,781 | (375) | 1,692 |
| Total | $ 50,606 | 100% | $ 50,489 | $ (540) | $ 3,316 |
| **Total subprime, option ARM, Alt-A and other loans, and CMBS:** | | | | | |
| AAA-rated | $ 25,320 | 20% | $ 25,357 | $ (60) | $ 66 |
| Other investment grade | 27,395 | 22 | 27,361 | (711) | 2,289 |
| Below investment grade (2) | 73,320 | 58 | 57,576 | (17,810) | 5,263 |
| Total | $ 126,035 | 100% | $ 110,294 | $ (18,581) | $ 7,618 |
| Total investments in mortgage-related securities | $238,802 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 53% | | | | |
| **Credit Ratings as of December 31, 2011** | | | | | |
| **Subprime loans:** | | | | | |
| AAA-rated | $ 1,000 | 2% | $ 1,000 | $ (115) | $ 23 |
| Other investment grade | 2,643 | 5 | 2,643 | (399) | 383 |
| Below investment grade (2) | 45,389 | 93 | 37,704 | (12,894) | 1,641 |
| Total | $ 49,032 | 100% | $ 41,347 | $ (13,408) | $ 2,047 |
| **Option ARM loans:** | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 76 | 1 | 76 | (8) | 76 |
| Below investment grade (2) | 13,873 | 99 | 8,943 | (3,161) | 39 |
| Total | $ 13,949 | 100% | $ 9,019 | $ (3,169) | $ 115 |
| **Alt-A and other loans:** | | | | | |
| AAA-rated | $ 350 | 2% | $ 348 | $ (20) | $ 6 |
| Other investment grade | 2,237 | 13 | 2,260 | (371) | 310 |
| Below investment grade (2) | 14,203 | 85 | 11,053 | (2,421) | 2,139 |
| Total | $ 16,790 | 100% | $ 13,661 | $ (2,812) | $ 2,455 |
| **CMBS:** | | | | | |
| AAA-rated | $ 25,499 | 47% | $ 25,540 | $ (22) | $ 42 |
| Other investment grade | 25,421 | 47 | 25,394 | (346) | 1,585 |
| Below investment grade (2) | 3,190 | 6 | 2,851 | (180) | 1,697 |
| Total | $ 54,110 | 100% | $ 53,785 | $ (548) | $ 3,324 |
| **Total subprime, option ARM, Alt-A and other loans, and CMBS:** | | | | | |
| AAA-rated | $ 26,849 | 20% | $ 26,888 | $ (157) | $ 71 |
| Other investment grade | 30,377 | 23 | 30,373 | (1,124) | 2,354 |
| Below investment grade (2) | 76,655 | 57 | 60,551 | (18,656) | 5,516 |
| Total | $ 133,881 | 100% | $ 117,812 | $ (19,937) | $ 7,941 |
| Total investments in mortgage-related securities | $261,232 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 51% | | | | |

(1)    Represents the amount of UPB covered by bond insurance. This amount does not represent the maximum amount of losses we could recover, as the bond insurance also covers interest.

(2)    Includes securities with S&P equivalent credit ratings below BBB– and certain securities that are no longer rated.

43

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Mortgage Loans**

The UPB of mortgage loans on our consolidated balance sheets declined to $1.76 trillion as of June 30, 2012, from $1.82 trillion as of December 31, 2011. This decline reflects that the amount of single-family loan liquidations has exceeded new loan purchase and guarantee activity, which we believe is due, in part, to declines in the amount of single-family mortgage debt outstanding in the market and our competitive position compared to other market participants.

The UPB of unsecuritized single-family mortgage loans declined by $19.2 billion to $152.5 billion at June 30, 2012, from $171.7 billion at December 31, 2011, primarily due to: (a) loan prepayments, foreclosure transfers, and foreclosure alternative activities; and (b) securitizations of loans through our PC cash auction process.

Based on the amount of the recorded investment of single-family loans on our consolidated balance sheets, approximately $67.2 billion, or 4.0%, of these loans as of June 30, 2012 were seriously delinquent, as compared to $72.4 billion, or 4.2%, as of December 31, 2011. This decline was primarily due to modifications, foreclosure transfers, and short sale activity. The majority of these seriously delinquent loans are unsecuritized, and were removed by us from our PC trusts. As guarantor, we have the right to remove mortgages that back our PCs from the underlying loan pools under certain circumstances. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information on our removal of single-family loans from PC trusts.

The UPB of unsecuritized multifamily mortgage loans was $79.6 billion at June 30, 2012 and $82.3 billion at December 31, 2011. Our multifamily loan activity during the six months ended June 30, 2012 primarily consisted of purchases of loans intended for securitization and subsequent sale through Other Guarantee Transactions. To pursue our primary multifamily business strategy, we expect to continue to purchase and then securitize multifamily loans, which provides liquidity for the multifamily market, supports affordability for multifamily rental housing, and helps us manage our credit risks.

We maintain an allowance for loan losses on mortgage loans that we classify as held-for-investment on our consolidated balance sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage-related securities backed by multifamily loans, certain single-family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risk. Collectively, we refer to our allowance for loan losses and our reserve for guarantee losses as our loan loss reserves. Our loan loss reserves were $35.8 billion and $39.5 billion at June 30, 2012 and December 31, 2011, respectively, including $35.3 billion and $38.9 billion, respectively, related to single-family loans. At June 30, 2012 and December 31, 2011, our loan loss reserves, as a percentage of our total mortgage portfolio, excluding non-Freddie Mac securities, were 1.9% and 2.1%, respectively, and as a percentage of the UPB associated with our non-performing loans were 29.5% and 32.0%, respectively. Our loan loss reserves declined during the first half of 2012 primarily due to continued high levels of charge-offs during the period combined with lower aggregate delinquent loan balances within our single-family guarantee portfolio at June 30, 2012 than at December 31, 2011. During the first half of 2012 we experienced improvements in both single-family borrower payment performance and in current LTV ratios for single-family loans. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further detail about the mortgage loans and associated allowance for loan losses recorded on our consolidated balance sheets.

The table below summarizes our mortgage purchase and other guarantee commitment issuances. This activity consists of: (a) mortgage loans underlying consolidated single-family PCs issued in the period (regardless of whether such securities are held by us or third parties); (b) single-family and multifamily mortgage loans purchased, but not securitized, in the period; and (c) mortgage loans underlying our mortgage-related financial guarantees issued in the period, which are not consolidated on our balance sheets.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 24 — Mortgage Loan Purchases and Other Guarantee Commitment Issuances** [1]

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2012 | | 2011 | | 2012 | | 2011 | |
| | UPB Amount | % of Total | UPB Amount | % of Total | UPB Amount | % of Total | UPB Amount | % of Total |
| | (dollars in millions) | | | | | | | |
| Mortgage loan purchases and guarantee issuances: | | | | | | | | |
| Single-family: | | | | | | | | |
| 30-year or more amortizing fixed-rate | $55,827 | 59% | $40,345 | 60% | $117,674 | 57% | $103,243 | 61% |
| 20-year amortizing fixed-rate | 6,260 | 7 | 3,315 | 5 | 14,670 | 7 | 10,030 | 6 |
| 15-year amortizing fixed-rate | 22,162 | 23 | 13,001 | 19 | 51,736 | 25 | 35,111 | 21 |
| Adjustable-rate [2] | 4,312 | 4 | 6,125 | 9 | 9,464 | 5 | 11,866 | 7 |
| FHA/VA and other governmental | 89 | <1 | 117 | <1 | 179 | <1 | 204 | <1 |
| Total single-family [3] | 88,650 | 93 | 62,903 | 93 | 193,723 | 94 | 160,454 | 95 |
| Multifamily | 6,661 | 7 | 4,512 | 7 | 12,412 | 6 | 7,561 | 5 |
| Total mortgage loan purchases and other guarantee commitment issuances [4] | $95,311 | 100% | $67,415 | 100% | $206,135 | 100% | $168,015 | 100% |
| Percentage of mortgage purchases and other guarantee commitment issuances with credit enhancements [5] | 11% | | 9% | | 10% | | 8% | |

(1) Based on UPB. Excludes mortgage loans traded but not yet settled. Excludes the removal of seriously delinquent loans and balloon/reset mortgages out of PC trusts. Includes other guarantee commitments associated with mortgage loans. See endnote (4) for further information.

(2) Includes amortizing ARMs with 1-, 3-, 5-, 7-, and 10-year initial fixed-rate periods. We did not purchase any option ARM loans during the six months ended June 30, 2012 or 2011.

(3) Includes $14.4 billion and $13.3 billion of mortgage loans in excess of $417,000, which we refer to as conforming jumbo mortgages, for the six month ended June 30, 2012 and 2011, respectively.

(4) Includes issuances of other guarantee commitments on single-family loans of $4.1 billion and $2.5 billion and issuances of other guarantee commitments on multifamily loans of $1.6 billion and $0.4 billion during the six months ended June 30, 2012 and 2011, respectively.

(5) See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for further details on credit enhancement of mortgage loans in our multifamily mortgage and single-family credit guarantee portfolios.

See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Table 15.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio" for information about mortgage loans in our single-family credit guarantee portfolio that we believe have higher-risk characteristics.

**Derivative Assets and Liabilities, Net**

The composition of our derivative portfolio changes from period to period as a result of derivative purchases, terminations, or assignments prior to contractual maturity, and expiration of the derivatives at their contractual maturity. We classify net derivative interest receivable or payable, trade/settle receivable or payable, and cash collateral held or posted on our consolidated balance sheets in derivative assets, net and derivative liabilities, net. See "NOTE 10: DERIVATIVES" for additional information regarding our derivatives.

The table below shows the fair value for each derivative type, the weighted average fixed rate of our pay-fixed and receive-fixed swaps, and the maturity profile of our derivative positions reconciled to the amounts presented on our consolidated balance sheets as of June 30, 2012. A positive fair value in the table below for each derivative type is the estimated amount, prior to netting by counterparty, that we would be entitled to receive if the derivatives of that type were terminated. A negative fair value for a derivative type is the estimated amount, prior to netting by counterparty, that we would owe if the derivatives of that type were terminated.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3633

Table of Contents

**Table 25 — Derivative Fair Values and Maturities**

| | | | June 30, 2012 | | | |
| | | | | Fair Value [1] | | |
| | Notional or Contractual Amount [2] | Total Fair Value [3] | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
|---|---|---|---|---|---|---|
| | | | (dollars in millions) | | | |
| **Interest-rate swaps:** | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 249,498 | $ 13,480 | $ 115 | $ 833 | $ 3,813 | $ 8,719 |
| Weighted average fixed rate [4] | | | 2.09% | 1.02% | 1.99% | 2.84% |
| Forward-starting swaps [5] | 10,930 | 1,347 | — | — | — | 1,347 |
| Weighted average fixed rate [4] | | | —% | —% | —% | 3.79% |
| Total receive-fixed | 260,428 | 14,827 | 115 | 833 | 3,813 | 10,066 |
| Basis (floating to floating) | 2,350 | 4 | (1) | — | 5 | — |
| Pay-fixed: | | | | | | |
| Swaps | 275,951 | (32,685) | (29) | (2,584) | (5,366) | (24,706) |
| Weighted average fixed rate [4] | | | 0.85% | 2.92% | 2.86% | 3.68% |
| Forward-starting swaps [5] | 16,709 | (2,041) | — | — | — | (2,041) |
| Weighted average fixed rate [4] | | | —% | —% | —% | 3.35% |
| Total pay-fixed | 292,660 | (34,726) | (29) | (2,584) | (5,366) | (26,747) |
| Total interest-rate swaps | 555,438 | (19,895) | 85 | (1,751) | (1,548) | (16,681) |
| **Option-based:** | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 48,500 | 9,616 | 2,579 | 4,182 | 260 | 2,595 |
| Written | 6,195 | (789) | — | (789) | — | — |
| Put swaptions | | | | | | |
| Purchased | 45,050 | 334 | 1 | 29 | 48 | 256 |
| Written | 250 | (1) | (1) | — | — | — |
| Other option-based derivatives [6] | 33,492 | 2,399 | — | — | — | 2,399 |
| Total option-based | 133,487 | 11,559 | 2,579 | 3,422 | 308 | 5,250 |
| Futures | 39,938 | (6) | (6) | — | — | — |
| Foreign-currency swaps | 1,123 | 28 | 27 | 1 | — | — |
| Commitments | 13,032 | 35 | 35 | — | — | — |
| Swap guarantee derivatives | 3,622 | (36) | — | (1) | — | (34) |
| Subtotal | 746,640 | (8,315) | $ 2,720 | $ 1,671 | $ (1,241) | $(11,465) |
| Credit derivatives | 9,272 | (3) | | | | |
| Subtotal | 755,912 | | | | | |
| Derivative interest receivable (payable), net | | (900) | | | | |
| Trade/settle receivable (payable), net | | — | | | | |
| Derivative cash collateral (held) posted, net | | 9,050 | | | | |
| Total | $ 755,912 | $ (168) | | | | |

(1) Fair value is categorized based on the period from June 30, 2012 until the contractual maturity of the derivative.
(2) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged. Notional or contractual amounts are not recorded as assets or liabilities on our consolidated balance sheets.
(3) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net, and includes derivative interest receivable or (payable), net, trade/settle receivable or (payable), net and derivative cash collateral (held) or posted, net.
(4) Represents the notional weighted average rate for the fixed leg of the swaps.
(5) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to thirteen years as of June 30, 2012.
(6) Primarily includes purchased interest-rate caps and floors.

At June 30, 2012, the net fair value of our total derivative portfolio was $(168) million, as compared to $(317) million at December 31, 2011. The increase in the net fair value of derivatives reflects a change in the mix of our derivatives whereby we increased our holdings of receive-fixed swaps relative to pay-fixed swaps to rebalance our portfolio during a period of steadily declining interest rates and increased our issuances of debt with longer-term maturities. See "NOTE 10: DERIVATIVES" for the notional or contractual amounts and related fair values of our total derivative portfolio by product type at June 30, 2012 and December 31, 2011, as well as derivative collateral posted and held.

46

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below summarizes the changes in derivative fair values.

### Table 26 — Changes in Derivative Fair Values

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2012[1] | 2011[2] |
| | (in millions) | |
| Beginning balance, at January 1 — Net asset (liability) | $ (8,662) | $ (6,560) |
| Net change in: | | |
| Commitments | 91 | 75 |
| Credit derivatives | 1 | (9) |
| Swap guarantee derivatives | 1 | — |
| Other derivatives:[3] | | |
| Changes in fair value | (75) | (1,213) |
| Fair value of new contracts entered into during the period [4] | — | 576 |
| Contracts realized or otherwise settled during the period | 326 | 89 |
| Ending balance, at June 30 — Net asset (liability) | $ (8,318) | $ (7,042) |

(1) Refer to "Table 25 — Derivative Fair Values and Maturities" for a reconciliation of net fair value to the amounts presented on our consolidated balance sheets as of June 30, 2012.

(2) At June 30, 2011, fair value in this table excludes derivative interest receivable or (payable), net of $(1.3) billion, trade/settle receivable or (payable), net of $6 million, and derivative cash collateral posted, net of $8.2 billion.

(3) Includes fair value changes for interest-rate swaps, option-based derivatives, futures, and foreign-currency swaps.

(4) Consists primarily of cash premiums paid or received on options.

See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for a description of gains (losses) on our derivative positions.

### REO, Net

We acquire properties, which are recorded as REO assets on our consolidated balance sheets, typically as a result of borrower default on mortgage loans that we own, or for which we have issued our financial guarantee. The balance of our REO, net, declined to $4.8 billion at June 30, 2012 from $5.7 billion at December 31, 2011. We believe the volume of our single-family REO acquisitions in the first half of 2012 was less than it otherwise would have been due to the lengthening of the foreclosure timeline, particularly in states that require a judicial foreclosure process and, in part, to resource constraints on foreclosure activities for five larger servicers involved in a recent settlement with a coalition of state attorneys general and federal agencies. The lower acquisition rate, coupled with high disposition levels, led to a lower REO property inventory level at June 30, 2012 compared to December 31, 2011. We expect that the length of the foreclosure timeline will continue to remain above historical levels. Additionally, we expect our REO activity to remain at elevated levels, as we have a large inventory of seriously delinquent loans in our single-family credit guarantee portfolio. To the extent a large volume of loans completes the foreclosure process in a short period of time, the resulting increase in the market's inventory of homes for sale could have a negative impact on home prices. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

### Deferred Tax Assets, Net

After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, related difficulty in forecasting future profit levels, and our assertion that we have the intent and ability to hold our available-for-sale securities until any temporary unrealized losses are recovered, we continue to record a valuation allowance on a portion of our net deferred tax assets. See "NOTE 12: INCOME TAXES" for additional information.

### Other Assets

Other assets consist of the guarantee asset related to non-consolidated trusts and other guarantee commitments, accounts and other receivables, and other miscellaneous assets. Other assets increased to $10.9 billion as of June 30, 2012 from $10.5 billion as of December 31, 2011 primarily due to an increase in servicer receivables resulting from an increase in the proceeds of mortgage loans paid off by borrowers at the end of the quarter that had not yet been remitted to us. See "NOTE 18: SIGNIFICANT COMPONENTS OF OTHER ASSETS AND OTHER LIABILITIES ON OUR CONSOLIDATED BALANCE SHEETS" for additional information.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from this use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3635

Table of Contents

**Total Debt, Net**

PCs and Other Guarantee Transactions issued by our consolidated trusts and held by third parties are recognized as debt securities of consolidated trusts held by third parties on our consolidated balance sheets. Debt securities of consolidated trusts held by third parties represent our liability to third parties that hold beneficial interests in our consolidated trusts. The debt securities of our consolidated trusts may be prepaid as the loans that collateralize the debt may prepay without penalty at any time.

Other debt consists of unsecured short-term and long-term debt securities we issue to third parties to fund our business activities. It is classified as either short-term or long-term based on the contractual maturity of the debt instrument. See "LIQUIDITY AND CAPITAL RESOURCES" for information about our other debt.

The table below presents the UPB for Freddie Mac-issued mortgage-related securities by the underlying mortgage product type.

**Table 27 — Freddie Mac Mortgage-Related Securities** [1]

| | June 30, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total |
| | (in millions) | | | | | |
| Single-family: | | | | | | |
| 30-year or more amortizing fixed-rate | $ 1,077,467 | $ — | $ 1,077,467 | $ 1,123,105 | $ — | $ 1,123,105 |
| 20-year amortizing fixed-rate | 73,826 | — | 73,826 | 68,584 | — | 68,584 |
| 15-year amortizing fixed-rate | 264,501 | — | 264,501 | 252,563 | — | 252,563 |
| Adjustable-rate [2] | 70,394 | — | 70,394 | 69,402 | — | 69,402 |
| Interest-only [3] | 50,321 | — | 50,321 | 59,007 | — | 59,007 |
| FHA/VA and other governmental | 3,147 | — | 3,147 | 3,267 | — | 3,267 |
| Total single-family | 1,539,656 | — | 1,539,656 | 1,575,928 | — | 1,575,928 |
| Multifamily | — | 4,334 | 4,334 | — | 4,496 | 4,496 |
| Total single-family and multifamily | 1,539,656 | 4,334 | 1,543,990 | 1,575,928 | 4,496 | 1,580,424 |
| Other Guarantee Transactions: | | | | | | |
| HFA bonds: [4] | | | | | | |
| Single-family | — | 5,579 | 5,579 | — | 6,118 | 6,118 |
| Multifamily | — | 911 | 911 | — | 966 | 966 |
| Total HFA bonds | — | 6,490 | 6,490 | — | 7,084 | 7,084 |
| Other: | | | | | | |
| Single-family [5] | 11,595 | 3,641 | 15,236 | 12,877 | 3,838 | 16,715 |
| Multifamily | — | 27,976 | 27,976 | — | 19,682 | 19,682 |
| Total Other Guarantee Transactions | 11,595 | 31,617 | 43,212 | 12,877 | 23,520 | 36,397 |
| REMICs and Other Structured Securities backed by Ginnie Mae Certificates [6] | — | 709 | 709 | — | 779 | 779 |
| Total Freddie Mac Mortgage-Related Securities | $ 1,551,251 | $ 43,150 | $ 1,594,401 | $ 1,588,805 | $ 35,879 | $ 1,624,684 |
| Less: Repurchased Freddie Mac Mortgage-Related Securities [7] | (108,028) | | | (136,329) | | |
| Total UPB of debt securities of consolidated trusts held by third parties | $ 1,443,223 | | | $ 1,452,476 | | |

(1) Amounts are based on UPB of the securities and exclude mortgage-related securities traded, but not yet settled.

(2) Includes $1.1 billion and $1.2 billion in UPB of option ARM mortgage loans as of June 30, 2012 and December 31, 2011, respectively. See endnote (5) for additional information on option ARM loans that back our Other Guarantee Transactions.

(3) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed- and variable-rate interest-only loans.

(4) Consists of bonds we acquired and resecuritized under the NIBP.

(5) Backed by non-agency mortgage-related securities that include prime, FHA/VA, and subprime mortgage loans and also include $6.8 billion and $7.3 billion in UPB of securities backed by option ARM mortgage loans at June 30, 2012 and December 31, 2011, respectively.

(6) Backed by FHA/VA loans.

(7) Represents the UPB of repurchased Freddie Mac mortgage-related securities that are consolidated on our balance sheets and includes certain remittance amounts associated with our security trust administration that are payable to third-party mortgage-related security holders. Our holdings of non-consolidated Freddie Mac mortgage-related securities are presented in "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets."

Excluding Other Guarantee Transactions, the percentage of amortizing fixed-rate single-family loans underlying our consolidated trust debt securities, based on UPB, was approximately 92% at both June 30, 2012 and December 31, 2011. Freddie Mac single-family mortgage-related securities that we issued during the first half of 2012 were backed by a

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3636

Table of Contents

significant proportion of refinance mortgages. During the first half of 2012, the outstanding UPB of Freddie Mac mortgage-related securities issued by consolidated trusts declined approximately 2.4%, as the volume of our new issuances was less than the volume of liquidations of these securities. The outstanding UPB of multifamily Other Guarantee Transactions, excluding HFA-related securities, increased to $28.0 billion as of June 30, 2012 from $19.7 billion as of December 31, 2011, due to multifamily loan securitization activity.

The table below presents additional details regarding our issued and guaranteed mortgage-related securities.

**Table 28 — Issuances and Extinguishments of Debt Securities of Consolidated Trusts** [1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| Beginning balance of debt securities of consolidated trusts held by third parties | $1,459,365 | $1,497,849 | $1,452,476 | $1,517,001 |
| Issuances to third parties of debt securities of consolidated trusts: | | | | |
| Issuances based on underlying mortgage product type: | | | | |
| 30-year or more amortizing fixed-rate | 63,985 | 36,517 | 128,026 | 98,308 |
| 20-year amortizing fixed-rate | 6,692 | 3,147 | 15,087 | 9,390 |
| 15-year amortizing fixed-rate | 22,928 | 15,648 | 53,600 | 35,514 |
| Adjustable-rate | 4,437 | 6,216 | 9,585 | 11,862 |
| Interest-only | — | — | — | 152 |
| FHA/VA | — | — | — | 160 |
| Debt securities of consolidated trusts retained by us at issuance | (8,536) | (313) | (11,441) | (6,658) |
| Net issuances of debt securities of consolidated trusts | 89,506 | 61,215 | 194,857 | 148,728 |
| Reissuances of debt securities of consolidated trusts previously held by us [2] | 11,010 | 11,977 | 22,652 | 36,553 |
| Total issuances to third parties of debt securities of consolidated trusts | 100,516 | 73,192 | 217,509 | 185,281 |
| Extinguishments, net [3] | (116,658) | (86,625) | (226,762) | (217,866) |
| Ending balance of debt securities of consolidated trusts held by third parties | $1,443,223 | $1,484,416 | $1,443,223 | $1,484,416 |

(1) Based on UPB.

(2) Represents our sales of PCs and certain Other Guarantee Transactions previously held by us.

(3) Represents: (a) UPB of our purchases from third parties of PCs and Other Guarantee Transactions issued by our consolidated trusts; (b) principal repayments related to PCs and Other Guarantee Transactions issued by our consolidated trusts; and (c) certain remittance amounts associated with our trust security administration that are payable to third-party mortgage-related security holders as of June 30, 2012 and 2011.

**Other Liabilities**

Other liabilities consist of the guarantee obligation, the reserve for guarantee losses on non-consolidated trusts and other mortgage-related financial guarantees, servicer liabilities, accounts payable and accrued expenses, and other miscellaneous liabilities. Other liabilities increased to $6.2 billion as of June 30, 2012 from $6.0 billion as of December 31, 2011 primarily due to an increase in: (a) accrued estimated losses on unsettled foreclosure alternative transactions at quarter end primarily related to an increase in short sales activity; and (b) real estate services payable relating to estimated taxes and insurance on REO properties held in inventory at quarter end. See "NOTE 18: SIGNIFICANT COMPONENTS OF OTHER ASSETS AND OTHER LIABILITIES ON OUR CONSOLIDATED BALANCE SHEETS" for additional information.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Total Equity (Deficit)**

The table below presents the changes in total equity (deficit) and certain capital-related disclosures.

