# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PERRY CAPITAL LLC,<br><br>    Plaintiff,<br> v.<br><br>JACOB J. LEW, *et al.*,<br><br>    Defendants. | Civil Action No. 13-cv-1025 (RLW) |
| FAIRHOLME FUNDS, INC., *et al*.,<br><br>    Plaintiffs,<br> v.<br><br>FEDERAL HOUSING FINANCE AGENCY, *et al.*,<br><br>    Defendants. | Civil Action No. 13-cv-1053 (RLW) |
| ARROWOOD INDEMNITY COMPANY, *et al.*,<br><br>    Plaintiffs,<br> v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION, *et al.*,<br><br>    Defendants. | Civil Action No. 13-cv-1439 (RLW) |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations<br>_____<br>This document relates to:<br>ALL CASES | Misc. Action No. 13-mc-01288 (RLW) |

**MOTION TO DISMISS ALL CLAIMS BY DEFENDANTS FEDERAL HOUSING FINANCE AGENCY AS CONSERVATOR FOR FANNIE MAE AND FREDDIE MAC, FHFA DIRECTOR MELVIN L. WATT, FANNIE MAE, AND FREDDIE MAC AND, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' ARBITRARY AND CAPRICIOUS CLAIMS BY DEFENDANTS FEDERAL HOUSING FINANCE AGENCY AS CONSERVATOR FOR FANNIE MAE AND FREDDIE MAC, <u>AND FHFA DIRECTOR MELVIN L. WATT</u>**

Defendants Federal Housing Finance Agency ("FHFA" or "Conservator"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac," together with Fannie Mae, the "Enterprises"), Melvin L. Watt, in his official capacity as Director of FHFA[1] (together with FHFA, the "FHFA Defendants"), and the Enterprises hereby move to dismiss the complaints as to all claims in the above-captioned actions for the reasons set forth in the FHFA Defendants' and the Enterprises' Memorandum in Support, filed contemporaneously herewith.  Additionally, the FHFA Defendants move for summary judgment with respect to Plaintiffs' Administrative Procedure Act ("APA") claims alleging that the Third Amendment to the Preferred Stock Purchase Agreements is arbitrary and capricious.  The factual record for those APA claims is complete and therefore summary judgment is appropriate.

Pursuant to Local Rule 7(f), FHFA respectfully requests oral argument on this motion.

A memorandum in support of this motion and a proposed order granting the relief requested by this motion are being filed contemporaneously herewith.

Also being filed herewith is a motion by the FHFA Defendants and the Enterprises requesting that the court take judicial notice of certain documents cited in the Memorandum in Support of the Motion to Dismiss.

---

[1]    Because he has succeeded Edward DeMarco, the originally-named defendant, as FHFA Director, Melvin L. Watt "is automatically substituted as a party" under Federal Rule of Civil Procedure 25(d).

Dated:  January 17, 2014

Respectfully submitted,


/s/ Howard N. Cayne
Howard N. Cayne (D.C. Bar # 331306)
Asim Varma (D.C. Bar # 426364)
David B. Bergman (D.C. Bar # 435392)
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
Howard.Cayne@aporter.com
Asim.Varma@aporter.com
David.Bergman@aporter.com

*Attorneys for Defendants Federal Housing Finance Agency and Director Melvin L. Watt*


s/ Michael Joseph Ciatti
Michael Joseph Ciatti (D.C. Bar # 467177)
mciatti@kslaw.com
Graciela Maria Rodriguez
(D.C. Bar # 438955)
gmrodriguez@kslaw.com
KING & SPALDING, LLP
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C.  20006
Telephone:  202.626.5508
Facsimile:  202.626.3737

*Attorneys for the Federal Home Loan Mortgage Corporation*

/s/ Paul D. Clement
Paul D. Clement (D.C. Bar # 433215)
pclement@bancroftpllc.com
Stephen V. Potenza (D.C. Bar # 1010066)
(*admitted pro hac vice*)
spotenza@bancroftpllc.com
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C.  20036
Telephone:  202.234.0090
Facsimile:  202.234.2806

*Attorneys for the Federal National Mortgage Association*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PERRY CAPITAL LLC,<br><br>    Plaintiff,<br><br> v.<br><br>JACOB J. LEW, *et al.*,<br><br>    Defendants. | Civil Action No. 13-cv-1025 (RLW) |
| FAIRHOLME FUNDS, INC., *et al*.,<br><br>    Plaintiffs,<br><br> v.<br><br>FEDERAL HOUSING FINANCE AGENCY, *et al.*,<br><br>    Defendants. | Civil Action No. 13-cv-1053 (RLW) |
| ARROWOOD INDEMNITY COMPANY,<br>*et al.*,<br><br>    Plaintiffs,<br><br> v.<br><br>FEDERAL NATIONAL MORTGAGE<br>ASSOCIATION, *et al.*,<br><br>    Defendants. | Civil Action No. 13-cv-1439 (RLW) |
| In re Fannie Mae/Freddie Mac Senior Preferred<br>Stock Purchase Agreement Class Action Litigations<br>————————————————<br>This document relates to:<br>ALL CASES | Misc. Action No. 13-mc-01288 (RLW) |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS ALL CLAIMS BY DEFENDANTS FEDERAL HOUSING FINANCE AGENCY AS CONSERVATOR FOR FANNIE MAE AND FREDDIE MAC, FHFA DIRECTOR MELVIN L. WATT, FANNIE MAE, AND FREDDIE MAC AND, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' ARBITRARY AND CAPRICIOUS CLAIMS BY DEFENDANTS FEDERAL HOUSING FINANCE AGENCY AS CONSERVATOR FOR <u>FANNIE MAE AND FREDDIE MAC, AND FHFA DIRECTOR MELVIN L. WATT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iv

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 6

I.  The Importance of the Enterprises to the National Economy, and Their Collapse .............. 6

II.  FHFA Is Appointed Statutory Conservator and Succeeds by Operation of Law
     to All the Rights of the Enterprises and Their Shareholders .................................. 9

III. The PSPAs Are Structured to Provide Unprecedented Financial Support in
     Consideration for Senior Preferred Rights That Protect Taxpayers .................................. 10

     A.  Treasury Agrees to Provide Unprecedented Support to the Enterprises Through
         the PSPAs.................................................................................................... 10

     B.  The Conservator Agrees to Terms in the PSPAs That Facilitate Treasury's Satisfaction
         of Its Statutory Obligation to "Protect the Taxpayer" .................................. 12

IV.  The Third Amendment Preserves and Extends the Treasury Commitment by
     Replacing the Dividend and Periodic Commitment Fee with a Variable Dividend
     Based on Net Worth........................................................................................ 15

V.   The Third Amendment Was Not Designed to Increase Compensation to Treasury............ 17

STANDARD OF REVIEW ................................................................................................ 19

ARGUMENT ...................................................................................................................... 19

I.   The Court Lacks Jurisdiction over Plaintiffs' Claims Seeking Declaratory and
     Equitable Relief ............................................................................................. 19

     A.  Section 4617(f) Bars Declaratory and Equitable Relief Where, as Here, the
         Conservator Is Carrying Out a Statutory Power or Function........................................... 19

         1.  The Conservator Acted Within Its Statutory Authority When It Arranged for
             and Acted to Preserve Treasury's Capital Commitment....................................... 21

         2.  The Conservator Acted Within Its Statutory Authority When It Agreed to
             Transfer Enterprise Assets ................................................................. 27

      B.     The Third Amendment Is Not an Unauthorized "Wind Down" of the Enterprises ....... 29

II.    Plaintiffs' Claims to Recover Their Liquidation Preferences Fail for Lack of Standing
       and Ripeness ........................................................................................................ 32

III.   Plaintiffs' Claims for Breach of Contract and the Implied Duty of Good Faith and Fair
       Dealing Fail as a Matter of Law ....................................................................... 35

      A.     The Conservator Has Succeeded to All Shareholder Rights During Conservatorship,
             Including Voting Rights Under the Stock Certificates .................................... 36

      B.     Plaintiffs Had No Right to Vote on the Third Amendment ........................... 39

      C.     Shareholders Do Not Have Any Present or Absolute Right to Dividends .................. 41

      D.     The Conservator Did Not Breach Any Implied Duty of Good Faith and Fair Dealing
             by Executing the Third Amendment ............................................................. 42

IV.   Plaintiffs' Breach of Fiduciary Duty Claims Against the Conservator Fail as a Matter of
       Law ........................................................................................................................ 45

      A.     HERA Precludes Derivative Breach of Fiduciary Duty Claims on Behalf of the
             Enterprises Against the Conservator ............................................................. 46

      B.     HERA Bars Shareholder Derivative Actions ................................................. 47

      C.     No "Conflict of Interest" Exception Applies to These Claims ..................... 50

      D.     Any Purported State Law Fiduciary Duty That Would Require the Conservator to
             Benefit Shareholders at the Expense of the Enterprises' Public Missions Is Preempted
             by the Federal Statutory Charters of the Enterprises and HERA ................................. 53

V.    Plaintiffs' Takings Claims Fail as a Matter of Law ............................................. 57

      A.     This Court Lacks Jurisdiction over Plaintiffs' Takings Claims Because the Named
             Plaintiffs Have Not Waived Any Claim to Damages over $10,000 .............................. 57

      B.     This Court Lacks Jurisdiction over Plaintiffs' Takings Claims Because FHFA Is Not
             the United States for Takings Purposes When Acting as Conservator ......................... 59

      C.     Plaintiffs' Takings Claims Fail Because They Have Not Identified a Cognizable
             Property Interest ............................................................................................. 60

D.    Plaintiffs' Takings Claims Fail Because the Issuance of More Senior Shares Does Not Constitute a Taking ........................................................................................ 62

VI.   Plaintiffs' APA Claims Fail as a Matter of Law ................................................................ 63

A.    Section 4617(f) Bars All APA Claims ................................................................ 63

B.    FHFA's Execution of the Third Amendment Was Within Its Statutory Authority ....... 63

C.    FHFA's Decision to Execute the Third Amendment Was Not Arbitrary and Capricious ........................................................................................................... 64

D.    FHFA Considered the Relevant Factors .......................................................... 65

E.    FHFA's Decision Was Rational and Effective ................................................. 69

CONCLUSION ............................................................................................................................. 70

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967)..............................................................................................32

*Air Pegasus of D.C., Inc. v. United States*,
   424 F.3d 1206 (Fed. Cir. 2005)............................................................................62

*Alabama By-Products Corp. v. Cede & Co.*,
   657 A.2d 254 (Del. 1995)......................................................................................47

*Am. Trucking Ass'n., Inc. v. E.P.A.*,
   283 F.3d 355 (D.C. Cir. 2002)..............................................................................64

*Ambase Corp. v. United States*,
   61 Fed. Cl. 794 (2004)...........................................................................................59

*\*Ameristar Fin. Serv. Co., LLC v. United States*,
   75 Fed. Cl. 807 (2007)...............................................................................30, 31, 59

*Antoine v. United States Bank Nat'l Ass'n*,
   547 F. Supp. 2d 30 (D.D.C. 2008)..........................................................................8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................19

*AT&T Corp. v. F.C.C.*,
   220 F.3d 607 (D.C. Cir. 2000)..............................................................................64

*Auction Co. of Am. v. FDIC*,
   141 F.3d 1198 (D.C. Cir. 1998)............................................................................59

*Auction Co. of America v. FDIC*,
   132 F.3d 746 (D.C. Cir. 1998)..............................................................................59

*Bair v. United States*,
   515 F.3d 1323 (Fed. Cir. 2008).............................................................................60

*Bank of Am. N.A. v. Colonial Bank*,
   604 F.3d 1239 (11th Cir. 2010) ............................................................................21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................................19

*Blackman v. Dist. of Columbia*,
  456 F.3d 167 (D.C. Cir. 2006)..................................................................48

*Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*,
  906 A.2d 827 (Del. Ch. 2006)..................................................................47

*Boykin v. Gray*,
  895 F. Supp. 2d 199 (D.D.C. 2012)..........................................................19

*Boyle v. United Techs. Corp.*,
  487 U.S. 500 (1988)...............................................................................55

*\*Cal. Hous. Sec., Inc. v. United States*,
  959 F.2d 955 (Fed. Cir. 1992)..................................................................61

*Chamison v. HealthTrust, Inc. Hosp. Co.*,
  735 A.2d 912 (Del. Ch. 1999)..................................................................44

*Charter Operators of Alaska v. Blank*,
  844 F. Supp. 2d 122 (D.D.C. 2012)..........................................................64

*Chlorine Inst., Inc. v. Fed. R.R. Admin.*,
  718 F.3d 922 (D.C. Cir. 2013)............................................................32, 33

*\*Clapper v. Amnesty Int'l USA*,
  133 S. Ct. 1138 (2013)............................................................................32

*Cnty. of Sonoma v. FHFA*,
  710 F.3d 987 (9th Cir. 2013) ..............................................................20, 29

*Commonwealth of Pa. v. Nat'l Ass'n of Flood Insurers*,
  520 F.2d 11 (3d Cir. 1975).......................................................................58

*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992)...............................................................................48

*Courtney v. Halleran*,
  485 F.3d 942 (7th Cir. 2007) .............................................................28, 29

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000)...............................................................................55

*Daily Income Fund, Inc. v. Fox*,
  464 U.S. 523 (1984)...............................................................................47

*Delta Savs. Bank v. United States*,
  265 F.3d 1017 (9th Cir. 2001) ...........................................................51, 52

*Domestic Sec., Inc. v. SEC*,
   333 F.3d 239 (D.C. Cir. 2003) .................................................................................65, 70

*Dunlap v. State Farm Fire & Cas. Co.*,
   878 A.2d 434 (Del. 2005) ........................................................................................43, 44

*Envtl. Def. Fund, Inc. v. Costle*,
   657 F.2d 275 (D.C. Cir. 1981) ........................................................................................64

*Esther Sadowsky Testamentary Trust v. Syron*,
   639 F. Supp. 2d 347 (S.D.N.Y. 2009) ...............................................................20, 37, 49, 52

*Eufaula Drugs, Inc. v. Tmesys, Inc.*,
   432 F. Supp. 2d 1240 (M.D. Ala. 2006) ............................................................................58

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
   545 U.S. 546 (2005)........................................................................................................58

*Fairfax Cnty. Redevelopment & Hous. Auth. v. W.M. Schlosser Co., Inc.*,
   41 Va. Cir. 118 (1996) ....................................................................................................41

*FDIC v. Am. Cas. Co.*,
   998 F.2d 404 (7th Cir. 1993) ...........................................................................................49

*FDIC v. Cobblestone Corp.*,
   No. 91-12741, 1992 WL 333961 (D. Mass. Oct. 28, 1992) ...............................................34

*In re Fed. Home Loan Mortg. Corp. Derivative Litig.*,
   643 F. Supp. 2d 790 (E.D. Va. 2009) .....................................................................20, 49, 52

*Fed. Home Loan Mortg. Corp. v. Shamoon*,
   922 F. Supp. 2d 641 (E.D. Mich. 2013).............................................................................60

*In re Fed. Nat. Mortg. Ass'n Sec., Derivative, ERISA Litig.*,
   629 F. Supp. 2d 1 (D.D.C. 2009) ...............................................................................20, 52

*First Hartford Corp. Pension Plan & Trust v. United States*,
   194 F.3d 1279 (Fed. Cir. 1999).................................................................................51, 52

*First Ind. Fed. Sav. Bank v. FDIC*,
   964 F.2d 503 (5th Cir. 1992) ..........................................................................................34

*Franklin Savs. Corp. v. United States*,
   56 Fed. Cl. 720 (2003) ...................................................................................................31

*Freeman v. FDIC*,
   56 F.3d 1394 (D.C. Cir. 1995) ..............................................................................20, 34, 53

*Furgatch v. Resolution Trust Corp.*,
No. 93-20304 SW, 1993 WL 149084 (N.D. Cal. Apr. 30, 1993)............................................21

*Gabriel v. Preble*,
396 F.3d 10 (1st Cir. 2005)...............................................................................................46

*\*Glinert v. Wickes Companies, Inc.*,
16 Del. J. Corp. L. 764, 778-80 (Del. Ch.) ...................................................................44, 45

*Goble v. Marsh*,
684 F.2d 12 (D.C. Cir. 1982)..........................................................................................57

*Golden Pac. Bancorp v. United States*,
15 F.3d 1066 (Fed. Cir. 1994)........................................................................................60

*Gosnell v. FDIC*,
No. 90-1266L, 1991 WL 533637 (W.D.N.Y. Feb. 4, 1991)...........................................27, 28

*Green v. McHugh*,
793 F. Supp. 2d 346 (D.D.C. 2011) ................................................................................19

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982)........................................................................................................50

*Gross v. Bell Sav. Bank PaSA*,
974 F.2d 403 (3d Cir. 1992)........................................................................................21, 29

*GTS 900F, LLC v. FDIC*,
No. 11-cv-06607, 2012 WL 2086305 (C.D. Cal. June 1, 2012)...........................................70

*H-M Wexford LLC v. Encorp, Inc.*,
832 A.2d 129 (Del. Ch. 2003)..........................................................................................36

*Heckler v. Chaney*,
470 U.S. 821 (1985)........................................................................................................63

*Henok v. Chase Home Fin., LLC*,
922 F. Supp. 2d 110 (D.D.C. 2013) ...................................................................................59

*\*Herron v. Fannie Mae*,
857 F. Supp. 2d 87 (D.D.C. 2012) ....................................................................................60

*Hillman v. Maretta*,
--- U.S. ----, 133 S. Ct. 1943 (2013) ................................................................................55

*Hinton v. Corrections Corp. of Am.*,
624 F. Supp. 2d 45 (D.D.C. 2006) .....................................................................................7

*Huntleigh USA Corp. v. United States*,
    525 F.3d 1370 (Fed. Cir. 2008)..................................................................................62

*Kamen v. Kemper Fin. Servs.*,
    500 U.S. 90 (1991)......................................................................................................51

*\*Kellmer v. Raines*,
    674 F.3d 848 (D.C. Cir. 2012) ..................................................................... *passim*

*\*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
    674 F. Supp. 2d 483 (S.D.N.Y. 2009)....................................................................20, 21

*Kuroda v. SPJS Holdings, L.L.C.*,
    971 A.2d 872 (Del. Ch. 2009)....................................................................................43

*Lakeland Reg'l Health Sys. v. Sebelius*,
    No. 12-600 RJL, 2013 WL 3776254, --- F. Supp. 2d ---- (D.D.C. July 16, 2013)............64, 69

*Leon Cnty. v. FHFA*,
    700 F.3d 1273 (11th Cir. 2012) ..................................................................................20

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)....................................................................................................32

*In re M & F Worldwide Corp. S'holders Litig.*,
    799 A.2d 1164 (Del. Ch. 2002)..................................................................................46

*May v. Wells Fargo Bank, N.A.*,
    No. 4:11-cv-3516, 2013 WL 3207511 (S.D. Tex. June 24, 2013)........................60

*MCG Capital Corp. v. Maginn*,
    No. CIV. A. 4521-CC, 2010 WL 1782271 (Del. Ch. May 5, 2010)......................47

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................................................64, 69

*Nat'l Trust for Historic Preserv. in U.S. v. FDIC*,
    21 F.3d 469 (D.C. Cir. 1994)......................................................................................20

*Nat'l Trust for Historic Preserv. v. FDIC*,
    995 F.2d 238 (D.C. Cir. 1993)....................................................................................29

*Nemec v. Shrader*,
    991 A.2d 1120 (Del. 2010) .........................................................................................42

*O'Brien v. Socony Mobil Oil Co.*,
    152 S.E.2d 278 (Va. 1967)..........................................................................................42

*O'Melveny & Myers v. FDIC,*
  512 U.S. 79 (1994) ............................................................................................59

*Omega Healthcare Investors, Inc. v. Res-Care, Inc.,*
  475 F.3d 853 (7th Cir. 2007) .............................................................................37

*\*Omnia Commercial Co. v. United States,*
  261 U.S. 502 (1923)...................................................................................62, 63

*Osborn ex rel. Osborn v. Kemp,*
  991 A.2d 1153 (Del. 2010) ................................................................................40

*\*Pa. Co. for Ins. v. Cox,*
  199 A. 671 (Del. 1938) ......................................................................................42

*Palmyra Pac. Seafoods v. United States,*
  561 F.3d 1361 (Fed. Cir. 2009)..........................................................................62

*Pareto v. FDIC,*
  139 F.3d 696 (9th Cir. 1998) .........................................................36, 38, 49, 50

*Parra v. Fed. Nat'l Mortg. Ass'n,*
  No. CV 13-4031, 2013 WL 5638824 (C.D. Cal. Oct. 16, 2013)...........................60

*Parsch v. Massey,*
  72 Va. Cir. 121, 2006 WL 4959616 (Oct. 4, 2006) .............................................46

*Providence Square Assocs., L.L.C. v. G.D.F. Inc.,*
  211 F.3d 846 (4th Cir. 2000) .............................................................................40

*Pruell v. Caritas Christi,*
  645 F.3d 81 (1st Cir. 2011)................................................................................58

