# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
FAIRHOLME FUNDS, INC., et al.,                  )
                                                )
            *Plaintiffs*,                       )
                                                )
        v.                                      )          No. 13-cv-1053-RCL
                                                )
THE FEDERAL HOUSING FINANCE                     )
     AGENCY, et al.,                            )
                                                )
            *Defendants*.                       )
_____ )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUPPLEMENTATION OF THE ADMINISTRATIVE RECORDS, FOR LIMITED DISCOVERY, FOR SUSPENSION OF BRIEFING ON DEFENDANTS' DISPOSITIVE MOTIONS, AND FOR A STATUS CONFERENCE

Charles J. Cooper (Bar No. 248070)
Vincent J. Colatriano (Bar No. 429562)
David H. Thompson (Bar No. 450503)
Peter A. Patterson (Bar No. 998668)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

February 12, 2014

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 5

 A. Background Facts Relating to Plaintiffs' Claims ...................................................... 5

 B. The Records Filed by Defendants. ......................................................................... 12

 C. The Pending Dispositive Motions .......................................................................... 14

ARGUMENT .................................................................................................................. 14

I. NEITHER DEFENDANT HAS PRODUCED AN ADEQUATE ADMINISTRATIVE RECORD AND THUS SUPPLEMENTATION IS NECESSARY ....................................................................................................... 14

II. PLAINTIFFS ARE ENTITLED TO TAKE LIMITED DISCOVERY INTO THE COMPLETENESS OF THE ADMINISTRATIVE RECORD ......................................... 20

III. PLAINTIFFS ARE ENTITLED TO DISCOVERY TO PRESENT FACTS ESSENTIAL TO THEIR OPPOSITION TO DEFENDANTS' CONVERTED MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM ........................................... 27

IV. THE COURT SHOULD NOT AWAIT RESOLUTION OF DEFENDANTS' JURISDICTIONAL ARGUMENTS BEFORE ADDRESSING THE MATTERS RAISED IN THIS MOTION ..................................... 34

V. THE COURT SHOULD SUSPEND BRIEFING ON DEFENDANTS' DISPOSITIVE MOTIONS, AND SHOULD SCHEDULE A STATUS CONFERENCE. ........................ 36

CONCLUSION ............................................................................................................... 37

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                                         <u>Page</u>

*Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134 (D.D.C. 2002)..................................15

*American Farm Bureau v. EPA*, 121 F. Supp. 2d 84 (D.D.C. 2000)............................................35

*American Radio Relay League v. FCC*, 524 F.3d 227 (D.C. Cir. 2008) ......................................23

*American Wild Horse Pres. Campaign v. Salazar*, 859 F. Supp. 2d 33 (D.D.C. 2012) ...............16

\* *Amfac Resorts, LLC v. Department of the Interior*, 143 F. Supp. 2d 7 (D.D.C. 2001) ......... *passim*

\* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).........................................................4, 5, 28

*Baker v. Henderson*, 150 F. Supp. 2d 13 (D.D.C. 2001).....................................................28, 29

\* *Bar MK Ranches v. Yuetter*, 994 F.2d 735 (10th Cir. 1993)...................................................4, 20

*Barnes v. District of Colombia*, 242 F.R.D. 113 (D.D.C. 2007) ............................................28, 29

*Berkeley v. Home Ins. Co.*, 68 F.3d 1409 (D.C. Cir. 1995) .....................................................31, 33

*California v. FHFA*, No. 10-3084 (N.D. Cal. Oct. 28, 2011).......................................................21

*Calloway v. Harvey*, 590 F. Supp. 2d 29 (D.D.C. 2008) ............................................................15

*Cape Hatteras Access Pres. Alliance v. Department of Interior*, 667 F. Supp. 2d 111
    (D.D.C. 2009) ...................................................................................................................16

*Center for Native Ecosystems v. Salazar*, 711 F. Supp. 2d 1267 (D. Colo. 2010) .......................19

*City of Dania Beach v. FAA*, 628 F.3d 581 (D.C. Cir. 2010) .......................................................15

\* *Convertino v. Department of Justice*, 684 F.3d 93 (D.C. Cir. 2012)..........................28, 30, 31, 33

*County of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64 (D.D.C. 2008) .................................15

\* *Dinkel v. Medstar Health, Inc.*, 286 F.R.D. 28 (D.D.C. 2012).........................................30, 31, 33

*Dopico v. Goldschmidt*, 687 F.2d 644 (2d Cir. 1982).................................................................25

*Earthworks v. Department of the Interior*, 279 F.R.D. 180 (D.D.C. 2012)...................................19

*Exxon Corp. v. Department of Energy*, 91 F.R.D. 26 (N.D. Tex. 1981) ......................................26

*Fonte v. Board of Managers of Cont'l Towers Condo.*, 848 F.2d 24 (2d Cir. 1988) ...................30

*Friedl v. City of New York*, 210 F.3d 79 (2d Cir. 2000) ..............................................................30

*Fund for Animals v. Williams*, 391 F. Supp. 2d 191 (D.D.C. 2005)........................................14, 23

*Greenpeace, U.S.A. v. Mosbacher*, CIV. No. 88–2158 GHR, 1989 WL 15854
    (D.D.C. Feb. 15, 1989) ......................................................................................................25

\* *IMS, P.C. v. Alvarez*, 129 F.3d 618 (D.C. Cir. 1997) ...............................................................14

*In re Sealed Case*, 877 F.2d 976 (D.C. Cir. 1989).......................................................................19

*Institute for Wildlife Prot. v. United States Fish & Wildlife Serv.*, No. CV-07-358-PK,
    2007 WL 4118136 (D. Or. July 25, 2007)............................................................................23

*Int'l Longshoremen's Ass'n v. National Mediation Bd.*, 2006 WL 197461
(D.D.C. Jan. 25, 2006) ................................................................................................20

\* *Kim v. United States*, 632 F.3d 713 (D.C. Cir. 2011) ..............................................5, 28

*Kostrzewa v. City of Troy*, 247 F.3d 633 (6th Cir. 2001) .............................................30

*Loughlin v. United States*, 230 F. Supp. 2d 26 (D.D.C. 2002) ...................................35

\* *Marcum v. Salazar*, 751 F. Supp. 2d 74 (D.D.C. 2010) ..........................................4, 16

*Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188 (D.D.C. 2006)......................................23

*Maritime Mgmt., Inc. v. United States*, 242 F.3d 1326 (11th Cir. 2001)......................25

*Messina v. Krakower*, 439 F.3d 755 (D.C. Cir. 2006)..................................................31

*Miami Nation of Indians v. Babbitt*, 979 F. Supp. 771 (N.D. Ind. 1996) .....................16

*Motor & Equip. Mfrs. Ass'n v. EPA*, 627 F. 2d 1095 (D.C. Cir. 1979)........................15

*National Wilderness Inst. v. U.S. Army Corps of Eng'rs*, 2002 WL 34724414
(D.D.C. Oct. 9, 2002)...................................................................................................25

\* *NRDC v. Train*, 519 F.2d 287 (D.C. Cir. 1975)....................................................20, 25

*Pacific Shores Subdivision v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1 (D.D.C. 2006)......14

*Public Citizen v. Heckler*, 653 F. Supp. 1229 (D.D.C. 1986)......................................15

*Smith v. FTC*, 403 F. Supp. 1000 (D. Del. 1975).........................................................23

\* *Styrene Information & Research Center v. Sebelius*, 851 F. Supp. 2d 57 (D.D.C. 2012).......15, 16

*Suffolk County v. Secretary of the Interior*, 562 F.2d 1368 (2d Cir. 1977) ..................23

*Tenneco Oil Co. v. Department of Energy*, 475 F. Supp. 299 (D. Del. 1979)........................16, 26

*Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497 (D.C. Cir. 2010) .................16

*Unite Here Local 25 v. Madison Ownership, LLC*, 850 F. Supp. 2d 219 (D.D.C. 2012).............35

*United States v. Government Acquisitions, Inc.*, 858 F. Supp. 2d 79 (D.D.C. 2012) ..................28

\* *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788 (D.C. Cir. 1984) ........................14, 23

## Legislative Materials and Rules

5 U.S.C. §§ 701 *et seq.*............................................................................................2

5 U.S.C. § 706.................................................................................................3, 23

12 U.S.C. § 4617(f)..............................................................................................34

76 Fed. Reg. 35,724 (June 20, 2011) ........................................................................5

FED. R. CIV. P. 12 .................................................................................................... *passim*

FED. R. CIV. P. 30(b)(6) ........................................................................................27, 33

FED. R. CIV. P. 56 .................................................................................................... *passim*

LCvR 7(a) ................................................................................................................1

## **Other**

5C CHARLES ALAN WRIGHT, ARTHUR R. MILLER ET AL., FEDERAL PRACTICE & PROCEDURE
    § 1366 (3d ed. 2013) ......................................................................................28

Fannie, Third Quarter Report (Form 10-Q) (Nov. 7, 2013),
    www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2013/q32013.pdf .....10, 11

Freddie, Third Quarter Report (Form 10-Q) (Nov. 7, 2013),
    www.freddiemac.com/investors/er/pdf/10q_3q13.pdf ...................................10, 11

GSE Preferred Stock Purchase Agreements: Summary Review and Key Considerations
    (May 23, 2012) ...............................................................................................17

Order Regarding Briefing Schedule in All Cases (Doc. 21) (filed Nov. 18, 2013) .......................12

Press Release, Treasury Department Announces Further Steps to Expedite Wind Down
    of Fannie Mae and Freddie Mac (Aug. 17, 2012) ..............................................9, 10

Pursuant to LCvR 7(a), Plaintiffs Fairholme Funds, Inc. et al. ("Fairholme" or "Plaintiffs") respectfully submit this memorandum of points and authorities in support of Plaintiffs' motion, filed this date, seeking (1) supplementation of the administrative record submissions produced by both sets of Defendants; (2) limited discovery into the completeness of the administrative records produced by Defendants;  (3) discovery, pursuant to Federal Rule of Civil Procedure 56(d), necessary to allow Plaintiffs to present facts essential to their opposition to the FHFA Defendants' motion for summary judgment on Plaintiffs' claim for breach of fiduciary duty; and (4) suspension of briefing on Defendants' dispositive motions until such supplementation of the records and limited discovery is completed.  Counsel for the plaintiffs in *Arrowood Indemnity Co. v. Federal National Mortgage Association*, No. 13-cv-1439, and *In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations*, No. 13-mc-1288, have indicated that their clients join Plaintiffs' motion.  Plaintiffs also respectfully request that the Court schedule a status conference, at the Court's earliest convenience, to address the issues raised by this motion.

