# EXHIBIT 2

# No. 13-cv-1053-RCL

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| PERRY CAPITAL LLC,<br><br>Plaintiff,<br><br>v.<br><br>JACOB J. LEW, *et al.*,<br><br>Defendants. | Civil Action No. 13-cv-1025 (RLW) |
| FAIRHOLME FUNDS, INC., *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL HOUSING FINANCE AGENCY, *et al.*,<br><br>Defendants. | Civil Action No. 13-cv-1053 (RLW) |
| ARROWOOD INDEMNITY COMPANY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION, *et al.*,<br><br>Defendants. | Civil Action No. 13-cv-1439 (RLW) |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations<br><br>_____<br>This document relates to:<br>ALL CASES | Misc. Action No. 13-mc-01288 (RLW) |

## NOTICE OF FILING DOCUMENT COMPILATION BY DEFENDANTS FEDERAL HOUSING FINANCE AGENCY AND EDWARD DEMARCO REGARDING THIRD AMENDMENT TO SENIOR PREFERRED STOCK PURCHASE AGREEMENTS

Case 1:13-cv-01053-RCL Document 32-2 Filed 02/12/14 Page 2 of 72

Defendants Federal Housing Finance Agency ("FHFA" or "Conservator"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac," together with Fannie Mae, the "Enterprises"), and Edward DeMarco, in his official capacity as Acting Director of the Federal Housing Finance Agency (collectively, the "FHFA Defendants") hereby provide this notice of filing a document compilation.

Plaintiffs allege that the Third Amendment to the Treasury Agreement is arbitrary and capricious under the Administrative Procedure Act ("APA"). It is undisputed that the actions challenged by plaintiffs were undertaken by FHFA in its capacity as statutory Conservator of Fannie Mae and Freddie Mac. This Court is without jurisdiction to review such actions of the Conservator. 12 U.S.C. § 4617(f). As the APA does not permit review of actions of the Conservator (5 U.S.C. § 701(a)(2)), Defendants FHFA and DeMarco are not required to—and have not—created or maintained an administrative record relating to the execution of the Third Amendment. Nevertheless, the enclosed documents reflect the considerations and views FHFA as Conservator took into account in connection with execution of the Third Amendment. The enclosed index to the documents identifies the relevant considerations.

Dated:  December 17, 2013

/s/ Asim Varma
Asim Varma
asim.varma@aporter.com
Howard N. Cayne
howard.cayne@aporter.com
David B. Bergman
david.bergman@aporter.com
Arnold & Porter LLP
555 12th Street, N.W.
Washington, D.C.  20004
Telephone:  202.942.5000
Facsimile:  202.942.5999

*Attorneys for the Federal Housing Finance
Agency and Edward DeMarco*

## CERTIFICATE OF SERVICE

I hereby certify that today, December 17, 2013, I electronically filed the foregoing using the Court's CM/ECF system, which caused true and correct copy of the foregoing to be served on all counsel of record.

/s/ Asim Varma
ASIM VARMA

*Attorney for the Federal Housing Finance Agency and Edward DeMarco*

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| PERRY CAPITAL LLC,<br><br>                        Plaintiff,<br><br>        v.<br><br>JACOB J. LEW, *et al.*,<br><br>                        Defendants. | Civil Action No. 13-cv-1025 (RLW) |
| FAIRHOLME FUNDS, INC., *et al.*<br><br>                        Plaintiffs,<br><br>        v.<br><br>FEDERAL HOUSING FINANCE AGENCY, *et al.*,<br><br>                        Defendants. | Civil Action No. 13-cv-1053 (RLW) |
| ARROWOOD INDEMNITY COMPANY, *et al.*,<br><br>                        Plaintiffs,<br><br>        v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION, *et al.*,<br><br>                        Defendants. | Civil Action No. 13-cv-1439 (RLW) |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations<br>_____<br>This document relates to:<br>ALL CASES | Misc. Action No. 13-mc-01288 (RLW) |

## INDEX TO DOCUMENT COMPILATION BY DEFENDANTS FEDERAL HOUSING FINANCE AGENCY AND EDWARD DEMARCO REGARDING THIRD AMENDMENT TO SENIOR PREFERRED STOCK PURCHASE AGREEMENTS

| Tab | Document | Pin Cite | Bates Range |
|-----|----------|----------|-------------|
| 1 | Declaration of FHFA Special Advisor to the Office of the Director Mario Ugoletti | | FHFA 0001-0010 |
| 2 | Statement of FHFA Director James B. Lockhart III (September 7, 2008) | 8 | FHFA 0011-0020 |
| 3 | Statement of Treasury Secretary Henry M. Paulson, Jr. (September 7, 2008) | 3 | FHFA 0021-0023 |
| 4 | Department of the Treasury Senior Preferred Stock Purchase Agreement Fact Sheet (September 7, 2008) | 1 | FHFA 0024-0025 |
| 5 | FHFA Questions and Answers on Conservatorship (September 7, 2008) | 3 | FHFA 0026-0028 |
| 6 | Testimony of FHFA Director James B. Lockhart III (September 25, 2008) | 5, 12, 34 | FHFA 0029-0127 |
| 7 | Fannie Mae's Senior Preferred Stock Purchase Agreement with Treasury (September 26, 2008) | | FHFA 0128-0141 |
| 8 | Freddie Mac's Senior Preferred Stock Purchase Agreement with Treasury (September 26, 2008) | | FHFA 0142-0155 |
| 9 | Department of the Treasury, Annual Financial Report, Part III (November 17, 2008) | 205 | FHFA 0156-0251 |
| 10 | FHFA Mortgage Market Note (December 5, 2008) | | FHFA 0252-0257 |
| 11 | Fannie Mae, Form 10-K 2008 (February 26, 2009) | 31, 162 | FHFA 0258-0675 |
| 12 | First Amendment to Fannie Mae's Senior Preferred Stock Purchase Agreement with Treasury (May 6, 2009) | | FHFA 0676-0680 |

| Tab | Document | Pin Cite | Bates Range |
|---|---|---|---|
| 13 | First Amendment to Freddie Mac's Senior Preferred Stock Purchase Agreement with Treasury (May 6, 2009) | | FHFA 0681-0685 |
| 14 | FHFA 2008 Annual Report to Congress (May 18, 2009) | 2, 30, 79, 83 | FHFA 0686-0841 |
| 15 | Department of the Treasury, Annual Financial Report, Fiscal Year 2009 (December 15, 2009) | 26 | FHFA 0842-1135 |
| 16 | Second Amendment to Fannie Mae's Senior Preferred Stock Purchase Agreement with Treasury (December 24, 2009) | 3 | FHFA 1136-1141 |
| 17 | Second Amendment to Freddie Mac's Senior Preferred Stock Purchase Agreement with Treasury (December 24, 2009) | 3 | FHFA 1142-1147 |
| 18 | CBO Background Paper (January 13, 2010 ) | 10 n.26 | FHFA 1148-1177 |
| 19 | Letter from FHFA Acting Director Edward J. DeMarco to Senator Dodd, Senator Shelby, Congressman Frank, and Congressman Bachus (February 2, 2010) | 3 | FHFA 1178-1186 |
| 20 | Written Testimony of Treasury Secretary Timothy F. Geithner (March 23, 2010) | | FHFA 1187-1197 |
| 21 | FHFA 2009 Annual Report to Congress (May 25, 2010) | iv | FHFA 1198-1377 |
| 22 | FHFA Projections of the Enterprises' Financial Performance (October 21, 2010) | | FHFA 1378-1390 |

Case 1:13-cv-01053-RCL Document 24-1 Filed 12/17/13 Page 4 of 8

| Tab | Document | Pin Cite | Bates Range |
|---|---|---|---|
| 23 | Department of the Treasury, 2010 Performance and Accountability Report  [Full document available at http://www.treasury.gov/about/organizational-structure/offices/Mgt/Documents/2010_Treasury_complete_PAR%20Nov30.pdf] (November 15, 2010) | 20-22; 211-15 | FHFA 1391-1399 |
| 24 | Periodic Commitment Fee Waiver Letter (December 29, 2010) | | FHFA 1400 |
| 25 | Moody's, Special Comment: The GSE Debate and the U.S. Mortgage Market (January 24, 2011) | | FHFA 1401-1415 |
| 26 | Budget of the United States Government, Fiscal Year 2012, Appendix [Full document available at http://www.whitehouse.gov/sites/default/files/omb/budget/fy2012/assets/appendix.pdf] (February 14, 2011) | 1319-20 | FHFA 1416-1418 |
| 27 | Fannie Mae, Form 10-K 2010 (February 24, 2011) | 34 | FHFA 1419-1821 |
| 28 | Freddie Mac, Form 10-K 2010 (February 24, 2011) | 8 | FHFA 1822-2177 |
| 29 | Freddie Mac Press Release, Freddie Mac Reports Fourth Quarter And Full-Year 2010 Financial Results (February 24, 2011) | | FHFA 2178-2191 |
| 30 | Periodic Commitment Fee Waiver Letter (March 31, 2011) | | FHFA 2192 |
| 31 | Fannie Mae, Form 10-Q Q1 2011 (May 6, 2011) | 54 | FHFA 2193-2358 |
| 32 | Statement of CBO Assistant Director for Financial Analysis Deborah Lucas (June 2, 2011) | 2 | FHFA 2359-2388 |

| **Tab** | **Document** | **Pin Cite** | **Bates Range** |
|---|---|---|---|
| 33 | Moody's Issuer Comment: CBO Estimate of GSE Loss Is Credit Positive (June 13, 2011) | | FHFA 2389-2391 |
| 34 | Periodic Commitment Fee Waiver Letter (June 30, 2011) | | FHFA 2392 |
| 35 | Edward J. DeMarco, FHFA Acting Director, Remarks at the American Mortgage Conference (September 19, 2011) | 5 | FHFA 2393-2402 |
| 36 | Moody's, Sector Comment: Plan To Raise Fannie Mae and Freddie Mac Guarantee Fees Raises Question of Support (September 26, 2011) | 2 | FHFA 2403-2405 |
| 37 | Periodic Commitment Fee Waiver Letter (September 30, 2011) | | FHFA 2406 |
| 38 | FHFA Projections of the Enterprises' Financial Performance (October 27, 2011) | | FHFA 2407-2422 |
| 39 | Freddie Mac, Form 10-Q Q3 2011 (November 3, 2011) | 11 | FHFA 2423-2636 |
| 40 | Statement of FHFA Acting Director Edward J. DeMarco (December 1, 2011) | 4 | FHFA 2637-2646 |
| 41 | FHFA Conservator's Report on the Enterprises' Financial Performance, Third Quarter 2011 (December 21, 2011) | | FHFA 2647-2664 |
| 42 | Periodic Commitment Fee Waiver Letter (December 21, 2011) | | FHFA 2665 |
| 43 | Department of the Treasury, Congressional Justification, 2013 FY Budget, Housing & Government Sponsored Enterprises (February 12, 2012) | 4 | FHFA 2666-2678 |

| Tab | Document | Pin Cite | Bates Range |
|---|---|---|---|
| 44 | FHFA Press Release and Strategic Plan (February 21, 2012) | 9 | FHFA 2679-2702 |
| 45 | Freddie Mac, Form 10-K 2011 (March 9, 2012) | 24 | FHFA 2703-3095 |
| 46 | Deutsche Bank, The Outlook: The Path of US Support for Fannie Mae, Freddie Mac (March 14, 2012) | 6 | FHFA 3096-3121 |
| 47 | Periodic Commitment Fee Waiver Letter (March 30, 2012) | | FHFA 3122 |
| 48 | FHFA Conservator's Report on the Enterprises' Financial Performance, Fourth Quarter 2011 (April 12, 2012) | | FHFA 3123-3140 |
| 49 | Freddie Mac, Form 10-Q Q1 2012 (May 3, 2012) | 10, 85 | FHFA 3141-3344 |
| 50 | Fannie Mae, Form 10-Q Q1 2012 (May 9, 2012) | 11, 81 | FHFA 3345-3532 |
| 51 | FHFA OIG Report (May 24, 2012) | 2, 7, 13, 25 | FHFA 3533-3562 |
| 52 | GSE Retained Portfolio, 2013-2016 Forecast (June 1, 2012) | | FHFA 3563 |
| 53 | GSE Retained Portfolio, 2013-2016 Forecast (June 8, 2012) | | FHFA 3564 |
| 54 | United States Treasury Presentation to the Securities and Exchange Commission "GSE Preferred Stock Purchase Agreements (PSPA) Overview and Key Considerations" (June 13, 2012) | | TREASURY 3833-3862 |
| 55 | FHFA Conservator's Report on the Enterprises' Financial Performance, First Quarter 2012 (June 15, 2012) | | FHFA 3565-3582 |

| Tab | Document | Pin Cite | Bates Range |
|---|---|---|---|
| 56 | Periodic Commitment Fee Waiver Letter (June 25, 2012) | | FHFA 3583 |
| 57 | Freddie Mac, Form 10-Q Q2 2012 (August 7, 2012) | 10, 92 | FHFA 3584-3831 |
| 58 | Freddie Mac News Release, *Freddie Mac Reports Net Income Of $3.0 Billion, Comprehensive Income Of $2.9 Billion For Second Quarter 2012* (August 7, 2012) | 3 | FHFA 3832-3841 |
| 59 | Fannie Mae, Form 10-Q Q2 2012 (August 8, 2012) | 12-13, 83 | FHFA 3842-4012 |
| 60 | Fannie Mae News Release, *Fannie Mae Reports Net Income of $5.1 Billion for Second Quarter* (August 8, 2012) | 2 | FHFA 4013-4025 |
| 61 | Nick Timiraos, *Fannie Mae Posts Profit as Home Prices Rise*, Wall Street Journal (August 8, 2012) | | FHFA 4026-4027 |
| 62 | Moody's Issuer Comment: Fannie Mae's and Freddie Mac's Return to Profitability is Fleeting (August 13, 2012) | | FHFA 4028-4030 |
| 63 | Third Amendment to Fannie Mae's Senior Preferred Stock Purchase Agreement with Treasury (August 17, 2012) | | FHFA 4031-4038 |
| 64 | Third Amendment to Freddie Mac's Senior Preferred Stock Purchase Agreement with Treasury (August 17, 2012) | | FHFA 4039-4046 |
| 65 | Statement of FHFA Acting Director Edward J. DeMarco on Changes to Fannie Mae and Freddie Mac Preferred Stock Purchase Agreements (August 17, 2012) | | FHFA 4047 |
| 66 | Barclays Interest Rates Research: Update: Treasury Changes the PSPAs: Initial Thoughts (August 17, 2012) | | FHFA 4048-4050 |

| **Tab** | **Document** | **Pin Cite** | **Bates Range** |
|---|---|---|---|
| 67 | Moody's Issuer Comment: US Treasury Amends Fannie Mae's and Freddie Mac's Capital Agreement, a Credit Positive (August 23, 2012) | 1 | FHFA 4051-4052 |
| 68 | FHFA Conservator's Report on the Enterprises' Financial Performance, Second Quarter 2012 (September 2012) | | FHFA 4053-4070 |
| 69 | Department of the Treasury Agency Financial Report, Fiscal Year 2012. [Full document available at http://www.treasury.gov/about/budget-performance/annual-performance-plan/Documents/FY%202012%20Treasury%20AFR%20Nov%2015%20Final.pdf] (November 15, 2012) | 98-102 | FHFA 4071-4076 |
| 70 | Moody's Credit Focus: Fannie Mae and Freddie Mac: Government Support Underpins Aaa Ratings (December 12, 2012) | | FHFA 4077-4087 |
| 71 | Data as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE & Mortgage-Related Securities | 2, 3 | FHFA 4088-4095 |
| 72 | Non-Core Asset Forecast (undated) | | FHFA 4096 |
| 73 | Retained Portfolio PSPA Compliance Forecast (undated) | | FHFA 4097-4099 |

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| PERRY CAPITAL LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>JACOB J. LEW, *et al.*,<br><br>        Defendants. | Civil Action No. 13-cv-1025 (RLW) |
| FAIRHOLME FUNDS, INC., *et al.*<br><br>        Plaintiffs,<br><br>    v.<br><br>FEDERAL HOUSING FINANCE AGENCY,<br>*et al.*,<br><br>        Defendants. | Civil Action No. 13-cv-1053 (RLW) |
| ARROWOOD INDEMNITY COMPANY,<br>*et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>FEDERAL NATIONAL MORTGAGE<br>ASSOCIATION, *et al.*,<br><br>        Defendants. | Civil Action No. 13-cv-1439 (RLW) |

## DECLARATION OF MARIO UGOLETTI

I, Mario Ugoletti, hereby declare, based on personal knowledge of the facts, as follows:

1.       I am Special Advisor to the Office of the Director of the Federal Housing Finance Agency ("FHFA"), a role I assumed in September 2009.  As Special Advisor, my responsibilities include advising FHFA's Acting Director Edward DeMarco concerning the Senior Preferred Stock Purchase Agreements ("PSPAs"), described *infra*.  Additionally, I serve as the primary liaison with Treasury concerning the PSPAs and any amendments to the PSPAs.

2.       I was employed at Treasury from 1995 to 2009, serving as Director of the Office of Financial Institutions Policy from 2004-2009.  In that capacity, I participated in the creation and implementation of the PSPAs.

3.       FHFA is an independent federal agency with regulatory authority over the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") (together, the "Enterprises") and the twelve Federal Home Loan Banks ("Banks").  12 U.S.C. § 4511.

4.       On September 6, 2008, FHFA's Director appointed FHFA as Conservator of the Enterprises, and on September 7, 2008 FHFA as Conservator of the Enterprises entered into two materially identical Senior Preferred Stock Purchase Agreements (together, the "PSPAs") with the United States Treasury ("Treasury")—one for Fannie Mae and one for Freddie Mac.  The Amended and Restated Agreements dated September 26, 2008 and subsequent amendments are currently available at http://www.fhfa.gov/Default.aspx?Page=364.