**Table 29 — Changes in Total Equity (Deficit)**

| | Three Months Ended | | | | | Six Months Ended |
|---|---|---|---|---|---|---|
| | 6/30/2012 | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 6/30/2012 |
| | (in millions) | | | | | |
| Beginning balance | $ (18) | $ (146) | $ (5,991) | $ (1,478) | $ 1,237 | $ (146) |
| Net income (loss) | 3,020 | 577 | 619 | (4,422) | (2,139) | 3,597 |
| Other comprehensive income (loss), net of taxes: | | | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | (238) | 1,147 | 701 | (80) | 903 | 909 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 107 | 111 | 118 | 124 | 135 | 218 |
| Changes in defined benefit plans | 3 | (46) | 68 | 2 | 1 | (43) |
| Comprehensive income (loss) | 2,892 | 1,789 | 1,506 | (4,376) | (1,100) | 4,681 |
| Capital draw funded by Treasury | 19 | 146 | 5,992 | 1,479 | — | 165 |
| Senior preferred stock dividends declared | (1,809) | (1,807) | (1,655) | (1,618) | (1,617) | (3,616) |
| Other | 2 | — | 2 | 2 | 2 | 2 |
| Total equity (deficit)/Net worth | $ 1,086 | $ (18) | $ (146) | $ (5,991) | $ (1,478) | $ 1,086 |
| Aggregate draws under the Purchase Agreement (as of period end) [1] | $ 71,336 | $ 71,317 | $ 71,171 | $ 65,179 | $ 63,700 | $ 71,336 |
| Aggregate senior preferred stock dividends paid to Treasury in cash (as of period end) | $ 20,137 | $ 18,328 | $ 16,521 | $ 14,866 | $ 13,248 | $ 20,137 |
| Percentage of dividends paid to Treasury in cash to aggregate draws (as of period end) | 28% | 26% | 23% | 23% | 21% | 28% |

(1)   Does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received.

FHFA, as Conservator, requested a $19 million draw on our behalf from Treasury under the Purchase Agreement to eliminate our quarterly equity deficit at March 31, 2012. At June 30, 2012, our assets exceeded our liabilities under GAAP; therefore there is no need for a draw from Treasury under the Purchase Agreement. In addition, we paid cash dividends to Treasury of $3.6 billion during the six months ended June 30, 2012.

Net unrealized losses on our available-for-sale securities in AOCI decreased by $0.9 billion during the six months ended June 30, 2012. The decrease was primarily due to fair value gains related to: (a) the movement of our single-family non-agency mortgage-related securities with unrealized losses towards maturity; and (b) the impact of declining rates, partially offset by the impact of widening OAS levels on our single-family non-agency mortgage-related securities. Net unrealized losses on our closed cash flow hedge relationships in AOCI decreased by $218 million during the six months ended June 30 2012, primarily attributable to the reclassification of losses into earnings related to our closed cash flow hedges as the originally forecasted transactions affected earnings.

<div align="center">

**RISK MANAGEMENT**

</div>

Our investment and credit guarantee activities expose us to three broad categories of risk: (a) credit risk; (b) interest-rate risk and other market risk; and (c) operational risk. See "RISK FACTORS" in our 2011 Annual Report for additional information regarding these and other risks.

**Credit Risk**

We are subject primarily to two types of credit risk: institutional credit risk and mortgage credit risk. Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will fail to meet its obligations. Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage we own or guarantee. We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment.

***Institutional Credit Risk***

Our exposure to single-family mortgage seller/servicers remained high during the first half of 2012 with respect to their repurchase obligations arising from breaches of representations and warranties made to us for loans they underwrote and sold

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3638

Table of Contents

to us. We rely on our single-family seller/servicers to perform loan workout activities as well as foreclosures on loans that they service for us. Our credit losses could increase to the extent that our seller/servicers do not fully perform these obligations in a timely manner. The financial condition of the mortgage insurance industry remained weak during the first half of 2012, and the substantial majority of our mortgage insurance exposure is concentrated with four counterparties, certain of which are under significant financial stress. In addition, our exposure to derivatives counterparties remains highly concentrated as compared to historical levels. On June 21, 2012, Moody's downgraded the credit ratings of several banks with whom we have had derivative counterparty relationships. The failure of any of our significant counterparties to meet their obligations to us could have a material adverse effect on our results of operations, financial condition, and our ability to conduct future business.

*Non-Agency Mortgage-Related Security Issuers*

Our investments in securities expose us to institutional credit risk to the extent that servicers, issuers, guarantors, or third parties providing credit enhancements become insolvent or do not perform their obligations. Our investments in non-Freddie Mac mortgage-related securities include both agency and non-agency securities. However, agency securities have historically presented minimal institutional credit risk due to the guarantee provided by those institutions, and the U.S. government's support of those institutions.

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non-agency mortgage-related securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. The effectiveness of our efforts is highly uncertain and any potential recoveries may take significant time to realize.

In 2011, FHFA, as Conservator for Freddie Mac and Fannie Mae, filed lawsuits against 18 corporate families of financial institutions and related defendants seeking to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in certain residential non-agency mortgage-related securities issued or sold by these financial institutions or control persons thereof. Many of the Ally entities that are defendants in the Ally lawsuit (with respect to the securities owned by Freddie Mac) filed for bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of New York on May 14, 2012. This creates additional uncertainty as to the likelihood, timing, and nature of potential recoveries from the Ally lawsuit.

See "MD&A — RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Non-Agency Mortgage-Related Security Issuers*" in our 2011 Annual Report and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for information about efforts to mitigate our losses on our investments in non-agency mortgage-related securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for information on credit risk associated with our investments in mortgage-related securities, including higher-risk components and impairment charges we recognized in the three and six months ended June 30, 2012 related to these investments. For information about institutional credit risk associated with our investments in non-mortgage-related securities, see "NOTE 7: INVESTMENTS IN SECURITIES — Table 7.9 — Trading Securities" as well as "Cash and Other Investments Counterparties" below.

*Single-family Mortgage Seller/Servicers*

We acquire a significant portion of our single-family mortgage purchase volume from several large lenders, or seller/servicers. Our top 10 single-family seller/servicers provided approximately 77% of our single-family purchase volume during the first half of 2012. Wells Fargo Bank, N.A., U.S. Bank, N.A., and JPMorgan Chase Bank, N.A. accounted for 28%, 12%, and 10%, respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume during the first half of 2012. In recent periods, certain large seller/servicers curtailed their lending activities, which may impact the concentration of our purchase volume in the remainder of 2012.

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our mortgage seller/servicers, including non-performance of their repurchase obligations arising from breaches of the representations and warranties made to us for loans they underwrote and sold to us or failure to honor their recourse and indemnification obligations to us. We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans, and represent and warrant that those loans have been originated under specified underwriting standards. If we subsequently discover that the representations and warranties were breached (*i.e.*, that contractual standards were not followed), we can exercise certain contractual remedies to mitigate our actual or potential credit losses. These contractual

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

remedies include the ability to require the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan, after consideration of other recoveries, if any. As part of our expansion of HARP, we have agreed not to require lenders to provide us with certain representations and warranties that they would ordinarily be required to commit to in selling loans to us. As a result, we may face greater exposure to credit and other losses on these HARP loans. FHFA recently stated that, under its oversight, we and Fannie Mae are developing new, consistent requirements for the representations and warranties made by lenders with respect to single-family loans sold to us and Fannie Mae. These requirements are designed to give lenders greater certainty in the future that a loan that performs successfully for a period of time will not later be subject to repurchase except for very limited reasons. FHFA stated that it anticipates the new requirements will be issued by September 2012. For more information, see " *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program — Home Affordable Refinance Program and Relief Refinance Mortgage Initiative*."

Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts, in which case the deadline for repurchase is extended until we decide the appeal. In recent periods, some of our seller/servicers have failed to fully perform their repurchase obligations in a timely manner, and to a lesser extent, certain others have failed to perform their obligations due to their weakened financial capacity. The table below provides a summary of our repurchase request activity for the six months ended June 30, 2012 and 2011.

**Table 30 — Repurchase Request Activity**[1]

| | Six Months Ended June 30, | |
|---|---|---|
| | **2012** | **2011** |
| | (in millions) | |
| Beginning balance, December 31, | $ 2,716 | $ 3,807 |
| New requests issued | 4,906 | 5,368 |
| Requests collected[2] | (2,030) | (2,540) |
| Requests cancelled[3] | (2,650) | (3,482) |
| Other[4] | (28) | (34) |
| Ending balance, June 30, | $ 2,914 | $ 3,119 |

(1) Beginning and ending balances represent the UPB of the loans associated with the repurchase requests. New requests issued and requests cancelled represent the UPB of the loans subject to the request, while requests collected represent the amount of cash payment received.

(2) Requests collected include payments received upon fulfillment of the repurchase request, reimbursement of losses for requests associated with foreclosed mortgage loans, negotiated settlements, and other alternative remedies.

(3) Consists primarily of those requests that were resolved by the servicer providing missing documentation or a successful appeal of the request.

(4) Other includes items that affect the UPB of the loan while the repurchase request is outstanding, such as changes in UPB due to payments made on the loan. Also includes requests deemed uncollectible due to the insolvency or other failure of the counterparty.

As shown in the table above, the UPB of loans subject to open repurchase requests increased to approximately $2.9 billion as of June 30, 2012 from $2.7 billion as of December 31, 2011 because the volume of new request issuances exceeded the combined volume of requests collected and cancelled. As measured by UPB, approximately 40% and 39% of the repurchase requests outstanding at June 30, 2012 and December 31, 2011, respectively, were outstanding for four months or more since issuance of the initial request (these figures include repurchase requests for which appeals were pending). As of June 30, 2012, two of our largest seller/servicers had aggregate repurchase requests outstanding, based on UPB, of $1.4 billion, and approximately 57% of these requests were outstanding for four months or more since issuance of the initial request. The amount we expect to collect on the outstanding requests is significantly less than the UPB of the loans subject to the repurchase requests primarily because many of these requests will likely be satisfied by reimbursement of our realized credit losses by seller/servicers, instead of repurchase of loans at their UPB. Some of these requests also may be rescinded in the course of the contractual appeal process. Based on our historical loss experience and the fact that many of these loans are covered by credit enhancements ( *e.g.*, mortgage insurance), we expect the actual credit losses experienced by us should we fail to collect on these repurchase requests will also be less than the UPB of the loans.

Repurchase requests related to mortgage insurance rescission and claim denial tend to be outstanding longer than other repurchase requests. Of the total amount of repurchase requests outstanding at June 30, 2012 and December 31, 2011, approximately $1.2 billion at both dates were issued due to mortgage insurance rescission or mortgage insurance claim denial. Our actual credit losses will be higher should the mortgage insurance coverage not be reinstated or we fail to collect on these repurchase requests.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3640

Table of Contents

During 2010 and 2009, we entered into agreements with certain of our seller/servicers to release specified loans from certain repurchase obligations in exchange for one-time cash payments. As of June 30, 2012, loans totaling $143.4 billion in UPB, representing 8.5% of our single-family credit guarantee portfolio, were subject to such negotiated agreements. In a memorandum to the FHFA Office of Inspector General dated September 19, 2011, FHFA stated that it had "suspended certain future repurchase agreements with seller/servicers concerning their repurchase obligations pending the outcome" of a review by Freddie Mac of its loan sampling methodology. Since the issuance of this memorandum, FHFA conducted their review of our evaluation process and provided us with guidelines for future repurchase-related agreements, under which larger agreements will generally need to be reviewed and approved by FHFA. We did not enter into any agreements with seller/servicers concerning release of their repurchase obligations during 2011 or the first half of 2012 (in the ordinary course of business, however, we sometimes rescind certain repurchase requests through the contractual appeals process).

During the first half of 2012, we revised our loan sampling methodology. Our new methodology expands the coverage of our loan reviews as compared to our prior sampling methodology and may result in higher levels of repurchase requests. We expect that changes in our loan sampling methodology will additionally increase our repurchase request volumes with our seller/servicers.

We meet with our larger seller/servicers with deficiencies identified during our performing loan sampling to help ensure they make appropriate changes to their underwriting processes. In addition, for all of our largest seller/servicers, we actively manage the current quality of loan originations by providing monthly written and oral communications regarding loan defect rates and the drivers of those defects as identified in our performing loan quality control sampling reviews. If necessary, we work with seller/servicers to develop an appropriate plan of corrective action. Our contracts with some seller/servicers give us the right to levy certain compensatory fees when mortgage loans delivered to us fail to meet our aggregate loan quality metrics.

Our estimate of recoveries from seller/servicer repurchase obligations is considered in our allowance for loan losses; however, our actual recoveries may be different than our estimates. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2011 Annual Report for further information. We believe we have appropriately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at June 30, 2012 and December 31, 2011; however, our actual losses may exceed our estimates.

A significant portion of our single-family mortgage loans is serviced by several large seller/servicers. Our top three single-family loan servicers, Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A., serviced approximately 26%, 12%, and 11%, respectively, of our single-family mortgage loans as of June 30, 2012, and together serviced approximately 49% of our single-family mortgage loans. Because we do not own our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, our business and financial results could be adversely affected. We also continue to be adversely affected by the length of the foreclosure timeline, particularly in states that require a judicial foreclosure process. See "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" in our 2011 Annual Report and "LEGISLATIVE AND REGULATORY MATTERS — Developments Concerning Single-Family Servicing Practices."

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loss mitigation efforts, including under the servicing alignment initiative and the MHA Program, and therefore, we also have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans. We significantly revised our monitoring program for servicer performance during 2011. In March 2012, we announced changes to our monitoring program in order to provide for the assessment of certain fees to compensate us for deficiencies in servicer performance. Certain of these fees went into effect on June 1, 2012, and the remaining fees are scheduled to go into effect on September 1, 2012.

Residential Capital LLC ("ResCap") and a number of its subsidiaries, including GMAC Mortgage, LLC and Residential Funding Company, LLC (with GMAC Mortgage, LLC, collectively, "GMAC"), filed for bankruptcy in the U.S. Bankruptcy Court for the Southern District of New York on May 14, 2012. ResCap and GMAC are direct or indirect subsidiaries of Ally Financial Inc. GMAC serviced (either as a servicer or a subservicer) approximately 3% of our single-family mortgage loans as of June 30, 2012. In March 2010, we entered into an agreement with GMAC, under which GMAC made a one-time

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3641

Table of Contents

payment to us for the partial release of repurchase obligations relating to loans sold to us prior to January 1, 2009. We continued to purchase loans from GMAC after January 1, 2009; Ally Bank (a subsidiary of Ally Financial Inc.) is liable for breaches of representations and warranties with respect to these loans. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information about the GMAC bankruptcy. For more information on the March 2010 agreement with GMAC, see "MD&A — RISK MANAGEMENT — Institutional Credit Risk — Single-family Mortgage Seller/Servicers" in our 2011 Annual Report.

*Multifamily Mortgage Seller/Servicers*

A significant portion of our multifamily mortgage loans is serviced by several large multifamily servicers. We are exposed to certain institutional credit risks arising from the potential non-performance by our multifamily mortgage servicers and our multifamily sellers, or customers. As of June 30, 2012, our top three multifamily servicers, Berkadia Commercial Mortgage LLC, Wells Fargo Bank, N.A., and CBRE Capital Markets, Inc., each serviced more than 10% of our multifamily mortgage portfolio, and together serviced approximately 41% of our multifamily mortgage portfolio. We acquire a significant portion of our multifamily purchase volume from several large sellers. For the six months ended June 30, 2012, our top three multifamily sellers, CBRE Capital Markets, Inc., subsidiaries of Merrill Lynch & Co, Inc. (a wholly-owned subsidiary of Bank of America N.A.), and Wells Fargo Bank, N.A., accounted for 21%, 11%, and 10%, respectively, of our multifamily purchase volume. Our top 10 multifamily sellers represented an aggregate of approximately 83% of our multifamily purchase volume for the six months ended June 30, 2012.

*Mortgage Insurers*

We have institutional credit risk relating to the potential insolvency of, or non-performance by, mortgage insurers that insure single-family mortgages we purchase or guarantee. As a guarantor, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligations to reimburse us for claims. If any of our mortgage insurers that provide credit enhancement fail to fulfill their obligation, we could experience increased credit losses.

As part of the estimate of our loan loss reserves, we evaluate the recovery and collectability related to mortgage insurance policies for mortgage loans that we hold on our consolidated balance sheets as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities or covered by other guarantee commitments. We also evaluate the collectability of outstanding receivables from these counterparties related to outstanding and unpaid claims. We believe that many of our mortgage insurers are not sufficiently capitalized to withstand the stress of the current weak economic environment. Additionally, a number of our mortgage insurers have exceeded risk to capital ratios required by their state insurance regulators. In some cases, such states have issued waivers to allow the companies to continue writing new business in their states. Most waivers are temporary in duration or contain other conditions that the companies may be unable to continue to meet due to their weakened condition or other factors. Given the difficulties in the mortgage insurance industry, we believe it is likely that other mortgage insurers may exceed their regulatory capital limit in the future. As a result of these and other factors, we reduced our estimates of recovery associated with the expected amount of our claims for several insurers in determining our allowance for loan losses associated with our single-family loans or receivables from these mortgage insurers on our consolidated balance sheets at June 30, 2012 and December 31, 2011.

The table below summarizes our exposure to mortgage insurers as of June 30, 2012. In the event that a mortgage insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses resulting from such failure. Our most significant exposure to these insurers is through primary mortgage insurance, and, as of June 30, 2012, we had primary mortgage insurance coverage on loans that represent approximately 11% of the UPB of our single-family credit guarantee portfolio.

<div align="center">54</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Table 31 — Mortgage Insurance by Counterparty

| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | Primary Insurance[2] | Pool Insurance[2] | Coverage Outstanding[3] |
|---|---|---|---|---|---|
| | | | (in billions) | | |
| Mortgage Guaranty Insurance Corporation (MGIC) | B | Negative | $ 44.8 | $ 21.8 | $ 11.8 |
| Radian Guaranty Inc. | B | Negative | 35.7 | 6.3 | 9.9 |
| Genworth Mortgage Insurance Corporation | B | Negative | 27.7 | 0.8 | 7.0 |
| United Guaranty Residential Insurance Co. | BBB | Stable | 29.1 | 0.2 | 7.2 |
| PMI Mortgage Insurance Co. (PMI)[4] | CCC– | Negative | 20.2 | 0.7 | 5.1 |
| Republic Mortgage Insurance Company (RMIC)[5] | Not Rated | N/A | 17.1 | 1.5 | 4.3 |
| Triad Guaranty Insurance Corp (Triad)[6] | Not Rated | N/A | 7.3 | 0.4 | 1.8 |
| CMG Mortgage Insurance Co. | BBB | Negative | 3.0 | 0.1 | 0.7 |
| Essent Guaranty, Inc. | Not Rated | N/A | 1.8 | — | 0.4 |
| Total | | | $ 186.7 | $ 31.8 | $ 48.2 |

(1) Represents the rating and exposure for the corporate entity to which we have the greatest exposure. Coverage amounts may include coverage provided by consolidated affiliates and subsidiaries of the counterparty. Latest rating available as of July 25, 2012. Represents the lower of S&P and Moody's credit ratings and outlooks stated in terms of the S&P equivalent.

(2) Represents the amount of UPB at the end of the period for our single-family credit guarantee portfolio covered by the respective insurance type. These amounts are based on our gross coverage without regard to netting of coverage that may exist to the extent an affected mortgage is covered under both types of insurance. See "Table 4.5 — Recourse and Other Forms of Credit Protection" in "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further information.

(3) Represents the remaining aggregate contractual limit for reimbursement of losses under policies of both primary and pool insurance. These amounts are based on our gross coverage without regard to netting of coverage that may exist to the extent an affected mortgage is covered under both types of insurance.

(4) In October 2011, PMI began paying valid claims 50% in cash and 50% in deferred payment obligations under order of its state regulator.

(5) In January 2012, RMIC began paying valid claims 50% in cash and 50% in deferred payment obligations under order of its state regulator.

(6) In June 2009, Triad began paying valid claims 60% in cash and 40% in deferred payment obligations under order of its state regulator.

We received proceeds of $1.0 billion and $1.3 billion during the six months ended June 30, 2012 and 2011, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers, net of associated reserves, of $0.8 billion and $1.0 billion as of June 30, 2012 and December 31, 2011, respectively.

The UPB of single-family loans covered by pool insurance declined approximately 20% during the six months ended June 30, 2012, primarily due to prepayments and other liquidation events. We did not purchase pool insurance on single-family loans during the six months ended June 30, 2012. In recent periods, we also reached the maximum limit of recovery on certain pool insurance policies.

In July 2012, MGIC requested a waiver from us to use a new subsidiary to write new insurance business in seven additional states. We have temporarily agreed to this request subject to certain conditions.

We and MGIC are involved in litigation concerning our current and future claims under certain of MGIC's pool insurance policies. We believe that our pool insurance policies with MGIC provide us with the right to obtain recoveries for losses up to the aggregate limit indicated in the table above. However, MGIC's interpretation of these policies would result in claims coverage approximately $0.5 billion lower than the amount of coverage outstanding set forth in the table above. For more information, see "NOTE 17: LEGAL CONTINGENCIES — Mortgage Guaranty Insurance Corporation."

In August 2011, we suspended PMI and its affiliates and RMIC and its affiliates as approved mortgage insurers, due to adverse developments concerning the companies. As a result, loans insured by either company (except relief refinance loans with pre-existing insurance) are ineligible for sale to Freddie Mac. Both PMI and RMIC have instituted partial claim payment plans, under which claim payments will be made 50% in cash, with the remaining amount deferred. We and FHFA are in discussions with the state regulators of PMI and RMIC concerning future payments of our claims. It is not yet clear how the state regulators of PMI and RMIC will administer their respective deferred payment plans, and neither company has begun paying its deferred payment obligations. In addition, to date, the state regulator has not allowed Triad to begin paying its deferred payment obligations, and it is uncertain when or if Triad will be permitted to do so. If Triad, PMI, and RMIC do not pay their deferred payment obligations, we would lose a significant portion of the coverage from these counterparties shown in the table above.

In addition to Triad, RMIC, and PMI, we believe that certain other of our mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as those claims emerge. In the future, we believe our mortgage insurance exposure will likely be concentrated among a smaller number of counterparties.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3643

Table of Contents

*Bond Insurers*

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering certain of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. Bond insurance exposes us to the risk that the bond insurer will be unable to satisfy claims.

The table below presents our coverage amounts of bond insurance, including secondary coverage, for the non-agency mortgage-related securities we hold. In the event a bond insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses related to such a failure.

**Table 32 — Bond Insurance by Counterparty**

| | | | As of June 30, 2012 | |
| --- | --- | --- | --- | --- |
| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | Coverage Outstanding[2] | Percent of Total[2] |
| | | | (dollars in billions) | |
| Ambac Assurance Corporation (Ambac)[3] | Not Rated | N/A | $    4.2 | 45% |
| Financial Guaranty Insurance Company (FGIC)[3] | Not Rated | N/A | 1.7 | 18 |
| MBIA Insurance Corp. | B– | Negative | 1.2 | 13 |
| Assured Guaranty Municipal Corp. | AA– | Stable | 1.0 | 11 |
| National Public Finance Guarantee Corp. | BBB | Negative | 1.1 | 12 |
| Syncora Guarantee Inc.[3] | CC | Developing | 0.1 | 1 |
| Radian Guaranty Inc. (Radian) | B | Negative | <0.1 | <1 |
| Total | | | $    9.3 | 100% |

(1) Represents the rating and exposure for the corporate entity to which we have the greatest exposure, which in some cases is a holding company. Coverage amounts may include coverage provided by consolidated affiliates and subsidiaries of the counterparty. Latest ratings available as of July 25, 2012. Represents the lower of S&P and Moody's credit ratings stated in terms of the S&P equivalent.

(2) Represents the remaining contractual limit for reimbursement of losses, including lost interest and other expenses, on non-agency mortgage-related securities.

(3) Ambac, FGIC, and Syncora Guarantee Inc. are currently operating under regulatory supervision.

We monitor the financial strength of our bond insurers in accordance with our risk management policies. Some of our larger bond insurers are in runoff mode where no new business is being written. We expect to receive substantially less than full payment of our claims from several of our bond insurers, including Ambac and FGIC, due to adverse developments concerning these companies. On June 28, 2012, a rehabilitation order was signed granting the Superintendent of Financial Services of the State of New York the authority to take possession and/or control of FGIC's property and assets and to conduct FGIC's business. Ambac and FGIC are currently not paying any of their claims. We believe that we will likely receive substantially less than full payment of our claims from some of our other bond insurers, because we believe they also lack sufficient ability to fully meet all of their expected lifetime claims-paying obligations to us as such claims emerge. In the event one or more of our other bond insurers were to become subject to a regulatory order or insolvency proceeding, our ability to recover certain unrealized losses on our mortgage-related securities would be negatively affected. We considered our expectations regarding our bond insurers' ability to meet their obligations in making our impairment determinations at June 30, 2012 and December 31, 2011. See "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-For-Sale Securities" for additional information regarding impairment losses on securities covered by bond insurers.