*\*Puerto Rico Higher Educ. Assistance Corp. v. Riley,*
  10 F.3d 847 (D.C. Cir. 1993)........................................................................64, 70

*Red Lake Band of Chippewa Indians v. U.S. Dep't of Interior,*
  624 F. Supp. 2d 1 (D.D.C. 2009) ........................................................................36

*Simmons v. Miller,*
  261 Va. 561, 544 S.E.2d 666 (2001)...................................................................46

*St. George Maronite Catholic Church v. Green,*
  No. SA-94-CA-334, 1994 WL 763743 (W.D. Tex. July 25, 1994)........................21

*Stone v. United States,*
  683 F.2d 449 (D.C. Cir. 1982) ...........................................................................58

*Sunrise Continuing Care, LLC v. Wright*,
   671 S.E. 2d 132 (Va. 2009)................................................................36

*Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*,
   No. Civ. A. 1668-N, 2006 WL 2521426 (Del. Ch. Aug. 25, 2006) .......................................42

*Superwire.com v. Hampton*,
   805 A.2d 904 (Del. Ch. 2002)................................................................41

*Texas v. United States*,
   523 U.S. 296 (1998)................................................................32, 33

*Toca Producers v. FERC*,
   411 F.3d 262 (D.C. Cir. 2005)................................................................32

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
   845 A.2d 1031 (Del. 2004)................................................................46

*Town of Babylon v. FHFA*,
   699 F.3d 221 (2d Cir. 2012)................................................................20

*Transit Cas. Co. v. Hartman's, Inc.*,
   218 Va. 703, 239 S.E.2d 894 (1978)................................................................41

*Trustees of Iron Workers Local 473 Pension Trust v. Allied Prods. Corp.*,
   872 F.2d 208 (7th Cir. 1989) ................................................................36

*U.S. Bank Nat. Ass'n v. First Nat. Bank of Keystone*,
   394 F. Supp. 2d 829 (S.D. W. Va. 2005)................................................................37

*United Liberty Life Ins. Co. v. Ryan*,
   985 F.2d 1320 (6th Cir. 1993) ................................................................28

*United States v. Ron Pair Enters., Inc.*,
   489 U.S. 235 (1989)................................................................50

*Volges v. Resolution Trust Corp.*,
   32 F.3d 50 (2d Cir. 1994)................................................................21, 28

*Ward's Equip., Inc. v. New Holland N. Am., Inc.*,
   493 S.E.2d 516 (Va. 1997)................................................................42, 43

*Waters v. Rumsfeld*,
   320 F.3d 265 (D.C. Cir. 2003)................................................................57

*Waterview Management Co. v. FDIC*,
   105 F.3d 696 (D.C. Cir. 1997)................................................................27

*Westberg v. FDIC*,
  926 F. Supp. 2d 61 (D.D.C. 2013) ........................................................................34

*Wood v. Coastal States Gas Corp.*,
  401 A.2d 932 (Del. 1979) ........................................................................39

**Statutes**

5 U.S.C. § 701(a)(1) ........................................................................63, 64

*12 U.S.C. § 1451 note ........................................................................54, 55

*12 U.S.C. § 1455(l) ........................................................................10, 61

12 U.S.C. § 1455 note
  (Pub. L. No. 111-203, Title XIII, § 1304(d), July 21, 2010, 124 Stat. 2134) ........................18

*12 U.S.C. §§ 1716 ........................................................................54, 55

*12 U.S.C. § 1719(g) ........................................................................10, 12, 61

12 U.S.C. § 1821(d)(2)(G)(i) ........................................................................27, 28

12 U.S.C. § 1821(j) ........................................................................20, 27, 28, 29

12 U.S.C. § 4513(a)(1)(B) ........................................................................9

12 U.S.C. § 4617(a)(2) ........................................................................9, 30, 61

12 U.S.C. § 4617(a)(3) ........................................................................61

12 U.S.C. § 4617(a)(4) ........................................................................8, 11, 31, 65

12 U.S.C. § 4617(b)(2) ........................................................................ *passim*

*12 U.S.C. § 4617(b)(2)(A) ........................................................................ *passim*

12 U.S.C. § 4617(b)(2)(B) ........................................................................ *passim*

*12 U.S.C. § 4617(b)(2)(D) ........................................................................ *passim*

12 U.S.C. § 4617(b)(2)(E) ........................................................................30

*12 U.S.C. § 4617(b)(2)(G) ........................................................................10, 27, 29, 30

*12 U.S.C. § 4617(b)(2)(J) ........................................................................ *passim*

12 U.S.C. § 4617(b)(2)(K)(i) ........................................................................34

12 U.S.C. § 4617(b)(3)-(6) ................................................................................34

12 U.S.C. § 4617(c)(1) ......................................................................................35

*12 U.S.C. § 4617(e) ..................................................................................28, 33

*12 U.S.C. § 4617(f) .................................................................................. *passim*

28 U.S.C. 1346(a)(2) ................................................................................. *passim*

Administrative Procedure Act ("APA"), 5 U.S.C. § 701-706 ............................. *passim*

Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, § 1101, 122 Stat. 2654, 2661 (codified at 12 U.S.C. § 4511 *et seq.*)................................. *passim*

## Other Authorities

12 C.F.R. § 1237.3(a) .......................................................................................54

12 C.F.R. § 1237.3(b) .......................................................................................54

12 C.F.R. § 1710.10(a) ......................................................................................54

Fed. R. Civ. P. 12(b)(1) .....................................................................................19

Fed. R. Civ. P. 12(b)(6) .....................................................................................19

Fed. R. Civ. P. 23.1 ...........................................................................................47

Fed. R. Civ. P. 25(d) ...........................................................................................1

Fed. R. Evid. 201 ................................................................................................8

H.R. 1461, 109th Cong., 1st Sess. (Oct. 31, 2005) ...........................................61

Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, in Benchmarks 196 (1967)..................................................................................................48

Restatement (First) of Contracts § 451 (1932) ..................................................37

Defendants Federal Housing Finance Agency ("FHFA" or "Conservator"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac," together with Fannie Mae, the "Enterprises"), and Melvin L. Watt, in his official capacity as Director of FHFA[1] (together with FHFA, the "FHFA Defendants"), and the Enterprises hereby move to dismiss the complaints as to all claims in the above-captioned actions.   Additionally, the FHFA Defendants move for summary judgment with respect to Plaintiffs' Administrative Procedure Act ("APA") claims alleging that the Third Amendment to the Preferred Stock Purchase Agreements is arbitrary and capricious.   The factual record for those APA claims is complete and therefore summary judgment is appropriate.

## INTRODUCTION

These litigations challenge the FHFA Defendants' response to the most calamitous economic crisis in generations.   During the fall of 2008, FHFA concluded that Fannie Mae and Freddie Mac were on the precipice of failure, mandatory statutory receivership, and liquidation. The Enterprises' creditors were at great risk of sustaining massive losses.   The Enterprises' perilous condition threatened the nation's housing market and the entire national economy.

In response to the rapidly escalating national economic crisis, Congress granted Treasury and FHFA expansive new statutory powers that gave Treasury the ability to enter into a long-term contractual commitment to infuse into the Enterprises the billions of federal tax dollars necessary to enable FHFA's Director to allow the Enterprises to continue their critical operations under FHFA conservatorships.   At that time, and by operation of law, the Conservator succeeded

---

[1]     Because he has succeeded Edward DeMarco, the originally named defendant, as FHFA Director, Melvin L. Watt "is automatically substituted as a party" under Federal Rule of Civil Procedure 25(d).

to "all rights, titles, powers, and privileges . . . of any stockholder, officer, or director of [the Enterprises]." 12 U.S.C. § 4617(b)(2)(A)(i).  The Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, § 1101, 122 Stat. 2654, 2661 (codified at 12 U.S.C. § 4511 *et seq.*) authorized the Conservator to "take over the assets of and operate [the Enterprises] with all the powers of the shareholders, the directors, and the officers of the [Enterprises] and conduct all business of the [Enterprises]."  *Id.* § 4617(b)(2)(B)(i).  In addition, Congress empowered the Conservator to "take such action as may be -- (i) necessary to put the [Enterprises] in a sound and solvent condition; and (ii) appropriate to carry on the business of the [Enterprises] and preserve and conserve [their] assets and property."  *Id.* § 4617(b)(2)(D).  Further, HERA authorizes the Conservator to exercise its "powers and authorities" "in the best interests of the [Enterprises] or [FHFA]."  *Id.* § 4617(b)(2)(J)(i) and (ii).

FHFA exercised these "rights, titles, powers, and privileges" of the Enterprises and their shareholders, officers, and directors by, among other things, creating and implementing a long-term contractual framework (the Senior Preferred Stock Purchase Agreements, or "PSPAs") pursuant to which Treasury would commit to invest federal tax dollars into the Enterprises, subject to an array of comprehensive taxpayer protections that Congress expressly mandated in authorizing these new rescue powers.  Treasury and FHFA had no viable choice but to exercise these newly granted emergency powers, as there was no other investor—private or public—able and willing to infuse new capital and rescue the Enterprises.  In compensation for the massive and continuing commitment of federal tax dollars, Treasury received a bundle of economic rights designed to compensate federal taxpayers for their unprecedented support, with the FHFA Defendants' full understanding that Treasury's lifeline was the only way to keep the Enterprises in operation and mitigate the impending national economic disaster.

The importance to the national economy of the massive, complex, and ongoing financial commitments from Treasury to the Enterprises cannot be overstated. The governing principle of the contractual framework between FHFA, as Conservator on behalf of the Enterprises, and Treasury was that whenever the Enterprises' net worth fell below zero, Treasury would infuse sufficient capital to eliminate the deficit. The Enterprises were obliged to pay Treasury a 10% dividend on a liquidation preference in amounts tied to the Treasury capital infusions. In addition, the Enterprises committed to pay Treasury Periodic Commitment Fees in any amounts necessary to fully compensate federal taxpayers for the "market value" of the continuing commitment. Subsequent to the execution of the PSPAs, Congress highlighted the critical importance of the Periodic Commitment Fees by enacting special legislation mandating that the Periodic Commitment Fees would be used exclusively for the purpose of reducing the national debt.

At the outset, the PSPAs capped the Treasury commitment at $100 billion per Enterprise. In the First Amended PSPAs, the cap was doubled to $200 billion per Enterprise, and in the Second Amended PSPAs, the method for calculating the cap was changed, resulting in a further increase to approximately $234 billion for Fannie Mae and $212 billion for Freddie Mac. But as events unfolded, there was concern that even this massive commitment of federal tax dollars might not suffice. The Enterprises were unable to meet their 10% dividend obligations without drawing more from Treasury, causing a downward spiral of repaying preexisting obligations *to* Treasury through additional draws *from* Treasury. Thus, once the capacity became fixed in 2013, the Enterprises' fixed dividend would erode the Treasury commitment. The very real possibility that the Enterprises might exhaust the Treasury commitment rattled the confidence of

key investors (holders of debt and mortgage-backed securities) and threatened to destabilize the housing finance markets once again.

In response, FHFA and Treasury, through the Third Amended PSPAs, acted to avoid further erosion of the Treasury Commitment by (1) replacing the fixed, 10% dividend rate with a variable dividend equal to the net worth of the Enterprises, and (2) suspending the Periodic Commitment Fee for as long as the variable dividend remains in effect. The Third Amendment worked: it ended the practice of drawing down the Treasury commitment to pay dividends to Treasury, keeping the commitment available to the Enterprises.

The national crisis having eased, Plaintiffs now ask the Court to re-write the agreements that FHFA, on behalf of the Enterprises, and Treasury executed to stabilize the Enterprises and the national economy, pursuant to express congressional authority. Plaintiffs want to cherry-pick those aspects of the agreements that they like—namely, the unprecedented financial support from Treasury at a time when the Enterprises required billions of dollars in capital—and discard the parts they do not like—namely, the Third Amended PSPAs—now that over one hundred billion dollars of federal taxpayer capital infusions and commitments have allowed the Enterprises to remain in business and produce positive earnings, rather than being placed into mandatory receivership and then liquidation. Plaintiffs' attempt to reward themselves, at the expense of federal taxpayers who risked and continue to risk billions of dollars to save the Enterprises from receivership and liquidation, directly contravenes the relevant statutory authorities as implemented by the unambiguous language of the PSPAs.

Plaintiffs' charges of common law and APA violations have it exactly backwards: FHFA, on behalf of the Enterprises, has acted at all times consistent with the Enterprises' contractual obligations and FHFA's powers as Conservator and statutory successor to all rights

of the Enterprises and their stockholders.  The shareholder-Plaintiffs, on the other hand, are

attempting through these cases to convince this Court, during the conservatorships, to give

shareholders financial value that they are not owed under the terms of their stock certificates or

statutes, and to ignore the rights of the Enterprises' senior preferred stockholder, the U.S.

Treasury.  By doing so, Plaintiffs seek not only to undermine the purposes of conservatorship,

but also the very statutory mission of the Enterprises in which they chose to invest.

Plaintiffs' claims against the FHFA Defendants fail as a matter of law because:

- No Jurisdiction.  The Court has no jurisdiction over Plaintiffs' claims seeking declaratory or equitable relief.  HERA provides that "no court may take any action to restrain or affect the exercise of powers or functions of the [FHFA] as a conservator."  12 U.S.C. § 4617(f).  The powers or functions of the Conservator are far-reaching and include, *inter alia*, the power to "carry on the business" of the Enterprises, "put the [Enterprises] in a sound and solvent condition," "take over the assets of and operate the [Enterprises] with all the powers of the shareholders, the directors, and the officers," and "[act] in the best interests of the [Enterprises] or the [FHFA]."  *Id.* § 4617(b)(2).  Because the Conservator was acting within its statutory power to enter the Third Amended PSPAs, the Court is barred from ordering declaratory or equitable relief.

- No Standing or Ripeness.  Plaintiffs' common law and takings claims for their liquidation preference fail on standing and ripeness grounds because there has been no liquidation — nor is one "imminent" or "certainly impending."  Accordingly, Plaintiffs fail to allege a present injury.  Instead, they merely speculate that when a receivership and liquidation occur, Plaintiffs somehow will be harmed.

- Contract Claims Fail.  Plaintiffs fail to state a claim for breach of contract or breach of the implied duty of good faith and fair dealing because, *inter alia*, (1) under HERA Plaintiffs have no rights, as asserted or otherwise, to consent to material changes to the stock certificates — those consent rights reside with the Conservator, (2) by their plain terms, the stock certificates do not give Plaintiffs the right to veto changes to *other* stockholders' agreements and plainly permit the changes to senior certificates allegedly made by the Third Amendment, and (3) Plaintiffs have no absolute right to dividends: the stock certificates give the Board of Directors discretion to declare dividends.

- Fiduciary Duty Claims Fail.  Plaintiffs fail to state a claim for breach of fiduciary duty because (1) the Conservator has succeeded to all of the rights of the Enterprises and the shareholders, including the right to bring derivative claims on behalf of the Enterprises alleging a violation of a supposed fiduciary duty, and (2) HERA and the Enterprises' charters preempt any fiduciary duties the Conservator might owe to shareholders to the extent such duties are inconsistent with the Conservator's responsibility to promote the public mission of the Enterprises: supporting the stability of the housing finance markets.

- Takings Claims Fail.  This Court lacks jurisdiction over the takings claims because no named Plaintiff has expressly disclaimed entitlement to more than $10,000 in damages for Little Tucker Act purposes.  Moreover, Plaintiffs fail to state a takings claim because, under well- established law, the Conservator steps into the shoes of the Enterprises and is not a government actor for purposes of constitutional claims.  Moreover, the Plaintiffs' ownership of stock of the Enterprises in the highly regulated conservatorship is not a cognizable property interest.  Accordingly, Plaintiffs fail to allege either government action or a cognizable property interest sufficient to state a takings claim.

- APA Claims Fail.  Finally, Plaintiffs fail to state any APA claim because the APA does not apply to the actions of the Conservator, which are shielded from judicial review by HERA, 12 U.S.C. § 4617(f).  In the alternative, even if the APA applied, FHFA and the Director would be entitled to summary judgment on Plaintiffs' arbitrary and capricious claims because the Conservator made a reasonable and considered decision to enter the Third Amendment to avoid continued erosion of the Treasury commitment.

## STATEMENT OF FACTS

**I.    The Importance of the Enterprises to the National Economy, and Their Collapse**

Fannie Mae and Freddie Mac are federally chartered corporations created by Congress to provide liquidity to the national housing finance system and to stabilize the nation's residential mortgage market.  To fulfill their congressional mandate, the Enterprises purchase residential mortgages originated by banks and other qualified lenders, which then can use the sale proceeds to originate additional mortgages.  To finance their purchases, the Enterprises borrow funds from large investors, and also bundle the mortgages into mortgage-backed securities ("MBS") that are sold to investors.  *See* Perry Compl. ¶ 30; Fairholme Compl. ¶ 32.

Plaintiffs are preferred and common shareholders of the Enterprises.  As shareholders, they held limited rights prior to conservatorship.  Plaintiffs were entitled to receive dividends, but only "if declared" by the Enterprises' boards of directors.  Consol. Compl. ¶ 22.  The preferred shareholder-Plaintiffs also held a right to a liquidation preference—a contractually defined amount to be paid to preferred shareholders upon liquidation—and limited rights to vote upon changes to their own stock when the changes were "materially adverse" to them.  *Id*. ¶¶ 22, 84, 85.  Plaintiffs have never held—either pre- or post-conservatorship—any right to block the

6

Enterprises from entering into commercial agreements or to exercise a veto over amendments to other, more senior stock certificates, such as those held by Treasury.

In late 2006, following an unprecedented rise in house prices, the housing market began to collapse, with homeowners defaulting on their mortgages at accelerating rates.  At that time, the Enterprises owned or guaranteed mortgages worth more than $5 trillion, nearly half of the U.S. mortgage market.  *See* FHFA3534 (FHFA Office of Inspector General, *Fannie Mae and Freddie Mac: Where the Taxpayers' Money Went* ("OIG Report (May 24, 2012)")).[2]  As a result of the housing crisis, the value of the Enterprises' assets substantially deteriorated and the Enterprises suffered major credit losses in their portfolios.  *See* Fairholme Compl. ¶ 38; Consol. Compl. ¶ 47.

By September 2008, the Enterprises tried to raise capital in the private markets, but no private resources were available for investment.  As FHFA Director Lockhart testified to Congress:  "After substantial effort and communication with market participants, each company reported to FHFA and to Treasury that it was unable to access capital markets to bolster its capital position without Treasury financing.  FHFA's and Treasury's own discussions with investment bankers and investors corroborated this conclusion."  FHFA0103 (Oversight Hearing to Examine Recent Treasury and FHFA Actions Regarding the Housing GSEs Before the H. Comm. on Fin. Services, 110th Cong. (Sept. 25, 2008) (Statement of James B. Lockhart III,

---

[2]     Documents relied upon in the complaints—including the OIG Report of May 24, 2012—are effectively incorporated by reference into the complaints, and therefore can be considered by the Court in resolving this motion to dismiss without converting it into a motion for summary judgment.  *See Hinton v. Corrections Corp. of Am.,* 624 F. Supp. 2d 45, 46 (D.D.C. 2006).  Each document cited herein that can be considered on this basis is identified in the motion for judicial notice filed by the FHFA Defendants and the Enterprises in connection with this briefing. Further, citations to documents contained in the document compilation filed by the FHFA Defendants begin with the prefix: "FHFA,"," while citations to documents contained in the adminstrative record of the Treasury Defendants begin with the prefix "AR."

Director, FHFA)).[3]  Likewise, Treasury Secretary Geithner testified that "both [Enterprises] were severely undercapitalized and would not have been able to meet their obligations without the intervention and financial support of the government."  FHFA1192 (Timothy F. Geithner, Secretary, U.S. Dep't of the Treasury, Written Testimony Before the H. Comm. on Fin. Services (Mar. 23, 2010)).  Indeed, in September 2008 FHFA and Treasury concluded that significant action and an infusion of new capital were required to address the systemic risk posed by the Enterprises' condition and to avoid a mandatory triggering of receivership.[4]

"A collapse of Fannie Mae or Freddie Mac would have had devastating consequences for the housing finance system and the broader economy."  FHFA1192 (Geithner Testimony (Mar. 23, 2010)).  In addition to guaranteeing nearly half the U.S. mortgage market, the Enterprises had over $1.7 trillion of debt securities outstanding and were "deeply interconnected with the broader global financial system."  *Id.*  "At a time when the foundations of the financial system were being deeply shaken by the broadening financial crisis, a collapse of either of these institutions would have caused a breakdown in the mortgage securities market, a significant worsening of the breakdown of confidence across the markets and a likely pull-back of foreign investment."  *Id.*

---

[3]   Under Federal Rule of Evidence 201, courts may take judicial notice of matters of public record that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  "A court may take judicial notice of a matter of public record without converting a motion to dismiss into a motion for summary judgment."  *Antoine v. United States Bank Nat'l Ass'n*, 547 F. Supp. 2d 30, 38 n.3 (D.D.C. 2008).  Each document that can be considered on this basis is identified in the motion for judicial notice filed by the FHFA Defendants and the Enterprises in connection with this briefing.