## INTRODUCTION

The Court has pending before it two separate, though related, dispositive motions filed by Defendants in the various related actions challenging certain decisions taken in connection with the conservatorships of the Federal National Mortgage Association ("Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie") (collectively, the "Companies" or the "Enterprises"):  (1) the motion to dismiss, or in the alternative, for summary judgment, filed by Defendants Department of the Treasury and the Secretary of the Treasury (collectively, the "Treasury Defendants"); and (2) the motion to dismiss, and in the alternative, for summary judgment, filed by Defendants Federal Housing Finance Agency ("FHFA"), the Director of the FHFA, Fannie, and

1

Freddie (collectively, the "FHFA Defendants").[1]

Plaintiffs are owners of shares of non-cumulative preferred stock issued by Fannie and Freddie. They brought this action challenging Defendants' actions in entering into agreements that effectively transfer to Treasury the entire positive net worth of Fannie and Freddie and thus effectively confiscate the value of Plaintiffs' shares of preferred stock. This so-called "Net Worth Sweep," pursuant to which the FHFA, as conservator for Fannie and Freddie, has already transferred tens of billions of dollars from the Enterprises to Treasury, is beyond the statutory authority of both the FHFA and Treasury, and is otherwise arbitrary and capricious, and must therefore be set aside as unlawful under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 *et seq. See* Fairholme Complaint for Declaratory and Injunctive Relief and Damages, No. 13-1053 (Doc. 1) ("Complaint"), Counts I-IV. Plaintiffs further allege that by entering into the Net Worth Sweep, the FHFA and its Director breached their fiduciary duty to Plaintiffs and other preferred shareholders of Fannie and Freddie, and also breached Plaintiffs' contract rights and the implied covenant of good faith and fair dealing. *See* Complaint, Counts V-VII.

On January 17, both the Treasury Defendants and the FHFA Defendants filed dispositive motions seeking dismissal of all of the claims raised by Fairholme (as well as the claims challenging the Net Worth Sweep raised by the other plaintiffs in these related actions). Both sets of Defendants request, in the alternative, the entry of summary judgment with respect to certain aspects of the APA claims. As pertinent here, however, Defendants' motions demonstrate that Plaintiffs are entitled to supplementation of the record before the Court and to discovery relating

---

[1] We cite herein to the brief in support of the Treasury Defendants' motion (Doc. 31) as "Treas. Br." and to the brief in support of the FHFA Defendants' motion (Doc. 32) as "FHFA Br." Unless otherwise noted, references herein to the document numbers of filings in this litigation refer to the document number as reflected in the docket for Case No. 13-cv-1025 (*Perry Capital, LLC v. Lew*).

both to the completeness of the administrative records and to Plaintiffs' claim for breach of fiduciary duty.

First, with respect to their motions to dismiss and/or for summary judgment on Plaintiffs' APA claims, *see* Treas. Br. 36-55; FHFA Br. 63-70, both sets of Defendants have produced a small set of nonpublic documents (as well as a variety of public documents) relating to Defendants' decision to enter into the Net Worth Sweep, although the FHFA Defendants object to this nomenclature.  Indeed, the FHFA Defendants contend that they never "created or maintained an administrative record relating to the execution of the [Net Worth Sweep]," and prefer to call their production of materials a "document compilation" rather than an "administrative record."[2]  But both of Defendants' *post hoc* compilations, which were assembled solely for purposes of this litigation, suffer from multiple deficiencies.  Far from constituting "the whole record" on which the challenged decisions were made, 5 U.S.C. § 706, the materials produced by both Defendants exclude multiple documents that were reviewed and relied upon by Treasury and the FHFA.  Moreover, both sets of Defendants rely in part on materials that were created *after* the Net Worth Sweep was implemented, and the FHFA Defendants rely heavily on a December 2013 declaration of Mr. Mario Ugoletti, a "special advisor" to the FHFA Director, which was prepared solely for purposes of this litigation and which includes numerous unsupported assertions of material fact.  *See, e.g.*, FHFA0001-0010[3] (Declaration of Mario Ugoletti) ("Ugoletti Dec.").  And both

---

[2] Notice of Filing Document Compilation by [FHFA Defendants] Regarding Third Amendment to Senior Preferred Stock Purchase Agreements (Doc. 24) (filed Dec. 17, 2013) ("FHFA Compilation Notice") at 2.

[3] We cite herein to materials included within the FHFA Defendants' document compilation as "FHFA____" and to materials included within the Treasury Defendants' administrative record compilation as "T____."  Relevant excerpts from the Treasury Defendants' administrative record compilation are attached hereto as Exhibit 1 and relevant excerpts from the FHFA Defendants' compilation are attached hereto as Exhibit 2.

FHFA's "document compilation" and Treasury's administrative record are almost completely silent with respect to Defendants' consideration of key facts and issues bearing upon the decision to enter into the Net Worth Sweep.

These facts, as detailed below, compel the conclusions that (1) supplementation of the administrative record is appropriate in order to ensure that the Court "consider[s] neither more nor less than what was before the agency at the time it made its decision," *Marcum v. Salazar*, 751 F. Supp. 2d 74, 78 (D.D.C. 2010), and (2) that limited discovery into the completeness of the records submitted by Defendants to the Court is necessary before the Court can fully or meaning-fully consider Defendants' dispositive motions on the APA claims. *See Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993); *Amfac Resorts, LLC v. Department of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001).

Second, the FHFA Defendants rely on disputed material facts to support their motion to dismiss Plaintiffs' fiduciary duty claim for failure to state a claim.  *See* FHFA Br. 5, 45-56.  For example, the FHFA Defendants seek to defend the Net Worth Sweep on the grounds that it was necessary to address concerns over the potential "erosion" in Treasury's financial commitment to the Enterprises and the implications such erosion would have for the housing finance markets. *See, e.g.*, FHFA Br. 56.  Plaintiffs' complaint alleges facts that are contrary to this factual asser-tion.  *See, e.g.*, Complaint ¶¶ 9-10, 13, 64-77, 139-44.  Because the FHFA Defendants rely on factual matters outside the pleadings, their motion to dismiss the breach of fiduciary duty claims "must," under Federal Rule of Civil Procedure 12(d), "be treated as one for summary judgment under Rule 56."  And under Federal Rule of Civil Procedure 56(d), Plaintiffs must be afforded an opportunity to take discovery in order to develop facts that are essential to their opposition to the FHFA's motion for summary judgment with respect to this claim.  *See Anderson v. Liberty Lob-*

*by, Inc.*, 477 U.S. 242, 250 n.5 (1986) (summary judgment must "be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition"). *See also Kim v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011).

## STATEMENT OF FACTS

### A.    Background Facts Relating to Plaintiffs' Claims

Plaintiffs are owners of non-cumulative preferred stock issued by Fannie and Freddie. Complaint ¶ 18.  In 2008, Fannie and Freddie owned and guaranteed trillions of dollars of assets, primarily mortgages and mortgage-backed securities.  *Id.* ¶ 1.  Although the Companies had been profitable for decades prior to 2008, during the mortgage-related financial crisis of 2008 they faced a steep reduction in the book value of their assets and a loss of investor confidence.  *Id.* ¶ 3.

In response to the financial crisis, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA").  *Id.*  As relevant here, HERA authorizes FHFA, under certain specified conditions, to place Fannie and/or Freddie into conservatorship or receivership.  Conservatorship and receivership are distinct statuses with distinct purposes.  "A conservator's goal is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition," while "[t]he ultimate responsibility of FHFA as receiver is to resolve and liquidate the existing entity."  Conservatorship and Receivership, 76 Fed. Reg. 35,724, 35,730 (June 20, 2011); *see also* Complaint ¶ 43.  HERA also gave Treasury temporary authority to invest in Fannie's and Freddie's equity securities.  When exercising this authority, Treasury is statutorily required to consider "[t]he need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]," *id.* ¶ 46 (first alteration added) (emphasis omitted) (quoting 12 U.S.C. §§ 1455(*l*)(1)(C), 1719(g)(1)(C)), and this authority expired December 31, 2009, *id.* ¶ 47.

Only weeks after HERA's enactment, on September 6, 2008, FHFA placed both Companies into conservatorship. *Id.* ¶ 40.  Consistent with HERA, FHFA acknowledged that conservatorship "is a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations." *Id*. ¶ 40 (quoting Statement of James B. Lockhart, Director, FHFA, at 5-6 (Sept. 7, 2008)).  FHFA accordingly committed to acting "as conservator to operate [Fannie and Freddie] until they are stabilized," *id.* ¶ 44 (alteration in original) (quoting Statement of James B. Lockhart, Director, FHFA, at 5-6 (Sept. 7, 2008)), and vowed to terminate the conservatorship "[u]pon the Director's determination that the Conservator's plan to restore the [Companies] to a safe and solvent condition has been completed successfully," *id.* (second alteration in original) (quoting FHFA Fact Sheet, Questions and Answers on Conservatorship).  FHFA also emphasized that "the common and all preferred stocks [of the Companies] will continue to remain outstanding," *id.* (alteration in original) (quoting Statement of Lockhart at 8), that "preferred and common shareholders . . . have some economic interest in [the Companies]," and that "going forward there may be some value," FHFA0066 (quoting Testimony of J. Lockhart before House Financial Services Committee (Sept. 25, 2008)); *see also* FHFA0061-62.