5.       The PSPAs were a last resort after it became apparent that no infusions of capital from the private sector were forthcoming to save the Enterprises.  *See Oversight Hearing to Examine Recent Treasury and FHFA Actions Regarding the Housing GSEs Before the H. Comm. on Financial Services*, 110th Cong., at 5 (Sep. 25, 2008) (statement of James B. Lockhart III,

Director, Federal Housing Finance Agency), currently *available at* http://archives.financialservices.house.gov/hearing110/lockhart092508.pdf ("After substantial effort and communication with market participants, each company reported to FHFA and to Treasury that it was unable to access capital markets to bolster its capital position without Treasury financing. FHFA's and Treasury's own discussions with investment bankers and investors corroborated this conclusion."). The PSPAs provided the market with assurances that Treasury would provide a backstop to the Enterprises. Absent the commitments of Treasury, the Enterprises would have collapsed. *See id.* at 5-6 ("In the absence of access to new capital, the only alternative left to the firms was to cease new business and shed assets in a weak market. That would have been disastrous for the mortgage markets as mortgage rates would have continued to move higher and, in turn, disastrous for the Enterprises as the prices of their securities would have fallen and credit losses would have increased."); Timothy F. Geithner, Secretary, U.S. Dep't of the Treasury, Written Testimony Before the H. Comm. on Financial Services (Mar. 23, 2010), currently *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg603.aspx ("In 2007, the GSEs reported combined losses of over $5 billion . . . The GSEs ultimately reported combined 2008 losses in excess of $108 billion. . . . Both companies were severely undercapitalized and would not have been able to meet their obligations without the intervention and financial support of the government."). With the PSPAs and the market assurance they provided, the Enterprises were able to remain in operation.

6.     The PSPAs provided that the Enterprises would draw funds from Treasury against the Treasury commitment if the Enterprises exhausted all of their stockholder equity and had a negative net worth (defined as liabilities exceeding assets). If Enterprise liabilities exceeded assets, the provision for mandatory receivership in the Housing and Economic Recovery Act of 2008 ("HERA") would be triggered. The PSPAs were designed so that the Enterprises could

3

draw funds from Treasury in amounts necessary to cure their negative net worth and bring their capital to zero. By the end of 2008, all shareholder equity had been exhausted and the Enterprises drew on the Treasury commitment to avoid mandatory receivership. *See* FHFA Data as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE & Mortgage-Related Securities at 2, currently *available at* http://www.fhfa.gov/webfiles/25784/TSYSupport%202013-11-13.pdf (Freddie Mac draw of $13.8 billion for third quarter 2008; Fannie Mae draw of $15.2 billion for fourth quarter 2008).

7.      The PSPAs gave Treasury an expansive bundle of rights and entitlements in exchange for the lifeline that Treasury provided, without which the Enterprises would have gone out of business. For example, Treasury received warrants to acquire 79.9% of the common stock of the Enterprises for a nominal payment. In addition, under the PSPAs, Treasury obtained Senior Preferred Stock that is senior in priority over all other series of preferred stock. The Treasury Senior Preferred Stock in each Enterprise had an initial face value of $1 billion, which increases by any amount that the Enterprises draw from Treasury under the Treasury Commitment. Further, the Treasury Senior Preferred Stock has a liquidation preference so that Treasury has priority over any other preferred or common shareholders in the event of a liquidation — that is, Treasury is entitled to the value of its Senior Preferred Stock (face value plus any amounts drawn from Treasury by the Enterprises, without reduction for dividends or other amounts that the Enterprises might pay to Treasury) before any other shareholders — preferred or common — are paid anything in liquidation.

8.      The Treasury Senior Preferred Stock also included payment obligations from the Enterprises to Treasury, commensurate with the enormous risks and financial commitments that Treasury assumed. The Enterprises were obligated to pay a 10% annual dividend together with a

4

Periodic Commitment Fee ("PCF") that was "intended to fully compensate [Treasury] for the support provided by the ongoing Commitment." Amended and Restated Agreements, § 3.2(b) (Sept. 26, 2008). The PSPAs provided that the amount of the PCF to be imposed beginning January 2010 "shall be determined with reference to the market value of the Commitment as then in effect." *Id.*

9.     The PSPA gave Treasury the right, in its sole discretion, to waive the PCF for a year at a time "based on adverse conditions in the United States mortgage market." Treasury exercised this right to waive the PCF for 2010 and 2011, years in which the Enterprises had insufficient funds to pay even the 10% dividend, let alone an additional PCF, stating that "the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer." Periodic Commitment Fee Waiver Letters from Dept. of Treasury to FHFA (Dec. 29, 2010; Mar. 31, 2011; Jun. 30, 2011; Sept. 30, 2011; Dec. 21, 2011). It was clear by this time that, given the risks of the Enterprises and the enormity of the Treasury commitment, the value of the PCF was incalculably large.

10.     Under the Second Amendment to the PSPAs (executed December 24, 2009), Treasury was obligated to commit any amount of funds necessary to maintain the Enterprises' positive net worth through December 31, 2012, subject to an initial cap of $200 billion for each of the Enterprises plus the amount of draws between January 1, 2010 and December 31, 2012. As of January 1, 2013, however, Treasury's financial commitment cap became fixed: the amount

remaining available to Fannie Mae under the cap was $117.6 billion, and the amount remaining available to Freddie Mac under the cap was $140.5 billion.[1]

11.     By late 2011, analysts and key stakeholders, including institutional and Asian investors in the Enterprises' debt and mortgage backed securities (MBS), began expressing concerns about the adequacy of Treasury's financial commitment to the Enterprises after January 1, 2013, when the cap on Treasury's funding commitment would become fixed.

12.     The principal driver of these concerns about the adequacy of Treasury's capital commitment were questions about the Enterprises' ability to pay the 10% annual dividend to Treasury without having to draw additional funds from Treasury, thereby eating away at the amount remaining available under the capped Treasury commitment.  From the outset of the PSPAs, the Enterprises could not at times generate enough income to make these dividend payments.

13.     The Enterprises drew funds from Treasury to pay the required 10% dividend back to Treasury.  Of the $188 billion the Enterprises drew from Treasury from the outset of the PSPAs (September 2008) to the execution of the Third Amendment (August 2012), $45.7 billion was drawn solely to pay the 10% annual dividend back to Treasury.  *See* FHFA, Data as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE and

---

[1]     Under the Second Amendment to the PSPAs, Treasury committed to provide each Enterprise the greater of: (i) $200 billion or (ii) $200 billion plus the Enterprise's cumulative draws for 2010, 2011, and 2012, less the Enterprise's positive net worth, if any, on December 31, 2012.  Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, at 3.

For Fannie Mae, alternative (ii) provided the greater amount: $200 billion + $40.9 billion (cumulative draws for 2010-2012) – $7.2 billion (positive net worth on December 31, 2012) – $116.1 billion (total draws from 2008-2012) = $117.6 billion.

For Freddie Mac, alternative (ii) provided the greater amount:  $200 billion + $20.6 billion (cumulative draws for 2010-2012) – $8.8 billion (positive net worth on December 31, 2012) – $71.3 (total draws from 2008-2012) = $140.5 billion.

FHFA 0006

Mortgage-Related Securities at 2, 3. Additionally, each time the Enterprises drew funds to pay the 10% dividend, the total amount of the Treasury draw increased, in turn increasing the amount of the next 10% dividend payment.

14. By mid-2012, the amount of the annual 10% dividend had grown so large—$11.7 billion for Fannie Mae and $7.2 billion for Freddie Mac—that it appeared unlikely that either of the Enterprises would be able to meet that amount consistently without drawing additional funds from Treasury. *See* Freddie Mac, Quarterly Report (Form 10-Q) at 10, 85 (May 3, 2012), currently *available at* http://www.freddiemac.com/investors/sec_filings/index.html ("Over time, our dividend obligation to Treasury will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term."); Freddie Mac, Quarterly Report (Form 10-Q) at 10, 92 (Aug. 7, 2012), currently *available at* http://www.freddiemac.com/investors/sec_filings/index.html (same); Fannie Mae, Quarterly Report (Form 10-Q) at 11, 81 (May 9, 2012), currently *available at* http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2012/q12012.pdf ("Although we may experience period-to-period volatility in earnings and comprehensive income, we do not expect to generate net income or comprehensive income in excess of our annual dividend obligation to Treasury over the long term."); Fannie Mae, Quarterly Report (Form 10-Q) at 12-13, 83 (Aug. 8, 2012), currently *available at* http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2012/q22012.pdf (same). Because the cap on the Treasury commitment became fixed on January 1, 2013, each dollar drawn from Treasury merely to repay the Treasury dividend was one less dollar available

7

to the Enterprises to draw in the event the Enterprise suffered losses due, for example, to a decline in the housing market or broader economic turbulence.

15.     Market forecasts—which FHFA monitored—predicted that the Enterprises' ongoing payment of the 10% dividend would completely exhaust Treasury's funding commitment within ten years, leading to potential downgrades in the Enterprises' credit ratings. Moody's rating service opined that the 10% dividend payments would "eliminate Fannie Mae's contingent capital by 2019 and Freddie Mac's by 2022 . . . [even] assum[ing] that the GSEs are able to fully offset credit losses, which we believe is unlikely." Moody's, Sector Comment, "Plan To Raise Fannie Mae and Freddie Mac Guarantee Fees Raises Question of Support," at 2 (Sept. 26, 2011). Moody's stated that this "would be credit negative and prompt a review of [the Enterprises'] Aaa ratings." *Id.* Likewise, Deutsche Bank observed that "diminishing Treasury support raises the risk that the agencies one day might face challenges in covering MBS losses" and that such a risk "becomes greater in a housing market catastrophe, such as the one that started in the US after 2006." Deutsche Bank, *The Path of US Support for Fannie Mae, Freddie Mac*, THE OUTLOOK, Mar. 14, 2012, at 6.

16.     FHFA shared the concerns that the 10% annual dividend to Treasury would reduce the amount of the Treasury commitment starting in 2013. Treasury also generated and provided certain forecasts to FHFA that were similar to those prepared by market participants.

17.     These concerns about the adequacy of Treasury's financial commitment undermined the purpose of the PSPAs to express financial support to holders of Enterprise debt (*i.e.*, bondholders) and mortgage backed securities. *See* FHFA Mortgage Market Note (Dec. 5, 2008), currently *available at* http://www.fhfa.gov/webfiles/1241/mmnote084.pdf. The strength of that support depends upon the Enterprises having a sufficiently large pool of available funds

8

from Treasury that will permit the Enterprises to continue to operate under adverse market conditions that may arise in the coming years.

18.     To resolve these concerns, FHFA and Treasury agreed on the provisions that were incorporated into the Third Amendment, executed on August 17, 2012.  The Third Amendment (1) eliminated the 10% annual dividend, (2) added a quarterly variable dividend in the amount (if any) of each Enterprises' positive net worth (above net worth values that were specified in the Third Amendment), and (3) suspended the PCF for as long as the quarterly variable dividend is in effect.  The new dividend structure eliminated the risk that borrowings to make fixed dividend payments would lead to the exhaustion of the Treasury commitment.

19.     These changes in structure did not change the underlying economics of the PSPAs.  It was my belief at this time, given the size and importance of the Treasury commitment, that through the liquidation preference, fixed dividends, and the market value of the PCF, Treasury would receive as much from the Enterprises under the Second Amendment as it would under the Third Amendment.  Thus, the intention of the Third Amendment was not to increase compensation to Treasury — the Amendment would not do that — but to protect the Enterprises from the erosion of the Treasury commitment that was threatened by the fixed dividend.  The Third Amendment was therefore consistent with the intent of the original PSPAs to (1) fully compensate Treasury for the value of its financial support, without which the Enterprises would have been forced into receivership, and (2) protect the Enterprises and the national housing market.

20.     At the time of the negotiation and execution of the Third Amendment, the Conservator and the Enterprises had not yet begun to discuss whether or when the Enterprises would be able to recognize any value to their deferred tax assets.  Thus, neither the Conservator

Case 1:13-cv-01053-RLW   Document 22-2   Filed 02/12/14   Page 23 of 72

nor Treasury envisioned at the time of the Third Amendment that Fannie Mae's valuation allowance on its deferred tax assets would be reversed in early 2013, resulting in a sudden and substantial increase in Fannie Mae's net worth, which was paid to Treasury in mid-2013 by virtue of the net worth dividend.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17 day of DECEMBER 2013 at Washington, D.C.

By: _____

MARIO UGOLETTI

*Special Advisor to the Office of the Director,*
*Federal Housing Finance Agency*

FHFA 0010

# OVERSIGHT HEARING TO EXAMINE RECENT TREASURY AND FHFA ACTIONS REGARDING THE HOUSING GSEs

————

**Thursday, September 25, 2008**

U.S. HOUSE OF REPRESENTATIVES,
COMMITTEE ON FINANCIAL SERVICES,
*Washington, D.C.*

The committee met, pursuant to notice, at 12:08 p.m., in room 2128, Rayburn House Office Building, Hon. Maxine Waters [member of the committee] presiding.

Members present: Representatives Kanjorski, Waters, Watt, Sherman, Capuano, Lynch, Miller of North Carolina, Green, Ellison, Wilson, Perlmutter, Murphy, Speier; Bachus, Castle, Royce, Biggert, Shays, Capito, Hensarling, Garrett, Brown-Waite, and Bachmann.

Ms. WATERS. [presiding] The Committee on Financial Services will come to order. This hearing is an oversight hearing to examine recent Treasury and FHFA actions regarding the housing GSEs.

I will yield myself as much time as I may consume. Let me start by saying that Chairman Frank and, I suppose, Subcommittee Chairman Kanjorski, should be joining us shortly. I think the world knows where Mr. Frank is today and what he is doing.

And, of course, the hearing that we are having today is a hearing that is absolutely necessary based on the recent actions that stunned many of us with the takeover of Fannie Mae and Freddie Mac.

Let me just say that when I first came to the House of Representatives, I was eager to be involved on the Financial Services Committee because of my concern for housing. And I was very pleased to learn about the mission of Fannie and Freddie and very pleased to work with Fannie and Freddie as we helped to find more ways to offer housing opportunities in communities that had been redlined in those days.

I think the mission of Fannie and Freddie was a good mission then, and should continue to be a mission that can certainly help many Americans realize the American dream. I know that Fannie and Freddie both were criticized very strongly by many, because some thought that they had too much perceived support from the government and were able to get money at favorable rates. Some thought they were much too big, and still others thought that their mission had creeped into areas where it should not be. And so I can recall when FM Watch was organized and all of the politics of that.

(1)

29

And so I have heard sort of two things, whether the dividends have been suspended or whether they have been permanently terminated. And you certainly said to Mr. Cleaver's questions that you don't have any plans now to revisit that issue. But do you have any timeframe, do you have any belief or reason to believe that in the future you may return dividends to those preferred shares?

Mr. LOCKHART. First of all, the dividends are noncumulative, so the ones that are missed are missed.

Mr. MURPHY. Yes.

Mr. LOCKHART. Going forward, coming out of conservatorship, there is a possibility. I don't know how large that possibility would be, but there is a possibility.

Many banks were aware. These prices had deteriorated well before we took our action in September, and many banks had already started to take impairments for well over a year on their holdings in these preferred. It wasn't as sudden as you might think. In fact, the preferred stocks were selling at about 50 percent of their face value before we took the action.

Mr. MURPHY. And without being able to reinstate those dividends, there are several other solutions that might be able to help those institutions, including a postponement of their ability to mark-to-market those assets pending some resolution of the actual value of the asset, as well as some differential tax treatment, their ability to potentially take ordinary versus capital losses.

Have you been involved at all in those conversations or spoken to the community banks about those requests pending on the legislation that we are examining now?

Mr. LOCKHART. We have talked to some of the community banks, and we have had some of the State banking associations in to discuss alternatives. It is really up to the bank regulators. To the extent it is going to be a change in the tax treatment, that is up to Congress.

Mr. MURPHY. And just lastly, to the extent the actions taken through the conservatorship have led to this problem for many banks that now precipitate them to be asking for relief before other bodies, to the extent that if you believe that that is a reasonable ask, I think that many of us would certainly appreciate your advocacy with them or on their behalf.

Mr. Chairman, thank you very much for the time.

Mr. KANJORSKI. Thank you, Mr. Murphy.

The gentlelady from California, Ms. Speier.

Ms. SPEIER. Thank you, Mr. Chairman.

Director Lockhart, the Federal Government, the taxpayers, have injected $250 billion into Fannie and Freddie, correct?

Mr. LOCKHART. No, that is not correct. They actually haven't invested anything yet. What they have done is, they have put facilities in place that they might draw down in the future if needed. At this point, there has been no taxpayer money put into Fannie and Freddie.

Ms. SPEIER. So they continue to be private companies?

Mr. LOCKHART. They are private companies in conservatorship, which means that the Agency, FHFA, has replaced the board of directors as the executive, if you will, and we have chosen new CEOs to take over the companies. The shareholders are still in place;

30

both the preferred and common shareholders have an economic interest in the companies.

Ms. SPEIER. All right. Do you think that the naked shorts contributed to the financial ruin of Fannie and Freddie?

Mr. LOCKHART. There was certainly a lot of activity in Fannie and Freddie's stocks over the last 2 or 3 months, and there was probably some short selling. Whether they were naked or not, I don't know.

Ms. SPEIER. Do you think there is any reason to call in the appropriate Federal investigators to see if there was any fraud associated with it?

Mr. LOCKHART. I am sure that the SEC is looking at those issues. We are pretty close to the SEC; in fact, the Chairman of the SEC is on our Oversight Board. I am sure that they are very aware of the situation and are looking at it.

Ms. SPEIER. So it is certainly, I think, the intent of those in Congress that if we are going to assist Fannie and Freddie to the tune of $250 billion, that we see mortgages reset so that foreclosures don't take place. But the reality, it appears, is that most of what you hold are not mortgages, but securities that are mortgage-backed. Is that correct?

Mr. LOCKHART. Their basic business is to buy mortgages. They package them into securities and then put a guarantee on them. They have well over $3 trillion of those outstanding.

In addition, they buy some of those securities themselves and keep them in their portfolio. They have also bought securities issued by other issuers, those private label ones I was talking about. In addition, they have whole mortgage loans.

The vast majority of their holdings are either that they have guaranteed or they hold in their portfolios. They have about, of their $5 trillion, $200 billion or so that are not their own securities, but are mortgages.

Ms. SPEIER. So you are in a position then to do, for instance, what some of the other institutions have done, FDIC being one, to freeze the interest rates, keep people in their homes, and adjust the mortgages?

Mr. LOCKHART. Fannie and Freddie have very active loan modification/foreclosure prevention programs. It is very important to them; they are working very hard on expanding those activities.