*Cash and Other Investments Counterparties*

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily major financial institutions and the Federal Reserve Bank. As of June 30, 2012 and December 31, 2011, including amounts related to our consolidated VIEs, there were $68.3 billion and $68.5 billion, respectively, of cash and securities purchased under agreements to resell invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information on counterparty credit ratings and concentrations within our cash and other investments.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3644

Table of Contents

*Derivative Counterparties*

We use exchange-traded derivatives and OTC derivatives and are exposed to institutional credit risk with respect to both types of derivatives. We are an active user of exchange-traded derivatives, such as Treasury and Eurodollar futures, and are required to post initial and maintenance margin with our clearing firm in connection with such transactions. The posting of this margin exposes us to institutional credit risk in the event that our clearing firm or the exchange's clearinghouse fail to meet their obligations. However, the use of exchange-traded derivatives lessens our institutional credit risk exposure to individual counterparties because a central counterparty is substituted for individual counterparties, and changes in the value of open exchange-traded contracts are settled daily via payments made through the financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk to individual counterparties because transactions are executed and settled directly between us and each counterparty, exposing us to potential losses if a counterparty fails to meet its contractual obligations. When our net position with a counterparty in OTC derivatives subject to a master netting agreement has a market value above zero ( *i.e.*, it would be an asset reported as derivative assets, net on our consolidated balance sheets), the counterparty is obligated to deliver collateral in the form of cash, securities, or a combination of both, in an amount equal to that market value (less a small unsecured "threshold" amount in most cases) as necessary to satisfy its net obligation to us under the master agreement.

All of our OTC derivative counterparties are major financial institutions and are experienced participants in the OTC derivatives market. On June 21, 2012, Moody's downgraded the credit ratings of several banks, which resulted in a change in the collateral posting threshold for two counterparties and a reduction of certain activities with others. A large number of our OTC derivative counterparties had credit ratings of A+, A, or A- as of July 25, 2012. We generally require counterparties with such credit ratings to post collateral if our net exposure to them on derivative contracts exceeds $1 million. One OTC derivative counterparty had a credit rating of BBB+ for which we require full collateralization. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information.

The relative concentration of our derivative exposure among our primary derivative counterparties remains high. This concentration has increased significantly since 2008 primarily due to industry consolidation and the failure or weakening of certain counterparties, and could further increase. In addition, on June 21, 2012, the Office of the Comptroller of the Currency published an interim final rule regarding limits on "loans and extensions of credit," which are defined to include credit exposures arising from derivative transactions. This rule might limit the ability of certain counterparties to engage in derivative transactions with us.

The table below summarizes our exposure to our derivative counterparties, which represents the net positive fair value of derivative contracts, related accrued interest and collateral held by us from our counterparties, after netting by counterparty as applicable ( *i.e.*, net amounts due to us under derivative contracts which are recorded as derivative assets). In addition, we have derivative liabilities where we post collateral to counterparties. Pursuant to certain collateral agreements we have with derivative counterparties, the amount of collateral that we are required to post is based on the credit rating of our long-term senior unsecured debt securities from S&P or Moody's. The lowering or withdrawal of our credit rating by S&P or Moody's may increase our obligation to post collateral, depending on the amount of the counterparty's exposure to Freddie Mac with respect to the derivative transactions. At June 30, 2012, our collateral posted exceeded our collateral held. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Derivative Assets and Liabilities, Net" and "Table 25 — Derivative Fair Values and Maturities" for a reconciliation of fair value to the amounts presented on our consolidated balance sheets as of June 30, 2012, which includes both cash collateral held and posted by us, net.

<div align="center">57</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                                                          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 33 — Derivative Counterparty Credit Exposure**

| Rating[1] | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
|---|---|---|---|---|---|---|
| | | | As of June 30, 2012 | | | |
| | | | (dollars in millions) | | | |
| AA– | 4 | $ 26,844 | $ — | $ — | 5.0 | $10 million or less |
| A+ | 4 | 110,473 | 1,487 | 4 | 6.1 | $1 million or less |
| A | 6 | 342,394 | 808 | 40 | 6.0 | $1 million or less |
| A– | 4 | 160,402 | 84 | 56 | 5.9 | $1 million or less |
| BBB+ | 1 | 42,893 | — | — | 6.1 | $ — |
| Subtotal[7] | 19 | 683,006 | 2,379 | 100 | 6.0 | |
| Futures and clearinghouse-settled derivatives | | 41,488 | 20 | 20 | | |
| Commitments | | 13,032 | 47 | 47 | | |
| Swap guarantee derivatives | | 3,622 | — | — | | |
| Other derivatives[8] | | 14,764 | 1 | 1 | | |
| Total derivatives | | $ 755,912 | $ 2,447 | $ 168 | | |

| Rating[1] | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
|---|---|---|---|---|---|---|
| | | | As of December 31, 2011 | | | |
| | | | (dollars in millions) | | | |
| AA– | 5 | $ 73,277 | $ 536 | $ 19 | 5.0 | $10 million or less |
| A+ | 6 | 337,013 | 2,538 | 1 | 5.8 | $1 million or less |
| A | 5 | 208,416 | 12 | 51 | 6.2 | $1 million or less |
| A– | 2 | 89,284 | — | — | 5.5 | $1 million or less |
| Subtotal[7] | 18 | 707,990 | 3,086 | 71 | 5.8 | |
| Futures and clearinghouse-settled derivatives | | 43,831 | 8 | 8 | | |
| Commitments | | 14,318 | 38 | 38 | | |
| Swap guarantee derivatives | | 3,621 | — | — | | |
| Other derivatives[8] | | 18,489 | 1 | 1 | | |
| Total derivatives | | $ 788,249 | $ 3,133 | $ 118 | | |

(1)   We use the lower of S&P's and Moody's ratings to manage collateral requirements. In this table, the Moody's rating of the legal entity is stated in terms of the S&P equivalent.

(2)   Based on legal entities.

(3)   Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged.

(4)   For each counterparty, this amount includes derivatives with a positive fair value (recorded as derivative assets, net), including the related accrued interest receivable/payable, when applicable. For counterparties included in the subtotal, positions are shown netted at the counterparty level including accrued interest receivable/payable and trade/settle fees.

(5)   Calculated as Total Exposure at Fair Value less cash collateral held as determined at the counterparty level. Includes amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level. For derivatives settled through an exchange or clearinghouse, excludes consideration of maintenance margin posted by our counterparty.

(6)   Counterparties are required to post collateral when their exposure exceeds agreed-upon collateral posting thresholds. These thresholds are typically based on the counterparty's credit rating and are individually negotiated.

(7)   Consists of OTC derivative agreements for interest-rate swaps, option-based derivatives (excluding certain written options), foreign-currency swaps, and purchased interest-rate caps.

(8)   Consists primarily of certain written options, and certain credit derivatives. Written options do not present counterparty credit exposure, because we receive a one-time up-front premium in exchange for giving the holder the right to execute a contract under specified terms, which generally puts us in a liability position.

Over time, our exposure to individual counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps varies depending on changes in fair values, which are affected by changes in period-end interest rates, the implied volatility of interest rates, foreign-currency exchange rates, and the amount of derivatives held. If all of our counterparties for these derivatives had defaulted simultaneously on June 30, 2012, the combined amount of our uncollateralized and overcollateralized exposure to these counterparties, or our maximum loss for accounting purposes after applying netting agreements and collateral, would have been approximately $100 million. Our similar exposure as of December 31, 2011 was $71 million. Two counterparties each accounted for greater than 10% and collectively accounted for 86% of our net uncollateralized exposure to derivative counterparties, excluding futures and clearinghouse-settled derivatives, commitments, swap guarantee derivatives, and other derivatives at June 30, 2012. These counterparties were Royal Bank of Scotland and UBS AG., both of which were rated "A–" or above using the lower of S&P's or Moody's rating stated in terms of the S&P equivalent as of July 25, 2012.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3646

Table of Contents

Approximately 98% of our counterparty credit exposure for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps was collateralized at June 30, 2012 (excluding amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level). The remaining exposure was primarily due to exposure amounts below the applicable counterparty collateral posting threshold, as well as market movements during the time period between when a derivative was marked to fair value and the date we received the related collateral. In some instances, these market movements result in us having provided collateral that has fair value in excess of our obligation, which represents our overcollateralization exposure. Collateral is typically transferred within one business day based on the values of the related derivatives.

In the event a derivative counterparty defaults, our economic loss may be higher than the uncollateralized exposure of our derivatives if we are not able to replace the defaulted derivatives in a timely and cost-effective fashion. We could also incur economic loss if the collateral held by us cannot be liquidated at prices that are sufficient to recover the amount of such exposure. We monitor the risk that our uncollateralized exposure to each of our OTC counterparties for interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps will increase under certain adverse market conditions by performing daily market stress tests. These tests, which involve significant management judgment, evaluate the potential additional uncollateralized exposure we would have to each of these derivative counterparties on OTC derivatives contracts assuming certain changes in the level and implied volatility of interest rates and certain changes in foreign currency exchange rates over a brief time period. Our actual exposure could vary significantly from amounts forecasted by these tests.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives for accounting purposes, was $47 million and $38 million at June 30, 2012 and December 31, 2011, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis in an effort to ensure that they continue to meet our internal risk-management standards.

*Selected European Sovereign and Non-Sovereign Exposures*

The sovereign debt of Spain, Italy, Ireland, Portugal, and Greece (which we refer to herein as the "troubled European countries") and the credit status of financial institutions with significant exposure to the troubled European countries has been adversely affected due to weaknesses in the economic and fiscal situations of those countries. In recent periods, Moody's and S&P downgraded a number of European countries. We are monitoring our exposures to European countries and institutions.

As of June 30, 2012, we did not hold any debt issued by the governments of the troubled European countries and did not hold any financial instruments entered into with sovereign governments in those countries. As of that date, we also did not hold any debt issued by corporations or financial institutions domiciled in the troubled European countries and did not hold any other financial instruments entered into with corporations or financial institutions domiciled in those countries. For purposes of this discussion, we consider an entity to be domiciled in a country if its parent entity is headquartered in that country.

Our derivative portfolio and cash and other investments portfolio counterparties include a number of major European and non-European financial institutions. Many of these institutions operate in Europe, and we believe that all of these financial institutions have direct or indirect exposure to the troubled European countries. For many of these institutions, their direct and indirect exposures to the troubled European countries change on a daily basis. We monitor our major counterparties' exposures to the troubled European countries, and adjust our exposures and risk limits to individual counterparties accordingly. Our exposures to derivative portfolio and cash and other investments portfolio counterparties are described in "Derivative Counterparties," "Cash and Other Investments Counterparties" and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

We have taken a number of actions since mid-2011 designed to reduce our exposures to certain derivative portfolio and cash and other investments portfolio counterparties due to their exposure to the troubled European countries, including substantially reducing our derivative exposure limits, our limits on the amount of unsecured overnight deposits, and our limits for asset-backed commercial paper. For certain repurchase counterparties, we reduced the credit limit and restricted the term of such transactions to overnight. We also ceased investing in prime money funds that could hold substantial amounts of non-U.S. sovereign debt.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

It is possible that continued adverse developments in Europe could significantly affect our counterparties that have direct or indirect exposure to the troubled European countries. In turn, this could adversely affect their ability to meet their obligations to us. For more information, see "RISK FACTORS — Competitive and Market Risks — *We depend on our institutional counterparties to provide services that are critical to our business, and our results of operations or financial condition may be adversely affected if one or more of our institutional counterparties do not meet their obligations to us*" in our 2011 Annual Report.

### Mortgage Credit Risk

We are exposed to mortgage credit risk principally in our single-family credit guarantee and multifamily mortgage portfolios because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment. All mortgages that we purchase or guarantee have an inherent risk of default. We are also exposed to mortgage credit risk related to our investments in non-Freddie Mac mortgage-related securities. For information about our holdings of these securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities.*"

#### Single-Family Mortgage Credit Risk

Single-family mortgage credit risk is primarily influenced by the credit profile of the borrower of the mortgage loan  (*e.g.*, credit score, credit history, and monthly income relative to debt payments), documentation level, the number of borrowers, the features of the mortgage itself, the purpose of the mortgage, occupancy type, property type, the LTV ratio, and local and regional economic conditions, including home prices and unemployment rates. Through our delegated underwriting process, single-family mortgage loans and the borrowers' ability to repay the loans are evaluated using a number of critical risk characteristics, including, but not limited to, the borrower's credit score and credit history, the borrower's monthly income relative to debt payments, the original LTV ratio, the type of mortgage product, and the occupancy type of the loan.

As part of our quality control process, we review the underwriting documentation for a sample of loans we have purchased for compliance with our contractual standards. We recently completed our review of a sample of single-family loans we purchased or guaranteed during 2011. We have worked actively with our seller/servicers to improve loan manufacturing quality. As a result, we have observed improving quality control results for loans funded during 2011. The average aggregate deficiency rate across all seller/servicers for loans funded during 2011 and 2010 was approximately 6% and 13%, respectively. The most common underwriting deficiencies found in the review of loans funded during 2011 were related to insufficient income and inadequate or missing documentation to support borrower qualification. The next most common deficiency was inaccurate data entered into Loan Prospector, our automated underwriting system. We give our seller/servicers an opportunity to appeal ineligible loan determinations in response to our request for the repurchase of the loan. Starting in late 2011, we began to require certain of our larger seller/servicers to maintain ineligible loan rates below a certain stated threshold (generally 5%), with financial consequences for non-compliance, as part of the renewals of our contracts with them. We expect these changes in seller/servicer contracts to positively impact ineligible loan rates in the future.

For loans with identified underwriting deficiencies, we may require immediate repurchase or allow performing loans to remain in our portfolio subject to our continued right to issue a repurchase request to the seller/servicers at a later date. Our right to request repurchase by seller/servicers is intended to protect us against deficiencies in underwriting by our seller/servicers. While this protection is intended to reduce our mortgage credit risk, it increases our institutional credit risk exposure to seller/servicers. See "*Institutional Credit Risk — Single-Family Mortgage Seller/Servicers*" for further information on recent and expected changes in our loan reviews for quality control as well as repurchase request activity.

Conditions in the mortgage market improved in certain geographical areas, but continued to remain challenging during the first half of 2012. Most single-family mortgage loans, especially those originated from 2005 through 2008, have been affected by the compounding pressures on household wealth caused by significant declines in home values that began in 2006 and the ongoing weak employment environment. As of June 30, 2012 and December 31, 2011, the serious delinquency rate for loans originated in 2005 through 2008 in our single-family credit guarantee portfolio was 9.21% and 8.75%, respectively, whereas the serious delinquency rate for loans originated after 2008 was 0.35% and 0.30%, respectively. Our serious delinquency rates remained high in the first half of 2012 compared to the rates we experienced in years prior to 2009, as discussed in "Credit Performance — Delinquencies." The UPB of our single-family non-performing loans also remained at high levels during the first half of 2012.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

*Characteristics of the Single-Family Credit Guarantee Portfolio*

The average UPB of loans in our single-family credit guarantee portfolio was approximately $151,000 at both June 30, 2012 and December 31, 2011. We purchased or guaranteed approximately 433,000 and 301,000 single-family loans totaling $88.7 billion and $62.9 billion of UPB during the second quarters of 2012 and 2011, respectively, and 924,000 and 762,000 single-family loans totaling $193.7 billion and $160.5 billion during the first half of 2012 and 2011, respectively. Our single-family credit guarantee portfolio predominately consists of first-lien, fixed-rate mortgage loans secured by the borrower's primary residence. Our guarantees related to second-lien mortgage loans in the single-family credit guarantee portfolio are insignificant. Approximately 95% of the single-family mortgages we purchased in both the three and six months ended June 30, 2012 were fixed-rate amortizing mortgages, based on UPB.

The credit quality of the single-family loans we acquired beginning in 2009 (excluding relief refinance mortgages) is significantly better than that of loans we acquired from 2005 through 2008, as measured by original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income. HARP loans represented 8% of the UPB of our single-family credit guarantee portfolio as of June 30, 2012. Mortgages originated after 2008, including HARP loans, represented 57% of the UPB of our single-family credit guarantee portfolio as of June 30, 2012, and the composition of that portfolio continues to grow.

The percentage of home purchase loans in our loan acquisition volume continued to remain at low levels and refinance activity remained high during the first half of 2012. Approximately 81% and 84% of the single-family mortgages we purchased in the three and six months ended June 30, 2012, respectively, were refinance mortgages, and approximately 32% and 25%, respectively, of these refinance mortgages were HARP loans, based on UPB.

The table below provides additional characteristics of single-family mortgage loans purchased during the three and six months ended June 30, 2012 and 2011, and of our single-family credit guarantee portfolio at June 30, 2012 and December 31, 2011.

<div align="center">61</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3649

Table of Contents

## Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio [1]

| | Purchases During the Three Months Ended June 30, | | Purchases During the Six Months Ended June 30, | | Portfolio Balance at [2] | |
|---|---|---|---|---|---|---|
| | 2012 | 2001 | 2012 | 2011 | June 30, 2012 | December 31, 2011 |
| **Original LTV Ratio Range** [3][4] | | | | | | |
| 60% and below | 30% | 29% | 31% | 31% | 23% | 23% |
| Above 60% to 70% | 17 | 16 | 18 | 17 | 15 | 16 |
| Above 70% to 80% | 42 | 46 | 41 | 44 | 41 | 42 |
| Above 80% to 90% | 6 | 5 | 5 | 5 | 10 | 9 |
| Above 90% to 100% | 5 | 4 | 5 | 3 | 8 | 8 |
| Above 100% | <1 | <1 | <1 | <1 | 3 | 2 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average original LTV ratio | 68% | 68% | 67% | 67% | 72% | 72% |
| **Estimated Current LTV Ratio Range** [5] | | | | | | |
| 60 % and below | | | | | 26% | 25% |
| Above 60% to 70% | | | | | 13 | 12 |
| Above 70% to 80% | | | | | 19 | 18 |
| Above 80% to 90% | | | | | 15 | 15 |
| Above 90% to 100% | | | | | 9 | 10 |
| Above 100% to 110% | | | | | 6 | 6 |
| Above 110% to 120% | | | | | 4 | 4 |
| Above 120% | | | | | 8 | 10 |
| Total | | | | | 100% | 100% |
| Weighted average estimated current LTV ratio: | | | | | | |
| Relief refinance mortgages [6] | | | | | 82% | 79% |
| All other mortgages | | | | | 78% | 80% |
| Total mortgages | | | | | 78% | 80% |
| **Credit Score** [3][7] | | | | | | |
| 740 and above | 77% | 71% | 77% | 73% | 55% | 55% |
| 700 to 739 | 16 | 19 | 16 | 18 | 21 | 21 |
| 660 to 699 | 6 | 8 | 6 | 7 | 14 | 14 |
| 620 to 659 | 1 | 2 | 1 | 2 | 7 | 7 |
| Less than 620 | <1 | <1 | <1 | <1 | 3 | 3 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average credit score: | | | | | | |
| Relief refinance mortgages [6] | 740 | 738 | 741 | 742 | 742 | 744 |
| All other mortgages | 762 | 755 | 763 | 757 | 735 | 734 |
| Total mortgages | 754 | 751 | 756 | 753 | 736 | 735 |
| **Loan Purpose** | | | | | | |
| Purchase | 19% | 30% | 16% | 21% | 28% | 30% |
| Cash-out refinance | 13 | 19 | 15 | 19 | 26 | 27 |
| Other refinance [8] | 68 | 51 | 69 | 60 | 46 | 43 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Property Type** | | | | | | |
| Detached/townhome [9] | 93% | 93% | 94% | 94% | 92% | 92% |
| Condo/Co-op | 7 | 7 | 6 | 6 | 8 | 8 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Occupancy Type** | | | | | | |
| Primary residence | 91% | 89% | 91% | 91% | 91% | 91% |
| Second/vacation home | 4 | 5 | 4 | 4 | 5 | 5 |
| Investment | 5 | 6 | 5 | 5 | 4 | 4 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

(1) Purchases and ending balances are based on the UPB of the single-family credit guarantee portfolio. Other Guarantee Transactions with ending balances of $1 billion and $2 billion at June 30, 2012 and December 31, 2011, respectively, are excluded from portfolio balance data since these securities are backed by non-Freddie Mac issued securities for which the loan characteristics data was not available.

(2) Includes loans acquired under our relief refinance initiative, which began in 2009.

(3) Purchases columns exclude mortgage loans acquired under our relief refinance initiative, unless otherwise noted. See "Table 37 — Single-Family Relief Refinance Loans" for further information on the LTV ratios of 60 % loans.

(4) Original LTV ratios are calculated as the amount of the mortgage we guarantee including the credit-enhanced portion, divided by the lesser of the appraised value of the property at the time of mortgage origination or the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation because we generally do not receive data about them. The existence of a second lien mortgage reduces the borrower's equity in the home and, therefore, can increase the risk of default.

(5) Current LTV ratios are management estimates, which are updated on a monthly basis. Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination. Estimated current LTV ratio range is not applicable to purchase activity, and excludes any secondary financing by third parties.

(6) Relief refinance mortgages of all LTV ratios comprised approximately 14% and 11% of our single-family credit guarantee portfolio by UPB as of June 30, 2012 and December 31, 2011, respectively.

(7) Credit score data is based on FICO scores. Although we obtain updated credit information on certain borrowers after the origination of a mortgage, such as those borrowers seeking a modification, the scores presented in this table represent the credit score of the borrower at the time of loan origination and may not be indicative of borrowers' creditworthiness at June 30, 2012. Excludes less than 1% of loans in the portfolio because the FICO scores at origination were not available at June 30, 2012.

(8) Other refinance transactions include: (a) refinance mortgages with "no cash out" to the borrower; and (b) refinance mortgages for which the delivery data provided was not sufficient for us to determine whether the mortgage was a cash-out or a no cash-out refinance transaction.

(9) Includes manufactured housing and homes within planned unit development communities. The UPB of manufactured housing mortgage loans purchased during the six months ended June 30, 2012 and 2011, was $288 million and $206 million, respectively.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                                 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3650

Table of Contents

As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or sell the property for an amount at or above the balance of the outstanding mortgage loan. Based on our historical experience, there is an increase in borrower default risk as LTV ratios increase, particularly for loans with LTV ratios above 80%. The proportion of loans we purchased with original LTV ratios over 100% increased from approximately 5% of our single-family mortgage purchases (including relief refinance loans) in the first half of 2011 to 11% of our single-family mortgage purchases in the first half of 2012 due, in large part, to the changes in HARP announced in the fourth quarter of 2011, which allow borrowers with higher LTV ratios to refinance. Strong gains in home prices in most areas of the U.S. during the first half of 2012 led to improved current LTV ratios of the loans in our portfolio as of June 30, 2012. The UPB of mortgages in our single-family credit guarantee portfolio with estimated current LTV ratios greater than 100% was 18% and 20% at June 30, 2012 and December 31, 2011, respectively, and the serious delinquency rate for these loans was 12.9% and 12.8%, respectively. Due to declines in home prices since 2006, we estimate that as of June 30, 2012 and December 31, 2011, approximately 48% and 49%, respectively, of the loans originated in 2005 through 2008 that remained in our single-family credit guarantee portfolio as of those dates had current LTV ratios greater than 100%. In recent years, loans with current LTV ratios greater than 100% have contributed disproportionately to our credit losses.

A second lien mortgage reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of both June 30, 2012 and December 31, 2011, approximately 15% of the loans in our single-family credit guarantee portfolio had second lien financing by third parties at the time of origination of the first mortgage, and we estimate that these loans comprised 17% of our seriously delinquent loans at both dates, based on UPB. However, borrowers are free to obtain second lien financing after origination and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages.

Certain combinations of loan characteristics often can indicate a higher degree of credit risk. For example, single-family mortgages with both high LTV ratios and borrowers who have lower credit scores typically experience higher rates of serious delinquency and default. We estimate that there were $11.4 billion and $11.1 billion at June 30, 2012 and December 31, 2011, respectively, of loans in our single-family credit guarantee portfolio with both original LTV ratios greater than 90% and FICO scores less than 620 at the time of loan origination. Certain mortgage product types, including interest-only or option ARM loans, that have additional higher risk characteristics, such as lower credit scores or higher LTV ratios, will also have a higher risk of default than those same products without these characteristics. See "Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for information about certain attribute combinations of single-family mortgage loans.

*Single-Family Mortgage Product Types*

Product mix affects the credit risk profile of our total mortgage portfolio. The primary mortgage products in our single-family credit guarantee portfolio are first lien, fixed-rate mortgage loans. In general, 15-year amortizing fixed-rate mortgages exhibit the lowest default rate among the types of mortgage loans we securitize and purchase, due to the accelerated rate of principal amortization on these mortgages and the credit profiles of borrowers who seek and qualify for them. In a rising interest rate environment, balloon/reset and ARM borrowers typically default at a higher rate than fixed-rate borrowers. However, in recent years, during which interest rates have generally remained relatively low, our delinquency and default rates on adjustable-rate and balloon/reset mortgage loans continue to be as high as, or higher than, those on fixed-rate loans because these borrowers also have been affected by declining housing and economic conditions and/or had other higher-risk characteristics. Interest-only and option ARM loans are higher-risk mortgage products based on the features of these types of loans. See "*Other Categories of Single-Family Mortgage Loans*" below for additional information on higher-risk mortgages in our single-family credit guarantee portfolio.