[4]   FHFA's Director is required as a matter of law to appoint FHFA as receiver for an Enterprise when the Enterprise's obligations exceed its assets or when the Enterprise is generally unable to pay its debts as they come due for the preceding 60 days.  *See* 12 U.S.C. § 4617(a)(4).

## II.    FHFA Is Appointed Statutory Conservator and Succeeds by Operation of Law to All the Rights of the Enterprises and Their Shareholders

Congress created FHFA in July 2008 as an independent agency to supervise and regulate the Enterprises, as well as the Federal Home Loan Banks, and to serve if necessary as the statutory conservator or receiver for the Enterprises.  Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, § 1101, 122 Stat. 2654, 2661 (codified at 12 U.S.C. § 4511 *et seq.*).  HERA charges FHFA as regulator with ensuring that the Enterprises operate in a "safe and sound manner," while "foster[ing] liquid, efficient, competitive, and resilient national housing finance markets."  12 U.S.C. § 4513(a)(1)(B).  HERA also authorizes FHFA's Director to "appoint the [FHFA] as conservator or receiver for a regulated entity . . . for the purpose of reorganizing, rehabilitating, or winding up [its] affairs."  *Id.* § 4617(a)(1), (2).

On September 6, 2008, in light of the dire economic circumstances, and having concluded that the Enterprises could not continue to operate safely and soundly and fulfill their critical public mission without intervention, FHFA's Director placed the Enterprises in FHFA's conservatorship.  FHFA as Conservator "immediately succeed[ed] to . . . all rights, titles, powers, and privileges of the [Enterprises], and of ***any stockholder***, officer, or director of [the Enterprises]."  *Id.* § 4617(b)(2)(A) (emphasis added).

As Conservator, FHFA has statutory authority to take any action that is "necessary to put [the Enterprises] in a sound and solvent condition" and "appropriate to carry on the business of [the Enterprises]."  *Id.* § 4617(b)(2)(D).  FHFA thus has express plenary authority as Conservator to:

- "conduct all business of the [Enterprises]," *id.* § 4617(b)(2)(B)(i);

- "perform all functions of the [Enterprises] in the name of the [Enterprises] which are consistent with the appointment as conservator," *id.* § 4617(b)(2)(B)(iii);

- "preserve and conserve the assets and property of the [Enterprises]," *id.* § 4617(b)(2)(B)(iv);

- "take over the assets of and operate the [Enterprises] with all the powers of the shareholders, the directors, and the officers," *id.* § 4617(b)(2)(B)(i);

- "transfer or sell any asset or liability of the [Enterprises] . . . without any approval, assignment, or consent with respect to such transfer or sale," *id.* § 4617(b)(2)(G); and

- "take any [authorized action], which the Agency determines is in the best interests of the [Enterprises] or the Agency," *id.* § 4617(b)(2)(J)(ii).

Reinforcing and facilitating the exercise of the Conservator's plenary operational authority, Congress insulated the Conservator's actions from judicial review.  Under 12 U.S.C. § 4617(f), "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator."

## III.   The PSPAs Are Structured to Provide Unprecedented Financial Support in Consideration for Senior Preferred Rights That Protect Taxpayers

### A.   Treasury Agrees to Provide Unprecedented Support to the Enterprises Through the PSPAs

In connection with the conservatorship appointments, Treasury and FHFA—expressly in its capacity as Conservator of the Enterprises—entered into two Senior Preferred Stock Purchase Agreements (together, the "PSPAs"), one for each Enterprise.[5]  Treasury agreed to infuse billions of taxpayer dollars into the Enterprises through the PSPAs to provide the capital needed for the Enterprises to remain in operation and avoid mandatory receivership and liquidation. FHFA0128-0155 (Fannie Mae and Freddie Mac's Senior Preferred Stock Purchase Agreements with Treasury (September 26, 2008) ("PSPAs")). This lifeline of unprecedented federal taxpayer

---

[5]   HERA specifically amended the statutory charters of the Enterprises to grant Treasury the authority to enter into such transactions for the purchase of securities issued by the Enterprises, so long as Treasury and the Enterprises reached a "mutual agreement" for such a purchase.  *See* 12 U.S.C. § 1719(g)(1)(A) (Fannie Mae); *id.* § 1455(l)(1)(A) (Freddie Mac).

financial support provided the market with assurances that Treasury would provide a "financial backstop" to the Enterprises, FHFA3545 (OIG Report (May 24, 2012)), and "effectively provide a very long-term federal guarantee" to holders of Enterprise debt (i.e., bondholders) and MBS. *See* FHFA0253 (FHFA Mortgage Market Note (Dec. 5, 2008)).  Indeed, the PSPAs enable holders of mortgage-backed and other debt securities to compel payment by Treasury to ensure that there is no default on those securities.  FHFA0138; 0152 (PSPAs § 6.1).

Treasury funding under the PSPAs is straightforward: if in any quarter an Enterprise's net worth is negative—defined as liabilities exceeding assets in accordance with US GAAP—then the Enterprise draws funds from Treasury in the amount necessary to cure its negative net worth and bring its capital and net worth back up to zero.  FHFA0131; 0145 (PSPAs § 2.2).  Thus, Treasury's funding under the PSPAs, by definition, saves the Enterprise from mandatory receivership, which would be triggered were an Enterprise's liabilities to exceed its assets.  *See* 12 U.S.C. § 4617(a)(4).

By late 2008, the Enterprises' liabilities exceeded their assets in dramatic fashion.  By the end of the third quarter of 2008—at the outset of the conservatorships—Freddie Mac had a negative net worth of $13.7 billion, and by the end of the fourth quarter of 2008, Fannie Mae had a negative net worth of $15.2 billion.[6]  Accordingly, both Enterprises began drawing on the Treasury commitment in amounts needed to cure that deficit and bring the Enterprises' net worth back up to zero.  To date, the Enterprises have drawn over $187 billion from Treasury—$116.1 billion for Fannie Mae, and $71.3 billion for Freddie Mac.  *Id*.

---

[6]    *See* FHFA4089 (Data as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE & Mortgage-Related Securities).

While the PSPAs initially capped Treasury's commitment at $100 billion per Enterprise, the parties subsequently amended the PSPAs (via the "First Amendment") to double the cap to $200 billion per Enterprise.  FHFA0676; 0681 (Amended and Restated PSPAs (May 6, 2009)).  Thereafter, the parties again amended the PSPAs (via the "Second Amendment") to increase the cap to an amount that became fixed again as of January 1, 2013.  FHFA1137; 1143 (Amended and Restated PSPAs (Dec. 24, 2009)).  On that date, the remaining capacity to the cap on Treasury's commitment to Fannie Mae became fixed at $117.6 billion (over and above the $116.1 billion already infused), and the remaining capacity to the cap on Treasury's commitment to Freddie Mac became fixed at $140.5 billion (over and above the $71.3 billion already infused), pursuant to a formula set forth in the Second Amendment.  *Id.*

## B.   The Conservator Agrees to Terms in the PSPAs That Facilitate Treasury's Satisfaction of Its Statutory Obligation to "Protect the Taxpayer"

In consideration of its unprecedented commitment to invest hundreds of billions of federal tax dollars into the Enterprises, and in order to protect this massive investment, the PSPAs gave Treasury a comprehensive and integrated bundle of rights, entitlements, and financial commitments.  Indeed, the statutory authority by which Treasury is permitted to provide funding to the Enterprises requires that any such investment by Treasury be structured so as to "protect the taxpayer."  12 U.S.C. § 1719(g)(1)(B)-(C).  These entitlements include:

Initial Commitment Fee: Initial Liquidation Preference and Warrants.  The PSPAs granted Treasury an "Initial Commitment Fee" consisting of (a) an initial senior liquidation preference of $1 billion for each Enterprise and (b) warrants to acquire 79.9% of the Enterprises' common stock for a nominal payment.  FHFA0133; 0147 (PSPAs § 3.1).  If Treasury exercises the warrants, it will possess a super-majority of common stock that would drastically dilute the remaining value—if any—of the common stock.  Exercise of the warrants would guarantee that

12

common shareholders (other than Treasury) would be unable to "control the outcome of any vote that is presented to the common shareholders."  FHFA0293 (Fannie Mae, Annual Report (Form 10-K) (Feb. 13, 2009)).

Senior Liquidation Preference.  The original PSPAs granted Treasury a senior liquidation preference equal to the total amount of Enterprise draws on Treasury funds, plus the $1 billion initial liquidation preference—currently $189 billion.  Thus, if the Enterprises are liquidated through receivership, Treasury must be paid $189 billion from the proceeds of the liquidation before preferred and common shareholders may recover anything.  From the outset of the PSPAs—long before the Third Amendment—Enterprise dividend payments did not reduce Treasury's liquidation preference.  *See* Fairholme Compl. ¶ 50.  They still do not.

Dividends.  The PSPAs required the Enterprises to pay Treasury a 10% annual dividend, assessed quarterly, based on the total amount of the liquidation preference.  Because the Enterprises quickly began drawing billions from Treasury after the PSPAs were executed, thereby increasing the size of the liquidation preference, the Enterprises' dividend obligation grew quickly as well.  As of the Fourth Quarter of 2010, Freddie Mac's annual 10% dividend obligation "exceed[ed] the company's annual historical earnings in all but one period."  FHFA2187 (Freddie Mac Press Release, Freddie Mac Announces Q4 2010 Financial Results (Feb. 24, 2011)).  Accordingly, the 10% dividend was expected—by itself—to transfer to Treasury "virtually all profits" of the Enterprises.  FHFA1392 (Treasury 2010 Performance and Accountability Report (Nov. 15, 2010)).

Periodic Commitment Fee.  The PSPAs also entitled Treasury to recover, *over and above the dividends*, an annual Periodic Commitment Fee, which was "intended to fully compensate [Treasury] for the support provided by the ongoing Commitment."  FHFA0133; 0147 (PSPAs

§ 3.2(b)).  The PSPAs provided that the amount of the Periodic Commitment Fee, to be imposed

beginning January 2010, reflect "the market value of the Commitment as then in effect."  *Id.*

The PSPAs gave Treasury the right, in its sole discretion, to waive the Periodic Commitment Fee

for a year at a time "based on adverse conditions in the United States mortgage market."  *Id.*

Treasury exercised its right to waive the Periodic Commitment Fee for 2010 and 2011, years in

which the Enterprises had insufficient capital to pay the 10% dividend, let alone an additional

Periodic Commitment Fee.[7]

     PSPA Covenants. The PSPAs also impose a series of covenants that preclude the

Enterprises from paying dividends on common stock and preferred stock, redeeming stock, and

exiting from conservatorship (other than through receivership) without Treasury consent, and

that make clear that shareholders are not third-party beneficiaries to the PSPAs.  *See* FHFA0135;

0149 (PSPAs §§ 5.1, 5.3); FHFA0136; 0150 (*id*. § 5.6); FHFA0138; 0152 (*id*. § 6.1).

     In sum, the PSPAs were intended and designed to fulfill Treasury's statutory obligation

to "protect the Taxpayer" and, through an array of interrelated contractual provisions, effectively

assured that the federal taxpayers, who saved the Enterprises from mandatory receivership,

would be the beneficiaries of the federal rescue.  The draws on the PSPAs were triggered by a

determination that liabilities exceeded assets, i.e. insolvency.  Accordingly, it has been widely

observed that common shares were rendered "virtually worthless," and common and preferred

---

[7]    *See* FHFA2437 (Freddie Mac, Form 10-Q Q3 (Nov. 3, 2011)) (describing Treasury's waiver
of the Periodic Commitment Fee); FHFA1832 (Freddie Mac, Annual Report (Form 10-K)) (Feb.
24, 2011)) (same); FHFA2251 (Fannie Mae Form 10-Q Q1 (May 6, 2011)) (same); FHFA1457
(Fannie Mae, Annual Report (Form 10-K) (Feb. 24, 2011)) (same).

shareholders "effectively lost their investments" when the Enterprises became insolvent.

FHFA3557 (OIG Report (May 24, 2012)).[8]

## IV. The Third Amendment Preserves and Extends the Treasury Commitment by Replacing the Dividend and Periodic Commitment Fee with a Variable Dividend Based on Net Worth

The Enterprises could not consistently generate enough income to make the required 10%

dividend payments.  The Enterprises thus drew funds from Treasury in order to pay the dividends

back to Treasury.  Of the $187 billion the Enterprises have drawn from Treasury, approximately

$26 billion was drawn solely to pay the 10% annual dividend back to Treasury.  Fairholme

Compl. ¶ 56.  Additionally, each time the Enterprises drew funds to pay the 10% dividend, the

total amount of the Treasury draw increased, in turn increasing the amount of the next 10%

dividend payment.  *See* Perry Compl. ¶ 42; Consol. Compl. ¶ 62.  By mid-2012, the amount of

the annual 10% dividend had grown so large—$11.7 billion for Fannie Mae and $7.2 billion for

Freddie Mac—that it appeared unlikely that either of the Enterprises would be able to meet that

---

[8]     *See also* FHFA0693; 1203 (FHFA 2008 and 2009 Reports to Congress) (draws under PSPAs indicated that the Enterprises had "depleted all of their shareholders' equity" long before the Third Amendment); FHFA2362 (Statement of Deborah Lucas, CBO Assistant Dir. for Fin. Analysis, Before the H. Comm. on the Budget  (Jun. 2, 2011)) ("In return [for Treasury's financial commitment], the government received senior preferred stock and warrants that made the Treasury the effective owners of the GSEs" long before the Third Amendment); FHFA1181 (Letter from FHFA Acting Dir. Edward J. DeMarco to Sens. Dodd, Shelby and Reps. Frank, Bachus (Feb. 2, 2010)) (observing that the Enterprises' losses and Treasury draws "have exhausted the value of each company's shareholder equity"); FHFA1165 (Congressional Budget Office, CBO's Budgetary Treatment of Fannie Mae and Freddie Mac (Jan. 13, 2010)) ("Since the conservatorship, the claims of private shareholders have been reduced to negligible value . . ."); *id* (conservatorship "g[ave] the federal government a complete claim to the equity of Fannie Mae and Freddie Mac.").

amount consistently without drawing additional funds from Treasury.[9]  Market forecasts predicted that the Enterprises' ongoing payment of the 10% dividend would completely exhaust Treasury's funding commitment within 10 years, leading to potential downgrades in the Enterprises' credit ratings.[10]  FHFA shared the concerns that the 10% annual dividend to Treasury would reduce the remaining amount, and thus the effective duration, of the Treasury commitment starting in 2013.  *See* FHFA4047 (FHFA Statement (Aug. 17, 2012)) ("[T]he continued payment of a fixed dividend could have called into question the adequacy of the financial commitment contained in the PSPAs.").  These concerns undermined the very purpose of the PSPAs: to express financial support to holders of Enterprise debt (i.e., bondholders) and MBS.  *See* FHFA0252 (FHFA Mortgage Market Note).  The strength of that support depends upon the Enterprises having a sufficiently large pool of available funds from Treasury that will permit the Enterprises to continue operating under any adverse market conditions that may arise in the coming years.

---

[9]    *See* FHFA3598 (Freddie Mac, Form 10-Q Q2 (Aug. 7, 2012)) ("Over time, our dividend obligation to Treasury will increasingly drive future draws.  Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term."); FHFA3857-3858 (Fannie Mae, Form 10-Q Q2 (Aug. 8, 2012)) ("Although we may experience period-to-period volatility in earnings and comprehensive income, we do not expect to generate net income or comprehensive income in excess of our annual dividend obligation to Treasury over the long term."); *see also* FHFA2407-2422 (FHFA "Projections of the Enterprises' Financial Performance" (Oct. 27, 2011)).

[10]    FHFA2404 (Moody's, Sector Comment, *Plan To Raise Fannie Mae and Freddie Mac Guarantee Fees Raises Question of Support* (Sept. 26, 2011); *see also* FHFA4028 (Moody's Issuer Comment: *Fannie Mae's and Freddie Mac's Return to Profitability is Fleeting* (Aug. 13, 2012) (observing that the Enterprises' "will deplete their capital bases because the dividends they'll be paying on their preferred securities will be greater than their earnings"); FHFA3101 (Deutsche Bank, *The Path of US Support for Fannie Mae, Freddie Mac* (Mar. 14, 2012)) (observing that "diminishing Treasury support raises the risk that the agencies one day might face challenges in covering MBS losses" and that such a risk "becomes greater in a housing market catastrophe, such as the one that started in the US after 2006").

On August 17, 2012, FHFA and Treasury executed the Third Amendment, which (1) eliminated the fixed annual dividend, (2) added a quarterly variable dividend in the amount (if any) of each Enterprise's positive net worth, and (3) suspended the Periodic Commitment Fee for as long as the quarterly variable dividend is in effect.  The new dividend structure eliminated the risk that taking draws to make the 10% dividend payment would lead to the exhaustion of the Treasury commitment and made it unnecessary to calculate the market value of the Periodic Commitment Fee.  The PSPAs specifically contemplate and authorize amendments thereto.  *See* FHFA0139; 0153 (PSPAs § 6.3).

## V.     The Third Amendment Was Not Designed to Increase Compensation to Treasury[11]

Before executing the Third Amendment, Treasury developed—and FHFA considered— forecasts and analyses concerning the difference, if any, between the 10% dividend (of the original PSPAs) and a variable net worth dividend (of the proposed Third Amendment). FHFA0008 (Declaration of Mario Ugoletti, ¶ 16 (hereinafter "Decl.")); AR3833-3862 ([Treasury Presentation to SEC]).  Treasury projected that "[t]he net cash returned to taxpayers post the dividend modification is materially equivalent under the proposal as with the 10 percent fixed dividend.  The aggregate net cash remains materially the same."  AR3861; *see also* AR3836 ("[T]here should be no material difference . . . as would be expected with the fixed ten percent dividend payment.").

FHFA also considered the fact that, absent the Third Amendment, the Enterprises would still be liable to pay Treasury the Periodic Commitment Fee, on top of the ongoing 10% dividend

---

[11]    The FHFA Defendants rely upon the materials cited in this section, including the Declaration of Mario Ugoletti, exclusively for purposes of their alternative request for summary judgment on Plaintiffs' arbitrary and capricious claims under the APA, should the Court decide it has jurisdiction over such claims.  *See infra* 63-70.

payments, which was to be calculated based on the "market value of the [Treasury] Commitment as then in effect."  FHFA0133; 0147 (PSPAs § 3.2(b)); *see also* FHFA0004-0005; 0009 (Decl. ¶¶ 8-9, 19).  FHFA believed that, in light of the ongoing risks faced by the Enterprises and the enormity of the Treasury commitment, the value of the Periodic Commitment Fee was "incalculably large."  FHFA0005 (Decl. ¶ 9).  Indeed, each time Treasury waived the fee, it reaffirmed its right to impose the fee in the future and reiterated that Treasury "remains committed to protecting taxpayers and ***ensuring that future positive earnings of the Enterprises are returned to taxpayers*** as compensation for their investment."  FHFA1400; 2192; 2392; 2406; 2665; 3122; 3583 (Letters from Treasury to FHFA (Dec. 29, 2010; Mar. 31, 2011; June 30, 2011; Sept. 30, 2011; Dec. 21, 2011; Mar. 30, 2012; June 25, 2012))  (emphasis added).[12] Accordingly, through the Initial Commitment Fee (initial liquidation preference and warrants), the senior liquidation preference, the massive Periodic Commitment Fee, and the fixed 10% dividends, the FHFA Defendants expected Treasury to receive as much from the Enterprises under the Second Amendment as it would under the Third Amendment.  FHFA0009 (Decl. ¶ 19).  That is, the Third Amendment was not intended to increase compensation to federal taxpayers but would protect the Enterprises from the erosion of the Treasury commitment that was threatened by the fixed dividend.  *Id.*  Thus, the Third Amendment was consistent with the intent of the original PSPAs to (1) fully compensate Treasury for the value of its financial

---

[12]    Congress had been fully apprised of the PSPAs and expressly recognized the potential magnitude of the fees produced by the Periodic Commitment Fee by enacting the "Pay It Back Act" in 2010, which requires that any Periodic Commitment Fees paid by the Enterprises to Treasury "shall be (1) dedicated for the sole purpose of deficit reduction; and (2) prohibited from use as an offset for other spending increases or revenue reductions."  12 U.S.C. § 1455 note (Pub. L. No. 111-203, Title XIII, § 1304(d), July 21, 2010, 124 Stat. 2134).

support, without which the Enterprises would have been forced into receivership, and (2) protect the Enterprises and the national housing market.  *Id.*

## STANDARD OF REVIEW

The FHFA Defendants and the Enterprises move to dismiss all claims pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  Although the Court must accept as true all well-pled factual allegations in the complaint, *Green v. McHugh*, 793 F. Supp. 2d 346, 349 (D.D.C. 2011), "the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint."  *Id.*  If the complaint fails to plausibly give rise to an entitlement to relief, it must be dismissed under Rule 12(b)(6).  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  To avoid dismissal for failure to state a claim, the complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing of entitlement to relief.  *Boykin v. Gray*, 895 F. Supp. 2d 199, 209 (D.D.C. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  A claim that does not allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged," or presents no "more than a sheer possibility that a defendant has acted unlawfully," cannot survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678-79.