On September 7, the day after imposition of the conservatorship, Treasury exercised its temporary authority under HERA to provide the Companies with capital by entering into agreements with FHFA to purchase equity securities of Fannie and Freddie. *Id.* ¶¶ 45-46.  These agreements were called Preferred Stock Purchase Agreements ("PSPAs").  Under the PSPAs, Treasury committed to invest up to $100 billion in a newly-created class of "Government Stock" in each Company. *Id*. ¶ 48.  The Government Stock ranked senior to all other preferred stock in the Companies, and the Government Stock in each Company had an initial liquidation preference

of $1 billion.  *Id.* ¶¶ 5, 50.  Under the PSPAs, Fannie and Freddie were permitted to draw from Treasury's commitment on a quarterly basis to maintain a positive net worth.  *Id.* ¶ 48.  In return, Treasury would receive additional Government Stock in the form of a dollar-for-dollar increase in the Government Stock liquidation preference.  *Id.* ¶¶ 5, 50.

The PSPAs entitled Treasury to quarterly dividends on its Government Stock at an annualized rate of 10% if Fannie and Freddie elected to pay the dividends in cash or 12% if the Companies elected to pay them in kind (by adding the amount of the dividend payment to the existing liquidation preference).  *See id.* ¶ 51; T0032-0034 (Fannie Government Stock Certificate).

The PSPAs also provided for a quarterly "periodic commitment fee."  *See* T0022 (Fannie PSPA).  The purpose of the fee was to compensate Treasury for the support provided by its ongoing commitment to purchase Government Stock, and it could be paid in cash or in kind.  *Id.* The fee was to be set for five-year periods by agreement of Treasury and the Companies, but Treasury could elect to waive it for up to a year at a time.  *Id.*  Treasury has exercised this option and has never received a periodic commitment fee under the PSPAs.  *See, e.g.*, T3882 (Periodic Commitment Fee Waiver Letter (June 25, 2012)).

In addition to the Government Stock, Treasury also received warrants to purchase 79.9% of the Companies' common stock at a nominal price.  Complaint ¶ 5.  The warrants gave Treasury an upside return in addition to the dividends on its Government Stock in the event that the Companies recovered and returned to profitability.  *Id*.

Treasury and FHFA amended the PSPAs twice before expiration of Treasury's purchase authority.  The first amendment increased Treasury's funding commitment to $200 billion per Company.  Complaint ¶ 53.  The second amendment, entered one week before Treasury's purchase authority expired, replaced the $200 billion commitment amount with a formula that would

allow Treasury's commitment to exceed (but not fall below) $200 billion depending upon any deficiencies experienced in 2010, 2011, and 2012 and any surplus existing as of December 31, 2012. *Id*. ¶ 54.

From 2008 through the second quarter of 2012, Treasury invested a total of $187 billion in Fannie and Freddie under the PSPAs, Complaint ¶ 6, bringing the total liquidation preference of the Government Stock to $189 billion. The Companies' draws from Treasury's commitment were made in large part to fill holes in the Companies' balance sheets caused by large non-cash losses based on exceedingly pessimistic views of the Companies' financial prospects, including write-downs of the value of significant tax assets and the establishment of large loan loss reserves. *Id*. ¶ 56. Approximately $26 billion of the draws were made to pay Treasury cash dividends on its Government Stock. *Id*. As explained above, the Companies were under no obligation to make these draws because they could have paid the dividends in kind.

By the middle of 2012, however, Fannie and Freddie had returned to profitability. "Due to rising house prices and reductions in credit losses, in early August 2012 the Companies reported significant income for the second quarter 2012 . . . and neither required a draw from Treasury under the [PSPAs]." Complaint ¶ 58 (quoting FHFA, Office of Inspector General, Analysis of the 2012 Amendments to the Senior Preferred Stock Purchase Agreements at 11 (Mar. 20, 2013) ("FHFA Inspector General Report")). In fact, in the first two quarters of 2012 the Companies posted sizable profits totaling more than $11 billion. *Id*. ¶ 57.

On August 17, 2012, just days after the Companies announced their positive second quarter results, Treasury and FHFA amended the PSPAs for a third time (the "Net Worth Sweep"). *See id.* ¶ 64. The effect of Net Worth Sweep was to ensure that despite their profitability Fannie and Freddie would be wound down and that their existing private shareholders would not receive

any benefit from their investments.  Treasury and FHFA (on information and belief, acting at the direction of Treasury, *id.* ¶ 70) accomplished this by replacing the existing dividend structure of the Government Stock with one that entitles Treasury to *all*—100%—of the Companies' profits going forward.  *Id.* ¶ 66.  Under the Net Worth Sweep, since January 1, 2013 the Companies have been required to make quarterly dividend payments equal to their entire net worth, minus a $3 billion reserve amount that steadily decreases to $0 by January 1, 2018.  *Id.*  In light of the fact that the Net Worth Sweep entitles Treasury to all the Companies' profits, it suspends payment of periodic commitment fees.  *See* T4338 (Third Amendment to Fannie PSPA).  As explained above, such fees had never been charged under the PSPAs.  The Net Worth Sweep implemented under this "Third Amendment" to the PSPAs also accelerates the rate at which the Companies are required to shrink their mortgage asset holdings down to $250 billion each, from 10% per year under the original PSPAs to 15% per year.  Complaint ¶ 66.

Treasury trumpeted that the "quarterly sweep of every dollar of profit that each firm earns going forward" would ensure "that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers" for their investment in those firms, and that Fannie and Freddie "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."  *Id.* ¶ 71 (quoting Press Release, Dep't of the Treasury, Treasury Department Announces Further Steps To Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012) ("Treasury Press Release")).  FHFA likewise emphasized that the Net Worth Sweep "ensures all the [Companies'] earnings are used to benefit taxpayers" and reinforces that "the [Companies] will not be building capital as a potential step to regaining their former corporate status."  Complaint ¶ 72 (quoting FHFA, REP. TO CONG. at 1 (2012); Edward J. DeMarco, Acting Director, FHFA, Statement Before the U.S. S. Comm. on Banking & Urban

Affairs 3 (Apr. 18, 2013)).

Treasury and FHFA have claimed that the Net Worth Sweep also "end[ed] the circular practice of the Treasury advancing funds to the [Companies] simply to pay dividends back to Treasury." Treasury Press Release. But, as explained above, the Companies were under no obligation to pay Treasury dividends in cash and thus were under no obligation to draw funds from Treasury for that purpose.

Fannie and Freddie have enjoyed record-breaking profitability since the imposition of the Net Worth Sweep. For the year 2012, Fannie and Freddie reported net income of $17.2 billion and $11 billion, respectively. Complaint ¶¶ 60, 62. Through the first three quarters of 2013 (the Companies have not yet reported fourth quarter results), the Companies were even more profitable, with Fannie reporting net income of $77.5 billion and Freddie $40 billion. *See* Fannie, Third Quarter Report (Form 10-Q) at 4 (Nov. 7, 2013); Freddie, Third Quarter Report (Form 10-Q) at 15 (Nov. 7, 2013).[4]

These profits reflect in part the reversal of accounting decisions that led Fannie and Freddie to experience large non-cash losses during the housing crisis. For example, FHFA's Office of Inspector General recognized that release of the Companies' deferred tax assets valuation allowances could lead to "an extraordinary payment to Treasury" under the Net Worth Sweep, Complaint ¶ 73 (quoting FHFA Inspector General Report at 15), and that is precisely what has happened. Fannie released $50.6 billion of the Company's deferred tax assets valuation allowance in the first quarter of 2013, and based on its results that quarter was required by the Net Worth Sweep to pay Treasury a dividend of $59.4 billion. *Id.* ¶¶ 61, 73. Freddie released $23.9

_____

[4] www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2013/q32013.pdf; www.freddiemac.com/investors/er/pdf/10q_3q13.pdf.

billion of its deferred tax assets valuation allowance in the third quarter of 2013, and it was re-
quired to pay Treasury a dividend of $30.4 billion.  Freddie, Third Quarter Report (Form 10-Q)
at 1 (Nov. 7, 2013).

Fannie and Freddie have now repaid to Treasury dividends totaling approximately $185
billion, which amounts to nearly all of the approximately $187 billion in capital provided to the
Companies by Treasury.  Fannie, Third Quarter Report (Form 10-Q) at 2 (Nov. 7, 2013); Fred-
die, Third Quarter Report (Form 10-Q) at 97 (Nov. 7, 2013).  Yet the liquidation preference of
the Government Stock remains at $189 billion, and the Companies' profits continue to be swept
to Treasury with no end in sight.

On July 10, 2013, Plaintiffs filed their complaint in this action against the FHFA and its
Acting Director and the Treasury.  Counts I and II of Plaintiffs' complaint allege that the FHFA
Defendants' conduct in implementing the Net Worth Sweep exceeded their statutory authority
and was arbitrary and capricious, entitling Plaintiffs to declaratory and injunctive relief under the
APA.  Complaint ¶¶ 84-93 (Count I); ¶¶ 94-99 (Count II).  Counts III and IV allege similar
claims under the APA against the Treasury.  *Id. ¶¶* 100-110 (Count III); ¶¶ 111-120 (Count IV).
Counts V and VI allege that by instituting the Net Worth Sweep, the FHFA, as conservator of
Fannie and Freddie, breached its contracts with owners of Fannie's and Freddie's preferred stock
and the covenant of good faith and fair dealing that is implied in those contracts.  *Id.* ¶¶ 121-128
(Count V); ¶¶ 129-135 (Count VI).  Finally, Plaintiffs allege in Count VII that by instituting the
Net Worth Sweep, the FHFA, as conservator of Fannie and Freddie, violated its fiduciary duties
to Plaintiffs and other owners of Fannie and Freddie preferred stock.  *Id.* ¶¶ 136-145.