We just put out a report yesterday, which we are going to update quarterly, looking at those loan modification activities. I would be happy to send you a copy of it.

Ms. SPEIER. Do I have any more time, Mr. Chairman?

Mr. KANJORSKI. There are no lights.

Ms. SPEIER. My last question, I guess I am very confused by why you would continue a no doc or low doc policy when the Fed has basically said that verification by institutions is mandatory now.

Mr. LOCKHART. They are not continuing. What they are doing is, they are making a few low documentation loans at this point, as I understand. The amount has dropped dramatically, as far as I know, and they are looking at that policy. Basically, as I understand, the ones that are made are to people with relatively high incomes and very high FICO scores.

Case 1:13-cv-01053-RLW   Document 24-2   Filed 12/17/13   Page 27 of 72

34

ship, they may be now technically in violation possibly of some of the capitalization requirements that they have; and pension funds—not capitalization requirements, but some of the underwriting standards that they are required to.

And I know you are aware of it, but again I would like to put it on the record that: Number one, you are aware of it; and number two, you are working positively towards trying to address those issues.

Mr. LOCKHART. We certainly are aware of it. One of the key reasons that the financing was put in the way it was, was to protect the mortgage-backed security holders and the debt holders of these companies, that over $5 trillion.

That was so important, to track that exposure. We had to make a decision that there were some parts that couldn't be protected, and that was the common and preferred. Common and preferred holders are equity holders, and they are more at risk. When you are investing in common stock or preferred, you have more risk than you do when you are in debt.

Mr. CAPUANO. And I understand that. If everything works out the way we hope it works out and people hold on to what they have—again, I know there are some bumps in the middle of the road—in theory, there is no reason to believe that anybody, in the final analysis, should lose any money when this is all said and done?

Mr. LOCKHART. I can't say that.

Mr. CAPUANO. I understand. I said it. I didn't think you would, but I thought I would try.

Mr. LOCKHART. I would think that the common shareholders have already lost a significant amount of money, and certainly the preferreds. It is hard to imagine they would go all the way back.

At any rate, they still have some economic interest in this company, and going forward there may be some value.

Mr. CAPUANO. Okay. Thank you very much.

Mr. KANJORSKI. Mr. Garrett, do you have a desire to examine Mr. Lockhart, or are you going to allow him to escape? He has been on that seat for a number of hours.

Mr. GARRETT. Two minutes. Thank you. I will be brief, and I apologize for just running in.

Following up on my introductory comments to you and commending you for some of the actions that you have previously taken in that area, I read through your full testimony, because your testimony here was an abbreviation of that testimony.

Along the lines of contributions by Fannie and Freddie, what you did was good, as far as I know, was the elimination, as far as lobbying on the Hill and also contributions by Fannie and Freddie from their respective accounts.

A question for you, though—and it is not clear in here—is, what is the status with regard to these entities making contributions, charitable contributions, instead? Is that continuing?

Mr. LOCKHART. What we said and what they are doing is they are reviewing their charitable contributions. They are going to put together a plan of what charities they think they should be giving to in the future.

AUGUST 23, 2012

BANKING

Case 1:13-cv-01053-RCL   Document 22-2   Filed 02/12/14   Page 28 of 72
Case 1:13-cv-01053-RLW   Document 24-16   Filed 12/17/13   Page 37 of 50



## MOODY'S
### INVESTORS SERVICE

ISSUER COMMENT

# US Treasury Amends Fannie Mae's and Freddie Mac's Capital Agreement, a Credit Positive

From <u>Credit Outlook</u>

Analyst Contacts:

NEW YORK                    +1.212.553.1653

Brian Harris              +1.212.553.4705
*Senior Vice President*
brian.harris@moodys.com

Last Friday, the US Treasury amended[1] its Senior Preferred Stock Purchase Agreement (the Capital Agreement) with the government-sponsored enterprises (GSEs) <u>Fannie Mae</u> (Aaa negative) and <u>Freddie Mac</u> (Aaa negative). The most significant provision of the amendment, which goes into effect on 1 January 2013, is the reduction of the dividends the GSEs will pay. This reduction is credit positive because it considerably diminishes the risk of the GSEs depleting the capital commitment that they have from the US Treasury.

The Treasury's capital commitment to the GSEs has been the source that provides positive net worth to the two GSEs since their conservatorship. Our Aaa ratings on the GSEs are based on effective credit substitution with the US government. We believe this amendment confirms the connection between the GSEs and the US government because the most tangible form of GSE support, the Capital Agreement, will remain in place and will continue to provide for a significant call on capital from the US government for the foreseeable future.

Prior to this amendment, the GSEs were to have a fixed capital commitment from the US Treasury, and we believed those dividend payments would have depleted the limited capital commitment over about the next 10 years. Therefore, the US government needed to take some action to avoid depleting the capital commitment.

The amendment reduces dividends from the GSEs to the US Treasury to any positive net worth above a pre-determined nominal capital reserve.[2] More importantly, limiting dividends to the amount of earnings each GSE generates and eliminating the burden of the former high dividends ensures that each company will have sufficient contingent capital under its Capital Agreement with the US Treasury, a credit positive.

Based on our analysis, Fannie Mae and Freddie Mac are likely to return to operating profitability in the next few years, increasing the certainty that they each will have a significant amount of contingent capital from the US government available to them. By our estimates, they are each likely to receive more than $100 billion of capital from the US Treasury, and given that only operating losses would reduce this amount, we expect this capital to remain in place for the foreseeable future.

## What is Moody's Credit Outlook?

Published every Monday and Thursday morning, Moody's <u>Credit Outlook</u> informs our research clients of the credit implications of current events.

---

[1] This is the third amendment of the Senior Preferred Stock Purchase Agreement between the US Treasury and Fannie Mae and Freddie Mac. In each case, the amendment resulted in increased protections for bondholders.

[2] The capital reserve for each company in 2013 will be $3.0 billion and will decline by $600 million per year. That is, each of the GSE's capital reserve will be $3.0 billion in 2013, $2.4 billion in 2014, $1.8 billion in 2015, $1.2 billion in 2016, $600 million in 2017, and $0 in 2018 and beyond.

Case 1:13-cv-01053-RLW   Document 22-2   Filed 02/12/14   Page 29 of 72
Case 1:13-cv-01053-RLW   Document 24-16   Filed 12/17/13   Page 38 of 50

BANKING

MOODY'S INVESTORS SERVICE

Report Number: 144994

| Author | Production Associate |
|---|---|
| Brian Harris | David Dombrovskis |

© 2012 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

**CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. ("MIS") AND ITS AFFILIATES ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATIONS") MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.**

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Any publication into Australia of this document is by MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657, which holds Australian Financial Services License no. 336969. This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001.

Notwithstanding the foregoing, credit ratings assigned on and after October 1, 2010 by Moody's Japan K.K. ("MJKK") are MJKK's current opinions of the relative future credit risk of entities, credit commitments, or debt or debt-like securities. In such a case, "MIS" in the foregoing statements shall be deemed to be replaced with "MJKK". MJKK is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO.

This credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors. It would be dangerous for retail investors to make any investment decision based on this credit rating. If in doubt you should contact your financial or other professional adviser.



2     AUGUST 23, 2012                    ISSUER COMMENT: US TREASURY AMENDS FANNIE MAE'S AND FREDDIE MAC'S CAPITAL AGREEMENT, A CREDIT POSITIVE

FHFA 4052

Case 1:13-cv-01053-RLW   Document 24-16   Filed 12/17/13   Page 40 of 50



Federal Housing Finance Agency

Conservator's Report
on the Enterprises' Financial Performance

Second Quarter 2012

Case 1:13-cv-01053-RLW   Document 24-16   Filed 12/17/13   Page 31 of 50

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
Second Quarter 2012

# Contents

Executive Summary…………………………………………..………………….……   3

1.  Mortgage Markets and the Enterprises' Market Presence…………………   4

2.  Credit Quality of New Single-Family Business……………………….………   6

3.  Capital…………..…………………….…………….………….........……………..   9

4.  Single-Family Credit Guarantee Segment Results………..……………….…   11

5.  Investments and Capital Markets Segment Results…………………………..   14

6.  Loss Mitigation Activity..…………..………………………………..……..…..   16

7.  Comparison of Actual Results to Projections of the Enterprises' Financial
    Performance……………………………….………..…………….………….....   17

The purpose of this report is to provide an overview of key aspects of the financial condition of Fannie Mae and Freddie Mac (the Enterprises) during conservatorship. The data in this report are derived primarily from the Enterprises' SEC filings and other publicly available sources.  In some cases, FHFA adjusted the classification of certain data to provide comparability between the Enterprises.  In other cases, the Enterprises' reporting methodologies changed over time. Therefore, the data in this report may not exactly match published figures.

FHFA 4054

# Executive Summary

## Mortgage Markets and the Enterprises' Market Presence

Seventy-two percent of all mortgage originations in the first half of 2012 were due to refinance volume. Refinances surged during the first half of 2012, in response to a sustained period of record low mortgage rates, enhancements to the Home Affordable Refinance Program (HARP), and lender reaction to the 10 basis point guarantee fee increase in April 2012. As a result, combined Enterprise mortgage-backed securities (MBS) issuance share grew to 77 percent in the first half of 2012.

## Credit Quality of New Single-Family Business

The quality of new business remained high in the first half of 2012, as evidenced by average FICO credit scores around the 760 range. Both Enterprises have experienced an increase in new business with loan-to-value (LTV) ratios greater than 90 percent, due to refinance programs that support improving the housing market, including HARP.

## Capital

For the first time since the start of the conservatorships in the third quarter of 2008, both Enterprises ended the second quarter of 2012 with positive net worth. Also for the first time in conservatorship, the Single-Family Credit Guarantee segment generated income in the second quarter of 2012, as a result of substantially lower provisions for credit losses, particularly at Fannie Mae. The Investments segment results continued to be positive in the second quarter of 2012 driven by low funding costs as a result of the low interest rate environment.

## Single-Family Credit Guarantee Segment Results

In the first half of 2012, Fannie Mae generated credit-related income and Freddie Mac incurred substantially lower credit-related expenses, primarily due to substantially lower provisions for credit losses. Lower provisions for credit losses were driven by improvement in both national home prices and real estate owned (REO) disposition values, and the continued decrease in the seriously delinquent loan population.

## Investments and Capital Markets Segment Results

The Investments and Capital Markets segment was a positive contributor to capital in the first half of 2012, as both Enterprises continued to benefit from low funding costs as a result of the low interest rate environment.

## Loss Mitigation Activity

Since conservatorship, the Enterprises have completed approximately 2.4 million foreclosure prevention actions. Half of these actions were permanent loan modifications.

## Projections of Financial Performance

The projected combined Treasury draws for the second half of 2011 and the first half of 2012 ranged from $35 billion to $91 billion. This compares to an actual combined draw of $19 billion. The primary driver of the difference between actual and projected performance was lower than projected provisions for credit losses. Lower provisions for credit losses were mainly driven by improved portfolio quality reflected in lower delinquencies and lower LTV ratios, combined with higher REO disposition values.

3

Federal Housing Finance Agency

Conservator's Report on the<br>Enterprises' Financial Performance<br>Second Quarter 2012

## 1   Mortgage Markets and the Enterprises' Market Presence

### 1.1   Primary Mortgage Market Trends—Mortgage Originations

- Seventy-two percent of all mortgage originations in the first half of 2012 were due to refinance volume.  Refinance volumes surged during the first half of 2012 in response to a sustained period of record low mortgage rates, enhancements to the Home Affordable Refinance Program (HARP), and increased volume ahead of the 10 basis point guarantee fee increase in April 2012.

**Figure 1.1 Mortgage Originations by Product Type** *($ in billions)*



Source:
Inside Mortgage Finance

4

Federal Housing Finance Agency

### 1.2   Secondary Mortgage Market Trends—Mortgage-Backed Securities Issued

- The Enterprises' market share of mortgage-backed securities (MBS) issuances for the first half of 2012 rose to 77 percent, driven by increased MBS issuance volumes in the first quarter of 2012, as lenders delivered mortgage products ahead of the April 1, 2012 guarantee fee increase.  Ginnie Mae's market share fell to 23 percent.  The Enterprises and Ginnie Mae continued to account for essentially all issuances of mortgage-backed securities.

**Figure 1.2 Enterprises' Market Share – MBS Issuance Volume**



|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | YTD 2Q12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Enterprises | 67% | 68% | 70% | 47% | 41% | 40% | 58% | 73% | 72% | 70% | 73% | 77% |
| Ginnie Mae | 13% | 9% | 8% | 7% | 4% | 4% | 5% | 22% | 25% | 26% | 25% | 23% |
| Total Agency | 80% | 77% | 78% | 54% | 45% | 44% | 63% | 95% | 97% | 96% | 98% | 100% |

Sources:
Inside Mortgage Finance, Inside MBS & ABS, Enterprises' Monthly Volume Summaries.
Issuance figures exclude MBS issued backed by assets previously held in the Enterprises' portfolios.

## 2   Credit Quality of New Single-Family Business

### 2.1   Credit Characteristics of the Enterprises' New Single-Family Business

- The credit quality of new Single-Family business remained high in the first half of 2012; however, new business with LTV ratios greater than 90 percent increased due to refinance programs targeting deeply underwater borrowers.  The increase in the percentage of new business with LTV ratios greater than 90 percent primarily relates to the Enterprises' refinance programs, including HARP.  Purchases of non-traditional and higher-risk mortgages continue to be very low and the average FICO credit score remained around the 760 range at both Enterprises.

## Figure 2.1 Characteristics of Single-Family Mortgage Acquisitions

(Categories overlap and are not additive)

| Percent of New Single-Family Business[1] | Fannie Mae | | | | | | | Freddie Mac | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | YTD 2Q12 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | YTD 2Q12 |
| Alt-A[2] | 22% | 17% | 3% | 0% | 1% | 1% | 1% | 18% | 22% | 7% | 0% | 0% | 0% | 0% |
| Interest-Only | 15% | 15% | 6% | 1% | 1% | 1% | 0% | 17% | 21% | 6% | 0% | 0% | 0% | 0% |
| Credit Score <620 | 6% | 6% | 3% | 0% | 0% | 0% | 1% | 5% | 6% | 3% | 1% | 1% | 1% | 1% |
| LTV >90 Percent | 10% | 16% | 10% | 4% | 7% | 9% | 15% | 6% | 11% | 9% | 4% | 9% | 11% | 19% |
| Average LTV | 73% | 75% | 72% | 67% | 68% | 69% | 73% | 73% | 74% | 71% | 67% | 69% | 70% | 76% |
| Average Credit Score | 716 | 716 | 738 | 761 | 762 | 762 | 762 | 720 | 718 | 734 | 756 | 755 | 755 | 756 |

Notes
[1] New business is defined as issuance of MBS/PC plus purchases of whole loans and does not include purchases of mortgage-related securities.
[2] Refer to sources for Alt-A definitions. Freddie Mac's 2010 figures include Alt-A purchases of $1.5 billion due to a long-term standby commitment termination and a subsequent PC issuance. There was no change to the Alt-A exposure on these mortgages as a result of these transactions. Fannie Mae newly originated Alt-A loans acquired since 2009 consist of the refinancing of existing loans.

Sources:
Enterprises' Forms 10-K and 10-Q, credit supplements to SEC disclosures, and management reports.

| 2.2 | Performance of Non-Traditional and Higher-Risk Mortgages (mostly purchased pre-conservatorship) |
|---|---|

- Single-family serious delinquency rates remained high for the Enterprises' single-family credit guarantee portfolios; however, serious delinquency rates continued to decline for all product categories in the second quarter of 2012, as delinquent loans were resolved through loss mitigation activities or foreclosure, and new loans with stronger credit profiles were acquired.  Non-traditional and higher-risk mortgages, which account for a relatively small portion of the credit guarantee portfolios, continue to show substantially higher serious delinquency rates than traditional mortgages.

## Figure 2.2 Single-Family Serious Delinquency Rates

| | Fannie Mae | | | | | | Freddie Mac | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4Q07 | 4Q08 | 4Q09 | 4Q10 | 4Q11 | 2Q12 | 4Q07 | 4Q08 | 4Q09 | 4Q10 | 4Q11 | 2Q12 | [1] Loans with multiple product features may be in more than one category.  Refer to sources for Alt-A definition. |
| **Product Type**[1] | | | | | | | | | | | | | |
| Alt-A | 2.2% | 7.0% | 15.6% | 13.9% | 12.4% | 11.8% | 1.9% | 5.6% | 12.3% | 12.2% | 11.9% | 11.7% | |
| Interest-Only | 2.0% | 8.4% | 20.2% | 17.9% | 15.3% | 14.5% | 2.0% | 7.6% | 17.6% | 18.4% | 17.6% | 17.1% | |
| **Credit Score** | | | | | | | | | | | | | [2] Represents loan-to-value ratio at origination, which is generally based on original unpaid principal balance divided by the appraised value at the time of acquisition of the loan. |
| <620 | 4.7% | 9.0% | 18.2% | 14.6% | 13.5% | 12.2% | 3.4% | 7.8% | 14.9% | 13.9% | 12.9% | 12.5% | |
| **Loan-to-Value Ratio**[2] | | | | | | | | | | | | | |
| >90 Percent | 3.0% | 6.3% | 13.1% | 10.0% | 8.1% | 6.5% | 1.9% | 4.8% | 9.1% | 7.8% | 6.7% | 5.8% | |
| **Risk-Layering** | | | | | | | | | | | | | |
| Credit score <620 & LTV >90 Percent[2] | 8.6% | 16.0% | 28.0% | 21.4% | 18.7% | 15.8% | 5.4% | 11.5% | 19.0% | 17.1% | 15.4% | 13.9% | |
| **Total Single-Family** | 1.0% | 2.4% | 5.4% | 4.5% | 3.9% | 3.5% | 0.7% | 1.8% | 4.0% | 3.8% | 3.6% | 3.5% | |

Sources:
Enterprises' Forms 10-K and 10-Q, credit supplements to SEC disclosures, and management reports.

Serious Delinquency - All loans in the process of foreclosure plus loans that are three or more payments delinquent (including loans in the process of bankruptcy).

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
Second Quarter 2012

### 2.3 Performance of Post-Conservatorship Business

- While not necessarily indicative of the ultimate performance, the improved credit characteristics of the new post-conservatorship business is reflected in substantially lower cumulative default rates for the 2009 and newer vintages compared to the years leading up to conservatorship.