In recent periods, we experienced a high volume of loan modifications, as troubled borrowers were able to take advantage of the various programs that we offered. The majority of our loan modifications result in new terms that include predetermined interest rates for the remaining term of the loan. For example, our HAMP loan modifications result in an initial below-market interest rate that after five years gradually adjusts to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate products for presentation within this Form 10-Q and elsewhere in our reporting even though they have a rate adjustment provision because the future rates are determined at the time of modification rather than at a subsequent date.

The following paragraphs provide information on the interest-only, option ARM, and conforming jumbo loans in our single-family credit guarantee portfolio. Interest-only and option ARM loans have experienced significantly higher serious delinquency rates than fixed-rate amortizing mortgage products.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

Interest-Only Loans

Interest-only loans have an initial period during which the borrower pays only interest, and at a specified date the monthly payment increases to begin reflecting repayment of principal. Interest-only loans represented approximately 4% of the UPB of our single-family credit guarantee portfolio at both June 30, 2012 and December 31, 2011. We discontinued purchasing such loans on September 1, 2010.

Option ARM Loans

Most option ARM loans have initial periods during which the borrower has various options as to the amount of each monthly payment, until a specified date, when the terms are recast. At both June 30, 2012 and December 31, 2011, option ARM loans represented less than 1% of the UPB of our single-family credit guarantee portfolio. Included in this exposure was $6.8 billion and $7.3 billion of option ARM securities underlying certain of our Other Guarantee Transactions at June 30, 2012 and December 31, 2011, respectively. While we have not categorized these option ARM securities as either subprime or Alt-A securities for presentation within this Form 10-Q and elsewhere in our reporting, they could exhibit similar credit performance to collateral identified as subprime or Alt-A. We have not purchased option ARM loans in our single-family credit guarantee portfolio since 2007. For information on our exposure to option ARM loans through our holdings of non-agency mortgage-related securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Conforming Jumbo Loans

We purchased $14.4 billion and $13.3 billion of conforming jumbo loans during the six months ended June 30, 2012 and 2011, respectively. The UPB of conforming jumbo loans in our single-family credit guarantee portfolio as of June 30, 2012 and December 31, 2011 was $52.9 billion and $49.8 billion, respectively, or 3% of the UPB of our single-family credit guarantee portfolio at both dates. The average size of these loans was approximately $537,000 and $545,000 at June 30, 2012 and December 31, 2011, respectively. For loans originated after September 30, 2011, conforming jumbo loans on a one-family residence have UPB at origination that is greater than $417,000 and up to $625,500 in certain "high-cost" areas. See "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments*" in our 2011 Annual Report for further information on the conforming loan limits.

*Other Categories of Single-Family Mortgage Loans*

While we have classified certain loans as subprime or Alt-A for purposes of the discussion below and elsewhere in this Form 10-Q, there is no universally accepted definition of subprime or Alt-A, and our classification of such loans may differ from those used by other companies. For example, some financial institutions may use FICO scores to delineate certain residential mortgages as subprime. In addition, we do not rely primarily on these loan classifications to evaluate the credit risk exposure relating to such loans in our single-family credit guarantee portfolio. For a definition of the subprime and Alt-A single-family loans and securities in this Form 10-Q, see "GLOSSARY."

Subprime Loans

Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see " *Higher-Risk Loans in the Single-Family Credit Guarantee Portfolio*" and "Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for further information). In addition, we estimate that approximately $2.2 billion and $2.3 billion of security collateral underlying our Other Guarantee Transactions at June 30, 2012 and December 31, 2011, respectively, were identified as subprime based on information provided to us when we entered into these transactions.

We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions. At June 30, 2012 and December 31, 2011, we held $46.7 billion and $49.0 billion, respectively, in UPB of non-agency mortgage-related securities backed by subprime loans. These securities were structured to provide credit enhancements, and 6% and 7% of these securities were investment grade at June 30, 2012 and December 31, 2011, respectively. The credit performance of loans underlying these securities has deteriorated significantly since 2008. For more information on our exposure to subprime mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Alt-A Loans

Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. The UPB of Alt-A loans in our single-family credit guarantee portfolio declined to $84 billion as of June 30, 2012 from $94.3 billion as of December 31, 2011. The UPB of our Alt-A loans declined in the first half of 2012 primarily due to refinancing into other mortgage products, foreclosure transfers, and other liquidation events. Modified loans within the Alt-A category continue to remain in that category, even though the borrower may have provided full documentation of assets and income before completing the modification. As of June 30, 2012, for Alt-A loans in our single-family credit guarantee portfolio, the average FICO score at origination was 716. Although Alt-A mortgage loans comprised approximately 5% of our single-family credit guarantee portfolio as of June 30, 2012, these loans represented approximately 23% and 24% of our credit losses during the three and six months ended June 30, 2012, respectively.

Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. In the event we purchase a refinance mortgage in one of these programs and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. From the time the relief refinance initiative began in 2009 to June 30, 2012, we purchased approximately $18.4 billion of relief refinance mortgages that were previously categorized as Alt-A loans in our portfolio, including $3.1 billion during the six months ended June 30, 2012.

We also hold investments in non-agency mortgage-related securities backed by single-family Alt-A loans. At June 30, 2012 and December 31, 2011, we held investments of $15.8 billion and $16.8 billion, respectively, of non-agency mortgage-related securities backed by Alt-A and other mortgage loans and 14% and 15%, respectively, of these securities were categorized as investment grade. The credit performance of loans underlying these securities has deteriorated significantly since 2008. We categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. For more information on our exposure to Alt-A mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Higher-Risk Loans in the Single-Family Credit Guarantee Portfolio

The table below presents information about certain categories of single-family mortgage loans within our single-family credit guarantee portfolio that we believe have certain higher-risk characteristics. These loans include categories based on product type and borrower characteristics present at origination. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Loans with a combination of these characteristics will have an even higher risk of default than those with an individual characteristic.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**Table 35 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio** [1]

| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
|---|---|---|---|---|
| | | As of June 30, 2012 | | |
| | | (dollars in billions) | | |
| Loans with one or more specified characteristics | $345.4 | 104% | 7.4% | 8.5% |
| Categories (individual characteristics): | | | | |
| Alt-A | 84.0 | 105 | 10.1 | 11.7 |
| Interest-only[5] | 61.4 | 118 | 0.2 | 17.1 |
| Option ARM[6] | 7.8 | 114 | 6.7 | 18.5 |
| Original LTV ratio greater than 90%, non-HARP mortgages[7] | 101.4 | 105 | 8.7 | 8.2 |
| Original LTV ratio greater than 90%, HARP mortgages[7] | 87.6 | 106 | 0.1 | 1.2 |
| Lower FICO scores at origination (less than 620)[7] | 53.1 | 92 | 14.2 | 12.5 |
| | | As of December 31, 2011 | | |
| | | (dollars in billions) | | |
| Loans with one or more specified characteristics | $342.9 | 105% | 7.2% | 9.3% |
| Categories (individual characteristics): | | | | |
| Alt-A | 94.3 | 107 | 8.8 | 11.9 |
| Interest-only[5] | 72.0 | 120 | 0.2 | 17.6 |
| Option ARM[6] | 8.4 | 119 | 5.5 | 20.5 |
| Original LTV ratio greater than 90%, non-HARP mortgages[7] | 107.9 | 108 | 8.1 | 8.5 |
| Original LTV ratio greater than 90%, HARP mortgages[7] | 59.3 | 104 | 0.1 | 1.3 |
| Lower FICO scores at origination (less than 620)[7] | 55.6 | 93 | 13.4 | 12.9 |

(1)   Categories are not additive and a single loan may be included in multiple categories if more than one characteristic is associated with the loan.

(2)   See endnote (5) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of current LTV ratios.

(3)   Represents the percentage of loans based on loan count in our single-family credit guarantee portfolio at period end that have been modified under agreement with the borrower, including those with no changes in the interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan. Excludes loans underlying certain Other Guarantee Transactions for which data was not available.

(4)   See "Credit Performance — Delinquencies" for further information about our reported serious delinquency rates.

(5)   The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post-modification), primarily due to delays in processing.

(6)   Loans within the option ARM category continue to remain in that category following modification, even though the modified loan no longer provides for optional payment provisions.

(7)   See endnotes (4) and (7) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios and our presentation of FICO scores, respectively.

A significant portion of the loans in the higher-risk categories presented in the table above were originated in 2005 through 2008. Except for HARP loans with LTV ratios greater than 90%, we purchased a limited amount of loans in the higher-risk categories presented above since the beginning of 2009, and have fully discontinued purchases of Alt-A (effective March 1, 2009), interest-only (effective September 1, 2010), and option ARM (since 2007) loans. The UPB of loans originated in 2005 to 2008 within our single-family credit guarantee portfolio, which have a higher composition of loans with higher-risk characteristics, continues to decline primarily due to repayments and other liquidations, including completed foreclosure alternatives and foreclosure transfers. We currently expect that, over time, the replacement (other than through relief refinance activity) of the 2005 to 2008 vintages should positively impact the serious delinquency rates and credit-related expenses of our single-family credit guarantee portfolio. However, the rate at which this replacement is occurring remains slow, primarily due to low volumes of home purchase mortgage originations and the length of the foreclosure process. For the first half of 2012, loans originated in 2005 through 2008 in our single-family credit guarantee portfolio comprised approximately 88% of our credit losses.

Loans within one or more of the higher-risk categories presented in the table above comprised approximately 20% of our single-family credit guarantee portfolio as of both June 30, 2012 and December 31, 2011. The total UPB of loans in our single-family credit guarantee portfolio with one or more of these characteristics increased slightly to $345.4 billion as of June 30, 2012 from $342.9 billion as of December 31, 2011. This slight increase was principally due to increased purchases of loans with original LTV ratios greater than 90% due to significant relief refinance activity in the first half of 2012, but was substantially offset by repayments and other liquidations, including completed foreclosure alternatives and foreclosure transfers. The serious delinquency rates associated with loans with one or more of the above characteristics declined to 8.5% as of June 30, 2012 from 9.3% as of December 31, 2011.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3654

Table of Contents

*Credit Enhancements*

The portfolio information below excludes our holdings of non-Freddie Mac mortgage-related securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities*" for credit enhancement and other information about our investments in non-Freddie Mac mortgage-related securities.

Our charter requires that single-family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests. However, as discussed below, under HARP, we allow eligible borrowers who have mortgages with current LTV ratios over 80% to refinance their mortgages without obtaining new mortgage insurance in excess of what was already in place. Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. In addition, for some mortgage loans, we elect to share the default risk by transferring a portion of that risk to various third parties through a variety of other credit enhancements. Our credit losses could increase if an entity that provides credit enhancement fails to fulfill its obligation, as this would reduce the amount of our recoveries.

At June 30, 2012 and December 31, 2011, our credit-enhanced mortgages represented 13% and 14%, respectively, of our single-family credit guarantee portfolio, excluding those backing Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative. Our financial guarantees backed by Ginnie Mae Certificates and HFA bonds under the HFA initiative are excluded because we consider the incremental credit risk to which we are exposed to be insignificant.

We recognized recoveries from credit enhancements (excluding reimbursements for our expenses) of $0.6 billion and $1.0 billion that reduced our charge-offs of single-family loans during the six months ended June 30, 2012 and 2011, respectively, which was almost entirely associated with our primary and pool mortgage insurance policies. We recognized additional recoveries associated with credit enhancements that reduced our single-family REO operations expenses by $56 million and $216 million for the six months ended June 30, 2012 and 2011, respectively. The declines in our recoveries in the 2012 periods compared to the 2011 periods was primarily due to the effect of the weakened financial condition of several of our mortgage insurance counterparties who have instituted plans of deferred payment obligation on our claims. See "*Institutional Credit Risk*" for information about our counterparties that provide credit enhancement on loans in our single-family credit guarantee portfolio.

During the first half of 2012 and 2011, the percentage of our single-family loan purchases with credit enhancement coverage was lower than in periods before 2009, primarily as a result of high refinance activity. Refinance loans (other than relief refinance mortgages) typically have lower LTV ratios than home purchase loans, and are more likely to have an LTV ratio below 80% and not require credit protection as specified in our charter. In addition, we have been purchasing significant amounts of relief refinance mortgages. These mortgages allow for the refinance of existing loans guaranteed by us under terms such that we may not have mortgage insurance for some or all of the UPB of the mortgage in excess of 80% of the value of the property.

See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Credit Enhancements*" in our 2011 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for additional information about credit protection and other forms of credit enhancements covering loans in our single-family credit guarantee portfolio.

*Single-Family Loan Workouts and the MHA Program*

Loan workout activities are a key component of our loss mitigation strategy for managing and resolving troubled assets and lowering credit losses. Our loan workouts consist of: (a) forbearance agreements; (b) repayment plans; (c) loan modifications; and (d) foreclosure alternatives ( *e.g.*, short sales or deed in lieu of foreclosure transactions). Our single-family loss mitigation strategy emphasizes early intervention by servicers in delinquent mortgages and provides alternatives to foreclosure. Other single-family loss mitigation activities include providing our single-family servicers with default management tools designed to help them manage non-performing loans more effectively and to assist borrowers in maintaining home ownership where possible, or facilitate foreclosure alternatives when continued homeownership is not an option. See "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Loss Mitigation and Loan Workout Activities*" in our 2011 Annual Report for a general description of our loan workouts.

Loan workouts are intended to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by reducing or eliminating a portion of the costs related to foreclosed properties and avoiding the additional credit losses that likely would be incurred in a REO sale. While we incur costs in the short term to execute our loan workout initiatives, we believe that, overall, these initiatives could reduce our ultimate credit losses over the long term. During the six months ended June 30, 2012, we helped approximately 81,000 borrowers either stay in their homes or sell

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

their properties and avoid foreclosures through our various workout programs, including HAMP, and we completed approximately 55,000 foreclosures. HAMP and our new non-HAMP standard loan modification are important components of our loan workout program and have many similar features, including the initial incentive fees paid to servicers upon completion of a modification.

Our seller/servicers have a significant role in servicing loans in our single-family credit guarantee portfolio, which includes an active role in our loss mitigation efforts. Therefore, a decline in their performance could impact the overall quality of our credit performance (including through missed opportunities for mortgage modifications), which could adversely affect our financial condition or results of operations and have significant effects on our ability to mitigate credit losses. The risk of such a decline in performance remains high.

The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts, and set market standards. Participation in the MHA Program is an integral part of our mission of providing stability to the housing market. Through our participation in this program, we help borrowers maintain home ownership. Some of the key initiatives of this program include HAMP and HARP, which are discussed below.

Home Affordable Modification Program

HAMP commits U.S. government, Freddie Mac and Fannie Mae funds to help eligible homeowners avoid foreclosures and keep their homes through mortgage modifications, where possible. Under this program, we offer loan modifications to financially struggling homeowners with mortgages on their primary residences that reduce the monthly principal and interest payments on their mortgages. HAMP requires that each borrower complete a trial period during which the borrower will make monthly payments based on the estimated amount of the modification payments. Trial periods are required for at least three months. After the final trial-period payment is received by our servicer and the borrower has provided necessary documentation, the borrower and servicer will enter into the modification. We bear the costs of these activities, including the cost of any monthly payment reductions. HAMP applies to loans originated on or before January 1, 2009.

The table below presents the number of single-family loans that completed modification under HAMP from the inception of the program through June 30, 2012 and December 31, 2011, or were in trial periods as of that date.

**Table 36 — Single-Family Home Affordable Modification Program Volume[1]**

| | As of June 30, 2012 | | As of December 31, 2011 | |
|---|---|---|---|---|
| | Amount[2] | Number of Loans | Amount[2] | Number of Loans |
| | (dollars in millions) | | | |
| Completed HAMP modifications[3] | $ 44,379 | 200,705 | $ 39,991 | 180,539 |
| Loans in the HAMP trial period | $ 2,390 | 11,219 | $ 2,790 | 12,802 |

(1)   Based on information reported by our servicers to the MHA Program administrator.

(2)   For loans in the HAMP trial period, this reflects the loan balance prior to modification. For completed HAMP modifications, the amount represents the balance of loans after modification under HAMP.

(3)   Amounts presented represent completed HAMP modifications with effective dates since our implementation of HAMP in 2009 through June 30, 2012 and December 31, 2011, respectively. As of June 30, 2012 and December 31, 2011, amounts include approximately 37,000 and 28,000 loans, respectively, that completed the HAMP modification and subsequently became ineligible for borrower incentive payments under HAMP due to: (a) serious delinquency; (b) payoff; or (c) the loan transitioning to a loss event. Prior period amounts have been revised to conform to the current period presentation.

As of June 30, 2012, the borrower's monthly payment was reduced on average by an estimated $539, which amounts to an average of $6,468 per year, and a total of $1.3 billion in annual reductions for all of our completed HAMP modifications (these amounts are calculated by multiplying the number of completed modifications by the average reduction in monthly payment, and have not been adjusted to reflect the actual performance of the loans following modification).

Approximately 22% of our loans in the HAMP trial period as of June 30, 2012 have been in the trial period for more than the minimum duration of three months. Based on information provided by the MHA Program administrator, the average length of the trial period for loans in the program as of June 30, 2012 was five months. When a borrower's HAMP trial period is cancelled, the loan is considered for our other workout activities. For information about the percentage of completed loan modifications that remained current, see "Table 39 — Quarterly Percentages of Modified Single-Family Loans — Current and Performing."

On January 27, 2012, Treasury announced enhancements to HAMP, including extending the end date to December 31, 2013, expanding the program's eligibility criteria for modifications, increasing incentives paid to investors who engage in

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3656

Table of Contents

principal reduction, and extending to the GSEs the opportunity to receive investor incentives for principal reduction. FHFA noted that Treasury's expanded eligibility criteria for HAMP modifications are consistent with our standard non-HAMP modification.

On July 31, 2012, FHFA announced that, after analysis of the new HAMP incentives available to the GSEs for the use of principal reduction, FHFA concluded that the anticipated benefits do not outweigh the costs and risks, and that it would not direct us to implement the new principal reduction alternative under HAMP.

The costs we incur related to HAMP have been, and will likely continue to be, significant. We paid $37 million and $83 million of servicer incentives during the three and six months ended June 30, 2012, respectively, as compared to $36 million and $75 million of such incentives during the three and six months ended June 30, 2011 respectively. As of June 30, 2012, we accrued $91 million for both initial and recurring servicer incentives not yet due. We paid $28 million and $58 million of borrower incentives during the three and six months ended June 30, 2012, respectively, as compared to $17 million and $38 million of these incentives during the three and six months ended June 30, 2011, respectively. As of June 30, 2012, we accrued $74 million for borrower incentives not yet due. We also have the potential to incur additional servicer incentives and borrower incentives as long as the borrower remains current on a loan modified under HAMP. See "MD&A — RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program*" in our 2011 Annual Report for additional information about the costs associated with HAMP.

<u>Servicing Alignment Initiative and Non-HAMP Standard Modifications</u>

During 2011, we completed the initial implementation of the FHFA-directed servicing alignment initiative, under which we and Fannie Mae are aligning certain standards for servicing non-performing loans owned or guaranteed by the companies. We believe that the servicing alignment initiative will ultimately: (a) change, among other things, the way servicers communicate and work with troubled borrowers; (b) bring greater consistency and accountability to the servicing industry; and (c) help more distressed homeowners avoid foreclosure. We provided standards to our servicers under this initiative that require they initiate earlier and more frequent communication with delinquent borrowers, employ consistent requirements for collecting documents from borrowers, and follow consistent timelines for responding to borrowers and for processing foreclosures. These standards are expected to result in greater alignment of servicer processes for both HAMP and most non-HAMP workouts. We expect that the servicing alignment initiative, under FHFA's direction, will continue to be expanded in 2012.

Under these new servicing standards, we pay incentives to servicers that exceed certain performance standards with respect to servicing delinquent loans. We also assess compensatory fees from servicers if they do not achieve a minimum performance benchmark with respect to servicing delinquent loans. These incentives may result in our payment of increased fees to our seller/servicers, the cost of which may be at least partially mitigated by the compensatory fees paid to us by our servicers that do not perform as required.

As part of the servicing alignment initiative, we have also implemented a new non-HAMP standard loan modification initiative. Our servicers began offering standard modification trial period plans with effective dates on or after October 1, 2011. This standard modification fully replaced our previous non-HAMP modification initiative beginning January 1, 2012. The standard modification requires a three-month trial period (our previous non-HAMP modification program did not require a trial period). As of June 30, 2012, approximately 6,000 borrowers having loans with aggregate UPB of $1.1 billion had completed this type of modification, and approximately 15,000 borrowers were in the modification trial period. Our completed modification volume in the first half of 2012 was below what otherwise would be expected, as servicers completed the transition to the new standard modification initiative and borrowers completed the trial period. However, we expect to complete a significant number of these non-HAMP standard loan modifications in the future and the costs we incur related to these modifications will likely be significant. While we incur costs in the short-term to execute our non-HAMP standard modifications, we believe that, overall, our non-HAMP standard modifications could reduce our ultimate credit losses over the long-term.

<u>Home Affordable Refinance Program and Relief Refinance Mortgage Initiative</u>

Our relief refinance mortgage initiative, including HARP (which is the portion of our relief refinance initiative for loans with LTV ratios above 80%), gives eligible homeowners (whose monthly payments are current) with existing loans that are owned or guaranteed by us an opportunity to refinance into loans with more affordable monthly payments and/or fixed-rate

<div align="center">6 9</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                               Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

terms. HARP is targeted at borrowers with current LTV ratios above 80%; however, our relief refinance initiative also allows borrowers with LTV ratios of 80% and below to participate.

A number of FHFA-directed changes to HARP were announced in late 2011. These changes are intended to allow more borrowers to participate in the program and benefit from refinancing their home mortgages, including borrowers whose mortgages have LTV ratios above 125%. These revisions to HARP will help to reduce our exposure to credit risk to the extent that HARP refinancing strengthens the borrowers' potential to repay their mortgages and, in some cases, reduces the payments under their mortgages. These revisions to HARP could also reduce our credit losses to the extent that the revised program contributes to bringing stability to the housing market. However, we may face greater exposure to credit and other losses on these HARP loans because we are not requiring lenders to provide us with certain representations and warranties on the refinanced HARP loans. As of June 30, 2012, we had purchased approximately $27 billion in UPB of HARP loans with reduced representations and warranties. In July 2012, we announced that we will expand the eligibility of loans subject to reduced representations and warranties to include relief refinance mortgages with LTV ratios of 80% or less beginning January 1, 2013. We could also experience declines in the fair values of certain agency security investments classified as available-for-sale or trading resulting from changes in expectations of mortgage prepayments and lower net interest yields over time on other mortgage-related investments.

We began purchasing HARP loans under the expanded program in January 2012, and the volume of our purchases of HARP loans increased 76% in the first half of 2012, compared to the first half of 2011. However, since industry participation in HARP is not mandatory, implementation schedules have varied as individual lenders, mortgage insurers, and other market participants modify their processes. There can be no assurance that the benefits from the revised program will exceed our costs.

Our underwriting procedures for relief refinance mortgages are limited in many cases, and such procedures generally do not include all of the changes in underwriting standards we have implemented in the last several years. As a result, relief refinance mortgages generally reflect many of the credit risk attributes of the original loans. However, borrower participation in our relief refinance mortgage initiative may help reduce our exposure to credit risk in cases where borrower payments under their mortgages are reduced, thereby strengthening the borrowers' potential to make their mortgage payments.

Over time, relief refinance mortgages with LTV ratios above 80% (*i.e.*, HARP loans) may not perform as well as other refinance mortgages because the continued high LTV ratios of these loans increase the probability of default. Our relief refinance initiative is only for qualifying mortgage loans that we already hold or guarantee. We continue to bear the credit risk for refinanced loans under this program, to the extent that such risk is not covered by existing mortgage insurance or other existing credit enhancements.