## ARGUMENT

**I.    The Court Lacks Jurisdiction over Plaintiffs' Claims Seeking Declaratory and Equitable Relief**

**A.    Section 4617(f) Bars Declaratory and Equitable Relief Where, as Here, the Conservator Is Carrying Out a Statutory Power or Function**

Plaintiffs' claims seeking declaratory and equitable relief are expressly barred by federal statute, 12 U.S.C. § 4617(f), which provides that "no court may take any action to restrain or

affect the exercise of powers or functions of the Agency as a conservator."[13]  This Court and others across the country consistently and routinely apply Section 4617(f) to bar claims—including APA claims—seeking relief that would "restrain or affect" the exercise of the powers of FHFA as Conservator of the Enterprises.[14]  These decisions are consistent with the substantial body of case law interpreting the materially identical provision that governs the operation of FDIC conservatorships and receiverships, 12 U.S.C. § 1821(j).[15]  The D.C. Circuit has described the statutory language of 1821(j) as "effect[ing] a sweeping ouster of courts' power to grant equitable remedies," that bars not only injunctive relief, but also any declaratory relief "that would effectively 'restrain'" the exercise of the conservator's powers.  *Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995).  Indeed, "given the breadth of the statutory language. . . the statute would appear to bar a court from acting in virtually all circumstances."  *Nat'l Trust for Historic Preserv. in U.S. v. FDIC*, 21 F.3d 469, 472 (D.C. Cir. 1994) (Wald, J., concurring).

---

[13]    Plaintiffs ask the Court to, *inter alia*, (1) vacate and set aside the Third Amendment (*Perry, Fairholme, Arrowood*, Consolidated Complaint); (2) enjoin the Conservator from implementing the Third Amendment (*Perry, Fairholme, Arrowood*); (3) declare that the Third Amendment violates the APA (*Perry, Fairholme, Arrowood*), breaches Plaintiffs' stock certificates (*Fairholme*, Consolidated Complaint), and is a breach of fiduciary duty by the Conservator (*Fairholme*, Consolidated Complaint); and (4) order Treasury to return to FHFA as Conservator all dividends distributed since the Third Amendment (*Fairholme*, Consolidated Complaint).

[14]    *See Cnty. of Sonoma v. FHFA*, 710 F.3d 987, 993 (9th Cir. 2013) (holding Section 4617(f) barred adjudication of APA claims against FHFA); *Leon Cnty. v. FHFA*, 700 F.3d 1273, 1278-79 (11th Cir. 2012) (same); *Town of Babylon v. FHFA*, 699 F.3d 221, 228 (2d Cir. 2012) (same); *In re Fed. Nat. Mortg. Ass'n Sec., Derivative, ERISA Litig.*, 629 F. Supp. 2d 1, 4 (D.D.C. 2009) ("*In re Fannie Mae*") (holding Section 4617(f) barred shareholder plaintiffs from pursuing derivative claims on behalf of the Enterprises), *aff'd sub nom.*, *Kellmer v. Raines*, 674 F.3d 848 (D.C. Cir. 2012); *In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 799 (E.D. Va. 2009) (same) *aff'd sub nom. La. Mun. Police Emp. Ret. Sys. v. FHFA*, 434 F. App'x 188 (4th Cir. 2011); *Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347, 351 (S.D.N.Y. 2009) (same); *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 674 F. Supp. 2d 483, 494 (S.D.N.Y. 2009) (Section 4617(f) bars claims "seeking an order which restrains the FHFA from enforcing [a] contractual provision in the future").

[15]    That provision states that "no court may take any action . . . to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver."  12 U.S.C. § 1821(j).  "In analyzing the limits of the Court's authority under § 4617(f), the Court may turn to precedent relating to [Section 1821(j)]."  *Kuriakose*, 674 F. Supp. 2d at 493 (citing cases).

The Court's "jurisdictional inquiry" under Section 4617(f) is "quite narrow." *Bank of Am. N.A. v. Colonial Bank*, 604 F.3d 1239, 1243 (11th Cir. 2010).  "[T]he only relevant question" is "whether the conservator or receiver is carrying out a statutory function or power.  If so, no injunction may issue." *Furgatch v. Resolution Trust Corp.*, No. 93-20304 SW, 1993 WL 149084, at *2 (N.D. Cal. Apr. 30, 1993).  Stated differently, only when the Conservator is "acting clearly outside its statutory powers" is Section 4617(f) inapplicable.  *See Gross v. Bell Sav. Bank PaSA*, 974 F.2d 403, 407 (3d Cir. 1992).  Allegations that a conservator or receiver acted improperly or unlawfully—or even in violation of a contract—"does not alter the calculus" so long as the conservator or receiver is carrying out one of its powers or functions.  *Volges v. Resolution Trust Corp.*, 32 F.3d 50, 52 (2d Cir. 1994).

1.    *The Conservator Acted Within Its Statutory Authority When It Arranged for and Acted to Preserve Treasury's Capital Commitment*

The Conservator had the unfettered authority to seek additional capital for the Enterprises, including the infusion of taxpayer funds as capital into the Enterprises pursuant to Treasury's express statutory authority to make such investments, to enable the Conservator to "carry on the business" of the Enterprises and "put the [Enterprises] in a sound and solvent condition."  12 U.S.C. § 4617(b)(2)(D).  This is precisely what the Conservator did, both when it entered into the PSPAs and subsequently when it executed the First, Second, and Third Amendments.  Because the Conservator acted within its statutory powers, Section 4617(f) precludes the Court from voiding, altering, or modifying in any way the terms of the PSPAs, including the variable net worth dividend, because any such action would "restrain or affect the exercise of powers or functions of the Agency as a conservator."  *See Kuriakose*, 674 F. Supp. 2d at 494 (holding section 4617(f) precludes claims that "restrain[] the FHFA from enforcing [a] contractual provision in the future"); *see also St. George Maronite Catholic Church v. Green*,

21

No. SA-94-CA-334, 1994 WL 763743, at *6-7 (W.D. Tex. July 25, 1994) ("1821(j) bars any relief that would affect the contract between [conservator or receiver] and [a third party], whether that relief is termed recession, declaratory, or anything else.").

Plaintiffs cannot—and, in fact, concede that they do not—dispute that the Conservator acted within its statutory authority in agreeing to the terms of the *original* PSPAs and the First and Second Amendments thereto.  To the contrary, Plaintiffs embrace the original PSPAs, characterizing them as having "restor[ed] the [Enterprises] to financial health," "reassured investors," "honored" shareholder rights, and "stabilized" the Enterprises.  Fairholme Compl. ¶¶ 14, 63; *see also* Perry Compl. ¶ 23 (describing as "lawful" Treasury's rights under original PSPAs).  In so doing, Plaintiffs effectively concede that this Court lacks the authority to restrain or affect the terms of the pre-Third Amendment PSPAs.[16]

Plaintiffs attempt to avoid the preclusive effect of Section 4617(f) by challenging only an *amendment* to the PSPAs, rather than the original PSPAs.  Plaintiffs seek reinstatement of the earlier and, in Plaintiffs' view, preferable version of the PSPAs.  This attempt to invest the Court with jurisdiction expressly withheld by Congress fails because the Conservator exercised the very same statutory powers in authorizing the Third Amendment as it did in authorizing the original PSPAs: the power to keep the Enterprises operating in a sound and solvent condition.  By executing the Third Amendment, the Conservator preserved and effectively extended the

---

[16]   Plaintiffs incorrectly represent that the FHFA OIG concluded that shareholders "effectively lost their investments" as a result of the Third Amendment.  *See* Perry Compl. ¶ 17.  The FHFA OIG's conclusion was issued on May 24, 2012, months *before* the Third Amendment was executed (in August 2012) and plainly describes the impact of the *original* terms of the PSPAs, which Plaintiffs expressly do not challenge: "In short, the PSPAs give priority in repayment to Treasury ahead of any other preferred or common shareholders.  Thus, the preferred and common shareholders of Fannie Mae and Freddie Mac did not benefit by Treasury's actions. They effectively lost their investments."  FHFA3557 (OIG Report (May 24, 2012)).

finite Treasury funds that can be drawn by the Enterprises, which was essential to ensuring the safety and soundness of the Enterprises and well within the core functions of the Conservator.

From the earliest months of the PSPAs, the Enterprises had insufficient capital to pay the 10% dividend to Treasury, and thus consistently drew funds *from* Treasury in order to make the dividend payments back *to* Treasury.  As Plaintiffs allege, this created a "harmful feedback loop" (Perry Compl. ¶ 42) that "requir[ed] the Companies to draw down Treasury's funding commitment, which, in turn, required the Companies to pay increased dividends to Treasury." Consol. Compl. ¶ 62; *see also* Perry Compl. ¶ 42.  At the time the Third Amendment was executed in August 2012, both Enterprises projected that this circular practice likely would continue over the long term because the Enterprises still could not afford the 10% dividend, which had grown to $11.7 billion for Fannie Mae and $7.2 billion for Freddie Mac.  For example, on August 7, 2012, Freddie Mac announced:  "Over time, our dividend obligation to Treasury will increasingly drive future draws.  Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term."  FHFA3598 (Freddie Mac Form 10-Q Q2 (Aug. 7, 2012)); *see also* FHFA3857-3858 (Fannie Mae Form 10-Q Q2 (Aug. 8, 2012)) ("we do not expect to generate . . . income in excess of our annual dividend obligation to Treasury over the long term"); FHFA4026 (Nick Timiraos, *Fannie Mae Posts Profit as Home Prices Rise*, Wall St. J. (Aug. 8, 2012)); FHFA2407-2422 (FHFA "Projections of the Enterprises' Financial Performance" (Oct. 27, 2011)).

Because the cap on the Treasury commitment became fixed on January 1, 2013, each dollar drawn from Treasury merely to pay the Treasury dividend was one less dollar available to the Enterprises to draw upon in the event the Enterprises suffered losses due, for example, to a

decline in the housing market or broader economic turbulence.  Accordingly, the prospect of the

Enterprises continuing this circular practice raised concerns in the marketplace over the

adequacy of the remaining Treasury funds.  In particular, market forecasts predicted that the

Enterprises' ongoing payment of the 10% dividend would completely exhaust Treasury's

funding commitment within ten years, leading to potential downgrades in the Enterprises' credit

ratings.  Moody's, a leading credit rating service, stated that the 10% dividend payments would

"eliminate Fannie Mae's contingent capital by 2019 and Freddie Mac's by 2022 . . . [even]

assum[ing] that the GSEs are able to fully offset credit losses, which we believe is unlikely."

FHFA2404 (Moody's, Sector Comment: *Plan To Raise Fannie Mae and Freddie Mac*

*Guarantee Fees Raises Question of Support* (Sept. 26, 2011)).  Moody's stated that this "would

be credit negative and prompt a review of [the Enterprises'] Aaa ratings."  *Id.*  Indeed, on August

13, 2012—four days before execution of the Third Amendment—Moody's announced that,

despite recently improved earnings of the Enterprises, their "ultimate path remains unchanged:

they will deplete their capital bases because the dividends they'll be paying on their preferred

securities will be greater than their earnings."  FHFA4028 (Moody's Issuer Comment: *Fannie*

*Mae's and Freddie Mac's Return to Profitability is Fleeting* (Aug. 13, 2012)).  Likewise, a large

international bank observed that "diminishing Treasury support raises the risk that the agencies

one day might face challenges in covering MBS losses" and that such a risk "becomes greater in

a housing market catastrophe, such as the one that started in the US after 2006."  FHFA3101

(Deutsche Bank, *The Path of US Support for Fannie Mae, Freddie Mac* (Mar. 14, 2012)).  The

circular practice thus threatened to undermine the very purpose of the PSPAs: to provide the

market with assurances that federal support stood behind the Enterprises' debts.  FHFA's

Inspector General recognized as much, observing that "[m]arket participants [had] expressed

concern that the dividends could siphon off Treasury money needed to keep the Enterprises solvent."  FHFA Office of Inspector General, *Analysis of the 2012 Amendments to the Government Stock Purchase Agreements*, ("OIG Report (Mar. 20, 2013)"), at "At a Glance" summary page (attached as Exhibit G to the FHFA and Enterprise Defendants' Motion for Judicial Notice ("MJN")).

On August 17, 2012, the Conservator entered into the Third Amendment with the specific purpose of arresting this erosion of Treasury's commitment, as well as public confidence.  In announcing the Third Amendment, the Conservator stated:  "Replacing the current fixed dividend in the PSPAs with a variable dividend based on net worth will . . . eliminate the need for Fannie Mae and Freddie Mac to continue to borrow from the Treasury Department to pay dividends.  As Fannie Mae and Freddie Mac shrink,[17] the continued payment of a fixed dividend could have called into question the adequacy of the financial commitment contained in the PSPAs."  FHFA4047 (FHFA Statement) (Aug. 17, 2012)).

The same market participants who had previously expressed concern about the adequacy of Treasury's commitment in light of the 10% dividend responded positively to the Third Amendment, expressing confidence that the Treasury commitment would now be adequate because of the change from the fixed dividend and Periodic Commitment Fee to a variable dividend.  Moody's stated that "limiting dividends to the amount of earnings each GSE generates and eliminating the burden of the former high dividends ensures that each company will have sufficient contingent capital under its Capital Agreement with the US Treasury, a credit

---

[17]     The original PSPAs require the Enterprises to shrink their portfolio of assets by 10% each year (FHFA0136; 0150 (PSPAs § 5.7) (Sept. 26, 2008)), thereby reducing the volume of the Enterprises' income streams going forward, and further reducing their ability to afford the 10% dividend payments.

positive." FHFA4051 (Moody's, Issuer Comment: *US Treasury Amends Fannie Mae's and Freddie Mac's Capital Agreement, a Credit Positive* (Aug. 23, 2012)).  Likewise, another large international bank stated that "we see virtually no chance of the . . . capital supports being exhausted over a multi-decade period. . . .  In our view, this puts to rest any worries about GSE credit risk even in intermediate/longer maturities."  FHFA4049 (Barclays, Interest Rates Research, *Treasury Changes the PSPAs: Initial Thoughts* (Aug. 17, 2012)).  FHFA's Inspector General also observed:  "The change to the dividends provides the market with greater assurance that the Enterprises will have sufficient capital to fulfill their obligations on their bonds and MBS, which encourages continued liquidity in the mortgage market."  OIG Report (Mar. 20, 2013) at 14 (Ex. G to MJN).

In sum, the Third Amendment successfully resolved a very real problem—drawing funds from Treasury to pay the 10% dividend to Treasury—that threatened to drain the Treasury commitment and disrupt the housing market that FHFA is charged to protect.  By executing the Third Amendment, the Conservator preserved and effectively extended the Treasury commitment, thereby reassuring the Enterprises' debt and MBS holders that the Enterprises would not default on their obligations.  These actions were squarely within the Conservator's statutory powers and functions because they were taken to "carry on the business" of the Enterprises, "put the [Enterprises] in a sound and solvent condition," 12 U.S.C. § 4617(b)(2)(D), and promote what the Conservator determined to be "the best interests of the [Enterprises] or the [FHFA]."  *Id.* § 4617(b)(2)(J)(ii).  That is the Conservator's prerogative based upon express statutory authority.  Section 4617(f) thus bars Plaintiffs' claims.

2.     *The Conservator Acted Within Its Statutory Authority When It Agreed to Transfer Enterprise Assets*

HERA authorizes the Conservator to "transfer or sell any asset" of the Enterprises "without any approval, assignment, or consent."  12 U.S.C. § 4617(b)(2)(G).  By executing the Third Amendment, the Conservator agreed to transfer an Enterprise asset—potential future profits—to Treasury in exchange for relief from an obligation—10% dividends—in order to minimize the possibility that the Enterprises would exhaust the Treasury commitment and thereby maximize the possibility that the Enterprises would survive and avoid receivership. Section 4617(f) thus precludes judicial review of that agreement and prevents the Court from taking any action to "restrain or affect" that agreement.

Section 4617(b)(2)(G) is materially identical to a corresponding provision in FIRREA (*see* 12 U.S.C. § 1821(d)(2)(G)(i)), which courts have interpreted broadly: "It is hard to imagine more sweeping language."  *See Gosnell v. FDIC*, No. 90-1266L, 1991 WL 533637, at *6 (W.D.N.Y. Feb. 4, 1991) (interpreting FIRREA), *aff'd sub nom. Gosnell v. Fed. Deposit Ins. Corp.*, 938 F.2d 372 (2d Cir. 1991).  The statute exemplifies "FIRREA's goal of giving the [conservator or receiver] broad discretion in disposing of the assets under its control."  *Gosnell*, 938 F.2d at 376.  It is "sweeping" in that it "does not provide any limitation" and "contains no directives concerning the manner and procedure by which the [conservator or receiver] is to accomplish this task."  *Gosnell*, 1991 WL 533637, at *6.

In light of this broad statutory authority, courts consistently hold that suits seeking equitable remedies in challenging a conservator or receiver's transfer of assets are barred by Sections 1821(j) and 4617(f).  For example, in *Waterview Management Co. v. FDIC*, 105 F.3d 696, 700-02 (D.C. Cir. 1997), the D.C. Circuit held that a plaintiff's claim for declaratory relief and specific performance of a real estate purchase option contract with the receiver, which the

27

receiver had breached, was barred because Section 1821(d)(2)(G)(i) authorized the receiver to transfer assets, including the property that was the subject of the option contract, and Section 1821(j) precluded judicial review of such transfers.[18]  Thus, when these two statutory provisions are read together—the Conservator's unlimited power to transfer assets, and the courts' inability to restrain or affect Conservator actions—"it is evident that [the statutory scheme] empowers [conservators] to sell a failed institution's assets, whatever they may be, free of interference by the courts."  *Gosnell*, 1991 WL 533637, at *5.

The jurisdictional bar of Section 4617(f) applies irrespective of Plaintiffs' allegations that transfer of assets pursuant to the Third Amendment allegedly circumvents HERA's priority scheme for distribution of the Enterprises' assets in receivership.  *See, e.g.*, Fairholme Compl. ¶¶ 10, 91; Arrowood Compl. ¶ 126; Perry Capital Compl. ¶ 86.  As an initial matter, this argument makes little sense because FHFA has no reason to circumvent the distribution scheme; its liability to shareholders in the event of receivership was fixed by HERA's "maximum liability" provision, 12 U.S.C. § 4617(e), which limits liability to the amount that shareholders would have received had the Enterprises been liquidated at the time the Conservator was appointed in September 2008.  In any event, Plaintiffs' argument is precisely the argument the Seventh Circuit rejected in *Courtney*, wherein the plaintiff asserted that an asset transfer was purportedly a "thinly disguised way of circumventing the statutory priority scheme and allowing

---

[18]  *See also Courtney v. Halleran*, 485 F.3d 942, 949 (7th Cir. 2007) (holding receiver's agreement to transfer assets was protected by Section 1821(j), even though the transfer was allegedly in violation of the receivership distribution priority scheme); *Volges v. Resolution Trust Corp.*, 32 F.3d 50, 53 (2d Cir. 1994) (holding receiver's transfer of assets, allegedly in breach of a contract, was authorized by Section 1821(d)(2)(G)(i) and thus Section 1821(j) barred the court from enjoining such transfers, "regardless of [plaintiff]'s ultimate chance of success on his contract claim"); *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1323, 1328-29 (6th Cir. 1993) (holding Section 1821(j) barred claims seeking rescission of a transaction in which the receiver "transferred substantially all" of the institution's assets).

the [investor] to get more than its proper share."  485 F.3d at 945.  The "glaring problem" with this argument, the court observed, was that the receiver was specifically authorized to "transfer assets or liabilities without any further approvals," and thus the relief requested was barred by "the anti-injunction language of § 1821(j)."  *Id.* at 948.

In sum, by executing the Third Amendment, the Conservator agreed that the Enterprises would transfer an Enterprise asset—potential future profits—to Treasury in exchange for elimination of the 10% dividend and suspension of the Periodic Commitment Fee.  This agreed-upon exchange of value between the Conservator and Treasury was expressly authorized by statute: the Conservator may "transfer or sell any asset"  of the Enterprises.  *See* 12 U.S.C. § 4617(b)(2)(G).  While Plaintiffs may disagree with the Conservator's use of its statutorily authorized powers, Section 4617(f) exists to prevent precisely this type of "second-guessing" of the Conservator's decisions.  *See Nat'l Trust for Historic Preserv. v. FDIC*, 995 F.2d 238, 240 (D.C. Cir. 1993).[19]

### B.    The Third Amendment Is Not an Unauthorized "Wind Down" of the Enterprises

Nothing pleaded in the complaints supports Plaintiffs' charge that the Third Amendment effectuates a "wind down" of the Enterprises that would be beyond FHFA's powers as Conservator.  Plaintiffs make much of Treasury's press release that describes the Third Amendment as "help[ing] expedite the wind down of Fannie Mae and Freddie Mac" and "taking the next step toward responsibly winding down Fannie Mae and Freddie Mac."  Treasury Press Release (Aug. 17, 2012) (Ex. A to MJN).  Plaintiffs argue that this so-called "wind down" of the

---

[19]    *See also Cnty. of Sonoma*, 710 F.3d at 993 ("it is not our place to substitute our judgment for FHFA's" as Conservator); *Gross v. Bell Sav. Bank PaSA*, 974 F.2d 403, 408 (3d Cir. 1992) ("the availability of injunctive relief does not hinge on our view of the [conservator or receiver's] proper exercise of otherwise-legitimate powers").