### B.    <u>The Records Filed by Defendants</u>.

Following the filing of the complaint in this action and numerous other complaints chal-
lenging the Net Worth Sweep, the parties agreed to a schedule for the production by Defendants
of the administrative record and the briefing and argument of dispositive motions.  *See* Order
Regarding Briefing Schedule in All Cases (Doc. 21) (filed Nov. 18, 2013).  Accordingly, on De-
cember 17, 2013, the Treasury Defendants filed with the Court an "administrative record on be-
half of Treasury" relating to the Third Amendment to the PSPAs.  This administrative record was
apparently compiled after the commencement of this litigation.  The filing by the Treasury De-
fendants included a certification, by Timothy Bowler, Treasury's Deputy Assistant Secretary,
Capital Markets, that the compiled materials "reflect, to the best of [his] knowledge, the nonpriv-
ileged information considered by Treasury in entering into" the Third Amendment to the PSPAs.
Certification of Administrative Record (Doc. 23-1) ¶ 3 (included in Ex. 1).

The Treasury Defendants have provided no information regarding the process by which
this record was compiled or how they have satisfied themselves that they have presented to the
Court the complete administrative record.  Although the Treasury record contains more than
4300 pages of materials, approximately 3985 of those pages are SEC filings and contracts, with
another approximately 167 pages of other documents that were already publicly available.  The
record contains precious little (approximately 205 pages) in the way of internal, nonpublic in-
formation.  Moreover, at least one of the documents contained in the Treasury record postdates
the Third Amendment and thus could not have been before Treasury at the time it decided to im-
plement the Net Worth Sweep.  *See* T4350-57.  And, as discussed in greater detail below, the
Treasury record is virtually silent as to critical issues that undoubtedly bore on Treasury's deci-
sion to enter into the Third Amendment.

Also on December 17, the FHFA Defendants filed what they call their "document compilation."  Like the record compiled by the Treasury Defendants, only a tiny fraction of the FHFA document compilation—approximately 43 of 4132 pages—is made up of documents that were not already publicly available.  Significantly, the FHFA Defendants took pains to emphasize that they were *not* filing an actual administrative record, which they contended they were not required to prepare, but were instead filing at best a rough approximation of same:

> As the APA does not permit review of actions of the Conservator (5 U.S.C. § 701(a)(2)), [the FHFA Defendants] are not required to – and have not – created or maintained an administrative record relating to the execution of the Third Amendment.  Nevertheless, the enclosed documents reflect the considerations and views FHFA as Conservator took into account in connection with execution of the Third Amendment.

FHFA Compilation Notice at 2 (included in Ex. 2).  Notably, the FHFA Defendants did not purport to certify or even represent that their "document compilation" included all of the materials that were before the FHFA when it decided to enter into the Third Amendment, or that they had even attempted to gather all such materials.  The FHFA Defendants' record is incomplete on its face: it includes no internal memoranda or other contemporaneous decisional documents memorializing the agency's decision to agree to the Net Worth Sweep.  And, even more so than the Treasury Defendants, the FHFA Defendants' record includes numerous materials that postdate the Third Amendment.  *See, e.g.*, FHFA4051-4095.  These *post hoc* materials include the 10-page Declaration of Mario Ugoletti, a "Special Advisor" to the FHFA Director.  This declaration, which was prepared solely for purposes of this litigation and dated December 17, 2013, purports to describe the substantive considerations that led the FHFA to enter into the PSPAs and their various amendments, including the Third Amendment implementing the Net Worth Sweep.  FHFA0001-10.

C.      **The Pending Dispositive Motions**

On January 17, the Treasury Defendants and the FHFA Defendants separately filed their motions to dismiss, or for summary judgment on, Plaintiffs' claims.  Under the Court's scheduling order, Plaintiffs' response to these motions is due on February 19.  A hearing on the motions, and on any cross motions filed by Plaintiffs, is scheduled for June 23 of this year.

## ARGUMENT

## I.      NEITHER DEFENDANT HAS PRODUCED AN ADEQUATE ADMINISTRATIVE RECORD AND THUS SUPPLEMENTATION IS NECESSARY

"It is a widely accepted principle of administrative law that the courts base their review of an agency's actions on the materials that were before the agency at the time its decision was made."  *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997).  The APA directs the Court to review "the whole record," 5 U.S.C. § 706, and this Court has "interpreted the 'whole record' to include all documents and materials that the agency directly or indirectly considered . . . [and nothing] more nor less."  *Pacific Shores Subdivision v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006) (alterations in original) (internal quotation marks omitted).  *See also Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) ("If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision.").

As this Court has noted, however, a plaintiff in an APA action who seeks to "supplement" the administrative record produced by the agency must overcome the "standard presumption that the agency properly designated the Administrative Record."  *Amfac Resorts*, 143 F. Supp. 2d at 12 (citation and internal quotation marks omitted).  "Courts grant motions to supplement the administrative record only in exceptional cases," *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197 (D.D.C. 2005), and the presumption will defeat a motion to supplement ab-

sent "clear evidence" that the agency considered something it did not place in the record, *Callo-way v. Harvey*, 590 F. Supp. 2d 29, 37 (D.D.C. 2008).[5]

Despite this presumption, supplementation of the record is appropriate when it is apparent that the agency failed to include in the record materials that the relevant decisionmakers directly or indirectly consulted in connection with their decision.  In *Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134, 139 (D.D.C. 2002), for example, the Court granted the plaintiffs' motion to add to the record a transcript that, according to internal agency documents, decisionmakers had read before deciding what to do.  Those internal documents, the Court found, overcame the agency's contention that it had not "relied" upon the transcript when it made its final decision.  *Id.  See also County of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 71 (D.D.C. 2008) (the "whole record include[s] all materials that might have influenced the agency's decision, and not merely those on which the agency relied in its final decision" (alteration in original) (internal quotation marks omitted)); *Public Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986) (supplementing the record with documents that were "known to [agency] at the time of their decisionmaking, are directly related to the decision made, and are adverse to the agency's position").

Supplementation of the record is also appropriate when an agency withholds a document the agency decisionmaker considered "indirectly" by relying on the work of his subordinates.  Thus, in *Styrene Information & Research Center v. Sebelius*, 851 F. Supp. 2d 57, 61-66 (D.D.C. 2012), the Court allowed supplementation of the record with documents that an agency expert

---

[5] *See also City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (courts "do not allow parties to supplement the record unless they can demonstrate unusual circumstances justifying a departure from [the] general rule"); *Motor & Equip. Mfrs. Ass'n v. EPA*, 627 F. 2d 1095, 1104 n.18 (D.C. Cir. 1979) (observing that supplementation of the record "is the exception not the rule").

panel drafted but did not submit to the agency's final decision makers.  The documents "were an integral part of the Expert Panel's peer review process and influenced [its] recommendation, upon which the [agency] based its listing determination."  *Id.* at 64.  Under those circumstances, "[t]he mere fact that the [documents] were not ultimately passed on to the final decisionmaker d[id] not lead to the conclusion that they were not before the agency," and plaintiffs satisfied their burden by pointing to "the fact that the administrative record contain[ed] several references" to the omitted documents.  *Id.  See also Amfac Resorts*, 143 F. Supp. 2d at 12 (if agency's final decision was based "on the work and recommendations of subordinates, those materials should be included as well"); *Miami Nation of Indians v. Babbitt*, 979 F. Supp. 771, 777 (N.D. Ind. 1996) ("[A] document need not literally pass before the eyes of the final agency decision maker to be considered part of the administrative record."); *Tenneco Oil Co. v. Department of Energy*, 475 F. Supp. 299, 318 (D. Del. 1979) ("The internal memoranda, directives and guidelines generated and disseminated at a variety of levels are proper items of discovery.").

To be sure, a passing citation by the agency to other materials is normally not sufficient to satisfy the plaintiff's burden to show that the record should be supplemented with those materials.  *Marcum*, 751 F. Supp. 2d at 80; *Cape Hatteras Access Pres. Alliance v. Department of Interior*, 667 F. Supp. 2d 111, 112 (D.D.C. 2009).  Similarly insufficient is the mere fact that the materials were somewhere in the agency's files.  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 515 (D.C. Cir. 2010).  But where materials in the record rely upon the document at issue, and the document was in the agency's possession when it made its decision, supplementation should ordinarily be ordered.  *American Wild Horse Pres. Campaign v. Salazar*, 859 F. Supp. 2d 33, 44 (D.D.C. 2012).

In light of the above standards, limited supplementation of the records is clearly required

here.  In particular, the materials contained in the documents produced by Defendants specifical-
ly refer to or illustrate Defendants' reliance upon several categories of records that were not pro-
duced:

**Financial Projections and Associated Records**.  The cornerstone of Defendants' de-
fense of their decision to enter into the Third Amendment to the PSPAs and to implement the
Net Worth Sweep is their factual claim that at the time of that decision, Defendants did not ex-
pect Fannie or Freddie to be able to generate sufficient net income to cover their dividend obliga-
tion to Treasury under the original PSPAs.  *See* Treas. Br. 16-18, 24-25, 49-55; FHFA Br. 15-16,
23-26, 64-70.  Defendants rely upon a series of contemporaneous financial projections in con-
nection with this contention.  While the documents produced by Defendants include materials
referring to and summarizing some of these projections, they do not include documents which
are specifically identified as providing the basis for many of the projections.  Thus, materials in
the records refer to and rely upon projections and analyses prepared by Grant Thornton, but the
Grant Thornton materials are not included in the documents produced by Defendants.  *See, e.g.*,
GSE Preferred Stock Purchase Agreements: Summary Review and Key Considerations, at T3786
(May 23, 2012) ("[T]he . . . Grant Thornton analysis [was] used to generate the forecast esti-
mates on the subsequent pages.").  *See also* T3837 (referring to Grant Thornton analyses).