## Figure 2.3 Cumulative Default Rate by Origination Year



Notes
[1] Defaults include loan liquidations other than through voluntary pay-off or repurchase by lenders and include loan foreclosures, preforeclosure sales, sales to third parties and deeds-in-lieu of foreclosure. Cumulative Default Rate is the total number of single-family conventional loans in the guarantee book of business originated in the identified year that have defaulted, divided by the total number of single-family conventional loans in Fannie Mae's guarantee book of business originated in the identified year.

[2] Rates are calculated for each year of origination as the number of loans that have proceeded to foreclosure transfer or short sale and resulted in a credit loss, excluding any subsequent recoveries, divided by the number of loans in Freddie Mac's single-family credit guarantee portfolio originated in the identified year.

| Vintage | Fannie Mae[1] Yr1Q4 | Yr 2Q4 | | Vintage | Freddie Mac[2] Yr1Q4 | Yr2Q4 |
|---------|------|--------|---|---------|------|-------|
| 2002 | 0.4 | 9.5 | | 2002 | 0.3 | 7.7 |
| 2003 | 0.4 | 7.1 | | 2003 | 0.2 | 3.7 |
| 2004 | 0.7 | 11.6 | | 2004 | 0.4 | 5.2 |
| 2005 | 0.7 | 14.0 | | 2005 | 0.2 | 6.3 |
| 2006 | 1.3 | 37.4 | | 2006 | 0.6 | 25.2 |
| 2007 | 3.0 | 78.9 | | 2007 | 2.3 | 63.4 |
| 2008 | 2.2 | 37.1 | | 2008 | 2.1 | 36.4 |
| 2009 | 0.1 | 4.3 | | 2009 | 0.1 | 4.0 |
| 2010 | 0.2 | 5.6 | | 2010 | 0.1 | 5.4 |
| 2011 | 0.3 | NA | | 2011 | 0.2 | NA |

Source:
Enterprises' quarterly credit supplements.

8

## 3.  Capital

### 3.1    Capital Changes: January 1, 2008 – June 30, 2012

- At the end of 2007, the Enterprises had $71 billion of combined capital.  From the end of 2007 through the second quarter of 2012, the Enterprises' combined charges against capital have totaled $262 billion, requiring Treasury support of approximately $187 billion through draws under the Senior Preferred Stock Purchase Agreements.  The Single-Family Credit Guarantee segment has been the largest contributor to charges against capital, accounting for $213 billion, or 81 percent, of capital reduction to date.  Senior preferred dividends on Treasury draws accounted for $46 billion, or 17 percent, of capital reduction.

**Figure 3.1 Capital Changes: January 1, 2008 – June 30, 2012** *($ in billions)*

| | Fannie Mae | | Freddie Mac | | Combined | |
|---|---|---|---|---|---|---|
| Beginning Capital[1] | $44 | | $27 | | $71 | |
| Equity Issuance[2] | 7 | | 0 | | 7 | |
| Available Capital | $51 | | $27 | | $78 | |
| **Capital Change** | | | | | | |
| Single-Family Comprehensive Income (Loss)[3] | ($138) | 84% | ($75) | 77% | ($213) | 81% |
| Multifamily Comprehensive Income (Loss)[3,4] | (5) | 3% | 16 | -16% | 11 | -4% |
| Investments Comprehensive Income (Loss)[3,4] | 16 | -9% | (3) | 3% | 13 | -5% |
| Consolidation Accounting Adjustment | 3 | -2% | (12) | 12% | (8) | 3% |
| Other | (15) | 9% | (3) | 3% | (18) | 7% |
| Senior Preferred dividends | (26) | 16% | (20) | 21% | (46) | 17% |
| Total Capital Change[5] | ($165) | 100% | ($97) | 100% | ($262) | 100% |
| Capital surplus (deficit) | ($113) | | ($70) | | ($184) | |
| Treasury Senior Preferred draw | $116.1 | | $71.3 | | $187.5 | |

Notes
Totals may not sum due to rounding.
[1] Capital is defined as stockholders' equity.
[2] Fannie Mae's figure includes common and preferred stock issuance pre-conservatorship.
[3] Segment comprehensive income (loss) represents net income (loss) plus total other comprehensive income (loss) by segment.
[4] Freddie Mac includes net interest income on investments in multifamily loans, net interest income on commercial mortgage-backed securities, and non-interest rate risk-related unrealized gains (losses) on commercial mortgage-backed securities in Multifamily Comprehensive Income (Loss), while Fannie Mae includes these items in Investments comprehensive income.  Investments comprehensive income includes the impact of accounting changes for security impairments.
[5] Included in total capital change for both Enterprises are losses attributable to the writedown of low income housing tax credits (LIHTC) investments to zero in the fourth quarter of 2009.  The writedown of these LIHTC losses for Fannie Mae and Freddie Mac were $5 billion and $3 billion, respectively, and are included in Other.  The establishment of a deferred tax asset valuation allowance, which reduced capital by $21 billion for Fannie Mae and $14 billion for Freddie Mac in 2008, is also contributing to the total capital change (valuation allowance has been allocated across segments).

Sources:
Fannie Mae segment earnings per Fannie Mae SEC disclosures for the relevant time periods.
Freddie Mac's 2008 and 2009 comprehensive income (loss) by segment reflect revised methodology effective January 1, 2010.

Federal Housing Finance Agency

### 3.2   Capital Changes: Second Quarter 2012

- During the second quarter of 2012, positive contributions to capital at both Enterprises, particularly from the Single-Family Credit Guarantee and Investments segments, more than offset senior preferred dividends paid to the Treasury.  Both Enterprises ended the quarter with positive net worth, and as a result, neither Enterprise required a draw from the Treasury.

**Figure 3.2 Capital Changes: March 31, 2012 – June 30, 2012** *($ in billions)*

| | Fannie Mae | Freddie Mac | Combined |
|---|---|---|---|
| Available Capital[1] | $0 | $0 | $0 |
| **Capital Change** | | | |
| Single-Family Comprehensive Income (Loss)[2] | $4 | $0 | $5 |
| Multifamily Comprehensive Income (Loss)[2] | 0 | 0 | 1 |
| Investments Comprehensive Income (Loss)[2] | 2 | 2 | 4 |
| Other | (1) | (0) | (1) |
| Capital increase (decrease) pre-dividends | $5 | $3 | $8 |
| Senior Preferred dividends | (3) | (2) | (5) |
| Total Capital Change | $3 | $1 | $4 |
| Capital Surplus (Deficit) | $3 | $1 | $4 |
| Treasury Senior Preferred draw[3] | - | - | - |

Notes
  Totals may not sum due to rounding.
 [1] Capital is defined as stockholders' equity.  Available capital is defined as beginning capital plus Treasury draw related to prior quarter's deficit.
 [2] Represents net income (loss) plus total other comprehensive income (loss) by segment.  Freddie Mac includes net interest income on investments in multifamily loans, net interest income on commercial mortgage-backed securities, and non-interest rate risk-related unrealized gains (losses) on commercial mortgage-backed securities in Multifamily comprehensive income (loss), while Fannie Mae includes these items in Investments comprehensive income (loss).
 [3] Reflects requested Treasury draws related to current quarter deficit, to be received during the next quarter.  Enterprises' draw requests are rounded up to the nearest $1 million.

Sources:
Fannie Mae and Freddie Mac SEC disclosures for the quarter ended June 30, 2012.

Federal Housing Finance Agency

Conservator's Report on the<br>Enterprises' Financial Performance<br>Second Quarter 2012

## 4. Single-Family Credit Guarantee Segment Results

### 4.1 Single-Family Credit Guarantee Segment Results

- Both Enterprises reported a significant decrease in the provision for credit losses in the first half of 2012. Fannie Mae generated income from the Single-Family Credit Guarantee segment for the first half of 2012. Provisions for credit losses decreased at both Enterprises driven by improvements in national home prices and REO disposition values, and the continued decrease in the seriously delinquent loan population.

**Figure 4.1 Single-Family Credit Guarantee Segment Results** *($ in billions)*

| | Fannie Mae | | | | | | Freddie Mac | | | | | | Combined 2008 - 2Q12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | YTD 2Q12 | Total | 2008 | 2009 | 2010 | 2011 | YTD 2Q12 | Total | |
| Revenue[1] | $9 | $9 | $2 | $6 | $4 | $30 | $5 | $4 | $5 | $5 | $2 | $22 | $51 |
| (Provision) benefit for credit losses[2] | (26) | (50) | (25) | (26) | 1 | (126) | (16) | (29) | (19) | (12) | (3) | (79) | (205) |
| Foreclosed Property Expenses | (2) | (1) | (2) | (1) | (0) | (5) | (1) | (0) | (1) | (1) | (0) | (3) | (8) |
| Credit-related expenses | (28) | (51) | (26) | (27) | 1 | (131) | (17) | (29) | (19) | (13) | (3) | (82) | (213) |
| SOP 03-3 Losses[3] | (2) | (20) | (0) | (0) | (0) | (23) | (2) | (5) | (0) | (0) | (0) | (6) | (29) |
| Other expenses[4] | (2) | (3) | (2) | (3) | (1) | (11) | (1) | (1) | (2) | (2) | (1) | (7) | (18) |
| Pre-tax income (loss) | (22) | (65) | (27) | (24) | 3 | (135) | (15) | (31) | (17) | (10) | (1) | (74) | (209) |
| (Provision) benefit for taxes | (5) | 1 | 0 | 0 | 0 | (3) | (5) | 4 | 1 | (0) | (0) | (1) | (4) |
| Net income (loss) | ($27) | ($64) | ($27) | ($24) | $3 | ($138) | ($20) | ($27) | ($16) | ($10) | ($1) | ($75) | ($214) |
| Other Comprehensive Income | - | 0 | 0 | - | - | 0 | - | 0 | 0 | 0 | (0) | 0 | 0 |
| Comprehensive Income (Loss)[5] | ($27) | ($64) | ($27) | ($24) | $3 | ($138) | ($20) | ($27) | ($16) | ($10) | ($1) | ($75) | ($213) |

Sources:
Fannie Mae segment earnings per Fannie Mae SEC disclosures for the relevant time periods. Effective in the first quarter 2010, Fannie Mae changed the presentation of segment financial information; prior periods were not revised. Freddie Mac segment comprehensive income (loss) for 2008 and 2009 reflect revised methodology effective January 1, 2010. Enterprise segment comprehensive income (loss) since 2010 is not comparable with prior periods due to the adoption of accounting standards for consolidations, effective January 1, 2010.

Notes
Totals may not sum due to rounding.
[1] Consists of guarantee fee income, trust management income, net interest income, and other income. Guarantee fee revenue of $3.9 billion for Fannie Mae year-to-date was offset by net interest expense of $0.6 billion primarily related to interest income not recognized for non-accrual loans.
[2] The provision for credit losses is the recognition of estimated incurred losses and increases the loan loss reserve. Fannie Mae's figures have been adjusted to exclude losses on credit-impaired loans acquired from MBS trusts.
[3] Losses on credit-impaired loans acquired from MBS/PC Trusts.
[4] Consists of investment gains (losses), fair value losses (Fannie Mae), administrative expenses, other expenses, and at Freddie Mac, segment adjustments.
[5] Represents segment earnings (loss) and, for periods after 2008, total comprehensive income (loss), net of taxes, for the Single-Family Credit Guarantee segment.

11

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
Second Quarter 2012

## 4.2   Loan Loss Reserves

- Loan loss reserves decreased at both Enterprises during the second quarter of 2012, particularly at Fannie Mae, but remain high.  The decrease in loan loss reserves was driven by the decrease in the provision for credit losses, resulting in charge-offs exceeding the provision for credit losses at both Enterprises for the quarter.  Differences in the magnitude of loan loss reserves stemmed from differences in the size and credit quality of the Enterprises' single-family credit guarantee portfolios. Fannie Mae's single-family credit guarantee portfolio is larger than Freddie Mac's and has historically reflected higher serious delinquency rates.

**Figure 4.2 Loan Loss Reserves** *($ in billions)*

| | Fannie Mae | | | | | | Freddie Mac | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Single-Family Loss Reserve | 2008 | 2009 | 2010 | 2011 | YTD 2Q12 | Total | 2008 | 2009 | 2010 | 2011 | YTD 2Q12 | Total |
| Beginning balance[1] | $3 | $24 | $62 | $60 | $72 | | $3 | $15 | $33 | $39 | $39 | |
| Provision (benefit) for credit losses[2,3] | 26 | 50 | 25 | 26 | (1) | 126 | 16 | 29 | 19 | 12 | 3 | 79 |
| Charge-offs, net[3] | (5) | (13) | (21) | (18) | (8) | (65) | (2) | (7) | (13) | (12) | (6) | (40) |
| Adoption of Accounting Standards[1] | - | - | (11) | - | - | | - | - | (0) | - | - | |
| Other | 0 | 0 | 5 | 3 | 1 | | (1) | (4) | 0 | (1) | (0) | |
| Ending balance[1] | $24 | $62 | $60 | $72 | $63 | | $15 | $33 | $39 | $39 | $35 | |
| **Credit Losses - Single-Family** | | | | | | | | | | | | |
| Charge-offs[3] | $5 | $13 | $21 | $18 | $8 | $65 | $2 | $7 | $13 | $12 | $6 | $40 |
| Other[4] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 |
| Foreclosed Property Expense | 2 | 1 | 2 | 1 | 0 | 5 | 1 | 0 | 1 | 1 | 0 | 3 |
| Total[3] | $6 | $13 | $23 | $18 | $9 | $70 | $4 | $8 | $14 | $13 | $6 | $45 |

Notes
Totals may not sum due to rounding.
[1] Fannie Mae's loan loss reserve excludes amounts related to the allowance for accrued interest receivable and allowance for preforeclosure property taxes and insurance receivable.  Freddie Mac's loan loss reserve excludes amounts related to the allowance for accrued interest receivable and forgone interest on loans placed on non-accrual status.
[2] Freddie Mac's figures represent Segment Earnings provision for credit losses, which is generally higher than that recorded under GAAP, primarily due to recognized provision associated with forgone interest income on loans placed on non-accrual status, which is not recognized under GAAP.
[3] Fannie Mae's provision for credit losses has been adjusted to exclude losses on credit-impaired loans acquired from MBS trusts. Additionally, the effect of losses from credit-impaired loans acquired from MBS trusts on charge-offs  and foreclosed property expense has been reflected as an adjustment to total credit losses and charge-offs, net.
[4] Freddie Mac's figures include charge-offs related to certain loans purchased under financial guarantees.

Sources:
SEC disclosures for the relevant time periods.

FHFA 4064

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
Second Quarter 2012

## 4.3   Credit Losses

- Non-traditional and higher-risk mortgages concentrated in the 2006 and 2007 vintages, and mortgages originated in California, Florida, Arizona and Nevada continue to account for a disproportionate share of credit losses (charge-offs and foreclosed property expenses).  However, the proportion of losses coming from non-traditional products continued to decline in the second quarter of 2012 as these vintages aged.

**Figure 4.3 Credit Losses** *(Percent of total credit losses)*

| | Fannie Mae | | | | | | Freddie Mac | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | % of UPB as of Dec 31, 2008[1] | 2008 | 2009 | 2010 | 2011 | YTD 2Q12 | % of UPB as of Dec 31, 2008[1] | 2008 | 2009 | 2010 | 2011 | YTD 2Q12 |
| **by State** | | | | | | | | | | | | |
| California | 16% | 25% | 24% | 23% | 27% | 20% | 14% | 30% | 32% | 26% | 29% | 24% |
| Florida | 7% | 11% | 16% | 18% | 11% | 20% | 7% | 10% | 15% | 19% | 13% | 16% |
| Arizona | 3% | 8% | 11% | 10% | 12% | 7% | 3% | 9% | 11% | 11% | 11% | 8% |
| Nevada | 1% | 5% | 7% | 6% | 8% | 5% | 1% | 4% | 6% | 6% | 7% | 7% |
| **by Product[2]** | | | | | | | | | | | | |
| Alt-A | 11% | 46% | 40% | 33% | 27% | 25% | 10% | 50% | 44% | 37% | 28% | 24% |
| Interest-Only | 8% | 34% | 33% | 29% | 26% | 23% | 9% | 50% | 47% | 37% | 29% | 24% |
| **by Vintage** | | | | | | | | | | | | |
| 2006 | 14% | 35% | 31% | 29% | 28% | 26% | 15% | 41% | 35% | 30% | 28% | 26% |
| 2007 | 20% | 28% | 36% | 36% | 30% | 34% | 19% | 25% | 36% | 34% | 36% | 36% |
| 2008 | 16% | 1% | 5% | 7% | 6% | 8% | 15% | 0% | 5% | 7% | 8% | 9% |
| 2009 | N/A | N/A | 0% | 0% | 2% | 2% | N/A | N/A | 0% | 0% | 1% | 2% |
| 2010 | N/A | N/A | N/A | 0% | 1% | 1% | N/A | N/A | N/A | 0% | 0% | 1% |

Notes
[1] Represents each category's share of the respective Enterprise's single-family book of business, which is based on the unpaid principal balance of all single-family unsecuritized mortgages held by the Enterprises and those underlying Freddie Mac mortgage-related securities, or covered by the Enterprise's other guarantee commitments.
[2] Product categories overlap.

Sources:
Enterprises' Forms 10-K and 10-Q, credit supplements to SEC disclosures, and management reports.

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
Second Quarter 2012

## 5. Investments and Capital Markets Segment Results

### 5.1 Investments and Capital Markets Segment Results

- In the first half of 2012, the Investments and Capital Markets segment was a positive contributor to capital as both Enterprises continued to benefit from low funding costs as a result of the low interest rate environment. Gains and losses on derivatives and trading securities during the first half of 2012 were muted.