The table below presents the composition of our purchases of relief refinance single-family loans during the six months ended June 30, 2012 and 2011, and ending balances of such loans in our portfolio as of June 30, 2012 and December 31, 2011.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

FHFA 3658

Table of Contents

**Table 37 — Single-Family Relief Refinance Loans**[1]

| | Six Months Ended June 30, 2012 | | | Six Months Ended June 30, 2011 | | |
|---|---|---|---|---|---|---|
| | Amount | Number of Loans | Percent[2] | Amount | Number of Loans | Percent[2] |
| | (dollars in millions) | | | | | |
| Relief refinance mortgages: | | | | | | |
| Above 125% LTV ratio | $ 8,118 | 38,466 | 5.0% | $ — | — | —% |
| Above 105% to 125% LTV ratio | 9,831 | 47,350 | 6.0 | 4,638 | 20,072 | 3.6 |
| Above 80% to 105% LTV ratio | 22,544 | 114,302 | 13.8 | 18,431 | 85,328 | 14.5 |
| 80% and below LTV ratio | 17,326 | 116,844 | 10.6 | 22,269 | 137,053 | 17.5 |
| Total relief refinance mortgages | $ 57,819 | 316,962 | 35.4% | $ 45,338 | 242,453 | 35.6% |
| Total refinance loan volume[3] | $163,327 | 781,244 | 100% | $127,198 | 610,266 | 100% |

| | As of June 30, 2012 | | | As of December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Amount | Number of Loans | Serious Delinquency Rate | Amount | Number of Loans | Serious Delinquency Rate |
| | (dollars in millions) | | | | | |
| Relief refinance mortgages: | | | | | | |
| Above 125% LTV ratio | $ 8,111 | 38,457 | 0.01% | $ — | — | —% |
| Above 105% to 125% LTV ratio | 21,545 | 99,891 | 1.18 | 12,056 | 53,335 | 1.34 |
| Above 80% to 105% LTV ratio | 105,335 | 504,785 | 1.08 | 87,614 | 406,290 | 1.02 |
| 80% and below LTV ratio | 108,492 | 697,525 | 0.27 | 100,861 | 621,720 | 0.23 |
| Total relief refinance mortgages | $243,483 | 1,340,658 | 0.64% | $200,531 | 1,081,345 | 0.58% |

(1) Consists of all single-family refinance mortgage loans that we either purchased or guaranteed during the period, including those associated with other guarantee commitments and Other Guarantee Transactions. Prior period amounts have been revised to conform to current period presentation.

(2) Based on UPB.

(3) Consists of relief refinance mortgages and other refinance mortgages.

Relief refinance mortgages comprised approximately 35% and 36% of our total refinance volume in the six months ended June 30, 2012 and 2011, respectively, based on UPB. Relief refinance mortgages with LTV ratios above 80% represented approximately 21% and 14% of our total single-family credit guarantee portfolio purchases during the six months ended June 30, 2012 and 2011, respectively. Relief refinance mortgages of all LTV ratios comprised approximately 14% and 11% of the UPB in our total single-family credit guarantee portfolio at June 30, 2012 and December 31, 2011, respectively.

Loan Workout Volumes and Modification Performance

The table below presents volumes of single-family loan workouts, serious delinquency, and foreclosures for the three and six months ended June 30, 2012 and 2011.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3659

Table of Contents

**Table 38 — Single-Family Loan Workouts, Serious Delinquency, and Foreclosures Volumes**(1)

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2012 | | 2011 | | 2012 | | 2011 | |
| | Number of Loans | Loan Balances | Number of Loans | Loan Balances | Number of Loans | Loan Balances | Number of Loans | Loan Balances |
| | | | | (dollars in millions) | | | | |
| **Home retention actions:** | | | | | | | | |
| Loan modifications | | | | | | | | |
| with no change in terms(2) | 38 | $ 7 | 1,058 | $ 190 | 484 | $ 89 | 2,323 | $ 409 |
| with term extension | 495 | 74 | 4,528 | 836 | 1,666 | 296 | 9,808 | 1,797 |
| with reduction of contractual interest rate and, in certain cases, term extension | 11,445 | 2,325 | 19,781 | 4,403 | 20,308 | 4,233 | 42,749 | 9,570 |
| with rate reduction, term extension and principal forbearance | 3,164 | 818 | 5,682 | 1,520 | 6,361 | 1,681 | 11,327 | 3,025 |
| Total loan modifications(3) | 15,142 | 3,224 | 31,049 | 6,949 | 28,819 | 6,299 | 66,207 | 14,801 |
| Repayment plans (4) | 8,712 | 1,271 | 7,981 | 1,157 | 19,287 | 2,748 | 17,080 | 2,443 |
| Forbearance agreements(5) | 4,738 | 1,010 | 3,709 | 703 | 8,394 | 1,702 | 11,387 | 2,229 |
| Total home retention actions | 28,592 | 5,505 | 42,739 | 8,809 | 56,500 | 10,749 | 94,674 | 19,473 |
| **Foreclosure alternatives:** | | | | | | | | |
| Short sale | 12,281 | 2,739 | 10,894 | 2,515 | 24,333 | 5,470 | 21,515 | 5,003 |
| Deed in lieu of foreclosure transactions | 250 | 42 | 144 | 25 | 443 | 75 | 229 | 40 |
| Total foreclosure alternatives | 12,531 | 2,781 | 11,038 | 2,540 | 24,776 | 5,545 | 21,744 | 5,043 |
| Total single-family loan workouts | 41,123 | $ 8,286 | 53,777 | $ 11,349 | 81,276 | $ 16,294 | 116,418 | $ 24,516 |
| Seriously delinquent loan additions | 75,904 | | 87,813 | | 156,719 | | 185,459 | |
| Single-family foreclosures(6) | 26,050 | | 30,139 | | 55,004 | | 61,226 | |
| Seriously delinquent loans, at period end | 386,570 | | 417,457 | | 386,570 | | 417,457 | |

(1) Based on completed actions with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent or effective, such as loans in modification trial periods. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period (see endnote 5).

(2) Under this modification type, past due amounts are added to the principal balance and reamortized based on the original contractual loan terms.

(3) Includes completed loan modifications under HAMP; however, the number of such completions differs from that reported by the MHA Program administrator in part due to differences in the timing of recognizing the completions by us and the administrator.

(4) Represents the number of borrowers as reported by our seller/servicers that have completed the full term of a repayment plan for past due amounts. Excludes the number of borrowers that are actively repaying past due amounts under a repayment plan, which totaled 16,940 and 20,342 borrowers as of June 30, 2012 and 2011, respectively.

(5) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarter; however, a single loan may be included under separate forbearance agreements in separate periods.

(6) Represents the number of our single-family loans that complete foreclosure transfers, including third-party sales at foreclosure auction in which ownership of the property is transferred directly to a third-party rather than to us.

We experienced declines in loan modifications in the three and six months ended June 30, 2012, compared to the three and six months ended June 30, 2011. Our completed modification volume in the first half of 2012 was below what otherwise would be expected, as servicers completed the transition to the new standard modification initiative and borrowers completed the trial period. To a lesser extent, the decline in loan modifications is also due to improved credit performance of loans originated in recent years, which has resulted in a reduction in the volume of loans transitioning to serious delinquency and a reduction in our inventory of problem loans.

Foreclosure alternative volume increased 13.9% in the first half of 2012, compared to the first half of 2011, and we expect the volume of foreclosure alternatives to remain high in the remainder of 2012 primarily because we offer incentives to servicers to complete short sales instead of foreclosures. A short sale transaction typically provides us with a comparable or higher level of recovery than what we would receive through property sales from our REO inventory. In large part, the benefit of a short sale arises from the avoidance or reduction of costs we would otherwise incur to complete the foreclosure and dispose of the property, including maintenance and other property expenses associated with holding REO property, legal fees, commissions, and other selling expenses of traditional real estate transactions. We also benefit from deed in lieu of foreclosure transactions, as these transactions expedite the process by which we acquire properties from defaulted borrowers and allow us to avoid costs we would otherwise incur to acquire such properties pursuant to foreclosures. We plan to introduce additional initiatives during the remainder of 2012 designed to help more distressed borrowers avoid foreclosure through short sales and deed in lieu of foreclosure transactions.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP., 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from this use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3660

Table of Contents

The UPB of loans in our single-family credit guarantee portfolio for which we have completed a loan modification increased to $71 billion as of June 30, 2012 from $69 billion as of December 31, 2011. The number of modified loans in our single-family credit guarantee portfolio continued to increase and such loans comprised approximately 3.1% and 2.9% of our single-family credit guarantee portfolio as of June 30, 2012 and December 31, 2011, respectively. The estimated current LTV ratio for all modified loans in our single-family credit guarantee portfolio was 121% and the serious delinquency rate on these loans was 17.1% as of June 30, 2012. Approximately $43 billion in UPB of our completed HAMP loan modifications at June 30, 2012 had provisions for reduced interest rates that remain fixed for the first five years of the modification and then increase at a rate of one percent per year (or such lesser amount as may be needed) until the interest rate has been adjusted to the market rate that was in effect at the time of the modification.

The table below presents the percentage of modified single-family loans that were current and performing in each of the last eight quarterly periods.

**Table 39 — Quarterly Percentages of Modified Single-Family Loans — Current and Performing** [1]

| | Quarter of Loan Modification Completion [2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **HAMP loan modifications:** | 1Q 2012 | 4Q 2011 | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 |
| Time since modification- | | | | | | | | |
| 3 to 5 months | 89% | 89% | 86% | 87% | 86% | 85% | 82% | 81% |
| 6 to 8 months | | 85 | 84 | 82 | 83 | 82 | 81 | 78 |
| 9 to 11 months | | | 81 | 82 | 79 | 78 | 78 | 79 |
| 12 to 14 months | | | | 79 | 80 | 76 | 76 | 76 |
| 15 to 17 months | | | | | 77 | 76 | 73 | 73 |
| 18 to 20 months | | | | | | 74 | 74 | 71 |
| 21 to 23 months | | | | | | | 72 | 72 |
| 24 to 26 months | | | | | | | | 70 |

| | Quarter of Loan Modification Completion [2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Non-HAMP loan modifications:** | 1Q 2012 | 4Q 2011 | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 |
| Time since modification- | | | | | | | | |
| 3 to 5 months | 72% | 78% | 73% | 76% | 78% | 80% | 77% | 73% |
| 6 to 8 months | | 69 | 70 | 67 | 69 | 71 | 74 | 66 |
| 9 to 11 months | | | 64 | 67 | 63 | 66 | 68 | 65 |
| 12 to 14 months | | | | 62 | 64 | 61 | 64 | 61 |
| 15 to 17 months | | | | | 60 | 63 | 61 | 56 |
| 18 to 20 months | | | | | | 60 | 62 | 54 |
| 21 to 23 months | | | | | | | 60 | 56 |
| 24 to 26 months | | | | | | | | 54 |

| | Quarter of Loan Modification Completion [2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Total (HAMP and Non-HAMP):** | 1Q 2012 | 4Q 2011 | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 |
| Time since modification- | | | | | | | | |
| 3 to 5 months | 85% | 86% | 81% | 83% | 83% | 82% | 80% | 79% |
| 6 to 8 months | | 80 | 79 | 77 | 77 | 76 | 78 | 75 |
| 9 to 11 months | | | 75 | 76 | 73 | 72 | 74 | 75 |
| 12 to 14 months | | | | 73 | 73 | 68 | 71 | 71 |
| 15 to 17 months | | | | | 70 | 69 | 68 | 68 |
| 18 to 20 months | | | | | | 67 | 69 | 66 |
| 21 to 23 months | | | | | | | 67 | 68 |
| 24 to 26 months | | | | | | | | 65 |

(1)   Represents the percentage of loans that are current and performing (no payment is 30 days or more past due) or have been paid in full. Excludes loans in foreclosure status and loans in modification trial periods.

(2)   Loan modifications are recognized as completed in the quarterly period in which the servicer has reported the modification as effective and the agreement has been accepted by us. For loans that have been remodified (e.g., where a borrower has received a new modification after defaulting on the prior modification) the rates reflect the status of each modification separately. For example, in the case of a remodified loan where the borrower is performing, the previous modification would be presented as being in default in the applicable period.

The redefault rate is the percentage of our modified loans that have become seriously delinquent ( *i.e.*, three months or more delinquent or in foreclosure), transitioned to REO, or completed a loss-producing foreclosure alternative. As of June 30, 2012, the redefault rate for all of our single-family loan modifications (including those under HAMP) completed during the first quarter of 2012, and full years of 2011, 2010 and 2009 was 5%, 14%, 23%, and 52%, respectively. Many of the borrowers that received modifications in 2009 were negatively affected by worsening economic conditions, including high unemployment rates during the last several years. As of June 30, 2012, the redefault rate for loans modified under HAMP during the first quarter of 2012, and full years of 2011, 2010, and 2009 was approximately 3%, 10%, 19%, and 21%, respectively. These redefault rates may not be representative of the future performance of modified loans, including those modified under HAMP. We believe the redefault rate for loans modified in the last three years, including those modified under HAMP, is likely to increase, particularly since the housing and economic environments remain challenging.

73

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Credit Performance*

Delinquencies

We report single-family serious delinquency rate information based on the number of loans that are three monthly payments or more past due or in the process of foreclosure, as reported by our servicers. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as seriously delinquent as long as the borrower is less than three monthly payments past due under the modified terms. Single-family loans for which the borrower is subject to a forbearance agreement will continue to reflect the past due status of the borrower. To the extent our borrowers participate in the HFA unemployment assistance initiatives and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency.

Our single-family delinquency rates include all single-family loans that we own, that back Freddie Mac securities, and that are covered by our other guarantee commitments, except Freddie Mac financial guarantees that are backed by either Ginnie Mae Certificates or HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancements provided on them by the U.S. government.

Some of our workout and other loss mitigation activities create fluctuations in our delinquency statistics. For example, single-family loans that we report as seriously delinquent before they enter a modification trial period continue to be reported as seriously delinquent for purposes of our delinquency reporting until the modifications become effective and the loans are removed from delinquent status by our servicers. Consequently, the volume and timing of loan modifications impact our reported serious delinquency rate. In addition, there may be temporary timing differences, or lags, in the reporting of payment status and modification completion due to differing practices of our servicers that can affect our delinquency reporting.

Our serious delinquency rates have been affected by delays, including those due to increases in foreclosure process timeframes, process requirements of HAMP and the servicing alignment initiative, general constraints on servicer capacity (which affects the rate at which servicers modify or foreclose upon loans), and court backlogs (in states that require a judicial foreclosure process). These delays lengthen the period of time in which loans remain in seriously delinquent status, as the delays extend the time it takes for seriously delinquent loans to be modified, foreclosed upon or otherwise resolved and thus transition out of seriously delinquent status. As a result, we believe our single-family serious delinquency rates were higher in the first half of 2012 than they otherwise would have been. As of June 30, 2012 and December 31, 2011, the percentage of seriously delinquent loans that have been delinquent for more than six months was 74% and 70%, respectively.

The table below presents serious delinquency rates for our single-family credit guarantee portfolio.

**Table 40 — Single-Family Serious Delinquency Rates**

| | As of | | | |
| --- | --- | --- | --- | --- |
| | June 30, 2012 | | December 31, 2011 | |
| | Percentage of Portfolio | Serious Delinquency Rate | Percentage of Portfolio | Serious Delinquency Rate |
| Single-family: | | | | |
| Non-credit-enhanced | 87% | 2.76% | 86% | 2.84% |
| Credit-enhanced[1] | 13 | 7.85 | 14 | 8.03 |
| Total single-family credit guarantee portfolio[2] | 100% | 3.45 | 100% | 3.58 |

(1)  See "Institutional Credit Risk" for information about our counterparties that provide credit enhancement on loans in our single-family credit guarantee portfolio.
(2)  As of June 30, 2012 and December 31, 2011, approximately 72% and 68%, respectively, of the single-family loans reported as seriously delinquent were in the process of foreclosure.

Serious delinquency rates of our single-family credit guarantee portfolio declined to 3.45% as of June 30, 2012 from 3.58% as of December 31, 2011. Our serious delinquency rate remains high compared to the rates in years prior to 2009 due to continued weakness in home prices, persistently high unemployment, extended foreclosure timelines, and continued challenges faced by servicers processing large volumes of problem loans. In addition, our serious delinquency rate was adversely affected by the decline in the size of our single-family credit guarantee portfolio in the first half of 2012 because this rate is calculated on a smaller number of loans at the end of the period.

Serious delinquency rates for interest-only and option ARM products, which together represented approximately 4% of our total single-family credit guarantee portfolio at June 30, 2012, were 17.1% and 18.5%, respectively, as compared with

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

17.6% and 20.5% at December 31, 2011, respectively. Serious delinquency rates of single-family 30-year, fixed rate amortizing loans, a more traditional mortgage product, were approximately 3.8% and 3.9% at June 30, 2012 and December 31, 2011, respectively.

The tables below present serious delinquency rates categorized by borrower and loan characteristics, including geographic region and origination year, which indicate that certain concentrations of loans have been more adversely affected by declines in home prices and weak economic conditions since 2006. In certain states, our single-family serious delinquency rates have remained persistently high. As of June 30, 2012, single-family loans in Arizona, California, Florida, and Nevada comprised 25% of our single-family credit guarantee portfolio, and the serious delinquency rate of loans in these states was 5.8%. During the first half of 2012, we also continued to experience high serious delinquency rates on single-family loans originated between 2005 and 2008. We purchased significant amounts of loans with higher-risk characteristics in those years. In addition, those borrowers are more susceptible to the declines in home prices and weak economic conditions since 2006 than those homeowners that have built up equity in their homes over a longer period of time.

<div align="center">75</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents credit concentrations for certain loan groups in our single-family credit guarantee portfolio.

**Table 41 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio**

| | As of June 30, 2012 | | | | | |
|---|---|---|---|---|---|---|
| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio[1] | Percentage Modified[2] | Serious Delinquency Rate |
| | (dollars in billions) | | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $ 35 | $ 394 | $ 429 | 88% | 5.0% | 5.8% |
| All other states | 49 | 1,213 | 1,262 | 75 | 2.7 | 2.8 |
| Year of origination: | | | | | | |
| 2012 | — | 148 | 148 | 75 | — | <0.1 |
| 2011 | — | 268 | 268 | 69 | 0.1 | 0.1 |
| 2010 | — | 285 | 285 | 71 | <0.1 | 0.4 |
| 2009 | <1 | 260 | 260 | 72 | 0.1 | 0.7 |
| 2008 | 6 | 92 | 98 | 92 | 5.6 | 6.3 |
| 2007 | 26 | 118 | 144 | 112 | 12.0 | 12.1 |
| 2006 | 23 | 84 | 107 | 110 | 11.0 | 11.2 |
| 2005 | 16 | 105 | 121 | 94 | 6.1 | 6.8 |
| 2004 and prior | 13 | 247 | 260 | 59 | 2.8 | 3.0 |

| | As of June 30, 2011 | | | | | |
|---|---|---|---|---|---|---|
| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio[1] | Percentage Modified[2] | Serious Delinquency Rate |
| | (dollars in billions) | | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $ 43 | $ 416 | $ 459 | 92% | 4.1% | 6.3% |
| All other states | 61 | 1,285 | 1,346 | 75 | 2.2 | 2.7 |
| Year of origination: | | | | | | |
| 2011 | — | 105 | 105 | 70 | — | <0.1 |
| 2010 | — | 361 | 361 | 71 | <0.1 | 0.1 |
| 2009 | <1 | 366 | 366 | 72 | 0.1 | 0.3 |
| 2008 | 9 | 131 | 140 | 90 | 3.4 | 4.9 |
| 2007 | 32 | 154 | 186 | 110 | 8.5 | 11.0 |
| 2006 | 28 | 111 | 139 | 109 | 7.7 | 10.3 |
| 2005 | 19 | 140 | 159 | 95 | 4.2 | 6.0 |
| 2004 and prior | 16 | 333 | 349 | 60 | 2.1 | 2.5 |

| | Six Months Ended June 30, 2012 | | | Six Months Ended June 30, 2011 | | |
|---|---|---|---|---|---|---|
| | Alt-A | Non Alt-A | Total | Alt-A | Non Alt-A | Total |
| | (in millions) | | | (in millions) | | |
| **Credit Losses** | | | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $1,001 | $ 2,431 | $ 3,432 | $ 1,395 | $ 2,556 | $ 3,951 |
| All other states | 483 | 2,378 | 2,861 | 507 | 1,874 | 2,381 |
| Year of origination: | | | | | | |
| 2012 | — | <1 | <1 | N/A | N/A | N/A |
| 2011 | — | 13 | 13 | — | — | — |
| 2010 | — | 70 | 70 | — | — | — |
| 2009 | <1 | 113 | 113 | <1 | 67 | 67 |
| 2008 | 52 | 507 | 559 | 50 | 434 | 484 |
| 2007 | 559 | 1,743 | 2,302 | 773 | 1,542 | 2,315 |
| 2006 | 528 | 1,096 | 1,624 | 680 | 1,150 | 1,830 |
| 2005 | 293 | 765 | 1,058 | 351 | 753 | 1,104 |
| 2004 and prior | 52 | 502 | 554 | 48 | 484 | 532 |

(1)   See endnote (5) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of estimated current LTV ratios.

(2)   Represents the percentage of loans, based on loan count, in our single-family credit guarantee portfolio at period end that have been modified under agreement with the borrower, including those with no changes in interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan.

76                                                                                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents statistics for combinations of certain characteristics of the mortgages in our single-family credit guarantee portfolio as of June 30, 2012 and December 31, 2011.

**Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations**

| | June 30, 2012 | | | | | | | | |
| | Current LTV Ratio ≤ 80%[1] | | Current LTV Ratio of > 80 to 100%[1] | | Current LTV > 100%[1] | | Current LTV Ratio All Loans[1] | | |
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
|---|---|---|---|---|---|---|---|---|---|
| **By Product Type** | | | | | | | | | |
| *FICO scores < 620:* | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 0.9% | 7.9% | 0.7% | 13.0% | 1.0% | 23.3% | 2.6% | 17.5% | 13.8% |
| 15- year amortizing fixed-rate | 0.2 | 4.1 | <0.1 | 8.7 | <0.1 | 14.3 | 0.2 | 1.2 | 4.5 |
| ARMs/adjustable-rate[4] | 0.1 | 10.1 | <0.1 | 17.1 | <0.1 | 24.8 | 0.1 | 10.6 | 14.6 |
| Interest-only[5] | <0.1 | 13.6 | <0.1 | 21.4 | 0.1 | 34.2 | 0.1 | 0.4 | 29.2 |
| Other[6] | <0.1 | 4.0 | 0.1 | 6.0 | <0.1 | 11.9 | 0.1 | 4.6 | 5.5 |
| Total FICO scores < 620 | 1.2 | 6.9 | 0.8 | 13.1 | 1.1 | 23.5 | 3.1 | 14.2 | 12.5 |
| *FICO scores of 620 to 659:* | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 2.0 | 5.2 | 1.4 | 9.0 | 2.0 | 18.5 | 5.4 | 12.5 | 9.9 |
| 15- year amortizing fixed-rate | 0.6 | 2.4 | <0.1 | 6.2 | <0.1 | 13.3 | 0.6 | 0.6 | 2.7 |
| ARMs/adjustable rate[4] | 0.1 | 5.2 | 0.1 | 11.3 | 0.1 | 23.0 | 0.3 | 2.3 | 11.7 |
| Interest-only[5] | <0.1 | 10.4 | 0.1 | 17.1 | 0.2 | 30.5 | 0.3 | 0.3 | 25.8 |
| Other[6] | <0.1 | 2.3 | <0.1 | 4.6 | <0.1 | 4.8 | <0.1 | 1.7 | 3.9 |
| Total FICO scores of 620 to 659 | 2.7 | 4.4 | 1.6 | 9.1 | 2.3 | 19.3 | 6.6 | 9.7 | 9.2 |
| *FICO scores of ≥ 660:* | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 36.3 | 1.0 | 18.9 | 2.6 | 11.7 | 9.5 | 66.9 | 3.0 | 2.8 |
| 15- year amortizing fixed-rate | 14.2 | 0.4 | 1.0 | 1.1 | 0.2 | 4.4 | 15.4 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 2.8 | 1.0 | 0.8 | 4.3 | 0.7 | 14.6 | 4.3 | 0.5 | 3.9 |
| Interest-only[5] | 0.4 | 3.8 | 0.6 | 9.2 | 2.1 | 20.5 | 3.1 | 0.2 | 15.8 |
| Other[6] | <0.1 | 1.8 | <0.1 | 1.5 | 0.1 | 2.0 | 0.1 | 0.6 | 1.8 |
| Total FICO scores ≥ 660 | 53.7 | 0.8 | 21.3 | 2.7 | 14.8 | 10.9 | 89.8 | 2.1 | 2.5 |
| Total FICO scores not available | 0.3 | 4.9 | 0.1 | 11.9 | 0.1 | 21.9 | 0.5 | 6.0 | 8.8 |
| *All FICO scores:* | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 39.5 | 1.6 | 21.1 | 3.5 | 14.6 | 11.8 | 75.2 | 4.4 | 3.8 |
| 15- year amortizing fixed-rate | 14.9 | 0.6 | 1.0 | 1.5 | 0.2 | 5.3 | 16.1 | 0.1 | 0.7 |
| ARMs/adjustable rate[4] | 3.0 | 1.7 | 0.9 | 5.5 | 0.8 | 16.2 | 4.7 | 1.1 | 4.9 |
| Interest-only[5] | 0.4 | 4.5 | 0.7 | 10.3 | 2.5 | 21.9 | 3.6 | 0.2 | 17.1 |
| Other[6] | 0.1 | 9.1 | 0.1 | 7.7 | 0.2 | 8.3 | 0.4 | 7.2 | 8.5 |
| Total single-family credit guarantee portfolio[7] | 57.9% | 1.3% | 23.8% | 3.7% | 18.3% | 12.9% | 100.0% | 3.1% | 3.5% |
| **By Region[8]** | | | | | | | | | |
| *FICO scores < 620:* | | | | | | | | | |
| North Central | 0.2% | 5.8% | 0.2% | 10.6% | 0.3% | 18.7% | 0.7% | 14.0% | 11.0% |
| Northeast | 0.4 | 9.5 | 0.2 | 18.9 | 0.2 | 29.4 | 0.8 | 15.3 | 15.4 |
| Southeast | 0.2 | 7.9 | 0.2 | 13.5 | 0.3 | 28.7 | 0.7 | 14.8 | 15.3 |
| Southwest | 0.2 | 5.0 | 0.1 | 10.9 | <0.1 | 18.7 | 0.3 | 9.9 | 7.5 |
| West | 0.2 | 4.5 | 0.1 | 9.0 | 0.3 | 18.8 | 0.6 | 17.1 | 11.2 |
| Total FICO scores < 620 | 1.2 | 6.9 | 0.8 | 13.1 | 1.1 | 23.5 | 3.1 | 14.2 | 12.5 |
| *FICO scores of 620 to 659:* | | | | | | | | | |
| North Central | 0.4 | 3.7 | 0.3 | 7.7 | 0.5 | 14.5 | 1.2 | 9.3 | 7.8 |
| Northeast | 0.8 | 6.0 | 0.5 | 13.3 | 0.4 | 24.3 | 1.7 | 9.9 | 10.9 |
| Southeast | 0.5 | 5.2 | 0.3 | 9.5 | 0.6 | 24.0 | 1.4 | 9.9 | 11.8 |
| Southwest | 0.5 | 3.0 | 0.3 | 7.3 | 0.1 | 13.8 | 0.9 | 6.3 | 4.9 |
| West | 0.5 | 3.1 | 0.2 | 6.9 | 0.7 | 17.0 | 1.4 | 13.0 | 9.3 |
| Total FICO scores of 620 to 659 | 2.7 | 4.4 | 1.6 | 9.1 | 2.3 | 19.3 | 6.6 | 9.7 | 9.2 |
| *FICO scores ≥ 660:* | | | | | | | | | |
| North Central | 9.0 | 0.6 | 4.4 | 2.2 | 2.7 | 7.3 | 16.1 | 1.7 | 1.9 |
| Northeast | 15.0 | 1.1 | 5.6 | 4.0 | 2.1 | 13.2 | 22.7 | 1.8 | 2.5 |
| Southeast | 7.7 | 1.2 | 3.7 | 3.0 | 3.4 | 14.5 | 14.8 | 2.3 | 4.0 |
| Southwest | 7.8 | 0.6 | 2.4 | 2.0 | 0.3 | 6.0 | 10.5 | 1.0 | 1.0 |
| West | 14.2 | 0.5 | 5.2 | 2.0 | 6.3 | 10.0 | 25.7 | 3.2 | 2.8 |
| Total FICO scores ≥ 660 | 53.7 | 0.8 | 21.3 | 2.7 | 14.8 | 10.9 | 89.8 | 2.1 | 2.5 |
| Total FICO scores not available | 0.3 | 4.9 | 0.1 | 11.9 | 0.1 | 21.9 | 0.5 | 6.0 | 8.8 |
| *All FICO scores:* | | | | | | | | | |
| North Central | 9.7 | 1.0 | 5.0 | 3.1 | 3.4 | 9.3 | 18.1 | 2.8 | 2.7 |
| Northeast | 16.3 | 1.7 | 6.3 | 5.4 | 2.8 | 16.4 | 25.4 | 2.9 | 3.6 |
| Southeast | 8.4 | 1.9 | 4.2 | 4.2 | 4.3 | 16.9 | 16.9 | 3.6 | 5.3 |
| Southwest | 8.6 | 1.0 | 2.7 | 3.2 | 0.5 | 9.2 | 11.8 | 1.9 | 1.7 |
| West | 14.9 | 0.7 | 5.6 | 2.4 | 7.3 | 11.1 | 27.8 | 4.1 | 3.3 |
| Total single-family credit guarantee portfolio[7] | 57.9% | 1.3% | 23.8% | 3.7% | 18.3% | 12.9% | 100.0% | 3.1% | 3.5% |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3665