Enterprises "necessarily involves dissipating their assets and property," and is therefore outside the statutory authority of the Conservator. *See* Perry Compl. ¶ 55. Plaintiffs' arguments miss the mark.

The Conservator is empowered with ample statutory authority to shrink the Enterprises and prepare them for potential liquidation; the Conservator's powers extend well beyond Enterprise rehabilitation. Plaintiffs simply ignore the fact that in addition to authorizing the Conservator to pursue Enterprise rehabilitation, HERA simultaneously expressly authorized the Conservator to pursue Enterprise reorganization and wind-up. Section 4617(a)(2) provides: "[t]he Agency may, at the discretion of the Director, be appointed *conservator* or receiver for the purpose of reorganizing, rehabilitating, *or winding up* the affairs of [the Enterprises]." (emphasis added).[20] The Conservator has the obligation to stabilize the troubled financial institution and ready it *either* for return to the marketplace *or* liquidation. *See Ameristar Fin. Serv. Co., LLC v. United States*, 75 Fed. Cl. 807, 808 n.3 (2007) (describing a conservator as "operat[ing] a troubled financial institution in an effort to conserve, manage, and protect the troubled institution's assets until the institution has stabilized *or has been closed by the chartering authority*") (emphasis added) (citation omitted). This Conservator "wind up" authority includes the ability, described above, to transfer Enterprise assets without any approvals or consents, 12 U.S.C. § 4617(b)(2)(G), and necessarily includes the ability to shrink the Enterprises' operations to ensure their safety and soundness. A receiver, on the other hand, has the "additional power[]" and obligation to "place the [Enterprises] in liquidation and proceed to realize upon the assets of the [Enterprises] in such manner as the Agency deems appropriate." *Id.* § 4617(b)(2)(E); *see*

---

[20] There is no analogue in FIRREA to this provision of HERA that explicitly grants FHFA as both conservator and receiver "winding up" authority.

*also Ameristar*, 75 Fed. Cl. at 811 ("FIRREA grants the FDIC as conservator almost identical powers…"); *Franklin Savs. Corp. v. United States*, 56 Fed. Cl. 720, 726 n.9 (2003) ("The difference between a conservator and a receiver lies primarily in the added ability of the receiver to liquidate a failing [institution]'s assets."). Thus, "winding up" and "liquidation" are not synonymous under HERA; the Conservator has the express authority to do the former in order to prepare it for the latter.

The Third Amendment does not effectuate a *de facto* liquidation of the Enterprises. The Enterprises remain in operation and continue to perform their critically important role of supporting housing finance in this country. Indeed, the Third Amendment was an action taken to *avoid* a lack of resources that could lead to a forced liquidation through mandatory receivership. *See* 12 U.S.C. § 4617(a)(4). Moreover, Plaintiffs take the "wind down" quote in the Treasury Press Release completely out of context. Under the original unchallenged PSPAs, the Enterprises are required to reduce their retained mortgage portfolios, (FHFA0136; 0150 (PSPAs § 5.7)), for the purpose of mitigating the Enterprises' risk and simplifying their operations. *See, e.g.*, FHFA0105 (FHFA Dir. Lockhart, Statement to Congress). The Third Amendment accelerated this longstanding and ongoing process, increasing the pace of annual reductions from 10% to 15% each year. The reference to "wind down" in the Treasury Press Release describes this shrinkage process; indeed, the press release heading reads: "Accelerated Wind Down *of the Retained Mortgage Investment Portfolios* at Fannie Mae and Freddie Mac." Treasury Press Release (Aug. 17, 2012) (emphasis added) (Ex. A to MJN). The Conservator plainly has the authority to adjust and contract the operations of the Enterprises in order to minimize their risk exposure. This is especially true when, as the FHFA OIG has observed, such an adjustment

"positions the Enterprises to function in a holding pattern, awaiting major policy decisions in the future."   OIG Report (Mar. 20, 2013) at 19 (Ex. G to MJN).

## II.    Plaintiffs' Claims to Recover Their Liquidation Preferences Fail for Lack of Standing and Ripeness

Plaintiffs' contract, implied covenant, fiduciary duty, and takings claims appear to seek recovery of Plaintiffs' liquidation preference as damages.  *See, e.g.*, Arrowood Compl. at Prayer for Relief, ¶¶ 35, 66, 72, 92, 95-96, 139; Consol. Compl. at Prayer for Relief, ¶¶ 26, 112-15, 141-43, 147-49, 161-62, 167, 173, p.64; Fairholme Compl. ¶¶ 18, 34, 122-26, 131-34, 146.  These claims fail because they are not ripe and Plaintiffs have suffered no injury.  To satisfy the standing requirement of Article III, a plaintiff "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and quotation marks omitted).  If not actual, the "threatened injury must be *certainly impending* to constitute injury in fact," and "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (internal quotation marks and citations omitted) (emphases and alteration in original).  Similarly, a claim must also be "ripe for judicial resolution" to satisfy Article III. *Toca Producers v. FERC*, 411 F.3d 262, 265 (D.C. Cir. 2005).  The ripeness doctrine is designed to prevent "premature adjudication" of "abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-149 (1967).  A claim is not ripe if it rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks and citations omitted).  Both the standing and ripeness inquiries require "an imminent or certainly impending injury." *Chlorine Inst., Inc. v. Fed. R.R. Admin.*, 718 F.3d 922, 927 (D.C. Cir. 2013).

32

The Enterprises are not in liquidation.  Thus, Plaintiffs have not—and cannot—allege that they have suffered any present injury or face an "imminent" or "certainly impending" injury resulting from the Third Amendment's alleged deprivation of their liquidation preference. Plaintiffs' right to a liquidation preference is triggered only upon liquidation, which is effectuated through receivership.  *See, e.g.*, Freddie Mac, Cert. Design. for Series M Preferred Stock, § 7(a) (Ex. C to MJN).  While Plaintiffs speculate that the Enterprises may one day be placed into receivership and that Plaintiffs may one day be entitled to a share of a potential liquidation surplus, (*see* Consol. Compl. ¶¶ 22, 26; Fairholme Compl. ¶ 98; Arrowood Compl. ¶¶ 7, 51), there is no dispute that the Enterprises have not been liquidated; instead, the Enterprises continue to operate with a 70% market share of mortgage purchases and guarantees.  Plaintiffs' alleged injuries thus are predicated on "contingent future events that may not occur as anticipated."  *Texas*, 523 U.S. at 300; *see also Chlorine Inst., Inc.*, 718 F.3d at 928-29 ("As the . . . process advances and its impact becomes clearer, such an injury may indeed emerge and the [Plaintiff]'s challenge may thereby ripen.  It is not ripe now.").

Moreover, Plaintiffs have not been injured as a result of the Third Amendment because HERA has already fixed Plaintiffs' recovery in any receivership following the conservatorships. HERA provides that Plaintiff shareholders are entitled only to what they would have received had the Enterprises been placed in receivership at the time of the conservatorship appointment. *See* 12 U.S.C. § 4617(e) (maximum liability is limited to amount Plaintiffs "would have received if the Agency had liquidated the [Enterprises'] assets and liabilities").  Thus, following the placement of the Enterprises in receivership, Plaintiffs would be entitled to no more than what they would have received had the Enterprises been liquidated as of September 6, 2008. Accordingly, in any receivership, HERA bars Plaintiffs from benefiting from any Treasury

infusions made to date or prior to any ultimate receivership.  *See First Ind. Fed. Sav. Bank v. FDIC*, 964 F.2d 503, 507 (5th Cir. 1992) ("In enacting FIRREA[s maximum liability provision], Congress unequivocally expressed its intent to limit the maximum liability of the FDIC to the amount the claimant would have received in a liquidation under federal priority regulations. . . . Congressional policy requires that creditors of failed institutions look only to the assets of the institution for recovery of their losses, and not to the taxpayers."); *FDIC v. Cobblestone Corp.*, No. 91-12741, 1992 WL 333961, at *3 (D. Mass. Oct. 28, 1992) (claimants are "not entitled to a windfall; they may recover only the liquidation value of their claims").

Adjudication of Plaintiffs' claim for a liquidation preference would ripen only in receivership after the receiver's disposition of the administrative claims.  The appointment of the receiver "terminate[s] all rights and claims that the stockholders . . . of the [Enterprises] may have against the assets or charter[s] of the [Enterprises] or the [FHFA] arising as a result of their status as stockholders . . . , *except for their right to payment, resolution, or other satisfaction of their claims*" through the receivership claims process.  12 U.S.C. § 4617(b)(2)(K)(i) (emphasis added).[21]  Plaintiffs would be statutorily required to present to the receiver their claims—within the period of time prescribed by the receiver.  *See id.* § 4617(b)(3)(A), (B).  The receiver may allow or disallow Plaintiffs' claims.  S*ee id.* § 4617(b)(4), (b)(5).  Plaintiffs may initiate federal district court proceedings seeking compensation for their shares only if and after the receiver has disallowed their claims.  *See id.* § 4617(b)(2)(K)(i), (b)(6).  Thus, awarding Plaintiffs damages during conservatorship for the alleged loss of an alleged future liquidation preference would

---

[21]    *See also Westberg v. FDIC*, 926 F. Supp. 2d 61, 67 (D.D.C. 2013) (FIRREA's materially identical claims provisions "require anyone bringing a claim against or 'seeking a determination of rights with respect to' the assets of a failed bank held by the FDIC as receiver to first exhaust administrative remedies by filing an administrative claim under the FDIC's administrative claims process." (quoting *Freeman v. FDIC*, 56 F.3d 1394, 1400 (D.C. Cir. 1995)).

34

circumvent the jurisdictionally mandated receivership claims process and the priority scheme established by HERA. *See id.* § 4617(c)(1).

## III.    Plaintiffs' Claims for Breach of Contract and the Implied Duty of Good Faith and Fair Dealing Fail as a Matter of Law

Plaintiffs' claims for breach of contract and the implied duty of good faith and fair dealing are premised upon the allegation that, by entering into the Third Amendment, the Conservator breached—or deprived Plaintiffs of the ability to recover—certain "contractual rights" allegedly possessed in connection with Plaintiffs' common and preferred stock certificates. *See, e.g.*, Fairholme Compl. ¶¶ 122, 131; Arrowood Compl. ¶ 92.  In particular, Plaintiffs allege that FHFA and the Enterprises breached their contractual obligations because the Third Amendment "eliminated" or "nullified entirely" Plaintiffs' "right" to liquidation preferences and dividends.[22]  *See* Consol. Compl. ¶ 87; Fairholme Compl. ¶¶ 125, 135; Arrowood Compl. ¶¶ 95-96.  Plaintiffs allege that the Third Amendment—which does not even mention Plaintiffs' stock certificates—nevertheless effected an amendment to the terms of *Plaintiffs'* stock certificates that could not be accomplished without the consent of two-thirds of the stockholders, which the Conservator did not obtain.  Arrowood Compl. ¶¶ 7, 9, 41, 92-94, 137; Fairholme Compl. ¶ 126; Consol. Compl. ¶¶ 86-88, 143, 155.[23]  Similarly, Plaintiffs allege

---

[22]    The only claims Plaintiffs have pleaded against the Enterprises are breach of contract and breach of implied duty claims related to Plaintiffs' Enterprise stock certificates.  The challenged conduct, however, is solely conduct that was undertaken by the Conservator on behalf of the Enterprises.  Because Plaintiffs have failed to allege that the Enterprises engaged in any of the challenged conduct, they have failed to state a claim upon which relief may be granted against either Fannie Mae or Freddie Mac.  Accordingly, all claims against the Enterprises should be dismissed.

[23]    The preferred stock certificates provide that an affirmative vote "of at least 66 2/3% of all of the shares of [the specific series of preferred stock] . . . shall be necessary for authorizing, effecting or validating the amendment, alteration, supplementation or repeal of the provisions of [the Certificates] if such amendment, alteration, supplementation or repeal would materially and adversely affect the" rights under the Certificates of Designation. *See, e.g.*, Freddie Mac, Cert.

Footnote continued on next page

that FHFA and the Enterprises violated the implied duty of good faith and fair dealing by

agreeing to the Third Amendment.  *See* Fairholme Compl. ¶¶ 130-35; Arrowood Compl. ¶¶ 140-

41; Consol. Compl. ¶¶ 157-62.  Plaintiffs' contract claims fail for numerous reasons.[24]

### A. The Conservator Has Succeeded to All Shareholder Rights During Conservatorship, Including Voting Rights Under the Stock Certificates

Congress could not have been more clear: upon its appointment, the Conservator

"immediately succeed[ed] to . . . ***all rights, titles, powers, and privileges*** of the [Enterprises], and

***of any stockholder***, officer, or director ***of [the Enterprises]*** with respect to the [Enterprises] and

the assets of the [Enterprises]."  12 U.S.C. § 4617(b)(2)(A) (emphases added).  In the words of

the D.C. Circuit, this broad, unequivocal language evidences Congress's intent to ensure "that

nothing was missed" and to "transfer[] everything it could to the [Conservator]."  *Kellmer v.

Raines*, 674 F.3d 848, 851 (D.C. Cir. 2012) (quoting *Pareto v. FDIC*, 139 F.3d 696, 700 (9th Cir.

1998)); *see also Trustees of Iron Workers Local 473 Pension Trust v. Allied Prods. Corp.*, 872

F.2d 208, 213 (7th Cir. 1989) (Congress "kn[ows] the difference between 'all,' 'substantially

---

Footnote continued from previous page

Design. for Series M Preferred Stock, § 9(h)(ii) (Ex C to MJN).  The voting provision in the Certificates of Designation for Freddie Mac's common stock is similar, providing that at least 66 2/3% of all holders of common stock must affirmatively vote to amend, alter, or repeal the provisions of the certificate in a way that materially and adversely affects the common stockholders.  *See* Freddie Mac, Eighth Amended & Restated Cert. Design. for Common Stock, § 10(h)(ii) (Ex. E to MJN).

[24]  Plaintiffs allege that Delaware law governs Plaintiffs' breach of contract claims against Fannie Mae, and Virginia law governs Plaintiffs' breach of contract claims against Freddie Mac. *See* Consol. Compl. ¶¶ 83, 102; Arrowood Compl. ¶ 115.  Freddie Mac's stock certificates provide that although federal law applies, Virginia law supplies the rule of decision.  *See, e.g.*, Freddie Mac, Cert. Design. for Series M Preferred Stock, § 9(f) (Ex. C to MJN); Freddie Mac, Eighth Amended & Restated Cert. Design. for Common Stock, § 10(f) (Ex. E to MJN).  Under Delaware and Virginia law, the party asserting a breach of contract claim bears the burden of establishing (1) a legally enforceable contractual obligation, (2) breach of that obligation, and (3) injury or damages caused by the breach.  *See Sunrise Continuing Care, LLC v. Wright*, 671 S.E. 2d 132, 154 (Va. 2009); *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003); *see also Red Lake Band of Chippewa Indians v. U.S. Dep't of Interior*, 624 F. Supp. 2d 1, 12 (D.D.C. 2009) (similar federal law elements).

all,' and 'virtually all'; and [where] it opt[s] for the unqualified 'all,'" that language must be given its expansive, natural meaning).

The Conservator's immediate statutory succession to ***all*** of Plaintiffs' rights as shareholders is dispositive of Plaintiffs' contract claims.  During conservatorship, Plaintiffs cannot exercise the very "contractual rights" they seek to vindicate through their claims for breach of contract and the implied duty of good faith and fair dealing.  Instead, by operation of federal statute, the Conservator possesses all of the rights of *both* the Enterprises *and* their shareholders—the two parties to the contracts at issue—during conservatorship.  *See Sadowsky*, 639 F. Supp. 2d at 351 ("The shareholders' rights are now the FHFA's.").  The Conservator thus owes no contractual duties to these shareholder-Plaintiffs.  *See Omega Healthcare Investors, Inc. v. Res-Care, Inc.*, 475 F.3d 853, 858 (7th Cir. 2007) (holding contract between two parties who later merged "could not have been breached" because "a party cannot contract with itself"); Restatement (First) of Contracts § 451 (1932) ("Where a person subject to a contractual duty . . . acquires the correlative right in the same capacity in which he owes the duty, the duty is discharged.").  Accordingly, Plaintiffs' contractual claims fail as a matter of law and should be dismissed on this basis alone.

Plaintiffs' theory that the Third Amendment amended the shareholders' stock certificates in a material way that triggered their voting rights (Arrowood Compl. ¶¶ 7, 9, 41, 92-94, 137; Fairholme Compl. ¶ 126; Consol. Compl. ¶¶ 86-88, 143, 155) is not only fanciful—the Third Amendment amended the *Treasury* stock certificates, not Plaintiffs'—it also fails because the Conservator's succession to "all rights" of the shareholders includes, at a minimum, shareholders' voting rights.  *See, e.g.*, *U.S. Bank Nat. Ass'n v. First Nat. Bank of Keystone*, 394 F. Supp. 2d 829, 835-36 (S.D. W. Va. 2005) ("When FDIC took over as receiver it succeeded to

the rights [the institution] had under the contracts.").  Indeed, the ability of a shareholder to vote

in the ordinary corporate context is one of the fundamental ways shareholders can exercise a

degree of control or influence over the corporation.  *See, e.g.*, Freddie Mac, Eighth Amended &

Restated Cert. Design. for Common Stock, § 3 (permitting common stockholders to vote to elect

officers and directors of the Enterprises and to provide input on various corporate actions) (Ex. E

to MJN).  But the conservatorships, pursuant to explicit congressional directive, have unified all

control over the Enterprises into the Conservator, who alone bears the responsibility of operating

the Enterprises.  *See, e.g.*, 12 U.S.C. § 4617(b)(2)(B), (D), and (J); *see also Pareto*, 139 F.3d at

701 (conservator or receiver's succession "includes a stockholder's right, power, or privilege to

demand corporate action" and, "like all others who have some interest in recovering funds from

the closed bank, [shareholders] must simply rely upon the FDIC [as conservator or receiver] to

do its job").  Accordingly, since the appointment of FHFA as Conservator, no stockholder votes

or annual shareholder meetings have occurred.  *See, e.g.*, FHFA1480 (Fannie Mae, Annual

Report (Form 10-K) (Feb. 24, 2011)) ("[T]he rights of the shareholders are suspended during the

conservatorship.  Accordingly, our common shareholders do not have the ability to elect

directors or to vote on other matters during the conservatorship unless the conservator delegates

this authority to them."); Fannie Mae, Annual Report (Form 10-K), at 201 (Feb. 26, 2010)

(similar, noting that, "[i]n consultation with the conservator, we currently do not plan to hold an

annual meeting of shareholders in 2010") (Ex. B to MJN).  Because the Conservator has

succeeded to the shareholders' right to vote in connection with their shares, Congress has

authorized the Conservator to take action that otherwise would require a shareholder vote.

Plaintiffs' contention that their consent was required to amend Treasury's stock certificates fails

to state a claim.

**B.      Plaintiffs Had No Right to Vote on the Third Amendment**

Plaintiffs' breach of contract claim also fails under the plain terms of the stock

certificates.  When interpreting stock certificates, courts "employ the methods used to interpret

contracts generally."  *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 937 (Del. 1979).

Accepting the factual allegations of the Complaints and reviewing the face of the stock

certificates, it is clear that Plaintiffs have no right to vote on amendments to *other* stock

certificates, including the stock certificates issued to Treasury.  There can be, therefore, no

breach of Plaintiffs' certificates.