Similarly, the Treasury administrative record includes financial analyses that were based
on "[s]cenarios developed by Treasury Staff," *see, e.g.*, T3887, T3894, but the record does not
include these Treasury scenarios.  And these Treasury "scenarios" played a particularly critical
role in the decision to enter into the Third Amendment, since they supported new and much low-
er projections of the Companies' future profitability than had been previously prepared.  For ex-
ample, analyses that were prepared in July 2012 on the basis of the Treasury "scenarios" project-

ed significantly lower net income for Fannie in subsequent years – approximately a 50% reduction for most years – than analyses that had been prepared only a month earlier, in June 2012. *Compare* T3847 (June analysis) *with* T3889 (July analysis).

Given Defendants' admitted reliance on these financial projections and associated analyses in their decision to implement the Net Worth Sweep, the data, models, and associated analyses on which the various financial projections were based should have been included in the administrative records. Such supplementation should include, at a minimum, the Grant Thornton projections and analyses, the Treasury "scenarios" and associated analyses, and any other records reflecting the data and analyses on which Defendants based their analyses of Fannie's and Freddie's ability to generate earnings sufficient to fund dividend payments.

**Freddie Projections Prepared after June 2012**. As discussed above, Defendants rely upon financial analyses prepared in July 2012 that projected significantly lower income than analyses prepared in May and June of that year. Unlike the May and June analyses, which evaluated both Fannie's and Freddie's profitability, the July analysis evaluated only Fannie's expected performance. *See* T3883-3894. To the extent that documents were prepared after June 2012 that analyzed Freddie's profitability and that were considered by Defendants in entering into the Third Amendment to the PSPAs, such documents should be included in the records.[6]

**Factual Portions of Department of Justice Records**. The Treasury record includes a "decision memorandum" signed by Secretary Geithner approving the Third Amendment that demonstrates that Treasury relied upon materials prepared by the Department of Justice ("DOJ"). *See* T4332 ("The Justice Department approved Treasury's request for authority to modify its div-

---

[6] Counsel for the Treasury Defendants have represented to Plaintiffs' counsel that the Treasury Defendants are unaware of such post-June Freddie analyses. To date, counsel for the FHFA Defendants have not made a similar representation.

idend rights under the PSPAs with the GSEs.  The Justice Department agreed that the proposed modification is fiscally prudent and in the best interest of the United States.").  No such DOJ materials, however, were included in Treasury's administrative record.  Nor have Defendants produced a privilege log asserting that DOJ's analysis was withheld on the basis of any applicable privilege.  Defendants must either produce the DOJ documents on which they relied or explain why they are entitled to exclude such documents from the administrative record.  Even if Defendants believe that portions of such DOJ documents are protected by applicable privileges, factual information contained within such documents is not privileged.  At a minimum, therefore, Defendants should be ordered to produce redacted versions of such documents.[7]

**Privilege Logs**.  Finally, to the extent Defendants have excluded from their administrative records materials that they claim are protected by applicable privileges, they should be required to produce a privilege log so that such claims can be assessed.  *Cf. Center for Native Ecosystems v. Salazar*, 711 F. Supp. 2d 1267, 1276 n.10 (D. Colo. 2010) ("[I]n order to allow meaningful review of any assertions of privilege Respondents shall compile, as necessary, a privilege log."); *Earthworks v. Department of the Interior*, 279 F.R.D. 180, 192-93 (D.D.C. 2012) (reviewing contents of privilege log).  While both sets of Defendants have represented to Plaintiffs' counsel that they have not excluded privileged materials from their record compilations, and thus have no obligation to produce a privilege log, such representations mean relatively little in light of Defendants' litigation-driven selection of materials to include in their compilations.  This is especially true of the FHFA Defendants, who have acknowledged that they did not even attempt

---

[7] Plaintiffs do not concede either that the DOJ materials identified in the record are protected by any privilege, or that any arguably applicable privilege has not been waived.  We note, in this regard, that the Treasury Defendants' disclosure of their reliance on DOJ materials and the conclusions that DOJ reached waived any claim that the DOJ materials were protected by the attorney-client privilege.  *See, e.g.*, *In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989).

to create or maintain a true or complete administrative record.  In light of the FHFA Defendants'

concession that all they have done is select documents that "reflect the considerations and views

FHFA as Conservator took into account" in executing the Third Amendment, FHFA Compila-

tion Notice at 2, their representation that they did not include privileged material in their selec-

tion is virtually meaningless.  And Treasury, for its part, represented that the documents in the

administrative record it produced "reflect . . . the *nonprivileged* information considered by

Treasury in entering into the" Net Worth Sweep.  Doc. 23-1 at 3 (Certification of Administrative

Record ¶ 3) (emphasis added).  A reasonable inference to draw from this statement is that Treas-

ury also considered additional information it deems privileged in entering the Net Worth Sweep.

## II.   PLAINTIFFS ARE ENTITLED TO TAKE LIMITED DISCOVERY INTO THE COMPLETENESS OF THE ADMINISTRATIVE RECORD

Many of the same considerations that support Plaintiffs' request for limited supplementa-

tion of the materials produced by the Treasury Defendants and FHFA Defendants also entitle

Plaintiffs to conduct limited discovery into the completeness of those records.  *See, e.g.*, *NRDC*

*v. Train*, 519 F.2d 287, 292 (D.C. Cir. 1975); *Bar MK Ranches*, 994 F.2d at 740 ("When a show-

ing is made that the record may not be complete, limited discovery is appropriate to resolve that

question.").  We acknowledge that the party seeking such discovery "must make a significant

showing—variously described as a 'strong,' 'substantial,' or 'prima facie' showing—that it will

find material in the agency's possession indicative of . . . an incomplete record."  *Amfac Resorts*,

143 F. Supp. 2d at 12.  *See also Int'l Longshoremen's Ass'n v. National Mediation Bd.*, 2006 WL

197461, at *3 n.1 (D.D.C. Jan. 25, 2006).

While discovery into the completeness of the record submitted by an agency is therefore

not the norm, this is far from a normal case.  Here, there are numerous and substantial reasons to

question the records assembled by Defendants for purposes of their dispositive motions.  Plain-

tiffs therefore have more than satisfied any obligation they may have to make a "significant

showing," *Amfac Resorts*, 143 F. Supp. 2d at 12, that the records presented to the Court are in-

complete.

 ***First***, and perhaps most important, the FHFA Defendants essentially concede that they

have not even attempted to compile a complete administrative record.  Instead, they claim only

to have gathered some documents that "reflect the considerations and views" taken into account

by the FHFA.  FHFA Compilation Notice at 2.  In fact, as discussed, they refuse to even call

what they have prepared an administrative record, labeling it instead a mere "document compila-

tion."  There is certainly no warrant to indulge a presumption that the FHFA Defendants have

prepared an adequate and complete administrative record when the FHFA Defendants them-

selves make no claim that they even tried to do so.  To the contrary, the FHFA Defendants' dis-

claimer of any obligation to compile a complete administrative record further underscores the

need for discovery into whether the materials they have submitted for the Court's consideration

are complete.[8]

 Indeed, even if the FHFA Defendants are correct that they were not required by the APA

to create or maintain an administrative record (and they are not correct), the fact remains that the

---

[8] Notably, in another APA case, the FHFA sought discovery against another party, argu-
ing that the FHFA's failure to maintain an administrative record justified such discovery.  The
FHFA argued that "[d]iscovery is especially appropriate . . . where FHFA did not compile a for-
mal administrative record in real time because it did not believe it was required to utilize APA
procedures."  FHFA Consent to Request for Management Conference at 7, *California v. FHFA*,
No. 10-3084 (N.D. Cal. Oct. 28, 2011) (Doc. 139) (relevant excerpts attached at Exhibit 3).  *See
also id.* at 11 ("FHFA did not utilize APA notice-and-comment procedures or compile a formal
administrative record in real time because the agency believed that it was not engaged in APA
rulemaking, yet the APA Plaintiffs' claim that the agency acted arbitrarily and capriciously in
issuing a substantive rule is before the Court. In these unusual circumstances, discovery is neces-
sary to establish whether the analysis and conclusions the APA Plaintiffs claim FHFA failed to
consider are 'relevant' or 'important.' ").

FHFA Defendants rely heavily on their "document compilation" in support of their pending dispositive motion.  *See, e.g.*, FHFA Br. 17 n.11.  The FHFA Defendants cannot have it both ways.  Having compiled and produced these materials in support of their dispositive motion, and having asked the Court to rely on this compilation in considering that motion, the FHFA Defendants cannot avoid inquiry into the completeness of their compilation.[9]

*Second*, neither the Treasury Defendants nor the FHFA Defendants have provided any details regarding the procedures they used to compile the materials they have submitted to the Court or how, if at all, they satisfied themselves as to the completeness of their submissions.  Especially when, as here, there are numerous other indications that relevant materials were excluded from the record, the agencies' failure to provide *any* information regarding how they went about compiling the materials they have submitted justifies limited discovery into that very question.