### Figure 5.1 Investments and Capital Markets Segment Results *($ in billions)*

| | Fannie Mae | | | | | | Freddie Mac | | | | | | Combined |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | YTD 2Q12 | Total | 2008 | 2009 | 2010 | 2011 | YTD 2Q12 | Total | 2008 - 2Q12 |
| Revenue[1] | $8 | $13 | $13 | $13 | $7 | $54 | $3 | $8 | $6 | $7 | $3 | $28 | $81 |
| Derivatives gains (losses) | (15) | (6) | (3) | (7) | (2) | (34) | (13) | 5 | (2) | (4) | 0 | (13) | (47) |
| Trading gains (losses) | (7) | 4 | 3 | 0 | 0 | 0 | 1 | 5 | (1) | (1) | (1) | 3 | 3 |
| Other gains (losses)[2] | 2 | 1 | 4 | 3 | 2 | 12 | 2 | (0) | 1 | 2 | 1 | 6 | 18 |
| Other-than-temporary impairments | (7) | (10) | (1) | (0) | (1) | (19) | (17) | (10) | (4) | (2) | (1) | (33) | (52) |
| Other expenses[3] | (1) | (1) | (0) | (1) | (0) | (2) | (2) | (1) | 1 | 0 | 0 | (1) | (3) |
| Pre-tax income (loss) | (21) | 1 | 16 | 9 | 6 | 11 | (26) | 7 | 1 | 3 | 4 | (11) | 0 |
| (Provision) benefit for taxes[4] | (9) | (0) | 0 | 0 | - | (9) | (2) | (1) | 0 | 0 | 0 | (2) | (11) |
| Net income (loss) | ($29) | $1 | $16 | $9 | $6 | $2 | ($28) | $6 | $1 | $3 | $4 | ($13) | ($11) |
| Unrealized gains (losses) on AFS[5] | (6) | 11 | 4 | 1 | 1 | 10 | (20) | 11 | 10 | 3 | 0 | 5 | 15 |
| Accounting change for Impairments | - | 3 | - | - | - | 3 | 0 | 5 | - | - | - | 5 | 8 |
| Total Comprehensive Income (Loss) | ($35) | $15 | $20 | $10 | $6 | $16 | ($48) | $23 | $11 | $6 | $4 | ($3) | $13 |

Notes
Totals may not sum due to rounding.
[1] Consists of guarantee fee expense, trust management income, net interest income, and other income.
[2] Figures consist of debt extinguishment losses, debt foreign exchange gains (losses), debt fair-value losses, investment gains (losses), and hedged mortgage assets gains, net.
[3] Consists of administrative expenses, other expenses, and at Freddie Mac, segment adjustments.
[4] Includes extraordinary losses /noncontrolling interest.
[5] Amount for 2008 includes consolidated changes in unrealized gains (losses) on available for sale securities, net of taxes. Effective April 2009, includes adjustments for other-than-temporary impairments, net of taxes, included in accumulated other comprehensive income due to a change in accounting standards for impairments. At Freddie Mac, amount also includes the change in unrealized gains (losses), net of taxes, related to cash flow hedge relationships.

Sources:
Fannie Mae segment earnings per Fannie Mae SEC disclosures for the relevant time periods. Effective in the first quarter 2010, Fannie Mae changed the presentation of segment financial information; prior periods were not revised. Freddie Mac segment comprehensive income (loss) for 2008 and 2009 reflect revised methodology effective January 1, 2010. Enterprise segment comprehensive income (loss) since 2010 is not comparable with prior periods due to the adoption of accounting standards for consolidations effective January 1, 2010.

Federal Housing Finance Agency

Conservator's Report on the<br>Enterprises' Financial Performance<br>Second Quarter 2012

## 5.2   Security Impairments

- Freddie Mac's non-agency portfolio is larger than Fannie Mae's, generally causing higher levels of security impairments. A substantial portion of both Enterprises' security impairments during the first half of 2012 was from 2006 and 2007 vintage subprime securities.

**Figure 5.2 Security Impairments** *($ in billions)*

**Fannie Mae**

| Vintage[1] | 2008 | | | 2009 | | | 2010 | | | 2011 | | | YTD 2Q12 | | | Total 2008-2Q12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | |
| Alt-A/Option | | | | | | | | | | | | | | | | |
| ARM Alt-A | $3.0 | $1.8 | $4.8 | $1.7 | $2.3 | $4.0 | $0.2 | $0.1 | $0.3 | $0.2 | $0.3 | $0.6 | $0.2 | $0.2 | $0.4 | $10.0 |
| Subprime | 1.9 | - | 1.9 | 5.6 | 0.1 | 5.7 | 0.4 | 0.0 | 0.4 | (0.3) | (0.0) | (0.3) | 0.3 | 0.0 | 0.3 | 8.0 |
| Other | 0.0 | 0.2 | 0.2 | 0.0 | 0.2 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.5 |
| Total[2] | $4.9 | $2.0 | $7.0 | $7.3 | $2.6 | $9.9 | $0.6 | $0.2 | $0.7 | ($0.1) | $0.4 | $0.3 | $0.5 | $0.2 | $0.7 | $18.5 |

**Freddie Mac**

| Vintage[1] | 2008 | | | 2009 | | | 2010 | | | 2011 | | | YTD 2Q12 | | | Total 2008-2Q12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | |
| Alt-A | $2.1 | $1.8 | $4.0 | $0.9 | $0.8 | $1.7 | $0.5 | $0.2 | $0.7 | $0.1 | $0.1 | $0.2 | $0.0 | $0.0 | $0.1 | $6.6 |
| Subprime | 3.4 | 0.2 | 3.6 | 6.4 | 0.1 | 6.5 | 1.7 | 0.0 | 1.8 | 1.3 | 0.0 | 1.3 | 0.5 | 0.0 | 0.5 | 13.7 |
| CMBS | - | - | - | 0.1 | 0.0 | 0.1 | 0.1 | 0.0 | 0.1 | 0.3 | 0.1 | 0.4 | 0.0 | 0.0 | 0.0 | 0.6 |
| Option ARM | 6.0 | 1.6 | 7.6 | 1.4 | 0.4 | 1.7 | 1.2 | 0.2 | 1.4 | 0.3 | 0.1 | 0.4 | 0.0 | 0.0 | 0.1 | 11.2 |
| Other | 1.1 | 0.4 | 1.4 | 0.8 | 0.1 | 0.9 | 0.3 | 0.1 | 0.3 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 2.7 |
| Total[2] | $12.6 | $4.0 | $16.6 | $9.6 | $1.5 | $11.0 | $3.8 | $0.5 | $4.3 | $2.0 | $0.3 | $2.3 | $0.6 | $0.1 | $0.7 | $34.8 |

Notes
Totals may not sum due to rounding.
[1] Vintage of private-label securities is based on security issue date.
[2] The adoption of an accounting standard for impairments in April 2009 required the Enterprises to begin recognizing only the credit portion of impairments in their statements of income and comprehensive income. This accounting standard did not require the Enterprises to revise previously recorded amounts in their statements of income and comprehensive income but did result in an equity increase of $5 billion and $3 billion for Freddie Mac and Fannie Mae, respectively, which is not reflected in Figure 5.2. For the full year of 2008 and a portion of 2009, amounts include both credit and non-credit-related security impairments.

Sources:
Fannie Mae and Freddie Mac management reports.

Federal Housing Finance Agency

Conservator's Report on the<br>
Enterprises' Financial Performance<br>
Second Quarter 2012

### 6. Loss Mitigation Activity

- The Enterprises have traditionally worked with delinquent borrowers to mitigate credit losses in situations where the borrower demonstrates the willingness and ability to cure the delinquency. Loss mitigation actions include home retention actions (loan modifications, repayment plans and forbearance plans), and home forfeiture actions (short sales and deeds-in-lieu).
- The Enterprises have completed approximately 2.4 million foreclosure prevention actions since the start of conservatorship in September 2008. Half of these actions have been permanent loan modifications.
- More information on the Enterprises' loss mitigation activities can be found in <u>FHFA's Second Quarter 2012 Foreclosure Prevention Report</u>.

**Figure 6 Enterprises' Completed Foreclosure Prevention Actions**

| | Full Year 2009 | Full Year 2010 | Full Year 2011 | YTD Jun-12 | Conservatorship to Date[1] |
|---|---|---|---|---|---|
| **Home Retention Actions** | | | | | |
| Repayment Plans | 142,360 | 185,954 | 181,558 | 80,979 | 604,160 |
| Forbearance Plans | 25,227 | 63,024 | 34,423 | 11,600 | 136,390 |
| Charge-offs-in-lieu | 2,247 | 3,118 | 2,263 | 849 | 8,750 |
| HomeSaver Advance *(Fannie)* | 39,199 | 5,191 | - | - | 70,178 |
| Loan Modifications | 163,647 | 575,022 | 322,108 | 110,822 | 1,195,376 |
| **Total** | **372,680** | **832,309** | **540,352** | **204,250** | **2,014,854** |
| **Nonforeclosure - Home Forfeiture Actions** | | | | | |
| Short Sales | 55,447 | 107,953 | 115,237 | 62,962 | 347,791 |
| Deeds-in-lieu | 2,971 | 6,043 | 10,231 | 7,894 | 27,679 |
| **Total** | **58,418** | **113,996** | **125,468** | **70,856** | **375,470** |
| **Total Foreclosure Prevention Actions** | **431,098** | **946,305** | **665,820** | **275,106** | **2,390,324** |

[1] Since the first full quarter in conservatorship (4Q08).

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
Second Quarter 2012

## 7. Comparison of Actual Results to Projections of the Enterprises' Financial Performance

### 7.1 Comparison of Actual Results to Projections of the Enterprises' Financial Performance

- FHFA published updated projections of the Enterprises' financial performance in October 2011. The purpose and approach of these projections can be found in FHFA's Projections of the Enterprises' Financial Performance, October 2011.
- October 2011 projections are not expected outcomes, but rather modeled projections in response to "what if" exercises based on assumptions about Enterprise operations, financial market conditions, and house prices.
- The combined projected Treasury draws for the Enterprises for the second half of 2011 and the first half of 2012 ranged from $35 billion to $91 billion. The actual combined Treasury draw for the second half of 2011 and the first half of 2012 was $19 billion.
- The primary driver of the difference was lower than projected credit-related expenses, mostly due to a substantially lower provision for credit losses. The main drivers of lower provisions for credit losses were improved portfolio quality reflected in lower delinquencies and lower LTV ratios, coupled with higher REO disposition values.

**Figure 7.1 Actual versus Projected Treasury Draws through 2Q12 *($ in billions)***

| | Cumulative Treasury Draw | Projected Draw through 2Q12 Scenario 1 | | Projected Draw through 2Q12 Scenario 2 | | Projected Draw through 2Q12 Scenario 3 | | Actual Draw through 2Q12 | |
|---|---|---|---|---|---|---|---|---|---|
| | As of 6/30/2011 | Additional Draw | Cumulative Draw as of 6/30/2012 | Additional Draw | Cumulative Draw as of 6/30/2012 | Additional Draw | Cumulative Draw as of 6/30/2012 | Additional Draw | Cumulative Draw as of 6/30/2012 |
| Fannie Mae | $103.8 | $26 | $130 | $31 | $135 | $67 | $171 | $12.4 | $116.1 |
| Freddie Mac | 65.2 | 9 | 75 | 10 | 76 | 24 | 89 | 6.2 | 71.3 |
| Total | $169.0 | $35 | $204 | $41 | $210 | $91 | $260 | $18.5 | $187.5 |

Numbers may not foot due to rounding.

17

| 7.2 | Impact of Actual Results on Future Projections of the Enterprises' Financial Performance |
|---|---|

- Mortgage defaults pushed out to later periods could reduce projected losses if home prices improve or increase projected losses if home prices worsen.
- The Enterprises' future financial performance is heavily dependent on the performance of the U.S. housing market. Trends observed in the second half of 2011 and the first half of 2012 should not be used to extrapolate future projections.





*Agency Financial Report*

DEPARTMENT OF THE TREASURY
FISCAL YEAR 2012

November 15, 2012

i

As of September 30, 2012 and 2011, the Department had committed up to $45.6 billion for these programs.  For fiscal year 2012 and 2011, payments made from the Housing Programs under TARP totaled $3.1 billion and $1.9 billion, respectively.

# 8. INVESTMENTS IN GOVERNMENT SPONSORED ENTERPRISES

Congress established Fannie Mae and Freddie Mac as GSEs to support the supply of mortgage loans.  A key function of the GSEs is to package purchased mortgages into securities, which are subsequently sold to investors.

Leading up to the financial crisis, increasingly difficult conditions in the housing market challenged the soundness and profitability of the GSEs, thereby undermining the entire housing market.  This led Congress to pass the Housing and Economic Recovery Act (HERA) (P.L. 110-289).  This Act created the new FHFA, with enhanced regulatory authority over the GSEs, and provided the Secretary with certain authorities intended to ensure the financial stability of the GSEs, if necessary.  On September 7, 2008, FHFA placed the GSEs under conservatorship, and the Department entered into a Senior Preferred Stock Purchase Agreement (SPSPA) with each GSE.  These actions were taken to preserve the GSEs' assets, ensure a sound and solvent financial condition, and mitigate systemic risks that contributed to current market instability.  The SPSPAs were amended in August 2012 (the amended SPSPAs) which changed, among other things, the basis by which quarterly dividends are paid by the GSEs to the U.S. Government.  The dividend change in the amended SPSPAs is effective commencing with the quarter ending March 31, 2013.

The actions taken by the Department thus far are temporary, as defined by section 1117 of HERA, and are intended to provide financial stability.  The purpose of the Department's actions is to maintain the solvency of the GSEs so they can continue to fulfill their vital roles in the home mortgage market while the Administration and Congress determine what structural changes should be made.  The FHFA director may terminate the conservatorship if safe and solvent conditions can be established.  Draws under the SPSPAs are designed to ensure that the GSEs maintain positive net worth as a result of any net losses from operations, and also meet taxpayer dividend requirements under the SPSPAs.  The SPSPAs were structured to ensure any draws result in an increased nominal investment as further discussed below.

Under the SPSPAs, the Department initially received from each GSE:  *(i)* 1,000,000 shares of non-voting variable liquidation preference senior preferred stock with a liquidation preference value of $1,000 per share, and *(ii)* a non-transferrable warrant for the purchase, at a nominal cost, of 79.9 percent of common stock on a fully-diluted basis.  The warrants expire on September 7, 2028.  Through December 31, 2012, the senior preferred stock accrues dividends at 10.0 percent per year, payable quarterly.  Under the amended SPSPAs, the quarterly dividend payment will change from a 10.0 percent per annum fixed rate dividend to an amount equivalent to the GSE's positive net worth above a capital reserve amount.  The capital reserve amount is initially set at $3.0 billion for calendar year 2013, and declines by $600 million at the beginning of each calendar year thereafter until it reaches zero by calendar year 2018.  The GSEs will not pay a quarterly dividend if their positive net worth is not above the required capital reserve threshold; in such cases, the Department may be required to provide funding pursuant to the amended SPSPAs.

Cash dividends of $18.4 billion and $15.6 billion were received during fiscal years ended September 30, 2012 and 2011, respectively.  In addition, beginning in fiscal year 2011, the GSEs were scheduled to begin paying the Department a "Periodic Commitment Fee" (PCF) on a quarterly basis, payable in cash or via an increase to the liquidation preference. This fee may be waived by the Department for up to one year at a time if warranted by adverse mortgage market conditions.  The Department waived the PCF payments for calendar years 2012 and 2011 given that the imposition of the PCF at that time would not fulfill its intended purpose of generating increased compensation to the American taxpayer. Commencing January 1, 2013, the PCF will no longer be required pursuant to the amended SPSPAs.

The SPSPAs, which have no expiration date, provide for the Department to disburse funds to the GSEs if, at the end of any quarter, the FHFA determines that the liabilities of either GSE exceed its assets. The maximum amount available to each GSE under this agreement was originally $100.0 billion in fiscal year 2008, raised to $200.0 billion in fiscal year 2009, and replaced in fiscal year 2010 with a formulaic cap. This formulaic cap allows for continued draws for a three-year period ending December 2012 at amounts that will automatically adjust upwards quarterly by the cumulative amount of any net deficits realized by either GSE and downward by the GSE's positive net worth, if any, as of December 31, 2012, but not below $200.0 billion, and will become fixed at the end of the three-year period. At the conclusion of this period, the remaining commitment will then be fully available to be drawn per the terms of the agreements (referred to hereafter as the "Adjusted Caps"). Draws against the funding commitment of the SPSPAs do not result in the issuance of additional shares of senior preferred stock; instead, the liquidation preference of the initial 1,000,000 shares is increased by the amount of the draw.

Actual payments to the GSEs for fiscal years ended September 30, 2012 and 2011 were $18.5 billion and $20.8 billion, respectively. Additionally, $9.0 billion and $316.2 billion were accrued as a contingent liability as of September 30, 2012 and 2011, respectively. This accrued contingent liability is based on the projected future draws under the SPSPAs. It is undiscounted and does not take into account any of the offsetting dividends which may be received, as the dividends are owed directly to the General Fund.

### ACCOUNTING TREATMENT

*Entity Transactions* − The estimated contingent liability to the GSEs accrued pursuant to the SPSPAs is funded through the Department's direct appropriations. Therefore, they are reflected at their gross amount as "entity" costs on the Department's Consolidated Statements of Net Cost and in the line item, "Cumulative Results of Operations" on the Department's Consolidated Balance Sheets, without considering the increase in senior preferred stock liquidation preference/fair value adjustments, future dividend receipts from the GSEs, or any PCFs.

*Non-Entity Transactions* − As actual payments are made to the GSEs, they result in increases to the U.S. Government's liquidation preference in the GSEs' senior preferred stock, and thus represent General Fund exchange revenue reported on the Department's Consolidated Statements of Net Cost as "GSEs Non-Entity Cost (Revenue)." The associated valuation losses and dividends are General Fund-related costs and revenues that are likewise reported as "GSEs Non-Entity Cost (Revenue)."