Table of Contents

| | As of December 31, 2011 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current LTV Ratio ≤ 80(1) | | Current LTV Ratio of > 80 to 100(1) | | Current LTV > 100(1) | | Current LTV Ratio All Loans(1) | | |
| | Percentage of Portfolio(2) | Serious Delinquency Rate | Percentage of Portfolio(2) | Serious Delinquency Rate | Percentage of Portfolio(2) | Serious Delinquency Rate | Percentage of Portfolio(2) | Percentage Modified(3) | Serious Delinquency Rate |
| **By Product Type** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 0.9% | 8.1% | 0.8% | 13.4% | 1.0% | 23.7% | 2.7% | 16.6% | 14.2% |
| 15- year amortizing fixed-rate | 0.2 | 4.2 | <0.1 | 10.1 | <0.1 | 17.6 | 0.2 | 1.2 | 4.7 |
| ARMs/adjustable rate(4) | 0.1 | 10.8 | <0.1 | 17.2 | <0.1 | 25.4 | 0.1 | 9.8 | 15.4 |
| Interest only(5) | <0.1 | 16.0 | <0.1 | 22.4 | 0.1 | 34.9 | 0.1 | 0.4 | 30.3 |
| Other(6) | <0.1 | 3.6 | <0.1 | 7.4 | 0.1 | 14.1 | 0.1 | 4.2 | 5.6 |
| Total FICO scores < 620 | 1.2 | 7.0 | 0.8 | 13.5 | 1.2 | 24.1 | 3.2 | 13.4 | 12.9 |
| FICO scores of 620 to 659: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 2.0 | 5.2 | 1.5 | 8.9 | 2.0 | 18.4 | 5.5 | 11.5 | 10.1 |
| 15- year amortizing fixed-rate | 0.6 | 2.5 | <0.1 | 6.1 | <0.1 | 15.1 | 0.6 | 0.6 | 2.8 |
| ARMs/adjustable rate(4) | 0.1 | 5.5 | 0.1 | 11.7 | 0.1 | 23.6 | 0.3 | 2.0 | 12.6 |
| Interest only(5) | <0.1 | 10.4 | 0.1 | 18.6 | 0.3 | 31.7 | 0.4 | 0.3 | 27.2 |
| Other(6) | <0.1 | 2.8 | <0.1 | 4.8 | <0.1 | 5.5 | <0.1 | 1.4 | 4.5 |
| Total FICO scores of 620 to 659 | 2.7 | 4.4 | 1.7 | 9.1 | 2.4 | 19.4 | 6.8 | 8.9 | 9.4 |
| FICO scores of ≥ 660: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 34.6 | 1.0 | 20.3 | 2.4 | 12.4 | 9.2 | 67.3 | 2.7 | 2.8 |
| 15- year amortizing fixed-rate | 13.1 | 0.4 | 1.0 | 1.1 | 0.2 | 6.0 | 14.3 | 0.1 | 0.5 |
| ARMs/adjustable rate(4) | 2.5 | 1.1 | 0.8 | 4.3 | 0.8 | 14.8 | 4.1 | 0.5 | 4.5 |
| Interest only(5) | 0.4 | 3.7 | 0.7 | 9.2 | 2.5 | 20.7 | 3.6 | 0.2 | 16.2 |
| Other(6) | <0.1 | 2.0 | <0.1 | 2.0 | 0.1 | 2.0 | 0.1 | 0.5 | 2.0 |
| Total FICO scores ≥ 660 | 50.6 | 0.8 | 22.8 | 2.6 | 16.0 | 10.8 | 89.4 | 1.9 | 2.6 |
| Total FICO scores not available | 0.3 | 4.8 | 0.2 | 11.9 | 0.1 | 21.4 | 0.6 | 5.5 | 8.9 |
| All FICO scores: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 37.7 | 1.6 | 22.5 | 3.4 | 15.6 | 11.5 | 75.8 | 4.1 | 3.9 |
| 15- year amortizing fixed-rate | 13.8 | 0.6 | 1.1 | 1.5 | 0.2 | 7.3 | 15.1 | 0.1 | 0.7 |
| ARMs/adjustable rate(4) | 2.7 | 1.8 | 1.0 | 5.5 | 0.9 | 16.4 | 4.6 | 1.0 | 5.5 |
| Interest only(5) | 0.5 | 4.4 | 0.8 | 10.5 | 2.8 | 22.2 | 4.1 | 0.2 | 17.6 |
| Other(6) | 0.1 | 8.9 | 0.1 | 8.4 | 0.2 | 8.4 | 0.4 | 6.8 | 8.6 |
| Total single-family credit guarantee portfolio(7) | 54.8% | 1.3% | 25.5% | 3.6% | 19.7% | 12.8% | 100.0% | 2.9% | 3.6% |
| **By Region(8)** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| North Central | 0.2% | 6.3% | 0.2% | 11.7% | 0.2% | 20.1% | 0.6% | 13.4% | 12.0% |
| Northeast | 0.4 | 9.3 | 0.2 | 19.0 | 0.3 | 28.9 | 0.9 | 14.3 | 14.9 |
| Southeast | 0.2 | 7.9 | 0.2 | 13.9 | 0.3 | 29.5 | 0.7 | 13.9 | 15.9 |
| Southwest | 0.2 | 5.1 | 0.1 | 11.0 | 0.1 | 19.5 | 0.4 | 9.4 | 8.0 |
| West | 0.2 | 4.6 | 0.1 | 9.1 | 0.3 | 19.5 | 0.6 | 16.2 | 11.8 |
| Total FICO scores < 620 | 1.2 | 7.0 | 0.8 | 13.5 | 1.2 | 24.1 | 3.2 | 13.4 | 12.9 |
| FICO scores of 620 to 659: | | | | | | | | | |
| North Central | 0.5 | 4.0 | 0.3 | 8.2 | 0.5 | 15.1 | 1.3 | 8.7 | 8.4 |
| Northeast | 0.8 | 5.8 | 0.5 | 12.9 | 0.4 | 23.3 | 1.7 | 9.1 | 10.3 |
| Southeast | 0.5 | 5.2 | 0.3 | 9.5 | 0.6 | 24.1 | 1.4 | 9.1 | 12.2 |
| Southwest | 0.5 | 3.1 | 0.3 | 7.0 | 0.1 | 13.6 | 0.9 | 5.9 | 5.1 |
| West | 0.4 | 3.1 | 0.3 | 6.8 | 0.8 | 17.6 | 1.5 | 12.0 | 10.0 |
| Total FICO scores of 620 to 659 | 2.7 | 4.4 | 1.7 | 9.1 | 2.4 | 19.4 | 6.8 | 8.9 | 9.4 |
| FICO scores of ≥660: | | | | | | | | | |
| North Central | 8.5 | 0.7 | 4.7 | 2.3 | 2.8 | 7.4 | 16.0 | 1.6 | 2.0 |
| Northeast | 14.9 | 1.0 | 5.7 | 3.9 | 2.0 | 12.6 | 22.6 | 1.6 | 2.3 |
| Southeast | 7.1 | 1.2 | 3.9 | 2.8 | 3.8 | 14.4 | 14.8 | 2.1 | 4.2 |
| Southwest | 7.4 | 0.6 | 2.7 | 2.0 | 0.4 | 6.2 | 10.5 | 0.9 | 1.1 |
| West | 12.7 | 0.5 | 5.8 | 1.7 | 7.0 | 10.1 | 25.5 | 2.9 | 3.0 |
| Total FICO scores ≥660 | 50.6 | 0.8 | 22.8 | 2.6 | 16.0 | 10.8 | 89.4 | 1.9 | 2.6 |
| Total FICO scores not available | 0.3 | 4.8 | 0.2 | 11.9 | 0.1 | 21.4 | 0.6 | 5.5 | 8.9 |
| All FICO scores: | | | | | | | | | |
| North Central | 9.1 | 1.0 | 5.3 | 3.2 | 3.6 | 9.5 | 18.0 | 2.6 | 2.9 |
| Northeast | 16.1 | 1.6 | 6.4 | 5.3 | 2.7 | 15.8 | 25.2 | 2.7 | 3.4 |
| Southeast | 7.9 | 1.8 | 4.4 | 4.0 | 4.7 | 16.8 | 17.0 | 3.4 | 5.5 |
| Southwest | 8.2 | 1.1 | 3.2 | 3.1 | 0.6 | 9.4 | 12.0 | 1.8 | 1.8 |
| West | 13.5 | 0.7 | 6.2 | 2.1 | 8.1 | 11.3 | 27.8 | 3.8 | 3.6 |
| Total single-family credit guarantee portfolio(7) | 54.8% | 1.3% | 25.5% | 3.6% | 19.7% | 12.8% | 100.0% | 2.9% | 3.6% |

(1)   The current LTV ratios are our estimates. See endnote (2) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information.

(2)   Based on UPB of the single-family credit guarantee portfolio.

(3)   See endnote (2) to "Table 41 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio".

(4)   Includes balloon/resets and option ARM mortgage loans.

(5)   Includes both fixed rate and adjustable rate loans. The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post-modification), primarily due to delays in processing.

(6)   Consist of FHA/VA and other government guaranteed mortgages.

(7)   The total of all FICO scores categories may not sum due to the inclusion of loans where FICO scores are not available in the respective totals for all loans. See endnote (7) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information about our presentation of FICO scores.

(8)   Presentation with the following regional designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); and Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3666

Table of Contents

The table below presents foreclosure and short sale rate information for loans in our single-family credit guarantee portfolio based on year of origination.

**Table 43 — Single-Family Credit Guarantee Portfolio by Year of Loan Origination**

| | As of June 30, 2012 | | As of December 31, 2011 | |
|---|---|---|---|---|
| Year of Loan Origination | Percentage of Portfolio | Foreclosure and Short Sale Rate[1] | Percentage of Portfolio | Foreclosure and Short Sale Rate[1] |
| 2012 | 9% | —% | N/A | N/A |
| 2011 | 16 | 0.02 | 14% | —% |
| 2010 | 17 | 0.11 | 19 | 0.05 |
| 2009 | 15 | 0.25 | 18 | 0.17 |
| Combined - 2009 to 2012 | 57 | 0.11 | 51 | 0.08 |
| 2008 | 6 | 2.74 | 7 | 2.23 |
| 2007 | 9 | 8.65 | 10 | 7.49 |
| 2006 | 6 | 7.82 | 7 | 6.95 |
| 2005 | 7 | 4.60 | 8 | 4.07 |
| Combined - 2005 to 2008 | 28 | 6.17 | 32 | 5.35 |
| 2004 and prior[2] | 15 | 1.12 | 17 | 1.04 |
| Total | 100% | | 100% | |

(1) Calculated for each year of origination as the number of loans that have proceeded to foreclosure transfer or short sale and resulted in a credit loss, excluding any subsequent recoveries, during the period from origination to June 30, 2012 and December 31, 2011, respectively, divided by the number of loans originated in that year that were acquired in our single-family credit guarantee portfolio.

(2) The foreclosure and short sale rate presented for loans originated in 2004 and prior represents the rate associated with loans originated in 2000 through 2004.

HARP loans represented 8% of the UPB of our single-family credit guarantee portfolio as of June 30, 2012. Including HARP loans, the UPB of loans originated after 2008 comprised 57% of our portfolio as of June 30, 2012. At June 30, 2012, approximately 28% of our single-family credit guarantee portfolio consisted of mortgage loans originated from 2005 through 2008. Loans originated from 2005 through 2008 have experienced higher serious delinquency rates in the earlier years of their terms as compared to our historical experience. We attribute this serious delinquency performance to a number of factors, including: (a) the expansion of credit terms under which loans were underwritten during these years; (b) an increase in the origination and our purchase of interest-only and Alt-A mortgage products in these years; and (c) an environment of persistently high unemployment, decreasing home sales, and broadly declining home prices in the period following the loans' origination. Interest-only and Alt-A products have higher inherent credit risk than traditional fixed-rate mortgage products.

*Multifamily Mortgage Credit Risk*

To manage our multifamily mortgage portfolio credit risk, we focus on several key areas: (a) underwriting standards and quality control process; (b) selling significant portions of credit risk through subordination in our Other Guarantee Transactions; (c) portfolio diversification, particularly by product and geographical area; and (d) portfolio management activities, including loss mitigation and use of credit enhancements. We monitor the loan performance, the underlying properties and a variety of mortgage loan characteristics that may affect the default experience on our multifamily mortgage portfolio, such as the DSCR, LTV ratio, geographic location, and loan maturity.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3667

Table of Contents

The table below provides certain attributes of our multifamily mortgage portfolio at June 30, 2012 and December 31, 2011.

**Table 44 — Multifamily Mortgage Portfolio — by Attribute**

| | UPB at | | Delinquency Rate[1] at | |
|---|---|---|---|---|
| | June 30, 2012 | December 31, 2011 | June 30, 2012 | December 31, 2011 |
| | (dollars in billions) | | | |
| **Original LTV ratio[2]** | | | | |
| Below 75% | $ 82.8 | $ 78.8 | 0.13% | 0.10% |
| 75% to 80% | 32.5 | 30.9 | 0.17 | 0.08 |
| Above 80% | 6.1 | 6.4 | 2.64 | 2.34 |
| Total | $ 121.4 | $ 116.1 | 0.27% | 0.22% |
| Weighted average LTV ratio at origination | 70% | 70% | | |
| **Maturity Dates** | | | | |
| 2012 | $ 2.0 | $ 3.0 | 1.41% | 1.35% |
| 2013 | 3.7 | 5.6 | — | — |
| 2014 | 7.3 | 7.6 | 0.66 | 0.03 |
| 2015 | 10.7 | 11.0 | 0.27 | 0.17 |
| 2016 | 14.0 | 13.5 | 0.16 | 0.06 |
| Beyond 2016 | 83.7 | 75.4 | 0.24 | 0.25 |
| Total | $ 121.4 | $ 116.1 | 0.27% | 0.22% |
| **Year of Acquisition or Guarantee[3]** | | | | |
| 2004 and prior | $ 11.1 | $ 12.4 | 0.22% | 0.40% |
| 2005 | 6.9 | 7.2 | 0.64 | 0.20 |
| 2006 | 10.3 | 10.8 | 0.47 | 0.25 |
| 2007 | 19.4 | 19.8 | 0.73 | 0.74 |
| 2008 | 18.7 | 20.6 | 0.38 | 0.09 |
| 2009 | 13.1 | 13.8 | — | — |
| 2010 | 12.4 | 12.7 | — | — |
| 2011 | 17.5 | 18.8 | — | — |
| 2012 | 12.0 | N/A | — | N/A |
| Total | $ 121.4 | $ 116.1 | 0.27% | 0.22% |
| **Current Loan Size** | | | | |
| Above $25 million | $ 44.4 | $ 42.8 | 0.12% | 0.06% |
| Above $5 million to $25 million | 67.8 | 64.0 | 0.38 | 0.31 |
| $5 million and below | 9.2 | 9.3 | 0.20 | 0.31 |
| Total | $ 121.4 | $ 116.1 | 0.27% | 0.22% |
| **Legal Structure** | | | | |
| Unsecuritized loans | $ 79.6 | $ 82.3 | 0.18% | 0.10% |
| Non-consolidated Freddie Mac mortgage-related securities | 32.3 | 24.2 | 0.45 | 0.64 |
| Other guarantee commitments | 9.5 | 9.6 | 0.40 | 0.18 |
| Total | $ 121.4 | $ 116.1 | 0.27% | 0.22% |
| **Credit Enhancement** | | | | |
| Credit-enhanced | $ 39.5 | $ 31.6 | 0.44% | 0.52% |
| Non-credit-enhanced | 81.9 | 84.5 | 0.19 | 0.11 |
| Total | $ 121.4 | $ 116.1 | 0.27% | 0.22% |

(1)   See "Delinquencies" below for more information about our multifamily delinquency rates.

(2)   Original LTV ratios are calculated as the UPB of the mortgage, divided by the lesser of the appraised value of the property at the time of mortgage origination or, except for refinance loans, the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.

(3)   Based on either: (a) the year of acquisition, for loans recorded on our consolidated balance sheets; or (b) the year that we issued our guarantee, for the remaining loans in our multifamily mortgage portfolio.

Our multifamily mortgage portfolio consists of product types that are categorized based on loan terms. Multifamily loans may be interest-only or amortizing, fixed or variable rate, or may switch between fixed and variable rate over time. However, our multifamily loans generally have balloon maturities ranging from five to ten years. Amortizing loans reduce our credit exposure over time because the UPB declines with each mortgage payment. Fixed-rate loans may also create less risk for us because the borrower's payments are determined at origination, and, therefore, the risk that the monthly mortgage payment could increase if interest rates rise is eliminated. As of June 30, 2012 and December 31, 2011, approximately 84% and 85%, respectively, of the multifamily loans on our consolidated balance sheets had fixed interest rates while the remaining loans had variable interest rates.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Because most multifamily loans require a significant lump sum ( *i.e.*, balloon) payment of unpaid principal at maturity, the borrower's potential inability to refinance or pay off the loan at maturity is a serious concern for us. Borrowers may be less able to refinance their obligations during periods of rising interest rates, which could lead to default if the borrower is unable to find affordable refinancing. Loan size at origination does not generally indicate the degree of a loan's risk, but it does indicate our potential exposure to default.

Our primary business strategy in the multifamily segment is to purchase multifamily mortgage loans for aggregation and then securitization. Currently, our most significant multifamily securitization activity involves our guarantee of the senior tranches of these securitizations in Other Guarantee Transactions. The subordinate tranches, that we do not guarantee, provide credit loss protection to the senior classes that we do guarantee. Subordinated classes are allocated credit losses prior to the senior classes. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections and other forms of credit enhancements covering loans in our multifamily mortgage portfolio.

We also use credit enhancements to mitigate risk of loss on certain multifamily mortgages and housing revenue bonds. For example, we may require credit enhancements during construction or rehabilitation in cases where we commit to purchase or guarantee a permanent loan upon completion and in cases where occupancy has not yet reached a level that produces the operating income that was the basis for underwriting the mortgage.

In certain cases, we may provide short-term loan extensions of up to 12 months for certain borrowers. Modifications of loans (including short-term loan extensions) are performed in an effort to minimize our losses. During the first half of 2012, we modified unsecuritized multifamily loans totaling $249 million in UPB, compared with $170 million during the first half of 2011. Multifamily unsecuritized loan modifications in the first half 2012 included: (a) $58 million in UPB for short-term loan extensions; and (b) $191 million in UPB for other loan modifications. Where we have granted a concession to borrowers experiencing financial difficulties, we account for these loans as TDRs. When we execute a modification classified as a TDR, the loan is then classified as nonperforming for the life of the loan regardless of its delinquency status. At June 30, 2012 and December 31, 2011, we had $870 million and $893 million, respectively, in UPB of multifamily loans classified as TDRs on our consolidated balance sheets.

*Delinquencies*

Our multifamily delinquency rates include all multifamily loans that we own, that are collateral for Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by HFA bonds because these guarantees do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancement provided by the U.S. government. We report multifamily delinquency rates based on UPB of mortgage loans that are two monthly payments or more past due or in the process of foreclosure, as reported by our servicers. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as delinquent as long as the borrower is less than two monthly payments past due under the modified terms. In addition, multifamily loans are not counted as delinquent if the borrower has entered into a forbearance agreement and is abiding by the terms of the agreement, whereas single-family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower, if applicable.

Our multifamily mortgage portfolio delinquency rate was 0.27% at June 30, 2012 and 0.22% at December 31, 2011. Our delinquency rate for credit-enhanced loans was 0.44% and 0.52% at June 30, 2012 and December 31, 2011, respectively, and for non-credit-enhanced loans was 0.19% and 0.11% at June 30, 2012 and December 31, 2011, respectively. As of June 30, 2012, approximately one-half of our multifamily loans that were two or more monthly payments past due, measured on a UPB basis, had credit enhancements that we currently believe will mitigate our expected losses on these loans.

Our delinquency rates have remained relatively low compared to other industry participants, which we believe to be, in part, the result of our prudent underwriting standards and practices versus those used by others in the industry. Our delinquency rates for multifamily loans are positively affected to the extent we have been successful in working with troubled borrowers to modify loans prior to becoming delinquent or by providing temporary relief through loan modifications, including short-term extensions, or entering into a forbearance agreement. The most recent market data available continues to reflect improving national apartment fundamentals, including decreasing vacancy rates and increasing effective rents. As a result we expect our multifamily delinquency rate to remain relatively low during the remainder of 2012. For further information regarding the loans in our multifamily mortgage portfolio, including regional geographic composition and other concentrations, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3669

Table of Contents

*Non-Performing Assets*

Non-performing assets consist of single-family and multifamily loans that have undergone a TDR, single-family seriously delinquent loans, multifamily loans that are three or more payments past due or in the process of foreclosure, and REO assets, net. Non-performing assets also include multifamily loans that are deemed impaired based on management judgment. We place non-performing loans on non-accrual status when we believe the collectability of interest and principal on a loan is not reasonably assured, unless the loan is well secured and in the process of collection. When a loan is placed on non-accrual status, any interest income accrued but uncollected is reversed. Thereafter, interest income is recognized only upon receipt of cash payments. We did not accrue interest on any loans three monthly payments or more past due during the three and six months ended June 30, 2012.