Under the terms of the certificates, Plaintiffs have no voting rights with respect to the

creation or issuance of superior stock.  Each of the Enterprises' stock certificates provides:

> Without the consent of the Holders of [this stock], [the Enterprise]
> will have the right to amend, alter, supplement or repeal any terms
> of this [stock]. . . to make any other provision with respect to
> matters or questions arising with respect to [this stock] that is not
> inconsistent with this Certificate of Designation so long as such
> action does not materially or adversely affect the interests of the
> Holders of [this stock]; **provided, however,** that any increase in
> the amount of authorized or issued [stock] or **the creation and
> issuance, or an increase in the authorized or issued amount, of
> any other class or series of stock of [the Enterprise], whether
> ranking prior to, on a parity with or junior to [this stock], as to
> the payment of dividends or the distribution of assets upon
> dissolution, liquidation or winding up of Fannie Mae, or
> otherwise, will not be deemed to materially and adversely
> affect the interests of the Holders of [this stock].**

Fannie Mae, Cert. Design. for Series T Preferred Stock, § 7(b) (emphasis added) (Ex. D to

MJN); *see also* Freddie Mac, Cert. Design. for Series M Preferred Stock, § 9(h) (Ex. C to MJN);

Freddie Mac, Eighth Amended & Restated Cert. Design. for Common Stock, § 10(h)(ii) (Ex. E

to MJN).  Thus, each Enterprise is expressly authorized under the plain language of the

certificates to create and/or issue more senior stock that will necessarily dilute and potentially

eliminate the benefits of the existing shareholders, including the ability to receive a dividend or

liquidation preference.  Plaintiffs bear the risk that the Enterprises or FHFA will create and/or issue more senior preferred stock that will rank prior to them and thereby diminish their ability to receive a dividend or the liquidation preference.  The fact that this particular risk came to fruition is not a breach of contract.

Plaintiffs attempt to avoid the plain language of the certificates by alleging that the Conservator was required to obtain Plaintiffs' consent because the Third Amendment was merely an "amendment" to the existing stock (between FHFA and Treasury), rather than "creation or issuance, or an increase in the authorized or issued amount of any other class or series of stock of Fannie Mae."  *See* Consol. Compl. ¶¶ 86, 89; Arrowood Compl. ¶ 41.  Not so.  Plaintiffs' voting rights extend only to acts that "effect[] . . .amend[] . . . or repeal[] any of the provisions of *this Certificate*."  Freddie Mac, Eighth Amended & Restated Cert. Design. for Common Stock § 10(h)(ii) (emphasis added) (Ex. E to MJN).  They have no right to vote or consent to the amendments of *other* stock, including the PSPAs.

Plaintiffs' argument also makes little sense on its own terms.  Under Plaintiffs' interpretation, it would have been permissible for the Conservator to provide a net worth dividend to Treasury as part of the issuance of *new* senior preferred stock to Treasury without first seeking shareholder approval (because the certificates expressly allow such creation without shareholder consent), but it is a breach of contract for the Conservator merely to *amend* the existing Treasury stock certificates to provide for the same thing.  This interpretation ignores the fact that, under either scenario, the effect on the existing junior shareholders is identical.  *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) (rejecting contract interpretation "contrary to both the plain meaning of the document and logic" that would "reach an absurd, unfounded result"); *Providence Square Assocs., L.L.C. v. G.D.F. Inc.*, 211 F.3d 846,

40

852 (4th Cir. 2000) ("'the construction [of a contract] adopted should be reasonable, and absurd results are to be avoided.'" (quoting *Transit Cas. Co. v. Hartman's, Inc.*, 218 Va. 703, 708, 239 S.E.2d 894, 896 (1978) (alteration in original)); *Fairfax Cnty. Redevelopment & Hous. Auth. v. W.M. Schlosser Co., Inc.*, 41 Va. Cir. 118 (1996) (in construing the meaning of an agreement, "the court should avoid a result which is absurd or nonsensical.").  Plaintiffs' interpretation also would give junior preferred shareholders effective veto power over the Enterprises' ability to amend more senior preferred certificates, and that is a right the plain language of the certificates does not support.  *See Superwire.com v. Hampton,* 805 A.2d 904, 910 (Del. Ch. 2002) (preferred stock certificates must be "strictly construed" and a court "must resolve any ambiguity against granting the alleged preference or right" to stockholders).  Whether included as a component of new stock or an amendment to existing stock, the net worth dividend affects existing shareholders in the exact same way.  Even assuming Plaintiffs' voting rights extend to amendments of other stock certificates (they do not), the Third Amendment did not "materially or adversely affect" shareholder interests any more than issuance of superior stock could have.

### C.    Shareholders Do Not Have Any Present or Absolute Right to Dividends

Plaintiffs' breach of contract claims based on an alleged deprivation of dividends also fail as a matter of law.  Consol. Compl. ¶ 143; Arrowood Compl. Prayer for Relief E; Fairholme Compl. ¶¶ 123-24.  Enterprise shareholders have no absolute right to dividends; they are entitled to a dividend only "when, as and if declared by the Board of Directors," "in its sole discretion," and only "out of funds legally available therefor," and only after all dividends owed to more senior preferred shareholders have been paid.  *See, e.g.*, Fannie Mae, Cert. Design. for Series T Preferred Stock, § 2(a), (c), (d) (Ex. D to MJN); Freddie Mac, Cert. Design. for Series M Preferred Stock, § 2(a), (d), (e) (Ex. C to MJN).  Delaware and Virginia courts have interpreted this standard language to mean that the shareholders' right to a dividend does not vest until a

dividend has been declared.  *See, e.g.*, *Pa. Co. for Ins. v. Cox*, 199 A. 671, 673 (Del. 1938)

(interpreting "when and as declared" as "declaratory of the law applicable to the right to

dividends in an active corporation in the usual situation," which provides "shareholders have no

right to dividends until they are declared"); *O'Brien v. Socony Mobil Oil Co.*, 152 S.E.2d 278,

285 (Va. 1967) (a stockholder's right to a dividend is "an expectancy" that does not "ripen[] into

[corporate] debt" until it is "legally declared").  Here, the Conservator has not declared a

dividend during the conservatorships; therefore, Plaintiffs are not entitled to one.

Indeed, the Conservator eliminated all common and preferred stock dividends

immediately upon conservatorship.  *See* Perry Compl. ¶ 40; FHFA0106 (FHFA Dir. Lockhart,

Statement to Congress).  Further, under the original PSPAs—which Plaintiffs do not challenge—

the Enterprises may not declare a dividend without the consent of Treasury.  FHFA0135; 0149

(PSPAs § 5.1).  Accordingly, even if the Conservator reversed course and sought to issue

dividends, Plaintiffs still would not be entitled to dividends absent Treasury consent.  Thus,

Plaintiffs' breach of contract claims based on an alleged deprivation of dividends fails as a

matter of law because, *inter alia*, the Third Amendment is not the cause of any alleged

deprivation of the right to a dividend.

> **D.    The Conservator Did Not Breach Any Implied Duty of Good Faith and Fair
> Dealing by Executing the Third Amendment**

The implied duty (or covenant) of good faith and fair dealing "is a limited and

extraordinary legal remedy."  *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010); *see also*

*Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 493 S.E.2d 516, 520 (Va. 1997) (implied duty

"cannot be the vehicle for rewriting an unambiguous contract in order to create duties that do not

otherwise exist").  Imposing such a remedy "is a cautious enterprise" and "instances should be

rare."  *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, No. Civ. A. 1668-N, 2006 WL

2521426, at *6 (Del. Ch. Aug. 25, 2006).  The implied covenant does not create a "free-floating duty . . . unattached to the underlying legal document," but generally "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."  *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).  The implied covenant "cannot be invoked to override the express terms of the contract," and it is "best understood as a way of implying terms in the agreement" that "analyze unanticipated developments or . . . fill gaps in the contract's provisions."  *See Dunlap*, 878 A.2d at 441 (internal quotation marks and citations omitted); *see also Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009); *Ward's Equipment*, 493 S.E.2d at 520 (implied covenant is "inapplicable" to "valid and binding" contractual rights).  Plaintiffs' allegations fail to meet these standards.

Plaintiffs cannot state a claim for breach of implied covenants by alleging that their stock certificates do not address whether an *amendment* to existing senior stock can adversely affect their rights as junior stockholders.  *See* Consol. Compl. ¶¶ 86, 89; Arrowood Compl. ¶ 41.  For one thing, as noted *supra* at 39-41, that charge is foreclosed by the plain language of the certificates, which expressly contemplate issuance of more senior preferred stock that is capable of later amendment.

But more to the point, even if there were a "gap" in the certificates with respect to whether such amendments to more senior certificates require junior stockholder approval (and there is not), Plaintiffs cannot plausibly allege that this purported gap must be filled in a manner that deviates from the existing terms of the stock certificates.  "Only when it is clear from the writing that the contracting parties would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter may a party invoke the covenant's

protections." *Dunlap*, 878 A.2d at 442 (internal quotation marks and citation omitted); *see also Chamison v. HealthTrust, Inc. Hosp. Co.*, 735 A.2d 912, 920-21 (Del. Ch. 1999) (implied covenant cannot be contrary to the "spirit" of the agreement).  Here, it is not "clear from the writing" of the stock certificates that, had the Enterprises and its stockholders "thought to negotiate" with respect to *amendments* to existing senior stock certificates, the Enterprises would have agreed to treat amendments any differently than the creation and issuance of new stock certificates or additions to existing stock certificates.  The import of the contractual language—i.e., the "spirit" of the agreement—is clear: the Enterprises have the right to create and expand entitlements to senior stock, and the exercise of that right necessarily diminishes junior shareholders' ability to receive dividends and liquidation preferences.  *See* Freddie Mac, Cert. Design. for Series M Preferred Stock, § 8 (Ex. C to MJN); Freddie Mac, Eighth Amended & Restated Cert. Design. for Common Stock, § 9 (Ex. E to MJN); Fannie Mae, Cert. Design. for Series T Preferred Stock, § 8 (Ex. D to MJN).  It is thus not an "unanticipated development[]" when the Enterprises treat more senior stock in a manner that adversely affects junior shareholders' ability to recover dividends or liquidation preferences.  *See Dunlap*, 878 A.2d at 441.  To impose this implied obligation on the Enterprises would treat amendments to existing stock differently from the creation and/or issuance of new stock, or an increase in the amount of existing stock, and would be manifestly inconsistent with both the text and spirit of Plaintiffs' stock certificates.

For example, in *Glinert v. Wickes Companies, Inc.*, 16 Del. J. Corp. L. 764, 778-80 (Del. Ch.), *aff'd*, 586 A.2d 1201 (Del. 1990), a warrant agreement provided that if a merger eliminated the company, the value of the warrant also could be eliminated entirely.  When the company entered into a merger in which the company *did* survive, but in a manner that still destroyed the

value of the warrants, the holder of the warrant asserted a claim for breach of the implied

covenant of good faith and fair dealing.  The holder argued that "while defendants could have

eliminated the economic value of the warrants under [the language of the contract] by the

effectuation of a merger identical to the one accomplished (except [the company] would *not* have

survived), defendants had no right to accomplish the same purpose with the reclassification and

merger in which [the company] *did* survive."  *Id.* at 779.  The court rejected this argument and

dismissed the claim because the contractual language "reveal[ed] that the creators of the contract

must have understood that the economic value of the option feature could properly be destroyed

by a merger in which [the company] disappeared."  *Id.*  The court found no plausible allegations

that the parties would have "regarded another form of corporate transaction that *accomplished*

*the same thing* but left [the company] surviving, as implicitly forbidden."  *Id.* (emphasis

added).[25]  So too here.  Plaintiffs assert that the Conservator could not amend the terms of senior

stock certificates in a way that impaired the value of the junior stock certificates.  But the junior

stock certificates expressly permit such impairment if accomplished via creation and/or issuance

of senior stock.

## IV.    Plaintiffs' Breach of Fiduciary Duty Claims Against the Conservator Fail as a Matter of Law

Plaintiffs allege that the Conservator has breached fiduciary duties to shareholders under

state law.  Fairholme Compl. ¶¶ 136-45; Consol. Compl. ¶¶ 102-09, 175-82.  These claims fail

for multiple reasons.  First, because the Enterprises themselves have no breach of fiduciary duty

claim against the Conservator, the shareholders may not bring such a claim derivatively on

---

[25]    Although the Delaware Chancery Court in *Glinert* applied California law, it did so "using
the same interpretative principles applicable under Delaware law."  *Aspen Advisors LLC v.
United Artists Theatre Co.*, 843 A.2d 697, 707 n.20 (Del. Ch. 2004) (discussing *Glinert*, 16 Del.
J. Corp. L. at 778-80).

behalf of the Enterprises.  Second, even assuming there were a derivative claim to be brought,

the Conservator succeeded to all rights of the shareholders, including the right to bring a

derivative claim.  Accordingly, HERA eliminates Plaintiffs' right to bring a derivative action.

Finally, any claim for breach of fiduciary duty would be preempted by federal law—HERA and

the Enterprises' statutory charters—which expressly authorizes the Conservator to promote the

public interest in a stable housing finance market.

### A.  HERA Precludes Derivative Breach of Fiduciary Duty Claims on Behalf of the Enterprises Against the Conservator

As explained above, the Conservator has succeeded to "all rights, titles, powers, and

privileges of [the Enterprises], and of any stockholder" of the Enterprises.  12 U.S.C.

§ 4617(b)(2)(A)(i).  This provision deprives Plaintiffs of the ability to bring a derivative action

for breach of fiduciary duty against the Conservator on behalf of the Enterprises because

shareholders cannot sue derivatively to enforce a right that the Enterprises lack.[26]  These claims

---

[26]   Fairholme does not expressly identify its fiduciary duty claim as derivative, unlike Plaintiffs in the Consolidated Action who raise identical claims.  *See* Consol. Compl. ¶ 3.  Nevertheless, Fairholme's fiduciary duty claim is derivative.  Under Delaware and Virginia law, whether a claim is derivative depends on whether it was the corporation or the stockholder who (1) suffered the alleged harm, and (2) would receive the benefit of the recovery or other remedy.  *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004); *Gabriel v. Preble*, 396 F.3d 10, 13 (1st Cir. 2005) (citing *Simmons v. Miller*, 261 Va. 561, 544 S.E.2d 666, 675 (2001)); *Parsch v. Massey*, 72 Va. Cir. 121, 128, 2006 WL 4959616 (Oct. 4, 2006).  Fairholme seeks to vacate the Third Amendment and to return to the Conservator all dividend payments made pursuant to the Third Amendment.  Fairholme Compl. ¶ 146.  Such relief, akin to the equitable remedy of rescission of a corporate transaction, is precisely the type that courts have held to be derivative in nature.  *See In re M & F Worldwide Corp. S'holders Litig.*, 799 A.2d 1164, 1173-74 (Del. Ch. 2002) (when the requested relief for a claim "would involve the undoing of a contract to which [the corporation] was a direct party," the claim belongs to the corporation, not the shareholders individually).

must be dismissed because HERA deprives the Enterprises—and, therefore, any entity

purporting to sue derivatively on behalf of the Enterprises—of any right to sue the Conservator.[27]

In a derivative shareholder action, the derivative plaintiff stands in the shoes of the

corporation, but the underlying claim belongs to the corporation rather than the shareholder.  *See,*

*e.g.*, *Ala. By-Products Corp. v. Cede & Co.*, 657 A.2d 254, 265 (Del. 1995) ("a plaintiff's

derivative claim is regarded as a property right belonging to the corporation instead of the

shareholder").  Because the Enterprises have no right to assert claims against the Conservator—

all their rights having been transferred to the Conservator—the derivative shareholder has no

right to assert claims against the Conservator on the Enterprises' behalf.  *See, e.g.*, Fed. R. Civ.

P. 23.1 (derivative action is brought "to enforce a right that the corporation or association *may*

*properly assert* but has failed to enforce" (emphasis added)); *Daily Income Fund, Inc. v. Fox*,

464 U.S. 523, 529 (1984) ("In sum, the term 'derivative action' . . . has long been understood to

apply only to those actions in which the right claimed by the shareholder is one the corporation

could itself have enforced in court.").

### B.    HERA Bars Shareholder Derivative Actions

Even if the Enterprises could assert claims against the Conservator, which they cannot,

Plaintiffs' claims must be dismissed because HERA bars shareholder derivative actions.  This

result is mandated by the D.C. Circuit's ruling in *Kellmer v. Raines*, 674 F.3d 848 (D.C. Cir.

---

[27]    If Fairholme's claims are deemed not to be derivative, they nevertheless must be dismissed because holders of preferred stock, such as Fairholme, cannot assert breach of fiduciary duty claims.  "[W]hen preferred shareholders assert fiduciary claims that relate to obligations expressly treated by their unique contractual rights with the corporation, the Court will review those claims as breach of contract claims and the claims for breach of fiduciary duty will be dismissed as superfluous."  *MCG Capital Corp. v. Maginn*, No. CIV. A. 4521-CC, 2010 WL 1782271, at *15 (Del. Ch. May 5, 2010); *see also Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827, 833-34 (Del. Ch. 2006).

2012), which affirmed the district court's substitution of the Conservator as plaintiff in a

shareholder derivative action.  As the D.C. Circuit explained:

> HERA provides that FHFA "shall, as conservator or receiver, and
> by operation of law, immediately succeed to . . . all rights, titles,
> powers, and privileges . . . of any stockholder." 12 U.S.C.
> § 4617(b)(2)(A).  ***This language plainly transfers shareholders'
> ability to bring derivative suits***—a "right[ ], title[ ], power[ ], [or]
> privilege[ ]"—***to FHFA***.

*Id.* at 850 (emphasis added).  Under *Kellmer*, derivative suits by shareholders are barred.

As *Kellmer* recognized, to resolve the issue whether shareholder plaintiffs may bring a

derivative action in the name of the Enterprises, this Court "need only heed Professor

Frankfurter's timeless advice: '(1) Read the statute; (2) read the statute; (3) read the statute!'"

*Id.* (quoting Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, in

Benchmarks 196, 202 (1967)).[28]  The relevant statutory language of HERA unequivocally states

that upon its appointment as Conservator, FHFA "immediately succeed[ed] to ***all*** rights, titles,

powers, and privileges of [Fannie Mae] and of any ***stockholder*** . . . ."  12 U.S.C.

§ 4617(b)(2)(A)(i) (emphases added).  Because a derivative action is a "right[ ], title[ ], power[ ],

[or] privilege[ ]" of a stockholder, 674 F.3d at 850, the Conservator has the sole right to bring

derivative actions.  In light of the clear statutory language, *Kellmer* deemed it unnecessary to

address shareholders' various arguments "delving deep into pre-HERA common law and

expounding HERA's legislative history."  *Id.*

---

[28]    *See also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (noting that the
Supreme Court has "stated time and again that courts must presume that a legislature says in a
statute what it means and means in a statute what it says there.  When the words of a statute are
unambiguous, then, this first canon is also the last:  judicial inquiry is complete.") (internal
citations and quotation marks omitted); *Blackman v. Dist. of Columbia*, 456 F.3d 167, 176 (D.C.
Cir. 2006) ("If the [statutory] language has a plain and unambiguous meaning, our inquiry ends
so long as the resulting statutory scheme is coherent and consistent.") (internal citations and
quotation marks omitted).

Other courts have reached the same conclusion, holding that the plain language of HERA bars derivative suits by shareholders.  In *Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347, 351 (S.D.N.Y. 2009), the U.S. District Court for the Southern District of New York granted FHFA's motion to substitute in a shareholder derivative action, explaining that "Congress has clearly announced that FHFA has inherited all rights and powers of the Freddie Mac shareholders.  Included in that inheritance is the right to substitute for shareholders in suits such as this one."  *Id.* at 351; *see also id.* ("Congress did not intend that acts lying fully within the FHFA's discretion as Conservator of Freddie Mac would violate some residual fiduciary duty owed to the shareholders.").  The U.S. Court of Appeals for the Fourth Circuit likewise affirmed the U.S. District Court for the Eastern District of Virginia's ruling granting FHFA's motion to substitute in another derivative case because "the plain meaning of the statute is that *all* rights previously held by Freddie Mac's stockholders, including the right to sue derivatively, now belong exclusively to the FHFA."  *In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 795 (E.D. Va. 2009) ("*In re Freddie Mac*") (emphasis in original), *aff'd sub nom. La. Mun. Police Emps. Ret. Sys. v. FHFA*, 434 F. App'x 188 (4th Cir. May 5, 2011).[29]

Since the enactment of HERA, courts have consistently applied its plain language and rejected shareholder derivative suits on behalf of the Enterprises.  There is no basis to depart from the statute's plain language or controlling precedent that unambiguously provides that a shareholder's right to pursue a derivative claim on behalf of the Enterprises—assuming the

---

[29]    *See also Pareto*, 139 F.3d at 700 (Congress transferred to the conservator or receiver "a stockholder's right, power, or privilege to . . . sue directors or others when action is not forthcoming"); *FDIC v. Am. Cas. Co.*, 998 F.2d 404, 406 (7th Cir. 1993) ("By virtue of its status as receiver, the FDIC succeeded to the rights of the Bank and its shareholders, one of which is the ability to sue the Bank's directors and officers.").

Enterprises had such a claim in the first place, which they do not here—belongs to the Conservator alone.