*Third*, notwithstanding Defendants' failure to explain how they compiled their submissions, it is apparent that they used inconsistent and *ad hoc* standards for deciding what to include therein.  A few examples illustrate this point.  A forecast prepared by Moody's in April 2012 is included in the Treasury record, T3285, but as discussed above, a similar forecast prepared around the same time by Grant Thornton, and upon which Defendants relied, is not, *see* T3295.  Similarly, voluminous SEC filings and contracts that the senior decisionmakers at Treasury and FHFA undoubtedly did not read are included in the record, but financial models on which those officials must have relied are excluded.  It is reasonable to infer from such inconsistencies that the Defendants withheld documents that were before the agencies when they made the relevant

---

[9] For this reason, FHFA's request for judicial notice does not obviate the need for a proper record.  FHFA does not claim that the materials it has requested the Court to judicially notice constitute the whole record that was before the FHFA at the time it entered the Net Worth Sweep.

decisions.[10]

Defendants' uneven determinations regarding what was "before the agency" in making the decision to institute the Net Worth Sweep is especially troubling because this case involves informal agency decisionmaking, not subject to notice and comment.  In such cases, deciding what was "before the agency" when it made its decision is a difficult task that requires the sound exercise of discretion.  *See Suffolk County v. Secretary of the Interior*, 562 F.2d 1368, 1384 n.9 (2d Cir. 1977) ("What constitutes part of the administrative record may be very unclear . . . where there is no formal factfinding process.").[11]  Allowing the Government to unilaterally and inconsistently apply that amorphous standard "would permit an agency to omit items that undermine its position," *Walter O. Boswell*, 749 F.2d  at 792, thus thwarting the APA's command that judicial review be conducted upon "the whole record," 5 U.S.C. § 706.[12]

**Fourth**, both sets of Defendants rely on materials that post-date the decision to enter into the Third Amendment.  *See, e.g.*, T4350-57; FHFA4051-4095.  These materials obviously were not before Defendants at the time of the decisions at issue, and even laying aside whether they should be stricken from the record for that reason, their inclusion in the materials submitted to the Court underscores the *post hoc*, litigation-driven nature of Defendants' effort to define the

---

[10] *See Institute for Wildlife Prot. v. United States Fish & Wildlife Serv.*, No. CV-07-358-PK, 2007 WL 4118136, at *11 (D. Or. July 25, 2007) (observing that "although *review* may generally be limited to the administrative record, *discovery* often is not so limited, in particular where . . . it is not clear . . . on what basis [the agency] will" designate the record).

[11] *See also American Radio Relay League v. FCC*, 524 F.3d 227, 244 (D.C. Cir. 2008) (Tatel, J., concurring) (suggesting that it is particularly appropriate for courts to order additional agency disclosures in APA cases that involve informal decisionmaking).

[12] *See Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006) (observing that "an agency may not unilaterally determine what constitutes the administrative record"); *Fund for Animals*, 391 F. Supp. 2d at 197 (agency "may not skew the record in its favor by excluding pertinent but unfavorable information"); *Smith v. FTC*, 403 F. Supp. 1000, 1008 (D. Del. 1975) (allowing agency to artificially truncate record would "make a mockery of judicial review").

23

record on which the Court should base its review.

No doubt the most significant example of Defendants' reliance on such after-the-fact materials is the FHFA Defendants' preparation and reliance upon the declaration of Mr. Ugoletti. This declaration, which was prepared two months ago solely for use in this litigation, is not limited, or even primarily devoted, to an identification of contemporaneous documents that the FHFA Defendants considered in entering into the Third Amendment. Rather, the declaration is devoted to a substantive, after-the-fact explanation and justification of the FHFA's actions. Indeed, many of the substantive claims made by Mr. Ugoletti are not supported by citation to any contemporaneous record evidence. *See, e.g.*, Ugoletti Dec. ¶ 9 (FHFA0005) (asserting that the value of the "periodic commitment fee" agreed to in the PSPAs was "incalculably large"); *id.* ¶ 12 (FHFA0006) (asserting that the "principal driver of these concerns . . . were questions about the Enterprises' ability to pay the 10% annual dividend to Treasury without having to draw additional funds from Treasury . . . ."); *id.* ¶ 19 (FHFA0009) (asserting that it was his "belief at this time, given the size and importance of the Treasury commitment, that through the liquidation preference, fixed dividends, and the market value of the PCF, Treasury would receive as much from the Enterprises under the Second Amendment as it would under the Third Amendment"); *id.* (asserting that "the intention of the Third Amendment was not to increase compensation to Treasury . . . ."); *id.* ¶ 20 (FHFA0009-10) (asserting that "neither the Conservator nor Treasury envisioned at the time of the Third Amendment that Fannie Mae's valuation allowance on its deferred tax assets would be reversed in early 2013 . . . ."). Given the FHFA Defendants' reliance on the *post hoc*, litigation-driven, and self-serving declaration of Mr. Ugoletti, Plaintiffs must be accorded an opportunity to take limited discovery into the bases and support for Mr. Ugoletti's assertions.

*Fifth*, discovery is also warranted in light of the fact that, as discussed above, there are specific documents that Defendants appear to have considered but that were not included in Defendants' productions.  *See Train*, 519 F.2d at 292 (where agency withheld critical document that should have been included in the administrative record, plaintiffs were "entitled to an opportunity to determine, by limited discovery, whether any other documents which are properly part of the administrative record have been withheld"); *Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982) (district court abused its discretion by failing to allow discovery into completeness of record where certain documents were "conspicuously absent" from the record agency submitted and it was "almost inconceivable that such fundamental documents" were not considered); *Maritime Mgmt., Inc. v. United States*, 242 F.3d 1326, 1335 (11th Cir. 2001) (affirming discovery order where district court found the government had "purposefully withheld negative documents").

*Sixth*, Plaintiffs' request for limited discovery is further supported by the fact that there are several critical subjects on which the record is conspicuously and almost completely silent, including the treatment and valuation of the Enterprises' deferred tax assets and loan loss reserves, and Defendants' consideration of alternatives to the Net Worth Sweep.  While, to be sure, the "mere fact that certain information is not in the record does not alone suggest that the record is incomplete," *Amfac Resorts*, 143 F. Supp. 2d at 13, the critical nature of the information missing from the records here suggest that something is almost certainly amiss.  *Cf. National Wilderness Inst. v. U.S. Army Corps of Eng'rs*, 2002 WL 34724414, at *4-5 (D.D.C. Oct. 9, 2002) (allowing discovery where numerous gaps in the administrative record led to the reasonable inference that not everything had been disclosed); *Greenpeace, U.S.A. v. Mosbacher*, CIV. No. 88–2158 GHR, 1989 WL 15854, at *1 (D.D.C. Feb. 15, 1989) (permitting plaintiffs to take discovery on whether final decisionmaker received additional scientific evidence orally where there

was very little scientific evidence in the record).

The valuation and treatment of Fannie's and Freddie's deferred tax assets and loss reserves, for example, is highly relevant to the decision to implement the Net Worth Sweep and to the impacts of that decision.  The Enterprises had tens of billions of dollars of unrecognized deferred tax assets and loss reserves on their books at the time of the decision, and the treatment of those assets had obvious and significant implications for the future profitability of the Enterprises, and thus for their ability to provide funds for the payment of dividends to Treasury under the PSPAs.  Yet the projections and analyses included in Defendants' document productions, and that supposedly buttress Defendants' concern that the Enterprises could not generate sufficient income to fund their dividend obligations to Treasury under the original PSPAs, do not appear to treat with the deferred tax assets and loss reserves at all.[13]  The almost complete absence from these records of materials speaking to this highly relevant issue raises significant concerns about the completeness of their administrative records.  *See Exxon Corp. v. Department of Energy*, 91 F.R.D. 26, 34 (N.D. Tex. 1981) (granting discovery motion where agency submitted so few documents that "it strain[ed] the . . . imagination to assume that [the] record contain[ed] all the information and data considered by the agency" (ellipsis in original) (internal quotation marks omitted)); *Tenneco*, 475 F. Supp. at 318 (similar).

***Finally***, the relatively small number of internal, nonpublic documents contained in the document productions counsels in favor of discovery.  Setting aside the thousands of pages of

---

[13] Mr. Ugoletti declares that at the time the Third Amendment was negotiated and executed, "the Conservator and the Enterprises had not yet begun *to discuss* whether or when the Enterprises would be able to recognize any value to their deferred tax assets."  Ugoletti Dec. ¶ 20 (FHFA0009) (emphasis added).  Notably, regardless of whether the Enterprises had "discussed" this issue with FHFA, Mr. Ugoletti is conspicuously silent about whether the Enterprises, FHFA, or Treasury had analyzed or assessed the value of the deferred tax assets.  And it is simply incredible that they did not do so.

publicly available SEC filings and contracts that undoubtedly were not the focal point for Defendants' decisionmaking process, there are relatively few documents in Defendants' productions. It is simply implausible that such a limited number of documents were before Defendants when they made the extraordinary decision to nationalize the Companies and expropriate the preferred and common stock of Plaintiffs and other private shareholders.

*        *        *

These considerations raise serious doubts about the completeness of the materials that both sets of Defendants have submitted to the Court, and more than amply justify the taking of limited discovery into the question of whether either defendant has produced a complete administrative record. Should the Court authorize such discovery, Plaintiffs anticipate that they would be able in short order to propound interrogatories, document requests, and requests for admissions concerning the procedures Defendants followed in assembling their submissions, the steps they took to satisfy themselves that their submissions were complete (assuming they attempted to do so), and the explanation for the various gaps and inconsistencies in their submissions discussed above. Plaintiffs would also anticipate taking depositions, under Federal Rule of Civil Procedure 30(b)(6), of Treasury and the FHFA with respect to the above topics, as well as the deposition of Mr. Ugoletti in order to discover the bases for the statements made in his declaration. Plaintiffs believe that, with Defendants' cooperation in such efforts, the limited discovery they contemplate would take only a few weeks to complete.