### INVESTMENTS IN GSEs

As of September 30, 2012 and 2011, the Department's investments in the GSEs consisted of the following (in millions):

| GSEs Investments | Gross Investments As of 9/30/12 | Cumulative Valuation Loss | 9/30/12 Fair Value |
|---|---|---|---|
| Fannie Mae Senior Preferred Stock | $ 116,989 | $ (51,331) | $ 65,658 |
| Freddie Mac Senior Preferred Stock | 72,160 | (30,224) | 41,936 |
| Fannie Mae Warrants Common Stock | 3,104 | (1,956) | 1,148 |
| Freddie Mac Warrants Common Stock | 2,264 | (1,664) | 600 |
| **Total GSEs Investments** | **$ 194,517** | **$ (85,175)** | **$ 109,342** |

| GSEs Investments | Gross Investments As of 9/30/11 | | Cumulative Valuation Loss | | 9/30/11 Fair Value | |
|---|---|---|---|---|---|---|
| Fannie Mae Senior Preferred Stock | $ | 104,627 | $ | (26,718) | $ | 77,909 |
| Freddie Mac Senior Preferred Stock | | 66,004 | | (12,380) | | 53,624 |
| Fannie Mae Warrants Common Stock | | 3,104 | | (2,137) | | 967 |
| Freddie Mac Warrants Common Stock | | 2,264 | | (1,721) | | 543 |
| **Total GSEs Investments** | $ | 175,999 | $ | (42,956) | $ | 133,043 |

### SENIOR PREFERRED STOCK AND WARRANTS FOR COMMON STOCK

In determining the fair value of the senior preferred stock and warrants for common stock, the Department relied on the GSEs' public filings and press releases concerning its financial statements, projection forecasts, monthly summaries, quarterly credit supplements, independent research regarding high-yield bond and preferred stock trading, independent research regarding the GSEs' common stock trading, discussions with the GSE's management, and other information pertinent to the fair valuations. Because of the nature of the instruments, which are not publicly traded and for which there is no comparable trading information available, the fair valuations rely on significant unobservable inputs that reflect assumptions about the expectations that market participants would use in pricing.

The fair value of the senior preferred stock considers the amount of forecasted dividend payments. The fair valuations assume that a hypothetical buyer would acquire the discounted dividend stream as of the transaction date. The significant decline in the fair value of the senior preferred stock at September 30, 2012 compared to 2011 is primarily due to a decrease in expected dividend payments and an increase in the discount rate used in the current year's valuation to reflect more of the variable nature of the future cash flows anticipated as a result of the amended SPSPAs compared to the prior fiscal year.

The fair value of the warrants are impacted by the nominal exercise price and the large number of potential exercise shares, the market trading of the common stock that underlies the warrants as of September 30, the principal market, and the market participants. Other discounting factors are the holding period risk related directly to the amount of time that it will take to sell the exercised shares without depressing market and the other activity under the SPSPA.

### CONTINGENT LIABILITIES TO GSES

As part of the fair valuation exercise, the Department prepared a series of long-range forecasts through 2025 to determine what the implied amount of the total contingent liability to the GSEs under the SPSPAs would be as of September 30. Since future payments under the SPSPAs are deemed to be probable, the Department estimated a contingent liability of $9.0 billion as of September 30, 2012. This estimate reflects the projected equity deficits of the GSEs stemming from credit losses and contractual dividend requirements until December 31, 2012. The estimated contingent liability as of September 30, 2012 included several case scenarios which resulted in total SPSPA estimates ranging from $3.5 billion (based on an "optimistic" case scenario) to $22.4 billion (based on an "extreme" case scenario). The $9.0 billion contingent liability reported as of September 30, 2012 reflects the Department's best estimate. This compares to the $316.2 billion contingent liability reported as of September 30, 2011 which was based on a range of $309.6 billion to $376.1 billion. At September 30, 2012, the maximum remaining potential commitment to the GSEs for the remaining life of the SPSPAs under the Adjusted Caps was estimated at $282.3 billion, which was based upon case scenario estimates ranging from $274.0 billion to $291.5 billion. The recorded contingent liability of $316.2 billion at September 30, 2011 constituted the maximum commitment payable under the Adjusted Caps, minus actual payments made through the end of that fiscal year. Such accruals are adjusted as new information develops or circumstances change.

Based on the annual valuation of the Department's estimated future contingent liability, the Department reduced its estimated liability by $288.7 billion and $22.9 billion at the end of fiscal years 2012 and 2011, respectively, via a reduction in expense. The significant reduction in this estimated liability at September 30, 2012 compared to 2011 is primarily due to a forecasted reduction in the amount of future draws needed by the GSEs which, in part, reflects lower quarterly dividend payments anticipated as a result of the amended provisions of the SPSPAs. The Department reported this expense reduction as a reduction to entity costs within the Economic Program section of the Department's Consolidated Statements of Net Cost.

In determining the contingent liability estimates, the Department relied on the GSEs' public filings and press releases concerning its audited and unaudited financial statements, monthly summaries, quarterly credit supplements, September 2012 forecast for the years 2012 through 2015 (as provided by FHFA), and discussions with the GSEs' forecasting team and FHFA. The forecasted draws under the SPSPAs after December 31, 2015 were based on general guidance provided by the GSE managers as to the key assumptions that were used for subsequent periods. Absent longer-term financial forecasts from the GSEs and FHFA, the forecasts after 2015 generally assume similar operating assumptions on the guarantee business and assume a gradual wind-down of the retained portfolios (and corresponding net interest income) through 2025, as directed under the amended SPSPAs for each GSE to reduce the maximum balance of its retained mortgage portfolio by 15.0 percent per annum beginning December 31, 2013 (a change from the 10.0 percent per annum prior to the amended SPSPAs). The maximum balance of the GSEs' retained mortgage portfolio is initially set at $650 billion as of December 31, 2012, and is required under the amended SPSPAs to be reduced to $250.0 billion by December 31, 2018. The Department also relied upon economic and demographic data from the 2012 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds and the FHFA's House Price Index.

As of September 30, 2012 and 2011, the summarized unaudited aggregated financial condition of the GSEs was as follows (in millions):

|  | | 2012 | | 2011 |
|---|---|---|---|---|
| Combined Assets | | | | |
| Investment Securities | $ | **338,974** | $ | 422,741 |
| Mortgage Loans | | **4,641,231** | | 4,715,057 |
| Other | | **262,548** | | 248,415 |
| Total Combined Assets | | **5,242,753** | | 5,386,213 |
| Combined Liabilities | | | | |
| Long-Term Debt | | **4,963,297** | | 4,974,759 |
| Other | | **272,137** | | 425,236 |
| Total Combined Liabilities | | **5,235,434** | | 5,399,995 |
| Combined Net Equity (Deficit) | $ | **7,319** | $ | (13,782) |
| **For the Nine Months Ended September 30** | | | | |
| Combined Net Interest Income | $ | **29,097** | $ | 28,832 |
| Combined Provisions for Loan Losses | | **(3,628)** | | (28,672) |
| Combined Net Interest Income After Provision for Loan Losses | $ | **25,469** | $ | 160 |
| Combined Regulatory Capital - Minimum Capital Deficit as of September 30 | $ | **(231,949)** | $ | (231,531) |

*Excludes financial guarantees not consolidated on GSE balance sheets.*

The above information was taken directly from the quarterly reports filed with the SEC, which are publicly available on the SEC's website (www.SEC.gov) and also the GSE investor relations websites.

Both GSEs reported significantly lower early delinquencies on additions to their credit books on loans originated after 2008. This favorable early delinquency experience is an improvement compared with the loans originated in 2005

through 2008.  Incremental draws under the SPSPAs through December 31, 2012 are projected in order to meet the 10.0 percent per annum dividend payment requirement.  Under the amended SPSPAs, both GSEs may require additional draws should they report a net deficit in any quarter commencing with the quarter ending March 31, 2013.

Under the amended SPSPAs, the Department's forecasts indicate that each GSE will not fully utilize the amount of funding available under the Adjusted Cap.  The Department's forecasts of future liquidity payments may differ from actual experience.  Future actual liquidity payment levels will depend on numerous factors that are difficult to predict, including, but not limited to, changes in government policy with respect to the GSEs, the business cycle, inflation, home prices, unemployment rates, interest rates, changes in housing preferences, home financing alternatives, availability of debt financing, market rates of guarantee fees, outcomes of loan refinancings and modifications, new housing programs, and other applicable factors.

## GSEs NON-ENTITY COST (REVENUE)

For the fiscal years ended September 30, 2012 and 2011, GSEs Non-Entity Cost (Revenue) consisted of the following (in millions):

| Summary of GSEs Non-Entity Cost (Revenue) | | 2012 | | 2011 |
|---|---|---|---|---|
| General Fund Revenue from Increase in Liquidity Preference of GSEs Preferred Stock | $ | **(18,519)** | $ | (20,766) |
| Fair Value (Gain)/Loss on GSEs Warrants/Preferred Stock | | **42,220** | | (3,061) |
| GSEs Preferred Stock Dividends | | **(18,379)** | | (15,588) |
| **Total GSEs Non-Entity Cost (Revenue)** | $ | **5,322** | $ | (39,415) |

## REGULATORY ENVIRONMENT

Pursuant to a provision within the Dodd Frank Act, the Secretary conducted a study and developed recommendations regarding the options for ending the conservatorship.  In February 2011, the President delivered to Congress a report from the Secretary that provided recommendations regarding the options for ending the conservatorship and plans to wind down the GSEs.  To date, Congress has not approved a plan to address the future of the GSEs, thus the GSEs continue to operate under the direction of their conservator, the FHFA, who's stated planned objectives are to build a revitalized infrastructure for the secondary mortgage market and a continued gradual contraction of the GSEs presence in the secondary mortgage market.

In December 2011, Congress passed the Temporary Payroll Tax Cut Continuation Act of 2011 (TPTCCA), which was funded by an increase of ten basis points in the GSEs' guarantee fees beginning April 1, 2012, and is effective through October 1, 2021.  The increased fees are to be remitted to the Department and not retained by the GSEs.  On September 28, 2012, the GSEs remitted to the Department an amount of $35 million as the first payment of these increased fees covering the period of April 1, 2012 through June 30, 2012.  This increase in guarantee fees did not affect the profitability of the GSEs during that time period.



# CREDIT FOCUS

# Fannie Mae and Freddie Mac: Government Support Underpins Aaa Ratings

## RATINGS

**Fannie Mae**

| BFSR | E+ | Stable |
|---|---|---|
| Issuer rating | Aaa | Negative |
| Senior unsecured | Aaa | Negative |
| Subordinate | Aa2 | Negative |
| Pref. stock | Ca (hyb) | Stable |
| Pref. stock non-cumulative | Ca (hyb) | Stable |
| Other short term | Prime-1 | |

**Freddie Mac**

| BFSR | E+ | Stable |
|---|---|---|
| Issuer rating | Aaa | Negative |
| Senior unsecured | Aaa | Negative |
| Subordinate | Aa2 | Negative |
| Pref. stock | Ca (hyb) | Stable |
| Pref. stock non-cumulative | Ca (hyb) | Stable |
| Other short term | Prime-1 | |

## KEY INDICATORS

**Fannie Mae**

| | YTD Sept. 30 2012 | Dec 31 2011 |
|---|---|---|
| ROAA | 0.40% | -0.52% |
| Serious delinquency rate | 3.41% | 3.91% |
| Net income (millions) | $9,650 | $(16,855) |
| Total assets (billions) | $3,226 | $3,211 |

*Source: Company reports*

**Freddie Mac**

| | YTD Sept. 30 2012 | Dec 31 2011 |
|---|---|---|
| ROAA | 0.42% | -0.24% |
| Serious delinquency rate | 3.37% | 3.58% |
| Net income (millions) | $6,525 | $(5,266) |
| Total assets (billions) | $2,017 | $2,147 |

*Source: Company reports*

## Analyst Contacts:

NEW YORK          +1.212.553.1653

Brian L. Harris          +1.212.553.4705
*Senior Vice President*
brian.harris@moodys.com

> >contacts continued on the last page

## Summary

**Despite a lack of an explicit (formal) guarantee there is very strong government support underpinning the Aaa senior ratings of <u>Fannie Mae</u> and <u>Freddie Mac.</u>** We believe that the US government will stand behind obligations of the two largest government-sponsored enterprises (GSEs), leaving their bondholders as protected as creditors of the US government itself (effective credit substitution). Accordingly, the senior ratings are aligned with the Aaa <u>US government</u> rating. The negative outlook on the debt ratings of Fannie Mae and Freddie Mac are also aligned with the US government rating outlook.

**Our support assumptions reflect the critical importance of Fannie Mae and Freddie Mac to the US mortgage market**. Both GSEs combined owned or guaranteed 79% of the estimated $1.2 trillion of US residential mortgages originated during the first nine months of 2012. This share demonstrates their role in anchoring this very large market, particularly in periods of prolonged uncertainty. To fulfill their role, the GSEs depend on government support.

**The amended Senior Preferred Stock Agreement (Capital Agreement) allows the two GSEs to maintain operations**. In August 2012, the US Treasury amended its agreement with Fannie Mae and Freddie Mac, reducing the dividends the GSEs must pay on preferred stock held by the Treasury. The amendment eliminates the previously-high risk that the committed capital support for both GSEs could prove insufficient, and it also confirmed our support expectations.

**Reform debate adds uncertainty, but we believe existing creditors will remain supported**. Given the wide range of proposals and a general lack of progress on reforming the GSEs, their future size and structure is uncertain, but under any plausible scenario, government support for existing creditors will remain strong. A key barrier to an abrupt removal of support is the widely-shared political commitment to provide stability to the US mortgage market and promote access to mortgage credit. Furthermore, the cost of supporting the GSEs is relatively modest compared with the economic cost of a disorderly exit from the housing market by these companies. Even if the government was to reduce its support in the future, we would expect it to protect existing creditors (grandfathering). For example, earlier in 1996, Congress passed legislation splitting Sallie Mae into two entities: a GSE and a non-GSE. Sallie Mae, the GSE was to be wound down by September 2006. The legislation enacted included government oversight of the wind-down and ultimately all creditors were fully paid.

## Strong government support underpins the Aaa ratings of Fannie Mae and Freddie Mac

The two housing GSEs' Aaa senior unsecured ratings reflect our view that bondholders benefit from effective credit substitution with the US government. That is, senior creditors of Fannie Mae or Freddie Mac face similar risks as creditors of the US government. The Aa2 subordinated debt ratings of the two GSEs are also based on very high government support assumptions. We believe current bondholders will be protected from losses, irrespective of the outcome of housing GSE reform, including a possible winding-down of these entities.

Our support assumptions are based mainly on the following factors:

» The role of the GSEs in providing an anchor and backstop for the US mortgage market, given the painful economic impact of a disruption in this market.

» The importance of implicit government support for the US model of GSEs, under which privately-owned institutions contribute to public policy goals by accessing market funds at very low cost.

» The limited cost to the government of supporting Fannie Mae and Freddie Mac relative to the adverse effects of not doing so.

» The long demonstrated history of support (see Appendix 2) for GSEs including the $187[1] billion of capital provided to the companies through the 3rd quarter of 2012, as well as the $275 billion of additional capital that the US Treasury committed to provide the GSEs.

» Sallie Mae is the one example in which a GSE has been wound down (see page 9). The resolution of Sallie Mae included legislation, oversight by the US government and protections for creditors. Ultimately all bondholders were paid in full and on time. Of course, the US government could choose to wind-down Fannie Mae and Freddie Mac without protecting bondholders. However, the economic consequences of that would be much more significant than the consequences of not supporting Sallie Mae's bondholders.

### Housing GSEs play important role for US mortgage market

U.S. Congress chartered Fannie Mae in 1938 and Freddie Mac in 1970 to provide stability and on-going assistance to the secondary market for residential mortgages, and to promote access to mortgage credit and home ownership. The two GSEs pursue their public policy mission by purchasing single- and multi-family residential mortgages from lenders in the primary mortgage market, as well as by guaranteeing the timely payment of principal and interest on mortgage-related securities.

Both GSEs combined owned or guaranteed 79% of the total $1.2 trillion of US residential mortgages issued during 2012 (Exhibit 1 below). The sheer size of the two GSEs also underpins their systemic importance, with Fannie Mae reporting total on-balance sheet assets of $3.2 trillion, while Freddie Mac reported $2.0 trillion.

---

[1]  The US Treasury has provided $116 billion of capital to Fannie Mae and $71 billion to Freddie Mac through the third quarter of 2012. In addition, the US Treasury is committed to provide an additional $125 billion of capital to Fannie Mae and $149 billion of capital to Freddie Mac. The US Treasury amounts will be reduced by any positive net worth as of year-end 2012.

FHFA 4078



EXHIBIT 1
**Fannie Mae and Freddie Mac Mortgage Origination Market Share**



*Source:  Company reports, Mortgage Bankers Association*

The GSEs' current share of the total mortgage market is far above the 40%-50% range typical before the period of prolonged financial turmoil accelerated in 2008. The recent increase indicates that Fannie Mae and Freddie Mac perform an important role as anchors and backstop of the US mortgage market, particularly in times of elevated uncertainty.

As long as the housing GSEs' market share remains substantial, the US government has little choice but to support the housing GSEs and by extension current bondholders, as needed. Not doing so would almost certainly lead to market volatility and higher costs for US residential mortgages, which would likely have a profound negative impact on housing prices, and therefore household wealth and the broader economy.

## Failure to support Fannie Mae and Freddie Mac would adversely affect other GSEs

Even if the size and importance of Fannie Mae and Freddie Mac declines over time (a plausible, if difficult scenario, as discussed below), government support would still be very strong, in our view. The reason is that a failure to support Fannie Mae and Freddie Mac would adversely affect the ability to obtain low-cost funding of other GSEs, for example the Federal Home Loan Banks and Federal Farm Credit Banks.

In the US, institutions that are neither wholly government-owned nor explicitly-guaranteed, i.e. GSEs, contribute to public-policy objectives like supporting the housing, agriculture, and banking sectors. The viability of this model depends on the ability of these institutions to access low-cost market funds, which would be imperiled, were the government to not support even a smaller Fannie Mae and/or Freddie Mac, if needed.

## Fannie Mae's and Freddie Mac's support needs are manageable for government

The US government has not only strong willingness, but also the ability to support the housing GSEs. As of September 30, 2012, the US Treasury injected $116.1 billion of capital into Fannie Mae and $71.3 billion into Freddie Mac (with additional capital committed if needed, as discussed below). These amounts are substantial in absolute terms, but manageable in comparison to the approximate US government expenditures of $3.5 trillion in 2012. The cost of support is also far lower than the likely adverse economic effects of a failure to support, in our view.

FHFA 4079

We believe the cost of supporting the GSEs is unlikely to increase materially going forward, since we expect the housing GSEs will be profitable on a long-term, sustainable basis and thus not require additional capital (provided, US housing prices do not fall materially lower). They have also re-gained low-cost, stable access to market funds.

## Amended Capital Agreement protects GSE creditors

Consistent with our support expectations, the US government has provided substantial capital and other assistance to both Fannie Mae and Freddie Mac since 2008. In September 2008, their regulator, the Federal Housing Finance Authority (FHFA), placed both firms into conservatorship. At the time, both faced a depletion of their capital from outsized losses on their mortgage exposures, given the US housing market downturn and subprime crisis.