We classify TDRs as those loans where we have granted a concession to a borrower that is experiencing financial difficulties. TDRs remain categorized as non-performing throughout the remaining life of the loan regardless of whether the borrower makes payments which return the loan to a current payment status after modification. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for further information about our TDRs.

The table below provides detail on non-performing loans and REO assets on our consolidated balance sheets and non-performing loans underlying our financial guarantees.

**Table 45 — Non-Performing Assets**[1]

| | June 30, 2012 | December 31, 2011 | June 30, 2011 |
|---|---|---|---|
| | | (dollars in millions) | |
| Non-performing mortgage loans—on balance sheet: | | | |
| Single-family TDRs: | | | |
| Less than three monthly payments past due | $ 47,960 | $ 44,440 | $ 36,243 |
| Seriously delinquent | 14,862 | 11,639 | 3,884 |
| Multifamily TDRs[2] | 870 | 893 | 988 |
| Total TDRs | 63,692 | 56,972 | 41,115 |
| Other seriously delinquent single-family loans[3] | 54,482 | 63,205 | 73,397 |
| Other multifamily loans[4] | 1,657 | 1,819 | 1,901 |
| Total non-performing mortgage loans - on balance sheet | 119,831 | 121,996 | 116,413 |
| Non-performing mortgage loans—off-balance sheet: | | | |
| Single-family loans | 1,159 | 1,230 | 1,295 |
| Multifamily loans | 429 | 246 | 221 |
| Total non-performing mortgage loans - off-balance sheet | 1,588 | 1,476 | 1,516 |
| Real estate owned, net | 4,809 | 5,680 | 5,932 |
| Total non-performing assets | $126,228 | $ 129,152 | $123,861 |
| Loan loss reserves as a percentage of our non-performing mortgage loans | 29.5% | 32.0% | 33.2% |
| Total non-performing assets as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | 6.8% | 6.8% | 6.4% |

(1) Mortgage loan amounts are based on UPB and REO, net is based on carrying values.
(2) As of June 30, 2012, approximately $837 million in UPB of these loans were current.
(3) Represents loans recognized by us on our consolidated balance sheets, including loans removed from PC trusts due to the borrower's serious delinquency.
(4) Of this amount, $1.5 billion, $1.8 billion, and $1.7 billion of UPB were current at June 30, 2012, December 31, 2011, and June 30, 2011, respectively.

The amount of non-performing assets declined to $126.2 billion as of June 30, 2012, from $129.2 billion as of December 31, 2011, primarily due to a decline in the rate at which loans transitioned into serious delinquency during the first half of 2012 combined with continued high levels of foreclosures and REO dispositions. The UPB of loans categorized as TDRs increased to $63.7 billion at June 30, 2012 from $57.0 billion at December 31, 2011, largely due to the significant volume of loan modifications and loans entering a modification trial period during the first half of 2012. TDRs during the first half of 2012 include HAMP and non-HAMP loan modifications as well as loans in modification trial periods and certain other loss mitigation actions. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report, and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for information about TDRs, including our implementation of an amendment to the accounting guidance on classification of loans as TDRs in the third quarter of 2011. We expect our non-performing assets, including loans deemed to be TDRs, to remain at elevated levels for the remainder of 2012.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3670

Table of Contents

The table below provides detail by region for REO activity. Our REO activity consists almost entirely of single-family residential properties. See "Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for information about regional serious delinquency rates.

**Table 46 — REO Activity by Region**[1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (number of properties) | | | |
| **REO Inventory** | | | | |
| Beginning property inventory | 59,323 | 65,174 | 60,555 | 72,093 |
| Properties acquired by region: | | | | |
| Northeast | 1,862 | 1,921 | 3,687 | 3,406 |
| Southeast | 5,924 | 5,131 | 12,991 | 9,865 |
| North Central | 6,737 | 6,405 | 14,375 | 12,780 |
| Southwest | 2,545 | 3,388 | 5,315 | 6,501 |
| West | 2,967 | 7,954 | 7,472 | 16,956 |
| Total properties acquired | 20,035 | 24,799 | 43,840 | 49,508 |
| Properties disposed by region: | | | | |
| Northeast | (1,956) | (2,427) | (3,878) | (5,088) |
| Southeast | (7,058) | (7,540) | (13,345) | (16,754) |
| North Central | (7,458) | (6,801) | (14,295) | (14,093) |
| Southwest | (3,279) | (3,539) | (6,532) | (7,019) |
| West | (6,325) | (9,048) | (13,063) | (18,029) |
| Total properties disposed | (26,076) | (29,355) | (51,113) | (60,983) |
| Ending property inventory | 53,282 | 60,618 | 53,282 | 60,618 |

(1) See endnote (8) to "Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for a description of these regions.

Our REO inventory (measured in number of properties) declined 12% from December 31, 2011 to June 30, 2012 as the volume of single-family REO dispositions exceeded the volume of single-family REO acquisitions. We believe our single-family REO acquisition volume in the first half of 2012 has been less than it otherwise would have been due to the length of the single-family foreclosure timeline, particularly in states that require a judicial foreclosure process and, in part, to resource constraints on foreclosure activities for five larger servicers involved in a recent settlement with a coalition of state attorneys general and federal agencies. Foreclosures generally take longer to complete in states where judicial foreclosures (those sold under the supervision of a court) are required than in states where non-judicial foreclosures are permitted.

The average length of time for foreclosure of a Freddie Mac loan significantly increased in recent years due to temporary suspensions, delays, legislative and regulatory developments, changes in servicing practices, and other factors. During the six months ended June 30, 2012 and 2011, respectively, the nationwide average for completion of a foreclosure (as measured from the date of the last scheduled payment made by the borrower) on our single-family delinquent loans, excluding those underlying our Other Guarantee Transactions, was 597 days and 477 days, respectively, which included: (a) an average of 756 days and 576 days, respectively, for foreclosures completed in states that require a judicial foreclosure process; and (b) an average of 461 days and 442 days, respectively, for foreclosures completed in states that do not require a judicial foreclosure process. We continue to experience significant variability in the average time for foreclosure by state. For example, during the six months ended June 30, 2012, the average time for completion of foreclosures associated with loans in our single-family credit guarantee portfolio, excluding Other Guarantee Transactions, ranged from 383 days in Michigan to 1,002 days in Florida. As of June 30, 2012, our serious delinquency rate for the aggregate of those states that require a judicial foreclosure and all other states was 4.35% and 2.52%, respectively, compared to 4.47% and 2.74%, respectively, as of December 31, 2011.

We expect the pace of our REO acquisitions will continue to be affected for the remainder of 2012 by the length of the foreclosure process, particularly in states with a judicial foreclosure process. However, we expect the volume of our REO acquisitions will likely remain elevated, as we have a large inventory of seriously delinquent loans in our single-family credit guarantee portfolio. Our single-family REO acquisitions in the first half of 2012 were most significant in the states of Florida, Illinois, Michigan, California and Georgia, which collectively represented 42% of total REO acquisitions based on the number of properties. The states with the most properties in our REO inventory as of June 30, 2012 were Michigan and Illinois, which comprised 12% and 11%, respectively, of total REO property inventory, based on the number of properties.

83

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The percentage of interest-only and Alt-A loans in our single-family credit guarantee portfolio, based on UPB, was approximately 4% and 5%, respectively, at June 30, 2012 and was 7% on a combined basis. The percentage of our REO acquisitions in the six months ended June 30, 2012 that had been financed by either of these loan types represented approximately 25% of our total REO acquisitions, based on loan amount prior to acquisition.

We are limited in our single-family REO disposition efforts by the capacity of the market to absorb large numbers of foreclosed properties. A significant portion of our REO acquisitions are: (a) located in jurisdictions that require a period of time after foreclosure during which the borrower may reclaim the property; or (b) occupied and we have either retained the tenant under an existing lease or begun the process of eviction. All of these factors resulted in an increase in the aging of our inventory. During the period when the borrower may reclaim the property, or we are completing the eviction process, we are not able to market the property. As of both June 30, 2012 and December 31, 2011, approximately 33% of our REO properties were not marketable due to the above conditions. In addition, certain of our REO properties may not be actively marketed because we are readying the property for sale, or we are involved in litigation or other legal and regulatory issues concerning the property. Though it varied significantly in different states, the average holding period of our single-family REO properties was little changed during the first half of 2012. Excluding any post-foreclosure period during which borrowers may reclaim a foreclosed property, the average holding period associated with our single-family REO dispositions during the six months ended June 30, 2012 and 2011 was 200 days and 193 days, respectively. As of June 30, 2012 and December 31, 2011, the percentage of our single-family REO property inventory that had been held for sale longer than one year was 6.5% and 7.1%, respectively, though the number of aged assets has steadily declined through the first half of 2012. Although we continue to actively market available properties through our established initiatives, as discussed above, a high percentage of properties remain unavailable for marketing.

We also have a variety of alternative methods for REO sales that we employ from time to time, as appropriate, including bulk sales and auctions; however, auction sales represented an insignificant portion of our REO dispositions in the first half of 2012 and bulk sales were not utilized. In June 2012, we implemented an online bulk sale process and expect to see an increase in bulk sales of our REO properties in the remainder of 2012. We are continuing to participate in discussions with FHFA and other agencies on new options for sales and rentals of our single-family REO properties. It is too early to determine the impact any potential new initiatives may have on the levels of our REO property inventory, the process for disposing of REO property or our REO operations expense.

*Credit Loss Performance*

Many loans that are seriously delinquent, or in foreclosure, result in credit losses. The table below provides detail on our credit loss performance associated with mortgage loans and REO assets on our consolidated balance sheets and underlying our non-consolidated mortgage-related financial guarantees.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**Table 47 — Credit Loss Performance**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | | (dollars in millions) | | |
| **REO** | | | | |
| REO balances, net: | | | | |
| Single-family | $ 4,715 | $ 5,834 | $4,715 | $5,834 |
| Multifamily | 94 | 98 | 94 | 98 |
| Total | $ 4,809 | $ 5,932 | $4,809 | $5,932 |
| REO operations (income) expense: | | | | |
| Single-family | $ (34) | $ 35 | $ 138 | $ 292 |
| Multifamily | 4 | (8) | 3 | (8) |
| Total | $ (30) | $ 27 | $ 141 | $ 284 |
| Charge-offs | | | | |
| Single-family: | | | | |
| Charge-offs, gross[1] (including $3.3 billion, $3.8 billion, $7.0 billion, and $7.3 billion relating to loan loss reserves, respectively) | $ 3,377 | $ 3,871 | $7,155 | $7,524 |
| Recoveries[2] | (485) | (800) | (1,000) | (1,484) |
| Single-family, net | $ 2,892 | $ 3,071 | $6,155 | $6,040 |
| Multifamily: | | | | |
| Charge-offs, gross[1] (including $7 million, $29 million, $8 million, and $41 million relating to loan loss reserves, respectively) | $ 7 | $ 29 | $ 8 | $ 41 |
| Recoveries[2] | — | — | — | — |
| Multifamily, net | $ 7 | $ 29 | $ 8 | $ 41 |
| Total Charge-offs: | | | | |
| Charge-offs, gross[1] (including $3.3 billion, $3.8 billion, $7.0 billion, and $7.4 billion relating to loan loss reserves, respectively) | $ 3,384 | $ 3,900 | $ 7,163 | $7,565 |
| Recoveries[2] | (485) | (800) | (1,000) | (1,484) |
| Total Charge-offs, net | $ 2,899 | $ 3,100 | $6,163 | $6,081 |
| Credit Losses[3] | | | | |
| Single-family | $ 2,858 | $ 3,106 | $6,293 | $ 6,332 |
| Multifamily | 11 | 21 | 11 | 33 |
| Total | $ 2,869 | $ 3,127 | $6,304 | $6,365 |
| Total (in bps)[4] | 62.5 | 64.9 | 68.1 | 66.0 |

(1) Represent the carrying amount of a loan that has been discharged in order to remove the loan from our consolidated balance sheets at the time of resolution, regardless of when the impact of the credit loss was recorded on our consolidated statements of comprehensive income through the provision for credit losses or losses on loans purchased. Charge-offs primarily result from foreclosure transfers and short sales and are generally calculated as the recorded investment of a loan at the date it is discharged less the estimated value in final disposition or actual net sales in a short sale.

(2) Recoveries of charge-offs primarily result from foreclosure alternatives and REO acquisitions on loans where: (a) a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements; or (b) we received a reimbursement of our losses from a seller/servicer associated with a repurchase request on a loan that experienced a foreclosure transfer or a foreclosure alternative.

(3) Excludes foregone interest on non-performing loans, which reduces our net interest income but is not reflected in our total credit losses. In addition, excludes other market-based credit losses: (a) incurred on our investments in mortgage loans and mortgage-related securities; and (b) recognized in our consolidated statements of comprehensive income.

(4) Calculated as credit losses divided by the average carrying value of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates.

Our credit loss performance metric generally measures losses at the conclusion of the loan and related collateral resolution process. There is a significant lag in time from the implementation of problem loan workout activities until the final resolution of seriously delinquent mortgage loans and REO assets. Our credit loss performance is based on our charge-offs and REO expenses. We primarily record charge-offs at the time we take ownership of a property through foreclosure and at the time of settlement of foreclosure alternative transactions. Single-family charge-offs, gross, for the three and six months ended June 30, 2012 were $3.4 billion and $7.2 billion, respectively, compared to $3.9 billion and $7.5 billion for the three and six months ended June 30, 2011, respectively. These charge-offs were associated with approximately $6.8 billion and $14.2 billion, in UPB of loans for the three and six months ended June 30, 2012, respectively, and $7.7 billion and $15.7 billion for the three and six months ended June 30, 2011, respectively. Our net charge-offs and credit losses in the first half of 2012 remained elevated, but were less than they otherwise would have been because of the suppression of loan and collateral resolution activity due to the length of the foreclosure timeline, particularly in states that require a judicial foreclosure process. We expect our charge-offs and credit losses to remain high for the remainder of 2012 due to the large number of single-family non-performing loans that will likely be resolved and because market conditions, such as home prices, continue to remain weak.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3673

Table of Contents

Our credit losses during the first half of 2012 continued to be disproportionately high in those states that experienced significant declines in property values since 2006, such as California, Florida, Nevada, and Arizona, which collectively comprised approximately 54% and 55% of our total credit losses in both the three and six months ended June 30, 2012, respectively. Loans originated in 2005 through 2008 comprised approximately 28% of our single-family credit guarantee portfolio, based on UPB at June 30, 2012, however, these loans accounted for approximately 88% of our credit losses during the six months ended June 30, 2012. Due to declines in property values since 2006, we continued to experience high REO disposition severity ratios on sales of our REO inventory. In addition, although Alt-A loans comprised approximately 5% of our single-family credit guarantee portfolio at June 30, 2012, these loans accounted for approximately 24% of our credit losses during the six months ended June 30, 2012. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for information on REO disposition severity ratios, and see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information about our credit losses.

*Loan Loss Reserves*

We maintain mortgage-related loan loss reserves at levels we believe appropriate to absorb probable incurred losses on mortgage loans held-for-investment on our consolidated balance sheets and those underlying Freddie Mac mortgage-related securities and other guarantee commitments. Determining the loan loss reserves is complex and requires significant management judgment about matters that involve a high degree of subjectivity. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for additional information on our accounting policies for loan loss reserves and TDR loans, including our implementation of changes to the accounting guidance related to the classification of loans as TDRs. In recent periods, the portion of our loan loss reserves attributable to individually impaired loans has increased while the portion of our loan loss reserves determined on a collective basis has declined. As of June 30, 2012 and December 31, 2011, the recorded investment of individually impaired single-family mortgage loans was $66.0 billion and $60.0 billion, respectively, and the loan loss reserves associated with these loans were $16.0 billion and $15.1 billion, respectively. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for additional information about our TDR loans. See "CONSOLIDATED RESULTS OF OPERATIONS — Provision for Credit Losses," for a discussion of our provision for credit losses and charge-off activity.

The table below summarizes our allowance for loan loss activity for individually impaired single-family mortgage loans on our consolidated balance sheets for which we have recorded a specific reserve.

**Table 48 — Single-Family Impaired Loans with Specific Reserve Recorded**

| | # of Loans | Amount |
|---|---:|---:|
| | | (in millions) |
| TDRs (recorded investment): | | |
| March 31, 2012 balance | 267,939 | $  56,186 |
| New additions | 26,025 | 4,996 |
| Repayments | (1,686) | (404) |
| Loss events[1] | (3,829) | (761) |
| Other | (314) | (63) |
| June 30, 2012 balance | 288,135 | 59,954 |
| Other (recorded investment)[2] | 22,961 | 2,132 |
| June 30, 2012 balance | 311,096 | 62,086 |
| Total allowance for loan losses of individually impaired single-family loans | | (16,041) |
| Net investment, June 30, 2012 | | $  46,045 |

(1)  Consists of foreclosure transfers or foreclosure alternatives, such as a deed in lieu of foreclosure or short sale transaction.

(2)  Consists of loans impaired upon purchase, which experienced further deterioration in borrower credit.

*Credit Risk Sensitivity*

Under a 2005 agreement with FHFA, then OFHEO, we are required to disclose the estimated increase in the NPV of future expected credit losses for our single-family credit guarantee portfolio over a ten year period as the result of an immediate 5% decline in home prices nationwide, followed by a stabilization period and return to the base case. This sensitivity analysis is hypothetical and may not be indicative of our actual results. We do not use this analysis for determination of our reported results under GAAP.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3674

Table of Contents

**Table 49 — Single-Family Credit Loss Sensitivity**

| | Before Receipt of Credit Enhancements[1] | | After Receipt of Credit Enhancements[2] | |
|---|---|---|---|---|
| | NPV[3] | NPV Ratio[4] | NPV[3] | NPV Ratio[4] |
| | (dollars in millions) | | | |
| At: | | | | |
| June 30, 2012 | $ 7,131 | 42.2 bps | $ 6,713 | 39.7 bps |
| March 31, 2012 | $ 8,568 | 49.6 bps | $ 8,095 | 46.8 bps |
| December 31, 2011 | $ 8,328 | 47.7 bps | $ 7,842 | 44.9 bps |
| September 30, 2011 | $ 8,824 | 49.5 bps | $ 8,229 | 46.1 bps |
| June 30, 2011 | $10,203 | 56.5 bps | $ 9,417 | 52.2 bps |

(1)   Assumes that none of the credit enhancements currently covering our mortgage loans has any mitigating effect on our credit losses.
(2)   Assumes we collect amounts due from credit enhancement providers after giving effect to certain assumptions about counterparty default rates.
(3)   Based on the single-family credit guarantee portfolio, excluding REMICs and Other Structured Securities backed by Ginnie Mae Certificates.
(4)   Calculated as the ratio of NPV of increase in credit losses to the single-family credit guarantee portfolio, defined in note (3) above.

**Interest Rate and Other Market Risks**

For a discussion of our interest rate and other market risks, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

**Operational Risks**

We face significant levels of operational risk, due to a variety of factors, including: (a) employee turnover and low employee engagement; (b) the level and pace of organizational change within our company; (c) the complexity of our business operations; (d) weaknesses in our core systems; and (e) the fact that we face a variety of different, and potentially competing, business objectives and new FHFA-mandated activities ( e.g., the initiatives we are pursuing under the 2012 conservatorship scorecard). For more information on these matters and other operational risks that we face, see "MD&A — RISK MANAGEMENT — Operational Risks" and "RISK FACTORS — Operational Risks" in our 2011 Annual Report.

In the first half of 2012, to help mitigate the uncertainty surrounding compensation, we introduced a new compensation program for employees. Under the program, the majority of employees will have a more predictable income, as the program generally reduces the amount of compensation that is subject to variability. During the three months ended June 30, 2012, employee turnover moderated compared to the same period in 2011. Should we experience significant turnover in key areas, we may need to exercise strategic arrangements and significantly increase the number of outside firms and consultants used in our business operations, limit certain business activities, and/or increase our operational costs. The use of outside firms and consultants could increase our operational risk in the near term as consultants become accustomed to new roles and responsibilities.

On May 21, 2012, our new Chief Executive Officer joined Freddie Mac. On July 16, 2012, our new General Counsel and Corporate Secretary joined Freddie Mac. Our Executive Vice President — Single-Family Business, Operations and Technology resigned from his position effective May 11, 2012.

Management, including the company's Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of June 30, 2012. As of June 30, 2012, we had two material weaknesses in our internal control over financial reporting causing us to conclude that our disclosure controls and procedures were not effective as of June 30, 2012, at a reasonable level of assurance. For additional information, see "CONTROLS AND PROCEDURES."

<div align="center">

**LIQUIDITY AND CAPITAL RESOURCES**

</div>

**Liquidity**

Our business activities require that we maintain adequate liquidity to fund our operations, which may include the need to make payments of principal and interest on our debt securities, including securities issued by our consolidated trusts, and otherwise make payments related to our guarantees of mortgage assets; make payments upon the maturity, redemption or repurchase of our other debt securities; make net payments on derivative instruments; pay dividends on our senior preferred stock; purchase mortgage-related securities and other investments; purchase mortgage loans; and remove modified or seriously delinquent loans from PC trusts.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We fund our cash requirements primarily by issuing short-term and long-term debt. Other sources of cash include:

- receipts of principal and interest payments on securities or mortgage loans we hold;

- other cash flows from operating activities, including the management and guarantee fees we receive in connection with our guarantee activities (excluding those fees we must remit to Treasury pursuant to the Temporary Payroll Tax Cut Continuation Act of 2011);

- borrowings against mortgage-related securities and other investment securities we hold; and

- sales of securities we hold.

We have also received substantial amounts of cash from Treasury pursuant to draws under the Purchase Agreement, which are made to address quarterly deficits in our net worth. We received $19 million in cash in June 2012 from Treasury pursuant to a draw request under the Purchase Agreement to address the deficit in our net worth at March 31, 2012.

### Liquidity Management

Maintaining sufficient liquidity is of primary importance and we continually strive to enhance our liquidity management practices and policies. Under these practices and policies, we maintain an amount of cash and cash equivalent reserves in the form of liquid, high quality short-term investments that is intended to enable us to meet ongoing cash obligations for an extended period, in the event we do not have access to the short- or long-term unsecured debt markets. We also actively manage the concentration of debt maturities and closely monitor our monthly maturity profile. For a discussion of our liquidity management practices and policies, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Liquidity Management*" in our 2011 Annual Report.

Throughout the three months ended June 30, 2012, we complied with all requirements under our liquidity management policies or FHFA guidance, as applicable. Furthermore, the majority of the funds used to cover our short-term cash liquidity needs was invested in short-term assets with a rating of A-1/P-1 or AAA or was issued by a counterparty with that rating. In the event of a downgrade of a position or counterparty, as applicable, below minimum rating requirements, our credit governance policies require us to exit from the position within a specified period.

We also continue to manage our debt issuances to remain in compliance with the aggregate indebtedness limits set forth in the Purchase Agreement.

We continue to monitor events related to the troubled European countries and have taken a number of actions since mid-2011 designed to reduce our exposures, including exposures related to certain derivative portfolio and cash and other investments portfolio counterparties. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Selected European Sovereign and Non-Sovereign Exposures* ."

To facilitate cash management, we forecast cash outflows. These forecasts help us to manage our liabilities with respect to asset purchases and runoff, when financial markets are not in crisis. For further information on our management of interest-rate risk associated with asset and liability management, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

Notwithstanding these practices and policies, our ability to maintain sufficient liquidity, including by pledging mortgage-related and other securities as collateral to other financial institutions, could cease or change rapidly and the cost of the available funding could increase significantly due to changes in market confidence and other factors. For more information, see "RISK FACTORS — Competitive and Market Risks — *Our investment activities may be adversely affected by limited availability of financing and increased funding costs* " in our 2011 Annual Report.

### Actions of Treasury and FHFA

Since our entry into conservatorship, Treasury and FHFA have taken a number of actions that affect our cash requirements and ability to fund those requirements. The conservatorship, and the resulting support we received from Treasury, has enabled us to access debt funding on terms sufficient for our needs.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The Purchase Agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011, and 2012. If we do not have a capital surplus ( *i.e.,* positive net worth) at the end of 2012, then the amount of funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 31, 2009). In the event we have a capital surplus at the end of 2012, then the amount of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as follows:

- If the year-end 2012 surplus is lower than the cumulative draws needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

- If the year-end 2012 surplus exceeds the cumulative draws for 2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws.

While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available to us under the Purchase Agreement after 2012. The costs of our debt funding could also increase in the event of any future downgrades in our credit ratings or the credit ratings of the U.S. government. At June 30, 2012, our aggregate funding received from Treasury under the Purchase Agreement was $71.3 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received.

We are required to pay a quarterly commitment fee to Treasury under the Purchase Agreement, as discussed below in " *Dividend Obligation on the Senior Preferred Stock.*"

For more information on these matters, see "BUSINESS — Conservatorship and Related Matters" and "— Regulation and Supervision" in our 2011 Annual Report.