### C.     No "Conflict of Interest" Exception Applies to These Claims

Plaintiffs invite the Court to create a "manifest conflict of interest" exception to HERA that permits shareholders to bring derivative actions on the Enterprises' behalf against the Conservator. *See* Consol. Compl. ¶¶ 133-38.  However, HERA does not authorize any "conflict of interest" exception.  HERA's plain language provides for no exception—based on purported conflicts of interest or otherwise—to the transfer of "all" shareholder rights, titles, powers, and privileges to the Conservator.  Indeed, Congress could not have crafted a broader transfer of shareholder rights to the Conservator.  HERA provides that FHFA as Conservator is empowered to "perform all functions of [Fannie Mae]," "take any action authorized by [HERA], which the Agency determines is in the best interests of [Fannie Mae] or the Agency," and "operate [Fannie Mae] with all the powers of the shareholders."  12 U.S.C. § 4617(b)(2)(B)(i), (iii), (J)(ii).  If Congress had intended less, then it would have so indicated on such an important subject. Instead, as the D.C. Circuit has recognized, HERA evidences Congress's intent to ensure that "nothing was missed" when Congress "*transferred everything it could to the* [Conservator]." *Kellmer*, 674 F.3d at 851 (emphasis added) (citing *Pareto*, 139 F.3d at 700).  Because no basis exists to depart from the plain meaning of HERA to create an extra-textual exception, the plain meaning controls.  *See, e.g.*, *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982) (alteration in *Ron Pair Enters.*))).

50

Plaintiffs' allegations of a purported conflict of interest exception seem to be based on two cases arising under FIRREA and involving both the pre- and post-FIRREA statutory and operational relationships between several other federal financial institution regulatory agencies. *See First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir. 1999); *Delta Savs. Bank v. United States*, 265 F.3d 1017 (9th Cir. 2001).  Neither case controls here.  As an initial matter, the D.C. Circuit's opinion in *Kellmer* declines to address whether HERA permits a "conflict of interest" exception, stating only that such an exception was "not at issue." 674 F.3d at 850.  In all events, neither decision is pertinent to the determination of whether HERA authorizes the judicial creation of a conflict of interest exception under the circumstances of this litigation.

In *First Hartford* and *Delta Savings*, the courts created an exception to FIRREA's transfer of rights and powers to the FDIC as receiver where the receiver faced a "conflict of interest" in "determining whether to bring suit."  *First Hartford*, 194 F.3d at 1295; *see also Delta Savs.*, 265 F.3d at 1022-23.  In creating this judicial exception, the courts relied heavily on the traditional derivative litigation concept, rooted in common law, that shareholders may be permitted to bring suit on behalf of the corporation "when the managers or directors of the corporation, perhaps due to a conflict of interest, are unable or unwilling to do so, despite it being in the best interests of the corporation."  *First Hartford*, 194 F.3d at 1295 (discussing *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 95 (1991)).  The traditional derivative analysis thus distinguishes between shareholder interests on the one hand, and officer and director interests on the other, to determine who can best police the interests of the corporation.  The decisions in *First Hartford* and *Delta Savings* which simply applied this traditional derivative analysis do not support Plaintiffs' attempt to engraft a judicially created conflict of interest exception onto

HERA under the circumstances of this case.  Neither decision considered the dispositive statutory provision that bars such an exception here; by express federal statute, a conservator or receiver succeeds not only to the rights of the officers and directors of the corporation, but *also* to all "rights, titles, powers, and privileges" *of the shareholders themselves*.  12 U.S.C. § 4617(b)(2)(A)(i).  HERA thus eliminates the distinction between shareholder interests on the one hand, and officer and director interests on the other, underlying the traditional derivative analysis by unifying and vesting all control over the corporation—whether by officers, directors, shareholders, or anyone else—in the conservator or receiver alone.  Indeed, to create a "conflict of interest" exception to HERA under the circumstances here presented would render the Conservator's succession to all shareholder rights meaningless.

Further, the decisions in *First Hartford* and *Delta Savings* do not consider or address another critical issue, also dispositive here: whether permitting derivative suits *against the conservator* or receiver would be barred by an anti-injunction provision that explicitly prohibits judicial action that would interfere with the exercise of the conservator's or receiver's powers. *See* 12 U.S.C. § 4617(f) ("[N]o court may take any action to restrain or affect the exercise of powers or functions of the [FHFA] as a conservator.").  Courts interpreting HERA have consistently noted that allowing a shareholder plaintiff to continue to pursue derivative claims independent of FHFA would impermissibly "require [a] Court to take action that would 'restrain or affect' FHFA's discretion, which HERA explicitly prohibits."  *In re Fannie Mae*, 629 F. Supp. 2d at 4 n.4; *see also In re Freddie Mac*, 643 F. Supp. 2d at 799 (granting FHFA's motions to substitute, and noting that HERA provides that "'no court may take any action to restrain or affect the exercise of powers or functions of the [FHFA] as a conservator or a receiver.'" (quoting 12 U.S.C. § 4617(f)); *Sadowsky*, 639 F. Supp. 2d at 350-51 ("Section 4617(f) of HERA

. . . constrains the Court in this situation, since maintenance of this suit with the shareholders acting as Plaintiffs would be inconsistent with the Conservator's exercise of its statutory powers.").  Applying a conflict-of-interest exception to HERA would open the floodgates to shareholders who seek to bring claims on behalf of the Enterprises against the Conservator, requiring courts to make case-by-case, ad hoc determinations of supposed conflicts and threatening dramatic interference with the exercise of the Conservator's powers.  *See Freeman*, 56 F.3d at 1398-99 (discussing how FIRREA's jurisdictional bar facilitates a conservator's or receiver's managing of financial institutions' assets).  Nowhere is the need and purpose for HERA's anti-injunction provision more acute than here, where Plaintiffs seek to bring an action, purportedly on behalf of the Enterprises, against the Conservator to challenge a contract into which the Conservator has entered.

### D.     Any Purported State Law Fiduciary Duty That Would Require the Conservator to Benefit Shareholders at the Expense of the Enterprises' Public Missions Is Preempted by the Federal Statutory Charters of the Enterprises and HERA

Any purported state law fiduciary duties of the Conservator to the shareholders of the Enterprises that would require the Conservator to benefit shareholders over the Enterprises' public mission are preempted by federal law—the Enterprises' charters and HERA.[30]

---

[30]     Plaintiffs allege that Enterprise directors are subject to state law fiduciary duties and that FHFA, as Conservator, is likewise subject to those duties.  However, the Enterprises are chartered by Congress and organized under federal law to act in a variety of specific ways to fulfill their public mission.  State law derivative actions brought by private shareholders seeking judicial review and modification of the corporate governance practices and procedures undertaken by the Enterprises—and now the Conservator on the Enterprises' behalf—would disrupt the carefully structured regulatory regime established by Congress long before the passage of HERA and appointment of the Conservator, and would interfere with the Conservator's ability, on behalf of the Enterprises, to carry out the Enterprises' federal mission.  For these and other reasons, Defendants therefore expressly reserve the right to argue that any claims concerning the Enterprises' corporate governance may arise only under federal law, not state law, and that the Conservator, standing in the shoes of the Enterprises and their directors, is not subject to the shareholder derivative claims under state law being asserted by Plaintiffs.

Specifically, the Enterprises' statutory charters provide that the purposes of the Enterprises are, *inter alia*, to "provide stability in the secondary market for residential mortgages," to "provide ongoing assistance to the secondary market for residential mortgages," and to "promote access to mortgage credit throughout the Nation."  12 U.S.C. §§ 1716, 1451 note.  These charters—federal statutes that are of course known to all shareholders—require the Enterprises, as a matter of law, to carry out their unique public missions, including support for the housing finance market and the secondary market for residential mortgages.  HERA likewise imposes these obligations on the Conservator by requiring the Conservator to "carry on the business" of the Enterprises.  *See id*. § 4617(b)(2)(B)(i), (b)(2)(B)(iii), (b)(2)(D)(ii).  In addition, HERA expressly authorizes the Conservator to take actions that the Conservator "determines [are] in the best interests of the [Enterprises] or the [FHFA]."  *Id.* § 4617(b)(2)(J)(ii).

Plaintiffs allege that the Conservator owes fiduciary duties to shareholders based on state law.  Even assuming *arguendo* that the Conservator is subject to any such duties at all, they are preempted to the extent that they conflict with *federal* law.  Thus, to the extent that Plaintiffs assert that the Conservator is subject to any state law fiduciary duty to benefit shareholders at the expense of the Enterprises' public missions, such a duty is preempted.[31]  Indeed, because the Enterprises' public missions are defined by their statutory charters, all who buy stock in the Enterprises do so with the knowledge that their interests may be subordinated to the public interest when there is a tension between the two.

---

[31]   This principle is consistent with FHFA's regulations that (a) authorize FHFA as Conservator to "[c]ontinue the missions of the [Enterprises]," 12 C.F.R. § 1237.3(a), and (b) authorize the Enterprises to adopt state corporate governance laws only to the extent that they are consistent with the "applicable chartering acts and other Federal law, rules, and regulations, and . . . the safe and sound operations of the Enterprise."  12 C.F.R. § 1710.10(a).

54

Courts may not apply state law if "the application of state law would frustrate specific objectives of federal legislation," *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988) (internal citations and quotation marks omitted), or if the application of state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hillman v. Maretta*, --- U.S. ----, 133 S. Ct. 1943, 1950 (2013) (internal citations and quotation marks omitted).  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

Plaintiffs contend that the Conservator has a fiduciary duty to promote the interests of the Enterprises' shareholders above any public interests.  *See* Consol. Compl. ¶ 105 ("FHFA was and is required to act in furtherance of the best interests of the Companies and their shareholders so as to benefit all shareholders equally and not in furtherance of the personal interest or benefit of FHFA, Treasury, or the federal government.").  The Conservator, however, is subject to an obligation under federal law to pursue the public interest—specifically, supporting the housing finance market and the secondary market for residential mortgages.  12 U.S.C. §§ 1716, 1451 note.  And FHFA concluded that, without funding from Treasury, Fannie Mae and Freddie Mac could have collapsed in 2008, with severe negative effects for the housing finance market.  To obtain Treasury funding, the Conservator exercised its contractual and statutory authority to execute the PSPAs, which give Treasury preferred shares that rank prior to those held by then-existing shareholders.  To the extent that state fiduciary duty laws would have required the Conservator to reject the PSPAs (and they do not), they would conflict with the Conservator's statutory duty to promote the public missions to support housing finance markets as set forth in the Enterprises' charters.  Therefore, Plaintiffs' state law fiduciary duty claims are preempted, as

they present a conflict with "an identifiable federal policy or interest" and "would frustrate specific objectives of federal legislation."

In the same way, the Third Amendment also is consistent with, and undertaken to promote, the public missions in the charters and HERA. As explained above, the Third Amendment ended the circular practice of the Enterprises drawing funds *from* Treasury merely to make dividend payments *to* Treasury, which threatened to erode the amount of the Treasury commitment available to the Enterprises. *See supra* 23-25. This potential erosion was the source of growing concern to the housing finance markets because it exposed the Enterprises to greater risk and increased the potential for instability in housing finance. The Third Amendment avoided continuing erosion of the Treasury commitment, thereby promoting the stability of the Enterprises and the housing market that FHFA seeks to protect. To the extent that Plaintiffs allege that state-law fiduciary duties prohibit the Conservator from entering the Third Amendment, the alleged fiduciary duty to shareholders would be in direct conflict with the Conservator's duty to support the public missions of the Enterprises and Plaintiffs' fiduciary duty claims would be preempted by federal law.[32]

---

[32]   Freddie Mac's Certificates of Designation for its common and preferred stock further confirm that Plaintiffs' fiduciary duty claims are preempted by the Enterprises' charters and public missions. Those certificates provide that the rights and obligations of Freddie Mac and its shareholders "*shall be construed in accordance with and governed by the laws of the United States*, provided that the law of the Commonwealth of Virginia shall serve as the federal rule of decision in all instances *except where such law is inconsistent with Freddie Mac's enabling legislation, its public purposes* or any provision of this Certificate." Freddie Mac, Cert. Design. for Series M Preferred Stock, § 9(f) (Ex. C to MJN); Freddie Mac, Eighth Amended & Restated Cert. Design. for Common Stock, § 10(f) (emphasis added) (Ex. E to MJN). Similarly, Fannie Mae's bylaws provide that "*to the extent not inconsistent with the Charter Act and other Federal law, rules, and regulations*, the corporation has elected to follow the applicable corporate governance practices and procedures of the Delaware General Corporation Law." Fannie Mae Bylaws at §1.05 (as amended through Jan. 30, 2009) (emphasis added) (Ex. F to MJN).

**V.      Plaintiffs' Takings Claims Fail as a Matter of Law**

Plaintiffs assert takings claims against FHFA arising from the Third Amendment. Consol. Compl. ¶¶ 110-16; 183-92.  These claims must be dismissed because (1) this Court lacks Little Tucker Act jurisdiction because the named Plaintiffs have not expressly waived damages in excess of $10,000; (2) this Court lacks Little Tucker Act jurisdiction because the Conservator is not the United States for takings purposes; and (3) Plaintiffs cannot identify a cognizable property interest; and (4) the United States has not taken Plaintiffs' dividend and liquidation interests.

**A.      This Court Lacks Jurisdiction over Plaintiffs' Takings Claims Because the Named Plaintiffs Have Not Waived Any Claim to Damages over $10,000**

This Court lacks jurisdiction over the Plaintiffs' takings claims because the named Plaintiffs have not established that they meet the monetary threshold for a "Little Tucker Act" claim in district court.  Under the Little Tucker Act, federal district courts have concurrent jurisdiction with the U.S. Court of Federal Claims over claims against the United States "not exceeding $10,000 in amount, founded . . . upon the Constitution."  28 U.S.C. § 1346(a)(2).  The Court of Federal Claims has exclusive jurisdiction over damages claims against the government that exceed $10,000.  Even assuming *arguendo* that the Conservator is "the United States" (which it is not, as discussed *infra* at 59-60), Plaintiffs' Little Tucker Act claims must be dismissed because the named Plaintiffs have made no effort to show that they—as opposed to unidentified class members— satisfy this jurisdictional requirement.

A plaintiff can satisfy the Little Tucker Act's jurisdictional requirements by "expressly disclaim[ing] monetary damages over $10,000."  *Waters v. Rumsfeld*, 320 F.3d 265, 270 (D.C. Cir. 2003).  The waiver of damages must be "'clearly and adequately expressed,'" *id.* (quoting *Goble v. Marsh*, 684 F.2d 12, 17 (D.C. Cir. 1982) and it should generally "be set forth in the

initial pleadings," *Stone v. United States*, 683 F.2d 449, 454 n.8 (D.C. Cir. 1982).  Plaintiffs

make no such disclaimer.  Instead, they define the Takings Class to be limited to persons and

entities "who suffered less than $10,000 damages" as a result of the Third Amendment.  Consol.

Compl. ¶ 120.  But the named Plaintiffs cannot establish jurisdiction merely by invoking the

possible claims of unidentified members of the putative class.  *See, e.g.*, *Commonwealth of*

*Pennsylvania v. Nat'l Ass'n of Flood Insurers*, 520 F.2d 11, 25-26 (3d Cir. 1975), *overruled on*

*other grounds*, 659 F.2d 306 (3d Cir. 1981) (affirming dismissal of Little Tucker Act claim

because "the complaint reflects no individual claim of a class member" that would satisfy Little

Tucker Act jurisdiction); *Pruell v. Caritas Christi*, 645 F.3d 81, 83 (1st Cir. 2011) ("The usual

rule in class actions is that to establish subject matter jurisdiction one looks only to the named

plaintiffs and their claims.").[33]  Because none of the named Plaintiffs has expressly disclaimed

damages in excess of $10,000,[34] there is no existing claim "not exceeding $10,000 in amount"

before the Court.  Therefore, this Court lacks jurisdiction over Plaintiffs' takings claims.

---

[33]   When analyzing the similar question of whether the amount-in-controversy requirement is
satisfied for a class action based on diversity jurisdiction, courts require that "at least one *named*
plaintiff in the action satisfies the amount-in-controversy requirement."  *Exxon Mobil Corp. v.*
*Allapattah Servs., Inc.*, 545 U.S. 546, 549 (2005) (emphasis added).  "Were a federal court to
exercise diversity jurisdiction on the basis of a putative class member and then decide not to
certify the class or to certify it in such a way as to exclude the unnamed plaintiff, the court would
be faced with a cause of action over which it had no jurisdiction. . . .  [B]asing jurisdiction solely
upon the characteristics of a hypothetical plaintiff is inappropriate guesswork for a federal
court."  *Eufaula Drugs, Inc. v. Tmesys, Inc.*, 432 F. Supp. 2d 1240, 1244-45 (M.D. Ala. 2006).

[34]   Some of the named Plaintiffs have filed the same takings claims in the Court of Federal
Claims.  *See* Complaint, *Cacciapalle v. United States*, No. 1:13-cv-00466 (Fed. Cl. filed July 10,
2013); Complaint, *Am. European Ins. Co. v. United States*, No. 1:13-cv-00496 (Fed. Cl. filed
July 19, 2013); Complaint, *Dennis v. United States*, No. 1:13-cv-00542 (Fed. Cl. filed Aug. 5,
2013) (consolidated with *Cacciapalle*).  These complaints seek to certify a class consisting of all
purchasers of certain types of stock without regard to the amount of damages.

**B.** **This Court Lacks Jurisdiction over Plaintiffs' Takings Claims Because FHFA Is Not the United States for Takings Purposes When Acting as Conservator**

Plaintiffs' takings claims also must be dismissed because FHFA executed the Third Amendment in its capacity as Conservator for the Enterprises, and is therefore not the United States for purposes of Plaintiffs' takings claims. Under the Little Tucker Act, district courts have jurisdiction over "claim[s] *against the United States*." 28 U.S.C. § 1346(a)(2) (emphasis added). Indeed, the Fifth Amendment applies solely to government action. *See, e.g.*, *Henok v. Chase Home Fin., LLC*, 922 F. Supp. 2d 110, 125 (D.D.C. 2013) ("the Fifth Amendment Takings Clause refers only to the *government's* physical occupation or regulation of private property").

The Supreme Court, in *O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994), interpreted FIRREA's provision governing the powers and rights of the FDIC as conservator and receiver, which is nearly identical to § 4617(b)(2)(A) of HERA, and held that the FDIC acting as receiver was "not the United States." *Id.* at 85. Other courts similarly have held that when acting as conservator, the FDIC is not the United States for purposes of the Tucker Act or Little Tucker Act. *See, e.g.*, *Ameristar Fin. Servicing Co. LLC v. United States*, 75 Fed. Cl. 807, 812 (2007) (extending *O'Melveny* to dismiss Tucker Act claim because the FDIC as conservator "was not acting as the United States"); *Ambase Corp. v. United States*, 61 Fed. Cl. 794, 796-97 (2004) ("Ambase's claim that the FDIC has mismanaged the [] receivership is a claim against the FDIC, but for purposes of this litigation this is not a claim against the government.").[35] Likewise,

---

[35] In *Auction Co. of America v. FDIC*, 132 F.3d 746 (D.C. Cir. 1998), the D.C. Circuit noted that the FDIC as receiver may be treated as the United States for Tucker Act purposes when it is not acting as receiver for any particular financial institution. 132 F.3d at 751; *see also Auction Co. of Am. v. FDIC*, 141 F.3d 1198, 1201-02 (D.C. Cir. 1998) ("In this case, however, the FDIC did not act as receiver for any particular depository. The contract it entered into related to the assets of an unspecified number of unnamed depositories . . . ."). The D.C. Circuit has not addressed whether the FDIC receiver for a specific institution is the United States for purposes of the Tucker Act. *See* 132 F.3d at 750 n.1.

FHFA "in its guise as a conservator . . . is not a government actor" for purposes of whether constitutional claims may be asserted against it. *Herron v. Fannie Mae*, 857 F. Supp. 2d 87, 94 (D.D.C. 2012).[36]  Instead, when FHFA's Director placed Fannie Mae and Freddie Mac into conservatorship, FHFA "stepped into the shoes" of those private corporations. *Id.* at 95.  FHFA as Conservator is not the United States and its actions cannot constitute a taking, so Plaintiffs' takings claims based on the Third Amendment must be dismissed.

### C.   Plaintiffs' Takings Claims Fail Because They Have Not Identified a Cognizable Property Interest

Plaintiffs also cannot allege a viable takings claim because they have no cognizable property interest in their shares.  To evaluate a takings claim, the Court "must determine as a threshold matter whether the claimant has established a property interest for purposes of the Fifth Amendment." *Bair v. United States*, 515 F.3d 1323, 1327 (Fed. Cir. 2008).  For takings purposes, property interests are limited by the applicable statutory and regulatory framework.  When the Government acts within this framework, no cognizable property interest exists.

In the financial institutions context, courts have recognized that institutions and their shareholders lack "the fundamental right to exclude the government from [their] property," and therefore hold "less than the full bundle of property rights." *Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1073 (Fed. Cir. 1994) (internal citation and quotation marks omitted).  Therefore, they cannot expect to "be compensated for a regulatory possession . . . if that

---

[36]   *See also Fed. Home Loan Mortg. Corp. v. Shamoon*, 922 F. Supp. 2d 641, 644-45 (E.D. Mich. 2013) (noting the argument that conservatorship transformed the Enterprises into government actors "has been soundly and consistently rejected" and collecting cases likewise holding that FHFA as Conservator is not a government actor for purposes of constitutional claims); *May v. Wells Fargo Bank, N.A.*, No. 4:11-cv-3516, 2013 WL 3207511, at *6 (S.D. Tex. June 24, 2013) ("FHFA as conservator assumed Freddie Mac's private role"); *Parra v. Fed. Nat'l Mortg. Ass'n*, No. CV 13-4031, 2013 WL 5638824, at *3 (C.D. Cal. Oct. 16, 2013) ("FHFA, which took over as Fannie Mae's conservator, also does not qualify as a government actor.").

possession were to occur following a determination that [their] financial situation mandated federal conservatorship or receivership." *Cal. Hous. Sec., Inc. v. United States*, 959 F.2d 955, 959 (Fed. Cir. 1992).[37]   The regulatory framework governing the Enterprises is materially similar to the framework governing financial institutions, including regulatory power to place the Enterprises into conservatorship or receivership.