III.  **PLAINTIFFS ARE ENTITLED TO DISCOVERY TO PRESENT FACTS ESSENTIAL TO THEIR OPPOSITION TO DEFENDANTS' CONVERTED MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM**

Under Federal Rule of Civil Procedure 12(d), if a party filing a motion under Rule 12(b)(6) presents matters outside the pleadings that are not excluded by the Court, "the motion

27

must be treated as one for summary judgment under Rule 56." In such a case, responding parties "must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* When the Court considers materials outside the pleadings, conversion of a motion to dismiss into a motion for summary judgment is not optional. Rather, the Court is required to treat the motion as one for summary judgment, with all the protections afforded to nonmoving parties under Rule 56. *Kim*, 632 F.3d at 719; *Barnes v. District of Colombia*, 242 F.R.D. 113, 116 (D.D.C. 2007). *See* 5C CHARLES ALAN WRIGHT, ARTHUR R. MILLER ET AL., FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed. 2013) ("As soon as a motion to dismiss under Rule 12(b)(6) is converted into a motion for summary judgment by the district judge, the requirements of Rule 56 become operable and the matter proceeds as would any motion made directly under that rule.").[14]

Among those protections is Federal Rule of Civil Procedure 56(d), which allows the nonmovant to "show[ ] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." If such a showing is made, the Court is authorized to, among other things, defer consideration of the converted summary judgment motion, deny the motion, or allow the movant "time to obtain affidavits or declarations or to take discovery." *Id.* *See Baker v. Henderson*, 150 F. Supp. 2d 13, 16 (D.D.C. 2001) ("When a district court converts a Rule 12(b)(6) motion to one for summary judgment, it must allow all parties a reasonable op-

---

[14] Indeed, it is reversible error for the Court to consider materials outside the pleadings without notifying the parties and soliciting further submissions on the disputed factual question. *Anderson*, 477 U.S. at 250 n.5 (1986). *See also Convertino v. Department of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012) ("While the district court enjoys broad discretion in structuring discovery, . . . summary judgment is premature unless all parties have had a full opportunity to conduct discovery." (citation and internal quotation marks omitted)); *United States v. Government Acquisitions, Inc.*, 858 F. Supp. 2d 79, 85 (D.D.C. 2012) ("Rule 56(d) exists to ensure that the nonmoving party isn't 'railroaded' by the moving party . . . ." (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986))).

portunity to present all material made pertinent to such a motion by Rule 56, and a chance to pursue reasonable discovery."). *Cf. Barnes*, 242 F.R.D. at 116 (converted summary judgment motion should be denied as premature "when the discovery process, which has [ ] not even commenced, might yield additional facts that would guide the Court's decision as to the merits of plaintiffs' . . . claims").

In their Rule 12(b)(6) motion to dismiss Plaintiffs' breach of fiduciary duty claim, the FHFA Defendants have relied upon matters outside the pleadings. Plaintiffs have alleged that the Net Worth Sweep did not serve or advance any legitimate interest of Fannie, Freddie, or their private shareholders, and was designed instead to serve only the interests of the Federal Government at the expense of the Enterprises and their shareholders.[15] The FHFA Defendants have responded to Plaintiffs' well-pled factual allegations by disputing them on the merits.[16] They assert primarily that Plaintiffs' breach of fiduciary duty count fails to state a claim because the decision to institute the Net Worth Sweep was "consistent with, and undertaken to promote, the public missions in the [Fannie and Freddie] charters and HERA." FHFA Br. 56. Integral to this claim are the FHFA Defendants' factual assertions that the purpose of the Net Worth Sweep was

---

[15] In particular, Plaintiffs have alleged, among other things, that (1) FHFA used its control over Fannie and Freddie to agree to and implement the Net Worth Sweep, Complaint ¶ 139; (2) as a federal agency, FHFA was interested in, and benefited from, the Net Worth Sweep, which essentially expropriated for the Government Fannie's and Freddie's entire net worth, *id.* ¶ 140; (3) FHFA had a conflict of interest with respect to the Net Worth Sweep transaction, which amounted to self-dealing, *id.* ¶ 141; (4) Defendants' purpose in implementing the Net Worth Sweep was to ensure "that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers," *id.* ¶ 71; (5) the Net Worth Sweep constituted waste, gross and palpable overreaching, and an abuse of discretion, *id.* ¶ 143; and (6) the Net Worth Sweep did not further any valid business purpose or legitimate business objective of Fannie or Freddie, did not reflect FHFA's good faith business judgment regarding Fannie's or Freddie's best interests, and was grossly unfair to the Enterprises and their preferred shareholders, *id.* ¶ 144.

[16] We focus herein on the FHFA's arguments with respect to breach of fiduciary claim because the Fairholme complaint alleges such a claim only against FHFA. *See* Complaint ¶¶ 136-145.

to end "the circular practice of the Enterprises drawing funds *from* Treasury merely to make dividend payments *to* Treasury," because it "threatened to erode the amount of the Treasury commitment available to" Fannie and Freddie under the PSPAs. *Id.* (emphasis in original). They further assert that this "potential erosion was the source of growing concern to the housing finance markets because it exposed the Enterprises to greater risk and increased the potential for instability in housing finance." *Id. See also id.* at 23-25.

Not only are the FHFA Defendants' factual contentions regarding the purposes underlying the Net Worth Sweep outside the well-pled allegations of Plaintiffs' complaint, they are also in direct conflict with those allegations. Thus, the Court must either disregard those contentions in connection with its review of the FHFA Defendants' motion to dismiss the fiduciary duty claim, or it must treat the motion as one for summary judgment.[17]

Given that FHFA Defendants' rely upon factual assertions that are outside of and inconsistent with the pleadings, and that Plaintiffs have not had any opportunity to test those assertions through discovery, the standards for relief under Rule 56(d) have been satisfied. And the Court must take a "generous approach" toward Plaintiffs' invocation of Rule 56(d). *Convertino*, 684

---

[17] It matters not at all that in making these factual contentions regarding the purpose of the Net Worth Sweep, the FHFA Defendants do not directly cite to any supporting documentation or other materials. *See* FHFA Br. 56. The moving party cannot avoid Rule 12(d) and 56(d) simply by making unsupported disputed factual assertions in its motion rather than through supporting affidavits or documentation. *See, e.g.*, *Kostrzewa v. City of Troy*, 247 F.3d 633, 643-44 (6th Cir. 2001) (reversing order granting Rule 12(b)(6) motion because the district court relied upon defendants' factual assertions made in the body of their motion to dismiss but did not convert the motion and afford plaintiffs discovery); *Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000) (A district court must convert a motion to dismiss for failure to state a claim into a motion for summary judgment if the court "relies on factual allegations contained in [the defendant's] legal briefs or memoranda."); *Fonte v. Board of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988) ("Factual allegations contained in legal briefs or memoranda are also treated as matters outside the pleading for purposes of Rule 12(b). Thus, it would [ ] have been error for the court to consider the factual allegations contained in the plaintiffs' memorandum of law without converting the motion to one for summary judgment.").

F.3d at 102 (citing *Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414 (D.C. Cir. 1995)).  A Rule

56(d) motion "requesting time for additional discovery should be granted 'almost as a matter of

course unless the non-moving party has not diligently pursued discovery of the evidence.' "

*Convertino*, 684 F.3d at 99 (citing *Berkeley*, 68 F.3d at 1414).  *See also Dinkel v. Medstar*

*Health, Inc.*, 286 F.R.D. 28, 31 (D.D.C. 2012).

        To obtain relief under Rule 56(d), a party must submit an affidavit or declaration that

"states with sufficient particularity . . . why additional discovery is necessary."  *Convertino*, 684

F.3d at 99 (brackets and internal quotation marks omitted).  The declaration must satisfy three

criteria.  First, "it must outline the particular facts [the Rule 56(d) movant] intends to discover

and describe why those facts are necessary to the litigation."  *Id.*  Second, "it must explain 'why

[he] could not produce [the facts] in opposition to the motion' " for summary judgment.  *Id.* (al-

terations in original) (citing *Carpenter v. Fed. Nat'l Mortg. Ass'n*, 174 F.3d 231, 237 (D.C. Cir.

1999)).  Finally, the movant "must show the information is in fact discoverable."  *Id.* at 100.  *See*

*also Messina v. Krakower*, 439 F.3d 755, 762 (D.C. Cir. 2006).  As discussed below and in the

supporting declaration of Vincent J. Colatriano ("Colatriano Dec.") (attached hereto as Exhibit

4), all three factors are established here.

        First, Plaintiffs have identified the particular factual assertions about which they seek dis-

covery and why those facts are necessary to the litigation.  Of course, Plaintiffs are not required

at this stage to provide a comprehensive discovery plan.  But we have established that discovery

is likely to disclose information highly relevant to the disputed question of why the FHFA en-

tered into the Third Amendment, and whether it acted independently, or at the direction of

Treasury, in agreeing to the Net Worth Sweep.  In particular, discovery is likely to disclose in-

formation (beyond the self-serving and *post hoc* information that the FHFA Defendants chose to

31

include in their "document compilation") relevant to the FHFA Defendants' assertions that the Net Worth Sweep was necessary to address concerns regarding the "potential erosion," FHFA Br. 56, in Treasury's financial commitment under the PSPAs allegedly threatened by Treasury's circular practice of loaning funds to Fannie and Freddie in order to finance the dividends that were then to be paid back to Treasury.  Such information is likely to include communications and documents of FHFA, Treasury, and other Government agencies concerning the agencies' analyses of the financial and other considerations implicated by the decision to enter into the Net Worth Sweep, including internal projections of Fannie's and Freddie's expected financial per-formance and profitability,[18] as well as the FHFA's consideration of alternatives to the Net Worth Sweep that could address the supposed concerns regarding the erosion of Treasury's commitment.  *See* Colatriano Dec. ¶¶ 6-10.  Also directly relevant to these disputed factual is-sues is information relating to any other purposes that Defendants may have had in instituting the Net Worth Sweep.