The US Treasury's commitment to prevent a negative net worth of the housing GSEs by covering their capital shortfall prevented their insolvency, thereby protecting creditors. The capital agreement was amended three times subsequently, each time to the benefit of bondholders[2].

The US Treasury also supported the GSEs by establishing a secured lending facility as a liquidity back-stop, shortly after placing Fannie Mae and Freddie Mac into conservatorship. The facility expired unused at year-end 2009. In addition, the GSEs are benefiting from the Federal Reserve's quantitative easing.  The Federal Reserve's purchasing of MBS is keeping mortgage rates low thereby allowing more homeowners to more easily meet their obligations or refinance.  The refinanced mortgages have lower monthly payments which strengthens the financial wherewithal of the borrowers and lowers the GSEs' credit losses.

These recent actions are consistent with our view that the government will stand behind the housing GSEs' obligations under any plausible scenario, despite there not being an explicit guarantee.

The substantial, ongoing support of Fannie Mae and Freddie Mac is not unprecedented. To the contrary, it is consistent with the US government's history of supporting GSEs, when needed (see Appendix 1 for detail), including regulatory forbearance for Fannie Mae in the 1980s, debt guarantees for Farm Credit Banks in the 1980s, as well as the orderly wind-down of the GSE arm of Sallie Mae in the late 1990s.

## GSEs' dividend obligations to US Treasury are limited to their profits

Each of the three amendments to the Capital Agreement (including the latest, agreed in August 2012) has increased protections for bondholders. We believe this amendment further formalizes the connection between the housing GSEs and the US government. The US government will receive all of the housing GSEs' earnings, w                         significant commitment to inject additional capital if needed.

Effective January 1, 2013, the US Treasury's amended Senior Preferred Stock Purchase Agreement (Capital Agreement) with Fannie Mae and Freddie Mac goes into effect. The most significant provision of the amendment is the reduction of dividends to be paid by the housing GSEs. The amendment reduces these dividends to any positive net worth above a pre-determined nominal capital

---

[2]   The US Treasury three times amended the Capital Agreements with Fannie Mae and Freddie Mac.  The first amendment in May 2009 increased the amount of capital available to $200 billion each from $100 billion each.  The second amendment in December 2009 enabled Fannie Mae and Freddie Mac to request an unlimited amount of capital though December 31, 2012.  After December 31, 2012, each company will have access to $200 billion of preferred capital, less any amount used through December 31, 2009 or $125 billion for Fannie Mae and $149 billion for Freddie Mac.

reserve[3]. By limiting dividends to the amount of earnings each housing GSE generates, the amendment reduces the risk of the housing GSEs depleting the capital commitment from the US Treasury at a time when that commitment becomes limited to about $275[4] billion for the combined entities.

Prior to this amendment, the housing GSE's dividend obligation to the US Treasury was a fixed 10%. As of September 30, 2012, Fannie Mae and Freddie Mac senior preferred stock outstanding was $117.1 billion and $72.3 billion, respectively, resulting in annual dividend payments of $11.7 billion for Fannie Mae and $7.2 billion for Freddie Mac.

### Amendment averts path to insolvency

Before the recent amendment we expected Fannie Mae to run out of contingent capital sometime around 2023 and Freddie Mac a couple of years later. We had projected that in 2023, Fannie Mae would have $233 billion of Senior Preferred Stock outstanding and be obligated to pay the US Treasury more than $23 billion of dividends annually, while Freddie Mac would have just over $140 billion of Senior Preferred Stock outstanding and owe the US Treasury just over $14 billion annually. Neither company has the earnings potential to service a dividend of this magnitude.

As a result, the companies would have had to borrow from the US Treasury in order to pay the dividend, further increasing the amount of preferred stock outstanding along with future dividend payments – creating a negative feedback cycle. Had this continued, all $275 billion of Senior Preferred Stock would have been drawn a few years later. Our projections of escalating dividend obligations prior to the amendment are shown in Exhibit 2 (Fannie Mae and Freddie Mac before amendment - green and blue bars).

Under the amended agreement, dividend payments will equal each company's net income, as shown in Exhibit 2 (Fannie Mae and Freddie Mac after Amendment – orange and gold bars). Therefore, the dividend will not deplete capital, averting the path to insolvency on which the housing GSEs were headed previously.

---

[3]   The capital reserve for each company in 2013 will be $3.0 billion and will decline by $600 million per annum.  That is, each of the GSE's capital reserve will be $3.0 billion, $2.4 billion, $1.8 billion, $1.2 billion, $600 million and $0 in 2013, 2014, 2015, 2016, 2017, and 2018, respectively.

[4]   As of January 1, 2013, Fannie Mae and Freddie Mac will have $125 billion and $150 billion, respectively of contingent capital available.

FHFA 4081

MOODY'S INVESTORS SERVICE

FINANCE COMPANIES

EXHIBIT 2
**Projected Earnings and Dividend Obligations of Fannie Mae and Freddie Mac ($ billions)**



Source: Moody's estimates

### Assuming sustained profitability, the reduced dividends could allow Fannie Mae and Freddie Mac to operate indefinitely

We expect that both GSEs will be profitable on a long-term, sustainable basis going forward (provided US house prices do not fall materially further). This outlook, together with the amended Capital Agreement, means that that the likelihood of either Fannie Mae or Freddie Mac requiring additional capital is low. Each company also will have sufficient contingent capital available from the US Treasury, allowing them to maintain operations indefinitely.

Over the next several years, we expect Fannie Mae to charge-off about $90 billion and Freddie Mac to charge-off $61 billion to recognize losses embedded in their current single-family guarantee portfolios. This compares with an allowance for mortgage losses of $63 billion for Fannie Mae and $33 billion for Freddie Mac as of September 30, 2012. Over that same period of time, we expect Fannie Mae and Freddie Mac to earn $54 billion and $28 billion in pre-tax, income, respectively. Therefore, the housing GSEs' profitability will meet or exceed the shortfall between charge-offs and their allowance.

FHFA 4082

## GSE reform debate adds uncertainty, but existing creditors will be supported

The many, diverse proposals to reform Fannie Mae and Freddie Mac that are currently being debated add uncertainty to the outlook for their future size, systemic importance and structure. We will continue to monitor these proposals and assess their credit implications. While the timing and nature of reform remains unclear, we firmly believe that any reform, including a complete wind-down, will protect current creditors.

In our view, even in a wind-down scenario, new creditors will still benefit from very strong government support, at least up to a well-defined transition date. This expectation reflects the systemic relevance of these institutions, as described above, and is reflected in our Aaa senior ratings. Senior government officials have clearly stated that the US government will continue to support these institutions and ensure that the GSEs have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations.

We recognize the clear intent of many relevant parties, including Fannie Mae's and Freddie Mac's regulator, the FHFA, to reduce the size of the two housing GSEs. The goal is to decrease Fannie Mae's and Freddie Mac's importance to the US mortgage market, which would reduce the need for government support. Also, the cost of supporting smaller GSEs would likely be lower.

Ultimately, we believe it likely that Fannie Mae and Freddie Mac will become smaller; they may even be wound down in their current form. However, we believe any reform will take many years to implement. It will be gradual rather than abrupt, well-specified rather than undefined, and, importantly, existing creditors will be supported. The key drivers of for our expectations are:

» A broad political consensus supports the public policy mission of the housing GSEs, namely to support the stability of the US mortgage market and promote access to mortgage credit and home ownership

» There is no near-term institutional alternative to the GSEs to pursue the aforementioned goals

» There is no catalyst for near-term reform now that the amended capital agreement is in place

### Intent to reduce GSEs' size is clear, but progress will be slow

The FHFA states its intent to reduce these entities' size in its strategic plan, but also mentions the challenges to achieving this: *"Fannie Mae and Freddie Mac have purchased or guaranteed approximately three of every four mortgages originated in the country since entering into conservatorship in September 2008. The challenge for FHFA is to reduce the Enterprises' position in the marketplace in a safe and sound manner without comparable private-sector players. FHFA will take steps to establish a path for shifting mortgage credit risk from the Enterprises to the private sector and gradually reduce the Enterprises' proportion of the market[5]."*

Even if Fannie Mae and Freddie Mac completely ceased purchasing and guaranteeing new mortgages, it would take many years for their existing portfolios to decline. As of September 30, 2012, 63% and 60% of Fannie Mae's and Freddie Mac's guarantee portfolio was originated on or after 2009. This leaves many years to maturity, given that most US mortgages have 30-year terms at origination. And while historically a US mortgage has prepaid at approximately 15% per year, it is likely that prepayment rates will be historically low in coming years given low current mortgage rates and the prospects for higher rates in the future.

---

[5]   Strategic Plan, Federal Housing Finance Agency, Fiscal Years 2013 – 2017, October 9, 2012

FHFA 4083

## There is no catalyst for change

Prior to the above-discussed capital amendment in August 2012, the prospect of capital depletion appeared to be a key catalyst for housing GSE reform. However, the amendment effectively eliminates that prospect, removing it as a possible catalyst of reform.

Furthermore, the cost of support will naturally decrease, if and as the housing GSEs become smaller, reducing the pressure for reform. We also expect the cost of future support to be lower as the risk profile of the companies continues to strengthen as FHFA is committed to maintaining strict underwriting standards. At the same time, increasing guarantee fees will elevate the earnings buffer available to absorb credit losses.

## Substantial barriers to reform exist

The primary barrier to any abrupt, radical housing GSE reform is the broad political consensus to support a functional market that provides mortgages at a reasonable cost to residential home borrowers. This goal conflicts with the goal to remove as much government support from the mortgage market as possible. Agreeing on how to manage these conflicting objectives is proving to be very contentious.

In addition, there are few institutional alternatives to the role currently played by the housing GSEs in the US mortgage market. Such alternatives include banks, covered bonds, and securitization. They all have drawbacks, and none can fully replace the role played today by the housing GSEs. The fragility of the current recovery of the mortgage market makes any transformative change even more difficult. Below, we briefly discuss each institutional alternative:

» **Banks**. Banks currently hold approximately $1.3trillion[6] out of a total of $4.4 trillion[7] of agency mortgage-backed securities (MBS) in their investment portfolio, most of which are 30-year fixed rate. MBS are widely held by financial institutions because of the presumption of support from the US government. If banks were to directly fund the mortgages that are currently financed in Agency MBS, this would significantly increase their risk weighted assets and capital requirements.  If they just replaced the current $1.4 trillion in Agency MBS that they have on their balance sheet, this would translate into $380 billion of risk-weighted assets and require over $30 billion of additional capital.  If the banks were required to replace the entire $4.4 trillion in Agency MBS with on-balance sheet mortgages, this would require over $145 billion in incremental capital, which, unless the return on mortgages was significantly higher, would be prohibitively expensive.

» **Covered bonds**. A covered bond market is also an alternative to the housing GSEs. However, covered bonds are strictly a financing tool and do not change the interest rate or credit risk exposure of the financial institution holding the mortgages backing the covered bonds. This is in contrast to the reduction of credit risk for a financial institution that securitizes mortgages with the housing GSEs or the reduction of interest rate risk that then sells the GSE-guaranteed MBS.

» **Securitization**. The securitization market is an alternative to the housing GSEs. Securitizations transfer interest rate risk and, depending on the structure, securitizations transfer some amount of credit risk. However, current volumes are low as a result of unfavorable economics involved in securitizing mortgages rather than selling them into agency mortgage pools, and on-going legal

---

6   FDIC Statistics as of September 30, 2012.

7   Fannie Mae and Freddie Mac have $2.7 trillion and $1.6 trillion, respectively of MBS outstanding as of September 30, 2012.

and regulatory uncertainty around the mortgage market. At its peak, securitizations accounted for about half of the mortgage issuance in the US and, given the post-crisis disruption in this market, it is difficult to envision volumes reaching anywhere near that peak in the foreseeable future.

### Sallie Mae provides example of assisted wind-down

The aforementioned barriers make any far-reaching reform unlikely in the near term. But it is imaginable that the housing GSEs could be wound down in the long term. Even then, we believe that creditors will be supported. This expectation is consistent with the so-far only example of winding down a GSE, that of the Student Loan Marketing Association (Sallie Mae).

In 1996, the Student Loan Marketing Association Reorganization Act (the Privatization Act) was passed to privatize Sallie Mae. The company was split into a GSE part and a non-GSE part. The targeted completion of the wind-down was September 2006. The non-GSE part was allowed to operate without previous business restrictions. Subsequent to the Privatization Act, the GSE continued to purchase student loans funded with new unsecured debt maturing prior to September 2006.

With respect to debt maturing beyond September 2006, high-quality assets such as cash or U.S. government obligations were accumulated and placed in a trust to defease such debt. The wind down of the GSE was overseen by the US Secretary of the Treasury. All obligations were paid in full and on time.

Case 1:13-cv-01053-RLW   Document 22-2   Filed 02/12/14   Page 63 of 72
Case 1:13-cv-01053-RLW   Document 24-18   Filed 12/17/13   Page 15 of 31

MOODY'S INVESTORS SERVICE                                                                FINANCE COMPANIES

## Appendix 1:

### Provisions of the Capital Agreement between the US Treasury and Fannie Mae and Freddie Mac

1.  Reduces the senior preferred stock dividends from a fixed 10% to any positive net worth above a pre-determined nominal capital reserve. The capital reserve for each company in 2013 will be $3.0 billion and will decline by $600 million per annum.

2.  Further reduces the housing GSEs retained mortgage portfolio to $650 billion as of December 31, 2012 from $656.1 billion. Requires the housing GSEs reduce their mortgage portfolio by 15% per year, up from 10%.

3.  Suspends the periodic commitment fee, which was part of the original Capital Agreement but has been waived every quarter.

4.  Eliminates the requirement that the housing GSEs obtain permission from the US Treasury for sales of assets less than $250 million.

5.  Requires Fannie Mae and Freddie Mac to provide an annual risk management plan to the Treasury no later than December 15 of each year that the companies remain in conservatorship, beginning on December 15, 2012.  Management is required to set out the companies' strategy for reducing its risk profile.  Each plan must include an assessment of the companies' actual performance against the prior year plan.

## Appendix 2:

### US government support for housing GSEs through the financial crisis was not unprecedented

US government support of GSEs is not new.  There are examples of government support of GSEs during times of economic stress. During these times, Moody's maintained Aaa ratings on the companies due to US government support even though the stand-alone financial strength of the companies weakened.

»   **Fannie Mae**. During the early 1980s, Fannie Mae incurred substantial losses.  Similar to other mortgage lenders such as Savings and Loan (S&L) institutions, the losses were partly caused by rising interest rates.  Similar to the S&Ls, Fannie Mae financed its long-term, fixed-rate mortgage portfolio with short-term debt.  The federal government provided certain financial benefits to Fannie Mae, such as regulatory forbearance and tax benefits to help it recover.

»   **Farm Credit System**. During the 1980's, adverse economic conditions, volatile interest rates, and poor management practices led to severe financial difficulties in many Farm Credit System institutions.  As a result, Congress passed The Agricultural Credit Act of 1987 (the Act), which provided financial assistance to Farm Credit institutions. The Act established the Farm Credit System Financial Assistance Corporation with authority to sell $4 billion of 15-year bonds, guaranteed by the US Treasury. Ultimately, $1.261 billion of debt was issued. The last of the outstanding bonds was repaid in 2005.

FHFA 4086

---

» contacts continued from page 1

**Analyst Contacts:**

| | |
|---|---|
| NEW YORK | +1.212.553.1653 |

Warren Kornfeld          +1.212.553.1932
*Senior Vice President*
warren.kornfeld@moodys.com

Robert Young             +1.212.553.4122
*Managing Director - Financial Institutions*
robert.young@moodys.com

Report Number: 148144

| | |
|---|---|
| **Author** | **Production Associate** |
| Brian L. Harris | Shubhra Bhatnagar |

© 2012 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. ("MIS") AND ITS AFFILIATES ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATIONS") MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Any publication into Australia of this document is by MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657, which holds Australian Financial Services License no. 336969. This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001.

Notwithstanding the foregoing, credit ratings assigned on and after October 1, 2010 by Moody's Japan K.K. ("MJKK") are MJKK's current opinions of the relative future credit risk of entities, credit commitments, or debt or debt-like securities. In such a case, "MIS" in the foregoing statements shall be deemed to be replaced with "MJKK". MJKK is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO.

This credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors. It would be dangerous for retail investors to make any investment decision based on this credit rating. If in doubt you should contact your financial or other professional adviser.



FHFA 4087

## Data as of November 14, 2013 on Treasury and Federal Reserve
## Purchase Programs for GSE and Mortgage-Related Securities

The five tables that follow provide data on activities by the Department of the Treasury and the Federal Reserve System to support mortgage markets through purchases of securities issued by the housing government-sponsored enterprises (GSEs; Fannie Mae, Freddie Mac, and the Federal Home Loan Banks) and by Ginnie Mae, a federal agency that guarantees securities backed by mortgages insured or guaranteed by the Federal Housing Administration, the Department of Veterans Affairs, and other federal agencies.  Those activities include purchases by the Treasury of senior preferred stock and mortgage-backed securities guaranteed by Fannie Mae and Freddie Mac.  For more information on Treasury support for Fannie Mae and Freddie Mac, see Mortgage Market Note 10-1.  In addition, the Federal Reserve announced in November 2008 its intention to buy up to $500 billion of MBS guaranteed by Fannie Mae, Freddie Mac, and Ginnie Mae and up to $100 billion of debt securities issued by the housing GSEs.  Those purchases commenced in January 2009.  In March 2009, the Federal Reserve announced its intention to purchase up to an additional $750 billion of MBS guaranteed by Fannie Mae, Freddie Mac, and Ginnie Mae and up to an additional $100 billion of debt issued by the housing GSEs.