### Dividend Obligation on the Senior Preferred Stock

As of June 30, 2012, our annual cash dividend obligation to Treasury on the senior preferred stock is $7.2 billion, which exceeds our annual historical earnings in all but one period. The senior preferred stock accrues quarterly cumulative dividends at a rate of 10% per year or 12% per year in any quarter in which dividends are not paid in cash until all accrued dividends have been paid in cash. We paid dividends of $1.8 billion in cash on the senior preferred stock in June 2012 at the direction of our Conservator. Through June 30, 2012, we paid aggregate cash dividends to Treasury of $20.1 billion, an amount equal to 28% of our aggregate draws received under the Purchase Agreement. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth and will increasingly drive future draws. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived. Treasury waived the fee for all quarters of 2011 and the first three quarters of 2012, but has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. The amount of the fee has not yet been established and could be substantial.

The payment of dividends on our senior preferred stock in cash reduces our net worth. For periods in which our earnings and other changes in equity (including the cash payment of dividends on our senior preferred stock) do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury. Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all.

As discussed in "Capital Resources," we expect to make additional draws under the Purchase Agreement in future periods. Further draws will increase the liquidation preference of and the dividends we owe on the senior preferred stock.

### Other Debt Securities

Spreads on our debt and our access to the debt markets remained favorable relative to historical levels during the three and six months ended June 30, 2012, which, we believe, is due largely to support from the U.S. government. As a result, we were able to replace certain higher cost debt with lower cost debt. Our short-term debt was 22% of outstanding other debt at June 30, 2012 as compared to 24% at December 31, 2011. Beginning in the fourth quarter of 2011, we started issuing a

<div align="center">89</div>

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar ® Document Research ℠

Table of Contents

higher percentage of debt with longer-term maturities. This allows us to take advantage of attractive long-term rates while decreasing our reliance on interest-rate swaps.

Because of the debt limit under the Purchase Agreement, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Our debt cap under the Purchase Agreement is $874.8 billion in 2012 and will decline to $787.3 billion on January 1, 2013. As of June 30, 2012, we estimate that the par value of our aggregate indebtedness totaled $589.7 billion, which was approximately $285.1 billion below the applicable debt cap. As of December 31, 2011, we estimate that the par value of our aggregate indebtedness was approximately $297.7 billion below the then applicable limit. Our aggregate indebtedness is calculated as the par value of other debt. We disclose the amount of our indebtedness on this basis monthly under the caption "Other Debt Activities — Total Debt Outstanding" in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC.

### Other Debt Issuance Activities

The table below summarizes the par value of other debt securities we issued, based on settlement dates, during the three and six months ended June 30, 2012 and 2011.

### Table 50 — Other Debt Security Issuances by Product, at Par Value[1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| Other short-term debt: | | | | |
| Reference Bills® securities and discount notes | $77,920 | $104,200 | $142,083 | $208,046 |
| Medium-term notes — non-callable [2] | — | 250 | — | 450 |
| Total other short-term debt | 77,920 | 104,450 | 142,083 | 208,496 |
| Other long-term debt: | | | | |
| Medium-term notes — callable | 7,375 | 33,246 | 44,873 | 71,047 |
| Medium-term notes — non-callable | 1,577 | 18,482 | 12,281 | 47,657 |
| U.S. dollar Reference Notes® securities — non-callable | 10,500 | 8,000 | 32,000 | 18,000 |
| Total other long-term debt | 19,452 | 59,728 | 89,154 | 136,704 |
| Total other debt issued | $97,372 | $164,178 | $231,237 | $345,200 |

(1) Excludes federal funds purchased and securities sold under agreements to repurchase, and lines of credit. Also excludes debt securities of consolidated trusts held by third parties.
(2) Includes $0 million and $250 million of medium-term notes — non-callable issued for the three months ended June 30, 2012 and 2011, respectively, which were related to debt exchanges. For the six months ended June 30, 2012 and 2011, there were $0 million and $0.5 billion accounted for as debt exchanges, respectively.

### Other Debt Retirement Activities

We repurchase, call, or exchange our outstanding medium- and long-term debt securities from time to time to help support the liquidity and predictability of the market for our other debt securities and to manage our mix of liabilities funding our assets.

The table below provides the par value, based on settlement dates, of other debt securities we repurchased, called, and exchanged during the three and six months ended June 30, 2012 and 2011.

### Table 51 — Other Debt Security Repurchases, Calls, and Exchanges[1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| Repurchases of outstanding medium-term notes | $ 50 | $ 1,030 | $ 1,747 | $ 3,768 |
| Calls of callable medium-term notes | 31,979 | 45,697 | 81,007 | 85,532 |
| Exchanges of medium-term notes | — | 250 | — | 450 |

(1) Excludes debt securities of consolidated trusts held by third parties.

### Credit Ratings

Our ability to access the capital markets and other sources of funding, as well as our cost of funds, is highly dependent upon our credit ratings. The table below indicates our credit ratings as of July 25, 2012.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 52 — Freddie Mac Credit Ratings**

| | Nationally Recognized Statistical Rating Organization | | |
| | S&P | Moody's | Fitch |
| --- | --- | --- | --- |
| Senior long-term debt [1] | AA+ | Aaa | AAA |
| Short-term debt [2] | A-1+ | P-1 | F1+ |
| Subordinated debt [3] | A | Aa2 | AA– |
| Preferred stock [4] | C | Ca | C/RR6 |
| Outlook | Negative (for senior long-term debt and subordinated debt) | Negative (for senior long-term debt and subordinated debt) | Negative (for AAA-rated long-term Issuer Default Rating) |

(1) Consists of medium-term notes, U.S. dollar Reference Notes ® securities and €Reference Notes ® securities.
(2) Consists of Reference Bills ® securities and discount notes.
(3) Consists of Freddie SUBS ® securities.
(4) Does not include senior preferred stock issued to Treasury.

For information about our ratings downgrade by S&P in 2011, factors that could lead to future ratings actions, and the potential impact of a downgrade in our credit ratings, see "RISK FACTORS — Competitive and Market Risks — *Any downgrade in the credit ratings of the U.S. government would likely be followed by a downgrade in our credit ratings. A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business*" in our 2011 Annual Report.

A security rating is not a recommendation to buy, sell or hold securities. It may be subject to revision or withdrawal at any time by the assigning rating organization. Each rating should be evaluated independently of any other rating.

### *Cash and Cash Equivalents, Federal Funds Sold, Securities Purchased Under Agreements to Resell, and Non-Mortgage-Related Securities*

Excluding amounts related to our consolidated VIEs, we held $60.8 billion in the aggregate of cash and cash equivalents, securities purchased under agreements to resell, and non-mortgage-related securities at June 30, 2012. These investments are important to our cash flow and asset and liability management and our ability to provide liquidity and stability to the mortgage market. At June 30, 2012, our non-mortgage-related securities primarily consisted of FDIC-guaranteed corporate medium-term notes, Treasury bills, and Treasury notes that we could sell to provide us with an additional source of liquidity to fund our business operations. For additional information on these assets, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell" and "— Investments in Securities — *Non-Mortgage-Related Securities*."

### *Mortgage Loans and Mortgage-Related Securities*

We invest principally in mortgage loans and mortgage-related securities, certain categories of which are largely unencumbered and highly liquid. Our primary source of liquidity among these mortgage assets is our holdings of agency securities. In addition, our unsecuritized performing single-family mortgage loans are also a potential source of liquidity. Our holdings of CMBS are less liquid than agency securities. Our holdings of non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans are illiquid due to market conditions and the continued poor credit quality of the underlying assets. Our holdings of unsecuritized seriously delinquent and modified single-family mortgage loans are also illiquid.

We are subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury. See "EXECUTIVE SUMMARY — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio" for more information on the relative liquidity of our mortgage assets.

### Cash Flows

Our cash and cash equivalents decreased $9.3 billion to $19.2 billion during the six months ended June 30, 2012 and decreased $19.5 billion to $17.5 billion during the six months ended June 30, 2011. Cash flows provided by operating activities during the six months ended June 30, 2012 and 2011 were $6.6 billion and $8.4 billion, respectively, primarily driven by cash proceeds from net interest income. Cash flows provided by investing activities during the six months ended June 30, 2012 and 2011 were $232.7 billion and $181.2 billion, respectively, primarily resulting from net proceeds received as a result of repayments of single-family held-for-investment mortgage loans. Cash flows used for financing activities during the six months ended June 30, 2012 and 2011 were $248.6 billion and $209.1 billion, respectively, largely attributable

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3679

Table of Contents

to funds used to repay debt securities of consolidated trusts held by third parties. In addition, during the six months ended June 30, 2012, our net repayments of other debt were $78.9 billion.

**Capital Resources**

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. Obtaining funding from Treasury pursuant to its commitment under the Purchase Agreement enables us to avoid being placed into receivership by FHFA. At June 30, 2012, our assets exceeded our liabilities under GAAP; therefore there is no need for a draw from Treasury under the Purchase Agreement. See "BUSINESS — Regulation and Supervision — *Federal Housing Finance Agency — Receivership*" in our 2011 Annual Report for additional information on mandatory receivership.

We expect to request additional draws under the Purchase Agreement in future periods. Over time, our dividend obligation to Treasury on the senior preferred stock will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if Treasury does not continue to waive the fee. See "Liquidity — *Dividend Obligation on the Senior Preferred Stock*" for more information.

The size and timing of our future draws will be determined by our dividend obligation on the senior preferred stock and a variety of other factors that could adversely affect our net worth. For more information on these other factors, see "RISK FACTORS — Conservatorship and Related Matters — *We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition*" in our 2011 Annual Report.

For more information on the Purchase Agreement, its effect on our business and capital management activities, and the potential impact of making additional draws, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Dividend Obligation on the Senior Preferred Stock*," "BUSINESS — Executive Summary — *Government Support for Our Business*" and "RISK FACTORS" in our 2011 Annual Report.

### FAIR VALUE MEASUREMENTS AND ANALYSIS

**Fair Value Measurements**

Fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. For additional information regarding the fair value hierarchy and measurements and validation processes, see "MD&A — FAIR VALUE MEASUREMENTS AND ANALYSIS" in our 2011 Annual Report.

We categorize assets and liabilities recorded or disclosed at fair value within the fair value hierarchy based on the valuation processes used to derive their fair values and our judgment regarding the observability of the related inputs. Those judgments are based on our knowledge and observations of the markets relevant to the individual assets and liabilities and may vary based on current market conditions. In applying our judgments, we review ranges of third-party prices and transaction volumes, and hold discussions with dealers and pricing service vendors to understand and assess the extent of market benchmarks available and the judgments or modeling required in their processes. Based on these factors, we determine whether the inputs are observable and whether the principal markets are active or inactive.

Our Level 3 assets recorded at fair value primarily consist of non-agency mortgage-related securities. The non-agency mortgage-related securities market continued to be illiquid during the second quarter of 2012, with low transaction volumes, wide credit spreads, and limited transparency. See "NOTE 16: FAIR VALUE DISCLOSURES — Assets and Liabilities Measured at Fair Value on Our Consolidated Balance Sheets" for additional information regarding the valuation of non-agency mortgage-related securities.

The table below summarizes our assets and liabilities measured at fair value on a recurring basis on our consolidated balance sheets at June 30, 2012 and December 31, 2011.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3680

Table of Contents

**Table 53 — Summary of Assets and Liabilities Measured at Fair Value on a Recurring Basis on Our Consolidated Balance Sheets**

| | June 30, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
| | Total GAAP Recurring Fair Value | Percentage in Level 3 | Total GAAP Recurring Fair Value | Percentage in Level 3 |
| | (dollars in millions) | | | |
| **Assets:** | | | | |
| Investments in securities: | | | | |
| Available-for-sale, at fair value | $ 194,098 | 29% | $ 210,659 | 28% |
| Trading, at fair value | 47,436 | 4 | 58,830 | 4 |
| Mortgage loans: | | | | |
| Held-for-sale, at fair value | 10,120 | 100 | 9,710 | 100 |
| Derivative assets, net(1) | 168 | — | 118 | — |
| Other assets: | | | | |
| Guarantee asset, at fair value | 862 | 100 | 752 | 100 |
| All other, at fair value | 139 | 100 | 151 | 100 |
| Total assets carried at fair value on a recurring basis(1) | $ 252,823 | 25 | $ 280,220 | 23 |
| **Liabilities:** | | | | |
| Debt securities recorded at fair value | $ 2,158 | 100% | $ 3,015 | —% |
| Derivative liabilities, net(1) | 336 | — | 435 | — |
| Other liabilities: | | | | |
| All other, at fair value | 1 | 100 | — | — |
| Total liabilities carried at fair value on a recurring basis(1) | $ 2,495 | 6 | $ 3,450 | — |

(1) Percentages by level are based on gross fair value of derivative assets and derivative liabilities before counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

### *Changes in Level 3 Recurring Fair Value Measurements*

At June 30, 2012 and December 31, 2011, we measured and recorded at fair value on a recurring basis, assets of $68.8 billion and $72.5 billion, respectively, or approximately 25% and 23% of total assets carried at fair value on a recurring basis, using significant unobservable inputs (Level 3), before the impact of counterparty and cash collateral netting. Our Level 3 assets at June 30, 2012 primarily consist of non-agency mortgage-related securities. At June 30, 2012 and December 31, 2011, we also measured and recorded at fair value on a recurring basis, Level 3 liabilities of $2.2 billion and $0.1 billion, or 6% and less than 1%, respectively, of total liabilities carried at fair value on a recurring basis, before the impact of counterparty and cash collateral netting. Our Level 3 liabilities at June 30, 2012 primarily consist of foreign-currency denominated and certain other debt securities recorded at fair value.

See "NOTE 16: FAIR VALUE DISCLOSURES — Recurring Fair Value Changes" for a discussion of changes in our Level 3 assets and liabilities and "— Table 16.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs" for the Level 3 reconciliation. For discussion of types and characteristics of mortgage loans underlying our mortgage-related securities, see "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets" and "RISK MANAGEMENT — *Credit Risk — Mortgage Credit Risk — Single-Family Mortgage Credit Risk.*"

### *Consideration of Credit Risk in Our Valuation*

We consider credit risk in the valuation of our assets and liabilities through consideration of credit risk of the counterparty in asset valuations and through consideration of our own institutional credit risk in liability valuations on our GAAP consolidated balance sheets.

We consider credit risk in our valuation of investments in securities based on fair value measurements that are largely the result of price quotes received from multiple dealers or pricing services. Some of the key valuation drivers of such fair value measurements include the collateral type, collateral performance, credit quality of the issuer, tranche type, weighted average life, vintage, coupon, and interest rates. We also make adjustments for items such as credit enhancements or other types of subordination and liquidity, where applicable. In cases where internally developed models are used, we maximize the use of market-based inputs or calibrate such inputs to market data.

We also consider credit risk when we evaluate the valuation of our derivative positions. The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. For derivatives that are in an asset position, we hold collateral against those positions in accordance with agreed upon thresholds. The amount of collateral held depends on the credit rating of the counterparty and is based on our credit risk

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012 Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

policies. Similarly, for derivatives that are in a liability position, we post collateral to counterparties in accordance with agreed upon thresholds. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Derivative Counterparties*" for a discussion of our counterparty credit risk.

See "NOTE 16: FAIR VALUE DISCLOSURES — Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets" for additional information regarding the valuation of our assets and liabilities.

### Consolidated Fair Value Balance Sheets Analysis

Our consolidated fair value balance sheets present our estimates of the fair value of our financial assets and liabilities. See "NOTE 16: FAIR VALUE DISCLOSURES — Table 16.7 — Consolidated Fair Value Balance Sheets" for our fair value balance sheets. In conjunction with the preparation of our consolidated fair value balance sheets, we use a number of financial models. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks," in this Form 10-Q and our 2011 Annual Report, and "RISK FACTORS" and "RISK MANAGEMENT — Operational Risks" in our 2011 Annual Report for information concerning the risks associated with these models.

### *Discussion of Fair Value Results*

The table below summarizes the change in the fair value of net assets for the six months ended June 30, 2012 and 2011.

### Table 54 — Summary of Change in the Fair Value of Net Assets

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (in billions) | |
| Beginning balance | $ (78.4) | $ (58.6) |
| Changes in fair value of net assets, before capital transactions | 5.2 | (1.7) |
| Capital transactions: | | |
| Dividends and share issuances, net[1] | (3.4) | (2.7) |
| Ending balance | $ (76.6) | $ (63.0) |

(1) Includes the funds received from Treasury of $0.2 billion and $0.5 billion for the six months ended June 30, 2012 and 2011, respectively, under the Purchase Agreement, which increased the liquidation preference of our senior preferred stock.

During the six months ended June 30, 2012, the fair value of net assets, before capital transactions, increased by $5.2 billion, compared to a $1.7 billion decrease during the six months ended June 30, 2011. The increase in the fair value of net assets, before capital transactions during the six months ended June 30, 2012 was primarily due to an increase in the fair value of our single-family mortgage loans as the result of the improvement in realized and expected home prices and improvement in the credit environment coupled with high core spread income on our mortgage-related securities and a tightening of OAS levels on our agency securities. These benefits were offset by a decrease of $13.8 billion in the fair value of our single-family mortgage loans as the result of the adoption of an amendment to the guidance pertaining to fair value measurements and disclosures. In addition, OAS levels widened on our single-family non-agency mortgage-related securities during the six months ended June 30, 2012. See "NOTE 16: FAIR VALUE DISCLOSURES — Consolidated Fair Value Balance Sheets" for additional details.

For loans that have been refinanced under HARP, we value our guarantee obligation using the delivery and guarantee fees currently charged by us under that initiative. If, subsequent to delivery, the refinanced loan no longer qualifies for purchase based on current underwriting standards (such as becoming past due or being modified as a part of a troubled debt restructuring), the fair value of the guarantee obligation is then measured using our internal credit models or third-party market pricing. See "NOTE 16: FAIR VALUE DISCLOSURES — Valuation Methods and Assumptions for Assets and Liabilities Not Measured at Fair Value in Our Consolidated Balance Sheets, but for Which the Fair Value is Disclosed — Mortgage Loans — *Single-Family Loans*" for additional details.

During the six months ended June 30, 2011, the decrease in the fair value of net assets, before capital transactions, was primarily due to a decrease in the fair value of our single-family loans due to a decline in forecasted home prices (on a seasonally adjusted basis) and a continued weak credit environment, as well as a decrease in the fair value of our investments

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3682

Table of Contents

in mortgage-related securities from the widening of OAS levels on our non-agency mortgage-related securities. The decrease in fair value was partially offset by an increase in fair value from a tightening of OAS levels on our agency and CMBS securities and high core spread income.

When the OAS on a given asset widens, the fair value of that asset will typically decline, all other market factors being equal. However, we believe such OAS widening has the effect of increasing the likelihood that, in future periods, we will recognize income at a higher spread on this existing asset. The reverse is true when the OAS on a given asset tightens — current period fair values for that asset typically increase due to the tightening in OAS, while future income recognized on the asset is more likely to be earned at a reduced spread. However, as market conditions change, our estimate of expected fair value gains and losses from OAS may also change, and the actual core spread income recognized in future periods could be significantly different from current estimates.

## OFF-BALANCE SHEET ARRANGEMENTS

We enter into certain business arrangements that are not recorded on our consolidated balance sheets or may be recorded in amounts that differ from the full contract or notional amount of the transaction, and may expose us to potential losses in excess of the amounts recorded on our consolidated balance sheets. We guarantee the payment of principal and interest on non-consolidated Freddie Mac mortgage-related securities we issue and on mortgage loans covered by our other guarantee commitments. Our maximum potential off-balance sheet exposure to credit losses relating to these securitization activities and the other guarantee commitments is primarily represented by the UPB of the underlying loans and securities, which was $66.7 billion and $56.9 billion, at June 30, 2012 and December 31, 2011, respectively, which consisted of: (a) $33.3 billion and $25.1 billion of multifamily non-consolidated Freddie Mac mortgage-related securities, (b) $9.9 billion and $10.7 billion of single-family non-consolidated Freddie Mac mortgage-related securities, (c) $9.8 billion and $10.0 billion of multifamily other guarantee commitments, and (d) $13.7 billion and $11.1 billion of single-family other guarantee commitments. We also enter into purchase commitments primarily related to future guarantor swap transactions for single-family loans, and, to a lesser extent, commitments to purchase or guarantee multifamily mortgage loans. These non-derivative commitments totaled $284.4 billion and $271.8 billion, in notional value at June 30, 2012 and December 31, 2011, respectively. For information on these and other off-balance sheet arrangements, see "OFF-BALANCE SHEET ARRANGEMENTS" in our 2011 Annual Report.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in conformity with GAAP requires us to make a number of judgments, estimates and assumptions that affect the reported amounts within our consolidated financial statements. Certain of our accounting policies, as well as estimates we make, are critical, as they are both important to the presentation of our financial condition and results of operations and require management to make difficult, complex, or subjective judgments and estimates, often regarding matters that are inherently uncertain. Actual results could differ from our estimates and the use of different judgments and assumptions related to these policies and estimates could have a material impact on our consolidated financial statements.

Our critical accounting policies and estimates relate to: (a) allowances for loan losses and reserve for guarantee losses; (b) fair value measurements; (c) impairment recognition on investments in securities; and (d) realizability of net deferred tax assets. For additional information about our critical accounting policies and estimates and other significant accounting policies, including recently issued accounting guidance, see "MD&A — CRITICAL ACCOUNTING POLICIES AND ESTIMATES" in our 2011 Annual Report and "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in this Form 10-Q.

## FORWARD-LOOKING STATEMENTS

We regularly communicate information concerning our business activities to investors, the news media, securities analysts, and others as part of our normal operations. Some of these communications, including this Form 10-Q, contain "forward-looking statements," including statements pertaining to the conservatorship, our current expectations and objectives for our efforts under the MHA Program, the servicing alignment initiative and other programs to assist the U.S. residential mortgage market, future business plans, liquidity, capital management, economic and market conditions and trends, market share, the effect of legislative and regulatory developments, implementation of new accounting guidance, credit losses,

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

FHFA 3683

Table of Contents

internal control remediation efforts, and results of operations and financial condition on a GAAP, Segment Earnings, and fair value basis. Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. Forward-looking statements are often accompanied by, and identified with, terms such as "objective," "expect," "trend," "forecast," "anticipate," "believe," "intend," "could," "future," "may," "will," and similar phrases. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties, including those described in the "RISK FACTORS" section of our 2011 Annual Report, and:

- the actions FHFA, Treasury, the Federal Reserve, the SEC, HUD, the Administration, Congress, and our management may take, including actions related to implementing FHFA's strategic plan for Freddie Mac and Fannie Mae's conservatorships;

- the effect of the restrictions and other terms of the conservatorship, the Purchase Agreement, the senior preferred stock, and the warrant on our business, including our ability to pay: (a) the dividend on the senior preferred stock; and (b) any quarterly commitment fee that we are required to pay to Treasury under the Purchase Agreement;

- our ability to maintain adequate liquidity to fund our operations, including following any changes in the support provided to us by Treasury or FHFA, a change in the credit ratings of our debt securities or a change in the credit rating of the U.S. government;

- changes in our charter or applicable legislative or regulatory requirements, including any restructuring or reorganization in the form of our company, whether we will remain a stockholder-owned company or continue to exist and whether we will be wound down or placed under receivership, regulations under the GSE Act, the Reform Act, or the Dodd-Frank Act, regulatory or legislative actions taken to implement the Administration's plan to reform the housing finance system, regulatory or legislative actions that require us to support non-mortgage market initiatives, changes to affordable housing goals regulation, reinstatement of regulatory capital requirements, or the exercise or assertion of additional regulatory or administrative authority;

- changes in the regulation of the mortgage and financial services industries, including changes caused by the Dodd-Frank Act, or any other legislative, regulatory, or judicial action at the federal, state, or local level;

- enforcement actions against mortgage servicers and other mortgage industry participants by federal or state authorities;

- the scope of various initiatives designed to help in the housing recovery (including the extent to which borrowers participate in HAMP, the recently expanded HARP, and the non-HAMP standard loan modification initiative), and the effect of such programs on our credit losses, expenses, and the size and composition of our mortgage-related investments portfolio;

- the effect of any deficiencies in foreclosure documentation practices and related lengthening of the foreclosure timeline;

- the ability of our financial, accounting, data processing, and other operating systems or infrastructure, and those of our vendors to process the complexity and volume of our transactions;

- changes in accounting or tax guidance or in our accounting policies or estimates, and our ability to effectively implement any such changes in guidance, policies, or estimates;

- changes in general regional, national, or international economic, business, or market conditions and competitive pressures, including changes in employment rates and interest rates, and changes in the federal government's fiscal and monetary policy;

- changes in the U.S. residential mortgage market, including changes in the rate of growth in total outstanding U.S. residential mortgage debt, the size of the U.S. residential mortgage market, and home prices;

- our ability to effectively implement our business strategies, including any efforts to improve the supply and liquidity of, and demand for, our securities, and restrictions on our ability to offer new products or engage in new activities;

- our ability to recruit, retain, and engage executive officers and other key employees;

- our ability to effectively identify and manage credit, interest-rate, operational, and other risks in our business, including changes to the credit environment and the levels and volatilities of interest rates, as well as the shape and slope of the yield curves;

<div align="center">96</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.