The reasoning of these cases is squarely applicable to Plaintiffs' argument that the Third Amendment to the PSPAs effects a taking.  The statutory framework grants the Director discretion to place the Enterprises into conservatorship or receivership under a variety of circumstances, and the choice between conservatorship and receivership belongs to the Director. 12 U.S.C. § 4617(a)(2), (3).  And as already discussed, the Enterprises' statutory charters long ago established that the Enterprises must serve a public purpose.  Plaintiffs cannot seriously contend that they had a "right to exclude the government from [their] property" under this statutory framework.[38]   Therefore, shareholders had no cognizable property interest within the meaning of the Takings Clause *before* conservatorship.  To show that they have a property

---

[37]   Financial institutions shareholders also have an expectation that the details of the regulatory framework may change.  *See Cal. Hous.*, 959 F.2d at 959 (holding that changes in the law did not create an expectation of compensation because financial institutions are "on notice that [they] might be subjected to different regulatory burdens over time").  Because the Enterprises benefited from preferential tax treatment, far lower capital requirements, and a widely perceived government guarantee, Plaintiffs should have anticipated that the Enterprises would be subject to substantial and likely increasing regulation.  FHFA1191 (Geithner Testimony (March 23, 2010)).  Indeed, the key provisions of HERA were first proposed as legislation in 2005.  *See* H.R. 1461, 109th Cong., 1st Sess. (Oct. 31, 2005).

[38]   Indeed, the statutory framework grants Treasury the right to purchase securities from the Enterprises under terms that "protect the taxpayer," including the establishment of "preferences or priorities regarding payments to the Government."  12 U.S.C. §§ 1719(g)(1)(B)-(C); 1455(l)(1)(B)-(C).  Plaintiffs were therefore on notice that the statutory framework permitted Treasury to purchase shares that could be senior to existing shares.  Indeed, some of the named Plaintiffs and putative class members purchased their shares *after* the conservatorships and PSPAs were in place.  *See, e.g.*, Consol. Compl. ¶¶ 34-37; 117-20.  For these Plaintiffs, conservatorship and Treasury purchases of securities were realities, not just hypothetical situations permitted by statute.

interest *during* conservatorship, Plaintiffs would have to show that the conservatorship somehow created a property interest in their shares when none existed before.  Such a showing is impossible because the statutory and regulatory framework has not changed; rather it was a change in the financial condition of the Enterprises that subjected the Enterprises and their shareholders to the statutory and regulatory framework applicable to failing Enterprises. Therefore, these shareholders will always lack the "full bundle of property rights" that could establish a cognizable property interest.

### D. Plaintiffs' Takings Claims Fail Because the Issuance of More Senior Shares Does Not Constitute a Taking

Even assuming *arguendo* that the Conservator were a government entity for Little Tucker Act purposes *and* that Plaintiffs had a cognizable property interest, Plaintiffs' claim that the government has taken their right to receive dividends (or a liquidation preference) would fail because the government stands to receive dividends (and liquidation proceeds) through a new series of more senior preferred shares, not through Plaintiffs' shares.  *Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923), is the controlling precedent.  In that case, the government requisitioned Allegheny Steel Company's steel production for an entire year and ordered Allegheny not to comply with its preexisting contractual obligation to deliver steel to the appellant at a favorable price.  261 U.S. at 507.  The Supreme Court held that no taking occurred because the government would receive the steel through its own requisition, not pursuant to any contract taken from the plaintiff.  261 U.S. at 507-08.[39]  Just as the government requisitioned "the future product of the steel company" that "would have been delivered" under the contract in

---

[39]     *See also, e.g.*, *Palmyra Pac. Seafoods v. United States*, 561 F.3d 1361, 1366 (Fed. Cir. 2009) (applying *Omnia*); *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377-82 (Fed. Cir. 2008) (same); *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1215-16 (Fed. Cir. 2005) (same).

*Omnia*, 261 U.S. at 510, Plaintiffs here allege that the government—by acquiring a separate series of preferred shares with a superior claim to the Enterprises' future profits—took the future profits of the Enterprises that otherwise might have been delivered to Plaintiffs. *Omnia* controls here, compelling dismissal of Plaintiffs' takings claim.

## VI.    Plaintiffs' APA Claims Fail as a Matter of Law

### A.    Section 4617(f) Bars All APA Claims

Section 701(a) of the APA provides that APA review is unavailable where other "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). "[B]efore any [APA] review at all may be had, a party must first clear the hurdle of § 701(a)." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985). Here, as explained above, Section 4617(f) presents an insurmountable hurdle to APA review. *See supra* 19-31. Accordingly, Plaintiffs' APA claims—which seek exclusively declaratory and injunctive relief—are barred by Section 4617(f) and therefore must be dismissed.

### B.    FHFA's Execution of the Third Amendment Was Within Its Statutory Authority

Plaintiffs assert APA claims based on the allegation that FHFA exceeded its statutory authority when executing the Third Amendment because that Amendment allegedly is contrary to the Conservator's statutory obligation to put the Enterprises in a sound and solvent condition, constitutes an unauthorized "wind down" of the Enterprises, and is an "end-run" around HERA's receivership claim priority scheme. *See* Perry Compl. ¶¶ 79-87; Fairholme Compl. ¶¶ 84-93; Arrowood Compl. ¶¶ 119-27. These APA claims should be dismissed because, as explained in detail above, FHFA as Conservator acted squarely within its statutory powers and functions when executing the Third Amendment. *See supra* 19-31.

### C.     FHFA's Decision to Execute the Third Amendment Was Not Arbitrary and Capricious

As explained above, dismissal is required because another "statute[] preclude[s] judicial review" (5 U.S.C. § 701(a)(1)).  In the alternative, FHFA and Director Watt are entitled to summary judgment on Plaintiffs' APA claims that FHFA's conduct was arbitrary and capricious.[40]  It is well-established that "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Instead, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.*  This standard is "highly deferential," (*AT&T Corp. v. F.C.C.*, 220 F.3d 607, 616 (D.C. Cir. 2000)), and permits setting aside agency action "only if it is not rational and based on consideration of the relevant factors."  *Lakeland Reg'l Health Sys. v. Sebelius*, No. 12-600 RJL, 2013 WL 3776254, at *4, --- F. Supp. 2d ---- (D.D.C. July 16, 2013) (quotation marks and citation omitted).  Review of agency action is based on the information that was before the agency "at the time its decision was made" (*Puerto Rico Higher Educ. Assistance Corp. v. Riley*, 10 F.3d 847, 850-51 (D.C. Cir. 1993)), and the court must affirm "if a rational basis for the agency's decision is presented, even though [the court] might otherwise disagree."  *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981 (internal citation omitted)); *see also Am. Trucking Ass'n., Inc. v. E.P.A.*, 283 F.3d 355, 362 (D.C. Cir. 2002) (agency action presumed valid so long as "a rational basis" is presented).  Finally, "agency determinations based upon highly complex and technical matters

---

[40]     Summary judgment "serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *Charter Operators of Alaska v. Blank*, 844 F. Supp. 2d 122, 127 (D.D.C. 2012).

are entitled to great deference." *Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 248 (D.C. Cir. 2003) (quotation marks and brackets omitted).

FHFA's decision to enter into the Third Amendment was not arbitrary or capricious. Rather, it was a patently rational and well-reasoned response to a serious operational concern that threatened to undermine the central purpose of the PSPAs—namely, to assure the financial markets that Treasury would provide the Enterprises sufficient capital to support their debts and prevent mandatory receivership of the Enterprises.

### D.    FHFA Considered the Relevant Factors

First, FHFA considered the importance and underlying purposes of the PSPAs. Through the PSPAs, Treasury provided a federal backstop of the Enterprises' obligations to debtholders, including MBS holders. *See* FHFA0252 (FHFA Mortgage Market Note). This backstop not only provided the Enterprises a lifeline that saved them from mandatory receivership, it reassured investors—debt and MBS holders—and the financial markets of the stability and safety of the Enterprises. *See id.*; FHFA0107 (FHFA Dir. Lockhart, Statement to Congress); FHFA3545 (OIG Report (May 24, 2012)). The total amount of the Treasury commitment—that is, the amount available for the Enterprises to draw on—is substantial, yet finite. On January 1, 2013, the amount of available funds became capped. FHFA0005 (Decl. ¶ 10). If the Enterprises' net worth becomes negative at any point after those funds are exhausted, the Enterprises face mandatory receivership and liquidation (*see* 12 U.S.C. § 4617(a)(4))—the very outcome the PSPAs were designed to avoid in the first place.

Second, FHFA recognized the problem: the Enterprises' ongoing payment of the annual 10% dividend to Treasury threatened to exhaust prematurely Treasury's financial commitment under the PSPAs. FHFA0006-0009 (Decl. ¶¶ 11-19). As described above (*see supra* 23-25), this "harmful feedback loop" (Perry Compl. ¶ 42) of circular draws came at a significant cost:

65

billions had been drawn by the Enterprises solely to pay the 10% dividend back to Treasury.

AR3845.  By late 2011, analysts and key stakeholders began expressing concerns about the

adequacy of Treasury's financial commitment in light of this ongoing circular practice.

FHFA0006 (Decl. ¶ 11).  And by mid-2012, it appeared unlikely that either of the Enterprises

could pay that amount consistently over the long term without more draws from Treasury.

FHFA3857-3858 (Fannie Mae, Form 10-Q Q2 (Aug. 8, 2012)); FHFA3598 (Freddie Mac, Form

10-Q Q2 (Aug. 7, 2012)).  Further compounding the problem was the requirement in the original

PSPAs that the Enterprises shrink their portfolio of assets by 10% each year, FHFA0136; 0150

(PSPAs § 5.7), thereby reducing the volume of the Enterprises' income streams going forward,

further reducing their ability to afford the 10% dividends.  FHFA4047 (FHFA Statement (Aug.

17, 2012)).

        <u>Third</u>, FHFA monitored and considered the concerns of the market.  FHFA0008 (Decl.

¶ 15).  As described above, in the months before the execution of the Third Amendment,

independent market forecasters, including Moody's, predicted that the Enterprises' ongoing

payment of the 10% dividend would completely exhaust Treasury's funding commitment within

ten years, leading to potential downgrades in the Enterprises' credit ratings.  *See supra* 23-25.

These market concerns were significant because they undermined one of the central purposes of

the PSPAs:  to express financial support to holders of Enterprise debt (i.e., bondholders) and

MBS.  FHFA0008-0009 (Decl. ¶ 17); *see also* FHFA0252 (FHFA Mortgage Market Note);

FHFA0103 (FHFA Dir. Lockhart, Statement to Congress); FHFA3557-3558 (OIG Report (May

24, 2012)).  The strength of that support depends upon the Enterprises having sufficient available

funds from Treasury to permit the Enterprises to continue to operate under adverse market

conditions that may arise in future years.  FHFA0008-0009 (Decl. ¶ 17).  That leading market

forecasters were opining that Treasury funds would run out prematurely cast a growing shadow over the safety and stability of investments in Enterprise bonds and MBS.

Fourth, FHFA considered what—if any—impact a net worth dividend would have on the amount of money the Enterprises would pay to Treasury.  FHFA0006-0008 (Decl. ¶¶ 12-14, 16).  The Enterprises announced publicly, the week before the parties executed the Third Amendment, that it was "unlikely that we will generate net income or comprehensive income in excess of our annual [10%] dividends payable to Treasury over the long term."  FHFA0007-0008 (Decl. ¶ 14); *see also* FHFA3598 (Freddie Mac, Form 10-Q Q2 (Aug. 7, 2012)); FHFA3857-3858 (Fannie Mae, Form 10-Q Q2 (Aug. 8, 2012)); FHFA4026 (*Fannie Mae Posts Profit as Home Prices Rise*, Wall St. J. (Aug. 8, 2012)); FHFA2407-2422 (FHFA "Projections of the Enterprises' Financial Performance" (Oct. 27, 2011)).  Additionally, FHFA considered Treasury's forecasts and analyses concerning the net difference between the 10% dividend and a quarterly net worth dividend.  FHFA0008 (Decl. ¶ 16); AR3833-3862.  Treasury had projected that "there should be no material difference in the net cash returned to taxpayers (i.e., the difference between the draws taken and dividends received) as would be expected with the fixed ten percent dividend payment."  AR3836.  Indeed, Treasury projected that "[t]he net cash returned to taxpayers post the dividend modification is materially equivalent under the proposal as with the 10 percent fixed dividend.  The aggregate net cash remains materially the same."  AR3861.  In sum, forecasts indicated that the Enterprises were not likely to transfer any more money to Treasury under a net worth dividend than a 10% dividend.

Fifth, FHFA considered the fact that, absent the Third Amendment, the Enterprises still would be liable to pay Treasury the Periodic Commitment Fee, on top of the ongoing 10% dividend payments.  The original PSPAs obligated the Enterprises to pay this fee, the amount of

which was to be negotiated by FHFA and Treasury and "determined with reference to the market value of the [Treasury] Commitment as then in effect."  FHFA0133; 0147 (PSPAs § 3.2(b)). The PSPAs provided that the Periodic Commitment Fee was "intended to fully compensate [Treasury] for the support provided by the ongoing Commitment."  *Id*.  Treasury waived the fee from 2010 to 2012 in light of the fact that, during that time period, the Enterprises generally had insufficient funds to pay even the 10% dividend, let alone an additional fee, and thus "imposition of the [Periodic Commitment Fee] . . . would not fulfill its intended purpose of generating increased compensation to the American taxpayer."  FHFA1400; 2192; 2392; 2406; 2665 (Letters from Treasury to FHFA (Dec. 29, 2010; Mar. 31, 2011; Jun. 30, 2011; Sept. 30, 2011; Dec. 21, 2011)).  However, Treasury always reserved its right to impose the Periodic Commitment Fee going forward, consistently reiterating that Treasury "remains committed to protecting taxpayers and ***ensuring that future positive earnings of the Enterprises are returned to taxpayers*** as compensation for their investment."  *Id.* (emphasis added).  FHFA believed that, in light of the ongoing risks faced by the Enterprises and the enormity of the Treasury commitment, the value of the Periodic Commitment Fee was incalculably large.  FHFA0005 (Decl. ¶ 9).

Accordingly, FHFA acted rationally and reasonably because the Third Amendment— which replaced the 10% dividend with a net worth dividend and suspended the Periodic Commitment Fee—was a reasonable exchange.  FHFA0009 (Decl. ¶ 19).  That is, through the Initial Commitment Fee (initial liquidation preference and warrants), the senior liquidation preference, the Periodic Commitment Fee, and the fixed 10% dividends, it appeared likely at the time that Treasury would receive as much from the Enterprises under the Second Amendment as it would under the Third Amendment.

E.      **FHFA's Decision Was Rational and Effective**

Taking all of these factors into account, FHFA and Treasury agreed on the need to

implement a rational and effective solution to eliminate the circulatory problem.  The Third

Amendment, executed on August 17, 2012, (1) eliminated the 10% annual dividend, (2) added a

quarterly variable dividend in the amount (if any) of each Enterprises' positive net worth (above

certain net worth values that were specified in the Third Amendment), and (3) suspended the

Periodic Commitment Fee for as long as the quarterly variable dividend is in effect.  As stated in

FHFA's announcement, this new structure eliminated the risk that draws to make fixed dividend

payments would lead to the exhaustion of the Treasury commitment.  *See* FHFA4047 (FHFA

Statement (Aug. 17, 2012) (announcing that the Third Amendment "eliminated the need . . . to

continue to borrow from [Treasury] to pay dividends," which "could have called into question

the adequacy of the financial commitment").  The market responded positively to the Third

Amendment, expressing confidence that the Third Amendment assured the adequacy of the

Treasury commitment.  *See* FHFA4051 (Moody's, Issuer Comment: *US Treasury Amends*

*Fannie Mae's and Freddie Mac's Capital Agreement, a Credit Positive* (Aug. 23, 2012));

FHFA4049 (Barclays, Interest Rates Research, *Treasury Changes the PSPAs: Initial Thoughts*

(Aug. 17, 2012)).

In light of the foregoing, FHFA's decision to enter into the Third Amendment was

neither arbitrary nor capricious.  FHFA considered all of the relevant factors and formulated a

highly rational—certainly not irrational—response to an objectively serious problem.  *See*

*Lakeland*, 2013 WL 3776254, at *4 (agency action is arbitrary and capricious "only if it is not

rational").  Further, FHFA committed no "clear error of judgment" by executing the Third

Amendment.  *See State Farm*, 463 U.S. at 43.  Indeed, the market quickly reacted by announcing

renewed confidence in the creditworthiness of the Enterprises due to the removal of the threat to

the adequacy of the Treasury Commitment.  Market confidence is one of the fundamental

purposes of the PSPAs, and was precisely what was threatened by the circularity and exhaustion

problem.  Moreover, FHFA's decision to enter into the Third Amendment was supported by

Treasury's determinations of the Enterprises' ability to afford the fixed 10% dividend, which

were based in large part on projections of the performance of the housing market.  Because these

areas are squarely within FHFA's expertise, FHFA's decision is due even greater deference.  *See*

*Domestic,* 333 F.3d at 248.  Even if the existing projections at the time of FHFA's decision to

execute the Third Amendment may turn out to be too conservative, such a development would be

irrelevant because this Court's review is limited to the information that was before the agency "at

the time its decision was made."  *Puerto Rico Higher Educ.*, 10 F.3d at 850-51; *see also GTS*

*900F, LLC v. FDIC*, No. 11-cv-06607, 2012 WL 2086305, at *8 (C.D. Cal. June 1, 2012) ("Even

if the FDIC's assumption regarding the housing recovery turns out to be incorrect, that does not

render its Determination arbitrary and capricious.").[41]

## CONCLUSION

For the foregoing reasons, the FHFA Defendants and the Enterprises respectfully request

the Court dismiss with prejudice all claims asserted against them.  Should the Court determine

that 12 U.S.C. § 4617(f) does not bar review of Plaintiffs' APA claims, FHFA and Director Watt

move for summary judgment on Plaintiffs' claims that the execution of the Third Amendment to

the Preferred Stock Purchase Agreements was arbitrary and capricious.

---

[41]   The complaints uniformly emphasize the Enterprises' positive economic performance *after*
the Conservator's execution of the Third Amendment in August 2012.  *See, e.g.*, Perry Compl.
¶¶ 7 & n.1, 10, 12-13, 49; Fairholme Compl. ¶¶ 12, 60-62; 67, 73, 77; Arrowood Compl. ¶¶ 10,
66-72, 81, 85; Consol. Compl. ¶¶ 19-20, 24.  Such data is irrelevant to the arbitrary and
capricious inquiry.

Dated:  January 17, 2014                    Respectfully submitted,


                                            /s/ Howard N. Cayne
                                            Howard N. Cayne (D.C. Bar # 331306)
                                            Asim Varma (D.C. Bar # 426364)
                                            David B. Bergman (D.C. Bar # 435392)
                                            ARNOLD & PORTER LLP
                                            555 12th Street, N.W.
                                            Washington, D.C.  20004
                                            Telephone: (202) 942-5000
                                            Facsimile: (202) 942-5999
                                            Howard.Cayne@aporter.com
                                            Asim.Varma@aporter.com
                                            David.Bergman@aporter.com

                                            *Attorneys for Defendants Federal Housing
                                            Finance Agency and Director Melvin L.
                                            Watt*


s/ Michael Joseph Ciatti                    /s/ Paul D. Clement
Michael Joseph Ciatti (D.C. Bar # 467177)   Paul D. Clement (D.C. Bar # 433215)
mciatti@kslaw.com                           pclement@bancroftpllc.com
Graciela Maria Rodriguez                    Stephen V. Potenza (D.C. Bar # 1010066)
(D.C. Bar # 438955)                         (*admitted pro hac vice*)
gmrodriguez@kslaw.com                       spotenza@bancroftpllc.com
KING & SPALDING, LLP                        BANCROFT PLLC
1700 Pennsylvania Avenue, N.W.              1919 M Street, N.W., Suite 470
Suite 200                                   Washington, D.C.  20036
Washington, D.C.  20006                     Telephone:  202.234.0090
Telephone:  202.626.5508                    Facsimile:  202.234.2806
Facsimile:  202.626.3737

*Attorneys for the Federal Home Loan*       *Attorneys for the Federal National*
*Mortgage Corporation*                      *Mortgage Association*