The FHFA Defendants are virtually certain to be in possession of evidence – e-mails and other communications and documents – regarding the above matters, all of which are of course directly relevant to the issue of whether the FHFA violated its fiduciary duties.  It is certain  –

---

[18] It is true that Defendants have included some summaries of some financial projections in the materials that they chose to include in the Treasury administrative record and the FHFA "document compilation" that they have filed with the Court.  As discussed in greater detail above, however, Defendants have excluded from the submitted materials many of the internal and external analyses on which the summaries they have provided were based.  In addition, as is also discussed in greater detail above, the materials provided include virtually nothing about the FHFA's analysis of and projections concerning the Enterprises' enormous deferred tax assets, even though the very fact that FHFA has allowed the Companies to recognize billions of dollars' worth of their deferred tax assets means that they necessarily analyzed the expected profitability of the Companies and determined that the Companies would be highly profitable.  Nor has any explanation been provided as to why Treasury's projections for Fannie's future profitability were sharply reduced on the eve of the Net Worth Sweep.

not mere speculation – that Treasury, FHFA, and perhaps other Government agencies have conducted financial analyses about the current and projected financial condition and earnings of Fannie and Freddie. *Id.* It is also a near-certainty that the FHFA and/or other agencies have formulated nonpublic long-term strategic plans for Fannie and Freddie, and it is highly likely as well that there are strategy documents and communications between and among Treasury, FHFA, and other Government agencies and officials that will disclose what role Treasury played in FHFA's decision to enter into the Third Amendment. *Id.* Plaintiffs should be afforded the opportunity, through targeted written discovery, document requests, and depositions of knowledgeable witnesses (including depositions noticed pursuant to Federal Rule of Civil Procedure 30(b)(6)), to develop evidence bearing upon these critical matters.

With respect to the second criterion that should be addressed in a Rule 56(d) request, Plaintiffs have not been able to obtain any of the evidence discussed above, because discovery has not yet begun, and the information discussed above is not publicly available. Therefore, Plaintiffs' failure thus far to discover this information is not "the product of a 'lack of diligence.'" *Convertino*, 684 F.3d at 100 (quoting *Berkeley*, 68 F.3d at 1414). *See* Colatriano Dec. ¶ 11.

Finally, the information we seek "is in fact discoverable." *Id.* In the circumstances of this case, this factor overlaps substantially with the first. "Where, as here, no privilege or other bar to disclosure has been asserted and the information is in the possession, custody, or control of one of the parties, this inquiry effectively merges with the question of whether the sought-after discovery is 'necessary to the litigation.'" *Dinkel*, 286 F.R.D. at 33 (quoting *Convertino*, 684 F.3d at 100). Thus, for the same reasons that Plaintiffs clearly satisfy the first criterion, they clearly satisfy this one as well.

In sum, the FHFA Defendants' reliance upon matters outside the pleadings in support of their Rule 12(b)(6) motion to dismiss Plaintiffs' breach of fiduciary duty claim converts that motion into a motion for summary judgment.  Under Rule 56(d), Plaintiffs are in that event entitled to take discovery relating to their breach of fiduciary duty claim.

## IV.   THE COURT SHOULD NOT AWAIT RESOLUTION OF DEFEND-ANTS' JURISDICTIONAL ARGUMENTS BEFORE ADDRESSING THE MATTERS RAISED IN THIS MOTION

Defendants may argue that this Court should defer consideration of whether Plaintiffs are entitled to discovery, or to supplementation of Defendants' record submissions, until the Court resolves Defendants' argument that this Court lacks jurisdiction over Plaintiffs' claims.  Plaintiffs submit, and will show in their response to Defendants' dispositive motions, that Defendants' jurisdictional arguments are meritless, and that this Court clearly has jurisdiction to address and resolve Plaintiffs' claims for relief.  But even leaving aside the substantive merit of Defendants' jurisdictional arguments, the Court should not defer consideration of the issues raised in this motion until it has addressed those arguments.

As an initial matter, there is considerable overlap between Defendants' jurisdictional arguments and its arguments on the merits.  Defendants' primary jurisdictional argument is their contention that Plaintiffs' claims are barred by 12 U.S.C. § 4617(f), which provides that "no court may take any action to restrain or affect the exercise of powers or functions of [FHFA] as a conservator."  *See* FHFA Br. 19-32; Treas. Br. 21-29.  But both sets of Defendants concede that section 4617(f) does not bar relief when the FHFA is acting in excess of its statutory powers. *See* FHFA Br. 21; Treas. Br. 23.  Both the Treasury Defendants and the FHFA Defendants therefore devote the bulk of their jurisdictional argument to their defense of FHFA's actions as within its statutory powers.  This defense is, in turn, devoted primarily to a justification of FHFA's and Treasury's decisions to agree to the Net Worth Sweep; integral to this justification are Defend-

ants' claims regarding their supposed desire to conserve Treasury's financial commitment to Fannie and Freddie by eliminating the need for the Enterprises to draw funds from Treasury in order to pay dividends back to Treasury.  *See* FHFA Br. 22-26; Treas. Br. 24.

There is obvious and substantial overlap between this "jurisdictional" argument and Defendants' merits arguments defending the Net Worth Sweep.  Where, as here, the jurisdictional issues are inextricably intertwined with the merits of the cause of action, jurisdictional motions, even when denominated as motions under Rule 12(b)(1), are more properly treated as motions for summary judgment.  *See Loughlin v. United States*, 230 F. Supp. 2d 26, 36-37 (D.D.C. 2002); *American Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 104 (D.D.C. 2000).  In these circumstances, discovery and supplementation of the record should be allowed to proceed, so that the overlapping jurisdictional and merits issues can be decided on an appropriate record.  *See Unite Here Local 25 v. Madison Ownership, LLC*, 850 F. Supp. 2d 219 (D.D.C. 2012) ("[W]here the jurisdictional question is closely intertwined with the merits of the case, the D.C. Circuit has instructed that it is appropriate for a court to allow discovery to proceed, and to consider the issue of subject matter jurisdiction on a motion for summary judgment thereafter." (citing *Herbert v. National Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992))).

Moreover, considerations of efficiency and judicial economy strongly support allowing the requested discovery and supplementation of the record to proceed now.  Defendants have chosen to raise both jurisdictional and merits issues in their dispositive motions, and the parties have agreed to a schedule whereby those issues would be briefed and argued on a consolidated basis.  This makes sense in light of the overlap between the jurisdictional and merits issues raised in Defendants' motions.  By the time these motions are argued in June of this year, these cases will have been pending for almost a year.  Between now and June, there is ample time to com-

plete the limited discovery and record supplementation that Plaintiffs are seeking.  In these circumstances, it would be inefficient and potentially wasteful to defer consideration of Plaintiffs' request until such time as the Court decides (as Plaintiffs are confident it will) that Defendants' jurisdictional arguments are meritless.[19]

## V.   THE COURT SHOULD SUSPEND BRIEFING ON DEFENDANTS' DISPOSITIVE MOTIONS, AND SHOULD SCHEDULE A STATUS CONFERENCE

Finally, the briefing schedule in this case was established, by agreement of the parties, before Defendants had filed their administrative records and dispositive motions, which have necessitated this motion.  Accordingly, the Court should suspend the briefing schedule until such time as the Court has had an opportunity to consider and decide this motion, and if this motion is granted, until such time as Defendants have supplemented their deficient administrative record submissions and have provided the limited discovery sought by Plaintiffs in order to adequately and fully respond to Defendants' dispositive motions.  Under the current briefing schedule, Plaintiffs' brief is due on February 19.  It would be inefficient, for both the parties and the Court, to require Plaintiffs to respond to Defendants' dispositive motions before this Court has resolved the issues raised in this motion and, if the motion is granted, before Plaintiffs have had the benefit of any supplementation and/or discovery allowed by the Court.

As discussed, the supplementation and discovery relating to the administrative records can be completed within a few weeks, and the limited discovery relating to Plaintiffs' breach of

---

[19] Defendants have also suggested that this motion may be premature or inappropriate because the stipulated briefing schedule makes clear that briefing on any dispositive motion filed by Defendants was without prejudice to any Rule 56(d) request by any plaintiff.  Any such suggestion would be meritless.  Plaintiffs certainly did not waive their right to file a motion seeking supplementation of the records or discovery under Rule 56(d) before they were required to file their brief on the merits.  And it would make little sense to force Plaintiffs essentially to file two merits briefs:  one before having the benefit of properly prepared and produced administrative records and the discovery to which Plaintiffs are entitled, and one after.

fiduciary duty claim can likely be completed within a few months at most.  In these circumstances, Plaintiffs request that Plaintiffs be allowed to file their response to Defendants' dispositive motions, and any cross-motion, within two weeks of the completion of any supplementation and discovery allowed by the Court.[20]

In any event, Plaintiffs believe it would be productive for the Court to schedule a status conference to address the above scheduling issues, and any other logistical/scheduling issues, implicated by this motion.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order (1) ordering supplementation of the record submissions prepared and filed by both sets of Defendants; (2) allowing Plaintiffs to take limited discovery into the completeness of the records filed by Defendants;  (3) allowing Plaintiffs to take discovery, pursuant to Federal Rule of Civil Procedure 56(d), necessary to allow Plaintiffs to present facts essential to their opposition to the FHFA Defendants' pending motion for summary judgment with respect to Plaintiffs' claim for breach of fiduciary duty; and (4) suspending briefing on Defendants' dispositive motions until such supplementation of the records and limited discovery is completed.  Plaintiffs also respectfully request that the Court schedule a status conference, at the Court's earliest convenience, to address the issues raised by this motion.

---

[20] Plaintiffs request that in the event the Court denies this motion, Plaintiffs be allowed to file their response to Defendants' dispositive motions within one week of that denial.

Date:   February 12, 2014                              Respectfully submitted,

                                                       /s/ Charles J. Cooper
                                                       Charles J. Cooper (Bar No. 248070)
                                                       ccooper@cooperkirk.com
                                                       Vincent J. Colatriano (Bar No. 429562)
                                                       David H. Thompson (Bar No. 450503)
                                                       Peter A. Patterson (Bar No. 998668)
                                                       COOPER & KIRK, PLLC
                                                       1523 New Hampshire Avenue, N.W.
                                                       Washington, D.C. 20036
                                                       (202) 220-9600
                                                       (202) 220-9601 (fax)