**Table 1: Quarterly Draws on Treasury Commitments to Fannie Mae and Freddie Mac per the Senior Preferred Purchase Agreements**
**Table 2:  Dividends on Enterprise Draws from Treasury**
**Table 3: Treasury Purchases of GSE MBS**
**Table 4: Federal Reserve Purchases of GSE and Ginnie Mae MBS**
**Table 5: Federal Reserve Purchases of GSE Debt**

**Table 1: Quarterly Draws on Treasury Commitments to Fannie Mae and Freddie Mac per the Senior Preferred Stock Purchase Agreements[1]** *($ billions)*

| Quarter | Freddie Mac | | | | Fannie Mae | | | |
|---|---|---|---|---|---|---|---|---|
| | Reported GAAP Net Worth | Requested Draw | Draw Date | Cumulative Enterprise Draws[2] | Reported GAAP Net Worth | Requested Draw | Draw Date | Cumulative Enterprise Draws[2] |
| 2008 Q3 | -$13.7 | $13.8 | 11/24/2008 | $13.8 | $9.4 | N/A | N/A | $0 |
| 2008 Q4 | -30.6 | 30.8 | 3/31/2009 | 44.6 | -15.2 | 15.2 | 3/31/2009 | 15.2 |
| 2009 Q1 | -6.0 | 6.1 | 6/30/2009 | 50.7 | -18.9 | 19.0 | 6/30/2009 | 34.2 |
| 2009 Q2 | 8.2 | 0 | N/A | 50.7 | -10.6 | 10.7 | 9/30/2009 | 44.9 |
| 2009 Q3 | 10.4 | 0 | N/A | 50.7 | -15.0 | 15.0 | 12/31/2009 | 59.9 |
| 2009 Q4 | 4.4 | 0 | N/A | 50.7 | -15.3 | 15.3 | 3/31/2010 | 75.2 |
| 2010 Q1 | -10.5 | 10.6 | 6/30/2010 | 61.3 | -8.4 | 8.4 | 6/30/2010 | 83.6 |
| 2010 Q2 | -1.7 | 1.8 | 9/30/2010 | 63.1 | -1.4 | 1.5 | 9/30/2010 | 85.1 |
| 2010 Q3 | -0.1 | 0.1 | 12/30/2010 | 63.2 | -2.4 | 2.5 | 12/30/2010 | 87.6 |
| 2010 Q4 | -0.4 | 0.5 | 3/31/2011 | 63.7 | -2.5 | 2.6 | 3/31/2011 | 90.2 |
| 2011 Q1 | 1.2 | 0 | N/A | 63.7 | -8.4 | 8.5 | 6/30/2011 | 98.7 |
| 2011 Q2 | -1.478 | 1.479 | 9/30/2011 | 65.179 | -5.087 | 5.087 | 9/30/2011 | 103.787 |
| 2011 Q3 | -5.991 | 5.992 | 12/30/2011 | 71.171 | -7.791 | 7.791 | 12/30/2011 | 111.578 |
| 2011 Q4 | -0.146 | 0.146 | 3/30/2012 | 71.317 | -4.571 | 4.571 | 3/30/2012 | 116.149 |
| 2012 Q1 | -0.019 | 0.019 | 6/29/2012 | 71.336 | 0.268 | 0.000 | N/A | 116.149 |
| 2012 Q2 | 1.086 | 0.000 | N/A | 71.336 | 2.770 | 0.000 | N/A | 116.149 |
| 2012 Q3 | 4.906 | 0.000 | N/A | 71.336 | 2.412 | 0.000 | N/A | 116.149 |
| 2012 Q4 | 8.826 | 0.000 | N/A | 71.336 | 7.224 | 0.000 | N/A | 116.149 |
| 2013 Q1 | 6.971 | 0.000 | N/A | 71.336 | 59.368 | 0.000 | N/A | 116.149 |
| 2013 Q2 | 7.357 | 0.000 | N/A | 71.336 | 13.243 | 0.000 | N/A | 116.149 |
| 2013 Q3 | 33.436 | 0.000 | N/A | 71.336 | 11.568 | 0.000 | N/A | 116.149 |
| **Remaining Treasury Support** | **$140.474** | | | | **$117.576** | | | |
| **Cumulative Draws by Both Enterprises** | **$187.485** | | | | | | | |

Source: Freddie Mac and Fannie Mae            **N/A = not applicable**

[1] Freddie Mac's draws have been based on reported GAAP stockholders' equity, while Fannie Mae's draw was based on GAAP net worth.  Both GAAP stockholders' equity and GAAP net worth are measures of the difference between an Enterprise's assets and liabilities.  Both measures include realized and unrealized losses as of the reporting date.  Losses ultimately realized in the future may differ from unrealized losses as of the reporting date.

The full text of the Senior Preferred Stock Purchase Agreements and the amendments to those agreements are available online here.  For an overview of those agreements, see MMN 10-1 "Treasury Support for Fannie Mae and Freddie Mac".  For Fannie Mae's quarterly financial results, click here.  For Fannie Mae's annual financial results, click here.  For Freddie Mac's quarterly financial results, click here.  For Freddie Mac's annual financial results, click here.

[2] Excludes $1 billion in liquidation preference on the senior preferred stock position obtained by Treasury from each Enterprise upon initiation of the Senior Preferred Stock Purchase Agreement. The initial $1 billion is not a draw on the Treasury's commitment under the agreement.

**Table 2: Dividends on Enterprise Draws from Treasury[3]** *($ billions)*

| Quarter | Freddie Mac | | | Fannie Mae | | |
|---|---|---|---|---|---|---|
| | Dividends Accrued | Date Paid | Cumulative Dividends Paid[4] | Dividends Accrued | Date Paid | Cumulative Dividends Paid[4] |
| 2008 Q3 | $0.006 | N/A | $0.000 | $0.006 | N/A | $0.000 |
| 2008 Q4 | 0.167 | 12/31/2008 | 0.173 | 0.025 | 12/31/2008 | 0.031 |
| 2009 Q1 | 0.370 | 3/31/2009 | 0.543 | 0.025 | 3/31/2009 | 0.056 |
| 2009 Q2 | 1.149 | 6/30/2009 | 1.691 | 0.409 | 6/30/2009 | 0.465 |
| 2009 Q3 | 1.294 | 9/30/2009 | 2.986 | 0.885 | 9/30/2009 | 1.351 |
| 2009 Q4 | 1.293 | 12/31/2009 | 4.278 | 1.150 | 12/31/2009 | 2.501 |
| 2010 Q1 | 1.293 | 3/31/2010 | 5.571 | 1.527 | 3/31/2010 | 4.028 |
| 2010 Q2 | 1.293 | 6/30/2010 | 6.863 | 1.909 | 6/30/2010 | 5.937 |
| 2010 Q3 | 1.560 | 9/30/2010 | 8.424 | 2.117 | 9/30/2010 | 8.055 |
| 2010 Q4 | 1.603 | 12/31/2010 | 10.027 | 2.153 | 12/31/2010 | 10.207 |
| 2011 Q1 | 1.605 | 3/31/2011 | 11.632 | 2.216 | 3/31/2011 | 12.424 |
| 2011 Q2 | 1.618 | 6/30/2011 | 13.249 | 2.281 | 6/30/2011 | 14.705 |
| 2011 Q3 | 1.618 | 9/30/2011 | 14.867 | 2.495 | 9/30/2011 | 17.199 |
| 2011 Q4 | 1.655 | 12/30/2011 | 16.522 | 2.621 | 12/30/2011 | 19.821 |
| 2012 Q1 | 1.808 | 3/30/2012 | 18.329 | 2.819 | 3/30/2012 | 22.639 |
| 2012 Q2 | 1.808 | 6/29/2012 | 20.137 | 2.931 | 6/29/2012 | 25.571 |
| 2012 Q3 | 1.808 | 9/28/2012 | 21.946 | 2.929 | 9/28/2012 | 28.499 |
| 2012 Q4 | 1.808 | 12/31/2012 | 23.754 | 2.929 | 12/31/2012 | 31.428 |
| 2013 Q1 | 5.826 | 3/29/2013 | 29.580 | 4.224 | 3/29/2013 | 35.652 |
| 2013 Q2 | 6.971 | 6/28/2013 | 36.552 | 59.368 | 6/28/2013 | 95.020 |
| 2013 Q3 | 4.357 | 9/30/2013 | 40.909 | 10.243 | 9/30/2013 | 105.263 |
| 2013 Q4 | 30.436 | TBD | 71.345 | 8.568 | TBD | 113.831 |
| **Cumulative Dividends Paid by Both Enterprises[4]** | **$185.176** | | | | | |

Source: Freddie Mac and Fannie Mae          **TBD = to be determined but not later than 12/31/2013**

---

[3] As set forth in the Third Amendment to the Amended and Restated Senior Preferred Stock Purchase Agreement, between January 1, 2013 and December 31, 2017, dividend amounts will be the Net Worth Amount at the end of the immediately preceding fiscal quarter minus the applicable capital reserve amount. The 2013 capital reserve amount of $3 billion will be reduced by $600 million each calendar year until it reaches zero on January 1, 2018.
[4] Dividends accrued may not add up to cumulative dividends due to rounding.

**Table 3: Treasury Purchases of Freddie Mac and Fannie Mae MBS[5]**
*($ billions, current face value as of purchase)*

| | Purchases of: | |
| --- | --- | --- |
| **Period** | **Freddie Mac MBS** | **Fannie Mae MBS** |
| September 2008 | $2.5 | $0.9 |
| October 2008 | 4.3 | 11.6 |
| November 2008 | 10.0 | 10.5 |
| December 2008 | 10.3 | 18.1 |
| January 2009 | 7.4 | 13.9 |
| February 2009 | 11.9 | 2.8 |
| March 2009 | 10.2 | 9.2 |
| April 2009 | 5.5 | 11.2 |
| May 2009 | 5.7 | 6.9 |
| June 2009 | 5.6 | 3.4 |
| July 2009 | 9.4 | 1.7 |
| August 2009 | 3.8 | 5.9 |
| September 2009 | 4.4 | 5.2 |
| October 2009 | 6.7 | 3.0 |
| November 2009 | 6.6 | 3.1 |
| December 2009 | 1.7 | 7.6 |
| **Total[6]** | 105.9 | 114.8 |
| **Total Purchases** | **$220.8** | |

Source: Department of the Treasury

---

[5] The Treasury's GSE MBS purchase program terminated on December 31, 2009.
[6] Columns may not add to totals due to rounding.

## Table 4: Federal Reserve GSE and Ginnie Mae MBS Purchase Program
*($ billions, current face value as of purchase)*

| Period[8] | Net Transactions[7] | | |
|---|---|---|---|
| | **Freddie Mac  MBS** | **Fannie Mae MBS** | **Ginnie Mae MBS** |
| January 5-7, 2009 | $6.9 | $2.9 | $0.4 |
| January 8-14, 2009 | 15.8 | 5.6 | 2.0 |
| January 15-21, 2009 | 5.4 | 11.7 | 1.8 |
| January 22-28, 2009 | 5.3 | 7.2 | 4.3 |
| January 29-February 4, 2009 | 9.7 | 10.5 | 2.0 |
| February 5-11, 2009 | 14.7 | 7.2 | 1.4 |
| February 12-18, 2009 | 7.9 | 10.9 | 1.0 |
| February 19-25, 2009 | 8.4 | 15.6 | 1.0 |
| February 26-March 4, 2009 | 15.6 | 13.6 | 1.0 |
| March 5-11, 2009 | 9.7 | 16.8 | 0.6 |
| March 12-18, 2009 | 12.5 | 5.2 | 2.1 |
| March 19-25, 2009 | 13.5 | 18.5 | 1.3 |
| March 25-April 1, 2009 | 14.4 | 17.0 | 1.6 |
| April 2-8, 2009 | 7.4 | 22.2 | 0.9 |
| April 9-15, 2009 | 1.3 | 20.2 | 0.3 |
| April 16-22, 2009 | 5.6 | 19.8 | 0.8 |
| April 23-29, 2009 | 9.1 | 13.5 | 0.5 |
| April 30-May 6, 2009 | 5.0 | 17.2 | 3.3 |
| May 7-13, 2009 | 4.4 | 20.6 | 2.2 |
| May 14-20, 2009 | 7.5 | 13.1 | 4.1 |
| May 21-27, 2009 | 11.0 | 12.0 | 2.5 |
| May 29-June 3, 2009 | 5.0 | 18.8 | 2.1 |
| June 4-10, 2009 | 7.4 | 14.6 | 1.0 |
| June 11-17, 2009 | 5.5 | 11.3 | 3.5 |
| June 18-24, 2009 | 8.5 | 10.2 | 3.6 |
| June 25-July 1, 2009 | 7.2 | 13.1 | 2.8 |
| July 2-8, 2009 | 3.2 | 9.9 | 4.1 |
| July 9-15, 2009 | 6.9 | 11.3 | 4.1 |
| July 16-22, 2009 | 6.5 | 11.2 | 3.5 |
| July 23-29, 2009 | 5.4 | 14.5 | 0.3 |
| July 20-August 5, 2009 | 5.0 | 14.2 | 0.0 |
| **[Table continued on next page]** | | | |

---

[7] The Federal Reserve Bank of New York reported "transactions" through the period ending February 25, 2009 and "net purchases" thereafter.
[8] Federal Reserve transactions commenced on January 5, 2009, and are reported on a weekly basis for weeks beginning on a Thursday and therefore overlap months.

| Period[8] | Net Transactions[7] | | |
|---|---|---|---|
| | Freddie Mac  MBS | Fannie Mae MBS | Ginnie Mae MBS |
| August 6-12, 2009 | 2.3 | 17.7 | 0.5 |
| August 13-19, 2009 | 5.9 | 17.5 | 1.7 |
| August 20-26, 2009 | 7.3 | 15.8 | 2.4 |
| August 27-September 2, 2009 | 8.3 | 17.3 | 0.0 |
| September 3-9, 2009 | 3.6 | 12.4 | 2.9 |
| September 10-16, 2009 | 6.3 | 15.7 | 3.5 |
| September 17-23, 2009 | 6.0 | 15.9 | 1.1 |
| September 24-30, 2009 | 7.6 | 10.6 | 1.8 |
| October 1-7, 2009 | 8.0 | 8.1 | 4.0 |
| October 8-14, 2009 | 7.3 | 8.4 | 0.5 |
| October 15-21, 2009 | 6.7 | 8.4 | 3.0 |
| October 22-28, 2009 | 5.3 | 11.4 | 1.4 |
| October 29-November 4, 2009 | 3.3 | 12.6 | 0.2 |
| November 5-11, 2009 | 2.9 | 9.8 | 0.8 |
| November 12-18, 2009 | 5.9 | 3.8 | 6.4 |
| November 19-25, 2009 | 6.5 | 6.0 | 3.5 |
| November 26-December 2, 2009 | 5.7 | 7.7 | 2.6 |
| December 3-9, 2009 | 4.8 | 9.6 | 1.5 |
| December 10-16, 2009 | 7.6 | 7.2 | 1.2 |
| December 17-23, 2009 | 7.8 | 7.2 | 0.0 |
| December 24-30, 2009 | 3.3 | 6.0 | 0.0 |
| December 31, 2009-January 6, 2010 | 1.8 | 10.2 | 0.0 |
| January 7-13, 2010 | 9.7 | 3.5 | 0.9 |
| January 14-20, 2010 | 1.3 | 8.5 | 2.3 |
| January 21-27, 2010 | 5.1 | 4.2 | 2.7 |
| January 28-February 3, 2010 | 5.7 | 3.7 | 2.7 |
| February 4-10, 2010 | 4.0 | 4.5 | 2.6 |
| February 11-17, 2010 | 4.5 | 4.0 | 2.6 |
| February, 18-24, 2010 | 5.4 | 4.3 | 1.4 |
| February 25-March 3, 2010 | 3.6 | 6.3 | 0.1 |

**[Table continued on next page]**

Case 1:13-cv-01053-RLW   Document 22-2   Filed 02/12/14   Page 71 of 72

**Table 4 (Continued): Federal Reserve GSE and Ginnie Mae MBS Purchase Program** *($ billions, current face value as of purchase)*

| Period[8] | Net Transactions[7] | | |
|---|---|---|---|
| | **Freddie Mac  MBS** | **Fannie Mae MBS** | **Ginnie Mae MBS** |
| March 4-10, 2010 | 4.4 | 5.6 | 0.0 |
| March 11-17, 2010 | 4.8 | 4.8 | 0.4 |
| March 18-24, 2010 | 3.6 | 4.1 | 0.3 |
| March 25-31, 2010 | 5.2 | 0.9 | 0.0 |
| **Total net transactions[9]** | **432.3** | **703.6** | **114.0** |
| **Total committed** | **$1,250** | | |
| **Unused commitment** | **$0 of $1,250** | | |

Source: Federal Reserve Bank of New York

---

[7] The Federal Reserve Bank of New York reported "transactions" through the period ending February 25, 2009 and "net purchases" thereafter.
[8] Federal Reserve transactions commenced on January 5, 2009, and are reported on a weekly basis for weeks beginning on a Thursday and therefore overlap months.
[9] Columns may not add to totals due to rounding.

**Table 5: Federal Reserve Purchases of GSE Debt** *($ billions, par amount)*

| Period | Purchases of: | | |
|---|---|---|---|
| | **Freddie Mac** Debt | **Fannie Mae** Debt | **FHLB** Debt |
| December 2008 | $6.1 | $5.8 | $3.1 |
| January 2009 | 4.8 | 4.0 | 2.5 |
| February 2009 | 4.2 | 2.4 | 2.8 |
| March 2009 | 5.8 | 7.1 | 4.0 |
| April 2009 | 2.9 | 6.6 | 5.0 |
| May 2009 | 5.2 | 6.4 | 2.2 |
| June 2009 | 6.7 | 6.1 | 3.0 |
| July 2009 | 3.8 | 4.8 | 1.9 |
| August 2009 | 4.6 | 5.2 | 1.5 |
| September 2009 | 5.7 | 4.3 | 2.6 |
| October 2009 | 7.6 | 5.4 | 2.7 |
| November 2009 | 2.4 | 4.0 | 1.7 |
| December 2009 | 1.9 | 1.5 | 1.4 |
| January 2010 | 2.3 | 1.7 | 0.9 |
| February 2010 | 1.6 | 1.1 | 1.6 |
| March 2010 | 1.4 | 0.9 | 0.7 |
| **Total[10]** | **67.1** | **67.4** | **37.7** |
| **Total committed** | **$172.1** | | |
| **Unused commitment** | **$2.9 of $175[11]** | | |

Source: Federal Reserve Bank of New York

---

[10] Columns may not add to totals due to rounding.
[11] On November 4, 2009, the Federal Reserve lowered its target level of purchases of GSE debt to $175 billion from $200 billion.